Brent O. Hatch (5715)
Mark F. James (5295)
Mark R. Clements (7172)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Robert Silver (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

OCT - 4 2004

MARKUS B. ZIMMER, CLERK
BY
    DEPUTY CLERK

*Attorneys for Plaintiff The SCO Group, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **THE SCO GROUP, INC.,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**NOVELL, INC.,**<br><br>        **Defendant.** | **MEMORANDUM IN OPPOSITION TO NOVELL, INC.'S MOTION TO DISMISS SCO'S AMENDED COMPLAINT**<br><br><br>**Civil No.: 2:04CV00139**<br><br>**Honorable Dale A. Kimball** |

*52*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND .........................................................................................................................6

I.    NOVELL'S RECENTLY CONTRIVED CLAIM TO OWNERSHIP OF
      THE UNIX COPYRIGHTS THAT IT SOLD TO SCO IS MERITLESS ...........................6

      A.    The APA Transferred Novell's Entire UNIX-Related Business,
            Including the UNIX Copyrights, to SCO.............................................................7

      B.    Amendment No. 2 to the APA Reaffirmed SCO's Ownership
            Of the UNIX Copyrights........................................................................................10

      C.    SCO's Contemporaneous Licensing of the UNIX Technology to Novell
            Further Evidences SCO's Ownership of the UNIX Copyrights ................................10

      D.    The Parties' Other Post-Sale Conduct Further Confirms SCO's
            Ownership of the UNIX Copyrights .........................................................................13

      E.    The Sworn Testimony of Novell's Own Principal Negotiator Supports
            SCO's Ownership of the UNIX Copyrights ...............................................................14

II.   SCO HAS SPECIFICALLY ALLEGED NOVELL'S FALSE AND MALICIOUS
      CLAIMS OF UNIX COPYRIGHT OWNERSHIP ..............................................................16

ARGUMENT..............................................................................................................................20

I.    NOVELL HAS ALREADY RAISED, OR ELSE HAS WAIVED, THE
      GROUNDS FOR ITS INSTANT MOTION TO DISMISS .................................................21

II.   SCO'S AMENDED COMPLAINT PROPERLY ALLEGES THAT NOVELL
      ACTED WITH THE REQUISITE MALICE, AND THE COURT'S PRIOR ORDER
      DOES NOT REMOTELY HOLD OTHERWISE................................................................25

      A.    SCO Has Alleged in Detail All of the Elements for a Claim
            of Slander of Title Under Utah Law ........................................................................25

            1.    SCO's Amended Complaint Properly Pleads Malice ...................................25

            2.    SCO's Allegations Present a Factual Question.............................................29

      B.    The Court's Prior Order Has No Bearing on the Legal
            Sufficiency of SCO's Allegations............................................................................30

i

III.   THE PRIVILEGES NOVELL INVOKES ARE NO BASIS FOR DISMISSAL
       OF SCO'S CLAIM FOR SLANDER OF TITLE ................................................................. 36

       A.   SCO Has Precluded the Application of Any Supposed Privileges
            By Sufficiently Pleading Malice .............................................................................. 36

       B.   SCO Sufficiently Alleges Facts Showing That Novell Has Exceeded
            The Scope of Any Applicable Privilege .................................................................. 39

CONCLUSION ......................................................................................................................... 41

The SCO Group, Inc. ("SCO") respectfully submits this Memorandum in Opposition to Novell, Inc.'s ("Novell") Motion to Dismiss dated August 6, 2004, and its Memorandum in Support thereof ("Novell Mem.").

## PRELIMINARY STATEMENT

Almost eight years after Novell sold its entire UNIX-related business, including the UNIX copyrights, to SCO, Novell asserted for the first time that it, and not SCO, was the true owner of those copyrights. After SCO asserted its legal rights against IBM for its improper contribution of SCO's intellectual property to Linux (a business in which Novell is heavily invested), Novell repeated its newly contrived ownership claims in press releases, in public statements by its CEO, in sworn statements to the United States Copyright Office, and in postings published to the world through Novell's website. As SCO set out in the slander-of-title Complaint that it filed against Novell on January 23, 2004 (and has now realleged in its Amended Complaint), Novell made all of these statements (1) with full knowledge of their falsity, having admitted in a June 6, 2003 press release that "ownership of certain copyrights for UNIX did transfer to SCO in 1996"; and (2) with the malicious intent to injure SCO, its business, and its enforcement of its UNIX-related rights.

On February 9, 2004, Novell moved to dismiss SCO's original Complaint on the grounds that SCO had not adequately pleaded the falsity of Novell's statements or SCO's special damages resulting from such statements. In its June 9, 2004 Memorandum and Order (the "June 9 Order"), the Court rejected Novell's falsity argument and granted SCO leave to replead special damages with greater specificity. SCO thereafter filed an Amended Complaint ("Am. Comp."), which realleges its slander-of-title claims in substantially identical form and adds specific allegations concerning SCO's special damages.

Now, Novell attempts to avoid discovery and to further delay the progress of this case through additional arguments directed at the very same allegations that were in SCO's original Complaint. Novell argues in a second motion to dismiss that SCO's allegations are insufficient to establish Novell's malice and that Novell enjoys certain privileges that, it argues, entitle it to dismissal of SCO's claim.

The principal basis for Novell's second motion is that this Court's June 9 Order somehow negates Novell's malice as a matter of law. Novell mistakenly maintains that in denying SCO's motion for a remand, the Court "made a sufficient determination to reject any claim that Novell lacked a good-faith basis to make its rival claim to the UNIX copyrights." Novell Mem. at 23-24. This Court in no way decided the issue of Novell's malice as a matter of law. To the contrary, in denying Novell's first motion to dismiss on falsity grounds, the Court concluded "that all of these arguments as to the parties' understandings and interpretations of the agreements would more properly be before the court on motions for summary judgment or trial." June 9 Order at 15. Moreover, the Court stated that it "could not conclude that SCO can present no set of facts that would prove its claim." Id. at 15. Thus, far from supporting Novell's new-found arguments in its second motion to dismiss, the Court's prior Order actually acknowledged the legal sufficiency of the very same slander-of-title allegations that now constitute SCO's Amended Complaint.

Novell's other arguments are also meritless. As noted, Novell has already moved to dismiss SCO's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and, in ruling on that motion, the Court has already held that SCO's allegations are sufficient to state a claim for slander of title. See June 9 Order at 15. To the extent Novell contends that it has not previously raised its arguments that SCO fails to "adequately plead the element of malice" or that its

2

statements fall under a supposed "privilege," Novell Mem. at 1, 14-20, Novell has waived its

right to raise those arguments. Under Fed. R. Civ. P. 12(g), a defendant may not raise in a

second motion to dismiss arguments that it could have, raised in its first motion. The case law

makes clear that neither the filing of SCO's Amended Complaint (which repeats the relevant

allegations of SCO's original Complaint) nor the fact of the Court's June 9 Order (which of

course does not constitute new matter in the Amended Complaint) suggests a contrary outcome.

Whether the Court has already resolved the issues presented by Novell's second motion or

Novell has waived its right to assert those issues by failing to raise them previously, the Court

must deny Novell's second Rule 12(b)(6) motion.

In addition, the allegations Novell challenges are more than sufficient. Under Federal

Rule of Civil Procedure 9(b), and the cases in this Circuit applying that Rule, SCO need only

"aver generally" malice. SCO has plainly (indeed, indisputably) done so. See, e.g., Am. Compl.

¶ 25 (alleging that Novell made its false public statements "intentionally," "maliciously," and

"with utter disregard for the truthfulness thereof"). SCO also easily satisfies even a more

demanding (albeit inapplicable) pleading standard, by alleging the facts of Novell's malicious

statements, Novell's purpose and motivation for making them, and the harm that Novell intended

them to cause to SCO's valuable UNIX and UnixWare copyrights, business, and reputation. See

Am. Compl. ¶¶ 4, 6, 7, 18, 19(b), 19(c), 21(b), 21(c). Under controlling legal authority, having

properly pleaded malice (both generally and specifically), SCO has presented a fact question that

cannot be resolved on a motion to dismiss.

Indeed, Novell's main argument – that the Court's prior comments on the issue of

copyright ownership must resolve the question of Novell's state of mind – relies entirely on

inferences favorable to Novell, even though the Rule 12(b)(6) standard requires that the Court

draw all such inferences in <u>SCO</u>'s favor here.  Although the legal plausibility of a party's

argument for ownership may be relevant (if only indirectly) to whether that party in fact

possessed a "good-faith belief" in its public statements of ownership, such plausibility does not

even constitute direct evidence of the party's "good faith," let alone <u>resolve</u> the question.

Novell also disregards (or improperly characterizes in its favor) crucial portions of the

"substantial record" it otherwise invokes.  Novell Mem. at 1.  The single example of Novell's

press release on June 6, 2003, makes the point:

> "Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to
> Novell last night by SCO.  To Novell's knowledge, this amendment is not present
> in Novell's files.  The amendment appears to support SCO's claim that ownership
> of certain copyrights for UNIX did transfer to SCO in 1996."  Am. Compl.
> ¶ 19(c).

This press release (however Novell tries to downplay it) is directly relevant to SCO's

claim in <u>all</u> of the following respects:  (1) it is an admission that Novell does not own the

copyrights at issue; (2) it is an admission regarding the relevance of Amendment No. 2 on

the question of copyright ownership; and (3) it shows that, even assuming (improperly on

a motion to dismiss) that Novell was telling the truth when it said it did not have

Amendment No. 2 in its files, Novell acted recklessly – sufficient to show malice – by

claiming ownership of the copyrights without even having reviewed the relevant contract

documents.

The Court's own discussion of the June 6, 2003 press release is instructive.  In

preliminarily considering (in 2004) the relevant contract documents, the Court of course made no

findings regarding Novell's state of mind (in 2003) at the time of the statements at issue:

> "Although the press release may argue in favor of a finding that the copyrights
> were in fact transferred under Amendment No. 2, this argument focuses on <u>the</u>
> <u>merits of the action</u> rather than the threshold question of whether Section 204(a) is

4

sufficiently implicated such that federal jurisdiction exists." June 9 Order at 10 (emphasis added).

The Court's June 9 Order does not resolve, either way, whether "the copyrights were in fact transferred" or whether Novell knew the copyrights had been transferred – as Novell said it did in its June 6, 2003 press release and a June 26, 2003 letter from its General Counsel – when it widely disseminated its ownership claims.

