# EXHIBIT E

Dockets.Justia.com

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUL 2 9 2005

MARKUS B. ZIMMER, CLERK
BY_____
DEPUTY CLERK

MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)
425 Market Street
San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT  84101
Telephone:  (801) 534-1700
Facsimile:  (801) 364-7697

**Attorneys for Defendant Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, | **NOVELL, INC.'S ANSWER AND COUNTERCLAIMS** |
| Plaintiff, | **(Jury Trial Demanded)** |
| vs. | |
| NOVELL, INC., a Delaware corporation, | Case No. 2:04CV00139 |
| Defendant. | Judge Dale A. Kimball |

<u>ANSWER</u>

In response to Plaintiff The SCO Group, Inc.'s ("SCO") Amended Complaint filed
July 9, 2004, Defendant Novell, Inc. ("Novell") pleads as follows:

1.    Novell admits that it entered into an Asset Purchase Agreement with SCO's
alleged predecessor in interest dated September 19, 1995. Each and every other allegation in
paragraph 1 is denied.

2.    Novell admits that Attachment E to the Asset Purchase Agreement provided a list
of approximately 106 copyright registrations. Novell denies that Attachment E, alone or in
connection with the Asset Purchase Agreement, transferred any UNIX or UnixWare copyrights
to SCO. Each and every other allegation in paragraph 2 is denied.

3.    Novell admits that SCO has registered a claim to UNIX and UnixWare copyrights
with the United States Copyright Office. Each and every other allegation in paragraph 3 is
denied.

4.    Novell admits that Novell has registered its claim to UNIX and UnixWare
copyrights with the United States Copyright Office. Each and every other allegation in
paragraph 4 is denied.

5.    Novell admits that it has, in good faith, publicly stated its belief that it owns
UNIX and UnixWare copyrights. Each and every other allegation in paragraph 5 is denied.

6.    Denied.

7.    Denied.

8.    Novell denies that SCO is entitled to any relief under its Amended Complaint, and
each and every allegation in paragraph 8 is therefore denied.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Novell admits that Schedule 1.1(a) to the Asset Purchase Agreement contains substantially the text quoted by the Amended Complaint. (SCO's Amended Complaint contains a typographical error, however: the first sentence of the quoted text actually reads "all versions of UNIX and UnixWare and *all* copies of UNIX and UnixWare.) Novell denies that this text acted to transfer UNIX or UnixWare copyrights to SCO. Each and every other allegation in paragraph 14 is denied.

15.    Denied.

16.    Denied

17.    Denied.

18.    Denied.

19.    Novell denies that it has made any false oath, misleading public representation, or wrongful assertion of ownership rights, and on that basis denies each and every allegation in paragraph 19, except as set forth below:

a)    Novell admits that on May 28, 2003 Jack Messman sent a letter to Darl McBride of SCO in order to assert Novell's claim to the UNIX and UnixWare copyrights and to protect Novell's interests and the interests of its customers. This letter contained the following text:

> Importantly, and contrary to SCO's assertions, SCO is not the owner of the UNIX copyrights. Not only would a quick check of U.S. Copyright Office records reveal this fact, but

2

> a review of the asset transfer agreement between Novell
> and SCO confirms it. To Novell's knowledge, the 1995
> agreement governing SCO's purchase of UNIX from
> Novell does not convey to SCO the associated copyrights.
> We believe it unlikely that SCO can demonstrate that it has
> any ownership interest whatsoever in those copyrights.
> Apparently, you share this view, since over the last few
> months you have repeatedly asked Novell to transfer the
> copyrights to SCO, requests that Novell has rejected.
> Finally, we find it telling that SCO failed to assert a claim
> for copyright or patent infringement against IBM.
>
> . . .
>
> [W]e demand that SCO retract its false and unsupported
> assertions of ownership in UNIX patents and copyrights or
> provide us with conclusive information regarding SCO's
> ownership claims.

On January 13, 2004, Novell made a copy of this letter available on its website at

http://www.novell.com/licensing/indemnity/legal.html. Novell is without further

knowledge as to details of other publication and therefore denies each and every

allegation related thereto. Each and every other allegation in paragraph 19(a) is

denied.

b)    Novell admits that on June 6, 2003, SCO sent Novell a letter pertaining to

Amendment 2 and the Asset Purchase Agreement. Each and every other

allegation in paragraph 19(b) is denied.

c)    Novell admits that on June 6, 2003, it issued a press release containing the

following text:

> In a May 28th letter to SCO, Novell challenged SCO's
> claims to UNIX patent and copyright ownership and
> demanded that SCO substantiate its allegations that Linux
> *infringes SCO's intellectual property rights.* Amendment
> #2 to the 1995 SCO-Novell Asset Purchase Agreement was
> sent to Novell last night by SCO. To Novell's knowledge,

3

> this amendment is not present in Novell's files. The
> amendment appears to support SCO's claim that ownership
> of certain copyrights for UNIX did transfer to SCO in
> 1996. The amendment does not address ownership of
> patents, however, which clearly remain with Novell.

Each and every other allegation in paragraph 19(c) is denied.

d)    Responding to a threat by SCO to sue Novell for federal securities fraud conveyed

in SCO's June 6, 2003 letter, Novell admits that Joseph LaSala sent a letter to

Darl McBride on June 6, 2003, containing the following text:

> Your letter contains absurd and unfounded accusations
> against Novell and others, coupled with a veiled threat to
> publicly state those allegations in a SCO press call to be
> held today at 11:00 am EST. Novell continues to demand
> that SCO cease and desist its practice of making
> unsubstantiated allegations, including the allegations
> contained in your letter of June 6, 2003.

Each and every other allegation in paragraph 19(d) is denied.

e)    Responding to a subsequent press release issued by SCO, Novell admits that

Joseph LaSala sent a letter to Darl McBride on June 26, 2003, containing the

following text:

> SCO's statements [claiming to own "the patents,
> copyrights, and core technology associated with the UNIX
> system"] are simply wrong. We acknowledge, as noted in
> our June 6 public statement, that Amendment No. 2 to the
> Asset Purchase Agreement appears to support a claim that
> Santa Cruz Operation had the right to acquire some
> copyrights from Novell. Upon closer scrutiny, however,
> Amendment No. 2 raises as many questions as it answers.
> Indeed, what is most certainly *not* the case is that "any
> question of whether UNIX copyrights were transferred to
> SCO as part of the Asset Purchase Agreement was clarified
> in Amendment No. 2" (as SCO stated in its June 6 press
> release). And there is no indication whatsoever that SCO
> owns all the *patents* associated with UNIX or UnixWare.

4

> We are still reviewing the Asset Purchase Agreement and
> other materials to determine the actual scope of rights
> transferred to SCO. In the meantime, we wish to make
> clear that we do not agree with SCO's public statement on
> this matter.

Each and every other allegation in paragraph 19(e) is denied.

f)    SCO subsequently registered claims to the UNIX and UnixWare copyrights with

the United States Copyright Office. Responding to that registration, Novell

admits that Joseph LaSala sent a letter to Darl McBride on August 4, 2003,

containing the following text:

> We dispute SCO's claim to ownership of these copyrights.
> The Asset Purchase Agreement, in Schedule 1.1(b),
> contains a general exclusion of copyrights from the assets
> transferred to Santa Cruz Operation. Amendment No. 2
> provides an exception to that exclusion, but only for
> "copyrights...required for [Santa Cruz Operation] to
> exercise its rights with respect to the acquisition of UNIX
> and UnixWare technologies."
>
> In other words, under the Asset Purchase Agreement and
> Amendment No. 2, copyrights were not transferred to Santa
> Cruz Operation unless SCO could demonstrate that such a
> right was "required for [Santa Cruz Operation]" to exercise
> the rights granted to it in the APA. Santa Cruz Operation
> has never made such a demonstration, and we certainly see
> no reason why Santa Cruz Operation would have needed
> ownership of copyrights in UNIX System V in order to
> exercise the limited rights granted SCO under the APA.
> Nor is there any reason to think that a transfer of the
> copyrights required for SCO to exercise its APA rights
> necessarily entails transfer of the entire set of exclusive
> rights associated with a particular copyrighted computer
> program.
>
> Unless and until SCO is able to establish that some
> particular copyright right is "required" for SCO to exercise
> its rights under the APA, SCO's claim to ownership of any
> copyrights in UNIX technologies must be rejected, and
> ownership of such rights instead remains with Novell.

Each and every other allegation in paragraph 19(f) is denied.

g)      Responding to SCO's copyright registrations, Novell admits that it has registered

its claim to the UNIX and UnixWare copyrights enumerated in paragraph 19(g).

Each and every other allegation in paragraph 19(g) is denied.

h)      Admitted.

i)      In response to a public claim by SCO that Novell had conceded the superiority of

SCO's claim to the UNIX and UnixWare copyrights, Novell admits it issued a

press release on December 22, 2003, containing the following text:

> Novell believes it owns the copyrights in UNIX, and has
> applied for and received copyright registrations pertaining
> to UNIX consistent with that position.  Novell detailed the
> basis for its ownership position in correspondence with
> SCO. Copies of our correspondence, and SCO's reply, are
> available here. Contrary to SCO's public statements, as
> demonstrated by this correspondence, SCO has been well
> aware that Novell continues to assert ownership of the
> UNIX copyrights.

Each and every other allegation in paragraph 19(i) is denied.

j)      On January 13, 2004 Novell announced a Linux Indemnification Program.  In

connection with this offer, Novell issued a press release clarifying its beliefs as to

its legal rights concerning the UNIX and UnixWare copyrights.  The press release

contained the following:

> Novell also made available today additional information on
> the unique contractual and intellectual property rights it
> holds because of its position in the historical ownership
> chain of UNIX and UnixWare. These rights include:
>
> · Novell's rights to license UNIX technology
>   pursuant to a Technology License Agreement
>   between SCO and Novell, including Novell's right

to authorize its customers to use that UNIX
technology in their internal business operations.

- Novell's rights to take action on behalf of SCO
  under legacy UNIX SVRX licenses pursuant to the
  Asset Purchase Agreement between SCO and
  Novell.

- As previously confirmed by Novell, copyright
  registrations on UNIX SVRX releases, consistent
  with Novell's position that it retained ownership of
  these copyrights.

Copies of relevant correspondence between Novell and
SCO are available at
http://www.novell.com/licensing/indemnity/legal.html. The
rights reflected in these documents are part of the
foundation for the indemnification program Novell is
announcing today.

Each and every other allegation in paragraph 19(i) is denied.

k)      Admitted.

20.     Denied.

21.     Novell denies that it has made any wrongful claims of copyrights and ownership

in UNIX and UnixWare and that SCO is entitled to any relief under its Amended Complaint, and

each and every allegation in paragraph 21 is therefore denied.

22.     Novell incorporates by reference the answers contained in paragraphs 1 - 21 as if

they were set forth here in full.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

7

28.    Denied.

## AFFIRMATIVE DEFENSES

29.    Novell also hereby asserts the following separate defenses to the Amended

Complaint, and each of its purported causes of action, without assuming any burden of proof on

such defenses that would otherwise rest with SCO:

### FIRST AFFIRMATIVE DEFENSE
### (Privilege)

30.    The Amended Complaint, and each of its purported causes of action, is barred due

to absolute and conditional privileges enjoyed by Novell.

### SECOND AFFIRMATIVE DEFENSE
### (Estoppel)

*31.    The Amended Complaint, and each of its purported causes of action, is barred, in*

*whole or in part, by the equitable doctrine of estoppel.*

### THIRD AFFIRMATIVE DEFENSE
### (Unclean Hands)

32.    The Amended Complaint, and each of its purported causes of action, is barred, in

whole or in part, by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE
### (Laches)

33.    The Amended Complaint, and each of its purported causes of action, is barred, in

whole or in part, by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE
### *(Comparative Fault)*

34.    To the extent that SCO did sustain any damages, which Novell denies, such

damages were caused, in whole or in part, by the comparative fault of SCO and/or third parties,

which thus bars SCO's recovery for said damages or diminishes such recovery by the amount of fault attributable to SCO and/or those third parties.

## SIXTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

35.     To the extent that SCO did sustain any damages, which Novell denies, such damages were caused, in whole or in part, by SCO's failure to mitigate any damages it may have suffered, which failure to mitigate bars and/or diminishes SCO's right to any relief against Novell.

## SEVENTH AFFIRMATIVE DEFENSE
### (No Causation)

36.     To the extent SCO has suffered any injury or damage, which Novell denies, such injury or damage was not proximately caused by any conduct or inaction of Novell, or was not foreseeable, or both.

## EIGHTH AFFIRMATIVE DEFENSE
### (U.S. Const. Amend. I)

37.     The Amended Complaint, and each of the purported causes of action, is barred, in whole or in part, by the First Amendment to the United States Constitution.

