SCO Grp v. Novell Inc                        Doc. 106

Case 2:04-cv-00139-DAK-BCW  Document 106  Filed 04/10/2006  Page 1 of 42

**MORRISON & FOERSTER LLP**
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
David E. Melaugh (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

**ANDERSON & KARRENBERG**
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

***Attorneys for Novell, Inc.***

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, | **MEMORANDUM IN SUPPORT OF NOVELL, INC.'S MOTION TO STAY CLAIMS RAISING ISSUES SUBJECT TO ARBITRATION** |
|   Plaintiff and Counterclaim-Defendant, | |
| | ***[REDACTED pursuant to this Court's April 10, 2006 Order]*** |
| vs. | |
| NOVELL, INC., a Delaware corporation, | Case No. 2:04CV00139 |
|   Defendant and Counterclaim-Plaintiff. | Judge Dale A. Kimball |

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF ISSUES.................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 1

    A.    SCO's Second Amended Complaint and the SUSE Linux Claims......................... 1

    B.    The UnitedLinux Contracts.................................................................................... 3

    C.    The ICC Arbitration Between SuSE and SCO....................................................... 4

    D.    SCO's Initial Support for UnitedLinux and the Release of SCO Linux
    and SUSE Linux..................................................................................................... 5

    E.    SCO's Attacks on Linux and SUSE Linux. .......................................................... 6

SUMMARY OF ARGUMENT ........................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    THE FEDERAL ARBITRATION ACT REQUIRES A STAY OF ANY
    CLAIM RAISING AN ISSUE SUBJECT TO ARBITRATION. ...................................... 9

II.    SCO'S CLAIMS SHOULD BE STAYED BECAUSE THEY RAISE
    ISSUES SUBJECT TO ARBITRATION UNDER THE UNITEDLINUX
    CONTRACTS. ................................................................................................................. 12

    A.    SCO's Copyright Infringement Claim Raises Arbitrable Issues........................... 12

    B.    SCO's Slander of Title Claim Raises Arbitrable Issues........................................ 14

    C.    SCO's Unfair Competition Claim Raises Arbitrable Issues. ................................. 15

    D.    SCO's Breach of Contract Claim Raises Arbitrable Issues. .................................. 16

    E.    SCO's Alternative Claim for Specific Performance Should Be Stayed
    Because It Is Closely Related to SCO's Other Claims. ......................................... 17

CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Continental Cas. Co. v. Am. Nat'l Ins. Co.*,
  417 F.3d 727 (7th Cir. 2005)...................................................................................... 11, 14

*Corpman v. Prudential-Bache Secs., Inc.*,
  907 F.2d 29 (3d Cir. 1990)................................................................................................ 9

*Gibson v. Wal-Mart Stores*,
  181 F.3d 1163 (10th Cir. 1999).......................................................................................11

*Long v. Silver*,
  248 F.3d 309 (4th Cir. 2001)............................................................................................11

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983).......................................................................................................... 1, 9

*National Am. Ins. Co. v. SCOR Reinsurance Co.*,
  362 F.3d 1288 (10th Cir. 2004).........................................................................................9

*Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
  No. 02-Civ.-9369-DFE, 2003 U.S. Dist. LEXIS 26928 (S.D.N.Y. June 14, 2003) ................. 11

*Perry et al. v. Thomas*,
  482 U.S. 483 (1987) ..........................................................................................................9

*Rain v. Schiffer Publ'g Ltd.*,
  964 F.2d 1455 (4th Cir. 1992)............................................................................. 10, 13, 15

*Turner v. Bain & Co.*,
  No. 97-C-4755, 1997 U.S. Dist. LEXIS 16007 (N.D. Ill. Oct. 6, 1997)................................. 10

*Waste Mgmt., Inc. v. Residuous Industriales Multiquim, S.A. de C.V.*,
  372 F.3d 339 (5th Cir. 2004)............................................................................... 10, 13

## STATUTES

9 U.S.C. § 3 ..........................................................................................................8, 9

## STATEMENT OF ISSUES

Novell's motion to stay presents the issue of whether the Court should stay proceedings on the claims in the recently filed Second Amended Complaint of Plaintiff The SCO Group, Inc. ("SCO"), pursuant to the Federal Arbitration Act, because SCO's claims raise issues that are subject to arbitration under the "UnitedLinux" contracts signed by SCO in May 2002.

## STATEMENT OF FACTS

On Novell's motion to stay, the Court properly has before it:

(i)     SCO's Second Amended Complaint, filed February 3, 2006;

(ii)    The UnitedLinux contracts signed by SCO in May 2002, which contain clauses requiring any disputes arising under those contracts to be resolved by arbitration;

(iii)   The Request for Arbitration recently filed against SCO, pursuant to the arbitration clause in the UnitedLinux contracts;

(iv)    The Declaration of Michael A. Jacobs ("Jacobs Decl."), which attaches the preceding documents, as well as several exhibits to the Request for Arbitration.

When this record is taken into consideration, a stay of SCO's claims is required.[1]

### A.     SCO's Second Amended Complaint and the SUSE Linux Claims

SCO's original complaint, filed on January 20, 2004, was limited to a single claim for "slander of title." SCO alleged that Defendant Novell, Inc. ("Novell") slandered SCO's alleged

---

[1]  Documentary evidence may properly be considered on a motion to stay litigation under the Federal Arbitration Act. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 n.26 (1983) ("affidavits, legal briefs, and documentary evidence" properly considered in connection with application to stay litigation pending arbitration).

title in UNIX and UnixWare copyrights, by falsely and maliciously asserting that SCO did not

own such copyrights.

SCO's Second Amended Complaint, filed on February 3, 2006, adds several new claims

directed against "SUSE Linux." SUSE Linux is a version of the Linux operating system

developed by SuSE Linux, GmbH ("SuSE"), a wholly-owned subsidiary of Novell. SUSE Linux

is distributed by Novell pursuant to a license with SuSE. Linux is an "open source" operating

system, meaning that many of its components are subject to an "open source" license that

requires any modified versions of those components to be made freely available to the public.

SCO's Second Amended Complaint includes the following allegations regarding SUSE

Linux:

- "On November 4, 2003, Novell announced its acquisition of SuSE Linux, one of the world's leading distributors of Linux. Since that time, Novell began distributing Linux worldwide."

- "Novell has infringed and continues to infringe SCO's copyrights by copying, reproducing, modifying, sublicensing, and/or distributing Linux products containing unauthorized contributions of SCO's copyrighted intellectual property"; and

- "Novell's unauthorized copying in its use and distribution of SuSE Linux includes but is not limited to the appropriation of numerous data structures and algorithms contained in or derived from SCO's copyrighted material. A partial listing of these data structures and algorithms is provided at Exhibit B."

(Jacobs Decl. Ex. 1, SCO's Second Am. Compl., ¶¶ 46, 116, 117.)

Thus, SCO is now claiming that Novell's distribution of SUSE Linux infringes SCO's

alleged UNIX copyrights. (*Id.*, ¶¶ 116-17.) SCO further asserts that Novell's distribution of

SUSE Linux constitutes unfair competition and a breach of contract. (*Id.*, ¶¶ 122, 97-99.)

SCO's new claims for unfair competition and breach of contract make clear that SCO's new

"SUSE Linux" claims are closely related to its original "slander of title" claim, as they rely on allegations relating to *both* SUSE Linux and the alleged slander of title. (*Id.*, ¶¶ 122, 99.)

**B.    The UnitedLinux Contracts**

SCO's new "SUSE Linux" claims raise issues that are subject to arbitration under the Master Transaction Agreement ("MTA") and UnitedLinux Joint Development Contract ("JDC"), signed in May 2002 by SuSE and Caldera International, Inc., which is the predecessor-in-name to SCO.[2] These two contracts are collectively referred to as the "UnitedLinux contracts," and are attached as Exhibits 2 and 3 to the accompanying Declaration of Michael Jacobs.[3]

As explained in the preamble to the UnitedLinux contracts, the UnitedLinux project arose from the agreement of SCO, SuSE, and two other Linux vendors (Turbolinux and Conectiva) to jointly develop a standard form of the Linux operating system, referred to as "UnitedLinux." By combining their respective expertise and intellectual property to develop and promote a uniform Linux platform under the "UnitedLinux" brand, the four UnitedLinux members sought to encourage widespread adoption of UnitedLinux "as a standard for the information technology industry." (Jacobs Decl. Ex. 2, MTA, Background.)

---

[2]  SCO admitted in its Answer to Novell's Counterclaim that "SCO" is simply the new name of Caldera International, Inc. (*See* Jacobs Decl. Ex. 4, Novell's Answer and Counterclaims, filed July 29, 2005, at 14, ¶ 36 (alleging that Caldera changed its name to SCO in May 2003); Jacobs Decl. Ex. 5, SCO's Answer to Novell's Counterclaims, filed September 12, 2005, at 6, ¶ 36 (admitting the name change).)

[3]  Because the UnitedLinux contracts require their terms to be kept confidential, the contracts are being filed under seal, and quotations of specific terms have been redacted from the public version of this motion and of the Request for Arbitration. Novell and SuSE have no objection to publicly releasing the terms of these contracts, provided that the other UnitedLinux members consent to such release.

Consistent with this goal, the UnitedLinux members agreed that each member would have a broad license to use the technology included in the UnitedLinux Software, including any related intellectual property rights of the other members. In particular, the members agreed that:

1.

2.

**\*\* REDACTED \*\***

3.

(Jacobs Decl. Ex. 2, MTA, Section 3.2.2; Jacobs Decl. Ex. 3, JDC, Section 8.2.)

    **C.**    **The ICC Arbitration Between SuSE and SCO**

**\*\* REDACTED \*\***

Pursuant to this arbitration clause, SuSE submitted a Request for Arbitration against SCO to the International Chamber of Commerce ("ICC") on April 10, 2006, a copy of which is attached as Exhibit 6 to the accompanying Jacobs Declaration.

SuSE contends in the arbitration that the UnitedLinux contracts preclude SCO from asserting that SUSE Linux infringes any copyrights of SCO for multiple reasons, including:

- The UnitedLinux contracts divested SCO of ownership of any copyrights in technology included in UnitedLinux;

- The UnitedLinux contracts confer a broad license on SuSE to use the technology included in UnitedLinux, including the right to sublicense such technology to Novell and others through multiple levels; and

- SCO agreed in the UnitedLinux contracts that any "open source" code included in UnitedLinux would remain subject to the terms of any open source license, and those terms prohibit SCO from asserting proprietary rights to modified versions of the Linux "kernel," which appears to be the target of SCO's infringement claims.

(Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 46-52, 82.)

Consistent with this position, SuSE has requested the Arbitral Tribunal to declare that (1) SCO is precluded from asserting copyright infringement claims against SUSE Linux; and (2) the UnitedLinux contracts divested SCO of ownership of any copyrights related to technology included in UnitedLinux (except for Pre-Existing Technology and Enhancements). (Jacobs Decl. Ex. 6, Request for Arbitration, ¶ 89.)

### D. SCO's Initial Support for UnitedLinux and the Release of SCO Linux and SUSE Linux

As noted in the Request for Arbitration, SCO was initially a strong supporter of the UnitedLinux project. (Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 58-60.) For example, Ransom Love, the Chairman and CEO of SCO (then called "Caldera") announced in May 2002 that SCO "sees the formation of UnitedLinux as a tremendous benefit to the industry, to our customers, [and] to our 16,000-member reseller channel," and that SCO "plans to make Linux not just an alternative OS, but the dominant choice for businesses worldwide who are wanting to

take advantage of the benefits of online services." (Jacobs Decl. Ex. 7, UnitedLinux Press Release of May 30, 2002.)

The UnitedLinux members announced the release of United Linux 1.0 in November 2002. UnitedLinux was described as "the engine that powers products to be sold" by the four UnitedLinux members, including SCO and SuSE. (Jacobs Decl. Ex. 8, UnitedLinux Press Release of Nov. 19, 2002.)

On the same day, SCO proudly announced the release of SCO Linux 4.0, "powered by UnitedLinux." SCO emphasized that SCO Linux 4.0 is "based on UnitedLinux 1.0, the core standards-based Linux operating system co-developed in an industry initiative to streamline Linux development and certification around a global, uniform distribution of Linux." (Jacobs Decl., Ex. 9, SCO Press Release, Nov. 19, 2002.)

Also in November 2002, SuSE announced its release of SUSE Linux, "[b]ased on the joint industry standard, UnitedLinux 1.0." (Jacobs Decl., Ex. 10, SuSE Press Release, Nov. 19, 2002.)

### E.    SCO's Attacks on Linux and SUSE Linux.

Following the November 2002 release of United Linux, SCO Linux, and SUSE Linux, SCO suddenly changed its position and began attacking the Linux operating system. In particular, SCO asserted, for the first time, that all versions of the Linux operating system include code that infringes on SCO's alleged proprietary rights in the UNIX operating system. (*See* Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 63-74.)

