

111 F.3d 140   Page 1
111 F.3d 140, 1997 WL 186257 (C.A.10 (Colo.))
**(Cite as: 111 F.3d 140)**

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.
ALTRESCO PHILIPPINES, INC.; William R. Williams, individually and as Trustee; WRW Corporation, Plaintiffs-Appellees,
v.
CMS GENERATION COMPANY, Defendant-Appellant.
**No. 96-1080.**

April 17, 1997.

ORDER AND JUDGMENT [FN*]

[FN*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before TACHA, BRISCOE, and MURPHY, Circuit Judges.

**\*1** Defendant CMS Generation Co. ("CMS") appeals the decision of the district court denying CMS's motion to stay the action pending arbitration. This court has jurisdiction under 9 U.S.C. § 16(a). We affirm the decision of the district court in part and reverse in part.

I. BACKGROUND

In the early 1990's, plaintiff William R. Williams was in the business of developing electric generating power plants. In 1992, a company with whom Williams was affiliated, WRW Corp. ("WRW") (then Altresco Development, Inc. [FN1]), entered into an agreement with Meralco Industrial Electric Power Company ("Meralco"), the primary power distribution utility on the Island of Luzon, Philippines. This agreement required Meralco to buy all electricity generated by a power project to be developed by a new Philippine entity, Luzon Power Associates, Inc. ("LPA"). Williams executed this agreement as an officer of WRW. Williams owned fifty percent of LPA and the remaining fifty percent was held by a trustee for Meralco Industrial Engineering Services Corporation. ("Miescor"), a subsidiary of Meralco.

[FN1.] Plaintiff WRW was known at various times relevant to this litigation as Altresco Development, Inc. and as Altresco International, Inc. For clarity we will refer to Altresco Development and Altresco International by its current name, WRW Corp.

To further development of the LPA power project ("the Luzon project"), Williams contacted CMS to explore the possibility of CMS's participating in the project. After preliminary discussions, CMS, WRW, and Altresco Philippines (a company with which Williams was affiliated) entered into a Confidentiality Agreement. The purpose of the Confidentiality Agreement was to enable CMS to determine whether it wanted to co-develop and invest in the Luzon project. The Confidentiality Agreement enabled CMS to evaluate Altresco Philippines' and WRW's plans for building the Luzon project. The Confidentiality Agreement expressly noted that CMS "may desire to act as co-developer and investor of the [Luzon] Project, including, but not limited to, participating in financing, providing construction management expertise and operations and maintenance overview...." It also mandated that for three years CMS not engage in any other power plant projects with Meralco without the participation of Altresco Philippines or WRW.

After CMS reviewed the plans, it agreed to participate in the Luzon project. Subsequently, Altresco Philippines, CMS, Miescor and LPA executed agreements detailing the management, administration, operations, maintenance and funding of the Luzon project. These agreements were known as the Project Development Agreement ("PDA") and Equity Funding Agreement ("EFA"). Williams executed the PDA and EFA as President of Altresco

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Philippines. Both the PDA and EFA contained the following arbitration clause:

Any dispute relating to or in connection with this Agreement that cannot be settled amicably between the parties shall finally be settled by arbitration to be conducted by one arbitrator under the Rules of Conciliation and Arbitration of the International Chamber of Commerce. Such arbitration shall be conducted in English in Hong Kong.

After executing the PDA and EFA, the parties moved forward with the development of the Luzon project. Unbeknownst to plaintiffs, CMS became involved in another power plant project, the Magellan Project, allegedly in contravention of the Confidentiality Agreement's restrictive covenant limiting the participation of CMS in any other power project with Meralco for a three year period.[FN2] When Meralco, the entity to which both the Magellan and the Luzon power projects were to sell power, learned that CMS was participating in the Magellan project as well as the Luzon project, it insisted that CMS either withdraw from or reduce its interest in the Luzon project. CMS refused to do either. Subsequently, the Luzon project failed. According to plaintiffs, the Luzon project failed because CMS became involved in the Magellan project, and CMS broke a promise to assign a senior project engineer full time to the Luzon project.

