MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)
425 Market Street
San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Bank One Tower
50 West Broadway
Salt Lake City,  UT  84101
Telephone:  (801) 534-1700
Facsimile:  (801) 364-7697

**Attorneys for Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>        Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>        Defendant and Counterclaim-Plaintiff. | **NOVELL, INC.'S AMENDED COUNTERCLAIMS**<br><br>Case No.  2:04CV00139<br><br>Judge Dale A. Kimball |

Dockets.Justia.com

Novell hereby amends those counterclaims it previously pled on April 10, 2006 against SCO, as follows:

## PARTIES

1.    Counterclaim-plaintiff Novell, Inc. ("Novell") is a Delaware corporation that was incorporated in 1983.  Its headquarters and principal executive offices are located in Waltham, Massachusetts.  Novell's principal product development facility is located in Provo, Utah. Novell also has offices in numerous cities worldwide.

2.    Counterclaim-defendant The SCO Group, Inc. ("SCO") is a Delaware corporation with its principal place of business in Utah County, State of Utah.

## JURISDICTION

3.    This Court has original jurisdiction over SCO's Amended Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.    This Court has jurisdiction over Novell's counterclaims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (arising under the Federal Copyright Act), 28 U.S.C. § 1367(a) (supplemental jurisdiction) and 28 U.S.C. §§ 2201(a) and 2202 (declaratory judgment).  Novell's slander of title claim involves questions of, and arises under, federal law. This Court has supplemental jurisdiction over Novell's state law claims of breach of contract, accounting, restitution and slander of title.

## VENUE

5.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(a), in that SCO resides or may be found in this district and is subject to personal jurisdiction in this district.

## FACTS

**A.    UNIX**

6.    UNIX is the name of a computer operating system originally developed beginning in the late 1960s by a group of software engineers at AT&T's Bell Laboratories.  Over time, AT&T

licensed its UNIX family of operating systems to universities, corporations, other entities and individuals.

7.    In 1993 AT&T sold its UNIX assets, held by its subsidiary UNIX System Laboratories ("USL"), to Novell.  This transfer of assets to Novell included UNIX copyrights, trademarks and all active UNIX licensing agreements, including contracts relating to the most recent version of the UNIX operating system called UNIX System V.  At the time there had been several major releases of System V, including Releases 1, 2, 3 and 4, also referred to as SVR1, SVR2, SVR3 and SVR4, or generically as SVRx.

**B.    Linux**

8.    Linux is the name of a computer operating system, originally developed beginning in the early 1990s when Linus Torvalds, an undergraduate student at the University of Helsinki, began writing the Linux kernel, or the core of the Linux operating system.  He released the first version of the Linux kernel on the Internet in 1991.  Since then, thousands of software programmers around the world have engaged in a collaborative effort to further develop Linux.

9.    Linux was developed as open-source software and has become a popular alternative to proprietary operating systems.  Unlike with other major operating systems, the underlying source code of Linux is available to the public.

**C.    The Asset Purchase Agreement Between Novell and The Santa Cruz Operation, Inc.**

10.    In 1995, Novell and a company called The Santa Cruz Operation, Inc. ("Santa Cruz") entered into negotiations over the sale of certain business assets of Novell relating to its UNIX and UnixWare software products.

11.    Santa Cruz was a California corporation that was incorporated in 1979.  It was founded as a UNIX system porting and consulting company and began to ship its first product, a packaged version of the UNIX operating system, in 1983.  In 1993 Santa Cruz completed an initial public offering and became a publicly-listed company on the NASDAQ Stock Exchange.

12.   On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement ("APA").  The APA provided each party with certain rights and obligations.

13.   The parties entered into two Amendments to the APA.  On December 6, 1995, Novell and Santa Cruz executed "Amendment No. 1."  Novell and Santa Cruz subsequently executed "Amendment No. 2" on October 16, 1996.

14.   Under the APA and its Amendments, Santa Cruz obtained a variety of assets, including assignment of tens of thousands of contracts and licenses, various trademarks, source code and binaries to UnixWare products, and physical assets such as furniture and personal computers.  Santa Cruz also obtained the right to develop a "Merged Product," a derivative work that would run on Intel platforms.

15.   Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell for these acquired assets and rights.  In order to bridge the price gap and consummate the transaction, Novell and Santa Cruz agreed that Novell would receive Santa Cruz stock and retain certain rights as protection.  For example (and as discussed further below), Novell retained the right to receive royalty payments under SVRX licenses, prior approval rights relating to new SVRX licenses and amended SVRX licenses, the right to direct Santa Cruz to take certain actions relating to SVRX licenses and the right to conduct audits of the SVRX license program.  Santa Cruz assumed several related obligations.

16.   One such obligation that Santa Cruz assumed under the APA was responsibility for administering the collection of royalty payments from SVRX licenses.  The APA provided that Santa Cruz shall collect and pass through to Novell 100% of the SVRX royalties.  In return, Novell agreed to pay Santa Cruz an administrative fee of 5% of those royalty amounts.  Santa Cruz also agreed to pay additional royalties relating to other products.

17.   Novell retained certain assets under the APA.  Schedule 1.1(b), which lists "Excluded Assets" under the agreement, specifies that Novell retained "all copyrights and

trademarks, except for the trademarks UNIX and UnixWare," "all patents," and "all right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof."

18. Novell also retained rights to supervise Santa Cruz's administration of SVRX licenses. Novell retained the "sole discretion" to direct Santa Cruz to amend, supplement, modify, waive or assign any rights under or to the SVRX licenses; if Santa Cruz fails to take any such action, the APA specifically granted Novell the right to take these actions on behalf of Santa Cruz. Novell retained the right to veto Santa Cruz's attempts to amend SVRX licenses, subject to two exceptions, as noted below. Novell also retained the right to veto Santa Cruz's attempts to enter into new SVRX licenses, subject to one exception, as noted below.

19. The APA gave Novell the right to confirm Santa Cruz's compliance with its contractual obligations under the SVRX licensing program. The APA explicitly provided that Novell "shall be entitled to conduct periodic audits" of Santa Cruz "concerning all royalties and payments due to Seller hereunder or under the SVRX Licenses." The APA required Santa Cruz to "diligently seek to collect all such royalties, funds and other amounts when due" and to "investigate and perform appropriate auditing and enforcement." The APA also required Santa Cruz to provide Novell monthly reports detailing the SVRX royalties it received.

20. Novell and Santa Cruz were the only parties to the APA and its Amendments. SCO was not a party to the APA or its Amendments. SCO was originally incorporated on August 21, 1998 as a company called Caldera Systems, a developer and provider of Linux-based business solutions. SCO purports to be the successor in interest to Santa Cruz under the APA and its Amendments. This dispute is about Novell's rights under the APA and whether SCO breached its obligations as the alleged successor of Santa Cruz.

**D.    Novell's Ownership of the UNIX Copyrights**

21. The APA transferred certain assets from Novell to Santa Cruz. However, as specified by Section V.A of Schedule 1.1(b) to the APA, certain assets were excluded from the

transfer. Among the "Excluded Assets" from the APA asset transfer were "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare."

