MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
425 Market Street
San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone:  (801) 534-1700
Facsimile:  (801) 364-7697

**Attorneys for Novell, Inc.**

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>    Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>    Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

STATEMENT OF ISSUES ................................................................................................... 1

INTRODUCTION ................................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ......................................................................... 3

    A.    The Creation of the Agency Relationship Under the Novell-Santa
        Cruz Asset Purchase Agreement ........................................................................ 3

    B.    The APA's Agency Provisions Concerning SVRX Royalties. ............................ 4

    C.    Santa Cruz's Further Obligations Concerning Potential Buy-Out
        Transactions. ....................................................................................................... 8

    D.    The Sale of UNIX Assets from Santa Cruz to Caldera; Caldera's
        Name Change to SCO. ......................................................................................... 8

    E.    SCO's Financial Difficulties Until 2003. ............................................................ 9

    F.    The 2003 SCOsource Campaign and SCO's Agreements with Sun
        and Microsoft. ..................................................................................................... 10

    G.    SCO's Financial Woes After the 2003 Sun and Microsoft
        Agreements. ......................................................................................................... 14

    H.    SCO Believes Its Future Financial State Depends on Whether or
        Not It Will Prevail in the IBM Litigation. .......................................................... 16

ARGUMENT ........................................................................................................................ 18

I.    SCO BREACHED ITS FIDUCIARY DUTIES TO NOVELL AND
    WRONGFULLY CONVERTED NOVELL'S PROPERTY BY NOT
    REMITTING SVRX ROYALTIES FROM THE 2003 SUN AND
    MICROSOFT AGREEMENTS ........................................................................... 18

    A.    The Standard of Review and the APA's Governing Law Provision. ................... 18

    B.    SCO Breached its Fiduciary Duties to Novell by Failing to
        Account for and Remit SVRX Royalty Payments to Novell. ............................. 19

        1.    The APA's Agency Provisions Evidence a Fiduciary
            Relationship Between Novell, the Principal and Owner of

i

the SVRX Royalties, and SCO, Novell's Administrative Agent...................................................................................................19

2.    SCO Breached its Fiduciary Duty By Not Accounting For Or Remitting Monies from the 2003 Sun and Microsoft Agreements. ...................................................................22

3.    Novell Suffered Damages as a Result of SCO's Breach. ...........................24

4.    A Constructive Trust is an Appropriate Remedy for Breach of Fiduciary Duty....................................................................25

C.    SCO Converted Novell's Property by Wrongfully Retaining SVRX Royalties from the Sun and Microsoft Agreements.................................................25

1.    Novell Holds "All Right, Title and Interest" to the SVRX Royalties. ..............................................................................26

2.    SCO Damaged Novell by Failing to Remit the Royalties to Novell and Failing to Inform Novell of Their Existence. ..........................27

3.    A Constructive Trust is a Proper Remedy for Conversion. ......................27

D.    Novell is Also Entitled to Summary Judgment on its Constructive Trust and Accounting Causes of Action. ...............................................27

1.    A Constructive Trust Arises From SCO's Wrongful Conversion of Royalties and Its Breach of Fiduciary Duty.......................28

2.    An Accounting Is Proper Because SCO Breached its Fiduciary Duty to Account for SVRX Royalties. .....................................30

II.    EVEN IF THE COURT DENIES SUMMARY JUDGMENT, A PRELIMINARY INJUNCTION SHOULD BE GRANTED. ...........................................31

A.    Novell is Substantially Likely to Prevail on Its Breach of Fiduciary Duty, Conversion, and Constructive Trust Claims. ...............................................32

B.    Novell Will Suffer Irreparable Harm Without an Injunction................................32

C.    The Balance of Hardships Weighs in Novell's Favor. ...........................................34

D.    Granting an Injunction Would Not Be Adverse to the Public Interest..................................................................................34

CONCLUSION....................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Bainbridge v. Stoner*,
   16 Cal. 2d 423 (1940) ..................................................................................................25

*Batson v. Strehlow*,
   68 Cal. 2d 662 (1968) ..................................................................................................24

*Bell v. Bayly Bros., Inc.*,
   53 Cal. App. 2d 149 (1942) ..........................................................................................27

*Callery v. United States Life Ins. Co.*,
   392 F.3d 401 (10th Cir. 2004) ......................................................................................27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................................19

*Continental Oil Co. v. Frontier Ref. Co.*,
   338 F.2d 780 (10th Cir. 1964) ......................................................................................31

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
   825 F.2d 1461 (10th Cir. 1987) ....................................................................................31

*Cruz v. United States*,
   219 F. Supp. 2d 1027 (N.D. Cal. 2002) ........................................................................30

*Eaves v. Penn.*,
   587 F.2d 453 (10th Cir. 1978) ......................................................................................28

*GHK Assoc. v. Mayer Group, Inc.*,
   224 Cal. App. 3d 856 (1990) ..................................................................................29, 30

*Heckmann v. Ahmanson*,
   168 Cal. App. 3d 119 (1985) ..........................................................................20, 25, 30

*Hicks v. Clayton*,
   67 Cal.App. 3d 251 (1977) ...........................................................................................30

*In re JD Servs., Inc.*,
   284 B.R. 292 (Bankr. Utah 2002)..................................................................................33

*In re PKR, P.C.*,
   220 B.R. 114 (B.A.P. 10th Cir. 1998) ...........................................................................33

*Kasdan, Simonds, McIntyre, Epstein & Martin v. World Sav. & Loan Ass'n (In re Emery)*,
  317 F.3d 1064 (9th Cir. 2003) ...................................................25, 26, 27

*Kraus v. Willow Park Public Golf Course*,
  73 Cal. App. 3d 354 (1977) ...............................................................28

*Mendoza v. Continental Sales Co.*,
  140 Cal. App. 4th 1395 (2006) .......................................................20, 24

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992) ......................................................................19

*Oakland Raiders v. Nat'l Football League*,
  131 Cal. App. 4th 621 (2005) ............................................................20

*Oldland v. Gray*,
  179 F.2d 408 (10th Cir. 1950) .......................................................28, 29

*Ornbaun v. Main*,
  198 Cal. App. 2d 92 (1961) ...............................................................28

*Pac. Frontier v. Pleasant Grove City*,
  414 F.3d 1221 (10th Cir. 2005) ..........................................................31

*Rattray v. Scudder*,
  28 Cal.2d 214 (1946) ........................................................................21

*Roberts v. Lomanto*,
  112 Cal. App. 4th 1553 (2003) ...........................................................19

*Snepp v. United States*,
  444 U.S. 507 (1980).........................................................................25

*Spector v. Miller*,
  199 Cal. App. 2d 87 (1962) ...............................................................20

*Tenneco Oil Co. v. Joiner*,
  696 F.2d 768 (10th Cir. 1982) ...........................................................28

*Towers v. Titus*,
  5 B.R. 786 (N.D. Cal. 1979) ..........................................................30, 31

*U.S. v. Pegg*,
  782 F.2d 1498 (9th Cir. 1986) .......................................................28, 29

*Van de Kamp v. Bank of America*,
  204 Cal. App. 3d 819 (1988) ......................................................20, 21, 30

iv

*Weiss v. Marcus,*
  51 Cal. App. 3d 590 (1975) ............................................................................26, 27

## STATUTES, RULES, AND REGULATIONS

Cal. Civ. Code
  § 1638 ............................................................................................................21
  § 1639 ............................................................................................................21
  § 2223 ......................................................................................................28, 31
  § 2224 ......................................................................................................28, 31


Fed. R. Civ. P.
  Rule 56(c) ......................................................................................................19
  Rule 65 ...........................................................................................................31

## OTHER AUTHORITIES

9 Wright & Miller
  § 2310 ............................................................................................................31

## STATEMENT OF ISSUES

Novell's motion for partial summary judgment as to its Sixth, Seventh, Eighth, and Ninth Claims for Relief presents two issues: (1) whether The SCO Group, Inc. ("SCO") breached its duties as Novell's administrative agent by wrongfully converting payments SCO received from SVRX license agreements that it executed in 2003 with Sun Microsystems, Inc. ("Sun") and Microsoft Corporation ("Microsoft"), and (2) whether Novell, as the equitable owner of those payments under the express terms of the relevant agreement, is entitled to an accounting and constructive trust of these sums.

Novell's motion for a preliminary injunction presents a single issue: whether, if summary judgment is denied, the Court should nevertheless, after an accounting, impose a constructive trust on the proceeds SCO wrongfully converted from its 2003 license agreements with Sun and Microsoft.

