MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)
425 Market Street
San Francisco, CA  94105–2482
Telephone:  (415) 268–7000
Facsimile:  (415) 268–7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone:  (801) 534–1700
Facsimile:  (801) 364–7697

Attorneys for Novell, Inc.

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>      Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>      Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH CLAIM FOR RELIEF**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No.  2:04CV00139<br><br>Judge Dale A. Kimball |

Dockets.Justia.co

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF ISSUES ............................................................. 1

II.  INTRODUCTION ........................................................................ 1

III. STATEMENT OF UNDISPUTED FACTS ................................... 2

    A.   The APA and Novell's Retained Rights Under Section 4.16(b) to Direct SCO to Take Action, or Upon SCO's Refusal, to Take Action on Behalf of SCO. .......................................................................................................... 2

    B.   The APA Amendments As Related to SVRX Licenses and Novell's 4.16(b) Right to Take Action. ................................................................. 5

    C.   The AT&T License Agreements Granting Rights to UNIX System V Software. ................................................................................................. 7

    D.   The IBM SVRX License. ....................................................................... 8

    E.   The Sequent SVRX License ............................................................... 11

    F.   The 2003 SCOsource Campaign and SCO's Breach Claims Against IBM and Sequent. .......................................................................................... 14

        1.   SCO's Purported Termination of the IBM SVRX License. .................. 14

        2.   SCO's Purported Termination of the Sequent SVRX License. ............... 17

IV.  THE APA UNAMBIGUOUSLY AUTHORIZES NOVELL TO DIRECT SCO TO WAIVE ITS PURPORTED CLAIMS AGAINST IBM AND SEQUENT, AND TO WAIVE ON SCO'S BEHALF WHEN, AS HERE, SCO REFUSES. ............ 18

    A.   A Declaration of Rights Is Proper Because an Actual Controversy Exists Over the Question of the Parties' Rights and Obligations Under the APA. ........ 19

    B.   The Plain Language of Section 4.16(b) Grants Novell the Authority to Waive Rights Under Any SVRX License, Including Those of IBM and Sequent. ........................................................................................... 20

        1.   Section 4.16(b) Unambiguously Authorizes Novell to Direct SCO to Take Action and to Act on SCO's Behalf. ........................................ 21

        2.   Novell's Rights Under Section 4.16(b) Apply to "Any SVRX License," a Term That is Defined in the APA. ....................................... 22

        3.   The IBM and Sequent Agreements Are SVRX Licenses. ....................... 24

4.  SCO's Narrow Interpretation of SVRX License Contradicts the Plain Language of the APA. ..................................................................... 24

5.  The Integrated Structure of the AT&T License Agreements Belies SCO's Narrow Interpretation of SVRX Licenses. ................................... 28

6.  SCO's Contemporaneous Course of Conduct Defeats its Narrow Interpretation of SVRX License. ............................................................ 29

C.  Novell's Interpretation of its Section 4.16(b) Authority is Consistent with the APA Amendments. ........................................................................ 32

D.  Consistent with the Agency Relationship Created by the APA, Novell Exercised its "Sole Discretion" to Direct SCO to Take Action as to the Sequent and IBM SVRX Licenses. ..................................................................... 32

E.  Consistent with the Agency Relationship Created by the APA, Novell Is Authorized to Take Action on Behalf of SCO Concerning the Sequent and IBM SVRX Licenses. ........................................................................ 34

V.  CONCLUSION .............................................................................................. 34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Hosp. Supply Corp. v. Damon Corp.*,
  597 F. Supp. 445 (N.D. Ill. 1984) ................................................................................20

*Bionghi v. Metro. Water Dist.*,
  70 Cal. App. 4th 1358 (1999) ......................................................................................21

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
  508 U.S. 83 (1993) ......................................................................................................20

*Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*,
  2 Cal. 4th 342 (1992) ..................................................................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................................19

*Duggins v. Hunt*,
  323 F.2d 746 (10th Cir. 1963) .....................................................................................20

*Haggard v. Kimberly Quality Care, Inc.*,
  39 Cal. App. 4th 508 (1995) ...................................................................................21, 28

*Jensen v. Traders & Gen. Ins. Co.*,
  52 Cal. 2d 786 (1959) ..................................................................................................20

*Kunkel v. Cont'l Cas. Co.*,
  866 F.2d 1269 (10th Cir. 1989) .........................................................................19, 20, 24

*Niederer v. Ferreira*,
  189 Cal. App. 3d 1485 (1987) ......................................................................................20

*PMC., Inc. v. Porthole Yachts, Ltd.*,
  65 Cal. App. 4th 882 (1998) .........................................................................................33

*Shaw v. Regents of the Univ. of Cal.*,
  58 Cal. App. 4th 44 (1997) ...........................................................................................26

*Tahoe Nat'l Bank v. Phillips*,
  4 Cal. 3d 11 (1971) ......................................................................................................21

*The SCO Group, Inc. v. IBM Corp.*,
  No. 2:03CV294 (D. Utah 2005) ......................................................................................3

*Third Story Music, Inc. v. Waits*,
  41 Cal. App. 4th 798 (1995) ....................................................................................33, 34

*Wickham v. Southland Corp.*,
  168 Cal. App. 3d 49 (1985) ...................................................................................................33

## STATUTES

28 USCS
  § 2201 .................................................................................................................................20

Cal. Civ. Code
  § 1638 .................................................................................................................................20
  § 1639 .............................................................................................................................20, 22

Fed. R. Civ. P.
  Rule 56(c) ...........................................................................................................................19

Cal. Code Civ. Proc.
  § 1858 .................................................................................................................................21

## I.    STATEMENT OF ISSUES

Novell's motion presents a single issue: whether the express terms of a 1995 contract authorize Novell to direct SCO to waive its purported legal claims for alleged breaches of SVRX license agreements with IBM and with Sequent, and to take action on SCO's behalf when SCO refuses to so waive, where the plain language of the 1995 contract gives Novell "at its sole discretion and direction" the right to take such action concerning "any SVRX License," and the IBM and Sequent SVRX license agreements are SVRX Licenses under the 1995 contract's plain meaning of that term.

## II.    INTRODUCTION

Novell, Inc. ("Novell") requests that the Court grant partial summary judgment on Novell's Fourth Claim for Relief.  Specifically, Novell asks the Court to declare that Novell has the authority pursuant to Section 4.16(b) of the 1995 Asset Purchase Agreement ("APA") to take the following actions: (1) to direct The SCO Group, Inc. ("SCO") to waive its purported claims against IBM under the SVRX license agreements between IBM Corporation ("IBM") and AT&T and between Sequent Computer Systems, Inc. ("Sequent") and AT&T, and (2) because SCO refused (and still refuses) to follow that direction, to waive those claims on SCO's behalf.

Section 4.16(b) of the APA is a broad and unambiguous grant of authority to Novell.  It states in plain language that Novell may, at its "sole discretion and direction," direct The Santa Cruz Operation, Inc. ("Santa Cruz") to "amend, supplement, modify or waive any rights under . . . any SVRX License . . . in any manner or respect."  If Santa Cruz refuses to follow that direction, Novell is "authorized, and hereby is granted, the rights to take any action on [Santa Cruz's] own behalf."  Novell's authority to take these actions is consistent with the agency relationship established by the APA, whereunder Santa Cruz is the administrative agent for Novell in connection with the SVRX Licenses.

1

In 2003, as part of its "SCOsource" campaign, SCO began to advance claims of SVRX License breach against IBM and Sequent. Novell subsequently directed SCO — the admitted successor-in-interest to Santa Cruz's rights and obligations under the APA — to waive those claims. When SCO refused to follow that direction, Novell waived the claims on SCO's behalf. SCO has ignored Novell's waiver, however, and in its co-pending lawsuit with IBM, continues to advance claims of SVRX License breach.

Under the APA's unambiguous grant of authority to Novell, SCO has no legal right to ignore Novell's actions. Novell waived SCO's claims on SCO's behalf, and that is — or should be — the end of the story. Novell therefore asks the Court to accord Novell's actions the legal effect they deserve by granting this motion.[1]

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    The APA and Novell's Retained Rights Under Section 4.16(b) to Direct SCO to Take Action, or Upon SCO's Refusal, to Take Action on Behalf of SCO.

1.    In 1995, Novell was engaged in the business of developing a line of operating-system software products called UNIX and UnixWare, and was selling binary and source code licenses to various versions of these products. (Brakebill Decl., Ex. 1 (APA) at 008 (Recital A).)

2.    On September 19, 1995, Novell and Santa Cruz entered into the APA. (*Id*. at 008.)

3.    Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business. (*Id*. at 008 (Recital B), 008-9 (§ 1.1(a)); Ex. 2 at 001

---

[1] The undisputed and indisputable facts set forth in this motion are supported by documents and depositions that are appended as exhibits to the Declaration of Kenneth W. Brakebill in Support of Novell's Motion for Partial Summary Judgment on its Fourth Claim for Relief (hereinafter "Brakebill Decl."). The exhibits are cited herein as "Brakebill Decl., Ex. _."

(Recital A).)

