EXHIBIT 4

Dockets.Justia.com

AMENDMENT No. 2
TO THE ASSET PURCHASE AGREEMENT

As of the 16th day of October, 1996, the September 19, 1995 Asset Purchase Agreement (the "Agreement") between Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("SCO") is amended in the following respects.

A.　With respect to Schedule 1.1(b) of the Agreement, titled "Excluded Assets", Section V, Subsection A shall be revised to read:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

B.　Except as provided in Section C below, and notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows:

　　1.　Should either party become aware of any such potential transaction, it will immediately notify the other in writing.

　　2.　Any meetings and/or negotiations with the licensee will be attended by both parties, unless agreed otherwise. Novell's participation will be by personnel who are engaged in corporate business development.

　　3.　Any written proposal to be presented to the licensee, including drafts and final versions of any proposed amendments to the SVRX licenses, will be consented to by both parties prior to its delivery to the licensee, unless agreed otherwise.

　　4.　Prior to either parties' unilateral determination as to the suitability of any potential buy-out transaction, the parties will meet face to face and analyze the potential merits and disadvantages of the transaction. No such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy.

　　5.　This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

G:\LEGAL\TRANSFER\SCO\AMEND3.1-0

6.   The parties agree that no member of Novell's sales force will receive a bonus, commission, quota attainment credit, or other type of sales incentive as a result of the buy-out of an SVRX license.

C.   Novell may execute a buy-out with a licensee without any approval or involvement of SCO, and will no longer be bound by any of the requirements stated in Section B. above, if: (I) SCO ceases to actively and aggressively market SCO's UNIX platforms; or (ii) upon a change of control of SCO as stated in schedule 6.3(g) of the Agreement.

D.   Novell and SCO agree to indemnify and hold harmless the other from and against any and all losses, liabilities, judgments, and costs incurred ("Liability") if either causes the other to incur Liability under Section 10 of Amendment No. X to Software Agreement SOFT-00015 as amended, Sublicensing Agreement SUB-00015A as amended, Software Agreement SOFT-00015 Supplement No. 170 as amended, and Substitution Agreement XFER-00015B ("Amendment No. X").

In witness whereof, the parties have executed this Amendment No. 2 to be signed by their duly authorized representatives as of the date first written above.

THE SANTA CRUZ OPERATION, INC.                    NOVELL, INC.

By: _____                        By: _____

Name: Steven M. Sabbath                             Name: _____

Title: Vice President Law &                          Title: _____
Corporate Affairs

G:\LEGAL\TRANSFER\SCO\AMEND3.1-0

6.    The parties agree that no member of Novell's sales force will receive a bonus, commission, quota attainment credit, or other type of sales incentive as a result of the buy-out of an SVRX license.

C.    Novell may execute a buy-out with a licensee without any approval or involvement of SCO, and will no longer be bound by any of the requirements stated in Section B. above, if: (I) SCO ceases to actively and aggressively market SCO's UNIX platforms; or (ii) upon a change of control of SCO as stated in schedule 6.3(g) of the Agreement.

D.    Novell and SCO agree to indemnify and hold harmless the other from and against any and all losses, liabilities, judgments, and costs incurred ("Liability") if either causes the other to incur Liability under Section 10 of Amendment No. X to Software Agreement SOFT-00015 as amended, Sublicensing Agreement SUB-00015A as amended, Software Agreement SOFT-00015 Supplement No. 170 as amended, and Substitution Agreement XFER-00015B ("Amendment No. X").

In witness whereof, the parties have executed this Amendment No. 2 to be signed by their duly authorized representatives as of the date first written above.

THE SANTA CRUZ OPERATION, INC.                    NOVELL, INC.

By:_____          By: _James R. Tolonen_

Name:_____          Name: _JAMES R. TOLONEN_

Title:_____          Title: _EVP & CFO_

# EXHIBIT 5

SS-Soft. Corp.-030184 . . Agreement Number  SOFT-00015

## AT&T TECHNOLOGIES, INC.
### SOFTWARE AGREEMENT

1. AT&T TECHNOLOGIES, INC., a New York corporation ("AT&T"), having an office at 222 Broadway, New York, New York 10038, and INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, having an office at Old Orchard Road, Armonk, New York 10504,

for itself and its SUBSIDIARIES (collectively referred to herein as "LICENSEE") agree that, after execution of this Agreement by LICENSEE and acceptance of this Agreement by AT&T, the terms and conditions set forth on pages 1 through 6 of this Agreement shall apply to use by LICENSEE of SOFTWARE PRODUCTS that become subject to this Agreement.

2. AT&T makes certain SOFTWARE PRODUCTS available under this Agreement. Each such SOFTWARE PRODUCT shall become subject to this Agreement on acceptance by AT&T of a Supplement executed by LICENSEE that identifies such SOFTWARE PRODUCT and lists the DESIGNATED CPUs therefor. The first Supplement for a specific SOFTWARE PRODUCT shall have attached a Schedule for such SOFTWARE PRODUCT. Any additional terms and conditions set forth in such Schedule shall also apply with respect to such SOFTWARE PRODUCT. Initially, Supplement(s) numbered 1, 2 and 3------ ----------------- are included in and made part of this Agreement.

3. Additional Supplements may be added to this Agreement to add additional SOFTWARE PRODUCTS (and DESIGNATED CPUs therefor) or to add or replace DESIGNATED CPUs for other SOFTWARE PRODUCTS covered by previous Supplements. Each such additional Supplement shall be considered part of this Agreement when executed by LICENSEE and accepted by AT&T.

4. This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of AT&T.

Accepted by:

INTERNATIONAL BUSINESS MACHINES CORPORATION        AT&T TECHNOLOGIES, INC.

By _____ 2/1/85    By _____ 2-4-85
(Signature)  (Date)     (Signature)  (Date)

R. A. McDONOUGH - JR    O. L. WILSON
(Type or print name)      (Type or print name)

COUNSEL - SYSTEMS PRODUCT    Manager, Software Sales and Marketing
(Title)               (Title)

Page 1 of 6

SS-Soft. Corp.-030184

## I. DEFINITIONS

1.01  CPU means central processing unit.

1.02  COMPUTER PROGRAM means any instruction or instructions, in source-code or object-code format, for controlling the operation of a CPU.

1.03  DESIGNATED CPU means any CPU listed as such for a specific SOFTWARE PRODUCT in a Supplement to this Agreement.

1.04  SOFTWARE PRODUCT means materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS. Materials available from AT&T for a specific SOFTWARE PRODUCT are listed in the Schedule for such SOFTWARE PRODUCT.

1.05  SUBSIDIARY of a company means a corporation or other legal entity (i) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) the majority of the equity interest in which is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be a SUBSIDIARY of such company only so long as such control or such ownership and control exists.

## II. GRANT OF RIGHTS

2.01  AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE'S own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.

2.02  A single back-up CPU may be used as a substitute for a DESIGNATED CPU without notice to AT&T during any time when such DESIGNATED CPU is inoperative because it is malfunctioning or undergoing repair, maintenance or other modification.

2.03  LICENSEE may at any time notify AT&T in writing of any changes, such as replacements or additions, that LICENSEE wishes to make to the DESIGNATED CPUs for a specific SOFTWARE PRODUCT. AT&T will prepare additional Supplements as required to cover such changes. Changes covered by a Supplement shall become effective after execution of such Supplement by LICENSEE, acceptance thereof by AT&T and, in the case of each additional CPU, receipt by AT&T of the appropriate fee.

002

SCON0019910

SS-Soft. Corp. 030184

2.04  On AT&T'S request, but not more frequently than annually, LICENSEE shall furnish to AT&T a statement, certified by an authorized representative of LICENSEE, listing the location, type and serial number of all DESIGNATED CPUs hereunder and stating that the use by LICENSEE of SOFTWARE PRODUCTS subject to this Agreement has been reviewed and that each such SOFTWARE PRODUCT is being used solely on DESIGNATED CPUs (or temporarily on back-up CPUs) for such SOFTWARE PRODUCTS pursuant to the provisions of this Agreement.

2.05  No right is granted by this Agreement for the use of SOFTWARE PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others.

## III.  DELIVERY

3.01  Within a reasonable time after AT&T receives the fee specified in the first Supplement for a SOFTWARE PRODUCT, AT&T will furnish to LICENSEE one (1) copy of such SOFTWARE PRODUCT in the form identified in the Schedule for such SOFTWARE PRODUCT.

3.02  Additional copies of SOFTWARE PRODUCTS covered by this Agreement will be furnished to LICENSEE after receipt by AT&T of the then-current distribution fee for each such copy.

## IV.  EXPORT

4.01  LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States.

## V.  FEES AND TAXES

5.01  Within sixty (60) days after acceptance of this Agreement by AT&T, LICENSEE shall pay to AT&T the fees required by the Supplement(s) initially attached hereto for the DESIGNATED CPUs listed in such Supplement(s).

5.02  Within sixty (60) days after acceptance of each additional Supplement by AT&T, LICENSEE shall pay to AT&T any fee required by such additional Supplement for the DESIGNATED CPUs listed in such additional Supplement.

5.03  Payments to AT&T shall be made in United States dollars to AT&T at the address specified in Section 7.11(a).

5.04  LICENSEE shall pay all taxes, including any sales or use tax (and any related interest or penalty), however designated, imposed as a result of the existence or operation of this Agreement, except any income tax imposed upon AT&T by any governmental entity within the United States proper (the fifty (50) states and the District of Columbia). Fees specified in Supplement(s) to this Agreement and in Schedule(s) attached to Supplement(s) are exclusive of any taxes. If AT&T is required to collect a tax to be paid by LICENSEE, LICENSEE shall pay such tax to AT&T on demand.

Page 3 of 6

SS-Soft. Corp.-030184

## VI. TERM

6.01  This Agreement shall become effective on and as of the date of acceptance by AT&T.

6.02  LICENSEE may terminate its rights under this Agreement by written notice to AT&T certifying that LICENSEE has discontinued use of and returned or destroyed all copies of SOFTWARE PRODUCTS subject to this Agreement.

