Use these links to rapidly review the document

TABLE OF CONTENTS
Item 8. Financial Statements and Supplementary Data

© 2004. EDGAR Online, Inc.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

(Mark One)

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended October 31, 2003

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from to .

### Commission file number: 0-29911

# THE SCO GROUP, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **87-0662823** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **355 South 520 West** | **(801) 765-4999** |
| **Lindon, Utah 84042** | (Registrant's telephone |
| (Address of principal executive offices, including zip code) | number, including area code) |

### Securities pursuant to Section 12(b) of the Act: None
### Securities registered pursuant to Section 12(g) of the Act:

### Title of Each Class
### Common Stock, par value $.001 per share

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference on Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes  No

The aggregate market value of the common stock held by non-affiliates of the Registrant was approximately $20.6 million based on the reported last sale price of common stock on April 30, 2003, which is the last business day of the Registrant's most recently completed second fiscal quarter. The number of shares of the Registrant's common stock outstanding as of January 27, 2004, was 14,306,640.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's proxy statement to be filed pursuant to Regulation 14A in connection with its annual meeting of stockholders are incorporated by reference into Part III of this Form 10-K.

© 2004, EDGAR Online, Inc.

PART I.
　Item 1.            Business
Item 2.            Properties
Item 3.            Legal Proceedings
Item 4.            Submission of Matters to a Vote of Security Holders
PART II.
Item 5.            Market for the Registrant's Common Equity and Related Stockholder Matters
Item 6.            Selected Financial Data
Item 7.            Management's Discussion and Analysis of Financial Condition and Results of Operations
Item 7A.           Quantitative and Qualitative Disclosures About Market Risk
Item 8.            Financial Statements and Supplementary Data
Item 9.            Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
Item 9A.           Controls and Procedures
PART III.
Item 10.           Directors and Executive Officers of the Registrant
Item 11.           Executive Compensation
Item 12.           Security Ownership of Certain Beneficial Owners and Management
Item 13.           Certain Relationships and Related Transactions
Item 14.           Principal Accountant Fees and Services
PART IV.
Item 15.           Exhibits, Financial Statement Schedules and Reports on Form 8-K
Signatures

© 2004. EDGAR Online, Inc.

PART I

## Item 1. Business

*The Business section and other parts of this Annual Report on Form10-K ("Form10-K") contain forward-looking statements relating to our business and strategy. These forward-looking statements involve risks and uncertainties. Many forward-looking statements are located in "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements can also be identified by words such as "intends," "anticipates," "expects," "believes," "plans," "predicts," and similar terms. Forward-looking statements are not guarantees of future performance and our actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those set forth below in the section entitled "Risk Factors" under PartII, Item 7A of this Form10-K. We assume no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

*As used in the Form10-K, "SCO," and "OpenServer" are trademarks or registered trademarks of our Company in the United States and other countries. "UNIX" and "UnixWare" are registered trademarks of The Open Group in the United States and other countries. All other brand or product names are or may be trademarks of, and are used to identify the products and services of, their respective owners.*

### Overview

We own the UNIX operating system and are a provider of UNIX-based products and services. We generate revenue from two sources: sales of our UNIX-based products and services and licenses of our UNIX technology through our SCOsource initiatives. Our core business is to sell and service our UNIX operating system and related software products to small-to-medium sized businesses and branch offices and franchisees of Fortune 1000 businesses. Our main products that drive the majority of our UNIX revenue are OpenServer and UnixWare. We intend to continue to maintain our core business in fiscal year 2004 by continuing our research and development efforts to enhance our OpenServer and UnixWare products and their related services.

We developed our SCOsource initiatives as part of our ongoing efforts to establish and protect our intellectual property rights, particularly relating to our UNIX source code. In reviewing our intellectual property rights in early 2003, we became aware that parts of our proprietary UNIX source code and derivative works have been included in the Linux operating system without our authorization or copyright attribution. Commencing in January2003, our SCOsource initiatives have included:

- reviewing and evaluating our UNIX license and sublicense agreements with UNIX vendors and identifying those in the software industry that may be currently using our intellectual property without obtaining the necessary licenses;

- requiring our UNIX licensees to certify that they are in full compliance with the terms of their respective licenses and have not misused copyrighted UNIX source code and are not misusing that code in Linux;

- warning users of the Linux operating system through written correspondence that their use of Linux may violate our intellectual property rights and specifically violate our copyrights; and

- offering our SCO Intellectual Property ("IP") Licenses to Linux end users to properly authorize their use of our intellectual property in the Linux operating system.

In connection with our SCOsource initiatives, in March2003, we filed a complaint against International Business Machines Corporation ("IBM"), alleging, in part, that IBM had breached its license agreement with us by, among other things, inappropriately contributing UNIX source code and derivative works to the open source community and seeking to use its knowledge and methods related to UNIX source code and derivative works and modifications licensed to it to decrease the value of the

3

© 2004. EDGAR Online, Inc.

UNIX operating system in favor of promoting the Linux operating system, of which it has been a major backer. Based on these alleged breaches, we delivered to IBM notice of termination of our license agreement with IBM that permitted IBM's use of our UNIX source code in developing its AIX operating system. We describe our legal action against IBM and its procedural status in more detail below under PartI, Item 3 of this Form10-K.

Additionally, as part of our SCOsource initiatives, in fiscal year 2003, we entered into two significant vendor license agreements with Sun Microsystems ("Sun") and Microsoft Corporation ("Microsoft"). We will continue pursuing our SCOsource initiatives in fiscal year 2004, seeking to obtain additional vendor licensing agreements similar to the Sun and Microsoft agreements and pursuing our SCOsource IP license initiative with Linux end users. We also plan to continue to pursue our litigation against IBM, and have announced that we expect in the near term to commence our first legal action against an end user violating our intellectual property or contractual rights. On January20, 2004, we brought suit against Novell,Inc. ("Novell") for slander of title seeking relief for Novell's alleged bad faith efforts to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare product. We describe our legal action against Novell in more detail below under PartI, Item 3 of this Form10-K.

**Historical Information**

We originally incorporated as Caldera Systems,Inc., a Utah corporation ("Caldera Systems"), in August1998, and reincorporated as a Delaware corporation in March2000, when we completed an initial public offering of our common stock. In May2001, we formed a new holding company in Delaware under the name of Caldera International,Inc. ("Caldera International") to acquire substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation, now known as Tarantella,Inc. In connection with this acquisition, Caldera Systems became a wholly-owned subsidiary of Caldera International. Former holders of shares and options to purchase shares of Caldera Systems received an equal number of shares and options to purchase shares in Caldera International.

On May16, 2003, our stockholders approved our corporate name change from Caldera International,Inc. to The SCO Group,Inc. As used herein, the "Company" or "us," "we," "ours," or similar terms refer to The SCO Group,Inc. and our operating subsidiaries.

*UNIX-Based Products and Services Business*

**Background**

Our core business focus is to serve the needs of small-to-medium sized businesses, including branch offices and franchisees of Fortune 1000 companies, by providing reliable, cost effective UNIX operating systems and software products to power computers running Intel architecture. We also provide a full range of pre and post sale technical support for all of our products, primarily focusing on OpenServer and UnixWare. Additionally, we provide UNIX-based professional consulting and custom software development services.

Our largest source of revenue for our core UNIX business is derived from our worldwide, indirect, leveraged channel of partners, which includes distributors and independent solution providers (collectively, "resellers"). We have local offices in a number of countries that provide support and services to customers and resellers in those geographic areas. The other principal channel for selling and marketing our products is through large corporations which have a large number of branch offices or franchisees. We access these corporations through their information technology or purchasing departments with our direct sales team in the United States and through our reseller channel in countries outside the United States. In addition, we also sell our operating system products to original

4

© 2004.  EDGAR Online, Inc.

equipment manufacturers ("OEMs") through our direct sales team in the United States and our reseller channel in countries outside the United States.

The UNIX operating system, which we own, was conceived on the premise that an operating system should be easily adapted to a broad range of hardware platforms and should provide a simple way of connecting programs. Over the years, the UNIX operating system has been adapted for almost every OEMs hardware architecture, and today UNIX has achieved the goal of seamlessly sharing data across heterogeneous environments. We own a broad and deep set of intellectual property rights relating to the UNIX operating system which we intend to continue to enforce and protect through our SCOsource initiatives, described in more detail below in the subsection entitled "SCOsource Initiatives" under the section entitled "SCOsource Business."

UNIX has had a long history of small business implementation, and has a large and loyal base of both customers and vendors that provide solutions and applications. On the Intel platform, our OpenServer and UnixWare products represent a low cost, UNIX operating system available for business. Our offerings permit businesses, particularly small businesses, to take advantage of the reliability of the UNIX operating system that runs on the Intel platform at a relatively low cost.

**Current Status and Strategy**

Sales of our UNIX-based products and services have been declining in each of the last four years. This decline in revenue has been primarily attributable to significant competition from alternative operating systems, particularly Linux, the worldwide economic slowdown and lower information technology spending.

We anticipate that our OpenServer and UnixWare products will continue to provide a revenue stream for our UNIX business, although we expect revenue from these products will continue to decline. Both of these UNIX products have a strong existing customer base and constitute a well-known brand with a reputation for quality and reliability. We also have a seasoned, mature sales channel of resellers focused on the small-to-medium sized business market. This channel is a unique asset that will allow us to continue to provide reliable UNIX operating systems for small-to-medium sized business customers.

In fiscal year 2004, we intend to focus our development resources on maintaining and enhancing our existing OpenServer and UnixWare products by increasing system reliability and performance, maintaining backward compatibility with existing applications and software, providing increased application support and additional hardware support and integrating widely-used internet applications and increase system performance.

We are also enhancing our UNIX operating systems with web services software that provides interoperability and compatibility with web services standards, under an initiative called SCOx. These enhancements will provide customers with a cost effective way to modernize and integrate legacy applications and modernize application user interfaces. Target end users may include small-to-medium sized businesses and branch offices and franchisees of Fortune 1000 companies, with an initial emphasis on end users currently using our UNIX operating systems. We will also continue to look at augmenting our current UNIX operating systems with more vertically focused solutions. Future expansion of this initiative may include acquisitions of technologies, acquisitions of companies with an established presence in key vertical markets, strategic alliances with industry participants and licensing transactions.

We have also completed the development of a "small footprint" version of UNIX that can be used in embedded devices. We believe that this will allow us to expand our reach in certain retail markets. Our research and development efforts are described in more detail below in the subsection entitled "Software Engineering and Development."

5

© 2004. EDGAR Online, Inc.

**Competition**

We face direct competition in the operating system market from Linux operating system providers, other non-UNIX operating system providers, other UNIX-based operating system providers, technical support providers and professional services organizations. In the operating system market, some of our competitors include Hewlett-Packard, IBM, Microsoft and Sun. Operating systems such as Linux and Microsoft's Windows Server are aggressively pursuing the current UNIX operating system market and have taken significant market share from our UNIX business. We are also in the process of asserting our copyrights and contractual rights related to our UNIX source code and derivative works that have been integrated into Linux.

We believe that we compete favorably with many of our competitors in a number of respects, including product performance, functionality and price, networking capability and breadth of hardware compatibility. However, many of our competitors are significantly larger than we are and have greater access to funding, technical expertise, marketing, and research and development. In addition, many of our competitors have established brand recognition and market presence that may prevent us from obtaining significant market share.

The success of our UNIX business will depend on the level of commitment and certification we receive from industry partners and developers. In recent years, we have seen hardware and software vendors as well as software developers turn their certification and application development efforts toward Linux and elect not to continue to support or certify to our UNIX operating system products. If this trend continues, our competitive position will be adversely impacted and our future revenue from our UNIX business will decline. The decline in our UNIX business may be accelerated if industry partners withdraw their support from us as a result of our SCOsource initiatives and in particular any lawsuit against end users violating our intellectual property and contractual rights.

**Products and Services**

*OpenServer.* OpenServer is our UNIX-based legacy offering. Businesses use OpenServer to simplify and speed business operations, better understand and respond to their customers' needs, and achieve a competitive advantage. OpenServer excels at running multi-user, transaction and business applications, communications gateways, and mail and messaging servers in both host and client/server environments. We continue to aggressively support existing users of OpenServer, keeping the operating system current with hardware platforms available in the market. The latest release, OpenServer 5.0.7, began shipping in February2003.

*UnixWare.* UnixWare is an advanced deployment platform for industry standard Intel processor systems. UnixWare is a foundation for solutions where proven scalability, reliability and affordability are critical. UnixWare includes enhancements and refinements to the UNIX platform, representing significant added value for existing UnixWare customers. The latest release, UnixWare 7.1.3, began shipping in December2002.

*Technical Support Services.* We provide a full range of pre and post sale technical support for all of our products, primarily focusing on OpenServer and UnixWare.

We also provide technical support to all our partners, including resellers, hardware and software vendors and solution providers, as well as directly supporting our end-user customers. Our partners have the option to direct their customers to us for technical support or to provide first-level customer support themselves and utilize our technical expertise for second-tier support.

Technical support services include a range of options from single incident email and telephone support to dedicated "enterprise" level support agreements. Customers seeking additional technical support directly from us may enter into service agreements that best suit their needs.

6

© 2004. EDGAR Online, Inc.

*Professional Consulting and Custom Development Services.* Our UNIX consulting services include project management, software development and programming, migration tools and services, development of customized operating systems, as well as assisting customers with modernizing and integrating legacy applications with web services. We assist our end-user customers and solution providers in planning, creating, implementing and deploying business application solutions.

**Strategic Alliances**

We have business alliances with a number of key global industry partners. These relationships encompass product integration, two-way technology transfers, channel partnerships and revenue generating initiatives in areas of product bundling, OEM agreements and training and education. The objectives of these partnerships include providing complete hardware and software UNIX solutions and mutually developing our sales and distribution channel by coordinating marketing initiatives in creating demand for our products.

We also have alliances with numerous solution providers who write and develop custom applications to run on UNIX operating systems. Most of our small business customers that cannot afford high-end solutions or an information technology staff rely on one of our channel partners for these services. We also intend to expand our relationships with key partners in certain vertical markets such as retail, medical and manufacturing/accounting where our UNIX operating systems have an existing presence. Our efforts to maintain or expand industry partnerships may be adversely impacted by our SCOsource initiatives, particularly any lawsuit against end users violating our intellectual property and contractual rights.

**Sales and Marketing**

Our UNIX sales and marketing or field operations are organized by geographic area: our Americas division and our International division. Each division includes a sales organization, field marketing, pre and post sales technical support, and local professional services personnel.

*Americas.* The Americas team has field sales and support personnel located around the United States, Latin America and Canada. This region delivered approximately 55percent of the total UNIX revenue for fiscal year 2003. The sales team is organized into Area Sales Managers ("ASMs"), who each manage a specific geographic area and support our channel partners as well as service our corporate account customer base, including OEM partners. ASMshave the following specific roles:

- Channel Sales—ASMsmanage our relationships with our resellers and vertical solution providers. Resellers sell numerous solutions to small business customers in their geographic territory. Vertical solution providers provide bundled applications to specific vertical markets, which include retail point of sale, manufacturing, accounting and medical/pharmaceutical. Many of our resellers and vertical solution providers purchase operating system platform products directly from us. In order to efficiently support the thousands of smaller resellers and vertical solution providers, we contract with several major distributors in a two-tier distribution model.

- Corporate Sales—ASMsalso sell directly to our major corporate accounts with branch offices or franchisees and other large corporations. Typically, these customers have an existing suite of third-party or internally developed applications designed to run on our dependable and scalable OpenServer or UnixWare operating systems. In many cases, our operating system and the application are then deployed in an identical fashion across thousands of branch offices or franchisees.

*International.* Our International division is headquartered in Dublin, Ireland. This region delivered the remaining 45percent of our UNIX revenue for fiscal year 2003 and includes EMEA ("Europe, the Middle East and Africa") and Asia Pacific. Our International division includes sales,

7

© 2004. EDGAR Online, Inc.

support and marketing teams in all major countries and territories, including the United Kingdom, Germany, France, Italy, Spain, Korea, India, Japan, Australia and Taiwan.

The country sales teams perform the same functions as the Americas sales team, including channel sales, corporate account sales and OEM sales. In the International division, particularly in smaller countries such as Spain, one sales representative will manage both channel and major account sales within that country. The International division also uses local distributors in each location to process all channel orders.

We consider our indirect sales channel one of our most valuable assets. In addition to the current revenue produced by our resellers, these partners are valuable for the influence they possess on the purchasing decisions of small businesses. Our resellers are often not only the primary point of contact for their small businesses customers' purchasing decisions, but their customer's outsourced information technology department. The reach of our network of resellers into the small business community is broad as evidenced by the base of approximately two million installed servers running various versions of our OpenServer and UnixWare operating systems. A critical key to our future success will depend in part on our ability to provide additional products and services to our reseller channel and to communicate our product and corporate strategy to these resellers.

Our marketing efforts support our sales and distribution efforts, promotions and product introductions, and include marketing development funds to promote our UNIX products. Pull marketing is focused on branding, solutions, advertising, tradeshows, press releases, white papers and marketing literature. In particular, our marketing strategy consists of:

- branding SCO through public relations announcements and advertising;

- creating an effective partner program to generate brand awareness and promote our products; and

- increasing public awareness through speaking engagements at strategic tradeshows and conferences and participating in technology forums.

Information regarding financial data by geographic segment and long-lived assets is set forth in PartII, Item 8 of this Form10-K in the notes to consolidated financial statements.

## Software Engineering and Development

We have undertaken an initiative to maintain our UNIX operating systems while at the same time gaining operational efficiencies where possible. We are modernizing our UNIX technology with the requirements to maintain system reliability, maintain backward compatibility, increase application support, provide broad hardware support, better integrate widely-used internet applications, improve usability, and increase system performance. While we believe that these product enhancements will extend the life and improve the functionality of our UNIX products, they will not result in significant revenue increases in the short-term due to the long adoption cycle for new operating system purchases and the length of our operating system product sales cycle.

Technology trends in the central processing unit ("CPU") market have enabled our 32-bit operating systems and associated applications to run on 64-bit hardware. These developments have significantly reduced the entry cost into the 64-bit market which will allow us to assign a limited but skilled amount of resources to develop a 64-bit version of our operating system technology. Our objective in making this investment is to provide our current and new customers a long-term product roadmap that will provide them a seamless upgrade path to 64-bit computing that is no more difficult than a standard 32-bit operating system upgrade. We expect this investment to provide future returns as we give customers confidence in their commitment to our technologies.

8

© 2004. EDGAR Online, Inc.

Our product development process is modeled to standard, commercial software engineering practices. We apply these practices to both documentation and procedures to ensure consistent product quality. As a result, we are able to offer our platform products to OEM customers in several configurations without significant additional effort. We are also able to move our platform products efficiently to new processor platforms as new business opportunities arise.

## SCOsource Business

### Background

We acquired our rights relating to the UNIX source code and derivative works and other intellectual property rights when we purchased substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation,Inc. in May2001. The Santa Cruz Operation (now known as Tarantella,Inc.) had previously acquired such UNIX source code and other intellectual property rights from Novell in September1995, which were initially developed by AT&T Bell Labs. Through this process, we acquired all UNIX source code, source code license agreements with thousands of UNIX vendors, all UNIX copyrights, all claims for violation of the above mentioned UNIX licenses and copyrights and other claims, and the control over UNIX derivative works. The UNIX licenses we obtained have led to the development of several proprietary UNIX-based operating systems, including but not limited to our own UnixWare and OpenServer products, Sun's Solaris, IBM's AIX, SGI's IRIX, Hewlett-Packard's UX, Fujitsu's ICL DRS/NX, Siemens' SINIX, Data General's DG-UX, and Sequent's DYNIX/Ptx. These operating systems are all derivatives of the original UNIX source code owned by us.

The success of our SCOsource business depends on our ability to protect our proprietary UNIX source code as well as our copyrights and other intellectual property rights. To protect our proprietary rights, we rely primarily on a combination of copyright laws, contractual rights and a detailed legal strategy. We have dedicated internal personnel and other resources to our SCOsource business and intend to dedicate additional SCOsource sales personnel in fiscal year 2004.

In January2003, we commenced our first SCOsource initiative in which, as described in more detail below, we began reviewing the status of our existing UNIX license agreements with UNIX vendors and to identify those in the software industry that may be using our intellectual property without obtaining the necessary licenses. As part of this process, we became aware that parts of our proprietary UNIX source code and derivative works have been included in the Linux operating system without attribution or our authorization in violation of our intellectual property rights. To respond to this concern, we have instigated additional SCOsource initiatives related to end users of Linux, which are described in more detail below. Additionally, we filed a complaint against IBM in March2003 alleging that IBM breached its license agreement with us related to its efforts to promote and support the Linux operating system. We describe our legal action against IBM in more detail below under PartI, Item 3 of this Form10-K.

### SCOsource Initiatives

*Reviewing and Evaluating Existing UNIX Licenses.* As mentioned above, in January2003, we began reviewing the status of our existing UNIX license agreements with UNIX vendors. This review is continuing and we will continue to expand our efforts in fiscal year 2004. During fiscal year 2003, we entered into two significant license agreements. The first of these licenses was with Sun, a long-time UNIX licensee and a major participant in the UNIX industry. The second license was to Microsoft and covers Microsoft's UNIX compatible products, subject to certain specified limitations. The Sun and Microsoft license agreements accounted for $25,846,000 of our revenue in fiscal 2003, representing approximately 33percent of our total revenue for such period.

9

© 2004. EDGAR Online, Inc.

*Warning Letters to Linux End Users.* In response to our belief that parts of our UNIX source code and derivative works have been inappropriately included in the Linux operating system, in May2003, we sent letters to approximately 1,500 large corporations notifying them that using the Linux operating system may violate our asserted intellectual property rights. Subsequently, we began contacting Linux end users about their use of Linux, and in December2003, we began sending additional letters to selected Fortune 1000 Linux end users specifically asserting that using the Linux operating system in a commercial setting violates our rights under the United States Copyright Act, including the Digital Millennium Copyright Act, because certain copyrighted application binary interfaces, or "ABI Code," have been copied from our copyrighted UNIX code base and derivative works and contributed to Linux without proper authorization and without copyright attribution. In the letter we also warned Linux end users that we intend to take appropriate actions to protect our rights and that they may not use our copyrighted code except as authorized by us.

*Linux End User Intellectual Property ("IP") License Initiative.* In August2003, we first offered to Linux end users our IP license in the United States and recently began offering the license in countries outside the United States. The license permits the use of our intellectual property, in binary form only, as contained in the Linux operating system. By purchasing the license, customers will properly compensate us for our UNIX intellectual property as currently found in Linux.

*Requiring UNIX Licensees to Certify Full Compliance with License Agreements.* Beginning in December2003, we began delivering written notice to a large number of our UNIX licensees that they must certify in writing to us that they are in full compliance with their license agreements, including certification that they are not using our proprietary UNIX code and derivative works in Linux, have not allowed unauthorized use of our licensed UNIX by their employees or contractors and have not breached confidentiality provisions relating to licensed UNIX code.

## Intellectual Property Protection Generally

Our SCOsource initiatives rely primarily on a combination of contract rights, copyright laws and a detailed legal strategy. We also require that our employees and consultants sign confidentiality and nondisclosure agreements. We also regulate access to, and distribution of, our documentation and other proprietary information.

We cannot guarantee the success of our SCOsource initiatives and other efforts to protect our intellectual property rights, but we will continue to seek to enforce and pursue these rights through public awareness and the legal system, if necessary. Additionally, we cannot be certain that we will succeed in preventing the future misappropriation of our copyrights or that we will be able to prevent the unauthorized use of our technology in the future.

## Current Status and Strategy

In fiscal 2004, we will continue to pursue our SCOsource initiatives. We will continue to review and evaluate our UNIX license agreements and pursue large vendor contracts similar to those completed in fiscal year 2003 with Sun and Microsoft. Additionally, we will further pursue our SCOsource IP license initiative with end users of Linux. To accomplish this objective, we plan to increase our SCOsource sales team in fiscal year 2004, and may also make the SCOsource IP license available through select SCO resellers.

In an effort to reinforce our ownership rights in UNIX, we brought suit against Novell on January20, 2004 for slander of title seeking relief for, among other things, Novell's alleged bad faith efforts to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare products. We also plan to continue to pursue our litigation against IBM, and have announced that we expect in the near term to commence our first legal action against an end user violating our intellectual property and contractual rights.

10

© 2004. EDGAR Online, Inc.

*Employees*

As of October 31, 2003, we had a total of 300 employees. Of the total employees, 75 were in product development, 86 in sales, 28 in marketing, 35 in customer service and technical support, 16 in customer delivery, five in SCOsource and 55 in administration. From time to time, we also engage independent contractors to support our professional services, product development, sales and marketing organizations. Our employees are not represented by any labor union and are not subject to a collective bargaining agreement, and we have never experienced a work stoppage. In general, we believe our relations with our employees are good.

## Item 2. Properties

We are headquartered in Lindon, Utah, where we lease administrative, sales and marketing and product development facilities. We lease additional facilities for administration, sales and marketing, product development and distribution in Santa Cruz, California, Murray Hill, New Jersey and Dublin, Ireland. The leases for our facilities expire at various dates through 2009.

Our international field operations occupy leased facilities in China, France, Japan, Germany, India, Italy, Korea, Spain, and the United Kingdom among others. We believe that our existing facilities are adequate to meet current business and operating requirements and that additional office space will be available to meet our needs if required.

## Item 3. Legal Proceedings

*IBM*

On or about March 6, 2003, we filed a complaint against IBM. This action is currently pending in the United States District Court for the District of Utah, under the title *The SCO Group, Inc. vs. International Business Machines Corporation* , Civil No. 2:03CV0294. The complaint includes claims for breach of contract, misappropriation of trade secrets, tortious interference, and unfair competition. The complaint also alleges that IBM obtained information concerning the UNIX source code and derivative works from us and inappropriately used and distributed that information in connection with its efforts to promote the Linux operating system. As a result of IBM's breach of contract and unfair competition and the marketplace injury sustained by us, we are requesting damages in an amount to be proven at trial, but no less than $1 billion, together with additional damages through and after the time of trial. On or about June 13, 2003, we provided IBM with notice that IBM's UNIX license agreement with us that underlies IBM's AIX software was terminated.

On or about June 16, 2003, we filed an amended complaint in the IBM case. The amended complaint essentially restates and re-alleges the allegations of the original complaint and expands on those claims in several ways. Most importantly, the amended complaint raises new allegations regarding IBM's actions and breaches through the products and services of Sequent Computer Systems, Inc. ("Sequent"), which IBM acquired. We allege that IBM breached the Sequent agreement in several ways similar to those set forth above and we seek damages for those breaches. We are also seeking injunctive relief on several claims.

IBM has filed a response and counterclaim to the complaint, including a demand for a jury trial. We have filed an answer to the IBM counterclaim denying the claims and asserting affirmative defenses.

In its counterclaim, as amended on September 25, 2003, IBM asserts that we do not have the right to terminate its UNIX license or assert claims based on our ownership of UNIX intellectual property against them or others in the Linux community. In addition, IBM asserts we have breached the GNU General Public License and have infringed certain patents held by IBM. IBM's counterclaims include claims for breach of contract, violation of the Lanham Act, unfair competition, intentional interference

11

© 2004. EDGAR Online, Inc.

with prospective economic relations, unfair and deceptive trade practices, promissory estoppel, copyright infringement and patent infringement. Discovery is ongoing in the case. We intend to vigorously defend these counterclaims.

*Red Hat*

On August 4, 2003, Red Hat filed a complaint against us. The action is currently pending in the United States District Court for the District of Delaware under the case caption *Red Hat, Inc. v. The SCO Group, Inc.,* Civil No 03-772. Red Hat asserts that the Linux operating system does not infringe our UNIX intellectual property rights and seeks a declaratory judgment for non-infringement of copyrights and no misappropriation of trade secrets. In addition, Red Hat claims we have engaged in false advertising in violation of the Lanham Act, deceptive trade practices, unfair competition, tortious interference with prospective business opportunities, trade libel, and disparagement.

On or about September 15, 2003, we filed a motion to dismiss the Red Hat complaint. The motion to dismiss asserts that Red Hat lacks standing and that no case or controversy exists with respect to the claims seeking a declaratory judgment of non-infringement. The motion to dismiss further asserts that Red Hat's claims under the Lanham Act and related state laws are barred by the First Amendment to the U.S. Constitution and the common law privilege of judicial immunity. Red Hat has filed an opposition to our motion to dismiss, but the court has not ruled on the motion. We intend to vigorously defend this action.

*Novell*

On January 20, 2004, we filed suit against Novell, Inc. for slander of title seeking relief for its alleged bad faith effort to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare products. The case is currently pending in the Third Judicial District Court, Salt Lake County, State of Utah, under the caption *The SCO Group, Inc. v. Novell, Inc.* , Case No.040900936. Novell has not yet responded to our complaint.

Among our allegations in the suit against Novell, we allege that Novell has improperly filed copyright registrations in the United States Copyright Office for UNIX technology covered by our copyrights and has made false and misleading public claims that it, and not our company, owns the UNIX and UnixWare copyrights. We also allege that Novell has made false statements with the intent to cause customers and potential customers to not do business with us and has attempted, in bad faith, to block our ability to enforce our copyrights. Additionally, we allege that Novell's false and misleading representations that it owns the UNIX and UnixWare copyrights have caused us irreparable harm to our copyrights, our business, and our reputation.

In the lawsuit, we request preliminary and permanent injunctive relief as well as damages. The injunction would require Novell to assign to us all copyrights that we believe Novell has wrongfully registered, prevent Novell from representing any ownership interest in those copyrights, and require Novell to retract or withdraw all representations it has made regarding its purported ownership of those copyrights.

*IPO Class Action Matter*

We are an issuer defendant in a series of class action lawsuits filed in the United States District Court for the Southern District of New York, involving over 300 issuers that have been consolidated under *In re Initial Public Offering Securities Litigation* , 21 MC 92 (SAS). The plaintiffs, the issuers and the insurance companies have negotiated a Memorandum of Understanding ("MOU") with the intent of settling the dispute between the plaintiffs and the issuers. We have executed this MOU and have been advised that almost all (if not all) of the issuers have elected to proceed under the MOU. The MOU is still subject to court approval and the preparation of appropriate settlement documents. If the

12

© 2004.  EDGAR Online, Inc.

settlement is approved by the court and settlement agreements can be entered into by the parties, and if no cross-claims, counterclaims or third party claims are later asserted, this action will be dismissed with respect to our company and its individuals.

*Other Matters*

In April2003, a former Indian distributor of ours filed a claim in India, requesting summary judgment for payment of $1,428,000, and an order that we trade in India only through the distributor until the claim is paid. The distributor claims that we are responsible to repurchase certain software products and to reimburse the distributor for certain other operating costs. Management does not believe that we are responsible to reimburse the distributor for any operating costs and also believes that the return rights related to any remaining inventory have lapsed. Discovery is ongoing in this case and initial hearings have been held. We intend to vigorously defend this action.

We are party to certain other legal proceedings arising in the ordinary course of business including legal proceedings arising from our SCOsource initiative. Management believes, after consultation with legal counsel, that the ultimate outcome of such legal proceedings will not have a material adverse effect on our results of operations or financial position.

### Item 4. Submission of Matters to a Vote of Security Holders

There were no matters submitted to a vote of security holders during the fourth quarter of fiscal year 2003.

### PART II

### Item 5. Market for the Registrant's Common Equity and Related Stockholder Matters

### Market Price of Our Common Stock

Our common stock initially traded on the Nasdaq National Market beginning in March2000, but has been traded on the Nasdaq SmallCap Market since February2003. In September2002, we changed our trading symbol from "CALD" to "SCOX." The table below sets forth the range of high and low closing prices (as adjusted for the four-for-one reverse split that occurred during March2002) of our common stock as reported on the Nasdaq National Market and the Nasdaq SmallCap Market, as applicable, for the last two years.

|  | SCO Common Stock | |
| --- | --- | --- |
|  | High | Low |
| **Fiscal Year 2003** | | |
| Quarter ended January 31, 2003 | $ 1.70 | $ 1.22 |
| Quarter ended April 30, 2003 | 3.27 | 1.09 |
| Quarter ended July 31, 2003 | 14.84 | 3.21 |
| Quarter ended October 31, 2003 | 20.50 | 9.29 |
| **Fiscal Year 2002** | | |
| Quarter ended January 31, 2002 | $ 6.12 | $ 1.12 |
| Quarter ended April 30, 2002 | 3.32 | 0.90 |
| Quarter ended July 31, 2002 | 1.15 | 0.60 |
| Quarter ended October 31, 2002 | 2.78 | 1.29 |

On January27, 2004, the closing sales price for our common stock as reported by the Nasdaq SmallCap Market was $15.70. As of January27, 2004, there were 347 holders of common stock of record.

13

© 2004. EDGAR Online, Inc.

## Dividend Policy

We have not historically declared or paid any cash dividends on shares of our common stock and plan to retain our future earnings, if any, to fund the development and growth of our business. However, dividends will begin to accrue on the outstanding shares of our SeriesA Convertible Preferred Stock after the first anniversary of the October16, 2003 closing of our $50,000,000 private placement of such shares and will be paid quarterly at a rate of 8percent per annum, subject to annual increases of 2percent per annum, not to exceed 12percent per annum. We will have the flexibility to pay these dividends in cash or additional shares of SeriesA Convertible Preferred Stock, subject to certain limitations.

## Recent Sales of Unregistered Securities

On October16, 2003, we issued 50,000 shares of our SeriesA Convertible Preferred Stock to two institutional investors for an aggregate cash offering price of $50,000,000 in connection with a private placement offering. Our net proceeds from the sale of shares of SeriesA Convertible Preferred Stock were $47,740,000, which included the payment of a $2,000,000 commission to Morgan Keegan& Company,Inc., our financial advisor for this financing transaction.

The SeriesA Convertible Preferred Stock is convertible into shares of our common stock at an initial conversion price of $16.93 per share (which may be adjusted for stock splits, stock dividends or similar occurrences in the future). The holders of the SeriesA Convertible Preferred Stock have the right to convert their preferred shares into shares of common stock any time at their option, provided they convert enough preferred shares to receive at least 100,000 shares of common stock and subject to certain other limitations. Additionally, we may force conversion of the outstanding shares of SeriesA Convertible Preferred Stock at any time the market price of our common stock exceeds 150percent of the then prevailing conversion price per share for 20 consecutive trading days, provided that we satisfy certain other requirements.

We sold the unregistered, restricted shares of SeriesA Convertible Preferred Stock in our private placement in reliance on the exemptions from registration provided by Section4(2) of, and Rule506 of RegulationD under, the Securities Act of 1933, as amended, as a transaction not involving a public offering. In connection with the issuance:

- each of the two participating institutional investors represented that (i)it was an accredited investor as that term is defined in RegulationD under the Securities Act, (ii)that the securities it acquired cannot be resold without registration under the Securities Act, except in reliance upon an exemption there from, and (iii)it intended to acquire the securities for investment only and not with a view to the distribution thereof; and

- we did not engage in any general solicitation or advertisement for the issuance, and we affixed appropriate legends to the certificates representing the shares of SeriesA Convertible Preferred Stock issued in the transaction.

## Equity Compensation Plans

We maintain our 1998 Stock Option Plan, our 1999 Omnibus Stock Incentive Plan, our 2002 Omnibus Stock Incentive Plan, and our 2000 Employee Stock Purchase Plan. We are no longer granting awards under the 1998 Stock Option Plan, which was superseded by the 1999 Omnibus Stock Incentive Plan.

14

© 2004. EDGAR Online, Inc.

The following table provides information about equity awards under each of our equity compensation plans as of October 31, 2003, (in thousands, except per share amounts):

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 3,661 $ | 3.74 | 811(1 )(2) |

(1)

    The 2002 Omnibus Incentive Plan incorporates an evergreen formula pursuant to which on each November 1, the aggregate number of shares reserved for issuance under the 2002 Plan will increase by a number of shares equal to three percent of the outstanding shares on the day preceding (October 31). The ESPP incorporates an evergreen formula pursuant to which on November 1 of each year the aggregate number of shares reserved for issuance under the ESPP will increase by a number of shares equal to one percent of the outstanding shares on the day preceding (October 31).

(2)

    Of these shares, 801,000 shares remain available for purchase under the ESPP.

## Item 6. Selected Financial Data

The following selected financial data set forth below should be read in conjunction with the consolidated financial statements and the related notes included elsewhere in this Form 10-K and in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in Item 7 of this Form 10-K. The selected statement of operations data for the years ended October 31, 2003, 2002 and 2001 and the selected balance sheet data as of October 31, 2003 and 2002 are derived from, and are qualified by reference to, the audited consolidated financial statements and related notes in this Form 10-K. The selected statement of operations data for the years

15

ended October 31, 2000 and 1999 and the selected balance sheet data as of October 31, 2001, 2000 and 1999 are derived from audited consolidated financial statements not appearing in this Form 10-K.

| | | Years Ended October 31, | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | | (In thousands, except per share data) | | | |
| **Statement of Operations Data:** | | | | | |
| Total revenue | $ 79,254 | $ 64,241 | $ 40,441 | $ 4,274 | $ 3,050 |
| Gross margin | 59,332 | 45,925 | 25,518 | 253 | 124 |
| Income (loss) from operations | 3,436 | (24,176 ) | (133,636 ) | (31,999 ) | (9,103 ) |
| Net income available (loss applicable) to common stockholders | 5,304 | (24,877 ) | (131,357 ) | (39,176 ) | (9,367 ) |
| Basic net income (loss) per common share | $ 0.43 | $ (1.93 ) | $ (10.92 ) | $ (4.76 ) | $ (2.04 ) |
| Diluted net income (loss) per common share | $ 0.34 | $ (1.93 ) | $ (10.92 ) | $ (4.76 ) | $ (2.04 ) |
| Weighted average basic common shares | 12,261 | 12,893 | 12,024 | 8,231 | 4,614 |
| Weighted averaged diluted common shares | 15,679 | 12,893 | 12,024 | 8,231 | 4,614 |

| | | As of October 31, | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | | (In thousands) | | | |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 64,428 | $ 6,589 | $ 20,541 | $ 36,560 | $ 122 |
| Working capital (deficit) | 37,168 | (6,332 ) | 14,401 | 88,680 | 678 |
| Total assets | 94,952 | 37,406 | 74,859 | 107,518 | 3,714 |
| Long-term liabilities | 508 | 1,625 | 5,925 | — | 6 |
| Series A redeemable preferred stock | 29,671 | — | — | — | — |
| Total stockholders' equity | 19,516 | 8,177 | 34,604 | 102,215 | 1,516 |

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*This Management's Discussion and Analysis of Financial Condition and Results of Operations and other parts of this Form 10-K contain forward-looking statements that involve risks and uncertainties. Forward-looking statements can also be identified by words such as "intends," "anticipates," "expects," "believes," "plans," "predicts," and similar terms. Forward-looking statements are not guarantees of future performance and our actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in the subsection entitled "Forward Looking Statements and Factors That May Affect Future Results and Financial Condition" and the subsection entitled "Risk Factors" below under Part II, Item 7A of this Form 10-K. The following discussion should be read in conjunction with our consolidated financial statements and notes thereto included in Part II, Item 8 of this Form 10-K. All information presented herein is based on our fiscal year ended October 31, 2003. We assume no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

### Overview

*Historical Background.* We originally incorporated as Caldera Systems, Inc., a Utah corporation ("Caldera Systems"), on August 21, 1998, and reincorporated as a Delaware corporation on March 6, 2000. In March 2000, we completed an initial public offering of our common stock. On May 7, 2001, we formed a new holding company in Delaware under the name of Caldera International, Inc. to acquire substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation, (now known as Tarantella, Inc.). In connection with this acquisition, Caldera Systems became a wholly-owned subsidiary of Caldera International, Inc. Former holders of

16

shares and options to purchase shares of Caldera Systems received an equal number of shares and options to purchase shares in Caldera International,Inc. Our operating results for fiscal year 2001 include the results of Caldera Systems for the period of November1 through May6 and include the results of Caldera International (which included the acquired operations of the server and professional services groups from The Santa Cruz Operation) from May7 through October31. On May16, 2003, our stockholders approved our corporate name change to The SCO Group,Inc.

*Recent Developments.* During fiscal year 2003, we launched our SCOsource intellectual property initiatives and brought a lawsuit against IBM. We disclose our lawsuit against IBM and its current status in more detail above under Part1, Item 3 of this Form10-K. On January20, 2004, we brought suit against Novell,Inc. for slander of title seeking relief for Novell's alleged bad faith effort to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare products. We disclose our lawsuit against Novell in more detail above under PartI, Item 3 of this Form10-K.

During fiscal year 2003, we increased our cash balance as a combined result of improved operations in our core UNIX business and license fees generated from our SCOsource initiatives. To further strengthen our competitive position, allow for investment in our UNIX business and pursue our intellectual property protection strategy, we issued 50,000 shares of our SeriesA Convertible Preferred Stock and raised net proceeds of $47,740,000. We believe that our cash and equivalents balance as of October31, 2003 of $64,428,000 will be adequate for us to execute our current UNIX business strategy as well as to continue to pursue our intellectual property claims. Our operating strategy for fiscal year 2004 includes strengthening our core UNIX business by investing in our UNIX technology as well as pursuing our SCOsource licensing initiatives to protect our rights in the UNIX source code and our other intellectual property.

**Business Focus**

We generate revenue primarily from two sources: product and services revenue from our UNIX operating systems business and license fees from our SCOsource licensing business.

*UNIX Business.* Our UNIX business serves the needs of small-to-medium sized businesses, including replicated site franchisees of Fortune 1000 companies, by providing reliable, cost effective UNIX operating systems and software products to power computers running on Intel architecture. Our largest source of UNIX business revenue is derived from our worldwide, indirect, leveraged channel of partners, which includes distributors and independent solution providers. We have local offices in a number of countries that provide support and services to customers and resellers in that geographic area. The other principal channel for selling and marketing our UNIX products is through major corporations that have a large number of replicated sites or franchisees. We access these corporations through their information technology or purchasing departments with our Area Sales Managers in the United States and through our reseller channel in countries outside the United States. In addition, we also sell our operating system products to OEMsthrough our direct sales team in the United States and our reseller channel in countries outside the United States. Until fiscal year 2003, the majority of our revenue and our operating expenses were derived from our UNIX business.

The revenue derived from our UNIX business was $53,408,000, $64,241,000 and $40,441,000 for fiscal years ended 2003, 2002 and 2001. The revenue from this business has been declining in each of the last four years primarily as a result of increased competition from alternative operating systems, particularly Linux, lower information technology spending and the general economic slowdown. In our results of operations, we recognize revenue from agreements for support and maintenance contracts and other long-term contracts that have been previously invoiced and are included in deferred revenue. Our deferred revenue balance has declined from $10,056,000 as of October31, 2002 to $5,501,000 as of October31, 2003, and this decline in deferred revenue may continue into future quarters, which may

17

have a negative impact on our operating system platform products revenue. Our future operating system platform revenue may be adversely impacted and may continue to decline if we are unable to replenish these deferred revenue balances with long-term maintenance and support contracts or replace them with other sustainable revenue streams. If we are unable to continue to generate positive cash flow and profitable operations, our operations may be adversely impacted.

The decline in our UNIX business revenue may be accelerated if industry partners withdraw their support as a result of our SCOsource initiatives and in particular any lawsuits against end users violating our intellectual property and contractual rights. Our SCOsource initiatives, particularly lawsuits against such end users, may cause industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products. This would lead to an accelerated decline in our UNIX products and services revenue.

In an effort to offset this decrease in UNIX revenue, we have significantly decreased our operating costs and increased our gross margin over the last three fiscal years. Operating costs have decreased from $159,154,000 in fiscal year 2001 to $70,101,000 in fiscal year 2002 to $55,896,000 in fiscal year 2003. We have reduced the number of employees and eliminated redundant facilities while still preserving our worldwide infrastructure. Our gross margin percentage from our UNIX business has increased from 63percent in fiscal year 2001, to 71percent in fiscal year 2002 to 80percent in fiscal year 2003. We have accomplished this by reducing excess manufacturing and overhead costs, reducing our third-party royalty and technology costs and decreasing the number of employees in our services organization.

An important initiative for our UNIX business for the 2004 fiscal year will be to maintain the level of investment in and commitment to our UNIX operating systems. As part of this initiative, we intend to increase our research and development costs for fiscal year 2004 and provide our OpenServer and UnixWare products with increased system reliability, maintain backward compatibility with existing applications and software, provide increased application support, provide additional hardware support, integrate widely-used internet applications and increase system performance. These enhancements will not have a direct impact on our short-term UNIX revenue because of the long adoption cycle for new operating system purchases and our long operating system product sales cycle.

*SCOsource Business.* Over the last fiscal year, we became aware that our UNIX code and derivative works had been inappropriately included in the Linux operating system. We believe the inclusion of our UNIX code and derivative works in Linux has been a major contributor to the decline in our UNIX business because users of Linux generally do not pay for the operating system, only minimal fees, if any, for service and maintenance. The Linux operating system competes directly with our OpenServer and UnixWare products and has taken significant market share from these products.

To offset the decline in our UNIX business and review the status of our UNIX licensing and sublicensing agreements, we initiated our SCOsource licensing initiatives in January2003. This effort resulted in the execution of two significant license agreements during fiscal year 2003 and generated $25,846,000 in SCOsource business revenue.

Our future success with our SCOsource initiatives and future revenue from SCOsource licenses will depend on our ability to protect our UNIX intellectual property. We will continue to devote resources to our SCOsource initiatives, and we expect legal fees and other SCOsource related costs will substantially increase in fiscal year 2004. In addition to pursuing large vendor licensing contracts similar to those executed in fiscal year 2003, we are implementing an IP licensing campaign to Linux end users. This IP licensing effort will allow Linux end users to continue to use our UNIX source code and derivative works found in Linux. We have announced worldwide availability of the IP license and plan to significantly increase our SCOsource sales team in fiscal 2004 to implement these licensing strategies.

18

© 2004. EDGAR Online, Inc.

Because of the uncertainties related to SCOsource licensing revenue, we are unable to estimate the amount and timing of future SCOsource licensing revenue. This uncertainty represents a significant risk and challenge for us, both in the short and long term. If we do receive revenue from this source, it may be sporadic and fluctuate from quarter to quarter. Our SCOsource initiatives are unlikely to produce a stable or predictable revenue stream for the foreseeable future. Additionally, the success of these initiatives may depend on the strength of our intellectual property rights and contractual claims regarding UNIX, including the strength of our claim that unauthorized UNIX source code and derivative works are prevalent in Linux. We do not expect significant SCOsource revenue in the first quarter of fiscal year 2004, but anticipate that revenue from vendor licenses and IP licenses will increase throughout fiscal year 2004.

**Critical Accounting Policies**

The preparation of financial statements and related disclosures in conformity with generally accepted accounting principles in the United States and our discussion and analysis of our financial condition and results of operations requires us to make judgments, assumptions and estimates that affect the amounts reported in our consolidated financial statements and accompanying notes. Note1 of the notes to consolidated financial statements in PartII, Item 8 of this Form10-K describes the significant accounting policies and methods used in preparation of our consolidated financial statements. We base our estimates on historical experience, current trends, future projections and on various other assumptions we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results may differ from these estimates. We believe the following to be our critical accounting policies because they are both important to the portrayal of our financial condition and results and they require us to make judgments and estimates about matters that are inherently uncertain.

Our critical accounting policies and estimates include the following:

- Revenue recognition;

- Deferred income taxes and related valuation allowances;

- Fair value of derivative financial instrument;

- Impairment of long-lived assets; and

- Allowances for doubtful accounts.

*Revenue Recognition.* We recognize revenue in accordance with Statement of Accounting Position ("SOP") 97-2, as amended, and Staff Accounting Bulletin ("SAB") 104. Revenue recognition in accordance with these pronouncements can be complex due to the nature and variability of our sales transactions. We recognize products revenue and SCOsource revenue upon shipment if a signed contract exists, the fee is fixed and determinable, collection of the resulting receivable is probable and product returns are reasonably estimable, except for sales to distributors, which are recognized upon sale by the distributor to resellers or end users. We recognize product revenue from royalty payments upon receipt of quarterly royalty reports from OEMsrelated to their product sales.

The majority of our revenue transactions relate to product sales only. On occasion we have revenue transactions that include multiple elements (i.e., delivered and undelivered elements including maintenance, support and other services). For invoices or contracts involving multiple elements we allocate revenue to each component of the contract based on objective evidence of its fair value. The fair value of each element is based on amounts charged when such elements are sold in separate transactions. We recognize revenue allocated to undelivered products when the criteria for revenue recognition set forth above have been met.

19

© 2004. EDGAR Online, Inc.

Estimates used in our revenue recognition include the determination of credit-worthiness and verification of sales-out reporting to end users through our two-tier distribution channel. To the extent these estimates were inaccurate; our recognized revenue would be adversely impacted and would harm our results of operations. Additionally, if our business conditions change or our revenue contracts begin to contain more multiple elements, our future revenue recognition in future periods may be impacted as a larger component of revenue may be deferred. As of October 31, 2003, our deferred revenue balance was $5,501,000 and related primarily to product maintenance and support contracts.

*Deferred Income Taxes and Related Valuation Allowance.* The amount, and ultimate realization, of our deferred income tax assets depends, in part, upon the tax laws in effect, our future earnings and other future events, the effects of which cannot be determined. We have provided a valuation allowance of $52,908,000 and $50,317,000 against our entire net deferred tax asset as of October 31, 2003 and 2002. The valuation allowance was recorded because of our history of net operating losses and the uncertainties regarding our future operating profitability and taxable income.

*Fair Value of Derivative Financial Instrument.* On October 16, 2003, we issued 50,000 shares of our Series A Convertible Preferred Stock for $1,000 per share. The net proceeds from the sale of the preferred stock were $47,740,000. The terms of the preferred stock include conversion and a number of redemption provisions that represent a derivative financial instrument under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. We determined that the conversion feature allowing the holders of the preferred stock to acquire common shares is an embedded derivative financial instrument that does not qualify as a scope exemption under the provisions of Emerging Issues Task Force ("EITF") 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in a Company's Own Stock."

As of October 16, 2003, through the assistance of an independent valuation firm, we determined the initial fair value of the derivative was $18,069,000 and the value of the preferred stock was $29,671,000. We were required to account for the conversion feature as an embedded derivative since the preferred stock instrument did not entitle the holders to equity features such as voting rights and board representation. Significant estimates used by management in the valuation of the preferred stock included an expected term of three years, a yield rate for the security of 15 percent and the value of our common stock of $19.89 on the date the preferred stock transaction closed. As of October 31, 2003, the fair value of the derivative was $15,224,000 and the decrease in fair value of $2,845,000 was recorded as other income in our consolidated statement of operations for fiscal year 2003.

To account for the derivative, we will mark-to-market its value at each balance sheet date and will include in our consolidated statement of operations any changes in value as a component of other income or expense. Changes in the value of the derivative may be significant, as the value of our common stock at each balance sheet date will have a significant impact on the value of the derivative. For example, an increase in the value of our common stock by $1.00 may require us to record an expense of approximately $1,000,000, and, conversely, a decrease in our common stock by $1.00 may require us to record income of approximately $1,000,000. Additionally, had different estimates been used in the valuation of the derivative, the valuation results could have been materially different than reported, which would have impacted our results of operations.

*Impairment of Long-lived Assets.* We review our long-lived assets for impairment when events or changes in circumstances indicate that the book value of an asset may not be recoverable. We evaluate, at each balance sheet date, whether events and circumstances have occurred which indicate possible impairment. The carrying value of a long-lived asset is considered impaired when the anticipated cumulative undiscounted cash flows of the related asset or group of assets is less than the carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the estimated fair market value of the long-lived asset.

© 2004. EDGAR Online, Inc.

We performed an impairment analysis, utilizing a valuation of our goodwill as of October 31, 2003 in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," and determined that the goodwill reported in the accompanying consolidated balance sheets is not impaired.

Write-downs of intangible assets may be necessary if the future fair value of these assets is less than carrying value. If the operating trends for our UNIX business continue to decline or the value of our common stock were to significantly decrease, we may be required to record an impairment charge in a future period related to their carrying value of our long-lived assets.

*Allowance for Doubtful Accounts.* We offer credit terms on the sale of our products to a majority of our customers and require no collateral from these customers. We perform ongoing credit evaluations of our customers' financial condition and maintain an allowance for doubtful accounts based upon our historical collection experience and expected collectibility of all accounts receivable and have applied these policies consistently throughout fiscal years 2003, 2002 and 2001. Our allowance for bad debts based on our historical experience and specific review as of October 31, 2003, was $230,000. Our past experience has resulted in minimal differences from the actual amounts provided for bad debts and our recorded estimates. However, our actual bad debts in future periods may differ from our current estimates and the differences may be material, which may have an adverse impact on our future accounts receivable and cash position.

**Results of Operations**

The acquisition of substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation, which was completed in May 2001, significantly increased our revenue and operating expenses. Results for fiscal year 2001 are not directly comparable to fiscal years 2003 and 2002 because the operating results of the server and professional services groups acquired from The Santa Cruz Operation are only included in our consolidated statement of operations for the last two quarters of fiscal year 2001.

21

© 2004. EDGAR Online, Inc.

The following table presents our results of operations for the fiscal years ended October 31, 2003, 2002 and 2001:

| | | Years Ended October 31, | | | |
|---|---|---|---|---|---|
| | | 2003 | 2002 | | 2001 |
| | | | (In thousands) | | |
| **Statement of Operations Data:** | | | | | |
| Revenue: | | | | | |
| Products | $ | 45,028 | $ | 52,975 | $ | 33,878 |
| SCOsource licensing | | 25,846 | — | | — |
| Services | | 8,380 | 11,266 | | 6,563 |
| Total revenue | | 79,254 | 64,241 | | 40,441 |
| Cost of revenue: | | | | | |
| Products | | 4,405 | 7,558 | | 6,966 |
| SCOsource licensing | | 9,163 | — | | — |
| Services | | 6,354 | 10,758 | | 7,957 |
| Total cost of revenue | | 19,922 | 18,316 | | 14,923 |
| Gross margin | | 59,332 | 45,925 | | 25,518 |
| Operating expenses: | | | | | |
| Sales and marketing | | 24,392 | 29,554 | | 33,858 |
| Research and development | | 11,012 | 17,558 | | 16,761 |
| General and administrative | | 6,230 | 9,307 | | 9,257 |
| Restructuring charges | | 498 | 6,728 | | 3,130 |
| Amortization of goodwill and intangibles | | 3,190 | 2,853 | | 10,664 |
| Loss on disposition and impairment of long-lives assets | | 164 | 1,796 | | 73,700 |
| Write-off of investments | | 250 | 1,180 | | 8,309 |
| Stock-based compensation | | 1,204 | 1,125 | | 1,373 |
| Compensation to law firms | | 8,956 | — | | — |
| In-process research and development | | — | — | | 1,500 |
| Cost-sharing arrangement with The Santa Cruz Operation | | — | — | | 602 |
| Total operating expenses | | 55,896 | 70,101 | | 159,154 |
| Income (loss) from operations | | 3,436 | (24,176 ) | | (133,636 ) |
| Equity in losses of affiliates | | (62 ) | (50 ) | | (648 ) |
| Other income (expense), net | | 2,827 | (168 ) | | 3,505 |
| Provision for income taxes | | (774 ) | (483 ) | | (578 ) |
| Net income (loss) | $ | 5,427 | $ | (24,877 ) | $ | (131,357 ) |

## Fiscal Years Ended October 31, 2003, 2002 and 2001

*Revenue*

| | | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|
| Revenue | $ | 79,254,000 | 23 % | $ 64,241,000 | 59 % | $ 40,441,000 |

Revenue for fiscal year 2003 increased by $15,013,000, or 23 percent, from fiscal year 2002 and this increase was primarily attributable to license fees generated from our SCOsource licensing initiatives offset by decreases in UNIX products and services revenue. Revenue for fiscal year 2002 increased by $23,800,000, or 59 percent, over fiscal year 2001 and this increase was primarily attributable to a full

22

© 2004. EDGAR Online, Inc.

year of acquired operations from the server and professional services groups acquired from The Santa Cruz Operation.

Revenue generated from our UNIX operating divisions (Americas and International) and SCOsource division was as follows:

| | | 2003 | Change | | 2002 | Change | | 2001 |
|---|---|---|---|---|---|---|---|---|
| Americas revenue | $ | 29,175,000 | (12 % ) | $ | 32,973,000 | 56 % | $ | 21,103,000 |
| Percent of total revenue | | 37 % | | | 51 % | | | 52 % |
| International revenue | | 24,124,000 | (23 % ) | | 31,268,000 | 62 % | | 19,338,000 |
| Percent of total revenue | | 30 % | | | 49 % | | | 48 % |
| SCOsource revenue | | 25,846,000 | n/a | | — | n/a | | — |
| Percent of total revenue | | 33 % | | | — | | | — |
| Other revenue | | 109,000 | n/a | | — | n/a | | — |
| Percent of total revenue | | 0 % | | | — | | | — |

The decrease in revenue from our International division for the 2003 fiscal year compared to prior periods was primarily related to the negative impact of the slowing European economy as well as from increased competition from other operating system products, particularly Linux, in Europe and Asia. We anticipate for fiscal year 2004 that UNIX revenue generated in the Americas and the International divisions will be lower than revenue generated in fiscal year 2003 and that the percentage split between these two UNIX divisions will be generally consistent with that in fiscal year 2003. Our UNIX product and services revenue may be lower than currently anticipated if we lose the support of any of our existing hardware and software vendors or our key industry partners withdraw their marketing and certification support or direct their support to our competitors. This may occur as a result of our SCOsource initiatives and in particular as a result of any lawsuits we may bring against end users violating our intellectual property and contractual rights.

*Products Revenue*

| | | 2003 | Change | | 2002 | Change | | 2001 |
|---|---|---|---|---|---|---|---|---|
| Products revenue | $ | 45,028,000 | (15 % ) | $ | 52,975,000 | 56 % | $ | 33,878,000 |
| Percent of total revenue | | 57 % | | | 82 % | | | 84 % |

Our products revenue consists of software licenses for UNIX products such as OpenServer and UnixWare, as well as sales of UNIX-related products. Products revenue also includes revenue derived from OEMs. We rely heavily on our two-tier distribution channel for approximately 50 percent of our products revenue in the Americas and approximately 90 percent of our revenue in our International division, and any disruption in our distribution channel could have an adverse impact on future revenue.

The decrease in products revenue in fiscal year 2003 as compared with fiscal year 2002 was attributable to decreased sales of OpenServer and UnixWare products primarily resulting from increased competition in the operating system market, particularly Linux, and from a decrease in information technology spending and the worldwide economic slowdown. This impact was felt in all of our distribution channels and we believe that this competition from Linux will continue in future periods. The increase in product revenue in fiscal year 2002 over fiscal year 2001 was primarily attributable to revenue from a full year's sales of OpenServer and UnixWare products acquired as part of the acquisition of the server and professional services groups from The Santa Cruz Operation. We recognized OpenServer and UnixWare revenue only in the final two quarters of fiscal year 2001.

23

© 2004.  EDGAR Online, Inc.

Our products revenue was derived primarily from sales of our OpenServer and UnixWare products. Other products revenue consists mainly of product maintenance and other UNIX-related products. Revenue for these products was as follows:

| | | 2003 | Change | | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|---|
| OpenServer revenue | $ | 22,162,000 | (24 %) | $ | 29,108,000 | 77 %$ | 16,464,000 |
| Percent of products revenue | | 49 % | | | 55 % | | 49 % |
| UnixWare revenue | | 14,083,000 | (0 %) | | 14,154,000 | 58 % | 8,970,000 |
| Percent of products revenue | | 31 % | | | 27 % | | 26 % |
| Other products revenue | | 8,783,000 | (10 %) | | 9,713,000 | 15 % | 8,444,000 |
| Percent of products revenue | | 20 % | | | 18 % | | 25 % |

*SCOsource Licensing Revenue*

| | | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|
| SCOsource licensing revenue | $ | 25,846,000 | n/a | $ – | n/a | $ — |
| Percent of total revenue | | 33 % | | – | | — |

SCOsource licensing revenue was $25,846,000 for fiscal year 2003 as compared to no revenue from this source for fiscal years 2002 and 2001. This revenue is the result of our SCOsource initiatives, including our intellectual property licensing program, launched in January2003. We initiated SCOsource for the purpose of protecting our intellectual property rights in our UNIX source code and derivative works. The SCOsource licensing revenue in fiscal year 2003 represents fees associated with vendor licenses entered into during the fiscal year from Sun and Microsoft. In fiscal year 2004, we anticipate continued revenue from our SCOsource activities in the form of vendor licenses and IP licenses, and that this revenue will be minimal in our first quarter of fiscal year 2004 and increase in future quarters. However, we are unable to predict the amount and timing of revenue from our SCOsource initiatives for future periods because of our lack of historical experience with this revenue source.

*Services Revenue*

| | | 2003 | Change | | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|---|
| Services revenue | $ | 8,380,000 | (26 %) | $ | 11,266,000 | 72 %$ | 6,563,000 |
| Percent of total revenue | | 11 % | | | 18 % | | 16 % |

Services revenue consists primarily of annual and incident support fees, engineering services fees, professional services and education fees. These fees are typically charged and invoiced separately from UNIX products sales. The decrease in services revenue in fiscal year 2002, compared to fiscal year 2003 of $2,886,000 was in part due to a decrease in professional services resulting from a decrease in the demand for our custom enterprise-level projects as well as from a decrease in our support services, engineering services and team services agreements. The increase in services revenue in fiscal year 2002 over fiscal year 2001 was primarily attributable to a full year of revenue in fiscal year 2002 generated by the support and professional services groups acquired from The Santa Cruz Operation which generated services revenue for us only in the final two quarters of fiscal year 2001 .

The majority of our support and professional services revenue continues to be derived from services for UNIX-based operating system products. Our future level of services revenue depends in part on our ability to generate UNIX products revenue from new customers as well as the renewal of certain annual support and services agreements from existing UNIX customers.

© 2004. EDGAR Online, Inc.

*Cost of Products Revenue*

|  | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Cost of products revenue | $ 4,405,000 | (42 % $ ) | 7,558,000 | 8 %$ | 6,966,000 |
| Percentage of products revenue | 10 % | | 14 % | | 21 % |

Cost of products revenue includes primarily overhead costs, manufacturing costs, royalties to third-party vendors and technology costs. Cost of products revenue decreased by $3,153,000 in fiscal year 2003 compared to fiscal year 2002. This decrease was primarily attributable to reduced overhead and manufacturing costs resulting from our cost reduction efforts, decreased royalties to third party vendors and lower amortized technology costs. Cost of products revenue increased by $592,000 in fiscal year 2002 compared to fiscal year 2001 primarily because of a full year of costs in fiscal year 2002 resulting from the acquired operations from The Santa Cruz Operation. These costs for the full year were partially offset by our initial undertaking to eliminate duplicate costs in manufacturing overhead.

For fiscal year 2004, we expect our cost of products revenue to be slightly less than in fiscal year 2003.

*Cost of SCOsource Licensing Revenue*

|  | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Cost of SCOsource licensing revenue | $ 9,163,000 | n/a $ — | n/a $ — | | |
| Percentage of SCOsource licensing revenue | 35 % | — | — | | |

Cost of SCOsource licensing revenue includes the salaries and related personnel costs of employees dedicated to the SCOsource licensing initiatives, legal and professional fees incurred in connection with our SCOsource initiatives, and an allocation of corporate costs.

Cost of SCOsource licensing revenue will fluctuate from quarter to quarter due in part to the unpredictability of the related SCOsource revenue and the level of legal and professional expenses incurred in connection with our efforts to protect our intellectual property rights. Legal expenses may include contingency payments made to the law firms engaged by us to protect our intellectual property rights. For fiscal year 2004, we will substantially increase the level of internal resources dedicated to our SCOsource initiatives as well as substantially increase the level of our legal expenses, however, we are unable to predict the percentage of cost of SCOsource licensing revenue for future quarters due to the unpredictability of the related licensing revenue.

*Cost of Services Revenue*

|  | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Cost of services revenue | $ 6,354,000 | (41 % $ ) | 10,758,000 | 35 %$ | 7,957,000 |
| Percentage of services revenue | 76 % | | 95 % | | 121 % |

Cost of services revenue includes the salaries and related personnel costs of employees delivering services revenue as well as third-party service agreements. Cost of services revenue decreased by $4,404,000 for fiscal year 2003 compared to fiscal year 2002. This decrease was attributable to reduced employee and related costs in our support services and professional services groups as well as the elimination of certain third party support contracts in order to increase the gross margin for these groups. Cost of services revenue increased by $2,801,000 for fiscal year 2002 compared to fiscal year 2001. This increase was primarily attributable to a full year of costs in fiscal year 2002 resulting from the acquired operations from The Santa Cruz Operation.

25

© 2004. EDGAR Online, Inc.

For fiscal year 2004, we expect our cost of services revenue to be slightly less than in fiscal year 2003.

*Sales and Marketing*

| | | 2003 | Change | | 2002 | Change | | 2001 |
|---|---|---|---|---|---|---|---|---|
| Sales and marketing expense | $ | 24,392,000 | (17 % ) | $ | 29,554,000 | (13 % ) | $ | 33,858,000 |
| Percentage of total revenue | | 31 % | | | 46 % | | | 84 % |

Sales and marketing expenses consist of the salaries, commissions and other personnel costs of employees involved in the revenue generation process, as well as advertising and corporate allocations. The decrease in sales and marketing expenses from fiscal year 2002 to fiscal year 2003 of $5,162,000 and from fiscal year 2001 to fiscal year 2002 of $4,304,000 was primarily attributable to reductions in sales and marketing employees, reduced travel expenses, and less commissions and lower co-operative advertising costs as a result of lower revenue. Our sales and marketing personnel decreased from 176 as of October31, 2001, to 133 as of October31, 2002, to 114 as of October31, 2003.

For fiscal year 2004, we anticipate that sales and marketing expenses will remain substantially consistent with 2003.

*Research and Development*

| | | 2003 | Change | | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|---|
| Research and development expense | $ | 11,012,000 | (37 % ) | $ | 17,558,000 | 5 % $ | 16,761,000 |
| Percentage of total revenue | | 14 % | | | 27 % | | 41 % |

Research and development expenses consist of the salaries and benefits of software engineers, consulting expenses and corporate allocations. The decrease in research and development expense in fiscal year 2003 of $6,546,000 compared to fiscal year 2002 was primarily attributable to work force reductions. The increase in research and development expense in fiscal year 2002 of $797,000 over fiscal year 2001 was attributable to development work on our UNIX operating systems acquired during fiscal year 2001. Our research and development personnel decreased from 136 as of October31, 2001, to 75 for fiscal year-ends October31, 2002 and 2003.

For fiscal year 2004, we anticipate that research and development expenses will increase from fiscal year 2003 due to our recently initiated efforts to maintain and enhance our UNIX products.

*General and Administrative*

| | | 2003 | Change | | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|---|
| General and administrative expense | $ | 6,230,000 | (33 % ) | $ | 9,307,000 | 1 % $ | 9,257,000 |
| Percentage of total revenue | | 8 % | | | 14 % | | 23 % |

26

© 2004. EDGAR Online, Inc.

General and administrative expenses consist of the salaries and benefits of finance, human resources, and executive management and expenses for professional services and corporate allocations. The decrease in general and administrative expense from fiscal year 2002 to fiscal year 2003 of $3,077,000 was primarily attributable to staff centralization and reduction programs as well as decreases in external professional services. The increase from fiscal year 2001 to fiscal year 2002 of $50,000 was primarily attributable to support required for our worldwide operations acquired from The Santa Cruz Operation for the entire fiscal year following the acquisition. Our general and administrative personnel decreased from 103 as of October 31, 2001, to 61 as of October 31, 2002, to 55 as of October 31, 2003.

For fiscal year 2004, we anticipate that general and administrative expenses will increase in comparison with fiscal year 2003 due to the new compliance and reporting regulations under the Sarbanes-Oxley Act and other new regulatory requirements, increased legal costs as a result of lawsuits against end users violating our intellectual property and contractual rights and other litigation costs not categorized as SCOsource cost of revenue.

*Restructuring Charges*

| | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Restructuring charges | $ 498,000 | (93 %) | $ 6,728,000 | 115 % | $ 3,130,000 |
| Percentage of total revenue | 1 % | | 10 % | | 8 % |

During fiscal years 2003, 2002 and 2001, we recorded restructuring charges totaling $498,000, $6,728,000 and $3,130,000, respectively. The restructuring charges for fiscal years 2003, 2002 and 2001 were comprised of termination payments made to employees in connection with reductions in headcount, closure of certain facilities and adjustments to previously recorded amounts as actual payments made were less than recorded accruals. The decrease in fiscal year 2003 from fiscal years 2002 and 2001 was primarily attributable to fewer terminated employees and fewer vacated facilities.

The detail of the restructuring charges for fiscal years 2003, 2002 and 2001, are as follows (in thousands):

| Fiscal 2001 | Balance at November 1, 2000 | Additions | Adjustments | Utilization | Balance at October 31, 2001 |
|---|---|---|---|---|---|
| Severance and related | $ — | $ 2,346 | $ — | $ (1,654 ) | $ 692 |
| Facilities | — | 784 | 1,507 * | (239 ) | 2,052 |
| Total | $ — | $ 3,130 | $ 1,507 | $ (1,893 ) | $ 2,744 |

*The facilities adjustment of $1,507,000 was recorded in connection with the Company's acquisition of The Santa Cruz Operation.

| Fiscal 2002 | Balance at November 1, 2001 | Additions | Adjustments | Utilization | Balance at October 31, 2002 |
|---|---|---|---|---|---|
| Severance and related | $ 692 | $ 4,053 | $ — | $ (4,185 ) | $ 560 |
| Facilities | 2,052 | 4,236 | (1,561 )* | (2,610 ) | 2,117 |
| Total | $ 2,744 | $ 8,289 | $ (1,561 ) | $ (6,795 ) | $ 2,677 |

* The facilities adjustment of $1,561,000 was the result of successfully re-negotiating an existing lease commitment.

27

© 2004. EDGAR Online, Inc.

| Fiscal 2003 | Balance at November 1, 2002 | | Additions | | Adjustments | | Utilization | | Balance at October 31, 2003 |
|---|---|---|---|---|---|---|---|---|---|
| Severance and related | $ | 560 | $ | 1,586 | $ | (273 ) | $ | (1,873 ) | $ | — |
| Facilities | | 2,117 | | — | | (815 )* | | (954 ) | | 348 |
| Total | $ | 2,677 | $ | 1,586 | $ | (1,088 ) | $ | (2,827 ) | $ | 348 |

* The facilities adjustment of $815,000 was the result of successfully negotiating out of lease commitments in connection with Company's winding down of the SCO Group,Ltd.

Amounts to be paid for restructurings are recorded as accrued liabilities.

*Amortization of Goodwill and Intangibles*

| | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Amortization of goodwill and intangibles | $ 3,190,000 | 12 % | $ 2,853,000 | (73 % ) | $ 10,664,000 |
| Percentage of total revenue | 4 % | | 4 % | | 26 % |

During fiscal years 2003, 2002 and 2001, we recorded $3,190,000, $2,853,000 and $10,664,000 for the amortization of intangible assets with finite lives. The increase of $337,000 in fiscal year 2003 over fiscal year 2002 was attributed to amortization expense on assets acquired from Vultus. The decrease in amortization expense in fiscal year 2002 compared to fiscal year 2001 was primarily attributed to a write-down of goodwill and intangibles in the fourth quarter of fiscal year 2001 that decreased the carrying value of these assets.

*Loss on Disposition and Impairment of Long-lived Assets*

| | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Loss on disposition and write-down of long-lived assets | $ 164,000 | (91 % ) | $ 1,796,000 | (98 % ) | $ 73,700,000 |
| Percentage of total revenue | 0 % | | 3 % | | 182 % |

During fiscal years 2003 and 2002, we recorded a write down of long-lived assets of $164,000 and $1,796,000, respectively, which primarily related to restructurings that occurred during each fiscal year. During fiscal year 2001, we determined that various long-lived assets were impaired and that the book value as of October31, 2001 exceeded the current estimates of fair value. As a result, we recorded an impairment of $73,700,000 related to the write-down of long-lived assets of goodwill and intangibles. This impairment was attributable to unanticipated decreases in actual and forecasted revenue of the acquired operations from the Santa Cruz Operation, a significant decline in economic conditions particular in the information technology sector and a weakening of partner relationships. The impairment recorded in fiscal year 2001 significantly reduced the amortizable base of intangible assets with finite lives, which has resulted in lower amortization on intangibles in the 2002 and 2003 fiscal years.

*Write-offs of Investments*

| | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|
| Write-offs of investments | $ 250,000 | (79 % ) | $ 1,180,000 | (86 % ) | $ 8,309,000 |
| Percentage of total revenue | 0 % | | 2 % | | 21 % |

Management routinely assesses our investments for impairments and adjusts the carrying amounts to estimated realizable values when impairment has occurred. During fiscal year 2003, in connection with the restructuring of our investment in and relationship with Vista.com ("Vista"), we recorded a write-off our Vista investment and incurred a charge of $250,000. We had been accounting for our investment in Vista under the equity method of accounting.

28

© 2004. EDGAR Online, Inc.

During fiscal year 2002, we determined that the current carrying value of $1,180,000 related to our investment in Lineo,Inc. would not be recovered and was written-off. This write-off was due to a significant deterioration in the operating results of Lineo and declines in general economic conditions. This investment had been accounted for under the cost method.

During fiscal year 2001, we determined the carrying value of our investments in Troll Tech AS, Evergreen Internet,Inc. and Ebiz Enterprises,Inc. would not be realized. The necessary write-offs were due to declines in general economic conditions and the impact of such declines in the operations of these companies as well as a decline in overall market valuations in these particular industries. As a result, we determined that the current carrying value of these investments would most likely not be recovered and we recorded write-offs of $8,309,000related to these investments. We had accounted for our investments in Troll Tech and Evergreen under the cost method and our investment in Ebiz under the equity method of accounting.

*Stock-based Compensation*

| | | 2003 | Change | 2002 | Change | 2001 |
|---|---|---|---|---|---|---|
| Stock-based compensation | $ | 1,204,000 | 7 % | $ 1,125,000 | (18 % ) | $ 1,373,000 |
| Percentage of total revenue | | 2 % | | 2 % | | 3 % |

In connection with stock options and restricted shares granted to employees and others, we recorded stock-based compensation of $1,204,000 in fiscal year 2003, $1,125,000 in fiscal year 2002, and $1,373,000 in fiscal year 2001. The increase in stock-based compensation in fiscal year 2003 when compared with fiscal year 2002 is primarily attributable to restricted stock grants. The fair value of these restricted stock awards was recorded as a component of stock-based compensation as the restrictions lapsed. We also issued a warrant to a consultant which increased our stock-based compensation in fiscal year 2003.

*Compensation to Law Firms*

On February26, 2003, we entered into an arrangement with Boies, Schiller& Flexner LLP and other firms to investigate and review our UNIX intellectual property rights. This arrangement was later modified on November17, 2003 and December8, 2003. The engagement with the law firms now includes the defense work related to counter suits and other retaliatory actions against us and lawsuits against end users violating our intellectual property and contractual rights. The law firms are also representing us in our lawsuit against Novell.

In addition to receiving fees at reduced hourly rates, our agreement with the law firms provides that the law firms will receive a contingency fee of 20percent of the proceeds from specified events related to the protection of our intellectual property rights. These events may include settlements, judgments, certain licensing fees, subject to certain exceptions, and a sale of our company during the pendancy of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees. Additionally, our agreement with the law firms may also be construed to include contingency fee payments in connection with our issuance of equity securities. Future payments payable to the law firms under this arrangement may be significant.

During fiscal year 2003, we incurred a charge of $8,956,000, or 11percent of revenue, related to this arrangement as contingency fees to these law firms in connection with the issuance of shares of our SeriesA Convertible Preferred Stock. This charge consisted of a non-cash charge of $7,956,000 related to the issuance of 400,000 shares of our common stock and a $1,000,000 cash payment that was accrued as of October31, 2003 and paid subsequent to year-end.

29

© 2004. EDGAR Online, Inc.

*In-process Research and Development*

In connection with the acquisition of the server and professional services groups of The Santa Cruz Operation, we recorded a charge of $1,500,000, or 4 percent of total revenue, in fiscal year 2001 for the fair value of in-process research and development. The write-off was necessary because the acquired in-process research and development related to UnixWare 7.1.2 and Messaging Server products had not yet reached technological feasibility and had no future alternative uses. Development work on the UnixWare 7.1.2 and Messaging Server products were substantially complete at the end of fiscal year 2001. We did not have any charges for in-process research and development in fiscal years 2003 and 2002.

*Cost-sharing Arrangement with The Santa Cruz Operation*

After entering into the agreement with The Santa Cruz Operation to acquire the server and professional services groups, we and The Santa Cruz Operation agreed that we would reimburse The Santa Cruz Operation for certain employee payroll and related costs. We viewed these employees as a critical part of the success of the new combined company and The Santa Cruz Operation agreed to retain the employees if we would reimburse The Santa Cruz Operation for a portion of its payroll and related costs. In fiscal year 2001, we reimbursed $602,000, or 1 percent of total revenue, to The Santa Cruz Operation for services rendered under the agreement. We did not have any such charges in fiscal years 2003 and 2002.

*Equity in Losses of Affiliate*

We account for our ownership interests in companies that we own at least 20 percent and less than 50 percent using the equity method of accounting. Under the equity method, we record our portion of the entities' net income or net loss in our consolidated statements of operation. During fiscal years 2003, 2002 and 2001, we recorded $62,000, $50,000 and $648,000, respectively, that related to net losses in these entities.

*Other Income (Expense), net*

Other income (expense), net, which consists principally of interest expense, interest income and the change in fair value of the derivative related to our Series A Convertible Preferred Stock, was $2,827,000 in fiscal year 2003, ($168,000) in fiscal year 2002 and $3,505,000 in fiscal year 2001. During fiscal year 2003, we recorded income of $2,845,000 related to the change in fair value of the derivative related to our Series A Convertible Preferred Stock. Exclusive of this income, our net other expense was ($18,000). The decrease in fiscal years 2003 and 2002 from fiscal year 2001 is primarily attributable to significantly less interest income earned as a result of lower cash balances. Our other income (expense), net, will be unpredictable in future periods because changes in the value of the derivative may be significant and will continue to be recorded until the holders of the Series A Convertible Preferred Stock have converted their shares into shares of our common stock.

*Provision for Income Taxes*

The provision for income taxes was $774,000 in fiscal year 2003, $483,000 in fiscal year 2002 and $578,000 in fiscal year 2001. The provision for income taxes is primarily related to earnings in foreign subsidiaries. As of October 31, 2003, we had net operating loss carry-forwards for U.S. federal and state income tax reporting purposes of approximately $88,642,000 that expire at various dates between 2018 and 2023. We had net deferred tax assets, including net operating loss carry-forwards and other temporary differences between book and tax deductions, totaling approximately $53,474,000 as of October 31, 2003. We also had net deferred tax liabilities of approximately $566,000 related to taxes on foreign earnings. A valuation allowance in the amount of $52,908,000, the difference between our

© 2004. EDGAR Online, Inc.

deferred tax assets and liabilities, has been recorded as of October 31, 2003 as a result of uncertainties regarding the ultimate realizability of the net deferred tax asset balance.

*Dividends Related to Series A Convertible Preferred Stock*

On October 16, 2003, we issued 50,000 shares of our Series A Convertible Preferred Stock for $1,000 per share. The net proceeds from the sale of the preferred stock were $47,740,000. The initial value of the preferred stock was bifurcated into two elements consisting of a derivative valued at $18,069,000 and the remaining preferred stock valued at $29,671,000. Dividends will be paid after the first anniversary of the closing and will be paid quarterly at a rate of 8 percent per annum, subject to annual increases of 2 percent per annum, not to exceed 12 percent per annum. Because dividends are not payable during the first year the preferred stock is outstanding, we have accrued dividends of $123,000 for fiscal year 2003, which reduced earnings available to common stockholders.

## Quarterly Results of Operations

The following table sets forth certain unaudited quarterly statement of operations data for the last eight quarters. This information has been derived from our unaudited consolidated financial statements, which, in management's opinion, have been prepared on the same basis as the audited financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the information for the quarters presented. This information should be read in conjunction with the audited consolidated financial statements and related notes included elsewhere in this Form 10-K. The operating results for any quarter are not necessarily indicative of the operating results for any future period.

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 31, 2003 | April 30, 2003 | July 31, 2003 | October 31, 2003 |
| | | (unaudited) | | |
| | | (In thousands, except per share data) | | |
| **Fiscal Year 2003** | | | | |
| Revenue | $ 13,540 | $ 21,369 | $ 20,055 | $ 24,290 |
| Gross margin | 10,662 | 16,222 | 15,521 | 16,927 |
| Income (loss) from operations | (738 ) | 4,925 | 3,410 | (4,161 ) |
| Net income available (loss applicable) to common stockholders | (724 ) | 4,500 | 3,096 | (1,568 ) |
| Net income (loss) to per common share: | | | | |
| Basic | $ (0.06 ) | $ 0.39 | $ 0.25 | $ (0.12 ) |
| Diluted | $ (0.06 ) | $ 0.33 | $ 0.19 | $ (0.12 ) |
| Weighted average basic common shares | 11,244 | 11,561 | 12,469 | 13,371 |
| Weighted average diluted common shares | 11,244 | 13,663 | 16,180 | 13,371 |

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 31, 2002 | April 30, 2002 | July 31, 2002 | October 31, 2002 |
| | | (unaudited) | | |
| | | (In thousands, except per share data) | | |
| **Fiscal Year 2002** | | | | |
| Revenue | $ 17,913 | $ 15,476 | $ 15,384 | $ 15,468 |
| Gross margin | 12,233 | 10,020 | 11,313 | 12,359 |
| Loss from operations | (10,914 ) | (6,441 ) | (4,242 ) | (2,579 ) |
| Net loss to common stockholders | (11,006 ) | (6,631 ) | (4,511 ) | (2,729 ) |
| Basic and diluted net loss per common share | $ (0.77 ) | $ (0.47 ) | $ (0.35 ) | $ (0.26 ) |
| Weighted average basic and diluted common shares | 14,355 | 14,235 | 12,714 | 10,396 |

31

© 2004. EDGAR Online, Inc.

**Fluctuations in Quarterly Results**

Factors that may affect quarterly results include:

- the interest level of solution providers in recommending UNIX business solutions to end users;

- the contingency fees we may pay to the law firms representing us in our efforts to establish and enforce our intellectual property rights;

- the level, magnitude and timing of SCOsource license revenue;

- the introduction, development, timing, competitive pricing and market acceptance of our products and services and those of our competitors;

- changes in general economic conditions, such as recessions, that could affect capital expenditures and recruiting efforts in the software industry in general and in the UNIX environments in particular; and

- changing business attitudes toward UNIX as a viable operating system alternative to other competing systems, especially Linux, and changes in attitudes resulting from our lawsuits against end users violating our intellectual property and contractual rights and other SCOsource initiatives.

As a result of the factors listed above and elsewhere in the "Forward-Looking Statements and Factors That May Effect Future Results and Financial Condition" and "Risk Factors" sections of this Form10-K, it is possible that in some future periods our results of operations may fall below management's expectations as well as the expectations of public market analysts and investors. If revenue falls below management's expectations in any quarter and we are unable to reduce spending, our operating results would be lower than expected.

**Liquidity and Capital Resources**

Our cash balance increased from $6,589,000 as of October31, 2002 to $64,428,000 as of October31, 2003. Our working capital increased from a deficit of ($6,332,000) as of October31, 2002 to $37,168,000 as of October31, 2003. During fiscal year 2003, we generated positive cash flow from operations for the first time in our operating history. This was achieved through reductions in costs and increased gross margin generated from our UNIX business and significant license revenue generated from our SCOsource business. We also completed the placement of 50,000 shares of our SeriesA Convertible Preferred Stock for net proceeds of $47,740,000 in October2003. We intend to use the proceeds from this offering as well as our other cash resources to maintain and enhance our UNIX business and pursue our SCOsource initiatives. We believe that we will have sufficient cash resources to fund our current operations for at least the next twelve months.

Our net cash provided by operations during fiscal year 2003 was $12,087,000. Cash provided by operations was attributable to net income of $5,427,000, non-cash expenses totaled $11,610,000 and changes in operating assets and liabilities of ($4,950,000). Our working capital position increased from a deficit of ($6,332,000) as of October31, 2002 to $37,168,000 as of October31, 2003 primarily because of our increase in cash from our private placement. Our long-term liabilities decreased from $1,625,000 to $508,000 during fiscal year 2003.

Cash used in operations during fiscal year 2002 was $10,592,000 and was primarily attributable to the net loss of $24,877,000, partially offset by non-cash expenses of $10,101,000 and cash provided by changes in operating assets and liabilities of $4,184,000. Cash used in operations declined in fiscal year 2002 from fiscal year 2001 primarily attributable to our cost-cutting actions.

Net cash used in operations during fiscal year 2001 was $40,065,000. Cash used in operations was primarily attributable to the net loss of $131,357,000, which was offset by non-cash charges of

32

© 2004. EDGAR Online, Inc.

$98,810,000. Cash used in operating activities as a result of changes in operating assets and liabilities was ($7,518,000).

Our investing activities have historically consisted of equipment purchases, investing in strategic partners and the purchase and sale of available-for-sale securities. During fiscal year 2003, cash used in investing activities was $5,512,000, which was primarily a result of our purchase of available-for-sale securities of $4,095,000, equipment purchases of $467,000, our investment in non-marketable securities of $950,000. During fiscal year 2004, we may invest in or acquire vertical application providers as part of our strategy to improve our core UNIX business operations.

During fiscal year 2002, cash provided by investing activities was $5,287,000, which was primarily generated from the sale of $5,943,000 of available-for-sale securities, offset by an investment in a non-marketable security of $350,000, cash paid for the purchase of equipment of $206,000 and payment of $100,000 to The Santa Cruz Operation.

Cash provided by investing activities was $23,238,000 during fiscal year 2001. This consisted of $23,005,000 paid, net of cash acquired, for certain acquisitions as well as $1,520,000 paid for the purchase of equipment. The cash uses were offset by proceeds from sales of available-for-sale securities, net of purchases, of $47,763,000.

Our financing activities provided $50,888,000 during the fiscal year 2003 and consisted primarily of net proceeds of $47,740,000 generated from the issuance of 50,000 shares of SeriesA Convertible Preferred Stock. Additional financing activities included proceeds received from the exercise of stock options of $2,056,000, proceeds from the purchase of shares of common stock by our employees through our employee stock purchase program of $236,000 and proceeds from the issuance of warrants of $856,000.

Our financing activities used $8,998,000 during fiscal year 2002 and consisted primarily of a $5,000,000 payment to retire the note payable to The Santa Cruz Operation and $4,584,000 for the purchase of shares of our common stock held by two investors. These payments were offset by $291,000 of proceeds received from the exercise of stock options and $295,000 received from employees who purchased shares of our common stock through our employee stock purchase program.

During fiscal year 2001, our financing activities provided $602,000 as a result of the exercise of vested stock options of $303,000, the purchase of shares of common stock through our employee stock purchase program of $126,000 and from minority stockholders in our majority-owned Japanese subsidiary of $173,000.

Our SeriesA Convertible Preferred Stock includes redemption provisions that may be triggered by events beyond our control. These redemption provisions are triggered by events including delisting of our common stock from the Nasdaq SmallCap Market, failure to have the SeriesA Convertible Preferred Stock investors' FormS-3 registration statement declared effective in a timely manner and other events. These redemption provisions, if triggered, would require us to redeem the then issued and outstanding shares of preferred stock for cash. If we were required to pay cash to the holders of our preferred stock, it could have a material impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations.

Dividends on the SeriesA Convertible Preferred Stock will begin to accrue after the first anniversary of the closing and will be paid quarterly at a rate of 8percent per annum, subject to annual increases of 2percent per annum, not to exceed 12percent per annum. Because dividends are not payable during the first year the preferred stock is outstanding, we have accrued dividends of $123,000 for fiscal year 2003. Dividends may be paid in cash or additional shares of our SeriesA Convertible Preferred Stock, subject to certain limitations.

Our net accounts receivable balance increased from $8,622,000 as of October31, 2002 to $9,282,000 as of October31, 2003, primarily as a result of higher invoicing in the fourth quarter of

33

© 2004. EDGAR Online, Inc.

fiscal year 2003 when compared to the fourth quarter of fiscal year 2002. The majority of our accounts receivable are current and our allowance for doubtful accounts was $230,000 as of October 31, 2003, which represented approximately 2 percent of our gross accounts receivable balance. This percentage of gross accounts receivable is consistent with our experience in prior periods, and we expect this trend to continue. Our write-offs of uncollectible accounts during fiscal year 2003 were not significant.

We recently expanded our efforts with the law firms assisting us with our pursuit of our intellectual property claims and currently expect to devote substantially more financial resources to this effort. We expect that legal fees paid to the law firms we have engaged to pursue these claims will increase substantially in fiscal year 2004. To the extent that SCOsource related costs and legal fees exceed our budgeted amounts for fiscal year 2004, our liquidity will be adversely impacted and fewer financial resources will be available for other initiatives such as maintaining and enhancing our UNIX business.

In addition to paying fees at reduced hourly rates to these firms,' our agreement with the law firms provides that we will pay the law firms a contingency fee of 20 percent of the proceeds from specified events related to the protection of our intellectual property rights. These events may include settlements, judgments, certain licensing fees, subject to certain exceptions, and a sale of our company during the pendency of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees. Additionally, our agreement with the law firms may also be construed to include contingency fee payments in connection with our issuance of equity securities. Future payments payable to the law firms under this arrangement may be significant in future periods, which may have an adverse impact on our liquidity. This arrangement could also impair our ability to raise equity capital in future periods and increase the cost of such equity.

We have entered into operating leases for our corporate offices located in the United States and our international sales offices. We have commitments under these leases that extend through fiscal year 2009. In recent corporate restructuring activities, we have partially vacated some of these facilities, but still have contractual obligations to continue to make ongoing lease payments for one facility that will use available cash. We have pursued and will continue to pursue sublease opportunities, as available, to minimize this use of cash; however, we may not be successful in eliminating or reducing cash expenditures for this facility.

The following table summarizes our contractual lease obligations as of October 31, 2003:

| | Total | Less than 1 year | 1-3 years | More than 3 years |
|---|---|---|---|---|
| Operating lease obligations | $ 7,917,000 | $ 2,736,000 | $ 3,829,000 | $ 1,352,000 |

As of October 31, 2003, we did not have any long-term debt obligations, purchase obligations, other long-term liabilities or material capital lease obligations.

Our ability to cut costs to offset revenue declines in our UNIX business is limited because of contractual commitments to maintain and support our existing UNIX customers. This decline in our UNIX business may be accelerated if industry partners withdraw their support as a result of our SCOsource initiatives and in particular any lawsuits against end users violating our intellectual property and contractual rights. Our SCOsource initiatives, particularly lawsuits against such end users, may cause industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products. This would lead to an accelerated decline in our UNIX products and services revenue. If our UNIX products and services revenue is less than expected, our liquidity will be adversely impacted.

In the event that cash required to fund operations and strategic initiatives exceeds our current cash resources and cash generated from operations, we will be required to reduce costs and perhaps raise additional capital. We may not be able to reduce costs in a manner that does not impair our ability to maintain our UNIX business and pursue our SCOsource initiatives. We may also not be able to raise

34

© 2004. EDGAR Online, Inc.

capital for any number of reasons including those listed under the section "Risk Factors" below. Our ability to raise additional equity capital is restricted under the terms of our SeriesA Convertible Preferred Stock. If additional equity financing is available, it may not be available to us on attractive terms and may be dilutive to our existing stockholders. Our ability to raise debt financing is restricted under the terms of our SeriesA Convertible Preferred Stock. In addition, if our stock price declines, we may not be able to access the public equity markets on acceptable terms, if at all. Our ability to effect acquisitions for stock would also be impaired.

**Recent Accounting Pronouncements**

In November2002, the EITF reached a consensus on EITF No.00-21, "Revenue Arrangements with Multiple Deliverables." EITF No.00-21 addresses certain aspects of the accounting by a vendor for arrangements under which the vendor will perform multiple revenue-generating activities. EITF No.00-21 is effective for interim periods beginning after June15, 2003. The adoption of this statement did not have a material effect on our financial position and results of operations.

In December2002, the FASB issued SFAS No.148, "Accounting for Stock-Based Compensation—Transition and Disclosure," an amendment of FASB Statement No.123. This Statement amends FASB Statement No.123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition for a voluntary change to the fair value method of accounting for stock-based employee compensation. In addition, SFAS No.148 amends the disclosure requirements of SFAS No.123 to require prominent disclosures in both annual and interim financial statements. We adopted SFAS No.148 for our fiscal year ended October31, 2003.

In May2003, the FASB issued SFAS No.150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No.150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. Financial instruments within the scope of SFAS No.150 will be classified as liabilities and measured at fair value. Many of those instruments were previously classified as equity. The statement is effective for financial instruments entered into or modified after May31, 2003, and otherwise effective at the beginning of the first interim period beginning after June15, 2003. The adoption of SFAS No.150 did not have an impact on our financial position or results of operations.

© 2004. EDGAR Online, Inc.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

*Foreign Currency Risk.* We have foreign offices and operations in Europe and Asia. As a result, a portion of our revenue is derived from sales to customers outside the United States. Most of this international revenue is denominated in U.S. dollars. However, most of the operating expenses related to the foreign-based operations are denominated in foreign currencies and therefore operating results are affected by changes in the U.S. dollar exchange rate in relation to foreign currencies such as the Euro, among others. If the U.S. dollar continues to weaken compared to the Euro, our operating expenses for foreign operations will be higher when translated back into U.S. dollars. Our revenue can also be affected by general economic conditions in the United States, Europe and other international markets. Our results of operations may be affected in the short term by fluctuations in foreign currency exchange rates.

We utilize foreign currency forward exchange contracts for market exposures of underlying assets and liabilities. We do not use forward exchange contracts for speculative or trading purposes. Our accounting policies for these instruments are based on our designation of such instruments. The criteria we use for designating an instrument include the instrument's effectiveness in risk reduction and one-to-one matching of forward exchange contracts to underlying assets and liabilities. Gains and losses on currency forward contracts that are firm commitments are deferred and recognized in income in the same period that the underlying transactions are settled. Gains and losses on currency forward contracts that are designated and effective for existing transactions are recognized in income in the same period as losses and gains on the underlying transactions are recognized and generally offset. Gains and losses on any instruments not meeting the above criteria are recognized in income in the current period. As of October 31, 2003, we had one foreign exchange contract with a maturity of 30 days to sell an aggregate of 900,000 United Kingdom pounds for approximately $1,514,000 U.S. dollars. We also had one foreign exchange contract with a maturity of 30 days to buy 1,000,000 Euros for approximately $1,179,000 U.S. dollars. As of October 31, 2003, we had no outstanding instruments classified as hedges.

*Interest Rate Risk.* The primary objective of our cash management strategy is to invest available funds in a manner that assures maximum safety and liquidity and maximizes yield within such constraints. We do not borrow money for short-term investment purposes.

*Investment Risk.* We have invested in equity instruments of privately held and public companies in the technology industry for business and strategic purposes. Investments are accounted for under the cost method if our ownership is less than 20 percent and we are not able to exercise influence over operations. Our investment policy is to regularly review the assumptions and operating performance of these companies and to record impairment losses when events and circumstances indicate that these investments may be impaired. As of October 31, 2003, our investments balance was approximately $452,000.

The stock market in general, and the market for shares of technology companies in particular, has experienced extreme price fluctuations. In addition, factors such as new product introductions by our competitors or developments in the litigation related to our SCOsource initiatives may have a significant impact on the market price of our common stock. Furthermore, quarter-to-quarter fluctuations in our results of operations caused by changes in customer demand may have a significant impact on the market price of our common stock. These conditions could cause the price of our common stock to fluctuate substantially over short periods of time.

**Forward-Looking Statements and Factors That May Affect Future Results and Financial Condition**

With the exception of historical facts, the statements contained in Management's Discussion and Analysis of Financial Condition and Results of Operations are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, which reflect our current expectations

36

© 2004. EDGAR Online, Inc.

and beliefs regarding our future results of operations, performance and achievements. The section entitled "Business" above in PartI, Item 1 of this Form10-K also includes forward-looking statements. These statements are subject to risks and uncertainties and are based upon assumptions and beliefs that may or may not materialize. These forward-looking statements include, but are not limited to, statements concerning:

- Our operating strategy to continue to support our existing users of our UNIX operating system products and to maintain and enhance our core UNIX business and pursue SCOsource licensing opportunities and protect our intellectual property rights;

- Our belief that our OpenServer and UnixWare products will continue to provide a revenue stream;

- Our intent to maintain the level of investment in and commitment to our operating systems and web services software by continuing our research and development efforts;

- Our intention to enhance and modernize our UNIX operating system and our expectation that our investment in this effort will give customers confidence in our technology;

- Our intention to continue to pursue our SCOsource initiatives in fiscal year 2004 and our plan to increase our SCOsource sales team and internal personnel in fiscal year 2004;

- Our belief that the future success of our SCOsource initiatives will depend on our ability to protect our intellectual property;

- Our intention to vigorously defend legal claims and counterclaims brought against us by others;

- Our intention to pursue our litigation against IBM and commence in the near term our first legal action against an end user violating our intellectual property and contractual rights;

- Our belief that our cash balance will be adequate for us to execute our business strategy as well as to continue to pursue our intellectual property claims and that we have sufficient cash reserves to fund our current operations for at least the next 12months;

- Our intention to expand our relationships with key partners in certain vertical markets;

- Our international marketing strategy;

- Our expectation of entering into future vendor license agreements with developers, manufacturers, distributors and end users of operating systems;

- Our belief that our allowance and bad debts for accounts receivable will remain consistent with our prior experience;

- The strength of our intellectual property rights and contractual claims regarding UNIX generally and specifically the strength of our claim that unauthorized UNIX source code and derivatives of UNIX source code are prevalent in Linux;

- Our expectation that SCOsource licensing revenue will be minimal in the first quarter of fiscal year 2004 and will increase in future quarters of fiscal year 2004;

© 2004. EDGAR Online, Inc.

- Our expectation that the majority of our services revenue will continue to be derived from UNIX-based products;

- Our expectation for fiscal year 2004 that our cost of products revenue will be slightly less than in fiscal year 2003;

- Our expectation for fiscal year 2004 that our cost of services revenue will be slightly less than in fiscal year 2003;

37

© 2004. EDGAR Online, Inc.

- Our expectation for fiscal year 2004 that our sales and marketing expenses will remain substantially consistent with our expenses incurred in fiscal year 2003;

- Our expectation for fiscal year 2004 that our research and development expenses will increase from fiscal year 2003;

- Our expectation for fiscal year 2004 that our general and administrative expenses will increase compared to our general and administrative expenses incurred in fiscal year 2003;

- Our belief that our legal costs will increase in fiscal year 2004;

- Our expectation that we may invest in or acquire vertical application providers and pursue strategic alliances with industry participants and licensing transactions as part of our strategy to improve our core UNIX business;

- Our belief that our facilities are adequate for our business; and

- Our belief that certain legal actions to which we are a party will not have a material adverse effect on us.

We wish to caution readers that our operating results are subject to various risks and uncertainties that could cause our actual results and outcomes to differ materially from those discussed or anticipated, including the success of our SCOsource initiatives, competition from other operating systems, particularly Linux, the amount and timing of SCOsource licensing revenue, our ability to enhance our UNIX operating systems and maintain our UNIX products and services business, and the factors set forth in the subsection entitled "Risk Factors" below. We also wish to advise readers not to place any undue reliance on the forward-looking statements contained in this report, which reflect our beliefs and expectations only as of the date of this report. We assume no obligation to update or revise these forward-looking statements to reflect new events or circumstances or any changes in our beliefs or expectations, other than as required by law.

## Risk Factors

*We do not have a history of profitable operations.*

Our fiscal year ended October 31, 2003 was the first full year we were profitable in our operating history. Our profitability in fiscal year 2003 resulted primarily from our SCOsource licensing initiative. If we do not receive SCOsource licensing revenue in future quarters and our revenue from the sale of our operating system platform products and services continues to decline, we will need to further reduce operating expenses to maintain profitability or generate positive cash flow.

Our UNIX products and services revenue has declined in each of the last four years. In our results of operations, we recognize revenue from agreements for support and maintenance contracts and other long-term contracts that have been previously invoiced and are included in deferred revenue. Our deferred revenue balance has declined from $10,056,000 as of October 31, 2002 to $5,501,000 as of October 31, 2003, and this decline in deferred revenue may continue into future quarters, which may have a negative impact on our operating system platform products revenue. Our future operating system platform revenue may be adversely impacted and may continue to decline if we are unable to replenish these deferred revenue balances with long-term maintenance and support contracts or replace them with other sustainable revenue streams. If we are unable to continue to generate positive cash flow and profitable operations, our operations may be adversely impacted.

Additionally, we accounted for the issuance of shares of our Series A Convertible Preferred Stock from our October 2003 private placement by bifurcating the value of the Series A Convertible Preferred Stock into a preferred stock component and a derivative component. As of October 31, 2003, we recorded a liability of $15,224,000 as the fair value of the derivative component. To account for the

© 2004.  EDGAR Online, Inc.

derivative component in subsequent periods, we will mark-to-market its value at each balance sheet date and will include in our consolidated statement of operations any changes in value as a component of other income or expense. Changes in the value of the derivative may be significant because the value of our common stock at each balance sheet date will have a significant impact on the derivative's value. For example, an increase in the value of our common stock by $1.00 may require us to record an expense of approximately $1,000,000, and, conversely, a decrease in our common stock by $1.00 may require us to record income of approximately $1,000,000. If this accounting treatment requires us to record significant expenses in future periods, our profitability in those periods may be adversely impacted.

*Our future SCOsource licensing revenue is uncertain.*

We initiated the SCOsource licensing effort in January 2003 to review the status of UNIX licensing and sublicensing agreements. This effort resulted in the execution of two significant vendor license agreements during fiscal year 2003 and generated $25,846,000 in revenue. Due to a lack of historical experience and the uncertainties related to SCOsource licensing revenue, we are unable to estimate the amount and timing of future SCOsource licensing revenue, if any. If we do receive revenue from this source, it may be sporadic and fluctuate from quarter to quarter. Our SCOsource initiatives are unlikely to produce a stable or predictable revenue stream for the foreseeable future. Additionally, the success of this initiative may depend on the strength of our intellectual property rights and contractual claims regarding UNIX, including, the strength of our claim that unauthorized UNIX source code and derivative works are prevalent in Linux.

*We may not prevail in our legal actions against IBM and Novell, and unintended consequences of our actions against IBM and Novell and initiatives to assert our intellectual property rights may adversely affect our business.*

On or about March 6, 2003, we filed a complaint against IBM alleging breach of contract, misappropriation of trade secrets, tortious interference, and unfair competition. The matter is currently pending in the United States District Court for the District of Utah. The complaint also alleges that IBM obtained information concerning our UNIX source code and derivative works from us and inappropriately used and distributed that information in connection with its efforts to promote the Linux operating system.

On or about June 16, 2003, we filed an amended complaint in the IBM case. The amended complaint essentially restates and realleges the allegations of the original complaint and expands on those claims in several ways. Most importantly, the amended complaint raises new allegations regarding IBM's actions and breaches through the products and services of Sequent which IBM acquired. We allege that IBM breached the Sequent agreement in several ways similar to those set forth above, and we are seeking damages flowing from those breaches. We are also seeking injunctive relief for several of our claims.

IBM has filed a response and counterclaim to the complaint, including a demand for jury trial. We have filed an answer to the IBM counterclaim denying the claims and asserting affirmative defenses.

In its counterclaim, as amended on September 25, 2003, IBM asserts that we do not have the right to terminate its UNIX license or assert claims based on our ownership of UNIX intellectual property against them or others in the Linux community. In addition, they assert that we have infringed on certain patents held by IBM. IBM's counterclaims include claims for breach of contract, violation of the Lanham Act, unfair competition, intentional interference with prospective economic relations, unfair and deceptive trade practices, breach of the GNU general public license, and patent infringement. Discovery is ongoing in the case. We intend to vigorously defend these counterclaims.

39

© 2004. EDGAR Online, Inc.

If we do not prevail in our action against IBM, or if IBM is successful in its counterclaim against us, our business and results of operations could be materially harmed. The litigation with IBM and potentially others could be costly, and our costs for legal fees may be substantial and in excess of amounts for which we have budgeted. Additionally, the market price of our common stock may be negatively affected as a result of developments in our legal action against IBM that may be, or may be perceived to be, adverse to us.

In addition, we have publicly, and in individual letters to 1,500 of the world's largest corporations, cautioned users of Linux that there are unresolved intellectual property issues surrounding Linux that may expose them to unanticipated liability. As a result of these concerns, we have suspended our sales of Linux products. We have also begun delivering written notice to a large number of licensees under our UNIX contracts requiring them to, among other things, provide written certification that they are in full compliance with their agreements, including certification that they are not using our proprietary UNIX code in Linux, have not allowed unauthorized use of licensed UNIX code by their employees or contractors and have not breached confidentiality provisions relating to licensed UNIX code. Additionally, we have begun notifying selected Linux end users in writing of violations we allege under the Digital Millennium Copyright Act related to our copyrights contained in Linux.

As a result of our action against IBM and our SCOsource initiatives to protect our intellectual property rights, several participants in the Linux industry and others affiliated with IBM or sympathetic to the Linux movement have taken actions attempting to negatively affect our business and our SCOsource efforts. Linux proponents have taken a broad range of actions against us, including, for example, attempting to influence participants in the markets in which we sell our products to reduce or eliminate the amount of our products and services they purchase from us. We expect that similar efforts likely will continue. There is a risk that participants in our marketplace will negatively view our action against IBM and our SCOsource initiatives, and we may lose support from such participants. Any of the foregoing could adversely affect our position in the marketplace, our results of operations and our stock price.

We have also experienced several denial-of-service attacks on our website, which have prevented web users from accessing our website and doing business with us for a period of time. Additionally, we have recently experienced a distributed denial-of-service attack as a result of the "Mydoom" worm virus. It is reported that the effects of this virus will continue into February2004. If such attacks continue or if our customers and strategic partners are also subjected to similar attacks, our business and results of operations could be materially harmed.

Also, some of the more significant participants in the Linux industry have made efforts to ease Linux end users' concerns that their use of Linux may subject them to potential copyright infringement claims from us. For example, Hewlett-Packard and Novell have each established indemnification programs for qualified customers purchasing Linux-based products and services that may potentially become subject to a copyright infringement claims from us. Additionally, Open Source Development Labs, a non-profit organization ("OSDL"), has established a legal defense fund that will be used to defend Linux users against copyright infringement lawsuits brought by us. It has been reported that OSDL so far has attracted several million dollars in pledges from contributors including IBM and Intel among others. Similarly, Red Hat,Inc. has announced it has committed one million dollars for a separate fund it created to cover the legal expenses of other companies developing Linux.

As a further response to our SCOsource initiatives and claim that our UNIX source code and derivative works have inappropriately been included in Linux, Novell has publicly asserted its belief that it owns certain copyrights in our UNIX source code, and it has filed 15 copyright applications with the United States Copyright Office related to UNIX. Novell also claims that it has a license to UNIX from us and the right to authorize its customers to use UNIX technology in their internal business operations. Specifically, Novell has also claimed to have retained rights related to legacy UNIX SVRX

40

© 2004.  EDGAR Online, Inc.

licenses, including the license with IBM. Novell asserts it has the right to take action on behalf of SCO in connection with such licenses, including termination rights. Novell has purported to veto our termination of the IBM, Sequent and SGI licenses. We have repeatedly asserted that we obtained the UNIX business, source code, claims and copyrights when we acquired the assets and operations of the server and professional services groups from The Santa Cruz Operation in May2001, which had previously acquired all such assets and rights from Novell in September1995 pursuant to an asset purchase agreement, as amended.

On January20, 2004, in response to Novell's actions, we brought suit against Novell for slander of title seeking relief for Novell's alleged bad faith effort to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare products. Novell has not yet responded to our complaint.

Among our allegations in the suit against Novell, we allege that Novell has improperly filed copyright registrations in the United States Copyright Office for UNIX technology covered by our copyrights and has made false and misleading public claims that it, and not our company, owns the UNIX and UnixWare copyrights. We also allege that Novell has made false statements with the intent to cause customers and potential customers to not do business with us and has attempted, in bad faith, to block our ability to enforce our copyrights. Additionally, we allege that Novell's false and misleading representations that it owns the UNIX and UnixWare copyrights have caused us irreparable harm to our copyrights, our business, and our reputation.

In the lawsuit, we request preliminary and permanent injunctive relief as well as damages. The injunction would require Novell to assign to us all copyrights that we believe Novell has wrongfully registered, prevent Novell from representing any ownership interest in those copyrights, and require Novell to retract or withdraw all representations it has made regarding its purported ownership of those copyrights.

Notwithstanding our assertions of full ownership of UNIX-related intellectual property rights, as set forth above, including copyrights, and even if we are successful in our legal action against Novell, the efforts of Novell and the other Linux proponents described above may cause Linux end users to be less willing to purchase from us our SCO IP licenses authorizing their use of our intellectual property contained in the Linux operating system, which may adversely affect our revenue from our SCOsource initiatives. These efforts also may increase the negative view some participants in our marketplace have regarding our legal actions against IBM and Novell and our SCOsource initiatives and may contribute to creating confusion in the marketplace about the validity of our claim that the unauthorized use of our UNIX source code and derivative works in Linux infringes on our copyrights. Increased negative perception and potential confusion about our claims in our marketplace could impede our continued pursuit of our SCOsource initiatives and negatively impact our business. Additionally, if we fail in our lawsuit against Novell, the negative perception and confusion in our marketplace about our intellectual property claims likely would increase significantly, and the effectiveness of our SCOsource initiatives could be materially harmed.

*We may lose the support of industry partners leading to an accelerated decline in our UNIX products and services revenue.*

Our SCOsource initiatives, particularly lawsuits against end users violating our intellectual property and contractual rights, may cause industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products. This would lead to an accelerated decline in our UNIX products and services revenue and would adversely impact our results of operations and liquidity.

41

© 2004. EDGAR Online, Inc.

*Our claims relating to our UNIX intellectual property may subject us to additional legal proceedings.*

On or about August 4, 2003, Red Hat filed a complaint against us that is currently pending in the United States District Court for the District of Delaware. Red Hat has asserted that the Linux operating system does not infringe on our UNIX intellectual property rights and seeks a declaratory judgment for non-infringement of copyrights and no misappropriation of trade secrets. In addition, Red Hat claims we have engaged in false advertising in violation of the Lanham Act, deceptive trade practices, unfair competition, tortious interference with prospective business opportunities, and trade libel and disparagement. We have filed a motion to dismiss the Red Hat complaint, asserting that Red Hat lacks standing and that no case or controversy exists on which to base a declaratory judgment. Red Hat has filed an opposition to our motion to dismiss, but the court has not ruled on the motion. If Red Hat is successful in its claim against us, our business and results of operations could be materially harmed.

The Australian Competition and Consumer Commission ("ACCC") contacted us in August 2003 regarding complaints it has received concerning our intellectual property claims and our statements regarding the need for commercial Linux users to obtain a UNIX license. The ACCC further informed us that it has not made any decision to pursue the complaints it has received or determined what, if any, action it will take. We have hired counsel in Australia and responded to the ACCC's request for information. We have not heard from the ACCC and it is unknown if future action will be taken.

Several entities in Germany have obtained temporary restraining orders in Germany precluding our German subsidiary, from making statements in Germany that, in substance, disparage Linux, or entities involved in the Linux industry, or implicate Linux as infringing our intellectual property rights. SCO GmbH has received an administrative fine of 10,000 Euros for a technical violation of one of the temporary restraining orders. We are currently negotiating with the various claimants in Germany over the temporary restraining orders and are evaluating whether we will appeal the administrative fine. Informal complaints similar to those raised in Germany have been received from companies in Austria and Poland. We have responded to those complaints. It is not known if those complainants will take future action.

In addition to these above-mentioned actions, other regulators or others in the Linux community may initiate legal actions against us, all of which may negatively impact our operations or future operating performance.

*Fluctuations in our operating results or the failure of our operating results to meet the expectations of public market analysts and investors may negatively impact our stock price.*

Fluctuations in our quarterly operating results or our failure to meet the expectations of analysts or investors, even in the short-term, could cause our stock price to decline significantly. Because of the potential for significant fluctuations in our SCOsource licensing revenue in any particular period, you should not rely on quarter-to-quarter comparisons of our results of operations as an indication of future performance.

Factors that may affect our results include:

- our ability to successfully negotiate and complete licensing and other agreements related to our intellectual property;

- the interest level of resellers in recommending our UNIX business solutions to end users;

- the introduction, development, timing, competitive pricing and market acceptance of our products and services and those of our competitors;

- changes in general economic conditions, such as recessions, that could affect capital expenditures and recruiting efforts in the software industry;

42

© 2004. EDGAR Online, Inc.

- changes to, or developments, in our on going litigation with IBM, Novell and Red Hat concerning our UNIX intellectual property;

- changes in business attitudes toward UNIX as a viable operating system compared to other competing systems, especially Linux;

- the contingency fees we may pay to the law firms representing us in our efforts to establish our intellectual property rights; and

- changes in attitudes of customers and partners due to our aggressive position against the inclusion of our UNIX code and derivative works in Linux and our lawsuits against end users violating our intellectual property and contractual rights.

We also experience fluctuations in operating results in interim periods in Europe and the Asia Pacific regions due to seasonal slowdowns and economic conditions in these areas. Seasonal slowdowns in these regions typically occur during the summer months.

As a result of the factors listed above and elsewhere, it is possible that our results of operations may be below the expectations of public market analysts and investors in any particular period. This could cause our stock price to decline. If revenue falls below our expectations and we are unable to quickly reduce our spending in response, our operating results will be lower than expected. Our stock price may fall in response to these events.

*We rely on our indirect sales channel for distribution of our products, and any disruption of our channel at any level could adversely affect the sales of our products.*

We have a two-tiered distribution channel. The relationships we have developed with resellers allow us to offer our products and services to a much larger customer base than we would otherwise be able to reach through our own direct sales and marketing efforts. Some solution providers also purchase solutions through our resellers, and we anticipate they will continue to do so. Because we usually sell indirectly through resellers, we cannot control the relationships through which resellers, solution providers or equipment integrators purchase our products. In turn, we do not control the presentation of our products to end-users. Therefore, our sales could be affected by disruptions in the relationships between us and our resellers, between our resellers and solution providers, or between solution providers and end users. Also, resellers and solution providers may choose not to emphasize our products to their customers. Any of these occurrences could diminish the effectiveness of our distribution channel and lead to decreased sales.

*If the market for UNIX continues to contract, it may adversely affect our business.*

Our revenue from the sale of UNIX-based products has declined over the last four years. This decrease in revenue has been attributable primarily to increased competition from other operating systems, particularly Linux, lower information technology spending and the worldwide economic slowdown. If the demand for UNIX-based products continues to decline, and we are unable to develop UNIX products and services that successfully address a market demand, our business will be adversely affected. Because of the long adoption cycle for operating system purchases and the long sales cycle of our operating system products, we will not be able to reverse these revenue declines quickly.

*We operate in a highly competitive market and face significant competition from a variety of current and potential sources; many of our current and potential competitors have greater financial and technical resources than we do; thus, we may fail to compete effectively.*

In the UNIX operating system market, our competitors include IBM, Hewlett-Packard, Sun, Microsoft and Linux distributors. These and other competitors are aggressively pursuing the current UNIX operating system market. Many of these competitors have access to substantially greater resources than we do. The major competitive alternatives to our UNIX products are Microsoft

43

© 2004. EDGAR Online, Inc.

Windows Server, Linux and other UNIX systems. The expansion of Microsoft's and our other competitors' offerings may restrict the overall market available for our server products, including some markets where we have been successful in the past.

Our future success may depend in part on our ability to continue to meet the increasing needs of our customers by supporting existing and emerging technologies. If we do not enhance our products to meet these evolving needs, we may not remain competitive and be able to grow our business. Additionally, because technological advancement in the UNIX operating system market and alternative operating system markets is at an advanced pace, we will have to develop and introduce enhancements to our existing products and any new products on a timely basis to keep pace with these developments, evolving industry standards and changing customer requirements. Our failure to meet any of these and other competitive pressures may render our existing products and services obsolete, which would have an adverse impact on our revenue and operations.

The success of our UNIX business will depend on the level of commitment and certification we receive from industry partners and developers. In recent years, we have seen hardware and software vendors as well as software developers turn their certification and application development efforts toward Linux and elect not to continue to support or certify to our UNIX operating system products. If this trend continues, our competitive position will be adversely impacted and our future revenue from our UNIX business will decline. The decline in our UNIX business may be accelerated if industry partners withdraw their support from us as a result of our SCOsource initiatives and in particular any lawsuit against end users violating our intellectual property and contractual rights.

*Our compensation arrangement with the law firms representing us to enforce our intellectual property rights may reduce our ability to raise additional financing.*

Our compensation arrangement with the law firms representing us in our efforts to establish our intellectual property rights could inhibit our ability to raise additional funding if needed. In addition to receiving fees at reduced hourly rates, our agreement with the law firms provides that the law firms will receive a contingency fee of 20percent of the proceeds from specified events related to the protection of our intellectual property rights. These events may include settlements, judgments, certain licensing fees, subject to certain exceptions, and a sale of our company during the pendancy of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees, and our agreement with the law firms may also be construed to include contingency fee payments in connection with issuances of our equity securities. Future payments payable to the law firms under this arrangement may be significant. Our law firms' right to receive such contingent payments could cause prospective investors to choose not to invest in our company or limit the price at which new investors would be willing to provide additional funds to our company.

*Our foreign-based operations and sales create special problems, including the imposition of governmental controls and fluctuations in currency exchange rates that could hurt our results.*

We have foreign operations, including development facilities, sales personnel and customer support operations in Europe, Latin America and Asia. These foreign operations are subject to certain inherent risks, including:

- potential loss of developed technology through piracy, misappropriation, or more lenient laws regarding intellectual property protection;

- imposition of governmental controls, including trade restrictions and other tax requirements;

- fluctuations in currency exchange rates and economic instability;

- longer payment cycles for sales in foreign countries;

- seasonal reductions in business activity; and

44

© 2004. EDGAR Online, Inc.

- political unrest, particularly in areas where we have facilities.

In addition, certain of our operating expenses are denominated in local currencies, creating risk of foreign currency translation losses that could harm our financial results and cash flows. When we generate profits in foreign countries, our effective income tax rate is increased.

In Latin America and Asia in particular, several countries have suffered and may be especially susceptible to recessions and economic instability which may lead to increased governmental ownership or regulation of the economy, higher interest rates, increased barriers to entry such as higher tariffs and taxes, and reduced demand for goods manufactured in the United States, resulting in lower revenue.

*The impact of domestic and global economic conditions may continue to adversely impact our operations.*

During the last several quarters the U.S. and European economies have experienced an economic slowdown that has affected the purchasing habits of many consumers across many industries and across many geographies. This has caused the delay, or even cancellation of technology purchases. The slowdown in the United States and Europe, together with the alleged unauthorized use of our UNIX code, has resulted in decreased sales of our products, longer sales cycles and lower prices. If the current slowdown continues, our revenue and results of operations may continue to be lower than expected. In addition, the slowdown may also affect the end-user market making it more difficult for our reseller channel to sell our products.

*If we are unable to retain key personnel in an intensely competitive environment, our operations could be adversely affected.*

We will need to retain our management, technical, and support personnel. Competition for qualified professionals in the software industry is intense, and departures of existing personnel could be disruptive to our business and can result in the departure of other employees. The loss or departure of any officers or key employees could harm our ability to implement our business plan and could adversely affect our operations. Our future success depends to a significant extent on the continued service and coordination of our management team, particularly Darl C. McBride, our President and Chief Executive Officer. We do not maintain key person insurance for any member of our management team.

*Our stock price is volatile.*

The trading price for our common stock has been volatile, ranging from a low closing sales price of $1.09 in mid-February 2003, to a sales price of $20.50 per share in October 2003, to a current sales price of $15.70 on January 27, 2004. The share price has changed dramatically over short periods with increases and decreases of over 25 percent in a single day. We believe that the changes in our stock price are affected by changing public perceptions concerning the strength of our intellectual property claims and other factors beyond our control. Public perception can change quickly and without any change or development in our underlying business or litigation position. An investment in our stock is subject to such volatility and is subject to significant risk.

*The shares offered under our recently completed private placement may have an adverse impact on the market value of our stock and the existing holders of our common stock.*

We have filed a prospectus relating to the sale or distribution of up to 3,850,000 shares of common stock by the selling stockholders. We will not receive any proceeds from the sales of these shares. The shares subject to the prospectus represent approximately 27 percent of our issued and outstanding common stock, although no selling stockholder and its affiliates may beneficially own more than 4.99 percent of our common stock at any time. The sale of this block of stock, or even the possibility of

45

© 2004. EDGAR Online, Inc.

its sale, may adversely affect the trading market for our common stock and reduce the price available in that market.

The shares of common stock subject to our prospectus will, upon issuance, dilute the equity ownership percentage of the holders of our common stock. The market price of our common stock also could decline as a result of a large number of shares of our common stock in the market, or the perception that such sales could occur.

*Risks associated with the potential exercise of our options outstanding.*

As of December31, 2003, we have issued and outstanding options to purchase up to approximately 3,620,000 shares of common stock with exercise prices ranging from $0.66 to $28.00 per share. The existence of such rights to acquire common stock at fixed prices may prove a hindrance to our efforts to raise future equity and debt funding, and the exercise of such rights will dilute the percentage ownership interest of our stockholders and may dilute the value of their ownership. The possible future sale of shares issuable on the exercise of outstanding options could adversely affect the prevailing market price for our common stock. Further, the holders of the outstanding rights may exercise them at a time when we would otherwise be able to obtain additional equity capital on terms more favorable to us.

*The holders of shares of SeriesA Convertible Preferred Stock have preferential redemption rights and rights upon liquidation that could adversely affect the holders of our common stock.*

If the selling stockholders choose not to convert shares of SeriesA Convertible Preferred Stock, then, as holders of shares of SeriesA Convertible Preferred Stock, among other rights, they will be entitled to require us to repurchase for cash all the shares of SeriesA Convertible Preferred Stock held by them at a premium price if any of several redemption trigger events occurs. Our redemption obligation may be triggered by events that are beyond our control. These redemption provisions, if triggered, would require us to redeem the then-issued and outstanding shares of our SeriesA Convertible Preferred Stock for cash. If we were required to pay cash to the holders of shares of our SeriesA Convertible Preferred Stock, it could have a material impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations and may negatively impact the holders of our common stock.

Additionally, the holders of shares of our SeriesA Convertible Preferred Stock will be entitled to receive a preferential distribution of our assets prior to any distribution to our holders of common stock upon a liquidation, dissolution, winding up or other change in control transaction in which we sell all or substantially all our assets or merge or consolidate or otherwise combine with another company or entity. Upon the occurrence of a liquidation event, the holders of SeriesA Convertible Preferred Stock will be entitled to receive the greater of:

- the value of the shares of SeriesA Convertible Preferred Stock held by them determined by multiplying the closing sale price of our common stock on the Nasdaq SmallCap Market on the date of the liquidation event by the number of shares of common stock into which the preferred shares could be converted at the time of the liquidation event; or

- up to $50,000,000, the aggregate purchase price paid by the selling stockholders for shares of SeriesA Convertible Preferred Stock in our private placement, plus eight percent of that amount less the amount of any dividends paid to the preferred stockholders in the calendar year in which the liquidation event occurs.

Depending on the amount of assets we have available for distribution to stockholders upon a liquidation event when shares of SeriesA Convertible Preferred Stock remain outstanding, we may be required to distribute all such assets or a portion of such assets that exceeds the preferred stockholders' pro rata ownership of our common stock assuming full conversion of their preferred shares into

46

© 2004. EDGAR Online, Inc.

common stock, which could eliminate or limit the assets available for distribution to our common stockholders. Our potential obligation to pay to the law firms representing us in our efforts to establish our intellectual property rights a contingent fee of 20percent of the proceeds we receive from a sale of our company, subject to certain limitations, could also contribute to eliminating or limiting the assets available for distribution to our common stockholders.

*The rights of the selling stockholders as holders of shares of SeriesA Convertible Preferred Stock may prevent or make it more difficult for us to raise additional funds or take other significant company actions.*

The Certificate of Designation creating our SeriesA Convertible Preferred Stock requires us to obtain the approval of the holders of a majority of the then outstanding SeriesA Convertible Preferred Stock to take the following actions, among others:

- change the rights, preferences or privileges of the SeriesA Convertible Preferred Stock or issue additional shares of SeriesA Convertible Preferred Stock;

- create or issue any other securities that are senior or equal in rank to the SeriesA Convertible Preferred Stock;

- create or issue any convertible securities having floating conversion rate terms or a fixed conversion price below $16.93 or the closing sale price of our common stock on the Nasdaq SmallCap Market on the date of such issuance;

- incur any indebtedness, subject to limited exceptions; or

- sell or transfer any material asset or intellectual property to a third party.

The Certificate of Designation also provides that the holders of our SeriesA Convertible Preferred Stock have a participation right entitling them to purchase their pro rata share of any future equity securities, or debt that is convertible into equity, on the same terms offered by us to other purchasers of such securities. Additionally, the board of directors has agreed with the holders of our SeriesA Convertible Preferred Stock that we will not complete a transaction or take any action that could result in a claim for a contingency payment by the law firms representing us in our efforts to establish our intellectual property rights, other than contingency payments related to certain license transactions, without first obtaining the consent of the investors holding at least two thirds of the shares of our SeriesA Convertible Preferred Stock. This right of consent, and the participation right and other approval rights described above, may make it more difficult for management, our board of directors or our stockholders to reach a settlement in our litigation with IBM, raise capital in the future in either equity or debt financing transactions or to take other significant company actions. These provisions could also limit the price that some investors might be willing to pay for shares of our common stock in the future.

*The right of our board of directors to authorize additional shares of preferred stock could adversely impact the rights of holders of our common stock.*

Our board of directors currently has the right, with respect to the 4,950,000 shares of our preferred stock not designated as SeriesA Convertible Preferred Stock, to authorize the issuance of one or more additional series of our preferred stock with such voting, dividend and other rights as our directors determine. The board of directors can designate new series of preferred stock without the approval of the holders of our common stock, subject to the approval rights of our holders of SeriesA Convertible Preferred Stock as described above. The rights of holders of our common stock may be adversely affected by the rights of any holders of additional shares of preferred stock that may be issued in the future, including without limitation, further dilution of the equity ownership percentage of our holders of common stock and their voting power if we issue preferred stock with voting rights. Additionally, the issuance of preferred stock could make it more difficult for a third party to acquire a majority of our outstanding voting stock.

47

© 2004. EDGAR Online, Inc.

**Item 8. Financial Statements and Supplementary Data**

*Index to Consolidated Financial Statements and Schedule*

**Consolidated Financial Statements:**

        Independent Auditors' Report

        Report of Predecessor Independent Public Accountants

        Consolidated Balance Sheets as of October 31, 2003 and 2002

        Consolidated Statements of Operations and Comprehensive Income (Loss) for the years ended October31, 2003, 2002 and2001

        Consolidated Statements of Stockholders' Equity for the years ended October31, 2003, 2002 and2001

        Consolidated Statements of Cash Flows for the years ended October31, 2003, 2002 and2001

        Notes to Consolidated Financial Statements

**Financial Statement Schedule:**

        Report of Predecessor Independent Public Accountants on Financial Statement Schedule

        Schedule II—Valuation and Qualifying Accounts for the years ended October31, 2003, 2002 and2001

48

© 2004. EDGAR Online, Inc.

**Independent Auditors' Report**

The Board of Directors and Stockholders of
The SCO Group,Inc.:

We have audited the consolidated balance sheets of The SCO Group,Inc. and subsidiaries as of October31, 2003 and 2002, and the related consolidated statements of operations and comprehensive income (loss), stockholders' equity and cash flows for the years then ended. In connection with our audits of the 2003 and 2002 consolidated financial statements, we have audited the financial statement schedule for the years ended October31, 2003 and 2002, as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits. The consolidated financial statements and financial statement schedule of The SCO Group,Inc. and subsidiaries for the year ended October31, 2001, were audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on those consolidated financial statements and financial statement schedule in their report dated November30, 2001.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of The SCO Group,Inc. and subsidiaries as of October31, 2003 and 2002, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedule for the years ended October31, 2003 and 2002, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed above, the consolidated financial statements of The SCO Group,Inc. and subsidiaries for the year ended October31, 2001 were audited by other auditors who have ceased operations. As discussed in Notes 6 and 9, these consolidated financial statements have been revised to include the transitional disclosures required by Statement of Financial Accounting Standards No.142, "Goodwill and Other Intangible Assets," which was adopted by the Company as of November1, 2001, and to retroactively reflect a one-for-four reverse stock split of the Company's common stock approved on March4, 2002. We audited the adjustments that were applied to retroactively reflect the reverse stock split in the 2001 consolidated financial statements. In our opinion, such adjustments are appropriate and have been properly applied and the transitional disclosures for 2001 in Note6 are appropriate. However, we were not engaged to audit, review, or apply any procedures to the fiscal year 2001 consolidated financial statements of The SCO Group,Inc. and subsidiaries other than with respect to such adjustments and disclosures and, accordingly, we do not express an opinion or any form of assurance on the fiscal year 2001 consolidated financial statements taken as a whole.

/s/ KPMG LLP

Salt Lake City, Utah
December20, 2003, except as to Note17
which is as of January20, 2004

49

© 2004. EDGAR Online, Inc.

This report is a copy of the previously issued Arthur Andersen LLP report, which has not been reissued since Arthur Andersen LLP has ceased operations. The prior period financial statements have been revised to retroactively reflect a reverse stock split approved on March4, 2002 and to include the transitional disclosures required by Statement of Financial Accounting Standards No.142, "Goodwill and Other Intangible Assets‚" which was adopted by the Company as of November1, 2001.

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Caldera International,Inc.:

We have audited the accompanying consolidated balance sheets of Caldera International,Inc. (a Delaware corporation) and subsidiaries as of October31, 2001, and the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows for the year ended October31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Caldera International,Inc. and subsidiaries as of October31, 2001, and the results of their operations and their cash flows for the year ended October31, 2001 in conformity with accounting principles generally accepted in the United States.

Arthur Andersen LLP

Salt Lake City, Utah
November30, 2001

50

## THE SCO GROUP, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### (in thousands)

|  | | October 31, | |
|---|---|---|---|
|  | | 2003 | 2002 |

### ASSETS

| | | | |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ | 64,428 | $ 6,589 |
| Restricted cash | | 2,025 | 1,428 |
| Available-for-sale securities | | 4,095 | — |
| Accounts receivable, net of allowance for doubtful accounts of $230 and $348, respectively | | 9,282 | 8,622 |
| Other current assets | | 2,450 | 4,483 |
| Total current assets | | 82,280 | 21,122 |
| PROPERTY AND EQUIPMENT: | | | |
| Computer and office equipment | | 3,482 | 3,884 |
| Leasehold improvements | | 608 | 724 |
| Furniture and fixtures | | 189 | 201 |
| | | 4,279 | 4,809 |
| Less accumulated depreciation and amortization | | (3,131 ) | (2,788 ) |
| Net property and equipment | | 1,148 | 2,021 |
| OTHER ASSETS: | | | |
| Goodwill, net | | 1,166 | — |
| Intangibles, net | | 9,286 | 11,258 |
| Other assets, net | | 1,072 | 3,005 |
| Total other assets | | 11,524 | 14,263 |
| Total assets | $ | 94,952 | $ 37,406 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | | |
|---|---|---|---|
| CURRENT LIABILITIES: | | | |
| Accounts payable | $ | 1,978 | $ 2,467 |
| Royalty payable to Novell, Inc. | | 2,025 | 1,428 |
| Accrued compensation to law firms | | 10,556 | — |
| Accrued payroll and benefits | | 4,752 | 4,089 |
| Accrued liabilties | | 3,754 | 7,632 |
| Derivative related to redeemable convertible preferred stock | | 15,224 | — |
| Deferred revenue | | 5,501 | 10,056 |
| Other royalties payable | | 523 | 669 |
| Taxes payable | | 799 | 1,113 |
| Total current liabilities | | 45,112 | 27,454 |
| LONG-TERM LIABILITIES | | 508 | 1,625 |
| MINORITY INTEREST | | 145 | 150 |
| SERIES A REDEEMABLE CONVERTIBLE PREFERRED STOCK, | | 29,671 | — |
| $0.001 par value, 50 and 0 shares outstanding, respectively (Note 9) | | | |
| COMMITMENTS AND CONTINGENCIES (Notes 9 and 11) | | | |
| STOCKHOLDERS' EQUITY: | | | |
| Preferred stock, $0.001 par value; 5,000 shares authorized, | | — | — |
| Common stock, $0.001 par value; 45,000 shares authorized, 13,824 and 11,412 shares outstanding, respectively | | 14 | 11 |
| Additional paid-in capital | | 218,690 | 214,299 |
| Warrants outstanding | | 1,099 | 294 |
| Deferred compensation | | (347 ) | (644 ) |
| Accumulated other comprehensive income | | 926 | 510 |
| Accumulated deficit | | (200,866 ) | (206,293 ) |
| Total stockholders' equity | | 19,516 | 8,177 |
| Total liabilities and stockholders' equity | $ | 94,952 | $ 37,406 |

The accompanying notes are an integral part of the financial statements.

51

© 2004. EDGAR Online, Inc.

### THE SCO GROUP, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)
#### (in thousands, except per share data)

| | Year Ended October 31, | | |
| | 2003 | 2002 | 2001 |
|---|---|---|---|
| REVENUE: | | | |
| Products | $ 45,028 | $ 52,975 | $ 33,878 |
| SCOsource licensing | 25,846 | — | — |
| Services | 8,380 | 11,266 | 6,563 |
| Total revenue | 79,254 | 64,241 | 40,441 |
| COST OF REVENUE: | | | |
| Products | 4,405 | 7,558 | 6,966 |
| SCOsource licensing | 9,163 | — | — |
| Services | 6,354 | 10,758 | 7,957 |
| Total cost of revenue | 19,922 | 18,316 | 14,923 |
| GROSS MARGIN | 59,332 | 45,925 | 25,518 |
| OPERATING EXPENSES: | | | |
| Sales and marketing (exclusive of stock-based compensation of $129, $89, and $385, respectively) | 24,392 | 29,554 | 33,858 |
| Research and development (exclusive of stock-based compensation of $112, $45, and $492, respectively) | 11,012 | 17,558 | 16,761 |
| General and administrative (exclusive of stock-based compensation of $963, $991, and $496, respectively) | 6,230 | 9,307 | 9,257 |
| Restructuring charges | 498 | 6,728 | 3,130 |
| Amortization of goodwill and intangibles | 3,190 | 2,853 | 10,664 |
| Loss on disposition and impairment of long-lived assets | 164 | 1,796 | 73,700 |
| Write-off of investments | 250 | 1,180 | 8,309 |
| Stock-based compensation | 1,204 | 1,125 | 1,373 |
| Compensation to law firms | 8,956 | — | — |
| In-process research and development | — | — | 1,500 |
| Cost-sharing arrangement with The Santa Cruz Operation | — | — | 602 |
| Total operating expenses | 55,896 | 70,101 | 159,154 |
| INCOME (LOSS) FROM OPERATIONS | 3,436 | (24,176 ) | (133,636 ) |
| EQUITY IN LOSSES OF AFFILIATES | (62 ) | (50 ) | (648 ) |
| OTHER INCOME (EXPENSE): | | | |
| Interest income | 188 | 377 | 3,605 |
| Interest expense | (3 ) | (206 ) | (251 ) |
| Change in fair value of derivative | 2,845 | — | — |
| Other income (expense), net | (203 ) | (339 ) | 151 |
| Total other income (expense), net | 2,827 | (168 ) | 3,505 |
| INCOME (LOSS) BEFORE INCOME TAXES | 6,201 | (24,394 ) | (130,779 ) |
| PROVISION FOR INCOME TAXES | (774 ) | (483 ) | (578 ) |
| NET INCOME (LOSS) | 5,427 | (24,877 ) | (131,357 ) |
| DIVIDENDS ON SERIES A REDEEMABLE CONVERTIBLE PREFERRED STOCK | (123 ) | | |
| NET INCOME AVAILABLE (LOSS APPLICABLE) TO COMMON STOCKHOLDERS | $ 5,304 | $ (24,877 ) $ | (131,357 ) |
| BASIC NET INCOME (LOSS) PER COMMON SHARE | $ 0.43 | $ (1.93 ) $ | (10.92 ) |
| DILUTED NET INCOME (LOSS) PER COMMON SHARE | $ 0.34 | $ (1.93 ) $ | (10.92 ) |
| WEIGHTED AVERAGE BASIC COMMON SHARES OUTSTANDING | 12,261 | 12,893 | 12,024 |
| WEIGHTED AVERAGE DILUTED COMMON SHARES OUTSTANDING | 15,679 | 12,893 | 12,024 |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Net income (loss) | $ 5,427 | $ (24,877 ) $ | (131,357 ) |
| Unrealized gain (loss) on available-for-sale securities | 23 | — | (356 ) |
| Foreign currency translation adjustment | 393 | 423 | 143 |
| COMPREHENSIVE INCOME (LOSS) | $ 5,843 | $ (24,454 ) $ | (131,570 ) |

The accompanying notes are an integral part of the financial statements.

52

## THE SCO GROUP, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (in thousands)

| | Common Stock | | Additional Paid-in Capital | Warrants Outstanding | Deferred Compensation | Accumulated Comprehensive Income (Loss) | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance, October 31, 2000 | 9,861 | $ 10 | $ 155,678 | $ — | $ (3,715 ) | $ 300 | $ (50,059 ) | $ 102,214 |
| Amortization of deferred compensation | — | — | — | — | 1,373 | — | — | 1,373 |
| Removal of deferred compensation related to termination of option holders | — | — | (1,052 ) | — | 1,052 | — | — | — |
| Issuance of common shares upon exercise of stock options | 73 | — | 303 | — | — | — | — | 303 |
| Issuance of common shares under employee stock purchase program | 19 | — | 126 | — | — | — | — | 126 |
| Issuance of common shares in connection with acquisitions | 4,313 | 4 | 62,154 | — | — | — | — | 62,158 |
| Cumulative translation adjustment | — | — | — | — | — | 143 | — | 143 |
| Unrealized loss on available-for-sale securities | — | — | — | — | — | (356 ) | — | (356 ) |
| Net loss | — | — | — | — | — | — | (131,357 ) | (131,357 ) |
| Balance, October 31, 2001 | 14,266 | 14 | 217,209 | — | (1,290 ) | 87 | (181,416 ) | 34,604 |
| Issuance of common shares for services | 30 | — | 113 | — | — | — | — | 113 |
| Compensation expense for modifications made to certain option grants | — | — | 73 | — | — | — | — | 73 |
| Amortization of deferred compensation | — | — | — | — | 986 | — | — | 986 |
| Removal of deferred compensation related to termination of option holders | — | — | (155 ) | — | 155 | — | — | — |
| Reversal of compensation expense previously recorded related to termination of option holders | — | — | (565 ) | — | — | — | — | (565 ) |
| Issuance of common stock for services to officers and key employees | 450 | 1 | 494 | — | (495 ) | — | — | — |
| Issuance of common stock for prior services to former Chief Executive Officer | 175 | — | 105 | — | — | — | — | 105 |
| Issuance of common stock for the cancellation of change in control agreements | 105 | — | 119 | — | — | — | — | 119 |
| Issuance of common shares upon exercise of stock options | 215 | — | 295 | — | — | — | — | 295 |
| Issuance of common shares under employee stock purchase program | 175 | — | 291 | — | — | — | — | 291 |
| Acquisition of common shares from stockholders | (4,804 ) | (5 ) | (4,579 ) | — | — | — | — | (4,584 ) |
| Issuance of common shares for a note receivable | 800 | 1 | 899 | — | — | — | — | 900 |
| Issuance of a warrant | — | — | — | 294 | — | — | — | 294 |
| Cumulative translation adjustment | — | — | — | — | — | 423 | — | 423 |
| Net loss | — | — | — | — | — | — | (24,877 ) | (24,877 ) |
| Balance, October 31, 2002 | 11,412 | 11 | 214,299 | 294 | (644 ) | 510 | (206,293 ) | 8,177 |
| Issuance of common shares to officers, key employees and directors for services, net of cancellations | 357 | 1 | 726 | — | (569 ) | — | — | 158 |
| Issuance of common shares upon exercise of stock options | 1,305 | 1 | 2,055 | — | — | — | — | 2,056 |
| Issuance of common shares under employee stock purchase program | 345 | — | 236 | — | — | — | — | 236 |
| Issuance of common shares in connection with business combination | 305 | 1 | 2,460 | — | — | — | — | 2,461 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Compensation expense for modifications made to certain option grants | — | — | 42 | — | — | — | — | 42 |
| Stock-based compensation for services | — | — | 296 | — | — | — | — | 296 |
| Issuance of warrants | — | — | — | 1,099 | — | — | — | 1,099 |
| Exercise of a warrant | 200 | — | 294 | (294 ) | — | — | — | — |
| Acquisition of common shares from stockholder | (100 ) | — | (1,718 ) | — | — | — | — | (1,718 ) |
| Amortization of stock-based compensation | — | — | — | — | 866 | — | — | 866 |
| Cumulative translation adjustment | — | — | — | — | — | 393 | — | 393 |
| Unrealized gain on available-for-sale securities | — | — | — | — | — | 23 | — | 23 |
| Net income | — | — | — | — | — | — | 5,427 | 5,427 |
| Balance, October 31, 2003 | 13,824 $ | 14 $ | 218,690 $ | 1,099 $ | (347 ) $ | 926 $ | (200,866 ) $ | 19,516 |

See accompanying notes to consolidated financial statements.

53

© 2004.  EDGAR Online, Inc.

**THE SCO GROUP,INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended October 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income (loss) | $ 5,427 | $ (24,877 ) | $ (131,357 ) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Issuance of common shares as compensation to law firms | 7,956 | — | — |
| Amortization of goodwill and intangibles (including $337, $334 and $0 classified as cost of revenue) | 3,527 | 3,187 | 10,664 |
| Stock-based compensation | 1,204 | 1,125 | 1,373 |
| Depreciation and amortization | 1,049 | 2,555 | 2,204 |
| Write-downs of investments | 250 | 1,180 | 8,309 |
| Issuance of a warrant (classified as cost of SCOsource licensing revenue) | 243 | — | — |
| Loss on disposition and write-downs of long-lived assets | 164 | 1,796 | 73,700 |
| Equity in losses of affiliates | 62 | 50 | 648 |
| Change in fair value of derivative | (2,845 ) | — | — |
| In-process research and development | — | — | 1,500 |
| Amortization of debt discount | — | 208 | 247 |
| Loss on disposal of assets | — | — | 165 |
| Changes in operating assets and liabilities, net of effects of acquisitions: | | | |
| Accounts receivable, net | (837 ) | 8,120 | (8,137 ) |
| Other current assets | 1,269 | (145 ) | (666 ) |
| Other assets | 1,501 | (1,387 ) | (903 ) |
| Accounts payable | (217 ) | (414 ) | 378 |
| Payable to The Santa Cruz Operation | — | 27 | (361 ) |
| Accrued payroll and benefits | 1,115 | (2,924 ) | 2,134 |
| Compensation to law firms | 2,600 | — | — |
| Accrued liabilities | (4,091 ) | 411 | 985 |
| Deferred revenue | (4,555 ) | 1,815 | (2,849 ) |
| Other royalties payable | (146 ) | (503 ) | 410 |
| Taxes payable | 90 | (240 ) | 297 |
| Other long-term liabilities | (1,679 ) | (576 ) | 1,194 |
| Net cash provided by (used in) operating activities | 12,087 | (10,592 ) | (40,065 ) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchase of property and equipment | (467 ) | (206 ) | (1,520 ) |
| Acquisitions, net of acquisition costs and cash received | — | (100 ) | (23,005 ) |
| Purchase of available-for-sale securities | (4,095 ) | — | (5,866 ) |
| Proceeds from available-for-sale securities | — | 5,943 | 53,629 |
| Investment in non-marketable securities | (950 ) | (350 ) | — |
| Net cash provided by (used in) investing activities | (5,512 ) | 5,287 | 23,238 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Proceeds from sale of common stock through ESP program | 236 | 291 | 126 |
| Proceeds from exercise of common stock options | 2,056 | 295 | 303 |
| Purchase of common shares from existing stockholders | — | (4,584 ) | — |
| Net proceeds from the issuance of warrants | 856 | — | — |
| Repayments of long-term debt | — | (5,000 ) | — |
| Net proceeds from issuance of Series A Convertible Preferred Stock | 47,740 | — | — |
| Minority interest in subsidiary | — | — | 173 |
| Net cash provided by (used in) financing activities | 50,888 | (8,998 ) | 602 |
| NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | 57,463 | (14,303 ) | (16,225 ) |
| EFFECT OF FOREIGN EXCHANGE RATES ON CASH | 376 | 351 | 206 |

| | | | | | |
|---|---|---|---|---|---|
| CASH AND CASH EQUIVALENTS, beginning of year | | 6,589 | | 20,541 | 36,560 |
| CASH AND CASH EQUIVALENTS, end of year | $ | 64,428 | $ | 6,589 | $ | 20,541 |

See accompanying notes to consolidated financial statements.

54

|  | Year Ended October 31, | | | | | |
|  | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | | | | | |
|    Cash paid for taxes | $ | 413 | $ | 877 | $ | 1,313 |
| SUPPLEMENTAL SCHEDULE OF NONCASH INVESTING AND FINANCING ACTIVITIES | | | | | | |
|    Acquisition of Vultus, Inc.: | | | | | | |
|       Intangible assets | $ | 1,555 | $ | — | $ | — |
|       Goodwill | $ | 1,166 | $ | — | $ | — |
|       Common stock issued | $ | (2,461 ) | $ | — | $ | — |
|       Accrued liabilities assumed | $ | (215 ) | $ | — | $ | — |
|       Acquisition costs | $ | (45 ) | $ | — | $ | — |
|    Settlement of notes receivable from Vista and NextEStage: | | | | | | |
|       SCO shares acquired | $ | 1,718 | $ | — | $ | — |
|       Investment write-off and other | $ | 500 | $ | — | $ | — |
|       Notes receivable, royalties and investment | $ | (2,218 ) | $ | — | $ | — |
|    Dividends on Series A Convertible Preferred Stock | $ | 123 | $ | — | $ | — |
|    Deferred compensation for issuance of common shares | $ | 569 | $ | 495 | $ | — |
|    Settlement related to the acquisition of the server and professional services groups of The Santa Cruz Operation reflected as an adjustment to the purchase price | $ | — | $ | 3,341 | $ | — |
|    Issuance of common shares for a note receivable | $ | — | $ | 900 | $ | — |
|    Issuance of non-interest bearing note in connection with the acquired operations of the server and professional services groups of The Santa Cruz Operation | $ | — | $ | — | $ | 8,000 |
|    Issuance of common shares and options in acquisitions | $ | — | $ | — | $ | 62,158 |

See accompanying notes to consolidated financial statements.

55

© 2004. EDGAR Online, Inc.

**THE SCO GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) ORGANIZATION AND DESCRIPTION OF BUSINESS**

The Company was originally incorporated as Caldera Systems, Inc. ("Caldera Systems"), a Utah corporation, on August 21, 1998, and reincorporated as a Delaware corporation on March 6, 2000. In March 2000, Caldera Systems completed an initial public offering of its common stock (see Note 9).

On May 7, 2001, Caldera International, Inc. ("Caldera") was formed as a holding company to own Caldera Systems and to acquire substantially all of the assets, liabilities and operations of the server and professional services groups of The Santa Cruz Operation, now known as Tarantella, Inc., pursuant to an Agreement and Plan of Reorganization (the "Reorganization Agreement"), dated as of August 1, 2000, as amended. Under the Reorganization Agreement, Caldera acquired the tangible and intangible assets used in the server and professional services groups, including all of the capital stock of certain of The Santa Cruz Operation's subsidiaries. In connection with the formation of Caldera, Caldera Systems became a wholly-owned subsidiary of Caldera. All shares of Caldera Systems' common stock, as well as options to purchase shares of Caldera Systems' common stock, were converted into the same number of shares of common stock of Caldera and options to purchase shares of common stock of Caldera.

The acquired operations from The Santa Cruz Operation developed and marketed server software related to networked business computing and were one of the leading providers of UNIX server operating systems. In addition, these operations provided professional services related to implementing and maintaining UNIX system software products. The acquisition provided Caldera with international offices and a distribution channel with resellers throughout the world. Subsequent to this acquisition, the Company has primarily sold UNIX based products and services.

On May 16, 2003, Caldera's stockholders approved an amendment to Caldera's certificate of incorporation that changed Caldera's name to The SCO Group, Inc. (the "Company").

The Company's business focuses on marketing reliable, cost-effective UNIX software products and related services for the small-to-medium sized business market. In January 2003 the Company established its SCOsource division and launched its first of several SCOsource initiatives to review and enforce its intellectual property surrounding the UNIX operating system which it acquired from The Santa Cruz Operation.

**(2) SIGNIFICANT ACCOUNTING POLICIES**

**Use of Estimates in the Preparation of Financial Statements**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from these estimates. Key estimates in the accompanying consolidated financial statements include, among others, revenue recognition, allowances for doubtful accounts receivable, determination of fair value of the derivative associated with the Series A Convertible Preferred Stock, impairment of long-lived assets, and valuation allowances against deferred income tax assets.

**Reclassifications**

Certain reclassifications have been made to the fiscal year 2002 amounts to conform to the current year presentation. The reclassifications had no effect on net loss for the prior year.

56

© 2004. EDGAR Online, Inc.

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and its wholly-owned and majority-owned operating subsidiaries after all intercompany balances and transactions have been eliminated.

The following table lists the Company's subsidiaries, location and ownership interest:

| Subsidiary | Location | Ownership Interest |
|---|---|---|
| SCO Operations, Inc. | United States | Wholly-owned |
| SCO Global, Inc. | United States | Wholly-owned |
| SCO Software (Ireland) Ltd. | Ireland | Wholly-owned |
| SCO Japan, Ltd. | Japan | Majority-owned |
| The SCO Group Korea, Inc. | Korea | Wholly-owned |
| SCO Canada, Inc. | Canada | Wholly-owned |
| The SCO Group (Deutschland) GmbH | Germany | Wholly-owned |
| The SCO Group (France) Sarl | France | Wholly-owned |
| The SCO Group (Italia) Srl | Italy | Wholly-owned |

**Fair Value of Financial Instruments**

The carrying amounts reported in the accompanying consolidated financial statements for cash and cash equivalents, accounts receivable and accounts payable approximate fair values because of the immediate or short-term maturities of these financial instruments. The fair values of available-for-sale securities are determined using quoted market prices for these securities. The fair value of the SeriesA Convertible Preferred Stock derivative and SeriesA Convertible Preferred Stock were determined using a binomial pricing model as of October31, 2003 (see Note9).

**Foreign Currency Translation**

The functional currency of the Company's foreign subsidiaries is the local foreign currency. All assets and liabilities denominated in foreign currencies are translated into U.S. dollars at the exchange rate prevailing on the balance sheet date. Revenue and expenses are translated at average exchange rates prevailing during the period. Translation adjustments resulting from translation of the subsidiaries' accounts are recorded in accumulated other comprehensive income. Gains and losses resulting from foreign currency transactions are included in the consolidated statements of operations and have not been material.

**Cash and Cash Equivalents and Available-for-Sale Securities**

The Company considers all highly liquid debt instruments purchased with original maturities of three or fewer months to be cash equivalents. Cash equivalents were $61,701,000 as of October31, 2003, which primarily consisted of investments in money market funds and commercial paper.

57

© 2004.  EDGAR Online, Inc.

The following table shows the cost, realized gain or loss and fair market value of the Company's cash equivalents and available-for-sale securities as of October31, 2003 (in thousands):

| | Cost | | Realized Gains (Losses) | | Fair Market Value |
|---|---|---|---|---|---|
| Commercial paper | $ | 46,052 | $ | — $ | 46,052 |
| Corporate notes | | 14,111 | | 16 | 14,127 |
| Money market | | 3,412 | | — | 3,412 |
| U.S. Government agencies | | 2,198 | | 7 | 2,205 |
| Total | $ | 65,773 | $ | 23 $ | 65,796 |

Available-for-sale securities as of October31, 2003 included government agencies and corporate debt. Available-for-sale securities are recorded at fair market value, based on quoted market prices, and unrealized gains and losses are recorded as a component of comprehensive income (loss). Realized gains and losses, which are calculated based on the specific-identification method, are recorded in operations as incurred. As of October31, 2003 and 2002, available-for-sale securities consisted of the following (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Maturity date | | |
| 3-6 months | $ 903 | $ — |
| 6-12 months | 703 | — |
| > 12 months | 2,489 | — |
| Total | $ 4,095 | $ — |

**Restricted Cash and Royalty Payable to Novell,Inc.**

Pursuant to the 1995 Asset Purchase Agreement and the Company's acquisition of assets and operations of The Santa Cruz Operation, the Company acts as an administrative agent in the collection of royalties from a limited number of pre-existing Novell,Inc. ("Novell") customers who continue to deploy SVRx technology. Under the agency agreement, the Company collects payments from such customers and receives 5percent as an administrative fee. The Company records the 5percent administrative fee as revenue in its consolidated statements of operations. The accompanying October31, 2003 and 2002 consolidated balance sheets reflect amounts collected related to this agency agreement but not yet remitted to Novell of $2,025,000 and $1,428,000, respectively, as restricted cash and royalty payable to Novell. The Company's obligation to act as an administrative agent for Novell is unrelated to the Company's SCOsource initiatives related to its intellectual property rights or the Company's lawsuit against Novell for slander of title alleging Novell's bad faith effort to interfere with the Company's copyrights in its UNIX source code and derivative works and its UnixWare product.

**Allowance for Doubtful Accounts Receivable**

The Company offer credit terms on the sale of the Company's products to a significant majority of the Company's customers and require no collateral from these customers. The Company performs ongoing credit evaluations of the Company's customers' financial condition and maintain an allowance for doubtful accounts receivable based upon the Company's our historical experience and a specific review of accounts receivable at the end of each period. The Company's actual bad debts may differ from the Company's our estimates and the difference could be significant.

58

© 2004. EDGAR Online, Inc.

**Inventories**

Inventories consist primarily of completed software products. Inventories are stated at the lower of cost (using the first-in, first-out method) or market value. As of October 31, 2003 and 2002, inventories amounted to $298,000 and $144,000, respectively. Inventories are included in other current assets in the accompanying consolidated balance sheets.

Provisions, when required, are made to reduce excess and obsolete inventories to their estimated net realizable value. Due to competitive pressures and technological innovation, it is possible that estimates of the net realizable value could change in the near term.

**Capitalized Software Costs**

In accordance with Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No.86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed," development costs incurred in the research and development of new software products to be sold, leased or otherwise marketed are expensed as incurred until technological feasibility in the form of a detail program design or working model has been established. Software development costs incurred after technological feasibility was established and prior to product release were not material for fiscal years 2003, 2002 and 2001. The Company has charged its software development costs to research and development expense in the accompanying consolidated statements of operations.

**Long-Lived Assets**

The Company reviews its long-lived assets for impairment when events or changes in circumstances indicate that the book value of an asset may not be recoverable. The Company evaluates, at each balance sheet date, whether events and circumstances have occurred which indicate possible impairment. The carrying value of a long-lived asset is considered impaired when the anticipated cumulative undiscounted cash flows of the related asset or group of assets is less than the carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the estimated fair market value of the long-lived asset.

**Revenue Recognition**

The Company recognizes revenue in accordance with Statement of Position ("SOP") 97-2, as modified by SOP 98-9 and Staff Accounting Bulletin ("SAB") No.104. Revenue recognition in accordance with these pronouncements can be complex due to the nature and variability of the Company's sales transactions. The Company's revenue is primarily from three sources: (i)product license revenue, primarily from product sales to resellers and end users, and royalty revenue from product sales by source code OEMs; (ii)service and support revenue, primarily from providing software updates, support and education and consulting services to end users; and (iii)licensing revenue from its SCOsource intellectual property initiative.

The Company recognizes product revenue upon shipment if a signed contract exists, the fee is fixed and determinable, collection of the resulting receivable is probable and product returns are reasonably estimable, except for sales to distributors, which are recognized upon sale by the distributor to resellers or end users.

The majority of the Company's revenue transactions relate to product-only sales. On occasion, the Company has revenue transactions that have multiple elements (i.e., delivered and undelivered products, maintenance and other services). For software agreements that have multiple elements, the Company allocates revenue to each component of the contract based on the relative fair value of the elements. The fair value of each element is based on vendor specific objective evidence ("VSOE").

59

© 2004. EDGAR Online, Inc.

VSOE is established when such elements are sold separately. The Company recognizes revenue allocated to undelivered products when the criteria for product revenue recognition set forth above have been met.

The Company recognizes product revenue from OEM's upon receipt of sales-out royalty reports and recognizes revenue from maintenance fees for ongoing customer support ratably over the period of the maintenance contract. Payments for maintenance fees are generally made in advance and are non-refundable. Revenue from education and consulting services is recognized as the related services are performed.

The Company's SCOsource licensing revenue to date has been generated from license agreements to utilize the Company's UNIX source code. The Company recognizes revenue from licensing agreements when a signed contract exists, the fee is fixed and determinable, collection of the receivable is probable and delivery has occurred. If the payment terms extend beyond the Company's normal payment terms, revenue is recognized as the payments are received.

**Royalty Costs**

Royalties paid by the Company on applications licensed from third parties that are incorporated into the software products sold by the Company are expensed as cost of revenue on a per unit basis as software products are sold. Royalties paid in advance of product sales are included in prepaid expenses and recorded as cost of revenue when the related products are sold. During fiscal years 2003, 2002 and 2001, the Company incurred $1,464,000, $1,552,000 and $1,989,000, respectively, of royalty expense.

**Sales and Marketing Expenses**

Sales and marketing expenses consist of the following: advertising, channel promotions, marketing development funds, promotional activities, public relations, trade shows and the salaries, commissions and related expenses of all personnel involved in the sales process. The Company expenses the cost of advertising the first time the advertising takes place. Advertising expenses totaled $665,000, $1,698,000 and $2,964,000 for fiscal years 2003, 2002 and 2001, respectively.

**Cooperative Advertising**

The Company reimburses certain qualified resellers and distributors for a portion of the advertising costs related to their promotion of the Company's products. The Company's liability for reimbursement is accrued at the time revenue is recognized as a percentage of the reseller's or distributor's net revenue derived from the Company's products. The consideration for cooperative advertising given by the Company, is considered a reduction in revenue when recognized in the statement of operations unless the benefit from the advertising can be separated and the fair value of the benefit can be reasonably estimated pursuant to Emerging Issues Task Force ("EITF") 01-9, "Accounting for Consideration Given by a Vendor". For fiscal years 2003, 2002 and 2001, the Company recognized cooperative advertising revenue and a corresponding expense of $408,000, $2,054,000 and $2,338,000, respectively. The advertising cost reimbursements are recorded as sales and marketing expense in the accompanying consolidated statements of operations.

**Stock-based Compensation**

The Company accounts for stock options issued to directors, officers and employees under Accounting Principles Board ("APB") No.25. Under APB No.25, compensation expense is recognized if an option's exercise price on the measurement date is below the fair market value of the Company's common stock.

© 2004. EDGAR Online, Inc.

SFAS No.148, "Accounting for Stock-Based Compensation," requires pro forma information regarding net income (loss) as if the Company had accounted for its stock options granted under the fair value method. The fair value for the Company's stock options is estimated on the date of grant using the Black-Scholes option-pricing model.

With respect to stock options and restricted stock awards granted and employee stock purchase program ("ESPP") shares purchased during fiscal years 2003, 2002 and 2001, the assumptions used are listed in the following table:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Risk-free interest rate | 2.9 % | 3.0 % | 3.5 % |
| Expected dividend yield | 0.0 % | 0.0 % | 0.0 % |
| Volatility | 126.0 % | 161.0 % | 112.0 % |
| Expected exercise life (in years) | 2.7 | 2.5 | 3.0 |

For purposes of the pro forma disclosure, the estimated fair value of stock options, restricted stock awards and ESPP shares are amortized over the vesting period of the award. The following is the pro forma disclosure and the related impact on net income (loss) to common stockholders and the net income (loss) to common stockholders per diluted common share for fiscal years 2003, 2002 and 2001 (in thousands, except per share amounts):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income available (loss applicable) to common stockholders: |  |  |  |
| As reported | $ 5,304 | $ (24,877 ) | $ (131,357 ) |
| Stock-based compensation included in reported net income (loss) | 1,204 | 1,125 | 1,373 |
| Stock-based compensation under fair value method | (1,855 ) | (6,814 ) | (8,815 ) |
| Pro forma net income available (loss applicable) to common stockholders | $ 4,653 | $ (30,566 ) | $ (138,799 ) |
| Net income available (loss applicable) to common stockholders per diluted common share: |  |  |  |
| As reported | $ 0.34 | $ (1.93 ) | $ (10.92 ) |
| Pro forma | $ 0.30 | $ (2.37 ) | $ (11.54 ) |

**Income Taxes**

The Company recognizes a liability or asset for the deferred tax consequences of all temporary differences between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements that will result in taxable or deductible amounts in future years when the reported amounts of the assets and liabilities are recovered or settled. These deferred tax assets or liabilities are measured using the enacted tax rates that will be in effect when the differences are expected to reverse. Deferred tax assets are reviewed periodically for recoverability, and valuation allowances are provided as necessary. The Company has provided a valuation allowance against the entire net deferred tax asset because of its history of net operating losses and the uncertainties regarding future operating profitability and taxable income.

**Comprehensive Income (Loss)**

Comprehensive income (loss) consists of net income (loss), foreign currency translation adjustments and unrealized gain (loss) on available-for-sale securities and is presented in the accompanying consolidated statements of operations and comprehensive income (loss).

© 2004. EDGAR Online, Inc.

**Hedging of Foreign Currency Transactions**

The Company utilizes foreign currency forward exchange contracts for foreign currency market exposures of underlying assets and liabilities. The Company does not use forward exchange contracts for speculative or trading purposes. The Company's accounting policies for these instruments are based on the Company's designation of such instruments. The criteria the Company uses for designating an instrument includes the instrument's effectiveness in risk reduction and one-to-one matching of forward exchange contracts to underlying assets and liabilities. Gains and losses on currency forward contracts that are designated and effective are deferred and recognized in income in the same period that the underlying transactions are settled. Gains and losses on currency forward contracts that are designated and effective are recognized in income in the same period as losses and gains on the underlying transactions are recognized and generally offset. Gains and losses on any instruments not meeting the above criteria are recognized in income in the current period. As of October 31, 2003, the Company had one foreign exchange contract with a maturity of 30 days to sell an aggregate of 900,000 United Kingdom pounds for approximately $1,514,000 U.S. dollars. The Company also had one foreign exchange contract with a maturity of 30 days to buy 1,000,000 Euros for approximately $1,179,000 U.S. dollars. As of October 31, 2003, the Company had no outstanding instruments classified as hedges.

**Net Income (Loss) per Common Share**

The Company computes net income (loss) per share in accordance with SFAS No. 128, "Earnings Per Share," and SAB No. 98. Under the provisions of SFAS No. 128 and SAB No. 98, basic net income (loss) per common share ("Basic EPS") is computed by dividing net income (loss) attributable to common stockholders by the weighted average number of common shares outstanding. Diluted net income (loss) per common share ("Diluted EPS") is computed by dividing net income (loss) attributable to common stockholders by the sum of the weighted average number of common shares and the dilutive potential common share equivalents then outstanding. Potential common share equivalents consist of shares issuable upon the exercise of stock options, restricted stock shares and warrants during the period which they were outstanding.

The following table is a reconciliation of the numerator and denominator of Basic EPS to the numerator and denominator of Diluted EPS (in thousands, except per share amounts):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Numerator: |  |  |  |
| Net income available (loss applicable) to common stockholders | $ 5,304 | $ (24,877 ) | $ (131,357 ) |
| Denominator: |  |  |  |
| Weighted average common shares outstanding | 12,256 | 12,893 | 12,024 |
| Series A Convertible Preferred Stock | 5 | — | — |
| Weighted average basic common shares outstanding | 12,261 | 12,893 | 12,024 |
| Stock options | 2,833 | — | — |
| Restricted stock | 471 | — | — |
| Warrants | 114 | — | — |
| Weighted average diluted common shares outstanding | 15,679 | 12,893 | 12,024 |
| Basic EPS | $ 0.43 | $ (1.93 ) | $ (10.92 ) |
| Diluted EPS | 0.34 | (1.93 ) | (10.92 ) |
| Excluded anti-dilutive common share equivalents | 387 | 4,374 | 3,099 |

© 2004. EDGAR Online, Inc.

Certain stock options were excluded from the computation of diluted net loss per common share as their effect would have been anti-dilutive, thereby decreasing the net loss per common share.

## (3) ACQUISITIONS

**Vultus**

Under the terms of an Asset Acquisition Agreement (the "Vultus Agreement") dated June6, 2003, the Company acquired substantially all of the assets of Vultus,Inc. ("Vultus"), a corporation engaged in the web services interface business. As consideration for the assets acquired, the Company issued approximately 167,000 shares of the Company's common stock, of which The Canopy Group ("Canopy"), the Company's principal stockholder, received approximately 37,000 shares. The Company also assumed approximately $215,000 in accrued liabilities of Vultus. In addition, the Company assumed the obligations of Vultus under two secured notes payable to Canopy totaling $1,073,000. In connection with the assumption of the notes payable to Canopy, Canopy agreed to accept the issuance of approximately 138,000 shares of the Company's common stock in full satisfaction of the obligations. Canopy was a stockholder and significant debt holder of Vultus. Neither Canopy nor any of its officers or directors participated in the approval of this transaction.

The following table summarizes the components of the consideration paid to Vultus (in thousands, except per share data):

| Consideration paid: | | |
|---|---|---|
| Fair value of common stock issued (305,000 shares at $8.06 per share) | $ | 2,461 |
| Assumed liabilities | | 215 |
| Direct expenses | | 45 |
| Total consideration | $ | 2,721 |

The $8.06 per share value of the common stock issued was determined based on the average market price of the Company's common stock for the two days before and the day of signing the Vultus Agreement.

The Company accounted for the acquisition of Vultus as a business combination in accordance with SFAS No.141. SFAS No.141 requires that the total purchase price, including direct fees and expenses, be allocated to the assets acquired based upon their respective fair values. No current assets or tangible assets of significant value were acquired. Based on the nature and status of the research and development projects at the date of acquisition, none of the purchase price has been allocated to in-process research and development. The purchase price has been allocated to the intangible assets acquired as follows (in thousands):

| Purchase price allocation: | | |
|---|---|---|
| Acquired technology (estimated useful life of two years) | $ | 1,555 |
| Goodwill | | 1,166 |
| Total | $ | 2,721 |

© 2004. EDGAR Online, Inc.

**The Santa Cruz Operation**

On May7, 2001, the Company acquired certain assets, liabilities and operations from The Santa Cruz Operation in exchange for: (i)the issuance of 4,000,000 shares of common stock (400,000 of which were held in escrow for a one-year period); (ii)the issuance of options to purchase up to an aggregate of 415,000 shares of the Company's common stock in exchange for options to purchase The Santa Cruz Operation common stock previously held by individuals who became employees of the Company; (iii)$23,000,000 in cash, including the forgiveness of $7,000,000 previously advanced to The Santa Cruz Operation; and (iv)a non-interest bearing promissory note in the amount of $8,000,000 due in quarterly installments of $2,000,000 beginning July2002. The following table summarizes the components of the consideration paid to The Santa Cruz Operation (in thousands, except per share data):

| Consideration paid: | | |
|---|---|---|
| Fair value of common stock (4,000 shares at $13.88 per share) | $ | 55,520 |
| Fair value of options to purchase 415 shares of common stock issued in exchange for 3,323 outstanding options of The Santa Cruz Operation | | 4,201 |
| Cash | | 23,000 |
| Note payable (discounted at 6.5%) | | 7,322 |
| Direct expenses | | 3,744 |
| Total consideration | $ | 93,787 |

The Company calculated the $13.88 per share price used in the computation of total consideration for the common stock by taking the closing stock price for the two days before, the day of, and the two days after the signing of the final amendment to the Agreement. The per share value calculated for each option exchanged was $10.12 and was calculated using the Black-Scholes option pricing model using the following assumptions: term of 2.5years, volatility of 134percent, dividend yield of 0percent and a discount rate of 5percent.

The Company accounted for the acquisition of certain assets and operations from The Santa Cruz Operation using the purchase method of accounting. Under this method, the total purchase price, including direct fees and expenses, was allocated to the tangible and intangible assets acquired and the liabilities assumed based upon their respective fair values. The following table summarizes the allocation of the consideration to the tangible and intangible assets acquired and liabilities assumed (in thousands):

| Purchase price allocation: | | |
|---|---|---|
| Liabilities assumed net of tangible assets acquired | $ | (5,482 ) |
| Accrual for severance payments, non-essential facilities and related costs | | (3,011 ) |
| Intangible assets acquired: | | |
| Distribution/reseller channel | | 26,700 |
| Existing technology (consisting primarily of UnixWare and OpenServer) | | 5,800 |
| Acquired in-process research and development | | 1,500 |
| Trade names | | 800 |
| Distribution agreement | | 1,400 |
| Goodwill | | 66,080 |
| Total | $ | 93,787 |

A one-time charge of $1,500,000 related to the fair value of the in-process research and development was recorded during fiscal year 2001. The write-off was necessary because the acquired

64

in-process research and development had not yet reached technological feasibility and had no future alternative uses. Engineering efforts were focused on developing the UnixWare 7.1.2 and Messaging Server products. Development work on these products was substantially complete at the end of fiscal year 2001.

**Pro Forma Financial Information**

The following table sets forth certain pro forma financial information had the Vultus acquisition been completed as of November 1, 2001 and The Santa Cruz Operation acquisition been completed as of November 1, 2000 (unaudited, in thousands, except per share amounts):

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | **2003** | **2002** | **2001** |
| Revenue | $ 79,254 | $ 64,296 | $ 87,039 |
| Net income (loss) from operations | 2,133 | (26,142 ) | (148,469 ) |
| Net income available (loss) applicable to common stockholders | 3,998 | (26,877 ) | (146,190 ) |
| Basic net income (loss) per common share | $ 0.32 | $ (2.04 ) $ | (10.38 ) |
| Diluted net income (loss) per common share | $ 0.25 | $ (2.04 ) $ | (10.38 ) |

**(4) OTHER CURRENT ASSETS**

Other current assets include the following as of October 31, 2003 and 2002 (in thousands):

|  | **2003** | **2002** |
|---|---|---|
| Prepaid expenses | $ 1,327 | $ 1,273 |
| Deposits | 534 | 417 |
| VAT receivable | 103 | 1,556 |
| Other | 486 | 1,237 |
| Total | $ 2,450 | $ 4,483 |

**(5) PROPERTY AND EQUIPMENT**

Property and equipment are stated at cost, less accumulated depreciation and amortization. Computer equipment is depreciated using the straight-line method over the estimated useful life of the asset, which is typically three years. Furniture and fixtures and office equipment are depreciated using the straight-line method over the estimated useful life of the asset, typically three to five years. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated useful life of the improvement or the remaining term of the applicable lease.

Expenditures for repairs and maintenance are charged to expense when incurred. Expenditures for major renewals and betterments that extend the useful lives of existing equipment are capitalized and depreciated. Upon retirement or disposition of property and equipment, the cost and related accumulated depreciation are removed from the accounts and any resulting gain or loss is recognized in the consolidated statements of operations.

Depreciation and amortization expense was $1,049,000, $2,555,000 and $2,204,000 during fiscal years 2003, 2002 and 2001, respectively.

**(6) GOODWILL AND INTANGIBLE ASSETS**

In July 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets." Under SFAS No. 142, goodwill and other intangible assets with indefinite lives are no longer amortized, but

65

© 2004. EDGAR Online, Inc.

rather are assessed annually for impairment. The Company adopted SFAS No.142 on November1, 2001, the beginning of fiscal year 2002. All of the Company's identifiable intangible assets other than goodwill are deemed to have finite lives and are being amortized over their remaining useful lives.

Subsequent to the acquisition of certain assets and operations from The Santa Cruz Operation, the Company experienced significant unanticipated decreases in actual and forecasted revenue of the acquired operations, a significant decline in market valuations and general economic conditions, particularly in the information technology sector, a weakening of partner relationships, the loss of certain key executives, and other factors which indicated the recorded values of the long-lived assets were impaired. As a result, the Company performed a valuation of its long-lived assets as of October31, 2001 and concluded that a $73,700,000 write-down of goodwill and intangible assets was necessary.

The following table summarizes the write-down for each of the Company's intangible assets and goodwill during fiscal year 2001 (in thousands):

|  | Estimated Useful Life | Net Book Value (prior to write-down) | Estimated Fair Market Value | Write-down |
|---|---|---|---|---|
| Intangible assets acquired: |  |  |  |  |
| Distribution/reseller channel | 5 years | $ 24,030 | $ 12,400 | $ 11,630 |
| Existing technology | 5 years | 5,220 | 1,800 | 3,420 |
| Existing technology | 2 years | 2,225 | 930 | 1,295 |
| Distribution agreement | 5 years | 1,260 | — | 1,260 |
| Trade names | 5 years | 720 | 278 | 442 |
| Goodwill | Indefinite | 57,931 | 2,278 | 55,653 |
| Total |  | $ 91,386 | $ 17,686 | $ 73,700 |

Upon adoption of SFAS No.142, the Company reassessed the useful lives of its intangible assets. The following table summarizes the remaining components of amortized intangible assets and their useful lives as of October31, 2003 (in thousands):

|  | Estimated Useful Life | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
|---|---|---|---|---|
| Amortized intangible assets: |  |  |  |  |
| Distribution/reseller channel | 5 years | $ 11,626 | $ 4,672 | $ 6,954 |
| Acquired technology | 5 years | 1,687 | 678 | 1,009 |
| Acquired technology | 2 years | 1,555 | 389 | 1,166 |
| Trade names | 5 years | 262 | 105 | 157 |
| Total intangible assets |  | $ 15,130 | $ 5,844 | $ 9,286 |

66

© 2004. EDGAR Online, Inc.

Future amortization expense for the above intangible assets as of October 31, 2003, is as follows (in thousands):

| Year ending October 31, | | Amortization Expense |
|---|---|---|
| 2004 | $ | 3,484 |
| 2005 | | 3,095 |
| 2006 | | 2,707 |
| Total | $ | 9,286 |

The carrying amount of goodwill as of October 31, 2003 was $1,166,000 related to the Company's acquisition of Vultus in fiscal year 2003.

Pursuant to SFAS No. 142, the Company is required to test its intangible assets for impairment at least annually. The Company performed a test as of October 31, 2003 and concluded that no impairment had occurred.

Amortization expense related to goodwill and other intangible assets was $3,527,000, $3,187,000 and $10,664,000 for fiscal years 2003, 2002 and 2001, respectively.

SFAS No. 142 requires transitional disclosures of previously reported net loss and net loss per share, as adjusted, to exclude amortization of goodwill which would not have been recorded under SFAS No. 142. The following information with respect to fiscal year 2001 has been included as a result of the adoption of SFAS No. 142 (in thousands):

| | | Year Ended October 31, 2001 | | (per share) |
|---|---|---|---|---|
| Net loss as reported | $ | (131,357 ) | $ | (10.92 ) |
| Amortization of goodwill | | 6,669 | | 0.55 |
| Adjusted net loss | $ | (124,688 ) | $ | (10.37 ) |

## (7) INVESTMENTS IN NON-MARKETABLE SECURITIES

The Company accounts for each of its investments in non-marketable securities under the cost method, if the Company owns less than 20 percent of the outstanding voting securities or under the equity method if the Company owns more than 20 percent but less than 50 percent of the outstanding voting securities. The Company's investments to date have consisted of investments in the common stock of other private technology companies, including Evergreen Internet, Inc. ("Evergreen"), Troll Tech AS ("Troll Tech"), Lineo, Inc. ("Lineo"), Vista.com ("Vista") and one public company, Ebiz Enterprises, Inc. ("Ebiz").

The Company accounted for its investments in Evergreen, Troll Tech and Lineo using the cost method and accounted for its investments in Vista and Ebiz using the equity method. The initial investments in Troll Tech, Lineo and Evergreen occurred in fiscal year 2000 and the Company's intent was to form strategic alliances and create partnering opportunities with each of these companies. As discussed in more detail below, management determined that the carrying value of these investments would most likely not be recoverable and as of October 31, 2003, the Company had no carrying value for its investments in Evergreen, Troll Tech and Lineo. The necessary write-offs in fiscal year 2001 related to these investments were due to declines in general economic conditions, the impact of such declines in the operations of these companies as well as a decline in overall market valuations.

67

© 2004. EDGAR Online, Inc.

In connection with the Company's acquisition of the server and professional services groups from The Santa Cruz Operation, it acquired a 30percent ownership interest in a joint venture in China. This investment is being accounted for using the equity method. As of October31, 2003, the Company had a balance of $452,000 for its China investment.

**Vista**

During August2002, the Company entered into a license agreement with Vista. Under the agreement, the Company acquired an exclusive license from Vista to sell and market Vista's web services solutions to the Company's channel partners. The Company prepaid $100,000 of royalties under the license agreement and advanced $250,000 to Vista in connection with a right to purchase 3,313,000 shares of Vista's SeriesC convertible preferred stock for $500,000 (see below). Additionally, the Company acquired a $1,000,000 convertible note receivable payable by Vista bearing interest at 8percent and due August15, 2003. The $1,000,000 note receivable was acquired from Vista's founder and majority stockholder in exchange for 800,000 shares of the Company's common stock (which had an estimated fair value of $900,000) and $100,000 in cash. The note receivable was guaranteed by Vista's founder and majority stockholder and was convertible at the Company's option into a 20percent fully diluted interest in Vista.

In December2002, the Company and Vista entered into a Stock Purchase Agreement, pursuant to which the Company acquired 3,313,000 shares of Vista's SeriesC preferred stock for $500,000. The 3,313,000 shares of SeriesC preferred stock represent a 10percent fully diluted interest in Vista. The $250,000 advance discussed above was applied toward the purchase and the remaining $250,000 was paid in January2003. Additionally, the Company and Vista entered into an Agreement and Plan of Merger pursuant to which the Company received an option through March31, 2003 to acquire the remaining 70percent ownership interest of Vista in exchange for 2,500,000 shares of the Company's common stock. The Company also received the right to representation on Vista's board of directors. The option to purchase the remaining 70percent of Vista expired unexercised on March31, 2003.

In January2003, the Company advanced Vista $100,000 in the form of a promissory note due on April14, 2003. On April2, 2003, the maturity date on this promissory note was extended to April30, 2003. This promissory note bore interest at 8percent payable at maturity and was convertible at the Company's option into a 5percent fully diluted interest in Vista. On April2, 2003, the Company advanced Vista an additional $100,000 in the form of a promissory note due on April30, 2003. The promissory note bears interest at 8percent payable at maturity and was convertible at the Company's option into a 5percent fully diluted interest in Vista.

As a result of the Company's 10percent ownership interest in Vista, the right to representation on Vista's board of directors, and the convertible features of the notes receivable from Vista, the Company has accounted for its interest in Vista using the equity method of accounting. During the fiscal year 2003, the Company recognized $171,000 of equity in losses of this affiliate.

In September2003, the Company's board of directors determined that the current operating relationship with Vista should be restructured. As a result of this decision, the Company and Vista reached an agreement whereby the Company would transfer the $1,000,000 note receivable plus accrued interest and the two $100,000 notes receivable plus accrued interest back to Vista's founder and majority shareholder, in exchange for 100,000 shares of the Company's common stock held by Vista's founder and majority shareholder. Additionally, the Company and Vista's founder and majority shareholder agreed to transfer two notes receivable the Company had outstanding from a third party. As a result of the above transaction, the Company has removed all notes receivable and related accrued interest due from Vista as well as any outstanding amounts characterized as an investment in Vista, and recorded a loss on disposition of the investment of $250,000 in its statement of operations for the year ended October31, 2003.

68

© 2004. EDGAR Online, Inc.

**Ebiz**

The Company accounted for its interest in Ebiz using the equity method of accounting due to its ability to exercise influence on Ebiz. During fiscal year 2001, the Company recognized $431,000 in its statement of operations that represented its portion of Ebiz's net losses.

In addition, because Ebiz had a stockholders' deficit at the time of the Company's investment, the Company was amortizing on a straight-line basis, the difference between its investment and the amount of underlying equity in the net assets of Ebiz. The Company allocated this difference to goodwill and was amortizing this amount on a straight-line basis over five years. At the time of the investment, Ebiz had no other substantial identifiable intangible assets. During fiscal year 2001, the Company recorded amortization of $217,000, in its statement of operations. In September 2001, Ebiz filed for bankruptcy and at that time management determined that the carrying value of its investment in Ebiz would not be recoverable and the remaining investment balance was written off. As of October31, 2003, the Company had no carrying value for this investment.

**Investment Impairments and Write-offs**

Management routinely assesses the Company's investments for impairment and adjusts the carrying amount to estimated realizable values when impairment has occurred. During the fiscal years ended 2003, 2002 and 2001 management determined that the carrying value of certain of its investments would most likely not be recoverable. The necessary write-offs were due to declines in general economic conditions and the impact of such declines in the operations of these companies as well as a decline in overall market valuations. The following table summarizes the investment write-offs (in thousands):

| | | Year ended October 31, | | | | |
| | | 2003 | | 2002 | | 2001 |
|---|---|---|---|---|---|---|
| Investment write-offs: | | | | | | |
| Troll Tech | | $   — | $ | — | $ | 400 |
| Evergreen | | — | | — | | 3,600 |
| Ebiz | | — | | — | | 4,309 |
| Lineo | | — | | 1,180 | | — |
| Vista | | 250 | | — | | — |
| | Total | $   250 | $ | 1,180 | $ | 8,309 |

## (8) NOTE PAYABLE TO THE SANTA CRUZ OPERATION

As discussed in Note3, the Company issued to The Santa Cruz Operation an unsecured, non-interest bearing promissory note in the amount of $8,000,000. Four quarterly payments of $2,000,000 were payable to The Santa Cruz Operation beginning in the Company's third quarter of fiscal year 2002. Because the promissory note was non-interest bearing, the promissory note was recorded at a discount using an interest rate of 6.5percent.

On March28, 2002, the Company completed an agreement with The Santa Cruz Operation to settle certain matters related to the acquisition of the server and professional services groups. In connection with the settlement, the parties agreed that the Company would pay $5,000,000 as total settlement of the $8,000,000 face value note payable, and The Santa Cruz Operation would pay the Company $564,000 for operating costs incurred and paid by the Company that related to operations of The Santa Cruz Operation. Prior to the settlement, the collectibility of these items from The Santa Cruz Operation was uncertain, and therefore, the amounts had been expensed as incurred by the Company. The difference between the carrying value of the note payable of $7,777,000 and the

69

© 2004. EDGAR Online, Inc.

$5,000,000 payment, along with the $564,000 expense reimbursement, have been recorded as an adjustment to the purchase price paid by the Company. As a result, goodwill was reduced from $2,278,000 to $0, and intangible assets were reduced by $1,063,000 in fiscal year 2002.

## (9) REDEEMABLE CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY

### SeriesA Redeemable Convertible Preferred Stock

On October16, 2003, the Company issued 50,000 shares of its SeriesA Convertible Preferred Stock (the "Series A"), for $1,000 per share. The net proceeds from the sale of the SeriesA were $47,740,000. The value of the SeriesA is classified outside of permanent equity because of certain redemption features outside the control of the Company. As of October31, 2003, the Company has 4,950,000 authorized and unissued shares of preferred stock.

The terms of the SeriesA include a number of redemption provisions that represent a derivative financial instrument under SFAS No.133, "Accounting for Derivative Instruments and Hedging Activities." The Company determined that the conversion feature to allow the holders of the SeriesA to acquire common shares was an embedded derivative that does not qualify as a scope exemption under the provisions of EITF 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in a Company's Own Stock." This required the Company to record at fair value and mark-to-market the fair value of the derivative. Changes in the fair value of the derivative are recorded in the Company's statement of operations. As of October16, 2003, the Company, through the assistance of an independent valuation firm, determined the initial fair value of the derivative was $18,069,000. As of October31, 2003, the fair value of the derivative was $15,224,000 and the decrease in fair value of $2,845,000 was recorded as other income in the statement of operations for fiscal year 2003. A binomial model was used to calculate the value of the derivative. Assumptions used to value the derivative as of October31, 2003 included a term of three years, fair value of common stock of $16.90 and an interest rate of 15percent.

The following is a listing of the material terms of the SeriesA:

*Dividends.* Dividends will be paid after the first anniversary of the closing and will be paid quarterly at a rate of 8percent per annum, subject to annual increases of 2percent per annum, not to exceed 12percent per annum. The Company has the option of paying dividends in cash or shares of the SeriesA, subject to certain limitations. Because dividends are not payable during the first year the SeriesA is outstanding, the Company has accrued dividends of $123,000 for fiscal year 2003, which reduced earnings to common stockholders.

*Conversion Provisions.* Subject to certain limitations, each holder of the SeriesA will have the right to convert, at the option of the holder, at any time, into shares of the Company's common stock at a stated conversion price of $16.93 per share, subject to stock splits, stock dividends or other occurrences. The Company has the ability to force conversion of the SeriesA at any time the Company's common stock price exceeds 150percent of the then prevailing conversion price per share for 20 consecutive trading days, provided the Company satisfies certain other requirements.

*Limitation of Beneficial Ownership.* The Company has no obligation to effect any conversion, and no holder of the SeriesA has the right to convert, to the extent that after giving effect to such conversion, the beneficial ownership of a number of shares exceeds 4.99percent of the number of shares of common stock outstanding immediately after giving effect to such conversion.

*Redemption Provisions.* Subject to certain limitations, the Company has the ability to redeem outstanding shares of the SeriesA (i)once the closing price for the Company's common stock price has been at or below 50percent of the then prevailing conversion price per share for at least 20 consecutive trading days, or (ii)on the third anniversary of the closing date.

70

© 2004. EDGAR Online, Inc.

Redemption of the SeriesA can be triggered by events outside the control of the Company. If the Company's common stock becomes delisted from the Nasdaq SmallCap Market, an effective registration statement covering the common shares issuable upon conversion of the SeriesA is not declared effective by the Securities and Exchange Commission, or certain other events occur the redemption provisions would be triggered.

*Voting Rights.* Holders of the SeriesA have no voting rights, except as required by law.

*Registration Rights.* The Company is required to filea registration statement on FormS-3 covering the resale of the shares of common stock issuable upon conversion of the SeriesA.

### Reincorporation as a Delaware Corporation

On March6, 2000, Caldera Systems reincorporated in Delaware. The reincorporation into Delaware was effected by way of a merger with a newly formed Delaware subsidiary and the associated issuance of one share of common stock of the subsidiary for each share of common stock of Caldera Systems held by stockholders of record.

### Initial Public Offering

In March2000, Caldera Systems completed the sale of an aggregate of 5,000,000 shares of its common stock (pre-split) at a price of $14.00 per share (pre-split) in its initial public offering. On April17 2000, the underwriters exercised an over allotment option for an additional 750,000 shares (pre-split) at a price of $14.00 per share (pre-split).

### Reverse Stock Split

On December17, 2001, the Company's board of directors approved a one-for-four reverse stock split for holders of common stock. On March4, 2002, the stockholders approved this reverse stock split and the Company's authorized shares were reduced from 200,000,000 shares to 50,000,000 shares consisting of 5,000,000 shares of preferred stock and 45,000,000 shares of common stock. The outstanding common shares were reduced from 57,715,000 shares to 14,428,750 shares. The reverse stock split of common shares has been retroactively reflected in the accompanying consolidated financial statements and notes for all periods presented, unless otherwise indicated.

### Stock Options

During fiscal year 1998, the Company adopted the 1998 Stock Option Plan (the "1998 Plan") that provided for the granting of nonqualified stock options to purchase shares of common stock.

On December1, 1999, the Company's board of directors approved the 1999 Omnibus Stock Incentive Plan (the "1999 Plan"), which was intended to serve as the successor equity incentive program to the 1998 Plan. The compensation committee of the board of directors administers the 1999 Plan. The 1999 Plan allows for the grant of awards in the form of incentive and non-qualified stock options, stock appreciation rights, restricted shares, phantom stock and stock bonuses. Awards may be granted to individuals in the Company's employ or service.

71

On May 16, 2003, the Company's stockholders approved the 2002 Omnibus Stock Incentive Plan (the "2002 Plan") upon the recommendation of the board of directors. The 2002 Plan permits the award of stock options, stock appreciation rights, restricted stock, phantom stock rights, and stock bonuses. Stock options may have an exercise price equal to, less than, or greater than the fair market value of the common stock on the date of grant, except that the exercise price of incentive stock options must be equal to or greater than the fair market value of the common stock as of the date of grant. Shares issued pursuant to the 2002 Plan may be authorized and unissued shares, treasury shares or shares acquired by the Company for purposes of the 2002 Plan. Generally, shares subject to an incentive award that remain unissued upon expiration, cancellation, surrender, exchange, or termination of the incentive award will be available for other incentive awards under the 2002 Plan.

The board may suspend, revise, terminate or amend the 2002 Plan at any time; provided, however, that stockholder approval must be obtained if and to the extent that the board deems it appropriate to satisfy Section 162(m) of the Code, Section 422 of the Code or the rules of any stock exchange on which the common stock is listed. No action under the 2002 Plan may, without the consent of the participant, reduce the participant's rights under any outstanding award.

A summary of stock option activity under the 1998, 1999 and 2002 Plans for the years ended October 31, 2003, 2002 and 2001 is as follows (in thousands, except per share amounts):

| | Options | | Weighted Average Exercise Price |
|---|---|---|---|
| Balance, October 31, 2000 | 1,545 | $ | 17.92 |
| Granted | 2,249 | | 6.24 |
| Exercised | (73) | | 4.16 |
| Cancelled | (613) | | 16.28 |
| Balance, October 31, 2001 | 3,108 | | 10.12 |
| Granted | 3,910 | | 0.98 |
| Exercised | (215) | | 1.37 |
| Cancelled | (2,537) | | 7.54 |
| Balance, October 31, 2002 | 4,266 | | 3.78 |
| Granted | 1,755 | | 5.56 |
| Exercised | (1,305) | | 1.57 |
| Cancelled | (1,055) | | 9.34 |
| Balance, October 31, 2003 | 3,661 | $ | 3.74 |

The weighted average fair value of options granted for fiscal year 2003, 2002 and 2001 was $5.56, $0.98 and $6.24, respectively.

During fiscal years 2003, 2002 and 2001, the Company did not grant any stock options with exercise prices that were less than the quoted market price of the Company's common stock. A

72

© 2004. EDGAR Online, Inc.

summary of stock options outstanding and exercisable under the Company's 1998, 1999 and 2002 Plans as of October31, 2003 is as follows (in thousands, except per share amounts):

| Exercise Prices | Options Outstanding | Options Outstanding Weighted Average Contractual Life | Weighted Average Exercise Price | Options Exercisable | Options Exercisable Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.66-$0.76 | 688 | 8.66 years | $ 0.75 | 153 | $ 0.75 |
| $0.77-$1.10 | 582 | 8.65 | 0.89 | 262 | 0.87 |
| $1.12-$2.00 | 743 | 8.32 | 1.25 | 226 | 1.17 |
| $2.07-$4.00 | 915 | 8.79 | 2.22 | 259 | 2.53 |
| $4.50-$9.12 | 324 | 9.30 | 7.70 | 28 | 8.95 |
| $9.12 and above | 409 | 8.99 | 17.73 | 74 | 26.89 |
| | 3,661 | 8.72 years | $ 3.74 | 1,002 | $ 3.51 |

## 2000 Employee Stock Purchase Plan

The 2000 Employee Stock Purchase Plan, as amended, was adopted by the board of directors on February15, 2000 and was approved by the stockholders on March1, 2000. The plan is designed to allow eligible employees of the Company and its participating subsidiaries to purchase shares of the Company's common stock, at semi-annual intervals, through periodic payroll deductions. A participant may contribute up to 10percent of his or her cash earnings through payroll deductions and the accumulated payroll deductions will be applied to the purchase of shares on the participant's behalf on each semi-annual purchase date (the last business day in May and November). The purchase price per share will be 85percent of the lower of the fair market value of the Company's common stock on the participant's entry date into the offering period or the fair market value on the semi-annual purchase date.

The board may at any time amend or modify the plan. The plan will terminate no later than the last business day in April2010.

During fiscal year 2003, 345,000 shares were purchased at prices ranging from $0.66 to $1.38 per share. During fiscal year 2002, 175,000 shares were purchased at prices ranging from $0.71 to $2.62 per share and during fiscal year 2001, 19,000 shares were purchased at prices ranging from $6.19 to $6.70 per share.

## Stock-based Compensation

Stock-based compensation was $1,204,000, $1,125,000 and $1,373,000, during fiscal years 2003, 2002 and 2001, respectively. The following table summarizes the components of stock-based compensation for fiscal years 2003, 2002 and 2001 (in thousands):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Amortization of stock-based compensation | $ 866 | $ 986 | $ 1,373 |
| Warrants to consultant for services | — | 294 | — |
| Options and shares for services | 296 | 337 | — |
| Option modifications | 42 | 73 | — |
| Reversal of previously recorded expense related to terminated employees | — | (565 ) | — |
| Total | $ 1,204 | $ 1,125 | $ 1,373 |

73

© 2004. EDGAR Online, Inc.

**Restricted Stock Awards**

During fiscal year 2003, the Company issued 180,000 shares of restricted stock to certain key employees. The restrictions on the restricted stock awards granted to key employees lapse over a period of 24months. The fair value of the restricted stock awards granted was approximately $374,000. The fair value of the restricted stock awards was recorded as a component of deferred compensation and is amortized to stock-based compensation as the restrictions lapse.

During fiscal year 2003, the Company's board of directors approved a resolution to receive remaining amounts owed to them for services provided during the 2002 fiscal year in the form of restricted stock awards. The Company issued 27,500 shares of common stock with a fair value of $36,000 that was expensed as options and shares for services in the above table. Additionally, the Company granted 150,000 shares of restricted common stock to members of the Company's board of directors with a fair value of $195,000 and was recorded as a component of deferred compensation. The restricted common stock issued to the board of directors was in lieu of cash compensation for their services to the Company during fiscal year 2003 and the restrictions lapse on October31, 2003.

During fiscal year 2002, the Company issued 450,000 shares of restricted stock to certain key employees. The restrictions related to the restricted stock awards lapse over a period of 24months. The fair value of the restricted stock awards granted of $495,000 was recorded as a component of deferred compensation and is amortized to stock-based compensation as the restrictions lapse.

**Warrant Agreement with Morgan Keegan**

In August2002, the Company entered into an agreement with Morgan Keegan& Company ("Morgan Keegan") to act as an exclusive financial advisor to assist the Company in its analysis, consideration and if appropriate, execution of various financial and strategic alternatives including, but not limited to, securing additional equity and/or debt capital and potential strategic transactions including mergers, acquisitions and joint ventures. During fiscal year 2003, the Company paid a fee to Morgan Keegan of $2,000,000 in connection with the Company's SeriesA private placement.

In consideration for the services provided, in August2002, the Company issued to Morgan Keegan a warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $0.01 per share. Morgan Keegan was granted demand registration rights to have the Company use its best efforts to register the shares upon exercise of the warrant. The Company expensed the fair value of the warrant of $294,000, determined using the Black-Scholes option-pricing model. Assumptions used in the Black-Scholes option-pricing model were the following: market value of common stock of $1.47 per share; risk-free interest rate of three percent; expected dividend yield of 0percent; volatility of 145percent; and expected exercise life of three months. In January2003, Morgan Keegan exercised the warrant.

**Warrant Agreements with Sun Microsystems,Inc.**

During fiscal year 2003, the Company issued three warrants to Sun Microsystems,Inc. ("Sun"). The warrants allow Sun to acquire a total of 235,000 shares of the Company's common stock at an exercise price of $1.83 per share for a term of five years from the date of grant. The warrants were issued in connection with a SCOsource revenue transaction with Sun, and the Company has recorded the fair value of the warrants of $856,000, as determined using the Black-Scholes option-pricing model, as a warrant outstanding and reduced SCOsource license revenue. The Company received the $856,000 in cash from Sun in connection with payments received under the terms of the revenue transaction. Assumptions used in the Black-Scholes option-pricing model to estimate fair value of the warrants were the following: market value of common stock of $2.40, $12.52 and $17.17, respectively, per share; risk-free interest rate of three percent, two percent and two percent, respectively; expected dividend

74

© 2004.  EDGAR Online, Inc.

yields of 0percent; volatility of 236percent, 137percent and 126percent, respectively; and terms of five years.

**Warrant Agreement with Consultant**

During fiscal year 2003, the Company issued a warrant to a consultant, as part of an agreement to assist the Company with its SCOsource licensing initiative. The warrant allows the consultant to acquire 25,000 shares of the Company's common stock at an exercise price of $8.50 per share for a term of two years from the date of the agreement. The Company has recorded the fair value of the warrant of $243,000, as determined using the Black-Scholes option-pricing model, as a warrant outstanding and included this cost as a cost of SCOsource licensing revenue. Assumptions used in the Black-Scholes option-pricing model to estimate the fair value were the following: market value of common stock of $12.84 per share; risk-free interest rate of two percent; expected dividend yield of 0percent; volatility of 143percent; and a term of 2years.

**Stock Buyback from The Santa Cruz Operation and MTI Technology Corp. ("MTI")**

During fiscal year 2002, the Company bought back an aggregate of 3,615,000 shares of its outstanding common stock from The Santa Cruz Operation in two transactions. The Company paid an aggregate of $3,514,000 for these shares, or an average of $0.97 per share. In connection with the repurchase, the Company received and accepted a resignation letter from one of the directors representing The Santa Cruz Operation on the Company's board of directors.

During fiscal year 2002, the Company purchased 1,189,000 shares of its outstanding common stock from MTI for $1,070,000, or $0.90 per share, which represented a premium from the quoted market price.

The Company has elected to retire the acquired shares and has accordingly reflected the amounts paid as a reduction to stockholders' equity.

**(10) INCOME TAXES**

The net income (loss) before income taxes consisted of the following components for fiscal years 2003, 2002 and 2001 (in thousands):

|  | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| Domestic U.S. operations | $ | 8,546 | $ | (25,371 ) | $ | (131,178 ) |
| Foreign operations |  | (2,345 ) |  | 977 |  | 399 |
| Total | $ | 6,201 | $ | (24,394 ) $ | (130,779 ) |

© 2004. EDGAR Online, Inc.

The components of the provision for income taxes for fiscal years 2003, 2002 and 2001 are as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Current:** | | | |
| U.S. State | $ 16 | $ — | $ — |
| Non-U.S. | 758 | 483 | 578 |
|  | 774 | 483 | 578 |
| **Deferred:** | | | |
| U.S. Federal | 1,114 | (8,894 ) | (31,813 ) |
| U.S. State | 42 | (335 ) | (1,135 ) |
| Change in valuation allowance | (1,156 ) | 9,229 | 32,948 |
|  | — | — | — |
| Total provision for income taxes | $ 774 | $ 483 | $ 578 |

Deferred tax assets and liabilities are determined based on the differences between the financial reporting and tax bases of assets and liabilities. They are measured by applying the enacted tax rates and laws in effect for the years in which such differences are expected to reverse. The significant components of the Company's deferred income tax assets and liabilities at October 31, 2003 and 2002 are as follows (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| **Deferred income tax assets:** | | |
| Net operating loss carry-forwards | $ 33,534 | $ 31,101 |
| Intangible assets | 7,326 | 6,996 |
| Tax basis in excess of book basis related to assets acquired by the Company from its Predecessor | 4,313 | 5,214 |
| Reserves and accrued expenses | 2,129 | 4,537 |
| Book depreciation in excess of tax | 1,356 | 1,478 |
| Deferred revenue | 514 | 1,469 |
| Basis difference in investments | 451 | 397 |
| Foreign tax credit | — | 89 |
| Capital loss carry-forward | 3,851 | — |
| Total deferred income tax assets | 53,474 | 51,281 |
| **Deferred tax liabilities:** | | |
| Tax on foreign earnings | (566 ) | (964 ) |
| Total deferred income tax liabilities | (566 ) | (964 ) |
| Valuation allowance | (52,908 ) | (50,317 ) |
| Net deferred income tax assets | $ — | $ — |

The amount, and ultimate realization, of the deferred income tax assets is dependent, in part, upon the tax laws in effect, the Company's future earnings, and other future events, the effects of which cannot be determined. The Company has established a full valuation allowance against its net deferred income tax assets. Management believes that as of October 31, 2003, based on a number of factors, the available objective evidence creates sufficient uncertainty regarding the ultimate realizability of these deferred income tax assets.

76

As of October 31, 2003, the Company had net operating loss carry-forwards for federal income tax reporting purposes totaling approximately $88,642,000 that expire between 2018 and 2023. Approximately $11,019,000 of this amount is a result of the exercise of employee stock options. When recognized the tax benefit of these exercises will be accounted for as a credit to stockholders' equity.

The Internal Revenue Code contains provisions that likely could reduce or limit the availability and utilization of net operating loss carry-forwards if certain changes in ownership have taken place or will take place. As of October 31, 2003, an ownership change had occurred and our net operating loss carry-forwards may be reduced or limited.

The differences between the provision for income taxes at the U.S. statutory rate and the Company's effective tax rate is as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Provision (benefit) at statutory rate | 34.0 % | (34.0 %) | (34.0 %) |
| Other permanent book to tax differences | 0.2 % | 0.2 % | 10.5 % |
| State income taxes, net of federal effect | 0.3 % | (3.9 %) | (3.6 %) |
| Foreign income taxes | 12.3 % | 2.0 % | 0.4 % |
| Change in fair value of derivative | (15.6 %) | — | — |
| Other | — | (0.1 %) | 1.9 % |
| Change in valuation allowance | (18.7 %) | 37.8 % | 25.2 % |
| Total provision for income taxes | 12.5 % | 2.0 % | 0.4 % |

## (11) COMMITMENTS AND CONTINGENCIES

### Litigation

*IBM*

On or about March 6, 2003, the Company filed a complaint against IBM. The action is currently pending in the United States District Court for the District of Utah. The complaint includes claims for breach of contract, misappropriation of trade secrets, tortious interference, and unfair competition. The complaint also alleges that IBM obtained information concerning the UNIX source code and derivative works from the Company and inappropriately used and distributed that information in connection with its efforts to promote the Linux operating system. As a result of IBM's breach of contract and unfair competition and the marketplace injury sustained by the Company, it is requesting damages in an amount to be proven at trial, but no less than $1 billion, together with additional damages through and after the time of trial. On or about June 13, 2003, the Company provided IBM notice that IBM's UNIX license agreement with the Company that underlies IBM's AIX software was terminated.

On or about June 16, 2003, the Company filed an amended complaint in the IBM case. The amended complaint essentially restates and realleges the allegations of the original complaint and expands on those claims. Most importantly, the amended complaint raises new allegations regarding IBM's actions and breaches through the actions of Sequent Computer Systems, Inc. ("Sequent") which IBM acquired. The Company alleges that the Sequent agreement was breached in several ways similar to those set forth above and it seeks damages flowing from those breaches. The Company also seeks injunctive relief on several of its claims.

IBM has filed a response and counterclaim to the complaint, including a demand for a jury trial. The Company has filed an answer to the IBM counterclaim denying the claims and asserting affirmative defenses. In its counterclaim, as amended on September 25, 2003, IBM asserts that the Company does not have the right to terminate IBM's UNIX license or assert claims based on the Company's ownership of UNIX intellectual property against IBM or others in the Linux community. In

77

© 2004. EDGAR Online, Inc.

addition, IBM asserts that the Company has breached the GNU General Public License and has infringed certain patents held by IBM. IBM's counterclaims include claims for breach of contract, violation of the Lanham Act, unfair competition, intentional interference with prospective economic relations, unfair and deceptive trade practices, breach of the GNU general public license and patent infringement. Discovery is ongoing in the case. The Company intends to vigorously defend these counterclaims.

*Red Hat, Inc.*

On or about August 4, 2003, Red Hat, Inc. ("Red Hat") filed a complaint against the Company in the United States District Court for the District of Delaware. Red Hat asserts that the Linux operating system does not infringe on the Company's UNIX intellectual property rights and seeks a declaratory judgment for non-infringement of copyrights and no misappropriation of trade secrets. In addition, Red Hat claims the Company has engaged in false advertising in violation of the Lanham Act, deceptive trade practices, unfair competition, tortious interference with prospective business opportunities, trade libel and disparagement.

On or about September 15, 2003, the Company filed a motion to dismiss the Red Hat complaint. The motion to dismiss asserts that Red Hat lacks standing and that no case or controversy exists with respect to the claims seeking a declaratory judgment of non-infringement. The motion to dismiss further asserts that Red Hat's claims under the Lanham Act and related state laws are barred by the First Amendment to the U.S. Constitution and the common law privilege of judicial immunity. Red Hat has filed an opposition to the Company's motion to dismiss, but the court has not ruled on the motion. The Company intends to vigorously defend this action.

*IPO Matter*

The Company is an issuer defendant in a series of class action lawsuits, involving over 300 issuers that have been consolidated under In re Initial Public Offering Securities Litigation, 21 MC 92 (SAS). The plaintiffs, the issuers and the insurance companies have negotiated a Memorandum of Understanding ("MOU") with the intent of settling the dispute between the plaintiffs and the issuers. The Company has executed this MOU and has been advised that almost all (if not all) of the issuers have elected to proceed under the MOU. The MOU is still subject to court approval and the preparation of appropriate settlement documents. If the settlement is approved by the court and settlement agreements can be entered into by the parties, and if no cross-claims, counterclaims or third party claims are later asserted, this action will be dismissed with respect to the Company and its individuals.

The Company has notified its underwriters and insurance companies of the existence of the claims. Management believes, after consultation with legal counsel, that the ultimate outcome of this matter will not have a material adverse effect on the Company's results of operations or financial position. As of October 31, 2003, the Company has paid or accrued the full retention amount of $200,000 under its insurance coverage.

*Other Matters*

In April 2003, a former Indian distributor of the Company filed a claim in India, requesting summary judgment for payment of $1,428,000, and an order that the Company trade in India only through the distributor until the claim is paid. The distributor claims that the Company is responsible to repurchase certain software products and to reimburse the distributor for certain other operating costs. Management does not believe that the Company is responsible to reimburse the distributor for any operating costs and also believes that the return rights related to any remaining inventory have lapsed. Management has engaged local counsel who has advised that it is likely that the current claims

78

will fail, but that the distributor will continue to pursue its claims either in the Indian courts or in the U.S. courts. Discovery has commenced and initial hearings have been held. The Company intends to vigorously defend this action.

Pursuit and defense of the above-mentioned matters will be costly, and management expects the costs for legal fees and related expenses may be substantial. The ultimate outcome or potential effect of the Company's results of operations or financial position as a result of the above-mentioned matters is not currently known or determinable.

The Company is a party to certain other legal proceedings arising in the ordinary course of business including legal proceedings arising from its SCOsource initiative. Management believes, after consultation with legal counsel, that the ultimate outcome of such legal proceedings will not have a material adverse effect on the Company's results of operations or financial position.

**Operating Lease Agreements**

Future minimum lease payments under non-cancelable operating leases as of October 31, 2003 were as follows (in thousands):

|  | | Operating Leases |
|---|---|---|
| Year ending October 31, | | |
| 2004 | $ | 2,736 |
| 2005 | | 2,282 |
| 2006 | | 1,547 |
| 2007 | | 1,002 |
| 2008 | | 332 |
| Thereafter | | 18 |
| Total minimum payments | $ | 7,917 |

Total rent expense for all of the Company's operating leases was $3,170,000, $3,799,000 and $3,182,000 for fiscal years 2003, 2002 and 2001, respectively.

**Arrangement with Law Firms**

On February 26, 2003, the Company entered into an arrangement with Boies, Schiller & Flexner LLP and other firms to investigate and review the Company's UNIX intellectual property rights. This arrangement was later modified on November 17, 2003 and December 8, 2003. The engagement with the law firms now includes the defense work related to counter suits and other retaliatory actions against the Company and lawsuits against end users violating the Company's intellectual property and contractual rights. The law firms are also representing the Company in its lawsuit against Novell (see Note 17).

In addition to receiving fees at reduced hourly rates, the Company's agreement with the law firms provides that the law firms will receive a contingency fee of 20 percent of the proceeds from specified events related to the protection of the Company's intellectual property rights. These events may include settlements, judgments, licensing fees, subject to certain exceptions, and a sale of the Company during the pendency of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees and the Company's agreement with the law firms may also be construed to include contingency fee payments in connection with the Company's issuance of equity securities. Future payments payable to the law firms under this arrangement may be significant.

During fiscal year 2003, the Company incurred $8,956,000 related to this arrangement as contingency fees to these law firms in connection with the issuance of shares of the Company's

79

SeriesA Convertible Preferred Stock. This charge consisted of a non-cash charge of $7,956,000 related to the issuance of 400,000 shares of the Company's common stock and a $1,000,000 cash payment that was accrued as of October31, 2003, and paid subsequent to year-end.

## (12) RESTRUCTURING PLANS

The Company's board of directors has adopted restructuring plans to reduce facilities and personnel. These restructuring plans have resulted in the Company recording restructuring accruals for the costs associated with the reduction in facilities and for severance costs of affected employees during each of the years ended October31, 2003, 2002 and 2001.

In connection with these restructurings, the Company incurred the following (in thousands):

The detail of the restructuring charges for fiscal years 2003, 2002 and 2001, are as follows (in thousands):

| Fiscal 2001 | Balance at November 1, 2000 | Additions | Adjustments | Utilization | Balance at October 31, 2001 |
|---|---|---|---|---|---|
| Severance and related | $ — | $ 2,346 | $ — | $ (1,654 ) | $ 692 |
| Facilities | — | 784 | 1,507 * | (239 ) | 2,052 |
| Total | $ — | $ 3,130 | $ 1,507 | $ (1,893 ) | $ 2,744 |

*The facilities adjustment of $1,507,000 was recorded in connection with the Company's acquisition of The Santa Cruz Operation.

| Fiscal 2002 | Balance at November 1, 2001 | Additions | Adjustments | Utilization | Balance at October 31, 2002 |
|---|---|---|---|---|---|
| Severance and related | $ 692 | $ 4,053 | $ — | $ (4,185 ) | $ 560 |
| Facilities | 2,052 | 4,236 | (1,561 ) * | (2,610 ) | 2,117 |
| Total | $ 2,744 | $ 8,289 | $ (1,561 ) | $ (6,795 ) | $ 2,677 |

*The facilities adjustment of $1,561,000 was the result of successfully re-negotiating an existing lease commitment.

| Fiscal 2003 | Balance at November 1, 2002 | Additions | Adjustments | Utilization | Balance at October 31, 2003 |
|---|---|---|---|---|---|
| Severance and related | $ 560 | $ 1,586 | $ (273 ) | $ (1,873 ) | $ — |
| Facilities | 2,117 | — | (815 ) * | (954 ) | 348 |
| Total | $ 2,677 | $ 1,586 | $ (1,088 ) | $ (2,827 ) | $ 348 |

* The facilities adjustment of $815,000 was the result of successfully negotiating out of lease commitments in connection with Company's winding down of the SCO Group,Ltd.

Amounts to be paid for restructurings are recorded as accrued liabilities.

80

© 2004. EDGAR Online, Inc.

**(13) RELATED PARTY TRANSACTIONS**

**The Santa Cruz Operation**

As discussed in Note3, the Company acquired certain assets, liabilities and operations from The Santa Cruz Operation during fiscal year 2001. Prior to the acquisition, the Company and The Santa Cruz Operation had entered into a strategic business agreement that provided for certain joint marketing activities between the parties. Additionally, both parties entered into a distribution agreement to sell each other's products. During fiscal year 2001, the Company paid to The Santa Cruz Operation $1,069,000 for the purchase of products that were sold to the Company's customers.

Subsequent to the acquisition, the Company and The Santa Cruz Operation have paid certain operating costs on each other's behalf, mostly pertaining to activities in foreign operations. On a monthly basis, each party submitted the actual operating costs for reimbursement. Transactions between the two companies decreased significantly through fiscal year 2002, and as of October31, 2003 and 2002, the Company had no amounts receivable or payable with The Santa Cruz Operation. The Company and The Santa Cruz Operation had no transactions during fiscal year 2003.

**Canopy**

The chairman of the Company's board of directors is the president and chief executive officer and a director of Canopy. Additionally, another director of the Company is the chief financial officer of Canopy. As of October31, 2003, Canopy owned approximately 40percent of the Company's issued and outstanding common stock.

In connection with the Company's acquisition of Vultus (see Note3), the Company assumed the obligations of Vultus under two secured notes payable to Canopy totaling $1,073,000. In connection with the assumption of the notes payable to Canopy, Canopy agreed to accept the issuance of approximately 138,000 shares of the Company's common stock in full satisfaction of the obligations. The Company also issued Canopy approximately 37,000 shares of its common stock as part of the purchase price for the acquisition. Canopy was a stockholder and significant debt holder of Vultus.

On April30, 2003, the Company and Center 7,Inc. ("C7") entered into a Marketing and Distribution Master Agreement (the "Marketing Agreement") and an Assignment Agreement. On October2, 2003, C7 assigned the Assignment Agreement to Vintela,Inc. ("Vintela") and Vintela and the Company entered into a new marketing agreement (the "Vintela Agreement"). Both C7 and Vintela are majority owned by Canopy. Under the Vintela Agreement, the Company was appointed as a worldwide distributor for Vintela products and will co-brand, market and distribute these products.

Under the Assignment Agreement, the Company assigned to C7 copyright applications, patents and contracts related to Volution Manager, Volution Authentication, Volution Online and Volution Manager Update Service (collectively, the "Assigned Software"). As consideration for this assignment, C7 issued and Vintela assumed, a $500,000 non-recourse promissory note payable to the Company, secured by the Assigned Software. This note is due on April30, 2005 with interest payable at a rate of one percent above the prime rate as reported in the Wall Street Journal.

During the time the Company was developing the Assigned Software, it had expensed all amounts for its research and development efforts. As a result, at the time the promissory note was executed, the Company had no recorded basis in the Assigned Software. Because the transfer of the Assigned Software was to a related party in exchange for a promissory note, no gain will be recognized by the Company until payments are received.

During fiscal year 2002, the Company entered into an operating lease agreement with Canopy for office space for its headquarters in Utah. The lease extends through December2007 and the Company

81

© 2004. EDGAR Online, Inc.

pays Canopy for rent and related expenses. During fiscal year 2003, the Company paid Canopy approximately $639,000 and paid Canopy approximately $348,000 during fiscal year 2002.

**Sales Force.com**

The chief financial officer for Sales Force.com was a member of the Company's board of directors until December 22, 2003. During the year ended October 31, 2003, the Company entered into a leasing agreement to use one of Sales Force.com's products to run its internal sales and marketing planning, lead generation and customer tracking ("CRM") system. Payments to Sales Force.com were approximately $117,000 during fiscal year 2003.

## (14) EMPLOYEE BENEFIT PLAN

The Company maintains a 401(k) plan through which eligible participants may elect to make contributions to the plan, subject to certain limitations under the Internal Revenue Code. Under the terms of the plan, the Company may make discretionary matching contributions up to predetermined limits to partially match employee contributions to the plan. During fiscal years 2003, 2002 and 2001, the Company contributed $206,000, $597,000 and $301,000, respectively, to the plan for matching contributions.

## (15) CONCENTRATION OF CREDIT RISK AND SIGNIFICANT CUSTOMERS

The Company offers credit terms on the sale of its software products to certain customers. The Company performs ongoing credit evaluations of its customer's financial condition and requires no collateral from its customers. The Company maintains an allowance for uncollectible accounts receivable based upon the expected collectibility of all accounts receivable and such losses have been within management's expectations.

As of October 31, 2003, the Company had no customers who made up more than 10 percent of the ending accounts receivable balance.

During the year ended October 31, 2003, two significant customers, Microsoft and Sun, accounted for approximately 21 percent and 12 percent of the Company's revenue. During fiscal years 2002 and 2001, no single customer accounted for more than ten percent of the Company's total revenue.

## (16) SEGMENT INFORMATION

The Company's resources are allocated and operating results managed to the operating income (loss) level for each of the Company's geographic units, Americas and International. For purposes of the segment disclosure, the Company's International group has been segmented into EMEA (Europe, Middle East and Africa) and Asia. The revenue, cost of revenue and direct sales and marketing expenses of each group are specifically tracked. Costs of corporate marketing, research and development and general and administration are allocated to each segment based on the segments percentage of total revenue.

82

© 2004, EDGAR Online, Inc.

It is impractical to provide historical segment operating expense information for fiscal year 2001 as internal information was not tracked and recorded in this format. Information for the Company's segments is as follows for fiscal year 2003 and 2002, respectively (in thousands):

**Fiscal Year 2003**

Fiscal Year 2003

|  | Americas | EMEA | Asia | Corporate | Total |
|---|---|---|---|---|---|
| Revenue | $ 29,175 | $ 18,539 | $ 5,585 | $ 25,955 | $ 79,254, |
| Cost of revenue | 5,593 | 3,668 | 819 | 9,842 | 19,922 |
| Gross margin | 23,582 | 14,871 | 4,766 | 16,113 | 59,332 |
| Sales and marketing | 9,624 | 11,539 | 3,129 | 100 | 24,392 |
| Research and development | 5,806 | 3,710 | 1,102 | 394 | 11,012 |
| General and administrative | 3,280 | 2,091 | 626 | 233 | 6,230 |
| Other | — | — | — | 14,262 | 14,262 |
| Total operating expenses | 18,710 | 17,340 | 4,857 | 14,989 | 55,896 |
| Income (loss) from operations | $ 4,872 | $ (2,469 ) | $ (91 ) | $ 1,124 | $ 3,436 |

**Fiscal Year 2002**

Fiscal Year 2002

|  | Americas | EMEA | Asia | Corporate | Total |
|---|---|---|---|---|---|
| Revenue | $ 32,973 | $ 24,086 | $ 7,182 | $ — | $ 64,241 |
| Cost of revenue | 11,160 | 5,541 | 1,615 | — | 18,316 |
| Gross margin | 21,813 | 18,545 | 5,567 | — | 45,925 |
| Sales and marketing | 12,837 | 12,253 | 4,464 | — | 29,554 |
| Research and development | 9,001 | 6,591 | 1,966 | — | 17,558 |
| General and administrative | 4,767 | 3,498 | 1,042 | — | 9,307 |
| Other | — | — | — | 13,682 | 13,682 |
| Total operating expenses | 26,605 | 22,342 | 7,472 | 13,682 | 70,101 |
| Loss from operations | $ (4,792 ) | $ (3,797 ) | $ (1,905 ) | $ (13,682 ) | $ (24,176 ) |

Revenue for the Company's segments for fiscal year 2001 is as follows (in thousands):

|  | 2001 |
|---|---|
| Revenue: |  |
| Americas | $ 21,103 |
| EMEA | 14,835 |
| Asia | 4,503 |
| Total revenue | $ 40,441 |

Long-lived assets, which include property and equipment as well as goodwill and intangible assets, by location consists of the following as of October 31, 2003 and 2002 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Long-lived assets: |  |  |
| United States | $ 11,234 | $ 12,866 |
| International | 366 | 413 |
| Total long-lived assets | $ 11,600 | $ 13,279 |

83

© 2004. EDGAR Online, Inc.

**(17) SUBSEQUENT EVENT**

On January20, 2004, the Company filed suit against Novell,Inc. for slander of title seeking relief from Novell's alleged bad faith effort to interfere with the Company's rights with respect to UNIX and UnixWare. Novell has not yet responded to the Company's complaint.

Among the Company's allegations in the suit against Novell, it alleges:

- Novell has improperly filed copyright registrations in the United States Copyright Office for UNIX technology covered by the Company's copyrights,

- Novell has made false and misleading public claims that it, and not our company, owns the UNIX and UnixWare copyrights,

- Novell has made false statements with the intent to cause customers and potential customers to not do business with the Company,

- Novell has attempted, in bad faith, to block the Company's ability to enforce our copyrights, and

- Novell's false and misleading representations that it owns the UNIX and UnixWare copyrights has caused the Company irreparable harm to its copyrights, business, and reputation.

In the lawsuit, the Company requests preliminary and permanent injunctive relief as well as damages. The injunction would require Novell to assign to the Company all copyrights that the Company believes Novell has wrongfully registered, prevent Novell from representing any ownership interest in those copyrights, and require Novell to retract or withdraw all representations it has made regarding its purported ownership of those copyrights.

84

© 2004.  EDGAR Online, Inc.

This report is a copy of the previously issued Arthur Andersen LLP report, which has not been reissued since Arthur Andersen LLP has ceased operations.

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS
### ON FINANCIAL STATEMENT SCHEDULE

To Caldera International,Inc.:

We have audited in accordance with auditing standards generally accepted in the United States, the 2001 consolidated financial statements of Caldera International,Inc. and subsidiaries and have issued our report thereon dated November30, 2001. Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. ScheduleII—Valuation and Qualifying Accounts is the responsibility of the Company's management and is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

ARTHUR ANDERSEN LLP
Salt Lake City, Utah
November30, 2001

85

© 2004. EDGAR Online, Inc.

**THE SCO GROUP, INC.**
**AND SUBSIDIARIES**
**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS**
**FOR THE YEARS ENDED OCTOBER 31, 2003, 2002 AND 2001**
**(in thousands)**

| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | | |
| Year ended October 31, 2003 | $ 348 | $ 296 | $ (414 | )(a) | $ 230 |
| Year ended October 31, 2002 | 362 | 198 | (212 | )(a) | 348 |
| Year ended October 31, 2001 | 312 | 470 | (420 | )(a) | 362 |
| Inventory reserves: | | | | | |
| Year ended October 31, 2003 | 115 | — | (96 | )(b) | 19 |
| Year ended October 31, 2002 | 269 | 18 | (172 | )(b) | 115 |
| Year ended October 31, 2001 | 284 | 275 | (290 | )(b) | 269 |
| Allowance for sales returns: | | | | | |
| Year ended October 31, 2003 | 1,055 | 1,958 | (2,194 | )(c) | 819 |
| Year ended October 31, 2002 | 2,199 | 2,602 | (3,746 | )(c) | 1,055 |
| Year ended October 31, 2001 | 364 | 2,270 | (435 | )(c) | 2,199 |
| Restructuring accrual: | | | | | |
| Year ended October 31, 2003 | 1,787 | 1,586 | (3,025 | )(d) | 348 |
| Year ended October 31, 2002 | 1,405 | 8,289 | (7,907 | )(d) | 1,787 |
| Year ended October 31, 2001 | — | 3,130 | (1,725 | )(d) | 1,405 |

(a)
   Represents write-offs of uncollectible accounts receivable

(b)
   Represents inventory destroyed or scrapped

(c)
   Represents product returns, product sell-through or transfers to deferred revenue

(d)
   Represents cash payments and adjustments to initial accruals

© 2004. EDGAR Online, Inc.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

*Evaluation of disclosure controls and procedures.* Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were adequately designed to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms.

*Changes in internal control over financial reporting.* During the most recent fiscal quarter ended October31, 2003, there has been no change in our internal control over financial reporting (as defined in Rule13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**PART III**

**Item 10. Directors and Executive Officers of the Registrant**

Information with respect to this item is set forth under "Executive Officers and Directors" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2003 Annual Meeting of Stockholders (the "Proxy Statement"). Such information is incorporated herein by reference.

**Item 11. Executive Compensation**

Information with respect to this item is set forth under "Historical Compensation of the Company" in the Proxy Statement. Such information is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

Information with respect to this item is set forth under "Security Ownership of Certain Beneficial Owners and Management" in the Proxy Statement. Such information is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions**

Information with respect to this item is set forth under "Certain Relationships and Related Transactions" in the Proxy Statement. Such information is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

Information with respect to this item is set forth under "Principal Accountant Fees and Services" in the Proxy Statement. Such information is incorporated herein by reference.

© 2004. EDGAR Online, Inc.

**PART IV.**

**Item 15. Exhibits, Financial Statement Schedules and Reports on Form8-K**

(a)
    The following documents are filed as part of this report:

  (1)
      Consolidated Financial Statements: See Index to Consolidated Financial Statements at Item 8 on page 50 of this report.

  (2)
      Financial Statement Schedule: See Index to Consolidated Financial Statements at Item 8 on page 50 of this report.

  (3)
      Exhibits are incorporated herein by reference or are filed with this report as indicated below:

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Reorganization by and among Caldera Systems, Inc., Caldera International, Inc., now known as The SCO Group, Inc. (the "Registrant"), and The Santa Cruz Operation, Inc., and related amendments (incorporated by reference to Exhibit 2.1 to the Registrant's Registration Statement on Form S-4 (File No.333-45936)). |
| 3.1 | Amended and Restated Certificate of Incorporation of Caldera International, Inc. (incorporated by reference to Exhibit 3.1 to the Registrant's Registration Statement on Form 8-A12G/A (File No. 000-29911)). |
| 3.2 | Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding consolidation of outstanding shares (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form 8-A12G/A (File No. 000-29911)). |
| 3.3 | Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding change of name to The SCO Group, Inc. (incorporated by reference to Exhibit 3.3 to the Registrant's Registration Statement on Form 8-A12G/A (File No.000-29911)). |
| 3.4 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form 8-A12G/A (File No. 000-29911)). |
| 3.5 | Certificate of Designation for Series A Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on October 17, 2003 (File No. 000-29911)). |
| 4.1 | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form 8-A12G/A (File No. 000-29911)). |
| 10.1 | 1998 Stock Option Plan (incorporated by reference to Exhibit 10.3 to the Registrant's Registration Statement on Form S-1 (File No. 333-94351)). |
| 10.2 | 1999 Omnibus Stock Incentive Plan, as amended (incorporated by reference to Exhibits 10.4 through 10.8 of the Registrant's Registration Statement on Form S-4 (File No.333-45936)). |
| 10.3 | 2000 Employee Stock Purchase Plan, as amended (incorporated by reference to Exhibit 10.9 to the Registrant's Registration Statement on Form S-4 (File No.333-45936)). |
| 10.4 | Amendment No. 4 to 2000 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 31, 2003 (File No.000-29911)). |

© 2004. EDGAR Online, Inc.

10.5   2002 Omnibus Stock Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 31, 2003 (File No.000-29911)).

10.6   Office Sublease Agreement by and among the Registrant, Canopy Properties, Inc. and Gateway Technology Center, LLC, dated January 10, 2002.

10.7   First Amendment to Office Sublease Agreement by and among the Registrant and Canopy Properties, Inc., dated September 15, 2003.

10.8   Engagement Letter by and among the Registrant and Morgan Keegan & Company, Inc., dated August 16, 2002.

10.9   First Amendment to Engagement Letter by and among the Registrant and Morgan Keegan & Company, Inc., dated February 13, 2003.

10.10  Second Amendment to Engagement Letter by and among the Registrant and Morgan Keegan & Company, Inc., dated August 16, 2003.

10.11  Warrant to Purchase Shares of Common Stock issued by the Registrant to Morgan Keegan & Company, Inc., dated August 16, 2002.

10.12  Common Stock Warrant issued by the Registrant to, and accepted and agreed to by, Sun Microsystems, Inc., dated March 11, 2003.

10.13  Common Stock Warrant issued by the Registrant to, and accepted and agreed to by, Sun Microsystems, Inc., dated July 31, 2003.

10.14  Common Stock Warrant issued by the Registrant to, and accepted and agreed to by, Sun Microsystems, Inc., dated October 31, 2003.

10.15  Independent Contractor Agreement by and among the Registrant and S2 Strategic Consulting, LLC, dated July 1, 2003.

10.16  Common Stock Warrant issued by the Registrant to, and accepted and agreed to by, S2Strategic Consulting, LLC, dated July 1, 2003.

10.17  Severance Agreement between Ransom H. Love and Caldera International, Inc. (incorporated by reference to Exhibit 10.16 to the Registrant's Annual Report on Form10-K for the fiscal year ended October 31, 2002 (000-29911)).

10.18  Securities Purchase Agreement dated as of October 16, 2003 between the Registrant and the persons listed therein as Purchasers (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on October 17, 2003 (File No.000-29911)).

10.19  Registration Rights Agreement dated as of October 16, 2003 between the Registrant and the persons listed therein as Purchasers (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on October 17, 2003 (File No.000-29911)).

10.20  Engagement Agreement dated February 26, 2003 among the Registrant, Boies Schiller & Flexner LLP, Angelo, Barry & Boldt, P.A. and Berger Singerman (incorporated by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed on December 9, 2003 (000-29911)).

89

© 2004. EDGAR Online, Inc.

10.21   Letter Amending Engagement Agreement dated November 17, 2003 from Darl C. McBride, President and Chief Executive Officer of the Registrant, to David Boies of Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed on December 9, 2003 (000-29911)).

10.22   Letter Agreement dated December 8, 2003 among the Registrant, BayStar Capital II, L.P., Royal Bank of Canada and Acknowledged by Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.3 to the Registrant's Current Report on Form8-K filed on December 9, 2003 (File No. 000-29911)).

10.23   Asset Purchase Agreement dated June 6, 2003 between the Registrant and Vultus, Inc. (incorporated by reference to Exhibit 2.1 to Amendment No. 1 to the Registrant's Registration Statement on Form S-3 (File No. 333-106885)).

21.1   Subsidiaries of the Registrant

23.1   Consent of KPMG LLP, Independent Auditors

23.2   Consent of Arthur Andersen LLP, Independent Public Accountants

31.1   Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Rule 13a-14(a) of the Securities Exchange Act, as adopted pursuant Section 302 of the Sarbanes-Oxley Act of 2002.

31.2   Certification of Robert K. Bench, Chief Financial Officer, pursuant to Rule 13a-14(a) of the Securities Exchange Act, as adopted pursuant Section 302 of the Sarbanes-Oxley Act of 2002.

32.1   Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Section1350, Chapter 63 of Title 18, United States Code, as adopted pursuant Section 906 of the Sarbanes-Oxley Act of 2002.

32.2   Certification of Robert K. Bench, Chief Financial Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant Section 906 of the Sarbanes-Oxley Act of 2002.

(b)

Reports on Form8-K

On October17, 2003, the Company filed a report on Form8-K announcing the completion of a $50,000,000 private placement of SeriesA Convertible Preferred Stock.

90

© 2004, EDGAR Online, Inc.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized, on January 28, 2004.

THE SCO GROUP, INC.

By:        /s/ ROBERT K. BENCH  Robert K. Bench

*Chief Financial Officer*


Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| /s/ DARL C. MCBRIDE  Darl C. McBride | President, Chief Executive Officer and Director | January 28, 2004 |
| **Principal Financial and Accounting Officer:** | | |
| /s/ ROBERT K. BENCH  Robert K. Bench | Chief Financial Officer | January 28, 2004 |
| **Additional Directors:** | | |
| /s/ RALPH J. YARRO III  Ralph J. Yarro III | Chairman of the Board | January 28, 2004 |
| /s/ DARCY G. MOTT  Darcy G. Mott | Director | January 28, 2004 |
| /s/ EDWARD E. IACOBUCCI  Edward E. Iacobucci | Director | January 28, 2004 |
| /s/ THOMAS P. RAIMONDI  Thomas P. Raimondi | Director | January 28, 2004 |
| /s/ R. DUFF THOMPSON  R. Duff Thompson | Director | January 28, 2004 |
| /s/ K. FRED SKOUSEN  K. Fred Skousen | Director | January 28, 2004 |
| /s/ DANIEL W. CAMPBELL  Daniel W. Campbell | Director | January 28, 2004 |

© 2004. EDGAR Online, Inc.

QuickLinks   -- Click here to rapidly navigate through this document

**Exhibit10.6**

## OFFICE SUBLEASE

### BASIC SUBLEASE INFORMATION

LEASE DATE: January10, 2002

LANDLORD: Gateway Technology Center, LLC

TENANT: Canopy Properties,Inc.

ADDRESS OF TENANT: Suite300, 333 South 520 West, Lindon, Utah 84042

SUBTENANT: Caldera International,Inc.

ADDRESS OF SUBTENANT: 355 South 520 West, Lindon, Utah 84042

CONTACT: Walter HammondTELEPHONE:801-765-4999

PROPERTY: Lot 4, Plat "A" Gateway Technology Center II Subdivision (A Revision of Gateway Technology Center "B"), Lindon, Utah, according to the official plat thereof, filed October1, 1999, as Entry No.106960, Map Filing No.8248, of the Official Records of the Utah County Recorder.

BUILDING: Canopy Office Building II, 355 South 520 West, Lindon, Utah, located on the Property.

PREMISES: Approximately 30,000 Rentable Square Feet identified as Suites 100, 200, and 250 of the Building. The square footage shall increase beginning in the 25 th month to approximately 35,000 Rentable Square Feet, and again in the 49 th month to approximately 40,000 Rentable Square Feet.

BUILDING SIZE: 40,000 Approximate Rentable Square Feet

SUBLEASE TERM: 70months, commencing on March1, 2002, ("Commencement Date") and ending on December31, 2007.

| Month | Annual Rent | Monthly Rent |
|---|---|---|
| 1-12 | $556,500 | $46,375 |
| 13-24 | $589,500 | $49,125 |
| 25-36 | $708,756 | $59,063 |
| 37-48 | $726,250 | $60,521 |
| 49-60 | $852,000 | $71,000 |
| 61-70 | $876,000 | $73,000 |

BASE RENT: (applies to the table above)

EXPENSE STOP FOR ADJUSTMENT OF BASIC OPERATING COSTS AND TAXES: $5.70 Per rentable square foot per year.

SUBTENANT'S PERCENTAGE SHARE OF OPERATING COSTS: 75% inmonths 1 through 24, 87.5% inmonths 25 through 48, 100% inmonths 49 through 70.

SUBLEASE CONSIDERATION: $46,375

The foregoing Basic Sublease Information is hereby incorporated into and made a part of this Sublease. Each reference in this Sublease to any of the Basic Sublease Information shall mean the respective information herein above set forth and shall be construed to incorporate all of the terms

© 2004.  EDGAR Online, Inc.

provided under the particular Sublease paragraph pertaining to such information. In the event of any conflict between any Basic Sublease Information and the Sublease, the latter shall control.

| TENANT/SUBLANDLORD: | | SUBTENANT: | |
|---|---|---|---|
| Canopy Properties,Inc. | | Caldera International,Inc. | |
| By: | /s/ BOYD WORTHINGTON | By: | /s/ ROBERT K. BENCH |
| Its: | Managing Director | Its: | Chief Financial Officer |

2

© 2004. EDGAR Online, Inc.

## TABLE OF CONTENTS

**Paragraph Number**                                                                                     **PageNumber**

1.  Occupancy                                                                     4
2.  Term, Possession and Leasehold Improvements                                   4
3.  Rent                                                                          4
4.  Restrictions on Use                                                           5
5.  Compliance with Laws                                                          5
6.  Alterations                                                                   5
7.  Repair                                                                        5
8.  Liens                                                                         6
9.  Assignment and Subletting                                                     6
10. Insurance and Indemnification                                                 7
11. Waiver of Subrogation                                                         8
12. Parking, Services and Utilities                                               8
13. Estoppel Certificate                                                          9
14. Holding Over                                                                  9
15. Subordination                                                                 10
16. Rulesand Regulations                                                          10
17. Reentry by Landlord                                                           10
18. Insolvency or Bankruptcy                                                      10
19. Default                                                                       10
20. Joint and Several Liability                                                   12
21. Damage by Fire, Etc.                                                          12
22. Hazardous Materials                                                           13
23. Eminent Domain                                                               13
24. Sale by Landlord                                                              13
25. Right of Landlord to Perform                                                  14
26. Surrender of Premises                                                         14
27. Waiver                                                                        14
28. Notices                                                                       15
29. Rental Adjustments                                                            15
30. Taxes Payable by Tenant                                                       17
31. Quiet Enjoyment                                                               17
32. Successors and Assigns                                                        18
33. Attorneys' Fees                                                               18
34. Sublease Consideration                                                        18
35. Corporate Authority                                                           18
36. Lease Effective Date                                                          18
37. Brokerage                                                                     18
38. Force Majeure                                                                 18
39. Certain Rights Reserved by Landlord                                           18
40. Personal Liability                                                            19
41. Right to Cancel                                                               19
42. Miscellaneous                                                                 19

3

© 2004. EDGAR Online, Inc.

**SUBLEASE AGREEMENT**

THIS SUBLEASE AGREEMENT (the "Sublease") is made as of this 10th day of January, 2002, Between **Canopy Properties, Inc.** , ("Tenant") and **Caldera International, Inc.** ("Subtenant").

Tenant hereby leases to Subtenant and Subtenant hereby leases from Tenant those Premises as shown on Exhibit A attached hereto and made a part hereof, specified in the Basic Lease Information attached hereto (the "Premises"), together with the right to use and access any common areas serving the Premises and all other rights appurtenant thereto. The parties understand and agree that the rentable square feet of the Premises and the Building of which the Premises is a part is measured in accordance with the architectural drawings of Naylor-Wentworth Architects, from which the Building was constructed. The parties acknowledge that the aforementioned measurement method is different from the Building Owners and Managers Association ("BOMA") method of measurement, but is in accordance with the square footage agreed to in that certain Master Lease by and between Gateway Technology Center, LLC, as "Landlord," and Tenant, as tenant, a true, correct and complete copy of which is attached hereto as Exhibit D.

1. *Occupancy* . Subtenant shall use and occupy the Premises for general office purposes and for no other use or purpose without the prior written consent of Tenant.

2. *Term, Possession and Subleasehold Improvement* .

    a. The term of this Sublease shall be for the period specified in the Basic Sublease Information commencing on the Commencement Date, and ending thereafter as specified in the Basic Sublease Information, provided, however, that in the event the Commencement Date is a date other than the first day of a calendar month, said term shall extend for said number of months in addition to the remainder of the calendar month following the Commencement Date (or until sooner terminated as herein provided).

    b. Subtenant expressly acknowledges that (A) Subtenant has thoroughly examined the premises and, subject to the Tenant's obligations set forth in paragraphs 2.b and 2.c above, shall take and accept the premises in its "as is" condition upon delivery pursuant to paragraph 2.c above, and (B) neither Tenant nor Tenant's agents nor employees have made representations or warranties as to the condition of the premises, the building, or the property, nor has the Tenant made any commitments to remodel, repair or redecorate, except as expressly set forth herein.

3. *Rent* .

    a. Subtenant shall pay to Tenant throughout the term of this Sublease rent as specified in the Basic Sublease Information, payable in monthly installments in advance on the first day of each month during every year of the term hereby demised in lawful money of the United States, to Tenant at the address specified in the Basic Sublease Information, or to such other firm or to such other place as Tenant may from time to time designate in writing. Said rental is subject to adjustment as provided in Paragraph 29 hereof. If this Sublease commences on a day other than the first day of a calendar month or ends on a day other than the last day of a calendar month, the monthly rental for the fractional month shall be appropriately prorated.

    b. Subtenant recognizes that late payment of any rent or other sum due hereunder from Subtenant to Tenant will result in administrative expense to Tenant, the extent of which additional expense is extremely difficult and economically impractical to ascertain. Subtenant therefore agrees that if rent or any other payment due hereunder from Subtenant to Tenant remains unpaid ten (10) days after said amount is due, the amount of such unpaid rent or other payment shall be increased by a late charge to be paid Tenant by Subtenant in an amount equal to five percent (5%) of the amount of the delinquent rent or other payment. The amount of the late charge to be paid to Tenant by Subtenant on any unpaid rent or other payment shall be reassessed and added to Subtenant's obligation for each successive monthly period accruing after the date on which the

4

late charge is initially imposed. Subtenant agrees that such amount is a reasonable estimate of the loss and expense to be suffered by Tenant as a result of such late payment by Subtenant and may be charged by Tenant to defray such loss and expense. The provisions of this Paragraph in no way relieve Subtenant of the obligations to pay rent or other payments on or before the date on which they are due, nor do the terms of this Paragraph in any way affect Tenant's remedies pursuant to Paragraph19 of this Sublease in the event said rent or other payment is unpaid after the date due.

c.Except as expressly provided herein to the contrary, Subtenant's covenants and obligations to pay all rent hereunder are unconditional and independent of any other covenant or condition imposed on either Tenant or Subtenant, whether under this Sublease, at law or in equity.

4.*Restrictions on Use* . Subtenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other Subtenants or occupants of the Building or injure or annoy them, nor use or allow the Premises to be used for any improper, immoral, unlawful, or objectionable purpose as reasonably determined by the Tenant, nor shall Subtenant cause or maintain or permit any nuisance in, on, or about the Premises. Subtenant shall not commit or suffer the commission of any waste in, on, or about the Premises, nor permit any use of the Premises which may be dangerous to persons or property. Subtenant shall not do nor permit anything to be done on or about the Premises or bring or keep anything therein which will in any way increase the rate of any insurance upon the Building or any of its contents or cause a cancellation of said insurance or otherwise affect said insurance in any manner. No retail sales shall be permitted upon the Premises without the prior written consent of Tenant.

5.*Compliance with Laws* . Subtenant shall not use the Premises or permit anything to be done in or about the Premises which will in any way conflict with any law, statute, ordinance, or governmental rule or regulation now in force or which may hereafter be enacted or promulgated. Subtenant shall at its sole cost and expense promptly comply with all laws, statutes, ordinances, and governmental rules, regulations, or requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use, or occupancy of the Premises, excluding structural changes not related to or affected by alterations or improvements made by or for Subtenant or Subtenant's acts.

6.*Alterations* . Subtenant shall not make or suffer to be made any alterations, additions, or improvements in, on, or to the Premises or any part thereof without the prior written consent of Tenant, said consent not to be unreasonably withheld or delayed; and any such alteration, addition, or improvement in, on, or to said Premises, except for Subtenant's movable furniture and equipment, shall immediately become Tenant's property and, at the end of the term hereof, shall remain on the Premises without compensation to Subtenant. In the event Tenant consents to the making of any such alteration, addition, or improvement by Subtenant, the same shall be made by Subtenant, at Subtenant's sole cost and expense, in accordance with plans and specifications approved by Tenant, and any contractor or person selected by Subtenant to make the same must first be approved in writing by Tenant, or, at Tenant's option, the alteration, addition, or improvement shall be made by Tenant (in accordance with the provisions of subsections2.b. and 2.c., above) for Subtenant's account and Subtenant shall reimburse Tenant for the cost thereof (said cost to be no greater than the lowest third-party bid submitted to Subtenant for such work) within twenty (20)days after receipt of a statement. Upon the expiration or sooner termination of the term herein provided, Subtenant shall upon demand by Tenant, at Subtenant's sole cost and expense forthwith and with all due diligence remove any or all alterations, additions, or improvements made by or for the account of Subtenant, designated by Tenant to be removed, and Subtenant shall forthwith and with all due diligence, at its sole cost and expense, repair and restore the Premises to their original condition.

7.*Repair* . Except as otherwise agreed by the parties in writing and except as otherwise provided in this Sublease, by taking possession of the Premises, Subtenant accepts the Premises as being in the

5

condition in which Tenant is obligated to deliver them and otherwise in good order, condition, and repair. Subtenant shall, at all times during the term hereof at Subtenant's sole cost and expense, keep the Premises and every part thereof in good order, condition, and repair. Subtenant shall upon the expiration or sooner termination of the term hereof provided, surrender to Tenant the Premises and all repairs, changes, alterations, additions, and improvements thereto, neat and clean and in the same condition as when received except for reasonable wear and tear as reasonably determined by Tenant. It is hereby understood and agreed that Tenant has no obligation to alter, remodel, improve, repair, decorate, or paint the Premises or any part thereof except as specified in Section2, above, and ExhibitB attached hereto and made a part hereof.

8. *Liens* . Subtenant shall keep the Premises free from any liens arising out of any work performed, material furnished, or obligations incurred by Subtenant. In the event that Subtenant shall not, within ten (10)days following the imposition of any such lien, cause the same to be released of record by payment or posting of a property bond, Tenant shall have, in addition to all other remedies provided herein and by law, the right, but no obligation, to cause the same to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien. All such sums paid by Tenant and all expenses incurred by it in connection therewith shall be considered additional rent and shall be payable to it by Subtenant on demand with interest at the rate of fifteen percent (15%) per annum or four percent (4%) above the prime rate of Wells Fargo Bank, whichever is less. Tenant shall have the right at all times to post and keep posted on the Premises any notices permitted or required by law, or which Tenant shall deem proper, for the protection of Tenant, the Premises, the Building, and any other party having an interest therein, from mechanics' and materialmen's liens, and Subtenant shall give to Tenant at least five (5)business days' prior notice of commencement of any construction on the Premises.

9. *Assignment and Subletting* .

   a.Subtenant shall not sell, assign, encumber, or otherwise transfer by operation of law or otherwise this Sublease or any interest herein, sublet the Premises or any part thereof, or suffer any person to occupy or use the Premises or any portion thereof, without the prior written consent of Tenant as provided herein, which consent shall not be unreasonably withheld provided the Landlord is not harmed nor potentially harmed by such consent, nor shall Subtenant permit any lien to be placed on the Subtenant's interest by operation of law. A transfer by the present majority shareholders of ownership and control of the voting stock of a corporate Subtenant, or a transfer of a controlling interest in a partnership or proprietorship, as applicable, shall be deemed an assignment for the purposes of this Section, Subtenant shall, by written notice, advise Tenant of its desire from and after a stated date (which shall not be less than thirty (30)days nor more than ninety (90)days after the date of Subtenant's notice), to sublet the Premises or any portion thereof for any part of the term hereof, and in such event Tenant shall have the right, to be exercised by giving written notice to Subtenant within ten (10)days after receipt of Subtenant's notice, to terminate this Sublease as to the portion of the Premises described in Subtenant's notice and such notice shall, if given, terminate this Sublease with respect to the portion of the Premises therein described as of the date stated in Subtenant's notice. Said notice by Subtenant shall state the name and address of the proposed sub- subtenant, and Subtenant shall deliver to Tenant a true and complete copy of the proposed sub-sublease with said notice. If said notice shall specify all of the Premises and Tenant shall give said termination notice with respect thereto, this Sublease shall terminate on the date stated in Subtenant's notice. If, however, this Sublease shall terminate pursuant to the foregoing with respect to less than all the Premises, the rent, as defined and reserved hereinabove and as adjusted pursuant to Paragraph29, 29 shall be adjusted on a pro rata basis to the number of square feet retained by Subtenant, and this Sublease as so amended shall continue thereafter in full force and effect. If Tenant, upon receiving said notice by Subtenant with respect to any of the Premises, shall not exercise its right to terminate, Tenant will not unreasonably withhold its consent to Subtenant's subletting the Premises specified in said notice.

6

© 2004. EDGAR Online, Inc.

b.Unless otherwise provided by Tenant in writing, any subletting hereunder by Subtenant shall not result in Subtenant being released or discharged from any liability under this Sublease. As a condition to Tenant's prior written consent as provided for in this Paragraph, the sub- subtenant or sub- subtenants shall agree in writing to comply with and be bound by all of the terms, covenants, conditions, provisions, and agreement of this Sublease, and Subtenant shall deliver to Tenant, promptly after execution, an executed copy of each sub-sublease and an agreement of said compliance by each sublessee.

c.Tenant's consent to any sale, assignment, encumbrances, subletting, occupation, lien or other transfer shall not release Subtenant from any of Subtenant's obligations hereunder or be deemed to be a consent to any subsequent occurrence. Any sale, assignment, encumbrance, subletting, occupation, lien or other transfer of this Sublease which does not comply with the provisions of this Paragraph9 shall be void.

d.If Tenant consents to any subletting or assignment by Subtenant as hereinabove provided and the rent, additional rent and other consideration received by Subtenant under or relating to such sub-sublease exceeds the rent payable to Tenant under this Sublease, or if Subtenant receives any consideration from the assignee under any such assignment, then 100% of such excess rents and consideration under or relating to such sub-sublease or 100% of such consideration for any assignment shall automatically be due and payable by Subtenant to Tenant as additional rent hereunder.

10. *Insurance and Indemnification* .

a.Tenant and Tenant's agent, shall not be liable to Subtenant and Subtenant hereby waives all claims against same for any injury or damage to any person or property in or about the Premises by or from any cause whatsoever, other than Tenant's gross negligence or willful acts or omissions, and, without limiting the generality of the foregoing, whether caused by water leakage of any character from the roof, walls, basement, or any other portion of the Premises or the Building, or caused by gas, fire, oil, or electricity in or about the Premises or the building or the complex of which it is a part or any part thereof.

b.Subtenant shall hold Tenant harmless from and defend Tenant against any and all claims or liability for any injury or damage to any person or property whatsoever: (i)occurring in, the Premises, (ii)occurring in, on, or about any facilities (including, without prejudice to the generality of the term "facilities," elevators, stairways, passageways, or hallways), the use of which Subtenant may have in conjunction with other Subtenants of the Building, when such injury or damage shall be caused by the act, negligence, fault of, or omission of any duty with respect to the same by Subtenant, its agents, servants, employees, or invitees, except to the extent caused by Tenant or its agents, servants, employees or invitees gross negligence or willful acts or omissions, or (iii)caused by or arising from the breach, failure or inaccuracy of any representation or warranty of Subtenant hereunder.

c.Tenant shall hold Subtenant harmless from and defend Subtenant against any and all claims or liability for any injury or damage to any person or property whatsoever: (i)occurring on the Property, (ii)occurring in, on, or about the Building (including, without prejudice to the generality of the term "facilities," elevators, stairways, passageways, or hallways) when such injury or damage shall be caused by the act, negligence, fault of, or omission of any duty with respect to the same by Tenant, its agents, servants, employees, or invitees, except to the extent caused by Subtenant's or its agents, servants, employees or invitees gross negligence or willful acts or omissions, or (iii)caused by or arising from the breach, failure or inaccuracy of any representation, warranty or confirmation of Tenant hereunder.

d.Subtenant agrees to purchase at its own expense and to keep in force during the term of this Sublease a policy or policies of worker's compensation and comprehensive liability insurance,

7

© 2004. EDGAR Online, Inc.

including personal injury and property damage, in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000) for property damage and FIVE HUNDRED THOUSAND DOLLARS ($500,000) per person and TWO MILLION DOLLARS ($2,000,000) per occurrence for personal injuries or deaths of persons occurring in or about the Premises, or such other amount as Tenant shall deem necessary, based on periodic insurance reviews in respect to injury or damage to persons or property. Said policies shall: (i)name Tenant and Tenant's agent as an additional insured and insure Tenant's contingent liability under this Sublease; (ii)be issued by an insurance company which is acceptable to Tenant and licensed to do business in the state of Utah; and (iii)provide that such insurance shall not be canceled unless thirty (30)days' prior written notice shall have been given to Tenant. Said policy or policies or certificates thereof shall be delivered to Tenant by Subtenant upon commencement of the term of the Sublease and upon each renewal of said insurance.

e.Landlord or Tenant shall procure and maintain, at all times during the term of this Sublease, comprehensive liability insurance, including personal injury and property damage, covering the roof, foundation, exterior walls, and the public and common areas of the Building and the Property, including lobbies, stairs, elevators, corridors and restrooms, the windows in the Building and the mechanical, plumbing and electrical equipment serving the Building, with coverage limits comparable to those carried by prudent owners of office buildings and properties located in Utah County, Utah. In addition, Landlord or Tenant shall, at all times during the term of this Sublease, procure and maintain any insurance required by law for the protection of employees of Tenant or the Landlord working in or around the Property (including without limitation workers' compensation insurance) with no less than the minimum limits required by law.

11. **_Waiver of Subrogation_** . Tenant and Subtenant hereby waive any right that each may have against the other on account of any loss or damage arising in any manner which is covered by policies of insurance for fire and extended coverage, theft, public liability, worker's compensation, or other insurance now or hereafter existing during the term hereof, provided, however, the parties each shall first have their respective insurance companies waive any rights of subrogation that such companies may have against Tenant or Subtenant, as the case may be.

12. **_Parking, Services and Utilities_** .

a.Outside surface parking is available on a first come, first served, unreserved basis.

b.Tenant shall maintain the public and common areas of the Building, including lobbies, stairs, elevators, corridors and restrooms, the windows in the Building, the mechanical, plumbing and electrical equipment serving the Building, and the structure itself, in reasonably good order and condition except for damage occasioned by the act of the Subtenant, which damage shall be repaired by Tenant at Subtenant's expense.

c.Tenant agrees to furnish to the Premises during ordinary businesshours of generally recognized businessdays, (7:30a.m.—6p.m. Monday through Friday, 9a.m.—1p.m. Saturday, but exclusive of Sundays and legal holidays), water and electricity suitable for the intended use of the Premises, heat and air conditioning required in Tenant's reasonable judgment for the comfortable use and occupation of the Premises, janitorial services and elevator service. Tenant reserves the right to charge a reasonable amount for after hours electrical and heating, ventilating and air conditioning (HVAC) usage and service. The present after-hour charge is $25 per hour and is subject to change upon notice. Subtenant agrees at all times to cooperate fully with Tenant and to abide by all the regulations and requirements which Tenant may prescribe for the proper functioning and protection of said heating, ventilating, and air-conditioning system. Wherever heat-generating machines, excess lighting, or equipment are used in the Premises which affect the temperature otherwise maintained by the air-conditioning system, Tenant reserves the right to install supplementary air-conditioning units in the Premises, and the cost thereof including the cost

8

© 2004. EDGAR Online, Inc.

of installation and the cost of operation and maintenance thereof, shall be paid by Subtenant to Tenant upon demand by Tenant. Tenant shall not be liable for any interruption or failure of utility services on the Premises over which Tenant has no control.

d.Except to the extent caused by Tenant or its agents, servants, employees or invitees negligence or willful acts or omissions, Tenant shall not be in default hereunder or be liable for any damages directly or indirectly resulting from, nor shall the rental herein reserved be abated by reason of (i)the installation, use, or interruption of use of any equipment in connection with the furnishing of any of the foregoing utilities and services by anyone other than Tenant, Tenant's agents or employees, (ii)failure to furnish or delay in connection with the furnishing of any of the foregoing utilities and services when such failure or delay is caused by acts of God or the elements, labor disturbances of any character, any other accidents or other conditions beyond the reasonable control of Tenant, or (iii)the limitation, curtailment, rationing, or restriction on use of water or electricity, gas, or any other form of energy or any other service or utility whatsoever serving the Premises or the Building.

e.Any sums payable under this Paragraph12 shall be considered additional rent and may be added to any installment or rent thereafter becoming due, and Tenant shall have the same remedies for a default in payment of such sum as for a default in the payment of rent.

13. **_Estoppel Certificate_** . Within thirty (30)days following any written request which Tenant may make from time to time, Subtenant shall execute and deliver to Tenant a certificate substantially in the form attached hereto as ExhibitC and made a part hereof, indicating thereon any exceptions thereto which may exist at that time. Failure of the Subtenant to execute and deliver such certificate shall constitute an acceptance of the Premises and acknowledgment by Subtenant that the statements included in ExhibitC are true and correct without exception. Tenant and Subtenant intend that any statement delivered pursuant to this Paragraph may be relied upon by any mortgagee, beneficiary, purchaser, or prospective purchaser of the Building or any interest therein.

14. **_Holding Over_** .

a.Any previously arranged holding over after the expiration of the term of this Sublease with the written consent of Tenant shall be a tenancy from month to month. The terms, covenants, and conditions of such tenancy shall be the same as provided herein, and the monthly rental shall be the then fair market value of the Premises as reasonably determined by Tenant, but in no event less than the monthly rental for the last period prior to expiration, subject to adjustment as provided in Paragraph29 herein. Acceptance by Tenant of rent after such expiration shall not result in any tenancy or any renewal of the term of this Sublease, and the provisions of this Paragraph are in addition to and do not affect Tenant's right of reentry or other rights provided under this Sublease or by applicable law.

b.If Subtenant shall retain possession of the Premises or any part thereof without Tenant's consent following the expiration or sooner termination of this Sublease for any reason, then Subtenant shall pay to Tenant for each day of such retention double the amount of the daily rental for the last period prior to the date of such expiration or termination, subject to adjustment as provided in Paragraph29. Subtenant shall also indemnify and hold Tenant harmless from any loss or liability resulting from delay by Subtenant in surrendering the Premises including, without limitation, any claims made by any succeeding Subtenant founded on such delay. Alternatively, if Tenant gives notice to Subtenant of Tenant's election thereof, such holding over shall constitute renewal of this Sublease for a period from month to month. Acceptance of rent by Tenant following expiration or termination shall not constitute a renewal of this Sublease, and nothing contained in this Paragraph shall waive Tenant's right of reentry or any other right. Unless Tenant exercises the option hereby given to it, Subtenant shall be only a Subtenant at sufferance, whether

9

or not Tenant accepts any rent from Subtenant while Subtenant is holding over without Tenant's written consent.

15. **Subordination** . Without the necessity of any additional document being executed by Subtenant for the purpose of effecting a subordination, this Sublease shall be subject and subordinate at all times to the lien of any mortgage or deed of trust which may now exist or hereafter be executed by Landlord or Tenant in any amount for which said Building is specified as security. The event that any mortgage or deed of trust is foreclosed or a conveyance in lieu of foreclosure is made for any reason, Subtenant shall, notwithstanding any subordination, attorn to and become the Subtenant of the relevant successor in interest. Subtenant covenants and agrees to execute and deliver, upon demand by Tenant and in the form reasonably requested by Tenant, any additional documents evidencing the priority or subordination of this Sublease with respect to the lien of any such mortgage or deed of trust.

16. **Rulesand Regulations** . Subtenant shall faithfully observe and comply with the rules and regulations printed on or annexed to this Sublease Tenant shall use reasonable efforts to ensure that all Subtenants or occupants of the Building shall comply with the rules and regulations printed on or annexed to this Sublease. Tenant further reserves the right to modify said rules and regulations as needs for the Building may change, and Subtenant agrees to observe and comply with all such reasonable changes.

17. **Reentry by Tenant or Landlord** . Tenant or Landlord shall have the right to reenter the Premises at reasonable times to supply janitor services and any other service to be provided by Tenant or Landlord to Subtenant hereunder. Tenant or Landlord shall, after reasonable notice to Subtenant, have the right to reenter the Premises to inspect the same, to show said Premises to prospective purchasers, mortgagees, or Subtenants, to post notices of nonresponsibility, and to alter, improve, or repair the Premises and any portion of the Building of which the Premises are a part, without abatement of rent, except when such alterations, improvements or repairs are necessitated by Tenant's or Landlord's negligence or willful acts or omissions in which event rent may be abated in proportion to the area of the Premises rendered untenantable by such alterations, improvements or repairs, provided that entrance to the Premises shall not be blocked thereby, and further provided that the business of Subtenant shall not be interfered with unreasonably. For each of the aforesaid purposes, Tenant or Landlord shall at all times have and retain a key with which to unlock all of the doors in, upon, and about the Premises, excluding Subtenant's vaults and safes, or special security areas (designated in advance), and Tenant or Landlord shall have the right to use any and all means which Tenant or Landlord may deem necessary or proper to open said doors in an emergency, in order to obtain entry to any portion of the Premises, and any entry to the Premises, or portions thereof obtained by Tenant or Landlord by any of said means, or otherwise, shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction, actual or constructive, of Subtenant from the Premises or any portions thereof.

18. **Insolvency or Bankruptcy** . The appointment of a receiver to take possession of all or substantially all of the assets of Subtenant, or an assignment of Subtenant for the benefit of creditors, or any action taken or suffered by Subtenant under any insolvency, bankruptcy, or reorganization act, shall at Tenant's option constitute a breach of this Sublease by Subtenant. Upon the happening of any such event or at any time thereafter, this Sublease shall terminate five (5)days after written notice of termination from Tenant to Subtenant. In no event shall this Sublease be assigned or assignable by operation of law or by voluntary or involuntary bankruptcy proceedings or otherwise and in no event shall this Sublease or any rights or privileges hereunder be an asset of Subtenant under any bankruptcy, insolvency, or reorganization proceedings.

19. **Default** . The failure to perform or honor any covenant, condition, or representation made under this Sublease shall constitute a default hereunder by Subtenant or Tenant. In the event of default in the payment of rental or adjustment thereto, Tenant shall provide Subtenant with one (1)written

10

© 2004. EDGAR Online, Inc.

notice per calendar year. After providing Subtenant one (1)written notice per calendar year Tenant shall not be required to give any further notice to Subtenant of any such default before exercising any remedies available to Tenant. Subtenant shall have a period of ten (10)days from the date of written notice from Tenant within which to cure any default under this Sublease other than a default in the payment of rental or adjustments thereto; provided, however, that with respect to any default which cannot reasonably be cured within ten (10)days, Subtenant shall have additional time necessary to cure the default so long as Subtenant commences to cure within ten (10)days from Tenant's notice, and continues to prosecute diligently the curing thereof. Upon a default under this Sublease by Subtenant, and failure to cure the default by Subtenant within the permissible time period, if any, Tenant shall have the following rights and remedies in addition to, or as an alternative to, any other rights or remedies available to Tenant at law or in equity:

    a.The Sublease may be terminated at the option of Tenant by notice in writing to Subtenant. If Tenant gives notice to Subtenant as herein provided, the Sublease will be deemed terminated as of the date specified in Tenant's notice and Subtenant shall have no further rights or obligations under the Sublease except as provided in this Paragraph19 which shall survive termination of the Sublease.

    b.Unless the Sublease is terminated as provided in subparagraph 19.a above, the Sublease will continue in full force and effect, except Subtenant's right to possession of the Premises may be terminated at any time, at the option of Tenant, by notice in writing to Subtenant. If Tenant gives notice to Subtenant as herein provided, Subtenant's right to possession of the Premises will be deemed terminated as of the date specified in Tenant's notice, and Tenant shall use commercially reasonable efforts to mitigate damages, to sublet the Premises or any part thereof for such term or terms and at such rent and such other terms as Tenant deems advisable, with the right to make alterations and repairs to the Premises. Upon each subletting, at the option of Tenant, (i)either Subtenant shall be immediately liable to pay to Tenant, in addition to indebtedness other than rent due hereunder, the cost of such subletting and such alterations and repairs incurred by Tenant and the amount, if any, by which the rent hereunder for the period of such subletting exceeds the amount to be paid as rent for the Premises for such period, or (ii)Tenant shall apply rents received from such subletting first, to payment of any indebtedness other than rent due hereunder from Subtenant to Tenant; second, to the payment of any costs of subletting and of any alterations and repairs; third, to payment of rent due and unpaid hereunder, and the residual, if any, shall be held by Tenant and applied in payment of future rent as the same becomes due hereunder. If, under option (i), the rent shall not be promptly paid to Tenant by the sub-Subtenant(s), or if, under option (ii), the rentals received from the subletting during any month are less than all amounts owed for that month by Subtenant hereunder, Subtenant shall pay any such deficiency to Tenant. Such deficiency shall be calculated and paid monthly. Unless and until the Sublease is terminated as provided in subparagraph 19.a above, Subtenant shall continue to be liable to Tenant for rent and all other amounts owing under the Sublease when and as they become due, whether or not Subtenant's possession of the Premises has been terminated, and whether or not the Premises are sublet by Tenant. For all purposes set forth in this subparagraph 19.b, Tenant is hereby irrevocably appointed attorney-in-fact for Subtenant, with power of substitution. No taking possession of the Premises by Tenant, as attorney-in-fact for Subtenant, shall be construed as an election on its part to terminate this Sublease unless a written notice of such intention is given to Subtenant as provided in subparagraph 19.a above. Notwithstanding any action taken by Tenant under this subparagraph, Tenant may at any time thereafter elect to terminate this Sublease for such previous breach.

11

© 2004. EDGAR Online, Inc.

c.Upon termination of the Sublease as provided in subparagraph 19.a above, or upon termination of Subtenant's right to possession of the Premises, as provided in subparagraph 19.b above, Tenant may reenter and take possession of the Premises, and may remove any persons or property by any legal means. Any of Subtenant's property remaining on the Premises including, without limitation, equipment, inventory, furnishings and trade fixtures, shall be deemed to have been abandoned by Subtenant and shall be and become the property of Tenant; provided, however, that Tenant may, in its sole discretion, reject the property and elect instead to store such property in a public warehouse or elsewhere at the cost of and for the account of Subtenant, and further may, but shall not be obligated to, sell such property and apply the proceeds there from in accordance with applicable law.

d.In the event the Sublease is terminated as provided in subparagraph 19.a above, Tenant shall be entitled to recover immediately, without waiting until the due date of any future rent or until the date fixed for expiration of the Sublease term provided in the Sublease, the following amounts as damages:

(1)All past due rent and other amounts owing by Subtenant to Tenant pursuant to the terms of this Sublease as of the date of termination of the Sublease.

(2)All costs associated with Subtenant's default, whether or not suit was commenced including, without limitation, costs of reentry and reletting, costs of clean-up, refurbishing, removal of Subtenant's property and fixtures, other expenses occasioned by Subtenant's failure to quit the Premises upon termination and to leave them in the required condition, any remodeling costs, attorneys' fees, court costs, broker commissions, and advertising costs.

20. *Joint and Several Liability.* If there be more than one Subtenant, the obligations hereunder imposed upon Subtenant shall be joint and several.

21. *Damage by Fire, Etc.* If the Premises or the Building are damaged by fire or other casualty, Tenant shall forthwith repair the same, provided such repairs can be made within ninety (90)days from the date of such damage under the laws and regulations of the federal, state, and local governmental authorities having jurisdiction thereof. In such event, this Sublease shall remain in full force and effect except that Subtenant shall be entitled to a proportionate reduction of rent while such repairs to be made hereunder by Tenant are being made. Said proportionate reduction shall be based on the extent to which the making of such repairs to be made hereunder by Tenant shall interfere with the business carried on by Subtenant on the Premises. Within twenty (20)days from the date of such damage, Tenant shall notify Subtenant whether or not such repairs can be made within ninety (90)days from the date of such damage and Tenant's determination thereof shall be binding on Subtenant. If such repairs cannot be made within ninety (90)days from the date of such damage either to: (a)notify Subtenant of Tenant's intention to repair such damage and diligently prosecute such repairs, in which event this Sublease shall continue in full force and effect and the rent shall be reduced as provided herein; or (b)notify Subtenant of Tenant's intention to terminate this Sublease as of a date specified in such notice, which date shall be not less than thirty (30)days nor more than sixty (60)days after such notice is given. In the event that such notice to terminate is given by Tenant, this Sublease shall terminate on the date specified in such notice. In case of termination by either event, the rent shall be reduced by a proportionate amount based upon the extent to which said damage interfered with the business carried on by Subtenant in the Premises, and the Subtenant shall pay such reduced rent up to the date of termination. Tenant agrees to refund to Subtenant any rent previously paid for any period of time subsequent to such date of termination. The repairs to be made hereunder by Tenant shall not include, and Tenant shall not be required to repair, any damage by fire or other cause to the property of Subtenant or any repairs or replacements of any paneling, decorations, railings, floor coverings, or any alterations, additions, fixtures, or improvements installed on the Premises by or at the expense of Subtenant.

12

© 2004. EDGAR Online, Inc.

22. *Hazardous Materials* **.**

      a.From and after the Commencement Date, except for Hazardous Materials as are normally used in the conduct of its permitted use of the Premises, Subtenant shall not bring, create or permit to remain on the Premises any Hazardous Materials. Subtenant's violation of the foregoing prohibition shall constitute a material breach and default hereunder and Subtenant shall indemnify, hold harmless and defend Tenant from and against any claims, damages, penalties, liabilities, and costs (including reasonable attorneys' fees and court costs) caused by or arising out of (i)a violation of the foregoing prohibition or (ii)the release of any Hazardous Materials on, under, or about the Premises by Subtenant or its agents, employees or contractors after the Commencement Date. Subtenant shall clean up, remove, remediate and repair any soil or ground water contamination and damage caused by the release of any Hazardous Materials in, on, under, or about the Premises by Subtenant or its agents, employees or contractors after the Commencement Date in conformance with the requirements of applicable law. Subtenant shall immediately give Tenant written notice of any suspected breach of this Paragraph 22.a, upon learning of the release of any Hazardous Materials, and upon receiving any notices from governmental agencies pertaining to Hazardous Materials which may affect the Premises. The obligations of Subtenant hereunder shall survive the expiration or earlier termination, for any reason, of this Sublease.

      b.For purposes of this Sublease, "Hazardous Material" or "Hazardous Materials" means (i)any substance, the presence of which requires investigation, remediation, or other response or corrective action under applicable law, or (ii)any substance which is on the date of this Sublease defined as a hazardous waste, hazardous substance, extremely hazardous substance, hazardous material, hazardous matter, hazardous chemical, toxic substance, toxic chemical, pollutant or contaminant, or other similar term, in or pursuant to applicable law, or (ii)any asbestos or asbestos-containing material, PCBs or equipment or articles conating PCBs, petroleum, diesel fuel, gasoline or other petroleum hydrocarbons.

23. *Eminent Domain* . If 50% or more of the floor area of the Premises shall be taken or appropriated (or voluntarily sold or conveyed under threat thereof) for public or quasi-public use by right of eminent domain, such that the Premises is unsuitable for Subtenant's business, either party shall have the right to terminate this Sublease agreement by giving notice to the other party not more than sixty (60)days after the date on which such title shall pass to the condemnor or possession thereof by the condemnor is required, whichever occurs first, and all unearned rent paid by Subtenant shall be refunded to the Subtenant. If a partial taking does not render the Premises unsuitable for Subtenants business, then the Sublease shall continue in full force and effect; the rent, however, shall be reduced proportionally as of the date that title passes or possession is required, whichever occurs first. All compensation, damages, and other proceeds awarded or paid by reason of the application of this Sectionshall belong to and be the property of Landlord or Tenant and Subtenant hereby waives and assigns to Landlord and Tenant all claims to any such compensation, damages, and other proceeds. Subtenant shall have the right, to the extent that the same shall not reduce Landlord or Tenant's award attributable to the Premises, to claim only from condemnor such compensation as may be recoverable by Subtenant in its own right for damages to Subtenant's business and for the taking or appropriation of Subtenant's personal property (including goodwill and relocation costs, etc.); furthermore, such award as is attributable to and needed in the restoration of the Premises shall be applied to the restoration of the Premises.

24. *Sale by Tenant* . In the event of a sale or conveyance by Tenant of its Leasehold interest in the Building, the same shall operate to release Tenant from any future liability upon any of the covenants or conditions, express or implied, herein contained in favor of Subtenant, and in such event Subtenant agrees to look solely to the responsibility of the successor in interest of Tenant in and to this Sublease. This Sublease shall not be affected by any such sale, and Subtenant agrees to attorn to the purchaser

13

© 2004. EDGAR Online, Inc.

or assignee provided that purchaser or assignee agrees to not disturb Subtenant's rights under this Sublease.

25. **_Right of Tenant to Perform_** . All covenants and agreements to be performed by Subtenant under any of the terms of this Sublease shall be performed by Subtenant at Subtenant's sole cost and expense and without any abatement of rent. If Subtenant shall fail to pay any sum of money, other than rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue for ten (10)days after notice thereof by Tenant, Tenant may, but shall not be obligated so to do, and without waiving or releasing Subtenant from any obligation of Subtenant, make any such payment or perform any such act on Subtenant's part to be made or performed as in this Sublease provided. All sums so paid by Tenant and all necessary incidental costs together with interest thereon at the rate of fifteen percent (15%) per annum or four percent (4%) above the prime rate of Wells Fargo Bank, whichever is less per annum from the date of such payment by Tenant, shall be payable as additional rent to Tenant on demand, and Subtenant covenants to pay any such sums, and Tenant shall have, in addition to any other right or remedy of Tenant, the same rights and remedies in the event of nonpayment thereof by Subtenant as in the case of default by Subtenant in the payment of rent.

26. **_Surrender of Premises_** .

     a.Subtenant shall, at least ninety (90)days before the last day of the term hereof, give to Tenant a written notice of intention to surrender the Premises on that date, but nothing contained herein shall be construed as an extension of the term hereof or as consent of Tenant to a holding over by Subtenant.

     b.At the end of the term or any renewal thereof or other sooner termination of this Sublease, or upon termination of Subtenant's right to possession, Subtenant will peaceably deliver up to Tenant possession of the Premises, together with all improvements or additions upon or belonging to same, by whomsoever made, in the same condition as received or first installed, reasonable wear and tear, damage by fire, earthquake, act of God, or the elements alone excepted. Subtenant shall, prior to the termination of this Sublease or termination of Subtenant's right to possession, remove all movable furniture and equipment belonging to Subtenant, at Subtenant's sole cost, title to which shall be in Subtenant until such termination, repairing any damage caused by such removal. Property not so removed upon the termination of this Sublease or upon termination of Subtenant's right to possession shall be deemed abandoned by Subtenant, and title to the same shall thereupon pass to Tenant. Upon request by Tenant, unless otherwise agreed to in writing by Tenant, Subtenant shall remove, at Subtenant's sole cost, any or all permanent improvements or additions to the Premises installed by or at the expense of Subtenant and all movable furniture and equipment belonging to Subtenant which may be left by Subtenant and repair any damage resulting from such removal.

     c.The voluntary or other surrender of this Sublease by Subtenant, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Tenant, terminate all or any existing sub-subleases or subtenancies, or may, at the option of Tenant, operate as an assignment to it of any or all such sub-subleases or subtenancies.

27. **_Waiver_** . If either Tenant or Subtenant waives the performance of any term, covenant, or condition contained in this Sublease, such waiver shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant, or condition contained herein. Furthermore, the acceptance of rent by Tenant shall not constitute a waiver of any preceding breach by Subtenant of any term, covenant, or condition of this Sublease, regardless of Tenant's knowledge of such preceding breach at the time Tenant accepted such rent. Failure by either party to enforce any of the terms, covenants, or conditions of this Sublease, for any length of time shall not be deemed to waive or to decrease said party's right to insist thereafter upon strict performance the other party. Waiver by either

14

party to the Sublease of any term, covenant, or condition contained in this Sublease may only be made by a written document signed by that party.

28. *Notices* . All notices or demands which may be or are required to be given by either party to the other hereunder shall be in writing. All notices or demands by Tenant to Subtenant shall be sent by United States certified or registered mail, postage prepaid, addressed to Subtenant at the Premises, or to such other place as Subtenant may from time to time designated in a notice to Tenant. All notices or demands by Subtenant to Tenant shall be sent by United States certified or registered mail, postage prepaid, addressed to Tenant at the address specified in the Basic Sublease Information, or to such other firm or to such other place as Tenant may from time to time designate in a notice to Subtenant. All notices and demands shall be deemed given on the date personally delivered to the address designated above or on the date mailed as provided above.

29. *Rental Adjustments* . In addition to Basic Rent provided to be paid hereunder, Subtenant shall pay, as Additional Rent, Subtenant's Proportionate Share of Basic Operating Cost which exceeds the expense stop noted in the Basic Sublease Information, in the manner set forth below.

a. *Definition* : For purposes hereof, the terms used in this Paragraph29 shall have the following meanings:

(1)"Basic Operating Cost" shall mean all expenses and costs of every kind and nature which Tenant shall pay or become obligated to pay because of or in connection with the operation of the Building and Tenant's personal property used in connection with the operation of the Building and supporting facilities of the Building, and such additional facilities now and in subsequentyears as may be determined by Tenant to be necessary to the operation of the Building including, but not limited to, the following:

(i)All wages, salaries, and related expenses and benefits of all on-site and off-site employees engaged directly in the operation, management, maintenance, engineering, and security of the Building, and the costs and rental value of an office in the Building; provided, however, that Basic Operating Cost shall not include leasing commissions paid to any real estate broker, salesperson, or agent.

(ii)Supplies, materials, tools, and rental of equipment used in the operation, management, and maintenance of the Building.

(iii)Utilities, including water and electricity, gas, sewer, heating, lighting, air conditioning and ventilating and the cost of electrical surveys of the Building.

(iv)All maintenance, janitorial, and service agreements for the Building and the equipment therein, including without limitation, alarm services, garbage and waste disposal, security service, water treatment, vermin extermination, facade maintenance, roof maintenance, landscaping, window cleaning, and elevator maintenance.

(v)A reasonable management cost recovery.

(vi)Accounting expenses, however Basic Operating Cost shall not include the cost of negotiating subleases, collecting rents, evicting Subtenants, nor shall it include costs incurred in legal proceedings with or against any Subtenant or to enforce the provisions of any sublease.

(vii)All insurance premiums and costs including, but not limited to, the premiums and cost of fire, casualty and liability coverage and rental abatement and earthquake insurance (if Tenant elects to provide such coverage) applicable to the Building and Tenant's personal property used in connection therewith.

15

© 2004.  EDGAR Online, Inc.

(viii)Repairs, replacements, and general maintenance (excluding repairs and general maintenance paid by proceeds of insurance or by Subtenant or other third parties, and the alterations attributable solely to Subtenants of the Building other than Subtenant).

(ix)All maintenance costs relating to public and service areas of the Building including (but without limitation) sidewalks, landscaping, service areas, mechanical rooms, and Building exteriors.

(x)All taxes and assessments and governmental charges, whether federal, state, county, or municipal, and whether by taxing districts or authorities presently taxing the Building or by others, whether subsequently created or otherwise, and whether foreseen or unforeseen, and any other taxes and assessments attributable to the Building, including rent taxes, gross receipt taxes, business license taxes, and fees for permits for the Building, and any other tax or charge levied wholly or partly in lieu thereof, excepting only inheritance or estate taxes and state or federal income taxes

(xi)Amortization (together with reasonable financing charges) of capital improvements over the useful life of such improvements made to the Building subsequent to the Term Commencement Date which will improve the operating efficiency of the Building or which may be required to comply with laws, ordinances, rules or regulations promulgated, adopted, after completion of the initial construction of the Building.

(xii)All costs of contesting the amount of any taxes affecting the Building.

Notwithstanding anything to the contrary herein contained, Basic Operating Cost shall not include (aa) the initial construction cost of the Building; (bb) depreciation on the initial construction of the Building; (cc) the cost of providing Subtenant Improvements to Subtenant or any other Subtenant; (dd) debt service (including, but without limitation, interest, principal, and any impound payments) required to be made on any mortgage or deed of trust recorded with respect to the Building and/or the real property on which the Building is located other than debt service and financing charges imposed pursuant to Paragraph27 a.(1)(xi)above; and (ee) the cost of special services, goods, or materials provided for the exclusive use of a single Subtenant. In the event that the Building is not fully occupied during any fiscal year of the Term as determined by Tenant, an adjustment shall be made in computing the Basic Operating Cost for such year so that Basic Operating Cost shall be computed as though the Building had been one hundred percent (100%) occupied; provided, however, that in no event shall Tenant be entitled to collect in excess of one hundred percent (100%) of the total Basic Operating Cost from all of the subtenants in the Building, including Subtenant. All costs and expenses shall be determined in accordance with generally accepted accounting principles which shall be consistently applied (with accruals appropriate to Tenant's business). Basic Operating Cost shall not include specific costs incurred for the account of, separately billed to and paid by specific Subtenants.

(2)"Estimated Basic Operating Cost" for any particular year shall mean Tenant's estimate of the Basic Operating Cost for such calendar year as hereinafter provided.

(3)"Basic Operating Cost Adjustment" shall mean the difference between Basic Operating Cost and Estimated Basic Operating Cost for any calendar year determined as hereinafter provided.

(4)"Building" shall mean the Building described in the Basic Sublease Information, plus all land on which it is located or which is used in connection with the Building.

(5)"Expense Stop Operating Costs" shall mean the Basic Operating Cost that exceeds $5.70 per Rentable Square Feet.

b. *Payment of Estimated Basic Operating Cost* . During the last month of each calendar year during the Term, or as soon thereafter as practicable, Tenant shall give Subtenant written notice of

16

the Estimated Basic Operating cost for the ensuing calendar year. Subtenant shall pay Subtenant's Proportionate Share of the increase in the Estimated Basic Operating Costs over the Expense Stop Operating Costs with installments of Base Rent required to be paid pursuant to Paragraph3 above for the calendar year to which the estimate applies in monthly installments on the first day of each calendar month during such year, in advance. Such payment shall be construed to be Rent for all purposes hereof.

c. *Computation of Basic Operating Cost Adjustment* . Within one hundred twenty (120)days after the end of each calendar year as determined by Tenant or as soon thereafter as practicable, Tenant shall deliver to Subtenant a statement of Basic Operating Cost for the calendar year just ended, accompanied by a computation of Basic Operating Cost Adjustment. If such statement shows that Subtenant's payment based upon Estimated Basic Operating Costs is less than Subtenant's Proportionate Share of the increase of Basic Operating Cost over Expense Stop Operating Costs, then Subtenant shall pay the difference within twenty (20)days after receipt of such statement, such payment to constitute additional rent hereunder. If such statement shows that Subtenant's payments of Estimated Basic Operating Cost exceed Subtenant's Proportionate Share of increases in Basic Operating Costs over Expense Stop Operating Costs, then (provided that Subtenant is not in default under this Sublease) Subtenant shall receive a credit for the amount of such payment against Subtenant's obligation for payment of Subtenant's Proportionate Share of Estimated Basic Operating Cost next becoming due hereunder. If this Sublease has been terminated or the Term hereof has expired prior to the date of such statement, then the Basic Operating Cost Adjustment shall be paid by the appropriate party within twenty (20)days after the date of delivery of the statement.

d. *Subtenant Audit* . Subtenant shall have the right, at Subtenant's expense and upon not less than five (5)workingdays prior written notice to Tenant, to review at reasonable times Tenant's books and records for any calendar year for purposes of verifying Tenant's calculation of Basic Operating Cost and Basic Operating Cost Adjustment. In the event that Subtenant shall dispute the amount set forth in any statement provided by Tenant under Paragraph29 above, Subtenant shall have the right not later than two (2)months following the receipt of such statement, and upon condition that Subtenant shall first deposit with Tenant the full amount in dispute, to cause Tenant's books and records with respect to such calendar year to be audited. The Basic Operating Cost Adjustment shall be appropriately adjusted, and any amounts shown as being due to Subtenant by Tenant shall be immediately refunded to Subtenant on the basis of such audit. If such audit discloses a liability for a refund or credit by Tenant to Subtenant in excess of five percent (5%) of Subtenant's Proportionate Share of the Basic Operating Cost Adjustment previously reported, the cost of such audit shall be borne by Tenant. Otherwise the cost of such audit shall be paid by Subtenant.

30. **Taxes Payable by Subtenant** . Subtenant shall be liable for all taxes levied or assessed against all personal property, furniture or fixtures placed by Subtenant in the Premises. If any such taxes for which Subtenant is liable are levied or assessed against Tenant or Tenant's property and if Tenant pays same or if the assessed value of Tenant's property is increased by inclusion of personal property, furniture or fixtures placed by Subtenant in the Premises, and Tenant pays the taxes based on such increase, Subtenant shall pay to Tenant upon demand that part of such tax for which Subtenant is primarily liable hereunder.

31. **Quiet Enjoyment** . Subtenant shall peaceably and quietly hold and enjoy the Premises for the Sublease Term, without hindrance from Tenant or Tenant's successors or assigns, subject to the terms and conditions of this Sublease, including the performance by Subtenant of all of the terms and conditions of this Sublease to be performed by Subtenant, including the payment of rent and other amounts due hereunder.

17

© 2004. EDGAR Online, Inc.

32. **Successors and Assigns** . Subject to the provisions of Paragraph9 hereof, the terms, covenants, and conditions contained herein shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators, and assigns of the parties hereto.

33. **Attorneys' Fees** . In the event that any action or proceeding is brought to enforce any term, covenant or condition of this Sublease on the part of Tenant or Subtenant, the prevailing party in such action or proceeding shall be entitled to reasonable attorneys' fees to be fixed by the court.

34. **Sublease Consideration** . Upon occupancy in the Premises, Subtenant has paid the sum of $46,375 as sublease consideration. Tenant may apply the sublease consideration to pay the cost of performing any obligation which Subtenant fails to perform within the time required by this Sublease, but such application by Tenant shall not be the exclusive remedy for Subtenant's default. If the sublease consideration is applied by Tenant, Subtenant shall on demand pay the sum necessary to replenish the sublease consideration to its original amount. To the extent not applied by Tenant to cure defaults by Subtenant, the sublease consideration may be applied against the rent payable for the last month of the term, or to cure damages caused by Subtenant during move out. The sublease consideration shall not be refundable.

35. **Corporate Authority** . If Subtenant signs as a corporation, each of the persons executing this Sublease on behalf of Subtenant does hereby covenant and warrant that Subtenant is a duly authorized and existing corporation, that Subtenant has and is qualified to do business in Utah, that the corporation has full right and authority to enter into this Sublease, and that each and all of the persons signing on behalf of the corporation were authorized to do so. Upon Tenant's request, Subtenant shall provide Tenant with evidence reasonably satisfactory to Tenant confirming the foregoing covenants and warranties.

36. **Sublease Effective Date** . Submission of this instrument for examination or signature by Subtenant does not constitute a reservation of or option for sublease, and it is not effective as a sublease or otherwise until execution and delivery by both Tenant and Subtenant.

37. **Brokerage** . Subtenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and/or that no broker, agent or other person brought about this transaction other than Canopy Properties,Inc., and Subtenant agrees to indemnify and hold Tenant harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Subtenant with regard to this leasing transaction. The provisions of this Articleshall survive the termination of this Sublease.

38. **Force Majeure** . Whenever a period of time is herein prescribed for action to be taken by either party to the Sublease, said party shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to strikes, riots, Acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the control of said party.

39. **Certain Rights Reserved by Tenant** . Tenant shall have the following rights, exercisable without notice and without liability to Subtenant for damage or injury to property, persons or business and without effecting an eviction, constructive or actual, or disturbance of Subtenant's use or possession or giving rise to any claim for setoff or abatement of rent:

    a.To decorate and make repairs, alterations, additions, changes or improvements, whether structural or otherwise, in and about the Building, or any part thereof, and for such purposes, and subject to the provisions of this Sublease, to enter upon the subleased Premises.

    b.To have and retain a paramount title to the subleased Premises free and clear of any act of Subtenant purporting to burden the encumber them.

    c.To change the name by which the Building is designated.

18

© 2004. EDGAR Online, Inc.

d.To take all such reasonable measures as Tenant may deem advisable for the security of the Building and its occupants including, without limitation, the evacuation of the Building for cause, suspected cause, or for drill purposes and the temporary denial of access to the Building.

40. *Personal Liability* . The liability of Tenant to Subtenant for any default by Tenant under the terms of this Sublease shall be limited to the interest of Tenant in the Building and the land, and Tenant shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Subtenant may have in the event of default by Tenant hereunder which do not involve the personal liability of Tenant.

41. **Sublease Cancellation** . Intentionally omitted.

42. *Miscellaneous* .

a.The term "Premises" wherever it appears herein includes and shall be deemed or taken to include (except where such meaning would be clearly repugnant to the context) the office space demised and improvements now or at any time hereinafter comprising or built in the space hereby demised. The paragraph headings herein are for convenience of reference and shall in no way define, increase, limit, or describe the scope or intent of any provision of this Sublease. The term "Tenant" in these presents shall include the Tenant, its agents, successors, and assigns. In any case where this Sublease is signed by more than one person, the obligations hereunder shall be joint and several. The term "Subtenant" or any pronoun used in place thereof shall indicated and include the masculine or feminine, the singular or plural number, individuals, firms or corporations, and their and each of their respective successors, executors, administrators, and permitted assigns, according to the context hereof.

b.Time is of the essence of this Sublease and all its provisions. This Sublease, in all respects, shall be governed by the laws of the State of Utah. The Sublease, together with its exhibits, contains all the agreements of the parties hereto and supersedes any previous negotiations. There have been no representations made by the Tenant or understandings made between the parties other than those set forth in this Sublease and its exhibits. This Sublease may not be modified except by a written instrument by the parties hereto.

c.If, for any reason whatsoever, any of the provisions hereof shall be unenforceable or ineffective, all of the other provisions shall be and remain in full force and effect.

d.This Sublease sets forth all the agreements and understandings between Tenant and Subtenant with respect to the Premises and there is no agreement or understanding, either oral or written, between Tenant and Subtenant other than as set forth in this Sublease.

e.The Master Lease between Canopy Properties,Inc. and Gateway Technology Center, LLC is attached hereto as ExhibitD, and is made a part of this Sublease Agreement. If there is any discrepancy existing between this Sublease Agreement and the Master Lease, the more stringent requirement shall govern for purposes of this Sublease Agreement.

f.Exhibits A through D attached hereto are hereby incorporated into this Sublease.

19

© 2004. EDGAR Online, Inc.

IN WITNESS WHEREOF, the parties hereto have executed this Sublease the day and year first above written.

| | |
|---|---|
| TENANT/SUBLANDLORD: | SUBTENANT: |
| Canopy Properties,Inc. | Caldera International,Inc. |
| By:            /s/ BOYD WORTHINGTON | By:            /s/ ROBERT K. BENCH |
| Its:            Managing Director | Its:            Chief Financial Officer |
| Accepted by LANDLORD: | |
| Gateway Technology Center, LLC | |
| By: | |
| Its: | |

20

© 2004.  EDGAR Online, Inc.

## EXHIBIT A

### Premises

Initially 30,000 Approximate Square Feet identified as Suites 100, 200, and 250 of the Canopy Office Building II, located at 355 South 520 West, Lindon, Utah; and subsequently 5,000 approximate square feet identified as Suite150, and later approximately 5,000 additional square feet identified as Suite175, as outlined in the Basic Sublease Information.

### Legal Description

Lot 4, Plat "A" Gateway Technology Center II Subdivision (A Revision of Gateway Technology Center "B"), Lindon, Utah, according to the official plat thereof, filed October1, 1999, as Entry No.106960, Map Filing No.8248, of the Official Records of the Utah County Recorder.

### Floor Plans

Attached

© 2004. EDGAR Online, Inc.

**EXHIBIT B**

**Building Work**

"Building Standard Work"

Subtenant accepts Subtenant Improvements existing in the Premises on February 1, 2002 in "as is condition," except as noted in nonstandard work below.

"Building Nonstandard Work"

Subtenant acknowledges the inclusion of existing furniture and structured communication cabling in the Premises on February 1, 2002 in "as is condition," but nevertheless as a "nonstandard" part of the sublease.

© 2004. EDGAR Online, Inc.

**EXHIBIT C**

**FORM OF ESTOPPEL CERTIFICATE**

I hereby certify that:

1.
    I am an authorized representative of the Subtenant in possession of

2.
    Subtenant holds the Premises under a written sublease between itself as Subtenant and Canopy Properties,Inc., as Tenant dated ˏ,
20

3.
    Subtenant's sublease of the Premises expires ˏ, 20

4.
    As of the date of this certificate, Subtenant is not in default in the performance of the sublease nor has it committed any breach.

5.
    So far as is known to me, the Tenant under the sublease is not, as of the date of this certificate, in default in the performance of the sublease nor has it committed any breach.

6.
    No rent has been paid by Subtenant in advance under the sublease except the rent that became due on ˏ, 20for the current month.

7.
    Subtenant has no claim against the Tenant for any deposits except ˏ

8.
    Subtenant has, as of the date of this certificate, no defenses or offsets it could allege in any action brought against it for rent accruing under the sublease after ˏ, 20

9.
    I make this certificate with the understanding that ˏis contemplating purchase of the subleased Premises and that if it does purchase the Premises it will do so in material reliance on this certificate.


Executed on ˏ, 20at Utah County, Utah.

I declare under penalty of perjury that the foregoing is true and correct.

Subtenant

By:
Its:

© 2004. EDGAR Online, Inc.

**EXHIBIT D**

**Rules and Regulations**

1.

Canopy Building II is a SECURE facility. Subtenant employees will be expected to accept security conscious behavior as a condition of occupancy. Employees will be fully responsible and accountable for their keys (if issued any), and for their proximity access control cards. They will be required to report IMMEDIATELY to Tenant's Security any loss of either!

2.

Subtenant must use Tenant's window coverings in all exterior window offices. No awning shall be permitted on any part of the Premises. Subtenant shall not place anything against or near glass partitions or doors or windows which may appear incompatible with the exterior architecture of the Building.

3.

Subtenant shall not obstruct any sidewalks, halls, passages, exits, entrances, elevators, or stairways of the Building. The halls, passages, exits, entrances, elevators and stairways are not for the general public, and Tenant shall in all cases retain the right to control and prevent access thereto of all persons whose presence in the judgment of Tenant would be prejudicial to the safety, character, reputation and interests of the Building and its Subtenants; provided that nothing herein contained shall be construed to prevent such access to persons with whom any Subtenant normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities.

a.

Subject to the provisions of the Sublease, no Subtenant and no employee or invitee of any Subtenant shall go up on the roof of the Building without Tenant's consent.

4.

Except as expressly provided in the Sublease, the directory of the Building will be provided exclusively for the display of the name and location of Subtenants only, and Tenant reserves the right to exclude any other names therefrom. Subtenant shall have certain rights respecting the Building lobby directory as set forth in the Sublease.

5.

All cleaning and janitorial services for the Building and the Premises shall be provided exclusively through Tenant, and except with the written consent of Tenant pursuant to the Sublease, no person other than those approved by Tenant shall be employed by Subtenant or permitted to enter the Building for the purpose of cleaning the same. Subject to Tenant's indemnification of Subtenant in the Sublease, Tenant shall not in any way be responsible to any Subtenant for any loss of any property on the Premises, however occurring, or for any damage to any Subtenant's property by the janitor or any other employee or any other person.

6.

Tenant will furnish Subtenant, free of charge, with one (1) key to each locking door within the premises. Tenant may make a reasonable charge for any additional keys. Subtenant shall not alter any lock or install a new additional lock or bolt on any door of its Premises without providing Tenant with additional keys, except for Subtenant's confidential or vault areas, if any, permitted in the Sublease. Subtenant, upon the termination of its tenancy, shall deliver to Tenant the keys of all doors which have been furnished to Subtenant, and in the event of loss of any keys so furnished, shall pay Tenant for Tenant's out of pocket cost for replacing such keys.

7.

If Subtenant requires telegraphic, telephonic, burglar alarm or similar services, it shall first obtain, and comply with, Tenant's reasonable instructions in their installation, as provided in the Sublease.

8.

The passenger elevators *may not* be used to move equipment, furniture, or large merchandise or other similar property without prior consent and coordination of the Property Manager, who will not unreasonably withhold or delay permission and use.

9.

Except as may be approved by Tenant as part of the Final Plans for the initial Subtenant Improvements, Subtenant shall not place a load upon the Premises exceeding the average pounds of live load per square foot of floor area specified for the Building by the Building's Plans with the partitions to be considered a part of the live load, without first obtaining Tenant's prior written

consent, which shall not be unreasonably withheld, conditioned or delayed. The design loads are 50 psf plus 20 psf for partitions.

10.
    Subtenant shall not use or keep in the Premises any kerosene, gasoline, or inflammable or combustible fluid or material other than those limited quantities necessary for the operation or maintenance of office equipment. Subtenant shall not use or permit to be used in the Premises any foul or noxious gas or substance, do or permit anything to be done in the Premises which materially obstructs, materially interferes, or materially injures Tenant or other Subtenants, *nor shall Subtenant bring into or keep in or about the Premises any birds or animals, except, as required for a disabled individual, a seeing eye dog when accompanied by its master.*

11.
    No posters or pictures that may project the image of something distasteful or insulting to anyone, or other potentially "distractive" adornments are allowed in the building.

12.
    Except as specified in Subtenant's Plans or the Sublease, Subtenant shall not use any method of heating or air conditioning other than that supplied or approved by Tenant.

13.
    Subtenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Tenant to assure the most effective operation of the Building's cooling system by closing window coverings and to comply with any reasonable governmental energy saving rules, laws or regulation of which Subtenant has actual notice and which does not adversely affect the conduct of Subtenant's business. Subtenant shall refrain from attempting to adjust controls for the heating and air conditioning system.

14.
    Except as expressly provided in your Sublease, Tenant reserves the right to change the street address of the Project or Building; provided, however, in the event the address of the Building is changed by Tenant, Tenant agrees to reimburse Subtenant for Subtenant's actual, documented and reasonable out-of-pocket costs incurred by Subtenant in changing it's stationery and notifying clients of its new address.

15.
    Tenant reserves the right to exclude from the Building between thehours of 6:00p.m. and 8:00a.m. (Monday—Friday), and all day Saturdays, Sundays and on legal holidays, any person unless that person has a pass and/or furnishes proper identification to Tenant's security personnel. Tenant reserves the right to prevent access to the Building in case of invasion, riot, earthquake or other emergency by closing the doors or by other appropriate action.

16.
    All water faucets or other water apparatus, and except with regard to Subtenant's computers and other equipment which requires utilities on a twenty-four hour basis, all electricity and gas outlets should be shut off before Subtenant and its employees leave the Premises.

17.
    Subtenant shall not have delivered for use on the Premises ice, drinking water, food, beverage, towel or other similar services, except at suchhours and under such regulations as may be fixed by Tenant.

18.
    The toilet rooms, toilets, urinals, wash bowls and other plumbing apparatus shall not be used for any purpose other than that for which whey were constructed and no foreign substance of any kind shall be thrown therein.

19.
    Subtenant shall not sell, or permit the sale at retail, of newspapers, magazines, periodicals, theater tickets or any other goods or merchandise to the general public in or on the Premises. Subtenant shall not make any room-to-room solicitation of business from other Subtenants in the Building. Subtenant shall not use the Premises for any business or activity other than that specifically provided for in the Sublease.

20.
    Subject to the provisions of the Sublease, Subtenant shall not drill holes into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof. All wall hangings/ pictures must be hung with a special hanger, therefore, Tenant will hang all wall hangings. Subject to the Sublease, Tenant reserves the right to direct electricians as to where and how telephone, telegraph,

© 2004.  EDGAR Online, Inc.

telecommunication and computer wires are to be introduced to the Premises. Subtenant

© 2004.  EDGAR Online, Inc.

shall not cut or bore holes for wires. Subtenant shall not affix any floor covering to the floor of the Premises in any manner except as reasonably approved by Tenant. Subtenant shall repair any damage resulting from noncompliance with this rule.

21.

Subtenant shall not install, maintain or operate upon the Premises any vending machine without the written consent of Tenant, except for the use of its employees and invitees only.

22.

Canvassing, soliciting and distribution of handbills or any other written material, and peddling within the Building are prohibited, and each Subtenant shall cooperate to prevent same.

23.

Tenant reserves the right to exclude or expel from the Building any person who, in Tenant's judgment is intoxicated or under the influence of liquor or drugs or who is in violation of any of the Rulesand Regulations of the Building.

24.

Subtenant shall not place in any trash receptacle any material which cannot be disposed of in the ordinary and customary manner of trash and garbage disposal. All refuse disposal shall be made in accordance with directions issued by Tenant.

25.

The Premises shall not be used for the storage of merchandise held for sale to the general public, or for lodging or for manufacturing of any kind. No cooking shall be done or permitted by Subtenant on the Premises, except that the preparation of coffee, tea, hot chocolate and other beverages shall be permitted, and the use of a microwave oven shall be permitted only in the breakroom, provided that such equipment and use is in accordance with all applicable federal, state and municipal laws, codes, ordinances, rules, and regulations.

26.

Subtenant shall not use in any space or in the public halls of the building any mail carts or hand trucks except those equipped with rubber tires and side guards or such other material handling equipment as Tenant may reasonably approve. Subtenant shall not bring any other vehicles of any kind into the Building including bicycles or scooters.

27.

Without the written consent of Tenant, Subtenant shall not use the name of the Building in connection with or in promoting or advertising the business of Subtenant, except as Subtenant's address.

28.

Subtenant shall comply with all safety, fire protection and evacuation procedures and regulations reasonably established by Tenant and that are consistent with the Sublease or any governmental agency.

29.

Except as otherwise provided in the Sublease, the requirements of Subtenant will be attended to only upon appropriate application to the Office of the Building Property Manager. Except as required by the Sublease, employees of Tenant shall not perform any work or do anything outside of the regular duties unless under special instructions from Tenant and no employee of Tenant will admit any person (Subtenant or otherwise) to any office (other than the Premises) without specific instructions from Tenant.

30.

Corridor doors, when not in use, shall be kept closed.

31.

Each Subtenant shall cooperate with Tenant's employees in keeping its Premises neat and clean.

32.

Bicycles are not permitted in the building at any time. Bicycles are to be kept in outside areas approved by Tenant, and not endangering any planted landscaping.

33.

Smoking will not be permitted within the Building or within 25 feet of building entries. No Subtenant or Subtenant's agent, employee, invitee or contractor may smoke anywhere on the Building Premises other than areas outside the Building which are expressly designated as smoking areas.

34.

No use of alcohol or illicit drugs will be tolerated in the building. With prior written approval of the Tenant, social alcohol may be used for hosting or other special events, and Subtenant will obtain Tenant's approval for such use at least forty-eight (48)hours prior to the event.

35.

No machinery of any kind shall be operated by any Subtenant in its Premises without the prior written consent of Tenant, nor shall any Subtenant use or keep in the Building any inflammable or explosive fluid or substance.

36.

No portion of any Subtenant's Premises shall at any time be used or occupied as sleeping or lodging quarters.

37.

Each Subtenant and its agents, employees and invitees shall park only in those areas designated by Tenant for parking and shall not park on any public or private streets contiguous to, surrounding or in the vicinity of the Building without Tenant's prior written consent. All parking is first come basis.

38.

Tenant will not be responsible for lost or stolen property, money or jewelry from any Subtenant's Premises or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.

39.

Movement in or out of the Building of furniture or large office equipment, or dispatch or receipt by Subtenants of any bulky material or merchandise which requires use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to suchhours as Tenant shall approve. All such movements shall be under the supervision of the Property Manager, and in the manner agreed between the Subtenants and the Property Manager by pre-arrangement before performance. Such pre-arrangement initiated by a Subtenant will include Property Manager's determination, and be subject to Property Manager's decision and control, as to the time, method, and routing of movement and as to limitations for safety or other concern which may prohibit any article, equipment or any other item from being brought into the Building. Subtenants shall assume all risk as to the damage to articles moved and injury to persons or public engaged or not engaged in such movement, including equipment, property and personnel of Tenant and it's Property Manager if damaged or injured as a result of acts in connection with carrying out this service for a Subtenant from time of entering the Property to completion of work; and Tenant nor Property Manager shall not be liable for acts of any person engaged in, or any damage or loss to any of said property or persons resulting from, any act in connection with such service performed for a Subtenant.

40.

Property Manager shall enforce the Rulesand Regulations in a non-discriminatory manner. If Property Manager agrees to less burdensome or more favorable rules and regulations for the benefit of any other Subtenant, these Rulesand Regulations shall be automatically amended to include any such less burdensome or more favorable rules and regulations.

41.

No open flames or candles are permitted in the building.

42.

Clean up of special events, birthday's and holiday decorations are the responsibility of the Subtenant. An additional charge will apply for janitorial clean up.

43.

These Rulesand Regulations are in addition to the terms, covenants, agreements and conditions of any sublease of Premises in the Building. In the event these Rulesand Regulations conflict with any provision of the Sublease, the Sublease shall control.

44.

Tenant reserves the right to make reasonable additions and modification to the Rulesand Regulations.

© 2004. EDGAR Online, Inc.

QuickLinks
OFFICE SUBLEASE
TABLE OF CONTENTS
SUBLEASE AGREEMENT
EXHIBIT A
EXHIBIT B
EXHIBIT C
EXHIBIT D

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit10.7**

**FIRST AMENDMENT to SUBLEASE AGREEMENT
DATED JANUARY10, 2002**

**[Canopy Properties,Inc./ Caldera International,Inc.]**

This FIRST ADMENDMENT is entered into as of the Fifteenth (15th) day of September2003 between Canopy Properties,Inc. ("Tenant") and Caldera International,Inc. ("Subtenant").

Whereas Tenant and Subtenant entered into a Sublease dated January10, 2002, Tenant and Subtenant hereby agree to amend the Sublease as follows:

1.The name of the Subtenant is hereby changed to The SCO Group.

2.Effective September15, 2003, Tenant and Subtenant agree that Tenant shall sublease the Premises for which Subtenant was to become responsible effective March1, 2004, to a third party subtenant for a period of twelvemonths, renewable up to twenty-ninemonths, which would be the equivalent time period of Subtenant's Sublease through Month forty-eight of Subtenant's Sublease.

Subtenant acknowledges that Tenant has entered into said third party subtenant agreement at a market rate which is below Subtenant's obligated rate for the same time period, and that Subtenant will be responsible for the difference between it's rate and that of the new subtenant for the part of the third party space that Subtenant is responsible for.

The amounts of the rent reduction to Subtenant may vary during this time period based on the amount of space the third party tenant occupies, and the renewal rates negotiated at the times of renewal. The initial difference in rent owed Tenant by Subtenant will be $18,750 annually from March1, 2004 through September30, 2004, on 5,000 rentable square feet, reducing Subtenant's obligations for this period from $708,756 annually to $626,255.

3.Provided that Subtenant elects to allow this third party subtenant to further renew it's sublease on March1, 2006, again acknowledging that the third party subtenant will likely renew at a rate below Subtenant's obligation, even though that renewal will be at market rates, since Subtenant will at that time be paying off deferred rent in it's overall lease-payment schedule, therefore Subtenant will continue to be responsible for the difference in the two rates, the amount of which will be at least $29,112 annually from March2006 through February2007, on 6,065 rentable square feet, should the third party renewal be at their same rate for the now committed space. If the third party renewal rate is higher, or if the third party subtenant should sublease a larger part of the Additional Premises, the above obligation would be reduced accordingly.

All other terms, conditions and provisions of said Lease shall remain in full force and effect.

| | | | |
|---|---|---|---|
| LANDLORD: | | TENANT: | |
| Canopy Properties,Inc. | | The SCO Group | |
| By: | /s/ BOYD WORTHINGTON | By: | /s/ WALTER HAMMOND |
| Its: | VP, Real Estate Development | Its: | Director, Operations |

© 2004. EDGAR Online, Inc.

QuickLinks

FIRST AMENDMENT to SUBLEASE AGREEMENT DATED JANUARY 10, 2002

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit10.8**

August16, 2002

Mr.Darl McBride
President& CEO
Caldera
355 South 520 West
Lindon, Utah 84042

Dear Darl:

This letter confirms the engagement of Morgan Keegan& Company,Inc. ("Morgan Keegan") to act as exclusive financial advisor to Caldera International,Inc. ("Caldera" or the "Company") to assist the Company in its analysis, consideration and, if appropriate, execution of various financial and strategic alternatives available to it, and such other matters to which you and we may agree during the course of our engagement. Such financial alternatives and other matters may include assisting the Company in securing additional equity and/or debt capital; and assisting the Company in its analysis and consideration of the financial aspects of certain potential strategic transactions, including, but not limited to, mergers, acquisitions, spin-offs, joint ventures, minority investments, negotiated purchases, or other similar transactions (individually, the "Transaction" and collectively, the "Transactions").

As exclusive financial advisor to the Company, Morgan Keegan will perform the following functions:

a.
Assist Caldera in the assessment of certain market information and business strategies relevant to the operations of the Company;

b.
Assist Caldera in developing an appropriate value range in connection with a Transaction;

c.
Assist Caldera in reviewing, evaluating and structuring any proposed Transaction;

d.
Assist Caldera in developing a general negotiating strategy and in actual negotiations with potential investors, lenders and/or merger and acquisition candidates and consult with and assist counsel and independent accountants in structuring and carrying through to settlement any agreement which may be reached;

e.
Assist Caldera in preparing summary information (the "Information") with respect to the Company for distribution to potential investors, lenders and/or merger and acquisition candidates selected by Morgan Keegan and Caldera, describing the Company and its business, it being specifically agreed that (i)the Information shall be based entirely upon information supplied by the Company (or public information), and Caldera hereby warrants that, to the best of its knowledge, the Information supplied shall be complete and accurate in all material respects, and not misleading and (ii)Morgan Keegan shall not be responsible for the accuracy and completeness of the Information except as it pertains to public information derived from research performed by Morgan Keegan.

f.
Morgan Keegan will advise and assist Caldera, on a best efforts basis, in obtaining the private equity and/or debt investment required to capitalize the Company in such amount and upon such terms as deemed to be appropriate by the Company and Morgan Keegan. Morgan Keegan agrees to provide Caldera with a list of all investors contacted by Morgan Keegan on a monthly basis. Morgan Keegan will provide advice and assistance in structuring and pricing the securities and in locating appropriate financing sources.

© 2004. EDGAR Online, Inc.

In order to coordinate our efforts with respect to a possible Transaction, during the period of our engagement hereunder, if the Company or its management receives an inquiry regarding a Transaction, the Company or such persons will promptly advise Morgan Keegan of such inquiry. All contact with third parties by Morgan Keegan must be approved by the Company.

© 2004.  EDGAR Online, Inc.

1.In consideration for the services rendered by Morgan Keegan hereunder, the Company shall pay Morgan Keegan:

    a.

       An advisory fee equal to a warrant to purchase 200,000 shares of Caldera common stock for an exercise price of $0.01 per share (the "Warrant Fee"), payable upon execution of this Agreement. The company will filea registration statement for the shares underlying the warrant. Morgan Keegan agrees that for a period of one year from the date of this agreement, it will sell no more than 50,000 shares in any single calendar quarter.

    b.

       In the event that the Company sells equity and/or debt securities, the Company will pay Morgan Keegan placement fees (the "Contingent Placement Fees") payable in cash at closing as follows:

        i.

          Cash equal to six (6)percent of the principal amount of equity financing (common stock, preferred stock and convertible preferred stock); plus

        ii.

          Cash equal to three (3)percent of the principal amount of mezzanine financing (convertible debt, whether subordinated or not); plus

        iii.

          Cash equal to one (1)percent of the principal amount of senior debt provided, however, that Morgan Keegan shall not be entitled to such a fee with respect to senior debt sourced from commercial banks and other institutional lenders.

          For those potential investors listed on AppendixA, the Contingent Placement Fee otherwise owing to Morgan Keegan shall be reduced by 50%. If more than one closing is required in connection with the sale of such Securities, only that portion of the Contingent Placement Fee applicable to each closing shall be payable at such closing.

    c.

       In the event of the sale or acquisition of the Company by a third party, the Company will pay Morgan Keegan a transaction fee (the "Transaction Fee") payable in cash at closing equal to the greater of: (i)two (2)percent of the aggregate consideration (the "Transaction Consideration"), as defined below, paid to the Company and its shareholders or (ii)$250,000 (not including gains, if any, from the Warrant Fee).

    d.

       In the event that the Company completes an acquisition, the Company will pay Morgan Keegan a Transaction Fee payable in cash at closing equal to the greater of: (i)two (2)percent of the Transaction Consideration paid to a target or its shareholders or (ii)$250,000 (not including gains, if any, from the Warrant Fee). Notwithstanding this section1 (d), the Transaction Fee payable to Morgan Keegan relating to the closing of a transaction or series of transactions with Vista.com will be limited to $150,000 which will be prorated based on a total transaction value of $5million.

          All fees payable pursuant to Sections1(b), (c), and (d)above (collectively the "Success Fees"), shall be subject to a credit in favor of Caldera in the amount of $200,000 (the "Warrant Credit"). The Warrant Credit shall be applied against all Success Fees at a rate of 25% per payment to Morgan Keegan until such time as the Warrant Credit is fully depleted. In addition, whether or not a Transaction is completed, the Company will reimburse Morgan Keegan, on a monthly basis, for its reasonable out of pocket expenses (including fees and expenses of counsel) incurred in connection with its acting as advisor hereunder. The Company agrees to provide to Morgan Keegan, upon signing this Agreement, a $20,000 advance against such out of pocket expenses. Such out of pocket expenses shall not exceed $25,000 without the prior consent of the Company, which shall not be unreasonably withheld.

The "Transaction Consideration" for purposes of calculating a Transaction Fee shall mean the gross value of all cash, securities and other property paid directly or indirectly by an acquiror to a seller or sellers in connection with a Transaction. A seller may include the Company, an affiliate of the

© 2004. EDGAR Online, Inc.

2

© 2004.  EDGAR Online, Inc.

Company or stockholders of the Company. The value of any securities (whether debt or equity) or other property delivered as consideration in any Transaction shall be determined as follows: (i)the value of securities that are freely tradeable in an established public market will be determined on the basis of the average closing market price on the last five tradingdays immediately prior to the closing of the Transaction and (ii)the value of securities that are not freely tradeable or have no established public market and the value of consideration that consists of other property, shall be the fair market value thereof, as reasonably determined by the Company and Morgan Keegan. Transaction Consideration also shall be deemed to include the aggregate principal amount of all indebtedness assumed or acquired, directly or indirectly, by the acquiring party or any of its affiliates in a Transaction or retired, defeased or otherwise cancelled in connection with the Transaction and the present value of any agreements not to compete or consulting agreements.

Amounts paid into escrow and contingent payments in connection with any Transaction will be included as part of the Transaction Consideration. Transaction Fees on amounts paid into escrow shall be payable upon the release of such amounts paid into such escrow. If any portion of the consideration in connection with any Transaction is payable in the future on the basis of occurrence of certain future events, the portion of the Transaction Fee relating to such contingent payments shall be payable at the time the actual consideration is paid.

2.The Company will advise Morgan Keegan of its intention to make any offers or sales of Securities during the term of this agreement. As used herein, the terms "offer" and "sale" have the meanings specified in Section2(3)of the Securities Act of 1933, as amended (the "Act").

3.The Company and Morgan Keegan agree that:

a.

The Company will not, directly or indirectly, make any offer or sale of any of the Securities or any securities of the same or similar class as the Securities, the result of which would cause the offer and sale of the Securities to fail to be entitled to the exemption from registration afforded by Section4(2)of the Act.[do not understand this]

b.

The Company will comply with all requirements of RegulationD promulgated under the Act. Without limitation, the Company will:

i.

not offer or sell the Securities by means of any form of general solicitation or general advertising;

ii.

not offer or sell the Securities to any person who it does not have a reasonable basis to believe is an "accredited investor" (as defined in Rule501under the Act);

iii.

exercise reasonable care to assure that the purchasers of the Securities are not underwriters within the meaning of Section2(11)of the Act and, without limiting the foregoing, that such purchases will comply with Rule502(d) under the Act; and

iv.

filea FormD with the Securities and Exchange Commission as contemplated by Rule503under the Act. (Morgan Keegan shall have the right to approve the FormD, which approval shall not be unreasonably withheld. The Company will not make any other filings with the Securities and Exchange Commission with respect to the offer and sale of the Securities without Morgan Keegan's prior consent, which may not be unreasonably withheld.)

b.

Morgan Keegan will comply with all applicable requirements of RegulationD promulgated under the Act. Without limitation, Morgan Keegan will:

i.

not offer the Securities by means of any form of general solicitation or general advertising; and

3

ii.

not offer the Securities to any person who it does not have a reasonable basis to believe is an "accredited investor" (as defined in Rule501 under the Act).

c.

The Company agrees to take such action (if any) as Morgan Keegan may reasonably request to qualify the Securities for offer and sale under the securities laws of such states as Morgan Keegan may specify; provided that in connection therewith the Company will not be required to qualify as a foreign corporation or filea general consent to service of process. The Company agrees that it will make any filings or take other actions required under applicable state securities laws to permit the sale of the Securities.

4.If, in connection with the services or matters that are the subject of this Agreement, Morgan Keegan or any controlling person, affiliate, director, officer, employee or agent of Morgan Keegan (Morgan Keegan and each such other person referred to as an "Indemnified Person") becomes involved in any capacity in any lawsuit, claim or other proceeding for which indemnity may be sought pursuant to Section4 of this Agreement, the Company shall immediately reimburse such Indemnified Person for any and all legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating, preparing to defend or defending such lawsuit, claim or other proceeding. The Company also agrees to indemnify each Indemnified Person from, and hold it harmless against, any and all losses, claims, damages, liabilities or expenses to which such Indemnified Person may become subject arising in any manner out of or in connection with the services or matters which are the subject of this Agreement; provided, however, that the Company shall not be liable under this Section4 in respect of any loss, claim, damage, liability or expense to the extent that it is finally judicially determined by a court of competent jurisdiction that such loss, claim, damage or liability resulted directly from the gross negligence or willful misconduct of Morgan Keegan in the performance of its services hereunder.

The Company agrees that the indemnification and reimbursement commitments set forth in this Section4: (i)shall apply whether or not any Indemnified Person is a formal party to any such lawsuit, claim or other proceeding and (ii)are in addition to any liability that the Company may otherwise have to any Indemnified Person. The Company agrees that, unless a final judicial determination is made to the effect specified in the proviso in the last sentence of the preceding paragraph, any settlement of a lawsuit, claim or other proceeding against the Company arising out of the transactions contemplated by this Agreement which is entered into by the Company shall include a release from the party bringing such lawsuit, claim or other proceeding of each Indemnified Person, which release shall be reasonably satisfactory to Morgan Keegan. The Company further agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company in connection with Morgan Keegan's engagement hereunder, except for such losses, claims, damages or liabilities incurred by the Company that are finally judicially determined by a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnified Person.

The Company and Morgan Keegan agree that if such indemnification or reimbursement sought pursuant to this Section4 is finally judicially determined by a court of competent jurisdiction to be unavailable, then, whether or not Morgan Keegan is the Indemnified Person, the Company and Morgan Keegan shall contribute to the losses, claims, damages, liabilities and expenses for which such indemnification or reimbursement is held unavailable (i)in such proportion as is appropriate to reflect the relative benefits to the Company, on one hand, and Morgan Keegan on the other, in connection with the transactions to which such indemnification or reimbursement relates, or (ii)if the allocation provided by clause(i)above is not permitted by applicable law, in such proportion as appropriate to reflect not only the relative benefits referred to in clause(i) but also the relative faults of the Company, on the one hand, and Morgan Keegan on the other, as well as any other equitable considerations; provided, however, that in no event shall the amount to be so contributed by Morgan Keegan exceed the amount of the cash fees actually received by Morgan Keegan hereunder.

4

5. The term of Morgan Keegan's appointment and authorization hereunder shall extend from the date hereof through February15, 2003, or such other date as may be mutually agreed by the Company and Morgan Keegan, and shall be automatically renewed for successive monthly periods until terminated in writing by either the Company or Morgan Keegan. The provisions of Sections1, 2, 3, 4, 6, 8, 9, 10 and this Section5 shall survive any termination of this Agreement. During the term of this Agreement, Morgan Keegan shall provide, on a monthly basis, the Company with a list of all potential investors, lenders and merger and acquisition candidates ("The Active Candidate List") that Morgan Keegan contacted on behalf of the Company in its capacity as exclusive financial advisor and with whom the Company had substantive, meaningful discussions. If the Company completes a Transaction with any entity on "The Active Candidate List" within twelve (12)months of the termination of this engagement, the Company shall be responsible for the payment of the fees under Section1 of this Agreement.

6. Morgan Keegan is a full service securities firm and as such may from time to time affect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of the Company and other companies which may be the subject of the engagement contemplated by this Agreement.

7. All opinions and advice provided to the Company in connection with this engagement are intended solely for the benefit and use of the Company in connection with the matters described in this Agreement, and accordingly such advice shall not be relied upon by any person or entity other than the Company. The Company will not make any other use of any such opinions or advice. In addition, none of (i)the name of Morgan Keegan, (ii)any advice rendered by Morgan Keegan to the Company, or (iii)any communication from Morgan Keegan pursuant to this Agreement will be quoted or referred to in any report, document, release or other communication prepared, issued or transmitted by the Company, or any person controlled by the Company, without Morgan Keegan's prior written consent, which consent will not be unreasonably withheld.

8. In the event of consummation of any transaction, Morgan Keegan shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder, provided that Morgan Keegan will submit a copy of any such advertisements to the Company for its approval, which approval shall not be unreasonably withheld.

9. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

10. This Agreement may not be amended or modified except in writing signed by each of the parties hereto and shall be governed by and construed in accordance with the laws of the State of Utah. Each of the parties hereto expressly waives all right to trial by jury in any action or proceeding arising out of this Agreement. This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous agreements should they exist with respect thereto and shall be binding upon and inure to the benefit of the Company, Morgan Keegan, and the other Indemnified Persons and their respective successors, assigns, heirs and personal representatives.

5

© 2004. EDGAR Online, Inc.

If the foregoing correctly sets forth the understanding and agreement between Morgan Keegan and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date first above written.

Very truly yours,

MORGAN KEEGAN& COMPANY,INC.

By:                        /s/ KIMBLE L. JENKINS
Name:                   Kimble L. Jenkins
Title:                    Managing Director


Agreed and Accepted:

CALDERA,INC.

By:        /s/ DARL C. MCBRIDE
Name:    Darl McBride
Title:     President and CEO

6

**APPENDIX A**

VSpring Capital (SCO)
Vector Capital (SCO)
IDG Ventures (Broadmark)
Group Atlantic Partners, LLC (Broadmark)
Paladin Capital Group (Broadmark)
Pequot Capital (Broadmark)
Technology Crossover Ventures (Broadmark)
Ram Capital Resources, LLC (Impact Capital)
Crestview Capital Fund (Impact Capital)

7

QuickLinks
Exhibit 10.8

QuickLinks   -- Click here to rapidly navigate through this document

Exhibit10.9

February13, 2003
Mr.Darl McBride
President& CEO
Caldera, dba The SCO Group
355 South 520 West
Lindon, Utah 84042

Dear Darl:

This letter shall serve as the first amendment and clarification to our engagement letter dated August16, 2002 (the "Engagement Letter").

First, I would like to memorialize your and your management team's satisfaction with Morgan Keegan's services to date. The SCO engagement has taken a number of unexpected twists and turns that have required assistance that goes beyond conventional investment banking services. I understand that you are pleased with Morgan Keegan's assistance and contributions in addressing SCO's atypical needs. It has been, and remains, Morgan Keegan's objective to work diligently with management to build shareholder value at SCO. I also understand that it is our collective intent that Morgan Keegan will continue to work with SCO in the broad range of capacities that Morgan Keegan has served the Company to date.

Accordingly, the Engagement Letter between SCO and Morgan Keegan is amended and clarified as follows:

1.
    SCO and Morgan Keegan mutually agree to extend the date of the Engagement Letter to August16, 2003. Further, SCO requires that Kim Jenkins continue to serve as the primary banker in connection with the SCO engagement.

2.
    SCO and Morgan Keegan agree that, in the event Sun Microsystems and/or Microsoft enters into a substantial SCOsource licensing arrangement with SCO during the term of the engagement, that such an event would fall under provision 1(b)of our Engagement Letter. As such, the aggregate amounts paid under the license agreements would be subject to the Contingent Placement Fee, calculated as six (6)percent for a license with Sun and one (1)percent for a license with Microsoft.

3.
    SCO and Morgan Keegan reaffirm the merger and acquisition provisions of the Engagement Letter and agree to the applicability of provision 1(c) regarding the payment of a Transaction Fee equal to 2% in the event of a sale or acquisition of SCO to a large strategic company.

Except as otherwise provided above, the Engagement Letter remains unamended in full force and effect.

    Very truly yours,
    MORGAN KEEGAN& CO.,INC.
    By:                     /s/ KIMBLE L. JENKINS
    Name:               Kimble L. Jenkins
    Title:                 Managing Director

Agreed and Accepted:

CALDERA,INC., dba The SCO Group

By:      /s/ DARL C. MCBRIDE
Name:    Darl C. McBride
Title:   Chief Executive Officer

2

QuickLinks
  Exhibit 10.9

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit10.10**

August16, 2003

Mr.Darl McBride
President& CEO
The SCO Group
355 South 520 West
Lindon, Utah 84042

Dear Darl:

This letter shall serve as the second amendment and clarification to our engagement letter dated August16, 2002, as amended in a letter dated February16, 2003 (hereinafter, the "Engagement Letter").

I am pleased to confirm in this letter that SCO and Morgan Keegan have mutually agreed to extend our Engagement Letter in accordance with the terms provided below.

1.
    SCO and Morgan Keegan mutually agree to extend the date of the Engagement Letter to August16, 2004, on a non-exclusive basis. SCO requires that Kimble Jenkins continue to serve as the primary banker in connection with the SCO engagement.

2.
    In the event SCO decides to engage a second investment bank to assist with a financing event, then the Contingent Placement Fees payable to Morgan Keegan provided in Section1(b)shall be reduced by 67% of the otherwise applicable fee (i.e., 2% for equity financings, 1.0% for mezzanine financing and 0.33% for debt financing). For clarification, if SCO does not engage a second firm, then 100% of the Contingent Placement Fee shall still apply. In the event that SCO does not engage a second full service investment bank, but instead engages the equivalent of a "finder," then the Contingent Placement Fee owed to Morgan Keegan shall be an amount equal to 6% minus the finder's fee, or 3%, whichever is greater. Further, SCO agrees to offer to Morgan Keegan the opportunity to be involved in all financing transactions that may take place during the term of this engagement, however, in the event that Morgan Keegan chooses to not be involved in a financing event, then no fees will be payable to Morgan Keegan for that event.

3.
    SCO and Morgan Keegan agree that all substantial SCOsource agreements entered into by SCO during the term of the engagement will fall under Section1(b)of our Engagement Letter. It is understood that the nature of these deals may vary, and therefore depending on the structure of each SCOsource agreement, the Contingent Placement Fee will also vary. For agreements that generate higher margin revenue for SCO such as licensing deals or customer access-related deals, then the Contingent Placement Fee shall equal 3%. For agreements that generate lower margin revenue for SCO such as co-marketing/sales or co-development agreements, then the Contingent Placement Fee shall equal 1%. It is understood that no Contingent Placement Fee will be owed to Morgan Keegan in connection with any licensing agreements for which Morgan Keegan did not provide assistance.

4.
    SCO and Morgan Keegan reaffirm the merger and acquisition provisions of the Engagement Letter including the applicability of Section1(c)regarding the payment of a Transaction Fee equal to 2% in the event of a sale, acquisition, or sale of all or a substantial portion of the assets of SCO. In the event of a settlement with IBM during the term of this engagement, SCO agrees to pay Morgan Keegan a Transaction Fee equal to 2% of the aggregate proceeds from such settlement.

For clarification, although a second firm may assist SCO in connection with an M&A transaction, such participation will not serve to reduce Morgan Keegan's fee hereunder. Further, SCO agrees to offer to Morgan Keegan the opportunity to be involved in all M&A transactions that may take place during the term of this engagement, however, in the event that Morgan Keegan chooses to not be involved in an M&A transaction, then no fees will be payable to Morgan Keegan for that transaction.

5.

   SCO and Morgan Keegan agree that the minimum payments of $250,000 provided in Sections1(c)and 1(d)no longer apply. Further, that upon payment of the Contingent Placement Fee owed to Morgan Keegan in connection with the recent Microsoft agreement and deduction from that fee of the Warrant Credit, that the Warrant Credit will be deemed to be paid in full.

Except as otherwise provided above, the Engagement Letter remains unamended in full force and effect.

   Very truly yours,
   MORGAN KEEGAN& CO.,INC.
   By:                      /s/ KIMBLE L. JENKINS
   Name:               Kimble L. Jenkins
   Title:                 Managing Director

Agreed and Accepted:

CALDERA,INC., dba The SCO Group

By:        /s/ ROBERT K. BENCH
Name:    Robert K. Bench
Title:     Chief Financial Officer

2

QuickLinks
    Exhibit 10.10

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit10.11**

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE, TRANSFER OR OTHER DISPOSITION OF THIS WARRANT OR SAID SHARES MAY BE EFFECTED WITHOUT (I)AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO, (II)AN OPINION OF COUNSEL FOR THE HOLDER THAT SUCH REGISTRATION IS NOT REQUIRED OR (III)RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION TO THE EFFECT THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED.

Void after 5:00p.m., Utah Time
On August16, 2005

**CALDERA INTERNATIONALINC.**

**WARRANT TO PURCHASE
SHARES OF COMMON STOCK**

This certifies that, for value received, Morgan Keegan& Company,Inc. (the " *Holder* "), is entitled, subject to the provisions of that certain Letter Agreement, dated as of August16, 2002 between the Company (as defined below) and the Holder (the " *Agreement* "), to a warrant entitling the Holder to purchase two hundred thousand (200,000) shares (the " *Warrant Shares* ") of the common stock, par value $0.001 per share (the " *Common Stock* "), of Caldera International,Inc., a Utah corporation (the " *Company* "), at a price of $0.01 per share (the " *Exercise Price* ") (such warrant and this certificate evidencing such warrant being referred to herein, collectively, as this " *Warrant* "). The number of shares of Common Stock to be received upon exercise of this Warrant and the Exercise Price may be adjusted from time to time as hereinafter set forth.

1. *Exercise of Warrant* . Subject to the provisions of Section2 below, this Warrant may be exercised in whole (but not in part) at any time or from time to time on or after the date hereof, but in any event no later than 5:00p.m., Utah time, on August16, 2005, or if such date is a day on which federal or state-chartered banking institutions in Utah are authorized by law to close, then on the next succeeding day which shall not be such a day. Such exercise shall be effective upon presentation and surrender to the Company at its principal office or at the office of its stock transfer agent, if any, of this Warrant with the duly executed Notice of Exercise form set forth on ExhibitA (attached hereto and made a part hereof by this reference) (the " *Notice of Exercise* ") indicating whether such exercise is being made in accordance with Section1(a)or 1(b)below and the form of payment necessary to comply with the provisions of such Section. The number of Warrant Shares which may be purchased upon exercise of this Warrant shall initially be equal to the number of warrants granted by this Warrant as identified above, which number may be adjusted, if at all, in accordance with Section7 below. The Company may require the purchaser to execute such further documents and make certain representations and warranties as the Company deems necessary to ensure compliance with exemptions from applicable federal and state securities laws as required by Section2 below. If the Notice of Exercise specifies that the exercise of this Warrant is made pursuant to this Section1(a), then the Notice of Exercise shall be accompanied by payment, in cash or by certified or official bank check, payable to the order of the Company, in the amount of the Exercise Price for the number of Warrant Shares, together with all taxes applicable upon such exercise.

2. *Compliance with Securities Laws* . This Warrant may not be exercised by the Holder unless at the time of exercise (i)the transaction in which such Warrant Shares are to be issued is exempted from the application of the registration requirements of the Securities Act of 1933, as amended (and together with the rules and regulations promulgated thereunder, collectively, the " *Securities Act* "), and (ii)the Warrant Shares have been registered or qualified under or the transaction in which such

Warrant Shares are to be issued is exempted from the application of the registration or qualification requirements under all applicable foreign and state securities laws. This Warrant may not be exercised so long as the Holder is in default under the representations, warranties or covenants of this Warrant or the Agreement.

3. *Stock Fully Paid; Reservation of Shares* . All Warrant Shares that may be issued upon the exercise of this Warrant shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issue thereof. The Company hereby covenants and agrees that at all times during the period this Warrant is exercisable it shall reserve from its authorized and unissued Common Stock for issuance and delivery upon exercise of this Warrant such number of shares of its Common Stock as shall be required for issuance and delivery upon exercise of this Warrant. The Company agrees that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the exercise of this Warrant.

4. *Fractional Shares* . No fractional shares or stock representing fractional shares shall be issued upon the exercise of this Warrant. In lieu of any fractional shares which would otherwise be issuable, the Company shall, in its sole discretion, either (i)pay cash equal to the product of such fraction multiplied by the fair market value of one share of Common Stock on the date of exercise, as determined in good faith by the Company's Board of Directors or (ii)issue the next largest whole number of Warrant Shares.

5. *Assignment or Loss of Warrant or Certificates* .

   (a)This Warrant may not be assigned or transferred.

   (b)Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction, upon receipt of an indemnity reasonably satisfactory to the Company, and, in the case of any such mutilation, upon surrender and cancellation of this Warrant, the Company will execute and deliver a new Warrant of like tenor and date, and any such lost, stolen, destroyed or mutilated Warrant shall thereupon become void.

   (c)The Holder shall indemnify and hold harmless the Company, its directors and officers, and each person, if any, who controls the Company, against any losses, claims, damages or liabilities, joint or several, to which the Company or any such director, officer or any such person may become subject under the Securities Act or any statute or common law, insofar as such losses, claims, damages or liabilities, or actions in respect thereof, arise out of or are based upon the disposition by the Holder of the Warrant, the Warrant Shares or other such securities in violation of the terms of this Warrant.

6. *Rights of the Holder* .

   (a)The Holder shall not, by virtue hereof, be entitled to any rights of a shareholder in the Company, either at law or equity, and the rights of the Holder by virtue hereof are limited to those expressed in this Warrant and are not enforceable against the Company except to the extent set forth herein.

   (b)Subject to the foregoing, the Holder shall be entitled to the registration rights with respect to the Warrant Shares in accordance with the terms and conditions of AppendixI, attached hereto and made a part hereof by this reference.

2

© 2004. EDGAR Online, Inc.

7. *Adjustment of Exercise Price and Number of Shares* . The number and kind of securities issuable upon the exercise of this Warrant and the Exercise Price of such securities shall be subject to adjustment from time to time upon the happening of certain events as follows:

(a) *Subdivision or Combination of Common Stock* . If the Company at any time subdivides (by any stock split, stock dividend or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, or combines by reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the number of Warrant Shares purchasable upon exercise of this Warrant immediately prior thereto shall be adjusted so that the Holder shall be entitled to receive the kind and number of Warrant Shares or other securities of the Company which it would have owned or have been entitled to receive after the happening of any of the events described above had this Warrant been exercised immediately prior to the happening of such event or any record date with respect thereto. If the Holder is entitled to receive shares of two or more classes of capital stock of the Company pursuant to the foregoing upon exercise of the Warrant, the Company shall determine the allocation of the adjusted Exercise Price between the classes of capital stock. After such allocation, the exercise privilege and the Exercise Price of each class of capital stock shall thereafter be subject to adjustment on terms comparable to those applicable to Common Stock in this Section. An adjustment made pursuant to this Section7(a)shall become effective immediately after the effective date of such event retroactive to the record date, if any, for such event. Such adjustment shall be made successively whenever such a payment, subdivision, combination or reclassification is made.

(b) *Adjustment in Exercise Price* . Whenever the number of Warrant Shares purchasable upon the exercise of the Warrant is adjusted as provided in this Section, the Exercise Price payable upon exercise of the Warrant shall be adjusted by multiplying such Exercise Price immediately prior to such adjustment by a fraction, of which the numerator shall be the number of Warrant Shares purchasable upon the exercise of the Warrant immediately prior to such adjustment, and of which the denominator shall be the number of Warrant Shares purchasable immediately thereafter.

8. *Officer's Certificate* . Whenever the Exercise Price or the number of Warrant Shares issuable on exercise of this Warrant shall be adjusted as required by the provisions of Section7 hereof, the Company shall forthwith file with its Secretary at its principal office an officer's certificate showing the adjusted Exercise Price and number of Warrant Shares determined as herein provided and setting forth in reasonable detail the facts requiring such adjustment. Each such officer's certificate shall be made available at all reasonable times for inspection by the Holder, and the Company shall, forthwith after each such adjustment, deliver a copy of such certificate to the Holder.

9. *Transfer to Comply with the Securities Act* .

(a)This Warrant and the Warrant Shares or any other security issued or issuable upon exercise of this Warrant may not be sold, transferred or otherwise disposed of except to a person who, in the opinion of counsel reasonably satisfactory to the Company, is a person to whom this Warrant or such Warrant Shares may legally be transferred pursuant to Section5 hereof without registration and without the delivery of a current prospectus under the Securities Act with respect thereto and then only against receipt of an agreement of such person to comply with the provisions of this Section9 with respect to any resale or other disposition of such securities unless, in the opinion of such counsel, such agreement is not required.

(b)The Holder, by acceptance of this Warrant, agrees that the Warrant Shares to be issued upon exercise hereof are being acquired for the account of the Holder for investment and not with a view to, or for resale in connection with, the distribution thereof and that the Holder will not offer, sell or otherwise dispose of such Warrant Shares except under circumstances which will not

3

© 2004. EDGAR Online, Inc.

result in a violation of the Securities Act and all applicable state securities laws. The Holder represents that the Holder has no present intention of distributing or reselling the Warrant Shares.

(c)The Company may cause the following legend, or one of similar substance, to be set forth on each certificate representing Warrant Shares or any other security issued or issuable upon exercise of this Warrant, unless counsel for the Company is of the opinion as to any such certificate that such legend is unnecessary:

> THE SECURITIES OF THE COMPANY EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND VARIOUS APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAYNOT BE SOLD, TRANSFERRED, PLEDGED OR ASSIGNED OR A SECURITY INTEREST CREATED THEREIN, UNLESS THE PURCHASE, TRANSFER, ASSIGNMENT, PLEDGE OR GRANT OF SUCH SECURITY INTEREST COMPLIES WITH ALL STATE AND FEDERAL SECURITIES LAWS (I.E., SUCH SHARES OF COMMON STOCK ARE REGISTERED UNDER SUCH LAWS OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE THEREUNDER) AND UNLESS THE SELLER, TRANSFEROR, ASSIGNOR, PLEDGOR OR GRANTOR OF SUCH SECURITY INTEREST PROVIDES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT THE TRANSACTION CONTEMPLATED WOULD NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS. TRANSFERABILITY OF THE SECURITIES IS THEREFORE LIMITED AND INVESTORS MUST BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

10. *Governing Law* . This Warrant shall be governed by, and construed in accordance with, the laws of the State of Utah applicable to contracts entered into and to be performed wholly within such State.

11. *Modification and Waiver* . This Warrant and any provision hereof may be modified, amended, waived or discharged only by an instrument in writing signed by the party against which enforcement of the same is sought.

12. *Notice* . Notices and other communications to be given to the Holder shall be delivered by hand or mailed, postage prepaid, to such address as the Holder shall have designated by written notice to the Company as provided in this Section. Notices or other communications to the Company shall be deemed to have been sufficiently given if delivered by hand or mailed postage prepaid to the Company at 355 South 520 West, Suite100, Lindon, Utah 84003, or such other address as the Company shall have designated by written notice to the Holder as provided in this Section. Notice by mail shall be deemed given when deposited in the United States mail, postage prepaid, as herein provided.

13. *Construction* . The descriptive headings of the several paragraphs and sectionsof this Warrant are inserted for convenience only and do not constitute a part of this Warrant. Unless otherwise indicated, references to sectionsshall be construed as references to the corresponding Sections of this Warrant.

4

© 2004. EDGAR Online, Inc.

IN WITNESS WHEREOF, the Company has executed this Warrant effective as of the 16 th day of August, 2002.

Caldera International,Inc.
By:                /s/ ROBERT K. BENCH
Its:                Chief Financial Officer

5

© 2004. EDGAR Online, Inc.

**EXHIBIT A**

**NOTICE OF EXERCISE**

TO: CALDERA INTERNATIONAL,INC. (the " *Company* "):

1.The undersigned holder of the attached warrant (the " *Warrant* ") hereby elects to purchase the Warrant Shares (as defined in the Warrant) pursuant to (Select (a)or (b)below):

|  |  |
|---|---|
| -<br>Initial<br>Here | (a) Section1(a)of the Warrant and the terms and conditions of the Warrant and tenders herewith payment of the purchase price of such shares in full; or |
| -<br>Initial<br>Here | (b) Section1(b)of the Warrant and the terms and conditions of the Warrant. |

2.Please issue a certificate or certificates representing the Warrant Shares in the name of the undersigned.

(DATE)

      (SIGNATURE)
      (PRINT OR TYPE NAME)

**APPENDIX I**

## REGISTRATION RIGHTS PROVISIONS

1. *Certain Definitions* . Capitalized terms used in this AppendixI that are not otherwise defined herein shall have the respective meanings assigned to them in the Warrant Agreement, dated as of August16, 2002 (the " *Agreement* "), to which this AppendixI is attached, if therein defined. For the purposes of this AppendixI, the following terms shall have the following meanings:

(a)" *Registrable Securities* " shall mean the Warrant Shares transferrable upon exercise of the Warrant (when and if transferred in accordance therewith).

(b)" *1934 Act* " shall mean the Securities Exchange Act of 1934, as amended.

(c)" *Holder* " shall mean any registered holder of the Warrant Shares or any registered transferee thereof.

2. *Registration* .

(a) *Demand Registration* . Whenever the Company proposes to register any of its Common Stock under the Securities Act for a public offering for cash, whether as a secondary offering or pursuant to registration rights granted to holders of other securities of the Company (other than a registration relating to employee benefit plans or to a transaction under Rule145 of the Securities Act), the Company shall, each such time, give the Holder advance written notice thereof. Upon the written request of any Holder within twenty (20)days after the Holder's receipt of such notice, the Company shall use its best efforts to cause to be included in such registration all of the Registrable Securities which the Holder requests to be registered; provided, however, that the Holder agrees to sell such Registrable Securities in the same manner and on the same terms and conditions as the other holders of Common Stock which the Company proposes to register.

(b) *Underwriting* . If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holder as a part of the written notice given pursuant to subsection2(a)of this AppendixI. In such event the right of the Holder to registration shall be conditioned upon the participation by such Holder in such underwriting and the inclusion of the Registrable Securities of such Holder in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the managing underwriter selected for such underwriting by the Company. Notwithstanding any other provision of this subsection, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the managing underwriter may limit the Registrable Securities to be included in such registration. The Company shall so advise all Holders and the other holders distributing their securities through such underwriting, and the number of shares of Registrable Securities and other securities that may be included in the registration and underwriting shall be allocated among all Holders and other holders thereof in proportion, as nearly as practicable, to the respective number of Registrable Securities or other securities entitled to inclusion in such registration held by the Holder and other selling Shareholders participating in such underwriting. If any Holder or other holder disapproves of the terms of any such underwriting, he may elect to withdraw therefrom by written notice to the Company and the managing underwriter.

7

© 2004. EDGAR Online, Inc.

3. *Obligations of the Company* . Whenever required under this AppendixI shall use reasonable efforts:

    (a)to prepare and file with the Securities and Exchange Commission a registration statement with respect to such Registrable Securities and to cause such registration statement to become and remain effective;

    (b)to prepare and file with the Securities and Exchange Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

    (c)to furnish to each Holder participating in such registration (each being a " *Participating Holder* ") such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as such Participating Holder may reasonably request in order to facilitate the disposition of Registrable Securities owned by it; and

    (d)to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably appropriate for the distribution of the securities covered by the registration statement, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to filea general consent to service of process in any such states or jurisdictions.

4. *Furnish Information* . It shall be a condition precedent to the obligations of the Company to take any action pursuant to this AppendixI that the Holder shall furnish to the Company such information regarding it, the Registrable Securities held by it and the intended method of disposition thereof as the Company shall reasonably request and as shall be required in connection with the action to be taken by the Company.

5. *Expenses of Registration* . Except as provided below, all expenses incurred in connection with a registration pursuant to this AppendixI, including without limitation all registration and qualification fees, printing and accounting fees and reasonable fees and disbursements of counsel for the Company shall be borne by the Company. All underwriting commissions and discounts, selling commissions and other fees and expenses incurred in connection with the sale of Registrable Securities shall be borne by the Company, the Holders and any other participating sellers, if any, in proportion to the number of shares sold thereunder by each. All fees and expenses of counsel for the Holder shall be paid by the Holder.

6. *Underwriting Requirements* . In connection with any underwritten public offering in which the Holder has a right to participate under this AppendixI and subject to the agreement of the underwriters, the Holder may sell to the underwriters, in lieu of all or any part of the shares of Registrable Securities to be included by the Holder in the offering, the Warrant.

7. *Delay of Registration* . So long as the Company has given any notice required by Section2 of this AppendixI, the Holder shall not have any right to take any action to restrain, enjoin or otherwise delay any registration as the result of any controversy which might arise with respect to the interpretation or implementation of this AppendixI; but nothing in this Section7 shall be construed as limiting any Holder's right to damages for breach of this Agreement.

8. *Indemnification* . In the event any of the Registrable Securities are included in a registration statement under this AppendixI:

    (a)The Company will indemnify and hold harmless the Holder against any losses, claims, damages or liabilities, joint or several, to which the Holder may become subject under the Securities Act, or otherwise, insofar as such losses, claims, damages or liabilities (or actions in

8

respect thereof) arise out of or are based upon (i)any untrue statement of any material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, or (ii)the omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading. The Company agrees to reimburse the Holder for any legal or other expenses reasonably incurred by the Holder in connection with defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this Section8 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld) nor shall the Company be liable in any such case for any such loss, claim, damage liability or action to the extent that it arises out of or is based upon an untrue statement or omission made in connection with such registration statement, preliminary prospectus, final prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by the Holder or any such underwriter, counsel or controlling person.

(b)The Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who have signed such registration statement, each person, if any, who controls the Company within the meaning of the Securities Act and any underwriter for the Company (within the meaning of the Securities Act) against any losses, claims, damages or liabilities to which the Company or any such director, officer, controlling person, counsel or underwriter may become subject, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon (i)any untrue statement of any material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, or (ii)the omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission was made in such registration statement, preliminary prospectus, final prospectus, or amendments or supplements thereto, in reliance upon and in conformity with written information furnished by the Holder expressly for use in connection with such registration. The Holder agrees to reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, controlling person, counsel or underwriter in connection with defending any such loss, claim, damage, liability or action. It is agreed that the indemnity agreement contained in this Section8 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld).

(c)Promptly after receipt by a party indemnified under this Section8 of notice of commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section8, notify the indemnifying party in writing of the commencement thereof and the indemnifying party shall have the right to participate in, and to the extent the indemnifying party desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties. The failure to notify an indemnifying party promptly of the commencement of any such action, if prejudicial to his ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section8, but the omission so to notify the indemnifying party will not relieve him of any liability which he may have to any indemnified party other than under this Section8.

9.*Transfer of Registration Rights* . The registration rights of the Holder under this AppendixI may be transferred to any transferee of a one hundred percent undivided interest in the Warrant, provided, that the Company is given written notice by the Holder at the time of such transfer stating the name

9

© 2004. EDGAR Online, Inc.

and address of the transferee and representing and warranting that such transferee is the transferee of a one hundred percent undivided interest in the Warrant.

10. *Reporting Requirements* . With a view toward making available the benefits of certain rules and regulations of the Securities and Exchange Commission that may at any time permit the sale of the Registrable Securities with or without registration, from and after the effective date of the Company's initial registration statement under the Securities Act, the Company agrees to:

(a) timely file and keep available such information, documents and reports as may be required or prescribed by the Securities and Exchange Commission under Section 13 or 15(d) (whichever is applicable) of the 1934 Act as well as any other information, reports and documents required of the Company under the Securities Act or 1934 Act; and

(b) furnish to the Holder, forthwith upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144, the Securities Act and the 1934 Act, as well as a copy of the most recent annual or quarterly report of the Company and such other reports and documents of the Company as the Holder may reasonably request in availing itself of any rule or regulation of the Securities and Exchange Commission allowing the Holder to sell such securities with or without registration.

10

© 2004. EDGAR Online, Inc.

QuickLinks
Exhibit 10.11
NOTICE OF EXERCISE

**QuickLinks** -- Click here to rapidly navigate through this document

Exhibit 10.12

### COMMON STOCK WARRANT
### CALDERA INTERNATIONAL, INC.

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). NO SALE, TRANSFER OR OTHER DISPOSITION OF THIS WARRANT OR SAID SHARES MAY BE EFFECTED WITHOUT (i) AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO, (ii) AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR (iii) RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION TO THE EFFECT THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED. THE WARRANT EVIDENCED HEREBY IS NON-TRANSFERABLE.

Right to Purchase 210,000
Shares of Common Stock

Caldera International, Inc., a Delaware corporation (the " **Company** "), hereby certifies that, for value received, Sun Microsystems, Inc., a Delaware corporation (" **Sun** "), or any transferee to whom this warrant (the " **Warrant** ") is properly transferred in accordance with Section 3(c) below (Sun or any such transferee, the " **Holder** "), is entitled, on the terms set forth below, to purchase from the Company at any time during the period commencing on March 11, 2003 (the " **Exercisability Date** ") and, subject to the provisions of Section 1 below, ending at 5:00 p.m., Pacific time, on March 11, 2008, 210,000 fully paid and nonassessable shares of the common stock, par value $0.001 per share (the " **Warrant Shares** "), of the Company, at a price of $1.83 per share, subject to adjustments as provided below (the " **Purchase Price** "). As used herein, the term " **Stock** " shall mean the Company's presently authorized common stock or any stock into or for which such common stock may hereafter be converted or exchanged prior to or concurrent with the exercise of this Warrant.

1.

   *Expiration* . This Warrant shall expire upon the first to occur of the following: (i) 5:00 p.m., Pacific time, on March 11, 2008; and (ii) the sale of all or substantially all of the assets of the Company or an acquisition of the Company by another corporation or entity by consolidation, merger or other reorganization or series of related transactions in which the holders of the Company's outstanding voting stock immediately prior to such transaction own, immediately after such transaction, securities representing less than fifty percent (50%) of the voting power of the surviving corporation, the surviving entity or the entity that controls such surviving entity (such sale of assets or acquisition, a "Merger or Consolidation").

2.

   *Exercise of Warrant.*

   (a)

   *Exercisability of the Warrant* . This Warrant will become exercisable on the Exercisability Date.

   (b)

   *Full Exercise* . This Warrant may be exercised by the Holder at any time during the period commencing on the Exercisability Date and ending upon its expiration for the full number of Warrant Shares by surrendering this Warrant and the Notice of Exercise attached hereto as **Exhibit A** properly endorsed to the Company's principal office, accompanied by payment in cash, by check or by wire transfer in an amount equal to the product of the Purchase Price and the number of Warrant Shares indicated on the face of this Warrant.

   (c)

   *Net Issue Exercise* . In lieu of exercising this Warrant pursuant to Section 2(b) above, the Holder may elect to receive a number of shares equal to the value (as determined below) of this Warrant by surrender of this Warrant at the principal office of the Company together with

© 2004. EDGAR Online, Inc.

Notice of Exercise. In such event, the Company shall issue to the Holder a number of shares computed using the following formula:

$$= \frac{Y(A-B)}{A}$$

where    the number of Shares to be issued to the Holder.
X =
Y =    the number of Shares subject to this Warrant.
A =    the fair market value of one share of the Company's common stock as determined by taking the average of the closing price for the ten most recent tradingdays ending on the date of exercise.
B =    the Exercise Price (as adjusted to the date of such calculation).

(d)

*Taxes* . The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Stock in any name other than that of the original holder hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or warrant until such tax is paid.

3. ***Representations and Covenants of the Holder.***  This Warrant has been issued by the Company in reliance upon the following representations and covenants of the Holder:

(a)

*Investment Purpose.*  The Stock issuable upon exercise of the Holder's rights contained herein will be acquired for investment and not with a view to the sale or distribution of any part thereof, and the Holder has no present intention of selling or engaging in any public distribution of the same except pursuant to a registration or exemption.

(b)

*Private Issue.*  The Holder understands (i)that the Stock issuable upon exercise of this Warrant is not registered under the Act or qualified under applicable state securities laws on the ground that the issuance contemplated by this Warrant will be exempt from the registration and qualifications requirements thereof, and (ii)that the Company's reliance on such exemption is predicated on the representations set forth in this Section3.

(c)

*Disposition of Holder's Rights.*  This Warrant and all rights hereunder are non-transferable; *provided, however* , that the Holder may transfer this Warrant and the rights hereunder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder.

The Stock issuable upon exercise of this Warrant is non-transferable, except in accordance with the terms of this provision. Notwithstanding the foregoing, the restrictions imposed upon the transferability of shares of the Stock do not apply to transfers by the Holder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder, and shall terminate as to any particular share of Stock when (1)the transfer of such security shall have been effectively registered under the Act and transferred by the Holder thereof in accordance with such registration, or (2)such security shall have been sold without registration in compliance with Rule144 under the Act or (3)a letter shall have been issued to the Holder at its request by the staff of the Securities and Exchange Commission or a ruling shall have been issued to the Holder at its request by such Commission stating that no action shall be recommended by such staff or taken by such Commission, as the case may be, if such security is transferred without registration under the Act in accordance with the conditions set forth in such letter or ruling and such letter or ruling specifies that no subsequent restrictions on transfer are required. Whenever the Stock issuable upon exercise of this Warrant may be sold pursuant to Rule144(k), the restrictions imposed herein shall terminate, the

© 2004.  EDGAR Online, Inc.

Holder or holder of a share of Stock issued upon exercise of this Warrant as to which such restrictions have terminated shall be entitled to receive from the Company,

2

© 2004. EDGAR Online, Inc.

without expense to such holder, one or more new certificates for the Warrant or for such shares of Stock not bearing any restrictive legend.

(d)

   *Financial Risk.* The Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment, and has the ability to bear the economic risks of its investment.

(e)

   *Risk of No Registration.* The Holder understands that if a registration statement covering the transfer of the Stock under the Act is not in effect when it desires to sell the Stock issuable upon exercise of this Warrant, it may be required to hold such securities for an indefinite period. The Holder also understands that any sale of Stock issuable upon exercise of this Warrant which might be made by it in reliance upon Rule144 under the Act may be made only in accordance with the terms and conditions of that Rule.

4. ***Delivery of Stock Certificates on Exercise .*** Promptly after the exercise of this Warrant and the payment of the Purchase Price pursuant to Section2(b)or after the net exercise of this Warrant pursuant to Section2(c), the Company will issue to the Holder or upon the order of the Holder hereof, a certificate or certificates for the number of whole shares of Stock to which the Holder is entitled; *provided, however,* that (i)the Holder shall have furnished to the Company at the time of such exercise a signed Investment Representation Statement substantially in the form attached hereto as **ExhibitB** and (ii)the Company will place on each certificate the following legend:

   "THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). THESE SECURITIES MAYNOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE ACT."

   Furthermore, the Company will place on each certificate any legend required by any applicable state blue sky law.

5. ***Adjustments for Dividends in Other Stock or Property; Reclassifications .*** The Purchase Price and the number and type of Warrant Shares and/or other property issuable upon exercise of this Warrant shall be appropriately and proportionately adjusted to reflect any stock dividend, stock split, combination of shares, reclassification, recapitalization, any corporate reorganization other than as provided in Section1 hereof or other similar event affecting the number or character of outstanding Warrant Shares, so that the number and type of securities and/or other property issuable upon exercise of this Warrant shall be equal to that which would have been issuable with respect to the number of Warrant Shares subject hereto at the time of such event, had such Warrant Shares then been outstanding.

6. ***Certificate as to Adjustments .*** In each case of an adjustment in the Purchase Price or in the shares of Stock or other stock, securities or property receivable on the exercise of the Warrant, the Company, at its expense, will compute such adjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment and showing in detail the facts upon which the adjustment is based. The Company will mail a copy of each such certificate to the Holder of the Warrant outstanding at that time.

7. ***Notices of Record Date .*** In case (i)the Company takes a record of the holders of its Stock (or other stock or securities at the time receivable upon the exercise of the Warrant) for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; or (ii)of any capital reorganization of the Company, any reclassification of the common stock of the Company, any consolidation or merger of the Company with or into another corporation, including, without limitation, any Merger or Consolidation, or any conveyance of all or substantially all of the assets of the Company to another

3

corporation; or (iii)of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail or cause to be mailed to each Holder of a Warrant at the time outstanding a notice specifying, as the case may be, (a)the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (b)the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the holders of record of Stock (or such other stock or securities at the time receivable upon the exercise of the Warrant) will be entitled to exchange their shares of Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up, and, in the case of a reorganization, consolidation, merger or conveyance, the fair market value of such securities or other property as determined by the Board of Directors of the Company. Such notice shall be mailed at least ten (10)days prior to the date specified therein; provided, however, that in the event of a Merger or Consolidation the Company shall use its best efforts to provide such notice in accordance with Section11 below at least twenty-one (21)days prior to the closing date of such Merger or Consolidation and, in any event, shall provide such notice in accordance with Section11 below at least fifteen (15)days prior to such closing date.

8. ***Reservation of Stock Issuable on Exercise of Warrant*** . The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, all such shares of Stock and other stock, or such other stock, securities and property as from time to time are receivable upon the exercise of the Warrant.

9. ***Exchanges of Warrant*** . Subject to the provisions of Section3(c) above, upon surrender for exchange of this Warrant (in negotiable form, if not surrendered by the Holder named on the face thereof) to the Company at its principal office, the Company, at its expense, will issue and deliver a new Warrant or Warrants exercisable in the aggregate for the same number of shares of Stock, in the denomination or denominations requested, to or on the order of such Holder upon payment by such Holder of any applicable transfer taxes; *provided, however* , that any transferee of the Warrant shall be required to make the representations set forth in ExhibitB attached hereto.

10. ***Replacement of Warrant*** . Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement in such reasonable amount as the Company may determine, or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement warrant in substantially identical form to this Warrant.

4

© 2004. EDGAR Online, Inc.

11. **Notices** . Any notices, demand, offer, request or other communication required or permitted to be given by either the Company or a Holder (collectively, a "Notice") pursuant to the terms of this Agreement, if delivered to the Holder, shall be sent to the following address:

> Sun Microsystems,Inc.
> 4150 Network Circle
> Santa Clara, California 95054
> Attention:
> Telephone:                         (408)276-
> Facsimile:                          (408)276-
> With a copy to:

> or at such other addresses provided to the Company or such other address as a party may request by notifying the other in writing.

(a)

Any Notice shall be delivered in writing. Any such Notice shall be deemed effectively given the earlier of (i)when received, (ii)when delivered personally, (iii)one (1)business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv)one (1)business day after being deposited with an overnight courier service and (v)four (4)days after being deposited in the U.S. mail, First Classwith postage prepaid.

12.

**Change; Waiver** . Neither this Warrant nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

13.

**No Fractional Shares or Script** . No fractional shares or script representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor upon the basis of the Purchase Price then in effect.

14.

**No Rights as Stockholder** . This Warrant does not entitle the Holder to any voting rights or other rights as a stockholder of the Company prior to the exercise of this Warrant.

15.

**Headings** . The headings in this Warrant are for purposes of reference only and shall not be deemed to constitute a part hereof.

16.

**Counterparts.** This Warrant may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

17.

**Governing Law** . This Warrant is delivered in the State of Delaware and shall be construed in accordance with and governed by the laws of such state.

5

© 2004. EDGAR Online, Inc.

18.

    *Confidentiality; No Public Disclosure.* The terms and conditions of this Warrant are confidential. The Holder shall not make any public disclosure concerning the terms and conditions of this Warrant without the prior written consent of the Company.

Dated: March, 2003            **CALDERA INTERNATIONAL,INC.**
                                       /s/ DARL MCBRIDE  *Signature of Authorized Signatory*
                                       Darl McBride, CEO *Print Name and Title*

**Agreed and accepted** :
Dated: March, 2003            **SUN MICROSYSTEMS,INC.**
                                       /s/ BRIAN SUTPHIN  *Signature of Authorized Signatory*
                                       Brian Sutphin, Vice President *Print Name and Title*

6

**EXHIBIT A**
**NOTICE OF EXERCISE**

### TO: CALDERA INTERNATIONAL,INC.

1.The undersigned hereby elects to purchase _shares of Common Stock of Caldera International pursuant to the terms of the attached Warrant.

2.Exercise (Please initial the blank):

The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.
The undersigned elects to exercise the attached Warrant by means of a net issue exercise pursuant to Section2(c)of the Warrant.

3.
Please issue a certificate, or certificates representing said shares of stock, in the name of the undersigned or in such other name as are specified below:

(Name)
(Address)

4.
The undersigned represents that the aforesaid shares of stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares. In support thereof, the undersigned has executed an Investment Representation Statement attached hereto as **ExhibitB** .

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

1

**EXHIBIT B**
**INVESTMENT REPRESENTATION STATEMENT**

Shares of Common Stock
of Caldera International,Inc.

In connection with the acquisition of the above-listed securities the undersigned hereby represents to Caldera International,Inc. (the "**Company**") as follows:

1.

The stock to be received upon the exercise of the Warrant will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and it has no present intention of selling, granting participation in or otherwise distributing the same, but subject, nevertheless, to any requirement of law that the disposition of its property shall at all times be within its control. By executing this Statement, the undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer, or grant participations to such person or to any third person, with respect to the stock acquired upon exercise of the Warrant.

2.

The undersigned understands that any stock acquired upon exercise of the Warrant at the time of issuance may not be registered under the Securities Act of 1933, as amended (the "**Act**"), and applicable state securities laws on the ground that the issuance of securities is exempt pursuant to Section4(2)of the Act, and state law exemptions relating to offers and sales not by means of a public offering and that the Company's reliance on such exemptions is predicated on the undersigned's representations set forth herein.

3.

The undersigned agrees that in no event will it make a disposition of any stock acquired upon the exercise of the Warrant unless and until (i)it shall have notified the Company of the proposed disposition and shall have furnished the Company with a statement of the circumstances surrounding the proposed disposition, and (ii)if requested by the Company, it shall have furnished the Company with an opinion of counsel satisfactory to the Company and its counsel to the effect that (A)appropriate action necessary for compliance with the Act and any applicable state securities laws has been taken or an exemption from the registration requirements of the Act and such laws is available, and (B)that the proposed transfer will not violate any of said laws.

4.

The undersigned represents that it is able to fend for itself in connection with its purchase of stock as contemplated by this Statement, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment and that it has the ability to bear the economic risks (including the risk of a total loss) of its investment.

5.

The undersigned acknowledges that the stock acquired upon exercise of the Warrant must be held indefinitely unless subsequently registered under the Act or an exemption from such registration is available. The undersigned is aware of the provisions of Rule144 promulgated under the Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being through a "broker's transaction" or in transactions directly with a "market maker"

2

(as provided by Rule144(f)) and the number of shares being sold during any three-month period not exceeding specified limitations.

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

3

© 2004. EDGAR Online, Inc.

QuickLinks
COMMON STOCK WARRANT CALDERA INTERNATIONAL, INC.
EXHIBIT A NOTICE OF EXERCISE
EXHIBIT B INVESTMENT REPRESENTATION STATEMENT
**QuickLinks**   -- Click here to rapidly navigate through this document

**Exhibit10.13**

## COMMON STOCK WARRANT
## THE SCO GROUP,INC.

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). NO SALE, TRANSFER OR OTHER DISPOSITION OF THIS WARRANT OR SAID SHARES MAYBE EFFECTED WITHOUT (i)AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO, (ii)AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR (iii)RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION TO THE EFFECT THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED. THE WARRANT EVIDENCED HEREBY IS NON-TRANSFERABLE.

Right to Purchase 12,500
Shares of Common Stock

The SCO Group,Inc., a Delaware corporation (the " **Company** "), hereby certifies that in consideration for early payment of the amount payable to the Company in August2003 under the terms of the Software License Agreement dated February25, 2003 between the Company and Sun Microsystems,Inc., a Delaware corporation (" **Sun** "), the receipt in full of which is hereby acknowledged, Sun, or any transferee to whom this warrant (the " **Warrant** ") is properly transferred in accordance with Section3(c) below (Sun or any such transferee, the " **Holder** "), is entitled, on the terms set forth below, to purchase from the Company at any time during the period commencing on July31, 2003 (the " **Exercisability Date** ") and, subject to the provisions of Section1 below, ending at 5:00p.m., Pacific time, on July31, 2008, 12,500 fully paid and nonassessable shares of the common stock, par value $0.001 per share (the " **Warrant Shares** "), of the Company, at a price of $1.83 per share, subject to adjustments as provided below (the " **Purchase Price** "). As used herein, the term " **Stock** " shall mean the Company's presently authorized common stock or any stock into or for which such common stock may hereafter be converted or exchanged prior to or concurrent with the exercise of this Warrant.

1.

   *Expiration* . This Warrant shall expire upon the first to occur of the following: (i)5:00p.m., Pacific time, on July31, 2008; and (ii)the sale of all or substantially all of the assets of the Company or an acquisition of the Company by another corporation or entity by consolidation, merger or other reorganization or series of related transactions in which the holders of the Company's outstanding voting stock immediately prior to such transaction own, immediately after such transaction, securities representing less than fifty percent (50%) of the voting power of the surviving corporation, the surviving entity or the entity that controls such surviving entity (such sale of assets or acquisition, a "Merger or Consolidation").

2.

   *Exercise of Warrant.*

   (a)

      *Exercisability of the Warrant* . This Warrant will become exercisable on the Exercisability Date.

   (b)

      *Full Exercise* . This Warrant may be exercised by the Holder at any time during the period commencing on the Exercisability Date and ending upon its expiration for the full number of Warrant Shares by surrendering this Warrant and the Notice of Exercise attached hereto as **ExhibitA** properly endorsed to the Company's principal office, accompanied by payment in cash, by check or by wire transfer in an amount equal to the product of the Purchase Price and the number of Warrant Shares indicated on the face of this Warrant.

   (c)

      *Net Issue Exercise* . In lieu of exercising this Warrant pursuant to Section2(b)above, the Holder may elect to receive a number of shares equal to the value (as determined below) of this Warrant by surrender of this Warrant at the principal office of the Company together with

Notice of Exercise. In such event, the Company shall issue to the Holder a number of shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

where  the number of Shares to be issued to the Holder.
   X =
   Y = the number of Shares subject to this Warrant.
   A = the fair market value of one share of the Company's common stock as determined by taking the average of the closing price for the ten most recent trading days ending on the date of exercise.
   B = the Exercise Price (as adjusted to the date of such calculation).

(d)

   *Taxes* . The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Stock in any name other than that of the original holder hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or warrant until such tax is paid.

3. **Representations and Covenants of the Holder.**  This Warrant has been issued by the Company in reliance upon the following representations and covenants of the Holder:

(a)

   *Investment Purpose.*  The Stock issuable upon exercise of the Holder's rights contained herein will be acquired for investment and not with a view to the sale or distribution of any part thereof, and the Holder has no present intention of selling or engaging in any public distribution of the same except pursuant to a registration or exemption.

(b)

   *Private Issue.*  The Holder understands (i)that the Stock issuable upon exercise of this Warrant is not registered under the Act or qualified under applicable state securities laws on the ground that the issuance contemplated by this Warrant will be exempt from the registration and qualifications requirements thereof, and (ii)that the Company's reliance on such exemption is predicated on the representations set forth in this Section3.

(c)

   Disposition *of Holder's Rights.*  This Warrant and all rights hereunder are non-transferable; *provided, however* , that the Holder may transfer this Warrant and the rights hereunder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder.

The Stock issuable upon exercise of this Warrant is non-transferable, except in accordance with the terms of this provision. Notwithstanding the foregoing, the restrictions imposed upon the transferability of shares of the Stock do not apply to transfers by the Holder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder, and shall terminate as to any particular share of Stock when (1)the transfer of such security shall have been effectively registered under the Act and transferred by the Holder thereof in accordance with such registration, or (2)such security shall have been sold without registration in compliance with Rule144 under the Act or (3)a letter shall have been issued to the Holder at its request by the staff of the Securities and Exchange Commission or a ruling shall have been issued to the Holder at its request by such Commission stating that no action shall be recommended by such staff or taken by such Commission, as the case may be, if such security is transferred without registration under the Act in accordance with the conditions set forth in such letter or ruling and such letter or ruling specifies that no subsequent restrictions on transfer are required. Whenever the Stock issuable upon exercise of this Warrant may be sold pursuant to Rule144(k), the restrictions imposed herein shall terminate, the

Holder or holder of a share of Stock issued upon exercise of this Warrant as to which such restrictions have terminated shall be entitled to receive from the Company,

2

© 2004. EDGAR Online, Inc.

without expense to such holder, one or more new certificates for the Warrant or for such shares of Stock not bearing any restrictive legend.

(d)

   *Financial Risk.* The Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment, and has the ability to bear the economic risks of its investment.

(e)

   *Risk of No Registration.* The Holder understands that if a registration statement covering the transfer of the Stock under the Act is not in effect when it desires to sell the Stock issuable upon exercise of this Warrant, it may be required to hold such securities for an indefinite period. The Holder also understands that any sale of Stock issuable upon exercise of this Warrant which might be made by it in reliance upon Rule144 under the Act may be made only in accordance with the terms and conditions of that Rule.

4. ***Delivery of Stock Certificates on Exercise*** . Promptly after the exercise of this Warrant and the payment of the Purchase Price pursuant to Section2(b)or after the net exercise of this Warrant pursuant to Section2(c), the Company will issue to the Holder or upon the order of the Holder hereof, a certificate or certificates for the number of whole shares of Stock to which the Holder is entitled; *provided, however,* that (i)the Holder shall have furnished to the Company at the time of such exercise a signed Investment Representation Statement substantially in the form attached hereto as **ExhibitB** and (ii)the Company will place on each certificate the following legend:

> "THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). THESE SECURITIES MAYNOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE ACT."

> Furthermore, the Company will place on each certificate any legend required by any applicable state blue sky law.

5. ***Adjustments for Dividends in Other Stock or Property; Reclassifications*** . The Purchase Price and the number and type of Warrant Shares and/or other property issuable upon exercise of this Warrant shall be appropriately and proportionately adjusted to reflect any stock dividend, stock split, combination of shares, reclassification, recapitalization, any corporate reorganization other than as provided in Section1 hereof or other similar event affecting the number or character of outstanding Warrant Shares, so that the number and type of securities and/or other property issuable upon exercise of this Warrant shall be equal to that which would have been issuable with respect to the number of Warrant Shares subject hereto at the time of such event, had such Warrant Shares then been outstanding.

6. ***Certificate as to Adjustments*** . In each case of an adjustment in the Purchase Price or in the shares of Stock or other stock, securities or property receivable on the exercise of the Warrant, the Company, at its expense, will compute such adjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment and showing in detail the facts upon which the adjustment is based. The Company will mail a copy of each such certificate to the Holder of the Warrant outstanding at that time.

7. ***Notices of Record Date*** . In case (i)the Company takes a record of the holders of its Stock (or other stock or securities at the time receivable upon the exercise of the Warrant) for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; or (ii)of any capital reorganization of the Company, any reclassification of the common stock of the Company, any consolidation or merger of the Company with or into another corporation, including, without limitation, any Merger or Consolidation, or any conveyance of all or substantially all of the assets of the Company to another

3

© 2004. EDGAR Online, Inc.

corporation; or (iii)of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail or cause to be mailed to each Holder of a Warrant at the time outstanding a notice specifying, as the case may be, (a)the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (b)the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the holders of record of Stock (or such other stock or securities at the time receivable upon the exercise of the Warrant) will be entitled to exchange their shares of Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up, and, in the case of a reorganization, consolidation, merger or conveyance, the fair market value of such securities or other property as determined by the Board of Directors of the Company. Such notice shall be mailed at least ten (10)days prior to the date specified therein; provided, however, that in the event of a Merger or Consolidation the Company shall use its best efforts to provide such notice in accordance with Section11 below at least twenty-one (21)days prior to the closing date of such Merger or Consolidation and, in any event, shall provide such notice in accordance with Section11 below at least fifteen (15)days prior to such closing date.

8. *Reservation of Stock Issuable on Exercise of Warrant* . The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, all such shares of Stock and other stock, or such other stock, securities and property as from time to time are receivable upon the exercise of the Warrant.

9. *Exchanges of Warrant* . Subject to the provisions of Section3(c) above, upon surrender for exchange of this Warrant (in negotiable form, if not surrendered by the Holder named on the face thereof) to the Company at its principal office, the Company, at its expense, will issue and deliver a new Warrant or Warrants exercisable in the aggregate for the same number of shares of Stock, in the denomination or denominations requested, to or on the order of such Holder upon payment by such Holder of any applicable transfer taxes; *provided, however* , that any transferee of the Warrant shall be required to make the representations set forth in **ExhibitB** attached hereto.

10. *Replacement of Warrant* . Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement in such reasonable amount as the Company may determine, or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement warrant in substantially identical form to this Warrant.

11. *Notices* . Any notices, demand, offer, request or other communication required or permitted to be given by either the Company or a Holder (collectively, a " **Notice** ") pursuant to the terms of this Agreement, if delivered to the Holder, shall be sent to the following address:

> Sun Microsystems,Inc.
> 18 Network Circle
> MS: UMPK18-203
> Menlo Park, CA 94025
> Attention: Brian Sutphin, VP, Strategic Investments
> Facsimile No.: (650)786-0838
> with a copy to:
>
> Sun Microsystems,Inc.
> 4120 Network Circle
> Santa Clara, CA 95054
> Attention: Laura Fennell, VP, Legal
> Facsimile No.: (408)276-4601

4

and to:

Wilson Sonsini Goodrich& Rosati
Professional Corporation
650 PageMill Road
Palo Alto, California 94304
Attention: Dave Segre, Esq.
Facsimile No.: (650)493-6811

or at such other addresses provided to the Company or such other address as a party may request by notifying the other in writing.

(a)      Any Notice shall be delivered in writing. Any such Notice shall be deemed effectively given the earlier of (i)when received, (ii)when delivered personally, (iii)one (1)business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv)one (1)business day after being deposited with an overnight courier service and (v)four (4)days after being deposited in the U.S. mail, First Classwith postage prepaid.

12.
*Change; Waiver* **.** Neither this Warrant nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

13.
*No Fractional Shares or Script* **.** No fractional shares or script representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor upon the basis of the Purchase Price then in effect.

14.
*No Rights as Stockholder* **.** This Warrant does not entitle the Holder to any voting rights or other rights as a stockholder of the Company prior to the exercise of this Warrant.

15.
*Headings* **.** The headings in this Warrant are for purposes of reference only and shall not be deemed to constitute a part hereof.

16.
*Counterparts.* This Warrant may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

17.
*Governing Law* **.** This Warrant is delivered in the State of Delaware and shall be construed in accordance with and governed by the laws of such state.

18.
*Confidentiality; No Public Disclosure.* The terms and conditions of this Warrant are confidential. Neither party shall make any public disclosure concerning the terms and conditions of this Warrant without the prior written consent of the other party, except as required by the rules and regulations of the Securities and Exchange Commission, the Nasdaq National Market or any other applicable stock exchanges.

5

© 2004.  EDGAR Online, Inc.

Dated: August, 2003

**THE SCO GROUP, INC.**
/s/ ROBERT K. BENCH  *Signature of Authorized Signatory*
Robert K. Bench, CFO *Print Name and Title*

**Agreed and accepted** :
Dated: August, 2003

**SUN MICROSYSTEMS, INC.**
/s/ BRIAN SUTPHIN  *Signature of Authorized Signatory*
Brian Sutphin, Vice President *Print Name and Title*

6

© 2004. EDGAR Online, Inc.

**EXHIBIT A**
**NOTICE OF EXERCISE**

**TO: THE SCO GROUP,INC.**

1.The undersigned hereby elects to purchase _shares of Common Stock of The SCO Group, Inc pursuant to the terms of the attached Warrant.

2.Exercise (Please initial the blank):

> The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.
> The undersigned elects to exercise the attached Warrant by means of a net issue exercise pursuant to Section2(c)of the Warrant.

3.Please issue a certificate, or certificates representing said shares of stock, in the name of the undersigned or in such other name as are specified below:

   (Name)
  (Address)

4.The undersigned represents that the aforesaid shares of stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares. In support thereof, the undersigned has executed an Investment Representation Statement attached hereto as **ExhibitB** .

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

1

© 2004. EDGAR Online, Inc.

**EXHIBIT B**
**INVESTMENT REPRESENTATION STATEMENT**

Shares of Common Stock
of The SCO Group,Inc.

In connection with the acquisition of the above-listed securities the undersigned hereby represents to The SCO Group,Inc.(the " **Company** ") as follows:

1.

   The stock to be received upon the exercise of the Warrant will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and it has no present intention of selling, granting participation in or otherwise distributing the same, but subject, nevertheless, to any requirement of law that the disposition of its property shall at all times be within its control. By executing this Statement, the undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer, or grant participations to such person or to any third person, with respect to the stock acquired upon exercise of the Warrant.

2.

   The undersigned understands that any stock acquired upon exercise of the Warrant at the time of issuance may not be registered under the Securities Act of 1933, as amended (the " **Act** "), and applicable state securities laws on the ground that the issuance of securities is exempt pursuant to Section4(2)of the Act, and state law exemptions relating to offers and sales not by means of a public offering and that the Company's reliance on such exemptions is predicated on the undersigned's representations set forth herein.

3.

   The undersigned agrees that in no event will it make a disposition of any stock acquired upon the exercise of the Warrant unless and until (i)it shall have notified the Company of the proposed disposition and shall have furnished the Company with a statement of the circumstances surrounding the proposed disposition, and (ii)if requested by the Company, it shall have furnished the Company with an opinion of counsel satisfactory to the Company and its counsel to the effect that (A)appropriate action necessary for compliance with the Act and any applicable state securities laws has been taken or an exemption from the registration requirements of the Act and such laws is available, and (B)that the proposed transfer will not violate any of said laws.

4.

   The undersigned represents that it is able to fend for itself in connection with its purchase of stock as contemplated by this Statement, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment and that it has the ability to bear the economic risks (including the risk of a total loss) of its investment.

5.

   The undersigned acknowledges that the stock acquired upon exercise of the Warrant must be held indefinitely unless subsequently registered under the Act or an exemption from such registration is available. The undersigned is aware of the provisions of Rule144 promulgated under the Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being through a "broker's transaction" or in transactions directly with a "market maker"

2

© 2004. EDGAR Online, Inc.

(as provided by Rule144(f)) and the number of shares being sold during any three-month period not exceeding specified
   limitations.

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

3

QuickLinks
COMMON STOCK WARRANT THE SCO GROUP, INC.
EXHIBIT A NOTICE OF EXERCISE
EXHIBIT B INVESTMENT REPRESENTATION STATEMENT
**QuickLinks**  -- Click here to rapidly navigate through this document

**Exhibit10.14**

## COMMON STOCK WARRANT
### THE SCO GROUP,INC.

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). NO SALE, TRANSFER OR OTHER DISPOSITION OF THIS WARRANT OR SAID SHARES MAYBE EFFECTED WITHOUT (i)AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO, (ii)AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR (iii)RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION TO THE EFFECT THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED. THE WARRANT EVIDENCED HEREBY IS NON-TRANSFERABLE.

Right to Purchase 12,500
Shares of Common Stock

The SCO Group,Inc., a Delaware corporation (the " **Company** "), hereby certifies that in consideration for early payment of the amount payable to the Company in November2003 under the terms of the Software License Agreement dated February25, 2003 between the Company and Sun Microsystems,Inc., a Delaware corporation (" **Sun** "), the receipt in full of which is hereby acknowledged, Sun, or any transferee to whom this warrant (the " **Warrant** ") is properly transferred in accordance with Section3(c) below (Sun or any such transferee, the " **Holder** "), is entitled, on the terms set forth below, to purchase from the Company at any time during the period commencing on October31, 2003 (the " **Exercisability Date** ") and, subject to the provisions of Section1 below, ending at 5:00p.m., Pacific time, on October31, 2008, 12,500 fully paid and nonassessable shares of the common stock, par value $0.001 per share (the " **Warrant Shares** "), of the Company, at a price of $1.83 per share, subject to adjustments as provided below (the " **Purchase Price** "). As used herein, the term " **Stock** " shall mean the Company's presently authorized common stock or any stock into or for which such common stock may hereafter be converted or exchanged prior to or concurrent with the exercise of this Warrant.

1.

   *Expiration* . This Warrant shall expire upon the first to occur of the following: (i)5:00p.m., Pacific time, on October31, 2008; and (ii)the sale of all or substantially all of the assets of the Company or an acquisition of the Company by another corporation or entity by consolidation, merger or other reorganization or series of related transactions in which the holders of the Company's outstanding voting stock immediately prior to such transaction own, immediately after such transaction, securities representing less than fifty percent (50%) of the voting power of the surviving corporation, the surviving entity or the entity that controls such surviving entity (such sale of assets or acquisition, a "Merger or Consolidation").

2.

   *Exercise of Warrant.*

   (a)

      *Exercisability of the Warrant* . This Warrant will become exercisable on the Exercisability Date.

   (b)

      *Full Exercise* . This Warrant may be exercised by the Holder at any time during the period commencing on the Exercisability Date and ending upon its expiration for the full number of Warrant Shares by surrendering this Warrant and the Notice of Exercise attached hereto as **ExhibitA** properly endorsed to the Company's principal office, accompanied by payment in cash, by check or by wire transfer in an amount equal to the product of the Purchase Price and the number of Warrant Shares indicated on the face of this Warrant.

   (c)

      *Net Issue Exercise* . In lieu of exercising this Warrant pursuant to Section2(b)above, the Holder may elect to receive a number of shares equal to the value (as determined below) of this Warrant by surrender of this Warrant at the principal office of the Company together with

Notice of Exercise. In such event, the Company shall issue to the Holder a number of shares computed using the following formula:

$$= \frac{Y(A-B)}{A}$$

where
$X =$ the number of Shares to be issued to the Holder.
$Y =$ the number of Shares subject to this Warrant.
$A =$ the fair market value of one share of the Company's common stock as determined by taking the average of the closing price for the ten most recent tradingdays ending on the date of exercise.
$B =$ the Exercise Price (as adjusted to the date of such calculation).

(d)

*Taxes* . The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Stock in any name other than that of the original holder hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or warrant until such tax is paid.

3. ***Representations and Covenants of the Holder.*** This Warrant has been issued by the Company in reliance upon the following representations and covenants of the Holder:

(a)

*Investment Purpose.* The Stock issuable upon exercise of the Holder's rights contained herein will be acquired for investment and not with a view to the sale or distribution of any part thereof, and the Holder has no present intention of selling or engaging in any public distribution of the same except pursuant to a registration or exemption.

(b)

*Private Issue.* The Holder understands (i)that the Stock issuable upon exercise of this Warrant is not registered under the Act or qualified under applicable state securities laws on the ground that the issuance contemplated by this Warrant will be exempt from the registration and qualifications requirements thereof, and (ii)that the Company's reliance on such exemption is predicated on the representations set forth in this Section3.

(c)

*Disposition of Holder's Rights.* This Warrant and all rights hereunder are non-transferable; *provided, however* , that the Holder may transfer this Warrant and the rights hereunder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder.

The Stock issuable upon exercise of this Warrant is non-transferable, except in accordance with the terms of this provision. Notwithstanding the foregoing, the restrictions imposed upon the transferability of shares of the Stock do not apply to transfers by the Holder, in part or whole, to any subsidiary, parent, affiliate, general partner or limited partner of the Holder, and shall terminate as to any particular share of Stock when (1)the transfer of such security shall have been effectively registered under the Act and transferred by the Holder thereof in accordance with such registration, or (2)such security shall have been sold without registration in compliance with Rule144 under the Act or (3)a letter shall have been issued to the Holder at its request by the staff of the Securities and Exchange Commission or a ruling shall have been issued to the Holder at its request by such Commission stating that no action shall be recommended by such staff or taken by such Commission, as the case may be, if such security is transferred without registration under the Act in accordance with the conditions set forth in such letter or ruling and such letter or ruling specifies that no subsequent restrictions on transfer are required. Whenever the Stock issuable upon exercise of this Warrant may be sold pursuant to Rule144(k), the restrictions imposed herein shall terminate, the

© 2004.  EDGAR Online, Inc.

Holder or holder of a share of Stock issued upon exercise of this Warrant as to which such restrictions have terminated shall be entitled to receive from the Company,

2

© 2004. EDGAR Online, Inc.

without expense to such holder, one or more new certificates for the Warrant or for such shares of Stock not bearing any restrictive legend.

(d)

*Financial Risk.* The Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment, and has the ability to bear the economic risks of its investment.

(e)

*Risk of No Registration.* The Holder understands that if a registration statement covering the transfer of the Stock under the Act is not in effect when it desires to sell the Stock issuable upon exercise of this Warrant, it may be required to hold such securities for an indefinite period. The Holder also understands that any sale of Stock issuable upon exercise of this Warrant which might be made by it in reliance upon Rule144 under the Act may be made only in accordance with the terms and conditions of that Rule.

4. ***Delivery of Stock Certificates on Exercise .*** Promptly after the exercise of this Warrant and the payment of the Purchase Price pursuant to Section2(b)or after the net exercise of this Warrant pursuant to Section2(c), the Company will issue to the Holder or upon the order of the Holder hereof, a certificate or certificates for the number of whole shares of Stock to which the Holder is entitled; *provided, however,* that (i)the Holder shall have furnished to the Company at the time of such exercise a signed Investment Representation Statement substantially in the form attached hereto as **ExhibitB** and (ii)the Company will place on each certificate the following legend:

> "THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). THESE SECURITIES MAYNOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE ACT."

Furthermore, the Company will place on each certificate any legend required by any applicable state blue sky law.

5. ***Adjustments for Dividends in Other Stock or Property; Reclassifications .*** The Purchase Price and the number and type of Warrant Shares and/or other property issuable upon exercise of this Warrant shall be appropriately and proportionately adjusted to reflect any stock dividend, stock split, combination of shares, reclassification, recapitalization, any corporate reorganization other than as provided in Section1 hereof or other similar event affecting the number or character of outstanding Warrant Shares, so that the number and type of securities and/or other property issuable upon exercise of this Warrant shall be equal to that which would have been issuable with respect to the number of Warrant Shares subject hereto at the time of such event, had such Warrant Shares then been outstanding.

6. ***Certificate as to Adjustments .*** In each case of an adjustment in the Purchase Price or in the shares of Stock or other stock, securities or property receivable on the exercise of the Warrant, the Company, at its expense, will compute such adjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment and showing in detail the facts upon which the adjustment is based. The Company will mail a copy of each such certificate to the Holder of the Warrant outstanding at that time.

7. ***Notices of Record Date .*** In case (i)the Company takes a record of the holders of its Stock (or other stock or securities at the time receivable upon the exercise of the Warrant) for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; or (ii)of any capital reorganization of the Company, any reclassification of the common stock of the Company, any consolidation or merger of the Company with or into another corporation, including, without limitation, any Merger or Consolidation, or any conveyance of all or substantially all of the assets of the Company to another

3

corporation; or (iii)of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail or cause to be mailed to each Holder of a Warrant at the time outstanding a notice specifying, as the case may be, (a)the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (b)the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the holders of record of Stock (or such other stock or securities at the time receivable upon the exercise of the Warrant) will be entitled to exchange their shares of Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up, and, in the case of a reorganization, consolidation, merger or conveyance, the fair market value of such securities or other property as determined by the Board of Directors of the Company. Such notice shall be mailed at least ten (10)days prior to the date specified therein; provided, however, that in the event of a Merger or Consolidation the Company shall use its best efforts to provide such notice in accordance with Section11 below at least twenty-one (21)days prior to the closing date of such Merger or Consolidation and, in any event, shall provide such notice in accordance with Section11 below at least fifteen (15)days prior to such closing date.

8. *Reservation of Stock Issuable on Exercise of Warrant* . The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, all such shares of Stock and other stock, or such other stock, securities and property as from time to time are receivable upon the exercise of the Warrant.

9. *Exchanges of Warrant* . Subject to the provisions of Section3(c) above, upon surrender for exchange of this Warrant (in negotiable form, if not surrendered by the Holder named on the face thereof) to the Company at its principal office, the Company, at its expense, will issue and deliver a new Warrant or Warrants exercisable in the aggregate for the same number of shares of Stock, in the denomination or denominations requested, to or on the order of such Holder upon payment by such Holder of any applicable transfer taxes; *provided, however* , that any transferee of the Warrant shall be required to make the representations set forth in **ExhibitB** attached hereto.

10. *Replacement of Warrant* . Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement in such reasonable amount as the Company may determine, or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement warrant in substantially identical form to this Warrant.

11. *Notices* . Any notices, demand, offer, request or other communication required or permitted to be given by either the Company or a Holder (collectively, a " **Notice** ") pursuant to the terms of this Agreement, if delivered to the Holder, shall be sent to the following address:

      Sun Microsystems,Inc.
      18 Network Circle
      MS: UMPK18-203
      Menlo Park, CA 94025
      Attention: Brian Sutphin, VP, Strategic Investments
      Facsimile No.: (650)786-0838
      with a copy to:

      Sun Microsystems,Inc.
      4120 Network Circle
      Santa Clara, CA 95054
      Attention: Laura Fennell, VP, Legal
      Facsimile No.: (408)276-4601

© 2004. EDGAR Online, Inc.

and to:

Wilson Sonsini Goodrich& Rosati
Professional Corporation
650 PageMill Road
Palo Alto, California 94304
Attention: Dave Segre, Esq.
Facsimile No.: (650)493-6811

or at such other addresses provided to the Company or such other address as a party may request by notifying the other in writing.

(a)      Any Notice shall be delivered in writing. Any such Notice shall be deemed effectively given the earlier of (i)when received, (ii)when delivered personally, (iii)one (1)business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv)one (1)business day after being deposited with an overnight courier service and (v)four (4)days after being deposited in the U.S. mail, First Classwith postage prepaid.

12.
   *Change; Waiver* . Neither this Warrant nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

13.
   *No Fractional Shares or Script* . No fractional shares or script representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor upon the basis of the Purchase Price then in effect.

14.
   *No Rights as Stockholder* . This Warrant does not entitle the Holder to any voting rights or other rights as a stockholder of the Company prior to the exercise of this Warrant.

15.
   *Headings* . The headings in this Warrant are for purposes of reference only and shall not be deemed to constitute a part hereof.

16.
   *Counterparts.* This Warrant may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

17.
   *Governing Law* . This Warrant is delivered in the State of Delaware and shall be construed in accordance with and governed by the laws of such state.

18.
   *Confidentiality; No Public Disclosure.* The terms and conditions of this Warrant are confidential. Neither party shall make any public disclosure concerning the terms and conditions of this Warrant without the prior written consent of the other party, except as required by the rules and regulations of the Securities and Exchange Commission, the Nasdaq National Market or any other applicable stock exchanges.

5

© 2004. EDGAR Online, Inc.

Dated: October, 2003          **THE SCO GROUP,INC.**
                              /s/ ROBERT K. BENCH  *Signature of Authorized*
                              *Signatory*
                              Robert K. Bench, CFO *Print Name and Title*

**Agreed and accepted** :
Dated: October, 2003          **SUN MICROSYSTEMS,INC.**
                              /s/ BRIAN SUTPHIN  *Signature of Authorized*
                              *Signatory*
                              Brian Sutphin, Vice President *Print Name and Title*

6

**EXHIBIT A**
**NOTICE OF EXERCISE**

**TO: THE SCO GROUP,INC.**

1.The undersigned hereby elects to purchase _shares of Common Stock of The SCO Group, Inc. pursuant to the terms of the attached Warrant.

2.Exercise (Please initial the blank):

> The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.
> The undersigned elects to exercise the attached Warrant by means of a net issue exercise pursuant to Section2(c)of the Warrant.

3.

Please issue a certificate, or certificates representing said shares of stock, in the name of the undersigned or in such other name as are specified below:

(Name)
(Address)

4.

The undersigned represents that the aforesaid shares of stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares. In support thereof, the undersigned has executed an Investment Representation Statement attached hereto as **ExhibitB** .

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

1

© 2004. EDGAR Online, Inc.

**EXHIBIT B**
**INVESTMENT REPRESENTATION STATEMENT**

Shares of Common Stock
of The SCO Group, Inc.

In connection with the acquisition of the above-listed securities the undersigned hereby represents to The SCO Group, Inc. (the "**Company** ") as follows:

1.

The stock to be received upon the exercise of the Warrant will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and it has no present intention of selling, granting participation in or otherwise distributing the same, but subject, nevertheless, to any requirement of law that the disposition of its property shall at all times be within its control. By executing this Statement, the undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer, or grant participations to such person or to any third person, with respect to the stock acquired upon exercise of the Warrant.

2.

The undersigned understands that any stock acquired upon exercise of the Warrant at the time of issuance may not be registered under the Securities Act of 1933, as amended (the " **Act** "), and applicable state securities laws on the ground that the issuance of securities is exempt pursuant to Section 4(2) of the Act, and state law exemptions relating to offers and sales not by means of a public offering and that the Company's reliance on such exemptions is predicated on the undersigned's representations set forth herein.

3.

The undersigned agrees that in no event will it make a disposition of any stock acquired upon the exercise of the Warrant unless and until (i) it shall have notified the Company of the proposed disposition and shall have furnished the Company with a statement of the circumstances surrounding the proposed disposition, and (ii) if requested by the Company, it shall have furnished the Company with an opinion of counsel satisfactory to the Company and its counsel to the effect that (A) appropriate action necessary for compliance with the Act and any applicable state securities laws has been taken or an exemption from the registration requirements of the Act and such laws is available, and (B) that the proposed transfer will not violate any of said laws.

4.

The undersigned represents that it is able to fend for itself in connection with its purchase of stock as contemplated by this Statement, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment and that it has the ability to bear the economic risks (including the risk of a total loss) of its investment.

5.

The undersigned acknowledges that the stock acquired upon exercise of the Warrant must be held indefinitely unless subsequently registered under the Act or an exemption from such registration is available. The undersigned is aware of the provisions of Rule 144 promulgated under the Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being through a "broker's transaction" or in transactions directly with a "market maker"

2

© 2004. EDGAR Online, Inc.

(as provided by Rule144(f)) and the number of shares being sold during any three-month period not exceeding specified limitations.

*Name of Warrantholder*
*Signature of Authorized Signatory*
*Print Name and Title*
*Date*

3

© 2004.  EDGAR Online, Inc.

QuickLinks

COMMON STOCK WARRANT THE SCO GROUP, INC.
EXHIBIT A NOTICE OF EXERCISE
EXHIBIT B INVESTMENT REPRESENTATION STATEMENT

QuickLinks  -- Click here to rapidly navigate through this document

Exhibit10.15

## INDEPENDENT CONTRACTOR AGREEMENT
### Between
### SCO OPERATIONS,INC.
### And
### S2 Strategic Consulting, LLC

### INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is made and entered into as of July1, 2003 ("Effective Date"), by and between SCO Operations,Inc., a Delaware corporation and a subsidiary of The SCO Group,Inc. (hereinafter referred to as "SCO"), with offices at 355 South 520 West, Suite100, Lindon, Utah 84042 and S2 Strategic Consulting, LLC ("Independent Contractor" or "IC"), a Delaware LLC, with offices at 4567 So. Mathews Way, Salt Lake City, UT 84124.

This agreement supercedes and/or replaces any prior contracts or agreements between the parties.

In consideration of the payments herein provided to be made and the mutual promises, agreements and undertakings herein contained, the parties mutually agree as follows:

## 1.0 SCOPE OF SERVICES

1.1

    IC shall perform the services ("Scope of Services") set forth in ExhibitA—Statement of Work. The failure of IC to use its best efforts to complete the Services shall constitute a material breach of this Agreement.

1.2

    The SCO representative designated in the Statement of Work shall provide to IC information appropriate for IC to perform the Services.

1.3

    IC shall devote such time to the performance of Services as is necessary for a satisfactory performance; however, IC shall have no obligation to work any particularhours ordays or any particular number ofhours ordays. IC retains the right to contract for similar services with other businesses or individuals.

1.4

    IC shall provide SCO with monthly reports of the Services together with appropriate explanatory materials in an agreed upon format. If SCO notifies IC of any errors or inadequacies in such example, IC shall promptly correct such errors or inaccuracies.

## 2.0 INDEPENDENT CONTRACTOR STATUS

2.1

    SCO shall not control the details, manner or means by which IC performs the Services in any material respect.

2.2

    SCO and IC expressly intend and agree that IC shall be independent contractors and not an employee of SCO. If, notwithstanding such specific intention and agreement, IC is finally adjudged to be an employee of SCO by a court of competent jurisdiction, then to the maximum extent permitted by applicable law, such status shall not entitle IC to, and IC specifically waives entitlement to SCO employee benefits, including but not limited to, medical, dental, life insurance, 401(k)program, stock option plans, stock purchase plan, vacation leave, sick leave and holidays. In the event IC is finally

adjudged to be entitled to any of such benefits by a court of competent jurisdiction, SCO shall be entitled to recover from IC the fair market value of any such benefits if, and to the extent that, the monetary compensation payable to IC under this Agreement exceeds the reasonable salary, prorated for the term of this Agreement, that IC would have received if IC had actually been hired, as of the Effective Date of this Agreement, as an employee of SCO to do equivalent work.

© 2004. EDGAR Online, Inc.

**3.0 COMPENSATION AND EXPENSES**

SCO agrees to pay IC, in the manner and to the extent set forth in ExhibitA.

**4.0 WARRANTIES**

4.1

Independent Contractor warrants that:

4.1.1

IC has the unrestricted right, power, and authority to enter into this Agreement.

4.1.2

IC has the knowledge, experience, and skill to provide the Services.

4.1.3

The Services will be performed in a good and professional manner and in accordance with any statutes, regulations or ordinances applicable to the Services including, but not limited to, all laws and regulations pertaining to wages andhours of employment, social security, unemployment, Workers' Compensation and the withholding of taxes.

4.2

The representations and warranties set forth in this Sectionare continuous in nature.

**5.0 CONFIDENTIAL INFORMATION**

5.1

IC shall retain in confidence all information of SCO, and its suppliers as appropriate, transmitted to IC by SCO under this Agreement, which SCO has identified as being confidential or which by the nature of the information (including but not limited to source code) or the circumstances surrounding the disclosure should be treated as confidential ("Confidential Information"). IC shall refrain from using or exploiting any Confidential Information for any purpose or activity other than those necessary to or contemplated by this Agreement. IC shall not disclose or facilitate the disclosure of Confidential Information to any third party and shall not copy, duplicate, reproduce, distribute or otherwise disseminate Confidential Information except as necessary to or contemplated by this Agreement. IC understands and agrees that Confidential Information constitutes valuable business assets of SCO, and its suppliers as appropriate, and that any unauthorized use or disclosure may cause irreparable damage to SCO and its suppliers.

5.2

This Sectionshall not apply or shall cease to apply to information supplied by SCO: (1)if it has come into the public domain without breach of confidence by IC; (2)which was known without restriction of disclosure to IC prior to its first receipt of the same from SCO; (3)which is hereafter rightfully furnished to IC by a third party without restriction on disclosure; or (4)is required to be disclosed pursuant to any statutory requirement or court order. In the event Confidential Information is required to be disclosed by any statutory requirement or court order, IC shall promptly notify SCO in writing and, upon SCO's request, shall assist SCO in obtaining a protective order and opposing such disclosure.

**6.0 INTELLECTUAL PROPERTY**

6.1

SCO, and its suppliers as appropriate, own all right, title and interest in and to SCO software and materials including, but not limited to, all patent, copyright, trade secret and other proprietary rights embodied therein, whether or not specifically recognized or perfected under relevant laws. IC shall not interfere with or jeopardize SCO's title and interest in SCO software

and materials or take any action toward acquiring any rights in SCO Provided Software.

6.2
   All copyrights, copyright registrations and copyrightable subject matter in SCO software and materials, whether resulting from IC's Services under this Agreement or based on Confidential Information, shall be the sole and exclusive property of SCO and/or SCO's suppliers, in SCO's

2

© 2004.  EDGAR Online, Inc.

sole discretion. IC and SCO agree that all copyrightable subject matter created hereunder shall be considered a "work made for hire" as this term is defined in 17 USC 101, 201(b). To the extent that any work may not, by operation of law, be a work made for hire, IC further irrevocably and exclusively assigns and agrees to assign as of the effective date of this Agreement, all of its rights in the copyright to SCO, including but not limited to the exclusive use, marketing and distribution rights to such work, and the right where legally possible to secure copyright registrations and similar protections worldwide in the name of SCO.

## 7.0 INDEMNIFICATION

IC agrees to indemnify, defend and hold SCO harmless from and against any and all losses, liabilities, damages, claims, demand, suits, actions and/or judgments, and all costs and expenses, including attorneys' fees, based upon, or arising out of damage to property or injury (including death) to any person or persons caused by any act or omission of IC or any of IC's agents, employees, contractors or representatives or sustained in connection with the performance of Services hereunder or based upon or arising from the failure by IC to carry out its obligations hereunder or from any unauthorized disclosure of all or part of the Confidential Information by IC or any of IC's agents, employees, contractors or representatives.

## 8.0 TERMINATION

8.1
This Agreement may be terminated in accordance with the following provisions: (a) by the mutual consent of the parties hereto; (b) if a party has breached the terms of this Agreement, this Agreement may be terminated by the non-breaching party on fifteen (15) days prior written notice to the breaching party providing the breaching party has not cured the breach within the fifteen (15) day notice period; (c) by SCO if IC is unable to fulfill the obligations of this Agreement; (d) upon completion of the Services to be performed; (e) upon ninety (90) days written notice by either party.

8.2
Within ten (10) calendar days after termination of this Agreement for any reason, IC shall, at SCO's discretion, return to SCO or destroy all whole and partial copies of SCO software and materials and other Confidential Information regardless of the form such SCO software and materials and/or other Confidential Information.

## 9.0 INSURANCE

9.1
During the term of this Agreement, IC shall carry and maintain in force at all times, at IC's expense, the following insurance, with coverage limits at the greater of those set forth below or the coverage limits under insurance held by IC as of the Effective Date of this Agreement:

9.1.1
Worker's Compensation-Statutory and Employer's Liability—$500,000 per accident/per employee.

9.1.2.
Commercial General Liability (occurrence form), including Contractual Liability, in a combined limit for Bodily Injury and Property Damage—$1,000,000 per occurrence.

9.2
Upon SCO's request, certificates of insurance evidencing the coverage's required of IC shall be provided to SCO.

## 10.0 NOTICE

© 2004. EDGAR Online, Inc.

Any notice required or permitted hereunder shall be in writing and sent to the address first written above or to such other addresses as the parties may from time to time specify, by

3

© 2004. EDGAR Online, Inc.

United States Mail, First Classpostage prepaid, by Federal Express, DHL or similar courier or by hand delivery.

## 11.0 LIMITATION OF LIABILITY

SCO SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES ARISING OUT OF THIS AGREEMENT.

## 12.0 MISCELLANEOUS

12.1

Except as otherwise expressly provided in this Agreement, the provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

12.2

IC shall not assign any rights or delegate any obligations hereunder without the prior written consent of SCO.

12.3

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Utah and the United States of America, specifically excluding the United Nations Convention on Contracts for the International Sale of Goods, and without giving effect to conflict of laws. Any litigation or arbitration between the Parties shall be conducted exclusively in the State of Utah. SCO and IC hereby consent to the jurisdiction and venue of such courts. If any provision of this Agreement is invalid under any applicable statute or rule of law, such invalidity shall not effect any other provision of this Agreement.

12.4

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

12.5

The failure of either party hereto to enforce any right under this Agreement shall not be construed to be a waiver of that right, or of damages caused thereby or of any other rights under this Agreement.

12.6

This Agreement and the Exhibits hereto encompass the entire Agreement of the parties.

12.7

The terms of this Agreement may be modified only in a written instrument signed by SCO and IC.

12.8

IC shall enter into appropriate agreements with others, including but not limited to employees and contractors, whose services may be required by IC to perform its obligations under this Agreement sufficient to enable IC to comply with all the terms of this Agreement.

12.9

While at SCO's facilities, IC shall have access only to areas designated by SCO. IC shall be subject to SCO's security requirements.

12.10

This Agreement has been negotiated by the parties hereto and their respective counsel. This Agreement will be fairly interpreted in accordance with its terms and without strict construction in favor of or against either party.

© 2004. EDGAR Online, Inc.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last set forth below.

**SCO OPERATIONS, INC.**                       **S2 STRATEGIC CONSULTING, LLC**
BY:        /s/ ROBERT K. BENCH                 BY:        /s/ MICHAEL ANDERER
NAME:      Robert K. Bench                      NAME:      Michael Anderer
TITLE:     Chief Financial Officer             TITLE:     Chief Executive Officer
DATE:      August 4, 2003                       DATE:      August 4, 2003
                                                Federal Tax ID number:

5

© 2004. EDGAR Online, Inc.

EXHIBIT A
STATEMENT OF WORK

1.

*Scope of Services* . IC will assist SCO as its non-exclusive advisor in connection with the formulation and implementation of various options for Intellectual property management, corporate restructuring, reorganization, channel development, joint ventures and other strategic alternatives for SCO under a variety of mechanisms. In connection with IC's role as advisor, IC will engage in the following activities which will be agreed in writing prior to commencement of such activities and the earning of payments:

(i)

advise SCO generally of available options relating to SCO's Intellectual property, including recommendations of specific courses of action and assist SCO in researching, licensing and leveraging these properties in the most effective manner in the market place.

(ii)

assist SCO with the development, negotiation and implementation of a Transaction, as defined below, including participation as a representative of SCO in negotiations with licensees, business partners and others who may be violating the company's property rights.

(iii)

assist SCO in valuing SCO and/or, as appropriate, valuing SCO's intellectual property or operations; provided that any formal valuation or fixed asset appraisals needed would be executed by outside appraisers;

(iv)

provide advice relating to financial, intellectual property, channel development and other business matters related to a Transaction, including the feasibility of any Transaction, the valuation of securities issued in connection with a Transaction, and any other matter as to which IC is rendering services hereunder;

(v)

advise SCO as to potential mergers or acquisitions, channel development and the sale or other disposition of any of SCO's assets or businesses;

(vi)

advise SCO as to any potential financings, either debt or equity, and assist SCO in arranging a customary revolving credit agreement or other financing in connection with any Transaction;

(vii)

assist in the preparation of proposals to licensees, employees, shareholders, partners and other parties-in-interest in connection with any Transaction;

(viii)

assist SCO's management with presentations made to SCO's Board of Directors regarding the Transaction and/or other issues related to SCO's contemplated licensing or partnering activities; and

(ix)

render such other advisory services as may be mutually agreed upon by IC and SCO.


As used herein, the term "Transaction" shall mean, collectively: (i)the development of SCO's Intellectual property including licensing, securing, enhancing or monetization of SCO's patents, copyrights, trademarks, and trade secrets; (ii)any merger, acquisition, consolidation, joint venture, spin-off, reorganization, recapitalization, business combination, license, settlement, partnership, joint venture or other transaction pursuant to which SCO acquires, or combines with, any person, group of persons, partnership, corporation or other entity (a "Target"), (iii)(a)any merger, consolidation, reorganization, recapitalization, license, joint venture, settlement business combination or other transaction pursuant to which SCO is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquiror") or (b)the acquisition, directly or indirectly, by an Acquiror (or by one or more persons acting together with an Acquiror pursuant to a written agreement or otherwise), in a single transaction or a series of transactions pursuant to a written agreement, with SCO providing for such acquisition, of (x)greater than 50% of the assets or operations of SCO or (y)any outstanding or newly-issued shares of SCO's capital stock (or any securities convertible into, or options, warrants or other rights to acquire such capital stock) (such capital stock and such other securities, options, warrants and other rights being collectively referred to as "SCO Securities") if the Acquiror thereby becomes the beneficial owner of more than 50% of the outstanding equity securities of SCO (any of the transactions in clauses (a)and (b)above being referred to as an

"Acquisition Transaction"), or (iv)any reorganization or restructuring pursuant to a Chapter 11 plan of reorganization confirmed pursuant to Section1129(b)of the Bankruptcy Code (collectively, a "Plan") that is initiated by IC and defined in writing as required in this section1. If SCO chooses to sell any of its securities or assets, SCO agrees to utilize legal counsel and a licensed Broker/Dealer to prepare and mail any offering materials for any Securities offering in which IC acts as an advisor. SCO and IC both acknowledge and agree that IC is not a licensed Broker/Dealer and cannot and will not deal in or negotiate the sale or purchase of any securities.

In performing its services pursuant to this Agreement, IC is not assuming any responsibility for SCO's decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Transaction.

2.
    *Information* . In connection with IC's activities on SCO's behalf, SCO will cooperate with IC and will furnish to, or cause to be furnished to IC any and all information and data concerning SCO (the "Information") which IC reasonably requests and will provide IC with reasonable access to SCO's officers, directors, employees, appraisers, independent accountants, legal counsel and other consultants and advisors. Except as required by applicable law, IC shall keep confidential all non-public Information and shall not disclose such Information without SCO's prior approval to any third party, other than to SCO and its advisors and to such of IC's directors, officers, employees, counsel and advisors (whom IC shall instruct to maintain the confidentiality to such information in accordance with this agreement) as IC determines have a need to know in order for it to render services hereunder. SCO represents and warrants that all Information (a)made available to holders of SCO Debt or SCO Securities and other parties to any Transaction by SCO or (b)contained in any filing by SCO with any court or any governmental or regulatory agency, commission or instrumentality each (an "Agency"), will, at all times during the period of the engagement of IC hereunder, not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. SCO further represents and warrants that any projections of SCO's financial results or other information provided by it to holders of SCO Debt or SCO Securities or other parties to any Transaction will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable. SCO acknowledges and agrees that, in rendering its services hereunder, IC will be using and relying on the Information (and information available from public sources and other sources deemed reliable by IC) without independent verification thereof by IC or independent appraisal by IC of any of SCO's assets. IC does not assume responsibility for the accuracy or completeness of the Information or any other information regarding SCO. Except as required by applicable law, any advice rendered by IC pursuant to this Agreement may not be disclosed publicly without our prior written consent and any reference to IC in any offering or solicitation material is subject to IC's prior written consent, which consent shall not be unreasonably withheld.

3.
    *Compensation* . In any consideration of its services pursuant to this Agreement and agreed to in writing by the parties prior to commencement of any such activities by IC, IC shall be entitled to receive, and SCO shall pay, the following compensation (Prior to commencing any activities for which IC shall be entitled to receive a transaction fee, as outlined below, it will be the responsibility of IC to obtain, in writing, a description of the activity, type of service, and expected consideration for which transaction fees will be paid):

    (a)
    *One-Time Retainer Fee:* SCO shall pay IC a one-time cash retainer fee of US $120,000. This retainer fee shall be due and payable upon the receipt by SCO of the cash related to the closing of the first transaction subsequent to the commencement date of July1, 2003.

© 2004. EDGAR Online, Inc.

(b)

*Transaction Fee:* In addition to the foregoing retainer fee, SCO shall pay IC a cash transaction fee equal to:

(i)

two percent (2%) of the net value (as recognized on SCO books) for IC's introductions for SCO to Targets where SCO solely engages in discussions and negotiations of a Transaction resulting in a final M&A agreement with such Target; or

(ii)

three percent (3%) of the net value (as recognized on SCO books) where IC engages in discussions and negotiations with a Target resulting in a final M&A agreement; or

(iii)

five percent (5%) of the net value (as recognized on SCO books) where IC engages in discussions and negotiations with a Target resulting in a final agreement where the transaction is a licensing agreement that is booked and recognized as revenue; or

(iv)

a percentage, as agreed to in advance and in writing, of the net value (as recognized on SCO books) where the IC engages in discussions and negotiations with a Target resulting in a final agreement leading to other 3 [rd] party product license sales, marketing agreement, joint venture, services, or development agreement.

The Transaction Fee shall be payable in cash upon the consummation of a Transaction and/or License and receipt of such transaction or license fee by SCO. In the event a Transaction is not completed during the term of this agreement, but is completed within six (6)months following the termination of this agreement, then transaction fee shall be payable to IC upon completion of such transaction, license fee, cost savings, services or other value received by SCO.

(c)

*Warrant* : In addition to the foregoing Fees if approved by The SCO Group,Inc. board of directors, The SCO Group,Inc., shall issue a warrant giving IC the right to purchase 25,000 shares of common stock. Said warrant will expire two (2)years from the date of this agreement and be exercisable at a strike price equal to $8.50 per share.

(d)

*Other Services:* To the extent SCO requests IC to perform additional services not contemplated by this Agreement; such fees shall be mutually agreed upon by IC and SCO, in writing, in advance.

Furthermore, if at any time after the termination of this Agreement IC is called upon to render services directly or indirectly relating to the subject matter of this Agreement beyond the services contemplated herein (including, but not limited to, producing of documents, answering interrogatories, giving depositions, giving expert or other testimony, whether by agreement, subpoena or otherwise), SCO shall pay IC the then current hourly rates for the persons involved for the time expended in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all related costs and expenses, inclusive of the reasonable legal fees and expenses of IC's counsel.

The SCO and IC acknowledge and agree that thehours worked, the results achieved and the ultimate benefit to SCO of the work performed, in each case, in connection with this engagement, may vary, and that SCO and IC have taken this into account in setting the fees hereunder.

4.

**Out-of Pocket Expenses** . In addition to the fees described above, SCO agrees to promptly reimburse IC, upon request from time to time, for all reasonable out-of-pocket expenses incurred by IC (including, without limitation, reasonable fees of counsel retained by IC) in connection with the performance of its services under this Agreement. IC must advise SCO, and obtains approval for such, prior to committing to such expenses. Such reimbursable out-of-pocket expenses *plus* all other compensation payable to IC shall be made to IC in same day funds, by wire transfer in lawful money of the United States to such accounts in the United States as IC shall designate in

© 2004.  EDGAR Online, Inc.

written notice to SCO and SCO shall provide contemporaneous written notice of each such payment to IC at the above address, Attention: Mike Anderer

3

© 2004. EDGAR Online, Inc.

QuickLinks
INDEPENDENT CONTRACTOR AGREEMENT Between SCO OPERATIONS, INC. And S2 Strategic Consulting, LLC

QuickLinks   -- Click here to rapidly navigate through this document

Exhibit10.16

## COMMON STOCK WARRANT
## THE SCO GROUP,INC.

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **ACT** "). NO SALE, TRANSFER OR OTHER DISPOSITION OF THIS WARRANT OR SAID SHARES MAYBE EFFECTED WITHOUT (i)AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO, (ii)AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR (iii)RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION TO THE EFFECT THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED. THE WARRANT EVIDENCED HEREBY IS NON-TRANSFERABLE

Right to Purchase 25,000
Shares of Common Stock

The SCO Group, a Delaware corporation (the " **Company** ") hereby certified that, for value received, S2 Strategic Consulting, LLC, a Delaware LLC (" **S2** "), is entitled, on the terms set forth below, to purchase from the Company at any time during the period commencing on July1, 2003 (the " **Exercisability Date** ") and, subject to the provisions of Section1 below, ending at 5:00p.m., Mountain Standard, time, on July2, 2005, Twenty five Thousand (25,000) fully paid and nonassessable shares of the common stock, par value $0.001 per share (the " **Warrant Shares** "), of the Company, at a price of $8.50 per share, subject to adjustments as provided below (the " **Purchase Price** "). As used herein, the term " **Stock** " shall mean the Company's presently authorized common stock or any stock into or for which such common stock may hereafter be converted or exchanged prior to or concurrent with the exercise of this Warrant.

1.
   **Expiration** . This Warrant shall expire upon the first to occur of the following: (i)5:00p.m., Mountain Standard time, on July2, 2005; and (ii)the sale of all or substantially all of the assets of the Company or an acquisition of the Company by another corporation or entity by consolidation, merger or other reorganization or series of related transactions in which the holders of the Company's outstanding voting stock immediately prior to such transaction own, immediately after such transaction, securities representing less than fifty percent (50%) of the voting power of the surviving corporation, the surviving entity or the entity that controls such surviving entity (such sale of assets or acquisition, a " **Merger or Consolidation** ").

2.
   **Exercise of Warrant** .
   (a)
      *Exercisability of the Warrant.* This Warrant will become exercisable on the Exercisability Date.

   (b)
      *Full Exercise.* This Warrant may be exercised by the Holder at any time during the period commencing on the Exercisability Date and ending upon its expiration for the full number of Warrant Shares by surrendering this Warrant and the Notice of Exercise attached hereto as **ExhibitA** properly endorsed to the Company's principal office, accompanied by payment in cash, by check or by wire transfer in an amount equal to the product of the Purchase Price and the number of Warrant Shares indicated on the face of this Warrant.

   (c)
      *Taxes* . The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Stock in any name other than that of the original holder hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or warrant until such tax is paid.

1

© 2004. EDGAR Online, Inc.

3.

**Representations and Covenants of the Holder** . This Warrant has been issued by the Company in reliance upon the following representations and covenants of the Holder:

(a)

*Investment Purpose.* The Stock issuable upon exercise of the Holder's rights contained herein will be acquired for investment and not with a view to the sale or distribution of any part thereof, and the holder has no present intention of selling or engaging in any public distribution of the same except pursuant to a registration or exemption.

(b)

*Private Issue* . The Holder understands (i)that the Stock issuable upon exercise of this Warrant is not registered under the Act or qualified under applicable state securities laws on the ground that the issuance contemplated by this Warrant will be exempt from the registration and qualifications requirements thereof, and (ii)that the Company's reliance on such exemption is predicated on the representations set forth in this Section3.

(c)

*Disposition of Holder's Rights.* This Warrant and all rights hereunder are non-transferable.

The Stock issuable upon exercise of this Warrant is non-transferable, except in accordance with the terms of this provision. Notwithstanding the foregoing, the restrictions imposed upon the transferability of shares of the Stock shall terminate as to any particular share of Stock when (1)the transfer of such security shall have been effectively registered under the Act and transferred by the Holder thereof in accordance with such registration, or (2)such security shall have been sold without registration in compliance with Rule144 under the Act or (3)a letter shall have been issued to the Holder at its request by the staff of the Securities and Exchange Commission or a ruling shall have been issued to the Holder at its request by such Commission stating that no action shall be recommended by such staff or taken by such Commission, as the case may be, if such security is transferred without registration under the Act in accordance with the conditions set forth in such letter or ruling and such letter or ruling specifies that no subsequent restrictions on transfer are required. Whenever the Stock issuable upon exercise of this Warrant may be sold pursuant to Rule144(k), the restrictions imposed herein shall terminate, the Holder or holder of a share of Stock issued upon exercise of this Warrant as to which such restrictions have terminated shall be entitled to receive from the Company, without expense to such holder, one or more new certificates for the Warrant or for such shares of Stock not bearing any restrictive legend.

(d)

*Financial Risk.* The Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment, and has the ability to bear the economic risks of its investment.

(e)

*Risk of No Registration.* The Holder understands that if a registration statement covering the transfer of the Stock under the Act is not in effect when it desires to sell the Stock issuable upon exercise of this Warrant, it may be required to hold such securities for an indefinite period. The Holder also understands that any sale of Stock issuable upon exercise of this Warrant which might be made by it in reliance upon Rule144 under the Act may be made only in accordance with the terms and conditions of that Rule.

4.

***Delivery of Stock Certificates on Exercise*** . Promptly after the exercise of this Warrant and the payment of the Purchase Price pursuant to Section2(b)or after the net exercise of this Warrant pursuant to Section2(c), the Company will issue to the Holder or upon the order of the Holder hereof, a certificate or certificates for the number of whole shares of Stock to which the Holder is entitled; provided, however, that (i)the Holder shall have furnished to the Company at the time of such exercise a signed Investment Representation Statement substantially in the form attached hereto as **ExhibitB** and (ii)the Company will place on each certificate the following legend:

"THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT

2

OF 1933, AS AMENDED (THE " **ACT** "). THESE SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE ACT.

Furthermore, the Company will place on each certificate any legend required by any applicable state blue sky law.

5.

    ***Adjustment for Dividends in Other Stock or Property; Reclassifications.*** The Purchase Price and the number and type of Warrant Shares and/or other property issuable upon exercise of this Warrant shall be appropriately and proportionately adjusted to reflect any stock dividend, stock split, combination of shares, reclassification, recapitalization, any corporate reorganization other than as provided in Section 1 hereof or other similar event affecting the number or character of outstanding Warrant Shares, so that the number and type of securities and/or other property issuable upon exercise of this Warrant shall be equal to that which would have been issuable with respect to the number of Warrant Shares subject hereto at the time of such event, had such Warrant Shares then been outstanding.

6.

    ***Certificate as to Adjustments*** . In each case of an adjustment in the Purchase Price or in the shares of Stock or other stock, securities or property receivable on the exercise of the Warrant, the Company, at its expense, will compute such adjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment and showing in detail the facts upon which the adjustment is based. The Company will mail a copy of each such certificate to the Holder of the Warrant outstanding at that time.

7.

    ***Notices of Record Date*** . In case (i) the Company takes a record of the holders of its Stock (or other stock or securities at the time receivable upon the exercise of the Warrant) for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for any purchase any shares of stock of any class or any other securities; or (ii) of any capital reorganization of the Company, any reclassification of the common stock of the Company, any consolidation or merger of the Company with or into another corporation, including, without limitation, any Merger or Consolidation, or any conveyance of all or substantially all of the assets of the Company to another corporation; or (iii) of any voluntary dissolution,, liquidation or winding-up on the Company; then, in each such case. The Company will mail or cause to be mailed to each Holder of a Warrant at the time outstanding a notice specifying, as the case may be, (a) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (b) the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed as of which the holders of record of Stock (or such other stock or securities at the time receivable upon the exercise of the Warrant) will be entitled to exchange their shares of Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up, and in the case of a reorganization, consolidation, merger or conveyance, the fair market value of such securities or other property as determined by the Board of Directors of the Company. Such notice shall be mailed at least ten (10) days prior to the date specified therein; provided, however, that in the event of a Merger or Consolidation the Company shall use its best efforts to provide such notice in accordance with Section 11 below at least twenty-one (21) days prior to the closing date of such Merger or Consolidation and, in any event, shall provide such notice in accordance with Section 11 below at least fifteen (15) days prior to such closing date.

8.

    ***Reservation of Stock Issuable on Exercise of Warrant.*** The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, all such shares of

3

Stock and other stock, or such other stock, securities and property as from time to time are receivable upon the exercise of the Warrant.

9.

*Replacement of Warrant* . Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement in such reasonable amount as the Company may determine, or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement warrant in substantially identical form to this Warrant.

10.

*Notices* . Any notices, demand, offer, request or other communication required or permitted to be given by either the Company or a Holder (collectively, a " **Notice** ") pursuant to the terms of this Agreement, if delivered to the Holder, shall be sent to the following address:

Fax No.<br>
With a copy to:<br>
Fax No.

or at such other addressed provided to the Company or such other address as a party may request by notifying the other in writing.

(a)

Any notice shall be delivered in writing. Any such Notice shall be deemed effectively given the earlier of (i)when received, (ii)when delivered personally, (iii)one (1)business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv)one (1)business day after being deposited with an overnight courier service and (v)four (4)days after being deposited in the U.S. mail, First Classwith postage prepaid.

11.

*Change; Waiver* . Neither this warrant nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

12.

*No Fractional Shares or Script.* No fractional shares or script representing fractional shares shall be issued upon the exercise of this Warrant, but in lieu of such fractional shares the Company shall make cash payment therefore upon the basis of the Purchase Price then in effect.

13.

*No Rights as Stockholder.* This Warrant does not entitle the Holder to any voting rights or other rights as a stockholder of the Company prior to the exercise of this Warrant.

14.

*Headings.* The headings in this Warrant are for purposes of reference only and shall not be deemed to constitute a part hereof.

15.

*Counterparts* . This Warrant may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

16.

*Governing Law.* This Warrant is delivered in the State of Delaware and shall be construed in accordance with and governed by the laws of such state.

4

© 2004.  EDGAR Online, Inc.

17.

    ***Confidentiality; No Public Disclosure*** . The terms and conditions of this Warrant are confidential. Neither party shall make any public disclosure concerning the terms and conditions of this Warrant without the prior written consent of the other party, except as required by the rules and regulations of the securities and Exchange Commission, the Nasdaq National Market or any other applicable stock exchanges.

| | |
|---|---|
| Dated: July1, 2003 | **THE SCO GROUP,INC.** |
| | /s/ ROBERT K. BENCH  *Signature of Authorized Signatory* |
| | Robert K. Bench, CFO *Print Name and Title* |
| **Agreed and Accepted:** | **S2 Strategic Consulting, LLC** |
| | /s/ MICHAEL ANDERER  *Signature of Authorized Signatory* |
| | Michael Anderer, CEO *Print Name and Title* |

5

**EXHIBIT A**

**NOTICE OF EXERCISE**

**TO: THE SCO GROUP, INC.**

1. The undersigned hereby elects to purchase 25,000 shares of Common Stock of The SCO Group, Inc. pursuant to the terms of the attached Warrant.

2. Exercise (Please initial the blank):

    The undersigned elects to exercise the attached Warrant by means of a cash payment, and tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.

3.

    Please issue a certificate, or certificates representing said shares of stock, in the name of the undersigned or in such other name as are specified below

    (Name)
    (Address)

4.

    The undersigned represents that the aforesaid shares of stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares. In support thereof, the undersigned has executed an Investment Representation Statement attached hereto as **Exhibit B** .

    *Name of Warrantholder*
    *Signature of Authorized Signatory*
    *Print Name and Title*

6

© 2004. EDGAR Online, Inc.

QuickLinks
COMMON STOCK WARRANT THE SCO GROUP, INC.
NOTICE OF EXERCISE
QuickLinks   -- Click here to rapidly navigate through this document

Exhibit21.1

## The SCO Group,Inc. Listing of Subsidiaries

| Subsidiary | Location | Ownership Interest |
| --- | --- | --- |
| SCO Operations,Inc. | United States | Wholly-owned |
| SCO Global,Inc. | United States | Wholly-owned |
| SCO Software (Ireland) Ltd. | Ireland | Wholly-owned |
| SCO Japan, Ltd. | Japan | Majority-owned |
| The SCO Group Korea,Inc. | Korea | Wholly-owned |
| SCO Canada,Inc. | Canada | Wholly-owned |
| The SCO Group (Deutschland) GmbH | Germany | Wholly-owned |
| The SCO Group (France) Sarl | France | Wholly-owned |
| The SCO Group (Italia) Srl | Italy | Wholly-owned |

QuickLinks
The SCO Group, Inc. Listing of Subsidiaries

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit23.1**

### Independent Auditors' Consent

The Board of Directors and Stockholders
The SCO Group,Inc.:

We consent to the incorporation by reference in Registration Statement No.s 333-43822, 333-97865, and 333-100105 on FormS-8 and Registration Statement No.s 333-102940, 333-106885, and 333-110556 on FormS-3 of The SCO Group,Inc. of our report dated December20, 2003, except as to note17 which is as of January20, 2004, relating to the consolidated balance sheets of The SCO Group,Inc. and subsidiaries as of October31, 2003 and 2002, and the related consolidated statements of operations and comprehensive income (loss), stockholders' equity, and cash flows for the years then ended, and related schedule, which report appears in the October31, 2003 Annual Report on Form10-K of The SCO Group,Inc.

The October31, 2001 consolidated financial statements of The SCO Group,Inc. and subsidiaries were audited by other auditors who have ceased operations. Our report dated December20, 2003, except as to note17 which is as of January20, 2004, refers to our audit of the transitional disclosures required by Statement of Financial Accounting Standards No.142, Goodwill and Other Intangible Assets, which was adopted by the Company as of November1, 2001, and of the adjustments that were applied to retroactively reflect a one-for-four reverse stock split of the Company's common stock approved on March4, 2002. However, we were not engaged to audit, review, or apply any procedures to the October31, 2001 consolidated financial statements of The SCO Group,Inc. and subsidiaries other than with respect to such disclosures and adjustments and, accordingly, we do not express an opinion or any form of assurance on the October31, 2001 consolidated financial statements taken as a whole.

/s/ KPMG LLP

Salt Lake City, Utah
January27, 2004

QuickLinks
Independent Auditors' Consent

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit 23.2**

This consent is a copy of the previously issued Arthur Andersen LLP consent, which has not been reissued since Arthur Andersen LLP has ceased operations. The prior period financial statements have been revised to retroactively reflect a reverse stock split approved on March 4, 2002 and to include the transitional disclosures required by Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets,* which was adopted by the Company as of November 1, 2001.

## CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation of our reports included in this Form 10-K, into the Company's previously filed Registration Statement on Form S-8, File No. 333-43822.

ARTHUR ANDERSEN LLP

Salt Lake City, Utah
January 15, 2001

QuickLinks
CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

QuickLinks   -- Click here to rapidly navigate through this document

Exhibit31.1

**CERTIFICATION PURSUANT TO RULE 13A-14**
**OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED,**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Darl C. McBride, certify that:

1. I have reviewed this annual report on Form10-K of The SCO Group,Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January28, 2004            /s/ DARL C. MCBRIDE  Darl C. McBride
                                 President and Chief Executive Officer

© 2004. EDGAR Online, Inc.

QuickLinks
CERTIFICATION PURSUANT TO RULE 13A-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

QuickLinks   -- Click here to rapidly navigate through this document

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO RULE 13A-14
OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert K. Bench, certify that:

1. I have reviewed this annual report on Form 10-K of The SCO Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 28, 2004          /s/ ROBERT K. BENCH  Robert K. Bench, Chief Financial Officer

QuickLinks
CERTIFICATION PURSUANT TO RULE 13A-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

QuickLinks   -- Click here to rapidly navigate through this document

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of The SCO Group, Inc. (the "Company") on Form 10-K, for the period ended October 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Darl C. McBride, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

1.
    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.
    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:  /s/ DARL C. MCBRIDE  Darl C. McBride
     President and Chief Executive Officer

Date: January 28, 2004

QuickLinks

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

QuickLinks  -- Click here to rapidly navigate through this document

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of The SCO Group, Inc. (the "Company") on Form 10-K, for the period ended October 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert K. Bench, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ ROBERT K. BENCH  Robert K.
Bench
Chief Financial Officer

Date: January 28, 2004

© 2004. EDGAR Online, Inc.

QuickLinks

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

**End of Filing**

© 2004. EDGAR Online, Inc.