Management believes that the Company's operations will continue to be near breakeven before non-cash expenses for the first quarter of fiscal 2003. In December 2002, the Company obtained a $2,910,000 line of credit from a bank. Borrowings under the line of credit are secured by a letter of credit from the Company's principal shareholder. As a result of the cost reductions and based on forecasted revenue and availability under the line of credit, management believes that the Company will have sufficient cash to fund its operations through fiscal 2003. If the Company's actual quarterly revenue is less than forecasted, management believes additional reductions in operating expenses can be made if necessary. The Company has engaged an investment-banking firm to assist in obtaining additional equity or debt funding to provide additional working capital and funding for growth and expansion.

However, there can be no assurance that the Company will be successful in achieving forecasted results or in obtaining additional equity or debt capital in amounts or on terms acceptable to the Company. If sufficient funds are not available or are not available on acceptable terms, the Company's principal stockholder has committed to provide additional financial support to enable the Company to continue as a going concern through November 2003.

On August 26, 2002, Caldera International, Inc. announced that it will change its name to The SCO Group, Inc. ("SCO"), pending shareholder approval at the annual stockholders' meeting to be held later in fiscal year 2003. The name change is in response to the continuing brand recognition related to the SCO OpenServer and SCO UNIXWare product lines.

## (2) SIGNIFICANT ACCOUNTING POLICIES

### Use of Estimates in the Preparation of Financial Statements

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from these estimates.

### Fair Value of Financial Instruments

The carrying amounts reported in the accompanying consolidated financial statements for cash, accounts receivable and accounts payable approximate fair values because of the immediate or short-term maturities of these financial instruments. The carrying amounts of the Company's debt obligations approximate fair value based on current interest rates. The fair values of available-for-sale securities are determined using quoted market prices for these securities.

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company and it's wholly and majority-owned operating subsidiaries after all intercompany balances and transactions have been eliminated.

Powered By EDGAR ONLINE     2003.  EDGAR Online, Inc.

Dockets.Justia.com

The following table lists the Company's subsidiaries, location and ownership interest:

| Subsidiary | Location | Ownership Interest |
| --- | --- | --- |
| SCO Operations, Inc. (formerly Caldera Systems, Inc.) | United States | Wholly-owned |
| SCO Global, Inc. (formerly Caldera Global, Inc.) | United States | Wholly-owned |
| The SCO Group, Ltd. (formerly Caldera Europe, Ltd.) | United Kingdom | Wholly-owned |
| SCO Japan, Ltd. (formerly Caldera KK) | Japan | Majority-owned |
| SCO Canada, Inc. | Canada | Wholly-owned |
| The SCO Group (Deutschland) GmbH (formerly The Santa Cruz Operation (Deutschland) GmbH) | Germany | Wholly-owned |
| The SCO Group (France) Sarl (formerly The Santa Cruz Operation (France) Sarl) | France | Wholly-owned |
| The SCO Group (Italia) Srl (formerly The Santa Cruz Operation (Italia) Srl) | Italy | Wholly-owned |

**Foreign Currency Translation**

The functional currency of the Company's foreign subsidiaries is the local foreign currency. All assets and liabilities denominated in foreign currencies are translated into U.S. dollars at the exchange rate prevailing on the balance sheet date. Revenue and expenses are translated at average rates of exchange prevailing during the period. Translation adjustments resulting from translation of the subsidiaries' accounts are recorded in accumulated other comprehensive income. Gains and losses resulting from foreign currency transactions are included in the consolidated statements of operations.

**Cash and Cash Equivalents**

The Company considers all highly liquid debt instruments purchased with original maturities of three or fewer months to be cash equivalents. Cash equivalents primarily consist of investments in money market mutual funds, commercial paper or other short-term debt instruments.

**Restricted Cash and Royalty Payable to Novell, Inc.**

The Company has an arrangement with Novell, Inc. ("Novell") in which it acts as an administrative agent in the collection of royalties for customers who deploy SVRx technology. Under the agency agreement, the Company collects all customer payments and remits 95 percent of the collected funds to Novell and retains 5 percent as an administrative fee. The Company records the 5 percent administrative fee as revenue in its consolidated statements of operations. The accompanying October 31, 2002 and 2001 consolidated balance sheets reflect the amounts collected related to this agency agreement but not yet remitted to Novell of $1,428,000 and $1,894,000, respectively, as restricted cash and royalty payable to Novell. The October 31, 2001 balances were reclassified from cash and equivalents and other royalties payable to conform to the current year presentation.

**Available-for-Sale Securities**

Available-for-sale securities as of October 31, 2001 included investments in debt securities such as commercial paper, treasury notes and bonds. Available-for-sale securities are recorded at fair market value, based on quoted market prices, and unrealized gains and losses are recorded as a component of comprehensive income (loss). Realized gains and losses, which are calculated based on the specific-identification method, are recorded in operations as incurred. As of October 31, 2002, the Company had no available-for-sale securities.

42

### Inventories

Inventories consist primarily of completed software products. Inventories are stated at the lower of cost (using the first-in, first-out method) or market value. As of October 31, 2002, and 2001, inventories amounted to $144,000 and $206,000, respectively. Inventories are included in other current assets in the accompanying consolidated balance sheets.

Provisions, when required, are made to reduce excess and obsolete inventories to their estimated net realizable value. Due to competitive pressures and technological innovation, it is possible that estimates of the net realizable value could change in the near term.

### Capitalized Software Costs

In accordance with Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed," development costs incurred in the research and development of new software products to be sold, leased or otherwise marketed are expensed as incurred until technological feasibility in the form of a working model has been established. Internally generated software development costs incurred after technological feasibility was established and prior to product release were not material for fiscal years 2002, 2001 and 2000. The Company has charged its software development costs to research and development expense in the accompanying consolidated statements of operations.

### Long-Lived Assets

The Company reviews its long-lived assets for impairment when events or changes in circumstances indicate that the book value of an asset may not be recoverable. The Company evaluates, at each balance sheet date, whether events and circumstances have occurred which indicate possible impairment. The carrying value of a long-lived asset is considered impaired when the anticipated cumulative undiscounted cash flows of the related asset or group of assets is less than the carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the estimated fair market value of the long-lived asset.

### Revenue Recognition

The Company's revenue is primarily from two sources: (i) product license revenue, primarily from product sales to resellers and end users, and royalty revenue, primarily from initial license fees and ongoing royalties from product sales by source code OEMs; and (ii) service and support revenue, primarily from providing software updates, support and education and consulting services to end users.

Prior to the acquisition of the OpenServer and UnixWare product lines from Tarantella, substantially all of the Company's revenue was derived from sales of Linux products and related services. Currently, over 95 percent of the Company's total revenue is derived from UNIX-related products and services.

The Company recognizes product revenue upon shipment if a signed contract exists, the fee is fixed and determinable, collection of resulting receivables is probable and product returns are reasonably estimable, except for sales to distributors, which are recognized upon sale by the distributor to resellers or end users.

For contracts involving multiple elements (i.e., delivered and undelivered products, maintenance and other services), the Company allocates revenue to each component of the contract based on

43

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

objective evidence of its fair value, which is specific to the Company. The fair value of each element is based on amounts charged when such elements are sold separately. The Company recognizes revenue allocated to undelivered products when the criteria for product revenue set forth above have been met.

The Company recognizes revenue from maintenance fees for ongoing customer support and product updates ratably over the period of the maintenance contract. Payments for maintenance fees are generally made in advance and are non-refundable. For revenue allocated to education and consulting services or derived from the separate sale of such services, the Company recognizes revenue as the related services are performed.

The Company recognizes product revenue from royalty payments upon receipt of royalty reports from OEMsrelated to their product sales.

## Royalty Costs

Royalties paid by the Company on applications licensed from third parties that are incorporated into the software products sold by the Company are expensed as cost of revenue on a per unit basis as software products are sold. Royalties paid in advance of product sales are included in prepaid expenses and recorded as cost of revenue when the related products are sold. During fiscal years 2002, 2001 and 2000, the Company incurred $1,552,000, $1,989,000 and $338,000, respectively, of royalty expense.

## Sales and Marketing Expenses

Sales and marketing expenses consist of the following: advertising, channel promotions, marketing development funds, promotional activities, public relations, trade shows and the salaries, commissions and related expenses of all personnel involved in the sales process. The Company expenses the cost of advertising the first time the advertising takes place. Advertising expenses totaled $1,698,000, $2,964,000 and $1,508,000 for fiscal years 2002, 2001 and 2000, respectively.

## Cooperative Advertising

The Company reimburses certain qualified resellers and distributors for a portion of the advertising costs related to their promotion of the Company's products. The Company's liability for reimbursement is accrued at the time revenue is recognized as a percentage of the reseller's or distributor's net revenue derived from the Company's products. For fiscal years 2002, 2001 and 2000, cooperative advertising expense totaled $2,054,000, $2,338,000 and $1,219,000, respectively. The advertising cost reimbursements are recorded as sales and marketing expense in the accompanying consolidated statements of operations.

## Stock-based Compensation

The Company accounts for stock options issued to directors, officers and employees under APB 25 and related interpretations ("APB 25"). Under APB 25, compensation expense is recognized if an option's exercise price on the measurement date is below the fair market value of the Company's common stock.

## Income Taxes

The Company recognizes a liability or asset for the deferred tax consequences of all temporary differences between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements that will result in taxable or deductible amounts in future years when the reported amounts of the assets and liabilities are recovered or settled. These deferred tax assets or

44

liabilities are measured using the enacted tax rates that will be in effect when the differences are expected to reverse. Deferred tax assets are reviewed periodically for recoverability, and valuation allowances are provided as necessary.

**Comprehensive Income**

Comprehensive income consists of net loss, foreign currency translation adjustments and unrealized gain (loss) on available-for-sale securities and is presented in the accompanying consolidated statements of operations and comprehensive loss.

**Hedging of Foreign Currency Transactions**

In June 1998, the FASB issued SFAS No.133, "Accounting for Derivative Instruments and Certain Hedging Activities." In June 2000, the FASB issued SFAS No.138, "Accounting for Certain Derivative Instruments and Certain Hedging Activity, an Amendment of SFAS 133." SFAS No.133 and SFAS No.138 require that all derivative instruments be recorded on the balance sheet at their respective fair values.

The Company utilizes foreign currency forward exchange contracts to hedge foreign currency market exposures of underlying assets and liabilities. The Company does not use forward exchange contracts for speculative or trading purposes. The Company's accounting policies for these instruments are based on the Company's designation of such instruments as hedging transactions. The criteria the Company uses for designating an instrument as a hedge include the instrument's effectiveness in risk reduction and one-to-one matching of forward exchange contracts to underlying transactions. Gains and losses on currency forward contracts that are designated and effective as hedges of firm commitments are deferred and recognized in income in the same period that the underlying transactions are settled. Gains and losses on currency forward contracts that are designated and effective as hedges of existing transactions are recognized in income in the same period as losses and gains on the underlying transactions are recognized and generally offset. Gains and losses on any instruments not meeting the above criteria are recognized in income in the current period. As of October 31, 2002, the Company had one foreign exchange contract with a maturity of 12 days to purchase an aggregate of 638,000 United Kingdom pounds for 1,000,000 U.S. dollars.

**Net Loss per Common Share**

The Company computes net loss per share in accordance with SFAS No.128, "Earnings Per Share," and Staff Accounting Bulletin ("SAB") No.98. Under the provisions of SFAS No.128 and SAB No.98, basic net loss per common share ("Basic EPS") is computed by dividing net loss attributable to common stockholders by the weighted average number of common shares outstanding. Diluted net loss per common share ("Diluted EPS") is computed by dividing net loss attributable to common stockholders by the sum of the weighted average number of common shares and the dilutive potential common share equivalents then outstanding. Potential common share equivalents consist of shares issuable upon the exercise of stock options and warrants and shares issuable upon the conversion of Series A and Series B convertible preferred stock for periods during which they were outstanding. For fiscal years 2002, 2001 and 2000, 4,374,000, 3,099,000 and 1,582,000 common share equivalents, respectively, were not included in the computation of diluted net loss per common share as their effect would have been anti-dilutive, thereby decreasing the net loss per common share.

