Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> NOVELL, INC., <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION AND IN SUPPORT OF SCO'S CROSS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Case No. 2:04CV00139 <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

I.      NOVELL SOLD THE ENTIRE UNIX BUSINESS TO SANTA CRUZ UNDER
        THE APA........................................................................................................ 3

II.     NOVELL RETAINED A LIMITED INTEREST IN THE BINARY
        ROYALTIES DUE UNDER EXISTING SVRX LICENSES........................... 5

        A.      Novell's Interest Is Limited to SVRX Licenses Transferred by the APA............. 5

        B.      The "SVRX Royalties" Refer Only to Binary Royalties. ....................... 9

        C.      The "SVRX Royalties" Do Not Include Fees from the Licensing of
                UnixWare........................................................................................... 10

        D.      The Agreements at Issue Are Not Subject to the Prior-Approval
                Requirement........................................................................................ 12

        E.      SCO Has Complied with Amendment No. 2. ....................................... 13

III.    SCO'S POSITION ACCURATELY REFLECTS THE INTENT OF THE APA
        AS SHOWN BY THE EXTRINSIC EVIDENCE.......................................... 14

        A.      Statements of Relevant Witnesses. ..................................................... 15

        B.      The Parties' Course of Performance. .................................................. 18

IV.     THE SUN AND MICROSOFT AGREEMENTS ARE NOT EXISTING SVRX
        LICENSES AS TO WHICH NOVELL HAS ANY INTEREST. .................... 24

        A.      The 2003 Sun Agreement. ................................................................... 24

        B.      The 2003 Microsoft Agreement.......................................................... 26

V.      NOVELL'S REQUEST FOR A PRELIMINARY INJUNCTION. ................. 27

LEGAL STANDARD ON SUMMARY JUDGMENT ................................................ 30

ARGUMENT ............................................................................................................ 30

I.     THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY
       JUDGMENT. ................................................................................................ 30

       A.     The Governing Law of Contract Interpretation. ..................................... 31

       B.     The SVRX Royalties Were Those Due Under the "Existing" SVRX
              Licenses. ................................................................................................ 35

       C.     The "SVRX Royalties" Refer Only to Binary Royalties. ..................... 37

       D.     The "SVRX Royalties" Do Not Include Fees from the  Licensing of
              UnixWare Products. ............................................................................... 40

       E.     The Sun and Microsoft Agreements Do Not Implicate the Prior-
              Approval Requirement or Amendment No. 2. ........................................ 42

       F.     Even If the Agreements at Issue Were Deemed to Be SVRX Licenses, an
              Allocation Would Be Required. .............................................................. 46

II.    NOVELL HAS NOT ESTABLISHED ANY ENTITLEMENT TO A
       PRELIMINARY INJUNCTION. .................................................................... 47

       A.     The Controlling Legal Standards. .......................................................... 47

       B.     Novell Has Not Shown a Substantial Likelihood of Success on the
              Merits. .................................................................................................... 48

       C.     Novell Has Not Established That It Would Suffer Irreparable Harm
              Without a Preliminary Injunction. ......................................................... 51

              1.     Risk of an Uncollectible Judgment Does Not Constitute
                     Irreparable Harm. .......................................................................... 52

              2.     Novell's Delay Precludes Any Finding of Irreparable Harm. ........ 54

D.     The Balance of Hardships Heavily Favors SCO.................................................... 57

E.     The Proposed Injunction Is Adverse to the Public Interest................................... 59

F.     Novell Should Be Required to Post Substantial Security Before Any
Preliminary Injunction Could Lawfully Issue....................................................... 60

CONCLUSION............................................................................................................................ 63

## TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Allen Organ Co. v CBS, Inc.</u>, No. 84 Civ. 3856 (SWK), 1986 WL 4901 (S.D.N.Y. Apr. 21, 1986) ............................................................................................................................ 55

<u>Aspen Limousine Serv., Inc. v. Colo. Mountain Express, Inc.</u>, 891 F. Supp. 1450 (D. Colo. 1995) ....................................................................................................................... 57, 59

<u>Bainbridge v. Stoner</u>, 6 Cal. 2d 423 (1940) ............................................................... 54

<u>Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.</u>, 132 F.3d 701 (Fed. Cir. 1997) .......................................................................................................................... 57

<u>Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co.</u>, 214 F.3d 1183 (10th Cir. 2000) .................................................................................................................. 30

<u>Boyer v. Bd. of County Comm'rs of Johnson County</u>, 922 F. Supp. 476 (D. Kan. 1996) ........... 30

<u>Bristol Tech. Inc. v. Microsoft Corp.</u>, 42 F. Supp. 2d 153 (D. Conn. 1998) ................................ 55

<u>Cal. Sate Auto. Ass'n Inter-Ins. Bur. v. Superior Ct.</u>, 177 Cal. App. 3d 855 (1986) .................. 32

<u>Citibank N.A. v. Citytrust</u>, 756 F.2d 273 (2d Cir. 1985) ........................................................ 55, 56

<u>City of Philadelphia v. One Reading Ctr. Assocs.</u>, 143 F. Supp. 2d 508 (E.D. Pa. 2001) ........... 62

<u>Continental Oil Co. v. Frontier Refining Co.</u>, 338 F.2d 780 (10th Cir. 1964) ............................ 61

<u>Coquina Oil Corp. v. Transwestern Pipeline Co.</u>, 825 F.2d 1461 (10th Cir. 1987) .................... 61

<u>Crestview Cemetery Ass'n v. Dieden</u>, 356 P.2d 171 (Cal. 1960) ......................................... 34, 35

<u>David v. City & County of Denver</u>, 101 F.3d 1344 (10th Cir. 1996).......................................... 30

<u>Docusign, Inc. v. Sertifi, Inc.</u>, No. C06-0906Z, 2006 WL 3000134 (W.D. Wash. Oct. 19, 2006) ......................................................................................................................... 57, 59

Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384 (2006) ........................................................ 31, 32

Ferguson v. Tabah, 288 F.2d 665 (2d Cir. 1961) ........................................................ 61

Fin. & Sec. Prods. Ass'n v. Diebold, Inc., No. C 04-04347 WHA, 2005 WL 1629813
(N.D. Cal. July 8, 2005) ........................................................ 59

Freedberg v. Landman, 930 F. Supp. 851 (S.D.N.Y. 1996) ........................................................ 49

GHK Assocs. v. Mayer Group, Inc., 224 Cal. App. 3d 856 (1990) ........................................................ 54

Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal, 126 S. Ct. 1211 (2006) ........... 48

Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc., 24 F. Supp. 2d 120 (D.
Mass. 1998) ........................................................ 58, 59

Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002) ........................................................ 53

Grupo Mexicano de Desarrollo SA v. Alliance Bond Fund Inc., 527 U.S. 308 (1999) ......... 47, 52

GTE Corp. v. Williams, 731 F.2d 676 (10th Cir. 1984) ........................................................ 55

Heckmann v. Ahamson, 168 Cal. App. 3d 119 (1985) ........................................................ 54

Heideman v. S. Salt Lake City, 348 F.3d 1182 (10th Cir. 2003) ........................................................ 52

Hernandez v. Badger Constr. Equip. Co., 28 Cal. App. 4th 1791 (1994) ........................................................ 34, 35

Hess v. Ford Motor Co., 27 Cal. 4th 516 (2002) ........................................................ 33

Hicks v. City of Watonga, 942 F.2d 737 (10th Cir. 1991) ........................................................ 30

Home-Stake Prod. Co. v. Talon Petro., C.A., 907 F.2d 1012 (10th Cir. 1990) ........................................................ 52

Honolulu Joint Apprenticeship & Training Comm. of United Ass'n Local Union No.
675 v. Foster, 332 F.3d 1234 (9th Cir. 2003) ........................................................ 53

Ill. Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679 (Fed. Cir. 1990) ........................................................ 57

In re Fredeman Litig., 843 F.2d 821 (5th Cir. 1988) .................................... 52

In re Kamand Constr., Inc., 298 B.R. 251 (Bankr. M.D. Pa. 2003)................................ 53

In re Qwest Communications Int'l, Inc. Secs. Litig., 243 F. Supp. 2d 1179 (D. Colo. 2003) ............................................................................................................. 53

Kan. Health Care Assoc., Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536 (10th Cir. 1994)............................................................................................. 56

Kingsford Prods. Co. v. Kingsford, Inc., 674 F. Supp. 1428 (D. Kan. 1987) ............................ 56

Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937 (Cal. 1993)........................................ 53

Kraus v. Willow Park Pub. Golf Course, 73 Cal. App. 3d 354 (1977)........................................ 54

L.G. Balfour Co. v. Drake, 703 F. Supp. 530 (S.D. Miss. 1988).................................................. 50

Manpower Inc. v. Mason, 405 F. Supp. 2d 959 (E.D. Wis. 2005) ........................................ 60, 61

Marshall v. R.S. Means Co., 940 F. Supp. 39 (D. Mass. 1996).................................................... 49

Mazurka v. Armstrong, 520 U.S. 968 (1997) ........................................................................... 47

Md. Dep't of Human Res. v. U.S. Dep't of Agric., 976 F.2d 1462 (4th Cir. 1992) .................... 61

Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883 (7th Cir. 2000)..................................... 60, 62

Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc., 76 Cal. App. 3d 886 (1986)............... 33

Mid-States AG-Chem. Co. v. Atchison Grain Co., 750 F. Supp. 465 (D. Kan. 1990)................. 52

Morey v. Vannucci, 64 Cal. App. 4th 904 (1998) .................................................................. 32, 34

Motown Record Co. v. Imesh.com, Inc., No. 03 Civ. 7339 (PKC), 2004 WL 503720 (S.D.N.Y. Mar. 12, 2004) ..................................................................................................... 59

Murray v. City of Sapulpa, 45 F.3d 1417 (10th Cir. 1995) ......................................................... 43

Nature's Life, Inc. v. Renew Life Formulas, Inc., No. 2:05 CV 162, 2006 WL 62829 (D. Utah Jan. 11, 2006) ........................................................................................................... 55

O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973 (10th Cir. 2004) ................................................................................................. 47, 48, 49, 50

Oldland v. Gray, 179 F.2d 408 (10th Cir. 1950) .......................................................... 54

Ornbaum v. Main, 198 Cal. App. 2d 92 (1961) ........................................................... 54

Pac. Gas & E. Co. v. G.W. Thomas Drayage. & Rigging Co., 69 Cal. 2d 33 (1968) .................. 32

Parsons v. Bristol Dev. Co., 62 Cal. 2d 861 (1965) ..................................................... 33

Rexnord, Inc. v. Laitram Corp., 628 F. Supp. 467 (E.D. Wis. 1986) .............................. 55

Rivera v. Pitt, 44 Fed. Appx. 934 (10th Cir. 2002) ..................................................... 43

Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002) ............................................ 30

Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380 (7th Cir. 1984) ...................... 61

S. Cal. Edison Co. v. Superior Ct., 37 Cal. App. 4th 839 (1995) ............................ 34, 35

Sanofi-Synthelabo v. Apotex Inc., No. 02 Civ. 2255 (SHS), 2006 WL 2516486 (S.D.N.Y. Aug. 31, 2006) ........................................................................................... 62

Scanvec Amiable Ltd. v. Chang, No. Civ. A. 02-6950, 2002 WL 32341772 (E.D. Pa. Nov. 1, 2002) ........................................................................................................... 60

Schrier v. Univ. of Colo., 427 F.3d 1253 (10th Cir. 2005) ....................... 47, 48, 49, 52

Sick, Inc. v. Motion Control Group Corp., No. 01-1496 JRT/FLN, 2001 WL 1640055 (D. Minn. Sept. 7, 2001) ........................................................................................... 49

Silverstein v. Penguin Putnam, Inc., No. 01 Civ. 309 JFK, 2003 WL 21361734 (S.D.N.Y. June 12, 2003) .......................................................................................... 60

Skrbina v. Fleming Cos., 45 Cal. App. 4th 1353 (1996) ............................................. 34

iv

Snepp v. United States, 444 U.S. 507 (1980) ............................................................ 54

St. James Armenian Church of Los Angeles v. Kurkjian, 47 Cal. App. 3d 547 (1975)............... 54

United States v. Pegg, 782 F.2d 1498 (9th Cir. 1986) ................................................... 54

Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co., 128 P.2d 665 (Cal. 1942) ........................... 34

Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810 (6th Cir. 1954) ................................... 61

Utah Gospel Mission v. Salt Lake City Corp., 316 F. Supp. 2d 1201 (D. Utah 2004)................. 56

Visto Corp. v. Sproqit Techs., Inc., 413 F. Supp. 2d 1073 (N.D. Cal. 2006) ............................... 58

Winn-Senter Constr. Co. v. Healy Enters., Inc., No. CIV. A. 90-2173-O, 1992 WL 350224 (D. Kan. Oct. 22, 1992)......................................................................... 50

