## LEGAL STANDARD ON SUMMARY JUDGMENT

"Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law." Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000).

It is axiomatic that the "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment," and that "the court must review the record in the light most favorable to the opposing party." Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Thus, the Court "must resolve factual disputes and draw inferences" in favor of the non-moving party, Rogers v. United States, 281 F.3d 1108, 1113 (10th Cir. 2002), and the Court may not "act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences." Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476, 484 (D. Kan. 1996). In short, summary judgment may not be granted unless "the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996).

## ARGUMENT[2]

### I.    THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY JUDGMENT.

In 2003, SCO entered in separate agreements with Sun and Microsoft. In this Motion, Novell now argues that the payments SCO received under those agreements are SVRX Royalties that SCO was obligated to remit to Novell pursuant to Section 1.2(b) of the APA. Novell's position does not square with the language and purpose of the APA and its Amendments, which

---

[2] The facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing Statement of Facts.

Dockets.Justia.com

make clear that the SVRX Royalties were binary royalties then in place under then-existing

SVRX licenses, or with the uncontroverted extrinsic evidence showing that Novell sold the entire

UNIX business to Santa Cruz with the exception of an interest in those royalties.  In addition, the

Sun and Microsoft Agreements were                              REDACTED

        REDACTED                              and the APA provides that Novell has no interest

in any fees paid under such licenses.  Under the APA, any right that Novell may have had in

such licenses expired in 2002.  Finally, even if (contrary to fact) SCO had an obligation to remit

payments from those licenses, those payments would be de minimis.

    A.    <u>The Governing Law of Contract Interpretation.</u>

    The plain meaning of language of the APA and its Amendments clearly demonstrate the

mutual intent of the parties that Novell was to retain only binary royalties paid under existing

SVRX licenses.  In addition, while Novell has not offered any extrinsic evidence in support of its

reading of those provisions, SCO has submitted substantial extrinsic evidence showing that those

provisions, if not unambiguous in SCO's favor, are at least ambiguous and cannot be disposed of

as a matter of law.

    In <u>Dore v. Arnold Worldwide, Inc.</u>, 39 Cal. 4th 384 (2006), the California Supreme Court

confirmed the relevance of extrinsic evidence in exposing contractual ambiguities.[3]  Addressing

the existing California law of contracts, the court first confirmed the precedent providing that the

"'meaning of language is to be found in its applications.  An indeterminacy in the application of

---

[3]    Novell does not cite <u>Dore</u> (or any other case law regarding contract interpretation).  Instead, Novell cites (at 21 n.4) only Cal. Civ. Code §§ 1638 & 1639, which the court in <u>Dore</u> did not cite.  In addition, under Section 1647 of the Civil Code, a contract may be explained by reference to the circumstances under which the contract was made, and the matter to which it relates; and under Section 1641, the court must consider the contract as a whole and interpret the language in context.  Cal. Civ. Code §§ 1641, 1647.

language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts.'" Id. at 391 (quoting Cal. Sate Auto. Ass'n Inter-Ins. Bur. v. Superior Ct., 177 Cal. App. 3d 855, 859 n.1 (1986)). Further confirming the precedent, the court further explained:

> Accordingly, "even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."

Id. (brackets omitted) (quoting Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (1998), and Pac. Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 37 (1968)).

If the Court were to decide that the relevant language of the APA and amendments thereto do not unequivocally support SCO's interpretation, Dore and the precedent endorsed therein make plain that extrinsic evidence is relevant and admissible on, for example, the following areas involving the application of contractual language to the facts:

- The "SVRX Licenses" in Sections 1.2(b) and 4.16(a) of the APA, and in Section VI of Schedule 1.1(a), are those agreements that were transferred to Santa Cruz and pursuant to which licensees paid the royalties and fees enumerated therein. (¶¶ 6-16, 39-45.)

- Amendment No. 1 clarifies the parties' intent under the APA that the only royalties or fees under the SVRX Licenses that Santa Cruz was obligated to remit to Novell were the binary royalties paid thereunder. (¶¶17-20, 39-45, 55.)

- REDACTED

- Consistent with the parties' intent that the entire UNIX business was transferred
  under the APA, the only "new SVRX licenses" that Novell had the right to approve
  pursuant to Section 4.16(b) and Section J of Amendment No. 1, as clarified in Section
  B.5 of Amendment No. 2, were any agreements that affected the binary royalties that
  had to be remitted to Novell. (¶¶ 17-20, 28-32, 39-45, 55.)

- REDACTED

SCO therefore sets forth below the uncontroverted extrinsic evidence to date confirming SCO's
interpretation of the relevant language and establishing that SCO was not obligated to remit to
Novell the amounts paid under the Sun and Microsoft Agreements.

SCO further submits that the extrinsic evidence uniformly supports SCO's interpretation,
and SCO is entitled to summary judgment based on such uncontradicted extrinsic evidence.
Under California law, where the extrinsic evidence is uncontroverted, the court may interpret the
contract as a matter of law.  See Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 865 (1965) (citing
cases); accord Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc., 76 Cal. App. 3d 886,
891-92 (1986) (citing cases and reversing the trial court); see also Hess v. Ford Motor Co., 27
Cal. 4th 516, 525-26 (2002) (determining mutual mistake as a matter of law where the "extrinsic

evidence is uncontroverted"); Skrbina v. Fleming Cos., 45 Cal. App. 4th 1353, 1370-71 (1996)

(affirming summary judgment granted in part on the basis of "uncontroverted extrinsic evidence"

of the meaning of the contract at issue). When the interpretation of a contract turn on the

credibility of conflicting extrinsic evidence, moreover, the interpretation is for the jury, not the

court. See Morey, 64 Cal. App. 4th at 913-14; S. Cal. Edison Co. v. Superior Ct., 37 Cal. App.

4th 839, 851-52 (1995).

The California Supreme Court and lower courts have emphasized the relevance of

various forms of extrinsic evidence:

> As an aid in discovering the all important element of intent of the
> parties to the contract, the trial court may look to the circumstances
> surrounding the making of the agreement, including the object,
> nature and subject matter of the writing, and the preliminary
> negotiations between the parties, and thus place itself in the same
> situation in which the parties found themselves at the time of
> contracting. Also applicable here is the familiar rule that when a
> contract is ambiguous, a construction given to it by the acts and
> conduct of the parties with knowledge of its terms, before any
> controversy has arisen as to its meaning, is entitled to great weight,
> and will, when reasonable, be adopted and enforced by the court.

Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co., 128 P.2d 665, 671-72 (Cal. 1942) (citations

omitted); accord Crestview Cemetery Ass'n v. Dieden, 356 P.2d 171, 176-77 (Cal. 1960);

Hernandez v. Badger Constr. Equip. Co., 28 Cal. App. 4th 1791, 1814-15 (1994). The court in

Universal Sales emphasized that "a practical construction placed by the parties upon the

instrument is the best evidence of their intention." 128 P.2d at 672; accord Crestview, 356 P.2d

at 176-77. The court in Universal Sales reasoned:

> Parties are far less liable to have been mistaken as to the intention of
> their contract during the period while harmonious and practical
> construction reflects that intention, than they are when subsequent
> differences have impelled them to resort to law, and one of them

then seeks a construction at variance with the practical construction
they have placed upon it.

Id.; accord Crestview, 356 P.2d at 176-77; S. Cal. Edison, 37 Cal. App. 4th at 850-51 (further

explaining that one party's practical interpretation of the contract is relevant extrinsic evidence in

addition to the "joint conduct of the parties in the course of performance of the contract");

Hernandez, 28 Cal. App. 4th at 1814-15 & n.19. SCO shows below that the substantial evidence

falling into the foregoing categories plainly supports SCO's interpretation, precludes Novell's

request for summary judgment (and preliminary injunction), and warrants summary judgment in

SCO's favor.

B.    The SVRX Royalties Were Those Due Under the "Existing" SVRX Licenses.

The plain language of the APA provisions that provide for and identify Novell's interest

in the SVRX Royalties make clear that it is limited to the royalty stream in place under the

SVRX licenses transferred to Santa Cruz under the APA. Even if (contrary to fact) the Sun and

Microsoft Agreements were SVRX licenses, those agreements were executed in 2003. (¶ 25.)

They were not and could not have been assets transferred to Santa Cruz under the APA.

Nothing in the APA suggests that "the contracts relating to the SVRX Licenses and

Auxiliary Licenses" extends to any future agreement that Santa Cruz or its successors might

execute. On the contrary, the language of the APA expressly provides for Novell's retention of

existing rights.

Section 1.2(b) provides that "Seller and Buyer further acknowledge and agree that Seller

is retaining all right to the SVRX Royalties notwithstanding the transfer of SVRX Licenses to

Buyer pursuant hereto." The remainder of Section 1.2(b) confirms that the referenced SVRX

Licenses are those agreements in place and transferred to Santa Cruz. After referring to the SVRX Licenses, Section 1.2(b) then goes on to state: "For purposes of administering the collection of SVRX Royalties, the parties acknowledge that the royalties shall <u>continue to be recognized</u> as royalties by Seller on an ongoing basis." (Emphasis added.) Section 1.2(b) then makes express reference to the "future sale" of UnixWare products, underscoring that the parties make no such reference to "royalties" for "future" SVRX licenses in the APA or Amendments thereto.

Similarly, Section 4.16 of the APA deals with existing agreements. There is nothing in the text of Section 4.16 that extends its reach to SVRX licenses not then in existence. Indeed, the prohibition of new SVRX licenses being issued by SCO post-closing, set forth in the second paragraph of 4.16(b) indicates that, except in a few exceptional circumstances, there would not be any new SVRX licenses issued.

The extrinsic evidence that SCO has discovered to date uniformly supports this reading of the APA. (¶¶ 37-61.) Indeed, in its 1995 Annual Report filed within weeks of the closing of the APA, Novell admitted that SVRX Royalties it has retained were those it would "continue to receive from <u>existing</u> licenses for the older versions of UNIX System source code." (Emphasis added.) Novell repeated this same description of the SVRX Royalties verbatim in each of its 1996 quarterly reports and its 1996 Annual Report.

In addition, the following extrinsic evidence confirms Novell's admission:

- The sworn statements of Ed Chatlos and Jim Wilt, the chief negotiators of the APA for Novell and Santa Cruz respectively, state that Novell retained only an interest in the binary royalties from the "existing" SVRX licenses. (¶¶ 40-41.)

- Duff Thompson, the Novell senior executive hand-picked by its CEO to execute Novell's complete divestiture of the UNIX and UnixWare business and oversee negotiations of the APA, also states that Novell retained only an interest in the binary royalties from the "existing" SVRX licenses. (¶ 39.)

- REDACTED

- John Maciaszek, William Broderick, and Jean Acheson, Novell employees who came over to Santa Cruz with the business and whose jobs required that they understand and perform under the APA, also confirm that Novell retained only an interest in the binary royalties from the "existing" SVRX licenses. (¶¶ 43-45.)

- In his April 23, 1996 letter to Novell CEO Robert Frankenberg, Santa Cruz CEO Alok Mohan stated that the APA "provided for Novell to receive the residual royalties from <u>the in-place SVRX license stream</u>". (¶ 49.)

- In an internal email dated October 18, 1995, Larry Bouffard, Novell sales manager for UNIX, stated that Santa Cruz had purchased the UnixWare business and the old source code business "lock, stock and barrel." Mr. Bouffard added that "if a contract is for UnixWare and lets [sic] say NetWare, the UnixWare part is theirs." (¶ 48.)

C.    <u>The "SVRX Royalties" Refer Only to Binary Royalties.</u>

The parties signed the APA on September 19, 1995, and quickly determined to clarify its provisions as necessary in an amendment to be signed in conjunction with the closing. (¶¶ 17.)

37

By adding paragraph (e) to Section 1.2 of the APA, Amendment No. 1 clarified that the description of the SVRX Royalties found in Paragraph 4.16(a) – the "fees, royalties and other amounts due under the SVRX Licenses" – refers only to binary royalties.

As shown above through the language of the APA and extrinsic evidence, Novell and Santa Cruz intended to transfer the entire UNIX business to Santa Cruz, with the exception of the SVRX Royalties. (¶¶ 1-16, 38-64.) Section 1.2(e) clarified that exception by expressly removing from its scope all the categories of "fees, royalties and other amounts <u>due</u> the SVRX Licenses" except for the binary royalties. (Emphasis added.)

Sections 1.2(e)(i) and 1.2(e)(iv) respectively clarified that Santa Cruz need not remit to Novell future revenues from contracts to provide support or maintenance to SVRX licensees, nor the binary royalties due under Santa Cruz's own SVRX Licenses.

Section 1.2(e)(ii) clarified that Santa Cruz need not remit to Novell "source code right to use fees under existing SVRX Licenses from the licensing of additional CPUs and from the distribution by Buyer of additional source code copies". As the one-time right-to-use fees and sublicensing fees for the transferred SVRX licenses would have already been paid to Novell, there were no other payments due under those licenses, other than the binary royalties. Thus, by a process of elimination, Section 1.2(e) made clear that the term "SVRX Royalties" refers only to those continuing royalties.

