## Appendix A

## Response to Novell's Statement of Undisputed Facts[1]

**A.    The Creation of the Agency Relationship Under the Novell-Santa Cruz Asset Purchase Agreement.**

1.    In 1995, Novell was engaged in the business of developing a line of software products known as UNIX and UnixWare, and was selling binary and source code licenses to various versions of these products. (Declaration of Michael Jacobs in Support of Motion for Partial Summary Judgment and Motion for Preliminary Injunction ("Jacobs Decl."), Ex. 1 (APA) at 1 (Recital A).)

Disputed in that on September 19, 1995, Novell transferred the entire UNIX business, including the UNIX source code and copyrights, to Santa Cruz except for the binary royalties paid under the existing agreements pursuant to which UNIX System V (or "SVRX") licensees were paying such royalties, and which Novell conveyed to Santa Cruz under the APA as part of the UNIX business. (¶¶ 1-20, 38-61.)

2.    On September 19, 1995, Novell and Santa Cruz entered into an Asset Purchase Agreement ("APA"). (*Id.* at 1.)

Undisputed.

3.    Through the APA, Santa Cruz acquired certain Novell assets relating to UNIX and UnixWare. (*Id.* at 1-2 (Recital B, § 1.1(a).)

Disputed to the extent that the term "certain Novell assets" suggests that after September 19, 1995, Novell retained any portion of the UNIX business, including the UNIX source code and copyrights, except for the binary royalties paid under the existing agreements pursuant to which SVRX licensees were paying such royalties. (¶¶ 1-20, 38-61.)

---

[1] In citing its basis for disputing an IBM statement of fact, SCO cites herein either the paragraphs in SCO's Statement of Facts above or directly to exhibits, or both.

Dockets.Justia.com

4.    In consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz issued 6,127,500 shares of its common stock to Novell. (*Id.* at 2 (§ 1.2(a)).)

Disputed to the extent that the term "certain Novell assets" suggests that after September 19, 1995, Novell retained any portion of the UNIX business, including the UNIX source code and copyrights, except for the binary royalties paid under the existing agreements pursuant to which SVRX licensees were paying such royalties. (¶¶ 1-20, 38-61.)

5.    In further consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz agreed "to collect and pass through to [Novell] one hundred percent (100%) of the SVRX Royalties as defined and described in Section 4.16" of the APA. (*Id.* at 2 (§ 1.2(b)) (collectively with § 4.16, "Agency Provisions").) In turn, Novell agreed to pay Santa Cruz "an administrative fee of five percent (5%) of the SVRX Royalties." (*Id.*)

Disputed to the extent that the term "certain Novell assets" suggests that after September 19, 1995, Novell retained any portion of the UNIX business, including the UNIX source code and copyrights, except for the binary royalties paid under the existing agreements pursuant to which SVRX licensees were paying such royalties. (¶¶ 1-20, 38-61.) Disputed to the extent Novell now uses the term "SVRX Royalties" to include fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

**B.    The APA's Agency Provisions Concerning SVRX Royalties.**

6.    The APA defines the "SVRX Royalties" that Santa Cruz was obligated "to collect and pass through" to Novell. (Jacobs Decl., Ex. 1 at 24 (§ 4.16(a)).) Section 4.16(a) provides that Santa Cruz "shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses" and that these "royalties, fees and other amounts" would be "referred to herein as 'SVRX Royalties.'" (*Id.*)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under

2

the APA for the distribution of SVRX products in binary form.  (¶¶ 6-36, 38-61.)  Disputed to

the extent the term "SVRX Licenses" includes agreements other than the product Supplements

(also known as product Schedules) under which Novell, like its predecessor and successors,

actually licensed SVRX products.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent that the

statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under

the APA.  (¶¶ 6-20, 28-32, 39-75.)

     7.     The term "SVRX Licenses" is also defined by Section 4.16 of the APA.  The first sentence of subparagraph (a) of Section 4.16 refers to "SVRX Licenses" and is then immediately followed by an explanatory parenthetical stating:  "as listed in detail under item VI of Schedule 1.1(a) hereof."  (*Id.*, Ex. 1 at 24 (§ 4.16(a)).)  Item VI of Schedule 1.1(a), in turn, provides a list of "the SVRX Licenses" that relate to various UNIX System V software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2 and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0."  (*Id.* at Sch. 1.1(a), pps. 3-4.)[2]

Disputed to the extent the term "SVRX Licenses" includes agreements other than the

product Supplements (also known as product Schedules) under which Novell, like its

predecessor and successors, actually licensed SVRX products.  (¶¶ 6-20, 28-32, 39-75.)

---

[2] Novell includes the following footnote:

> Amendment No. 1 further expanded the term "SVRX Licenses" to include contracts relating to certain "Auxiliary Products" that are specifically identified in Attachment A to that Amendment.  Item K.4 of Amendment No. 1 thus provides that "SVRX Licenses" shall "collectively" refer to the contracts relating to the aforementioned UNIX System V releases and Auxiliary Product Licenses.  The "Auxiliary Products" are listed in Attachment A to Amendment No. 1 (also referred to as "Attachment 1 to Schedule 1.1(a)").  (Jacobs Decl., Ex. 2 (Amendment No. 1) at 8 (§ K.1(vi)), 9 (§ K.4), 10 (§ O).)

