Brent O. Hatch (5715)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST, SECOND, AND FIFTH CAUSES OF ACTION AND FOR SUMMARY JUDGMENT ON NOVELL'S FIRST COUNTERCLAIM** <br><br> **Civil No.: 2:04CV00139** <br><br> Judge Dale A. Kimball <br> Magistrate Brooke C. Wells |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ................................................................ 3

I.    THE AMENDED APA UNAMBIGUOUSLY TRANSFERS THE UNIX AND
      UNIXWARE COPYRIGHTS.......................................................................... 3

II.   OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER
      OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ
      UNDER THE APA. ........................................................................................ 6

      A.    Testimonial Evidence.......................................................................... 6

      B.    The Parties' Prior Conduct................................................................. 17

      C.    Novell's Recent Conduct. ................................................................... 17

LEGAL STANDARD ON SUMMARY JUDGMENT............................................... 19

ARGUMENT .............................................................................................................. 20

I.    THE APA PLAINLY TRANSFERRED THE UNIX AND UNIXWARE
      COPYRIGHTS TO SANTA CRUZ. .............................................................. 20

      A.    The Plain Language Provides for the Transfer. ................................. 20

      B.    The APA Bill of Sale Exceeds the Requirements of the Copyright Act. ............. 25

II.   OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER
      OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ
      UNDER THE APA. ........................................................................................ 27

      A.    Testimonial Evidence.......................................................................... 27

      B.    The Parties' Prior Conduct................................................................. 28

C.     Novell's Recent Conduct. ....................................................................................... 30

CONCLUSION .................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

Arthur Rutenberg Homes, Inc. v. Drew Homes, 29 F.3d 1529 (11th Cir. 1994) ........................ 26

Dean v. Burrows, 732 F. Supp. 816 (E.D. Tenn. 1989)................................................................. 26

Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043, 2004 WL 2967556 (N.D. Ill. Nov. 24, 2004)....................................................................................................... 26

Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) ...................................................... 26

Harm v. Frasher, 181 Cal. App. 2d 405 (Ct. App. 1960)............................................................. 22

Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402 (Ct. App. 1984) ....................................... 22

ITOFCA, Inc. v. Megatrans Logistics, Inc., 322 F.3d 928 (7th Cir. 2003) .................................. 25

Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc., 690 F. Supp. 298 (S.D.N.Y. 1988) ................. 25

McDonnell v. Cardiothoracic & Vascular Surgical Assocs., Inc., No. C2-03-0079, 2004 WL 1234138 (S.D. Ohio May 27, 2004) ........................................................................... 19

Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922 (9th Cir. 1999)....... 25

Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323 (D. Kan. May 25, 1993).................................................................................................................. 20

S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081 (9th Cir. 1989) ........................................................ 21

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992)................................. 20

Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280 (S.D.N.Y. 1997).......................................... 20

Thompson v. United Transp. Union, No. 99-2288-JWL, 2000 WL 1929963 (D. Kan. Dec. 19, 2000) .......................................................................................................................... 19

Volkman v. United Transp. Union, 73 F.3d 1047 (10th Cir. 1996).............................................. 19

**Statutes**

17 U.S.C. § 204(a) ..................................................................................................... 26

**Other Authorities**

11 J. Moore, <u>Moore's Federal Practice</u> ¶ 56.40 (3d ed. 1998).................................... 19

Fed. R. Civ. P. 56........................................................................................................ 19

<u>Nimmer on Copyrights</u> § 10.03[2]............................................................................ 25

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this Memorandum in Support of Its Motion for Partial Summary Judgment on Its First, Second, and Fifth Causes of Action and for Summary Judgment on Novell's First Counterclaim.

## PRELIMINARY STATEMENT

In a public statement issued on May 28, 2003, and for the first time since 1995, Novell claimed to own the copyrights at issue in this case. Novell announced that it had retained ownership of the UNIX and UnixWare copyrights under the Asset Purchase Agreement ("APA") whereby it sold the UNIX and UnixWare business to SCO's predecessor-in-interest, The Santa Cruz Operation, Inc. ("Santa Cruz"). SCO's claims for slander of title (Count I), breach of contract (Count II), and unfair competition (Count V), as well as Novell's counterclaim for slander of title (Count I), are each based in part on the allegation that the opposing party has laid false claim to those copyrights. SCO submits that the Court should grant partial summary judgment on those claims and summary judgment on Novell's slander-of-title counterclaim, because the APA as amended plainly transferred the copyrights to Santa Cruz.

The APA provides for the transfer to Santa Cruz of "all right, title, and interest" in the UNIX and UnixWare source code and products and "All rights and ownership of UNIX and UnixWare." Such language plainly includes the UNIX and UnixWare copyrights. The APA Bill of Sale, in which Novell stated that it "does hereby transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets," effectuated the transfer in words that exceed the requirements of the Copyright Act. Novell relies on language in the excluded assets schedule of the APA, but Amendment No. 2 to the APA expressly <u>replaced</u> that language to clarify that the UNIX and

UnixWare copyrights were <u>not</u> among the excluded assets.  The provision on which Novell relies simply does not exist for purposes of construing the APA.

In addition, overwhelming extrinsic evidence confirms the intent to transfer the copyrights under the APA.  Such evidence includes the deposition testimony of the central witnesses on both sides of the transaction, including Robert Frankenberg, Novell's CEO at the time of the APA, who recently testified in this matter:

> Q.  Was your initial intent in the transaction that Novell would transfer copyrights to UNIX and UnixWare technology to Santa Cruz?
>
> A.  Yes.
>
> Q.  Was that your intent at the time when the APA was signed?
>
> A.  Yes.
>
> Q.  Was it your intent when that transaction closed?
>
> A.  Yes.
>
> Q.  And did that remain your intent, as you view it, at all relevant times?
>
> A.  Yes.
>
> Q.  So that never changed?
>
> A.  No.

In all, the intent to transfer the copyrights reflected in the unambiguous language of the APA is confirmed by the deposition testimony of no fewer than nine witnesses, including the CEOs, responsible executives, and chief negotiators for Novell and Santa Cruz, as well as the parties' conduct in the years that followed the APA.

SCO has now brought to light evidence of Novell's motives for suddenly claming ownership of the copyrights starting in late May 2003.  Maureen O'Gara, a journalist covering the computer industry since 1972, recently testified that then Novell Vice Chairman Chris Stone

conveyed to her, with "laughter," that Novell was timing its ownership claims to coincide with

SCO's earnings report in order to "confound SCO's stock position" and "upset the stock price."

