# EXHIBIT A

Dockets.Justia.com

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1234138 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

H

Briefs and Other Related Documents
McDonnell v. Cardiothoracic & Vascular Surgical
Associates, Inc.S.D.Ohio,2004.Only the Westlaw
citation is currently available.

United States District Court,S.D. Ohio, Eastern
Division.
Bryan E. MCDONNELL, Plaintiff,
v.
CARDIOTHORACIC & VASCULAR SURGICAL
ASSOCIATES, INC., et al., Defendants.
**No. C2-03-0079.**

May 27, 2004.

Thomas J. Collin, Thompson Hine LLP, Christopher
R. Johnson, Thompson Hine & Flory, Cleveland,
OH, Jane Ellen Garfinkel, Thompson Hine & Flory
LLP, Cincinnati, Paul Giorgianni, Thompson Hine
LLP, Columbus, OH, for Plaintiff and Counter
Defendant.
Carl A. Aveni, II, David K. Orensten, Joseph Francis
Elliott, Porter Wright Morris & Arthur, Columbus,
OH, for Defendants.
Marion H. Little, Zeiger Tigges Little & Lindsmith
LLP, Columbus, OH, for Defendants and Counter
Claimant.

*OPINION AND ORDER*
FROST, J.
**\*1** This matter is before the Court on Defendant
Genesis Health Care's Motion to Strike Plaintiff's
Motion for Partial Summary Judgment (Doc. # 110);
Defendants' Cardiothoracic & Vascular Surgical
Associates ("CVSA") and Cardiothoracic and
Vascular Surgical Specialists ("CVSS") Motion to
Strike Plaintiff's Motion for Partial Summary
Judgment (Doc. # 114); Plaintiff Bryan E.
McDonnell's ("McDonnell") Memorandum In
Opposition to Defendants' Motion to Strike (Docs. #
113 and 115); and the Defendant Genesis' Reply
Memorandum In Support of Motion to Strike (Doc. #
116). The defendants' motions to strike the plaintiff's
motion for partial summary judgment (docs. # 110
and 114) are not well-taken and the Court DENIES
the same.

Plaintiff moves the Court for partial summary
judgment pursuant to Rule 56(a) of the Federal Rules
of Civil Procedure finding that the Physicians

Recruitment Agreement, a subject of the Amended
Complaint, did not satisfy the safe harbor provision
of either the Anti-Kickback Statute, 42 U.S.C. §
3020(a)-7(b)(b), or the Stark Law, 42 U.S.C. §
1395nn(a). Defendants oppose the plaintiff's motion,
arguing that, as a matter of procedure, the Court may
not entertain summary judgment motions seeking
adjudication of "issues" rather than "claims."
Defendants' position however, is contrary to recent
case law interpreting Fed.R.Civ.P. 56(a).

Numerous courts have, under certain circumstances,
entertained and decided motions for partial summary
judgment which address particular issues rather than
claims. *See Cook v. Rockwell Intern. Corp.,* 181
F.R.D. 473, 486 (D.Colo.1998) (quoting 11 James
Wm. Moore, *Moore's Federal Practice* ¶ 56.40[2] at
56-279 (3d ed.1998) (footnote omitted)) (A partial
summary judgment ruling may dispose of only a
single issue relevant to a claim.... In availing itself of
the ability granted by Rule 56 to issue orders which
resolve significant questions, a court can focus the
litigation on the true matters in controversy. *Id.* at 56-
280 to 56-281.); *Rotorex Co., Inc. v. Kingsbury
Corp.,* 42 F.Supp.2d 563, 570 -571 (D.Md.1999)
(Rule 56(a) permits a party seeking to recover upon a
claim to move for summary judgment "in the party's
favor upon all *or any part thereof."* ) (Emphasis
added); *In re Ciprofloxacin Hydrochloride Antitrust
Litigation,* 261 F.Supp.2d 188 (2003) ("In fact,
Federal Rule of Civil Procedure 56 authorizes partial
summary judgment that falls short of a final
determination to limit the issues to be determined at
trial.") *See also In re Cardizem CD Antitrust
Litigation,* 105 F.Supp.2d 682, 691 -692
(E.D.Mich.2000) (citing Fed.R.Civ.P. 56(d))
("Defendant Andrx argues that Plaintiffs' motions for
partial summary judgment are improper because
resolution of the issue presented will not streamline
the litigation process, materially shorten discovery or
trial, or conserve judicial resources. This Court
disagrees").[FN1]

> FN1. Defendants cite the decision *Teletech
> Teleservices, Inc. v. CompuServe
> Incorporated,* Case No. C-2-96-1252 (S.D.
> Ohio June 17, 1997) for the proposition that
> Rule 56 does not permit parties to pursue
> summary adjudication of issues as opposed
> to summary adjudication of claims. This

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2004 WL 1234138 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Court finds the conclusion of other district courts, addressing the summary adjudication of issues in certain circumstances, to be the better approach. *See Wuliger v. Christie, 2004 WL 626644 (N.D.Ohio March 30, 2004)* (Under Rule 56, the claimant may move for summary judgment regarding "all or any part thereof" of a claim or counterclaim. When construing a motion for partial summary judgment, the court employs the normal summary judgment standard. The effect of a partial summary judgment ruling is to narrow the issues for further disposition).

A motion for partial summary judgment is recognized as a useful pretrial tool; the Advisory Committee Notes to the 1946 amendment to Rule 56 state: "The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This type of adjudication ... serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *See Rotorex, 42 F.Supp.2d at 570; Dooley v. Liberty Mut. Ins. Co., 307 F.Supp.2d 234, 240 (D.Mass.2004)* (quoting Fed.R.Civ.P. 56(d) Advisory Committee's Note (1946) ("[A] partial summary 'judgment' is not a final judgment, and, therefore, is not [generally] appealable. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case").

**\*2** In fact, district courts in the very circuits that the defendants cite as being within the "majority rule" (summary judgement motions proper as to entire claims only), have recently entertained motions for partial summary judgment on issues, in order to narrow claims for further disposition. *See Nutrition Management v. Harborside Healthcare Corp., 2004 WL 764809, \*3 (E.D.Pa. March 19, 2004)* (entertaining a motion for partial summary judgment: "Plaintiff does not seek summary judgment with respect to any single claim. Rather, Plaintiff seeks summary judgment only with respect to the fact that Plaintiff did not contractually guarantee to be financially responsible for Defendants' costs exceeding a specified rate). *See also Rhythm & Hues, Inc. v. Terminal Marketing Co., Inc., 2004 WL 941908, \*8 (S.D.N.Y. May 4, 2004)* (Fed.R.Civ.P. 56(a) states that a party may move for summary judgment upon "any part" of a claim or counterclaim. As one treatise notes: "[I]t is now well-established that a court may 'grant' partial summary 'judgment' that establishes the existence or nonexistence of

certain facts, even though no actual judgment is entered on a claim." 11 James Wm. Moore, *Moore's Federal Practice* § 56.40[1], at 56-279 (3d ed.2003) (footnote omitted).

Defendants argue that a proper reading of Rule 56 in its completion, proves that partial summary judgment is only warranted in two circumstances; on the issue of liability and when used to establish certain facts *after* a full-blown motion for summary judgment on an entire claim has been denied. The defendants' argument, however, unnecessarily restricts the Court's ability to further the goal of Rule 56; expediting litigation. *In re Ciprofloxacin Hydrochloride Antitrust Litigation, 261 F.Supp.2d 188, 231 (E.D.N.Y.2003)* (citing Advisory Committee's Note and finding that Federal Rule of Civil Procedure 56 authorizes partial summary judgment that falls short of a final determination to limit the issues to be determined at trial). *But see Felix v. Sun Microsystems, Inc., 2004 WL 911303, \*7 (D.Md. April 12, 2004)* (finding that a party is simply not entitled to summary judgment if the judgment would not be dispositive of an entire claim. Moreover, a party may not attempt to use Rule 56(a) to evade the restriction in Rule 56(a) because Rule 56(d) does not authorize independent motions to establish certain facts as true).[FN2] *Rhythm & Hues, Inc.,* sets forth the following analysis for considerations of motions for summary judgment on issues which are parts of:

FN2. Although the Sixth Circuit has yet to address the appropriateness of motions for partial summary judgment on issues rather than claims, the appellate court recently reviewed a district court's decision granting a motion for partial summary judgment. *In re Cardizem CD Antitrust Litigation, 332 F.3d 896 (2003), petition for cert. pending,* No. 03-779 (U.S. Nov. 24, 2003) provided the opportunity for the appellate court to review a Michigan District Court's grant of partial summary judgment on whether or not an agreement was per se illegal under the Section 1 of the Sherman Act. The court reviewed the district court's decision without expressing concern with the appropriateness of the district court's partial ruling, implicitly upholding the appropriateness of partial motions for summary judgment in certain instances.

Indeed, Fed.R.Civ.P. 56(d) specifically contemplates

that a court in adjudicating a motion for summary judgment "shall ... make an order specifying the facts that appear without substantial controversy" and that such facts "shall be deemed established" for purposes of a trial. R & H contends that this procedure applies only where a party has made a motion for summary judgment that is unsuccessful in disposing of a particular claim in full. As a matter of logic, however, if a court has the power under Fed.R.Civ.P. 56(d) to make a ruling regarding the establishment of facts for trial as an ancillary result of a motion for summary judgment, a court surely has the power to do so in situations where a party recognizes that a motion for summary judgment as to a particular claim is not possible. Put in terms of the language of the rule, the Court concludes that a "part" of a claim or counterclaim under Fed.R.Civ.P. 56(a) for which a motion for partial summary judgment is explicitly permitted must necessarily include the adjudication of facts contemplated by Fed.R.Civ.P. 56(d).
**\*3** *Rhythm & Hues, Inc., 2004 WL 941908, \*8 (S.D.N.Y. May 4, 2004).* This Court finds such analysis instructive.

Rule 56(a) provides a party may seek summary judgment upon "all or part" of a claim. Fed.R.Civ.P. 56(a). Additionally, Rule 56(d) states a court may "make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." Fed.R.Civ.P. Rule 56(d). When these sections are considered in tandem, along with Rule 56's goal of streamlining litigation, it is apparent that Rule 56 allows the Court to resolve significant questions of law pretrial so that a court can focus the litigation on the true matters in controversy. See *Cook v. Rockwell Intern. Corp.,* 181 F.R.D. 473, 486 (D.Colo.1998).

In the case *sub judice,* adjudication of whether the Physician Recruitment Agreement is per se illegal under the Anti-Kickback Statute and the Stark Law will aid in narrowing the triable issues before this Court. The legality of the Physician Recruitment Agreement is central to both the claims and the defenses in this case. Indeed, the resolution of many other disputed issues hinges on the Court's preliminary determination of the legality of this agreement. For example, the plaintiff claims that the defendants fraudulently induced him to accept employment in Zanesville, Ohio with CVSA by

failing to disclose, among other things, the necessity of signing the Physician Recruitment Agreement, which the plaintiff refused to sign because of its illegality. Genesis asserts that the agreement was legal, and that requiring the plaintiff to sign the Physician Recruitment Agreement was Genesis' effort to comply with the "regulatory web of the Stark regulations and the federal Anti-Kickback statute." (Defs.' Mot. Summ. J., Doc. # 110 at 18).

A pretrial determination of whether the Physician Recruitment Agreement was proper, as a matter of law, will allow the Court to focus on the true matter of controversy in this claim: whether Genesis acted in "good faith," or whether Genesis acted fraudulently, in requiring that the plaintiff sign the Physician Recruitment Agreement. Rule 56 allows the Court to issue such orders. *See Rotorex,* at 571, citing *Capitol Records, Inc. v. Progress Record Distrib., Inc.,* 106 F.R.D. 25, 29 (N.D.Ill.1985) ("[E]ven though Rotorex is not here seeking judicial resolution of its entire claim, the Court's determination as a matter of law concerning the documents which set forth the terms of the contract between the parties will serve the desirable goal of Rule 56 of expediting this litigation").

The legality of the Physician Recruitment Agreement is central to both the plaintiff's claims and the defendants' defenses. There is persuasive authority, discussed *infra,* that Rule 56 of the Federal Rules of Civil Procedure permits such issues to be raised in a motion for partial summary judgment. Accordingly, the Court shall consider the plaintiff's motion for partial summary judgment.

**\*4** Defendants' motions to strike the plaintiff's motion for partial summary judgement are therefore DENIED. A revised briefing schedule on the plaintiff's motion for partial summary judgment is as follows:
1. Defendants Genesis and CVSA/CVSS shall file a memorandum in opposition, if any, on or before Friday, June 18, 2004.
2. Plaintiff's reply memorandum, if any, shall be filed on or before Friday July 2, 2004.
3. A non-oral hearing on all pending motions (docs. # 101; 105; 109) is Re-scheduled for Friday July 9, 2004 at 8:00 a.m.

IT IS SO ORDERED.

S.D.Ohio,2004.
McDonnell v. Cardiothoracic & Vascular Surgical

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2004 WL 1234138 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Associates, Inc.
Not Reported in F.Supp.2d, 2004 WL 1234138
(S.D.Ohio)

Briefs and Other Related Documents (Back to top)

• 2:03CV00079 (Docket) (Jan. 27, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Thompson    v.    United    Transp.
Union.D.Kan.,2000.Only the Westlaw citation is
currently available.
United States District Court, D. Kansas.
Jocelyn THOMPSON, Plaintiff,
v.
UNITED TRANSPORTATION UNION, Defendant.
**No. 99-2288-JWL.**

Dec. 19, 2000.

