transaction or a series of related transactions) of all or substantially all the assets of such party, or (ii) the stockholders of such party shall approve any plan or proposal for the liquidation or dissolution of such party, or (iii) any party, other than such party or a subsidiary thereof or any employee benefit plan sponsored by such party or a subsidiary thereof or a corporation owned, directly or indirectly, by the stockholders of such party in substantially the same proportions as their ownership of stock of such party, shall become the beneficial owner of securities of such party representing greater than fifty percent (50%) of the combined voting power of then outstanding securities ordinarily (and apart from rights accruing in special circumstances) having the right to vote in the election of directors, as a result of a tender or exchange offer, open market purchases, privately negotiated purchases or otherwise, or (iv) at any time after the date of this Agreement, individuals who at the date hereof constituted the Board of Directors of such party shall cease for any reason to constitute at least a majority thereof, unless the election or the nomination for election by such party's stockholders of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the date hereof, or (v) any other event shall occur with respect to such party that would be required to be reported in response to Item 6(e) (or any successor provision) of Schedule 14A of Regulation 14A promulgated under the Exchange Act.

## ARTICLE VII

### TERMINATION, AMENDMENT AND WAIVER

7.1  <u>Termination</u>.  Except as provided in Section 7.2 below, this Agreement may be terminated and the Acquisition abandoned at any time prior to the Closing Date:

(a)  by mutual consent of Seller and Buyer;

(b)  by Buyer or Seller if: (i) the Closing has not occurred by February 29, 1996; (ii) there shall be a final nonappealable order of a federal or state court in effect preventing consummation of the Acquisition; or (iii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Acquisition by any Governmental Entity that would make consummation of the Acquisition illegal;

(c)  by Buyer if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Seller and such breach has not been cured within five (5) business days after written notice to Seller (provided that, no cure period shall be required for a breach which by its nature cannot be cured);

(d)  by Buyer at any time prior to November 1, 1995, if as a result of its due diligence review of the Business subsequent to the date of this Agreement it

BPHPA1\RB\0147981.06
09/19/95

42.

discovers a fact or condition existing on the date of this Agreement and not disclosed to Buyer prior to or on the date of this Agreement that Buyer reasonably determines has a material adverse effect on the Business Condition of Seller;

(e)    by Seller at any time prior to November 1, 1995 if as result of its due diligence review of Buyer subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement not disclosed to Seller prior to or on the date of this Agreement that Seller reasonably determines has a material adverse effect on the Business Condition of Buyer;

(f)    by Seller if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Buyer and such breach has not been cured within five (5) business days after written notice to Buyer (provided that, no cure period shall be required for a breach which by its nature cannot be cured).

7.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Buyer or Seller, or their respective officers, directors or shareholders, provided that each party shall remain liable for any breaches of this Agreement prior to its termination.

7.3    Amendment.  This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto.

7.4    Extension; Waiver.  At any time prior to the Closing Date, Buyer on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other party hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

CONFIDENTIAL                                    SCO1185943

# ARTICLE VIII

## INDEMNIFICATION

8.1 <u>Survival of Representations, Warranties and Agreements</u>. Notwithstanding any investigation conducted at any time with regard thereto by or on behalf of either party, no representation or warranty by Seller shall survive the closing of this Agreement and no claim may be brought by any party with respect thereto other than the representation made by Seller in Section 2.10, including any schedules thereto, which shall survive the execution, delivery and performance of this Agreement, and be subject to the provisions of Section 8.2 below, until the first anniversary of the Closing Date.

8.2 <u>Indemnification</u>.     Seller hereby agrees to indemnify and hold harmless Buyer against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys' fees, any and all out-of-pocket expenses incurred in investigating, preparing or defending against any litigation, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation, but only to the extent that the aggregate of the foregoing exceeds $250,000, (collectively "Damages") asserted against, resulting to, imposed upon, or incurred or suffered by Buyer, directly or indirectly, as a result of or arising from any inaccuracy in or breach of the representation and warranty made by Seller in Section 2.10, including schedules thereto ("Identifiable Claims"). Seller's indemnity obligation pursuant to this Article VIII shall in no event exceed, either individually or in the aggregate, $5,000,000.

