# EXHIBIT 2

Dockets.Justia.com

# AMENDMENT NO 1

## TO ASSET PURCHASE AGREEMENT

As of the effective date indicated below, the September 19, 1995 Asset Purchase Agreement (the "Agreement") between Novell, Inc. ("NOVELL") and The Santa Cruz Operation, Inc. ("SCO") is amended in the following respects.

A.    In the Recitals, Paragraph A, line 4 is amended to read as follows:

- - other products ("Auxiliary Products") which are directly related to UNIX and UnixWare (collectively, the - -

B    In Section 1.1, the following new paragraph (d) is added:

- - (d) <u>Right of First Refusal</u>.  The parties agree that, within a reasonable time after the Closing Date, they will enter into a separate agreement whereby Buyer will have a right of first refusal to purchase from Seller (i) all appropriate copies of publications relating to the Business and in the possession, custody or control of Seller's technical library located at its facility in Florham Park, New Jersey and (ii) physical assets, including lab equipment and financial accounting server(s), owned by Seller and used in the Business. Each such item will be valued at net book value as of November 1, 1995.  Such right of first refusal shall be exercisable until (1) February 29, 1996 as to the financial accounting server(s) and (2) January 31, 1996 as to all other items. - -

C.    In Section 1.2. paragraph (b):

(1)    The following clause is added at the beginning of the first sentence ("Buyer agrees ... Section 4.16 hereof".):

- - Except as otherwise provided in paragraph (e) of this Section 1.2. - -

NOVELL-SCO-Proprietary (Restricted)
Not for Disclosure to Third Parties

Page 1

CONFIDENTIAL

Execution Copy

(2)     Lines 14-15 are amended to read as follows:

- - The amounts of additional royalties to be paid in connection with Buyer's sale of the UnixWare products are identified in detail in Schedule 1.2(b) hereto.  Seller - -

D.     Section 1.2(d), is amended in its entirety to read as follows:

- - (d)  Asset Transfer and Transfer Taxes.  Notwithstanding any other provision of this Agreement, the Assets shall remain the property of Seller until expeditiously delivered to Buyer in the manner and at the locations prescribed as follows in this Section 1.2(d), or as subsequently agreed in writing.

Seller shall deliver and Buyer shall accept source code, object code, related documentation and other software assets described in Schedule 1.1(a) (collectively referred to as "Software Assets") only at Seller's facility in Florham Park, New Jersey.

In the event that Seller subsequently discovers Software Assets outside of New Jersey contemplated by this Agreement which have not heretofore been delivered to Buyer in New Jersey, Seller shall consult with Buyer to determine if Seller may destroy such assets in place without delivery to Buyer, or transport them to New Jersey or another location specified by Buyer for delivery to Buyer.

Seller represents that to its knowledge software documentation previously delivered to Buyer for the purpose of due diligence is the property of Seller, and Buyer agrees that it will destroy or return possession to Seller in New Jersey before title passes to Buyer.

Seller and Buyer agree that the license that Seller is entitled to exercise after Closing pursuant to Section 1.6 hereof is a right not sold to Buyer and as such is a right retained by Seller.

NOVELL-SCO-Proprietary (Restricted)
Not for Disclosure to Third Parties

CONFIDENTIAL

SCO1186001

Buyer shall pay and promptly discharge when due the entire amount of any and all sales and use taxes ("Sales Taxes") imposed or levied by reason of the sale of the Assets to Buyer. The parties shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any such Sales Taxes. If Seller is obligated to pay any of such Sales Taxes, Buyer shall reimburse Seller on demand for the amount of such payment. - -

E.    In section 1.2, the following new paragraphs (e) and (f) are added:

- - (e)  Revenues to be Retained by Buyer. Subject to the last sentence of paragraph (a) of Section 4.16 hereof, Buyer shall be entitled to retain 100% of the following categories of SVRX Royalties collected by Buyer:

(i)    fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a) hereof;

(ii)    source code right to use fees under existing SVRX Licenses from the licensing of additional CPU's and from the distribution by Buyer of additional source code copies;

(iii)    source code right to use fees attributable to new SVRX licenses approved by Seller pursuant to Section 4.16(b) hereof; and

(iv)    royalties attributable to the distribution by Buyer and its distributors of binary copies of SVRX products, to the extent such copies are made by or for Buyer pursuant to Buyer's own licenses from Seller acquired before the Closing Date through Software Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A.

Execution Copy

(f) _Monthly Reports._ Within one (1) calendar month following each calendar month in which SVRX Royalties [and royalties from Royalty-Bearing Products as contemplated in Schedule 1.2(b) hereof] are received by Buyer, Buyer shall provide to Seller, in electronic file format, a report detailing all such royalties. Such monthly reports shall be separately broken down by revenue type (i.e., source code right to use fees, gross and net binary per copy fees, and support fees), by product, by customer, by quarterly period by which distribution occurs, and by country (if provided by customer) of distribution. Each such report shall also detail, with respect to the revenues reported, any third party payments attributable to such revenues, broken down by the identity of such third parties and the applicable payments to each. Buyer shall provide Seller with a single point of contact to discuss specific additional revenue and unit information (by customer) which, in Seller's judgment, are appropriate to supplement such monthly reports. Buyer shall also provide to Seller, on a monthly basis, a report that reconciles monthly revenues reported (and accounts receivable) to cash remittances actually made to Seller by Buyer. - -

F.    In Section 1.4, line 8 is amended to read as follows:

- - in the loss or diminution thereof: provided, however, that Seller shall, as soon as practicable after the Closing Date and at its own expense, - -

G.    In Section 1.6, lines 1-2 are amended to read as follows:

- - 1.6 Seller's Licenses to Assets.  Concurrent with the Closing, Buyer and Seller shall enter into a license agreement providing Seller with a royalty free, perpetual - -

H.    In Section 4.13:

(1)    In the first paragraph, lines 5-6 are amended to read as follows:

- - is comparable to that offered by Seller. The Benefits Package - -

Execution Copy

(2)    The following new paragraphs are added at the end of the section:

- - For purposes of this Section 4.13, the term "Type 1 employee" means a person who (1) as of the effective date of this Agreement was employed by Seller in any technical, business or financial (but not sales) capacity in Seller's Operating System Division in Florham Park, New Jersey, Provo, Utah or San Jose, California or otherwise in connection with the Business and/or the Assets and (2) whose employment with Seller thereafter terminates under circumstances under which such employee is given severance benefits from Seller including payment ("Severance Payment") calculated for a prescribed interval ("Severance Period").

Buyer agrees that it will not knowingly offer employment to, or offer to hire as a contractor, any Type 1 employee until the Severance Period for such employee is completed.

In the event that for any reason Buyer offers employment to, or offers to hire as a contractor, any such employee before the end of the period contemplated in the preceding sentence, Buyer shall remit to Seller a prorated portion of such Severance Payment applicable to the period between February 1, 1996 and the date of such offer.  Such remittance shall be made to Seller within ten (10) days after such employee commences work on behalf of Buyer.

Seller agrees that prior to February 1, 1996, it will provide to Buyer a list of persons who are Type 1 employees.

Notwithstanding the above and except for normal attrition of previously hired employees, Buyer agrees not to hire any Type 1 employee for a period of 150 days from February 1, 1996.  If Buyer does then Buyer will remit to Seller the full Severance Payment made to such Type 1 employees. - -

CONFIDENTIAL

SCO1186004

I.    In Section 4.16, paragraph (a):

1.    The second sentence ("Within 45 days . . . preceding quarter") is amended to read as follows:

> - - Within one (1) calendar month following each calendar month in which SVRX royalties (and royalties from Royalty-Bearing Products) are received by Buyer [except for those SVRX Royalties to be retained in their entirety by Buyer pursuant to paragraph (e) of Section 1.2 hereof] Buyer shall remit 100% of all such royalties to Seller or Seller's assignee.  Buyer shall also provide to Seller, within six (6) days following the calendar month in which such royalties are received, and estimate of the total amount of such royalties.  - -

2.    In the last sentence ("In consideration . . . SVRX Royalties") the following is added at the end before the period:

> - - together with a remittance sufficient to cover applicable third party payments, (if any) which are attributable to distributions giving rise to such SVRX Royalties (and royalties from Royalty-Bearing Products) and for which Buyer has assumed Seller's obligation of payment to such third party. - -

J.    In Section 4.16, paragraph (b), the last sentence ("Buyer shall not . .  Merged Product") is amended to read as follows:

> - - Notwithstanding the foregoing, Buyer shall have the right to enter into amendments of the SVRX Licenses (i) as may be incidentally involved through its rights to sell and license UnixWare software or the Merged Product [as such latter term is defined in a separate Operating Agreement between the parties to be effective as of the Closing Date, a copy of which is  attached hereto as Exhibit 5.1(c)], or future versions of the Merged Product, or (ii) to allow a licensee under a particular SVRX License to use the source

CONFIDENTIAL

code of the relevant SVRX product(s) on additional CPU's or to receive an additional distribution, from Buyer, of such source code. In addition, Buyer shall not, and shall have no right to, enter into new SVRX Licenses except in the situation specified in (i) of the preceding sentence or as otherwise approved in writing in advance by Seller on a case by case basis. - -

K.      In Schedule 1.1(a):

1.      In Item I:

(i)      each occurrence of "UNIX and "UnixWare" is changed to read   - - UNIX, UnixWare and Auxiliary Products - -.

(ii)     line 3, before "technical" the word "appropriate" is added.

(iii)    line 5, before "engineering" the word "appropriate" is deleted.

(iv)     in the UNIX Source Code Products listing, the title is changed to "UNIX and UnixWare Source Code Products" and item D is amended to read as follows:

        - - The following foreign versions of UnixWare software :
        UnixWare 1.0 French
        UnixWare 1.0 German
        UnixWare 1.0 Italian
        UnixWare 1.0 Spanish

        UnixWare 1.1 French
        UnixWare 1.1 German
        UnixWare 1.1 Italian
        UnixWare 1.1 Spanish

NOVELL-SCO-Proprietary (Restricted)
Not for Disclosure to Third Parties

CONFIDENTIAL

UnixWare 1.1 Japanese

UnixWare 1.1. Chinese


UnixWare 2.01 French

UnixWare 2.01 German

UnixWare 2.01 Italian

UnixWare 2.01 Spanish

UnixWare 2.01 Japanese



(v)    in the <u>Products Under Development</u> listing, the following is added at the end:
- - F.   Amadeus Software - -


(vi)    the following new listing is inserted between the <u>Products Under Development</u> listing and the <u>Other Technology</u> listing:


- - <u>Auxiliary Products</u>
[as listed in Attachment 1 to this Schedule 1.1(a)] - -


2.    The following is added at the end of Item III:


- - N.   Agreements for development and licensing of Amadeus Software. - -


3.    Item IV is changed to read:


- - All master copies of UNIX. UnixWare and Auxiliary Software  owned by Seller. except as retained by Seller in connection with seller's licenses specified in Section 1.6 hereof. - -


NOVELL-SCO-Proprietary (Restricted)
Not for Disclosure to Third Parties

CONFIDENTIAL                                        SCO1186007

4.    In Item VI:

(i)    The first line is amended in its entirety to read as follows:

- - All contracts relating to the SVRX Licenses and Auxiliary Product Licenses (collectively "SVRX Licenses") listed below: - -

(ii)   The following is added to the list of SVR4 Licenses:

- - Auxiliary Products - -

L.    In Schedule 1.1(b), Item VII is amended to read as follows:

- - VII.  All accounts receivable or rights to payment concerning the Assets arising prior to the Closing Date, subject to appropriate payments to Buyer in several situations involving (a) prepayments received by Seller prior to the Closing Date under its customer agreements which cover orders for licenses to and/or support for UnixWare products that remain unfulfilled as of the Closing Date or (b) any other rights to payments which accrued to Seller prior to the Closing Date under such agreements for such unfulfilled orders for UnixWare Products.  Such situations are described in Attachment 1 to this Schedule 1.1(b). The parties agree to adapt more detailed procedures, where appropriate, to deal with such payments in each of such situations within ninety (90) days after the Closing Date.

