# EXHIBIT 10

Dockets.Justia.com

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:  (305) 539-1307

*Attorneys for* The *SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **DECLARATION OF R. DUFF THOMPSON**<br><br>Case No. 2:03CV-0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

I, R. Duff Thompson, declare as follows:

1.     I submit this declaration in connection with <u>The SCO Group, Inc. v. International</u> <u>Business Machines Corporation</u>, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003), and <u>The</u> <u>SCO Group v. Novell, Inc.</u>, Civil Action No. 2:04CV00139 DAK (D. Utah 2004). I make this declaration based upon personal knowledge.

2.     I began my professional legal career as a practicing attorney in 1981 in Salt Lake City, Utah. I began working in the software industry in 1986 when I joined WordPerfect Corporation as vice president and general counsel. At the time of the WordPerfect/Novell merger in 1994 I accepted a position with Novell as Senior Vice President of Business Development and Strategic Relations. I held that position until early 1996 and then I stayed on in a part time and consulting role to assist Robert Frankenberg with selected issues until 1997.

3.     I joined the Caldera International Board of Directors in May of 2001 after Caldera International acquired the two UNIX divisions of Santa Cruz Operations. Caldera International is now known as The SCO Group and I continue to server on the Board of Directors.

**Novell's Sale of Its UNIX Business to Santa Cruz**

4.     In early 1995, Novell Chairman and CEO Robert Frankenberg directed me to sell the complete UNIX business and related assets so the company could focus on its flagship product NetWare, cut the related UNIX costs and thereby increase shareholder values for the company. I understood my directive was to sell all of the UNIX business and related assets and that is how I approached the assignment.

5.     After receiving this directive from Mr. Frankenberg, we engaged in a selection process, the end result of which was the determination that Santa Cruz Operations was a good candidate to purchase Novell's UNIX business and assets. Thereafter, I formed a transaction

team including myself, Ed Chatlos and other Novell executives and staff, including Ty

Mattingly, and we entered into negotiations with Santa Cruz for a potential sale. Lawyers from

Wilson, Sonsini, Goodrich & Rosati represented Novell in the transaction and lawyers from

Brobeck, Phleger & Harrison represented Santa Cruz Operation. During the negotiations in the

summer of 1995, I had the responsibility to report back to Mr. Frankenberg regularly on the

status of the transaction, which I did. Mr. Chatlos conducted the day to day negotiations with the

Santa Cruz team throughout the summer of 1995. l also participated in several of the negotiation

sessions meeting with the Santa Cruz CEO and President, Alok Mohan and its general counsel,

Steve Sabbath and others, including Jim Wilt, Geoff Seabrook, and Kim Madsen.

     **6.**     Early in the process I informed Mr. Mohan that we were selling the entire UNIX

business and all related assets. I wanted that to be very clear to him as we were asking for a

substantial sum for the sale. We continued to inform Santa Cruz that it was buying the entire

UNIX business and assets, except as explained below.

     **7.**     During the course of the negotiations, it became clear that Santa Cruz could not

afford to pay the purchase price we were requesting, so various ways were explored to make it

possible for Santa Cruz to make the purchase. The solution was that Novell would retain an

interest in the binary royalty stream from the existing SVRX sub-licenses. It was never

suggested or agreed in the negotiation in which I participated that Novell would retain the right

to receive additional royalties or fees from licensing of source code or from new sales of SVRX

products. Novell did, however, retain certain limited rights to protect that existing SVRX binary

royalty stream. The responsibility for the collection of those royalties was placed upon Santa

Cruz because after the closing of the sale, they were to own the customer relationships as they

had purchased the entire business and associated assets. Since Novell could report this ongoing

binary royalty stream as profit( keeping in mind that this revenue source was simply a

mechanism to reduce the upfront purchase price for Santa Cruz) it made the sale more attractive

and more easily justified to the Novell shareholders. To the extent Novell claims it retained

rights to waive claims that Santa Cruz or its successors might have regarding breaches of the

System V source code agreements, this does not comport with the instructions I received from

Robert Frankenberg nor with my recollection of the negotiations or the agreements; and, is

certainly contrary to discussions I had with representatives of Santa Cruz regarding what Santa

Cruz was buying and what Novell was retaining. As the Novell executive charged with the sale

of the UNIX business and assets, it was never my intent or understanding that Novell was

retaining rights to waive breaches of the UNIX System V source code agreements that may have

occurred years after Novell sold those UNIX source assets to Santa Cruz.

       **8.**    Likewise, it was my understanding and intent, as the Novell executive responsible

for the negotiation of the transaction, that the UNIX copyrights were transferred to Santa Cruz

as part of the transaction that was closed in December 1995. To that end, I signed on behalf of

Novell the Technology License Agreement ("TLA") with Santa Cruz Operations in December

1995 which, among other things, granted Novell the right, with certain limitations set forth

therein, to use the technology that we had just sold to Santa **Cruz.** If Novell had retained the

UNIX copyrights as it now claims, there would have been no need for the TLA; indeed, Novell

would have needed to grant Santa **Cruz** a license to the technology.

       9.    During the course of the negotiations, and in my meetings with representatives of

Santa **Cruz,** I never represented that Novell was retaining the copyrights. I did, however, inform

the Santa Cruz team, including Mr. Mohan, that they were getting all of the assets except for (i) the payment back to Novell of the binary royalty stream as mentioned above, (ii) any patents, (iii) accounts receivable relating to the binary royalty stream and (iv) some Master License Agreements. Because Santa Cruz was buying the entire UNIX business, including the source code, it was clear that they were getting the copyrights to that source code. We specifically and repeatedly confirmed with Santa Cruz that they were not purchasing any patents, but no such representations were made about the UNIX copyrights because it followed that with the sale of the underlying UNIX source code, they were getting those associated copyrights. To the extent the Excluded Asset Schedule is unclear on the copyright transfer issue, it should be read to conform to the intent and understanding as stated above, i.e., Novell sold the copyrights to Santa Cruz. If that schedule were construed to exclude the UNIX copyrights from the transaction, it would not reflect the intent and understanding of the transaction as agreed to between representatives of Santa Cruz, including Mr. Mohan, and myself, nor does it comport with the instructions I received from Bob Frankenberg upon commencing the negotiations. I have read paragraph 11 of Mr. Chatlos's declaration of October 1, 2004 and I agree with his conclusion there regarding the Excluded Asset schedule. I also agree that Mr. Chatlos's declaration accurately reflects the negotiation and agreements of the parties in the sale of the UNIX business and associated assets to Santa Cruz Operations.

10.    I have reviewed paragraphs 41 through 48 of Michael DeFazio's October 3, 2003 declaration and to the extent he states that Novell retained the UNIX copyrights, or that Novell retained the right to receive source code fees or waive, on behalf of Santa Cruz or its successors, breaches of the UNIX System V source code agreements, he is mistaken. Mr. DeFazio may have

been involved somewhat in the sale of the UNIX assets in some fashion, but he was not on the lead negotiation team and was not in a position to dictate the intent or understanding of the transaction. Certainly, if Mr. DeFazio really held those views at the time, he never expressed them to me or anyone else of whom I am aware on the Novell transaction team.

11.     It is my understanding that in 1996 the parties executed Amendment No. 2 to, among other things, clarify any confusion on the copyright transfer issue, as I have explained above.

12.     As noted above, I joined the Caldera International Board of Directors in May of 2001 after Caldera International acquired the two UNIX divisions of Santa Cruz Operations. Caldera International is now known as The SCO Group and I continue to serve on the Board of Directors. During the time that Ransom Love was the CEO of Caldera International and after I joined its Board, there was never any occasion when I heard or was informed that the company had reviewed its UNIX System V source agreements in relation to IBM's initiatives to support and enhance Linux, and that Caldera International had concluded that IBM was not breaching those source agreements or if there was a breach, the company did not care.. . In my view, as a director of Caldera International (later renamed SCO Group) there was never a decision, let alone a conscious decision, to allow IBM or any other party to freely and without restriction license technology protected under the UNIX source code agreements, for the purpose of making contributions to Linux, or for any other purpose.

13.     I have been made aware of a declaration entered in this matter by Greg Jones, who, at the time of the Novell-Santa Cruz Operations transaction was a staff attorney in the Novell legal department. Although it is possible that someone in the Novell legal department

gave Greg Jones assignments relative to the documentation of the Novell- Santa Cruz transaction, I do not recall him being involved with the APA and related closing documents. . Greg Jones was not part of the core Novell negotiating team, nor, to the best of my knowledge was he involved in the negotiations with Santa Cruz business negotiators. The firm of Wilson Sonsini Goodrich & Rosati represented Novell in the transaction with Santa Cruz and worked with the Novell legal department in drafting the agreements. The lawyers' direction and assignment was to memorialize the intent and agreement of the parties as directed by Bob Frankenberg and as carried out by by me, Ed Chatlos and our **team.** The inside and outside lawyers for **Novell** working on the transaction did not have the authority or directive to change material terms of the transaction as intended and agreed by the respective negotiating teams. If any of those lawyers, including Mr. Jones, claim that the APA and related documents mean something other than what is stated in my declaration and the declaration of Ed Chatlos they are wrong. It appears to me that Mr. Jones may be offering his current view or interpretation of the agreements rather than offering any factual testimony from personal involvement in the transaction.

I declare under penalty of perjury that the foregoing is true and correct. November 9, 2006

R. Duff Thompson

# EXHIBIT 11

Duff Thompson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,            :  Case No. 2:04CV00139
                                :
        Plaintiff,              :  Videotaped Deposition of:
                                :
vs.                             :  R. DUFF THOMPSON
                                :
NOVELL, INC.,                   :
                                :
        Defendant.              :
                                :

February 13, 2007 - 9:13 a.m.

Location:  HATCH, JAMES & DODGE
         10 West Broadway, Suite 400
         Salt Lake City, UT  84101

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

6e60cdac-2231-408b-b03e-a2cd31e63189

Duff Thompson

Page 6

1    A.  I had reviewed this document but in terms of
2  specific provisions, but generally with counsel, with SCO's
3  counsel.
4    Q.  (By Mr. Jacobs)  So let me ask you about that.  You
5  were appointed to the SCO Group's board of directors by
6  Novell after the asset purchase agreement, correct?
7    A.  That's correct.
8    Q.  And you understood there that you were on the SCO
9  Group's board as a Novell representative?
10    A.  Yes.
11    Q.  And you reported back to Novell about developments
12  at the SCO Group in accordance with your representative
13  capacity?
14    A.  That's correct, for a period of time.
15    Q.  And when did that end?
16    A.  Well, at the time that Novell sold its stock.
17    Q.  And when was that?
18    A.  I don't have a clear date in mind.  A few years
19  after the transaction, it seems to me.
20    Q.  And so immediately or in association with that
21  sale, did you leave the SCO Group's board, or did your
22  capacity change?
23    A.  At that point I had -- I was no longer a
24  representative director.  I was simply elected as a director
25  and asked to stay on the board by the SCO management.

Page 7

1    Q.  And just to be clear, we're talking then about the
2  SCO Group before the Caldera acquisition, correct?
3    A.  Yes.
4    Q.  And then did you stay on the SCO Group's board up
5  until the Caldera acquisition?
6    A.  Yes.
7    Q.  And then after the Caldera acquisition, did you
8  join the -- did you join the renamed Caldera company; that
9  is, SCO's board?
10    A.  Maybe I can help you with some of the names.
11    Q.  That would be good.  Thank you.
12    A.  The old SCO Group actually changed its name to
13  Tarantella, and it will help to help differentiate who was on
14  first.  I was a member of the Tarantella board at the time of
15  the sale to Caldera, and in a similar fashion I was appointed
16  to the board of Caldera because of the stockholder interest
17  in Caldera that Tarantella retained.
18       So at that point I was actually a member of two
19  boards, Tarantella board and the Caldera board.  Tarantella
20  went through a sale to Sun not long after that, and their
21  board obviously went away.  The Caldera group then changed
22  its name to SCO, and so hence the confusion, the -- there was
23  -- there now became a new SCO, which was essentially the
24  transformation of Caldera to SCO.
25    Q.  And with respect to Caldera SCO, what has been --

Page 8

1  what was your board tenure?  How long were you on the board
2  or are you on the board?
3    A.  I am currently on the board.
4    Q.  And you have been on that board pretty much since
5  the acquisition of Tarantella?
6    A.  I think 2001, something like that.
7    Q.  When --
8       MR. SINGER:  Object to the form.  You said
9  acquisition of Tarantella.  I don't know if you meant to say
10  that.
11    A.  Oh, sorry.
12    Q.  (By Mr. Jacobs) Acquisition of the Unix business
13  from Tarantella, correct?
14    A.  Yes.
15    Q.  In connection with the acquisition by -- well,
16  strike that.  What was your role in the acquisition by
17  Caldera of the Unix business of Tarantella?
18    A.  I had no role other than the fact that I was on the
19  board of the selling enterprise.
20    Q.  And then were appointed to the board of the
21  acquiring enterprise, correct?
22    A.  That's correct.
23    Q.  But that occurred after the acquisition closed?
24    A.  That's correct.
25    Q.  In your capacity as a member of the board of the

Page 9

1  selling enterprise, were you involved in any of the diligence
2  that the acquiror did into the status of the Unix assets at
3  Tarantella?
4    A.  Any of the due diligence you say that Caldera did?
5    Q.  Correct.
6    A.  No.  The board was not part of the negotiation team
7  in that transaction.
8    Q.  When you joined the Caldera board, the company was
9  named Caldera at that point, correct?
10    A.  That's right.
11    Q.  And the CEO was Ransom Love?
12    A.  That's correct.
13    Q.  During your tenure on the board, the CEOs switched,
14  and Darl McBride became the CEO?
15    A.  That's correct.
16    Q.  And you were a member of the board of Caldera that
17  took recommendations from Mr. McBride as to the launching of
18  SCOsource?
19    A.  That is correct.
20    Q.  And in the course of -- of evaluating those
21  recommendation did you have occasion to review the asset
22  purchase agreement?
23    A.  I don't remember reviewing the asset purchase
24  agreement at that time.
25    Q.  In evaluating Mr. McBride's recommendations with

3  (Pages 6 to 9)

6e60cdac-2231-408b-b03e-a2cd31e63189

Duff Thompson

Page 22

1  recused yourself?
2     A.  I did, and my recollection is that the -- while I
3  was aware that this amendment was in the works, that I was
4  not given any information by either party, by either side as
5  to how it was being negotiated and who was signing it and all
6  those sorts of things.
7     Q.  So you anticipated my next question, but just to be
8  clear, did you provide any input to the Novell side about
9  Amendment No. 2 as it related to ownership of the Unix
10 copyrights?
11    A.  I don't remember any instance in which I was either
12 asked to give input or that I did give input.  Is it
13 possible?  You have to understand that all of the legal staff
14 or many members of the legal staff at Novell were employees
15 of mine who I had hired and brought into the company, and so
16 I had not -- I hadn't brought them into Novell.  I had
17 brought them into a previous company which merged with
18 Novell.  And so I had interaction with these attorneys on a
19 fairly regular basis, socially and just in the community.
20        And so is it possible I had discussions?  Yes.  I
21 saw Bob Frankenberg on a social basis.  Is it possible I had
22 discussions?  Yes.  But I have no recollection that there was
23 any specific input that I was asked to give nor that I
24 actually gave that resulted in the creation of Amendment 2.
25    Q.  So just to prod your memory a little bit, you don't

Page 23

1  recall something along the lines of, Duff, there is a
2  provision in the asset purchase agreement that gives Novell
3  ownership of the Unix copyrights.  SCO is claiming that needs
4  to be clarified.  Do you recall why that provision is the way
5  it is in the asset purchase agreement?
6     A.  I don't recall having that discussion with anyone.
7     Q.  When you prepared this declaration that's in front
8  of us dated November 9th, 2006, did you have in mind the fact
9  that Amendment No. 2 had a provision relating to ownership of
10 the Unix copyrights?
11    A.  In the general sense.
12    Q.  So if you take a look at paragraph 8, for example.
13       MR. SINGER:  Paragraph 8?
14    A.  Did you say eight?
15    Q.  (By Mr. Jacobs) Yes.  You say there in the first
16 sentence:  Likewise, it was my understanding and intent, as
17 the Novell executive responsible for the negotiation of the
18 transaction, that the Unix copyrights were transferred to
19 Santa Cruz as part of the transaction that was closed in
20 December 1995.  You see that?
21    A.  Yes.
22    Q.  Now, the Amendment No. 2 was executed in October
23 1996.  Does Amendment No. 2 and the fact that it has, as you
24 said, a clarifying provision relating to Unix copyrights,
25 bear on your testimony in that first sentence?

Page 24

1     A.  Not at all.  My understanding of the deal starting
2  in May and June of 1995 was exactly this, and the document,
3  the APA, that I -- that we signed in September of '95 to my
4  understanding said this.  And to the extent it didn't say
5  this, the -- or at least it didn't say it clearly, the
6  Amendment No. 2 was a clarification of the ambiguous
7  language.
8        But you have to read that whole paragraph 8
9  together to kind of understand part of the rationale there,
10 because not only did we sign the APA, but we signed the
11 technology license agreement in December of 1995.  And it
12 certainly wouldn't have made any sense to me to sign the
13 technology licensing agreement in December from SCO to Novell
14 if Novell had retained all of that intellectual property.
15       That was kind of -- I mean, I didn't -- maybe a way
16 to answer your question is, the Amendment 2 was not the
17 instructive document on where the copyrights were for me.
18 The instructions I received from Bob Frankenberg were the
19 instructive charge.  What I said to Alok Mohan when I was
20 negotiating this transaction were consistent with Bob's
21 directions, and the APA -- we intended in the APA to make
22 that clear.  So I didn't need Amendment 2 to help me
23 understand what we had conveyed and what we hadn't conveyed.
24 I just make that distinction.
25    Q.  So just to press that point a bit, do you recall

Page 25

1  specific discussions leading up to the execution of the APA
2  in September 1995 about copyright -- and I emphasize
3  copyright -- ownership?
4     A.  I don't recall any specific discussion about
5  copyright.
6     Q.  Do you recall any specific discussions about
7  copyright ownership leading up to the execution in December
8  1995 of Amendment No. 1?
9     A.  I mean, the answer is, I -- not only is this now 11
10 and a half years in the past, so trying to remember a
11 specific discussion about copyright is difficult, but what
12 I -- I guess what I can recall is the actual negotiations and
13 the tenor of those negotiations and what was said, what we
14 said and what they said.  And so if you are asking me --
15 well, what are you asking me?
16    Q.  I am asking you -- I think you're answering about
17 tenor or overall deal structure, and I am asking you
18 specifically about the legal question of copyright ownership.
19    A.  Yeah, and I guess I would answer that by saying, I
20 was instructed to sell the entire Unix business, everything,
21 everything.  That was the initial instruction, sell
22 everything, from Bob Frankenberg to me, and sell UnixWare.
23 So sell Unix, sell UnixWare.
24       And having practiced law in this area previous to
25 joining Novell, so I was a general counsel for another

7 (Pages 22 to 25)

6e60cdac-2231-408b-b03e-a2cd31e63189

Duff Thompson

Page 130

1    A.  Yes.
2    Q.  Does the fact that the board minutes record that
3  Novell will retain all the copyrights have any effect on your
4  recollections of the structure of the deal and what was
5  understood to be occurring with respect to the Unix
6  copyrights?
7    A.  Yeah, well.  What it says is, "Novell will retain
8  all of its patents, its copyrights and trademarks."  Now, my
9  mindset would say, of course it is.  It's keeping all of the
10  NetWare and NetWare-specific products.  Otherwise, everything
11  that Bob told me to do and the instructions I received were a
12  fraud.  So I kind of come at this from the standpoint that,
13  when it says Novell is keeping all of its trademarks and
14  copyrights and patents, I understand that to mean its, as in
15  Novell's, not those that it sold.
16      And as backup for that, in reading this boxed
17  language, it says, "Novell will retain all of its patents,
18  copyrights and trademarks and a royalty-free, perpetual
19  worldwide license back to Unix and UnixWare for internal use
20  and resale in bundled products."  And I guess that seems
21  perfectly consistent to me because it says it needed to have
22  a license back to be able to use those products because it
23  had sold the underlying asset to SCO.
24      So it kind of -- even though it's the first time I
25  have seen this, as I read it, I think to myself, I'm not

Page 131

1  sure -- I'm not sure that even today, if you were to ask the
2  members of the board who were there, if they understood that
3  to known Novell was retaining all the Unix copyrights because
4  it says in the next sentence, they're getting back a
5  royalty-free perpetual worldwide license back to Unix and
6  UnixWare for internal use.
7      So my own reading of this is that this is perfectly
8  consistent with what I understood we did and what we were
9  signing the next day in the September 19th APA.
10    Q.  Now, it does say, except for the trademarks Unix
11  and UnixWare, doesn't it?
12    A.  Right.
13    Q.  So it does get pretty granular about something
14  associated with Unix when it talks about trademarks?
15    A.  Trademarks, right.
16    Q.  But it doesn't have similar degree of granularity
17  when it's discussing copyrights?
18    A.  No.  But the license back to Unix and UnixWare in
19  the next line, it seems to me, is relatively granular.
20    Q.  So let's talk -- let's get granular about that,
21  then.  The -- you understood that there were a bundle of
22  assets associated with Unix and UnixWare that were being
23  transferred to SCO?
24    A.  That's right, that this was a business that
25  included a bundle of rights.  That's right.

