# EXHIBIT 28

Dockets.Justia.com





**SCO**

Release **2.1.3**

Application Server
Personal Edition
(Installation CD)

English, Français,
Italiano, Deutsch
and Español

400-930-102

© 1976-1997 The Santa Cruz Operation, Inc. and
its suppliers. All Rights Reserved.

## Included on this CD   Additional information inside

The following SCO® UnixWare® configurations are included on this CD-ROM. Depending on the configuration you've purchased, one of the following SCO products is licensed for use:

**SCO UnixWare Application Server**

Now internet/intranet-enhanced with:
- Netscape Navigator Gold™
- Netscape FastTrack Server™
- SCO PPP from Morning Star

**SCO UnixWare Personal Edition**

Now internet/intranet-enhanced with:
- Netscape Navigator®
- SCO PPP from Morning Star

To activate additional product services you must obtain a separate SCO Certificate of License and Authenticity from an SCO authorized supplier. Other SCO UnixWare products currently available for purchase include:

**SCO UnixWare Online Data Manager**
**SCO UnixWare Software Development Kit**

SCO, the SCO logo, The Santa Cruz Operation, and UnixWare are trademarks or registered trademarks of The Santa Cruz Operation, Inc. in the USA and other countries. UnixX is a registered trademark of The Open Group in the USA and other countries. Netscape, Netscape FastTrack Server, Netscape Navigator, Netscape Navigator Gold are trademarks or registered trademarks of Netscape Communications Corporation. All other brand and product names are or may be trademarks of, and are used to identify products or services of, their respective owners. © 1976-1997 The Santa Cruz Operation, Inc. All Rights Reserved.     B4400009NA

# EXHIBIT 29

Maureen O'Gara

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

4    -------------------------------------------

5    THE SCO GROUP, INC., a Delaware Corporation,

6

7                         Plaintiff,

8

9         vs.        2:04CV00139

10

11   NOVELL, INC., a Delaware Corporation.

12

13                    Defendant.

14   -------------------------------------------

15

16

17     VIDEOTAPED DEPOSITION OF MAUREEN O'GARA

18            Friday, March 23, 2007

19                 11:00 a.m.

20

21

22

23   Reported by:

24   Joan Urzia, RPR

25   JOB NO. 192768

Maureen O'Gara

Page 10

1       O'Gara
2   this document?
3       A    Yes, I do.
4       Q    Does that appear to be the
5   document in which we were just talking
6   about in which you wrote about Novell's
7   announcement about its alleged ownership of
8   UNIX copyrights?
9       A    Yes.
10      Q    And what is the date of the
11  article?
12      A    It's dated May 28.
13      Q    Is that consistent with your
14  recollection of the article and the
15  announcement?
16      A    Yes.
17      Q    Great.
18          Before you published this
19  article, did you speak with Novell?
20      A    Yes.
21      Q    Did you speak with someone named
22  Chris Stone of Novell?
23      A    Yes.
24      Q    And what was Mr. Stone's
25  position at Novell at the time?

Page 11

1       O'Gara
2       A    I believe he was vice chairman.
3       Q    Would it be safe to say that you
4   understood him to be a senior executive
5   under whatever title he may have had?
6       A    Yes.
7       Q    And what did Mr. Novell tell
8   you --
9       A    Mr. Stone.
10      Q    I'm sorry, thank you.
11          What did Mr. Stone tell you
12  about Novell's public announcement in which
13  it was going to assert its purported
14  ownership of the UNIX copyrights?
15      A    Well, he informed me of the
16  substance of what this story is about, that
17  they were going to, what's the right word,
18  assert their ownership.
19      Q    Did he say anything about the
20  reasons why they were issuing that
21  announcement on that date?
22      A    Yes, he did.
23      Q    And what did he say?
24      A    He said they were doing it
25  because SCO's earnings were that day.

Page 12

1       O'Gara
2       Q    And did he say anything about
3   the effect, the intended effect of the
4   announcement on that date?
5       A    The reason that they were doing
6   it, as I understood it, was to confound
7   SCO's stock position.
8       Q    When you say confound SCO's
9   stock position, can you be a little more
10  specific or can you clarify it in any way?
11      A    Well, I think the object of the
12  game was to throw a monkey wrench into the
13  works.
14      Q    And can you explain that, that
15  metaphor, a little further?
16          MS. FOLEY:  I'm going to object
17  to the form of the question.
18          Do you understand?
19      Q    Well, when you say that they
20  were trying to confound or throw a monkey
21  wrench, can you explain that?
22      A    They were trying to upset the
23  stock price.
24      Q    And when you say stock price,
25  whose stock price are you referring to?

Page 13

1       O'Gara
2       A    SCO's.
3       Q    Did Mr. Stone say anything about
4   harming SCO?
5          MR. JACOBS:  Objection.
6   Leading.
7       A    Do I answer that then?
8       Q    Yes, you may.
9       A    Logically, there wouldn't be any
10  other reason.
11      Q    So you understood that to be the
12  intent?
13      A    That's what I understood.
14      Q    If we may go back to Exhibit
15  1080, the article that you wrote on May 28,
16  2003 --
17      A    Actually, I wrote it the night
18  before.
19      Q    And published it on May 28,
20  2003, is that accurate?
21      A    That's accurate.
22      Q    Thank you.
23          Do you recall --
24      A    I don't get up at 8:15 in the
25  morning and put these things out.

# EXHIBIT 30

# VERTICAL SOLUTION PROVIDER AGREEMENT

between

The Santa Cruz Operation, Inc.

and

Integration Design – *5533*

(Contract #)

*31044*

# VERTICAL SOLUTION PROVIDER AGREEMENT

This Agreement is made and entered into on the date last executed by and between The Santa Cruz Operation, Inc. ("SCO"), a corporation of the State of California with its principal place of business at 400 Encinal Street, Santa Cruz, California 95060, and Integration Design ("VSP"), a corporation of the State of Victoria, with its principal place of business at 172 Burwood Road, Hawthorn, Victoria, 3122, Australia.

WHEREAS, SCO is a licensor, manufacturer and distributor of SCO software and related products and materials ("Licensed Product"),

WHEREAS, VSP is a reseller of computer products, and possess expertise in one or more vertical markets, and

WHEREAS, the parties are desirous of VSP's marketing of Licensed Products in conjunction with substantial added value in the form of hardware and/or software to its end user customers.

NOW, THEREFORE, the parties agree as follows:

1.  Appointment of VSP.

    SCO hereby appoints VSP as a non-exclusive "SCO Vertical Solution Provider". VSP shall have the right, during the term of and subject to the provisions of this Agreement, to market to its end user customers limited licenses for the use of Licensed Product set forth on Exhibit A attached hereto, which includes software and its documentation and related materials supplied by SCO. In no event shall VSP export Licensed Product outside the United States of America; further, in no event shall VSP distribute the Licensed Product when VSP knows or should know that the Licensed Product may be exported by VSP's customer. In no event shall VSP market or otherwise distribute Licensed Product to other than an end user customer for use in such customer's own business or operation.

2.  Relationship with SCO and/or SCO Reseller.

    VSP understands that it may acquire the Licensed Product to be marketed hereunder by VSP from either SCO or from an authorized SCO distributor or other SCO authorized source. Notwithstanding its source of Licensed Product, VSP shall comply with all applicable provisions of this Agreement at all times.

