# EXHIBIT 32

Dockets.Justia.com

SS-Soft. Corp.-030184-012596

Agreement Number : **F-SOFT-347**

## THE SANTA CRUZ OPERATION, INC.
## SOFTWARE AGREEMENT

1. THE SANTA CRUZ OPERATION, INC. ("SCO"), a California corporation, having an office at 400 Encinal Street, Santa Cruz, California 95061-1900, and SAMSUNG ELECTRONICS CO., LTD. ("SAMSUNG") as defined in the signature block of this Agreement, for itself and its SUBSIDIARIES agree that, after SAMSUNG's execution and SCO's acceptance of this Agreement, the terms and conditions set forth in this Agreement shall apply to use by SAMSUNG of SOFTWARE PRODUCTS that become subject to this Agreement.

2.  SCO makes certain SOFTWARE PRODUCTS available under this Agreement. Each such SOFTWARE PRODUCT shall become subject to this Agreement on SCO's acceptance of a Supplement executed by SAMSUNG that identifies such SOFTWARE PRODUCT and lists the DESIGNATED CPUs therefor. The first Supplement for a specific SOFTWARE PRODUCT shall have attached a Schedule for such SOFTWARE PRODUCT. Any additional terms and conditions set forth in such Schedule shall also apply with respect to such SOFTWARE PRODUCT.

3. Additional Supplements may be added to this Agreement to add additional SOFTWARE PRODUCTS (and DESIGNATED CPUs therefor). Each such additional Supplement shall be considered part of this Agreement when executed by SAMSUNG, if required, and accepted by SCO.

4. This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by SAMSUNG shall be applicable unless such provision is expressly accepted in writing by an authorized representative of SCO.

5. Initially, Supplement(s) numbered ____1____ are included in and made part of this Agreement.

**SAMSUNG ELECTRONICS CO., LTD.**                  **THE SANTA CRUZ OPERATION, INC.**

By: _W. Murphey_

_Senior Contract Mgr._

KOREA                                              (Title)
_____                   _11/4/97_
(State or Country of Incorporation)               ( Date)
144-17, SAMSUNG-DONG,
_____
(Corporate Address)
KANGNAM-KU, SEOUL
_____
(Corporate Address)
_Keeho Park_
_____
(By)
KEE HO  PARK
_____
(Print or Type Name)
DIRECTOR
_____
(Title)
OCT. 29, 1997
_____
(Date)

_____
(Notice Address)

CONFIDENTIAL                                        SCO1042254

SS-Soft. Corp.-030184-012596

## I. DEFINITIONS

1.01 CPU means central processing unit.

1.02 COMPUTER PROGRAM means any instruction or instructions, in source-code or object-code format, for controlling the operation of a CPU.

1.03 DESIGNATED CPU means any CPU listed as such for a specific SOFTWARE PRODUCT in a Supplement to this Agreement.

1.04 SOFTWARE PRODUCT means materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS. Materials available from SCO for a specific SOFTWARE PRODUCT are listed in the Schedule for such SOFTWARE PRODUCT. Certain SOFTWARE PRODUCTS available under this Agreement may contain materials prepared by other developers.

1.05 SUBSIDIARY of a company means a corporation or other legal entity (i) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) the majority of the equity interest in which is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be a SUBSIDIARY of such company only so long as such control or such ownership and control exists.

## II. GRANT OF RIGHTS

2.01 SCO grants to SAMSUNG a personal, nontransferable and nonexclusive right to use in the Republic of Korea each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for SAMSUNG's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this agreement is treated hereunder the same as such SOFTWARE PRODUCT. SCO claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT.

2.02 (a) SAMSUNG may permit access to SOFTWARE PRODUCTS by its contractors and allow use of SOFTWARE PRODUCTS by its contractors on DESIGNATED CPUs, provided such access and use is exclusively for SAMSUNG in connection with work called for in written agreements between SAMSUNG and such contractors in accordance with Section 2.02(f) of this Agreement. SAMSUNG may designate contractors' CPUs as DESIGNATED CPUs pursuant to Section 2.04 and furnish SOFTWARE PRODUCTS to contractors for use on such CPUs.

(b) Any claim, demand or right of action arising on behalf of a contractor from the furnishing to it or use by it of SOFTWARE PRODUCTS shall be solely against SAMSUNG.

(c) Contractors shall agree to the same responsibilities and obligations and other restrictions pertaining to the use of SOFTWARE PRODUCTS as those undertaken by SAMSUNG under this Agreement.

