are *treated hereunder as part of the original Software Product*.
[Emphasis added.]

113. IBM has violated §2.01 of the Software Agreement by, *inter alia*, using, and assisting others to use, the Software Products (including System V source code, derivative works, documentation related thereto and methods based thereon) for ***external purposes*** that are different from, and broader than, IBM's own internal business purposes. By actively supporting, assisting and promoting the transfer of UNIX technology to Linux, and using its access to UNIX technology to accomplish this objective, IBM is (a) using the Software Product for ***external business purposes***, which include use for the benefit of Linus Torvalds, the general Linux community and IBM's Linux distribution partners, Red Hat, Inc., Novell, Inc., SuSE Linux AG and their respective subsidiaries; and is (b) directly and indirectly preparing ***unauthorized derivative works*** based on the Software Products and ***unauthorized modifications thereto*** in violation of §2.01 of the Software Agreement.

114. In addition, § 2.01 limited use to the United States. This limitation was modified in the Side Letter to include other countries, but at no time was IBM granted the right to use the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon) in India. On information and belief, IBM has violated this restriction by allowing the Protected Materials to be used in India.

115. IBM agreed in §2.05 of the Software Agreement to the following additional restrictions on use of the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon):

Dockets.Justia.com

> No right is granted by this Agreement for the use of Software Products directly *for others, or for any use of Software Products by others*.

116. IBM has breached §2.05 of the Software Agreement by, *inter alia*, actively promoting and allowing use of the Software Products, documentation and development methods related thereto in an open and hostile attempt to destroy the entire economic value of the Software Products and plaintiff's rights to protect the proprietary nature of the Software Products. By way of example and not limitation, IBM has used protected UNIX source code, documentation, development notes and methods for others in accelerating development of the 2.4.x kernel and above in, among others, the following areas: (a) scalability improvements, (b) performance measurement and improvements, (c) serviceability and error logging improvements, (d) NUMA scheduler and other scheduler improvements, (e) Linux PPC 32- and 64-bit support, (f) AIX Journaling File System, (g) enterprise volume management system to other Linux components, (h) clusters and cluster installation, including distributed lock manager and other lock management technologies, (i) threading, (j) general systems management functions, and (k) other areas. But for the use by IBM of these protected UNIX methods in Linux development, the Linux 2.4.x kernel, 2.5.x kernel, and 2.6.x kernel's capacity to perform high-end enterprise computing functions would be severely limited.

117. IBM agreed in §7.10 of the Software Agreement to the following restrictions on *transfer* of the Software Product, including AIX as a derivative work of UNIX System V:

> [N]othing in this Agreement grants to Licensee the right to sell, lease or otherwise transfer or dispose of a Software Product in whole or in part.

118.IBM has breached §7.10 of the Software Agreement by, *inter alia*, transferring portions of the Software Products (including System V source code, documentation, modifications, derivative works and methods based thereon), including but not limited to the AIX Journaling File System and all other UNIX-based source code publicly announced by IBM, to Linus Torvalds for open distribution to the general public under a software license that destroys the proprietary and confidential nature of the Software Products.

119.IBM has further stated its intention to transfer the entirety of AIX into open source in anticipatory violation of its obligations under §7.10 of the Software Agreement.

120.IBM agreed in Side Letter ¶9, a substitute provision to §7.06(a) of the Software Agreement, to the following restrictions on *confidentiality* of the Software Product, including AIX as a derivative work of UNIX System V:

> Licensee agrees that it shall hold Software Products subject to this Agreement *in confidence for AT&T*. Licensee further agrees that it *shall not make any disclosure* of such Software Products to anyone, except to employees of Licensee to whom such disclosure is necessary to the use for which rights are granted hereunder. Licensee shall appropriately notify each employee to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee.

121.In recognition of SCO's right of confidentiality of the Software Products, IBM directs all customers who need to view AIX source code to first obtain a source code license from SCO as a condition to viewing *any part* of AIX. For example, SCO received a letter on or about March 4, 2003 from Lockheed Martin Corporation requesting verification of the existence of a Software Agreement by and between Lockheed and SCO as a condition to Lockheed obtaining access to view AIX source code. The letter stated, in part, as follows:

LMATM is in the process of licensing [AIX] from IBM to be used for integration purposes only. Per the attached supplement to the subject document, contained within the AIX source code is third party IP which must be licensed from the owner prior to IBM providing the AIX source code to any licensee (see Prerequisite Source License, Para.2.2).

\* \* \*

2.2 Prerequisite Source License. **IBM cannot disclose** (includes viewing) certain Third-Party Source Code **to any party who does not have a license that permits access to the Code**. Prior to receiving or accessing the Source Code described above in this Supplement, LMATM must obtain the following Source Code Licenses:

a) **AT&T Technologies, Inc., AT&T Information Systems, Inc., or UNIX ™ Systems Laboratory Software Agreement** No. SOFT---and AT&T Information Systems, Inc. Software Agreement Supplement for Software Product AT&T UNIX System V Release 4.0, or AT&T Information Systems, Inc. Schedule for Upgrades (from UNIX System V Release 3.1 to UNIX System V Release 3.2 or from UNIX System V Release 3.1 International Edition to UNIX System V Release 3.2 International Edition) or **equivalent SCO Group License**.

