# EXHIBIT 36

Dockets.Justia.com

Jack Messman
*Chairman and CEO*

# Novell

VIA FAX AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

May 28, 2003

Mr. Darl McBride
President and CEO
The SCO Group
355 South 520 West
Suite 100
Lindon, Utah 84042

Re: SCO's "Letter to Linux Customers"

Dear Darl:

As you know, Novell recently announced some important Linux initiatives. These include an upcoming NetWare version based on the Linux kernel, as well as collaboration and resource management solutions for Linux.

Put simply, Novell is an ardent supporter of Linux and the open source development community. This support will increase over time.

It was in this context that we recently received your "Letter to Linux Customers." Many Novell business partners and customers apparently received the same letter. Your letter compels a response from Novell.

As we understand the letter, SCO alleges that unnamed entities incorporated SCO's intellectual property into Linux without its authorization. You apparently base this allegation on a belief that these unnamed entities copied some UNIX System V code into Linux. Beyond this limited understanding, we have been unable to glean any further information about your allegation because of your letter's vagueness.

In particular, the letter leaves certain critical questions unanswered. What specific code was copied from UNIX System V? Where can we find this code in Linux? Who copied this code? Why does this alleged copying infringe SCO's intellectual property? By failing to address these important questions, SCO has failed to put us on meaningful notice of any allegedly infringing Linux code, and thus has withheld from us the ability - and removed any corresponding obligation - to address your allegation.

As best we can determine, the vagueness about your allegation is intentional. In response to industry demands that you be more specific, you attempt to justify your vagueness by stating, "That's like saying, 'show us the fingerprints on the gun so you can rub them off.'" (Wall Street Journal, May 19, 2003) Your analogy is weak and inappropriate. Linux has existed for over a decade, and there are plenty ~~of~~ the marketplace with which SCO could attempt to prove its allegation.

EXHIBIT

1012

Novell, Inc. • 404 Wyman Street, Suite 500 • Waltham, MA 02451 • Tel: 781.464.8038 • Fax: 781.464.8058 • jack.messman@novell.com • www.novell.com

NOV 000043053

Mr. Darl McBride
Page 2
May 28, 2003

We are aware that you recently offered to disclose some of the alleged Linux problems to Novell and others under a nondisclosure agreement. If your offer is sincere, it may be a step in the right direction. But we wonder whether the terms of the nondisclosure agreement will allow Novell and others in the Linux community to replace any offending code. Specifically, how can we maintain the confidentiality of the disclosure if it is to serve as the basis for modifying an open source product such as Linux? And if we cannot use the confidential disclosure to modify Linux, what purpose does it serve?

In your letter, you analogize SCO's campaign against the Linux community to that of the record industry against major corporations whose servers contained downloaded music files. There are crucial differences between the two campaigns. The record industry has provided specific information to back up its allegation, while SCO steadfastly refuses to do so. In its allegation letter, the record industry provides evidence of allegedly infringing activity that is specific to the targeted company. This offers the company real notice of the activity, sufficient information to evaluate the allegation, and an opportunity to stop the activity if it determines the allegation is true. If SCO wants to compare its actions to those of the record industry, it should follow the example set by that industry and present specific evidence of the alleged infringement.

SCO claims it has specific evidence supporting its allegation against the Linux community. It is time to substantiate that claim, or recant the sweeping and unsupported allegation made in your letter. Absent such action, it will be apparent to all that SCO's true intent is to sow fear, uncertainty, and doubt about Linux in order to extort payments from Linux distributors and users.

This true intent becomes clearer when one considers various public statements you and other SCO personnel have made about SCO's intellectual property rights in UNIX. SCO continues to say that it owns the UNIX System V patents, yet it must know that it does not. A simple review of U.S. Patent Office records reveals that Novell owns those patents.

Importantly, and contrary to SCO's assertions, SCO is not the owner of the UNIX copyrights. Not only would a quick check of U.S. Copyright Office records reveal this fact, but a review of the asset transfer agreement between Novell and SCO confirms it. To Novell's knowledge, the 1995 agreement governing SCO's purchase of UNIX from Novell does not convey to SCO the associated copyrights. We believe it unlikely that SCO can demonstrate that it has any ownership interest whatsoever in those copyrights. Apparently, you share this view, since over the last few months you have repeatedly asked Novell to transfer the copyrights to SCO, requests that Novell has rejected. Finally, we find it telling that SCO failed to assert a claim for copyright or patent infringement against IBM.

NOV 000043054

Mr. Darl McBride
Page 3
May 28, 2003

SCO's actions are disrupting business relations that might otherwise form at a critical time among partners around Linux technologies, and are depriving these partners of important economic opportunities. We hope you understand the potential significant legal liability SCO faces for the possible harm it is causing to countless customers, developers, and other Linux community members. SCO's actions, if carried forward, will lead to the loss of sales and jobs, delayed projects, canceled financing, and a balkanized Linux community.

We, like others, are concerned about the direction of SCO's campaign. For now, we demand that SCO either promptly state its Linux infringement allegations with specificity or recant the accusation made in your letter. Further, we demand that SCO retract its false and unsupported assertions of ownership in UNIX patents and copyrights or provide us with conclusive information regarding SCO's ownership claims. In the future, we hope SCO will adhere to standards of strict accuracy when stating its rights in UNIX.

