Brent O. Hatch (5715)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone:  (914) 749-8200
Facsimile:   (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH COUNTERCLAIM FOR RELIEF, AND IN SUPPORT OF SCO'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Civil No. 2:04CV00139 <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ i

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................ 5

I.    NOVELL SOLD THE ENTIRE UNIX BUSINESS TO SANTA CRUZ UNDER
      THE APA.............................................................................................. 5

      A.    The APA Plainly Transfers the UNIX and UnixWare Business to Santa
            Cruz........................................................................................ 6

      B.    Payment for the Business Included the Residual SVRX Binary Royalties. ........... 9

II.   NOVELL'S PROPOSED INTERPRETATION CANNOT BE RECONCILED
      WITH THE LANGUAGE AND PURPOSE OF THE APA. ........................... 12

      A.    The Term "SVRX Licenses" Is Undefined and Ambiguous. ..................... 12

      B.    Novell's Interpretation Conflicts with The Language and Purpose of the
            APA......................................................................................... 13

      C.    Novell's Section 4.16(b) Rights Are Limited to Protecting the Royalties
            Under the Transferred SVRX Product Supplements. ............................. 16

            1.    The Language and Extrinsic Evidence Show That the SVRX
                  Product Supplements Are the SVRX Licenses. ....................... 16

            2.    Novell Retained Only the Right to Continue Receiving Residual
                  Binary Royalties Under the SVRX Licenses. .......................... 19

      C.    Amendment No. 2 Forecloses Novell's Interpretation of Section 4.16(b). .......... 21

III.  THE EXTRINSIC EVIDENCE DEFEATS NOVELL'S INTERPRETATION. ............. 22

      A.    Documents Connected with the APA Belie  Novell's Interpretation of
            Section 4.16(b)............................................................................. 22

B.    The 1996 IBM Buyout Also Belies Novell's Interpretation................................ 26

C.    Witnesses Who Negotiated and Implemented the APA Reject Novell's
      Interpretation of Section 4.16(b)................................................................ 33

D.    Novell's Conduct in the Years That Followed the APA Also Belies Its
      Interpretation of Section 4.16(b)................................................................ 39

E.    Novell's Interpretation of the APA and Its Amendments Shifted
      Dramatically in 2003................................................................................ 41

LEGAL STANDARD ON SUMMARY JUDGMENT................................................ 43

ARGUMENT....................................................................................................... 43

I.    NOVELL'S PROPOSED DEFINITION CANNOT BE RECONCILED WITH
      THE APA AND THE TRANSACTION THEREUNDER. ............................... 44

A.    The Governing Law of Contract Interpretation. ...................................... 44

B.    The Term "SVRX Licenses" Is Ambiguous on Its Face. .......................... 49

C.    Section 4.16(b) Cannot Be Read to Conflict With the Language and
      Purpose of the APA. ................................................................................ 52

D.    The Term "SVRX Licenses" Refers to the Product Supplements........................ 58

      1.    The SVRX Supplements Actually Licensed the SVRX Products. ............ 58

      2.    Novell Retained Only the Right to Continue Receiving Residual
            Binary Royalties Under the SVRX Licenses. ............................................ 61

E.    Amendment No. 2 Forecloses the Rights Novell Claims Under Section
      4.16(b)....................................................................................................... 64

F.    The Extrinsic Evidence Confirms That Novell Did Not Retain the Rights
      It Claims.................................................................................................... 66

ii

1. Documents Connected with the APA Belie Novell's
Interpretation...................................................................... 66

2. The 1996 IBM Buyout Belies Novell's Newly Conceived Claim
of Rights Under Section 4.16(b). ............................................. 68

3. Novell's Other Conduct in the Years That Followed the APA
Also Belies Its New Interpretation of Section 4.16(b)................. 74

II. NOVELL'S MOTION ALSO FAILS FOR NOVELL'S BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING UNDER
CALIFORNIA LAW. ...................................................................... 76

CONCLUSION................................................................................. 80

## TABLE OF AUTHORITIES

### Cases

Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,
        5 Cal. 4th 854 (Cal. Ct. App. 1993) ................................................................ 50

Bionghi v. Metro. Water Dist. of So. Cal.,
        70 Cal. App. 4th 1358 (1999) ...................................................................... 46

Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co.,
        214 F.3d 1183 (10th Cir. 2000) ................................................................... 43

Boyer v. Bd. of County Comm'rs of Johnson County,
        922 F. Supp. 476 (D. Kan. 1996) ................................................................. 43

Cal. Sate Auto. Ass'n Inter-Ins. Bur. v. Superior Ct.,
        177 Cal. App. 3d 855 (1986) ....................................................................... 45

Carma Developers, Inc. v. Marathon Dev. Cal., Inc.,
        2 Cal. 4th 342 (1992) ................................................................................ 46

Cooper v. Mart Assocs.,
        225 Cal. App. 2d 108 (1964) ....................................................................... 54

County of Marin v. Assessment Appeals Bd.,
        134 Cal. Rptr. 349 (Ct. App. 1976) ......................................................... 52, 54

Crestview Cemetery Ass'n v. Dieden,
        356 P.2d 171 (Cal. 1960) ....................................................................... 48, 49

David v. City & County of Denver,
        101 F.3d 1344 (10th Cir. 1996) ................................................................... 43

Dore v. Arnold Worldwide, Inc.,
        39 Cal. 4th 384 (2006) .......................................................................... 45, 57

