> product line. This revenue stream is not to exceed $84 million net
> present value, and will end by the year 2002. <u>In addition, Novell
> will continue to receive revenue from existing licenses for older
> versions of UNIX System source code.</u>

(Ex. 43-47 (emphasis added.)

      55.      In connection with the APA, the parties signed an Operating Agreement effective

the closing date of the APA, December 6, 1995. Recital B of the Operating Agreement explains

its purpose:

> In connection with the entering into of the Asset Purchase
> Agreement, the Parties deem it to be in their respective best interests
> to provide for an orderly transition of the Business (as such term is
> defined in the Asset Purchase Agreement), and to set out their
> mutual understanding of how that business is to be transferred.

(Ex. 10 Recital B.)

      56.      Paragraph 7 of the Operating Agreement explains:

> It is intent of the Parties to <u>transfer the agreements and associated
> rights and obligations</u> which relate to Novell's UNIX System
> business to SCO. Novell will use commercially reasonable efforts to
> assist SCO in effecting such transfers or, if not transferable, to assist
> in finding alternative solutions.

(<u>Id.</u> ¶ 7 (emphasis added).)

      57.      The Operating Agreement makes no mention of 4.16(b), let alone any purported

rights thereunder qualifying or limiting the "transfer" of "the agreements and associated rights

and obligations which relate to Novell's UNIX System business to SCO."

      58.      Paragraph 5 explains: "The parties have established a transition team to transition

the UNIX System and UnixWare business to SCO. The transition will be completed by February

29, 1996 (the 'Transition Period')." (Ex. 10.) During the Transition Period, the transition team

Dockets.Justia.com

entered into Statements of Work ("SOW"), which were agreements authorizing Novell to

conduct the affairs of the business during the Transition Period. (Ex. 11; Ex. 34.)

59.     The SOW for Legal provided that the Novell legal team would:

> Provide legal counsel and support to the Contract Management and
> Licensing group, to Product Development and to others pertaining to
> the UnixWare and SVRx and any other products and business
> functions acquired by SCO from Novell.

(Ex. 11 at SCO1299953.)

60.     In an email from Novell Senior Product Manager Skip Jonas to other members of

the transition team, Mr. Jonas explained that Novell needed a "delegation" or "agency"

agreement from SCO "in order for the Licensing group to continue their work after the Closing."

He added that the "agreement will protect Novell in the event that there is a dispute about any

contract that was processed by Novell during the transition period." (Ex. 11 at SCO1299952.)

61.     In an email from Novell team member Lou Ackerman to Santa Cruz dated

November 8, 1995, Mr. Ackerman explained the need for a Licensing SOW. (Ex. 11.) "As part

of the transition process of the licensing business to SCO," he explained, "there will be a need to

continue performing functions for SCO until the employees that SCO will recruit are on SCO's

payroll and SCO has the systems in place to support them." (Ex. 11 at SCO1299982.)

62.     Mr. Ackerman then proposed an "SOW for LICENSING & CONTRACT

MANAGEMENT" permitting Novell to: "Act as SCO's worldwide agent for UnixWare (*) and

SVRx (and any other Novell source code products being transferred to SCO) licensing activities

with OEM, Commercial, Government and Educational customers," such delegation to include

"Executing new agreements (including product supplements) with customers" and "Responding

to customer inquiries about the products and transfer of ownership to SCO." (Ex. 11 at

SCO1299982.)

63.    On October 18, 1995, Larry Bouffard, Novell's Worldwide Sales Director for

UNIX Products another participant in the transition team, stated in an internal Novell document:

> We are obligated to give SCO all information, contracts, assets etc.
> pertaining to the UnixWare business and the old UNIX source code
> business. They have bought it lock, stock and barrel. Once the
> transaction is closed (Nov.-Dec.) we will have no more involvement
> with this business. Therefor [sic], if a contract is for UnixWare or
> UNIX, it will be SCO's.

(Ex. 12.)

64.    In an internal email dated December 4, 1995, to other members of the Novell

transition team, including Novell attorney Burt Levine, Mr. Jonas explained:

> As of the Closing Date (now set for 12/6), all UNIX & UW
> agreements transfer to SCO . . . including the Distributor
> Agreements. Novell is out of the UNIX/UW business after the
> Closing and does not have the right to sell UW. So if Novell has any
> inventory of UW after the Closing, I believe that Novell has only 2
> choices: sell it to SCO or destroy it.

(Ex. 13 (emphasis added).)

65.    Novell sent letters to third parties with whom it had contractual relationships

related to the UNIX and UnixWare business. (See e.g., Ex. 14, Ex. 15, Ex. 16.) In those letters,

Novell either notified the third party of, or sought its concurrence to, the assignment of its

respective agreement to Santa Cruz. For example, in a letter to Prentice-Hall regarding its

"Publication Agreement," Novell explained:

> As you may know, Novell transferred to The Santa Cruz Operation,
> Inc. ("SCO") its existing ownership interest in UNIX System-based

offerings and related products as listed in Attachment A of this letter ("collectively "Transferred Products" [sic]).

(Ex. 16.)

66.     This sentence appears verbatim in other letters. (See e.g., Ex. 14, Ex. 15.) Those letters do not qualify Novell's transfer of "its existing ownership interest UNIX-based System-based offerings and related products as listed in Attachment A" to the letter. (See e.g., Ex. 14, Ex. 15.) Moreover, Attachment A of the Prentice-Hall letter identified as the Transferred Products the exact same SVRX products listed in Item VI of Schedule 1.1(a) of the APA. (Ex. 16, Attachment A.)

67.     The letter to Prentice-Hall also stated:

> It makes immeasurably more business sense for SCO, as the owner of the Transferred Products, to handle directly with Prentice-Hall any matters that may become relevant under the subject Agreement. Accordingly, Novell would appreciate Prentice-Hall's concurrence under Section 28 of the subject Agreement, to Novell's assignments of its rights and delegation of any remaining obligations under the subject Agreement insofar as such rights and obligations relate to the Transferred Products, to SCO. Novell represents that SCO has undertaken in writing to assume such obligations.

(Id.) This language also appears verbatim in other letters from Novell.

B.     The 1996 IBM Buyout Also Belies Novell's Interpretation.

68.     On April 26, 1996, less than five months after the closing date of the APA, Novell and IBM entered into an "Amendment" of IBM's UNIX Software Agreement, Sublicensing Agreement, and SVRX 3.2 Product Supplement  Under the purported amendment, Novell, "on behalf of itself and The Santa Cruz Operation," purported to grant IBM a buyout of its SVR 3.2 binary-royalty obligations. (Ex. 17 at 1.)

