agreement") (Ex. B).  (Paragraph 9.8 of the APA provides that the APA "shall be governed by and construed in accordance with the laws of the state of California" (¶ 4).)

As Novell attempts to read it, Section 4.16(b) of the APA would give Novell the unfettered right to, among other things:

- require SCO to permit any and all SVRX licensees to copy, distribute, export, or even open source the licensed UNIX source code (and all of the protected elements contained in that code) – the very value of the assets SCO had acquired – without any protection or compensation for SCO;

- direct SCO to waive any of its rights to enforce any licensee's material breach of any Software and Sublicensing Agreement – even where such rights have no bearing whatsoever on Novell's binary royalty stream; and

- because UnixWare is built on the prior SVRX source code, effectively destroy the value of UnixWare technology (which even Novell accepts was transferred to SCO without strings) by requiring SCO to permit SVRX licensees to ignore the use and disclosure restrictions in the Software and Sublicensing Agreements that protect the prior SVRX source code upon which UnixWare is built.

Novell thus argues that in a single sentence of Section 4.16(b), SCO gave Novell the authority – for any reason or no reason at all – to extinguish the value of the UNIX assets that SCO had acquired through the APA even though Novell's sole continuing interest under the APA was limited to the SVRX binary royalties.  That implausible construction of Section 4.16(b) cannot be accepted as a matter of well-settled contract interpretation law.

As a corollary to the requirement that contractual provisions are not be construed as meaningless,[7] it is well settled that a contract which confers certain rights or benefits in one clause will not be construed in other provisions completely to undermine those rights or benefits.

---

[7]    See, e.g., Heidlebaugh v. Miller, 271 P.2d 557, 559 (Cal. Ct. App. 1954) ("The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.").

Dockets.Justia.com

See <u>Kavruck v. Blue Cross of Cal.</u>, 134 Cal. Rptr. 2d 152, 159 (Cal. App. 2003) ("A contract may not be interpreted in a manner which would render one of its terms meaningless."); <u>County of Marin</u>, 134 Cal. Rptr. at 353-55 (rejecting interpretation of clause that would have permitted party to unilaterally deny the other party the bargained-for benefit provided for in another clause of the contract); <u>Cooper v. Mart Assocs.</u>, 225 Cal. App. 2d 108, 114-16 (1964) (holding that contract's waiver clause would not be read to nullify the right to sue provided in another clause, because a "contract is to be construed as a whole," with "each clause helping to interpret the other").

Novell's proposed reading of Section 4.16(b) must fail because it would completely undermine numerous other clear provisions of the APA, including:

- <u>Section 1.1 and Schedule 1.1(a)</u> grants to SCO "<u>all right, title and interest</u> in and to" and "<u>All rights and ownership</u> of UNIX and UnixWare including but not limited to" the "source code" to the "UNIX Source Code Products" (including UNIX System Five and all prior and subsequent UNIX and UnixWare products).  (¶32.)  But if Novell had the right to amend or nullify any of the intellectual-property protections in the Software Agreements and Sublicensing Agreements, this express asset-transfer provision would be rendered hollow for the same reasons that IBM's interpretation would undermine the purpose of the APA itself.

- <u>Schedule 1.1(a)</u> grants SCO "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business." (<u>Id.</u>)  But if Novell had the rights it claims, it could amend, modify, or waive at its sole discretion SCO's rights under all such contracts related to SVRX.

- <u>Section 4.16(a)</u> provides that in consideration for collecting binary royalties and ensuring proper payment of such royalties, "Seller shall pay Buyer within 5 days of receipt of SVRX Royalties from Buyer."  But if Section 4.16(b) were as broad as IBM contends, then Novell purportedly could have vitiated this provision by simply requiring SCO to direct licensees to make their royalty payments directly to Novell.

- Section 4.16(c) states: "Seller further covenants that immediately following the Closing Date neither it, nor any of its officers, directors or employees shall . . . take any material action designed to promote the sale of SVRX products." APA § 4.16(c). But if Section 4.16(b) were as broad as IBM contends, then Novell could "at its sole discretion" modify, amend, or supplement the SVRX agreements to sell licensees additional SVRX products or rights.

Novell's interpretation makes a sham of the APA in other ore-preposterous ways.

First, because Novell defines "SVRX Licenses" as any contract "related to" SVRX products, the TLA fits that definition as it relates to the Licensed Technology, including UNIX System V. Under Novell's interpretation, therefore, Novell could "at its own discretion" waive SCO's rights under the TLA, including the non-compete provision. Indeed, Novell could breach the TLA at will and then direct SCO to waive, or waive on SCO's behalf, its claims against Novell. In addition, Novell could amend, supplement, or modify rights under the TLA at its sole discretion. In effect, Novell could use its purported Section 4.16(b) rights to grant itself unlimited ownership and control of the very UNIX and UnixWare technology it sold to Santa Cruz under the APA, thus rending both the APA and TLA an exercise in futility and utterly destroying the value of the Business to SCO.

Second, Santa Cruz was itself an SVRX licensee. Under its Software and Sublicensing Agreements, Santa Cruz developed and distributed its own UNIX flavor known as Open Server. Even today, SCO continues to develop and distribute its Open Server line of products. Under its interpretation of Section 4.16(b), Novell could have directed Santa Cruz to waive its rights under any and all Software and Sublicensing Agreements, including its own. Thus, after signing the APA and paying millions of dollars in stock consideration, Santa Cruz could have been left with fewer rights than before it signed the APA.

