## Appendix A

### Response to Novell's Statement of Undisputed Facts[1]

**A.    The APA and Novell's Retained Rights Under Section 4.16(b) to Direct SCO to Take Action, or Upon SCO's Refusal, to Take Action on Behalf of SCO.**

1.      In 1995, Novell was engaged in the business of developing a line of operating system software products called UNIX and UnixWare, and was selling binary and source code licenses to various versions of these products.  (Brakebill Decl., Ex. 1 (APA) at 008 (Recital A).)

Disputed in that on September 19, 1995, Novell transferred the entire UNIX business, including the UNIX source code and copyrights, to Santa Cruz, except for the binary royalties paid under the existing agreements pursuant to which UNIX System V (or "SVRX") licensees were paying such royalties, and which Novell conveyed to Santa Cruz under the APA as part of the UNIX business.  (¶¶ 1-15.)

2.      On September 19, 1995, Novell and Santa Cruz entered into the APA.  (*Id.* at 008.)

Undisputed.

3.      Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business.  (*Id.* at 008 (Recital B), 008-9 (§ 1.1(a)); Ex. 2 at 001 (Recital A).)

Disputed to the extent that the term "certain of the assets" suggests that after September 19, 1995, Novell retained any portion of the UNIX business, including the UNIX source code and copyrights, except for the binary royalties paid under the existing agreements pursuant to which SVRX licensees were paying such royalties.  (¶¶ 1-24.)

---

[1] In citing its basis for disputing a Novell statement of fact, SCO cites herein either paragraphs in SCO's Statement of Facts above or directly to exhibits, or both.

Dockets.Justia.com

4.      Through the APA, Santa Cruz also acquired the right to develop, license, and sell a new consolidated Intel UNIX product referred to as the "Merged Product." (*Id.*, Ex. 1 at 032 (§ 4.18); Ex. 2 at 001-2 (§§ 1-2); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 3-4 (¶ 14).)  Santa Cruz also obtained the right to convert "SVRX-based customers" to a UnixWare derived product. (*See, e.g.*, Brakebill Decl., Ex. 1 at 065-066 (Sch. 1.2(b) at subsection (f)).)

The first sentence is disputed because the APA did not grant the referenced right. (See Ex. 3.)  The second sentence is disputed to the extent the statement suggests that the right to "convert SVRX-based customers" to UnixWare was not one of the numerous rights SCO acquired in acquiring "all right, title and interest" and "All rights and ownership" in the Business. (See Ex. 3 § 1.1(a), Schedule 1.1(a) Item I.)

5.      Because Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell, Novell and Santa Cruz agreed that Novell would receive Santa Cruz stock and retain certain UNIX rights. (*The SCO Group, Inc. v. IBM Corp.*, No. 2:03CV294 (D. Utah 2005) (hereinafter "*SCO v. IBM*"), SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims, dated November 11, 2006 (hereinafter "SCO's Opp. to IBM's MSJ on SCO's Contract Claims"), PACER No. 872-75 at Appendix A, p. 69 (Undisputed Fact ¶ 136).)

Disputed to the extent the statement suggests that Novell retained any rights in UNIX other the right to receive and protected the residual SVRX binary royalties due under then-existing SVRX Licenses (the "binary royalty stream"). (¶¶ 1-20.)

6.      In consideration of Novell's transfer of certain assets to Santa Cruz, Santa Cruz issued 6,127,500 shares of its common stock to Novell. (Brakebill Decl., Ex. 1 at 009 (§ 1.2).)

Undisputed.

7.      As further consideration, Novell retained rights, and Santa Cruz assumed certain obligations, relating to "the SVRX Licenses." (*Id.* at 009 (§ 1.2(b)), 031 (§ 4.16), 059-60 (Sch. 1.1(a)(Item VI)), and 062 (Sch. 1.1(b)(Item VIII)).)

Disputed to the extent that the statement "Novell retained rights" suggests that pursuant to the APA, Novell retained any portion of the UNIX business, including the UNIX source code

and copyrights, except for the binary royalties paid under the existing agreements pursuant to

which SVRX licensees were paying such royalties.  (¶¶ 1-20.)  Disputed to the extent the term

"SVRX Licenses" includes agreements other than the product Supplements (also known as

product Schedules) under which Novell, like its predecessor and successors, actually licensed

SVRX products.  (¶¶ 36-49.)

8.    First, Novell retained "[a]ll right, title and interest" to "all royalties, fees, and
other amounts due under all SVRX Licenses" — referred to as "SVRX Royalties."  (*Id.* at 031 (§
4.16(a)), 062 (Sch. 1.1(b)(Item VIII)).)  Although the APA transferred "the SVRX Licenses" to
Santa Cruz, Novell and Santa Cruz expressly acknowledged and agreed "that [Santa Cruz] only
has legal title and not an equitable interest in such royalties."  (*Id.* at 009 (§ 1.2(b)).)  As Novell's
"administrative agent" for the sums due under all SVRX Licenses, Santa Cruz agreed "to collect
and pass through to [Novell] one hundred percent (100%)" of these monies and Novell, in turn,
agreed to pay Santa Cruz a 5% administrative fee.  (*Id.* at 009 (§ 1.2(b)), 031 (§ 4.16(a)); Ex. 42
at 42).)

Disputed in that the APA transferred the entire UNIX business, including the UNIX

source code and copyrights, to Santa Cruz except for the binary royalties paid under the existing

agreements pursuant to which SVRX licensees were paying such royalties, and which Novell

conveyed to Santa Cruz under the APA as part of the UNIX business.  (¶¶ 1-15.)  Disputed to the

extent the term "SVRX Licenses" includes agreements other than the product Supplements (also

known as product Schedules) under which Novell, like its predecessor and successors, actually

licensed SVRX products.  (¶¶ 36-49.)  Disputed to the extent the term "SVRX Royalties"

includes fees other than the per-copy, or binary-royalty, fees paid by licensees under SVRX

licenses transferred to Santa Cruz under the APA for the distribution of SVRX products in binary

form.  (¶¶ 16-24.)

3

9.      Prior to this lawsuit, SCO publicly acknowledged that these administrative duties with respect to SVRX Licenses extend to "customers who deploy SVRX technology." Specifically, SCO stated that:

> [SCO] acts as an administrative agent in the collection of royalties for ***customers who deploy SVRX technology.***  Under the agency agreement, the Company collects all customer payments and remits 95 percent of the collected funds to Novell and retains 5 percent as an administrative fee.

