Brent O. Hatch (5715)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S REPLY MEMORANDUM IN SUPPORT OF ITS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT ON NOVELL'S FOURTH COUNTERCLAIM** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Civil No. 2:04CV00139 <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... i

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

I.  NOVELL'S INTERPRETATION CANNOT BE RECONCILED WITH THE
    LANGUAGE AND PURPOSE OF THE APA. ................................................. 2

    A.  Section 4.16(b) Is Ambiguous on Its Face............................................ 2

    B.  The APA Is Reasonably Susceptible to SCO's Interpretation............... 6

    C.  Amendment No. 2 Forecloses the Rights Novell Claims. .................... 10

II. THE EXTRINSIC EVIDENCE FORECLOSES NOVELL'S
    INTERPRETATION................................................................................... 12

    A.  The Testimonial Evidence. .................................................................. 12

    B.  The Documentary Evidence................................................................. 16

    C.  The Parties' Prior Conduct................................................................. 17

CONCLUSION........................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

Dore v. Arnold Worldwide, Inc.,
 39 Cal. 4th 384 (2006) .......................................................................................... 6

Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,
 69 Cal. 2d 33 (1968) ............................................................................................. 6

Wolf v. Super. Ct.,
 114 Cal. App. 4th 1343 (Ct. App. 2004).............................................................. 6

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this Reply Memorandum in Support of its Cross Motion For Partial Summary Judgment on Novell's Fourth Counterclaim.

## PRELIMINARY STATEMENT

In the face of testimony of no fewer than thirteen witnesses on both sides of the transaction, including the deposition testimony of its own CEO at the time of the APA, Novell continues to press its interpretation of the relevant APA provisions. In order to keep that testimony and other overwhelming extrinsic evidence out of the case, Novell insists that such evidence is inadmissible because the APA is not susceptible to any other interpretation. Novell is simply wrong.

In its opening brief, SCO showed the patent ambiguity of the term – "SVRX Licenses" – on which the Fourth Counterclaim admittedly "turns," and why Novell's proposed interpretation cannot be squared with the language and express intent of the APA. SCO accordingly argued that the Court must look at extrinsic evidence. In addition, as an independent basis for the admission of extrinsic evidence, SCO showed why that term is reasonably susceptible to SCO's interpretation, which unlike Novell's, does not conflict with the APA.

In addition, SCO has shown why Amendment No. 2 forecloses Novell's interpretation. The central provisions of the APA provide for an expansive and unequivocal transfer of all rights and ownership in the SVRX source code. Amendment No. 2 plainly provides that, notwithstanding Section 4.16(b), Novell cannot prevent SCO from exercising the unlimited rights granted in those provisions. In response, Novell does not even acknowledge those provisions, but merely states that Amendment No. 2 is irrelevant because it does not alter the

1

parties' rights with respect to source code. That may be right, but those rights under the APA reside entirely with SCO.

Accordingly, because the extrinsic evidence and Amendment No. 2 each independently establishes that Novell does not posses the rights it claims in its Fourth Counterclaim, that Counterclaim fails as a matter of law and the Court should grant SCO's Cross Motion for Summary Judgment.

## STATEMENT OF FACTS

I. **NOVELL'S INTERPRETATION CANNOT BE RECONCILED WITH THE LANGUAGE AND PURPOSE OF THE APA.**

A.   Section 4.16(b) Is Ambiguous on Its Face.

Although Novell argued (at 22 of its Opening Brief) that the scope of its authority under Section 4.16(b) "turns on the meaning of SVRX License," Novell has done nothing to establish that the term has a definite meaning, let alone one that includes the Software and Sublicensing Agreements. In its Opposition brief, Novell merely reiterates (at 4) its view that Section 4.16(b) extends to those Agreements because it refers to "any" SVRX License, but that view merely begs the question whether the term "SVRX License" includes those Agreements in the first place. Novell does not address, much less refute, the evidence that the term is ambiguous on its face:

- The term is not defined anywhere in the APA, except in a circular reference to itself in Item VI of Schedule 1.1(a). Nor does Novell address the case law holding that the absence of a definition alone may support a finding of ambiguity.

