MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant and Counterclaim-Plaintiff Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>      Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>      Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S NON-COMPETE CLAIM IN ITS SECOND CLAIM FOR BREACH OF CONTRACT AND FIFTH CLAIM FOR UNFAIR COMPETITION**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

I.     STATEMENT OF ISSUES ............................................................................1

II.    INTRODUCTION .........................................................................................1

III.   STATEMENT OF UNDISPUTED FACTS ....................................................3

     A.     The APA Transferred Certain Assets of Novell's UNIX and
           UnixWare Business to Santa Cruz, But Did Not Transfer Novell's
           Copyrights, Goodwill, or NetWare Product. ............................................3

     B.     The APA Required Santa Cruz to Execute a Separate License to
           Novell to the Technology Included in the Assets Acquired by
           Santa Cruz. ..............................................................................................5

     C.     The TLA Implements the License Contemplated by the APA. ..............6

     D.     The Clause in the TLA Regarding "Competitive" Products Is a
           Limitation on the Scope of the License, and Not an Affirmative
           Prohibition Against Selling Competing Products. ...................................6

     E.     The TLA Restrictions on the Sublicense and Distribution of
           Licensed Technology "Cease to Exist" Upon a "Change of
           Control," Meaning a Sale of "All or Substantially All Assets." ...........7

     F.     Santa Cruz's Sale of Substantially All of its Assets to Caldera in
           2001 Constituted a "Change of Control" as Defined by the APA. .........8

           1.     In May 2001, Caldera acquired Santa Cruz's Server
                  Software and Professional Services Divisions. ...........................8

           2.     The assets acquired by Caldera accounted for 100% of
                  Santa Cruz's operating income and 94.7% of its net
                  revenues. ...................................................................................9

           3.     The assets acquired by Caldera included all of Santa
                  Cruz's UNIX assets, including the UNIX assets that Santa
                  Cruz bought from Novell under the APA. ................................11

4.    The official statements and conduct of Santa Cruz and Caldera confirm that the transaction included substantially all of Santa Cruz's assets, and thus constituted a "Change of Control." ...................................................................................14

5.    SCO has failed to explain why Caldera's purchase of Santa Cruz's assets did not constitute a "Change of Control" that terminated any non-compete obligations. ...................................................15

IV.    ARGUMENT ...................................................................................................16

A.    Novell Is Entitled to Summary Judgment Because the Alleged Non-Compete Clause is Merely a Restriction on the Scope of the License, and Not an Affirmative Covenant Prohibiting Distribution of Competing Products. ......................................................17

B.    Novell Is Entitled to Summary Judgment Because Santa Cruz's Sale of Substantially All of its Assets Terminated Any Non-Compete Obligations. ...........................................................................23

1.    Any non-compete obligations "cease to exist" upon a "Change of Control," meaning a sale of all or substantially all of Santa Cruz's assets. ..........................................23

2.    Santa Cruz's sales of its assets to Caldera in 2001 constituted a "Change of Control," thereby terminating any non-compete obligations. ...................................................24

C.    Novell Is Entitled to Summary Judgment Because a Prohibition Against the Distribution of Competing Products Would Be Void Under the Controlling California Law. ...................................................27

1.    Covenants not to compete are void under California law unless they meet one of several narrow exceptions. ...................................27

2.    SCO cannot demonstrate that any of the narrow exceptions to the rule against covenants not to compete applies in this case. ...........................................................................30

V.    CONCLUSION ...............................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brobeck Phleger & Harrison v. The Telex Corp.*,
    602 F.2d 866 (9th Cir. 1972) ................................................................................... 19

*Evolution, Inc. v. Prime Rate Premium Fin. Corp.*,
    No. 03-2315-KHV, 2004 U.S. Dist. LEXIS 25017 (D. Kan. Aug. 13, 2004) .......................... 22

*Frangipani v. Boecker*,
    64 Cal. App. 4th 860 (1998) ................................................................................... 26

*Hill Med. Corp. v. Wycoff*,
    86 Cal. App. 4th 895 (2001) ........................................................................ 28, 29, 30, 31

*Machado v. S. Pac. Transp. Co.*,
    233 Cal. App. 3d 347 (1991) ................................................................................... 19

*Marshall v. New Kids on the Block P'ship*,
    780 F. Supp. 1005 (S.D.N.Y. 1991) ........................................................................... 22

*Microsoft Corp. v. Harmony Computers & Elecs., Inc.*,
    846 F. Supp. 208 (E.D.N.Y. 1994) ............................................................................ 22

*Nat'l Labor Relations Bd. v. Int'l Union of Operating Eng'rs*,
    323 F.2d 545 (9th Cir. 1963) ................................................................................. 27

*Summerhays v. Scheu*,
    10 Cal. App. 2d 574 (1935) ................................................................................... 29

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    81 F. Supp. 2d 1026 (N.D. Cal. 2000) ................................................................. 19, 20, 20

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999) ......................................................................... 18, 19, 22

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ................................................................................ 22

*Zajicek v. Koolvent Metal Awning Corp. of Am.*,
    283 F.2d 127 (9th Cir. 1960) .............................................................................. 29, 31

## STATUTES

Cal. Bus. & Prof. Code
  § 16600 ................................................................................................27, 28, 29, 30
  § 16601 ....................................................................................................27, 28, 31
  § 16602 ...................................................................................................................27
  § 16602.5 ................................................................................................................27

Cal. Civ. Code
  § 1641 .....................................................................................................................19
  § 1624 .....................................................................................................................29

Cal. Corp. Code
  § 181 .................................................................................................................25, 26
  § 181(c) ...........................................................................................................15, 26
  § 1001(a) .........................................................................................................15, 25
  § 1200 .............................................................................................................15, 26
  § 1200(c) ...............................................................................................................26
  § 1201 .....................................................................................................................15
  § 1201(a) ...............................................................................................................26
  § 1300(a) .........................................................................................................15, 25

I.      **STATEMENT OF ISSUES**

This motion presents three issues:

1.      Is Novell entitled to summary judgment on SCO's claim for breach of an alleged non-compete covenant, because the contractual clause cited by SCO is merely a limitation on the scope of a license that does not impose affirmative "non-compete" obligations?

2.      Is Novell entitled to summary judgment on the alternative ground that Santa Cruz's sale of substantially all of its assets to SCO's predecessor in 2001 constituted a "Change of Control" that terminated any non-compete obligations?

3.      Is Novell entitled to summary judgment on the alternative ground that any covenant not to distribute competing products would be void under the governing California law?

II.     **INTRODUCTION**

In September 1995, Novell agreed to sell certain UNIX-related assets to The Santa Cruz Operation, Inc. ("Santa Cruz"), a predecessor of The SCO Group, Inc. ("SCO"), through the "Asset Purchase Agreement" ("APA"). The APA required Santa Cruz to execute a separate license granting Novell the right to use technology included in the transferred assets and derivatives thereof, subject to certain limitations. Novell and Santa Cruz implemented this requirement by executing the "Technology License Agreement" ("TLA") in December 1995.

