LEXSEE 2004 U.S. DIST. LEXIS 25017

**EVOLUTION, INC., Plaintiff, v. PRIME RATE PREMIUM FINANCE CORPORATION, INC., et. al., Defendants.**

**CIVIL ACTION No. 03-2315-KHV**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2004 U.S. Dist. LEXIS 25017; Copy. L. Rep. (CCH) P28,923**

**August 13, 2004, Decided**

**DISPOSITION:** Plaintiffs First Motion For Partial Summary Judgment and Defendants' Cross Motion For Summary Judgment overruled.

**COUNSEL:** [*1]  For Evolution Inc, Plaintiff: Michael R. Clarke, Law Office of Michael R. Clarke, Chartered, Lawrence, KS.

For Prime Rate Premium Finance Corporation Inc, Defendant: Samuel P. Logan, Foulston Siefkin LLP -- Overland Park, Overland Park, KS.

For Southeast Fidelity Corporation, Defendant: Samuel P. Logan, Foulston Siefkin LLP -- Overland Park, Overland Park, KS.

For BB&T/SEFCO LLC, Defendant: Samuel P. Logan, Foulston Siefkin LLP -- Overland Park, Overland Park, KS.

**JUDGES:** Kathryn H. Vratil, United States District Judge.

**OPINION BY:** Kathryn H. Vratil

**OPINION:**

### MEMORANDUM AND ORDER

Evolution, Inc. brings suit against Prime Rate Premium Finance Corporation, Inc., Southeast Fidelity Corporation and BB&T/SEFCO LLC, alleging copyright infringement and breach of contract. This matter comes before the Court on Plaintiffs First Motion For Partial Summary Judgment (Doc. # 24) filed February 28, 2004, and Defendants' Cross Motion For Summary Judgment (Doc. # 28) filed March 22, 2004. For reasons stated below, the Court overrules both motions.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions [*2] on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); [*3]  see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"We must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment maybe granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of

Case 2:04-cv-00139-DAK-BCW    Document 274-2    Filed 04/20/2007    Page 2 of 8

Page 2
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must [*4] prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**Factual Background**

The following facts are either uncontroverted or, where controverted, set forth alternatively in the light most favorable to each party.

Evolution owns the copyright on the "PF2000," "Agents Tool Box" and "Voice Communication Server" software. n1 Southeast Fidelity Corporation ("SEFCO"), a Florida corporation which engaged in the insurance premium financing business in Tallahassee, Florida, acquired licenses to use this software to manage its accounts.

> n1 The record reveals that plaintiff has copyright registrations for PF2000 and Agent's Tool Box, see Plaintiff's Initial Disclosures (Doc. 30) filed March 22, 2004 PP 2(r) and (s), but it contains no evidence of copyright registration for "Voice Communication Server." Memorandum In Opposition To Plaintiff's Motion For Partial Summary Judgment And In Support Of Defendant's [sic] Cross Motion For Summary Judgment ("Defendants' Memorandum") (Doc. # 29) filed March 22, 2004 at 2.
>
> Registration of a copyright is a prerequisite to filing an infringement action. 17 U.S.C. § 411(a) ("no action for infringement of the copyright of any work shall be instituted until registration of the copyright claim has been made"); see also M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1488 (11th Cir. 1990) (registration is jurisdictional prerequisite).

[*5]

On April 15, 1997, Evolution and SEFCO entered a License Agreement which gave SEFCO a "single site, non-exclusive, non-transferable" license for the PF2000 software and options. PF2000 Agreement at Pt. II, P 1.1, Exhibit A to Plaintiffs Memorandum (Doc. # 25). The PF2000 License agreement stated that the "Licensee is strictly prohibited from transferring the Licensed Software to any other entity without the written consent of Evolution." Id. at Pt. II, P 1.3.

On July 30, 1997, Evolution and SEFCO entered a License Agreement which gave SEFCO a license for Agents Tool Box software. That agreement states that "Evolution hereby grants to Customer, and Customer hereby accepts, subject to the terms and conditions provided in this Agreement, a single site, non-exclusive, non-transferable, single user license to use in the United States." Agents Tool Box Agreement at Pt. II, P 1.1, Exhibit C to Plaintiff's Memorandum (Doc. # 25).

