MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant and Counterclaim-Plaintiff Novell, Inc.**

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>     Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>     Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE AND THIRD CLAIM FOR SPECIFIC PERFORMANCE**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

I.  STATEMENT OF ISSUES ...................................................................................... 1

II.  INTRODUCTION .................................................................................................... 1

III.  STATEMENT OF UNDISPUTED FACTS ............................................................ 3

A.  The APA Expressly Excluded "All Copyrights" from the Assets to
be Transferred by Novell to Santa Cruz. .................................................... 3

B.  Novell Deliberately Excluded Copyrights from the Transferred
Assets to Protect its Right to Receive SVRX and UnixWare
Royalties and its Continuing Interest in the UNIX Business................... 5

C.  The Lists of Transferred Assets Were Revised to Include a
Copyright Exclusion and Then Exchanged By the Parties Before
the APA Was Signed. .................................................................................. 9

D.  Amendment No. 1 Made Further Revisions to the Lists of
Transferred Assets, But Not to the Copyright Exclusion. ..................... 12

E.  The Bill of Sale Transferred Only the Assets Identified in the
APA and Amendment No. 1, Which Did Not Include Copyrights........ 12

F.  Amendment No. 2 Revised the "Excluded Assets" Provision, But
Did Not Transfer Ownership of Copyrights or Specify Which
Copyrights Might Be "Required" for the UNIX Business..................... 13

G.  The Negotiation History of Amendment No. 2 Confirms that It
Was Not Intended to Transfer Ownership of UNIX and UnixWare
Copyrights.................................................................................................. 14

IV.  ARGUMENT ......................................................................................................... 16

A.  Novell Is Entitled to Summary Judgment that the APA as
Amended by Amendment No. 1 Excluded UNIX and UnixWare
Copyrights from the Assets Transferred to Santa Cruz by the Bill
of Sale. ...................................................................................................... 16

1.  The Plain Language of the APA and Amendment No. 1
Excluded "All Copyrights" from the Assets to Be
Transferred by Novell to Santa Cruz. ....................................... 17

2.      SCO's Attempt to Rewrite "All Copyrights" As "NetWare
        Copyrights Only" Should Be Rejected as Contrary to the
        Plain Language and to the Parol Evidence Rule. .......................................18

3.      The Exclusion of "All Copyrights" from the Transferred
        Assets Was Deliberate and Consistent with the Basic
        Objectives of the APA. .......................................................................23

        a.      The scope of the transferred assets was specifically
                negotiated. ...................................................................................24

        b.      Novell deliberately excluded copyrights to protect
                its continuing interests in UNIX and UnixWare. ..........................25

        c.      Santa Cruz had a license to use the UNIX and
                UnixWare copyrights, and hence did not need to
                acquire ownership to implement the APA. ...................................26

4.      The Other Contractual Provisions Cited by SCO Do Not
        Demonstrate that the UNIX and UnixWare Copyrights
        Transferred to Santa Cruz. .......................................................................29

        a.      Schedule 1.1(a) does not demonstrate that the
                exclusion of "all copyrights" was limited to
                "NetWare" copyrights. ...................................................................29

        b.      The definition of "Business" does not demonstrate
                that "all copyrights" means "NetWare copyrights
                only." .............................................................................................30

        c.      Section 1.6 and the Technology License
                Agreement do not demonstrate that "all
                copyrights" means "NetWare copyrights only." ...........................31

5.      The Scope of Assets Transferred by the Bill of Sale Is
        Controlled by the APA and Amendment No. 1, and Not by
        Amendment No. 2. ...................................................................................33

B.      Novell Is Entitled to Summary Judgment that Amendment No. 2
        Does Not Constitute a Sufficient Written Instrument to Transfer
        UNIX and UnixWare Copyrights to Santa Cruz. ....................................34

1.      The Copyright Act Requires a Signed Instrument of
        Conveyance to Transfer Ownership of Copyrights. ...................................34

2.      Amendment No. 2 Did Not Purport to Transfer Copyrights
        or to Retroactively Amend the Bill of Sale. ...............................................35

3.      Amendment No. 2 Did Not Identify Which Copyrights, If Any, Should be Transferred. .......................................................................37

4.      Santa Cruz Did Not "Require" Ownership of the UNIX and UnixWare Copyrights for its Business As It Already Had a License to Use these Copyrights as Needed to Implement the APA. ...............................................................38

C.     Novell Is Entitled to Summary Judgment on SCO's Slander of Title Claim Because SCO Cannot Demonstrate that Novell's Assertion of Copyright Ownership Was False. ......................................................38

D.     Novell Is Entitled to Summary Judgment On SCO's Claim for Specific Performance of Novell's Alleged Obligation to Transfer the UNIX and UnixWare Copyrights to SCO. ......................................................39

V.     CONCLUSION .............................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Blumenfeld v. R.H. Macy & Co.*,
  92 Cal. App. 3d 38 (1979) ...................................................................................21

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989)...........................................................................................35

*Dore v. Arnold Worldwide, Inc.*,
  39 Cal. 4th 384 (2006) ......................................................................................19

*EPA Real Estate P'ship v. Kang*,
  12 Cal. App. 4th 171 (1992) .......................................................................20, 24

*Effects Assoc. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) .......................................................................28, 34

*First Sec. Bank of Utah v. Banberry Crossing*,
  780 P.2d 1253 (Utah 1989)................................................................................39

*Foad Consulting Group, Inc. v. Musil Govan Azzalino*,
  270 F.3d 821 (9th Cir. 2001) ...............................................................19, 27, 28

*Gerdlund v. Electronic Dispensers Int'l*,
  190 Cal. App. 3d 263 (1987) ......................................................................21, 22

*Konigsberg Int'l, Inc. v. Rice*,
  16 F.3d 355 (9th Cir. 1994) .........................................................................35, 37

*National Ins. Underwriters v. Maurice Carter*,
  17 Cal. 3d 380 (1976) ........................................................................................30

*Pamfiloff v. Giant Records, Inc.*,
  794 F. Supp. 933 (N.D. Cal. 1992) ..............................................................35, 37

*Radio Television Espanola S.A. v. New World Entm't, Ltd.*,
  183 F.3d 922 (9th Cir. 1999) ............................................................................35

*Wilder v. Wilder*,
  138 Cal. App. 2d 152 (1955) .............................................................................31

iv

# STATUTES

17 U.S.C.
    § 101 ........................................................................................................................35
    § 204 ..................................................................................................2, 34, 35, 37, 38
    § 204(a) .............................................................................................19, 33, 34, 35

Cal. Civ. Proc. Code
    § 1859 ......................................................................................................................30

Cal. Bankr. Code
    § 541(d) .....................................................................................................................8

## I.     STATEMENT OF ISSUES

SCO's First and Third Causes of Action for slander of title and specific performance, respectively, are based on SCO's assertion that Novell sold the UNIX and UnixWare copyrights to SCO's alleged predecessor, the Santa Cruz Operation ("Santa Cruz"), as part of the Asset Purchase Agreement ("APA").  This motion raises two issues related to this alleged transfer of the UNIX and UnixWare copyrights.

1.     Is Novell entitled to summary judgment that the APA expressly excluded "all copyrights" from the assets to be transferred, and hence the Bill of Sale that implemented the APA did not transfer the UNIX and UnixWare copyrights to Santa Cruz?

2.     Is Novell entitled to summary judgment that Amendment No. 2 to the APA did not transfer the UNIX and UnixWare copyrights to Santa Cruz?

This Court visited similar issues in the context of Novell's motion to dismiss filed prior to discovery in this action.  After discovery, Novell can now demonstrate that there is no genuine dispute of fact precluding judgment as a matter of law in Novell's favor on both issues.  Therefore, Novell is also entitled to summary judgment on SCO's claims for slander of title and specific performance.

## II.     INTRODUCTION

The APA, signed by Novell and Santa Cruz on September 19, 1995, explicitly excluded "all copyrights" from the assets that Novell transferred to Santa Cruz.  This copyright exclusion is found in a Schedule 1.1(b) of Excluded Assets.  It is further reinforced by express language in the contract providing that the Assets purchased "shall not include those assets ... set forth on

Schedule 1.1(b)."  SCO has nevertheless claimed that the APA transferred the UNIX and

UnixWare copyrights to Santa Cruz, which later sold these copyrights to SCO.[1]

As a matter of law, the original APA did not transfer ownership of any copyrights.  The

language of the APA is clear and unequivocal: "all copyrights" are excluded from the assets to

be transferred.  SCO's attempt to overcome this exclusion by citing extrinsic evidence that "all

copyrights" does not mean "all copyrights" is unavailing.  Once again in this dispute, "all"

means all,[2] and parol evidence to the contrary is inadmissible.  Moreover, the admissible

extrinsic evidence confirms that the exclusion of all copyrights from the transferred assets was

deliberate and consistent with the APA's objectives.

The APA as amended by Amendment No. 2 also did not transfer the UNIX and

UnixWare copyrights to Santa Cruz.  The Copyright Act, 17 U.S.C. § 204, requires a written

---

[1] SCO's position in this litigation has shifted on copyright ownership.  Initially, SCO focused its ownership claim on Amendment No. 2 to the APA, a contract that was executed more than one year after the APA was signed.  (*See, e.g.*, Pl.'s Memo. in Opp. to Def.'s Motion to Dismiss, filed March 4, 2004, PACER No. 13, at 7, 8 (repeatedly referring only to the "Asset Purchase Agreement, as amended" by Amendment No. 2 as having transferred the copyrights).)  Subsequently, SCO argued that the original APA transferred copyrights to SCO even before Amendment No. 2 was executed.  (*See, e.g.*, Pl.'s Mem. in Opp. to Def.'s Motion to Dismiss SCO's Amended Complaint, filed Oct. 1, 2004, PACER No. 52, at 7-9 (arguing that the APA, standing on its own, acted to transfer the UNIX copyrights from Novell to Santa Cruz).)

