SCO Grp v. Novell Inc Doc. 279



MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant Counterclaim-Plaintiff Novell, Inc.**

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>Defendant. | **DECLARATION OF DAVID BRADFORD**<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

Dockets.Justia.com

I, David Bradford, declare as follows:

1. The statements made in this Declaration are based on my personal knowledge. In connection with this Declaration, I have also reviewed documents I authored or received contemporaneous to the transaction discussed herein. I have attached several of these documents as Exhibits to this Declaration.

2. I am an attorney duly licensed to practice law in the state of California. I have an undergraduate degree and JD degree from Brigham Young University. I also have an MBA from Pepperdine University.

3. I was employed by Novell, Inc. from 1985 to 2000 in various legal and business capacities. From 1987 to 2000, I was Senior Vice-President, General Counsel and Corporate Secretary. My responsibilities included overseeing legal, security, government relations and, from time to time, corporate development functions at Novell. During this period of time, I also was part of a group of executives that comprised the Executive Staff, which advised Novell's President and Chief Executive Officer regarding business decisions for the company. In addition, I was a Secretary to the Novell Board of Directors. I participated in strategic management decisions. I led Novell through a number of complex transactions, including acquisitions, asset sales and public offerings.

4. In 1995, Novell decided to sell certain UNIX-related assets that it had acquired in 1993 from AT&T's UNIX System Laboratories subsidiary. A company called Santa Cruz Operation, Inc. ("Santa Cruz") surfaced as a prospective buyer. After a series of executive-level discussions during the summer of 1995, I was tasked, in my role as Senior Vice-President and General Counsel, with overseeing the negotiation and drafting of a contract between Novell and Santa Cruz that would protect Novell's interests.

5. I retained the law firm of Wilson, Sonsini, Goodrich & Rosati, then Novell's regular outside counsel, to negotiate and draft the agreement between Novell and Santa Cruz. The Wilson team was led by Tor Braham, an experienced partner in that firm who was already

familiar with Novell's business. In fact, Tor had negotiated Novell's purchase of UNIX assets from USL in 1993.

6. I charged Tor Braham with the responsibility of putting together the necessary agreements to protect Novell's interests. He was the principal drafter of what became the Asset Purchase Agreement executed on September 19, 1995. Tor Braham communicated directly with me during the drafting and negotiation process, including sending me drafts of the Asset Purchase Agreement.

7. The Novell-Santa Cruz transaction took on a more complex form due to various concerns that arose during the course of the negotiations. For example, at the outset, Novell had been hopeful that the transaction would be a cash deal. It became apparent, however, that Santa Cruz would not be able to come up with the requisite cash to buy all of the UNIX assets that Novell had purchased from USL in 1993, as well as Novell's UnixWare business. Among other things, this resulted in an agency relationship, under which Santa Cruz would collect and pass through a revenue stream for SVRX contracts and Novell would retain control over the SVRX licensing arrangements.

8. There also arose serious concerns about Santa Cruz's viability as a company. Santa Cruz was not the most financially stable company. We thus became focused on building in protections for Novell in the event that Santa Cruz went bankrupt.

9. Because of these concerns, during the negotiations I discussed with Tor Braham the need to increase Novell's protections in the transaction, including but not limited to the need to retain Novell's intellectual property rights in UNIX and UnixWare. This retention of intellectual property rights was implemented with an eye to protecting Novell's interest in the significant revenue stream that Novell would be retaining from SVRX source code. Novell's copyright ownership would permit Novell to continue to have rights to this revenue, should Santa Cruz go bankrupt.

10. The Wilson team drafted a schedule of assets to be included in the asset transfer and a schedule of assets to be excluded from the transfer. These schedules specifically addressed how intellectual property rights in UNIX and UnixWare would be treated in the deal. Copyrights were not included as an asset; instead copyrights were specifically excluded. It is my understanding that the Wilson team exchanged these schedules with representatives of Santa Cruz prior to the execution of the Asset Purchase Agreement.

11. In its final form, the Asset Purchase Agreement executed on September 19, 1995 included a Schedule 1.1(a). Schedule 1.1(a) specifically identified the "Intellectual Property" included in the assets to be transferred; it only identified certain UNIX and UnixWare trademarks. The Asset Purchase Agreement also contained an "Excluded Assets" list in Schedule 1.1(b); this list provided that certain "Intellectual Property" was excluded from the asset transfer, including "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." It also excluded "[a]ll patents."

