MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant Counterclaim-Plaintiff Novell, Inc.**

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| THE SCO GROUP, INC., a Delaware corporation,<br><br>Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>Defendant and Counterclaim-Plaintiff. | **DECLARATION OF TOR BRAHAM**<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |
|---|---|

I, Tor Braham, declare as follows:

1.  The statements made in this Declaration are based on my personal knowledge. In connection with this Declaration, I have also reviewed documents contemporaneous to the transaction I discuss. I have attached several of them as Exhibits to this Declaration.

2.  I have an undergraduate degree from Columbia University and a JD degree from New York University. I was admitted as an attorney in California in 1983. I practiced law as a corporate transaction attorney from 1984 through 1997 at the law firm of Wilson, Sonsini, Goodrich & Rosati ("Wilson Sonsini" or "Wilson") in Palo Alto, California. I became a partner at Wilson Sonsini in 1989. During my time there, I worked on dozens of complex corporate transactions, including mergers, acquisitions and asset sales, involving high technology companies.

3.  At the end of 1997, I left Wilson Sonsini and became an investment banker. In December 1997, I joined UBS Securities as the Global Head of Technology Mergers & Acquisitions. In March 2000, I became a Managing Director at Credit Suisse First Boston. In February 2004, I joined Deutsche Bank, where I am now Head of Technology Mergers & Acquisitions.

4.  In 1995 Wilson Sonsini was Novell's regular outside counsel. In the late summer we were retained by Novell to negotiate and draft an agreement with Santa Cruz Operation, Inc. relating to Novell's UNIX System V ("SVRX") and UnixWare operating system business. UnixWare was Novell's derivative work based on UNIX System V. I was already familiar with Novell's business. I had represented Novell in its purchase of UNIX-related assets from USL in 1993. Novell paid over $300 million for these assets.

5.  I led, oversaw and actively managed the Wilson Sonsini team that negotiated the Novell-Santa Cruz deal. That team also included Aaron Alter and Shannon Whisenant, with whom I communicated regularly. I was the primary representative of Novell in negotiating the legal terms of the contract between Novell and Santa Cruz, called the Asset Purchase Agreement

1

("APA"). I also was the primary drafter of the APA text. I negotiated the terms of the APA directly with Santa Cruz's representatives on the deal, Brobeck, Phleger & Harrison ("Brobeck"), through a series of meetings and exchanges of contract drafts. Like Wilson Sonsini, Brobeck was a large law firm experienced in complex technology transactions.

6. The negotiation and drafting of the APA occurred in the first part of September 1995, leading up to the APA's execution on September 19, 1995. As Novell's lead negotiator of the contract, I was given the responsibility of putting together the necessary agreements and contractual provisions to protect Novell's interests. I received this direction directly from David Bradford (Novell's Senior Vice-President and General Counsel), with whom I communicated during the drafting and negotiation process. The Wilson team and I worked to achieve Novell's goals as transmitted to us through Mr. Bradford. As I describe below, the Wilson team worked to implement Novell's business directive to protect its interests in executing a contract with Santa Cruz, including Novell's interests relating to SVRX revenues and buy-outs, and future development of an enhanced version of UnixWare.

7. The APA was not a straight up asset purchase. The contract took on a more complex form due to various issues that arose in the course of negotiations. For example, Santa Cruz did not have the cash to buy both the UNIX assets that Novell had purchased from USL in 1993 plus Novell's UnixWare business. SCO's financial health also raised serious concerns about Santa Cruz's viability as a company. Further, once the form of consideration for the deal became Santa Cruz stock, it became necessary to structure the deal so that Novell would receive less than 20% of Santa Cruz stock. This structuring enabled Santa Cruz to complete the deal more quickly without the delay of seeking shareholder approval. However, the value of the Santa Cruz stock that Novell received -- or approximately 16.7% -- was approximately $50 million, or far less than the $300 million that Novell paid to USL in 1993 and far less than what Novell believed the USL assets were worth. With these issues in mind, we negotiated specific

provisions in the contract whereby Novell's business and legal interests were protected through contractual mechanisms.

8. The APA was primarily a forward-looking deal. The common goal of both Novell and Santa Cruz was for Santa Cruz to take Novell's UnixWare operating system, to enhance and innovate it, and to proliferate it as a low-cost UNIX competitor to Microsoft's Windows NT product for use on personal computers. To that end, the parties specifically contemplated that Santa Cruz would develop a product called, in the APA, the "Merged Product" to run on computers powered by 32-bit Intel x86 chips. Novell, on the other hand, would focus its business on its networking operating system, called NetWare, as well as related products, including NetWare Directory Services. It was not in Novell's interest to have a homogeneous operating system environment in the PC world dominated by Microsoft. Novell would benefit from a heterogeneous computing environment that included Santa Cruz's successful proliferation of an enhanced UnixWare or Merged Product.

