# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

### THE SANTA CRUZ OPERATION, INC.

#### AND

#### NOVELL, INC.

Dated as of September ___, 1995

BPHPA1\R5\0147581.03
09/16/95

NOV 000042686

Dockets.Justia.com

## TABLE OF CONTENTS

Page

ARTICLE I  THE ACQUISITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1    Purchase of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2    Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.3    Transfer of Customers . . . . . . . . . . . . . . . . . . . . . . . 3
    1.4    License Back of Unix and UnixWare. . . . . . . . . . . . . . . . 4

ARTICLE II  REPRESENTATIONS AND WARRANTIES OF SELLER . . . . . . . 5
    2.1    Organization, Standing and Power . . . . . . . . . . . . . . . . . 5
    2.2    Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.3    Financial Statements . . . . . . . . . . . . . . . . . . . . . . . 7
    2.4    Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . 7
    2.5    No Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.6    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.7    Absence of Certain Changes . . . . . . . . . . . . . . . . . . . . 8
    2.8    Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.9    Tax Returns and Reports . . . . . . . . . . . . . . . . . . . . . 9
    2.10   Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    2.11   Title to Properties; Absence of Liens and Encumbrances . . . . . . . 11
    2.12   Governmental Authorizations and Licenses . . . . . . . . . . . . 11
    2.13   Environmental Matters . . . . . . . . . . . . . . . . . . . . . . 12
    2.14   Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    2.15   Proprietary Information and Inventions and Confidentiality
          Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    2.16   Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    2.18   Reliance Upon Seller's Representations . . . . . . . . . . . . . . 12
    2.19   Receipt of Information . . . . . . . . . . . . . . . . . . . . . . 13
    2.20   Accredited Investor . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.21   Restricted Securities . . . . . . . . . . . . . . . . . . . . . . . 13
    2.22   Legends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.23   No Implied Representations . . . . . . . . . . . . . . . . . . . . 14

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF BUYER . . . . . . . 14
    3.1    Organization, Standing and Power . . . . . . . . . . . . . . . . . 14
    3.2    Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    3.3    Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.4    SEC Documents; Buyer Financial Statements . . . . . . . . . . . 16
    3.5    Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . 16
    3.6    No Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    3.7    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

BPHPA1\RB\0147981.03
09/16/95

i.


NOV 000042687

3.8    Absence of Certain Changes .............................. 17
3.9    Agreements .......................................... 17
3.10   Tax Returns and Reports ................................ 17
3.11   Technology .......................................... 18
3.12   Governmental Authorizations and Licenses .................. 18
3.13   Environmental Matters ................................ 18
3.14   Proprietary Information and Inventions and Confidentiality
       Agreements .......................................... 19
3.15   Status of Shares ..................................... 19
3.16   No Implied Representations ............................. 19

ARTICLE IV  CERTAIN COVENANTS ............................. 19
4.1    Conduct of Business of Seller ........................... 19
4.2    Conduct of Business of Buyer ........................... 19
4.3    No Solicitation ...................................... 20
4.4    Access to Information ................................. 20
4.5    Confidentiality ...................................... 21
4.6    Expenses ........................................... 21
4.7    Public Disclosure .................................... 21
4.8    Consents ........................................... 21
4.9    Commercially Reasonable Efforts ........................ 21
4.10   Notification of Certain Matters ......................... 21
4.11   Delivery of Schedules ................................ 22
4.12   Additional Documents and Further Assurances .............. 22
4.13   Treatment of Employees of the Business ................... 22
4.14   Tax Returns ........................................ 23
4.15   Bulk Sales ......................................... 23
4.16   SVRX Licenses ...................................... 23
4.17   Audited Financials ................................... 23
4.18   Standstill Agreement ................................. 24
4.19   Right of Repurchase .................................. 24

ARTICLE V  CONDITIONS TO THE ACQUISITION ................... 24
5.1    Conditions to Obligations of Each Party to Effect the Acquisition ... 24
5.2    Additional Conditions to Obligations of Seller .............. 24
5.3    Additional Conditions to the Obligations of Buyer ........... 25

ARTICLE VI  CERTAIN CORPORATE GOVERNANCE MATTERS ......... 26
6.1    Nomination of Director to Buyer's Board of Directors ........ 26
6.2    Right to Maintain .................................... 26
6.3    Right of First Refusal on Change of Control ............... 27
6.4    Registration Rights .................................. 29

NOV 000042688

ARTICLE VII  TERMINATION, AMENDMENT AND WAIVER . . . . . . . . . . .  36
    7.1    Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
    7.2    Effect of Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
    7.3    Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
    7.4    Extension; Waiver  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

ARTICLE VIII  INDEMNIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
    8.1  Survival of Representations, Warranties and Agreements . . . . . . . . . . . .  38
    8.2  Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
    8.3  Procedure for Indemnification with Respect to Third-Party Claims . . . . .  38
    8.4    Procedure For Indemnification with Respect to Non-Third
          Party Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

ARTICLE IX  GENERAL PROVISIONS  . . . . . . . . . . . . . . . . . . . . . . . . . .  40
    9.1    Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
    9.2    Survival  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    9.3    Interpretation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    9.4    Counterparts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    9.5    Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    9.6    Severability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
    9.7    Other Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42
    9.8    Governing Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42
    9.9    Rules of Construction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

BPHPA1\RB\0147981.03
09/16/95

NOV 000042689

# INDEX OF EXHIBITS

**Exhibit**             **Description**


NOV 000042690

## INDEX OF SCHEDULES

Schedule 1.1(a)        Assets

Schedule 1.1(b)        Excluded Assets

Schedule 1.1(c)        Assumed Liabilities]

BPHPA1\RB\0147981.03
09/16/95

v.

NOV 000042691

## THE ACQUISITION

1.1    Purchase of Assets.

(a)    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.4), all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1 (a) hereto.  Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1 (b)):

(b)    Assumption of Liabilities.  At the Closing Buyer shall assume those obligations and liabilities of Seller set forth in Schedule 1.1(c) hereto (collectively, the "Assumed Liabilities").

1.2    Consideration.

(a)    Consideration for Assets: Stock.  On the terms and subject to the conditions set forth in this Agreement, as full payment for the transfer of the Assets by Seller to Buyer, at the Closing Buyer shall assume the Assumed Liabilities and issue to Seller {}[_____] shares of fully paid and nonassessable shares of Common Stock of Buyer (the "Shares" or the "Purchase Price").

(b)    Consideration for Assets: Royalties.  As additional consideration for the transfer of the Assets by Seller to Buyer, Buyer agrees to collect and {immediately} pass through to Seller {all} [a percent of the] amounts paid by OEMs and other third party customers on account of the SVRX business, including royalties and other payments of any kind[, all as described in detail in Section 4.16 hereof].  In addition, Buyer agrees to make payment to Seller of additional royalties on account of its sale of UnixWare products.  The amounts {of payments to be made by Buyer on account of the foregoing pass-through Unix arrangement, and the amounts} [and timing] of additional royalties to be paid in connection with the UnixWare business are identified in detail on Schedule 1.2(b) hereto.

(c)    Allocation of Purchase Price.  Within 45 days following the Closing Buyer shall prepare and deliver to Seller (subject to Seller's approval) an allocation of the Purchase Price plus any other consideration properly allocable among the Assets (the "Allocation").  The parties agree that all tax returns and reports (including Internal Revenue Service ("IRS") Form 8594) and all financial statements shall be prepared in a manner consistent with (and the parties shall not otherwise take a position inconsistent with) the Allocation unless required by the IRS or state taxing authority.  The Allocation shall be prepared in a manner consistent with Section 1060 of

NOV 000042692

the Internal Revenue Code of 1986, as amended (the "Code"), and the income tax regulations promulgated thereunder.

        (d)    <u>Transfer Taxes.</u>  Buyer shall pay and promptly discharge when due the entire amount of any and all sales and use tax ("Sales Taxes") imposed or levied by reason of the sale of the Assets to Buyer.  The parties shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any such Sales Taxes.

    1.3    <u>Transfer of Customers.</u>

        (a)    <u>Transfer of Customers.</u>

            (i)    <u>Intent.</u>  It is the intent of parties hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer.  Accordingly, all parties agree to facilitate the transfer of customers of the Business from Seller to Buyer following the Closing.

            (ii)    <u>Purchase Order Data.</u>  Seller shall make available to Buyer, upon request (A) a list of all outstanding written customer orders, purchase orders and other customer commitments from the current customers of the Business, (B) the names of all such customers (the "Current Customers"), and (C) data regarding Seller's standard cost of sales for the items covered by such orders, and shall provide upon request such other information as is (AA) relevant to profitability on such items, (BB) available to Seller without incurring undue effort or expense and (CC) requested by Buyer.

            (iii)    <u>Transfer of Orders; Assignments.</u>  Prior to the Closing, Seller and Buyer agree to cooperate with each other in conducting joint contacts with the Current Customers (as appropriate) for the purpose of attempting to obtain such customers' consent to transfer orders from Seller to Buyer (or to issue new orders to Buyer for the same or similar items) and to assign Seller's rights and benefits under the contracts included in the Assets to Buyer as of the Closing.

            (iv)    <u>Assumption of Obligation.</u>  To the extent that an order is transferred or assigned to Buyer or that Buyer accepts a new purchase order from a Current Customer, Buyer agrees to assume and perform all obligations thereunder.

