
there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Acquisition, which makes the consummation of the Acquisition illegal.

      (b)     The waiting period under the Hart-Scott-Rodino Antitrust Improvement Act shall have expired.

      (c)     The parties shall have entered into a mutually satisfactory Operating Agreement. Because certain terms contained herein are defined in the proposed Operating Agreement, a non-binding form of the proposed Operating Agreement is attached hereto as of the date hereof for definitional purposes only; notwithstanding the foregoing, Seller and Buyer have agreed upon the terms of Exhibit A and Exhibit B of the proposed Operating Agreement and the terms set forth in Exhibit 5.1(c) regarding Eiger development, and will accordingly be bound thereby.

      5.2     Additional Conditions to Obligations of Seller. The obligations of Seller to consummate and effect this Agreement and the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Seller:

      (a)     Representations, Warranties and Covenants. The representations and warranties of Buyer in this Agreement (as may be modified by the Subsequent Buyer Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time, and Buyer shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it in all material respects as of the Closing Date.

      (b)     Certificate of Buyer. Seller shall have been provided with a certificate duly executed on behalf of Buyer to the effect that, as of the Closing Date:

          (i)     all representations and warranties made by Buyer in this Agreement are true and complete in all material respects;

          (ii)     all covenants, obligations and conditions of this Agreement to be performed by Buyer on or before such date have been so performed in all material respects; and

          (iii)     there are no pending negotiations with respect to any offer to acquire all or any portion of the business of Buyer.

      (c)     Legal Opinion. Seller shall have received a legal opinion from legal counsel to Buyer, in form and substance reasonably satisfactory to Seller, relating to due authority, execution, validity and similar matters.

CONFIDENTIAL                      SCO1185926

Dockets.Justia.com

(d)  No Material Adverse Change.  There shall not have occurred any material adverse change in the Business Condition of Buyer between the date of this Agreement and the Closing Date.

5.3  Additional Conditions to the Obligations of Buyer.  The obligations of Buyer to consummate and effect this Agreement and the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Buyer:

(a)  Representations, Warranties and Covenants.  The representations and warranties of Seller in this Agreement (as may be modified by the Subsequent Seller Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Seller shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it as of the Closing Date in all material respects.

(b)  Certificate of Seller.  Buyer shall have been provided with a certificate executed on behalf of Seller by its Chief Executive Officer to the effect that, as of the Closing Date:

(i)  all representations and warranties made by Seller in this Agreement are true and complete in all material respects; and

(ii)  all covenants, obligations and conditions of this Agreement to be performed by Seller on or before such date have been so performed in all material respects.

(c)  Legal Opinion.  Buyer shall have received a legal opinion from legal counsel to Seller, in form and substance reasonably satisfactory to Buyer, relating to due authority, execution, validly and similar matters.

(d)  No Material Adverse Changes.  There shall not have occurred any material adverse change in the Business Condition of the Business between the date of this Agreement and the Closing Date.

## ARTICLE VI

## CERTAIN CORPORATE GOVERNANCE MATTERS

6.1  Nomination of Director to Buyer's Board of Directors.  As of the Closing and thereafter until such time as Seller together with its affiliates shall cease to own more than 5% of the outstanding shares of Common Stock of Buyer (the "Threshold

CONFIDENTIAL                                    SCO1185927

Date") and except as set forth further below, Buyer shall cause one individual designated by Seller (the "Seller Designee") to be nominated for election to the Board of Directors of Buyer, which Seller Designee shall be a Senior Executive Officer or outside board member of Seller and reasonably acceptable to Buyer. In the event that the Seller Designee shall be elected as a director of Buyer, but shall cease to serve as a director of Buyer prior to the Threshold Date, Seller shall have the right to designate another individual to fill the vacancy created by such cessation in order to serve as a member of the Board of Directors of Buyer. The right to nomination for election to Buyer's Board of Directors as set forth in this Section 6.1 shall terminate in the event that Seller's core products become directly competitive with Buyer.

6.2  Right to Maintain.

(a)  Until the earlier to occur of (i) Threshold Date; (ii) Seller's core products becoming competitive with Buyer's core products or (iii) the expiration of three years from the date of this Agreement, in the event (including a public offering), Buyer desires to sell and issue shares of its capital stock or rights, options or other securities exercisable for or convertible into shares of its capital stock (directly or indirectly) and whether or not such right or option is immediately exercisable or convertible, then Buyer shall first notify Seller of the material terms of the proposed sale and shall permit Seller to acquire, at the time of consummation such proposed issuance and sale and on such terms as are specified in Buyer's notice to Seller, such number of the shares of capital stock or other securities of Buyer proposed to be issued as would be required to enable Seller to maintain its voting and ownership rights in Buyer following such issuance, on a percentage basis, at a level maintained by it immediately prior to such proposed issuance. Seller shall have ten (10) days after the date of any such notice to elect by notice to Buyer to purchase such shares or securities on such terms and at the time the proposed sale is consummated.

(b)  The rights set forth in Section 6.2(a) shall not apply to (i) the issuance of shares or grant of options to purchase shares of Common Stock under Buyer's employee stock purchase and stock option plans, net of repurchases or cancellations and (ii) bona fide business acquisitions.

6.3  Right of First Refusal on Change of Control.

(a)  First Refusal Right.

(i)  Until the earlier of (i) Threshold Date and (ii) three (3) years from the Closing Date, in the event Buyer's Board of Directors has approved an intention to merge with, sell shares representing 50% or more of the voting power of Buyer to, or sell all or substantially all of Buyer's assets to any of the six (6) parties identified by Seller in Schedule 6.3(a) hereof, Buyer shall deliver a notice (an "Acquisition Notice") to Seller, which Acquisition Notice shall be kept confidential by

28.

035

CONFIDENTIAL

SCO1185928

Seller, setting forth the proposed material terms of the merger, sale or acquisition, including the structure and price terms of the merger, sale or acquisition, the name and address of the party proposed to acquire or merge with Buyer and the date on or about which such sale or merger is proposed to be made (the date of such an Acquisition Notice being an "Acquisition Notice Date"). Seller shall have the right of first refusal to acquire or merge with Buyer on the terms set forth in the Acquisition Notice (subject to the valuation provisions of Section 6.3(b) below), as provided in this Section. If the terms in the Acquisition Notice contemplate a tax-free reorganization then Seller's right of first refusal may only be exercised if Seller proposes a tax-free reorganization.

