Date and (ii) all Taxes attributable to, levied or imposed upon, or incurred in connection with the Seller's business operations, other than the Business, following the Closing Date.

4.15   Bulk Sales.  Buyer hereby agrees to waive the requirement, if any, that Seller comply with any bulk transfer law which may be applicable to the transactions contemplated by this Agreement; provided, that Seller agrees to indemnify and hold harmless Buyer with respect to any noncompliance with such laws and Buyer's waiver with respect thereto.

[4.16   SVRX Licenses.]

{4.16 SVRX Licenses.}[(i)] Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and {such amounts hereafter called} [referred to herein as] "SVRX Royalties").  Within 45 days of the end of each fiscal quarter of Buyer, Buyer shall deliver to Seller or Seller's assignee 95% of any SVRX Royalties collected in the immediately preceding quarter.  Buyer shall diligently seek to collect all such royalties, funds and other amounts when due [(and shall investigate and perform appropriate auditing and enforcement under such agreements at Buyer's cost)].

[(ii)] Buyer shall not, and shall not have the authority to amend, modify or waive any right under or assign any {SVRX} [SVRx] License without the prior written consent of Seller. {[]In addition, at Seller's sole discretion, and at Seller's direction, Buyer shall amend, [supplement,] modify or waive any rights under, or shall assign any rights to, any such SVRX License to the extent so directed {by Seller.}

}[in any manner or respect by Seller.] Buyer shall not, and shall have no right to, enter into future licenses or amendments of the SVRX technologies, except as may be incidenlly involved through its rights to sell and license UnixWare, Eiger or the Merger Product or future versions thereof.

[(iii)]   Seller further covenants that neither it, nor any of its officers, directors or employees shall {(i)} [(a)] take any [material] action [designed] to promote the sale of SVRX products or {(ii)}[(b)] provide {any} [material] compensation to any employee designed {to incentize} [and intended to incentivize] such employee to promote the sale of SVRX products[, except for actions incidental to unrelated business activities of Seller].

4.17   Audited Financials.  {Seller shall deliver to Buyer within days of this Agreement audited , for the periods ended with respect to the Business.} [The parties shall work diligently together to prepare audited financial statements relating to the Business as may be required for Buyer's financial reporting requirements under the

BPHPA1\RB\0147981.04
09/16/95                                          24.

[handwritten:] In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller should, and hereby is granted, the right to take any action on its own behalf. (RB)

[handwritten margin note:] authorized

NOV 000042765

Dockets.Justia.com

federal securities laws. The costs associated with preparation of any required audited financial statements shall be shared equally between Seller and Buyer.]

[4.18 Standstill Agreement. Buyer and Seller shall have entered into the Standstill] [4.18    Development of Merged Product. Following the Closing, Buyer shall diligently and vigorously market, sell and promote the Business. In addition, Buyer shall use its commercially reasonable efforts to complete the Merged Product (as such term is defined in the Operating] Agreement attached hereto as Exhibit [5.1(c)) by a date not later than December 31, 1997 to be agreed upon by Buyer and Seller. Buyer shall be entitled to modify the specifications of the Merged Product provided that any modification (i) is approved by the Architecture Board described in Section 3(e) of the Operating Agreement, (ii) does not impact upon the anticipated migration of Seller's customers to the Merged Product or (iii) eases the anticipated migration of the Merger Product to the White Box Product (as such term is defined in the Operating Agreement). Notwithstanding the foregoing, Buyer shall not change the specifications of the Merged Product such that the Merged Product will not include the "NetWare services" specification set forth on Exhibit ___ of the Operating Agreement.] [4.18.

4.19 Right of Repurchase. [To Come]]

## ARTICLE V

## CONDITIONS TO THE ACQUISITION

5.1    Conditions to Obligations of Each Party to Effect the Acquisition. The respective obligations of each party to this Agreement to effect the Acquisition shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    No Injunctions or Restraints; Illegality. No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Acquisition shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending, nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Acquisition, which makes the consummation of the Acquisition illegal.

(b)    The waiting period under the Hart-Scott-Rodino Antitrust Improvement Act shall have expired.

(c)    The parties shall have entered into an Operating Agreement [on substantially] [including] the terms attached hereto as Exhibit [5.10(c).] [5.1(c).

NOV 000042766

Certain terms contained herein are defined in the Operating Agreement, and therefore a non-binding form of the Operating Agreement is also attached hereto for definitional purposes only.]

5.2    Additional Conditions to Obligations of Seller.  The obligations of Seller to consummate and effect this Agreement and the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Seller:

(a)    Representations, Warranties and Covenants.  The representations and warranties of Buyer in this Agreement (as may be modified by the [subsequent] [Subsequent] Buyer Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Buyer shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it in all material respects as of the Closing Date.

(b)    Certificate of Buyer.  Seller shall have been provided with a certificate duly executed on behalf of Buyer to the effect that, as of the Closing Date:

(i)    all representations and warranties made by Buyer in this Agreement are true and complete in all material respects;

(ii)    all covenants, obligations and conditions of this Agreement to be performed by Buyer on or before such date have been so performed in all material respects; and

(iii)    there are no pending negotiations with respect to any offer to acquire all or any portion of the business of Buyer.

(c)    Legal Opinion.  Seller shall have received a legal opinion from legal counsel to Buyer, in form and substance reasonably satisfactory to Seller[, relating to due authority, execution and validity and similar matters].

(d)    No Material Adverse Change.  There shall not have occurred any material adverse change in the Business Condition of Buyer between the date of this Agreement and the Closing Date.

[(e) Fairness Opinion. Seller shall have received a fairness opinion from Morgan Stanley in a form satisfactory to Seller.]

5.3    Additional Conditions to the Obligations of Buyer.  The obligations of Buyer to consummate and effect this Agreement and the transactions contemplated

BPNPA1\RB\0147981.04
09/16/95

26.

