Telephone
(415) 493-9300

FAX
(415) 493-6811

Senders' Direct Fax
(415) 496-4086

# WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 PAGE MILL ROAD
PALO ALTO, CALIFORNIA 94304-1050

ORIGINAL

X Will Not Follow
__ Follows Via Mail
__ Follows Via Courier

## TELECOPY COVER SHEET

**TO**   Jeffrey P. Higgins, Esq.                **ON**  September 18, 1995  at  3·7
                                                              (Date)                    (Time)

**FIRM:**   BROBECK PHLEGER & HARRISON          **CLIENT NO.:**   9062 NEWMAT

**CITY/STATE**   PALO ALTO, CA                  **CLIENT NAME:**   Novell, Inc

**OFFICE PHONE:**      415/496-2932            **WSGR OPERATOR:** ✓

| TELECOPY #: 415/496-2921 | ATTENTION | NOTIFY RECIPIENT BEFORE |
| ATTENTION   USE THIS FAX NO. ONLY | | SENDING |

**FROM:**   AARON J. ALTER              **EXT.:** 4693       **LOCATION:** FH1-1

**TOTAL NUMBER OF PAGES** *INCLUDING THIS COVER SHEET.* 38

*IF YOU DO NOT RECEIVE THE ENTIRE DOCUMENT*
*PLEASE CONTACT THE WSGR OPERATOR AT (415) 493-9300, Ext. 7255*

**MESSAGE** Jeff  I enclose our comments to the last draft of the Asset Purchase Agreement for Project Sleigh Ride.
Tor and I may have one or two additional riders, but wanted to give you a head start on substantially all of our
comments.  Please call with any questions regarding our comments you may have.

cc: Tor R. Braham, Esq.
      Shannon D. Whisenant, Esq.

THE DOCUMENTS ACCOMPANYING THIS TELECOPY TRANSMISSION CONTAIN INFORMATION FROM WILSON, SONSINI, GOODRICH & ROSATI
AND ARE FOR THE SOLE USE OF THE ABOVE INDIVIDUAL OR ENTITY, AND MAY BE PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM
DISCLOSURE UNDER LAW.  ANY OTHER DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED
PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE IF YOU ARE NOT THE INTENDED RECIPIENT AND RETURN THE ORIGINAL MESSAGE TO US AT
THE ABOVE ADDRESS.  WE WILL REIMBURSE YOUR REASONABLE PHONE AND POSTAGE EXPENSES FOR DOING SO
1993 © WILSON, SONSINI, GOODRICH & ROSATI  [ALL RIGHTS RESERVED]
H:\HOME\MAS\FAXES\HIGGINS.FAX

NOV 000039964

Dockets.Justia.com

TRANSMISSION REPORT

```
                                    TIME      :  SEP 18 '95 15:25
                                    TEL NUMBER :  415-493-6811
                                    NAME      :  WILSON SONSINI
```

| NBR CARD# FILE DATE | TIME | DURATION PGS TO | | MODE | | STATUS | |
|---|---|---|---|---|---|---|---|
| 985 | SEP 18 14:37 | 0:47'43" 38 | | EC | 08 | OK | 00 |

NOV 000039965

USCR master
SDW
9/17/95

# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## THE SANTA CRUZ OPERATION, INC.

## AND

## NOVELL, INC.

Dated as of September ___, 1995

BPHPA1\RB\0147981.04
09/16/95

NOV 000039966

## TABLE OF CONTENTS

Page

ARTICLE I  THE ACQUISITION ................................. 1
  1.1    Purchase of Assets .................................. 1
  1.2    Consideration ..................................... 2
  1.3    Transfer of Customers .............................. 3
  1.4    License Back of ~~Unix and UnixWare~~. ................ 4

<span>Assets</span>

ARTICLE II  REPRESENTATIONS AND WARRANTIES OF SELLER ....... 5
  2.1    Organization, Standing and Power ................... ~~[5]~~ [6]
  2.2    Authority ........................................ 6
  2.3    Financial Statements .............................. 7
  2.4    Compliance with Law ............................... 7
  2.5    No Defaults ...................................... 7
  2.6    Litigation ....................................... ~~[7]~~ [8]
  2.7    Absence of Certain Changes ......................... 8
  2.8    Agreements ...................................... 8
  2.9    Tax Returns and Reports ............................ 9
  2.10   Technology ...................................... 10
  2.11   Title to Properties; Absence of Liens and Encumbrances .... 11
  2.12   Governmental Authorizations and Licenses ............. 11
  2.13   Environmental Matters ............................. 12
  2.14   Customers ....................................... 12
  2.15   Proprietary Information and Inventions and Confidentiality
       Agreements .................................... 12
  2.16   Inventory ........................................ 12
  2.18   Reliance Upon Seller's Representations ............... 13
  2.19   Receipt of Information ............................. 13
  2.20   Accredited Investor ............................... 13
  2.21   Restricted Securities .............................. 13
  2.22   Legends ......................................... 13
  2.23   No Implied Representations ......................... 14

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF BUYER ....... 14
  3.1    Organization, Standing and Power ................... 14
  3.2    Authority ........................................ 14
  3.3    Capitalization .................................... 15
  3.4    SEC Documents; Buyer Financial Statements ........... 16
  3.5    Compliance with Law ............................... 16
  3.6    No Defaults ...................................... 16
  3.7    Litigation ....................................... 17

NOV 000039967

## INDEX OF EXHIBITS

**Exhibit**            **Description**

Exhibit 5.1(c)         ~~The~~ Operating Agreement
                       Form of

NOV 000039968

# INDEX OF SCHEDULES

Schedule 1.1(a)          Assets

Schedule 1.1(b)          Excluded Assets

Schedule 1.1(c)          Assumed Liabilities

Schedule 1.2 (b)         Royalties with respect to ~~database products~~ relating to Unixware product

Schedule 4.3 (a)         Change of Control ~~BAh~~ Parties

BPHPA1\RB\0147981.04
09/16/95

v.

NOV 000039969



## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of September ____, 1995 by and between The Santa Cruz Operation, Inc., a Delaware corporation ("Buyer") and Novell, Inc., a Delaware corporation ("Seller").

### RECITALS

A.    Seller is engaged in the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business").

B.    The Boards of Directors of each of Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the "Acquisition").

C.    In connection with the Acquisition Buyer will issue to Seller _____ shares of Common Stock of Buyer (the "Shares").

D.    In connection with the acquisition by Seller of the Shares, Buyer and Seller desire to set forth certain agreements with respect to the governance of Buyer following the closing of the Acquisition.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the parties agree as follows:

### ARTICLE I

### THE ACQUISITION

1.1    Purchase of Assets.

(a)    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.4), all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on

BFHPA1\88\0147981.04
09/16/95

7

NOV 000039970

Schedule 1.1 (a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1 (b).

(b) <u>Assumption of Liabilities</u>. At the Closing Buyer shall assume those obligations and liabilities of Seller set forth in Schedule 1.1(c) hereto (collectively, the "Assumed Liabilities").

[(c) <u>Liabilities Not Assumed</u>. Other than the Assumed Liabilities, Buyer shall not assume, nor shall Buyer or any affiliate of Buyer be deemed to have assumed or guaranteed, any other liability or obligation of any nature of Seller, or claims of such liability or obligation, whether accrued, matured or unmatured, liquidated or unliquidated, fixed or contingent, known or unknown arising out of (i) acts or occurrences, or related to any of the Assets, prior to the Closing Date, or (ii) any other liability or obligation of Seller which is not an Assumed Liability (collectively, the "Unassumed Liabilities"). Seller will remain responsible for all Unassumed Liabilities.]

1.2  <u>Consideration</u>.

(a) <u>Consideration for Assets: Stock</u>. On the terms and subject to the conditions set forth in this Agreement, as full payment for the transfer of the Assets by Seller to Buyer, at the Closing Buyer shall assume the Assumed Liabilities and issue to Seller _____ shares of fully paid and nonassessable shares of Common Stock of Buyer (the "Shares" or the "Purchase Price"). *ninety-five percent (95%)*

(b) <u>Consideration for Assets: Royalties</u>. As additional consideration for the transfer of the Assets by Seller to Buyer, Buyer agrees to collect and pass through to Seller a percent of the {amounts paid by OEMs and other third party customers on account of the SVRX business, including royalties and other payments of any kind} [SVRx Royalties], all as described *in detail* in Section 4.16 hereof. *defined and* In addition, Buyer agrees to make payment to Seller of additional royalties on account of its sale of UnixWare products. The amounts and timing of additional royalties to be paid in connection with the UnixWare business are identified in detail on Schedule 1.2(b) hereto. [Seller shall be entitled to conduct periodic audits of Buyer concerning all royalties and payments due to Seller hereunder or under the SVRx agreements, provided that Seller shall not conduct such audits more often than twice per year after reasonable notice and during normal business hours. The cost of any such audit shall be borne by Seller, unless such audit reveals a payment shortfall in excess of 5% of amounts due hereunder.] *in which case at least the cost of such audit shall be paid borne by Buyer.*

*Buyer's sole $*

*+ Buyer*

(c) <u>Allocation of Purchase Price</u>. Within 45 days following the Closing Buyer shall prepare and deliver to Seller [O] subject to Seller's approval [O] an allocation of the Purchase Price plus any other consideration properly allocable among the Assets (the "Allocation"). The parties agree that all tax returns and reports

*(as defined _____ )*



*Ritleraft
(to come)*

NOV 000039971

**{(v)} [1.4]    Non-Assignment of Certain Items.**  Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment or license hereunder of any of the Assets {(or the Seller Intellectual Property related thereto)} or contracts would require the consent of any other party (or in the event that any of the ~~same~~ shall be nonassignable), neither this Agreement nor any action taken pursuant to its provisions shall constitute an assignment or license or an agreement to assign or license if the requisite consents are not obtained and such assignment or license or attempted assignment or license would constitute a material breach or result in the loss or diminution thereof; provided, however, that ~~in each such case,~~ Seller shall, at its own expense, use its {best} [reasonable commercial] efforts to obtain ~~the consent of such other party to an assignment or license (as applicable)~~ to Buyer, and {hereby consents to Buyer using such efforts as it deems necessary or appropriate to effect the same.  In the event that the assignments or licenses ~~provided for elsewhere in this Agreement~~ cannot be fully provided to Buyer, Seller shall negotiate an alternative assignment{as to such Assets so as to afford Buyer, to the extent practicable, the same or similar benefits and rights as if such assignment had occurred.