Novell further claims, without citation to any slander-of-title case under Utah law, that it has both a conditional privilege to assert its own "rival claim" to the copyrights in question and a conditional privilege to inform "other interested parties" of its purported claim to ownership. See Novell Mem. at 16-21; see also id. at 17 n.6 (acknowledging that Novell could find no Utah case applying its supposed "rival claimant" privilege). The absence of any such case law appears to reflect the elements of the claim under Utah law, under which SCO must prove malice, and by doing so would preclude any privilege. Novell in fact concedes that its malice would overcome any applicable privilege. See Novell Mem. at 15-16. SCO's plainly sufficient allegations of malice thus preclude dismissal of SCO's claims on the basis of any asserted privilege.

Additionally, SCO alleges the facts showing that Novell's statements were excessively published (that is, through Novell's unrestricted publication of those statements to the entire world), such that any supposed privilege would not apply. SCO alleges that Novell made its false statements regarding its purported ownership of the UNIX copyrights to the public in general. See, e.g., Am. Compl. ¶¶ 5, 18, 19. In addition, SCO's allegations easily permit the conclusion, and SCO will prove through facts uncovered in discovery, that to preserve its claim Novell did not have to publish its statements about that claim nearly as broadly as it did. On this

5

additional and distinct basis, well-established law precludes Novell's reliance on any privilege at this stage of the proceedings.

## BACKGROUND[1]

### I.    NOVELL'S RECENTLY CONTRIVED CLAIM TO OWNERSHIP OF THE UNIX COPYRIGHTS THAT IT SOLD TO SCO IS MERITLESS

This Court has already concluded that any ambiguities in the parties' Asset Purchase Agreement dated September 19, 1995 (the "APA") do not warrant dismissal of SCO's slander-of-title claim. See June 9 Order at 14-15. As the Court stated, "this court cannot conclude as a matter of law at the motion to dismiss stage that the APA as amended is too vague to act as a guidepost as to what rights were transferred." Id. at 15. "Drawing all inferences in favor of SCO as this court must do on a motion dismiss, this court cannot conclude that SCO can present no set of facts that would prove its claims." Id.

Despite the Court's Order, and even though Novell's legal arguments concerning copyright ownership cannot warrant the dismissal of SCO's Amended Complaint on the new grounds set forth in Novell's second such motion,[2] Novell persists in arguing throughout its motion that its ownership is "meritorious," Novell Mem. at 23, 24, 27, and that SCO has "pointed only to the Asset Purchase Agreement and Amendment No. 2 – documents this Court has already concluded are ambiguous and arguably support Novell's claims of ownership." Id. at

---

[1] Consistent with the legal standard governing Novell's Rule 12(b)(6) motion, the allegations in SCO's Amended Complaint are taken as true and all inferences are construed herein in the light most favorable to SCO.

[2] This Court correctly recognized that the falsity of Novell's ownership claims bears on the issue of malice. June 9 Order at 5. Indeed, SCO has alleged, and intends to show at trial, that the falsity of Novell's position is one of many facts supporting a finding of Novell's malice. As this Court has recognized, however, the issue of falsity cannot be resolved at this stage of the proceedings. See also Argument, Part II, below. Similarly, and particularly in light of the requirement that all inferences be drawn in SCO's favor on Novell's motion, any argument that Novell raises concerning its ownership of the UNIX copyrights cannot support its defense of lack of malice at the motion to dismiss stage.

6

27. In light of such arguments, and to provide the context for its allegations, SCO addresses here the numerous bases – even before discovery has begun in this case – that compel the conclusion that Novell's claim to ownership of the UNIX copyrights is meritless.[3]

**A.    The APA Transferred Novell's Entire UNIX-Related Business, Including the UNIX Copyrights, to SCO**

In 1995, Novell sold its entire UNIX-related business to SCO's predecessor-in-interest The Santa Cruz Organization, Inc. (hereinafter "SCO"), through the APA. The APA transferred to SCO "all of Seller's right, title and interest in and to the assets and properties of Seller relating

---

[3] The evidence not only shows that Novell did in fact transfer to SCO the Unix copyrights, as the parties intended, but that the transfer complies with Section 204 of the Copyright Act. Under that standard, no "magic words" are required to effect a copyright transfer, Radio Television Espanola S.A. v. New World Entertainment, Ltd., 183 F.3d 922, 927 (9th Cir. 1999) – not even the word "copyright." See, e.g., Dean v. Burrows, 732 F. Supp. 816, 823 (E.D. Tenn. 1989) (an endorsed check, with no mention of the word copyright, "complies with the requirements of 17 U.S.C. § 204(a)"); Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc., 690 F. Supp. 298, 301 (S.D.N.Y. 1988) (short letter transferring ownership of certain products but never mentioning copyrights and invoice showing payment sufficient to satisfy Section 204(a)); see also Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990) (to satisfy § 204(a), "a one-line pro forma statement will do"). Moreover, any writing may satisfy Section 204(a) – even a non-contemporaneous document written after the parties entered into their sale agreement. See, e.g., Nimmer on Copyright § 10.03[3] ("[I]f a prior oral grant is subsequently confirmed in writing, it validates the grant ab initio as of the time of the oral grant."); Arthur Rutenberg Homes, Inc. v. Drew Homes, 29 F.3d 1529, 1532 (11th Cir. 1994) ("[T]he requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer."). In applying section 204, courts should interpret agreements between the parties to avoid the nonsensical and inefficient situation created by divided ownership of tangible and non-tangible property. See Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992) (court should not interpret agreement to divide ownership of property from ownership of copyrights for that property; such divided ownership creates "diseconomies" because a "stand off" would ensue between the property holder, whose ability to exploit the property he owns is significantly curtailed, and the copyright holder, who of course cannot exploit the copyright without the tangible property). Finally, for purposes of section 204(a), any ambiguity in a writing may be resolved by resort to extrinsic evidence. See, e.g., Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366, 376 (7th Cir. 1987) ("Parol evidence may be admitted to establish the original intentions of the parties with respect to copyright ownership."); Johnson v. Tuff-N-Rumble Mgmt., Inc., No. CIV.A.99-1374, 2000 WL 1145748 at *6 (E.D. La. Aug. 14, 2000) (Exh. A) ("To the extent that the notation is deemed ambiguous as to the copyrights transferred, the Court may consider extrinsic or parol evidence."); Friedman v. Stacey Data Processing Servs., No. 89 C 4444, 1990 WL 172586 at *5 (N.D. Ill. Nov. 1, 1990) (Exh. B) (same). As in contract interpretation generally, the "overarching principle" under Section 204(a) is to effectuate the intent of the contracting parties. See Nimmer, supra, § 10.08.

7

to [Seller's] Business (collectively the 'Assets') identified on Schedule 1.1(a) hereto.'"[4] APA §

1.1(a).  Schedule 1.1(a), in turn, included the entirety of Novell's UNIX business:  "<u>All rights</u>

<u>and ownership of UNIX and UnixWare including but not limited to</u>," among other things, the

following:

- "all versions of UNIX and UnixWare and all copies of UNIX and UnixWare
  (including revisions and updates in process)," <u>id</u>. § I;

- "all technical, design, development, installation, operation and maintenance
  information concerning UNIX and UnixWare, including source code," <u>id.</u>;

- "UNIX Source Code Products," <u>id.</u>;

- "Binary Product Releases," <u>id.</u>;

- "Products Under Development," <u>id.</u>;

- "All of Seller's claims arising after the Closing Date against any parties relating to
  any right, property or asset included in the Business," <u>id.</u> § II; and

- "All of Seller's rights pertaining to UNIX and UnixWare under any software
  development contracts, licenses and any other contracts to which Seller is a party or
  by which it is bound and which pertain to the Business (to the extent that such
  contracts are assignable)," <u>id.</u> § III;

- "All copies of UNIX and UnixWare, wherever located, owned by Seller," <u>id.</u> § IV.

This language clearly expressed the parties' intention that Novell transferred the copyrights in

UNIX and UnixWare to SCO.  <u>See</u> <u>Shugrue v. Cont'l Airlines, Inc.</u>, 977 F. Supp. 280, 285-86

(S.D.N.Y. 1997) ("In a non-consumer setting such as this, a transfer of all right, title and interest

to computer programs and software can only mean the transfer of the copyrights as well as the

actual computer program or disks."); <u>Relational Design & Tech., Inc. v. Brock</u>, No. 91-2452-

---

[4] The APA defined Novell's "Business" as "the business of developing a line of software products
currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of
Unix and UnixWare, the support of such products and the sale of other products which are directly related
to Unix and UnixWare."  APA, Recital A.

EEO, 1993 WL 191323 at *6 (D. Kan. May 25, 1993) (Exh. C) (transfer of "all rights to the

completed program with no licensing or royalties fees due" included copyright); see also

Nimmer, supra, § 10.03[2] ("As with all matters of contract law, the essence of the inquiry here

is to effectuate the intent of the parties. Accordingly, even though a written instrument may lack

the terms 'transfer' and 'copyright,' it still may suffice to evidence their mutual intent to transfer

the copyright interest." (collecting cases)). The eight-page document titled "Selling Copyrights

in Product(s) of Business," which was Attachment E to Novell's Seller Disclosure Schedule,

specified those UNIX-related copyrights – those "that are used in the Business as currently

conducted," APA § 2.10(i), and that "cover[] product(s) relating to the Business," Seller

Disclosure Schedule, § 2.10(i).

     Moreover, the Bill of Sale the parties executed on the date of closing (December 6, 1995)

provides that all of the assets sold through the APA were to be transferred as of that date:

> "In accordance with Article 1.1(a) of the Agreement, Seller, for good and
> valuable consideration, the receipt and sufficiency of which is hereby
> acknowledged, <u>does hereby transfer, convey, sell, assign and deliver to Buyer,
> without recourse, representation or warranty except as otherwise expressly
> provided in the Agreement, all of the Assets</u>. Excepted from the transfer of Assets
> pursuant to the preceding sentence are the rights reserved by Seller pursuant to
> that certain Technology License Agreement between Seller and Buyer dates as of
> December 6, 1995." Exh. 1 (emphasis added).[5]

This Court did not have the benefit of access to the Bill of Sale when it observed in its June 9

Order that the APA lacked transfer language (e.g., "seller hereby conveys to buyer"); the Bill of

Sale supplies that language. The evidence will also show that, following the closing of the APA,

SCO obtained the assets otherwise identified in the APA (including UNIX copyrights).