**WHEREFORE**, Novell prays for judgment as follows:

38.     That SCO take nothing by the Amended Complaint;

39.     That the Court enter judgment in favor of Novell and against SCO, dismissing with prejudice the Amended Complaint and each of its causes of action;

40.     That the Court award Novell its reasonable expenses and costs incurred, including without limitation attorneys' fees, in defending against the Amended Complaint; and

9

41.     That the Court grant Novell such other and further relief to which Novell may be entitled as a matter of law or which the Court deems just and proper.

## COUNTERCLAIMS

Novell counterclaims against SCO as follows:

### PARTIES

1.      Counterclaim-plaintiff Novell, Inc. ("Novell") is a Delaware corporation that was incorporated in 1983. Its headquarters and principal executive offices are located in Waltham, Massachusetts. Novell's principal product development facility is located in Provo, Utah. Novell also has offices in numerous cities worldwide.

2.      Counterclaim-defendant The SCO Group, Inc. ("SCO") is a Delaware corporation with its principal place of business in Utah County, State of Utah.

### JURISDICTION

3.      This Court has original jurisdiction over SCO's Amended Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has jurisdiction over Novell's counterclaims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (arising under the Federal Copyright Act), 28 U.S.C. § 1367(a) (supplemental jurisdiction) and 28 U.S.C. §§ 2201(a) and 2202 (declaratory judgment). Novell's slander of title claim involves questions of, and arises under, federal law. This Court has supplemental jurisdiction over Novell's state law claims of breach of contract, accounting, restitution and slander of title.

## VENUE

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c)

and 1400(a), in that SCO resides or may be found in this district and is subject to personal

jurisdiction in this district.

## FACTS

**A.      UNIX**

6.      UNIX is the name of a computer operating system originally developed beginning

in the late 1960s by a group of software engineers at AT&T's Bell Laboratories.  Over time,

AT&T licensed its UNIX family of operating systems to universities, corporations, other entities

and individuals.

7.      In 1993 AT&T sold its UNIX assets, held by its subsidiary UNIX System

Laboratories ("USL"), to Novell.  This transfer of assets to Novell included UNIX copyrights,

trademarks and all active UNIX licensing agreements, including contracts relating to the most

recent version of the UNIX operating system called UNIX System V.  At the time there had been

several major releases of System V, including Releases 1, 2, 3 and 4, also referred to as SVR1,

SVR2, SVR3 and SVR4, or generically as SVRx.

**B.      Linux**

8.      Linux is the name of a computer operating system, originally developed

beginning in the early 1990s when Linus Torvalds, an undergraduate student at the University of

Helsinki, began writing the Linux kernel, or the core of the Linux operating system.  He released

the first version of the Linux kernel on the Internet in 1991.  Since then, thousands of software

programmers around the world have engaged in a collaborative effort to further develop Linux.

9.    Linux was developed as open-source software and has become a popular alternative to proprietary operating systems. Unlike with other major operating systems, the underlying source code of Linux is available to the public.

**C.    The Asset Purchase Agreement Between Novell and The Santa Cruz Operation, Inc.**

10.    In 1995, Novell and a company called The Santa Cruz Operation, Inc. ("Santa Cruz") entered into negotiations over the sale of certain business assets of Novell relating to its UNIX and UnixWare software products.

11.    Santa Cruz was a California corporation that was incorporated in 1979. It was founded as a UNIX system porting and consulting company and began to ship its first product, a packaged version of the UNIX operating system, in 1983. In 1993 Santa Cruz completed an initial public offering and became a publicly-listed company on the NASDAQ Stock Exchange.

12.    On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement ("APA"). The APA provided each party with certain rights and obligations.

13.    The parties entered into two Amendments to the APA. On December 6, 1995, Novell and Santa Cruz executed "Amendment No. 1." Novell and Santa Cruz subsequently executed "Amendment No. 2" on October 16, 1996.

14.    Under the APA and its Amendments, and subject to various conditions and exclusions set forth therein, Santa Cruz obtained a variety of assets, including assignment of tens of thousands of contracts and licenses, various trademarks, source code and binaries to UNIX and UnixWare products, and physical assets such as furniture and personal computers. The obtained assets also included the right for Santa Cruz to develop a "Merged Product."

15.    Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell for these acquired assets and rights. In order to bridge the price gap and

consummate the transaction, Novell and Santa Cruz agreed that Novell would receive Santa Cruz stock and retain certain rights as protection. For example (and as discussed further below), Novell retained the right to receive royalty payments under SVRX licenses, prior approval rights relating to new SVRX licenses and amended SVRX licenses, the right to direct Santa Cruz to take certain actions relating to SVRX licenses and the right to conduct audits of the SVRX license program. Santa Cruz assumed several related obligations.

16.    One such obligation that Santa Cruz assumed under the APA was responsibility for administering the collection of royalty payments from SVRX licenses. The APA provided that Santa Cruz shall collect and pass through to Novell 100% of the SVRX royalties. In return, Novell agreed to pay Santa Cruz an administrative fee of 5% of those royalty amounts. Santa Cruz also agreed to pay additional royalties relating to other products.

17.    Novell retained certain assets under the APA. Schedule 1.1(b), which lists "Excluded Assets" under the agreement, specifies that Novell retained "all copyrights and trademarks, except for the trademarks UNIX and UnixWare," "all patents," and "all right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof."

18.    Novell also retained rights to supervise Santa Cruz's administration of SVRX licenses. Novell retained the "sole discretion" to direct Santa Cruz to amend, supplement, modify, waive or assign any rights under or to the SVRX licenses; if Santa Cruz fails to take any such action, the APA specifically granted Novell the right to take these actions on behalf of Santa Cruz. Novell retained the right to veto Santa Cruz's attempts to amend SVRX licenses, subject to two exceptions, as noted below. Novell also retained the right to veto Santa Cruz's attempts to enter into new SVRX licenses, subject to one exception, as noted below.

19.     The APA gave Novell the right to confirm Santa Cruz's compliance with its contractual obligations under the SVRX licensing program. The APA explicitly provided that Novell "shall be entitled to conduct periodic audits" of Santa Cruz "concerning all royalties and payments due to Seller hereunder or under the SVRX Licenses." The APA required Santa Cruz to "diligently seek to collect all such royalties, funds and other amounts when due" and to "investigate and perform appropriate auditing and enforcement." The APA also required Santa Cruz to provide Novell monthly reports detailing the SVRX royalties it received.

20.     Novell and Santa Cruz were the only parties to the APA and its Amendments. SCO was not a party to the APA or its Amendments. SCO was originally incorporated on August 21, 1998 as a company called Caldera Systems, a developer and provider of Linux-based business solutions. SCO purports to be the successor in interest to Santa Cruz under the APA and its Amendments. This dispute is about Novell's rights under the APA and whether SCO breached its obligations as the alleged successor of Santa Cruz.

**D.     Novell's Ownership of the UNIX Copyrights**

21.     The APA transferred certain assets from Novell to Santa Cruz. However, as specified by Section V.A of Schedule 1.1(b) to the APA, certain assets were excluded from the transfer. Among the "Excluded Assets" from the APA asset transfer were "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare."

22.     The APA as executed on September 19, 1995 therefore does not transfer any copyrights.

23.     Novell and Santa Cruz later executed Amendment No. 2 to the APA. Amendment No. 2 modifies Section V.A of Schedule 1.1(b) to provide that Excluded Assets include:

14

> All copyrights and trademarks, except for the copyrights
> and trademarks owned by Novell as of the date of the
> Agreement required for SCO to exercise its rights with
> respect to the acquisition of UNIX and UnixWare
> technologies.

24.    Neither Amendment No. 2 nor the APA as modified by Amendment No. 2 were

intended to, nor do they actually, transfer ownership of the UNIX or UnixWare copyrights

owned by Novell at the time of the APA and its Amendments ("UNIX Copyrights").

25.    Neither Amendment No. 2 nor the APA as modified by Amendment No. 2 qualify

as "an instrument of conveyance, or a note or memorandum of the transfer" under 17 U.S.C.

§ 204(a) for at least the following reasons:

a.    Amendment No. 2 merely amends the schedule of excluded assets and

therefore does not, itself, constitute a transfer of any asset.

b.    Neither Amendment No. 2 nor the modified APA identifies "the

copyrights and trademarks owned by [Novell] as of the date of the

Agreement required for Santa Cruz to exercise its rights with respect to the

acquisition of UNIX and UnixWare technologies."

c.    Neither Amendment No. 2 nor the modified APA contains any language

suggesting a contemporaneous transfer of any copyright. To the contrary,

the APA provides only that certain assets "will" be transferred.

d.    Neither Amendment No. 2 nor the modified APA provides a date for any

purported transfer of copyrights.

26.    Title to the UNIX Copyrights therefore remains with Novell.

*15*

27.    By and during early 2003, SCO repeatedly asked Novell to transfer the UNIX Copyrights to SCO. In doing so, SCO conceded that title to the UNIX Copyrights remains exclusively with Novell. Novell rejected all of SCO's requests.

**E.    The Sale of Certain Santa Cruz Assets to Caldera Systems**

28.    During the second quarter of its fiscal year 2000, Santa Cruz restructured its business into three divisions: the Server Software division, the Professional Services division and the Tarantella division. The Server Software division included Santa Cruz's UNIX-related business.

29.    On August 1, 2000, Santa Cruz entered into an agreement with Caldera Systems, under which Caldera Systems acquired Santa Cruz's Server Software and Professional Services divisions. With the acquisition, Caldera Systems planned to add Santa Cruz's UNIX server solutions and services to its Linux business.

30.    On May 7, 2001, pursuant to an amendment to the agreement between Santa Cruz and Caldera Systems, Caldera International ("Caldera") was formed as a holding company to own Caldera Systems, including the assets, liabilities and operations of Santa Cruz's Server Software and Professional Services divisions.

**F.    Caldera's Financial Woes and Its Shift in Business Strategy Under New Leadership**

31.    Prior to Caldera's acquisition of Santa Cruz's Server Software and Professional Services divisions, substantially all of Caldera's revenue was derived from sales of Linux products and services. However, Caldera had been unsuccessful in creating a profitable Linux business.

32.    After the acquisition of Santa Cruz's Server Software and Professional Services divisions, most of Caldera's revenue came from UNIX products and services, including 90% of

16

Caldera's total revenue at the end of fiscal year 2001 and 95% of Caldera's total revenue at the end of fiscal year 2002. But Caldera's revenue from the sale of UNIX-based products declined in the fiscal quarters following the acquisition. Caldera experienced significant decreases in actual and forecasted revenue of the acquired Santa Cruz operations.

33.    Caldera incurred significant financial losses during its fiscal years 2000, 2001 and 2002. Caldera suffered losses from operations totaling $32 million in 2000, $133 million in 2001 and $24 million in 2002.

34.    In June 2002, Caldera hired Darl McBride as its President and Chief Executive Officer. Mr. McBride was responsible for the company's strategic direction and planning.

35.    On our about the time of Mr. McBride's arrival at Caldera, Caldera began to pursue a new business strategy for the company, launching a rebranding effort of its products and services as well as its corporate image.

36.    On August 26, 2002, Caldera announced that it would change its name to The SCO Group, Inc. ("SCO"), pending shareholder approval. On or about that time, Caldera then began doing business as SCO. Caldera soon thereafter changed its trading symbol on the NASDAQ Stock Exchange from "CALD" to "SCOX." Caldera's name change was formalized on May 16, 2003, when Caldera's shareholders approved an amendment to Caldera's certificate of incorporation that changed the company's name to SCO.

37.    As part of Caldera's rebranding efforts and shift in business strategy, Caldera purportedly initiated a review of its intellectual property rights. This effort culminated in the launching of a licensing initiative, which it called SCOsource, in January 2003. SCOsource, as described in further detail below, was an effort by Caldera to expand the revenue base of a company that had never before been profitable.

17

**G.     SCO's Requests to Novell To Assist in a Licensing Scheme and To Transfer the UNIX Copyrights**

38.     In late 2002, SCO repeatedly contacted Novell in connection with SCO's soon-to-be-announced SCOsource campaign. SCO requested copies of certain documentation concerning rights to UNIX, including the agreement between Novell and Santa Cruz. SCO also expressed its interest in a campaign to assert UNIX infringement claims against users of Linux. SCO asked Novell to assist SCO in a Linux licensing program, under which SCO contemplated extracting a license fee from Linux end users to use the UNIX intellectual property purportedly contained in Linux. Novell refused to participate.

39.     In aid of its scheme, SCO requested that Novell transfer its UNIX Copyrights to SCO and thereby acknowledged that it did not own the UNIX Copyrights. SCO contacted Novell on multiple occasions by and during early 2003. For example, SCO's CEO, Darl McBride, repeatedly contacted Novell and asked Novell to amend the Novell-Santa Cruz agreement to give SCO the UNIX Copyrights. Novell rejected all of these requests.