In March 2003, SCO filed a suit against IBM in this Court, based on IBM's allegedly improper contribution of UNIX code, methods, and concepts to the Linux operating system. In May 2003, SCO sent a letter to numerous Linux users (including Novell), asserting that Linux is

"an unauthorized derivative of UNIX," which infringes on SCO's alleged intellectual property rights in UNIX. (Jacobs Decl., Ex. 11, SCO letter to Novell, May 12, 2003.)

In response to SCO's attack on Linux, SuSE stated that SuSE and its customers were protected by the broad licenses in the UnitedLinux contracts. (Jacobs Decl., Ex. 12, May 5, 2003, Article of CNET News.com.) SCO's Senior Vice President, Chris Sontag, replied in May 2003 that SuSE and its customers were *not* protected by the UnitedLinux contracts:

> Regarding contracts we have with SuSE and UnitedLinux, I would unequivocally state that there is nothing in those contracts that provides them with any protection or shelter in the way they are characterizing this in the press. If I were them, I would not be making those kinds of statements.

(Jacobs Decl., Ex. 13, John Blau Interview with Chris Sontag of May 13, 2006.)

On January 13, 2004, Novell purchased 100% of the shares of SuSE. At the same time, SuSE granted an exclusive license to Novell to all of SuSE's intellectual property rights, including SuSE's rights under the UnitedLinux contracts.

Shortly after Novell completed its acquisition of SuSE, SCO filed this lawsuit against Novell on January 20, 2004. Although Novell had announced its plan to acquire SuSE and to distribute SuSE Linux several months earlier, SCO's original complaint did not include any claims directed against SUSE Linux. In fact, SCO did not assert claims against SUSE Linux in this litigation until it filed its Second Amended Complaint in February 2006.

As discussed below, the claims in SCO's Second Amended Complaint directly implicate the respective rights and obligations of SCO and SuSE under the UnitedLinux contracts, and hence should be stayed pending resolution of the ICC arbitration between SCO and SuSE.

## SUMMARY OF ARGUMENT

The Federal Arbitration Act, 9 U.S.C. § 3, requires the Court to stay proceedings on a suit involving "*any issue referable to arbitration under an agreement in writing for such arbitration,*" provided that there has been no default in proceeding with the arbitration.

As discussed below, four of the five claims in SCO's Second Amended Complaint raise issues referable to arbitration under the UnitedLinux contracts signed by SCO in May 2002. These issues include (1) whether the UnitedLinux contracts divest SCO of ownership of any copyrights in the UnitedLinux technology; (2) whether the UnitedLinux contracts preclude SCO from asserting copyright infringement claims against SUSE Linux, in view of the broad license conferred by those contracts, as well as the incorporation of the terms of any applicable open source licenses. The Court should stay proceedings on these claims until these issues are decided in the ICC arbitration. If SuSE prevails in the arbitration, this will moot some of SCO's claims entirely, and will substantially reduce the scope of other claims.

SCO's "alternative" claim for specific performance of Novell's alleged obligation to transfer UNIX copyrights to SCO does not raise arbitrable issues, but is related to SCO's other claims, which do raise arbitrable issues. Indeed, SCO has presented this claim as an "alternative" that is contingent on the Court's rulings on SCO's other claims. Because SCO's alternative claim is related to, and contingent on, SCO's other claims, the stay of proceedings on SCO's claims should encompass this alternative claim.

## ARGUMENT

**I.    THE FEDERAL ARBITRATION ACT REQUIRES A STAY OF ANY CLAIM RAISING AN ISSUE SUBJECT TO ARBITRATION.**

Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, provides that:

> If any suit or proceeding be brought in any of the courts of the United Statues upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action, until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The Supreme Court has emphasized that the Federal Arbitration Act expresses "a liberal federal policy favoring arbitration agreements," which requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25; *see Perry et al. v. Thomas*, 482 U.S. 483, 489 (1987) (privately negotiated agreements to arbitrate "must be 'rigorously enforce[d]'") (citation omitted); *National Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290-92 (10th Cir. 2004) (applying this policy in granting motion to dismiss complaint and to compel arbitration).

Consistent with the policy favoring arbitration, federal courts have broadly construed their authority to stay litigation of arbitrable issues. For example, Section 3 has been interpreted as requiring a stay of *all* proceedings, including pre-trial discovery, even though it refers to a stay of "trial." *See, e.g., Corpman v. Prudential-Bache Secs., Inc.*, 907 F.2d 29, 31 (3d Cir. 1990) ("[w]here an action has been stayed pending arbitration, a district court may not permit the parties to conduct discovery under the Federal Rules of Civil Procedure").

Similarly, federal courts have held that when a claim involves both arbitrable and non-arbitrable issues, it is proper to stay proceedings on the entire claim, especially when

resolution of the arbitrable issues will have a substantial impact on the non-arbitrable issues. *See, e.g., Rain v. Schiffer Publ'g Ltd.*, 964 F.2d 1455, 1461 (4th Cir. 1992) (reversing the district court's denial of a stay as to fifteen of sixteen claims because "it will not be necessary for the district court to render a decision on the non-arbitrable issue of the determination of royalty amounts if the arbitrable issues are decided in favor of the defendants"); *Turner v. Bain & Co.*, No. 97-C-4755, 1997 U.S. Dist. LEXIS 16007, *12 (N.D. Ill. Oct. 6, 1997) (staying claim for tortious interference with contract because the arbitration involves the validity of the underlying contract and hence "clearly influences this claim") (attached as Ex. A hereto).

Moreover, federal courts have stayed litigation and/or compelled arbitration even when the party requesting the stay was not a signatory to the arbitration agreement. For example, in *Waste Mgmt., Inc. v. Residuous Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 340-41 (5th Cir. 2004), the Fifth Circuit held that defendant was entitled to a stay of litigation in view of an ICC arbitration between the plaintiff and defendant's corporate parent, even though defendant was not a party to the arbitration. The Fifth Circuit noted that "*any* of the parties to the suit" may request a stay pending arbitration, and hence "nonsignatories do have the right to ask the court for a *mandatory* stay of litigation, in favor of pending arbitration to which they are not a party." *Id.* at 342 (emphasis in original). The Fifth Circuit found that the district court should have stayed the litigation, because the arbitration involved the same basic dispute, even though the specific legal theories were different. *Id.* at 345. The Fifth Circuit emphasized that "there is a valid concern here about the integrity of the arbitration," given that "[a]llowing the instant litigation to proceed would risk inconsistent results, and 'substantially impact' the arbitration." *Id.*

Similarly, in *Continental Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 728-29 (7th Cir. 2005), the Seventh Circuit held that the defendant insurer could rely on the arbitration clause in a "Participation Agreement" for a reinsurance pool that plaintiff had signed, even though defendant had not signed that agreement. The Seventh Circuit emphasized that the Participation Agreement provided a "framework" that was "central" to plaintiff's relationship with all members of the reinsurance pool, including defendant, and hence defendant "may enforce the Participation Agreement's arbitration provision as a third-party beneficiary...." *Id.* at 734-35.

Other courts, including the Tenth Circuit, have likewise allowed nonsignatories to invoke an arbitration clause to stay litigation and/or to compel arbitration. *See, e.g., Gibson v. Wal-Mart Stores*, 181 F.3d 1163, 1170 n.3 (10th Cir. 1999) (compelling arbitration and dismissing suit even though defendant had not signed the arbitration agreement, because "[defendant] was, at the very least, a third party beneficiary of the Agreement") (citations omitted); *Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001) (defendant shareholders are entitled to stay litigation based on arbitration agreement between plaintiff shareholder and corporation, because "the facts and claims against the Corporation and its shareholders are so closely intertwined that [plaintiff's] claims against the non-signatory shareholders of the Corporation are properly referable to arbitration even though the shareholders are not formal parties to the 1972 [arbitration] Agreement"); *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*, No. 02-Civ.-9369-DFE, 2003 U.S. Dist. LEXIS 26928, *32 (S.D.N.Y. June 14, 2003) (arbitration clause in contract between U.S. company and Brazilian company requires arbitration of Brazilian company's claims against both the U.S. company and its Brazilian affiliate, because the claims are intertwined and enforcement of the clause by the non-signatory Brazilian affiliate was foreseeable) (attached as Ex. B hereto).

11

## II.    SCO'S CLAIMS SHOULD BE STAYED BECAUSE THEY RAISE ISSUES SUBJECT TO ARBITRATION UNDER THE UNITEDLINUX CONTRACTS.

### A.    SCO's Copyright Infringement Claim Raises Arbitrable Issues.

SCO's copyright infringement claim alleges that (1) SCO "is the sole and exclusive owner of the copyrights in UNIX, UnixWare, and the associated supporting materials"; (2) Novell's "distribution of SuSE Linux" infringes SCO's alleged UNIX copyrights; and (3) Novell's "unauthorized copying" involves "numerous data structures and algorithms contained in or derived from SCO's copyright material." (Jacobs Decl. Ex. 1, Second Am. Compl., ¶¶ 111, 116, 117.)

SCO's copyright infringement claim is wholly dependent on the results of the arbitration in three critical respects. First, SCO's copyright claim requires SCO to prove that it owns the copyrights at issue. However, SuSE has asserted in the arbitration that SCO does *not* own these copyrights because the UnitedLinux contracts transferred any such copyrights from SCO to UnitedLinux LLC.[4] (Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 46, 48, 82.) If the Arbitral Tribunal agrees with SuSE's position, this ruling will be dispositive of SCO's infringement claim.

Second, SuSE has asserted in the arbitration that the UnitedLinux contracts confer a broad, royalty-free license on SuSE to use any intellectual property rights of SCO in the UnitedLinux technology, including the right to sublicense such technology to others. (*Id.*,

---

[4] This transfer does not include "Pre-Existing Technology" identified in Exhibit C to the JDC, but this is irrelevant because SCO's infringement allegations do not appear to relate to "Pre-Existing Technology." (*See id.*, ¶ 81.)

¶¶ 46-48, 75, 82.) If the Arbitral Tribunal agrees, this will preclude SCO from asserting infringement claims against SuSE or Novell, which has a sublicense from SuSE.

Third, SuSE has asserted in the arbitration that the UnitedLinux contracts obligate SCO to comply with any open source licenses, including the "General Public License" that requires modified versions of the Linux "kernel" to be made freely available to the public.[5] (Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 29-32, 51, 61, 82.) SCO's infringement claim appears to be directed against technology included in the UnitedLinux kernel. (Id., ¶ 80.) Thus, if the Arbitral Tribunal agrees that the UnitedLinux contracts require SCO to make the Linux kernel freely available, this would require dismissal of SCO's infringement claim.

Because the arbitration involves the critical issue of whether the UnitedLinux contracts preclude SCO from asserting a copyright infringement claim against SUSE Linux, the Court should stay proceedings on this claim until the arbitration is completed. See Rain, 964 F.2d at 1461 (claims raising both arbitrable and non-arbitrable issues should be stayed in their entirety, because resolution of the arbitrable issues may dispose of these claims). Allowing the litigation to proceed would not only result in inefficient duplicative litigation, it would threaten the integrity of the arbitration by creating a risk of "inconsistent results." See Waste Mgmt., 372 F.3d at 345. Moreover, the UnitedLinux contracts authorize SuSE to sublicense the UnitedLinux technology "through multiple levels," and create an overall framework for the rights and obligations of SCO and SuSE regarding Linux products. Thus, Novell is entitled to rely on the arbitration clause in the UnitedLinux Contracts, as a third-party beneficiary of SuSE's sublicense

---

[5] As explained in the Request for Arbitration, the "kernel" is a set of software files that provide certain functions that are essential for every operating system. (See Jacobs Decl. Ex. 6, Request for Arbitration, ¶ 27.)

rights. *See Continental Cas. Co.*, 417 F.3d at 734-35 (allowing third-party beneficiary of "framework" agreement to rely on the arbitration clause in that agreement).

**B.    SCO's Slander of Title Claim Raises Arbitrable Issues.**

SCO's slander of title claim alleges that (1) "SCO is the sole and exclusive owner of all copyrights related to the UNIX and UnixWare source code"; and (2) Novell has slandered SCO's alleged title to the UNIX copyrights by falsely and maliciously asserting that SCO does not own these copyrights. (Jacobs Decl. Ex. 1, Second Am. Compl., ¶¶ 90-92.) Thus, as indicated by SCO's own pleading, SCO must prove that it is "the sole and exclusive owner" of UNIX copyrights to prevail on its slander of title claim.

Whether SCO owns the UNIX copyrights depends on two issues. The first is whether SCO acquired ownership of the UNIX copyrights by purchasing certain assets of the Santa Cruz Operation, which allegedly acquired these copyrights from Novell through the 1995 Asset Purchase Agreement (including its amendments). This is a disputed issue in this litigation related to the meaning of these agreements between Novell and the Santa Cruz Operation, which is not subject to arbitration.