> [FN2.] Appellees contend that CMS's involvement in the Magellan Project violated the following provision of the Confidentiality Agreement:
> For a period of three (3) years from the date of this Agreement, CMS shall participate in the Project only with [Altresco International, Inc. and Altresco Philippines, Inc.] or its Affiliates, on mutually acceptable terms and conditions, and shall not pursue the Project or any transaction with Meralco alone or in conjunction with any third party.

**\*2** Plaintiffs filed a lawsuit in the district court alleging the following:
(1) CMS breached the Confidentiality Agreement by engaging in the Magellan project;
(2) CMS breached a fiduciary duty owed to LPA as its shareholder;
(3) CMS intentionally interfered with LPA's contract with Meralco by pursuing the Magellan project and refusing to reduce its interest in the Luzon project;
(4) CMS breached an implied covenant of good faith and fair dealing in the Confidentiality Agreement by breaking a promise to assign an engineer full time to the Luzon project; and
(5) CMS engaged in unfair competition by using information acquired under the Confidentiality Agreement to pursue the Magellan project and by failing to reduce its interest in the Luzon project.

Plaintiffs sought compensation in the amount of $85,000,000 to cover all of their losses relating to the failure of the Luzon project. CMS filed a motion to stay the action pending arbitration pursuant to the provisions in the PDA and EFA. The district court denied CMS's motion. This appeal followed.

II. APPLICABILITY OF THE PDA AND EFA ARBITRATION PROVISIONS TO PLAINTIFFS' CLAIMS

CMS contends the district court erred when it ruled that plaintiffs' claims against CMS are not subject to arbitration. It points to the PDA and EFA arbitration clauses which broadly mandate arbitration of any claim "related to" or "connect[ed] with" those agreements. CMS believes that the claims in this action fall within that language and are thus subject to arbitration. CMS asserts that plaintiffs have deliberately attempted to avoid the arbitration clauses in the PDA and EFA by drafting their complaint to avoid pleading specific breaches of those agreements.

Plaintiffs respond that their claims are not arbitrable because they arise out of the Confidentiality Agreement and are separate from the PDA and EFA and the arbitration clauses contained therein. In support of their position, Plaintiffs note that (1) the Confidentiality Agreement is governed by Colorado law while the PDA and EFA are governed by New York law; (2) the Confidentiality Agreement is supported by separate consideration; (3) the parties to the PDA and EFA (Altresco Philippines, CMS, LPA and Miescor) are different from the parties to the Confidentiality Agreement (WRW, Altresco Philippines and CMS); (4) the Confidentiality Agreement authorizes redress in the court system;[FN3] (5) the Confidentiality Agreement expires under terms different from the PDA and EFA; and (6) CMS warranted in the PDA and EFA that those agreements did not contravene any other agreement by which it was bound.

> [FN3.] Plaintiffs point to a provision of the Confidentiality Agreement referencing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parties' right to seek relief in court as determinative of the parties' intent that claims under the Confidentiality Agreement are not subject to subsequent expressions in the PDA and EFA of intent to arbitrate. No doubt such an expression of the right to seek redress in court is a factor weighing in favor of plaintiffs' position. It is, however, but a factor, extant in one of many agreements governing the parties' obligations, conduct and claims in relation to two projects. As hereafter discussed, it does not overcome the arbitration provisions in two subsequent agreements, particularly when considered in light of the ringing precedential preference for arbitration.

This court reviews the arbitrability of a contract *de novo*. O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 901 (10th Cir.1992). The interpretation of the arbitration clause at issue is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* The FAA requires courts to stay judicial proceedings when a written agreement provides that the subject of the litigation is to be arbitrated. *Id.* § 3. "There is a strong federal policy favoring arbitration for dispute resolution." Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1514 (10th Cir.1995) (quoting Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 465 (10th Cir.1988)). While a party may not be compelled to submit a dispute to arbitration unless it has agreed to do so, federal arbitration policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Indeed, arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). The federal policy favoring arbitration is "particularly strong in the context of international transactions." Coors, 51 F.3d at 1514. Any claim that has a "reasonable factual connection to the [arbitration] contract" is arbitrable. Coors, 51 F.3d at 1516. However, "[a]n arbitration clause 'does not extend to all disputes of any sort ... but only to disputes touching specified provisions of the agreement.'" *Id.* at 1516 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 723 F.2d 155, 159 (1st Cir.1983), *aff'd in part and rev'd in part*, 473 U.S. 614 (1985)).