22. The APA as executed on September 19, 1995 therefore does not transfer any copyrights.

23. Novell and Santa Cruz later executed Amendment No. 2 to the APA. Amendment No. 2 modifies Section V.A of Schedule 1.1(b) to provide that Excluded Assets include:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies.

24. Neither Amendment No. 2 nor the APA as modified by Amendment No. 2 were intended to, nor do they actually, transfer ownership of the UNIX or UnixWare copyrights owned by Novell at the time of the APA and its Amendments ("UNIX Copyrights").

25. Neither Amendment No. 2 nor the APA as modified by Amendment No. 2 qualify as "an instrument of conveyance, or a note or memorandum of the transfer" under 17 U.S.C. § 204(a) for at least the following reasons:

    a. Amendment No. 2 merely amends the schedule of excluded assets and therefore does not, itself, constitute a transfer of any asset.

    b. Neither Amendment No. 2 nor the modified APA identifies "the copyrights and trademarks owned by [Novell] as of the date of the Agreement required for Santa Cruz to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."

    c. Neither Amendment No. 2 nor the modified APA contains any language suggesting a contemporaneous transfer of any copyright. To the contrary, the APA provides only that certain assets "will" be transferred.

    d. Neither Amendment No. 2 nor the modified APA provides a date for any purported transfer of copyrights.

26.   Title to the UNIX Copyrights therefore remains with Novell.

27.   By and during early 2003, SCO repeatedly asked Novell to transfer the UNIX Copyrights to SCO.  In doing so, SCO conceded that title to the UNIX Copyrights remains exclusively with Novell.  Novell rejected all of SCO's requests.

**E.      The Sale of Certain Santa Cruz Assets to Caldera Systems**

28.   During the second quarter of its fiscal year 2000, Santa Cruz restructured its business into three divisions:  the Server Software division, the Professional Services division and the Tarantella division.  The Server Software division included Santa Cruz's UNIX-related business.

29.   On August 1, 2000, Santa Cruz entered into an agreement with Caldera Systems, under which Caldera Systems acquired Santa Cruz's Server Software and Professional Services divisions.  With the acquisition, Caldera Systems planned to add Santa Cruz's UNIX server solutions and services to its Linux business.

30.   On May 7, 2001, pursuant to an amendment to the agreement between Santa Cruz and Caldera Systems, Caldera International ("Caldera") was formed as a holding company to own Caldera Systems, including the assets, liabilities and operations of Santa Cruz's Server Software and Professional Services divisions.

**F.      Caldera's Financial Woes and Its Shift in Business Strategy Under New Leadership**

31.   Prior to Caldera's acquisition of Santa Cruz's Server Software and Professional Services divisions, substantially all of Caldera's revenue was derived from sales of Linux products and services.   However, Caldera had been unsuccessful in creating a profitable Linux business.

32.   After the acquisition of Santa Cruz's Server Software and Professional Services divisions, most of Caldera's total revenue came from UNIX products and services, ranging from 90 to 95% of Caldera's revenue during fiscal years 2001 and 2002.  But Caldera's revenue from

the sale of UNIX-based products declined in the fiscal quarters following the acquisition. Caldera experienced significant decreases in actual and forecasted revenue of the acquired Santa Cruz operations.

33.   Caldera incurred substantial financial losses during its fiscal years 2000, 2001 and 2002.  Caldera suffered losses from operations totaling $32 million in 2000, $133 million in 2001 and $24 million in 2002.

34.   In June 2002, Caldera hired Darl McBride as its President and Chief Executive Officer.  Mr. McBride was responsible for the company's strategic direction and planning.

35.   On our about the time of Mr. McBride's arrival at Caldera, Caldera began to pursue a new business strategy for the company, launching a rebranding effort of its products and services as well as its corporate image.

36.   On August 26, 2002, Caldera announced that it would change its name to The SCO Group, Inc. ("SCO"), pending shareholder approval.  On or about that time, Caldera then began doing business as SCO.   Caldera soon thereafter changed its trading symbol on the NASDAQ Stock Exchange from "CALD" to "SCOX."  Caldera's name change was formalized on May 16, 2003, when Caldera's shareholders approved an amendment to Caldera's certificate of incorporation that changed the company's name to SCO.

37.   As part of Caldera's rebranding efforts and shift in business strategy, Caldera purportedly initiated a review of its intellectual property rights.  This effort culminated in the launching of a licensing initiative, which it called SCOsource, in January 2003.  SCOsource, as described in further detail below, was an effort by Caldera to expand the revenue base of a company that had never before been profitable.

**G.    SCO's Requests to Novell To Participate in a Licensing Scheme and To Transfer the UNIX Copyrights**

38.   In late 2002, SCO repeatedly contacted Novell in connection with SCO's soon-to-be- announced SCOsource campaign.  SCO requested copies of certain documentation

concerning rights to UNIX, including the agreement between Novell and Santa Cruz. SCO also expressed its interest in a campaign to assert UNIX infringement claims against users of Linux. SCO asked Novell to partner with SCO in a Linux licensing program, under which SCO contemplated extracting a license fee from Linux end users to use the UNIX intellectual property purportedly contained in Linux. Novell refused to participate.

39. In aid of its scheme, SCO requested that Novell transfer its UNIX Copyrights to SCO and thereby acknowledged that it did not own the UNIX Copyrights. SCO contacted Novell on multiple occasions by and during early 2003. For example, SCO's CEO, Darl McBride, repeatedly contacted Novell and asked Novell to amend the Novell-Santa Cruz agreement to give SCO the UNIX Copyrights. Novell rejected all of these requests.

**H.    SCO's Scheme To Claim Ownership of the UNIX Copyrights**

40. Notwithstanding Novell's rejections, SCO embarked on an aggressive campaign in which it falsely asserted ownership over these same copyrights via public statements, a series of letters to Linux end users, several lawsuits against Linux distributors and end users, and a licensing program purporting to offer SCO's Intellectual Property Licenses for Linux.

41. SCO's misleading and wrongful public assertions of ownership include the following:

      a.    On March 7, 2003, SCO stated in a press release, "In 1995, SCO purchased the rights and ownership of UNIX and UnixWare that had been originally owned by AT&T. This included source code, source documentation, software development contracts, licenses and other intellectual property that pertained to UNIX-related business. . . . 'SCO is in the enviable position of owning the UNIX operating system,' said Darl McBride, president and CEO, SCO."

      b.    On May 14, 2003, SCO stated in a press release, "[SCO], the owner of the UNIX operating system, today warned that Linux is an unauthorized

derivative of UNIX and that legal liability for the use of Linux may extend to commercial users."

c.    On June 6, 2003, SCO stated in a press release, "[SCO], the owner of the UNIX® operating system, today confirmed its previously stated ownership of UNIX copyrights. As SCO has consistently maintained, all rights to the UNIX and UnixWare technology, including the copyrights, were transferred to SCO as part of the Asset Purchase Agreement between Novell and SCO dated September 19, 1995. Any question of whether the UNIX copyrights were transferred to SCO under the Asset Purchase Agreement was clarified in Amendment No. 2 to the Asset Purchase Agreement dated October 16, 1996.