## INTRODUCTION

This motion boils down to SCO's wrongful retention of payments in derogation of its duties to Novell.  SCO is Novell's administrative agent.  Under the relevant agreement, SCO is bound to collect payments for which Novell is an equitable owner and hold them in trust.  That obligation was broken when, in 2003, SCO executed licenses with Sun and Microsoft and then converted the collected amounts for its own benefit.

The agency relationship between Novell and SCO arises from the Asset Purchase Agreement ("APA") signed by Novell and The Santa Cruz Operation, Inc. ("Santa Cruz") in 1995.  The APA makes SCO the fiduciary of Novell, entrusting SCO "to collect and pass through to [Novell] one hundred percent (100%) of the SVRX Royalties."  In return, Novell

agreed to pay SCO "an administrative fee of five percent (5%) of the SVRX Royalties."  "SVRX Royalties" is defined by the contract to include "all royalties, fees and other amounts due under all SVRX Licenses."  The term "SVRX Licenses," in turn, is defined as including those licenses "listed in detail under item VI of Schedule 1.1(a)" of the APA – a list of UNIX System V software releases.  Although these licenses were transferred to SCO, Novell expressly retained "all right, title and interest to the SVRX Royalties."  Under the agency provisions of the APA, SCO was therefore obliged to hold these monies in trust for Novell.  It did not.

Instead, SCO breached its trust relationship with Novell.  SCO entered into license agreements with Sun and Microsoft in 2003.  Under the plain language of those agreements, SCO purported to license Sun and Microsoft                     *** **REDACTED** ***

               *** **REDACTED** ***                          SCO received at least $25,846,000 from Sun and Microsoft through these SVRX Licenses.  Rather than pass through these amounts to Novell, SCO converted these payments for its own benefit.

SCO breached its obligations in other ways as well.  For three years, SCO intentionally concealed the contents of these agreements.  Notwithstanding Novell's express right under the APA to conduct audits of royalties, fees, and other amounts SCO collects under SVRX Licenses, Novell's repeated requests for copies of the agreements were ignored.  Only recently through this litigation was Novell able to obtain copies of the Sun and Microsoft agreements and thereby confirm SCO's violations.  Now, having finally acquired them, Novell moves for partial summary judgment and seeks to impose a constructive trust on the Sun and Microsoft monies that SCO wrongfully retained.

Even if the Court were to deny summary judgment, the Court should preliminarily impose a constructive trust remedy.  SCO is on the verge of insolvency and will likely be unable

to satisfy any adverse judgment relating to its failure to remit the Sun and Microsoft monies.

Moreover, SCO has repeatedly stated in public filings with the Securities and Exchange

Commission that its financial state is unlikely to improve unless and until it prevails in its

litigation against IBM and Novell.  Given recent developments in the IBM case, SCO's financial

picture will therefore continue to deteriorate for the foreseeable future.  Because SCO has no

"equitable interest" in the Sun and Microsoft revenues, Novell is likely to succeed on the merits

that SCO wrongfully converted a trust *res* in violation of its agency obligations to Novell.

Novell faces irreparable injury without an immediate injunction.  Therefore, a preliminary

injunction should be granted.

## STATEMENT OF UNDISPUTED FACTS

**A.    The Creation of the Agency Relationship Under the Novell-Santa
        Cruz Asset Purchase Agreement.**

1.      In 1995, Novell was engaged in the business of developing a line of software

products known as UNIX and UnixWare, and was selling binary and source code licenses to

various versions of these products.  (Declaration of Michael Jacobs in Support of Motion for

Partial Summary Judgment and Motion for Preliminary Injunction ("Jacobs Decl."), Ex. 1 (APA)

at 1 (Recital A).)

2.      On September 19, 1995, Novell and Santa Cruz entered into an Asset Purchase

Agreement ("APA").  (*Id*. at 1.)

3.      Through the APA, Santa Cruz acquired certain Novell assets relating to UNIX

and UnixWare.  (*Id*. at 1-2 (Recital B, § 1.1(a).)

4.      In consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz

issued 6,127,500 shares of its common stock to Novell.  (*Id*. at 2 (§ 1.2(a)).)

3

5.      In further consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz agreed "to collect and pass through to [Novell] one hundred percent (100%) of the SVRX Royalties as defined and described in Section 4.16" of the APA.  (*Id.* at 2 (§ 1.2(b)) (collectively with § 4.16, "Agency Provisions").)  In turn, Novell agreed to pay Santa Cruz "an administrative fee of five percent (5%) of the SVRX Royalties."  (*Id.*)

**B.      The APA's Agency Provisions Concerning SVRX Royalties.**

6.      The APA defines the "SVRX Royalties" that Santa Cruz was obligated "to collect and pass through" to Novell.  (Jacobs Decl., Ex. 1 at 24 (§ 4.16(a)).)  Section 4.16(a) provides that Santa Cruz "shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses" and that these "royalties, fees and other amounts" would be "referred to herein as 'SVRX Royalties.'"  (*Id.*)

7.      The term "SVRX Licenses" is also defined by Section 4.16 of the APA.  The first sentence of subparagraph (a) of Section 4.16 refers to "SVRX Licenses" and is then immediately followed by an explanatory parenthetical stating: "as listed in detail under item VI of Schedule 1.1(a) hereof."  (*Id.*, Ex. 1 at 24 (§ 4.16(a)).)  Item VI of Schedule 1.1(a), in turn, provides a list of "the SVRX Licenses" that relate to various UNIX System V software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2 and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0."  (*Id.* at Sch. 1.1(a), pps. 3-4.)[1]

---

[1] Amendment No. 1 further expanded the term "SVRX Licenses" to include contracts relating to certain "Auxiliary Products" that are specifically identified in Attachment A to that Amendment.  Item K.4 of Amendment No. 1 thus provides that "SVRX Licenses" shall "collectively" refer to the contracts relating to the aforementioned UNIX System V releases and

(Footnote continues on next page.)

8.      The APA transfers "the SVRX Licenses" to Santa Cruz.  (*Id*. at 2 (§ 1.2(b)).)

However, Novell and Santa Cruz expressly "acknowledge[d] and agree[d] that [Novell] is

retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to

[Santa Cruz] hereto, and that [Santa Cruz] only has legal title and not an equitable interest in

such royalties . . . ."  (*Id.*)

9.      Novell and Santa Cruz contemplated that certain assets would be excluded from

purchase and identified them on Schedule 1.1(b) to the APA.  (*Id*. at 1-2 (§ 1.1(a)).)  Schedule

1.1(b) specifically memorializes that the APA did not transfer any rights to the SVRX Royalties

to Santa Cruz.  Listed as an excluded asset in Schedule 1.1(b) is: "*[a]ll right, title and interest to

the SVRx Royalties*, less the 5% fee for administering the collection thereof pursuant to Section

4.16."  (*Id.* at Sch. 1.1(b), p. 2 (emphasis added).)

10.      Santa Cruz assumed certain obligations by virtue of these SVRX Agency

Provisions in the APA.  First, the APA requires Santa Cruz to act as an administrative agent of

Novell in the collection of "all royalties, fees and other amounts due under all SVRX Licenses."

Santa Cruz "shall diligently seek to collect all such royalties, funds and other amounts when

due."  (*Id*., Ex. 1 at 24 (§ 4.16(a)).)

11.      The Agency Provisions also oblige Santa Cruz to pass through the SVRX

Royalties to Novell within a prescribed time period.  Section 4.16(a) requires that, within 45 days

of the end of each fiscal quarter of Santa Cruz, Santa Cruz "shall deliver to [Novell] . . . 100% of

any SVRX Royalties collected in the immediately preceding quarter."  (*Id.*)  This deadline was

_____

(Footnote continued from previous page.)

Auxiliary Product Licenses.  The "Auxiliary Products" are listed in Attachment A to Amendment
No. 1 (also referred to as "Attachment 1 to Schedule 1.1(a)").  (Jacobs Decl., Ex. 2 (Amendment
No. 1) at 8 (§ K.1(vi)), 9 (§ K.4), 10 (§ O).)

later altered so as to require Santa Cruz to pass through the SVRX Royalties to Novell "within one (1) calendar month following each calendar month in which SVRX royalties . . . are received" by Santa Cruz.  (*Id*., Ex. 2 (Amendment No. 1) at 6 (§ I(1)).)

12.     Amendment No. 1 to the APA further obliges Santa Cruz to give Novell: (1) an estimate of the total SVRX Royalties amount within six days following the calendar month when the royalties are received; and (2) a "report detailing all such royalties," within one calendar month following each calendar month in which SVRX Royalties are received by Novell.  (*Id*., Ex. 2 at 4-6 (§§ E(f), I(1)).)  "Such monthly reports shall be separately broken down by revenue type (i.e., source code right to use fees, gross and net binary per copy fees, and support fees), by product, by customer, by quarterly period by which distribution occurs, and by country . . . of distribution."  (*Id*., Ex. 2 at 4 (§ E(f)).)