4.      Through the APA, Santa Cruz also acquired the right to develop, license, and sell

a new consolidated Intel UNIX product referred to as the "Merged Product."  (*Id.*, Ex. 1 at 032

(§ 4.18); Ex. 2 at 001–2 (§§ 1-2); *SCO v. Novell*, SCO's Reply to Novell's Amended

Counterclaims, PACER No. 158 at 3–4 (¶ 14).)  Santa Cruz also obtained the right to convert

"SVRX-based customers" to a UnixWare derived product.  (*See, e.g.*, Brakebill Decl., Ex. 1 at

065-066 (Sch. 1.2(b) at subsection (f)).)

5.      Because Santa Cruz did not have the financial capacity to pay the purchase price

contemplated by Novell, Novell and Santa Cruz agreed that Novell would receive Santa Cruz

stock and retain certain UNIX rights.  (*The SCO Group, Inc. v. IBM Corp.*, No. 2:03CV294

(D. Utah 2005) (hereinafter "*SCO v. IBM*"), SCO's Memorandum in Opposition to IBM's

Motion for Summary Judgment on SCO's Contract Claims, dated November 11, 2006

(hereinafter "SCO's Opp. to IBM's MSJ on SCO's Contract Claims"), PACER No. 872–75 at

Appendix A, p. 69 (Undisputed Fact ¶ 136).)

6.      In consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz

issued 6,127,500 shares of its common stock to Novell.  (Brakebill Decl., Ex. 1 at 009 (§ 1.2).)

7.      As further consideration, Novell retained rights, and Santa Cruz assumed certain

obligations, relating to "the SVRX Licenses."  (*Id.* at 009 (§ 1.2(b)), 031 (§ 4.16), 059-60 (Sch.

1.1(a)(Item VI)), and 062 (Sch. 1.1(b)(Item VIII)).)

8.      <u>First</u>, Novell retained "[a]ll right, title and interest" to "all royalties, fees, and

other amounts due under all SVRX Licenses" — referred to as "SVRX Royalties."  (*Id.* at 031

(§ 4.16(a)), 062 (Sch. 1.1(b)(Item VIII)).)  Although the APA transferred "the SVRX Licenses"

to Santa Cruz, Novell and Santa Cruz expressly acknowledged and agreed "that [Santa Cruz]

only has legal title and not an equitable interest in such royalties."  (*Id.* at 009 (§ 1.2(b)).)  As

Novell's "administrative agent" for the sums due under all SVRX Licenses, Santa Cruz agreed

"to collect and pass through to [Novell] one hundred percent (100%)" of these monies and

Novell, in turn, agreed to pay Santa Cruz a 5% administrative fee. (*Id.* at 009 (§ 1.2(b)), 031

(§ 4.16(a)); Ex. 42 at 42).)

      9.     Prior to this lawsuit, SCO publicly acknowledged that these administrative duties

with respect to SVRX Licenses extend to "customers who deploy SVRX technology."

Specifically, SCO stated that:

> [SCO] acts as an administrative agent in the collection of royalties for
> ***customers who deploy SVRX technology***. Under the agency agreement, the
> Company collects all customer payments and remits 95 percent of the
> collected funds to Novell and retains 5 percent as an administrative fee.

(*Id.*, Ex. 42 at 42 (emphasis added).) In this announcement, SCO did not report that its

administrative duties under the APA are limited to a more narrow set of SVRX customers that

includes only those licensing SVRX products in binary code format.

      10.     As part of the agency relationship created by the APA, Santa Cruz agreed to

provide Novell with monthly reports concerning its administration of the SVRX License

revenue. (*Id.*, Ex. 3 at 4 (§ E(f)), 6 (I(1)).) In those reports, Santa Cruz recorded SVRX revenue

it received from customers and detailed the cash Santa Cruz remitted to Novell. In particular,

Santa Cruz set forth the total SVRX revenue due or collected from customers (which it recorded

as "Total Revenue for Administrative Consideration for Period"), SCO's 5% administrative fee

(which it recorded as "Administrative Fee" or "Domestic Administrative Fee Calculation"), and

the cash amount it would pay Novell after deduction of SCO's administrative fee, third party

royalty payments, bank fees or other miscellaneous offsets (which it recorded as "Total Payment

Due to Novell for Period"). (*See, e.g.*, *id.*, Ex. 14 at 1; Ex. 43 at 1.)

      11.     <u>Second</u>, Novell retained the right, "at [its] sole discretion and direction," to direct

Santa Cruz to take certain actions as to "any SVRX License" — including to direct Santa Cruz to

waive any rights under "any SVRX License" — and to take such action on Santa Cruz's behalf

should Santa Cruz fail to follow Novell's direction.  (*Id*., Ex. 1 at 031 (§ 4.16(b)).)

Section 4.16(b) provides, in pertinent part:

> (b)    [SCO] shall not, and shall not have the authority to, amend, modify or
> waive any right under or assign any SVRX License without the prior
> written consent of [Novell].  ***In addition, at [Novell]'s sole discretion
> and direction, [SCO] shall amend, supplement, modify or waive any
> rights under, or shall assign any rights to, any SVRX License to the
> extent so directed in any manner or respect by [Novell].  In the event
> that [SCO] shall fail to take any such action concerning the SVRX
> Licenses as required herein, [Novell] shall be authorized, and hereby
> is granted, the rights to take any action on [SCO]'s own behalf*** . . . .
> (*Id*. (emphasis added).)

14.    Section 4.16 of the APA — entitled SVRX Licenses — defines that term.  (*Id*. at

031 (§ 4.16(a)).)  The first sentence of subparagraph (a) of Section 4.16 refers to "SVRX

Licenses" and is then immediately followed by an explanatory parenthetical stating: "as listed in

detail under item VI of Schedule 1.1(a) hereof . . ."  (*Id*.)  Item VI of Schedule 1.1(a), in turn,

provides a list of "the SVRX Licenses" that relate to various UNIX System V software releases,

including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2 and "[a]ll prior

UNIX System releases and versions preceding UNIX System V Release No. 2.0."  (*Id.* at 059-60

(Sch. 1.1(a)).)

### B.    The APA Amendments As Related to SVRX Licenses and Novell's 4.16(b) Right to Take Action.

13.    Novell and Santa Cruz amended the APA twice — on December 6, 1995

("Amendment No. 1"), and on October 16, 1996 ("Amendment No. 2").  (*Id*., Exs. 3–4.)

14.    Amendment No. 1 confirms that SVRX Licenses includes those contracts relating

to the UNIX System V software releases listed under Item VI of Schedule 1.1(a) of the original

APA.  Amendment No. 1 also expands SVRX Licenses to additionally include those contracts

relating to certain "Auxiliary Products" expressly identified in Attachment A to that Amendment

5

(which is alternatively referred to as "Attachment 1 to Schedule 1.1(a)).[2] (*Id.*, Ex. 3 at 9 (§ K.4),

8 (§ K.1(vi)), 10 (§ O).)

     15.     Amendment No. 1 modifies Section 4.16(b) in only one respect: it carves out two

limited exceptions where Santa Cruz has "the right to enter into amendments of the SVRX

Licenses" and "new SVRX Licenses" — exceptions that are not at issue in this motion. (*Id.* at 6-

7 (§ J).) Amendment No. 1 contains no language purporting to modify Section 4.16(b)'s grant of

authority to Novell to direct SCO to take action, or to take action on behalf of SCO. (*Id.*, Ex. 3.)

     16.     Amendment No. 2 addresses Section 4.16 of the APA in one limited respect: it

details how prospective buy-outs with SVRX licensees shall be managed by Novell and Santa

Cruz. (*Id.*, Ex. 4 at 1.) In relevant part, Section B of Amendment No. 2 provides:

> B.     Except as provided in Section C below, and notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, ***any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows*** . . . . (*Id.* (emphasis added).)[3]

Section B then immediately proceeds to list six subsections to be followed by Novell and Santa

Cruz in managing future buy-out transactions. (*Id.* at 1-2.)

     17.     Subsections B(1) through B(4) of Amendment No. 2 require participation of both

Novell and Santa Cruz in any prospective buy-out transaction with SVRX licensees. (*Id.* at 1.)

Subsection B(5) of Amendment No. 2 confirms that Amendment No. 2's new procedure for

---

[2] Specifically, Item K.4 of Amendment No. 1 provides that the term SVRX Licenses shall "collectively" refer to the contracts relating to the SVRX Licenses listed in detail under Item VI of Schedule 1.1(a) (*see* Undisputed Fact ¶ 12, *supra*) and "Auxiliary Product Licenses" listed in Attachment A to Amendment No. 1. (*Id.*, Ex. 3 at 9 (§ K.4).)

[3] Section C of Amendment No. 2 authorizes Novell to enter into buy-outs "without any approval or involvement of SCO" and free from "the requirements stated in Section B" in two circumstances: (1) where SCO "ceases to actively and aggressively market SCO's UNIX platforms" or (2) upon a change of control of SCO "as stated in schedule 6.3(g)" of the APA. (*Id.*, Ex. 4 at 2.) Neither circumstance is at issue in this motion.

managing future buy-out transactions does not alter the parties' existing source code rights under the APA. (*Id*.) Subsection B(6) of Amendment No. 2 prohibits Novell's sales force from receiving sales incentives as a result of these prospective buy-out transactions. (*Id*. at 2.)