6.03  If LICENSEE fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to LICENSEE specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement.

6.04  In the event of termination of rights under Sections 6.02 or 6.03, AT&T shall have no obligation to refund any amounts paid to it under this Agreement.

6.05  LICENSEE agrees that when a SUBSIDIARY'S relationship to LICENSEE changes so that it is no longer a SUBSIDIARY of LICENSEE, (i) all rights of such former SUBSIDIARY in the SOFTWARE PRODUCTS subject to this Agreement shall immediately cease, and (ii) such former SUBSIDIARY shall immediately discontinue use of and return to LICENSEE or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement. No fees paid to AT&T for use of SOFTWARE PRODUCTS on DESIGNATED CPUs of such former SUBSIDIARIES shall be refunded; however, LICENSEE may substitute other CPUs for such DESIGNATED CPUs in accordance with Section 2.08.

## VII.  MISCELLANEOUS PROVISIONS

7.01  Nothing contained herein shall be construed as conferring by implication, estoppel or otherwise any license or right under any patent or trademark. However, in respect of patents under which AT&T can grant rights, AT&T grants to LICENSEE all such rights necessary for the use by LICENSEE, pursuant to the rights granted herein, of SOFTWARE PRODUCTS, except to the extent that such patents apply (i) independently of the use of any such SOFTWARE PRODUCT, (ii) because a DESIGNATED CPU is used in combination with other hardware or (iii) because any such SOFTWARE PRODUCT is modified from the version furnished hereunder to LICENSEE by AT&T or is used in combination with other software.

7.02  This Agreement shall prevail notwithstanding any conflicting terms or legends which may appear in a SOFTWARE PRODUCT.

004

SCON0019912

SS-Soft. Corp.-030184

7.03  AT&T warrants that it is empowered to grant the rights granted hereunder. AT&T makes no other representations or warranties, expressly or impliedly. By way of example but not of limitation, AT&T makes no representations or warranties of merchantability or fitness for any particular purpose, or that the use of any SOFTWARE PRODUCT will not infringe any patent, copyright or trademark. AT&T shall not be held to any liability with respect to any claim by LICENSEE, or a third party on account of, or arising from, the use of any SOFTWARE PRODUCT.

7.04  LICENSEE agrees that it will not, without the prior written permission of AT&T, (i) use in advertising, publicity, packaging, labeling or otherwise any trade name, trademark, trade device, service mark, symbol or any other identification or any abbreviation, contraction or simulation thereof owned by AT&T (or a corporate affiliate thereof) or used by AT&T (or such an affiliate) to identify any of its products or services, or (ii) represent, directly or indirectly, that any product or service of LICENSEE is a product or service of AT&T (or such an affiliate), or is made in accordance with or utilizes any information or documentation of AT&T (or such an affiliate).

7.05  Neither the execution of this Agreement nor anything in it or in any SOFTWARE PRODUCT shall be construed as an obligation upon AT&T to furnish any person, including LICENSEE, any assistance of any kind whatsoever, or any information or documentation other than the SOFTWARE PRODUCTS to be furnished pursuant to Sections 3.01 and 3.02.

7.06  (a) LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T. LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. LICENSEE shall appropriately notify each employee to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee. If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE'S obligations under this section shall not apply to such information after such time.

(b)  Notwithstanding the provisions of Section 7.06(a), LICENSEE may distribute copies of a SOFTWARE PRODUCT, either in modified or unmodified form, to third parties having licenses of equivalent scope herewith from AT&T for a corporate affiliate thereof) for the same SOFTWARE PRODUCT, provided that LICENSEE first verifies the status of any such third party in accordance with specific instructions issued by AT&T. Such instructions may be obtained on request from AT&T at the correspondence address specified in Section 7.11(b). LICENSEE may also obtain materials based on a SOFTWARE PRODUCT subject to this Agreement from such a third party and use such materials pursuant to this Agreement, provided that LICENSEE treats such materials as if they were part of such SOFTWARE PRODUCT.

Page 5 of 6

005

SCON0019913

SS-Soft. Corp.-030184

7.07 The obligations of LICENSEE and its employees under Section 7.06(a) shall survive and continue after any termination of rights under this Agreement or cessation of a SUBSIDIARY'S status as a SUBSIDIARY.

7.08 LICENSEE agrees that it will not use SOFTWARE PRODUCTS subject to this Agreement except as authorized herein and that it will not make, have made or permit to be made any copies of such SOFTWARE PRODUCTS except for use on DESIGNATED CPUs for such SOFTWARE PRODUCTS (including backup and archival copies necessary in connection with such use) and for distribution in accordance with Section 7.06(b). Each such copy shall contain the same copyright and/or proprietary notices or notice giving credit to a developer, which appear on or in the SOFTWARE PRODUCT being copied.

7.09 Neither this Agreement nor any rights hereunder, in whole or in part, shall be assignable or otherwise transferable by LICENSEE and any purported assignment or transfer shall be null and void.

7.10 Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part.

7.11 (a) Payments to AT&T under this Agreement shall be made payable and sent to:

> AT&T TECHNOLOGIES, INC.
> P.O. Box 65080
> Charlotte, North Carolina 28265

(b) Correspondence with AT&T relating to this Agreement shall be sent to:

> AT&T TECHNOLOGIES, INC.
> Software Sales and Marketing Organization
> P.O. Box 25000
> Greensboro, North Carolina 27420

(c) Any payment, statement, notice, request or other communication shall be deemed to be sufficiently given to the addressee and any delivery hereunder deemed made when sent by certified mail addressed to LICENSEE at its office specified in this Agreement or to AT&T at the appropriate address specified in this Section 7.11. Each party to this Agreement may change an address relating to it by written notice to the other party.

7.12 If LICENSEE is not a corporation, all references to LICENSEE'S SUBSIDIARIES shall be deemed deleted.

7.13 The construction and performance of this Agreement shall be governed by the law of the State of New York.

Page 6 of 6

SCON0019914

O-040184
R-120184

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

1. Fees

    (a)  Right-to-use fees

          (i)  First DESIGNATED CPU (Source)      $43,000***

          (ii)  Each additional DESIGNATED CPU (Source)      $16,000

         (iii)  Each of third and subsequent DESIGNATED CPUs
              (Source) after initial sublicensing fee has been
              paid

|  |  |
|---|---|
| 1-32 user system | $ 1,000 |
| 1-64 user system | $ 3,500 |
| > 64 user system | $ 7,000 |
| (See Notes 1 and 3) | |

         (iv)  DESIGNATED CPU (Object)      $ 4,800

              (See Note 2)

         (v)  Fees listed in items (iii) and (iv) do not
              include a distribution of software.

    (b)  Distribution fee for each additional
        copy      $ 400

    (c)  Sublicensing fees (applicable only to
        SUBLICENSED PRODUCT under a Sublicensing
        Agreement)

          (i)  Initial      $25,000***

          (ii)  Per-Copy

|  |  |
|---|---|
| 1-2 user system | $ 60 |
| 1-8 user system | $ 125 |
| 1-16 user system | $ 500 |
| 1-32 user system | $ 1,000 |
| 1-64 user system | $ 3,500 |
| > 64 user system | $ 7,000 |
| (See Notes 1 and 3) | |

---

*UNIX is a trademark of AT&T Bell Laboratories
**Furnished to LICENSEES outside the United States
***Lower fees may apply to LICENSEES for other versions of UNIX System V

007

SCON0019915

O-040184
R-120184

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

(d) Upgrade Fees

LICENSEES for the following UNIX operating system(s) may upgrade those systems for the fees shown:

| | |
|---|---|
| UNIX System V Release 1.0 or Release 1.1 | $2,500 |
| UNIX System III | $3,500 |

Information on upgrade fees for other UNIX operating systems is available upon request.

(e) Fees in this schedule are subject to change without notice.

Notes:

1. "User" means a terminal for entry of information and display or printing of information, such terminal being serviced on a time-sharing basis by a DESIGNATED CPU running UNIX System V, Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1, International Edition, or an end-user CPU running a SUBLICENSED PRODUCT based on UNIX System V, Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1, International Edition. An end-user must not be given the ability to increase the number of users supported by a SUBLICENSED PRODUCT.

2. All of UNIX System V, Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1, International Edition may be used on or in conjunction with a DESIGNATED CPU (Source). Only the materials that may be included in a SUBLICENSED PRODUCT pursuant to Section 4 of this Schedule may be used on or in conjunction with a DESIGNATED CPU (Object).

3. The number of users supported on a DESIGNATED CPU paid for under Paragraph 1(a) (iii) or supported by a SUBLICENSED PRODUCT may be increased from a lower number to a higher number on payment of the difference between the fee stated for the lower number and the fee stated for the higher number.

**008**

SS-Soft. Corp. Supp-030184

Agreement Number ___SOFT-00015___

Supplement Number _____1_____

## AT&T TECHNOLOGIES, INC.
## SOFTWARE AGREEMENT SUPPLEMENT

The CPU(s) listed below are hereby made DESIGNATED CPUs for the following
SOFTWARE PRODUCT: UNIX* System V, Release 2.0——————————

subject to the referenced Agreement.

[X] A Schedule for such SOFTWARE PRODUCT is attached to this
Supplement.

[ ] A Schedule for such SOFTWARE PRODUCT was attached to
Supplement No._____

|  | DESIGNATED CPUs | | Source or | |
|---|---|---|---|---|
| Location | Type | Serial No. | Object | Fee |

All CPUs that are SOURCE CPUs under the prior January 1, 1982 Software
Agreement, as Modified, Between Our Companies Relating to UNIX System V,
Release 2.0 and other UNIX Operating System, for which agreement this
agreement has been substituted. All fees for such CPUs have been paid
pursuant to such prior agreement.

[X] This Supplement is attached to and made a part of the referenced
Agreement. Execution and acceptance of such Agreement also
constitutes execution and acceptance of this Supplement.

[ ] Execution and acceptance of this Supplement follow.