45

## (3) ACQUISITIONS

### Tarantella

On May 7, 2001, the Company acquired certain assets, liabilities and operations from Tarantella in exchange for: (i) the issuance of 4,000,000 shares of common stock (400,000 of which were held in escrow for a one-year period); (ii) the issuance of options to purchase up to an aggregate of 415,000 shares of the Company's common stock in exchange for options to purchase Tarantella common stock previously held by individuals who became employees of the Company; (iii) $23,000,000 in cash, including the forgiveness of $7,000,000 previously advanced to Tarantella; and (iv) a non-interest bearing promissory note in the amount of $8,000,000 due in quarterly installments of $2,000,000 beginning July 2002. In addition, if the OpenServer line of business generates revenue in excess of specified thresholds during the three-year period following the acquisition, the Company would pay Tarantella 45 percent of such excess revenue. The following table summarizes the components of the consideration paid to Tarantella (in thousands, except per share data):

| Consideration paid: | |
|---|---:|
| Fair value of common stock (4,000 shares at $13.88 per share) | $  55,520 |
| Fair value of options to purchase 415 shares of common stock issued in exchange for 3,323 outstanding Tarantella options | 4,201 |
| Cash | 23,000 |
| Note payable (discounted at 6.5%) | 7,322 |
| Direct expenses | 3,744 |
| Total consideration | $  93,787 |

The Company calculated the $13.88 per share price used in the computation of total consideration for the common stock by taking the closing stock price for the two days before, the day of, and the two days after the signing of the final amendment to the Agreement. The per share value calculated for each option exchanged was $10.12 and was calculated using the Black-Scholes option pricing model using the following assumptions: term of 2.5 years, volatility of 134 percent, dividend yield of 0 percent and a discount rate of 5 percent.

The Company accounted for the acquisition of the assets and operations from Tarantella using the purchase method of accounting. Under this method, the total purchase price, including direct fees and expenses, was allocated to the tangible and intangible assets acquired and the liabilities assumed based upon their respective fair values. The following table summarizes the allocation of the consideration to the tangible and intangible assets acquired and liabilities assumed (in thousands):

| Purchase price allocation: | |
|---|---:|
| Liabilities assumed net of tangible assets acquired | $  (5,482 ) |
| Accrual for severance payments, non-essential facilities and related costs | (3,011 ) |
| Intangible assets acquired: | |
| Distribution/reseller channel | 26,700 |
| Existing technology (consisting primarily of UNIXWare and OpenServer) | 5,800 |
| Acquired in-process research and development | 1,500 |
| Trade name and trademarks | 800 |
| Distribution agreement | 1,400 |
| Goodwill | 66,080 |
| Total | $  93,787 |

Powered By EDGAR Online    2003.  EDGAR Online, Inc.

A one-time charge of $1,500,000 related to the fair value of the in-process research and development was recorded during fiscal year 2001. The write-off was necessary because the acquired in-process research and development had not yet reached technological feasibility and had no future alternative uses. Engineering efforts were focused on developing the UNIXWare 7.1.2 and Messaging Server products. UNIXWare 7.1.2 was expected to deliver purpose-built operating system configurations designed to power departmental databases, application servers, intranet servers, mail and messaging servers and other environments specifically tailored to run telecommunications and other embedded environments. At the time of the acquisition, Tarantella had invested approximately 76 man-months of effort (or $741,000) in the UNIXWare 7.1.2 product and anticipated 122 man-months of effort (or $1,187,000) to complete UNIXWare 7.1.2. UNIXWare 7.1.2 was estimated to be approximately 38 percent complete at the time of the acquisition.

The Messaging Server product was an entirely new product, which provides messaging functionality. At the time of the acquisition, Tarantella had invested approximately 36 man-months of effort (or $352,000) in the Messaging Server product and anticipated 12 man-months of effort (or $117,000) to complete Messaging Server. Messaging Server was estimated to be approximately 75 percent complete at the time of the acquisition.

As discussed above in Note 2, the Company determined that various assets related to the acquired operations from Tarantella were impaired as of October 31, 2001, and accordingly wrote-down these assets to their fair value.

**WhatIfLinux Technology from Acrylis, Inc.**

On May 3, 2001, the Company acquired the WhatIfLinux technology from Acrylis, Inc. ("Acrylis"). WhatIfLinux technology provides Open Source users and system administrators with Internet-delivered tools and services for software management. In consideration for the assets acquired from Acrylis, the Company issued 312,500 shares of common stock with a market price of $7.80 per share, or $2,438,000, paid $1,000,000 in cash and incurred $100,000 in direct expenses. The Company has accounted for the acquisition of the WhatIfLinux technology using the purchase method of accounting. The allocation of the consideration paid for the WhatIfLinux technology consisted of assigning $2,968,000 to purchased technology and $470,000 to goodwill. The acquired technology is being amortized over a two-year life.

As discussed above in Note 2, the Company determined that various assets related to the acquired operations from Acrylis were impaired as of October 31, 2001, and accordingly wrote-down these assets to their fair value.

**(4) OTHER CURRENT ASSETS**

Other current assets include the following as of October 31, 2002 and 2001 (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| VAT receivable | $ 1,556 | $ 895 |
| Prepaid expenses | 1,273 | 1,201 |
| Other | 1,654 | 1,342 |
| Total | $ 4,483 | $ 3,438 |

47

Powered By EDGAR Online    2003. EDGAR Online, Inc.

**(5) PROPERTY AND EQUIPMENT**

Property and equipment are stated at cost, less accumulated depreciation and amortization. Computer equipment is depreciated using the straight-line method over the estimated useful life of the asset, which is typically three years. Furniture and fixtures and office equipment are depreciated using the straight-line method over the estimated useful life of the asset, typically three to five years. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated useful life of the improvement or the remaining term of the applicable lease.

Expenditures for repairs and maintenance are charged to expense when incurred. Expenditures for major renewals and betterments that extend the useful lives of existing equipment are capitalized and depreciated. Upon retirement or disposition of property and equipment, the cost and related accumulated depreciation are removed from the accounts and any resulting gain or loss is recognized in the consolidated statements of operations.

Depreciation and amortization expense was $2,555,000, $2,204,000 and $580,000 during fiscal years 2002, 2001 and 2000, respectively.

During fiscal year 2002, the Company had the following property retirements and dispositions that were primarily the result of corporate restructurings (in thousands):

|  | Cost | Accumulated Depreciation and Amortization | Loss on Disposition |
|---|---|---|---|
| Computer and office equipment | $ 2,338 | $ 1,261 | $ 1,077 |
| Leasehold improvements | 1,437 | 1,152 | 285 |
| Furniture and fixtures | 1,121 | 687 | 434 |
| Total | $ 4,896 | $ 3,100 | $ 1,796 |

**(6) GOODWILL AND INTANGIBLE ASSETS**

In July 2001, the FASB issued SFAS No.142, "Goodwill and Other Intangible Assets." Under SFAS No.142, goodwill and other intangible assets with indefinite lives are no longer amortized, but rather are assessed annually for impairment. The Company adopted SFAS No.142 on November 1, 2001, the beginning of fiscal year 2002. All of the Company's identifiable intangible assets other than goodwill are deemed to have finite lives and are amortized over their remaining useful lives.

Goodwill and intangible assets are the result of the acquisition of certain assets and operations from Tarantella and the acquisition of the WhatIfLinux technology from Acrylis, Inc. Subsequent to the acquisition of certain assets and operations from Tarantella (see Note 3), the Company experienced significant unanticipated decreases in actual and forecasted revenue of the acquired operations, a significant decline in market valuations and general conditions, particularly in the information technology sector, a weakening of partner relationships, the loss of certain key executives, and other factors which indicated the recorded values of the long-lived assets were impaired. As a result, the Company performed a valuation of its long-lived assets as of October 31, 2001 and concluded that a $73,700,000 write-down of goodwill and intangible assets was necessary.

48

Powered By EDGAR ONLINE    2003. EDGAR Online, Inc.

The following table summarizes the write-down for each of the Company's intangible assets and goodwill during fiscal year 2001 (in thousands):

| | Estimated Useful Life | Net Book Value (prior to write-down) | Estimated Fair Market Value | Write-down |
|---|---|---|---|---|
| Intangible assets acquired: | | | | |
| Distribution/reseller channel | 5 years | $   24,030 | $   12,400 | $   11,630 |
| Existing technology—Tarantella | 5 years | 5,220 | 1,800 | 3,420 |
| Existing technology—Acrylis | 2 years | 2,225 | 930 | 1,295 |
| Distribution agreement | 5 years | 1,260 | — | 1,260 |
| Trade name and trademarks | 5 years | 720 | 278 | 442 |
| Goodwill | Indefinite | 57,931 | 2,278 | 55,653 |
| Total | | $   91,386 | $   17,686 | 73,700 |

Upon adoption of SFAS No.142, the Company reassessed the useful lives of its intangible assets. The following table summarizes the remaining components of amortized intangible assets and their useful lives as of October 31, 2002 (in thousands):

| | Estimated Useful Life | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
|---|---|---|---|---|
| Amortized intangible assets: | | | | |
| Distribution/reseller channel | 5 years | $   11,626 | $   2,354 | $   9,272 |
| Acquired technology—Tarantella | 5 years | 1,687 | 341 | 1,346 |
| Acquired technology—Acrylis | 2 years | 871 | 439 | 432 |
| Trade name and trademarks | 5 years | 261 | 53 | 208 |
| Total intangible assets | | $   14,445 | $   3,187 | $   11,258 |

Amortization expense related to goodwill and other intangible assets was $3,187,000 (including $334,000 classifies as cost of product revenue), $10,664,000 and $0 for fiscal years 2002, 2001 and 2000, respectively.

SFAS No.142 requires transitional disclosures of previously reported net loss and net loss per share, as adjusted, to exclude amortization of goodwill which would not have been recorded under SFAS No.142. The following information with respect to fiscal years 2001 and 2000 has been included as a result of the adoption of SFAS No.142 in fiscal year 2002 (in thousands):

| | Year Ended October 31, 2001 | | (per share) | Year Ended October 31, 2000 | | (per share) |
|---|---|---|---|---|---|---|
| Net loss as reported | $   (131,357 ) | $ | (10.92 ) | $   (39,176 ) | $ | (4.76 ) |
| Amortization of goodwill | 6,669 | | 0.55 | 163 | | 0.02 |
| Adjusted net loss | $   (124,688 ) | $ | (10.37 ) | $   (39,013 ) | $ | (4.74 ) |

Pursuant to SFAS No.142, the Company is required to test its intangible assets for impairment at least annually. The Company performed an initial impairment test as of November 1, 2001, and again as of October 31, 2002 and concluded that no impairment needed to be recognized.

49

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

**(7) OTHER ASSETS**

As of October31, 2002, other assets consisted primarily of a note receivable from and an advance to Vista.com discussed below, prepaid royalties, deposits and an investment in a joint venture in China.

**Vista.com**

During August2002, the Company entered into a license agreement with Community IQ.com d/b/a Vista.com ("Vista"). Under the agreement, the Company acquired an exclusive license from Vista to sell and market Vista's web services solutions for the small business market. The Company prepaid $100,000 of royalties under the license agreement and also advanced another $250,000 to Vista in connection with a right to purchase 3,312,737 shares of Vista's SeriesC convertible preferred stock for $500,000 (see below). Additionally, the Company acquired a $1,000,000 convertible note receivable payable by Vista from Vista's founder in exchange for 800,000 shares of the Company's common stock with an estimated fair market value of $900,000 and $100,000 in cash. The $1,000,000 note receivable is due on August15, 2003, bears interest at 8percent payable at maturity and is convertible at the Company's option into a 20percent fully diluted interest in Vista.

In December2002, the Company and Vista entered into the Stock Purchase Agreement, pursuant to which the Company acquired 3,312,737 shares of Vista's SeriesC preferred stock for $500,000. The 3,312,737 shares of SeriesC preferred stock of Vista represent a 10percent fully diluted interest in Vista. The $250,000 advance as of October31, 2002 was applied toward the purchase. Additionally, the Company and Vista entered into an Agreement and Plan of Merger pursuant to which the Company received an option through March31, 2003 for no additional consideration to acquire the remaining 70percent ownership interest of Vista in exchange for 2,500,000 shares of the Company's common stock. The Company also received the right to representation on Vista's board of directors.

**(8) EQUITY INVESTMENT IN EBIZ ENTERPRISES, INC.**

On September15, 2000, the Company sold to Ebiz Enterprises, Inc. ("Ebiz") the rights, title and interest in and to all of the intellectual property and assets comprising the Company's Electronic Linux Marketplace concept (the "ELM assets"). The Company transferred assets with a net book value of $38,000 as well as cash of $3,000,000 for 4,000,000 shares of Ebiz common stock. The Company could have received up to 4,000,000 additional shares of Ebiz common stock, depending upon the amount of gross revenue generated by the ELM assets during the twelve-month period ended December15, 2001. No additional shares were received under the earn-out provision.

The Company accounted for its interest in Ebiz using the equity method of accounting due to its ability to exercise influence on Ebiz. Under the equity method, the Company recognizes its portion of the net income or net loss of Ebiz in its consolidated statements of operations. During fiscal years 2001 and 2000, the Company recognized $431,000 and $224,000, respectively, in its statements of operations that represented its portion of Ebiz's net losses.