World Sleep Prods., Inc. v. Restonic Corp., No. 93-CV-986, 1995 WL 792078 (N.D.N.Y. Aug. 25, 1995) .................................................................................... 52

**Statutes**

11A C. Wright et al. Federal Practice & Procedure § 2946 (2006)................................................. 56

11A C. Wright et al., Federal Practice & Procedure § 2948.1 (2006) .................................... 52, 55

**Other Authorities**

Dobbs, Remedies. § 4.3, at 240-43 (1980) ................................................................... 53

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this memorandum in opposition to the Motion of Defendant/Counterclaim-Plaintiff, Novell, Inc. ("Novell"), for Partial Summary Judgment on its Sixth, Seventh, Eighth, and Ninth Counterclaims, or in the alternative, for a Preliminary Injunction, and in support of SCO's Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The disparity between the dispositive, extraordinary, and drastic relief that Novell seeks and the purported grounds for its Motion could hardly be greater. Novell propounds an interpretation of the relevant contracts inconsistent with the language and purpose of those agreements and contrary to the intent of these agreements as expressed by witnesses for both The Santa Cruz Operation, Inc. ("Santa Cruz") and Novell, as well as the parties' course of performance. Novell nevertheless asks the Court to employ what the United States Supreme Court has described as "the nuclear weapon of the law" in seeking to tie up SCO's assets and thereby effectively put SCO out of business.

First, with respect to the interpretation of the contracts, there are no grounds on which the Court can find in Novell's favor as a matter of law. The Asset Purchase Agreement ("APA") and Amendments thereto, considered as a whole, obligated Santa Cruz to remit to Novell only the binary royalties that were being paid and that would continue to be paid under the existing SVRX licenses, which Novell conveyed to Santa Cruz as part of its sale of the entire UNIX business. As Novell's own contemporaneous public filings repeatedly stated, "Novell will

continue to receive revenue from <u>existing licenses</u> for older versions of UNIX System source code." (Ex. 1 at 4; Ex. 2 at 4; Ex. 3 at 6; Ex. 4 at 6; Ex. 5 at 6 (emphasis added).[1])

The 2003 Sun and Microsoft Agreements do not remotely qualify as such licenses.

REDACTED

The parties to the APA and Amendment No. 1 expressly contemplated such licenses and made clear that the fees paid thereunder would <u>not</u> be remitted to Novell under the APA provisions it invokes. On the contrary, any Novell interest in such REDACTED licenses must derive from a separate section of the APA that Novell does not even mention, because it is clear beyond argument that Novell is not entitled to any payments whatever under that provision.

At a minimum, there are ambiguities in the APA and its Amendments. Under the controlling law, the extrinsic evidence is admissible both to expose such ambiguities and to establish the parties' intent. Novell presents no such evidence, whereas SCO presents extensive evidence regarding the intent of the negotiators of the APA, as well as the course of performance of the parties under the APA and its Amendments, confirming SCO's foregoing interpretation and understanding of those contracts. SCO therefore is entitled to summary judgment on that basis. Indeed, even if Novell could present any extrinsic evidence to support its mistaken interpretation, the presence of such conflicting evidence would preclude summary judgment.

---

[1] The documents and declarations supporting SCO's response are appended to the December 12, 2006, Declaration of Brent O. Hatch and are cited herein as "Ex. __." Where exhibits attached to Novell's September 29, 2006 Declaration of Michael A. Jacobs are referenced herein, they are cited as "Jacobs Ex. __."

Second, there are no grounds on which the Court could impose the equitable relief that Novell seeks. The monies that SCO received under the Sun and Microsoft Agreements were spent long before Novell brought its Motion. Under the controlling law, Novell thus cannot show the existence of the "res" that is a precondition for imposition of a constructive trust. SCO therefore is entitled to summary judgment on that basis.

Third, Novell's alternative request for a preliminary injunction should be rejected. Novell has not established and cannot establish the "clear and unequivocal" right to prevail on the merits of its claim that is the foundation for a preliminary injunction. Moreover, Novell ignores SCO's own claims, upon which SCO's success would result in an outcome likely to lead to a net payment due from Novell to SCO even if Novell were to prevail on its claim here. Further, Novell cannot establish irreparable harm in the absence of a preliminary injunction, as it is well established that the risk of a money judgment being uncollectible does not suffice. Finally, where Novell can continue its business absent the injunctive relief but such relief would prevent SCO from sustaining its operations, the balance of hardships weigh heavily in SCO's favor, and the Court should not disrupt the status quo.

Accordingly, for the reasons summarized above and described in detail below, the Court should deny Novell's Motion in all respects and grant SCO's Motion.

## STATEMENT OF FACTS

**I.      NOVELL SOLD THE ENTIRE UNIX BUSINESS TO SANTA CRUZ UNDER THE APA.**

1.      Novell and Santa Cruz intended for the APA to transfer all of the UNIX and UnixWare business to Santa Cruz. Section 1.3(a)(i) of the APA states: "It is the intent of parties

3

hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer." (Jacobs Ex. 1 at § 1.3(a)(i).)

   2. The first provision of the APA, Recital A as amended, defined the business that Novell transferred to Santa Cruz:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the "Business").

(Id. at 1.)

   3. Section 1.1(a) of the APA described the assets pertaining to the transferred Business as:

> [A]ll of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).

(Id. at §1.1.)

   4. Schedule 1.1(a), in turn, identified seven categories of "assets and properties of Seller relating to the Business" transferred to Santa Cruz. For example:

>  a. Item I identified "All rights and ownership of UNIX, UnixWare and Auxiliary Products," including source code, as part of the transferred assets and properties.

>  b. Item II identified "All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business" as part of the transferred assets and properties.

    c.  Item III identified "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable), including without limitation" fourteen subcategories of contracts.

    d.  Item III.L specifically identified the "Software and Sublicensing Agreements".

    e.  Item VI identified "All contracts relating to the SVRX Licenses and Auxiliary Product Licenses (collectively 'SVRX Licenses') listed below"; Item VI then listed specific UNIX System V products.

(Id. Schedule 1.1(a).)

    5.    Section 1.1(b) of the APA defined the liabilities and obligations assumed by Santa Cruz at the Closing as "those obligations and liabilities of Seller set forth in Schedule 1.1(c) hereto (collectively, the 'Assumed Liabilities'). Schedule 1.1(c), in turn, identified three categories of liabilities assumed by Santa Cruz, including "All obligations, whether existing on the date hereof or arising hereafter, under the assigned contracts listed on Schedule 1.1(a)." (Id. § 1.1(b); Schedule 1.1(c).)