Novell's suggestion that Section 1.2(e) provided relief from SCO's obligation to pay all types of fees due under the SVRX Licenses is unfounded. Novell sold the entire UNIX business to Santa Cruz, except for the limited financial interest in the SVRX Royalties. (¶¶ 1-16, 38-64.)

38

The plain language of Amendment No. 1 clarifies that the exception did not extend to any fees other than the per-copy fees, or binary royalties, that were in place at the time of the APA.

In 2000, three years before SCO brought suit against IBM, Novell agreed to grant HP a buyout of its SVRX binary-royalty obligations.  (¶ 54.)  In the buyout agreement, Novell made crystal clear that it had retained only the right to the continuing binary royalties and not to any interest in source code fees:

> NOVELL retained or has acquired all rights <u>to outstanding and future HP binary code royalty</u> and license fee payments, but not source code royalties ("HP BINARY ROYALTY OBLIGATIONS').  NOVELL hereby warrants that as of NOVELL's signature date of this ADDENDUM, as provided below, <u>NOVELL has no present, or future or reversionary interest in any such source code royalties</u>.  NOVELL hereby warrants that NOVELL has full right and authority to modify the terms and conditions of the AGREEMENT <u>with respect to the HP BINARY ROYALTY OBLIGATIONS</u>.  The purpose of this ADDENDUM is to simplify those obligations, as well as corresponding reporting obligations.

(¶ 55.)

In addition, other extrinsic evidence confirms that the parties intended for the SVRX Royalties in the APA to include only SVRX binary royalty stream then in place:

- Each of the above-quoted witnesses states that Novell's interest in the SVRX royalties was limited to "binary royalty stream" or the "the binary royalties" from the "existing" SVRX licenses.  (¶¶ 39-45.)

- In agreeing to negotiate with Cray on behalf of both parties, Novell acknowledged that Santa Cruz had the right to approve "any proposed settlement" that "would alter Cray's obligation to SCO for source code royalties currently due under the Cray Agreements."  (¶ 59.)

39

- The Operating Agreement between the parties, which became effective on the closing date of the APA, stated: "It is the intent of the Parties to transfer the agreements and associated rights and obligations which relate to Novell's UNIX System business to SCO." (¶ 51.) Like other contemporaneous documents, the Operating Agreement did not deem it necessary even to mention the limited financial interest in the royalty stream. (¶¶ 50-51.)

- In its 1996 Annual Report, Santa Cruz reported its "acquisition of the UNIX business from Novell" and recognized "SVRX source license revenue related to the acquisition of the UNIX business from Novell, Inc., which occurred in 1995." (¶¶ 52-53.)

Novell presents no evidence to suggest any contradiction with the foregoing evidence of the parties' intent.

D.    The "SVRX Royalties" Do Not Include Fees from the
      Licensing of UnixWare Products.

The APA forged a strategic relationship between the parties. (¶¶ 7-12.) Under the Operating Agreement, Santa Cruz agreed to build a "Merged Product," which combined Santa Cruz's UNIX flavor with UnixWare and integrated "hooks" for Novell's flagship product, Netware. (¶ 7.) In addition, under Section 1.2 of the APA, Santa Cruz's payment to Novell was structured to include a 17% equity position in Santa Cruz common stock and a contingent interest in the future performance of UnixWare products, including the Merged Product. (¶¶ 7-12.) To make the deal possible, Novell also retained the limited interest in the SVRX Royalties. (¶¶ 13-14, 38-45.)

The structure of the transaction and the nature of the parties' strategic relationship reveals that Novell's interest in UnixWare royalties was covered by the second part of Section 1.2(b), which was unaffected by Section 1.2(e), and which states:

> In addition, Buyer agrees to make payment to Seller of additional royalties retained by Seller in respect of the transfer of UnixWare and on account of Buyer's future sale of UnixWare products. The amounts and timing of additional royalties to be paid in connection with Buyer's sale of UnixWare products are identified in detail on Schedule 1.2(b) hereto.

In turn, Paragraph (b)(i)(a) of Schedule 1.2(b) provided that Santa Cruz's obligation to pay such UnixWare royalties was contingent:

> No royalties shall be payable in connection with any of the UW Products until Buyer shall have shipped or licenses, in any year, 40% of the units contemplated by the Plan for such year;

Moreover, Paragraph (c) of Schedule 1.2(b) provided that Novell's contingent interest would expire no later than December 31, 2002. Because UnixWare shipments and licenses did not reach the required benchmarks, the interest expired on that date without Novell receiving any payment under Schedule 1.2(b). (¶¶ 11.)

Novell is utterly silent about the language of Section 1.2(b) and Schedule 1.2(b) that creates this potential UnixWare revenue stream for Novell distinct from the SVRX binary royalty stream. Novell ignores the structure of the payments under the APA, its own investment in Santa Cruz, and the strategic relationship between the parties based on the Merged Product. Novell clearly had an interest in the success of UnixWare, and it protected that interest by negotiating and obtaining the contingent right to UnixWare royalties. If it were not the case that

that right has expired, it would be ironic for Novell to argue that the Sun and Microsoft

Agreements are SVRX licenses instead of          REDACTED

      Novell does not and cannot contend it is entitled to a payment of          REDACTED          for

              REDACTED          and

              REDACTED

      Novell cannot convert those Agreements into SVRX licenses, let alone SVRX

licenses existing at the time of the APA, just because they          REDACTED

      E.      The Sun and Microsoft Agreements Do Not Implicate
              the Prior-Approval Requirement or Amendment No. 2.

      The APA and its amendments, as well as the structure of the royalty consideration paid to

Novell, make clear that the prior-approval right in Amendment No. 1 was limited to preventing

the sale of new SVRX licenses that affected the binary royalties due to Novell.

      Section 4.16 of the APA, titled "SVRX Licenses," governed Novell's SVRX interest in

SVRX binary royalties.  Section 4.16(a) set out procedures for Santa Cruz's collection and

payments to Novell of the binary royalties, and gave Novell the right to audit those collection

efforts.  Section 4.16(b) set forth legal protections for Novell's binary-royalty interest.  As stated

previously, Section J of Amendment No. 1 clarified that Santa Cruz could enter into new SVRX

licenses as an incidental part of licensing UnixWare.  Otherwise, Section J prohibited Santa Cruz

from entering into new SVRX licenses except with Novell's prior approval.[4]

---

[4]     Novell claims (at 13 ¶ 40) harm in "the marketplace" regarding licenses to Sun and Microsoft, but
upon inspection that assertion provides no basis for Novell's Motion.  The sole basis for the claim is a
single, conclusory sentence from the declaration of Novell's General Counsel, Joseph A. LaSala, Jr.  Mr.
LaSala states: "Novell competes with Sun and Microsoft in the marketplace, and is harmed when Sun