The footnote is disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed the SVRX products and Auxiliary products.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent that the statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under the APA.  (¶¶ 6-20, 28-32, 39-75.)

Disputed to the extent that the statement includes any agreement other than the SVRX licenses

transferred to Santa Cruz under the APA. (¶¶ 6-20, 28-32, 39-75.)

8.     The APA transfers "the SVRX Licenses" to Santa Cruz. (*Id.* at 2 (§ 1.2(b)).)
However, Novell and Santa Cruz expressly "acknowledge[d] and agree[d] that [Novell] is
retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to
[Santa Cruz] hereto, and that [Santa Cruz] only has legal title and not an equitable interest in
such royalties . . . ." (*Id.*)

Disputed to the extent the term "SVRX Licenses" includes agreements other than the

product Supplements (also known as product Schedules) under which Novell, like its

predecessor and successors, actually licensed SVRX products. (¶¶ 6-20, 28-32, 39-75.)

Disputed to the extent that the statement includes any agreement other than the SVRX licenses

transferred to Santa Cruz under the APA. (¶¶ 6-20, 28-32, 39-75.) Disputed to the extent the

term "SVRX Royalties" includes fees other than the per-copy, or binary-royalty, fees paid by

licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of

SVRX products in binary form. (¶¶ 6-36, 38-61.)

9.     Novell and Santa Cruz contemplated that certain assets would be excluded from
purchase and identified them on Schedule 1.1(b) to the APA. (*Id.* at 1-2 (§ 1.1(a)).) Schedule
1.1(b) specifically memorializes that the APA did not transfer any rights to the SVRX Royalties
to Santa Cruz. Listed as an excluded asset in Schedule 1.1(b) is: "*[a]ll right, title and interest to
the SVRx Royalties*, less the 5% fee for administering the collection thereof pursuant to Section
4.16." (*Id.* at Sch. 1.1(b), p. 2 (emphasis added).)

Disputed in that the APA transferred the entire UNIX business, including the UNIX

source code and copyrights, to Santa Cruz except for the binary royalties paid under the existing

agreements pursuant to which SVRX licensees were paying such royalties, and which Novell

conveyed to Santa Cruz under the APA as part of the UNIX business. (¶¶ 1-20, 38-61.)

10.     Santa Cruz assumed certain obligations by virtue of these SVRX Agency
Provisions in the APA. First, the APA requires Santa Cruz to act as an administrative agent of
Novell in the collection of "all royalties, fees and other amounts due under all SVRX Licenses."

4

Santa Cruz "shall diligently seek to collect all such royalties, funds and other amounts when due." (*Id.*, Ex. 1 at 24 (§ 4.16(a)).)

Disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products. (¶¶ 6-20, 28-32, 39-75.) Disputed to the extent that the statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under the APA. (¶¶ 6-20, 28-32, 39-75.) Disputed to the extent the term "royalties, fees and other amounts" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

11.     The Agency Provisions also oblige Santa Cruz to pass through the SVRX Royalties to Novell within a prescribed time period. Section 4.16(a) requires that, within 45 days of the end of each fiscal quarter of Santa Cruz, Santa Cruz "shall deliver to [Novell] . . . 100% of any SVRX Royalties collected in the immediately preceding quarter." (*Id.*) This deadline was later altered so as to require Santa Cruz to pass through the SVRX Royalties to Novell "within one (1) calendar month following each calendar month in which SVRX royalties . . . are received" by Santa Cruz. (*Id.*, Ex. 2 (Amendment No. 1) at 6 (§ 1(1)).)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

12.     Amendment No. 1 to the APA further obliges Santa Cruz to give Novell: (1) an estimate of the total SVRX Royalties amount within six days following the calendar month when the royalties are received; and (2) a "report detailing all such royalties," within one calendar month following each calendar month in which SVRX Royalties are received by Novell. (*Id.*, Ex. 2 at 4-6 (§§ E(f), I(1)).) "Such monthly reports shall be separately broken down by revenue type (i.e., source code right to use fees, gross and net binary per copy fees, and support fees), by product, by customer, by quarterly period by which distribution occurs, and by country . . . of distribution." (*Id.*, Ex. 2 at 4 (§ E(f)).)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy,

or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under

the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

13.     The APA gives Novell the right, as the principal, to audit Santa Cruz's
administration of the SVRX Royalties program. Section 1.2(b) provides that Novell "shall be
entitled to conduct periodic audits of [Santa Cruz] concerning all royalties and payments due to
[Novell] hereunder or under the SVRX Licenses." (*Id.*, Ex. 1 at 2 (§ 1.2(b)).)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy,

or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under

the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

14.     Further, under Section 4.16(b) of the APA, Novell retains the "sole discretion" to
direct Santa Cruz to amend, supplement, modify, waive or assign any rights under or to any
SVRX Licenses; if Santa Cruz fails to take any such action, the APA specifically grants Novell
the right to take these actions on behalf of Santa Cruz. (*Id.* at 24 (§ 4.16(b)).) Novell also retains
the right to veto Santa Cruz's attempts to "enter into amendments of the SVRX Licenses,"
subject to two limited exceptions listed in Section J of Amendment No. 1, and "to enter into new
SVRX Licenses," subject to one of those limited exceptions. (*Id.*, Ex. 2 at 6 (§ J).) Section J
does not, however, alter Santa Cruz's duty to remit "all royalties, fees and other amounts"
flowing from any new or amended SVRX Licenses that satisfy these limited exceptions. (*Id.*,
Ex. 1 at 24 (§ 4.16(a).)