On June 6, 2003, after SCO had found and sent to Novell a copy of Amendment No. 2, Novell

candidly recanted its ownership claims, stating in pertinent part in a press release:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase
> Agreement was sent to Novell last night by SCO. To Novell's
> knowledge, this amendment is not present in Novell's files. The
> amendment appears to support SCO's claim that ownership of
> certain copyrights for UNIX did transfer to SCO in 1996.

Novell has now admitted that it made its announcement of copyright ownership on May 28,

2003, without consulting the witnesses cited herein, none of whom were even at Novell at that

time. Novell has also admitted that it made those claims even though it then possessed

Amendment No. 2. Such evidence leaves little doubt about Novell's motivations for making its

ownership claims.

In light of the transfer of the UNIX and UnixWare copyrights under the plain language of

the APA and Bill of Sale, SCO is entitled to partial summary judgment on its First, Second, and

Fifth Causes of Action and summary judgment on Novell's First Counterclaim.

### STATEMENT OF UNDISPUTED FACTS

## I.    THE AMENDED APA UNAMBIGUOUSLY TRANSFERS THE UNIX AND UNIXWARE COPYRIGHTS.

1.    Novell and Santa Cruz intended for the APA to transfer all of the UNIX and

UnixWare business to Santa Cruz. (Ex. 1, Recital B, § 1.3(a)(i).) Section 1.3(a)(i) of the APA

states:

> It is the intent of parties hereto that <u>all of the Business</u> and all of Seller's backlog, if any, relating to the Business <u>be transferred to Buyer</u>.

(Ex. 1 § 1.3(a)(i) (emphasis added).)

2.    The first provision of the APA, Recital A as amended, defines the "Business" that the parties intended to transfer:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the "Business").

(<u>Id.</u> at 1; Ex. 2 ¶ A.)

3.    Section 1.1(a) of the APA defines the assets transferred to Santa Cruz as those identified in Schedule 1.1(a) of the APA:

> On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7) <u>all of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets")</u> identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b):

(Ex. 1 § 1.1 (emphasis added).)

4.    Schedule 1.1(a), in turn, identifies seven categories of "assets and properties of Seller" transferred to Santa Cruz, including:

> I.  <u>All rights and ownership of UNIX and UnixWare, including but not limited to</u> all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process),

and all appropriate technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, <u>including source code</u>, source documentation, source listings and annotations, engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include <u>without limitation</u>:  Source Code Products . . . Binary Product Releases . . . and Products Under Development.

II.  All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

III.  All of Seller's rights pertaining to UNIX and UnixWare under any [assignable] software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertains to the . . . :

VI.  All copies of UNIX and UnixWare, wherever located, owned by Seller.

(<u>Id.</u> Schedule 1.1(a), Items I-IV (emphasis added).)  The assets identified in Item I include source code products, binary products, and products in development.  (<u>Id.</u> Schedule 1.1(a), Item I.)

5.      Through the APA Bill of Sale, executed on the Closing Date, Novell in fact transferred to Santa Cruz all of the Assets:

In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, <u>does hereby transfer, convey, sell, assign and deliver to Buyer</u>, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, <u>all of the Assets</u>.

(Ex. 3 (emphasis added).)

6.      Section 1.6 of the APA provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the

"Licensed Technology").  (Ex. 1 § 1.6.)  On the Closing Date, the parties signed a Technology

License Agreement ("TLA") whereby Santa Cruz granted that license to Novell, subject to strict

limitations.  (Ex. 4 § II.A.)  The TLA also specified that "Ownership of the Licensed Technology

shall reside in SCO."  (Id. § III.)

       7.      Schedule 1.1(b) identifies assets excluded from the transfer to Santa Cruz.  Item

V.A identifies "All copyrights and trademarks, except for the trademarks UNIX and UnixWare."

       8.      Amendment No. 2 to the APA, however, revised Schedule 1.1(b) so that Item

V.A. now reads:

> All copyrights and trademarks, <u>except for the copyrights and
> trademarks owned by Novell as of the date of the Agreement
> required for SCO to exercise its rights with respect to the
> acquisition of UNIX and UnixWare technologies</u>.  However, in no
> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

(Ex. 5 § A (emphasis added).)

## II.    OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ UNDER THE APA.

    A.    <u>Testimonial Evidence.</u>

       9.      The APA provided for the public disclosure of the transaction through a "joint

press release with respect to the subject matter of this Agreement."  (Ex. 1 § 4.7.)  Novell and

Santa Cruz issued that press release on September 20, 1995.  (Ex. 6 at 222; Ex. 7 at 22-23.)  It

states in pertinent part:

> According to the terms of the agreement, SCO will acquire
> <u>Novell's UnixWare business and UNIX intellectual property</u>.

(Ex. 8 at 2 (emphasis added).)

       10.    Robert Frankenberg was the President and CEO of Novell at the time of the APA.

(Ex. 7 at 7.)  On February 10, 2007, Mr. Frankenberg testified:

> Q.  Was your initial intent in the transaction that Novell would transfer copyrights to UNIX and UnixWare technology to Santa Cruz?
>
> A.  Yes.
>
> Q.  Was that your intent at the time when the APA was signed?
>
> A.  Yes.
>
> Q.  Was it your intent when that transaction closed?
>
> A.  Yes.
>
> Q.  And did that remain your intent, as you view it, at all relevant times?
>
> A.  Yes.
>
> Q.  So that never changed?
>
> A.  No.

(Id. at 135.)  Mr. Frankenberg never contradicted that testimony.

       11.    Indeed, Mr. Frankenberg understood that the APA's sale of all rights and ownership included the copyrights:

> Q.  Is it your understanding that that sale of all rights and ownership of UNIX and UnixWare would include copyrights associated with UNIX and UnixWare?
>
> MR. JACOBS:  Objection, calls for a legal conclusion.
>
> A.  I guess I have to answer the question?
>
> (By Mr. Singer)  Yes, you should if you understand the question.
>
> A.  Okay.  I understand.  Yes.
>
> Q.  Now, did you ever give any directions to the team that was negotiating the deal, including Mr. Thompson, Mr. Chatlos, that they should transfer all right and title and interest to UNIX and

7

> UnixWare but retain copyrights for UNIX and UnixWare from
> being sold?
>
> A.  No.
>
> Q.  Did you ever tell anyone at Santa Cruz Operation that
> copyrights for UNIX and UnixWare were not part of the
> technology being sold?
>
> A.  No.
>
> Q.  Did you ever authorize anyone at Novell to tell anyone at Santa
> Cruz that copyrights were not being sold as part of the transaction?
>
> A.  No.