MEMORANDUM AND ORDER
LUNGSTRUM.
**\*1** Plaintiff Jocelyn Thompson filed suit against
defendant United Transportation Union alleging
violations of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. Specifically,
plaintiff claims that she was subjected to sexual
harassment, sex discrimination and retaliation by
union representatives. In addition, plaintiff claims
that union representatives failed to assist her in
connection with her complaints concerning alleged
discriminatory and retaliatory conduct by her
employer. Finally, plaintiff asserts that the union's
conduct led to her constructive discharge.

This matter is presently before the court on
defendant's motion for summary judgment (doc. #
69) and plaintiff's motion to strike alleged defense of
release (doc. # 79). As set forth in more detail below,
defendant's motion for summary judgment is granted
and plaintiff's motion to strike is denied.

• Facts

The following facts are either uncontroverted or
related in the light most favorable to plaintiff, the
nonmoving party. Plaintiff began her employment
with Kansas City Southern Railroad ("KCSR") in
April 1995 at KCSR's Pittsburg, Kansas depot. KCSR
is a Class I Railroad with freight operations
extending from Kansas City, Missouri to Beaumont,
Texas and Shreveport, Louisiana. During the first
several years of her employment with KCSR,
plaintiff worked as a conductor. As a conductor,
plaintiff was represented for collective bargaining
purposes by the United Transportation Union
("UTU"). The UTU was the certified collective

bargaining representative for the conductors at KCSR
during the entire period of plaintiff's employment.
From June 1995 through the time she resigned her
employment in May 1999, plaintiff was the only
female member of the UTU at the Pittsburg, Kansas
depot.

The UTU has a collective bargaining agreement with
KCSR which governs the terms and conditions of the
Conductors' employment. Claims for violations of the
conductors' collective bargaining agreement must be
initiated in writing. An employee who believes that
the agreement has been violated begins the grievance
process by filing a "penalty timeslip" with KCSR
describing the violation. If KCSR rejects the claim,
the matter may then be handled by local union
representatives. Local union representatives, upon
learning that KCSR has rejected a timeslip, may
advance a claim by presenting it to a company
official. If the claim is not resolved at that level, the
claim may be appealed to successive levels of
management. If the final level of appeal does not
resolve the claim, the union or the individual
employee may then appeal the matter to a Public Law
Board. A Public Law Board is an arbitral panel with
the authority to issue final and binding orders
resolving disputes under the collective bargaining
agreement. It is undisputed that the collective
bargaining agreement between UTU and KCSR with
respect to KCSR Conductors did not specifically
address discrimination or sexual harassment in the
workplace.

**\*2** Pursuant to the terms of the collective bargaining
agreement, KCSR is obligated to promote its
Conductors to Engineer positions. KCSR carries out
this obligation by posting a circular seeking "Student
Engineer Applications." Applicants who are accepted
undergo a period of training and, if successful, are
eligible to be promoted to Engineer. In January 1998,
KCSR issued a circular announcing that it was
accepting applications for Student Engineers.
Plaintiff applied for the Student Engineer position in
February 1998. During the next two months, as male
Conductors with less seniority than plaintiff were
accepted into the Student Engineer position, plaintiff
apparently began to wonder whether KCSR was
denying her the promotion based on her sex. In April
1998, plaintiff, per the advice of a local union
representative, began filing penalty timeslips with
KCSR. None of the timeslips submitted by plaintiff

were based on alleged sex discrimination. Rather, the timeslips merely stated:

Claim basic day at Engineers rate of pay. Account not accepted into Engineer training program in Seniority Order. This is in violation of Article XIII, Section 3 of the October 31, 1985 UTU National Agreement. Engineer trainees junior to me have been accepted into the program around me.

Plaintiff filed penalty timeslips based on the company's failure to accept her application to the Engineer training program in seniority order for each day beginning on April 20, 1998 and ending July 20, 1998.[FN1]

> FN1. On June 15, 1998, plaintiff was accepted into the Engineer training program, with training to begin on July 20, 1998.

Plaintiff's timeslips were filed in six separate groups. All timeslips were denied by KCSR. The first set of timeslips were denied by KCSR on May 27, 1998. The second set of timeslips were denied by KCSR on July 5, 1998. UTU appealed the denial of these first two sets of claims to the final conference level.[FN2] UTU and KCSR then agreed that the appeal regarding plaintiff's first set of timeslips would be resolved by a Public Law Board and that the appeal regarding plaintiff's second set of timeslips would be held in abeyance pending resolution of the first appeal. UTU and KCSR also agreed to hold the further processing of daily timeslips in abeyance regardless of where those timeslips were in the grievance-handling process. According to defendant's evidence, which plaintiff has failed to controvert, the practice of holding claims in abeyance is common at KCSR. The purpose is to allow an arbitration of the initial claims to proceed, with an understanding that subsequent (and essentially identical) claims will be settled on the basis of the arbitration decision. With respect to plaintiff's claims, then, the effect of the agreement was to arbitrate the ultimate question of whether plaintiff was improperly denied a promotion to the Engineer training position and, if so, whether she was entitled to an adjustment of her Engineer seniority and a day's pay for each day she should have been paid as an Engineer but for the denial of her application.[FN3]

> FN2. At no time during the grievance process did UTU challenge KCSR's promotion decisions as discriminatory,

despite plaintiff's apparent desire that UTU do so.

> FN3. The arbitration of plaintiff's first appeal was scheduled for a Public Law Board which convened in February 2000. This appeal was never arbitrated, however, because plaintiff ultimately settled her claims against KCSR and, in connection with that settlement, agreed to "withdraw, with prejudice, and to otherwise abandon, any and all claims or grievances" that she had filed or asserted against KCSR through UTU.

**\*3** On October 16, 1998, plaintiff filed a charge of discrimination with the EEOC against both KCSR and UTU based on allegations of sex discrimination and sexual harassment. Before filing her EEOC charge, plaintiff never submitted any written grievance to the UTU alleging sex discrimination or sexual harassment in connection with her employment at KCSR. In May 1999, plaintiff settled her claims against KCSR. In exchange for $350,000, plaintiff agreed to release "any and all persons" from all claims "arising out of her employment" with KCSR. She also agreed to resign her employment with KCSR, effective May 21, 1999.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant that does not bear the ultimate

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

### • Effect of Plaintiff's Settlement Agreement with KCSR

**\*4** On May 21, 1999, plaintiff signed a settlement agreement and release with KCSR. In the release, plaintiff agreed to

fully and finally forever release, acquit, and discharge KCSR, its ... current and former employees ... and any and all other persons, and each and all of them, of and from any and all liability, claims, actions, demands, suits or causes of action whatsoever, known or unknown, which [plaintiff] may have or claim to have against them or any of them, whether in tort, or in contract, or for violation of Federal, State or local law, or otherwise, whether herein described or not. Such liability, claims, actions, demands, suits or causes of action include, but are not limited to, those arising in any manner out of, relating to, or connected with [plaintiff's] KCSR employment or the relinquishment of her KCSR employment rights, and whether based on Federal, State or local laws, including, but not limited to ... Title VII of the Civil Rights Act of 1964....

In its motion, defendant first contends that summary judgment is mandated on all of plaintiff's claims by virtue of the fact that plaintiff, in the settlement agreement and release entered into between plaintiff and KCSR, released "all persons" from all claims "arising out of plaintiff's employment." According to defendant, the plain language of the agreement evinces a clear intent by plaintiff to release all persons, including the union and its representatives, from any claims arising out of plaintiff's employment. In response, plaintiff urges that defendant has waived this argument. Specifically, plaintiff maintains that the issue of whether the release bars plaintiff's claims against defendant is an affirmative defense and that defendant has failed to plead this affirmative defense. *See* Fed.R.Civ.P. 8(c). In the alternative, plaintiff argues that she never intended to release any claims against defendant UTU. As set forth in more detail below, the court concludes that defendant did not waive this defense and that plaintiff's settlement agreement with KCSR in effect released all of plaintiff's claims arising out of her employment-including those claims against defendant UTU. For this reason, summary judgment in favor of defendant UTU is warranted.

The court begins with the waiver issue. Although defendant has set forth its defense concerning plaintiff's release in the pretrial order, it is undisputed that defendant never articulated this defense in any responsive pleading. It is also undisputed, however, that plaintiff learned of defendant's intent to raise this defense in July 2000 approximately one month after defendant obtained a copy of plaintiff's settlement agreement and release with KCSR. At that time, defendant's counsel advised plaintiff's counsel of defendant's intent to file a Rule 11 motion for sanctions on the grounds that plaintiff filed suit against defendant UTU despite her release of "all persons" from "all claims" arising out of her employment. In response, plaintiff's counsel sent a letter to defendant's counsel specifically advising counsel that the affirmative defense had not been raised in defendant's answer.[FN4]

> FN4. At the time defendant filed its answer, it had not obtained a copy of plaintiff's settlement agreement and release.

**\*5** According to established Tenth Circuit precedent, then, the defense has not been waived. As the Circuit has emphasized, the purpose behind Rule 8(c) is that of putting "plaintiff on notice well in advance of trial that defendant intends to present a defense in the

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

nature of an avoidance." *See Ball Corp. v. Xidex Corp., 967 F.2d 1440, 1443-44 (10th Cir.1992)* (quoting *Marino v. Otis Eng'g Corp., 839 F.2d 1404, 1408 (10th Cir.1988)*). In *Ball,* the Circuit held that the defendant had not waived its immunity defense even though the defendant had not raised the defense in its answer. *See id.* at 1443. The Circuit focused on the fact that the defendant had filed a motion for partial summary judgment three months prior to trial, based in part on the immunity defense. *See id.* The defendant in *Ball* also argued for immunity in its pretrial statement. According to the Circuit, then, the plaintiff "had notice at least three months prior to trial that [the defendant] would claim immunity, and the issue was therefore properly litigated at trial." *See id.* at 1444; *accord Marino, 839 F.2d at 1408* (purpose of Rule 8(c) was served when the plaintiff had notice at least three months prior to trial that the defendant intended to raise affirmative defense, even though the defendant had failed to plead that affirmative defense). Here, plaintiff concedes that she had notice six months prior to trial [FN5] that defendant would claim that plaintiff's release with KCSR released plaintiff's claims against defendant. The defense was also specifically set forth in the pretrial order and, of course, in defendant's motion for summary judgment. In short, the purpose of Rule 8(c) has been satisfied and the defense has not been waived. Plaintiff's motion to strike defendant's defense of release is denied.

    FN5. This case is set for trial on January 30, 2001.

Turning to the release itself, the issue to be resolved is whether the release should be read broadly to include defendant UTU even though UTU is nowhere named in the release. When a release or settlement agreement impacts upon significant federal rights or interest, federal common law controls the interpretation of that release or agreement. *See Heuser v. Kephart, 215 F.3d 1186, 1190 (10th Cir.2000)* (enforcement and interpretation of settlement agreements in Title VII cases are governed by federal common law). Under federal common law, the effect of a release upon unnamed parties "shall be determined in accordance with the intentions of the parties." *See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 345-46 (1971)* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 501 (1964)*); *see also Sims v. Western Steel Co., 551 F.2d 811, 817-18 (10th Cir.1977)* (where federal law controls release question, the effect of release is determined in accordance with the

intention of the parties).

The court, then, must endeavor to ascertain the intent of plaintiff and KCSR in connection with the settlement agreement and release. In doing so, the court looks first to the plain language of the release. Under general principles of contract law, where a contract is complete and unambiguous, its plain language is the "only legitimate evidence of the parties' intent." *See United Bank & Trust Co. v. Kansas Bankers Surety Co., 901 F.2d 1520, 1522 & n. 1 (10th Cir.1990)*. In express terms, plaintiff agreed to release "any and all persons" from "any and all liability" for claims "arising out of her employment with KCSR." In other words, the release did not foreclose actions by plaintiff against particular persons or entities. Rather, the release foreclosed any and all actions against any and all persons connected with plaintiff's employment. The only possible conclusion that may be drawn from the plain language of the release is that plaintiff agreed to and intended to put an end to litigation involving claims of any nature, against any persons, involving her employment at KCSR. *See Bennett v. Coors Brewing Co., 189 F.3d 1221, 1232 (10th Cir.1999)* (where plaintiffs agreed to release "all ... claims ... in any way relating to [their] employment with Coors," plain meaning of the releases-and the only reasonable meaning of the releases-was to release all claims in any way relating to plaintiffs' employment with Coors); *Coleson v. Inspector General of Dep't of Defense, 721 F.Supp. 763, 767-68 (E.D.Va.1989)* (dismissing claims against individuals unnamed in release based on express terms of release-plaintiff released "any action or actions arising out of his employment"); *see also United Bank & Trust Co., 901 F.2d at 1522* (language in a contract is given its plain and ordinary meaning).

**\*6** Because the release signed by plaintiff evinces a clear intent to release all persons, plaintiff's claims against defendant UTU are barred by the release. Summary judgment, therefore, is appropriate in favor of defendant on all of plaintiff's claims.[FN6] Compare *Zenith, 401 U.S. at 347-48* (defendant unnamed in release not entitled to benefit of that release where contract made prior to release expressly provided that release would benefit only parties thereto and parent and subsidiaries of the parties) *and Aro, 377 U.S. at 501* (defendant unnamed in release not entitled to benefit of that release where defendant did not fit within any of the special categories of persons and entities expressly enumerated in release). Even assuming, however, that plaintiff's claims were not barred by the plain meaning of the release, the court

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

would nonetheless grant summary judgment in favor of defendant as plaintiff's claims fail on the merits.