8.3 <u>Procedure for Indemnification with Respect to Third-Party Claims</u>.

(a)     If Buyer determines to seek indemnification under this Article VIII with respect to Identifiable Claims (the party seeking such indemnification hereinafter referred to as the "Indemnified Party" and the party against whom such indemnification is sought is hereinafter referred to as the "Indemnifying Party") resulting from the assertion of liability by third parties, the Indemnified Party shall give notice to the Indemnifying Party within thirty (30) days of the Indemnified Party becoming aware of any such Identifiable Claim or of facts upon which any such Identifiable Claim will be based; the notice shall set forth such material information with respect thereto as is then reasonably available to the Indemnified Party. In case any such liability is asserted against the Indemnified Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within twenty (20) days after receiving the Indemnified Party's notice, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of

CONFIDENTIAL                                    SCO1185944

such counsel shall be at the sole, unreimbursable expense of the Indemnified Party unless the Indemnified Party does not assume control or the Indemnified Party shall reasonably determine that there is a conflict of interest between Buyer and Seller with respect to such Identifiable Claim, in which case the fees and expenses of such counsel will be borne by the Indemnifying Party, (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing, and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Identifiable Claims resulting from the assertion of liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and, if so, only to the extent that, the Indemnifying Party is prejudiced thereby. With respect to any assertion of liability by a third party that results in an Identifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(b)     In the event that the Indemnifying Party, within thirty (30) days after receipt of the aforesaid notice of an Identifiable Claim, fails to assume the defense of the Indemnified Party against such Identifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

(c)     Notwithstanding anything in this Section to the contrary, (i) if there is a reasonable probability that an Identifiable Claim may materially and adversely affect the Indemnified Party, other than as a result of money damages or other money payments, the Indemnified Party shall have the right to participate in such defense, compromise or settlement and the Indemnifying Party shall not, without the Indemnified Party's written consent (which consent shall not be unreasonably withheld), settle or compromise any Identifiable Claim or consent to entry of any judgment in respect thereof unless such settlement, compromise or consent includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect of such Identifiable Claim.

# ARTICLE IX

# GENERAL PROVISIONS

9.1     <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via telecopy (with acknowledgment of complete transmission) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

CONFIDENTIAL

SCO1185945

(a)   if to Buyer, to:
      The Santa Cruz Operation, Inc.
      400 Encinal Street
      P.O. Box 1900
      Santa Cruz, CA  95061-1900
      Attention: Legal Department
      Telecopy No.:  (408) 427-5474

      with a copy to:

      Brobeck, Phleger & Harrison
      Two Embarcadero Place
      2200 Geng Road
      Palo Alto, CA  94303
      Attention:  Edward M. Leonard
      Telecopy No.: (415) 496-2921

(b)   if to Seller, to:

      Novell, Inc.
      122 East 1700 South
      Provo, Utah 84606
      Attention:  David R. Bradford, Esq.
      Telecopy No.:  (801) 228-7077

      with a copy to:

      Wilson Sonsini Goodrich & Rosati
      650 Page Mill Road
      Palo Alto, California 94304
      Attention:  Larry W. Sonsini
      Telecopy No.: (415) 496-4084

   9.2   Survival.  The representations and warranties contained in Section 2 and Section 3 hereof except for the representation of Seller set forth in Section 2.10 shall not survive the closing of the sale of assets and issuance of stock contemplated by this Agreement; provided, however, that the foregoing provision shall not eliminate the rights and remedies of the parties hereto in the case of a willful fraud by the other party provided that the agreed party shall establish all elements of the existence of such fraud by clear and convincing evidence.

CONFIDENTIAL                                    SCO1185946

9.3    Interpretation.  When a reference is made in this Agreement to Schedules or Exhibits, such reference shall be to a Schedule or Exhibit to this Agreement unless otherwise indicated.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.4    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

9.5    Entire Agreement.  This Agreement, and the Schedules and Exhibits hereto: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or remedies hereunder, unless expressly provided otherwise; and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided.

9.6    Severability.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.7    Other Remedies.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

9.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

9.9    Rules of Construction.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of

CONFIDENTIAL                                                   SCO1185947

construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

CONFIDENTIAL

SCO1185948

OCT 04 '95 10:20

IN WITNESS WHEREOF, Buyer and Seller have caused this Agreement to be signed by their duly authorized respective officers, all as of the date first written above.