M.    In Schedule 1.2(b), paragraph (b), the first sentence is amended to read as follows:

- - (b) Amount of Royalties.  Attachment 1 to this Schedule 1.2(b) represents Seller's annual forecast, as of the Closing Date, of the potential estimated market for units of Unix System V, UnixWare, Eiger, MXU and White Box software (the "Plan" or "Unit Plan"). - -

N.     In Exhibit 5.1(c) paragraph (b) is rewritten in its entirety as follows:

- - Commencing November 1, 1995. Seller shall be responsible for bearing a certain amount of the reasonable, auditable and fully burdened costs incurred on a combined basis by Buyer and Seller for the completion of the GA version of the Eiger product, as follows:

      (i)     100% of such costs incurred by SELLER from November 1, 1995 up to the Closing Date (estimated to be about $2,600,000);

      (ii)    50% of the first $5,000,000 of such costs incurred by both Companies after the Closing Date;

      (iii)   25% of the next $10,000,000 of such costs incurred by both Companies after the Closing Date.

Buyer and Seller will separately maintain records of such costs incurred. On a calendar month basis after the Closing Date, Buyer and Seller will exchange information as to such development costs incurred in that month.  Each party ("first party") will render payment to the other party  for any amounts such first party is responsible for which are in excess of all amounts such first party  has incurred.  Each such payment shall be remitted by such first party within thirty (30) days after receipt from the other party of an invoice for such excess amount.

O.     Attachments A, B and C to this Amendment No. 1 are incorporated as Attachment 1 to Schedule 1.1(a). Attachment 1 to Schedule 1.1(b). and Attachment 1 to Schedule 1.2(b), respectively.

All other terms and conditions of the Agreement shall remain in full force and effect.

The parties have executed this Amendment No. 1 through their duly authorized representatives on the respective dates indicated below.  The effective date of this Amendment No. 1 shall be the later of such respective dates.

THE SANTA CRUZ OPERATION, INC.

By: _____

Printed Name:  Alok  Mohan

Title:  Chief  Executive  Officer

Date:  December 6, 1995

NOVELL, INC.

By: _____

Printed Name:  R. Duff  Thompson

Title:  Senior Vice President – Corporate Development

Date:  December 6, 1995

CONFIDENTIAL

SCO1186010

## ATTACHMENT A

## Listing of Auxiliary Products

```
Open Network Computing+
386 Implementation of UNIX System V Release 4
Multi-National Language Supplement
386 Implementation of UNIX System V Release 4
Multi-National Language Supplement
3B2 Implementation of UNIX System V Release 4
Multi-National Language Supplement
Application Source Verifier Release 2.0
Artus
C Compilation System for Motorola 68000
C Optimized Compilation System for UNIX System V
386/486
C++ Documents
C++ Language System Release 2.1
C++ Language System Release 3.0 and 3.0.1
C++ Language System Release 3.0.2
C++ Language System Release 3.0.3
C++ Object Interface Library Release 1.1
C++ Standard Components Release 2.0
C++ Standard Components Release 2.0.1
C++ Standard Components Release 3.0
C++ Standard Libraries Release 2.0
C++ Standard Libraries Release 3.0
C++ Standard Library Extension Release 1.0
C++LS 2.0
C++Translator
CFRONT Release 1.2
Chinese System Messages Implementation of UNIX
System V Release 4 System Messages
Distributed Manager/Framework & Host Manager
Release 1.0
Distributed Manager/Framework & Host Manager
Technology Licensing Program 1
Distributed Manager/Framework & Host Manager U.I.
Early Access
Distributed Manager/Print Manager Release 1.0
Distributed Manager/Print Manager Technology
```

Licensing Program 1
Distributed Manager/Print Manager Technology
Licensing Program 1
Distributed Manager/Print Manager U.I. Early
Access
DM/SM-TLP1
Documentation Reproduction Provision - UNIX System
V Handbook
Documentation Reproduction Provision - UNIX System
V Programming Books
Documentation Reproduction Provision - UNIX System
V Reference Books
Documentation Reproduction Provision - UNIX System
V User_s and Administrator_s Books
European Supplement Release 3.2
European System Messages Release 3.2
French Application Environment1.0/3b2
French System Messages Implementation of UNIX
System V Release 4 System Messages
French System Messages Implementation of UNIX
System V Release 4.1 Enhanced Security System
Messages
German Application Environment
German System Messages Implementation of UNIX
System V Release 4 System Messages
German System Messages Implementation of UNIX
System V Release 4.1 Enhanced Security System
Messages
Hindi System Messages Implementation of UNIX
System V Release 4 System Messages
Intel386 Microprocessor Implementation of VERITAS
File System (VxFS) Release 1.0
Intel386 Microprocessor Implementation of VERITAS
Visual Administrator Release 1.01
Intel386 Microprocessor Implementation of VERITAS
Volume Manager (VxVM) Release 1.01
Intel386 Microprocessor Implementation of VERITAS
Volume Manager (VxVM) Release 1.1
Intel386 Microprocessor Implementation of VERITAS
Volume Manager (VxVM) Release 1.1.1
Italian System Messages Implementation of UNIX
System V Release 4.1 Enhanced Security System
Messages
Italian System Messages Implementation Of UNIX
System V Release 4 System Messages

Japanese Application Environment I/O Rel 1.0
Japanese Application Environment Release 2.0
Japanese Application Environment Release 2.0
Japanese Application Environment Release 2.1
Japanese Environment for SVR4.2
Japanese Extension Implementation of UNIX System V
Release 4.2
Japanese I/O Release 1.0
Japanese System Messages Implementation of UNIX
System V Release 4 System Messages
Japanese System Messages Implementation of UNIX
System V Release 4.1 Enhanced Security System
Messages
Japanese System Messages Release 3.2
Korean System Messages Implementation of UNIX
System V Release 4 System Messages
Optimizing C Compiler for Intel, Release 3.0
Spanish System Messages Implementation of UNIX
System V Release 4 System Messages
Spanish System Messages Implementation of UNIX
System V Release 4.1 Enhanced Security System
Messages
System V Release 2.0 Machine Readable
Documentation
System V Release 3.0 Documentation Reproduction
Provision
System V Release 3.1 Documentation Reproduction
Provision
System V Release 3.2 Documentation Reproduction
Provision
System V Verification Suite Release 2
System V Verification Suite Release 3
System V Verification Suite Release 4
UNIX System V French System Messages Release 3.2
UNIX System V German System Messages Release 3.2
UNIX System V Release 1.0 for 3B2 Multi-National
Language Supplement
UNIX System V Release 1.0 for Intel 386 Multi-
National Language Supplement
UNIX System V Release 3.2 386 Doc. Reproduction
Provision
UNIX System V Release 3.2 for Intel 386 Multi-
National Language Supplement
UNIX System V Release 3.2 for Intel 386 Multi-
National Language Supplement

NOVELL-SCO-Proprietary (Restricted)
Not for Disclosure to Third Parties

CONFIDENTIAL

SCO1186013

```
UNIX System V Release 3.2 Multi-National Language
Supplement
UNIX System V Release 4 European Language
Supplement
UNIX System V Release 4 STREAMS-Based Korean
Input/Output Subsystem
UNIX System V Release 4.0 386 Doc. Reproduction
Provision
UNIX System V Release 4.0 3B2 Doc. Reproduction
Provision
UNIX System V Release 4.0 i860 Doc. Reproduction
Provision
UNIX System V Release 4.2 European Language
Supplement, Version 1
UNIX System V Release 4.2 MP Japanese Extension
UNIX Time Sharing Operating System Phototypesetter
and C Compiler Edition #7
USL Standard C Development Environment for the 860
Implementation of UNIX System V Release 4.0
Veritas File System (VxFS) Release 1.3 for UNIX
System V Release 4.2
XWIN Graphical Windowing System Release 3.0
XWIN Graphical Windowing System Release 4.0
XWIN Graphical Windowing System Release 4.0i
```

ATTACHMENT B

Treatment of Certain Prepayments and Rights

to Payment Specified in Item VII of Schedule 1.1(b)

Situation 1 - where the Seller customer contract (other than in Situation 3) involves a prepayment and/or an accrued right to payment (collectively "prepayment") that applies to a mix of UnixWare and non-UnixWare products.

Seller will send a notice requiring the customer to specify in writing (i) whether it wants any of the prepayment to be allocated to the UnixWare products and (ii) if so, how much of such prepayment should be so allocated. The notice shall state that if the customer does not respond

within 30 days after the date of transmission by Seller, none of such prepayment shall apply to the UnixWare products. The notice shall also specify that any future prepayment under the contract in question will not apply to UnixWare products, and that orders for UnixWare products after the prepayment allocation is used up must be directed to Buyer.

If the customer elects a UnixWare allocation of $100,000 or more, or makes a UnixWare allocation of an unspecified amount, Buyer will fulfill all of such customer's orders of UnixWare products against the unused prepayment allocation (or prepayment, if no allocation is made). Buyer will receive from Seller a payment reflecting a pro-rated portion of such prepayment allocation (or such prepayment). Such payment shall be deemed to be royalties received by Buyer for the UnixWare products in question.

If the customer allocates less than $100,000 of the prepayment to UnixWare products in response to such notice, Buyer will fulfill all of such customer's orders for UnixWare products against the prepayment and will receive from Seller its actual and reasonable costs (including third party royalties assumed by Buyer under this Agreement) of such fulfillment plus a markup of five percent (5%).

Situation 2 - where Seller's customer's contract (other than in Situation 3) calls for prepayments applicable to UnixWare products only.

If the prepayment is $100,000 or more, the roles of Seller and Buyer set forth in Situation 1 for an allocation of $100,000 or more shall apply.

If the prepayment is less than $100,000, the roles of Seller and Buyer set forth in Situation 1 for an allocation of less than $100,000 shall apply.

Situation 3 - Seller's customer contracts with Siemens-Rolm, TMAC, Microport, Tatung and Sysorex.

These contracts involve prepayments that may apply either to a mix of UnixWare and non-UnixWare products (TMAC and Sysorex) or to UnixWare products alone. Irrespective of the type of allocation, the roles of Seller and Buyer set forth for a UnixWare allocation of $100,000 or greater shall apply.

For a period of up to sixty (60) days after the Closing Date Buyer and Seller will cooperate to attempt to identify additional ones of Seller's customers who have prepayments which could be allocated to UnixWare products in the amount of $100,000 or more. For each of such additional customers so identified, the roles of Buyer and Seller shall be as mutually agreed.