Page 132

1    Q.  And a bundle of rights you believed included --
2  looking back on it, you believed the structure of the deal
3  meant that the bundle of rights included the copyrights?
4    A.  No.  At the time I believe it included the bundle
5  of the copyrights, at the time.
6    Q.  Well, I'm a little confused because I thought you
7  said this morning that you don't recall any specific
8  discussion about copyrights.
9    A.  Yeah, but that doesn't mean that that's not what I
10  understood we were doing at the time.
11    Q.  So you --
12    A.  So the fact that I may not have had a specific
13  discussion that I can recall 11 and a half years later should
14  not be taken to mean I don't recall what our intention was in
15  selling the business.  It is impossible for me to parse in my
16  mind the assignment that we received to sell the -- to sell
17  the entire business, all of Unix and UnixWare to SCO, and to
18  somehow also in that same breath say, except the copyrights.
19      I just -- I don't understand that kind of thinking,
20  and certainly I just have to tell you that that kind of trick
21  play was not something that Bob Frankenberg would have
22  directed, nor is it something he would have stood for.  It's
23  not something I would have done.
24      If we had intended not to transfer the copyrights,
25  we would have been very careful to say, you don't get the

Page 133

1  copyrights.  And it wouldn't have been an oblique reference.
2  It would have been, you get all the business except the
3  copyrights.  Not, you get all the business.
4    Q.  You know there are a lot of arguments on both sides
5  of this issue, and I don't want to get into a debate with you
6  that you and I can't resolve.  But if -- but does your
7  testimony on this point turn on your view that this is all a
8  trick if Novell in fact retained the copyrights?  If it were
9  demonstrated to you that it was not a trick, for example,
10  would that change your view?
11      MR. SINGER:  Object to the form of the question.
12    Q.  (By Mr. Jacobs) I'm trying to --
13    A.  I think --
14    Q.  -- let me be a little clearer.  What exactly -- as
15  you sit here today, what exactly are you calling upon in your
16  memory to testify that you understood it was Novell's intent
17  to transfer the copyrights?
18    A.  My conversations with my staff, Ed Chatlos in
19  particular.  Ty Mattingly was in some of those meetings.  My
20  conversations with Alok Mohan, Jeffrey Seabrook, I think was
21  his name, Steve Sabbath, in which I said, "We are selling our
22  Unix business, lock, stock and barrel, all of it."  That's
23  how it started.
24    Q.  Exactly.  That's how it started, isn't it?
25    A.  Yes.  We are selling everything.

34  (Pages 130 to 133)

6e60cdac-2231-408b-b03e-a2cd31e63189

# EXHIBIT 12

I, ED CHATLOS, declare as follows:

1. I submit this Declaration in connection with the lawsuits entitled *The SCO Group v.*

   *Novell, Inc.* and *The SCO Group v. International Business Machines Corporation.*

**I.    WORK HISTORY**

2. Following my graduation from college, in 1980, I went to work for Western Electric,

   an AT&T subsidiary. After taking time off to obtain a Master's Degree in Computer

   Science in 1981, I resumed working that year at Western Electric on product

   management. In approximately 1984, I joined the Computer System Division of

   AT&T, the UNIX group working on international business development. I worked in

   that division through 1986.

3. In February 1987, I transferred to London and worked on licensing UNIX to

   European users. In 1988, I became Acting International Managing Director in

   Europe. In 1989, I transferred back to the United States and began working on

   business planning and development on UNIX issues. The UNIX business was

transferred to UNIX Systems Laboratories, Inc. ("USL") by 1991, and I continued

working on strategic business issues for UNIX.

4. After Novell, Inc. ("Novell") purchased USL in 1993, I went to work for Novell on

UNIX Strategic Partnerships and Business Development issues within the Strategic

Relations and Mergers and Acquisitions organization.  My title at Novell was Senior

Director.  I voluntarily left Novell in early 1996.

II.     **NOVELL'S SALE OF UNIX TO THE SANTA CRUZ OPERATION, INC. ("SCO")**

5. In 1995, I learned that Bob Frankenberg, Novell's Chief Executive Officer, had

determined that Novell should explore selling the entire UNIX business which Novell

had purchased from USL.  Under the direction of Duff Thompson, Senior Vice

President of Corporate Development, and Mike DeFazio, Executive Vice President of

the UNIX System Group, Novell considered several potential purchasers.  Novell

thereafter began serious discussions with SCO.

6. I was assigned the responsibility of negotiating and completing the deal to sell UNIX

and its business to SCO.  In or about June 1995, I became the lead negotiator for

2

Novell in the negotiations with SCO and headed the day-to-day responsibility for the

potential deal. I was the principal interface with SCO on the business negotiations

for Novell.

7. During these negotiations, I met regularly with SCO representatives, sometimes

several times a week from June to September 1995. Early in our discussions, it

became apparent that SCO could not pay the full purchase price as contemplated by

Novell. To bridge the price gap, it was ultimately agreed that Novell would retain

certain binary royalty payments under UNIX licenses. It was my understanding –

and intent, on behalf of Novell – that the complete UNIX business would be

transferred to SCO. I am not aware of any instance in which anyone at Novell or

SCO ever stated or exhibited any contrary intent or understanding, to me or anyone

else.

8. SCO and Novell thereafter negotiated the Asset Purchase Agreement ("APA") dated

September 19, 1995. Under the APA, Novell received shares of SCO common stock

and other consideration, and retained rights to certain binary product royalty

3

payments. SCO acquired all right, title, and interest in and to the UNIX and

UnixWare business, operating system, and source code. In the transaction, it was my

intent – and to my understanding was Novell's intent – to sell the entire UNIX

business to SCO, including the UNIX source code and all associated copyrights.

9. The above-described proposal was for Novell to transfer the entire UNIX business to

SCO except for certain binary product royalties that would be remitted to Novell. It

was always my understanding and intent, on behalf of Novell, that the UNIX source

code and its copyrights were part of the assets SCO purchased. I do not recall anyone

else ever suggesting that Novell would retain any copyright relating to UNIX, nor

was I present for any discussions, general or specific, during the negotiations that

contradicted my understanding of the transaction described herein. None of my

superiors at Novell ever informed me that Novell was not transferring the UNIX

copyrights to SCO. Likewise, I never communicated to SCO in any way that the

UNIX copyrights were not being sold to SCO. Nor am I aware of any instance in

4

which anyone from Novell ever informed SCO in any way that the UNIX copyrights

were not being sold to SCO as part of this transaction.

10. Given my central role in the negotiations, I believe I would have known if the parties

had agreed that Novell would retain any UNIX copyrights. My intent and

understanding as the lead negotiator for Novell was that Novell was transferring the

copyrights to SCO in the APA. At the time the transaction was signed and closed, I

did not observe anyone at Novell or SCO stating or acting as if Novell had retained

any UNIX copyrights. If they had, it would have been contrary to the intent and

structure of the deal as I understood it and communicated with SCO. In fact, from

the time the APA transaction closed in 1995 until this day, it has been my

understanding and belief that Novell sold the UNIX copyrights to SCO as of the time

of the closing in 1995.

11. I have reviewed Schedule 1.1(b), Excluded Assets of the APA (the "Excluded Assets

Schedule") with attention to the question of whether Novell was to retain any UNIX

copyrights. In my opinion the word "copyrights" in Paragraph V.A. refers – and was

5

intended by the parties to refer – to Novell copyrights other than those relating to UNIX and UnixWare, including the NetWare assets specifically referenced in Paragraphs I, II, and IV of the Excluded Assets Schedule.

12. Pursuant to a Technology Licensing Agreement signed by the parties in early December 1995, Novell licensed from SCO the use of the UNIX source code. I believe this licensing arrangement was consistent with SCO's ownership of the copyrights upon the closing of the APA.

13. Paragraph 4.16 of the APA was specifically designed and intended to protect Novell's retained binary product royalty stream. Based on the foregoing, including my understanding of the parties' intent, I do not believe Novell has any right to waive, or to direct or require SCO to waive, any of SCO's source code rights, including under customer source code licenses.

14. I declare under penalty of perjury that the foregoing is true and correct.

Executed: __10/1/04__
New York, New York

_____
Ed Chatlos

6

# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH


-----------------------------------------x

THE SCO GROUP, INC.

        Plaintiff/Counterclaim Defendant

    vs.               CASE NO. 2:04CV00139

 NOVELL, INC.

        Defendants/Counterclaim-Plaintiff.
-----------------------------------------x


DEPOSITION OF EDWARD CHATLOS

March 22, 2007


JOB NO: 192711

REPORTED BY:

Danielle Grant

19e5985f-fed9-417a-b8a3-1ea966eb97f7

Page 34

Chatlos
1
2  understanding after the execution of the APA as
3  to whether Novell had the right to direct Santa
4  Cruz to modify its SVRX licenses as defined or
5  referenced in the APA?
6      A   Yes, Novell had the right to modify
7  the terms of the binary royalties -- binary
8  royalties or the schedules associated with them.
9  And we did that to protect their -- the revenues
10 stream, the rights and their flexibility on that
11 revenue stream.
12     Q   When you say protect the flexibility
13 on that revenue stream, what do you mean?
14     A   In some cases we contemplated an
15 acceleration of binary payments or a buyout.
16     Q   I'm handing you, Mr. Chatlos, what's
17 marked as Exhibit 1065.  Exhibit 1065 is a
18 declaration, Mr. Chatlos, that you signed on
19 October 1st, 2004.  Do you recognize the
20 document?
21     A   Yes.
22     Q   Now, you had occasion to give
23 deposition testimony in the SCO versus IBM case;
24 is that correct?
25     A   Yes.

Page 35

Chatlos
1
2      Q   And you discussed in that deposition
3  the contents of this declaration; is that right?
4      A   Yes.
5      Q   And I don't want to walk you back
6  through all of that, but I wanted to ask if you
7  could generally explain the process by which you
8  came to execute this declaration, if you can
9  recall it?
10     A   Yeah, there were several discussions
11 with a number of the SCO representatives in which
12 I talked about the intent of the agreement and
13 ultimately what is reflected in here.
14     Q   Have you had occasion to review
15 Exhibit 1065 recently?
16     A   I don't think I looked at this since
17 the deposition.
18     Q   As you sit here is there any
19 amendment or clarification you would like to make
20 to this Exhibit?
21     A   Without reading it --
22         MR. SOLECKI:  You can read it.
23     Q   Feel free to take a couple of
24 minutes to read it if you would like to.
25     A   I don't want to modify this, this

Page 36

Chatlos
1
2  reflects the intent.
3      Q   Let me ask you about some of the
4  particular language in the declaration looking at
5  Paragraph 7 on Page 3.  You said beginning the
6  second sentence, "Early in your discussions it
7  become apparent that SCO could not pay the full
8  purchase price as contemplated by Novell to
9  bridge the price gap.  It was ultimately agreed
10 that Novell would retain certain binary royalty
11 payments under UNIX licenses.
12         "It was my understanding and
13 intent on behalf of Novell that the complete
14 UNIX business would be transferred to SCO, I am
15 not aware of any instance in which anyone at
16 Novell or SCO ever stated or exhibited any
17 contrary intent or understanding to me or
18 anyone else."  Do you see that language?
19     A   Yes.
20     Q   How does that language comport with
21 your understanding of the issue of the price gap
22 that you addressed in the paragraph?
23     A   It reflects the resolution we've
24 come up with to bridge that gap.
25     Q   Did you have occasion to deal with

Page 37

Chatlos
1
2  any outside counsel in the fall of 1995 regarding
3  the negotiation of the APA?
4      A   Yes, I can't remember specific
5  instances, but I remember discussing or meeting
6  with both sides outside counsel.
7      Q   And can you recall the individuals
8  with whom you dealt with?
9      A   I don't remember the names of the
10 SCO counsels, I remember Wilson Sonsini was the
11 counsel for Novell.
12     Q   You say in Paragraph 8 of your first
13 declaration in the last sentence, "In the
14 transaction it was my intent and to my
15 understanding was Novell's intent to sell the
16 entire UNIX business to SCO including the UNIX
17 source code and all associated copyrights."  Do
18 you see that language?
19     A   Yes.
20     Q   Does that statement accurately
21 reflect your intent?
22     A   Yes, it was to get -- to sell SCO
23 the entire business, so that they could conduct
24 the business in a complete manner on their side.
25     Q   You say Paragraph 9 beginning in the

10  (Pages 34 to 37)

ESQUIRE DEPOSITION SERVICES
212-687-8010

19e5985f-fed9-417a-b8a3-1ea966eb97f7

Page 38

Chatlos

1
2  third sentence, "I do not recall anyone else ever
3  suggesting that Novell would retain any copyright
4  relating to UNIX, nor was I present for any
5  discussions general or specific during the
6  negotiations that contradicted my understanding
7  of the transaction described herein.  None of my
8  superiors at Novell ever informed me that Novell
9  was not transferring the UNIX copyrights to SCO.
10  Likewise, I never communicated to SCO in any way
11  that the UNIX copyrights were not being sold to
12  SCO, nor am I aware of any instance in which
13  anyone from Novell ever informed SCO in any way
14  that the UNIX copyrights were not being sold to
15  SCO as part of this transaction."
16        Does that language accurately
17  reflect your recollection and intent regarding
18  the issue of copyrights?
19     A   Very much reflects it. It's intended
20  to sell the entire business, including the
21  copyrights.  And there were no discussions to
22  counter that.
23     Q   Did anyone ever suggest to you that
24  Novell did not intend to sell the UNIX and
25  UnixWare copyrights to SCO?

Page 39

Chatlos

1
2     A   No, not when we were -- not at this
3  time.
4     Q   You say in Paragraph 10 in the
5  beginning, "Given my central role in the
6  negotiations, I believe I would have known if the
7  party's had agreed that Novell would retain any
8  UNIX copyrights.  My intent and understanding as
9  the lead negotiator for Novell was that Novell
10  was transferring the copyrights to SCO and the
11  APA.  At the time the transaction was signed and
12  closed, I did not observe anyone at Novell or SCO
13  stating or acting as if Novell had retained any
14  UNIX copyrights."  Do you see that language?
15     A   Yes.
16     Q   Does that language accurately
17  reflect your intent and understanding on the
18  issue of copyrights?
19     A   Yes, it does.
20     Q   Why do you believe that you would
21  have known if the party's had agreed that Novell
22  would have retained any UNIX copyrights?
23     A   As the lead negotiator I was forming
24  a business arrangement between SCO and Novell.
25  And if they wanted to take out a significant

Page 40

Chatlos

1
2  portion of the assets, I potentially would have
3  fundamentally changed the deal and changed the
4  intent.
5     Q   I want to ask you, Mr. Chatlos,
6  about Paragraph 11 of your declaration which
7  references the APA, so I thought we could first
8  turn to schedule 1.1B of the APA, and that is
9  beginning on the page ending 954?
10     A   Yes, I see that.
11     Q   And it goes over to 955?
12     A   Yes.
13     Q   You say in your declaration in
14  Paragraph 11, "I have reviewed schedule 1.1B,
15  excluded assets of the APA, the excluded asset
16  schedule, with attention to the question of
17  whether Novell was to retain any UNIX copyrights.
18  In my opinion, the word copyrights in Paragraph
19  5A refers to and was intended by the parties to
20  refer to Novell copyrights other than those
21  related to UNIX and UnixWare, including the
22  Netware assets referenced in Paragraph 1, two and
23  4 of the excluded assets scheduled."  Do you see
24  that language?
25     A   Yes.

Page 41

Chatlos

1
2     Q   Does that language accurately
3  reflect your views of schedule 1.1B on the issue
4  of UNIX and UnixWare copyrights?
5     A   Yeah, 1.1B refers to those items in
6  that Novell was retaining and addressing all
7  those items it was retaining, not those that were
8  being transferred to SCO.
9     Q   Now, do you know whether this
10  excluded asset schedule was the subject of a
11  subsequent amendment?
12     A   I believe it was amended.
13     Q   Have you heard of Amendment No. 2 to
14  the APA?
15     A   Yes, I wasn't party of that.
16     Q   You left Novell by the time it was
17  negotiated; is that right?
18     A   Correct, um-hum.
19     Q   I'm handing you, Mr. Chatlos, what's
20  been previously marked as Exhibit 1009, which is
21  a copy of Amendment No. 2.  We seem to be short
22  of copies, but you've probably heard of it.  Do
23  we have one other that I can use?
24        MR. SOLECKI:  I can give you this
25  back if you need it.

11  (Pages 38 to 41)

19e5985f-fed9-417a-b8a3-1ea966eb97f7

# EXHIBIT 14

                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,            )
                                )
            Plaintiff/           )    2:04CV00139
            Counterclaim-Defendant, )
                                )
        vs.                     )
                                )
NOVELL, INC.,                   )
                                )
            Defendant/          )
            Counterclaim-Plaintiff. )
--------------------------------*

                    Friday, March 23, 2007
                    Elizabeth, New Jersey
                    10:01 a.m.



        Videotaped Deposition of BURT LEVINE,

taken by Defendant/Counterclaim-Plaintiff, pursuant

to Notice, held at the Sheraton Four Points Hotel,

901 Spring Street, Elizabeth, New Jersey, on Friday,

March 23, 2007 at 10:01 a.m. before Josephine H.

Fassett, a Certified Shorthand Reporter and Notary

Public of the State of New York.