3.  End User Licenses.

    VSP shall distribute with each Licensed Product the end user enforceable "break-the-seal" license agreement included by SCO in the Licensed Product package or shall, prior to installation, require the end user to execute an enforceable license agreement containing provisions substantially similar to those of Exhibit B attached hereto. VSP may use it's own enforceable end user software license agreement, provided it has been approved in writing by SCO and is attached hereto. VSP shall retain any such executed license agreements and shall provide them to SCO upon SCO's request or upon expiration or termination of this Agreement. VSP grants to SCO the right to enforce such agreements on VSP's behalf should VSP fail to enforce said agreement. In addition, VSP shall ensure that installed Licensed Product is distributed with the Licensed Product reference manuals, original floppy diskettes, and related materials contained in the Licensed Product package, including serial numbers and activation keys. However, if the Licensed Product is installed so as to be embedded in VSP's total system offered the end user such that the Licensed Product is imperceptible to the end user, then VSP shall not be required to distribute said manuals.

SCO1041482

4.    Obligations of VSP.

A.    VSP shall at all times remarket the Licensed Product only in conjunction with substantial added value in the form of hardware and/or software as set forth on Exhibit A.    VSP's added value, in conjunction with Licensed Product, shall comprise a total solution for VSP's end user customer.  VSP's offer of a total solution shall be a primary reason for the end user customer's purchase from VSP.

B.    VSP shall at all times employ adequately trained sales and technical support personnel, in accordance with reasonable training requirements and policies as may be issued by SCO from time to time.  SCO's training requirements and policies in effect upon the execution of this Agreement are as set forth on Exhibit C attached hereto.

C.    VSP shall maintain at all times its expertise in its vertical market(s) and shall provide adequate support and training to its end user customers.

D.    VSP shall market the Licensed Product to its end user customers in a face-to-face manner.  VSP may utilize mail order or telemarketing methods, so long as these methods are not VSP's primary method of marketing Licensed Product. VSP acknowledges that its breach of this requirement shall result in immediate termination of this Agreement.

E.    VSP shall not distribute any Licensed Product which has been provided to VSP solely for demonstration or other promotional purposes without the prior written consent of SCO.

F.    VSP shall maintain an adequate inventory of its added value and Licensed Product (VSP's total solution) so as to enable VSP to meet its customers' demands in a timely fashion.

G.    VSP shall make no representations to customers regarding Licensed Product other than those made by SCO product literature or as otherwise provided by SCO in writing.

H.    VSP shall, no later than the tenth (10th) business day of each quarter, provide SCO with a report indicating all Licensed Product acquired by VSP from sources other than SCO in the previous quarter,  and the source(s) from which VSP acquired such Licensed Product.  Further, VSP shall report the customers to whom the Licensed Product had been remarketed.  Such report(s) shall be in a format(s) reasonably requested by SCO and include the following information:

a) Customer city and state
b) Country where Licensed Product has been remarketed
c) Model and Serial Number of Licensed Product
d) Unit Cost

Any report regarding Licensed Product acquired from other SCO authorized sources received by SCO later than the tenth (10th) business day of the quarter shall not be credited against VSP's volume commitment.

SCO or its representative shall have the right to audit VSP's records, at SCO's expense, as reasonably requested by SCO, provided however, that VSP shall reimburse SCO for said expenses in the event the audit discloses an underpayment of royalties by VSP of five percent (5%) or $5,000, whichever shall be greater.

5. **Installation License.**

A. VSP shall have the right to reproduce the Licensed Product as expressly specified on Exhibit A. The Licensed Product may not be modified or revised in any way, nor may it be translated or localized in any way without the prior written consent of SCO. All copies of the Licensed Product reproduced by VSP shall include the copyright notice of SCO and/or its suppliers and all other applicable proprietary markings. Except as expressly set forth herein, VSP shall have no right, title, or interest in the Licensed Product, which shall at all times remain the property of SCO and/or its suppliers.

B. Prior to delivery to an end user, VSP shall incorporate a unique serial number and activation key from SCO with each Licensed Product. VSP may replace an end user's defective hard disk containing Licensed Product with another hard disk containing Licensed Product which uses the same serial number and activation key as the defective disk.

C. VSP shall ensure that installed Licensed Product is distributed with no more than one copy of reference manuals and related materials, provided, however, if the Licensed Product is installed so as to be embedded in VSP's total system offered the end user such that the Licensed Product is imperceptible to the end user, then VSP shall not be required to distribute said manuals and materials.

6. **Marketing Milestones for Licensed Product; Price; Payment.**

A. During the term of this Agreement VSP agrees to acquire Licensed Product in the amount equal to the Marketing Milestones as set forth in Exhibit D attached hereto, which will be calculated on the basis of SCO's invoiced totals and VSP's reports, regarding Licensed Product acquired from SCO distributors and other SCO authorized sources less returns, allowances and invoices not paid when due.

B. Regarding Licensed Product acquired from SCO, VSP's license fees for Licensed Product shall be SCO's then current U.S. list price, less the then current VSP discount. SCO shall have the right to increase any list price on thirty (30) days prior written notice and the VSP discount on sixty (60) days prior written notice. SCO shall have the right to adjust VSP's discount immediately in the event VSP fails to meet the marketing milestones set forth in Exhibit D.

C. Regarding Licensed Product acquired from SCO, VSP shall order Licensed Product from SCO by a written purchase order submitted by VSP's central purchasing location, which shall be subject to acceptance by SCO at its offices in Santa Cruz, California, and which shall comply with any minimum order requirements. VSP shall be required to pay additional fees for "rush orders."

D. Regarding Licensed Product acquired from SCO, VSP shall pay SCO the applicable license fees, freight, insurance, and any required sales taxes. With approved credit, payments shall be due and payable thirty (30) days from date of invoice; which shall be directed to VSP's central bill to address, otherwise, payment shall accompany VSP's order. SCO may charge VSP interest at the rate of 1 ½ percent per month, or such maximum rate as may be permitted by law, whichever shall be less, with respect to any sum which is not paid in accordance with this provision.

E. Regarding Licensed Product acquired from SCO, Licensed Product shall be shipped F.O.B. SCO's facility to VSP's central "Ship To" address specified by VSP. VSP shall be responsible for any sales or use taxes or shall provide an exemption certificate acceptable to SCO and the applicable taxing authority.

F.    Regarding Licensed Product acquired from SCO, VSP hereby grants to SCO a security interest in the Licensed Product and in the proceeds arising from the remarketing thereof to secure payment of the license fees and related charges. SCO's security interest shall expire upon payment to SCO of such fees and charges. VSP agrees to execute such other documents as SCO shall reasonably require to perfect SCO's security interest.

7.    Discontinuance or Modification of Licensed Product.

A.    SCO may discontinue or modify a Licensed Product at any time.

B.    Additional Licensed Product may be added to Exhibit A by the mutual written agreement of the parties.

CONFIDENTIAL                                        SCO1041485

8.    Term of Agreement; Obligations upon Termination.

A.    This Agreement shall be in effect upon the date last executed and shall continue thereafter until terminated by either party, for any reason whatsoever and with no liability arising therefrom, upon at least sixty (60) days prior written notice.

B.    However, should either party breach any provision of this Agreement and fail to remedy such breach within thirty (30) days of written notice thereof, the injured party may terminate this Agreement immediately and rescind any purchase orders submitted by VSP and accepted by SCO, as well as pursue any other rights and remedies provided by law or equity or this Agreement.