(d) When a contractor's work for SAMSUNG is completed, all copies of SOFTWARE PRODUCTS furnished to such contractor or made by such contractor and all copies of any modifications or derivative works made by such contractor based on such SOFTWARE PRODUCT shall be returned to SAMSUNG or destroyed, including any copies stored in any computer memory or storage medium.

(e) A contractor may not acquire any ownership interest in any modification or derivative work prepared by such contractor based on or using a SOFTWARE PRODUCT subject to this Agreement unless such contractor also becomes a SAMSUNG of SCO for such SOFTWARE PRODUCT.

(f) SAMSUNG and any such contractor shall enter into a written agreement before or at the time of permitting access to or allowing use of any SOFTWARE PRODUCT by a contractor or furnishing a SOFTWARE PRODUCT to a contractor. Such written agreement shall be consistent with the requirements of this Section 2.02. Copies of such agreements shall be provided to SCO

CONFIDENTIAL                    SCO1042255

SS-Soft. Corp.-030184-012596

on request; however, portions of such agreements not required by this Section may be deleted from such copies.

2.03 A single back-up CPU may be used as a substitute for a DESIGNATED CPU without notice to SCO during any time when such DESIGNATED CPU is inoperative because it is malfunctioning or undergoing repair, maintenance or other modification.

2.04 SAMSUNG may at any time notify SCO in writing of any changes, such as replacements or additions, that SAMSUNG wishes to make to the DESIGNATED CPUs for a specific SOFTWARE PRODUCT. SCO will prepare additional Supplements as required to cover such changes. Changes covered by a Supplement shall become effective after execution of such Supplement by SAMSUNG, if required, acceptance thereof by SCO and, in the case of each additional CPU, receipt by SCO of the appropriate fee.

2.05 On SCO's request, but not more frequently than annually, SAMSUNG shall furnish to SCO a statement, certified by an authorized representative of SAMSUNG, listing the location, type and serial number of all DESIGNATED CPUs hereunder and stating that the use by SAMSUNG of SOFTWARE PRODUCTS subject to this Agreement has been reviewed and that each such SOFTWARE PRODUCT is being used solely on DESIGNATED CPUs (or temporarily on back-up CPUs) for such SOFTWARE PRODUCTS in full compliance with the provisions of this Agreement.

2.06 No right is granted by this Agreement for the use of SOFTWARE PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others, except SAMSUNG's contractors pursuant to Section 2.02, unless such uses are permitted for a particular SOFTWARE PRODUCT by a specific provision in the Schedule for such SOFTWARE PRODUCT. For example, use of a SOFTWARE PRODUCT in a time-sharing service or a service-bureau operation is permitted only pursuant to such a specific provision.

## III. DELIVERY

3.01 Within 45 days after SCO receives the fee specified in the first Supplement for a SOFTWARE PRODUCT, SCO will furnish to SAMSUNG one (1) copy of such SOFTWARE

PRODUCT in the form identified in the Schedule for such SOFTWARE PRODUCT.

3.02 Additional copies of SOFTWARE PRODUCTS covered by this Agreement will be furnished to SAMSUNG after receipt by SCO of the then-current distribution fee for each such copy.

3.03 From time to time, if SCO makes update releases generally available, SCO shall provide additional deliveries of SOFTWARE PRODUCTs or elements of SOFTWARE PRODUCTs to SAMSUNG at no additional charge which will consist of the following:

(a) Revised source and/or object code for a SOFTWARE PRODUCT.

(b) New or modified documentation or information regarding such documentation.

All such additional deliveries of SOFTWARE PRODUCTs furnished to SAMSUNG with respect to a SOFTWARE PRODUCT shall be deemed to be part of such SOFTWARE PRODUCT and shall be governed by the terms and conditions of this Agreement including the applicable Supplement for such SOFTWARE PRODUCT.

## IV. EXPORT

4.01 SAMSUNG agrees that it will not, without the prior written consent of SCO, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the Republic of Korea. SAMSUNG also agrees that it will obtain any and all necessary export licenses for any such export or for any disclosure of a SOFTWARE PRODUCT to a foreign national.

## V. FEES AND TAXES

5.01 Within sixty (60) days after acceptance of this Agreement by SCO, SAMSUNG shall pay to SCO the fees required by the Supplement(s) initially attached hereto for the DESIGNATED CPUs listed in such Supplement(s).

5.02 Within sixty (60) days after acceptance of each additional Supplement by SCO, SAMSUNG shall pay to SCO any fee required by such additional Supplement for the DESIGNATED CPUs listed in such additional Supplement.