122. IBM has breached its obligation of confidentiality, and has failed to otherwise hold the Software Products in confidence for SCO by contributing portions of the Software Product (including System V source code, modifications, derivative works and methods based thereon, together with documentation and development notes) to open source development of Linux and by using UNIX development methods, programming notes, change logs and other documentation in making modifications to Linux 2.4.x kernel and above, which are, in material part, unauthorized derivative works of the Software Product. These include, among others, (a) scalability improvements, (b) performance measurement and improvements, (c) serviceability and error logging improvements, (d) NUMA scheduler and other scheduler improvements, (e) Linux PPC 32- and 64-bit support, (f) AIX

Journaling File System, (g) enterprise volume management system to other Linux components, (h) clusters and cluster installation, including distributed lock manager and other lock management technologies, (i) threading, (j) general systems management functions, and (k) others.

123. IBM has further stated its intention to transfer the entirety of AIX into open source in anticipatory violation of its obligations under §7.06 (a) of the Software Agreement.

124. Export of UNIX technology is controlled by the United States government. Thus, SCO, IBM and all other UNIX vendors are subject to strict export control regulations with respect to any UNIX-based customer distribution. To this end, IBM agreed in §4.01 of the Software Agreement to restrictions on **export** of the Software Product (including System V source code, derivative works, modifications, and methods based thereon), as follows:

> Licensee agrees that it will not, without the prior written consent of AT&T, export, ***directly or indirectly***, Software Products covered by this Agreement to any country outside of the United States.

This provision was later modified to allow export rights to several countries outside the United States. However, no permission has ever been granted by SCO or its predecessors to IBM to allow it to indirectly make available all or portions of the Software Product to countries outside the United States that are subject to strict technology export control by the United States government: *viz.*, Cuba, Iran, Syria, North Korea and Libya. IBM is ignoring and attempting to circumvent the export control restrictions that apply to UNIX as it accelerates development of Linux for enterprise use.

125. Thus, IBM has breached §4.01 of the Software Agreement by, *inter alia*, making extensive, advanced multiprocessor scaling functions of the Software Product, including

derivative works and methods based thereon, available for free distribution to anyone in the world with a computer. As it relates to Linux 2.4.x and above releases, IBM is indirectly making the Software Product and operating system modifications available to countries and organizations in those countries for scaling single processor computers into multi-processor supercomputers that can be used for encryption, scientific research and weapons research.

126. IBM was aware of the importance of these restrictions and the need to protect the confidentiality of UNIX System V, including modifications and derivatives such as AIX and Dynix/ptx. Indeed, Amendment X, ¶3.7, provides examples under which IBM is entitled to disclose UNIX and AIX source code to its development partners—and examples under which IBM is not entitled to make such disclosures. Paragraph 3.7 of Amendment X provides as follows:

> The following illustrations are intended to clarify and illustrate the relief provided in Subsection 2.1 of this Amendment [relating to disclosure of source code to contractors].
>
> Company A, sublicensee of the Sublicensed Product [AIX] is a general computing system manufacturing firm. IBM may distribute Source Copies to Company A for Authorized Purposes.
>
> *However, IBM may not distribute Source Copies to Company A for purposes of making modifications to adapt the Sublicensed Products [AIX] as a general operating system for Company A's general computer hardware system.* (Emphasis added).

127. As is made perfectly clear in ¶3.7 of Amendment X, IBM may not use any Sublicensed Product from SCO, including AIX, for the purposes of making modifications to adapt AIX as a competing general operating system. IBM nonetheless has chosen to adapt UNIX,

AIX, and Dynix/ptx for use in a competing operating system (i.e. Linux) in violation of its obligations to SCO.

128. SCO has the self-executing contractual right to terminate IBM's right to use and distribute the Software Product, including derivative works and methods based thereon, if IBM fails to fulfill one or more of its obligations under the Software Agreement. This authority is contractually granted under the following provisions of the IBM Related Agreements:

> If Licensee fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to Licensee specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination Licensee shall immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement. [Software Agreement, §6.03]

> Regarding Section 6.03 of the Software Agreement and Sections 2.07 and 3.03 of the Sublicensing Agreement, we will not terminate your rights for breach, nor will we give notice of termination under such Sections, for breaches we consider to be immaterial. We agree to lengthen the notice period referenced in such Sections from two (2) months to one hundred (100) days. If a breach occurs that causes us to give notice of termination, you may remedy the breach to avoid termination if you are willing and able to do so. In the event that a notice of termination is given to you under either of such Sections and you are making reasonable efforts to remedy the breach but you are unable to complete the remedy in the specified notice period, we will not unreasonably withhold our approval of a request by you for reasonable extension of such period. We will also consider a reasonable extension under Section 2.07 of the Sublicensing Agreement in the case of a Distributor who is making reasonable efforts to remedy a breach.