Sincerely,

*Jack L. Messman*

Jack L. Messman

NOV 000043055

# EXHIBIT 37

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone:  (801) 363-6363
Facsimile:  (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

*Attorneys for The SCO Group, Inc.*

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF DARL MCBRIDE** |
| Plaintiff/Counterclaim-Defendant, | Case No. 2:03CV0294DAK |
| | Honorable Dale A. Kimball |
| v. | Magistrate Judge Brooke C. Wells |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendant/Counterclaim-Plaintiff. | |

1.      I submit this declaration in connection with The SCO Group, Inc. v.

International Business Machines Corporation, Civil Action No. 2:03CV-0294 DAK (D. Utah

2003), and The SCO Group v. Novell, Inc., Civil Action No. 2:04CV00139 DAK (D. Utah

2004). I make this declaration based upon personal knowledge.

2.      I have been the CEO of the SCO Group, Ltd. since June of 2002.

3.      In late 2002 and early 2003, SCO began researching the intellectual property

surrounding Linux. We learned that customers were using its proprietary UNIX libraries with

Linux, but without the license necessary to use UNIX for this purpose. We began exploring

licensing programs designed to protect our UNIX and UnixWare assets from further dilution.

4.      I described the planned library licensing initiative to IBM executive Steve

Solazzo. Though Mr. Solazzo did not initially express any negative reaction to the plan, I was

soon contacted by IBM and asked to halt the program.

5.      In December of 2002, I was a participant on a phone call between SCO

executives and several IBM executives and attorneys. The IBM representatives tried to

persuade us not to issue the anticipated press release announcing the library licensing program

or to launch the program. SCO agreed to delay the announcement, and did delay it until

January of 2003.

6.      I did not, in that call or at any time, state that the press release would not go

out; I agreed only to delay its release.

7.      Around this time, I wanted to confirm with Novell, from whom Santa Cruz,

SCO's predecessor, had purchased the UNIX assets, my understanding that SCO owns the

UNIX and UnixWare copyrights pursuant to the Asset Purchase Agreement (APA). I was not

then aware of Amendment No. 2 of the APA, which reiterates and unequivocally confirms that

the APA transferred to SCO "the copyrights and trademarks owned by Novell as of the date of

the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX

and UnixWare technologies." If I had known about Amendment No. 2, I would not have sought additional assurances from Novell.

8.     I spoke to Greg Jones, Novell's associate general counsel in November 2002. Mr. Jones agreed with me on this point and confirmed that it was his understanding that the copyrights had been transferred to SCO pursuant to the APA. I then asked whether he had any paperwork that reflected our mutual understanding of the APA. Mr. Jones told me he would check.

9.     In December 2002 or early January 2003, Mr. Jones called me and explained that the documents relating to the APA were in storage and would be difficult to access. Instead, Mr. Jones proposed that someone at Novell simply sign a statement or letter confirming their mutual understanding that SCO had acquired the UNIX copyrights, rather than trying to find the old documents in storage. I told him that would be fine.

10.     Not once in the course of these conversations did Mr. Jones state or imply that SCO did not own the Unix and UnixWare copyrights. To the contrary, he consistently agreed with my understanding that the copyrights had transferred to SCO.

11.     Sometime early in 2003, Mr. Jones called to inform me that Novell would not issue the clarification we had discussed. Mr. Jones explained that it was not that Novell did not agree with SCO's position, but that they did not want to be involved or to take any position. Mr. Jones further explained that Novell was "not interested in Unix anymore."

12.     Also in January of 2003, I learned from Karen Smith of IBM that IBM was unconcerned with SCO's claims because IBM had looked into the question of SCO's ownership of the UNIX copyrights, and had concluded that SCO had not acquired the copyrights from Novell. Ms. Smith stated that IBM lawyers had examined the APA. She also implied that IBM had sought assurance from Novell that the APA had not transferred the copyrights to SCO. This exchange occurred in the context of and followed my notification to her that SCO was contemplating suing IBM for the breach of its licensing agreement.

13.　　In May of 2003, Novell made public statements that Novell, not SCO, held the copyrights to UNIX. On June 3, 2003, I called and spoke to Novell's CEO, Mr. Jack Messman. I told him Novell was wrong about the copyrights, and asked if he had read Amendment No. 2 to the Asset Purchase Agreement. He responded that he was not aware of Amendment No. 2.

14.　　I had a copy of Amendment No. 2 faxed to Mr. Messman, and he called me back a short time later. Mr. Messman said he agreed that Amendment No. 2 confirmed that Novell had transferred the Unix and UnixWare copyrights to SCO.

15.　　I explained to Mr. Messman the injury that Novell's false statements had caused SCO and its shareholders. I asked him if Novell and IBM had a conversation regarding Novell's public statements about its ownership of the UNIX assets. He would not answer me directly. He implied that he had discussed the issue with IBM, but when I pushed for a concrete answer, he told me he would not discuss it any further without an attorney present.

16.　　I understand that in his declaration, Mr. Jones states that I repeatedly contacted Novell, requested that Novell transfer the UNIX copyrights to SCO, and asked Novell to amend the agreement to transfer the copyrights to SCO. I disagree with Mr. Jones' account of the events. At no point did I or anyone on SCO's behalf request that Novell transfer UNIX copyrights to SCO. Nor did I ask Novell to amend the APA to give SCO the copyrights.

17.　　In the midst of these communications with Novell regarding our respective rights to enforce and terminate the licensing agreement, SCO was attempting to negotiate with IBM regarding their disclosures of protected UNIX technology to the Linux community. In early 2003, SCO began to discover IBM had disclosed proprietary UNIX technology to Linux. Through a series of calls, letters, and meetings, I and other SCO representatives tried in good faith to reach an agreement with IBM to protect the integrity of our intellectual property.