EOTT Energy Corp. v. Storebrand Int'l Ins. Co., A/S,
        45 Cal. App. 4th 565 (Cal. Ct. App. 1996) .................................................... 50

Haggard v. Kimberly Quality Care, Inc.,
       39 Cal. App. 4th 508 (1995) ................................................................. 45, 46

Heidlebaugh v. Miller,
       271 P.2d 557 (Cal. Ct. App. 1954) ................................................................ 53

Hernandez v. Badger Constr. Equip. Co.,
       28 Cal. App. 4th 1791 (1994) ............................................................... 48, 49

Hess v. Ford Motor Co.,
       27 Cal. 4th 516 (2002) ....................................................................... 48

Hicks v. City of Watonga,
       942 F.2d 737 (10th Cir. 1991) ................................................................ 43

Jensen v. Traders & General Ins. Co.,
       52 Cal. 2d 786 (1959) ....................................................................... 46

Kavruck v. Blue Cross of Cal.,
       134 Cal. Rptr. 2d 152 (Cal. App. 2003).......................................................... 54

Kunkel v. Continental Casualty Co.,
       866 F.2d 1269 (10th Cir. 1989) ............................................................... 46

Leo F. Piazza Paving Co. v. Found. Constructors, Inc.,
       128 Cal. App. 3d 583 (Ct. App. 1981)........................................................... 52

Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.,
       76 Cal. App. 3d 886 (1986) .................................................................. 48

Morey v. Vannucci,
       64 Cal. App. 4th 904 (1998) .............................................................. 45, 48

Niederer v. Ferreira,
       189 Cal. App. 3d 1485 (1987) ................................................................ 46

Pac. Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co.,
       69 Cal. 2d 33 (1968) ....................................................................... 45

Parsons v. Bristol Dev. Co.,
    62 Cal. 2d 861 (1965) ................................................................ 48

Ramming v. Barnard,
    No. E030334, 2002 WL 393118 (Cal. Ct. App. Mar. 13, 2002) ..................... 50

Rogers v. United States,
    281 F.3d 1108 (10th Cir. 2002) ..................................................... 43

S. Cal. Edison Co. v. Superior Ct.,
    37 Cal. App. 4th 839 (1995) ..................................................... 48, 49

Shaw v. Regents of the Univ. of Cal.,
    58 Cal App. 4th 44 (1997) ........................................................... 46

Skrbina v. Fleming Cos.,
    45 Cal. App. 4th 1353 (1996) ....................................................... 48

Tahoe National Bank v. Phillips,
    4 Cal. 3d 11 (1971) ................................................................. 44

Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co.,
    128 P.2d 665 (Cal. 1942) ......................................................... 48, 49

Viacao Aerea Sao Paulo, S.A. v. Int'l Lease Fin. Corp.,
    1988 WL 103286 (9th Cir. 1988) ..................................................... 52

Wolf v. Super. Ct.,
    114 Cal. App. 4th 1343 (Cal. Ct. App. 2004) ....................................... 50

World Trade Ctr. Props. v. Hartford Fire Ins. Co.,
    345 F.3d 154 (2d Cir. 2003) ......................................................... 50

**Statutes**

California Civil Code § 1638 .............................................................. 45

California Civil Code § 1639 .............................................................. 45

California Civil Code § 1647 .............................................................. 45

California Civil Code §1641 ................................................................................. 45

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 56(f) ................................................................. 76

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this memorandum in opposition to the Motion of Defendant/Counterclaim-Plaintiff, Novell, Inc. ("Novell"), for Partial Summary Judgment on its Fourth Counterclaim, and in support of SCO's Cross Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In again seeking partial summary judgment on its interpretation of the agreements at issue, Novell again has it exactly backwards. Neither the plain language of the agreements nor any extrinsic evidence supports Novell's claim of the authority to waive, or direct SCO to waive, SCO's rights with respect to IBM's and Sequent's source code agreements. As a matter of plain language, these agreements are not listed as UNIX System V ("SVRX") licenses, are not in fact themselves SVRX licenses, and were transferred to SCO's predecessor-in-interest The Santa Cruz Operations, Inc. ("Santa Cruz") in an entirely different section of the Schedule of transferred assets.

Moreover, Novell's interpretation would have given Novell rights to completely frustrate Santa Cruz's operation of the business it bought, contrary to the stated purpose of the Asset Purchase Agreement between Novell and Santa Cruz ("APA") to transfer the entire business to Santa Cruz, and in derogation of the well-established rule that a court not interpret a contract so as to defeat the whole purpose of the transaction. Novell's interpretation also is clearly prohibited by Amendment No. 2 to the APA, which provides that Novell was not authorized to "prevent SCO from exercising its rights with respect to SVRX source code in accordance with" the APA. Finally, the testimony of principals involved in the transaction on both the Santa Cruz and Novell sides proves that Novell's interpretation is simply not what was intended by either

party. Accordingly, as with Novell's previous motion,[1] the Court should deny Novell's motion and enter summary judgment for SCO.

Under the APA, Santa Cruz acquired from Novell, in Novell's words, the entire UNIX business "lock, stock and barrel." SCO has shown in opposition to Novell's previous motion for summary judgment, and in support of SCO's cross-motion for summary judgment, that Novell retained a financial stake only in the binary royalties paid under the existing SVRX licenses. The corollary to that interest, as the logical reading of the APA and the uncontroverted extrinsic evidence shows, was Novell's limited right under Section 4.16(b) of the APA to preclude SCO from taking steps to interfere with that binary-royalty stream.