26

69.     Mr. Bouffard conceived the April 1996 agreement as a way to generate revenue

that Novell needed at the time.  He explains:

> In early 1996, I had occasion to review the language of Section 4.16
> of the APA, and prior to consulting with anyone who had negotiated
> the APA for Novell, came to the conclusion that Section 4.16 as
> written permitted Novell to amend IBM's UNIX license agreements
> to grant IBM a buyout of its UNIX royalty obligations.  I viewed
> Section 4.16 as a way for Novell to generate needed revenue, and I
> thought that the language of Section 4.16 permitted me to enter into
> the buyout with IBM.

> I clearly recall a discussion with Chris Hogan about the language of
> 4.16.  When he saw that I was drafting a proposed buyout between
> IBM and Novell, Chris stated that Santa Cruz would not agree that
> Section 4.16 gave Novell the right to enter into such buyouts or
> otherwise amend or impair the UNIX agreements transferred to
> Santa Cruz under the APA.

(Ex. 19 ¶¶ 31-32.)

70.     On April 4, 1996, Mr. Bouffard wrote to John Maciaszek of Santa Cruz directing

him to prepare a "side letter" granting IBM the buyout.  (Ex. 20 at 1.)  Mr. Bouffard specified

that the side letter should include this "General" provision:

> For payments to Novell totaling $10,125,000 per the payment
> schedule below, Novell will modify IBM's rights and obligations
> under their Master Software License Agreement, Master Sublicense
> Agreement, SVR 2.x and SVR 3.x Source Right to Use Agreements
> and associated Schedules as well as any other agreements necessary,
> to grant IBM the following rights:

(Id.)

71.     Mr. Bouffard's letter then directed Mr. Masciaszek to include provisions granting

IBM a buyout of its royalty obligations and limited additional rights to distribute the source code

to contractors and other SVRX licensees for support purposes.  (Id. at 1-2.)

27

72.    In March 1996, soon after Santa Cruz learned that Novell was offering such buyouts, Santa Cruz CEO Alok Mohan corresponded with Novell CEO Robert Frankenberg to convey Santa Cruz's objections. (Exs. 21-27.) On March 28, 1996, Mr. Mohan wrote:

> It has been brought to my attention that Novell has initiated discussions with a variety of customers to negotiate paid up licenses for SVR-X. I am concerned that such a move would further fragment the Unix world and is not in the best interest of SCO or Novell because it will reduce the incentive for OEMs to move to Unixware. As our two companies had agreed, we want the industry to move to a common Unixware base. A buyout will effectively ensure that they will move to an independent track to SCO and Unixware.

(Ex. 21 at 1.)

73.    On April 10, 1996, Mr. Mohan wrote Mr. Frankenberg "a follow-up" to the March 28 letter, stating:

> Novell's solicitation of fully paid up SVR-X licenses is contrary to the purpose of our transaction, constitutes a breach of our agreement, and will cause great harm to SCO's business.

(Ex. 22 at 1-2.)

74.    On April 19, 1996, Mr. Mohan explained that the "benefit IBM will receive from the buyout as currently proposed is great and is disproportional to the buyout price." (Ex. 23 at 1.) That same day, Mr. Frankenberg explained why, in his view, the "value of this paid up license is indeed proportional to the other paid-up licenses (SCO, SUN, SGI) that have been previously granted." (Ex. 24 at 1.)

75.    In a letter dated April 23, 1996, Mr. Mohan further explained how buyouts undermined Santa Cruz's business:

> When we originally contemplated SCO's purchase of the UnixWare business, one of the primary goals was to drive the conversion of the industry to UnixWare. We modeled the business based on a high percentage of the existing SVRX and SVR4 licenses eventually converting to UnixWare, and to a large extent the valuation we agreed for this business was based on these models. The deal was structured per Novell's stated preference to provide SCO with significant incentives to do everything in its power to accelerate this conversion. <u>The agreement provided for Novell to receive the residual royalties from the in-place SVRX license stream,</u> but SCO was to provide all account management and manage the relationships with the customers in order to further this agreed upon conversion.
>
> I would strongly prefer that we not allow IBM or any other OEM to buyout their SVRX royalties and would request that you instruct your sales force to cease promoting such harmful agreements. In the future if such requests are initiated by OEM's, I would hope our companies could cooperatively respond to them. <u>I do understand that discussions with IBM are quite advanced and, on an exception basis, would be willing to try and accommodate them.</u>

(Ex. 25 at 1 (emphasis added).)

76.    In his correspondence, Mr. Frankenberg also addressed Santa Cruz's concerns about a provision in the proposed buyout granting IBM relief from source-code distribution restrictions in the Sublicensing Agreement. In an April 19 letter, Mr. Frankenberg explained that "no right to sub-license source code is being granted." (Ex. 24 at 1.)

77.    In his letter of April 23, Mr. Mohan responded:

> I am also troubled by the fact that the proposed IBM buyout gives IBM broader rights to the UNIX intellectual property than their current license provides. <u>It is my understanding that our agreements provide SCO with ownership and exclusive rights to license the UNIX source code.</u> The proposed grant of additional source rights and relaxation of the anti-pyramiding provisions, rights which Novell (and formerly USL and AT&T) historically refused to grant to SCO and others at any price, can only be granted directly by SCO.

29

> If IBM requires these rights, I would request that they negotiate
> these directly with us.

(Ex. 25 at 1 (emphasis added.)

78.    In a letter dated April 29, 1996, Mr. Frankenberg did not dispute Santa Cruz's

claim that it had "ownership and exclusive rights to license the UNIX source code." (Ex. 26.)

Instead, Mr. Frankenberg sought to persuade Mr. Mohan that the buyout agreement, which

Novell had executed in the interim, "expressly prohibited such a situation, without any limitation

on the term of this prohibition." (Id.)  Mr. Frankenberg further explained:

> Our intentions have always been, and continue to be, to limit this
> paid up license to only cover IBM's current business model and to
> avoid creating the situations you are concerned may arise.

> *            *            *

> Having addressed your concerns as indicated above, we have
> proceeded with signing the IBM Amendment.

(Id.)

79.    In its letters, Novell did not invoke any rights under Section 4.16(b) of the APA.

(Exs. 21-27.)  The letters do not even mention that provision.