In sum, Novell's proposed interpretation of a miscellaneous provision in the "Certain Covenants" Article of the APA makes a sham of the "Acquisition" as set forth in Article I. That interpretation defeats the purpose of the APA, conflicts with its unambiguous key provisions, and makes a sham of the APA and TLA. Under the applicable law, even if (contrary to fact) Novell's interpretation were reasonable and not rooted in ambiguous language, the Court could not read Section 4.16(b) as Novell proposes.

———————

In its reply memorandum dated January 12, 2007, IBM addresses some of the same issues as Novell regarding Novell's alleged rights of waiver.[8] None of IBM's arguments supports Novell's motion, and many of them highlight points that plainly support SCO's position.

IBM first argues (at 72-73) that the plain language of Section 4.16(b) "forecloses SCO's position," but IBM fails to undertake any serious effort to reconcile the supposed meaning of that language with the rest of the APA, the amendments thereto, or the whole purpose of the transaction thereunder. IBM says (at 77) that Novell's alleged right unilaterally to control the very business that Santa Cruz had just acquired does not raise any problem because the parties' "incentives are aligned." That argument misses the point. If the parties' interests were indeed "aligned," and where Santa Cruz had just acquired the entire UNIX business, why would Santa Cruz have given Novell the unilateral right to modify or amend any provision of any of the thousands of contracts that Santa Cruz had just acquired? A fair reading of the quoted language

---

[8]    In addressing IBM's arguments from that IBM memorandum, SCO references page numbers from the memorandum.

of Section 4.16(b) in context, and in light of Amendment No. 2, simply precludes the meaning that IBM and Novell give that language.[9]

When IBM elsewhere tries (at 76-77) to reconcile its interpretation of the APA with the purpose of the Agreement, moreover, IBM in fact relies on extrinsic evidence. IBM thus directly undercuts its later assertion (at 79-81) that SCO's evidence is "irrelevant." IBM also fails even to acknowledge the California Supreme Court's controlling decision in Dore , 39 Cal. 4th at 391, which makes clear that extrinsic evidence is admissible in this context.

In addition, IBM chooses extrinsic evidence that subsequent testimony has overridden (or contradicted). IBM first cites a generic allusion to the "economic benefit" going to Novell under the transferred UNIX licenses in a declaration signed by Steve Sabbath of Santa Cruz, but Mr. Sabbath subsequently testified repeatedly at deposition in the IBM case that that it was only the binary-royalty payments under the existing SVRX Licenses that Santa Cruz had to remit to Novell. (Ex. 61 at 19-21, 31-37, 40-41, 97, 140, 143, 267.) IBM then cites the same language in the declaration of Michael DeFazio of Novell, but Mr. DeFazio did not specify (in either his declaration or his deposition) what he meant by the referenced "economic benefits." In addition, Mr. DeFazio acknowledged that Ed Chatlos understood Novell's intent under the APA (Ex. 62 at 315-16, 318, 325), and Mr. Chatlos has testified in both this case and the IBM case that it was only the binary-royalty payments under the existing SVRX Licenses that Santa Cruz had to remit to Novell. (¶¶ 4, 31.)

---

[9]     IBM later asserts (at 76) that SCO's CEO once referred to IBM's UNIX license agreement as its "SVRX License," but IBM does not even claim that Mr. McBride was purporting to use that term within its meaning in the APA. Indeed, IBM's citation to the statement underscores the importance of the context of the use of the term in the APA, because on its own the term permits multiple meanings.

D.    The Term "SVRX Licenses" Refers to the Product Supplements.

    1.    The SVRX Supplements Actually
        Licensed the SVRX Products.

Novell argues (at 22) that its interpretation turns on its definition of the term "SVRX

Licenses." SCO has shown why that definition not only finds no support in the ambiguous

language of Sections 4.16(a) and Item VI, but also conflicts with the unambiguous portions of

the agreement. In contrast, a definition that limits the term to the agreements that actually

licensed the SVRX Products listed in Item VI is consistent with the APA. Thus, even if the list

of products in Item VI were read to identify the "SVRX Licenses" for those products, that

reading would still exclude the Software and Sublicensing Agreements from the term, for the

following textual reasons.

Ｆirst, Section 4.16(a) describes the SVRX Royalties as "all royalties, fees and other

amounts due under the SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a)

hereof and referred to herein as "SVRX Royalties)." Under the licensing practices of AT&T and

its successors, the only agreements "under" which "royalties, fee and other amounts" could be

"due" were the Product Supplements. (¶ 37.) Indeed, Novell and Santa Cruz maintained such

financial information by product, and after the closing, Santa Cruz reported that information to

Novell by product. (Id.) No monies were due or reported under Software or Sublicensing

Agreements. (Id.)

Ｓecond, Section 1.2(e)(iv) provided that, notwithstanding its obligation to remit to Novell

the SVRX Royalties due under the SVRX Licenses, Santa Cruz could keep royalties formerly

due under "its own licenses from Seller acquired before the Closing Date through Software

Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A." (Id.) Section 1.2(e)(iv) thus expressly identifies the multiple "licenses" that Santa Cruz had acquired "through" its Software Agreement and Sublicensing Agreements. The only such licenses to which "royalties" could be "attributable" were the numerous SVRX Supplements that Santa Cruz had executed under its Software and Sublicensing Agreements. In addition, Santa Cruz obtained its Software and Sublicensing Agreements from AT&T. Santa Cruz's only "licenses from Seller" under those Agreements were the product supplements it executed with Novell.