(*Id.*, Ex. 42 at 42 (emphasis added).)  In this announcement, SCO did not report that its administrative duties under the APA are limited to a more narrow set of SVRX customers that includes only those licensing SVRX products in binary code format.

Disputed because the quotation actually supports SCO's position, in that the word "royalties" shows that SCO's obligations (and Novell's rights) are limited to the SVRX binary royalty stream.  Disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products.  (¶¶ 36-49.)  Disputed to the extent that the statement includes any agreement other than the SVRX licenses transferred to Santa Cruz under the APA.  (Id.)  Disputed to the extent that the public statement, when taken in context, accurately describes SCO's obligations under the APA.

10.     As part of the agency relationship created by the APA, Santa Cruz agreed to provide Novell with monthly reports concerning its administration of the SVRX License revenue.  (*Id.*, Ex. 3 at 4 (§ E(f)), 6 (I(1)).)  In those reports, Santa Cruz recorded SVRX revenue it received from customers and detailed the cash Santa Cruz remitted to Novell.  In particular, Santa Cruz set forth the total SVRX revenue due or collected from customers (which it recorded as "Total Revenue for Administrative Consideration for Period"), SCO's 5% administrative fee (which it recorded as "Administrative Fee" or "Domestic Administrative Fee Calculation"), and the cash amount it would pay Novell after deduction of SCO's administrative fee, third party royalty payments, bank fees or other miscellaneous offsets (which it recorded as "Total Payment Due to Novell for Period").  (*See, e.g., id.*, Ex. 14 at 1; Ex. 43 at 1.)

Disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its

4

predecessor and successors, actually licensed SVRX products.  (¶¶ 36-49.)  Disputed to the

extent the document relies on reports in Novell's, but not SCO's, possession, custody, or control.

Disputed to the extent the term "SVRX revenue" includes fees other than the per-copy, or

binary-royalty, fees paid by licensees under SVRX licenses transferred to Santa Cruz under the

APA for the distribution of SVRX products in binary form.  (¶¶ 16-24.)

      11.    <u>Second</u>, Novell retained the right, "at [its] sole discretion and direction," to direct
Santa Cruz to take certain actions as to "any SVRX License" — including to direct Santa Cruz to
waive any rights under "any SVRX License" — and to take such action on Santa Cruz's behalf
should Santa Cruz fail to follow Novell's direction.  (*Id.*, Ex. 1 at 031 (§ 4.16(b)).)  Section
4.16(b) provides, in pertinent part:

    (b)    [SCO] shall not, and shall not have the authority to, amend, modify or
waive any right under or assign any SVRX License without the prior
written consent of [Novell]. ***In addition, at [Novell]'s sole discretion and
direction, [SCO] shall amend, supplement, modify or waive any rights
under, or shall assign any rights to, any SVRX License to the extent so
directed in any manner or respect by [Novell]. In the event that [SCO]
shall fail to take any such action concerning the SVRX Licenses as
required herein, [Novell] shall be authorized, and hereby is granted, the
rights to take any action on [SCO]'s own behalf…***
(*Id.* (emphasis added).)

Disputed to the extent the term "SVRX License" includes agreements other than the

product Supplements (also known as product Schedules) under which Novell, like its

predecessor and successors, actually licensed SVRX products.  (¶¶ 36-47.)  Disputed to the

extent the statement asserts or suggests that the rights in Section 4.16(b) extend beyond the right

to protect the binary royalty stream.  Disputed to the extent the statement suggests that, pursuant

to the APA, Novell transferred the entire UNIX business, including the UNIX source code and

copyrights, to Santa Cruz except for the binary royalties paid under the existing agreements

pursuant to which SVRX licensees were paying such royalties, and which Novell conveyed to

Santa Cruz under the APA as part of the UNIX business.

12.    Section 4.16 of the APA — entitled SVRX Licenses — defines that term. (*Id.* at 031 (§ 4.16(a)).)  The first sentence of subparagraph (a) of Section 4.16 refers to "SVRX Licenses" and is then immediately followed by an explanatory parenthetical stating: "as listed in detail under item VI of Schedule 1.1(a) hereof..." (*Id.*)  Item VI of Schedule 1.1(a), in turn, provides a list of "the SVRX Licenses" that relate to various UNIX System V software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2 and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0." (*Id.* at 059-60 (Sch. 1.1(a)).)

Disputed in that Sections 4.16(a) and Item VI do not define the term "SVRX Licenses" except in a circular reference to itself in Item VI.  Disputed in that Item VI does not list any licenses.  Disputed to the extent the term "SVRX Licenses" includes agreements other than the product Supplements (also known as product Schedules) under which Novell, like its predecessor and successors, actually licensed SVRX products. (¶¶ 26-49.)

**B.    The APA Amendments As Related to SVRX Licenses and Novell's 4.16(b) Right to Take Action.**

13.    Novell and Santa Cruz amended the APA twice — on December 6, 1995 ("Amendment No. 1"), and on October 16, 1996 ("Amendment No. 2"). (*Id.*, Exs. 3-4.)

Undisputed.

14.    Amendment No. 1 confirms that SVRX Licenses includes those contracts relating to the UNIX System V software releases listed under Item VI of Schedule 1.1(a) of the original APA.  Amendment No. 1 also expands SVRX Licenses to additionally include those contracts relating to certain "Auxiliary Products" expressly identified in Attachment A to that Amendment (which is alternatively referred to as "Attachment 1 to Schedule 1.1(a)"). (*Id*, Ex. 3 at 9 (§ K.4), 8 (§ K.1(vi)), 10 (§ 0).)

Disputed in that Amendment No. 1 does make the confirmation Novell contends. (<u>See</u> 49.)  Disputed in that Attachment A does not list any licenses. (¶¶ 25-29.)  Disputed in that Sections 4.16(a) and Item VI do not define the term "SVRX Licenses" except in a circular reference to itself in Item VI. (<u>Id.</u>)  Disputed in that Item VI does not list any licenses. (<u>Id.</u>)

6

Disputed to the extent the term "SVRX Licenses" includes agreements other than the product

Supplements (also known as product Schedules) under which Novell, like its predecessor and

successors, actually licensed SVRX products. (¶¶ 26-49.)