- Section 4.16(a) and Item VI refer to the SVRX Licenses as those listed in Item VI, but Item VI plainly does not list any licenses or agreements. Rather, Item VI lists

2

twenty SVRX <u>products</u> and several <u>categories of products</u>.  Novell purports to give

the APA a plain and literal reading, but that reading only means that Novell did not

retain any royalty, waiver, or other rights under Section 4.16.  Those rights plainly

pertain to the SVRX Licenses listed in Item VI.  Where no licenses are listed in Item

VI, Novell literally retained rights to nothing under Section 4.16.[1]

- The Software and Sublicensing Agreements that Novell attempts to fold into Item VI,
  including "All of Seller's rights" in those Agreements, are expressly transferred in
  Item III, a distinct provision of Schedule 1.1(a).

- Section 1.2(b), which provides that, "notwithstanding the transfer of the SVRX
  Licenses to Buyer," the "SVRX Royalties shall continue to be recognized as royalties
  by Seller on an ongoing basis," points to Section 4.16(a) for a description of those
  royalties.  Section 4.16(a), in turn, describes those royalties by reference to the
  "SVRX Licenses" and points to Item VI.  Given that Item VI and the SVRX Licenses
  are not referenced elsewhere, the only purpose of Item VI is to identify the SVRX
  Royalties.  But, since the APA does not identify the agreements under which such
  royalties were paid, the Court must look outside the four corners of the agreement.

Such language in the APA forecloses any definite meaning to the term "SVRX Licenses," let

alone the meaning that Novell proposes.  Novell cannot cure the patent ambiguity of the term

---

[1]    In addition, Novell ignores the language of Section 4.16(b) to the extent that it <u>is</u> unambiguous. Section 4.16(b) provides that "at Seller's own discretion and direction, Buyer shall, amend, supplement, or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner by the Seller."  By its own terms, Section 4.16(b) thus applies only to prospective actions.  Where SCO's actions against IBM and Sequent already accrued with the filing of the lawsuit against IBM in March 2003 without Novell even purporting to direct SCO to waive any rights, Novell's alleged waiver rights are inapplicable.  That is, Novell itself waived its purported rights.  Novell cannot, after the fact, assert its purported rights to make SCO drop its lawsuit against IBM.

merely by stating that it is not ambiguous. The Court must look at evidence extrinsic to the APA to resolve the ambiguity.

Novell is also silent on the other arguments that foreclose its proposed interpretation.

First, Novell does not dispute that its interpretation is hopelessly at odds with the key provisions and express purpose of the APA. Recitals A and B and Section 1.3(a)(i) of the APA could not more clearly reflect Novell's intent to transfer its entire UNIX and UnixWare Business to Santa Cruz. Similarly, Sections 1.1(a) and Schedule 1.1(a) could not be more expansive and unequivocal in their transfer of all rights and ownership of the assets pertaining to that Business. Yet, as SCO shows (at 52-55), Novell argues that a single sentence in Section 4.16(b) should be read to frustrate the purpose of the APA and extinguish the rights granted to Santa Cruz in those key provisions. That implausible construction of Section 4.16(b) cannot be accepted as a matter of settled contract-interpretation law. In its briefing, Novell does not contest the authority establishing that a contractual provision cannot be read that way, nor does Novell even dispute that its interpretation in fact conflicts with the APA.

Second, Novell makes only a glancing attempt, in a footnote, to address the arguments that its interpretation would make a sham of the APA transaction. As SCO argued (at 55), Novell's proposed interpretation would authorize Novell to:

- Waive its own breaches of the TLA, and modify its limited rights under the TLA, thus granting itself unlimited ownership and control of the very technology it sold under the APA. Novell now argues (at 7 of its Reply) that its purported rights do not extend to the TLA because "the TLA is expressly integrated into the APA." While

4

that may true for evidentiary purposes, the TLA remains a distinct contract that fits the sweeping definition of "SVRX License" that Novell proposes.