The TLA stated that Novell retained a broad, royalty-free license to use "Licensed Technology" in bundled or integrated products sold by Novell, provided that this license was limited to products that were not "directly competitive" with Santa Cruz's core products and in which the Licensed Technology did not constitute a "primary portion" of their value. The TLA

further stated that this limitation "shall cease to exist" in the event of a "Change of Control" of Santa Cruz, which was defined in the APA to include a sale of "all or substantially all" assets. In 2001, Santa Cruz sold its UNIX business to Caldera Systems, Inc., the immediate predecessor to SCO. The assets sold by Santa Cruz included all of the UNIX assets that it had purchased from Novell in 1995, plus other assets that collectively accounted for 100% of Santa Cruz's operating income and over 94% of its net revenues.

SCO now contends that this limitation on the scope of Novell's license is an affirmative covenant that prohibits Novell from using the Licensed Technology to compete with SCO's core operating system products. SCO further contends that Novell has breached this supposed covenant by distributing the SUSE Linux operating system since acquiring SUSE Linux in November 2003. In a separate but stayed claim,[1] SCO has asserted a copyright infringement claim, alleging that Novell's distribution of SUSE Linux infringes SCO's purported UNIX copyrights. Thus, the key question presented by this motion is: Does Novell's alleged use of "Licensed Technology" in competing products support a breach of contract claim that is *separate and independent* from SCO's copyright claim? The answer is "No" for at least three reasons:[2]

---

[1] SCO's Fourth Claim for Relief for copyright infringement has been stayed because it relates to SUSE Linux and thus raises the arbitrable issue of whether the "UnitedLinux" contracts between SCO and SUSE Linux preclude this claim. (August 21, 2006, Memorandum Decision and Order on Novell's Motion to Stay Claims Raising Issues Subject to Arbitration, PACER No. 139, at 8 (staying "the portions of the claims relating to SuSE").) SCO and Novell have agreed that the stay applies to significant portions of SCO's non-compete claim, but does not preclude discovery or summary judgment motions related to the negotiation and interpretation of the TLA. This motion is limited to issues related to the meaning and interpretation of the TLA and is hence not subject to the stay.

[2] SCO's non-compete claim fails for additional reasons beyond the scope of this motion. For example, SCO does not own the UNIX copyrights that SCO has asserted against Novell, and

(Footnote continues on next page.)

1.      The clause relied upon by SCO is merely a limitation on the scope of Novell's license, and is not an independent covenant that prohibits Novell from distributing competing products.  If Novell has exceeded the scope of this license (which Novell disputes), then Novell cannot use this license as a "shield" to defend against a claim for infringement of SCO's alleged intellectual property rights.  However, SCO cannot use this limitation as a "sword" to bring a claim for breach of a non-compete covenant that does not exist.

2.      Santa Cruz's sale of its UNIX assets to Caldera in 2001 constituted a "Change of Control," as defined in the APA.  Therefore, even if the TLA imposed an affirmative obligation not to sell competing products, any such obligation automatically "ceased to exist" upon this "Change of Control."

3.      Under controlling California law, a covenant not to sell competing products is void except in narrow circumstances that do not apply here.  Therefore, even if the TLA imposed an affirmative non-compete obligation that was not automatically terminated by the Change of Control, this obligation would be void as a matter of law.

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    The APA Transferred Certain Assets of Novell's UNIX and UnixWare Business to Santa Cruz, But Did Not Transfer Novell's Copyrights, Goodwill, or NetWare Product.

1.      In 1995, Novell was a leading networking software company, which had developed its flagship networking product, Netware, to work together with the UNIX operating system.  (Declaration of Kenneth W. Brakebill, filed herewith ("Brakebill Decl."), Ex. 1, Second

---

(Footnote continued from previous page.)

Linux is not a "directly competitive" product whose "primary" value is from Licensed Technology.  Novell reserves the right to address these issues later.

Amended Complaint, ¶ 40.)[3]  Novell also had a business relating to the UNIX and UnixWare operating systems.  (Brakebill Decl., Ex. 2 at 008, APA, Recital A.)

2.      On September 19, 1995, the APA was signed by Novell and Santa Cruz.  Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business.  (*Id.*, Recital B, Section 1.1(a).)

3.      The APA initially defined the assets to be acquired by Santa Cruz by reference to the attached Schedule 1.1(a)  (*Id.*, Section 1.1(a).)  Schedule 1.1(a) generally referred to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare…."  (Brakebill Decl., Ex. 3, Schedule 1.1(a), Item I.)  However, Schedule 1.1(a) specifically limited the "Intellectual Property" assets included in the purchase to "Trademarks UNIX and UnixWare as and to the extent held by Seller ..."  (*Id.*, Item V.)  Schedule 1.1(a) did not list copyrights or "goodwill" as assets included in the sale, nor did it refer to any Linux products.  (*Id.*, Schedule 1.1(a).)

4.      The APA further defined the assets to be transferred by reference to Schedule 1.1(b), which listed assets that were excluded from the sale, referred to as the "Excluded Assets." (Brakebill Decl., Ex. 2 at 008, APA, Section 1.1(a).)  Among the "Excluded Assets" in Schedule 1.1(b) were Novell's "NetWare" operating system, as well as "[a]ll copyrights and trademarks,

---

[3] Novell submits the Brakebill Declaration, and the exhibits cited therein, in support of this motion, as well as three other concurrently-filed summary judgment motions: (1) Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance; (2) Novell's Motion for Partial Summary Judgment on the Copyright Ownership Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; and (3) Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages.

except for the trademarks UNIX and UnixWare." (Brakebill Decl., Ex. 4, Schedule 1.1(b), Items II, IV, and V.)

     **B.**    **The APA Required Santa Cruz to Execute a Separate License to Novell to the Technology Included in the Assets Acquired by Santa Cruz.**

    5.    The APA contemplated that the Closing of the transaction would take place two business days after the satisfaction or waiver of the last of the conditions to Closing set forth in Article IV of the APA, or at such other time and date as agreed by the Parties. (Brakebill Decl., Ex. 2 at 012, APA, Section 1.7(a).)

    6.    The APA required the Buyer (Santa Cruz) to execute, concurrent with the Closing, a separate "royalty-free, perpetual worldwide license" to the Seller (Novell) of the technology included in the Assets acquired by Santa Cruz and derivatives thereof (referred to collectively as "Licensed Technology"). (*Id.*, Section 1.6.)

    7.    The APA stated that this separate license would allow Novell to use the Licensed Technology "for internal purposes without restriction." (*Id.*)

    8.    The APA stated that this separate license would allow Novell to use the Licensed Technology "for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product." (*Id.*)

    9.    The APA further stated that the separate license shall provide Novell "with an unlimited royalty-free, perpetual worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof." (*Id.*)

10.    The APA lists numerous "Covenants" agreed to by Novell and Santa Cruz in Article IV, Sections 4.1 to 4.19.  None of these covenants prohibit Novell from distributing competing products.  (*Id.* at 027-032, Sections 4.1 to 4.19.)

### C.    The TLA Implements the License Contemplated by the APA.

11.    After the APA was signed, Novell and Santa Cruz negotiated the terms of the TLA, which was signed by Novell and Santa Cruz on December 6, 1995.  (Brakebill Decl., Ex. 5, TLA at 5.)

12.    The preamble of the TLA recites: "Whereas, pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licenses for Licensed Technology, including related documentation and support."  (*Id.* at 1.)  As indicated by this recital and confirmed by the content of the TLA, the TLA is the separate license contemplated by Section 1.7(a) of the APA.