On September 27, 2000, Evolution and SEFCO entered a License Agreement which gave SEFCO a single user license for Voice Communication Server software and options. The agreement stated that "Customer is strictly prohibited from transferring the [*6] Licensed Software to any other entity without the written consent of Evolution." Voice Communication Server Agreement at Pt. II, P 1.3, Exhibit B to Plaintiff's Memorandum (Doc. # 25).

Evolution did not consent to the transfer of any license.

Under the PF2000 and Voice Communication Server agreements, a user is defined as "each computer terminal which has access to the database." PF2000 Agreement at Pt. II, P 1.1 and Voice Communication Server Agreement at Pt. II, P 1.1. The Agents Tool Box agreement does not define the term "user."

Regarding third party use, the PF2000 and Voice Communication Server agreements provide that "use of said licensed programs is strictly restricted to Customers [sic] own internal operations," and that "Customer shall not use the licensed programs to service the accounts of third parties." PF2000 Agreement at Pt. I, P 2, Voice Communication Server Agreement at Pt. I, P 2. These two agreements also provide that "the Licensed Programs are solely for customers [sic] own internal operations." PF2000 Agreement at Pt. II, P 1.2, Voice Communication Server Agreement at Pt. II, P 1.2. The Agents Tool Box agreement also provides [*7] that "Customer use of said licensed programs is strictly restricted to Customers [sic] own operations." Agents Tool Box Agreement at Pt. I, P 2.

Each of the three agreements state that it "shall also govern all other products delivered to Customer by Evolution." PF2000 Agreement at Pt. IV, P 1, Voice Communication Server Agreement at Pt. IV, P 1, Agents Tool Box Agreement at Pt. IV, P1.

All three agreements address confidentiality. The PF2000 and Agents Tool Box agreements provide as follows:

> Customer acknowledges that the Licensed Programs . . . are commercially valuable proprietary products of Evolution, and are

Case 2:04-cv-00139-DAK-BCW   Document 274-2   Filed 04/20/2007   Page 3 of 8

Page 3
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

> CONFIDENTIAL INFORMATION and TRADE SECRETS disclosed to Customer on a confidential basis under this Agreement. Customer agrees it will not, without first obtaining Evolution's written consent, disclose such Confidential information and Trade Secrets to any person, firm or enterprise, use for its own benefit or make copies of such Confidential information or Trade Secrets except as expressly permitted under this Agreement, and it will take all reasonable steps to protect the confidentiality thereof including instructing its employees and agents [*8] of Customer's obligations hereunder. Title to, and ownership of, the Licensed Programs shall at all times remain with Evolution.

PF2000 Agreement at Pt. IV, P 2. The Voice Communication Server agreement provides in relevant part as follows:

> Customer expressly acknowledges that Evolution is the sole owner of all right, title and interest in and to the Licensed Programs. . . . Customer acknowledges that the Licensed Programs includes Intellectual Property. . . . Customer agrees it will not, without first obtaining Evolution's written consent, disclose such any [sic] Intellectual Property to any person, firm or enterprise, use for its own benefit or make copies of such Intellectual Property except as expressly permitted under this Agreement, and it will take all reasonable steps to protect the confidentiality of the Intellectual Property thereof including instructing its employees and agents of Customer's obligations hereunder. Title to, and ownership of, the Intellectual Property shall at all times remain with Evolution. * * *
>
> Customer agrees to take all reasonable steps to protect the Intellectual Property from unauthorized copy or use. * * *
>
> Customer [*9] recognizes and acknowledges that Evolution desires that the Intellectual Property remain confidential. Customer will not, during or after termination of this Agreement, disclose any information whatsoever relating to the Intellectual Property or the terms of this Agreement to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever.

Voice Communication Server Agreement at Pt. IV, P 2.

All three License Agreements provide that they shall be governed by Kansas law. PF2000 Agreement at Pt. IV, P 9, Voice Communication Server Agreement at Pt. IV, P 9, Agents Tool Box Agreement at Pt. IV, P 9.