[2] SCO's position that "all copyrights" means less than "all copyrights" mirrors its interpretation of other provisions in the APA.  For example, SCO claims that the APA limits Novell's broad authority under Section 4.16(b) to just certain SVRX Licenses, even though the APA expressly extends that authority to "any" and "all" SVRX Licenses.  (Mem. in Support of Novell's Mot. for Partial Summary Judgment on its Fourth Claim for Relief, PACER No. 155, at 22-29; Novell's Reply to SCO's Opposition to Novell's Motion for Partial Summary Judgment on its Fourth Claim for Relief, PACER No. 237, at 4-7.)  In addition, SCO claims that Novell's entitlement to SVRX Royalties extends only to some royalties from a narrow subset of licenses, even though SVRX Royalties is defined in the APA to include "all royalties, fees and other amounts" from "all SVRX Licenses."  (Novell's Reply to SCO's Opp. to Novell's Mot. for Partial Summary Judgment or Preliminary Injunction, PACER No. 205, at 4-7, 9-13.)

instrument, signed by the copyright owner, to transfer copyrights. Amendment No. 2 does not constitute such a written instrument because it did not transfer any copyrights or other assets. Rather, it merely revised the definition of "Excluded Assets," effective as of the date it was signed, to create an exception for copyrights "required" for Santa Cruz to exercise its rights regarding the UNIX business. In addition, Amendment No. 2 did not identify which copyrights were "required," and SCO cannot demonstrate that Santa Cruz "required" ownership of the copyrights, because Santa Cruz already had a license to use the UNIX and UnixWare copyrights as needed to implement the APA.

Because neither the APA nor Amendment No. 2 transferred copyright ownership to Santa Cruz, Novell is entitled to summary judgment on SCO's slander of title claim on the ground that SCO cannot establish that Novell made "false" statements.

Because SCO has no right to obtain ownership of the UNIX and UnixWare copyrights, Novell is also entitled to summary judgment on SCO's claim for an order transferring ownership of these copyrights to SCO.

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    The APA Expressly Excluded "All Copyrights" from the Assets to be Transferred by Novell to Santa Cruz.

1.    Novell and Santa Cruz signed the APA on September 19, 1995. Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare

business.  (Declaration of Kenneth W. Brakebill In Support of Novell's Motions for Summary Judgment ("Brakebill Decl."), Ex. 2, Recital B.)[3]

2.      The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the transfer; and Schedule 1.1(b), which listed assets excluded from the transfer.  In this regard, Section 1.1(a) of the APA stated:

> *Seller will sell*, convey, transfer, assign, and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7), all of Seller's right, title and interest in and to *the assets* and properties of Seller relating to the Business (collectively the "Assets") *identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).*

(*Id.*, Section 1.1(a) (emphasis added).)

3.      The first paragraph of the Schedule 1.1(a) list of included assets referred to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare…."  (Brakebill Decl., Ex. 3, Schedule 1.1(a), Section I.)  This general reference was followed by more detailed, itemized lists of specific categories of assets.  The "Intellectual Property" category stated:

> V.      Intellectual Property — Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark).

---

[3] Novell submits the Brakebill Declaration, and the exhibits cited therein, in support of this motion, as well as three other concurrently-filed summary judgment motions: (1) Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claim in Its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; (2) Novell's Motion for Partial Summary Judgment on the Copyright Ownership Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; and (3) Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages.

(*Id.*, Section V.)  Thus, the only "Intellectual Property" identified in the list of assets to be

transferred were the UNIX and UnixWare trademarks.  Neither the "Intellectual Property"

category, nor any other part of Schedule 1.1(a) identified copyrights in UNIX and UnixWare (or

in any other product) as an asset to be transferred.  (*Id.*)

    4.    Similarly, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded the

following "Intellectual Property" from the sale:

>    V.    Intellectual Property
>
>        A. *All copyrights* and trademarks, except for the
>           trademarks UNIX and UnixWare.
>
>        B. All Patents

(Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V (emphasis added).)  Thus, the

intellectual property listed as included assets under Schedule 1.1(a) was consistent with

the intellectual property excluded by Schedule 1.1(b): only the UNIX and UnixWare

trademarks were included, and all patents, copyrights, and trademarks were excluded

except for the UNIX and UnixWare trademarks.


**B.    Novell Deliberately Excluded Copyrights from the Transferred Assets
        to Protect its Right to Receive SVRX and UnixWare Royalties and its
        Continuing Interest in the UNIX Business.**

    5.    Novell's initial goal was to sell its UNIX assets for an all-cash payment.

However, because Santa Cruz did not have sufficient cash to purchase all of Novell's UNIX

assets, the deal was structured so that Novell would retain certain UNIX-related rights and would

receive other forms of consideration.  (Brakebill Decl., Ex. 21 (Deposition of Robert

Frankenberg, February 10, 2007 ("Frankenberg Dep.") at 30:19 to 33:19, 61:23 to 64:21);

Declaration of David Bradford, filed herewith ("Bradford Decl."), ¶ 7, 15, 16; Declaration of Tor

Braham, filed herewith ("Braham Decl."), ¶ 7, 9-13, 18; Declaration of Jim Tolonen, filed

herewith ("Tolonen Decl."), ¶ 5-6, 11-12.)  In particular, Novell was entitled to receive 95% of

"all royalties, fees, and other amounts" that were due under licenses to the Unix System V

software Releases listed in Schedule 1.1(a) (the "SVRX Licenses").  (Brakebill Decl., Ex. 2,

Sections 1.2(b), 4.16(a); Ex. 3, Section VI.)  Novell's right to receive future SVRX revenues was

an important part of the overall consideration for the APA; Novell had received $50 million in

SVRX revenues in Fiscal Year 1995 alone.  (Bradford Decl., ¶ 15, Ex. 2.)  In contrast, the Santa

Cruz stock that Novell received under the APA had a value of approximately $50 million.

(Braham Decl., ¶ 7.)

   6. In addition to the right to receive future SVRX revenues, Novell also retained the

right to require Santa Cruz to "amend, supplement, modify or waive any rights under" or "assign

any rights to" the SVRX Licenses as directed by Novell.  (Brakebill Decl., Ex. 2, Section

4.16(b).)  One reason for this provision was to ensure that Novell could negotiate "buy-outs" of

particular SVRX Licenses, in which the licensee made a substantial payment to obtain a "paid-

up" license in which no future royalty payments were due.  (Braham Decl., ¶¶ 6, 12, 13;

Bradford Decl. ¶ 16; Brakebill Decl., Ex. 21, Frankenberg Depo. at 88:14 to 89:3.)  Novell had

already negotiated SVRX buyouts before the APA was signed, and wanted to be able to continue

to enter buyouts after the APA was signed.  (Braham Decl., ¶ 13; Brakebill Decl., Ex. 21,

Frankenberg Dep. at 63:1 to 64:21.)

   7. Another important consideration for Novell's sale of UNIX assets was Santa

Cruz's commitment to develop enhanced UnixWare products that were compatible with Novell's

NetWare product.  The APA required Santa Cruz to use "commercially reasonable efforts" to

develop a "Merged Product" that would combine Novell's version of the UNIX operating system

(UnixWare 2.1, or "Eiger") with Santa Cruz's flavor of UNIX ("OpenServer Release 5.1," or "Comet").  (Brakebill Decl., Ex. 2, § 4.18.)  Development of this Merged Product was the detailed subject of a separate "Operating Agreement," which was executed by Novell and Santa Cruz upon the Closing.  (Brakebill Decl., Ex. 22 (further detailing SCO's obligation to develop the Merged Product).)

8.     Novell and Santa Cruz hoped that the Merged Product, which was designed to run on Intel 32-bit processors, would provide a commercially successful alternative to Microsoft Windows.  (Braham Decl., ¶ 8.)  This was a very important consideration for Novell, because Novell's flagship "NetWare" product needed an alternative operating system if it was to compete successfully with Microsoft.  Thus, if the Merged Product successfully penetrated the Intel 32-bit market, this would likely lead to increased sales of NetWare as well.  (Braham Decl., ¶ 8.)  Moreover, Novell also had a direct financial interest in Santa Cruz's future sale of UnixWare products, as the APA entitled Novell to receive revenues on such sales.  (Brakebill Decl., Ex. 2, § 1.2(b) and Schedule 1.2(b).)

9.     Novell also had a strong interest in the development of a commercially successful UNIX operating system that would run on Intel's next generation, 64-bit processors, as this would further expand the market for Novell's NetWare product.  (Braham Decl., ¶ 13-14; Bradford Decl., Ex. 1 at 1; Tolonen Decl., ¶ 12.)  Novell discussed development of a 64-bit UNIX operating system with several companies, including Santa Cruz and Hewlett-Packard. (Bradford Decl., Ex. 1 at 1, 3.)

10.    In sum, although Novell sold certain UNIX-related assets to Santa Cruz, Novell retained significant rights and commercial interests in the UNIX business, including (a) the right to collect 95% of "all" revenues due under "all" SVRX Licenses; (b) the right to negotiate

buy-outs of the SVRX Licenses; (c) the right to require Santa Cruz to develop a unified UNIX operating system for Intel 32-bit processors; (d) the right to receive revenues on Santa Cruz's sales of UnixWare products; and (e) an interest in development of a UNIX operating system for Intel 64-bit processors by Santa Cruz, Hewlett-Packard, or someone else.