12. The Asset Purchase Agreement means what it says: copyrights were not included as an asset; copyrights were specifically excluded from the asset transfer. The exclusion was intentional. Should any persons suggest otherwise, they are mistaken.

13. I attended the Novell Board of Directors meeting held on September 18, 1995, or the day immediately prior to the execution of the Asset Purchase Agreement. The Novell-Santa Cruz transaction was the subject of that Board meeting. As Senior Vice-President and General Counsel of Novell and as the Novell executive responsible for implementing the Novell-Santa Cruz transaction into a binding, legal contract, I participated in the discussion. I even reviewed the terms of the Asset Purchase Agreement with the Board. As Secretary to the Board of Directors, I memorialized the meeting in Board Minutes, a true and correct copy of which I attach to this Declaration as Exhibit 1. As I recorded in those Minutes that I sent to the Board of Directors, in the meeting the Board:

**RESOLVED**:

...

> Novell will retain all of its patents, copyrights and trademarks (except for the trademarks UNIX and UnixWare) ...

(See Exhibit 1 at 2.)

14. The Board meeting minutes are accurate in their description of the intellectual property assets Novell retained.

15. Under the Asset Purchase Agreement, Novell retained the right to receive 95% of the revenue from licenses of SVRX software. I confirmed our retention of SVRX licensing revenue to the Board of Directors in a memorandum on September 15, 1995, a true and correct copy of which I attach as Exhibit 2. I told the Board: "For example, we will be retaining our traditional royalty stream from UNIX SVRX source code which was approximately $50 million for FY 1995." (Exhibit 2 at 1. I underscored "retaining" in my original memo.) Again, at the September 18, 1995 Board of Directors meeting, I informed the Board of this retained revenue stream, which was referred to as SVRX Royalties in the contract. (Exhibit 1 at 2.) The term SVRX Royalties was drafted so as to be broadly applicable to "all royalties, fees and other amounts" from SVRX agreements, and was not limited to monies paid under binary licenses; Novell retained 95% of all monies from SVRX agreements, source and binary included.

16. Under the Asset Purchase Agreement, Novell also retained control over the licensing arrangements with SVRX customers. As indicated in the Asset Purchase Agreement, this right applies to all SVRX Licenses; it was not restricted to binary licenses of SVRX. In particular, Novell intended to use its control over the SVRX license agreements to do "buyouts" of SVRX agreements or, if necessary, to provide source rights to Hewlett Packard in its development of a 64-bit UNIX technology -- a development effort that I memorialized in the September 18, 1995 Board Minutes. (Exhibit 1 at 1, 3.)

17. I was presented the final Asset Purchase Agreement between Novell and Santa Cruz on the day it was to be executed. I was to review it and approve it for final signature by Bob Frankenberg, Novell's CEO at the time. I reviewed the contract and considered it to reflect

the intent that I have described above in this Declaration. Indeed, I wrote a memorandum (a true and correct copy of which I have attached as Exhibit 3), reflecting my approval of the Asset Purchase Agreement for signature by Mr. Frankenberg. I still agree with what I said nearly twelve years ago:

> The purpose of this memorandum is to let you know that I have reviewed the final document and find the same to be an accurate reflection of the business and legal terms and conditions negotiated between the parties...

18. Novell has retained intellectual property rights in other transactions involving the sale of part of its business. In late 1995 and early 1996, I was part of a Novell business team evaluating the future ownership direction of Novell's TUXEDO software business, which we also had acquired from AT&T. On January 24, 1996, Novell entered into an agreement with BEA Systems, Inc., in which Novell transferred certain assets relating to its TUXEDO software product. In that transaction, Novell specifically retained the copyrights in the TUXEDO software.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this 19th day of April, 2007 in Newport Beach California.

[signature]

David Bradford

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of April, 2007, I caused a true and correct copy of the foregoing **DECLARATION OF DAVID BRADFORD** to be served to the following:

*Via CM/ECF*:

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stuart H. Singer
William T. Dzurilla
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301

David Boies
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Devan V. Padmanabhan
John J. Brogan
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55401

*Via U.S. Mail, postage prepaid*:

Stephen Neal Zack
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

*/s/ Heather M. Sneddon*