9. As to SVRX, the intent was that Santa Cruz would act as Novell's agent. The Wilson team and I drafted the APA provisions that memorialized the agency relationship. This drafting is reflected in contemporaneous documents that still exist. Exhibit 1, for example, is a true and correct copy of my marked-up redline of Wilson's early draft of the APA containing Section 4.16. In this early draft of 4.16, as well as the final APA, we defined SVRX License to include any agreements relating to a series of UNIX System V software products that we listed in Item VI of Schedule 1.1.(a). (See Exhibit 1 at NOV 42711; See Exhibit 2 at 31.) We did not limit SVRX License to a subset of SVRX license agreements relating only to the binary rights and royalties under those agreements. Indeed, we drafted the contract to state "all SVRX Licenses" and that term was intended to encompass licenses governing source and binary rights and revenues. (*Id.*)

10. One agency obligation we included in the contract -- and to which Santa Cruz agreed -- was that Santa Cruz would collect and pass through all SVRX Royalties to Novell,

3

subject to a 5% administrative fee. In Section 4.16(a), the Wilson team and I defined SVRX Royalties to be "all royalties, fees and other amounts due under all SVRX Licenses." (See Exhibit 2 at 31.) We did not limit this revenue stream to a subset of "all royalties, fees and other amounts" such as binary royalties or sums being paid by existing SVRX customers. Further, because we were concerned about Santa Cruz's viability and what could happen to these revenues if Santa Cruz went bankrupt, at my direction we proposed contract language to Santa Cruz whereby Novell would remain the equitable owner of the SVRX Royalties under the Bankruptcy Code:

> Seller and Buyer further acknowledge and agree that Seller is retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX licenses to Buyer pursuant hereto, and that Buyer only as legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code.

(See Exhibit 3 at NOV 41922.) In case Santa Cruz declared bankruptcy, the SVRX Royalties would be protected from the bankruptcy estate and Novell would continue to receive them. Attached hereto as Exhibit 3 is a true and correct copy of Wilson's transmittal to Santa Cruz of the aforementioned proposed language. Santa Cruz agreed to our proposed language.

11. We also proposed that "all right, title and interest to the SVRx Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof" would be an Excluded Asset under APA. (See Exhibit 4 at NOV 40413.) Attached hereto as Exhibit 4 is a true and correct copy of Wilson's transmittal to Santa Cruz in which we proposed this exclusion language. Santa Cruz agreed to our proposal.

12. I drafted Section 4.16(b) of the APA to confirm Novell's control over SVRX Licenses. Although Santa Cruz remained Novell's agent to administer the SVRX licensing arrangements, Novell retained the "sole discretion" to direct Santa Cruz to take certain actions under SVRX Licenses. I emphasized the unqualified nature of this sole discretion right by adding the phrase "to the extent so directed in any manner or respect by Seller." (See Exhibit 1

4

at NOV 42711.) I drafted additional language in Section 4.16(b) providing that Novell was authorized to act on Santa Cruz's behalf when Santa Cruz so refused:

> In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and is hereby granted, the rights to take any action on its own behalf.

(See Exhibit 5, a true and correct copy of my edits to Section 4.16 in an APA draft, at NOV 42765.) Santa Cruz accepted our proposed language.

13. The language in Section 4.16(b) was broadly worded and intentionally so. It was meant to make clear that Novell could take whatever action it wanted to protect its ongoing interests in SVRX. For example, Novell could enter into "buy outs" of its SVRX license agreements, similar to the buy out agreement Novell executed with Sun Microsystems in 1994. Novell could also grant Hewlett Packard ("HP") SVRX source rights in connection with HP's contemplated development of a UNIX operating system for Intel 64-bit chips, should Santa Cruz so refuse. There was no intent to limit Novell's authority under Section 4.16(b) to protecting a binary royalty stream.

14. During the negotiations, David Bradford indicated to me that Novell was unwilling to transfer intellectual property rights in UNIX and UnixWare, including patents and copyrights. The Wilson team and I implemented this retention of rights to protect Novell's interest in the significant revenue stream that Novell would be retaining from SVRX Licenses. Novell was receiving an annual SVRX revenue stream of approximately $50 million. Novell's copyright ownership, in particular, would permit Novell to continue to have rights to this revenue, should Santa Cruz go bankrupt; the rights to the revenue would follow the copyrights to Novell. Novell's ownership of the copyrights also would aid in Novell's negotiation of buy-outs of SVRX Licenses and in Novell's interest in the development of UNIX on 64-bit Intel processors, for example by Hewlett Packard.