            <u>[(v)    Non-Assignment of Certain Items.  Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment or license hereunder of any of the Assets (or the Seller Intellectual Property related thereto) or contracts shall require the consent of any other party (or in the event that any of the same shall be nonassignable), neither this Agreement nor any action taken pursuant to</u>

NOV 000042693

(a)    Closing.  Unless this Agreement is earlier terminated pursuant to Section ___ the closing of the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304, at 10:00 a.m. on the date which is two business days following satisfaction or waiver of the last of the conditions to Closing as set forth in the Article IV hereof, or on such other time and/or date as the parties agree (the actual date on which the Closing occurs is referred to herein as the "Closing Date").

(b)    Delivery.  At the Closing:

(i)    Buyer shall deliver to Seller an instrument of assumption of liabilities by which Buyer shall assume the Assumed Liabilities as of the Closing;

(ii)    Buyer shall deliver to Seller a certificate or certificates representing the Shares;

(iii)    Seller shall deliver to Buyer all bills of sale, endorsements, assignments, consents to assignments to the extent obtained and other instruments and documents as Buyer may reasonably request to sell, convey, assign, transfer and deliver to Buyer Seller's title to all the Assets; and

(iv)    Seller and Buyer shall deliver or cause to be delivered to one another such other instruments and documents necessary or appropriate to evidence the due execution, delivery and performance of this Agreement.

(c)    Taking of Necessary Action; Further Action.  If, at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement the parties agree to take, and will take, all such lawful and necessary and/or desirable action.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as described [with reasonable particularity] in the Seller Disclosure Schedule [(which shall cross-reference to the particular section below to which such description applies)] delivered by Seller to Buyer simultaneously with the execution of this Agreement, as such Seller Disclosure Schedule may be updated and/or amended pursuant to Section ___ hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer that:

NOV 000042694

2.1    <u>Organization, Standing and Power.</u>  Seller is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted.  Seller is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which the failure to so qualify reasonably would be expected to have a material adverse effect on the Business Condition of the Business.  (As used in this Agreement, "Business Condition" with respect to any corporate entity, group of corporate entities or the Business shall mean the business, financial condition, results of operations and assets of such corporate entity, group of corporate entities or the Business, as the case may be.)  Seller has made available to Buyer complete and correct copies of the Certificate of Incorporation and Bylaws of Seller, as amended to the date hereof.

2.2    <u>Authority.</u>  Seller has all requisite corporate power and authority to enter into this Agreement and, to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance by Seller of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Seller, and have been approved by the Board of Directors of Seller.  No other corporate proceeding on the part of either Seller is necessary to authorize the execution and delivery of this Agreement by Seller or the performance of Seller's obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.  Subject to satisfaction or waiver of the conditions set forth in Article (——)[5] the execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with or result in any violation of any statute, law, rule, regulation, judgment, order, decree, or ordinance applicable to Seller, or its properties or assets that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the Business Condition of the Business, or conflict with any provision of the Certificate of Incorporation or Bylaws of Seller or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of a lien or encumbrance on any of the properties or assets of Seller pursuant to any agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license to which Seller is a party or by which Seller or its properties or assets may be bound that would reasonably be expected, either individually or in the aggregate, to have a material adverse effect on the Business Condition of the Business).  No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency, commission, regulatory authority or other governmental

BPHPA1\R8\0147961.03
09/16/95

9.

NOV 000042695

2.6    Litigation.  There is no action, suit, proceeding, claim or governmental investigation pending or, to the knowledge of Seller, threatened, against Seller that reasonably would be expected to have a material adverse effect on the Business Condition of the Business.  There is no action, suit, proceeding, claim or governmental investigation pending against Seller as of the date hereof that in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

2.7    Absence of Certain Changes.  Since _____, Seller has conducted the Business in the ordinary course and, except for the execution, delivery and performance of this Agreement or as required hereby, there has not occurred: (a) any material adverse change in the Business Condition of the Business; (b) any entry into any material commitment or transaction by Seller relating to the Business, other than in the ordinary course of business; (c) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the Business Condition of the Business; (d) any acquisition or disposition of a material amount of property or assets of Seller relating to the Business outside of the ordinary course of business; (e) any transfer or grant by Seller of a right under any Seller Intellectual Property Rights (as defined in Section ___ hereof), other than those transferred or granted in the ordinary course of business;

2.8    Agreements.  With respect to the Business, Seller is not a party to, and the Business is not subject to:

(a)    Any union contract or any employment contract or arrangement providing for future compensation, written or oral, with any officer, consultant, director or employee which is not cancelable by Seller on 30 days' notice or less without penalty or obligation to make payments related to such termination, other than (A) (in the case of employees other than executive officers of Seller) such agreements as are not materially different from standard arrangements offered to employees generally in the ordinary course of business consistent with Seller's past practices and (B) such agreements as may be imposed or implied by law;

(b)    Any plan, contract or arrangement, the obligations under which exceed {$_____}[$100,000], written or oral, providing for bonuses, pensions, deferred compensation, severance pay or benefits, retirement payments, profit-sharing, or the like;

(c)    As of the date hereof, any existing OEM agreement, distribution agreement, volume purchase agreement, or other similar agreement in which the annual amount paid or received by Seller during the twelve-month period ended _____ exceeded $1,500,000 or pursuant to which Seller has granted most favored nation pricing provisions or exclusive marketing rights related to any product, group of products or territory to any person;

NOV 000042696

(d)    Any lease or month-to-month tenancy for real or personal property in which the amount of payments which Seller is required to make on an annual basis exceeds $100,000;

(e)    Any contract containing covenants purporting to limit Seller's freedom to compete in any line of business in any geographic area[.]; or]

[(f)    Any license to a third party involving Seller Intellectual Property source code, which license includes a right to sublicense such source code royalty-free.]

Each agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license and commitment listed in the Seller Disclosure Schedule pursuant to this Section is valid and binding on Seller, and is in full force and effect, and Seller has not breached any provision of, nor is it in default under the terms of, any such agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license or commitment except for such failures to be valid and binding or in full force and effect and such breaches or defaults as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.9    Tax Returns and Reports.

(a)    Definition of Taxes. For the purposes of this Agreement, "Tax" or "Taxes" refers to any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts and any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for taxes of a predecessor entity.

(b)    Tax Returns and Audits. Except as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business:

(i)    Seller has timely filed all federal, state, local and foreign returns, estimates, information statements and reports ("Returns") relating to Taxes required to be filed by it, except such Returns which are not material to the Business, and has paid all Taxes shown to be due on such Returns or is contesting them in good faith.

(ii)    Seller has withheld with respect to its employees all federal and state income taxes, FICA, FUTA and other Taxes required to be withheld.

BPHPA1\RB\0147981.03
09/16/95

12.

NOV 000042697

(iii)     Seller has not been delinquent in the payment of any Tax nor is there any Tax deficiency outstanding, proposed or assessed against Seller, nor has Seller executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv)     No audit or other examination of any Return of Seller is presently in progress, nor has Seller been notified of any request for such an audit or other examination.

(v)     None of the Assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(vi)     Seller is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

2.10    Technology.  To the knowledge of Seller, as of the date hereof, Seller owns, co-owns or is licensed or otherwise entitled to use rights to all patents, trademarks, trade names, service marks, copyrights, mask work rights, trade secret rights, and other intellectual property rights and any applications therefor, and all maskworks, net lists, schematics, technology, source code, know-how, computer software programs and all other tangible information or material, that are used in the Business as currently conducted (the "Seller Intellectual Property Rights").

The Seller Disclosure Schedule lists, as of the date hereof, (i) all pending registered copyrights, trademarks, service marks, mask work rights, and any applications therefor, included in the Seller Intellectual Property Rights; (ii) the jurisdictions in which each such Seller Intellectual Property Right has been issued or registered or in which an application for such issuance and registration has been filed, including the respective registration or application numbers; and (iii) which, if any, of such products have been registered for copyright protection with the United States Copyright Office and any foreign offices.  The Seller Disclosure Schedule also sets forth a list of license agreements which, to Seller's knowledge, constitutes all license agreements under which Seller licenses as licensee the intellectual property rights of third parties relating to technology or software which is incorporated in existing products of the Business for which products Seller has received revenues in excess of $2,000,000 in the twelve-month period ended _____.  To Seller's knowledge, Seller is not in material violation of any such license agreement.

With respect to the Business, Seller is not a party to nor is the Business subject to (i) any joint venture contract or arrangement or any other agreement that involves a sharing of profits with other persons other than the payment or receipt of royalties by Seller; (ii) any agreement pursuant to which Seller was obligated to make payment of royalties in the twelve-month period ended _____ of $1,000,000 or

NOV 000042698

more; or (iii) any agreement pursuant to which Seller utilizes the intellectual property rights of others in any products currently marketed by Seller and which is either non-perpetual or terminable by the licensor thereunder in the event of the Acquisition and which, if terminated, reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

No claims with respect to the Seller Intellectual Property Rights have been communicated in writing to Seller (i) to the effect that the manufacture, sale or use of any product of the Business as now used or offered by Seller infringes on any copyright, patent, trade secret or other intellectual property right of a third party or (ii) challenging the ownership or validity of any of the Seller Intellectual Property Rights, any or all of which claims reasonably would be expected to have a material adverse effect on the Business Condition of the Business. To the knowledge of Seller, as of the date hereof, all patents and registered trademarks, service marks and registered copyrights held by Seller in connection with the Business are valid and subsisting except for failures to be valid and subsisting that reasonably would not be expected to have a material adverse effect on the Business Condition of the Business. Seller does not know of any unauthorized use, infringement or misappropriation of any of the Seller Intellectual Property Rights by any third party that reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

2.11    <u>Title to Properties; Absence of Liens and Encumbrances</u>.