(ii)     Seller shall have until ten (10) days after the later of (i) receipt of an Acquisition Notice and (ii) the date Seller receives notice of the completion of the appraisal of any items included as part of the proposed consideration specified in the Acquisition Notice that are subject to valuation pursuant to Section 6.3(b), to elect by notice to Buyer to acquire or merge with Buyer on the terms set forth in the Acquisition Notice. If Seller notifies the Buyer within such time period of its election to so acquire or merge with Buyer, a closing with respect to such acquisition or merger shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than the later to occur of (i) forty-five (45) days after receipt by Buyer of such notice of Seller's election and (ii) five (5) days after the receipt of any governmental consent or approval necessary for the consummation of such transaction, including, but not limited to, any such approval or consent required under the HSR Act.

(iii)     In the event Seller elects not to exercise the foregoing right of first refusal, Buyer shall have six (6) months to sell Buyer on the same material terms as are set forth in the Acquisition Notice. If Buyer proposes to sell to or merge with one of the identified parties on terms more favorable to such party than those set forth in the notice, or proposes to sell to or merge with one of the identified parties after the six (6) month period, it shall first notify Seller and Seller shall have another opportunity to exercise its right of first refusal.

(b)     Appraisal Procedure.

(i)     Whenever the terms of a proposed sale or merger include forms of consideration other than cash or securities which are traded on a National Exchange (as defined below), Seller shall have the option to exercise its first refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the Acquisition Notice Date, and shall be determined in the manner set forth in clause (ii) below. If an item of consideration constitutes securities which are traded on a National Exchange (as defined below), the value of such items shall be the average of the closing prices of such securities on such exchange during

036

CONFIDENTIAL                                      SCO1185929

(with reference to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading days on such National Exchange prior to the applicable Acquisition Notice Date. If the terms of the proposed sale or merger include securities which are traded on a National Exchange in a tax free reorganization, then Seller's right granted under this Section 6.3 may only be exercised by Seller paying in its own securities where the value is determined on the same basis as set forth in this Section 6.3(b)(ii). If the transaction specified in the Acquisition Notice is a taxable transaction and the form of consideration is in securities traded on a National Exchange, then Seller shall have the option of paying in cash in its own securities where the value is determined on the same basis as set forth in this Section 6.3(b)(ii).

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

(ii)     The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the Acquisition Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.

(c)     Expansion of Seller's Rights Relating to the Licensed Technology upon a Change of Control. Until two (2) years from the Closing Date, in the event Buyer has merged with, sold shares representing 50% or more of the voting power of Buyer to, sold all or substantially all of Buyer's assets to, or engaged voluntarily in any other change of control transaction with, any party identified by Seller on Schedule 6.3(a) hereof, or in the event any party identified by Seller on Schedule 6.3(a) hereof, shall acquire shares representing 50% or more of the voting power of Buyer,

037

CONFIDENTIAL                                    SCO1185930

Seller shall automatically have unlimited, royalty-free, perpetual rights to the Licensed Technology.

6.4    <u>Registration Rights</u>.

(a)    <u>Seller Demand Rights</u>.

(i)    <u>Request for Registration</u>. In case at any time from and after the Closing Buyer shall receive from Seller a written request that Buyer effect any registration with respect to all or a part of the Shares (or any securities issued or issuable in respect of the Shares; collectively, the "Registrable Securities"), <u>provided</u> that the number of Shares (or other securities) designated by Seller to be included in such registration would result in an anticipated aggregate offering price of at least $5,000,000, Buyer will as soon as practicable, use its reasonable commercial efforts to effect such registration (including, without limitation, the execution of an undertaking to file pre-effective and post-effective amendments and supplements, appropriate qualification under the applicable blue sky or other state securities laws and appropriate compliance with exemptive regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of Registrable Securities as are specified in such request; <u>provided</u>, that Buyer shall not be obligated to take any action to effect any such registration after Buyer has effected two registrations pursuant to a request by Seller hereunder. A registration proceeding pursuant to this section which is subsequently withdrawn prior to effectiveness of a registration statement under the Securities Act shall not be considered an effected registration, qualification or compliance for purposes of the two demand registrations to which Seller is entitled.

Subject to the foregoing, Buyer shall file a registration statement covering the Registrable Securities so requested or otherwise elected to be registered as soon as practicable, but in any event within sixty (60) days, after receipt of the request of Seller, <u>provided</u> that Buyer shall have the right to defer such registration for a period of up to ninety (90) days following the receipt of such a request if in the opinion of the Board of Directors of Buyer, it would be seriously detrimental to Buyer for a registration statement to be filed.

(ii)    <u>Underwriting</u>. If Seller intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise Buyer as a part of its request made pursuant to Section 6.4(a)(i). Buyer shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Seller, which underwriter or underwriters shall be reasonably acceptable to Buyer.

CONFIDENTIAL

SCO1185931

(b)    Company Registration.

(i)    Notice of Registration.  If at any time or from time to time after the Closing Buyer shall determine to register any of its securities for its own account (other than a registration relating solely to employee stock option or purchase plans or relating solely to a Rule 145 transaction), Buyer will:

(A)    promptly give to Seller written notice thereof (which shall include a list of the jurisdictions in which Buyer intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

(B)    include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within thirty (30) days after the date of such written notice from Buyer to Seller, except as set forth in Section 6.4(b)(ii).

(ii)    Underwriting.  If the registration of which Buyer gives notice is for a registered public offering involving an underwriting, Buyer shall so advise Seller as a part of the written notice given pursuant to Section 6.4(b)(i)(A).  In such event the right of Seller to registration pursuant to Section 6.4(b) shall be conditioned upon Seller's participation in such underwriting and the inclusion of Seller's Registrable Securities in the underwriting to the extent provided herein.  If Seller proposes to distribute its securities through such underwriting it shall (together with Buyer and other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Buyer.  Notwithstanding any other provision of this Section, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting but in no event shall (i) the amount of Registrable Securities of Seller included in the offering be reduced below twenty-five percent (25%) of the total amount of securities included in such offering or (ii) notwithstanding (i) above, any shares being sold by a shareholder exercising a demand registration right similar to that granted in Section 6.4(a) and granted by Buyer prior to the date of this Agreement be excluded from such offering, and in such situation Seller's shares may be completely excluded from registration.  Buyer shall advise Seller of any such limitations, and the number of Registrable Securities that may be included in the registration.  If Seller disapproves of the terms of any such underwriting, it may elect to withdraw therefrom by written notice to Buyer and the underwriter.  Any Registrable Securities excluded or withdrawn from such underwriting shall not be included in such registration.