NOV 000042767

hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Buyer:

(a)     Representations, Warranties and Covenants.  The representations and warranties of Seller in this Agreement (as may be modified by the Subsequent Seller Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Seller shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it as of the Closing Date in all material respects.

(b)     Certificate of Seller.  Buyer shall have been provided with a certificate executed on behalf of Seller by its Chief Executive Officer to the effect that, as of the Closing Date:

(i)     all representations and warranties made by Seller in this Agreement are true and complete in all material respects; and

(ii)     all covenants, obligations and conditions of this Agreement to be performed by Seller on or before such date have been so performed in all material respects.

(c)     Legal Opinion.  Buyer shall have received a legal opinion from legal counsel to Seller, in form and substance reasonably satisfactory to Buyer.

(d)     No Material Adverse Changes.  There shall not have occurred any material adverse change in the Business Condition of the Business between the date of this Agreement and the Closing Date.

{(e) Fairness Opinion. Buyer shall have received a fairness opinion from Hambrecht and Quist in a form satisfactory to Buyer.}

{(f) Standstill Agreement. Buyer and Seller shall have entered into the Standstill Agreement attached hereto as Exhibit 4.18.}

## ARTICLE VI

## CERTAIN CORPORATE GOVERNANCE MATTERS

6.1     Nomination of Director to Buyer's Board of Directors.  As of the Closing and thereafter until such time as Seller together with its affiliates shall cease to own more than 5% of the outstanding shares of Common Stock of Buyer (the "Threshold Date") [and except as set forth further below], Buyer shall cause one individual

BPHPA1\RB\0147981.04
09/16/95

27.

NOV 000042768

designated by Seller (the "Seller Designee") to be nominated for election to the Board of Directors of Buyer, which Seller Designee shall be a Senior Executive Officer or outside board member of Seller and reasonably acceptable to Buyer.  In the event that the Seller Designee shall be elected as a director of Buyer, but shall cease to serve as a director of Buyer prior to the Threshold Date, Seller shall have the right to designate another individual to fill the vacancy created by such cessation in order to serve as a member of the Board of Directors of Buyer.  The right to {a board seat} [nomination for election to Buyer's Board of Directors] as set forth in Section 6.1 shall {also} terminate in the event that Seller's core products become directly competitive with Buyer.

6.2   Right to Maintain.

(a)    Until the earlier to occur of (i) Threshold Date; (ii) Seller's core products {become} [becoming] competitive with Buyer or (iii) the expiration of three years from the date of this Agreement, in the event (including a public offering), Buyer desires to sell and issue shares of its capital stock or rights, options or other securities exercisable for or convertible into shares of its capital stock (directly or indirectly) and whether or not such right or option is immediately exercisable or convertible, then Buyer shall first notify Seller of the material terms of the proposed sale and shall permit Seller to acquire, at the time of consummation such proposed issuance and sale and on such terms as are specified in Buyer's notice to Seller, such number of the shares of capital stock or other securities of Buyer proposed to be issued as would be required to enable Seller to maintain its voting and ownership rights in Buyer following such issuance, on a percentage basis, at a level maintained by it immediately prior to such proposed issuance.  Seller shall have ten (10) days after the date of any such notice to elect by notice to Buyer to purchase such shares or securities on such terms and at the time the proposed sale is consummated.

(b)    The rights set forth in Section 6.2(a) shall not apply to (i) the issuance of shares or grant of options to purchase shares of Common Stock under Buyer's employee stock purchase and stock option plans, net of repurchases or {cancellations; (ii) Rule 145 transactions, and (iii)}  [cancellation and (ii) bona fide business acquisitions].

6.3   Right of First Refusal on Change of Control.

(a)    First Refusal Right.

(i)    Until the earlier of (i) Threshold Date and (ii) three (3) years from the Closing Date, in the event Buyer's Board of Directors has approved an intention to merge with, sell shares representing 50% or more of the voting power of Buyer to, or sell all or substantially all of Buyer's assets to any of the six (6) parties identified by Seller in Schedule 6.3(a) hereof, Buyer shall deliver a notice (an "Acquisition Notice") to Seller [, which Acquisition Notice shall be kept confidential by


NOV 000042769

Seller,] setting forth the proposed material terms of the merger, sale or acquisition, including the structure and price terms of the merger, sale or acquisition, the name and address of the party proposed to acquire or merge with Buyer and the date on or about which such sale or merger is proposed to be made (the date of such an Acquisition Notice being an "Acquisition Notice Date"). Seller shall have the right of first refusal to acquire or merge with Buyer on the terms set forth in the Acquisition Notice (subject to the valuation provisions of Section 6.3(b) below), as provided in this Section.

(ii)     Seller shall have until ten (10) days after the later of (i) receipt of an Acquisition Notice and (ii) the date Seller receives notice of the completion of the appraisal of any items included as part of the proposed consideration specified in the Acquisition Notice that are subject to valuation pursuant to Section 6.3(b), to elect by notice to Buyer to acquire or merge with Buyer on the terms set forth in the Acquisition Notice. If Seller notifies the Buyer within such time period of its election to so acquire or merge with Buyer, a closing with respect to such acquisition or merger shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than the later to occur of (i) forty-five (45) days after receipt by Buyer of such notice of Seller's election and (ii) five (5) days after the receipt of any governmental consent or approval necessary for the consummation of such transaction, including, but not limited to, any such approval or consent required under the HSR Act.

(iii)     In the event Seller elects not to exercise the foregoing right of first refusal, Buyer shall have six (6) months to sell Buyer on the same material terms as are set forth in the Acquisition Notice. If Buyer proposes to sell to or merge with one of the identified parties on terms more favorable to such party than those set forth in the notice, or proposes to sell to or merge with one of the identified parties after the six (6) month period, it shall first notify Seller and Seller shall have another opportunity to exercise its right of first refusal.

(b)     Appraisal Procedure.