**{(vi)} [1.5]    Transitional Contracts.**  The parties acknowledge that it may not be practical or advisable to assign or terminate contracts {(such as Seller's MLA Agreements)] pursuant to which Seller has granted third parties rights to sell, distribute, ~~or~~ obtain the products or to support {or maintain them} ("Transitional Contracts").  In such cases, Seller and Buyer will use diligent efforts to transition such business [(concerning the Business only)] and the customer relationship to Buyer such that {orders will be filled} [any new agreements concerning the Business will be entered into] by, and support and maintenance [will be] provided by, Buyer, except where Buyer is unable {or unwilling} to do so.  In any event, Buyer shall be entitled to the revenue and benefits received by Seller reasonably attributable to {the products (e.g., the sales,} support or maintenance {thereof)} [of the products] pursuant to such Transitional Contracts (even if prepaid before Closing) net of Seller's identifiable direct expenses of {distribution,} support and maintenance related specifically thereto and documented to Buyer.  Seller may retain such units of inventory of products as it deems reasonably necessary solely to satisfy customers under Transitional Contracts in accordance with this paragraph if Buyer is unable {or unwilling} to do so.  [Following the Closing,] Seller shall not enter into any new Transitional Contracts nor extend the term of any existing contract.  [Except for revenue from MLAs, Buyer and Seller shall negotiate a mutually acceptable arrangement to afford Buyer the benefits of ongoing licenses which are intended to be assigned hereunder, attributable to the Business following the Closing.]

**1.6] {1.4]    License Back of {Unix and UnixWare}  [Assets].**

Concurrent with the closing, Buyer shall execute a license agreement under which it shall grant to Seller a royalty-free, perpetual license to (i) all of the {transferred assets}  [technology included in the Assets] and (ii) all derivatives of the {transfer assets}  [technology] included in [the Assets, including] the "Eiger" product

BPNPA1\89\0147981.04
09/16/95

4.

*For the Licensed Technology*

*(such licensed back technology to be referred to and collectively as "Licensed Technology")*

release. Seller agrees that it shall use ~~such~~ the licensed ~~back~~ technology only (i) for internal purposes without restriction or (ii) for resale ~~in bundles or~~ integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the licensed ~~back~~ technology does not constitute a primary portion ~~(l)~~ of the value of the total bundled or integrated product. ~~(l)~~ The license agreement shall include reasonable provisions concerning Buyer's obligation to provide documentation ~~[[and support] of the transferred assets.]~~ [and support of the Assets. The license agreement shall provide Seller with an unlimited royalty-free perpetual license to the ~~technology included in the Assets~~ upon the occurrence of a change of control of Buyer described in Section 6.3(c) hereof. In the event of a Change of Control of Seller (as defined in Section 6.5 hereof), the license granted hereunder shall be limited to Seller products either developed or substantially developed as of the time of the Change of Control.]

*for any licensed Technology*

*who*

*worldwide*    *Licensed Technology.*

**[1.5] [1.7]**    **Closing.**

*pursuant to the license agreement*

(a)    **Closing.**   Unless this Agreement is earlier terminated pursuant to ~~(Section     )~~ [Article VIII the closing of the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304, at 10:00 a.m. on the date which is two business days following satisfaction or waiver of the last of the conditions to Closing as set forth in the Article IV hereof, or on such other time and/or date as the parties agree (the actual date on which the Closing occurs is referred to herein as the "Closing Date").

(b)    **Delivery.**   At the Closing:

(i)    Buyer shall deliver to Seller an instrument of assumption of liabilities by which Buyer shall assume the Assumed Liabilities as of the Closing;

(ii)    Buyer shall deliver to Seller a certificate or certificates representing the Shares;

(iii)    Seller shall deliver to Buyer all bills of sale, endorsements, assignments, consents to assignments to the extent obtained and other instruments and documents as Buyer may reasonably request to sell, convey, assign, transfer and deliver to Buyer Seller's title to all the Assets; and

(iv)    Seller and Buyer shall deliver or cause to be delivered to one another such other instruments and documents necessary or appropriate to evidence the due execution, delivery and performance of this Agreement.

(c)    **Taking of Necessary Action; Further Action.**   If, at any time after the Closing Date, any further action is necessary or desirable to carry out the

NOV 000039973

consummation of the transactions contemplated hereby will not, conflict with or result in
any violation of any statute, law, rule, regulation, judgment, order, decree, or ordinance
applicable to Seller, or its properties or assets that, individually or in the aggregate,
reasonably would be expected to have a material adverse effect on the Business
Condition of the Business, or conflict with any provision of the Certificate of
Incorporation or Bylaws of Seller or result in any breach or default (with or without
notice or lapse of time, or both) under, or give rise to a right of termination, cancellation
or acceleration of any obligation or to loss of a material benefit under, or result in the
creation of a lien or encumbrance on any of the properties or assets of Seller pursuant to
any agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession,
franchise or license to which Seller is a party or by which Seller or its properties or
assets may be bound that would reasonably be expected, either individually or in the
aggregate, to have a material adverse effect on the Business Condition of the Business).
No consent, approval, order or authorization of, or registration, declaration or filing with,
any court, administrative agency, commission, regulatory authority or other governmental
authority or instrumentality, domestic or foreign (a "Governmental Entity"), is required
by or with respect to Seller in connection with the execution and delivery of this
Agreement or the consummation by Seller of the transactions contemplated hereby,
except for (i) the filing of a pre-merger notification report under the Hart-Scott-Rodino
Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) those required to
be made or obtained by Buyer or any of its affiliates, (iii) such consents, approvals,
orders, authorizations, registrations, declarations and filings as would not have a material
adverse effect on the ability of Seller to transfer the Assets to Buyer at the Closing.

2.3    Financial Statements. Seller has furnished Buyer with unaudited
financial {statements of the Business for each of the fiscal years ended
including a balance sheet of the Business as at each of the fiscal years ended
(the             balance sheet being referred to herein as the "             Balance
Sheet"), and the related consolidated statements of income and cash flow] [information
of the Business ](the foregoing financial statements are referred to collectively as the
"Business Financial {Statements}] [Information)]. The Business Financial
{Statements} [Information] have been prepared in accordance with generally accepted
accounting principles consistently applied (except as may be indicated in the notes
thereto) and fairly present, in all material respects, the financial position of the Business
as at the dates thereof and the results of operations {and changes in financial position}
for the periods then ended. There has been no material change in Seller's accounting
policies during such periods relating to the Business, except as described in the notes to
the Business Financial {Statements} [Information].

2.4    Compliance with Law. Seller has conducted the Business so as to
comply in all material respects with all laws, rules and regulations, judgments, decrees or
orders of any Governmental Entity applicable to its operations except where the failure
so to comply reasonably would not be expected to have a material adverse effect on the
Business Condition of the Business. As of the date hereof, there are no judgments or

SPHPA1\RS\0147981.04
09/16/95

7.

NOV 000039974



orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against Seller with any continuing effect that reasonably would be expected to have a material adverse affect on the Business Condition of the Business. To the knowledge of Seller, there is no investigation by any Governmental Entity with respect to Seller pending against Seller which is reasonably likely to have a material adverse effect on the Business Condition of the Business.