_____

[5] The license rights that were expressly excepted from the Bill of Sale provide further support for the
conclusion that SCO owns the UNIX copyrights. See Background, Part I.C, below.

**B.     Amendment No. 2 to the APA Reaffirmed
        SCO's Ownership of the UNIX Copyrights**

Notwithstanding the above, Novell now purports to read one clause of the APA's

"Excluded Assets" Schedule to suggest that the sale had excluded all of Novell's copyrights, as

opposed to only Novell's copyrights in its own non-Unix-related products, such as NetWare,

which Novell was clearly retaining and to which most of the "Excluded Assets" Schedule is

devoted. Novell's reading is inconsistent with the entire structure, meaning, and intent of the

APA. In any event, the parties' October 1996 Amendment No. 2 to the APA puts that

interpretation to rest. Amendment No. 2 revised Schedule 1.1(b) of the APA to clarify that the

"Excluded Assets" was not intended to apply to any "copyrights and trademarks owned by

Novell as of the date of the Agreement [the APA] required for SCO to exercise its rights with

respect to the acquisition of UNIX and UnixWare technologies." Amendment No. 2, ¶ A.[6]

Novell has publicly acknowledged this plain reading of Amendment No. 2. See Part II, below.

**C.     SCO's Contemporaneous Licensing of the UNIX Technology to Novell
        Further Evidences SCO's Ownership of the UNIX Copyrights**

Furthermore, the parties' contemporaneous license agreement provides yet additional

support for the unavoidable conclusion that Novell intended to sell, and sold, to SCO the UNIX-

related copyrights. Paragraph 1.6 of the APA (aptly titled "License Back of Assets") expressly

contemplated and described that license in detail:

> "Concurrent with the Closing, Buyer [SCO] shall execute a license agreement
> under which it shall grant to Seller [Novell] a royalty-free, perpetual, worldwide
> license to (i) all of the technology included in the Assets and (ii) all derivatives of

---

[6] The parties also reiterated in Amendment No. 2 that Novell had no "right to increase any SVRX
licensee's rights to SVRX source code," no "right to grant new SVRX source code licenses," and no right
to "prevent SCO from exercising its rights with respect to SVRX source code in accordance with the
Agreement." Amendment No. 2, ¶ B.5.

the technology included in the Assets . . . (such licensed back technology to be referred to collectively as "Licensed Technology"). Seller [Novell] agrees that it shall use the Licensed Technology only (i) for internal purposes without restriction or (ii) for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product. The license agreement shall include reasonable provisions concerning Buyer's obligation to provide documentation and support for the Licensed Technology. The license agreement shall also provide Seller with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof. In the event of a Change of Control of Seller (as defined in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to Seller's products either developed or substantially developed as of the time of the Change of Control."

Thus, as provided by the APA, SCO "licensed back" to Novell, at the time of the closing, the right to use the technology covered by the UNIX and UnixWare copyrights through a Technology License Agreement that tracks the terms described in the APA.

The parties' post-closing licensing arrangement further evidences SCO's ownership of the UNIX license in a number of ways. <u>First</u>, entirely consistently with the transfer of the UNIX copyrights to SCO (through the APA and as later clarified by Amendment No. 2), the Technology Licensing Agreement specified, in a section titled "Ownership," that

"As between Novell and SCO:
(1)    <u>Ownership of Licensed Technology shall reside in SCO.</u>
(2)    Ownership of any modifications made to Licensed Technology pursuant to the licenses specified in Section II above shall reside in Novell." Exh.2 (emphasis added).

<u>Second</u>, and perhaps most obviously, if SCO were not the rightful owner of the UNIX and UnixWare copyrights, there would have been no need for the Technology License Agreement; Novell would not have needed a "License Back of Assets" (in the words of the APA). Novell's Chairman, President, and CEO has more recently claimed (in September 2004) that Novell owns the copyrights and took out a license from SCO "As a real belt-and-

11

suspenders approach." Exh. 3. This claim – coming from the very person who publicly acknowledged in June that Amendment No. 2 supports SCO's claim to ownership of the UNIX copyrights – is incredible on its face. The terms of the license that SCO gave Novell also directly undermines Novell's recent position, as described immediately below.

Third, and contrary to Novell's CEO's "belt-and-suspenders" claim, the license that SCO granted Novell gave Novell only a limited right to use UNIX and UnixWare. Novell could use UNIX and UnixWare only for internal purposes, and only in bundled products insofar as a material part of the bundled product did not compete with SCO's UnixWare business. This limited right in UNIX and UnixWare is utterly inconsistent with Novell's new-found claims of ownership of the copyrights. Under the Copyright Act, copyright ownership consists of exclusive rights to, among other things, reproduce, prepare derivative works, and distribute a work, 17 U.S.C. § 106, and "transfer of copyright ownership" is defined as: "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (emphasis added). In other words, a transfer of copyright ownership entails the alienation of exclusive rights; a nonexclusive license involves no such compliance.

This point is underscored by a comparison of the language of the writings under which SCO obtained its right to UNIX and the language of the Technology License Agreement under which SCO licensed back to Novell certain limited rights to UNIX. As described above, SCO obtained under the APA all "right and interest" in UNIX-related source and binary code and ancillary products. Moreover, under Amendment No. 2, the parties clarified that SCO owned "the copyrights and trademarks owned by Novell as of the date of the [APA] required for SCO

12

to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."
This language plainly contemplates exclusive rights in the receiving party (SCO).  In direct
contrast, the parties' license expressly limited in significant ways, Novell's right to use the
UNIX and UnixWare technologies.  See Shugrue, 977 F. Supp. at 286 (recognizing that in a
non-consumer setting involving the transfer of "all right, title and interest" to computer
programs and software, "If the parties to such a transaction intend to transfer just a license to
use the program, with the transferor retaining the copyrights, the parties surely would spell that
out."); DSC Communications Corp. v. Pulse Communications, Inc., 170 F.3d 1354, 1361-62
(Fed. Cir. 1999) (ownership claim in software rejected where licensing agreement severely
limited rights of licensee with respect to use of software in ways inconsistent with the rights
normally enjoyed by owners of software).

**D.      The Parties' Other Post-Sale Conduct Further Confirms
          SCO's Ownership of the UNIX Copyrights**

       The parties' other conduct immediately after, and for many years following, the
closing of the APA further evidences SCO's acquisition of the UNIX copyrights.  See
Nimmer, supra, § 10.08 (recognizing the relevance, in interpreting written copyright
conveyance of "the manner in which they [the contracting parties] conducted themselves
after the contract was entered"); Mid-West Conveyor Co. v. Jervis B. Webb Co., 92 F.3d
992, 993, 1001 (10th Cir. 1996) (relying on evidence of parties' post-agreement conduct
to determine their intent in executing license agreement).  Specifically, although
discovery in this case has not even begun, SCO expects that the evidence will reveal the
parties' understanding of the agreement through, among other things, the following:

13

- Shortly after the closing of the APA, SCO obtained physical possession of UNIX copyrights; those copyrights remain in SCO's possession to this day.

- Since 1995, SCO has shipped countless UNIX-related products with copyright notices affixed to them.

- Since 1995, SCO has entered into hundreds of license agreements for UNIX products that not only contain express representations and warranties of SCO's right, title, and ownership interest intellectual property rights required to provide the licensed product, but also indemnify licensees against any third-party claims for copyright infringement.

- In May 2001, when Santa Cruz Operation, Inc. sold to Caldera the UNIX and UnixWare business, the Intellectual Property Assignment specifically included a conveyance of all copyrights and indemnified Caldera from and against any claims relating to Santa Cruz's breach of its warranty that it owned all such copyrights.

- From the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell <u>never</u> contested SCO's ownership of the UNIX copyrights.

Thus, for the approximately eight years following the APA, Novell and SCO both engaged in a course of conduct entirely consistent with SCO's ownership of the UNIX copyrights.

### E.     The Sworn Testimony of Novell's Own Principal Negotiator <u>Supports SCO's Ownership of the UNIX Copyrights</u>

The sworn testimony of Ed Chatlos, <u>Novell's</u> chief negotiator for the APA, further confirms that Novell's new-found copyright ownership claims are baseless. At the time of the APA, Mr. Chatlos was a Senior Director working on UNIX Strategic Partnerships and Business Development issues within Novell's Strategic Relations and Mergers and Acquisitions organization. Chatlos Decl. ¶ 4 (Exh. 4). In 1995, Mr. Chatlos was assigned the responsibility of negotiating and completing the deal to sell Novell's UNIX business to SCO, and in or about June 1995, Mr. Chatlos became the lead negotiator for Novell in the negotiations with SCO. <u>Id.</u>

¶ 6. In that capacity, Mr. Chatlos held the day-to-day responsibility for the potential deal and acted as the principal interface with SCO on the business negotiations for Novell. Id. During the Novell-SCO negotiations, Mr. Chatlos met regularly with SCO representatives, sometimes several times a week, from June to September 1995. Id. ¶ 7.

Mr. Chatlos's sworn Declaration confirms that Novell and SCO both intended for the 1995 Asset Purchase Agreement to convey Novell's entire UNIX business, specifically including the UNIX copyrights, to SCO. According to Mr. Chatlos's sworn testimony:

- Under the APA, "SCO acquired all right, title, and interest in and to the UNIX and UnixWare business, operating system, and source code. In the transaction, it was my intent – and to my understanding was Novell's intent – to sell the entire UNIX business to SCO, including the UNIX source code and all associated copyrights." Id. ¶ 8.

- "It was always my understanding and intent, on behalf of Novell, that the UNIX source code and its copyrights were part of the assets SCO purchased. I do not recall anyone else ever suggesting that Novell would retain any copyright relating to UNIX, nor was I present for any discussions, general or specific, during the negotiations that contradicted my understanding of the transaction described herein. None of my superiors at Novell ever informed me that Novell was not transferring the UNIX copyrights to SCO." Id. ¶ 9.

- "Likewise, I never communicated to SCO in any way that the UNIX copyrights were not being sold to SCO. Nor am I aware of any instance in which anyone from Novell ever informed SCO in any way that the UNIX copyrights were not being sold to SCO as part of this transaction." Id.

- "Given my central role in the negotiations, I believe I would have known if the parties had agreed that Novell would retain any UNIX copyrights. My intent and understanding as the lead negotiator for Novell was that Novell was transferring the copyrights to SCO in the APA. At the time the transaction was signed and closed, I did not observe anyone at Novell or SCO stating or acting as if Novell had retained any UNIX copyrights. If they had, it would have been contrary to the intent and structure of the deal as I understood it and communicated with SCO." Id. ¶ 10.