**H.     SCO's Scheme To Claim Ownership of the UNIX Copyrights**

40.     Notwithstanding Novell's rejections, SCO embarked on an aggressive campaign in which it falsely asserted ownership over these same copyrights via public statements, a series of letters to Linux end users, several lawsuits against Linux distributors and end users, and a licensing program purporting to offer SCO's Intellectual Property Licenses for Linux.

41.     SCO's misleading and wrongful public assertions of ownership include the following:

     a.     On March 7, 2003, SCO stated in a press release, "In 1995, SCO purchased the rights and ownership of UNIX and UnixWare that had been

18

originally owned by AT&T. This included source code, source

documentation, software development contracts, licenses and other

intellectual property that pertained to UNIX-related business. . . . 'SCO is

in the enviable position of owning the UNIX operating system,' said Darl

McBride, president and CEO, SCO."

b.    On May 14, 2003, SCO stated in a press release, "[SCO], the owner of the

UNIX operating system, today warned that Linux is an unauthorized

derivative of UNIX and that legal liability for the use of Linux may extend

to commercial users."

c.    On June 6, 2003, SCO stated in a press release, "[SCO], the owner of the

UNIX® operating system, today confirmed its previously stated ownership

of UNIX copyrights. As SCO has consistently maintained, all rights to the

UNIX and UnixWare technology, including the copyrights, were

transferred to SCO as part of the Asset Purchase Agreement between

Novell and SCO dated September 19, 1995. Any question of whether the

UNIX copyrights were transferred to SCO under the Asset Purchase

Agreement was clarified in Amendment No. 2 to the Asset Purchase

Agreement dated October 16, 1996.

'This amendment simply confirms SCO's long stated position that it owns

all copyrights associated with the UNIX and UnixWare businesses,' said

Chris Sontag, senior vice president and general manager, SCOsource

intellectual property division, SCO.

. . .

19

'SCO is the owner of the UNIX operating system, *as well as all of the*
*UNIX* contracts, claims and copyrights necessary to conduct that
business,' said Sontag. 'None of the litigation we are currently involved
with asserts claims based on copyrights. Because others have called into
question SCO's ownership of the UNIX and UnixWare copyrights, we are
satisfied that we have now proven without a doubt that SCO owns those
copyrights.'"

d.    During at least June and July, 2003, SCO wrongfully registered copyrights
in UNIX and UnixWare releases owned by Novell. These registrations
related to UNIX System V release 3.0, UNIX System V release 3.1, UNIX
System V release 3.2, UNIX System V release 3.2/386, UNIX System V
release 4.0, UNIX System V release 4.1, *UNIX System V release 4.1ES,*
UNIX System V release 4.2, UNIX System V release 4.2MP, and
UnixWare 7.1.3.

e.    On January 13, 2004, SCO stated, "[SCO] today reiterated its ownership
of UNIX intellectual property, source code, claims and copyrights and has
made all of the documents surrounding the companies' ownership of
UNIX and UnixWare available for public viewing at
www.sco.com/novell."

f.    On January 28, 2004, in its Form 10-K filed with the United States
Securities and Exchange Commission, SCO stated, "We own the UNIX
operating system and are a provider of UNIX-based products and services.
. . .

20

We acquired our rights to the UNIX source code and derivative works and
other intellectual property rights when we purchased substantially all of
the assets and operations of the server and professional services groups of
The Santa Cruz Operation, Inc., in May 2001. The Santa Cruz Operation
(now known as Tarantella, Inc.) had previously acquired such UNIX
source code and other intellectual property rights from Novell in
September 1995, which were initially developed by AT&T Bell Labs.
Through this process, we acquired all UNIX source code, source code
license agreements with thousands of UNIX vendors, all UNIX
copyrights, all claims for violation of the above mentioned UNIX licenses
and copyrights and other claims, and the control over UNIX derivative
works . . . ."

42.     As part of SCO's scheme to claim ownership of the UNIX copyrights, SCO has
falsely claimed that Novell acquiesced to SCO's claims. For example, on July 21, 2003, Darl
McBride stated in a public interview:

|  |  |
|---|---|
| Interviewer: | Well, Novell would say that you actually don't own those copyrights fully. |
| McBride: | Yeah, well, the Novell thing, they, they came out and made a claim that held up for about four days and then we put that one to bed. If you go talk to Novell today, I'll guarantee you what they'll say, which is they don't have a claim on those copyrights. |

43.     Novell has not acquiesced to SCO's claims, as recited in SCO's own Amended
Complaint. (Amended Complaint ¶ 19(d)-(e).) To the contrary, Novell was vigorously

contesting those claims in private correspondence with SCO at the very same time SCO was publicly claiming otherwise. For example:

    a.    On May 12, 2003, SCO's CEO Darl McBride sent Novell a letter asserting that it owned the UNIX copyrights and that Linux end users were *infringing those copyrights.*

    b.    On May 28, 2003, Novell's CEO, Jack Messman, responded by letter, asserting in no uncertain terms that "SCO is not the owner of the UNIX copyrights."

    c.    *After SCO registered its claim to the UNIX copyrights with the U.S. Copyright Office, Novell's General Counsel, Joseph LaSala wrote to SCO, again disputing its claim to ownership of the copyrights. In his August 4, 2003, letter, LaSala stated, "We dispute SCO's claim to ownership of these copyrights."*

    44.    In September and October 2003, Novell attempted to protect its rightful ownership of the UNIX Copyrights, and to correct SCO's erroneous registrations claiming ownership, by filing its own copyright registrations.

**I.**    ***SCO's Scheme To Extract Licensing Fees from Novell, the Linux Community and UNIX Vendors***

    45.    A significant aspect of SCO's rebranding efforts and new business strategy was its adoption of a scheme to extract "licenses" from the UNIX and Linux communities based on claims to own intellectual property specifically reserved to Novell, i.e., the UNIX Copyrights. SCO proceeded on its own in this scheme after Novell rebuffed SCO's overtures to participate.

46.    On January 22, 2003, SCO publicly announced its licensing scheme as part of its "SCOsource" program. In connection with this announcement, SCO's CEO, Darl McBride, commented that "SCO owns much of the core UNIX intellectual property, and has full rights to license this technology and enforce the associated patents and copyrights."

47.    Under the SCOsource licensing program, SCO seeks to enter into license agreements with UNIX vendors and offers Intellectual Property Licenses to Linux end users ("Intellectual Property Licenses"). The purported purpose of these licenses is to allow UNIX vendors to use SCO's UNIX intellectual property and to permit Linux end users to "properly compensate us for our UNIX intellectual property as currently found in Linux." One term of SCO's Intellectual Property Licenses for Linux is that licensees "will be held harmless against past and future copyright violations based on their use of SCO's intellectual property . . . in Linux distributions . . . ."

48.    SCO charges a sizeable licensing fee for SCO's Intellectual Property Licenses for Linux. For example, for a server with 8 CPUs, the initial licensing fee is $4,999, with $1,079 payable every year after that.

49.    As part of its SCOsource initiative, SCO filed a lawsuit against IBM on March 7, 2003, asserting, among other things, UNIX Copyrights that SCO does not own. SCO has alleged that it owns the UNIX Copyrights and that IBM's contributions to Linux and use of Linux infringe these copyrights.

50.    As part of the SCOsource program, SCO entered into at least two license agreements. These licenses related to the use of UNIX technology by the licensees. The first of these licenses was with Sun Microsystems, Inc. ("Sun"). The second license was with Microsoft Corporation ("Microsoft") and purportedly covers Microsoft's UNIX compatibility products. On

23

information and belief, through these licenses SCO broadened the rights of Sun and Microsoft to use SVRX code.

51.    The Sun and Microsoft licenses resulted in significant revenue for SCO and produced the first profitable quarter in SCO's history. During the fiscal quarter ended April 30, 2003, SCO recognized $8,250,000 in revenue from these two new licenses. In addition, these licenses accounted for $25,846,000 of SCO's revenue in fiscal year 2003.

52.    As part of the SCOsource program, in May 2003, SCO sent letters to 1,500 of the world's largest corporations threatening suit based on its alleged ownership of the UNIX Copyrights ("End User Letters"). On May 12, 2003, SCO sent one of these letters to IBM, and sent another letter to Novell. On information and belief, all of the End User Letters were nearly identical in content to the IBM and Novell letters.

53.    In the End User Letters, SCO made the false and misleading statement that "SCO holds the rights to the UNIX operating system software originally licensed by AT&T to approximately 6,000 companies and institutions worldwide (the 'UNIX Licenses')."

54.    In the End User Letters, SCO also made the unsupported assertion that "We [SCO] have evidence that portions of UNIX System V software code have been copied into Linux and that additional other portions of UNIX System V software code have been modified and copied into Linux, seemingly for the purposes of obfuscating their original source."

55.    After setting forth these alleged facts in the End User Letters, SCO erroneously concluded that "Linux infringes on our UNIX intellectual property and other rights." According to SCO, end users of Linux were liable for this alleged infringement whether or not they participated in any contribution of UNIX System V software code into Linux.

24

56.    As set forth in detail above, besides sending the End User Letters, SCO has made numerous public statements that it owns the UNIX Copyrights and that end users of Linux are liable for infringement of those copyrights. For instance, contrary to the express terms of the APA, SCO has stated on its website that "only SCO is in a position to license the use of this infringing intellectual property." The Court itself has noted SCO's "barrage of public statements about pursuing alleged infringers of its alleged intellectual property." *The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK, Memorandum Decision and Order at 5 (Feb. 9, 2004).

57.    Shortly after the inception of its letter writing campaign, SCO brought suit against Autozone and Daimler Chrysler, both Linux end users. In these lawsuits, SCO has made substantially the same allegations as set forth in its letters. In the Autozone lawsuit, SCO has alleged that "[Autozone] uses one or more versions of the Linux operating system that infringe on SCO's exclusive rights in its proprietary UNIX System V operating system technology." In the Daimler-Chrysler lawsuit, SCO has alleged that Daimler-Chrysler's use of the Linux operating system violates the UNIX license between Daimler-Chrysler and SCO.

58.    Novell has established a Linux Indemnification Program under which it offers indemnification for copyright infringement claims made by third parties against qualifying, registered Novell customers of the SUSE LINUX Enterprise Server 8, SUSE LINUX Enterprise Server 9, SUSE LINUX Retail Solution, and Novell Linux Desktop products.

59.    SCO has continued to pursue its SCO source initiative with other industry participants that it believes will lead to additional licensing agreements. On information and belief, via this campaign, SCO has convinced several Linux end users to participate in its licensing program, obtain purported licenses to use "SCO's intellectual property contained in

Linux," and thereby avoid suit by SCO. In fiscal years 2004 and 2005, SCO generated

additional revenue from sales of its SCOsource Intellectual Property Licenses.

**J.      SCO's Breaches of the Asset Purchase Agreement**

60.      SCO's misguided campaign has led SCO, as the alleged successor of Santa Cruz,

to breach its obligations under the APA and its Amendments.

61.      Novell has performed its obligations under the APA and its Amendments.

62.      SCO or Santa Cruz has received adequate consideration for its duties under the

APA and its Amendments.

**Breach of Section 1.2(b)'s and 1.2(f)'s Audit Provisions**

63.      Section 1.2(b) of the APA gives Novell broad audit rights relating to the

administration of the SVRX licensing program. It reads in pertinent part:

> [Novell] shall be entitled to conduct periodic audits of
> [SCO] concerning all royalties and payments due to
> [Novell] hereunder or under the SVRX Licenses, provided
> that [Novell] shall conduct such audits after reasonable
> notice to [SCO] and during normal business hours and shall
> not be entitled to more than two (2) such audits per year.

64.      Further, section 1.2(f) of the APA obligates SCO to provide Novell monthly

reports detailing the SVRX royalties that SCO received.

65.      On July 11, 2003 Novell notified SCO that it intended to conduct an audit

beginning on August 18, 2003 covering the period beginning January 1, 1998 through June 30,

2003.

66.      By reply correspondence dated July 17, 2003, SCO accepted Novell's right to an

audit. Novell's audit began during the week of August 25, 2003.

67.    As part of Novell's aforementioned audit rights, on November 21, 2003, Novell sought information and documentation relating to:

a.    Any amendments and modifications to SVRX licenses, and in particular the amendments to the Sun and Microsoft SVRX licenses. Novell specifically requested (1) "copies of the Sun and Microsoft amendments to verify SCO's compliance" with the APA and (2) "a detailed explanation of SCO's position" if SCO contends that either of the two exceptions to the prohibition on unilateral amendments by SCO were applicable.

b.    Any buy-out of SVRX licenses, and in particular any information concerning any buy-out of Sun's and Microsoft's royalty obligations under their SVRX licenses. Novell specifically requested that SCO identify any potential buy-out transactions so that Novell could verify SCO's compliance with the APA.

c.    Any new SVRX licenses, and in particular SCO's Intellectual Property Licenses for Linux. Novell specifically requested (1) "copies of all SCO Intellectual Property Licenses for Linux, and any other agreements connected with attempts by SCO to enter into new SVRX Licenses, so Novell can verify SCO's compliance" with the APA and (2) "a detailed explanation of SCO's position" if SCO contends that the exception to the prohibition on new SVRX licenses by SCO was applicable.

d.    Any SVRX to UnixWare Conversions. Novell specifically requested that SCO (1) identify and provide documentation for any allegedly valid conversions and (2) "explain in detail" how the alleged conversion

27

complies with the APA and (3) provide "a detailed explanation of SCO's
position" if SCO contends that any exception to the prohibition on
conversion by SCO was applicable.