However, SCO's ownership claim raises a second issue that is subject to arbitration. As noted above, SuSE has asserted in the arbitration that the UnitedLinux contracts transferred any intellectual property rights of SCO in the UnitedLinux technology to UnitedLinux LLC. (Jacobs Decl. Ex. 6, Request for Arbitration, ¶¶ 46, 48, 82.) Thus, even if it were assumed that SCO acquired ownership of UNIX copyrights from Novell, SuSE contends that the UnitedLinux contracts divested SCO of such ownership with respect to any claims by SCO directed against technology included in UnitedLinux.

If the Arbitral Tribunal accepts SuSE's position, this ruling would preclude SCO from asserting a "slander of title" claim as to copyrights that allegedly cover UnitedLinux technology, as SCO would not have "title" to such copyrights. Because resolution of this issue in the arbitration will have a substantial impact on SCO's slander of title claim, the Court should stay all proceedings on this claim. *See, e.g., Rain*, 964 F.2d at 1461 (claims raising both arbitrable and non-arbitrable issues should be stayed in their entirety, because resolution of the arbitrable issues may dispose of these claims).

### C.    SCO's Unfair Competition Claim Raises Arbitrable Issues.

SCO's unfair competition claim is extremely vague, but appears to combine its slander of title and copyright infringement claims. Thus, SCO alleges that Novell has (1) "falsely claimed ownership of SCO's copyrights in UNIX and UnixWare"; (2) "misappropriated SCO's UNIX technology in Linux and forced SCO to compete in the marketplace against its own intellectual property"; and (3) wrongfully attempted to thwart SCO's rights and efforts to bring legal claims in defense of its UNIX intellectual property." (Jacobs Decl. Ex. 1, Second Am. Compl., ¶ 122.)

SCO's allegations regarding SCO's ownership of UNIX copyrights and alleged interference with SCO's efforts to enforce those copyrights relate to SCO's slander of title claim. SCO's allegations regarding Novell's supposed misappropriation of "SCO's UNIX technology in Linux" relate to SCO's claim that Novell's distribution of SUSE Linux infringes SCO's copyrights.

As demonstrated above, SCO's claims for slander of title and copyright infringement should be stayed, because they raise potentially dispositive issues that will be resolved in the ICC arbitration between SuSE and SCO. SCO's unfair competition claim is basically just a new label

for its slander of title and copyright infringement claims, and hence should be stayed for the same reasons.

**D.    SCO's Breach of Contract Claim Raises Arbitrable Issues.**

SCO's breach of contract claim should also be stayed because it overlaps, in substantial part, with its claims for copyright infringement and slander of title. SCO alleges that Novell has breached the 1995 Asset Purchase Agreement (as amended) with the Santa Cruz Operation by (1) distributing "Licensed Technology" as part of Novell's Linux product; (2) "undermining" SCO's business by "distributing UNIX technology in Linux"; and (3) "making false and misleading statements denying SCO's ownership of the copyrights in UNIX and UnixWare." (Jacobs Decl. Ex. 1, Second Am. Compl., ¶ 99.)

SCO's first and second arguments regarding Novell's distribution of Linux are related to its copyright infringement claim, and hence raise the same arbitrable issues discussed above in connection with the copyright claim. SCO's third argument regarding Novell's allegedly false statements about SCO's copyright ownership is a repeat of its slander of title claim, and hence raises the arbitrable issue of whether the UnitedLinux contracts divested SCO of any such ownership. Because all three of these grounds for SCO's breach of contract claim raise arbitrable issues, the Court should stay proceedings on this claim.[6]

---

[6] SCO's breach of contract claim also alleges that Novell breached the "covenant of good faith and fair dealing" by "purporting to waive and revoke SCO's rights and claims against IBM." (Jacobs Decl. Ex. 1, Second Am. Compl., ¶ 99.) This argument does not appear to directly raise arbitrable issues. However, the other three bases for SCO's contract claim do raise arbitrable issues, and SCO's "IBM" argument may relate to the arbitration in that IBM is a distributor of SUSE Linux, and hence IBM's distribution of SUSE Linux is covered by the broad license in the UnitedLinux contracts.

**E.    SCO's Alternative Claim for Specific Performance Should Be Stayed Because It Is Closely Related to SCO's Other Claims.**

SCO has asserted an "alternative breach-of-contract claim seeking specific performance," which requests an order requiring Novell to take all actions necessary to transfer the UNIX copyrights to SCO. (Jacobs Decl. Ex. 1, Second Am. Compl., pp. 25-26.) This is phrased as an "alternative" because SCO's primary position, as stated in its slander of title and copyright infringement claims, is that SCO is *already* "the sole and exclusive owner" of the UNIX copyrights. (*Id.*, ¶¶ 90, 111.) Thus, SCO's "alternative" claim applies only if the Court *rejects* SCO's primary position that SCO already owns the copyrights.

SCO's alternative claim for specific performance does not directly raise arbitrable issues, as it is limited to the parties' rights and obligations under the 1995 Asset Purchase Agreement. However, it is logical to stay this claim as well, since it is related to SCO's other claims, which do raise arbitrable issues. Indeed, there is no need for the Court to consider SCO's alternative claim until and unless the Court first considers and rejects SCO's primary position that SCO is the owner of the UNIX copyrights.

## CONCLUSION

For the foregoing reasons, Novell respectfully requests that this Court stay all proceedings on the claims asserted by SCO in its Second Amended Complaint.

DATED:      April 10, 2006

ANDERSON & KARRENBERG

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

- and -

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)

**Attorneys for Novell, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of April, 2006, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF NOVELL, INC.'S MOTION TO STAY CLAIMS RAISING ISSUES SUBJECT TO ARBITRATION [*REDACTED pursuant to this Court's April 10, 2006 Order*]** to be served via first class mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
Mark R. Clements
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101


Kevin P. McBride
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401


Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131


Robert Silver
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

19

# EXHIBIT A

LEXSEE 1997 U.S. DIST LEXIS 16007

**GARY TURNER AND A.T. KEARNEY, INC., Plaintiffs, v. BAIN & COMPANY, INC., Defendant.**

No. 97 C 4755

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1997 U.S. Dist. LEXIS 16007*

**October 6, 1997, Decided
October 8, 1997, Docketed**

**DISPOSITION:** [*1] Plaintiffs' motion for preliminary injunction denied, defendant's motion for stay of the proceedings granted in part and denied in part, and plaintiffs' motion for partial summary judgment denied.

**COUNSEL:** For GARY TURNER, plaintiff: Robert J. Zaideman, Jerry A. Esrig, David Robert Nordwall, Epstein, Zaideman & Esrig, P.C., Chicago, IL.

For A T KEARNEY INC, plaintiff: John Anthony Ybarra, Jill Suzanne Miller, Allison Despard, Littler Mendelson, P.C., Chicago, IL.

For BAIN & COMPANY, INC., defendant: Joseph G. Bisceglia, Jenner & Block, Chicago, IL.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINIONBY:** Wayne R. Andersen

**OPINION:**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on three motions: (1) plaintiffs' motion for preliminary injunction pursuant to *Fed. R. Civ. P. 65(a)*; (2) defendant's motion to stay the proceedings pending arbitration pursuant to the Federal Arbitration Act ("FAA"), *9 U.S.C. § 1* et seq, and; (3) plaintiffs' motion for partial summary judgment pursuant to *Fed. R. Civ. P. 56*. For the following reasons, plaintiffs' motion for preliminary injunction is denied, defendant's motion for stay of the proceedings is granted in part and [*2] denied in part, and plaintiffs' motion for partial summary judgment is denied.

### BACKGROUND

Plaintiff Gary Turner ("Turner") is a citizen of Britain and a current and permanent resident of Australia. Turner is a management consultant. Plaintiff A.T. Kearney, Inc. ("A.T. Kearney") is a Delaware corporation with its principal place of business in Chicago, Illinois. A. T. Kearney provides its clients with management consulting services worldwide. Defendant Bain & Company, Inc. ("Bain") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Bain provides strategic consulting services for clients worldwide.

In 1990, Turner began working for Bain in its London, England office. In June, 1990, Bain transferred Turner to its Sydney, Australia office. In December, 1995, Bain promoted Turner to Vice President and transferred him to Bain's Chicago, Illinois office in April, 1996.

As a new officer, Turner signed a Confidentiality and Non-Competition Agreement ("Non-Competition Agreement") with Bain on December 15, 1995. Pursuant to the Non-Competition Agreement, subject to various conditions precedent, Turner is prohibited from rendering consulting [*3] services to any Bain clients, competitors of Bain clients, or prospective Bain clients for a two-year period after leaving Bain. (Non-Competition Agreement §§ 4, 5). The Non-Competition Agreement also prohibits Turner from having any business relationship with specified Bain competitors, including A.T. Kearney. (Non-Competition Agreement § 5, Schedule B).

The Non-Competition Agreement also contains a disgorgement provision which requires that Turner provide an accounting to Bain and repay Bain, "all of my profits, compensation, commissions, remunerations, or other benefits that I directly or indirectly realize or may realize as a result of [a violation of Section 4 or 5]." (Non-Competition Agreement § 7.1).

In addition, section 7.2 of the Non-Competition Agreement provides that any dispute between the par-

ties arising out of or relating to the agreement will be settled by arbitration. Further, in lieu of arbitration, Bain may choose to submit any dispute arising out of or relating to the Non–Competition Agreement to a court with proper jurisdiction. (Non–Competition Agreement § 7.3). Moreover, only Bain may obtain injunctive relief to enforce the terms of the Non–Competition **[*4]** Agreement. (Non–Competition § 7.3).

On March 28, 1997, A.T. Kearney offered Turner a position in its Sydney, Australia office as Vice President of its Financial Institutions Group in Australia and South East Asia. Turner accepted the offer and intended to begin working for A.T. Kearney on July 15, 1997. Turner announced his resignation from Bain on May 2, 1997 and tendered his formal letter of resignation on May 3, 1997. Turner's resignation from Bain was effective May 30, 1997.

After Turner's resignation, Turner and Bain attempted to negotiate mutually acceptable terms regarding Turner's new employment in light of the Non–Competition Agreement. The negotiations, however, were unsuccessful and, on June 12, 1997, Bain filed a demand for arbitration with the American Arbitration Association. Bain seeks an order that Turner comply with the Non–Competition Agreement and damages including all monies Turner received from A.T. Kearney.

On July 3, 1997, Turner and A.T. Kearney filed a five-count complaint in this Court. Count I seeks: (1) a declaration that the arbitration clause of the Non–Competition Agreement is unenforceable because it lacks mutuality of obligation; (2) an injunction **[*5]** enjoining Bain from compelling arbitration, and; (3) an order staying the arbitration proceedings pending final resolution of the enforceability of the arbitration clause. Counts II and III seek declarations that the disgorgement provision and certain covenants in the Non–Competition Agreement are unenforceable. Count IV requests a declaration that A.T. Kearney has not tortiously interfered with the Non–Competition Agreement. Count V alleges that Bain violated the Illinois Wage Payment and Collection Act, *820 ILCS 115/1* et. seq., by failing to pay Turner bonuses for 1996 and 1997.

Also on July 3, 1997, Turner and A.T. Kearney moved this Court to issue a preliminary injunction enjoining Bain from enforcing the arbitration clause of the Non–Competition Agreement. On July 29, 1997, Bain filed a motion to stay this action pending the completion of the arbitration proceedings between Bain and Turner pursuant to section 3 of the FAA, *9 U.S.C. § 3*. On September 2, 1997, Turner and A.T. Kearney moved for partial summary judgment on Count I of the complaint.

## DISCUSSION

### A. Plaintiffs' Motion for Preliminary Injunction

In order to grant a preliminary injunction, the court must **[*6]** find as a threshold matter that plaintiffs have some likelihood of success on the merits, lack an adequate remedy at law, and will be irreparably harmed if an injunction is not granted. *Vencor, Inc. v. Webb, 33 F.3d 840, 845 (7th Cir. 1994)*. Once these criteria are satisfied, the court must determine whether (1) the threatened harm to plaintiffs outweighs any harm the injunction may impose on defendant and (2) the public interest will be harmed by granting or denying the injunction. Id. Plaintiffs bear the burden of establishing that a preliminary injunction is warranted. Id.

### 1. Likelihood of Success on the Merits

The FAA governs the enforcement, interpretation and validity of arbitration clauses in commercial contracts. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983); Snyder v. Smith, 736 F.2d 409, 417 (7th Cir. 1984)*, cert. denied, *469 U.S. 1037, 83 L. Ed. 2d 403, 105 S. Ct. 513 (1984)*. The FAA also provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." *9 U.S.C. § 2*. Courts **[*7]** look to state contract law to determine whether an arbitration agreement is enforceable. *Perry v. Thomas, 482 U.S. 483, 492 n.9, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1987)*.