**\*3** Because arbitration is a matter of contract, in evaluating whether a claim is subject to arbitration, the language of the arbitration clause dictates whether a particular claim is subject to arbitration. Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Internat'l, Ltd., 1 F.3d 639, 643 (7th Cir.1993) ("[C]ontracting parties control their own fate when it comes to deciding which disputes to consign to arbitration. On the one hand, they may delineate precisely those claims that are subject to arbitration or, on the other, they may employ general-even vague-language in their arbitration provisions."). The arbitration clauses in the PDA and EFA broadly provide that "[a]ny dispute relating to or in connection with this Agreement" must be arbitrated. We consider each claim in the complaint to see whether it falls within the scope of this language.

1. First Claim for Relief.

Plaintiffs first cause of action states a claim for breach of the restrictive covenant in the Confidentiality Agreement. It alleges that "[b]y pursuing the Magellan project, CMS breached ... the confidentiality agreement ... [and as a] result of [such] breach ... LPA has been unable to *develop* the [Luzon] project and, therefore, plaintiffs have suffered damages for lost profits, loss of investment and other damages" (emphasis added). The essence of this claim is that CMS's actions prevented the development of the Luzon project and that failure caused plaintiffs to suffer $85,000,000 in damages. A cause of action based on the failure to *develop* the project necessarily relates to and is connected with the *development* and funding agreements for that very project.

Although plaintiffs have not specifically pleaded breaches of the PDA or EFA, direct breaches of those agreements are not necessary to invoke the arbitration clauses contained therein. In re Oil Spill by the "Amoco Cadiz" Off the Coast of France March 16, 1978 (Amoco Transport Co. v. Bugsier Reederei and Bergungs, A.G.), 659 F.2d 789, 794 (7th Cir.1981) ("Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause. Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims."). Instead, claims that fall within the scope of the agreement to arbitrate are arbitrable.

The district court relied on United International Holdings, Inc. v. Wharf (Holdings) Ltd., No. 95-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

111 F.3d 140                                                                                                         Page 4
111 F.3d 140, 1997 WL 186257 (C.A.10 (Colo.))
**(Cite as: 111 F.3d 140)**

1184, 1996 WL 55657 (10th Cir. Feb. 9, 1996) *cert. denied,* 116 S.Ct. 2524 (1996) in concluding that none of plaintiffs' claims for relief were subject to arbitration. We note as a preliminary matter that *Wharf* is an unpublished case and is not binding on this court. More importantly, *Wharf* is wholly inapposite.

In *Wharf,* plaintiff United International Holdings, Inc. ("UIHI") entered into a written agreement (the "TCA") with Wharf Cable whereby UIHI was to provide to Wharf a variety of technical services for a Hong Kong cable television venture ("Wharf Cable project"). In return, UIHI would receive quarterly fees. UIHI had also expressed an interest in investing in the Wharf Cable project, thereby becoming an equity participant in the project. The parties disputed whether they had entered into an oral contract regarding UIHI's investment. When Wharf (and its newly formed parent, through which the investment was allegedly to have been made) refused to permit UIHI's investment, UIHI brought an action in federal district court. Wharf cable moved to compel arbitration of the action.

**\*4** This court rejected Wharf Cable's argument that an arbitration clause in the TCA encompassed claims based on UIHI's alleged oral contract to invest in Wharf's parent. The court noted that the TCA was a narrow agreement regarding UIHI's provision of technical services to Wharf and that it specifically provided that UIHI was to have "no right or interest" in Wharf Cable. *Id.* at 4. This court concluded the claims brought against Wharf and its affiliates were "too remote, in substance and in distance, from the TCA to compel their arbitration pursuant to that agreement." *Id.* at 5.