'This amendment simply confirms SCO's long stated position that it owns all copyrights associated with the UNIX and UnixWare businesses,' said Chris Sontag, senior vice president and general manager, SCOsource intellectual property division, SCO.

. . .

'SCO is the owner of the UNIX operating system, as well as all of the UNIX contracts, claims and copyrights necessary to conduct that business,' said Sontag. 'None of the litigation we are currently involved with asserts claims based on copyrights. Because others have called into question SCO's ownership of the UNIX and UnixWare copyrights, we are satisfied that we have now proven without a doubt that SCO owns those copyrights.'"

d.    During at least June and July, 2003, SCO wrongfully registered copyrights in UNIX and UnixWare releases owned by Novell. These registrations related to UNIX System V release 3.0, UNIX System V release 3.1, UNIX

       System V release 3.2, UNIX System V release 3.2/386, UNIX System V release 4.0, UNIX System V release 4.1, UNIX System V release 4.1ES, UNIX System V release 4.2, UNIX System V release 4.2MP, and UnixWare 7.1.3.

e.     On January 13, 2004, SCO stated, "[SCO] today reiterated its ownership of UNIX intellectual property, source code, claims and copyrights and has made all of the documents surrounding the companies' ownership of UNIX and UnixWare available for public viewing at www.sco.com/novell."

f.     On January 28, 2004, in its Form 10-K filed with the United States Securities and Exchange Commission, SCO stated, "We own the UNIX operating system and are a provider of UNIX-based products and services. . . .

We acquired our rights to the UNIX source code and derivative works and other intellectual property rights when we purchased substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation, Inc., in May 2001. The Santa Cruz Operation (now known as Tarantella, Inc.) had previously acquired such UNIX source code and other intellectual property rights from Novell in September 1995, which were initially developed by AT&T Bell Labs. Through this process, we acquired all UNIX source code, source code license agreements with thousands of UNIX vendors, all UNIX copyrights, all claims for violation of the above mentioned UNIX licenses and copyrights and other claims, and the control over UNIX derivative works . . . ."

42. As part of SCO's scheme to claim ownership of the UNIX copyrights, SCO has falsely claimed that Novell acquiesced to SCO's claims. For example, on July 21, 2003, Darl McBride stated in a public interview:

> Interviewer: Well, Novell would say that you actually don't own those copyrights fully.
>
> McBride: Yeah, well, the Novell thing, they, they came out and made a claim that held up for about four days and then we put that one to bed. If you go talk to Novell today, I'll guarantee you what they'll say, which is they don't have a claim on those copyrights.

43. Novell has not acquiesced to SCO's claims, as recited in SCO's own Amended Complaint. (Amended Complaint ¶ 19(d)-(e).) To the contrary, Novell was vigorously contesting those claims in private correspondence with SCO at the very same time SCO was publicly claiming otherwise. For example:

    a.    On May 12, 2003, SCO's CEO Darl McBride sent Novell a letter asserting that it owned the UNIX copyrights and that Linux end users were infringing those copyrights.

    b.    On May 28, 2003, Novell's CEO, Jack Messman, responded by letter, asserting in no uncertain terms that "SCO is not the owner of the UNIX copyrights."

    c.    After SCO registered its claim to the UNIX copyrights with the U.S. Copyright Office, Novell's General Counsel, Joseph LaSala wrote to SCO, again disputing its claim to ownership of the copyrights. In his August 4, 2003, letter, LaSala stated, "We dispute SCO's claim to ownership of these copyrights."

44. In September and October 2003, Novell attempted to protect its rightful ownership of the UNIX Copyrights, and to correct SCO's erroneous registrations claiming ownership, by filing its own copyright registrations.

I.    **SCO's Scheme To Extract Licensing Fees from Novell, the Linux Community and UNIX Vendors**

45.    A significant aspect of SCO's rebranding efforts and new business strategy was its adoption of a scheme to extract "licenses" from the UNIX and Linux communities based on claims to own intellectual property specifically reserved to Novell, i.e., the UNIX Copyrights. SCO proceeded on its own in this scheme after Novell rebuffed SCO's overtures to participate.

46.    On January 22, 2003, SCO publicly announced its licensing scheme as part of its "SCOsource" program.  In connection with this announcement, SCO's CEO, Darl McBride, commented that "SCO owns much of the core UNIX intellectual property, and has full rights to license this technology and enforce the associated patents and copyrights."

47.    Under the SCOsource licensing program, SCO seeks to enter into license agreements with UNIX vendors and offers Intellectual Property Licenses to Linux end users ("Intellectual Property Licenses").  The purported purpose of these licenses is to allow UNIX vendors to use SCO's UNIX intellectual property and to permit Linux end users to "properly compensate us for our UNIX intellectual property as currently found in Linux."  One term of SCO's Intellectual Property Licenses for Linux is that licensees "will be held harmless against past and future copyright violations based on their use of SCO's intellectual property . . . in Linux distributions . . . ."

48.    SCO charges a sizeable licensing fee for SCO's Intellectual Property Licenses for Linux.  For example, for a server with 8 CPUs, the initial licensing fee is $4,999, with $1,079 payable every year after that.

49.    As part of its SCOsource initiative, SCO filed a lawsuit against IBM on March 7, 2003, asserting, among other things, UNIX Copyrights that SCO does not own.  SCO has alleged that it owns the UNIX Copyrights and that IBM's contributions to Linux and use of Linux infringe these copyrights.

50.    As part of the SCOsource program, SCO entered into at least two license agreements.  These licenses related to the use of UNIX technology by the licensees.  The first of these licenses was with Sun Microsystems, Inc. ("Sun").  The second license was with Microsoft Corporation ("Microsoft") and purportedly covers Microsoft's UNIX compatibility products.  On information and belief, through these licenses SCO broadened the rights of Sun and Microsoft to use SVRX code.

51.    The Sun and Microsoft licenses resulted in significant revenue for SCO and produced the first profitable quarter in SCO's history.  During the fiscal quarter ended April 30, 2003, SCO recognized $8,250,000 in revenue from these two new licenses.  In addition, these licenses accounted for $25,846,000 of SCO's revenue in fiscal year 2003.

52.    As part of the SCOsource program, in May 2003, SCO sent letters to 1,500 of the world's largest corporations threatening suit based on its alleged ownership of the UNIX Copyrights ("End User Letters").  On May 12, 2003, SCO sent one of these letters to IBM, and sent another letter to Novell.  On information and belief, all of the End User Letters were nearly identical in content to the IBM and Novell letters.

53.    In the End User Letters, SCO made the false and misleading statement that "SCO holds the rights to the UNIX operating system software originally licensed by AT&T to approximately 6,000 companies and institutions worldwide (the 'UNIX Licenses')."

54.    In the End User Letters, SCO also made the unsupported assertion that "We [SCO] have evidence that portions of UNIX System V software code have been copied into Linux and that additional other portions of UNIX System V software code have been modified and copied into Linux, seemingly for the purposes of obfuscating their original source."