13.     The APA gives Novell the right, as the principal, to audit Santa Cruz's administration of the SVRX Royalties program.  Section 1.2(b) provides that Novell "shall be entitled to conduct periodic audits of [Santa Cruz] concerning all royalties and payments due to [Novell] hereunder or under the SVRX Licenses."  (*Id*., Ex. 1 at 2 (§ 1.2(b)).)

14.     Further, under Section 4.16(b) of the APA, Novell retains the "sole discretion" to direct Santa Cruz to amend, supplement, modify, waive or assign any rights under or to any SVRX Licenses; if Santa Cruz fails to take any such action, the APA specifically grants Novell the right to take these actions on behalf of Santa Cruz.  (*Id*. at 24 (§ 4.16(b)).)  Novell also retains the right to veto Santa Cruz's attempts to "enter into amendments of the SVRX Licenses," subject to two limited exceptions listed in Section J of Amendment No. 1, and "to enter into new SVRX Licenses," subject to one of those limited exceptions.  (*Id*., Ex. 2 at 6 (§ J).)  Section J does not, however, alter Santa Cruz's duty to remit "all royalties, fees and other amounts" flowing from

any new or amended SVRX Licenses that satisfy these limited exceptions.  (*Id.*, Ex. 1 at 24 (§

4.16(a).)

       15.     Amendment No. 1 permits Santa Cruz to retain 100% of only four narrow

categories of SVRX Royalties:

> (i)      fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a) [of the APA];
>
> (ii)     source code right to use fees under existing SVRX Licenses from the licensing of additional CPU's and from the distribution by Buyer of additional source code copies;
>
> (iii)   source code right to use fees attributable to new SVRX licenses *approved by Seller pursuant to Section 4.16(b) hereof*; and
>
> (iv)    royalties attributable to the distribution by Buyer and its distributors of binary copies of SVRX products, to the extent such copies are made by or for Buyer pursuant to Buyer's own licenses from Seller acquired before the Closing Date through Software Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A.

(*Id.*, Ex. 2 at 3 (§ E(e)) (emphasis added).)  Amendment No. 1 does not, however, alter SCO's

duty to report the details of these SVRX Royalties to Novell.  *See* ¶ 12, *supra*.  Moreover, Novell

remains the equitable owner *of all other categories* of SVRX Royalties, and SCO remains

obliged to "collect and pass [them] through" to Novell.  (*Id*. at 3, 4.)

       16.     In return for Santa Cruz's agency functions relating to the collection and

administration of the SVRX Royalties, Novell agreed to pay Santa Cruz an administrative fee

equivalent to 5% of the Royalties, but only *after* Santa Cruz fulfills its duty to pass them through

to Novell.  (*Id*., Ex. 1 at 24 (§ 4.16(a)); Ex. 2 at 6 (§ I(1)).)

### C.    Santa Cruz's Further Obligations Concerning Potential Buy-Out Transactions.

17.    On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA.  (Jacobs Decl., Ex. 3 (Amendment No. 2).)

18.    In Amendment No. 2, Novell and Santa Cruz agreed to a procedure that would govern "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations."  (*Id.* at 1 (§ B(1)-(5)).)  They agreed that: (1) they "will" provide written notification to each other upon becoming aware of any potential buy-out transaction; (2) "any meetings and/or negotiations with the licensee will be attended by both parties, unless agreed otherwise;" (3) "any written proposal to be presented to the licensee, including drafts and final versions of any proposed amendments to the SVRX licenses, will be consented to by both parties prior to its delivery to the licensee, unless agreed otherwise;" and (4) "prior to either parties' unilateral determination as to the suitability of any potential buy-out transaction, the parties will meet face to face and analyze the potential merits and disadvantages of the transaction."  The parties also agreed that, "[n]o such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy."  (*Id.*)

### D.    The Sale of UNIX Assets from Santa Cruz to Caldera; Caldera's Name Change to SCO.

19.    Approximately five years after execution of the APA, on August 1, 2000, Caldera Systems acquired Santa Cruz's Server Software and Professional Services divisions.  (Jacobs Decl., Ex. 4 (July 31, 2003 SCO Form 10-Q) at 6.)  The Server Software division included Santa Cruz's UNIX-related business.  (*Id.*)

20.    On May 7, 2001, Caldera International ("Caldera") was formed as a holding company to own Caldera Systems, including the assets, liabilities and operations of Santa Cruz's Server Software and Professional Services divisions.  (*Id.*)

21.    On August 26, 2002, Caldera announced that it would change its name to The SCO Group, Inc. ("SCO"), pending shareholder approval; on or about that time, Caldera began doing business as SCO.  (*Id.*, Ex. 5 (2002 Caldera Form 10-K) at 41.)  Caldera's name change to SCO was formalized on May 16, 2003.  (*Id.*, Ex. 4 at 6.)

22.    SCO claims to be the successor-in-interest to Santa Cruz's rights and obligations under the APA.  (SCO's Second Amended Complaint, Feb. 3, 2006, at 22 (¶ 88).)

**E.    SCO's Financial Difficulties Until 2003.**

23.    Prior to Caldera's acquisition of Santa Cruz's Server Software and Professional Services divisions in 2001, substantially all of Caldera's revenue had been derived from sales of Linux products and services.  Caldera was unsuccessful, however, in creating a profitable Linux business.  (SCO's Reply to Novell's Counterclaims, May 1, 2006, at 6 (¶ 31).)

24.    After the Santa Cruz acquisition, Caldera derived most of its revenues from UNIX products and services, ranging from 90-95% of Caldera's revenues during fiscal years 2001 and 2002.  (*Id.* at 6 (¶ 32).)  However, Caldera's revenue from sale of its UNIX-based products declined after acquiring these UNIX operations from Santa Cruz.  (Jacobs Decl., Ex. 5 at 12.)

25.    Until 2003, SCO had never been profitable.  In fact, Caldera "incurred significant losses during the years ended October 31, 2002, 2001, and 2000."  (*Id.* at 40.)  For the fiscal year ending October 31, 2000, the company posted operational losses of $31,999,039, followed by $133,636,000 in 2001, and $24,176,000 in 2002.  (*Id.* at 34-35; Ex. 6 (2000 Caldera Amended Form 10-K) at 47-48.)  SCO was burning through cash at a precipitous rate; its $36,560,267 in

cash and cash equivalents for fiscal year 2000 dropped 44% to $20,541,000 for fiscal year 2001. (*Id*.)  From 2001 to 2002, its cash and cash equivalents fell an additional 78%, to just $6,589,000.  (*Id*.)

26.     Until 2003, SCO's total assets were also quickly dwindling, especially in comparison to its high operating expenses.  (*Id*.)  For 2000, the company posted total assets of $107,518,303, and $32,252,026 in total operating costs.  (*Id*.)  By fiscal year 2001, those assets had fallen 30% to $74,859,000, while operating expenses jumped to $159,154,000.  (*Id*.)  For 2002, SCO reduced total operating costs to $70,101,000, but total assets fell another 50% to $37,406,000.  (*Id*.)

27.     By the end of 2002, SCO had only $6,589,000 in cash and cash equivalents, total assets of just over $21 million, and a stock price hovering below $2 per share.  (*Id*., Ex. 5 at 15, 34-35.)

     **F.**     **The 2003 SCOsource Campaign and SCO's Agreements with Sun and Microsoft.**

28.     In January 2003, SCO announced its "SCOsource" initiative to increase revenue by licensing UNIX technology that it claimed to own.  (*See, e.g*., Jacobs Decl., Ex. 7 (2003 SCO Form 10-K) at 3-4, 9; Ex. 8 (May 12, 2003 SCO letter).)  In implementing SCOsource, SCO publicly stated that it owned the UNIX copyrights, wrote letters to Linux users and distributors threatening to sue them for infringement, and filed a number of lawsuits against end-users and distributors.  (*Id*.)

29.     As part of SCOsource, SCO began to license the right to use UNIX technology. (Jacobs Decl., Ex. 7 at 9, 18, 24.)

30.     First, SCO executed an agreement with Sun on February 25, 2003 ("the 2003 Sun Agreement"), through which

**\*\*\* REDACTED \*\*\***

31.     In connection with the 2003 Sun Agreement, SCO also granted Sun a warrant valued at $150,000 to purchase up to 125,000 shares of SCO common stock, for a period of five years, at a price of $1.83 per share.  (Jacobs Decl., Ex. 4 at 22.)