**C.    The AT&T License Agreements Granting Rights to UNIX System V Software.**

18.    UNIX was originally developed by AT&T. Over time, AT&T, through various business units and subsidiaries, licensed various versions of its UNIX software, in both source and object code form, to universities, corporations, other entities and individuals. (*SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 1-2 (¶ 6); *SCO v. Novell,* SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 2 (¶ 6); *SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at Appendix A p. 3 (Undisputed Facts ¶¶ 10-11).)

19.    In 1983, AT&T developed a new version of UNIX called UNIX *System* V, Release 1. Subsequently, AT&T released other versions of System V, including Releases 2, 3 and 4. These releases of UNIX System V are referred to as SVR1, SVR2, SVR3 and SVR4, or generically as SVRX. (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at Appendix A p. 3 (Undisputed Fact ¶ 9); *SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 2 (¶ 7); *SCO v. Novell,* SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 2 (¶ 7).)

20.    AT&T licensed its UNIX System V software products through a combination of Software Agreements, Sublicensing Agreements, Supplements, and Schedules. The "Software Agreements" granted the licensee the right to use, modify and prepare modifications and derivative works of the "SOFTWARE PRODUCT." (*See, e.g.*, Brakebill Decl., Ex. 5, at 002 (§ 2.01).) The SOFTWARE PRODUCT was defined to include COMPUTER PROGRAMS in source-code or binary-code (*i.e.*, "object-code") format. (*Id.* (§§ 1.02, 1.04).)

7

21.    The "Sublicensing Agreements" permitted the licensee to sublicense derivative works of the SOFTWARE PRODUCT to others in binary-code format.  (*See, e.g.*, *id.*, Ex. 6 at 002 (§§ 1.04, 2.01).)  These derivative works were referred to as the SUBLICENSED PRODUCT.  (*Id.* (§ 1.04).)

22.    The "Software Agreements" were accompanied by one or more "Supplements" (through attached "Schedules") that set forth the specific SOFTWARE PRODUCT being licensed, listed the designated CPUs on which the SOFTWARE PRODUCT was to be used, and enumerated the fees owed.  (*See, e.g., id.*, Ex. 5 at 007-15.)  Any given Supplement (through an attached "Schedule") identified, among other things, both the fees owed for use and distribution of source code and the fees owed for use and distribution of binary code.  (*Id.* at 007; Ex. 10 at 009.)  They also contained additional provisions governing sublicensed code.  (*See, e.g.*, *id.* Ex. 12 at 043-44, Ex. 22 at 006-14.)

23.    Under the Software Agreements, the licensee typically paid a one-time source code right-to-use fee and a distribution fee for each additional copy of the SOFTWARE PRODUCT distributed by the licensee.  (*See, e.g.*, *id.*, Ex. 5 at 007 (Items 1(a) & 1(b)), 003 (§ V) (referring to fees set forth in attached "Supplement(s)" and "Schedule(s)").)  The Sublicensing Agreements explicitly reference the Schedules to the Software Agreements for the amounts of sublicensing fees due for each SOFTWARE PRODUCT.  (*See, e.g.*, *id.*, Ex. 6 at 006 (§ 4.01(a)).)  The licensee typically paid a one-time "sublicensing fee" in addition to a "per copy" fee for each copy of the SUBLICENSED PRODUCT sold to a customer of the licensee.  (*Id.*, Ex. 5 at 007 (Item 1(c)).)

### D.    The IBM SVRX License.

24.    Between February 1, 1985 and October 17, 1996, IBM entered into various agreements, supplements, and amendments concerning its rights to use UNIX System V software

products (hereinafter, collectively termed the "IBM SVRX License").  (*See* ¶¶ 25-27, *infra*.)

25.     Specifically, on February 1, 1985, IBM and AT&T entered into a software
agreement (SOFT-00015), sublicensing agreement (SUB-00015A), substitution agreement, and
side letter (hereinafter, collectively referred to as "the 1985 IBM Agreement").  In these
agreements, AT&T granted IBM a license to, among other things, use, modify, prepare
derivative works of, and sublicense designated "Software Products," including UNIX System V
Release No. 2.0.  (Brakebill Decl., Exs. 5–8.)

26.     Between April 21, 1986 and January 25, 1989, IBM and AT&T executed
numerous supplements to the 1985 IBM Agreement.  (*Id*., Exs. 9–12.)  These supplements
granted IBM additional rights to UNIX System V Release No * **REDACTED** * and 3.2. (*Id*., Ex. 9
* **REDACTED** *; Ex. 10 * **REDACTED** *; Ex. 11 * **REDACTED** *; Ex. 12 (SVR3.2).)

27.     On October 17, 1996, IBM entered into Amendment No. X, also executed by
Novell and Santa Cruz on October 16, 1996.  (*Id*., Ex. 13 at 007.)  Amendment No. X modified
the terms of the 1985 IBM Agreement and the various supplements thereto, including
Supplement No. 170 to the software agreement (pertaining to SVR3.2) and "any other
Supplements that pertain to prior versions or releases" of UNIX System V software.  (*Id*. at 001.)
Amendment No. X granted additional source code rights to IBM.  (*Id*., Ex. 13 at 001-5; *SCO v.
IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 103–04.)

28.     Amendment No. X also granted IBM an "irrevocable, fully-paid-up, perpetual
right to exercise all of its rights . . . beginning January 1, 1996 at no additional royalty fee."
(Brakebill Decl., Ex. 13 at 001 (§ 1).)  As consideration for the rights granted by Amendment
No. X, IBM paid Santa Cruz $10,125,000 in two installments — one payment of $4,860,000 and
a second payment of $5,265,000. (*Id.* at 005 (§ 4).)

29.     In Amendment No. X, the parties to that Agreement, including Santa Cruz,

explicitly recognized that Novell "retained certain rights with respect to" to the agreements that IBM had entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended." (*Id.* at 001.)

30.    In November 1996, Santa Cruz collected $4,860,000 for its first payment from IBM under Amendment No. X.  In its monthly report for this period, Santa Cruz treated 100% of this amount as SVRX revenue payable to Novell, subject to a 5% "Administrative Fee for IBM" (or $243,000) that Santa Cruz would pay itself.  (*Id.*, Ex. 14 at 1.)

31.    In January 1997, Santa Cruz collected $5,265,000 for its second payment from IBM under Amendment No. X.  In its monthly report for this period, Santa Cruz treated 100% of this amount as SVRX revenue payable to Novell, subject to a 5% "administrative fee" for the "IBM Buyout" (or $263,250) that Santa Cruz would pay itself. (*Id.*, Ex. 43 at 1, 3.)

32.

**\* REDACTED \***

(*Id.*, Ex. 44 at 1 ¶¶ 1, 2.)

33.    The contracts comprising the IBM UNIX System V license agreements grant IBM rights to the same versions of UNIX System V software that are included within the universe of SVRX Licenses listed in Item VI of the APA — namely, UNIX System V Release Nos. 2.0, **\* REDACTED \***, and 3.2:

| **IBM Licenses** | **Item VI of Schedule 1.1(a)** |
| --- | --- |
| "UNIX* System V, Release 2.0, Version 1" (Brakebill Decl., Ex. 5 at 007, 009) | "All prior releases and versions of UNIX System V Release 2.0" (Brakebill Decl., Ex. 1 at 060) |
| "UNIX System V, Release 2.0, Version 1, International Edition"  (*Id.*, Ex. 5 at 007) | "#All prior releases and versions of UNIX System V Release 2.0 International Editions" (*Id.*, Ex. 1 at 060) |

| IBM Licenses | Item VI of Schedule 1.1(a) |
|---|---|
| * REDACTED * (*Id.*, Ex. 9 at 003-6) | "All prior releases and versions of UNIX System V Release 2.1"( *Id.*, Ex. 1 at 060) |
| * REDACTED * (*Id.*, Ex. 9 at 003-6) | "#All prior releases and versions of UNIX System V Release 2.1 International Editions" (*Id.*, Ex. 1 at 060) |
| * REDACTED * (*Id.*, Ex. 10 at 009-14) | "UNIX System V Release 3.0" (*Id.*, Ex. 1 at 060) |
| * REDACTED * (*Id.*, Ex. 10 at 009-14) | "UNIX System V Release 3.0 International Edition" (*Id.*, Ex. 1 at 060) |
| * REDACTED * (*Id.*, Ex. 11 at 001, 032-33) | "UNIX System V Release 3.1" (*Id.*, Ex. 1 at 060) |
| * REDACTED * (*Id.*, Ex. 11 at 032-33) | "UNIX System V Release 3.1 International Edition" (*Id.*, Ex. 1 at 060) |
| "UNIX® System V, Release 3.2"  (*Id.*, Ex. 12 at 001-43; Ex. 13 at 0011) | "UNIX System V Release 3.2" (*Id.*, Ex. 1 at 060) |
| "UNIX System V, Release 3.2, International Edition"  (*Id.*, Ex. 12 at 042-44) | "UNIX System V Release 3.2 International Edition"  (*Id.*, Ex. 1 at 060) |

34.     Novell became the successor-in-interest to AT&T's rights under the IBM SVRX License after it purchased UNIX System Laboratories in 1993.  (*SCO v. IBM*, SCO's Second Amended Complaint, PACER No. 108 at 11 (¶ 47).)