Accepted by:

_____    AT&T TECHNOLOGIES, INC.

By_____    By_____
   (Signature)    (Date)       (Signature)    (Date)

_____    _____
   (Type or print name)          (Type or print name)

_____    _____
      (Title)                       (Title)

*UNIX is a trademark of AT&T Bell Laboratories.

009

SCON0019917

O-040184
R-120184

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

1. Fees

    (a) Right-to-use fees

        (i) First DESIGNATED CPU (Source)                   $43,000***

        (ii) Each additional DESIGNATED CPU (Source)    $16,000

        (iii) Each of third and subsequent DESIGNATED CPUs
                (Source) after initial sublicensing fee has been
                paid

|  |  |
|---|---|
| 1-32 user system | $ 1,800 |
| 1-64 user system | $ 3,500 |
| > 64 user system | $ 7,000 |
| (See Notes 1 and 3) | |

        (iv) DESIGNATED CPU (Object)                  $ 4,800

                (See Note 2)

        (v) Fees listed in items (iii) and (iv) do not
                include a distribution of software.

    (b) Distribution fee for each additional
        copy                                   $  400

    (c) Sublicensing fees (applicable only to
        SUBLICENSED PRODUCT under a Sublicensing
        Agreement)

        (i) Initial                         $25,000***

        (ii) Per-Copy

|  |  |
|---|---|
| 1-2 user system | $    60 |
| 1-8 user system | $   125 |
| 1-16 user system | $   500 |
| 1-32 user system | $ 1,000 |
| 1-64 user system | $ 3,500 |
| > 64 user system | $ 7,000 |
| (See Notes 1 and 3) | |

---

*UNIX is a trademark of AT&T Bell Laboratories
**Furnished to LICENSEES outside the United States
***Lower fees may apply to LICENSEES for other versions of UNIX System V

**010**

SCON0019918

D-040184                                                              Page 2 of 6
R-120184

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

(d)  Upgrade Fees

        LICENSEES for the following UNIX operating system(s)
        may upgrade those systems for the fees shown:

            UNIX System V Release 1.0 or Release 1.1        $2,500
            UNIX System III                                 $3,500

        Information on upgrade fees for other UNIX operating
        systems is available upon request.

(e)  Fees in this schedule are subject to change without notice.

Notes:                                                                           1

1.   "User" means a terminal for entry of information and display
     or printing of information, such terminal being serviced on a
     time-sharing basis by a DESIGNATED CPU running UNIX System V,
     Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1,
     International Edition, or an end-user CPU running a
     SUBLICENSED PRODUCT based on UNIX System V, Release 2.0
     Version 1 or UNIX System V, Release 2.0 Version 1,
     International Edition. An end-user must not be given the
     ability to increase the number of users supported by a
     SUBLICENSED PRODUCT.

2.   All of UNIX System V, Release 2.0 Version 1 or UNIX System V,
     Release 2.0 Version 1, International Edition may be used on or
     in conjunction with a DESIGNATED CPU (Source). Only the
     materials that may be included in a SUBLICENSED PRODUCT
     pursuant to Section 4 of this Schedule may be used on or in
     conjunction with a DESIGNATED CPU (Object).

3.   The number of users supported on a DESIGNATED CPU paid for
     under Paragraph 1(a) (iii) or supported by a SUBLICENSED
     PRODUCT may be increased from a lower number to a higher
     number on payment of the difference between the fee stated for
     the lower number and the fee stated for the higher number.

**011**

SCON0019919

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

2. Documentation Furnished

   (a) Printed Documentation

   Items marked with an asterisk (*) are supplied with UNIX
   System V, Release 2.0 Version 1, International Edition only

   - UNIX System V - System Release Description
   - UNIX System V - Portfolio
   - UNIX System V - User Reference Manual
   - UNIX System V - Administrator Reference Manual
   - UNIX System V - Programmer Reference Manual
   - UNIX System V - Error Message Reference Manual
   - UNIX System V - Programming Guide
   - UNIX System V - Support Tools Guide
   - UNIX System V - Graphics Guide
   - UNIX System V - User Guide
   - UNIX System V - Operator Guide
   - UNIX System V - Administrator Guide
   - *UNIX System V - International Release Description

   (b) On-Line Documentation

   On-line documentation is provided for the UNIX System User
   Reference Manual, the Administrator Reference Manual and the
   Programmer Reference Manual.

   NOTE: The printed documentation listed is general in nature and
   not intended to completely describe the COMPUTER PROGRAMS
   listed in Section 3; nor are all COMPUTER PROGRAMS described
   in such documentation necessarily included in the SOFTWARE
   PRODUCT.

3. COMPUTER PROGRAMS Furnished

   The COMPUTER PROGRAMS listed in this section and the on-line
   documentation listed in Section 2(b) above will be supplied on four
   reels of nine track, 800 BPI (PDP** 11/70 only) or 1600 BPI
   magnetic tape; plus a diagnostic tape for tape transport.

   (a) Tape Boot Loader and Initial System Load program for copying
   the system software from the distribution tape to the system
   disk.

   (b) An executable copy of the cpio program.

   **PDP is a trademark of Digital Equipment Corporation

SCON0019920

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

(c) A physical copy of the root file system.
Includes the following directories and their associated files:

bck
bin
etc
dev
lib
stand
tmp

(d) The root file system in cpio format.
Includes the following directories and their associated files:

bck
bin
etc
dev
lib
stand
tmp

(e) The /usr file system in cpio format.  Includes the following
subdirectories and their associated lower level subdirectories
and files:

| adm | include | news |
| bin | lib | preserve |
| catman | lost + found | pub |
| games | mail | spool |
| | | tmp |

(f) Source code for the RJE software includes the RJE make file
(rje.mk) and the following directories and their associated
files:

lib
send.d
src
util
vpm

013

SCON0019921

D-040184
R-120184

Schedule for
UNIX* System V, Release 2.0 Version 1
and
UNIX System V, Release 2.0 Version 1, International Edition**

(g) Source code for the graphics software.
Includes the graphics make file (graf.mk) and the following
directories and their associated files and subdirectories:

        include
        lib
        src

(h) Source code of the system software (includes top level make
commands and the following directories and their associated
subdirectories and files:

        cmd
        games
        head
        lib
        stand
        uts

Note:   The "crypt" command and associated documentation are not
included in UNIX System V, Release 2.0 Version 1,
International Edition.

4. Sublicensing (under a Sublicensing Agreement)

A SUBLICENSED PRODUCT based on UNIX System V, Release 2.0 Version 1
or UNIX System V, Release 2.0 Version 1, International Edition, may
include:

(a) Copies of the documents listed in Section 2 of this schedule.

(b) COMPUTER PROGRAMS in object-code format. All COMPUTER
PROGRAMS may be treated as object-code except for files and
subdirectories under directory /usr/src.

    Also, the following files in the /usr/src/cmd/spell directory

        American        hash make
        British         list
        extra           htemp1
        list            local
        hash check

NOTE:   Run-time Libraries

Routines from the following run-time libraries may be included
in customer-developed application software without payment of
a sublicensing fee to AT&T.

Standard C Library          /lib/libc.a
Math Library                /lib/libm.a
Object File Access Library   /lib/libld.a
Fortran Library             /usr/lib/libF77.a

**014**

SCON0019922

O-040184
R-120184

Page 6 of 6

### Schedule for
### UNIX* System V, Release 2.0 Version 1
### and
### UNIX System V, Release 2.0 Version 1, International Edition**

**5. Other Software**

The products listed below may be used in the United States on
DESIGNATED CPUs for UNIX System V, Release 2.0 Version 1 and
sublicensed for use in the United States as if they were that
product. The products may be used outside the United States on
DESIGNATED CPUs for UNIX System V, Release 2.0 Version 1,
International Edition and sublicensed for use outside the United
States as if they were that product. Only those products marked
with a pound symbol (#) may be shipped outside the United States by
AT&T. Versions of such products, except those marked with an
asterisk (*), are available from AT&T for various types of CPUs at
$400 per copy.

```
    UNIX System V, Release 2.0 Version 1
   #UNIX System V, Release 1.0, International Edition
   #UNIX System V, Release 2.0 Version 1, International Edition
    UNIX System V, Release 1.0
    UNIX System V, Release 1.1
    UNIX System III
    UNIX 32V Time-Sharing System, Version 1.0
    UNIX Time-Sharing System, Seventh Edition
   *UNIX Time-Sharing System, Sixth Edition
    UNIX Programmer's Workbench System, Edition 1.0
   *UNIX Mini Time-Sharing System, Version 6
```

**6. Time Sharing**

UNIX System V, Release 2.0 Version 1 or UNIX System V, Release 2.0
Version 1, International Edition, may be used on a DESIGNATED CPU
for such SOFTWARE PRODUCT to furnish a time-sharing service to
third parties. A SUBLICENSED PRODUCT based on UNIX System V,
Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1,
International Edition, may also be used to furnish a time-sharing
service to third parties.

**015**

SCON0019923

SS-Soft. Corp. Supp-030184

Agreement Number  SOFT-00015

Supplement Number  2

## AT&T TECHNOLOGIES, INC.
## SOFTWARE AGREEMENT SUPPLEMENT

The CPU(s) listed below are hereby made *DESIGNATED CPUs* for the following
SOFTWARE PRODUCT:  UNIX* Documenter's Workbench** Software—

subject to the referenced Agreement.

[X]  A Schedule for such SOFTWARE PRODUCT is attached to this
Supplement.

[ ]  A Schedule for such SOFTWARE PRODUCT was attached to
Supplement No. _____

| Location | DESIGNATED CPUs | | Source or | |
| | Type | Serial No. | Object | Fee |
|---|---|---|---|---|

All CPUs that are SOURCE CPUs under the prior *January 1, 1982 Software
Agreement*, as Modified, Between our Companies relating to UNIX System V,
Release 2.0 and other UNIX operating systems, for which agreement this
agreement has been substituted.  All fees for such CPUs have been paid
pursuant to the prior agreement.