In addition, because Ebiz had a stockholders' deficit at the time of the Company's investment, the Company was amortizing on a straight-line basis, the difference between its investment and the amount

50

of underlying equity in the net assets of Ebiz, which was calculated as follows (in thousands, except per share amounts):

| | |
|---|---:|
| Fair value of Ebiz shares received (4,000 shares at $1.60 per share) | $  6,400 |
| Less portion of gain deferred due to the Company's continuing ownership interest | (1,056 ) |
| Basis of recorded investment | 5,344 |
| The Company's portion of Ebiz deficit | 1,162 |
| | $  6,506 |

The Company allocated this difference to goodwill and was amortizing this amount on a straight-line basis over five years. At the time of the investment, Ebiz had no other substantial identifiable intangible assets. During fiscal years 2001 and 2000, the Company recognized $217,000 and $163,000, respectively, in its statements of operations that represented this amortization.

On January 5, 2001, the Company's ownership interest in Ebiz was diluted to approximately 12 percent as a result of Ebiz issuing new shares in connection with an acquisition and the conversion of convertible securities. As a result of these transactions, on January 5, 2001, the Company discontinued the use of the equity method of accounting for its investment in Ebiz. Subsequent to January 5, 2001, the Company accounted for the investment in Ebiz as an available-for-sale security in accordance with SFAS No.115. Under SFAS No.115, the Company carried its investment at fair market value using quoted trading prices and recorded any unrecognized gains or losses as a component of other comprehensive income (loss).

During the year ended October 31, 2001, the Company determined that the quoted trading price of the Ebiz common stock on the Over the Counter Bulletin Board was not reflective of the realizable value of the Company's investment in Ebiz. During fiscal year 2001, Ebiz's financial condition declined and on September 7, 2001, Ebiz filed for Chapter 11 bankruptcy protection. Accordingly, the investment was written down to $0 resulting in an impairment charge of $4,309,000.

## (9) INVESTMENTS IN NON-MARKETABLE SECURITIES

The Company accounts for each of its investments in non-marketable securities under the cost method, if the Company owns less than 20 percent of the outstanding voting securities and has no ability to exercise influence over the entities or under the equity method if the Company owns 20 percent or more of the outstanding voting securities or has the ability to influence operations. The Company's investments to date have consisted of investments in the common stock of other technology companies, including Evergreen Internet, Inc. ("Evergreen"), Troll Tech AS ("Troll Tech") and Lineo, Inc. ("Lineo"). In connection with the Company's acquisition of the server and professional services groups from Tarantella, it acquired a 30 percent ownership interest in a joint venture in China.

### Evergreen

In January 2000, the Company and Evergreen entered into a master agreement which set forth the terms and conditions of a business alliance. The Company acquired approximately 370,000 shares of common stock of Evergreen for $2,000,000, and Evergreen transferred 222,000 additional shares of its common stock to the Company in exchange for 50,000 shares of the Company's common stock.

The Company recorded its investment in Evergreen at cost, based on the cash consideration paid by the Company and the estimated fair market value of the Company's common stock on the date of the agreement of $32.00 per share. The Company determined that the estimated fair value of the

51

Company's common stock was more clearly evident of the value of the transaction since Evergreen is a privately owned company. In management's opinion, the consideration exchanged by the Company for the common shares of Evergreen was equal to the fair value of the shares acquired. The Evergreen investment was accounted for using the cost method.

**Troll Tech**

In December1999, the Company and The Canopy Group,Inc. ("Canopy") entered into an agreement with Troll Tech AS and its stockholders. Pursuant to the agreement, the Company acquired 159 shares of common stock of Troll Tech (approximately 2percent of Troll Tech's outstanding common stock) in exchange for approximately 26,000 shares of the Company's common stock, and Canopy acquired 398 shares of common stock of Troll Tech in exchange for $1,000,000, payable in monthly installments of $100,000. The agreement also granted to Canopy and its affiliates certain license rights with respect to Troll Tech's software. To date, the Company has not sold any products that incorporate Troll Tech's technology and has not paid any royalties to Troll Tech.

The Company recorded its investment in Troll Tech's common stock at $400,000, based on the cash price per share paid by Canopy. The Company determined that the cash price per share paid by Canopy was the most reliable evidence of the value of Troll Tech's common stock. The difference between the estimated fair value of the approximately 26,000 shares of the Company's common stock at $32.00 per share of $851,000 and the $400,000 investment was recorded as a license fee. The license fee was classified as contra-equity and was subsequently reflected as a distribution to Canopy because the license rights were used by Canopy and its affiliates.

**Lineo**

In January2000, the Company and Lineo entered into a stock purchase and sale agreement. As of January2000, both Lineo and Caldera Systems were majority owned by Canopy. Pursuant to the stock purchase agreement, the Company acquired 3,238,000 shares of common stock of Lineo (approximately 17percent of Lineo's outstanding voting stock) in exchange for 312,500 shares of the Company's common stock.

Because Lineo was also majority owned by Canopy, the investment in Lineo was accounted for as a transaction between entities under common control with the transfer being reflected in the Company's consolidated financial statements at Lineo's carry over basis. At the date of the agreement, Lineo had a stockholders' deficit of which approximately $150,000 was associated with the 17percent interest the Company acquired. Accordingly, the investment was recorded at a nominal value of $1.00 because the Company did not have any obligation to provide additional funding to Lineo. The Company recorded the estimated fair value of the shares of its common stock issued to Lineo at $10,000,000 with the difference between the $10,000,000 and the $1.00 investment recorded as a distribution to Canopy.

On May11, 2000, Canopy transferred 1,762,000 shares of Lineo's common stock held by Canopy to the Company. This transfer was reflected as a capital contribution by Canopy at Lineo's carry over basis of $1,966,000. As a result of this transaction, the Company had a total of 5,000,000 shares of Lineo's common stock (approximately 14percent of Lineo's outstanding voting stock).

On August31, 2000, the Company, Canopy and Metrowerks Holdings,Inc. ("Metrowerks"), an affiliate of Motorola,Inc., entered into a Stock Purchase and Sale Agreement whereby the Company and Canopy sold 2,000,000 and 1,000,000 shares, respectively, of common stock of Lineo to Metrowerks at $7.50 per share. Prior to this transaction, the Company, Canopy and Lineo had no relationship with

52

Metrowerks; however, Motorola, Inc. was a preferred stockholder of Lineo. The Company received the $15,000,000 of proceeds from the sale in October 2000.

**Investment Impairments**

Management routinely assesses the Company's investments for impairment and adjusts the carrying amount to estimated realizable values when impairment has occurred. During fiscal year 2001, management determined that the carrying value of the investment in Evergreen of $3,600,000 and Troll Tech of $400,000 would most likely not be recoverable, and both investments were written down to $0. As discussed above in Note 8, the remaining investment in Ebiz of $4,309,000 was also written down to $0. These write-downs totaled $8,309,000 for fiscal year 2001. During fiscal year 2002, management determined that the remaining investment balance for Lineo of $1,180,000 would not be realized and the investment was written down to $0. As of October 31, 2002, the Company's remaining investments balance was $341,000 and was recorded in other assets and was related to its 30 percent ownership interest in a China joint venture.

### (10) OTHER CURRENT LIABILITIES

As of October 31, 2002 and 2001, other accrued liabilities consisted of the following (in thousands):

|  | 2002 | 2001 |
|---|---|---|
| Accrual for unvouchered payables | $ 1,824 | $ 1,700 |
| Co-operative advertising | 1,630 | 1,335 |
| Restructuring accrual—current portion | 1,113 | 1,221 |
| Other | 3,065 | 2,965 |
| Total | $ 7,632 | $ 7,221 |

### (11) NOTE PAYABLE TO TARANTELLA, INC.

As discussed in Note 3, the Company issued to Tarantella an unsecured, non-interest bearing promissory note in the amount of $8,000,000. Four quarterly payments of $2,000,000 were payable to Tarantella beginning in the Company's third quarter of fiscal year 2002. Because the promissory note was non-interest bearing, the promissory note was recorded at a discount using an interest rate of 6.5 percent. As of October 31, 2001, the current portion of the note payable was $3,845,000, which represented the discounted value of the two payments that were to be paid during fiscal year 2002. The remaining two payments were to be made during fiscal year 2003.

On March 28, 2002, the Company completed an agreement with Tarantella to settle certain matters related to the acquisition of Tarantella's server and professional services divisions. In connection with the settlement, the parties agreed that the Company would pay $5,000,000 as total settlement of the $8,000,000 face value note payable, and Tarantella would pay the Company $564,000 for operating costs incurred and paid by the Company that related to Tarantella's operations. Prior to the settlement, the collectibility of these items from Tarantella was uncertain, and therefore, the amounts had been expensed as incurred by the Company. The difference between the carrying value of the note payable of $7,777,000 and the $5,000,000 payment, along with the $564,000 expense reimbursement, have been recorded as an adjustment to the purchase price paid by the Company to Tarantella. As a result, goodwill was reduced from $2,278,000 to $0, and intangible assets were reduced by $1,063,000.

53

Powered By EDGAR ONLINE   2003. EDGAR Online, Inc.

## (12) STOCKHOLDERS' EQUITY

### Reincorporation as a Delaware Corporation

On March 6, 2000, Caldera Systems reincorporated in Delaware. The reincorporation into Delaware was effected by way of a merger with a newly formed Delaware subsidiary and the associated issuance of one share of common stock of the subsidiary for each share of common stock of Caldera Systems held by stockholders of record. Additionally, stockholders of record of Series A and Series B preferred stock received shares of Series A and Series B preferred stock of the newly formed company.

### Initial Public Offering

In March 2000, Caldera Systems complete the sale of an aggregate of 5,000,000 shares of its common stock (pre-split) at a price of $14.00 per share (pre-split) in its initial public offering. On April 17 2000, the underwriters exercised an over allotment option for an additional 750,000 shares (pre-split) at a price of $14.00 per share (pre-split).

### Reverse Stock Split

On December 17, 2001, the Company's board of directors approved a one-for-four reverse stock split for holders of common stock. On March 4, 2002, the stockholders approved this reverse stock split and the Company's authorized shares were reduced from 200,000,000 shares to 50,000,000 shares consisting of 5,000,000 shares of preferred stock and 45,000,000 shares of common stock. The outstanding common shares were reduced from 57,715,000 shares to 14,428,750 shares. The reverse stock split of common shares has been retroactively reflected in the accompanying consolidated financial statements and notes for all periods presented, unless otherwise indicated. No adjustments have been made to preferred shares of preferred prices per share.

### Preferred Stock

As of October 31, 2002, the Company has 5,000,000 authorized shares of preferred stock and none outstanding. The Company's board of directors is authorized, without stockholder approval, to designate and determine the preferences, limitations and relative rights granted to or imposed upon each share of preferred stock that are not fixed by the Company's articles of incorporation, as amended.

On December 30, 1999, the Company's stockholders approved articles of amendment to the Company's articles of incorporation which designated 6,596,000 shares as Series A Convertible Preferred Stock ("Series A") and 5,000,000 shares as Series B Convertible Preferred Stock ("Series B"). The Series A and B shares had initial stated values per share of $4.03 and $6.00, respectively, and ranked on parity with each other and prior to any other class or series of capital stock of the Company with respect to dividend rights, rights upon liquidation, winding up or dissolution, and redemption rights. The Series A and B shares were entitled to receive, when, as and if declared by the board of directors, cumulative and accruing preferential dividends at eight percent per annum, compounded annually, based on the stated value per share; provided, however, solely for dividend purposes the Series A stated value per share was deemed to be $6.00. Any holder of Series A or B shares could convert all or any shares of Series A or B into common shares and each share of Series A or B automatically converted into common shares immediately prior to the closing of a firm commitment underwritten public offering of at least $25,000,000, as defined. Each Series A and B share initially converted into one share of common stock. The holders of Series A and B shares were entitled to vote on all matters submitted to the stockholders of the Company, including the election of directors, together with the holders of common stock voting together as a single class. Each share of Series A

54

Powered By EDGAR Online    2003.   EDGAR Online, Inc.

and B was entitled to one vote for each share of common stock that would be issuable upon conversion of such share.

In connection with the Company's initial public offering, all then outstanding preferred stock was converted to common stock on March20, 2000.

**Conversion of Common Shares into SeriesA Shares**

Prior to the offering of SeriesB shares discussed below, on December30, 1999, the Company entered into a Conversion Agreement with its two major stockholders, Canopy and MTI Technology Corporation ("MTI"). These two stockholders held 99percent of the outstanding shares of the Company's common stock at December30, 1999. Pursuant to the Conversion Agreement, the Company converted 6,596,000 shares (pre-split) of outstanding common stock held by Canopy and MTI into 6,596,000 shares of SeriesA.

**Issuance of SeriesB Shares**

On December30, 1999, the Company's board of directors authorized the issuance of 5,000,000 shares of SeriesB convertible preferred stock at $6.00 per share with the rights, preferences, privileges and restrictions as described above. On January10, 2000, the 5,000,000 shares were sold for net proceeds of $29,787,000.