## II.    NOVELL RETAINED A LIMITED INTEREST IN THE BINARY ROYALTIES DUE UNDER EXISTING SVRX LICENSES.

    A.    <u>Novell's Interest Is Limited to SVRX Licenses Transferred by the APA.</u>

    6.    In its 1995 Annual Report, its 1996 Annual Report, and its 1996 Quarterly Reports, Novell described the payments it received under Section 1.2 of the APA:

> Under the agreement, Novell received approximately 6.1 million shares of SCO common stock, resulting in an ownership position of approximately 17% of the outstanding SCO common stock. The agreement also calls for Novell to receive a revenue stream from SCO based on revenue performance of the purchased UnixWare product line. This revenue stream is not to exceed $84 million net

> present value, and will end by the year 2002. In addition, Novell
> will continue to receive revenue from existing licenses for older
> versions of UNIX System source code.

(Ex. 1 at 4; Ex. 2 at 3-4; Ex. 3 at 6; Ex. 4 at 6; Ex. 5 at 6.)

7.     The APA thus forged a strategic relationship between the parties. Under an

Operating Agreement executed with the APA, Santa Cruz agreed to build a "Merged Product,"

which combined Santa Cruz's UNIX flavor with UnixWare, and integrated Novell's flagship

product, Netware. (Ex. 6 at 1-2.) In addition, Santa Cruz's payment to Novell was structured to

include a 17% equity position in Santa Cruz common stock and a contingent interest in the

performance of UnixWare products, including the Merged Product. (Jacobs Ex. 1. § 1.2.)

8.     Section 1.2 of the APA reflected the structure of the payments to Novell. Section

1.2(a) identified Santa Cruz stock as the consideration paid by Santa Cruz for the Assets:

> On the terms and subject to the conditions set forth in this
> Agreement, as full payment for the transfer of the Assets by Seller to
> Buyer, at the Closing Buyer shall assume the Assumed Liabilities
> and issue to Seller 6,127,500 shares of fully paid and nonassessable
> shares of Common Stock of Buyer (the "Shares" or "Purchase
> Price").

(Jacobs Ex. 1 § 1.2(a).)

9.     In addition, Section 1.2(b) provided that Novell would receive a contingent

interest in UnixWare products described in its Annual and Quarterly Reports:

> In addition, Buyer agrees to make payment to Seller of additional
> royalties retained by Seller in respect of the transfer of UnixWare
> and on account of Buyer's future sale of UnixWare products. The
> amounts and timing of additional royalties to be paid in connection
> with Buyer's sale of UnixWare products are identified in detail on
> Schedule 1.2(b) hereto.

(Id. § 1.2(b).)

      10.    In turn, Paragraph (b)(i)(a) of Schedule 1.2(b) provided that Santa Cruz's

obligation to pay such UnixWare royalties was contingent:

> No royalties shall be payable in connection with any of the UW
> Products until Buyer shall have shipped or licenses, in any year, 40%
> of the units contemplated by the Plan for such year. . . .

(Id. Schedule 1.2(b), § 1.2(b)(1)(a).)

      11.    Moreover, Paragraph (c) of Schedule 1.2(b) provided that Novell's contingent

interest would expire no later than December 31, 2002.  (Jacobs Ex. 1.)  Because UnixWare

shipments and licenses did not reach the required benchmarks, Novell did not receive any

payments under Schedule 1.2(b).  (Ex. 12 ¶ 15.)

      12.    To bridge the gap between the purchase price and the price set by Novell for the

Business, Section 1.2(b) also provided that Novell would retain a financial interest in the SVRX

Royalties:

> Except as otherwise provided in paragraph (e) of this Section 1.2,
> Buyer agrees to collect and pass through to Seller one hundred
> percent (100%) of the SVRX Royalties as defined and described in
> Section 4.16 hereof.  Seller agrees to pay Buyer an administrative
> fee of five percent (5%) of the SVRX Royalties.  Seller and Buyer
> further acknowledge and agree that Seller is retaining all right to the
> SVRX Royalties notwithstanding the transfer of SVRX Licenses to
> Buyer pursuant hereto, and that Buyer only has a legal title and not
> an equitable interest in such royalties within the meaning of Section
> 541(d) of the Bankruptcy Code.  For the purposes of administering
> the collection of SVRX Royalties, the parties acknowledge that the
> royalties shall continue to be recognized as royalties by Seller on an
> ongoing basis and the parties shall take such commercially
> reasonable steps as may be necessary to effectuate the foregoing for
> financial accounting and tax purposes.  In addition, Buyer agrees to
> make payment to Seller of additional royalties retained by Seller in

respect of the transfer of UnixWare and on account of Buyer's future sale of UnixWare products.

(Jacobs Ex. 1 § 1.2(b).)

13.     In turn, Section 4.16(a) states:

Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under the SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties:").

(Id. § 4.16(a).)

14.     Item VI of Schedule 1.1(a), as amended by Amendment No. 1 to the APA, under the heading of "All contracts relating to the SVRX Licenses and Auxiliary Product Licenses (collectively 'SVRX Licenses') listed below," lists SVRX products.  (Jacobs Ex. 2.)

15.     These sections indicate that only then-existing SVRX licenses are subject to the SVRX royalty provision.  There is no provision in the APA or its schedules that provides for royalties on future SVRX licenses to be paid to Novell.  (Jacobs Ex. 1; Jacobs Ex. 2.)

16.     That Section 4.16(a) relates only to existing licenses also follows from Section 4.16(b)'s language precluding the issuance by the Buyer of new SVRX licenses, except in certain limited situations.  Section 4.16(b) provides in full (brackets in original):

Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby granted, the rights to take any action on Buyer's own behalf. Notwithstanding the foregoing, Buyer shall have the right to enter into amendments of the SVRX Licenses (i) as may be incidentally

8

involved through its rights to sell and license UnixWare software or the Merged Product [as such latter term is defined in a separate Operating Agreement between the parties to be effective as of the Closing Date, a copy of which is attached hereto as Exhibit 5.1(c)], or future versions of the Merged Product, or (ii) to allow a licensee under a particular SVRX License to use the source code of the relevant SVRX product(s) on additional CPU's or to receive an additional distribution, from Buyer, of such source code. In addition, Buyer shall not, and shall have no right to, enter into new SVRX Licenses except in the situation specified in (i) of the preceding sentence or as otherwise approved in writing in advance by Seller on a case by case basis.

(Jacobs Ex. 1 § 4.16(b).).)