Because SVRX was the legacy technology and both parties had an interest in the growth of UnixWare, they did not contemplate that Santa Cruz would enter in a significant number of new SVRX licenses. (¶ 30.) Consistent with the purpose of Section 4.16(b), the sole purpose of the prior-approval requirement was to protect Novell's interest in the SVRX Royalties. (Ex. 14 ¶ 8; Ex. 15 ¶ 8; Ex. 19 ¶ 10.) Amendment No. 2 further made clear that Santa Cruz had a continuing right, as the owner of the UNIX business, to license the SVRX source code:

> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

Moreover, Novell's position does not square with the extrinsic evidence. First, Mr. Chatlos, Mr. Wilt, and REDACTED all agree that the prior-approval provision was intended solely as protection for Novell's interest in the SVRX binary royalties. (Ex. 14 ¶ 8; Ex. 15 ¶ 8; Ex. 19 ¶ 10.) Second, Novell's own conduct during the Cray negotiations in 1997 contradicts its

---

and Microsoft obtain licenses to SVRX technology without Novell's approval." (Declaration of Joseph A. LaSala. ¶ 7.) The Court should disregard the assertion, because it lacks foundation and is merely conclusory. Mr. LaSala does not even purport to describe (as the company's attorney) his supposed "personal knowledge" for the statement, how Novell competes with Sun or Microsoft, what "marketplace" he refers to, the relevance of "SVRX technology" in any such marketplace, or how Novell is harmed when Sun or Microsoft license such technology. On those bases alone, the Court should ignore the statement. See Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (noting that "conclusory and self-serving affidavits are not sufficient" for purposes of summary judgment); see also Rivera v. Pitt, 44 Fed. Appx. 934, 936-37 (10th Cir. 2002) (disregarding affidavit as conclusory and so lacking in foundation as to fail to constitute admissible evidence). In addition, the conclusory statement makes no sense on its own terms. Mr. LaSala does not even attempt to explain how "Novell's approval" would avoid the supposed "harm" to Novell as a result of the licensing of SVRX technology to Sun or Microsoft. Such licensing either harms Novell, does not harm Novell, or has no effect; Novell's mere "approval" would not make any difference. Mr. LaSala fails even to assert, moreover, that Novell would have refused to approve the Sun and Microsoft Agreements if (contrary to fact) they had the right to review them. At bottom, Mr. LaSala does not assert and thus makes no effort to specify or quantify at all any "harm" to Novell from the Sun and Microsoft Agreements at issue.

position today.  In 1997, Novell asked Santa Cruz to sign a letter agreement authorizing Novell to negotiate a potential buyout with Cray.  (¶¶ 58-59.)  The executed letter reveals that shared understanding of the parties that (1) Santa Cruz had the exclusive right to negotiate source code rights, and (2) that it was Novell who required Santa Cruz's "prior approval" before it could execute any settlement that "would alter Cray's obligation to SCO for source code royalties currently due under the Cray Agreements".  (Id.)  Indeed, consistent with Amendment No. 2, the letter shows that Novell could not even negotiate binary-royalty rights, over which it had a majority interest, without SCO's authorization.

Under Section B of Amendment No. 2, the parties must follow certain procedures for their joint management of "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations."  Novell accuses SCO (at 24 n.6) of violating Amendment No. 2 by allegedly failing to "consult Novell in connection with the Sun Agreement."  Novell points out that the Sun Agreement amended and restated the 1994 Sun Agreement under which Novell granted Novell its buyout.  Novell apparently believes that the 2003 Sun Agreements falls within the scope of Section 5 because it "concerns" a buyout.  That view defies the language of Amendment No. 2.

Section B plainly applies to an agreement that itself grants a buyout.  Paragraph B.4, for example, states that "Prior to either parties' unilateral determination as to the suitability of any potential buyout transaction, the parties will meet face to face and analyze the potential merits and disadvantages of the transaction."  (Jacobs Ex. 3 (emphasis added.).)  Novell seeks to apply the provision to the circumstances in which it least applies, when a licensee already has a buyout

and now merely enters into a subsequent agreement that merely relates to the prior agreement in which the buyout was granted.

Novell also ignores the circumstances that led to the execution of Amendment No. 2. The parties entered into Amendment No. 2 after SCO objected to Novell's unilateral attempt to grant IBM a buyout of its binary-royalty obligations. (¶¶ 33-36.) As explained by Larry Bouffard, the Novell account manager who conceived and oversaw the Novell-IBM buyout, the purpose of Amendment No. 2 was to protect <u>Santa Cruz</u> from any further attempts by Novell to grant unilateral buyouts. (¶ 35.) SCO did not run afoul of Amendment No. 2, simply because the Sun Agreement did not grant any buyout.

REDACTED

REDACTED                            Those agreements did not in any way affect the interest in binary royalties that Novell retained under the APA. Accordingly, SCO properly executed those agreements without seeking Novell's prior approval or participation.

————————————

SCO submits that the uncontroverted extrinsic evidence thus confirms the parties' intent under the APA and Amendments thereto, and therefore warrants summary judgment for SCO. With respect to the remainder of fact discovery, moreover, SCO reasonably expects that the prospective deposition testimony of other Novell and Santa Cruz employees will be consistent with the testimony that SCO has cited from the chief participants in the negotiation of the APA (Ed Chatlos and Jim Wilt) and in the course of performance of the obligations thereunder (Bill Broderick, John Maciaszek and Jean Acheson), and will thus further confirm that SCO was not obligated to remit to Novell the monies received under the Sun and Microsoft Agreements. (<u>See</u>

Declaration of Edward Normand (Dec. 11, 2006) (Ex. 40) ¶¶ 2-5.)  Accordingly, in addition to the grounds for denying Novell's Motion set forth throughout this Memorandum, and to the extent the Court may not enter summary judgment in SCO's favor, Novell's Motion also fails under Federal Rule of Civil Procedure 56(f).

> F.    Even If the Agreements at Issue Were Deemed to Be
>        SVRX Licenses, an Allocation Would Be Required.

If the Sun and Microsoft Agreements were deemed to be SVRX Licenses giving rise to SCO's obligation to remit SVRX Royalties, SCO would be obligated to remit only the de minimis payments that actually related to the licensing of SVRX products.  Both Agreements were first and foremost licenses for             REDACTED


REDACTED


To allocate the payments due Novell for the licensing of the SVRX products, the portions of the payments pertaining to other rights would have to be subtracted, including:

- REDACTED

- REDACTED

- REDACTED

Novell has not even attempted to carry its burden of proof to establish what amount should be allocated to SVRX licenses, even if its interpretation of the APA were adopted. While SCO submits that any reasonable allocation process would result in nominal or *de minimis* payments to Novell, Novell has failed to even conduct the necessary analysis.