Disputed to the extent the term "SVRX Licenses" includes agreements other than the

product Supplements (also known as product Schedules) under which Novell, like its

predecessor and successors, actually licensed SVRX products. (¶¶ 6-20, 28-32, 39-75.)

Disputed to the extent that the statement includes any agreement other than the SVRX licenses

transferred to Santa Cruz under the APA. (¶¶ 6-20, 28-32, 39-75.) Disputed in that the

statement ignores the parties' intent as clarified in Amendment No. 2. (¶¶ 28-32; Jacobs Ex. 3.)

Disputed to the extent the term "royalties, fees and other amounts", as clarified in Amendment

No. 1, includes fees other than the per-copy, or binary-royalty, fees paid by licensees under

SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.)

15.    Amendment No. 1 permits Santa Cruz to retain 100% of only four narrow categories of SVRX Royalties:

(i)    fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a) [of the APA];

(ii)    source code right to use fees under existing SVRX Licenses from the licensing of additional CPU's and from the distribution by Buyer of additional source code copies;

(iii)    source code right to use fees attributable to new SVRX licenses *approved by Seller pursuant to Section 4.16(b) hereof*; and

(iv)    royalties attributable to the distribution by Buyer and its distributors of binary copies of SVRX products, to the extent such copies are made by or for Buyer pursuant to Buyer's own licenses from Seller acquired before the Closing Date through Software Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A.

(*Id.*, Ex. 2 at 3 (§ E(e)) (emphasis added).) Amendment No. 1 does not, however, alter SCO's duty to report the details of these SVRX Royalties to Novell. *See* ¶ 12, *supra*. Moreover, Novell remains the equitable owner *of all other categories* of SVRX Royalties, and SCO remains obliged to "collect and pass [them] through" to Novell. (*Id.* at 3, 4.)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form. (¶¶ 6-36, 38-61.) Disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products. (¶¶ 6-20, 28-32, 39-75.) Disputed to the extent that the statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under the APA. (¶¶ 6-20, 28-32, 39-75.)

7

16.    In return for Santa Cruz's agency functions relating to the collection and administration of the SVRX Royalties, Novell agreed to pay Santa Cruz an administrative fee equivalent to 5% of the Royalties, but only after Santa Cruz fulfills its duty to pass them through to Novell.  (*Id.*, Ex. 1 at 24 (§ 4.16(a)); Ex. 2 at 6 (§ l(1)).)

Disputed to the extent the term "SVRX Royalties" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form.  (¶¶ 6-36, 38-61.)

### C.    Santa Cruz's Further Obligations Concerning Potential Buy-Out Transactions.

17.    On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA.  (Jacobs Decl., Ex. 3 (Amendment No. 2).)

Undisputed.

18.    In Amendment No. 2, Novell and Santa Cruz agreed to a procedure that would govern "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations."  (*Id.* at 1 (§ B(1)-(5)).)  They agreed that: (1) they "will" provide written notification to each other upon becoming aware of any potential buy-out transaction; (2) "any meetings and/or negotiations with the licensee will be attended by both parties, unless agreed otherwise;" (3) "any written proposal to be presented to the licensee, including drafts and final versions of any proposed amendments to the SVRX licenses, will be consented to by both parties prior to its delivery to the licensee, unless agreed otherwise;" and (4) "prior to either parties' unilateral determination as to the suitability of any potential buy-out transaction, the parties will meet face to face and analyze the potential merits and disadvantages of the transaction."  The parties also agreed that, "[n]o such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy."  (*Id.*)

Disputed to the extent the term "SVRX licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products.  (¶¶ 6-20, 28-32, 39-75.) Disputed to the extent that the statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under the APA.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent the

term "royalty" includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary form.  (¶¶ 6-36, 38-61.)  Disputed to the extent the statement suggests that the quoted procedures in Section B of Amendment No. 2 apply to any negotiations other than those for a prospective agreement granting an SVRX licensee a buyout of its SVRX binary-royalty obligations.  (¶¶ 33-36.)

### D.    The Sale of UNIX Assets from Santa Cruz to Caldera; Caldera's Name Change to SCO.

19.    Approximately five years after execution of the APA, on August 1, 2000, Caldera Systems acquired Santa Cruz's Server Software and Professional Services divisions.  (Jacobs Decl., Ex. 4 (July 31, 2003 SCO Form 10-Q) at 6.)  The Server Software division included Santa Cruz's UNIX-related business.  (*Id.*)

Undisputed.

20.    On May 7, 2001, Caldera International ("Caldera") was formed as a holding company to own Caldera Systems, including the assets, liabilities and operations of Santa Cruz's Server Software and Professional Services divisions.  (*Id.*)

Undisputed.

21.    On August 26, 2002, Caldera announced that it would change its name to The SCO Group, Inc. ("SCO"), pending shareholder approval; on or about that time, Caldera began doing business as SCO.  (*Id.*, Ex. 5 (2002 Caldera Form 10-K) at 41.)  Caldera's name change to SCO was formalized on May 16, 2003.  (*Id.*, Ex. 4 at 6.)