(Id. at 19.)

12.    Ty Mattingly was the Vice President for Strategic Relations at Novell at the time

of the APA.  (Ex. 9 at 10-11.)  He also participated in the APA negotiations as Mr.

Frankenberg's personal liaison with the Novell negotiating team.  (Id.)  Mr. Mattingly testified:

> Q.  Do you know whether in this case Novell is asserting that the
> copyrights were not transferred?
>
> A.  Well, I mean, I have read enough about the case early on.  I
> haven't stayed real current lately.  But I mean, obviously we're
> here today because Novell is asserting that the copyrights were not
> sold with the Unix business to SCO, and obviously SCO would
> assert that they purchased the Unix business from us lock, stock
> and barrel.
>
> Q.  And do you have a view as to the merits of Novell's assertion,
> such as you understand it?
>
> A.  I do.
>
> Q.  And what is your view?
>
> A.  Well, my firm belief is that we sold the Unix business to SCO,
> and that is why SCO paid us roughly 125 million dollars at that
> point because they bought the Unix business from us basically in
> its entirety.  The only things that did not go with that was a kind of
> an agent relationship whereby SCO was collecting the SVRX
> royalties from existing OEMs at the time we sold that business and
> then giving the bulk of those moneys back to Novell.
>
>                    *              *              *

8

> Q.  <u>Would it be fair to say that the transfer of the Unix copyrights</u>
> <u>to SCO was consistent with your view of this overall strategy</u>?

> MR. BRAKEBILL:  Objection, mischaracterizes testimony.

> A.  So I can still answer?  <u>Yeah.  I mean, absolutely.</u>  I believe that
> when they bought the business, when they paid us 125 million
> dollars, that the negotiations that we were involved with there was
> about selling them the entire business, the software, which would
> have <u>included the copyrights</u>.

(<u>Id.</u> at 29-32 (emphasis added).)

13.    Duff Thompson was the Novell executive responsible under Mr. Frankenberg's

direction for the sale of the UNIX and UnixWare business.  (Ex. 10 ¶ 4.)  After the transaction

closed, Novell appointed Mr. Thompson to serve as its representative on the Santa Cruz Board of

Directors.  (Ex. 11 at 6.)  Mr. Thompson testified:

> Q.  And a bundle of rights you believed included -- looking back
> on it, you believed the structure of the deal meant that the bundle
> of rights included the copyrights?

> A.  No.  At the time I believe <u>it included the bundle of the</u>
> <u>copyrights</u>, at the time.

> Q.  Well, I'm a little confused because I thought you said this
> morning that you don't recall any specific discussion about
> copyrights.

> A.  Yeah, but that doesn't mean that that's not what I understood
> we were doing at the time.

> Q.  So you –

> A.  So the fact that I may not have had a specific discussion that I
> can recall 11 and a half years later should not be taken to mean I
> don't recall what our intention was in selling the business.  It is
> impossible for me to parse in my mind the assignment that we
> received to sell the -- to sell the entire business, all of Unix and
> UnixWare to SCO, and to somehow also in that same breath say,
> except the copyrights.

> I just -- I don't understand that kind of thinking, and certainly I just
> have to tell you that that kind of trick play was not something that
> Bob Frankenberg would have directed, nor is it something he

would have stood for.  It's not something I would have done.  If we had intended not to transfer the copyrights, we would have been very careful to say, you don't get the copyrights.  And it wouldn't have been an oblique reference.   It would have been, you get all the business except the copyrights.  Not, you get all the business.

(Id. at 132-133 (emphasis added).)

14.     Ed Chatlos was the Novell Senior Director for UNIX Strategic Partnerships and

Business Development at the time of the APA.  (Ex. 12 ¶ 4.)  He was also Novell's chief

negotiator of the APA.  (Id. ¶ 6.)  Mr. Chatlos explains:

It was always my understanding and intent, on behalf of Novell, that the UNIX source code and its copyrights were part of the assets SCO purchased.  I do not recall anyone else ever suggesting that Novell would retain any copyright relating to UNIX, nor was I present for any discussion, general or specific, during the negotiations that contradicted my understanding of the transaction described herein.  None of my superiors at Novell ever informed me that Novell was not transferring the UNIX copyrights to SCO.  Likewise, I never communicated to SCO in any way that the UNIX copyrights were not being sold to SCO.  Nor am I aware of any instance in which anyone from Novell ever informed SCO in any way that the UNIX copyrights were not being sold to SCO as part of the transaction.

Given my central role in the negotiations, I believe I would have known if the parties had agreed that Novell would retain UNIX copyrights.  My intent and understanding as the lead negotiator for Novell was that Novell was transferring the copyrights to SCO in the APA.  At the time the transaction was signed and closed, I did not observe anyone at Novell or SCO stating or acting as if Novell had retained any UNIX copyrights.  If they had, it would have been contrary to the intent and structure of the deal as I understood it and communicated with SCO.  In fact, from the time the APA transaction closed in 1995 until this day, it has been my understanding and belief that Novell sold the UNIX copyrights to SCO as of the time of the closing in 1995.

(Id. ¶¶ 9-10 (emphasis added).)  In his recent deposition in this case, Mr. Chatlos confirmed his

views regarding the transfer of the copyrights.  (Ex. 13 at 37-39.)

10

15.     As he testified at his deposition in this matter, Burt Levine was an attorney at Novell at the time of the APA.  (Ex. 14 at 15-23.)  Mr. Levine reviewed and revised drafts of the APA.  (Id. at 163-64.)  After the Business was transitioned to Santa Cruz in February 1996, Mr. Levine worked as an attorney for Santa Cruz.  (Id. at 22-23.)  Mr. Levine testified that under the APA the "intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright."  (Id. at 68.)  He further testified:

> Q.  Mr. Levine, from the time of the APA in 1995 until you left Santa Cruz in 2000, did you ever hear anyone whether inside or outside of Santa Cruz or inside or outside of Novell say that Novell had retained the UNIX or UnixWare copyrights?
>
> A.  No.
>
> Q.  If you had heard anyone make such a statement, would that have been a surprise to you?
>
> A.  Very much so, yeah.
>
> Q.  And why do you say "very much so"?
>
> A.  My personal experience with the couple of years that I spent at Novell was that it was a very ethical company and I, I was very impressed with that.
>
> Q.  And how does that fact bear on your answer, the fact that you had the view that Novell was an ethical company?
>
> A.  Was ethical and I believe that being an ethical company in its dealings with its partners or transferees or whatever it is that they would not resort to withholding information or trying to withhold something that the transferee in this case would be entitled to.