> FN6. Plaintiff avers that she never intended to release defendant. Because the court has concluded, however, that the plain language of the release is unambiguous, it cannot look to extrinsic evidence in ascertaining plaintiff's intent. See *Volkman v. United Transportation Union,* 73 F.3d 1047, 1050 (10th Cir.1996) (pursuant to "basic contract interpretation principles," there is no need to resort to extrinsic evidence of intent where the language of the contract is unambiguous).

• Merits of Plaintiff's Claims Against Defendant UTU

In the pretrial order, plaintiff alleges not only that union representatives engaged in unlawful sexual harassment, sex discrimination and retaliation, thus exposing the union to direct liability under Title VII,[FN7] but also that union representatives failed to assist plaintiff in connection with her complaints concerning KCSR's alleged discriminatory and retaliatory conduct. [FN8] Finally, plaintiff asserts that the totality of the union's conduct led to her constructive discharge.

> FN7. Pursuant to § 703(c) and (d) of Title VII, a union is liable for its own discrimination against its members.

> FN8. The Supreme Court has held that unions also may be liable under § 703(c) for deliberately choosing not to process grievances of discrimination by the employer. See *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 667-69 (1987).

### A. Direct Liability of Defendant UTU

#### 1. Sexual Harassment

Plaintiff alleges that her union representatives subjected her to sexual harassment in violation of Title VII. In support of its motion for summary judgment, defendant argues that plaintiff has failed to state a prima facie case of sexual harassment. As set forth in more detail below, the court agrees. After carefully considering plaintiff's evidence concerning the alleged conduct, the totality of the circumstances,

and the applicable standard for analyzing such a claim, the court concludes that plaintiff has not made a sufficient showing to withstand summary judgment on this claim. Specifically, plaintiff has failed to come forward with evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Accordingly, the court grants defendant's motion for summary judgment on this claim.

Title VII prohibits a union from discriminating against its members on the basis of sex. *See* 42 U.S.C. § 2000e-2(c)(1). The parties apparently agree that this prohibition encompasses sexual harassment and, indeed, the Circuit has assumed as much. *See Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 797 (10th Cir.1997) (union representatives who engage in sexual harassment expose union to direct liability under Title VII). For a sexual harassment claim to survive summary judgment, however, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *O'Shea v. Yellow Technology Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir.1999) (quoting *Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir.1998) (quoting *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998))). The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective. *Id.* (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993)). [FN9] The objective severity or pervasiveness of the alleged harassment is measured from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *Id.* at 1098 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 118 S.Ct. 998, 1003 (1998)). Such circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris,* 510 U.S. at 23). The court also considers the context in which the conduct occurred. *Id.* at 1096 (quoting *Penry,* 155 F.3d at 1262 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 69 (1986))).

> FN9. Defendant does not appear to take issue with whether plaintiff subjectively found her work environment to be hostile.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

Thus, the court focuses its analysis of plaintiff's claim only on the objective severity or pervasiveness of the work environment.

**\*7** Plaintiff grounds her sexual harassment claim on certain comments allegedly made by her union representatives.[FN10] Plaintiff first complains about two comments allegedly made by Dave George, a union representative from 1995 through June 1996. According to plaintiff, on one occasion in January 1996, Mr. George advised plaintiff that "she was being watched and if she was late for work the company would bust her for drug/alcohol test [sic] and try to fire her." Plaintiff further avers that on one occasion prior to January 1996, Mr. George told her that the only reason he talked to her was because he was "hoping to get some." Plaintiff also complains about one incident that occurred between her and another union representative, Tom Montemurro. Plaintiff avers that she asked Mr. Montemurro when the conductors would receive their five percent increase in pay and Mr. Montemurro replied, "Go fuck yourself. If you think you can do a better fucking job, do it your own fucking self." Plaintiff further avers that Mr. Montemurro was leaning over her and "spitting at her" as he said those words.

> FN10. In her papers, plaintiff highlights numerous incidents that allegedly occurred and comments that allegedly were made over the course of her employment that, according to plaintiff, support her sexual harassment claim. It is undisputed, however, that plaintiff's union representatives did not affirmatively participate in the vast majority of these incidents and/or comments. It is further undisputed that only those acts and comments committed or made by union representatives-during the time period when those individuals were agents of the union-may properly support plaintiff's sexual harassment claim against the union on a theory of direct liability.

In essence, then, plaintiff complains of three separate incidents spread over the course of nearly four years of union membership. Moreover, two of the three comments do not appear to be based in any way on plaintiff's sex. It is well established that "isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Smith v. Northwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1414 (10th Cir.1997) (citing *Bolden v. PRC*

*Inc.,* 43 F.3d 545, 551 (10th Cir.1994)); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (five separate incidents perpetrated by plaintiff's supervisor, although "unpleasant and boorish," were not sufficiently severe or pervasive to create an actionable hostile work environment). Moreover, while the court has no doubt that these experiences, to the extent they occurred, were unpleasant for plaintiff (particularly the incident with Mr. Montemurro), the three incidents-taken alone or in tandem-are simply not severe enough to state a claim for sexual harassment.

Plaintiff does complain about one other specific comment made by Mark Crouch, a union representative from October 1997 through November 1999. According to plaintiff, Mr. Crouch stated in her presence that he could not go to KCSR's Kansas City depot because "some nigger bitch accused [him] of pinching her on the ass." It is undisputed, however, that this comment was not directed toward plaintiff and that Mr. Crouch was not referring to plaintiff. As at least one circuit has recognized, the impact of this type of "second-hand harassment" is "obviously not as great as the impact of harassment directed at the plaintiff." *See Cowan v. Prudential Ins. Co. of Am.,* 141 F.3d 751, 758 (7th Cir.1998). This comment, then, adds very little to plaintiff's claim.

The remainder of plaintiff's allegations are simply too vague to support her sexual harassment claim. This is particularly true with respect to plaintiff's allegations concerning comments allegedly made by Jim Wood, a UTU representative from June 1998 through December 1998. According to plaintiff, she "heard Jim Wood [and three other individuals] talking about her sex life." She further avers that Jim Wood was "constantly harassing her, calling her offensive names, and degrading her." [FN11] Plaintiff offers no information with respect to when or how often she heard Mr. Wood talking about her sex life. Similarly, she offers no information concerning the nature of the "harassment" that Mr. Wood allegedly inflicted upon her or the names that he allegedly called her. In other words, plaintiff has failed to support these vague allegations with the requisite evidentiary detail. Such allegations are insufficient to defeat defendant's motion for summary judgment and, accordingly, the court will not consider these allegations in its analysis of plaintiff's claim. *See Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 8000 (10th Cir.1993) ("In order to defeat summary judgment, the nonmoving party must do more than assert conclusory allegations;" plaintiff must allege "concrete facts"); *Woodward v. City of*

*Worland,* 977 F.2d 1392, 1398 (10th Cir.1992) (affirming summary judgment for defendant in section 1983 action where plaintiff was "unable to respond to the ... motion for summary judgment with evidence of specific acts of sexual harassment;" "generalized allegations of continuing sexual harassment" were too "vague, non-time-specific and conclusory" to support claim).[FN12]

> FN11. Although plaintiff does identify two specific comments allegedly made by Mr. Wood, it is undisputed that these comments, to the extent they were made, were made prior to the time that Mr. Wood became a union representative.

> FN12. Similarly, plaintiff alleges that Mark Crouch "called [her] sexually offensive names and degraded [her];" that Mr. Crouch was "rude to [her];" and that Mr. Crouch "acted like she didn't have time for [her]." Plaintiff fails to elaborate on these allegations and, thus, the allegations are simply too vague to defeat a motion for summary judgment.

*8 In short, construing the evidence in the light most favorable to plaintiff, the court concludes that the handful of comments identified by plaintiff in support of her sexual harassment claim against the union are simply insufficient to state a claim for sexual harassment within the meaning of Title VII. For all of the above reasons, summary judgment is granted in favor of defendant on plaintiff's sexual harassment claim.

2. Sex Discrimination

In the pretrial order, plaintiff alleges that defendant UTU "treated plaintiff differently from similarly situated male members in its representation of her as an employee of [KCSR]." Each and every one of the specific allegations in the pretrial order, however, concern defendant's alleged failure to assist and/or protect plaintiff in connection with KCSR's alleged discrimination against plaintiff on the basis of her sex. Similarly, plaintiff's papers in response to defendant's motion for summary judgment reference only defendant's alleged failure to assist or protect plaintiff in connection with KCSR's alleged sexual discrimination. Thus, the court can discern no specific allegations supporting plaintiff's claim in the pretrial order that defendant treated plaintiff

differently from similarly situated male members in its representation of her. To be sure, the record is devoid of any evidence suggesting that male union members received more favorable treatment by UTU. [FN13] There is no evidence, for example, that the union assisted male members in connection with discrimination claims. Indeed, plaintiff does not even argue that male members received assistance or protection from the union with respect to discrimination claims. Thus, to the extent that plaintiff purports to hold the union directly liable for sex discrimination, that claim must fail. *See Greenslade v. Chicago Sun-Times, Inc.,* 112 F.3d 853, 867 (7th Cir.1997) (affirming summary judgment in favor of union on sex discrimination claim where plaintiff pointed to no evidence that the union treated similarly situated female members differently than it treated plaintiff); *see also Richardson v. Bakery, Confectionary & Tobacco Workers, Local No. 26,* 92 F.3d 1197, 1996 WL 422070, at *2 (10th Cir. July 29, 1996) (affirming summary judgment in favor of union on race discrimination claim where plaintiff failed to provide any evidence of intentional discrimination or that he was treated differently than non-minority union members).[FN14]

> FN13. The only possible exception is plaintiff's allegations that she was subjected to sexual harassment by her union representatives. These allegations, however, have been addressed in the prior section of this opinion.

> FN14. While the court recognizes that citation to unpublished opinions remains unfavored, it concludes that the Circuit's decision in Richardson is helpful in that it specifically addresses the very issue presented here.

3. Retaliation

Plaintiff also claims that defendant, after plaintiff filed her charge of discrimination against the union on October 16, 1998, refused to process any of plaintiff's timeslips concerning her Engineer training grievance. Defendant contends that summary judgment is appropriate because there is simply no evidence that defendant "failed to process" plaintiff's timeslips; rather, plaintiff's subsequent timeslips were held in abeyance by agreement of UTU and KCSR pending arbitration of plaintiff's initial appeal. In essence, then, defendant maintains that plaintiff has

failed to show the requisite "adverse action" and has failed to show that any action with respect to plaintiff's timeslips was based on plaintiff's filing of an EEOC charge. As set forth below, the court agrees with defendant that plaintiff has failed to establish a prima facie case of retaliation against UTU. Summary judgment on this claim is, therefore, appropriate.

**\*9** Title VII prohibits a labor organization from retaliating against a member who has claimed discrimination: "It shall be an unlawful employment practice ... for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge ... under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *See Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1234 (10th Cir.2000). According to defendant, plaintiff cannot satisfy the second and third elements of her prima facie case of retaliation.

With respect to the first element, the parties apparently agree that a union's refusal to process a valid grievance may, in certain circumstances, constitute an adverse action for purposes of establishing a retaliation claim under Title VII. *See Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (a union's abandonment of a grievance that the union has a contractual responsibility to pursue on the employee's behalf amounts to an adverse action). The district court in *Johnson,* however, determined that an adverse action may be found "where a plaintiff is deprived of the ability 'to expeditiously ascertain and enforce his rights under [a] collective bargaining agreement with his employer.' " *See id.* (quoting *McCauley v. Greensboro City Bd. of Educ.,* 714 F.Supp. 146, 152 (M.D.N.C.1987). Here, it is undisputed that plaintiff was not deprived of her ability to "expeditiously ascertain and enforce" her rights under the collective bargaining agreement. Rather, the union continued to grieve plaintiff's timeslips even after she filed her EEOC charge. While the formal processing of her subsequent timeslips was held in abeyance pending arbitration of her initial appeal, that initial appeal encompassed the same issues and employment rights as plaintiff's subsequent timeslips. And the union, at all times, continued to press that appeal, including scheduling

the appeal for arbitration. In fact, the only reason that the union did not ultimately process plaintiff's subsequent timeslips (and the reason that the arbitration never took place) is because plaintiff unilaterally agreed to withdraw all grievances and claims against KCSR in connection with her May 1999 settlement. In other words, plaintiff has simply not shown that she suffered any adverse action-or that she was harmed in any way-by virtue of the fact that the union held the processing of certain claims in abeyance pending the resolution of plaintiff's initial (and identical) claims. Thus, plaintiff has failed to set forth sufficient facts with respect to the second element of her prima facie case of retaliation.

**\*10** Plaintiff also falls short with respect to the third element of her prima facie case. Simply put, plaintiff has failed to come forward with any evidence from which a jury could reasonably conclude that a causal connection exists between plaintiff's filing an EEOC charge in October 1998 and defendant's alleged refusal to process further her penalty timeslips. As the Tenth Circuit has noted, a causal connection is established where the plaintiff presents "evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." Here, the union has come forward with undisputed evidence that the practice of holding claims in abeyance pending arbitration of related claims is common at KCSR. It is further undisputed that the purpose of the practice is to allow an arbitration of the initial claims to proceed, with an understanding that subsequent, related claims will be settled on the basis of the arbitration decision. Plaintiff offers no evidence that the union's agreement with KCSR to hold plaintiff's subsequent timeslips in abeyance was based on anything other than this common practice. Plaintiff's only evidence in support of causal connection is that she filed her charge in October 1998 and, sometime thereafter, the union agreed to hold her subsequent claims in abeyance. No reasonable jury could infer a causal connection based solely on this evidence. Accordingly, plaintiff has failed to establish the third element of her prima facie case.