THE SANTA CRUZ OPERATION, INC.

By: _____

Name:  Alok Mohan

Title:  Chief Executive Officer


NOVELL, INC.

By: _____

Name:  Robert J. Frankenberg

Title:  Chairman of the Board,

President and Chief
Executive Officer

CONFIDENTIAL

SCO1185949

49.

Schedule 1.1(a)
Assets
(Page 1 of 4)

I.   All rights and ownership of UNIX and UnixWare, including but not limited to all versions of
UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates
in process), and all technical, design, development, installation, operation and maintenance
information concerning UNIX and UnixWare, including source code, source documentation,
source listings and annotations, appropriate engineering notebooks, test data and test results,
as well as all reference manuals and support materials normally distributed by Seller to end-
users and potential end-users in connection with the distribution of UNIX and UnixWare, such
assets to include without limitation the following:

### UNIX Source Code Products

A.   UnixWare 2.0 as described in the UnixWare 2.0 Licensing Schedule and those
products listed as "prior" products on such schedule (includes source code updates
where appropriate - i.e. UnixWare product family).

B.   UNIX SVR4.1 ES as described in the UNIX SVR4.1 ES Licensing Schedule and
those products listed as "prior" products on such schedule

C.   UNIX SVR4.0MP as described in the UNIX SVR4.0 MP Licensing Schedule and
those products listed as "prior" products on such schedule.

D.   Ancillary SVRx Products (a final list of which shall be developed by the parties prior
to the Closing)

### Binary Product Releases

A.   UnixWare 2.01 Product Family as described by the Novell UnixWare 2.01 Part/Price
List

B.   UnixWare 2.0.x update releases

C.   UnixWare 1.1 Product Family as described by the Novell UnixWare 1.1 Part/Price List

D.   UnixWare 1.1.x - update releases

### Products Under Development

A.   UnixWare 2.1 (Eiger) - contains NetWare UNIX Client and Server capabilities

B.   UnixWare 2.1 Oracle Parallel Server (OPS)

C.   UnixWare 2.03 - maintenance update under development

D.   UnixWare 2.0.x/2.1 Enhanced Mode Merge

E.   UnixWare 2 Internet Server

CONFIDENTIAL

Schedule 1.1(a)
Assets
(Page 2 of 4)

## Other Technology

A.   UnixWare system/HBA/etc. Test/Certification Suites Used by Novell Labs
B.   UnixWare "OS Branding" Test Suites
C.   UnixWare "OS Compatible" Requirements
D.   Gaede Performance Test suite
E.   ARTUS, Bart, Buster Internal UNIX Test suites and test harnesses
F.   UnixWare Training/Education Courseware
G.   Requirements, Design, and Test Specifications for UnixWare 2
H.   Technical Support Update Manager
I.   Marketing collateral/information in electronic form
J.   ODI Transmogrification software

II.   All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

III.   All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable), including without limitation:

A.   Joint Development with third parties:

1.   In-Process development agreements
2.   Past development agreements with on-going pricing discounts
3.   Past development agreements without ongoing pricing discounts
4.   Joint development agreements in which Seller didn't get full rights to the code developed.

B.   Third party software license agreements - Those agreements in which Seller pays per copy fees for technology/products which are shipped with or to be used with UNIX System and/or UnixWare.

C.   Joint marketing agreements - Marketing programs with customers.

D.   End user MLA agreements - Agreements to allow end users to copy binary products for internal use only. Associated with these agreements are support requirements.

E.   UNIX-only VAR agreements - UNIX Masters VARs

SDW::ODMA\PCDOCS\SQL2\89406\1

CONFIDENTIAL                                                          SCO1185951

Schedule 1.1(a)
Assets
(Page 3 of 4)

F.    Support agreements - End user support agreements (i.e., TMAC, NALCOMIS)

G.    Microsoft agreement (Xenix Agreement) - Xenix compatibility and per copy fee
      agreement.  Seller will agree to discuss with SCO Seller's interpretation of this
      agreement.