CONFIDENTIAL                                                    SCO1186016

Execution Copy

ATTACHMENT C

Unit Plan

Table A below represents Seller's forecast of the rates of shipments, through all appropriate channels, of units of the following offerings of Unix System V, UnixWare, Eiger, MXU and White Box software:

◊   Single user and multi-user versions
◊   Upgrades to existing units
◊   Processor upgrades
◊   Other components, specifically:
    •   Software developers kit
    •   OnLine Data Manager
    •   Locus Merge
◊   All Units which Buyer receives payment for, directly or indirectly

Table A

Units (in thousands)

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| SCO Shipments | 216.40 | 216.40 | 216.40 | 216.40 | 216.40 | 216.40 | 216.40 | 216.40 |
| UnixWare Binary - Indirect | 57.50 | 99.10 | 131.50 | 107.00 | 39.20 | 0.00 | 0.00 | 0.00 |
| UnixWare - OEM | 10.10 | 35.50 | 55.60 | 68.10 | 68.10 | 49.30 | 34.50 | 0.00 |
| MXU Binary - Indirect | 0.00 | 0.00 | 43.80 | 160.40 | 282.60 | 334.40 | 305.30 | 201.30 |
| MXU - OEM | 0.00 | 0.00 | 13.90 | 45.40 | 91.90 | 148.00 | 186.50 | 233.20 |
| WBOS Binary - Indirect | 0.00 | 0.00 | 0.00 | 0.00 | 70.60 | 222.90 | 457.90 | 805.40 |
| WBOS - OEM | 0.00 | 0.00 | 0.00 | 0.00 | 10.20 | 49.30 | 124.40 | 233.20 |
| SVRX converted units | 0.00 | 33.80 | 69.80 | 108.40 | 149.50 | 193.30 | 239.90 | 289.60 |
| SVRX remaining | 1072.00 | 1091.80 | 1112.00 | 1132.60 | 1153.60 | 1174.90 | 1196.60 | 1218.80 |
| Total Unix Software Units | 1356.00 | 1476.60 | 1643.00 | 1838.30 | 2082.10 | 2388.50 | 2761.50 | 3197.90 |

# EXHIBIT 3

## BILL OF SALE

Reference hereby is made to that certain Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995 (together, the "Agreement"). Capitalized terms used in this Bill of Sale and not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets. Excepted from the transfer of Assets pursuant to the preceding sentence are the rights reserved by Seller pursuant to that certain Technology License Agreement between Seller and Buyer dated as of December 6, 1995.

Seller does not sell to Buyer and Buyer does not purchase from Seller any interest in any of Seller's assets other than the Assets.

This Bill of Sale shall be binding upon the successors and assigns of Seller and shall inure to the benefit of the successors and assigns of Buyer as permitted under the Agreement.

It is acknowledged and agreed that this Bill of Sale is intended only to document the sale and assignment of the Assets to Buyer, and that the Agreement is the exclusive source of the agreement and understanding between Seller and Buyer respecting the Assets. Nothing in this Bill of Sale shall limit, expand or otherwise affect any of the representations, warranties, agreements or covenants contained in the Agreement. If any provision of this Bill of Sale is construed to conflict with any provision of the Agreement, the provision of the Agreement shall control.

IN WITNESS WHEREOF, Seller has cause this Bill of Sale to be duly executed as of the 6th day of December, 1995.

NOVELL, INC.

By: _____

Title: Senior Vice President – Corporate Development

Acknowledged this 6th day of December, 1995:

THE SANTA CRUZ OPERATION, INC.

By: _____

Title: Chief Executive Officer

E:\PUBLIC\SD\0145678.01

# EXHIBIT 4

## TECHNOLOGY LICENSE AGREEMENT

This Agreement is made between Novell. Inc. ("NOVELL"), a Delaware corporation, and The Santa Cruz Operation, Inc. ("SCO"), a California corporation.   The effective date of this Agreement shall be the Closing Date of the Asset Purchase Agreement.

WHEREAS, pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licenses for Licensed Technology, including related documentation and support.

NOW, THEREFORE, for mutual consideration, the adequacy and sufficiency of which are acknowledged, the parties agrees as follows.

## I.     DEFINITIONS

For purposes of this Agreement:

"Asset Purchase Agreement" means the September 19, 1995 Asset Purchase Agreement between NOVELL and SCO, as amended by Amendment No. 1 to the Asset Purchase Agreement dated as of December 6, 1995.

"Assigned Vendor Agreement" means an agreement (i) originally entered into by NOVELL, or a predecessor in interest of NOVELL, for the acquisition of software to be incorporated into or bundled with Licensed Technology, and (ii) imposing payment obligations on NOVELL that were assumed by SCO under the Asset Purchase Agreement.

NOVELL-SCO -Proprietary (Restricted)
Not for disclosure to third parties

CONFIDENTIAL

SCO1186018

The terms "Assets" "Change of Control", "Closing Date", "Licensed Technology" and "Transitional Contracts" shall have the respective meanings attributed to such terms in the Asset Purchase Agreement.

## II.    NOVELL'S RETAINED LICENSES

A.    Effective upon  the Closing Date and in connection with the transfer of the Assets by NOVELL to SCO pursuant to  the Asset Purchase Agreement, NOVELL hereby retains, with the consent of SCO and, shall have a non-exclusive, non-terminable, world-wide, fee-free license to

(1) use, reproduce and modify, and authorize its customers to use, reproduce and modify, Licensed Technology (including related documentation) in their respective internal business operations; and

(2) subject to paragraphs B and C of this Section II, to sublicense and distribute, and authorize its customers to sublicense and distribute, such Licensed Technology and modifications thereof, in source and binary form; provided, however, that (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering.  SCO understands and acknowledges that such restrictions on sublicensing and/or distribution shall not affect any rights specifically retained by NOVELL under the Asset Purchase Agreement, including but not limited to rights under Transitional Contracts.

B.    In the event of a Change of Control of SCO, and commencing with the effective date of such  Change of  Control, the proviso  in subparagraph IIA(2) setting forth

restrictions on the sublicense and/or distribution of Licensed Technology and modifications thereof shall cease to exist.

C.     In the event of a Change of Control of NOVELL, and commencing with the effective date of such Change of Control, the term "Composite Offering" in the proviso of subparagraph IIA(2) above shall be restricted to bundled and integrated offerings of NOVELL or its customers, as the case may be, that have been developed or substantially developed as of the effective date of such Change of Control.

III.     OWNERSHIP

As between NOVELL and SCO:

(1)     Ownership of Licensed Technology shall reside in SCO.

(2)     Ownership of any modifications made to Licensed Technology pursuant to the licenses specified in Section II above shall reside in NOVELL.

IV.     REIMBURSEMENT TO SCO FOR CERTAIN PAYMENT OBLIGATIONS

In the event that the exercise of any of NOVELL's licenses specified in Section II above results in an obligation on the part of SCO to remit any payment to a third party under an Assigned Vendor Agreement, NOVELL shall reimburse SCO for the amount of any such payment remitted by SCO to such third party.

V.     SUPPORT

NOVELL-SCO -Proprietary (Restricted)
Not for disclosure to third parties

CONFIDENTIAL

SCO1186020

With respect to any version or load of the "Eiger" product forming part of the Licensed Technology, SCO shall provide to NOVELL a reasonable degree of support to assist NOVELL's licensing activities pursuant to Section II above.

## VI.    DISCLAIMER OF WARRANTY

THE PARTIES AGREE THAT LICENSED TECHNOLOGY IS PROVIDED "AS IS".  ANY AND ALL WARRANTIES OF ANY KIND WHATSOEVER WITH RESPECT TO LICENSED TECHNOLOGY, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES AGAINST INFRINGEMENT OF ANY THIRD PARTY PROPRIETARY RIGHT, ARE EXPRESSLY DISCLAIMED AND EXCLUDED.

## VII.    ASSIGNMENT

A.    Neither party hereto may assign this Agreement or any of its rights hereunder to any other person or entity without the prior written consent of the other party; provided, however, that either party may assign its rights and delegate its obligations under this Agreement to its corporate parent, another subsidiary of such parent, or a third party transferee of substantially the entire portion of such party's business to which this agreement relates.

B.    Subject to Paragraph A of this Section, this Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of NOVELL and SCO and is not intended to confer upon any other person any rights or remedies hereunder.

## VIII.    ENTIRE AGREEMENT

NOVELL-SCO -Proprietary (Restricted)
Not for disclosure to third parties

- 4 -

This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter.

## IX.   NO WAIVER

No waiver, modification or amendment of any provision of this Agreement shall be effective unless made in writing and signed by duly authorized representatives of both parties.

## X.   GOVERNING LAW

This Agreement shall be governed by, and construed in accordance with, the substantive laws of California.

IN WITNESS WHEREOF, the parties have executed this Agreement through their duly authorized representatives on the respective dates indicated below.

NOVELL, INC.                              THE SANTA CRUZ OPERATION, INC.

By: _____            By: _____

Printed Name: R. Duff Thompson            Printed Name: Alok Mohan

Title: Senior Vice President - Corporate Development    Title: Chief Executive Officer

Date: December 6, 1995                    Date: December 6, 1995

NOVELL-SCO -Proprietary (Restricted)
Not for disclosure to third parties

CONFIDENTIAL                                                    SCO1186022

# EXHIBIT 5

# AMENDMENT No. 2
## TO THE ASSET PURCHASE AGREEMENT

As of the ____ day of _____ , 1996, the September 19, 1995 Asset Purchase Agreement (the "Agreement") between Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("SCO") is amended in the following respects.

A.  With respect to Schedule 1.1(b) of the Agreement, titled "Excluded Assets", Section V, Subsection A shall be revised to read:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

B.  Except as provided in Section C below, and notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows:

1.  Should either party become aware of any such potential transaction, it will immediately notify the other in writing.

2.  Any meetings and/or negotiations with the licensee will be attended by both parties, unless agreed otherwise. Novell's participation will be by personnel who are engaged in corporate business development.

3.  Any written proposal to be presented to the licensee, including drafts and final versions of any proposed amendments to the SVRX licenses, will be consented to by both parties prior to its delivery to the licensee, unless agreed otherwise.

4.  Prior to either parties' unilateral determination as to the suitability of any potential buy-out transaction, the parties will meet face to face and analyze the potential merits and disadvantages of the transaction. No such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy.

5.  This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

G:\LEGAL\TRANSFER\SCO\AMEND3 1-0

6.     The parties agree that no member of Novell's sales force will receive a bonus, commission, quota attainment credit, or other type of sales incentive as a result of the buy-out of an SVRX license.

C.     Novell may execute a buy-out with a licensee without any approval or involvement of SCO, and will no longer be bound by any of the requirements stated in Section B. above, if: (I) SCO ceases to actively and aggressively market SCO's UNIX platforms; or (ii) upon a change of control of SCO as stated in schedule 6.5(g) of the Agreement.

D.     Novell and SCO agree to indemnify and hold harmless the other from and against any and all losses, liabilities, judgments, and costs incurred ("Liability") if either causes the other to incur Liability under Section 10 of Amendment No. X to Software Agreement SOFT-00015 as amended, Sublicensing Agreement SUB-00015A as amended, Software Agreement SOFT-00015 Supplement No. 170 as amended, and Substitution Agreement XFER-00015B ("Amendment No. X").

In witness whereof, the parties have executed this Amendment No. 2 to be signed by their duly authorized representatives as of the date first written above.

THE SANTA CRUZ OPERATION, INC.

By:_____

Name:_____

Title:_____

NOVELL, INC.

By: _James R Tolonen_ (signature)

Name: _James R Tolonen_

Title: _EUP & CFO_

G:\LEGAL\TRANSFER\SCO\AMEND3.1-0

6.   The parties agree that no member of Novell's sales force will receive a bonus, commission, quota attainment credit, or other type of sales incentive as a result of the buy-out of an SVRX license.

C.   Novell may execute a buy-out with a licensee without any approval or involvement of SCO, and will no longer be bound by any of the requirements stated in Section B. above,  if: (I) SCO ceases to actively and aggressively market SCO's UNIX platforms; or (ii) upon a change of control of SCO as stated in schedule 6.3(g) of the Agreement.

D.   Novell and SCO agree to indemnify and hold harmless the other from and against any and all losses, liabilities, judgments, and costs incurred ("Liability") if either causes the other to incur Liability under Section 10 of Amendment No. X to Software Agreement SOFT-00015 as amended, Sublicensing Agreement SUB-00015A as amended, Software Agreement SOFT-00015 Supplement No. 170 as amended, and Substitution Agreement XFER-00015B ("Amendment No. X").

In witness whereof, the parties have executed this Amendment No. 2 to be signed by their duly authorized representatives as of the date first written above.

THE SANTA CRUZ OPERATION, INC.                    NOVELL, INC.