            SHARI MOSS & ASSOCIATES
         Certified Shorthand Reporters
            877 Cowan Road, Suite A
          Burlingame, California 94010
               (415) 402-0004

```
                                    Page 14
1   don't know if we got the ownership from AT&T, I
2   think we got the rights to use it in the business
3   when we went over. But whether there were any
4   actual patents that USL was the owner of, I don't
5   have a recollection of that.
6       Q    They could have been but you're just
7   not sure?
8       A    That's correct.
9       Q    Do you know if USL had any
10  copyrights while you were working for USL relating
11  to UNIX?
12          MR. NORMAND: Objection to form.
13      A    Again I believe they did, I believe
14  they did.
15      Q    And do you know if the copyright
16  registrations for those copyrights or the original
17  certificates for those copyrights were maintained
18  in New Jersey where you were?
19      A    I don't. I believe that the
20  copyrights may have still have been in New York at
21  that time.
22      Q    At some point in time while you were
23  at USL would you have gotten the copyright
24  registrations and original copyright certificates
25  in the New Jersey office for USL?
```

```
                                    Page 15
1       A    I can't answer that, I don't know.
2       Q    You don't remember?
3       A    I don't remember.
4       Q    It's possible that the copyright
5   registrations and original copyright certificates
6   could have been in New Jersey when you were with
7   USL?
8           MR. NORMAND: Objection to form.
9       A    It's possible, more likely they were
10  in New York.
11      Q    Now do you recall that I believe in
12  1993 USL and its UNIX assets were purchased by
13  Novell?
14      A    Yes.
15      Q    Do you recall what the purchase
16  price was?
17      A    I don't.
18      Q    When Novell purchased USL and its
19  UNIX assets in 1993, did you move to Novell?
20      A    Yes.
21      Q    And when I say "moved to Novell," I
22  meant you went to work for Novell in 1993; is that
23  right?
24      A    That's correct.
25      Q    Did any other lawyers for USL begin
```

```
                                    Page 16
1   to work for Novell after Novell purchased USL and
2   its UNIX assets?
3       A    Yes.
4       Q    Okay. Which other lawyers for USL
5   went to Novell?
6       A    One of them was Ted Weitz. And the
7   other was Sandy Tannenbaum who in the interim from
8   the time that USL was formed and the time that the
9   Novell deal with USL was, he took Snedeker's place
10  I believe and he was made a, a director or a vice
11  president, I forget which.
12      Q    After the purchase of USL and its
13  assets by Novell in 1993, did you stay in your New
14  Jersey office of USL?
15      A    Yes.
16      Q    And I take it Mr. Weitz and
17  Mr. Tannenbaum, the other two USL lawyers, stayed
18  in the New Jersey offices of USL after the Novell
19  purchase of USL?
20      A    Yes, they did.
21      Q    Did the UNIX business itself that
22  was USL also stay in New Jersey after the Novell
23  purchase of USL?
24      A    Primarily, yes.
25      Q    And when you say "primarily," I take
```

```
                                    Page 17
1   it that perhaps some other part of the business
2   might have been elsewhere; is that correct?
3       A    Yeah. As I understood it, the
4   Novell product NetWare and various appendages of
5   that stayed in Utah whereas the UNIX part stayed
6   primarily in New Jersey. There may have been
7   salespeople, marketing people of UNIX out in Utah.
8   Again, my memory isn't great on that one.
9       Q    But the UNIX business primarily was
10  back in New Jersey with you; is that right?
11      A    Yes.
12      Q    Is it fair to say that the legal
13  team working on the UNIX business was also back
14  with you in New Jersey after the Novell purchase
15  of USL?
16      A    Do you mean Weitz and -- yeah, there
17  were three of us as I recall, Weitz, myself and
18  Tannenbaum.
19      Q    Now you mentioned that there might
20  have been some salespeople or marketing people for
21  UNIX who were out in Utah; is that right?
22      A    No, I was just guessing that. You
23  wanted to know where the division was and I said
24  if there were people for UNIX out there, it
25  probably would have been salespeople.
```

Page 18

1    Q    You're not sure if there were any --
2  sorry.
3    A    No, I'm not sure.
4    Q    You're not sure if there were any
5  UNIX business persons who were operating out in
6  Utah where Novell's business was headquartered?
7    A    No, I'm not sure now.
8    Q    Did you have an understanding that
9  prior to Novell's purchase of USL in 1993 that
10 Novell was headquartered in Utah?
11   A    I believe so.
12   Q    Did you have any understanding as to
13 whether there was an existing Novell Legal
14 Department at the time of the USL purchase by
15 Novell?
16   A    I don't know if it was before or
17 after the merger that I found that out, I had
18 assumed that there was.
19   Q    After the purchase of USL by Novell,
20 did you come to an understanding that there were
21 other lawyers for Novell who were working out in
22 Utah?
23   A    You mean after, after we were all
24 Novell?
25   Q    Yes.

Page 19

1    A    Yes.
2    Q    Do you know how many lawyers were
3  working for Novell in Utah?
4    A    No.  No.  At least four, maybe more.
5    Q    Is it fair to say that you and
6  Mr. Weitz and Mr. Tannenbaum in New Jersey were
7  continuing to head up the legal efforts relating
8  to UNIX after Novell's purchase of USL in 1993?
9    A    That was my understanding.
10   Q    After the purchase of USL and its
11 UNIX assets by Novell in 1993, did you and the
12 rest of the USL Legal Department back in New
13 Jersey continue to maintain legal files for the
14 UNIX business that was part of USL?
15   A    Well, we worked with the same group
16 in Greensboro and they would have maintained those
17 files, I don't think there was any change
18 physically in that aspect of it when these various
19 transactions took place.
20   Q    To the extent that there were any
21 patents or copyright registrations or original USL
22 copyright certificates relating to UNIX, would
23 those documents have been maintained by you and
24 the rest of the USL Legal Department back in New
25 Jersey after the Novell acquisition?

Page 20

1    A    No, we still didn't maintain those
2  ourselves.  I think there was a separate
3  department in AT&T that maintained these.  Again,
4  this is assuming that these were the original UNIX
5  registrations that came over from one entity to
6  another.
7    Q    To the best of your understanding,
8  is it the case that to the extent there was any
9  copyright registration, copyright certificate or
10 patents for AT&T or USL at the time of the Novell
11 purchase of USL, those legal documents would have
12 been maintained in the New York office of AT&T?
13   A    I think by that point being that we
14 were spun off they would have been maintained with
15 us.
16   Q    To the extent any of those
17 documents, patents, copyright registrations or
18 original copyright certificates existed when you
19 were at USL, those documents would have been back
20 in New Jersey with USL; is that right?
21   A    If they originated after say 1991
22 when the USL transaction took place, I would say
23 so.
24   Q    And if they had originated with AT&T
25 they would have been maintained with AT&T; is that

Page 21

1  right?
2    A    I believe so.
3    Q    Do you recall after moving from USL
4  to Novell ever sending anything like copyright
5  certificates or copyright registrations or patents
6  to Novell --
7    A    I --
8    Q    -- in Utah?
9    A    I don't remember that.
10   Q    To the best of your belief those
11 would have been maintained in New Jersey and not
12 sent to Utah?
13   A    I could only speculate on that, I
14 don't know.
15   Q    Based on your understanding as to
16 how the legal department operated for USL, is it a
17 fair statement that those likely remained in New
18 Jersey?
19   A    I would say it's a strong
20 possibility, again, I have, you know, no
21 information one way or the other.
22   Q    Do you have an understanding that in
23 1995 Novell then sold certain UNIX assets to a
24 company called the Santa Cruz Operation?
25         MR. NORMAND:  Objection to form.

6 (Pages 18 to 21)

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 22

1      A      I did.
2      Q      After the purchase by Santa Cruz of
3  certain UNIX assets from Novell, did you initially
4  continue to work with Novell back in New Jersey?
5            MR. NORMAND:  Objection to form.
6      A      Excuse me, what date are we, what
7  time frame are we talking now?
8      Q      1995.
9      A      After the --
10     Q      Original.  Let me just -- I'll
11 clarify it with a date.
12     A      Okay.
13     Q      Do you have an understanding that on
14 September 19th, 1995 Novell sold certain UNIX
15 assets to a company called Santa Cruz?
16           MR. NORMAND:  Objection to form.
17     A      Yes.
18     Q      Immediately after that purchase on
19 September 19, 1995 did you continue to work with
20 Novell back in New Jersey?
21     A      As I recall I did.  In the same
22 facility --
23     Q      Right.
24     A      -- I remember I did.
25     Q      Were you still in Summit, New Jersey

Page 23

1  at that point in time?
2      A      I believe we were, yeah.
3      Q      A few months or so after the
4  purchase by Santa Cruz of certain UNIX assets from
5  Novell did you then move to Santa Cruz, meaning
6  you began to work for Santa Cruz?
7      A      Yes.
8      Q      Do you remember approximately when
9  that happened?
10     A      It was a transition time and by
11 February 1st of 2006 I know that the three of us
12 in the Legal Department were considered SCO
13 employees, whether there was anything that was
14 formalized on company records before that, I don't
15 know.
16     Q      Okay.  I think you said 2006, you
17 meant February 1st, 1996, right?
18     A      Yeah.
19     Q      Just so the record is clear.
20     A      How time flies.  Yeah.
21     Q      When you did transition to Santa
22 Cruz in approximately February of 1996, did you
23 continue to work in New Jersey?
24     A      Yes.
25     Q      Did Mr. Tannenbaum and Mr. Weitz

Page 24

1  continue to work for Santa Cruz in New Jersey?
2      A      Weitz did.  I think sometime in 1996
3  Tannenbaum left the company and I think went back
4  to AT&T.
5      Q      When you say Mr. Tannenbaum left the
6  company, you meant he left Novell?
7      A      He left SCO.
8      Q      Oh, okay.  So Mr. Tannenbaum went to
9  Santa Cruz and then went back to AT&T?
10     A      I think that was the sequence of it,
11 yeah.
12     Q      Now you said that you, after the
13 purchase by Santa Cruz you went -- you stayed in
14 New Jersey, right?
15     A      Yes.
16     Q      Okay.  Did the rest of the USL
17 business that was part of Novell in New Jersey
18 also continue to reside in New Jersey?
19     A      There was a big development group
20 that was doing the UNIX software development and I
21 believe most, if not all of them went over to SCO.
22     Q      And they stayed in New Jersey?
23     A      And they stayed in New Jersey.
24     Q      After you went to work for -- after
25 you went from Novell to Santa Cruz, did you keep

Page 25

1  your various UNIX business files with you?
2      A      Yeah, whatever we had we kept.
3      Q      And would you and the rest of the
4  USL Legal Department that was part of Novell have
5  kept any files that they had including files such
6  as copyright registrations, copyright certificates
7  or patents that USL had been maintaining as part
8  of Novell?
9      A      Yeah, yeah, I think we would have
10 kept them in the same place if we had them.
11     Q      Now, Mr. Levine, you're a lawyer by
12 training; is that right?
13     A      Yes.
14     Q      Okay.  How long did you practice as
15 a lawyer or are you still practicing as a lawyer?
16     A      Well, I'm still a member of the New
17 Jersey bar, but the last time I did any legal work
18 really was the middle of 2002.
19     Q      Are you retired?
20     A      Semi.
21     Q      When did you graduate from law
22 school?
23     A      1962.
24     Q      Where did you graduate from law
25 school?

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 66

1  that right?
2      A    Eight Roman numerals, yes.
3      Q    Right.  And those are assets of
4  substance; isn't that right?
5          MR. NORMAND:  Objection to form.
6      A    Intellectual property, yes,
7  definitely.
8      Q    Okay.  And if you look at Roman V it
9  is entitled Intellectual Property, correct?
10     A    Right.
11     Q    And it lists two types of excluded
12 intellectual property, one, all copyrights and
13 trademarks except for the trademarks UNIX and
14 UnixWare, and two, all patents; do you see that?
15     A    I see that.
16     Q    Okay.  What is listed is (a) and (b)
17 of Roman V are specifically excluded assets under
18 this contract, would you agree with me?
19     A    Specifically listed assets, yes.
20     Q    Specifically listed as excluded --
21     A    Right.
22     Q    -- assets, correct?
23         MR. NORMAND:  Objection to form.
24 BY MR. BRAKEBILL:
25     Q    In reading this do you understand

Page 67

1  that Novell is excluding all patents from this
2  asset transfer?
3      A    I understand what the agreement
4  says, I understand what the exclusions are in the
5  document.
6      Q    Okay.  And based on reading this
7  exclusion in the contract do you understand that
8  all copyrights and trademarks except for the
9  trademarks UNIX and UnixWare are excluded from
10 this asset transfer?
11     A    No, I don't.
12         MR. NORMAND:  Objection to form.
13     Objection to the extent it calls for a
14     legal conclusion.
15 BY MR. BRAKEBILL:
16     Q    You disagree with the language in
17 this schedule; is that right?
18         MR. NORMAND:  Objection to form.
19     A    No, I don't disagree that these are
20 listed here, I disagree that in the context of
21 this agreement that this is, that this is the
22 whole story.
23     Q    Do you disagree that the contract on
24 September 19th, 1995 specifically excluded all
25 copyrights and trademarks except for the

Page 68

1  trademarks UNIX and UnixWare?
2          MR. NORMAND:  Objection to form.
3      Objection to the extent it calls for a
4      legal conclusion.
5      A    I cannot answer that Yes or No.
6      Q    Why can't you answer that Yes or No?
7      A    Because there's a premise that
8  hasn't been stated here, we're talking about a
9  written document and we're talking about the
10 party's intent.
11     Q    Is this document, Schedule 1.1(b),
12 unclear to you?
13     A    Yes.
14     Q    How is it unclear to you?
15     A    The asset that purports to be
16 transferred from Novell to SCO in the intent of
17 the parties will ex -- will include, to my reading
18 or to my knowledge, even though I don't remember
19 the specific terms of this agreement, the
20 intention was to convey all of these ownership and
21 auxiliary ownership rights to the asset including
22 copyright.  And the fact that there is this kind
23 of an exclusion there tells me that there is an
24 ambiguity in this agreement or a mutual mistake
25 which wipes out any kind of an integration clause.

Page 69

1  I don't agree that that's what the agreement
2  means.
3      Q    Can you tell me in your view what is
4  ambiguous about the exclusion on Schedule 1.1(b)
5  of, quote, all copyrights and trademarks except
6  for the trademarks UNIX and UnixWare?
7          MR. NORMAND:  Objection to form.
8      Mischaracterizes his testimony.
9      A    Can you repeat that question,
10 please?
11     Q    Can you tell me in your view what is
12 ambiguous about the exclusion on Schedule 1.1(b)
13 of, quote, all copyrights and trademarks except
14 for the trademarks UNIX and UnixWare?
15     A    I don't think you can exclude a
16 copyright in this kind of an asset transfer.  I
17 think you can exclude a copyright if you're
18 transferring the physical manifestation of the
19 asset, but when you purport to transfer the whole
20 asset and all the business and everything else I
21 think inherent in that is going to be the
22 copyright and it's a contradiction in terms for
23 the copyright to be excluded like this.
24     Q    So I take it if you had seen this in
25 the course of the negotiations you would have

18 (Pages 66 to 69)

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 154

1    Q    Do you know whether Mr. Bradford
2  personally was involved in the drafting of the APA
3  at all?
4    A    No, I don't know that.
5    Q    Was it your understanding at the
6  time of the drafting or negotiation of the APA
7  that Mr. Bradford was personally involved at all?
8    A    Yes.
9         MR. BRAKEBILL:  Form.
10 BY MR. NORMAND:
11   Q    Did Mr. Bradford ever tell you that
12 Novell was retaining any UNIX or UnixWare
13 copyrights with respect to the APA?
14        MR. BRAKEBILL:  Form.
15   A    No.
16   Q    Did Mr. Bradford ever tell you that
17 he had informed Wilson Sonsini lawyers to draft
18 the APA so as to have Novell retain any UNIX or
19 UnixWare copyrights?
20   A    No.
21   Q    Mr. Levine, from the time of the APA
22 in 1995 until you left Santa Cruz in 2000, did you
23 ever hear anyone whether inside or outside of
24 Santa Cruz or inside or outside of Novell say that
25 Novell had retained the UNIX or UnixWare

Page 155

1  copyrights?
2    A    No.
3    Q    If you had heard anyone make such a
4  statement, would that have been a surprise to you?
5    A    Very much so, yeah.
6    Q    And why do you say "very much so"?
7    A    My personal experience with the
8  couple of years that I spent at Novell was that it
9  was a very ethical company and I, I was very
10 impressed with that.
11   Q    And how does that fact bear on your
12 answer, the fact that you had the view that Novell
13 was an ethical company?
14   A    Was ethical and I believe that being
15 an ethical company in its dealings with its
16 partners or transferees or whatever it is that
17 they would not resort to withholding information
18 or trying to withhold something that the
19 transferee in this case would be entitled to.
20   Q    I wanted to ask you, Mr. Levine,
21 about the APA which was presented to you as an
22 exhibit and was previously marked in this case as
23 Exhibit 1.  And I think you've testified in
24 response to Mr. Brakebill's questions that it was
25 your view that the transfer of the UNIX and

Page 156

1  UnixWare copyrights was, quote, inherent in the
2  APA, do you recall testimony to that effect?
3         MR. BRAKEBILL:  Mischaracterizes
4    testimony.
5    A    I said something like that, yeah, I
6  don't remember the exact words.
7    Q    What would the, what would the words
8  that you would use be?
9         MR. BRAKEBILL:  Mischaracterizes
10   testimony.  It speaks for itself.
11 BY MR. NORMAND:
12   Q    As I ask you now, what words would
13 you use to describe your view that the copyrights
14 had been transferred?
15   A    Right.  That the transfer of the
16 business, including both the physical assets and
17 the intellectual property assets, would
18 automatically convey the copyright along with the
19 rest of the business assets.
20   Q    I want to direct your attention in
21 the APA, Mr. Levine, to the page with the Bates
22 number 950 on the bottom right.
23   A    (Complies.)
24   Q    In looking at the first paragraph
25 Roman I of Schedule 1.1(a) of the Asset Schedule,

Page 157

1  and that language says, quote, All rights and
2  ownership of UNIX and UnixWare, including, but not
3  limited to all versions of UNIX and UnixWare, and
4  all copies of UNIX and UnixWare, including
5  revisions and updates and progress, dot, dot, dot,
6  including source code, dot, dot, dot, such assets
7  to include without limitation the following, and
8  then here's a list of source code products,
9  binary product releases, products under
10 development and other technology, do you see that
11 language?
12   A    I do.
13   Q    How does that language bear on your
14 understanding at the time of the APA and today
15 that the UNIX copyrights and UnixWare copyrights
16 were among the assets transferred under the APA?
17   A    Do you mean the fact that these are
18 listed specifically as categories?
19   Q    I mean to ask you about the scope of
20 Roman I.
21   A    Oh, the scope of Roman I with or
22 without this listing, all rights and ownership of
23 UNIX and UnixWare, that gives all the components
24 of the business, including physical components and
25 intellectual components, to my mind will carry

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 158

1 with it the transfer of any copyrights that apply
2 to them.
3      Q    Mr. Brakebill asked you a couple of
4 questions earlier on the issue of whether Santa
5 Cruz had at the very least been licensed the right
6 to use and to make copies of the UNIX and UnixWare
7 source code, do you remember those questions?
8      A    I believe so, yeah.
9           MR. BRAKEBILL:  Mischaracterizes my
10     questions.
11 BY MR. NORMAND:
12     Q    Is it your view that Santa Cruz
13 under the APA merely took a license to use UNIX
14 and UnixWare source code?
15           MR. BRAKEBILL:  Form.
16     A    I'm sorry, can I hear the last part
17 of that?
18     Q    Is it your view that under the Asset
19 Purchase Agreement between Novell and Santa Cruz
20 that Santa Cruz merely acquired a license from
21 Novell to use the UNIX and UnixWare source code?
22     A    No, they obtained a full right,
23 title and interest in ownership of that asset.
24     Q    I wanted to ask you, Mr. Levine,
25 about Exhibit 125 which is titled AT&T Technology,

Page 159

1 Inc. Software Agreement, and I think Mr. Brakebill
2 identified this as the Software Agreement from
3 1985 regarding Sequent Computer Systems.
4      A    Yes.
5      Q    Do you remember reviewing the
6 document?
7      A    Yes.
8      Q    Did AT&T's software agreements
9 necessarily pertain to SVRX source code?
10     A    Not in its form as given to me.
11     Q    If a prospective licensee had signed
12 a software agreement and no other documentation
13 with AT&T, what rights with respect to source code
14 did it have?
15     A    It would have no rights under the
16 agreement because there was no product identified.
17     Q    And how would that licensee gain
18 rights to use source code from AT&T?
19     A    It would have to obtain a supplement
20 and schedule for that product to define what it
21 was it was licensing and pay the fees.
22     Q    And would the same be true of AT&T's
23 sublicensing agreements?
24           MR. BRAKEBILL:  Form.  Calls for a
25     legal conclusion --

Page 160

1 BY MR. NORMAND:
2      Q    In other words, if a licensee --
3           MR. BRAKEBILL:  -- as to all the
4     questions.
5 BY MR. NORMAND:
6      Q    If a licensee had entered into a
7 software agreement and sublicensing agreement and
8 no other agreement with AT&T, what rights would it
9 have, if any, with respect to binary products or
10 sublicensed products?
11           MR. BRAKEBILL:  Form.  Calls for a
12     legal conclusion as to this whole series of
13     questions.
14     A    If you mean a form sublicensing
15 agreement without any identification of the
16 product, then they would have no rights.
17     Q    I'm handing you, Mr. Levine, what's
18 previously been marked as Exhibit 1009 which is
19 titled Amendment No. 2 to the Asset Purchase
20 Agreement.
21           MR. NORMAND:  Do you have this?
22           MR. BRAKEBILL:  Yeah.
23 BY MR. NORMAND:
24     Q    Mr. Brakebill asked you earlier
25 whether to the best of your knowledge you have any

Page 161

1 views or viewpoints regarding any amendments to
2 the APA, do you remember a question in that
3 spirit?
4      A    Yes, and I recall that I said that I
5 hadn't reviewed this or I wasn't sure what he was
6 referring to, I couldn't, I couldn't answer it.
7      Q    Do you recall whether you had
8 occasion to review Amendment No. 2 to the Asset
9 Purchase Agreement?
10     A    Yes, I have.
11     Q    And I'm looking at paragraph A of
12 Amendment No. 2 which says "With respect to
13 Schedule 1.1(b) of the Agreement titled Excluded
14 Assets, Section V, subsection A shall be revised
15 to read:  All copyrights and trademarks, except
16 for the copyrights and trademarks owned by Novell
17 as of the date of the Agreement required for SCO
18 to exercise its rights with respect to the
19 acquisition of UNIX and UnixWare technologies," do
20 you see that language?
21     A    I do.
22     Q    Do you have a view as to what
23 copyrights it was necessary for SCO to have to
24 exercise its rights with respect to the
25 acquisition of UNIX and UnixWare technologies?