C.    Further, either party may terminate this Agreement immediately if the other party becomes insolvent, admits in writing its inability to pay its debts as they mature, makes an assignment for the benefit of creditors, files or has filed against it by a third party any petition under any Bankruptcy Act, or an application for a receiver of the other party is made by anyone and such petition or application is not resolved favorably to the other party within sixty (60) days.

D.    In the event SCO terminates this Agreement pursuant to Subparagraph A above, VSP may, at its option, return to SCO any Licensed Product acquired directly from SCO within ninety (90) days of the effective date of termination at the price paid for such Licensed Product less a restocking fee of twenty percent (20%), provided such Licensed Product is in unopened, shrink-wrapped, complete packaging.

E.    In the event SCO terminates this Agreement pursuant to either Subparagraph B or C above, SCO may, at its option, take return of any or all Licensed Product in VSP's possession and credit or refund to VSP the price paid for such Licensed Product.

F.    Upon termination, VSP shall immediately cease using any SCO logos, trademarks, trade names and the like and shall return to SCO any SCO property, including, but not limited to, marketing materials.

9.    Disclaimer of Warranty.

A.    SCO does not warrant that the function contained in the Licensed Product will meet VSP's or any user's requirements or that its operation will be uninterrupted or error free. SCO warrants that Licensed Product substantially conforms to the specifications and functional descriptions contained in the pertinent documentation; and that the reproduction of the software on the media material provided by SCO is correct; and that the documentation is correctly printed to SCO's standard at the time of execution of the Agreement.  Provided VSP notifies SCO of any non-conformance within ninety (90) days of VSP's receipt of Licensed Product, SCO shall at its sole discretion either 1) repair of nonconforming Licensed Product, 2) replace the nonconforming Licensed Product, or 3) accept return of same and refund or credit any fees paid by VSP for such returned Licensed Product.

B.    Further, SCO warrants the SCO supplied media on which the SCO software component of the Licensed Product resides to be free from defects in material and workmanship under normal use for a period of ninety (90) days from date of delivery by VSP to VSP's customer, not to exceed one hundred twenty days (120) days from SCO's shipment to VSP, and shall at its sole discretion either 1) repair the defective media, 2) replace the defective media, or 3) accept return of same and refund or credit any fees paid by VSP for such returned Licensed Product.

CONFIDENTIAL

SCO1041486

C.    EXCEPT AS PROVIDED HEREIN, LICENSED PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

D.    SCO MAKES NO WARRANTY DIRECTLY TO VSP'S END USER CUSTOMERS.

10.    LIMITATION OF LIABILITY.

SCO SHALL NOT BE LIABLE TO VSP FOR INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND SUSTAINED OR INCURRED IN CONNECTION WITH THIS AGREEMENT AND THE SOFTWARE THAT IS SUBJECT TO THIS AGREEMENT REGARDLESS OF THE FORM OF ACTION AND WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE, AND EVEN IF SCO HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS. IN NO CASE WILL SCO BE LIABLE FOR ANY REPRESENTATION OR WARRANTY MADE TO ANY THIRD PARTY BY VSP OR ANY AGENT OF VSP.

SCO's total liability to VSP shall not exceed the sum of monies received by VSP in the (3) months immediately preceding the claim.

11.    Acts Beyond Parties' Control.

Neither party shall be liable for any delay or failure in its performance hereunder due to any cause beyond its control provided, however, that this provision shall not be construed to relieve VSP of its obligation to make any payments pursuant to this Agreement.

12.    Indemnification.

VSP shall indemnify and hold harmless SCO against any and all claims and expenses, including reasonable attorney's fees, arising out of VSP's performance hereunder and due to VSP's negligent acts or omissions or due to VSP's willful misconduct.

13.    Non-infringement

SCO warrants that it has sufficient right, title and interest in the Licensed Product to enter into this Agreement and that the Licensed Product does not infringe a United States Patent or United States copyright or violate a trade secret or other proprietary right afforded protection under United States law. VSP shall promptly notify SCO of any alleged claim of infringement and shall cooperate with SCO in the defense or settlement of same.

14.    Ownership of Licensed Product, Trademarks, etc.

A.    VSP acknowledges that, subject only to the rights specifically granted herein, all rights, title, and interest in the Licensed Product provided to VSP are and shall remain at all times the property of SCO and/or SCO's suppliers.

B.    VSP further acknowledges that the Licensed Product is copyrighted and that VSP is not authorized to reproduce or modify any copies of the Licensed Product nor authorize any other party to do so. In no event shall VSP reverse engineer or decompile the Licensed Product.

C.    VSP shall not alter or remove any copyright notices or other proprietary notices on or in the Licensed Product. Except as required to install Licensed Product for the end user's convenience, VSP shall not alter, tamper with, or otherwise open Licensed Product packaging prior to delivery of the Licensed Product to the end

CONFIDENTIAL                    SCO1041487

D.   VSP shall cause to appear in any of its advertising, publications, packaging, external communications, and the like the appropriate proprietary designations for the Licensed Products (e.g. copyright notices, trademark notices, service marks).

15.   Restricted Rights Legend.

VSP agrees that Licensed Product is commercial computer software and, together with any related documentation, is subject to the restrictions on U.S. Government use, duplication or disclosure as set forth in subparagraph ©(1)(ii) of Department of Defense Federal Acquisition Regulations Supplement (DFARS) 52.227-7013 or in subparagraph (g)(3)(i) of Federal Acquisition Regulations (FAR) 52.227-14, Alternate III, as applicable. VSP shall ensure that said software media and documentation are marked with the appropriate Restricted Rights Legend in accordance with said DFARS and FAR provisions prior to delivery to any U.S. Government agency.

16.   Confidentiality.

A.   Each party (as receiving party) shall retain in confidence, with the same degree of care that it uses for its own proprietary information, confidential information and know-how, that has been supplied to it by the other party (as disclosing party). This duty shall apply to any material in writing or other tangible form and clearly marked or identified in writing as 'confidential' or similar legend at the time of disclosure. It shall also apply to information divulged orally, provided that the receiving party was informed of the confidential nature of the information prior to receiving it, and provided that the subject matter of the information is reduced to writing and identified in writing to be confidential within seven (7) days of disclosure. Neither party shall make use of such information and know-how except under the terms and for the duration of this Agreement.

B.   Neither party (as receiving party) shall have any obligation under this section with respect to any information received from the other party (as disclosing party) that:

(1)   is or becomes hereafter in the public domain through no fault of the receiving party to its obligation hereunder,

(2)   was already known by the receiving party prior to disclosure by the disclosing party,

(3)   is subsequently rightfully received by the receiving party from a third party free from obligation of non-disclosure or

(4)   is independently developed by employees of the receiving party.

C.   The parties agree that all the terms and condition of the Agreement and Exhibits hereto shall be treated as confidential material and shall not be disclosed without prior written consent.

D.   The parties' obligations of confidentiality shall survive any termination of this Agreement by five (5) years.

17.   Prohibition Against Assignment of Rights.

This Agreement may not be assigned in whole or in part by VSP without the prior written consent of SCO, which may be granted or withheld at SCO's sole discretion.

18. **Notices.**

Any notice required by this Agreement shall be given in writing, referencing contract and sent to the addresses set forth above, or to such other addresses as the parties may from time to time specify, via United States Mail, first class postage prepaid, via courier, or via hand-delivery.