5.03 Payments to SCO shall be made in United States dollars to SCO at the address specified in Section 7.10(a).

Page 3 of 6

CONFIDENTIAL

SCO1042256

SS-Soft. Corp.-030184-012596

5.04 SAMSUNG shall pay all taxes, including any sales or use tax (and any related interest or penalty), however designated, imposed as a result of the existence or operation of this Agreement, except any income tax imposed upon SCO by any governmental entity. Fees specified in Supplement(s) to this Agreement and in Schedule(s) attached to Supplement(s) do not include taxes. If SCO is required to collect a tax to be paid by SAMSUNG, SAMSUNG shall pay such tax to SCO on demand. Taxes paid by the SAMSUNG on behalf of SCO can be offset against fees due SCO by providing SCO a paid Tax Certificate.

## VI. TERM

6.01 This Agreement shall become effective on and as of the date of execution by both parties and the approval of the appropriate Korean Governmental Agency, which ever comes last.

6.02 SAMSUNG may terminate its rights under this Agreement by written notice to SCO certifying that SAMSUNG has discontinued use of and returned or destroyed all copies of SOFTWARE PRODUCTS subject to this Agreement.

6.03 If SAMSUNG fails to fulfill one or more of its obligations under this Agreement, SCO may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to SAMSUNG specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination SAMSUNG shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement.

6.04 In the event of termination of rights under Sections 6.02 or 6.03, SCO shall have no obligation to refund any amounts paid to it under this Agreement.

6.05 SAMSUNG agrees that when a SUBSIDIARY's relationship to SAMSUNG changes so that it is no longer a SUBSIDIARY of SAMSUNG, (i) all rights of such former SUBSIDIARY to use SOFTWARE PRODUCTS subject to this Agreement shall immediately cease, and (ii) such former SUBSIDIARY shall immediately discontinue use of and return to SAMSUNG or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement. No fees paid to SCO for use of SOFTWARE PRODUCTS on DESIGNATED CPUs of such former

SUBSIDIARIES shall be refunded; however, SAMSUNG may substitute other CPUs for such DESIGNATED CPUs in accordance with Section 2.04.

## VII. MISCELLANEOUS PROVISIONS

7.01 This Agreement shall prevail notwithstanding any conflicting terms or legends which may appear in a SOFTWARE PRODUCT.

7.02 **SCO warrants for a period of ninety (90) days from furnishing a SOFTWARE PRODUCT to SAMSUNG that any magnetic medium on which portions of a SOFTWARE PRODUCT are furnished will be free under normal use from defects in materials, workmanship or recording. If such a defect appears within such warranty period SAMSUNG may return the defective medium for replacement without charge. Replacement is SAMSUNG's sole remedy with respect to such a defect. SCO also warrants that it is empowered to grant the rights granted herein.  SCO and other developers make no other representations or warranties, expressly or impliedly. By way of example but not of limitation, SCO and other developers make no representations or warranties of merchantability or fitness for any particular purpose.**

**SCO represents that SCO's Law and Corporate Affairs Department (meaning the organization responsible for the protection of SCO's patents and other intellectual property, and for the response to suits and claims in connection therewith), has no knowledge of any patents or copyrights which are infringed or may be infringed, or any trade secrets or other proprietary rights of other parties which are or may be misappropriated or violated by using, making, copying, licensing or SOFTWARE PRODUCT supplied by SCO.**

**SCO shall indemnify and hold SAMSUNG harmless from any and all damages, liabilities, costs and expenses incurred by SAMSUNG as a result of any claim, judgment or adjudication against SAMSUNG which provides that the SOFTWARE PRODUCT infringes any intellectual property rights, including copyright, patent, and/or trademark, provided: (i) SAMSUNG promptly notifies SCO in writing of the claim; and (ii) SAMSUNG agrees that SCO will have the**

CONFIDENTIAL

SCO1042257

SS-Soft. Corp.-030184-012596

sole control of the defense of any action and all negotiations for settlement and compromise. Company has the option to be represented by Counsel at its own expense.

If, pursuant to any such claim, a court of final jurisdiction removes or restricts SAMSUNG's right to use SOFTWARE PRODUCT, SCO shall, at its sole option (i) procure for SAMSUNG the right to continue to use SOFTWARE PRODUCT; or (ii) modify SOFTWARE PRODUCT, provided the functionality thereof is not substantially affected, so as to make it non-infringing; or (iii) require SAMSUNG, immediately upon written notice, to discontinue use of SOFTWARE PRODUCT; provided that SCO provides a refund of the fees received by SCO for SOFTWARE PRODUCT as depreciated on a straight-line method, using a useful life of five (5) years. In addition, SCO shall have the right to exercise any of options (i) to (iii) at any time following receipt of notice of a claim of infringement of copyright or other proprietary right.