> In any event our respective representatives will exert their mutual good faith best efforts to resolve any alleged breach short of termination. [Side Letter, ¶ 5]

129. Consistent with these rights, on March 6, 2003, plaintiff delivered a notice of termination to Sam Palmisano, Chief Executive Officer of IBM (the "AIX Termination Notice") for IBM's breaches of the Software (and Sublicensing) Agreement by IBM.

130. Following delivery of the AIX Termination Notice, plaintiff took every reasonable step to meet and confer with IBM regarding IBM's breach of the Software Agreement and Related Agreements.

131. IBM has disregarded SCO's rights under the IBM Related Agreements by failing to undertake any efforts to cure its numerous and flagrant violations thereunder. As a result, effective June 13, 2003, the IBM Related Agreements are terminated and IBM has no further rights thereunder.

132. IBM nonetheless continues to operate under the IBM Related Agreements, and use the Software Products and Source Code thereunder as though its rights under the Agreement have not been terminated.

133. IBM no longer has any right to use the UNIX Software Code or make modifications or derivative works thereunder. In fact, IBM is contractually obligated to "immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement."

134. As a result of IBM's breaches before termination, SCO has been damaged in the marketplace for violations by IBM in an amount to be proven at trial, but not less than $1 billion.

135. In addition, and to the extent that IBM continues to completely repudiate its obligations regarding the Software Product, plaintiff will sustain substantial continuing and ongoing

damages. These damages include the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware.

136. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

## SECOND CAUSE OF ACTION
### (Breach of IBM Sublicensing Agreement)

137. Plaintiff incorporates and re-alleges paragraphs No. 1-136, above.

138. As set forth above, SCO is the successor to AT&T under that certain Sublicensing Agreement originally executed by and between AT&T and IBM designated as SUB-00015A. The Sublicensing Agreement grants the right to *distribute object-based code* of UNIX System V and modifications thereto and derivative works based thereon.

139. SCO has terminated IBM's right to use and distribute the Software Product, including derivative works and methods based thereon as of the AIX Termination Date, June 13, 2003.

140. From and after the AIX Termination Date, any and all distributions of AIX by IBM are in violation of the Sublicensing Agreement.

141. IBM has disregarded and continues to completely disregard and repudiate its obligations under the Sublicensing Agreement, to plaintiff's substantial, continuing and ongoing

damage. These damages include the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware.

142. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed.  As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

### THIRD CAUSE OF ACTION
### (Breach of Sequent Software Agreement)

143. Plaintiff incorporates and re-alleges paragraphs No. 1-142, above.

144. As set forth above, SCO is the successor to AT&T under that certain Software Agreement originally executed by and between AT&T and Sequent designated as SOFT-000321. The Software Agreement specifies the terms and conditions for use of UNIX System V source code, documentation and methods related thereto, together with modifications and derivative works created by IBM/Sequent based on UNIX System V (collectively, the "Software Products").

145. With respect to the rights granted for use of the System V source code under Section 2.01 of the Sequent Software Agreement, Sequent received the following:

> [A] personal, ***nontransferable*** and nonexclusive right to ***use*** in the United States each Software Product identified in the one or more Supplements hereto, ***solely for Licensee's own internal business purposes*** and solely on or in conjunction with Designated CPUs for such Software Product.  Such right to use includes the right to ***modify*** such Software Product and to ***prepare derivative works based on*** such Software product, provided the resulting materials

42

are *treated hereunder as part of the original Software Product*.
[Emphasis added.]

146. IBM has violated §2.01 of the Sequent Software Agreement by, *inter alia*, modifying and assisting others to modify the Software Products (including System V source code, derivative works, documentation related thereto and methods based thereon) for purposes *other than* Sequent and/or IBM's own internal business purposes. By actively supporting, assisting and promoting the transfer from UNIX to Linux, and using its access to UNIX technology to accomplish this objective, IBM is (a) using the Software Product for *external business purposes*, which include use for the benefit of the Open Source Development Laboratory ("OSDL"), IBM's various joint venture partners in OSDL, Linus Torvalds, the general Linux community and IBM's Linux distribution partners, Red Hat, Inc., Novell, Inc. and SuSE Linux AG and their respective subsidiaries; and is (b) directly and indirectly preparing *unauthorized derivative works* based on the Software Product and *unauthorized modifications thereto* in violation of §2.01 of the Sequent Software Agreement.

147. In addition, § 2.01 limited use to the United States. At no time was Sequent granted the right to use the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon) in India. On information and belief, IBM has violated this restriction by allowing the Protected Materials to be used in India.

43

148.Sequent agreed in §2.05 of the Sequent Software Agreement to the following restrictions on *use* of the Software Products (including System V source code, modifications, derivative works, documentation related thereto and methods based thereon):

> No right is granted by this Agreement for the use of Software Products directly *for others, or for any use of Software Products by others.*

149.IBM has breached Sequent's obligations under §2.05 of the Sequent Software Agreement by, *inter alia*, actively promoting and allowing use of the Software Products and development methods related thereto in an open and hostile attempt to destroy the entire economic value of the Software Products and plaintiff's rights to protect the proprietary nature of the Software Products.  Particularly, IBM has caused all or materially all of Dynix/ptx-based NUMA source code and methods, and RCU source code and methods, to be used for the benefit of Linux.  But for the use by IBM of these protected UNIX methods in Linux development, the Linux 2.4.x kernel through 2.6.x kernel's capacity to perform high-end enterprise computing functions would be severely limited.