18.　　In early March 2003, I received a call from Tony Befi with whom I had had earlier conversations about Project Monterey and related issues. Mr. Befi said that he had read an article indicating that SCO had turned its attention in its pursuit to protect its intellectual

property towards IBM. He asked me if it was true, and if SCO was planning to sue IBM. I told

him that SCO had serious problems with what IBM had been doing with regard to Linux. I

reminded him of the conversation I had had with Karen Smith in January, two months earlier, in

which I had affirmed her suspicion that if SCO's pursuit to protect its intellectual property

progressed to litigation, IBM would be a target of that course of action. Mr. Befi asked if we

had problems we needed to talk about, and I told him we did, and sought a meeting as soon as

he could arrange it. Though I told him that our problems with IBM had reached a crisis point,

he tried to push for a meeting that wouldn't happen until June, months away. This was a signal

to me that he was just fishing for information and that IBM had no intention to sit down and try

and resolve the issues between our two companies which had clearly reached a boiling point.

19.     Finally, after months of discussions with IBM executives and repeated

warnings that we planned to legally protect our rights SCO filed its complaint and notified IBM

in a letter dated March 6, 2003 of its intent to terminate the license agreement for IBM's

material breach of that agreement. Following that, I exchanged a series of letters with IBM's

general counsel, in which IBM pressed for more specific information about the violation of the

confidentiality provision of the licensing agreement. I was surprised by the letters I received

during this time because we had discovered that IBM had publicly bragged about how it was

disclosing its disclosure of AIX and Dynix technology to Linux, and yet in conversations with

us they refused to acknowledge that they had in fact made those disclosures.

20.     On June 2, 2003, I attended a meeting with counsel for SCO and

representatives and counsel for IBM. SCO had a presentation prepared which identified

specific examples of AIX and Dynix technology that we had discovered in Linux. Because

discovery had not commenced, we were relying at that point on IBM's public statements, and

on public postings by IBM programmers, suggesting how AIX technology could be used in

Linux applications. I recall that the AIX Journaling File System and the AIX enterprise volume

management system were identified as two technologies that had been disclosed to the Linux

community. I also remember the emphasis in the presentation on the disclosure of methods and concepts derived from Unix System V to the Linux community.

21.     During the meeting, IBM representatives showed very little interest in what we were saying. For the most part no one asked questions, or sought clarification or additional information; they just listened. None of the IBM representatives indicated to us any of the following: that IBM would consider retracting its statement that it was willing to open-source any part of AIX; that IBM agreed it was a violation of its UNIX Agreements to contribute source code from AIX to Linux; that IBM believed SCO had access to AIX or Dynix/ptx source code; that IBM would not be able to determine from its own employees what contributions they had made to Linux; or that IBM was willing "to cure" its breaches by somehow removing, for example, JFS from Linux. At the end of the presentation, we were advised that we would hear something from IBM in the near future.

22.     More than a week lapsed, and hearing nothing from IBM, SCO terminated the license agreement and communicated the termination to IBM in a letter dated June 12, 2003.

23.     Shortly thereafter, I called IBM's CEO, Sam Palmisano, and asked for a meeting with him in an effort to resolve this dispute. He agreed to the meeting, which occurred that month, and was attended by myself and Mr. Palmisano, as well as the general counsel for IBM and counsel for SCO. Initially, Mr. Palmisano told me that because SCO's claims were not affecting IBM's stock price, or words to that effect, IBM had no reason to deal with SCO. I tried to impress upon Mr. Palmisano SCO's intent to take whatever steps necessary to protect its intellectual property. We talked for over an hour on the specifics of the legal issues that SCO had IBM. Eventually, Mr. Palmisano suggested that a settlement could be reached to compensate SCO, so long as it did not publicly appear as though any monies came from IBM. Mr. Palmisano opined that other companies profiting from Linux's development and distribution should be willing to help with the settlement. He asked for ninety days to reach a settlement. However, attempts to resolve this dispute have failed.

24.     As was the case in the preceding meeting, neither Mr. Palmisano nor his general counsel indicated in any way that IBM was retracting its statement that it was willing to open-source any part of AIX; that IBM denied that it had made contributions to Linux from AIX and Dynix/pt; that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux; that IBM believed SCO had access to AIX or Dynix/ptx source code; that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx; or that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux.

25.     At every turn, our attempts to alert IBM to the breach and resolve the dispute were met with indifference and delay.  Despite the apparent futility of our efforts, we tried, in good faith, to resolve the dispute with IBM arising from their breach of the licensing agreement.

II.     **BayStar**

26.     I understand that Larry Goldfarb of BayStar capital has submitted a declaration in support of IBM's motion for summary judgment.  I disagree with his characterization of the events that led to BayStar substantially withdrawing its investment in SCO in the summer of 2004.

**27.**     BayStar invested $50 million in SCO in October 2003.  The investment had been made through a preferred stock transaction.  SCO sought the investment from BayStar to fund its ongoing operations, which included continuing development and marketing of its UNIX and other products, protection of its intellectual property, and its lawsuits against IBM and other companies. Soon after its investment, BayStar became a difficult partner.  Larry Goldfarb made constant complaints regarding SCO's business and litigation strategies, demanding that I focus more on the business one moment, more on litigation the next.

28.     I originally attributed Mr. Goldfarb's erratic behavior to a statement he had made to me early in his investment. He told me words to the effect that because he was a

trader, he did not really care whether the stock went up or down, so long as it was volatile, because he could make money either way. I suspected that Mr. Goldfarb was trying to manipulate the stock of this company to his own advantage.

29.    I had a conversation with Mr. Goldfarb after the settlement between SCO and Baystar. The object of the conversation, from my perspective, was to address why the relationship deteriorated. Mr. Goldfarb expressly said that IBM had been "on him, on him, on him" to retract his support from SCO. He also said that IBM was not then in contact with him.