In now asserting an unfettered right to direct SCO to waive any of its rights under the UNIX agreements that Santa Cruz had acquired and to require Novell's approval of any new UNIX-related agreement, Novell fails entirely to reconcile (1) the internal provisions of the APA, (2) the agreements the parties negotiated concurrently with the APA, (3) the amendments to the APA, the parties' course of performance, and (4) the uncontroverted testimony of the people who negotiated the APA. Section 1.1 and Schedule 1.1(a) of the APA, for example, grant SCO "All rights and ownership of UNIX and UnixWare including but not limited to" the "source code" to the "UNIX Source Code Products." If Novell had the right to change or cancel any of the terms of the SVRX software agreements, such a right would have nullified the express asset-transfer provision. Similarly, under Section 4.16(c), Novell agreed that "immediately following the Closing Date, neither it, nor any of its officers, directors or employees shall . . . take any

---

[1] While SCO has made this Memorandum and its attachments a self-contained and complete response, because of the similarity in the issues, SCO incorporates by reference its memoranda and exhibits filed in opposition to Novell's Motion for Partial Summary Judgment or Preliminary Injunction.

material action designed to promote the sale of SVRX products." If Section 4.16(b) were as broad as Novell contends, then Novell purportedly could have directed Santa Cruz to amend or modify its SVRX licenses in any of several ways to promote the sale of SVRX products.

Novell's reading also renders meaningless the Technology License Agreement ("TLA") that the parties entered into contemporaneously with the execution of the APA. As Section 1.6 of the APA contemplated, the TLA effected a "license back" to Novell of the right to use (among other things) the UNIX System V source code. Under the TLA, Novell was permitted to use the licensed code only for internal purposes and only in bundled products (and then only to the extent that no material part of the bundled product competed with SCO's UnixWare business). Under Novell's interpretation of Section 4.16(b), however, Novell would have the right to waive even its own strict obligations with respect to SVRX code under the TLA. By waiving such obligations, Novell could have given itself the right to continue its UNIX business in competition with SCO, effectively nullifying yet another fundamental purpose of the APA.

Novell's argument also flatly conflicts with the parties' conduct in connection with the buyout of IBM's binary-royalty obligations in Amendment No. X and with the concomitant execution of Amendment No. 2 to the APA. After the execution of the APA, a Novell executive named Larry Bouffard, relying on Section 4.16(b), purported to enter into a buyout by IBM of IBM's binary-royalty obligations "on behalf of" Santa Cruz. Santa Cruz objected, and the three parties subsequently entered into an Amendment No. X to IBM's UNIX agreements. If Novell's rights under Section 4.16(b) were as broad as Novell now asserts, Amendment No. X would not have been necessary, let alone negotiated and executed. Indeed, in conjunction with Amendment No. X, Novell and Santa Cruz entered into Amendment No. 2 to the APA. Mr. Bouffard

3

confirms that the parties did so "to preclude Novell from undertaking the precise type of unilateral conduct with respect to the UNIX license agreements that I had undertaken with respect to the IBM-Novell buyout." Amendment No. 2 in fact expressly states that "Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement." Novell's interpretation renders that language meaningless.

The uncontroverted witness testimony regarding the parties' intent under the APA further supports SCO's interpretation, and completely rejects Novell's. The sworn testimony of Novell's chief negotiator, of Santa Cruz's chief negotiator and his support team, of Novell's senior executive overseeing Novell's negotiation of the APA, and of Santa Cruz's CEO overseeing Santa Cruz's negotiation of the APA are all in accord: Novell did not have the right to direct SCO to waive any of its rights under the SVRX licenses, but rather could do so only to protect Novell's binary-royalty stream. Santa Cruz did not need Novell's approval to enter into new UNIX licenses. In the absence of a binary-royalty stream, moreover, Novell lacked any waiver rights at all.

Finally, Novell's request for summary judgment is improper under California law regarding the covenant of good faith and fair dealing. Under that law, Novell's attempt to have this Court declare that the APA grants it unilateral discretionary power to waive any or all of SCO's rights under an SVRX license fails, because it has not remotely demonstrated its compliance with the covenant. Novell's undisputed close Linux partnership with IBM, for example, raises the possibility that Novell's motives in re-interpreting the APA were improper.

SCO respectfully submits, for the reasons set forth above and below, that the Court should deny Novell's motion for partial summary judgment and grant SCO's cross-motion for partial summary judgment.

## STATEMENT OF FACTS

**I.    NOVELL SOLD THE ENTIRE UNIX BUSINESS TO SANTA CRUZ UNDER THE APA.**

1.    In early 1995, about two years after acquiring the UNIX and UnixWare business, Novell decided to sell that business to focus on its flagship product Netware, cut costs, and increase shareholder values. (Ex. 1 ¶ 4.) Through the APA, Novell transferred the business to Santa Cruz. (Ex. 3, Recital A, 1.1(a).)

2.    Novell, like all of AT&T's successors to the UNIX business, used a combination of agreements in its relationship with its licensees. Those agreements included the Software Agreement, which set forth the rights and obligations for the use of products the licensee might license; the Sublicensing Agreement, which set for general rights and obligations for the licensee's distributions in binary form of products developed based on any licensed product; and the Product Supplement, which was the actual license to a particular product. Novell used this combination of agreements in licensing its UNIX System V ("SVRX"), UnixWare, and Tuxedo Documenter's Workbench ("DWB") technologies.