80.    While Mr. Mohan raised Santa Cruz's concerns with Mr. Frankenberg by letter,

Santa Cruz prepared for legal action by drafting a complaint and motion for a preliminary

injunction against Novell.  (See Ex. 63.)  Over the subsequent months, the parties signed and

renewed a stand-still agreement while they negotiated a new amendment to IBM's UNIX

agreements. (Ex. 28.)

81.     On October 16, 1996, Novell and Santa Cruz jointly granted IBM the buyout through Amendment No. X, which expressly replaced the April 1996 agreement between Novell and IBM.  (Ex. 29.)  On the same date, and in conjunction with Amendment No. X, Novell and Santa Cruz also signed two other documents, Amendment No. 2 to the APA and a General Release of Claims Agreement.  (Ex. 8; Ex. 30.)

82.     Section B of Amendment No. 2 specifically addressed Santa Cruz's two objections to the Unilateral Amendment as expressed by Mr. Mohan in his correspondence with Mr. Frankenberg.  (Ex. 8.)

83.     Amendment No. 2 expressly foreclosed the kind of unilateral action Novell had undertaken, by requiring the joint management, participation, and consent of the parties for any future buyout.  Paragraph B.4., for example, explains:

> No such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy.

(Ex. 8 at SCO1451873.)

84.     Paragraph B.5 of Amendment No. 2 clarified that Novell could not expand source code rights even in the relatively minor ways granted in the April 1996 agreement:

> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses.  In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

(Ex. 8 at SCO1451873.)

31

85.     Following on the heels of the thwarted April 1996 agreement, and signed in conjunction with the bilateral Amendment No. X, these provisions clarified that Novell's conduct was not permitted under the APA.  As Mr. Bouffard, who also negotiated Amendment No. X for Novell, explains:

> Novell and Santa Cruz proceeded to negotiate Amendment No. 2 to the APA.  I understood Amendment No. 2 to preclude Novell from undertaking the precise type of unilateral conduct with respect to the UNIX license agreements that I had undertaken with respect to the IBM-Novell buyout.

(Ex. 19.)

86.     The second agreement the parties signed in conjunction with Amendment No. X was the General Release of Claims Agreement.

REDACTED

87.                         REDACTED

32

REDACTED

(Id. (emphasis added).)

88.    Of the $10,125,000 that IBM paid for the buyout of its SVR 3.2 binary royalty

obligations, Novell paid Santa Cruz the 5% administrative fee due under the APA.  (Ex. 36; Ex.

37.)  In addition,                    REDACTED

C.    Witnesses Who Negotiated and Implemented the APA
       Reject Novell's Interpretation of Section 4.16(b).

89.    Duff Thompson, the Novell senior executive who oversaw the sale of the

Business, states:

> During the course of the negotiations, it became clear that Santa
> Cruz could not afford to pay the purchase price we were requesting,
> so various ways were explored to make it possible for Santa Cruz to
> make the purchase.  The solution was that Novell would retain an
> interest in the binary royalty stream from the existing SVRX sub-
> licenses.  It was never suggested or agreed in the negotiation in
> which I participated that Novell would retain the right to receive
> additional royalties or fees from licensing of source code or from
> new sales of SVRX products.  Novell did, however, retain certain
> limited rights to protect that existing SVRX binary royalty stream.
> The responsibility for the collection of those royalties was placed
> upon Santa Cruz because after the closing of the sale, they were to
> own the customer relationships as they had purchased the entire
> business and associated assets.  Since Novell could report this
> ongoing binary royalty stream as profit (keeping in mind that this
> revenue source was simply a mechanism to reduce the upfront
> purchase price for Santa Cruz) it made the sale more attractive and

more easily justified to the Novell shareholders. <u>To the extent</u>
<u>Novell claims it retained rights to waive claims that Santa Cruz or its</u>
<u>successors might have regarding breaches of the System V source</u>
<u>code agreements, this does not comport with the instructions I</u>
<u>received from Robert Frankenberg nor with my recollection of the</u>
<u>negotiations or the agreements; and, is certainly contrary to</u>
<u>discussions I had with representatives of Santa Cruz regarding what</u>
<u>Santa Cruz was buying and what Novell was retaining.</u>  As the
Novell executive charged with the sale of the UNIX business and
assets, it was never my intent or understanding that Novell was
retaining rights to waive breaches of the UNIX System V source
code agreements that may have occurred years after Novell sold
those UNIX source assets to Santa Cruz.

(Ex. 1 ¶ 7 (emphasis added).)

90.    Ed Chatlos, who was appointed by Mr. Thompson as the chief negotiator for

Novell, explains:

Under the APA, Novell received shares of SCO common stock and
other consideration, and retained rights to certain binary product
royalty payments.  SCO acquired all right, title, and interest in and to
the UNIX and UnixWare business, operating system, and source
code.  In the transaction, it was my intent – and to my understanding
was Novell's intent – to sell the entire UNIX business to SCO,
including source code and all associated copyrights.

*                *                *

Paragraph 4.16 of the APA was specifically designed and intended
to protect Novell's retained binary product royalty stream.  Based on
the foregoing, including my understanding of the parties' intent, I do
not believe that Novell has any right to waive, or to direct or require
SCO to waive, any of SCO's source code rights, including under
customer source code licenses.

(Ex. 31 ¶¶ 8, 13.)

91.    Lawrence Bouffard, who was Worldwide Sales Director for UNIX Products at

Novell, states:

34

My understanding is that Novell had sold its UNIX business to Santa Cruz lock, stock and barrel, and that Novell only retained the right to continue receiving binary royalties paid by then-existing UNIX licensees for their distribution of binary products based on their UNIX flavor pursuant to their UNIX sublicensing agreements (the "binary royalty stream").

\*          \*          \*

To clarify, Novell's rights under Section 4.16(b) pertain only to the portion of the UNIX business that Novell retained, namely, the right to continue receiving the binary royalty stream. That is, Novell retained the right to take the actions listed in Section 4.16(b) but only for purposes of protecting its interest in unpaid binary royalties. Novell did not retain the right to waive, modify, revoke, or otherwise impair SCO's rights under the UNIX source code agreements, particularly against a licensee like IBM who previously bought out its royalty obligations.

(Ex. 19 ¶¶ 29, 34.)