Third, Recital A of the APA defined the transferred Business as the development of "a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale" of "Auxiliary Products." (Id.) The only agreements that licensed "the various versions of UNIX and UnixWare," the "products currently known as UNIX and UnixWare," or the "Auxiliary Products" were the Product Supplements for such versions or products. The only "source and binary licenses" that were for "sale" were the Product Supplements, which identified the licensed product and fees and gave rise to a payment obligation. (Id.) The Software and Sublicensing agreements did not identify any such fees or give rise to any payment obligation. (¶¶ 37-38.)

Novell, like AT&T and its other successors, used a combination of agreements in licensing its SVRX technology, including the Software Agreement, the Sublicensing Agreement, and the various Product Supplements. (¶ 38.) Of these, the only agreement that licensed the products listed in Item VI of the Schedule 1.1(a) were the Product Supplements for each product.

59

(Id.) The Software and Sublicensing Agreements did not even mention, much less grant a license to, any specific product listed in Item VI. (Id.)

The Software Agreement set forth rights and obligations for a licensee's internal use of the unidentified "LICENSED PRODUCT" that the licensee might license under a Supplement, whether that product was an SVRX, UnixWare, Tuxedo, or DWB product. (¶ 39.) Similarly, the Sublicensing Agreement set forth the general rights and obligations for the distribution in binary form of products based on any product the licensee might choose to license under a Supplement. (Id.) Without executing the Supplement for the product it desired, a licensee did not obtain delivery of, let alone a license to, the product.

The licensing groups of the companies that have owned the UNIX and UnixWare business considered the Product Supplements to be the licenses to UNIX and UnixWare products. (Id.)

Novell attempts in several ways to conflate the Software Agreement, Sublicensing Agreement, and Supplements. Novell states (at 8), for example, that licensees paid source code fees "[u]nder the Software Agreement," and suggests that licensees also paid sublicensing fees and royalties under the Sublicensing Agreement. That is flatly wrong. No fees, royalties, or other amounts were ever due or paid under those Agreements. Novell points out (at 8) that, between February 1, 1985, the date IBM signed its Software Agreement, and October 17, 1996, the day after Amendment No. X, "IBM entered into various agreements, supplements, and amendments concerning its rights to use" SVRX products. In the parenthetical, Novell then labels all these agreements "collectively" as the "IBM SVRX License," and Novell then uses that

term throughout its brief. Similarly, Novell (at 9) labels a collection of distinct documents, executed separately, as "the 1985 IBM Agreement."

Novell also states (at 9) that IBM and AT&T executed "numerous supplements to the 1985 IBM Agreement," and that these "supplements granted IBM additional rights to" several SVRX releases. Novell's attempt to consolidate the supplements with the "1985 IBM Agreement" aside, the referenced Supplements did not grant IBM "additional" rights to the SVRX releases. Those supplements simply granted rights to those products.[10]

### 2. Novell Retained Only the Right to Continue Receiving Residual Binary Royalties Under the SVRX Licenses.

In its memorandum dated December 12, 2006, in opposition to Novell's motion for summary judgment or preliminary injunction, SCO sets forth textual and extrinsic evidence showing that the term "SVRX Licenses" refers only to then-existing Product Supplements. Such evidence includes:

- Section 1.2(b) provided that "Seller and Buyer further acknowledge and agree that Seller is retaining all right to the SVRX Royalties notwithstanding the transfer of SVRX Licenses to Buyer pursuant" to the APA." (¶¶ 17, 43.)

- Nothing in the APA even suggests that the parties intended for Novell to have an interest in any future SVRX license. (¶ 43.)

- In identifying the SVRX Royalties, Novell's 1995 Annual Report explained that "Novell will continue to receive revenue from existing licenses for older versions of UNIX System source code." (Id (emphasis added).)

---

[10]    Novell also attempts to conflate the agreements physically. As its Exhibit 5, Novell submits IBM's Software Agreement and an unsigned copies of what appear to be IBM's Supplement No. 1 and Supplement No. 2. The pages of these documents are separately paginated, so that the Software Agreement, for instance, starts with page "1 of 6" and ends with page "6 of 6." Novell has apparently added page numbers to these documents, so that they run consecutively from page 1 through 20 in a format in which they were never negotiated or executed.

- Novell's 1996 Annual Report and Quarterly Reports described the SVRX Royalties using that same language verbatim. (<u>Id.</u>)

- The sworn statements from the Mr. Chatlos, the lead negotiator for Novell; Mr. Wilt, the chief negotiator for Santa Cruz; Ms. Madsen, who assisted Mr. Wilt; Mr. Thompson, the Novell senior executive personally charged with overseeing the transaction; and several other witnesses familiar with the intent and performance of the APA. (<u>Id.</u>)

- Documentary evidence, including the letter dated April 23, 1996, from Santa Cruz CEO Alok Mohan to Novell CEO Robert Frankenberg, in which Mr. Mohan explained that the APA "provided for Novell to receive the residual royalties from <u>the in-place SVRX license stream</u>." (<u>Id</u> (emphasis added).)