15.    Amendment No. 1 modifies Section 4.16(b) in only one respect: it carves out two limited exceptions where Santa Cruz has "the right to enter into amendments of the SVRX Licenses" and "new SVRX Licenses" — exceptions that are not at issue in this motion. (*Id.* at 6-7 (§ J).) Amendment No. 1 contains no language purporting to modify Section 4.16(b)'s grant of authority to Novell to direct SCO to take action, or to take action on behalf of SCO. (*Id.*, Ex. 3.)

Disputed to the extent the statement does not identify the universe to which the purported

exceptions apply. Disputed to the extent the term "SVRX Licenses" includes agreements other

than the product Supplements (also known as product Schedules) under which Novell, like its

predecessor and successors, actually licensed SVRX products. (¶¶ 26-49.) Disputed to the

extent that the statement includes any agreements other than the SVRX licenses transferred to

Santa Cruz under the APA. (Id.)

16.    Amendment No. 2 addresses Section 4.16 of the APA in one limited respect: it details how prospective buy-outs with SVRX licensees shall be managed by Novell and Santa Cruz. (*Id.*, Ex. 4 at 1.) In relevant part, Section B of Amendment No. 2 provides:

B.    Except as provided in Section C below, and notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement, ***any potential transaction with an S VRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows....*** (*Id.* (emphasis added).)

Section B then immediately proceeds to list six subsections to be followed by Novell and Santa Cruz in managing future buy-out transactions. (*Id.* at 1-2.)

Disputed in that Amendment No. 2 addressed Section 4.16 in other respects. Disputed to

the extent Paragraph B.5. set forth clarifications that applied far beyond the management of

buyouts. (¶¶ 50-52.) Disputed to the extent the term "SVRX licensees" includes parties to

agreements other than the product Supplements (also known as product Schedules) under which

Novell, like its predecessor and successors, actually licensed SVRX products. (¶¶ 26-49.)
Disputed to the extent the term "royalty" includes fees other than the per-copy, or binary-royalty,
fees paid by licensees under SVRX licenses transferred to Santa Cruz under the APA for the
distribution of SVRX products in binary form. (¶¶ 16-24.)

      17.    Subsections B(1) through B(4) of Amendment No. 2 require participation of both
Novell and Santa Cruz in any prospective buy-out transaction with SVRX licensees. (*Id.* at 1.)
Subsection B(5) of Amendment No. 2 confirms that Amendment No. 2's new procedure for
managing future buy-out transactions does not alter the parties' existing source code rights under
the APA. (*Id.*) Subsection B(6) of Amendment No. 2 prohibits Novell's sales force from
receiving sales incentives as a result of these prospective buy-out transactions. (*Id.* at 2.)

      Disputed to the extent the statement attempts to paraphrase in one paragraph a two-page
document that speaks for itself. Disputed in that Paragraph B clarified and was intended to
clarify that, in granting buyouts, Novell could not grant any source code rights. (¶¶ 50-51.)
Disputed in that Paragraph B clarified and was intended to clarify that, notwithstanding Section
4.16(b) or any prior Novell interpretation of that provision, Novell did not have any rights with
respect to the licensing of source code under the APA. (¶¶ 50-52.) Disputed in that that
paragraph made clear that under the APA Santa Cruz had exclusive right to license source code.
(Id.) Disputed to the extent the term "SVRX licensees" includes parties to agreements other than
the product Supplements (also known as product Schedules) under which Novell, like its
predecessor and successors, actually licensed SVRX products. (¶¶ 26-49.)

### C.    The AT&T License Agreements Granting Rights to UNIX System V Software.

      18.    UNIX was originally developed by AT&T. Over time, AT&T, through various
business units and subsidiaries, licensed various versions of its UNIX software, in both source
and object code form, to universities, corporations, other entities and individuals. (*SCO v.
Novell*, Novell's Amended Counterclaims, PACER No. 142 at 1-2 (¶ 6); *SCO v. Novell*, SCO's
Reply to Novell's Amended Counterclaims, PACER No. 158 at 2 (¶ 6); *SCO v. IBM*, SCO's

Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872-75 at Appendix A p. 3 (Undisputed Facts ¶¶ 10-11).)

Undisputed.

19.     In 1983, AT&T developed a new version of UNIX called UNIX System V, Release 1. Subsequently, AT&T released other versions of System V, including Releases 2, 3 and 4. These releases of UNIX System V are referred to as SVR1, SVR2, SVR3 and SVR4, or generically as SVRX. (*SCO v. IBM*, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872-75 at Appendix A p. 3 (Undisputed Fact ¶ 9); *SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 2 (¶ 7); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 2 (¶ 7).)

Undisputed.

20.     AT&T licensed its UNIX System V software products through a combination of Software Agreements, Sublicensing Agreements, Supplements, and Schedules. The "Software Agreements" granted the licensee the right to use, modify and prepare modifications and derivative works of the "SOFTWARE PRODUCT." (*See, e.g.*, Brakebill Decl., Ex. 5, at 002 (§ 2.01).) The SOFTWARE PRODUCT was defined to include COMPUTER PROGRAMS in source-code or binary-code (*i.e.*, "object-code") format. (*Id.* (§§ 1.02, 1.04).)

Disputed in that AT&T used the Product Supplements, which included the Schedule, to license its software products, including non-UNIX products. (¶ 2.) Disputed in that Software Agreement granted the listed rights only with respect to any product that the licensee actually licensed under that product's respective Supplement. (Id.) Disputed in that a licensee did not obtain any rights to, or even delivery of, any product until the licensee signed the respective Supplement. (¶¶ 35-40.) Disputed, here and elsewhere in this response, to the extent the statements place the referenced agreements in quotations marks without any explanation for doing so.

21.     The "Sublicensing Agreements" permitted the licensee to sublicense derivative works of the SOFTWARE PRODUCT to others in binary-code format. (*See, e g., id.*, Ex 6 at 002 (§§ 1.04, 2.01).) These derivative works were referred to as the SUBLICENSED PRODUCT. (*Id.* (§ 1.04).)

Disputed in that the Sublicensing Agreements granted the referenced right only with respect to any product that the licensee actually licensed under the product's respective Supplement. (¶¶ 35-40.) Disputed in that a licensee did not obtain any rights to, or even delivery of, any product until the licensee signed the respective Supplement. (Id.)