- Waive SCO's rights under its own Software and Sublicensing Agreements. As a result, SCO would have fewer rights than it would have had had Santa Cruz <u>not</u> entered into the APA. Novell makes no response to this argument.

- Extinguish SCO's rights to UnixWare and other products. Licensees such as NCR executed Product Supplements for SVRX, UnixWare, and DWB products. (Ex. 35 at 89-90; James Ex. 10; James Ex. 11.)[2] According to Novell, its 4.16(b) rights extend to NCR's Software and Sublicensing Agreements because they "relate" to the licensed SVRX products. But those Agreements also "relate" to UnixWare and DWB products. Thus, Novell would be able to waive SCO's rights even with respect to non-SVRX products, eviscerating the undisputed transfer of such products under the APA. Novell does not address, much less take issue with, this conclusion.

In sum, Novell's interpretation defeats the purpose of the APA, conflicts with its unambiguous key provisions, and makes a sham of the APA and TLA. Under the applicable law, even if Novell's interpretation were reasonable and not rooted in ambiguous language, the Court could not read Section 4.16(b) as Novell proposes.

---

[2]    The documents, declarations, and depositions supporting SCO's memorandum are appended to the Declaration of Mark F. James filed herewith and cited herein as "James Ex. __." Where exhibits attached to the January 17, 2007 Declaration of Brent O. Hatch are referenced herein, they are cited as "Ex. __." Where exhibits attached to Novell's February 20, 2007 Declaration of Heather M. Sneddon in Support of Novell's Opposition to SCO's Cross-Motion for Summary Judgment on Novell's Fourth Claim for Relief are referenced herein, they are cited as "Sneddon Ex. __."

B.     <u>The APA Is Reasonably Susceptible to SCO's Interpretation.</u>

Novell argues that SCO's reading of "SVRX Licenses" is unreasonable and thus the Court should disregard SCO's extrinsic evidence. Novell's argument is flawed on several levels.

<u>First</u>, Novell turns the controlling law on its head. Under California law, even if Section 4.16(b) were unambiguous on its face, the Court must provisionally receive extrinsic evidence to determine if the provision is reasonably susceptible to another interpretation.[3] Novell itself resorts (at 4-10 of its Reply) to extrinsic evidence, including the standard UNIX agreements and Amendment No. X, to make its purported "plain reading" against SCO's interpretation.

<u>Second</u>, SCO has specifically argued that the term is ambiguous on its face and so the Court must resort to extrinsic evidence to determine the scope and intent of Section 4.16(b). SCO posited its interpretation as an alternative argument for the admission of extrinsic evidence, in the event the Court concluded that the term is not ambiguous. Furthermore, SCO expressly argued (at 47) that "Irrespective of the definition of the term 'SVRX Licenses,' Section B of Amendment No. 2 clarified that Novell's rights under Section 4.16(b) were limited to the protection of the residual binary royalties and could not prevent SCO from exercising its exclusive rights with respect to source code."

---

[3]     <u>See</u> <u>Dore v. Arnold Worldwide, Inc.</u>, 39 Cal. 4th 384, 391 (2006) (holding that "even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible"); <u>Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.</u>, 69 Cal. 2d 33, 37 (1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."); <u>Wolf v. Super. Ct.</u>, 114 Cal. App. 4th 1343, 1351, 1357 (Ct. App. 2004) ("Where the meaning of the words used in a contract is disputed, the trial court <u>must</u> provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning"; indeed, "it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.").