### D.    The Clause in the TLA Regarding "Competitive" Products Is a Limitation on the Scope of the License, and Not an Affirmative Prohibition Against Selling Competing Products.

13.    Under the TLA, Novell retained a "non-exclusive, non-terminable, worldwide, fee free license" to Licensed Technology, under certain conditions.  (*Id.*, Section II.A.)

14.    First, with regard to internal use, the TLA granted Novell an unrestricted license to "use, reproduce and modify, and authorize its customers to use, reproduce and modify, Licensed Technology (including related documentation) in their respective internal business operations."  (*Id.*, Section II.A(1).)

15.    Second, with regard to external use, the TLA granted Novell a license to "sublicense and distribute, and authorize its customers to sublicense and distribute, such

Licensed Technology and modifications thereof, in source and binary form…." (*Id.*, Section II.A(2).)  This license was subject to the following limitation:  "provided, however, that (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering." (*Id.*)

16.     Thus, the TLA granted Novell an unrestricted license to use Licensed Technology for internal purposes, but limited Novell's license to sublicense and distribute such technology to Licensed Technology that is part of a "Composite Offering" that is not "directly competitive with core application server offerings" of Santa Cruz, and for which the Licensed Technology does not constitute "a primary portion of the value of such Composite Offering."  (*Id.*, Sections II.A(1) and (2).)

17.     The TLA does not include any provisions regarding "competitive" products other than the limitation on the scope of Novell's license to sublicense and distribute the Licensed Technology that is set forth in Section II.A(2).  (*Id.*)

**E.      The TLA Restrictions on the Sublicense and Distribution of Licensed Technology "Cease to Exist" Upon a "Change of Control," Meaning a Sale of "All or Substantially All Assets."**

18.     The TLA expressly provides that:  "In the event of a Change of Control of SCO [Santa Cruz], and commencing with the effective date of such Change of Control, the proviso in subparagraph II.A(2) setting forth restrictions on the sublicense and/or distribution of Licensed Technology and modifications thereof shall cease to exist."  (*Id.*, Section II.B.)

19.    The TLA states that "Change of Control" and "Licensed Technology" "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement."  (*Id.*, Section I.)

20.    The APA defines "Change of Control" as follows:

> For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated . . . (2) any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of such party[.]

(Brakebill Decl., Ex. 2 at 048, APA, Section 6.6(c).)

21.    Thus, the TLA restrictions on the sublicense and distribution of Licensed Technology set forth in subparagraph II.A(2) shall "cease to exist" if Santa Cruz undergoes a "Change of Control," which includes a sale or transfer of "all or substantially all" of Santa Cruz's assets.

**F.    Santa Cruz's Sale of Substantially All of its Assets to Caldera in 2001 Constituted a "Change of Control" as Defined by the APA.**

**1.    In May 2001, Caldera acquired Santa Cruz's Server Software and Professional Services Divisions.**

22.    On August 2, 2002, Caldera Systems, Inc. ("Caldera") and Santa Cruz jointly announced that Caldera had entered into an agreement to acquire Santa Cruz's "Server Software Division" and "Professional Services Division" in consideration for a cash payment of $7 million, a loan of $18 million, and 17.54 million shares of Caldera stock, or about 28% of its total stock.  (Brakebill Decl., Ex. 6, at 1.)

23.    On February 9, 2001, Caldera and Santa Cruz announced that they had agreed to expand Caldera's acquisition of Santa Cruz's Server Software and Professional Services Divisions to include Santa Cruz's "SCO OpenServer product line," thereby "giving Caldera

complete ownership of SCO's operating system products." The amended agreement required Caldera to make a cash payment of $23 million upon closing the transaction, plus a note for $8 million and 16 million shares of the resulting company, Caldera International, Inc. (Brakebill Decl., Ex. 7, at 1.)

24.     On May 7, 2001, Caldera announced its completion of the acquisition of Santa Cruz's Server Software and Professional Services divisions, including the UnixWare and Open Server technologies. (Brakebill Decl., Ex. 8, at 1.)

25.     SCO explained in a Form 10-Q submitted to the SEC that it had "formed a new holding company under the name of Caldera International, Inc. ('Caldera') to acquire substantially all of the assets and operations of the server and professional services groups of Tarantella Inc., formerly known as The Santa Cruz Operation, Inc., pursuant to an Agreement and Plan of Reorganization, dated August 1, 2000 as subsequently amended." (Brakebill Decl., Ex. 9, at 20.) SCO also explained that it had changed its name from Caldera to "The SCO Group, Inc." in 2003, "in response to the continuing brand recognition related to the SCO OpenServer and SCO UNIXWare product lines." (*Id.*)

### 2.     The assets acquired by Caldera accounted for 100% of Santa Cruz's operating income and 94.7% of its net revenues.

26.     Before Caldera acquired the Server Software and Professional Services Divisions in May 2001, Santa Cruz was comprised of three independent divisions: Server Software, which was "a leading provider of UNIX server operating systems"; Professional Services, which "help[ed] organizations create and deploy personalized IT strategies"; and "Tarantella," which promoted web-related software technologies and products. (Brakebill Decl., Ex. 7, at 1.)

27.    The Server Software and Professional Services Divisions were responsible for substantially all of Santa Cruz's net revenues before they were acquired by Caldera in May 2001. The Joint Proxy Statement and Prospectus issued by Santa Cruz and Caldera on March 26, 2001 stated that these two divisions generated net revenues of more than $162 million, $214 million, and $139 million in the fiscal years ending in 1998, 1999, and 2000.  (Brakebill Decl., Ex. 10, at 104, "Selected Financial Data of the Server and Professional Services Groups.")  This constituted an average of 94.7% of Santa Cruz's total net revenues during this same period, as summarized in the following chart (*id.* at 103-04):

**Dollar amounts in thousands**

|  | **1998** | **1999** | **2000** | **Total** |
|---|---|---|---|---|
| **Net Revenues of Server & Professional Services Divisions** | $162,720 | $214,083 | $139,632 | $889,339 |
| **Santa Cruz's Total Net Revenues** | $171,900 | $223,624 | $148,923 | $945,997 |
| **Percentage of Total Revenues from Server & Prof'l Services** | 94.7% | 95.7% | 93.8% | **94.7%** |

28.    The Form S-4 Registration Statement filed by Caldera International with the SEC on March 26, 2001, emphasized that the sale of the Server Software and Professional Services Divisions would result in a "dramatic decline" in Santa Cruz's revenues:

> Historically, revenues generated by the server business and professional services have been a significant portion of SCO's total revenues.  *The sale of the server and professional services groups …will lead to a dramatic decline in SCO's revenues.*  For the year ended September 30, 2000, revenues generated by these two divisions were 93.8% of SCO's total revenues.  For the fiscal years 1999 and 1998, revenues generated by these two divisions were 95.7% and 94.7% of total revenues, respectively.

(Brakebill Decl., Ex. 11, at 31.)