SEFCO initially paid Evolution about $ 42,066.00 for software licensing fees. In addition, it paid monthly user fees. Declaration Under Penalty Of Perjury Of James R. Sweat, III P 4, in Defendants' Supplemental Exhibit (Doc. # 32) filed March 25, 2004. SEFCO ran the Evolution software on 11 computers in Tallahassee, to manage its accounts and record data concerning its business. The software licenses permitted SEFCO to input and retrieve data pertaining to its business and such data remained the sole property of SEFCO. [*10] Affidavit Of James R. Sweat, III P 3, Exhibit A to Defendants' Memorandum (Doc. # 29). Because the software was password-controlled, SEFCO had to obtain a new password from Evolution every three months.

On March 31, 2003, SEFCO merged into BB&T/SEFCO, LLC. n2 The next day, April 1, 2003, BB&T/SEFCO, LLC was dissolved and its parent company, BB&T Corporation, absorbed its assets and liabilities and took over the SEFCO business. BB&T Corporation immediately transferred the SEFCO assets and liabilities to Branch Banking and Trust Company, its wholly owned subsidiary, which in turn transferred them to its own wholly owned subsidiary, Prime Rate Premium Finance Corporation ("Prime Rate"). n3 The end result was that on April 1, 2003, SEFCO's business was merged with Prime Rate, and Prime Rate continued to run the old SEFCO business. Affidavit Of James R. Sweat, III P 4. After the acquisition, Prime Rate maintained the same employees and management for SEFCO business. Id. P 5.

> n2 The record does not reveal details of the merger or the merger agreement. The record only reveals that on February 28, 2003, SEFCO and BB&T Corporation executed a letter agreement which provided that SEFCO would merge into BB&T/SEFCO, LLC, a wholly owned subsidiary of BB&T Corporation. Thereafter, the assets and liabilities of BB&T/SEFCO, LLC would be transferred to BB&T Corporation, which would transfer such assets and liabilities to Branch Banking and Trust Company (its wholly owned subsidi-

Case 2:04-cv-00139-DAK-BCW   Document 274-2   Filed 04/20/2007   Page 4 of 8

Page 4
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

ary), which in turn would transfer such assets and liabilities to its own wholly owned subsidiary, Prime Rate Premium Finance Corporation, Inc.

[*11]

n3 The record does not reveal the states in which BB&T/SECFO, Prime Rate and Branch Banking and Trust Company were incorporated. In response to Evolution's factual allegation, defendants state that BB&T/SEFCO was organized under North Carolina law. It provides no record citation for this allegation.

After the merger, Prime Rate used a loan processing program which it had developed internally, and it entered all **new** SEFCO business into its system in Florence, South Carolina. On April 3, 2003, SEFCO informed Evolution that Prime Rate had its own premium finance software program; that as it converted agents to Prime Rate, the business would go on the Prime Rate system; and that it needed to maintain the SEFCO license for a while. Evolution continued billing SEFCO, and Prime Rate paid the monthly user fees. Evolution, however, did not cash the checks, Plaintiff's Initial Disclosure (Doc. # 30) filed March 22, 2004, PP 2.m.-p. Instead, it demanded from Prime Rate new licensing fees totaling $ 86,445.00. Declaration Under Penalty Of Perjury Of James R. Sweat, III P 6. Prime Rate responded [*12] that it was only using Evolution software at the SEFCO branch in Tallahassee on the 11 computers for which SEFCO was licensed.

Prime Rate and its affiliates did not attempt to illegally copy the Evolution software, and they did not intend to use the Evolution software after Prime Rate transferred the SEFCO data to its own system. On June 30, 2003, three months after the merger, Prime Rate transferred the last SEFCO data to its computer system in South Carolina.

Evolution contends that Prime Rate used the software which it had licensed to SEFCO. Prime Rate, SEFCO and BB&T/SEFCO contend that SEFCO continued to exist after dissolution to wind up its business and carry out the merger agreement; that SEFCO used the software for three months to wind up its pre-merger business and retrieve proprietary business information; that SEFCO did so on computers for which it was licensed; that Prime Rate did not record new transactions on Evolution software after April 1, 2003; that Prime Rate did not use the Evolution software; and that any "use" of Evolution software was by SEFCO.