11.    Robert Frankenberg, the CEO of Novell, directed his team to take steps to protect Novell's UNIX-related rights and interests under the APA.  (Brakebill Decl., Ex. 21 (2/10/2007 Frankenberg Dep. at 63:10 to 64:21).)  Novell had a specific concern about entrusting the future of UNIX to Santa Cruz.  In particular, Santa Cruz was not the most financially stable company and Novell had concerns about Santa Cruz's viability as a company.  (Braham Decl., ¶ 7*;* Bradford Decl., ¶ 8; Tolonen Decl., ¶ 12.)  After a series of executive-level discussions during the summer of 1995, David Bradford, Novell's Senior Vice-President and General Counsel, was then entasked with overseeing the negotiation and drafting of the contract between Novell and Santa Cruz to protect Novell's interests.  (Bradford Decl. ¶ 4, Tolonen Decl., ¶ 8.)

12.    Pursuant to Mr. Frankenberg's and then Mr. Bradford's instruction, Novell's legal team took several steps to protect Novell's UNIX-related interests.  First, Novell inserted a provision that "Seller is retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to Buyer pursuant hereto, and that Buyer only has legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code."  (Brakebill Decl., Ex. 2, Section 1.2(b); Braham Decl. ¶ 10.)  Novell added this provision to decrease the risk that if Santa Cruz went into bankruptcy, this would interfere with Novell's receipt of SVRX revenues.  (Braham Decl., ¶ 10, Tolonen Decl. ¶ 12.)

13.    Second, Novell expressly excluded "all copyrights" from the assets to be transferred to Santa Cruz, as reflected in Schedules 1.1(a) and 1.1(b) to the APA.  (Braham

Decl., ¶¶ 18-19; Bradford Decl., ¶¶ 11-12; Tolonen Decl. ¶ 11.)  This exclusion ensured that if Santa Cruz went into bankruptcy, the UNIX and UnixWare copyrights would not be part of the bankruptcy estate, decreasing the risk that the bankruptcy trustee would assert an interest in the future SVRX revenues due to Novell under the APA.  (Braham Decl., ¶ 14; Bradford Decl., ¶ 9; Tolonen Decl. ¶ 12; *see also* Brakebill Decl., Ex. 23, ¶ 45.)

14.    Excluding copyrights from the transferred assets also protected Novell's other UNIX-related interests.  Retaining ownership of the copyrights strengthened Novell's rights to negotiate buy-outs of the SVRX Licenses and to receive future revenues.  (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12.)  Retaining ownership of the copyrights also put Novell in a better position to ensure successful development of future versions of the UNIX operating system by Santa Cruz, Hewlett-Packard, or other companies.  (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12; *see* Bradford Decl., ¶¶ 9, 16.)

**C.    The Lists of Transferred Assets Were Revised to Include a Copyright Exclusion and Then Exchanged By the Parties Before the APA Was Signed.**

15.    The correspondence between Novell and Santa Cruz shows that, before the APA was signed on September 19, 1995, several significant revisions were made to the lists of included and excluded assets.

16.    After receiving David Bradford's business direction to retain Novell's intellectual property rights in UNIX and UnixWare, Novell's outside legal team revised an early draft of a Schedule of Assets that had included patents, copyrights and trademarks.  (Braham Decl. ¶ 15.)  Unlike the final version of Schedule 1.1(a), this early draft of Schedule 1.1(a), which Novell's outside counsel faxed to Santa Cruz's legal representatives on September 8, 1995, included "all

patents, patent applications, copyrights…and all other intellectual property…that pertain to Unix or UnixWare." (Braham Decl. ¶ 15, Ex. 6 at NOV 31783.)

17.    Novell's outside counsel drafted a new schedule of assets to be included in the asset transfer, as well as a schedule of assets to be excluded from the transfer. (Braham Decl. ¶ 15, Ex. 7; *see generally* Tolonen Decl. ¶ 9 (discussing Braham role).) The new Schedule 1.1(a) deleted "copyrights," "patents," and "all other intellectual property" from the list of assets to be transferred. It revised Schedule 1.1(a) so that the UNIX and UnixWare trademarks were the *only* "Intellectual Property" included in the transaction. The new Schedule 1.1(b) made clear that patents and copyrights were not included as assets; instead they were specifically excluded. (*Id.*)

18.    During the negotiations, Novell transmitted drafts of Schedules 1.1(a) and 1.1(b) to Santa Cruz, including the Schedule 1.1(b) that explicitly excluded "all patents" and "all copyrights." (Braham Decl. ¶ 17 and Ex. 4 thereto.) On September 18, 1995, for example, Novell's outside counsel sent revised Schedules 1.1(a) and 1.1(b) to Santa Cruz's legal representatives. (Braham Decl. ¶ 17 and Ex. 4 thereto.) Novell proposed to alter the prior version of Intellectual Property assets to be included in the transfer — previously limited to "Trademarks UNIX and UnixWare as held by Seller" — to also include the below, underlined language:

> V.    Intellectual property — Trademarks UNIX and UnixWare as <u>and to the extent</u> held by Seller (<u>excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark</u>).

(*Id.* at NOV 40410) Novell also proposed several other changes to the Schedule 1.1(a) list of included assets and the Schedule 1.1(b) list of excluded assets. (*Id.*, Schedule 1.1(a), at 1, 2, 4; Schedule 1.1(b), at 2.)

19.     The draft of Schedule 1.1(b) that Novell sent to Santa Cruz on September 18, 1995, expressly excluded from the assets to be transferred "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." (*Id.*, Schedule 1.1(b).)  Santa Cruz accepted this exclusion.  Thus, the final version of the APA, signed on September 19, 1995, excludes "all copyrights" from the transferred assets.  (Brakebill Decl., Ex. 4, Section V.)

20.     During the APA negotiations, several representatives of Novell reviewed and approved the language in the Excluded Assets provision excluding copyrights from the asset transfer:  David Bradford, Tor Braham, Aaron Alter and Burt Levine.  (Braham Decl. ¶ 16.)

21.     Aaron Alter of the Wilson firm specifically edited the Intellectual Property provisions of Schedules 1.1(a) and 1.1(b), confirming that only certain UNIX and UnixWare trademarks would be transferred to Santa Cruz and leaving the copyright exclusion intact. (Braham Decl. ¶ 16(c), Ex. 8.)  Mr. Alter had also marked up an early term sheet, adding the handwritten notation, "already excluded," next to a Section including "Intellectual Property ... Copyrights, trademarks ... ."  (Braham Decl., ¶ 16(c), Ex. 9 at NOV 39798.)

22.     Burt Levine, a lawyer for AT&T, Unix Systems Laboratories ("USL") and Novell who then joined Santa Cruz in early 1996, also reviewed and edited the Intellectual Property provisions in Schedules 1.1(a) and 1.1(b) during the APA negotiation period.  He kept UNIX and UnixWare trademarks as a category of intellectual property to be included as an asset.  He did not add UNIX or UnixWare copyrights as included assets.  He left intact the copyright exclusion. (Braham Decl., ¶ 16(d), Ex. 10; Brakebill Decl., Ex. 25, Levine Dep. at 74:1-75:1, 76:10-77:7.) Further, Mr. Levine's comments on Schedules 1.1(a) and 1.1(b) -- including the identification of "all copyrights" as an excluded asset -- were transmitted to Santa Cruz's legal representatives

11

during the negotiations. (Braham Decl., ¶ 17, Ex. 4; Brakebill Decl., Ex. 25, Levine Dep. at 83:20-85:9, 184:5-19.)

> **D.    Amendment No. 1 Made Further Revisions to the Lists of Transferred Assets, But Not to the Copyright Exclusion.**

23.    After the APA was signed on September 19, 1995, Novell and Santa Cruz had discussions about clarifying certain provisions in the APA in the form of an Amendment No. 1. (Brakebill Decl., Ex. 17 (Madsen Dep. at 154:7-16.)

24.    Novell and Santa Cruz signed Amendment No. 1 on December 6, 1995, which is the date that the transaction closed.  (*See* Brakebill Decl., Ex. 26, Amendment 1.)  Amendment No. 1 made several clarifying amendments, including specific revisions to the Schedule 1.1(a) and Schedule 1.1(b) lists of included and excluded assets.  (*Id.*, § K, L.)  Amendment No. 1 did not, however, change the description of the Intellectual Property that was included and excluded from the transferred assets by Section V of Schedules 1.1(a) and 1.1(b).  (*Id.*)

> **E.    The Bill of Sale Transferred Only the Assets Identified in the APA and Amendment No. 1, Which Did Not Include Copyrights.**

25.    The APA did not, itself, transfer any assets.  Rather, it described the assets that would be transferred *in the future* when the transaction was closed.  (*See* Brakebill Decl., Ex. 2, § 1.1(a).)  Thus, the APA contemplated that at the Closing, Novell would deliver a "bill of sale" transferring Novell's title to the "Assets" described in the APA to Santa Cruz.  (*Id.*, § 1.7(b)(iii).)

26.    Novell and Santa Cruz executed a "Bill of Sale" when the transaction was closed on December 6, 2005, which is the same day that Amendment No. 1 was signed.  (*See* Brakebill Decl., Ex. 27.)  The Bill of Sale stated that Novell "does hereby transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets."  (*Id.*)  The Bill of Sale further stated that all capitalized

terms had the meanings set forth in "the Agreement," which was defined as "the Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995." (*Id.*)

27.     As noted above, Section 1.1(a) of the APA defined the "Assets" to be transferred as the assets that were included in Schedule 1.1(a), and not excluded by Schedule 1.1(b). Schedule 1.1(a) did not include any copyrights, and Schedule 1.1(b) excluded "all copyrights." Thus, the Bill of Sale did not transfer any UNIX or UnixWare copyrights to Santa Cruz.

> **F.      Amendment No. 2 Revised the "Excluded Assets" Provision, But Did Not Transfer Ownership of Copyrights or Specify Which Copyrights Might Be "Required" for the UNIX Business.**

28.     On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. (*See* Brakebill Decl., Ex. 28.) Amendment No. 2 revised the definition of "Excluded Assets" in Section V.A of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies.

(*Id.*, Paragraph A.)