15. The Wilson team thus revised an early draft of a Schedule of Assets that had included patents, copyrights and trademarks. (Attached hereto as Exhibit 6 is a true and correct

5

copy of an early draft of the APA from the Wilson Sonsini files that we revised.) We drafted a new schedule of assets to be included in the asset transfer, as well as a schedule of assets to be excluded from the transfer. Attached hereto as Exhibit 7 is a true and correct copy of these new Schedules from my Wilson Sonsini files. Both schedules specifically addressed how intellectual property rights in UNIX and UnixWare would be treated in the deal. Patents and copyrights were not included as assets; instead patents and copyrights were specifically excluded. Only certain UNIX and UnixWare trademarks were identified as included assists.

16. To my knowledge and based on my review of the Wilson Sonsini files, during the APA negotiations at least four representatives of Novell reviewed and approved the Excluded Assets provision that excluded copyrights from the asset transfer:

(a) David Bradford reviewed and approved the exclusion.

(b) I reviewed and approved Schedules 1.1(a) and 1.1(b), including the copyright exclusion.

(c) Aaron Alter reviewed and approved Schedules 1.1(a) and 1.1(b). In fact, Aaron specifically edited their Intellectual Property provisions, confirming that only certain UNIX and UnixWare trademarks would be transferred to Santa Cruz and leaving the copyright exclusion intact. Attached hereto as Exhibit 8 is a true and correct copy of Aaron's marked-up Schedule 1.1(a) and 1.1(b) from my Wilson Sonsini files. Aaron also marked up a term sheet contained in the Wilson Sonsini files, a true and correct copy of which I attach hereto as Exhibit 9. Notably, next to a Section entitled "C. Intellectual Property" -- which was followed by a line item with the phrase "Copyrights, trademarks ...", Aaron made the handwritten annotation "already excluded." (See Exhibit 9 at NOV 39798.)

(d) Burt Levine of Novell also reviewed and edited the Intellectual Property provisions in Schedules 1.1(a) and 1.1(b). He too left the copyright exclusion intact. Attached hereto as Exhibit 10 is a true and correct copy of Burt's marked-up Schedule 1.1(a) and 1.1(b) from the Wilson Sonsini files.

17.     During the negotiations, the Wilson team and I transmitted drafts of Schedule 1.1(a) and Schedule 1.1(b), containing the exclusion of copyrights, to Santa Cruz representatives. I attach Exhibit 4 to this Declaration as an example; we sent it to Santa Cruz's counsel on September 18, 1995. The Schedules attached to Exhibit 4 were redlined to show changes to drafts we had previously given to Santa Cruz. The draft of Schedule 1.1(b) in Exhibit 4, which excluded "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare," did not contain any redlining -- thereby indicating that the exclusion of "all copyrights" had already appeared in a previously exchanged draft with Santa Cruz. (See Exhibit 4 at NOV 40413.) The draft of Schedule 1.1(a) in Exhibit 4 identified just one type of "Intellectual Property" to be included in the transfer: "Trademarks UNIX and UnixWare as <u>and to the extent</u> held by Seller <u>(excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark)</u>." (*Id.* at NOV 40410.) The redlining indicates that the previously exchanged draft had referred to "Trademarks UNIX and UnixWare as held by Seller" as the sole included IP Asset; it did not refer to "copyrights" or "patents." (*Id.*)

18.     In its final form, the APA included a Schedule 1.1(a) list of Assets. This schedule specifically identified the "Intellectual Property" to be included in the transferred assets; it only identified certain UNIX and UnixWare trademarks. (See Exhibit 2 at 059-060.) The APA also contained an "Excluded Assets" list in Schedule 1.1(b). (*Id.* at 061-062.) This list specifically called out that certain "Intellectual Property" was excluded from the asset transfer. In particular, the Schedule excluded "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare" and "all patents." (*Id.* at 062.)

19.     The exclusion of copyrights and patents from the asset transfer is also confirmed through a provision I drafted in Section 1.1(a) of the APA. That section provides that Santa Cruz's purchase of "all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business ... identified on Schedule 1.1(a)" was subject to a specific set of exclusions:

7

>Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).

(*Id.* at 009.) As indicated in this provision, Schedule 1.1(b) was intended to operate as an explicit carve-out of any rights otherwise listed in Schedule 1.1(a).