(a)    The Seller Disclosure Schedule sets forth a list of all real property owned or, as of the date hereof, leased by Seller for use in connection with the Business and the aggregate annual rental or mortgage payment or other fees payable under any such lease or loan.

(b)    Seller has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all of the tangible properties and assets, real, personal and mixed, which are material to the conduct of the Business, free and clear of any liens, charges, pledges, security interests or other encumbrances, except for such of the foregoing as (A) are reflected in the Seller Financial Statements, or (B) arise out of taxes or general or special assessments not in default and payable without penalty or interest or the validity of which is being contested in good faith by appropriate proceedings, or (C) such imperfections of title and encumbrances, if any, which are not substantial in character, amount or extent, and which do not materially detract from the value, or interfere with the present use, of the property subject thereto or affected thereby.

2.12    <u>Governmental Authorizations and Licenses</u>.  Seller is the holder of all licenses, authorizations, permits, concessions, certificates and other franchises of any Governmental Entity required to operate the Business, the failure to hold which reasonably would be expected to have a material adverse effect on the Business

NOV 000042699

Condition of the Business (collectively, the "Licenses"). The Licenses are in full force and effect. There is not now pending, or to the knowledge of Seller is there threatened, any action, suit, investigation or proceeding against Seller before any Governmental Entity with respect to the Licenses, nor is there any issued or outstanding notice, order or complaint with respect to the violation by Seller of the terms of any License or any rule or regulation applicable thereto, except in any such case as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.13   Environmental Matters. To Seller's knowledge, Seller has at all relevant times with respect to the Business been in material compliance with all environmental laws, and has received no potentially responsible party ("PRP") notices or functionally equivalent notices from any governmental agencies or private parties concerning releases or threatened releases of any "hazardous substance" as that term is defined under 42 U.S.C. 9601(14).

2.14   Customers. The Seller Disclosure Schedule sets forth each customer of the Business that paid Seller royalties and licensee fees in an aggregate amount in excess of $1,000,000 during the twelve-month period ended _____.

2.15   Proprietary Information and Inventions and Confidentiality Agreements. To the knowledge of Seller, each employee, consultant, and officer of Seller (exclusively with respect to the Business) has executed a proprietary information and inventions and confidentiality agreement, copies of which have been made available to counsel to Buyer, and it is Seller's policy that such agreements be executed by each new employee, consultant, officer and director of Seller in the ordinary course of Seller's business.

[2.16   Inventory. The Seller Disclosure Schedule sets forth the amount of [UnixWare] inventory, including pre-paid royalties, that was held by Seller's resellers as of the date of this Agreement.

2.17   Investment Intent. The purchase of the Shares pursuant to this Agreement is for the account of Seller for the purpose of investment and not with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act and the rules and regulations promulgated thereunder, and that Seller has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Seller further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.

2.18   Reliance Upon Seller's Representations. Seller understands that the Shares are not registered under the Securities Act on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from

BPNPA1\RB\0147981.03
09/16/95

15.

NOV 000042700

registration under the Securities Act pursuant to section 4(2) thereof, and that Buyer's reliance on such exemption is predicated on Seller's representations set forth herein. Seller realizes that the basis for the exemption may not be present if, notwithstanding such representations, Seller has in mind merely acquiring the Shares for a fixed or determinable period in the future, or for a market rise, or for sale if the market does not rise. Seller does not have any such intention.

2.19    Receipt of Information.  Seller believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Seller further represents that it has had an opportunity to ask questions and receive answers from Buyer regarding the terms and conditions of the offering of the Shares and the business, properties, prospects and financial condition of Buyer and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access. The foregoing, however, does not limit or modify the representations and warranties of the Buyer in Section 3 of this Agreement or the right of Seller to rely thereon.

2.20    Accredited Investor.   Seller is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D, as presently in effect.

2.21    Restricted Securities.  Seller understands that the Shares may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the Shares or an available exemption from registration under the Securities Act, the Shares must be held indefinitely.  In particular, Seller is aware that the Shares may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of that Rule are met.

2.22    Legends.  To the extent applicable, each certificate or other document evidencing any of the Shares shall be endorsed with the legends set forth below, and Seller covenants that, except to the extent such restrictions are waived by Buyer, Seller shall not transfer the shares represented by any such certificate without complying with the restrictions on transfer described in the legends endorsed on such certificate:

(a)    The following legend under the Securities Act:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED ABSENT AN

NOV 000042701

<u>EFFECTIVE REGISTRATION THEREOF UNDER SUCH
ACT OR COMPLIANCE WITH RULE 144
PROMULGATED UNDER SUCH ACT, OR UNLESS
THE COMPANY HAS RECEIVED AN OPINION OF
COUNSEL, SATISFACTORY TO THE COMPANY AND
ITS COUNSEL, THAT SUCH REGISTRATION IS NOT
REQUIRED."]</u>

~~{2.16}~~ [2.23] <u>No Implied Representations</u>. It is the explicit intent of each party hereto that Seller is not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Seller contained in this Agreement or in the Seller Disclosure Schedule.

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as described in the Buyer Disclosure Schedule delivered by Buyer to Seller simultaneously with the execution of this Agreement, as such Buyer Disclosure Schedule may be updated and/or amended pursuant to Section ___ hereof (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Seller that:

3.1    <u>Organization, Standing and Power</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted. Buyer is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on the Business Condition of Buyer. Buyer has made available to Seller complete and correct copies of the Certificate of Incorporation and Bylaws of Buyer, as amended to the date hereof.

3.2    <u>Authority</u>. Buyer has all requisite corporate power and authority to enter into this Agreement and, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the performance by Buyer of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Buyer, and have been approved by the Board of Directors of Buyer. No other corporate proceeding on the part of either Buyer is necessary to authorize the execution and delivery of this Agreement by Buyer or the performance of Buyer's obligations hereunder or the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting the

NOV 000042702

enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought. Subject to satisfaction or waiver of the conditions set forth in Article __, the execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with or result in any violation of any statute, law, rule, regulation, judgment, order, decree, or ordinance applicable to Buyer, or its properties or assets that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the Business Condition of Buyer, or conflict with any provision of the Certificate of Incorporation or Bylaws of Buyer or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of a lien or encumbrance on any of the properties or assets of Buyer pursuant to any agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license to which Buyer is a party or by which Buyer or its properties or assets may be bound that would reasonably be expected to have a material adverse effect on the Business Condition of Buyer. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated hereby, except for (i) the filing of a pre-merger notification report under the HSR Act, (ii) those required to be made or obtained by Seller or any of its affiliates, (iii) filings following the Closing under federal and state securities laws relating to issuance of the Shares; and (iv) such consents, approvals, orders, authorizations, registrations, declarations and filings as would not have a material adverse effect on the ability of Buyer to issue the Shares to Seller and assume the Assumed Liabilities at the Closing.

      3.3    Capitalization.  {[To come from Brobeck]} [The authorized capital stock of Buyer consists of _____ shares of Common Stock, no par value, and _____ shares of Preferred Stock, no par value, of which there were issued and outstanding as of the close of business on September __, 1995, _____ shares of Common Stock and no shares of Preferred Stock.  There are no other outstanding shares of capital stock or voting securities of Buyer other than shares of Buyer Common Stock issued after September __, 1995 upon the exercise of options issued under the Buyer Amended and Restated 1987 Stock Option Plan (the "Buyer Stock Option Plan").  All outstanding shares of Buyer have been duly authorized, validly issued, fully paid and are nonassessable and free of any liens or encumbrances other than any liens or encumbrances created by or imposed upon the holders thereof.  As of the close of business on September __, 1995, Buyer has reserved _____ shares of Common Stock for issuance to employees, directors and independent contractors pursuant to the Buyer Stock Option Plan, of which _____ shares have been issued pursuant to option exercises, and _____ shares are subject to outstanding, unexercised options.  Other than this Agreement, there are no other options, warrants, calls, rights, commitments or agreements of any character to which Buyer is a party or by

NOV 000042703

which it is bound obligating Buyer to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of the capital stock of Buyer obligating Buyer to grant, extend or enter into any such option, warrant, call, right, commitment or agreement.  The shares of Buyer Common Stock to be issued pursuant to this Agreement will be duly authorized, validly issued, fully paid, and non-assessable.]

3.4    SEC Documents; Buyer Financial Statements.  Buyer has made available to Seller a true and complete copy of each statement, annual, quarterly and other report, {registration statement} and definitive proxy statement filed by Buyer with the Securities and Exchange Commission ("SEC") since [September 30, 1993] (the "Buyer SEC Documents"), which are all the documents (other than preliminary material) that Buyer was required to file with the SEC since such date.  As of their respective filing dates, the Buyer SEC Documents complied in all material respects with the requirements of the Securities Exchange Act of 1934 (the "Exchange Act") or the Securities Act of 1933 (the "Securities Act"), as the case may be, and none of the Buyer SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.  The financial statements of Buyer included in the Buyer SEC Documents (the "Buyer Financial Statements") comply as to form in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and fairly present the consolidated financial position of Buyer and its consolidated subsidiaries at the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal, recurring audit adjustments).  Since [September 30, 1994], there has been no material change in Buyer's accounting policies except as described in the notes to Buyer's Financial Statements.

3.5    Compliance with Law.  Buyer has conducted its business so as to comply in all material respects with all laws, rules and regulations, judgments, decrees or orders of any Governmental Entity applicable to its operations except where the failure so to comply reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer.  As of the date hereof, there are no judgments or orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against Buyer with any continuing effect that reasonably would be expected to have a material adverse affect on the Business Condition of Buyer.  To the knowledge of Buyer, there is no investigation by any Governmental Entity with respect to Buyer pending against Buyer which is reasonably likely to have a material adverse effect on the Business Condition of Buyer.