**039**

CONFIDENTIAL                                    SCO1185932

(iii)    Notwithstanding anything to the contrary in this Section 6.4(b), Buyer shall not be obligated to effect any registration of securities under this Section 6.4(b) pursuant to a registration statement covering any of its securities to be issued in connection with mergers, acquisitions, exchange offers, dividend reinvestment plans or stock option or other employee benefit plans.

(c)    Expenses of Registration.

(i)    Subject to Sections 6.4(c)(ii) and 6.4(c)(iii), all expenses incurred in connection with any registration pursuant to Section 6.4(a) or 6.4(b), including, without limitation, all registration, filing and qualification fees, printing expenses, fees and disbursements of counsel for Buyer, expenses of complying with state securities or Blue Sky laws (including fees of counsel for Buyer and counsel for the underwriters), accountants' fees and expenses incident to or required by any such registration, expenses incident to the listing of securities on any exchange in which the Registrable Securities are to be listed, expenses of any special audits incidental to or required by such registration.

(ii)    Buyer shall not be required to pay for expenses of any registration proceeding begun pursuant to Section 6.4(a), the request of which has been subsequently withdrawn by Seller, in which case, such expenses shall be borne by Seller; provided that Seller shall not be required to pay (a) for the cost of normal audits of Buyer that would have been performed in any event, and (b) for the time of any executives or other personnel of Buyer involved in the preparation of the registration statement; and provided further, however, that if at the time of such withdrawal, Seller shall have learned of a material adverse change in the Business Condition of Buyer from that known to Seller at the time of its request, then Seller shall not be required to pay any of such expenses.

(iii)    Notwithstanding anything to the contrary elsewhere in this Section 6.4(c), all underwriters' discounts, commissions, or applicable stock transfer and documentary stamp taxes (if any) relating to the sale of Registrable Securities shall be borne by the seller of the Registrable Securities in all cases.

(d)    Registration Procedures.

(i)    In the case of each registration effected by Buyer pursuant to Section 6.4, Buyer will keep Seller advised in writing as to the initiation of each registration and as to the completion thereof. At its expense (except as otherwise provided in Section 6.4(c) above) Buyer will:

(A)    keep such registration effective for a period of six months or until Seller has completed the distribution described in the registration statement relating thereto, whichever first occurs;

CONFIDENTIAL

SCO1185933

(B)    furnish such number of prospectuses and other documents incident thereto as Seller from time to time may reasonably request; and

(C)    notify Seller, (1) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and, with respect to the registration statement or any post-effective amendment, when the same has become effective; (2) of any request by the SEC or any other federal or state governmental authority during the period of effectiveness of the registration statement for amendments or supplements to the registration statement or related prospectus or for additional information relating to the registration statement, (3) of the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose, (4) of the receipt by Buyer of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation of any proceeding for such purpose; or (5) of the happening of any event which makes any statement made in the registration statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or which requires the making of any changes in the registration statement or prospectus so that, in the case of the registration statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(e)    Buyer may, upon the happening of any event (x) of the kind described in clauses (2), (3), (4), or (5) of Section 6.4(d)(i)(C) or (y) that, in the judgment of Buyer's Board of Directors, renders it advisable to suspend use of the prospectus due to pending corporate developments, public filings with the SEC or similar events, suspend use of the prospectus on written notice to Seller, in which case Seller shall discontinue disposition of Registrable Securities covered by the registration statement or prospectus until copies of a supplemented or amended prospectus are distributed to Seller or until Seller is advised in writing by Buyer that the use of the applicable prospectus may be resumed. Buyer shall use its reasonable efforts to ensure that the use of the prospectus may be resumed as soon as practicable. Buyer shall use every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the securities for sale in any jurisdiction, at the earliest practicable moment. Buyer shall prepare as soon as practicable a supplement or post-effective amendment to the registration statement or a supplement to the related prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such prospectus will not contain an

CONFIDENTIAL

SCO1185934

untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

   (f)  <u>Indemnification.</u>

      (i)  Buyer will indemnify and hold harmless Seller, each of its officers and directors, and each person controlling Seller, with respect to which a registration has been effected pursuant to this Section 6.4 and each underwriter, if any, and each person who controls any underwriter of the Registrable Securities held by or issuable to Seller, against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Buyer of the Securities Act or any state securities law or of any rule or regulation promulgated under the Securities Act or any state securities law applicable to Buyer and relating to action or inaction required of Buyer in connection with any such registration, and will reimburse Seller, each of its officers and directors, and each person controlling Seller, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses as reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, provided that Buyer will not be liable in any such case to the extent that any such claim, loss, damage, cost, expense, or liability arises out of or is based on any untrue statement or omission based upon written information furnished to Buyer by an instrument duly executed by Seller or any underwriter and stated to be specifically for use therein.

      (ii)  Seller will, if Registrable Securities held by or issuable to Seller are included in the securities as to which such registration is being effected, indemnify and hold harmless Buyer, each of its directors and officers who sign such registration statement, each underwriter, if any, of Buyer's securities covered by such registration statement, each person who controls Buyer within the meaning of the Securities Act against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement of a material fact contained in any such registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, incident to any such registration, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Seller of the Securities Act or of state securities laws or any rule or regulation promulgated under the Securities Act or any state securities law applicable to Seller and relating to action or inaction required of Seller in connection with any such registration and will reimburse Buyer, such directors, officers, persons or

CONFIDENTIAL

SCO1185935

underwriters for any legal or any other expenses as reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such registration statement, prospectus, in reliance upon and in conformity with written information furnished to Buyer by an instrument duly executed by Seller and stated to be specifically for use therein; provided, however, that the foregoing indemnity agreement is subject to the condition that, insofar as it relates to any such untrue statement or omission made in the preliminary prospectus but eliminated or remedied in the amended prospectus on file with the SEC at the time the registration statement becomes effective or the amended prospectus filed with the SEC pursuant to Rule 424(b) (the "Final Prospectus"), such indemnity agreement shall not inure to the benefit of Buyer, any underwriter or any Holder, if there is no underwriter, if a copy of the Final Prospectus was not furnished to the person or entity asserting the loss, liability, claim or damage at or prior to the time such action is required by the Securities Act.