(i)     Whenever the terms of a proposed sale or merger include forms of consideration other than cash or securities which are traded on a National Exchange (as defined below), Seller shall have the option to exercise its first refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the Acquisition Notice Date, and shall be determined in the manner set forth in clause (ii)(-) below. If an item of consideration constitutes securities which are traded on a National Exchange (as defined below), the value of such items shall be [determined by taking] the average of the closing prices of such securities on such exchange during (with reference to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading

BPHPA1\R8\0147981.04
09/16/95

29.


NOV 000042770

days on such National Exchange prior to the applicable Acquisition Notice Date [and Seller shall have the option of paying in cash or in its own securities where the value is determined on the same basis].

        For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

        (ii)    The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the Acquisition Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.

        [(e)    Expansion of the License Agreement upon a Change of Control. Until two (2) years from the Closing Date, in the event Buyer's Board of Directors has approved an intention to merge with, sell shares representing 50% or more of the voting power of Buyer to, sell all or substantially all of Buyer's assets to, or engage voluntarily in any other change of control transaction with, any party or any affiliate of any party identified by Seller on Schedule 6.3(a) hereof and Seller has not exercised its Right of First Refusal pursuant to Section 6.3(a), or in the event any party or any affiliate of any party identified by Seller on Schedule 6.3(a) shall acquire shares representing 50% or more of the voting power of Buyer, the License Agreement shall automatically become an unlimited, royalty-free perpetual license.]

        6.4    Registration Rights.

        (a)    Seller Demand Rights.

NOV 000042771

(i)     Request for Registration. In case at any time from and after the Closing, Buyer shall receive from Seller a written request that Buyer effect any registration with respect to all or a part of the Shares (or any securities issued or issuable in respect of the shares; collectively, the "Registrable Securities"), provided that the number of Shares (or other securities) designated by Seller to be included in such registration would result in an anticipated aggregate offering price of at least $5,000,000, Buyer will as soon as practicable, use its {diligent best} [reasonable commercial] efforts to effect such registration (including, without limitation, the execution of an undertaking to file pre(b)-effective and post-effective amendments and supplements, appropriate qualification under the applicable blue sky or other state securities laws and appropriate compliance with exemptive regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of Registrable Securities as are specified in such request; provided, that Buyer shall not be obligated to take any action to effect any such registration pursuant to this Section after Buyer has effected {three} [two] registrations pursuant to a request by Seller under this Section. A registration proceeding pursuant to this Section which is subsequently withdrawn prior to effectiveness of a registration statement under the Securities Act shall not be considered an effected registration, qualification or compliance for purposes of this Section.

Subject to the foregoing provisions, Buyer shall file a registration statement covering the Registrable Securities so requested or otherwise elected to be registered as soon as practicable, but in any event within sixty days, after receipt of the request of Seller, provided that Buyer shall have the right to defer such registration for a period of up to ninety (90) days following the receipt of such a request if in the opinion of the Board of Directors of Buyer, it would be seriously detrimental to Buyer for a registration statement to be filed.

(ii)     Underwriting. If Seller intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise Buyer as a part of its request made pursuant to Section {6.5(a)(i)} [4.5(a)(i)]. Buyer shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Seller [and reasonably acceptable to Buyer].

(b)     Company Registration.

(i)     Notice of Registration. If at any time or from time to time after the Closing, Buyer shall determine to register any of its securities, for its own account (other than a registration relating solely to employee stock option or purchase plans or relating solely to a Rule 145 transaction), Buyer will:

BPHPA5\RB\0147951.04
09/16/95                    31.

NOV 000042772

         (A)     promptly give to Seller written notice thereof (which shall include a list of the jurisdictions in which Buyer intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

         (B)     include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within thirty (30) days after the date of such written notice from Buyer to Seller, except as set forth in Section ~~[6.5(b)(ii)]~~ [6.4(b)(ii)].

         (ii)     <u>Underwriting.</u> If the registration of which Buyer gives notice is for a registered public offering involving an underwriting, Buyer shall so advise Seller as a part of the written notice given pursuant to Section ~~[6.5(b)(i)(A)]~~ [6.4(b)(i)(A)]. In such event the right of Seller to registration pursuant to Section ~~[6.5(b)]~~ [6.4(b)] shall be conditioned upon Seller's participation in such underwriting and the inclusion of Seller's Registrable Securities in the underwriting to the extent provided herein. If Seller proposes to distribute its securities through such underwriting it shall (together with Buyer and other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Buyer. Notwithstanding any other provision of this Section, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting ~~[on a pro rata basis based on the total number of Registrable Securities held by Seller and based on the total number of securities being offered by Buyer for its own account]~~ [but in no event shall (i) the amount of securities of Seller included in the offering be reduced below twenty-five percent (25%) of the total amount of securities included in such offering or (ii) notwithstanding (i) above, any shares being sold by a shareholder exercising a demand registration right similar to that granted in Section 6.4(a) be excluded from such offering]. Buyer shall advise Seller of any such limitations, and the number of Registrable Securities that may be included in the registration. If Seller disapproves of the terms of any such underwriting, it may elect to withdraw therefrom by written notice to Buyer and the underwriter. Any Registrable Securities excluded or withdrawn from such underwriting shall not be included in such registration.

         (iii)     Notwithstanding anything to the contrary in this Section ~~[6.5(b)]~~ [6.4(b)], Buyer shall not be obligated to effect any registration of securities under this Section ~~[6.5(b)]~~ [6.4(b)] pursuant to a registration statement covering any of its securities to be issued in connection with mergers, acquisitions, exchange offers, dividend reinvestment plans or stock option or other employee benefit plans.