2.5    No Defaults. To the knowledge of Seller, Seller is not, nor has it received written notice that it would be with the passage of time, (i) in violation of any provision of its Certificate of Incorporation or Bylaws or (ii) in default or violation of any term, condition or provision of (A) any judgment, decree, order, injunction or stipulation applicable to the Business or (B) any agreement, note, mortgage, indenture, contract, lease or instrument, permit, concession, franchise or license to which Seller is a party (with respect to the Business) or by which the Business may be bound, in any such case in a manner that reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

2.6    Litigation. There is no action, suit, proceeding, claim or governmental investigation pending or, to the knowledge of Seller, threatened, against Seller that reasonably would be expected to have a material adverse effect on the Business Condition of the Business. There is no action, suit, proceeding, claim or governmental investigation pending against Seller as of the date hereof that in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

2.7    Absence of Certain Changes. Since _____, Seller has conducted the Business in the ordinary course and, except for the execution, delivery and performance of this Agreement or as required hereby, there has not occurred: (a) any material adverse change in the Business Condition of the Business; (b) any entry into any material commitment or transaction by Seller relating to the Business, other than in the ordinary course of business; (c) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the Business Condition of the Business; (d) any acquisition or disposition of a material amount of property or assets of Seller relating to the Business outside of the ordinary course of business; (e) any transfer or grant by Seller of a right under any Seller Intellectual Property Rights (as defined in Section (____)[2.10] hereof), other than those transferred or granted in the ordinary course of business;

2.8    Agreements. With respect to the Business, Seller is not a party to, and the Business is not subject to:

(a)    Any union contract or any employment contract or arrangement providing for future compensation, written or oral, with any officer, consultant, director or employee which is not cancelable by Seller on 30 days' notice or

NOV 000039975

less without penalty or obligation to make payments related to such termination, other than (A) (in the case of employees other than executive officers of Seller) such agreements as are not materially different from standard arrangements offered to employees generally in the ordinary course of business consistent with Seller's past practices and (B) such agreements as may be imposed or implied by law;

(b)     Any plan, contract or arrangement, the obligations under which exceed $100,000, written or oral, providing for bonuses, pensions, deferred compensation, severance pay or benefits, retirement payments, profit-sharing, or the like;

(c)     As of the date hereof, any existing OEM agreement, distribution agreement, volume purchase agreement, or other similar agreement in which the annual amount paid or received by Seller during the twelve-month period ended {_____}[July 31, 1995] exceeded $1,500,000 or pursuant to which Seller has granted most favored nation pricing provisions or exclusive marketing rights related to any product, group of products or territory to any person;

(d)     Any lease or month-to-month tenancy for real or personal property in which the amount of payments which Seller is required to make on an annual basis exceeds $100,000;

(e)     Any contract containing covenants purporting to limit Seller's freedom to compete in any line of business in any geographic area; or

(f)     Any license to a third party involving Seller Intellectual Property source [or binary] code which {includes} includes a right to sublicense such source {code royalty-free} [or binary code without additional payment].

Each agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license and commitment listed in the Seller Disclosure Schedule pursuant to this Section is valid and binding on Seller, and is in full force and effect, and Seller has not breached any provision of, nor is it in default under the terms of, any such agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license or commitment except for such failures to be valid and binding or in full force and effect and such breaches or defaults as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.9     Tax Returns and Reports.

(a)     Definition of Taxes.  For the purposes of this Agreement, "Tax" or "Taxes" refers to any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and

NOV 000039976



new employee, consultant, officer and director of Seller in the ordinary course of Seller's business. *(as defined therein)*

2.16    Inventory.  The Seller Disclosure Schedule sets forth the [estimated] amount of {{}UnixWare {}} inventory, including pre-paid royalties, that was held by Seller's resellers as of the date of this Agreement.

2.17    Investment Intent.  The purchase of the Shares pursuant to this Agreement is for the account of Seller for the purpose of investment and not with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act [of 1933, as amended (the "Securities Act")] and the rules and regulations promulgated thereunder, and that Seller has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, Seller further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.

2.18    Reliance Upon Seller's Representations.  *the Shares* Seller understands that the Shares are not registered under the Securities Act on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from registration under the Securities Act pursuant to section 4(2) thereof, and that Buyer's reliance on such exemption is predicated on Seller's representations set forth herein. Seller realizes that the basis for the exemption may not be present if, notwithstanding such representations, Seller has in mind merely acquiring the Shares for a fixed or determinable period in the future, or for a market rise, or for sale if the market does not rise.  Seller [presently] does not have any such intention.

2.19    Receipt of Information.  Seller believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Seller further represents that it has had an opportunity to ask questions and receive answers from Buyer regarding the terms and conditions of the offering of the Shares and the business, properties, prospects and financial condition of Buyer and to obtain additional information (to the extent {the Company} [Buyer] possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access.  The foregoing, however, does not limit or modify the representations and warranties of the Buyer in {Section 3} [Article III] of this Agreement or the right of Seller to rely thereon.

2.20    Accredited Investor.  Seller is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D, as presently in effect.

NOV 000039977



Buyer of the transactions contemplated hereby, except for (i) the filing of a pre-merger notification report under the HSR Act, (ii) those required to be made or obtained by Seller or any of its affiliates, (iii) filings following the Closing under federal and state securities laws relating to issuance of the Shares; and (iv) such consents, approvals, orders, authorizations, registrations, declarations and filings as would not have a material adverse effect on the ability of Buyer to issue the Shares to Seller and assume the Assumed Liabilities at the Closing.

3.3    Capitalization. The authorized capital stock of Buyer consists of _____ shares of Common Stock, no par value, and _____ shares of Preferred Stock, no par value, of which there were issued and outstanding as of the close of business on September __, 1995, _____ shares of Common Stock and no shares of Preferred Stock. There are no other outstanding shares of capital stock or voting securities of Buyer other than shares of Buyer Common Stock issued after September __, 1995 upon the exercise of options issued under the Buyer Amended and Restated 1987 Stock Option Plan (the "Buyer Stock Option Plan"). All outstanding shares of Buyer have been duly authorized, validly issued, fully paid and are nonassessable and free of any liens or encumbrances other than any liens or encumbrances created by or imposed upon the holders thereof. As of the close of business on September __, 1995, Buyer has reserved _____ shares of Common Stock for issuance to employees, directors and independent contractors pursuant to the Buyer Stock Option [Plans and the Buyer Employee Stock Purchase] Plan, of which _____ shares have been issued pursuant to option exercises [and employee stock purchases], and _____ shares are subject to outstanding, unexercised options. Other than this Agreement, there are no other options, warrants, calls, rights, commitments or agreements of any character to which Buyer is a party or by which it is bound obligating Buyer to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of the capital stock of Buyer obligating Buyer to grant, extend or enter into any such option, warrant, call, right, commitment or agreement. The shares of Buyer Common Stock to be issued pursuant to this Agreement will be duly authorized, validly issued, fully paid, and non-assessable.

3.4    SEC Documents; Buyer Financial Statements. Buyer has made available to Seller a true and complete copy of each statement, annual, quarterly and other report, and definitive proxy statement filed by Buyer with the Securities and Exchange Commission ("SEC") since September 30, 1993 (the "Buyer SEC Documents"), which are all the documents (other than preliminary material) that Buyer was required to file with the SEC since such date. As of their respective filing dates, the Buyer SEC Documents complied in all material respects with the requirements of the Securities Exchange Act of 1934 (the "Exchange Act") or the Securities Act of 1933 (the "Securities Act"), as the case may be, and none of the Buyer SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. The financial statements of Buyer included in

NOV 000039978



or other convertible securities; or (e) cause or permit any amendments to its Certificate o. Incorporation or Bylaws.

4.3    No Solicitation.  Until the earlier to occur of (i) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, Seller will not (nor will Seller permit any of Seller's officers, directors, agents, representatives or {Affiliates} [affiliates] to) directly or indirectly, take any of the following actions with any party other than Buyer and its designees:  solicit, encourage, initiate or participate in any negotiations or discussions with respect to, any offer or proposal to acquire all or any portion of the Business.  Until the earlier to occur of (I) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, [and] except to the extent the Board of Directors of Buyer _____ ⟨let⟩ believes (after consultation with outside legal counsel) {it (is)} necessary to comply with its fiduciary duties, Buyer will not (nor will Buyer permit any of Buyer's officers, directors, agents, representatives or affiliates to) directly or indirectly take any of the following actions with any party other than Seller and its designees: solicit, encourage, initiate or participate in any negotiation or discussions with respect to, any offer or proposal to acquire all or any portion of the business of Buyer.

4.4    Access to Information.  Seller and Buyer shall each afford the other and its accountants, counsel and other representatives, reasonable access during normal business hours during the period prior to the Closing Date to (a) all of its properties, books, contracts, commitments and records, and (b) all other information concerning the business, properties and personnel (subject to restrictions imposed by applicable law) of it as the other may reasonably request (it being understood that access to information concerning Seller shall pertain only to the Business).

4.5    Confidentiality.  Each of the parties hereto hereby agrees to keep such information or knowledge obtained in any investigation pursuant to {Sections 4.3 or 4.4, or pursuant to the negotiation and execution of this Agreement or the effectuation of the transactions contemplated hereby,} [Section 4.4  ]confidential; provided, however, that the foregoing shall not apply to information or knowledge which (a) a party can demonstrate was already lawfully in its possession prior to the disclosure thereof by the other party, (b) is generally known to the public and did not become so known through any violation of law or this Agreement, (c) became known to the public through no fault of such party, (d) is later lawfully acquired by such party from other sources, (e) is required to be disclosed by order of court or government agency with subpoena powers or (f) which is disclosed in the course of any litigation between any of the parties hereto.

4.6    Expenses.  Whether or not the Acquisition is consummated, all fees and expenses incurred in connection with the Acquisition including, without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties ("Third Party Expenses") incurred by a party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the

NOV 000039979



transactions contemplated hereby, shall be the obligation of the respective party
incurring such fees and expenses.