- "In fact, from the time the APA transaction closed in 1995 until this day, it has been my understanding and belief that Novell sold the UNIX copyrights to SCO as of the time of the closing in 1995." Id.

15

- "I have reviewed Schedule 1.1(b), Excluded Assets of the APA (the "Excluded Assets Schedule") with attention to the question of whether Novell was to retain any UNIX copyrights. In my opinion the word "copyrights" in Paragraph V.A. refers – and was intended by the parties to refer – to Novell copyrights other than those relating to UNIX and UnixWare, including the NetWare assets specifically referenced in Paragraphs I, II, and IV of the Excluded Assets Schedule." Id. ¶ 11.

- "Pursuant to a Technology Licensing Agreement signed by the parties in early December 1995, Novell licensed from SCO the use of the UNIX source code. I believe this licensing arrangement was consistent with SCO's ownership of the copyrights upon the closing of the APA." Id. ¶ 12.

SCO expects that testimony from other participants and persons with knowledge of the parties' intentions, from both sides of the APA transaction, will further support SCO's ownership of the UNIX copyrights and further reveal the bad faith underlying Novell's false claims to ownership of those copyrights.

---

For all of these reasons, the evidence will show that the parties intended to transfer to SCO all UNIX and UnixWare copyrights, that Novell has always known this, and that its new claims of copyright ownership are a bad-faith effort to promote its new Linux business at the expense of SCO's true ownership rights in UNIX and UnixWare.

## II.    SCO HAS SPECIFICALLY ALLEGED NOVELL'S FALSE AND MALICIOUS CLAIMS OF UNIX COPYRIGHT OWNERSHIP

As described above, for approximately eight years after SCO obtained the UNIX copyrights from Novell, Novell never objected to and, indeed, acted entirely consistently with, SCO's ownership of those copyrights. In 2003, however, within months after SCO filed its legal

claims relating to Linux (in which Novell had and has strong business interests),[7] Novell began

to engage, with full knowledge that it had sold the UNIX copyrights to SCO, in an "unfounded

and malicious campaign to slander SCO's ownership of the copyrights." Am. Compl. ¶ 19(g).[8]

"In particular, Novell has wrongfully asserted ownership over UNIX and UnixWare

technologies by filing for copyright protection in its own name, and has made numerous false

and misleading public representations disparaging SCO's ownership of the UNIX and UnixWare

copyrights and claiming that it, and not SCO, owns the Unix and UnixWare copyrights." Am.

Compl. ¶ 18. Novell engaged in this wrongful and injurious course of conduct for the purpose

of, among other things, "interfer[ing] with SCO's exercise of its rights with respect to the UNIX

and UnixWare technologies," id. ¶ 4, causing "customers and potential customers of SCO to not

do business with SCO and to slander and impugn the ownership rights of SCO in UNIX and

UnixWare," id. ¶ 6, and "attempt[ing], in bad faith, to block SCO's ability to enforce its

copyrights therein," id. The nature of Novell's false statements and the context in which they

were made confirm that "Novell made such representations intentionally, maliciously, and with

the utter disregard for the truthfulness thereof." Id. ¶ 25.

For example, on May 28, 2003, Novell's Chairman, President, and CEO publicly claimed

that Novell had not transferred the UNIX and UnixWare copyrights to SCO and that "SCO is not

the owner of the UNIX copyrights." Am. Compl. ¶ 19(a). His statement, published in several

---

[7] Although Novell's copyright ownership claims do impact certain copyright right claims in the SCO v. IBM case, Novell does not (and cannot) dispute SCO's ownership of the rights to the IBM and Sequent license agreements. Novell's copyright-ownership claims do not impact those agreements.

[8] In fact, SCO expects the evidence to show that after Novell had operated for years in proper recognition of SCO's ownership of UNIX and UnixWare copyrights, Novell's new executive management concocted Novell's recent ownership claims only after Novell decided to acquire the Linux distributor SuSE and otherwise assist IBM in litigation against SCO.

newspapers and other publications, was timed to be released on the eve of the release of SCO's

quarterly statements. Id.

In response, SCO wrote to Novell on June 6, 2003, that Amendment No. 2 to the APA

clearly evidenced SCO's ownership of the UNIX copyrights:

> "As you know, your accusation that SCO does not own the UNIX copyrights was
> false and was without a good faith basis for belief. The documents clarifying this
> issue have been in your possession for nearly seven years. Any question of
> whether the UNIX copyrights transferred to SCO under the Sept. 19, 1995 Asset
> Purchase Agreement was clarified in Amendment No. 2 to the Asset Purchase
> Agreement dated October 16, 1996." Am Compl. ¶ 19(b) & Exh. 5.

Concerning Novell's malice in "intend[ing] to harm SCO's share value and customer

relations," SCO further stated:  "we have a direct statement that Chris Stone an executive

employee working closely with you on this matter, stated that the timing of your May 28,

2003 press release was intended to coincide with our earnings announcement that

occurred later that day." Id.[9]

That same day, Novell recanted its ownership claims to the UNIX copyrights.  In a press

release dated June 6, 2003, Novell stated:

> "In a May 28th letter to SCO, Novell challenged SCO's claims to UNIX patent
> and copyright ownership and demanded that SCO substantiate its allegations that
> Linux infringes SCO's intellectual property rights. Amendment #2 to the 1995
> SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To
> Novell's knowledge, this amendment is not present in Novell's files.  The
> amendment appears to support SCO's claim that ownership of certain copyrights
> for UNIX did transfer to SCO in 1996.  The amendment does not address
> ownership of patents, however, which clearly remain with Novell." Exh. 6
> (emphasis added).

---

[9] In fact, the evidence will show that SCO's market capitalization decreased 30% as a result of
Novell's claims, notwithstanding SCO's announcement of record earnings.

This Court recognized that Novell's own June 6 "press release may argue in favor of a finding that the copyrights were in fact transferred under Amendment No. 2." June 9 Order at 10.

Even after thus recanting its CEO's prior statements, recognizing the import of Amendment No. 2, and acknowledging SCO's ownership of the UNIX copyrights, Novell persisted in its false and malicious claims of ownership to the UNIX copyrights. For example:

- On June 6, 2003, Novell's General Counsel sent a letter to SCO in which he referred to the claims in SCO's letter of that same day – the very same letter that had caused Novell to recant its CEO's prior, false statement concerning Novell's ownership of the UNIX copyrights – as "absurd" and "unsubstantiated." Am. Compl. ¶ 19(d).

- On June 26, 2003, Novell's General Counsel sent another letter to SCO calling SCO's claims of ownership to UNIX and UnixWare, and the copyrights associated therewith, "simply wrong" and declared "that we do not agree with SCO's public statements on this matter." Id. ¶ 19(e).

- On August 4, 2003, Novell responded to SCO's registration of UNIX System V copyrights with the United States Copyright Office, and explicitly "dispute[d] SCO's claim of ownership of the copyrights." Id. ¶ 19(f).

- Beginning September 22, 2003 and continuing through October 14, 2003, Novell again falsely asserted ownership of UNIX copyrights by submitting twelve certifications to the United States Copyright Office. Novell published those false certifications to the world by posting them on Novell's website. Id. ¶ 19(g).

- On October 10, 2003, Novell publicly filed under oath with the United States Copyright Office four iterations of a "Declaration Regarding Ownership" of UNIX copyrights, therein declaring "that it retains all or substantially all of the ownership of the copyrights in UNIX, including U.S. Copyright Registration referenced above." Id. ¶ 19(h).

- In a December 22, 2003 press release, Novell stated that "it owns the copyrights in UNIX, and has applied for and received copyright registrations pertaining to UNIX consistent with that position." Id. ¶ 19(i).

- In a January 13, 2004 press release, Novell again stated that "it retained ownership of [the UNIX] copyrights." Id. ¶ 19(j).

19

- At the March 2004 Open Source Business Conference in San Francisco, Novell's Vice Chairman Chris Stone proclaimed during his keynote address that Novell "Still own[s] UNIX." Id. ¶ 19(k).

Novell made all of these statements even though it knew – and had admitted (by its prior conduct and its public statements on June 6, 2003) – that "ownership of certain copyrights for UNIX did transfer to SCO in 1996."

Just as they were intended, Novell's false and malicious claims of ownership of the UNIX copyrights have caused and will continue to cause SCO irreparable harm "to its valuable UNIX and UnixWare copyrights, to its business, and its reputation." Am. Compl. ¶ 7. More specifically, Novell's tortious conduct has, among other things:

- "caused several third parties to refuse to enter into license agreements with SCO relating to SCO's UNIX and UnixWare business," id. ¶ 7;

- subjected "SCO's efforts to protect its ownership of UNIX and UnixWare, and copyrights therein," to "a false cloud of ownership created by Novell," ¶ 21(c); and

- "hinder[ed] SCO's ability to protect its copyrights and caus[ed] SCO to incur significant additional attorneys' fees and costs litigating in other forums issues resulting from the cloud Novell has placed on SCO's title to UNIX and UnixWare." Id.

Indeed, in its instant motion, Novell does not challenge the sufficiency of SCO's allegations regarding damages.

## ARGUMENT

The Court should deny Novell's second motion to dismiss for each of the independently sufficient grounds set forth below. As an initial matter, Novell has either already raised in its first motion to dismiss, or else has waived for failing to raise when it could have, the grounds for its instant motion. In either event, the Court must dismiss the motion. See Part I, below. SCO has sufficiently alleged, moreover, that Novell acted with the requisite malice, and, contrary to

20

Novell's claim, this Court's prior Order does not remotely hold otherwise. See Part II, below.

SCO further shows that SCO has overcome Novell's supposed privileges – which no Utah court

has acknowledged on a claim for slander of title – by sufficiently pleading malice and facts

showing that Novell has exceeded the scope of any such privilege. See Part III, below.