68.     Novell renewed its November 21, 2003 demand on December 29, 2003 and again
on February 4, 2004.

69.     On February 5, 2004, SCO conveyed its refusal to provide at least the information
identified in subparagraphs a, b, and c of Paragraph 67, above.

70.     On March 1, 2004, Novell again contacted SCO for the above categories of
information: "In order to complete our audit, we need the Sun, Microsoft and any other
Intellectual Property Licenses for Linux.  Stated more categorically, we need all agreements in
which SCO purported to grant rights with respect to Unix System V."  Novell noted that SCO's
Intellectual Property Licenses for Linux appeared to be SVRX Licenses since they purported to
grant rights relating to UNIX System V or UnixWare.

71.     Novell again sent a letter to SCO on April 2, 2004 urging a response.

72.     On November 17, 2004, Novell contacted SCO yet again:

> We have communicated with SCO several times about our
> concerns with SCO's handling of UNIX licenses, including
> the license with Sun.  In these communications, we have
> noted that our audit rights under the Asset Purchase
> Agreement require SCO to provide Novell with copies of
> any UNIX agreements (including amendments) SCO has
> reached with Sun.  We have sent you letters twice on this
> issue (in March and April 2004), and have not received an
> adequate response.
>
> . . .
>
> Accordingly, we must once again insist that you provide us
> with copies of any agreements with Sun (including

28

> amendments) that relate to UNIX. We would appreciate a
> response by Friday, December 3, 2004.

73.    Despite Novell's repeated requests, SCO has never provided copies of the Sun

and Microsoft licenses, or amendments, or copies of SCO's Intellectual Property Licenses for

Linux or other agreements connected with attempts by SCO to enter into new or amended SVRX

licenses. SCO also never provided any explanation why SCO was not obligated under the APA

to seek Novell's consent to amend or otherwise enter into new SVRX agreements. As a result,

Novell has been unable to verify SCO's compliance with the APA, as Novell is entitled under

the APA.

### Breach of Obligation To Remit Royalties Under Sections 1.2(b) and 4.16(a)

74.    Sections 1.2(b) and 4.16(a) of the APA obligate SCO to remit 100% of "all

royalties, fees and other amounts due under all SVRX Licenses" to Novell. "SVRX Licenses"

are in turn defined to include "[a]ll contracts relating to" the various UNIX System releases and

auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1.

Under the APA, Novell has "all right, title and interest to the SVRX Royalties, less the 5% fee

for administering the collection thereof."

75.    SCO has failed to remit to Novell all royalties owed under §§ 1.2(b) and 4.16(a)

of the APA.

76.    As SCO admitted in its February 5, 2004 letter to Novell, SCO has entered into

"new" agreements with Sun and Microsoft.

77.    On information and belief, these new agreements are "contracts relating to" the

various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and

Attachment A to Amendment No. 1. The new agreements are therefore SVRX Licenses under the APA.

78.    SCO *has not remitted any royalties from its new SVRX Licenses with Sun or Microsoft.*

79.    In addition, SCO has entered into Intellectual Property Licenses with a variety of parties. For example, on March 1, 2004, SCO announced an intellectual property licensing agreement with "EV1Servers.Net" that purportedly grants that company a site license to use SCO's intellectual property on all Linux servers managed by EV1Servers.Net in its hosting facilities.

80.    On information and *belief, SCO's Intellectual Property Licenses are* "contracts relating to" the various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1. The Intellectual Property Licenses are therefore SVRX Licenses under the APA. SCO has not remitted any royalties from these SVRX Licenses.

81.    Among other changes to the APA, Amendment No. 1 added § 1.2(e), which provides that SCO has a right to retain all "source code right to use fees attributable to new SVRX Licenses approved by [Novell] pursuant to Section 4.16(b)."

82.    SCO has neither sought nor obtained Novell's approval to enter into any new SVRX license. Therefore, none of SCO's new SVRX Licenses fall within § 1.2(e)'s exception to SCO's general duty to remit 100% of SVRX royalties to Novell.

### Breach of Section 4.16(b)'s Obligations

83.    Section 4.16(b) of the APA reads in pertinent part:

30

> In addition, at [Novell's] sole discretion and direction,
> [SCO] shall amend, supplement, modify or waive any
> rights under, or shall assign any rights to, any SVRX
> License to the extent so directed in any manner or respect
> by [Novell].

84.    SCO has threatened to cancel or terminate various parties' SVRX licenses and has purported to cancel or terminate certain parties' SVRX licenses. For example, on March 6, 2003, SCO sent a letter to IBM threatening to cancel or terminate IBM's SVRX license. On May 29, 2003, SCO sent a similar letter to Sequent Computer Systems ("Sequent").

85.    SCO subsequently purported to cancel or terminate IBM's SVRX licenses as of June 13, 2003. On August 11, 2003, SCO sent a letter to Sequent similarly purporting to terminate Sequent's SVRX licenses.

86.    SCO did not obtain Novell's prior written consent to cancel or terminate either SVRX license. Accordingly, on June 9, 2003, and again on October 7, 2003, Novell directed SCO to waive any purported right SCO claimed to have to terminate IBM's SVRX licenses. On February 6, 2004, Novell similarly directed SCO to waive certain of its purported rights under the IBM and Sequent SVRX licenses.

87.    Following SCO's failure to take the actions identified in the preceding paragraphs, Novell elected to take actions on SCO's behalf, as Novell is empowered to do by § 4.16(b). Section 4.16(b) of the APA provides in pertinent part:

> In the event that [SCO] shall fail to take any such action
> concerning the SVRX Licenses as required herein, [Novell]
> shall be authorized, and hereby is granted, the rights to take
> any action on [SCO's] own behalf.

88.    After SCO conveyed its refusal on February 11, 2004 to waive its purported rights against Sequent, Novell on the same day waived SCO's purported right to revoke any rights

31

under Sequent's SVRX licenses. Similarly, on October 11, 2003, Novell waived certain of

SCO's purported rights under IBM's SVRX licenses.

89.    SCO refuses to acknowledge Novell's right to take such actions on SCO's behalf.

90.    Under Section 4.16(b) of the APA, SCO shall not amend or modify any SVRX

license "without the prior written consent of [Novell]." As modified by Amendment 1, Section

4.16(b) of the APA provides further that:

> Notwithstanding the foregoing, [SCO] shall have the right
> to enter into amendments of the SVRX Licenses (i) as may
> be incidentally involved through its rights to sell and
> license UnixWare software or the Merged Product .. or
> future versions of the Merged Product, or (ii) to allow a
> licensee under a particular SVRX License to use the source
> code of the relevant SVRX product(s) on additional CPU's
> or to receive an additional distribution, from [SCO], of
> such source code.
>
> In addition, [SCO] shall not, and shall have no right to,
> enter into new SVRX Licenses except in the situation
> specified in (i) of the preceding sentence as otherwise
> approved in writing in advance by [Novell] on a case by
> case basis.

91.    On information and belief, SCO has entered into new SVRX Licenses with Sun,

Microsoft and others (through, for example, SCO's Intellectual Property Licenses with Linux

end users or UNIX vendors), or otherwise amended the Sun and Microsoft SVRX licenses.

92.    SCO never sought advance approval from Novell to enter into these new SVRX

Licenses or amendments thereof. SCO also never explained why under the APA it was not

obligated to obtain Novell's advance approval.

93.    Under the APA, SCO also had no authority to enter into the Sun and Microsoft

SVRX Licenses, or the Intellectual Property Licenses with Linux end users and UNIX vendors.

32

## FIRST CLAIM FOR RELIEF
### (Slander of Title)

94.    Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

95.    SCO made its public statements claiming ownership of the UNIX Copyrights, and improperly registered its claim to UNIX Copyrights, with knowledge that title to these copyrights remains with Novell.

96.    SCO made such statements maliciously, in bad faith, and with intentional disregard for the truth.

97.    SCO made such statements with the intent to cause customers and potential customers of Novell not to do business with Novell, to slander and impugn the ownership rights of Novell in UNIX and UnixWare, and to attempt, in bad faith, to block Novell's ability to exercise its copyrights therein.

98.    SCO's slander of Novell's title has resulted in special damages including, *inter alia*, Novell's costs and fees in preparing and filing copyright registrations and declarations correcting SCO's erroneous registrations claiming ownership of Novell's intellectual property and in prosecuting this action.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract:  §§ 1.2(b) and 1.2(f) of the Asset Purchase Agreement)

99.    Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

100.    Pursuant to its audit rights under the APA, Novell requested certain information from SCO to verify SCO's compliance with the APA, including:

33

a.   Any amendments and modifications to SVRX licenses, and in particular the amendments to the Sun and Microsoft SVRX licenses, including a copy of these amendments and a detailed explanation of SCO's position if SCO contends that either of the two exceptions to the prohibition on unilateral amendments by SCO was applicable;

b.   Any buy-out or potential buy-out of SVRX licenses, and in particular any information concerning any buy-out of Sun and Microsoft's royalty obligations under their SVRX licenses;

c.   Any new SVRX licenses, and in particular SCO's new SVRX agreements with Sun and Microsoft and SCO's Intellectual Property Licenses with Linux end users or UNIX vendors, including copies of these agreements and a detailed explanation of SCO's position if SCO contends that the exception to the prohibition on new SVRX Licenses by SCO was applicable; and

d.   Any SVRX to UnixWare Conversions, including documentation for any allegedly valid conversions, a detailed explanation of how the alleged conversion complies with the APA and a detailed explanation of SCO's position if SCO contends that any of the exceptions to the prohibition on conversion by SCO were triggered.

101.   Under the APA, SCO was obligated to provide all this information to Novell. SCO substantially and materially breached §§ 1.2(b) and 1.2(f) of the APA by refusing to do so.

102.   On information and belief, SCO's breaches of §§ 1.2(b) and 1.2(f) of the APA have caused Novell damage in an amount to be later proven. In addition, these breaches have

34

caused Novell special damages, including, *inter alia*, the costs associated with making repeated requests for information necessary to confirm SCO's compliance with its contractual obligations to administer SVRX licensing program, conducting further reviews of the limited information provided by SCO, attempting to estimate royalties owing based upon incomplete information provided, and prosecuting this action.

103.     The legal remedies available to Novell for future failures by SCO to comply with its audit obligations under §§1.2(b) and 1.2(f) of the APA may be inadequate.  Therefore, Novell seeks an order from this Court compelling SCO's specific performance of its aforementioned audit obligations under §§1.2(b) and 1.2(f).

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract: §§ 1.2(b) & 4.16(a) of the Asset Purchase Agreement)**

104.     Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

105.     SCO has substantially and materially breached §§ 1.2(b) and 4.16(a) of the APA by failing to remit all royalties owed to Novell, including any royalties SCO obtained from its new SVRX Licenses with Sun or Microsoft or from its Intellectual Property Licenses with Linux end users or UNIX vendors.

106.     On information and belief, SCO's breaches of §§ 1.2(b) & 4.16(a) of the APA have caused Novell damage in an amount to be later proven.  These breaches have caused Novell special damages, including, *inter alia*, the costs associated with attempting to ascertain from SCO the royalty amounts due to Novell, and with prosecuting this action.

107.     The legal remedies available to Novell for future failures by SCO to comply with its royalty obligations under §§ 1.2(b) & 4.16(a) of the APA may be inadequate.  Therefore,

35

Novell seeks an order from this Court compelling SCO's specific performance of its remittance obligations under §§ 1.2(b) & 4.16(a) of the APA.

108.    In addition, Novell seeks an order from the Court imposing a constructive trust on revenues received by SCO from its new SVRX Licenses with Sun and Microsoft and from its Intellectual Property Licenses with Linux end users and UNIX vendors. Creation of this trust is necessary to protect Novell from SCO's wrongful retention of monies owing Novell due to SCO's failure to perform its remittance obligations under §§ 1.2(b) & 4.16(a) of the APA. As set forth above, Novell owns "all right, title and interest" to these royalties, less SCO's 5% administrative fee.