The parties contest which state law applies to this dispute. We apply the choice of law rules of Illinois, our forum state. Illinois choice of law rules require that the court follow a contractual choice of law clause. *Gramercy Mills, Inc. v. Wolens, 63 F.3d 569, 572 (7th Cir. 1995)*; Restatement (Second) Conflict of Law § 188(2) (1977). The Non–Competition Agreement specifically provides that Massachusetts law governs the agreement. (Non–Competition Agreement § 10). Accordingly, we apply Massachusetts law to determine whether the arbitration clause is enforceable.

Turner and A.T. Kearney claim that they will successfully prove that the arbitration clause is unenforceable because the clause lacks mutuality. Bain contends mutuality is not required because the Non–Competition Agreement as a whole is supported by sufficient consideration. We agree with Bain.

Under Massachusetts law, a contract is enforceable without mutuality of obligation. *Hancock Bank & Trust Co. V. Shell Oil Co., 365 Mass. 629,* **[*8]** *309 N.E.2d 482, 483 (Mass. 1974)*. Indeed, the Massachusetts Supreme Court specifically upheld a unilateral arbitration clause

and found that such clauses are not unconscionable. Eg. *Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 434 N.E.2d 611, 618 (Mass. 1982).* Under Massachusetts law, therefore, the instant arbitration clause is enforceable. Moreover, Illinois law does not require mutuality of obligation to enforce an arbitration clause where the entire contract is otherwise supported by consideration. *Design Benefit Plans, Inc. v. Enright, 940 F. Supp. 200, 205–06 (N.D. Ill. 1996).*

Turner and A.T. Kearney also rely on the doctrine of separability articulated by the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967),* to assert that the arbitration clause is unenforceable without independent consideration. We disagree.

Under Prima Paint, if the validity of the whole contract is in dispute, the arbitrator determines whether the contract as a whole is valid and the court decides whether the arbitration clause itself is valid. *Prima Paint Corp., 388 U.S. at 403–404;* Accord Flender [*9] *Corp. v. Techna–Quip Co., 953 F.2d 273, 277 (7th Cir. 1992).* Prima Paint does not hold, as plaintiffs suggest, that an arbitration clause must be supported by consideration independent of the entire contract.

Because we find that the arbitration clause is enforceable, plaintiffs have failed to establish any likelihood of success on the merits. Thus, plaintiffs cannot establish the elements required for a preliminary injunction. Plaintiffs' motion for preliminary injunction is denied.

**B. Defendant's Motion to Stay Pending Arbitration**

Bain contends that the arbitration clause is valid. Bain also claims that it has properly instituted arbitration proceedings under section 7.2 of the Non–Competition Agreement and that it has complied with all the requirements necessary for entry of a stay. Accordingly, Bain now moves this Court to stay the suit pending resolution of the arbitration proceedings.

Section 3 of the FAA provides,

> If any suit . . . be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved [*10] in such suit . . . is referable to arbitration under such any agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

*9 U.S.C. § 3.*

We have already determined that the arbitration clause of the Non–Competition Agreement is enforceable. Therefore, we must determine which of plaintiffs' claims are arbitrable:

> The duty to arbitrate is one imposed by contract and parties are not compelled to arbitrate a dispute unless they have agreed to do so. *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress Int'l, Ltd., 1 F.3d 639, 641 (7th Cir. 1993).* Arbitration clauses are construed broadly and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp., 460 U.S. at 24–25.* In this case, the arbitration clause specifically provides that "any claim or controversy *arising out of* . . . this Ageement shall be settled by arbitration." (Non–Competition Agreement § 7.2) (emphasis added). The "arising out of" language reaches "all disputes having their origin or genesis in the contract, whether or [*11] not they implicate interpretation or performance of the contract per se." *Sweet Dreams, 1 F.3d at 642.* A court may use its discretion to stay an entire suit if any issues in the case are arbitrable, even if some are not. *Pryner v. Tractor Supply Co., 109 F.3d 354, 361 (7th Cir. 1997).*

Counts I, II and III are brought by both plaintiffs. These claims challenge the enforceability of various provisions of the Non–Competition Agreement. Counts I, II, and III, therefore, concern the subject matter of the Non–Competition Agreement and have their origin in the agreement itself.

Plaintiffs, however, contend that A.T. Kearney's claims should not be stayed because A.T. Kearney is not a party to the Non–Competition Agreement. The court may stay a case pending arbitration between parties not in privity to the arbitration agreement. *IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524, 529–530 (7th Cir. 1996); Contracting Northwest, Inc. v. City of Fredericksburg, IA, 713 F.2d 382, 386–387 (8th Cir. 1983).* Here, A.T. Kearney's claims depend on the validity of the Non–Competition Agreement, an issue which will be decided in arbitration. Accordingly, Counts I, II and III as to both [*12] plaintiffs are stayed pending arbitration.

Count IV seeks a declaration that A.T. Kearney has not tortiously interfered with the Non–Competition Agreement or with Bain's business interests. To sustain a claim of tortious interference with a contractual relationship, the following elements must be established under Massachusetts and Illinois law: (1) a valid contract existed between Bain and Turner; (2) A.T. Kearney knowingly induced a breach of the contract, and; (3) Bain was harmed by A.T. Kearney's actions. *United Truck*

Case 2:04-cv-00139-DAK-BCW    Document 106    Filed 04/10/2006    Page 27 of 42
Page 4

1997 U.S. Dist. LEXIS 16007, *12

*Leasing Corp. v. Geltman, 406 Mass. 811, 551 N.E.2d 20, 21 (Mass. 1990); HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill.2d 145, 154–55, 545 N.E.2d 672, 676, 137 Ill. Dec. 19 (1989).* The arbitrator will determine whether the Non–Competition Agreement is a valid contract, an element of Count IV. Thus, because the arbitration clearly influences this claim, Count IV is also stayed pending resolution of the arbitration.

Turner's claim under the Illinois Wage Payment and Collection Act (Count V), however, is unrelated to the arbitrator's determination of the enforceability of the Non–Competition Agreement. The Non–Competition Agreement concerns [*13] issues of confidentiality and competition, not Turner's compensation. Thus, Count V is not stayed and discovery may proceed on this claim.

### C. Plaintiffs' Motion for Partial Summary Judgment

In their motion for partial summary judgment, plain- tiffs again contend that Bain cannot enforce the arbitration clause due to its lack of mutuality. Because the Court has already determined that the arbitration clause is enforceable, plaintiffs' motion for partial summary judgment is denied.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for preliminary injunction is denied. Defendant's motion to stay these proceedings pending arbitration is granted in part and denied in part. Counts 1, II, III, and IV are stayed pending arbitration. Count V may proceed in this Court. Plaintiffs' motion for partial summary judgment is denied.

It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: October 6, 1997

# EXHIBIT B

LEXSEE 2003 U.S. DIST LEXIS 26928

**PARAMEDICS ELECTROMEDICINA COMERCIAL LTDA., Plaintiff, v. GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES, INC., Defendant.**

**Case No. 02 Civ. 9369 (DFE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 26928*

**June 4, 2003, Decided**
**June 4, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed in part and appeal dismissed in part by, Remanded by *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 2004 U.S. App. LEXIS 10235 (2d Cir. N.Y., 2004)

**COUNSEL:** [*1] For Paramedics Electromedicina Comercial, Ltda, Plaintiff: O'Donnell & Fox, P.C., O'Donnell & Fox, P.C., New York, NY.

For GE Medical Systems, Inc., Defendant: Edward Maurice Mullins, Astigarraga Davis, Miami, FL; Howard Schiff, Michael Luskin, Scott A. Burr, Luskin, Stern & Eisler, L.L.P., New York, NY; Jose I. Astigarraga, Paul A. Capua, Astigarraga Davis Mullins & Grossman, P.A., Miami, FL.

For GE Medical Systems, Inc., Counter Claimant: Howard Schiff, Michael Luskin, Scott A. Burr, Luskin, Stern & Eisler, L.L.P., New York, NY.

For Paramedics Electromedicina Comercial, Ltda, Counter Defendant: O'Donnell & Fox, P.C., O'Donnell & Fox, P.C., New York, NY.

**JUDGES:** Douglas F. Eaton, United States Magistrate Judge.

**OPINIONBY:** Douglas F. Eaton

**OPINION:**

**ORDER: A) DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS SEEKING TO STAY ARBITRATION, B) GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION, C) GRANTING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION, AND D) INCLUDING FINDINGS**

**OF FACT AND CONCLUSIONS OF LAW**

This matter came before this Court on May 22, 2003 for hearing on the Motion of Plaintiff Paramedics Electromedicina Comercial Ltda. for Judgment on the Pleadings Seeking [*2] To Stay Arbitration (Docket No. 10) and Defendant GE Medical Systems Information Technologies, Inc.'s Motion to Compel Arbitration (Docket No. 15) and Motion for Preliminary Injunction Enjoining Tecnimed from Prosecuting the Brazilian Action (Docket No. 16). This Court has considered the motions, supporting memoranda and exhibits and the rest of the record as well as the oral arguments.

**FINDINGS OF FACT**

The parties have each filed affidavits and exhibits. On the material issues, the facts are not in dispute. Accordingly, being fully advised in the premises, the Court makes the following findings of fact.

1. Plaintiff Paramedics Electromedicina Comercial Ltda. ("Tecnimed") is a Brazilian company that markets, sells, and services medical products and equipment in Brazil.

2. Defendant GE Medical Systems Information Technologies, Inc. ("GEMS-IT") is a Wisconsin corporation, with its principal place of business in Milwaukee, Wisconsin. It manufactures and sells, among other things, medical products and equipment in Brazil and elsewhere. GEMS-IT was formerly known as GE Marquette Medical Systems.

3. In 1999, Tecnimed negotiated and entered into an International Distribution [*3] Agreement (sometimes denominated the "Distribution Agreement") and an International Sales and Service Representative Agreement (sometimes denominated the "Representative Agreement") (collectively "the Agreements"), for the distribution, sale and service of GEMS-IT's medical

2003 U.S. Dist. LEXIS 26928, *3

equipment and products in Brazil. According to the Agreements, Tecnimed became a GEMS-IT authorized, distributor and sales and service representative in Brazil.

4. The Agreements were for a term of two years, from May 1, 1999 to May 1, 2001. Sales made after the expiration of the Agreements are, nevertheless, expressly to be governed by the terms of the Agreements.

5. The International Distribution Agreement contains an arbitration clause that provides that any and all disputes pertaining to the Agreement would be resolved by binding arbitration before the IACAC:

> 24.1 This Agreement shall be governed by, and in accordance with, the internal laws of the State of New York, USA, without giving effect to the conflict of laws principles hereof.

> 24.2 The Parties agree that **any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement** which the Parties [*4] are unable to resolve by mutual negotiation will be submitted to good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA. . . .

> 24.3 In the event of **any controversy, dispute or difference between the Parties hereto, with respect to the interpretation of the provisions of this Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder,** either party may give notice to the other in writing of the existence of such controversy, dispute or difference specifying its nature and the points at issue. If the same shall not be amicably resolved by negotiation or mediation within thirty (30) days from the receipt of such notice, **either party shall be entitled to have such controversy, dispute or difference finally settled by arbitration,** in accordance with the rules of the Inter-American Commercial Arbitration Commission in effect on the date of this Agreement. The arbitration shall be conducted in Miami, Florida, USA . . .

Emphasis added.

6. The International Sales and Service Representative Agreement contains a similar provision in Article 19,

which states in relevant part:  [*5]

> 19.2 The Parties agree that **any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement** which the Parties are unable to resolve by mutual negotiation will be submitted to good faith, non-binding mediation before a qualified mediator in Miami, Florida, USA. . .

> 19.3 In the event of **any such controversy, claim or dispute,** either Party may give notice to the other in writing of the existence of such controversy, claim or dispute specifying its nature and the points at issue. If the same shall not be amicably resolved by negotiation or mediation within thirty (30) days from the receipt of such notice, **either party shall be entitled to have such controversy, dispute or difference finally settled by arbitration,** in accordance with the rules of the Inter-American Commercial Arbitration Commission in effect on the date of this Agreement. The arbitration shall be conducted in Miami, Florida, USA . . .

Emphasis added.

7. GEMS-IT alleges that during the term of the Agreements, GEMS-IT sold and delivered medical equipment to Tecnimed, which Tecnimed accepted. By March 2000, Tecnimed allegedly had stopped [*6] paying GEMS-IT's invoices when they became due, as required under the International Distribution Agreement. GEMS-IT claims that in reliance upon Tecnimed's assurance that it would pay GEMS-IT's outstanding invoices, it continued to deliver additional goods to Tecnimed and, pursuant to the terms of the Agreements, continued to do so even after the expiration of the terms of the Agreements in May 2001. Tecnimed allegedly owes GEMS-IT an amount in excess of $1 million and has refused to make payment.