In stark contrast, the contracts at issue in this case are directly related to one another. The Confidentiality Agreement specifically contemplates that CMS may participate in financing, construction, and operation of the Luzon project, *i.e.,* subjects finalized in the PDA and EFA. The two agreements are integrally connected and were essential to the development of the Luzon project. A claim alleging damages for failure to develop a project is not "too remote" in substance or in distance from the development and funding agreements for that very project to avoid arbitration. Because this court cannot conclude "with positive assurance" that the arbitration clauses in the EFA and PDA are "not susceptible of an interpretation that covers [Claim 1]," arbitration of this claim cannot be denied. *See AT & T Technologies, Inc. V. Communications Workers of America,* 475 U.S. 643, 650 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960)).

2. Second Claim for Relief.

The second claim alleges that CMS breached its shareholder fiduciary duty to LPA by "becoming involved in the Magellan project in the first instance and then later refusing to reduce its interest in LPA, despite repeated demands and warnings from Meralco that should CMS fail to reduce its interest, the LPA project would fail." Although this claim sounds in tort, the arbitration provisions in the PDA and EFA may compel its arbitration if it touches on matters covered by the PDA and EFA. *Sweet Dreams,* 1 F.3d at 643.

The EFA was the very instrument by which CMS became a shareholder of LPA. It is that shareholder status upon which plaintiffs premise their second claim for relief. As a consequence, that claim necessarily touches upon the EFA and is subject to arbitration.

3. Third Claim for Relief.

Plaintiffs' third cause of action is one for intentional interference with contract. Plaintiffs contend that CMS intentionally interfered with the power contract between LPA and Meralco by pursuing the Magellan project and refusing to reduce its holdings in LPA. This claim is not connected with the development and funding obligations of the Luzon project as set forth in the PDA and EFA. CMS's duty, if any, not to interfere with a contract between LPA and Meralco is unrelated to any obligation imposed by the PDA and EFA. Because this claim cannot be construed to be "related to" or "connect[ed] with" the PDA and EFA, it is not subject to arbitration.

4. Fourth Claim for Relief.

**\*5** Plaintiffs' fourth claim is one for a breach of the implied covenant of good faith and fair dealing based on CMS's failure to assign a project engineer full time to the development of the Luzon project, and its participation in another power project involving Meralco. This claim is closely connected to the PDA because that agreement sets forth the parties' obligations relating to the development of the Luzon project. A claim that the project was not *developed*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

quickly enough is necessarily related to the PDA. Further, as set forth in the analysis of Claim One above, Plaintiffs' claims that the Luzon project failed because of CMS's involvement in the Magellan project are necessarily related to and connected with the PDA and EFA. This claim is therefore subject to arbitration.

5. Fifth Claim for Relief.

The Fifth Claim [FN4] is one for unfair competition based on CMS's misuse of the information obtained under the Confidentiality Agreement to pursue the Magellan project as well as its refusal to reduce its interest in the Luzon project. Unlike claims one, two and four, this claim stands independent of the PDA and EFA. The obligation of confidentiality under the Confidentiality Agreement is unrelated to the obligations in the PDA and EFA. Had CMS elected not to participate in the Luzon project but had used the information obtained under the Confidentiality Agreement to pursue another project, plaintiffs could still pursue this claim. We simply do not view this claim as being "related to" or "connect[ed]" with the PDA or EFA.

> FN4. This is labeled as the Sixth Claim in the Complaint but because there is no "Fifth Claim," we refer to this as the Fifth Claim.

III. APPLICABILITY OF THE PDA AND EFA TO NONSIGNING PARTIES

CMS contends that although neither William R. Williams nor WRW Corporation signed the PDA or EFA, both are bound equally with Altresco Philippines by those agreements and by the arbitration clauses contained therein under standard principles of agency and contract law. CMS relies upon the following in support of its position: (1) the derivative claims Williams brought on behalf of LPA are subject to arbitration because LPA signed the PDA and EFA; [FN5] (2) WRW signed two initial memoranda of understanding related to the Luzon project and "thus is in privity with the other two plaintiffs"; (3) WRW is an agent of Altresco Philippines and Williams; and (4) in documents submitted to the district court, Altresco Philippines and WRW are referred to collectively as "Altresco" and the "Developer." CMS concludes that "[t]hese facts demonstrate that all three plaintiffs are in privity as to the Luzon project, and that Altresco Development, Inc., now known as WRW Corporation, should be equally bound by the arbitration agreements."