55.    After setting forth these alleged facts in the End User Letters, SCO erroneously concluded that "Linux infringes on our UNIX intellectual property and other rights."  According to SCO, end users of Linux were liable for this alleged infringement whether or not they participated in any contribution of UNIX System V software code into Linux.

56.   As set forth in detail above, besides sending the End User Letters, SCO has made numerous public statements that it owns the UNIX Copyrights and that end users of Linux are liable for infringement of those copyrights.  For instance, contrary to the express terms of the APA, SCO has stated on its website that "only SCO is in a position to license the use of this infringing intellectual property."  The Court itself has noted SCO's "barrage of public statements about pursuing alleged infringers of its alleged intellectual property."  *The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK, Memorandum Decision and Order at 5 (Feb. 9, 2004).

57.   Shortly after the inception of its letter writing campaign, SCO brought suit against Autozone and Daimler Chrysler, both Linux end users.  In these lawsuits, SCO has made substantially the same allegations as set forth in its letters.  In the Autozone lawsuit, SCO has alleged that "[Autozone] uses one or more versions of the Linux operating system that infringe on SCO's exclusive rights in its proprietary UNIX System V operating system technology."  In the Daimler-Chrysler lawsuit, SCO has alleged that Daimler-Chrysler's use of the Linux operating system violates the UNIX license between Daimler-Chrysler and SCO.

58.   Novell has established a Linux Indemnification Program under which it currently offers indemnification for copyright infringement claims made by third parties against qualifying, registered Novell customers of specified SUSE LINUX Enterprise products.

59.   SCO has continued to pursue its SCO source initiative with other industry participants that it believes will lead to additional licensing agreements.   On information and belief, via this campaign, SCO has convinced several Linux end users to participate in its licensing program, obtain purported licenses to use "SCO's intellectual property contained in Linux," and thereby avoid suit by SCO.  In fiscal year 2004, SCO generated additional revenue from sales of its SCOsource Intellectual Property Licenses.

**J.      SCO's Breaches of the Asset Purchase Agreement**

60.   SCO's misguided campaign has led SCO to breach various obligations that Santa Cruz assumed under the APA and its Amendments.

61.   Novell has performed its obligations under the APA and its Amendments.

62.   SCO or Santa Cruz has received adequate consideration for its duties under the APA and its Amendments.

**Breach of Section 1.2(b)'s and 1.2(f)'s Audit Provisions**

63.   Section 1.2(b) of the APA gives Novell broad audit rights relating to the administration of the SVRX licensing program.  It reads in pertinent part:

> [Novell] shall be entitled to conduct periodic audits of
> [SCO] concerning all royalties and payments due to
> [Novell] hereunder or under the SVRX Licenses, provided
> that [Novell] shall conduct such audits after reasonable
> notice to [SCO] and during normal business hours and shall
> not be entitled to more than two (2) such audits per year.

64.   Further, section 1.2(f) of the APA obligates SCO to provide Novell monthly reports detailing the SVRX royalties that SCO received.

65.   On July 11, 2003 Novell notified SCO that it intended to conduct an audit beginning on August 18, 2003 covering the period beginning January 1, 1998 through June 30, 2003.

66.   By reply correspondence dated July 17, 2003, SCO accepted Novell's right to an audit.  Novell's audit began during the week of August 25, 2003.

67.   As part of Novell's aforementioned audit rights, on November 21, 2003, Novell sought the following categories of information and documentation relating to:

> a.      Any amendments and modifications to SVRX licenses, and in particular
> the amendments to the Sun and Microsoft SVRX licenses.  Novell
> specifically requested (1) "copies of the Sun and Microsoft amendments to
> verify SCO's compliance" with the APA and (2) "a detailed explanation

of SCO's position" if SCO contends that either of the two exceptions to the prohibition on unilateral amendments by SCO were applicable.

b.    Any buy-out of SVRX licenses, and in particular any information concerning any buy-out of Sun's and Microsoft's royalty obligations under their SVRX licenses.  Novell specifically requested that SCO identify any potential buy-out transactions so that Novell could verify SCO's compliance with the APA.

c.    Any new SVRX licenses, and in particular SCO's Intellectual Property Licenses for Linux.  Novell specifically requested (1) "copies of all SCO Intellectual Property Licenses for Linux, and any other agreements connected with attempts by SCO to enter into new SVRX Licenses, so Novell can verify SCO's compliance" with the APA and (2) "a detailed explanation of SCO's position" if SCO contends that the exception to the prohibition on new SVRX licenses by SCO was applicable.

d.    Any SVRX to UnixWare Conversions.  Novell specifically requested that SCO (1) identify and provide documentation for any allegedly valid conversions and (2) "explain in detail" how the alleged conversion complies with the APA and (3) provide "a detailed explanation of SCO's position" if SCO contends that any of the exceptions to the prohibition on conversion by SCO were triggered.

68.   Novell renewed its November 21, 2003 demand on December 29, 2003 and again on February 4, 2004.

69.   On February 5, 2004, SCO conveyed its refusal to provide the information identified in Paragraph 68.

70.   On March 1, 2004, Novell again contacted SCO for the above categories of information:  "In order to complete our audit, we need the Sun, Microsoft and any other

Intellectual Property Licenses for Linux.  Stated more categorically, we need all agreements in which SCO purported to grant rights with respect to Unix System V."  Novell noted that SCO's Intellectual Property Licenses for Linux appeared to be SVRX Licenses since they purported to grant rights relating to UNIX System V or UnixWare.

71.   Novell again sent a letter to SCO on April 2, 2004 urging a response.

72.   On November 17, 2004, Novell contacted SCO yet again:

> We have communicated with SCO several times about our concerns with SCO's handling of UNIX licenses, including the license with Sun.  In these communications, we have noted that our audit rights under the Asset Purchase Agreement require SCO to provide Novell with copies of any UNIX agreements (including amendments) SCO has reached with Sun.  We have sent you letters twice on this issue (in March and April 2004), and have not received an adequate response.
>
> . . .
>
> Accordingly, we must once again insist that you provide us with copies of any agreements with Sun (including amendments) that relate to UNIX.  We would appreciate a response by Friday, December 3, 2004.

73.   Despite Novell's repeated pre-litigation requests, SCO did not provide Novell with copies of the Sun and Microsoft licenses, or amendments, or with copies of SCO's Intellectual Property Licenses for Linux or other agreements connected with attempts by SCO to enter into new or amended SVRX licenses.  SCO also never provided any explanation why SCO was not obligated under the APA to seek Novell's consent to amend or otherwise enter into new SVRX agreements.  As a result, prior to this litigation Novell was unable to verify whether SCO had complied with the APA, as Novell is entitled under the APA.  Only through discovery in this litigation was Novell first able to obtain copies of certain aforementioned licenses and thereby conclude that SCO did not comply with its obligations under the APA.