32.     The 2003 Sun Agreement purports **\*\*\* REDACTED \*\*\*** a Software License and Distribution Agreement signed March 17, 1994, and effective January 1, 1994, between Novell and Sun ("the 1994 Sun Agreement").  (*Id*., Ex. 9 at 1 (Recitals).)  In the 1994 Sun Agreement,

**\*\*\* REDACTED \*\*\***

33.     The 2003 Sun Agreement           **\*\*\* REDACTED \*\*\***

**\*\*\* REDACTED \*\*\***                                    The 2003 Sun Agreement

**\*\*\* REDACTED \*\*\***

34.     Through SCOsource, SCO also executed an agreement with Microsoft.

**\*\*\* REDACTED \*\*\***

11

35.     As SCO confirmed publicly at the time, the 2003 Microsoft Agreement "covers Microsoft's UNIX compatibility products" and licenses rights "to utilize the UNIX source code, including the right to sublicense that code." (*Id.*, Ex. 26 (April 30, 2003 SCO Form 10-Q) at 21, 22; Ex. 4 at 22; *see also* Ex. 27 (SCO's May 19, 2003 press release).)  To that end, the Agreement

**\*\*\*  REDACTED  \*\*\***

36.     Microsoft made payments to SCO in the amount of **\*REDACTED\*** for these rights. **\*\*\*  REDACTED  \*\*\*** SCO also granted Microsoft a $500,000 warrant to purchase up to 210,000 shares of SCO common stock, for a period of five years, at a price of $1.83 per share. (*Id.*, Ex. 26 at 21.)

37.     The 2003 Microsoft Agreement

**\*\*\*  REDACTED  \*\*\***

38.

**\*\*\*  REDACTED  \*\*\***

39.     SCO did not contact Novell for approval before executing the 2003 Sun Agreement or the 2003 Microsoft Agreement.  Novell did not authorize either agreement.

(Declaration of Joseph A. LaSala, Jr. in Support of Motion for Partial Summary Judgment and Motion for Preliminary Injunction ("LaSala Decl.") at ¶ 3.)

40.     Novell competes with Sun and Microsoft in the marketplace, and is harmed when these companies obtain licenses to SVRX technology without Novell's approval.  (*Id*. at ¶ 7.)

41.     The 2003 Sun and Microsoft Agreements gave SCO its first profitable year in history.  They "accounted for $25,846,000 of [SCO's] revenue in fiscal 2003, representing approximately 33 percent of [its] total revenue for such period."  (Jacobs Decl., Ex. 7 at 9.)

42.     SCO never remitted to Novell any monies it received from the 2003 Sun or Microsoft Agreements.  (LaSala Decl. at ¶ 4.)

43.     SCO never provided Novell an estimate of the total amount of royalties flowing from the 2003 Sun and Microsoft Agreements.  (*Id*. at ¶ 5.)

44.     On July 11, 2003, when Novell had not received any royalty reports from SCO for over half a year, it sent SCO a letter demanding royalty reports and payments as required by the APA.  (*Id*. at ¶ 6, Ex. 1 (July 11, 2003 letter from Novell to SCO).)  In response, on July 17, 2003, SCO submitted limited royalty payments from November 2002 through May 31, 2003.  (*Id*., Ex. 2 (July 17, 2003 letter from SCO to Novell).)  These payments did not include or mention any royalties from the 2003 Sun or Microsoft Agreements.  (*Id*. at ¶ 6.)

45.     Later in 2003, Novell began to conduct an audit of SCO's compliance with the APA's Agency Provisions.  On November 21, 2003 Novell demanded copies of the Sun and Microsoft Agreements, two major SVRX Licenses executed during the audit period.  SCO did not respond.  (Jacobs Decl., Ex. 13 at 2 (§§ 1.4, 1.5).)  On December 29, 2003, Novell again contacted SCO requesting copies of the agreements.  (*Id*., Ex. 14.)  On January 7, 2004, SCO replied that it anticipated being in a position to respond in the near future.  (*Id*., Ex. 15.)  Again

hearing no response, on February 4, 2004, Novell sent yet another inquiry. (*Id*., Ex. 16.) Novell sent additional written requests for the agreements on March 1, 2004, April 2, 2004, and November 17, 2004. (*Id*., Ex. 17-19.) Despite these requests, SCO refused to produce the agreements.[2]

46.     It was not until February 7, 2006 that Novell finally received the Sun and Microsoft Agreements from SCO, alongside a simultaneous production of many hundreds of thousands of other pages, pursuant to discovery requests in this litigation. (*Id*. at ¶ 22, Ex. 20 at 8-10 (SCO's Resp. to Novell's Second Set of Req. for Production Nos. 6-9).) Novell filed a motion to stay on April 10, 2006. The Court issued an order on August 21, 2006 that stayed part of this case, but permitted the claims relating the 2003 Sun and Microsoft Agreements (among other things) to proceed.

**G.     SCO's Financial Woes After the 2003 Sun and Microsoft Agreements.**

47.     SCO's profitability following the 2003 Sun and Microsoft Agreements was short-lived. Although SCO posted an operational gain of $3,436,000 in 2003, SCO suffered an operational loss of $28,573,000 in 2004. (Jacobs Decl., Ex. 7 at 51-52; Ex. 21 (2005 SCO Form 10-K) at 47-48; Ex. 22 (Jan. 31, 2006 SCO 10-Q) at 3-4.) For fiscal year ended October 31, 2005, SCO posted an operational loss of $11,899,000. (*Id*., Ex. 21 at 21.) Operational losses have continued into 2006, with SCO posting $13,127,000 in operational losses through its first three fiscal quarters of 2006. (*Id*., Ex. 23 (Jul. 31, 2006 SCO Form 10-Q) at 4.)

---

[2] In a February 5, 2004 letter, SCO side-stepped Novell's requests for copies of the Sun and Microsoft agreements, instead cursorily claiming that these licenses were "new" agreements not covered by the APA without further explanation. (Jacobs Decl., Ex. 25.)

48.     Revenue from both portions of SCO's business – SCOsource and UNIX – has steadily declined.  SCOsource revenue declined from $25,846,000 in 2003 to $829,000 in 2004 to $166,000 in 2005.  (*Id.*, Ex. 21 at 48.)  Through the first three fiscal quarters of 2006, SCOsource revenue was at $95,000.  (*Id.*, Ex. 23 at 16-17.)  UNIX revenue has declined from $53,408,000 in 2003 to $41,980,000 in 2004 to $35,838,000 in 2005.  (*Id.*, Ex 21 at 23.)  Through the first three quarters of 2006, UNIX revenue stood at $21,795,000.  (*Id.*, Ex. 23 at 16-17.)  SCO's combined SCOsource and UNIX revenue was down over 20% from the prior year, as of July 31, 2006.  (*Id.*)

49.     SCO's assets have similarly eroded since the 2003 Sun and Microsoft revenue spike.  Since 2003, SCO's assets have dwindled from $82,280,000 in October 2003, to $48,240,000 in October 2004, to $24,924,000 in October 2005, and to $21,762,000 as of July 31, 2006.  (*Id.*, Ex. 7 at 51-52; Ex. 21 (2005 SCO Form 10-K) at 47-48; Ex. 23 at 3.)

50.     SCO is bleeding cash at a rapid rate.  In October of 2003, SCO's cash, cash equivalents, and available-for-sale marketable securities ("liquid assets") amounted to $68,523,000.  (*Id.*, Ex. 7 at 51.)  Just one year later, this figure fell 44% to $31,449,000.  (*Id.*, Ex. 21 at 47.)  By October 2005, SCO's liquid assets had fallen another 77% to $10,437,000.  (*Id.*)

51.     To stop this downward spiral, on November 29, 2005, SCO raised $10,005,000 in cash by selling stock to investors.  (*Id.*, Ex. 22 at 13.)  Even with that influx, by January 31, 2006, SCO had only $19,214,000 in liquid assets on the books.  (*Id.* at 3.)  By July 31, 2006 (the date of SCO's last publicly available financials), or two months ago, this figure had dropped to $13,960,000, as part of a total asset base of only $23,472,000.  (*Id.*, Ex. 23 at 3.)

52.     Through the first three quarters of its current fiscal year, SCO has been losing cash on an operating basis at the rate of nearly $800,000 per month.  (*Id.* at 5.)  Based on its

latest publicly-available cash figures, SCO will run out of cash and cash equivalents by June 2007. (*See id.* at 3, 5.) This is the same month that trial of this matter is scheduled to begin. (Scheduling Order and Order Vacating Hearing, Dec. 6, 2005 at 4.)