**E.      The Sequent SVRX License**

35.     Between April 18, 1985, and November 9, 1989, AT&T entered into various agreements and supplements licensing rights to UNIX System V software products to Sequent (hereinafter, collectively termed the "Sequent SVRX License").  (*See* ¶¶ 36-37, *infra*.)

36.     In particular, on April 18, 1985, AT&T entered into a Software Agreement (SOFT-000321 or "1985 Sequent Agreement"), supplemented on January 28, 1986, giving Sequent the right to, among other things, use, modify, and prepare derivative works of *REDACTED*

11

\* **REDACTED** \*     . (Brakebill Decl., Ex. 15 at 001–2 (§§ 1.01, 1.02, 1.04, 2.01); Ex. 16 at 001.)  On January 28, 1986, AT&T and Sequent also entered into a Sublicensing Agreement (SUB-000321A) that gave Sequent the right to sublicense the software products designated in the 1985 Sequent Agreement, including      \* **REDACTED** \*     . (*Id.*, Ex. 17 at 001–2 (§§ 1.01, 1.02, 1.04, 2.01).)

37.    Between   \* **REDACTED** \*   and November 9, 1989, Sequent and AT&T executed several supplements to the 1985 Sequent Agreement.  These supplements      \* **REDACTED** \*

\* **REDACTED** \*          . (*Id.*, Ex. 18 \* **REDACTED** \*; Ex. 19 \* **REDACTED** \*; Ex. 20 \* **REDACTED** \*; Ex. 21 \* **REDACTED** \*; Ex. 22 \* **REDACTED** \*.)

38.    The contracts comprising the Sequent UNIX System V license agreements

\* **REDACTED** \*

:

| Sequent Licenses | Item VI of Schedule 1.1(a) |
|---|---|
| \* **REDACTED** \*    (Brakebill Decl., Ex. 16 at 001-5) | "All prior releases and versions of UNIX System V Release 2.0"  (Brakebill Decl., Ex. 1 at 060) |
| \* **REDACTED** \* (*Id.*, Ex. 16 at 002-7) | "#All prior releases and versions of UNIX System V Release 2.0, International Edition" (*Id.*, Ex. 1 at 060) |
| \* **REDACTED** \*    (*Id.*, Ex. 18 at 001-5) | "All prior releases and versions of UNIX System V Release 2.1"  (*Id.*, Ex. 1 at 060) |
| \* **REDACTED** \* (*Id.*, Ex. 18 at 002-5) | "#All prior releases and versions of UNIX System V Release 2.1, International Edition" (*Id.*, Ex. 1 at 060) |
| \* **REDACTED** \*    (*Id.*, Ex. 19 at 001-9) | "UNIX System V Release 3.0"  (*Id.*, Ex. 1 at 060) |
| \* **REDACTED** \* (*Id.*, Ex. 19 at 003-9) | "UNIX System V Release 3.0 International Edition"  (*Id.*, Ex. 1 at 060) |

| **Sequent Licenses** | **Item VI of Schedule 1.1(a)** |
| --- | --- |
| * **REDACTED** *                    (*Id.*, Ex. 20 at 001-4) | "UNIX System V Release 3.1"  (*Id.*, Ex. 1 at 060) |
| * **REDACTED** *<br>(*Id.*, Ex. 20 at 001, 003-4) | "UNIX System V Release 3.1 International Edition"  (*Id.*, Ex. 1 at 060) |
| * **REDACTED** *                    (*Id.*, Ex. 21 at 001-5) | "UNIX System V Release 3.2"  (*Id.*, Ex. 1 at 060) |
| * **REDACTED** *<br>(*Id.*, Ex. 21 at 002-5) | "UNIX System V Release 3.2 International Edition"  (*Id.*, Ex. 1 at 060) |
| * **REDACTED** *<br>(*Id.*, Ex. 22 at 001, 003) | "UNIX System V Release 4.0, Intel 386 Version 1 Implementation"; "UNIX System V Release 4.0, Intel 386 Version 2 Implementation"; "UNIX System V Release 4.0, Intel 386 Version 3 Implementation"; "UNIX System V Release 4.0 MP, Intel 386 Version 4 Implementation"; "UNIX System V Release 4.0 MP, Intel 386 Implementation"  (*Id.*, Ex. 1 at 060) |
| * **REDACTED** *<br>(*Id.*, Ex. 22 at 003) | "#UNIX System V Release 4.0 International Edition, Intel 386 Version 1 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 2 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 3 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 4 Implementation"  (*Id.*, Ex. 1 at 060) |

39.    Santa Cruz administered the Sequent UNIX System V license agreements as an SVRX License under the APA.  For example, when Santa Cruz administered collection of revenue to be passed on to Novell from SVRX Licenses for the month of January 1997, Santa Cruz accounted for $6,560.49 in fees from the Sequent Licenses and noted a 5% "Admin Fee" in consideration of its administrative duties.  (*Id.*, Ex. 43 at 3.)

40.    In July of 1999, IBM purchased Sequent in a stock transaction, and assumed its

13

rights and obligations under the Sequent Agreements.  (*SCO v. IBM*, SCO's Second Amended

Complaint, PACER No. 108 at 5, 49 (¶¶ 17, 168); *SCO v. IBM,* SCO's Answer to IBM's Second

Amended Counterclaims, PACER No. 141 at 3 (¶¶ 15-16).)

      41.     Novell became the successor-in-interest to AT&T's rights under the Sequent

SVRX License after Novell purchased UNIX System Laboratories in 1993.  (*SCO v. IBM*,

SCO's Second Amended Complaint, PACER No. 108 at 11 (¶ 47).)

      **F.**      **The 2003 SCOsource Campaign and SCO's Breach Claims Against
IBM and Sequent.**

      42.     SCO was not a party to the APA or its Amendments.  SCO claims to be the

successor-in-interest to Santa Cruz's rights and obligations under the APA.  (*SCO v. Novell*,

Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 20); *SCO v. Novell,* SCO's Reply to

Novell's Amended Counterclaims, PACER No. 158 at 5 (¶ 20).)

      43.     In January 2003, SCO unveiled its "SCOsource" initiative to "offset the decline in

[its] UNIX business" and to increase revenue through license fees it would attempt to procure by

licensing UNIX technology it claimed to own  (*See*, *e.g*., Brakebill Decl., Ex. 23 at 3-4, 9-10, 17-

18; Ex. 24.)  In implementing SCOsource, SCO publicly stated that it owned the UNIX

copyrights, wrote letters to Linux users and distributors threatening to sue them for infringement,

and filed a number of lawsuits against end-users and distributors.  (*Id*.)

      44.     As part of SCOsource, SCO threatened and purported to cancel or terminate the

IBM and Sequent SVRX Licenses.  (*Id*., Exs. 25-26.)

      **1.**      **SCO's Purported Termination of the IBM SVRX License.**

      45.     On March 6, 2003, SCO sent a letter to IBM threatening to terminate the IBM

SVRX License as of June 13, 2003, if IBM did not remedy certain alleged breaches of that

License.  (Brakebill Decl., Ex. 25.)

      46.     On June 9, 2003, Novell wrote to SCO explaining that Section 4.16(b) of the APA

(1) gave Novell the right to require SCO to (among other things) waive any rights under any SVRX License, and (2) authorized Novell to take such action on behalf of SCO should SCO fail to so act.  (*Id*., Ex. 27.)  Novell also noted that SCO had no right to terminate IBM's SVRX License because Amendment No. X granted IBM an "irrevocable, fully paid-up, perpetual right" to exercise all of its rights under IBM's SVRX Licenses.  (*Id*.)  Novell concluded the letter by directing SCO "to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM."  (*Id*.)  Novell directed SCO to do this by noon on June 12, 2003, and to notify Novell that it had done so by that time.  (*Id*.)

47.    Novell's former CEO, Jack Messman, who authored the June 9, 2003 letter to SCO, confirmed that Novell directed SCO to take action, in part, to protect its royalty payment from IBM: ". . . we'd got a significant royalty payment that we were worried about; that if the licenses were terminated, we might have to pay back; and it was a big risk to Novell."  (*Id*., Ex. 29 at 203:18–204:1.)

48.    On June 11, 2003, Darl McBride, SCO's President and Chief Executive Officer, responded to Novell on SCO's behalf with a refusal to take the action requested by Novell pursuant to Novell's Section 4.16(b) authority.  (*Id*., Ex. 28.)  Mr. McBride acknowledged that IBM's System V license agreements are "SVRX License[s]."  (*Id*. at 1.)

49.    On June 12, 2003, Novell sent a letter to SCO explaining the legal basis for Novell's waiver, including Novell's rights to take action at its "sole discretion" under Section 4.16(b).  (*Id*., Ex. 30.)

50.    When SCO failed to take the action demanded by Novell before noon on June 12, 2003, Novell sent another letter that same day to SCO.  (*Id*., Ex. 31.)  The letter waived "any

purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM." (*Id.* at 2.)

51. Notwithstanding Novell's directive, SCO publicly announced on June 16, 2003 that it had terminated IBM's SVRX License as of June 13, 2003. (*Id.*, Ex. 32.)