[X]  This Supplement is attached to and made a part of the referenced
Agreement. Execution and acceptance of such Agreement also
constitutes execution and acceptance of this Supplement.

[ ]  Execution and acceptance of this Supplement follow.

Accepted by:

_____          AT&T TECHNOLOGIES, INC.

By_____       By_____
   {Signature}      {Date}           {Signature}      {Date}

_____          _____
   (Type or print name)              (Type or print name)

_____          _____
   (Title)                           (Title)

*UNIX is a trademark of AT&T Bell Laboratories.
**Documenter's Workbench is a trademark of AT&T Technologies.

**016**

SCON0019924

Schedule for
UNIX* Documenter's Workbench** Software
April 1, 1984

1. Fees

    (a) Right-to-use fees

        (i) First CPU                   $ 4,000

        (ii) Each additional CPU      $ 2,000

    (b) Sublicensing fees (applicable only to
        SUBLICENSED PRODUCT under a Sublicensing
        Agreement)

        (i) Initial                  $ 3,000

        (ii) Per-Copy

| | |
|---|---|
| 1-2 user system | $ 10 |
| 1-8 user system | $ 15 |
| 1-16 user system | $ 30 |
| 1-32 user system | $ 45 |
| 1-64 user system | $ 125 |
| > 64 user system | $ 250 |
| (See Notes 1 and 2) | |

    (c) Fees in this schedule are subject to
        change without notice.

    Notes:

        1.    "User" means a terminal for entry of information and
             display or printing of information, such terminal being
             serviced on a time-sharing basis by an end-user CPU
             running a SUBLICENSED PRODUCT based on Documenter's
             Workbench Software. An end-user must not be given the
             ability to increase the number of users supported by a
             SUBLICENSED PRODUCT.

---

\* UNIX is a trademark of AT&T Bell Laboratories
\*\* Documenter's Workbench is a trademark of AT&T Technologies.

SCON0019925

2.  The number of users supported by a SUBLICENSED PRODUCT may be increased from a lower number to a higher number on payment of the difference between the fee stated for the lower number and the fee stated for the higher number.

## 2.  Documentation Furnished

### (a)  Printed Documentation

- UNIX Documenter's Workbench Software System Release Description 1.0
- UNIX Documenter's Workbench Software Introduction and Reference Manual
- UNIX Documenter's Workbench Text Formatters Reference
- UNIX Documenter's Workbench Software Macro Packages Reference
- UNIX Documenter's Workbench Software Preprocessors Reference
- UNIX Documenter's Workbench Software MM Quick Reference
- UNIX Documenter's Workbench Software Text Processing Quick Reference

### (b)  On-Line Documentation

- UNIX Documenter's Workbench Software Introduction and Reference Manual
- UNIX Documenter's Workbench Software Text Formatters Reference
- UNIX Documenter's Workbench Software Macro Packages Reference
- UNIX Documenter's Workbench Software Preprocessors Reference

Note:  The printed documentation listed in 2(a) is general in nature and not intended to completely describe the COMPUTER PROGRAMS listed in Section 3; nor are all COMPUTER PROGRAMS described in such documentation necessarily included in the SOFTWARE PRODUCT.

## 3.  Computer Programs Furnished

The on-line documentation listed in section 2(b) and the COMPUTER PROGRAMS listed in Section 3 will be supplied on one reel of nine track, 1600 BPI magnetic tape (or on one reel of nine track, 800 BPI magnetic tape for PDP*** 11/70 only).

---

*** PDP is a trademark of Digital Equipment Corporation.

018

SCON0019926

All text and programs included in the following directories and
subdirectories and associated files:

    catman/u man
    catman/z man
    catman/p man
    src/cmd/text

4. Sublicensing (under a Sublicensing Agreement)

    A SUBLICENSED PRODUCT may include:

    (a) Copies of the documents listed in Section 2 of this schedule.

    (b) COMPUTER PROGRAMS referenced in Section 3 of this schedule in
        object-code format only.

1

**019**

SCON0019927

SS-Soft. Corp. Supp-030184

Agreement Number SOFT-00015

Supplement Number 3

AT&T TECHNOLOGIES, INC.
SOFTWARE AGREEMENT SUPPLEMENT

The CPU(s) listed below are hereby made DESIGNATED CPUs for the following SOFTWARE PRODUCT: 370 DEVELOPMENT SYSTEM V

subject to the referenced Agreement.

[X] A Schedule for such SOFTWARE PRODUCT is attached to this Supplement.

[ ] A Schedule for such SOFTWARE PRODUCT was attached to Supplement No. ____________.

| Location | DESIGNATED CPUs Type | Serial No. | Source or Object | Fee |
|---|---|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION 220 Las Colinas Boulevard Irving, Texas 75062 | IBM 4331-11 | 14439 | SOURCE | ~~$43,000~~ $16,000 |

[X] This Supplement is attached to and made a part of the referenced Agreement. Execution and acceptance of such Agreement also constitutes execution and acceptance of this Supplement.

[ ] Execution and acceptance of this Supplement follow.

Accepted by:

______________________ AT&T TECHNOLOGIES, INC.

By______________________ (Signature) (Date) By______________________ (Signature) (Date)

______________________ (Type or print name) ______________________ (Type or print name)

______________________ (Title) ______________________ (Title)

020

SCON0019928

# EXHIBIT 6

SS-Sub-030186                    Agreement Number SUB-03015A

AT&T TECHNOLOGIES, INC.
SUBLICENSING AGREEMENT

1. AT&T TECHNOLOGIES, INC., a New York corporation ("AT&T"), having an office at 222 Broadway, New York, New York 10038, and INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation,

having an office at Old Orchard Road, Armonk, New York 10504,

for itself and its SUBSIDIARIES (collectively referred to herein as "LICENSEE") agree that, after execution of this Sublicensing Agreement by LICENSEE and acceptance of this Sublicensing Agreement by AT&T, the terms and conditions set forth on pages 1 through 5 of this Sublicensing Agreement shall apply to the SOFTWARE PRODUCTS subject to Software Agreement Number SOFT-00015 between AT&T and LICENSEE ("the Software Agreement").

2. The discount percentage applicable to per-copy fees payable hereunder shall be ___% during the initial period. The advance commitment for the initial period shall be $ _____ [See Section 4.28].

3. Except as otherwise specifically provided herein, all the provisions of the Software Agreement remain in full force and effect.

4. This Sublicensing Agreement, together with the Software Agreement and its Supplements, sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the effective date hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of AT&T.


INTERNATIONAL BUSINESS                    Accepted by:
MACHINES CORPORATION                      AT&T TECHNOLOGIES, INC.

By _____ 2/1/85             By _____ _____
    (Signature)        (Date)                (Signature)      (Date)

R. A. McDowell II                        D. L. Wilson
  (Type or print name)                     (Type or print name)

Counsel - Systems Product Div.           Manager, Software Sales and Marketing
  (Title)                                   (Title)

001

SCON0019930

SS-Sub.-030184

## I. DEFINITIONS

1.01  The terms "CPU", "COMPUTER PROGRAM", "SOFTWARE PRODUCT" and "SUBSIDIARIES" are defined in the Software Agreement.

1.02  AUTHORIZED COPIER means a DISTRIBUTOR authorized by LICENSEE to make copies of SUBLICENSED PRODUCTS.

1.03  DISTRIBUTOR means an entity authorized by LICENSEE or another DISTRIBUTOR to receive copies of SUBLICENSED PRODUCTS from LICENSEE or another DISTRIBUTOR and furnish such copies to customers and/or other DISTRIBUTORS.

1.04  SUBLICENSED PRODUCT means (i) COMPUTER PROGRAMS in object-code format based on a SOFTWARE PRODUCT subject to the Software Agreement and (ii) any other materials identified in the "Sublicensing" section of the Schedule for such SOFTWARE PRODUCT.

## II. GRANT OF RIGHTS

2.01  Notwithstanding any provisions to the contrary in the Software Agreement, AT&T grants to LICENSEE personal, nontransferable and nonexclusive rights:

(a)  to make copies of SUBLICENSED PRODUCTS and to furnish, either directly or through DISTRIBUTORS, such copies of SUBLICENSED PRODUCTS to customers anywhere in the world (subject to U.S. government export restrictions) for use on customer CPUs solely for each such customer's internal business purposes, provided that the entity (LICENSEE or a DISTRIBUTOR) furnishing the SUBLICENSED PRODUCTS obtains agreement as specified in Section 2.02 from such a customer, before or at the time of furnishing each copy of a SUBLICENSED PRODUCT, that:

(i)  only a personal, nontransferable and nonexclusive right to use such copy of the SUBLICENSED PRODUCT on one CPU at a time is granted to such customer;

(ii)  no title to the intellectual property in the SUBLICENSED PRODUCT is transferred to such customer;

(iii)  such customer will not copy the SUBLICENSED PRODUCT except as necessary to use such SUBLICENSED PRODUCT on such one CPU;

002

SCON0019931

SS-Sub.-030184

(iv)  such customer will not transfer the SUBLICENSED PRODUCT to any other party except as authorized by the entity furnishing the SUBLICENSED PRODUCT;

(v)  such customer will not export or re-export the SUBLICENSED PRODUCT without the appropriate United States or foreign government licenses;

(vi)  such customer will not reverse compile or disassemble the SUBLICENSED PRODUCT;

(b)  to use SUBLICENSED PRODUCTS on LICENSEE'S CPUs solely for LICENSEE'S own internal business purposes; and

(c)  to use, and to permit DISTRIBUTORS to use, SUBLICENSED PRODUCTS without fee solely for testing CPUs that are to be delivered to customers and for demonstrating SUBLICENSED PRODUCTS to prospective customers.

2.02  In the United States and in other jurisdictions where an enforceable copyright covering the COMPUTER PROGRAMS of the SUBLICENSED PRODUCT exists, the agreement specified in Section 2.01(a) may be a written agreement signed by the customer or a written agreement on the package containing the SUBLICENSED PRODUCT that is fully visible to the customer and that the customer accepts by opening the package. In all other jurisdictions such agreement must be a written agreement signed by the customer. AT&T does not undertake to inform LICENSEE of the jurisdictions where such copyright exists.