Each share of SeriesB was immediately convertible to one share of common stock (pre-split) upon issuance. During the year ended October31, 2000, the Company recorded a dividend related to the SeriesB in the amount of $10,000,000 representing the value of the beneficial conversion feature. The beneficial conversion feature was calculated based on the difference between the conversion price of $6.00 per share and the estimated fair value of the common stock of $8.00 per share (pre-split) for financial reporting purposes based on the estimated price range for the Company's IPO. The Company's board of directors determined that the $6.00 per share price for the SeriesB preferred stock represented their estimate of the fair value of the SeriesB at the time sold and that the SeriesB were not issued for other consideration or goods and services.

**Warrant Agreement Between Canopy and SeriesB Preferred Stockholder**

In connection with the SeriesB offering, Canopy and Egan-Managed Capital, L.P. ("EMC"), one of the investors in the SeriesB offering, entered into an agreement wherein Canopy agreed to purchase the shares of SeriesB purchased by EMC if EMC did not receive a warrant in a satisfactory form to EMC to purchase approximately 416,000 shares (pre-split) of the Company's common stock from Canopy. On March13, 2000, Canopy sold to EMC a warrant for $10,000 to purchase 416,000 shares (pre-split) of the Company's common stock held by Canopy at $5.98 per share (pre-split) for a two-year period. Upon exercise of the warrant, all proceeds will be paid to Canopy. Since the sale of this warrant directly related to the issuance of the SeriesB, the Company accounted for this transaction as if the Company had sold the warrant to EMC with an offsetting contribution to capital. Accordingly, the Company recorded the fair value of the warrant of $2,253,000, determined using the Black-Scholes option-pricing model, as a beneficial conversion feature reflected as a dividend related to the SeriesB during the year ended October31, 2000. Assumptions used in the Black-Scholes option-pricing model were the following: estimated fair value of common stock of $8.00 per share (pre-split); risk-free interest rate of 6percent; expected dividend yield of 0percent; volatility of 118percent; and expected exercise life of two years.

55

**Warrant Agreement with Morgan Keegan**

In August 2002, the Company entered into an agreement with Morgan Keegan & Company ("Morgan Keegan") to act as an exclusive financial advisor to assist the Company in its analysis, consideration and if appropriate, execution of various financial and strategic alternatives available to it including, but not limited to, securing additional equity and/or debt capital and potential strategic transactions including mergers, acquisitions and joint ventures.

In consideration for the services provided, the Company issued to Morgan Keegan a warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $0.01 per share. Morgan Keegan was granted demand registration rights to have the Company use its best efforts to register the shares upon exercise of the warrant. In the event that the Company is successful in raising equity, it will have a contingent fee owed to Morgan Keegan for six percent of the principal amount of the financing. If the Company is successful in raising mezzanine financing (convertible debt) and/or senior debt, it will have a contingent fee owed to Morgan Keegan of three percent and one percent, respectively, of the amounts borrowed. In the event that the Company is successful in completing an acquisition, it will have a contingent fee owed to Morgan Keegan for the greater of two percent of the transaction value or $250,000.

During August 2002, the Company and Morgan Keegan executed the warrant agreement. Upon execution of the warrant agreement, the Company recorded the fair value of the warrant of $294,000 as stock-based compensation, determined using the Black-Scholes option-pricing model. Assumptions used in the Black-Scholes option-pricing model were the following: estimated fair value of common stock of $1.47 per share; risk-free interest rate of three percent; expected dividend yield of 0 percent; volatility of 145 percent; and expected exercise life of three months.

Subsequent to October 31, 2002, Morgan Keegan exercised the warrant agreement.

**Stock Option Plan**

During fiscal year 1998, the Company adopted the 1998 Stock Option Plan (the "1998 Plan") that provided for the granting of nonqualified stock options to purchase shares of common stock. Under the 1998 Plan, the Company could grant up to 1,250,000 options to employees, non-employee members of the board of directors or consultants who provide services to the Company. Options granted under the 1998 Plan are subject to expiration and vesting terms as determined by a committee of the Company's board of directors. No options can expire more than ten years from the date of grant. The exercise price for the options may be paid in cash or in shares of the Company's common stock if held by the optionee for more than six months. The options may also be exercised through a broker arranged same-day sale program without any cash outlay by the optionee. At October 31, 2002, there are no shares of common stock available for future grants under the 1998 Plan.

On December 1, 1999, the Company's board of directors approved the 1999 Omnibus Stock Incentive Plan (the "1999 Plan"), which is intended to serve as the successor equity incentive program to the 1998 Plan. The compensation committee of the board of directors administers the 1999 Plan. The 1999 Plan allows for the grant of awards in the form of incentive and non-qualified stock options, stock appreciation rights, restricted shares, phantom stock and stock bonuses. Awards may be granted to individuals in the Company's employ or service. The 1999 Plan initially increased the aggregate number of shares available for issuance under both plans to 1,675,000 shares and designated that 175,000 shares be used as director incentives. As of October 31, 2002, there were 596,000 shares available for grant under the 1999 Plan.

56

Powered by EDGAR Online    2003. EDGAR Online, Inc.

In addition, the board and stockholders have approved amendments to the 1999 Plan that effected the following changes: (i)established an automatic share increase feature pursuant to which the number of shares available for issuance under the 1999 Plan will automatically increase, beginning with the 2000 calendar year, as of November1 of each year, by 3percent of the total number of shares of common stock outstanding on the previous October31st, and (ii)added a formula awards program pursuant to which directors of the Company are automatically granted options to purchase shares of common stock at specified times. The stockholders have approved all amendments.

A summary of stock option activity under the 1998 and 1999 Plans for the years ended October31, 2002, 2001 and 2000 is as follows (in thousands, except per share amounts):

| | Options | Price Range | Weighted Average Exercise Price |
|---|---|---|---|
| Balance, October 31, 1999 | 741 $ | 4.00 — $4.52 | $ 4.16 |
| Granted | 1,113 | 4.52 —59.00 | 26.12 |
| Exercised | (113 ) | 4.00 —24.00 | 4.72 |
| Forfeited | (196 ) | 4.00 —38.00 | 19.92 |
| Balance, October 31, 2000 | 1,545 | 4.00 —59.00 | 17.92 |
| Granted | 2,249 | 1.20 —11.88 | 6.24 |
| Exercised | (73 ) | 4.00 —16.00 | 4.16 |
| Forfeited | (613 ) | 3.00 —38.00 | 16.28 |
| Balance, October 31, 2001 | 3,108 | 1.20 —59.00 | 10.12 |
| Granted | 3,910 | 0.66 —3.28 | 0.98 |
| Exercised | (216 ) | 0.84 —4.50 | 1.37 |
| Forfeited | (2,536 ) | 0.84 —59.00 | 7.54 |
| Balance, October 31, 2002 | 4,266 $ | 0.66 — $59.00 | $ 3.73 |

During fiscal years 2002 and 2001, the Company did not grant any stock options with exercise prices that were less than the quoted market price of the Company's common stock. The weighted-average fair value of options granted was $0.98, and $6.24, for fiscal years 2002 and 2001, respectively. A summary of stock option grants with exercise prices equal to or less than the estimated fair market value on the date of grant during fiscal year 2000 is as follows (in thousands, except per share amounts):

| | Options Granted | Weighted Average Exercise Price | Weighted Average Fair Value Of Options |
|---|---|---|---|
| Grants with exercise price equal to estimated fair market value | 148 $ | 34.28 $ | 2.28 |
| Grants with exercise price less than estimated fair market value | 965 | 24.88 | 5.16 |
| | 1,113 $ | 26.12 $ | 4.76 |

57

Powered By EDGAR Online    2003.  EDGAR Online, Inc.

A summary of stock options outstanding and exercisable under the Company's 1998 and 1999 Plans as of October 31, 2002 is as follows (in thousands, except per share amounts):

| Exercise Prices | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| | Options Outstanding | Weighted Average Contractual Life | Weighted Average Exercise Price | Options Exercisable | | Weighted Average Exercise Price |
| $0.66 - $0.76 | 700 | 9.66 years | $ 0.75 | — | $ | — |
| $0.77 - $1.10 | 1,546 | 9.62 | 0.88 | 570 | | 0.84 |
| $1.11 - $2.00 | 779 | 8.99 | 1.13 | 88 | | .1.15 |
| $2.01 - $4.00 | 493 | 8.39 | 3.12 | 94 | | 3.96 |
| $4.01 - $9.12 | 470 | 8.37 | 8.67 | 315 | | 8.61 |
| $9.12 and above | 278 | 7.34 | 27.20 | 233 | | 26.76 |
| | 4,266 | 9.08 years | $ 3.73 | 1,300 | $ | 7.61 |

## Stock-based Compensation

During fiscal year 1999, the Company granted 162,000 stock options with exercise prices that were below the estimated fair market value on the measurement date resulting in $3,144,000 in deferred compensation. This deferred compensation was recorded as a component of stockholders' equity and is expensed consistent with the vesting of the underlying stock options on an accelerated amortization method. During fiscal year 2000, the Company granted 965,000 stock options with exercise prices below the fair market value on the measurement date resulting in $5,370,000 of deferred compensation to be recognized as expense over the vesting period of the options. During fiscal years 2001 and 2002, the Company granted 2,249,000 and 3,910,000 stock options, respectively, with average exercise prices of $6.24 and $0.98 per share, respectively. None of these options were granted at prices that were below the quoted market price on the date of grant.

Stock-based compensation was $1,012,000, $1,373,000 and $5,216,000 during fiscal years 2002, 2001 and 2000, respectively. During fiscal year 2002, the Company recorded an adjustment of $565,000 to reverse previously recorded stock-based compensation related to non-vested options forfeited by certain employees whose employment was terminated during the year. In addition, during fiscal year 2002, the Company terminated change in control agreements that were in place for certain executives. In exchange for the cancellation of the change in control agreements, 105,000 shares of the Company's common stock were issued to these executives. The fair value of the common stock of $119,000 was recorded as stock-based compensation. Also during fiscal year 2002, the Company agreed to extend the exercise period for certain employees that were terminated. The Company recorded $73,000 of compensation expense related to these modifications.

For fiscal year 2002, certain members of the Company's board of directors elected to receive shares of common stock in lieu of cash compensation for their services. The value of the 30,000 shares received by these board members was determined using the closing price of the Company's common stock on the date the shares were issued. During fiscal year 2002, the Company recorded $113,000 for these services.

During July 2002, the Company granted 175,000 shares of common stock to its former Chief Executive Officer as part of a severance agreement. The fair value of this common stock of $105,000 was recorded as stock-based compensation.

SFAS No.123, "Accounting for Stock-Based Compensation." requires pro forma information regarding net loss as if the Company had accounted for its stock options granted under the fair value method. The fair market value of the stock options is estimated on the date of grant using the Black-

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

Scholes option-pricing model with the following assumptions for grants during fiscal years 2002, 2001 and 2000: risk-free interest rates of 3.0 percent, 3.5 percent and 6.1 percent, respectively; expected dividend yield of 0 percent; volatility of 370 percent, 112 percent and 132 percent, respectively; and expected exercise lives of two and one-half years, three years and four years, respectively.

For purposes of the pro forma disclosure, the estimated fair market value of the stock options is amortized over the vesting periods of the respective stock options. The following is the pro forma disclosure and the related impact on net loss for fiscal years 2002, 2001 and 2000 (in thousands, except per share amounts):

|  | | 2002 | 2001 | 2000 |
|---|---|---|---|---|
| Net loss attributable to common stockholders: | | | | |
| | As reported | $ (24,877 ) $ | (131,357 ) $ | (39,176 ) |
| | Pro forma | (31,691 ) | (140,172 ) | (43,291 ) |
| Net loss per share attributable to common stockholders: | | | | |
| | As reported | $ (1.93 ) $ | (10.92 ) $ | (4.76 ) |
| | Pro forma | (2.46 ) | (11.64 ) | (5.24 ) |

### Restricted Stock Awards

During fiscal year 2002, the Company issued 450,000 shares of restricted stock to certain key employees. The restrictions related to the restricted stock awards lapse over a period of 24 months. The fair value of the restricted stock awards granted of $495,000 was recorded as a component of deferred compensation and is amortized to stock-based compensation as the restrictions lapse.

### Stock Buyback From Tarantella and MTI

During the second quarter of fiscal year 2002, the Company bought back 500,000 shares of its outstanding common stock from Tarantella. The Company paid $555,000 for these shares, or $1.11 per share, which represented a discount from the quoted market price. During the third quarter of fiscal year 2002, the Company purchased an additional 3,115,000 shares from Tarantella and paid $2,959,000, or $0.95 per share, which represented a premium from the quoted market price. In connection with the second repurchase from Tarantella, the Company received and accepted a resignation letter from one of the directors representing Tarantella on the Company's board of directors.