B.     The "SVRX Royalties" Refer Only to Binary Royalties.

17.     The parties signed the APA on September 19, 1995, and quickly recognized the need to clarify certain provisions. (Ex. 19 ¶ 5.) The parties shortly thereafter executed Amendment No. 1, in connection with the closing of the transaction. (Id.)

18.     By adding paragraph (e) to Section 1.2 of the APA, Amendment No. 1 clarified that the description of the SVRX Royalties found in Paragraph 4.16(a) – the "fees, royalties and other amounts due under the SVRX Licenses" – refers only to binary royalties. (Ex. 10 ¶ 20; Ex. 11 ¶ 23; Ex. 14 ¶ 8; Ex. 15 ¶ 8; Ex. 19 ¶ 10.)

19.     Section 1.2(e) defined four categories of fees to be retained by Santa Cruz under the SVRX Licenses.

a.     Section 1.2(e)(i) provided that Santa Cruz could keep "fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a) hereof."

b.     Section 1.2(e)(ii) provided that Santa Cruz could keep "source code right to use fees under existing SVRX Licenses from the licensing of additional CPUs and from the distribution by Buyer of additional source code copies."

      c.  Section 1.2(e)(iii) provided that Santa Cruz could "source code right to use fees attributable to new SVRX licenses approved by Seller pursuant to Section 4.16(b) hereof."

      d.  Section 1.2(e)(iv) provided that Santa Cruz could keep "royalties attributable to the distribution by Buyer and its distributors of binary copies of SVRX products, to the extent such copies are made by or for Buyer pursuant to Buyer's own licenses from Seller acquired before the Closing Date through Software Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A."

(Jacobs Ex. 1 § 1.2(e).)

    20.    Section 1.2(e)(ii) provided that SCO need not remit to Novell source code fees from an amendment to an "existing SVRX License" granting an additional copy of the SVRX product or the right to use it on an additional CPU. (Jacobs Ex. 1 § 1.2(e)(ii).) As the one-time right-to-use fees and sublicensing fees would have already been paid to Novell, there were no other "fees, royalties or other amounts due" under the transferred SVRX licenses, other than the binary royalties. (Ex. 12 ¶ 7.) Section 1.2(e) thus made clear that the term "SVRX Royalties" refers only to the binary royalties. (Ex. 10 ¶ 20; Ex. 11 ¶ 23; Ex. 14 ¶ 8; Ex. 15 ¶ 8; Ex. 19 ¶ 10.)

    C.    The "SVRX Royalties" Do Not Include Fees from the Licensing of UnixWare.

    21.    Section 4.16(b) of the APA set forth legal protections for Novell's interest in the existing SVRX Royalties. Section J of Amendment No. 1 amended the last sentence of Section 4.16(b), as follows (brackets in orginal):

> Notwithstanding the foregoing, Buyer shall have the right to enter into amendments of the SVRX Licenses (i) as may be incidentally involved through its rights to sell and license UnixWare software or the Merged Product [as such latter term is defined in a separate Operating Agreement between the parties to be effective as of the Closing Date, a copy of which is attached hereto as Exhibit 5.1(c)], or future versions of the Merged Product, or (ii) to allow a licensee under a particular SVRX License to use the source code of the

> relevant SVRX product(s) on additional CPU's or to receive an
> additional distribution, from Buyer, of such source code. In
> addition, Buyer shall not, and shall have no right to, enter into new
> SVRX Licenses except in the situation specified in (i) of the
> preceding sentence or as otherwise approved in writing in advance
> by Seller on a case by case basis.

(Jacobs Ex. 2 § J.)

22.     The second enumerated point of Section J thus clarified that Santa Cruz could amend the transferred SVRX Licenses to provide licensees additional copies of the licensed SVRX product or the right to use it on additional CPUs. (Id.)  As previously noted, Section 1.2(e)(ii) made clear that Santa Cruz did not have to remit any fees resulting from such amendments.  (Jacobs Ex. 1 § 1.2(e)(ii).)

23.     In addition, the first enumerated point and the second sentence of Section J clarified that Santa Cruz could amend or enter into new SVRX licenses "as may be incidentally involved through its right to sell and license UnixWare software."  This provision reflected the reality that UnixWare products were licensed with SVRX technology.  (Ex. 10 ¶ 22; Ex. 11 ¶ 26; Ex. 12 ¶ 12; Ex. 14 ¶ 9; Ex. 17 ¶ 8.)

24.     Because UnixWare is built on prior SVRX products, Novell, like its predecessors and successors, as a matter of course licensed those prior products as an incidental part of licensing UnixWare.  (Ex. 10 ¶ 22; Ex. 11 ¶ 26; Ex. 12 ¶ 12; Ex. 14 ¶ 9; Ex. 17 ¶ 8.)  The fees paid by a UnixWare licensee to Novell were for the UnixWare product, not for the prior SVRX products.  Accordingly, there was no need for Section 1.2(e) to clarify that Santa Cruz kept any "SVRX Royalties" under UnixWare licenses, as no such royalties were paid.

25.     Rather, Novell's interest in UnixWare royalties was covered by the second part of Section 1.2(b), which was unaffected by Section 1.2(e), and which states:

> In addition, Buyer agrees to make payment to Seller of additional royalties retained by Seller in respect of the transfer of UnixWare and on account of Buyer's future sale of UnixWare products. The amounts and timing of additional royalties to be paid in connection with Buyer's sale of UnixWare products are identified in detail on Schedule 1.2(b) hereto.

(Jacobs Ex. 1 § 1.2(b).)

26.     Schedule 1.2(b), in turn, provided that Santa Cruz was obligated to pay Novell those UnixWare royalties only if the sales of UnixWare reached certain benchmarks, and that that requirement expired on December 31, 2002. (Jacobs Ex. 1 Schedule 1.2(b) ¶¶ (b) – (c).)

27.

REDACTED

D.     <u>The Agreements at Issue Are Not Subject to the Prior-Approval Requirement.</u>

28.     Section 4.16 of the APA, titled "SVRX Licenses," governed Novell's SVRX interest in SVRX binary royalties. Section 4.16(a) set out procedures for Santa Cruz's collection and payments to Novell of the binary royalties and gave Novell the right to audit those collection efforts. Section 4.16(b) set forth legal protections for Novell's binary-royalty interest.

29.     As stated previously, Section J of Amendment No. 1 clarified that Santa Cruz could enter into new SVRX licenses as an incidental part of licensing UnixWare. Otherwise,

Section J prohibited Santa Cruz from entering into new SVRX licenses except with Novell's prior approval.