## II.    NOVELL HAS NOT ESTABLISHED ANY ENTITLEMENT TO A PRELIMINARY INJUNCTION.

SCO shows below that under the controlling legal standards (Part II.A), Novell fails to satisfy the elements for a preliminary injunction (Parts II.B-D).

### A.    The Controlling Legal Standards.

The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurka v. Armstrong, 520 U.S. 968, 972 (1997) (per curium); accord Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (quotations and citation omitted)). The Supreme Court has more recently described the prejudgment asset-freeze injunction that Novell seeks as "the nuclear weapon of the law." Grupo Mexicano de Desarrollo SA v. Alliance Bond Fund Inc., 527 U.S. 308, 329 (1999).

Indeed, the Tenth Circuit has emphasized that "courts should be hesitant to grant the extraordinary interim relief of a preliminary injunction in any particular case, but especially so when such an injunction would alter the status quo prior to a trial on the merits." O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), aff'd sub nom. Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal, 126 S. Ct.

47

1211 (2006). Accordingly, in this Circuit, any motion for injunctive relief that seeks to alter the status quo "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." Id. at 975; accord Schrier, 427 F.3d at 1258-59.

The "status quo" under the foregoing standard is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Schrier, 427 F.3d at 1260 (quotations and citation omitted). Novell plainly seeks to alter the status quo. Instead of permitting SCO to do as it wishes with its cash in the best interests of its shareholders, as SCO has been doing, Novell asks the Court to place a constructive trust on those monies and preclude SCO from expending them for purposes of its business and pending litigation. The Court therefore must even more closely scrutinize Novell's request for a preliminary injunction.

In order to be entitled to a preliminary injunction, "the moving party must establish that: (1) he or she will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits." Schrier, 427 F.3d at 1258 (quotations, brackets, ellipsis, and citations omitted). SCO shows below that Novell fails to satisfy these elements.

B.    Novell Has Not Shown a Substantial Likelihood of Success on the Merits.

Novell acknowledges that all of the relief on which it seeks summary judgment turns on its interpretation of the APA and the amendments thereto. SCO has shown that the relevant evidence belies Novell's interpretation of the APA and the amendments and thus precludes the

summary judgment Novell seeks.  (See Part I, above.)  It follows that there is no basis for Novell's claim that it is substantially likely to prevail on the merits of that interpretation.

Where neither the plain language of the agreement at issue nor the extrinsic evidence of the parties' intent supports Novell's interpretation, Novell has not nearly established the requisite "clear and unequivocal" right to the relief that Novell seeks.  Schrier, 427 F.3d at 1258; see, e.g., Sick, Inc. v. Motion Control Group Corp., No. 01-1496 JRT/FLN, 2001 WL 1640055, at *5-6 (D. Minn. Sept. 7, 2001) (Ex. H) (party seeking preliminary injunction failed to establish likelihood of success on merits of claim relating to contract where at most the contract was ambiguous, and the extrinsic evidence of the parties' intent did not resolve the issue); Marshall v. R.S. Means Co., 940 F. Supp. 39, 41-42 (D. Mass. 1996) (party seeking preliminary injunction failed to establish likelihood of success on merits of claim relating to contract where the agreement was ambiguous and the moving party failed to adduce extrinsic evidence that would tend to resolve the ambiguity in its favor); Freedberg v. Landman, 930 F. Supp. 851, 856-58 (S.D.N.Y. 1996) (party seeking preliminary injunction failed to establish likelihood of success on merits of claim relating to contract where the contract was ambiguous and the extrinsic evidence of the parties' intent did not support the moving party's interpretation).  The lack of support for Novell's interpretation is particularly conspicuous in light of the heightened standard of scrutiny that applies here.  Schrier, 427 F.3d at 1258-59; O Centro, 389 F.3d at 975.

In order to establish a substantial likelihood of any financial recovery, moreover, Novell would have to take account of SCO's claims, which it fails to do.  The "purpose of the preliminary injunction is to assure that the non-movant does not take unilateral action which would prevent the court from providing effective relief to the movant should the movant prevail

on the merits." O Centro, 389 F.3d at 977. It follows that where the movant would not be entitled to any relief even if it did prevail on the merits, a preliminary injunction is unwarranted. Cf. L.G. Balfour Co. v. Drake, 703 F. Supp. 530, 532 (S.D. Miss. 1988).[5] In this case, even if Novell were to prevail on the merits of its claims for the monies paid under the Sun and Microsoft Agreements, any such recovery would be set-off against any recovery that SCO makes under its own claims. See, e.g., Winn-Senter Constr. Co. v. Healy Enters., Inc., No. CIV. A. 90-2173-O, 1992 WL 350224, at *6 (D. Kan. Oct. 22, 1992) (Ex. J) (offsetting award of damages on plaintiff's claim by amount of defendant's counterclaim). SCO shows briefly below with respect to the merits of its copyright claim, by way of example, that SCO's recovery on that claim would well exceed any recovery Novell might make on its counterclaims.[6]

The basis of SCO's copyright claim against Novell is that "Novell has infringed and continues to infringe SCO's copyrights by copying, reproducing, modifying, sublicensing, and/or distributing Linux products containing unauthorized contributions of SCO's copyrighted intellectual property," including UNIX System V, version 4 ("SVr4"). (SCO's 2d Am. Comp. ¶ 117.) SCO alleges that "Novell's unauthorized copying in its use and distribute of SuSE Linux includes but is not limited to the appropriation of numerous data structures and algorithms contained in or derived from SCO's copyrighted material." (Id. ¶ 118.)

---

[5]     In Balfour, the court considered a request by the plaintiff for a preliminary injunction imposing a constructive trust over funds that the defendants obtained via sale of plaintiff's merchandise. The defendants also asserted "claims for damages as a result of a contract breach by Balfour, which they believe to be a set-off of any debt owed by them to Balfour." 703 F. Supp at 531. The court held that Balfour sought to reach an award of damages "ahead of a judgment through an artifice of equity," and denied the request for preliminary injunction. Id. at 532-33.

[6]     The Court's stay of SCO's copyright claim is irrelevant to the analysis. The question at issue for purposes of analyzing Novell's request for preliminary injunction is whether Novell will ultimately retain a net recovery in this case, after the disposition of all of the parties' claims.

REDACTED

This alone precludes entry of a preliminary

injunction.

      C.     Novell Has Not Established That It Would Suffer Irreparable
             <u>Harm Without a Preliminary Injunction.</u>

Novell's request for a preliminary injunction and constructive trust also fails to satisfy the

element of irreparable harm.