Undisputed.

22.    SCO claims to be the successor-in-interest to Santa Cruz's rights and obligations under the APA.  (SCO's Second Amended Complaint, Feb. 3, 2006, at 22 (¶ 88).)

Undisputed.

9

**E.     SCO's Financial Difficulties Until 2003.**

23.     Prior to Caldera's acquisition of Santa Cruz's Server Software and Professional Services divisions in 2001, substantially all of Caldera's revenue had been derived from sales of Linux products and services.  Caldera was unsuccessful, however, in creating a profitable Linux business.  (SCO's Reply to Novell's Counterclaims, May 1, 2006, at 6 (¶ 31).)

Disputed to the extent the term "unsuccessful" is ambiguous.  Caldera (like Novell and nearly all other companies) did not produce a profitable Linux business.  (SCO's Reply to Novell's Counterclaims, May 1, 2006, at 6 (¶ 31).)  Disputed to the extent that Caldera's revenues were affected by the unauthorized use of SCO's proprietary UNIX code and other protected materials in Linux.  (Ex. 32 at 62-69 and attached Exs. 6-7.)

24.     After the Santa Cruz acquisition, Caldera derived most of its revenues from UNIX products and services, ranging from 90-95% of Caldera's revenues during fiscal years 2001 and 2002.  (*Id.* at 6 (¶ 32).)  However, Caldera's revenue from sale of its UNIX-based products declined after acquiring these UNIX operations from Santa Cruz.  (Jacobs Decl., Ex. 5 at 12.)

Undisputed that after the acquisition of Santa Cruz's Software and Professional Services divisions, most of Caldera's revenue came from UNIX products and services, including approximately 90% of its total revenues at the end of fiscal year 2001 and 95% of its total revenues at the end of fiscal year 2002.  Undisputed that (at least in part because of the unauthorized use of SCO's proprietary UNIX code and other protected materials in Linux) Caldera's actual and forecasted revenues from the sale of UNIX-based products declined in the fiscal quarters following the acquisition.  (SCO's Reply to Novell's Counterclaims, May 1, 2006, at 6 (¶ 32); Ex. 32 at 62-69 and attached Exs. 6-7.)

25.     Until 2003, SCO had never been profitable.  In fact, Caldera "incurred significant losses during the years ended October 31, 2002, 2001, and 2000."  (*Id.* at 40.)  For the fiscal year ending October 31, 2000, the company posted operational losses of $31,999,039, followed by $133,636,000 in 2001, and $24,176,000 in 2002.  (*Id.* at 34-35; Ex. 6 (2000 Caldera Amended Form 10-K) at 47-48.)  SCO was burning through cash at a precipitous rate; its $36,560,267 in

cash and cash equivalents for fiscal year 2000 dropped 44% to $20,541,000 for fiscal year 2001. (*Id.*) From 2001 to 2002, its cash and cash equivalents fell an additional 78%, to just $6,589,000. (*Id.*)

Disputed to the extent that portions of Caldera's and SCO's losses were attributable to the unauthorized use of SCO's proprietary UNIX code and other protected materials in Linux. (Ex. 32 at 62-69 and attached Exs. 6-7.) Disputed to the extent that SCO reported $1,894,000 in "restricted cash" in FY 2001, making its "Cash and Cash Equivalents" $22,435,000 in 2001 instead of the 20,541,000 stated by Novell. (Jacobs Ex. 5 p. 34.) This difference results in a 39% decrease, rather than the 44% stated by Novell. Undisputed as to the data as reported on SCO's SEC filings.

26.    Until 2003, SCO's total assets were also quickly dwindling, especially in comparison to its high operating expenses. (*Id.*) For 2000, the company posted total assets of $107,518,303, and $32,252,026 in total operating costs. (*Id.*) By fiscal year 2001, those assets had fallen 30% to $74,859,000, while operating expenses jumped to $159,154,000. (*Id.*) For 2002, SCO reduced total operating costs to $70,101,000, but total assets fell another 50% to $37,406,000. (*Id.*)

Disputed to the extent the terms "quickly dwindling" and "in comparison to its high operating expenses" are ambiguous. Undisputed as to the data as reported on SCO's SEC filings. Disputed to the extent that the 2001 operating expenses included a series of non-cash write-offs totaling $94,173,000 that were not present in the 2000 time period and make the comparison attempted by the statement inappropriate. (Jacobs Ex. 5 at 34.)

27.    By the end of 2002, SCO had only $6,589,000 in cash and cash equivalents, total assets of just over $21 million, and a stock price hovering below $2 per share. (*Id.*, Ex. 5 at 15, 34-35.)

Disputed to the extent the term "hovering" is ambiguous. Undisputed as to the data as reported on SCO's SEC filings.

**F.    The 2003 SCOsource Campaign and SCO's Agreements with Sun and Microsoft.**

28.    In January 2003, SCO announced its "SCOsource" initiative to increase revenue by licensing UNIX technology that it claimed to own. (*See, e.g.*, Jacobs Decl., Ex. 7 (2003 SCO Form 10-K) at 3-4, 9; Ex. 8 (May 12, 2003 SCO letter).) In implementing SCOsource, SCO publicly stated that it owned the UNIX copyrights, wrote letters to Linux users and distributors threatening to sue them for infringement, and filed a number of lawsuits against end-users and distributors. (*Id.*)

Disputed to the extent the statement implies that SCO does not own the UNIX technology

that is the subject of the SCOsource initiative. (SCO's Mem. in Opp. to IBM's Mot. for Summ.