(Id. at 154-55 (emphasis added).)

> Q.  In looking at the first paragraph Roman I of Schedule 1.1(a) of the Asset Schedule, and that language says, quote, All rights and ownership of UNIX and UnixWare, including, but not limited to all versions of UNIX and UnixWare, and all copies of UNIX and UnixWare, including revisions and updates and progress, dot, dot, dot, including source code, dot, dot, dot, such assets to include without limitation the following, and then there's a list of source

11

> code products, binary product releases, products under
> development and other technology, do you see that language?
>
> A.  I do.
>
> Q.  How does that language bear on your understanding at the time
> of the APA and today that the UNIX copyrights and UnixWare
> copyrights were among the assets transferred under the APA?
>
> A.  Do you mean the fact that these are listed specifically as
> categories?
>
> Q.  I mean to ask you about the scope of Roman I.
>
> A.  Oh, the scope of Roman I with or without this listing, all rights
> and ownership of UNIX and UnixWare, that gives all the
> components of the business, including physical components and
> intellectual components, to my mind <u>will carry with it the transfer
> of any copyrights that apply to them</u>.

(<u>Id.</u> at 156-58 (emphasis added).)

16.    Bill Broderick was a contract manager in the UNIX licensing group at Novell and

Santa Cruz.  (Ex. 15 ¶¶ 6-7.)  He was also a member of the Novell APA Transition Team.  (<u>Id.</u> ¶

10.)  Mr. Broderick states:

> My understanding of the sale of the UNIX assets from Novell to
> Santa Cruz was that <u>the UNIX copyrights were transferred</u>.  To the
> best of my knowledge, from the time of the closing of the APA in
> 1995 until after SCO asserted legal claims concerning its Linux-
> related rights in 2003, Novell never contested SCO's ownership of
> the UNIX copyrights.

(<u>Id.</u> ¶ 7 (emphasis added).)

17.    In his recent deposition, Mr. Broderick testified that his understanding is based on

(among other things) Novell's explanation of the transaction during "company-wide meetings"

as well as discussion in "contracts transition team," including discussion about "changing the

copyright notices in the source code to Santa Cruz Operation, Inc."  (Ex. 16 at 48-51.)

18.    Alok Mohan was CEO of Santa Cruz at the time of the APA.  (Ex. 6 at 8.)  Mr.

Mohan has testified in this case:

> THE WITNESS:
>
> A.  My belief is that we bought the business, except for the revenue stream.  And when we bought the business everything came with it.
>
> BY MR. BRAKEBILL:
>
> Q.  You believe that Santa Cruz got the Unix copyrights to through the APA; is that right?
>
> A.  I believe –
>
> MR. NORMAND:  Objection to form.
>
> THE WITNESS:
>
> A.  <u>I believe I bought the whole business.  That includes all kinds of stuff.  And -- and, you know, that's the answer, I think we bought -- we got the whole thing</u>.
>
> BY MR. BRAKEBILL:
>
> Q.  Okay.  But you haven't -- you haven't confirmed -- is -- is part of the –
>
> A.  Yes, they are –
>
> Q.  Is Unix copyrights part of the Unix business?
>
> A.  Absolutely.
>
> Q.  Okay.  So you believe that Santa Cruz got the Unix copyrights?
>
> A.  Santa –
>
> MR. NORMAND:  Objection to form.
>
> THE WITNESS:
>
> A.  <u>Santa Cruz got the whole business.  Includes lots of things. Copyrights are part of it</u>.
>
> \*        \*        \*        \*
>
> Q.  What is the basis of your opinion that Santa Cruz got the business?
>
> MR. NORMAND:  Objection to form.
>
> THE WITNESS:

A.  That -- that's -- <u>that was the whole discussion and intent, negotiations.  That's my recollection of what we were doing</u>.

(<u>Id.</u> at 138-40 (emphasis added).)

19.    Doug Michels founded Santa Cruz and was its Senior Vice President at the time of the APA.  (Ex. 17 ¶¶ 2-3.)  He states:

> In connection with the 1995 purchase from Novell, the parties agreed that (as is accurately explained by both Mr. Wilt and Ms. Madsen) Novell could retain the existing binary royalty stream even though <u>the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz</u>.

(<u>Id.</u> ¶ 9 (emphasis added).)  In his recent deposition, Mr. Michels repeatedly confirmed that the parties to the APA intended for Novell to transfer and for Santa Cruz to acquire the UNIX and UnixWare copyrights:

> Q.  To the extent that you did, what did you mean by that?
>
> A.  <u>Well, I meant that the only way that I know of, and anyone on my team knew of to buy a software business is to buy the copyrights, and there's no way we would have ever done a deal to buy a software business where we didn't get the copyrights</u> and all the other intellectual property.  That's what you're buying.  And especially in the case of UNIX, with its convoluted intellectual property history, and whatnot, to not get that stuff would be to not do the deal.  And so it was implicit in everything we did, everything we thought.  <u>Every single person on my team understood that.  The lawyers understood.  The business development people understood it.  The people at Novell understood it</u>.
>
> I mean, it – it's just so essential.  It's -- you know, it's like breathing oxygen, you know, I mean, you just – <u>there's no way that deal could have happened without getting the copyrights</u>.
>
> *       *       *       *
>
> A.  I know that <u>everybody involved in this negotiation knew the copyrights were being transferred</u>.  I know that.

<div align="center">14</div>

Q. How do you know that?

A. Because I was there and I know it. That's -- I -- I know what -- I know there were discussions. I know there was shared vision. I know we all understood what it meant to buy a software company. You know, I've known these people for many years. It -- it just wasn't ambiguous. It wasn't something that was ambiguous.

(Ex. 18 at 134-38 (emphasis added).)