For the foregoing reasons, summary judgment is granted on plaintiff's retaliation claim against defendant.

• Plaintiff's Failure-to-Assist Claims

In addition to her claims based on a theory of direct liability, plaintiff claims that defendant is liable under

Case 2:04-cv-00139-DAK-BCW    Document 259-2    Filed 04/09/2007    Page 15 of 35

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

Title VII for failing to assist and/or protect plaintiff in connection with her claims against KCSR. Specifically, plaintiff claims that defendant failed to file a grievance alleging sex discrimination in connection with the Engineer training position; failed to file a grievance challenging the sexual harassment that plaintiff allegedly endured as a KCSR employee; failed to adequately and reasonably investigate plaintiff's complaints of KCSR's discriminatory practices, including sexual harassment in the workplace; failed to refer plaintiff to the EEOC or to KCSR's human resources office regarding her complaints of sex discrimination and sexual harassment; and failed to protect plaintiff from the retaliatory acts of KCSR.

A union's deliberate refusal to file grievable discrimination claims violates Title VII. See *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 667-69 (1987); accord *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 798 (10th Cir.1997); *York v. AT & T Co.,* 95 F.3d 948, 956-57 (10th Cir.1996). To establish a prima facie case against a union under Title VII for failing to file a grievance, plaintiff must demonstrate that (1) the employer violated the collective bargaining agreement with respect to plaintiff; (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair representation; and (3) there was some indication that the union's actions were motivated by discriminatory animus. See *York,* 95 F.3d at 955-56. Here, it is undisputed that the collective bargaining agreement between UTU and KCSR did not contain a non-discrimination provision or a sexual harassment provision.[FN15] Thus, plaintiff simply cannot establish that KCSR violated the agreement with respect to her or that the union permitted the violation to go unrepaired. In other words, neither sex discrimination nor sexual harassment was a "grievable" claim that the union could pursue. See *Goodman,* 482 U.S. at 668-69 (deliberately refusing to file "grievable" racial discrimination claims violated Title VII; collective bargaining agreement contained express nondiscrimination clause). Under the clear test adopted by the Tenth Circuit in York, plaintiff's claims against the union based on the union's failure to file grievances based on sex discrimination and sexual harassment must fail. Compare *Woods v. Graphic Communications,* 925 F.2d 1195, 1197, 1201-02 (9th Cir.1991) (union liable under Title VII for failure to file grievance where collective bargaining agreement contained explicit anti-discrimination clause); *Agosto v. Correctional Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 305-06 (S.D.N.Y.2000) (union's refusal to process

plaintiff's sexual harassment complaint against employer was valid basis for Title VII claim against union where sexual harassment was a grievable offense pursuant to collective bargaining agreement); *Rainey v. Town of Warren,* 80 F .Supp.2d 5, 16-17 (D.R.I.2000) (denying summary judgment on plaintiff's Title VII failure-to-file-grievance claim against union where both management and union agreed that sexual harassment and sex discrimination were covered by the collective bargaining agreement); *Dohrer v. Metz Baking Co.,* No. 96-C-50455, 1999 WL 60140, at *9 (N.D.Ill. Jan. 27, 1999) (denying union's motion to dismiss plaintiff's Title VII failure-to-file-grievance claim where collective bargaining agreement contained express nondiscrimination clause).

> FN15. A copy of the collective bargaining agreement has not been included in the record before the court and, thus, the court has not had the opportunity to review the relevant provisions of the agreement.

**\*11** Plaintiff's allegations that defendant failed to refer to the EEOC,[FN16] failed to reasonably investigate her complaints, and failed to protect her from the retaliatory acts of KCSR meet a similar fate. Simply put, plaintiff has not demonstrated that the union had a duty to refer her to the EEOC, to investigate her complaints (that were not grievable anyway), or to protect her from retaliation. Certainly, there is no evidence in the record that the union assumed these duties under the collective bargaining agreement. Moreover, there is no evidence (or argument from plaintiff) that the union otherwise assumed such duties. In the absence of such evidence, the union cannot be liable to plaintiff for its failure to assist her as fully as she would have liked. Summary judgment is, therefore, appropriate on plaintiff's failure-to-assist claims.

> FN16. Even without the union's assistance, plaintiff contacted the EEOC in a timely fashion.

Plaintiff's Constructive Discharge Claim

Plaintiff also claims that the union constructively discharged her from her employment with KCSR. A constructive discharge occurs when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

*Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir.1998) (citing *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986)).

Summary judgment on plaintiff's constructive discharge claim is appropriate for at least two reasons. First, because the court has concluded that defendant did not commit any "illegal discriminatory acts" and is entitled to summary judgment on plaintiff's other claims, the court must grant summary judgment in favor of defendant on plaintiff's constructive discharge claim. See *Perez v. Interconnect Devices Inc.,* No. CIV.A. 97-2194-GTV, 1998 WL 781220, at *12-13 (D.Kan. Oct. 22, 1998), *aff'd,* 189 F.3d 478 (10th Cir.1999). Second, it is undisputed that plaintiff voluntarily resigned her employment with KCSR in exchange for $350,000. See *Orback v. Hewlett Packard Co.,* 97 F.3d 429, 433-34 (10th Cir.1996) (no evidence to support inference of constructive discharge where plaintiffs "left voluntarily, availing themselves of the benefit of a severance package in exchange for their resignations"). Summary judgment, then, is granted on plaintiff's constructive discharge claim.[FN17]

        FN17. Moreover, plaintiff has failed to set forth any facts establishing that the union could have terminated plaintiff's employment with KCS or caused plaintiff to be terminated from her employment with KCS. While the court need not decide whether summary judgment would be appropriate on this basis, at least one court has concluded that summary judgment is appropriate in such circumstances. See *LaPointe v. United Autoworkers Local 600,* 103 F.3d 485, 488 (6th Cir.1996) (employee failed to create genuine issue of material fact regarding whether union had constructively discharged him from underlying employment where it was undisputed that the union could not terminate plaintiff's underlying employment or cause plaintiff to be terminated from employment).

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion for summary judgment (doc. # 69) is granted and plaintiff's motion to strike defendant's defense of release (doc. # 79) is denied. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

D.Kan.,2000.

Thompson v. United Transp. Union
Not Reported in F.Supp.2d, 2000 WL 1929963 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents
Relational Design & Technology, Inc. v. BrockD.Kan.,1993.Only the Westlaw citation is currently available.
United States District Court, D. Kansas.
RELATIONAL DESIGN & TECHNOLOGY, INC., Plaintiff,
v.
Stuart BROCK, Wesley Brock, and Data Team Corporation, Defendants.
**Civ. A. No. 91-2452-EEO.**

May 25, 1993.

John C. Eisele, George R. McGrew, John C. Eisele, Chartered, Overland Park, KS, Kirk D. Auston, Auston & Skinner, Overland Park, KS, for plaintiff. Richard P. Stitt, Michael Yakimo, Jr., D.A.N. Chase, Chase & Yakimo, Overland Park, KS, Karen D. Wedel, Kip D. Richards, Waltes, Bender & Strohbehn, Kansas City, MO, for defendants.

MEMORANDUM AND ORDER
EARL E. O'CONNOR, District Judge.
***1** This suit was filed by plaintiff Relational Design and Technology ("RDT") against defendants Data Team Corporation ("DTC"), and Stuart and Wesley Brock alleging copyright infringement, fraud, and breach of contract. DTC counterclaimed seeking a declaratory judgment on ownership of the copyright and alleging breach of contract, and breach of the duty of good faith and fair dealing. The trial of this case was bifurcated and the jury decided all of the claims except the copyright claims. The jury returned a verdict for the defendants on the fraud claim and awarded $52,700 to plaintiff RDT on the breach of contract claim. In deciding the copyright issue, the court, after considering all of the evidence and briefs submitted by the parties, makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

*Findings of Fact*

1. Plaintiff RDT was a corporation incorporated in Kansas in 1989. Gene Kubin was the president of RDT.

2. Defendant DTC was a corporation incorporated in Kansas in 1983.

3. At all relevant times, defendant Stuart Brock was the president of DTC and acted within the course and scope of his employment.

4. Defendant Wesley Brock is Stuart Brock's son who has been employed by DTC since graduation from college in 1989. During the course of his employment, Wesley was responsible for the day-to-day operations of DTC. These responsibilities included: programming, marketing, and administrative duties.

5. As early as 1983, DTC developed a software package called "Data Team DDS." This program was written in the Basic programming language for use with IBM and IBM compatible computers (the "Basic program"). The Basic program was marketed to dental offices as a dental office management program. "Data Team DDS" was a registered trademark for the DTC Basic program. The Basic program was designed to assist dental office personnel in preparing patient recall notices, patient billing statements, attending dentist statements, and insurance claim forms as well as various other internal office documents: patient information forms, daily sheets, summaries of dental procedures performed, and reports of accounts receivable balances.

6. The first version of the DTC Basic program was labeled as version 1.0. DTC paid Art Coleman $5,000 to write the original Basic Data Team DDS program. DTC registered the Basic program with the United States copyright office on April 9, 1985.

7. The Basic program language or source code was a third generation language. Program code consists of instructions having a syntax particular to the programming language used. The programmer writes the instructions to enable the program to perform a desired function. The programmer must use a particular syntax or the computer will not understand the instructions. The computer converts the instructions from written source code to object code which is intelligible by the computer, but not by the programmer. The object code enables the computer to execute the instructions. Basic language code must be written line by line by a programmer

Not Reported in F.Supp.                                                                                                  Page 2
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

who is familiar with the Basic language because the language is not user friendly and does not generate its own source code. Since 1983, the Basic program code had been updated periodically by employees of DTC. During his employment at DTC, Wesley Brock was responsible for these updates. With each significant update, the version number for the Basic program was changed-1.0 to 1.01 to 1.02 and so on with the most recent version being version 2.03.

**\*2** 8. Since 1983, DTC had sold Data Team DDS programs and updates as well as preprinted forms and specialized programming services to dental offices. In September 1990, the Data Team DDS program was only available in the Basic language. The disadvantage to the Basic program was that it required the user to have a separate Basic program for each stand-alone computer. DTC became interested in adding network capabilities to the program to enable users to access the program from multiple terminals.

9. Gene Kubin of RDT contacted DTC about developing a link between RDT's general ledger program and DTC's dental management program. RDT wanted to increase sales by gaining access to DTC's customers.

10. The RDT general ledger program was written in the Clarion programming language using the Clarion Professional Developer, a user-friendly computer program used in programming. The Clarion Professional Developer actually wrote the source code. The Clarion language was a fourth generation: program source code was generated by the Clarion Professional Developer according to information entered by the user in response to message prompts on the screen.

11. Attracted by these enhanced features, Stuart Brock asked Gene Kubin if he could translate the Data Team DDS Basic program into the Clarion language using the Clarion Professional Developer. Kubin indicated that he could and prepared a contract to that effect which he presented to Stuart Brock. Stuart Brock suggested that they add a provision requiring RDT to return half of the price paid by DTC if the program was not completed on time or was not satisfactory to DTC. Kubin agreed and changed the contract as suggested by Stuart Brock and both DTC and RDT executed the contract on September 26, 1990 (the "original contract"). Kubin drafted all parts of the original contract.

12. The original contract required that RDT use the Clarion Professional Developer language in translating the Dental Team DDS Program into the Clarion language. The new Clarion program was to follow the specifications used in the existing Data Team DDS Basic program. The original contract stated a two-fold intent: 1) to obtain the "look, feel, and functions" of the Basic program so that existing Basic users could instinctively use the Clarion program; and 2) to enhance the existing features of the Basic program to increase the marketability of the new program. RDT projected 10 weeks to complete the program but promised to complete it within 16 weeks. The contract provided that DTC would pay RDT $50 per hour to a maximum of $20,000 for the completed program.

13. In return, RDT agreed to translate the Basic program into Clarion language, deliver the source code to the completed program, and provide some basic training in Clarion to DTC employees. Kubin was not responsible for maintaining the Clarion program once he delivered it to DTC. Pursuant to the original contract, DTC was to own "all rights to the completed program with no licensing or royalties fees due any other parties upon completion of the program." RDT agreed not to sell the program to any other party and not to "do anything that would be considered as competition in the dental field."

**\*3** 14. The contract called for the following "enhancements": 1) multi-user code for file and record locking; 2) online held screens; 3) scrolling lookup lists; 4) scrolling reports to screen or printers; 5) unlimited file sizes; and 6) EGA and VGA support. The original contract also provided that other enhancements would be discussed on a weekly basis as the development process progressed.

15. The original contract provided for the development of a "data migration" program by RDT. This program, suggested by Gene Kubin, would convert existing Basic data files into the Clarion format thus eliminating the need to rekey the existing data. The data migration option was to be produced by RDT at no expense to DTC and offered along with the Clarion program to existing Data Team DDS users for a fee. DTC was to collect these fees and remit them to RDT. RDT assumed all liability for any data loss occurring and agreed to provide purchasers of the data migration program with any support necessary during the conversion process.

16. The final paragraph of the original contract provided, "[i]n the event that the programs are not completed, or not completed on a timely basis, or not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

completed to the satisfaction of Data Team Corp., then 50% of all monies paid shall be refunded, and source code shall become the sole property of Relational Design & Technology, Inc."