H.    Microsoft Agreement (Extra-Ordinary Discount) - Microsoft's additional discount
      beyond 80%.

I.    Strategic Relationship Agreements (i.e.  MTA, ECPA, MBA, etc.)

J.    Out-sourced development (i.e., India) - Development agreements with third parties
      (Wipro and HCL) and India Development Center.  IDC is a Seller subsidiary.

K.    Out-sourced Support Agreements

L.    Software and Sublicensing Agreements - This includes the source code and
      sublicensing agreements that Seller has with its OEM, End User and Educational
      customers.  The total number of these agreements is approximately 30,000.

M.    OEM Binary Licensing Agreements - OEM distribution of UnixWare with Seller's
      agreement to include some OEM added value into future releases of UnixWare.


IV.   All copies of UNIX and UnixWare, wherever located, owned by Seller.

V.    Intellectual property - Trademarks UNIX and UnixWare as and to the extent held by Seller
(excluding any compensation Seller receives with respect of the license granted to X/Open regarding
the UNIX trademark).

VI.   All contracts relating to the SVRX Licenses listed below:

      - UNIX System V Release 4.2 MP, Intel386 Implementation
      - #UNIX System V Release 4.2 MP International Edition, Intel386 Implementation
      - UNIX System V Release 4.2, Intel386 Implementation
      - #UNIX System V Release 4.2 International Edition, Intel386 Implementation
      - UNIX System V Release 4.1 ES, Intel386 Implementation
      - #UNIX System V Release 4.1 ES International Edition, Intel386 Implementation

SDW::ODMA\PCDOCS\SOL2\89406\1

CONFIDENTIAL                                          SCO1185952

Schedule 1.1(a)
Assets
(Page 4 of 4)

- UNIX System V Release 4.0 MP, Intel386 Implementation
- #UNIX System V Release 4.0 MP International Edition, Intel386 Implementation
- UNIX System V Release 4.0 MP, Intel386 Version 4 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 4 Implementation
- UNIX System V Release 4.0, Intel386 Version 3 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 3 Implementation
- UNIX System V Release 4.0, Intel386 Version 2 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 2 Implementation
- UNIX System V Release 4.0, Intel386 Version 1 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 1 Implementation
- UNIX System V/386 Release 3.2 and #UNIX System V/386 Release 3.2 International
  Edition
- UNIX System V Release 3.2 and #UNIX System V Release 3.2 International Edition
- UNIX System V Release 3.1 and #UNIX System V Release 3.1 International Edition
- UNIX System V Release 3.0 and #UNIX System V Release 3.0 International Edition
- All prior releases and versions of UNIX System V Release 2.1
- #All prior releases and versions of UNIX System V Release 2.1 International Editions
- All prior releases and versions of UNIX System V Release 2.0
- #All prior releases and versions of UNIX System V Release 2.0 International Editions
- All prior UNIX System releases and versions preceding UNIX System V Release 2.0
- #All prior UNIX System releases and versions preceding UNIX System V Release 2.0
  International Editions

VII.    Such office furniture and personal computers or work stations as may be currently used by the
        employees of Seller hired by Buyer pursuant to Section 4.13 hereof.

SDW::ODMA\PCDOCS\SQL2\89406\1

Schedule 1.1(b)
Excluded Assets
(Page 1 of 2)

I.    Any asset not listed on Schedule 1.1(a), including without limitation any asset which pertains to NetWare which is not listed on Schedule 1.1(a)

II.   NetWare Operating System and Services

III.  TUXEDO Transaction Processing

IV.   Licensed technology, including:

   A.   NetWare and other Novell code contained in UnixWare 2.01 and Eiger:

      1.   ODI Software contained in NetWare and UnixWare LAN Drive Test Kit
      2.   Nprinter (for printing from NetWare to UnixWare Server)
      3.   NUC (NetWare UNIX Client - for print, etc. from UnixWare to NetWare Server)
      4.   TNVT, Host Presenter (Terminal Emulation to Log into UnixWare Server from NetWare Client)
      5.   MHS Gateway (Mail Gateway)
      6.   IPX/SPX (Re-Write of Native 4.1)
      7.   ODI (Networking driver protocol; version 3.3 of assembly Spec and 1.0 of C Spec)
      8.   Xconsole (Log-in to NetWare console)
      9.   UnixWare TSA (SMS is back-up and restore, TSA is the 'agent' needed to do this)
      10.  Some NetWare Client APIs
      11.  DR-DOS
      12.  Host Presenter (*Binary only*)
      13.  TNVT (*Binary only*)
      14.  criptor (*Binary only*)
      15.  NetWare NLM (*Binary only*)