By: _____                    By: _____

Name: _____                    Name: _____

Title: _____                    Title: _____

CONFIDENTIAL                     SCO1451875

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


THE SCO GROUP, INC.,

    Plaintiff and
    Counterclaim Defendant,

 vs.                   C.A. No. 2:04CV00139

NOVELL, INC.,

    Defendant and
    Counterclaim Plaintiff.
_____/


Deposition of

ALOK MOHAN

February 23, 2007


Reported by
Katherine E. Lauster
CSR 1894


SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California  94010-1204
(415) 402-0004
(650) 692-8900
FAX:  (415) 402-0005


SHARI MOSS & ASSOCIATES           (415 ) 402-0004

bc655717-7cea-4ae3-9faa-01e0e23d222a

Page 6

08:59:51 1      THE VIDEOGRAPHER: Here begins the
09:42:06 2   videotape number 1 of Volume 1 in the deposition of
09:42:12 3   Alok Mohan in the matter of the SCO Group, Inc.,
09:42:18 4   versus Novell, Inc. in the United States District
09:42:24 5   Court of Utah, Central Division. The Case Number
09:42:27 6   is 2:04CV00139.
09:42:30 7      Today's date is February 23rd, 2007. The
09:42:34 8   time on the video monitor is 9:42. The video
09:42:39 9   operator today is Vincent Spanier, contracted by
09:42:42 10  Eureka Street Legal Video at 511 Eureka Street, San
09:42:47 11  Francisco, California, telephone: 415.643.9190.
09:42:53 12  This video deposition is taking place at 6001 La
09:42:56 13  Madrona Drive, Santa Cruz, California, and was
09:43:01 14  noticed by Morrison & Foerster.
09:43:04 15     Counsel, please identify yourselves and
09:43:07 16  state whom you represent.
09:43:09 17     MR. NORMAND: Edward Normand for SCO
09:43:09 18  Group and the witness.
09:43:13 19     MR. TIBBITTS: Brian Tibbitts, General
09:43:15 20  Counsel for SCO Group and the witness.
09:43:19 21     MR. BRAKEBILL: Ken Brakebill for Novell.
09:43:22 22     THE VIDEOGRAPHER: The court reporter's
09:43:24 23  name Kathy Lauster of Shari Moss and Associates.
09:43:25 24     Would the re- --- oh, would you identify
09:43:26 25  yourself for the record, please?

Page 7

09:43:28 1      LAURA JOHNSON: Laura Johnson, Boies,
09:43:29 2   Schiller & Flexner.
09:43:38 3      THE VIDEOGRAPHER: Would the reporter
09:43:38 4   please swear in the witness?
09:43:41 5         ALOK MOHAN,
09:43:41 6   having been first duly sworn, testified as follows:
09:43:41 7      THE VIDEOGRAPHER: Please begin.
09:43:41 8      EXAMINATION BY MR. BRAKEBILL
09:43:42 9   Q. Good morning, Mr. Mohan.
09:43:43 10  A. Good morning.
09:43:44 11  Q. How are you today?
09:43:45 12  A. Good.
09:43:59 13     Is that better?
09:44:01 14     THE VIDEOGRAPHER: Thank you.
09:44:02 15  BY MR. BRAKEBILL:
09:44:02 16  Q. Do you understand you're here today to
09:44:04 17  give some testimony, among other things, about the
09:44:07 18  transaction between Novell and Santa Cruz Operation
09:44:12 19  in 1995?
09:44:13 20  A. Yes.
09:44:13 21  Q. In 1995 were you the President of Santa
09:44:15 22  Cruz Operation?
09:44:17 23  A. I was CEO around that time, '95 to '98.
09:44:23 24  Q. Were you President and CEO of Santa Cruz
09:44:25 25  Operation in 1995?

Page 8

09:44:27 1   A. I was chief operating officer for a short
09:44:31 2   while and then I became CEO.
09:44:33 3   Q. Do you remember what your position was at
09:44:36 4   the time of the transaction between Novell and
09:44:40 5   Santa Cruz?
09:44:42 6   A. I was the CEO.
09:44:45 7   Q. Were you also a member of the Board of
09:44:47 8   Directors?
09:44:49 9   A. Yes.
09:44:49 10  Q. And would it be fair -- what would --
09:44:52 11  were you aware that there was a contract relating
09:44:55 12  to the transaction between Novell and Santa Cruz?
09:45:01 13  Correct?
09:45:02 14  A. Yes.
09:45:03 15  Q. Would it be fair to say that your
09:45:06 16  involvement in the Novell/Santa Cruz deal was only
09:45:10 17  at a high level?
09:45:11 18     MR. NORMAND: Objection to form.
09:45:15 19     THE WITNESS: The -- I was involved as a
09:45:17 20  CEO, at the CEO level.
09:45:20 21  BY MR. BRAKEBILL:
09:45:20 22  Q. Would it be fair to say that your
09:45:22 23  involvement as CEO for Santa Cruz on the
09:45:25 24  Novell/Santa Cruz transaction was only at a high
09:45:29 25  level?

Page 9

09:45:30 1      MR. NORMAND: Objection to form.
09:45:31 2      THE WITNESS: What do you mean by "high
09:45:32 3   level"?
09:45:33 4   BY MR. BRAKEBILL:
09:45:33 5   Q. Do you recall having characterized your
09:45:35 6   involvement in the Novell/Santa Cruz transaction as
09:45:38 7   at the high level?
09:45:41 8   A. Well, I was the CEO, and there were a lot
09:45:45 9   of people involved in the transaction from our
09:45:47 10  side. So I was involved as a CEO.
09:45:51 11  Q. Do you recall giving a declaration in
09:45:53 12  this matter?
09:45:55 13  A. I've given a declaration, yes.
09:45:57 14  Q. And do you recall having characterized
09:45:59 15  your involvement in the Novell/Santa Cruz
09:46:01 16  transaction as at the high level?
09:46:08 17  A. I could read it.
09:46:08 18     MR. BRAKEBILL: To save some time, let me
09:46:14 19  just mark as -- as a new exhibit -- I believe,
09:46:20 20  Exhibit 69.
09:46:33 21     (Deposition Exhibit Number 69 was marked
09:46:33 22     for identification.)
09:46:35 23  BY MR. BRAKEBILL:
09:46:35 24  Q. Mr. Mohan, we're handing you a document
09:46:40 25  which we've marked as Exhibit 69 in this case, and

3 (Pages 6 to 9)

bc655717-7cea-4ae3-9faa-01e0e23d222a

Page 138

13:45:31  1      A.  I assume, yes.
13:45:32  2      Q.  And I'm trying to find out the basis of
13:45:35  3  your belief.
13:45:35  4          (Mr. Tibbitts entered the deposition
13:45:39  5          room.)
13:45:39  6  BY MR. BRAKEBILL:
13:45:40  7      Q.  Is it true that if I wanted to find out
13:45:42  8  what rights Novell did retain I could look at the
13:45:44  9  contract?
13:45:45 10      A.  I don't know that.
13:45:46 11      Q.  Okay.  Was it a fair characterization
13:45:51 12  that the -- that Novell was retaining no rights,
13:45:54 13  with the exception that it was retaining a revenue
13:45:59 14  stream, and it could do something to protect that
13:46:04 15  revenue stream?
13:46:05 16      A.  That's right.  That's my understanding.
13:46:07 17          MR. NORMAND:  Objection to form.
13:46:08 18  BY MR. BRAKEBILL:
13:46:12 19      Q.  Now, do you have a personal belief as
13:46:14 20  to -- I take it you have a personal belief that no
13:46:17 21  copyrights were transferred -- I'm sorry, that
13:46:20 22  Novell retained no copyrights as part of this
13:46:23 23  transaction?
13:46:24 24          MR. NORMAND:  Objection to form.
13:46:25 25          THE WITNESS:  My belief is that we bought

Page 139

13:46:27  1  the business, except for the revenue stream.  And
13:46:30  2  when we bought the business everything came with
13:46:31  3  it.
13:46:32  4  BY MR. BRAKEBILL:
13:46:34  5      Q.  You believe that Santa Cruz got the Unix
13:46:37  6  copyrights to through the APA; is that right?
13:46:41  7      A.  I believe --
13:46:42  8          MR. NORMAND:  Objection to form.
13:46:43  9          THE WITNESS:  I believe I bought the
13:46:45 10  whole business.  That includes all kinds of stuff.
13:46:47 11  And -- and, you know, that's the answer, I think we
13:46:52 12  bought -- we got the whole thing.
13:46:54 13  BY MR. BRAKEBILL:
13:46:54 14      Q.  Okay.  But you haven't -- you haven't
13:46:55 15  confirmed -- is -- is part of the --
13:46:57 16      A.  Yes, they are --
13:46:56 17      Q.  Is Unix copyrights part of the Unix
13:47:00 18  business?
13:47:01 19      A.  Absolutely.
13:47:01 20      Q.  Okay.  So you believe that Santa Cruz got
13:47:03 21  the Unix copyrights?
13:47:04 22      A.  Santa --
13:47:05 23          MR. NORMAND:  Objection to form.
13:47:06 24          THE WITNESS:  Santa Cruz got the whole
13:47:07 25  business.  Includes lots of things.  Copyrights are

Page 140

13:47:10  1  part of it.
13:47:10  2  BY MR. BRAKEBILL:
13:47:10  3      Q.  And what is the basis for your
13:47:12  4  understanding that Santa Cruz got the Unix
13:47:15  5  copyrightsNow --
13:47:16  6          MR. NORMAND:  Objection to form.
13:47:17  7          THE WITNESS:  I'm being very specific,
13:47:18  8  and you're asking me about copyrights.  I'm talking
13:47:21  9  about the business.  I believe we bought the
13:47:23 10  business, and the APA states that too.  We bought
13:47:26 11  the business, and in that business everything
13:47:29 12  belongs in that business, that's ours.
13:47:31 13  BY MR. BRAKEBILL:
13:47:32 14      Q.  Where --
13:47:33 15      A.  We bought it.
13:47:34 16      Q.  What is the basis of your opinion that
13:47:36 17  Santa Cruz got the business?
13:47:37 18          MR. NORMAND:  Objection to form.
13:47:39 19          THE WITNESS:  That -- that's -- that was
13:47:41 20  the whole discussion and intent, negotiations.
13:47:44 21  That's my recollection of what we were doing.
13:47:48 22  BY MR. BRAKEBILL:
13:47:49 23      Q.  Is there anything in the contract you can
13:47:50 24  point me to here today to support your belief that
13:47:53 25  Santa Cruz got the whole Unix business?