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 162

1      MR. BRAKEBILL: Objection to form.
2  Foundation. Calls for speculation.
3      A    Well, in my mind this is, this is
4  confirmatory of my view that the, the copyrights
5  that are now specified in this amendment would
6  have been transferred in any event because of the
7  scope of the rights in the transfer of the assets,
8  and this is confirmatory of that. This leaves no
9  doubt on black and white that, that this is what
10 was intended.
11     Q    I'd like to ask you, Mr. Levine,
12 about Exhibit 202 which should be in your pile
13 somewhere.
14         Exhibit 202 has the fax cover sheet
15 indicating that it's from Burt Levine, yourself,
16 to Aaron Alter.
17     A    Okay.
18     Q    Dated September 18th, 1995. And --
19     A    Yes.
20     Q    -- attached to the fax cover sheet
21 is I believe your markup of Schedule 1.1(a) and
22 the Seller Disclosure Statement, do you see that?
23     A    Yes.
24     Q    Do you remember reviewing the
25 document earlier?

Page 163

1      A    Yes.
2      Q    At any time when you were reviewing
3  this document in 1995 was it your view that Novell
4  was intending to retain the UNIX or UnixWare
5  copyrights under the APA?
6          MR. BRAKEBILL: Form.
7      A    Not in the least, no.
8          THE REPORTER: I'm sorry, I didn't
9  hear your answer.
10         THE WITNESS: "Not in the least,
11 no."
12 BY MR. NORMAND:
13     Q    At any time when you were reviewing
14 the schedule attached as part of Exhibit 202, was
15 it your view that the language of the APA served
16 to retain for Novell the UNIX or UnixWare
17 copyrights?
18         MR. BRAKEBILL: Form.
19     A    Do you mean the APA in its original
20 form?
21     Q    In the form that you were reviewing
22 it in the markup reflected in Exhibit 202.
23         You want the question read back?
24     A    Please.
25     Q    At any time when you were reviewing

Page 164

1  the schedule attached as part of Exhibit 202, was
2  it your view that the language of the APA served
3  to retain for Novell the UNIX or UnixWare
4  copyrights?
5          MR. BRAKEBILL: Form.
6      A    No. No.
7      Q    I'm going to show you, Mr. Levine,
8  or have you turn your attention to Exhibit 203.
9      A    (Complies.)
10     Q    Exhibit 203 is the document with a
11 telecopy cover sheet under Wilson Sonsini
12 letterhead to you from Shannon Whisenant dated
13 September 18th, 1995, and attached to the cover
14 sheet is a version of Schedule 1.1(a) of the APA,
15 and it's stamped Draft on each page.
16     A    Okay.
17     Q    And the same is true for Schedule
18 1.1(b). Do you remember reviewing this document
19 this morning?
20     A    Yes.
21     Q    Was it ever your view in reviewing
22 the document attached as part of Exhibit 203 that
23 Novell intended to retain the UNIX or UnixWare
24 copyrights under the APA?
25     A    No.

Page 165

1          MR. BRAKEBILL: Form.
2  BY MR. NORMAND:
3      Q    Was it ever your view when reviewing
4  the language of the document attached as Exhibit
5  203 that the language of the APA served to retain
6  for Novell the UNIX or UnixWare copyrights?
7          MR. BRAKEBILL: Form.
8      A    No.
9      Q    I direct your attention, Mr. Levine,
10 to Exhibit 204.
11     A    (Complies.)
12     Q    Exhibit 204 is the document with the
13 cover sheet under Novell's letterhead dated
14 September 15th, 1995 from you to Shannon
15 Whisenant, and attached to the document, among
16 other things, is your markup of the Seller
17 Disclosure Schedule and towards the back half of
18 the document your handwriting appears?
19     A    Yes.
20     Q    Do you remember reviewing this
21 document this morning?
22     A    Yes.
23     Q    Or this afternoon?
24     A    Yes.
25     Q    Was it your view at any time in

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

e463c127-8ffd-49b9-80e6-fe34f2330dd0

# EXHIBIT 15

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard–Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower–Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF WILLIAM M. BRODERICK** |
| *Plaintiff/Counterclaim Defendant,* | |
| v. | |
| NOVELL, INC., | Case No. 2:04CV00139 |
| *Defendant/Counterclaim-Plaintiff.* | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

I, William M. Broderick, declare as follows:

1.   I submit this declaration in connection with The SCO Group v. Novell, Inc., Civil Action
     No. 2:04CV00139 DAK (D. Utah 2004).

2.   I am Director of Software Licensing for The SCO Group, Inc. ('SCO'). My office is
     located in Murray Hill, New Jersey.

3.   Unless otherwise noted or evident from context, this Declaration is based on my personal
     knowledge.

4.   Since December 1991, I have been continuously employed with the successive
     companies that have owned the UNIX technology and business.

5.   From December 1991 to June 1993, I was the Manager of Sales Operation for UNIX
     System Laboratories ('USL'), a company that owned and operated the UNIX business that
     AT&T originally created.

6.   When AT&T sold USL to Novell, Inc. ('Novell') in June 1993, I remained with the UNIX
     business as a Novell employee performing substantially the same work as at USL.
     During most of my time at Novell, my title was Contract Manager.

7.   When Novell sold the UNIX business to The Santa Cruz Operation ('Santa Cruz') in 1995,
     I remained with the UNIX business as a Santa Cruz employee performing substantially
     the same work as at Novell. During my employment at Santa Cruz, my title was
     Manager, Law and Corporate Affairs.

8.   When Santa Cruz sold the UNIX business to Caldera International, Inc. ('Caldera') in
     2001, I remained with the UNIX business as a Caldera employee performing essentially
     the same work as at Santa Cruz. For a short period after the sale to Caldera, my official

title remained the same, but it later changed to my current title, Director of Software

Licensing. In 2003, Caldera changed its name to SCO.

9.     In sum, my career has followed the UNIX business as it has been transferred successively

from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO). I personally witnessed

and experienced the transition of the business from one owner to the next.

10.    As part of my duties as Contract Manager for Novell and as Manager, Law and Corporate

Affairs, for Santa Cruz, I was responsible for implementing the APA, and was thus

required to understand the meaning and intent of the APA. In the performance of my

duties for Novell and Santa Cruz, I also attended several meetings, including Novell

company-wide meetings, during which the purpose and intent of the APA explained. I

also participated in the transition team, composed of representatives of both companies,

that was responsible for the transitioning of the business to Santa Cruz.

11.    During the transition period that preceded and followed the closing of the transaction, and

the seven-plus years that followed the execution of the APA, I had numerous

communications and interactions with numerous people on both sides of the transaction,

including people who were directly involved in negotiating and implementing the APA.

Without exception, those people always manifested a common understanding that Novell

intended to and did transfer the entire UNIX and UnixWare business to Santa Cruz under

the APA, including all rights, title and interest in the assets and properties related to that

business, with the exception of interest in certain binary royalties. During that time, no

one ever communicated or otherwise indicated to me a contrary understanding.

2

12.    In addition to transferring the business to Santa Cruz, the APA helped forge a strategic

relationship between the parties. Santa Cruz planned to merge its own UNIX-derivative

product, Open Server 5.1, with UnixWare Release 2.1, to create a standard high-volume

UnixWare operating system that also integrated Novell's Netware networking services. In

addition, as described below, as part of the payment for the transferred business, Novell

took an equity position in Santa Cruz and obtained a contingent interest in the

performance of UnixWare, including the merged product.

**The SVRX Licenses**

13.    The agreements Novell transferred to Santa Cruz under the APA included all software

agreements, sublicensing agreements, and product supplements and related contracts.

The software agreements delineated the general rights and conditions for a licensee's

internal use of any UNIX or UnixWare product the licensee chose to license under a

product supplement. The sublicensing agreement outlined the rights and conditions for a

licensee's distribution of such a product in binary form. The supplements were the

licenses for individual UNIX or UnixWare products. Thus, for example, all licensees

who licensed UNIX System V, Release 3.2 signed the standard supplement licensing that

product. The contracts related to the supplements included amendments to the standard

product supplements, including letter-agreements adjusting binary royalties due under the

supplements.

14.    Like its predecessors and successors, Novell licensed UNIX and UnixWare through this

set of agreements. While the software and sublicensing agreements described general

rights and obligations that would apply if a licensee licensed a product, they did not

3

themselves license any product. They did not identify any product, specify the CPUs on which use of the product was authorized, require the payment of any consideration, or list any fees or royalties to be paid by the licensee. Rather, that information was contained in the supplement for each product.

15.    Each time a licensee sought to license a UNIX or UnixWare product, the licensee executed a supplement for that specific product. If the licensee later sought to license the same source code on additional CPUs, the licensee executed a supplement licensing those additional CPUs. If a licensee sought an additional distribution (that is, another copy) of the source code, the licensee entered into a supplement for that additional distribution. If a licensee sought to license a different UNIX or UnixWare product, such as a later version or release, the parties executed the supplement for that specific product. In the licensing groups at Novell and its predecessors and successors, we understood an SVRX license to be a SVRX product supplement.

16.    Each product supplement included a product schedule that listed the specific technologies licensed as part of the product. The schedule also listed the fees corresponding to the product, including the one-time "right-to-use fee" for use of the source code internally on a designated CPU, right-to-use fees for each additional CPU, the one-time "sublicensing fee" for the right to distribute binary copies of a product based on the licensed product, and the "per-copy fees" to be paid by the licensee for each such copy distributed by the licensee. In the licensing group at Novell and its predecessors and successors, we often used the terms "supplement" and "schedule" interchangeably.

17.  The software agreement itself bears out the relationship between the foregoing agreements. The software agreement granted the right to create derivative works based on the licensed product, for example, provided that the licensee treated any such modifications and derivatives the same as the licensed product and kept any such modifications and derivative work confidential. A licensee, however, was permitted to disclose a derivative work to an equivalent-scope licensee, that is, a licensee who had executed a supplement, or license, for the same or a later version of UNIX or UnixWare.

**The Configuration of Santa Cruz's Payment for the Business**

18.  As I stated previously, my understanding was that Novell intended to transfer, and Santa Cruz to acquire, the entire UNIX and UnixWare business under the APA. However, because Santa Cruz could not afford the price that Novell asked for the business, the parties agreed that Novell would retain interests in certain royalties.

19.  Based on what Novell told those of us in the Novell licensing group when the APA was announced and explained, my understanding is that Novell and Santa Cruz agreed that Novell would retain an interest in the continuing binary royalties paid under the SVRX licenses to which Novell was a party and that were transferred to Santa Cruz under the APA. That is, the parties agreed that Novell would retain an interest in the per-copy fees that the then-current SVRX licensees would continue to pay under their existing SVRX product supplements for their distribution of binary products based on the licensed SVRX product.

20.  The parties also agreed that Santa Cruz would pay royalties for the shipment or distribution of certain UnixWare-related products if those shipments and distributions

reached certain annual benchmarks through 2002. Novell never received those royalties because the required benchmarks were never reached.

21.    My understanding is that Novell's financial interest in the SVRX binary royalties and its contingent interest in the UnixWare-related royalties were not intended to grant Novell any other interest of any kind in the UNIX and UnixWare business. Novell and Santa Cruz simply intended for those royalties to bridge the gap between the price that Santa Cruz could pay for the business and the value that Novell deemed appropriate.

**Novell's Limited Rights Under Sections 1.2(b) and 4.16(b) of the APA**

22.    Under Section 1.2(b), the parties agreed that the SVRX binary royalties would continue to be recognized as royalties by Novell on an ongoing basis and Santa Cruz was obligated to collect and pass through to Novell 100% of these SVRX binary royalties, subject to a 5% administrative fee that Novell paid back to Santa Cruz. Section 1.2(b) also granted Novell the right to receive periodic reports and conduct audits of those royalties and the contingent UnixWare-related royalties.

23.    Amendment No. 1 was intended to clarify that Novell's interest in the SVRX product licenses transferred to Santa Cruz was limited to the binary royalties listed in the corresponding product schedules. Accordingly, Amendment No. 1 expressly provided that, notwithstanding Novell's interest in the binary royalties due under those licenses, Santa Cruz would retain every other category of fees that a licensee could pay under such a product license, namely, source code fees for additional copies of the SVRX product or for its use on additional CPUs. (The one-time right-to-use and sublicensing fees would

6

have already been paid to Novell upon the execution of the licenses because the licenses transferred to Santa Cruz were licenses to which Novell was a party.)

24.     Under Section 4.16(b) of the APA, the parties granted Novell certain rights and imposed on Santa Cruz certain obligations with respect to the SVRX licenses. Novell and Santa Cruz intended for those rights and obligations to protect Novell's interest in the binary royalties due under the transferred SVRX licenses. The parties did not intend for Section 4.16(b) to apply to any other assets or properties transferred to Santa Cruz under the APA.

25.     Again based on the training I received from Novell and my experience licensing UNIX products at Novell and its successors, my understanding is that Amendment No. 1 was intended to clarify that Section 4.16(b) applied only to Novell's interest in the SVRX binary royalties I have described above. Accordingly, Amendment No. 1 provided that, notwithstanding Novell's interest in those royalties, Santa Cruz obtained the right to license the SVRX source code without any restrictions except when such action by Santa Cruz would adversely affect Novell's rights to royalties in the current SVRX licenses. Specifically, Amendment No. 1 provided that Santa Cruz could amend the SVRX licenses to license additional distributions of the licensed product, additional designated CPUs, or the SVRX source code incidental to the licensing of UnixWare products.

26.     UnixWare products, like SVRX products, are built on prior versions of the same technology. Accordingly, each time Novell licensed a UnixWare product, Novell also granted the right to use prior UnixWare and SVRX products by listing them in the schedule for the licensed product. Because Santa Cruz could not have licensed

7

UnixWare products going forward without the ability to also license the legacy SVRX products on which UnixWare was built, Amendment No. 1 provided that Santa Cruz could amend or enter into new SVRX license as an incidental part of its UnixWare licenses.

27.    Amendment No. 1 otherwise prohibited Santa Cruz from entering into new SVRX licenses without Novell's prior approval. Like the other provisions in Sections 1.2(b) and 4.6(b), this provision was intended solely to protect Novell's limited financial interest in the SVRX royalties and contingent UnixWare royalties. As the SVRX was the legacy product and both parties had an interest in the growth of UnixWare products, the parties did not anticipate that Santa Cruz would enter into new SVRX product licenses but rather would offer UnixWare to new licensees or licensees seeking to upgrade their product. The prior-approval provision, therefore, was specifically intended to preclude Santa Cruz from entering into SVRX licenses that cut out Novell from its royalty interests.

28.    In other words, the provision was intended to apply to instances where Santa Cruz might have sold an SVRX licensee a new version of the product, extinguishing the SVRX binary royalties due to Novell without converting the existing SVRX license to a UnixWare license in which Novell would have a contingent interest. As the sole purpose and intent of Sections 1.2(b) and 4.1(b) were to secure and protect Novell's royalty interests, the prior-approval provision did not apply to any agreement that Santa Cruz or its successors might enter into that did not disturb those interests.

**SCO's 2003 Agreements with Sun and Microsoft**

29.   I understand that Novell claims that the payments SCO received for its 2003 agreements

      with Sun and Microsoft are SVRX royalties owed to Novell under Section 1.2(b) of the

      APA. That claim is inconsistent with the intent and meaning of the APA as they were

      explained to me by Novell. In 1994, Novell granted Sun a buyout of its obligations to

      pay any SVRX fees under its SVRX license. Similarly, Microsoft was under no

      obligation to pay any SVRX binary royalties under its SVRX license. Section 1.2(b) was

      not intended to apply, and in my view does not apply, to any payments that SCO received

      from licensing its technology to Sun and Microsoft in 2003.

30.   Novell did not negotiate for or obtain any right under the APA to receive any fees or

      royalties that Santa Cruz might collect in licensing its fully acquired UNIX and

      UnixWare code without disturbing Novell's royalty interest described above. Sections 1.2

      and 4.16 of the APA do not apply to the 2003 Sun and Microsoft agreements.

31.   Insofar as those agreements are licenses to technology, moreover, they are licenses for

      UnixWare. Consistent with the licensing practices of Novell and its predecessors and

      successors and consistent with the reality of licensing products that are built on prior

      technology, the license for the prior SVRX products contained in those agreements is

      incidental to the license for UnixWare. Amendment No. 1 to the APA thus expressly

      permits both agreements. The interest that Novell had in such UnixWare licenses expired

      in 2002. Novell cannot claim any interest in the 2003 Sun and Microsoft agreements.

32.   I also understand that Novell has claimed that the rights it retained under Section 4.16(b)

      of the APA extend to any agreements related to SVRX, including those that Santa Cruz

      and its successors entered into following the APA. That claim also is inconsistent with

9

the intent and meaning of the APA, as I understand them. The only interest that Novell

retained in the UNIX business was the right to continue receiving SVRX binary royalties

under the product supplements, or licenses, transferred under the APA. Novell and Santa

Cruz did not intend for Novell's rights under Section 4.16(b) to extend either to new

SVRX agreements that did not disturb Novell's limited royalty interests, or to any

software and sublicensing agreements whether then existing or not.

**Amendment No. 2**

33.    In April 1996, Novell attempted to grant IBM a buyout of its binary royalty obligations

under its System V, Release 3.2 product license. Santa Cruz objected for several reasons.

First, the purported buyout also extended IBM's rights to distribute the source code.

Second, although Santa Cruz understood that Novell had a 95% interest in the binary

royalties that IBM would pay for the distribution of that product, Santa Cruz explained

that the buyout violated the APA because it denied Santa Cruz the opportunity to convert

IBM's SVRX license to UnixWare, as intended by the parties under the APA. Although

Novell was willing to forego the royalties it might receive from the licensing of

UnixWare in favor of an up-front payment of the SVRX binary royalties, Santa Cruz

understood that buyouts hurt its UnixWare business going forward. In addition, Santa

Cruz pointed out that Novell, in a bid to recognize revenue for that quarter, had

underestimated the royalties that IBM would pay absent a buyout, so that the buyout

diminished Santa Cruz's 5% percent interest in the royalties.