19. **Governing Law; Venue and Jurisdiction.**

This Agreement shall be construed in accordance with and governed by the laws of the State of California, excluding that State's laws regarding conflict of laws. The state courts of Santa Clara County, California, or, if there is exclusive federal jurisdiction, the U.S. District Court for the Northern District of California, shall have exclusive jurisdiction and venue over any dispute or claim arising out of this Agreement; both parties hereby consent to the jurisdiction of said courts.

20. **Waiver.**

The waiver of any breach or default hereunder by either party shall not constitute the waiver of any subsequent breach or default.

21. **VSP as an Independent Contractor.**

VSP shall at all times be an independent contractor and shall not be or represent itself to be an agent, partner, employee or the like of SCO.

22. **Severability.**

If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. The parties will seek in good faith to agree on replacing an invalid, illegal, or unenforceable provision with a valid, legal, and enforceable provision which, in effect, will, from an economic viewpoint, most nearly and fairly approach the effect of the invalid, illegal, or unenforceable provision.

23. **Entire Agreement.**

This Agreement constitutes the entire agreement between VSP and SCO regarding the subject matter hereof and supersedes all previous negotiations, proposals, commitments, writings, advertisements, and understandings of any nature whatsoever. This Agreement may be modified only in a writing executed by an authorized representative of the party to be charged. Any terms set forth on any purchase order or other document submitted to SCO which are in conflict with or in addition to the terms of this Agreement shall be null and void.

In witness whereof, the parties have caused this Agreement to be executed by their duly authorized representatives.

THE SANTA CRUZ OPERATION, INC.

BY: _W. J. Murphy_

Name: _W. J. MURPHY_

Title: _SENIOR CONTRACT MANAGER_

Date: _1/7/97_

VSP

BY: _INTEGRATION DESIGN_

Name: _JOE BARBER_

Title: _DIRECTOR_

Date: _9/12/96_

CONFIDENTIAL

SCO1041489

**EXHIBIT A**

LICENSED PRODUCT, DISCOUNT AND DESCRIPTION OF ADDED VALUE

1.    Licensed Product to be marketed by VSP:

   SCO FastStart

   SCO Internet to Netware Gateway
   Internet Security Package
   Oracle WebServer
   MorningStar PPP
   Netscape Communications Server
   Netscape Commerce Server
   Netscape Proxy Server
   Netscape Navigator

2.    DISCOUNT

   VSP shall be entitled to a forty percent (40%) discount on packaged Licensed Products listed in Section 1 above and a forty percent (40%) discount on installation Licensed Products listed in Section 1 above.

3.    DESCRIPTION OF ADDED VALUE:

   VSP shall install all Licensed Product with VSP's _____ prior to delivery to customers.

**EXHIBIT B**
**END USER LICENSE AGREEMENT**
(Minimum Provisions)

1. Certain SCO Products will exhibit modified functioning if they are not registered as required.

2. Sublicensor grants Sublicensee (the Software User) and Sublicensee accepts from Sublicensor, the following non- exclusive rights. Sublicensee is not granted any other right in the Software. All proprietary rights in or related to the Software are and will remain the exclusive property of Sublicensor or its licensors. Sublicensee further acknowledges that the Software contains confidential information owned by Sublicensor or its licensors and agrees to take reasonable steps to protect the confidentiality of such information.

3. Sublicensee may load, copy or transmit the Software in whole or in part, only as necessary to use the Software on a single personal computer or workstation, unless the Software is designated on the registration document as being for use on a multi-user or multiple system configuration, in which case Sublicensee must take reasonable means to assure that the number of Users does not exceed the permitted number of Users. In addition, Sublicensee may make back-up or archival copies of the Software.

4. SUBLICENSEE MAY NOT COPY THE PRINTED DOCUMENTATION.

5. All trademarks, service marks, patents, copyright and other proprietary notices must be reproduced when making copies in whole or in part.

6. Sublicensee may not reverse compile the Software for any purpose. If Sublicensee wishes to exercise any rights under Article 6.1 b of the EC Directive on the Legal Protection of Software, (Directive 91/250), Sublicensee shall, in the first instance, write to Sublicensor's Legal Department. Sublicensee may not copy or adapt the Software for the purpose of correcting errors in it.

7. Sublicensee may not export or re-export, directly or indirectly, the Product, the media, or any related technical information or materials unless Sublicensee has obtained an appropriate authorization from the U.S. Commerce Department and any other relevant government authority.

8. The Software is derived from third party software and no such third party warrants the Software, assumes any liability regarding the use of the Software, or undertakes to furnish any support or information relating to the software.

9. SUBLICENSOR'S SUPPLIERS SHALL NOT BE HELD TO ANY LIABILITY FOR ANY DAMAGES SUFFERED OR INCURRED BY SUBLICENSEE, INCLUDING BUT NOT LIMITED TO GENERAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM OR IN CONNECTION WITH THE DELIVERY, USE OR PERFORMANCE OF THE SOFTWARE.

10. This Product is commercial computer software. If Sublicensee is a U.S. Government End-User, this license is granted subject to the U.S. Government End-User provisions set forth in the Documentation; and the Product together with its related documentation is subject to the restrictions of U.S. Government use, duplication or disclosure as set forth in subparagraph ©(1)(ii) of DFARS 252.227-7013 or subparagraph (g)(3)(i) of FAR 52.227-14, Alt. III, as applicable. Contractor/Manufacturer is The Santa Cruz Operation, Inc.

11.  Upon any transfer of the Software permanently to another Software User, the original Sublicensee must notify Sublicensor and the new Sublicensee must certify to Sublicensor their agreement to be bound by the terms of the Agreement. Except for such permanent transfer, Sublicensee may not assign, sublicense, rent, lend, lease, pledge or otherwise transfer or encumber the Software, this Agreement or Sublicensee's rights or obligations hereunder without Sublicensor's approval.

CONFIDENTIAL

# EXHIBIT C

## SUPPORT AND TRAINING

1.  <u>SCO Support.</u>

    For each year this Agreement is in effect, VSP shall maintain, at a minimum, a 5 Call Pack of SCO Premier Support.  VSP may purchase additional Premier Support Call Pack's or higher support such as SCO TEAM Support or SCO Engineering Services by contacting either its Sales Representative or SCO Professional Services directly.

2.  <u>SCO Training.</u>

    A.  Within thirty (30) days from the date this Agreement is last signed, at least one of VSP's support or development personnel must successfully complete SCO training classes, held at SCO training centers, in the Licensed Product(s) which VSP is remarketing hereunder.  If these classes are not available during that 30-day period, then VSP's personnel shall enroll in the next available classes.

    B.  If VSP's SCO-trained personnel leave VSP's employ, within thirty (30) days of the SCO-trained personnel leaving VSP's employ, VSP shall so notify SCO and shall have other personnel enroll in applicable training classes unless VSP can demonstrate to SCO that its other personnel possess sufficient expertise regarding the Licensed Product(s).

CONFIDENTIAL                                    SCO1041493

**EXHIBIT D**

MARKETING MILESTONES

VSP's Marketing Milestones for the initial term are as listed below.

| Marketing Milestones | Minimum Purchase Amount | Cumulative Purchase |
|---|---|---|
| 1. Upon signing Agreement | US $20,000 | US $ 20,000 |
| 2. 3 months after signing | US $20,000 | US $ 40,000 |
| 3. 6 months after signing | US $20,000 | US $ 60,000 |
| 4. 9 months after signing | US $20,000 | US $ 80,000 |
| 5. 12 months after signing | US $20,000 | US $100,000 |

The Marketing Milestones for each calendar quarter thereafter shall be provided by SCO at the end of each twelve month period.