SCO shall have no obligation under this section with respect to any claim of infringement of copyright or other proprietary right based upon any modification of SOFTWARE PRODUCT by SAMSUNG or the combination, operation or use of SOFTWARE PRODUCT with materials not supplied by SCO.

SAMSUNG shall indemnify and hold harmless SCO against any and all claims and expenses, including reasonable attorney's fees, arising out of SAMSUNG's performance hereunder and due to SAMSUNG's negligent acts or omissions or due to SAMSUNG 's willful misconduct.

THE ABOVE STATES THE ENTIRE LIABILITY OF SCO WITH RESPECT TO INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS OR ANY OTHER FORM OF INTELLECTUAL PROPERTY RIGHT BY ANY PRODUCT SUPPLIED BY SCO.

7.03  No right is granted herein to use any identifying mark (such as, but not limited to, trade names, trademarks, trade devices, service marks or symbols, and abbreviations, contractions or simulations thereof) owned by, or used to identify any product or service of, SCO or a corporate affiliate thereof. SAMSUNG agrees that it will not, without the prior written permission of SCO, (i) use any such identifying mark in advertising, publicity, packaging, labeling or in any other manner to identify any of its products or services or (ii) represent, directly or indirectly, that any product or service of SAMSUNG is a product or service of SCO or such an affiliate or is made in accordance with or utilizes any information or documentation of SCO or such an affiliate.

7.04  Neither the execution of this Agreement nor anything in it or in any SOFTWARE PRODUCT shall be construed as an obligation upon SCO or any other developer to furnish any person, including SAMSUNG, any assistance of any kind whatsoever, or any information or documentation other than the SOFTWARE PRODUCTS to be furnished by SCO pursuant to Sections 3.01 and 3.02.

7.05  (a) SAMSUNG agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for SCO. SAMSUNG further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees and contractors of SAMSUNG to whom such disclosure is necessary to the use for which rights are granted hereunder. SAMSUNG shall appropriately notify each employee to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee. If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to SAMSUNG, its contractors or employees of either, SAMSUNG's obligations under this section shall not apply to such information after such time.

(b) Notwithstanding the provisions of Section 7.05(a), SAMSUNG may distribute copies of a SOFTWARE PRODUCT, either in modified or unmodified form, to third parties having licenses of equivalent scope herewith from SCO (or a corporate affiliate or authorized distributor thereof) for the same SOFTWARE PRODUCT, provided that SAMSUNG first verifies the status of the recipient by calling SCO. SCO will give oral verification of the recipient's status for

CONFIDENTIAL                    SCO1042258

SS-Soft. Corp.-030184-012596

recipients in the United States and written verification for recipients outside the United States. SAMSUNG shall maintain a record of each such distribution and, for each quarterly period (ending on March 31st, June 30th, September 30th and December 31st) during which any such distribution occurs, forward a copy of such record for such period to SCO at the correspondence address specified in Section 7.10(b) within thirty (30) days of the end of such period. Such record shall include, for each such distribution, the identity of the recipient, the date of verification, the name of the person at SCO providing verification and the date of distribution. SAMSUNG may also obtain materials based on a SOFTWARE PRODUCT subject to this Agreement from such a third party and use such materials pursuant to this Agreement, provided that SAMSUNG treats such materials hereunder the same as such SOFTWARE PRODUCT.

7.06  The obligations of SAMSUNG, its employees and contractors under Section 7.05(a) shall survive and continue after any termination of rights under this Agreement or cessation of a SUBSIDIARY's status as a SUBSIDIARY.

7.07  SAMSUNG agrees that it will not use SOFTWARE PRODUCTS subject to this Agreement except as authorized herein and that it will not make, have made or permit to be made any copies of such SOFTWARE PRODUCTS except for use on DESIGNATED CPUs for such SOFTWARE PRODUCTS (including backup and archival copies necessary in connection with such use) and for distribution in accordance with Section 7.05(b). Each such copy shall contain any copyright notice, proprietary notice or notice giving credit to another developer, which appears on or in the SOFTWARE PRODUCT being copied. Specific instructions regarding such notices may also appear in the Schedules for certain SOFTWARE PRODUCTS.

7.08  Neither this Agreement nor any rights hereunder, in whole or in part, shall be assignable or otherwise transferable by SAMSUNG and any purported assignment or transfer shall be null and void.