150.IBM has even gone so far as to publish the Dynix/ptx copyright as part of the source code and documentation contribution of UNIX-derived RCU technology it has improperly made available to the open source community.  The following copyright attribution is found in Linux kernel 2.4.x:

> Copyright (c) International Business Machines Corp., 2001  This program is free software; you can redistribute it and/or modify it under the terms of the GNU General Public License as published by the Free Software Foundation; either version 2 of the License, or (at your option) any later version. This program is distributed in the hope that it will be useful, but WITHOUT ANY WARRANTY; without even the implied warranty of MERCHANTABILITY or FITNESS FOR A PARTICULAR

> PURPOSE. See the GNU General Public License for more details. You should have received a copy of the GNU General Public License along with this program; if not, write to the Free Software Foundation, Inc., 59 Temple Place - Suite 330, Boston, MA 02111-1307, USA.   Author: Dipankar Sarma (***Based on a Dynix/ptx implementation by Paul Mckenney).*** (Emphasis added).

151. This publication of the RCU copyright is an example of IBM's blatant disregard of SCO's rights to control the use of the Software Product, including derivative works and modifications thereof, pursuant to §2.05 of the Sequent Software Agreement.

152. Sequent agreed in §7.10 of the Sequent Software Agreement to the following restrictions on ***transfer*** of the Software Product, including Dynix/ptx as a derivative work of UNIX System V:

> [N]othing in this Agreement grants to Licensee the right to sell, lease or otherwise transfer or dispose of a Software Product in whole or in part.

153. IBM has breached Sequent's obligations under §7.10 of the Sequent Software Agreement by, *inter alia*, transferring portions of the Software Product (including System V source code, modifications, derivative works and methods based thereon), including Dynix/ptx source code, documentation and methods for NUMA, RCU and SMP technologies, to the OSDL and/or Linus Torvalds for open distribution to the general public under a software license that destroys the proprietary and confidential nature of the Software Products.

154. Sequent agreed under §7.06(a) of the Sequent Software Agreement, to the following restrictions on ***confidentiality*** of the Software Product, including Dynix/ptx as a derivative work of UNIX System V:

> Licensee agrees that it shall hold all parts of the Software Products subject to this Agreement ***in confidence*** for AT&T.   Licensee further agrees that it ***shall not make any disclosure*** of any or all of

> such Software Products (including methods or concepts utilized
> therein) to anyone, except to employees of Licensee to whom such
> disclosure is necessary to the use for which rights are granted
> hereunder. Licensee shall appropriately notify each employee to
> whom any such disclosure is made that such disclosure is made in
> confidence and shall be kept in confidence by such employee.

155. IBM has breached Sequent's obligation of confidentiality by contributing portions of the

Software Product (including System V source code, derivative works, modifications, and

methods based thereon) to open source development of Linux and by using UNIX

development methods in making modifications to Linux 2.4.x kernel and above, which are

in material part, unauthorized derivative works of the Software Product, including but not

limited to Dynix/ptx-based NUMA technology, source code and methods, RCU source

code and methods, and SMP source code and methods.

156. Export of UNIX technology is controlled by the United States government. Thus, SCO,

Sequent, IBM and all other UNIX vendors are subject to strict export control regulations

with respect to any UNIX-based customer distribution. To this end, Sequent agreed in

§4.01 of the Software Agreement to restrictions on **export** of the Software Product

(including System V source code, derivative works, documentation related thereto and

methods based thereon), as follows:

> Licensee agrees that it will not, without the prior written consent of
> AT&T, export, ***directly or indirectly***, Software Products covered
> by this Agreement to any country outside of the United States.

No permission has ever been granted by SCO or its predecessors to Sequent to allow it to

directly or indirectly make available all or portions of the Software Product to countries

outside the United States that are subject to strict technology export control by the United

States government: *viz.*, Cuba, Iran, Syria, North Korea and Libya. IBM is ignoring and attempting to circumvent the export control restrictions that apply to UNIX as it accelerates development of Linux for enterprise use.

157. Thus, IBM has breached §4.01 of the Sequent Software Agreement by, *inter alia*, making extensive, advanced multiprocessor scaling functions of the Software Product, including NUMA technology, RCU technology, SMP technology and other derivative works and methods based thereon, available for free distribution to anyone in the world with a computer. As it relates to Linux 2.4.x and above releases, IBM is indirectly making the Software Product and operating system modifications, particularly NUMA technology, RCU technology and SMP technology, available to countries and organizations in those countries for scaling single processor computers into multi-processor supercomputers that can be used for encryption, scientific research and weapons research.