30.    In May of 2004, SCO settled BayStar's request for the return of its investment with a $13 million cash payment, and the issuance of approximately 2.1 million shares of common stock. In return, Baystar relinquished its preferred stock. The value of the cash and stock issued to Baystar pursuant to this resolution amounted to $20 million from SCO.

31.    The decision in 2003 to bring a lawsuit against IBM resulted from SCO's discovery that IBM's disclosures to Linux had included proprietary UNIX technology that SCO had a right to insist be held in confidence.

32.    SCO had no intent to "wage legal warfare" on Linux. Nor did I, or anyone from SCO, ever ask Novell to "participate" in any such a campaign.

33.    Rather, by offering intellectual property compliance licenses through its SCOsource program, and informing Linux users of its rights, SCO sought to provide its customers and others with legally legitimate methods to continue to using Linux.

34.    I understand that IBM relies in part on a presentation authored by Kim Jenkins, who was an outside analyst hired in the summer of 2003 to perform an analysis of potential growth strategies available to the company. When Mr. Jenkins began this analysis, he had no prior experience in the software operating system industry or with The SCO Group. The presentation, Ex. 203, was drafted by Mr. Jenkins very early in his work on this analysis.

35.    It is my understanding that Mr. Rick Becker, formerly of Hewlett Packard, is no longer working with that company.

36. Finally, I understand that IBM accuses SCO of intentionally obfuscating evidence in this litigation for strategic purposes. It was never SCO's purpose or strategy, intent or desire to obfuscate evidence in this case in any way.

37. In each of the Complaints that SCO has filed, to the best of my knowledge, SCO and its counsel set forth in detail the nature of our claims based on what we knew at that time.

38. SCO did not publicly disclose that code it had identified in 2003 because the company believed that code had to be kept confidential and could not be disclosed without a nondisclosure agreement.

I declare under penalty of perjury that the foregoing is true and correct.

November 10, 2006

_____
Darl McBride

# EXHIBIT 38

Joseph A. LaSala, Jr.
*Senior Vice President.*
*General Counsel and Secretary*

# Novell



**EXHIBIT**

1014

ALL-STATE LEGAL®

**VIA FAX AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

June 6, 2003

Mr. Darl McBride
President and CEO
The SCO Group
355 South 520 West
Suite 100
Lindon, Utah 84042

Re: Letter of June 6

Dear Mr. McBride:

    I have received your letter to Jack L. Messman with respect to "Novell's May 28, 2003 Press Release."

    For your information, Novell has today issued a press release with respect to Amendment No. 2. A copy is attached for your ease of reference.

    Your letter contains absurd and unfounded accusations against Novell and others, coupled with a veiled threat to publicly state those allegations in a SCO press call to be held today at 11:00 am EST. Novell continues to demand that SCO cease and desist its practice of making unsubstantiated allegations, including the allegations contained in your letter of June 6, 2003.

                Sincerely,

                Joseph A. LaSala, Jr.

Novell, Inc. • 404 Wyman Street, Suite 500 • Waltham, MA 02451 • Tel: 781.464.8041 • Fax: 781.464.8062 • www.novell.com

NOV 000043058

**FOR IMMEDIATE RELEASE**
June 6, 2003

# Novell Statement on SCO Contract Amendment

**PROVO, Utah – June 6, 2003 – In** a May 28th letter to SCO, Novell challenged SCO's claims to UNIX patent and copyright ownership and demanded that SCO substantiate its allegations that Linux infringes SCO's intellectual property rights. Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996. The amendment does not address ownership of patents, however, which clearly remain with Novell.

Novell reiterates its request to SCO to address the fundamental issue Novell raised in its May 28 letter: SCO's still unsubstantiated claims against the Linux community.

**About Novell**
Novell, Inc. (Nasdaq: NOVL) is a leading provider of information solutions that deliver secure identity management (Novell Nsure™), Web application development (Novell exteNd™) and cross-platform networking services (Novell Nterprise™), all supported by strategic consulting and professional services (Novell Ngage[SM]). Novell's vision of one Net – a world without information boundaries – helps customers realize the value of their information securely and economically. For more information, call Novell's Customer Response Center at (888) 321-4CRC (4272) or visit http://www.novell.com. Press should visit http://www.novell.com/pressroom.

###

Novell is a registered trademarks; Nsure, exteNd and Nterprise are trademarks; and Ngage is a service mark of Novell, Inc. in the United States and other countries. * All third-party trademarks are the property of their respective owners.

Press Contact:
Bruce Lowry
Novell, Inc.

NOV 000043059

# EXHIBIT 39

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,            :  Case No. 2:04CV00139
                                :
        Plaintiff,              :  Videotaped Deposition of:
                                :
vs.                             :  GREGORY JONES
                                :
NOVELL, INC.,                   :
                                :
        Defendant.              :
                                :

January 26, 2007 - 9:35 a.m.