3.    Santa Cruz was itself an SVRX licensee prior to its acquisition of the UNIX and UnixWare business from Novell. (Ex. 2 at 6.)

5

A.     The APA Plainly Transfers the UNIX and
       UnixWare Business to Santa Cruz.

4.     Paragraph 9.8 of the APA provides that the APA "shall be governed by and
construed in accordance with the laws of the state of California." (Ex. 3.) Novell and Santa Cruz
intended for the APA to transfer all of the UNIX and UnixWare business to Santa Cruz. Section
1.3(a)(i) of the APA states:

> It is the intent of parties hereto that all of the Business and all of
> Seller's backlog, if any, relating to the Business be transferred to
> Buyer.

(Ex. 3 § 1.3(a)(i).)

5.     The first provision of the APA, Recital A as amended, defines the business that
Novell transferred to Santa Cruz:

> Seller is engaged in the business of developing a line of software
> products currently known as UNIX and UnixWare, the sale of binary
> and source code licenses to various versions of UNIX and
> UnixWare, the support of such products and the sale of other
> products ("Auxiliary Products") which are directly related to Unix
> and UnixWare (collectively, the "Business").

(Id. at 1.)

6.     The second provision of the APA, Recital B, memorialized the parties' mutual
understanding that the APA transferred the assets and liabilities of the Business:

> The Board of Directors of each Seller and Buyer believe it is in the
> best interests of each company and their respective stockholders that
> Buyer acquire certain of the assets of, and assume certain of the
> liabilities of Seller comprising the Business (the "Acquisition").

6

7.    Article I of the APA, entitled "THE ACQUISITION," sets forth the provisions that effectuated the Acquisition. Section 1.1 describes the assets transferred to Santa Cruz, and Section 1.2 sets forth the payments to Novell. (Id. § 1.2.)

8.    Section 1.1(a) of the APA describes the assets pertaining to the transferred Business as:

> [A]ll of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a) hereto.

(Id. §1.1.)

9.    Schedule 1.1(a), in turn, identifies seven categories of "assets and properties of Seller relating to the Business" transferred to Santa Cruz.

10.    Item I of Schedule 1.1(a) identifies:

> All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, including source code, source documentation, source listings and annotations, appropriate engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include without limitation the following:

(Id. Schedule 1.1, Item I.)

11.    Item II of Schedule 1.1(a) identifies:

> All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business

(Id. Schedule 1.1, Item II.)

12.    Item III of Schedule 1.1(a) identifies:

> All of Seller's rights pertaining to UNIX and UnixWare under any
> software development contracts, licenses and any other contracts to
> which Seller is a party or by which it is bound and which pertain to
> the Business (to the extent that such contracts are assignable),
> including without limitation:

(Id. Schedule 1.1, Item III.)

13.    Item III then lists fourteen categories of transferred contracts. (Id. Schedule 1.1,

Items III.A.-III.N.) Item III.L. expressly includes the "Software and Sublicensing Agreements"

among such contracts:

> Software and Sublicensing Agreements – This includes the source and
> sublicensing agreements that Seller has with OEM, End User and
> Educational customers. The total number of these agreements is
> approximately 30,000.

(Id. Schedule 1.1, Item III.L.)

14.    Separately, Item VI of Schedule 1.1(a) identifies: "All contracts relating to the

SVRX Licenses and Auxiliary Product Licenses (collectively 'SVRX Licenses') listed below:"

(Id. Schedule 1.1, Item IV.) But Item VI then lists SVRX products, not licenses.

15.    Section 1.1(b) of the APA defined the liabilities and obligations assumed by Santa

Cruz at the Closing as "those obligations and liabilities of Seller set forth in Schedule 1.1(c)

hereto (collectively, the 'Assumed Liabilities')." (Id. §1.1(b).) Schedule 1.1(c), in turn,

identified three categories of liabilities assumed by Santa Cruz, including "All obligations,

whether existing on the date hereof or arising hereafter, under the assigned contracts listed on

Schedule 1.1(a)." (Id. § 1.1(b); Schedule 1.1(c).)

8

    B.    Payment for the Business Included the
        <u>Residual SVRX Binary Royalties.</u>

    16.    Section 1.2 provided for the "Payments" to Novell. Specifically, Section 1.2(a)

provided that Santa Cruz would assume the "Assumed Liabilities" and issue 6,127,500 shares of

common stock to Novell, "as full payment for the transfer of the Assets by Seller to Buyer."

(Ex. 3 (emphasis added).)

    17.    Section 1.2(b) provided that Novell also retained an equitable majority interest in

the SVRX Royalties at issue in this litigation:

> Except as otherwise provided in paragraph (e) of this Section 1.2,
> Buyer agrees to collect and pass through to Seller one hundred
> percent (100%) of the SVRX Royalties as defined and described in
> Section 4.16 hereof. Seller agrees to pay Buyer an administrative
> fee of five percent (5%) of the SVRX Royalties. Seller and Buyer
> further acknowledge and agree that Seller is retaining all right to the
> SVRX Royalties notwithstanding the transfer of SVRX Licenses to
> Buyer pursuant hereto, and that Buyer only has a legal title and not
> an equitable interest in such royalties within the meaning of Section
> 541(d) of the Bankruptcy Code. For the purposes of administering
> the collection of SVRX Royalties, the parties acknowledge that the
> royalties shall continue to be recognized as royalties by Seller on an
> ongoing basis and the parties shall take such commercially
> reasonable steps as may be necessary to effectuate the foregoing for
> financial accounting and tax purposes.