92.     Alok Mohan, who was CEO of Santa Cruz, states:

I have reviewed the declaration of Jim Wilt (10/04) and Steve Sabbath (10/04). Their statements comport with my general understanding of and intent regarding the negotiations and transaction between Novell and Santa Cruz during that time period, including the APA, Amendments No. 1 and No. 2, and the Technology License Agreement. To the extent anyone is claiming that Novell retained the UNIX copyrights or that Novell retained the right to waive material breaches of UNIX System V agreements years after the sale to Santa Cruz, such claims are contrary to my understanding, intent and agreement. I would not have agreed to those terms if anyone had suggested that was what Novell was offering.

(Ex. 32 ¶ 4.)

93.     Doug Michels, who founded Santa Cruz and served as its CEO after Mr. Mohan, states:

35

> I have reviewed the declarations of former Santa Cruz employees
> Jim Wilt and Kim Madsen and agree with their explanation of the
> transaction with Novell and other issues.
>
> *          *          *
>
> In connection with the 1995 purchase from Novell, the parties
> agreed that (as is accurately explained by both Mr. Wilt and Ms.
> Madsen) Novell would retain the existing binary royalty stream even
> though the entire UNIX business, source code and related assets,
> including copyrights, were transferred to Santa Cruz. There was no
> intent to grant Novell any right to waive, or to direct or require SCO
> to waive, any of its intellectual property rights or protections
> contained in the UNIX licenses.

(Ex. 2 ¶¶ 5, 9.)

94.    Steve Sabbath, who was General Counsel for Santa Cruz and oversaw its

negotiation of the APA and its Amendments, explains:

> Based on my involvement with the APA, I understand that the
> parties' intent and purpose in executing the APA was to transfer to
> Santa Cruz Novell's entire UNIX-related business, including all
> rights to UNIX and UnixWare and the UNIX copyrights; that the
> parties agreed to permit Novell to retain an interest in future System
> V binary royalties to enable SCO to afford the asset purchase; and
> that the parties never intended to give Novell any right with respect
> to any of Santa Cruz's future source code interests in UNIX and
> UnixWare, including under the SVRX licenses.
>
> I understand that IBM has argued that Section 4.16(b) of the APA
> gave Novell the right to require Santa Cruz to waive any breach of
> the intellectual property protections provided in the SVRX licenses.
> That argument is contrary to the intent of Paragraph 4.16(b) as I
> understood it. Indeed, Santa Cruz would never have agreed to give
> Novell the right under the APA to waive such protections under the
> SVRX licenses because such a right could have eviscerated the
> entire purpose of the APA and the value of the assets transferred to
> Santa Cruz under the APA.

(Ex. 18 ¶¶ 4-5.)

95.   Jim Wilt, the chief negotiator for Santa Cruz, states:

It was my understanding and intent during those negotiations that
SCO would acquire Novell's entire UNIX and UnixWare business
including the copyrights. I do not recall, and do not believe there
ever was, any instance in which anyone at SCO or Novell ever stated
or exhibited any contrary intent or understanding.

Paragraph 4.16 of the APA pertains to the binary royalty income
stream that Novell retained through the APA. The parties agreed to
the language of Paragraph 4.16(b) in order to allow Novell to
manage that royalty stream within the operation of SCO's customer
source code licenses – not at the expense of SCO's right to enforce
its intellectual property protections under any such licenses, and not
to permit Novell to waive any of those protections. I have reviewed
Amendment No. 2 to the APA and believe that the language therein
confirms that intent. In light of my intent, and based on my
understanding of the parties' intent, I do not believe that Novell had
or has any right to waive, or to direct SCO to waive, any of its
intellectual property rights or protections.

(Ex. 5 ¶¶ 8, 10.)

96.   Kim Madsen, who assisted Mr. Wilt in the negotiations, states:

Under the APA, Novell also retained rights to certain binary royalty
payments. That retention of rights allowed Novell to manage that
royalty stream within the operation of Santa Cruz's customer source
code licenses. I did not understand the retention to be at the expense
of Santa Cruz's right to enforce its intellectual property protections
under such licenses or to permit Novell to waive any of those
protections, and I never heard anyone from any negotiation team
suggest otherwise. I do not believe that Novell had any right to
waive, or direct or require Santa Cruz to waive, any of its intellectual
property rights or protections.

(Ex. 33 ¶ 13.)

97.   William Murphy, who was a Contract Manager in the licensing group at all of

Novell's predecessors and successors to the Business, states:

37

Based on my experiences in both companies and the training I received from them regarding the APA, my understanding is that Novell intended to transfer, and Santa Cruz to acquire, the entire UNIX and UnixWare business under the APA. However, because Santa Cruz could not afford the price that Novell asked for the business, the parties agreed that Novell would retain interests in certain royalties.

Specifically, the parties agreed that Novell would retain an interest in the continuing binary royalties paid by licensees under the SVRX licenses to which Novell was a party and that were transferred to Santa Cruz under the APA. That is, the parties agreed that Novell would retain an interest in the per-copy fees that existing SVRX licensees would continue to pay their existing SVRX product supplements for their distribution of binary products based on the licensed SVRX product.

*          *          *

Under Section 4.16(b) of the APA, the parties granted Novell certain rights and imposed on Santa Cruz certain obligations with respect to the SVRX licenses. Novell and Santa Cruz intended for those rights and obligations to protect Novell's interest in the binary royalties due under the transferred SVRX licenses. The parties did not intend for Section 4.16(b) to apply to any other assets or properties transferred to Santa Cruz under the APA.

(Ex. 34 ¶¶ 16-17, 23.)

98.     John Maciaszek, who was a senior engineer at Novell and a member of the Novell transition team; Bill Broderick, who was a member of UNIX licensing group at Novell and who became a member of the Santa Cruz licensing group after the Transition Period; and Jean Acheson, who administered the royalties paid to Novell pursuant to Section 1.2(b) of the APA, also confirm that Novell's Section 4.16(b) rights were limited to the protection of its interest in the residual SVRX binary royalties. (Ex. 5 ¶¶ 19-24; Ex. 50 ¶¶ 22-25; Ex. 52 ¶6.)