Because the Software Agreement and Sublicensing Agreement set forth the general rights and obligations for the licensee's use of any software product it might choose to license, the Product Supplements only identified the product the licensee had a right to use and the CPUs on which it had that right, and the fees the licensor had a right to receive in exchange. (¶ 44.) The only rights the licensor had in the Supplements were the rights of payment of any applicable fees listed in the Schedule. (<u>Id.</u>)

Upon execution of the Product Supplement, licensees received the product and were obligated to pay the scheduled one-time source license fee, the fees for any CPUs designated in the Product Supplement, and the one-time sublicensing fee (if any). (¶ 45.) As all these fees were paid up-front, at the transfer of the Business in 1996, Novell had already collected such fees due under the SVRX Licenses. (<u>Id.</u>) Novell had also been paid the per-copy fees, or royalties, for each licensee's distribution to that point of binary copies of its UNIX-derived product. (<u>Id.</u>)

The only fees that could be paid under the SVRX Licenses after the day of the APA were (1) the source fees for any additional distributions (that is, copies) of the source code or for its use on any additional CPUs, and (2) the continuing binary royalties from the ongoing

distribution of binary products. (¶ 46.) Section 1.2(e) expressly provided that Santa Cruz need not remit to Novell fees in the former category. Thus, the only payments that Novell could receive under the SVRX Licenses were the binary royalties for the ongoing binary distributions. But even within this remaining category, Section 1.2(e) provided that Santa Cruz could keep the binary royalties it paid prior to the APA under its "own licenses with from" Novell. (Id.) After the Closing Date, therefore, the only unpaid sums under the SVRX Licenses were any per-copy fees paid by other current SVRX licensees for their ongoing distribution of SVRX products. As the SVRX Licenses did not provide for rights in the licensor other than the right to be paid the various fees, the only Novell payment "rights" remaining in the SVRX Licenses were the rights to continue receiving the binary royalties.

Mr. Chatlos, Mr. Wilt, and Ms. Madsen believe that the only exception to the transfer of the entire Business was Novell's right to continue receiving the "binary royalties paid under existing agreements pursuant to which" SVRX licensees "were paying such royalties." (¶ 47.) Mr. Murphy, Mr. Broderick, and Mr. Maciaszek, who for decades, including at Novell, worked on the licensing of UNIX products all agree that the Product Supplements were "the licenses for individual UNIX or UnixWare products." (¶ 49.)

---

In its memorandum, IBM argues (at 73) that "nothing in the APA" supports SCO's interpretation of the meaning of the term "SVRX Licenses" therein. IBM commits another interpretative error. The fact is that IBM's and Novell's interpretation fails to draw any distinction between the agreements referenced in the list of transferred assets in Item III.L of Schedule 1.1(a) and those referenced in Item VI. Under the law, the Court must not interpret the

Agreement to create such a redundancy. SCO interprets Item VI to refer to that subset of the agreements referred to in Item III.L under which the binary-royalty payments are made. It follows that, as IBM acknowledges (at 74), Item VI is specifically referenced by Section 4.16(b) – the provision of the APA referring to such payments.

In attempting to support its assertion that the "Software Agreements are agreements that license various UNIX System V releases," IBM makes SCO's point. The document IBM cites (at 73) is the "Schedule" to the IBM Software Agreement, which on its face is plainly not an agreement unique to UNIX software at all. It is such Schedules, or Product Supplements, pursuant to which SVRX licensees license specific UNIX products and make payments for the use and distribution of such products.[11]

     E.     Amendment No. 2 Forecloses the Rights
               Novell Claims Under Section 4.16(b).

Even the term "SVRX Licenses" included the Software Agreements and Sublicensing Agreements, Amendment No. 2 makes clear that Novell's rights under 4.16(b) do not extend to such licenses. Paragraph B of Amendment No. 2 provides:

> Except as provided in Section C below, and notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows:

(¶ 50.) Subparagraph B.5 then provides:

> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give

---

[11]     IBM argues (at 75 n.50) that such schedules may refer to "fees due for use and distribution of both binary and source SVRX products," but Santa Cruz retained such source fees under Section E of Amendment No. 1.

> Novell the right to grant new SVRX source code licenses. In
> addition, Novell may not prevent SCO from exercising its rights
> with respect to SVRX source code in accordance with the
> Agreement.

(¶ 51.)

Amendment No. 2 thus provides that, "notwithstanding the provisions of Article 4.16,"

Novell is not authorized to "increase any SVRX licensee's right to SVRX source" or "grant new

SVRX source code licenses," even in the context of granting a buyout of its majority interest in

the binary royalties. That is, following as it did Novell's attempt relax the restrictions

concerning the distribution of source code in the IBM's Sublicensing Agreement, Amendment

No. 2 clarified that Novell had no authority to license source code rights, even incident to a

buyout.

But Amendment No. 2 provides an additional protection. It states that "In addition,

Novell may not prevent SCO from exercising rights with respect to SVRX source code in

accordance with" the APA. That is, "notwithstanding the provisions of Article 4.16," Novell

may not prevent SCO's exercise of rights with respect to source code under any of the other

provisions of the APA, including those in Article I and Schedule 1.1(a) effectuating the transfer

of "all right, title and interest in and to" and all "rights and ownership" in the UNIX source code

and products and "all rights pertaining to UNIX and UnixWare" under the "Software and

Sublicensing Agreements."

The Court may deny Novell's Motion, and grant SCO's, on the basis of this language in

Amendment No. 2 alone. The rights SCO asserts against IBM relate to its use and disclosure of

source code under its Software and Sublicensing Agreements. (¶ 52.) In addition, contrary to

Novell's misguided attempt to categorize the Software Agreement as a "source code license" and that Sublicensing Agreement as a "binary" license, both agreements plainly concern and grant source code rights. Amendment No. 2 simply forecloses Novell's attempt to exploit Section 4.16(b) in derogation of SCO's rights under the IBM and Sequent Software and Sublicensing Agreements.[12]

      F.    The Extrinsic Evidence Confirms That Novell
              <u>Did Not Retain the Rights It Claims.</u>

Even if the Court concludes that Amendment No. 2 insufficiently clarified Section 4.16(b), Novell's Motion fails because it has no extrinsic evidence to support it. In addition, because the extrinsic evidence, which Novell does not even attempt to refute, uniformly supports SCO's position, the Court should grant SCO's request for summary judgment.