22.     The "Software Agreements" were accompanied by one or more "Supplements" (through attached "Schedules") that set forth the specific SOFTWARE PRODUCT being licensed, listed the designated CPUs on which the SOFTWARE PRODUCT was to be used, and enumerated the fees owed. (See, e.g., id., Ex. 5 at 007-15.) Any given Supplement (through an attached "Schedule") identified, among other things, both the fees owed for use and distribution of source code and the fees owed for use and distribution of binary code. (Id. at 007; Ex. 10 at 009.) They also contained additional provisions governing sublicensed code. (See, e.g., id., Ex. 12 at 043-44, Ex. 22 at 006-14.)

Disputed in that the Software Agreements were not accompanied by one or more Supplements, but were entered into independently, sometimes over the course of many years. (See Ex. 35.) Licensees who signed a Software Agreement were under no obligation to sign any Supplement. (See e.g., Ex. 57.) Licensees who signed a Software Agreement typically licensed numerous Supplements over the course of their licensing relationship with AT&T and/or its successors. (See Ex. 35.) Disputed to the extent the last sentence is vague and ambiguous. Disputed in that the pagination Novell has apparently applied to the cited exhibit gives the incorrect impression that the Supplement and Software Agreement are one continuous document. (n.10)

23.     Under the Software Agreements, the licensee typically paid a one-time source code right-to-use fee and a distribution fee for each additional copy of the SOFTWARE PRODUCT distributed by the licensee. (See, e.g., id., Ex. 5 at 007 (Items 1(a) & 1(b)), 003 (§ V) (referring to fees set forth in attached "Supplement(s)" and "Schedule(s)").) The Sublicensing Agreements explicitly reference the Schedules to the Software Agreements for the amounts of sublicensing fees due for each SOFTWARE PRODUCT. (See, e.g., id., Ex. 6 at 006 (§ 4.01(a)).) The licensee typically paid a one-time "sublicensing fee" in addition to a "per copy" fee for each

copy of the SUBLICENSED PRODUCT sold to a customer of the licensee. (*Id.*, Ex. 5 at 007 (Item 1(c)).)

Disputed in that licensees did not pay any fees under the Software Agreements and those Agreements did not give rise to any payment obligation. (¶ 42.) Disputed in that the phrase "distribution fee for each additional copy of the SOFTWARE PRODUCT distributed by the licensee" is vague and ambiguous. Disputed in that there were no "Schedules to the Software Agreements." Instead, the Schedules were part of the Product Supplement, and each Product Supplement had its own Product Schedule. (¶¶ 36-42.) Disputed in that the pagination Novell has apparently applied to the cited exhibit gives the incorrect impression that the Supplement and Software Agreement are one continuous document. (n.10.) Disputed to the extent the statement conflates the referenced agreements. (¶¶ 36-42.)

### D.    The IBM SVRX License.

24.    Between February 1, 1985 and October 17, 1996, IBM entered into various agreements, supplements, and amendments concerning its rights to use UNIX System V software products (hereinafter, collectively termed the "IBM SVRX License"). (*See* ¶¶ 25-27, *infra*.)

Disputed to the extent the statement conflates or blurs the distinction between discrete agreements. (¶¶ 36-42; Part I.D.) Disputed to the extent the term "IBM SVRX License" is misleading and nonsensical in that it tries to merge distinct documents into a single purported agreement. (Part I.D.) Disputed in that the statement incorrectly equates the various agreements with an "SVRX License" under the APA. (Id.)

25.    Specifically, on February 1, 1985, IBM and AT&T entered into a software agreement (SOFT-00015), sublicensing agreement (SUB-00015A), substitution agreement, and side letter (hereinafter, collectively referred to as "the 1985 IBM Agreement"). In these agreements, AT&T granted IBM a license to, among other things, use, modify, prepare derivative works of, and sublicense designated "Software Products," including UNIX System V Release No. 2.0. (Brakebill Decl., Exs. 5-8.)

11

Disputed to the extent the statement conflates or blurs the distinction between discrete

agreements. (¶¶ 36-42; Part I.D.) Disputed to the extent the term "the 1985 IBM Agreement" is

misleading and nonsensical in that it tries to merge distinct documents into a single purported

agreement. (Part I.D.) Disputed to the extent the statement incorrectly equates the various

agreements with an "SVRX License" under the APA. (Id.) Disputed in that AT&T did not grant

"a license" to any particular product under the Software and Sublicensing Agreements. (¶¶ 36-

42.) Disputed in that only a Product Supplement actually granted a license to a product. (¶¶ 36-

42.)

 26. Between April 21, 1986 and January 25, 1989, IBM and AT&T executed
numerous supplements to the 1985 IBM Agreement. (Id., Exs. 9-12.) These supplements
granted IBM additional rights to UNIX System V Release Nos.  REDACTED

Disputed to the extent the statement conflates or blurs the distinction between discrete

agreements. (¶¶ 36-42; Part I.D.) Disputed to the extent the term "the 1985 IBM Agreement" is

misleading and nonsensical in that it tries to merge distinct documents into a single purported

agreement. (Part I.D.) Disputed to the extent the statement incorrectly equates the various

agreements with an "SVRX License" under the APA. (Id.) Disputed in that the supplements did

not grant "additional" rights to the referenced products; the supplements granted rights to the

products. (¶¶ 36-42.)

 27. On October 17, 1996, IBM entered into Amendment No. X, also executed by
Novell and Santa Cruz on October 16, 1996. (Id., Ex. 13 at 007.) Amendment No. X modified
the terms of the 1985 IBM Agreement and the various supplements thereto, including
Supplement No. 170 to the software agreement (pertaining to SVR3.2) and "any other
Supplements that pertain to prior versions or releases" of UNIX System V software. (Id. at 001.)
Amendment No. X granted additional source code rights to IBM. (Id., Ex. 13 at 001-5; SCO v.
IBM, SCO's Opp. to IBM's MSJ on SCO's Contract Claims, PACER No. 872-75 at 103-04.)

Disputed to the extent the statement conflates or blurs the distinction between discrete

agreements. (¶¶ 36-42; Part I.D.) Disputed to the extent the term "the 1985 IBM Agreement" is

misleading and nonsensical in that it tries to merge distinct documents into a single purported

agreement. (Part I.D.) Disputed to the extent the statement incorrectly equates the various

agreements with an "SVRX License" under the APA. (Id.) Disputed to the extent that phrase

"additional source code rights" suggests that that IBM received any such rights other than the

limited right to distribute the source code to its contractors or certain other licensees for specified

purposes. (¶¶ 36-42.)