Third, Novell fails to address SCO's evidence (at 58-59) showing that its interpretation is reasonable and, unlike Novell's, consistent with the language and purpose of the APA:

- Section 4.16(a) describes the SVRX Royalties as "all royalties, fees and other amounts due under the SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as 'SVRX Royalties')." The only agreements "under" which "royalties, fee and other amounts" could be "due" were the Product Supplements. (Exs. 50 ¶¶ 13-17; Ex. 51 ¶¶ 10-14.) Indeed, Novell and Santa Cruz maintained such financial information by product, and after the closing, Santa Cruz reported that information to Novell by product. (Ex. 52 ¶ 8)

- Section 1.2(e)(iv) provided that Santa Cruz could keep royalties formerly due under "its own licenses from Seller acquired before the Closing Date through Software Agreement No. SOFT-000302 and Sublicensing Agreement No. SUB-000302A." Section 1.2(e)(iv) thus expressly identifies the multiple "licenses" that Santa Cruz had acquired "through" its Software Agreement and Sublicensing Agreements. The only such licenses to which "royalties" could be "attributable" were the numerous SVRX Supplements that Santa Cruz had executed under its Software and Sublicensing Agreements. In addition, Santa Cruz obtained its Software and Sublicensing Agreements from AT&T. Santa Cruz's only "licenses from Seller" under those Agreements were the Supplements it executed with Novell.

- Recital A defines the Business as the development of "a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the

sale" of "Auxiliary Products." (Ex. 50 ¶¶ 13-17; Ex. 51 ¶¶ 10-14.) The only agreements that licensed "the various versions of UNIX and UnixWare," the "products currently known as UNIX and UnixWare," or the "Auxiliary Products" were the Product Supplements for such versions or products. (Id.) The only "source and binary licenses" that were for "sale" were the Product Supplements, which identified the licensed product and fees and gave rise to a payment obligation. (Id.) The Software and Sublicensing agreements did not identify any such fees or give rise to any payment obligation. (Id.)

- Novell, like AT&T and its other successors, used a combination of agreements in licensing its SVRX technology, including the Software Agreement, the Sublicensing Agreement, and the various Product Supplements. (Id.) Of these, the only agreement that licensed the products listed in Item VI of the Schedule 1.1(a) were the Product Supplements for each product. (Id.) The Software and Sublicensing Agreements did not even mention, much less grant a license to, any specific product listed in Item VI. (Id.)

Fourth, Novell's arguments against SCO's interpretation are unavailing:

- Novell argues (at 5 of its Reply) that "Section 4.16(b) cannot possibly be referring only to Product Supplements, because those Supplements, by their own terms, indisputably do not grant any *rights*." But in the very sentence from SCO's Opposition that Novell quotes (at 7 of its Reply), SCO makes clear that the Product Supplements identified "the fees the licensor had a right to receive in exchange." Indeed, the very next sentence in the Opposition, which Novell does not quote, states

8

(at ¶ 44): "The only rights the licensor had in the Supplements were the rights of payment of any applicable fees listed in the Schedule." Thus, the Supplements do grant rights, and Novell's belief to the contrary is not undisputed.

- Novell next argues (at 7-8 of its Reply) that the Software Agreements, Sublicensing Agreements, and Supplements must be read as an integrated whole. Novell argues that SCO's declarants contradict themselves by testifying that they considered the Supplements to be the SVRX Licenses and yet stating that "like its predecessors, Novell licensed UNIX and UnixWare through this set of agreements." There is no inconsistency. SCO has stated that licensing of UNIX products involved "a combination of agreements" which set forth the rights and obligations of the parties. The question is which of those agreements – whether one or more or any – were intended to be the "SVRX Licenses" under the APA.

- Novell states (at 8 of its Opposition) that Amendment No. X amended the Related Agreements, including the Software and Sublicensing Agreements. But, as SCO has pointed out, Amendment No. X, under Santa Cruz's authority, granted IBM minor source code rights. Thus, Amendment No. X had to amend the Software and Sublicensing Agreements which governed those rights. In addition, because the Software and Sublicensing Agreements contemplate the payment of binary royalties, a royalty buyout might also require the amendment of those Agreements. Finally, the treatment of the Related Agreements as an integration says nothing about the particular contracts that the parties had in mind for the term "SVRX Licenses."