29.     Steven M. Sabbath, a Santa Cruz executive who was Santa Cruz's "principal

in-house attorney" for the "sale of Santa Cruz's Software and Professional Services Divisions,"

confirmed in a declaration submitted in the *SCO v. IBM* case that these divisions accounted for

almost all of Santa Cruz's revenues.  (Brakebill Decl., Ex. 12, Declaration of Steven M. Sabbath,

dated December 22, 2003, ¶¶ 2, 4, 32.)  Sabbath relied on financial information in the Form 10-K

that Tarantella (the new name of Santa Cruz after the sale) submitted to the SEC for the year

ending September 30, 2001, which showed that:

> [T]he Server Software and Professional Services Divisions
> accounted for approximately 95% of Santa Cruz's total revenues in
> fiscal 1999 and 92% in fiscal 2000, the two full fiscal years
> preceding the sale.  Furthermore, the Server Software division was
> the only division of Santa Cruz that generated operating income in
> either of the two full fiscal years preceding the sale.

(*Id.*, ¶ 36; *see* Brakebill Decl., Ex. 13, Tarantella's Form 10-K for Fiscal Year Ended September

30, 2001, Note 16, at 49-50.)

### 3.     The assets acquired by Caldera included all of Santa Cruz's UNIX assets, including the UNIX assets that Santa Cruz bought from Novell under the APA.

30.     Under the agreement announced in August 2000, Caldera's acquisition of Santa

Cruz's Server Software Division included

**\* \* REDACTED \* \***

(Brakebill

Decl., Ex. 14, October 31, 2000 Caldera newsletter, "The Caldera Connection," at SCO

1337711.)  Thus, the transaction meant that                    **\* \* REDACTED \* \***

**\* \* REDACTED \* \***                    (*Id.* at SCO 1337712.)

31.    Under the expanded agreement announced in February 2001, Caldera also purchased Santa Cruz's "OpenServer product line," thus "giving Caldera complete ownership of SCO's operating system products." (Brakebill Decl., Ex. 7, at 1.)

32.    William M. Broderick, SCO's current director of Software Licensing and a former employee of Santa Cruz, submitted a declaration in the *SCO v. IBM* case that described how the UNIX business and assets were transferred between successive companies. (Brakebill Decl., Ex. 15, Declaration of William M. Broderick, dated October 21, 2005, ¶¶ 1, 4-9.) Broderick noted that his career "has followed the UNIX business as it has been transferred successively from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO)." (*Id.*, ¶ 9.) He further asserted that the transfer from Santa Cruz to Caldera (as well as the preceding transfers) included all of the UNIX assets and business, stating as follows:

- "In each instance (USL to Novell, Novell to Santa Cruz, and Santa Cruz to Caldera), the company selling the UNIX technology also transferred *control* of the commercial enterprise that developed, marketed and licensed that technology (the UNIX business). In each instance, the makeup and operation of the UNIX business continued as constituted through and after each transition." (*Id.*, ¶ 10.)

- "In each instance, the transferred UNIX business included without limitation the UNIX source code, binary code, and intellectual property, licenses and other agreements; and the rights, liabilities, and claims related to that business."[4] (*Id.*, ¶ 11.)

---

[4] Novell disputes SCO's assertion that Novell's sale to Santa Cruz included the UNIX copyrights. However, this dispute is not relevant to the issue presented by this motion, which is whether the sale from Santa Cruz to Caldera included substantially all of Santa Cruz's assets.

- "In each instance, the transferred UNIX business also included all or many of the people who managed and operated the business, including senior-level managers, engineers, sales people, support staff, and other employees.  It also included customer, supplier, and vendor relationships."  (*Id.*, ¶ 12.)

- "In each instance, the transferred UNIX business also included office space, leaseholds, furniture, and equipment."  (*Id.*, ¶ 13.)

- "In short, through and after each transaction, my colleagues and I almost universally kept doing the same work, with the same people, from the same offices and buildings, developing and delivering the same UNIX products and services to the same customers.  We also continued to develop the same technology, service the same contracts, and collect revenues under those contracts."  (*Id.*, ¶ 14.)

- "In each instance, after each transaction, neither the seller nor its employees remained involved in managing or operating the business.  The buyer (mainly through its newly acquired employees) took over those responsibilities."  (*Id.*, ¶ 15.)

33.      Consistent with Mr. Broderick's testimony, Darl McBride, SCO's current CEO, admitted at his deposition in the *SCO v. IBM* case that "in the 2001 timeframe, Santa Cruz transferred substantially the UNIX business to Caldera International."  (Brakebill Decl., Ex. 16, December 2, 2005, Deposition of Darl McBride at 202:16-18.)

34.      Similarly, Kim Madsen, a member of Santa Cruz's legal department who was involved in the Santa Cruz-Caldera transaction and participated in the negotiations, testified that all of Santa Cruz's UNIX asserts were transferred to Caldera (including both the UNIX assets

13

that Santa Cruz had previously bought from Novell and its additional UNIX assets such as SCO OpenServer), as well as a substantial portion of SCO's assets at that time. (Brakebill Decl., Ex. 17, at 11:14-12:16, 13:16-23.)

35.     Further, Alok Mohan, Santa Cruz's former CEO and then member of the Santa Cruz Board of Directors, testified that Santa Cruz sold "everything" of its UNIX business to Caldera, including the UNIX business it had purchased from Novell and also its SCO OpenServer product, which "comprised the significant part of [Santa Cruz's] revenue stream" and was "the largest" and "the dominant part" of Santa Cruz's business. (Brakebill Decl., Ex. 33, at 123:125:23.)

### 4.     The official statements and conduct of Santa Cruz and Caldera confirm that the transaction included substantially all of Santa Cruz's assets, and thus constituted a "Change of Control."

36.     The official statements and conduct of Santa Cruz and Caldera confirm that the transaction included substantially all of Santa Cruz's assets, and thus triggered the legal protections that apply upon a "Change of Control."

37.     The Joint Proxy Statement and Prospectus of Santa Cruz and Caldera, issued March 26, 2001 ("Joint Proxy Statement"), stated that Santa Cruz "will provide change-of-control benefits to its current executive officers." (Brakebill Decl., Ex. 10 at 4, "Interests of Persons in the Combination.")

38.     The Joint Proxy Statement further stated that approval of a majority of the shareholders of Santa Cruz was required for the asset sale. (*Id.* at 4, "Vote Required.") Santa

Cruz was a California corporation, governed by California law. (Brakebill Decl., Ex. 18, Form

10-K of The Santa Cruz Operation, for the Fiscal Year Ending September 30, 1994.)[5]

39.    Finally, Santa Cruz determined that if holders of 5% or more of its outstanding

stock voted against the transaction and demanded dissenters' rights, those shareholders would be

entitled to exercise dissenters' rights under Chapter 13 of the California Corporations Code,

including the right to be paid the fair market value of their stock. (Brakebill Decl., Ex. 10, Joint

Proxy Statement, at 4, 39.)[6]

### 5.    SCO has failed to explain why Caldera's purchase of Santa Cruz's assets did not constitute a "Change of Control" that terminated any non-compete obligations.

40.    On October 7, 2003, Novell sent a letter to SCO regarding SCO's plan to

"invoice" Linux users based on SCO's claim that Linux contains UNIX code. Novell pointed

out that Section II.A(2) of the TLA authorizes Novell to sublicense and distribute Licensed

Technology, and to authorize its customers to sublicense and distribute such technology.