On June 11, 2003, Evolution filed suit against Prime Rate, SEFCO and BB&T/SEFCO, alleging that (1) Prime Rate and [*13] BB&T/SEFCO infringed its copyrights in PF2000 (Counts I and II), Voice Communication Server (Counts III and IV) and Agents Tool Box (Count V and VI); and (2) SEFCO breached the License Agreements for PF2000, Voice Communication Server and Agents Tool Box (Counts VII, VIII and IX). Complaint (Doc. # 1) filed June 11, 2003. Plaintiff seeks summary judgment on all claims except its copyright infringement claims as to Voice Communication Server (Counts III and IV). n4 Plaintiff argues that as a matter of law, defendants infringed the copyrights for PF2000 and Agents Tool Box and breached the license agreements as to all three copyrights by using the software and transferring the non-exclusive licenses. Plaintiff's First Motion For Partial Summary Judgment (Doc. # 24) filed February 28, 2004. Plaintiff specifically argues that because it did not consent to transfer the SEFCO licenses, BB&T/SEFCO and Prime Rate were not entitled to use the software after the merger. Plaintiff's Memorandum (Doc. # 25) at 1-2.

n4 Apparently because it has not registered the Voice Communication Server copyright, Evolution does not seek summary judgment on Counts III and IV.

[*14]

Defendants seek summary judgment on all Evolution claims, arguing that as a matter of law (1) they did not "transfer" or make impermissible "use" of the Evolution software when they retrieved their business data from it; (2) SEFCO's change in form of ownership did not occasion a transfer which required Evolution's consent; (3) even if a transfer occurred, Evolution could not withhold consent because of its obligation of good faith and fair dealing; and (4) any breach of the license agreements was not material and the licenses could not be terminated. Defendants' Memorandum (Doc. # 29) at 7-19.

**Analysis**

**I. Plaintiff's First Motion For Partial Summary Judgment**

Evolution seeks summary judgment on its claims that Prime Rate and BB&T/SEFCO infringed its copyrights in PF2000 and Agents Tool Box, and that SEFCO breached all three license agreements by transferring them without its consent. Evolution argues that as a matter of law, Prime Rate and BB&T/SECFO could not acquire any SEFCO license rights because (1) non-exclusive licenses are not transferable without the consent of the copyright holder; (2) a change in form of ownership causes a transfer of the licenses; [*15] and

Case 2:04-cv-00139-DAK-BCW   Document 274-2   Filed 04/20/2007   Page 5 of 8

Page 5
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

(3) Evolution did not consent to any transfer. Plaintiff's Memorandum (Doc. # 25) at 4.

### A. Copyright Infringement

Copyright law grants the copyright owner a limited monopoly to exploit his creation; "[copyright law] is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429, 78 L. Ed. 2d 574, 104 S. Ct. 774 (1984); accord Fogerty v. Fantasy, Inc. 510 U.S. 517, 526, 127 L. Ed. 2d 455, 114 S. Ct. 1023 (1994). To prevail on its copyright claim, plaintiff must establish that (1) it possesses valid copyrights and (2) that defendants "copied" protectable elements of the copyrighted works. n5 Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1284 (10th Cir. 1996) (citations and footnote omitted). The existence of a license, exclusive or non-exclusive, creates an affirmative defense to a claim of copyright infringement. I.A.E. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).

> n5 "Copying" is regularly used as a shorthand to refer to the infringement of a copyright holder's exclusive rights under a copyright. Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 832 n.6 (10th Cir. 1993).

 [*16] 

The parties do not deny that Evolution possesses valid copyrights in PF2000 and Agents Tool Box and that it granted non-exclusive software licenses to SEFCO. They dispute whether SEFCO impermissibly transferred those licenses by merging with BB&T/SEFCO and Prime Rate. Plaintiff's brief reads like a learned treatise, but it does not clearly articulate any analysis which the Court can readily apply to this case. The record suggests that to determine whether a change in ownership constitutes a transfer of the license in this case, the Court must examine both the applicable law with respect to mergers and the terms of the license agreements.