29.     Amendment No. 2 did not specify which copyrights, if any, were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (*Id.*) Amendment No. 2 also did not contain any provision transferring ownership of copyrights or other assets from Novell to Santa Cruz. (*Id.*)

30.     Amendment No. 2 stated that the APA was amended "[a]s of the 16th day of October, 1996," or about thirteen months after the APA was executed on September 19, 1995,

and ten months after the transaction closed on December 6, 1995. (*Id.*) Thus, by its own terms, Amendment No. 2's revision to Schedule 1.1(b) did not retroactively amend the APA as of the date the APA was signed or the transaction closed. Moreover, Novell did not execute a "Bill of Sale" or any similar document transferring copyrights from Novell to Santa Cruz in connection with Amendment No. 2. (Declaration of Allison Amadia, filed herewith ("Amadia Decl."), ¶ 17.)

### G.     The Negotiation History of Amendment No. 2 Confirms that It Was Not Intended to Transfer Ownership of UNIX and UnixWare Copyrights.

31.     Amendment No. 2 was negotiated primarily through communications between two in-house lawyers, Allison Amadia (then Allison Lisbonne) of Novell, and Steve Sabbath of Santa Cruz. (Amadia Decl., ¶¶ 4-5.) During the summer of 1996, Mr. Sabbath telephoned Ms. Amadia and raised an issue relating to the UNIX and UnixWare copyrights. He told Ms. Amadia that the Original APA explicitly excluded copyrights to UNIX and UnixWare as assets being sold by Novell to Santa Cruz and that it should not have. He wanted Novell to amend the original APA to explicitly give Santa Cruz rights to copyrights in UNIX and UnixWare. (*Id.*, ¶ 6.) Mr. Sabbath was not seeking a clarification that the APA gave copyright ownership to Santa Cruz. Rather, he wanted Novell to change the original APA to give Santa Cruz ownership of copyrights in UNIX and UnixWare because the original APA did not so provide. (*Id.* ¶ 18.)

32.     Ms. Amadia was not involved in the negotiation and drafting of the original APA. Accordingly, after her conversation with Sabbath, Amadia undertook to find out the intent of the original APA concerning copyrights. She confirmed that ownership of the UNIX and UnixWare copyrights did not transfer by reviewing the APA and by contacting Novell's outside counsel, Tor Braham, who was the principal drafter of the APA. (*Id.*, ¶ 7.)

33.     Mr. Sabbath later sent Ms. Amadia a first draft of Amendment No. 2.  (*Id.*, ¶ 8, Ex. 1 thereto.)  Santa Cruz proposed to revise Section V of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder...

(*Id.*, Ex. 1, Paragraph A.)

34.     Santa Cruz's initial Amendment No. 2 proposal created a blanket exception for copyrights and trademarks "owned by Novell as of the date of this Amendment, *which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder*."  (*Id.* (emphasis added).)  Thus, insofar as the UNIX and UnixWare copyrights were concerned, Santa Cruz's draft acknowledged that Novell owned them "as of the date of the amendment," and proposed that all of them were to be transferred to Santa Cruz.  Moreover, Santa Cruz's reference to copyrights "which SCO has acquired hereunder," indicated that its proposed amendment was intended to transfer ownership of the UNIX and UnixWare copyrights to Santa Cruz.  (*Id.*)

35.     Novell rejected Santa Cruz's proposed amendment.  Ms. Amadia told Mr. Sabbath that while Novell was willing to affirm that Santa Cruz had a license under the APA to use Novell's UNIX and UnixWare copyrighted works in its business, Novell was not going to transfer ownership of any copyrights to Santa Cruz through Amendment No. 2.  (Amadia Decl., ¶ 10.)

36.     After further negotiations, Novell and Santa Cruz agreed to the narrower exception in the final version of Amendment No. 2.  Instead of a blanket exception for copyrights that "pertain to the UNIX and UnixWare technologies," the final version was limited to copyrights that were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies."  (Amadia Decl., ¶ 11, Ex. 2, Paragraph A.)  In addition,

the final version did not include Santa Cruz's proposed reference to copyrights "which SCO has acquired hereunder," nor did it include any other reference to an "acquisition" or transfer of copyrights. (*Id.*) Accordingly, Jim Tolonen, the Novell executive who signed Amendment No. 2, confirms that it was never Novell's intent to transfer copyrights by way of Amendment No. 2 (or the APA), and that he would not have signed Amendment No. 2 had he believed it would do so. (Tolonen Decl. ¶ 13-16.)

## IV.    ARGUMENT

### A.    Novell Is Entitled to Summary Judgment that the APA as Amended by Amendment No. 1 Excluded UNIX and UnixWare Copyrights from the Assets Transferred to Santa Cruz by the Bill of Sale.

As noted in the Undisputed Facts above, the Bill of Sale executed by Novell on December 6, 1995, transferred ownership to Santa Cruz of "the Assets," as defined in the APA and Amendment No. 1. (Undisputed Facts, ¶ 23; Brakebill Decl., Ex. 27.)[4] Thus, the scope of assets transferred by the Bill of Sale must be determined by the definition of "Assets" set forth in the APA and Amendment No. 1.

Novell is entitled to summary judgment that the Bill of Sale did not transfer the UNIX and UnixWare copyrights to Santa Cruz because:

- The plain language of the APA and Amendment No. 1 excluded "all copyrights" from the assets transferred to Santa Cruz;

---

[4] Undisputed Facts set forth above are cited by the relevant paragraph number of the Undisputed Facts section.

- The parol evidence rule precludes SCO from relying on extrinsic evidence to rewrite "all copyrights" as "NetWare copyrights only," because the plain language is not reasonably susceptible to SCO's interpretation;

- The exclusion of "all copyrights" was deliberate and consistent with the basic objectives of the APA;

- The other contractual provisions cited by SCO do not demonstrate that "all copyrights" means "NetWare copyrights only," as some SCO witnesses have argued; and

- The "Assets" transferred by the Bill of Sale is controlled by the APA as amended by Amendment No. 1; Amendment No. 2 is irrelevant to the Bill of Sale.

      **1.**     **The Plain Language of the APA and Amendment No. 1 Excluded "All Copyrights" from the Assets to Be Transferred by Novell to Santa Cruz.**

The APA defined the assets to be transferred by Novell to Santa Cruz by reference to lists of included and excluded assets. (Undisputed Facts, ¶ 2; Brakebill Decl., Ex. 2, Section 1.1(a).) Both schedules require the same conclusion: the transferred assets did not include the UNIX and UnixWare copyrights.

The only "Intellectual Property" identified in the Schedule 1.1(a) list of assets to be transferred are the UNIX and UnixWare trademarks. (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.) Schedule 1.1(a) did *not* identify the UNIX and UnixWare copyrights as an asset to be transferred. (*Id.*) Conversely, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded from the transferred assets "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." (Undisputed Facts, ¶ 4, Brakebill Decl., Ex. 4, Section V.)

Amendment No. 1 made some revisions to Schedules 1.1(a) and (b), but did not change the description of the Intellectual Property included and excluded from the transfer. (Undisputed Facts, ¶¶ 23-24, Brakebill Decl. Ex. 26, § K, L.) Thus, the language of the APA and Amendment No. 1 is clear: "[a]ll copyrights" were excluded from the assets to be transferred.

   **2.     SCO's Attempt to Rewrite "All Copyrights" As "NetWare Copyrights Only" Should Be Rejected as Contrary to the Plain Language and to the Parol Evidence Rule.**

SCO has asserted that even though the APA excluded "all copyrights" from the assets to be transferred, the "intent" of the APA was to transfer the UNIX and UnixWare copyrights to Santa Cruz. SCO has relied on declarations and deposition testimony to support its assertion that the intent of the APA was to transfer the UNIX and UnixWare copyrights. (*See* SCO's Motion for Partial Summary Judgment On Its First, Second, and Fifth Causes of Action and For Summary Judgment on Novell's First Counterclaim, filed April 9, 2007, PACER No. 259 ("SCO's Ownership MSJ 4/9/2007, PACER No. 259") at 6-16.)[5] SCO also has relied on testimony that the Schedule 1.1(b) exclusion of "all copyrights" should be interpreted as limited to Novell's NetWare product only, and as not including UNIX and UnixWare copyrights. (*Id.* at 28, footnote 3.)

SCO's attempt to rewrite "all copyrights" as meaning "NetWare copyrights only" should be rejected because it is contrary to the plain language of the APA. Under the governing

_____

   [5] On April 9, 2007, SCO filed a summary judgment motion raising similar issues concerning copyright ownership. Although in this motion Novell responds to many of the arguments in SCO's motion, Novell will address some additional issues in its opposition to SCO's motion.

California law,[6] oral testimony and other extrinsic evidence are not admissible to support an interpretation of a contract that is contrary to the plain language. The critical issue is "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006) (citation omitted). If the contract is not reasonably susceptible to the proposed interpretation, extrinsic evidence is inadmissible and does not create a triable issue of fact that would defeat summary judgment. *Id.* at 388, 391-93 (affirming summary judgment on wrongful termination claim because letter agreement that employment was "at will" and could be terminated "at any time" could not reasonably be interpreted as allowing termination for cause only, and hence contrary extrinsic evidence did not create a triable issue of fact).

The rule against considering extrinsic evidence contrary to the plain language is particularly strong for an integrated contract. As the California Court of Appeal has noted:

> The parol evidence rule generally prohibits the introduction of extrinsic evidence — oral or written — to vary or contradict the terms of an integrated written instrument … . According to this substantive rule of law, when the parties intend a written agreement to be the final and complete expression of their understanding, that writing becomes the final contract between the parties, which may not be contradicted by even the most persuasive evidence of collateral agreements. Such evidence is legally irrelevant.