20. Although the APA did not transfer copyright ownership to Santa Cruz, Santa Cruz received other rights and interests in UNIX and UnixWare copyrighted code that were not carved out through the operation of Schedule 1.1(b) and Section 1.1(a). Santa Cruz received possession of the source code and its programs. Santa Cruz also received the right to make derivative works -- to develop an enhanced UnixWare product and a new Merged Product. Santa Cruz thus received a license to copy and use the Novell's copyrighted code in this endeavor, as needed to implement the activities contemplated by the APA.

21. Because it was contemplated that Santa Cruz would be making improvements in SVRX and UnixWare code, Novell wanted a provision in the APA addressing its right to use any Santa Cruz enhancements or innovations in the future. Santa Cruz agreed and the resulting provision was Section 1.6 of the APA. (See Exhibit 2 at 012.) Section 1.6 required the parties to execute a license agreement at the Closing that would govern Novell's future rights to use Licensed Technology. Such a license agreement was executed at the Closing (called the Technology License Agreement, or TLA).

22. I am familiar with the term Licensed Technology as it is used in the APA and the TLA. In fact, it is a term that the Wilson team and I added to Section 1.6 during the drafting process. Attached hereto as Exhibit 11 is a true and correct copy of an APA draft that we sent to Santa Cruz showing our insertion of the term Licensed Technology into Section 1.6. (See Exhibit 11 at NOV 39972-39973.)

23. Licensed Technology was intended primarily to include Santa Cruz improvements in code, *i.e.*, the derivative works that Santa Cruz was to develop. Although Novell retained the copyrights in the original code, Santa Cruz would own the copyrights in any code that it newly

8

...
...

wrote and Novell would need a license to such code. Licensed Technology also was meant to encompass other technology in UNIX and UnixWare, including trade secrets, software know-how, methods and concepts and documentation. Because these latter items were not excluded from the assets transferred to Santa Cruz, Novell needed a license to use such technology.

24. I understand that various individuals have offered personal opinions concerning the meaning of the contractual provisions I have discussed in this Declaration. In reviewing their testimony, I think it is important to understand that the contractual terms of the APA were negotiated in an approximate two-week period, and that the task of drafting was primarily a legal one: from our perspective, how to protect Novell's interests given the complexity of the transaction and Novell's continuing interest in UNIX.

(a) To my knowledge, Duff Thompson was not involved in negotiating or drafting the APA contract language.

(b) To my knowledge, Ty Mattingly was not involved in negotiating or drafting the APA contract language.

(c) Ed Chatlos was a business person for Novell involved in the deal. I understand that he may have been involved in negotiating the basic deal structure, before the drafting phase. However, to my knowledge, Mr. Chatlos was not a Novell executive, nor was he the Novell business person directing the drafting of the contract. To my knowledge, Mr. Chatlos did not draft the APA. I reported to and received instructions from David Bradford, and not from Mr. Chatlos.

(d) I have never heard of Bill Broderick. To my knowledge, he was not involved in the APA negotiations and drafting.

(e) I do not know Alok Mohan. I understand he was Santa Cruz's CEO at the time of the APA. I had no interaction with him in the APA negotiations and drafting.

(f) Bob Frankenberg was Novell's CEO at the time of the APA. To my knowledge, he was not involved in the negotiation or drafting of the contract language of the APA.

(g) I have no recollection of any interaction with Burt Levine in the APA negotiations. To my knowledge, he did not participate in the APA negotiations with Santa Cruz -- although, as I discussed above, Mr. Levine provided the Wilson team with his comments and edits on Schedules 1.1(a) and 1.1(b), which we transmitted to Santa Cruz's representatives.

(h) To my knowledge, I had no interactions with Doug Michels in the negotiation and drafting of the APA contract language. I am not aware that he had any involvement in this.

(i) To my knowledge, I did not conduct any APA negotiations with Jim Wilt. I am not aware that he had any involvement in these negotiations or the drafting of the APA contract language.

(j) I am aware that Kim Madsen was a member of Santa Cruz's in-house legal department at the time of the APA. I do not recall any specific interactions with her in drafting or negotiating any of the contractual provisions I have discussed in this Declaration.

25. Since the completion of the Novell-Santa Cruz transaction, no one from SCO has asked me for my views of the APA.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this 19th day of April, 2007 in San Francisco, California.

Tor Braham

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of April, 2007, I caused a true and correct copy of the foregoing **DECLARATION OF TOR BRAHAM** to be served to the following:

*Via CM/ECF*:

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

Stuart H. Singer
William T. Dzurilla
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301

David Boies
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504

Devan V. Padmanabhan
John J. Brogan
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55401

*Via U.S. Mail, postage prepaid*:

Stephen Neal Zack
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131

/s/ Heather M. Sneddon