3.6    No Defaults.  To the knowledge of Buyer, Buyer is not, nor has received written notice that it would be with the passage of time, (i) in violation of any

NOV 000042704

provision of its Certificate of Incorporation or Bylaws or (ii) in default or violation of any term, condition or provision of (A) any judgment, decree, order, injunction or stipulation applicable to Buyer or (B) any agreement, note, mortgage, indenture, contract, lease or instrument, permit, concession, franchise or license to which Buyer is a party or by which Buyer may be bound, in any such case in a manner that reasonably would be expected to have a material adverse effect on the Business Condition of Buyer.

        3.7    Litigation. There is no action, suit, proceeding, claim or governmental investigation pending or, to the knowledge of Buyer, threatened, against Buyer which reasonably would be expected to have, a material adverse effect on the Business Condition of Buyer. There is no action, suit, proceeding, claim or governmental investigation pending against Buyer as of the date hereof which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

        3.8    Absence of Certain Changes. Since [June 30, 1995], Buyer has conducted its business in the ordinary course and, except for the execution, delivery and performance of this Agreement or as required hereby, there has not occurred: (a) any material adverse change in the Business Condition of Buyer; (b) any entry into any material commitment or transaction by Buyer, other than in the ordinary course of business; (c) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the Business Condition of Buyer; or (d) any acquisition or disposition of a material amount of property or assets of Buyer outside of the ordinary course of business.

        3.9    Agreements. Each agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license and commitment that is an Exhibit to {a Buyer SEC Document} [Buyer's most recent Form 10-Q] is valid and binding on Buyer, and is in full force and effect, and Buyer has not breached any provision of, nor is it in default under the terms of, any such agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license or commitment except for such failures to be valid and binding or in full force and effect and such breaches or defaults as reasonably would not, be expected to have a material adverse effect on the Business Condition of Buyer.

        3.10    Tax Returns and Reports. Except as reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer:

                (i)      Buyer has timely filed all federal, state, local and foreign returns, estimates, information statements and reports (Returns) relating to Taxes required to be filed by it, except such Returns which are not material to Buyer, and has paid all Taxes shown to be due on such Returns or is contesting them in good faith.

NOV 000042705

(ii)    Buyer has withheld with respect to its employees all federal and state income taxes, FICA, FUTA and other Taxes required to be withheld.

(iii)    Buyer has not been delinquent in the payment of any Tax nor is there any Tax deficiency outstanding, proposed or assessed against Buyer, nor has Buyer executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv)    No audit or other examination of any Return of Buyer is presently in progress, nor has Buyer been notified of any request for such an audit or other examination.

(v)    None of Buyer's assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(vi)    Buyer is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

3.11    Technology.  To the knowledge of Buyer, as of the date hereof, Buyer owns, co-owns or is licensed or otherwise entitled to use rights to all patents, trademarks, trade names, service marks, copyrights, mask work rights, trade secret rights, and other intellectual property rights and any applications therefor, and all maskworks, net lists, schematics, technology, source code, know-how, computer software programs and all other tangible information or material, that are used in its business as currently conducted (the "Buyer Intellectual Property Rights").

~~[The Buyer Disclosure Schedule lists, as of the date hereof, (i) all patents, registered copyrights, trademarks, service marks, mask work rights, and any applications therefor, included in the Buyer Intellectual Property Rights; (ii) the jurisdictions in which each such Buyer Intellectual Property Right has been issued or registered or in which an application for such issuance and registration has been filed, including the respective registration or application numbers; and (iii) which, if any, of such products have been registered for copyright protection with the United States Copyright Office and any foreign offices. The Buyer Disclosure Schedule also sets forth a list of license agreements which, to Buyer's knowledge, constitutes all license agreements under which Buyer licenses as licensee the intellectual property rights of third parties relating to technology or software which is incorporated in existing products of Buyer for which products Buyer has received revenues in excess of $2,000,000 in the twelve-month period ended _____. To Buyer's knowledge, Buyer is not in material violation of any such license agreement.~~

~~Buyer is not a party to nor is it subject to (i) any joint venture contract or arrangement or any other agreement that involves a sharing of profits with other persons other than~~

NOV 000042706

~~the payment or receipt of royalties by Buyer; (ii) any agreement pursuant to which Buyer was obligated to make payment of royalties in the twelve-month period ended of $1,000,000 or more; or (iii) any agreement pursuant to which Buyer utilizes the intellectual property rights of others in any products currently marketed by Buyer and which is either non-perpetual or terminable by the licensor thereunder in the event of the Acquisition and which, if terminated, reasonably would be expected to have a material adverse effect on the Business Condition of Buyer.~~

~~No claims with respect to the Buyer Intellectual Property Rights have been communicated in writing to Buyer (i) to the effect that the manufacture, sale or use of any product of Buyer as now used or offered by Buyer infringes on any copyright, patent, trade secret or other intellectual property right of a third party or (ii) challenging the ownership or validity of any of the Buyer Intellectual Property Rights, any or all of which claims reasonably would be likely to have a material adverse effect on the Business Condition of Buyer. To the knowledge of Buyer, as of the date hereof, all patents and registered trademarks, service marks and registered copyrights held by Buyer are valid and subsisting except for failures to be valid and subsisting that reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer. Buyer does not know of any unauthorized use, infringement or misappropriation of any of the Buyer Intellectual Property Rights by any third party that reasonably would be expected to have a material adverse effect on the Business Condition of Buyer.]~~

    3.12  <u>Governmental Authorizations and Licenses</u>.  Buyer is the holder of all licenses, authorizations, permits, concessions, certificates and other franchises of any Governmental Entity required to operate its business, the failure to hold which reasonably would be expected to have a material adverse effect on the Business Condition of Buyer (collectively, the "Buyer Licenses").  The Buyer Licenses are in full force and effect.  There is not now pending, or to the knowledge of Buyer is there threatened, any action, suit, investigation or proceeding against Buyer before any Governmental Entity with respect to the Buyer Licenses, nor is there any issued or outstanding notice, order or complaint with respect to the violation by Buyer of the terms of any Buyer License or any rule or regulation applicable thereto, except in any such case as reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer.

    3.13  <u>Environmental Matters</u>.  To Buyer's knowledge, Buyer has at all relevant times been in material compliance with all environmental laws, and has received no PRP notices or functionally equivalent notices from any governmental agencies or private parties concerning releases or threatened releases of any "hazardous substance" as that term is defined under 42 U.S.C. 9601(14).

    3.14  <u>Proprietary Information and Inventions and Confidentiality Agreements</u>.  To the knowledge of Buyer, each employee, consultant, and officer of Buyer has executed a proprietary information and inventions and confidentiality

NOV 000042707

agreement, copies of which have been made available to counsel to Seller, and it is Buyer's policy that such agreements be executed by each new employee, consultant, officer and director of Buyer in the ordinary course of Buyer's business.

3.15    Status of Shares.  When issued to Seller at the Closing, the Shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of any and all liens and encumbrances of any kind, except as may be imposed by Seller.

3.16    No Implied Representations.  It is the explicit intent of each party hereto that Buyer is not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Buyer contained in this Agreement or in the Buyer Disclosure Schedule.

## ARTICLE IV

## CERTAIN COVENANTS

4.1    Conduct of Business of Seller.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement and the Closing Date, Seller agrees (except to the extent that Buyer shall otherwise consent in writing), to carry on the Business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted, [including sales of products in a manner and on terms consistent with the past practices,] to pay or perform other obligations when due, and use all reasonable efforts consistent with past practice and policies to preserve intact the Business, keep available the services of its present officers and key employees and preserve their relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it, all with the goal of preserving unimpaired the Business at the Closing Date.  Except as contemplated by this Agreement, Seller shall not, with respect to the Business, without the prior written consent of Buyer (which shall be given, or reasonably withheld, within one business day after receipt of written request therefor) (a) enter into any commitment or transaction not in the ordinary course of business; or (b) enter into any strategic alliance or joint marketing arrangement or agreement.

4.2    Conduct of Business of Buyer.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement and the Closing Date, Buyer agrees (except to the extent that Seller shall otherwise consent in writing), to carry on its business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted, to pay or perform other obligations when due, and use all reasonable efforts consistent with past practice and policies to preserve intact its business, keep available the services of its present officers and key employees and preserve their relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it, all with the goal of preserving unimpaired its business at the Closing Date.  Except as contemplated

NOV 000042708

by this Agreement, Buyer shall not, without the prior written consent of Seller (which shall be given, or reasonably withheld, within one business day after receipt of written request therefor) (a) enter into any commitment or transaction not in the ordinary course of business; (b) enter into any strategic alliance or joint marketing arrangement or agreement; (c) declare or pay any dividends on or make any other distributions (whether in cash, stock or property) in respect of any of its capital stock, or split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of capital stock of Buyer, or repurchase, redeem or otherwise acquire, directly or indirectly, any shares of its capital stock (or options, warrants or other rights exercisable therefor); (d) except for the issuance of shares of capital stock of Buyer upon exercise or conversion of options granted to employees, issue, deliver or sell or authorize or propose the issuance, delivery or sale of, or purchase or propose the purchase of, any shares of its capital stock or securities convertible into, or subscriptions, rights, warrants or options to acquire, or other agreements or commitments of any character obligating it to issue any such shares or other convertible securities; or (e) cause or permit any amendments to its Certificate of Incorporation or Bylaws.