(iii)    Each party entitled to indemnification under this Section 6.4(e) (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. If any such Indemnified Party shall have been advised by counsel chosen by it that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party and will promptly reimburse such Indemnified Party and any person controlling such Indemnified Party for the reasonable fees and expenses of any counsel retained by the Indemnified Party, it being understood that the Indemnifying Party shall not, in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys for such Indemnified Party or controlling person, which firm shall be designated in writing by the Indemnified Party to the Indemnifying Party.

(g)    Contribution. If the indemnification provided for in Section 6.4(e) is unavailable or insufficient to hold harmless an Indemnified Party thereunder, then each Indemnifying Party thereunder shall contribute to the account paid

CONFIDENTIAL

SCO1185936

or payable by such Indemnified Party as a result of the losses, claims, damages, costs, expenses, liabilities or actions referred to in Section 6.4(e)(i) or (ii), as the case may be in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and the Indemnified Party on the other in connection with statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or the Indemnified Party and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statements or omission. The Parties hereto agree that it would not be just and equitable if contributions pursuant to this Section 6.4(f) were to be determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the first sentence of this Section 6.4(f). The amount paid by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this Section 6.4(f) shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any action or claim which is the subject of this Section 6.4(f). Promptly after receipt by an Indemnified Party of notice of the commencement of any action against such party in respect of which a claim for contribution may be made against an Indemnifying Party under this Section 6.4(f), such Indemnified Party shall notify the Indemnifying Party in writing of the commencement thereof if the notice specified in Section 6.4(e)(iii) has not been given with respect to such action; provided that the omission so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to any Indemnified Party otherwise under this Section 6.4(f), except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(h)    Information by Holder. Seller shall furnish to Buyer such information regarding Seller and the distribution proposed by Seller as Buyer may reasonably request in writing and as shall be required in connection with any registration referred to in this Section 6.4.

(i)    Rule 144 Reporting. With a view to making available to Seller the benefits of certain rules and regulations of SEC which may permit the sale of Registrable Securities to the public without registration, Buyer agrees to:

(i)    make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after ninety (90) days after the effective date of the first registration filed by Buyer which involves a sale of securities of Buyer to the general public;

CONFIDENTIAL    SCO1185937

(ii)    file with the SEC in a timely manner all reports and other documents required of Buyer under the Securities Act and the Exchange Act; and

(iii)    furnish to Seller so long as it owns any Registrable Securities forthwith upon request a written statement by Buyer that it has complied with the reporting requirements of said Rule 144 (at any time after ninety (90) days after the effective date of said first registration statement filed by Buyer), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of Buyer, and such other reports and documents so filed by Buyer as may be reasonably requested in availing Seller of any rule or regulation of the SEC permitting the selling of any such securities without registration.

(j)    Transfer of Registration Rights.  Any registration rights granted by Buyer under this Section 6.4 may be assigned by Seller in connection with the sale by Seller of any Registrable Securities, to a transferee or assignee, who, after such assignment or transfer, holds at least 500,000 shares or all remaining shares of Buyer held prior thereto by Seller, and following such assignment, the assignee shall be entitled to all rights of Seller under this Section 6.4, provided that such assignee agrees in writing to be bound to the obligations of Seller under this Section 6.4.

(k)    Termination of Registration Rights.  All registration rights provided hereunder shall terminate upon the earlier to occur of (a) the tenth anniversary of the Closing and (b) such time as Seller is able to sell all of its Registrable Securities under Rule 144 during any two successive, three-month periods.

(l)    Future Grants of Registration Rights.  Buyer agrees for the benefit of Seller that it will not grant registration rights with respect to any of its securities upon terms more favorable to the holders of such securities than those contained herein.

6.5    Standstill Agreement.

(a)    Standstill.  Notwithstanding any other provision of this Agreement, subject to the exceptions set forth in Section 6.5(b), without the approval of the Board of Directors of Buyer (whether by written consent of the directors or pursuant to a resolution duly adopted by the directors at a meeting of the Board of Directors), Seller (which shall include any affiliate of Seller for purposes of this Section 6.5) shall not, after the Closing Date, acquire "beneficial ownership" (which, for purposes of this Section 6.5, shall have the meaning set forth in Rule 13d-3 of the Exchange Act) of any securities of Buyer entitled to vote with respect to the election of any directors of Buyer ("Voting Securities"), any security convertible into, exchangeable for, or exercisable for, or that may become any Voting Securities or any other right to acquire Voting Securities

045

CONFIDENTIAL                                        SCO1185938

(such Voting Securities and rights to acquire Voting Securities are collectively referred to herein as "Securities").

        (b)     Exceptions to Standstill Provision.

        (i)     Seller may acquire Securities without regard to the limitations set forth in Section 6.5(a) in accordance with the provisions of Section 6.2 or Section 6.3 hereof; and

        (ii)     Seller may, after written notice to Buyer, acquire Securities without regard to the limitations set forth in this Section 6.5 if a bona fide tender or exchange offer is made by any person or 13D Group to acquire Securities that, if added to the Securities (if any) already owned by such person or 13D Group, would represent ownership of Securities greater than fifty percent (50%) of Buyer's then outstanding Securities; provided, however, that Seller shall only be permitted to take such actions and make such offers as may be considered to be of the same nature and type of action or offer and directed to the same person or persons and within the same time period and for the same resulting amount of Securities as that which is being taken by such person or 13D Group; and provided further, that Seller may only acquire that amount of Securities that, when added to the amount of Securities already owned by Seller, shall not exceed the amount of Securities acquired or to be acquired (assuming any offers to purchase have been consummated) by such person or 13D Group. In proceeding with any action or offer permitted under this subsection 6.5(b)(ii), Seller shall be permitted to offer more favorable terms than those terms offered by such person or 13D Group, so long as such terms are substantially consistent with an offer of the same nature and type of consideration as that which is being proposed by such person or 13D Group.

        (c)     Notice of Securities Purchases and Sales.  Seller shall advise Buyer as to its plans to acquire or dispose of beneficial ownership of Securities, or rights thereto, reasonably in advance of any such action.

        (d)     Acts in Concert with Others.  Seller shall not join a partnership, limited partnership, syndicate or other group, or otherwise act in concert with any third person, for the purpose of acquiring, holding, voting or disposing of Securities, or rights thereto.