        (c)     <u>Expenses of Registration.</u>

NOV 000042773

(i)    Subject to Sections {6.5(c)(ii) and 6.5(c)(iii)} [6.4(c)(ii) and 6.4(c)(iii)], all expenses incurred in connection with any registration pursuant to Section {6.5(a)} [6.4(a)] or {6.5(b)} [6.4(b)], including, without limitation, all registration, filing and qualification fees, printing expenses, fees and disbursements of counsel for Buyer, expenses of complying with state securities or Blue Sky laws (including fees of counsel for Buyer and counsel for the underwriters), accountants' fees and expenses incident to or required by any such registration, expenses incident to the listing of securities on any exchange in which the Registrable Securities are to be listed, expenses of any special audits incidental to or required by such registration {and the fees and disbursements of one counsel retained by Seller shall be borne by Buyer}.

(ii)    Buyer shall not be required to pay for expenses of any registration proceeding begun pursuant to Section {6.5(a)} [6.4(a)], the request of which has been subsequently withdrawn by Seller, in which case, such expenses shall be borne by Seller; provided that Seller shall not be required to pay (a) for the cost of normal audits of Buyer that would have been performed in any event, and (b) for the time of any executives or other personnel of Buyer involved in the preparation of the registration statement; and provided further, however, that if at the time of such withdrawal, Seller shall have learned of a material adverse change in the Business Condition of Buyer from that known to Seller at the time of its request, then Seller shall not be required to pay any of such expenses.

(iii)    Notwithstanding anything to the contrary elsewhere in this Section {6.5(c)} [6.4(c)], all underwriters' discounts, commissions, or applicable stock transfer and documentary stamp taxes (if any) relating to the sale of Registrable Securities shall be borne by the seller of the Registrable Securities in all cases.

(d)    Registration Procedures.

(i)    In the case of each registration effected by Buyer pursuant to Section {6.5} [6.4], Buyer will keep Seller advised in writing as to the initiation of each registration and as to the completion thereof. At its expense (except as otherwise provided in Section {6.5(c)} [6.4(c)] above) Buyer will:

(A)    keep such registration effective for a period of six months or until Seller has completed the distribution described in the registration statement relating thereto, whichever first occurs;

(B)    furnish such number of prospectuses and other documents incident thereto as Seller from time to time may reasonably request; and

(C)    notify Seller, (1) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and, with respect to the registration statement or any post-effective amendment, when the same has become

GPHPA1\RR\0147931.04
09/16/95

33.

NOV 000042774

effective; (2) of any request by the SEC or any other federal or state governmental authority during the period of effectiveness of the registration statement for amendments or supplements to the registration statement or related prospectus or for additional information relating to the registration statement, (3) of the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose, (4) of the receipt by Buyer of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation of any proceeding for such purpose; or (5) of the happening of any event which makes any statement made in the registration statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or which requires the making of any changes in the registration statement or prospectus so that, in the case of the registration statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(e)    Buyer may, upon the happening of any event (x) of the kind described in clauses (2), (3), (4), or (5) of Section ~~[6.5(d)(i)(C)]~~ [6.4(d)(i)(C)] or (y) that, in the judgment of Buyer's Board of Directors, renders it advisable to suspend use of the prospectus due to pending corporate developments, public filings with the SEC or similar events, suspend use of the prospectus on written notice to Seller ~~[for no more than thirty days in the aggregate in any six-month period of time]~~, in which case Seller shall discontinue disposition of Registrable Securities covered by the registration statement or prospectus until copies of a supplemented or amended prospectus are distributed to Seller or until Seller is advised in writing by Buyer that the use of the applicable prospectus may be resumed. Buyer shall use its reasonable efforts to ensure that the use of the prospectus may be resumed as soon as practicable. Buyer shall use every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the securities for sale in any jurisdiction, at the earliest practicable moment. Buyer shall prepare as soon as practicable a supplement or post-effective amendment to the registration statement or a supplement to the related prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(f)    Indemnification.

BPHPA1\RB\0147981.04
09/16/95

34.



NOV 000042775

(i)    Buyer will indemnify and hold harmless Seller, each of its officers and directors, and each person controlling Seller, with respect to a registration has been effected pursuant to this Section {6.5} [6.4] and each underwriter, if any, and each person who controls any underwriter of the Registrable Securities held by or issuable to Seller, against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto,{ offering circular or other documents (including any related registration statement, notification or the like) incident to any such registration,} or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Buyer of the Securities Act or any state securities law or of any rule or regulation promulgated under the Securities Act or any state securities law applicable to Buyer and relating to action or inaction required of Buyer in connection with any such registration, and will reimburse Seller, each of its officers and directors, and each person controlling Seller, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses [as] reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, provided that Buyer will not be liable in any such case to the extent that any such claim, loss, damage, cost, expense, or liability arises out of or is based on any untrue statement or omission based upon written information furnished to Buyer by an instrument duly executed by Seller or any underwriter and stated to be specifically for use therein.

(ii)    Seller will, if Registrable Securities held by or issuable to Seller are included in the securities as to which such registration is being effected, indemnify and hold harmless Buyer, each of its directors and officers who sign such registration statement, each underwriter, if any, of Buyer's securities covered by such registration statement, each person who controls Buyer within the meaning of the Securities Act against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement of a material fact contained in any such registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, {offering circular or other documents (including any related registration statement, notification or the like)} incident to any such registration, or based on any omission [(or alleged omission)] to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, [or any violation by Seller of the Securities Act or of state securities law or any rule or regulation promulgated under the Securities Act or any state securities law applicable to Seller and relating to action or inaction required of Seller in connection with any such registration] and will reimburse Buyer, such directors, officers, persons or underwriters for any legal or any other expenses [as] reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, in each case to the extent, but only to the


NOV 000042776

extent, that such untrue statement or omission is made in such registration statement, prospectus, ~~{offering circular or other document}~~ in reliance upon and in conformity with written information furnished to Buyer by an instrument duly executed by Seller and stated to be specifically for use therein; provided, however, that the foregoing indemnity agreement is subject to the condition that, insofar as it relates to any such untrue statement or omission made in the preliminary prospectus but eliminated or remedied in the amended prospectus on file with the SEC at the time the registration statement becomes effective or the amended prospectus filed with the SEC pursuant to Rule 424(b) (the "Final Prospectus"), such indemnity agreement shall not inure to the benefit of Buyer, any underwriter or any Holder, if there is no underwriter, if a copy of the Final Prospectus was not furnished to the person or entity asserting the loss, liability, claim or damage at or prior to the time such action is required by the Securities Act.