4.7    Public Disclosure.    ~~[Unless otherwise required by law including,~~    *Buyer and Seller*
~~without limitation, applicable securities laws, prior to the Closing Date, no disclosure~~
~~(whether or not in response to an inquiry) of]~~ [The parties shall issue a joint press
release with respect to ]the subject matter of this Agreement ~~[shall be made by any~~
~~party hereto unless approved by Buyer and Seller prior to release, provided that such~~
~~approval shall not be unreasonably withheld]~~.    *insert*

4.8    Consents.    Seller shall use commercially reasonably efforts to obtain
all necessary consents, waivers and approvals under any of the contracts of the Business
as may be required in connection with the Acquisition so as to transfer to Buyer all
rights of Seller thereunder as of the Closing.

4.9    Commercially Reasonable Efforts.    Subject to the terms and
conditions provided in this Agreement, each of the parties hereto shall use its
commercially reasonable efforts to take promptly, or cause to be taken, all actions, and
to do promptly, or cause to be done, all things necessary, proper or advisable under
applicable laws and regulations: to consummate and make effective the transactions
contemplated hereby, to obtain all necessary waivers, consents and approvals and to
effect all necessary registrations and filings, and to remove any injunctions or other
impediments or delays, legal or otherwise, in order to consummate and make effective
the transactions contemplated by this Agreement.

4.10    Notification of Certain Matters.    Seller shall give prompt notice to
Buyer, and Buyer shall give prompt notice to Seller, of (i) the occurrence or
non-occurrence of any event, the occurrence or non-occurrence of which is likely to
cause any representation or warranty of Seller or Buyer, respectively, contained in this
Agreement to be untrue or inaccurate at or prior to the Closing Date and (ii) any failure
of Seller or Buyer, as the case may be, to comply with or satisfy any covenant, condition
or agreement to be complied with or satisfied by it hereunder; provided, however, that
subject to Section 4.11, the delivery of any notice pursuant to this Section shall not limit
or otherwise affect any remedies available to the party receiving such notice.

4.11    Delivery of Schedules.    It is understood that the Seller Disclosure
Schedule and the Buyer Disclosure Schedule may not be complete as of the date hereof.
Because of this, the parties agree that until 5:00 California time on October 15, 1995,
Seller and Buyer shall each be permitted to amend its respective Disclosure Schedule so
as to qualify the representations and warranties of such party contained in this
Agreement (as each may be so amended, the "Subsequent Seller Disclosure Schedule"
and the "Subsequent Buyer Disclosure Schedule", respectively). It is further understood
that, to the extent that this Agreement is not terminated pursuant to Section 7.1 (d) or
~~[7.1(f)]~~ [7.1(e)] after delivery of any such Subsequent Disclosure Schedule, the

NOV 000039980

representations and warranties in this Agreement of the party delivering such Subsequent Disclosure Schedule shall be qualified in their entirety by the modified or supplemented disclosures contained therein.

4.12  Additional Documents and Further Assurances.  Each party hereto, at the request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

4.13  Treatment of Employees of the Business.  Following the execution and delivery of this Agreement and prior to Closing, the person(s) responsible for the hiring of Buyer's personnel and the person(s) responsible for the hiring of Seller's personnel shall agree upon an employee benefits package (the "Benefits Package") which in their mutual opinion shall be sufficiently enticing to attract and retain existing employees of the Business as new employees of Buyer.  The Benefits Package shall [give] {full} credit {to} Seller's employees who become employees of Buyer with [all] years of service accrued by such employee with Seller or any predecessor of Seller or the Business.  Buyer {may} [shall] offer employment consistent with the terms of the Benefits Package to any of the employees of the Business it shall so choose.  Seller will use {best} [reasonable commercial] efforts to assist Buyer {in this regard and to assure} [to encourage such employees to become employees to Buyer and to support] an orderly and successful transition.  [Except as may be agreed between Buyer and Seller in accordance with the Benefits Purchase.] Buyer shall not [be required to] assume any obligation of Seller with respect to liabilities relating to such {Employees} [employees], including without limitation, obligations for accrued vacation time, severance arrangements, workers' compensation or any liability for any insurance, medical or other welfare benefits, other than under Buyer's plans.  All welfare [or] benefit claims {for treatment or services} rendered prior to midnight on the {day of the} Closing [Date] shall be the responsibility of Seller.

{Although} {Employees} [employees] may be located at Buyer's facilities, such Employees shall continue to be employees of Seller through the Closing and [through the Closing] Seller shall continue in force all employee benefits and salaries in place as of _____ 199_ ][the date of this Agreement].

Seller agrees to use its {best} [reasonable commercial] efforts to support the transition of the Business to Buyer, including without limitation, cooperation between {Seller} [Seller's] sales and field service personnel and {Buyers} [Buyer's] sales and field service personnel to help assure an orderly transition of customer accounts.

4.14  Tax Returns.  Seller shall be responsible for and pay when due (i) all of Seller's Taxes attributable to or levied or imposed upon the Assets relating or pertaining to the period (or that portion of any period) ending on or prior to the Closing

NOV 000039981



*including auditing two (2) SVI + Licensees identified by Seller during each quarter in which SVRX Royalties are collected.*

Date and (ii) all Taxes attributable to, levied or imposed upon, or incurred in connection with the Seller's business operations, other than the Business, following the Closing Date.

4.15 <u>Bulk Sales</u>. Buyer hereby agrees to waive the requirement, if any, that Seller comply with any bulk transfer law which may be applicable to the transactions contemplated by this Agreement; provided, that Seller agrees to indemnify and hold harmless Buyer with respect to any noncompliance with such laws and Buyer's waiver with respect thereto.

[4.16 <u>SVRX Licenses</u>.]

*additional language to come*

[4.16 SVRX Licenses.] [(i)] Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and [such amounts hereafter called] [referred to herein as] "SVRX Royalties"). Within 45 days of the end of each fiscal quarter of Buyer, Buyer shall deliver to Seller or Seller's assignee 95% of any SVRX Royalties collected in the immediately preceding quarter. Buyer shall diligently seek to collect all such royalties, funds and other amounts when due [[and shall investigate and perform appropriate auditing and enforcement under such agreements at Buyer's cost]].

*↳ licenses*

[(ii)] Buyer shall not and shall not have the authority to amend, modify or waive any right under or assign any [SVRX] [SVRx] License without the prior written consent of Seller. [[]In addition, at Seller's sole discretion, and at Seller's direction, Buyer shall amend, [supplement.] modify or waive any rights under, or shall assign any rights to, any such SVRX License to the extent so directed [by Seller.]

[]In any manner or respect by Seller. Buyer shall not, and shall have no right to, enter into future licenses or amendments of the SVRX technologies, except as may be incidently involved through its rights to sell and license UnixWare, Eiger or the Merged Product or future versions thereof.

*↳ Licenses*

*↳ the Assets*

*04-?* [(iii)] Seller further covenants that neither it, nor any of its officers, directors or employees shall [(i)] [(a)] take any [material] action [designed] to promote the sale of SVRX products or [(ii)][(b)] provide [any] [material] compensation to any employee designed [to incentize] [and intended to incentivize] such employee to promote the sale of SVRX products[, except for actions incidental to unrelated business activities of Seller].

*immediately following the Closing Date*

4.17 <u>Audited Financials</u>. [Seller shall deliver to Buyer within days of this Agreement audited, for the periods ended with respect to the Business.] [The parties shall work diligently together to prepare audited financial statements relating to the Business as may be required for Buyer's financial reporting requirements under the

*[as such term is defined in Section # the Operating Agreement attached hereto as Exhibit 5.1(c)]*

BPHPA1\HB\0147981.04
09/16/95

24.

NOV 000039982



federal securities laws. The costs associated with preparation of any required audited financial statements shall be shared equally between Seller and Buyer.]

~~{4.18 Standstill Agreement. Buyer and Seller shall have entered into the Standstill}~~ [4.18    Development of Merged Product. Following the Closing, Buyer shall diligently and vigorously market, sell and promote the Business. In addition, Buyer shall use its commercially reasonable efforts to complete the Merged Product ~~(as such term is defined in the Operating Agreement attached hereto as Exhibit (5.1(e))~~ by a date not later than December 31, 1997 to be agreed upon by Buyer and Seller. Buyer shall be entitled to modify the specifications of the Merged Product provided that any modification (i) is approved by the Architecture Board described in Section 3(e) of the Operating Agreement, (ii) does not impact upon the anticipated migration of Seller's customers to the Merged Product or (iii) eases the anticipated migration of the Merged Product to the White Box Product (as such term is defined in the Operating Agreement). Notwithstanding the foregoing, Buyer shall not change the specifications of the Merged Product such that the Merged Product will not include the "NetWare Services" specification set forth on Exhibit _____ of the Operating Agreement.] ~~[4.18.~~

~~4.19 Right of Repurchase. [To Come]]~~

## ARTICLE V

## CONDITIONS TO THE ACQUISITION

5.1    Conditions to Obligations of Each Party to Effect the Acquisition. The respective obligations of each party to this Agreement to effect the Acquisition shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Acquisition shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending, nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Acquisition, which makes the consummation of the Acquisition illegal.

(b)    The waiting period under the Hart-Scott-Rodino Antitrust Improvement Act shall have expired.