## I.    NOVELL HAS ALREADY RAISED, OR ELSE HAS WAIVED, THE GROUNDS FOR ITS INSTANT MOTION TO DISMISS

On February 9, 2004, Novell moved to dismiss SCO's Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  SCO submits that the Court has already resolved, in its Order

dated June 9, 2004, Novell's arguments concerning the sufficiency of SCO's pleading.  In that

Order, the Court addressed Novell's claim that "SCO has not pleaded sufficient facts

demonstrating falsity and has not adequately pleaded special damages." June 9 Order at 13.  On

special damages, this Court granted Novell's motion and gave SCO "thirty days leave to amend

its Complaint to plead special damages specifically in accord with Rule 9(g) of the Federal Rules

of Civil Procedure." Id. at 19.  SCO amended its Complaint to plead special damages consistent

with the Court's June 9 Order (see, e.g., Am. Comp. ¶¶ 21(c), 27 and 28), and repeats its prior

allegations in all other substantial respects.

On SCO's claim for slander of title, the Court held that resolution of the question of the

parties' "understandings and interpretations of the agreements" is improper on a motion to

dismiss. June 9 Order at 15 (emphasis added).  Yet in its instant motion, Novell relies on the

Court's June 9 Order as evidencing Novell's supposed "good-faith belief in the validity of its

claim." Novell Mem. at 27.  The Court did not find in its Order that Novell had acted in good

faith and without malice in making its repeated, false statements of copyright infringement.  To

the contrary, after reviewing all of the elements of a slander-of-title claim, including malice, the

21

Court stated that it "could not conclude that SCO can present no set of facts that would prove its claim." June 9 Order at 15.  Novell thus has it exactly backwards:  whereas the Court has <u>not</u> decided the question of Novell's knowledge at the time it asserted its claims of copyright ownership, it <u>has</u> decided that SCO's allegations are sufficient to state a claim for slander of title and thus to preclude dismissal.  <u>See also</u> Part II.B, below.

Novell may contend that it did not previously argue that SCO fails to "adequately plead the element of malice" or that its statements fall under any supposed privilege.  Novell Mem. at 1, 14-20.  In that event, Novell has contravened the well-settled rule, embodied in Rule 12(g), that after filing a motion to dismiss, a party "<u>shall not</u> thereafter make a motion based on the defense or objection so omitted" from its initial motion.  Fed. R. Civ. P. 12(g) (emphasis added). Rule 12(g) requires that "a party who raises a defense by motion prior to an answer must raise all possible defenses in a single motion.  Omitted defenses cannot be raised in a second pre-answer motion."  <u>U.S. Fid. & Guar. Co. v. Jepsen</u>, No. 90 C 6931, 1991 WL 249706 at *2 (N.D. Ill. Nov. 14, 1991) (Exh. D).  Put another way, Rule 12(g) "precludes a defendant from bringing successive motions to dismiss raising arguments that the defendant failed to raise at the first available opportunity."  <u>766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.</u>, 274 F. Supp. 2d. 926, 930 (N.D. Ill. 2003).  The rule is not new.  <u>See, e.g.</u>, <u>United States v. Columbia Gas & Elec. Corp.</u>, 1 F.R.D. 606, 606 (D. Del. 1941) (applying the rule).

Rule 12(g) bars a defendant from asserting <u>any</u> subsequent Rule 12 defense in a second motion to dismiss.[10]  Under the rule, "the ban against successive pre-answer motions extends to the three 'substantial defenses' listed in Rule 12(h)(2)," including "failure to state a claim upon

---

[10] The sole exception to the rule pertains to subject matter jurisdiction, Fed. R. Civ. P. 12(h)(3), which is not at issue here.

which relief can be granted (Rule 12(b)(6))" – the defense Novell asserted in its first motion to dismiss and now reasserts.  5A Charles A. Wright et al., Federal Practice and Procedure § 1385 (3d. ed. 1998).[11]  Accordingly, "the right to raise these defenses by preliminary motion is lost when the defendant neglects to consolidate them in his initial motion."  Id.; see also Moore v. Ford Motor Co., No. 92 C 1130, 1994 WL 25822 at *2 (N.D. Ill. Jan. 26, 1994) (Exh. E) (permitting arguments that "could and should have been introduced in the first motion to dismiss would contravene the purpose of Rule 12(g)"); Thorn v. N.Y.C. Dep't of Social Servs., 523 F. Supp. 1193, 1196 n.1 (S.D.N.Y. 1981) ("Defendants' motion to dismiss for failure to state a claim is untimely under Rule 12(g), because they previously made a Rule 12(b)(3) motion.").  To the extent it has not already raised its instant arguments for dismissal, Novell must now comply with the Rule 12 requirement that it "should file [its] answer."

SCO's filing of its Amended Complaint does not change the analysis in any way.  Under Rule 12(g), "the filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to amendment." Wright, supra, § 1388; see also Rowley v. McMillan, 502 F.2d 1326, 1333 (4th Cir. 1974) ("An amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading. An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended.").

---

[11] Under this exclusion, a defendant who failed to raise one of these substantial defenses – including an allegation of failure to state a claim – in an initial motion to dismiss is barred from advancing that defense as another motion to dismiss at this stage of the litigation, but may include it in his answer.  Fed. R. Civ. P. 12(g), 12(h)(2), 7(a).

In <u>Jepsen</u>, 1991 WL 249706, (Exh. D) for example, the defendant (Quinn) filed a

12(b)(6) motion to dismiss the plaintiff's amended complaint. The court noted that the "novel

Rule 12(b)(6) arguments raised in the second motion to dismiss were all available to Quinn at the

time of his first motion to dismiss." <u>Id.</u> at *2. On that basis, the court concluded that the

defendant "may not challenge the sufficiency of the complaint with a second motion to dismiss,"

and ruled that "consequently, Quinn's motion to dismiss the second amended complaint is denied

pursuant to Rule 12(g)." <u>Id.</u> Similarly, here, Novell expressly challenges SCO's complaint

"pursuant to Rule 12(b)(6)." Novell Mot. to Dismiss (Aug. 4, 2004), at 2. None of the defenses

Novell now alleges became available "because of a new matter in the amended complaint."

Wright, <u>supra</u>, § 1388; <u>see also</u> <u>Keefe v. Derounian</u>, 6 F.R.D. 11, 13 (D.N.J. 1946) (plaintiff's

amended complaint "merely corrected an insufficient allegation" in the first complaint and

consequently did not "revive the defendant's right to challenge the sufficiency of the

complaint").[12]

Accordingly, the Court must deny Novell's motion on one or the other of the foregoing

bases. In addition, SCO shows in Parts II and III, below, that there is no merit to Novell's new

arguments in its second motion to dismiss SCO's slander-of-title claim.

---

[12] Nor does the Court's June 9 Order suggest a contrary outcome. Nothing the Court said in that Order
constitutes "a new matter in the amended complaint." Wright, <u>supra</u>, § 1388. To the contrary, to the
extent that Novell (incorrectly) relies on the Court's Order, the underlying basis for the Order (and for
Novell's argument) was available to Novell when it filed its first motion to dismiss. In any event, as
demonstrated below, there is no merit to Novell's reliance on the Court's Order for its new argument that
"SCO cannot possibly demonstrate that Novell's statements were 'knowingly false' or that they 'were
made from spite, ill will or hatred.'" Novell Mem. at 22. <u>See</u> Part II, below.

II.    **SCO'S AMENDED COMPLAINT PROPERLY ALLEGES THAT NOVELL ACTED WITH THE REQUISITE MALICE, AND THE COURT'S PRIOR ORDER DOES NOT REMOTELY HOLD OTHERWISE**

Novell's second motion to dismiss challenges the sufficiency of SCO's malice allegations

in its Amended Complaint.  Novell Mem. at 22-27.  Novell's argument is meritless, because

SCO's Amended Complaint adequately alleges (indeed, details) Novell's malice.  See Part II.A,

below.  And, contrary to Novell's argument, this Court's prior Order does not remotely hold

otherwise.  See Part II.B, below.

A.    **SCO Has Alleged in Detail All of the Elements For a Claim of Slander of Title Under Utah Law**

In its June 9 Order, this Court set forth the governing standard with respect to a plaintiff's

allegations on a motion to dismiss:

> "On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept all well pleaded facts as true and construe them in the light most favorable to the non-moving party.  Cottrell v. Biotrol Int'l, Inc., 191 F.3d 1248, 1251 (10th Cir. 1999); Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1251 (10th Cir. 1997).  In this context, dismissal is appropriate only when it appears that the plaintiff can prove no set of facts in support of the claims asserted.  Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997).  The Federal Rules of Civil Procedure 'erect a powerful presumption against rejecting pleadings for failure to state a claim.'  Cottrell, 191 F.3d at 1251."  June 9 Order at 13.

Applying these standards, and particularly drawing "all inferences" in SCO's favor, the

Court must reject Novell's new argument.

1.    **SCO's Amended Complaint Properly Pleads Malice.**

Under Utah law, the malice element of a claim for slander of title may be <u>affirmatively</u>

proved or <u>implied</u> by law.  First Sec. Bank of Utah, N.A. v. Banberry Crossing, 780 P.2d 1253,

1257 (Utah 1989).  The plaintiff may prove "that the wrong was done with an intent to injure,

vex, or annoy," id., or "because of hatred, spite or ill will."  Howarth v. Ostergaard, 575 P.2d

25

442, 444 (Utah 1973). Or, "Malice may be implied where a party knowingly and wrongfully records or publishes something untrue or spurious or which gives a false or misleading impression adverse to one's title under circumstances that it should reasonably foresee might result in damage to the owner of the property." Banberry, 780 P.2d at 1257 (emphasis added).[13]

SCO's Amended Complaint easily meets the general, notice pleading standard, under Federal Rule of Civil Procedure 9(b), that applies to malice allegations. See Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1269-70 (10th Cir. 1989) ("In evaluating the sufficiency of plaintiff's allegations, we cannot ignore the plain language of Rule 9(b) of the Federal Rules of Civil Procedure, which permits 'malice, intent, knowledge, and other condition of mind of a person' to be 'averred generally.'"); see also Scheidt v. Klein, 956 F.2d 963, 967 (10th Cir. 1992) ("In view of this circuit's strict adherence to the relaxed pleading standard expressed in Rule 9(b), Defendant's objection to the conclusory nature of Plaintiffs' allegations of fraudulent intent is meritless." (citation omitted)). Indeed, in this Circuit a party need not aver any specific facts in support of its general allegations of malice. See Phelps, 886 F.2d at 1270 n.5 (agreeing with courts and commentators who "have interpreted Rule 9(b) to permit a general averment of intent unaccompanied by supporting factual allegations"). In plain satisfaction of that standard, SCO has alleged that Novell's false public statements regarding its ownership of the UNIX copyrights were made "intentionally," "maliciously," and "with utter disregard for the truthfulness thereof." Am. Compl. ¶ 25.