109.    This constructive trust should be imposed for the additional reason that SCO is quickly dissipating its assets. On information and belief, SCO's revenues are declining, its operational losses are increasing and its cash is dwindling quickly. SCO expects to have only $11 million in cash remaining for its business operations as of October 31, 2005, just a fraction of the revenue it purportedly generated as a result of its new SVRX Licenses with Sun and Microsoft.

110.    Novell also seeks an order from the Court attaching SCO's assets pending adjudication of this claim because SCO is quickly dissipating its assets.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Relief: Rights and Duties under § 4.16(b) of the
### Asset Purchase Agreement)

111.    Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

112.    Under § 4.16(b) of the APA, Novell has the right, at its sole discretion, to direct SCO to waive any rights under any SVRX Licenses. In the event that SCO fails to take any such

action at Novell's direction, § 4.16(b) gives Novell the right to take any action on SCO's own behalf. SCO refused to perform its corresponding duties under § 4.16(b) and substantially and materially breached § 4.16(b) by:

    a.    Purporting to cancel or terminate SVRX licenses, including the IBM and Sequent SVRX licenses, and then refusing to waive these purported rights as directed by Novell; and

    b.    Refusing to recognize actions taken by Novell on SCO's behalf pursuant to § 4.16(b), including Novell's waiver of SCO's purported claims against IBM and Sequent.

113.    Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that:

    a.    Under § 4.16(b) of the APA, Novell is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM, Sequent and other SVRX licensees;

    b.    Under § 4.16(b) of the APA, Novell is entitled to waive on SCO's behalf SCO's purported claims against IBM, Sequent and other SVRX licensees, when SCO refuses to act as directed by Novell; and

    c.    SCO is obligated to recognize Novell's waiver of SCO's purported claims against IBM and Sequent.

114.    Under § 4.16(b) of the APA, SCO is obligated to seek Novell's prior approval to enter into new SVRX Licenses or amendments of SVRX Licenses, subject to limited exception. SCO did not perform its corresponding duties under § 4.16(b) and substantially and materially breached § 4.16(b) by:

      a.      Purporting to enter into new SVRX licenses without Novell's prior

approval, including agreements with Sun, Microsoft and other licensees of

SCO's Intellectual Property Licenses, without demonstrating that a limited

exception to the prohibition against new licenses by SCO was applicable;

and

      b.      Purporting to enter into amendments of SVRX Licenses without Novell's

prior approval, including agreements with Sun, Microsoft and other

licensees of SCO's Intellectual Property Licenses, without demonstrating

that a limited exception to the prohibition against amendments by SCO

was applicable.

115.    Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that:

      a.      Under § 4.16(b) of the APA, SCO was obligated to seek Novell's prior

approval to enter into new SVRX licenses or amendments to SVRX

licenses, including SCO's agreements with Sun, Microsoft and other

licensees of SCO's Intellectual Property Licenses; and

      b.      Under § 4.16(b) of the APA, SCO is obligated to seek Novell's prior

approval to enter into new SVRX licenses or amendments to SVRX

licenses, unless SCO can demonstrate to Novell that an exception to the

prohibitions against new licenses and amendments by SCO is applicable.

116.     Novell pleads in the alternative for a declaration pursuant to 28 U.S.C. § 2201

that SCO had no authority to enter into the Sun and Microsoft SVRX Licenses, as well as the

Intellectual Property Licenses with Linux end users and UNIX vendors.

38

## FIFTH CLAIM FOR RELIEF
### (Declaratory Relief: Rights and Obligations Under APA's Covenant of Good Faith and Fair Dealing)

117.    Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

118.    The APA incorporates a covenant of good faith and fair dealing whereby each party agrees to work with the other to fulfill the purposes of the contract.

119.    The APA granted Novell broad audit rights to verify SCO's compliance with the APA, as well as rights to approve (subject to limited exception) new SVRX licenses and amendments to SVRX licenses. The APA also granted Novell the right to direct SCO to amend, supplement, modify or waive any rights under any SVRX license, and to act on SCO's behalf if SCO fails to take such direction.

120.    Under the APA, SCO was obligated to administer the SVRX License Program, subject to the additional duties provided in §§ 1.2(b), 1.2(f) and 4.16. SCO failed to abide by these obligations under the APA and therefore substantially and materially breached the APA's covenant of good faith and fair dealing.

121.    Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that SCO is obligated under the APA to:

  a.    Comply with Novell's exercise of its audit rights under §§ 1.2(b) and 1.2(f) by providing information requested concerning new SVRX licenses and amendments to SVRX licenses;

  b.    Seek Novell's prior approval before entering into new SVRX licenses or amendments to SVRX licenses, or otherwise demonstrate to Novell that an

exception to the prohibition against new licenses or amendments by SCO
is applicable;

c.    Amend, supplement, modify or waive any rights under any SVRX License
to the extent so directed in any manner or respect by Novell in its sole
discretion; and

d.    Accept actions taken by Novell on SCO's behalf when SCO fails to take
such action in subparagraph c, above, as directed by Novell.

**SIXTH CLAIM FOR RELIEF**
**(Restitution/Unjust Enrichment)**

122.    Novell incorporates by reference all prior paragraphs as if they were set forth here
in full.

123.    SCO has been unjustly enriched by retaining in part or in full portions of all
SVRX Royalties to which Novell was entitled under the APA.

124.    In addition, SCO has been unjustly enriched by retaining a 5% administrative fee
for administering the SVRX License Program but having failed to fulfill its administrative
auditing duties under the APA.

125.    Novell seeks restitution of all monies constituting SCO's unjust enrichment.

126.    Novell also seeks an order from the Court imposing a constructive trust on
revenues SCO unjustly received by failing to perform its administrative auditing and remittance
obligations under the APA.

**SEVENTH CLAIM FOR RELIEF**
**(Accounting)**

127.    Novell incorporates by reference all prior paragraphs as if they were set forth here
in full.

40

128.    Under the APA, Novell and SCO shared the stream of revenues from the SVRX licenses. In particular, SCO agreed to collect and pass through to Novell 100% of the SVRX royalties as defined and described in Section 4.16 hereof, while Novell agreed to pay an administrative fee of 5% of the SVRX Royalties. SCO was also responsible for making additional royalties and payments to Novell.

129.    Under section 1.2(b) of the APA, Novell was entitled to "periodic audits" of SCO concerning "all royalties and payments due to [Novell] . . . ." Under section 4.16(a), SCO was required to "diligently seek to collect all [SVRX] royalties . . . and [to] investigate and perform appropriate auditing and enforcement under [the SVRX] licenses." SCO was also required to provide regular audit reports to Novell regarding the SVRX royalties and the other royalties under section 1.2(f) of the APA.

130.    Under the APA, the amounts due Novell were determined and verified on the basis of the audits required under the APA. The right to an accounting of the royalties and payments due to Novell under the SVRX licenses and other provisions of the APA was inherent in the APA.

131.    SCO has failed to fulfill its duties under the audit provisions of the APA, and substantially and materially breached those provisions.

132.    Between the time the APA was concluded and the present, there have been hundreds of customers responsible for making royalty payments to SCO under the SVRX Licenses or under other agreements relating to royalty bearing products. SCO was obligated under the APA to receive and administer these royalty payments and share them with Novell.

133.    Under the APA, royalty payments under the SVRX licenses or other agreements relating to royalty bearing products were to be paid to Novell through SCO.  The amount of royalties was calculated through a specified formula.

134.    On information and belief, SCO has entered into new and/or amendments of the SVRX licenses with Sun and Microsoft, as well as with Linux end users under SCO's Intellectual Property Licenses. SCO failed to seek approval to enter into these licenses, and failed to explain why it was not obligated to obtain Novell's advance approval. Despite repeated requests by Novell to SCO to obtain the underlying information and documentation to verify SCO's APA compliance as part of the audit, SCO failed to report these licenses. This failure to report constitutes a substantial and material breach of the APA.

135.    On information and belief, SCO has received royalties under the SVRX licenses which it consummated with Sun and Microsoft, as well as from Linux end users under SCO's Intellectual Property Licenses. SCO has not passed on to Novell the required 100% of the royalties it has received under these licenses. This failure to pay royalties also constitutes a substantial and material breach of the APA.

136.    Because SCO has refused to provide Novell with a copy of these licenses, Novell is unable to allege with particularity the precise payment terms of the licenses or the corresponding amounts payable to Novell under these licenses pursuant to the APA. Without an accounting, it is therefore impracticable for Novell to name a fixed sum that is owing with respect to these licenses.

137.    Given the large number of customers currently responsible for making royalty payments to SCO under the SVRX licenses or under other agreements relating to royalty bearing products, the complexity of the formulas by which these royalty payments are calculated, and the fact that SCO receives directly all these royalty payments without immediate notice to Novell, it is impracticable for Novell to name a fixed sum that is owing with respect to these royalty payments without an accounting.

138.    Novell therefore seeks an accounting for monies owed to Novell under the APA.

### PRAYER FOR RELIEF

WHEREFORE, Novell prays for judgment as follows:

139.    For actual and special damages, in an amount to be proven at trial, caused by SCO's slander of Novell's title to the UNIX Copyrights;

140.    For punitive damages in an amount to be proven at trial for SCO's malicious and willful conduct in slandering Novell's title to the UNIX Copyrights as alleged herein;

141.    For preliminary and permanent injunctive relief requiring SCO to withdraw its improperly registered claims to UNIX Copyrights and to withdraw all other representations it has made regarding its purported ownership of the UNIX Copyrights;

142.    For actual and special damages, in an amount to be proven at trial, caused by SCO's breaches of §§ 1.2(b), 1.2(f) and 4.16 of the APA;

143.    For specific performance of future compliance with SCO's audit obligations under §§ 1.2(b) and 1.2(f) of the APA;

43

144.    For specific performance of future compliance with SCO's royalty obligations under §§ 1.2(b) and 4.16(a) of the APA;

145.    For an order imposing a constructive trust on the revenues remitted to SCO under new or amended SVRX Licenses;

146.    For an order attaching SCO's assets pending adjudication of Novell's contract claims;

147.    For declaratory relief pursuant to 28 U.S.C. § 2201 establishing Novell's rights and SCO's obligations under § 4.16(b), as well as SCO's authority to undertake certain actions under § 4.16(b);

148.    For preliminary and permanent injunctive relief enforcing Novell's contractual rights under the APA, including injunctive relief barring SCO from taking actions inconsistent with or in violation of §§ 1.2(b), 1.2(f), 4.16(a) and 4.16(b);

149.    For declaratory relief pursuant to 28 U.S.C. § 2001 establishing Novell's rights and SCO's obligations under the covenant of good faith and fair dealing in the APA;

150.    For an order of restitution of all monies constituting SCO's unjust enrichment;

151.    For an accounting of the royalties remitted to SCO under the SVRX licenses and the monies owing to Novell under the APA;

152.    For pre-judgment interest on any monetary recovery;

153.    For Novell's reasonable expenses and costs incurred, including without limitation attorneys' fees, in defending against the Amended Complaint; and

154.    For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Counterclaim-plaintiff Novell hereby demands a trial by jury of any and all issues triable by a jury.

DATED:        July 29, 2005.

ANDERSON & KARRENBERG

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon


MORRISON & FOERSTER LLP

Michael A. Jacobs
Kenneth W. Brakebill

45

I HEREBY CERTIFY that on July 29, 2005, I caused a true and correct copy of the

foregoing **NOVELL, INC.'S ANSWER AND COUNTERCLAIMS,** to be served via first-

class U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark R. Clements
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101


Kevin P. McBride
1299 Ocean Avenue, Suite 900
Santa Monica, California  90401


Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131


Robert Silver
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504


DATED:      July 29, 2005.

ANDERSON & KARRENBERG

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
**Attorneys for Defendant Novell, Inc.**

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                   Page 1
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Edward KREINIK, Plaintiff,
v.
SHOWBRAN PHOTO, INC., et al, Defendants.
**No. 02Civ.1172(RMB)(DF).**

Oct. 14, 2003.

Former employee filed suit against employer seeking
to enforce rights under Employee Retirement Income
Security Act (ERISA) plan and also claiming right to
unpaid commissions under state law. After employee
amended complaint, employer counterclaimed,
asserting state tort and statutory claims. Employee
sought leave to amend complaint to add two new
claims alleging that assertion of counterclaims
constituted unlawful retaliation. Employer opposed
amendment on ground of futility. The District Court,
Freeman, United States Magistrate Judge, held that:
(1) ERISA covered post-employment retaliation; (2)
employee stated prima facie cases of retaliation for
exercise of ERISA and Labor Law rights sufficient to
survive motion to dismiss, such that amendment
would not be futile; and (3) allowing amendment
would not unduly delay suit or prejudice employer.

Motion granted.