8. Before the expiration of the term in May 2001, GEMS-IT attempted to negotiate with Tecnimed to obtain payment of Tecnimed's past due debt. By letter of December 8, 2000, Tecnimed wrote to GEMS-IT informing GEMS-IT that Tecnimed was "directing all [its] attention and disposition to find a solution attending to the best interest of GE and Tecnimed" and proposing "some possibilities to diminish [Tecnimed's] debt."

9. During 2001, GEMS-IT and Tecnimed met and communicated on several occasions to discuss and negotiate repayment of Tecnimed's outstanding debt to

Case 2:04-cv-00139-DAK-BCW    Document 106    Filed 04/10/2006    Page 31 of 42

Page 3
2003 U.S. Dist. LEXIS 26928, *6

GEMS–IT, which debt by then had allegedly reached approximately $1.2 million. As part of these discussions, Tecnimed allegedly [*7] repeatedly assured GEMS–IT that it would become current on all outstanding payments, causing GEMS–IT to further deliver goods to Tecnimed.

10. By letter of October 24, 2001, Tecnimed informed GEMS–IT that it would not pay its debt and, instead, enumerated a series of expenses that it had allegedly incurred to be able to market GEMS–IT's products and claimed $3,640,000 in damages. By letter of November 21, 2001, GEMS–IT informed Tecnimed that it rejected Tecnimed's demands.

11. On March 18, 2002, GEMS–IT sent a letter to Tecnimed requesting mediation of its claim as well as Tecnimed's claims. This letter requested that all these disputes "be submitted to a qualified mediator in Miami, Florida" and cited the articles quoted above (Article 24.2 and Article 19.2). On or about March 25, 2002, Tecnimed sent a letter to GEMS–IT rejecting mediation and demanding damages. Tecnimed's letter did not remotely suggest that Tecnimed was asking for further negotiation, to be followed (if unsuccessful) by mediation. Instead, Tecnimed's letter made seven points, including:

> 1. We do not agree with the date you suggested.
>
> 2. We do not agree with the way established for the mediation, [*8] foreseen in the contract, by lack of equilibrium in the contract, between the parties[.]
>
> 3. We do not accept an indication of a mediator[.]

12. On March 28, 2002, Tecnimed served GEMS–IT with an "Extrajudicial Notice" in anticipation of filing a lawsuit in Brazil.

13. On April 22, 2002, GEMS–IT filed a Request for Arbitration with the Inter–American Commercial Arbitration Commission ("IACAC") pursuant to Article 3 of the IACAC Rules of Procedure and the applicable provisions of the Agreements (the "IACAC Arbitration").

14. On May 2, 2002, GEMS–IT and Tecnimed representatives met in Miami, Florida to negotiate further. The parties, however, were unable to reach any agreement.

15. In response to GEMS–IT's Request for Arbitration, Tecnimed informed the IACAC that it would not participate in arbitration.

16. Thereafter, GEMS–IT named an American attorney as its party–appointed arbitrator, the IACAC ap-

pointed a Brazilian attorney as the second arbitrator in view of Tecnimed's failure to designate an arbitrator, and the IACAC appointed a Canadian attorney as the Chair (hereafter the three arbitrators are referred to as the "IACAC Arbitral Tribunal").

17. On May 23, 2002, Tecnimed [*9] filed a complaint in the Tenth Civil Circuit Court of Porto Alegre, Brazil (the "Brazil Court"), entitled Tecnimed Paramedics Eletromedicina Comercial Ltda v. GE Marquette Medical Systems and General Eletric do Brasil (the "Brazil Action"). As mentioned earlier, GEMS–IT was formerly known as GE Marquette Medical Systems. General Eletric do Brasil ("GE Brasil") is an affiliate of GEMS–IT. In the Brazil Action, Tenimed's complaint asserts seven (7) principal claims against GEMS–IT and GE Brasil ('the GE Defendants"), which this Court has examined. The claims include:

(a) A request that the Brazil court void the International Sales and Service Representative Agreement and International Distribution Agreement because these Agreements allegedly lacked "contractual equilibrium" and are, therefore, "abusive."

(b) A request that the Brazil court declare that Tecnimed is not bound to arbitrate its dispute with GEMS–IT in Miami, Florida, pursuant to the arbitration clauses contained in the International Sales and Service Representative Agreement and the International Distribution Agreement, because those agreements expired and are, therefore, not enforceable.

(c) A request that the Brazil [*10] court declare that the non–exclusive distributorship relationship agreed upon by the parties in Article 2 of the International Distribution Agreement was modified so that Tecnimed became the exclusive distributor of GEMS–IT's line of medical products and equipment in Brazil.

(d) A claim that GEMS–IT wrongfully terminated the International Sales and Service Representative Agreement and the International Distribution Agreement, allegedly causing the loss of profits that should be awarded to Tecnimed.

(e) A claim for "declaration of non–existence of debt" to the GE Defendants for the medical products and equipment Tecnimed purchased from GEMS–IT under the Agreements.

18. On August 19, 2002, the GE Defendants responded to the Complaint in the Brazil Action and opposed the action on the basis that the claims asserted by Tecnimed are subject to the mandatory arbitration provisions of the Agreements. On August 29, 2002, Tecnimed filed its Reply to GEMS–IT's defenses.

2003 U.S. Dist. LEXIS 26928, *10

19. No material ruling has been issued in the Brazil Action.

20. On November 13, 2002, Tecnimed filed, in the Supreme Court of the State of New York in the County of New York, a Verified Petition for a Permanent Stay of [*11] the [IACAC] Arbitration. n1

> n1 In its pending petition in the IACAC Arbitration, GEMS-IT seeks essentially the following relief: (a) a declaration that Tecnimed has breached the Distribution Agreement and the Sales Agreement; (b) a finding that Tecnimed is liable to GEMS-IT for breach of the Distribution Agreement and an award ordering Tecnimed to pay for goods sold and delivered in the amount of US $1,159,129.61 plus agreed upon interest of 12%, costs, legal fees and damages for Tecnimed's failure to provide services and other support as required by the Agreements; (c) a declaration that the disputes asserted by Tecnimed in the Brazil Action are arbitrable under the terms of the Agreements and may not be prosecuted in the Brazilian Courts; (d) a declaration that GEMS-IT has fully complied with its obligations and is not liable to Tecnimed; and (e) a finding that Tecnimed's claims are in any event barred by the terms of the Agreements limiting the liability of GEMS-IT.

21. On November 22, 2002, GEMS-IT removed [*12] Tecnimed's Verified Petition to this Court (hereinafter the "New York Action"). Jurisdiction of the New York action is based on (a) federal question jurisdiction pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (known as the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201 et seq., and the Inter-American Convention on International Commercial Arbitration (known as the "Inter-American Convention"), and its implementing legislation, 9 U.S.C. § 301 et seq.; and (b) diversity of citizenship, pursuant to 28 U.S.C. § 1332.

22. On November 27, 2002, GEMS-IT filed its Answer to the Verified Petition and asserted its counterclaims for (a) an order to compel arbitration and for (b) an anti-suit injunction to enjoin Tecnimed from proceeding with the Brazil Action.

23. On December 20, 2002, Tecnimed filed its Reply to the counterclaim and a motion for judgment on the pleadings, seeking to stay the IACAC Arbitration.

24. On January 3, 2003, GEMS-IT filed (a) a motion to compel arbitration of the claims Tecnimed is advancing in the Brazil Action and memorandum [*13] of law

in support of that motion and (b) a motion for a preliminary injunction enjoining Tecnimed from prosecuting the Brazil Action.

25. Tecnimed elected not to participate in the IACAC Arbitration. It did, however, file with the IACAC Arbitral Tribunal a copy of the memoranda and motions filed in this case, including the memoranda asserting that the IACAC Arbitral Tribunal lacked jurisdiction and the IACAC Arbitration should be stayed.

26. On April 4, 2003, the IACAC Arbitral Tribunal entered an award ("Award") ruling that: (a) the arbitration clauses in the two agreements between Tecnimed and GEMS-IT are valid and binding on Tecnimed; (b) the disputes submitted by GEMS-IT are within the scope of the arbitral clauses and are arbitrable; and (c) the alleged conditions precedent to arbitration (good faith negotiation, mediation, etc.) have been met and the Tribunal may proceed to adjudicate the disputes before it.

27. On May 14, 2003, the parties consented to proceed before the undersigned United States Magistrate Judge Douglas F. Eaton, pursuant to 28 U.S.C. § 636(c).

28. On May 22, 2003, this Court heard oral argument on Tecnimed's Motion for Judgment on [*14] the Pleadings Seeking To Stay Arbitration (Docket No. 10) and GEMS-IT's Motion to Compel Arbitration (Docket No. 15) and GEMS-IT's Motion for Preliminary Injunction Enjoining Tecnimed from Prosecuting the Brazilian Action (Docket No. 16).

## CONCLUSIONS OF LAW

Tecnimed has moved for an order, pursuant to Fed.R.Civ.P. 12(c), granting it a judgment on its pleading — specifically, the Verified Petition Tecnimed filed in this action — and a stay of the arbitration of all claims by GEMS-IT against Tecnimed, on the basis that the arbitration agreements are invalid and that GEMS-IT has failed to comply with the conditions precedent for initiating an arbitration against Tecnimed under the International Distribution Agreement and the International Sales and Service Representative Agreement, which provide for arbitration.

GEMS-IT has moved to compel arbitration of the claims that Tecnimed is attempting to litigate in the Brazil Court and to enjoin Tecnimed from prosecuting such suit.

Essentially, the same legal principles apply to Tecnimed's motion and to GEMS-IT's motion to compel arbitration.

## I. The Federal Arbitration Act and [*15] Case Law.

The Federal Arbitration Act, 9 U.S.C. § 1 et

*seq.* ("FAA"). in conjunction with the Inter–American Convention, implemented by *9 U.S.C. § 301*, provides the Court with subject matter jurisdiction. n2 The federal arbitral laws are divided into three chapters: Chapter One, *9 U.S.C. §§ 1–16*, contains the general provisions; Chapter Two, *9 U.S.C. §§ 201–208*, implements the provisions of the New York Convention; and Chapter Three, *9 U.S.C. §§ 301–307*, implements the provisions of the Inter–American Convention.

> n2 In addition, the Court has subject matter jurisdiction by virtue of the diversity of the citizenships of Tecnimed, a citizen of Brazil, a foreign state, and GEMS–IT, a citizen of a state of the United States. *28 U.S.C. § 1332.*

Because the parties are from the United States and Brazil, and both countries are signatories to the Inter–American Convention, see *9 U.S.C. § 301*, [*16] this case involves both Chapter One, the general provisions, and Chapter Three, implementing the Inter–American Convention. See *9 U.S.C. § 305.*

*Section 307* of Chapter Three provides that the provisions of Chapter One, *9 U.S.C. §§ 1–16*, apply to actions and proceedings brought pursuant to Chapter Three to the extent that the two chapters do not conflict with each other. *Section 4* of Chapter One provides, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner provided for in such agreement... The court shall hear the parties, and **upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue**, the court **shall** make an order direct**ing** the parties to proceed to arbitration in accordance with the terms of the agreement... If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. [*17]

*9 U.S.C. § 4* (emphasis added).

Thus, under Federal law, where the facts presented to the Court establish that (a) an arbitration agreement exists, and (b) that a party to such agreement is not in compliance with it, an order compelling arbitration without holding further proceedings may issue. *Evans*

*& Sutherland Computer Corp. v. Thomson Training & Simulation Ltd., 1994 U.S. Dist. LEXIS 15496, 1994 WL 593808, *3 (S.D.N.Y. Oct. 28, 1994).*

## II. Tecnimed's Motion For Judgment on The Pleadings and To Stay the IACAC Arbitration.

### A. Federal Policy Favors Arbitration.

"Federal policy strongly favors arbitration as an alternative dispute resolution process." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991).* While parties are not required to arbitrate when they have not agreed to, see *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989),* they are bound by provisions to which they have agreed. See *Genesco, Inc. v. T. Kakiuchi & Co., Ltd, 815 F.2d 840, 845 (2d Cir. 1987).* In accordance with that policy, courts [*18] should "construe arbitration clauses as broadly as possible," *Threlkeld, 923 F.2d at 250* (internal quotation and citation omitted), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24–25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983);* see also *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc., 473 U.S. 614, 625–26, 105 S. Ct. 3346, 87 L. Ed. 2d 444(1985).*

The federal policy in favor of arbitration is even stronger in the context of international business transactions. *Mitsubishi Motors Corp, 473 U.S. at 629–31; Scherk v. Alberto–Culver Co., 417 U.S. 506, 516–18, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974).* Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time–consuming and expensive litigation. The parties may agree in advance as to how their disputes will be resolved should their business relationship sour. See *Scherk, 417 U.S. at 516–17.* Thus, a district court should compel arbitration "unless it may be said with positive assurance that the arbitration clause is [*19] not susceptible of an interpretation that it covers the asserted dispute." *Threlkeld, 923 F.2d at 250.*

### B. The Arbitration Provisions Are Valid.

Against that backdrop, the arbitration provisions contained in the Agreements are valid and enforceable. In *Prima Paint Corp. v. Flood & Conklin Mfg., 388 U.S. 395, 404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967),* the Supreme Court instructed that an arbitration clause is to be treated as conceptually "separable" from the rest of the agreement, and that under the FAA, the role of the court is to consider only issues relating to the making and performance of an agreement to arbitrate and not issues relating

to the enforceability of the contract generally. Id; see also *Belship Navigation, Inc. v. Sealift, Inc., 1995 U.S. Dist. LEXIS 10541, 1995 WL 447656 at *5 (S.D.N.Y. 1995)* (citing cases).