> FN5. CMS posits this theory in one sentence of its opening brief and one sentence of its reply and omits any supporting legal authority. By failing to develop this argument or cite any authority to support its assertion, CMS has waived this issue. _United States v. Hardwell,_ 80 F.3d 1471, 1492 (10th Cir.1996).

This court is not aware of any legal support for CMS's vague position that non-signatories who are "in privity" with signatories to a contract may be bound by that contract. It is true that a non-signatory may be bound by a contract containing an arbitration clause upon a determination that the non-signatory is the alter ego of a signatory. _ARW Exploration Corp. v. Aguirre,_ 45 F.3d 1455, 1460-61 (10th Cir.1995). CMS, however, has not made such a showing as to Williams or WRW.

*6 To establish that Williams or WRW is the alter ego of Altresco Philippines, the signatory to the PDA and EFA, CMS must prove that Altresco Philippines is a "mere instrumentality" of Williams and/or WRW, and that Altresco Philippines' separate corporate structure was used to perpetuate a fraud, illegality or inequity. _Key v. Liquid Energy Corp.,_ 906 F.2d 500, 503-04 (10th Cir.1990). In evaluating an alter ego theory, we note that "[c]ourts do not lightly pierce the corporate veil, 'even in deference to the strong policy favoring arbitration.'" _ARW Exploration,_ 45 F.3d 1455, 1461 (10th Cir.1995) (quoting _Califano v. Shearson Lehman Bros., Inc.,_ 690 F.Supp. 1354, 1355 (S.D.N.Y.1988)). In this case, the record reveals only that Williams and WRW were involved in steps leading to the development of the Luzon project. This is simply insufficient to bind them to a contract they did not sign. Based on the record before us, we are unable to conclude either were the alter ego of Altresco Philippines.[FN6]

> FN6. On May 13, 1996, CMS filed a motion to supplement the record in this case. This court denied that motion. We are aware that discovery has been ongoing during the pendency of this appeal. In fact, the deposition of Mr. Williams was taken only days before the oral argument of this case. Although information pertinent to the issue of which parties are bound by the PDA and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EFA may have been developed in such additional discovery, this court must decide this case on the record before it.

### IV. WAIVER

Plaintiffs contend CMS waived arbitration by removing, answering the complaint, and moving for dismissal before moving to compel arbitration. Their discussion of this argument is cursory. "[T]he right to arbitrate, like any other contract right, can be waived." *Metz v. Merrill Lynch, Pierce, Fenner & Smith,* 39 F.3d 1482, 1489 (10th Cir.1994). In determining whether a party has waived its right to arbitrate, we must examine the following factors:

(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* (quoting *Peterson v. Shearson/American Express,* 849 F.2d 464, 465 (10th Cir.1988)). After applying these factors, we reject this argument as merely makeweight.

### V. CONCLUSION

Although neither all parties nor all claims are subject to arbitration in this case, the FAA compels us to enforce the signing parties' agreement as drafted. *See Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 217 (1985) ( "[T]he Arbitration Act requires district courts to compel arbitration ... even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."). Given that mandate and in light of the strong federal policy favoring arbitration, we construe the language contained in the arbitration provisions of the PDA and EFA to require Altresco Philippines to arbitrate claims one, two, and four against CMS. To that extent, the judgment of the district court is REVERSED; in all other respects it is AFFIRMED. This matter is therefore REMANDED to the district court for entry of a stay consistent with this decision.

C.A.10 (Colo.),1997.
Altresco Philippines, Inc. v. CMS Generation Co.
111 F.3d 140, 1997 WL 186257 (C.A.10 (Colo.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.