**Breach of Obligation To Remit Royalties Under Sections 1.2(b) and 4.16(a)**

74.   Sections 1.2(b) and 4.16(a) of the APA create an agency relationship between SCO and Novell, obligating SCO to remit 100% of "all royalties, fees and other amounts due under all SVRX Licenses" to Novell.  "SVRX Licenses" are in turn defined to include "[a]ll contracts relating to" the various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1.  Under the APA, Novell has "all right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof."

75.   SCO has failed to remit to Novell all royalties owed under §§ 1.2(b) and 4.16(a) of the APA.

76.   As SCO admitted in its February 5, 2004 letter to Novell, SCO has entered into "new" agreements with Sun and Microsoft.

77.   On information and belief, these new agreements are "contracts relating to" the various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1.  The new agreements are therefore SVRX Licenses under the APA.

78.   SCO has not remitted any royalties from its new SVRX Licenses with Sun or Microsoft.

79.   In addition, SCO has entered into Intellectual Property Licenses with a variety of parties.  For example, on March 1, 2004, SCO announced an intellectual property licensing agreement with "EV1Servers.Net" that purportedly grants that company a site license to use SCO's intellectual property on all Linux servers managed by EV1Servers.Net in its hosting facilities.

80.   On information and belief, SCO's Intellectual Property Licenses are "contracts relating to" the various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1.  The Intellectual Property Licenses are

therefore SVRX Licenses under the APA.  SCO has not remitted any royalties from these SVRX
Licenses.

81.  Among other changes to the APA, Amendment No. 1 added § 1.2(e), which
provides that SCO has a right to retain all "source code right to use fees attributable to new
SVRX Licenses approved by [Novell] pursuant to Section 4.16(b)."

82.  SCO has neither sought nor obtained Novell's approval to enter into any new SVRX
license.  Therefore, none of SCO's new SVRX Licenses fall within § 1.2(e)'s exception to
SCO's general duty to remit 100% of SVRX royalties to Novell.

### Breach of Obligation Concerning Potential Buy-Out Transactions

83.  In Amendment No. 2, Novell and Santa Cruz agreed to a procedure that would
govern "any potential transaction with an SVRX licensee which concerns a buy-out of any such
licensee's royalty obligations."  In § B, they agreed that: (1) they "will" provide written
notification to each other upon becoming aware of any potential buy-out transaction; (2) "any
meetings and/or negotiations with the licensee will be attended by both parties, unless agreed
otherwise"; (3) "any written proposal to be presented to the licensee, including drafts and final
versions of any proposed amendments to the SVRX licenses, will be consented to by both parties
prior to its delivery to the licensee, unless agreed otherwise"; and (4) "prior to either parties'
unilateral determination as to the suitability of any potential buy-out transaction, the parties will
meet face to face and analyze the potential merits and disadvantages of the transaction."

84.  Through Amendment No. 2, the parties also agreed that no potential buy-out
transaction "will be concluded unless the execution copy of the amendment is consented to in
writing by both parties, and either party will have the unilateral right to withhold its consent
should it judge, for any reason whatsoever, the transaction to be contrary to its economic
interests and/or its business plans and strategy."

85.  On March 17, 1994, Novell and Sun entered into a Software License and
Distribution Agreement, effective January 1, 1994 ("the 1994 Sun Agreement").  Through this

agreement, Novell granted Sun an "irrevocable, perpetual, world-wide, royalty-free, paid-up right and license" concerning certain UNIX System V technology that Sun had previously licensed through SVRX licenses with Novell and its predecessors.

86.  SCO has acknowledged that the 1994 Sun Agreement was a buy-out agreement.  In a letter to Novell dated February 5, 2004, SCO contended that "Sun Microsystems bought out its license from Novell in 1994."

87.  The 2003 Sun Agreement purported "to amend and restate" the 1994 buy-out agreement between Novell and Sun and, thus, was a potential transaction with an SVRX licensee that concerns a buy-out of the licensee's royalty obligations.  The 2003 agreement relicensed SVRX technology that was the subject of the 1994 agreement.  It also purported to license additional SVRX technology.

88.  SCO did not secure Novell's approval prior to concluding its transaction with Sun in 2003.  Nor did SCO consult with Novell or provide any advance notification to Novell concerning this potential buy-out transaction with Sun.

### Breach of Section 4.16(b)'s Obligations

89.  Section 4.16(b) of the APA reads in pertinent part:

> In addition, at [Novell's] sole discretion and direction, [SCO] shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by [Novell].

90.  SCO has threatened to cancel or terminate various parties' SVRX licenses and has purported to cancel or terminate certain parties' SVRX licenses.  For example, on March 6, 2003, SCO sent a letter to IBM threatening to cancel or terminate IBM's SVRX license.  On May 29, 2003, SCO sent a similar letter to Sequent Computer Systems ("Sequent").

91.  SCO subsequently purported to cancel or terminate IBM's SVRX licenses as of June 13, 2003.  On August 11, 2003, SCO sent a letter to Sequent similarly purporting to terminate Sequent's SVRX licenses.

92.  SCO did not obtain Novell's prior written consent to cancel or terminate either SVRX license.  Accordingly, on June 9, 2003, and again on October 7, 2003, Novell directed SCO to waive any purported right SCO claimed to have to terminate IBM's SVRX licenses.  On February 6, 2004, Novell similarly directed SCO to waive certain of its purported rights under the IBM and Sequent SVRX licenses.

93.  Following SCO's failure to take the actions identified in the preceding paragraphs, Novell elected to take actions on SCO's behalf, as Novell is empowered to do by § 4.16(b). Section 4.16(b) of the APA provides in pertinent part:

> In the event that [SCO] shall fail to take any such action concerning the SVRX Licenses as required herein, [Novell] shall be authorized, and hereby is granted, the rights to take any action on [SCO's] own behalf.

94.  After SCO conveyed its refusal on February 11, 2004 to waive its purported rights against Sequent, Novell on the same day waived SCO's purported right to revoke any rights under Sequent's SVRX licenses.  Similarly, on October 11, 2003, Novell waived certain of SCO's purported rights under IBM's SVRX licenses.

95.  SCO refuses to acknowledge Novell's right to take such actions on its own behalf.

96.  Under Section 4.16(b) of the APA, SCO shall not amend or modify any SVRX license "without the prior written consent of [Novell]."  As modified by Amendment 1, Section 4.16(b) of the APA provides further that:

> Notwithstanding the foregoing, [SCO] shall have the right to enter into amendments of the SVRX Licenses (i) as may be incidentally involved through its rights to sell and license UnixWare software or the Merged Product .. or future versions of the Merged Product, or (ii) to allow a licensee under a particular SVRX License to use the source code of the relevant SVRX product(s) on additional CPU's or to receive an additional distribution, from [SCO], of such source code.
>
> In addition, [SCO] shall not, and shall have no right to, enter into new SVRX Licenses except in the situation specified in (i) of the preceding sentence as otherwise

approved in writing in advance by [Novell] on a case by case basis.

97.  On information and belief, SCO has entered into new SVRX Licenses with Sun, Microsoft and others (through, for example, SCO's Intellectual Property Licenses with Linux end users or UNIX vendors), or otherwise amended the Sun and Microsoft SVRX licenses.