53.    SCO also has been rapidly burning cash set aside for its SCO Litigation, further threatening its liquidity. As of July 31, 2006, SCO had just $2,010,000 of additional restricted cash, down 65% from a restricted cash amount of $5,690,000 nine months earlier on October 31, 2005. (*Id.* at 3; Ex. 21 at 47.) Notwithstanding SCO's infusion of $5,000,000 of additional cash into an escrow account to cover SCO Litigation costs and expenses on June 5, 2006, only $1,561,000 remained in that escrow account as restricted cash for the Litigation as of the end of July 2006. (*Id.*, Ex. 23 at 31, 33, 42.) Accordingly, just two months ago, SCO recognized that if it burns through the remaining restricted cash for the SCO Litigation, it "may be required to place additional amounts into the escrow account, which could harm our liquidity position." (*Id.* at 42.)

54.    Meanwhile, SCO's legal and professional fees for pursuing and defending its multiple SCOsource-related lawsuits have continued to escalate. These fees jumped "from $9,467,000 for the nine months ended July 31, 2005 to $10,087,000 for the nine months ended July 31, 2006." (*Id.* at 21.) Notwithstanding these cash-draining fees, SCO has "not recorded any reserves or contingencies related to these legal matters." (*Id.* at 22.)

### H.    SCO Believes Its Future Financial State Depends on Whether or Not It Will Prevail in the IBM Litigation.

55.    SCO's future success depends on its ability to prevail in its litigation with IBM. In its most recent SEC filing, SCO stated "[i]f we do not prevail in our action against IBM, or if

IBM is successful in its counterclaims against us, our business and results of operations would be materially harmed and we may not be able to continue in business." (Jacobs Decl., Ex. 23 at 37.)

56.    The IBM Litigation is set for trial in February of 2007 – several months before the trial of this case. (Order, July 1, 2005, at 6, *The SCO Group, Inc. v. IBM Corp.*, No. 2:03CV294 (D. Utah 2005).)

57.    The Magistrate Judge recently dismissed two-thirds of SCO's claims in the IBM Litigation. (Order Granting in Part Motion to Limit SCO's Claims, June 28, 2006.) Although SCO has yet to comment on the effect that the dismissal will have on its finances, SCO spokesperson Blake Stowell recently acknowledged, "[i]f two-thirds of your case is stricken, that is a pretty serious matter." (*Id.*, Ex. 24 (*Judge Voids Most SCO Claims,* SALT LAKE TRIBUNE, June 30, 2006).) SCO has appealed the ruling of Magistrate Judge Wells.

58.    With respect to SCOsource, in its most recent annual report, SCO stated, "[w]e are unlikely to generate significant revenue from our SCOsource business unless and until we prevail in our SCO Litigation. Additionally, the success of the SCOsource business may depend on the strength of our intellectual property rights and claims regarding UNIX, including our claims against Novell and the strength of our claim that unauthorized UNIX source code and derivative works are contained in Linux." (*Id.*, Ex. 21 at 25.)

59.    SCO has made similar statements with respect to the uncertainty of its UNIX business, and believes that the decline that has already occurred in the UNIX business may continue. SCO acknowledges that industry response to this decline, to the SCO Litigation, and to SCO's "aggressive position against the inclusion of our UNIX code and derivative works in Linux" may cause "attitudes of customers and partners" to change and "industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX

operating system products." (*Id.*, Ex. 23 at 40-41.) This may further accelerate the decline of SCO's UNIX business.

## ARGUMENT

**I.    SCO BREACHED ITS FIDUCIARY DUTIES TO NOVELL AND WRONGFULLY CONVERTED NOVELL'S PROPERTY BY NOT REMITTING SVRX ROYALTIES FROM THE 2003 SUN AND MICROSOFT AGREEMENTS.**

Summary judgment should be granted on Novell's Seventh and Eighth Claims for Relief

for breach of fiduciary duty and conversion. The undisputed facts establish that:

1.    The APA creates an agency relationship between Novell and SCO;

2.    As Novell's agent, SCO has a fiduciary duty to diligently collect, administer, and deliver to Novell any SVRX Royalties;

3.    Novell is the equitable owner of the SVRX Royalties and holds all right, title, and interest to them;

4.    SVRX Royalties are amounts due under all SVRX Licenses as defined in the APA;

5.    The 2003 Sun and Microsoft Agreements are SVRX Licenses because they    **\*\*\*  REDACTED  \*\*\***
; and

6.    SCO retains the monies it collected from the 2003 Sun and Microsoft Agreements.

Because SCO did not "collect and pass through" to Novell the Sun and Microsoft monies,

SCO breached its agency obligations, which are fiduciary in nature, and wrongfully converted

Novell's property for its own benefit. The equitable remedies of an accounting and constructive

trust should therefore be imposed on those monies.

### A.    The Standard of Review and the APA's Governing Law Provision.

Summary judgment is proper where the pleadings, discovery, and affidavits show that

"there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issues of material fact exist, and that the undisputed facts entitle that party to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

California law governs all causes of action arising from or related to the APA.[3] (Jacobs Decl. Ex. 1, at 47 (§ 9.8).) Because Novell's breach of fiduciary duty and conversion claims (and constructive trust and accounting claims) arise directly from the principal-agent relationship created by the APA, California law governs the Court's analysis. *See Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 468, 470 (1992) (choice of law provision providing that a specified body of law "governs" the "agreement" extends to any "tortious breaches of duties emanating from the agreement or the legal relationship it creates," including breach of fiduciary duty).

**B.    SCO Breached its Fiduciary Duties to Novell by Failing to Account for and Remit SVRX Royalty Payments to Novell.**

To establish breach of fiduciary duty on its Seventh Claim for Relief, Novell must show "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *Roberts v. Lomanto*, 112 Cal. App. 4th 1553, 1562 (2003). All three elements are present here.

**1.    The APA's Agency Provisions Evidence a Fiduciary Relationship Between Novell, the Principal and Owner of the SVRX Royalties, and SCO, Novell's Administrative Agent.**

SCO has a fiduciary relationship with Novell based on the APA's Agency Provisions. (Jacobs Decl., Ex. 1 at 2, 24 (§ 1.2(b), § 4.16(a)).) As the California Court of Appeal has stated:

---

[3] The APA's governing law provision provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof." (Jacobs Decl., Ex. 1, at 47 (§ 9.8).)

> [A] fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client. A fiduciary must give 'priority to the best interest of the beneficiary.' In addition to this duty of preference toward the beneficiary, the fiduciary also is required to manage the subject matter of the relationship (or res) with due care, must account to the beneficiary, and must keep the beneficiary fully informed as to all matters pertinent to the beneficiary's interest in the res.

*Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 631 (2005) (distinguishing fiduciary duties arising from a defined principal-agent relationship from those arising solely from an ordinary contract or debt); *see also Heckmann v. Ahmanson,* 168 Cal. App. 3d 119, 136 (1985) (imposing a preliminary injunction for constructive trust and accounting based on a breach of fiduciary duty claim).

An agent is a fiduciary who owes to his principal the same duty of diligent and faithful service imposed on a trustee. *Spector v. Miller*, 199 Cal. App. 2d 87, 95 (1962) (a breach of fiduciary duty claim was properly stated where "it . . . might well appear that [defendant] was the agent for all principals; that in acting as such agent, he did so under the agreement executed; and that he received the property as such agent or trustee and distributed the property of plaintiff in violation of his trust."); *see also Mendoza v. Continental Sales Co.*, 140 Cal. App. 4th 1395, 1405 (2006) (finding breach of fiduciary duty claim adequately pled, and stating "an agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal."). This duty extends "to matters within the scope of the agency, and the agent's duties include 'the duty to account for profits . . . , the duty not to act as, or on account of, an adverse party without the principal's consent . . . , and the duty to deal fairly with the principal in all transactions between them." *Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819, 857 (1988). "A long-established rule of equity, the rule of individual loyalty . . . prevents a fiduciary from profiting at the expense of his beneficiary." *Heckmann*, 168 Cal. App. 3d at 131-32. Moreover, "the agent

owes the principal the duty of fullest disclosure of material facts concerning a transaction which might affect the principal's decision thereon." *Van de Kamp*, 204 Cal. App. 3d at 857 (citing *Rattray v. Scudder*, 28 Cal. 2d 214, 223 (1946)).  SCO, as Novell's agent, owes Novell these same duties.