52. On October 7, 2003, in response to public positions being taken by SCO concerning code developed by IBM, Novell again sent SCO a letter notifying it of Novell's Section 4.16(b) authority, and "direct[ing] SCO to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of the [IBM] Agreements." (*Id.*, Ex. 33 at 3.) Pursuant to that authority, Novell directed SCO to "take these actions by noon, MST, on October 10, 2003, and to notify Novell that it has done so by that time." (*Id.*)

53. SCO responded to Novell's letter on October 9, 2003, stating that "[y]our analysis of the obligations that IBM . . . owe[s] to SCO pursuant to the relevant Software Agreements is incorrect. However, we need not debate the incorrectness of your views, particularly Novell's purported ability to waive any and all licensees' obligations under the Software Agreements, because, as you are well aware, we are currently litigating these issues with IBM." (*Id.*, Ex. 34.)

54. On October 10, 2003, Novell again wrote to SCO stating that because "SCO has failed to take the action directed by Novell," Novell "hereby waives any purported right SCO may claim to require IBM to treat IBM Code . . . as subject to the confidentiality obligations or use restrictions of the [IBM] Agreements." (*Id.*, Ex. 35.)

55. SCO responded to Novell on October 13, 2003, stating that "Novell is without authority to make such a waiver and thus it is of no force and effect." (*Id.*, Ex. 36.)

56. At no point during the written correspondence between SCO and Novell in 2003

concerning Novell's Section 4.16(b) authority to direct SCO to waive IBM's alleged breach of its System V license agreements (or to waive them on SCO's behalf) did SCO argue that the IBM agreements were not SVRX Licenses under the APA. (*Id.*, Exs. 28, 34, 36.)  In addition, SCO never took the position in that correspondence that Novell was not authorized because SVRX Licenses are limited to binaries and that, therefore, Novell's rights under Section 4.16(b) are limited to binary licenses or binary royalty streams. (*Id.*)

57.    SCO still disputes Novell's rights under Section 4.16(b) to direct SCO to take action, or to take action on SCO's behalf, as to the IBM SVRX Licenses. (*SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 18), 20-22 (¶¶ 89–96); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 4 (¶ 18), 17–18 (¶¶ 89–96).)

### 2.    SCO's Purported Termination of the Sequent SVRX License.

58.    On May 29, 2003, SCO sent a letter to Sequent's Legal Department threatening to terminate the Sequent SVRX License, and all of Sequent's rights thereunder, as of September 2, 2003. (Brakebill Decl., Ex. 26 at 4.)  Among other things, SCO alleged that Sequent violated source code restrictions on Sequent's Dynix software product, which SCO said is subject to Sequent's "*S*ystem *V R*elease 4.0 *L*icense." (*Id.* at 2-3.)

59.    On August 11, 2003, SCO sent another letter to Sequent purporting to terminate the Sequent License, effective retroactively as of July 30, 2003. (*Id.*, Ex. 37.)

60.    On August 14, 2003, IBM, acting on behalf of Sequent, responded to SCO's termination threats by stating that it did not believe it had breached the Sequent License, and requesting more details on the alleged breach. (*Id.*, Ex. 38.)  In addition, IBM rejected SCO's claim that it had any right to terminate the Sequent License. (*Id.*)

61.    On February 6, 2004, Novell sent a letter to SCO outlining the lack of support for

17

SCO's position, and directing SCO "to waive any purported right SCO may claim to require

Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality

obligations or use restrictions of Sequent's SVRX License" no later than noon on February 11,

2004.  (*Id.*, Ex. 39 at 2.)

     62.    On February 11, 2004, after SCO conveyed its refusal to waive its purported

rights against Sequent, Novell waived SCO's purported right to terminate the Sequent SVRX

License on SCO's behalf, notifying SCO of this waiver via letter and fax.  (*Id.*, Exs. 40–41.)

     63.    At no point during the written correspondence between SCO and Novell in early

2004 concerning Novell's authority under Section 4.16(b) to direct SCO to waive Sequent's (or

IBM as its successor) alleged breach of its System V license agreements (or to waive them on

SCO's behalf) did SCO argue that the Sequent agreements were not SVRX Licenses under the

APA.  (*Id.*, Ex. 40.)  In addition, SCO never took the position in that correspondence that Novell

was not authorized because SVRX Licenses under the APA are limited to binaries and that,

therefore, Novell's rights under Section 4.16(b) are limited to binary licenses or binary royalty

streams.  (*Id.*)

     64.    SCO still disputes Novell's rights under Section 4.16(b) of the APA to direct SCO

to take action, or to take action on SCO's behalf, as to the Sequent SVRX License.  (*SCO v.

Novell*, Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 18), 20-22 (¶¶ 89–96);

*SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 4 (¶ 18),

17–18 (¶¶ 89–96).)

## IV.    THE APA UNAMBIGUOUSLY AUTHORIZES NOVELL TO DIRECT SCO TO WAIVE ITS PURPORTED CLAIMS AGAINST IBM AND SEQUENT, AND TO WAIVE ON SCO'S BEHALF WHEN, AS HERE, SCO REFUSES.

     The Court should grant partial summary judgment in favor of Novell on its Fourth Claim

for Relief because the undisputed facts establish that:

1.    The APA gives Novell the authority, at its sole discretion, to direct SCO to waive rights under any SVRX License;

2.    The IBM and Sequent Licenses are SVRX Licenses because they license rights to the UNIX System V software listed in Item VI to Schedule 1.1(a);

3.    Novell directed SCO to waive its purported rights under the IBM and Sequent SVRX Licenses;

4.    SCO refused to follow Novell's direction as to both the IBM and Sequent SVRX Licenses;

5.    The APA authorizes Novell to take any action on SCO's behalf when SCO fails to take action directed by Novell;

6.    When SCO refused to waive its purported breach claims against IBM and Sequent, as directed by Novell, Novell properly took action on behalf of SCO by waiving these claims; and

7.    SCO improperly refused, and still refuses, to recognize Novell's authority and to abide by Novell's waiver.

## A.    A Declaration of Rights Is Proper Because an Actual Controversy Exists Over the Question of the Parties' Rights and Obligations Under the APA.

Summary judgment is proper where the pleadings, discovery, and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issues of material fact exist, and that the undisputed facts entitle that party to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

The Court can enter declaratory relief on summary judgment to settle this question of the parties' rights and obligations under the APA.[4]  Federal courts have broad discretion to grant declaratory relief on summary judgment.  *See Kunkel v. Cont'l Cas. Co*., 866 F.2d 1269, 1275–

---

[4] California law governs the declaration of rights under the APA.  The APA's governing law provision provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof."  (Brakebill Decl., Ex. 1 at 054 (§ 9.8).)

76 (10th Cir. 1989) (affirming district court's grant of summary judgment as to declaration of rights under a contract). The entry of declaratory judgment on summary judgment is particularly appropriate in cases like this one that involve a legal question of contract interpretation. *Id.*; *see also Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1499 (1987) (a clear and unambiguous contract is to be "interpreted by the language therein without resort to extrinsic evidence," and that such interpretation "is a question of law which may be resolved on summary judgment").

Declaratory relief may be granted here for the additional reason that there is an "actual case or controversy." *Cardinal Chem. Co. v. Morton Int'l, Inc*., 508 U.S. 83, 95 (1993) (party seeking declaratory judgment has burden of establishing existence of an actual case or controversy); *see also Duggins v. Hunt*, 323 F.2d 746 (10th Cir. 1963) (Declaratory Judgment Act provides an immediate forum for adjudication of rights and obligations in actual controversy where such controversy may be settled in its entirety and with expediency and economy); *Am. Hosp. Supply Corp. v. Damon Corp.*, 597 F. Supp. 445 (N.D. Ill. 1984) (declaratory judgment action arising out of license agreement between plaintiff licensee and defendant patent owner satisfies "actual controversy" requirement of 28 USCS § 2201). SCO continues to refuse to recognize Novell's authority under Section 4.16(b) to direct SCO to take action or to act on SCO's behalf when SCO refuses to act as directed. (Undisputed Facts ¶¶ 57, 64.)

### B.    The Plain Language of Section 4.16(b) Grants Novell the Authority to Waive Rights Under Any SVRX License, Including Those of IBM and Sequent.

The plain language alone governs the meaning of a contract unless that language "involve[s] an absurdity." *See* Cal. Civ. Code §§ 1638, 1639. The California Supreme Court has held that "in the construction of a contract, the office of the court is simply to ascertain and declare what, in terms or in substance, is contained therein, and not to insert what has been omitted or omit what has been inserted." *Jensen v. Traders & Gen. Ins. Co*., 52 Cal. 2d 786, 790

(1959) (citing Cal. Code Civ. Proc. § 1858). The Court has also found that "as a general matter, implied terms should never be read to vary express terms." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992).