2.03  LICENSEE shall require each DISTRIBUTOR to enter into a written agreement with its supplier of SUBLICENSED PRODUCTS (LICENSEE or another DISTRIBUTOR) before any SUBLICENSED PRODUCT is furnished to such DISTRIBUTOR. Such agreement shall include provisions consistent with and containing the relevant substance of Sections 2.01, 2.02, 2.04, 2.07, this Section 2.03 and Section 3.05 of this Sublicensing Agreement. For a DISTRIBUTOR who is also to be an AUTHORIZED COPIER, such agreement shall also include provisions consistent with and containing the relevant substance of Sections 2.05, 2.08, 2.10 and 5.01 of this Sublicensing Agreement.

2.04  DISTRIBUTORS who are not also AUTHORIZED COPIERS may not make copies of SUBLICENSED PRODUCTS, but may furnish to customers copies of SUBLICENSED PRODUCTS furnished to such DISTRIBUTOR by LICENSEE or other DISTRIBUTORS. In such cases the product name appearing on such copies shall not be deleted or altered by such a DISTRIBUTOR.

003

SCON0019932

SS-Sub.-030184

2.05  (a) A DISTRIBUTOR who is also an AUTHORIZED COPIER may modify and make copies of SUBLICENSED PRODUCTS, select a name for SUBLICENSED PRODUCTS to appear on such copies (consistent with the provisions of Section 2.10), and furnish such copies to customers and other DISTRIBUTORS.

(b) If an AUTHORIZED COPIER who has been granted a right to use a SOFTWARE PRODUCT, either as a licensee of AT&T (or of a corporate affiliate thereof) or as a contractor of LICENSEE (in accordance with requirements of AT&T), such AUTHORIZED COPIER may use such SOFTWARE PRODUCT to modify a SUBLICENSED PRODUCT derived from such SOFTWARE PRODUCT. If LICENSEE and such AUTHORIZED COPIER agree in writing that all right, title and interest in the resulting modifications belong to LICENSEE, then copies of such modified SUBLICENSED PRODUCT may be furnished to such customers and fees for such copies may be paid to AT&T pursuant to this Sublicensing Agreement. However, if all right, title and interest in the resulting modifications do not belong to LICENSEE then such AUTHORIZED COPIER must be a licensee of AT&T (or of a corporate affiliate thereof) for such SOFTWARE PRODUCT and copies of such modified SUBLICENSED PRODUCT must be furnished to customers and fees must be paid to AT&T only pursuant to a Sublicensing Agreement between AT&T and such AUTHORIZED COPIER, even if the version of such SOFTWARE PRODUCT used by such AUTHORIZED COPIER is furnished to such AUTHORIZED COPIER by LICENSEE. Regardless of which Sublicensing Agreement is involved in furnishing a copy of a SUBLICENSED PRODUCT to a customer, only one fee shall be collected by AT&T for such copy.

2.06  LICENSEE shall use its best efforts to enforce the agreements with DISTRIBUTORS and customers specified in this Sublicensing Agreement.

2.07  If a DISTRIBUTOR fails to fulfill one or more of its obligations under the agreement required by Section 2.03, AT&T may, upon its election and in addition to any other remedies that it may have, at any time notify LICENSEE in writing of such breach and require LICENSEE to terminate all the rights granted in such agreement by not less than two (2) months' written notice to such DISTRIBUTOR specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination such DISTRIBUTOR shall within thirty (30) days immediately discontinue use of and return or destroy all copies of SUBLICENSED PRODUCTS in its possession.

2.08  (a) Any notice acknowledging a contribution of a third party appearing in a SOFTWARE PRODUCT shall be included in corresponding portions of SUBLICENSED PRODUCTS made by LICENSEE or AUTHORIZED COPIERS.

Page 4 of 9

004

SCON0019933

SS-Sub.-030184-031984

(h) Each portion of a SUBLICENSED PRODUCT shall include an appropriate copyright notice. Such copyright notice may be the copyright notice or notices appearing in or on the corresponding portions of the SOFTWARE PRODUCT on which such SUBLICENSED PRODUCT is based or, if copyrightable changes are made in developing such SUBLICENSED PRODUCT, a copyright notice identifying the owner of such changes.

2.09   In certain cases AT&T may make copies of software materials available on appropriate media for purchase by LICENSEE for distribution by LICENSEE as SUBLICENSED PRODUCTS. However, purchase of such copies shall not relieve LICENSEE of its obligation to pay fees under this Sublicensing Agreement for such SUBLICENSED PRODUCTS.

2.10   No right is granted hereunder or under the Software Agreement to use any trademark of AT&T (or a corporate affiliate thereof) in the name of the SUBLICENSED PRODUCTS offered or furnished to customers by LICENSEE or DISTRIBUTORS. However, LICENSEE and DISTRIBUTORS may state in advertising, publicity, packaging, labeling or otherwise that a SUBLICENSED PRODUCT is derived from AT&TS software under license from AT&T and identify such software (including any trademark, provided the proprietor of the trademark is appropriately identified). LICENSEE agrees, for itself and its DISTRIBUTORS, not to use a name or trademark for a SUBLICENSED PRODUCT that is confusingly similar to a name or trademark used by AT&T (or a corporate affiliate thereof).

## III.  TERM

3.01   This Sublicensing Agreement shall become effective for an initial period that expires one year from the end of the quarter ending March 31st, June 30th, September 30th or December 31st) during which this Sublicensing Agreement is accepted.

3.02   Unless LICENSEE notifies AT&T in writing or AT&T notifies LICENSEE in writing at least thirty (30) days before the expiration date established in Section 3.01 that such party does not wish renewal, this Sublicensing Agreement shall be renewed automatically for an additional one-year period and shall continue to be renewed in such a manner from year to year. Alternatively, new one-year periods may be initiated as specified in Section 4.03(d).

3.03   If LICENSEE fails to fulfill one or more of its obligations under this Sublicensing Agreement or the Software Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder and under the Software Agreement by not less than two (2) months' written notice to LICENSEE specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS covered by the Software Agreement and immediately discontinue distribution and use of and destroy all copies of SUBLICENSED PRODUCTS in its possession.

Page 5 of 9

**005**

SCON0019934

SS-Sub.-030184-031984

3.04  Neither the expiration of this Sublicensing Agreement nor the termination of LICENSEE'S rights hereunder shall relieve LICENSEE of its obligation to pay any fee hereunder. In the event of termination of LICENSEE'S rights hereunder, all fees that LICENSEE has become obligated to pay hereunder shall become immediately due and payable.

3.05  LICENSEE agrees that when a SUBSIDIARY'S or a DISTRIBUTOR'S relationship to LICENSEE changes so that it is no longer a SUBSIDIARY or a DISTRIBUTOR of LICENSEE, all rights of such former SUBSIDIARY or DISTRIBUTOR under this Sublicensing Agreement shall immediately cease, and such former SUBSIDIARY or DISTRIBUTOR shall return to LICENSEE or destroy all copies of SUBLICENSED PRODUCTS for which per-copy fees have not been paid to AT&T. However, such former SUBSIDIARY or DISTRIBUTOR may continue to use copies of SUBLICENSED PRODUCTS for which per-copy fees have been paid on the same basis that a customer may use copies of SUBLICENSED PRODUCTS pursuant to Section 3.01(a).

## IV.  FEES AND DISCOUNTS

4.01  (a) For rights granted under this Sublicensing Agreement, LICENSEE shall pay to AT&T, in the manner and at the times specified in Article V, any initial sublicensing fee specified for the SOFTWARE PRODUCT on which a SUBLICENSED PRODUCT is based and a per-copy fee for each copy of a SUBLICENSED PRODUCT either (i) furnished by LICENSEE to a customer or to a DISTRIBUTOR, (ii) made by an AUTHORIZED COPIER and furnished by such AUTHORIZED COPIER to a customer or to another DISTRIBUTOR or (iii) put into use by LICENSEE on a CPU of LICENSEE. The amounts of such sublicensing fees are listed in the Schedule for each SOFTWARE PRODUCT.

(b) Amounts paid to AT&T under this Sublicensing Agreement for a copy of a SUBLICENSED PRODUCT furnished to a particular customer shall not be creditable toward any fees payable under any agreement between AT&T (or between a corporate affiliate thereof) and such customer.

(c) Fees paid to AT&T under this Sublicensing Agreement shall not be creditable toward fees that become payable under the Software Agreement. Fees paid under the Software Agreement shall not be creditable toward fees that become payable under this Sublicensing Agreement.

(d) No additional fee is payable for the transfer of a SUBLICENSED PRODUCT from one customer to another customer in conjunction with the transfer of a CPU between such customers, provided that the first customer does not retain any portion of the SUBLICENSED PRODUCT after such transfer and that agreement of the second customer is obtained in accordance with Sections 2.01 and 2.02. Such transfer of a SUBLICENSED PRODUCT may result from, for example, a sale of a CPU by the first customer to the second customer or the termination of a lease with the first customer for a CPU and the execution of a new lease with the second customer for such CPU.

(e) No additional fee is payable for the transfer of a SUBLICENSED PRODUCT from one CPU of LICENSEE to another or the transfer of a SUBLICENSED PRODUCT from one CPU of a customer to another CPU of the same customer.

Page 6 of 9

006

SCON0019935

SS-Sub.-030184-031984

4.02 (a) The discount percentage applicable during the initial period referred to in Section 3.01 shall be based on LICENSEE'S advance commitment to pay a specified minimum total amount of discounted per-copy fees for SUBLICENSED PRODUCTS furnished or put into use during such initial period. If no such commitment is made, no discount shall be available during the initial period. The discount percentage and the advance commitment, if any, for the initial period are set forth on page 1 of this Sublicensing Agreement. The discount percentage applicable during each additional one-year period referred to in Section 3.02 shall be based either on LICENSEE'S advance commitment to pay a specified minimum total amount of discounted per-copy fees for such additional one-year period or on the actual total of such fees payable for the preceding period, as LICENSEE shall elect.