During the third quarter of fiscal year 2002, the Company purchased 1,189,000 shares of its outstanding common stock from MTI for $1,070,000, or $0.90 per share, which represented a premium from the quoted market price.

The Company has elected to retire the acquired shares and has accordingly reflected the amounts paid as a reduction to equity.

### 2000 Employee Stock Purchase Plan

The 2000 Employee Stock Purchase Plan was adopted by the board of directors on February 15, 2000 and was approved by the stockholders on March 1, 2000. The plan became effective upon the closing of the Company's initial public offering. The plan is designed to allow eligible employees of the Company and its participating subsidiaries to purchase shares of the Company's common stock, at semi-annual intervals, through periodic payroll deductions. A total of 125,000 shares of common stock were initially reserved for issuance under the plan. The share reserve increases on the first trading day of each fiscal year beginning with the 2001 fiscal year by 1 percent of the total number of shares of common stock outstanding on the last day of the immediately preceding year but no such annual increase will exceed 187,500 shares. In no event, however, may a participant purchase more than 188 shares, nor may all participants in the aggregate purchase more than 31,250 shares on any semi-annual purchase date.

Powered By EDGAR Online     2003.  EDGAR Online, Inc.

In July2000, the board of directors amended the plan to increase the maximum number of shares of common stock authorized for issuance over the term of the plan by an additional 375,000 shares. The stockholders approved this increase on April27, 2001. The board of directors also amended the plan to eliminate the cap on the number of shares each participant may purchase in each offering period, increased the aggregate shares that may be purchased by all employees on any semi-annual purchase date to 87,500 shares from 31,250 shares, and changed the purchase interval date to May31 and November30, starting with the May31, 2001 purchase interval.

A participant may contribute up to 10percent of his or her cash earnings through payroll deductions and the accumulated payroll deductions will be applied to the purchase of shares on the participant's behalf on each semi-annual purchase date (the last business day in April and October of each year). The purchase price per share will be 85percent of the lower of the fair market value of the Company's common stock on the participant's entry date into the offering period or the fair market value on the semi-annual purchase date.

The board may at any time amend or modify the plan. The plan will terminate no later than the last business day in April2010.

On October31, 2000, 15,000 shares of common stock of the Company were purchased through the plan at a price of $11.90 per share. During fiscal year 2001, 19,000 shares were purchased at prices ranging from $6.19 to $6.70 per share and during fiscal year 2002, 175,000 shares were purchased at prices ranging from $0.71 to $2.62 per share. Subsequent to October31, 2002, 87,000 shares of common stock of the Company were purchased through the plan at a price of $0.66 per share.

## (13) INCOME TAXES

The net loss before income taxes consisted of the following components for fiscal years 2002, 2001 and 2000 (in thousands):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Domestic U.S. operations | $ (25,371 ) $ | (131,178 ) $ | (26,980 ) |
| Foreign operations | 977 | 399 | 138 |
| Total | $ (24,394 ) $ | (130,779 ) $ | (26,842 ) |

The components of the provision for income taxes for fiscal years 2002, 2001 and 2000 are as follows (in thousands):

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Current: |  |  |  |
| U.S. Federal | $ — $ | — $ | — |
| U.S. State | — | — | — |
| Non-U.S. | 483 | 578 | 81 |
|  | 483 | 578 | 81 |
| Deferred: |  |  |  |
| U.S. Federal | (8,894 ) | (30,139 ) | (3,977 ) |
| U.S. State | (335 ) | (1,135 ) | (386 ) |
| Change in valuation allowance | 9,229 | 31,274 | 4,363 |
| Total provision for income taxes | $ 483 $ | . 578 $ | 81 |

Deferred tax assets and liabilities are determined based on the differences between the financial reporting and tax bases of assets and liabilities. They are measured by applying the enacted tax rates and laws in effect for the years in which such differences are expected to reverse. The significant

60

components of the Company's deferred income tax assets and liabilities at October 31, 2002 and 2001 are as follows (in thousands):

|  |  | 2002 | 2001 |
|---|---|---|---|
| Deferred income tax assets: |  |  |  |
| Net operating loss carryforwards |  | $ 31,101 | $ 16,834 |
| Intangible assets |  | 5,322 | 5,897 |
| Tax basis in excess of book basis related to assets acquired by the Company from its Predecessor |  | 5,214 | 5,694 |
| Reserves and accrued expenses |  | 4,537 | 4,815 |
| Book depreciation in excess of tax |  | 1,478 | 1,641 |
| Deferred revenue |  | 1,469 | 1,075 |
| Basis difference in investments |  | 397 | 3,913 |
| Foreign tax credit |  | 89 | 181 |
|  | Total deferred income tax assets | 49,607 | 40,050 |
| Deferred tax liabilities: |  |  |  |
| Tax on foreign earnings |  | (964 ) | (636 ) |
|  | Total deferred income tax liabilities | (964 ) | (636 ) |
| Valuation allowance |  | (48,643 ) | (39,414 ) |
|  | Net deferred income tax assets | $ — | $ — |

The amount, and ultimate realization, of the deferred income tax assets is dependent, in part, upon the tax laws in effect, the Company's future earnings, and other future events, the effects of which cannot be determined. The Company has established a full valuation allowance against its net deferred income tax assets. Management believes that as of October 31, 2002, based on a number of factors, the available objective evidence creates sufficient uncertainty regarding the realizability of these deferred income tax assets.

As of October 31, 2002, the Company had net operating loss carryforwards for federal income tax reporting purposes totaling approximately $84,334,000 that expire between 2018 and 2022.

The Internal Revenue Code contains provisions that will limit the availability and utilization of net operating loss carryforwards if certain changes in ownership have taken place or will take place. As of October 31, 2001, an ownership change had occurred and the utilization of $23,897,000 of the Company's net operating loss carryforwards are restricted in use to an amount of approximately $6,843,000 annually.

The differences between the provision for income taxes at the U.S. statutory rate and the Company's effective tax rate is as follows:

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Benefit at statutory rate | (34.0 )% | (34.0 )% | (34.0 )% |
| Non-deductible items | 0.2 % | 11.8 % | 21.2 % |
| State income taxes, net of federal effect | (3.9 )% | (3.6 )% | (3.3 )% |
| Foreign income taxes | 2.0 % | 0.4 % | 0.1 % |
| Other | (2.9 )% | 1.9 % | 0.0 % |
| Increase in valuation allowance | 40.6 % | 23.9 % | 16.3 % |
| Total provision for income taxes | 2.0 % | 0.4 % | 0.3 % |

61

Powered By EDGAR Online    2003.  EDGAR Online, Inc.

**(14) COMMITMENTS AND CONTINGENCIES**

**Litigation**

Beginning in July2001, the Company, certain of its officers and directors, and the underwriters of the Company's initial public offering were named as defendants in a series of class action lawsuits filed in the United States District Court for the Southern District of New York (the "Actions") by parties alleging violations of the securities laws. The complaints were subsequently amended and consolidated into a single complaint. The consolidated complaint alleges certain improprieties regarding the circumstances surrounding the underwriters' conduct during the Company's initial public offering and the failure to disclose such conduct in the registration statement in violation of the Securities Act of 1933, as amended. The consolidated complaint also alleges that, whether or not the Company's officers or directors were aware of the underwriters' conduct, the Company and those officers and directors have statutory liability under the securities laws for issuing a registration statement in connection with the Company's initial public offering that failed to disclose that conduct.

The consolidated complaint also alleges claims solely against the underwriters under the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended. Over 300 other issuers, and their underwriters and officers and directors, have been sued in similar cases pending in the same court. In September2002, the plaintiffs agreed to dismiss the individual defendants for the time being. Management believes that the claims against the Company and any of its officers and directors are without legal merit and intend to defend them vigorously. The Company is not aware of any improper conduct by the Company, its officers and directors, or its underwriters, and the Company denies any liability relating thereto. In addition, the Company's underwriting agreement with its underwriter provides for the indemnification of the Company and its officers and directors for liabilities arising out of misstatements in its registration statement attributable to material non-disclosures by the underwriters. The Company also maintains liability insurance coverage that is expected to substantially cover the costs of defending the claims, once the retention amount has been expended.

The Company has notified its underwriters and insurance companies of the existence of the claims. Recently, motions to dismiss were filed by the underwriters and the issuers with respect to all of the class action cases. The court has not yet ruled on those motions to dismiss, but the Company expects a ruling in the near term. Management believes, after consultation with legal counsel, that the ultimate outcome of this matter will not have a material adverse effect on the Company's results of operations or financial position.

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

In October 2002, a former Indian distributor of the Company asserted a claim for $1,428,000. The distributor claims that the Company is responsible to repurchase certain software products and to reimburse the distributor for certain other operating costs. Management does not believe that the Company is responsible to reimburse the distributor for any operating costs and also believes that the return rights related to any remaining inventory have lapsed. In accordance with the Company's revenue recognition policy, revenue related to the inventory with the distributor in included in deferred revenue as of October 31, 2002. This matter is in the initial stage of discovery; however, management believes, after consultation with legal counsel, that the ultimate outcome of this matter will not have a material adverse effect on the Company's results of operations or financial position.

The Company is a party to certain other legal proceedings arising in the ordinary course of business. Management believes, after consultation with legal counsel, that the ultimate outcome of such legal proceedings will not have a material adverse effect on the Company's results of operations or financial position.

### Operating Lease Agreements

Future minimum lease payments under non-cancelable operating leases as of October 31, 2002 were as follows (in thousands):

|  | Operating Leases |
|---|---|
| Year ending October 31, |  |
| 2003 | $ 3,318 |
| 2004 | 3,102 |
| 2005 | 2,744 |
| 2006 | 2,049 |
| 2007 | 1,444 |
| Thereafter | 465 |
| Total minimum payments | $ 13,122 |

Total rent expense for all of the Company's operating leases was $3,799,000, $3,182,000 and $722,000 for fiscal years 2002, 2001 and 2000, respectively.

### Operating Lease Guarantee

In connection with the acquisition of the server and professional services groups from Tarantella, the Company acquired Tarantella's subsidiary in the United Kingdom. The United Kingdom subsidiary continued as the lessee under certain operating leases for facilities retained and used by Tarantella. The Company and Tarantella have completed assignment agreements with the respective lessors to assign the leases to Tarantella. However, the Company's United Kingdom subsidiary remained on these operating leases as a second guarantor and may be liable under these obligations in the event that Tarantella defaults. Future minimum operating lease payments under these leases extend through 2020 and total $10,518,000. As of October 31, 2002, the Company does not believe that it will be required to make any payments under this guarantee, and therefore, no liability has been recorded.

### UnitedLinux Development

On May 30, 2002, the Company and other Linux vendors including Connectiva, SuSe and TurboLinux announced the organization of UnitedLinux, a new initiative expected to streamline Linux development and certification around a global, uniform distribution of Linux for business. Each of the four Linux companies involved in the initiative will collaborate on the development of one common

63

Powered By EDGAR ONLINE    2003. EDGAR Online, Inc.

core Linux operating system. The Company anticipates bundling current Linux product offerings and services with the UnitedLinux operating system and selling these products under the SCO brand.

Under the initiative, the Company will contribute and fund a portion of the total engineering efforts for the development of UnitedLinux, which is approximately $44,000 per month, for a period of 12months that began in May2002. During October2002, the first UnitedLinux release was completed and a product was made available for shipping to the Company's customers. Under the terms of the development agreement, once the first product release was complete, the Company was obligated to make the remaining future engineering payments, regardless if the Company recognized any revenue on the product. Accordingly, the Company expensed the cost of the remaining engineering efforts totaling $305,000 and has accrued the remaining seven months payment as an accrued liability in the accompanying consolidated balance sheet as of October31, 2002.

Additionally, for products UnitedLinux products sold under the SCO brand, the Company will pay a per-unit royalty. The amounts the Company expects to pay under the UnitedLinux initiative are anticipated to be less than the costs that would be incurred internally to fund Linux development.

In connection with the UnitedLinux effort, the Company made a non-refundable $50,000 capital contribution to UnitedLinux LLC in return for a 25percent ownership interest in this entity. The entity's purpose is to oversee the development of and provide direction to the UnitedLinux effort. Because the Company has a greater than 20percent ownership interest in UnitedLinux LLC, the investment has been recorded using the equity method of accounting. Under the equity method, the Company recognized its portion of the net loss of UnitedLinux LLC in its consolidated statement of operations, which for the year ended October31, 2002, was estimated to be equal the Company's $50,000 investment.

## (15) RESTRUCTURING PLANS

The Company's board of directors has adopted restructuring plans to reduce facilities and personnel. These restructuring plans have resulted in the Company recording restructuring accruals for the costs associated with the reduction in facilities and for severance costs of affected employees.