30.    Because SVRX was the legacy technology and both parties had an interest in the growth of UnixWare, they did not contemplate that Santa Cruz would enter into a significant number of new SVRX licenses, if any. (Ex. 13 ¶ 11.) Consistent with the purpose of Section 4.16(b), the sole intent of the prior-approval requirement was to protect Novell's interest in the SVRX Royalties. (Ex. 19 ¶ 10; Ex. 14 ¶ 10; Ex. 15 ¶ 10; Ex. 10 ¶ 23.)

31.    Amendment No 2 further made clear that Santa Cruz had a continuing right, as the owner of the UNIX business, to license the SVRX source code:

> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

(Jacobs Ex. 3 § B.5.)

32.    Sun and Microsoft were not any paying any SVRX Royalties under their own SVRX Licenses at the time of the APA. (Ex. 10 ¶ 25; Ex. 11 ¶ 29; Ex. 14 ¶ 12.) Novell therefore had no interest in any such royalties or in any continuing rights relative to Sun or Microsoft under Section 4.16 of the APA as amended.

E.    <u>SCO Has Complied with Amendment No. 2.</u>

33.    On April 26, 1996, Novell executed an agreement with IBM purporting to grant it a buyout of its obligations to pay SVRX Royalties and to expand its rights to distribute SVRX source code. (Ex. 7.) Surprisingly, Novell purported to agree to this buyout agreement on behalf

of Santa Cruz and even signed the agreement "for" Santa Cruz without Santa Cruz's consent.

(Id.)

34.     Although Novell had retained a 95% interest in the binary royalties that IBM was paying, Santa Cruz objected on the grounds that IBM had no right to license source code rights and could not unilaterally grant such buyouts.  (Ex. 34; Ex. 35; Ex. 36; Ex. 16 ¶ 33.)

35.     As explained by Larry Bouffard, the Novell account manager who conceived and oversaw the Novell-IBM buyout and who later became Novell's worldwide sales director for UNIX, the purpose of Amendment No. 2 was to protect Santa Cruz from any further attempts by Novell to grant unilateral buyouts:

> After Santa Cruz learned of the Novell-IBM buyout, Santa Cruz immediately objected.  When I visited Santa Cruz's offices, I recall a Santa Cruz representative objecting vehemently to me in person. Novell and SCO proceeded to negotiate Amendment No. 2 to the APA.  I understood Amendment No. 2 to preclude Novell from undertaking the precise type of unilateral conduct with respect to the UNIX license agreements that I had undertaken with respect to the IBM-Novell buyout.

(Ex. 16 ¶ 33.)

36.                              REDACTED

## III.   SCO'S POSITION ACCURATELY REFLECTS THE INTENT OF THE APA AS SHOWN BY THE EXTRINSIC EVIDENCE.

37.     Novell does not any present any extrinsic evidence concerning the intent and meaning of the APA and its Amendments.  In contrast, SCO has submitted the following

extensive evidence in support of its position that Novell sold the entire UNIX business and retained only the limited interests noted above.

A.    Statements of Relevant Witnesses.

38.    The sworn statements of witnesses who negotiated and implemented the APA on both sides of the transaction consistently and unequivocally substantiate SCO's positions.

39.    Duff Thompson, the Novell senior executive who oversaw the sale of the Business, states:

> In early 1995, Novell Chairman and CEO Robert Frankenberg directed me to sell the complete UNIX business and related assets so the company could focus on its flagship product NetWare, cut the related UNIX costs and thereby increase shareholder values for the company.  I understood my directive was to sell all of the UNIX business and related assets and that is how I approached the assignment.
>
> *        *        *
>
> During the course of the negotiations, it became clear that Santa Cruz could not afford to pay the purchase price we were requesting, so various ways were explored to make it possible for Santa Cruz to make the purchase.  The solution was that Novell would retain an interest in the binary royalty stream from the existing SVRX sub-licenses.  It was never suggested or agreed in the negotiation in which I participated that Novell would retain the right to receive additional royalties or fees from licensing of source code or from new sales of SVRX products.

(Ex. 18 ¶¶ 4, 7.)

40.    Ed Chatlos, who was appointed by Mr. Thompson as the chief negotiator for Novell, explains:

> Novell's intent and agreement under the APA and Amendment No. 1 was to transfer the entire UNIX business, including the UNIX source

15

code and copyrights, to Santa Cruz except for the binary royalties
paid under the existing agreements pursuant to which UNIX System
V (or "SVRX") licensees were paying such royalties, and which
Novell conveyed to Santa Cruz under the APA as part of the UNIX
business.

*           *           *

The APA and Amendment No. 1 thus reflect Novell's intent in
entering into the APA:  Santa Cruz was obligated to remit to Novell
only the binary royalties that were being paid and that would
continue to be paid under the existing SVRX licenses pursuant to
which UNIX System V licensees were paying such royalties, and
which Novell conveyed to Santa Cruz under the APA as part of the
UNIX business.

(Ex. 14 ¶¶ 4, 10.)

41.    Jim Wilt, the chief negotiator for Santa Cruz, states:

Santa Cruz's intent and agreement under the APA and Amendment
No. 1 was for Novell to transfer the entire UNIX business, including
the UNIX source code and copyrights, to Santa Cruz except for
binary royalties paid under the existing agreements pursuant to
which UNIX System V ("SVRX") licensees were paying such
royalties, and which Novell conveyed to Santa Cruz under the APA
as part of the UNIX business.

*           *           *

The APA and Amendments thereto thus reflect Santa Cruz's intent
in entering into the APA:  Santa Cruz was obligated to remit to
Novell only the binary royalties that were then being paid and that
would continue to be paid under the existing agreements pursuant to
which UNIX System V licensees were paying such royalties, and
which Novell conveyed to Santa Cruz under the APA as part of the
UNIX business.

(Ex. 15 ¶¶ 4, 10.)

42.                            REDACTED

16

REDACTED

\*            \*            \*

REDACTED

(Ex. 19 ¶¶ 6, 12.)

    43.    John Maciaszek, who was a senior engineer at Novell and a member of the Novell

transition team, states:

> The only interest that Novell retained in the UNIX business was the
> right to continue receiving SVRX binary royalties under the product
> supplements, or licenses, transferred under the APA.  Novell and
> Santa Cruz did not intend for Novell's rights under Section 4.16(b)
> to extend either to new SVRX agreements that did not disturb
> Novell's limited royalty interests, or to any software and
> sublicensing agreements whether then existing or not.

(Ex. 10 ¶ 28.)