1.    Risk of an Uncollectible Judgment Does
Not Constitute Irreparable Harm.

The prospect of economic loss or monetary damage to a party, which in reality is the outcome that Novell seeks to avoid, fails to constitute irreparable harm.  See Schrier, 427 F.3d at 1267; Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003); see also 11A C. Wright et al., Federal Practice & Procedure § 2948.1 (2006).

Novell nevertheless asserts (at 32-33) that it might be unable to collect a judgment if it were to prevail on its counterclaims – and (although Novell does not concede this point) if SCO were to lose its own claims.  This argument for irreparable harm fails as a matter of law.  A party's alleged prospective inability to collect on a claimed debt does not constitute irreparable harm.  See, e.g., Mid-States AG-Chem. Co. v. Atchison Grain Co., 750 F. Supp. 465, 467 (D. Kan. 1990).  "The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment."  Home-Stake Prod. Co. v. Talon Petro., C.A., 907 F.2d 1012, 1021 (10th Cir. 1990) (emphasis added) (quotations and citations omitted); accord In re Fredeman Litig., 843 F.2d 821, 824 (5th Cir. 1988); World Sleep Prods., Inc. v. Restonic Corp., No. 93-CV-986, 1995 WL 792078, at *2 (N.D.N.Y. Aug. 25, 1995) (Ex. K).

Indeed, as noted, the Supreme Court has more recently described the prejudgment asset-freeze injunction that Novell seeks as "the nuclear weapon of the law."  Grupo Mexicano, 527 U.S. at 329.  It is therefore particularly noteworthy that Novell's request for a preliminary injunction imposing a constructive trust ignores the controlling California law that directly defeats the request:

> To create a constructive trust, there must be a res, an "identifiable kind of property or entitlement in defendant's hands." (I Dobbs, Law of Remedies (1993) § 4.1(2), at 589-590.) As the United States Supreme Court recently said, a constructive trust requires "money or property identified as belonging in good conscience to the plaintiff which can clearly be traced to particular funds or property in the defendant's possession." (*Great-West Life & Annuity* Insurance *Co. v. Knudson* (2002) 534 U.S. 204, 213, 122 S. Ct. 708, 714.)

Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 947 (Cal. 1993). Where the recovery "cannot be traced to any particular funds" in the opposing party's possession, the request "is not the proper subject of a constructive trust." Id. at 947-48; see also In re Qwest Communications Int'l, Inc. Secs. Litig., 243 F. Supp. 2d 1179, 1184 (D. Colo. 2003) (analyzing Great-West Life and explaining that "a plaintiff seeking an asset freeze injunction must assert an equitable claim, and that claim must have a clear and close nexus to the assets sought to be enjoined").[7]

Novell does not meet its burden of showing that SCO's assets are monies received from Sun and Microsoft. Novell asserts that as of July 31, 2006, SCO's cash position was $8,861,000,[8] and acknowledges the $10 million in cash that SCO raised in November 2005 by

---

The absence of a specific res precludes the imposition of a constructive trust whether or not the proposed constructive trustee dissipated the res. Dobbs, Remedies. § 4.3, at 240-43 (1980) ("If defendant obtains Blackacre from the plaintiff by fraud, sells it and dissipates the money, this gives the plaintiff no claim to other property owned by the defendant, and it may not be said that the defendant is a constructive trustee of such other property."); accord Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-14 (2002); Honolulu Joint Apprenticeship & Training Comm. of United Ass'n Local Union No. 675 v. Foster, 332 F.3d 1234, 1237-38 (9th Cir. 2003); In re Kamand Constr., Inc., 298 B.R. 251, 258 n.5 (Bankr. M.D. Pa. 2003).

While SCO disputes the use of this "Cash and Cash Equivalents" figure in the "burn through" calculation performed by Novell (App. A ¶ 52), this number does in fact represent SCO's "Cash and Cash Equivalents" as filed with the SEC. (Jacobs Ex. 23 at 5.) Regardless of whether this number or the total liquid asset calculation of $13,961,000 (App. A ¶ 52) is used to approximate the "res" of the proposed trust, the total amount of SCO's remaining assets is far less than the monies SCO received from the Agreements, and the data noted by Novell clearly shows that those monies were dissipated prior to November 2005.

selling stock to investors long after the execution of the Sun and Microsoft Agreements. There is thus no remaining "res" from the payment of the amounts under the Sun or Microsoft Agreements. (Ex. 23 ¶¶ 3-6.) California law makes clear that where the alleged res of a constructive trust no longer exists, the imposition of a constructive trust "will not do equity" and therefore is inappropriate. St. James Armenian Church of Los Angeles v. Kurkjian, 47 Cal. App. 3d 547, 553 (1975); accord Dep't of Heckmann v. Ahamson, 168 Cal. App. 3d 119, 134 (1985). The lack of any "clear and close nexus" between those monies and the monies SCO received under the Sun and Microsoft Agreements combined with the fact that the monies in question have already been spent thus precludes the constructive trust Novell seeks.[9]

## 2. Novell's Delay Precludes Any Finding of Irreparable Harm.

Novell's stark delay in seeking its preliminary injunction further precludes its request. Novell first requested the Agreements from SCO by name in November of 2003, nearly three years before seeking a preliminary injunction. By the time they filed their counterclaims in July of 2005, some fourteen months before they sought the present injunction, Novell knew the context of the Sun and Microsoft Agreements well enough to assert that the agreements

---

[9]    The absence of a specific res also compels partial summary judgment against Novell on its claims for a constructive trust and/or accounting under its Third, Sixth, Seventh, Eighth, and Ninth causes of action. The cases Novell cites (at 25, 28-30) in asserting the propriety of a constructive trust underscore the "res" requirement that Novell fails to satisfy here. See Snepp v. United States, 444 U.S. 507, 514 (1980) (profits from future sales of a book); United States v. Pegg, 782 F.2d 1498, 1499 (9th Cir. 1986) (a house and lot); Oldland v. Gray, 179 F.2d 408, 414 (10th Cir. 1950) (a percentage royalty on future sales of oil produced under a lease); Bainbridge v. Stoner, 6 Cal. 2d 423, 429 (1940) (title to mining claims); GHK Assocs. v. Mayer Group, Inc., 224 Cal. App. 3d 856, 878 (1990) (future rent and sales proceeds from a construction project); Heckmann v. Ahmanson, 168 Cal. App. 3d 119, 127-28 (1985) (profits from tender offer); Kraus v. Willow Park Pub. Golf Course, 73 Cal. App. 3d 354, 358 (1977) (a leasehold interest in real property); Ornbaum v. Main, 198 Cal. App. 2d 92, 95, 99 (1961) (a cabin). In this case, Novell points to no current or future res over which it could be entitled to any such constructive trust.

concerned "UNIX Technology" that it claimed "SCO does not own." (Answer and Countercls. at 23.) Yet Novell did not attempt to seek injunctive relief at either of these junctures. These delays in seeking relief are far outside the acceptable range that legally permits a party to claim that it faces irreparable harm.