J. on SCO's Contract Claims, SCO v. IBM, No. 2:03CV-0294, Nov. 11, 2006, at 63-65.)

Disputed to the extent that the statement characterizes SCO's actions to enforce its rights

concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."

29.    As part of SCOsource, SCO began to license the right to use UNIX technology. (Jacobs Decl., Ex. 7 at 9, 18, 24.)

Disputed to the extent the statement suggests that SCO had ever intentionally neglected

to enforce its rights concerning SCO's proprietary UNIX code and other protected materials.

(SCO's Mem. in Opp. to IBM's Mot. for Summ. J. on SCO's Contract Claims, SCO v. IBM, No.

2:03CV-0294, Nov. 11, 2006, at 83-89, 152-173.)

30.

                    REDACTED




                    REDACTED

REDACTED

31.          REDACTED

This statement of fact was redacted as errata by Novell in its October 8, 2006 submission

to the Court.

32.          REDACTED

Disputed to the extent the statement suggests that the 2003 Sun Agreement or the 1994

Sun Agreement is an SVRX License under the meaning and intent of Section 4.16(b) of the

APA.  (¶¶ 1-16, 38-61,65-70; Ex. 17 ¶¶ 4-15.)

33.           REDACTED

REDACTED

REDACTED   (¶¶ 65-70, Part I.F; Ex. 17 ¶¶ 4-15.).  Disputed to the extent the use of the term "SVRX

Licenses" includes agreements other than the product Supplements (also known as product

Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX

products.  (¶¶ 6-20, 28-32, 39-75.)   Disputed to the extent that the statement includes any

13

agreement other than the SVRX licenses transferred to Santa Cruz under the APA.  (¶¶ 6-20, 28-32, 39-75.)

     34.                REDACTED


Disputed to the extent that the term "licensed technology" is ambiguous.  Undisputed to the extent that "licensed technology" refers only to the UNIX technology that is the subject of the 2003 Microsoft Agreement.  (¶¶ 71-75.)

     35.    As SCO confirmed publicly at the time, the 2003 Microsoft Agreement "covers Microsoft's UNIX compatibility products" and licenses rights "to utilize the UNIX source code, including the right to sublicense that code." (*Id.*, Ex. 26 (April 30, 2003 SCO Form 10-Q) at 21, 22; Ex. 4 at 22; *see also* Ex. 27 (SCO's May 19, 2003 press release).) To that end, the Agreement grants Microsoft a release from claims and liability and a license to current Microsoft products, as well as purported rights to make, use, copy, test, service, modify, and create derivative works of certain UNIX technology, including rights to source and binary code. (*Id.*, Ex. 11 at 1-4 (§§ 2.1, 2.2, 2.4, 3.5, 3.6, 4.1, 4.2, 4.4); Ex. 12 at 3-6 (Amendments No. 3, 4).)

    Disputed.  This statement mischaracterizes the 2003 Microsoft Agreement.  (¶¶ 71-75, Part I.E.; Ex. 17 ¶¶ 16-36.)

     36.                  REDACTED


The second sentence of this statement was redacted as errata by Novell in its October 8, 2006 submission to the Court.       REDACTED

                           REDACTED

    REDACTED      . (Ex. 23 ¶ 3.)  Disputed to the extent that the term "these rights" is ambiguous.

37.                    REDACTED

Disputed.  The statement mischaracterizes the 2003 Microsoft Agreement.  (¶¶ 71-75,

Part I.E-F; Ex. 17 ¶¶ 16-36.)

38.                    REDACTED


                       REDACTED

(¶¶ 71-75, Part I.F; Ex. 17 ¶¶ 16-36.)  Disputed to the extent the use of the term "SVRX

Licenses" includes agreements other than the product Supplements (also known as product

Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX

products.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent the term "SVRX Licenses" includes

any agreement other than the SVRX licenses transferred to Santa Cruz under the APA.  (¶¶ 6-20,

28-32, 39-75.)

39.    SCO did not contact Novell for approval before executing the 2003 Sun
Agreement or the 2003 Microsoft Agreement.  Novell did not authorize either agreement.
(Declaration of Joseph A. LaSala, Jr. in Support of Motion for Partial Summary Judgment and
Motion for Preliminary Injunction ("LaSala Decl.") at ¶ 3.)

Disputed to the extent the statement implies that Novell's approval or authorization was

required.  (¶¶ 28-32; Ex 17 ¶¶ 6-36.)

40.    Novell competes with Sun and Microsoft in the marketplace, and is harmed when
these companies obtain licenses to SVRX technology without Novell's approval.  (*Id.* at ¶ 7.)

15

Disputed in that the material cited in support of the statement is inadmissible.  Dispute to the extent the statement suggests that the APA contains any non-compete provision to the benefit of Novell.  Disputed to the extent the use of the term "licenses to SVRX technology" is ambiguous and includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent that the statement implies Novell's approval was required for SCO to enter into 2003 Sun and Microsoft Agreements.  (¶¶ 28-32.)