20. Jim Wilt was the lead negotiator for Santa Cruz. (Ex. 19 ¶ 7.) Mr. Wilt testified

with respect to his declaration executed on November 23, 2004:

Q. You say in paragraph 8, quote, "It was my understanding and intent during those negotiations that SCO would acquire Novell's entire UNIX and UnixWare business, including the copyrights. I do not recall and do not believe that there ever was any instance in which anyone at SCO or Novell ever stated or exhibited any contrary intent or understanding to me or anyone else." Is that an accurate statement?

A. That's an accurate statement.

Q. You say in the back half of paragraph 9, quote, "It was my intent on behalf of SCO to acquire, through the APA, Novell's entire UNIX and UnixWare business, including the UNIX and UnixWare source code and all associated copyrights, and I believed then, open parens, as now, close parens, that Novell's intent was to sell all of those assets and rights." Is that an accurate statement?

A. Yes, that's an accurate statement. You wouldn't have had a business without having the copyrights and trademarks.

Q. You say in paragraph 12, quote, "I do not recall anyone on either side of the negotiations or transaction ever suggesting that Novell would retain a copyright relating to UNIX or UnixWare. I am not aware of any discussions, whether general or specific, during the negotiations that contradict my understanding of the transaction as set forth in this declaration." Is that an accurate statement?

A. That is an accurate statement.

(Ex. 20 at 76-78.)  Independent of his previous declaration, moreover, Mr. Wilt repeatedly

testifed to the parties' intent under the APA was for Novell to transfer and Santa Cruz to acquire

the UNIX and UnixWare copyrights.  (Id. at 28-29.)

      21.     Kimberlee Madsen was a member of the Santa Cruz legal department at the time

of the APA and Amendment No. 2 and assisted in the negotiations.  (Ex. 21 ¶¶ 3-4.)  She

explains:

> It was always my understanding that the UNIX source code and its
> copyrights were part of the assets Santa Cruz purchased and were
> transferred to Santa Cruz at the closing in December 1995.
>
> I do not recall anyone in the negotiation teams ever saying, or
> suggesting, that Novell would retain any UNIX copyrights.  The
> negotiation team for Santa Cruz never discussed the possibility, as
> far as I am aware, that Novell sought to retain any UNIX
> copyright.
>
> Since the transaction closed in 1995 until Novell publicly
> announced in 2003 that it still owned the UNIX copyrights, it was
> my understanding and belief that neither party disputed that Santa
> Cruz had acquired the UNIX copyrights in 1995.
>
>         *      *      *      *
>
> My understanding from the negotiations and discussions leading
> up to the Amendment was that Amendment No. 2 was intended to
> confirm, among other things, the parties' intent and agreement that
> Santa Cruz had obtained ownership of the UNIX copyrights under
> the APA and that Novell had received no rights with respect to
> UNIX source code under the APA.

(Id. ¶¶ 9-11 (emphasis added).)  In her recent deposition in this case, Ms. Madsen confirmed that

the parties' intent and understanding at the time of negotiations was that the APA transferred the

copyrights to Santa Cruz.  (Ex. 22 at 73-75, 81.)

B.     The Parties' Prior Conduct.

22.     Shortly after the closing of the APA in 1995, Santa Cruz obtained physical possession of UNIX copyright registrations from Novell; those registrations remain in SCO's possession to this day.  (See, e.g., Exs. 23-25.)

23.     Since 1995, without objection from Novell, Santa Cruz and SCO shipped countless UNIX-related products with copyright notices affixed to them.  (See, e.g., Ex. 26 ¶ 3; Exs. 27-28.)

24.     Since 1995, without objection from Novell, Santa Cruz and SCO entered into hundreds of license agreements for UNIX products that not only contain express representations and warranties of SCO's rights and ownership in the intellectual property required to provide the licensed product, but also indemnify licensees against any third-party claims for copyright infringement.  (See, e.g., Ex. 30 §§ 13-14; Ex. 31 § 2.4; Ex. 32 § 7.02; Ex. 33 ¶ 28.)

25.     Before May 28, 2003, Novell never contested SCO's public statements and conduct asserting ownership of the UNIX copyrights.  (Ex. 33 ¶ 7; Ex. 34 ¶ 7.)

26.     There is no evidence that Novell publicly asserted ownership of UNIX copyrights between the date of the APA and May 28, 2003.

C.     Novell's Recent Conduct.

27.     On March 6, 2003, SCO filed its lawsuit against IBM alleging, among other things, that IBM had violated its UNIX Software and Sublicensing Agreements by disclosing UNIX-derivative source code.  (Ex. 35 at 32-50.)

28.     On May 28, 2003, Novell publicly announced that it, and not SCO, is the owner of the UNIX copyrights.  In a letter to SCO CEO Darl McBride that Novell published to the world, Novell CEO Jack Messman stated:

> Importantly, and contrary to SCO's assertions, SCO is not the owner of the UNIX copyrights.  Not only would a quick check of U.S. Copyright Office records reveal this fact, but a review of the asset transfer agreement between Novell and SCO confirms it.  To Novell's knowledge, the 1995 agreement governing SCO's purchase of UNIX from Novell does not convey to SCO the associated copyrights.  We believe it unlikely that SCO can demonstrate that it has any ownership interest whatsoever in those copyrights.

(Ex. 36 at NOV 000043054.)

29.     The Novell executives who negotiated or were primarily responsible for the APA in 1995, including Messrs. Frankenberg, Mattingly, Thompson, Chatlos, and Levine, were no longer with Novell in 2003.  (Ex. 39 at 219-221.)  Novell did not consult with them before announcing its alleged ownership of the copyrights.  (Ex. 40 at 27, 60; Ex. 41 at 90-91.)

30.     A few days after its May 28, 2003, announcement, Novell received from SCO a copy of Amendment No. 2, which Novell had said it did not have in its files and had not reviewed.  (Ex. 37 ¶ 13.)  On June 6, 2003, Novell stated in a press release:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO.  To Novell's knowledge, this amendment is not present in Novell's files.  The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(Ex. 38 at NOV 000043059.)

31.     Novell has admitted that Amendment No. 2 was present in its files prior to May 28, 2003.  (Ex. 41 at 82-83.)

## LEGAL STANDARD ON SUMMARY JUDGMENT

In this Motion, SCO asks the Court to resolve the issue of copyright ownership that lies at the heart of the parties' respective slander-of-title claims and that forms the basis in part for SCO's contract and unfair-competition claims. Under Federal Rule of Civil Procedure 56, a "party seeking to recover on a claim . . . may . . . move . . . for a summary judgment in the party's favor upon . . . any part thereof." The Advisory Committee Notes to the 1946 amendment to <u>Rule 56</u> state: "The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This type of adjudication . . . serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." <u>Accord</u> <u>McDonnell v. Cardiothoracic & Vascular Surgical Assocs., Inc.</u>, No. C2-03-0079, 2004 WL 1234138, at *1 (S.D. Ohio May 27, 2004) (Ex. A.).