17. Kubin followed DTC's instructions about how the program was to "look and feel."  Kubin delivered whatever he had completed of the Clarion program to DTC weekly.  Those updates to the Clarion program were placed on DTC's computer.  Wesley Brock then checked the program for programming problems, also known as "bugs."  Wesley Brock discussed the bugs with Kubin and compiled an extensive list of requested edits specifically stating the errors found in the Clarion program and the corrections or modifications which were required.

18. Kubin "hand coded" portions of the program such as the patient ledger function because it was unique and complex.  Hand coding required Kubin to write the source code himself instead of using the Clarion developer to write the source code.

19. By January 24, 1991, Kubin's records indicated that he had expended 400 hours on the program thus reaching the $20,000 original contract limit.  RDT's billing statements indicate that the translation work was complete on January 24, 1991.  Kubin delivered what he represented to be the completed program to DTC on January 29, 1991.

20. Upon reviewing the delivered program, Wesley Brock found that only part of the most recent list of requested edits had been completed.  For example, the scrolling list for insurance transactions did not operate properly.      Moreover, the following significant capabilities of the Basic program were not in the delivered Clarion program:  1) printing special insurance forms;  2) sorting patient billing statements by zip code;  3) printer configuration formats;  4) word-processing capabilities with mail merge;  5) alternate sub-directory data access;  and 6) a patient archive routine.  DTC felt that the delivered Clarion program was not in a form that could be marketed to DTC's customers.

**\*4** 21. DTC asked RDT to address the problems listed on the edit list and the missing capabilities without further payment from DTC.  Although DTC believed that the $20,000 maximum contract price set in the original contract covered the requested work, DTC eventually paid RDT $5,400 for "additional work."

22.  Besides  DTC's  dissatisfaction  with  the

programming bugs, DTC was concerned about how slowly the program operated and the large amount of memory the program required.   Wesley Brock attended a Clarion Professional Developers seminar in Florida on September 21, 1991, to learn more about Clarion in an effort to address these concerns.  Wesley Brock learned that an update to the Clarion Professional Developer was available which would eliminate the speed and memory problems.  However, the update would not work on the Clarion Dental Management Program.   Wesley Brock was advised that the only solution was to rewrite those hand-coded portions of the program which were causing the problems using the Clarion Professional Developer.

23.  DTC asked RDT to fix the program and threatened to exercise the refund option if RDT did not correct the problems with the Clarion program.  In the end, DTC was not satisfied with the final program delivered by RDT.   On August 2, 1991, DTC requested the return of $12,700, one half of the price paid to RDT.

24. On August 30, 1991, Kubin sent the following proposed written agreement to Stuart Brock:
This agreement between Data Team Corp. and Relational Design & Technology, Inc. dated this _____ day of _____, 1991 will constitute the completion of all terms and conditions of the attached contract dated Sept. 26, 1990.
In consideration of $12,700 dollars, to be paid by Relational Design & Technology, Inc., Data Team shall return all copies of source code that comprise the Dental Management System written in the Clarion Language by RDT, Inc, including any edits or changes made by Data Team.
Data Team shall surrender *all rights* to the returned source code but retains all rights to the original Data Team program written in the Basic language.   RDT shall not market the returned source code as Data Team DDS.
Both parties agree to waive all obligations specified in the original contract and agree to hold each other harmless in all other dealings concerning the development and sales of the Dental Software, and any associated upgrades or modifications.
Upon payment of the amount specified above, Relational Design & Technology, Inc. will own all rights to the source code.

Plaintiff's Exhibit 6 (emphasis added).  Stuart Brock did not sign the proposed contract.   Instead, he notified Gene Kubin on September 3, 1991, that the August 30, 1991, proposed contract was, in effect, a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 4
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

new contract and that he, Brock, wished to proceed with the refund option under the September 26, 1990, original contract.

25. Kubin delivered a check for $12,700 to DTC on September 30, 1991. At that time, Stuart Brock copied the Clarion source code from DTC's computer onto a disk which he gave to Gene Kubin and deleted the source code from DTC's computer. DTC had a copy of the source code on disk and later reinstalled the program on the DTC computer.

**\*5** 26. In exercising the refund option, DTC did not intend that RDT become the owner of the copyright in the Clarion program. Rather, the refund contemplated in the final paragraph of the contract was intended to provide for liquidated damages if RDT failed to complete the program on time or to DTC's satisfaction. DTC did not exercise the refund option in bad faith by falsely or unreasonably claiming dissatisfaction with the delivered Clarion program.

27. On October 12, 1991, RDT registered a program called "RDT Dental Management Program" in the United States Copyright Office. The registered program was the version of the Clarion program which Kubin delivered to DTC on June 16, 1991. The registration certificate indicates that the rights to the copyright in the Clarion program were obtained from DTC by contract.

*Conclusions of Law*

RDT's copyright infringement action was brought pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.* The court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

To establish liability for copyright infringement, the party claiming infringement must establish: 1) that it owned a valid copyright in an original work which was properly registered;[FN1] and 2) that the infringing party violated an exclusive right protected under the Copyright Act. An original work of authorship is one fixed in a tangible medium of expression and capable of being perceived, reproduced or otherwise communicated. *See* 17 U.S.C. § 102(a). Copyright protection does not extend to ideas, procedures, processes, systems, methods of operation, concepts, principles, or discoveries, "regardless of the form in which [they are] described, explained, illustrated, or embodied" in an otherwise copyrighted work. *Id.* at § 102(b).

The certificate of registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *Id.* at § 410(c). However, the statutory presumption of validity may be rebutted. *Wihtol v. Wells,* 231 F.2d 550 (7th Cir.1956). In the instant case, RDT holds a certificate of copyright registration for the Clarion Dental Management Program and is thus presumptively the owner of the copyright to that program. However, DTC rebutted this presumption by establishing that pursuant to the parties' original contract, DTC owned the rights in the Clarion Dental Management Program and thus RDT's registration is invalid.

"A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). The original contract was in writing and was signed by both Stuart Brock and Gene Kubin. Thus, regardless of who owned the copyright under the various authorship provisions of the Copyright Act,[FN2] to the extent that the parties provided for the transfer of ownership of the rights to the Clarion program, the original contract controls ownership of the copyright. *Id.*

**\*6** The original contract (page 2 paragraph 3) stated that DTC would own "all rights to the completed program with no licensing or royalties fees due." Thus, all rights in the program (including the copyright) were transferred to DTC upon delivery of the completed program by RDT. However, the final paragraph of the original contract states that upon payment of the 50% refund by RDT, the "source code shall become the sole property" of RDT.

Significantly, the tangible source code of a program and the intangible copyrights to that program are separate and distinct concepts. 17 U.S.C. § 202. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.... Transfer of ownership in any material object ... does not of itself convey any rights in the copyrighted work embodied in the object." *Id.*

This fundamental copyright principle has been repeated many times in various other contexts. *Salinger v. Random House, Inc.,* 811 F.2d 90, 94-95 (2d Cir.1987); *Harris v. Emus Records Corp.,* 734 F.2d 1329 (9th Cir.1984); *NIKA Corp. v. City of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 5
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

*Kansas City,* 582 F.Supp. 343, 367-68 (W.D.Mo.1983) (the owner of a copyright may limit the use of physical property embodying the copyright, regardless of ownership of the physical property); *Walt Disney Prod. v. United States,* 327 F.Supp. 189, 192 (C.D.Ca.1971) (distinguishing between tangible and intangible property under federal tax laws). The court in *Salinger v. Random House, Inc.,* held that author J.D. Salinger's ownership of the copyright in his unpublished letters was separate and distinct from the recipient's rights in the actual letters. 811 F.2d at 94-95. Similarly, in *Harris v. Emus Records Corp.,* the court held that singer Emmylou Harris retained the copyrights to her compositions even though the master tapes of the performances were the sole property of the record company. 734 F.2d at 1336 n. 6.

Kansas law presumes that the parties incorporated the laws existing at the time of contracting as a part of the contract unless the parties include a provision in the contract expressly declaring otherwise. *See Steele v. Latimer,* 521 P.2d 304, 309-10 (Kan.1974). The original contract is devoid of any language excluding copyright law. Thus, the court presumes that the parties incorporated the distinction between the right to the intangible copyright and the right to the tangible source code as a part of the original contract in this case.

Interpreted accordingly, the original contract was, at best (for RDT), ambiguous about what effect, if any, the refund provision in the final paragraph of the contract had on the rights to the copyright in the Clarion program.[FN3] Ambiguities in a contract should be construed against the drafter. *Thomas v. Thomas,* 824 P.2d 971, 977 (Kan.1992). Construing the original contract against the drafter, RDT, the court finds that RDT's payment of the refund did not transfer ownership in the copyright to the Clarion program to RDT. Instead, RDT merely acquired sole ownership of the source code which was the material object embodying the Clarion program. *See* 17 U.S.C. § 202.

*7 RDT must have understood the limitations of the original contract because, prior to refunding the $12,700, Kubin sent a proposed second contract to DTC. The proposed contract provided that RDT would transfer "all rights" in the Clarion program to RDT upon payment of the refund by RDT. Notably, this second contract was never signed or agreed to by DTC.

The refund provision of the final paragraph was

merely a liquidated damages clause available if RDT failed to complete the program on time or to DTC's satisfaction. To construe the provision otherwise would leave DTC paying $12,700 without receiving anything of value in return.

The court therefore concludes that, pursuant to the parties' original contract, DTC owned the copyright in the Clarion program upon delivery of the completed program by RDT. RDT's claim for copyright infringement will therefore be dismissed. *See* 17 U.S.C. § 501(b) (ownership of the copyright is a prerequisite to an action for infringement).

Having decided that, pursuant to the parties' original contract and 17 U.S.C. § 204(a), the rights to the Clarion Dental Management Program belonged to DTC, we need not discuss the parties' alternative arguments on the copyright issue. In closing, we note that the court's decision that DTC owned the rights to the Clarion program is not inconsistent with the jury's determination that DTC breached the contract. The only theory of breach of contract by DTC about which the jury was instructed was that DTC breached the contract, if at all, by failing to market RDT's data migration program and remit the proceeds. Ownership of the copyright was unrelated to the parties' contractual agreement that DTC would market RDT's data migration program.

IT IS THEREFORE ORDERED that plaintiff RDT's claim for copyright infringement is dismissed.

IT IS FURTHER ORDERED that declaratory judgment be entered to the effect that defendant DTC is the owner of the copyright in the Clarion Dental Management Program and that RDT's certificate of copyright registration is invalid.

IT IS FURTHER ORDERED that each party will bear their own costs and attorney's fees.

FN1. Registration is a jurisdictional prerequisite for a copyright infringement action. 17 U.S.C. § 411(a); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1488 (11th Cir.1990).

FN2. *See, e.g.,* 17 U.S.C. § § 102(a) (original works of authorship) and 101, 201 (works made for hire).

FN3. The other possible interpretation is that the contract was not ambiguous and thus, is

Not Reported in F.Supp.                                                                                          Page 6
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

       enforceable as written.    Under either
       analysis, the court would reach the same
       result.

D.Kan.,1993.
Relational Design & Technology, Inc. v. Brock
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)

Briefs and Other Related Documents (Back to top)

• 2:91cv02452 (Docket) (Dec. 06, 1991)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



H
Briefs and Other Related Documents

Dick Corp. v. SNC-Lavalin Constructors, Inc.N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern Division.

DICK CORPORATION, a Pennsylvania corporation Plaintiff,

v.

SNC-LAVALIN CONSTRUCTORS, INC., a Delaware corporation, and PCL Industrial Construction, Inc., a Colorado corporation Defendants.

**No. 04 C 1043.**

Nov. 24, 2004.

Lawrence R. Moelmann, Timothy Allen Hickey, Hinshaw & Culbertson, Chicago, IL, Tarek F. Abdalla, Kirsten R. Rydstrom, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Plaintiff.

David T. Pritikin, Douglas I. Lewis, Jamie L. Secord, Sidley, Austin, Brown & Wood LLP, Chicago, IL, Peter J. Gleekel, Winthrop & Weinstine, P.A., Minneapolis, MN, for Defendants.

*MEMORANDUM OPINION AND ORDER*

ASPEN, J.

**\*1** Plaintiff Dick Corporation ("Dick") filed a five-count amended complaint [FN1] on April 15, 2004, alleging a federal copyright claim and state common law claims for tortious interference with prospective business relations, tortious interference with contractual relations, unjust enrichment, and conversion, against defendants SNC-Lavalin Constructors, Inc. ("SLCI") and PCL Industrial Construction, Inc. ("PCL"). PCL moved to dismiss the all claims against it. SLCI moved for summary judgment on Dick's copyright claim against it and moved to dismiss Dick's state common law claims. Dick then filed a second amended complaint, which amended some of the state law claims, withdrew its unjust enrichment claim, and added a new state law claim for misappropriation of trade secrets. Defendants SLCI and PCL moved to dismiss the re-pled state law claims, or, in the alternative, for a more definite statement. For the reasons stated below, we grant in part and deny in part the motions to dismiss. We deny the motion for summary judgment, and we deny the motions for a more definite statement.[FN2]

FN1. Plaintiff's original complaint was filed on February 10, 2004 and first amended before Defendants filed any dispositive motions.

FN2. As is our discretion, we grant Dick's motion for leave to file a surreply brief and consider it in our analysis of Defendants' motions.

I. Copyright Claim

Defendant PCL moves to dismiss Dick's copyright infringement claim (Count I) against it under Federal Rule of Civil Procedure 12(b)(6). Defendant SLCI has moved for summary judgment on Dick's copyright infringement claim against it under Federal Rule of Civil Procedure 56(b). For the reasons stated below, we deny both motions.