   B.   NetWare code contained in Eiger Only:

      1.   NDS APIs
      2.   NWS (Incl. NetWare File, Print and Directory Services)

   C.   NetWare 4.1 for UnixWare

<u>Schedule 1.1(b)</u>
Excluded Assets
(Page 2 of 2)

V.    Intellectual Property:

    A.    All copyrights and trademarks, except for the trademarks UNIX and UnixWare.

    B.    All Patents

VI.    Existing Master License Agreements with end users which include, in addition to other products of Seller, integrated delivery of UnixWare.

VII.    All accounts receivable or rights to payment concerning the Assets arising prior to the Closing Date.

VIII.    All right, title and interest to the SVRx Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof.

SDW::ODMA\PCDOCS\SQL2\89375\1

CONFIDENTIAL

SCO1185955

Schedule 1.1(c)

Assumed Liabilities

1.    All obligations, whether existing on the date hereof or arising hereafter, under the
      assigned contracts listed on Schedule 1.1(a).

2.    All obligations relating to the Business which arise subsequent to the Closing Date.

3.    Obligation of product support and customer service concerning UnixWare and Eiger.

SDW::ODMA\PCDOCS\SQL2\89429.01

## SCHEDULE 1.2(b)

Buyer shall make payments of the royalties in accordance with the structure set forth below.

(a)     <u>Royalty-Bearing Products</u>.  Royalties shall be paid on sales of the following products by Buyer (the "Royalty-Bearing Products"):

(i)     UnixWare

(ii)    Eiger

(iii)   MXU

(iv)   White Box

(v)     any derivative, upgrades, updates or new releases of (i) through (iv) above.

(b)     <u>Amount of Royalties</u>.  Concurrent with the execution of this Agreement, Seller has delivered to Buyer a business plan provided by Seller to Buyer on September 11, 1995 including an annual forecast by Seller of the potential estimated market for UnixWare, Eiger, MXU and White Box (the "Plan").  The amount of royalties shall be as follows:

(i)  Royalties on UnixWare, Eiger, MXU and derivatives ("UW Products"):

(a)     No royalties shall be payable in connection with any of the UW Products until Buyer shall have shipped or licensed, in any year, 40% of the units contemplated by the Plan for such year;

(b)  Buyer shall pay royalties equal to $30.00 per net unit in connection with each and every net unit of UW Products shipped or licensed by Buyer over and above 40% and less than 70% of the total units contemplated by the Plan for such year;

(c)  Buyer shall pay royalties equal to $60.00 per net unit in connection with each and every net unit of UW Products shipped or licensed by Buyer over and above 70% of the total units contemplated by the Plan for such year.

BPHPA1\JPH\0148738.WP          -

(ii)  Royalties on White Box:

(a)  No royalties shall be payable in connection with any of the White Box units until Buyer shall have shipped or licensed 50% of the White Box units contemplated by the Plan for such year.

(b)  Buyer shall pay royalties equal to $20.00 per net unit in connection with each and every net unit of White Box product shipped or licensed by Buyer over and above 50% of the total units contemplated by the Plan for such year.

(iii)   Net Units shall mean total gross shipments minus returns and evaluation and demonstration units (on which revenue is not received).

(c)  <u>Termination of Royalty Obligations</u>.  The royalty obligations set forth in subsection (b) above will terminate (i) after Buyer shall have made aggregate cumulative payments to Seller equal to such amount which has a total net present value of $ 84,000,000 (determined as of the date of Closing) or (ii) December 31, 2002, whichever is sooner.  A discount rate of 15% will be used to calculate the net present value.

(d)  <u>Annual Cap; Carryover Provisions</u>.   In the event that Buyer's net shipments and licenses of UW Products shall reach or exceed 130% of the units contemplated by the Plan for such year, Buyer shall not have royalty obligations in connection with such shipments or licenses over such 130% threshold (the "Annual Cap").  In the event that the actual sale and license of units of UW Products fail to reach 40% of the Plan for any given year as contemplated by (b)(i) above, then 30% of the Plan units for such year may be carried forward and added to the following year solely for the purposes of determining the Annual Cap on royalties for such subsequent year.