Page 141

13:47:55  1      A.  I can -- I can start going through line
13:47:57  2  item by line item, but I think that APA does talk
13:48:01  3  about the business and that we acquired the
13:48:03  4  business.
13:48:04  5      Q.  Okay.  You have before you Exhibit 1.
13:48:06  6  Can you point to me anything in there in support of
13:48:09  7  your view that Santa Cruz got the entire Unix
13:48:13  8  business in this transaction?
13:48:15  9          MR. NORMAND:  Objection to form.  Do you
13:48:17 10  mean short of having him read it, or do you want
13:48:20 11  him to read it?
13:48:21 12  BY MR. BRAKEBILL:
13:48:21 13      Q.  Do you need to read -- do you need to
13:48:23 14  read this document?
13:48:24 15          MR. NORMAND:  How would he not have to
13:48:25 16  read the document in order to find any provision
13:48:28 17  that supports his view, Ken?  That was your
13:48:32 18  question.  How could he not read the document?  I'm
13:48:36 19  asking you a question.  How could he not read the
13:48:39 20  document to do that?
13:48:40 21          MR. BRAKEBILL:  I don't think you need to
13:48:41 22  elevate your voice.
13:48:42 23          MR. NORMAND:  I think I do, because we've
13:48:44 24  been wasting time for two and a half hours, and now
13:48:47 25  you ask this question and express incredulity over

Page 222

16:28:01 1  previously been marked as Exhibit 1028. Exhibit
16:28:07 2  1028 is entitled "Press Release" under SCO
16:28:12 3  letterhead. The title of the press release is,
16:28:15 4  quote:
16:28:16 5       SCO Acquires Unix Business From Novell
16:28:18 6       And Licenses Netware Technology, end
16:28:21 7       quote.
16:28:23 8  Do you see that you're quoted in the second
16:28:25 9  paragraph of the first page?
16:28:31 10      A.  Yes.
16:28:35 11      Q.  And do you see that Robert Frankenberg,
16:28:38 12  Chairman and CEO of Novell, is quoted at the top of
16:28:41 13  the second page?
16:28:50 14      A.  Yes.
16:28:53 15      Q.  To your understanding, was this press
16:28:55 16  release one that was approved by both Santa Cruz
16:28:58 17  and Novell?
16:28:58 18      MR. BRAKEBILL:  Foundation, speculation.
16:29:01 19      THE WITNESS:  I would assume -- I would
16:29:03 20  assume that to be so.  Our process of press
16:29:07 21  releases -- we're a large enough company, 200 plus
16:29:11 22  million in revenue.  We had a process of running --
16:29:14 23  getting approvals, especially when you quote
16:29:17 24  somebody.  So that would be my -- my read on it,
16:29:20 25  that it would have gone through approvals.

Page 223

16:29:23 1  BY MR. NORMAND:
16:29:25 2       Q.  The press release states, on page 2, in
16:29:30 3  the first sentence of the second paragraph, quote:
16:29:33 4       According to the terms of the agreement,
16:29:35 5       SCO will acquire Novell's UnixWare
16:29:37 6       business and UNIX intellectual property,
16:29:40 7       end quote.
16:29:41 8  Do you see that language?
16:29:43 9       A.  Yes.
16:29:43 10      Q.  Does that language accurately reflect
16:29:45 11  your understanding of the transaction?
16:29:47 12      A.  This language is consistent with what
16:29:50 13  I've been saying today about we bought the
16:29:52 14  business.  We bought UnixWare and Unix intellectual
16:29:57 15  property, we bought the business, and that's what I
16:29:59 16  thought we were buying, and I still believe that's
16:30:03 17  what we bought.
16:30:04 18      Q.  Did you have occasion in the last several
16:30:06 19  years to become aware of -- of Novell's public
16:30:10 20  claim that it had not sold the Unix copyrights to
16:30:14 21  Santa Cruz?
16:30:15 22      A.  I had seen that, yes, somewhere.
16:30:18 23      Q.  What was your reaction when you saw that?
16:30:21 24      A.  I was absolutely surprised, because, as I
16:30:24 25  said, again, I've said I thought we had bought the

Page 224

16:30:28 1  business, and for them to say that they are -- that
16:30:31 2  they retained it was just not -- did not make any
16:30:35 3  sense to me, and I was just surprised.
16:30:39 4       Of course, I was not involved in any of
16:30:41 5  the businesses.  There was nothing for me to do.
16:30:49 6       Q.  Did anyone from Novell ever say to you,
16:30:52 7  prior to the execution of the APA, that Novell
16:30:55 8  intended to retain any Unix or UnixWare copyrights?
16:30:59 9       A.  No.
16:31:00 10      Q.  Did anyone from Santa Cruz ever say to
16:31:02 11  you, prior to the execution of the APA, that they
16:31:05 12  understood that Novell intended to retain any of
16:31:08 13  the Unix or UnixWare copyrights?
16:31:11 14      A.  No.
16:31:38 15      Q.  You say in paragraph 6 of your
16:31:40 16  declaration, quote:
16:31:42 17      In approximately early April 1996, it
16:31:45 18      came to my attention that Novell,
16:31:47 19      purportedly on behalf of itself and Santa
16:31:52 20      Cruz, was planning to enter into an
16:31:54 21      agreement with IBM purportedly amending
16:31:57 22      its UNIX license agreements by granting
16:32:00 23      IBM a buy-out of its binary royalty
16:32:02 24      obligations and expanding its source code
16:32:07 25      rights, end quote.

Page 225

16:32:08 1  Do you see that language?
16:32:09 2       A.  Yes.
16:32:09 3       Q.  Did anyone from Novell ever say to you,
16:32:11 4  at any time in 1996, that Novell had retained any
16:32:14 5  Unix or UnixWare copyrights under the APA?
16:32:19 6       MR. BRAKEBILL:  Form.
16:32:20 7       THE WITNESS:  No, I don't recall that.
16:32:21 8  BY MR. NORMAND:
16:32:21 9       Q.  Did anyone from Santa Cruz, including
16:32:23 10  Santa Cruz's outside counsel, ever say to you, at
16:32:26 11  any time in 1996, that they believed Novell had
16:32:30 12  retained any Unix or UnixWare copyrights?
16:32:33 13      A.  I --
16:32:34 14      MR. BRAKEBILL:  Form.
16:32:35 15      THE WITNESS:  I don't recall that.
16:32:36 16  BY MR. NORMAND:
16:32:37 17      Q.  You say in the second sentence of
16:32:40 18  paragraph 6 of your declaration, quote:
16:32:43 19      I promptly contacted Novell and
16:32:45 20      communicated Santa Cruz's view that
16:32:47 21      Novell lacked the authority under the APA
16:32:49 22      to enter in such agreements and that they
16:32:52 23      ran counter to the intent of the APA.
16:32:55 24      Over the next several weeks, I gained
16:32:56 25      Novell's assurances that the purported

# EXHIBIT 7

```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF UTAH
_____

THE SCO GROUP, INC.,          )
                              )   Case No. 2:04CV-00139
      Plaintiff/              )
      Counterclaim Defendant, )   Videotaped Deposition of:
                              )   ROBERT J. FRANKENBERG
NOVELL, INC.,                 )
                              )
                              )
      Defendant/             )
                              )
      Counterclaim Plaintiff. )

_____
```

February 10, 2007

10:00 a.m.

Fillmore & Spencer

3301 N. University avenue

Provo, UT 84604

Sharon Morgan, CSR, RPR, CRR

Notary Public in and for the State of Utah

Job: 191635

53fda4cd-3ed3-497b-8e38-a024e61c0e87

Page 6

1  object.  Hopefully less frequently than more, but, in
2  any event, if you understand a question, you should
3  still seek to answer it.  The objections are for the
4  record and before a judge, if necessary, to rule upon
5  at some future time.
6      A.  Uh-huh (affirmative).
7      Q.  Are you represented by counsel here in
8  connection with this deposition?
9      A.  I am, yes.  Bill Fillmore is my attorney.
10     Q.  I would like to begin by asking you to
11 briefly summarize your educational background.
12     A.  I have a bachelor's degree in computer
13 engineering from San Jose State University, and I'm an
14 SEP graduate of the Stanford Graduate School of
15 Business.
16     Q.  Can you briefly summarize your employment
17 background prior to coming to Novell?
18     A.  I was in the U.S. Air Force from 1965 to
19 1969, joined Hewlett-Packard out of the Air Force as a
20 manufacturing technician, and stayed there nearly 25
21 years, just a few months short of 25 years.  And when
22 I left, I was the vice president responsible for
23 Hewlett-Packard's networking in personal computer
24 businesses.
25     Q.  When did you leave Hewlett-Packard?

Page 7

1      A.  In April of 1994.
2      Q.  Where did you go?
3      A.  To Novell.
4      Q.  And what position did you assume at Novell?
5      A.  I became the CEO and president of Novell and
6  shortly thereafter also became chairman.
7      Q.  What was the date, Mr. Frankenberg, that you
8  assumed the office of chief executive officer of
9  Novell?
10     A.  It would have been in late March of 1994, or
11 early April.  I can't remember.  It was right at the
12 boundary.
13     Q.  Could you briefly describe the different
14 lines, major lines, of Novell's business at that
15 point?
16     A.  Novell's largest single business was NetWare.
17 The second largest business was training people in the
18 use, installation and application of NetWare.  After
19 that we had a number of smaller businesses including
20 UNIX, UnixWare, DR-DOS, and a range of much smaller
21 businesses having to do with document management and
22 so forth.
23     Q.  Can you briefly describe what the NetWare
24 business was?
25     A.  The NetWare business, as I said, was the

Page 8

1  largest single business.  It provided the ability to
2  connect personal computers to shared resources such as
3  disks and printers and also, through those shared
4  resources, to connect to other networks.
5      Q.  Did there come a --
6      A.  It also provided the capability to write
7  applications on that shared resource and make further
8  use of it.
9      Q.  Did there come a time when you decided, as
10 CEO of the board, to explore divesting certain of the
11 business lines of the company?
12     A.  Excuse me, I misspoke.  At about the same --
13 at about the same time that I joined, Novell had just
14 purchased WordPerfect and the associated products
15 there.  So at the moment I was there it hadn't been
16 completed, but shortly thereafter those were added.  I
17 don't know whether that was the intent of your
18 question or not.
19     Q.  Well, it helps to add that to the picture.
20 WordPerfect, as a lot of people will be familiar with,
21 had a word processing program --
22     A.  Correct.
23     Q.  -- of the same name?
24     A.  Uh-huh (affirmative).
25     Q.  And did there come a time after you became

Page 9

1  CEO when you decided it would be in the best interest
2  of Novell to sell one or more of these businesses?
3      A.  Yes.
4      Q.  Approximately when did you come to that view?
5      A.  That would have been late in '94 to early in
6  '95.
7      Q.  Can you recall your thinking as to why that
8  would be advantageous?
9      A.  Well, there were several reasons.  One, after
10 a very thorough study, we looked at the range of
11 businesses that we were trying to advance and came to
12 the conclusion that we weren't able to fund
13 appropriately all of those businesses.  And as such,
14 it made sense to get out of some of them or sell them
15 and concentrate our efforts on the ones that we
16 thought would be the most successful or the ones that
17 we thought we could have the greatest success with,
18 having moved the responsibility for some of the others
19 elsewhere.
20     Q.  Were there particular businesses that fell in
21 the category of those that you wanted to sell?
22     A.  Yes.
23     Q.  Which were those?
24     A.  The WordPerfect word processing software, and
25 the associated office product that we called Perfect

3 (Pages 6 to 9)

53fda4cd-3ed3-497b-8e38-a024e61c0e87

Page 18

1    Is that, Mr. Frankenberg, an accurate
2 statement in your understanding of the intent of the
3 deal?
4    A.  Yes.
5    Q.  If we turn now -- now turn to Schedule
6 1.1(a), which appears after page 49, I would like to
7 direct your attention to the very first Roman numeral
8 item on this list of the assets, which you'll recall
9 as the assets being sold.  It states that "All rights
10 and ownership of UNIX and UnixWare, including but not
11 limited to all versions of UNIX and UnixWare and all
12 copies of UNIX and UnixWare (including revisions and
13 updates in process), and all technical, design,
14 development, installation, operation and maintenance
15 information concerning UNIX and UnixWare, including
16 source codes, source documentation, source listings
17 and annotations, appropriate engineering notebooks,
18 test data and test results, as well as all reference
19 manuals and support materials normally distributed by
20 seller to end users and potential end users in
21 connection with the distribution of UNIX and UnixWare,
22 such assets to include without limitation the
23 following," and it lists a variety of different
24 technologies.  Is that statement consistent with your
25 understanding of the intent of this transaction?