34.    After months of negotiations, the parties agreed that Novell could not enter into any new

royalty buyouts without Santa Cruz's participation and approval. Section B of

Amendment No. 2 was intended to prevent the reoccurrence of a unilateral buyout by Novell. Amendment No. 2 was a protection that Santa Cruz insisted upon before agreeing to the buyout that the parties jointly granted IBM. Thus, I understood Amendment No. 2 to be an acknowledgement by Novell that even its interest in the SVRX binary royalties was subject to Santa Cruz's rights under the APA.

35.  I understand that Novell now argues that SCO has violated Amendment No. 2 by entering into the 2003 Sun and Microsoft agreements without Novell's involvement. That position is simply wrong. The buyout provisions of Amendment No. 2 apply only to the buyouts, and specifically to buyouts of SVRX binary royalties due under the SVRX licenses transferred to Santa Cruz under the APA. The Sun and Microsoft agreements are UnixWare licenses that only incidentally licensed prior SVRX products. They did not grant Sun and Microsoft any buyouts because, prior to the APA, those parties had either previously bought out their obligations to pay SVRX binary royalties or did not have an obligation to pay SVRX binary royalties under their SVRX licenses. Microsoft terminated its software agreement and SVRX licenses in 1998.

36.  I understand that Novell also takes the position that the interests it was granted in the APA and amendments thereto to protect the royalty stream it retained gave Novell protection from competition with respect to competitors such as Sun and Microsoft. The APA and its amendments were never intended to afford Novell any such prospective protections. There was never any discussion or agreement of any kind regarding any such protections. In fact, the only non-compete provision in the APA imposed restrictions on Novell to the benefit of Santa Cruz.

11

37.   In 1999, SVRX licensee Hewlett-Packard ('HP') sent the Santa Cruz legal department a
      check for several million dollars purporting to exercise a so-called favored pricing clause
      in its UNIX agreement. In compliance with Amendment No. 2 to the APA, Santa Cruz
      contacted Novell to determine if the parties were willing to grant HP the proposed
      buyout.

38.   Under an agreement dated January 28, 2000, Novell and Santa Cruz bilaterally granted
      HP a buyout for twenty-two million dollars, several times the amount of the check
      received by Santa Cruz.

39.   In 1994, Novell gave Texas Instruments ('TI') a three-year binary-royalty buyout for
      specified distributions of its SVRX product with renewal rights after the period expired.
      The price of the buyout was $500,000. In 1997, after Santa Cruz had acquired the UNIX
      and UnixWare business, TI contacted the Santa Cruz legal department seeking to renew
      the buyout for an additional three-year period at the same price.

40.   In an effort to comply with Amendment No. 2, over the subsequent several months, I
      made every effort to contact the persons at Novell with the authority to review the
      proposed renewal, including the persons in Novell finance who received Santa Cruz's
      quarterly royalty reports. After receiving no response from Novell, and to comply with
      Santa Cruz's contractual obligations to TI, Santa Cruz unilaterally granted TI the renewal
      and sent Novell its 95% share of the $500,000 payment. In 2000 and 2003, Santa Cruz
      and SCO again granted TI a renewal and again sent Novell its 95% share of the $500,000
      payment. It was not until the 2006 renewal, after Novell filed this lawsuit, that Novell
      took an active participation in the renewal negotiations.

12

41.     Prior to its sale of the UNIX and UnixWare business to Santa Cruz, Novell granted

Silicon Graphics, Inc. ('SGI') a buyout of its SVRX binary-royalty obligations. On April

2, 1996, Cray Research, Inc. ('Cray'), a distinct SVRX licensee, became a subsidiary of

SGI. Later that year, Cray wrote me stating that it intended to operate under the terms of

the SGI buyout agreement. Although Santa Cruz had only a 5% interest in the Cray's

royalty stream, I negotiated with Cray for nearly seven months. On May 6, 1997, after

Santa Cruz had expended resources far above the 5% administrative fee that it would get,

I turned the dispute over to Novell.

42.     In doing so, I advised Novell that it had no right under the APA to negotiate source code

rights or fees, and Novell agreed. In fact, before negotiating with Cray, Novell asked

Santa Cruz to execute a letter agreement to "enable Novell to negotiate directly with Cray

on the issue of Cray's intention to operate under the SGI Agreements for all SVRX

royalty-generating binary shipment without requiring direct involvement from SCO."

43.     I declare under penalty of perjury that the foregoing is true and correct.


Executed:     December 11, 2006


<br>

                                    William M. Broderick

# EXHIBIT 16

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION
CASE NO.  2:04 CV 00139


THE SCO GROUP, INC., a Delaware
corporation,

   Plaintiffs and Counterclaim Defendants,

     vs.

NOVELL, INC.,

   Defendants and Counterclaim Plaintiffs.

_____


  VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

WILLIAM BRODERICK

DATE:  February 1, 2007

REPORTED BY:  MICHAEL FRIEDMAN, CCR


ESQUIRE DEPOSITION SERVICES
90 Woodbridge Center Drive
Suite 340
Woodbridge, New Jersey  07095
(732) 283-1060 or (800) 247-8366

JOB  #  642838

237e0c97-4032-445b-9600-424f99eef537

Page 46

1  then over the years I have worked -- we in
2  the legal department, we've had meetings and
3  discussed contracts and terms, and why they
4  were included and why we will not change
5  them, or why we would.
6      When we were Santa Cruz, we would
7  have staff meetings, and occasionally during
8  each of the -- during the staff meetings
9  somebody would be assigned to discuss a
10  certain aspect of a contract.
11     Q    Any other training sessions
12  you can think of?
13     A    Not right now.
14     Q    Have you ever received written
15  materials at any of those training sessions
16  that you kept?
17     A    No.
18     Q    So, I mean, I'm not familiar
19  with -- I don't have firsthand knowledge of
20  someone in your line of business and
21  expertise, but I'm just wondering, is there
22  a -- I use the word treatise.
23        Is there some kind of Bible
24  you look to when questions come up, how to
25  draft materials, or some kind of guide book,

Page 47

1  anything like that that you have in your
2  office?
3      A    No. The agreements were prepared
4  with review with the corporate attorneys, and
5  we work with those agreements, and we will
6  occasionally go through the agreements and
7  see if they need to be updated for any reason
8  with -- with in-house legal, and I work with
9  the agreements.
10      MR. PERNICK:  Let's take a break.
11      THE VIDEOGRAPHER:  Off the record.
12  10:44.
13      (Brief recess taken from 10:42 to
14  10:51.)
15      THE VIDEOGRAPHER:  Stand by,
16  please.  Back on the record, 10:52.
17     Q    Mr. Broderick, could you look
18  at what we've marked at Exhibit 29, which is
19  your declaration in the SCO versus IBM case
20  dated November 7, 2006.  Actually, I think
21  this declaration says it's in connection with
22  both the IBM case and this case, but here's
23  that declaration.
24        I would ask you to look at
25  paragraph 7, please.  You can just read it to

Page 48

1  yourself.
2      A    (Witness reviewing.)
3        Okay.
4      Q    Can you just read the first
5  sentence out loud?
6      A    "My understanding of the sale of
7  the UNIX assets from Novell to Santa Cruz was
8  that the UNIX copyrights were transferred."
9      Q    What's the basis for your
10  statement there?
11     A    It's an understanding of the asset
12  purchase agreement, and discussions with
13  people at Santa Cruz.
14     Q    Why don't you tell me about
15  the people at Santa Cruz who you discussed
16  this with.
17     A    Well, actually, it was more than
18  the people at Santa Cruz.  It was -- with the
19  discussions, once we were told that the
20  business was being sold to Santa Cruz, we had
21  company-wide meetings.
22        And then we had smaller meetings
23  within the functional groups, when we were
24  identified which company we were going to be
25  with.

Page 49

1      Q    Are you still at Novell when
2  you say you had those meetings?
3      A    I think we were still officially
4  Novell employees, and there was one or two
5  company-wide meetings held in the cafeteria
6  in the building in Florham Park, and then we
7  had separate -- what I would call breakout
8  meetings.
9        There were a lot of transition
10  teams set up, and we had meetings related to
11  contracts, and there was a contracts
12  transition team which included people from
13  Santa Cruz and Novell, and we had discussions
14  with them.
15     Q    Are you saying that in some or
16  all of these meetings, it was said that
17  copyrights were transferred from Novell to
18  Santa Cruz?
19     A    There was no --
20      MR. NORMAND:  Objection to form.
21     A    There was no specific discussion of
22  copyrights, but in the initial company-wide
23  meeting, we were told -- I believe the
24  wording was Novell is going to focus on its
25  core technology, which is Net Ware, and

13  (Pages 46 to 49)

237e0c97-4032-445b-9600-424f99eef537

Page 50

```
 1  they're going to be selling the UNIX Ware
 2  business to Santa Cruz.
 3          And then in the breakout meetings,
 4  we discussed it further, and we were told
 5  they sold all right, title and interest in
 6  the business, which was defined as the UNIX
 7  and UNIX Ware business, and to the assets of
 8  the business, and the assets were described
 9  as the source code, the binaries, development
10  projects, all contracts.
11          And our opinion as contracts
12  people, if you sell all right, title and
13  interest in the assets, the assets include
14  source code.  Well, if you're selling all
15  right, title and interest in the source code,
16  the copyrights go.
17          It was not -- they were not
18  specifically addressed in any of our
19  discussions, because it was just assumed
20  totally illogical for copyrights not to go
21  with the source code if you're selling all
22  title, right and interest in the source code.
23      Q   But to clarify, nobody said in
24  any of these meetings that the copyrights
25  were also being transferred to Santa Cruz.
```

Page 51

```
 1          Is that right?
 2      MR. NORMAND:  Objection to form.
 3      A   I don't remember anybody
 4  specifically discussing copyrights, except to
 5  the point in some of the meetings they talked
 6  about activities related to changing the
 7  copyright notices in the source code to Santa
 8  Cruz Operation, Inc.
 9      Q   In UNIX code?
10      A   In the source code products.  It
11  was a long time ago.  I don't remember if
12  they identified which one.
13          I think they were just talking
14  about source code product activities, and
15  developers, if they had time to do certain
16  things.
17      Q   Do you remember what meeting
18  that was, when it took place, where it took
19  place, anything like that?
20      A   During the transition time, people
21  were talking about activities necessary to
22  move the business to Santa Cruz, and there
23  were a lot of meetings going on with trying
24  to identify activities that had to be done,
25  who would do them, who was staying at Novell,
```

Page 52

```
 1  who was going to Santa Cruz, who was going to
 2  HP, who was not, and who would be doing what
 3  functions, and did we have resources to get
 4  everything done, what the timing would be.
 5      Q   Do you remember who said that
 6  there was going to be work on changing the
 7  copyrights in the source code?
 8      MR. NORMAND:  Actually, did you
 9  hear the question?  What was the
10  question?
11      (Whereupon the record was read back
12  by the reporter.)
13      A   It would be a guess.  I'm trying to
14  picture the meetings and the discussions that
15  were going on, and the probable people -- it
16  would be a guess.
17          You would have to confirm it with
18  those people.  I believe John Maciaszek would
19  have been involved in it, in the discussion,
20  possibly Lisa Osmik.
21          She was on the technical side.
22  There were a lot of meetings and a lot of
23  people going in and out, and a lot of
24  discussions going on.
25      Q   Do you remember ever seeing
```

Page 53

```
 1  anything in writing saying that we need to
 2  change the copyrights in the source code?
 3      A   No, I don't.
 4      Q   Did you ever look for anything
 5  on that topic?
 6      MR. NORMAND:  Objection, form.
 7      Q   Did you look for any written
 8  materials saying that?
 9      A   No, I didn't, but as I said
10  earlier, it was illogical for the
11  copyrights -- if they were selling all
12  rights, title and interest in the source
13  code, it was illogical for the copyrights not
14  to go, so there was not a concern, something
15  we went looking for.
16      Q   Why would that be illogical?
17      A   Well, part of all right, title and
18  ownership in the source code would include
19  the copyrights.  Otherwise, how could you
20  protect your source code, if you don't own
21  the copyrights?
22      Q   Can you just sell source code?
23  Can't you just give someone the code?
24      A   Oh, you never give anybody source
25  code without very strict licensing
```

14  (Pages 50 to 53)

Page 102

1  engaged in the business of developing a line
2  of software products, currently known as UNIX
3  and UNIX Ware, the sale of binary and source
4  code licenses to various versions of UNIX and
5  UNIX Ware, the support of such products, and
6  the sale of other products, which are
7  directly related to UNIX and UNIX Ware,
8  collectively, the business.
9       Then I go down to section 1.1A,
10  which you had me look at earlier.  Purchase
11  and sale of assets, it's not a license to
12  assets, it's a purchase and sale of assets on
13  the terms, and subject to the conditions set
14  forth in this agreement, seller will sell,
15  convey, transfer, assign and deliver to
16  buyer, and buyer will purchase and acquire
17  from seller on the closing date all of
18  seller's right, title and interest in and to
19  the assets, and the properties of seller
20  relating to the business, collectively, the
21  assets.
22       Q    You left out --
23       A    (Reading.)  Identified on schedule
24  1.1A hereto, notwithstanding the foregoing,
25  the assets to be so purchased shall not

Page 103

1  include those assets, the excluded assets set
2  forth on 1.1B.  Then, if you just quickly
3  take a look at section 1.3AI, intent, it is
4  the intent of the parties hereto that all of
5  the business and all of the seller's backlog
6  in any -- relating to the business be
7  transferred to buyer, accordingly.
8       All parties agree to facilitate the
9  transfer of customers of the business from
10  seller to buyer, following the closing.  To
11  me, this is the sale of assets.
12       And if you're going to sell an
13  asset, you sell it all, related to UNIX and
14  UNIX Ware.  That's my opinion.
15       Q    Even though the agreement
16  expressly says that we're not selling any
17  patents on schedule 1.1B, right?
18       MR. NORMAND:  Objection to form.
19       Q    You agree it says that?
20       A    I agree that that's what the
21  agreement says, but I'm not clear on how you
22  can sell all right, title and interest, and
23  not get the -- and not get the part of the
24  technology that's used to protect it, if
25  there is any.

Page 104

1       Q    We were talking about patents,
2  but doesn't Roman 5 section 5 of schedule
3  1.1B, the excluded assets, also exclude all
4  copyrights?
5       MR. NORMAND:  Objection to form.
6       A    I've got the same argument on
7  copyrights.  I -- what I just read you before
8  follows through on my opinion on the
9  copyrights.
10       Q    You think that the only
11  copyrights that were excluded by section
12  1.1A, and these two schedules, the only
13  copyrights that you think were excluded were
14  the Net Ware and Tuxedo copyrights?
15       A    Yes.
16       Q    And is that based on your same
17  reasoning, as with patents?
18       A    Yes, it is.
19       Q    And do you have the same
20  reasoning for trademarks?
21       A    Are you talking about where it
22  says, Trademarks, except for the trademarks
23  UNIX and UNIX Ware?
24       Q    Yes.
25       A    One of the reasons why I have the

Page 105

1  opinion that this is related to the Net Ware
2  and the Tuxedo, Net Ware worked as a bundled
3  product, or integrated with UNIX and UNIX
4  Ware.  They were excluding that from the
5  assets transferred.
6       So, if you transferred UNIX Ware,
7  if you sold UNIX Ware lock, stock and barrel
8  to Santa Cruz, if it had the Net Ware in it,
9  in order that SCO couldn't say, We now own
10  Net Ware, they listed it on this excluded
11  assets.
12       Within the Net Ware, I believe
13  there were attributes to -- there were UNIX
14  and UNIX Ware and there were attributes to
15  the UNIX and UNIX Ware trademarks, and that's
16  why they exclude it here, except for the
17  trademarks UNIX and UNIX Ware, to the extent
18  they were used in those products.
19       Q    I'm sorry, I don't follow,
20  Mr. Broderick.  As I understand your
21  reasoning when you were talking about patents
22  and copyrights, you said that you have to
23  interpret this agreement, as -- this schedule
24  implicitly as only applying, only carving
25  out, the patents and copyrights that relate

27 (Pages 102 to 105)

237e0c97-4032-445b-9600-424f99eef537

Page 106

1  to Net Ware and Tuxedo?
2      A   Yes.
3      Q   You don't think that the
4  patents for UNIX and copyrights for UNIX were
5  ever intended to be on the excluded assets,
6  right?
7      A   Correct.
8          MR. NORMAND:  Objection to form.
9      Q   So, wouldn't that also be true
10  for trademarks?
11     A   My explanation on the trademarks
12  was within -- it's my understanding that
13  within the Net Ware product, since it was
14  bundled with UNIX Ware, there were references
15  to UNIX and UNIX Ware which would have had
16  the UNIX and UNIX Ware trademark attribution.
17         That was inside the Net Ware
18  product, built with the Net Ware product in
19  their documentation.  So, they're excluding
20  the copyrights and trademarks to the Net
21  Ware, except for the UNIX and UNIX Ware
22  trademark, which may be -- have an attribute
23  within that product.  That's how I believe
24  that this is to be read.
25     Q   You're really reading in a lot

Page 107

1  here.
2          MR. NORMAND:  Objection to form.
3      Q   This schedule 1.1B in numerous
4  places contains the modifier, Net Ware or
5  Tuxedo, the parties knew how to spell it out
6  when they wanted to.
7          MR. NORMAND:  Is this a question?
8      Q   And yet you believe they
9  intended modifiers for Tuxedo and Net Ware on
10  the intellectual property, but just didn't
11  put it in there?
12         MR. NORMAND:  Objection to form,
13     argumentative, asked and answered, lack
14     of foundation, mischaracterizes his
15     previous testimony.
16     Q   Is that what you're saying?
17     A   I stated my opinion.  I can see no
18  reason why the copyrights for UNIX or UNIX
19  Ware would have been excluded in the sale of
20  the assets to Santa Cruz, and that's
21  supported by other information, other
22  agreements between Novell and Santa Cruz that
23  I reviewed.
24     Q   So, let me just make sure I
25  have it right.  Look at Roman 2 on schedule

Page 108

1  1.1B, excluded assets, it says that Net Ware
2  operating system and services are excluded,
3  right?
4          MR. NORMAND:  Objection to form.
5      A   Yes.
6      Q   Why did they need to use the
7  modifier, Net Ware?  Wasn't it already --
8  under your rational, wasn't it already
9  assumed that everything listed here relates
10  to Net Ware or Tuxedo?
11         MR. NORMAND:  Objection to form,
12     mischaracterizes his testimony.
13     A   That's to clarify it further,
14  but -- I don't want to get into an argument
15  here, but if you look at 4A, it says, Net
16  Ware and other Novell code contained in UNIX
17  Ware 2.01 and higher, this is my position,
18  that there was Net Ware and UNIX Ware, and
19  they were excluding that so that Santa Cruz
20  could not at some point in time claim
21  ownership of Net Ware.  That's why they are
22  listing it as excluded.  It's my opinion.
23     Q   Why would it be, in your
24  opinion, listed expressly as a modifier in
25  Roman 2, but not listed explicitly on the

Page 109

1  copyrights or the patents?
2      A   I don't know.
3          MR. NORMAND:  Objection to form.
4      Q   Isn't it possible if they
5  didn't include a modifier, they didn't intend
6  the modifier?
7          MR. NORMAND:  Objection to form.
8      A   I can't believe that.
9      Q   Why not?
10     A   One reason is if Novell retained
11  the copyrights and ownership of UNIX, as they
12  are claiming, why at the time when they
13  signed the asset purchase agreement did they
14  sign a technology license agreement with
15  Santa Cruz, which gave them very limited
16  rights to use UNIX source code internally,
17  only internally, with also very strict
18  requirements and limitations on their
19  distribution of any use of that source code
20  in binary form?
21         If in fact Novell owned the UNIX,
22  didn't transfer the copyright and still owned
23  UNIX, there would be no reason for them to
24  take a license for the product.
25     Q   Can you point me to anywhere

28  (Pages 106 to 109)

237e0c97-4032-445b-9600-424f99eef537

# EXHIBIT 17

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>   Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>   Defendant/Counterclaim-Plaintiff. | **DECLARATION OF<br>DOUG MICHELS**<br><br>Case No. 2:03CV-0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |



I, Doug Michels, declare as follows:

1. I submit this declaration in connection with The SCO Group, Inc. v. International Business Machines Corporation, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003), and The SCO Group v. Novell, Inc., Civil Action No. 2:04CV00139 DAK (D. Utah 2004). I make this declaration based upon personal knowledge.