# EXHIBIT 31

LUCENT NO: LMH-003E

SCO•UWSFSA•020795•032696                    AGREEMENT SERV- 237

## THE SANTA CRUZ OPERATION, INC.
## SCO® UNIXWARE® OEM RESELLER SOURCE FOR SUPPORT AGREEMENT

**This Agreement is available only to LICENSEEs who have previously executed and retained in force agreements with The Santa Cruz Operation, Inc. ("SCO") or with NOVELL, Inc. which have been assigned to SCO, to distribute PACKAGED PRODUCT COPIES of SCO UNIXWARE BINARY PRODUCT(s) and who have previously executed and retained in force agreements with SCO for package product support.**

1.  Agreement made by and between SCO, a corporation organized and existing under the laws of the State of California of the United States of America, having an office at 430 Mountain Avenue, Murray Hill, NJ 07974-0004, and LICENSEE, as defined in the signature block of this Agreement for itself and its SUBSIDIARIES. The parties agree that, after LICENSEE's execution and SCO's acceptance of this Agreement, the terms and conditions set forth in this Agreement shall apply to use by LICENSEE of SCO UNIXWARE SOURCE PRODUCT(s) that become subject to this Agreement.

2.  SCO makes certain SCO UNIXWARE SOURCE PRODUCT(s) available under this Agreement. Each such SCO UNIXWARE SOURCE PRODUCT shall become subject to this Agreement on SCO's acceptance of a Supplement executed by LICENSEE that identifies such SCO UNIXWARE SOURCE PRODUCT and lists the SUPPORT SITES and/or DESIGNATED CPUs therefor. The first Supplement for a specific SCO UNIXWARE SOURCE PRODUCT shall have attached a Schedule for such SCO UNIXWARE SOURCE PRODUCT. Any additional terms and conditions set forth in such Schedule shall also apply with respect to such SCO UNIXWARE SOURCE PRODUCT.

3.  Additional Supplements may be added to this Agreement to add additional SCO UNIXWARE SOURCE PRODUCT(s) (and SUPPORT SITES and/or DESIGNATED CPUs therefor). Each such additional Supplement shall be considered part of this Agreement when executed by LICENSEE, if required, and accepted by SCO.

4.  This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of SCO.

5.  Initially, Supplement(s) numbered _____**1**_____ are included in and made part of this Agreement.

LICENSEE:                                    THE SANTA CRUZ OPERATION, INC.

Lucent Technologies, Inc.                    By: _Gil Sandhu_
(Company Name)

Delaware
(State or Country of Incorporation)

600 Mountain Ave, Murray Hill, NJ            _5-20-97_
(Corporate Address)                          (Date)

_Florence G Martin_
(By)

Florence G. Martin
(Print or Type Name)

Sr. Contract Specialist
(Title)
5-20-97
(Date)

CONFIDENTIAL                                 SCO1041736

**LUCENT NO: LMH-003E**

# 1. DEFINITIONS

Unless the context clearly requires otherwise, the capitalized terms within this Agreement shall have the meaning ascribed to the terms below.  The term "Section" within this Agreement refers to the identified Section of this Agreement.

1.01  ADOBE™ SOFTWARE PRODUCT(s) means the Adobe Type Manager™ ("ATM™ OBJECT"), UTOPIA™ FONTS, and ATM BASIC FONTS software products of Adobe Systems Inc. ("Adobe").

1.02  CPU means central processing unit.

1.03  COMPUTER PROGRAM means any instruction or instructions, in source code or object code format, for controlling the operation of a CPU.

1.04  DESIGNATED CPU means any CPU listed as such for SCO UNIXWARE SOURCE PRODUCT(s) under this Agreement.

1.05  DUPLICATING OEM means a RESELLER which is granted the right to duplicate and distribute copies of MASTER SOFTWARE supplied by SCO.

1.06  END USER means any entity which acquires SCO UNIXWARE BINARY PRODUCT(s), directly or indirectly, for its own internal business or personal use.

1.07  LOCUS SOFTWARE PRODUCT(s) means the Advanced Merge™ software products of Locus Computing Corporation.

1.08  MASTER SOFTWARE means a master copy of the SCO UNIXWARE BINARY PRODUCT which a DUPLICATING OEM may duplicate and distribute to END USERS under an appropriate agreement.

1.09  MODIFICATION(S) means a binary patch(es) or fix(es) of a SEVERITY 1 ERROR and/or SEVERITY 2 ERROR.

1.10  OPEN SOFTWARE FOUNDATION SOFTWARE PRODUCT means the OSF/Motif® 1.2 product of the Open Software Foundation Inc.

1.11  PACKAGED PRODUCT COPIES means (i) unmodified binary shrink-wrapped off the shelf copies of SCO UNIXWARE BINARY PRODUCT(s); or (ii) MASTER SOFTWARE, which are or were supplied to  RESELLERS or DUPLICATING OEMS respectively, by SCO or predecessor or a corporate affiliate of SCO orunder a separate appropriate distribution and/or duplicating agreement.

1.12  RESELLERS means entities authorized by SCO to market and distribute PACKAGED PRODUCT COPIES to END USERS either directly or via sub-distributors.

1.13  SEVERITY 1 ERROR means any defect in SCO UNIXWARE BINARY PRODUCT(s) which results in a system crash or similar state of the machine for which no acceptable circumvention exists.

1.14  SEVERITY 2 ERROR means any defect in SCO UNIXWARE BINARY PRODUCT(s) wherein the system remains operational but the problem causes loss of essential functionality in SCO UNIXWARE BINARY PRODUCT(s), which cannot be worked around or otherwise circumvented.

1.15  SIRIUS SOFTWARE PRODUCT means the Fingertip Librarian™ product of Sirius Technologies Inc.

Page 2 of 11

CONFIDENTIAL

SCO1041737

1.16  SUBSIDIARY of a company means a corporation or other legal entity (i) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) the majority of the equity interest in which is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be a SUBSIDIARY of such company only so long as such control or such ownership and control exists.

1.17  SUPPORT SITE means LICENSEE's locations within a  five (5) mile radius of each other.

1.18  THIRD PARTY SOFTWARE PRODUCT(s) means ADOBE SOFTWARE PRODUCTS, LOCUS SOFTWARE PRODUCTS, OPEN SOFTWARE FOUNDATION SOFTWARE PRODUCT, SIRIUS SOFTWARE PRODUCT, VERITAS SOFTWARE PRODUCT AND NOVELL NETWARE® SOFTWARE PRODUCTS.

1.19  SCO UNIXWARE BINARY PRODUCT means an implementation of SCO's SCO UNIXWARE COMPUTER PROGRAMS in binary format (including UPDATES thereof made by SCO) (i) which is adapted for use with the Intel 80x86 architecture, and (ii) for which LICENSEE has acquired distribution rights.

1.20  SCO UNIXWARE SOURCE PRODUCT means a source code implementation of SCO's SCO UNIXWARE  COMPUTER PROGRAMS and documentation relating to the use of such COMPUTER PROGRAMS, which is intended for the Intel 80x86 architecture, and UPDATES thereof made by SCO.