7.09  Except as provided in Section 7.05(b), nothing in this Agreement grants to SAMSUNG the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part.

7.10  (a) Payments to SCO under this Agreement shall be made payable and sent to:

THE SANTA CRUZ OPERATION, INC.
P.O. Box                    7745
San Francisco, CA 94120-7745

(b) Correspondence with SCO relating to this Agreement shall be sent to:

THE SANTA CRUZ OPERATION, INC.
430 Mountain Avenue
P. O. Box 4
Murray Hill, New Jersey 07974-0004
Attention: Law and Corporate Affairs

(c) Any statement, notice, request or other communication shall be deemed to be sufficiently given to the addressee and any delivery hereunder deemed made when sent by certified mail addressed to SAMSUNG at its office specified in this Agreement or to SCO at the appropriate address specified in this Section 7.10.Each party to this Agreement may change an address relating to it by written notice to the other party.

7.11  If SAMSUNG is not a corporation, all references to SAMSUNG's SUBSIDIARIES shall be deemed deleted.

7.12  The construction and performance of this Agreement shall be governed by the law of the State of California.

CONFIDENTIAL

SCO1042259

# EXHIBIT 33

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC. | **DECLARATION OF WILLIAM M. BRODERICK** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | Case No. 2:03CV-0294DAK |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |
| Defendant/Counterclaim-Plaintiff. | |

I, William M. Broderick, declare as follows:

1. I submit this declaration in connection with The SCO Group, Inc. v. International Business Machines Corporation, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003), and The SCO Group v. Novell, Inc., Civil Action No. 2:04CV00139 DAK (D. Utah 2004). I make this declaration based upon personal knowledge.

2. I am Director of Software Licensing for The SCO Group, Inc. ("SCO"). My office is located in Murray Hill, New Jersey. Since December 1991, I have been continuously managing contracts for the successive companies that have owned the UNIX technology and business, except for a few months from late 2002 to early 2003, when technically I served as a consultant. From December 1991 to June 1993, I was the Manager of Sales Operation for UNIX System Laboratories ("USL"), a company that owned and operated the UNIX business that AT&T originally created.

3. When AT&T sold USL to Novell, Inc. ("Novell") in June 1993, I remained with the UNIX business at Novell. During most of my time at Novell, I was a Contract Manager.

4. When Novell sold the UNIX business to The Santa Cruz Operation ("Santa Cruz") in 1995, I remained with the UNIX business as a Santa Cruz employee performing substantially the same work as at Novell. During my employment at Santa Cruz, I was a Manager of Law and Corporate Affairs.

5. When Santa Cruz sold the UNIX business to Caldera International, Inc. ("Caldera") in 2001, I remained with the UNIX business as a Caldera employee performing substantially the same work as at Santa Cruz. For a short period after the sale to Caldera,

1

my official title remained the same, but it later changed to my current title, Director of Software Licensing. In 2003, Caldera changed its name to SCO.

6. My career has thus followed the UNIX business as it has been transferred successively from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO).

7. My understanding of the sale of the UNIX assets from Novell to Santa Cruz was that the UNIX copyrights were transferred. To the best of my knowledge, from the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights.

8. My understanding of the sale of certain divisions of Santa Cruz to Caldera International, Inc. (now SCO) in 2001 was that Santa Cruz transferred, among many other UNIX assets, the UNIX copyrights.

9. Through and after each of the foregoing transactions, my colleagues and I almost universally kept doing the same work, with the same people, developing and delivering the same UNIX products and services to the same customers. We also continued to develop the same technology, service the same contracts, and collect revenues under those contracts.

10. During the foregoing employment, I have had an understanding of the scope of the license agreements under which AT&T licensed its UNIX source code to various licensees, whose licenses my colleagues and I oversaw and managed. My understanding is based on my review of the licenses, my discussions with my colleagues, and the training I received from my supervisors and legal counsel.

11. My understanding has always been that AT&T's UNIX licensees were obligated to keep confidential not only all parts of the UNIX software product they had licensed, but also all parts of the modifications and derivative works those licensees developed based on the licensed UNIX software product.

12. My understanding has always been that the contractual language of AT&T's UNIX licenses protected the full content of all of the "resulting materials" created over time from the licensee's exercise of their contractual "right to modify" and "to prepare derivative works" based on the original UNIX software product. Such a modification or derivative work includes any product that includes any part of the licensed UNIX software product or was developed with exposure to the software product.

13. If a licensee took material from one of its other products and "put" that material (as necessarily modified) in their derivative work based on the licensed UNIX software product, then the licensee was obligated to keep confidential the newly included material as well as all other parts of the derivative work.