158. SCO has the self-executing, contractual right to terminate IBM's right to use and distribute the Software Product, including modifications, derivative works and methods based thereon, if IBM fails to fulfill one or more of its obligations under the Software Agreement. This authority is contractually granted under the following provisions of the Sequent Agreements:

> If Licensee fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to Licensee specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination Licensee shall immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement. [Software Agreement, §6.03]

159. Consistent with these rights, plaintiff delivered a notice of termination to Sequent (the "Dynix/ptx Termination Notice") for IBM's breaches of the Software (and Sublicensing) Agreement.

160. Following delivery of the Dynix Termination Notice, IBM did not respond during the two months provided to cure.

161. IBM has disregarded SCO's rights under the Sequent Agreements by failing to undertake any efforts to cure its numerous and flagrant violations thereunder. As a result, effective July 30, 2003, the Sequent Agreements were terminated and IBM has no further rights thereunder.

162. IBM nonetheless continues to operate under the Sequent Agreements, and use the Software Products and Source Code thereunder as though its rights under the Agreements have not been terminated.

163. IBM no longer has any right to use the UNIX Software Code or make modifications or derivative works thereunder. In fact, IBM is contractually obligated to "immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement."

164. As a result of IBM's breaches before termination, SCO has been damaged in the marketplace for violations by IBM in an amount to be proven at trial, but not less than $1 billion.

165. In addition, and to the extent that IBM continues to completely repudiate its obligations under the Sequent Agreements regarding the Software Product, plaintiff will sustain substantial continuing and ongoing damages. These damages include the full amount IBM

receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware.

166. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products received pursuant to the Sequent Agreements and/or continues to contribute some or all of these Protected Materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

## FOURTH CAUSE OF ACTION
### (Breach of Sequent Sublicensing Agreement)

167. Plaintiff incorporates and re-alleges paragraphs No. 1-166, above.

168. As set forth above, SCO is the successor to AT&T under that certain Sequent Sublicensing Agreement originally executed by and between AT&T and Sequent designated as SUB-000321A. The Sequent Sublicensing Agreement grants the right to distribute *object-based code* of UNIX System V and modifications thereto and derivative works based thereon.

169. SCO has terminated IBM's right to use and distribute under the Sequent Agreements the Software Product, including derivative works and methods based thereon as of the Dynix/ptx Termination Date.

170. From and after the Dynix/ptx Termination Date, any and all distributions of Dynix/ptx by IBM, or any part or sub-program or sub-routine thereof, is in violation of the Sequent Sublicensing Agreement.

171.IBM has disregarded and continues to completely disregard and repudiate Sequent's obligations under the Sequent Sublicensing Agreement, to plaintiff's substantial, continuing and ongoing damage. These damages include the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware.

172.Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

### FIFTH CAUSE OF ACTION
### (Copyright Infringement)

173.Plaintiff incorporates and re-alleges paragraphs No. 1-172, above.

174.As set forth above, SCO is the successor in interest to the IBM Related Agreements and the Sequent Agreements.

175.Despite termination of such Agreements, IBM has continued to reproduce, prepare derivative works of, and distribute UNIX software, source code, object code, programming tools, and documentation related to UNIX operating system technology, and has induced others to do the same.

176. SCO is the owner of copyright rights to UNIX software, source code, object code, programming tools, documentation related to UNIX operating system technology, and derivative works thereof. These materials are covered by numerous copyright registrations

issued by the United States Copyright Office (the "Copyrighted Programs"). These

registrations have been obtained by SCO and its predecessors in interest and are owned by

SCO. For example, included among such registrations (attached as Exhibits H toU) are the

following:

|   | Title | Registration Number | Registration Date |
|---|-------|---------------------|-------------------|
| H | UNIX Operating System Edition 5 and Instruction Manual | TXU-510-028 | March 25, 1992 |
| I | UNIX Operating System Edition 6 and Instruction Manual | TXu-511-236 | April 7, 1992 |
| J | UNIX Operating System Edition 32V and Instruction Manual | TXu-516-704 | May 15, 1992 |
| K | UNIX Operating System Edition 7 and Instruction Manual | TXu-516-705 | May 15, 1992 |
| L | Operating System Utility Programs | TXu-301-868 | November 25, 1987 |
| M | UNIXWARE 7.1.3 | TX 5-787-679 | June 11, 2003 |
| N | UNIX SYSTEM V RELEASE 3.0 | TX 5-750-270 | July 7, 2003 |
| O | UNIX SYSTEM V RELEASE 3.1 | TX 5-750-269 | July 7, 2003 |
| P | UNIX SYSTEM V RELEASE 3.2 | TX 5-750-271 | July 7, 2003 |
| Q | UNIX SYSTEM V RELEASE 4.0 | TX 5-776-217 | July 16, 2003 |
| R | UNIX SYSTEM V RELEASE 4.1ES | TX 5-705-356 | June 30, 2003 |
| S | UNIX SYSTEM V RELEASE 4.2 | TX 5-762-235 | July 3, 2003 |
| T | UNIX SYSTEM V RELEASE 4.1 | TX 5-762-234 | July 3, 2003 |
| U | UNIX SYSTEM V RELEASE 3.2 | TX 5-750-268 | July 9, 2003 |

177. SCO and its predecessors in interest created the Copyrighted Programs as original works

of authorship, and, as such, the Copyrighted Programs constitute copyrightable subject

matter under the copyright laws of the United States. The Copyrighted Programs were

automatically subject to copyright protection under 17 U.S.C. § 102(a) when such

programs were fixed in a tangible medium of expression. Copyright protection under 17

U.S.C. § 106 extends to derivative works which are defined in 17 U.S.C. §101 to include

works based on the original work or any other form in which the original work may be recast, transformed, modified or adapted.