Location:  Hatch, James & Dodge
  10 West Broadway, Suite 400
  Salt Lake City, Utah  84111

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

Esquire Deposition Services
1-800-944-9454

5ec65c64-c0ae-4f3b-aec5-b84159c29256

Page 218

1  say that they made and were involved in making the public
2  statements in 2003, Mr. Stone, Mr. LaSala and Mr. Messman,
3  without to your knowledge them being involved in the very
4  contract that they were addressing, namely the APA?
5      MR. BRAKEBILL: Argumentative.
6      A. If by involved you mean -- I guess, first of all,
7  the extent to which they were involved making those -- in
8  making the public statements, I guess we have -- you have
9  asked of that. And I guess I have said that Mr. Stone and
10  Mr. LaSala -- if you mean by being involved that they were
11  there at the time, then Mr. LaSala and Mr. Stone were not
12  there even at Novell at the time. And Jack Messman was on
13  the board of directors, and I didn't see him involved. I
14  don't have a way of knowing for certain that he was not
15  involved.
16      Q. (By Mr. Gonzalez) In your experience would it be
17  unusual for a member of the board to be involved in
18  negotiations of a contract like that?
19      A. Of the -- in the negotiations, the actual back and
20  forth with the other side?
21      Q. Yeah.
22      A. You know, of transactions of that magnitude, I
23  think that, yeah, I'm not certain as to what extent the board
24  members may potentially get involved.
25      Q. Do you recall any board member at Novell being

Page 219

1  involved in negotiating, negotiating an agreement or an
2  amendment to an agreement?
3      A. Yeah. If, if those -- if there are conversations
4  being held at that level, they're not the types of things
5  that I would see.
6      Q. Okay. So you have no knowledge. Is that fair?
7      A. Yeah. I can't recall anything right now in that
8  regard.
9      Q. Okay.
10      A. I guess except -- with the exception of, you know,
11  we have had situations where the CEO is also the chairman of
12  the board.
13      Q. Yeah.
14      A. Right? And so in those types of situations, you
15  know, very possibly that particular board member can be
16  involved.
17      Q. Sure. But with that exception aside, your answer
18  was the one you gave me before?
19      A. Yeah, no knowledge.
20      Q. Okay.
21      A. That I can recall.
22      Q. So to your knowledge did any of the senior
23  management at Novell in 2003 participating -- participate in
24  negotiating the APA?
25      A. Yeah, I -- trying to inventory all of the people.

Page 220

1  I am not recalling right off anyone who would have been there
2  at that time, in the executive capacity in 2003 who would
3  have participated in negotiations of the APA.
4      Q. And you identified earlier some of the people that
5  you did know to have participated in the negotiations of the
6  APA. Do you recall telling me some names like, I think you
7  said Ed Chatlos and Ty Mattingly specifically?
8      A. And Tor Braham.
9      Q. Yeah. Were any of those people at Novell in 2003
10  to your knowledge?
11      A. No.
12      Q. Did any of Novell's senior management in 2003 to
13  your knowledge participate in negotiating the amendments to
14  the APA?
15      A. Not to my knowledge, no.
16      Q. And do you know of anyone who did participate in
17  those negotiations who was at Novell in 2003?
18      A. The original APA?
19      Q. No, the amendments to the APA.
20      A. Greg Jones. But again, I described my role as
21  being peripheral.
22      Q. Peripheral, yeah.
23      A. But --
24      Q. And that was with respect to Amendment No. 2, I
25  believe you said?

Page 221

1      A. Right. Amendment No. 2, and there may have been
2  other -- there may have been other in-house counsel who may
3  have been involved. I just -- it was a protracted
4  negotiation.
5      Q. Sure.
6      A. And I just can't -- I don't know if anyone else is
7  currently on our staff might have been consulted as well. I
8  just can't recall.
9      Q. Would that person be senior management?
10      A. Now I'm referring to right now -- and I'm sorry.
11  Was your question before limited to senior management or just
12  anyone?
13      Q. Well, no. It was just anyone. But now I'm
14  asking --
15      A. Okay. Because I'm not senior management, you know,
16  so there could have been perhaps other counsel. And in
17  senior management level I'm not recalling anyone who would
18  have been there in 2003 that was involved in the APA or the
19  amendments, in negotiating those at the time.
20      Q. Okay. Thank you. Have you had any communications
21  with nonparties about this litigation that you can recall?
22      MR. BRAKEBILL: I'm going to object on the basis of
23  attorney work product or attorney-client communications.
24      Q. (By Mr. Gonzalez) Other than --
25      A. So nonparties, yeah, from time to time.

56 (Pages 218 to 221)

5ec65c64-c0ae-4f3b-aec5-b84159c29256

# EXHIBIT 40

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

- - - - - - - - - - - - - - -

THE SCO GROUP, INC.,            :

a Delaware corporation,         :

          Plaintiff,            :

VS.                             :   CIVIL NO.

NOVELL, INC.,                   :   2:04CV00139

a Delaware corporation,         :

          Defendant.            :

- - - - - - - - - - - - - - -


   VIDEOTAPED DEPOSITION OF JOSEPH A. LASALA, a

witness called by and on behalf of the

Plaintiff, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Sandra L. Bray, Registered

Diplomate Reporter, CSR Number 103593, and

Notary Public in and for Commonwealth of

Massachusetts, at the offices of Ropes & Gray,

One International Place, Boston, Massachusetts,

on Thursday, February 8, 2007, commencing at

9:23 a.m.

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 26

1    copyright transfer under the APA?
2  A.  I doubt that it would shed light on it because
3      we have a document here that's fairly clear on
4      its face with respect to the exclusion of
5      copyrights from the transfer.
6  Q.  But to the extent you would have to speculate to
7      the meaning of Attachment E, is it possible that
8      a discussion with somebody who negotiated the
9      APA could flush out that speculation?
10         MR. BRAKEBILL:  Form.
11 A.  I suppose that's possible, yeah.
12 Q.  To the extent it's not a subject of privilege,
13     can you tell me why you've not spoken with
14     anyone who negotiated the APA?
15 A.  I didn't view it as a need for me to have
16     conversations with those who negotiated the APA.
17     I do know that there have been discussions with
18     those who have negotiated the APA.
19 Q.  And to the extent it's not a subject of
20     privilege -- and since you have an attorney, I
21     can probably stop saying that --
22         MR. BRAKEBILL:  It's always helpful to
23     clarify.
24         MR. NORMAND:  Yeah.