(<u>Id.</u> §1.2(b).)

    18.    Novell acknowledges (at 3) that the parties agreed to Novell's continued interest

in the SVRX Royalties to bridge the gap between the price Novell deemed appropriate for the

Business, including the SVRX Royalties, and the price that Santa Cruz was willing to pay. As

Duff Thompson, the Novell senior executive who was the architect of the transaction, explains,

referring to communications with Santa Cruz's CEO at the time, Alok Mohan:

Early in the process I informed Mr. Mohan that we were selling the entire UNIX business and all related assets. I wanted to be very clear to him as we were asking for a substantial sum for the sale. We continued to inform Santa Cruz that it was buying the entire UNIX business and assets, except as explained below.

During the course of the negotiations, it became clear that Santa Cruz could not afford to pay for the purchase price we were requesting, so various ways were explored to make it possible for Santa Cruz to make the purchase. The solution was that Novell would retain an interest in the binary royalty stream from the existing SVRX sub-licenses.

(Ex. 1 ¶¶ 6-7.)

19.    Ed Chatlos, the lead APA negotiator for Novell, states:

This binary royalty interest that Novell retained was simply a means to lower the purchase price to SCO. Novell had no interest in continuing in the UNIX business at all, and if Santa Cruz could have paid the full purchase price originally proposed by Novell, Novell would not have retained the binary royalty stream. In that context, it is clear and easy to understand that it was the intent of the APA and Amendment No. 1 that Novell retained rights to protect that existing royalty stream, but other than the limited interest in UNIX that Novell retained under the Technology License Agreement for use with NetWare, there was no other reason or interest for Novell to have broader rights relative to the UNIX business and assets its sold Santa Cruz.

(Ex. 4 ¶ 5.)

20.    Steve Sabbath, who was General Counsel for Santa Cruz and oversaw its

negotiation of the APA and its Amendments, states:

Based on my involvement with the APA, I understand that the parties' intent and purpose in executing the APA was to transfer to Santa Cruz Novell's entire UNIX-related business, including all rights to UNIX and UnixWare and the UNIX copyrights; that the parties agreed to permit Novell to retain an interest in future System V binary royalties to enable SCO to afford the asset purchase; and

10

> that the parties never intended to give Novell any right with respect
> to any of Santa Cruz's future source code interests in UNIX and
> UnixWare, including under the SVRX licenses.

(Ex. 18 ¶ 4.)

21.     Jim Wilt, the chief negotiator for Santa Cruz, states in reference to Santa Cruz's

founder and senior executive Doug Michels:

> During the discussions, SCO made clear to Novell that SCO could
> not afford a direct purchase of the complete UNIX and UnixWare
> business, in light of the price being asked for the entire business.
> Mr. Michels proposed the idea of reducing the proposed purchase
> price by permitting Novell to retain certain binary royalty payments
> under certain UNIX licenses.
>
> It was my understanding and intent during those negotiations that
> SCO would acquire Novell's entire UNIX and UnixWare business
> including the copyrights. I do not recall, and do not believe that
> there ever was, any instance in which anyone at SCO or Novell ever
> stated or exhibited any contrary intent or understanding to me or
> anyone else.

(Ex. 5 ¶¶ 6, 8.)

22.     Kimberlee Madsen, who assisted Mr. Wilt in the negotiations, states:

> This binary royalty interest that Novell retained was simply a means
> to lower the purchase price to SCO. My understanding was that
> Novell had no interest in continuing in the UNIX business at all, and
> if Santa Cruz could have paid the full purchase price originally
> proposed by Novell, Novell would not have retained the binary
> royalty stream or any rights to protect that royalty stream.

(Ex. 6 ¶ 7.)

23.     Doug Michels, founder of Santa Cruz and its CEO after Mr. Mohan, states he has

reviewed and agrees with the foregoing statements by Mr. Wilt and Ms. Madsen. (Ex. 2.)

11

24.     Other than in Section 1.2(b), there is no mention of the terms "SVRX Royalties" or "SVRX Licenses" anywhere in Article I of the APA. Indeed, the only other place in the body of the APA where those terms are mentioned is Section 4.16, the provision that Novell invokes in this Motion for its purported waiver rights. Section 4.16 is found on page twenty-four of the APA, in Article IV, which is entitled "CERTAIN COVENANTS." (Ex. 3 § 4.16.)

## II.    NOVELL'S PROPOSED INTERPRETATION CANNOT BE RECONCILED WITH THE LANGUAGE AND PURPOSE OF THE APA.

### A.    The Term "SVRX Licenses" Is Undefined and Ambiguous.

25.     As noted, Section 1.2(b) identifies the SVRX Royalties as those "defined and described in Section 4.16 hereof." Section 4.16(a) sets forth that definition and description, stating in pertinent part (brackets in original):

> Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under the SVRX Licenses (<u>as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties:"</u>). Within one (1) calendar month following the each calendar month in which SVRX royalties (and royalties from Royalty-Bearing products) are received by Buyer [except for those SVRX Royalties to be retained in their entirety by Buyer pursuant to paragraph (c) of Section 1.2 hereof] Buyer shall remit 100% of all such royalties to Seller or Seller's assignee.