38

D.    Novell's Conduct in the Years That Followed the
       APA Also Belies Its Interpretation of Section 4.16(b).

99.    Under an agreement dated January 28, 2000, the parties bilaterally granted HP a

buyout of its SVRX binary royalty obligations for $22 million dollars.  In Paragraph 2 of that

agreement, Novell explained the purpose of that agreement:

> NOVELL retained or has acquired all rights to outstanding and
> future HP binary code royalty and license fee payments, but not
> source code royalties ("HP BINARY ROYALTY
> OBLIGATIONS").  NOVELL hereby warrants that as of
> NOVELL's signature date of this ADDENDUM, as provided below,
> NOVELL has no present, or future or reversionary interest in any
> such source code royalties.  NOVELL hereby warrants that
> NOVELL has full right and authority to modify the terms and
> conditions of the AGREEMENT with respect to the HP BINARY
> ROYALTY OBLIGATIONS.  The purpose of this ADDENDUM is
> to simplify those obligations, as well as corresponding reporting
> obligations.

(Ex. 38 at 1 (emphasis added).)

100.    Prior to its sale of the Business to Santa Cruz, Novell granted Silicon Graphics,

Inc. ("SGI") a buyout of its SVRX binary-royalty obligations.  (Ex. 50 ¶ 41.)  In April 1996,

Cray Research, Inc. ("Cray"), a distinct SVRX licensee, became a subsidiary of SGI.  (Id.)  In

1997, Cray stated it intended to operate under the SGI buyout.  (Id.)  After lengthy negotiations,

Santa Cruz turned over the dispute to Novell.  (Id.)

101.    In doing so, Santa Cruz advised Novell that it had no right under the APA to

negotiate source code rights or fees, and Novell agreed.  (Id.¶ 42.)  In fact, before negotiating

with Cray, Novell asked Santa Cruz to execute a letter agreement to "enable Novell to negotiate

directly with Cray on the issue of Cray's intention to operate under the SGI Agreements for all

SVRX royalty-generating binary shipments without requiring direct involvement from SCO."

(Ex. 39.)  That letter also stated:

> By signature below, SCO authorizes Novell to negotiate and conclude with Cray the issue of Cray's intention to operate under the SGI agreements for all SVRX royalty-generating binary shipments. Novell agrees to inform SCO of any settlement prior to concluding a settlement with Cray.  <u>SCO's prior approval of any such settlement will be required only if the proposed settlement would alter Cray's obligation to SCO for source code royalties currently due under the Cray Agreements</u>, including allowing Cray to operate wholly under the SGI Agreements instead of the Cray Agreements.  In such a case, <u>in addition to having the right to give prior approval, SCO shall have the right to negotiate directly with Cray for the continuation of Cray's rights to distribute source code currently provided under the Cray Agreements.</u>

(<u>Id.</u> (emphasis added.))

102.  In 1998, Novell conducted an audit of SCO's royalty payments to Novell pursuant to Section 1.2 and Section 4.16 of the APA.  (Ex. 52 ¶ 9-10.)  Novell representatives did not ask for anything other than the reports of the binary royalties from the SVRX licenses that existed at the time of the APA, and never asked about licensing of source code.  (<u>Id.</u>)

103.  From the closing of the APA until a second audit in 2003, Santa Cruz and SCO sent Novell nearly 100 monthly reports in compliance Sections 1.2(b) and 4.16(a).  Those reports contained invoicing or revenue data only for the SVRX binary royalties paid during each period, and did not contain information on SVRX source code fees or any other payments. (Ex. 55 26-28.)

104.  Through 2005, SCO paid to Novell approximately $174,545,098.90 in SVRX binary royalties.  (Ex. 52 ¶ 13.)  In addition, Novell received $28,521,250 in lump payments from buyouts granted after the APA to such companies as IBM, HP, and Cray.  (<u>Id.</u>)

40

E.   Novell's Interpretation of the APA and Its
     Amendments Shifted Dramatically in 2003.

105.  In early 2003, Novell undertook plans to acquire SuSE Linux, one of the world's

leading distributors of Linux operating systems.  In November 2003, Novell announced the

acquisition, financed in part by a $50 million dollar investment by IBM.  (Ex. 58.)

106.  Under the IBM-Novell deal, Novell became a major Linux distributor, allowing

IBM to continue its official distance from the Linux distribution channel.  IBM spokesman

Mike Darcy stated:  "IBM is not a Linux distributor and has no interest in being in that

business."  (Ex. 41.)  Nevertheless, IBM benefits significantly from the Linux distributions

made by Novell.  As Jack Messman, Novell's CEO at the time, explained:  "IBM stands to

gain a great deal of revenue by providing systems, peripheral devices, software and services for

Linux."  (Ex. 42.)

107.  On March 6, 2003, SCO filed its lawsuit against IBM alleging, among other

things, that IBM had violated its UNIX Software and Sublicensing Agreements, by

contributing to Linux source code subject to restrictions in those agreements.  (Ex. 9 at 32-50.)

Thereafter, Novell undertook a course of conduct diametrically opposed to the above-cited

course of performance and conduct of the prior seven-plus years, as detailed above.

108.  Novell announced that it, and not SCO, owned the UNIX copyrights under the

APA.  Soon thereafter, Novell received from SCO a copy of Amendment No. 2, which Novell

inexplicably said it did not have in its files and had not reviewed.  (Ex. 59 ¶ 13.)  After

receiving the document, Novell stated in a press release dated June 6, 2003:

>  Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement
>  was sent to Novell last night by SCO.  To Novell's knowledge, this
>  amendment is not present in Novell's files.  The amendment appears

41

> to support SCO's claim that ownership of certain copyrights for
> UNIX did transfer to SCO in 1996.

(Ex. 40.)

109.  In subsequent public statements, however, Novell downplayed this recantation of

its previous ownership claims, and reasserted those claims.  (Ex. 60.)

110.  In November 2003, the same month it announced its acquisition of SuSE, Novell

conducted a second audit of SCO's royalty reports.  (Id. ¶ 10.)  For the first time since its sale

of the Business to Santa Cruz, Novell asked for information regarding the licensing of source

code.  (Id.)  In connection with the audit, Novell also requested and claimed rights to the 2003

Sun and Microsoft Agreements.

111.  Starting in 2003, although Novell had not previously invoked its rights under

Section 4.16(b), Novell wrote SCO a series of letters purporting to direct SCO to waive, and

later waiving on SCO's behalf, its contractual rights and claims against IBM.  (See e.g., Ex.

56.)

## LEGAL STANDARD ON SUMMARY JUDGMENT

"Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law." Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000).

It is axiomatic that the "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment," and that "the court must review the record in the light most favorable to the opposing party." Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Thus, the Court "must resolve factual disputes and draw inferences" in favor of the non-moving party, Rogers v. United States, 281 F.3d 1108, 1113 (10th Cir. 2002), and the Court may not "act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences." Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476, 484 (D. Kan. 1996). In short, summary judgment may not be granted unless "the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996).