      1.  Documents Connected with the
          <u>APA Belie Novell's Interpretation.</u>

Numerous documents that Novell generated in connection with the APA during the Transition Period reflect Novell's intent to transfer the Business without any of the limitations that Novell now reads into Section 4.16(b). Such documents include:

- Novell's 1995 Annual Report identified only two rights Novell retained under the APA: the contingent right to future UnixWare royalties, and the right to the residual SVRX royalties. With respect to the latter, the Report explained that "Novell <u>will continue to receive revenue</u> from existing licenses for older versions of UNIX System source code." That language was repeated verbatim in Novell's 1996 Annual and Quarter Reports.

- The TLA provided that, as between Novell and Santa Cruz, "Ownership of Licensed Technology shall reside in SCO."

---

[12]    IBM finally argues (at 78-79) that "Amendment 2 is irrelevant," but SCO has shown in detail why IBM is incorrect, and why both the existence and language of Amendment No. 2 confirm SCO's interpretation of the APA.

- Mr. Bouffard's email, dated October 18, 1995, stating: "We are obligated to give SCO all information, contracts, assets etc. pertaining to the UnixWare business and the old UNIX source code business. They have bought it lock, stock and barrel. Once the transaction is closed (Nov.-Dec.) we will have no more involvement with this business. Therefor [sic], if a contract is for UnixWare or UNIX, it will be SCO's. (¶ 43.)

- Mr. Jonas's email of December 4, 1995, to Novell attorney Burt Levine and other, stating: "As of the Closing Date (now set for 12/6), all UNIX & UW agreements transfer to SCO . . . including the Distributor Agreements. Novell is out of the UNIX/UW business after the Closing and does not have the right to sell UW." (¶ 64.)

- Novell letters to third parties announcing that "Novell transferred to The Santa Cruz Operation, Inc. ('SCO') its existing ownership interest in UNIX System-based offerings and related products as listed in Attachment A of this letter ('collectively 'Transferred Products' [sic])," where the Transferred Products were exact same SVRX products listed in Item VI of Schedule 1.1(a) of the APA. (¶ 65.)

- Statements in such letters saying that it "makes immeasurably more business sense for SCO, as the owner of the Transferred Products, to handle directly with" the third party "any matters that may become relevant under the subject Agreement." (¶¶ 66-67.)

These contemporaneous documents reveal Novell's intent to transfer the UNIX and UnixWare business without qualification. None even mentions the rights Novell now claims for itself. Moreover, those purported rights would have made the foregoing statements unnecessary or untrue. Similarly, the following documents concerning the joint efforts during the Transition Period reveal Novell's intent:

- The Operating Agreement explains that "It is intent of the Parties to transfer the agreements and associated rights and obligations which relate to Novell's UNIX System business to SCO." The Operating Agreement makes no mention of 4.16(b), let alone any purported rights thereunder qualifying or limiting the "transfer" of "the agreements and associated rights and obligations." (¶¶ 55-57.)

67

- The Transition Team's SOW for Legal provided that the Novell legal team would "Provide legal counsel and support to the Contract and Management and Licensing Group, to Product Development and to others pertaining to the <u>UnixWare and SVRx and any other products and business functions acquired by SCO from Novell.</u> (¶ 59.)

- In an email, Mr. Jonas explained that Novell needed a "delegation" or "agency" agreement from Santa Cruz "in order for the Licensing group to continue their work after the Closing." He added that the "agreement will protect Novell in the event that there is a dispute about any contract that was processed by Novell during the transition period." (¶ 60.)

- In an email from Novell team member Lou Ackerman to Santa Cruz dated November 8, 1995, Mr. Ackerman proposed an "SOW for LICENSING & CONTRACT MANAGEMENT" permitting Novell to "Act as SCO's worldwide agent for UnixWare (*) and SVRx (and any other Novell source code products being transferred to SCO) licensing activities with OEM, Commercial, Government and Educational customers," such delegation to include "Executing new agreements (including product supplements) with customers" and "Responding to customer inquiries about the products and transfer of ownership to SCO." (¶ 61.)

These documents reflect the transfer of the "agreements and rights and obligations" to Santa Cruz without any qualification. In addition, they show that Novell understood that it needed, and indeed sought, Santa Cruz's "delegation" of authority to license "SVRX" and "any other source code products being transferred to SCO" during the Transition Period. Had Novell possessed the rights it now claims such delegation would have been unnecessary. Thus, these documents pointedly contradict Novell's assertions that it has unfettered rights over the UNIX agreements and licensing rights, and that SCO merely manages the business as its agent.

2.  The 1996 IBM Buyout Belies Novell's Newly
    <u>Conceived Claim of Rights Under Section 4.16(b).</u>

The Court should deny Novell's motion on the basis alone of Novell's course of performance during the dispute over the 1996 IBM buyout. In the early part of the year, Mr.

68

Bouffard, without consulting those who had negotiated the APA, decided to grant IBM a buyout of its SVRX binary royalty obligations, in order to generate revenue Novell needed. (¶¶ 68-70.) Mr. Bouffard relied on a reading of Section 4.16(b) much less restrictive than the interpretation Novell proposes. (Id.) Whereas Novell now claims unfettered rights with respect to any SVRX agreement, Mr. Bouffard only sought to grant IBM a buyout of the royalties that Novell unquestionably retained under the APA. (Id.)