28.     Amendment No. X also granted IBM an "irrevocable, fully-paid-up, perpetual
right to exercise all of its rights . . . beginning January 1, 1996 at no additional royalty fee."
(Brakebill Decl., Ex. 13 at 001 (§ 1).) As consideration for the rights granted by Amendment
No. X, IBM paid Santa Cruz $10,125,000 in two installments – one payment of $4,860,000 and a
second payment of $5,265,000. (Id. at 005 (§ 4).)

Disputed to the extent the statement quotes the Amendment No. X out of context.

Disputed to the extent the statement equates the quoted language with a "non-terminable right."

29.     In Amendment No. X, the parties to that Agreement, including Santa Cruz,
explicitly recognized that Novell "retained certain rights with respect to" to the agreements that
IBM had entered into with AT&T, including "Software Agreement SOFT-00015 as amended"
and "Sublicensing Agreement SUB-00015A as amended." (Id. at 001.)

Disputed to the extent the quoted statement refers to any right other than the right to

continue receiving the SVRX binary royalties paid by IBM which were the subject of the buyout.

(¶¶ 85-88.)

30.     In November 1996, Santa Cruz collected $4,860,000 for its first payment from
IBM under Amendment No. X. In its monthly report for this period, Santa Cruz treated 100% of
this amount as SVRX revenue payable to Novell, subject to a 5% "Administrative Fee for IBM"
(or $243,000) that Santa Cruz would pay itself. (Id., Ex. 14 at 1.)

Disputed in that the statement omits the fact that Santa Cruz retained $750,000 from the

IBM payment in addition to the 5% administrative fee. (¶¶ 86-88.)

31.     In January 1997, Santa Cruz collected $5,265,000 for its second payment from IBM under Amendment No. X. In its monthly report for this period, Santa Cruz treated 100% of this amount as SVRX revenue payable to Novell, subject to a 5% "administrative fee" for the "IBM Buyout" (or $263,250) that Santa Cruz would pay itself. (*Id.*, Ex. 43 at 1, 3.)

Disputed in that the statement omits the fact that Santa Cruz retained $750,000 from the

IBM payment in addition to the 5% administrative fee. (¶¶ 86-88.)

32.     REDACTED

Disputed in that the word "separately" indicates the $1.5 million dollars retained by Santa

Cruz were unrelated to the buyout effected in Amendment No. X. (¶¶ 86-88.) Disputed in that

the SCO retained that money to release Novell of claims arising from its handling of the IBM

buyout, including the attempt to unilaterally grant the buyout. (Id.)

33.     The contracts comprising the IBM UNIX System V license agreements grant IBM rights to the same versions of UNIX System V software that are included within the universe of SVRX Licenses listed in Item VI of the APA — namely, UNIX System V Release Nos.
REDACTED

| IBM Licenses | Item VI of Schedule 1.1(a) |
|---|---|
| "UNIX* System V, Release 2.0, Version 1" (Brakebill Decl., Ex. 5 at 007, 009) | "All prior releases and versions of UNIX System V Release 2.0" (Brakebill Decl., Ex. 1 at 060) |
| "UNIX System V, Release 2.0, Version 1, International Edition" (*Id.*, Ex. 5 at 007) | "# All prior releases and versions of UNIX System V Release 2.0 International Editions" (*Id.*, Ex. 1 at 060) |
| `REDACTED                    (Id., Ex. 9 at 003-6) | "All prior releases and versions of UNIX System V Release 2.1" (*Id.*, Ex. 1 at 060) |

14

| | |
|---|---|
| REDACTED<br>          (*Id.*, Ex. 9 at 003-6) | "# All prior releases and versions of UNIX System V Release 2.1 International Editions" (*Id.*, Ex. 1 at 060) |
| ˙REDACTED                              (*Id.*, Ex. 10 at 009-14) | "UNIX System V Release 3.0" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>          (*Id.*, Ex. 10 009-14) | "UNIX System V Release 3.0 International Edition" (*Id.*, Ex. 1 at 060) |
| REDACTED                              (*Id.*, Ex. 11 at 001, 032-33) | "UNIX System V Release 3.1" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>          (*Id.*, Ex. 11 at 032-33) | "UNIX System V Release 3.1 International Edition" (*Id.*, Ex. 1 at 060) |
| "UNIX® System V, Release 3.2" (*Id.*, Ex. 12 at 001-43; Ex. 13 at 0011) | "UNIX System V Release 3.2" (*Id.*, Ex. 1 at 060) |
| "UNIX System V, Release 3.2, International Edition" (*Id.*, Ex. 12 at 042-44) | "UNIX System V Release 3.2 International Edition" (*Id.*, Ex. 1 at 060) |

Disputed in that Item VI does not list any licenses or agreements. (¶ 27.) Disputed to the extent the statement conflates or blurs the distinction between discrete agreements. (¶¶ 36-42.) Disputed to the extent the statement incorrectly equates any listed agreements with an "SVRX License" under the APA. (¶¶ 36-42.) Disputed in that the supplements did not grant "additional" rights to the referenced products; the supplements granted rights to the products. (Id.) Disputed in that the pagination Novell has apparently applied to the cited exhibits gives the incorrect impression that separate documents are one continuous document. Disputed to the extent the statement, by listing products here in the left column of the chart, suggests that Item VI lists licenses by listing products.

34.    Novell became the successor-in-interest to AT&T's rights under the IBM SVRX License after it purchased UNIX System Laboratories in 1993.  (*SCO v: IBM*, SCO's Second Amended Complaint, PACER No. 108 at 11 (¶ 47).)

Undisputed.

E.    **The Sequent SVRX License**

35.    Between April 18, 1985, and November 9, 1989, AT&T entered into various agreements and supplements licensing rights to UNIX System V software products to Sequent (hereinafter, collectively termed the "Sequent SVRX License").  (*See* ¶ 36-37, *infra*.)

Disputed to the extent the statement conflates or blurs the distinction between discrete

agreements.  (¶¶ 36-42.)  Disputed to the extent the term "Sequent SVRX License" is misleading

and nonsensical in that it tries to merge distinct documents into a single purported agreement.

(¶¶ 36-42.)  Disputed in that the statement incorrectly equates the various agreements with an

"SVRX License" under the APA.  (Id.)