9

- Novell also argues (at 11 of its Reply) that Amendment No. X states that "Novell retained certain rights with respect to the Related Agreements." Novell then infers that those rights must include its purported rights under Section 4.16(b). But that is wrong. Most obviously, had Novell then believed it had retained those rights, it would not have participated in Amendment No. X in the first place. Novell would have asserted those rights to modify the Related Agreements on its own. The language Novell quotes only establishes that Novell retained the right to participate in buyouts of its binary royalty interests, and to the extent that right implicated the Related Agreements, they would need to be amended upon a buyout. That in no way establishes that the parties intended the term "SVRX Licenses" to include any or all of the Related Agreements.

In sum, Novell's efforts to preclude the admission of extrinsic evidence fail. Not only is the relevant provision ambiguous on its face, but SCO's reasonable interpretation opens the door to that evidence.

C.    <u>Amendment No. 2 Forecloses the Rights Novell Claims.</u>

Even if the term "SVRX Licenses" included the Software Agreements and Sublicensing Agreements and was not reasonably susceptible to another interpretation, Amendment No. 2 makes clear that Novell's rights under 4.16(b) do not extend to those Agreements. Novell argues (at 11-12 of its Reply) that Amendment No. 2 is "utterly silent as to what source code rights SCO actually did or did not have under the APA; instead, it only states that those rights will not be altered in the context of any future buyout of SVRX royalty obligations." Novell's views do not square with the language of the Amendment.

10

Paragraph B of Amendment No. 2 provides:

> Except as provided in Section C below, and <u>notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement</u>, any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows:

(Ex. 8 at 1.)  While Subparagraphs B.1- B.4 clearly set forth procedures for handling such buyouts, Subparagraph B.5 uses different language and provides:

> This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses.  In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.

(<u>Id.</u>)  Amendment No. 2 thus provides that, "notwithstanding the provisions of Article 4.16," Novell is not authorized to "increase any SVRX licensee's right to SVRX source" or "grant new SVRX source code licenses," even in the context of granting a buyout of its majority interest in the binary royalties.  That is, Amendment No. 2 clarifies that Novell has no authority to license source code rights, even incident to a buyout.

But Amendment No. 2 provides an additional protection.  It states that "<u>In addition</u>, Novell may not prevent SCO from exercising rights with respect to SVRX source code in accordance with" the APA.  (<u>Id.</u>)  That is, "notwithstanding the provisions of Article 4.16," Novell may not prevent SCO's exercise of rights with respect to source code under any of the <u>other</u> provisions of the APA, including those in Article I and Schedule 1.1(a) effectuating the transfer of "all right, title and interest in and to" and all "rights and ownership" in the UNIX source code and products and "all rights pertaining to UNIX and UnixWare" under the "Software and Sublicensing Agreements."

11

As it forecloses the rights Novell claims under Section 4.16(b), Amendment No. 2, without more, supports SCO's motion for summary judgment.[4]

## II.    THE EXTRINSIC EVIDENCE FORECLOSES NOVELL'S INTERPRETATION.

SCO previously presented extensive extrinsic evidence foreclosing Novell's interpretation as a matter of law.  In both its Reply and Opposition briefs, Novell is utterly silent on most of that evidence.  In addition, Novell fails even to acknowledge new evidence the parties have recently discovered, including the deposition testimony of Robert Frankenberg, Novell's CEO at the time of the APA.

A.    The Testimonial Evidence.

On February 10, 2007, two days before Novell filed its Opposition brief, Mr. Frankenberg testified:

> Q.  Do you have an understanding, Mr. Frankenberg, of what the purpose of 4.16(b) was?
>
> A.  Yes.
>
> Q.  Could you explain that purpose in your words?
>
> A.  This was to make sure that Novell continued to receive the SVRX license fees and that those efforts weren't interfered with.
>
> Q.  Did it have any broader purpose than that?