(Brakebill Decl., Ex. 19, October 7, 2003, Letter from Joseph A. LaSala to Ryan E. Tibbits.)

Novell noted that Section II.B of the TLA states that the restrictions on the sublicense and

distribution of Licensed Technology cease to exist upon a "Change of Control" as defined in

Section 6.6(c) of the APA. Novell concluded that the transactions by which SCO had acquired

---

[5] As discussed below, California law requires approval of a majority of the shareholders for only a few types of transactions, one of which is the sale of "all of substantially all" of the corporation's assets. (Cal. Corp. Code Section 1001(a).)

[6] As explained below, dissenters' rights arise only in limited circumstances, including a sale of "all or substantially all of the assets" of a corporation. *See* Cal. Corp. Code §§ 181(c), 1200, 1201, 1300(a).

the UNIX assets constituted a "Change of Control," and therefore "the restrictions on Novell's sublicensing and distribution of Licensed Technology are no longer applicable." (*Id.*)

41.     On October 9, 2003, SCO replied to Novell's letter by asserting that Novell's "analysis of the Technology License Agreement is not a supportable interpretation of the transaction between Novell and SCO." However, SCO provided no explanation of the basis for this assertion. (Brakebill Decl., Ex. 20, October 9, 2003, Letter from Ryan E. Tibbits to Joseph A. LaSala.)

## IV.    ARGUMENT

SCO's non-compete claim is based on the assertion that "the APA and TLA each contained a non-compete provision, whereby Novell covenanted not to use the Licensed Technology to compete with SCO's core operating-system products." (Brakebill Decl., Ex. 1, Second Amended Complaint, ¶ 42.) SCO claims that Novell's distribution of the Linux operating system violates the alleged non-compete covenant in Section II.A(2) of the TLA and Section 1.6 of the APA because Linux is "directly competitive" with SCO's core application server offerings, and contains the "Licensed Technology." (*Id.*, ¶¶ 43-44, 46, 48-51, 97, 98.)

SCO has asserted essentially the same non-compete claim under several different theories, including:

- Breach of the express provisions of the TLA and APA, as part of SCO's Second Claim for breach of contract (*id.*, ¶¶ 97 and 98);

- Breach of the implied covenant of good faith and fair dealing by "distributing UNIX technology in Linux, in violation of the APA's and TLA's non-compete provisions," also as part of SCO's Second Claim for breach of contract (*id.*, ¶ 99); and

- "Unfair competition" by "misappropriat[ing] SCO's UNIX technology in Linux and forc[ing] SCO to compete in the marketplace against its own intellectual property," as part of SCO's Fifth Claim (*id.*, ¶ 122).

As demonstrated below, Novell is entitled to summary judgment on SCO's non-compete claim because (A) the clause cited by SCO is merely a limitation on the scope of Novell's license, and not an independent prohibition against distributing competing products; (B) Santa Cruz's sale of substantially all of its assets terminated any non-compete obligation; and (C) any non-compete obligation would be void under the governing California law.

**A.    Novell Is Entitled to Summary Judgment Because the Alleged Non-Compete Clause is Merely a Restriction on the Scope of the License, and Not an Affirmative Covenant Prohibiting Distribution of Competing Products.**

SCO's claim fails as a matter of law because the clause cited by SCO is merely a limitation on the scope of Novell's license, and not an independent covenant that prohibits distribution of competing products.  The TLA states that Novell "hereby retains, with the consent of SCO and, shall have a non-exclusive, non-terminable, worldwide, fee free license to":

> (2)    sublicense and distribute, and authorize its customers to sublicense and distribute, such Licensed Technology and modifications thereof, in source and binary form; ***provided, however, that*** (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ('Composite Offering'); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering.

(Brakebill Decl., Ex. 5, TLA, Section II.A (emphasis added).)  By using "*provided, however,*" to connect the first and second portions of this sentence, the TLA unequivocally indicates that the

following restriction on distributing "directly competitive" products is a limitation on the scope of the license set forth in the preceding clause.

Similarly, the APA states that Santa Cruz "shall execute a license agreement under which it shall grant to Seller a royalty-free, perpetual worldwide license to the Licensed Technology." (Brakebill Decl., Ex. 2 at 012, APA, Section 1.6.)  The APA then qualifies this broad license by stating that Novell shall use the Licensed Technology (1) "for internal purposes without restriction"; and (2) "for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product."  (*Id.*)  As in the TLA, the restriction on distributing "directly competitive" products appears *immediately after* the clause describing Novell's "royalty-free, perpetual worldwide license," as part of the same section defining the scope of Novell's license to Licensed Technology.

The conclusion that the alleged non-compete clause is a limitation on the license and not an independent covenant not to compete is reinforced by the decision in *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115 (9th Cir. 1999).  Sun and Microsoft had entered a Technical License and Distribution Agreement ("TLDA"), which (1) granted Microsoft broad rights to use and modify Sun's "Java" computer programming language; and (2) included a separate "compatibility provision" that required Microsoft's products to be "compatible implementations" of Java that would work on multiple operating systems.  *Sun Microsystems*, 188 F.3d at 1118. Sun sued for copyright infringement, claiming that Microsoft had exceeded the scope of the license by creating an enhanced version of Java that violated the "compatibility" provision.  *Id.* at 1117.  The district court granted a preliminary injunction in favor of Sun, finding that Sun was

likely to prevail on the merits and that Sun was entitled to the presumption of irreparable harm that applies in copyright infringement suits. *Id.*

The Ninth Circuit agreed that Sun was likely to prevail, but remanded for further consideration of whether the presumption of irreparable harm for copyright cases applied. *Id.* at 1119-22. The Ninth Circuit explained the issue on remand as follows:

> With regard to the applicability of a presumption of irreparable harm, we agree with Microsoft that the issue turns upon whether the terms Microsoft allegedly breached were *limitations on the scope of the license*, which would mean that *Microsoft had infringed the copyright* by acting outside the scope of the license; or whether the terms were merely *separate contractual covenants*, which would make this *a contract dispute* in which the copyright presumption of irreparable harm has no application.

*Id.* at 1119 (emphasis added). The Ninth Circuit further held that "[t]he determination of whether the compatibility terms in the TLDA are covenants or limitations on the scope of the licenses" was a contractual issue governed by California contract law. *Id.* at 1122.

On remand, the Northern District of California noted that under California law, "the court must review the entire TLDA and effect the mutual intention of the parties 'as gathered from the four corners of the instrument.'" *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1031-32 (N.D. Cal. 2000) (*citing Machado v. S. Pac. Transp. Co.*, 233 Cal. App. 3d 347, 352 (1991); *Brobeck Phleger & Harrison v. The Telex Corp.*, 602 F.2d 866, 871-72 (9th Cir. 1972); and Cal. Civ. Code § 1641). The court concluded that the "language and structure" of the agreement showed that the "compatibility obligations" "are separate covenants and not conditions of, or restrictions on, the license grants" for the following reasons:

1.   The license grants in Section 2.1 and 2.2 confer broad rights on Microsoft to distribute products including the licensed technology, "but say nothing about the license grants being subject to, conditional on, or limited by

compliance with the compatibility obligations," which were in a separate
provision (Section 2.6). *Sun Microsystems,* 81 F. Supp. 2d at 1032.