### B. Merger Law

Whether a merger effectuates an automatic assignment or transfer of license rights is a matter of state law. See, e.g., PPG Indus., Inc. v. Guardian Indus. Corp., 597 F.2d 1090, 1093 (6th Cir. 1979); SQL Solutions v. Oracle Corp., 1991 U.S. Dist. LEXIS 21097, No. C-91-1079, 1991 WL 626458 (N.D.Cal. Dec. 18, 1991); Hartford-Empire Co. v. Demuth Glass Works, Inc., 19 F. Supp. 626 (E.D.N.Y. 1937); see also Elaine D. Ziff, The Effect of Corporate Acquisitions on the Target Company's License Rights [*17] , 57 Bus. Law. 767, 775 (2002); Brandon M. Villery, The Transferability of Non-Exclusive Copyright Licenses: A New Default Rule for Software in the Ninth Circuit?, 22 Hastings Comm. & Ent. L.J. 153, 157 (1999). Thus, absent a contrary agreement of the parties, state merger statutes determine the effect of mergers with respect to assignment or transferability of licenses.

In this case, the merger agreement is not a part of the record and the Court cannot determine where the parties entered the merger agreement or which state law controlled the merger. The record reveals that SEFCO was a Florida corporation and that BB&T/SEFCO was incorporated in a state other than Kansas and has its principle place of business in a state other than Kansas. The record does not reveal the states in which BB&T/SEFCO and Prime Rate are organized.

Merger statutes are not identical and the effect of a merger can vary from state to state. For example, under K.S.A. § 17-7707(d), all rights of each of the constituent entities "shall be . . . deemed to be transferred to and vested in the surviving or new entity without further act or deed." Florida [*18]  and North Carolina statutes, which are virtually identical to each other, do not expressly provide that a merger effectuates a "transfer" of rights. See F.S.A. § 607.1106; N.C.G.S.A. § 55-11-06.

As noted, the record does not reveal the states in which BB&T/SEFCO and Prime Rate are organized, or which state law governed the merger agreement. Therefore the Court cannot determine what law applies. Genuine issues of material fact prevent the Court from determining whether, by operation of law, the merger effectuated a transfer of license rights. The Court overrules Evolution's motion for summary judgment on this issue.

### C. Contractual Provisions Relating To Merger And Transfer

The PF2000 license agreement gave SEFCO a single site, non-transferable license and "strictly prohibited [SEFCO] from transferring the Licensed Software" without plaintiff's written consent. PF2000 Agreement at Pt. II, P 1.1. The Agents Tool Box license agreement gave SEFCO, a single site, non-transferable, single user license. Agents Tool Box Agreement at Pt. II, P 1.1. The Voice Communication Server license agreement "strictly prohibited [SEFCO] from transferring [*19]  the Licensed Software" without plaintiff's written consent. Voice Communication Server Agreement, Exhibit B to Plaintiff's Memorandum (Doc. # 25).

Under Kansas law, the construction of a written contract is a matter of law for the Court. Wagnon v. Slawson Exploration Co., 255 Kan. 500, 511, 874 P.2d 659

Case 2:04-cv-00139-DAK-BCW    Document 274-2    Filed 04/20/2007    Page 6 of 8

Page 6
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

(1994). The "cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." Ryco Packaging Corp. v. Chapelle Int'l, Ltd., 23 Kan. App.2d 30, 36, 926 P.2d 669 (1996) (citing Hollenbeck v. Household Bank, 250 Kan. 747, 751, 829 P.2d 903 (1992)). Where a contract is complete and unambiguous on its face, the Court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. Simon v. Nat'l Farmers Org., Inc., 250 Kan. 676, 679-80, 829 P.2d 884 (1992).

As an element of contractual construction, whether an instrument is ambiguous is a question of law for the Court. Id. A contract is ambiguous if it contains "provisions or language of doubtful or conflicting [*20] meaning, as gleaned from a natural and reasonable interpretation of its language." Id. Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." Marquis v. State Farm Fire & Cas. Co., 265 Kan. 317, 324, 961 P.2d 1213 (1998).

Here, the license agreements do not address the effect of a merger, and they do not define the meaning of "transfer" or "non-transferrable." n6 The parties have not squarely addressed the issues of contract interpretation and the Court will not construct their arguments for them. On this record, the Court cannot ascertain the parties' contractual intent. It therefore overrules plaintiff's motion for summary judgment.

n6 The fact that a contract does not define each term does not necessarily mean that the contract is ambiguous in that respect. Ambiguity arises only if the language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain. Id. (citing Security State Bank of Kan. City v. Aetna Cas. & Sur. Co., 825 F. Supp. 944, 946 (D. Kan. 1993)).