---

[6] The APA provides for application of California law. (Brakebill Decl., Ex. 2, Section 9.8.) Thus, interpretation of the APA is governed by California law, except that federal law controls to the extent that California law conflicts with federal copyright law or policy. *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827-28 (9th Cir. 2001). Here, California law requires exclusion of SCO's cited parol evidence and affirmation of the plain language of the APA. Thus, California law is consistent with the strong federal policy, embodied in 17 U.S.C. § 204(a), requiring a written instrument to transfer copyrights.

*EPA Real Estate P'ship  v. Kang*, 12 Cal. App. 4th 171, 175 (1992) (citations omitted).  Thus, when a contract is integrated, "extrinsic evidence is admissible *only* to supplement or explain the terms of the agreement — and even then, only where such evidence is *consistent* with the terms of the integrated document … ."  *Id.* at 176-77 (citations omitted).

The APA includes an express integration clause, which states in relevant part:

> Entire Agreement.  This Agreement, and the Schedules and Exhibits hereto: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understanding, both written and oral, among the parties with respect to the subject matter hereof….

(Brakebill Decl., Ex. 2, Section 9.5.)  Novell and Santa Cruz further agreed, in connection with the Bill of Sale, that the APA is an integrated agreement not to be altered by any other understandings:

> It is acknowledged and agreed ... that the Agreement is the exclusive source of the agreement and understanding between Seller and Buyer respecting the Assets.

(Brakebill Decl., Ex. 27.)  On the same day the Bill of Sale was executed, Santa Cruz's outside counsel sent an opinion letter to Novell's Board of Directors stating that:


**\* \* REDACTED \* \***


(Brakebill Decl., Ex. 24 at NOV 16188.)

As a matter of law, the express exclusion of "all copyrights" in Schedule 1.1(b) is not "reasonably susceptible" to SCO's proposed interpretation of "NetWare copyrights only."  The plain meaning of "all" is all.  "All copyrights" cannot reasonably be interpreted as "NetWare

copyrights only."  Nor can "all copyrights" reasonably be interpreted as "all copyrights *except for UNIX and UnixWare copyrights*."

Directly on point is the California Court of Appeal's decision in *Blumenfeld v. R.H. Macy & Co.*, 92 Cal. App. 3d 38 (1979), which rejected a similar attempt to interpret "all" as meaning "less than all."  The trial court had relied on extrinsic evidence to interpret a contract assigning "all claims against third parties relating to the [shopping] Center" as limited to claims against current tenants of the Center and excluding plaintiff's claim against Macy's, which was never a tenant, for breach of an agreement to lease key store space.  *Id.* at 41-44.  The Court of Appeal reversed, holding that the "all-inclusive language of the agreement is not reasonably susceptible of the meaning advanced."  *Id.* at 46.

Similarly, in *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263 (1987), the California Court of Appeal rejected an attempt to use parol evidence to interpret "any" in a less than all-inclusive manner.  "Testimony by all parties" had established that "all had the same general intent" that the plaintiffs "would not be terminated as long as they were doing a good job."  *Id.* at 273.  Plaintiffs relied on this evidence to interpret a contract that allowed termination of employment "for *any* reason" as meaning, "for any *good* reason."  *Id.*  The Court of Appeal excluded this evidence as "totally inconsistent" with the plain language:

> The term "any reason" is plainly all-inclusive, encompassing all reasons "*of whatever kind*," good, bad, or indifferent … .  Adding the modifier "good" has a delimiting effect which changes the meaning entirely … .  The trial court admitted the evidence on the ground that "both parties have testified as to what they interpreted the contract to mean."  Testimony of intention which is contrary to a contract's express terms, however, does not give meaning to the contract: rather it seeks to substitute a different meaning.  It follows … that such evidence must be excluded.

21

*Id.* Based on its conclusion that the "testimony of intention" should have been excluded, the Court of Appeal reversed the jury verdict for the plaintiffs and directed that judgment be entered for the defendant. *Id.* at 267, 278.

Here, too, it is clear that the exclusion of "all copyrights" was "all-inclusive," encompassing copyrights to UNIX, UnixWare, NetWare, and any other copyrighted work. Therefore, the parol evidence offered by SCO to show that "all" means "NetWare only" must be excluded.

SCO's proposed interpretation is especially far-fetched in view of the plain language of the remainder of Section V of Schedule 1.1(b). Section V excluded from the transferred assets "[a]ll copyrights and trademarks, *except for the trademarks UNIX and UnixWare.*" (Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V.A (emphasis added).) Had the parties intended to make an exception for the UNIX and UnixWare copyrights, it would have been simple to draft this clause as "all copyrights and trademarks, except for the UNIX and UnixWare trademarks *and copyrights.*" However, the parties chose not to do so. Instead, the "UNIX and UnixWare" exception was limited to trademarks only.

Moreover, if "all copyrights" were interpreted as "NetWare only," then Section V.A of Schedule 1.1(b) would effectively read, "NetWare copyrights and trademarks, except for the UNIX and UnixWare trademarks." But this interpretation would make no sense. "NetWare trademarks" do not include UNIX and UnixWare trademarks. If "all copyrights and trademarks" were limited to "NetWare only," the exception for UNIX and UnixWare trademarks would be superfluous. Thus, the exception for UNIX and UnixWare trademarks logically implies that "*all*" copyrights and trademarks means "*all*" copyrights and trademarks, including UNIX and UnixWare.

The bizarre nature of SCO's proposed interpretation is further demonstrated by the next clause of Section V of Schedule 1.1(b), which excludes "All Patents" from the assets to be transferred. (Brakebill Decl., Ex. 4, Section V.B.) SCO's own witnesses have admitted that the exclusion of "all" patents excludes "all" patents from the transfer, including patents related to UNIX and UnixWare.[7] SCO thus proposes two conflicting interpretations of "all": (1) "all patents" means "all patents, including UNIX and UnixWare patents"; but (2) "all copyrights" means "NetWare copyrights only." SCO's attempt to interpret "all" in two different ways in the same paragraph of the same contract is an untenable distortion of the plain language.

### 3. The Exclusion of "All Copyrights" from the Transferred Assets Was Deliberate and Consistent with the Basic Objectives of the APA.

SCO has argued that there is no evidence that the parties intended to exclude the UNIX and UnixWare copyrights from the transferred assets, and that this exclusion would render the APA meaningless by preventing Santa Cruz from pursuing its UNIX business. SCO is wrong on both points. In fact, the parties specifically negotiated the scope of the transferred assets, and Novell deliberately excluded the UNIX and UnixWare copyrights to protect its UNIX-related rights. Moreover, Novell's sale of its UNIX and UnixWare products to Santa Cruz necessarily conferred a license on Santa Cruz to use the copyrights as needed to implement the APA.

---

[7] For example, Duff Thompson, a current member of SCO's Board and head of its litigation committee, admitted in the declaration submitted by SCO that patents were expressly excluded from the assets transferred to Santa Cruz. (Declaration of R. Duff Thompson, filed November 9, 2006, ¶ 9 (attached as Exhibit 10 to Declaration of Edward Normand In Support of SCO's Ownership MSJ 4/9/2007, PACER No. 260)). Similarly, Burt Levine, a former paid SCO litigation consultant who was represented by SCO's counsel at his deposition, testified that Novell's UNIX patents were not transferred to Santa Cruz. (Brakebill Decl., Ex. 25, Deposition of Burt Levine, March 23, 2007 ("Levine Dep.") at 146:22 to 149:9, 185:9-23.)

### a. The scope of the transferred assets was specifically negotiated.

SCO has asserted that there is no evidence that the parties intentionally excluded the

UNIX and UnixWare copyrights from the assets to be transferred by Novell to Santa Cruz.

However, the best evidence of the parties' intent is the language of the APA itself.  The language

of the APA could not be clearer: "all copyrights" are excluded.

In any event, SCO's assertions regarding intent conveniently overlook the very written

communications exchanged between the parties at the time the APA was being negotiated.

Counsel for Novell and Santa Cruz exchanged specific communications about the precise scope

of the assets to be transferred.

On September 8, 1995, Novell's counsel sent a first draft of Schedule 1.1(a) to Santa

Cruz's counsel on September 8, 1995, along with a draft of the APA.  This initial draft *included*

"all patents, patent applications, copyrights…and all other intellectual property…that pertain to

Unix or UnixWare" in the assets to be transferred to Santa Cruz.[8]  (Undisputed Facts, ¶ 16;

Braham Decl., ¶ 15, Ex. 6 thereto.)  However, Novell then revised Schedule 1.1(a) to *delete* the

reference to patents and copyrights, leaving UNIX and UnixWare trademarks as the *only*

"Intellectual Property" identified as assets.  (Undisputed Facts, ¶ 17; Braham Decl., ¶ 15, Ex. 7

thereto.)

---

[8]  As noted above, extrinsic evidence is inadmissible to contradict the plain language of an integrated contract, but is admissible "to supplement or explain the terms of the agreement," where "such evidence is *consistent* with the terms of the integrated document."  *EPA Real Estate P'ship*, 12 Cal. App. 4th at 176-77 (emphasis in original; citations omitted).  Because the APA explicitly excludes "all copyrights" from the transfer, the Court need not consider extrinsic evidence to decide the meaning of the APA.  However, the extrinsic evidence cited in support of this motion is consistent with the plain language of the APA, and hence may be properly considered if the Court wishes to do so.  In contrast, the extrinsic evidence cited by SCO is not admissible because the APA is not "reasonably susceptible" to SCO's proposed interpretation.

Further, on September 18, 1995, Novell's counsel sent revised Schedules 1.1(a) and 1.1(b) to Santa Cruz's counsel. (Undisputed Facts, ¶ 18; Braham Decl., ¶ 17 and Ex. 4 thereto.) These drafts made redlined revisions to the included and excluded assets, including to the Section V list of included and excluded "Intellectual Property." However, the revised Schedule 1.1(b) continued to exclude "all copyrights" from the transferred assets. (Undisputed Facts, ¶¶ 19, 22; Braham Decl., Ex. 4.) The description of "Intellectual Property" in the final versions of Schedules 1.1(a) and (b) attached to the APA were identical to Novell's drafts of September 18, 1995, confirming that Santa Cruz accepted Novell's proposed revisions. (*Compare* Braham Decl., Ex. 4 *with* Brakebill Decl. Exs. 3, 4.)