4.3    No Solicitation.  Until the earlier to occur of (i) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, Seller will not (nor will Seller permit any of Seller's officers, directors, agents, representatives or Affiliates to) directly or indirectly, take any of the following actions with any party other than Buyer and its designees:  solicit, encourage, initiate or participate in any negotiations or discussions with respect to, any offer or proposal to acquire all or any portion of the Business.  Until the earlier to occur of (i) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, [except to the extent the Board of Directors of Buyer believes (after consultation with outside legal counsel) it is necessary to comply with its fiduciary duties,] Buyer will not (nor will Buyer permit any of Buyer's officers, directors, agents, representatives or affiliates to) directly or indirectly or indirectly take any of the following actions with any party other than Seller and its designees: solicit, encourage, initiate or participate in any negotiation or discussions with respect to, any offer or proposal to acquire all or any portion of the business of Buyer.

4.4    Access to Information.  Seller and Buyer shall each afford the other and its accountants, counsel and other representatives, reasonable access during normal business hours during the period prior to the Closing Date to (a) all of its properties, books, contracts, commitments and records, and (b) all other information concerning the business, properties and personnel (subject to restrictions imposed by applicable law) of it as the other may reasonably request (it being understood that access to information concerning Seller shall pertain only to the Business).

4.5    Confidentiality.  Each of the parties hereto hereby agrees to keep such information or knowledge obtained in any investigation pursuant to Sections {1.3}

BPHPA1\RB\01479S1.03
09/16/95

24.

[4.3] or 4.4, or pursuant to the negotiation and execution of this Agreement or the effectuation of the transactions contemplated hereby, confidential; provided, however, that the foregoing shall not apply to information or knowledge which (a) a party can demonstrate was already lawfully in its possession prior to the disclosure thereof by the other party, (b) is generally known to the public and did not become so known through any violation of law or this Agreement, (c) became known to the public through no fault of such party, (d) is later lawfully acquired by such party from other sources, (e) is required to be disclosed by order of court or government agency with subpoena powers or (f) which is disclosed in the course of any litigation between any of the parties hereto.

4.6    Expenses.  Whether or not the Acquisition is consummated, all fees and expenses incurred in connection with the Acquisition including, without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties ("Third Party Expenses") incurred by a party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective party incurring such fees and expenses.

4.7    Public Disclosure.  Unless otherwise required by law including, without limitation, applicable securities laws, prior to the Closing Date, no disclosure (whether or not in response to an inquiry) of the subject matter of this Agreement shall be made by any party hereto unless approved by Buyer and Seller prior to release, provided that such approval shall not be unreasonably withheld.

4.8    Consents.  Seller shall use commercially reasonably efforts to obtain all necessary consents, waivers and approvals under any of the contracts of the Business as may be required in connection with the Acquisition so as to transfer to Buyer all rights of Seller thereunder as of the Closing.

4.9    Commercially Reasonable Efforts.  Subject to the terms and conditions provided in this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations: to consummate and make effective the transactions contemplated hereby, to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings, and to remove any injunctions or other impediments or delays, legal or otherwise, in order to consummate and make effective the transactions contemplated by this Agreement.

4.10    Notification of Certain Matters.  Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which is likely to cause any representation or warranty of Seller or Buyer, respectively, contained in this Agreement to be untrue or inaccurate at or prior to the Closing Date and (ii) any failure

NOV 000042710

Employees, including without limitation, obligations for accrued vacation time, severance arrangements, workers' compensation or any liability for any insurance, medical or other welfare benefits, other than under Buyer's plans. All welfare benefit claims for treatment or services rendered prior to midnight on the day of the Closing shall be the responsibility of Seller.

Although Employees may be located at Buyer's facilities, such Employees shall continue to be employees of Seller through the Closing and Seller shall continue in force all employee benefits and salaries in place as of                    , 199   .

Seller agrees to use its best efforts to support the transition of the Business to Buyer, including without limitation, cooperation between Seller sales and field service personnel and Buyer's sales and field service personnel to help assure an orderly transition of customer accounts.]

4.14    Tax Returns.  Seller shall be responsible for and pay when due (i) all of Seller's Taxes attributable to or levied or imposed upon the Assets relating or pertaining to the period (or that portion of any period) ending on or prior to the Closing Date and (ii) all Taxes attributable to, levied or imposed upon, or incurred in connection with the Seller's business operations, other than the Business, following the Closing Date.

4.15    Bulk Sales.  Buyer hereby agrees to waive the requirement, if any, that Seller comply with any bulk transfer law which may be applicable to the transactions contemplated by this Agreement; provided, that Seller agrees to indemnify and hold harmless Buyer with respect to any noncompliance with such laws and Buyer's waiver with respect thereto.

4.16    SVRX Licenses.  Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and such amounts hereafter called "SVRX Royalties"). Within 45 days of the end of each fiscal quarter of Buyer, Buyer shall deliver to Seller or Seller's assignee 95% of any SVRX Royalties collected in the immediately preceding quarter.  Buyer shall diligently seek to collect all such royalties, funds and other amounts when due.

Buyer shall not and shall not have the authority to amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller. [In addition, at Seller's sole discretion, and at Seller's direction, Buyer shall amend, modify or waive any rights under, or shall assign any rights to, any such SVRX License to the extent so directed by Seller.]

Seller further covenants that neither it, nor any of its officers, directors or employees shall (i) take any action to promote the sale of SVRX products or (ii) provide

BPHPA1\RB\0147981.03
09/16/95

27.

of Seller or Buyer, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that subject to Section 4.11, the delivery of any notice pursuant to this Section shall not limit or otherwise affect any remedies available to the party receiving such notice.

4.11    Delivery of Schedules.  It is understood that the Seller Disclosure Schedule and the Buyer Disclosure Schedule may not be complete as of the date hereof. Because of this, the parties agree that until 5:00 California time on {_____} [October 15], 1995, Seller and Buyer shall each be permitted to amend its respective Disclosure Schedule so as to qualify the representations and warranties of such party contained in this Agreement (as each may be so amended, the "Subsequent Seller Disclosure Schedule" and the "Subsequent Buyer Disclosure Schedule", respectively).  It is further understood that, to the extent that this Agreement is not terminated pursuant to Section 7.1 (d) or 7.1(f) after delivery of any such Subsequent Disclosure Schedule, the representations and warranties in this Agreement of the party delivering such Subsequent Disclosure Schedule shall be qualified in their entirety by the modified or supplemented disclosures contained therein.

4.12    Additional Documents and Further Assurances.  Each party hereto, at the request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

4.13    Treatment of Employees of the Business.  {[To be expanded.] Buyer agrees to offer employment, conditioned upon and effective upon the Closing at the current sites at which the business is operated, to all} [Following the execution and delivery of this Agreement and prior to Closing, the person(s) responsible for the hiring of Buyer's personnel and the person(s) responsible for the hiring of Seller's personnel shall agree upon an employee benefits package (the "Benefits Package") which in their mutual opinion shall be sufficiently enticing to attract and retain existing] employees of the Business {on the Closing Date. To the extent feasible and consistent with past practices of Buyer and to the extent not previously compensated for, the rights of Seller employees, who following the Closing are employed by Buyer ("New Employees"), to accrued vacation, sick leave and related matters shall be preserved and continued. New Employees shall be permitted to participate in all aggregate Buyer benefit, bonus, profit sharing, welfare and similar plans available to all other employees of Buyer on the terms and conditions provided in such plans.} [as new employees of Buyer.  The Benefits Package shall credit Seller's employees who become employees of Buyer with years of service accrued by such employee with Seller or any predecessor of Seller or the Business.  Buyer may offer employment consistent with the terms of the Benefits Package to any of the employees of the Business it shall so choose.  Seller will use best efforts to assist Buyer in this regard and to assure an orderly and successful transition. Buyer shall not assume any obligation of Seller with respect to liabilities relating to such

26.

NOV 000042712

*[handwritten annotation: material]*

*[handwritten annotation: and intent]*

any compensation to any employee designed to incentize such employee to promote the sale of SVRX products.

4.17   Audited Financials.  Seller shall deliver to Buyer within ____ days of this Agreement audited _____, for the periods ended ____ with respect to the Business.

4.18   Standstill Agreement.  Buyer and Seller shall have entered into the Standstill Agreement attached hereto as Exhibit 4.18.

*[handwritten annotation: First ReNsal]*

4.19   Right of Repurchase.  [To Come]]

*[handwritten annotations: extent for actions, with to rightful business of Seller, activities, in either Other]*

### ARTICLE V

### CONDITIONS TO THE ACQUISITION

5.1   Conditions to Obligations of Each Party to Effect the Acquisition. The respective obligations of each party to this Agreement to effect the Acquisition shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)   No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Acquisition shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending, nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Acquisition, which makes the consummation of the Acquisition illegal.

(b)   The waiting period under the Hart-Scott-Rodino Antitrust Improvement Act shall have expired ~~{without the commencement of legal action by the U.S. Federal Trade Commission or Department of Justice}~~.

(c)   The parties shall have entered into an Operating Agreement~~{,}~~ [on] substantially ~~{in}~~ the ~~{form}~~ [terms] attached hereto as Exhibit ~~{___ concerning (i) the scope of the ongoing product relationship between Buyer and Seller; (ii) the scope of the ongoing product marketing relationship between Buyer and Seller; (iii) the ongoing business and licensing relationship between Buyer and Seller; (iv) future areas of cooperation; and (v) the transition teams which will coordinate between Buyer and Seller in effecting the foregoing matters.}~~ [5.10(c).]