        (e)     Restrictions on Transfer of Securities.  Seller shall not dispose of beneficial ownership or voting control of Securities or any right thereto, except: (i) in accordance with the provisions of Section 6.7 hereof; (ii) to Buyer or any person or group approved by Buyer; (iii) pursuant to a bona fide public offering registered under the Securities Act (in which Seller does not have the ability to select the purchasers), including any offering pursuant to the registration rights granted in Section 6.4 hereof; (iv) pursuant to Rule 144 under the Securities Act; (v) in transactions not

CONFIDENTIAL

SCO1185939

described in (i), (ii), (iii) or (iv) hereof so long as such transactions do not, directly or indirectly, result in any person or group owning or having the right to acquire beneficial ownership of Securities with aggregate voting power of five percent (5%) or more of the aggregate voting power of all outstanding Securities (assuming the conversion, exchange and/or exercise of all convertible, exchangeable and exercisable securities); or (v) in response to an offer to purchase or exchange for cash or other consideration any Securities that (a) is made by or on behalf of Buyer, or (b) is made by another person or group to all holders of Securities and is not opposed by the Board of Directors of Buyer within the time such Board is required, pursuant to regulations under the Exchange Act, to advise Company shareholders of such Board's position on such offer.

6.6    Buyer's Right of First Refusal

    (a)    First Refusal Right.

        (i)    In the event Seller proposes to sell any Securities, other than in a transaction described in Sections 6.5(e)(ii)-(v), Seller shall deliver a written notice to Buyer setting forth the terms of the proposed sale, including the name of the proposed purchaser and the date on or about which such sale is proposed to be completed. Buyer shall have the right of first refusal to acquire such Securities on the terms set forth in such notice (subject to the valuation provisions of Section 6.7(b) below), as provided in this Section.

        (ii)    Buyer shall have until twenty (20) days after the receipt of such a notice to elect by notice to Seller to acquire all or any portion of such Securities proposed to be sold by Seller on the terms set forth in such notice. If Buyer notifies Seller within such time period of its election to acquire any of such Securities, a closing with respect to such acquisition shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than ten (10) days after receipt by Seller of such notice of Buyer's election.

        (iii)    In the event Buyer elects not to exercise the foregoing right of first refusal, Seller shall have ninety (90) days to sell such Securities on the same terms as are set forth in such notice. If Seller proposes to sell such Securities on terms different than those set forth in the notice, or proposes to sell such Securities after the ninety (90) day period, Seller shall first notify Buyer of such proposed sale, and Seller shall have another opportunity to exercise its right of first refusal under this Section.

    (b)    Appraisal Procedure.

        (i)    Whenever the terms of a proposed sale of Securities include forms of consideration other than cash or securities which are traded on a National Exchange (as defined below), Seller shall have the option to exercise its first

CONFIDENTIAL

SCO1185940

refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the date of the notice delivered pursuant to Section 6.7(a)(i) (the "First Offer Notice Date"), and shall be determined in the manner set forth in Section 6.7(b)(ii) below. If an item of consideration constitutes securities which are traded on a National Exchange (as defined below), the value of such items shall be the average of the closing prices of such securities on such exchange during (with reference to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading days on such National Exchange prior to the First Offer Notice Date.

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

(ii)    The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the First Offer Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.

(c)    <u>Change of Control</u>.  For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated (1) any consolidation or merger of such party in which such party is not the continuing or surviving corporation, or pursuant to which shares of such party's common stock would be converted in whole or in part into cash, other securities or other property, other than a merger of such person in which the holders of such party's common stock immediately prior to the merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the merger, or (2) any sale, lease, exchange or transfer (in one

BPHPA1\RB\0147981.06
09/19/95

41.

CONFIDENTIAL

SCO1185941

transaction or a series of related transactions) of all or substantially all the assets of such party, or (ii) the stockholders of such party shall approve any plan or proposal for the liquidation or dissolution of such party, or (iii) any party, other than such party or a subsidiary thereof or any employee benefit plan sponsored by such party or a subsidiary thereof or a corporation owned, directly or indirectly, by the stockholders of such party in substantially the same proportions as their ownership of stock of such party, shall become the beneficial owner of securities of such party representing greater than fifty percent (50%) of the combined voting power of then outstanding securities ordinarily (and apart from rights accruing in special circumstances) having the right to vote in the election of directors, as a result of a tender or exchange offer, open market purchases, privately negotiated purchases or otherwise, or (iv) at any time after the date of this Agreement, individuals who at the date hereof constituted the Board of Directors of such party shall cease for any reason to constitute at least a majority thereof, unless the election or the nomination for election by such party's stockholders of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the date hereof, or (v) any other event shall occur with respect to such party that would be required to be reported in response to Item 6(e) (or any successor provision) of Schedule 14A of Regulation 14A promulgated under the Exchange Act.

## ARTICLE VII

## TERMINATION, AMENDMENT AND WAIVER

7.1    Termination.  Except as provided in Section 7.2 below, this Agreement may be terminated and the Acquisition abandoned at any time prior to the Closing Date:

(a)    by mutual consent of Seller and Buyer;

(b)    by Buyer or Seller if: (i) the Closing has not occurred by February 29, 1996; (ii) there shall be a final nonappealable order of a federal or state court in effect preventing consummation of the Acquisition; or (iii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Acquisition by any Governmental Entity that would make consummation of the Acquisition illegal;

(c)    by Buyer if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Seller and such breach has not been cured within five (5) business days after written notice to Seller (provided that, no cure period shall be required for a breach which by its nature cannot be cured);

(d)    by Buyer at any time prior to November 1, 1995, if as a result of its due diligence review of the Business subsequent to the date of this Agreement it

CONFIDENTIAL

SCO1185942

discovers a fact or condition existing on the date of this Agreement and not disclosed to Buyer prior to or on the date of this Agreement that Buyer reasonably determines has a material adverse effect on the Business Condition of Seller;

(e)    by Seller at any time prior to November 1, 1995 if as result of its due diligence review of Buyer subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement not disclosed to Seller prior to or on the date of this Agreement that Seller reasonably determines has a material adverse effect on the Business Condition of Buyer;

(f)    by Seller if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Buyer and such breach has not been cured within five (5) business days after written notice to Buyer (provided that, no cure period shall be required for a breach which by its nature cannot be cured).