        (iii)      Each party entitled to indemnification under this Section ~~{6.5(e)}~~ [6.4(e)] (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. If any such Indemnified Party shall have been advised by counsel chosen by it that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party and will promptly reimburse such Indemnified Party and any person controlling such Indemnified Party for the reasonable fees and expenses of any counsel retained by the Indemnified Party, it being understood that the Indemnifying Party shall not, in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys for such Indemnified Party or controlling person, which firm shall be designated in writing by the Indemnified Party to the Indemnifying Party.

        (g)      Contribution. If the indemnification provided for in Section ~~{6.5(e)}~~ [6.4(e)] is unavailable or insufficient to hold harmless an Indemnified Party thereunder, then each Indemnifying Party thereunder shall contribute to the account paid or payable by such Indemnified Party as a result of the losses, claims, damages, costs, expenses, liabilities or actions referred to in Section ~~{6.5(e)(i)}~~ [6.4(e)(i)]


NOV 000042777

or (ii), as the case may be in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and the Indemnified Party on the other in connection with statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or the Indemnified Party and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statements or omission. The Parties hereto agree that it would not be just and equitable if contributions pursuant to this Section {6.5(f)} [6.4(f)] were to be determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the first sentence of this Section {6.5(f)} [6.4(f)]. The amount paid by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this Section {6.5(f)} [6.4(f)] shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any action or claim which is the subject of this Section {6.5(f)} [6.4(f)]. Promptly after receipt by an Indemnified Party of notice of the commencement of any action against such party in respect of which a claim for contribution may be made against an Indemnifying Party under this Section {6.5(f)} [6.4(f)], such Indemnified Party shall notify the Indemnifying Party in writing of the commencement thereof if the notice specified in Section {6.5(e)(iii)} [6.4(e)(iii)] has not been given with respect to such action; provided that the omission so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to any Indemnified Party otherwise under this Section {6.5(f)} [6.4(f)], except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

        (h)    <u>Information by Holder</u>.  Seller shall furnish to Buyer such information regarding Seller and the distribution proposed by Seller as Buyer may reasonably request in writing and as shall be required in connection with any registration referred to in this Section {6.5} [6.4].

        (i)    <u>Rule 144 Reporting</u>  With a view to making available to Seller the benefits of certain rules and regulations of SEC which may permit the sale of Registrable Securities to the public without registration, Buyer agrees to:

        (i)    make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after ninety (90) days after the effective date of the first registration filed by Buyer which involves a sale of securities of Buyer to the general public;

NOV 000042778

(ii)    file with the SEC in a timely manner all reports and other documents required of Buyer under the Securities Act and the Exchange Act; and

(iii)    furnish to Seller so long as it owns any Registrable Securities forthwith upon request a written statement by Buyer that it has complied with the reporting requirements of said Rule 144 (at any time after ninety (90) days after the effective date of said first registration statement filed by Buyer), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of Buyer, and such other reports and documents so filed by Buyer as may be reasonably requested in availing Seller of any rule or regulation of the SEC permitting the selling of any such securities without registration.

(j)    Transfer of Registration Rights.  Any registration rights granted by Buyer under this Section {6.5}  [6.4] may be assigned by Seller in connection with the sale by Seller of any Registrable Securities, [to a transferee or assignee, who, after such assignment or transfer, holds at least 500,000 shares,] and following such assignment, the assignee shall be entitled to all rights of Seller under this Section  {6.5} [6.4], provided that such assignee agrees in writing to be bound to the obligations of Seller under this Section {6.5}  [6.4].

(k)    Termination of Registration Rights.  All registration rights provided hereunder shall terminate upon the earlier to occur of (a) the tenth anniversary of the Closing and (b) such time as Seller is able to sell all of its Registrable Securities under Rule 144 during any two successive, three-month periods.

(l)    Future Grants of Registration Rights.  Buyer agrees for the benefit of Seller that it will not grant registration rights with respect to any of its securities upon terms more favorable to the holders of such securities than those contained herein.

[6.5    Standstill Agreement.

(a)    Standstill.  Notwithstanding any other provision of this Agreement, subject to the exceptions set forth in Section 6.5(b), without the approval of the Board of Directors of Buyer (whether by written consent of the directors or pursuant to a resolution duly adopted by the directors at a meeting of the Board of Directors), Seller (which shall include any affiliate of Seller for purposes of this Section 6.5) shall not acquire "beneficial ownership" (which, for purposes of this Section 6.5, shall have the meaning set forth in Rule 13d-3 of the Exchange Act) of any securities of Buyer entitled to vote with respect to the election of any directors of Buyer ("Voting Securities"), any security convertible into, exchangeable for, or exercisable for, or that may become any Voting Securities or any other right to acquire Voting Securities (such Voting Securities and rights to acquire Voting Securities are collectively referred to herein as "Securities").

NOV 000042779

(b)     Exceptions to Standstill Provision.