(c)    The parties shall have entered into an Operating Agreement ~~{on substantially}~~ [including] the terms attached hereto as Exhibit ~~{5.10(e).}~~ [5.1(c).

NOV 000039983

*as of the date hereof*

*Because*

Certain terms contained herein are defined in the Operating Agreement, and therefore a non-binding form of the Operating Agreement is also attached hereto for definitional purposes only; *except that Seller and Buyer have agreed upon the terms of Exhibit A and Exhibit B of the Operating Agreement and will accordingly be bound thereby.*

5.2    Additional Conditions to Obligations of Seller.  The obligations of Seller to consummate and effect this Agreement and the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Seller:

(a)    Representations, Warranties and Covenants.  The representations and warranties of Buyer in this Agreement (as may be modified by the [subsequent] [Subsequent] Buyer Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Buyer shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it in all material respects as of the Closing Date.

(b)    Certificate of Buyer.  Seller shall have been provided with a certificate duly executed on behalf of Buyer to the effect that, as of the Closing Date:

(i)    all representations and warranties made by Buyer in this Agreement are true and complete in all material respects;

(ii)    all covenants, obligations and conditions of this Agreement to be performed by Buyer on or before such date have been so performed in all material respects; and

(iii)    there are no pending negotiations with respect to any offer to acquire all or any portion of the business of Buyer.

(c)    Legal Opinion.  Seller shall have received a legal opinion from legal counsel to Buyer, in form and substance reasonably satisfactory to Seller[, relating to due authority, execution, *and* validity and similar matters].

(d)    No Material Adverse Change.  There shall not have occurred any material adverse change in the Business Condition of Buyer between the date of this Agreement and the Closing Date.

[(e) Fairness Opinion. Seller shall have received a fairness opinion from Morgan Stanley in a form satisfactory to Seller.]

5.3    Additional Conditions to the Obligations of Buyer.  The obligations of Buyer to consummate and effect this Agreement and the transactions contemplated

NOV 000039984

hereby shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Buyer:

    (a)    <u>Representations, Warranties and Covenants</u>. The representations and warranties of Seller in this Agreement (as may be modified by the Subsequent Seller Disclosure Schedule) shall be true and correct in all material respects on and as of the Closing Date as though such representations and warranties were made on and as of such time and Seller shall have performed and complied with all covenants, obligations and conditions of this Agreement required to be performed and complied with by it as of the Closing Date in all material respects.

    (b)    <u>Certificate of Seller</u>. Buyer shall have been provided with a certificate executed on behalf of Seller by its Chief Executive Officer to the effect that, as of the Closing Date:

    (i)    all representations and warranties made by Seller in this Agreement are true and complete in all material respects; and

    (ii)    all covenants, obligations and conditions of this Agreement to be performed by Seller on or before such date have been so performed in all material respects. *relating to due authority, execution, validity and similar matters.*

    (c)    <u>Legal Opinion</u>. Buyer shall have received a legal opinion from legal counsel to Seller, in form and substance reasonably satisfactory to Buyer.

    (d)    <u>No Material Adverse Changes</u>. There shall not have occurred any material adverse change in the Business Condition of the Business between the date of this Agreement and the Closing Date.

    ~~[(e) Fairness Opinion. Buyer shall have received a fairness opinion from Hambrecht and Quist in a form satisfactory to Buyer.~~

    ~~(f) Standstill Agreement. Buyer and Seller shall have entered into the Standstill Agreement attached hereto as Exhibit 4.18.]~~

## ARTICLE VI

## CERTAIN CORPORATE GOVERNANCE MATTERS

    6.1    <u>Nomination of Director to Buyer's Board of Directors</u>. As of the Closing and thereafter until such time as Seller together with its affiliates shall cease to own more than 5% of the outstanding shares of Common Stock of Buyer (the "Threshold Date") [and except as set forth further below], Buyer shall cause one individual

NOV 000039985

*this*

designated by Seller (the "Seller Designee") to be nominated for election to the Board of Directors of Buyer, which Seller Designee shall be a Senior Executive Officer or outside board member of Seller and reasonably acceptable to Buyer. In the event that the Seller Designee shall be elected as a director of Buyer, but shall cease to serve as a director of Buyer prior to the Threshold Date, Seller shall have the right to designate another individual to fill the vacancy created by such cessation in order to serve as a member of the Board of Directors of Buyer. The right to {a board seat} [nomination for election to Buyer's Board of Directors] as set forth in Section 6.1 shall {also} terminate in the event that Seller's core products become directly competitive with Buyer.

6.2    Right to Maintain.

*these 2)*

(a)    Until the earlier to occur of (i) Threshold Date; (ii) Seller's core products {become} [becoming] competitive with Buyer or (iii) the expiration of three years from the date of this Agreement, in the event (including a public offering), Buyer desires to sell and issue shares of its capital stock or rights, options or other securities exercisable for or convertible into shares of its capital stock (directly or indirectly) and whether or not such right or option is immediately exercisable or convertible, then Buyer shall first notify Seller of the material terms of the proposed sale and shall permit Seller to acquire, at the time of consummation such proposed issuance and sale and on such terms as are specified in Buyer's notice to Seller, such number of the shares of capital stock or other securities of Buyer proposed to be issued as would be required to enable Seller to maintain its voting and ownership rights in Buyer following such issuance, on a percentage basis, at a level maintained by it immediately prior to such proposed issuance. Seller shall have ten (10) days after the date of any such notice to elect by notice to Buyer to purchase such shares or securities on such terms and at the time the proposed sale is consummated.

(b)    The rights set forth in Section 6.2(a) shall not apply to (i) the issuance of shares or grant of options to purchase shares of Common Stock under Buyer's employee stock purchase and stock option plans, net of repurchases or {cancellations; (ii) Rule 145 transactions, and (iii)} [cancellations and (ii) bona fide business acquisitions].

6.3    Right of First Refusal on Change of Control.

*is this ok when we only 3 yr.*

(a)    First Refusal Right.

(i)    Until the earlier of (i) Threshold Date and (ii) three (3) years from the Closing Date, in the event Buyer's Board of Directors has approved an intention to merge with, sell shares representing 50% or more of the voting power of Buyer to, or sell all or substantially all of Buyer's assets to any of the six (6) parties identified by Seller in Schedule 6.3(a) hereof, Buyer shall deliver a notice (an "Acquisition Notice") to Seller [, which Acquisition Notice shall be kept confidential by

*make sure Schedule relates to offsho as well*

BPHPA1\RB\0147981.04
09/16/95

28.





days on such National Exchange prior to the applicable Acquisition Notice Date [and Seller shall have the option of paying in cash or in its own securities where the value is determined on the same basis].

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

(ii)    The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the Acquisition Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.

*Seller's rights relating to the Licensed Technology*

[(c)    Expansion of the License Agreement upon a Change of Control. Until two (2) years from the Closing Date, in the event Buyer's Board of Directors has approved an intention to merge with, sell shares representing 50% or more of the voting power of Buyer to, sell all or substantially all of Buyer's assets to, or engage voluntarily in any other change of control transaction with, any party or any affiliate of any party identified by Seller on Schedule 6.3(a) hereof and Seller has not exercised its Right of First Refusal pursuant to Section 6.3(a), or in the event any party or any affiliate of any party identified by Seller on Schedule 6.3(a) shall acquire shares representing 50% or more of the voting power of Buyer, ~~the License Agreement shall automatically become an unlimited, royalty-free perpetual license.~~]

6.4    Registration Rights.

(a)    Seller Demand Rights.

*Seller's rights in the Licensed Technology shall expand automatically expand such that — Buyer Seller shall have unlimited rights to the Licensed Technology*

*royalty-free perpetual worldwide*

NOV 000039987

(i)    Request for Registration.  In case at any time from and after the Closing, Buyer shall receive from Seller a written request that Buyer effect any registration with respect to all or a part of the Shares (or any securities issued or issuable in respect of the shares; collectively, the "Registrable Securities"), provided that the number of Shares (or other securities) designated by Seller to be included in such registration would result in an anticipated aggregate offering price of at least $5,000,000, Buyer will as soon as practicable, use its {diligent best} [reasonable commercial] efforts to effect such registration (including, without limitation, the execution of an undertaking to file pre-effective and post-effective amendments and supplements, appropriate qualification under the applicable blue sky or other state securities laws and appropriate compliance with exemptive regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of Registrable Securities as are specified in such request; provided, that Buyer shall not be obligated to take any action to effect any such registration pursuant to this Section after Buyer has effected {three} [two] registrations pursuant to a request by Seller under this Section. A registration proceeding pursuant to this Section which is subsequently withdrawn prior to effectiveness of a registration statement under the Securities Act shall not be considered an effected registration, qualification or compliance for purposes of this Section.

Subject to the foregoing provisions, Buyer shall file a registration statement covering the Registrable Securities so requested or otherwise elected to be registered as soon as practicable, but in any event within sixty days, after receipt of the request of Seller, provided that Buyer shall have the right to defer such registration for a period of up to ninety (90) days following the receipt of such a request if in the opinion of the Board of Directors of Buyer, it would be seriously detrimental to Buyer for a registration statement to be filed.