---

[13] As an evidentiary matter, of course, the distinct types of malice are related. That is, "if the plaintiff proved that the defendant knew the falsity of the statement or if it proved that the statements were made with recklessness, malice, and intent to injure the plaintiff, ill-will, spite, or hostility could be inferred." Charles Atlas, Ltd. v. Time-Life Books, Inc., 570 F. Supp. 150, 155 n.5 (S.D.N.Y. 1983). It follows that (drawing all inferences in SCO's favor) the Court must infer from SCO's allegation of Novell's knowledge of falsity alone that Novell acted with ill will, spite, and hostility.

SCO's allegations easily satisfy even a more demanding (and inapplicable) pleading standard. In addition to alleging that Novell engaged in "malicious" conduct by falsely asserting ownership, SCO has alleged numerous facts from which the Court may easily infer such malicious intent. See pp. 16-20, above. SCO has alleged both the facts of the malicious statements as well as Novell's purpose and motivation for making them. For example:

- "Novell has wrongfully asserted ownership over UNIX and UnixWare technologies by filing for copyright protection in its own name, and has made numerous false and misleading public representations disparaging SCO's ownership of the UNIX and UNIXWare copyrights and claiming that it, and not SCO, owns the Unix and UnixWare copyrights." Am. Compl. ¶ 18.

- Novell engaged in this wrongful and injurious course of conduct in order to, among other things, "interfere with SCO's exercise of its rights with respect to the UNIX and UnixWare technologies," id. ¶ 4, cause "customers and potential customers of SCO to not do business with SCO and to slander and impugn the ownership rights of SCO in UNIX and UnixWare," id. ¶ 6, and "attempt, in bad faith, to block SCO's ability to enforce its copyrights therein," id.

- In response to Novell's claim of ownership made on May 28, 2003, SCO wrote to Novell on June 6, 2003, and explained: "we have a direct statement that Chris Stone an executive employee working closely with you on this matter, stated that the timing of your May 28, 2003 press release was intended to coincide with our earnings announcement that occurred later that day." Id. ¶ 19(b) & Exh. 5.

- The day that Novell received SCO's June 6 letter, Novell admitted: "Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996. The amendment does not address ownership of patents, however, which clearly remain with Novell." Id. ¶ 19(c) & Exh. 6.

27

SCO further alleges that Novell's statements have caused the harm that Novell intended them to cause to SCO's "valuable UNIX and UnixWare copyrights, its business, and its reputation." Am. Compl. ¶ 7; see also id. ¶¶ 21(b) & 21(c).

Novell insists that "the statements identified in the complaint do not evidence malice" because they "are a model of equanimity." Novell Mem. at 25. Novell further claims that its "statements demonstrate its good-faith belief in the validity of its claim." Id. at 27. Novell thus disregards the governing legal standards and proposes, instead, the following standard: a plaintiff asserting a claim for slander of title cannot survive a motion to dismiss unless the defendant's claims themselves "evidence malice." Apart even from the question of how a defendant's claim of ownership would ever itself evidence malice, Novell's claim makes no sense. By Novell's lights, a defendant – whatever malicious intent it harbored in making the statements – could avoid a claim for slander of title merely by making the false statements with "equanimity." Novell's argument obviously finds no support in any authority.[14] Rule 9(b) directly refutes it.[15]

---

[14] Novell's argument on this score points out one obvious difference between the law of defamation and the law of slander of title. Unlike claims for slander of title, courts may "routinely" resolve defamation claims at the motion to dismiss stage because a court can glean from the statement and context itself "'whether the statement at bar is capable of bearing a defamatory meaning.'" Novell Mem. at 14 (quoting Robert D. Sack, Sack on Defamation § 16.2.1 (3d ed. 2004), 16-3 to 16-4); see, e.g., Cox v. Hatch, 761 P.2d 556, 561 (Utah 1988) ("If no defamatory meaning can reasonably be inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim."). Notwithstanding Novell's suggestion to the contrary, a court of course cannot determine from a defendant's public assertion of ownership itself whether the claim is false, or (at least not necessarily) whether the defendant has made the statement maliciously. Cf. Lawrence v. Moss, 639 F.2d 634, 639 (10th Cir. 1981) (noting that when relevant to a claim for even defamation, "malice calls in question a defendant's state of mind and does not lend itself readily to summary judgment"); see also Church of Scientology Int'l, 238 F.3d 168, 173 (2nd Cir. 2001) (noting that on a claim for defamation "resolution of the falsity and actual malice inquiries typically requires discovery") (cited in Sack, supra, § 16.2.1).

[15] Although the issue does not bear on Novell's instant motion (because of the nature and sufficiency of SCO's allegations), Novell puts in issue the question of whether a plaintiff must prove that the defendant

### 2.    SCO's Allegations Present a Factual Question.

Having properly pleaded malice (both generally and specifically), SCO has presented a

fact question. See Brehany v. Nordstrom, Inc., 812 P.2d 49, 59 (Utah 1991) (addressing an

appeal from a directed verdict after the close of a full trial). That is, determination of the

existence of malice, because it is a question of intent, involves "many intangible factors, such as

witness credibility, that are best left to the consideration of a factfinder after a full trial." Buell

Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979) (internal citations omitted). As the

Tenth Circuit has recognized in evaluating public statements, "malice calls in question a

defendant's state of mind and does not lend itself readily to summary judgment." Lawrence, 639

F.2d at 639. The Ninth Circuit has similarly held, in addressing the question of what the

defendant thought about the accuracy of its statement at the time of making it, that "the issue of

actual malice cannot be properly disposed of by a motion to dismiss, where the plaintiff has had

no opportunity to present evidence in support of his allegations." Flowers v. Carville, 310 F.3d

1118, 1131 (9th Cir. 2002).[16]

---

knew or even believed that its claim was false to show that the defendant acted maliciously. See Novell
Mem. at 22. SCO submits that the line of authority from Banberry – which cites Howarth v. Ostergaard,
515 P.2d 442, 444 (Utah 1973), which cites the Restatement of Torts § 624 and Olsen v. Kidman, 235
P.2d 510, 512-13 (Utah 1951), which cites the Restatement §§ 624, 625 & the comment to clause (b)
thereof – makes clear that (although SCO properly alleges these facts in any event) SCO need not prove
that Novell knew or even believed that its statements were false. See, e.g., Gillmor v. Cummings, 904
P.2d 703, 708 (Utah. Ct. App. 1995) (affirming trial court's findings of malice on claim for slander of title
following a bench trial, where the evidence showed that the defendant in fact "assumed" the descriptions
in the property deeds he recorded and published were accurate).

[16] The cases Novell cites do not suggest otherwise. In Fischer v. Bar Harbor Banking & Trust Co., 857
F.2d 4 (1st Cir. 1988), the court granted summary judgment because the plaintiff failed to provide
evidence, after discovery, that the defendant had acted with malice. Id. at 5, 8. That case merely
buttresses the Court's decision in its June 9 Order that summary judgment is the earliest stage at which
the questions surrounding copyright ownership could be addressed. In Echtenkamp v. Loudon County
Public Schools, 263 F. Supp. 2d 1043 (E.D. Va. 2003), the court applied a pleading standard that is
contrary to controlling Tenth Circuit law and Rule 9(b). In any event, the court held that the plaintiff had

**B.    The Court's Prior Order Has No Bearing
On the Legal Sufficiency of SCO's Allegations**

Novell cites the Court's analysis of federal-question jurisdiction in the portion of the

Court's June 9 Order denying SCO's remand motion and concludes:  "Because this Court has

indicated that Novell has meritorious legal arguments, it has made a sufficient determination to

reject any claim that Novell lacked a good-faith basis to make its rival claim to the UNIX

copyrights."  Novell Mem. at 24.  This <u>non sequitur</u> does not remotely support Novell's motion.

Neither the Court's Order nor the law on which Novell relies supports Novell's argument that the

Court's prior ruling precludes a finding of malice as a matter of law.

In denying SCO's motion to remand this case to state court, this Court concluded that

SCO's original Complaint presented a substantial federal question because "Although SCO's

slander-of-title claim is a state law claim, the determination of copyright ownership controls

necessary elements of the claim."  June 9 Order at 13.  In so concluding, the Court reasoned that

the "court will be required to analyze the requirements of Section 204(a) and the cases

interpreting that law."  <u>Id.</u> at 10.  The Court did not even <u>comment</u> on what Novell's intent was,

might have been, or must have been when it made statements about copyright ownership in

2003, and certainly did not make any <u>findings</u> in that regard.  The question of how the APA and

related documents operate does not resolve the factual question of what thought (if any) Novell

had given the statements at the time it published them.  Novell's claim that this Court "has made

---

sufficiently alleged malice by placing the defendants' statements in the context of a general pattern or
conspiracy to discredit her. <u>Id.</u> at 1062.  SCO's allegations place Novell's false statements in the same
type of context – a deliberate campaign to damage SCO's ability to protect its valuable copyrights in
UNIX and UnixWare.

an objective determination that Novell's statements were made in good-faith," Novell Mem. at

18, is baseless.

In fact, the Court made clear that the argument Novell now raises is inappropriate at the

motion to dismiss stage. The Court stated with respect to certain of the written materials bearing

on the question of copyright ownership:

> "because there are conflicting arguments as to the parties' understandings with
> respect to the agreements, this court cannot conclude as a matter of law at the
> motion to dismiss stage that the APA as amended is too vague to act as a
> guidepost as to what rights were transferred. The parties each have their own
> divergent interpretations of the agreements at issue in this case. However, the
> court agrees with SCO and concludes that all of these arguments as to the parties'
> understandings and interpretations of the agreements would more properly be
> before the court on motions for summary judgment or trial. Drawing all
> inferences in favor of SCO as this court must do on a motion to dismiss, this court
> cannot conclude that SCO can present no set of facts that would prove its claim.
> Accordingly, Novell's motion to dismiss as to SCO's pleading of falsity is
> denied." June 9 Order at 15 (emphasis added).

The Court thus specifically held that the question of the parties' "understandings and

interpretations of the agreements" is improper on a motion to dismiss. Novell's attempt

to resolve – "as a matter of law at the motion to dismiss stage" – issues concerning its

knowledge and intent when it made its statements is equally inappropriate.