West Headnotes

**[1] Labor and Employment 231H ⟨⟩794**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk793 Pensions and Benefits
                231Hk794 k. In General. Most Cited
Cases
            (Formerly 255k30(6.10)   Master and
Servant)
Prima facie case of retaliation against employee for
exercising rights under ERISA required proof that:
(1) employee was engaged in a protected activity; (2)
employer was aware of employee's participation in
the protected activity;  (3) employer took adverse
employment action against employee;  and (4) a
causal connection existed between the protected
activity  and  the  adverse  action.      Employee

Retirement Income Security Act of 1974, § 510, 29
U.S.C.A. § 1140.

**[2] Labor and Employment 231H ⟨⟩796**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk793 Pensions and Benefits
                231Hk796 k. Protected Activities. Most
Cited Cases
            (Formerly 255k30(1.20)   Master and
Servant)
Employee's attempt to assert his right to employee
benefits under ERISA plainly constituted protected
activity against which interference was prohibited.
Employee Retirement Income Security Act of 1974,
§ 510, 29 U.S.C.A. § 1140.

**[3] Labor and Employment 231H ⟨⟩827**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk823   What   Constitutes   Adverse
Action
                231Hk827 k. Other Particular Actions.
Most Cited Cases
            (Formerly 255k30(6.10)   Master and
Servant)
Section of ERISA prohibiting retaliation for exercise
of  employee  rights  covered  post-employment
retaliation.  Employee Retirement Income Security
Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[4] Labor and Employment 231H ⟨⟩858**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(B) Actions
            231Hk858 k. Pleading. Most Cited Cases
            (Formerly 255k39(1) Master and Servant)
Because of their apparent potential for adverse
impact on former employee's livelihood, allegations
made in employer's counterclaims in employee's
ERISA suit involved type of adverse employment
action sufficient for ERISA retaliation claim to
survive at pleading stage; employer's claims alleged
trade  name  infringement,  unfair  competition,
misappropriation, tortious interference with actual
and prospective business relations, and statutory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

violations of business law   Employee Retirement
Income Security Act of 1974, § 510, 29 U.S.C.A. §
1140; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[5] Labor and Employment 231H ⬅858

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(B) Actions
      231Hk858 k. Pleading. Most Cited Cases
      (Formerly 255k39(1) Master and Servant)
Fact that tort claims based on post-employment
competition could have been asserted against former
employee earlier, but were instead asserted only as
counterclaims after the former employee had initiated
ERISA claims seeking to vindicate his federal rights
was sufficient at pleading stage to show causal
element for ERISA retaliation claim based on those
counterclaims.    Employee Retirement Income
Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

[6] Labor and Employment 231H ⬅858

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(B) Actions
      231Hk858 k. Pleading. Most Cited Cases
      (Formerly 255k39(1) Master and Servant)
To state a claim under Labor Law for alleged
retaliation by employer in response to former
employee's assertion of right under state law to
unpaid commissions, former employer was required
to adequately plead that employer's counterclaims
constituted an adverse employment action taken
because of employee's complaints under the Labor
Law. McKinney's Labor Law § 215.

[7] Labor and Employment 231H ⬅858

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(B) Actions
      231Hk858 k. Pleading. Most Cited Cases
      (Formerly 255k39(1) Master and Servant)
Because of their apparent potential for adverse
impact on former employee's livelihood, allegations
made in employer's counterclaims for business torts
in employee's suit to recover unpaid commissions
involved type of adverse employment action that
could support claim for retaliation at pleading stage
under New York Labor Law; filing of complaint for
unpaid commissions could be deemed motivating
factor for counterclaims, because counterclaims
closely followed complaint, even though they could

have been raised earlier. McKinney's Labor Law § §
190, 215.

[8] Federal Civil Procedure 170A ⬅841

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak839 Complaint
      170Ak841 k. New Cause of Action in
General. Most Cited Cases
Allowing employee leave to amend complaint to
assert claims of retaliation based on employee's
exercise of right under ERISA and state labor law
would not unduly delay suit or prejudice employer;
claims, which related to employer's motivation for
filing counterclaims, would not significantly prolong
discovery or litigation, and forcing employee to
institute new suit would have run counter to interests
of judicial economy. Fed.Rules Civ.Proc.Rule 15(a),
28 U.S.C.A.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

INTRODUCTION

*1 Plaintiff Edward Kreinik ("Kreinik") has moved
pursuant to Rule 15(a) of the Federal Rules of Civil
Procedure to amend his First Amended Complaint to
add two new claims alleging that defendants'
assertion of counterclaims in this action constitutes
unlawful retaliation under (1) Section 510 of the
Employee Retirement Income Security Act, 29
U.S.C. § 1001, et. seq. ("ERISA"), and (2) Section
215 of the New York State Labor Law, and also to
add new factual allegations in support of claims
previously asserted. Defendants Showbran Photo,
Inc., Showbran, Inc., Showbran, Inc. 401(K) Plan,
and Showbran Photo, Inc. Atlantis Health Plan
(collectively "Showbran"), oppose Kreinik's motion
to the extent that Kreinik seeks to add new claims, on
the ground that such amendments would be futile.
For the reasons stated below, Kreinik's motion to
amend is granted in its entirety.

BACKGROUND

On February 13, 2002, Kreinik filed a complaint
against his former employer, Showbran Photo, Inc.,
seeking to enforce his rights under the terms of two
employee benefit plans,[FN1] and also claiming, inter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*alia,* that he was entitled to payment of unpaid commissions. In that initial pleading, Kreinik sought both damages and equitable relief under ERISA, the New York Labor Law § 190, *et seq.,* and state common law. (Complaint dated Feb. 13, 2002 (Dkt.1), ¶ ¶ 1-2.) Defendant Showbran Photo Inc., filed an Answer to the Complaint on March 26, 2002 (Dkt.4), but asserted no counterclaims at that time.

> FN1. The benefits plans at issue are: (1) a 401(K) Plan, *which is a pension and welfare benefit* plan available to Showbran employees administered by Showbran, Inc.; and (2) the Showbran Photo, Inc. Atlantis Health Plan, an additional welfare benefit plan provided to employees. (First Amended Complaint dated June 14, 2002 ("First Am. Compl.") (Dkt.14), ¶ ¶ 7-10.)

On June 14, 2002, after receiving documents regarding Showbran Photo, Inc.'s, benefit plans, Kreinik filed his First Amended Complaint, adding as defendants certain parties responsible for the plans at issue. (First Am. Compl.; Affidavit of Anne Clark sworn to Nov. 14, 2002 ("Clark Aff.") (Dkt.22), ¶ ¶ 5, 8.) On July 16, 2002, Showbran answered the First Amended Complaint, asserting seven counterclaims against Kreinik demanding monetary and injunctive relief for: (1) trade name infringement, unfair competition, and misappropriation under New York State common law; (2) violations of New York Business Law § § 368-d, 133, and 349; (3) tortious interference with actual business relations; (4) tortious interference with prospective business relations; (5) misappropriation of proprietary information; (6) breach of contract; and (7) breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint dated July 16, 2002 (Dkt.15), ¶ ¶ 61-126.) The counterclaims are based on events that allegedly occurred during, as well as subsequent to, the time Showbran Photo, Inc., employed Kreinik. On August 7, 2002, Kreinik answered the counterclaims, asserting, as affirmative defenses, that the counterclaims constituted retaliation for his claims, in violation of ERISA and the Labor Law. (Answer to Defendants' Counterclaims dated Aug. 7, 2002 (Dkt.17), ¶ ¶ 135-36.)

On November 14, 2002, *Kreinik* moved to amend the First Amended Complaint to add new claims charging that Showbran's counterclaims had been asserted unlawfully, in retaliation for Kreinik's assertion of his rights, under ERISA and the Labor

Law. (Proposed Second Amended Complaint dated Nov. 14, 2002 ("Proposed Second Am. Compl."), ¶ ¶ 57-62.) According to Kreinik, the retaliation claims pleaded in his Proposed Second Amended Complaint are supported by law, and permitting them at this juncture would not cause undue prejudice or delay. (Plaintiff's Memorandum of Law in Support of his Motion for Leave to Amend the Complaint ("Plaintiff's Mem.") (Dkt.21), dated Nov. 14, 2002, at 1.) Showbran, however, argues that the new retaliation claims do not satisfy the elements of a *prima facie* case under ERISA or New York Labor Law, and that the proposed amendments should therefore be denied as futile. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Opp.Mem."), dated Dec. 11, 2002, at 2, 4.) Showbran adds that allowing the amendments would cause undue delay and prejudice, although it argues that the Court need not reach those issues because of the purported futility of the amendments. (Opp. Mem. at 2.)

*2 Kreinik also seeks to amend the factual allegations asserted in paragraphs 12, 14 and 26 of the First Amended Complaint, to conform those paragraphs to deposition testimony. (Plaintiff's Mem. at 1.) Showbran does not oppose these proposed factual amendments. (Opp. Mem. at 11.)

## DISCUSSION

### I. *APPLICABLE LEGAL STANDARDS*

Because Kreinik already amended his Complaint once as a matter of right, he must obtain leave of the Court for any further amendment. Fed.R.Civ.P. 15(a). Although leave to amend "shall be freely given when *justice so requires,*" Fed.R.Civ.P. 15(a), a motion to amend should be denied for reasons " 'such as undue delay, bad faith or dilatory motive ..., undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment .' " *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (interpreting Fed.R.Civ.P. 15(a)); *The Randolph Found. v. Duncan,* No. 00 Civ. 6445, 2002 WL 32862, at *1 (S.D.N.Y. Jan.1, 2002). The Court has broad discretion in determining whether to grant a motion to amend. *Local 802, Associated Musicians of Greater New York v. Parker-Meridian Hotel,* 145 F.3d 85, 89 (2d Cir.1998).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Where a party opposes a motion to amend a complaint based on futility, the proposed pleading may be reviewed for adequacy. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). The amendment will be deemed futile, and the motion to amend denied, where the amendment would be subject to "immediate dismissal" for failure to state a claim upon which relief can be granted, or would be subject to dismissal on some other basis. *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979); *see Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d. Cir.1993) (upholding denial of motion where "granting leave to amend is unlikely to be productive"); *Whimsicality, Inc. v. Battat,* 27 F.Supp.2d 456, 465 (S.D.N.Y.1998) (denying the motion where proposed claim would fail in any event). If, however, there are " 'at least colorable grounds for relief, justice ... require[s]" ' that the motion to amend be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (quoting *S.S. Silberblatt,* 608 F.2d at 42); *Schwimmer v. Guardian Life Ins. Co.,* No. 93 Civ. 0428, 1996 WL 146004, at *3 (S.D.N.Y. Apr. 1) (allowing amendment where "it is not so frivolous or outlandish to render it futile"), *aff'd,* 104 F.3d 354 (2d Cir.1996); *Weg v. Macciarola,* 729 F.Supp. 328, 341 (S.D.N.Y.1990) (motion should be granted unless amendment is frivolous or facially insufficient).

Determining whether the amendment states "colorable grounds for relief" mandates an inquiry into the sufficiency of the proposed pleading comparable to that required by Fed.R.Civ.P. 12(b)(6). *Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1098 (S.D.N.Y.1992); *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 18 (S.D.N.Y.1985). Thus, as both parties acknowledge (*see* Plaintiff's Mem. at 6; Opp Mem. at 2), the standard for evaluating Showbran's opposition to the amendment, on the ground that it would be futile, requires the Court to examine whether Kreinik's proposed retaliation claims could withstand a Rule 12(b)(6) motion to dismiss. *See Nettis v. Levitt,* 241 F.3d 186, 194 n. 4 (2d Cir.2001) ("Determinations of futility are made under the same standards that govern Rule 12(b)(6) motion to dismiss."); *Finley v. Simonovitch,* No. 97 Civ. 1455, 1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997) (citing cases).

*3 A Rule 12(b)(6) motion is decided solely on the pleadings. *See, e.g., Allen v. WestPoint-Pepperell,*

*Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *CBS, Inc.,* 108 F.R.D. at 18. The Court must accept all factual allegations in the complaint as true and "draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Ed.,* 131 F.3d 326, 329 (2d Cir.1997) (citing *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)); *see Rotter v. Leahy,* 93 F.Supp.2d 487, 497 (S.D.N.Y.2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). A claim may not be dismissed under Rule 12(b)(6) unless " 'it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The task of the Court is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Connell v. City of New York,* No. 00 Civ. 6306, 2002 WL 22033, at *2 (S.D.N.Y. Jan.8, 2002) (quoting *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000)); *Coffey v. Cushman & Wakefield, Inc.,* No. 01 Civ. 9447, 2002 WL 1610913, at * 1 (S.D.N.Y. July 22, 2002). These standards will be applied to Kreinik's proposed amended claims of retaliation under ERISA and New York Labor Law to determine whether his motion should be granted.