The validity of the arbitration provisions is governed by *9 U.S.C. § 2*, entitled "Validity, irrevocability and enforcement of agreements to arbitrate." *Section 2*, although contained in Chapter One of Title 9, is incorporated by reference under Chapter Three, which implements the Inter–American Convention. See *9 U.S.C. § 302*. [*20] *Section 2* provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The Distribution Agreement and the Representative Agreement clearly contain written provisions to the effect that "any controversy, dispute or difference between the Parties" as to the "interpretation of the provisions of the Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder" shall be settled by arbitration. Accordingly, the issue for determination is whether Tecnimed agreed to the written arbitration provisions contained in the Agreements. See, e.g., *Siderurgica Del Orinoco, C.A., v. Linea Naviera De Cabotaje, C.A., 1999 U.S. Dist. LEXIS 12705, 1999 WL 632870 at *5 (S.D.N.Y. Aug. 19, 1999);* [*21] *Ocean Prods., Inc. v. Molinaos Rio de la Plata, S.A., 1999 U.S. Dist. LEXIS 5778, 1999 WL 239692, *2 (S.D.N.Y. April 22, 1999).*

In determining whether parties have agreed to arbitrate, the Court must apply accepted principles of contract law. *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir. 1993); Genesco, 815 F.2d at 844–45.* Under New York law, which governs the Agreements, "where the contract is unambiguous, courts must effectuate its plain language." *Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir. 2002).* "It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." *Marshall v. Marshall,*

*264 A.D.2d 826, 695 N.Y.S.2d 595, 596 (2d Dept. 1999)* (citations omitted).

A party who signs a contract in the absence of fraud or other wrongful acts on the part of another contracting party is presumed as a matter of law to [*22] know its contents and to have assented to them. *Progressive Casualty Ins. Co., 991 F.2d at 46; DeGaetano v. Smith Barney, Inc., 1996 U.S. Dist. LEXIS 1140, No. 95 Civ. 1613(DLC), 1996 WL 44226, *7–8 (S.D.N.Y. Feb. 5 1996).* There is no suggestion that the arbitration provisions were procured by fraud or that the arbitration provisions were hidden or kept from Tecnimed. Accordingly, this Court concludes that the arbitration agreements are valid and binding upon Tecnimed. n3

> n3 Tecnimed contends that the Agreements expired and are therefore not binding upon it. The issue of whether or not the Agreements expired as Tecnimed asserts, voiding the obligation to arbitrate, involves interpretation of the Agreements, termination of the Agreements, and the parties' obligations under the Agreements, and therefore is arbitrable. This Court notes that a court may compel arbitration of a dispute that arose after the expiration of the arbitration provision. See e.g. *Litton Fin. Printing v. NLRB, 501 U.S. 190, 206, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991); Fleck v. E.F. Hutton, 891 F.2d 1047, 1052–53 (2d Cir. 1989);* see also *CPR, Inc. v. Spray, 187 F.3d 245, 254 (2d Cir.1999).* Moreover, as held by the Arbitral Tribunal, the arbitral clauses are deemed to constitute agreements separate from the terms of the main agreements, and the expiration of the main agreements do not operate to extinguish the arbitral clauses. See Award P76, Ex. 19; see *Sphere Drake Ins. Ltd v. Clarendon Nat'l Ins., 263 F.3d 26, 30–32 (2d Cir. 2001),* citing, *Prima Paint Corp. v. Food & Conklin Mfg. Co., 388 U.S. 395, 402–04, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967).* An arbitration claim survives after the contract's expiration "where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where normal principles of contract interpretation, the disputed contractual right survives expiration of the agreement." *Gordon v. New York Times Employees Fed. Credit Union, 2001 U.S. Dist. LEXIS 15531, 2001 WL 1142174, *2 (S.D.N.Y. Sept. 26, 2001).* The determination of whether a contract containing an arbitration clause has expired is for the arbitrator to decide. *4200 Avenue K LLC v. Fishman, 164 F.Supp.2d 339, 342 (S.D.N.Y. 2001). Fishman v. Towers, 2001 U.S. Dist.*

LEXIS 17759, 2001 WL 1338897, *4n. 8 (S.D.N.Y. Oct. 31, 2001).

[*23]

### C. The Condition Precedent Was Excused

GEMS–IT argues that once this Court determines that the arbitration provisions are valid, this Court's work is finished, because the parties agreed to submit the issue of the arbitrability of claims to the IACAC Arbitral Tribunal; and thus that there is no need for this Court to determine whether GEMS–IT has complied with conditions precedent for the arbitration. As well, GEMS–IT has argued that the IACAC Arbitral Tribunal has already ruled upon the issue finding that any condition precedent to arbitration has been excused.

In contrast, Tecnimed argues that the determination of whether the conditions precedent to arbitration have been satisfied is the province of this Court, not the arbitrators.

Assuming without deciding that it is for the Court and not the arbitrators to determine compliance with conditions precedent to arbitration, this Court concludes that such conditions have been excused.

The Distribution Agreement provides, *inter alia:*

> 24.2 The Parties agree that any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement which the Parties are unable to resolve [*24] by mutual negotiation will be submitted to good faith, non–binding mediation before a qualified mediator in Miami, Florida, USA. . . .

This Court does not regard the mention of "mutual negotiation" in the Distribution Agreement or the Representative Agreement as creating a condition precedent to arbitration but rather regards this as descriptive language setting the stage for a mediation. In any event, to the extent that such language were to create a condition precedent, the record is clear that any such condition was more than satisfied as the parties had extensive mutual negotiations within the meaning of the Agreements.

This Court does, however, regard the requirement of a "good faith, non–binding mediation before a qualified mediator in Miami, Florida, USA" to constitute a condition precedent to arbitration. It is undisputed that a mediation was not held. However, this does not end the inquiry.

It is an elemental principle of contract law that "[a] party cannot insist upon a condition precedent, when its non–performance has been caused by himself". *Rochester Community Individual Practice Ass'n, Inc. v. Finger Lakes Health Ins. Co., Inc., 281 A.D.2d 977, 722 N.Y.S.2d 663, 666 (N.Y.A.D. 2001);* [*25] *Roberts v. H. Gin Realty Co., 185 A.D.2d 209, 586 N.Y.S.2d 264 (N.Y.A.D. 1992)* ("it is a familiar principle that one who frustrates the other party's fulfillment of a condition precedent by unilateral termination cannot avail himself of that condition precedent as a defense").

The record is clear that once the negotiations reached an impasse, Tecnimed refused to participate in mediation. By letter dated March 18, 2002, GEMS–IT requested that Tecnimed mediate and even suggested dates and location. Beyond that, GEMS–IT expressed that it was open to Tecnimed's suggestions for how the mediation should proceed, including any dates for the mediation that would be convenient for Tecnimed. Although GEMS–IT "rejected" Tecnimed's claims in the letter, GEMS–IT expressly stated that Tecnimed's claims as well as GEMS–IT's claims would be the subject of the mediation. Exhibit E, Affidavit of Eva Reynoso. Tecnimed, however, refused to participate, instead, sending a letter demanding damages, and in no way indicating any desire to mediate. See above, Finding of Fact P11.

Tecnimed cannot now use its own refusal to mediate to avoid arbitration. See, e.g., *Glover v. St. Louis-san Francisco Railway, 393 U.S. 324, 329–30, 89 S. Ct. 548, 21 L. Ed. 2d 519 (1969)* [*26] (employees not required to exhaust grievance procedure "where the effort to proceed formally with contractual or administrative remedies would be wholly futile"); *Welborne Clinic v. Medquist, Inc., 301 F.3d 634, 638 (7th Cir. 2002)* ("a party cannot avoid arbitration because of the other party's failure to comply with the negotiation steps of a grievance procedure."); *Beer, Soft Drink, etc. Local Union No. 744 v. Skokie Valley Beverage Co., 644 F. Supp. 213, 218 (N.D.Ill. 1986)* (employer precluded from raising as defense to arbitration Union's failure to fulfill contractual prerequisites to arbitration when employer "has refused from the outset to process" the grievance).

Accordingly, this Court concludes that any condition precedent to arbitration has been excused by Tecnimed's conduct.

### D. Arbitrability of GEMS–IT's Claims

Assuming without deciding that this Court is the proper forum to determine the arbitrability of the claims that GEMS–IT has asserted in the IACAC Arbitration, this Court concludes that such claims are arbitrable, and accordingly, that Tecnimed's motion for judgment on the pleadings must be denied.

The Agreements entered into by Tecnimed with GEMS–IT [*27] provide for mandatory arbitration of disputes between the parties arising out of or relating to

2003 U.S. Dist. LEXIS 26928, *27

the Agreements, including "any controversy, dispute or difference between the Parties hereto, with respect to the interpretation of the provisions of this Agreement or to the breach or termination thereof or the determination of the rights and obligations of the Parties hereunder. . . ." GEMS-IT's arbitral claims against Tecnimed relate to the interpretation of, the breach of, the termination of, and the obligations of the parties under, the Agreements. Accordingly, GEMS-IT's claims all fall within the scope of the arbitration provisions of the Agreements, and Tecnimed's motion for judgment on the pleadings and to stay the IACAC Arbitration must be denied.

### III. The Arbitrability of Tecnimed's Claims

GEMS-IT has moved to compel the arbitration of the claims that Tecnimed is prosecuting in the Brazil court. As noted, the Federal Arbitration Act provides in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed [*28] in the manner provided for in such agreement... The court shall hear the parties, and **upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue,** the court shall make an order **directing** the parties to proceed to arbitration in accordance with the terms of the agreement...

*9 U.S.C. § 4* (emphasis added).

Federal law instructs that:

> Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability.

*Progressive Casualty Ins. Co., 991 F.2d at 48,* quoting *Mitsubishi Motors Corp., 473 U.S. at 626.* "Indeed, unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should [*29] be submitted to arbitration." n4 *Progressive Casualty Ins.*

*Co., 991 F.2d at 48.* "Whether a particular claim falls within the scope of the parties' arbitration agreement, [the court] focus[es] on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International Inc., 198 F.3d 88, 99 (2d Cir. 1999).*

> n4 Paragraphs 19 and 24 of the Agreements, respectively, provide that the "Agreement" shall be "governed by and interpreted in accordance with" New York law. Tecnimed has argued that New York law of arbitration should govern by virtue of such language. In *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 60–64, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995),* the Supreme Court ruled that the mere inclusion of a choice–of–law provision in an arbitration provision does not thereby incorporate state arbitration law. Accord *National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 134–35 (2d Cir.1996);* cf. *Coleman & Co. Securities, Inc. v. Giaquinto Family Trust, 2000 U.S. Dist. LEXIS 16215, No. 00 Civ. 1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov. 9, 2000)* (holding that provision for "agreement and its enforcement" to be governed by New York law did not evidence parties' intent to be bound by New York arbitration law).

**[*30]**

In this Court's view, a review of Tecnimed's claims asserted in the Brazil Action against GEMS–IT and GE Brasil indicates that they are within the scope of the arbitral clauses of the Agreements. Accordingly, the Court grants GEMS–IT's motion to compel Tecnimed to arbitrate the claims that Tecnimed is prosecuting in the Brazil Court.