98.  SCO never sought advance approval from Novell to enter into these new SVRX Licenses or amendments thereof.  SCO also never explained why under the APA it was not obligated to obtain Novell's advance approval.

99.  Under the APA, SCO also had no authority to enter into the Sun and Microsoft SVRX Licenses, or the Intellectual Property Licenses with Linux end users and UNIX vendors.

## FIRST CLAIM FOR RELIEF
### (Slander of Title)

100. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

101. SCO made its public statements claiming ownership of the UNIX Copyrights, and improperly registered its claim to UNIX Copyrights, with knowledge that title to these copyrights remains with Novell.

102. SCO made such statements maliciously, in bad faith, and with intentional disregard for the truth.

103. SCO made such statements with the intent to cause customers and potential customers of Novell not to do business with Novell, to slander and impugn the ownership rights of Novell in UNIX and UnixWare, and to attempt, in bad faith, to block Novell's ability to exercise its copyrights therein.

104. SCO's slander of Novell's title has resulted in special damages including, *inter alia*, Novell's costs and fees in preparing and filing copyright registrations and declarations correcting SCO's erroneous registrations claiming ownership of Novell's intellectual property and in prosecuting this action.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract: §§ 1.2(b) and 1.2(f) of the Asset Purchase Agreement)**

105. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

106. Pursuant to its audit rights under the APA, Novell requested certain information from SCO to verify SCO's compliance with the APA, including:

a.    Any amendments and modifications to SVRX licenses, and in particular the amendments to the Sun and Microsoft SVRX licenses, including a copy of these amendments and a detailed explanation of SCO's position if SCO contends that either of the two exceptions to the prohibition on unilateral amendments by SCO was applicable;

b.    Any buy-out or potential buy-out of SVRX licenses, and in particular any information concerning any buy-out of Sun and Microsoft's royalty obligations under their SVRX licenses;

c.    Any new SVRX licenses, and in particular  SCO's new SVRX agreements with Sun and Microsoft and SCO's Intellectual Property Licenses with Linux end users or UNIX vendors, including copies of these agreements and a detailed explanation of SCO's position if SCO contends that the exception to the prohibition on new SVRX Licenses by SCO was applicable; and

d.    Any SVRX to UnixWare Conversions, including documentation for any allegedly valid conversions, a detailed explanation of how the alleged conversion complies with the APA and a detailed explanation of SCO's position if SCO contends that any of the exceptions to the prohibition on conversion by SCO were triggered.

107. Under the APA, SCO was obligated to provide this information. SCO substantially and materially breached §§ 1.2(b) and 1.2(f) of the APA by refusing to do so during the course of Novell's audit of the SVRX licensing program. Novell was forced to initiate suit against SCO to obtain this previously requested information.

108. On information and belief, SCO's breaches of §§ 1.2(b) and 1.2(f) of the APA have caused Novell damage in an amount to be later proven. In addition, these breaches have caused Novell special damages, including, *inter alia*, the costs associated with making repeated requests for information necessary to confirm SCO's compliance with its contractual obligations to administer SVRX licensing program, conducting further reviews of the limited information provided by SCO, attempting to estimate royalties owing based upon incomplete information provided, and initiating and maintaining suit against SCO due to SCO's breaches.

109. The legal remedies available to Novell for future failures by SCO to comply with its audit obligations under §§1.2(b) and 1.2(f) of the APA may be inadequate. Therefore, Novell seeks an order from this Court compelling SCO's specific performance of its aforementioned audit obligations under §§1.2(b) and 1.2(f).

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract: §§ 1.2(b) & 4.16(a) of the Asset Purchase Agreement)**

110. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

111. SCO has substantially and materially breached §§ 1.2(b) and 4.16(a) of the APA by failing to remit all royalties owed to Novell, including any royalties SCO obtained from its new SVRX Licenses with Sun or Microsoft or from its Intellectual Property Licenses with Linux end users or UNIX vendors.

112. On information and belief, SCO's breaches of §§ 1.2(b) & 4.16(a) of the APA have caused Novell damage in an amount to be later proven. These breaches have caused Novell special damages, including, *inter alia*, the costs associated with attempting to ascertain from

SCO the royalty amounts due to Novell and the unpaid royalty amounts and initiating and maintaining suit against SCO due to SCO's breaches.

113. The legal remedies available to Novell for future failures by SCO to comply with its royalty obligations under §§ 1.2(b) & 4.16(a) of the APA may be inadequate. Therefore, Novell seeks an order from this Court compelling SCO's specific performance of its remittance obligations under §§ 1.2(b) & 4.16(a) of the APA.

114. In addition, Novell seeks an order from this Court imposing a constructive trust on revenues received by SCO from its new SVRX Licenses with Sun and Microsoft, its Intellectual Property Licenses with Linux end users and UNIX vendors, and any other new or amended SVRX Licenses, as defined by the APA, executed by SCO without Novell's approval. Creation of this trust is necessary to protect Novell from SCO's wrongful retention of monies owing Novell due to SCO's failure to perform its remittance obligations under §§ 1.2(b) & 4.16(a) of the APA. As set forth above, Novell owns "all right, title and interest" to these royalties, less SCO's 5% administrative fee.

115. This trust should be imposed for the additional reason that SCO is quickly dissipating its assets. On information and belief, SCO's revenues are declining, its operational losses are increasing and its cash is dwindling quickly. As of April 30, 2006, SCO had just $9,524,000 in cash and cash equivalents, just a fraction of the revenue it purportedly generated as a result of the Sun and Microsoft licenses.

116. Novell also seeks an order from the Court attaching SCO's assets pending adjudication of this claim because SCO is quickly dissipating its assets.

**FOURTH CLAIM FOR RELIEF**
**(Declaratory Relief: Rights and Duties under § 4.16(b) of the**
**Asset Purchase Agreement, § B of Amendment No. 2)**

117. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

118. Under § 4.16(b) of the APA, Novell has the right, at its sole discretion, to direct SCO to waive any rights under any SVRX Licenses.  In the event that SCO fails to take any such action at Novell's direction, § 4.16(b) gives Novell the right to take any action on SCO's own behalf.  SCO refused to perform its corresponding duties under § 4.16(b) and substantially and materially breached § 4.16(b) by:

      a.    Purporting to cancel or terminate SVRX licenses, including the IBM and Sequent SVRX licenses, and then refusing to waive these purported rights as directed by Novell; and

      b.    Refusing to recognize actions taken by Novell on SCO's behalf pursuant to § 4.16(b), including Novell's waiver of SCO's purported claims against IBM and Sequent.

119. Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that:

      a.    Under § 4.16(b) of the APA, Novell is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM, Sequent and other SVRX licensees; and

      b.    Under § 4.16(b) of the APA, Novell is entitled to waive on SCO's behalf SCO's purported claims against IBM, Sequent and other SVRX licensees, when SCO refuses to act as directed by Novell; and

      c.    SCO is obligated to recognize Novell's waiver of SCO's purported claims against IBM and Sequent.