Here, the APA's Agency Provisions prescribe SCO's duties as an administrative agent for Novell's SVRX Royalties.  These duties, which can be found directly in the plain language of the APA,[4] include SCO's obligation "to collect and pass through to [Novell] one hundred percent (100%) of the SVRX Royalties," to "administer the collection of all royalties, fees and other amounts due under all SVRX Licenses," and to "diligently seek to collect all such royalties, funds and other amounts when due."  (Jacobs Decl., Ex. 1 at 2, 24 (§ 1.2(b), § 4.16(a)).)  The Agency Provisions, as amended, further impose a fiduciary duty to promptly remit to Novell all SVRX Royalties "within one (1) calendar month following each calendar month in which SVRX royalties . . . are received."  (*Id.*, Ex. 2 at 4 (§ E(f)).)  The APA explains that the monies to be passed through are those derived from licenses of the SVRX technology listed in Item VI of Schedule 1.1(a) of the APA, including UNIX System V releases 1.0, 1.1, 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2.  Therefore, SCO has a fiduciary duty to collect and pass through, in a timely manner, "all royalties, funds and other amounts due" from any agreements that license this SVRX technology.

_____

[4] The plain language of the APA governs its meaning.  *See* Cal. Civ. Code §§ 1638, 1639 ("[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity," and "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . .").

SCO's position of trust as an administrative agent for Novell is confirmed by its own words and actions.  SCO has acknowledged its ongoing duties in its public filings:

> [SCO] acts as an administrative agent in the collection of royalties for customers who deploy SVRX technology.  Under the agency agreement, the Company collects all customer payments and remits 95 percent of the collected funds to Novell and retains 5 percent as an administrative fee.

(*Id.*, Ex. 5 at 42.)  SCO also has acknowledged, after execution of the Sun and Microsoft Agreements, its continuing obligations under the APA's Agency Provisions, by actually passing through other SVRX Royalties to Novell, and by accepting the 5% administrative fee where other royalties have been remitted.  (LaSala Decl., Ex. 2, ¶ 6.)  Accordingly, any argument that SCO was not a fiduciary, and that APA's Agency Provisions somehow do not apply to SCO, must be rejected.

      **2.**      **SCO Breached its Fiduciary Duty By Not Accounting For Or Remitting Monies from the 2003 Sun and Microsoft Agreements.**

A comparison of the language of the APA to the language of the 2003 Sun and Microsoft Agreements demonstrates that the 2003 Agreements are SVRX Licenses.  The 2003 Sun Agreement purports

***  **REDACTED**  ***

The 2003 Microsoft Agreement purports      ***  **REDACTED**  ***

***  **REDACTED**  ***

Because these agreements purport      ***  **REDACTED**  ***

, they are "SVRX Licenses."      ***  **REDACTED**  ***

***  **REDACTED**  ***      Thus, the "royalties, fees and other amounts due" from these agreements are "SVRX Royalties" and SCO was obligated to

22

collect and pass them through to Novell.  Indeed, Novell owns "all right, title and interest" to these funds.  (Jacobs Decl., Ex. 1 at Sch. 1.1(b), p. 2.)

Even though Attachment 1 of the Sun Agreement and Exhibit C to the Microsoft Agreement unmistakably                **\*\*\* REDACTED \*\*\***                          , SCO has failed to account for and pass through the accompanying royalties from these contracts. SCO did not report on these royalties to Novell, as required by the APA.  (*See* LaSala Decl. at ¶¶ 3-5.)  Instead, strapped for cash, SCO hid the terms of these licenses from Novell for as long as it could, in derogation of its fiduciary duties as Novell's administrative agent.

Amendment No. 1 does not change the analysis.  It alters the Agency Provisions in only a few respects.  First, it affirms the Agency Provisions by adding a monthly royalty reporting requirement and, second, it changes the amount of time that SCO must remit royalties to Novell from 45 days to one month.  The undisputed fact is that SCO failed to comply with either.

In addition, even though Amendment No. 1 allows SCO to retain 100% of SVRX Royalties in four narrow circumstances, none of them apply here.[5]  Moreover, SCO's duty to remit SVRX Royalties does not disappear in the limited circumstances where, pursuant to Section J of Amendment No. 1 (a provision that SCO has not invoked as a justification of

_____

[5] The first circumstance, "fees attributable to stand-alone contracts for maintenance and support of SVRX products . . ." does not apply, because the 2003 Sun and Microsoft Agreements        **\*\*\* REDACTED \*\*\***                The next, "source code right to use fees under existing SVRX licenses from the licensing of additional CPUs and from the distribution by Buyer of additional source code copies" is also inapplicable, because these **\*\*\* REDACTED \*\*\***        The third exception, "source code right to use fees attributable to new SVRX licenses approved by Seller pursuant to Section 4.16(b) hereof" is also notably absent.  Novell never approved either the Sun or Microsoft licenses; SCO actively concealed their terms from Novell until long after their execution.  Finally, the fourth circumstance is inapplicable because the licenses were        **\*\*\* REDACTED \*\*\***

withholding the Sun and Microsoft funds), it may enter into amendments of and new SVRX Licenses. Amendment No. 1 does not change the simple fact that, as with any SVRX Licenses, Novell is the equitable owner of the monies flowing therefrom, including from the Sun and Microsoft Agreements. As such, SCO breached its fiduciary duty to timely account for and remit those monies to Novell. *See Batson v. Strehlow*, 68 Cal. 2d 662, 675 (1968) (finding a fiduciary relationship and stating that in the course of an agency relationship, the agent must act "with the utmost good faith toward the principal," including making "a full disclosure of all the facts relating to the acts under attack.").

### 3. Novell Suffered Damages as a Result of SCO's Breach.

"The sums allegedly owing to [the principal] but concealed by [the agent] are sufficient to constitute damage caused by the alleged breach of fiduciary duty." *Mendoza*, 140 Cal. App. 4th at 1460. Therefore, the very fact that SCO concealed royalties from Novell is enough to satisfy the damages element. Moreover, Novell competes with Sun and Microsoft in the marketplace, and suffered harm when SCO licensed them the SVRX technology without Novell's approval. (LaSala Decl. at ¶ 7)[6] Accordingly, Novell suffered damage as a result of SCO's breach of fiduciary duty.

---

[6] SCO's deliberate failure to consult Novell in connection with the Sun Agreement also violated SCO's obligations under Amendment No. 2 to the APA. That Amendment requires that Novell and SCO consult each other and receive approval prior to executing any transaction with an SVRX licensee that concerns a buy-out of that licensee's royalty obligations. (Jacobs Decl., Ex. 3 at 1.) The 2003 Sun Agreement provided that it would    *** **REDACTED** *** ; yet SCO failed to contact Novell, much less attempt to receive its approval.

**4.**    **A Constructive Trust is an Appropriate Remedy for Breach of Fiduciary Duty.**

Courts frequently base the equitable constructive trust remedy on a breach of fiduciary duty. *See Snepp v. United States*, 444 U.S. 507, 515 (1980) (upholding a constructive trust over proceeds flowing from breach of a fiduciary obligation).

In *Bainbridge v. Stoner*, the California Supreme Court embraced the remedy of a constructive trust based on a fiduciary "agency" relationship. 16 Cal. 2d 423, 428-29 (1940). The Court held "[t]he person holding the [taken] property may have acquired it through fraud, undue influence, breach of trust, or in any other improper manner and he is usually personally liable in damages for his acts. But the one whose property has been taken from him is not relegated to a personal claim against the wrongdoer which might have to be shared with other creditors; he is given the right to a restoration of the property itself."

Moreover, in *Heckmann*, the California Court of Appeal affirmed a constructive trust remedy based on breach of fiduciary duty where "by the time plaintiff obtains a final judgment, the original fund may have grown far greater than the legal rate of interest would recognize," and "[t]o allow the defendant to pocket the difference would reward the defendant for his wrongdoing." 168 Cal. App. 3d at 135. Accordingly, a constructive trust is a particularly appropriate remedy for breach of fiduciary duty under the present circumstances.

**C.**    **SCO Converted Novell's Property by Wrongfully Retaining SVRX Royalties from the Sun and Microsoft Agreements.**

SCO's wrongful acts also warrant summary judgment on conversion, Novell's Eighth Claim for Relief. "[C]onversion is the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property." *Kasdan, Simonds, McIntyre, Epstein & Martin v. World Sav. & Loan Ass'n (In re Emery)*, 317 F.3d 1064, 1069 (9th Cir.

2003); *Weiss v. Marcus*, 51 Cal. App. 3d 590, 599 (1975).  Conversion is a strict liability tort in California; good faith, lack of knowledge, and motive are usually immaterial.  *Kasdan*, 317 F.3d at 1069.  In addition, money is the proper subject of an action for conversion where, as here, there is a "specific sum capable of identification" involved.[7]  *Weiss v. Marcus*, 51 Cal. App. 3d 590, 599 (1975) ("it is not necessary that each coin or bill be earmarked.").