California courts will not consider extrinsic evidence altering the meaning of an integrated writing where the contract is not reasonably susceptible to more than one interpretation. *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 519-20 (1995) (refusing to allow extrinsic evidence contradicting an integrated employment contract, and noting that evidence of intent "which is contrary to a contract's express terms . . . does not give meaning to the contract; rather it seeks to substitute a different meaning"). The parol evidence rule thus "generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument." *Bionghi v. Metro. Water Dist.*, 70 Cal. App. 4th 1358, 1363-66 (1999) (affirming summary adjudication where a contractual clause was not reasonably susceptible to more than one meaning, and holding that a party cannot "smuggle extrinsic evidence to add a term to an integrated contract" ); *Tahoe Nat'l Bank v. Phillips*, 4 Cal. 3d 11, 23 (1971) (extrinsic evidence excluded "because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself.").

### 1. Section 4.16(b) Unambiguously Authorizes Novell to Direct SCO to Take Action and to Act on SCO's Behalf.

The plain language of the APA expressly grants Novell two broad rights. First, it grants Novell the right — at its "sole discretion and direction" — to direct SCO to take action as to "any SVRX License." In relevant part, Section 4.16(b) begins:

> In addition, *at [Novell]'s sole discretion and direction*, [SCO] shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License *to the extent so directed in any manner or respect by [Novell]*.

(Brakebill Decl., Ex. 1 at 031 (emphasis added).)

Second, if SCO fails to follow Novell's direction as to any SVRX License, the contract authorizes Novell to take "any action" on behalf of SCO:

> In the event that [SCO] shall fail to take any such action concerning the SVRX Licenses as required herein, ***[Novell] shall be authorized, and hereby is granted, the rights*** to take any action on [SCO]'s own behalf.

(*Id*. (emphasis added))

### 2. Novell's Rights Under Section 4.16(b) Apply to "Any SVRX License," a Term That is Defined in the APA.

Section 4.16(b) plainly extends Novell's aforementioned rights to "<u>any</u> SVRX License." The scope of Novell's authority therefore turns on the meaning of SVRX License.

As an initial matter, SVRX License is readily understood. At the time of the APA, Novell was engaged in developing a software product called UNIX System V, or SVRX.[5] (*Id.*, Ex. 1 at 008 (Recital A).) Novell also was engaged in the business of selling binary and source code licenses to the various versions of this software. (*Id*.) The natural meaning of SVRX Licenses thus includes any licenses to this SVRX technology.

In any event, the unambiguous meaning of SVRX License can be ascertained from the APA alone. *See* Cal. Civ. Code § 1639. Section 4.16(a), in plain language, defines SVRX Licenses as those licenses "listed in detail under item VI of Schedule 1.1(a)" of the APA. (Brakebill Decl., Ex. 1 at 031 (§ 4.16(a); *see also id*., Ex. 3 at 9 (§ K.4).) Item VI of Schedule 1.1(a), in turn, provides an explicit list of UNIX System V software releases. Item VI states, in full:

All contracts relating to ***the SVRX Licenses listed below***:

- UNIX System V Release 4.2 MP, Intel386 Implementation

---

[5] These SVRX products were the various releases of different versions of UNIX System V, including Releases 1, 2, 3 and 4 — referred to as SVR1, SVR2, SVR3 and SVR4, or generically as SVRX. (Undisputed Fact ¶ 19.)

- #UNIX System V Release 4.2 MP International Edition, Intel386 Implementation
- UNIX System V Release 4.2, Intel386 Implementation
- #UNIX System V Release 4.2, International Edition, Intel386 Implementation
- UNIX System V Release 4.1 ES, Intel386 Implementation
- #UNIX System V Release 4.1 ES International Edition, Intel386 Implementation
- UNIX System V Release 4.0 MP, Intel386 Implementation
- #UNIX System V Release 4.0 MP International Edition, Intel386 Implementation
- UNIX System V Release 4.0 MP, Intel386 Version 4 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 4 Implementation
- UNIX System V Release 4.0, Intel386 Version 3 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 3 Implementation
- UNIX System V Release 4.0, Intel386 Version 2 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 2 Implementation
- UNIX System V Release 4.0, Intel386 Version 1 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 1 Implementation
- UNIX System V/386 Release 3.2 and #UNIX System V/386 Release 3.2 International Edition
- UNIX System V Release 3.2 and #UNIX System V Release 3.2 International Edition
- UNIX System V Release 3.1 and #UNIX System V Release 3.1 International Edition
- UNIX System V Release 3.0 and #UNIX System V Release 3.0 International Edition
- All prior releases and versions of UNIX System V Release 2.1
- #All prior releases and versions of UNIX System V Release 2.1 International Editions
- All prior releases and versions of UNIX System V Release 2.0
- #All prior releases and versions of UNIX System V Release 2.0 International Editions
- All prior UNIX System releases and versions preceding UNIX System V Release 2.0
- #All prior UNIX System releases and versions preceding UNIX System V Release 2.0 International Editions

(*Id.* at 059-60 (Sch. 1.1(a)) (emphasis added).)

This wording plainly means that the term SVRX License under the APA includes at least the licenses relating to the aforementioned UNIX System V releases — including contracts relating to UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2, and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0." (*Id.*) Novell's Section 4.16(b) authority thus extends to contracts relating to each of these software products.

### 3.  The IBM and Sequent Agreements Are SVRX Licenses.

A comparison of the "SVRX License" language in the APA with the IBM and Sequent Licenses leaves no doubt that the IBM and Sequent Licenses are SVRX Licenses as a matter of law. *See Kunkel*, 866 F.2d at 1275–76.  The IBM and Sequent Licenses are contracts that

**\* REDACTED \***

.  (Undisputed Facts ¶¶ 33, 38 (IBM: SVRX releases 2.0  **\* REDACTED \*** , 3.2; Sequent:

**\* REDACTED \***                    ), *supra*.)  Accordingly, they are SVRX Licenses

and Novell's rights to take action under Section 4.16(b) extend to them.

### 4.  SCO's Narrow Interpretation of SVRX License Contradicts the Plain Language of the APA.

In an effort to circumscribe Novell's authority under Section 4.16(b), SCO engrafts a binary limitation on SVRX Licenses that does not exist in the text of the APA.  Specifically, SCO argues that SVRX Licenses refers only to those licenses involving "the SVRX binary royalty stream" collected from "then-existing SVRX licensees" and does not include "SVRX software agreements" that allegedly "specify the restrictions on licensees' source code rights."[6] Although SCO purports to support this binary-only limitation with "a plain reading of the

---

[6] *See, e.g.*, *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158, at 4 (¶¶ 15–16); *SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 160–61.

agreement" (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER

No. 872–75 at 160), SCO's reading directly contradicts the plain language of the APA.

SCO's textual argument does not follow the APA's clear roadmap for determining

whether a contract is an SVRX License. SCO acknowledges, as it must, that the term SVRX

Licenses is introduced in the APA with capital letters, just "*like the other defined terms in the*

*APA.*" (*Id.* (emphasis added).) SCO also concedes, as it must, that the language immediately

after SVRX Licenses expressly "refers" the parties to Item VI of Schedule 1.1(a) of the APA to

interpret this term. (*Id.* at n.24; Brakebill Decl., Ex. 1 at 031 (§ 4.16(a) (expressly noting that

SVRX Licenses are "*listed in detail under item VI of Schedule 1.1(a) hereof.*").) However,

SCO's plain meaning approach conveniently ends there. SCO looks beyond Item VI's list of

"*the SVRX Licenses*" and, instead, uses an entirely different provision — Item III.L of Schedule

1.1(a) — to exclude "software agreements" relating to source code from the universe of SVRX

Licenses. (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER

No. 872–75 at 58, 160 n.24.) SCO's interpretive move enjoys no support in the text of the APA.

Item III.L is not even referenced in Section 4.16(a)'s definition of SVRX Licenses.

Moreover, SCO's narrow interpretation of SVRX Licenses produces a result that is

contrary to SCO's own conclusion that Novell's Section 4.16(b) authority at least extends to

binary agreements. (*Id.* at 56-57 (¶ 174), 57 (¶ 176), 58 (¶ 177); *see also SCO v. Novell*, SCO's

Reply to Novell's Amended Counterclaims, PACER No. 158, at 4 (¶ 15), 18 (¶ 96).) Under

SCO's interpretation, SVRX source code licenses are not SVRX Licenses because so-called

"software agreements" governing SVRX source code are not mentioned in Item VI of Schedule

1.1(a) but are "expressly" referred to in Item III.L of that Schedule. This same reasoning,

however, would exclude binary licenses from the universe of SVRX Licenses. That is because

Item VI also does not mention "sublicensing agreements" governing SVRX binary code, which,

like software agreements, are expressly referred to in Item III.L of Schedule 1.1(a). (*See* Brakebill Decl., Ex. 1 at 059-60.) SCO's "plain reading" therefore would mean that Section 4.16(b) applies to neither source nor binary licenses.[7]

SCO's "plain reading" of SVRX Licenses ends with an attempt to define that term by using a document not even referenced in the APA: a "product Schedule" attached to the AT&T SVRX license agreements. According to SCO, SVRX Licenses "refer just to the SVRX product Schedules" that identify the amounts due under all SVRX Licenses. (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 161.) There is no textual basis in the APA, however, for using "Schedules" attached to AT&T license agreements to interpret the meaning of SVRX Licenses. *See Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44, 53-55 (1997) (extrinsic evidence should not be used to interpret a disputed contractual term where the contract contains "clear and unequivocal" and "explicit reference" to a document incorporated into the contract to interpret that term).