(b) Such discount percentage shall be two percent (2%) for each whole one hundred thousand dollars ($100,000.00) of either the advance commitment or the actual total for the preceding period, as the case may be, up to a maximum of sixty percent (60%).

(c) If LICENSEE elects to base its discount percentage for a forthcoming additional period on its advance commitment, LICENSEE shall notify AT&T in writing of the amount of such advance commitment before the end of the preceding period. If such notification is not received by such time, such discount percentage shall be based on the actual total of discounted per-copy fees payable for the preceding period.

(d) An advance commitment may not be reduced. However, LICENSEE may at any time request of AT&T in writing that the then-current initial period or additional one-year period be terminated and that a new one-year period be started, beginning with the next quarter, for which new period LICENSEE shall make an advance commitment corresponding to a higher discount percentage than that currently applicable. Such request will be subject to AT&T'S acceptance. In the case of such termination and start of a new period, the discount percentage for the terminated period shall apply to all transactions occurring before the end of such period.

4.03 The section of the Software Agreement relating to taxes shall apply to fees payable under this Sublicensing Agreement.

## V.  REPORTS AND PAYMENTS

5.01 (a) LICENSEE shall keep full, clear and accurate records of the number of copies of each SUBLICENSED PRODUCT furnished by it and AUTHORIZED COPIERS to other DISTRIBUTORS and customers and put into use on LICENSEE'S CPUs.

(b) Each AUTHORIZED COPIER shall keep full, clear and accurate records of the number of copies of each SUBLICENSED PRODUCT furnished by it to other DISTRIBUTORS and customers.

(c) Each AUTHORIZED COPIER shall furnish a statement at least quarterly to LICENSEE identifying the number of copies recorded according to Section 5.01(b) since the previous such statement was furnished.

(d) LICENSEE shall keep full, clear and accurate records of the identities and locations of AUTHORIZED COPIERS.

Page 7 of 9

SCON0019936

SS-Sub.-030184-031984

(a) AT&T shall have the right through its accredited auditing representatives to make an examination and audit, during normal business hours, not more frequently than annually, of all records kept pursuant to this Section by LICENSEE and AUTHORIZED COPIERS and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts of fees payable to it under this Sublicensing Agreement. Prompt adjustment shall be made by the proper party to compensate for any errors or omissions disclosed by such examination or audit. Neither such right to examine and audit nor the right to receive such adjustment shall be affected by any statement to the contrary, appearing on checks or otherwise, unless such statement appears in a letter, signed by the party having such right and delivered to the other party, expressly waiving such right.

5.02  (a) LICENSEE shall notify AT&T in writing at least thirty (30) days in advance of the date LICENSEE intends to begin furnishing copies of a SUBLICENSED PRODUCT to customers or DISTRIBUTORS or putting any such copies into use on LICENSEE'S CPUs. Before such date LICENSEE shall pay to AT&T any initial sublicensing fee specified for the SOFTWARE PRODUCT on which such SUBLICENSED PRODUCT is based. Discount percentages established under Section 4.02 do not apply to initial sublicensing fees.

(b) Within thirty (30) days after the end of each quarter ending on March 31st, June 30th, September 30th or December 31st, commencing with the quarter during which this Sublicensing Agreement first becomes effective, LICENSEE shall furnish to AT&T a statement, in form acceptable to AT&T, certified by an authorized representative of LICENSEE, identifying the number of copies of each SUBLICENSED PRODUCT furnished by it and AUTHORIZED COPIERS or put into use on LICENSEE'S CPUs, the SOFTWARE PRODUCT on which each such SUBLICENSED PRODUCT is based, the per-copy fees for such copies and the net fees payable after the applicable discount percentage is taken into account. If the per-copy fees for a particular SUBLICENSED PRODUCT are based on a characteristic such as number of users supported, information on such characteristic for the copies of such SUBLICENSED PRODUCT furnished or put into use shall also be included in such statement. Each SUBLICENSED PRODUCT for which LICENSEE has given notice to AT&T pursuant to Section 5.02(a) shall be covered by such statement. In such statement, LICENSEE shall also fully identify any AUTHORIZED COPIER added or terminated during the quarter covered by such statement.

(c) Within such thirty (30) days LICENSEE shall, irrespective of its own business and accounting methods, pay to AT&T the net fees payable for such quarter as shown in the statement required by Section 5.02(b), except that if the applicable discount percentage is based on an advance commitment for a period, LICENSEE shall pay the net fees payable for such quarter plus any additional amount necessary for the total of amounts paid for such period after the first, second, third and fourth full quarters thereof to be, respectively, one-quarter, one-half, three-quarters and the full amount of such advance commitment. Any such additional amount paid during a period shall be creditable against net fees payable later in the same period, but no such additional amount remaining at the end of the fourth full quarter of a period shall be refunded or creditable against any other amounts payable to AT&T. If AT&T accepts a new one-year period pursuant to Section 4.02(d), no such additional amount remaining at the end of the last full quarter of the terminated period shall be refunded or creditable against any other amounts payable to AT&T.

Page 8 of 9

SCON0019937

35-Sub.-030184-031984

(d) LICENSEE shall furnish whatever additional information AT&T may reasonably prescribe from time to time to enable AT&T to ascertain the amounts of fees payable pursuant hereto.

5.03  Payments provided for in this Sublicensing Agreement shall, when overdue, be subject to a late payment charge calculated at an annual rate of one percent (1%) over the posted prime rate or successive posted prime rates in effect in New York City during delinquency; provided, however, that if the amount of such late payment charge exceeds the maximum permitted by law for such charge, such charge shall be reduced to such maximum amount.

## VI.  MISCELLANEOUS PROVISIONS

6.01  Neither this Sublicensing Agreement nor any rights hereunder, in whole or in part, shall be assignable or otherwise transferable by LICENSEE and any purported assignment or transfer shall be null and void.

6.02  (a) Payments to AT&T under this Sublicensing Agreement shall be made payable and sent to:

AT&T TECHNOLOGIES, INC.
P.O. Box 65080
Charlotte, North Carolina 28265

(b) Correspondence with AT&T relating to this Sublicensing Agreement shall be sent to:

AT&T TECHNOLOGIES, INC.
Software Sales and Marketing Organization
P.O. Box 25000
Greensboro, North Carolina 27420

(c) Any payment, statement, notice, request or other communication shall be deemed to be sufficiently given to the addresses and any delivery hereunder deemed made when sent by certified mail addressed to LICENSEE at its office specified in this Sublicensing Agreement or to AT&T at the appropriate address specified in this Section 6.02. Each party to this Sublicensing Agreement may change an address relating to it by written notice to the other party.

6.03  The limited grant of rights under patents in the Software Agreement applies to any use permitted under Section 2.01 of this Sublicensing Agreement.

6.04  If LICENSEE is not a corporation, all references to LICENSEE'S SUBSIDIARIES shall be deemed deleted.

6.05  The construction and performance of this Sublicensing Agreement shall be governed by the law of the State of New York.

Page 9 of 9

009

SCON0019938

# EXHIBIT 7

SS-SNA-041084                          Agreement Number  XFER-000158

### AT&T TECHNOLOGIES, INC.
Substitution Agreement



The following agreements ("the prior agreements") are in effect between AT&T TECHNOLOGIES, INC., a New York corporation ("AT&T"), or an affiliate thereof, and INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation                              ("LICENSEE"):

1. January 1, 1982 Software Agreement, as Modified, Relating to UNIX* System V, Release 2.0 and other UNIX Operating Systems.

2. June 2, 1983 Supplemental Agreement (Customer Provisions) relating to UNIX System V, Release 2.0 and other UNIX Operating Systems.

Agreement Numbers  SOFT-00015 and SUB-00015A-------- between AT&T and LICENSEE ("the new agreements") are hereby substituted for the prior agreements. Accordingly, the rights and obligations of the parties under the prior agreements are terminated and replaced by the rights and obligations of the parties under the new agreements. No other agreements between the parties hereto are affected by this Agreement.

The following provision is   ☐   applicable

                             ☒   not applicable:

The discount percentage for the initial period pursuant to Agreement No.
      is      %, based on total per-copy fees of $
paid by LICENSEE under the prior Supplemental Agreement (Customer Provisions) listed above relating to UNIX System III and/or UNIX System V.

|                                          | Accepted by:                              |
|------------------------------------------|-------------------------------------------|
| INTERNATIONAL BUSINESS MACHINES CORPORATION | AT&T TECHNOLOGIES, INC.                |
| By _(Signature)_ _(Date)_                | By _(Signature)_ _(Date)_                 |
| R. A. McDonald  _(Type or print name)_   | O. L. WILSON  _(Type or print name)_      |
| Counter Systems Market Div.  _(Title)_   | Manager, Software Sales and Marketing  _(Title)_ |

*UNIX is a trademark of AT&T Bell Laboratories.

**001**

EXHIBIT 8



C. L. Wilson
Manager, Software
Sales and Marketing

Guilford Center
P. O. Box 25000
Greensboro, NC 27420
919 279-XXXX

FEB 1 1985

INTERNATIONAL BUSINESS MACHINES CORPORATION
Old Orchard Road
Armonk, New York 10504

Gentlemen:

Re: Software Agreement Number SOFT-00015, Sublicensing
Agreement Number SUB-00015A and Substitution Agreement
Number XFER-00015B

This letter states understandings between our companies relating to
the referenced agreements and amends certain sections in such
agreements concerning SOFTWARE PRODUCTS subject to the referenced
Software Agreement.