The following tables summarize the activity related to the restructuring accruals for fiscal years 2001 and 2002 (in thousands):

| | Balance as of October 31, 2000 | Additions | Payments | Adjustments | Balance as of October 31, 2001 |
|---|---|---|---|---|---|
| Restructuring accrual during quarter ended Oct. 31, 2001 | $ — | $ 3,130 | $ (1,725 ) | $ — | $ 1,405 |

64

Powered by EDGAR Online    2003. EDGAR Online, Inc.

During the fourth quarter of fiscal year 2001, the Company announced a restructuring plan to eliminate various positions and to close certain facilities. The $3,130,000 restructuring charge included $2,346,000 related to severance costs and $784,000 related to facilities.

| | Balance as of October 31, 2001 | Additions | Payments | Adjustments | Balance as of October 31, 2002 |
|---|---|---|---|---|---|
| Restructuring accrual during quarter ended Oct. 31, 2001 | $ 1,405 | $ — | $ (1,222 ) | $ — | $ 183 |
| Restructuring accrual during quarter ended Jan. 31, 2002 | — | 4,292 | (2,268 ) | (1,561 ) | 463 |
| Restructuring accrual during quarter ended July 31, 2002 | — | 2,735 | (2,555 ) | — | 180 |
| Restructuring accrual during quarter ended Oct. 31, 2002 | — | 1,262 | (301 ) | — | 961 |
| Total | $ 1,405 | $ 8,289 | $ (6,346 ) | $ (1,561 ) | $ 1,787 |

During the first quarter of fiscal year 2002, in connection with management's plan to reduce operating expenses, the Company announced a restructuring plan that resulted in a charge of $4,292,000. The restructuring included the elimination of various positions within sales, marketing, product development and administration and the elimination of non-essential office space and facilities that will be permanently idle. The $4,292,000 restructuring charge included $872,000 related to severance costs and $3,420,000 related to facilities.

During the third quarter of fiscal year 2002, the Company announced a corporate restructuring that resulted in a charge of $2,735,000. The $2,735,000 restructuring charge included $2,485,000 related to severance costs and $250,000 related to facilities. Also during the third quarter of fiscal year 2002, the Company was successful in negotiating a decrease in the monthly rent for one of its facilities that had been vacated in connection with a previous corporate restructuring. At the time of the restructuring, the estimated future operating lease costs had been accrued based on management's best estimate of the future costs. As a result of the lease renegotiation, the Company recorded a reduction of $1,561,000 to the restructuring accrual.

During the fourth quarter of fiscal year 2002, the Company announced a restructuring plan that resulted in a charge of $1,262,000. The restructuring included the elimination of various positions within sales, marketing, product development and administration and the elimination of non-essential office space and facilities that will be permanently idle. The $1,262,000 restructuring charge included $653,000 related to severance costs and $609,000 related to facilities.

## (16) RELATED PARTY TRANSACTIONS

### Tarantella

As discussed in Note3, the Company acquired certain assets, liabilities and operations from Tarantella during fiscal year 2001. Prior to the acquisition, the Company and Tarantella had entered into a strategic business agreement that provided for certain joint marketing activities between the parties. Additionally, both parties entered into a distribution agreement to sell each other's products. During fiscal year 2001, the Company paid to Tarantella $1,069,000 for the purchase of products that were sold to the Company's customers.

65

Subsequent to the acquisition, the Company and Tarantella have paid certain operating costs on each other's behalf, mostly pertaining to activities in foreign operations. On a monthly basis, each party submits the actual operating costs for reimbursement. Transactions between the two companies decreased significantly through fiscal year 2002, and as of October 31, 2002 the Company had no amounts receivable or payable to Tarantella.

**Canopy**

Canopy was the sole stockholder of the Company upon incorporation. The chairman of the Company's board of directors is the president and chief executive officer and a director of Canopy. Additionally, another director of the Company is the chief financial officer of Canopy. During fiscal year 2002, the Company entered into an operating lease agreement with Canopy for office space for its headquarters in Utah through December 2007. The Company pays Canopy approximately $46,000 per month for this office space.

Prior to fiscal year 2001, the Company entered into certain transactions with Canopy and other entities that are majority-owned by Canopy. These transactions consisted mainly of participating in joint insurance coverage, training and testing services, and rent. During fiscal year 2000, the Company also had sales to other entities that are majority-owned by Canopy of approximately $47,000. During fiscal years 2002 and 2001, the Company did not enter into any revenue transactions with Canopy or its affiliates.

### (17) EMPLOYEE BENEFIT PLAN

Until June 30, 2000, the Company utilized a 401(k) plan sponsored by Canopy for its employees, through which the Company made matching contributions. In June 2000, the Company adopted its own 401(k) plan through which eligible participants may elect to make contributions to the plan, subject to certain limitations under the Internal Revenue Code. Under the terms of the new plan, the Company may make discretionary matching contributions up to predetermined limits to partially match employee contributions to the plan. During fiscal years 2002, 2001 and 2000, the Company contributed $597,000, $301,000 and $145,000, respectively, to the plan for matching contributions.

### (18) CONCENTRATION OF CREDIT RISK AND SIGNIFICANT CUSTOMERS

The Company offers credit terms on the sale of its software products to certain customers. The Company performs ongoing credit evaluations of its customers' financial condition and requires no collateral from its customers. The Company maintains an allowance for uncollectable accounts receivable based upon the expected collectibility of all accounts receivable and such losses have been within management's expectations. As of October 31, 2002 and 2001, no customer accounted for more than ten percent of the total accounts receivable balance. As of October 31, 2002 and 2001, the allowance for bad debts was $348,000 and $362,000, respectively.

During fiscal years 2002 and 2001, no single customer accounted for more than ten percent of the Company's total revenue. During fiscal year 2000, the Company had sales to one customer that accounted for approximately 19 percent of total revenue.

### (19) SEGMENT INFORMATION

The Company's resources are allocated and operating results managed to the operating income (loss) level for each of the Company's three geographic units. The geographic units consist of the Americas, EMEA (Europe, Middle East and Africa) and Asia. The Company made the decision to

66

review and allocate resources by geography during one of the corporate restructurings announced during fiscal year 2002. Revenue, cost of revenue and direct sales and marketing expenses are tracked specifically for each geographic unit. Costs of corporate marketing, research and development and general and administration are allocated to each geographic unit based on the geographic unit's percentage of total revenue.

It is impractical to provide historical operating expense information for three units for years prior to fiscal year 2002 as internal information was not tracked and recorded in this format. Segment disclosures for the Company's operating divisions are as follows for fiscal year 2002 (in thousands):

| | Americas | EMEA | Asia | Corporate | Total |
|---|---|---|---|---|---|
| Revenue | $ 32,973 | $ 24,086 | $ 7,182 | $ — | $ 64,241 |
| Cost of revenue | 11,160 | 5,541 | 1,615 | — | 18,316 |
| Gross margin | 21,813 | 18,545 | 5,567 | — | 45,925 |
| Sales and marketing | 12,837 | 12,253 | 4,464 | — | 29,554 |
| Research and development | 9,001 | 6,591 | 1,966 | — | 17,558 |
| General and administrative | 4,825 | 3,540 | 1,055 | — | 9,420 |
| Other | — | — | — | 13,569 | 13,569 |
| Total operating expenses | 26,663 | 22,384 | 7,485 | 13,569 | 70,101 |
| Loss from operations | $ (4,850 ) | $ (3,839 ) | $ (1,918 ) | $ (13,569 ) | $ (24,176 ) |

Revenue for the Company's geographic units for fiscal years 2001 and 2000 are as follows (in thousands):

| | 2001 | 2000 |
|---|---|---|
| Revenue: | | |
| Americas | $ 21,103 | $ 3,201 |
| EMEA | 14,835 | 367 |
| Asia | 4,503 | 706 |
| Total revenue | $ 40,441 | $ 4,274 |

Long-lived assets, which include property and equipment as well as goodwill and intangible assets, by location consists of the following as of October 31, 2002 and 2001 (in thousands):

| | 2002 | 2001 |
|---|---|---|
| Long-lived assets: | | |
| United States | $ 12,866 | $ 22,491 |
| International | 413 | 1,311 |
| Total long-lived assets | $ 13,279 | $ 23,802 |

## (20) SUBSEQUENT EVENT

### Line of Credit

During December 2002, the Company entered into an arrangement with a commercial bank to provide the Company with a $2,910,000 line of credit. If needed, this line of credit will be used for working capital purposes. The line of credit is secured by a letter of credit from Canopy. The initial interest rate on the line of credit is 3.75 percent and will remain outstanding through October 31, 2003.

67

This report is a copy of the previously issued Arthur Andersen LLP report, which has not been reissued since Arthur Andersen LLP has ceased operations.

**REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS**
**ON FINANCIAL STATEMENT SCHEDULE**

To Caldera International, Inc.:

We have audited in accordance with auditing standards generally accepted in the United States, the consolidated financial statements of Caldera International, Inc. and subsidiaries and have issued our report thereon dated November 30, 2001. Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. Schedule II—Valuation and Qualifying Accounts is the responsibility of the Company's management and is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

ARTHUR ANDERSEN LLP

Salt Lake City, Utah
November 30, 2001

68

CALDERA INTERNATIONAL, INC.
AND SUBSIDIARIES
SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS
FOR THE YEARS ENDED OCTOBER 31, 2002, 2001 AND 2000
(in thousands)

| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for doubtful accounts:** | | | | |
| Year ended October 31, 2002 | $ 362 | $ 198 | $ (212)(a) | $ 348 |
| Year ended October 31, 2001 | 312 | 470 | (420)(a) | 362 |
| Year ended October 31, 2000 | 90 | 325 | (103)(a) | 312 |
| **Inventory reserves:** | | | | |
| Year ended October 31, 2002 | 269 | 18 | (172)(b) | 115 |
| Year ended October 31, 2001 | 284 | 275 | (290)(b) | 269 |
| Year ended October 31, 2000 | 354 | 43 | (113)(b) | 284 |
| **Allowance for sales returns:** | | | | |
| Year ended October 31, 2002 | 2,199 | 2,602 | (3,746)(c) | 1,055 |
| Year ended October 31, 2001 | 364 | 2,270 | (435)(c) | 2,199 |
| Year ended October 31, 2000 | 169 | 555 | (360)(c) | 364 |
| **Restructuring accrual:** | | | | |
| Year ended October 31, 2002 | 1,405 | 8,289 | (7,907)(d) | 1,787 |
| Year ended October 31, 2001 | — | 3,130 | (1,725)(d) | 1,405 |

(a)
Represents write-offs of uncollectable accounts receivable

(b)
Represents inventory destroyed or scrapped

(c)
Represents product returns, product sell-through or transfers to deferred revenue

(d)
Represents cash payments and adjustments to initial accruals

69

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

The Audit Committee of the Board of Directors annually considers and recommends to the Board the selection of the Company's independent auditor. Arthur Andersen LLP ("Andersen") served as independent auditor of the Company beginning in 1998. In April 2002, the Audit Committee determined that it would be in the best interest of the Company to solicit proposals from other independent audit firms. In making this decision, the Audit Committee considered all of the relevant factors regarding Andersen's ability to continue to provide services to the Company on an on-going basis. After an extensive process, the Company and the Audit Committee recommended to the Board that Andersen be dismissed and replaced with KPMG LLP ("KPMG") as the Company's independent auditor for the 2002 fiscal year. This recommendation was approved by Board action on May 8, 2002.

Andersen has issued unqualified or "clean" opinions for each of the two years ending October 31, 2001 and 2000. For the years ended October 31, 2001 and 2000, and through the current date, there were no disagreements with Andersen on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Andersen, would have caused it to make reference to the subject matter of the disagreement in connection with its reports. Additionally, there were no reportable events as defined in Item 304(a)(1)(v) of Regulation S-K.

During the two years ended October 31, 2001 and 2000, and through May 8, 2002, the Company did not consult with KPMG on the application of accounting principles to a specific transaction, the type of opinion that may be rendered on the Company's consolidated financial statements or any other matters as defined in Item 304(a)(2)(i) and (ii) of Regulation S-K.

## PART III

### Item 10. Directors and Executive Officers of the Registrant

Information with respect to this item may be found in the section titled "Executive Officers and Directors" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2002 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

### Item 11. Executive Compensation

Information with respect to this item may be found in the section titled "Historical Compensation of the Company" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2002 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management

Information with respect to this item may be found in the section titled "Security Ownership of Certain Beneficial Owners and Management" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2002 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

### Item 13. Certain Relationships and Related Transactions

Information with respect to this item may be found in the section titled "Certain Relationships and Related Transactions" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2002 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

70

**Item 14. Controls and Procedures**

Based on their evaluation as of a date within 90 days of the filing date of this Annual Report on Form 10-K, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) under the Securities Exchange Act of 1934 (the "Exchange Act")) are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. There were no significant changes in the Company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

**Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K**

(a)
  The following documents are filed as part of this report:

  (1)
    Consolidated Financial Statements: See Index to Consolidated Financial Statements at Item 8 on page 31 of this report.