    44.    Bill Broderick, who was a member of UNIX licensing group at Novell and who

became a member of the Santa Cruz licensing group after the Transition Period, states:

> As I stated previously, my understanding was that Novell intended to
> transfer, and Santa Cruz to acquire, the entire UNIX and UnixWare
> business under the APA.  However, because Santa Cruz could not

afford the price that Novell asked for the business, the parties agreed that Novell would retain interests in certain royalties.

Based on what Novell told those of us in the Novell licensing group when the APA was announced and explained, my understanding is that Novell and Santa Cruz agreed that Novell would retain an interest in the continuing binary royalties paid under the SVRX licenses to which Novell was a party and that were transferred to Santa Cruz under the APA. That is, the parties agreed that Novell would retain an interest in the per-copy fees that the then-current SVRX licensees would continue to pay under their existing SVRX product supplements for their distribution of binary products based on the licensed SVRX product.

(Ex. 11 ¶¶ 18-19.)

45.     Jean Acheson, who administered the royalties paid to Novell pursuant to Section

1.2(b) of the APA, states:

My understanding from the company meetings and from the course of performance of the parties, in which I participated, was that Santa Cruz acquired the entire ongoing UNIX business from Novell, and only owed Novell binary royalties on the SVRX licenses that were in existence at the closing of the APA. In other words, the only part of SCO's ongoing business in which Novell retained an interest was the binary royalties from SVRX product licenses that existed at the time of the APA.

(Ex. 12 ¶ 6.)

B.     The Parties' Course of Performance.

46.     In its 1995 Annual Report, Novell described the payments provided for under

Section 1.2 of the APA:

Under the agreement, Novell received approximately 6.1 million shares of SCO common stock, resulting in an ownership position of approximately 17% of the outstanding SCO common stock. The agreement also calls for Novell to receive a revenue stream from SCO based on revenue performance of the purchased UnixWare

18

> product line. This revenue stream is not to exceed $84 million net
> present value, and will end by the year 2002. In addition, Novell
> will continue to receive revenue from existing licenses for older
> versions of UNIX System source code.

(Ex. 1 at 4.)

47.    Novell reiterated this same statement verbatim in its 1996 quarterly reports and its

1996 Annual Report. (Ex. 2 at 3-4; Ex. 3 at 6; Ex. 4 at 6; Ex. 5 at 6.)

48.    On October 18, 1995, Mr. Bouffard stated in an internal Novell document:

> We are obligated to give SCO all information, contracts, assets etc.
> pertaining to the UnixWare business and the old UNIX source code
> business. They have bought it lock, stock and barrel. Once the
> transaction is closed (Nov.-Dec.) we will have no more involvement
> with this business. Therefor [sic], if a contract is for UnixWare or
> UNIX, it will be SCO's.

(Ex. 20.)

49.    In letter dated April 23, 1996, from Santa Cruz CEO Alok Mohan to Novell CEO

Robert Frankenberg, Mr. Mohan objected to Novell's attempt to give IBM a buyout of its

obligation to pay SVRX binary royalties. Among other things, Mr. Mohan explained:

> When we originally contemplated SCO's purchase of the UnixWare
> business, one of the primary goals was to drive the conversion of the
> industry to UnixWare. We modeled the business based on a high
> percentage of the existing SVRX and SVR4 licenses eventually
> converting to UnixWare, and to a large extent the valuation we
> agreed for this business was based on these models. The deal was
> structured per Novell's stated preference to provide SCO with
> significant incentives to do everything in its power to accelerate this
> conversion. The agreement provided for Novell to receive the
> residual royalties from the in-place SVRX license stream, but SCO
> was to provide all account management and manage the
> relationships with the customers in order to further this agreed upon
> conversion.

(Ex. 21 at 1.)

     50.     In connection with the APA, Novell and Santa Cruz entered into an Operating

Agreement effective on the closing date of the APA, December 6, 1995. Recital B of the

Operating Agreement explained the purpose of the Agreement:

> In connection with the entering into of the Asset Purchase
> Agreement, the Parties deem it to be in their respective best interests
> to provide for an orderly transition of the Business (as such term is
> defined in the Asset Purchase Agreement), and to set out their
> mutual understanding of how that business is to be transferred.

(Ex. 6 Recital B.)

     51.     Paragraph 7 of the Operating Agreement explained:

> It is intent of the Parties to transfer the agreements and associated
> rights and obligations which relate to Novell's UNIX System
> business to SCO. Novell will use commercially reasonable efforts to
> assist SCO in effecting such transfers or, if not transferable, to assist
> in finding alternative solutions.

(Id. ¶ 7.)

     52.     In its 1996 Annual Report, Santa Cruz reported its acquisition of the Business.

For example, Santa Cruz stated:

> The fiscal 1996 increase in cost of services as a percentage of service
> revenues resulted primarily from incremental support costs for
> product offerings associated with the acquisition of the UNIX
> business from Novell.

(Ex. 24 at Recall 0007265.)

     53.     In that same Report, Santa Cruz recognized revenues from UNIX source code

licensing:

> Beginning in fiscal 1996, net revenues included revenues derived
> from UnixWare packaged product shipments and SVRX source
> license revenue related to the acquisition of the UNIX business from
> Novell Inc., which occurred in December of 1995.

(Id. at Recall 0007264.)

54.    In 1999, SVRX licensee Hewlett-Packard ("HP") sent the Santa Cruz legal

department a check for several million dollars purporting to exercise a "favored pricing clause"

in its UNIX agreement. (Ex. 11 ¶ 37.) In compliance with Amendment No. 2, Santa Cruz

contacted Novell to determine if the parties were willing to grant HP the proposed buyout. (Id.)

55.    Under an agreement dated January 28, 2000, the parties bilaterally granted HP a

buyout for $22 million dollars, several times the amount of the check received by Santa Cruz. In

Paragraph 2 of that agreement, Novell explained the purpose of that agreement:

> NOVELL retained or has acquired all rights to outstanding and
> future HP binary code royalty and license fee payments, but not
> source code royalties ("HP BINARY ROYALTY
> OBLIGATIONS"). NOVELL hereby warrants that as of
> NOVELL's signature date of this ADDENDUM, as provided below,
> NOVELL has no present, or future or reversionary interest in any
> such source code royalties. NOVELL hereby warrants that
> NOVELL has full right and authority to modify the terms and
> conditions of the AGREEMENT with respect to the HP BINARY
> ROYALTY OBLIGATIONS. The purpose of this ADDENDUM is
> to simplify those obligations, as well as corresponding reporting
> obligations.

(Ex. 8 at 1.)