Delay in seeking a preliminary injunction severely undermines any claim that the moving party faces irreparable harm. See 11A C. Wright et al., Federal Practice and Procedure. § 2948.1 (2006) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Federal courts have found that delay alone "can be fatal to a motion for preliminary injunction." Bristol Tech. Inc. v. Microsoft Corp., 42 F. Supp. 2d 153, 162 (D. Conn. 1998); see Citibank N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir. 1985) (ten-week delay in seeking preliminary injunction indicated an absence of irreparable harm); Rexnord, Inc. v. Laitram Corp., 628 F. Supp. 467, 474 (E.D. Wis. 1986) (failure to promptly move for an injunction is fatal to contention of irreparable harm); Allen Organ Co. v CBS, Inc., No. 84 Civ. 3856 (SWK), 1986 WL 4901, at *2 (S.D.N.Y. Apr. 21, 1986) (Ex. A) ("Allen's eight month delay in seeking relief is thus fatal to its request for a preliminary injunction, and the motion is denied.").

Within this Circuit, courts also have found that a delay in seeking preliminary relief undercuts a party's assertion of irreparable harm. See GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984) ("Delay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm pendente lite; therefore, such delay may justify denial of a preliminary injunction for trademark infringement."); Nature's Life, Inc. v. Renew Life Formulas, Inc., No. 2:05 CV 162, 2006 WL 62829, at *5 (D. Utah Jan. 11, 2006) (Ex. E)

(finding that a nine-month delay "severely undercuts Renew Life's claim that it is suffering immediate and irreparable harm as a result of Nature's Life updated logo" and denying Renew Life's motion for preliminary injunction); Utah Gospel Mission v. Salt Lake City Corp., 316 F. Supp. 2d 1201, 1221 (D. Utah 2004) (Kimball, J.) (finding that five-month delay "belie[d] any irreparable injury to [plaintiffs'] rights" and citing 11A C. Wright et al. Federal Practice & Procedure § 2946 and Citibank, N.A., 756 F.2d at 276 in support of viewing delay as inconsistent with finding of irreparable harm); see also Kan. Health Care Assoc., Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1544 (10th Cir. 1994) (holding that "[a]s a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury," but finding a delay of three months after the conclusion of settlement negotiations acceptable). Further, "a delay in seeking a preliminary injunction indicates that the damages plaintiff contemplates are not serious enough to justify a preliminary injunction." Mid-States, 750 F. Supp. at 467; see also Kingsford Prods. Co. v. Kingsford, Inc., 674 F. Supp. 1428, 1431 (D. Kan. 1987) (delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief").

By its own pleadings, Novell knew of the existence of the Agreements between SCO and Sun and Microsoft by November 21, 2003, when they "demanded copies" (at 13) of the Agreements from SCO. Novell amended its counterclaims in September 2006 to squarely assert these claims. By any measure, this request for preliminary relief coming on the eve of the most critical year in SCO's litigation should be rejected as untimely.

D.    The Balance of Hardships Heavily Favors SCO.

Novell briefly argues (at 34) that the balance of hardships weigh in its favor, but the opposite is true, and SCO submits that it is not a close call.

It is true across jurisdictions that where the moving party can continue its business absent the injunction, but the injunction would preclude the non-moving party from sustaining its operations, the balance of hardships plainly weighs in favor of the non-moving party. See Aspen Limousine Serv., Inc. v. Colo. Mountain Express, Inc., 891 F. Supp. 1450, 1458 (D. Colo. 1995) (balance of hardships weighed in non-moving party's favor where, even if the moving party would suffer irreparable harm absent the injunction, the injunction would require the shutdown of the overwhelming majority of the non-moving party's business); Mid-States, 750 F. Supp. at 467 (balance of hardships weighed in non-moving party's favor where absent the preliminary injunction the moving party "is not in jeopardy of having to shut down," whereas as a result of the injunction the non-moving party "will be forced to go out of business"); see also Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 707-08 (Fed. Cir. 1997) (district court properly considered on question of balance of hardships that "Bell & Howell would sustain only minimal damage if a preliminary injunction did not issue, and that Keystone would be put out of business if a preliminary injunction did issue"); Ill. Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679. 683 (Fed. Cir. 1990) (balance of hardships weighed in non-moving party Grip-Pak's favor where granting the preliminary injunction "might destroy Grip-Pak while a denial would leave ITW a going concern"); Docusign, Inc. v. Sertifi, Inc., No. C06-0906Z, 2006 WL 3000134, at *4 (W.D. Wash. Oct. 19, 2006) (Ex. B) (balance of hardships weighed in non-moving party's favor where the moving party might "lose market share," but the non-moving

57

party "would be put out of business"); Visto Corp. v. Sproqit Techs., Inc., 413 F. Supp. 2d 1073,

1093 (N.D. Cal. 2006) (balance of hardships weighed in non-moving party's favor where, even if

the moving party would suffer irreparable harm absent the injunction, the injunction would

"devastate" the non-moving party's business); Grease Monkey Int'l, Inc. v. Ralco Lubrication

Servs., Inc., 24 F. Supp. 2d 120, 125 (D. Mass. 1998) (balance of hardships weighed in non-

moving party's favor where the moving party's "alleged harm is compensable" but a preliminary

injunction would shut down part of the non-moving party's business operations).

    The preliminary injunction Novell seeks would likely preclude SCO from sustaining its

operations. The very premise of Novell's request is that the Court impose a constructive trust on

SCO's remaining cash reserves.      REDACTED

REDACTED

    In contrast, Novell does not (because it cannot) even claim that, absent the injunction,

Novell's business would be threatened in the least. Novell argues only an immediate desire for

money, asserting without explanation that absent an injunction it "will permanently lose" the

requested royalties, but that is plainly untrue. If there ever were a bankruptcy, the estate would

pursue SCO's valuable legal claims; and if there ever were a net judgment in Novell's favor,

Novell would be a creditor to be compensated. Accordingly, the balance of hardships weighs heavily in SCO's favor.

E.    The Proposed Injunction Is Adverse to the Public Interest.

Novell argues at bottom (at 34-35) that its proposed preliminary injunction would not be against the public interest because the injunction would be the product of the Court's enforcement of the law underlying the causes of action Novell has brought and would discourage SCO from violating such law. If that were sufficient to satisfy the "public interest" factor, any finding of the likelihood of success on the merits would mean the preliminary injunction is in the public interest. Under the precedent, however, the "public interest" factor requires independent consideration, and Novell fails to satisfy it in this case for two main reasons.