41.    The 2003 Sun and Microsoft Agreements gave SCO its first profitable year in history.  They "accounted for $25,846,000 of [SCO's] revenue in fiscal 2003, representing approximately 33 percent of [its] total revenue for such period."  (Jacobs Decl., Ex. 7 at 9.)

Disputed to the extent that SCO's declared revenues prior to 2003 did not account for the unauthorized use of SCO's proprietary UNIX code and other protected materials in Linux.  Undisputed as to the data as reported on SCO's SEC filings.  (Ex. 32 at 62-69 and attached Exs. 6-7).

42.    SCO never remitted to Novell any monies it received from the 2003 Sun or Microsoft Agreements.  (LaSala Decl. at ¶ 4.)

Disputed to the extent that the statement implies SCO was required to remit monies it received from the Sun or Microsoft agreements to Novell.  (¶¶ 28-32.)

43.    SCO never provided Novell an estimate of the total amount of royalties flowing from the 2003 Sun and Microsoft Agreements.  (*Id.* at ¶ 5.)

Disputed to the extent that the term "royalties" is ambiguous and the statement implies SCO was required to provide Novell an estimate of the royalties flowing from the 2003 Sun and Microsoft Agreements.  Disputed to the extent that the statement implies that the "royalties" mentioned are "SVRX royalties" under the APA.  (¶¶ 6-36, 38-61.)

44.    On July 11, 2003, when Novell had not received any royalty reports from SCO for over half a year, it sent SCO a letter demanding royalty reports and payments as required by the APA. (*Id.* at ¶ 6, Ex. 1 (July 11, 2003 letter from Novell to SCO).)  In response, on July 17, 2003, SCO submitted limited royalty payments from November 2002 through May 31, 2003. (*Id.*, Ex. 2 (July 17, 2003 letter from SCO to Novell).)  These payments did not include or mention any royalties from the 2003 Sun or Microsoft Agreements. (*Id.* at ¶ 6.)

Disputed in that SCO has timely complied with its reporting obligations and SCO timely sent Novell reports in the "over half year" preceding the referenced letter.  Disputed to the extent that the term "royalties" is ambiguous and the statement implies SCO was required to report the royalties from the 2003 Sun and Microsoft Agreements to Novell.  Disputed to the extent that the statement implies that the "royalties" mentioned are "SVRX royalties" under the APA.  (¶¶ 6-36, 38-61.)  Disputed to the extent the phrase "limited royalty payments" suggests that SCO has not complied with its reporting or payment obligations.

45.    Later in 2003, Novell began to conduct an audit of SCO's compliance with the APA's Agency Provisions.  On November 21, 2003 Novell demanded copies of the Sun and Microsoft Agreements, two major SVRX Licenses executed during the audit period.  SCO did not respond. (Jacobs Decl., Ex. 13 at 2 (§§ 1.4, 1.5).)  On December 29, 2003, Novell again contacted SCO requesting copies of the agreements. (*Id.*, Ex. 14.)  On January 7, 2004, SCO replied that it anticipated being in a position to respond in the near future. (*Id.*, Ex. 15.)  Again hearing no response, on February 4, 2004, Novell sent yet another inquiry. (*Id.*, Ex. 16.)  Novell sent additional written requests for the agreements on March 1, 2004, April 2, 2004, and November 17, 2004. (*Id.*, Ex. 17-19.)  Despite these requests, SCO refused to produce the agreements.[3]

Disputed in that the Sun and Microsoft Agreements are not "SVRX Licenses" under the APA.  (¶¶ 6-20, 28-32, 39-75.)  Disputed to the extent the statement (including footnote) suggests that SCO was obligated to provide, and Novell to receive, those agreements.  (¶¶ 6-36,

---

[3] Novell adds the following footnote:

In a February 5, 2004 letter, SCO side-stepped Novell's requests for copies of the Sun and Microsoft agreements, instead cursorily claiming that these licenses were "new" agreements not covered by the APA without further explanation. (Jacobs Ex. 25.)

38-61.) Disputed in that the payments SCO received for those agreements were not "SVRX Royalties" subject to Novell's audit rights under the APA. (¶¶ 6-36, 38-61.) Disputed to the extent the statement mischaracterizes the content and nature of the communications between the parties.

46.    It was not until February 7, 2006 that Novell finally received the Sun and Microsoft Agreements from SCO, alongside a simultaneous production of many hundreds of thousands of other pages, pursuant to discovery requests in this litigation. (*Id.* at ¶ 22, Ex. 20 at 8-10 (SCO's Resp. to Novell's Second Set of Req. for Production Nos. 6-9).) Novell filed a motion to stay on April 10, 2006. The Court issued an order on August 21, 2006 that stayed part of this case, but permitted the claims relating the 2003 Sun and Microsoft Agreements (among other things) to proceed.

Disputed in that the statement implies that, prior to February 7, 2006, Novell was not aware that the 2003 Sun and Microsoft Agreements concerned UNIX technology. (¶¶ 81-82.) Disputed to the extent the statement suggests that the referenced SCO production of documents did not promptly respond to Novell's document requests, including requests that for the first time covered the Sun and Microsoft Agreements. Disputed to the extent the word "finally" suggests that SCO had any prior obligation to produce or provide the documents to Novell.