"[I]t is now well established that a court may 'grant' partial summary 'judgment' that establishes the existence or nonexistence of certain facts, even though no actual judgment is entered on a claim." 11 J. Moore, <u>Moore's Federal Practice</u> ¶ 56.40[2] at 56-279 (3d ed. 1998) (footnote omitted). "A partial summary judgment ruling may dispose of only a single issue relevant to a claim . . . . In availing itself of the ability granted by Rule 56 to issue orders which resolve significant questions, a court can focus the litigation on the true matters in controversy." <u>Id.</u> at 56-280 to 56-281.

Summary judgment is appropriate where the plain language of a contract is unambiguous. <u>Thompson v. United Transp. Union</u>, No. 99-2288-JWL, 2000 WL 1929963, at *6 (D. Kan. Dec. 19, 2000) (Ex. B) (citing <u>Volkman v. United Transp. Union</u>, 73 F.3d 1047, 1050 (10th Cir. 1996)).

# ARGUMENT[1]

## I.    THE APA PLAINLY TRANSFERRED THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

### A.    The Plain Language Provides for the Transfer.

The APA provided for the transfer of the UNIX and UnixWare copyrights where it indisputably provided for the transfer of:

- All of Novell's "right, title, and interest in and to" the UNIX and UnixWare source code and products (¶¶ 3-4), and

- "All rights and ownership of UNIX and UnixWare," including "without limitation" the source code, source code products, binary products, and products in development (¶ 4).

Under the case law, each of these provisions provides for the transfer of the copyrights.

"In a non-consumer setting such as this, a transfer of all right, title and interest to computer programs and software can only mean the transfer of the copyrights as well as the actual computer program or disks." Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997) (transfer of "all right, title, and interest" unambiguously transferred copyrights); see also Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) (Ex. C) (concluding that "all rights in the program (including the copyright) were transferred" to purchaser because contract provided for transfer of "all rights" in the program); Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992) (copyrights transferred by wording leaving "little doubt" that seller sold "all the assets" of

---

[1] The facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing Statement of Undisputed Facts.

business); <u>cf</u>. <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081, 1088 (9th Cir. 1989) (the phrase "all

rights of ownership" plainly includes ownership of both software and associated copyrights).

Under Section 1.1(a) of the APA, Novell and Santa Cruz agreed that on the Closing Date

Novell would "sell, convey, transfer, assign and deliver" and Santa Cruz "purchase and acquire"

at minimum "all right, title and interest in and to the assets and properties" identified in Schedule

1.1(a) of the APA.  (¶ 3.)  In turn, Schedule 1.1(a) identifies seven categories of "as assets and

properties" transferred to Santa Cruz, including:

> "<u>All rights and ownership of UNIX and UnixWare</u>, including but
> not limited to <u>all versions of UNIX and UnixWare and all copies of</u>
> <u>UNIX and UnixWare</u> (including revisions and updates in process)
> and all appropriate technical, design, development, installation,
> operations and maintenance information concerning UNIX and
> UnixWare, including <u>source code</u>," source code products, binary
> products releases, and products under development.

(¶ 4.)  The APA thus plainly provides for the transfer – without limitation – of all right, title, and

interest in the UNIX and UnixWare source code and products, and all rights and ownership of

UNIX and UnixWare, including a non-exhaustive list of express assets and properties.  In

providing for the transfer of <u>all rights</u>, Section 1(a) and Item I plainly include the copyrights.

There can be no question, moreover, that the transfer of the copyrights in fact took place.

Section 1.1(a) of the APA defines the assets and properties to be transferred on the Closing Date

as the "Assets."  (¶ 3.)  On the Closing Date, Novell and Santa Cruz executed the Bill of Sale,

which provides:

> In accordance with [Section] 1.1(a) of the Agreement, Seller, for
> good and valuable consideration, the receipt and sufficiency of
> which is hereby acknowledged, <u>does hereby transfer, convey, sell,</u>
> <u>assign and deliver to Buyer</u>, without recourse, representation or
> warranty except as otherwise expressly provided in the Agreement,
> <u>all of the Assets</u>.

21

(¶ 5.)  The Bill of Sale thus expressly effectuated the transfer, conveyance, sale, assignment, and delivery to Santa Cruz of "all of the Assets," as provided by Section 1.1(a) of the APA.  As the Assets plainly included "all rights and ownership" of UNIX and UnixWare, including the copyrights, the Bill of Sale in fact transferred the copyrights to Santa Cruz on the Closing Date.

The TLA confirms that Novell transferred the copyrights to Santa Cruz on the Closing Date.  "It is a general rule that several papers relating to the same subject-matter and executed as parts of substantially one transaction, are to be construed together as one contract."  Harm v. Frasher, 181 Cal. App. 2d 405, 412-13 (Ct. App. 1960); Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402, 417 (Ct. App. 1984) ("The two documents are interrelated and must be read together for purposes of interpretation.").

Section 1.6 of the APA expressly provided for a license back to Novell of the same UNIX and UnixWare technology indisputably transferred to Santa Cruz under the APA (the "Licensed Technology").  (¶ 6.)  On the Closing Date, Santa Cruz granted that license to Novell in the TLA, subject to strict restrictions, specifying that "Ownership of the Licensed Technology shall reside in SCO."  (Id.)  Section 1.6 and the TLA would be senseless had Novell retained ownership of the copyrights.  Novell would not have needed a license to the Licensed Technology, let alone agreed to a license subject to strict restrictions, and ownership of the Licensed Technology would have resided in Novell, not Santa Cruz.  Simply put, Novell would have licensed the technology to Santa Cruz, not the other away around.  In reading the APA in harmony with the plain language of the TLA, the Court may properly conclude, on this basis alone, that the APA transferred the copyrights to Santa Cruz.

Other touchstone provisions of the APA confirm the transfer of the copyrights.  The first provision of the APA, Recital A as amended, explains:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the "Business").

(¶ 2.)  Recital B and Section 1.3(a)(i) then express the intent to transfer the entire Business to Santa Cruz through the APA.  Recital B provides:

> The Board of Directors of each Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller <u>comprising the Business</u> (the "Acquisition").