A. PCL's Motion to Dismiss

1. Standard of Review

In ruling on a motion to dismiss under Rule 12(b)(6), we view the complaint in the light most favorable to plaintiff, accepting all well-pleaded allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Marshall-Mosby v. Corporate Receivables, Inc.,* 205 F.3d 323, 326 (7th Cir.2000). The court will dismiss a complaint for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, a plaintiff may plead itself out of court if a plaintiff pleads particulars that show it has no claims. *Thomas v. Farley,* 31 F.3d 557, 558-59 (7th Cir.1994).

Normally, in deciding a motion to dismiss, the court may not consider matters outside the pleadings, like affidavits and other materials. *See* Fed.R.Civ.P. 12(b). However, documents that a defendant attaches to a motion to dismiss may be considered if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *Albany Bank & Trust Co. v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
(Cite as: Not Reported in F.Supp.2d)

*Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002). In this case, Defendant PCL has attached a copy of the Joint Venture Agreement ("JVA") to its motion to dismiss. The court will consider the JVA, along with the pleadings, in deciding the motion to dismiss because the JVA is central to Dick's copyright claim and is referred to in its complaint.[FN3]

FN3. While the court has additional evidence through Defendant SLCI's summary judgment motion, in ruling on PCL's motion to dismiss, we confine our inquiry to the submissions on PCL's motion. *See, e.g., Frane v. Kijowski,* 992 F.Supp. 985, 989 (N.D.Ill.1998). We do not consider the documents other than the JVA that PCL has attached to its motion to dismiss, as they are not central to Dick's claim. *Albany Bank & Trust Co.,* 310 F.3d at 971.

2. Background [FN4]

FN4. Accepting the plaintiff's allegations as true, we set forth the following facts relevant to PCL's motion to dismiss Dick's copyright claim.

*2 On or about May 12, 1999, National Energy Production Corporation ("NEPCO"), which has since filed for Chapter 11 bankruptcy, and Dick entered into a Joint Venture Agreement ("JVA") to construct the Kendall County Generation Facility, a power plant to be located in Minooka, Illinois. (Sec.Am.Cmplt.¶ ¶  2, 9.) The JVA provided, at paragraph 25, that "all documents produced for or by the Joint Venture shall be owned by the Joint Venture.... [N]either party shall use the documents for other projects without the prior written consent of the others." *Id.* ¶ 14.

As part of the Joint Venture, Dick and NEPCO created certain engineering designs, drawings, design data, calculations, specifications, intellectual property, and other related documents ("Joint Venture Drawings") for the purpose of constructing the Kendall facility. *Id.* ¶ 15. As part of the Joint Venture, Dick also created certain scheduling information, cost projections, cost information, bidding information, and other financial reports ("Joint Venture Data") for the purpose of constructing the Kendall facility. *Id.* ¶ 16.

Dick and LSP-Kendall Energy, LLC entered into a contract to provide engineering, procurement and construction services for the construction of the Kendall facility. (Sec.Am.Cmplt.¶  11.) Under the Kendall contract, Dick granted LSP-Kendall "an irrevocable, royalty-free, nonexclusive licence under all patents and other intellectual property, and agrees to provide [LSP-Kendall] with all vendor drawings and data ... to the extent necessary for the operation, maintenance, repair, or alteration (other than improvements affecting basic design) of the [Kendall] facility." *Id.* ¶ 12.

Even prior to NEPCO's bankruptcy filing in 2002, NEPCO abandoned the Joint Venture and Dick assumed management and operation of the Joint Venture. *Id.* ¶  17. As a result of the default, Dick assumed all ownership interest in the Joint Venture assets, including its intellectual property. *Id.*

On December 21, 2000, NEPCO entered into a contract with LSP-Nelson for NEPCO to perform the engineering, procurement, and construction services for the Nelson Facility, a power plant to be located in Dixon, Illinois. (Sec.Am.Cmplt. ¶ ¶  3, 19.) On February 28, 2002, NEPCO assigned its rights under the Nelson contract to Defendant PCL. In Spring of 2002, Defendant SLCI entered into an arrangement to perform construction-related services at the Nelson Facility. Defendants improperly and without Dick's consent used the Joint Venture Drawings and Joint Venture Data to construct the Nelson Facility. Dick has ownership rights in the Joint Venture Drawings and Joint Venture Data and has not granted any rights in the copyrighted Joint Venture Drawings to Defendants. *Id.* ¶ ¶ 25-27. Dick has obtained federal copyright registrations on the Joint Venture Drawings. *Id.* ¶  29. Dick asserts a claim for copyright infringement based on Defendants' use of the Joint Venture Drawings.

3. Analysis

*3 Defendant PCL moves to dismiss Dick's copyright infringement claim against it (Count I) for failure to state a claim. To establish a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying by the defendant of the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); 17 U.S.C. §  501(a). PCL argues that Dick has not alleged that it is the exclusive owner of the copyrights in question. Specifically, PCL argues that Dick's basis for exclusive ownership of the copyrights in the Joint

Venture Drawings is the transfer of those copyrights to the Joint Venture, which Dick allegedly assumed upon NEPCO's default. Because Dick's allegations do not support a valid transfer of the copyrights from NEPCO to the Joint Venture, PCL argues, NEPCO retained a copyright interest in the drawings at issue and could, therefore, lawfully license them to PCL. We hold that Dick has sufficiently alleged that NEPCO transferred its copyright interest to the Joint Venture and that Dick became the exclusive owner of the copyright interest when NEPCO defaulted on the JVA. Therefore, Dick has properly alleged a copyright violation, and dismissal under Rule 12(b)(6) is not appropriate.

The Copyright Act allows a copyright owner to transfer its copyrights "in whole or in part" to a third party. 17 U.S.C. § 201(d). Section 204(a) of the Copyright Act governs the transfer of copyright ownership and provides that a "transfer of copyright ownership ... is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and is signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990). Both Dick and PCL agree that there is an instrument in writing, the JVA. The parties disagree as to whether the JVA effects a valid transfer of NEPCO's copyright interest in the Joint Venture Drawings to the Joint Venture. At issue is the interpretation of paragraph 25 of the JVA between Dick and NEPCO, which states:
All documents produced for or by the Joint Venture shall be owned by the Joint Venture. Upon termination of this Agreement, each party shall own an undivided interest in such documents in proportion to the entitlement of such party to the profits of the Joint Venture. These documents shall be stored at a location determined by the Executive Committee and neither party shall use these documents for other projects without the prior written consent of the other. Either party may make duplicate copies of such documents without consent of the other parties.

Whether the language in paragraph 25 of the JVA satisfies the requirements of Section 204(a) to effect a valid transfer of the copyright in the Joint Venture Drawings from NEPCO to the Joint Venture is a matter of pure contract interpretation. As contract interpretation is a matter of law, in deciding a motion to dismiss, we need only to construe this provision to determine whether Dick has sufficiently alleged that NEPCO transferred its copyright interest to the Joint Venture. *See Hufford v. Balk*, 113 Ill.2d 168, 100

Ill.Dec. 564, 497 N.E.2d 742, 744 (Ill.1986). PCL argues that paragraph 25 is insufficient to transfer NEPCO's copyright because it is silent as to the transfer of ownership in the Joint Venture Drawings and as to NEPCO's ownership of the copyrights in the Joint Venture Drawings.

**\*4** Under Section 204(a), a writing need not use the term "copyright" to effectuate a valid transfer. *See ITOFCA, Inc. v. Megatrans Logistics, Inc.*, 322 F.3d 928, 931 (7th Cir.2003); *Schiller v. Schmidt, Inc.*, 969 F.2d 410, 413 (7th Cir.1992). The writing may be sufficient to transfer a copyright if it uses terminology and language that clearly includes copyrights. *See, e.g.*, *ITOFCA*, 322 F.3d at 931 (finding that a transfer of "all assets" included copyrights); *Schiller*, 969 F.2d at 414 ("Although the agreement does not mention the word 'copyright,' its wording leaves little doubt that Bertel sold all of the assets of Spotline Studios, tangible and intangible alike."); *see also John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F.Supp.2d 1, 11 (D.Mass.2002) (finding that writing specifying "Work, Drawings, and Specifications," when read with other provisions indicated a copyright transfer was intended). Whether a Section 204 copyright transfer has been effectuated is determined by interpreting the writing as a whole, and seeing if the writing suggests that the parties intended to transfer a copyright interest. *Schiller*, 969 F.2d at 413 (looking beyond the sale of photographic negatives to the sale agreement to intent, "to see what was sold"); *Liu v. Price Waterhouse*, 302 F.3d 749, 755 (7th Cir.2002) (finding that it was proper for a jury to consider the parties' intent to determine whether a letter agreement transferred copyrights); *see also* 3 Nimmer on Copyright § 10.03[A] [2] ("even though a written instrument may lack the terms 'transfer' and 'copyright,' it still may suffice to evidence [the author's and the transferee's] mutual intent to transfer the copyright interest"). In construing a written agreement, the court must "consider every phrase and clause in light of all the others in the instrument, 'which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.' " *John G. Danielson*, 186 F.Supp.2d at 11 (quoting *SAPC, Inc. v. Lotus Dev. Corp.*, 921 F.2d 360, 363 (1st Cir.1990)).

At issue in the present case is whether "[a]ll documents" in paragraph 25 of the JVA refers only to physical documents or may be read to refer to all interests in the documents, including copyrights. PCL argues that "[a]ll documents" refers only to the physical documents, and not to any associated

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

intellectual property rights. Dick argues that when read in light of the other sentences in paragraph 25, the sentence effectuated the intent of the parties to transfer the copyrights along with the physical documents to the Joint Venture. When we construe the JVA in light of all the sentences of paragraph 25, we find that it may have effectuated the intent of the parties to transfer copyright interests to the Joint Venture.

The broad language "all documents" used in the first sentence of paragraph 25 may be read to refer either to physical documents or to all interests in documents, including copyrights. This language is sufficiently broad that either interpretation is plausible. *See, e.g., Friedman v. Stacey Data Processing Servs., Inc., 17 U.S.P.Q.2d 1858, 1862 (N.D.Ill.1990)* ("What did the parties mean by 'property'-did they mean simple ownership rights to the programs themselves, or did they mean those rights plus the copyright? The language of the contract is sufficiently broad that either interpretation is plausible.") The language in the rest of paragraph 25 could also support an interpretation that copyrights were transferred to the Joint Venture. The second sentence of the paragraph indicates that each party shall own an "undivided interest" in the documents upon termination of the Agreement, and the third sentence states, "[N]either party shall use these documents for other projects without the prior written consent of the other." This language restricting the right to reproduce or use the property in question could refer to copyright interests. Furthermore, the language in the last sentence of the paragraph, which authorizes either party to make duplicate copies of the documents without the consent of the other, is suggestive of a copyright interest, as the right to duplicate is an enumerated right exclusive to a copyright holder. 17 U.S.C. § 106(1).

**\*5** Thus, we find that when considering the language of paragraph 25 as a whole, Dick has alleged a credible interpretation of this clause that may reflect the parties' intent to transfer the copyright interest in the Joint Venture Drawings to the Joint Venture. As such, Dick may be able to prove a set of facts that will entitle it to relief on its copyright violation claim,[FN5] and, therefore, Dick has sufficiently alleged a cause of action for copyright violation. *See, e.g., Friedman, 17 U.S.P.Q.2d at 1862 (N.D.Ill.1990)* (holding that where the language of a contract was sufficiently broad to support an interpretation that a transfer of copyrights was intended, motion to dismiss for failure to state a claim is denied). We do

not hold that the JVA actually did transfer the copyright interest in the Joint Venture Drawings; we simply hold that Section 204's writing requirement does not bar the plaintiff's copyright infringement claim at this stage. Defendant PCL's motion to dismiss is denied.[FN6]

> FN5. For example, Dick may be able to introduce extrinsic evidence of the parties' intent regarding the transfer of copyright. *See Schiller, 969 F.2d at 413* (court relied in part upon party's testimony that he believed he was purchasing copyrights in finding that a transfer occurred); *Liu, 302 F.3d at 755* (jury could properly consider the parties' intent in determining whether a transfer of copyright occurred); *Friedman v. Stacey Data Processing Servs., Inc., 17 U.S.P.Q.2d at 1862* (extrinsic evidence can be introduced to support a claim of copyright transfer).

> FN6. Having found that Dick has sufficiently alleged a copyright violation based upon a Section 204(a) transfer, it is unnecessary to address Dick's second argument against dismissal based upon NEPCO having contracted away its rights to convey copyright interests in the JVA.

### B. SLCI's Motion for Summary Judgment

SLCI moves for summary judgment on Dick's copyright infringement claim against it (Count I). For the reasons stated below, we deny summary judgment on Dick's copyright claim.

### 1. Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S.*

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). Once the moving party has met this burden of production, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true and draw all inferences in that party's favor. *See Anderson,* 477 U.S. at 255.

2. Facts [FN7]

FN7. The following facts are culled from Dick and SLCI's Local Rule 56.1 Statements of Material Facts and attached exhibits.

On May 12, 1999, NEPCO and Dick executed the JVA to build the Kendall County Generational Facility. NEPCO, at the very least, co-authored some of the drawings at issue in this lawsuit with Dick related to the construction of the Kendall facility. The JVA included the language in paragraph 25, which has been cited above. *See* Section I.A.3. The JVA also provided that, "If either party ... shall default in any of its obligations under this Agreement including ... fail to make available the benefit of its experience, technical knowledge and skill or fail to contribute its share of working capital ..., then the other party may give written notice to the Defaulting Party specifying the event of default. In the event that the Defaulting Party does not cure its default within 7 days after receipt of such notice then the Non-Defaulting Party may terminate the Defaulting Party's interest in the Joint Venture."