(e)  <u>Protective Provisions</u>.  In the event that the pricing of royalties set forth herein shall cause Buyer to become unprofitable or substantially non-competitive in the marketplace, management of Buyer and Seller will meet to negotiate a mutually acceptable adjustment so as to support the economic viability of Buyer.

(f)   <u>SVRx Converted Units</u>.  The parties agree that SCO will have the opportunity to convert existing SVRx-based customers to a UnixWare derived product, thus depriving Seller of the economic benefit of the SVRx licenses.  The process for determining if a customer is validly converted is as follows:

The conversion of an SVRx customer to UnixWare will validly occur and result in the UnixWare based revenue flowing to SCO, without giving rise to a continued obligation to make payment to Seller of royalties due under the SVRx licenses, only if the following are true (note:  if the customer continues to sell their SVRx based product separately, then these SVRx revenues continue to flow to Novell):

8PHPA1\JPH\0148738.WP          -

(i) The customer ships a binary copy of a Golden Master of UnixWare, Eiger, MXU or White Box, or

(ii) The product is derived from a source version of UnixWare, Eiger, MXU or White Box and (i) none of the original SVRx code provided by Novell to the customer, under the SVRx license, is included in the new product or (ii) Buyer shall demonstrate to Seller's reasonable satisfaction that an insignificant amount of original SVRx code is so included and the adoption of UnixWare is so substantial as to constitute a valid conversion.

In addition, an SVRx customer can be defined as having converted to UnixWare only if one of the above is satisfied and only if support is provided for NDS (client/server where appropriate) in the resulting product.

BPHPA1\JPH\0148738.WP

CONFIDENTIAL

SCO1185959

<u>Schedule 6.3(a)</u>

The proposed merger with or sale of shares representing 50% or more of the voting power of Buyer to any of the following parties, or any affiliates or successors to the business thereof, would give rise to the respective rights and obligations contained in Section 6.3(a) of the Agreement:

Sun Microsystems

Microsoft

Hewlett-Packard

IBM

Digital

Fujitsu

::ODMA\PCDOCS\QLT\90488\1

CONFIDENTIAL

SCO1185960

EXHIBIT 5.1(c)

Eiger Development.

(a)     Prior to the Closing Date, Seller shall use its reasonable commercial efforts to continue development of the Eiger product (as such term is defined in the Operating Agreement) in accordance with the development schedule previously furnished to Buyer.

(b)     After the Closing Date, Seller shall contribute to Buyer a portion of the direct development costs associated with development of the Eiger product as follows:

(i)     Seller shall contribute to Buyer 50% (fifty percent) of such direct development costs until such contribution reaches an aggregate of $2.5 million (Two Million Five Hundred Thousand Dollars).

(ii)   Once an aggregate of $5 million (Five Million Dollars) is spent by Buyer on the development of the Eiger product, including the Seller contribution described in (i) above, Seller shall contribute to Buyer 25% (twenty-five percent) of such additional direct development costs until such additional contribution equals $2.5 million (Two Million Five Hundred Thousand Dollars).

(iii)  Except for the foregoing, Seller shall have no obligations to Buyer whatsoever respecting the development of the Eiger product.

(iv)  Buyer shall provide Seller with such evidence of direct expenditures on the development of the Eiger product as Seller may reasonably request before any Seller contributions are made.

(v)  Any such contributions shall be made quarterly in arrears upon written notice by Buyer of the expenditure of sums as to which Seller agrees to contribute its aforementioned percentages.

CONFIDENTIAL                                          SCO1185961

## SELLER DISCLOSURE SCHEDULE

For convenience, section numbers refer to the Asset Purchase Agreement dated as of September 19, 1995 between Seller and The Santa Cruz Operation, Inc. However, the disclosure herein of any information which is relevant in connection with more than one section of such agreement shall be deemed adequate in all respects notwithstanding the fact that such information is disclosed herein only with reference to one section.

Section 2.6

Claims and threatened litigation:

Seller has been put on notice of a possible infringement of Unisys patent 4,558,302, covering the so-called LZW data-compression algorithm.