Page 19

1    A.  Yes.
2    Q.  Is it your understanding that that sale of
3 all rights and ownership of UNIX and UnixWare would
4 include copyrights associated with UNIX and UnixWare?
5        MR. JACOBS:  Objection, calls for a legal
6 conclusion.
7    A.  I guess I have to answer the question?
8    Q.  (By Mr. Singer)  Yes, you should if you
9 understand the question.
10    A.  Okay.  I understand.  Yes.
11    Q.  Now, did you ever give any directions to the
12 team that was negotiating the deal, including
13 Mr. Thompson, Mr. Chatlos, that they should transfer
14 all right and title and interest to UNIX and UnixWare
15 but retain copyrights for UNIX and UnixWare from being
16 sold?
17    A.  No.
18    Q.  Did you ever tell anyone at Santa Cruz
19 Operation that copyrights for UNIX and UnixWare were
20 not part of the technology being sold?
21    A.  No.
22    Q.  Did you ever authorize anyone at Novell to
23 tell anyone at Santa Cruz that copyrights were not
24 being sold as part of the transaction?
25    A.  No.

Page 20

1    Q.  Did you ever hear from anyone at Novell that
2 copyrights were not being sold?
3    A.  I have some memory of there being a
4 discussion of whether copyrights would be sold or not.
5    Q.  And as we've covered it, it was your intent
6 under this transaction that those copyrights would be
7 sold?
8    A.  Yes.
9    Q.  Now, I would like to briefly look at the
10 other assets which were being sold on Schedule 1.1(a).
11 If you look at III, is it your understanding that all
12 of the seller's rights pertaining to UNIX and UnixWare
13 under any software development contracts, licenses and
14 other contracts to which seller is a party or by which
15 it is bound and which pertain to the business (to the
16 extent that such contracts are assignable), was being
17 sold, including those listed without limitation in the
18 various subparts below that?
19    A.  Yes.
20    Q.  Is it your understanding that to the extent
21 there were contracts involving source code that had
22 been entered into by AT&T and IBM that pertain to UNIX
23 technology, that that was part of all of the seller's
24 rights which were being sold to Santa Cruz in this
25 transaction?

Page 21

1    A.  Yes.
2    Q.  There is a separate schedule that
3 subsequently was amended by an amendment to the
4 transaction that we will look at in a few moments --
5 two amendments to the transaction, one in particular
6 amended the schedule.  That's Schedule 1.1(b) of
7 Excluded Assets.
8        Now, as we begin at the top of that page, you
9 see the NetWare operating system that any asset not
10 listed on Schedule 1.1(a), including the assets
11 pertaining to NetWare and the NetWare operating system
12 and services.
13        Is it fair to say that you wanted to be clear
14 that NetWare was not being transferred as part of the
15 transaction?
16    A.  Yes.  It was very important that we be clear
17 that it was not part of the transaction.
18    Q.  If you now look at V under Intellectual
19 Properties where it says, as part of the assets not
20 being transferred, "All copyrights and trademarks,
21 except for the trademarks UNIX and UnixWare," would
22 you understand that to be a reference to Novell not
23 transferring its own copyrights and trademarks with
24 respect to NetWare products?
25        MR. JACOBS:  Objection.  The document speaks

6  (Pages 18 to 21)

53fda4cd-3ed3-497b-8e38-a024e61c0e87

Page 22

1  for itself.
2      A.  I think -- well, it says that copyrights
3  aren't transferred, so...
4      Q.  (By Mr. Singer)  Is it your understanding of
5  the intent of the transaction that the copyrights that
6  would be retained would be those pertaining to
7  NetWare?
8      A.  Yes.
9      Q.  And that the copyrights pertaining to UNIX
10  and UnixWare would be transferred?
11      A.  Yes.
12      Q.  I would like to show you a joint -- a press
13  release which was issued after the transaction.
14      A.  Are we through with this?
15      Q.  We're going to be coming back to it, but
16  we're through with it for the moment.
17      A.  I'll leave it partly open, then.
18      MR. GONZALEZ:  This is what was previously
19  marked as 1028.
20      Q.  (By Mr. Singer)  Do you recall,
21  Mr. Frankenberg, under the terms of the asset purchase
22  agreement, Novell and Santa Cruz were to agree upon
23  and issue a joint press release concerning a
24  transaction?
25      A.  Yes.

Page 23

1      Q.  Take a moment and look at this press release,
2  and my first question to you is whether you recognize
3  this to be the jointly approved press release
4  pertaining to that transaction?
5      A.  Yes, it is.
6      Q.  If you turn to page 2 of the press release,
7  at the top of the page there's a quote attributed to
8  you which says, "SCO's Business Critical Server focus
9  and worldwide distribution channel makes them an ideal
10  partner for taking UNIX application servers forward on
11  the Intel platform.  By focusing on our areas of
12  expertise and working to integrate our technologies,
13  Novell and SCO together will meet the application
14  server needs of customers in a networked world."
15      Is that a direct quote that you made at the
16  time?
17      A.  It is, yes.
18      Q.  Right below that it states that "According to
19  the terms of the agreement, SCO will acquire Novell's
20  UnixWare business and UNIX intellectual property."  Is
21  that also consistent with your understanding of the
22  transaction?
23      A.  Yes.
24      Q.  And is it consistent with your understanding
25  that all right, title and interest, including the

Page 24

1  copyrights for UNIX and UnixWare were so transferred?
2      A.  Yes.
3      Q.  I would like to show you a Wall Street
4  Journal article that appeared after the transaction,
5  which we'll mark as the next exhibit.
6      MR. GONZALEZ:  This has been previously
7  marked as 1030.
8      Q.  (By Mr. Singer)  Mr. Frankenberg, Exhibit
9  1030 appears to be an excerpt -- or a copy of an
10  article that appeared in The Wall Street Journal on
11  September 20, 1995 under the title "Novell to Cede
12  Control of UNIX To 2 Companies."
13      If you could take a moment to look at this, I
14  have just a couple of questions.
15      Does this summary of the transaction,
16  including specifically the statement on page -- in
17  paragraph two, "The deal includes the purchase by
18  Santa Cruz Operation of most trademarks and
19  intellectual property associated with UNIX software"
20  appear accurate to you?
21      A.  Yes, it does.
22      Q.  I would like to show you a Technology
23  Licensing Agreement that was entered into in December
24  of 1995.
25      MR. GONZALEZ:  This one has been previously

Page 25

1  marked as 1008.
2      Q.  (By Mr. Singer)  Please take a moment to look
3  at Exhibit 1008.
4      A.  All right.
5      Q.  Do you recognize this to be an agreement
6  called the Technology License Agreement that was
7  entered into between Novell and Santa Cruz Operation
8  on December 6th, 1995?
9      A.  Yes, I do.
10      Q.  And it was signed by Mr. Thompson as senior
11  vice president - corporate development on behalf of
12  Novell; is that correct?
13      A.  Yes.
14      Q.  Do you have an understanding of what the
15  purpose was of the Technology License Agreement?
16      A.  To have a complete license back so that -- of
17  the technologies so that we could make use of them as
18  we saw fit internally and in our product.
19      Q.  Were there certain restrictions, which we'll
20  come back to in a few moments, as to how Novell could
21  use that technology with respect to the sale of
22  products?
23      A.  That would be included in Novell's products,
24  is my recollection.
25      Q.  You see Section II-A(2).  Did you understand

7 (Pages 22 to 25)

53fda4cd-3ed3-497b-8e38-a024e61c0e87

Page 134

1  competitor to Microsoft. I remember that being part
2  of the charge and I remember reminding Mr. Thompson
3  about that. And we wanted to make sure Intel was
4  supportive of what we came up with.
5      Q. In connection with the Intel discussions that
6  you had around the time of the Asset Purchase
7  Agreement, do you remember any input Intel gave you
8  about things that Intel thought would be important in
9  the transaction that you were about to enter into with
10 SCO?
11     A. Not specifically. I'm sure we talked about a
12 number of things, but I can't cite you a very specific
13 this is what Intel told me was important right now,
14 but I'm sure we talked about that.
15     Q. Do you recall who your counterpart was at
16 Intel on those discussions?
17     A. Yeah, Dave Howse.
18     Q. What was his position?
19     A. Dave was a senior vice president, if I
20 remember right, at least a vice president if not a
21 senior vice president, and deeply involved in
22 marketing and selling of processors.
23     Q. Just give me a minute.
24        MR. JACOBS: No further questions, sir.
25 Thank you very much.

Page 135

1          FURTHER EXAMINATION
2  BY MR. SINGER:
3      Q. Mr. Frankenberg, I do have some redirect.
4         Do you recall being asked in
5  cross-examination some questions about the intent of
6  the transaction?
7      A. Uh-huh (affirmative).
8      Q. And the initial intent of the transaction?
9      A. Yes.
10     Q. I just want to be clear on a few things. Was
11 your initial intent in the transaction that Novell
12 would transfer copyrights to UNIX and UnixWare
13 technology to Santa Cruz?
14     A. Yes.
15     Q. Was that your intent at the time when the APA
16 was signed?
17     A. Yes.
18     Q. Was it your intent when that transaction
19 closed?
20     A. Yes.
21     Q. And did that remain your intent, as you view
22 it, at all relevant times?
23     A. Yes.
24     Q. So that never changed?
25     A. No.

Page 136

1      Q. Would you have expected that if the lawyers
2  or any other party to the negotiating team on behalf
3  of Novell was going to seek to change a deal point
4  like that, that they would have told you about it
5  rather than just go off and do it?
6      A. Yes.
7      Q. And that never happened, did it?
8      A. Not that I recall.
9      Q. Now, there's been some questioning about the
10 exact scope of the rights regarding Section 4.16 over
11 which Novell had a continued interest. Do you recall
12 those questions?
13     A. Yes.
14     Q. And do you recall testifying in questions I
15 asked you on direct that what Novell was retaining
16 when it's referring to SVRX licenses was a continuing
17 right to retain a binary royalty stream that was in
18 place at the time of the transaction. Do you recall
19 that?
20     A. I do.
21     Q. Then there was some questions by Mr. Jacobs
22 directed at whether or not in the course of a buyout
23 there would be some need to deal with source code
24 rights. Do you recall questions there?
25     A. I do, yes.

Page 137

1      Q. Would you agree that Mr. Chatlos was one of
2  the individuals specifically -- in fact, the
3  individual specifically charged with negotiating the
4  agreement from a business standpoint?
5      A. With SCO?
6      Q. Yes.
7      A. Yes.
8      Q. I would like to show you a declaration
9  Mr. Chatlos has executed and which has previously been
10 provided to counsel to Novell in this litigation,
11 which we would like to mark as the next exhibit.
12        MR. GONZALEZ: This will be marked as Exhibit
13 1045.
14        (Exhibit No. 1045 marked.)
15     Q. (By Mr. Singer) Could you take a moment to
16 review Mr. Chatlos' declaration.
17     A. Okay.
18     Q. Have you had a chance to review Mr. Chatlos'
19 declaration?
20     A. Yes.
21     Q. I would like to ask you about certain
22 passages. If we turn to 4 of Mr. Chatlos'
23 declaration, he states, "Novell's intent and agreement
24 under the APA and Amendment No. 1 was to transfer the
25 entire UNIX business, including the UNIX source code

35  (Pages 134 to 137)

Esquire Deposition Services
1-800-944-9454

53fda4cd-3ed3-497b-8e38-a024e61c0e87

# EXHIBIT 8

# Press Release



SCO

400 Encinal Street
P.O. Box 1900
Santa Cruz, California 95061-1900
408 425 7222

**FOR IMMEDIATE RELEASE**

CONTACT:

Jeff Finn
The Santa Cruz Operation, Inc.
TEL: 408/427-7671
FAX: 408/427-7319

## SCO ACQUIRES UNIX BUSINESS FROM NOVELL AND LICENSES NETWARE TECHNOLOGY

### Novell Takes 17% Equity Position in SCO

**NEW YORK, NY (September 20, 1995)** — The Santa Cruz Operation, Inc. (NASDAQ:SCOC) and Novell, Inc. (NASDAQ: NOVL) today announced a definitive agreement for SCO to purchase the UNIX business from Novell. Under the agreement, Novell will receive approximately 6.1 million shares of SCO common stock, resulting in an ownership position of approximately 17% (post transaction) of the outstanding SCO capital stock. SCO will also license Novell's NetWare Directory Services and other NetWare 4 technologies as the basis for future networking services. SCO plans to merge the SCO OpenServer Release 5 and UnixWare 2 product lines to create a standard high-volume UNIX operating system that contains integrated NetWare networking services, and expects to release this merged product in 1997.