**Career at Santa Cruz**

2. I co-founded The Santa Cruz Operation, Inc. ("Santa Cruz") with my father in 1978, and was then employed with the company in various executive management positions.

3. I was the President and Chief Executive Officer of Santa Cruz from April 1998 until May 2001, when Caldera International, Inc. ("Caldera") acquired certain divisions of Santa Cruz. Santa Cruz then changed its name to Tarantella, Inc., where I stayed on as President and Chief Executive Officer until 2003.

4. As the President and CEO of Santa Cruz, I became familiar with Santa Cruz's UNIX System V license agreements after we acquired the UNIX business and assets, including the UNIX copyrights, from Novell in 1995.

5. I have reviewed the declarations of former Santa Cruz employees Jim Wilt and Kim Madsen and agree with their explanation of the transaction with Novell and other issues.

**Santa Cruz's Rights Under the System V License Agreement**

6. Santa Cruz was itself a UNIX System V licensee prior to its acquisition of the UNIX business and copyrights from Novell. As a UNIX System V licensee, Santa Cruz understood it was obligated to keep confidential all parts of System V software, including modifications and derivative works, and including the methods and concepts therein.

1

After Santa Cruz obtained the UNIX business and assets from Novell, Santa Cruz viewed the agreements the same way and informed our customers of those confidentiality obligations.

7. I understand that others, including David McCrabb, may have offered less restrictive interpretations of the UNIX System V licenses than I have set forth above. To the extent those interpretations are at odds with the explanation given above, they are at odds with company practice and policy. I have reviewed the Declaration of Kim Madsen, who was Santa Cruz's Manager of Law and Corporate affairs, on this point and I agree with her explanation of the UNIX System V licenses. It was our policy and practice that the sales organization defer to the legal department on issues such as this.

8. The employees at Santa Cruz who had the most experience in interpreting and enforcing the UNIX System V license agreements were the members of the UNIX licensing group that had been part of UNIX Systems Labs ("USL") and Novell. The management of Santa Cruz relied to a great extent on the experience and views of such individuals which was consistent with the description set forth above.

9. In connection with the 1995 purchase from Novell, the parties agreed that (as is accurately explained by both Mr. Wilt and Ms. Madsen) Novell could retain the existing binary royalty stream even though the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz. There was no intent to grant Novell any right to waive or to direct or require SCO to waive, any of its intellectual property rights or protections contained in the UNIX licenses.

2

10. After 1995, Santa Cruz's business with respect to the UNIX System V source code license agreements consisted primarily in collecting binary royalties attributable to sublicensed object code product. At the same time, the UNIX System V software included substantial intellectual property that Santa Cruz was using in later versions of its UNIX and UnixWare products. Accordingly, Santa Cruz had a strong continuing interest in protecting that property under the existing UNIX System V license agreements.

**IBM's System V License Buyout**

11. In early 1996, Novell, and IBM attempted to negotiate an agreement whereby Novell would be paid a buy-out settlement from IBM's obligation of paying binary royalties pursuant to its UNIX licenses. Novell even signed the agreement "on behalf of" Santa Cruz without authority to do so. Santa Cruz believed this unilateral action by Novell was contrary to SCO's rights under the APA. We notified Novell of our belief that their actions had breached our agreement with them and that we intended to aggressively pursue all available remedies under the agreement. After protracted discussion, correspondence and negotiation a settlement agreement was reached between Santa Cruz and Novell and Santa Cruz, Novell and IBM agreed to a modified Amendment No. X additionally, it was agreed Santa Cruz would receive a payment for this buy-out. It was my understanding that all parties clearly understood that the Amendment did not negatively impact our rights under the APA, and the related UNIX licenses, including our core source code rights.

12. No one ever expressed the view to me that Amendment No. X precluded Santa Cruz from terminating IBM's UNIX source code or sublicensing agreements in the event of a

3

breach. I would not have agreed to the terms of Amendment X if it had been explained to

me that way. I also agree with Ms. Madsen's statements on this point.

**Project Monterey**

13. I supported and helped to negotiate Santa Cruz's work with IBM in Project Monterey in

1998, and I oversaw the progress of the work during my tenure at Santa Cruz. I thought

that Project Monterey represented a valuable opportunity for both companies.

14. One of the principal components of Project Monterey was that Santa Cruz and IBM

would work together as partners in the joint development and general commercial release

of a product designed for use on a prospective Intel 64-bit chip.

15. In conjunction with the foregoing principal component of the Project, IBM would have

the right to use Santa Cruz's UnixWare/SVr4 code in IBM's AIX for Power product, but

the propriety of IBM's use of that code was inextricably linked to the release of a

commercially viable joint product for use on the Intel 64-bit chip.

16. I am told that as early as October 2000, IBM had released a version of AIX for Power

with hundreds of thousands of lines of UnixWare/SVr4 source code which I did not know

at the time. At the same time, Santa Cruz was focused on moving the project forward

and was looking forward to the release of the joint products as contemplated by the

agreement between the IBM and Santa Cruz and we believed IBM was pursuing the same

goal at that time.

17. Santa Cruz believed during the course of Project Monterey that IBM was serious about

the joint development of a general commercial release of the joint product for use on the

Intel 64-bit chip, and relied on IBM's repeated representations of its commitment to the

4

Project. I specifically recall a meeting with IBM executives, including Ron Lauderdale, in the summer of 2000 in which I asked IBM to confirm that it was not focusing on Linux at the expense of Project Monterey, and in which IBM assured me that they were pursuing Project Monterey vigorously. During the course of Project Monterey, IBM consistently maintained this position.

18. IBM also strenuously maintained that its support of Linux through the project known as Trillian (to port Linux to IA-64) in no way impacted their support of Project Monterey and that the free operating systems needed to support some IBM database products would not be a significant factor in the enterprise or high-end server markets where we were well positioned. We accepted IBM's assertions on this point.



5

**Santa Cruz's View of Linux**

19. In mid to late 1999, because the Linux system was beginning to encroach into some small business uses and major players in the computer industry, including IBM, had announced support for Linux, Santa Cruz considered and preliminarily investigated the possibility that UNIX System V source code had been incorporated into Linux without authorization. Although this preliminary investigation indicated that there were some potential and suspicious problems with Linux, we concluded that it was not then in Santa Cruz's interests to undertake an exhaustive and expensive investigation of the issue. Santa Cruz did not undertake to analyze, for example, whether any version of Linux constituted a derivative work of any version of UNIX System V within the meaning of the copyright laws.

20. One of the key premises of Project Monterey, as representatives of IBM repeatedly confirmed to me, was that the parties were to create a family of UNIX-based products that would provide revenues to benefit both parties in the market for UNIX on the Intel architecture chips, including the 64-bit chip.

21. The intent of the Joint Development Agreement, as confirmed by IBM's representations, was that (among other things) the parties would jointly develop an IA-64 product and each receive royalties from the sales of that product; that the commercial release of the IA-64 product would permit IBM to use SCO's UnixWare source code for use in IBM's existing AIX operating system; and that IBM would permit SCO to use AIX source code to develop SCO's UnixWare product.

6

22. When I and others at Santa Cruz informed IBM that Santa Cruz was concerned about IBM's announced support for Linux and how that might impact Project Monterey, IBM's response was to emphasize that Linux was not being supported by IBM as a commercially hardened operating system and would not substantially encroach on Santa Cruz's core markets or the markets targeted by Project Monterey, and that we need not worry about it.

23. By 1999, systems based on Intel processors and designed for corporate server environments had become more competitive with proprietary RISC based systems. With both Project Monterey products and Santa Cruz's other offerings, Santa Cruz was well positioned to obtain greater penetration into this market.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 9, 2006

Doug Michels

# EXHIBIT 18

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


THE SCO GROUP, INC.,

    Plaintiff and
    Counterclaim Defendant,

  vs.                   C.A. No. 2:04CV00139

NOVELL, INC.,

    Defendant and
    Counterclaim Plaintiff.
_____/


Deposition of

DOUGLAS MICHELS

March 28, 2007


Reported by
Katherine E. Lauster
CSR 1894


SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California  94010-1204
(415) 402-0004
(650) 692-8900
FAX:  (650) 692-8909

2b3d0e84-a667-4e76-8ac0-3013eb73124a

Page 98

12:10:18 1      A.  I doubt it.  I was CTO.  I mean, could
12:10:21 2  the CEO sign off on it without asking me, legally?
12:10:24 3  I suspect.
12:10:25 4      Q.  So as a general matter of practice, was
12:10:28 5  your agreement necessary to execute something like
12:10:30 6  Amendment Number X?
12:10:32 7      A.  Alok and I had a very close relationship,
12:10:37 8  and I had a deeper understanding of these issues
12:10:40 9  than he did, so he tended to rely on my opinion,
12:10:44 10  and I was on the Board.  You know, I mean, I had
12:10:46 11  a -- I had a strong say.  Whether it was
12:10:50 12  technically necessary, I doubt it.
12:10:53 13      Q.  All right.  And to clarify, at the
12:10:54 14  time -- I think you just said this, but let me be
12:10:57 15  sure.  We're now in sort of mid '96.  You're still,
12:11:02 16  as far as you recall, CTO of --
12:11:06 17      A.  And EV-P.
12:11:09 18      Q.  And EV-P?
12:11:14 19      A.  That's right.
12:11:14 20      THE REPORTER:  "NEV-P"?
12:11:16 21      MR. MELAUGH:  Executive Vice-President.
12:11:17 22  BY MR. MELAUGH:
12:11:17 23      Q.  Correct?
12:11:17 24      A.  Correct.
12:11:17 25      MR. NORMAND:  And EV-P.  And, not NEV-P.

Page 99

12:11:21 1      THE REPORTER:  It's really helpful if you
12:11:23 2  don't speak at the same time.
12:11:25 3      THE WITNESS:  I apologize.
12:11:27 4      MR. MELAUGH:  We'll try.
12:11:29 5      THE WITNESS:  We just get excited.  It's
12:11:32 6  so exciting.
12:11:34 7  BY MR. MELAUGH:
12:11:34 8      Q.  How much stock do you currently own?
12:11:37 9  SCO?
12:11:38 10      A.  Zero.
12:11:38 11      Q.  Do you have any retained options to buy
12:11:41 12  stock?
12:11:42 13      A.  No.
12:11:45 14      Q.  Have you been promised any compensation
12:11:48 15  in connection with your testimony in this dispute?
12:11:53 16      A.  Ryan buy dinner?
12:11:58 17      Q.  Aside from Ryan's generosity as regards
12:12:01 18  dinner, have you been provided any compensation?
12:12:06 19      A.  All the generosity I've seen.
12:12:09 20      Q.  I take it the answer is no?
12:12:12 21      A.  No.
12:12:12 22      Q.  And Mr. Normand currently represents you,
12:12:16 23  I take it, in connection with this dispute?
12:12:19 24      MR. NORMAND:  Objection to form.
12:12:21 25      THE WITNESS:  In connection with this --

Page 100

12:12:22 1  the Novell suit?  Yes.
12:12:24 2  BY MR. MELAUGH:
12:12:25 3      Q.  And his bills are being paid by SCO?
12:12:29 4      A.  I believe so.
12:12:30 5      Q.  Not by you?
12:12:31 6      A.  Not by me.
12:12:36 7      MR. MELAUGH:  If we could take another
12:12:37 8  short break, I actually don't think I have a lot --
12:12:40 9  hell of a lot more.  So let me just take a break
12:12:43 10  and look over things.
12:12:46 11      THE WITNESS:  Okay.
12:12:46 12      MR. MELAUGH:  And then we'll come back.
12:12:48 13      THE VIDEOGRAPHER:  Going off the record.
12:12:49 14  The time is 12:12 p.m.
12:15:54 15      (Short break.)
12:15:56 16      THE VIDEOGRAPHER:  Back on the record.
12:15:57 17  The time is 12:15 p.m.  And this marks the end of
12:16:02 18  tape number 1 in the deposition of Douglas Michels.
12:16:06 19  Going off the record.  The time is 12:15 p.m.
12:16:10 20      (Short break.)
12:24:19 21      THE VIDEOGRAPHER:  Back on the record.
12:24:21 22  Here marks the beginning of tape number 2 in the
12:24:23 23  deposition of Douglas Michels.  The time is
12:24:25 24  12:24 p.m.
12:24:25 25  //

Page 101

12:24:29 1  BY MR. MELAUGH:
12:24:31 2      Q.  In 2001 SCO sold certain assets to
12:24:37 3  Caldera and changed its name to Tarantella; is that
12:24:41 4  right?
12:24:41 5      A.  Correct.
12:24:41 6      Q.  And you continued on with Tarantella?
12:24:44 7      A.  Correct.
12:24:45 8      Q.  As part of that transaction, did you
12:24:47 9  receive change of control benefits?
12:24:49 10      A.  I did.
12:24:50 11      MR. MELAUGH:  That's my last question.
12:24:53 12  Do you have any?
12:24:55 13      MR. NORMAND:  I do have some questions.
12:25:00 14      EXAMINATION BY MR. NORMAND
12:25:02 15      Q.  Good morning, Mr. Michels.
12:25:03 16      A.  Good morning.
12:25:06 17      Q.  Did you play any role in connection with
12:25:06 18  the 2001 asset transfer from Santa Cruz to Caldera?
12:25:11 19      A.  I did.
12:25:11 20      Q.  What role did you play?
12:25:14 21      A.  The original creator and negotiator for
12:25:18 22  that deal.
12:25:18 23      Q.  And can you describe for me your general
12:25:20 24  intent with respect to the transaction?
12:25:29 25      A.  Yeah.  I think the -- the general intent

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

2b3d0e84-a667-4e76-8ac0-3013eb73124a

Page 102

12:25:31 1   was to sell the UNIX business to -- to Caldera.
12:25:36 2       Q.  Was the intent to sell the same UNIX
12:25:38 3   assets you had acquired from Novell in 1995?
12:25:42 4       A.  Well, they were included in the UNIX
12:25:44 5   business, yeah.  They were a small part of it.
12:25:53 6       Q.  What was the larger part of the business?
12:25:55 7       A.  The OpenServer business.
12:26:02 8       Q.  You testified this morning that one of
12:26:05 9   the purposes of the APA was to buy the original
12:26:08 10  UNIX business.  Do you recall that?
12:26:10 11      A.  Yes.
12:26:13 12      Q.  Was one of the purposes of the APA to buy
12:26:16 13  the UnixWare business as well?
12:26:19 14      A.  Yeah, what I meant was the -- the intent
12:26:21 15  was to buy the business that had originally started
12:26:24 16  at AT&T and Bell Labs, and then became USL, and
12:26:29 17  then was acquired by Novell, and then -- and that
12:26:31 18  -- and that whole business is also what created
12:26:35 19  UnixWare, but I mean we bought the employees and
12:26:37 20  the body of that business, which is -- included
12:26:40 21  everything they ever did, which obviously included
12:26:44 22  UnixWare as well as SVR IV and SVR III and SVR V.
12:26:51 23      Q.  Mr. Melaugh asked you this morning about
12:26:53 24  the Technology License Agreement or TLA.  Do you
12:26:57 25  remember that question, or those series of

Page 103

12:27:00 1   questions?
12:27:00 2       A.  Where he was talking about different
12:27:01 3   piles of paper?
12:27:02 4       Q.  I think you were both talking about that,
12:27:05 5   yes.
12:27:05 6       A.  Uh-huh.
12:27:06 7       Q.  Do you recall independently of how it was
12:27:08 8   embodied in a particular agreement, do you recall
12:27:11 9   the issue of a license back to Novell --
12:27:14 10      A.  Yes.
12:27:15 11      Q.  -- in connection with the APA?
12:27:16 12      A.  Yes.  Novell had a concern that, during
12:27:19 13  the course of time where they had commingled the
12:27:22 14  UNIX and Novell Development efforts, that some UNIX
12:27:26 15  may have crept into Netware, and they wanted to
12:27:29 16  make sure that any incidental technology that had
12:27:34 17  crept into Netware from UNIX was not a violation of
12:27:37 18  anything.
12:27:37 19      And we, of course, were fine with that,
12:27:39 20  but we wanted to make sure that license didn't
12:27:42 21  give them any rights to go back into the UNIX
12:27:45 22  business, or to use that technology, other than had
12:27:47 23  incidentally perhaps crept in.  And so we -- we did
12:27:55 24  effectively grant them rights to UNIX technology as
12:28:00 25  necessary to protect them from any incidental use

Page 104

12:28:06 1   of UNIX inside of their existing products.
12:28:09 2       Q.  And did you have an understanding at the
12:28:10 3   time as to the basis on which Santa Cruz granted
12:28:15 4   Novell rights to the UNIX technology?
12:28:18 5       A.  "The basis"?  What do you mean?
12:28:20 6       Q.  Was it your view that Santa Cruz owned
12:28:24 7   the rights and the UNIX technology as of the date
12:28:28 8   of the license back to Novell?
12:28:29 9       A.  Of course.  We bought the business.  And
12:28:32 10  as a result of buying the business, we owned all
12:28:34 11  the intellectual property.  And they were concerned
12:28:37 12  that, since we owned all the intellectual property,
12:28:41 13  we might turn around and sue them for using our
12:28:45 14  intellectual property in -- in Netware, and of
12:28:46 15  course they didn't know if they actually had used
12:28:49 16  it in Netware, but they thought they might have,
12:28:52 17  maybe accidentally, since the same engineers worked
12:28:54 18  on both.
12:28:55 19      And, you know, obviously we weren't suing
12:28:56 20  them over that, so we granted them a license to
12:28:59 21  cover that eventuality, in case it had happened.
12:29:08 22      Q.  Did you have an understanding at the time
12:29:11 23  of the license back as to the scope of the
12:29:15 24  restrictions on Novell's ability to compete with
12:29:19 25  Santa Cruz using the license back technology?