1.21  UPDATE means a software fix or compilation of fixes made by SCO to correct operational defects (program bugs) in a SCO UNIXWARE BINARY PRODUCT corresponding to such SCO UNIXWARE SOURCE PRODUCT.

1.22  VERITAS™ SOFTWARE PRODUCT means the Veritas Journaling File System (VjFS™) product of Veritas Software Corporation.

## 2.  GRANT OF RIGHTS

2.1 Subject to the terms and conditions specified in this Agreement, SCO hereby grants and LICENSEE hereby accepts, a non-exclusive and (except as otherwise provided herein), non-transferable license to use (or have a contractor use pursuant to Section 3) SCO UNIXWARE SOURCE PRODUCT(s) solely in the countries specified in Exhibit A of this Agreement.  Such SCO UNIXWARE SOURCE PRODUCT(s) may be used solely on or in conjunction with DESIGNATED CPUs for SCO UNIXWARE SOURCE PRODUCT(s); but such use shall be limited only to creating MODIFICATIONS for a SCO UNIXWARE BINARY PRODUCT distributed by LICENSEE to an END USER. **No other rights are granted.**

2.2 A single back-up CPU may be used as a substitute for a DESIGNATED CPU without notice to SCO during any time when such DESIGNATED CPU is inoperative because it is malfunctioning or undergoing repair, maintenance or other modification.

2.3 LICENSEE may at any time notify SCO in writing of any  additions that LICENSEE wishes to make to the DESIGNATED CPUs for one or more SCO UNIXWARE SOURCE PRODUCT(s).  SCO will prepare additional Supplements to this Agreement as required to cover such changes.  Changes covered by a Supplement shall become effective after execution of such Supplement by LICENSEE, if required, acceptance thereof by SCO and, in the case of each additional DESIGNATED CPU, receipt by SCO of the applicable fee, if any.

2.4 **Ownership.**

As between SCO and LICENSEE, ownership of SCO UNIXWARE SOURCE PRODUCT(s) including all UPDATES and MODIFICATIONS made by LICENSEE (and any intellectual property rights embodied in any such software) is and shall remain in SCO.

CONFIDENTIAL                                               SCO1041738

2.5 **MODIFICATIONS.**

(a) **Process.** Once LICENSEE has become aware of a SEVERITY 1 ERROR and/or a SEVERITY 2 ERROR condition, LICENSEE shall promptly notify SCO's Engineering Services Organization either by telephone or electronic mail as provided for in LICENSEE's existing support agreements with SCO for SCO UNIXWARE BINARY PRODUCT(s). In the event that SCO is unable to provide MODIFICATIONS in a timely fashion, then LICENSEE shall be allowed to prepare its own MODIFICATIONS for distribution.

(b) **Distribution.** SCO grants to LICENSEE personal, nontransferable and nonexclusive rights to make copies of MODIFICATIONS and to furnish, either directly or through RESELLERS, such copies of MODIFICATIONS to those END USERS who obtained copies of SCO UNIXWARE BINARY PRODUCT(s) solely for use on END USER's CPUs and solely for each such END USER's internal business purposes. Such distribution of MODIFICATIONS shall be subject to the terms and conditions as outlined above in this Section and shall comply with all applicable governmental export requirements. The use of such MODIFICATIONS shall be subject to the terms and conditions of the agreement accompanying the original END USER SCO UNIXWARE BINARY PRODUCT.

(c) LICENSEE shall be responsible for providing permitted MODIFICATIONS made by LICENSEE back to SCO. This also includes LICENSEE providing SCO with the complete source files which have been modified, along with a written statement as to what LICENSEE changed and the reason for making such changes. Such MODIFICATIONS shall be either transmitted by electronic mail or mailed by LICENSEE to SCO on other media. Such delivery back to SCO shall be completed within seven (7) business days from the day LICENSEE first shipped such MODIFICATIONS to END USERS.

(d) LICENSEE agrees that its MODIFICATIONS shall be superseded by official MODIFICATIONS and/or UPDATES provided by SCO as described in Section 6 of this Agreement.

## 3. CONTRACTOR PROVISIONS

3.1 LICENSEE may permit access to SCO UNIXWARE SOURCE PRODUCT(s) by its contractors and allow use of SCO UNIXWARE SOURCE PRODUCT(s) by its contractors on DESIGNATED CPUs, provided such access and use is exclusively for LICENSEE in connection with work called for in written agreements between LICENSEE and such contractors in accordance with this Section 3. Furthermore, all work performed by contractors shall be limited in accordance with Section 2 of this Agreement. LICENSEE may designate contractors' CPUs as DESIGNATED CPUs pursuant to Section 2.3 and subject to this Section furnish SCO UNIXWARE SOURCE PRODUCT(s) to contractors for use on such CPUs.

3.2 Any claim demand or right of action arising on behalf of a contractor from the furnishing to it or use by it of SCO UNIXWARE SOURCE PRODUCT(s) shall be solely against LICENSEE.

3.3 Contractors shall agree to the same responsibilities and obligations and other restrictions pertaining to the use of SCO UNIXWARE SOURCE PRODUCT(s) as those undertaken by LICENSEE under this Agreement.

3.4 When a contractor's work for LICENSEE is completed, all copies of SCO UNIXWARE SOURCE PRODUCT(s) furnished to such contractor or made by such contractor and all copies of MODIFICATIONS made by such contractor based on SCO UNIXWARE SOURCE PRODUCT(s) shall be returned to LICENSEE or destroyed, including any copies stored in any computer memory or storage medium.

3.5 A contractor may not acquire any ownership interest in any MODIFICATION prepared by such contractor based on SCO UNIXWARE SOURCE PRODUCT(s).

CONFIDENTIAL   SCO1041739

3.6 LICENSEE and any such contractor shall enter into a written agreement before or at the time of permitting access to or allowing use of one or more SCO UNIXWARE SOURCE PRODUCT(s) by a contractor or furnishing one or more SCO UNIXWARE SOURCE PRODUCT(s) to a contractor. Such written agreement shall be consistent with the requirements of this Section 3. Copies of such agreements shall be provided to SCO upon request. However, portions of such agreements not required by this Section may be deleted from such copies.

## 4. TERM

4.1 This Agreement shall become effective on and as of the date of acceptance by SCO. With respect to a particular SCO UNIXWARE SOURCE PRODUCT, the duration of LICENSEE's rights shall be as specified in the Schedule associated with the applicable Supplement.

4.2 LICENSEE may terminate its rights under this Agreement by written notice to SCO certifying that LICENSEE has discontinued use of and returned or destroyed all copies of SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement.

4.3 If LICENSEE fails to fulfill one or more of its obligations under this Agreement, SCO may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by giving LICENSEE not less than sixty (60) days written notice specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement.

4.4 In the event of termination of rights under Sections 4.2 or 4.3, SCO shall have no obligation to refund any amounts paid to it under this Agreement.

4.5 LICENSEE agrees that when a SUBSIDIARY's relationship to LICENSEE changes so that it is no longer a SUBSIDIARY of LICENSEE, (i) all rights of such former SUBSIDIARY to use SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement shall immediately cease, and (ii) such former SUBSIDIARY shall immediately discontinue use of and return to LICENSEE or destroy all copies of SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement. No fees paid to SCO for use of SCO UNIXWARE SOURCE PRODUCT(s) on DESIGNATED CPUs of such former SUBSIDIARIES shall be refunded; however, LICENSEE may substitute other CPUs for such DESIGNATED CPUs.