14. The license agreements thereby safeguarded the UNIX licensor's UNIX asset by protecting the chain of development that resulted from the special access and development rights that the licensees were afforded. My understanding has always been that the contracts were designed to provide greater protection for AT&T's UNIX assets than the copyright or other law might otherwise provide.

15. There was nothing inherent in the licensing program of AT&T or its successors-in-interest that would result in the disclosure of the source code, methods or concepts or the licensed UNIX software product or of the modifications and derivative works based on

such software product.  That is, if the licensees honored their obligations of confidentiality, such material would remain confidential notwithstanding the wide licensing of the UNIX software product.

16. It has also been my understanding during the foregoing employment that certain AT&T UNIX licensees, such as IBM, entered into side letters or subsequent amendments with AT&T that clarified or amended certain provisions of the licensees' standard UNIX license.  My understanding has always been that none of those side letters or amendments eliminated the foregoing, core protections of the UNIX licenses.  My understanding also has always been that a side letter with one licensee did not affect the terms or conditions of any other licensee's agreement.

17. I understand that IBM now argues that it has relied on certain alleged representations from individuals at AT&T and its successors-in-interest for the proposition that IBM was entitled to distribute, however it saw fit, IBM's so-called "homegrown material."  By "homegrown material" IBM appears to mean, with respect to any modification or derivative work based on the UNIX software product, any material in such a modification or derivative work other than the literal licensed UNIX source code.

18. In addition to the fact that (as explained above) I never understood AT&T's UNIX licensees to afford any licensee any such right, I never said or suggested to any UNIX licensee that they had any such right, and I am not aware of any colleague saying or suggesting to any UNIX licensee that they had any such right.

19. Such a significant and material change to the UNIX licenses would have been entirely inconsistent with the goals of the licensing agreements as I understood them and as we

drafted them, with the policies consistently espoused by the licensing groups in which I

have worked, and with the position that the licensing groups in which I have worked took

in dealing with licensees throughout the years that I have worked with the licenses.

20. In the course of my foregoing employment, I never learned or ever heard that a licensee

had or might have improperly disclosed (such as to the public or a non-equivalent-scope

licensee) any part of its modifications or derivative works based on the licensed UNIX

software product.

21. During the course of my employment, my colleagues and I made diligent efforts to

monitor the UNIX licensees' compliance with their contractual and other legal

obligations as we understood them.  I never intended to waive any of those rights, and,

for the reasons set forth above, I cannot believe that any representative of the companies

for which I have worked in UNIX licensing intended to do so.

22. Since learning of the existence of these operating systems (in the mid-1990s), it has

always been my understanding (and, I believe, the understanding of my colleagues) that

the AIX and Dynix/ptx operating systems are modifications or derivative works based on

the UNIX software product licensed to IBM and Sequent, respectively.  I did not learn

that IBM had publicly disclosed parts of AIX and Dynix/ptx until late 2002, when the

matter was raised with and subsequently pursued by counsel for SCO.

23. The terms and conditions of each UNIX licensee's use of the licensed UNIX software

product were confidential.  The UNIX licensees did not have access to and, on that basis,

would not know the terms and conditions of the other UNIX licensees' use of the

licensed UNIX software product.

24. I understand from reading his declaration submitted by IBM that David McCrabb, formerly of Santa Cruz, says that in license negotiations with Lucent Technologies he interpreted the standard UNIX license agreements to require licensees to keep confidential only the licensed UNIX source code in a licensee's modification or derivative work based on the licensed UNIX software product.

25. Given Lucent's UNIX-related agreements, Mr. McCrabb's claim is of no moment. Lucent did not have a standard UNIX license agreement, and did not have the right under any of its agreements to create derivative works based on the licensed UNIX software product. Among Lucent's agreements were a Reference Software Agreement and a Source for Support Agreement. The Reference Software Agreement gave Lucent read-only access to the UNIX source code; the Source for Support Agreement provided that Lucent could use the UNIX software product to fix bugs but that SCO would then own the bug fixes. To the extent that Mr. McCrabb's statements are meant to suggest the views of USL, Novell, Santa Cruz or SCO regarding the UNIX license agreements, his view is contrary to my understanding and to the policies of those companies as I have always understood them.

26. In those quite distinct contexts, it might have made sense to say that Lucent had to keep confidential "only" the licensed UNIX source code, but those statements could not have related to any right on Lucent's part to create modifications or derivative works based on the licensed UNIX software product.