178. Pursuant to 17 U.S.C. §410 (c), the certificates of copyright registrations for each Copyrighted Program constitute *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates. SCO and its predecessors' registered copyrights in the Copyrighted Programs are entitled to such statutory presumptions.

179. IBM's breaches of the IBM Related Agreements and the Sequent Agreements and its post-termination actions have infringed, have induced infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors. Such actions have been willful and have been done with knowledge of the copyright rights of SCO.

180. SCO has been damaged by IBM's conduct and has no adequate remedy at law. IBM's conduct has caused, and, if not enjoined, will continue to cause, irreparable harm to SCO. As a result of IBM's wrongful conduct, SCO is entitled to injunctive relief pursuant to 17 U.S.C. § 502 and SCO's actual damages and IBM's profits as a result of the infringing acts pursuant to 17 U.S.C. § 504 (a), statutory damages to the extent applicable pursuant to 17 U.S.C. § 504 (b) and enhanced damages, together with attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## SIXTH CAUSE OF ACTION
### (Unfair Competition)

181. Plaintiff incorporates and re-alleges paragraphs No. 1-180, above.

182. Plaintiff and its predecessors have built the UNIX System V Technology, the UNIX Software Code, SCO OpenServer, UnixWare and their derivatives through very substantial efforts over a time span in excess of 20 years and expenditure of money in excess of $1 billion.

183. IBM has engaged in a course of conduct that is intentionally and foreseeably calculated to undermine and/or destroy the economic value of UNIX anywhere and everywhere in the world, and to undermine and/or destroy plaintiff's rights to fully exploit and benefit from its ownership rights in and to UNIX System V Technology, the UNIX Software Code, SCO OpenServer, UnixWare and their derivatives, and thereby seize the value of UNIX System V Technology, the Unix Software Code, SCO OpenServer, UnixWare and their derivatives directly for its own benefit and indirectly for the benefit of its Linux distribution partners.

184. In furtherance of its scheme of unfair competition, IBM has engaged in the following conduct:

   a) Misappropriation of source code, methods, and confidential information of plaintiff;

   b) Breach of contract;

   c) Violation of confidentiality provisions running to the benefit of plaintiff;

   d) Inducing and encouraging others to violate confidentiality provisions;

   e) Contribution of protected source code and methods for incorporation into one or more Linux software releases, intended for transfer of ownership to the general public;

   f) Use of deceptive means and practices in dealing with plaintiff with respect to its software development efforts; and

g) Other methods of unlawful and/or unfair competition.

185. IBM's unfair competition has directly and/or proximately caused significant foreseeable and consequential harm to plaintiff in the following particulars:

a) Plaintiff's revenue stream from UNIX licenses for Intel-based processing platforms has decreased substantially;

b) As Intel-based processors have now become the processing platform of choice for a rapidly-increasing customer base of enterprise software users, plaintiff has been deprived of the opportunity to fairly exploit its market-leading position for UNIX on Intel-based processors, which revenue opportunity would have been very substantial on a recurring, annual basis but for IBM's unfairly competitive practices;

c) Plaintiff stands at imminent risk of being deprived of its entire stream of all UNIX licensing revenue in the foreseeably near future;

d) Plaintiff has been deprived of the effective ability to market and sell its new UNIX-related improvements, including a 32-bit version of UNIX for Intel processors developed prior to Project Monterey, and its new web-based UNIX-related products, including UNIX System V Release 6;

e) Plaintiff has been deprived of the effective revenue licensing opportunity to transfer its existing UNIX System V Release 4 and Release 5 customer base to UNIX System V Release 6; and

f) Plaintiff has been deprived of the effective ability to otherwise fully and fairly exploit UNIX's market-leading position in enterprise software market, which deprivation is

highly significant given the inability of Microsoft Windows to properly support large-scale enterprise applications.

186. As a result of IBM's unfair competition and the marketplace injury sustained by plaintiff as set forth above, plaintiff has suffered damages in an amount to be proven at trial, but no less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's unfair competition in an amount to be proven at the time of trial.

188. IBM's unfairly competitive conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood and all opportunities of plaintiff to derive value from its UNIX-based assets in the marketplace. As such, IBM's wrongful acts and course of conduct has created a profoundly adverse effect on UNIX business worldwide. As such, this Court should impose an award of punitive damages against IBM in an amount to be proven and supported at trial.

### SEVENTH CAUSE OF ACTION
#### (Interference with Contract)

187. Plaintiff incorporates and re-alleges by reference paragraphs 1-186, above.

188. SCO has contracts with customers around the world for licensing of SCO OpenServer and UnixWare.

189. IBM knew, or should have known, of these corporate software licensing agreements between SCO and its customers, including the fact that such agreements contain confidentiality provisions and provisions limiting the use of the licensed object-based code.