Page 27

1  Q.  -- have you had occasion to consider the
2      testimony of anyone in this case or the IBM case
3      who negotiated the APA on the issue of copyright
4      transfer?
5          MR. BRAKEBILL:  Objection, foundation.
6  A.  I don't think I have with respect to the issue
7      of copyright transfer.
8  Q.  Do you allow for the possibility that that
9      testimony might shed some light on the issue of
10     copyright transfer under the APA?
11         MR. BRAKEBILL:  Foundation.
12 A.  I suppose it could, but, again, the document, in
13     my view, is very clear on the issue, and I have
14     really no need to speak to anyone involved in
15     the negotiations because of the clarity of the
16     document.
17 Q.  If I were to represent to you that Chris Stone
18     and Jack Messman have both testified to their
19     understanding that no trademarks were
20     transferred under the APA -- and it's just my
21     representation, but to the extent they gave that
22     testimony, would you think that they're wrong?
23         MR. BRAKEBILL:  Foundation.
24 A.  Trademarks.  I believe the agreement says there

Page 28

1      were certain trademarks that did transfer.
2  Q.  You think that's clear under the agreement?
3  A.  Yes.
4  Q.  Do you have any explanation for why Mr. Stone
5      and Mr. Messman would have reached a different
6      conclusion?
7          MR. BRAKEBILL:  Speculation.
8  A.  No, I don't.
9  Q.  I'm handing you, Mr. LaSala, what's been marked
10     as Exhibit 1009, which is titled Amendment
11     Number 2 to the Asset Purchase Agreement.  Do
12     you recognize this document, Mr. LaSala?
13 A.  Yes, I do.
14 Q.  And do you recall whether you had occasion to
15     review this document in connection with your
16     review of the APA in the early part of 2003?
17 A.  I have a recollection that I did not review this
18     document in early 2003 in connection with my
19     review of the APA.
20 Q.  Do you recall whether in the early part of 2003
21     you had occasion to see an unsigned version of
22     Amendment Number 2?
23 A.  If you could be more precise when you talk about
24     early in 2003, the time frame.

Page 29

1  Q.  We've discussed in this case -- and we'll
2      discuss today -- a May 28th, 2003 press release.
3  A.  Yeah.
4  Q.  And I know there'll be a foundation objection,
5      but does that date refresh your recollection at
6      all as to events in 2003?
7  A.  Yes, if you consider May 28th or thereabouts as
8      early in 2003.
9  Q.  I didn't mean to --
10 A.  That's what I was asking.  When you say early, I
11     think January, February, March, and I wanted to
12     make sure that that's the time frame that you
13     were thinking about.  That's all.
14 Q.  I took it from our early exchanges that January,
15     February, March fell into early.  May 28th
16     wouldn't.
17 A.  Right.
18 Q.  So I just wanted to have that date as a
19     benchmark for us to work around.
20 A.  All right.
21 Q.  Do you recall whether prior to May 28th, 2003
22     you saw an unsigned copy of Amendment Number 2?
23 A.  I don't recall that I did prior to May 28th.
24 Q.  I think we've also discussed in this case a

8  (Pages 26 to 29)

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 58

1    interpret Paragraph A of Amendment Number 2,
2    it's not immediately obvious from the language
3    of Paragraph A?
4         MR. BRAKEBILL: Form, argumentative.
5    A. I'm sorry. What's not immediately obvious?
6    Q. The view that Novell ultimately came to that it
7    didn't effect the transfer of copyrights but,
8    rather, creates limited circumstances in which
9    Santa Cruz could obtain copyrights.
10        MR. BRAKEBILL: Form, argumentative.
11   A. Well, we've never acknowledged that it does
12   effect copyright transfer.
13   Q. No, I didn't mean to suggest that you ever did.
14   A. Okay.
15   Q. What I'm asking is, the view that you have
16   formed of what Paragraph A of Amendment Number 2
17   means with respect to copyright transfer is not
18   a meaning that is immediately obvious from the
19   language of Paragraph A; is it?
20        MR. BRAKEBILL: Form, argumentative.
21   A. I guess that's correct, but it's clear and was
22   clear immediately upon review and has been since
23   then that the language of Amendment Number 2 did
24   not effect the transfer of copyrights.

Page 59

1    Q. No, I've heard you just say that, and I don't
2    mean to quibble with that. I mean to ask a
3    narrow question, which is, the view that you
4    have formed of what Paragraph A means as you've
5    articulated it to me is not immediately obvious
6    from the language of Paragraph A; is it?
7         MR. BRAKEBILL: Form, argumentative.
8    A. I don't know. I'm not sort of connecting with
9    your question. I mean the form -- say it again.
10   Q. My questions arise out of the fact that twenty
11   days after having seen Amendment Number 2,
12   you're making the statements that we've reviewed
13   in this June 26th, 2003 letter.
14   A. Right.
15   Q. I don't think it's controversial for me to ask
16   you whether the fact that you're using that
17   language three weeks after having seen the
18   document suggests that there are answers to
19   questions that aren't immediately obvious from
20   the language.
21   A. Okay.
22        MR. BRAKEBILL: Wait. I'm not sure if
23   there was a question there, but form, compound,
24   argumentative. Is that, like, a statement?