(<u>Id.</u> § 4.16(a) (emphasis added).)

26.     In turn, the introductory sentence of Item VI of Schedule 1.1(a), as amended by Amendment No. 1 to the APA, identifies among the assets of the transferred Business:

> All contracts relating to the SVRX Licenses and Auxiliary Product Licenses (collectively "SVRX Licenses") <u>listed below</u>:

(<u>Id.</u> Schedule 1.1(a) (emphasis added).)

12

27.    Item VI, however, does not list licenses.  Instead, it lists twenty SVRX products and identifies six categories of additional SVRX products.  Similarly, Attachment A, which is incorporated into Item VI by Item VI by Amendment No. 1 and which is entitled "Listing of Auxiliary Products," lists products, but not licenses.

28.    The APA expressly transferred the SVRX Software and Sublicensing Agreements, including the IBM agreements at issue, through Item III, an entirely separately provision of Schedule 1.1(a), which states:

> Software and Sublicensing Agreements – This includes the source and sublicensing agreements that Seller has with OEM, End User and Educational customers.  The total number of these agreements is approximately 30,000.

B.    Novell's Interpretation Conflicts with
      The Language and Purpose of the APA.

29.    Novell claim its rights of waiver are found in the plain language of Section 4.16(b), which states in pertinent part:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby granted, the rights to take any action on Buyer's own behalf.

(Id. § 4.16(b).)

30.    Novell claims that this provision permits it to amend, supplement, modify, waive, or assign any of SCO's rights under the numerous Software and Sublicensing Agreements with

13

its licensees, all at Novell's "sole discretion." The very next provision in the APA, however, states:

> Seller further covenants that immediately following the Closing Date neither it, nor any of its officers, directors or employees shall (i) take any material action designed to promote the sale of SVRX products or (ii) provide material compensation to any employee designed and intended to incentivize such employee to promote the sale of SVRX products, except for actions incidental to unrelated business activities of Seller.

(Id. § 4.16(c).)

     31.    Novell's interpretation would permit it to negate its express intent and purpose to transfer the defined Business as set forth in these unambiguous provisions:

- Recital A expressly defines the Business sold to SCO as "developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ('Auxiliary Products') which are directly related to Unix and UnixWare (collectively, the 'Business')." (Id. at 1.)

- Section 1.3(a)(i) states that the parties' intended that "all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer." (Ex. 3 § 1.3(a)(i).)

- Recital B states that parties believed that it was in their best interest for Novell to sell its assets and liabilities "comprising the Business."

     32.    Novell's interpretation would also permit it to waive SCO's licensing rights notwithstanding the following unambiguous provisions:

- Section 1.1 and Schedule 1.1(a) grant to SCO "all right, title and interest in and to" and all "rights and ownership of UNIX and UnixWare including but not limited to" the "source code" to the "UNIX Source Code Products" (including UNIX System Five and all prior and subsequent UNIX and UnixWare products).

- Section 1.3(a)(i) states that it was parties' intent "that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer."

- Schedule 1.1(a) grants SCO "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business."

33.    The APA expressly provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the "Licensed Technology"). (Ex. 3 § 1.6.)  On the closing date of the APA, the parties signed a Technology License Agreement (the "TLA") to that end.  In a section entitled "Ownership," the TLA states:

> As between Novell and SCO:
>
> (1)  Ownership of Licensed Technology shall reside in SCO.
>
> (2)  Ownership of any modifications made to Licensed Technology pursuant to the licenses specified in Section II above shall reside in Novell.

(Ex. 7 (emphasis added).)

34.    In addition, the TLA imposed several strict limitations on Novell's use of the Licensed Technology, including the condition that Novell not use the technology in a general-purpose operating system in competition with Santa Cruz.  (Ex. 7.)

35.    The TLA plainly "relates to" the SVRX products listed in Item VI of the APA. Under Novell's interpretation, therefore, the TLA is also an "SVRX License."

15

C.    Novell's Section 4.16(b) Rights Are Limited to Protecting the
<u>Royalties Under the Transferred SVRX Product Supplements</u>.

    1.  The Language and Extrinsic Evidence Show That the
<u>SVRX Product Supplements Are the SVRX Licenses</u>.

36.    Novell argues (at 22) that its interpretation turns on its definition of the term
"SVRX Licenses." SCO has shown why that definition not only finds no support in the
ambiguous language of Sections 4.16(a) and Item VI that purportedly defines the term, but also
that the definition conflicts with the Agreement.

37.    In contrast, a definition that limits the term to the SVRX Product Supplements
that actually licensed the SVRX Products listed in Item VI is consistent with the APA. Thus,
even if the list in Item VI were read to identify the "SVRX Licenses" for those products, that
reading would still exclude the Software and Sublicensing Agreements from the term, for the
following reasons.