## ARGUMENT[2]

Novell's Motion is predicated on a fundamental misinterpretation of the limited rights Novell retained under Section 4.16 of the APA. The interpretation Novell proposes simply does not square with the text of the APA, the parties' course of performance in the seven-plus years after the following execution of the APA, and the overwhelming and uncontroverted statements of relevant witness including the principals who negotiated the agreement.

---

[2] The facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing Statement of Facts.

Article I of the APA unambiguously sets forth the transaction between Novell and Santa Cruz. It provides for the transfer of the UNIX and UnixWare "Business" to Santa Cruz, and for Santa Cruz's payment in the form of the issuance of stock, the assumption of liabilities, and the retention by Novell of an interest in residual SVRX binary royalties. Novell does not even acknowledge these provisions, let alone explain them or reconcile them with its proposed interpretation of Section 4.16(b), a miscellaneous covenant in Article IV that relates only to Novell's retained royalty interest.

## I.    NOVELL'S PROPOSED DEFINITION CANNOT BE RECONCILED WITH THE APA AND THE TRANSACTION THEREUNDER.

Novell openly acknowledges that its Motion hinges on the meaning of the term "SVRX Licenses." As used in the APA, the term is ambiguous. Under the governing law, the Court should resort to extrinsic evidence both to expose and resolve the ambiguity. The interpretation Novell proposes fails because it conflicts with the unambiguous provisions of the APA, defeats the entire purpose of the agreement, and runs counter to the overwhelming extrinsic evidence.

### A.    The Governing Law of Contract Interpretation.

The term "SVRX Licenses" in the relevant APA provisions is ambiguous on its face. Even the term were to appear to the Court to be unambiguous, under the governing law, the Court should resort to the extrinsic because it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.[3]

---

[3]    Novell mistakenly cites two cases for the principle that extrinsic evidence should not be examined in this case. In Tahoe National Bank v. Phillips, 4 Cal. 3d 11, 23 (1971), the court noted that under California law, "[r]ecent decisions make clear that, in most cases, extrinsic evidence must be admitted provisionally in order that the court may determine if that evidence is relevant to establish an interpretation of the instrument to which it is reasonably susceptible," Id. at 22, and held that the defendant "cannot now take exception to the trial court's receipt of extrinsic evidence, but that she may

44

In <u>Dore v. Arnold Worldwide, Inc.</u>, 39 Cal. 4th 384 (2006), the California Supreme Court

confirmed the relevance of extrinsic evidence in exposing contractual ambiguities. Addressing

the existing California law of contracts, the court first confirmed the precedent providing that the

"'meaning of language is to be found in its applications. An indeterminacy in the application of

language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably

susceptible of more than one application to material facts.'" <u>Id.</u> at 391 (quoting <u>Cal. Sate Auto.</u>

<u>Ass'n Inter-Ins. Bur. v. Superior Ct.</u>, 177 Cal. App. 3d 855, 859 n.1 (1986)). Further confirming

the precedent, the court further explained:

> Accordingly, "even if a contract appears unambiguous on its face, a
> latent ambiguity may be exposed by extrinsic evidence which
> reveals more than one possible meaning to which the language of the
> contract is yet reasonably susceptible." "The test of admissibility of
> extrinsic evidence to explain the meaning of a written instrument is
> not whether it appears to the court to be plain and unambiguous on
> its face, but whether the offered evidence is relevant to prove a
> meaning to which the language of the instrument is reasonably
> susceptible."

<u>Id.</u> (brackets omitted) (quoting <u>Morey v. Vannucci</u>, 64 Cal. App. 4th 904, 912 (1998), and <u>Pac.</u>

<u>Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co.</u>, 69 Cal. 2d 33, 37 (1968)).[45]

---

argue on appeal that such extrinsic evidence conflicts with any interpretation to which the instrument is
reasonably susceptible." <u>Id.</u> at 23-24.

    Novell also mischaracterizes the Court's finding in <u>Haggard v. Kimberly Quality Care, Inc.</u>, 39
Cal. App. 4th 508, 519-20 (1995) by implying (at 21) that the Court found that California courts "will not
consider" extrinsic evidence in an integrated contract. To the contrary, the court correctly stated
California law as <u>allowing</u> parol evidence, even in an integrated contract. <u>Id.</u> ("Where the contract is
integrated, parol evidence still might be admissible if it is 'relevant to prove a meaning to which the
language of the instrument is reasonably susceptible.'") (citation omitted). The contract in that case,
unlike the APA, was not 'reasonably susceptible' to the plaintiff's interpretation.

[4]    Novell does not even acknowledge <u>Dore</u> or <u>Pacific Gas & Electric</u>. Novell does cite (at 20, 22)
California Civil Code Sections 1638 and 1639 , which must be read in the context of two other
provisions of the California Code, Sections 1647 and 1641. Under Section 1647, a contract may be
explained by reference to the circumstances under which the contract was made, and the matter to which

45

If the Court were to decide that the relevant language of the APA and Amendments does

not unequivocally support SCO's interpretation, <u>Dore</u> and the precedent endorsed therein make

---

it relates; and under Section 1641, the court must consider the contract as a whole and interpret the language in context.

The cases Novell does cite are inapposite as well as decided prior to <u>Dore</u>. Novell's attempt (at 24) to use a Tenth Circuit case that applied federal law, <u>Kunkel v. Continental Casualty Co.</u>, 866 F.2d 1269, 1275-76 (10th Cir. 1989), concerning the APA (governed by California law) is unfounded.

Novell cites four cases, including one from 1959 that involve attempts to supersede a clearly stated express contract provision with an implied covenant in the very specific contexts of cancellation clauses and termination clauses. <u>Carma Developers, Inc. v. Marathon Dev. Cal., Inc.</u>, 2 Cal. 4th 342, 374 (1992) (implied covenant of good faith cannot be used to prohibit invoking an express cancellation clause); <u>Jensen v. Traders & General Ins. Co.</u>, 52 Cal. 2d 786, 790 (1959) (same); <u>Bionghi v. Metro. Water Dist. of So. Cal.</u>, 70 Cal. App. 4th 1358, 1363-66 (1999) (implied covenant to terminate only for cause could not prohibit express provision allowing termination at will); <u>Haggard</u>, 39 Cal. App. 4th at 519-20 (same). SCO shows here that there is no express provision that governs and so the Court must look to extrinsic evidence to determine intent.