Despite this relatively restrained interpretation, Santa Cruz rejected his "direction" to draft a letter effectuating the buyout and contested Novell's interpretation. (¶¶ 71-80.) Over the weeks that followed, Santa Cruz CEO Alok Mohan communicated his objections directly to Novell CEO Robert Frankenberg. Specifically, Mr. Mohan complained that the buyout ran counter to the provisions of the APA that contemplated the conversion of SVRX licensees to UnixWare products and violated Section 4.16(c), which prohibits Novell from selling or promoting SVRX products. (¶¶ 72-75.) Mr. Mohan also observed that the buyout agreement Novell proposed relaxed restrictions in IBM's Sublicensing Agreement. During the period of these communications, Santa Cruz prepared a complaint and a motion for a preliminary injunction against Novell. (¶ 80.) Mr. Mohan's response to the proposed buyout evidences Santa Cruz's understanding and intent that Section 4.16(b) granted Novell limited rights even with respect to the protection of its interest in the SVRX binary royalty stream.

Novell manifested the same understanding and intent. In responding to Mr. Mohan's letters, Mr. Frankenberg did not question Mr. Mohan's argument that Santa Cruz had exclusive rights to license the source code. (¶¶ 76, 78.) Instead, Mr. Frankenberg sought to convince Mr. Mohan that the proposed agreement did not relax the restrictions in IBM's Sublicensing

Agreement.  (Id.)  The dispute thus focused on Novell's purported unilateral right to grant the buyout of binary royalties.

Even though Novell unquestionably owned the majority (95%) interest in IBM's residual royalties, Novell did not even mention Section 4.16(b), much less invoke the rights it now claims for itself, to effectuate the buyout without interference from Santa Cruz.  Instead, having warranted to IBM that it had the right to grant it the buyout on behalf of Santa Cruz, Novell executed the buyout agreement, but immediately entered into a stand-still agreement with Santa Cruz and IBM.  (¶¶ 80-81.)  Over the months that followed, the parties negotiated a new buyout agreement, Amendment No. X, which they signed on October 16, 1996.  (¶ 80.)

In connection with Amendment No. X, the parties also entered into two additional agreements on the same date.  First, the parties entered into Amendment No. 2 to the APA.  With respect Novell's attempt to grant a unilateral buyout without regard for the impact on Santa Cruz's economic and strategic interests, Paragraph B of Amendment No. 2 provided:

> Except as otherwise provided in Section C below, and not withstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows:

(¶ 82.)  Section B then required the joint management, participation, and consent of the parties for any future buyout, including at Paragraph B.4:

> No such transaction will be concluded unless the execution copy of the amendment is consented to in writing by both parties, and either party will have the unilateral right to withhold its consent should it judge, for any reason whatsoever, the transaction to be contrary to its economic interests and/or its business plans and strategy.

70

(¶ 83.)  With respect to Novell's attempt to relax the restrictions on the redistribution of SVRX

source code, Paragraph B.5 of Amendment No. 2 stated:

> This Amendment does not give Novell the right to increase any
> SVRX licensee's rights to SVRX source code, nor does it give
> Novell the right to grant new SVRX source code licenses.  In
> addition, Novell may not prevent SCO from exercising its rights
> with respect to SVRX source code in accordance with the
> Agreement.

(¶ 84.)  Following, as it did, on the heels of aborted Unilateral Amendment, and signed in

conjunction with the bilateral Amendment No. X, these provisions made clear that Novell's

conduct – even with respect to the binary royalties – ran afoul of the APA.  As Mr. Bouffard,

who also negotiated Amendment No. X for Novell, explains:

> Novell and Santa Cruz proceeded to negotiate Amendment No. 2 to
> the APA. I understood Amendment No. 2 to preclude Novell from
> undertaking the precise type of unilateral conduct with respect to the
> UNIX license agreements that I had undertaken with respect to the
> IBM-Novell buyout.

(¶ 85.)

REDACTED

71

(¶ 87 (emphasis added).) Of the $10,125,000 that IBM paid for the buyout of its binary royalty obligations, Novell paid Santa Cruz the 5% administrative fee due under the APA. (¶ 88.) In addition, under the General Release of Claims Agreement, Novell paid Santa Cruz $1,500,000 for the release of claims. (Id.)

In light of the foregoing account, it is unbelievable that Novell now claims the Section 4.16(b) rights it invokes. Had Novell believed in 1996 – in the days following the closing of the APA – that Section 4.16(b) provided it such rights, Novell surely would not have suspended its agreement with IBM, addressed Santa Cruz's concerns without mention of Section 4.16(b), negotiated with Santa Cruz for over six months, agreed to Amendment No. 2 whose language specifically precludes Novell's conduct,                    REDACTED

                                                                                               If its interpretation of Section 4.16(b) were not newly concocted, IBM could have simply "directed" SCO to waive its rights in the IBM agreements. Instead, Novell recognized that its April 1996 amendment, and the underlying misinterpretation of Section 4.16(b), ran afoul of the APA.

Novell's attempt (at 29-30) to convert the IBM buyout into evidence in its favor is without merit. Novell alleges that SCO acknowledged its obligation to remit source code fees because it remitted 95% of the proceeds of Amendment No. X, which amended IBM's Software Agreement and granted limited source code rights. Novell revises history by ignoring it.

First, Santa Cruz recognized and specifically objected to Novell's attempt to grant IBM source code rights. In his letter of April 23, 1996, Mr. Mohan told Mr. Frankenberg that "our agreements provide SCO with ownership and exclusive rights to license the UNIX source code." Mr. Frankenberg did not dispute that assertion, instead reassuring Mr. Mohan that the proposed

buyout did not expand IBM's source code rights and addressing his concerns. Mr. Mohan

disagreed but recognized that Novell, by representing to IBM that it had the authority to grant the

buyout, had painted itself into a corner. He explained: "I understand that discussions with IBM

are quite advanced and, <u>on an exception basis</u>, would be willing to try and accommodate them."