36.    In particular, on April 18, 1985, AT&T entered into a Software Agreement (SOFT-000321 or "1985 Sequent Agreement"), supplemented on January 28, 1986, giving Sequent the right to, among other things, use, modify, and prepare derivative works of REDACTED    Brakebill Decl., Ex. 15 at 001-2 (§§ 1.01, 1.02, 1.04, 2.01); Ex. 16 at 001.)  On January 28, 1986, AT&T and Sequent also entered into a Sublicensing Agreement (SUB-000321A) that gave Sequent the right to sublicense the software products designated in the 1985 Sequent Agreement, including    REDACTED    *Id.*, Ex. 17 at 001-2 (§§ 1.01, 1.02, 1.04, 2.01).)

Disputed to the extent the statement conflates or blurs the distinction between discrete

agreements.  Disputed to the extent the term "the 1985 IBM Agreement" is misleading and

nonsensical in that it tries to merge distinct documents into a single purported agreement.  (¶¶

36-42.)  Disputed to the extent the statement incorrectly equates various agreements with an

"SVRX License" under the APA.  (¶¶ 36-42.)  Disputed in that AT&T did not grant "a license"

to any particular product under the Software and Sublicensing Agreements.  (¶¶ 36-42.)

Disputed in that only a Product Supplement actually granted a license to a product.  (¶¶ 36-42.)

16

Disputed to the extent that the statement suggests that the Sublicensing agreement granted rights to sublicense any particular product. (Id.) Disputed in that the phrase "supplemented on" is ambiguous and misleading. Disputed in that Sequent's Software Agreement, like any other Software Agreement, did not identify, much less "designate," any products. (¶¶ 36-42.)

    37.    Between   REDACTED   and November 9, 1989, Sequent and AT&T executed several supplements to the 1985 Sequent Agreement. These supplements
REDACTED

    Disputed to the extent the statement conflates or blurs the distinction between discrete agreements. (¶ 27.) Disputed to the extent the term "the 1985 Sequent Agreement" is misleading and nonsensical in that it tries to merge distinct documents into a single purported agreement. (¶¶ 36-42.) Disputed to the extent the statement incorrectly equates various agreements with an "SVRX License" under the APA. (¶¶ 36-49.) Disputed in that the supplements did not grant "additional" rights to the referenced products; the supplements granted rights to the products. (Id.)

    38.    The contracts comprising the Sequent UNIX System V license agreements

REDACTED

| Sequent Licenses | Item VI of Schedule 1.1(a) |
|---|---|
| REDACTED   (Brakebill Decl., Ex. 16 at 001-5) | "All prior releases and versions of UNIX System V Release 2.0"  (Brakebill Decl., Ex. 1 at 060) |
| REDACTED   (Id., Ex. 16 at 002-7) | "# All prior releases and versions of UNIX System V Release 2.0, International Edition" (Id., Ex. 1 at 060) |
| REDACTED   (Id., Ex. 18 at 001-5) | "All prior releases and versions of UNIX System V Release 2.1" (Id., Ex. 1 at 060) |

| | |
|---|---|
| REDACTED<br>(*Id.*, Ex. 18 at 002-5) | "# All prior releases and versions of UNIX System V Release 2.1, International Edition" (*Id.*, Ex. 1 at 060) |
| REDACTED                    (*Id.*, Ex. 19 at 001-9) | "UNIX System V Release 3.0" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>(*Id.*, Ex. 19 at 003-9) | "UNIX System V Release 3.0 International Edition" (*Id.*, Ex. 1 at 060) |
| REDACTED                    (*Id.*, Ex. 20 at 001-4) | "UNIX System V Release 3.1" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>(*Id.*, Ex. 20 at 001, 003-4) | "UNIX System V Release 3.1 International Edition" (*Id.*, Ex. 1 at 060) |
| REDACTED                    (*Id.*, Ex. 21 at 001-5) | "UNIX System V Release 3.2" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>(*Id.*, Ex. 21 at 002-5) | "UNIX System V Release 3.2 International Edition" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>(*Id.*, Ex. 22 at 001, 003) | "UNIX System V Release 4.0, Intel 386 Version 1 Implementation"; "UNIX System V Release 4.0, Intel 386 Version 2 Implementation"; "UNIX System V Release 4.0, Intel 386 Version 3 Implementation"; "UNIX System V Release 4.0 MP, Intel 386 Version 4 Implementation"; "UNIX System V Release 4.0 MP, Intel 386 Implementation" (*Id.*, Ex. 1 at 060) |
| REDACTED<br>(*Id.*, Ex. 22 at 003) | "#UNIX System V Release 4.0 International Edition, Intel 386 Version 1 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 2 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 3 Implementation"; "#UNIX System V Release 4.0 International Edition, Intel 386 Version 4 Implementation" (*Id.*, Ex. 1 at 060) |

Disputed in that Item VI does not list any licenses or agreements. (¶ 27.) Disputed to the extent the statement conflates or blurs the distinction between discrete agreements. (¶¶ 36-42.)

Disputed to the extent the statement incorrectly equates any listed agreement with an "SVRX License" under the APA. (¶¶ 36-49.) Disputed in that the supplements did not grant "additional" rights to the referenced products; the supplements granted rights to the products. (Id.) Disputed in that the pagination Novell has apparently applied to the cited exhibits gives the incorrect impression that separate documents are one continuous document. Disputed to the extent the statement, by listing products here in the left column of the chart, suggests that Item VI lists licenses by listing products.

39.  Santa Cruz administered the Sequent UNIX System V license agreements as an SVRX License under the APA. For example, when Santa Cruz administered collection of revenue to be passed on to Novell from SVRX Licenses for the month of January 1997, Santa Cruz accounted for $6,560.49 in fees from the Sequent Licenses and noted a 5% "Admin Fee" in consideration of its administrative duties. (Id., Ex. 43 at 3.)

Disputed in that SCO accounted for and reported the royalties to Novell by product, corresponding to the Product Supplement under which the licensee paid those royalties. (See Ex. 35; Ex. 55 at 20- 25.) Disputed in that Santa Cruz did not administer the "Sequent UNIX System V license agreements" as an SVRX License. (¶¶ 36-39.) Disputed in that the cited document does not support the statement.

40.  In July of 1999, IBM purchased Sequent in a stock transaction, and assumed its rights and obligations under the Sequent Agreements. (SCO v. IBM, SCO's Second Amended Complaint, PACER No. 108 at 5, 49 (¶¶ 17, 168); SCO v. IBM, SCO's Answer to IBM's Second Amended Counterclaims, PACER No. 141 at 3 (¶¶ 15-16).)