---

[4]    Even if the Court were to find that Amendment No. 2 itself is ambiguous, SCO's motion should be granted because the extrinsic evidence supports SCO's reading of the Amendment.  Novell, for example, does not dispute the facts associated with Amendment No. 2, including the detailed correspondence between Mr. Frankenberg and Mr. Mohan, the General Release of Claims Agreement, and subsequent jointly granted buyouts, all of which establish that Amendment No. 2 clarified that Novell had no rights with respect to source code and had limited rights even with respect to its binary royalty interest in the event of a buyout.  In addition, the testimony of those who negotiated Amendment No. 2, including Duff Thompson, Steve Sabbath, and Kim Madsen, supports SCO's interpretation of the Amendment.  (Ex. 1 ¶¶ 9, 11; Ex. 18 ¶ 6; Ex. 33 ¶¶ 14-16.)

A.  No.

Q.  Was it Novell's intent to maintain a veto on how SCO operated its business in the future except for protecting that royalty stream?

MR. JACOBS:  Objection, lacks foundation, calls for speculation

A.  No.

(James Ex. 1 at 44.)  Similarly, on January 19, 2007, Ty Mattingly, Mr. Frankenberg's

personal liaison with the Novell negotiating team, testified:

Q.  Are you familiar with a claim that's arisen in these litigations in which Novell claims the right to waive SCO's claims against IBM for alleged breaches of IBM's Unix agreements?

A.  I am aware of that.

Q.  And do you have a view from your experience in negotiating the APA as to the merits of that claim?

A.  Well, I mean, my perspective on that is that, you know, quite honestly, Novell doesn't have any rights to do that.  And I, personally, you know, look at this whole litigation between Novell and SCO and think it's absurd.  I think it's unbelievable to me that, you know, a great company like Novell would suggest that somebody spent 125 million dollars and didn't buy this Unix business.  And then I don't know what the relationships or discussions are between Novell and IBM, and I don't know why they have done some of those things.  I mean, I have been out of the company for, well, since 1998.  So I don't have any idea what transpired and why they felt compelled to do that, but those are the facts.

(James Ex. 2 at 53-54.)

Messrs. Frankenberg's and Mattingly's testimony confirms the sworn statements that

SCO previously presented from witnesses on both sides of the transaction.  Such witnesses

include:

13

- Duff Thompson, the Novell senior executive who oversaw the APA and its Amendments. (James Ex. 3 at 56-58.)  In his recent deposition in this litigation, Mr. Thompson confirmed his declaration.  (Ex. 1 ¶ 7.)

- Ed Chatlos, Novell's chief negotiator.  (Ex. 4 ¶ 5; Ex. 31 ¶¶ 8, 13.)

- Lawrence Bouffard, Novell Worldwide Sales Director for UNIX products.  (Ex. 19 ¶¶ 29, 34.)

- John Maciaszek, UnixWare product manager for Novell and later Santa Cruz.  (Ex. 51 ¶¶ 19-24.)

- William Broderick, contract manager for Novell and later Santa Cruz.  (Ex. 50 ¶¶ 22-25.)

- Jean Acheson, revenue administrator for Novell and later Santa Cruz.  (Ex. 52 ¶ 6.)

- Alok Mohan, CEO of Santa Cruz at the time of the APA.  (James Ex. 4 at 229.)  In his recent deposition in this case, Mr. Mohan confirmed his declaration.  (Ex. 32 ¶¶ 4, 6-7.)

- Doug Michels, founder of Santa Cruz and its CEO after Mr. Mohan.  (Ex. 2 ¶¶ 5, 9.)

- Steve Sabbath, General Counsel for Santa Cruz, who oversaw its negotiation of the APA and its Amendments (James Ex. 5 at 67-68.)  In his recent deposition in this case, Mr. Sabbath confirmed his declaration.  (Ex. 18 ¶¶ 4-5.)