2.      "The Trademark License incorporated into the TLDA expressly limits
Microsoft's license to use SUN's Compatibility Logo to those Products
that have passed the Java Test Suites," showing that "when the parties
intended to condition or limit the scope of a license, they expressly did
so."

*Id.* Based on this analysis, the court concluded that the compatibility clause was an independent

covenant, rather than a limitation on the scope of the license, and hence Sun's claim was one for

breach of a contractual covenant, rather than copyright infringement. *Id.* at 1033.

Here, as in *Sun,* the parties' contracts are governed by California law. (Brakebill Decl.,

Ex. 5, TLA, Section X; Brakebill Decl., Ex. 2 at 054, APA, Section 9.8.) Therefore, this Court

should examine the "four corners" of these contracts to determine whether the clause cited by

SCO is a limitation on the scope of the license rather than an independent covenant not to

compete. *See Sun Microsystems,* 81 F. Supp. 2d at 1031-32.

The "language and structure" of the TLA and APA are almost *exactly opposite* to that of

the Sun/Microsoft contract. Thus, the same reasoning that led the court in the Sun/Microsoft

case to conclude that the "compatibility clause" was a contractual covenant rather than a

limitation on the license supports the *opposite* conclusion here.

In addition, the court in *Sun* emphasized that the provisions granting the license (Sections

2.1 and 2.2) did not include any qualifications, and that the compatibility clause appeared in a

separate part of the agreement (Section 2.6). 81 F. Supp. 2d at 1032. Here, in contrast, the

restriction on competing products *immediately follows* the description of the license, as part of

the same section, titled "Novell's Retained Licenses" (Brakebill Decl., Ex. 5, TLA, Section II) or

"License Back of Assets" (Brakebill Decl., Ex. 2 at 012, APA, Section 1.6.). In the TLA, the

license is expressly limited by the clause regarding competing products, which is introduced by

20

the phrase, "provided, however." (Brakebill Decl., Ex. 5, TLA, Section II.A(2).) The APA does not include an introductory phrase, but the restriction on competing products immediately follows the license grant, as part of the same section defining the scope of the "license back of assets," indicating that this is a limitation on the scope of the license.

In *Sun*, the court emphasized that other provisions of the TLDA showed that "when the parties intended to condition or limit the scope of a license, they expressly did so." *Sun Microsystems*, 81 F. Supp. 2d at 1032. Here, in contrast, the parties' contracts demonstrate that when Novell and Santa Cruz intended to impose an affirmative covenant, they expressly did so. Novell and Santa Cruz devoted *the entirety* of Article IV of the APA (Section 4.1 to 4.19) to setting forth numerous "Covenants," which were clearly intended to impose affirmative obligations on the parties. Significantly, none of the "Covenants" in Article IV impose any obligation on Novell not to distribute competing products.

Finally, it bears emphasis that the TLA, which is the detailed implementation of the APA, states that Novell "retains" a license, subject to certain limitations. (Brakebill Decl., Ex. 5, TLA, Section II.A(1).) Given that the TLA defines a pre-existing right that Novell already had, it would be illogical to transform Novell's *retention* of rights into an affirmative prohibition against Novell distributing competing products.

In sum, the language and structure of the TLA and APA demonstrate that the clause cited by SCO is merely a limitation on the scope of the license because:

1.    It is part of the provision that grants the license, rather than a separate provision;

2.    It immediately follows and modifies the description of the license;

3.    The parties chose to insert this clause in the license provision of the APA and the separate Technology License Agreement, and not in the list of affirmative covenants in Section IV of the APA; and

4.      The TLA defines the license as a right retained by Novell, and not as an affirmative prohibition that has been imposed on Novell.

Because the clause cited by SCO is a limitation on the scope of the license, if Novell has exceeded the scope of this license (which Novell disputes), then Novell may not use the license as a "shield" to defend against SCO's copyright infringement claim.  *See Sun Microsystems*, 188 F.3d at 1119 (Sun would have a copyright infringement claim if the compatibility provisions were "limitations on the scope of the license" and Microsoft had "acted outside of the scope of the license"); *see also Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1114 (9th Cir. 2000) ("[t]he existence of a license creates an affirmative defense to a claim of copyright infringement"); *Evolution, Inc. v. Prime Rate Premium Fin. Corp.*, No. 03-2315-KHV, 2004 U.S. Dist. LEXIS 25017, at * 15 (D. Kan. Aug. 13, 2004) (same) (attached hereto as Ex. 1).

At the same time, because the clause cited by SCO is merely a limitation on the scope of Novell's retained license and not an independent covenant, SCO cannot use the alleged *lack* of a "shield" as a "sword" to bring a claim for breach of a non-compete covenant that does not exist. *See Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 214 (E.D.N.Y. 1994) ("plaintiff's claim that defendants exceeded the scope of its license agreements states a claim for copyright infringement rather than breach of contract"); *Marshall v. New Kids on the Block P'ship*, 780 F. Supp. 1005, 1011 (S.D.N.Y. 1991) (claim that defendants exceeded the scope of a copyright license states a claim for copyright infringement).

**B.    Novell Is Entitled to Summary Judgment Because Santa Cruz's Sale of Substantially All of its Assets Terminated Any Non-Compete Obligations.**

Even if it were assumed that the TLA and APA had been drafted to include an affirmative covenant prohibiting distribution of competing products (which is not the case), Novell would still be entitled to summary judgment because Santa Cruz's sale of its assets to Caldera in 2001 indisputably constituted a "Change of Control" that terminated any non-compete obligations.

**1.    Any non-compete obligations "cease to exist" upon a "Change of Control," meaning a sale of all or substantially all of Santa Cruz's assets.**

The TLA states that: "In the event of a Change of Control of SCO [Santa Cruz], and commencing with the effective date of such Change of Control, the proviso in subparagraph II.A(2) setting forth restrictions on the sublicense and/or distribution of Licensed Technology and modifications thereof shall cease to exist." (Brakebill Decl., Ex. 5, TLA, Section II.B.)  The TLA also states that "Change of Control" shall have the meaning "attributed to such term[] in the Asset Purchase Agreement." (*Id.*, Section I.)

The APA defines "Change of Control" as follows:

> For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated . . . (2) any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of such party[.]

(Brakebill Decl., Ex. 2 at 048, APA, Section 6.6(c).)  Thus, the TLA restrictions on the sublicense and distribution of Licensed Technology set forth in subparagraph II.A(2) shall "cease to exist" if  "all or substantially all" of Santa Cruz's assets are sold, as this would constitute a

"Change of Control" as defined in Section 6.6(c) of the APA and incorporated by reference into

the TLA.[7]

      2.      **Santa Cruz's sales of its assets to Caldera in 2001 constituted a "Change of Control," thereby terminating any non-compete obligations.**

Santa Cruz's sales of its Server Software and Professional Services divisions to Caldera

in May 2001 indisputably constituted a "Change of Control" as defined in the APA, because it

included "substantially all" of Santa Cruz's assets.  As noted in the Undisputed Facts above, the

assets in these two transferred divisions accounted for 94.7% of Santa Cruz's net revenues in the

several years before the sale, and all of its operating income.  (Undisputed Facts 27-29.)