[*21]

## II. Defendants' Motion For Summary Judgment

As stated above, Evolution alleges that (1) Prime Rate and BB&T/SEFCO infringed its copyrights in PF2000 (Counts I and II), Voice Communication Server (Counts III and IV) and Agents Tool Box (Count V and VI); and (2) SEFCO breached the license agreements for PF2000, Voice Communication Server and Agents Tool Box (Counts VII, VIII and IX). Defendants seek summary judgment on all claims, arguing that (1) they did not "transfer" or make impermissible "use" of the Evolution software when they retrieved their business data from it; (2) SEFCO's change in form of ownership did not occasion a transfer which required Evolution's consent; (3) even if a transfer occurred, Evolution could not withhold consent because of its obligation of good faith and fair dealing; and (4) any breach of the license agreements was not material and the licenses could not be terminated. Defendants' Memorandum (Doc. # 29) at 7-19.

As noted above, the Court cannot determine whether SEFCO's merger with Prime Rate effectuated a transfer which required the consent of Evolution. Aside from that issue, defendants essentially seek summary judgment on the theory [*22] that even if a transfer occurred, they are entitled to judgment as a matter of law.

### A. Whether Defendants "Used" The Licenses When They Retrieved Business Data

The license agreements permitted SEFCO to input and retrieve data pertaining to its business, and that data remained SEFCO's sole property. Defendants contend that SEFCO did not transfer the software to a third party, but merely used it to wind up pre-merger business and retrieve its own business data, and that said retrieval was within the scope of rights which plaintiff granted to SEFCO in the license agreements. Defendants' Memorandum (Doc. # 29) at 7-8. Plaintiff agrees that SEFCO did not make impermissible use of the software, but argues that by using the transferred software, Prime Rate made impermissible use of the software. Memorandum In Opposition To Defendants' Cross Motion For Summary Judgment And Plaintiff's Reply To Defendants' Memorandum In Opposition to Plaintiff's Motion For Partial Summary Judgment ("Plaintiff's Reply") (Doc. # 36) filed April 14, 2004 at 8.

The PF2000 and Voice Communication Server agreements provide that the licensed programs are "solely for customers [sic] own internal [*23] operations." PF2000 Agreement at Pt. II, P 1.2, Voice Communication Server Agreement at Pt. II, P 1.2. The Agents Tool Box agreement provides that "Customer use of said licensed programs is strictly restricted to Customers [sic] own operations." Agents Tool Box Agreement at Pt. I, P 2. The Agents Tool Box agreement does not define "user," but the PF2000 and Voice Communication Server agreements define "user" as "each computer terminal which has access to the database." PF2000 Agreement at Pt. II, P 1.1, Voice Communication Server Agreement at Pt. II, P 1.1.

After the merger, Prime Rate used the software on the 11 licensed computer terminals to wind up SEFCO's pre-merger business. Prime Rate entered all new business from the SEFCO branch office in Florida into its system in South Carolina. Three months after the merger,

Case 2:04-cv-00139-DAK-BCW    Document 274-2    Filed 04/20/2007    Page 7 of 8

Page 7
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

Prime Rate transferred the last remaining SEFCO data to its computer system in South Carolina. If the merger effectuated a transfer of license rights, the software was arguably used for purposes other than the internal operations of SEFCO. As stated above, however, genuine issues of fact remain whether the merger effectuated a transfer. Thus, the [*24] Court cannot find as a matter of law that Prime Rate did not impermissibly use the software. The Court therefore overrules defendants' motion for summary judgment on this issue.

### B. Whether The Merger Effectuated A Transfer

For reasons stated above, genuine issues of material fact remain whether the merger effectuated a transfer of license rights. The Court therefore overrules defendants' motion on this issue.

### C. Whether Evolution Had Legal Right To Withhold Consent

Defendants contend that if plaintiffs consent was required to retrieve SEFCO business data, plaintiff could not withhold that consent for the purpose of charging higher fees. Defendants' Memorandum (Doc. # 29) at 13. Plaintiff responds that SEFCO never sought consent.