In sum, the negotiation history demonstrates that counsel to Novell and Santa Cruz specifically considered and revised the lists of included and excluded assets. Novell provided advance written notice that Novell had decided to *delete* copyrights and patents from the included assets, and instead proposed to *exclude* all copyrights and patents from the transferred assets. Santa Cruz accepted this exclusion, and SCO — as the successor-in-interest to Santa Cruz — is in no position to attempt to reverse that concession.

### b.    Novell deliberately excluded copyrights to protect its continuing interests in UNIX and UnixWare.

As noted above, Novell's initial goal was to sell its UNIX assets for an all-cash payment. (Undisputed Facts, ¶ 5.) However, because Santa Cruz did not have sufficient cash, the transaction was structured so that Novell would retain significant UNIX-related rights. In particular, Novell retained the right to receive 95% of future "SVRX" revenues collected by Santa Cruz under licenses to the UNIX System V operating system. (*Id.*) Novell also retained the right to modify the SVRX Licenses, so that Novell could, *inter alia*, negotiate "buy-outs" of

the SVRX revenue stream.  (*Id.*, ¶ 6.)  In addition, Novell obtained a commitment from Santa

Cruz to develop an enhanced version of UnixWare that was intended to increase the market for

Novell's "NetWare" product, as well as the right to receive royalties on Santa Cruz's future sales

of UnixWare products.  (*Id.*, ¶¶ 7-8.)  Novell also had a strong interest in the development of a

UNIX operating system that would run on Intel's 64-bit processor, to further expand the market

for Novell's NetWare product.  (*Id.*, ¶ 9.)

     Robert Frankenberg, Novell's CEO, directed his team to take steps to protect Novell's

UNIX-related rights and interests.  (Undisputed Facts, ¶ 11.)  To implement this instruction,

Novell's legal team decided to exclude the UNIX and UnixWare copyrights from the assets

transferred to Santa Cruz.  (*Id.*, ¶¶ 12-13.)  This exclusion ensured that the UNIX and UnixWare

copyrights would not be part of the bankruptcy estate if Santa Cruz went into bankruptcy, and

thus made it less likely that the bankruptcy trustee would assert an interest in these copyrights or

in the related revenue streams.  (*Id.*, ¶ 14.)  Retaining ownership of the UNIX and UnixWare

copyrights also strengthened Novell's legal basis for receiving royalties and negotiating buy-outs

of SVRX Licenses, and put Novell in a better position to ensure development of future versions

of the UNIX operating system.  (*Id.*)

        **c.**    **Santa Cruz had a license to use the UNIX and UnixWare copyrights, and hence did not need to acquire ownership to implement the APA.**

     SCO has asserted that excluding UNIX and UnixWare copyrights from the transferred

assets would be inconsistent with the APA's purpose because Santa Cruz allegedly could not

pursue its UNIX business unless it owned these copyrights.  However, as noted above, this

exclusion was consistent with the goal of protecting the UNIX-related rights retained by Novell,

which were a critical part of the consideration for Novell's sale of most of its UNIX assets.

Moreover, contrary to SCO's assertion, Santa Cruz did not need to own the UNIX and UnixWare copyrights to pursue its UNIX business. It is well-established that a contract involving copyrighted works confers an implied license to use the copyrights as needed to implement the transaction, even if the contract does not expressly refer to a license. For example, in *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821 (9th Cir. 2001), defendant's predecessor paid $175,000 to plaintiff to prepare a preliminary plot plan and final engineering drawings for a proposal to build a shopping center. *Id.* at 824. When defendant hired a different firm to complete the project using a modified version of plaintiff's plan, plaintiff claimed that defendant had no right to use and modify plaintiff's copyrighted drawings. *Id.* at 824-25. The Ninth Circuit rejected this claim, holding that the contract granted "an implied license to use the revised plot plan to build the project." *Id.* at 828. The Ninth Circuit emphasized that "[t]he central purpose of the contract" was the production of engineering documents for the shopping center. Given this purpose and the amount of money paid, "it would have been surprising if the parties had intended for [defendant] to seek [plaintiff's] permission before using the plans to build the project. *Id.*

Here, while copyrights were excluded from the transferred assets, Santa Cruz did acquire ownership of other rights in multiple versions of UNIX and UnixWare. (Brakebill Decl., Ex. 3, Schedule 1.1(a), Section I (list of "UNIX Source Code Products," "Binary Product Releases," "Products Under Development," and "Other Technology" included in the sale).) Moreover, a "central purpose" of the APA was to enable Santa Cruz to develop and distribute an improved version of UNIX that combined Novell's "UnixWare" product with Santa Cruz's "OpenServer." (Undisputed Facts, ¶¶ 7-8.) Implementing this purpose required Santa Cruz to copy, modify, distribute, and sublicense the copyrighted code in Novell's UnixWare products. Thus, Novell's

27

sale of its UNIX and UnixWare products necessarily conferred a license on Santa Cruz to use the related copyrights as needed to carry out the business activities contemplated by the APA, including the development of derivative works such as the Merged Product. *See Foad*, 270 F.3d at 828; *see also Effects Assoc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (plaintiff's delivery of special effects sequence conferred an implied copyright license to use the sequence in a movie, because plaintiff "created a work at defendant's request and handed it over, intending that defendant copy and distribute it").

The conclusion that Santa Cruz had a license to the UNIX copyrights is reinforced by the fact that Santa Cruz indisputably did not acquire ownership of Novell's UNIX-related patents. (*See supra*, footnote 7.)  Santa Cruz needed to use these patents to be able to distribute and modify UNIX products.  Therefore, Novell's sale of its UNIX products to Santa Cruz necessarily conveyed a license to use the patents as needed to implement the APA.  As noted by Burt Levine, a former paid consultant to SCO and in-house attorney for AT&T, USL, Novell, and Santa Cruz, the APA "convey[ed] enough of a patent license under Novell's patents that would be necessary for SCO to conduct its business."  (Brakebill Decl., Ex. 25, Levine Dep. at 185:17-23; *see id.* at 7-24, 148-49.)

Similarly, because Santa Cruz needed to use the UNIX and UnixWare copyrights to distribute and modify UNIX products, the APA conferred a license on Santa Cruz to use the copyrights as needed to implement the APA.  (Braham Decl., § 20.)  As Burt Levine testified:

> Q.    Assuming that the copyrights had been retained by Novell
>       in the transaction, SCO would have had a license to use
>       those copyrights in the business, correct?
>
> A.    Correct.

(Brakebill Decl., Ex. 25, Levine Dep. at 89:7-11; *see id.* at 88:5-89:2 (Santa Cruz "absolutely, absolutely" would have had a license to use copyrights in its business; there would be an "inherent" license to do "anything necessary to practice the copyright in the transferred asset").) Mr. Levine testified further: "My understanding is similarly to my stand on copyrights that the grant of the whole business carries with it at least licenses under the patents needed to carry on the business to the extent that Novell had them."  (*Id.* at 87:2-6; *see also id.* at 185:9-23.)

> **4.    The Other Contractual Provisions Cited by SCO Do Not Demonstrate that the UNIX and UnixWare Copyrights Transferred to Santa Cruz.**

SCO has asserted that other provisions of the APA demonstrate that the APA was intended to transfer ownership of the UNIX and UnixWare copyrights, despite the Schedule 1.1(b) exclusion of "all copyrights."  None of the provisions cited by SCO support this assertion.

> **a.    Schedule 1.1(a) does not demonstrate that the exclusion of "all copyrights" was limited to "NetWare" copyrights.**

SCO contends that UNIX and UnixWare copyrights were included in the assets to be transferred to Santa Cruz, because Schedule 1.1(a) refers to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare…."  (*See, e.g.*, SCO's Ownership MSJ 4/9/2007, PACER No. 259, at 2.)  SCO fails to mention, however, that Schedule 1.1(a)'s description of the "Intellectual Property" to be transferred identified only UNIX and UnixWare *trademarks*, and did not include any copyrights.  (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.)

Moreover, even if Schedule 1.1(a) were deemed to include "UNIX and UnixWare copyrights" as an asset to be transferred, this would have been overridden by Schedule 1.1(b)'s exclusion of "all copyrights."  (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.)  The

APA initially defined the "Assets" to be transferred by reference to Schedule 1.1(a), but then

added a critical qualification: "*Notwithstanding the foregoing*, the assets to be so purchased

*shall not include* those assets (the 'Excluded Assets') set forth on Schedule 1.1(b))." (Brakebill

Decl., Ex. 2, Section 1.1(a) (emphasis added).) This "notwithstanding" clause makes clear that

the Schedule 1.1(b) exclusion of "all copyrights" controls over any contrary language in

Schedule 1.1(a). (Braham Decl., ¶ 19.) *See National Ins. Underwriters v. Maurice Carter*, 17

Cal. 3d 380, 384-86 (1976) (specific exclusion of insurance coverage when airplane is operated

by an unqualified pilot prevails over general definition of "insured" as including "any person

while using or riding in the aircraft").

> ### b. The definition of "Business" does not demonstrate that "all copyrights" means "NetWare copyrights only."

SCO also relies on the APA's general references to the "Business" to support its

argument that the APA transferred all copyrights. (*See, e.g.*, SCO's Ownership MSJ 4/9/2007,

PACER No. 259, at 21.) SCO cites, for example, Recital A of the APA, which defined the

"Business" as Novell's business in developing UNIX and UnixWare, selling binary and source

code licenses to these products and to directly related products, and supporting these products.

(Brakebill Decl., Ex. 2, at 1.) SCO also relies on references in Recital B and Section 1.3(a)(i) to

the parties' intent to sell "the Business."