5.2   Additional Conditions to Obligations of Seller.  The obligations of Seller to consummate and effect this Agreement and the transactions contemplated

NOV 000042713

hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Seller:

(a)    Representations, Warranties and Covenants. The representations and warranties of Buyer in this Agreement [(as may be modified by the subsequent Buyer Disclosure Schedule)] shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Buyer shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it in all material respects as of the Closing Date.

(b)    Certificate of Buyer. Seller shall have been provided with a certificate duly executed on behalf of Buyer to the effect that, as of the Closing Date:

(i)    all representations and warranties made by Buyer in this Agreement are true and complete in all material respects; [ and ]

(ii)    all covenants, obligations and conditions of this Agreement to be performed by Buyer on or before such date have been so performed in all material respects[.][; and]

[(iii)    there are no pending negotiations with respect to any offer to acquire all or any portion of the business of Buyer.]

(c)    Legal Opinion. Seller shall have received a legal opinion from legal counsel to Buyer[ in form and substance reasonably satisfactory to Seller.

(d)    No Material Adverse Change. There shall not have occurred any material adverse change in the Business Condition of Buyer [between the date of this Agreement and the Closing Date.

(e)    Fairness Opinion. Seller shall have received a fairness opinion from Morgan Stanley in a form satisfactory to Seller].

5.3    Additional Conditions to the Obligations of Buyer . The obligations of Buyer to consummate and effect this Agreement and the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Buyer:

(a)    Representations, Warranties and Covenants. The representations and warranties of Seller in this Agreement (as may be modified by the Subsequent Seller Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made

3PHPA1\RB\0147981.03
09/16/95

29.



NOV 000042714

on and as of such time and Seller shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it as of the Closing Date in all material respects.

(b)    Certificate of Seller.  Buyer shall have been provided with a certificate executed on behalf of Seller by its Chief Executive Officer to the effect that, as of the Closing Date:

(i)    all representations and warranties made by Seller in this Agreement are true and complete in all material respects; and

(ii)    all covenants, obligations and conditions of this Agreement to be performed by Seller on or before such date have been so performed in all material respects.

(c)    Legal Opinion.  Buyer shall have received a legal opinion from legal counsel to Seller, in form and substance reasonably satisfactory to Buyer.

(d)    No Material Adverse Changes.  There shall not have occurred any material adverse change in the Business Condition of the Business [between the date of this Agreement and the Closing Date.

(e)    Fairness Opinion.  Buyer shall have received a fairness opinion from Hambrecht and Quist in a form satisfactory to Buyer.

(f)    Standstill Agreement.  Buyer and Seller shall have entered into the Standstill Agreement attached hereto as Exhibit 4.18].

**ARTICLE VI**

**CERTAIN CORPORATE GOVERNANCE MATTERS**

6.1    Nomination of Director to Buyer's Board of Directors.  As of the Closing and thereafter until such time as Seller together with its affiliates shall cease to own {less} [more] than 5% of the outstanding shares of Common Stock of Buyer (the "Threshold Date"), Buyer shall cause one individual designated {as} [by] Seller (the "Seller Designee") to be nominated for election to the Board of Directors of Buyer[, which Seller Designee shall be a Senior Executive Officer or outside board member of Seller and reasonably acceptable to Buyer].  In the event that the Seller Designee shall be elected as a director of Buyer, but shall cease to serve as a director of Buyer prior to the Threshold Date, Seller shall have the right to designate another individual to fill the vacancy created by such cessation in order to serve as a member of the Board of Directors of Buyer.  [The right to a board seat as set forth in Section 6.1 shall also



NOV 000042715

terminate in the event that Seller's core products become directly competitive with ~~Buyer.~~]

6.2    Right to Maintain.

(a)    Until the [earlier to occur of (i)] Threshold Date[; (ii) Seller's core products become competitive with Buyer or (iii) the expiration of three years from the date of this Agreement], in the event (including a public offering), Buyer desires to sell and issue shares of its capital stock or rights, options or other securities exercisable for or convertible into shares of its capital stock (directly or indirectly) and whether or not such right or option is immediately exercisable or convertible, then Buyer shall first notify Seller of the material terms of the proposed sale and shall permit Seller to acquire, at the time of consummation such proposed issuance and sale and on such terms as are specified in Buyer's notice to Seller, such number of the shares of capital stock or other securities of Buyer proposed to be issued as would be required to enable Seller to maintain its voting and ownership rights in Buyer following such issuance, on a percentage basis, at a level maintained by it immediately prior to such proposed issuance. Seller shall have ~~{forty-five (45)}~~ [ten (10)] days after the date of any such notice to elect by notice to Buyer to purchase such shares or securities on such terms and at the time the proposed sale is consummated.

(b)    The rights set forth in Section 6.2(a) shall not apply to [(i)] the issuance of shares or grant of options to purchase shares of Common Stock ~~{representing in the aggregate up to ten percent (10%) of the fully diluted outstanding capital stock of Buyer}~~ under ~~{the}~~ Buyer's employee stock purchase and stock option plans, net of repurchases or cancellations[; (ii) Rule 145 transactions, and (iii)] _____

6.3    Right of First Refusal on Change of Control.

(a)    First Refusal Right.  ~~the~~ cceptance of a tender offer

(i)    Until the [earlier of (i)] Threshold [Date and (ii) three (3) years from the Closing] Date, in the event ~~{Buyer proposes}~~ [Buyer's Board of Directors has approved an intention] to merge with, sell shares representing 50% or more of the voting power of Buyer to, or sell all or substantially all of Buyer's assets to ~~{a third party or engage voluntarily in any other change-of-control transaction}~~ [any of the six (6) parties identified by Seller in Schedule 6.3(a) hereof], Buyer shall deliver a notice (an "Acquisition Notice") to Seller setting forth the proposed material terms of the merger, sale or acquisition, including the structure and price terms of the merger, sale or acquisition, the name and address of the party proposed to acquire or merge with Buyer and the date on or about which such sale or merger is proposed to be made (the date of such an Acquisition Notice being an "Acquisition Notice Date"). Seller shall have the right of first refusal to acquire or merge with Buyer on the terms set forth in the

31.

NOV 000042716

Acquisition Notice (subject to the valuation provisions of Section 6.3(b) below), as provided in this Section.

        (ii)      Seller shall have until {thirty (30)} [ten (10)] days after the later of (i) receipt of an Acquisition Notice and (ii) the date Seller receives notice of the completion of the appraisal of any items included as part of the proposed consideration specified in the Acquisition Notice that are subject to valuation pursuant to Section 6.3(b), to elect by notice to Buyer to acquire or merge with Buyer on the terms set forth in the Acquisition Notice. If Seller notifies the Buyer within such time period of its election to so acquire or merge with Buyer, a closing with respect to such acquisition or merger shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than the later to occur of (i) forty-five (45) days after receipt by Buyer of such notice of Seller's election and (ii) five (5) days after the receipt of any governmental consent or approval necessary for the consummation of such transaction, including, but not limited to, any such approval or consent required under the HSR Act.

        (iii)      In the event Seller elects not to exercise the foregoing right of first refusal, Buyer shall have six (6) months to sell Buyer on the same material terms as are set forth in the Acquisition Notice. If Buyer proposes to sell to or merge with {a party} [one of the identified parties] on terms more favorable to such party than those set forth in the notice, or proposes to sell to or merge with {a party} [one of the identified parties] after the six (6) month period, it shall first notify Seller and Seller shall have another opportunity to exercise its right of first refusal.

        (b)    Appraisal Procedure.

        (i)      Whenever the terms of a proposed sale or merger include {non-cash} forms of consideration [other than cash or securities which are traded on a National Exchange (as defined below)], Seller shall have the option to exercise its first refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the Acquisition Notice Date, and shall be determined in the manner set forth in clause (ii), below. [If an item of consideration]{

(ii) The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the Acquisition Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to

NOV 000042717

~~choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm. If an item to be valued]~~ constitutes securities which are traded on a National Exchange (as defined below) ~~[the investment banking firm or other consultant selected in accordance with the above procedure shall determine the Appraised Value of such items by averaging]~~[, the value of such items shall be determined by taking the average of] the closing prices of such securities on such exchange during (with reference to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading days on such National Exchange prior to the applicable Acquisition Notice Date.

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

~~[(iii) Promptly following the delivery by Buyer of any Acquisition Notice hereunder, Buyer shall use reasonable efforts under the circumstances to attempt to cause the party proposing to acquire or merge with Buyer (the "Acquiring Party") to provide such information as Seller shall reasonably request in order to enable Seller to evaluate the business and financial condition of the Acquiring Party and to establish the bona fide nature of the transaction proposed in]~~[(ii)    The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after] the Acquisition Notice~~[, provided, however, that Seller shall agree to take reasonable precautions to hold in confidence all non-public information so provided and so designated by the Acquiring Party.~~

~~6.4 Restrictive Legend. Each certificate representing Shares held by Seller shall be stamped or otherwise imprinted with a legend substantially in the following form (unless no longer required in the opinion of counsel for Buyer):~~



NOV 000042718

~~THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS AN EXEMPTION UNDER SUCH ACT IS THEN AVAILABLE]~~ [Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm]

~~[6.5]~~ [6.4]     Registration Rights.

(a)     Seller Demand Rights.