7.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Buyer or Seller, or their respective officers, directors or shareholders, provided that each party shall remain liable for any breaches of this Agreement prior to its termination.

7.3    Amendment.  This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto.

7.4    Extension; Waiver.  At any time prior to the Closing Date, Buyer on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other party hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

**050**

CONFIDENTIAL

SCO1185943

ARTICLE VIII

INDEMNIFICATION

8.1    <u>Survival of Representations, Warranties and Agreements</u>. Notwithstanding any investigation conducted at any time with regard thereto by or on behalf of either party, no representation or warranty by Seller shall survive the closing of this Agreement and no claim may be brought by any party with respect thereto other than the representation made by Seller in Section 2.10, including any schedules thereto, which shall survive the execution, delivery and performance of this Agreement, and be subject to the provisions of Section 8.2 below, until the first anniversary of the Closing Date.

8.2    <u>Indemnification</u>.    Seller hereby agrees to indemnify and hold harmless Buyer against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys' fees, any and all out-of-pocket expenses incurred in investigating, preparing or defending against any litigation, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation, but only to the extent that the aggregate of the foregoing exceeds $250,000, (collectively "Damages") asserted against, resulting to, imposed upon, or incurred or suffered by Buyer, directly or indirectly, as a result of or arising from any inaccuracy in or breach of the representation and warranty made by Seller in Section 2.10, including schedules thereto ("Identifiable Claims"). Seller's indemnity obligation pursuant to this Article VIII shall in no event exceed, either individually or in the aggregate, $5,000,000.

8.3    <u>Procedure for Indemnification with Respect to Third-Party Claims</u>.

(a)    If Buyer determines to seek indemnification under this Article VIII with respect to Identifiable Claims (the party seeking such indemnification hereinafter referred to as the "Indemnified Party" and the party against whom such indemnification is sought is hereinafter referred to as the "Indemnifying Party") resulting from the assertion of liability by third parties, the Indemnified Party shall give notice to the Indemnifying Party within thirty (30) days of the Indemnified Party becoming aware of any such Identifiable Claim or of facts upon which any such Identifiable Claim will be based; the notice shall set forth such material information with respect thereto as is then reasonably available to the Indemnified Party. In case any such liability is asserted against the Indemnified Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within twenty (20) days after receiving the Indemnified Party's notice, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of

BPHPA1\RB\0147981.06
09/19/95

44.

051

CONFIDENTIAL                                    SCO1185944

such counsel shall be at the sole, unreimbursable expense of the Indemnified Party unless the Indemnified Party does not assume control or the Indemnified Party shall reasonably determine that there is a conflict of interest between Buyer and Seller with respect to such Identifiable Claim, in which case the fees and expenses of such counsel will be borne by the Indemnifying Party, (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing, and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Identifiable Claims resulting from the assertion of liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and, if so, only to the extent that, the Indemnifying Party is prejudiced thereby.  With respect to any assertion of liability by a third party that results in an Identifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(b)     In the event that the Indemnifying Party, within thirty (30) days after receipt of the aforesaid notice of an Identifiable Claim, fails to assume the defense of the Indemnified Party against such Identifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

(c)     Notwithstanding anything in this Section to the contrary, (i) if there is a reasonable probability that an Identifiable Claim may materially and adversely affect the Indemnified Party, other than as a result of money damages or other money payments, the Indemnified Party shall have the right to participate in such defense, compromise or settlement and the Indemnifying Party shall not, without the Indemnified Party's written consent (which consent shall not be unreasonably withheld), settle or compromise any Identifiable Claim or consent to entry of any judgment in respect thereof unless such settlement, compromise or consent includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect of such Identifiable Claim.

## ARTICLE IX

## GENERAL PROVISIONS

9.1     Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via telecopy (with acknowledgment of complete transmission) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

BPHPA1\RB\0147981.06
09/19/95                45.

**052**

CONFIDENTIAL                                    SCO1185945

(a)    if to Buyer, to:
       The Santa Cruz Operation, Inc.
       400 Encinal Street
       P.O. Box 1900
       Santa Cruz, CA  95061-1900
       Attention: Legal Department
       Telecopy No.:  (408) 427-5474

       with a copy to:

       Brobeck, Phleger & Harrison
       Two Embarcadero Place
       2200 Geng Road
       Palo Alto, CA  94303
       Attention:  Edward M. Leonard
       Telecopy No.: (415) 496-2921

(b)    if to Seller, to:

       Novell, Inc.
       122 East 1700 South
       Provo, Utah 84606
       Attention:  David R. Bradford, Esq.
       Telecopy No.:  (801) 228-7077

       with a copy to:

       Wilson Sonsini Goodrich & Rosati
       650 Page Mill Road
       Palo Alto, California 94304
       Attention:  Larry W. Sonsini
       Telecopy No.: (415) 496-4084

    9.2   Survival.  The representations and warranties contained in Section 2 and Section 3 hereof except for the representation of Seller set forth in Section 2.10 shall not survive the closing of the sale of assets and issuance of stock contemplated by this Agreement; provided, however, that the foregoing provision shall not eliminate the rights and remedies of the parties hereto in the case of a willful fraud by the other party provided that the agreed party shall establish all elements of the existence of such fraud by clear and convincing evidence.

SPHPA1\RB\0147981.06
09/19/95

46.

**053**

CONFIDENTIAL

SCO1185946

9.3    Interpretation.  When a reference is made in this Agreement to Schedules or Exhibits, such reference shall be to a Schedule or Exhibit to this Agreement unless otherwise indicated.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.4    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

9.5    Entire Agreement.  This Agreement, and the Schedules and Exhibits hereto: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or remedies hereunder, unless expressly provided otherwise; and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided.

9.6    Severability.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.7    Other Remedies.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

9.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

9.9    Rules of Construction.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of

054

CONFIDENTIAL                                          SCO1185947

construction providing that ambiguities in an agreement or other document will be
construed against the party drafting such agreement or document.

CONFIDENTIAL

SCO1185948

IN WITNESS WHEREOF, Buyer and Seller have caused this Agreement to be signed by their duly authorized respective officers, all as of the date first written above.

THE SANTA CRUZ OPERATION, INC.

By: _____
Name:    Alok Mohan
Title:   Chief Executive Officer

NOVELL, INC.

By: _____
Name:    Robert J. Frankenberg
Title:   Chairman of the Board,
         President and Chief
         Executive Officer

IPWPA1\EB\0147981.06
09/19/95

49.