(i)     Seller may acquire Securities without regard to the limitations set forth in Section 6.5(a) in accordance with the provisions of Section 6.2 or Section 6.3 hereof; and

(ii)     Seller may, after written notice to Buyer, acquire Securities without regard to the limitations set forth in this Section 6.5 if a bona fide tender or exchange offer is made by any person or 13D Group to acquire Securities that, if added to the Securities (if any) already owned by such person or 13D Group, would represent ownership of Securities greater than fifty percent (50%) of Buyer's then outstanding Securities; provided, however, that Seller shall only be permitted to take such actions and make such offers as may be considered to be of the same nature and type of action or offer and directed to the same person or persons and within the same time period and for the same resulting amount of Securities as that which is being taken by such person or 13D Group; and provided further, however, that Seller may only acquire that amount of Securities that, when added to the amount of Securities already owned by Seller, shall not exceed the amount of Securities acquired or to be acquired (assuming any offers to purchase have been consummated) by such person or 13D Group. In proceeding with any action or offer permitted under this subsection 6.5(b)(ii), Seller shall be permitted to offer more favorable terms than those terms offered by such person or 13D Group, so long as such terms are consistent with an offer of the same nature and type of consideration as that which is being proposed by such person or 13D Group.

(c)     Notice of Securities Purchases and Sales. Seller shall advise Buyer as to its plans to acquire or dispose of beneficial ownership of Securities, or rights thereto, reasonably in advance of any such action.

(d)     Acts in Concert with Others. Seller shall not join a partnership, limited partnership, syndicate or other group, or otherwise act in concert with any third person, for the purpose of acquiring, holding, voting or disposing of Securities, or rights thereto.

(e)     Restrictions on Transfer of Securities. Seller shall not dispose of beneficial ownership or voting control of Securities or any right thereto, except: (i) in accordance with the provisions of Section 6.7 hereof; (ii) to Buyer or any person or group approved by Buyer; (iii) pursuant to a bona fide public offering registered under the Securities Act (in which Seller does not have the ability to select the purchasers); (iv) pursuant to Rule 144 under the Securities Act; (v) in transactions not described in (i), (ii), (iii) or (iv) hereof so long as such transactions do not, directly or indirectly, result in any person or group owning or having the right to acquire beneficial ownership of Securities with aggregate voting power of five percent (5%) or more of the aggregate voting power of all outstanding Securities (assuming the conversion, exchange

BPHPA1\RB\0147981.04
09/16/95

39.



NOV 000042780

and/or exercise of all convertible, exchangeable and exercisable securities); or (v) in response to an offer to purchase or exchange for cash or other consideration any Securities that (a) is made by or on behalf of Buyer, or (b) is made by another person or group to all holders of Securities and is not opposed by the Board of Directors of Buyer within the time such Board is required, pursuant to regulations under the Exchange Act, to advise Company shareholders of such Board's position on such offer.

6.6    Buyer's Right of Repurchase on Seller Change of Control.

(a)    In the event of a proposed Change of Control (as defined below) of Seller, Buyer shall have the right to repurchase all Securities beneficially owned by Seller on the terms set forth in this Section 6.6. For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated (1) any consolidation or merger of such party in which such party is not the continuing or surviving corporation, or pursuant to which shares of such party's common stock would be converted in whole or in part into cash, other securities or other property, other than a merger of such person in which the holders of such party's common stock immediately prior to the merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the merger, or (2) any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of such party, or (ii) the stockholders of such party shall approve any plan or proposal for the liquidation or dissolution of such party, or (iii) any party, other than such party or a subsidiary thereof or any employee benefit plan sponsored by such party or a subsidiary thereof or a corporation owned, directly or indirectly, by the stockholders of such party in substantially the same proportions as their ownership of stock of such party, shall become the beneficial owner of securities of such party representing greater than fifty percent (50%) of the combined voting power of then outstanding securities ordinarily (and apart from rights accruing in special circumstances) having the right to vote in the election of directors, as a result of a tender or exchange offer, open market purchases, privately negotiated purchases or otherwise, or (iv) at any time after the date of this Agreement, individuals who at the date hereof constituted the Board of Directors of such party shall cease for any reason to constitute at least a majority thereof, unless the election or the nomination for election by such party's stockholders of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the date hereof, or (v) any other event shall occur with respect to such party that would be required to be reported in response to Item 6(e) (or any successor provision) of Schedule 14A of Regulation 14A promulgated under the Exchange Act.

(b)    In the event of a proposed Change of Control of Seller, Seller shall deliver to Buyer written notice of the proposed Change of Control at least 30 days prior to the completion of the transaction resulting in the Change of Control stating that a Change of Control is proposed.

BPXPA1\RB\0147981.04
09/16/95

40.



NOV 000042781

(c)    Within twenty (20) days following receipt by Buyer of the notice delivered pursuant to Section 6.6(b), Buyer shall be entitled to purchase all Securities beneficially owned by Seller at the "Fair Market Value" of such Securities, as determined in accordance with Section 6.6(d).  Buyer shall deliver its written notice of election to purchase such Securities within such twenty (20) day period.  If Buyer notifies Seller of its election to acquire such Securities in accordance with this Section 6.6, a closing with respect to such purchase shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than ten (10) days after delivery of the notice of election by Buyer.

(d)    The "Fair Market Value" of such Securities shall be determined as follows:

(i)    If the Securities are traded on a securities exchange or through the Nasdaq National Market, the fair market value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty-day period ending three (3) days prior to the closing of the purchase;

(ii)    If the Securities are actively traded over-the-counter, the fair market value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty-day period ending three (3) days prior to the closing of the purchase; and

(iii)    If there is no active public market for the Securities, the fair market value shall be the appraised value thereof, as determined by an investment banking firm or other qualified valuation consultant of nationally recognized standing mutually selected by Buyer and Seller.  Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified valuation consultant to undertake such determination.  In the event Buyer and Seller fail to so agree within five (5) business days after the notice of election to purchase, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified valuation consultant and, within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified valuation consultant to make such determination of the appraised value; and the determination of such third investment banking firm or other qualified valuation consultant of the appraised value shall be binding.  The investment banking firm or other qualified valuation consultant selected pursuant hereto to make the determination of the appraised value shall be required to make such determination within twenty (20) business days after its selection.  Buyer shall pay all costs and fees of up to the three such investment banking firms or other valuation qualified consultants, and shall cooperate fully

NOV 000042782

with the investment banking firm or other qualified valuation consultant selected to make such determination by promptly providing such information as is requested by such firm.