(ii)    Underwriting.  If Seller intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise Buyer as a part of its request made pursuant to Section {6.5(a)(i)} [6.4(a)(i)]. Buyer shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Seller, [and reasonably acceptable to Buyer].

(b)    Company Registration.

(i)    Notice of Registration.  If at any time or from time to time after the Closing, Buyer shall determine to register any of its securities for its own account (other than a registration relating solely to employee stock option or purchase plans or relating solely to a Rule 145 transaction), Buyer will:

NOV 000039988



(A)    promptly give to Seller written notice thereof (which shall include a list of the jurisdictions in which Buyer intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

(B)    include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within thirty (30) days after the date of such written notice from Buyer to Seller, except as set forth in Section ~~[6.5(b)(ii)]~~ [6.4(b)(ii)].

(ii)    Underwriting.  If the registration of which Buyer gives notice is for a registered public offering involving an underwriting, Buyer shall so advise Seller as a part of the written notice given pursuant to Section ~~[6.5(b)(i)(A)]~~ [6.4(b)(i)(A)].  In such event the right of Seller to registration pursuant to Section ~~[6.5(b)]~~ [6.4(b)] shall be conditioned upon Seller's participation in such underwriting and the inclusion of Seller's Registrable Securities in the underwriting to the extent provided herein.  If Seller proposes to distribute its securities through such underwriting it shall (together with Buyer and other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Buyer.  Notwithstanding any other provision of this Section, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting ~~[on a pro rata basis based on the total number of Registrable Securities held by Seller and based on the total number of securities being offered by Buyer for its own account]~~ [but in no event shall (i) the amount of securities of Seller included in the offering be reduced below twenty-five percent (25%) of the total amount of securities included in such offering or (ii) notwithstanding (i) above, any shares being sold by a shareholder exercising a demand registration right similar to that granted in Section 6.4(a) be excluded from such offering].  Buyer shall advise Seller of any such limitations, and the number of Registrable Securities that may be included in the registration.  If Seller disapproves of the terms of any such underwriting, it may elect to withdraw therefrom by written notice to Buyer and the underwriter.  Any Registrable Securities excluded or withdrawn from such underwriting shall not be included in such registration.

*[handwritten margin notes: "need clarification", "Registrable Securities", "Dan Colk Should pro rat between Novell an other Sell Shareho", "is this meant to be demand or p'ros?"]*

(iii)    Notwithstanding anything to the contrary in this Section ~~[6.5(b)]~~ [6.4(b)], Buyer shall not be obligated to effect any registration of securities under this Section ~~[6.5(b)]~~ [6.4(b)] pursuant to a registration statement covering any of its securities to be issued in connection with mergers, acquisitions, exchange offers, dividend reinvestment plans or stock option or other employee benefit plans.

(c)    Expenses of Registration.

NOV 000039989

effective; (2) of any request by the SEC or any other federal or state governmental authority during the period of effectiveness of the registration statement for amendments or supplements to the registration statement or related prospectus or for additional information relating to the registration statement, (3) of the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose, (4) of the receipt by Buyer of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation of any proceeding for such purpose; or (5) of the happening of any event which makes any statement made in the registration statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or which requires the making of any changes in the registration statement or prospectus so that, in the case of the registration statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(e)    Buyer may, upon the happening of any event (x) of the kind described in clauses (2), (3), (4), or (5) of Section ~~6.5(d)(i)(C)~~ [6.4(d)(i)(C)] or (y) that, in the judgment of Buyer's Board of Directors, renders it advisable to suspend use of the prospectus due to pending corporate developments, public filings with the SEC or similar events, suspend use of the prospectus on written notice to Seller ~~(for no more than thirty days in the aggregate in any six month period of time)~~, in which case Seller shall discontinue disposition of Registrable Securities covered by the registration statement or prospectus until copies of a supplemented or amended prospectus are distributed to Seller or until Seller is advised in writing by Buyer that the use of the applicable prospectus may be resumed. Buyer shall use its reasonable efforts to ensure that the use of the prospectus may be resumed as soon as practicable. Buyer shall use every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the securities for sale in any jurisdiction, at the earliest practicable moment. Buyer shall prepare as soon as practicable a supplement or post-effective amendment to the registration statement or a supplement to the related prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(f)    Indemnification.

NOV 000039990



(i)      Buyer will indemnify and hold harmless Seller, each of its officers and directors, and each person controlling Seller, with respect to which a registration has been effected pursuant to this Section {6.5} [6.4] and each underwriter, if any, and each person who controls any underwriter of the Registrable Securities held by or issuable to Seller, against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, { offering circular or other documents (including any related registration statement, notification or the like) incident to any such registration,} or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by Buyer of the Securities Act or any state securities law or of any rule or regulation promulgated under the Securities Act or any state securities law applicable to Buyer and relating to action or inaction required of Buyer in connection with any such registration, and will reimburse Seller, each of its officers and directors, and each person controlling Seller, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses [as] reasonably incurred in connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, provided that Buyer will not be liable in any such case to the extent that any such claim, loss, damage, cost, expense, or liability arises out of or is based on any untrue statement or omission based upon written information furnished to Buyer by an instrument duly executed by Seller or any underwriter and stated to be specifically for use therein.

(ii)      Seller will, if Registrable Securities held by or issuable to Seller are included in the securities as to which such registration is being effected, indemnify and hold harmless Buyer, each of its directors and officers who sign such registration statement, each underwriter, if any, of Buyer's securities covered by such registration statement, each person who controls Buyer within the meaning of the Securities Act against all claims, losses, damages, costs, expenses and liabilities whatsoever (or actions in respect thereof) arising out of or based on any untrue statement of a material fact contained in any such registration statement, preliminary or final prospectus contained therein or any amendment or supplement thereto, {offering circular or other documents (including any related registration statement, notification or the like)} incident to any such registration, or based on any omission [(or alleged omission)] to state therein a/material fact required to be stated therein or necessary to make the statements therein not misleading, [or any violation by Seller of the Securities Act or of state securities law or any rule or regulation promulgated under the Securities Act or any state securities law applicable to Seller and relating to action or inaction required of Seller in connection with any such registration] and will reimburse Buyer, such directors, officers, persons or underwriters for any legal or any other expenses [as] reasonably incurred in/connection with investigating or defending any such claim, loss, damage, cost, expense, liability or action, in each case to the extent, but only to the

BPHPA1\RB\0147981.04
09/16/95



or (ii), as the case may be in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and the Indemnified Party on the other in connection with statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or the Indemnified Party and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statements or omission. The Parties hereto agree that it would not be just and equitable if contributions pursuant to this Section {6.5(f)} [6.4(f)] were to be determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the first sentence of this Section {6.5(f)} [6.4(f)]. The amount paid by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this Section {6.5(f)} [6.4(f)] shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any action or claim which is the subject of this Section {6.5(f)} [6.4(f)]. Promptly after receipt by an Indemnified Party of notice of the commencement of any action against such party in respect of which a claim for contribution may be made against an Indemnifying Party under this Section {6.5(f)} [6.4(f)], such Indemnified Party shall notify the Indemnifying Party in writing of the commencement thereof if the notice specified in Section {6.5(e)(iii)} [6.4(e)(iii)] has not been given with respect to such action; provided that the omission so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to any Indemnified Party otherwise under this Section {6.5(f)} [6.4(f)], except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

      (h)      **Information by Holder.** Seller shall furnish to Buyer such information regarding Seller and the distribution proposed by Seller as Buyer may reasonably request in writing and as shall be required in connection with any registration referred to in this Section {6.5} [6.4].

      (i)      **Rule 144 Reporting.** With a view to making available to Seller the benefits of certain rules and regulations of SEC which may permit the sale of Registrable Securities to the public without registration, Buyer agrees to:

            (i)      make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after ninety (90) days after the effective date of the first registration filed by Buyer which involves a sale of securities of Buyer to the general public;

NOV 000039992

(:)       file with the SEC in a timely manner all reports and
other documents required of Buyer under the Securities Act and the Exchange Act; and

(iii)      furnish to Seller so long as it owns any Registrable
Securities forthwith upon request a written statement by Buyer that it has complied with
the reporting requirements of said Rule 144 (at any time after ninety (90) days after the
effective date of said first registration statement filed by Buyer), and of the Securities
Act and the Exchange Act (at any time after it has become subject to such reporting
requirements), a copy of the most recent annual or quarterly report of Buyer, and such
other reports and documents so filed by Buyer as may be reasonably requested in
availing Seller of any rule or regulation of the SEC permitting the selling of any such
securities without registration.

(j)      Transfer of Registration Rights.  Any registration rights
granted by Buyer under this Section {6.5}  [6.4] may be assigned by Seller in connection
with the sale by Seller of any Registrable Securities, [to a transferee or assignee, who,
after such assignment or transfer, holds at least 500,000 shares] and following such
assignment, the assignee shall be entitled to all rights of Seller under this Section  {6.5}
[6.4], provided that such assignee agrees in writing to be bound to the obligations of
Seller under this Section {6.5}  [6.4].



(k)      Termination of Registration Rights.  All registration rights
provided hereunder shall terminate upon the earlier to occur of (a) the tenth anniversary
of the Closing and (b) such time as Seller is able to sell all of its Registrable Securities
under Rule 144 during any two successive, three-month periods.