Indeed, Novell's main argument – that the Court's comments on the issue of ownership

must resolve the question of Novell's state of mind – relies entirely on inferences of the sort that

the Court must draw in SCO's favor. Novell claims the Court has "made a sufficient

determination to reject any claim that Novell lacked a good-faith basis to make its rival claim to

the UNIX copyrights." Novell Mem. at 23-24. It may be true that the legal plausibility of a

party's argument for ownership is relevant (albeit indirectly) to whether that party in fact

possessed a "good-faith belief" in its claims of ownership when it made them. But such

31

plausibility does not even constitute direct evidence of the party's "good faith," let alone <u>resolve</u> the question. In asking the Court to conclude otherwise, Novell repeatedly and improperly argues for the Court to draw all of the key inferences in <u>Novell</u>'s favor. Novell asks the Court simply to <u>infer</u> that:

- "each of the statements was made in direct furtherance of Novell's belief that it owns UNIX and that SCO's contrary claim called for rebuttal, not silence," Novell Mem. at 18;

- "SCO cannot possibly demonstrate that SCO's statements were 'knowingly false' or that they 'were made from spite, ill will or hatred,'" <u>id.</u> at 22; <u>see also id.</u> at 27;

- "Novell's public assertion of such claims cannot represent the sort of knowing falsehood sufficient to constitute malice," <u>id.</u> at 23; and

- "Novell's statements demonstrate its good-faith belief in the validity of its claim." <u>id.</u> at 27.

These assertions, based on Novell's hopeful inferences from its counsel's legal arguments on the question of ownership, are obviously no basis on which to dismiss SCO's claim.[17]

The foregoing statements also improperly disregard crucial portions of the "substantial record" on which Novell otherwise purports to rely. Novell Mem. at 1. The single example of Novell's press release on June 6, 2003, makes the point:

---

[17] Indeed, Novell could not prevail as a matter of law even if, contrary to fact, it were <u>undisputed</u> that before Novell's statements its attorneys took the same view of ownership they argued to the Court on Novell's first motion to dismiss, <u>and</u> that Novell relied on that advice. <u>See, e.g., Miller v. Colorado Farms</u>, No. Civ. A 97 WY 2015WD, 2001 WL 629463, at *2 (D. Colo. Jan. 16, 2001) (Exh. F) (noting the four elements of "the defense of advice of counsel" to a claim for slander of title and holding that plaintiff "is entitled to discover from the opposition all evidence which bears upon, or is related to, these four requirements"); <u>Murren v. Foster</u>, 674 S.W.2d 406, 409-12 (Tex. Ct. App. 1984) (reversing trial court's entry of summary judgment for defendant on plaintiff's claim of slander of title because evidence that defendant "acted on the advice of her attorney does not conclusively establish her good faith; it is but a circumstance to be considered by the trier of fact in determining the issue"); <u>Allington Towers Condominium N., Inc. v. Allington Towers N., Inc.</u>, 415 So. 2d 118, 119 (Fla. Ct. App. 1982) (in light of defendant's claim of reliance "upon advice of counsel" in filing lien, the "affirmative defense of good faith creates a factual dispute as to the malicious intent element of a cause of action for slander of title").

"Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996." [Am. Compl. ¶ 19(c) & Exh. 6) (emphasis added).]

This press release (however Novell tries to downplay it) is directly relevant to SCO's claim in all of the following ways: (1) it is an admission that Novell does not own the copyrights at issue; (2) it is an admission regarding the relevance of Amendment No. 2 on the question of copyright ownership; and (3) it is evidence that, even assuming Novell was telling the truth when it said it did not have Amendment No. 2 in its files (an assumption contrary to the one that the Court must draw against Novell on its motion to dismiss), Novell acted recklessly – which suffices under the law to show malice – by claiming ownership of the copyrights without first reviewing the relevant contract documents. This press release alone defeats Novell's claims about what SCO "cannot possibly" show, and precludes even summary judgment for Novell. See, e.g., Lawrence, 639 F.2d at 639; see also Flowers, 310 F.3d at 1131; Part II.A.2, above.

The Court's own discussion of the June 6, 2003, press release is revealing. In its analysis, the Court clearly drew the very distinction Novell refuses to draw – between the threshold standard for remand and the merits of SCO's claim. In concluding (in 2004) that it will have to decide whether a Section 204(a) writing exists, the Court made no findings regarding Novell's state of mind (in 2003) at the time of the statements at issue. As this Court stated:

"Although the press release may argue in favor of a finding that the copyrights were in fact transferred under Amendment No. 2, this argument focuses on the merits of the action rather than the threshold question of whether Section 204(a) is sufficiently implicated such that federal jurisdiction exists." June 9 Order at 10.

33

The resolution of the threshold jurisdictional question does not resolve, one way or the other, whether (1) "the copyrights were in fact transferred"; (2) Novell knew the copyrights had been transferred (as it said it did in its June 6, 2003 press release and June 26, 2003 letter from its General Counsel); and/or (3) Novell knowingly and maliciously stated otherwise. SCO properly and specifically pleaded those facts in the Amended Complaint, and they are fully consistent with the Court's decision that it has federal-question jurisdiction.

The authority on which Novell relies does not suggest a contrary result. Novell cites Timpanogos Highlands, Inc. v. Harper, 544 P.2d 481, 486 (Utah 1975), for the proposition that "[where a party] had sufficient basis for believing that it had rights under the contract . . . there is no foundation upon which it could be found that it willfully and knowingly recorded a false or fraudulent instrument for the purpose of slandering the defendants' title." Novell Mem. at 24. In that case, however, the court upheld the trial court's findings of fact after a trial at which an advisory jury considered the evidence. Noting the large amount of deference due the jury and the trial court, see id. at 485 ("[W]e would not reverse unless the evidence was so clear and persuasive that will reasonable minds must necessarily to find.") the court found that the evidence of the counterclaim-defendants' belief in their entitlement to record the "contract and assignments relating thereto" justified the verdict. Id. at 486. Timpanogos does not remotely hold that where a party makes an argument (even a non-frivolous argument) for a certain contract interpretation, it is established as a matter of law that the party acted in good faith. In fact, Timpanogos supports SCO's position that a defendant's subjective beliefs are for a jury to evaluate.

Novell also relies on a handful of patent and copyright infringement cases for the proposition that "bad faith is not supported when the information is objectively accurate."

34

Novell Mem. at 24. From these cases, Novell attempts to argue that it cannot be held to have acted with malice because this Court has found that the issue of whether SCO owns the UNIX copyrights is not "obvious." Novell Mem. at 25.[18] The cases upon which Novell relies, however, merely hold that where the evidence demonstrates that the holder of an intellectual property right in fact acted in good faith, an objectively reasonable yet misconceived belief as to his rights will not preclude a claim of bad faith. Novell presents no such evidence here – and even if it had, SCO has had no opportunity to uncover contrary evidence in discovery.

In Golan v. Pingel Enterprise, Inc., 310 F.3d 1360 (Fed. Cir. 2002), for example, the court held that "patentees do not violate the rules of fair competition by making accurate representations, and are allowed to make representations that turn out to be inaccurate provided they make them in good faith." Id. at 1371 (emphasis added). The Golan court further stated that "if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out." Id. (quoting Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1354 (Fed. Cir. 1999)).[19] SCO specifically alleges that Novell knew its claims of copyright ownership were false when it announced them publicly. See also note 15, above.

---

[18] Novell claims that SCO made a similar argument on a motion to dismiss in a case pending before a different court. Novell Mem. at 24. In the brief Novell cites, SCO addressed the standard "for evaluating public statements to the industry about pending patent infringement matters" in support of its argument that the public statements SCO had made "do not have the fundamental characteristics of commercial speech required to support a Lanham Act claim." Novell's Melaugh Decl. Ex. G at 20, 24. SCO thus addressed a plainly different set of questions than those before this Court.

[19] The other cases Novell cites are also inapposite. The grounds for the court's holding in Globetrotter Software Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1371 (Fed. Cir. 2004), are the same as those in Golan, and are unavailing for the same reason as Golan. In Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993), the Supreme Court considered a "sham" copyright infringement action. Having reviewed the long line of federal authority concerning "sham" litigation and applying the express "two-part definition of 'sham' litigation" it outlined in the opinion, the Court

Novell has not cited a single case holding that a party's assertion of a plausible legal argument precludes – let alone as a matter of law – a finding of malice in a slander-of-title (or defamation) action. The cases Novell cites clearly hold that a showing of bad faith supports a claim of malice – even where a meritorious contrary argument is, or can be, made.

## III.   THE PRIVILEGES NOVELL INVOKES ARE NO BASIS FOR DISMISSAL OF SCO'S CLAIM FOR SLANDER OF TITLE

Novell further contends that its statements fall within certain privileges, yet fails to cite any case in which a court even considered the application of any privilege to a claim for slander of title under Utah law. SCO shows below why the absence of any such case reflects the nature of the claim under Utah law. In any event, SCO's Amended Complaint precludes the application of any such privilege in two ways: first, by sufficiently pleading malice; and second, by showing that Novell has exceeded the scope of any otherwise applicable privilege.

### A.   SCO Has Precluded the Application of Any Supposed Privileges By Sufficiently Pleading Malice

Novell claims, without citation to any slander-of-title case under Utah law, that it has both the conditional privilege to assert its own "rival claim" to the copyrights in question and the conditional privilege to inform "other interested parties" of Novell's purported claim to ownership. See Novell Mem. at 16-21; see also id. at 17 n.6 (acknowledging that Novell could

---

explained that first "the lawsuit must be objectively baseless." Id. at 60. To the extent this opinion is even remotely analogous to the law of slander of title under Utah law (with its own, discrete line of authority), the "objectively baseless" element is simply the analog of the "falsity" element of a claim for slander of title; it does not even touch on the defendant's state of mind. In On Command Video Corp. v. Columbia Pictures Industries, Inc., 764 F. Supp. 1372, 1374 (N.D. Cal. 1991), the defendants sought a declaratory judgment permitting them to send a letter to the plaintiff's customers informing the customers of the pendency of an infringement suit between the parties. The plaintiff, who offered to notify the customers itself of the suit, claimed that the defendants were acting in bad faith for insisting on sending the notification. The court held that the defendants had a legal right to send the notification and specifically noted that the plaintiff made no objection to the content of the defendants' proposed letter. The court, finding no misrepresentation in the letter, granted the defendants' motion. The defendants' subjective intent was not at issue.

find no Utah case applying its supposed "rival claimant" privilege). SCO's research similarly reveals no Utah case applying any privilege to a claim for slander of title.