## II. *KREINIK'S PROPOSED RETALIATION CLAIM UNDER ERISA*

[1] Section 510 of ERISA makes it unlawful for an employer to retaliate against an employee for, *inter alia,* "exercising any right to which [the employee] is entitled under the provisions of an employee benefit plan...." 29 U.S.C. § 1140. To prove unlawful retaliation for the assertion of rights under ERISA, the employee must establish that the employer's action was at least partially motivated by the specific intent to engage in the prohibited retaliatory conduct. [FN2] *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir.1988). Because direct evidence of intent is often scarce or non-existent in this context, the Court evaluates retaliation claims under Section 510 of ERISA using the same analytical framework applied to similar claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and other civil rights statutes, where direct evidence of discriminatory intent is often equally unavailable. *Id.* at 1112. [FN3] Thus, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

(1973), which allows a plaintiff to prevail with indirect proof of intent, applies to claims brought pursuant to Section 510 of ERISA. *Id.*

> FN2. It is not necessary that retaliation for the protected activity was the sole cause of the adverse action, but only that the retaliatory motive played "a part" in the motivation behind that action. *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *Titch v. Reliance Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir.1983).

> FN3. The courts have frequently relied on interpretations of the anti-retaliatory provisions in federal labor statutes interchangeably, given that such provisions in Title VII, the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the National Labor Relations Act ("NLRA"), the Fair Labor Standards Act ("FLSA"), and ERISA are modeled on one another or are similarly worded, thus assuming parallel congressional intent with respect to meaning. *See, e.g., Robinson v. Shell,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (noting that the NLRA, FLSA and Title VII all share a "primary purpose" of "maintaining unfettered access to statutory remedial mechanisms"); *Passer v. Am. Chem. Soc'y,* 935 F.2d 322, 330 (D.C.Cir.1991) (comparing parallel retaliation provisions in the ADEA and Title VII and noting that "cases interpreting the latter are frequently relied upon in interpreting the former"); *Patterson v. McCarron,* No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001) (employing Title VII analysis in ERISA retaliation case).

Under this framework, Kreinik would first have to establish a *prima facie* case of retaliation by showing that: (1) he was engaged in a protected activity; (2) Showbran was aware of Kreinik's participation in the protected activity; (3) Showbran took adverse employment action against Kreinik; and (4) a causal connection existed between the protected activity and the adverse action. [FN4] *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *Patterson v. McCarron,* No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001). Kreinik's

claim of retaliation will survive a motion to dismiss if, after construing all reasonable inferences and implications of the allegations in the complaint liberally in his favor, the Court determines that he has pleaded facts sufficient to support the elements of a *prima facie* case, as set out above. *See Coffey,* 2002 WL 1610913, at *4-5; *Mendelsohn v. Univ. Hosp.,* 178 F.Supp.2d 323, 329 (E.D.N.Y.2002); *Connell,* 2002 WL 22033, at *4; *E.E.O.C. v. Die Fliedermaus,* 77 F.Supp.2d 460, 471-72 (S.D.N.Y.1999).

> FN4. Neither party disputes that this is the appropriate test for establishing a *prima facie* case, although Kreinik articulates the test in an alternative manner that combines the first two elements, requiring him to have been "engaged in a protected activity known to defendants." (Plaintiff's Reply Memorandum of Law in Support of his Motion for Leave to Amend the Complaint dated Dec. 18, 2002 ("Reply Mem.") (Dkt.23), at 2); *see, e.g., Quinn v. Green Tree Credit,* 159 F.3d 759, 769 (2d Cir.1998) (identifying three elements of *prima facie* case).

*4 If a plaintiff's retaliation claim survives the pleading stage, then, either at trial or on a motion based on the evidence, the plaintiff would have to prove its *prima facie* case, the defendant would then need to articulate a legitimate reason for its allegedly retaliatory conduct, and the plaintiff would ultimately bear the burden of demonstrating that the stated reason was pretextual. *See Dister,* 859 F.2d at 1115; *Patterson,* 2001 WL 1488122, at *3; *see also Richardson v. New York State Dept. of Corr. Serv.,* 180 F.3d 426, 444-45 (2d Cir.1999) (on summary judgment motion, parties must meet their burdens under the complete burden-shifting analysis); *Cosgrove,* 1999 WL 163218, at *23 (same); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995) (same).

At this stage, the Court need not look beyond the question of whether Kreinik has sufficiently pleaded facts which identify and support a *prima facie* case of retaliation. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (to survive a motion to dismiss, an employment discrimination complaint need not specifically establish every fact proving a *prima facie* case under the *McDonnell-Douglas* framework, as long as the complaint gives defendant fair notice of the claim and on what grounds it is based as required by the

federal pleading rules); *Coffey*, 2002 WL 1610913, at *5 (complaint alleging retaliation under the ADEA was sufficient to withstand a motion to dismiss, where defendant was placed on notice of the nature and basis of the claim). This, therefore, is the question to which both parties have addressed their arguments. (Reply Mem. at 2-7; Opp. Mem. at 4-7.)

### A. *The First and Second Elements of a* Prima Facie *Case: Kreinik's Protected Activity and Showbran's Awareness of that Activity*

[2] Showbran does not dispute that Kreinik's proposed ERISA retaliation claim, as pleaded, would satisfy the first and second elements of a *prima facie* case. (Opp. Mem. at 4.) With respect to the first element, Kreinik's attempt to assert his right to employee benefits under the statute plainly constitutes a protected activity against which interference is prohibited. *See* 29 U.S.C. § 1140. More specifically, ERISA expressly empowers individuals to enforce their rights under the terms of their employee benefit plans by bringing civil actions. 29 U.S.C. § 1132(a)(1)(a).

As to the second element, there is no question that Showbran was fully aware of Kreinik's involvement in a protected activity, given that Showbran has appeared in and defended this suit. (Opp. Mem. at 4.)

### B. *The Third Element of a* Prima Facie *Case: Showbran's Alleged Adverse Action Against Kreinik*

Showbran does challenge Kreinik's ability to demonstrate that counterclaims, asserted after the termination of a plaintiff's employment, can constitute the type of "adverse employment action" required to meet the third element of a *prima facie* case of retaliation. (Opp. Mem. at 4.) In evaluating Kreinik's argument on this point, the first inquiry is whether *former* employees can be protected under ERISA against retaliatory action by their *former* employers. *See, e.g., Straus v. Prudential Employment Sav. Plan,* 253 F.Supp.2d 438, 447-48 (E.D.N.Y.2003) (analyzing whether non-employee beneficiaries are entitled to Section 510 protection). The second inquiry is whether the challenged action can be considered "adverse" in relation to the plaintiff's employment. *See Wannamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (noting that "because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action

reaches the level of 'adverse' "); *see also Ginsberg v. Valhalla Anesthesia Assoc.,* 971 F.Supp. 144, 148-49 (S.D.N.Y.1997) (analyzing the extent to which the alleged retaliatory conduct had some impact on plaintiff's employment or prospective employment); *Yankelevitz v. Cornell Univ.,* No. 95 Civ. 4593, 1996 WL 447749, at *5 (S.D.N.Y. Aug.7, 1996) (discussing whether the adverse action was related to the "terms, privileges, duration, or conditions of the plaintiff's employment").

### 1. *ERISA's Coverage of Former Employees*

**\*5** [3] Although the law is not well-settled as to whether "post-employment" retaliation is actionable under Section 510 of ERISA, the Supreme Court has articulated a broad rationale behind anti-retaliation provisions in federal labor statutes, stating that the primary purpose of such provisions is to maintain "unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). In *Robinson,* the Court noted that the exclusion of former employees from the protection of Title VII's retaliatory provisions would undermine the effectiveness of that statute by allowing the threat of post-employment retaliation to deter victims of discrimination from complaining and by providing "a perverse incentive for employers to fire employees who might bring ... claims." *Id.* The Court therefore reasoned that the best approach would be to include former employees within the scope of protected "employees." *Id.* at 345.

This reasoning, combined with the case law in this circuit as it has developed with respect to this issue in various statutory contexts, supports Kreinik's position that Section 510 should be read to cover post-employment retaliation. *See, e.g., Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979) (post-employment blacklisting falls within the scope of retaliatory provisions of Title VII), *rev'd on other grounds,* 477 U.S. 807, 814 n. 17 (1980); *Patchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978) (finding that Title VII "prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct"); *Straus,* 253 F.Supp.2d at 447-48 (noting that while the Second Circuit hasn't spoken squarely on this issue, "[i]t seems only logical that former employees and beneficiaries, who in many instances have as strong an interest in the pension rights as their employee counterparts, receive

some protection from alienation of those rights under § 510 of ERISA"); *Patel v. Lutheran Med. Ctr., 753 F.Supp. 1070, 1073 (S.D.N.Y.1991)* (noting that a claim for retaliation under the ADEA is cognizable even where the employment relationship had been terminated before the alleged adverse action occurred).

Further, the text of Section 510 itself suggests that post-employment retaliation is actionable under the statute. *See Straus*, 253 F.Supp.2d at 447-48 (accepting the textual argument that protection under Section 510 includes former employees and beneficiaries); *see also Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir.1997) (Section 510 specifically covers "participants" and "beneficiaries," which are defined as including both employees and former employees); *Choi v. Mass. Gen. Physicians Org.*, 66 F.Supp.2d 251, 254 (D.Mass.1999) (for the purposes of retaliation claims under Section 510 of ERISA, an adverse employment action need not relate to a current employer-employee relationship because the statute specifically protects "participants," which includes former employees).

*6 For these reasons, the Court concludes that Kreinik's proposed retaliation claim under ERISA is not barred merely because he no longer had an employment relationship with Showbran at the time the counterclaims were asserted.

### 2. The Adverse Effect of the Counterclaims

[4] The next question is whether Showbran's counterclaims, by their nature, can constitute an "adverse employment action." On this point, Kreinik argues that his proposed claim is sufficient because the allegations made in the counterclaims may have the effect of marring his reputation as a businessman and jeopardizing his future business relations. (Plaintiff's Reply Mem. at 4-6.) Showbran argues that the allegations fail to assert an adverse employment action because the alleged retaliation lacks any "nexus" to Kreinik's employment. (Opp. Mem at 5.)

Although an adverse employment action is generally one that affects the terms, privileges, duration, or conditions of a plaintiff's employment, reprisals less flagrant than job termination or reduced wages can constitute adverse employment actions that warrant statutory protection. *Wannamaker*, 108 F.3d at 466; *Yankelevitz*, 1996 WL 447749, at *5 (claims of retaliation are not limited " 'only to acts of retaliation that take the form of cognizable employment actions

such as discharge, transfer or demotion' ") (quoting *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C.Cir.1991)); *Dortz v. New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995). Indeed, retaliatory actions injurious to a plaintiff's ability to secure future employment are actionable. *See, e.g., Wannamaker*, 108 F.3d at 466 (a retaliation claim could be maintained where a former employer sullies a plaintiff's reputation, thereby affecting "tangible *future* employment objectives") (emphasis in original); *see also Silver*, 602 F.2d at 1090 (finding that post-employment blacklisting falls within the scope of retaliatory provisions of Title VII); *Patchenko*, 581 F.2d at 1055 (finding that a refusal to provide an employee with an employment reference, allegedly in retaliation for filing a claim against the employer, constituted an adverse employment action); *Gonzalez v. Police Comm'r Bratton*, 147 F.Supp.2d 180, 196 (S.D.N.Y.2001) ("[R]etaliatory conduct that would naturally create major obstacles for a former employee in obtaining employment in her field ... is actionable under [Title VII]."), *aff'd*, No. 01 Civ. 7826, 2002 WL 31317871 (2d Cir. Oct.16, 2002); *E.E.O.C. v. Die Fliedernaus, L.L.C.*, 77 F.Supp.2d 460, 472 (S.D.N.Y.1999) (finding that public distribution of derogatory flyers in response to the filing of a charge with the E.E.O.C. constituted retaliation under Title VII where the flyers could affect plaintiffs' ability to find jobs).

Specifically, with regard to allegedly retaliatory counterclaims, this Court has expressly refused "to adopt a rule stating that ... counterclaims, or any other legal cause of action, cannot, as a matter of law, constitute retaliation in violation of the employment discrimination laws." *Yankelevitz*, 1996 WL 447749, at *4. The plaintiff in *Yankelevitz* was a doctor, and the defendant's counterclaim was based on the plaintiff's alleged failure to conform with professional practice procedures. *Id.* The court found that the counterclaim at issue was actionable because it "shed a negative light on plaintiff's professionalism and ethics ... mar[red] plaintiff's professional reputation ... [and] could have an adverse impact on plaintiff's employment prospects." *Id.* at *5.