#### A. Tecnimed's Joinder of GE Brasil in the Brazil Action Does Not Alter the Result.

Tecnimed has sued not only GEMS–IT in its Brazilian lawsuit but also a related corporation, GE Brasil. The claims against GE Brasil, however, are intertwined with and indistinct from the claims that Tecnimed has asserted against GEMS–IT. Under the law, if non-signatories to a forum selection clause are "closely related" to one of the contracting parties, then all such parties can be encompassed by the clause. "Closely related" is broadly defined to encompass those non-signatory parties whose enforcement of the clause is foreseeable. See e.g., Direct Mail

Prod. Servs. Ltd. v. MBNA Corp., 2000 WL 1277597 (S.D.N.Y. 2000) (non-party to an agreement containing a forum selection clause may invoke such a clause if "the relationship between the non-party [*31] and the signatory [is] sufficiently close that the non-party's enforcement of the forum selection clause is 'foreseeable' by virtue of the relationship between the signatory and the party sought to be bound"); *Scher v. Bear Stearns & Co., Inc., 723 F.Supp. 211 (S.D.N.Y. 1989)* (non-signatory agent of principal who was party to arbitration clause was bound thereby); *Puerto Rico v. Airborne Group PLC, 882 F.Supp. 1212, 1216 (D.P.R. 1995)* (forum clause in contract benefited defendants other than signatories to the contract where such parties were related thereto as agent or parent or sister company); *Hirschfeld Productions, Inc. v. Mirvish, 88 N.Y.2d 1054, 673 N.E.2d 1232, 651 N.Y.S.2d 5 (N.Y. 1996)* (noting that "federal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation").

Here, Tecnimed's claims are substantially identical with respect to each defendant. Tecnimed has sued both defendants together in each claim. The claims alleged against them arise directly out [*32] of their relationship with each other. Tecnimed alleges that GE Brasil was acting as GEMS-IT's agent. Thus, it was clearly foreseeable to Tecnimed that GEMS-IT's alleged agent would seek to enforce the arbitration provision at issue. Based upon Tecnimed's allegations, both GE defendants are equally entitled to enforce the arbitration provision. n5

> n5 Even if the claims asserted against GE Brasil were sufficiently separate from the claims asserted against GEMS-IT as to be non-arbitrable, then, at a minimum, this Court would enjoin Tecnimed from litigating in Brazil Court its claims against GE Brasil pending the arbitration of the GEMS-IT/Tecnimed dispute. See *WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997)*, citing with approval *IDS Life Ins. Co. v. Sun America, Inc., 103 F.3d 524 (7th Cir. 1996)*; *Societe Nationale Pour La Rechereche, 430 F. Supp. 1332, 196 (S.D.N.Y. 1977)*. In IDS, Chief Judge Posner noted that where a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, "such a maneuver should not be allowed to succeed, [and] . . . is blocked . . . by the principles of parallel-proceeding abstention, which . . . require the court to stay the proceedings before it and let the arbitra-

tion go forward unimpeded." *103 F.3d at 530.*

[*33]

## IV. GEMS-IT's Motion and Petition For Anti-Suit Injunction

GEMS-IT additionally moved for an anti-suit injunction enjoining Tecnimed from prosecuting the Brazilian lawsuit. In its Memorandum of Law in Support of its Verified Petition at page 19, Tecnimed stated that it intends to pursue the Brazil Action "no matter what happens in the Arbitration and with this Petition." To assure compliance with the Court's order compelling arbitration, GEMS-IT's motion for injunction is hereby granted as set forth below.

### A. Applicable Legal Standards

#### 1. Preliminary Injunction

To obtain a preliminary injunction, the moving party must show: (a) irreparable harm and (b) either (1) the likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Beal v. Stearn, 184 F.3d 117, 122 (2d Cir. 1999)*; *International Fashion Products, B.V., v. Calvin Klein, Inc., 1995 U.S. Dist. LEXIS 2598, 1995 WL 92321 (S.D.N.Y. March 7, 1995)* (granting preliminary injunction enjoining plaintiff from prosecuting its [*34] injunction application in the Netherlands), citing *Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985)*; *Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd., 876 F.Supp. 482, 487 (S.D.N.Y. 1994)* (granting preliminary injunction in aid of arbitration).

#### 2. Anti-Foreign Suit Injunction

"The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well-established." *China Trade & Development Corp v. M.V. Choong Yong, 837 F.2d 33, 35-36 (2d Cir. 1987)*; see also *United States v. Davis, 767 F.2d 1025, 1038 (2d Cir. 1985)*; *Laker Airways Ltd v. Sabena Belgian World Airlines, 235 U.S. App. D.C. 207, 731 F.2d 909, 926 (D.C. Cir. 1984)*. n6 Such injunctions operate directly on the parties themselves, rather than on a foreign court. *Mastercard Int'l Inc. v. Argencard Sociedad Anonima, 2002 U.S. Dist. LEXIS 4625, 2002 WL 432379, *9 (S.D.N.Y. March 20, 2002)*, citing *Laker Airways, 731 F.2d at 926.*

> n6 When a party seeks affirmative relief from a court, as Tecnimed has done, it submits itself to the jurisdiction of the court with respect to the adjudi-

cation of the claims arising from the same subject matter. *Paine Webber Inc. v. The Chase Manhattan Private Bank, 260 F.3d 453, 460 (5th Cir. 2001); Bel Ray Co. Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir. 1999).*

[*35]

In order to obtain an anti–foreign–suit injunction, the moving party must first make two threshold showings: first, that the parties to both suits are substantially the same, and second, that "the resolution of the case before the enjoining court would be dispositive of the enjoined action." *China Trade, 837 F.2d at 36.* If these requirements are established, the court should then consider: (1) whether the foreign litigation poses a threat to the enjoining court's jurisdiction; (2) whether the foreign litigation would frustrate important United States policies; (3) whether the foreign action is vexatious; (4) whether adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment; and (5) other equitable considerations, including the possibility of prejudice to either party if the foreign action were to proceed. *Id.*

GEMS–IT meets the *China Trade* requirements for injunctive relief.

**B. GEMS–IT Will Suffer Irreparable Harm If Tecnimed Is Not Enjoined From Prosecuting the Brazil Action.**

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary [*36] injunction." *Rodriguez ex rel. Rodriguez v. DeBuonon, 175 F.3d 227, 233–34 (2d Cir. 1999); Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).* Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995).* Further, "irreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters, 903 F.2d at 907.* A federal court has the power to enjoin a party before it from prosecuting similar litigation in a foreign tribunal where the foreign action presents a threat of irreparable harm to the party seeking injunctive relief. *International Fashion Products, B.V., 1995 U.S. Dist. LEXIS 2598, 1995 WL 92321 at *2; National Trust Co. v. American Home Assurance Co., 1987 WL 5837, *6 (S.D.N.Y. Jan. 22, 1987).*

GEMS–IT will be irreparably harmed if a preliminary injunction is not entered enjoining Tecnimed from continuing the Brazil Action. First, GEMS–IT will be required to litigate claims relating to the Agreements, both here and in Brazil, in contravention of agreed–to forum selection provisions [*37] calling for arbitration before the

IACAC in Miami, Florida.

The deprivation of GEMS–IT's contractual right to arbitrate its claims, a right protected by international, federal, and state law, constitutes irreparable harm. See *Reliance Nat. Ins. Co. v. Seismic Risk Ins. Service, Inc., 962 F.Supp. 385, 391 (S.D.N.Y. 1997),* citing *Olde Discount Corp. v. Tupman, 805 F.Supp. 1130, 1135 (D.Del. 1992),* aff'd, *1 F.3d 202 (3d Cir. 1993),* cert. denied, *510 U.S. 1065 (1994)* ("loss of [plaintiff's] federal substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic loss"); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 482 F.Supp. 788, 792 (D.Fla. 1980),* rev'd on other grounds, *677 F.2d 391 (4th Cir. 1982)* (risk of engaging in discovery and going to trial "over a controversy for which this court ordered arbitration" constitutes irreparable harm); *see also Borden, Inc. v. Meiji Milk Prods. Co., 919 F.2d 822, 826 (2d 1990)* (New York Convention does not preclude injunction in aid of arbitration). [*38]

Tecnimed has submitted the issue of arbitrability to this Court. This Court has ruled on and rejected Tecnimed's contention. If Tecnimed is permitted to proceed in the Brazil Action, the possibility exists of conflicting judgments as to arbitrability. In addition, GEMS–IT faces the prospect of conflicting judgments on the merits from the IACAC Arbitral Tribunal and the Brazilian court. See *International Fashion Products, B.V., 1995 U.S. Dist. LEXIS 2598, 1995 WL 92321 at *2* (court finding irreparable harm where CKI was "compelled to litigate on two continents and may be subject to inconsistent rulings"); *Allendale Mutual Ins. Co. v. Bull Data Systems, Inc., 10 F.3d 425, 1993 WL 171359, *5 (N.D. Ill. 1993)* (court finding irreparable harm on basis that plaintiffs will not have had an opportunity to litigate the arson issue fully in a French court, and if French court reaches merits of the claims first, the French judgment will have a res judicata effect).

Accordingly, GEMS–IT will be irreparably harmed if a preliminary injunction is not entered enjoining Tecnimed from prosecuting the Brazil Action.

**C. GEMS–IT Has Demonstrated That Tecnimed Should Be Enjoined From Prosecuting the [*39] Brazil Action.**

The two *China Trade* threshold requirements and both of the China Trade specific circumstances that warrant an injunction against prosecution of a foreign litigation are met.

**1. The Parties to the Brazil Action Are Sufficiently Similar To the Parties in this Action.**

GEMS–IT and Tecnimed are parties in both this action and the Brazil Action. Although General Electric Company's subsidiary, GE Brasil, has been named in the Brazil Action, the claims made by Tecnimed against GEMS–IT and GE Brasil relate to the contractual relationship between GEMS–IT and Tecnimed. Tecnimed has alleged no independent claim against GE Brasil. Furthermore, as noted earlier, Tecnimed alleges GE Brasil acted as GEMS–IT's agent in GEMS–IT's dealings with Tecnimed.

Finally, GE Brasil is entitled to the benefit of GEMS–IT's arbitration agreements where its alleged misconduct relates to its behavior as an alleged agent of GEMS–IT. See *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 665, 668 (2d Cir. 1997); Thomas v. A.R. Baron & Co., Inc., 967 F.Supp. 785, 788 (S.D.N.Y. 1997); Hirschfeld Productions, Inc. v. Mirvish, 88 N.Y.2d 1054, 673 N.E.2d 1232, 651 N.Y.S.2d 5, 6 (N.Y. 1996)* **[*40]** (cases applying arbitration agreements to non-signatories who served as agents to signatories).

Accordingly, the present cases are sufficiently similar in terms of parties to meet the first threshold criterion for an anti–foreign–suit injunction against Tecnimed. *Mastercard Int'l Inc., 2002 U.S. Dist. LEXIS 4625, 2002 WL 432379 at *10; Farrell Lines Inc. v. Columbus Cello-Poly–Corp., 32 F.Supp.2d 118, 130 (S.D.N.Y. 1997),* aff'd *161 F.3d 115 (2d Cir. 1998).*

**2. An Order in this Action Compelling Arbitration Would Be Dispositive of the Brazil Action.**

The second threshold criterion is "whether the resolution of the case before this Court would be dispositive of the enjoined action. *China Trade, 837 F.2d at 36.* A comparison of GEMS–IT's Statement of Claim in the arbitration with Tecnimed's Brazilian Complaint shows that they raise the same issues.

As noted previously, in the IACAC Arbitration GEMS–IT seeks a ruling that its claims are arbitrable and an award ruling that: (a) Tecnimed has breached the International Distribution Agreement and the International Sales and Service Representative Agreement, (b) Tecnimed is liable to GEMS–IT **[*41]** for breach of the Distributorship Agreement in the amount of $1,159,129.61, for goods sold and delivered; (c) the disputes asserted by Tecnimed in the Brazil Action are arbitrable under the terms of the Agreements and may not be prosecuted in the Brazilian courts; (d) GEMS–IT has fully complied with its obligations and is not liable to Tecnimed; and (e) any claims of Tecnimed are in any event barred by the terms of the Agreements limiting the liability of GEMS–IT.

In the Brazil Action, Tecnimed seeks (a) a declaration

that GEMS–IT's claim for indebtedness is not subject to the arbitration requirements set forth in the Agreements, (b) money damages for the termination of the Agreements, (c) the revision of the contractual clauses of the terminated Agreements, and (d) a declaration that it owes nothing to GEMS–IT.

Thus, in both actions, GEMS–IT and Tecnimed both seek rulings regarding the (a) arbitrability or non-arbitrability of their claims, (b) monetary damages for alleged breaches of the Agreements, and (c) declarations of no liability of indebtedness as to the other party. Similarly, in this New York Action, Tecnimed seeks an adjudication of the arbitrability or non-arbitrability **[*42]** of GEMS–IT's claims and GEMS–IT seeks to compel arbitration of Tecnimed's claims.