120. Under § 4.16(b) of the APA, SCO is obligated to seek Novell's prior approval to enter into new SVRX Licenses or amendments of SVRX Licenses, subject to limited exception. SCO did not perform its corresponding duties under § 4.16(b) and substantially and materially breached § 4.16(b) by:

      a.    Purporting to enter into new SVRX licenses without Novell's prior approval, including agreements with Sun, Microsoft and other licensees of

SCO's Intellectual Property Licenses, without demonstrating that either of two limited exceptions was applicable; and

b.    Purporting to enter into amendments of SVRX Licenses without Novell's prior approval, including agreements with Sun, Microsoft and other licensees of SCO's Intellectual Property Licenses, without demonstrating that a limited exception was applicable.

121. Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that:

a.    Under § 4.16(b) of the APA, SCO was obligated to seek Novell's prior approval to enter into new SVRX licenses or amendments to SVRX licenses, including SCO's agreements with Sun, Microsoft and other licensees of SCO's Intellectual Property Licenses; and

b.    Under § 4.16(b) of the APA, SCO is obligated to seek Novell's prior approval to enter into new SVRX licenses or amendments to SVRX licenses, unless SCO can demonstrate to Novell that any exceptions to the prohibitions against new licenses and amendments by SCO are applicable.

122. Under § B of Amendment No. 2 to the APA, SCO is obligated to consult Novell and obtain Novell's approval before concluding any potential buy-out transaction with an SVRX licensee.   SCO did not perform its corresponding duties under § B of Amendment No. 2 and substantially and materially breached § 4.16(b) by entering into the 2003 Agreement with Sun without consulting Novell or securing Novell's prior approval.

123. Novell pleads in the alternative for a declaration pursuant to 28 U.S.C. § 2201 that SCO had no authority to enter into the Sun and Microsoft SVRX Licenses, as well as the Intellectual Property Licenses with Linux end users and UNIX vendors.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Relief: Rights and Obligations Under APA's Covenant of Good Faith and Fair Dealing)

124. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

125. The APA incorporates a covenant of good faith and fair dealing whereby each party agrees to work with the other to fulfill the purposes of the contract.

126. The APA granted Novell broad audit rights to verify SCO's compliance with the APA, as well as rights to approve (subject to limited exception) new SVRX licenses and amendments to SVRX licenses. The APA also granted Novell the right to direct SCO to amend, supplement, modify or waive any rights under any SVRX license, and to act on SCO's behalf if SCO fails to take such direction.

127. Under the APA, SCO was obligated to administer the SVRX License Program, subject to the additional duties provided in §§ 1.2(b), 1.2(f) and 4.16.

128. SCO failed to abide by these obligations under the APA and therefore substantially and materially breached the APA's covenant of good faith and fair dealing.

129. Novell seeks a declaration pursuant to 28 U.S.C. § 2201 that SCO is obligated under the APA to:

    a.    Comply with Novell's exercise of its audit rights under §§ 1.2(b) and 1.2(f) by providing information requested concerning new SVRX licenses and amendments to SVRX licenses;

    b.    Seek Novell's prior approval before entering into new SVRX licenses or amendments to SVRX licenses, or otherwise demonstrate that an exception to the prohibition against new licenses or amendments by SCO is applicable;

    c.      Amend, supplement, modify or waive any rights under any SVRX License to the extent so directed in any manner or respect by Novell in its sole discretion; and

    d.      Accept actions taken by Novell on SCO's behalf when SCO fails to take such action in (c) above as directed by Novell.

130. Novell further seeks a declaration pursuant to 28 U.S.C. § 2201 that Novell is the equitable owner of the SVRX Royalties, and that SCO is obligated under the APA to remit to Novell all royalties, fees and other amounts arising out of the 2003 Sun and Microsoft licenses, SCO's Intellectual Property Licenses, and any additional past or future SVRX Licenses as defined in the APA.

**SIXTH CLAIM FOR RELIEF**
**(Constructive Trust/Restitution/Unjust Enrichment)**

131. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

132. Novell holds "all right, title and interest," including equitable interest, to the SVRX Royalties as defined in the APA.

133. SCO has wrongfully retained in part or in full portions of all SVRX Royalties to which Novell was entitled under the APA.

134. In addition, SCO has wrongfully retained a 5% administrative fee for administering the SVRX License Program but having failed to fulfill its administrative auditing duties under the APA.

135. Novell seeks restitution of all monies constituting SCO's unjust enrichment, including all monies held by SCO in constructive trust for Novell pursuant to California Civil Code §§ 2223 and 2224.

136. Novell seeks an order from this Court imposing a constructive trust on revenues SCO unjustly received by failing to perform its administrative auditing and remittance obligations under the APA.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

137. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

138. The APA creates an agency relationship between Novell and SCO whereby Santa Cruz assumed fiduciary duties to diligently collect, administer, and deliver to Novell all SVRX Royalties, which was defined to include "all royalties, fees and other amounts due under all SVRX Licenses." As Novell's agent, SCO has a fiduciary duty to Novell. This fiduciary duty includes a duty to "to collect and pass through to [Novell] one hundred percent (100%) of the SVRX Royalties," to "administer the collection of all royalties, fees and other amounts due under all SVRX Licenses," to "diligently seek to collect all such royalties, funds and other amounts when due" and to promptly remit to Novell all SVRX Royalties within a time period prescribed by the APA. The fiduciary duty of loyalty flowing from the agency relationship also prohibits SCO from profiting at Novell's expense.

139. From all times after execution of the APA to present, including during 2003, SCO has owed Novell fiduciary duties as a result of the APA's agency provisions.

140. SCO breached its fiduciary duties to Novell by failing to account for and pass through all royalties, fees and other amounts received from the 2003 Sun and Microsoft SVRX Licenses, SCO's Intellectual Property Licenses, and any additional past or future SVRX Licenses as defined in the APA. SCO also did not report to Novell on the royalties, fees and other amounts due under those agreements, as required by the APA.

141. SCO further breached its fiduciary duties by failing to faithfully comply with the audit provisions of the APA. SCO failed to keep Novell fully informed as to all matters pertinent

to Novell's interest in the SVRX Royalties. Instead, SCO hid the terms of the 2003 Sun and Microsoft SVRX Licenses and other SVRX Licenses from Novell for as long as it possibly could, in derogation of its fiduciary duties as Novell's administrative agent.

142. SCO's breaches of fiduciary duty have caused Novell damage in an amount to be later proven. In addition, these breaches have caused Novell special damages, including, *inter alia*, the costs associated with making repeated requests for information necessary to confirm SCO's compliance with its contractual obligations to administer SVRX licensing program, conducting further reviews of the limited information provided by SCO, attempting to estimate royalties owing based upon incomplete information provided, and initiating and maintaining suit against SCO for its breaches.

143. Novell also seeks an order from this Court imposing a constructive trust on revenues SCO unjustly received by failing to perform its administrative auditing and remittance obligations under the APA.