The elements of conversion are "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages."  *Kasdan*, 317 F.3d at 1069.  Each of these factors is satisfied here, and summary judgment is therefore proper.

### 1.     Novell Holds "All Right, Title and Interest" to the SVRX Royalties.

Novell owns the SVRX Royalties retained by SCO.  The APA, to which SCO has repeatedly asserted it is the successor-in-interest, transferred "the SVRX Licenses" to Santa Cruz.  (Jacobs Decl., Ex. 1 at 2 (§ 1.2(b)); Ex. 5 at 42.)  However, Novell and Santa Cruz expressly agreed that Novell would be "retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to [SCO] hereto, and that [SCO] only has legal title and not an equitable interest in such royalties . . . ."  (*Id.*, Ex. 1 at 2 (§ 1.2(b)).)  Further to this agreement, Novell and Santa Cruz *specifically excluded* from Santa Cruz's purchase "[a]ll right, title and interest to the SVR[X] Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16."  (*Id.* at Sch. 1.1(b), p. 2.)  Novell has remained the owner of the SVRX Royalties at all times.

---

[7] The sum can be identified as the monies from the Sun and Microsoft Agreements.  In its public filings, SCO valued these amounts at $25,846,000.  (Jacobs Decl., Ex. 7 at 9.)

As discussed, the 2003 Sun and Microsoft Agreements generated SVRX Royalties that were, by definition, owned by Novell. Novell is thus the equitable owner of all SVRX Royalties that SCO collected from Sun and Microsoft through these agreements.

### 2. SCO Damaged Novell by Failing to Remit the Royalties to Novell and Failing to Inform Novell of Their Existence.

It is undisputed that SCO failed to remit any monies flowing from the 2003 Sun and Microsoft Agreements to Novell. SCO's refusal to inform Novell of the terms of the Agreements until nearly three years after their execution (when Novell was forced to use the legal process in this case) further evidences SCO's wrongdoing. Despite Novell's repeated requests for the Agreements and royalty payments, SCO refused to provide either. As explained above, this "wrongful exercise of dominion" over Novell's property has caused *per se* damage to Novell. *See Kasdan*, 317 F.3d at 1069.

### 3. A Constructive Trust is a Proper Remedy for Conversion.

A constructive trust is a proper remedy for the underlying "wrongful act" of conversion. *Weiss*, 51 Cal. App. 3d at 599; *see also Bell v. Bayly Bros., Inc.*, 53 Cal. App. 2d 149, 159 (1942) (holding that allegedly converted oil royalties could be held in constructive trust). Accordingly, summary judgment should be granted as to conversion, and a constructive trust of the SVRX Royalties should be established.

### D. Novell is Also Entitled to Summary Judgment on its Constructive Trust and Accounting Causes of Action.

Novell's Sixth and Ninth Claims for Relief encompass the equitable remedies of constructive trust and accounting. The Court has broad discretion to impose either remedy, and under the undisputed facts, both should be granted. *See Callery v. United States Life Ins. Co.*, 392 F.3d 401, 408 (10th Cir. 2004) ("[t]raditional trust law provides for broad and flexible

equitable remedies in cases involving breaches of fiduciary duty.") (quoting *Eaves v. Penn*,

587 F.2d 453, 462 (10th Cir. 1978)); *Tenneco Oil Co. v. Joiner*, 696 F.2d 768, 776 (10th Cir.

1982) (applying Oklahoma constructive trust law, and discussing breadth of constructive trust

remedy under principles of federal equity jurisprudence).

### 1.    A Constructive Trust Arises From SCO's Wrongful Conversion of Royalties and Its Breach of Fiduciary Duty.

Under California law, the constructive trust cause of action arises from two statutes. Cal.

Civ. Code §§ 2223 ("[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for

the benefit of the owner."), 2224 ("[o]ne who gains a thing by fraud, accident, mistake, undue

influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and

better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who

would otherwise have had it.").

Courts interpret these statutes broadly, applying them to "practically any case where there

is a wrongful acquisition of property to which another is entitled." *Ornbaun v. Main*, 198 Cal.

App. 2d 92, 99 (1961); *see also U.S. v. Pegg*, 782 F.2d 1498, 1500-01 (9th Cir. 1986) (applying

California law to grant a constructive trust, noting that because constructive trusts are "creatures

of equity," these statutes merely set out the general principles to guide the court). "A

constructive trust is an equitable remedy imposed where the defendant holds title or some

interest in certain property which it is inequitable for him to enjoy as against the plaintiff."

*Kraus v. Willow Park Public Golf Course*, 73 Cal. App. 3d 354, 373 (1977). Federal courts also

have broad equitable powers to impose a constructive trust remedy. In *Oldland v. Gray*, the

Tenth Circuit concluded:

> [F]iducial relationships, universally recognized in equity jurisprudence, do not
> depend upon nomenclature. The doctrine extends 'in all of its breadth and with all

> of its effects' to all persons who obtain legal title or possession of property in any manner so that he cannot equitably retain it against the rightful owner. In such circumstances, 'equity carries out this theory of double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.'

179 F.2d 408, 414 (10th Cir. 1950) (affirming the imposition of a constructive trust in the oil and gas lease royalty context). Thus, the standard for obtaining a constructive trust is quite flexible.

The factors necessary to prove a constructive trust cause of action are: "existence of a *res* (some property or some interest in property), the plaintiff's right to that *res*, and the defendant's gain of the *res* by fraud, accident, mistake, undue influence or other wrongful conduct." *Pegg*, 782 F.2d at 1500. The facts in this case strongly support each of these elements. The *res* is the SVRX Royalties, to which Novell retains "all right, title, and interest." This *res* is traceable to the monies received from the Sun and Microsoft Agreements.

There also has been "wrongful conduct" by SCO. A breach of fiduciary duty, conversion, unjust enrichment, breach of trust, or breach of an express contract – each of which is present here – are all sufficient "wrongful conduct" to impose a constructive trust. In *GHK Associates v. Mayer Group, Inc.*, for example, the trial court imposed a constructive trust based on breach of obligations flowing from a contract.[8] 224 Cal. App. 3d 856, 878 (1990) ("a breach of contract or intentional interference with contract can make the offending party a constructive

---

[8] In *GHK*, the defendants signed a written agreement to develop plaintiff's land and pay plaintiff 40% of the profits. 224 Cal. App. 3d at 862-64. The plaintiff never received his 40%, and subsequently sued for breach of contract and constructive trust. The trial court found a wrongful act based on, among other things, defendants' failure to pay the 40% in profits. Since the agreements would have called for the owner to receive 40% of the profits realized through sales and rentals had there been no breach, the court imposed a constructive trust on the rents and sale proceeds of the project.

trustee."); *see also Heckmann*, 168 Cal. App. 3d 119.  The court explicitly recognized the lower court's power to grant equitable relief in the form of a constructive trust and held that the imposition of the constructive trust was proper to ensure the owner received its damages.  *GHK*, 224 Cal. App. 3d at 878 (citing *Hicks v. Clayton*, 67 Cal. App. 3d 251, 265 (1977)).

Like the defendants in *GHK*, SCO breached its fiduciary obligations by failing to remit the royalties it collected from the 2003 Sun and Microsoft Agreements.  Novell thus meets the standard for establishing a constructive trust.

**2.     An Accounting Is Proper Because SCO Breached its Fiduciary Duty to Account for SVRX Royalties.**

Novell also meets its burden for an accounting under its Ninth Claim for Relief.  An accounting is proper "when the relationship of the parties created an equitable duty to account (e.g., the duty to account imposed upon a trustee or constructive trustee)" and "when an accounting on an otherwise legal claim [is] incidental to a demand for an injunction or other equitable relief."  *Towers v. Titus*, 5 B.R. 786, 793 (N.D. Cal. 1979) (basing an accounting on a constructive trust).  Each of these independent grounds for invoking an accounting exists.

First, the Agency Provisions expressly impose upon SCO a fiduciary duty to give detailed monthly reports and comply with audits. (Jacobs Decl. Ex. 2 at 4 (§ E(f)); Ex. 1 at 2 (§ 1.2(b)).)  The existence of a fiduciary duty gives rise to an accounting cause of action; "where there is a fiduciary relationship . . . and the facts are peculiarly within the knowledge of one of the parties. . . an accounting lies."  *Van de Kamp*, 204 Cal. App. 3d at 864 (citations omitted); *see also Cruz v. United States*, 219 F. Supp. 2d 1027, 1040 n.8 (N.D. Cal. 2002).  Since SCO never provided an accounting of the SVRX Royalties arising from the 2003 Sun and Microsoft Agreements, SCO breached its fiduciary duty, and an accounting is appropriate.