In addition, the product Schedule document that SCO cites actually contradicts its primary assertion that the term SVRX Licenses excludes source licenses. This document — a six-page "Schedule" attached as Supplement No. 1 to the 1985 IBM Software Agreement SOFT-00015 — identifies fees due for use and distribution of binary SVRX products <u>and</u> source SVRX products. (Brakebill Decl., Ex. 5 at 007-15; *SCO v. IBM*, Declaration of Brent O. Hatch in Support of SCO's Opp. to IBM's MSJ on SCO's Contract Claims, dated November 11, 2006,

---

[7] SCO also seeks to exclude source licenses from SVRX Licenses by arguing that the combination of the phrase "all contracts relating to" with the phrase "the SVRX Licenses" in Item VI of Schedule 1.1(a) suggests that the term SVRX Licenses standing alone in Section 4.16(b) excludes "software agreements." (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 160-61.) However, this reasoning — again, without support in the text of the APA — would lead to the unreasonable result of also excluding agreements sublicensing binary code distributions from the universe of SVRX Licenses.

PACER No. 876 at 1254-60 (Ex. 56).)  Thus, even if the product Schedules were to inform the

meaning of SVRX Licenses (which they do not), they support the proposition that SVRX

Licenses includes source and binary SVRX contracts.

Put simply, the APA does not limit Novell's rights and SCO's obligations under Section

4.16(b) to "certain" SVRX Licenses.  Instead, it unambiguously extends Novell's rights and

SCO's obligations to "any SVRX Licenses."  Although SCO has posited that "Section 4.16(b)

set forth legal protections for Novell's future binary royalty interests" (*see, e.g.*, *SCO v. IBM*,

SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 109), Novell's

Section 4.16(b) authority is plainly not circumscribed by a binary limitation.  Indeed, the drafters

of the APA knew how to specifically distinguish between matters relating to source and binary

code, including source and binary agreements.  (*See, e.g*., Brakebill Decl., Ex. 1 at 008 (Recital

A), 015 (§ 2.8(f)), 057-59 (Sch. 1.1(a) ("Binary Licensing Agreements" in Item III.M)), 061

(Sch. 1.1(b) ("binary only")); Ex. 3 at 3 (Section E(e)(ii)-(iv)), at 4 (Section E(f)), at 6-7 (Section

J).)  Yet, in regard to SVRX Licenses and Novell's authority under Section 4.16(b), the APA

makes no distinction (or limitation) whatsoever.[8]

Quite the opposite.  It is clear from other relevant provisions of the APA that SVRX

Licenses includes contracts relating to any SVRX-based product; there is no source code

exclusion.  Schedule 1.2(b) is particularly germane to the SVRX License question because it

specifically addresses SCO's obligation to remit to Novell royalty payments "due under the

SVRX licenses" in circumstances where SCO converts "SVRx-based customers" to a UnixWare

---

[8] Even SCO's favorite declarant, Ed Chatlos, contradicts SCO's binary-limitation
argument.  At his deposition in the *SCO v. IBM* case, Mr. Chatlos acknowledged that one should
look at Item VI of Schedule 1.1(a) of the APA to understand what constitutes an SVRX License
and that Item VI includes both source code licenses and binary agreements.  He further
acknowledged that Section 4.16 of the APA does not state anything about a binary distinction.
(Brakebill Decl., Ex. 45 at 100:25-103:4, 105:6-16, 202:2-203:19.)

derived product.  (Brakebill Decl., Ex. 1 at 065.)  Schedule 1.2(b) makes clear that "if a customer continues to sell their ***SVRX based product*** separately"  — not simply their binary SVRX product — "***then these SVRx revenues continue to flow to Novell***."  (*Id.* (emphasis added).) Further, SCO's royalty obligation to Novell would continue if the converted unit uses a significant amount of "***the original SVRX code***" "under the SVRX license" rather than being "derived from the ***source version***" of UnixWare (or derivatives thereof).  (*Id.* at 066.)  Together, these additional royalty provisions in Schedule 1.2(b) confirm that Novell retained rights to ***any SVRX code*** under SVRX Licenses — irrespective of its source or binary nature.

Nor is there any express temporal limitation in the APA that constrains Novell's Section 4.16(b) rights to the protection of future royalty streams.  SCO's proposal to impose these limitations on Novell's rights results in a rewriting of the APA so that "<u>any</u> SVRX Licenses" means "<u>just some</u> SVRX Licenses."  The APA is simply not susceptible to such a reading.  *See Haggard*, 39 Cal. App. 4th at 517-20.

### 5.    The Integrated Structure of the AT&T License Agreements Belies SCO's Narrow Interpretation of SVRX Licenses.

SCO's interpretation of "SVRX Licenses" also does not comport with the structure of the Software Agreements, Sublicensing Agreements, Supplements, and Schedules that comprise the UNIX System V license agreements.  These licenses are integrated documents that defy neat segregation as "source" and "binary" agreements.

First, the Schedules that are attached as Supplements to Software Agreements expressly apply to Sublicensing Agreements as well.  (*See, e.g.*, Brakebill Decl., Ex. 5 at 007, Ex. 19 at 003-05, Ex. 22 at 004-05 (identifying fees due for <u>both</u> source SVRX products and binary SVRX products); Ex. 5 at 014, Ex. 19 at 007-09, Ex. 22 at 006-14 (listing provisions governing sublicensed products); Undisputed Fact ¶ 22, *supra*.)  Indeed, Sublicensing Agreements, like Software Agreements, expressly incorporate the "Schedules" into their terms.  (*Id.*, Ex. 5 at 001

(§ 2), 003 (§ 5.04); Ex. 6 at 006 (§ 4.01).); Undisputed Fact ¶ 22, *supra*.)  Second, the

Sublicensing Agreements refer to, and are informed by, the Software Agreement.  (*Id*., Ex. 6 at

001 (§ 1) (noting that the agreement applies to specific SOFTWARE PRODUCTS subject to a

software agreement), 007 (§ 4.03).)  Even the SOFTWARE PRODUCT itself, which is defined

in the Software Agreement, is defined in reference to binary-code format as well as source-code

format.  (*Id.*, Ex. 5 at 002 (§§ 1.02, 1.04).)

 Because there is such integration of the UNIX System V licenses, SCO's view of the

APA has the untenable result that only certain <u>portions</u> of those licenses — *i.e.*, those parts of the

respective agreements relating to sublicensed products — would fall under the definition of

SVRX Licenses.  Accordingly, "<u>any</u> SVRX Licenses" in Section 4.16(b) would mean "<u>just some</u>

<u>parts</u> of just some SVRX Licenses."  There is no support for this in the text of the APA.

### 6. SCO's Contemporaneous Course of Conduct Defeats its Narrow Interpretation of SVRX License.

 Even if the Court were to consider extrinsic evidence, SCO's conduct after the execution

of the APA and its amendments confirms what the plain language reveals: that Novell's rights

under the APA, including its 4.16(b) authority, are not "limited binary royalty rights."  (*SCO v.

IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 164.)

Before this litigation, SCO treated SVRX Licenses to include agreements relating to UNIX

System V (*i.e.*, SVRX) products — not to the smaller universe of binary SVRX products.

 First, in performing its administrative function of collecting and passing through to

Novell 100% of "all royalties, fees and other amounts due under all SVRX Licenses" (Brakebill

Decl., Ex. 1 at 031 (§ 4.16(a))), SCO passed through to Novell revenues due under agreements

***relating to SVRX source code rights***.  As SCO concedes, Amendment No. X to the IBM SVRX

License involved a grant of additional source code rights to IBM.  (*SCO v. IBM*, SCO's Opp. to

IBM's MSJ on SCO's Contract Claims, PACER No. 872–75 at 103–04; Brakebill Decl., Ex. 13

at 001-5.)  On its face, Amendment No. X modified the terms of the Software Agreements between IBM and AT&T concerning IBM's use of System V source code.  (Brakebill Decl., Ex. 13 at 001; Undisputed Fact ¶ 27, *supra*.)

In accounting for the proceeds from Amendment No. X, Santa Cruz treated the revenues as subject to the agency relationship created by the APA, including the collection and payment structure prescribed for SVRX revenues.  The APA mandates that 100% of royalties, fees, and other amounts due under "*all SVRX Licenses*" be treated as SVRX revenue for Novell from which SCO's 5% administrative fee is calculated.  (Brakebill Decl., Ex. 1 at 009 (§ 1.2(b)), 031 (§ 4.16(b)) (emphasis added).)  SCO followed this structure in accounting for the $10,125,000 payment by IBM under Amendment No. X, just as it had agreed to do under the APA.  After Santa Cruz collected $4,860,000 in November 1996 for IBM's first payment under Amendment No. X, SCO treated 100% of this amount as SVRX revenue payable to Novell subject to its 5% administrative fee.  Applying the 5% calculation, Santa Cruz concluded that $243,000 was its "Administrative Fee for IBM" and reported this amount to Novell in its monthly reports.[9]  (*Id.*, Ex. 14 at 1; Undisputed Fact ¶ 30.)