1. Software Agreement

1. Regarding Sections 2.01 and 4.01, we will consider
extending rights granted under Section 2.01 to include use of
SOFTWARE PRODUCTS in countries other than the United States
and giving written consent under Section 4.01 to export
SOFTWARE PRODUCTS to such countries when specific needs
arise. In the case of additional DESIGNATED CPUs in such
countries such extension and consents will be given by the
Supplements for such CPUs prepared in accordance with Section
3.03. In the case of your export of modified SOFTWARE
PRODUCTS to our source licensees in such countries such
consents will be given by an appropriate writing consistent
with Section 7.06(b). We are presently willing to grant such
rights for the countries you have requested, namely,
Australia, Austria, Belgium, Canada, Republic of China
(Taiwan), Denmark, Finland, France, Federal Republic of
Germany (West Germany), Greece, Hong Kong, Ireland, Israel,
Italy, Japan, Republic of Korea (South Korea), Luxembourg,
The Netherlands, New Zealand, Norway, Sweden, Switzerland,
United Kingdom (England, Wales, Scotland, Northern Ireland),
and Singapore. We will not unreasonably withhold such
permission for such listed countries or for other countries
that you may identify. Our concerns in this regard are the
laws of the recipient country relating to protection of
software and U. S. export control laws.

**001**

SCON0019942

INTERNATIONAL BUSINESS MACHINES
CORPORATION                              2.

2.  Regarding Section 2.01, we agree that modifications and
    derivative works prepared by or for you are owned by you.
    However, ownership of any portion or portions of SOFTWARE
    PRODUCTS included in any such modification or derivative work
    remains with us.

3.  You have requested that your contractors be permitted to use
    SOFTWARE PRODUCTS pursuant to the referenced Software
    Agreement.

    Accordingly, notwithstanding any provision to the contrary in
    the Software Agreement, including Section 7.06(a) as amended
    hereby, it is agreed that, subject to the conditions set
    forth herein, the rights granted in Section 2.01 of the
    Software Agreement be extended to permit you to provide
    access to and allow use of SOFTWARE PRODUCTS by your
    contractors.

    Such use may be on your DESIGNATED CPUs or on such
    contractors' CPUs that you designate as additional DESIGNATED
    CPUs pursuant to Section 2.03 of the Software Agreement.
    Such use by contractors will be deemed to be for your own
    internal business purposes. If such use is on a contractor's
    CPU, you may furnish a copy of a SOFTWARE PRODUCT to such
    contractor. You shall secure from each such contractor, at
    the time of or before providing access to or furnishing any
    copy of a SOFTWARE PRODUCT, the agreement of such contractor
    in writing that any claim, demand or right of action arising
    on behalf of such contractor from access to or use of the
    SOFTWARE PRODUCT shall be solely against you and that such
    contractor agrees to the same obligations and
    responsibilities as to confidentiality and other restrictions
    pertaining to the use of the SOFTWARE PRODUCT as those
    undertaken by you under the Software Agreement. Each such
    agreement shall also provide that, when a contractor's work
    for you is completed, all copies of the SOFTWARE PRODUCT and
    any software derived from or developed with the use of a
    SOFTWARE PRODUCT shall be returned to you by such contractor
    and such contractor shall erase any such software from any
    storage element of apparatus. Copies of such agreements with
    contractors shall be provided to us at our request. However,
    portions of such agreements not specifically required by this
    paragraph may be deleted. Information furnished by LICENSE
    relating to contractors shall be subject to Paragraph A15 in
    this Letter Agreement.

4.  Regarding Section 5.04, we agree that you shall not be
    obligated to pay any tax based on our net income in the
    United States or elsewhere.

002

SCON0019943

INTERNATIONAL BUSINESS MACHINES
CORPORATION                                    3.

5.  Regarding Section 6.03 of the Software Agreement and Sections
    3.07 and 3.03 of the Sublicensing Agreement, we will not
    terminate your rights for breach, nor will we give notice of
    termination under such Sections, for breaches we consider to
    be immaterial.  We agree to lengthen the notice period
    referenced in such Sections from two (2) months to one
    hundred (100) days.  If a breach occurs that causes us to
    give notice of termination, you may remedy the breach to
    avoid termination if you are willing and able to do so.  In
    the event that a notice of termination is given to you under
    either of such Sections and you are making reasonable efforts
    to remedy the breach but you are unable to complete the
    remedy in the specified notice period, we will not
    unreasonably withhold our approval of a request by you for
    reasonable extension of such period.  We will also consider a
    reasonable extension under Section 3.07 of the Sublicensing
    Agreement in the case of a DISTRIBUTOR who is making
    reasonable efforts to remedy a breach.

    We will consider arbitration if a dispute arises on payments.

    In any event our respective representatives will exert their
    mutual good faith best efforts to resolve any alleged breach
    short of termination.

6.  Regarding Section 6.05 of the Software Agreement and Section
    3.05 of the Sublicensing Agreement, we will offer new
    software and sublicensing agreements to your former
    SUBSIDIARIES on the same basis as to any other prospective
    licensee.  A former SUBSIDIARY would be unlicensed during the
    period between its ceasing to be your SUBSIDIARY and the
    effective date of such new agreements.  Therefore, new
    agreements should be in effect before a SUBSIDIARY is
    divested.

7.  Regarding Section 7.03, we are not aware of any patent or
    copyright infringement action against us relating to SOFTWARE
    PRODUCTS.            —CLAIM OR ...

8.  Regarding Section 7.05, we will cooperate with you in
    defending litigation arising from your use of SOFTWARE
    PRODUCTS (or sublicensing of SUBLICENSED PRODUCTS under the
    Sublicensing Agreement), but the extent of such cooperation
    cannot be determined until such litigation arises.

9.  Amend Section 7.05(a) by replacing such section with the
    following:

SCON0019944

INTERNATIONAL BUSINESS MACHINES
CORPORATION       4,

—7.06(a). LICENSEE agrees that it shall hold SOFTWARE
PRODUCTS subject to this Agreement in confidence for IBM.
LICENSEE further agrees that it shall not make any disclosure
of such SOFTWARE PRODUCTS to anyone, except to employees of
LICENSEE to whom such disclosure is necessary to the use for
which rights are granted hereunder. LICENSEE shall
appropriately notify each employee to whom any such
disclosure is made that such disclosure is made in confidence
and shall be kept in confidence by such employee. Nothing in
this agreement shall prevent LICENSEE from developing or
marketing products or services employing ideas, concepts,
know-how or techniques relating to data processing embodied
in SOFTWARE PRODUCTS subject to this Agreement, provided that
LICENSEE shall not copy any code from such SOFTWARE PRODUCTS
into any such product or in connection with any such service
and employees of LICENSEE shall not refer to the physical
documents and materials comprising SOFTWARE PRODUCTS subject
to this Agreement when they are developing any such product
or service or providing any such service. If information
relating to a SOFTWARE PRODUCT subject to this Agreement at
any time becomes available without restriction to the general
public by acts not attributable to LICENSEE or its employees,
LICENSEE's obligations under this section shall not apply to
such information after such time.—.

10. Regarding Section 7.06(b), this section covers the situation
where one of our licensees wishes to furnish its modified
version of our source code for a SOFTWARE PRODUCT to another
of our licensees for the same product. The last sentence of
this section makes clear that you may receive source code
from another such licensee, provided you treat such source
code as if it were the source code we furnished to you. This
language is not intended to refer to an object-code product
that you obtain from another of our licensees pursuant to
that licensee's sublicensing rights.

11. Regarding Section 7.06, we recognize that you may at some
time be required to disclose a SOFTWARE PRODUCT to others (i)
by law, (ii) by a valid order of a court or other
governmental body, (iii) by your existing undertaking with
the European Economic Community or (iv) in order to establish

004

SCON0019945

INTERNATIONAL BUSINESS MACHINES
CORPORATION                                5.

your rights under the Software Agreement.  You recognize the
proprietary nature of SOFTWARE PRODUCTS and the need to
protect SOFTWARE PRODUCTS from unrestricted disclosure.
Accordingly, you agree not to make any such disclosure
without giving notice to us so that we have an opportunity to
intervene.  We agree to respond to any such notice within a
reasonable time, consistent with the requirement that you
disclose.  You agree to obtain, or assist us in obtaining, a
protective order appropriately limiting the extent of any
such disclosure that may eventually be made.

12.  We agree that all SOFTWARE PRODUCTS, including enhancements
to or new versions of existing SOFTWARE PRODUCTS, generally
available under the Software Agreement will be made available
to you at the fees and under terms, warranties and benefits
equivalent to those offered to other licensees.

13.  Regarding Section 1(c) of the "Schedule for UNIX System V,
Release 2.0, Version 1.0" attached to Supplement 1 of the
Software Agreement, Section 1(c) of the "Schedule for UNIX
Documentar's Workbench* Software" attached to Supplement 2
of the Software Agreement, and the "Schedule for 3B0
DEVELOPMENT SYSTEM V" attached to Supplement 3 of the
Software Agreement, we agree that the fees in such Schedules
are not subject to increase.

14.  Regarding the documentation listed in Section 2 of the
Schedule for UNIX System V, Release 2.0, Version 1.0, the
documents entitled "UNIX System V System Release Description"
and "UNIX System V-International Release Description" are not
presently available without restriction to the general
public.  All other listed documents are available without
restriction.

15.  We agree that the identities of your contractors,
DISTRIBUTORS and AUTHORIZED COPIERS, as well as the types and
serial numbers of DESIGNATED CPUs of such parties, are
confidential and need only be disclosed to us as specified
under the referenced agreements, as modified hereby; and that
such information will be used by us only for the purposes of
administering and enforcing such agreements and will not be
disclosed to anyone except those having a need to know for
the purpose of administering the referenced agreements.

*UNIX is a trademark of AT&T Bell Laboratories.
**Documentar's Workbench is a trademark of AT&T Technologies.

**005**

SCON0019946

INTERNATIONAL BUSINESS MACHINES
CORPORATION                                    5.

2.  Sublicensing Agreement

    1.  A DISTRIBUTOR may also be your contractor pursuant to the
        terms set forth in item 13 above.

    2.  We agree that "internal business purposes" in Sections
        2.01(a) and 2.02(b) includes the right to offer data
        processing services to others.