  (2)
    Financial Statement Schedule: See Index to Consolidated Financial Statements at Item 8 on page 31 of this report.

  (3)
    Exhibits are incorporated herein by reference or are filed with this report as indicated below:

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Reorganization by and among Caldera Systems, Inc., Caldera International, Inc. ("Registrant") and The Santa Cruz Operation, Inc., and related amendments (incorporated by reference to Exhibit 2.1 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)). |
| 3.1 | Amended and Restated Certificate of Incorporation of Caldera International, Inc. (incorporated by reference to Exhibit 3.1 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)). |
| 3.2 | Amended and Restated Bylaws of Caldera International Inc. (incorporated by reference to Exhibit 3.2 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)). |
| 4.1 | Form of certificate of common stock (incorporated by reference to Exhibit 4.1 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)). |
| 10.1 | Caldera 1998 Stock Option Plan (incorporated by reference to Exhibit 10.3 to Caldera's Registration Statement on Form S-1 (File No. 333-94351)). |
| 10.2 | Caldera 1999 Omnibus Stock Incentive Plan, as amended (incorporated by reference to Exhibits 10.3 through 10.4 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)). |

71

10.3   Caldera 2000 Employee Stock Purchase Plan, as amended (incorporated by reference to Exhibit 10.9 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.4   GNU General Public License (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1 (File No. 333-94351)).

10.5   Form of Indemnification Agreement by and between Caldera and its executive officers and directors (incorporated by reference to Exhibit 10.24 to Caldera's Registration Statement on Form S-1 (File No. 333-94351)).

10.6   Master Lease dated March 30, 2000, between Caldera and 106 th South Business Park, L.C. (incorporated by reference to Exhibit 10.4 to Caldera's quarterly report on Form 10-Q for the quarter ended April 30, 2000).

10.7   Form of Senior Executive Severance Agreement (incorporated by reference to Exhibit 10.31 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.8   Form of Secured Convertible Promissory Note issued by The Santa Cruz Operation, Inc. to Caldera Systems, Inc. (incorporated by reference to Exhibit 10.43 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.9   Form of Security Agreement between The Santa Cruz Operation, Inc., as debtor, and Caldera Systems, Inc., as secured party (incorporated by reference to Exhibit 10.44 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.10  Form of Intercreditor Agreement among The Canopy Group, Inc., The Santa Cruz Operation, Inc. and Caldera Systems, Inc. (incorporated by reference to Exhibit 10.45 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.11  Form of Loan Agreement between The Canopy Group, Inc., The Santa Cruz Operation, Inc. and Caldera Systems, Inc. (incorporated by reference to Exhibit 10.46 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.12  Form of Security Agreement between The Canopy Group, Inc. and The Santa Cruz Operation, Inc. (incorporated by reference to Exhibit 10.47 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.13  Form of Secured Convertible Promissory Note issued by The Santa Cruz Operation, Inc. to The Canopy Group, Inc. (incorporated by reference to Exhibit 10.48 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

72

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

10.14   Form of Secured Promissory Note to be issued by Caldera International, Inc. to The Santa Cruz Operation, Inc. (incorporated by reference to Exhibit 10.49 to Caldera's Registration Statement on Form S-4 (File No. 333-45936)).

10.15   Form of Security Agreement between Caldera International, Inc., as debtor, and The Santa Cruz Operation, Inc., as secured party (incorporated by reference to Exhibit 10.50 to Caldera's Registration Statement on Form S-4 (File No. 333-45936) ).

10.16   Severance Agreement between Ransom H. Love and Caldera International, Inc.

21.1    Subsidiaries of the Registrant

23.1    Consent of KPMG LLP, Independent Auditors

23.2    Consent of Authur Andersen LLP, Independent Public Accountants

99.1    Section 906 Certifications

+

   Confidential treatment was granted by the Commission for certain provisions. Omitted material for which confidential treatment has been granted has been filed separately with the Commission.

   (b)
      Reports on Form 8-K

On August 21, 2002, the Company submitted a current report on form 8-K that updated the Company's beneficial ownership.

73

Powered by EDGAR Online     2003.  EDGAR Online, Inc.

**Signatures**

Pursuant to the requirements of Section13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized, on January27, 2003.

CALDERA INTERNATIONAL,INC.
By:                  /s/ ROBERT K. BENCH  Robert K.
                     Bench
                     *Chief Financial Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **Principal Executive Officer:** | | |
| /s/ DARL C. MCBRIDE  Darl C. McBride | President and Chief Executive Officer | January 27, 2003 |
| **Principal Financial and Accounting Officer:** | | |
| /s/ ROBERT K. BENCH  Robert K. Bench | Chief Financial Officer | January 27, 2003 |
| **Additional Directors:** | | |
| /s/ DARCY MOTT  Darcy Mott | Director | January 27, 2003 |
| /s/ RALPH J. YARRO III  Ralph J. Yarro III | Chairman of the Board | January 27, 2003 |
| /s/ ED I. IACOBUCCI  Ed I. Iacobucci | Director | January 27, 2003 |
| /s/ STEVEN M. CAKEBREAD  Steven M. Cakebread | Director | January 27, 2003 |
| /s/ THOMAS P. RAIMONDI  Thomas P. Raimondi | Director | January 27, 2003 |
| /s/ R. DUFF THOMPSON  R. Duff Thompson | Director | January 27, 2003 |

74

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

**Certifications of the Chief Executive Officer and the Chief Financial Officer**

I, Darl C. McBride, certify that:

1.
   I have reviewed this annual report on Form 10-K of Caldera International, Inc;

2.
   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.
   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.
   The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   (a)
      designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b)
      evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   (c)
      presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.
   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee or registrant's board of directors (or persons performing the equivalent function):

   (a)
      all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   (b)
      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.
   The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

January 27, 2003

/s/ DARL C. MCBRIDE   Darl C. McBride,
*Chief Executive Officer*

75

Powered by EDGAR Online   2003.  EDGAR Online, Inc.

I, Robert K. Bench, certify that:

1.
    I have reviewed this annual report on Form10-K of Caldera International, Inc;

2.
    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.
    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.
    The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules13a-14 and 15d-14) for the registrant and we have:

    (a)
        designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)
        evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90days prior to the filing date of this annual report (the "Evaluation Date"); and

    (c)
        presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.
    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee or registrant's board of directors (or persons performing the equivalent function):

    (a)
        all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)
        any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.
    The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

January27, 2003

/s/ ROBERT K. BENCH   Robert K. Bench,
*Chief Financial Officer*

Powered By EDGAR ONLINE    2003.  EDGAR Online, Inc.

QuickLinks  -- Click here to rapidly navigate through this document

Exhibit 10.16

## SEVERANCE AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into this 24th day of July, 2002, by and between CALDERA INTERNATIONAL, INC., a Delaware corporation ("Caldera"), and RANSOM LOVE, an individual ("Mr.Love"), based on the following:

### Premises

A. Mr.Love has served as the president and chief executive officer of Caldera, and on June26, 2002 announced his resignation. Mr.Love currently holds options (the "Options") to acquire 328,414 shares of Caldera common stock, a portion of which are still subject to vesting. The exercise price of such options ranges from $1.12 per share to $24.00 per share.

B. Mr.Love has agreed to remain with Caldera and to provide transitional services to assist the new chief executive officer of Caldera.

C. Caldera agreed on June26, 2002, to pay Mr.Love severance and certain other benefits as well as issue him 175,000 shares of its restricted common stock in connection with his resignation as chief executive officer and the cancellation of his options and this Agreement is intended to document such prior agreement.

### Agreement

NOW, THEREFORE, based on the foregoing premises, which are incorporated herein by this reference, and for and in consideration of the mutual promises and covenants hereinafter set forth and the benefit to the parties to be derived therefrom, it is hereby agreed as follows:

1. *Severance.* In connection with the resignation and termination of Mr.Love's employment and position with Caldera, Caldera agrees to make, on or about July31, 2002, the following severance payments and issuances:

    1.1 Caldera shall issue 175,000 shares of its common stock to Mr.Love valued at the closing price of $0.60 per share on the date the issuance was agreed to, *i.e.,* June26, 2002.

    1.2 Caldera shall make a severance payment of $304,857.38 to Mr.Love.

    1.3 Caldera shall provide medical, dental, life insurance, and RD&D coverage to Mr.Love through December31, 2002, in an aggregate amount not to exceed $4,050.00.

    1.4 Caldera shall continue Mr.Love's base salary through July31, 2002 and, as part of Mr.Love's final regular paycheck, Caldera shall compensate Mr.Love for any unused and accrued PTO.

2. *Taxes.* All payments set forth in Section1 above shall be subject to appropriate withholding taxes, including appropriate withholding taxes on the issuance of the 175,000 shares of common stock.

3. *Termination and Resignation.* Mr.Love's resignation as chief executive officer of Caldera was effective June26, 2002. The cancellation of his Options and his rights under prior agreements with Caldera shall be effective upon receipt of the items provided for in Sections1.1 and 1.2 above (the "Effective Date").

4. *Termination of Options.* The options held by Mr.Love to purchase up to 328,414 shares of Caldera common stock shall be of no further force and effect and all rights thereunder are terminated as of the Effective Date. Mr.Love shall deliver the original of the options to Caldera.

5. *Representations and Warranties of Mr. Love*. Mr.Love represents and warrants to Caldera with the express intention that Caldera rely upon such representations and warranties and with the knowledge that Caldera will rely upon same:

5.1 Mr.Love is not a party to, subject to, or bound by any loan agreement, security agreement, lien, or other agreement or instrument of any kind, or any judgment, order, writ, or injunction or decree of any court or governmental body that conflicts with Mr.Love's obligations under this Agreement or that would prohibit, prevent, or affect the carrying out of the transactions contemplated by this Agreement or the performance by Mr.Love.

5.2 Mr.Love is the sole legal and beneficial owner of all of the options terminated pursuant to this Agreement, free and clear of any lien, claim, demand, encumbrance, security interest, or restriction on transfer of any nature whatsoever, and Mr.Love has full right, power, and authority to sell and transfer such options to Caldera, free and clear of any liens, claims, demands, encumbrances, security interests, or restrictions on transfer, other than restrictions imposed by federal and state securities laws.

5.3 Mr.Love served as the chief executive officer of Caldera up until June26, 2002, and is currently a director of Caldera. Mr.Love has had full access to information concerning the business, operations, and plans of Caldera.

5.4 Mr.Love has reviewed the public reports of Caldera, including:

- Caldera's annual report on Form10-K for the year ended October31, 2001;

- Caldera's quarterly reports on Form10-Q for the quarters ended January31, 2002, and April30, 2002;

- Caldera's definitive proxy statement for the stockholder meeting held March4, 2002; and

- Caldera's reports on Form8-K reporting events occurring on April1, 2002; May8, 2002, and May8, 2002.

5.5 Mr.Love understands that the shares of common stock he will receive under the terms of this Agreement may not be as valuable as the options he has agreed to terminate under certain circumstances such as a substantial increase in the trading price of the common stock. Mr.Love is not entering into this Agreement based on any representation or warranty by Caldera or of any of Caldera's directors, officers, or employees that the shares he receives are more valuable than the options he has agreed to terminate. In reaching his decision, Mr.Love has relied solely on his own analysis of the value of receiving stock in exchange for the termination of his options.

5.6 All representations and warranties of Mr.Love set forth in this Agreement will survive the consummation of the transactions contemplated by this Agreement.

5.7 Mr.Love understands the meaning and legal consequences of the representations and warranties contained in this Agreement and agrees to indemnify and hold harmless Caldera and its directors and officers from and against any and all loss, damage, or liability due to or arising out of a breach of or the inaccuracy of any representation or warranty of Mr.Love set forth in this Agreement. Notwithstanding any of the representations, warranties, acknowledgments, or agreements made herein by Mr.Love, Mr.Love does not hereby or in any other manner waive any right granted to Mr.Love under federal or state securities laws.

6. *Representation of Caldera*. Caldera has taken all corporate action necessary to duly authorize the transactions contemplated by this Agreement and has all requisite power and authority to enter into this Agreement and to perform all of its obligations under this Agreement.

2

## 7. *Confidentiality.*

7.1 *Obligations of Mr. Love.* Mr. Love agrees to keep the facts of and terms of this Agreement confidential, except Mr. Love may disclose the substance of this Agreement to his spouse, counsel and financial advisor. Mr. Love also agrees to refrain from making derogatory or disparaging statements about Caldera and its current and past customers and employees, or making such statements as may serve to undermine Caldera's image to the public.