56.    In 1994, Novell gave Texas Instruments ("TI") a three-year binary-royalty buyout

for specified distributions of its SVRX product with renewal rights after the period expired. (Ex.

11 ¶ 39; Ex. 42.) The price of the buyout was $500,000. (Ex. 11 ¶ 39; Ex. 42 at 1.) In 1997,

after Santa Cruz had acquired the Business, TI contacted the Santa Cruz legal department seeking to renew the buyout for an additional three-year period at the same price. (Id.)

57.    In an effort to comply with Amendment No. 2, over the subsequent several months, Santa Cruz made every effort to contact the persons at Novell with the authority to review the proposed renewal, including the persons in Novell finance who received Santa Cruz's quarterly royalty reports. (Ex.11 ¶ 40.)  After receiving no response from Novell, and to comply with Santa Cruz's contractual obligations to TI, Santa Cruz granted TI the renewal and sent Novell at least 95% of the $500,000 payment. (Id.; Ex. 43.)  In 2000 and 2003, Santa Cruz again granted TI a renewal and again sent Novell at least 95% of the payment. (Ex. 11 ¶ 40; Ex. 44; Ex. 45.)  It was not until the 2006 renewal, after Novell this lawsuit was filed, that Novell took an active participation in the renewal negotiations. (Id.; Ex. 46.)

58.    Prior to its sale of the Business to Santa Cruz, Novell granted Silicon Graphics, Inc. ("SGI") a buyout of its SVRX binary-royalty obligations. (Ex. 11 ¶ 41.)  On April 2, 1996, Cray Research, Inc. ("Cray"), a distinct SVRX licensee, became a subsidiary of SGI. (Ex. 37.)  Later that year, Cray wrote to Santa Cruz's legal department stating that Cray intended to operate under the terms of the SGI buyout agreement. (Id.)  Although Santa Cruz had only a 5% interest in Cray's royalty stream, the Santa Cruz legal department negotiated with Cray for a period of nearly seven months. (Ex. 11 ¶ 41.)  On May 6, 1997, after Santa Cruz had expended resources far above the 5% administrative fee that it would get, Santa Cruz turned the dispute over to Novell. (Ex. 38.)

59.    In doing so, Santa Cruz advised Novell that it had no right under the APA to negotiate source code rights or fees, and Novell agreed. (Ex. 11 ¶ 42.)  In fact, before

negotiating with Cray, Novell asked Santa Cruz to execute a letter agreement to "enable Novell

to negotiate directly with Cray on the issue of Cray's intention to operate under the SGI

Agreements for all SVRX royalty-generating binary shipment without requiring direct

involvement from SCO." (Ex. 39.) That letter also stated:

> By signature below, SCO authorizes Novell to negotiate and
> conclude with Cray the issue of Cray's intention to operate under the
> SGI agreements for all SVRX royalty-generating binary shipments.
> Novell agrees to inform SCO of any settlement prior to concluding a
> settlement with Cray. SCO's prior approval of any such settlement
> will be required only if the proposed settlement would alter Cray's
> obligation to SCO for source code royalties currently due under the
> Cray Agreements, including allowing Cray to operate wholly under
> the SGI Agreements instead of the Cray Agreements. In such a case,
> in addition to having the right to give prior approval, SCO shall have
> the right to negotiate directly with Cray for the continuation of
> Cray's rights to distribute source code currently provided under the
> Cray Agreements.

(Id.)

60.     In 1998, Novell conducted an audit of SCO's royalty payments to Novell pursuant

to Section 1.2 and Section 4.16 of the APA. (Ex. 12 ¶ 9.) Novell representatives did not ask

for anything other than the reports of the binary royalties from the SVRX licenses that existed

at the time of the APA, and never asked about licensing of source code. (Id.) In 2003, after

SCO had sued IBM and Novell claimed it had the right to waive SCO's rights against IBM,

Novell conducted a second audit. (Id. ¶ 10.) During that audit, for the first time since its sale

of the business to Santa Cruz in 1995, Novell asked for information regarding the licensing of

source code. (Id.)

61.     Through 2005, SCO has paid to Novell approximately the following amounts in

binary royalties, complying with the APA:     REDACTED     . In addition, Novell received the

following lump payments from buyouts granted after the APA to such companies

REDACTED

## IV.    THE SUN AND MICROSOFT AGREEMENTS ARE NOT EXISTING SVRX LICENSES AS TO WHICH NOVELL HAS ANY INTEREST.

62.    Novell claims that the payments SCO received from the agreements at issue are SVRX Licenses under Section 1.2(b) of the APA and Amendment 2 (in the case of Sun), and thus SCO had an obligation to remit those payments to Novell.

63.    Both the 2003 Sun and Microsoft Agreements provide licenses that are fully permissible under SCO's right to conduct an ongoing UNIX business, and UnixWare business, as acquired from Novell under the APA.  The Sun Agreement is a

REDACTED

64.                        REDACTED

A.    The 2003 Sun Agreement.

65.                        REDACTED

24

REDACTED

66.

REDACTED

67.

REDACTED

68.

REDACTED

REDACTED

69.

REDACTED

70.

REDACTED

B.     The 2003 Microsoft Agreement.

71.

REDACTED

72.

REDACTED

73.

REDACTED

74.

REDACTED

75.

REDACTED

V.    **NOVELL'S REQUEST FOR A PRELIMINARY INJUNCTION.**

76.

REDACTED

77.

REDACTED

27

REDACTED

78.

REDACTED

79.

REDACTED

_____

80.    SCO raised $10 million dollars from the sale of stock in November 2005 (Novell

Br. ¶ 50), and SCO put $5 million of cash into an escrow account in June 2006 (Novell Br. ¶ 53).

81.    Novell says (at 13) that it "demanded copies" of the Sun and Microsoft

Agreements from SCO on November 21, 2003. At that time, Novell Director of Contract

Management Mike Bready wrote SCO CFO Robert Bench stating that "Novell has noted recent

public statements by SCO indicating that SCO has unilaterally amended and modified SVRX

licenses with Sun Microsystems and Microsoft. These public statements also indicate that SCO

may have agreed to a buy-out of Sun and Microsoft's royalty obligations under their SVRX

licenses." (Jacobs. Ex. 15.)  Other than a few like communications in the subsequent several

months, Novell took further action to pursue this issue until it filed document requests last year.

82.    The injunctive relief requested by Novell would have the likely effect of causing SCO to cease operations as an on-going business and would certainly interfere with and greatly handicap the conduct of its current litigation with Novell, SuSE, and IBM.  (Ex. 23 ¶ 7.)