First, the public interest is not served when a preliminary injunction precludes the non-moving party from operating its business. See Docusign, 2006 WL 3000134, at *4 (preliminary injunction would adversely affect the public interest by putting a corporation out of business); Grease Monkey, 24 F. Supp. 2d at 126 (preliminary injunction would adversely affect the public interest by shutting down part of the non-moving party's business and thereby depriving customers of the services of the business); Aspen Limousine, 891 F. Supp. at 1458-59 (same). The injunction Novell seeks would preclude SCO from serving its current and future customers, and thus is not in the public interest.

Second, there is a strong public interest in the enforcement of the copyright laws. See, e.g., Fin. & Sec. Prods. Ass'n v. Diebold, Inc., No. C 04-04347 WHA, 2005 WL 1629813, at *7 (N.D. Cal. July 8, 2005) (Ex. C); Motown Record Co. v. Imesh.com, Inc., No. 03 Civ. 7339 (PKC), 2004 WL 503720, at *7 (S.D.N.Y. Mar. 12, 2004) (Ex. D); Silverstein v. Penguin

Putnam, Inc., No. 01 Civ. 309 JFK, 2003 WL 21361734, at *3 (S.D.N.Y. June 12, 2003) (Ex. I).

Novell's proposed injunction would preclude SCO from pursuing its copyright claims in this

case as well as the IBM and AutoZone litigations, and thus is not in the public interest. Indeed,

the injunction would preclude SCO from enforcing any of its causes of action in this litigation

and the others. If the general standard that Novell proposes were to apply – that it is in the

public interest for the court to enforce the law underlying a party's legal claims – then it follows

that it is not in the public interest for the Court to impose an injunction that would preclude SCO

from having the Court or factfinder enforce the law underlying SCO's many claims in its

pending litigations.

  F.  Novell Should Be Required to Post Substantial Security
     Before Any Preliminary Injunction Could Lawfully Issue.

  Novell asserts in a footnote (at 31 n.9) that it need not post security, under Federal Rule

of Civil Procedure 65(c), because "there is no risk of monetary loss to the enjoined party." That

is incorrect. Rule 65(c) states in pertinent part: "No restraining order or preliminary injunction

shall issue except upon the giving of security by the applicant, in such sum as the court deems

proper, for the payment of such costs and damages as may be incurred or suffered by any party

who is found to have been wrongfully enjoined or restrained." "When setting the amount of

security, district courts should err on the high side." Mead Johnson & Co. v. Abbott Labs., 201

F.3d 883, 888 (7th Cir. 2000); accord Manpower Inc. v. Mason, 405 F. Supp. 2d 959, 976 (E.D.

Wis. 2005); Scanvec Amiable Ltd. v. Chang, No. Civ. A. 02-6950, 2002 WL 32341772. at *3

(E.D. Pa. Nov. 1, 2002) (Ex. G).

  Only "if there is an absence of proof showing a likelihood of harm" to the non-moving

party may a court properly consider dispensing with an injunction bond. Coquina Oil Corp. v.

Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987) (quotations and citation omitted).[10] The circumstances here do not satisfy that exception. The prospective damages to SCO is not measured by the money that Novell asks to be placed into a constructive trust, as Novell argues (at 31 n. 9), but rather by the harm SCO would suffer as a result of its inability to use that money to pursue its legal claims. That harm is both irreparable and substantial. Where Novell seeks a constructive trust over all of SCO's cash reserves, the necessary and likely intended effect of the requested preliminary injunction would be to shut down SCO. Such an outcome would cause SCO irreparable harm. (¶ 82.) See Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984) (a business suffers irreparable harm if forced to shut down while awaiting trial); accord Manpower, 405 F. Supp. at 974.[11]

SCO has shown above, moreover, that the value of its pending claims against IBM and Novell must be measured in the multiple hundreds of millions of dollars – far exceeding the recovery Novell seeks to protect through its requested preliminary injunction. (See Part II.D, above.) Accordingly, in the event it determines to enter a preliminary injunction, the Court should both require Novell to post security and to err on the high side in fixing the amount of such security. Acknowledging a reasonable discount on the likelihood of prevailing on its claims

---

[10]    Other circuits have declined to recognize any exception to the security requirement set forth in Rule 65(c). See, e.g., Md. Dep't of Human Res. v. U.S. Dep't of Agric., 976 F.2d 1462, 1483 n.20 (4th Cir. 1992) ("The rule's only exception to the security requirement exempts 'the United States or . . . an officer or agency thereof.' . . . There are no other exceptions.").

[11]    Novell cites Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782-83 (10th Cir. 1964), but the brief consideration of Rule 65(c) in that case turned on the court's view that the enjoined party was unlikely to suffer any damages and that, if it did, they would be solely in the form of easily compensable monetary harm. Similarly, in the cases cited in Continental regarding Rule 65(c), the court expressly found that the enjoined party would not suffer any harm as a result of the injunction. See Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961); Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 815-16 (6th Cir. 1954). Those facts do not exist in this case: SCO will in fact suffer considerable and irreparable harm if the injunction is imposed.

against IBM and Novell, SCO requests that the Court require Novell to post a bond of at least

$400 million. See, e.g., Sanofi-Synthelabo v. Apotex Inc., No. 02 Civ. 2255 (SHS), 2006 WL

2516486, at *28-29 (S.D.N.Y. Aug. 31, 2006) (Ex. F) (requiring plaintiff to post a bond for

$400, reflecting defendant's potential lost profits, market share, and cost of re-launch of

business); City of Philadelphia v. One Reading Ctr. Assocs., 143 F. Supp. 2d 508, 528 (E.D. Pa.

2001) (requiring plaintiff to post a bond for $80 million, reflecting the value of the sale the

injunction would preclude); see also Mead Johnson, 201 F.3d at 888 (reversing district court and

noting that a bond requirement of $50 million, erring on the high side, rather than the $1 million

bond the court had imposed would have been appropriate).

## CONCLUSION

SCO respectfully submits, for the foregoing reasons, that the Court should deny Novell's

Motion for Partial Summary Judgment or Preliminary Injunction and grant SCO's Cross-Motion

for Summary Judgment.

DATED this 12th day of December, 2006.

<div style="margin-left:40%;">

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

*Counsel for The SCO Group, Inc.*

By: _____

</div>

63

## CERTIFICATE OF SERVICE

I, Edward Normand, hereby certify that a true and correct copy of the foregoing SCO's Memorandum in Opposition to Novell's Motion For Partial Summary Judgment or Preliminary Injunction and in Support of SCO's Cross Motion For Summary Judgment or Partial Summary Judgment, in redacted form, was served on this 12th day of January, 2007, via CM/ECF to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-2482


_____/s/ Edward Normand_____
          Edward Normand