**G.    SCO's Financial Woes After the 2003 Sun and Microsoft Agreements.**

47.    SCO's profitability following the 2003 Sun and Microsoft Agreements was short-lived. Although SCO posted an operational gain of $3,436,000 in 2003, SCO suffered an operational loss of $28,573,000 in 2004. (Jacobs Decl., Ex. 7 at 51-52; Ex. 21 (2005 SCO Form 10-K) at 47-48; Ex. 22 (Jan. 31, 2006 SCO 10-Q) at 3-4.) For fiscal year ended October 31, 2005, SCO posted an operational loss of $11,899,000. (*Id.*, Ex. 21 at 21.) Operational losses have continued into 2006, with SCO posting $13,127,000 in operational losses through its first three fiscal quarters of 2006. (*Id.*, Ex. 23 (Jul. 31, 2006 SCO Form 10-Q) at 4.)

Undisputed as to the data as reported on SCO's SEC filings. Disputed to the extent the statement suggests that non-business factors such as Novell's misconduct in claiming ownership of the UNIX copyrights did not harm SCO's business.

48.    Revenue from both portions of SCO's business – SCOsource and UNIX – has steadily declined. SCOsource revenue declined from $25,846,000 in 2003 to $829,000 in 2004 to $166,000 in 2005. (*Id.*, Ex. 21 at 48.) Through the first three fiscal quarters of 2006, SCOsource revenue was at $95,000. (*Id.*, Ex. 23 at 16-17.) UNIX revenue has declined from $53,408,000 in 2003 to $41,980,000 in 2004 to $35,838,000 in 2005. (*Id.*, Ex. 21 at 23.) Through the first three quarters of 2006, UNIX revenue stood at $21,795,000. (*Id.*, Ex. 23 at 16-17.) SCO's combined SCOsource and UNIX revenue was down over 20% from the prior year, as of July 31, 2006. (*Id.*)

Disputed to the extent that the term "steadily declined" is ambiguous. Disputed to the extent the statement suggests that non-business factors such as Novell's misconduct in claiming ownership of the UNIX copyrights did not harm SCO's business. Undisputed as to the data as reported on SCO's SEC filings.

49.    SCO's assets have similarly eroded since the 2003 Sun and Microsoft revenue spike. Since 2003, SCO's assets have dwindled from $82,280,000 in October 2003, to $48,240,000 in October 2004, to $24,924,000 in October 2005, and to $21,762,000 as of July 31, 2006. (*Id.*, Ex. 7 at 51-52; Ex. 21 (2005 SCO Form 10-K) at 47-48; Ex. 23 at 3.)

Disputed to the extent that Novell characterizes "assets" as "current assets" rather than "total assets." SCO's "total assets" were in fact: $94,952,000 in October 2003, $55,400,000 in October 2004, $28,948,000 in October 2005 and $23,472,000 as of July 31, 2006. Disputed to the extent the statement suggests that non-business factors such as Novell's misconduct in claiming ownership of the UNIX copyrights did not harm SCO's business. Disputed to the extent the terms "similarly eroded" and "revenue spike" are ambiguous. Undisputed as to the data as reported on SCO's SEC filings. (Jacobs Ex. 7 at 51-52; Jacobs Ex. 21 at 47-48; Jacobs Ex. 23 at 3, 16-17.)

19

50.    SCO is bleeding cash at a rapid rate.  In October of 2003, SCO's cash, cash equivalents, and available-for-sale marketable securities ("liquid assets") amounted to $68,523,000.  (*Id.*, Ex. 7 at 51.)  Just one year later, this figure fell 44% to $31,449,000.  (*Id.*, Ex. 21 at 47.)  By October 2005, SCO's liquid assets had fallen another 77% to $10,437,000.  (*Id.*)

Disputed to the extent the statement suggests that non-business factors such as Novell's

misconduct in claiming ownership of the UNIX copyrights did not harm SCO's business.

Disputed to the extent that the terms "bleeding cash" and "rapid rate" are ambiguous.  Disputed

to the extent that the percentage declines are incorrectly calculated and should be 54% and 67%,

respectively.  Undisputed as to the data as reported on SCO's SEC filings.

51.    To stop this downward spiral, on November 29, 2005, SCO raised $10,005,000 in cash by selling stock to investors.  (*Id.*, Ex. 22 at 13.)  Even with that influx, by January 31, 2006, SCO had only $19,214,000 in liquid assets on the books.  (*Id.* at 3.)  By July 31, 2006 (the date of SCO's last publicly available financials), or two months ago, this figure had dropped to $13,960,000, as part of a total asset base of only $23,472,000.  (*Id.*, Ex. 23 at 3.)

Disputed to the extent the statement suggests that non-business factors such as Novell's

misconduct in claiming ownership of the UNIX copyrights did not harm SCO's business.

Disputed to the extent that the term "downward spiral" is ambiguous.  Undisputed as to the data

as reported on SCO's SEC filings.

52.    Through the first three quarters of its current fiscal year, SCO has been losing cash on an operating basis at the rate of nearly $800,000 per month.  (*Id.* at 5.)  Based on its latest publicly-available cash figures, SCO will run out of cash and cash equivalents by June 2007.  (See *id.* at 3, 5.)  This is the same month that trial of this matter is scheduled to begin.  (Scheduling Order and Order Vacating Hearing, Dec. 6, 2005 at 4.)