(Ex. 1, Recital B (emphasis added).)  Similarly, Section 1.3(a)(i) expressly states that "It is the intent of parties hereto that <u>all of the Business</u> and all of Seller's backlog, if any, relating to the Business be transferred to Buyer."  (¶ 1.)  Such provisions do not even suggest any limitation on the transfer of the Business and its assets.  On the contrary, they expressly set forth Novell's intent to transfer the entire Business.  There is no exclusion of copyrights.

Throughout the course of this litigation, Novell has not acknowledged, much less explained, the provisions setting forth the transfer of, as well as the intent to transfer, all of the Assets.  Instead, Novell has relied on Item V.A of the Excluded Assets Schedule in the original APA, but that Item literally no longer exists.  Amendment No. 2 to the APA revised Item V.A "to read" as follows:

> All copyrights and trademarks, except for <u>the copyrights</u> and trademarks owned by Novell as of the date of the Agreement

23

> <u>required for SCO to exercise its rights with respect to the</u>
> <u>acquisition of UNIX and UnixWare technologies</u>.  However, in no
> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

(¶ 8.)  To perpetuate the alleged exclusion of the UNIX and UnixWare copyrights in Item V.A,

Novell has read the original APA and Amendment No. 2 in isolation.  In fact, Section A <u>replaces</u>

the original Item V.A, clarifying that the Excluded Assets do <u>not</u> include those copyrights, which

were transferred with "all the Assets" under the APA and Bill of Sale.

      Amendment No. 2 clarified that the <u>copyrights at issue</u> were not Excluded Assets.

Section A states that the Excluded Assets do not include the copyrights "required for SCO to

exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (<u>Id.</u>)

Plainly the UNIX and UnixWare copyrights are so required.  SCO's rights with respect to its

acquisition of UNIX and UnixWare technologies include:

- The rights to develop, license, and support UNIX and UnixWare products to evolve the
  Business transferred under the APA.  (¶ 1-2.)  Absent a license, only the owner of the
  UNIX and UnixWare copyrights has such rights.  Those copyrights were plainly required
  for Santa Cruz to exercise its rights to run the Business.

- All rights and ownership in UNIX and UnixWare source code and products.  (¶¶ 3-4.)
  Only the owner of the UNIX and UnixWare copyrights has the authority to exercise such
  unlimited rights.  Those copyrights thus were clearly required for Santa Cruz to exercise
  its other, unlimited rights in the source code and products.

- Claims arising after the Closing Date against any parties relating to any right, property, or
  asset included in the Business.  (¶ 4.)  Without the copyrights, Santa Cruz could not have

pursued such claims for the unauthorized use and distribution of its UNIX and UnixWare

code and products.

- All rights pertaining to UNIX and UnixWare under any assignable contract or license.

   (Id.)  Because without the copyrights Santa Cruz would have been powerless to enforce

   covenants and conditions in such contracts or licenses, the copyrights were required for

   Santa Cruz to exercise those rights.

The copyrights at issue thus were required for Santa Cruz to exercise these and other rights it

obtained with its acquisition of the UNIX and UnixWare technologies.  Novell cannot seriously

argue otherwise.

   B.   The APA Bill of Sale Exceeds the Requirements of the Copyright Act.

   Under the case law, the transfer language in the Bill of Sale far exceeds the requirements

of Section 204 of the Copyright Act.

   "As with all matters of contract law, the essence of the inquiry here is to effectuate the

intent of the parties.  Accordingly, even though a written instrument may lack the terms

'transfer' and 'copyright,' it still may suffice to evidence their mutual intent to transfer the

copyright interest."  Nimmer on Copyrights § 10.03[2] (collecting cases); Kenbrooke Fabrics,

Inc. v. Soho Fashions, Inc., 690 F. Supp. 298, 301 (S.D.N.Y. 1988) (invoice and short letter

transferring ownership of products without mention of copyrights suffice).  No particular

language or "magic words" are required.  Radio Television Espanola S.A. v. New World Entm't,

Ltd., 183 F.3d 922, 927 (9th Cir. 1999).  The word "copyright" is not required.  See, e.g.,

ITOFCA, Inc. v. Megatrans Logistics, Inc., 322 F.3d 928, 931 (7th Cir. 2003) (transfer of "all

assets" to a business suffices); Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043,

2004 WL 2967556, at *4 (N.D. Ill. Nov. 24, 2004) (Ex. D) (explaining that "a writing need not use the term 'copyright' to effectuate a valid transfer"); <u>Dean v. Burrows</u>, 732 F. Supp. 816, 823 (E.D. Tenn. 1989) (endorsed check, with no mention of the word, "complies with the requirements"); <u>see also</u> <u>Effects Assocs., Inc. v. Cohen</u>, 908 F.2d 555, 557 (9th Cir. 1990) (explaining that "a one-line pro forma statement will do").[2]

        In this case, the APA provided for the transfer by Novell and acquisition by Santa Cruz of the Assets, including all rights and ownership of UNIX and UnixWare.  (¶¶ 3-4.)  On the Closing Date, the parties executed the Bill of Sale effectuating the transfer of all the Assets:

> In accordance with [Section] 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, <u>does hereby transfer, convey, sell, assign and deliver to Buyer</u>, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, <u>all of the Assets</u>.

(¶ 5.)  Under the applicable authority, the language identifying the Assets by reference to Section 1.1(a) of the APA easily meets the statutory requirements and the language providing for the transfer, conveyance, sale, assignment and delivery of the Assets far exceeds the requirements.

---

[2]        Even a subsequent confirmatory writing suffices to effectuate a valid transfer.  <u>Arthur Rutenberg Homes, Inc. v. Drew Homes</u>, 29 F.3d 1529, 1532 (11th Cir. 1994) ("[T]he requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer."); Nimmer, <u>supra</u>, § 10.03[3] ("[I]f a prior oral grant is subsequently confirmed in writing, it validates the grant ab initio as of the time of the oral grant.").

        In addition, courts avoid the nonsensical and inefficient situation created by divided ownership of tangible and non-tangible property.  <u>See</u> <u>Schiller</u>, 969 F.2d at 413 (court should not interpret agreement to divide ownership of property from ownership of copyrights for that property; such divided ownership creates "diseconomies" because a "stand off" would ensue between the property holder, whose ability to exploit the property he owns is significantly curtailed, and the copyright holder, who of course cannot exploit the copyright without the tangible property).