**\*6** On February 4, 2002, the Joint Venture Project Manager made a request to NEPCO for capital contribution in the amount of $1,500,605. NEPCO did not make the capital contribution. On April 24, 2002, the Joint Venture Project Manager made a request for capital contribution in the amount of $6,413,363. NEPCO did not make the capital contribution.

On May 14, 2002, NEPCO and Defendant SLCI entered into an Asset Purchase Agreement and Services Agreement. The Asset Purchase Agreement included a provision, which gave SLCI "[a]ll right, title and interest of the Seller in ... assets and properties ... used in connection with the design, development, construction ... of power generating plants and facilities, including the following: ... all Intellectual Property...." The Asset Purchase

Agreement's definition of "Intellectual Property" included "service marks and copyrights." Section 2(e) of the Services Agreement stated, "NEPCO shall license the Intellectual Property (as defined in the License Agreement) to [SLCI], pursuant to a License Agreement in the form attached hereto as Exhibit C." Under the License Agreement, the intellectual property was to be conveyed from NEPCO to SLCI, "if and to the extent owned by NEPCO." Section 4 of the License Agreement stated "All intellectual property licensed to [SLCI] (and its affiliates) hereunder are licensed "as is," "where is," and "with all faults."

On May 20, 2002, NEPCO filed for bankruptcy. The bankruptcy court approved the Asset Purchase Agreement between NEPCO and SLCI on September 5, 2002, and the transaction was completed on September 17, 2002. The Sale Order contained the following language: "[SLCI takes NEPCO's assets] free and clear of all mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to ... all debts arising in any way in connection with any acts of NEPCO."

3. Analysis

SLCI asserts that it is entitled to summary judgment on Dick's copyright claim because: 1) the JVA did not transfer NEPCO's copyrights to the Joint Venture as a matter of law and fact; and 2) even if the Joint Venture owned the copyrights at issue, SLCI purchased NEPCO's share of the Joint Venture's copyrights from the bankruptcy court free of any use restrictions.

SLCI argues that the JVA is insufficient as a matter of law to transfer a copyright interest, a similar argument to that presented by PCL in its motion to dismiss. Having found that the language of the JVA may evidence an intent by the parties to transfer copyright interests, we reject SLCI's argument that the JVA did not transfer NEPCO's copyrights to the Joint Venture as a matter of law. Dick has presented evidence through affidavits that the parties intended to transfer their copyright interests through the JVA. *See, e.g.,* Ambroso Aff. ¶¶ 5, 6; Muerken Aff. ¶¶ 7, 9. SLCI has presented opposing evidence that the parties maintained their copyright interests. *See, e.g.,* Ex. D to SLCI's Mem., Kendall EPC Agreement ¶ 3.13. Thus, a genuine issue of material fact exists as

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
(Cite as: Not Reported in F.Supp.2d)

to whether a copyright transfer occurred.

**\*7** SLCI asserts that even if Dick could prove that the JVA transferred NEPCO's copyrights to the Joint Venture, Dick has not alleged facts to support its claim to have assumed all Joint Venture assets before NEPCO filed for bankruptcy. Therefore, SLCI argues, SLCI bought NEPCO's share of the Joint Venture assets from the bankruptcy estate unencumbered through the bankruptcy court's Sale Order approving the Asset Purchase Agreement. In its complaint, Dick alleges that "Even prior to NEPCO's bankruptcy filing in 2002, NEPCO abandoned the Joint Venture, and Dick assumed management and operation of the Joint Venture. As a result of the default, Dick assumed all ownership interest in the Joint Venture assets, including its intellectual property." Dick supports its allegation with the fact that in February and April of 2002 Dick asked for capital contributions, and NEPCO did not supply them. The JVA, however, requires that a party in default be given notice of the default and the opportunity to cure within seven days before its interest is terminated. Dick did not give notice and an opportunity to cure, and, therefore, NEPCO's interest in the Joint Venture did not terminate by its failure to make capital contributions. NEPCO retained its interest in the Joint Venture assets when it filed for bankruptcy.

The next issue, then, is whether NEPCO's interest in the Joint Venture assets passed to its bankruptcy estate. If so, bankruptcy law would have prohibited Dick from sweeping in and assuming the Joint Venture's assets, and SLCI then properly purchased NEPCO's interest in the Joint Venture Drawings through the bankruptcy sale. 11 U.S.C. § 362(a). If not, SLCI did not purchase NEPCO's interest in the Joint Venture assets and may be liable for copyright infringement on the Joint Venture Drawings.

Dick argues that under bankruptcy law, assets of a joint venture are not part of the bankruptcy estate of one of the joint venturers, and, therefore, SLCI did not purchase an interest in the Joint Venture Drawings through the bankruptcy sale. In support of its position, Dick states that, in Illinois, a joint venture is governed by partnership principles, and it is well-established that assets of a partnership are not part of the bankruptcy estate of one of the partners. *See Federal Deposit Ins. Co. v. Braemoor Assoc., 686 F.2d 550, 556 (7th Cir.1982)* (noting that under Illinois law, "a joint venture of individuals is subject to the Uniform Partnership Act."); *In re Funneman, 155 B.R. 197, 200 (Bankr.S.D.Ill.1993)* ("It is well-

settled that assets owned by a partnership are not included in the bankruptcy estate of an individual partner."). SLCI argues that the Joint Venture should not be treated as a partnership, but rather as an unincorporated association, which holds property through the individuals who comprise it rather than in its associate name. *See Chicago Grain Trimmers Ass'n v. Murphy, 389 Ill. 102, 58 N.E.2d 906, 909 (Ill.1945).* In support, SLCI points out that paragraph 30 of the JVA is entitled "No Partnership" and states that "Nothing in this Agreement or in the relationship of the parties respecting the Joint Venture or the Work is intended to create nor shall it be construed to create or confirm a partnership between them."

**\*8** In accordance with Illinois partnership law and bankruptcy law, the Joint Venture assets should be treated as partnership assets and not considered part of NEPCO's bankruptcy estate. It is clear that, reading the JVA as a whole, paragraph 30 was intended only to recognize that NEPCO and Dick did not intend to create a general partnership with a continuing relationship for future endeavors, but rather only a partnership for the purpose of building the Kendall facility. A "joint venture" relates to a single specific enterprise or transaction, while a "partnership" relates to a general business of a particular kind. *See Nussbaum v. Kennedy, 267 Ill.App.3d 325, 204 Ill.Dec. 689, 642 N.E.2d 151, 155 (Ill.App.Ct.1994).* The Joint Venture is, therefore, to be governed by partnership principles and treated as a partnership for the purposes of applying bankruptcy law. *See Lutheran Gen. Hosp., Inc. v. Printing Indus. of Illinois/Indiana Employee Benefit Trust, 24 F.Supp.2d 846, 851 (N.D.Ill.1998)* ("Partnership principles govern joint ventures and the rights and liabilities of the members of a joint venture are tested by the same legal principles which govern partnerships."). Under bankruptcy law, the Joint Venture assets, including the Joint Venture Drawings, did not pass into NEPCO's bankruptcy estate, and SLCI did not purchase them. *See In re Funneman, 155 B.R. at 200; see also In re Olszewski, 124 B.R. 743, 746 (Bankr.S.D.Ohio 1991); In re Minton Group, 46 B.R. 222, 226 (Bankr.S.D.N.Y.1985).* As such, there exists a genuine issue of material fact about whether SLCI's use of the Joint Venture Drawings constitutes copyright infringement. SLCI's motion for summary judgment is denied.

II. State Law Claims

A. Misappropriation of Trade Secrets

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants move to dismiss Dick's misappropriation of trade secrets claim (Count V), arguing several different grounds for dismissal. These arguments are without merit.

SLCI first moves to dismiss Dick's misappropriation of trade secrets claim against it, with prejudice, on the basis that the alleged trade secrets in the "Joint Venture Data" lost their confidentiality protection when the JVA terminated. Specifically, SLCI argues that Dick must allege a confidentiality obligation to state a claim for misappropriation of trade secrets, and, in this case, the only basis for such an obligation is the JVA. When the JVA terminated upon NEPCO's bankruptcy filing or default, so too did NEPCO's obligation to keep the Joint Venture Data confidential, says SLCI. Therefore, no confidentiality obligation existed, and no misappropriation occurred when SLCI used the Joint Venture Data. However, even if we were to accept the premise that the confidentiality obligation terminated when the JVA did,[FN8] Dick's complaint supports the allegations that NEPCO breached its confidentiality obligation before the JVA terminated and that Defendants misappropriated and used the Joint Venture Data before the JVA terminated. Thus, we deny SLCI's motion to dismiss the misappropriation of trade secrets claim on this ground.

   FN8. At this point, we do not opine on this issue.

*9 PCL first moves to dismiss Dick's misappropriation of trade secrets claim on the basis that Dick has judicially admitted that the documents at issue are not trade secrets. In *NEPCO/Dick v. LSP-Nelson Energy, LLC., et al.,* in response to a motion to dismiss, Dick stated, "There is no doubt, as Defendants are well aware, that the Joint Venture Drawings are not secrets. There was never an effort to keep them 'secret' or 'confidential." 'Plaintiff's Response to Defendant's Motion to Dismiss at 5, *NEPCO/Dick et al. v. LSP-Nelson, LLC., et al., 2003 WL 21557383 (N.D.Ill. Jul.8, 2003)* (No. 02-50355). However, the Joint Venture Data at issue in the misappropriation claim is alleged to be distinct from the Joint Venture Drawings at issue in the prior case and in other counts of the present complaint. (*See* Sec. Am. Cmplt. ¶ ¶ 15-16.) Therefore, at this pleading stage, there is no judicial admission which precludes this claim.

Next, SLCI and PCL both move to dismiss Dick's misappropriation of trade secrets claim as insufficiently pled. To state a claim for misappropriation of a trade secret under the Illinois Trade Secrets Act (ITSA), *765 ILCS 1065/1,* the complaint must allege that information was (1) a trade secret, (2) misappropriated, and (3) used in the defendant's business. *Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265-66 (7th Cir.1992).* A trade secret is defined as information that "is sufficiently secret to derive economic value ... from not being generally known to other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *765 ILCS 1065/2(d)(1)(2).* Under the ITSA, "misappropriation" is defined as the "acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by *improper means,"* which includes the "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use." Defendants argue that the plaintiff has failed to (1) identify the trade secret; (2) allege what reasonable efforts were made to maintain secrecy; (3) plead that a confidentiality obligation applies to the alleged secrets; (4) plead what "improper means" were used to acquire the trade secret. We hold that Dick has sufficiently pled the elements for a misappropriation of trade secrets claim under the Federal Rules' liberal notice pleading standards. We discuss below each of the elements of Dick's ITSA claim and Defendants' arguments against them as insufficiently pled.

PCL first argues that Dick fails to identify the trade secrets it claims PCL improperly used. Dick has alleged that the "Joint Venture Data" is the subject of its misappropriation claim against PCL. (Sec.Am.Cmplt.¶ 63.) Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation. *Automed Techs., Inc. v. Eller, 160 F.Supp.2d 915, 920-21 (N.D.Ill.2001)* (citing *Leucadia, Inc. v. Applied Extrusion Techs., Inc., 755 F.Supp. 635, 636 (D.Del.1991)*). The query is whether the allegations provide the defendants with notice as to the substance of the claims. *Id. at 921.* Dick describes the Joint Venture Data as "scheduling information, cost projections, cost information, bidding information and other financial reports for the purpose of constructing the Kendall facility." Other courts in this district, faced with similar descriptions of alleged trade secrets, have found them sufficient at the pleading stage, and we do as well. See *MJ Partners*

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

*Rest., Ltd. v. Zadikoff,* 10 F.Supp.2d 922, 933 (N.D.Ill.1998) (holding that "information regarding suppliers, sales, employee history, gross profits, revenues, expenses, financing agreements, investor lists, marketing plans, and special customer relationships" sufficiently alleged trade secrets); *Labor Ready, Inc. v. Williams Staffing, LLC,* 149 F.Supp.2d 398, 412 (N.D.Ill.2001) (holding that trade secrets alleged as "unique, confidential business practices, models and data; ... pricing data; ... formats; manuals; ... and marketing strategies" satisfied notice pleading requirements).

**\*10** PCL and SLCI both argue that Dick alleges only the unsupported legal conclusion that Dick took reasonable efforts to maintain the secrecy of the Joint Venture Data, which is insufficient. It is true that a rote repetition of statutory language, pleading bare legal conclusions, is not permissible. *Magellan Intern. Corp. v. Salzgitter Handel GmbH,* 76 F.Supp.2d 919, 927 (N.D.Ill.1999); *Abbott Labs. v. Chiron Corp.,* 43 U.S.P.Q.2d 1695, 1697 (N.D.Ill.1997). However, Dick has not merely repeated the language of the statute. Dick has alleged that JVA contains a use restriction clause,[FN9] and Dick relies at least partly upon this clause to support its misappropriation claim. An agreement restricting the use of information may be considered a reasonable step to maintain secrecy of a trade secret. *See Master Tech Prods. v. Prism Enters., Inc.,* No. 00-C-4599, 2002 WL 475192, at \*5 (N.D.Ill. Mar.27, 2002). Whether the measures taken by a trade secret owner satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury and not one to be decided at the pleading stage. *See Learning Curve Toys, Inc. v. Playwood Toys, Inc.,* 342 F.3d 714, 725 (7th Cir.2003). Thus, we need not opine as to whether Dick could prove the steps alleged to be taken are in fact proven to be reasonable. At this point, it is sufficient that Dick pleads at least some step was taken.