Section 2.8(c)

(i)     Contracts under which Seller paid $1,500,000 or more in Business related royalties, additional license fees and revenue sharing during the period 8/1/94 - 7/31/95:

    (1)     February 7, 1987 Development and License Agreement now in effect between Seller and Microsoft Corporation

    (2)     March 8, 1993 International OEM Distribution Agreement now in effect between Seller and Locus Computing Corporation

(ii)     Customers from whom Seller received $1,500,000 or more in Business related royalties, additional license fees and revenue sharing during the period 8/1/94 - 7/31/95:*

    See Attachment A

NOVELL-SCO-Proprietary (Restricted)
Not for disclosure to third parties
- 1 -

CONFIDENTIAL

(iii)    Contracts now in existence in which Seller granted most favored nation pricing or exclusive marketing rights related to any Business related product, group of products, or territory:

> See Attachment B

*Pursuant to various Software Agreements and Sublicensing Agreements administered by Seller's Licensing Organization.*

Section 2.8(f)

(f)    Contracts containing rights for a customer to sublicense Business related source or binary code without additional payments to Seller:

> (1)    January 1, 1994 Software License and Distribution Agreement now in effect between Seller and Sun Microsystems, Inc.

> (2)    June 9, 1986 Sublicensing Agreement now in effect between Seller and Silicon Graphics, Inc.

Section 2.10

(i)    Intellectual Property:

Attachment C to this Schedule contains the most current listing of pending and issued applications for trademarks covering products of the Business.

Attachment D to this Schedule contains a listing of pending and issued applications for patents covering products of the Business.

Attachment E to this Schedule contains a listing of Seller's copyright registrations covering product(s) relating to the Business.

NOVELL-SCO-Proprietary (Restricted)
Not for disclosure to third parties
- 2 -

CONFIDENTIAL

(ii)    Contracts under which Seller received Business-related revenues in excess of $2,000,000 in the twelve month period ending 7/31/95:

    See Attachment A

(iii)    Contracts pursuant to which Seller was obligated to pay Business-related royalties of $1,000,000 or more over the period 8/1/94-7/31/95:

    See Attachment F

(iv)    Contracts containing Business-related rights which are non-perpetual or which are terminable in the event of acquisition:

    See Attachment G

(v)    Claims of infringement:

    See entry for Section 2.6 above

Section 2.11(a)

Real property and leases:

The Business (excluding outside sales and support activities conducted in the ordinary course) is primarily concentrated in a facility leased from Exxon Corporation in Florham Park, New Jersey. A copy of the current lease covering such facility is appended hereto as Attachment H. Other facilities in which relatively minor portions of the Business are conducted are located in San Jose, California, Orem, Utah and Provo, Utah.

Section 2.14

    See Attachment A

NOVELL-SCO-Proprietary (Restricted)
Not for disclosure to third parties

CONFIDENTIAL

SCO1185964

Section 2.16

Estimated level of UnixWare software inventory as of October 11, 1995:

| | |
|---|---|
| U.S. / Canada | $1,516,860 |
| International | 750,700 |
| **Total** | $2,267,560 |

NOVELL-SCO-Proprietary (Restricted)
Not for disclosure to third parties

- 4 -

CONFIDENTIAL

SCO1185965

ATTACHMENT A

Largest Volume OEM Customers of Seller

| Sales Over $2 Million | Sales Over $1.5 Million | Sales Over $1 Million |
|---|---|---|
| Microsoft | Microsoft | Microsoft |
| AT&T | AT&T | AT&T |
| Hewlett-Packard | Hewlett-Packard | Hewlett-Packard |
| Fujitsu | Fujitsu | Fujitsu |
| NEC | NEC | NEC |
| Siemens-Nixdorf | Siemens-Nixdorf | Siemens-Nixdorf |
| ICL | ICL | ICL |
| Digital Equipment | Digital Equipment | Digital Equipment |
| IBM | IBM | IBM |
| Silicon Graphics | Silicon Graphics | Silicon Graphics |
| | Hitachi | Hitachi |
| | Motorola | Motorola |
| | | Cray |
| | | Stratus |
| | | Tandem |
| | | Mitsubishi |

SCO1185966