Alok Mohan, president and CEO of SCO, said, "This extends SCO's leadership position in the Business Critical Server market. Our customers and resellers not only get a powerful UNIX operating system, but also the most advanced network services in the world. Novell's advanced network services, such as NetWare Directory Services, are setting the standard for business networking. Our customers will be able to integrate their Business Critical Servers with their existing workgroups to provide their people with greater access to corporate data."

(More)



EXHIBIT
1028
2-707AO

"SCO's Business Critical Server focus and worldwide distribution channel makes them an ideal partner for taking UNIX application servers forward on the Intel platform," said Robert J. Frankenberg, chairman and CEO of Novell. By focusing on our areas of expertise, and working to integrate our technologies, Novell and SCO together will meet the application server needs of customers in a networked world."

According to the terms of the agreement, SCO will acquire Novell's UnixWare business and UNIX intellectual property. In order to meet customer support needs and protect development requirements, SCO intends to hire a number of Novell employees. In addition to the SCO stock, Novell will receive a revenue stream back from SCO based on revenue performance of the purchased UNIX business. This revenue stream will end in the year 2002 and is not to exceed $84 million net present value.

SCO and Novell expect the agreement to close on or about December 1, 1995, conditional upon several items including U.S. government approval under the Hart-Scott-Rodino Act. Shareholder approval is not required by either party.

SCO has outlined a product roadmap in which both SCO OpenServer and UnixWare will initially continue to be individually supported and enhanced. Upcoming releases include enhanced SCO OpenServer and UnixWare products, containing integrated NetWare services, in the first half of 1996. In the summer of 1996, SCO expects to release a beta version of the product that merges SCO OpenServer and UnixWare, with a complete software migration toolkit. This beta kit will enable developers to begin developing their applications to a single merged product line that contains the best capabilities of both environments. SCO expects to release the final version of this merged product, containing integrated NetWare services, in 1997. The merged product will offer binary compatibility with existing SCO OpenServer and UnixWare applications, as well as a full set of migration tools to ensure that developers can easily develop for the new line from either predecessor.

(More)

SCO will continue to offer UnixWare source code to existing and new OEM licensees worldwide. Existing Certified Novell Engineers (CNEs) for UnixWare are fully certified to support UnixWare products from SCO.

In order to smooth the transition for existing customers of SCO OpenServer and UnixWare to the future merged product, SCO plans to offer a number of enhancements to the product lines over the coming months. These include UNIX 95 compliance; NetWare file, print, and directory services; and tools that allow software developers to quickly create a single binary that will run on SCO OpenServer Release 5, UnixWare 2, and the next-generation merged operating system.

SCO is the world's leader for UNIX System servers and multiuser hosts. SCO Business Critical Servers run the critical, day-to-day operations of large branch organizations in retail, finance, and government, as well as corporate departments and small to medium-sized businesses of every kind. SCO is also a leading supplier of client-integration software that integrates Windows PCs and other clients with UNIX servers from all of the major vendors. SCO sells and supports its products through a worldwide network of distributors, resellers, systems integrators, and OEMs.

The business of Novell, Inc. is connecting people with other people and the information they need, enabling them to act on it anytime, anywhere. Novell is the world's leading network software provider. The company's software products provide the distributed infrastructure, network services, advanced network access and network applications required to make networked information and computing an integral part of everyone's daily life.

### # # #

SCO, The Santa Cruz Operation, the SCO logo, and SCO OpenServer are registered trademarks of The Santa Cruz Operation, Inc. in the USA and other countries. NetWare and UnixWare are registered trademarks of Novell, Inc. UNIX is a registered trademark in the US and other countries, licensed exclusively through X/Open Company Limited. All other brand or product names are or may be trademarks of, and are used to identify products or services of, their respective owners.

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


| | | |
|---|---|---|
| THE SCO GROUP, INC., | : | Case No. 2:04CV00139 |
| | : | |
| Plaintiff, | : | Videotaped Deposition of: |
| | : | |
| vs. | : | TY MATTINGLY |
| | : | |
| NOVELL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |


January 19, 2007 - 9:23 a.m.


Location:  SCO Group
355 South 520 West
Lindon, Utah  84042


Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

1    Q.  Uh-huh.  I think you said you joined as senior
2  product manager.  When did your title change?  What did it
3  change to?
4    A.  I think the first change in it was probably a year
5  later when Ray Noorda basically hired me to work directly for
6  him, and Ray Noorda was the then chairman and CEO and founder
7  of Novell.
8    Q.  In what capacity did he hire you to work for him?
9    A.  Title was executive director, office of the
10  chairman.
11    Q.  What were your responsibilities?
12    A.  To be his right-hand man and gopher and body guard
13  and --
14    Q.  Okay.  How long did you hold that title?
15    A.  I probably worked for Ray for about two years.
16    Q.  Okay.  And what was your next title at Novell?
17    A.  Basically kept the same title, and then when Ray
18  retired, I worked in that same capacity for Bob Frankenberg.
19    Q.  Uh-huh.
20    A.  Who was his successor.
21    Q.  And until what time did you do that?
22    A.  I probably worked for Bob for maybe 18 months.
23  Yeah, probably about 18 months.
24    Q.  So it started at some point in 1995, your
25  responsibilities for Mr. Frankenberg?

1    A.  It sounds about right.
2    Q.  Let me ask it a different way.  Can you recall with
3  any specificity either when you began working --
4    A.  Exactly.
5    Q.  -- in that capacity or when you stopped working?
6    A.  The day he was hired --
7    Q.  Oh, okay.
8    A.  -- is when I started work working for Bob
9  Frankenberg, so I don't know exactly what day that was.  So I
10  remained in that transition through the transition of the new
11  CEO and remained in that position until I left about a year
12  and a half later and started working for Duff Thompson.
13    Q.  Uh-huh.
14    A.  And in that position and title I was vice president
15  of corporate development and strategic relationships.
16    Q.  And when did your responsibilities in connection
17  with Mr. Thompson begin?
18    A.  Well, probably about '96 time frame.  Roughly, I
19  think it was about a year and a half with Bob Frankenberg.
20    Q.  And the responsibilities you had in connection with
21  your work with Mr. Frankenberg were similar to the work you
22  had done with Mr. Noorda?
23    A.  Correct.
24    Q.  And when did you leave Novell?
25    A.  Well, I actually left Novell probably in '97, but

1  that was to go to a joint venture that Novell created with
2  Netscape called Novonyx, N-O-V-O-N-Y-X.
3    Q.  How long did you work at Novonyx?
4    A.  About a year.
5    Q.  And then what?
6    A.  Novell basically acquired all of the equity in
7  Novonyx, pulled that back into Novell, and that's when I had
8  my severance agreement and left Novonyx.
9    Q.  Okay.  What did you do at Novonyx?
10    A.  Sales and marketing.
11    Q.  And if you could take a minute to summarize the
12  kind of work you have done since you left Novonyx.
13    A.  We started a consulting company.  I knew that I did
14  not like hardware from my IBM days and did not like software
15  from my Novell days, and so thought I would get into the
16  consulting where we just talked about both of those things.
17  And we started a Internet consulting firm right when the
18  Internet was all of the rage in about '98.  And basically
19  myself and a couple of others founded that company, and we
20  built it and sold it in 2004.
21    Q.  What was the name of that company?
22    A.  It was SBI Razorfish, R-A-Z-O-R-F-I-S-H.
23    Q.  And what were your responsibilities with SBI
24  Razorfish?
25    A.  Corporate development.

1    Q.  And those ended in 2004?
2    A.  Yes.
3    Q.  How about since 2004?
4    A.  I have just been doing a consulting, personal
5  consulting gigs and personal investing.
6    Q.  Okay.  Were you involved with Novell's acquisition
7  of the Unix business?
8    A.  I was not involved in the acquisition, but when
9  Novell bought Unix Systems Labs from AT&T, that was one of
10  the key reasons why I decided to join Novell because of the
11  application environment and the business applications that
12  ran on Unix that I believed would now be merged into NetWare.
13    Q.  Do you know why Novell acquired USL?
14    A.  I believe it was for the same reason.  Ray Noorda
15  had a vision of getting an application development
16  environment inside of NetWare that he knew we needed to have
17  in order to be competitive with Microsoft.
18    Q.  Did there come a time during your tenure at Novell
19  when you learned that Novell was interested in selling some
20  or all of its Unix business?
21    A.  Yes.
22    Q.  And when was that time?
23    A.  Well, let me think about that.  It was probably a
24  few months before we actually completed the divestiture to
25  SCO, so I think that would have been about the '95 time

4  (Pages 10 to 13)

fc7210ab-5c79-4713-a720-d85ad5886cea

Page 26

1    A.  I just told him about the deal, that we were
2  divesting of the Unix business to SCO and gave him specifics
3  as to why.
4    Q.  And do you recall what he said or how he reacted?
5    A.  I don't.  It was a very cordial call, and he's a
6  very nice guy, and that's basically it.  That's the only one
7  I can really remember, but I'm sure we had calls with all of
8  the other people because there were about, I think, 13
9  partners that we really tried to work with.
10    Q.  Okay.  I take it that the negotiations we have been
11  discussing resulted in an asset purchase agreement?
12    A.  That's correct.
13    Q.  I'm going to mark this as an exhibit just to get it
14  in.
15    (Deposition Exhibit No. 1 was marked.)
16    Q.  (By Mr. Normand)  I am handing you, Mr. Mattingly,
17  the -- a document titled asset purchase agreement by and
18  between the Santa Cruz Operation Inc. and Novell Inc.
19    A.  Uh-huh.
20    Q.  Dated as of September 19th, 1995.  I take it you
21  have seen this document before?
22    A.  Many moons ago.
23    Q.  Okay.  When was the last time you saw this
24  document?
25    A.  Probably -- this was dated on the 19th.  It

Page 27

1  probably would have been maybe a few days prior to the
2  signature.
3    Q.  Were your responsibilities in the weeks leading up
4  to the negotiation -- let me rephrase that.  Were your
5  responsibilities in the weeks leading up to the execution of
6  this agreement --
7    A.  Uh-huh.
8    Q.  -- any different than your responsibilities had
9  been in the summer of '95?
10    A.  Well, they probably were just because I don't know
11  that I was -- well, actually, I probably had been in that job
12  for a while.  But I think I transitioned from working for Bob
13  Frankenberg to working for Duff Thompson probably in '95.
14    Q.  Okay.  Did you have -- if you can recall, did you
15  have occasion to attend a meeting of the Novell board of
16  directors in September '95 regarding the APA?
17    A.  You know, I am sure that I attended all of the
18  board of directors' meetings that would have dealt with the
19  divestiture of Unix.
20    MR. NORMAND:  Let's mark that.
21    MS. BORUCHOW:  Can we just go off the record for a
22  one second?
23    VIDEOGRAPHER:  Going off the record.  The time is
24  9:59.
25    (Discussion off the record and recess.)