Page 105

12:29:23 1       A.  Well, I mean, our purpose was only to
12:29:26 2   give them rights to any incidental use of the
12:29:34 3   technology in their -- in their Netware product
12:29:40 4   family.
12:29:43 5       THE REPORTER:  -- "in their Netware
12:29:43 6   product" --
12:29:43 7       THE WITNESS:  In their Netware product
12:29:43 8   family, and we wanted to be certain that, you know,
12:29:46 9   we didn't accidentally give them rights to -- to,
12:29:49 10  you know, suddenly say, you know, we didn't really
12:29:53 11  sell the business.  We're still selling UNIX.
12:29:56 12      So we had a non-compete provision in
12:29:58 13  there that said they couldn't -- you know, they
12:30:01 14  couldn't use this technology.  We weren't licensing
12:30:06 15  them to compete with us other than through Netware,
12:30:08 16  but I don't -- I don't know how the exact wording
12:30:12 17  got implemented, but that was the purpose.
12:30:14 18  BY MR. NORMAND:
12:30:14 19      Q.  Now, Exhibit 241 is your November 2006
12:30:18 20  declaration, Mr. Michels.
12:30:21 21      A.  Oh, this?
12:30:25 22      Q.  I think you testified, in response to
12:30:26 23  Mr. Melaugh's questions this morning, that you had
12:30:29 24  occasion to potentially send drafts of this
12:30:33 25  declaration to some former co-workers at Santa

2b3d0e84-a667-4e76-8ac0-3013eb73124a

Page 134

13:00:03 1  just the intent then, the intent was not -- part of
13:00:06 2  the intent -- the intent did not include a license
13:00:11 3  to SCO's efforts going forward?
13:00:14 4      A.  Correct.
13:00:26 5      Q.  The questions went by a little quickly.
13:00:28 6  I -- I -- I do want to make sure I heard the
13:00:30 7  answer.
13:00:30 8          When you were shown Exhibit 1009, which
13:00:34 9  is Amendment Number 2, you said you did not
13:00:36 10 recognize this document initially?
13:00:38 11     A.  Looks like a piece of paper with words on
13:00:40 12 it.
13:00:41 13     Q.  So it's not something that you reviewed
13:00:43 14 in preparation for your declaration or for this
13:00:46 15 deposition testimony?
13:00:47 16     A.  I think it might have flown by while we
13:00:51 17 were talking at dinner about this testimony, but --
13:00:54 18 and it wasn't something we spent much time on.
13:00:57 19     Q.  So were there documents exchanged during
13:01:00 20 the dinner you had?
13:01:01 21     A.  Exchanged?  No.  We looked at some.
13:01:03 22     Q.  What documents did you look at?
13:01:07 23         MR. NORMAND:  What are we talking about
13:01:09 24 right now?  What dinner?
13:01:09 25 //

Page 135

13:01:10 1  BY MR. MELAUGH:
13:01:10 2      Q.  That's a -- we'll treat that as a
13:01:11 3  question from me.  What dinner are we talking
13:01:14 4  about?
13:01:15 5      A.  The dinner last night, that I had last
13:01:16 6  with him.
13:01:18 7          MR. NORMAND:  Well, that's at a point
13:01:18 8  when we were representing Mr. Michels, so you need
13:01:19 9  to craft your questions more carefully about what
13:01:22 10 documents he reviewed.
13:01:24 11 BY MR. MELAUGH:
13:01:25 12     Q.  What documents did you review at the
13:01:27 13 dinner last night?
13:01:28 14         MR. NORMAND:  I'm going to instruct the
13:01:30 15 witness not to answer the question.
13:01:31 16 BY MR. MELAUGH:
13:01:32 17     Q.  Did you review any documents that
13:01:34 18 refreshed your recollection about the issues in
13:01:36 19 this case last night?
13:01:45 20     A.  I would not say they refreshed my
13:01:47 21 recollection, because I never studied the documents
13:01:50 22 before.
13:01:54 23     Q.  Okay.  Apart from the dinner last night,
13:02:00 24 have you reviewed any documents at the request of
13:02:04 25 Mr. Normand, or Mr. Tibbitts, or any other SCO

Page 136

13:02:08 1  employees, apart from the drafts of your
13:02:11 2  declaration?
13:02:12 3          MR. NORMAND:  You can answer the question
13:02:13 4  yes or no.
13:02:15 5          THE WITNESS:  I did not review any
13:02:16 6  documents at their request, no.
13:02:18 7  BY MR. MELAUGH:
13:02:53 8      Q.  So I understand, I think you answered a
13:02:55 9  similar question from Mr. Normand, but I just want
13:02:57 10 to understand your testimony on this point.
13:03:00 11         Is it your opinion that -- just a moment.
13:03:08 12     A.  Take your time.
13:03:17 13     Q.  So turning to Amendment Number 2 here,
13:03:19 14 Mr. Normand read you some text from this under
13:03:23 15 paragraph A.  I'll read it again, so we're all on
13:03:26 16 the same page.  It modifies the excluded assets to
13:03:30 17 read:
13:03:30 18         All copyrights and trademarks, except for
13:03:33 19         the copyrights and trademarks owned by
13:03:36 20         Novell as of the date of the Agreement
13:03:37 21         required for SCO to exercise its rights
13:03:40 22         with respect to the acquisition of UNIX
13:03:42 23         and UnixWare technologies.
13:03:46 24 What is your opinion as to the scope of that
13:03:48 25 phrase, namely, "copyrights required for SCO to

Page 137

13:03:52 1  exercise its rights," and so on?  What copyrights
13:03:56 2  does that include?
13:03:57 3          MR. NORMAND:  Objection to form, and
13:03:58 4  asked and answered.
13:04:24 5          THE WITNESS:  I mean, I believe the scope
13:04:26 6  of the term here is all copyrights relating to the
13:04:39 7  UNIX business -- source code, documentation,
13:04:42 8  screens, you know, training materials, you know,
13:04:50 9  that -- brochures, marketing literature -- every --
13:04:54 10 you know, there's millions of copyright things in a
13:04:58 11 business.
13:04:59 12 BY MR. MELAUGH:
13:05:00 13     Q.  Were there any copyrights held by Novell
13:05:03 14 that -- that you believe were excluded from this --
13:05:05 15 from the scope of this phrase?
13:05:08 16     A.  Netware.
13:05:10 17     Q.  Aside from the Netware copyrights, are
13:05:12 18 there any copyrights --
13:05:14 19     A.  All of the things not related to the UNIX
13:05:17 20 business -- Netware, all Novell's other products
13:05:20 21 that we weren't buying, all their documentation,
13:05:23 22 marketing materials, training materials for their
13:05:26 23 products.  I mean, we were only buying the UNIX
13:05:29 24 business.
13:05:29 25     Q.  Are there any copyrights that related in

SHARI MOSS & ASSOCIATES          (415 ) 402-0004

2b3d0e84-a667-4e76-8ac0-3013eb73124a

Page 138

13:05:31 1   any way to UNIX or UnixWare that you believe are
13:05:34 2   excluded from the scope of this phrase?
13:05:37 3       MR. NORMAND: Objection to form.
13:05:39 4       THE WITNESS: I -- I mean, the only
13:05:41 5   copyrights would be you, know, like how to hook up
13:05:44 6   your Netware server to Unix. I mean -- you know, I
13:05:48 7   mean, I'm sure there were documents that were in
13:05:51 8   the Netware pile that discussed Unix, but anything
13:05:54 9   that's in the -- in the UNIX business would have
13:05:57 10  been included.
13:05:57 11  BY MR. MELAUGH:
13:05:58 12      Q.  Why are all those copyrights required for
13:06:01 13  SCO to exercise its rights with respect to the
13:06:04 14  acquisition?
13:06:06 15      A.  We took over --
13:06:07 16      MR. NORMAND: Objection. Asked and
13:06:07 17  answered.
13:06:08 18      THE WITNESS: We took over the business.
13:06:09 19  We were in the business of selling intellectual
13:06:13 20  property. We were in the business of supporting
13:06:15 21  the intellectual property. We were in the business
13:06:15 22  of providing training. We were in the business of
13:06:19 23  providing marketing materials. We couldn't do any
13:06:21 24  of that without owning the copyrights.
13:06:23 25      Q.  Well, let's take SVRX licenses, for
13:06:25

Page 139

13:06:30 1   example. Was SCO, at the time, in the business of
13:06:33 2   entering into new SVRX binary resource --
13:06:39 3       A.  Yes.
13:06:39 4       Q.  -- licenses?
13:06:41 5       MR. NORMAND: Objection to form.
13:06:41 6   BY MR. MELAUGH:
13:06:42 7       Q.  Both binary and resource licenses?
13:06:42 8       A.  Yes. If somebody wanted one, we were the
13:06:45 9   place they would have got it. OpenServer was an
13:06:52 10  SVRX license, and we were -- that was still our
13:06:54 11  primary product. So we were still selling source
13:06:58 12  and binary rights to OpenServer. It was all based
13:07:02 13  on SVRX licenses.
13:07:04 14      Q.  But for SVRX binary licenses at least,
13:07:07 15  SCO owed an obligation to Novell to turn over
13:07:12 16  revenue from those licenses; isn't that right?
13:07:15 17      MR. NORMAND: Objection to form.
13:07:16 18      THE WITNESS: I'm sorry?
13:07:16 19  BY MR. MELAUGH:
13:07:17 20      Q.  For binary SVRX licenses, SCO --
13:07:21 21      A.  That's an OpenServer.
13:07:23 22      Q.  I'm talking about SVRX.
13:07:25 23      A.  But OpenServer is SVRX.
13:07:27 24      Q.  For the SVRX -- what's -- then for the
13:07:29 25  older versions of -- of UNIX, the ones that are,

Page 140

13:07:33 1   for example, listed -- for the older versions of --
13:07:40 2   of -- of SVRX?
13:07:43 3       A.  OpenServer is one of the oldest, but I'm
13:07:47 4   not sure what distinction you're making.
13:07:50 5       Q.  Well, I'm trying to determine the scope
13:07:52 6   of the -- of the licenses that SCO had to turn over
13:07:57 7   revenue to Novell from. What is the scope of those
13:08:03 8   licenses?
13:08:05 9       MR. NORMAND: Objection to form. Asked
13:08:05 10  and answered.
13:08:10 11      THE WITNESS: Now, there was a specific
13:08:12 12  list of revenue streams from specific customers
13:08:15 13  that constituted the residual royalties, and there
13:08:19 14  were many documents that went back and forth
13:08:21 15  itemizing what revenue streams were on that list.
13:08:24 16      I mean -- I mean, it was a very clear
13:08:30 17  thing. I mean, I don't know the -- I couldn't
13:08:32 18  enumerate it for you, but -- but there was never
13:08:36 19  really any ambiguity about what was on the list.
13:08:38 20  BY MR. MELAUGH:
13:08:38 21      Q.  Okay. Let's take a look at Exhibit
13:08:41 22  Number 1 again. This is the Asset Purchase
13:08:45 23  Agreement, the large document. Could you turn --
13:08:47 24  it's about three-quarters of a way through, to page
13:08:52 25  -9- -- the last three digits are -952.

Page 141

13:08:59 1       A.  Have I got the same -- okay.
13:09:03 2       Q.  And looking at item number VI, V-I, at
13:09:09 3   the bottom of this page, and it continues onto the
13:09:11 4   next page, so it begins:
13:09:14 5           All contracts relating to the SVRX
13:09:17 6       Licences listed below:
13:09:19 7   and then it lists a series of software, basically.
13:09:21 8   Is this the list you're referring to?
13:09:24 9       MR. NORMAND: Objection to form.
13:09:26 10      THE WITNESS: I don't know what this is a
13:09:27 11  list of.
13:09:28 12  BY MR. MELAUGH:
13:09:29 13      Q.  So what list were you referring to? You
13:09:31 14  said there's a -- a list of software for --
13:09:35 15      A.  There was a list of specific customers
13:09:39 16  who had binary license agreements for which we
13:09:42 17  continued to pay 95 percent of the royalties to
13:09:46 18  Novell. And I don't know if the list is in the
13:09:49 19  contract or not. I don't know where it is. I know
13:09:52 20  there was --
13:09:53 21      I mean, our royalty payment people knew
13:09:55 22  which -- which royalties they got their share of.
13:09:58 23  There was clearly a documented list that everybody
13:10:00 24  had signed off on. Where it was in the stack of
13:10:03 25  paper, I have no idea.

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

2b3d0e84-a667-4e76-8ac0-3013eb73124a

# EXHIBIT 19

Brent O. Hatch (5715)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, | Case No. 2:03CV0294DAK |
| Plaintiff, | Hon. Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | **DECLARATION OF JIM WILT** |
| Defendant. | |

I, JIM WILT, declare as follows:

1. I submit this Declaration in connection with the lawsuits entitled *The SCO Group v. IBM* and *The SCO Group v. Novell, Inc.*

## I.   EDUCATIONAL BACKGROUND

2. I received a Bachelor's Degree in Mathematics from Case Western Reserve University in 1966, and a Master's Degree in Computer Science from the University of Wisconsin in 1967. In 1968 I completed my course work towards a PhD in Computer Science at the University of Wisconsin.

## II.  WORK HISTORY

3. After leaving the University of Wisconsin, I worked as a software systems programmer and instructor at Vanderbilt University for a year. In 1969, I joined Xerox Corporation and worked for them (and subsequently Honeywell when they purchased Xerox's computer business) for nine years. My positions at Xerox/Honeywell included field systems analyst, systems analyst manager, and software product manager. In 1978, I joined Amdahl Corporation and worked in their software product planning department. After I left Amdahl, I did consulting to provide computer and business advice to smaller companies.

4. In 1983, I joined The Santa Cruz Operation, Inc. ("SCO"). Initially I worked in the marketing department and subsequently became the Vice President Marketing and Sales. While in that position I moved to the UK and opened SCO's European Office. I was based in Europe for five years. In 1989, I became the Vice President of Corporate Development, which included responsibility for mergers and acquisitions. While in that position I was responsible for acquiring two companies, and the UNIX

2



intellectual property and UnixWare product business. I became the Senior Vice
President Products in 1998 and was responsible for all product software
development, product management and product support. In 2000, I became the
President of the Professional Services Business Unit. I worked at SCO through May
2001, when Caldera acquired the Server Software and Professional Services
Business Units.

## III. NOVELL'S SALE OF UNIX TO SCO

5.  In 1995, Novell, Inc. ("Novell"), through Mike DeFazio and Ed Chatlos, approached
    SCO about the possibility of selling Novell's entire UNIX and UnixWare business.

6.  Doug Michels (SCO's Chief Executive Officer), Geoff Seabrook (an Executive Vice
    President), and I met with representatives of Novell. During the discussions. SCO
    made clear to Novell that SCO could not afford a direct purchase of the complete
    UNIX and UnixWare business, in light of the price being asked for the entire
    business. Mr. Michels proposed the idea of reducing the proposed purchase price by
    permitting Novell to retain certain binary royalty payments under certain UNIX
    licenses.

7.  Mr. Seabrook and I were assigned the responsibility of negotiating and completing a
    deal with Novell along those lines. Mr. Seabrook and I thereafter became the lead
    negotiators for SCO and oversaw the day-to-day responsibility for the potential
    purchase. During the negotiations, I met regularly with Novell representatives.
    sometimes several times a week, from approximately August to September 1995. I

3

met primarily with Ed Chatlos of Novell during those negotiations. I understood Mr. Chatlos to be Novell's chief negotiator during the negotiations.

8.  It was my understanding and intent during those negotiations that SCO would acquire Novell's entire UNIX and UnixWare business including the copyrights. I do not recall, and do not believe that there ever was, any instance in which anyone at SCO or Novell ever stated or exhibited any contrary intent or understanding, to me or anyone else.

9.  As a result of those negotiations, Novell and SCO entered into the Asset Purchase Agreement ("APA") dated as of September 19, 1995, through which Novell received shares of SCO common stock and other consideration, and received rights to certain binary product royalty payments to be collected by SCO. SCO acquired all right, title, and interest in and to the UNIX and UnixWare business, operating system, and source code. It was my intent on behalf of SCO to acquire through the APA Novell's entire UNIX and UnixWare business, including the UNIX and UnixWare source code and all associated copyrights, and I believed then (as now) that Novell's intent was to sell all of those assets and rights.

10. Paragraph 4.16 of the APA pertains to the binary royalty income stream that Novell retained through the APA. The parties agreed to the language in Paragraph 4.16(b) in order to allow Novell to manage that royalty stream within the operation of SCO's customer source code licenses – not at the expense of SCO's right to enforce its intellectual property protections under any such licenses, and not to permit Novell to waive any of those protections. I have reviewed Amendment No. 2 to the APA and believe that the language therein confirms that intent. In light of my intent, and

4



based on my understanding of the parties' intent, I do not believe that Novell had or has any right to waive, or to direct or require SCO to waive, any of its intellectual property rights or protections.

11. By the time of the APA closing, SCO's business plan did not contemplate any significant additional sales of SVRX source-code licenses. The remaining interest in that particular part of the UNIX business consisted primarily in collecting binary royalties attributable to sublicensed object-code product. However, because the SVRX software included substantial intellectual property that SCO was using in later versions of its UNIX and UnixWare products, SCO had a strong continuing interest in protecting that property under the existing SVRX licenses.

12. I do not recall anyone on either side of the negotiations or transaction ever suggesting that Novell would retain any copyright relating to UNIX or UnixWare. I am not aware of any discussions, whether general or specific, during the negotiations that contradict my understanding of the transaction as set forth in this Declaration. None of my superiors at SCO or Mr. Seabrook ever even suggested that SCO was not acquiring the UNIX or UnixWare copyrights, nor did Novell ever communicate to me that it was not selling the UNIX or UnixWare copyrights.

13. At the time the transaction was signed and closed, I did not observe anyone at SCO or Novell stating or acting as if Novell had retained any UNIX or UnixWare copyrights. Any such statement or conduct would have been contrary to the intent and structure of the deal as I understood it and communicated it to Novell and within SCO. It has been my understanding and belief since the time the APA closed that

5

Novell sold the UNIX and UnixWare copyrights to SCO as of the time of the closing in 1995.

14. In light of my central role for SCO in negotiations, I believe I would have known if the parties had agreed or ever discussed the possibility that Novell would retain any UNIX or UnixWare copyrights. Indeed, if I had thought that SCO was not acquiring all of the UNIX and UnixWare copyrights, I would not have agreed for SCO to proceed with the deal as priced.

15. I have reviewed Schedule 1.1(b) of the APA (the "Excluded Assets Schedule") with attention to the question of whether Novell was to retain any UNIX or UnixWare copyrights. In my view, Paragraph V.A does not refer, and was not intended to refer, to Novell copyrights relating to UNIX or UnixWare.

16. Pursuant to the APA, the parties also signed a Technology Licensing Agreement in early December 1995, in which Novell licensed source code rights from SCO. In my view, this licensing agreement was consistent with SCO's ownership of the UNIX and UnixWare copyrights following the closing of the APA.

17. I declare under penalty of perjury that the foregoing is true and correct.

Executed: 23 November 2004
Nashville, Tennessee

Jim Wilt

6

# EXHIBIT 20

James Wilt

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

THE SCO GROUP, INC., a Delaware   )
corporation,                      )
                                  )
    Plaintiff and Counterclaim-   )
    Defendant,                    )NO. 2:04CV00139
                                  )
vs.                               )Judge Dale A.
                                  )  Kimball
NOVELL, INC., a Delaware          )
corporation,                      )Magistrate Judge
                                  )  Brook C. Wells
    Defendant and Counterclaim-   )
    Plaintiff.                    )
                                  )

        Videotape deposition of:

        JAMES WILT

        Taken on behalf of the Defendant
        and Counterclaim Plaintiff

        January 26, 2007

--------------------------------------------------------
        Reported by:  Martha B. Davis, RPR, RDR
           CLEETON DAVIS COURT REPORTERS, LLC
           200 Fourth Avenue North, Suite 825
              Nashville, Tennessee 37219
                   (615) 726-2737

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

James Wilt

Page 26

1    Q.    Yes, sir.
2    A.    I believe this was modified by one of the
3    amendments.
4    Q.    That's true, but my questions right now
5    concern only this document.  Can you and I agree as a
6    preliminary matter that this page lists, quote, all
7    copyrights, end quote, as one of the excluded assets?
8         MR. NORMAND:  Objection to form.
9         THE WITNESS:  Are you asking me to agree
10   that that's what the words on the page say?
11   BY MR. MELAUGH:
12   Q.    Yes, I am.
13   A.    That's what the words on the page say.
14   Q.    Based on that language, can you and I also
15   agree that if someone with no knowledge about the
16   background or negotiations of this contract came in and
17   read this list of excluded assets, they would conclude
18   that no copyrights were transferred under this
19   agreement?
20        MR. NORMAND:  Objection to form.  In this
21   hypothetical, has someone read anything other than the
22   list of excluded assets in the APA?
23        THE WITNESS:  Actually, I can't put
24   myself in somebody's shoes like that.
25   BY MR. MELAUGH:

Page 27

1    Q.    Why is that?
2    A.    Because I know what the agreement was about
3    and what the intents of the parties were, so what
4    somebody who had no knowledge of that would have is
5    something I can't do.
6    Q.    We can agree, though, that the face of this
7    contract, the language that's written here, excludes
8    all copyrights from the assets transferred?
9    A.    No, I can only agree that what we did before
10   is that what -- those are the words that are on this
11   page.  You asked me whether the words under A say all
12   copyrights and trademarks except for the trademarks
13   UNIX and UnixWare and, indeed, those are the letters
14   and words that are on this page.
15   Q.    So, again, the language of this contract
16   excludes all copyrights from the assets transferred?
17   A.    No, the language of the contract do not
18   exclude all copyrights and trademarks because the
19   language of the contract, including its amendments,
20   clarify and state about what was sold, which is when
21   you go back to -- I don't know exactly where the
22   sections are.  It talks about selling the UNIX and the
23   UnixWare business, and then the copyrights and
24   trademarks relative to the UnixWare business were part
25   of the assets that were conveyed.