## 5. DELIVERY

5.1 Within a reasonable time after SCO receives the fee(s) specified in the first Supplement for one or more SCO UNIXWARE SOURCE PRODUCT(s) requiring a distribution, SCO will furnish to LICENSEE one (1) copy, for each SUPPORT SITE for which LICENSEE has paid a fee, of such SCO UNIXWARE SOURCE PRODUCT(s) in the form identified in the Schedule for such SCO UNIXWARE SOURCE PRODUCT.

## 6. UPDATES

6.1 SCO shall provide to LICENSEE, for the purpose of fixing program bugs in a SCO UNIXWARE BINARY PRODUCT(s), UPDATES to the corresponding SCO UNIXWARE SOURCE PRODUCT(s) which in SCO's sole discretion are commercially reasonable, desirable or practicable and which SCO makes generally available to all of its SCO UNIXWARE SOURCE PRODUCT LICENSEES. These UPDATES shall be included in the annual fees paid as outlined in the Schedule for such applicable SCO UNIXWARE SOURCE PRODUCT(s). All such UPDATES shall be deemed to be, and shall be treated by LICENSEE as,  SCO UNIXWARE SOURCE PRODUCT(s) under this Agreement.

CONFIDENTIAL
SCO1041740

6.2 LICENSEE agrees that UPDATES, should they contain SEVERITY 1 or SEVERITY 2 fixes from SCO, (which were previously fixed and distributed to END USERS as MODIFICATIONS by LICENSEE), will be distributed by LICENSEE to END USERS in binary form as the official fix within a reasonable amount of time.

# 7. EXPORT

7.1 Except as provided in Section 2.5(c) of this Agreement, LICENSEE agrees that it will not, without prior written consent of SCO, export, directly or indirectly, SCO UNIXWARE SOURCE PRODUCT(s) covered by this Agreement to any country not listed in Exhibit A hereto. LICENSEE also agrees that it will obtain any and all necessary export licenses for any such export or for any disclosure of a SCO UNIXWARE SOURCE PRODUCT to a foreign national.

# 8. STANDARD SUPPORT

8.1 SCO shall have no obligation to provide support to LICENSEE except as outlined in LICENSEE's required Support Agreement with SCO.

# 9. TRADEMARKS

9.1 No right is granted herein to use any trademarks, trade devices, service marks or symbols, or other trade indications, and abbreviations, contractions or simulations thereof (collectively "trademarks") owned by, or used to identify any product or service of, SCO (or a corporate affiliate thereof) or any third party including any third party who has contributed to any portion of a SCO UNIXWARE SOURCE PRODUCT. LICENSEE agrees that it will not, without the prior written permission of SCO;

    (a) use any such trademark in advertising, publicity, packaging, labeling or in any other manner to identify any of LICENSEE's products or services; or

    (b) represent, directly or indirectly, that any of LICENSEE's products or services is a product or service of SCO or such an affiliate, or is made in accordance with or utilizes any information or documentation of SCO or such an affiliate.

# 10. FEES AND TAXES

10.1 Within thirty (30) days after the acceptance of this Agreement by SCO, LICENSEE shall pay to SCO the fees required by the Supplement(s) initially attached hereto for the SUPPORT SITE(s) and associated DESIGNATED CPU(s) listed in such Supplements, and any other deliverables listed in such Supplement including but not limited to distribution copies of SCO UNIXWARE SOURCE PRODUCT(s).

10.2 Within thirty (30) days after acceptance of each additional Supplement by SCO, LICENSEE shall pay to SCO any fee required by such additional Supplement for the SUPPORT SITE(s) and/or DESIGNATED CPU(s) listed in such additional Supplement, and any other deliverables listed in such Supplement including but not limited to distribution copies of SCO UNIXWARE SOURCE PRODUCT(s).

10.3 Payments to SCO shall be made in United States dollars at the applicable address specified in Section 11.1

CONFIDENTIAL        SCO1041741

10.4 LICENSEE shall pay all taxes, including any sales tax (and any related interest or penalty), however designated, imposed as a result of the existence or operation of this Agreement, except any income tax imposed upon SCO by any governmental entity. Fees specified in Supplement(s) to this Agreement and in Exhibit(s) attached to Supplement(s) do not include taxes. If SCO is required to collect a tax to be paid by LICENSEE, LICENSEE shall pay such tax to SCO on demand.

10.5 SCO reserves the right to change the fees under this Agreement at any time upon providing LICENSEE sixty (60) days or more prior written notice.

## 11. PAYMENTS

11.1 Payments to SCO under this Agreement shall be in United States dollars and made payable and sent to the following address:

The Santa Cruz Operation, Inc.
P. O. Box 7745
San Francisco, CA 94120-7745;

or made via bank wire transfer to:

Bank of the West
Corporate Division
Beneficiary:The Santa Cruz Operation, Inc.
Account No. 064-001456, ABA #1211-00782
1450 Treat Boulevard
Walnut Creek, CA 94596
USA

11.2 Payments provided for in this Agreement shall, when overdue, be subject to a late payment charge calculated at an annual rate of three percent (3%) over the posted prime rate or successive posted prime rates in effect in New York City during delinquency. In no event shall such late payment charge exceed the maximum permitted by law for such charge.

## 12. TECHNICAL AUDITS

12.1 At least once annually, LICENSEE shall furnish to SCO a statement certified by an authorized representative of LICENSEE listing the location, type and serial number of all DESIGNATED CPUs hereunder and stating that the use by LICENSEE of SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement has been reviewed and that each such SCO UNIXWARE SOURCE PRODUCT is being used solely on DESIGNATED CPUs (or temporarily on back-up CPUs) for such SCO UNIXWARE SOURCE PRODUCT(s) in full compliance with the provisions of this Agreement.

12.2 If after reviewing the above records, SCO has reasonable basis to believe:

(a) that LICENSEE is not maintaining records of SCO UNIXWARE SOFTWARE PRODUCT(s) in a manner consistent with the terms and conditions of this Agreement; and
(b) that LICENSEE is not taking adequate steps to correct inconsistencies, if any, pointed out to LICENSEE by SCO based on review of such records,

then upon reasonable notice, LICENSEE agrees to allow SCO to have its accredited auditing representative(s) make an on-site inspection of all of LICENSEE's CPUs during normal business hours.

12.3 Such inspection shall not be made more frequently than annually. LICENSEE may elect to have such inspection made under the terms of a reasonable and appropriate confidentiality agreement executed by the auditor. The type of information provided to SCO by the auditor as a result of an on-site inspection shall be restricted to:

CONFIDENTIAL                                    SCO1041742

(a) the number of unreported CPUs on which SCO UNIXWARE SOURCE PRODUCT(s) were being used by, or on behalf of, LICENSEE and which therefore should have been listed as DESIGNATED CPUs;

and

(b) the location, type and serial numbers of such unreported CPUs.

## 13. LIMITED WARRANTY

13.1 SCO warrants for a period of ninety (90) days from furnishing a SCO UNIXWARE SOURCE PRODUCT to LICENSEE that any magnetic or optical medium on which portions of a SCO UNIXWARE SOURCE PRODUCT are furnished will be free under normal use from defects in materials, workmanship or recording. If such a defect appears within such warranty period, LICENSEE may return the defective medium for replacement without charge.