27. IBM has a side letter stating that UNIX software products "will be made available to you at the fees and under terms, warranties and benefits equivalent to those offered to other

licensees." In overseeing and enforcing the UNIX agreements during my tenure at the foregoing companies, I have always understood that provision to relate to offering IBM an opportunity to license a new version of a software product under similar terms as the licensee. If another licensee had bought out its source-code license, for example, it obviously would not be the case that IBM was free to use the version of UNIX licensed to that licensee however IBM wanted. In addition, IBM did not license any version of UNIX System V later that version 3.2.

28. The warranties for intellectual property protection and indemnification in Exhibits 124 and 127 are the same ones that Santa Cruz and SCO have used in hundreds of such agreements since 1995.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 7, 2006

_William M. Broderick_
William M. Broderick

7

# EXHIBIT 34

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>     Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>     Defendant/Counterclaim-Plaintiff. | **DECLARATION OF JOHN MACIASZEK**<br><br>Case No. 2:03CV-0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

I, John Maciaszek, declare as follows:

1.  I submit this declaration in connection with The SCO Group, Inc. v. International Business Machines Corporation, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003), and The SCO Group v. Novell, Inc., Civil Action No. 2:04CV00139 DAK (D. Utah 2004). I make this declaration based upon personal knowledge.

2.  I am a Product Manager for operating systems and associated products for The SCO Group, Inc. ("SCO"). My office is located in Murray Hill, New Jersey. Since December 1991, I have been employed as a product manager for UnixWare operating systems for the successive companies that have owned the UNIX technology and business. In this capacity, I have had responsibility for working with the contracts management and legal departments to prepare source code licenses. I have also been involved in the negotiations of specific terms and pricing with various licensees. From December 1991 to June 1993, I was Product Manager for SVR4.2, SVR4.2MP and UnixWare for UNIX System Laboratories ("USL"), a company that owned and operated the UNIX business that AT&T originally created.

3.  When AT&T sold USL to Novell, Inc. ("Novell") in June 1993, I remained with the UNIX business at Novell. During all of my time at Novell, I was a Product Manager for UnixWare.

4.  When Novell sold the UNIX business to The Santa Cruz Operation ("Santa Cruz") in 1995, I remained with the UNIX business as a Santa Cruz employee performing substantially the same work as at Novell. During my employment at Santa Cruz, I was a Product Manager for UnixWare.

5. When Santa Cruz sold the UNIX business to Caldera International, Inc. ("Caldera") in 2001, I remained with the UNIX business as a Caldera employee performing substantially the same work as at Santa Cruz. During my employment at Santa Cruz, I remained a Product Manager for UnixWare and OpenServer. In 2003, Caldera changed its name to SCO.

6. My career has thus followed the UNIX business as it has been transferred successively from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO).

7. My understanding of the sale of the UNIX assets from Novell to Santa Cruz was that the UNIX copyrights were transferred. To the best of my knowledge, from the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights.

8. My understanding of the sale of certain divisions of Santa Cruz to Caldera International, Inc. (now SCO) in 2001 was that Santa Cruz transferred, among many other UNIX assets, the UNIX copyrights.

9. Through and after each of the foregoing transactions, my colleagues and I almost universally kept doing the same work, with the same people, developing and delivering the same UNIX products and services to the same customers. We also continued to develop the same technology, service the same contracts, and collect revenues under those contracts.

10. During the foregoing employment, I have had an understanding of the scope of the license agreements under which AT&T licensed its UNIX source code to various

licensees. My understanding is based on my review of the licenses, my discussions with my colleagues and legal counsel.

11. My understanding has always been that AT&T's UNIX licensees were obligated to keep confidential not only all parts of the UNIX software product they had licensed, but also all parts of the modifications and derivative works those licensees developed based on the licensed UNIX software product.

12. My understanding has always been that the contractual language of AT&T's UNIX licenses protected the full content of all of the "resulting materials" created over time from the licensee's exercise of their contractual "right to modify" and "to prepare derivative works" based on the original UNIX software product. Such a modification or derivative work includes any product that includes any part of the licensed UNIX software product or was developed with exposure to the software product.

13. If a licensee took material from one of its other products and "put" that material (as necessarily modified) in their derivative work based on the licensed UNIX software product, then the licensee was obligated to keep confidential the newly included material as well as all other parts of the derivative work.

14. The license agreements thereby safeguarded the UNIX licensor's UNIX asset by protecting the chain of development that resulted from the special access and development rights that the licensees were afforded. My understanding has always been that the contracts were designed to provide greater protection for AT&T's UNIX assets than the copyright or other law might otherwise provide.