190. IBM, directly and through its Linux distribution partners, has intentionally and without justification induced SCO's customers and licensees to breach their corporate licensing agreements, including but not limited to, by inducing the customers to reverse engineer, decompile, translate, create derivative works, modify or otherwise use the UNIX software in ways that violate the license agreements. These customers include Sherwin Williams, Auto Zone, and others.

191. IBM's tortious interference has directly and/or proximately caused significant foreseeable damages to SCO, including a substantial loss of revenues.

192. IBM's tortious conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood and all opportunities of plaintiff to derive value from its UNIX-based assets in the marketplace. As such, this Court should impose an award of punitive damages against IBM in an amount to be proven and supported at trial.

### EIGHTH CAUSE OF ACTION
#### (Interference with Contract)

193. Plaintiff incorporates and re-alleges by reference paragraphs 1- 192, above.

194. Through an Asset Purchase Agreement dated September 19, 1995, as amended ("Asset Purchase Agreement," attached hereto with amendments as Exhibit "V") wherein Novell received 6.1 million shares of SCO common stock, valued at the time at over $100 million in consideration, SCO, through its predecessor in interest, acquired from Novell all right, title, and interest in and to the UNIX and UnixWare business, operating system, source code, and all copyrights related thereto, as well as all claims arising after the closing date against any parties relating to any right, property, or asset included in the business.

195. Schedule 1.1(a) to the Asset Purchase Agreement provides that SCO, through its predecessor in interest, acquired from Novell:

    I.     All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and copies of UNIX and UnixWare (including revisions and updates in process), and all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code, source documentation, source listings and annotations, appropriate engineering notebooks, test data and results, as well as all reference manuals and support materials normally distributed by [Novell] to end-users and potential end-users in connection with the distribution of UNIX and UnixWare …

    II.    All of [Novell's] claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

(Exh. V, at Schedule 1.1(a) I and II)

196. In Amendment No. 2 to the Asset Purchase Agreement, Novell and SCO made clear that SCO owned all "copyrights and trademarks owned by Novell as of the date of the [Asset Purchase Agreement] required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies," and that Novell would no longer be liable should any third party bring a claim against SCO "pertaining to said copyrights and trademarks." (Exh. V, Amendment No. 2 to the Asset Purchase Agreement dated October 16, 1996 at 1).

197. IBM is well aware of the terms of the Asset Purchase Agreement and the obligations Novell owes to SCO pursuant to the Asset Purchase Agreement. Indeed, IBM expressly acknowledged the existence of the Asset Purchase Agreement when it executed Amendment X, attached hereto as Exhibit E.

198. After suit against IBM was filed, and more than seven years after the Asset Purchase Agreement was executed by Novell, IBM intentionally and improperly interfered with the Asset Purchase Agreement.

199. Specifically, commencing on or about May 2003, Novell began falsely claiming that Novell, not SCO, owned the copyrights relating to UNIX System V. On information and belief, IBM had induced or otherwise caused Novell to take the position that Novell owned the copyrights—a position that is flatly contradicted by the Asset Purchase Agreement. Since that time, Novell has improperly registered the same copyrights that it sold to SCO and that SCO had previously registered.

200. In addition, IBM intentionally and improperly interfered with the Asset Purchase Agreement by inducing or otherwise causing Novell to violate the Asset Purchase Agreement by claiming Novell could waive and was waiving breaches of license agreements by various licensees, including IBM. Specifically, with the IBM Termination Date looming only days away, Novell wrote to SCO claiming that either SCO must waive its right to terminate IBM's license based upon IBM's numerous breaches thereof or else Novell would purportedly waive SCO's right to terminate the license and otherwise excuse IBM's numerous breaches of the license agreements.

201. Again, Novell's position, improperly encouraged and induced by IBM, is flatly contrary to the terms of the Asset Purchase Agreement.

202. Under the Asset Purchase Agreement, Novell merely retained an interest in receiving future royalties from System V licensees. SCO, conversely, obtained "all of Sellers' right, title and interest in and to the assets and properties of the seller relating to the Business

(collectively the "Assets") identified on Schedule 1.1(a) hereto." The Assets identified on Schedule 1.1(a) include "all rights and ownership of Unix and UnixWare," including source code, software and sublicensing agreements and "all claims against any parties relating to any right or asset included in the business."

203. Thus, SCO acquired all of Novell's right, title and interest:  (a) to the AT&T software and sublicensing agreements, including the IBM Related Agreements and Sequent Agreements, and (b) to all claims against any parties.