Page 60

1    A. I guess that's fair. And we, in fact, say
2    further in the letter that we're still reviewing
3    the asset purchase agreement to review the
4    rights transferred to SCO, so I won't quibble
5    with your assertion.
6    Q. Have you had occasion to speak with anyone who
7    negotiated the APA regarding any aspect of the
8    APA? I think I asked you the question earlier
9    about copyright transfer. Now, I'm sort of
10   broadening the question.
11   A. Any aspect of the APA?
12   Q. Yes.
13   A. I have not.
14   Q. And have you had occasion to speak with anyone
15   who negotiated Amendment Number 2 regarding any
16   aspect of Amendment Number 2?
17   A. I have not.
18   Q. Mr. LaSala, is there a joint defense or common
19   interest agreement between Novell and IBM
20   relating to the two SCO litigations?
21   A. Yes.
22   Q. And when did that agreement begin?
23        MR. BRAKEBILL: Foundation, form.
24   A. I don't recall.

Page 61

1    Q. The agreement did begin at some point, correct?
2    A. Yes. I don't recall precisely when it began.
3    Q. Can you recall roughly? Because I'm going to
4    have to structure questions around honoring that
5    privilege.
6    A. Yeah. My recollection, that it was sometime
7    around the end of May, give or take, you know,
8    weeks on either side, but I don't remember
9    exactly when it was.
10        MR. NORMAND: Ken, is that a question
11   that has an obvious answer or is it something we
12   should wait for a break for, the date when this
13   joint defense and common agreement began?
14        MR. BRAKEBILL: The reason why I
15   objected is because there's a built-in
16   assumption in your question that privilege only
17   begins with an actual agreement. I'm not sure
18   that answered your question, but his memory is
19   what it is, I guess, would be my response to
20   you.
21        MR. NORMAND: Why don't you and I talk
22   about it on the break? I can talk about
23   something else right now.
24   Q. I'm handing you, Mr. LaSala, what's been

Esquire Deposition Services
1-800-944-9454

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

# EXHIBIT 41

Page 1

Volume I
Pages 1 to 183
Exhibits 1026-1034

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

- - - - - - - - - - - - - - - -x
                                    :
THE SCO GROUP, INC., a              :
Delaware corporation,               :
    Plaintiff/Counterclaim          :
    Defendant,                      :   Case No.
                                    :   2:04CV00139
        vs.                         :
                                    :
NOVELL, INC., a Delaware            :
corporation,                        :
    Defendant/Counterclaim          :
    Plaintiff.                      :
                                    :
- - - - - - - - - - - - - - - -x


        VIDEOTAPED DEPOSITION OF JACK L. MESSMAN,
a witness called on behalf of the Plaintiff/
Counterclaim Defendant, taken pursuant to the
Federal Rules of Civil Procedure, before Anne H.
Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Ropes & Gray LLP, One
International Place, Boston, Massachusetts, on
Wednesday, February 7, 2007, commencing at 9:59
a.m.

f7976b7e-36a7-41e2-9fff-97e2686cec85

Page 82

1    A.  Yes.
2        MR. BRAKEBILL:  Form.
3    A.  Correct.  I did approve the release of
4    this.
11:59:46  5    Q.  Everything in that statement was true and
6    correct, to the best of your knowledge?
7    A.  Yes.
8        MR. BRAKEBILL:  There is another sentence
9    at the end, that's why I'm objecting, because you're
11:59:59  10    characterizing that as the entire statement.
11        MR. SINGER:  There is another statement
12    that involves the infringement claims and all, but
13    that's not what my question concerns.
14    Q.  These statements are all true and correct,
12:00:11  15    to the best of your knowledge?
16    A.  Yes.
17    Q.  Now, the statement that to Novell's
18    knowledge, Amendment No. 2 is not present in
19    Novell's files, it turns out that statement was
12:00:24  20    false, correct?
21    A.  No.
22        MR. BRAKEBILL:  Form.
23    A.  There was no signed amendment in our files.
24    Q.  You had determined at a later time that

Page 83

1    there was a signed copy in the CFO's files?
2    A.  Yes.
3    Q.  Don't you consider the CFO's files to be
4    Novell's files?
12:00:43  5        MR. BRAKEBILL:  Form.
6    A.  Sure.
7    Q.  So what you're -- at the time Novell said
8    this, it was not aware that that signed copy was in
9    Novell's files; it later turned out to be in
12:00:57  10    Novell's files; is that correct?
11        MR. BRAKEBILL:  Form.
12    A.  Yes.
13    Q.  You were aware, even at the time of this
14    press statement, that there was an unsigned copy
12:01:09  15    that had been in Novell's files, correct?
16        MR. BRAKEBILL:  Form, mischaracterizes
17    earlier testimony.
18    A.  I was aware that there was an unsigned copy
19    of Amendment 2, but there could have been unsigned
12:01:21  20    copies of other things too; they don't become
21    binding until they're signed.
22    Q.  As of the date of this press release, you
23    had become aware that in fact Amendment No. 2 had
24    been signed, right?