- Section 4.16(a) describes the SVRX Royalties as "all royalties, fees and other
amounts due under the SVRX Licenses (as listed in detail under item VI of
Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties)." Under the
long-standing licensing practices of AT&T and all its successors, the only
agreements "under" which "royalties, fee and other amounts" could be "due" were
the Product Supplements. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)
Indeed, Novell and Santa Cruz maintained such financial information by product,
and after the closing, Santa Cruz reported that information to Novell by product.
(Ex. 52 ¶ 8) No monies were due or reported under Software or Sublicensing
Agreements. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

- Section 1.2(e)(iv) provided that, notwithstanding its obligation to remit to Novell
the SVRX Royalties due under the SVRX Licenses, Santa Cruz could keep royalties
due prior to the APA under "its own licenses from Seller acquired before the
Closing Date through Software Agreement No. SOFT-000302 and Sublicensing
Agreement No. SUB-000302A." (Ex. 49 (emphasis added).) Section 1.2(e)(iv)
thus expressly identifies the multiple "licenses" that Santa Cruz had acquired prior
to the APA "through" its Software Agreement and Sublicensing Agreements. The

only such licenses to which "royalties" could be "attributable" were the SVRX Product Supplements that Santa Cruz had executed.

- Recital A of the APA defined the transferred Business as follows the development of "a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the 'Business')." (Ex. 3, Recital A (emphasis added).)  The only agreements that licensed "the various versions of UNIX and UnixWare," the "products currently known as UNIX and UnixWare," or the "Auxiliary Products" were the Product Supplements for such versions or products.  The only "source and binary licenses" that were for "sale" were the Product Supplements, which identified the licensed product and fees and gave rise to a payment obligation. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

- The APA expressly transferred the SVRX Software and Sublicensing Agreements, including "all of Seller's rights," through Item III, an entirely separate provision in Schedule 1.1(a).

38.    Novell, like AT&T and its other successors, used a combination of agreements in licensing its SVRX technology, including the Software Agreement, the Sublicensing Agreement, and the various Product Supplements.  (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)  Of these, the only agreement that licensed the products listed in Item VI of the Schedule 1.1(a) were the Product Supplements for each product.  (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) The Software and Sublicensing Agreements did not even mention, much less grant a license to, any specific product listed in Item VI.  (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

39.    The Software Agreement set forth rights and obligations for a licensee's internal use of the unidentified "LICENSED PRODUCT" that the licensee might choose to license under a Supplement, whether that product was an SVRX, UnixWare, Tuxedo, or DWB product.  (Ex. 35 at 89-90; Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)  Similarly, the Sublicensing Agreement set forth rights and obligations for the distribution in binary form of products based

17

on any product the licensee might choose to license under a Supplement. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

40.    That is, the Software and Sublicensing Agreements were not unique to UNIX products. NCR Corporation, for example, executed its Software Agreement with AT&T on August 1, 1984. (Ex. 35 at 89.) Thereafter, NCR executed a Sublicensing Agreement on June 25, 1987 and numerous Product Supplements for SVRX, UnixWare, and DWB products. (Id. at 89-90.) During the time that Novell owned the Business, NCR executed the Supplements for SVR 4.2MP, on March 30, 1993, and UnixWare 1.1, on July 13, 1995. (Id. at 90.) After Santa Cruz acquired the Business, NCR executed the Supplement for UnixWare 2.1 on Mar 31, 1997. (Id.)

41.    Unlike the Software and Sublicensing agreements, the Product Supplements included a Schedule for the licensed product, and for that reason was sometimes referred to as the Schedule in the licensing groups at AT&T and all its successors, including Novell and Santa Cruz. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) Those groups, in fact, used the terms "Supplement," "Schedule," and "license" interchangeably. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) Those groups considered the Supplements to be the licenses to the products, including the SVRX products listed in Item VI of Schedule 1.1(a). (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

42.    The Schedule listed the source-code "right-to-use fees," the "sublicensing fees," and the "per-copy distribution fees" due for the use and distribution of the licensed product or its derivative. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) In contrast, Software and Sublicensing agreements did not identify any royalties, fees, or other amounts, or even give rise

18

to any payment obligation. (Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) No payments were due under any Software Agreement or Sublicensing Agreement.

>    2.    Novell Retained Only the Right to Continue Receiving
>           Residual Binary Royalties Under the SVRX Licenses.

43.    In its opposition to Novell's motion for summary judgment or preliminary injunction, SCO sets forth textual and extrinsic evidence showing that the term "SVRX Licenses" refers only to then-existing Product Supplements. Such evidence includes:

- Section 4.16(b) and Item VI both identify the SVRX Licenses as those actually "listed in detail" or "listed" under Item VI. (Ex. 3.)

- Section 1.2(b) provided that "Seller and Buyer further acknowledge and agree that Seller is retaining all right to the SVRX Royalties notwithstanding the transfer of SVRX Licenses to Buyer pursuant" to the APA." (Id. (emphasis added).)

- Nothing in the APA even suggests that the parties intended for Novell to have an interest in any future SVRX license. (Id.)

- In identifying the SVRX Royalties, Novell's 1995 Annual Report explained that "Novell will continue to receive revenue from existing licenses for older versions of UNIX System source code." (Ex. 43 (emphasis added).)

- Novell's 1996 Annual Report and Quarterly Reports described the SVRX Royalties using that same language verbatim. (Ex. 44; Ex. 45; Ex. 46; Ex. 47.)

- On October 18, 1995, Larry Bouffard, Novell's Worldwide Sales Director for UNIX Products, explained in an internal email that Santa Cruz had purchased the UNIX source code business "lock, stock and barrel." Mr. Bouffard further explained that "Once the transaction is closed (Nov.-Dec.) we will have no more involvement with this business. Therefor [sic], if a contract is for UnixWare or UNIX, it will be SCO's." (Ex. 12 (emphasis added).)