Novell cites two other cases that involve situations where no extrinsic evidence was presented. See <u>Shaw v. Regents of the Univ. of Cal.</u>, 58 Cal App. 4th 44, 53-55 (1997); <u>Niederer v. Ferreira</u>, 189 Cal. App. 3d 1485, 1499 (1987) (where the parties "presented no extrinsic evidence as to their intent at the time the document was signed" contract was considered "clear and unambiguous"). Here, SCO presents significant extrinsic evidence of the parties' intent.

[5]    In <u>Bionghi</u>, 70 Cal. App. 4th at 1363-66, cited by Novell to support their incorrect assertion that the parol evidence rule prohibits introduction of extrinsic evidence of intent, the court found that a clause of an employment contract requiring only thirty days notice in order to terminate was not superseded by an implied covenant to terminate only for cause. Within the pages cited by Novell, the <u>Bionghi</u> Court summarized California law as follows:

> First, the court must determine whether the language of the contract is reasonably susceptible to the meanings urged by the parties. In so doing, the court must give consideration to <u>any</u> evidence offered to show that the parties' understanding of words used differed from the common understanding. If the court determines that the contract is reasonably susceptible of the meanings urged, extrinsic evidence relevant to prove the meaning agreed to by the parties is admissible.

<u>Id.</u> at 1365 (emphasis added). <u>Bionghi</u> also notes that had the parties disputed whether the "30 days" in the contract referred to 'calendar' days or 'business' days, then extrinsic evidence would have been permitted to resolve the issue. <u>Id.</u> at 1366.

46

clear that extrinsic evidence is relevant and admissible on, for example, the following areas involving the application of contractual language to the facts:

- Under the APA, Novell sold "all right, title and interest" to the UNIX and UnixWare Business to Santa Cruz, except for an interest in the residual SVRX binary royalties.

- Novell's right to take the actions listed in Section 4.16(b) is limited to the protection of those royalties.

- The term "SVRX Licenses" in Sections 1.2(b) and 4.16(a) of the APA, and in Section VI of Schedule 1.1(a), are those agreements that were transferred to Santa Cruz and pursuant to which licensees paid the royalties and fees enumerated therein, that is, the Product Supplements.

- Irrespective of the definition of the term "SVRX Licenses," Section B of Amendment No. 2 clarified that Novell's rights under Section 4.16(b) were limited to the protection of the residual binary royalties and could not prevent SCO from exercising its exclusive rights with respect to source code.

SCO therefore sets forth below the uncontroverted extrinsic evidence to date confirming SCO's interpretation of the relevant language and establishing that the rights Novell retained under Section 4.16(b) were intended to apply, and could only apply, to the protection of its interest in the continuing SVRX binary royalties.

SCO further submits that, because the extrinsic evidence uniformly supports SCO's interpretation, SCO is entitled to summary judgment based on such uncontradicted extrinsic evidence. Under California law, where the extrinsic evidence is uncontroverted, the court may interpret the contract as a matter of law. See Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 865

(1965) (citing cases); <u>accord</u> <u>Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.</u>, 76 Cal.

App. 3d 886, 891-92 (1986) (citing cases and reversing the trial court); <u>see also</u> <u>Hess v. Ford</u>

<u>Motor Co.</u>, 27 Cal. 4th 516, 525-26 (2002) (determining mutual mistake as a matter of law where

the "extrinsic evidence is uncontroverted"); <u>Skrbina v. Fleming Cos.</u>, 45 Cal. App. 4th 1353,

1370-71 (1996) (affirming summary judgment granted in part on the basis of "uncontroverted

extrinsic evidence" of the meaning of the contract at issue).  When the interpretation of a

contract turns on the credibility of conflicting extrinsic evidence, moreover, the interpretation is

for the jury, not the court.  <u>See</u> <u>Morey</u>, 64 Cal. App. 4th at 913-14; <u>S. Cal. Edison Co. v. Superior</u>

<u>Ct.</u>, 37 Cal. App. 4th 839, 851-52 (1995).

      The California Supreme Court and lower courts have emphasized the relevance of

various forms of extrinsic evidence:

> As an aid in discovering the all important element of intent of the
> parties to the contract, the trial court may look to the circumstances
> surrounding the making of the agreement, including the object,
> nature and subject matter of the writing, and the preliminary
> negotiations between the parties, and thus place itself in the same
> situation in which the parties found themselves at the time of
> contracting.  Also applicable here is the familiar rule that when a
> contract is ambiguous, a construction given to it by the acts and
> conduct of the parties with knowledge of its terms, before any
> controversy has arisen as to its meaning, is entitled to great weight,
> and will, when reasonable, be adopted and enforced by the court.

<u>Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co.</u>, 128 P.2d 665, 671-72 (Cal. 1942) (citations

omitted); <u>accord</u> <u>Crestview Cemetery Ass'n v. Dieden</u>, 356 P.2d 171, 176-77 (Cal. 1960);

<u>Hernandez v. Badger Constr. Equip. Co.</u>, 28 Cal. App. 4th 1791, 1814-15 (1994).  The court in

<u>Universal Sales</u> emphasized that "a practical construction placed by the parties upon the

instrument is the best evidence of their intention." 128 P.2d at 672; accord Crestview, 356 P.2d

at 176-77. The court in Universal Sales reasoned:

> Parties are far less liable to have been mistaken as to the intention of
> their contract during the period while harmonious and practical
> construction reflects that intention, than they are when subsequent
> differences have impelled them to resort to law, and one of them
> then seeks a construction at variance with the practical construction
> they have placed upon it.

Id.; accord Crestview, 356 P.2d at 176-77; S. Cal. Edison, 37 Cal. App. 4th at 850-51 (further

explaining that one party's practical interpretation of the contract is relevant extrinsic evidence in

addition to the "joint conduct of the parties in the course of performance of the contract");

Hernandez, 28 Cal. App. 4th at 1814-15 & n.19.

SCO shows below that the substantial evidence falling into the foregoing categories

plainly and uniformly precludes Novell's interpretation and motion for partial summary

judgment, and supports SCO's interpretation and cross motion for partial summary judgment.