(¶ 75 (emphasis added).) Thus, the minor source code rights that IBM received under

Amendment No. X were an accommodation by Santa Cruz, not any grant of rights by Novell.

    <u>Second</u>, Santa Cruz did not retain only 5% of the proceeds from Amendment No. X.


REDACTED


    <u>Third</u>, Novell's unauthorized relaxation of restrictions on source code were clearly a

secondary issue in the dispute. Even though Novell unquestionably had the right to receive 95%

of the IBM binary royalties, Mr. Mohan objected to the buyout itself. As a secondary matter,

Mr. Mohan explained that he was "<u>also</u> troubled by the fact that the proposed IBM buyout gives

IBM broader rights to the UNIX intellectual property than their current license provides." (¶ 77

(emphasis added.).) Indeed, Mr. Frankenberg even attempted to convince Mr. Mohan that source

code rights were not at stake. Thus, the parties understood that their disagreement was at heart

about Novell's authority to grant buyouts.

73

3. Novell's Other Conduct in the Years That Followed the
    APA Also Belies Its New Interpretation of Section 4.16(b).

In Paragraph 2 of the agreement jointly granting HP a buyout in 1998, Novell explained

the purpose of the agreement:

> NOVELL retained or has acquired all rights to outstanding and
> future HP binary code royalty and license fee payments, but not
> source code royalties ("HP BINARY ROYALTY
> OBLIGATIONS"). NOVELL hereby warrants that as of
> NOVELL's signature date of this ADDENDUM, as provided below,
> NOVELL has no present, or future or reversionary interest in any
> such source code royalties. NOVELL hereby warrants that
> NOVELL has full right and authority to modify the terms and
> conditions of the AGREEMENT with respect to the HP BINARY
> ROYALTY OBLIGATIONS. The purpose of this ADDENDUM is
> to simplify those obligations, as well as corresponding reporting
> obligations.

(¶ 99 (emphasis added).) Novell specifically warrants that it has "no present, or future or

reversionary interest in any such source code royalties." In view of its purported right to amend

the SVRX agreements at whim, this warranty represents an inexplicable and gratuitous self-

imposed limitation.

In 1997, Santa Cruz turned over to Novell negotiations with Cray Computers. Santa Cruz

advised Novell that it had no right under the APA to negotiate source code rights or fees, and

Novell agreed. (¶¶ 100-101.) In fact, before negotiating with Cray, Novell asked Santa Cruz to

execute a letter agreement to "enable Novell to negotiate directly with Cray on the issue of

Cray's intention to operate under the SGI Agreements for all SVRX royalty-generating binary

shipment without requiring direct involvement from SCO." (¶ 101.) That letter also stated:

> By signature below, SCO authorizes Novell to negotiate and
> conclude with Cray the issue of Cray's intention to operate under the
> SGI agreements for all SVRX royalty-generating binary shipments.

74

> Novell agrees to inform SCO of any settlement prior to concluding a
> settlement with Cray. <u>SCO's prior approval of any such settlement
> will be required only if the proposed settlement would alter Cray's
> obligation to SCO for source code royalties</u> currently due under the
> Cray Agreements, including allowing Cray to operate wholly under
> the SGI Agreements instead of the Cray Agreements. <u>In such a case,
> in addition to having the right to give prior approval, SCO shall have
> the right to negotiate directly with Cray for the continuation of
> Cray's rights to distribute source code currently provided under the
> Cray Agreements.</u>

(<u>Id.</u>) Had Novell believed that it had the broad rights it now claims, it would not have needed

SCO's "prior approval" to negotiate the continuation of Cray's rights to distribute source code.

In 1998, Novell conducted an audit of SCO's royalty payments to Novell pursuant to

Section 1.2 and Section 4.16 of the APA. (¶ 102.) Novell representatives did not ask for any

data other than the reports of the binary royalties from the SVRX licenses that existed at the

time of the APA, and never asked about licensing of source code. (<u>Id.</u>)

Before the 2003 audit, Santa Cruz and SCO sent Novell nearly 100 monthly reports in

compliance with their obligations to collect and remit 95% of the SVRX Royalties. (¶ 103.)

Those reports contained data only for the SVRX binary royalties paid during each period, and

did not contain information on SVRX source code fees or any other payments. (<u>Id.</u>)

Through 2005, SCO paid to Novell approximately the following amounts in binary royalties,

complying with the APA: $174,545,098.90. (¶ 104.) In addition, Novell received the

following lump payments from buyouts granted after the APA to such companies as IBM, HP,

and Cray: $28,521,250. (<u>Id.</u>)

Novell's conduct in the seven years that followed the APA contrasts starkly with its

current conduct. Starting in 2003, when SCO sued IBM and Novell undertook its Linux

partnership with IBM, Novell suddenly starting claiming Section 4.16(b) and other rights belied by its prior conduct.[13]

———————————

SCO submits that the uncontroverted extrinsic evidence thus confirms the parties' intent under the APA and Amendments thereto, and therefore warrants summary judgment for SCO. Accordingly, in addition to the grounds for denying Novell's Motion set forth throughout this Memorandum, and to the extent the Court may not enter summary judgment in SCO's favor, Novell's Motion also fails under Federal Rule of Civil Procedure 56(f).