Undisputed.

41.  Novell became the successor-in-interest to AT&T's rights under the Sequent SVRX License after Novell purchased UNIX System Laboratories in 1993. (SCO v. IBM, SCO's Second Amended Complaint, PACER No. 108 at 11 (¶ 47).)

Undisputed.

F.    **The 2003 SCOsource Campaign and SCO's Breach Claims Against IBM and Sequent.**

42.    SCO was not a party to the APA or its Amendments.  SCO claims to be the successor-in-interest to Santa Cruz's rights and obligations under the APA.  (*SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 20); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 5 (¶ 20).)

Undisputed.

43.    In January 2003, SCO unveiled its "SCOsource" initiative to "offset the decline in [its] UNIX business" and to increase revenue through license fees it would attempt to procure by licensing UNIX technology it claimed to own.  (*See, e.g.*, Brakebill Decl., Ex. 23 at 3-4, 9-10, 17-18; Ex. 24.)  In implementing SCOsource, SCO publicly stated that it owned the UNIX copyrights, wrote letters to Linux users and distributors threatening to sue them for infringement, and filed a number of lawsuits against end-users and distributors.  (*Id.*)

Disputed to the extent the statement implies that SCO does not own the UNIX technology, including copyrights, that is the subject of the SCOsource initiative.  (SCO's Mem. in Opp. to IBM's Mot. for Summ. J. on SCO's Contract Claims, <u>SCO v. IBM</u>, No. 2:03CV-0294, Nov. 11, 2006, at 63-65.)  Disputed to the extent that the statement mischaracterizes SCO's actions to enforce its rights concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."  Disputed to the extent the statement quotes SCO's statements out of context.  Disputed to the extent the statement is not supported by the cited material.

44.    As part of SCOsource, SCO threatened and purported to cancel or terminate the IBM and Sequent SVRX Licenses.  (*Id.*, Exs. 25-26.)

Disputed in that SCO terminated IBM's and Sequent's Software and Sublicensing Agreements.  Disputed to the extent that the statement characterizes SCO's actions to enforce its rights concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."

### 1.    SCO's Purported Termination of the IBM SVRX License.

45.    On March 6, 2003, SCO sent a letter to IBM threatening to terminate the IBM SVRX License as of June 13, 2003, if IBM did not remedy certain alleged breaches of that License. (Brakebill Decl., Ex. 25.)

Disputed in that SCO did not threaten but rather gave IBM and Sequent notice of their breaches of their Software and Sublicensing Agreements.  Disputed in that SCO terminated those Agreements.  Disputed to the extent that the statement characterizes SCO's actions to enforce its rights concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."

46.    On June 9, 2003, Novell wrote to SCO explaining that Section 4.16(b) of the APA (1) gave Novell the right to require SCO to (among other things) waive any rights under any SVRX License, and (2) authorized Novell to take such action on behalf of SCO should SCO fail to so act. (*Id.*, Ex. 27.)  Novell also noted that SCO had no right to terminate IBM's SVRX License because Amendment No. X granted IBM an "irrevocable, fully paid-up, perpetual right" to exercise all of its rights under IBM's SVRX Licenses. (*Id.*)  Novell concluded the letter by directing SCO "to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM." (*Id.*)  Novell directed SCO to do this by noon on June 12, 2003, and to notify Novell that it had done so by that time. (*Id.*)

Disputed in that the statement mischaracterizes Novell's rights under the APA.  (¶¶ 1-52.) The APA transferred the entire UNIX business, including the UNIX source code and copyrights, to Santa Cruz except for the binary royalties paid under the existing agreements pursuant to which SVRX licensees were paying such royalties, and which Novell conveyed to Santa Cruz under the APA as part of the UNIX business.  (Id.)  Disputed to the extent the statement suggests that the referenced Novell statements were truthful or correct.

47.    Novell's former CEO, Jack Messman, who authored the June 9, 2003 letter to SCO, confirmed that Novell directed SCO to take action, in part, to protect its royalty payment from IBM: "… we'd got a significant royalty payment that we were worried about; that if the

licenses were terminated, we might have to pay back; and it was a big risk to Novell." (*Id.*, Ex. 29 at 203:18-204:1.)

Disputed as to the accuracy of the conclusions made by Mr. Messman. Undisputed as to

the existence of the statement.

48.    On June 11, 2003, Darl McBride, SCO's President and Chief Executive Officer, responded to Novell on SCO's behalf with a refusal to take the action requested by Novell pursuant to Novell's Section 4.16(b) authority. (*Id.*, Ex. 28.) Mr. McBride acknowledged that IBM's System V license agreements are "SVRX License[s]." (*Id.* at 1.)

Disputed to the extent the statement suggests that Mr. McBride stated that the Software

and Sublicensing Agreements, or any other particular document, were "SVRX Licenses" under

the APA.

49.    On June 12, 2003, Novell sent a letter to SCO explaining the legal basis for Novell's waiver, including Novell's rights to take action at its "sole discretion" under Section 4.16(b). (*Id.*, Ex. 30.)

Disputed as to the legal accuracy of the statements made in the letter. Undisputed as to

the existence of the statements.

50.    When SCO failed to take the action demanded by Novell before noon on June 12, 2003, Novell sent another letter that same day to SCO. (*Id.*, Ex. 31.) The letter waived "any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM." (*Id.* at 2.)

Undisputed as to Novell's unauthorized attempt to waive SCO's rights. Disputed as to

Novell's right or authority to do so.

51.    Notwithstanding Novell's directive, SCO publicly announced on June 16, 2003 that it had terminated IBM's SVRX License as of June 13, 2003. (*Id.*, Ex. 32.)

22

Disputed in that SCO announced it had terminated IBM's Software and Sublicensing

Agreements. Disputed to the extent that the statement is not supported by the cited material.


52.    On October 7, 2003, in response to public positions being taken by SCO concerning code developed by IBM, Novell again sent SCO a letter notifying it of Novell's Section 4.16(b) authority, and "direct[ing] SCO to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of the [IBM] Agreements." (*Id.*, Ex. 33 at 3.) Pursuant to that authority, Novell directed SCO to "take these actions by noon, MST, on October 10, 2003, and to notify Novell that it has done so by that time." (*Id.*)

Disputed as to Novell's right or authority to waive or direct SCO to waive its rights

against IBM. Undisputed as to the existence and content of the letter.