- Jim Wilt, the chief negotiator for Santa Cruz.  (James Ex. 6 at 78-79.)  In his recent deposition in this case, Mr. Wilt confirmed his declaration.  (Ex. 5 ¶¶ 6, 8, 10.)

- Kim Madsen, assistant to Mr. Wilt in the negotiations.  (James Ex. 7 at 129-130, 133-134.)  In her recent deposition in this case, Ms. Madsen confirmed her declaration.  (Ex. 6 ¶ 7; Ex. 33 ¶ 13.)

14

Novell responds to such overwhelming testimony with two marginally relevant documents that in fact support SCO's position, and the declaration of Michael DeFazio from the IBM Litigation:

- Novell quotes (at 6 of its Opposition) a 1996 letter by Mr. Broderick to Novell regarding Unisys, in which he states that the "Agreement requires prior written approval or changes to current agreements relating to UNIX System V." But that statement does not contradict Mr. Broderick's view that the "SVRX Licenses" refers to Supplements. As he explained in his recent deposition, the statement refers to "new agreements or changes to current agreements" with then-existing SVRX licensees, such as Unisys. (James Ex. 8 at 255-258.) Mr. Broderick sought Novell's approval to modify the "per-copy fees due for the SVRX portion" but not the "deducted" UnixWare portion. The letter thus differentiates between UnixWare fees paid under Unisys's UnixWare Supplement, and the SVRX fees paid under Unisys SVR4.0 MP Supplement.

- Novell (at 7 of its Opposition) tries to make similar use of an internal Santa Cruz email from Kim Madsen, in which she states that "new SVRX licenses have to be approved by Novell."[5] But that statement is entirely consistent with her testimony. Ms. Madsen was responding to a question about royalties to be paid by DEC for its prospective shipment of SVR4 products. As DEC was "currently an SVRX licensee," the phrase "new SVRX licenses" cannot mean new Software or Sublicensing Agreements, but must refer to the Product Supplement that DEC needed for the SVR4 product. Indeed, DEC had long

---

[5]    Novell misquotes the clause by replacing the word "licenses" with "licensees."

before signed its Software and Sublicensing Agreements and was at the time distributing
SVR3.2 products.  (James Ex. 9.)

- Mr. DeFazio's declaration is insufficient to preclude summary judgment for SCO.  First,
he admits with respect to Amendment No. 2 that he has no "personal knowledge as to
what it was intended to accomplish."  (Sneddon Ex. 4 ¶ 43.)  Second, no fewer than
thirteen witnesses, including the CEOs and negotiators for both Novell and Santa Cruz,
flatly contradict his declaration regarding the APA.

B.    The Documentary Evidence.

Novell is also silent regarding its numerous documents connected to APA.  Such
documents (cited at 22-26) include Novell's 1995 and 1996 SEC filings which describe Novell's
retained rights without any hint of the rights Novell now claims; the TLA, which provides that
"Ownership of the Licensed Technology shall reside in SCO"; Novell internal emails stating
Novell "will have no more involvement with" the Business and "Novell is out of the UNIX/UW
business" after the closing date; Novell's letters to third parties announcing that it transferred to
Santa Cruz "its existing ownership interest in UNIX System-based offerings" including the same
products listed in Item VI; and Novell documents showing that it understood that it needed, and
indeed sought, Santa Cruz's delegation of authority to license SVRX products during the
Transition Period.  These contemporaneous documents reveal Novell's intent to transfer the
Business without qualification.  Had Novell retained the rights it now claims under Section
4.16(b), the relevant portions of those documents would have been unnecessary or untrue.

C.    <u>The Parties' Prior Conduct.</u>

SCO presented evidence of Novell's conduct during the seven-plus years that followed the signing of the APA.  Novell again does not even address most such evidence, including:

- As part of the HP buyout in 2000, Novell warranted (among other things) that it has "no present, or future or reversionary interest in any such source code royalties." (Ex. 38 at 1.)  In view of its purported right to amend SVRX agreements at whim, this warranty represents an inexplicable self-imposed limitation.