Moreover, the transferred divisions included all of Santa Cruz's UNIX business,

including                    **\* \* REDACTED \* \***

        **\* \* REDACTED \* \***           (Undisputed Fact

30.)  As amended in February 2001, the sale also included Santa Cruz's "OpenServer product

line," "giving Caldera complete ownership of SCO's operating system products."  (Undisputed

Fact 31.)  The sale included all of the UNIX assets that Santa Cruz had bought from Novell in

1995, as well as other UNIX assets.  (Undisputed Facts 34, 35.)  Thus, as SCO's CEO admitted,

"in the 2001 timeframe, Santa Cruz transferred substantially the UNIX business to Caldera

International."  (Undisputed Fact 33.)

---

   [7]  A different provision of the APA, Section 6.3(c), refers to certain change of control transactions that occur within 2 years of the Closing Date.  However, Section II.B of the TLA does not refer to Section 6.3(c); instead, it refers to the capitalized phrase, "Change of Control," as defined in the APA.  The only definition of "Change of Control" in the APA is in Section 6.6(c), which does not include a two-year limitation.  Therefore, the "Change of Control" provision in the TLA should be defined by reference to Section 6.6(c).

Under any reasonable interpretation, Santa Cruz's sale of the assets that generated 94.7% of its net revenues and 100% of its operating income included "substantially all" of its assets and hence constituted a "Change of Control." This conclusion is reinforced by the fact that the sale included 100% of Santa Cruz's UNIX assets, including all of the assets that Santa Cruz had bought from Novell under the APA. The purpose of the "Change of Control" provision of the TLA is to determine what events terminate the restriction on Novell's license to distribute the Licensed Technology that Novell sold to Santa Cruz. For this purpose, the most important factor is whether Santa Cruz sold "all or substantially all" of the UNIX assets that it bought from Novell. The answer is an unequivocal "Yes." (Undisputed Facts 30-35.)

The conclusion that the sale included "substantially all" of Santa Cruz's assets is further reinforced by Santa Cruz's and Caldera's treatment of the transaction. The Joint Proxy Statement of Santa Cruz and Caldera stated that Santa Cruz "will provide change-of-control benefits to its current executive officers." (Undisputed Fact 37.) The Joint Proxy Statement also stated that approval of a majority of the shareholders was required. (Undisputed Fact 38.) As a California corporation (Undisputed Fact 38), Santa Cruz needed shareholder approval for only a limited number of transactions, such as a sale of "substantially all" of the corporation's assets. (Undisputed Facts 38; Cal. Corp. Code § 1001(a).)

In addition, Santa Cruz determined that dissenting shareholders may have dissenters' rights under Chapter 13 of the California Corporations Code. (Undisputed Fact 40.) This determination indicates that Santa Cruz concluded that the transaction was a "reorganization" under Section 181 of the California Corporations Code, because dissenters' rights arise under Chapter 13 of the California Corporations Code only if the transaction involves a "reorganization" under Section 181. *See* Cal. Corp. Code § 1300(a) (dissenters rights arise for

reorganization requiring approval of outstanding shares under § 1201(a) and (b)); Cal. Corp.

Code § 1201(a) (approval of outstanding shares required if board approval required under

§ 1200); Cal. Corp. Code § 1200(c) (board approval required for sale-of-assets reorganization

under § 181). For asset sales, only the sale of "all or substantially all of the assets" of a

corporation would be considered a "reorganization" under Section 181. *See* Cal. Corp. Code

Section 181(c).

In sum, Santa Cruz's sale of its Server Software and Professional Services divisions to

Caldera in 2001 included "substantially all" of Santa Cruz's assets, because these two divisions

were responsible for 94.7% of Santa Cruz's net revenues, 100% of Santa Cruz's operating

income, and 100% of Santa Cruz's UNIX business and assets, including all of the UNIX assets

that Santa Cruz had previously bought from Novell. This conclusion is confirmed by Santa

Cruz's and Caldera's decision to provide the legal protections arising from a "sale of

substantially all assets," including "change-of-control" benefits, shareholder approval, and

dissenters' rights.

Because Santa Cruz sold "substantially all" of its assets, this sale was a "Change of

Control" as defined in Section 6.6(c) of the APA, and therefore terminated the "restrictions on

the sublicense and/or distribution of Licensed Technology and modifications thereof" set forth in

Section II.A(2) of the TLA. (Brakebill Decl., Ex. 5, TLA, Section II.B.) The Change of Control

also terminated the similar restrictions on the sublicense and distribution of Licensed Technology

in Section 1.6 of the APA, because the TLA is the detailed implementation of the license

contemplated by Section 1.6 of the APA, and hence replaces and overrides Section 1.6 of the

APA to the extent that there is any conflict. *See Frangipani v. Boecker*, 64 Cal. App. 4th 860,

863 (1998) ("[w]here there is an inconsistency between two agreements both of which are

executed by all the parties, the later contract supersedes the former"); *Nat'l Labor Relations Bd. v. Int'l Union of Operating Eng'rs*, 323 F.2d 545, 548 (9th Cir. 1963) (under California law, where two contracts "were entered into by the same parties and cover the same subject matter, it is a well settled principle of law that the later contract supersedes the former contract as to inconsistent provisions") (citations omitted).

Because the Change of Control terminated any restrictions under Section II.A(2) of the TLA and Section 1.6 of the APA, Novell is entitled to summary judgment on SCO's non-compete claim on the ground that the restriction relied upon by SCO has "ceased to exist."

>C.    **Novell Is Entitled to Summary Judgment Because a Prohibition Against the Distribution of Competing Products Would Be Void Under the Controlling California Law.**

Finally, even if it were assumed that the TLA and APA included an affirmative covenant not to compete that was not terminated by the Change of Control (neither of which is the case), Novell would still be entitled to summary judgment because any such non-compete provision would be void as contrary to California law and public policy.

>1.    **Covenants not to compete are void under California law unless they meet one of several narrow exceptions.**

As noted above, the TLA and the APA are governed by California law. (Brakebill Decl., Ex. 5, TLA, Section X; Brakebill Decl., Ex. 2 at 054, APA, Section 9.8.) California Business and Professions Code Section 16600 declares that: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." The only exceptions set forth in the Business and Professions Code relate to the sale of the goodwill of a business (§ 16601), and dissolution of a partnership or a limited liability company (§§ 16602, 16602.5).

California courts have strictly construed Section 16600 as requiring contractual non-compete clauses to be stricken, unless they meet one of the narrow exceptions. For example, in *Hill Med. Corp. v. Wycoff*, 86 Cal. App. 4th 895, 899 & n. 4 (2001), the California Court of Appeal struck a non-compete covenant prohibiting a radiologist from practicing radiology for three years within seven and a half miles of his former medical group. The court emphasized that California's rule against non-compete agreements is stricter than many other states:

> At common law, and in many states, restraints on the practice of a profession, trade, or businesses were valid, if reasonable…. In contrast, however, California has settled public policy in favor of open competition.… California codified its public policy and rejected the common law "rule of reasonableness" in 1872, upon the enactment of the Civil Code.

86 Cal. App. 4th at 900-01 (citations omitted). The court stated that "Section 16600 sets out the general rule in California — covenants not to compete are void." 86 Cal. App. 4th at 901 (citations omitted).