Under Kansas law, a duty of good faith and fair dealing is implied in every contract except employment-at-will contracts. Daniels v. Army Nat'l Bank, 249 Kan. 654, 658, 822 P.2d 39, 43 (1991) (good faith duty implied in every contract); Morriss v. Coleman Co., 241 Kan. 501, 518, 738 P.2d 841, 851 (1987) (covenant not implied in employment-at-will contracts). "The purpose of the good faith doctrine is to [*25] protect the reasonable expectations of the parties." Flight Concepts Ltd. Partnership v. Boeing Co., 38 F.3d 1152, 1157 (10th Cir. 1994) (applying Kansas law). This implied duty requires the parties to an agreement to refrain from "intentionally and purposely doing anything to prevent the other party from carrying out his part of the agreement, or doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Daniels, 249 Kan. at 658, 822 P.2d at 43 (quoting Bonanza, Inc. v. McLean, 242 Kan. 209, 222, 747 P.2d 792 (1987)).

Two days after the merger, Prime Rate notified plaintiff that it did not intend to continue using the Evolution software after it transferred the SEFCO data to its own system, but that it wanted to maintain the SEFCO license for a while. Plaintiff responded by requesting new licensing fees totaling $ 86,445.00. Although Evolution may not have been able to withhold consent for Prime Rate to retrieve SEFCO business data from the software, the record indicates that besides retrieving data, Prime Rate used the software for three months to wind [*26] up SEFCO business. On this record, the Court cannot conclusively determine that a duty of good faith and fair dealing required Evolution to allow such use of its software. The Court therefore overrules defendants' motion on this issue.

### D. Whether Alleged Breach Was Material

Defendants argue that even if the merger effectuated a transfer, the resulting breach was not material and resulted in no damage to plaintiff. Defendants' Memorandum (Doc. # 29) at 15. Specifically, defendants argue that Prime Rate only used the software to process data of pre-existing SEFCO customers, that it only used the software on 11 licensed computers for a period of three months, and that it paid all monthly user fees during that period. Plaintiff replies that the License Agreements contained absolute prohibitions against transfer and that a transfer was therefore a material breach. n7

> n7 Defendants argue that plaintiff had no right to terminate the licenses, but the record contains no evidence that plaintiff has terminated the agreements.

[*27]

The standard for determining whether a breach was material must necessarily be "imprecise and flexible" to "further the purpose of securing for each party his expectation of an exchange of performances." Restatement (Second) of Contracts § 241, comment a (1981); see also HealthOne, Inc. v. Columbia Wesley Med. Ctr., 93 F. Supp. 2d 1152, 1160 (D. Kan. 2000). In determining whether a breach is material, Restatement (Second) of Contracts states that the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

Case 2:04-cv-00139-DAK-BCW Document 274-2 Filed 04/20/2007 Page 8 of 8

Page 8
2004 U.S. Dist. LEXIS 25017, *; Copy. L. Rep. (CCH) P28,923

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with [*28] standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241. This determination is generally a question of fact. Gordon v. Matthew Bender & Co., Inc., 186 F.3d 183 (2d Cir. 1999); Ahern v. Scholz, 85 F.3d 774 (1st Cir. 1996); Lerman v. Joyce Intern., Inc., 10 F.3d 106 (3d Cir. 1993). If only one reasonable conclusion is evident, the Court must address the question as a question of law. Gibson v. City of Cranston, 37 F.3d 731 (1st Cir. 1994). Here, however, one reasonable conclusion is not evident. The record can certainly be construed as revealing nothing but a technical breach. Given the express language of the license agreements, however, reasonable minds could disagree on this issue. The Court therefore overrules defendants' motion.

**IT IS THEREFORE ORDERED** that Plaintiff's First Motion For Partial Summary Judgment (Doc. # 24) filed February 28, 2004 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendants' Cross Motion For Summary Judgment (Doc. # 28) filed March 22, 2004 be and hereby is **OVERRULED**. [*29]

Dated this 13th day of August, 2004 at Kansas City, Kansas.

Kathryn H. Vratil

United States District Judge