These provisions do not support SCO's position because the specific assets to be

transferred were defined in Section 1.1(a) and Schedules 1.1(a) and (b), and not in Recitals A

and B or Section 1.3. "[W]hen a general and particular provision are inconsistent, the latter is

paramount to the former." *National Ins. Underwriters*, 17 Cal. 3d at 86 (quoting Cal. Civ. Proc.

Code § 1859). Schedule 1.1(b)'s specific exclusion of "all copyrights" from the assets to be

transferred prevails over the general definition of "Business" in other parts of the APA.  *See id.*

(holding that "[t]he specific language of the pilot exclusion clause overrides the general coverage

provisions of the insuring clause"); *Wilder v. Wilder*, 138 Cal. App. 2d 152, 157-58 (1955)

(where settlement agreement stated an intent to settle "all property rights" but then identified the

specific obligations that were settled, the settlement was limited to the itemized list).

> **c.      Section 1.6 and the Technology License Agreement do not demonstrate that "all copyrights" means "NetWare copyrights only."**

SCO contends that the "license back" contemplated by Section 1.6 of the APA and

implemented by the Technology License Agreement implies that Novell transferred the UNIX

and UnixWare copyrights to Santa Cruz, because this license would have been unnecessary if

Novell retained ownership of the UNIX and UnixWare copyrights.  (SCO's Ownership MSJ

4/9/2007, PACER No. 259, at 22.)  The Technology License Agreement stated that Novell

"retains" a license to the "Licensed Technology," which was defined in the APA as:

> (i)      all of the technology included in the Assets and

> (ii)     all derivatives of such technology included in the Assets, including the "Eiger" product release … .

(Brakebill Decl. Ex. 2, Section 1.6, and Ex. 5, TLA, Section II.A.)

SCO's argument fails because the "Licensed Technology" included valuable rights that

were distinct from Novell's "UNIX and UnixWare copyrights."  "Technology" is a broad

concept, which encompasses trade secrets and know-how, in addition to copyrights and patents.

Schedule 1.1(b) excluded copyrights and patents from the assets transferred to Santa Cruz, but

did not exclude trade secrets or software know-how.  Thus, Novell needed a license to be able to

use trade secrets and know-how related to the UNIX and UnixWare products that Novell sold to Santa Cruz. (Braham Decl., ¶ 23.)

Further, "Licensed Technology" was defined to encompass "derivatives" of the technology included in the Assets. The APA contemplated that Santa Cruz would create derivative works, including a "Merged Product" that was an enhanced version of Novell's UnixWare product. (Undisputed Facts, ¶¶ 7-8.) Although Novell retained ownership of the UnixWare copyrights, Santa Cruz would own the copyrights in any new code written for the "Merged Product." Thus, to be able to use any new code in the "Merged Product" and other enhanced versions of UnixWare, Novell needed a license to Santa Cruz's copyrights in derivative works. (Braham Decl., ¶ 23.)

A further defect in SCO's argument is that the same "logic" would imply that Novell transferred ownership of UNIX-related patents because Novell would not have needed a license to these patents if it retained ownership. However, it is undisputed that Novell did *not* transfer ownership of the patents to Santa Cruz. (*See supra,* footnote 7.) This admission refutes SCO's argument that the Technology License Agreement implies that Novell must have transferred ownership of all UNIX-related technology to Santa Cruz.[9]

_____

[9] SCO previously made a similar "argument-by-implication" that Novell's representation in Section 2.10 of the APA that Novell owns or has rights to the UNIX-related copyrights and patents identified in the attached schedules implies that Novell must have transferred ownership. SCO appears to have abandoned this argument, as it does not appear in SCO's Ownership MSJ 4/9/2007, PACER No. 259. In any event, these schedules support the *opposite* conclusion. Had the parties intended to transfer the UNIX copyrights, they easily could have done so by referring to the UNIX copyright list. However, not only did Schedule 1.1(a) fail to refer to this list, Schedule 1.1(b) expressly *excluded* "all copyrights" from the transfer. Moreover, as noted above, the APA conferred a license on Santa Cruz to Novell's UNIX copyrights and patents. Novell's representation in Section 2.10 that it owned or had rights to the UNIX copyrights and patents served the purpose of ensuring that Novell had the right to grant this license.

**5.** **The Scope of Assets Transferred by the Bill of Sale Is Controlled by the APA and Amendment No. 1, and Not by Amendment No. 2.**

SCO has argued that the exclusion of "all copyrights" in Schedule 1.1(b) of the APA "does not exist for purposes of construing the APA," because this exclusion was modified by Amendment No. 2. (SCO's Ownership MSJ 4/9/2007, PACER No. 259, at 2.) At the same time, however, SCO contends that the alleged transfer of the UNIX and UnixWare copyrights was "effectuated" by the Bill of Sale executed by Novell on December 6, 1995. (*Id.* at 1, 27.) SCO is forced to rely on the Bill of Sale because the Copyright Act requires a signed "instrument of conveyance" to transfer copyright ownership. 17 U.S.C. § 204(a). The APA does not constitute an "instrument of conveyance," because it merely describes the assets that Novell "will" sell and transfer *in the future*, and does not actually transfer such assets. (Undisputed Facts, ¶ 22.)

SCO's argument suffers from a fatal defect: the Bill of Sale transferred the "Assets" as defined by "the Agreement," which the Bill of Sale defines as the APA and Amendment No. 1. (Undisputed Facts, ¶ 22.) The Bill of Sale did not transfer the "Assets" as defined by the APA *and Amendment No. 2.* Indeed, the Bill of Sale did not mention Amendment No. 2. This is not surprising, since the Bill of Sale was executed on December 6, 1995, or ten months *before* Amendment No. 2 was signed on October 16, 1996. When the Bill of Sale was executed, it obviously could not and did not transfer the "Assets" as defined by an amendment that did not even exist. Moreover, Amendment No. 2 was *not* retroactive and did not purport to transfer any copyrights or other assets. (Undisputed Facts, ¶¶ 29, 30; *see infra*, Section IV.B.2.)

Thus, contrary to SCO's assertion, Schedule 1.1(b)'s exclusion of "all copyrights" is highly relevant — indeed, dispositive — in determining whether the Bill of Sale transferred the UNIX and UnixWare copyrights. Conversely, Amendment No. 2 is irrelevant in determining the

legal effect of the Bill of Sale.  Of course, there is a *separate* issue as to whether Amendment No. 2, standing alone, transferred the UNIX and UnixWare copyrights.  As demonstrated in the following section, however, Amendment No. 2 did not transfer the copyrights.

### B.  Novell Is Entitled to Summary Judgment that Amendment No. 2 Does Not Constitute a Sufficient Written Instrument to Transfer UNIX and UnixWare Copyrights to Santa Cruz.

The APA as amended by Amendment No. 2 did not transfer the UNIX and UnixWare copyrights because (1) the Copyright Act requires a signed "instrument of conveyance" to transfer copyright ownership; (2) Amendment No. 2 did not include any provisions transferring ownership of copyrights, nor did it purport to retroactively amend the Bill of Sale to transfer copyrights; (3) Amendment No. 2 did not specifically identify which copyrights, if any, should be transferred; and (4) Santa Cruz did not "require" ownership of the UNIX and UnixWare copyrights for its business, as Santa Cruz already had a license to use these copyrights as needed to implement the APA.

### 1.  The Copyright Act Requires a Signed Instrument of Conveyance to Transfer Ownership of Copyrights.

The Copyright Act requires a signed written instrument to transfer ownership of copyrights.  Section 204(a) states: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

The "instrument of conveyance" required by Section 204 "enhances predictability and certainty of copyright ownership," which was Congress's "paramount goal" when it amended the Copyright Act in 1976.  *Effects Assoc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (citing

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 749-50 (1989)).  Consistent with this purpose, Section 204 has been strictly applied to bar claims due to the absence of the required "instrument of conveyance."  *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) (dismissing claim for breach of exclusive copyright license due to the absence of a signed final contract); *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 926 (9th Cir. 1999) (granting summary judgment on claim for breach of exclusive copyright license due to the absence of a signed contract).[10]  Section 204 is a substantive prerequisite to a valid transfer of copyright ownership, and not merely an evidentiary rule; a transfer of copyright is simply "not valid" without the required written instrument.  *Konigsberg Int'l,* 16 F.3d at 357. Further, unlike a statute of frauds, Section 204 is not subject to equitable defenses such as estoppel, as allowing such defenses would "undermine the goal of uniformity and predictability in the field of copyright ownership and transfer."  *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992).

Amendment No. 2 does not constitute the "instrument of conveyance" required by Section 204(a) for three independent reasons, as discussed below.

### 2. Amendment No. 2 Did Not Purport to Transfer Copyrights or to Retroactively Amend the Bill of Sale.

The first reason that Amendment No. 2 does not satisfy Section 204(a) is that it did not include any provision that purported to transfer ownership of copyrights.  Amendment No. 2 did

---

[10]  Both of these cases involved exclusive licenses, but were governed by Section 204(a) because the Copyright Act defines "transfer of ownership" as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of any of the exclusive rights comprised in a copyright…but not including a nonexclusive license."  17 U.S.C. § 101. Thus, a signed writing is required for either a transfer of copyright ownership or an exclusive license, but not for a nonexclusive license.

not state that copyrights "are hereby transferred," "have been transferred," or even "will be transferred." Rather, it merely revised the definition of the "Intellectual Property" category of "Excluded Assets" under Schedule 1.1(b) by adding an exception for copyrights "required" for Santa Cruz to exercise its rights. (Undisputed Facts, ¶ 24; Brakebill Decl., Ex. 28.)