(i)     Request for Registration.  In case at any time from and after the Closing, Buyer shall receive from Seller a written request that Buyer effect any registration with respect to all or a part of the Shares (or any securities issued or issuable in respect of the shares; collectively, the "Registrable Securities"), provided that the number of Shares (or other securities) designated by Seller to be included in such registration would result in an anticipated aggregate offering price of at least $5,000,000, Buyer will as soon as practicable, use its diligent best efforts to effect such registration (including, without limitation, the execution of an undertaking to file pre(b)-effective and post-effective amendments and supplements, appropriate qualification under the applicable blue sky or other state securities laws and appropriate compliance with exemptive regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of Registrable Securities as are specified in such request; provided, that Buyer shall not be obligated to take any action to effect any such registration pursuant to this Section after Buyer has effected three registrations pursuant to a request by Seller under this Section.  A registration proceeding pursuant to this Section which is subsequently withdrawn prior to effectiveness of a registration statement under the Securities Act shall not be considered an effected registration, qualification or compliance for purposes of this Section.

Subject to the foregoing provisions, Buyer shall file a registration statement covering the Registrable Securities so requested or otherwise elected to be registered as

NOV 000042719

soon as practicable, but in any event within sixty days, after receipt of the request of Seller, provided that Buyer shall have the right to defer such registration for a period of up to ninety (90) days following the receipt of such a request if in the opinion of the Board of Directors of Buyer, it would be seriously detrimental to Buyer for a registration statement to be filed.

(ii)     Underwriting. If Seller intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise Buyer as a part of its request made pursuant to Section 6.5(a)(i). Buyer shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Seller.

(b)     Company Registration.

(i)     Notice of Registration. If at any time or from time to time after the Closing, Buyer shall determine to register any of its securities, for its own account (other than a registration relating solely to employee stock option or purchase plans or relating solely to a Rule 145 transaction), Buyer will:

(A)     promptly give to Seller written notice thereof (which shall include a list of the jurisdictions in which Buyer intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

(B)     include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within thirty (30) days after the date of such written notice from Buyer to Seller, except as set forth in Section 6.5(b)(ii).

(ii)     Underwriting. If the registration of which Buyer gives notice is for a registered public offering involving an underwriting, Buyer shall so advise Seller as a part of the written notice given pursuant to Section 6.5(b)(i)(A). In such event the right of Seller to registration pursuant to Section 6.5(b) shall be conditioned upon Seller's participation in such underwriting and the inclusion of Seller's Registrable Securities in the underwriting to the extent provided herein. If Seller proposes to distribute its securities through such underwriting it shall (together with Buyer and other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Buyer. Notwithstanding any other provision of this Section, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting on a pro rata basis based on the total number of Registrable Securities held by Seller and based on the total number of securities being offered by Buyer for its own account. Buyer shall

NOV 000042720

advise Seller of any such limitations, and the number of Registrable Securities that may be included in the registration. If Seller disapproves of the terms of any such underwriting, it may elect to withdraw therefrom by written notice to Buyer and the underwriter. Any Registrable Securities excluded or withdrawn from such underwriting shall not be included in such registration.

(iii)    Notwithstanding anything to the contrary in this Section 6.5(b), Buyer shall not be obligated to effect any registration of securities under this Section 6.5(b) pursuant to a registration statement covering any of its securities to be issued in connection with mergers, acquisitions, exchange offers, dividend reinvestment plans or stock option or other employee benefit plans.

(c)    Expenses of Registration.

(i)    Subject to Sections 6.5(c)(ii) and 6.5(c)(iii), all expenses incurred in connection with any registration pursuant to Section 6.5(a) or 6.5(b), including, without limitation, all registration, filing and qualification fees, printing expenses, fees and disbursements of counsel for Buyer, expenses of complying with state securities or Blue Sky laws (including fees of counsel for Buyer and counsel for the underwriters), accountants' fees and expenses incident to or required by any such registration, expenses incident to the listing of securities on any exchange in which the Registrable Securities are to be listed, expenses of any special audits incidental to or required by such registration and the fees and disbursements of one counsel retained by Seller shall be borne by Buyer.

(ii)    Buyer shall not be required to pay for expenses of any registration proceeding begun pursuant to Section 6.5(a), the request of which has been subsequently withdrawn by Seller, in which case, such expenses shall be borne by Seller; provided that Seller shall not be required to pay (a) for the cost of normal audits of Buyer that would have been performed in any event, and (b) for the time of any executives or other personnel of Buyer involved in the preparation of the registration statement; and provided further, however, that if at the time of such withdrawal, Seller shall have learned of a material adverse change in the Business Condition of Buyer from that known to Seller at the time of its request, then Seller shall not be required to pay any of such expenses.

(iii)    Notwithstanding anything to the contrary elsewhere in this Section 6.5(c), all underwriters' discounts, commissions, or applicable stock transfer and documentary stamp taxes (if any) relating to the sale of Registrable Securities shall be borne by the seller of the Registrable Securities in all cases.

(d)    Registration Procedures.

BPHPA1\RB\0147981.03
09/16/95

36.

NOV 000042721

(i)      In the case of each registration effected by Buyer pursuant to Section 6.5, Buyer will keep Seller advised in writing as to the initiation of each registration and as to the completion thereof. At its expense (except as otherwise provided in Section 6.5(c) above) Buyer will:

(A)      keep such registration effective for a period of six months or until Seller has completed the distribution described in the registration statement relating thereto, whichever first occurs;

(B)      furnish such number of prospectuses and other documents incident thereto as Seller from time to time may reasonably request; and

(C)      notify Seller, (1) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and, with respect to the registration statement or any post-effective amendment, when the same has become effective; (2) of any request by the SEC or any other federal or state governmental authority during the period of effectiveness of the registration statement for amendments or supplements to the registration statement or related prospectus or for additional information relating to the registration statement, (3) of the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose, (4) of the receipt by Buyer of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation of any proceeding for such purpose; or (5) of the happening of any event which makes any statement made in the registration statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or which requires the making of any changes in the registration statement or prospectus so that, in the case of the registration statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(e)      Buyer may, upon the happening of any event (x) of the kind described in clauses (2), (3), (4), or (5) of Section 6.5(d)(i)(C) or (y) that, in the judgment of Buyer's Board of Directors, renders it advisable to suspend use of the prospectus due to pending corporate developments, public filings with the SEC or similar events, suspend use of the prospectus on written notice to Seller for no more than thirty days in the aggregate in any six month period of time, in which case Seller shall discontinue disposition of Registrable Securities covered by the registration statement or prospectus until copies of a supplemented or amended prospectus are distributed to Seller or until Seller is advised in writing by Buyer that the use of the applicable

NOV 000042722

prospectus may be resumed. Buyer shall use its reasonable efforts to ensure that the use of the prospectus may be resumed as soon as practicable. Buyer shall use every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the securities for sale in any jurisdiction, at the earliest practicable moment. Buyer shall prepare as soon as practicable a supplement or post-effective amendment to the registration statement or a supplement to the related prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(f)    Indemnification.

(i)    Buyer will indemnify and hold harmless Seller, each of its officers and directors, and each person controlling Seller, with respect to which a registration has been effected pursuant to this Section 6.5 and each underwriter, if any, and each person who controls any underwriter of the Registrable Securities held by or issuable to Seller, against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, offering circular or other documents (including any related registration statement, notification or the like) incident to any such registration, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Buyer of the Securities Act or any state securities law or of any rule or regulation promulgated under the Securities Act or any state securities law applicable to Buyer and relating to action or inaction required of Buyer in connection with any such registration, and will reimburse Seller, each of its officers and directors, and each person controlling Seller, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, provided that Buyer will not be liable in any such case to the extent that any such claim, loss, damage, cost, expense, or liability arises out of or is based on any untrue statement or omission based upon written information furnished to Buyer by an instrument duly executed by Seller or any underwriter and stated to be specifically for use therein.

(ii)    Seller will, if Registrable Securities held by or issuable to Seller are included in the securities as to which such registration is being effected, indemnify and hold harmless Buyer, each of its directors and officers who sign such registration statement, each underwriter, if any, of Buyer's securities covered by such



NOV 000042723

registration statement, each person who controls Buyer within the meaning of the Securities Act against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement of a material fact contained in any such registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, offering circular or other documents (including any related registration statement, notification or the like) incident to any such registration, or based on any omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse Buyer, such directors, officers, persons or underwriters for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to Buyer by an instrument duly executed by Seller and stated to be specifically for use therein; provided, however, that the foregoing indemnity agreement is subject to the condition that, insofar as it relates to any such untrue statement or omission made in the preliminary prospectus but eliminated or remedied in the amended prospectus on file with the SEC at the time the registration statement becomes effective or the amended prospectus filed with the SEC pursuant to Rule 424(b) (the "Final Prospectus"), such indemnity agreement shall not inure to the benefit of Buyer, any underwriter or any Holder, if there is no underwriter, if a copy of the Final Prospectus was not furnished to the person or entity asserting the loss, liability, claim or damage at or prior to the time such action is required by the Securities Act.

(iii)     Each party entitled to indemnification under this Section 6.5(e) (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. If any such Indemnified Party shall have been advised by counsel chosen by it that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party and will promptly reimburse such Indemnified Party and any person controlling such Indemnified Party for the reasonable fees and expenses of any counsel retained by the

NOV 000042724

Indemnified Party, it being understood that the Indemnifying Party shall not, in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys for such Indemnified Party or controlling person, which firm shall be designated in writing by the Indemnified Party to the Indemnifying Party.