CONFIDENTIAL                                    SCO1185949

Schedule 1.1(a)
Assets
(Page 1 of 4)

I.   All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code, source documentation, source listings and annotations, appropriate engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include without limitation the following:

## UNIX Source Code Products

A.   UnixWare 2.0 as described in the UnixWare 2.0 Licensing Schedule and those products listed as "prior" products on such schedule (includes source code updates where appropriate - i.e. UnixWare product family).

B.   UNIX SVR4.1 ES as described in the UNIX SVR4.1 ES Licensing Schedule and those products listed as "prior" products on such schedule

C.   UNIX SVR4.0MP as described in the UNIX SVR4.0 MP Licensing Schedule and those products listed as "prior" products on such schedule.

D.   Ancillary SVRx Products (a final list of which shall be developed by the parties prior to the Closing)

## Binary Product Releases

A.   UnixWare 2.01 Product Family as described by the Novell UnixWare 2.01 Part/Price List

B.   UnixWare 2.0.x update releases

C.   UnixWare 1.1 Product Family as described by the Novell UnixWare 1.1 Part/Price List

D.   UnixWare 1.1.x - update releases

## Products Under Development

A.   UnixWare 2.1 (Eiger) - contains NetWare UNIX Client and Server capabilities

B.   UnixWare 2.1 Oracle Parallel Server (OPS)

C.   UnixWare 2.03 - maintenance update under development

D.   UnixWare 2.0.x/2.1 Enhanced Mode Merge

E.   UnixWare 2 Internet Server

**057**

<u>Schedule 1.1(a)</u>
Assets
(Page 2 of 4)

## <u>Other Technology</u>

A.   UnixWare system/HBA/etc. Test/Certification Suites Used by Novell Labs
B.   UnixWare "OS Branding" Test Suites
C.   UnixWare "OS Compatible" Requirements
D.   Gaede Performance Test suite
E.   ARTUS, Bart, Buster Internal UNIX Test suites and test harnesses
F.   UnixWare Training/Education Courseware
G.   Requirements, Design, and Test Specifications for UnixWare 2
H.   Technical Support Update Manager
I.   Marketing collateral/information in electronic form
J.   ODI Transmogrification software

II.   All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

III.   All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable), including without limitation:

A.   Joint Development with third parties:

1.   In-Process development agreements
2.   Past development agreements with on-going pricing discounts
3.   Past development agreements without ongoing pricing discounts
4.   Joint development agreements in which Seller didn't get full rights to the code developed.

B.   Third party software license agreements - Those agreements in which Seller pays per copy fees for technology/products which are shipped with or to be used with UNIX System and/or UnixWare.

C.   Joint marketing agreements - Marketing programs with customers.

D.   End user MLA agreements - Agreements to allow end users to copy binary products for internal use only. Associated with these agreements are support requirements.

E.   UNIX-only VAR agreements - UNIX Masters VARs

SDW::ODMA\PCDOCS\SQL2\89406\1

058

CONFIDENTIAL

SCO1185951

Schedule 1.1(a)
Assets
(Page 3 of 4)

F.    Support agreements - End user support agreements (i.e., TMAC, NALCOMIS)

G.    Microsoft agreement (Xenix Agreement) - Xenix compatibility and per copy fee agreement. Seller will agree to discuss with SCO Seller's interpretation of this agreement.

H.    Microsoft Agreement (Extra-Ordinary Discount) - Microsoft's additional discount beyond 80%.

I.    Strategic Relationship Agreements (i.e. MTA, ECPA, MBA, etc.)

J.    Out-sourced development (i.e., India) - Development agreements with third parties (Wipro and HCL) and India Development Center. IDC is a Seller subsidiary.

K.    Out-sourced Support Agreements

L.    Software and Sublicensing Agreements - This includes the source code and sublicensing agreements that Seller has with its OEM, End User and Educational customers. The total number of these agreements is approximately 30,000.

M.    OEM Binary Licensing Agreements - OEM distribution of UnixWare with Seller's agreement to include some OEM added value into future releases of UnixWare.

IV.    All copies of UNIX and UnixWare, wherever located, owned by Seller.

V.    Intellectual property - Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark).

VI.    All contracts relating to the SVRX Licenses listed below:

   - UNIX System V Release 4.2 MP, Intel386 Implementation
   - #UNIX System V Release 4.2 MP International Edition, Intel386 Implementation
   - UNIX System V Release 4.2, Intel386 Implementation
   - #UNIX System V Release 4.2 International Edition, Intel386 Implementation
   - UNIX System V Release 4.1 ES, Intel386 Implementation
   - #UNIX System V Release 4.1 ES International Edition, Intel386 Implementation

SDW::ODMA\PCDOCS\SQL2\89406\1

**059**

CONFIDENTIAL                                                  SCO1185952

Schedule 1.1(a)
Assets
(Page 4 of 4)

- UNIX System V Release 4.0 MP, Intel386 Implementation
- #UNIX System V Release 4.0 MP International Edition, Intel386 Implementation
- UNIX System V Release 4.0 MP, Intel386 Version 4 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 4 Implementation
- UNIX System V Release 4.0, Intel386 Version 3 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 3 Implementation
- UNIX System V Release 4.0, Intel386 Version 2 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 2 Implementation
- UNIX System V Release 4.0, Intel386 Version 1 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 1 Implementation
- UNIX System V/386 Release 3.2 and #UNIX System V/386 Release 3.2 International
  Edition
- UNIX System V Release 3.2 and #UNIX System V Release 3.2 International Edition
- UNIX System V Release 3.1 and #UNIX System V Release 3.1 International Edition
- UNIX System V Release 3.0 and #UNIX System V Release 3.0 International Edition
- All prior releases and versions of UNIX System V Release 2.1
- #All prior releases and versions of UNIX System V Release 2.1 International Editions
- All prior releases and versions of UNIX System V Release 2.0
- #All prior releases and versions of UNIX System V Release 2.0 International Editions
- All prior UNIX System releases and versions preceding UNIX System V Release 2.0
- #All prior UNIX System releases and versions preceding UNIX System V Release 2.0
  International Editions

VII.     Such office furniture and personal computers or work stations as may be currently used by the
         employees of Seller hired by Buyer pursuant to Section 4.13 hereof.