**6.7    Buyer's Right of First Refusal**

    **(a)    First Refusal Right.**

        **(i)**    In the event Seller proposes to sell any Securities, other than in a transaction described in Sections 6.5(e)(ii)-(v), Seller shall deliver a written notice to Buyer setting forth the terms of the proposed sale, including the name of the proposed purchaser and the date on or about which such sale is proposed to be completed. Buyer shall have the right of first refusal to acquire such Securities on the terms set forth in such notice (subject to the valuation provisions of Section 6.7(b) below), as provided in this Section.

        **(ii)**    Seller shall have until twenty (20) days after the receipt of such a notice to elect by notice to Buyer to acquire all or any portion of such Securities proposed to be sold by Seller on the terms set forth in such notice. If Buyer notifies Seller within such time period of its election to acquire any of such Securities, a closing with respect to such acquisition shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than ten (10) days after receipt by Seller of such notice of Buyer's election.

        **(iii)**    In the event Seller elects not to exercise the foregoing right of first refusal, Seller shall have sixty (60) days to sell such Securities on the same terms as are set forth in such notice. If Seller proposes to sell such Securities on terms different than those set forth in the notice, or proposes to sell such Securities after the sixty (60) day period, Seller shall first notify Buyer of such proposed sale, and Seller shall have another opportunity to exercise its right of first refusal under this Section.

    **(b)    Appraisal Procedure.**

        **(i)**    Whenever the terms of a proposed sale of Securities include forms of consideration other than cash or securities which are traded on a National Exchange (as defined below), Seller shall have the option to exercise its first refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the date of the notice delivered pursuant to Section 6.7(a)(i) (the "First Offer Notice Date"), and shall be determined in the manner set forth in Section 6.7(b)(ii) below. If an item of consideration constitutes securities which are traded on a National Exchange (as defined below), the value of such items shall be the average of the closing prices of such securities on such exchange during (with reference

NOV 000042783

to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading days on such National Exchange prior to the First Offer Notice Date.

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

(ii)     The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the First Offer Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.]

**ARTICLE VII**

**TERMINATION, AMENDMENT AND WAIVER**

7.1     Termination. Except as provided in Section 7.2 below, this Agreement may be terminated and the Acquisition abandoned at any time prior to the Closing Date:

(a)     by mutual consent of Seller and Buyer;

(b)     by Buyer or Seller if: (i) the Closing has not occurred by [December 31, 1995] [February 28, 1996]; (ii) there shall be a final nonappealable order of a federal or state court in effect preventing consummation of the Acquisition; or (iii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Acquisition by any Governmental Entity that would make consummation of the Acquisition illegal;

BPHPA1\RB\0147981.04
09/16/95

43.

NOV 000042784

(c)     by Buyer if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Seller and such breach has not been cured within five (5) business days after written notice to Seller (provided that, no cure period shall be required for a breach which by its nature cannot be cured);

(d)     by Buyer at any time prior to November 1, 1995, if as a result of its due diligence review of the Business subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement and not disclosed to Buyer prior to or on the date of this Agreement that Buyer {believes,} [reasonably determines] in its good faith reasonable judgment, has a material adverse effect on the {condition} [Business Condition] of the Business {or substantially impairs the value of this Business};

(e)     by Seller at any time prior to November 1, 1995 if as result of its due diligence review of Buyer subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement not disclosed to Seller prior to or on the date of this Agreement that Seller believes, in its good faith reasonable judgment, has a material adverse effect on the {value of the Shares to Seller} [Business Condition of the Business];

(f)     by Seller if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Buyer and such breach has not been cured within five (5) business days after written notice to Buyer (provided that, no cure period shall be required for a breach which by its nature cannot be cured).

7.2     Effect of Termination. In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Buyer or Seller, or their respective officers, directors or shareholders, provided that each party shall remain liable for any breaches of this Agreement prior to its termination; and provided further that, the provisions of Sections _____ of this Agreement shall remain in full force and effect and survive any termination of this Agreement.

7.3     Amendment. This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto.

7.4     Extension; Waiver. At any time prior to the Closing Date, Buyer on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other party hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with

SFHPA1\RB\0147981.04
09/16/95

44.

NOV 000042785

any of the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

## ARTICLE VIII

### INDEMNIFICATION

8.1 <u>Survival of Representations, Warranties and Agreements</u>.

Notwithstanding any investigation conducted at any time with regard thereto by or on behalf of either party, the representation made by Seller in Section 2.10, including any schedules thereto, shall survive the execution, delivery and performance of this Agreement. The obligation of indemnity provided herein shall terminate one (1) year after the Closing.

8.2 <u>Indemnification</u>.

(i)    Seller hereby agrees to indemnify and hold harmless Buyer against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys' fees, any and all out-of-pocket expenses incurred in investigating, preparing or defending against any litigation, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation, only to the extent that the aggregate of the foregoing exceeds $250,000, (collectively "Damages") asserted against, resulting to, imposed upon, or incurred or suffered by Buyer, directly or indirectly, as a result of or arising from any inaccuracy in or breach of the representation and warranty made by Seller in Section 2.10, including schedules thereto. Seller's indemnity obligation pursuant to this Article VIII shall in no event exceed $5,000,000.

8.3 <u>Procedure for Indemnification with Respect to Third-Party Claims</u>.