(l)      Future Grants of Registration Rights.  Buyer agrees for the
benefit of Seller that it will not grant registration rights with respect to any of its
securities upon terms more favorable to the holders of such securities than those
contained herein.

[6.5    Standstill Agreement.

(a)      Standstill.  Notwithstanding any other provision of this
Agreement, subject to the exceptions set forth in Section 6.5(b), without the approval of
the Board of Directors of Buyer (whether by written consent of the directors or pursuant
to a resolution duly adopted by the directors at a meeting of the Board of Directors),
Seller (which shall include any affiliate of Seller for purposes of this Section 6.5) shall
not acquire "beneficial ownership" (which, for purposes of this Section 6.5, shall have the
meaning set forth in Rule 13d-3 of the Exchange Act) of any securities of Buyer entitled
to vote with respect to the election of any directors of Buyer ("Voting Securities"), any
security convertible into, exchangeable for, or exercisable for, or that may become any
Voting Securities or any other right to acquire Voting Securities (such Voting Securities
and rights to acquire Voting Securities are collectively referred to herein as "Securities").

RPNPA11RB10147781.04
09/16/95

38.



NOV 000039993



(b)    Exceptions to Standstill Provision.

(i)    Seller may acquire Securities without regard to the limitations set forth in Section 6.5(a) in accordance with the provisions of Section 6.2 or Section 6.3 hereof; and

(ii)    Seller may, after written notice to Buyer, acquire Securities without regard to the limitations set forth in this Section 6.5 if a bona fide tender or exchange offer is made by any person or 13D Group to acquire Securities that, if added to the Securities (if any) already owned by such person or 13D Group, would represent ownership of Securities greater than fifty percent (50%) of Buyer's then outstanding Securities; provided, however, that Seller shall only be permitted to take such actions and make such offers as may be considered to be of the same nature and type of action or offer and directed to the same person or persons and within the same time period and for the same resulting amount of Securities as that which is being taken by such person or 13D Group; and provided further, however, that Seller may only acquire that amount of Securities that, when added to the amount of Securities already owned by Seller, shall not exceed the amount of Securities acquired or to be acquired (assuming any offers to purchase have been consummated) by such person or 13D Group. In proceeding with any action or offer permitted under this subsection 6.5(b)(ii), Seller shall be permitted to offer more favorable terms than those terms offered by such person or 13D Group, so long as such terms are consistent with an offer of the same nature and type of consideration as that which is being proposed by such person or 13D Group.

(c)    Notice of Securities Purchases and Sales.  Seller shall advise Buyer as to its plans to acquire or dispose of beneficial ownership of Securities, or rights thereto, reasonably in advance of any such action.

(d)    Acts in Concert with Others.  Seller shall not join a partnership, limited partnership, syndicate or other group, or otherwise act in concert with any third person, for the purpose of acquiring, holding, voting or disposing of Securities, or rights thereto.

(e)    Restrictions on Transfer of Securities.  Seller shall not dispose of beneficial ownership or voting control of Securities or any right thereto, except: (i) in accordance with the provisions of Section 6.7 hereof; (ii) to Buyer or any person or group approved by Buyer; (iii) pursuant to a bona fide public offering registered under the Securities Act (in which Seller does not have the ability to select the purchasers); (iv) pursuant to Rule 144 under the Securities Act; (v) in transactions not described in (i), (ii), (iii) or (iv) hereof so long as such transactions do not, directly or indirectly, result in any person or group owning or having the right to acquire beneficial ownership of Securities with aggregate voting power of five percent (5%) or more of the aggregate voting power of all outstanding Securities (assuming the conversion, exchange

BPHPA1\RB\0147981.04
09/16/95

39.

NOV 000039994

and/or exercise of all convertible, exchangeable and exercisable securities; or (v) in response to an offer to purchase or exchange for cash or other consideration any Securities that (a) is made by or on behalf of Buyer, or (b) is made by another person or group to all holders of Securities and is not opposed by the Board of Directors of Buyer within the time such Board is required, pursuant to regulations under the Exchange Act, to advise Company shareholders of such Board's position on such offer.

 6.6    Buyer's Right of Repurchase on Seller Change of Control.

*Not accepted; still offer*

 (a)    In the event of a proposed Change of Control (as defined below) of Seller, Buyer shall have the right to repurchase all Securities beneficially owned by Seller on the terms set forth in this Section 6.6. For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated (1) any consolidation or merger of such party in which such party is not the continuing or surviving corporation, or pursuant to which shares of such party's common stock would be converted in whole or in part into cash, other securities or other property, other than a merger of such person in which the holders of such party's common stock immediately prior to the merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the merger, or (2) any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of such party, or (ii) the stockholders of such party shall approve any plan or proposal for the liquidation or dissolution of such party, or (iii) any party, other than such party or a subsidiary thereof or any employee benefit plan sponsored by such party or a subsidiary thereof or a corporation owned, directly or indirectly, by the stockholders of such party in substantially the same proportions as their ownership of stock of such party, shall become the beneficial owner of securities of such party representing greater than fifty percent (50%) of the combined voting power of then outstanding securities ordinarily (and apart from rights accruing in special circumstances) having the right to vote in the election of directors, as a result of a tender or exchange offer, open market purchases, privately negotiated purchases or otherwise, or (iv) at any time after the date of this Agreement, individuals who at the date hereof constituted the Board of Directors of such party shall cease for any reason to constitute at least a majority thereof, unless the election or the nomination for election by such party's stockholders of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the date hereof, or (v) any other event shall occur with respect to such party that would be required to be reported in response to Item 6(e) (or any successor provision) of Schedule 14A of Regulation 14A promulgated under the Exchange Act.

*need to clean mileum to tell directors); they may vote*

*need to clear this*

 (b)    In the event of a proposed Change of Control of Seller, Seller shall deliver to Buyer written notice of the proposed Change of Control at least 30 days prior to the completion of the transaction resulting in the Change of Control stating that a Change of Control is proposed.

*ten (10)*



NOV 000039995

(c)    Within twenty (20) days following receipt by Buyer of the notice delivered pursuant to Section 6.6(b), Buyer shall be entitled to purchase all Securities beneficially owned by Seller at the "Fair Market Value" of such Securities, as determined in accordance with Section 6.6(d).  Buyer shall deliver its written notice of election to purchase such Securities within such twenty (20) day period.  If Buyer notifies Seller of its election to acquire such Securities in accordance with this Section 6.6, a closing with respect to such purchase shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than ten (10) days after delivery of the notice of election by Buyer.

(d)    The "Fair Market Value" of the Securities shall be determined as follows:

(i)    If the Securities are traded on a securities exchange or through the Nasdaq National Market, the fair market value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty-day period ending three (3) days prior to the closing of the purchase;  (30)

(ii)    If the Securities are actively traded over-the-counter, the fair market value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty-day period ending three (3) days prior to the closing of the purchase; and  (30)

(iii)    If there is no active public market for the Securities, the fair market value shall be the appraised value thereof, as determined by an investment banking firm or other qualified valuation consultant of nationally recognized standing mutually selected by Buyer and Seller.  Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified valuation consultant to undertake such determination.  In the event Buyer and Seller fail to so agree within five (5) business days after the notice of election to purchase, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified valuation consultant and, within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified valuation consultant to make such determination of the appraised value; and the determination of such third investment banking firm or other qualified valuation consultant of the appraised value shall be binding.  The investment banking firm or other qualified valuation consultant selected pursuant hereto to make the determination of the appraised value shall be required to make such determination within twenty (20) business days after its selection.  Buyer shall pay all costs and fees of up to the three such investment banking firms or other valuation qualified consultants, and shall cooperate fully

NOV 000039996



with the investment banking firm or other qualified valuation consultant selected to make such determination by promptly providing such information as is requested by such firm.

6.7    Buyer's Right of First Refusal

*include 6.4 CReg. Rights*

(a)    First Refusal Right.

(i)    In the event Seller proposes to sell any Securities, other than in a transaction described in Sections 6.5(e)(ii)-(v), Seller shall deliver a written notice to Buyer setting forth the terms of the proposed sale, including the name of the proposed purchaser and the date on or about which such sale is proposed to be completed. Buyer shall have the right of first refusal to acquire such Securities on the terms set forth in such notice (subject to the valuation provisions of Section 6.7(b) below), as provided in this Section.

(ii)    Seller shall have until twenty (20) days after the receipt of such a notice to elect by notice to Buyer to acquire all or any portion of such Securities proposed to be sold by Seller on the terms set forth in such notice. If Buyer notifies Seller within such time period of its election to acquire any of such Securities, a closing with respect to such acquisition shall be held at the principal office of Buyer (or at such other place as may be agreed upon by Buyer and Seller) on a date and at a time which are mutually agreeable to Buyer and Seller, but in no event later than ten (10) days after receipt by Seller of such notice of Buyer's election.

(iii)    In the event Seller elects not to exercise the foregoing right of first refusal, Seller shall have sixty (60) days to sell such Securities on the same terms as are set forth in such notice. If Seller proposes to sell such Securities on terms different than those set forth in the notice, or proposes to sell such Securities after the sixty (60) day period, Seller shall first notify Buyer of such proposed sale, and Seller shall have another opportunity to exercise its right of first refusal under this Section.