The absence of any such case law, and the inapplicability of any such privilege, correctly reflect the elements of the claim for slander of title under Utah law. The unbroken line of authority shows that the elements for the claim derive from the Restatement of the Law on Torts. See note 15, above. Under the elements of the claim as set forth in the Restatement, the defendant must have published the matter "'without privilege to do so.'" Dowse v. Doris Trust Co., 208 P.2d 956, 958 (Utah 1949) (quoting the Restatement § 624). "'The idea expressed in the Restatement by the phrase 'without a privilege to do so' is in common legal speech often expressed by the statement that the disparaging matter was published maliciously.'" Id. (quoting the comments in the Restatement). Given that as an element of its claim SCO must prove that Novell acted maliciously, where SCO proves its claim, it by definition precludes any privilege.[20]

Novell further contends, again without citation, that if "a privilege appears on the face of the pleadings and the plaintiff presents only conclusory allegations in an effort to overcome that privilege, dismissal is appropriate." Novell Mem. at 15. That argument is plainly wrong. The plaintiff may "aver generally" states of mind such as "malice," and SCO has indisputably made such allegations. See Part II.A, above. Accordingly, on this basis alone, Novell's claim of

---

[20] Indeed, Novell concedes that its malice would overcome any such privilege (even if one applied). See Novell Mem. at 15-16 (citing Brehany v. Nordstrom, Inc., 812 P.2d 49, 57 (Utah 1991), for the proposition that conditional privileges of the type Novell claims are for the court to decide as a matter of law, unless a genuine issue of material fact exists as to whether "the defendant acted with malice," and Echtenkamp, 263 F. Supp. 2d 1043, for the proposition that the claimed privileges are lost if the plaintiff proves "that the defamatory words were spoken with common-law malice"). The law of defamation – for which malice is not an element – plainly compels Novell's concession. See, e.g., Brehany, 812 P.2d at 58 ("The plaintiff can show abuse of the privilege by proving that the defendant acted with malice or that the publication of the defamatory material extended beyond those who had a legally justified reason for receiving it."); Restatement (Second) of Torts § 603 (2004) (the defendant's malice defeats a rival claimant's conditional privilege).

37

privilege must fail at this stage. In addition, SCO has alleged in detail the facts demonstrating Novell's malice. See Background (Part II) & Part II.A, above. Novell acted with malice by repeatedly and falsely publishing to the world that it owned the UNIX copyrights when it knew (or should have known) that SCO owned the copyrights; Novell made the statements for the improper purpose of harming SCO. If a plaintiff alleges that the defendant acted with malice or exceeded the scope of any conditional privilege, the Court cannot decide as a matter of law whether the privilege applies. See Combs v. Montgomery Ward & Co., 228 P.2d 272, 277 (Utah 1951); see also Lind v. Lynch, 665 P.2d 1276, 1278-79 (Utah 1983); Brehany, 812 P.2d at 58-59. SCO's allegations thus defeat Novell's assertion of privilege.

In addition, if Novell has evidence to support its alleged good-faith bases for claiming ownership of the UNIX copyrights, the proper place to introduce that evidence and argue its significance is at trial. "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991); see also Part II.A.2, above. Indeed, as noted above, the Tenth Circuit has specifically recognized in the context of evaluating public statements that "malice calls in question a defendant's state of mind and does not lend itself readily to summary judgment." Lawrence, 639 F.2d at 639. It is simply mistaken for Novell to argue that its merely supposed good-faith basis for asserting copyright ownership requires this Court to hold that SCO's allegations (which repeatedly refer to Novell's bad faith and deliberate efforts to damage the value of SCO's property, see Am. Compl. ¶¶ 4-5, 20, 25) are insufficient to state a claim of slander of title. Novell's conclusory assertions of privilege, cloaked in a privilege Utah law does not appear to recognize, are an inappropriate basis for Novell's motion.

38

**B.     SCO Sufficiently Alleges Facts Showing That Novell
        Has Exceeded the Scope of Any Applicable Privilege**

The privileges Novell invokes are no basis for Novell's motion for the additional, and

distinct, reason that SCO's Amended Complaint alleges that Novell's statements were

excessively published (that is, through Novell's unrestricted publication of those statements to

the entire world). "Statements that are otherwise privileged lose their privilege if they are

excessively published, that is, 'published to more persons than the scope of the privilege requires

to effectuate its purpose.'" Krouse v. Bower, 20 P.3d 895, 900 (Utah 2001) (quoting DeBry v.

Godbe, 992 P.2d 979, 985 (Utah 1999)); see also Brehany, 812 P.2d at 58 (stating that a privilege

may be abused through publication to persons "beyond those who had a legally justified reason

for receiving it." (emphasis added)); Combs, 228 P.2d at 275 ("[F]or the purpose of safeguarding

against too wide-spread, careless or ill-advised inquiry under the protection of the cloak of

conditional privilege, the law requires that there also be a proper interest on the part of the one to

whom the inquiry is made." (citing Restatement (Second) of Torts § 594 (emphasis added)).

Moreover, the "defense of qualified privilege does not extend to a publication to the general

public." Knudsen v. Kansas Gas and Elec. Co., 807 P.2d 71, 79 (Kan. 1991) (citing 50 Am. Jur.

2d Libel and Slander § 195); see also Thomas v. St. Luke's Health Sys., Inc., 869 F. Supp. 1413,

1443 (N.D. Iowa 1994) ("The privilege does not extend to publication to the general public."

(citing Rees v. O'Malley, 461 N.W.2d 833, 837 (Iowa 1990))); Adserv Corp. v. Lincecum, 385

So. 2d 432, 435 (La. Ct. App. 1980) (same); Owens v. Scott Publ'g Co., 284 P.2d 296, 304

(Wash. 1955) (same).

SCO's Amended Complaint repeatedly alleges that Novell made its false statements

regarding its purported ownership of the UNIX copyrights to the public in general. See, e.g.,

Am. Compl. ¶ 5 ("Novell has repeatedly claimed <u>publicly in press releases</u> and otherwise that it, and not SCO, owns the UNIX and UnixWare copyrights") (emphasis added); ¶ 18 (Novell "has made numerous false and misleading <u>public representations</u> disparaging SCO's ownership of the UNIX and UnixWare copyrights and claiming that it, and not SCO, owns the Unix and UnixWare copyrights") (emphasis added); and ¶ 19 (alleging Novell published false representations in numerous "<u>press releases</u>" and "<u>several newspapers and other publications</u>") (emphasis added). Thus, even apart from the settled law holding that a qualified privilege does not extend to publication to the general public, SCO's allegations easily permit the conclusion, and SCO will further demonstrate through facts uncovered in discovery, that Novell's preservation of its copyright ownership claim did not require Novell to publish its statements about that claim to the general public. Novell could have preserved its claim, for example, simply through its filings with the U.S. Copyright Office.

In light of the plain sufficiency of SCO's allegations regarding the scope of Novell's publication, at this stage the Court cannot resolve the application of the privileges Novell purports to invoke. The issue of whether there has been an excessive publication is a question of fact for the jury. <u>See</u> <u>Brehany</u>, 812 P.2d at 58; <u>see also</u> <u>Higgins v. Gordon Jewelry Corp.</u>, 433 N.W.2d 306, 309 (Iowa Ct. App. 1988) ("As to whether there has been excessive publication depends upon the circumstances as disclosed by the evidence and is a question of fact for the jury if different inferences reasonably can be drawn from the evidence." (quotation omitted)); <u>Shallenberger v. Scoggins-Tomlinson, Inc.</u>, 439 N.E.2d 699, 707 (Ind. Ct. App. 1982) (whether the privilege was abused by excessive publication is a question of fact for the jury). Accordingly, on these additional bases, the Court cannot decide as a matter of law whether any qualified privilege applies to Novell's statements, and therefore must deny Novell's motion.

## CONCLUSION

For all of the above reasons, Novell's second Motion to Dismiss should be denied.

DATED this 1st day of October, 2004.

By: _____

HATCH JAMES & DODGE
Brent O. Hatch
Mark F. James
Mark R. Clements

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stephen N. Zack
Mark J. Heise

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of October, 2004, I caused to be mailed a true

and correct copy of the foregoing via first class U.S. Mail, postage prepaid, to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101


Michael A. Jacobs
Matthew I. Kreeger
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-2482

# EXHIBITS TO SCO'S MEMORANDUM IN OPPOSITION
# TO NOVELL, INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

| Exhibit No. | Date | Description |
|---|---|---|
| 1 | 12/6/95 | Bill of Sale between Novell, Inc. and The Santa Cruz Operation, Inc. |
| 2 | 12/6/95 | Technology License Agreement between Novell, Inc. and The Santa Cruz Operation, Inc. |
| 3 | 9/20/04 | "Man in the middle: Jack Messman talks to vnunet.com" vnunet.com http://www.vnunet.com/analysis/1158206 |
| 4 | 10/1/04 | Declaration of Ed Chatlos |
| 5 | 6/6/03 | Letter from Darl McBride to Jack Messman Re: Novell's May 28, 2003 Press Release |
| 6 | 6/6/03 | Novell Press Release |

### Authorities

| | |
|---|---|
| A | *Joseph Johnson, et al. v. Tuff-N-Rumble Management, Inc., et al.*, No. CIV.A.99-1374, 2000 WL 1145748 (E.D. La. Aug. 14, 2000) |
| B | *Lawrence Friedman v. Stacey Data Processing Services, Inc.*, No. 89 C 4444, 1990 WL 172586 (N.D. Ill. Nov. 1, 1990) |
| C | *Relational Design & Technology, Inc. v. Stuart Brock, Wesley Brock, and Data Team Corporation*, Civ. A. No. 91-2452-EEO, 1993 WL 191323 (D. Kan. May 25, 1993) |
| D | *United States Fidelity & Guaranty Company v. Jack Jespen, et al.*, No. 90 C 6931, 1991 WL 249706 (N.D. Ill. Nov. 14, 1991) |
| E | *George W. Moore v. Ford Motor Company, Monty Scher, Barry Scher, and Kenneth Weinberger*, No. 92 C 1130, 1994 WL 25822 (N.D. Ill. Jan. 26, 1994) |
| F | *Vernon R. Miller v. Colorado Farms, et al.*, No. CIV. A. 97WY2015WD, 2001 WL 629463 (D. Colo. Jan. 16, 2001) |

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.