*7 For a counterclaim to be actionable as retaliatory, however, it must, as in *Yankelevitz*, have "some impact on [the] plaintiff's employment or prospective employment." *Ginsberg*, 971 F.Supp. at 148 (finding that a doctor had not stated a claim for retaliation based on the assertion of a breach-of-contract counterclaim that did not reflect negatively on her ethical or professional reputation); *see also Jetter v. Knothe Corp.*, 200 F.Supp.2d 254, 267

(S.D.N.Y.2002) (plaintiff failed to demonstrate that his former employer's communication to clients of plaintiff's retirement rose to the level of adverse), *aff'd,* 324 F.3d 73 (2d Cir.2003); *Patel,* 753 F.Supp. at 1074 (former employer's alleged tortious interference was not an adverse employment action because, where the employee had not worked for the employer for two years and was not even undertaking to find a new job when the alleged act occurred, the challenged action did not impact on the employee's attempt to secure future employment). Thus, for Kreinik's proposed retaliation claim to withstand a motion to dismiss, the claim as pleaded must sufficiently suggest that Showbran's counterclaims could have a direct, adverse impact on Kreinik's present employment or future employment prospects.

In this case, Showbran's counterclaims allege that Kreinik engaged in trade name infringement, unfair competition, and misappropriation under state common law; violations of New York Business Law § § 368-d, 133, and 349; tortious interference with actual business relations; tortious interference with prospective business relations; misappropriation of proprietary information; breach of contract; and breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint, ¶ ¶ 61-126.) These counterclaims go beyond what Showbran characterizes as "simple breach of contract and related claims." (Opp. Mem. at 6.) The counterclaims challenge Kreinik's ability to compete fairly and to exhibit good faith in his business relationships. Accepting all factual allegations in the Proposed Second Amended Complaint as true and drawing all inferences in the light most favorable to Kreinik, it is reasonable to assume that Showbran's counterclaims could impact on Kreinik's personal and professional reputation and on his ongoing efforts to create and maintain his own business. (Proposed Second Am. Compl. ¶ ¶ 28, 57-59.) Furthermore, Kreinik is apparently seeking to compete with Showbran and to share the same clientele. (Plaintiff's Reply Mem. at 4.) In these circumstances, the ancillary consequences of litigation, such as the potential need for customers to testify, could have a detrimental effect on Kreinik's future business relationships.

Even if, as Showbran argues, the likelihood is not great that the counterclaims will have an actual, adverse effect on Kreinik's business, the apparent potential for an adverse impact to his livelihood is sufficient for the retaliation claim to survive at the pleading stage. *See, e.g., Mendelsohn,* 178 F.Supp.2d at 329 (finding that a description of the employment duties that diminished after filing a complaint under

Title VII was sufficient to plead an adverse employment action); *Connell,* 2002 WL 22033, at *4 (the allegation that pension board members "commenced actions to arbitrarily deprive [plaintiff] of a [pension], as retribution for seeking complaints against their peers," sufficiently alleged a *prima facie* case of retaliation to withstand a motion to dismiss); *Coffey,* 2002 WL 1610913, at *4-5 (despite the fact that plaintiff did not specify what the adverse action was, the allegations in the complaint sufficiently placed the defendant on notice of the nature and basis of the retaliation claim); *Die Fliedermaus,* 77 F.Supp.2d at 471-72 (adverse employment action identified where plaintiffs alleged that defendants had publicly distributed derogatory flyers about employees who had filed of charges of discrimination).

*8 The Court therefore concludes that Kreinik's proposed allegations are sufficient, for pleading purposes, to satisfy the third element of a *prima facie* case of retaliation under ERISA.

### C. *The Fourth Element of a* Prima Facie *Case: Causal Connection Between the Protected Activity and the Adverse Action*

[5] Finally, the "causal connection" between (a) Kreinik's assertions of his rights through the commencement of this suit, and (b) the challenged counterclaims, can be inferred from the circumstances of the case. In the Title VII context, the Second Circuit has held that evidence of a causal connection between a protected activity and an adverse employment action may be established indirectly, by showing that the adverse action or discriminatory treatment occurred shortly following the protected activity. *See Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986); *see also, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (finding a casual connection between the protected activity and the retaliatory conduct where the adverse action occurred less than two months after the filing of a complaint); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995) (causal element of retaliation met where adverse action occurred three months after the protected activity); *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d. Cir.1986) (firing plaintiff "within one year" of a Title VII action may be probative of an indirect causal connection).

Applying this reasoning, this Court has permitted a plaintiff to challenge a defendant's counterclaims as

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

retaliatory, where, as here, the claims could have been asserted earlier, but were instead asserted only after the plaintiff had initiated the action seeking to vindicate his federal rights. *See Yankelevitz, 1996 WL 447749, at *6* (further noting that the fact that asserted counterclaims might have been compulsory did *not per se* negate the retaliatory animus). Indeed, Showbran does not contest that this element is likely satisfied in this case "as the counterclaims were filed after the instant complaint." (Opp. Mem. at 4.) Thus, Kreinik has established that a causal connection could exist between the assertion of rights and the adverse action, satisfying the fourth element of the *prima facie* case.

Overall, regardless of whether Kreinik's ERISA retaliation claim will ultimately stand, Kreinik has stated a *prima facie* case for retaliation and has shown that the claim would not be subject to "immediate dismissal" for failure to state a claim. There is therefore no basis for the Court to reject the proposed amendment on the ground of futility.

### III. *NEW YORK LABOR LAW*

[6] Kreinik also seeks leave to amend his First Amended Complaint to assert a retaliation claim under New York Labor Law Section 215. (Proposed Second Am. Compl., ¶ ¶ 1, 60-62.) In relevant part, this state statute provides that an employer may not "discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint ... or because such employee has caused to be instituted a proceeding under or related to this chapter...." N.Y. Labor Law § 215(1). Section 215 is analogous to Section 510 of ERISA, in that it covers claims for retaliation against employees who make complaints under the state Labor Law. *See Jacques v. DiMarzio, 200 F.Supp.2d 151, 162 (E.D.N.Y.2002)* (evaluating claim of retaliation under New York Labor Law § 215); *Warden v. E.R. Squibb & Sons, Inc., 840 F.Supp. 203, 208 (E.D.N.Y.1993)* ("[Section 215] provide[s] a right of action to an employee who has been subjected to retaliation."); *Kelly v. Xerox Corp., 681 N.Y.S.2d 322, 256 A.D.2d 311 (2d Dep't 1998)*. To state a claim under Section 215, Kreinik must adequately plead that Showbran's counterclaims constitute an adverse employment action taken because of Kreinik's complaints under the Labor Law. *Jacques, 200 F.Supp. at 162; Shaw v. Baldowski, 747 N.Y.S.2d 136, 145, 192 Misc.2d 635, 646 (Sup.Ct. Albany Co.2002).*

*9 [7] Under New York law, as under federal law, an alleged adverse employment action need not rise to the level of improper discharge, demotion, or reduction in pay, in order to be actionable as retaliatory. *See Shaw, 747 N.Y.S.2d at 145, 192 Misc.2d at 646* (non-traditional employment actions may be sufficient to sustain a claim under Section 215); *cf. In the Matter of Electchester Housing Project, Inc. v. Rosa, 639 N.Y.S.2d 848, 849, 225 A.D.2d 772, 773 (2d Dep't 1996)* (under analogous provision of New York Executive Law, defendant's contesting of former employee's unemployment benefits, in response to the filing of a complaint with the State Division of Human Rights, constituted retaliation). This Court has recognized that counterclaims can be used as a retaliatory practice, with a concrete, adverse impact on the plaintiff. *See Jacques, 200 F.Supp.2d at 162* ("The Court is deeply troubled by [defendant employer's counterclaim], which appears to be nothing more than a naked form of retaliation [against the employee]."). Here, as discussed above, Kreinik has alleged facts sufficient to infer that the counterclaims asserted against him could harm his reputation in his industry and negatively affect his prospective employment or business opportunities. (Proposed Second Am. Compl. ¶ ¶ 28, 60-62.) Kreinik's assertions, if proven, could lead a trier of fact to view the counterclaims as an adverse employment action under Section 215. *Cf. Shaw, 747 N.Y.S.2d at 146, 192 Misc.2d at 647* (dismissing a claim of retaliation under Section 215 where a potential adverse impact could not be fairly inferred from the facts as alleged).

In addition, Kreinik's First Amended Complaint alleged violations of Section 190, et seq., of New York Labor Law (*see* First Am. Compl., ¶ ¶ 1-2, 32-36), and Showbran's counterclaims, which could have been raised earlier, instead closely followed the assertion of those claims. For this reason, Kreinik's allegations sufficiently plead that his labor law complaints were a motivating factor for Showbran's adverse action. *See Jacques, 200 F.Supp.2d at 162* (finding that a close connection in time between the complaint and termination indicated that labor law complaints could have been a motivating factor for the employee's discharge).

Therefore, for essentially the same reasons discussed above in connection with Kreinik's proposed ERISA retaliation claim, Kreinik's proposed amendment to add a claim under Section 215 may not be rejected as futile.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### IV. *UNDUE PREJUDICE AND DELAY*

[8] Kreinik additionally maintains that his proposed amended complaint will not cause undue delay or prejudice and, therefore, that his motion should not be denied on this basis. (Plaintiff's Mem. at 5-6; Reply Mem. at 1). Showbran does not offer any meaningful opposition to Kreinik's argument, stating only that the amendments would also cause delay and prejudice, but that the "Court need not reach these[ ] issues because the proposed claims are in any case futile." (Opp. Mem. at 2.) The Court has nonetheless reviewed these issues, and concludes that granting the motion to amend will not inordinately delay the proceedings or unduly prejudice Showbran.

*10 Mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis to deny a motion to amend. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981)). In determining whether a party's interests will be unduly prejudiced by an amendment, this Court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute...." *Id.* (citations omitted).

Here, although the deadline for completion of discovery has passed and the amendments may result in a slight delay, Kreinik asserts that additional discovery will be minimal, and Showbran has not shown to the contrary. (Plaintiff's Mem. at 5-6, n. 3.) Moreover, the mere fact that discovery has concluded does not provide a reason for denying leave to amend. *Cemar Tekstil Ithalat Ihracat San ve Tic. A.S. v. Joinpac, Inc.*, No. 91 Civ. 8408, 1993 WL 126890, at *1 (S.D.N.Y. Apr.16, 1993) (allowing amendment to add a counterclaim where discovery had already closed). This is especially true where the proposed amendment arises from the same set of operative facts as the original claims, or from events closely related to those originally pleaded. *Fluor Corp.*, 654 F.2d at 856; *see, e.g., Harrison v. New York City Admin. for Children's Servs.*, 02-Civ. 0947, 2002 WL 2022932, *1 (S.D.N.Y. Sept.3, 2002); *Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, No. 99 Civ. 12003, 2002 WL 31387269, *3 (S.D.N.Y. Oct.23, 2002). Even if discovery were to be prolonged, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir.1989) (citation omitted). In

this case, the proposed new claims relate to the defendants motivation and intent in asserting their counterclaims, a subject on which the parties should not need substantial additional discovery. Thus, allowing the amendments will not call for a great expenditure of resources or significantly prolong the dispute.

Showbran also has not alleged any bad faith on Kreinik's part. Showbran does not contest Kreinik's assertions that he had good reasons for failing to raise his new claims sooner, nor does Showbran contest that it was on notice of these claims for some time . [FN5] Nor has Kreinik asserted these claims on the eve of trial in an attempt to "sandbag" Showbran.

> FN5. For instance, Showbran does not contest that it took some time to respond to Kreinik's counsel's inquiries as to whether Showbran would consent to the proposed amendments, and that Showbran requested that counsel hold off in filing the proposed amendments in order to explore a resolution of the claims. (*See* Clark Aff. at ¶ ¶ 14-19.)

Finally, forcing Kreinik to institute a new action against Showbran would run counter to the interests of judicial economy. Kreinik's proposed retaliation claims are related to his original claims and are also tied to his affirmative defense of unclean hands and retaliation, which he pleaded in reply to Showbran's counterclaims. (Answer to Defendant's Counterclaims ¶ ¶ 128, 135-36.) Allowing all of the claims and counterclaims to be litigated in a single action would avoid unnecessary duplication of effort by counsel, ultimately reduce litigation costs, and save time. *See Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 145 F.R.D. 336, 339 (S.D.N.Y.1993) (granting motion to amend, even though five years had passed and over 5600 pages of deposition testimony had been taken, because the amendment did not add to the complexity of the case or to discovery, and a separate lawsuit would have resulted in duplicative efforts and might have resulted in consolidation in any event).

*11 Thus, in the circumstances presented, concerns about undue delay and prejudice are insufficient to warrant denial of the motion to amend.

### CONCLUSION

For all of the foregoing reasons, Kreinik's motion to

Not Reported in F.Supp.2d                                                      Page 11
Not Reported in F.Supp.2d, 2003 WL 22339268 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

amend his First Amended Complaint is granted in its
entirety.

S.D.N.Y.,2003.
Kreinik v. Showbran Photo, Inc.
Not Reported in F.Supp.2d, 2003 WL 22339268
(S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv01172 (Docket) (Feb. 13, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.