Accordingly, the resolution of this action and the arbitration before the IACAC will resolve the Brazil Action. Therefore, the second threshold requirement is met

**3. Tecnimed's Prosecution of the Brazil Action Also Violates Two Additional Factors Required for An Anti-suit Injunction.**

GEMS–IT also meets the additional factors required by *China Trade* for an injunction: (a) Tecnimed's Brazil Action threatens this Court's jurisdiction, and (b) Tecnimed's Brazil Action violates a public policy of this forum. See *Mastercard Int'l Inc., 2002 U.S. Dist. LEXIS 4625, 2002 WL 432379 at *10,* citing *China Trade, 837 F.2d at 36.*

**a. Tecnimed's Brazil Action Threatens the Court's Jurisdiction Over The Matters at Issue.**

Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full and fair justice to litigants." *Laker Airways Ltd. V. Sabena Belgian World Airlines, 235 U.S. App. D.C. 207, 731 F.2d 909, 927 (D.C. Cir. 1984);* see also *China Trade, 837 F.2d at 37.* "When the action of a litigant in another forum threatens to paralyze **[*43]** the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceeding." *Laker Airways, 731 F.2d at 927.* Moreover, "when the availability of the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims, a court should preserve that forum." *Id. at 931–32.*

Under the Federal Arbitration Act, *9 U.S.C. § 1 et seq.,* and the IACAC Rules of Procedure [Ex. 6], a court of law and an arbitral tribunal may not have concurrent jurisdiction over a cause of action; only one of the forums may have jurisdiction. See *Paine Webber v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990)* ("If a court determines

2003 U.S. Dist. LEXIS 26928, *43

that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside the substantive scope of the agreement, it is obliged to enjoin arbitration. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute"); [*44] IACAC Rules, Articles 21, Ex. 4 (provides that the Arbitral Tribunal shall have the power to determine whether the parties agreed to arbitrate); accord, *Laitasalo, 196 B.R. 913, 925* ("Since, I now find that Kansa General is bound by that arbitration agreement, Kansa General must arbitrate this dispute in the U.S. and not litigate in Finland. . . ."); *Smoothline, 2002 U.S. Dist. LEXIS 3123, 2002 WL 273301 at *6* (court stating that "neither Smoothline nor Greatsino may continue the Liechtenstein action in so far as they seek to challenge in that suit the validity of the obligations encompassed by their respective agreements to arbitrate").

Tecnimed has submitted the issue of arbitrability to this Court. But Tecnimed has also asked the Brazilian court to declare that the Agreements are unenforceable and it is not required to arbitrate. [Ex. 9 at 11-15]. This Court has determined that Tecnimed did agree to arbitrate. Accordingly, once this Court has ruled, jurisdiction over such claims lies with this Court, and hereafter with the IACAC Arbitral Tribunal. Any decision to the contrary in the Brazilian court would undermine the jurisdiction of this Court and the IACAC Arbitration Tribunal. [*45] Upon referral to arbitration, this Court will retain jurisdiction to enforce its order. *Satcom Intern. Group v. Orbcomm International Partners, L.P., 49 F.Supp.2d 331, 336 (S.D.N.Y. 1999),* citing *Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 316 (2d Cir. 1998).*

Accordingly, Tecnimed's continued prosecution of the Brazil Action imperils this Court's jurisdiction (and the jurisdiction of the IACAC Arbitral Tribunal) and its order compelling arbitration.

**b. Tecnimed's Brazil Action Violates United States Policy Favoring Enforcement of Forum Selection Clauses.**

"An anti-suit injunction may ... be appropriate when a party seeks to evade important policies of the forum by litigating before a foreign court." *China Trade, 837 F.2d at 37;* see also *Laker Airways Ltd., 731 F.2d at 931 n. 73* ("An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important state policies.").

The United States has a well-established [*46] pub-lic policy of enforcing forum selection agreements and, in particular, arbitration agreements, and mandating the speedy removal of arbitral disputes from the courts. See *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972); Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974); Moses H. Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1, 22, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218-20, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985); Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 233, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987); Vimar Seguros v Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 537-39, 115 S. Ct. 2322, 132 L. Ed. 2d 462 (1995); International Fashion Products, B.V. v. Calvin Klein, Inc., 1995 U.S. Dist. LEXIS 2598, 1995 WL 92321, *2 (S.D.N.Y. March 7, 1995); Babcock & Wilcox Co. v. Control Components, Inc., 161 Misc.2d 636, 641, 614 N.Y.S.2d 678, 681 (Sup.Ct.N.Y. Co. 1993).*

Tecnimed does not deny that it filed the Brazil Action to avoid arbitral agreements. In paragraphs 16 through 20 of the Verified Petition, Tecnimed acknowledges that it [*47] filed the Brazil Action only after receiving notice of GEMS–IT's intent to submit its dispute to arbitration before the IACAC in Miami, Florida, USA:

> 16. Upon receiving GE's [March 18, 2002] letter, Tecnimed feared that just as GE was trying to proceed prematurely to mediation, it would next try to force arbitration on Tecnimed without taking the steps called for by the Rep Document or the Distribution Document. Tecnimed also knew it had uniquely Brazilian law claims against GE which were best heard by a Brazilian court. Thus, Tecnimed promptly sent GE an Extrajudicial Notice. Under Brazilian law, this event (on March 28, 2002) is the first step in filing suit. . . .

> 17. . . . GE's response, on April 22, 2002, was to begin the Arbitration, filing the Notice in Manhattan. . . .

> 19. On May 19, 2002, Tecnimed wrote the IACAC in Manhattan (and GE), stating that the Arbitration was invalid, and it would not participate, and would keep pursuing its remedies under Brazilian law and in Brazil. . . .

> 20. On May 23, 2002, Tecnimed filed a Complaint in the Tenth Circuit Court of Porto

Alegre, seeking, *inter alia,* declaratory relief and damages . . . .

In addition, Paulo Werlang, [*48] president of Tecnimed, states at paragraph 15 of his Affidavit in support of the Verified Petition, that Tecnimed filed its Extrajudicial Notice "to avoid being dragged into an arbitration process that GE had no right to force upon it."

Judges in our Court have enjoined parties from proceeding in foreign lawsuits that were filed in violation of agreed-upon forum selection clauses, as here. See *Farrell Lines Inc., 32 F.Supp.2d at 130-31* (issuing anti-suit injunction against insurers from prosecuting lawsuit in Italy where parties were bound by forum selection clause in bill of lading to litigate in New York); *International Fashion Prods., B.V. v. Calvin Klein, Inc., 1995 U.S. Dist. LEXIS 2598, 1995 WL 92321, *2 (S.D.N.Y. March 7, 1995)* (issuing anti-suit injunction against distributor from prosecuting an injunction application in the District Court of Amsterdam, The Netherlands where parties were bound by forum selection clause in distribution agreement to litigate in New York).

Judges in our Court have enjoined parties from proceeding in foreign actions where the parties have agreed to arbitrate their disputes in a particular forum. See *Smith/Enron Cogeneration Limited Partnership, Inc., 198 F.3d 88, 99 (2d Cir. 1999)* [*49] (affirming issuance of anti-suit injunction against SCI from prosecuting Dominican lawsuit where bound by arbitration agreement to arbitrate in New York); *Smoothline Ltd., 2002 U.S. Dist. LEXIS 3123, 2002 WL 273301 at *6* (issuing anti-suit injunction against Smoothline and Greatsino from proceeding against NAFT in Princely Court of Liechtenstein seeking damages for NAFT's alleged failure to pay its share of Smoothline's tooling costs and a declaration of "non-liability" that Smoothline and Greatsino had no obligation to repair or replace CRUs where NAFT was bound by arbitration agreement to arbitrate in New York); *In re Laitasalo, 196 B.R. at 924* (issuing anti-suit injunction against Kansa German from prosecuting in Helsinki, Finland District Court action seeking return of Letter of Credit where Kansa General is bound by arbitration agreement to arbitrate dispute in United States).

The issuance of a preliminary injunction here to preserve the status quo, pending arbitration, therefore, will fulfill this Court's obligation under the FAA and the Inter-American Convention to enforce a valid agreement to arbitrate. *Blumental, 910 F.2d 1049, at 1054.* In Blumental, [*50] the Second Circuit held that preliminary injunctions are appropriate whenever they are necessary to protect the integrity of a pending arbitration: "Arbitration can become a hollow formality if parties are able to al-

ter irreversibly the status quo before the arbitrators are able to render a decision in the dispute. A district court must ensure that the parties get what they bargained for— a meaningful arbitration of the dispute." *910 F.2d at 1053.*

Since Tecnimed agreed to arbitrate "any controversy, dispute, or difference" between the Parties arising out of or relating to the Agreements, GEMS-IT is entitled to enjoin Tecnimed from prosecuting the Brazil Action.

**D. Permanent Injunction**

GEMS-IT moved for a preliminary injunction pending this Court's ruling on its motion to compel arbitration, and in its counterclaim, GEMS-IT requested a permanent injunction barring Tecnimed from prosecuting the Brazil Action. As noted, to obtain a preliminary injunction (setting aside for the moment the question of whether the standards for anti-suit injunction are different), "the moving party must show (1) irreparable harm, and (2) either (a) a likelihood of success [*51] on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." *Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir.1992)*; see also *Richard Feiner & Co., Inc. v. Turner Entertainment Co., 98 F.3d 33, 34 (2d Cir.1996).* The standard for a permanent injunction is "essentially the same" as for a preliminary injunction with the exception that the plaintiff must actually succeed as to the merits rather than merely make a showing that such success is likely in a future proceeding. See *Rodriguez v. DeBuono, 44 F.Supp.2d 601, 606 (S.D.N.Y. 1999)*; *National Helicopter Corp. of America v. City of New York, 952 F.Supp. 1011, 1018 (S.D.N.Y. 1997).*

This Court has the discretion to consolidate the motion for a preliminary injunction with the request for permanent injunctive relief with the result that "the papers submitted and oral argument shall constitute the full trial on the merits." *American Train Dispatchers Asso. v. Metro-North C. R. Co. 698 F.Supp. 1102, 1107 (S.D.N.Y. 1988)*; see also *Rodriguez v. DeBuono, 162 F.3d 56, 62 n.9 (2d Cir. 1998).* [*52] *Rule 65(a)(2) of the Federal Rules of Civil Procedure* expressly permits the Court to order consolidation of trial on the merits with a hearing on an application for a preliminary injunction "before or after the commencement of the hearing" on the application. *Reese Publishing Co., Inc. v. Hampton Int'l Communications, Inc., 620 F.2d 7, 12 (2d Cir. 1980).* Although notice of intent to consolidate is ordinarily required, that requirement may be excused when no prejudice to the parties would result. Id. (holding that district court did not err in providing notice of consolidation at the close of preliminary injunction proceedings because the parties were not prejudiced); *Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n, 725 F.2d 564, 568 (10th Cir. 1984)*

2003 U.S. Dist. LEXIS 26928, *52

(district court's notice of its intent to consolidate on the second day of testimony was not error where the adverse party failed to ask for a continuance to present additional evidence and admitted in oral argument that it would not have significantly changed the presentation of evidence even if it had received more timely notice).

At the hearing [*53] on the subject motions, this Court inquired of the parties whether there was anything further to be considered, and specifically questioned Tecnimed through its counsel about any other matters that would bear on this Court's rulings on the pending motions. The parties did not indicate that any other matters would be needed to dispose of the merits of this proceeding, as the motions in fact frame and present the substance of the dispute. Once this Court compels arbitration of the Tecnimed claims in the Brazil Action, and denies Tecnimed's motion to stay the IACAC Arbitration, nothing remains for this Court to do. GEMS–IT having demonstrated that it is not only likely to prevail on the merits, but in fact entitled to prevail, this Court exercises its discretion to treat this matter as the trial and to treat GEMS–IT's application for a preliminary anti–suit injunction as one for permanent injunctive relief as well, thus bringing this matter to a conclusion. See *Fed.R.Civ.P. 65(a)(2)*; *National Helicopter, 952 F. Supp. at 1018*; *American Train Dispatchers, 698 F. Supp. at 1107 n.5*.

**Conclusion**

Accordingly, [*54] in light of the foregoing considerations, and this Court being fully advised in the premises and having considered the motions, memoranda of law,

supporting affidavits, legal arguments and all other pertinent matters of record, it is ORDERED and ADJUDGED as follows:

1. Paramedics Electromedicina Comercial Ltda.'s Motion for Judgment on the Pleadings Pursuant to *Federal Rule of Civil Procedure 12(c)* on its Verified Petition Seeking To Stay Arbitration (Docket No. 10) be and the same is hereby denied.

2. GE Medical Systems Information Technologies, Inc.'s Motion To Compel Arbitration (Docket No. 15) be and the same is hereby granted.

3. GE Medical Systems Information Technologies, Inc.'s Motion for Preliminary Injunction (Docket No. 16) be and the same is hereby granted.

4. This Court shall enter judgment separately in accordance with *Federal Rules of Civil Procedure 58* and *65(a)(2)*, in a Final Judgment of Injunction.

DONE AND ORDERED in the Southern District of New York, at New York, New York, this 4th day of June, 2003.

Douglas F. Eaton [*55]

United States Magistrate Judge