### EIGHTH CLAIM FOR RELIEF
### (Conversion)

144. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

145. Novell holds "all right, title and interest" to the SVRX Royalties, as set forth in §§ 1.2 and 4.16 of the APA.

146. In 2003, SCO entered into SVRX Licenses with Sun Microsystems and Microsoft. SCO received millions of dollars worth of SVRX Royalties, as defined by the APA, from these licenses. SCO has also entered into other SVRX Licenses as defined in the APA, including but not limited to SCO's Intellectual Property Licenses.

147. SCO converted Novell's property by intentionally and maliciously failing to remit any monies flowing from the 2003 Sun and Microsoft Agreements to Novell and other SVRX Licenses as defined by the APA. This wrongful exercise of dominion over the Sun and

Microsoft SVRX Royalties, as well as the royalties, fees and other amounts arising from these other SVRX Licenses, resulted in damage to Novell in an amount to be later proven.

148. SCO's conversion also has caused Novell special damages including, *inter alia*, the costs associated with making repeated requests for information necessary to confirm SCO's compliance with its contractual obligations to administer SVRX licensing program, attempting to estimate royalties owing based upon incomplete information provided, and initiating and maintaining suit against SCO for its breaches.

149. Novell seeks an order from this Court imposing a constructive trust on the SVRX Royalties wrongfully withheld by SCO. In the alternative, Novell seeks a writ of replevin, ordering the immediate return of the wrongfully withheld royalties.

150. SCO's wrongful conversion was done maliciously, with the intent of harming Novell for its own financial gain. Accordingly, Novell seeks an award of punitive damages against SCO in an amount to be proven at trial.

### NINTH CLAIM FOR RELIEF
### (Accounting)

151. Novell incorporates by reference all prior paragraphs as if they were set forth here in full.

152. Under the agency relationship between Novell and SCO created by the APA, SCO assumes fiduciary duties to diligently collect, administer, and deliver to Novell all SVRX Royalties and to account for these royalties. In particular, SCO agreed to collect and pass through to Novell 100% of the SVRX royalties as defined and described in Section 4.16 of the APA, while Novell agreed to pay an administrative fee of 5% of the SVRX Royalties. SCO was also responsible for making additional royalties and payments to Novell.

153. Under section 1.2(b) of the APA, Novell was entitled to "periodic audits" of SCO concerning "all royalties and payments due to [Novell] . . . ." Under section 4.16(a), SCO was required to "diligently seek to collect all [SVRX] royalties . . . and [to] investigate and perform

appropriate auditing and enforcement under [the SVRX] licenses." SCO was also required to provide regular audit reports to Novell on the SVRX royalties and the other royalties under section 1.2(f) of the APA, including a breakdown of these royalties based on facts peculiar to the knowledge of SCO acting as Novell's administrative agent.

154. Under the APA, the amounts due Novell were determined and verified on the basis of the audits required under the APA. The right to an accounting of the royalties and payments due to Novell under the SVRX licenses and other provisions of the APA was inherent in the APA.

155. SCO has failed to fulfill its duties under the audit provisions of the APA, and substantially and materially breached those provisions.

156. Between the time the APA was concluded and the present, there have been hundreds of customers responsible for making royalty payments to SCO under the SVRX Licenses or under other agreements relating to royalty bearing products. SCO was obligated under the APA to receive and administer these royalty payments and share them with Novell.

157. Under the APA, royalty payments under the SVRX licenses or other agreements relating to royalty bearing products were to be paid to Novell through SCO. The amount of royalties was calculated through a specified formula.

158. On information and belief, SCO has entered into new and/or amendments of the SVRX licenses with Sun and Microsoft, as well as with Linux end users under SCO's Intellectual Property Licenses. SCO failed to seek approval to enter into these licenses, and explain why it was not obligated to obtain Novell's advance approval. During the course of Novell's audit of SCO's compliance with the SVRX licensing program, SCO also failed to report these licenses, to provide the relevant documentation as requested by Novell, and to account for or pass through to Novell the sums SCO collected from these licenses. These failures constitute a substantial and material breach of the APA, as well as a breach of SCO's fiduciary duties.

159. Given the large number of customers currently responsible for making royalty payments to SCO under the SVRX licenses or under other agreements relating to royalty bearing products, the complexity of the formulas by which these royalty payments are calculated, the fact that SCO receives directly all these royalty payments without immediate notice to Novell, and the fact that SCO has failed to fully account for the sums collected from these licenses as required by the APA (including, but not limited to, the SVRX licenses that SCO executed with Sun and Microsoft in 2003), it is impracticable for Novell to name a fixed sum that is owing with respect to these royalty payments without an accounting.

160. Novell therefore seeks an accounting for monies owed to Novell under the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Novell prays for judgment as follows:

161. For actual and special damages, in an amount to be proven at trial, caused by SCO's slander of Novell's title to the UNIX Copyrights;

162. For punitive damages in an amount to be proven at trial for SCO's malicious and willful conduct in slandering Novell's title to the UNIX Copyrights as alleged herein;

163. For preliminary and permanent injunctive relief requiring SCO to withdraw its improperly registered claims to UNIX Copyrights;

164. For actual and special damages, in an amount to be proven at trial, caused by SCO's breaches of §§ 1.2(b), 1.2(f) and 4.16 of the APA;

165. For specific performance of future compliance with SCO's audit obligations under §§ 1.2(b) and 1.2(f) of the APA;

166. For specific performance of future compliance with SCO's royalty obligations under §§ 1.2(b) and 4.16(a) of the APA;

167. For an order imposing a constructive trust on the revenues remitted to SCO under new or amended SVRX Licenses;

168. For an order attaching SCO's assets pending adjudication of Novell's contract claims;

169. For a writ of replevin, ordering the immediate return of the royalties wrongfully withheld by SCO;

170. For declaratory relief pursuant to 28 U.S.C. § 2201 establishing Novell's rights and SCO's obligations under § 4.16(b) and Amendment No. 2, as well as SCO's authority to undertake certain actions under § 4.16(b) and Amendment No. 2;

171. For preliminary and permanent injunctive relief enforcing Novell's contractual rights under the APA, including injunctive relief barring SCO from taking actions inconsistent with or in violation of §§ 1.2(b), 1.2(f), 4.16(a) and 4.16(b);

172. For declaratory relief pursuant to 28 U.S.C. § 2001 establishing Novell's rights and SCO's obligations under the covenant of good faith and fair dealing in the APA;

173. For an order of restitution of all monies constituting SCO's unjust enrichment;

174. For an accounting of the royalties remitted to SCO under the SVRX licenses and the monies owing to Novell under the APA;

175. For punitive damages in an amount to be proven at trial for SCO's malicious and willful conduct in converting monies flowing from the 2003 Sun and Microsoft Agreements;

176. For pre-judgment interest on any monetary recovery;

177. For Novell's reasonable expenses and costs incurred, including without limitation attorneys' fees, in defending against SCO's Second Amended Complaint; and

178. For such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Counterclaim-plaintiff Novell hereby demands a trial by jury of any and all issues triable by a jury.

DATED:        September 21, 2006

ANDERSON & KARRENBERG

_____/s/  Heather M. Sneddon_____
Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)

**Attorneys for Novell, Inc.**