30

An accounting is also proper because it is incidental to the constructive trust cause of action.  There is a "duty to account incumbent upon a constructive trustee."  *Towers*, 5 B.R. at 794; 9 Wright & Miller § 2310.  SCO is a constructive trustee to Novell's SVRX Royalties under California Civil Code §§ 2223 and 2224, and general principles of equity, and thus has an associated duty to account.

## II.    EVEN IF THE COURT DENIES SUMMARY JUDGMENT, A PRELIMINARY INJUNCTION SHOULD BE GRANTED.

Should the Court deny Novell's motion for partial summary judgment, Novell requests a preliminary injunction imposing a constructive trust and an accounting on the wrongfully withheld revenues from the Sun and Microsoft Agreements.

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the moving party must show:  (1) substantial likelihood of prevailing on the merits; (2) irreparable injury if the injunction is denied; (3) greater injury to the movant absent the injunction than that which the opposing party will suffer under the injunction; and (4) lack of adverseness to the public interest.[9]  *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005).  Here, each factor weighs strongly in Novell's favor, and a preliminary injunction should be granted.

_____

[9] The Court's entry of a preliminary injunction against SCO does not implicate a security requirement for Novell since Novell has considerable assets to cover any damage, and because there is no risk of monetary loss to the enjoined party.  *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782-83 (10th Cir. 1964) (finding no security requirement where the movant has with "considerable assets" and "is able to respond in damages if [the nonmovant] does suffer damages by reason of the injunction.");  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (upholding preliminary injunction and finding no bond requirement under Fed. R. Civ. Proc. 65 for moving party).  Here, Novell is merely requesting that the royalties received by SCO pursuant to the 2003 Sun and Microsoft agreements be placed into an interest-bearing trust account for the duration of the litigation.  No security is necessary

(Footnote continues on next page.)

A.    **Novell Is Substantially Likely to Prevail on Its Breach of Fiduciary Duty, Conversion, and Constructive Trust Claims.**

Novell meets its burden of showing that it is entitled to judgment as a matter of law as to its breach of fiduciary duty, conversion, and constructive trust counterclaims, and Novell reincorporates all of its summary judgment arguments herein.  Because (1) the "substantial likelihood of success on the merits" standard is lower than the summary judgment standard, (2) the facts strongly suggest the existence of a breach of fiduciary duty, conversion, or statutory constructive trust, and (3) any of those underlying wrongful acts can form the foundation for a constructive trust, Novell is likely to prevail on the merits.

B.    **Novell Will Suffer Irreparable Harm Without an Injunction.**

Novell will suffer irreparable harm if the Court does not impose a constructive trust immediately.  In particular, Novell will lose any ability to recover a judgment from SCO.

SCO is hemorrhaging assets at an unsustainable rate, and is in a very unstable financial position.  SCO's most recent financial statements show that, two months ago, it had only $13,960,000 in liquid assets.  (*See* Jacobs Decl., Ex. 23 at 5.)  Further, as of July 31, 2006, SCO's cash position was just $8,861,000, and it was burning through cash (based on 2006 operations) at a rate of nearly $800,000 each month.  (*Id*., Ex. 23 at 3-5.)  At this rate, which does not even take into consideration SCO's dwindling litigation reserves and burgeoning litigation expenses (*see* Undisputed Fact ¶ 53, *supra*), SCO will be unable to fully satisfy a judgment against it by the time this case goes to trial in June 2007.

---

(Footnote continued from previous page.)

because the principal royalty amount, along with the interest accrued, would be collectible by SCO as damages if SCO were to ultimately prevail.

Furthermore, by SCO's own admission, its financial picture will continue to darken. With its UNIX revenues rapidly declining, SCO has tied its financial future to its ability to prevail in the IBM Litigation. (*See* Jacobs Decl., Ex. 23, 19, 21, 37-38.) SCO recently suffered a substantial loss in the IBM Litigation when two-thirds of its case was dismissed. Moreover, notwithstanding SCO's infusion of $5,000,000 of additional cash into an escrow account to cover SCO Litigation costs and expenses on June 5, 2006, only $1,561,000 remained in that escrow account as restricted cash for the Litigation as of the end of July 2006. (*See* Undisputed Fact ¶ 53, *supra*.) Indeed, just two months ago, SCO admitted that if it burns through the remaining restricted cash for the SCO Litigation (a likely scenario given the intensive ongoing proceedings in the IBM Litigation), which it is already doing, it "may be required to place additional amounts into the escrow account, which could harm our liquidity position." (Jacobs Decl., Ex. 23 at 42.) Thus, with a fast-growing burn rate and limited cash, SCO is trapped in a financial tailspin from which it cannot escape.

An immediate injunction is also essential to preserve Novell's right to satisfy its equitable rights to the SVRX Royalties. Without an accounting and constructive trust, if SCO goes into bankruptcy, Novell would likely be viewed as an unsecured creditor. *See In re PKR, P.C.*, 220 B.R. 114, 117 (B.A.P. 10th Cir. 1998) ("numerous courts have held that constructive trusts are not recognized or imposed in bankruptcy proceedings unless the trust was imposed either statutorily or judicially prior to the bankruptcy"). In addition, if a constructive trust is not imposed prior to a bankruptcy petition, any commingling of funds by SCO could prevent Novell from recovering the full amount it is owed. *See In re JD Servs., Inc.*, 284 B.R. 292, 296-98 (Bankr. Utah 2002) (discussing the stringent tracing requirements for constructive trusts imposed post-bankruptcy petition). Therefore, absent an injunction here, Novell will lose not just money,

but the legal rights associated with collecting the full value of its royalties.  The loss of those legal rights cannot be made whole with money alone, particularly from an insolvent debtor, and must therefore be secured before it is too late.

### C.    The Balance of Hardships Weighs in Novell's Favor.

Without an injunction, Novell will permanently lose up to $25,846,000 in royalties, as well as interest accrued since the execution dates of the 2003 Agreements.  Not only is this a present hardship and competitive disadvantage for Novell, but it will represent a significant future burden when SCO cannot satisfy Novell's judgment against it.  In addition, if preliminary relief is not granted, SCO will be encouraged to continue its SCOsource practices of licensing software without remitting royalties to Novell, and hiding licensing contracts from Novell during audits.

An injunction would not, however, disproportionately injure SCO.  A constructive trust and accounting would not divest SCO of any funds to which it has lawful title.  Instead, it would merely require SCO to serve as a diligent trustee of all SVRX Royalty funds stemming from the 2003 Sun and Microsoft Agreements.  So long as SCO does this, it will be in no danger of losing any money to which it is lawfully entitled.  In addition, a constructive trust would not unfairly harm SCO, as it would only restore the balance contemplated by the APA in the first instance. The balance of hardships, therefore, weighs firmly in Novell's favor.

### D.    Granting an Injunction Would Not Be Adverse to the Public Interest.

A constructive trust injunction would not run against public policy.  There is no public policy to uphold breach of fiduciary obligations or conversion generally, much less a breach of the Agency Provisions in the APA specifically.  Constructive trusts also have long been held to be appropriate equitable remedies, and thus are not adverse to the public interest.  In any event, a

constructive trust in this instance would cause no particular harm to the public interest. In fact, it would be a strong statement in support of fiduciary duties and equitable rights, and would discourage SCO from continuing to license software to which it has no title. Accordingly, a preliminary injunction should be granted.

<strong>CONCLUSION</strong>

For the foregoing reasons, Novell respectfully requests that this Court grant partial summary judgment as to Novell's Sixth, Seventh, Eighth, and Ninth Claims for Relief and impose a constructive trust on the monies SCO received and improperly retained from the 2003 Sun and Microsoft Agreements. If summary judgment is denied, Novell requests in the alternative that this Court issue a preliminary injunction requiring an accounting and establishing a constructive trust.

DATED:        September 29, 2006

ANDERSON & KARRENBERG


_____*/s/ Heather M. Sneddon*_____
Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)

**Attorneys for Novell, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of September, 2006, I caused a true and

correct copy of the **MEMORANDUM IN SUPPORT OF NOVELL, INC.'S MOTION FOR**

**PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION** *[REDACTED*

*pursuant to the August 2, 2006 Stipulated Protective Order]* to be served via CM/ECF to the

following:

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131

_____ */s/ Heather M. Sneddon* _____