Similarly, after Santa Cruz collected $5,265,000 for its second payment from IBM under Amendment No. X, it treated 100% of this amount as SVRX revenue payable to Novell, subject to a 5% administrative fee.  Applying the 5%, Santa Cruz reported to Novell that it would pay to itself $263,250 as an "administrative fee" for the "IBM Buyout."  (Brakebill Decl., Ex. 43 at 1, 3; Undisputed Fact ¶ 31.)  SCO's conduct in 1996 thus belies its litigation position that Novell

---

[9] Pursuant to the APA, SCO provided Novell with monthly reports detailing the SVRX revenue, SCO's administrative fee, and the revenue to be passed through to Novell.  It is these reports, for November 1996 and January1997, respectively, that document SCO's adherence to the 100% SVRX Revenue – 5% Administrative Fee payment structure for the IBM Buyout payment.  (Undisputed Facts ¶¶ 11, 31, 32, *supra*.)

has no rights relating to source code.  Santa Cruz understood that SVRX Licenses (and Novell's rights under Section 4.16) related to licensing of <u>both</u> source code and binary code.

Second, prior to this lawsuit, SCO announced publicly that its administrative duties with respect to SVRX Licenses extend to "customers who deploy SVRX technology."  Specifically, SCO stated that:

> [SCO] acts as an administrative agent in the collection of royalties for ***customers who deploy SVRX technology***.  Under the agency agreement, the Company collects all customer payments and remits 95 percent of the collected funds to Novell and retains 5 percent as an administrative fee.

(*Id.*, Ex. 42 at 42 (Caldera Form 10-K for the fiscal year ended October 31, 2002) (emphasis added).)  In this announcement, SCO did not report that its administrative duties under the APA are limited to a more narrow set of SVRX customers that includes only those customers licensing binary SVRX products.  The reason is simple: the APA does not limit SVRX Licenses as SCO is now advancing in this litigation.

Finally, even when SCO purported to terminate IBM's System V license agreements in 2003, there was no question in SCO's mind that those licenses constituted an SVRX License. When SCO's CEO wrote to Novell refusing to waive its purported claims against IBM, he specifically called IBM's System V license agreements "IBM's ***SVRX License***."  (Brakebill Decl., Ex. 28 at 1 (emphasis added).)[10]  Further, at no point during the written correspondence between SCO and Novell in 2003 and early 2004 concerning Novell's authority to direct SCO to waive alleged breaches of the IBM and Sequent System V license agreements (or to waive those

---

[10] When SCO's CEO sent a letter to Sequent threatening to terminate the Sequent SVRX License, and all of Sequent's rights thereunder, he alleged that Sequent violated source code restrictions on Sequent's Dynix software product, which he said was subject to Sequent's "***S****ystem **V R***elease 4.0 ***L****icense*."  (Brakebill Decl., Ex. 26 at 3.)

breaches on SCO's behalf when SCO refused to waive) did SCO raise an issue that Novell was

not so authorized because the APA limited SVRX Licenses — and therefore Novell's Section

4.16(b) rights — to binaries.  (Undisputed Facts ¶¶ 56, 63, *supra*.)

### C.    Novell's Interpretation of its Section 4.16(b) Authority is Consistent with the APA Amendments.

Novell's interpretation of Section 4.16(b) is consistent with the APA Amendments.

Amendment No. 1 in no way altered or amended Novell's Section 4.16(b) right to take action or

to act on SCO's behalf when SCO refuses.  First, Amendment No. 1 reaffirms the plain language

of the original agreement signed just a few months earlier to define "SVRX Licenses" — the

licenses to which Novell's Section 4.16(b) rights apply — by reference to Item VI of Schedule

1.1(a) of the APA.  Although Amendment No. 1 expands the term "SVRX Licenses" to include

contracts relating to certain "Auxiliary Products," these Auxiliary Products are not at issue in this

motion.  (Brakebill Decl., Ex. 3 at 9 (§ K.4).)  Second, Amendment No. 1 modifies Section

4.16(b) to provide limited circumstances in which Santa Cruz could enter into new or amended

SVRX Licenses.  However, these circumstances are not at issue in this motion.  (*Id*. at 6-7 (§ J).)

Nor does Amendment No. 2 alter Novell's plain language contractual interpretation of

Section 4.16(b).  Section B of Amendment No. 2 requires the participation of both Novell and

Santa Cruz in any prospective buy-out transaction with any SVRX licensee.  (Brakebill Decl.,

Ex. 4 at 1 (§ B1- B4).)  It also provides that the newly prescribed procedures for managing future

buy-outs would not alter the parties' existing source code rights under the APA.  (*Id.* at 1

(§ B5).)  These buy-out provisions are not at issue in this motion since Novell's waiver actions

vis-à-vis IBM and Sequent do not effectuate such a transaction.

### D.    Consistent with the Agency Relationship Created by the APA, Novell Exercised its "Sole Discretion" to Direct SCO to Take Action as to the Sequent and IBM SVRX Licenses.

Under Section 4.16(b), Novell retains the "sole discretion" to direct SCO to take action as

to any SVRX Licenses.  Novell repeatedly invoked this discretion to direct SCO to take action as to the Sequent and IBM SVRX Licenses.  On both June 9 and June 12, 2003, and again on October 7, 2003, Novell wrote to SCO directing it "to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM."  (Undisputed Facts ¶¶ 46, 49, 52, *supra*.)  Similarly, on February 6, 2004, Novell wrote to SCO directing it to waive its purported rights under the Sequent License.  (Undisputed Fact ¶ 61, *supra*.)

The "sole discretion" provision of Section 4.16(b) is an express grant of authority that cannot be written out of the APA.  This broad grant of discretion is consistent with the agency relationship established by the APA.  *See, e.g., Wickham v. Southland Corp.*, 168 Cal. App. 3d 49, 59 (1985) (a party's authority to control "the means and manner" of a contemplated enterprise corresponds with a principal-agency relationship).  This authority must be given effect for the additional reason that, under California law, "[c]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement."  *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (1995) (implied covenant of good faith and fair dealing does not limit a contract containing an express clause giving respondent complete discretion "at its election" to market or to refrain from marketing music, where that contract contains other consideration); *see also PMC., Inc. v. Porthole Yachts, Ltd.*, 65 Cal. App. 4th 882, 809 (1998) (the explicit reservation of a discretionary power in a contract cannot be contradicted by the implied covenant of good faith and fair dealing).

As in *Third Story Music*, the promises in Section 4.16(b) are not illusory because the

contract contains other consideration.  *See* 41 Cal. App. 4th at 808–09.  For example, in exchange for Novell's retention of rights relating SVRX Licenses, Santa Cruz received the right to develop, license and sell a new merged UNIX product in the marketplace.  (Undisputed Fact ¶ 4, *supra*.)  Santa Cruz obtained the right to convert "SVRX-based customers" to a UnixWare derived product.  (*Id*.)  Santa Cruz also acquired Novell's UNIX-related customer list as a platform for future business.  (Brakebill Decl., Ex. 1 at 010 (§ 1.3).)  Accordingly, Novell's "sole discretion" is an enforceable grant of authority that must be recognized.

> **E.      Consistent with the Agency Relationship Created by the APA, Novell Is Authorized to Take Action on Behalf of SCO Concerning the Sequent and IBM SVRX Licenses.**

The undisputed facts also establish that SCO failed to follow Novell's directions regarding the IBM and Sequent SVRX Licenses.  Despite Novell's clear direction, SCO purported to cancel or terminate IBM's SVRX License as of June 13, 2003, and refused to recognize Novell's right to direct SCO concerning Sequent's SVRX License on February 11, 2004.  (Undisputed Facts ¶¶ 51, 62, *supra*.)  Under the plain language of the APA, SCO's actions immediately triggered — as a matter of law — Novell's "rights to take any action on [SCO]'s own behalf."  (Brakebill Decl., Ex. 1 at 031 (§ 4.16(b)).)

Novell has attempted to waive SCO's purported claims against IBM and Sequent, but SCO still refuses to abide by Novell's waiver.  (Undisputed Facts ¶¶ 54, 62, 57, 64, *supra*.)  Instead, SCO continues to pursue its unauthorized claims against IBM, alleging breach of both the IBM and Sequent SVRX Licenses.  (Undisputed Facts ¶¶ 42-45, 57, 64, *supra*.)

# V.      CONCLUSION

For the foregoing reasons, Novell respectfully requests that this Court grant partial summary judgment as to Novell's Fourth Claim for Relief by declaring:

> 1.      Under Section 4.16(b) of the APA, Novell was and is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM and

Sequent; and

2.   Under Section 4.16(b) of the APA, Novell was and is entitled to waive, on SCO's behalf, SCO's purported claims against IBM and Sequent, after SCO refused to act as directed by Novell; and

3.   SCO is obligated to recognize and respect Novell's waiver of SCO's purported claims against IBM and Sequent.


Dated:  December 1, 2006


ANDERSON & KARRENBERG


_____/s/  Heather M. Sneddon_____
Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (*pro hac vice*)
Kenneth W. Brakebill (*pro hac vice*)

Attorneys for Novell, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of December, 2006, I caused a true and correct copy of the **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH CLAIM FOR RELIEF** *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]* to be served to the following:

*Via CM/ECF:*

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

*Via E-mail:*

Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301

Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504

_____*/s/  Heather M. Sneddon*_____