    3.  Regarding the following IBM form agreements:

        Our
        Reference    Form No.                    Title

        1.    Z125-3253-0    Agreement for IBM Licensed Programs
        2.    Z125-3419-0    IBM Usage License Amendment to
                             Agreement for IBM Licensed Programs
        3.    Y125-0391-0    IBM Program License Agreement
        4.    Z133-0073-0    IBM Instruments, Inc. Program License
                             Agreement
        5.    04-83          Amendment to Agreement for IBM
                             Licensed Programs (Value Added
                             Remarketer)
        6.    06-83          Agreement for IBM Licensed Programs
                             (Value Added Remarketer's Licensed
                             End User)
        7.    6172268        IBM Program License Agreement
        8.    Unnumbered     IBM Personal Computer Retail Dealer
                             Agreement, Software
        9.    Z26-2681-00    IBM Personal Computer Retail Dealer
                             Agreement

        We have reviewed such form agreements for use under the
        provisions of the Sublicensing Agreement and have no
        objections to such use, or the use of substantially similar
        forms, in the United States and Puerto Rico provided that:

        (a)  In using forms such as 1 and 5 (our references), you
        will not specify "Installation License Applies" or "Location
        License Applies";

        (b)  If your customer is permitted to make its own additional
        copies of "licensed program materials" for use on additional
        machines, as permitted under form 1, you treat such
        additional copies under the Sublicensing Agreement as if you
        had furnished such copies;

        (c)  In the next revision of form 3 you correct the language
        in the second paragraph relating to title to indicate that
        title may be retained by a third party (or by your licensor);

006

SCON0019947

INTERNATIONAL BUSINESS MACHINES
CORPORATION                    7.

(d)  In the next revision of Forms 4 and 7 you include a
provision prohibiting reverse assembly or reverse
compilation, as appears in forms 1, 7 and 5; and

(e)  In dealing with AUTHORIZED COPIES you obligate such
parties to include in copies they make of SUBLICENSED
PRODUCTS the notices required by Section 3.08(a) of the
Sublicensing Agreement.

4.  Amend Section 2.02 by changing "written agreement on the
package" to --written agreement on or accompanying the
package--.

5.  Amend Section 2.05(b) by replacing such Section with the
following:

--(b) If an AUTHORIZED COPIER also has been granted a right
to use a SOFTWARE PRODUCT, either as a licensee of AT&T (or
of a corporate affiliate thereof) or as a contractor of
LICENSEE (in accordance with requirements of AT&T), such
AUTHORIZED COPIER may use such SOFTWARE PRODUCT to modify a
SUBLICENSED PRODUCT derived from such SOFTWARE PRODUCT.  If
the resulting modifications are owned solely by LICENSEE,
then fees for copies of such modified SUBLICENSED PRODUCT
distributed to customers by such AUTHORIZED COPIER may be
paid to AT&T pursuant to this sublicensing Agreement  or
pursuant to a Sublicensing Agreement between AT&T and such
AUTHORIZED COPIER, as LICENSEE shall elect.  However, if such
AUTHORIZED COPIER retains any ownership interest in such
modifications, then fees for copies of such modified
SUBLICENSED PRODUCT distributed to customers by such
AUTHORIZED COPIER must be paid to AT&T only pursuant to a
Sublicensing Agreement between AT&T and such AUTHORIZED
COPIER.  Regardless of which Sublicensing Agreement is
involved, only one fee shall be collected by AT&T for such
copy.--;

6.  Regarding Section 3.05, "best efforts" need be no more than
the efforts you would customarily use to enforce equivalent
agreements (such as those listed in 13 above) with your
customers, value added resellers, end users, and dealers.

7.  Regarding Section 3.08(a), only bona fide notices need be
included, not irrelevant comments that may appear in a
SOFTWARE PRODUCT.

SCON0019948

INTERNATIONAL BUSINESS MACHINES
CORPORATION                              6.

8.  Regarding Section 2.03, we have not yet made any copies of
    software materials available under this Section.  If we do
    so, you may elect whether to make your own copies or purchase
    such copies from us.

9.  Regarding the references you are permitted to make to our
    trademark under Section 2.10, you are under no obligation to
    make such references.

10. Amend Section 3.02, first and second lines, by deleting "or
    AT&T notified LICENSEE in writing", and, third line, by
    changing "such party" to --LICENSEE--.

11. The discount provisions in the Sublicensing Agreement are
    deleted.  We will exert our good faith best efforts to
    propose a new discount provision by April 1, 1985.  Such new
    discount provisions will be retroactive to the effective date
    of the Sublicensing Agreement and, at a minimum will:

        (i)   provide a discount percentage, applicable to
        essentially yearly discount periods, of at least two percent
        (2%) for each whole one hundred thousand dollars
        ($100,000.00) of discounted per-copy fees up to a maximum of
        sixty percent (60%), or equivalent;

        (ii)  require advance payment of per-copy fees by you no more
        frequently than quarterly;

        (iii) require no advance commitment by you regarding volume
        of SUBLICENSED PRODUCTS furnished to customers or put into
        use; and

        (iv)  provide for no retention by us of advance payments made
        by you unless mutually agreed.

12. Regarding Section 5.01, we agree that neither you nor your
    AUTHORIZED COPIERS or DISTRIBUTORS will be required to
    provide or disclose the identity of customers to us or our
    accredited auditing representatives.

13. Regarding Section 5.02(A), we agree that the notification in
    writing required by such Section may be within thirty (30)
    days after the date you begin furnishing copies of a
    SUBLICENSED PRODUCT to customers or DISTRIBUTORS or putting
    such copies into use on your CPUs, and that you may pay any
    sublicensing fee for the DESIGNED PRODUCT on which such
    SUBLICENSED PRODUCT is based at the time of such notification.

008

SCON0019949

14. Regarding Section 3.02(C), you need not pay a per-copy fee
for copies of SUBLICENSED PRODUCTS that are returned without
having been used or are furnished in place of a defective
copy. You are not required to pay an additional per-copy fee
for an enhancement if the enhancement does not increase the
number of users supported by a product into the next higher
category. However, when we furnish later versions of a
SOFTWARE PRODUCT with new features, we may require payment of
additional sublicensing fees to upgrade your earlier
SUBLICENSED PRODUCTS to include the new features.

15. Regarding the documentation you may furnish to a customer or
end user, which documentation is defined as part of a
SUBLICENSED PRODUCT, you may furnish the number of copies
necessary to reasonably support the product without paying an
additional sublicensing fee. You may also furnish to
prospective customers the number of copies of such
documentation necessary to reasonably support the marketing
of the SUBLICENSED PRODUCT without paying a sublicensing fee
for such copies.

16. Regarding your obligation under the sublicensing agreement to
pay per-copy sublicensing fees for SUBLICENSED PRODUCTS
furnished to customers (or put into use on your internal
CPUs), we recognize that certain of your SUBLICENSED PRODUCTS
may comprise a set of parts, with one major part being a
prerequisite for the other, minor part(s), such that if you
furnished (or put into use) all the parts together you would
be obligated to pay only one per-copy fee. However, we
understand that you wish to furnish (or put into use) the
parts separately, paying the full per-copy fee when you
furnish (or put into use) the major part and no fee at all
when you furnish (or put into use) the minor part(s). We
agree that you may do this, provided that you report,
pursuant to Section 3.02 of the Sublicensing Agreement, the
quantities of each major and minor part furnished (or put
into use) and that such quantities be reconciled periodically
to determine whether the quantity of any minor part ever
exceeds the quantity of major parts, and that if there is
such an excess, you pay an additional per-copy fee for each
excess minor part. We will exert our good faith best efforts
to propose by April 1, 1984 methods for such reconciliation
and for determining such additional per-copy fees. We would
expect such fees to be based on a proportional reduction of
the full per-copy fee with the objective of achieving an
equitable fee arrangement, taking into account the excess
quantities of minor parts over major parts. The discount
arrangement applicable to the full per-copy fees will also
apply to the additional per-copy fees.

SCON0019950

INTERNATIONAL BUSINESS MACHINES
CORPORATION                        18.

C.  Substitution Agreement

Regarding SUBLICENSED PRODUCTS based on LICENSED SOFTWARE
under the prior Software Agreement listed in the Substitution
Agreement, we agree that you may elect to pay per-copy
sublicensing fees for some such SUBLICENSED PRODUCTS at the
rates set forth in Sections 4.01(a) and (b) of the prior
Supplemental Agreement (Customer Provisions) ("the old
rates") and other such SUBLICENSED PRODUCTS at the rates set
forth in Section 1(u) of the Schedule for UNIX System V,
Release 3.0 ("the new rates"), provided:

(a)  You pay the Initial Sublicensing Fee specified in
Section 1(u)(1) of such Schedule when you begin paying some
per-copy fees at the new rates while continuing to pay other
per-copy fees at the old rates.  (Such Initial Sublicensing
Fee will be waived if you elect to pay all per-copy fees at
the new rates.)

(b)  Per-copy fees you pay under the old rates do not apply
to the determination of any discount percentage under the new
Sublicensing Agreement and per-copy fees you pay under the
new rates do not apply to the "Cumulative Total of Fees Paid"
under the prior Supplemental Agreement (Customer Provisions).

(c)  In the statements furnished pursuant to Section 5.02(b)
of the new Sublicensing Agreement you clearly distinguish
whether you are applying the old rates or the new rates for
relevant SUBLICENSED PRODUCTS.

Capitalized terms in this letter agreement are defined in the
referenced agreements.

SCON0019951

INTERNATIONAL BUSINESS MACHINES
     CORPORATION                          11.

If you agree with the above understandings and amendments, please so
indicate by signing and dating the attached copy of this letter
agreement in the spaces provided therefor and returning such copy to
us.

                              Very truly yours,

                              ATEX TECHNOLOGIES, INC.


ACCEPTED AND AGREED TO:

INTERNATIONAL BUSINESS MACHINES CORPORATION

By

Title

Date