7.2 *Obligations of Caldera.* Caldera agrees to keep the facts of and terms of this Agreement confidential, except as required by law, and further agrees that it will refrain from making derogatory or disparaging statements about Mr. Love, Mr. Love's conduct and performance while employed by Caldera or making such statements as may serve to undermine Mr. Love's professional image.

## 8. *Release and Indemnification.*

8.1 *Release and Indemnification by Mr. Love.* Effective upon receipt of the consideration provided for in Sections 1.1 and 1.2 above and except as otherwise set forth in this Agreement, Mr. Love, on behalf of himself, his heirs, executors, administrators, agents, successors, assigns and all affiliated persons or entities, both past and present, waives, discharges, and releases all claims against Caldera, their shareholders, directors, officers, agents and employees ("the Releasees"), and agrees to hold them harmless from any and all liabilities, debts, demands, contracts, promises, agreements, claims, causes of action, injuries, costs, attorneys' fees, salary, compensation, benefits and/or damages of any kind or character, both known and unknown, including any claim for attorneys' fees and including, without limitation, all claims directly or indirectly related to or arising out of matters relating in any way to Mr. Love's employment with or termination from Caldera. Mr. Love understands and agrees that this release extends to all claims arising before signing this release of every nature and kind whatsoever, whether known or unknown by Mr. Love. Nothing in this Agreement is intended to release or adversely affect any ownership interest, or claims to additional ownership interest, Mr. Love may have or may have had in Caldera, Inc., a Utah corporation. Mr. Love agrees to indemnify and hold Caldera and its shareholders, directors, officers, agents and employees harmless from any liabilities, debts, demands, causes of action, injuries, costs, attorneys' fees or damages of any kind arising out of his breach of this Agreement.

8.2 *Release and Indemnification by Caldera.* Effective upon receipt of the consideration provided for in Sections 1.1 and 1.2 above and except as otherwise set forth in this Agreement, Caldera, its subsidiaries, parents and affiliated entities, waives, discharges, and releases all claims against Mr. Love and agrees to hold him harmless from any and all liabilities, debts, demands, contracts, promises, agreements, claims, causes of action, injuries, costs, attorneys' fees, salary, compensation, benefits and/or damages of any kind or character, both known and unknown, including any claim for attorneys' fees and including, without limitation, all claims directly or indirectly related to or arising out of matters relating in any way to Mr. Love's employment with or termination from Caldera: provided that, such release shall not include any criminal conduct by Mr. Love, or any conduct involving willfull or intentional harm to the corporation. Caldera understands and agrees that this release extends to all claims arising before signing this release of every nature and kind whatsoever, whether known or unknown by Caldera, except as specifically set forth above. Caldera agrees to indemnify and hold Mr. Love harmless from any liabilities, debts, demands, causes of action, injuries, costs, attorneys' fees or damages of any kind arising out of Caldera's breach of this Agreement.

3

9. *Further Agreements.* In addition to the waivers and releases contained in Section 8 above, Mr. Love further agrees:

9.1 In consideration of the benefits provided above, Mr. Love also specifically releases the Releasees from any and all liabilities, claims, causes of action, demands for damages or remedies of any kind or character, including claims for attorneys' fees and legal costs, that arise under or from the Age Discrimination in Employment Act of 1967, as amended, and that are related to or arise out of his employment or termination of his employment with Caldera, up to and including the date of this Agreement.

9.2 Mr. Love understands and acknowledges that by this Agreement he does not waive any rights or claims relating to age discrimination that may arise after the date of his termination.

9.3 Mr. Love is advised to consult with an attorney regarding this Agreement prior to agreeing to and signing it.

9.4 Mr. Love acknowledges that, prior to signing this Agreement, he has forty-five (45) days from the date of his receipt of this Agreement within which to consider it, and to consult with an attorney of his choice regarding it. Should he nevertheless elect to execute this Agreement sooner than 45 days after he has received it, he specifically and voluntarily waives the right to claim or allege that he has not been allowed by Caldera or by any circumstances beyond his control to consider this Agreement for a full 45 days.

9.5 Mr. Love acknowledges and agrees that this Agreement will not become effective or enforceable until after seven days from the date it is signed by him. During that seven-day period, Mr. Love understands and agrees that he may revoke this Agreement by delivering written notice of his revocation to Human Resources at the Corporate Headquarters.

9.6 Mr. Love acknowledges that he has read this Agreement and that the language and meaning of this Agreement are sufficiently clear and that he has understood it.

10. *Registration Rights.* The 175,000 shares of common stock shall be issued to Mr. Love pursuant to an effective registration on Form S-8 and, consequently, will not be "restricted securities" as defined in Rule 144 promulgated under the Securities Act of 1933, as amended. Mr. Love agrees that he will not sell, transfer, or hypothecate such shares on or before October 31, 2002. The certificates representing the shares shall contain a legend reflecting the foregoing restrictions on transfer.

11. *Noncompetition.* Mr. Love shall not, for a period of six months after June 26, 2002, engage in, support, or facilitate: (i) the development, creation, marketing, sales, promotion, distribution, licensing, or commercialization of any Linux product which competes with any Linux product of Caldera; or (ii) any business involving the commercial distribution of any existing or future version of Linux. Said six month period shall be extended by any period of time during which Mr. Love is not in compliance with this obligation. This paragraph 11 shall be limited to the geographic markets in or to which the products or services of Caldera are now or hereafter marketed, distributed, licensed, used, sold, commercialized, or delivered. Notwithstanding the forgoing, the provisions of this paragraph 11 will not apply to the acceptance by Mr. Love of a position with UnitedLinux, LLC. Mr. Love acknowledges that this paragraph 11 is reasonable and is necessary for the legitimate protection of Caldera, and will not deprive Mr. Love of a reasonable opportunity to practice his profession or trade.

12. *No Admission.* Mr. Love expressly agrees and acknowledges that this Agreement cannot be construed as an admission of or evidence of wrongdoing with respect to the termination of Mr. Love, nor is it an admission of or evidence that Love or any employee of Caldera is other than an at-will employee.

4

Powered By EDGAR Online    2003. EDGAR Online, Inc.

13. *No Assignment.* Mr.Love represents and warrants that there has been no assignment or other transfer of any claims he has or may have as against Caldera.

14. *Arbitration.* All disputes under this Agreement shall be resolved by final and binding arbitration in the County of Utah, State of Utah, before an arbitrator agreed upon by the parties and judgment upon the award rendered may be entered in any court having jurisdiction.

15. *Survival.* The representations and warranties of the respective parties set forth herein shall survive the date of closing, the consummation of the transactions contemplated in this Agreement, and the delivery of the shares of common stock pursuant hereto.

16. *Governing Law.* This Agreement shall be governed by and construed under and in accordance with the laws of the state of Utah.

17. *Entire Agreement.* This Agreement is the only agreement or understanding between parties, with the exception of that certain Proprietary Information Agreement that Mr.Love previously executed, and supersedes and is controlling over any and all prior existing agreements or communications between the parties, except as set forth in the Proprietary Information Agreement concerning confidential or proprietary information and Mr.Love's covenant not to compete. All negotiations, commitments, and understandings acceptable to both parties have been incorporated in this Agreement and the accompanying termination letter.

18. *Severability.* If any provision of this Agreement or the application of such provisions to any person or circumstance shall be held invalid or unenforceable, the remainder of this Agreement or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be effected thereby.

19. *Attorneys' Fees.* If any suit, action, or proceeding is brought to enforce any term or provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs, and expenses incurred, in addition to any other relief to which such party may be legally entitled.

20. *Execution in Counterparts.* This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument.

21. *No Waiver.* Every right and remedy provided herein shall be cumulative with every other right and remedy, whether conferred herein, in law, or in equity, and may be enforced concurrently herewith, and no waiver by any party of the performance of any obligation of the other shall be construed as a waiver of the same or any other default then, theretofore, or thereafter occurring or existing.

22. *Expenses.* Each of the parties shall bear its own costs and expenses, including legal fees, incurred in connection with this Agreement and the transactions contemplated hereby.

23. *No Third-Party Beneficiaries.* This Agreement is for the sole benefit of the parties hereto and nothing herein expressed or implied shall give, or be construed to give, any other person any legal or equitable rights hereunder.

24. *Amendment.* This Agreement may not be amended except as mutually agreed to in writing by the parties.

5

IN WITNESS WHEREOF, the parties to this Agreement have executed the same as of the date first above written.

Caldera:
CALDERA INTERNATIONAL, INC.
By:                    /s/ DARL MCBRIDE
                       Darl McBride, CEO

Mr. Love:
CALDERA INTERNATIONAL, INC.
/s/ RANSOM LOVE   Ransom Love

6

QuickLinks
    Exhibit 10.16

QuickLinks  -- Click here to rapidly navigate through this document

Exhibit21.1

**Caldera International, Inc list of Subsidiaries**

SCO Operations,Inc. (formerly Caldera Systems, Inc (a US Company))

SCO Global,Inc. (formerly Caldera Global, Inc (a US Company))

The SCO Group,Ltd. (formerly Caldera EuropeLtd (a UK Company))

The SCO Group (Deutschland) GmbH (formerly Caldera Deutschland GmbH (a German Company))

SCO Japan,Ltd. (formerly Caldera KK (a Japan Company))

The SCO Group (France) Sarl (formerly The Santa Cruz Operation (France) Sarl (a France Company))

The SCO Group (Italia) Srl (formerly The Santa Cruz Operation (Italia) Srl (a Italy Company))

SCO Canada, Inc (a Canada Company)

1

Powered By EDGAR Online    2003. EDGAR Online, Inc.

QuickLinks
　　Exhibit 21.1

<u>QuickLinks</u>  -- Click here to rapidly navigate through this document

Exhibit 23.1

**Independent Auditors' Consent**

The Board of Directors and Stockholders
Caldera International, Inc.:

We consent to the incorporation by reference in Registration Statement No.s 333-43822, 333-97865, and 333-100105 on Form S-8 and Registration Statement No. 333-65658 on Form S-3 of Caldera International, Inc. of our report dated January 27, 2003, on the consolidated balance sheet of Caldera International, Inc. and subsidiaries as of October 31, 2002, and the related consolidated statements of operations and comprehensive loss, stockholders' equity, and cash flows for the year then ended, which report appears in the October 31, 2002 Annual Report on Form 10-K of Caldera International, Inc.

/s/ KPMG LLP

Salt Lake City, Utah
January 27, 2003

QuickLinks
    Exhibit 23.1

QuickLinks  -- Click here to rapidly navigate through this document

Exhibit 23.2

This consent is a copy of the previously issued Arthur Andersen LLP consent, which has not been reissued since Arthur Andersen LLP has ceased operations. The prior period financial statements have been revised to retroactively reflect a reverse stock split approved on March 4, 2002 and to include the transitional disclosures required by Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets,* which was adopted by the Company as of November 1, 2001.

CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation of our reports included in this Form 10-K, the Company's previously filed Registration Statement on Form S-8, File No. 333-43822.

Arthur Andersen LLP

Salt Lake City, Utah
January 15, 2001

QuickLinks
    Exhibit 23.2
CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

QuickLinks -- Click here to rapidly navigate through this document

Exhibit99.1

**Section906 Certifications**

Pursuant to 18 U.S.C. 1350, as created by Section906 of the Sarbanes-Oxley Act of 2002, the following certifications were made to accompany the Form10-K.

Certification of the Chief Financial Officer of
Caldera International,Inc. pursuant to 18 U.S.C. 1350

In connection with the annual report of Caldera International,Inc. (the "Company") on Form10-K for the year ended October31, 2002, Robert K. Bench hereby certifies, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

1.
    The annual report fully complies with the requirements of Section13(a) of the Securities Exchange Act of 1934; and

2.
    The information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of the Company.

January27, 2003

/s/ ROBERT K. BENCH  Robert K. Bench, Chief Financial Officer

The above certification is furnished solely to accompany the Report pursuant to Section906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350) and is not being filed as part of the Form10-K or as a separate disclosure statement.

Pursuant to 18 U.S.C. 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the following certifications were made to accompany the Form 10-K.

Certification of the Chief Financial Officer of
Caldera International, Inc. pursuant to 18 U.S.C. 1350

In connection with the annual report of Caldera International, Inc. (the "Company") on Form 10-K for the year ended October 31, 2002, Darl C. McBride hereby certifies, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

1. The annual report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2. The information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of the Company.

January 27, 2003

/s/ DARL C. MCBRIDE  Darl C. McBride, Chief Executive Officer

The above certification is furnished solely to accompany the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350) and is not being filed as part of the Form 10-K or as a separate disclosure statement.

QuickLinks
    Exhibit 99.1

Powered By EDGAR Online    2003.  EDGAR Online, Inc.

# End of Filing

Powered By **EDGAR**    2003.  EDGAR Online, Inc.