Disputed in to the extent that Novell provides no explanation how it arrived at the loss

rate calculation, a figure that is not readily apparent from the cited material.  Disputed to the

extent that Novell appears to have applied this rate to SCO's "Cash and Cash Equivalents" rather

than the "liquid assets" of $13,960,000 Novell cites in Statement 51 above.  (Jacobs Ex. 23 at 3.)

20

Disputed to the extent that the calculation assumes the "burn rate" is a constant and does not

adjust for reductions in personnel and adjustments in operating expenses. Disputed to the extent

the statement suggests that non-business factors such as Novell's misconduct in claiming

ownership of the UNIX copyrights did not harm SCO's business.

53.     SCO also has been rapidly burning cash set aside for its SCO Litigation, further
threatening its liquidity. As of July 31, 2006, SCO had just $2,010,000 of additional restricted
cash, down 65% from a restricted cash amount of $5,690,000 nine months earlier on October 31,
2005. (*Id.* at 3; Ex. 21 at 47.) Notwithstanding SCO's infusion of $5,000,000 of additional cash
into an escrow account to cover SCO Litigation costs and expenses on June 5, 2006, only
$1,561,000 remained in that escrow account as restricted cash for the Litigation as of the end of
July 2006. (*Id.*, Ex. 23 at 31, 33, 42.) Accordingly, just two months ago, SCO recognized that if
it burns through the remaining restricted cash for the SCO Litigation, it "may be required to
place additional amounts into the escrow account, which could harm our liquidity position." (*Id.*
at 42.)

Disputed to the extent that the terms "rapidly burning," "threatening its liquidity" and

"burns through" are ambiguous and incorrectly characterize SCO's financial position.

Undisputed as to the data as reported on SCO's SEC filings. Disputed to the extent the statement

suggests that non-business factors such as Novell's misconduct in claiming ownership of the

UNIX copyrights did not harm SCO's business.

54.     Meanwhile, SCO's legal and professional fees for pursuing and defending its
multiple SCOsource-related lawsuits have continued to escalate. These fees jumped "from
$9,467,000 for the nine months ended July 31, 2005 to $10,087,000 for the nine months ended
July 31, 2006." (*Id.* at 21.) Notwithstanding these cash-draining fees, SCO has "not recorded
any reserves or contingencies related to these legal matters." (*Id.* at 22.)

Disputed to the extent that the term "cash draining fees" is ambiguous and incorrectly

characterize SCOs legal and professional fees. Undisputed as to the data as reported on SCO's

SEC filings.

**H.    SCO Believes Its Future Financial State Depends on Whether or Not It Will Prevail in the IBM Litigation.**

55.    SCO's future success depends on its ability to prevail in its litigation with IBM. In its most recent SEC filing, SCO stated "[i]f we do not prevail in our action against IBM, or if IBM is successful in its counterclaims against us, our business and results of operations would be materially harmed and we may not be able to continue in business." (Jacobs Decl., Ex. 23 at 37.)

Disputed to the extent the first sentence mischaracterizes the quotation in the second

sentence of the statement.  Undisputed as to the information reported on SCO's SEC filings.

56.    The IBM Litigation is set for trial in February of 2007 – several months before the trial of this case.  (Order, July 1, 2005, at 6, *The SCO Group, Inc. v. IBM Corp.*, No. 2:03CV294 (D. Utah 2005).)

Disputed.  As per the Court's Order dated October 24, 2006, there is no trial date set in

the IBM Litigation.

57.    The Magistrate Judge recently dismissed two-thirds of SCO's claims in the IBM Litigation.  (Order Granting in Part Motion to Limit SCO's Claims, June 28, 2006.)  Although SCO has yet to comment on the effect that the dismissal will have on its finances, SCO spokesperson Blake Stowell recently acknowledged, "[i]f two-thirds of your case is stricken, that is a pretty serious matter."  (*Id.*, Ex. 24 (*Judge Voids Most SCO Claims*, SALT LAKE TRIBUNE, June 30, 2006).)  SCO has appealed the ruling of Magistrate Judge Wells.

Disputed in that the statement calls for a legal conclusion and improperly seeks to

summarize the terms of the referenced Magistrate Court Order, which the District Court affirmed

on November 29, 2006.

58.    With respect to SCOsource, in its most recent annual report, SCO stated, "[w]e are unlikely to generate significant revenue from our SCOsource business unless and until we prevail in our SCO Litigation.  Additionally, the success of the SCOsource business may depend on the strength of our intellectual property rights and claims regarding UNIX, including our claims against Novell and the strength of our claim that unauthorized UNIX source code and derivative works are contained in Linux."  (*Id.*, Ex. 21 at 25.)

Undisputed.

59.    SCO has made similar statements with respect to the uncertainty of its UNIX business, and believes that the decline that has already occurred in the UNIX business may continue.  SCO acknowledges that industry response to this decline, to the SCO Litigation, and to SCO's "aggressive position against the inclusion of our UNIX code and derivative works in Linux" may cause "attitudes of customers and partners" to change and "industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products." (*Id.*, Ex. 23 at 40-41.)  This may further accelerate the decline of SCO's UNIX business.

Undisputed.