More to the point, the Bill of Sale manifests the intent to transfer <u>all rights</u> and ownership of UNIX and UnixWare, including the copyrights.

The APA unambiguously provided for the transfer to Santa Cruz of all right, title, and interest and all rights and ownership of UNIX and UnixWare. The Bill of Sale unambiguously effectuated that transfer and complied with the Copyright Act. Based on the plain language of the APA and its Bill of Sale, SCO is entitled to partial summary judgment on the transfer of the UNIX and UnixWare copyrights to Santa Cruz under the APA.

## II.  OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ UNDER THE APA.

The overwhelming extrinsic evidence, including the testimony of all the central witnesses and the parties' conduct during the years that followed the APA, confirms SCO's position.

### A.  <u>Testimonial Evidence.</u>

On September 20, 1995, pursuant to the APA, Novell and Santa Cruz issued a joint press release announcing the transaction. In that press release, Novell admitted that "SCO will acquire Novell's UnixWare business and UNIX intellectual property." (¶ 9.)

The following witnesses who were with Novell at the time of the APA have testified, in no uncertain terms, that Novell intended to transfer the copyrights under the APA:

- Robert Frankenberg, CEO of Novell at the time of the APA. (¶¶ 10-11.)

- Ty Mattingly, Novell's Vice President for Strategic Relations, member of the Novell negotiating team, and Mr. Frankenberg's liaison to the negotiations. (¶ 12.)

- Duff Thompson, the Novell senior executive assigned by Mr. Frankenberg to oversee the transaction and Novell's representative on the Santa Cruz Board after the sale. (¶ 13.)

- Ed Chatlos, the chief negotiator for Novell. (¶ 14.)

- Burt Levine, a Novell attorney who reviewed and revised drafts of the APA, was familiar with the negotiations, and worked for Santa Cruz after the sale. (¶ 15.)

- Bill Broderick, a contract manager in the UNIX licensing group at Novell and Santa Cruz, and a member of the Novell transition team. (¶¶ 16-17.)

The following witnesses who were with Santa Cruz at the time of the APA have testified that the parties intended for the APA to transfer the copyrights to Santa Cruz:

- Alok Mohan, CEO of Santa Cruz at the time of the APA. (¶ 18.)

- Doug Michels, founder and Senior Vice President of Santa Cruz at the time of the APA. (¶ 19.)

- Jim Wilt, the chief negotiator for Santa Cruz. (¶ 20.)

- Kimberlee Madsen, a member of the Santa Cruz legal department who assisted Mr. Wilt in the negotiations. (¶ 21.)

Thus, to date, no fewer than nine witnesses have given sworn deposition testimony in support of SCO's position.[3] (¶¶ 10-21.)

    B.   The Parties' Prior Conduct.

The parties' conduct during the years that followed the APA confirms the transfer of the copyrights under the APA and belies Novell's current litigation position. Such conduct includes:

---

[3]    Such witnesses, including Messrs. Frankenberg, Mattingly, Chatlos, and Wilt, testified that the original Item V of the Excluded Assets Schedule was intended to exclude copyrights in Netware, not in UNIX or UnixWare. (Ex. 7 at 21-22; Ex. 9 at 52; Ex. 13 at 40-41; Ex. 16 at 104-07; Ex. 20 at 29-30, 35.) Moreover, witnesses with personal knowledge of the negotiation and intent of Amendment No. 2 have testified that that amendment was intended to clarify or confirm that the copyrights were transferred under the APA. (Ex. 11 at 24; Ex. 18 at 100-03; Ex. 20 at 35; Ex. 21 ¶ 11.)

- With the closing, Santa Cruz obtained physical possession of UNIX copyright registrations, which remain in SCO's possession to this day.  (¶ 22.)

- Since 1995, without objection from Novell, Santa Cruz and SCO shipped countless UNIX-related products with Santa Cruz or SCO copyright notices affixed.  (¶ 23.)

- Since 1995, without objection from Novell, Santa Cruz and SCO entered into hundreds of license agreements for UNIX products that not only contain express representations and warranties of SCO's rights and ownership in the intellectual property required to provide the licensed product, but that also indemnify licensees against any third-party claims for copyright infringement.  (¶ 24.)

- Before May 28, 2003, Novell did not contest Santa Cruz's or SCO's public statements and conduct asserting ownership of the UNIX copyrights.  (¶ 25.)

- There is no evidence that Novell publicly asserted ownership of UNIX copyrights between the Closing Date of the APA and May 28, 2003.

Such conduct establishes that Santa Cruz understood it had obtained the copyrights in 1995 and that Novell was aware of and agreed with that understanding.

C.  Novell's Recent Conduct.

On May 28, 2003, for the first time since the execution of the APA, Novell asserted ownership of the copyrights at issue.  (¶ 28.)  The evidence reveals that Novell's ownership claims were minted anew to thwart and harm SCO.  (Ex. 29 at 11-13; ¶¶ 27-31.)  Novell made those claims without consulting the Novell executives who had actually negotiated or been responsible for the APA in 1995.  (¶ 29.)  On June 6, 2003, after SCO had found and sent to Novell a copy of Amendment No. 2, Novell candidly admitted:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO.  To Novell's knowledge, this amendment is not present in Novell's files.  The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(¶ 30.)  Although in early 2003 Novell denied having Amendment No. 2, Novell has now admitted that the amendment was found in its files prior to  May 28, 2003.  (¶¶ 30-31.)  Such evidence leaves little doubt about Novell's motivations for making its contested ownership claims.

## CONCLUSION

SCO respectfully submits, for the foregoing reasons, that the Court should grant SCO's

Motion for Partial Summary Judgment on Its First, Second, and Fifth Causes of Action and for

Summary Judgment on Novell's First Counterclaim.


DATED this 9th day of April, 2007.

<div style="margin-left:40%">

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

DORSEY & WHITNEY LLP
Devan V. Padmanabhan


*Counsel for The SCO Group, Inc.*

By: _____/s/ Edward Normand_____

</div>

31

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing SCO's Memorandum in Support of Its Motion for Partial Summary Judgment on Its First, Second, and Fifth Causes of Action and for Summary Judgment on Novell's First Counterclaim was served on Defendant, Novell, Inc., on this 9th day of April, 2007, via CM/ECF to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-248

/s/ Edward Normand