> FN9. The NEPCO/Dick JVA provided, at Paragraph 25, that "... [N]either party shall use the documents for other projects without the prior written consent of the others." (Sec.Am.Cmplt.¶ 14.)

Finally, SLCI argues that Dick has failed to plead a confidentiality obligation, which is a necessary element of the "misappropriation" prong of an ITSA claim. Dick again relies on the use restriction of the JVA to satisfy its pleading requirement for a confidentiality obligation. At this early stage, we find

that Dick has sufficiently pled a confidentiality obligation, based upon the JVA's use restriction, to survive a 12(b)(6) motion to dismiss. Again, we observe that we need not, at this time, address the question of whether this is sufficient to *prove* that a confidentiality obligation existed. Defendants' motions to dismiss the misappropriation of trade secrets claim are denied.

### B. Tortious Interference and Conversion

#### 1. Preemption

Defendants move to dismiss Counts II (tortious interference with prospective business relations), III (tortious interference with contractual relations), and IV (conversion) because they are preempted by the ITSA. We grant Defendants' motions to the extent that these counts are premised upon the misuse of confidential information, but we deny the motions to the extent that these counts are premised upon alleged solicitation of employees.

The ITSA expressly preempts all non-contract common law causes of action based on the misappropriation or misuse of information or ideas. *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 971 (N.D.Ill.2000). The law is clear that Illinois has "abolished all common law theories of misuse of information." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992). In particular, the types of claims at issue in the present case-tortious interference and conversion-are preempted by the ITSA, where the claim relies on misappropriation or misuse of ideas. *See, e.g., Hecny Transp., Inc. v. Chu,* No. 98-C-7335, 2004 WL 725466, at \*3 (N.D.Ill. Mar.31, 2004) (tortious interference with contract and conversion claims preempted by ITSA); *Thomas & Betts,* 108 F.Supp.2d at 978 (tortious interference with business relations and conversion claims preempted by ITSA).

**\*11** Dick argues that its allegations of the unlawful possession of *tangible documents* distinguishes its claims from misuse of *ideas* allegations, which result in ITSA preemption. However, in cases where the value of a claim stems primarily from the ideas contained within items rather than their tangible forms, the ITSA preempts the claim. *See Automed Techs.,* 160 F.Supp.2d at 922 ("Although these items exist in tangible form, their value is primarily from the information contained within that form."); *Thomas & Betts,* 108 F.Supp.2d at 973 ("[T]hese

Not Reported in F.Supp.2d                                                                          Page 9
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

physical items have little value apart from the information contained therein...."). Like these cases, the drawings and data at issue here have little value outside of the ideas contained therein. Therefore, to the extent that Dick's claims for tortious interference and conversion stem from Defendants' misuse of the drawings and data, the misuse is of the ideas contained within, rather than their tangible forms, and the ITSA preempts such claims.

However, Dick's tortious interference claims also contain allegations that Defendants wrongfully solicited and utilized employees of the Joint Venture. (Sec Am. Cmplt ¶ ¶ 40, 45.) Solicitation of employees is independent of the misuse of trade secrets, and a claim premised upon such an allegation is not preempted by the ITSA. *See Automed Techs., 160 F.Supp.2d at 922; Labor Ready, 149 F.Supp.2d at 410*.

Therefore, to the extent Dick's tortious interference claims are based upon misuse of ideas in the Joint Venture Drawings and Data, they are dismissed because of preemption. To the extent that Dick's tortious interference claims are based upon the solicitation of its employees, they remain viable claims. Dick's conversion claim relies solely upon the misappropriation of ideas in the drawings and data and is, therefore, dismissed as preempted by the ITSA.

### 2. Failure to State a Claim

Defendants move to dismiss Dick's tortious interference with prospective business relations (Count II) and tortious interference with contract (Count III) allegations under *Rule 12(b)(6)* on the basis that they fail to state causes of action.[FN10] We deny these motions.

> **FN10.** Having dismissed Dick's conversion claim in its entirety based upon preemption, it is unnecessary for us to address Defendants' motions to dismiss the conversion claim for failure to state a cause of action.

Under the Federal Rules, a plaintiff is only required to provide "a short and plain statement showing that [he] is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. A complaint will be dismissed under *Rule 12(b)(6)* only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the complaint. *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)*. Under Illinois law, to state a cause of action for tortious interference with prospective business relations, a plaintiff must plead (1) a reasonable expectation of entering into a valid business relationship, (2) that the defendant knew of this expectancy, (3) that the defendant purposefully interfered to prevent the expectancy from being fulfilled, and (4) that damages to the plaintiff resulted. *Cook v. Winfrey, 141 F.3d 322, 327 (7th Cir.1998)*. Dick has alleged these elements. Dick states that it had a reasonable expectancy of entering into a valid business relationship with LSP-Nelson (Sec.Am.Cmplt.¶ 39), that Defendants knew of this expectancy (*Id.*), that Defendants interfered with this expectancy by soliciting and utilizing Joint Venture employees to assist in designing and constructing the Nelson facility (*Id.* ¶ 40), and that Dick suffered damages (*Id.* ¶ 42). Contrary to Defendants' contentions, Dick is under no obligation to plead further facts to support its claim. *See Cook, 141 F.3d at 328*. It may be true that Dick will be unable to prove some or all of these allegations to be successful on its claim, but that would require resolution of factual issues beyond the pleadings.[FN11] *See id. at 327.*

> **FN11.** For example, the issues raised by Defendants in their briefs as to whether Dick can show causation between the alleged solicitation and use of employees and a lost business relationship and whether Dick can prove that Defendants' actions, rather than the now-bankrupt NEPCO's actions, frustrated Dick's expectancy go to the merits of the case and are not to be decided at this pleading stage.

**\*12** Under Illinois law, to state a cause of action for tortious interference with contract, the plaintiff must plead that (1) the plaintiff had a valid contractual relationship with some other party; (2) the defendant was aware of the contractual obligation; (3) the defendant intentionally or unjustifiably induced the other party to breach; (4) the other party in fact breached as a result of the defendant's actions; and (5) the breach caused the plaintiff damages. *Cook, 141 F.3d at 328* (citing *Williams v. Shell Oil Co., 18 F.3d 396, 402 (7th Cir.1994)*). Dick has alleged that Defendants interfered with Dick's contractual relationship with NEPCO by soliciting and utilizing the services of Joint Venture personnel to benefit Defendants in the performance of work at the Nelson Facility and that these interferences constituted a

Not Reported in F.Supp.2d                                                                                     Page 10
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

breach of the JVA. (Sec.Am.Cmplt.¶ 45.) It has also alleged that Defendants were unjustified in these actions (*Id.* ¶ 46), and that Dick suffered damages as a result (*Id.* ¶ 47). Dick's complaint alleges the necessary elements of the claim and shows that he might be able to prove a set of facts consistent with the complaint that would entitle him to relief. Once again, it may be true that Dick will be unable to prove some or all of these allegations to be successful on its claim, but that would require resolution of factual issues beyond the pleadings.[FN12]

> FN12. For example, the issues raised by Defendants in their briefs as to whether NEPCO actually did breach the JVA under the terms of that agreement as a result of Defendants' solicitation and utilization of the employees, whether solicitation and utilization in this case was in fact unjustifiable, and whether Defendants' alleged tortious actions actually caused a breach before the JVA terminated go to the merits of the case and are not to be decided at this pleading stage.

### III. Motion for a More Definite Statement

Finally, Defendants move for a more definite statement of Dick's Second Amended Complaint arguing that because the complaint provides general, conclusory allegations and does not identify allegations with respect to each defendant, it is vague and ambiguous. Rule 12(e) allows for a more definite statement only where the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). 12(e) motions are not designed to replace traditional discovery, but to clear up confusion. *Sheen v. Bil-Jax, Inc., No. 93-C-6390, 1993 WL 524211, at *1 (N.D.Ill.Dec.10, 1993).* Accordingly, motions for a more definite statement should not be used to gain additional information, but, particularly in light of our liberal notice pleading requirement, should be granted "only when the pleading is so unintelligible that the movant cannot draft a responsive pleading." *United States for Use of Argyle Cut Stone Co. v. Paschen Contractors, Inc., 664 F.Supp. 298, 303 (N.D.Ill.1987).*

Contrary to Defendants' argument, a complaint that refers to defendants collectively is not necessarily so ambiguous as to require a more definite standard. *See, e.g., Guess?, Inc. v. Chang, 912 F.Supp. 372, 381 (N.D.Ill.1995).* Furthermore, unless the claim is

one that must be pled with particularity, *see* Fed.R.Civ.P. 9(b), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). Under these standards, we cannot conclude that Dick's complaint is so ambiguous as to require a more definite statement. The complaint sufficiently apprises Defendants of the charges against them to permit a response. We therefore deny Defendants' motion for a more definite statement.

### IV. Conclusion

**\*13** For the foregoing reasons, Defendants' motions are granted in part and denied in part. We deny PCL's motion to dismiss and SLCI's motion for summary judgment on Count I (copyright infringement). We deny the motions to dismiss Count II (tortious interference with prospective business relations) and Count III (tortious interference with contract). These counts remain viable to the extent provided in this opinion. We grant the motions to dismiss Count IV (conversion). We deny the motions to dismiss Count V (misappropriation of trade secrets). Finally, we deny the motions for a more definite statement.

It is so ordered.

N.D.Ill.,2004.
Dick Corp. v. SNC-Lavalin Constructors, Inc.
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912

Briefs and Other Related Documents (Back to top)

• 2007 WL 605400 (Verdict, Agreement and Settlement) Agreed Stipulation to Dismiss (Jan. 3, 2007)
• 2006 WL 740328 (Trial Motion, Memorandum and Affidavit) Defendant Snc-Lavalin Constructors, Inc.'s Response to Plaintiff Dick Corporation's Motion to Compel Production of Documents of Snc-Lavalin Constructors, Inc. (Feb. 27, 2006) Original Image of this Document with Appendix (PDF)
• 2006 WL 740327 (Trial Motion, Memorandum and Affidavit) Plaintiff Dick Corporation's Motion to Compel Production of Documents of Snc Lavalin Constructors, Inc. (Feb. 21, 2006) Original Image of this Document (PDF)
• 2006 WL 427416 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff Dick Corporation's Motion to Compel Production of Documents of PCL Industrial Construction, Inc. (Jan. 24, 2006) Original Image of

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2004 WL 2967556 (N.D.Ill.), 2004 Copr.L.Dec. P 28,912
**(Cite as: Not Reported in F.Supp.2d)**

this Document (PDF)
• 2006 WL 427415 (Trial Motion, Memorandum and Affidavit) Defendants John Gillis and Michael Ranz's Public Reply in Support of their Motion to Dismiss the Fourth Amended Complaint (Jan. 18, 2006) Original Image of this Document (PDF)

• 2005 WL 3286508 (Trial Motion, Memorandum and Affidavit) Defendants John Gillis and Michael Ranz's Memorandum in Support of their Motion to Dismiss the Fourth Amended Complaint (Oct. 26, 2005) Original Image of this Document (PDF)

• 2005 WL 2611786 (Trial Pleading) Snc-Lavalin Constructors, Inc.'s Answer to Dick Corpporation'S Fourth Amended Complaint (Sep. 1, 2005) Original Image of this Document (PDF)

• 2005 WL 2611779 (Trial Pleading) Answer of Defendant Pcl Industrial Construction, Inc. to Plaintiff'S Fourth Amended Complaint (Aug. 30, 2005) Original Image of this Document (PDF)

• 2005 WL 2611772 (Trial Pleading) Fourth Amended Complaint (Aug. 15, 2005) Original Image of this Document (PDF)

• 2004 WL 2816284 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendant PCL's Motion to Dismiss or, Alternatively, Motion for More Definite Statement (Aug. 27, 2004) Original Image of this Document (PDF)

• 2004 WL 2816291 (Trial Motion, Memorandum and Affidavit) SNC-Lavalin Constructors, Inc.'s Reply in Support of its Motion to Dismiss Counts II-V of Plaintiff's Second Amended Complaint, or in the Alternative for a More Definite Statement (Aug. 27, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2816273 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Pcl's Motion to Dismiss or, Alternatively, Motion for More Definite Statement (Aug. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2816277 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant SNC-Lavalin Constructors, Inc's Motion to Dismiss or, Alternatively, Motion for More Definite Statement (Aug. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2816259 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendant PCL's Motion to Dismiss (Jul. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2816265 (Trial Motion, Memorandum and Affidavit) Defendant Slci's Reply in Support of Its Motion for Summary Judgment as to Count I, Motion to Dismiss Counts II Through V (Jul. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2816270 (Trial Motion, Memorandum and Affidavit) SNC-Lavalin Constructors, Inc.'s Response to Plaintiff's L.R. 56 Statement of Additional Facts (Jul. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2816252 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Defendant Pcl Industrial Construction, Inc.'s Motion to Dismiss Complaint (Jun. 15, 2004) Original Image of this Document (PDF)

• 2004 WL 3658815 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Defendant SNC-Lavalin Constructors, Inc.'s Motion for Summary Judgment as to Count I, Motion to Dismiss Counts II Through V (Jun. 15, 2004) Original Image of this Document (PDF)

• 2004 WL 2816247 (Trial Pleading) Amended Complaint (Apr. 15, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2816241 (Trial Pleading) Complaint (Feb. 10, 2004) Original Image of this Document (PDF)

• 1:04cv01043 (Docket) (Feb. 10, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.