Page 28

1    VIDEOGRAPHER:  Going back on the record.  The time
2  is 10:07.
3    Q.  (By Mr. Normand) Mr. Mattingly, do you recall
4  considering during the APA negotiations the issue of the Unix
5  copyrights?
6    MR. BRAKEBILL:  Objection, vague and ambiguous.
7    THE WITNESS:  So what does that mean?
8    MR. BRAKEBILL:  Oh, we should probably say this.
9  During the course of the deposition I will make objections as
10  to the question just to preserve the record, but you can go
11  ahead and answer the question.
12    THE WITNESS:  Okay.
13    MR. BRAKEBILL:  Unless it's a privilege issue that
14  comes up due to your tenure at Novell.
15    THE WITNESS:  Uh-huh.
16    MR. BRAKEBILL:  We can consider it, and if
17  necessary either answer or not answer.
18    A.  Okay.  You want to give me a little more
19  specificity?
20    Q.  (By Mr. Normand)  Did you have an understanding
21  during the course of the APA negotiations as to whether
22  Novell owned copyrights in its Unix business?
23    A.  Yeah.  Clearly Novell owned copyrights.  We bought
24  Unix Systems Labs from AT&T for some 300 plus million
25  dollars.  So, yeah, we owned the Unix business, lock, stock

Page 29

1  and barrel, and it was the Unix business that we divested to
2  SCO.
3    Q.  And can you recall considering specifically the
4  issue of Unix copyrights during the course of the APA
5  negotiations?  When I say you, I mean you personally.
6    A.  You know, I, personally do not recall sitting there
7  saying, yes.  The Unix copyrights are part of this
8  lock-stock-and-barrel Unix business that we are selling.  But
9  once again, I think it's important to understand that at the
10  high level, that's where I was involved.
11    The detail level would be more Ed Chatlos, but at
12  the highest level, the intention was that we were exiting the
13  Unix business and selling that business to SCO so that they
14  could pick up, unify the industry around Unix on X-86.
15    Q.  Do you know whether in this case Novell is
16  asserting that the copyrights were not transferred?
17    A.  Well, I mean, I have read enough about the case
18  early on.  I haven't stayed real current lately.  But I mean,
19  obviously we're here today because Novell is asserting that
20  the copyrights were not sold with the Unix business to SCO,
21  and obviously SCO would assert that they purchased the Unix
22  business from us lock, stock and barrel.
23    Q.  And do you have a view as to the merits of Novell's
24  assertion, such as you understand it?
25    A.  I do.

8  (Pages 26 to 29)

fc7210ab-5c79-4713-a720-d85ad5886cea

Page 30

1    Q.  And what is your view?
2    A.  Well, my firm belief is that we sold the Unix
3  business to SCO, and that is why SCO paid us roughly 125
4  million dollars at that point because they bought the Unix
5  business from us basically in its entirety.
6       The only things that did not go with that was a
7  kind of an agent relationship whereby SCO was collecting the
8  SVRX royalties from existing OEMs and move them from those
9  business and then giving the bulk of those moneys back to
10  Novell.  So that piece of the business, if you will, Novell
11  maintained the royalty stream base of that going forward, and
12  SCO acted as Novell's agent there for a very good reason.
13      And that is that SCO wanted to create the
14  relationships with those OEMs and move them from those
15  existing licenses to their new UnixWare platform on X-86.
16  That was basically the strategy that we wanted, and that was
17  a rational approach for them to actually begin to create the
18  relationships, associations, ties with those OEMs that they
19  aspired to move.  And we wanted them to move those OEM
20  relationships over to UnixWare.
21     Q.  Why did you want them to do that?
22     A.  Well, remember the strategy.  The strategy was
23  about, how do we set up an alternative application platform
24  out there in the industry that all of the -- what were
25  existing minicomputer, microcomputer, mid-range computer RISC

Page 31

1  architecture, that would move to this unified Unix that would
2  run on the new Intel X-86 architecture.
3       So the idea is, if you can create a platform there
4  so that now as an ISV -- so strategically, Microsoft's big
5  strength in the industry is, they have this ISV control.  And
6  that means that these independent software vendors that write
7  business applications that solve business problems run on NT.
8  And they secured more of those people on their platform by, I
9  don't know, a hundred X or more than what Novell did.
10      So the whole strategy here is, how do you take and
11  create this alternative platform so that ISVs will say, gosh,
12  if I write for UnixWare, now HP, Sun, IBM, et al., I'll be
13  able to sell my applications into those environments, and it
14  will run on every one of those vendors' platforms that run on
15  Intel architecture.
16      So the strategy there, I think, is really important
17  to understand because that's what drove all of our decisions.
18  And quite honestly that was my value-add in this negotiation
19  is, is everything we're doing consistent with that strategy.
20  I am not the guy then or even today that is the detail guy
21  that gets down into all of the nuts and bolts and looks at
22  all of the fine language inside of this nice, thick document.
23     Q.  Would it be fair to say that the transfer of the
24  Unix copyrights to SCO was consistent with your view of this
25  overall strategy?

Page 32

1        MR. BRAKEBILL:  Objection, mischaracterizes
2  testimony.
3    A.  So I can still answer?  Yeah.  I mean, absolutely.
4  I believe that when they bought the business, when they paid
5  us 125 million dollars, that the negotiations that we were
6  involved with there was about selling them the entire
7  business, the software, which would have included the
8  copyrights.
9    Q.  (By Mr. Normand)  You mentioned in the course of
10  one of your answers the royalty stream.  Do you recall
11  mentioning that?
12    A.  Uh-huh, yes.
13    Q.  Is that an issue that you can recall specifically
14  discussing either within Novell or with representatives of
15  SCO?
16    A.  Yeah.  I remember that, you know, at a fairly high
17  level.
18    Q.  Uh-huh.
19    A.  With some clarity.
20    Q.  Okay.  And who do you recall discussing that with
21  either within Novell or with representatives of SCO?
22    A.  Well, I mean, we discussed that, you know, all the
23  way up to the board level inside of Novell.
24    Q.  Okay.
25    A.  And then certainly we talked about that amongst our

Page 33

1  deal team, the Novell deal team.  We talked about it amongst
2  the SCO deal team, and we talked about it with our outside
3  advisors.
4    Q.  You mentioned, I think in the course of an earlier
5  answer, new UnixWare or new version of Unix.  Do you recall
6  sort of using that phrase?
7    A.  Well, I don't know if I said new, but yeah,
8  UnixWare.  I mean, basically UnixWare was the word play.  I
9  mean, Novell had NetWare, UnixWare.  We're calling everything
10  Ware, AppWare, and so Novell's version of Unix that we sold
11  there was basically, you know, the old AT&T Unix.  We just
12  branded it UnixWare.
13    Q.  And do you recall the phrase merged product?  Is
14  that a phrase you recall being used in the course of these
15  APA negotiations?
16    A.  I do recall that.
17    Q.  And what do you recall about what the merged
18  product was?
19    A.  Well, I think it's important to understand that
20  SCO, when I say that they were the leading Unix on Intel
21  provider, my memory might be a little off here, but the
22  leader was only selling 200,000 servers a year, you know,
23  every year, year -- every year in and year out.
24      You know, to contrast that, I mean Novell, we were
25  probably in the, you know, 4 million plus servers out there.

9  (Pages 30 to 33)

fc7210ab-5c79-4713-a720-d85ad5886cea

1  sale of UnixWare technology as more fully set forth in the
2  asset purchase agreement. So that seems to be consistent.
3      Q.  Okay. In that same paragraph there's a reference
4  in the preceding sentence to 95 percent of the SVRX
5  royalties. Do you see that phrasing?
6      A.  Uh-huh, uh-huh.
7      Q.  What did you understand that to mean?
8      A.  Well, at the time we sold the business, Novell had
9  a number of existing SVRX OEMs that were predominantly these
10 minicomputer OEMs.
11     Q.  Yeah.
12     A.  And with respect to those people, and I guess you
13 can see down below who the big ones must have been, because
14 we had this right of first refusal on Sun Microsystems,
15 Microsoft, Hewlett-Packard, IBM, Digital and Fujitsu, so
16 those likely were some of the big licensees.
17         And the intent there was to, you know, is for SCO
18 to collect all of those existing SVRX royalty streams and
19 then pay Novell 95 percent of that and keep 5 percent as an
20 administrative fee.
21     Q.  The minutes say that -- I'm looking now back at
22 page 1 at the end of the last paragraph on page 1. The
23 minutes say that you answered questions from the board. Do
24 you recall any of the questions?
25     A.  You know, I don't. But I mean, as usual, I mean,

1  you take a grilling in these types of meetings, and so I'm
2  sure I was grilled by the board, asking all of the obvious
3  questions that yes, we had thought of any --
4      Q.  But nothing in particular comes to mind?
5      A.  Not really. I mean, it's been a long time.
6      Q.  The minutes say on page 2 in the paragraph that's
7  actually squared off.
8      A.  Uh-huh.
9      Q.  And as a side note, that's just how the document
10 was produced. They say, quote, Novell will retain all of its
11 patents, copyrights and trademarks, open parens, except for
12 the trademarks Unix and UnixWare, close parens. The sentence
13 goes on, but that's the phrase I want to focus on.
14         Do you recall the issue of copyrights being
15 discussed at the meeting?
16     A.  You know, I don't. I mean, here where it talks
17 about the trademark Unix and UnixWare, that goes to the
18 naming convention that we talked about earlier, which was,
19 didn't want SCO to be able to not grant the ability to call
20 an EOM's product Unix if they met the certain specifications,
21 and so that's why that was not retained by Novell. It was
22 also not transferred to SCO because that was the piece that
23 was moved over to X/Open.
24     Q.  Uh-huh. With respect to the reference to
25 copyrights, was it your understanding that Novell was

1  retaining all of the Unix and NetWare copyrights?
2      A.  Not the Unix copyrights, but Novell clearly -- and
3  you asked this earlier. Novell would not have transferred
4  any of their copyrights around NetWare and ZenWorks and
5  GroupWise or any of those bundled products that Novell sold
6  with UnixWare.
7         So I think, I think that's probably what that's
8  getting to is that, hey, look. We're going to own all our
9  intellectual property. They're going to own all of this,
10 with the exception of the naming of Unix and then, of course,
11 that 95 percent fee that you see above it.
12     Q.  Is there anything else specific about this meeting
13 that you can recall?
14     A.  No. I remember those are always -- they're
15 always tense meetings, and you know, when we got into that
16 final discussion, I think as you would expect, you take a
17 pretty thorough set of questioning from a number of directors
18 just firing questions away at you, but --
19     Q.  But nothing specific?
20     A.  Nothing specific. I think we had, you know, the
21 facts down pretty clearly at that point. And even though 12
22 years later I'm not as good on the facts, I was pretty good
23 back then.
24     Q.  I think you said earlier that you were familiar
25 with some of the issues arising out of these lawsuits from

1  reading press. Is that a fair description of what you said
2  before?
3      A.  Yeah, I think press and some of these, you know,
4  hate SCO message boards and all that good stuff.
5      Q.  You have been on those message boards?
6      A.  I have looked at them back when they first -- back
7  when the first shots across the bow went out.
8      Q.  Are you familiar with a claim that's arisen in
9  these litigations in which Novell claims the right to waive
10 SCO's claims against IBM for alleged breaches of IBM's Unix
11 agreements?
12     A.  I am aware of that.
13     Q.  And do you have a view from your experience in
14 negotiating the APA as to the merits of that claim?
15     A.  Well, I mean, my perspective on that is that, you
16 know, quite honestly, Novell doesn't have any rights to do
17 that. And I, personally, you know, look at this whole
18 litigation between Novell and SCO and think it's absurd. I
19 think it's unbelievable to me that, you know, a great company
20 like Novell would suggest that somebody spent 125 million
21 dollars and didn't buy this Unix business.
22         And then I don't know what the relationships or
23 discussions are between Novell and IBM, and I don't know why
24 they have done some of those things. I mean, I have been out
25 of the company for, well, since 1998. So I don't have any

14  (Pages 50 to 53)

fc7210ab-5c79-4713-a720-d85ad5886cea