Page 28

1    Q.    Part of your answer concerned the amendments,
2    and I am going to ask you about the amendments.  Right
3    now I want to talk only about the documents in front of
4    you, the Asset Purchase Agreement.  Do you understand
5    that?
6    A.    I understand that.  I also understand that
7    this agreement transfers and sells all the assets of
8    the UNIX and the UnixWare business.  The amendment
9    clarifies the wording in this contract.  It did not add
10   new business terms.
11   Q.    From the assets of the UNIX and UnixWare
12   business transferred, though, there are certain assets
13   that are excluded from transfer in this contract, isn't
14   that right?
15   A.    Yes, there are.
16        MR. NORMAND:  Objection to form.
17        THE WITNESS:  It did not include the
18   Empire State Building.
19   BY MR. MELAUGH:
20   Q.    Did Novell own the Empire State Building at
21   the time of the contract?
22   A.    I don't know if that was relevant.  You asked
23   if it excluded certain assets and it does.
24   Q.    And one of the assets excluded from transfer
25   in this contract is, quote, all copyrights, end quote?

Page 29

1    A.    No.
2         MR. NORMAND:  Objection to form.
3         THE WITNESS:  In this contract, the UNIX
4    and the UnixWare business and its assets were
5    transferred to SCO.
6    BY MR. MELAUGH:
7    Q.    And the contract also lists from within that
8    category certain assets that are excluded, isn't that
9    right?
10        MR. NORMAND:  Objection to form.
11        THE WITNESS:  No.  Are you saying that
12   the contract is ambiguous?
13   BY MR. MELAUGH:
14   Q.    I'm not asking that.
15   A.    No, I'm asking if that's what you're saying,
16   because that's the interpretation I would get from your
17   statements.  In one place it says that all the assets
18   of the UNIX and UnixWare business were transferred.
19   Q.    Well, let's take a couple of steps back.  The
20   way I understand this contract is that it sets out a
21   broad class of assets that are transferred and then it
22   carves out a portion of those assets that are excluded
23   from transfer.  Do I have -- does my understanding
24   match --
25   A.    Novell did not transfer their NetWare business

8 (Pages 26 to 29)

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

James Wilt

Page 30

1  to SCO, nor did it transfer the copyrights and
2  trademarks relative to the NetWare business to SCO.
3  Q.    Let's focus on my question for a moment. Did
4  I state that accurately? And I'll restate it.
5  A.    Restate it, please.
6  Q.    Sure. As a general matter, this deal is
7  structured as a transfer of assets, the contract spells
8  out a broad class of assets, and then it spells out a
9  class of assets that are excluded from transfer. Does
10 my understanding of the contract match your
11 understanding of the contract?
12       MR. NORMAND: Objection to form.
13       THE WITNESS: On an extremely high level
14 you could certainly make that statement. You can't
15 draw any conclusions from that statement at that high
16 level.
17 BY MR. MELAUGH:
18 Q.    Let's look at page 8 and 9. Again, I'm using
19 the page numbers that Novell has added to this
20 document. If you could read Section 1.1(a) on these
21 two pages to yourself, I'll have a couple of questions
22 for you about that.
23 A.    I have read it.
24 Q.    So this was what I was talking about a moment
25 ago. This transfers all of seller's right, title and

Page 31

1  interest to the assets relating to the business, and
2  then on the next page it says that those assets won't
3  exclude the things listed in the excluded assets?
4  A.    Uh-huh.
5        MR. NORMAND: Objection to form.
6  BY MR. MELAUGH:
7  Q.    Do I have that right?
8  A.    That's what the words say.
9  Q.    And on the list of excluded assets is the
10 phrase, quote, all copyrights?
11       MR. NORMAND: Objection to form.
12 BY MR. MELAUGH:
13 Q.    Isn't that right?
14 A.    That's what the words say.
15 Q.    And so wouldn't you agree then that on the
16 face of this contract, apart from the later amendment,
17 all copyrights are excluded from the assets
18 transferred?
19 A.    No.
20       MR. NORMAND: Objection to form.
21       THE WITNESS: You're picking out two
22 sections of the contract and ignoring other items in
23 the contract, in the amendment.
24 BY MR. MELAUGH:
25 Q.    So what items am I -- I'm not talking about

Page 32

1  the amendment. I'm just talking about this document.
2  What items in --
3  A.    I'm sorry. I'm having a problem for one
4  understanding why you talk about this contract and not
5  the amendments.
6  Q.    Well, with respect -- I get to ask the
7  questions and I'll get to the amendment, I promise you.
8  What I'm interested in here is just what's in this
9  Asset Purchase Agreement. And I think you said that
10 there are other parts of this contract that I'm
11 ignoring and I would like to know what parts those are?
12       MR. NORMAND: Objection, calls for a
13 narrative. You want him to page through the APA?
14       MR. TIBBITTS: Yeah, why don't we do
15 that?
16       THE WITNESS: Yeah, do you want me to go
17 all the way through? I mean, I covered some of this, I
18 believe, in one of my declarations where I had spent
19 the time to go through the APA and identify areas that
20 talk about what is sold and certainly what the intent
21 of what was sold. And so, you know, it says -- well,
22 I'm not going to go through it. I mean, unless you
23 want me to go through each page of the APA right now, I
24 can't answer your question with more specific --
25 BY MR. MELAUGH:

Page 33

1  Q.    You said earlier, quote, you're picking out
2  two sections of the contract and ignoring other items
3  in the contract. I want to know what other items you
4  had in mind when you said that?
5        MR. NORMAND: Objection to form. The
6  rest of the contract.
7        MR. MELAUGH: Mr. Normand, that may be
8  your answer, but --
9        THE WITNESS: That's my answer. That's
10 my answer. I have asked you before do you want me to
11 go through each page of the agreement and start talking
12 about which sections of the agreement identify
13 statements about what was transferred and what was
14 sold?
15       I mean, for one, you can go back to --
16 was it -- a Schedule C which lists all the trademarks.
17 If they weren't transferred as part of this agreement,
18 why are they listed? There is certainly no right in
19 this contract granted to use the trademarks, so they
20 obviously must have been transferred. Otherwise, we
21 would have been using them without having any right to
22 do that.
23       The copyrights must have been
24 transferred. There is no right in this contract to
25 make copies of the software, so obviously the

James Wilt

Page 34

1  copyrights must have been transferred.  Otherwise, we
2  would have been violating copyright law with no
3  objection from Novell for probably a good ten years.
4        Can you show me in this contract where
5  there is a right to reproduce or a right to grant
6  someone the right to reproduce other than to transfer
7  the copyright to us?
8  BY MR. MELAUGH:
9  Q.    Sir, I have a couple of questions about what
10  you have just said.  Did you say that no trademarks
11  were transferred under this contract and --
12  A.    No, they are transferred.
13  Q.    They are transferred?
14  A.    Because there is no right to use the
15  trademarks that's explicitly put into this agreement,
16  so the only way we had a right to use the trademarks is
17  if they were transferred to us.  Then you have an
18  implicit right to use the trademark because you own
19  them, which is what happened in this agreement.
20        And the same thing with the copyright.  There
21  is no explicit right to copy.  There is no explicit
22  right to grant others to copy.  You don't need it in
23  this agreement because the copyright was transferred to
24  us.
25  Q.    I take it then your testimony is that when the

Page 35

1  excluded assets says all copyrights, it means something
2  less than all copyrights?
3        MR. NORMAND:  Objection to form.
4        THE WITNESS:  It certainly does not mean
5  all copyrights in the broadest sense of the word.  In
6  fact, it was referring to the copyrights related to the
7  NetWare assets, which were not transferred and sold to
8  SCO.
9  BY MR. MELAUGH:
10  Q.    Where in this agreement does it say that the
11  phrase "all copyrights" refers only to NetWare
12  copyrights?
13        MR. NORMAND:  Objection to form.
14        THE WITNESS:  I don't know that I can say
15  that in this agreement those explicit words are there.
16  I believe it was the amendment that helped clarify that
17  issue because the contract may have been poorly
18  drafted.
19  BY MR. MELAUGH:
20  Q.    Okay.  I think you can put the Asset Purchase
21  Agreement to the side point now.  I have some more general
22  questions at this point.  Now, the time frame I'm going
23  to be asking about is just prior to the Asset Purchase
24  Agreement.  Can you give me a general overview of what
25  SCO is doing at this point?  What is SCO's business at

Page 36

1  this point?
2        MR. NORMAND:  Objection to the form.
3        THE WITNESS:  Yeah, what -- can you be a
4  little bit more specific?  We were in business to make
5  money.  I mean, that's --
6  BY MR. MELAUGH:
7  Q.    That's a good -- I think that's a fair
8  clarification.  What -- so how is SCO making money?
9  What is it doing to make money?
10  A.    Selling product and services to the company
11  and collecting that revenue.
12  Q.    And what sorts of products is it selling?
13  This is before the Asset Purchase Agreement.
14  A.    It was selling software products.
15  Q.    What kind of software products?
16  A.    Licenses and some boxes.  I mean, how specific
17  do you want to get?  If you want to get down to
18  specific -- clarify your question and I'll answer it
19  more specifically.
20  Q.    What kinds of licenses and boxes are you
21  selling?  I mean, what's the -- as a general matter,
22  what products is SCO -- I'm not talking about -- I
23  don't want to know lines and version numbers, but as a
24  general matter, what kind of licensing and boxing
25  business is SCO in?

Page 37

1  A.    We sold system software, and some people, to
2  clarify, classify it as Tarantella systems software,
3  some people wouldn't.  They would classify it as an
4  application.  Infrastructure products maybe is a more
5  general term.
6  Q.    And the sorts of -- you said that -- you
7  divided it into we're selling products and we're also
8  selling services.  What sorts of services was SCO
9  selling at the time just prior to the Asset Purchase
10  Agreement?
11  A.    The services were support contracts to either
12  provide assistance to customers, provide break-fix
13  assistance, services -- there were some installation
14  and bespoke programming services sold.
15        THE COURT REPORTER:  I'm sorry, something
16  services?
17        THE WITNESS:  Bespoke.  Oh, installation
18  services?
19  BY MR. MELAUGH:
20  Q.    Did the services always relate to the products
21  that SCO was selling or was there a broader class of
22  services?
23  A.    At that time prior to the -- actually prior to
24  the formation of the business unit, all the services
25  were related to the products that we sold.

10 (Pages 34 to 37)

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

James Wilt

Page 74

1  A.    Yes.
2  Q.    Now, I'm going to have the same sort of
3  questions I had about the first declaration for you.
4  Is this something that in the first instance you
5  authored or is it something in the first instance that
6  your counsel authored?
7  A.    The process was the same for this declaration
8  as for the other.
9  Q.    So let me see if I can walk through that with
10  your indulgence.  That process was you spoke over the
11  phone, they sent you a first draft, you had comments
12  back about it, it proceeded from there?
13  A.    Yes.
14  Q.    Do you recall what comments you had on the
15  first draft of this?
16  A.    No, actually I don't.
17  Q.    Do you recall how many drafts this went
18  through before the document we see here?
19  A.    It could have been a couple of drafts.
20  Q.    Have you had any communications about this
21  declaration with anyone other than SCO and its counsel?
22  A.    No.
23  Q.    Did you receive any compensation in connection
24  with this declaration?
25  A.    No.  But, again, I'll take your business card.

Page 75

1  Q.    I'll keep that in mind.  I don't think I have
2  any more questions for you today.
3  A.    Okay.
4  Q.    And I spoke with opposing counsel off the
5  record.  I think I am going to have to leave this
6  deposition technically open because I haven't received
7  drafts of your declaration in production from counsel.
8  It may be that I need to ask you more questions once I
9  see those drafts, but aside from that, I have no more
10  questions for you today.
11  A.    Okay.
12      MR. NORMAND:  Let me just state for the
13  record I have had a conversation with counsel.  To the
14  extent the draft declarations that he refers to have
15  not been produced, my view and SCO's view is that that
16  is an issue that should have been raised before this
17  deposition, so my position is the deposition is closed
18  and that if the declarations or the draft declarations
19  were to have been used at this deposition, it was an
20  issue that counsel for Novell should have raised before
21  the deposition today.  But I take it we can't resolve
22  that issue today.
23      MR. MELAUGH:  I agree we can't resolve
24  that issue today.  It's something that Mr. Normand and
25  I will discuss after today.

Page 76

1      MR. NORMAND:  And I have a few questions.
2
3      CROSS-EXAMINATION
4  QUESTIONS BY MR. NORMAND:
5  Q.    Mr. Wilt, you were handed an Exhibit 25
6  earlier in the day, which is --
7  A.    Yes.
8  Q.    -- what we have described as your first
9  declaration.  Have you had occasion recently to review
10  that declaration?
11  A.    Yes, I did read through it last night.
12  Q.    Is there any part of the declaration that you
13  feel is inaccurate or that you would like to correct?
14  A.    No.
15  Q.    If I could direct your attention to some
16  language in that declaration.  I'm looking at paragraph
17  7 at the end where you say, in referring to the
18  negotiations from August to September 1995 between
19  Santa Cruz and Novell, that you, quote, "... understood
20  Mr. Chatlos to be Novell's chief negotiator during
21  those negotiations."  Is that a correct statement?
22  A.    That is a correct statement.
23  Q.    You say in paragraph 8, quote, "It was my
24  understanding and intent during those negotiations that
25  SCO would acquire Novell's entire UNIX and UnixWare

Page 77

1  business, including the copyrights.  I do not recall
2  and do not believe that there ever was any instance in
3  which anyone at SCO or Novell ever stated or exhibited
4  any contrary intent or understanding to me or anyone
5  else."
6      Is that an accurate statement?
7  A.    That's an accurate statement.
8  Q.    You say in the back half of paragraph 9,
9  quote, "It was my intent on behalf of SCO to acquire,
10  through the APA, Novell's entire UNIX and UnixWare
11  business, including the UNIX and UnixWare source code
12  and all associated copyrights, and I believed then,
13  open parens, as now, close parens, that Novell's intent
14  was to sell all of those assets and rights."
15      Is that an accurate statement?
16  A.    Yes, that's an accurate statement.  You
17  wouldn't have had a business without having the
18  copyrights and trademarks.
19  Q.    You say in paragraph 12, quote, "I do not
20  recall anyone on either side of the negotiations or
21  transaction ever suggesting that Novell would retain a
22  copyright relating to UNIX or UnixWare.  I am not aware
23  of any discussions, whether general or specific, during
24  the negotiations that contradict my understanding of
25  the transaction as set forth in this declaration."

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

9dca1273-d111-46f6-8e03-6ceaad00824b

James Wilt

Page 78

1    Is that an accurate statement?
2    A.    That is an accurate statement.
3    Q.    You say in paragraph 16, quote, "Pursuant to
4    the APA, the parties also signed a Technology Licensing
5    Agreement in early December 1995 in which Novell
6    licensed source code rights from SCO.  In my view, this
7    licensing agreement was consistent with SCO's ownership
8    of the UNIX and UnixWare copyrights following the
9    closing of the APA," end quote.
10    Is that an accurate statement?
11    A.    That's an accurate statement because if you
12    look at the Technology Licensing Agreement, it includes
13    our giving Novell the right to reproduce and license,
14    under certain conditions, that code, which if we didn't
15    own the copyrights and such, we wouldn't have had to
16    give to Novell and wouldn't have been able to give to
17    Novell.
18    Q.    I direct you back to paragraph 10 of your
19    declaration.  It states, quote, "Paragraph 4.16 of the
20    APA pertains to the binary royalty income stream that
21    Novell retained through the APA.  The parties agreed to
22    the language in paragraph 41.6(b) in order allow Novell
23    to manage that royalty stream within the operation of
24    SCO's customer source code licenses - not at the
25    expense of SCO's right to enforce its intellectual

Page 79

1    property protections under any such licenses, and not
2    to permit Novell to waive any of those protections.  I
3    have reviewed Amendment No. 2 to the APA and believe
4    that the language therein confirms that intent.  In
5    light of my intent, and based on my understanding of
6    the parties' intent, I do not believe that Novell had
7    or has any right to waive, or to direct or require SCO
8    to waive, any of its intellectual property rights or
9    protections."
10    Is that an accurate statement?
11    A.    That's an accurate statement.
12    Q.    Let me direct your attention, Mr. Wilt, to
13    what was marked earlier as Exhibit 27, which was
14    described as your second declaration.
15    A.    Okay.
16    Q.    Have you had occasion recently to review
17    Exhibit 27?
18    A.    Yes, I reviewed this yesterday again.
19    Q.    Is there any aspect of Exhibit 27 that you
20    believe is incorrect or that you would like to correct?
21    A.    No.
22    Q.    Let me ask you about some specific paragraphs
23    in this declaration.  You say in paragraph 4, quote,
24    "Santa Cruz's intent and agreement under the APA and
25    Amendment No. 1 was for Novell to transfer the entire

Page 80

1    UNIX business, including the UNIX source code and
2    copyrights, to Santa Cruz except for binary royalties
3    paid under the existing agreements pursuant to which
4    UNIX System V, open paren, quote, SVRX, end quote,
5    close parens, licensees were paying such royalties, and
6    which Novell conveyed to Santa Cruz under the APA as
7    part of the UNIX business."
8    Is that an accurate statement?
9    A.    That's an accurate statement, and it was the
10    existing licenses at the time of the transfer for SVRx
11    that Novell retained, you know, the equity interest or
12    the financial interest in.
13    Q.    I'm looking at paragraph 5.  You say,
14    beginning with the second sentence, quote, "My
15    understanding was that Novell had no interest in
16    continuing in the UNIX business at all.  If Santa Cruz
17    had paid the full purchase price originally proposed by
18    Novell, Novell would not have retained the binary
19    royalty stream or any rights to protect that royalty
20    stream.  That context makes it clear that it was the
21    intent of the APA and Amendment No. 1 that Novell
22    retain rights to protect the existing binary royalty
23    stream, but other than the limited interest in UNIX
24    that Novell retained under the Technology License
25    Agreement for use with NetWare, there was no other

Page 81

1    reason or interest for Novell to have broader rights
2    relative" -- there is a "to" missing -- "relative to
3    the UNIX business and assets it sold Santa Cruz."
4    Is that an accurate statement?
5    A.    That's an accurate statement.
6    Q.    I direct your attention to paragraph 9.
7    Quote, "Amendment No. 1 made clear that Santa Cruz was
8    not prohibited from amending or entering into new SVRx
9    licenses as a incidental part of licensing UnixWare.
10    UnixWare products are built on the prior versions of
11    the UNIX technology.  Accordingly, when Novell and its
12    predecessors licensed a UnixWare product to a customer,
13    they also licensed all prior products as an incidental
14    part of the license."  There is an "of" missing.
15    "Amendment No. 1 reflected the parties' intent
16    and understanding that Santa Cruz would continue to
17    license the prior UnixWare and SVRx products with its
18    UnixWare licenses without additional approvals from
19    Novell and without remitting any payments to Novell.
20    This was simply consistent with the reality of
21    licensing UnixWare," end quote.
22    Is that an accurate statement?
23    A.    That's an accurate statement.
24    Q.    You say in paragraph 10, quote, "The APA and
25    amendments thereto thus reflect Santa Cruz's intent in

21 (Pages 78 to 81)

9dca1273-d111-46f6-8e03-6ceaad00824b