13.2 EXCEPT FOR THE LIMITED WARRANTY SET FORTH ABOVE, SCO EXPRESSLY DISCLAIMS ALL WARRANTIES INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE AND FITNESS FOR A PARTICULAR PURPOSE AND AGAINST INTELLECTUAL PROPERTY INFRINGEMENT.

13.3 To the best of SCO's knowledge, no material claim is pending or threatened against SCO or any SCO licensor that would adversely affect the right of LICENSEE to use SCO UNIXWARE SOURCE PRODUCT(s) for its intended purposes.

## 14. LIMITATION OF LIABILITY

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS) SUSTAINED OR INCURRED IN CONNECTION WITH THIS AGREEMENT AND THE PRODUCT(s) THAT ARE SUBJECT TO THIS AGREEMENT REGARDLESS OF THE FORM OF ACTION AND WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE.

## 15. INTELLECTUAL PROPERTY PROTECTION

15.1 LICENSEE agrees that it shall hold all parts of SCO UNIXWARE SOURCE PRODUCT(s) subject to this Agreement in confidence for SCO. LICENSEE further agrees that it shall not make any disclosure of any or all of such SCO UNIXWARE SOURCE PRODUCT(s) (including methods or concepts utilized therein) to anyone, except to employees and contractors of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder.    LICENSEE shall appropriately notify each employee and/or contractor to whom any disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee and/or contractor. If information relating to a SCO UNIXWARE SOURCE PRODUCT subject to this Agreement at any time becomes legally available without restriction to the general public by acts not attributable to LICENSEE, its contractors or employees of either, LICENSEE's obligations under this Section shall not apply to such information after such time.

15.2 In the event LICENSEE becomes aware of any infringement or potential infringement of SCO's intellectual property rights in SCO UNIXWARE SOURCE PRODUCT(s) by a third party, LICENSEE agrees to promptly report the infringement or potential infringement to SCO in writing. LICENSEE also agrees to assist SCO in any reasonable way in investigating the infringement or potential infringement and/or in enforcing SCO's rights against infringing parties in exchange for payment by SCO of LICENSEE's reasonable out-of-pocket expenses.

15.3 Each party agrees not to disclose the terms and conditions of this Agreement to any third party without the express written consent of the other party.

CONFIDENTIAL                                    SCO1041743

## 16. DEFAULT/TERMINATION

**16.1  Default.** In addition to any other rights or remedies available to SCO at law or in equity, SCO may terminate this Agreement for any of the following reasons:

**16.1.1**    LICENSEE is in default of any obligation hereunder and default continues for sixty (60) days following receipt of written notice.

**16.1.2**    LICENSEE is dissolved, is involved in a reorganization, or attempts to assign this Agreement or any of its rights under this Agreement.

**16.1.3**    LICENSEE is not paying its debts as the debts become due, becomes insolvent, files or has filed against it a petition under any Bankruptcy Law, proposes any dissolution, liquidation, composition, financial reorganization or recapitalization with creditors, makes an assignment or trust mortgage for the benefit of creditors, or if a receiver trustee, custodian or similar agent is appointed or takes possession of any property or business.

## 17. MISCELLANEOUS PROVISIONS

**17.1**  Neither the execution of this Agreement nor anything in it or in any SCO UNIXWARE SOURCE PRODUCT shall be construed as an obligation upon SCO or any other developer to furnish any person including LICENSEE, any assistance of any kind whatsoever, or any information or documentation other than the SCO UNIXWARE SOURCE PRODUCT(s) to be furnished by SCO pursuant to Sections 5.1, 6.1, and 6.2 of this Agreement.

**17.2  Notice.** Unless otherwise agreed to by the parties, all notices required under this Agreement shall be deemed effective when received and made in writing by either (i) registered mail, (ii) certified mail, return receipt requested, or (iii) overnight mail, addressed and sent to the attention:

The Santa Cruz Operation, Inc.
P. O. Box 4
Murray Hill, New Jersey 07974-0004
Attention: Law & Corporate Affairs

and;

LICENSEE
LUCENT TECHNOLOGIES

1 CROSSROADS DRIVE

BEDMINSTER NS 07921 - 0763

Attention: F.G. MARTIN

**17.3  Headings.**  The headings of this Agreement are provided for reference only and shall not be used as a guide to interpretation.

**17.4  Singular, Plural and Gender.**  When used in this Agreement, the singular includes the plural, the plural includes the singular and gender related pronouns include the feminine, masculine and neuter.

**17.5  Governing Law.**  This Agreement shall be governed by and construed and enforced with the substantive laws of the State of New Jersey. The parties agree that any action relating to ownership of SCO UNIXWARE SOURCE PRODUCT(s) shall be instituted and prosecuted exclusively in the courts of competent jurisdiction of the State of New Jersey.

CONFIDENTIAL

SCO1041744

17.6  **Force Majeure.**  If either party shall be prevented from performing any portion of this Agreement (except the payment of money) by causes beyond its control, including labor disputes civil commotion, war, governmental regulations or controls, casualty, inability to obtain materials or services or acts of God, the defaulting party shall be excused from performance for the period of the delay and for a reasonable time thereafter.

17.7  **Survival of Terms.**  The provisions of this Agreement which by their nature extend beyond the expiration or termination of this Agreement, including but not limited to Sections 1, 13, 14, 15 and 17 will survive and remain in effect until all obligations are satisfied.

17.8  **Waiver.**  No waiver of any right or remedy on one occasion by either party shall be deemed a waiver of the right or remedy on any other occasion.

17.9  **Superior Agreement.**  This Agreement, including all exhibits referenced herein sets forth the entire agreement and understanding between the parties as to the subject matter and merges all prior discussions.   Neither of the parties shall be bound by any conditions, definitions, warranties understandings or representations with respect to the subject matter other than as expressly provided under this Agreement.  This Agreement may not be modified by usage of trade, course of dealing or otherwise.  This Agreement is subject to amendment or modification only by a writing duly signed by both parties.

17.10 **Assignment.**  Any attempted assignment of this Agreement by LICENSEE shall be null and void without SCO's prior written consent.  Such consent shall not unreasonably be withheld.

17.11 **Severability.**  If any provision of this Agreement is held invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and shall be interpreted, to the extent possible, to achieve the extent possible, to achieve the purpose of this Agreement as originally expressed with the invalid, illegal or unenforceable provision.

17.12 **Independent Contractors.**  Both parties to this Agreement are independent contractors and each agrees not to represent itself as an agent or legal representative of the other party.

17.13 **Compliance with Laws.**  LICENSEE shall comply, at LICENSEE's own expense, with all statutes regulations, rules, ordinances, and orders of any governmental body, department or agency which apply to or result from LICENSEE's obligations under this Agreement.  LICENSEE hereby agrees that it and its subsidiaries and affiliates will fully comply with all applicable governmental export control laws and regulations.

CONFIDENTIAL                                      SCO1041745

# EXHIBIT A

<u>COUNTRIES IN WHICH SCO UNIXWARE SOURCE PRODUCT(s) MAY BE USED BY LICENSEE UNDER THE SCO, INC. SCO UNIXWARE OEM RESELLER SOURCE FOR SUPPORT AGREEMENT:</u>

1

2.

3.

4.

SCO and SCO UNIXWARE are registered trademarks of SCO, Inc.  All other trademarks are the property of their respective holders.

CONFIDENTIAL                                        SCO1041746