15. There was nothing inherent in the licensing program of AT&T or its successors-in-interest that would result in the disclosure of the source code, methods or concepts or the licensed UNIX software product or of the modifications and derivative works based on such software product. That is, if the licensees honored their obligations of confidentiality, such material would remain confidential notwithstanding the wide licensing of the UNIX software product.

16. It has also been my understanding during the foregoing employment that certain AT&T UNIX licensees, such as IBM, entered into side letters or subsequent amendments with AT&T that clarified or amended certain provisions of the licensees' standard UNIX license. My understanding has always been that none of those side letters or amendments eliminated the foregoing, core protections of the UNIX licenses. My understanding also has always been that a side letter with one licensee did not affect the terms or conditions of any other licensee's agreement.

17. I understand that IBM now argues that it has relied on certain alleged representations from individuals at AT&T and its successors-in-interest for the proposition that IBM was entitled to distribute, however it saw fit, IBM's so-called "homegrown material." By "homegrown material" IBM appears to mean, with respect to any modification or derivative work based on the UNIX software product, any material in such a modification or derivative work other than the literal licensed UNIX source code.

18. In addition to the fact that (as explained above) I never understood AT&T's UNIX licensees to afford any licensee any such right, I never said or suggested to any UNIX

licensee that they had any such right, and I am not aware of any colleague saying or

suggesting to any UNIX licensee that they had any such right.

19. Such a significant and material change to the UNIX licenses would have been entirely

inconsistent with the goals of the licensing agreements as I understood them and as we

drafted them, with the policies consistently espoused by the licensing groups in which I

have worked, and with the position that the licensing groups in which I have worked took

in dealing with licensees throughout the years that I have worked with the licenses.

20. In the course of my foregoing employment, I never learned or ever heard that a licensee

had or might have improperly disclosed (such as to the public or a non-equivalent-scope

licensee) any part of its modifications or derivative works based on the licensed UNIX

software product.

21. In my discussions with contract managers, legal staff and licensees I never intended to

waive any of those rights, and, for the reasons set forth above, I cannot believe that any

representative of the companies for which I have worked in UNIX licensing intended to

do so.

22. Since learning of the existence of these operating systems (starting in December of 1991),

it has always been my understanding (and, I believe, the understanding of my colleagues)

that the AIX and Dynix/ptx operating systems are modifications or derivative works

based on the UNIX software product licensed to IBM and Sequent, respectively. I did

not learn that IBM had publicly disclosed parts of AIX and Dynix/ptx until late 2002,

when the matter was raised with and subsequently pursued by counsel for SCO.

23. The terms and conditions of each UNIX licensee's use of the licensed UNIX software product were confidential. The UNIX licensees did not have access to and, on that basis, would not know the terms and conditions of the other UNIX licensees' use of the licensed UNIX software product.

24. I understand from reading his declaration submitted by IBM that David McCrabb, formerly of Santa Cruz, says that in license negotiations with Lucent Technologies he interpreted the standard UNIX license agreements to require licensees to keep confidential only the licensed UNIX source code in a licensee's modification or derivative work based on the licensed UNIX software product.

25. Given Lucent's UNIX-related agreements, Mr. McCrabb's claim is of no moment. Lucent did not have a standard UNIX license agreement, and did not have the right under any of its agreements to create derivative works based on the licensed UNIX software product. Among Lucent's agreements were a Reference Software Agreement and a Source for Support Agreement. The Reference Software Agreement gave Lucent read-only access to the UNIX source code; the Source for Support Agreement provided that Lucent could use the UNIX software product to fix bugs but that SCO would then own the bug fixes. To the extent that Mr. McCrabb's statements are meant to suggest the views of USL, Novell, Santa Cruz or SCO regarding the UNIX license agreements, his view is contrary to my understanding and to the policies of those companies as I have always understood them.

26. In those quite distinct contexts, it might have made sense to say that Lucent had to keep confidential "only" the licensed UNIX source code, but those statements could not have

related to any right on Lucent's part to create modifications or derivative works based on the licensed UNIX software product.

27. IBM has a side letter stating that UNIX software products "will be made available to you at the fees and under terms, warranties and benefits equivalent to those offered to other licensees." During my tenure at the foregoing companies, I have always understood that provision to relate to offering IBM an opportunity to license a new version of a software product under similar terms as the licensee. If another licensee had bought out its source-code license, for example, it obviously would not be the case that IBM was free to use the version of UNIX licensed to that licensee however IBM wanted. In addition, IBM did not license any version of UNIX System V later that version 3.2.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

November 9, 2006

John Maciaszek