204. As a beneficiary of the royalties, Novell arguably can modify or waive the royalty amounts due under a license agreement.  However, at IBM's improper urging and inducement, Novell now claims that it can amend, modify or waive any and all terms of the software and sublicensing agreements.  Thus, according to Novell's position prompted by IBM, if a licensee such as IBM is egregiously breaching its agreement and thereby destroying the value of System V, Novell claims that it can waive any such breach of the agreement. Such position, of course, is unfounded and preposterous; otherwise, the over $100 million dollars paid for the software and sublicensing agreements was for naught if Novell retained all rights to waive *any* breach by a licensee.  Of course, Novell could not sell all right, title and interest to the AT&T software and sublicensing agreements and the rights to all claims against third parties, only to have Novell also claim it can waive those rights. While Novell may be able to modify or waive the royalties to which Novell was entitled, Novell cannot waive rights it clearly unequivocally sold to SCO (*i.e.* the software and sublicensing agreements, including all the restrictive covenants, and all claims against any

parties relating to those agreements.)  Novell nonetheless has attempted to do so at IBM's improper direction.

205. Since improperly inducing Novell to breach the Asset Purchase Agreement by falsely claiming copyright ownership of System V (and subsequently registering those copyrights after SCO had registered them) and since improperly inducing Novell to attempt to breach the Asset Purchase Agreement by purporting to waive SCO's rights under the Asset Purchase Agreement, IBM has contributed $50 million dollars to Novell so that Novell can complete the purchase of SuSE, the largest Linux distributor in Europe.

206. IBM's tortious interference has directly and/or proximately caused significant foreseeable damages to SCO.

207. IBM's tortious conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood and all opportunities of plaintiff to derive value from its Unix based assets in the marketplace.  As such, this Court should impose and award punitive damages against IBM in an amount to be proved and supported at trial.

### NINTH CAUSE OF ACTION
### (Interference with Business Relationships)

208. Plaintiff incorporates and re-alleges by reference  paragraphs 1- 207, above.

209. SCO had existing or potential economic relationships with a variety of companies in the computer industry, including but not limited to Hewlett Packard.

210. IBM has intentionally interfered with plaintiff's existing or potential economic relations. For example, at Linux World in January, 2003 IBM representatives contacted various companies with whom SCO had existing or potential economic relations. These IBM representatives said that IBM was discontinuing doing business with SCO and that these

other companies, some of whom are business partners with IBM, also should discontinue doing business with SCO.

211. IBM, as the world's largest information technology company, as well as the world's largest business and technology services provider ($36 billion), and the world's largest IT financier ($35 billion in assets), has considerable clout with these companies that it told to stop doing business with SCO.

212. IBM's intentional interference was for an improper purpose and/or by improper means.

213. IBM's intentional interference has directly and/or proximately caused significant foreseeable damages to SCO.

214. IBM's tortious conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood. As such, this Court should impose an award of punitive damages against IBM in an amount to be proved and supported at trial.

WHEREFORE, having fully set forth its complaint, plaintiff prays for relief from this Court as follows:

1. Under the First Cause of Action, damages for breach of the IBM Software Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of

its ongoing sales of AIX, including software, services and hardware; and for attorneys fees and costs;

2.  Under the Second Cause of Action, damages for breach of the IBM Sublicensing Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware; and for attorneys fees and costs;

3.  Under the Third Cause of Action, damages for breach of the Sequent Software Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware; and for attorneys fees and costs;

4.  Under the Fourth Cause of Action, damages for breach of the Sequent Sublicensing Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware; and for attorneys fees and costs;

5.  Under the Fifth Cause of Action, injunctive relief pursuant to 17 U.S.C. § 502 and SCO's actual damages and IBM's profits as a result of the infringing acts pursuant to 17 U.S.C. § 504 (a), statutory damages to the extent applicable pursuant to 17 U.S.C. § 504 (b) and enhanced damages, together with attorneys' fees and costs pursuant to 17 U.S.C. § 505

6.  Under the Sixth Cause of Action, for damages in an amount not less than $1 billion, for unfair competition arising from common law, and damages for violations thereof, together with additional damages through and after the time of trial;

7.  Under the Seventh through Ninth Causes of Action, for damages in an amount to be proven at trial for tortious interference, together with additional damages through and after the time of trial;

8.  For a permanent injunction to prohibit IBM from further contributions of the protected Software Products into open source;

9. For punitive damages under the Sixth through Ninth Causes of Action for IBM's malicious and willful conduct, in an amount to be proven at trial;

10. For attorneys' fees and costs as provided by statute and/or by contract in an amount to be proven at trial; together with pre- and post-judgment interest and;

11. For all other legal and equitable relief deemed just and proper by this Court.

### Jury Trial Demand

SCO demands trial by jury on all issues so triable.

DATED THIS 27 th day of February, 2004

By: _____

HATCH, JAMES & DODGE
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER
David Boies
Stephen N. Zack
Mark J. Heise

Attorneys for The SCO Group, Inc.

Plaintiff's address:

355 South 520 West
Lindon, Utah 84042

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiff The SCO Group hereby certifies that on this 27th

day of February 2004, a true and correct copy of the following:

- *Second Amended Complaint*

was served on the following by the indicated method of service:

By **Hand Delivery** to:

Todd Shaughnessy, Esq.
Snell & Wilmer L.L.P
15 West South Temple, Ste. 1200
Gateway Tower West
Salt Lake City, UT 84101


And by **Regular Mail** to:

David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, NY 10604

Brent O. Hatch
HATCH, JAMES & DODGE
Attorney for Plaintiff