Page 84

1    A.  That's the purpose of that first statement.
2    Q.  Right.  And that is the reason why you're
3    informing the public on June 6, 2003 that Amendment
4    No. 2 appears to support SCO's claim that ownership
12:01:47  5    of certain copyrights for UNIX did transfer to SCO
6    in 1996; is that correct?
7        MR. BRAKEBILL:  Form.
8    A.  We're saying that this amendment appears to
9    support SCO's claim.  We're not saying that
12:02:01  10    Amendment 2 transferred the copyrights.
11    Q.  The reason why you made this statement that
12    Amendment No. 2 appears to support SCO's claim is
13    because you had now received a signed copy of
14    Amendment No. 2; is that correct?
12:02:29  15    A.  Yes.
16        MR. BRAKEBILL:  Form.
17    Q.  If you had had in your possession a signed
18    copy of Amendment No. 2, would you have issued the
19    letter that you wrote on May 28th and the
12:02:40  20    accompanying press release?
21    A.  I can't speculate as to whether I would
22    have done it then.
23    Q.  In referring -- on the last line of the
24    first paragraph where it says, "The amendment does

Page 85

1    not address ownership of patents, however, which
2    clearly remain with Novell," were you seeking to
3    distinguish the ownership of patents from the
4    ownership of copyrights?
12:03:05  5    A.  No.  I was just saying that the amendment
6    didn't address the issue of patents, and in my
7    opinion, it would have addressed both, if it was
8    with regard to transferring the copyrights.
9    Q.  So it's your view that the statement,
12:03:28  10    looking at the two sentences which says, "The
11    amendment appears to support SCO's claim that
12    ownership of certain copyrights for UNIX did
13    transfer to SCO in 1996.  The amendment does not
14    address ownership of patents, however, which clearly
12:03:41  15    remain with Novell," it's your testimony that that
16    was not intended to distinguish the copyright
17    treatment from the patent treatment?
18        MR. BRAKEBILL:  Form.
19    A.  Basically, I was saying that it was not
12:03:53  20    addressed.
21    Q.  Did there come a time when Novell clarified
22    its position or changed its position once more back
23    to the statement that it didn't transfer any
24    copyrights?

22  (Pages 82 to 85)

f7976b7e-36a7-41e2-9fff-97e2686cec85

Page 90

1    MR. BRAKEBILL: I just want the record to
2  be clear.
3    A. And the answer is no.
4    Q. Did you recognize in this time frame in
12:08:52  5  June 2003 that the individuals who had worked on the
6  Asset Purchase Agreement transaction, the
7  negotiation of the transaction, the drafting of the
8  agreement, were no longer at Novell?
9    A. I think I learned that most of them were
12:09:10 10  not.
11    Q. And you knew that back in 2003, correct?
12    A. I think that's when I learned that most of
13  them were not any longer with us.
14    Q. As you sit here today, who do you identify
12:09:20 15  in your mind, if you know, were the individuals who
16  were in fact involved at Novell in the Asset
17  Purchase Agreement transaction?
18    MR. BRAKEBILL: Foundation.
19    A. Well, we had a law firm that was doing most
12:09:34 20  of the work.
21    Q. Which law firm was that?
22    A. Wilson Sonsini. And I can't remember the
23  guys in corporate development that were working on
24  this, there were several of them. As a board member

Page 91

1  I'm talking, not as the CEO of the company.
2    Q. Right. You were a board member then.
3    A. Yes.
4    Q. I was asking, really trying to fix your
12:10:04  5  knowledge in 2003. In June 2003, who were the
6  people who at that time you would have expected that
7  others at Novell would have gone to and asked about
8  what was intended?
9    A. I would expect they would have gone to the
12:10:21 10  people that -- they would have found out who worked
11  on it and gone to them to find out.
12    Q. But you just can't identify the names?
13    A. I just don't know who they are.
14    Q. As you sit here today, you don't know
12:10:40 15  whether or not that happened, whether they went to
16  those people or not?
17    A. I don't know whether that happened.
18    Q. I'd like to now show you Exhibit 1023,
19  which is another piece of correspondence between Mr.
12:10:59 20  LaSala and Mr. McBride that's been dated August 4,
21  2003.
22    A. (Witness reviews document)
23    Q. Did you review this letter and approve it
24  before it was sent?

Page 92

1    A. Yes.
2    Q. In this letter, is it fair to say Novell
3  rejects SCO's claim to ownership of any copyrights
4  in UNIX technologies?
12:11:43  5    A. Yes.
6    Q. What background materials or other
7  information not available to Novell in June of 2003
8  have resulted now in August of 2003 Novell taking
9  this position?
12:12:04 10    MR. BRAKEBILL: Form.
11    A. I don't think there were any new materials;
12  there was a lot more attention devoted to the
13  agreement and understanding the agreement.
14    Q. So there was no new information which came
12:12:19 15  to light that you're aware of between June 6, 2003
16  and August 4, 2003?
17    A. Not that I'm aware of.
18    Q. The position that Novell took in this
19  letter was, quote, and I'm quoting from the third
12:12:45 20  paragraph, "...we certainly see no reason why Santa
21  Cruz Operation would have needed ownership of
22  copyrights in UNIX System V in order to exercise the
23  limited rights granted SCO under the APA. Nor is
24  there any reason to think that a transfer of the

Page 93

1  copyrights required for SCO to exercise its APA
2  rights necessarily entails transfer of the entire
3  set of exclusive rights associated with a particular
4  copyrighted computer program."
12:13:17  5    That was Novell's position; is that
6  correct?
7    A. Yes.
8    Q. Which of those two things is Novell's
9  position, as you understand it, that no copyrights
12:13:28 10  at all transferred or that only partially a
11  copyright transferred, as suggested by the last
12  sentence I read?
13    MR. BRAKEBILL: Form, compound,
14  argumentative.
12:13:40 15    A. My view is that we sold SCO the right to
16  develop the code further than what it was at the
17  time we sold it, we transferred the business to
18  them, and they were going to evolve the code,
19  particularly to try to unify UNIX, the various
12:13:56 20  flavors of UNIX, and sell UnixWare.
21    Q. So it's your view --
22    A. And they didn't need the copyrights to do
23  that.
24    Q. So it's your view that the transaction did

24  (Pages 90 to 93)

f7976b7e-36a7-41e2-9fff-97e2686cec85