- The sworn statements from the Mr. Chatlos, the lead negotiator for Novell; Mr. Wilt, the chief negotiator for Santa Cruz; Ms. Madsen, who assisted Mr. Wilt; Mr. Thompson, the Novell senior executive personally charged with overseeing the transaction; and several other witnesses familiar with the intent and performance of the APA. (Ex. 1; Ex. 4; Ex. 6; Ex. 48.)

- Documentary evidence, including the letter dated April 23, 1996, from Santa Cruz CEO Alok Mohan to Novell CEO Robert Frankenberg, in which Mr. Mohan explained that the APA "provided for Novell to receive the residual royalties from the in-place SVRX license stream." (Ex. 25 (emphasis added).)

44.    Because the Software and Sublicensing Agreements set forth the rights and obligations for the licensee's use of a software product it might choose to license, the Product Supplements only identified the product the licensee had a right to use and the CPUs on which it had that right, and the fees the licensor had a right to receive in exchange. (See Ex. 53; Ex. 54.) The only rights the licensor had in the Supplements were in the payment of the scheduled fees. (See Ex.53; Ex. 54.)

45.    Upon execution of the Product Supplement, licensees received the product and were obligated to pay the scheduled one-time source license fee, the fees for designated CPUs, and the one-time sublicensing fee (if any). (See Ex. 53; Ex. 54; Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) As all these fees were paid up-front, at the transfer of the Business in 1996, Novell had already collected such fees due under the SVRX Licenses. (See Ex.53; Ex. 54; Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.) Novell had also been paid the per-copy fees, or royalties, for each licensee's distribution to that point of binary copies of its SVRX-derived product. (See Ex.53; Ex. 54; Ex. 34 ¶¶ 11-15; Ex. 51 ¶¶ 10-14; Ex. 50 ¶¶ 13-17.)

46.    The only fees that could be paid under the SVRX Licenses after the day of the APA were (1) the source fees for any additional distributions (that is, copies) of the source code or for its use on any additional CPUs, and (2) the continuing binary royalties from the ongoing distribution of binary products. Section 1.2(e) expressly provided that Santa Cruz need not remit to Novell the first category. (Ex. 49 § 1.2(e)(ii).) Thus, the only payments that Novell could receive under the SVRX Licenses were the second category, the residual binary royalties. Even

20

within this remaining category, however, Section 1.2(e) provided that Santa Cruz could keep the binary royalties it paid prior to the APA under its "own licenses with from" Novell. (Id. § 1.2(e)(ii).)

47.     After the Closing Date, the only unpaid sums under the SVRX Licenses were any per-copy fees to be paid by other current SVRX licensees for their ongoing distribution of binary products. As the SVRX Licenses did not provide for rights in the licensor other than the right to be paid the various fees, the only Novell "rights" remaining in the SVRX Licenses were the rights to continue receiving the binary royalties.

48.     Mr. Chatlos, Mr. Wilt, and Ms. Madsen believe that the only exception to the transfer of the entire Business was Novell's right to continue receiving the "binary royalties paid under existing agreements pursuant to which" SVRX licensees "were paying such royalties." (Ex. 4; Ex. 6; Ex. 48.)

49.     Mr. Murphy, Mr. Broderick, and Mr. Maciaszek, who for decades (including their time at Novell), worked on the licensing of UNIX products, all agree that the Product Supplements were "the licenses for individual UNIX or UnixWare products." (Ex. 34; Ex. 50; Ex. 51.)

C.     Amendment No. 2 Forecloses Novell's
        Interpretation of Section 4.16(b).

50.     Even if the term "SVRX Licenses" included the Software Agreements and Sublicensing Agreements, Amendment No. 2 makes clear that Novell's rights under 4.16(b) do not extend to source code licensing. Paragraph B of Amendment No. 2 provides:

> Except as provided in Section C below, and notwithstanding the
> provisions of Article 4.16, Sections (b) and (c) of the Agreement,
> any potential transaction with an SVRX licensee which concerns a

21

buy-out of any such licensee's royalty obligations shall be managed
as follows:

(Ex. 8.)

51.    Subparagraph B.5 then provided:

This Amendment does not give Novell the right to increase any
SVRX licensee's rights to SVRX source code, nor does it give
Novell the right to grant new SVRX source code licenses. In
addition, Novell may not prevent SCO from exercising its rights
with respect to SVRX source code in accordance with the
Agreement.

(Ex. 8.)

52.    The rights SCO asserts against IBM relate to its use and disclosure of source code

under its Software and Sublicensing Agreements. (Ex. 9.)

## III.    THE EXTRINSIC EVIDENCE DEFEATS NOVELL'S INTERPRETATION.

53.    The extrinsic evidence, including the sworn statements of key witnesses,

consistently and unequivocally confirms that Novell transferred the entire UNIX and UnixWare

business and, under Section 4.16(b), retained only the right to continue to receive and protect the

existing SVRX binary royalty stream.

### A.    Documents Connected with the APA Belie
### Novell's Interpretation of Section 4.16(b).

54.    In its 1995 Annual Report, its 1996 Annual Report, and its 1996 Quarterly

Reports, Novell described the rights it retained as payments under the APA:

Under the agreement, Novell received approximately 6.1 million
shares of SCO common stock, resulting in an ownership position of
approximately 17% of the outstanding SCO common stock. The
agreement also calls for Novell to receive a revenue stream from
SCO based on revenue performance of the purchased UnixWare

22