B.    The Term "SVRX Licenses" Is Ambiguous on Its Face.

Novell relies on the plain language of the relevant provisions for its definition of the

term. Instead of defining or elucidating the term, however, those provisions only render it

ambiguous on its face. Novell's contention that the term is unambiguous, and particularly in

favor of the definition it proposes, fails for at least the following textual reasons:

First, contrary to Novell's contention, the term is not defined in the APA, except in a

circular reference to itself. (¶¶ 25-28.) Section 4.16(a) appears to identify the "SVRX Licenses"

by pointing to Item VI of Schedule 1.1(a). The introductory sentence of Item VI, in turn, states:

49

> All contracts relating to the SVRX Licenses and Auxiliary Product
> Licenses (collectively "SVRX Licenses") listed below:

(¶ 26.) The absence of a definition alone may support a finding of ambiguity.[6]

Second, Novell contends that Section 4.16(a) says that the "SVRX Licenses" are "listed

in detail" in Item VI and that the introductory sentence of Item VI states that the "SVRX

Licenses" are "listed" therein. Item VI, however, plainly does not list any licenses or

agreements, whether by title, licensee, date, or any other information. Rather, Item VI plainly

lists twenty SVRX products and several categories of such products. (¶¶ 26-27.)

Third, the Software and Sublicensing Agreements that Novell attempts to fold into Item

VI, including "All of Seller's rights" in those Agreements, are expressly transferred in a distinct

provision of the APA. (¶ 28.) There is no basis to believe that the Software and Sublicensing

Agreements are redundantly transferred in another part of the Schedule, especially a mere seven

lines down the page from Item III.L.

Novell argues (at 25) that SCO is not helped by the fact that the Software and

Sublicensing Agreements are transferred separately in Item III. According to Novell, "This same

---

[6]     The "absence of a [contract] definition, though perhaps not dispositve, might weigh, even strongly, in favor of finding an ambiguity, for example, when the term in question has no generally accepted meaning outside the context of the [contract] itself." Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 867 (Cal. Ct. App. 1993). Indeed, California courts routinely deny summary judgment where an undefined relevant term is subject to more than one reasonable interpretation. See, e.g., Wolf v. Super. Ct., 114 Cal. App. 4th 1343, 1357 (Cal. Ct. App. 2004) (reversing summary judgment because "the only way to construe the meaning of the term" was by considering extrinsic evidence); EOTT Energy Corp. v. Storebrand Int'l Ins. Co., A/S, 45 Cal. App. 4th 565, 574, 578 (Cal. Ct. App. 1996) (undefined term "certainly presents a problem [precluding summary judgment] if the term is reasonably susceptible to more than one meaning"); cf. Ramming v. Barnard, No. E030334, 2002 WL 393118, at *5 (Cal. Ct. App. Mar. 13, 2002) ("It cannot seriously be contended that the [agreement] is not ambiguous. For example, the use of the undefined term 'sale proceeds' is susceptible to many meanings[.]") (Ex. A.); accord World Trade Ctr. Props. v. Hartford Fire Ins. Co., 345 F.3d 154, 190 (2d Cir. 2003) (summary judgment was properly denied because meaning of undefined term was "an open question as to which reasonable finders of fact could reach different conclusions").

reasoning, however, would exclude binary licenses from the universe of SVRX Licenses. That is because Item VI also does not mention 'sublicensing agreements' governing SVRX binary code, which like software agreements, are expressly referred to in Item III.L of Schedule 1.1(a)."

Novell misapprehends both the agreements and SCO's position. The Sublicensing Agreements are not "binary licenses," nor do they govern "SVRX binary code." Novell apparently confuses the Sublicensing Agreements with the end-user licenses for licensees of SVRX binary products. Instead, among other things, the Sublicensing Agreements grants rights to copy and distribute the licensed product in binary format. They also grant rights and impose restrictions on the distribution of source code to the licensee's contractors or other licensees. SCO does not argue that the Sublicensing Agreements are the SVRX Licenses. On the contrary, SCO positively argues that they are not. SCO's position is that the only interest Novell retained was the right to receive the residual royalties that licensees paid for their distribution of binary SVRX products. The licensee paid those royalties pursuant to the Product Supplements, which are the "SVRX Licenses" under the APA. (See Part I.D., below.)

Fourth, Item VI is plainly part of the provision of payments to Novell in the form of royalties. Section 1.2(b), which provides that, "notwithstanding the transfer of the SVRX Licenses to Buyer, the SVRX Royalties "shall continue to be recognized as royalties by Seller on an ongoing basis," points to Section 4.16(a) for a description of those royalties. (¶¶ 17, 26-27.) Section 4.16(a), in turn, describes those royalties by reference to the "SVRX Licenses" and points to Item VI for the purported definition of that term. (¶ 25.) Given that the Software and Sublicensing Agreements are expressly transferred elsewhere and that Item VI is not referenced elsewhere in the body of the agreement, Item VI serves no purpose other than to identify the

royalties due to Novell. The APA does not anywhere identify the agreements under such

ongoing royalties were pa<u>Id.</u> Accordingly, the Court must look outside the four corners of the

agreement to determine which agreements are the "SVRX Licenses."

For the foregoing reasons, the provisions Novell relies on as a plain language definition

do nothing to establish a definite meaning of the term. They do not reveal one way or other

which contracts are covered by the term "SVRX Licenses," let alone establish that the Software

and Sublicensing Agreements at issue are included. The term is plainly ambiguous.

C.    <u>Section 4.16(b) Cannot Be Read to Conflict
      With the Language and Purpose of the APA.</u>

The language of the APA could not be more expansive and unequivocal in its transfer of

the UNIX and UnixWare business from Novell to Santa Cruz. Novell's proposed interpretation

of Section 4.16(b), which Novell acknowledges hinges on the meaning of "SVRX Licenses," is

utterly at odds with that language as well as the stated purpose of the transaction.

"The words, phrases and sentences employed are to be construed in light of the objectives

and fundamental purposes of the parties to the agreement." <u>Leo F. Piazza Paving Co. v. Found.

Constructors, Inc.</u>, 128 Cal. App. 3d 583, 591 (Ct. App. 1981); <u>see also</u> <u>County of Marin v.

Assessment Appeals Bd.</u>, 134 Cal. Rptr. 349 (Ct. App. 1976) ("A contract entered into for the

mutual benefit of the parties is to be interpreted so as to give effect to the main purpose of the

contract and not to defeat the mutual objectives of the parties; language which is inconsistent

with the objective of the contract shall be rejected."); <u>Viacao Aerea Sao Paulo, S.A. v. Int'l

Lease Fin. Corp.</u>, 1988 WL 103286, at *4 (9th Cir. 1988) (reversing summary judgment because

"the language of a contract is to be construed in light of the purposes of the parties to the