## II.    NOVELL'S MOTION ALSO FAILS FOR NOVELL'S BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING UNDER CALIFORNIA LAW.

Novell's request for summary judgment on the entirety of its Fourth Request for Relief is also improper under California law regarding the covenant of good faith and fair dealing. SCO alleges in its Second Claim for Relief that "Novell has also breached the covenant of good faith and fair dealing under the APA and TLA," including by "purporting to waive and revoke SCO's rights and claims against IBM." (SCO's Second Amended Complaint ¶¶ 96-100.)

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 372 (1992). In other words, "where a contract confers on one party a discretionary power

———————————

[13]    In contrast, the vast evidence of Novell's conduct that SCO presents, Novell and IBM strain to identify any conduct by SCO or Santa Cruz that creates an issue of fact. Both cite (at 31 and 75, respectively) SCO's public statement that it acts as Novell's agent "in the collection of royalties for customers who deploy SVRX technology." But that statement directly supports SCO's arguments here. The reference to "royalties" in the context of source-code licensing plainly refers to binary payments; source-code right-to-use fees are just that: "fees," not royalties.

affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." Perdue v. Crocker Nat'l Bank, 38 Cal. 3d 913, 923 (1985) (quotations omitted); accord Kendall v. Ernest Pestana, Inc., 40 Cal. 3d 488, 500 (1985); Cal. Lettuce Growers v. Union Sugar Co., 45 Cal. 2d 474, 484 (1955); Badie v. Bank of Am., 67 Cal. App. 4th 779, 795-96 (1998); Locke v. Warner Bros. Inc., 57 Cal. App. 4th 354, 363 (1997).[14] The duty is violated where the party either exercises the discretionary right in bad faith or in an objectively unreasonable way, regardless of the actor's motive. Carma, 2 Cal. 4th at 372-73; Badie, 67 Cal. App. 4th at 795-96. Under the objective test, the covenant "requires the party holding such power to exercise it for any purpose within the reasonable contemplation of the parties at the time of formation -- to capture opportunities that were preserved upon entering into the contract." Carma, 2 Cal. 4th at 372 (quotations and citations omitted); accord Badie, 67 Cal. App. 4th at 796.

Novell seeks a blanket declaration that it "has the right, at its sole discretion, to direct SCO to waive any rights under any SVRX Licenses." (Novell's Amended Counterclaims ¶ 118.) Novell also seeks a specific declaration, pertaining to its conduct with respect to IBM, that "Novell is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM, Sequent and other SVRX licensees." (Id. ¶ 119(a).) Novell is not entitled to summary judgment on either declaration, because there are material issues of fact indicating Novell's waiver is in breach of the covenant of good faith and fair dealing.

---

[14]   Indeed, to the extent Novell seeks to argue that Section 4.16(b) disclaimed any such obligation of good faith in the exercise of Novell's discretion, Novell was not then permitted to obtain any such disclaimer, which would have constituted an unconscionable contractual provision. See Seaman's Direct Buying Serv., Inc. v. Standard Oil Co. of Cal., 36 Cal. 3d 752, 769 n.7 (1984). In addition, the argument that Novell had no obligation of good faith or fair dealing in the exercise of its discretion would render the APA illusory. See Perdue, 38 Cal. 3d at 924; Cal. Lettuce, 45 Cal. 2d at 484.

SCO's evidence showing that at the time Novell directed SCO to waive its rights, Novell was improperly seeking to promote business interests entirely separate from any rights it retained under the APA. In a series of deals struck between November 2003 and March 2004, Novell and IBM have formed a very close Linux partnership: Novell acquired Linux distributor SuSE Linux, and IBM invested $50 million in Novell to finance part of the acquisition. Press Release, Novell, Inc., Novell Finalizes IBM Investment (Mar. 3, 2004) (Ex. 45). Under the IBM-Novell deal, Novell became a major Linux distributor, allowing IBM to continue its official distance from the Linux distribution channel. IBM spokesman Mike Darcy stated: "IBM is not a Linux distributor and has no interest in being in that business." Hiawatha Bray, Novell to Buy SuSE Linux for $210M; Firm's Commitment to Software Boosted, The Boston Globe, Nov. 5, 2003 (Ex. 41.) IBM benefits significantly from the Linux distributions made by Novell. Novell CEO Jack Messman explained the benefits of its partnership with IBM as follows: "IBM stands to gain a great deal of revenue by providing systems, peripheral devices, software and services for Linux." Bom Mims, Novell, IBM and HP unite efforts to put Linux on top: Three companies unite to boost Linux and topple Microsoft, The Salt Lake Tribune, Mar. 25, 2004, at E1 (Ex. 42.)

Whether Novell exercised it purported waiver right in conjunction with IBM's decision to invest in Novell or for other motives, it is clear that the action damages SCO, interferes with its rights to manage the UNIX business the APA was intended to transfer, and thus cannot be accepted as a good faith exercise of discretion, beyond factual dispute. Novell has not even attempted to present evidence establishing that its exercise of any waiver rights protected interests that Novell and Santa Cruz contemplated when they executed the APA and amendments

thereto.  Accordingly, for this additional, independently sufficient reason, the Court must deny

Novell's motion.

## CONCLUSION

SCO respectfully submits, for the foregoing reasons, that the Court should deny Novell's

Motion for Partial Summary Judgment on Its Fourth Counterclaim and grant SCO's Cross-

Motion for Partial Summary Judgment.

DATED this 17th day of January, 2007.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

*Counsel for The SCO Group, Inc.*

By: _____

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant, Novell, Inc., on this 16th day of April, 2007, via CM/ECF to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-248

/s/ Edward Normand