53.    SCO responded to Novell's letter on October 9, 2003, stating that "[y]our analysis of the obligations that IBM...owe[s] to SCO pursuant to the relevant Software Agreements is incorrect. However, we need not debate the incorrectness of your views, particularly Novell's purported ability to waive any and all licensees' obligations under the Software Agreements, because, as you are well aware, we are currently litigating these issues with IBM." (*Id.*, Ex. 34.)

Undisputed.


54.    On October 10, 2003, Novell again wrote to SCO stating that because "SCO has failed to take the action directed by Novell," Novell "hereby waives any purported right SCO may claim to require IBM to treat IBM Code...as subject to the confidentiality obligations or use restrictions of the [IBM] Agreements." (*Id.*, Ex. 35.)

Disputed as to Novell's right or authority to waive SCO's rights against IBM.

Undisputed as to the existence and content of the letter.


55.    SCO responded to Novell on October 13, 2003, stating that "Novell is without authority to make such a waiver and thus it is of no force and effect." (*Id.*, Ex. 36.)

Undisputed.


56.    At no point during the written correspondence between SCO and Novell in 2003 concerning Novell's Section 4.16(b) authority to direct SCO to waive IBM's alleged breach of its System V license agreements (or to waive them on SCO's behalf) did SCO argue that the IBM agreements were not SVRX Licenses under the APA. (*Id.*, Exs. 28, 34, 36.) In addition, SCO never took the position in that correspondence that Novell was not authorized because

SVRX Licenses are limited to binaries and that, therefore, Novell's rights under Section 4.16(b) are limited to binary licenses or binary royalty streams. (*Id.*)

Disputed in that the statement is misleading. Disputed in that the statement suggests

SCO had any obligation to make statements Novell alleges SCO did not make. In the cited

communications, as in its complaint against IBM, SCO specifically stated that Novell had no

right with respect to the Software and Sublicensing Agreements. Disputed in that the phrase

"SVRX Licenses are limited to binaries" is unintelligible and misleading.


57.    SCO still disputes Novell's rights under Section 4.16(b) to direct SCO to take action, or to take action on SCO's behalf, as to the IBM SVRX Licenses. (*SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 18), 20-22 (¶¶ 89-96); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 4 (¶ 18), 17-18 (¶¶ 89-96).)

Disputed in that the term "IBM SVRX Licenses" is vague and ambiguous. Undisputed to

the extent the statement indicates that SCO still contends that Novell's rights under Section

4.16(b) are limited to the protection of its interest in the binary royalty stream.


## 2.    SCO's Purported Termination of the Sequent SVRX License.

58.    On May 29, 2003, SCO sent a letter to Sequent's Legal Department threatening to terminate the Sequent SVRX License, and all of Sequent's rights thereunder, as of September 2, 2003. (Brakebill Decl., Ex. 26 at 4.) Among other things, SCO alleged that Sequent violated source code restrictions on Sequent's Dynix software product, which SCO said is subject to Sequent's "System V Release 4.0 License." (*Id.* at 2-3.)

Disputed to the extent that the statement characterizes SCO's actions to enforce its rights

concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."

59.    On August 11, 2003, SCO sent another letter to Sequent purporting to terminate the Sequent License, effective retroactively as of July 30, 2003. (*Id.*, Ex. 37.)

Disputed to the extent that the statement implies that SCO did not terminate Sequent's

Software and Sublicensing Agreements.

60.    On August 14, 2003, IBM, acting on behalf of Sequent, responded to SCO's termination threats by stating that it did not believe it had breached the Sequent License, and requesting more details on the alleged breach. (*Id.*, Ex. 38.) In addition, IBM rejected SCO's claim that it had any right to terminate the Sequent License. (*Id.*)

Disputed to the extent that the statement characterizes SCO's actions to enforce its rights

concerning SCO's proprietary UNIX code and other protected materials in Linux as a "threat."

Disputed as to the legal accuracy of the statements made by IBM. Undisputed as to the existence

of the statements.

61.    On February 6, 2004, Novell sent a letter to SCO outlining the lack of support for SCO's position, and directing SCO "to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX License" no later than noon on February 11, 2004. (*Id.*, Ex. 39 at 2.)

Disputed as to Novell's right or authority to waive SCO's rights against Sequent or IBM.

Undisputed as to the existence and content of the letter.

62.    On February 11, 2004, after SCO conveyed its refusal to waive its purported rights against Sequent, Novell waived SCO's purported right to terminate the Sequent SVRX License on SCO's behalf, notifying SCO of this waiver via letter and fax. (*Id.*, Exs. 40-41.)

Disputed as to Novell's right or authority to waive SCO's rights against Sequent.

Undisputed as to the existence and content of the letter and the fax.

63.    At no point during the written correspondence between SCO and Novell in early 2004 concerning Novell's authority under Section 4.16(b) to direct SCO to waive Sequent's (or IBM as its successor) alleged breach of its System V license agreements (or to waive them on SCO's behalf) did SCO argue that the Sequent agreements were not SVRX Licenses under the APA. (*Id.*, Ex. 40.) In addition. SCO never took the position in that correspondence that Novell was not authorized because SVRX Licenses under the APA are limited to binaries and that, therefore, Novell's rights under Section 4.16(b) are limited to binary licenses or binary royalty streams. (*Id.*)

Disputed in that the statement is misleading.  Disputed in that the statement suggests SCO had any obligation to make statements Novell alleges SCO did not make.  In the cited communications, as in its complaint against IBM, SCO specifically stated that Novell had no right with respect to the Software and Sublicensing Agreements.  Disputed in that the phrase "SVRX Licenses are limited to binaries" is unintelligible and misleading.

64.     SCO still disputes Novell's rights under Section 4.16(b) of the APA to direct SCO to take action, or to take action on SCO's behalf, as to the Sequent SVRX License.  (*SCO v. Novell*, Novell's Amended Counterclaims, PACER No. 142 at 4 (¶ 18), 20-22 (¶¶ 89-96); *SCO v. Novell*, SCO's Reply to Novell's Amended Counterclaims, PACER No. 158 at 4 (¶ 18), 17-18 (¶¶ 89-96).)

Disputed in that the term "Sequent SVRX License" is vague and ambiguous.  Undisputed to the extent the statement indicates that SCO still contends that Novell's rights under Section 4.16(b) are limited to the protection of its interest in the binary royalty stream.