- In 1997, Novell asked Santa Cruz to execute a letter agreement to "enable Novell to negotiate directly with Cray" on the controversy over Cray's royalty obligations.  (Ex. 39.)  Novell acknowledged that it needed Santa Cruz's "prior approval" to negotiate the continuation of Cray's rights to distribute source code. (<u>Id.</u>)  Had it believed that it had the broad rights it now claims, Novell would not have needed or sought Santa Cruz's agreement or prior approval.

- In 1998, Novell conducted an audit of SCO's royalty payments to Novell pursuant to Section 1.2 and Section 4.16 of the APA.  (Ex. 52 ¶¶ 9-10.)  Novell representatives did not ask for any data other than the reports of the binary royalties from the SVRX licenses that existed at the time of the APA, and never asked about licensing of source code.  (<u>Id.</u>)

- Before the 2003 audit, Santa Cruz and SCO sent Novell nearly 100 monthly reports in compliance with their obligations to collect and remit 95% of the SVRX Royalties. (Ex. 55 at 26-28.)  Those reports contained data only for the SVRX binary royalties

17

paid during each period, and did not contain information on SVRX source code fees or any other payments. (Id.)

Novell's continued efforts to convert the IBM buyout into favorable evidence are without merit. Novell contends (at 9-10 of its Opposition) that SCO acknowledged its obligation to remit source code fees because it remitted 95% of the proceeds of Amendment No. X. Novell revises history by ignoring it.

First, Santa Cruz specifically objected to Novell's attempt to grant IBM source code rights. In his letter of April 23, 1996, Mr. Mohan told Mr. Frankenberg that "our agreements provide SCO with ownership and exclusive rights to license the UNIX source code." (Ex. 25 at 1.) Mr. Frankenberg did not dispute that assertion, instead reassuring Mr. Mohan that the proposed buyout did not expand IBM's source code rights. (Ex. 26.) Mr. Mohan disagreed but recognized that Novell, by representing to IBM that it had the authority to grant the buyout, had painted itself into a corner. He explained: "I understand that discussions with IBM are quite advanced and, on an exception basis, would be willing to try and accommodate them." (Ex. 25 at 1.) Thus, the minor source code rights that IBM received under Amendment No. X were an accommodation by Santa Cruz, not any grant of rights by Novell.

Second, Santa Cruz did not retain only 5% of the proceeds from Amendment No. X.

REDACTED

In other words, these were direct payments for Santa Cruz's accommodation.

18

<u>Third</u>, source code rights were a secondary issue.  Even though Novell unquestionably had the right to receive 95% of the IBM binary royalties, Mr. Mohan objected to the buyout itself.  As a secondary matter, he explained that he was "<u>also</u> troubled by the fact that the proposed IBM buyout gives IBM broader rights to the UNIX intellectual property than their current license provides."  (Ex. 25 at 1.)  Indeed, Mr. Frankenberg even attempted to convince Mr. Mohan that source code rights were not at stake.  (Ex. 26.)  Section 1 of the Amendment expressly provided that "If IBM requests delivery of additional copies of the Software Product, IBM will pay the fees listed" in its relevant Product Supplement.  (Ex. 29 at 1.)  Thus, the parties understood that their disagreement was at heart about Novell's authority to grant buyouts.  As is confirmed by Amendment No. 2, Amendment No. X thus only underscores the fact that Novell has limited rights even when seeking a buyout of its undisputable majority interest in binary royalties.

## CONCLUSION

SCO respectfully submits, for the foregoing reasons, that the Court should grant SCO's Cross-Motion for Partial Summary Judgment on Novell's Fourth Counterclaim.

DATED this 16th day of March, 2007.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

DORSEY & WHITNEY LLP
Devan V. Padmanabhan
John J. Brogan

*Counsel for The SCO Group, Inc.*

By: _____

20

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant, Novell, Inc., on this 16th day of April, 2007, via CM/ECF to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-248

/s/  Edward Normand