The California Court of Appeal held that the prohibition again practicing radiology within a specific region for three years was void because it "falls squarely within the proscription of section 16600." 86 Cal. App. 4th at 901. The court also held that this non-compete agreement did not meet the exception in Section 16601, which allows an agreement not to compete in a particular region, when (1) substantially all of the shares or assets of a company are sold; (2) the sale includes goodwill; and (3) the buyer carries on a "like business" within that area. 86 Cal. App. 4th at 901-02. The court emphasized that this exception should be narrowly construed:

> [I]n order to uphold a covenant not to compete pursuant to section 16601, the contract for sale of the corporate shares may not circumvent California's deeply rooted public policy favoring open competition. The transaction must clearly establish that it falls

> within this limited exception.  The practical effect of the
> transaction and the economic realities must be considered.

86 Cal. App. 4th at 903.  The court concluded that the "goodwill" exception did not apply

because the purchase price "did not include any payment for goodwill," and there was no

evidence that "goodwill was considered in arriving at the repurchase price."  86 Cal. App. 4th at

906-07.

The California rule against non-compete covenants has also been applied to agreements

involving a license or sale of intellectual property.  In *Zajicek v. Koolvent Metal Awning Corp. of

Am.*, 283 F.2d 127, 129 (9th Cir. 1960), the Plaintiff had licensed a group of patents related to

metal awning.  The license included a non-compete provision that prohibited the licensee from

engaging in the awning business in the licensed territory for two years.  *Id.* at 131 & n.2.  The

Ninth Circuit held that this prohibition was "undisputedly" illegal and void under Section 16600

of the California Business and Professions Code.  *Id.*

Similarly, in *Summerhays v. Scheu*, 10 Cal. App. 2d 574, 575 (1935), the Plaintiff had

bought pending patent applications related to orchard heaters from the Defendant, allegedly

based on Defendant's oral promise that Defendant was retiring and would never enter the

business again.  *Id.*  Plaintiff alleged that Defendant had nevertheless made and sold the orchard

heaters described in the patent applications, and accordingly sought an injunction enforcing the

oral agreement not to compete.  *Id.*  The California Court of Appeal sustained a demurrer to the

complaint, holding that the agreement was "a contract in restraint of trade," and hence void

under Section 1624 of the Civil Code, which was the predecessor to Section 16600 of the

Business and Professions Code.  *Id.* at 577.

29

### 2.    SCO cannot demonstrate that any of the narrow exceptions to the rule against covenants not to compete applies in this case.

SCO has asserted that "the APA and TLA each contained a non-compete provision, whereby Novell covenanted not to use the Licensed Technology to compete with SCO's core operating-system products." (Brakebill Decl., Ex. 1, Second Amended Complaint, ¶ 42.) As demonstrated in Section IV.A above, the clause cited by SCO is merely a limitation on the scope of the license, and not an affirmative covenant not to compete. However, if this limitation were assumed to be a covenant not to compete, it would be void under the general California rule that "covenants not to compete are void," as set forth in Section 16600 of the California Business and Professions Code and the precedents discussed above. *See, e.g., Hill Med. Corp.*, 86 Cal. App. 4th at 901 (citations omitted).

SCO's attempt to enforce the alleged non-compete clause is particularly objectionable in view of the overreaching nature of SCO's claim. The APA and TLA were signed in 1995. Novell did not begin to distribute the SUSE Linux operating system until it acquired SUSE Linux eight years after the APA and TLA were signed. (Brakebill Decl., Ex. 1, Second Amended Complaint, ¶ 46.) Because Novell did not enter the Linux business until many years after the APA was signed, Linux was not on the list of Novell assets that were sold to Santa Cruz (Brakebill Decl., Ex. 3, Schedule 1.1(a) to the APA), nor was it among the list of assets that were explicitly excluded from the sale (Brakebill Decl., Ex. 4, Schedule 1.1(b) to the APA). Nevertheless, SCO now claims that contracts signed more than *eleven years ago* prohibit Novell from distributing an operating system that was not part of Novell's business when the APA was signed, and which was not among the assets purchased by Santa Cruz.

The California Court of Appeal has held that a *narrower* covenant not to compete, limited to a specific time period and region, "fall[s] squarely within the proscription of section

16600." *Hill Med. Corp.*, 86 Cal. App. 4th at 901 (striking covenant not to compete for three years within a seven and a half mile radius of former medical practice); *see also Zajicek*, 283 F.2d at 129, 131 & n.2 (striking covenant not to compete in licensed business for two years after termination of patent license).  SCO, in contrast, is apparently claiming that the non-compete clause in the TLA and APA has *no* limitation as to time or place.  This much broader covenant "falls squarely within the proscription of section 16600."

Moreover, SCO cannot demonstrate that any of the narrow exceptions to the general rule against non-compete agreements applies in this case.  The exceptions for dissolution of a partnership or limited liability corporation in Sections 16602 and 16602.5 obviously do not apply, as Novell's sale of its UNIX assets to Santa Cruz did not involve a dissolution.

Similarly, SCO cannot rely on the exception in Section 16601 for sale of a business in connection with "goodwill."  The California Court of Appeal has held that "[t]he transaction must clearly establish that it falls within this limited exception," in view of "California's deeply rooted public policy favoring open competition."  *Hill Med. Corp.*, 86 Cal. App. 4th at 903.  In particular, this exception requires a "clear indication" that "the parties valued or considered goodwill as a component of the sales price."  *Hill Med. Corp.*, 86 Cal. App. 4th at 903.  SCO cannot meet this test, as "goodwill" is *not* among the assets that Novell sold to Santa Cruz, as listed in Schedule 1.1(a) to the APA.  (Undisputed Fact 3.)

In sum, if the TLA and APA were interpreted as prohibiting Novell from distributing Licensed Technology in competing operating systems to any customers for an unlimited period of time, this prohibition would be void as a matter of law under controlling California law.

## V.    CONCLUSION

SCO's attempt to pursue a claim for breach of a covenant not to compete that is independent from its copyright claim fails as a matter of law because the alleged non-compete clause is merely a limitation on the scope of Novell's retained license, and not an affirmative covenant not to compete.  Further, any non-compete obligations were terminated by Santa Cruz's sale of substantially all of its assets to SCO's predecessor.  Finally, even if the APA and TLA included a covenant not to compete that was not terminated by the sale of Santa Cruz's assets, this covenant would be void under the governing California law.  For all of these reasons, Novell respectfully requests that this Court grant summary judgment on the "non-compete" claim in SCO's Second and Fifth Claims for Relief.

DATED:   April 20, 2007

ANDERSON & KARRENBERG

By:    _____*/s/  Heather M. Sneddon*_____

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)

**Attorneys for Defendant and
Counterclaim-Plaintiff Novell, Inc.**

32

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of April, 2007, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S NON-COMPETE CLAIM IN ITS SECOND CLAIM FOR BREACH OF CONTRACT AND FIFTH CLAIM FOR UNFAIR COMPETITION** *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]* to be served to the following:

*Via CM/ECF*:

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

Stuart H. Singer
William T. Dzurilla
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301

David Boies
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504

Devan V. Padmanabhan
John J. Brogan
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55401

*Via U.S. Mail, postage prepaid*:

Stephen Neal Zack
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131

_____ */s/  Heather M. Sneddon* _____