Amendment No. 2's failure to include a provision transferring copyrights is particularly significant in view of its negotiation history. Santa Cruz's first draft of Amendment No. 2 referred to copyrights "which pertain to UNIX and UnixWare technologies *and which SCO has acquired hereunder.*" (Undisputed Facts, ¶¶ 33-34; Amadia Decl., Ex. 1 (emphasis added).) This was clearly intended to transfer the UNIX and UnixWare copyrights to Santa Cruz. However, Novell rejected Santa Cruz's proposed amendment, explaining that Novell was willing to confirm that Santa Cruz had a license to use the UNIX and UnixWare copyrights, but was not willing to transfer ownership of the copyrights. (Undisputed Facts, ¶ 35.) As a result, the final version of Amendment No. 2 did not refer to SCO's "acquisition" of any copyrights. (Undisputed Facts, ¶ 36.)

Further, unlike the APA, Amendment No. 2 was *not* accompanied by a separate "Bill of Sale" or similar document that transferred additional assets. (Undisputed Facts, ¶ 30) Nor did Amendment No. 2 purport to retroactively change the scope of assets transferred by the Bill of Sale that was previously executed in connection with the APA. On the contrary, Amendment No. 2 stated that it "amended" the APA "[a]s of the 16th day of October, 1996," which was thirteen months *after* the APA was signed on September 19, 1996, and ten months after the Bill of Sale was executed on December 6, 1995. (*Id.*) Thus, Amendment No. 2 did not retroactively cause the Bill of Sale to transfer copyrights that were expressly excluded from transfer by the APA and Amendment No. 1.

### 3.    Amendment No. 2 Did Not Identify Which Copyrights, If Any, Should be Transferred.

Another reason why Amendment No. 2 fails to constitute the required "instrument of conveyance" that it did not specify which copyrights, if any, should be transferred.  The written instrument required by Section 204 should contain sufficient information "to serve as a guidepost for the parties to resolve their disputes," thereby enabling the parties to resolve disputes by examining "the writing that sets out their respective rights."  *Konigsberg Int'l,* 16 F.3d at 357.  Consistent with Section 204's goal of "enhanc[ing] the predictability and certainty of copyright ownership," the written instrument must "(1) reasonably identify the subject matter of the agreement, (2) be sufficient to indicate the parties have come to an agreement, and (3) state with reasonable certainty the essential terms of the agreement."  *Pamfiloff*, 794 F. Supp. at 936-37.

Santa Cruz's first draft of Amendment No. 2 referred to copyrights "*which pertain to UNIX and UnixWare technologies* and which SCO has acquired hereunder."  (Undisputed Facts, ¶ 30; Amadia Decl., Ex. 1 (emphasis added).)  However, because Novell objected to this draft, the final version referred to copyrights "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies."  (Undisputed Facts, ¶ 33.)

SCO now contends that Santa Cruz "required" ownership of all of Novell's UNIX and UnixWare copyrights to exercise its rights regarding the UNIX assets that Santa Cruz acquired under the APA.  Novell, in contrast, contends that Santa Cruz did not need to own these copyrights, because Santa Cruz already had a license to the copyrights.  The questions that Amendment No. 2 leaves open are legion, including what particular rights as to which of the many versions and releases of UNIX and UnixWare were transferred.  Thus, it is clear that there was no "meeting of the minds" regarding which copyrights, if any, were required for Santa Cruz to exercise its rights.

4.      **Santa Cruz Did Not "Require" Ownership of the UNIX and UnixWare Copyrights for its Business As It Already Had a License to Use these Copyrights as Needed to Implement the APA.**

A final reason that Amendment No. 2 does not constitute an "instrument of conveyance" under Section 204 is that Santa Cruz did not "require" ownership of Novell's UNIX and UnixWare copyrights to exercise its rights under the APA.  In fact, because the APA excluded "all copyrights" from the transfer, Santa Cruz indisputably did not own the copyrights during the ten months between the execution of the Bill of Sale at the closing on December 6, 1995, and entry of Amendment No. 2 on October 16, 1996.  Nevertheless, Santa Cruz was able to pursue its UNIX business during this time period without any problems caused by its lack of ownership of the copyrights.

Santa Cruz was able to pursue its UNIX business without owning the UNIX and UnixWare copyrights because, as discussed above, the APA conferred a license on Santa Cruz to use Novell's copyrights as needed to implement the purposes of the APA.  (*See supra*, Section IV.A.3.c.)  Because Santa Cruz already had a license, Santa Cruz did not "require" ownership of the copyrights.  Therefore, even if Amendment No. 2 had stated that it "hereby transfers" all copyrights required by Santa Cruz for its UNIX business (which it did not), Amendment No. 2 would not have transferred any copyrights as no copyrights were "required."

C.      **Novell Is Entitled to Summary Judgment on SCO's Slander of Title Claim Because SCO Cannot Demonstrate that Novell's Assertion of Copyright Ownership Was False.**

SCO's first claim in its Second Amended Complaint alleges that Novell has slandered SCO's title by falsely and maliciously asserting that Novell, not SCO, owns the copyrights in UNIX and UnixWare.  (Brakebill Decl., Ex. 1, Second Amended Complaint, filed February 3,

2006, PACER No. 96, ("Second Am. Compl., PACER No. 96") at ¶¶ 91-92.)  To prevail on its

slander of title claim, SCO must establish:

    1.      Novell published a slanderous statement disparaging SCO's title;

    2.      the statement was false;

    3.      the statement was made with malice; and

    4.      the statement caused actual or special damages.

*First Sec. Bank of Utah v. Banberry Crossing*, 780 P.2d 1253, 1256-67 (Utah 1989).

As demonstrated above, the Bill of Sale did not transfer the UNIX and UnixWare

copyrights from Novell to Santa Cruz, because the APA excluded "all copyrights" from the

transferred assets.  Amendment No. 2 also did not transfer the copyrights for multiple reasons.

Therefore, Novell is entitled to summary judgment on SCO's slander of title claim because SCO

cannot establish that Novell's assertion that it owned the copyrights was false.

    **D.**      **Novell Is Entitled to Summary Judgment On SCO's Claim for Specific Performance of Novell's Alleged Obligation to Transfer the UNIX and UnixWare Copyrights to SCO.**

SCO's third claim in its Second Amended Complaint alleges that the "purpose and

effect" of the APA was to transfer title to the UNIX and UnixWare copyrights to SCO's

predecessor, Santa Cruz, and that the APA required Novell to take all actions necessary to

effectuate this purpose.  (Brakebill Decl., Ex. 1, Second Am. Compl., PACER No. 96, at

¶¶ 103-04.)  SCO claims that it is entitled to an order directing Novell to specifically perform its

obligations under the APA by executing all documents needed to transfer ownership of the copyrights to SCO.[11]  (*Id.*, ¶¶ 107-08.)

As demonstrated above, neither the original APA nor Amendment No. 2 entitled Santa Cruz to obtain ownership of the UNIX and UnixWare copyrights.  Therefore, Novell is entitled to summary judgment on SCO's claim for specific performance because SCO cannot establish that Santa Cruz had the right to obtain title to the copyrights.

## V.     CONCLUSION

The APA explicitly excluded "all copyrights" from the assets to be transferred by Novell to Santa Cruz.  SCO's attempt to rewrite "all copyrights" as "some copyrights" fails because it is contrary to the plain language and to the parol evidence rule.  SCO's reliance on Amendment No. 2 is also misplaced, because Amendment No. 2 did not transfer ownership of any copyrights, and Santa Cruz already had a license and hence did not "require" ownership of the UNIX and UnixWare copyrights.

For all of these reasons, Novell requests the Court to enter summary judgment that neither the APA nor Amendment No. 2 transferred ownership of the copyrights to Santa Cruz, and that SCO's slander of title and specific performance claims fail as a matter of law.

---

[11] SCO has also requested that this court require Novell to transfer to SCO "the UNIX and UnixWare business, without subjecting any portion of that business, other than the SVRX binary royalty stream, to Sections 4.16, 1.2(b), and 1.2(f)."  (*Id.*, ¶ 108.)  This appears to be an unjustified attempt to place a binary limitation on Novell's authority and rights under Sections 1.2(b), 1.2(b) and 4.16 of the APA.  This attempt fails for the reasons set forth in Novell's pending Motion for Partial Summary Judgment on its Fourth Claim for Relief (PACER No. 155) and pending Motion for Partial Summary Judgment or Preliminary Injunction (PACER No. 148).  Therefore, Novell is entitled to summary judgment on the "Section 4.16" portion of SCO's Third Claim for specific performance.

DATED:   April 20, 2007

ANDERSON & KARRENBERG

By: _____ */s/  Heather M. Sneddon* _____

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)

**Attorneys for Defendant and
Counterclaim-Plaintiff Novell, Inc.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of April, 2007, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE AND THIRD CLAIM FOR SPECIFIC PERFORMANCE** *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]* to be served to the following:

*Via CM/ECF*:          Brent O. Hatch
                            Mark F. James
                   HATCH JAMES & DODGE, P.C.
                    10 West Broadway, Suite 400
                    Salt Lake City, Utah  84101

                         Stuart H. Singer
                        William T. Dzurilla
                       Sashi Bach Boruchow
                 BOIES, SCHILLER & FLEXNER LLP
                  401 East Las Olas Blvd., Suite 1200
                    Fort Lauderdale, Florida  33301

                           David Boies
                        Edward J. Normand
                 BOIES, SCHILLER & FLEXNER LLP
                          333 Main Street
                     Armonk, New York  10504

                       Devan V. Padmanabhan
                          John J. Brogan
                    DORSEY & WHITNEY, LLP
                  50 South Sixth Street, Suite 1500
                  Minneapolis, Minnesota  55401

*Via U.S. Mail, postage prepaid*:

                       Stephen Neal Zack
                 BOIES, SCHILLER & FLEXNER LLP
                100 Southeast Second Street, Suite 2800
                       Miami, Florida  33131

                          _____ */s/  Heather M. Sneddon* _____