(g)     Contribution. If the indemnification provided for in Section 6.5(e) is unavailable or insufficient to hold harmless an Indemnified Party thereunder, then each Indemnifying Party thereunder shall contribute to the account paid or payable by such Indemnified Party as a result of the losses, claims, damages, costs, expenses, liabilities or actions referred to in Section 6.5(e)(i) or (ii), as the case may be in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and the Indemnified Party on the other in connection with statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or the Indemnified Party and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statements or omission. The Parties hereto agree that it would not be just and equitable if contributions pursuant to this Section 6.5(f) were to be determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the first sentence of this Section 6.5(f). The amount paid by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this Section 6.5(f) shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any action or claim which is the subject of this Section 6.5(f). Promptly after receipt by an Indemnified Party of notice of the commencement of any action against such party in respect of which a claim for contribution may be made against an Indemnifying Party under this Section 6.5(f), such Indemnified Party shall notify the Indemnifying Party in writing of the commencement thereof if the notice specified in Section 6.5(e)(iii) has not been given with respect to such action; provided that the omission so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to any Indemnified Party otherwise under this Section 6.5(f), except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. No Person guilty of fraudulent misrepresentation (within the meaning of Section 1 l(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(h)     Information by Holder. Seller shall furnish to Buyer such information regarding Seller and the distribution proposed by Seller as Buyer may



NOV 000042725

reasonably request in writing and as shall be required in connection with any registration referred to in this Section 6.5.

(i)    Rule 144 Reporting  With a view to making available to Seller the benefits of certain rules and regulations of SEC which may permit the sale of Registrable Securities to the public without registration, Buyer agrees to:

(i)    make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after ninety (90) days after the effective date of the first registration filed by Buyer which involves a sale of securities of Buyer to the general public;

(ii)    file with the SEC in a timely manner all reports and other documents required of Buyer under the Securities Act and the Exchange Act; and

(iii)    furnish to Seller so long as it owns any Registrable Securities forthwith upon request a written statement by Buyer that it has complied with the reporting requirements of said Rule 144 (at any time after ninety (90) days after the effective date of said first registration statement filed by Buyer), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of Buyer, and such other reports and documents so filed by Buyer as may be reasonably requested in availing Seller of any rule or regulation of the SEC permitting the selling of any such securities without registration.

(j)    Transfer of Registration Rights.  Any registration rights granted by Buyer under this Section 6.5 may be assigned by Seller in connection with the sale by Seller of any Registrable Securities, and following such assignment, the assignee shall be entitled to all rights of Seller under this Section 6.5, provided that such assignee agrees in writing to be bound to the obligations of Seller under this Section 6.5.

(k)    Termination of Registration Rights.  All registration rights provided hereunder shall terminate upon the earlier to occur of (a) the tenth anniversary of the Closing and (b) such time as Seller is able to sell all of its Registrable Securities under Rule 144 during any two successive, three-month periods.

(l)    Future Grants of Registration Rights.  Buyer agrees for the benefit of Seller that it will not grant registration rights with respect to any of its securities upon terms more favorable to the holders of such securities than those contained herein.

## ARTICLE VII

## TERMINATION, AMENDMENT AND WAIVER

NOV 000042726

~~consummation of the Acquisition and acquisition of the Shares would not be in its best interest.)~~

7.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Buyer or Seller, or their respective officers, directors or shareholders, provided that each party shall remain liable for any breaches of this Agreement prior to its termination; and provided further that, the provisions of Sections _____ of this Agreement shall remain in full force and effect and survive any termination of this Agreement.

7.3    Amendment.  This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto.

7.4    Extension; Waiver.  At any time prior to the Closing Date, Buyer on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other party hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

**ARTICLE VIII**

**[INDEMNIFICATION**

8.1  Survival of Representations, Warranties and Agreements.

Notwithstanding any investigation conducted at any time with regard thereto by or on behalf of either party, the representation made by Seller in Section 2.10, including any schedules thereto, representations shall survive the execution, delivery and performance of this Agreement.  The obligation of indemnity provided herein shall terminate one (1) year after the Closing.

8.2  Indemnification.

(i)    Seller hereby agrees to indemnify and hold harmless Buyer against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys' fees, any and all out-of-pocket expenses incurred in investigating, preparing or defending against any litigation, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation (collectively "Damages")

NOV 000042727

asserted against, resulting to, imposed upon, or incurred or suffered by Buyer, directly or indirectly, as a result of or arising from any inaccuracy in or breach of the representation and warranty made by Seller in Section 2.10, including schedules thereto.

### 8.3  Procedure for Indemnification with Respect to Third-Party Claims.

(i)  If Buyer determines to seek indemnification under this Article VIII with respect to Identifiable Claims (the party seeking such indemnification hereinafter referred to as the "Indemnified Party" and the party against whom such indemnification is sought is hereinafter referred to as the "Indemnifying Party") resulting from the assertion of liability by third parties, the Indemnified Party shall give notice to the Indemnifying Party within 60 days of the Indemnified Party becoming aware of any such Identifiable Claim or of facts upon which any such Identifiable Claim will be based; the notice shall set forth such material information with respect thereto as is then reasonably available to the Indemnified Party.  In case any such liability is asserted against the Indemnified Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within 20 days after receiving the Indemnified Party's notice, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the sole, unreimbursable expense of the Indemnified Party unless the Indemnifying Party does not assume control or the Indemnified Party shall reasonably determine that there is a conflict of interest between Buyer and Seller with respect to such Identifiable Claim, in which case the fees and expenses of such counsel will be borne by the Indemnifying Party, (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing, and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Identifiable Claims resulting from the assertion of liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and, if so, only to the extent that, the Indemnifying Party is materially prejudiced thereby.  With respect to any assertion of liability by a third party that results in an Identifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(ii)  In the event that the Indemnifying Party, within 20 days after receipt of the aforesaid notice of an Identifiable Claim, fails to assume the defense of the Indemnified Party against such Identifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

(iii)  Notwithstanding anything in this Section to the contrary, (i) if there is a reasonable probability that an Identifiable Claim may materially and adversely affect the Indemnified Party, other than as a result of money damages or other money



NOV 000042728

payments, the Indemnified Party shall have the right to participate in such defense, compromise or settlement and the Indemnifying Party shall not, without the Indemnified Party's written consent (which consent shall not be unreasonably withheld), settle or compromise any Identifiable Claim or consent to entry of any judgment in respect thereof unless such settlement, compromise or consent includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect of such Identifiable Claim.

8.4     Procedure For Indemnification with Respect to Non-Third Party Claims.

In the event that the Indemnified Party asserts the existence of a claim giving rise to Damages (but excluding claims resulting from the assertion of liability by third parties), it shall give written notice to the Indemnifying Party. Such written notice shall state that it is being given pursuant to this Section 8.4, specify the nature and amount of the claim asserted and indicate the date on which such assertion shall be deemed accepted and the amount of the claim deemed a valid claim (such date to be established in accordance with the next sentence). If the Indemnifying Party, within 60 days after the mailing of notice by the Indemnified Party, shall not give written notice to the Indemnified Party announcing its intent to contest such assertion of the Indemnified Party, such assertion shall be deemed accepted and the amount of claim shall be deemed a valid claim. In the event, however, that the Indemnifying Party contests the assertion of a claim by giving such written notice to the Indemnified Party within said period, then the parties shall act in good faith to reach agreement regarding such claim. In the event that litigation shall arise with respect to any such claim, the prevailing party shall be entitled to reimbursement of costs and expenses incurred in connection with such litigation including attorney fees, if the parties hereto, acting in good faith, cannot reach agreement with respect to such claim within ten days after such notice.

### ARTICLE IX]

### GENERAL PROVISIONS

{8.1} [9.1]     Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via telecopy (with acknowledgment of complete transmission) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)     if to Buyer, to:
The Santa Cruz Operation, Inc.
]{[400 Encinal Street]
]{P.O. Box 1900

BPWPA1\RB\0147981.03
09/16/95

45.

NOV 000042729

Santa Cruz, CA 95061-1900]
Attention: [————————————]Legal Department]
Telecopy No.: [————————————](408) 427-5474]

with a copy to:

[————————————————]Brobeck, Phleger &

Harrison]

Place]        [————————————————]Two Embarcadero

              [————————————————]2200 Geng Road
Palo Alto, CA 94303]
Attention: [————————————]Edward M. Leonard]
Telecopy No.: [————————————](415) 496-2921]

    (b)    if to Seller, to:

Novell, Inc.

_____
_____

Attention: _____
Telecopy No.: _____

with a copy to:

Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304
Attention: Larry W. Sonsini
Telecopy No.: (415) 496-4084

[8.2] [9.2]    Survival.  The representations and warranties contained in Section 2 and Section 3 hereof [except for the representation of Seller set forth in Section 2.10] shall not survive the closing of the sale of assets and issuance of stock contemplated by this Agreement; provided, however, that the foregoing provision shall not eliminate the rights and remedies of the parties hereto in the case of a willful fraud by the other party provided that the agreed party shall establish all elements of the existence of such fraud by clear and convincing evidence.

[8.3] [9.3]    Interpretation.  When a reference is made in this Agreement to Schedules or Exhibits, such reference shall be to a Schedule or Exhibit to this

NOV 000042730

Agreement unless otherwise indicated. The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

{8.4} [9.4]   Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

{8.5} [9.5]   Entire Agreement.  This Agreement, and the Schedules and Exhibits hereto: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or remedies hereunder, unless expressly provided otherwise; and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided.

{8.6} [9.6]   Severability.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

{8.7} [9.7]   Other Remedies.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

{8.8} [9.8]   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of {_____} [California] regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

{8.9} [9.9]   Rules of Construction.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule

NOV 000042731

of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.



NOV 000042732

IN WITNESS WHEREOF, Buyer and Seller have caused this Agreement to be signed by their duly authorized respective officers, all as of the date first written above.

THE SANTA CRUZ OPERATION, INC.

By: _____
Name: _____
Title: _____


NOVELL, INC.

By: _____
Name: _____
Title: _____

BPHPA1\RB\0147981.03
09/16/95

49.

NOV 000042733