CONFIDENTIAL                                    SCO1185953

Schedule 1.1(b)
Excluded Assets
(Page 1 of 2)

I.    Any asset not listed on Schedule 1.1(a), including without limitation any asset which pertains to NetWare which is not listed on Schedule 1.1(a)

II.    NetWare Operating System and Services

III.    TUXEDO Transaction Processing

IV.    Licensed technology, including:

    A.    NetWare and other Novell code contained in UnixWare 2.01 and Eiger:

        1.    ODI Software contained in NetWare and UnixWare LAN Drive Test Kit
        2.    Nprinter (for printing from NetWare to UnixWare Server)
        3.    NUC (NetWare UNIX Client - for print, etc. from UnixWare to NetWare Server)
        4.    TNVT, Host Presenter (Terminal Emulation to Log into UnixWare Server from NetWare Client)
        5.    MHS Gateway (Mail Gateway)
        6.    IPX/SPX (Re-Write of Native 4.1)
        7.    ODI (Networking driver protocol; version 3.3 of assembly Spec and 1.0 of C Spec)
        8.    Xconsole (Log-in to NetWare console)
        9.    UnixWare TSA (SMS is back-up and restore, TSA is the 'agent' needed to do this)
        10.    Some NetWare Client APIs
        11.    DR-DOS
        12.    Host Presenter (*Binary only*)
        13.    TNVT (*Binary only*)
        14.    criptor (*Binary only*)
        15.    NetWare NLM (*Binary only*)

    B.    NetWare code contained in Eiger Only:

        1.    NDS APIs
        2.    NWS (Incl. NetWare File, Print and Directory Services)

    C.    NetWare 4.1 for UnixWare

**061**

SCO1185954

Schedule 1.1(b)
Excluded Assets
(Page 2 of 2)


V.    Intellectual Property:

      A.    All copyrights and trademarks, except for the trademarks UNIX and UnixWare.

      B.    All Patents

VI.   Existing Master License Agreements with end users which include, in addition to other
      products of Seller, integrated delivery of UnixWare.

VII.  All accounts receivable or rights to payment concerning the Assets arising prior to the Closing
      Date.

VIII. All right, title and interest to the SVRx Royalties, less the 5% fee for administering the
      collection thereof pursuant to Section 4.16 hereof.

SDW::ODMA\PCDOCS\SQLZ\89375\1                                                          **062**

Schedule 1.1(c)

Assumed Liabilities

1.   All obligations, whether existing on the date hereof or arising hereafter, under the assigned contracts listed on Schedule 1.1(a).

2.   All obligations relating to the Business which arise subsequent to the Closing Date.

3.   Obligation of product support and customer service concerning UnixWare and Eiger.

**063**

CONFIDENTIAL

## SCHEDULE 1.2(b)

Buyer shall make payments of the royalties in accordance with the structure set forth below.

(a)    <u>Royalty-Bearing Products</u>. Royalties shall be paid on sales of the following products by Buyer (the "Royalty-Bearing Products"):

(i)    UnixWare

(ii)    Eiger

(iii)    MXU

(iv)    White Box

(v)    any derivative, upgrades, updates or new releases of (i) through (iv) above.

(b)    <u>Amount of Royalties</u>. Concurrent with the execution of this Agreement, Seller has delivered to Buyer a business plan provided by Seller to Buyer on September 11, 1995 including an annual forecast by Seller of the potential estimated market for UnixWare, Eiger, MXU and White Box (the "Plan"). The amount of royalties shall be as follows:

(i) Royalties on UnixWare, Eiger, MXU and derivatives ("UW Products"):

(a)    No royalties shall be payable in connection with any of the UW Products until Buyer shall have shipped or licensed, in any year, 40% of the units contemplated by the Plan for such year;

(b) Buyer shall pay royalties equal to $30.00 per net unit in connection with each and every net unit of UW Products shipped or licensed by Buyer over and above 40% and less than 70% of the total units contemplated by the Plan for such year;

(c) Buyer shall pay royalties equal to $60.00 per net unit in connection with each and every net unit of UW Products shipped or licensed by Buyer over and above 70% of the total units contemplated by the Plan for such year.

8PHPA1\JPH\0148738.WP    -

**064**

(ii) Royalties on White Box:

(a) No royalties shall be payable in connection with any of the White Box units until Buyer shall have shipped or licensed 50% of the White Box units contemplated by the Plan for such year.

(b) Buyer shall pay royalties equal to $20.00 per net unit in connection with each and every net unit of White Box product shipped or licensed by Buyer over and above 50% of the total units contemplated by the Plan for such year.

(iii) Net Units shall mean total gross shipments minus returns and evaluation and demonstration units (on which revenue is not received).

(c) Termination of Royalty Obligations. The royalty obligations set forth in subsection (b) above will terminate (i) after Buyer shall have made aggregate cumulative payments to Seller equal to such amount which has a total net present value of $ 84,000,000 (determined as of the date of Closing) or (ii) December 31, 2002, whichever is sooner. A discount rate of 15% will be used to calculate the net present value.

(d) Annual Cap: Carryover Provisions. In the event that Buyer's net shipments and licenses of UW Products shall reach or exceed 130% of the units contemplated by the Plan for such year, Buyer shall not have royalty obligations in connection with such shipments or licenses over such 130% threshold (the "Annual Cap"). In the event that the actual sale and license of units of UW Products fail to reach 40% of the Plan for any given year as contemplated by (b)(i) above, then 30% of the Plan units for such year may be carried forward and added to the following year solely for the purposes of determining the Annual Cap on royalties for such subsequent year.

(e) Protective Provisions. In the event that the pricing of royalties set forth herein shall cause Buyer to become unprofitable or substantially non-competitive in the marketplace, management of Buyer and Seller will meet to negotiate a mutually acceptable adjustment so as to support the economic viability of Buyer.

(f) SVRx Converted Units. The parties agree that SCO will have the opportunity to convert existing SVRx-based customers to a UnixWare derived product, thus depriving Seller of the economic benefit of the SVRx licenses. The process for determining if a customer is validly converted is as follows:

The conversion of an SVRx customer to UnixWare will validly occur and result in the UnixWare based revenue flowing to SCO, without giving rise to a continued obligation to make payment to Seller of royalties due under the SVRx licenses, only if the following are true (note: if the customer continues to sell their SVRx based product separately, then these SVRx revenues continue to flow to Novell):

8PHPA1\JPH\0148738.WP

**065**

SCO1185958