(i)    If Buyer determines to seek indemnification under this Article VIII with respect to Identifiable Claims (the party seeking such indemnification hereinafter referred to as the "Indemnified Party" and the party against whom such indemnification is sought is hereinafter referred to as the "Indemnifying Party") resulting from the assertion of liability by third parties, the Indemnified Party shall give notice to the Indemnifying Party within 60 days of the Indemnified Party becoming aware of any such Identifiable Claim or of facts upon which any such Identifiable Claim will be based; the notice shall set forth such material information with respect thereto as is then reasonably available to the Indemnified Party. In case any such liability is asserted against the Indemnified Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within 20 days after receiving the Indemnified Party's notice, to

NOV 000042786

assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the sole, unreimbursable expense of the Indemnified Party unless the Indemnified Party does not assume control or the Indemnified Party shall reasonably determine that there is a conflict of interest between Buyer and Seller with respect to such Identifiable Claim, in which case the fees and expenses of such counsel will be borne by the Indemnifying Party, (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing, and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Identifiable Claims resulting from the assertion of liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and, if so, only to the extent that, the Indemnifying Party is materially prejudiced thereby.  With respect to any assertion of liability by a third party that results in an Identifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(ii)    In the event that the Indemnifying Party, within 20 days after receipt of the aforesaid notice of an Identifiable Claim, fails to assume the defense of the Indemnified Party against such Identifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

(iii)    Notwithstanding anything in this Section to the contrary, (i) if there is a reasonable probability that an Identifiable Claim may materially and adversely affect the Indemnified Party, other than as a result of money damages or other money payments, the Indemnified Party shall have the right to participate in such defense, compromise or settlement and the Indemnifying Party shall not, without the Indemnified Party's written consent (which consent shall not be unreasonably withheld), settle or compromise any Identifiable Claim or consent to entry of any judgment in respect thereof unless such settlement, compromise or consent includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect of such Identifiable Claim.
f

~~8.4 Procedure For Indemnification with Respect to Non Third-~~
~~Party Claims.~~

~~In the event that the Indemnified Party asserts the existence of a claim giving rise to~~
~~Damages (but excluding claims resulting from the assertion of liability by third parties),~~
~~it shall give written notice to the Indemnifying Party. Such written notice shall state that~~
~~it is being given pursuant to this Section 8.4, specify the nature and amount of the claim~~
~~asserted and indicate the date on which such assertion shall be deemed accepted and the~~
~~amount of the claim deemed a valid claim (such date to be established in accordance~~


NOV 000042787

~~with the next sentence). If the Indemnifying Party, within 60 days after the mailing of notice by the Indemnified Party, shall not give written notice to the Indemnified Party announcing its intent to contest such assertion of the Indemnified Party, such assertion shall be deemed accepted and the amount of claim shall be deemed a valid claim. In the event, however, that the Indemnifying Party contests the assertion of a claim by giving such written notice to the Indemnified Party within said period, then the parties shall act in good faith to reach agreement regarding such claim. In the event that litigation shall arise with respect to any such claim, the prevailing party shall be entitled to reimbursement of costs and expenses incurred in connection with such litigation including attorney fees, if the parties hereto, acting in good faith, cannot reach agreement with respect to such claim within ten days after such notice.]~~

## ARTICLE IX

## GENERAL PROVISIONS

9.1    _Notices._  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via telecopy (with acknowledgment of complete transmission) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

       (a)    if to Buyer, to:

The Santa Cruz Operation, Inc.
400 Encinal Street
P.O. Box 1900
Santa Cruz, CA  95061-1900
Attention: Legal Department
Telecopy No.:  (408) 427-5474

with a copy to:

Brobeck, Phleger & Harrison
Two Embarcadero Place
2200 Geng Road
Palo Alto, CA  94303
Attention:  Edward M. Leonard
Telecopy No.: (415) 496-2921

       (b)    if to Seller, to:

Novell, Inc.

_____

_____

NOV 000042788

Attention: _____
Telecopy No.: _____

with a copy to:

Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304
Attention: Larry W. Sonsini
Telecopy No.: (415) 496-4084

9.2    Survival. The representations and warranties contained in Section 2
and Section 3 hereof except for the representation of Seller set forth in Section 2.10 shall
not survive the closing of the sale of assets and issuance of stock contemplated by this
Agreement; provided, however, that the foregoing provision shall not eliminate the rights
and remedies of the parties hereto in the case of a willful fraud by the other party
provided that the agreed party shall establish all elements of the existence of such fraud
by clear and convincing evidence.

9.3    Interpretation. When a reference is made in this Agreement to
Schedules or Exhibits, such reference shall be to a Schedule or Exhibit to this
Agreement unless otherwise indicated. The words "include," "includes" and "including"
when used herein shall be deemed in each case to be followed by the words "without
limitation." The table of contents and headings contained in this Agreement are for
reference purposes only and shall not affect in any way the meaning or interpretation of
this Agreement.

9.4    Counterparts. This Agreement may be executed in one or more
counterparts, all of which shall be considered one and the same agreement and shall
become effective when one or more counterparts have been signed by each of the parties
and delivered to the other party, it being understood that all parties need not sign the
same counterpart.

9.5    Entire Agreement. This Agreement, and the Schedules and Exhibits
hereto: (a) constitute the entire agreement among the parties with respect to the subject
matter hereof and supersede all prior agreements and understandings, both written and
oral, among the parties with respect to the subject matter hereof; (b) are not intended to
confer upon any other person any rights or remedies hereunder, unless expressly
provided otherwise; and (c) shall not be assigned by operation of law or otherwise except
as otherwise specifically provided.

BPHPA1\RB\0147981.04
09/16/95

48.

NOV 000042789

9.6     Severability.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.7     Other Remedies.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

9.8     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

9.9     Rules of Construction.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

BPHPA1\RS\0147981.04
09/16/95

49.

NOV 000042790

IN WITNESS WHEREOF, Buyer and Seller have caused this Agreement to be signed by their duly authorized respective officers, all as of the date first written above.

THE SANTA CRUZ OPERATION, INC.

By: _____
Name: _____
Title: _____

NOVELL, INC.

By: _____
Name: _____
Title: _____

NOV 000042791