*ninety (90)*

(b)    Appraisal Procedure.

(i)    Whenever the terms of a proposed sale of Securities include forms of consideration other than cash or securities which are traded on a National Exchange (as defined below), Seller shall have the option to exercise its first refusal right under this section by paying the "Appraised Value" in cash of such proposed non-cash consideration. "Appraised Value" shall mean the fair saleable value of such non-cash consideration as of the date of the notice delivered pursuant to Section 6.7(a)(i) (the "First Offer Notice Date"), and shall be determined in the manner set forth in Section 6.7(b)(ii) below. If an item of consideration constitutes securities which are traded on a National Exchange (as defined below), the value of such items shall be the average of the closing prices of such securities on such exchange during (with reference

NOV 000039997



to the principal trading market if such securities are traded on more than one National Exchange) each day within the fifteen (15) trading days on such National Exchange prior to the First Offer Notice Date.

For purposes of this provision, "National Exchange" means the New York Stock Exchange, the American Stock Exchange, the Midwest Stock Exchange, the Pacific Stock Exchange or the National Market System of the National Association of Securities Dealers, Inc.

(ii)   The determination of "Appraised Value" shall be made by an investment banking firm or other qualified consultant of nationally recognized standing, in accordance with this provision. Buyer and Seller shall endeavor to mutually agree upon the investment banking firm or other qualified consultant to undertake such determination. In the event Buyer and Seller fail to so agree within five (5) business days after the First Offer Notice Date, within two (2) business days after such failure each of Buyer and Seller shall choose one such investment banking firm or other qualified consultant and within five (5) business days after such failure, the respective chosen firms shall be required to choose a third such investment banking firm or other qualified consultant to make such determination of the Appraised Value; and the determination of such third investment banking firm or other qualified consultant of the Appraised Value shall be binding. The investment banking firm or other qualified consultant selected pursuant hereto to make the determination of the Appraised Value shall be required to make such determination within twenty (20) business days after its selection. Buyer shall pay all costs and fees of up to the three such investment banking firms or other qualified consultants, and shall cooperate fully with the investment banking firm or other qualified consultant selected to make such determination by promptly providing such information as is requested by such firm.]

### ARTICLE VII

### TERMINATION, AMENDMENT AND WAIVER

7.1    Termination. Except as provided in Section 7.2 below, this Agreement may be terminated and the Acquisition abandoned at any time prior to the Closing Date:

(a)    by mutual consent of Seller and Buyer;

(b)    by Buyer or Seller if: (i) the Closing has not occurred by (December 31, 1995) [February 28, 1996] (ii) there shall be a final nonappealable order of a federal or state court in effect preventing consummation of the Acquisition; or (iii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Acquisition by any Governmental Entity that would make consummation of the Acquisition illegal;

NOV 000039998



(c)    by Buyer if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Seller and such breach has not been cured within five (5) business days after written notice to Seller (provided that, no cure period shall be required for a breach which by its nature cannot be cured);

(d)    by Buyer at any time prior to November 1, 1995, if as a result of its due diligence review of the Business subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement and not disclosed to Buyer prior to or on the date of this Agreement that Buyer {believes,} [reasonably determines] in its good faith reasonable judgment, has a material adverse effect on the {condition} [Business Condition] of the Business {or substantially impairs the value of this Business};

(e)    by Seller at any time prior to November 1, 1995 if as result of its due diligence review of Buyer subsequent to the date of this Agreement it discovers a fact or condition existing on the date of this Agreement not disclosed to Seller prior to or on the date of this Agreement that Seller believes, in its good faith reasonable judgment, has a material adverse effect on the {value of the Shares to Seller} [Business Condition of the Business];

this is right

(f)    by Seller if it is not in material breach of this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Buyer and such breach has not been cured within five (5) business days after written notice to Buyer (provided that, no cure period shall be required for a breach which by its nature cannot be cured).

7.2    **Effect of Termination**.  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Buyer or Seller, or their respective officers, directors or shareholders, provided that each party shall remain liable for any breaches of this Agreement prior to its termination; and provided further that, the provisions of Sections _____ of this Agreement shall remain in full force and effect and survive any termination of this Agreement.

7.3    **Amendment**.  This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto.

7.4    **Extension; Waiver**.  At any time prior to the Closing Date, Buyer on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other party hereto, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with

BPHPA1\RB\0147981.04
09/16/95

NOV 000039999

any of the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

## ARTICLE VIII

## INDEMNIFICATION

8.1 Survival of Representations, Warranties and Agreements.

Notwithstanding any investigation conducted at any time with regard thereto by or on behalf of either party, the representation made by Seller in Section 2.10, including any schedules thereto, shall survive the execution, delivery and performance of this Agreement. The obligation of indemnity provided herein shall terminate one (1) year after the Closing.

8.2 Indemnification.

(i)     Seller hereby agrees to indemnify and hold harmless Buyer against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys' fees, any and all out-of-pocket expenses incurred in investigating, preparing or defending against any litigation, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation, only to the extent that the aggregate of the foregoing exceeds $250,000, (collectively "Damages") asserted against, resulting to, imposed upon, or incurred or suffered by Buyer, directly or indirectly, as a result of or arising from any inaccuracy in or breach of the representation and warranty made by Seller in Section 2.10, including schedules thereto. Seller's indemnity obligation pursuant to this Article VIII shall in no event exceed $5,000,000.

8.3 Procedure for Indemnification with Respect to Third-Party Claims.

(i)     If Buyer determines to seek indemnification under this Article VIII with respect to Identifiable Claims (the party seeking such indemnification hereinafter referred to as the "Indemnified Party" and the party against whom such indemnification is sought is hereinafter referred to as the "Indemnifying Party") resulting from the assertion of liability by third parties, the Indemnified Party shall give notice to the Indemnifying Party within 60 days of the Indemnified Party becoming aware of any such Identifiable Claim or of facts upon which any such Identifiable Claim will be based; the notice shall set forth such material information with respect thereto as is then reasonably available to the Indemnified Party. In case any such liability is asserted against the Indemnified Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within 20 days after receiving the Indemnified Party's notice, to

BPHPA1\RB\0147981.04
09/16/95

45.

assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the sole, unreimbursable expense of the Indemnified Party unless the Indemnified Party does not assume control or the Indemnified Party shall reasonably determine that there is a conflict of interest between Buyer and Seller with respect to such Identifiable Claim, in which case the fees and expenses of such counsel will be borne by the Indemnifying Party, (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing, and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Identifiable Claims resulting from the assertion of liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and, if so, only to the extent that, the Indemnifying Party is materially prejudiced thereby.  With respect to any assertion of liability by a third party that results in an Identifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

        (ii)    In the event that the Indemnifying Party, within 20 days after receipt of the aforesaid notice of an Identifiable Claim, fails to assume the defense of the Indemnified Party against such Identifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

        (iii)    Notwithstanding anything in this Section to the contrary, (i) if there is a reasonable probability that an Identifiable Claim may materially and adversely affect the Indemnified Party, other than as a result of money damages or other money payments, the Indemnified Party shall have the right to participate in such defense, compromise or settlement and the Indemnifying Party shall not, without the Indemnified Party's written consent (which consent shall not be unreasonably withheld), settle or compromise any Identifiable Claim or consent to entry of any judgment in respect thereof unless such settlement, compromise or consent includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect of such Identifiable Claim.

8.4 Procedure For Indemnification with Respect to Non-Third-
Party Claims.

In the event that the Indemnified Party asserts the existence of a claim giving rise to Damages (but excluding claims resulting from the assertion of liability by third parties), it shall give written notice to the Indemnifying Party. Such written notice shall state that it is being given pursuant to this Section 8.4, specify the nature and amount of the claim asserted and indicate the date on which such assertion shall be deemed accepted and the amount of the claim deemed a valid claim (such date to be established in accordance

NOV 000040001

[EXHIBIT 5.1(c)  [TO BE EXPANDED]

Eiger Development.

(a)    Prior to the Closing Date, Seller shall use its reasonable commercial efforts to complete the Eiger product (as such term is defined in the Operating Agreement) in accordance with the development schedule previously furnished to Buyer.

(b)    After the Closing Date, Seller shall contribute to Buyer a portion of the direct development costs associated with development of the Eiger product as follows:

(i)    Seller shall contribute to Buyer 50% (fifty percent) of such direct development costs until such contribution reaches an aggregate of $2.5 million (Two Million Five Hundred Thousand Dollars).

(ii)   Once an aggregate of $5 million (Five Million Dollars) is spent by Buyer on the development of the Eiger product, including the Seller contribution described in (i) above, Seller shall contribute to Buyer 25% (twenty-five percent) of such direct development costs until such additional contribution equals $2.5 million (Two Million Five Hundred Thousand Dollars).

(iii)  Except for the foregoing, Seller shall have no obligations to Buyer whatsoever respecting the development of the Eiger product.

(iv)   Buyer shall provide Seller with such evidence of direct expenditures on the development of the Eiger product as Seller may reasonably request before any Seller contributions are made.

(v)    Any such contributions shall be made quarterly in arrears upon written notice by Buyer of the expenditure of sums as to which Seller agrees to contribute its aforementioned percentages.]

NOV 000040002