MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
David E. Melaugh (pro hac vice)
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant and Counterclaimant Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff and Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE BASED ON FAILURE TO ESTABLISH SPECIAL DAMAGES** <br><br> *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]* <br><br> Case No. 2:04CV00139 <br><br> Judge Dale A. Kimball |

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF ISSUE ............................................................................... 1

II.   INTRODUCTION ........................................................................................ 1

III.  STATEMENT OF UNDISPUTED FACTS ..................................................... 3

IV.   ARGUMENT ............................................................................................ 21

      A.    SCO Cannot Establish Special Damages to Support the Slander of Title
            Claim By Pointing to Harm to Its Licensing Program ......................................... 21

            1.    SCO Cannot Establish That the Failure of SCOsource Was a Direct
                  and Immediate Result of Novell's Ownership Claim .............................. 22

            2.    SCO Cannot Produce Evidence of Realized and Liquidated Loss
                  Based on the Failure of the SCOsource Program .................................. 25

                  a.    Novell's Statements Could Not Have Any Residual Effect
                        on the Copyrights ........................................................................ 26

                  b.    Allowing SCO to Claim SCOsource Royalties As Special
                        Damages Would Constitute Double Recovery ........................... 29

      B.    SCO's Allegation That Its Stock Lost Value Is a Claim for General, Not
            Special Damages ........................................................................................... 31

      C.    SCO Cannot Claim Its Costs and Fees in this Action as Special Damages ........ 32

      D.    SCO Has Not Produced Evidence to Support Special Damages for
            Researching Copyright Registrations or for Correcting Public Statements ......... 34

V.    CONCLUSION .......................................................................................... 36

# TABLE OF AUTHORITIES

## CASES

*Ams. Disabled for Accessible Pub. Transp. v. Skywest Airlines, Inc.*,
  762 F. Supp. 320 (D. Utah 1991)..................................................................35

*Bass v. Planned Mgmt. Servs.*,
  761 P.2d 566 (Utah 1988)..........................................................................21

*Bothmann v. Harrington*,
  458 So. 2d 1163 (Fla. Ct. App. 1984)......................................................22, 28

*C.P. Interests, Inc. v. Cal. Pools, Inc.*,
  238 F.3d 690 (5th Cir. 2001) ....................................................................33

*Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc.*,
  175 F.R.D. 646 (C.D. Cal. 1997)..............................................................14

*Childers v. Commerce Mortgage Investors*,
  579 N.E.2d 219 (Ohio Ct. App. 1989).......................................................29

*Colquhoun v. Webber*,
  684 A.2d 405 (Me. 1996)...........................................................................32

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*,
  2001 U.S. Dist. LEXIS 24905 (D. Utah Mar. 28, 2001),
  *aff'd,* 312 F.3d 1292 (10th Cir. 2002).................................................25, 31, 32

*Cont'l Casualty Co. v. Southwestern Bell Tel. Co.*,
  860 F.2d 970 (10th Cir. 1988) ..................................................................22

*Continental Nut Co. v. Robert L. Berner Co.*,
  345 F.2d 395 (7th Cir. 1967) ....................................................................27

*Dent v. Balch*,
  213 Ala. 311 (1925) ..................................................................................30

*Falic v. Legg Mason Wood Walker, Inc.*,
  347 F. Supp. 2d 1260 (S.D. Fla 2004) ....................................................22, 32

*First Security Bank of Utah, N.A. v. Banberry Crossing*,
  780 P.2d 1253 (Utah 1989).....................................................................24, 34

*Frank Pisano & Assocs. v Taggart*,
  29 Cal. App. 3d 1 (Cal. Ct. App. 1972) ............................................................30, 31

*G.O. Reaugh v. McCollum Exploration Co.*,
  163 S.W.2d 620 (Tex. 1942) ..............................................................................27, 29

*Geer v. Cox*,
  2003 U.S. Dist. LEXIS 9230 (D. Kan. May 21, 2003) ...........................................14

*Hicks v. McLain's Bldg. Materials, Inc.*,
  209 Ga. App. 191 (1993) .........................................................................................33

*Hodges v. Gibson Prods. Co.*,
  811 P.2d 151 (Utah 1991) ..........................................................................................1

*Howe v. Hull*,
  873 F. Supp. 70 (N.D. Ohio 1994) ...........................................................................24

*King v. E.F. Hutton & Co.*,
  117 F.R.D. 2 (D.D.C. 1987) ......................................................................................14

*Kleier Advertising, Inc. v. Premier Pontiac, Inc.*,
  921 F.2d 1036 (10th Cir. 1990) ................................................................................28

*Lee v. Washington Square Homeowners' Ass'n*,
  273 Ga. App. 392 (2005) ..........................................................................................33

*Macia v. Microsoft Corp.*,
  152 F. Supp. 2d 535 (D. Vt. 2001) ......................................................................22, 26

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*,
  2003 U.S. Dist LEXIS 1652 (N.D. Ill. Feb. 4, 2003) ........................................21, 25

*Ostarly v. Johnson*,
  700 S.W.2d 643 (Tex. Ct. App. 1985) ......................................................................27

*Prof'l Asset Mgmt. v. Penn Square Bank, N.A.*,
  1984 U.S. Dist. LEXIS 15230 (D. Okla. July 5, 1984) ...........................................35

*Ruiz v. Varan*,
  797 P.2d 267 (N.M. 1990) ........................................................................................24

*SCO Group, Inc. v. Novell, Inc.*,
  2004 U.S. Dist. LEXIS 12267 (D. Utah, June 9, 2004) ......................................1, 21

*Salit v. Ruden, Mcclosky, Smith, Schuster & Russell*,
    742 So. 2d 381 (Fla. Ct. App. 1999)................................................................32

*Sannerud v. Brantz*,
    879 P.2d 341 (Wyo. 1994)................................................................33

*Stiles v. Kuriloff*,
    6 N.J. Misc. 271 (Cir. Ct. 1928) ................................................................30

*Stoody Co. v. Royer*,
    374 F.2d 672 (10th Cir. 1967) ................................................................22

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
    21 F. Supp. 2d 1247 (D. Kan. 1998)................................................................24

*Valley Colour, Inc. v. Beuchert Builders, Inc.*,
    944 P.2d 361 (Utah 1997)................................................................1, 21, 25, 28

*Zapata v. IBP, Inc.*,
    1995 U.S. Dist. LEXIS 6436 (D. Kan. May 10, 1995)................................................14

## STATUTES

17 U.S.C. § 504(b) ................................................................28

Fed. Rule Civ. Proc. 56(d) ................................................................34

## MISCELLANEOUS

Restatement (Second) of Torts § 633 (1977)................................................................24, 25, 29

## I.    STATEMENT OF ISSUE

SCO's claim for slander of title alleges that SCO suffered harm as a result of Novell's claim that SCO does not own the UNIX copyrights.  SCO contends that as a result of Novell's statements, SCO suffered a drop in its stock price and the failure of its licensing business.  Even if SCO were to prevail on the rest of its slander of title claim, these are not special damages.  Accordingly, this motion raises the sole issue:

Is Novell entitled to summary judgment of SCO's slander of title claim on the grounds that SCO has failed to establish special damages resulting from the alleged slander?

## II.    INTRODUCTION

Early in this case, in permitting SCO's slander of title action to proceed, this Court noted that special damages were a required element for a slander of title claim, and that special damages had to "consist of 'a realized or liquidated' pecuniary loss."  *SCO Group, Inc. v. Novell, Inc.*, Civil Case No. 2:04CV139DAK, 2004 U.S. Dist. LEXIS 12267, at *28 (D. Utah, June 9, 2004) ("*SCO I*") (attached hereto as Ex. 1), citing *Hodges v. Gibson Prods. Co.,* 811 P.2d 151, 162 (Utah 1991).  Indeed, as this Court recognized, "'[i]t is not sufficient to show that the [property]'s value has dropped on the market, as this is general damage, not a realized or liquidated loss.'"  *Id.* at *29, citing *Valley Colour, Inc. v. Beuchert Builders, Inc.,* 944 P.2d 361, 364 (Utah 1997).  After years of discovery, SCO has failed to establish that Novell's public statements challenging SCO's ownership of the UNIX copyrights have caused any realized or liquidated loss.

Instead, SCO has admitted publicly and in discovery that licensees have declined to take SCOsource licenses                              **\* REDACTED \***

1

**\* REDACTED \***                                   At the same time, all of the

evidence produced by SCO makes one point inescapably clear: if SCO should ultimately

establish its ownership claim, it expects to renew its campaign to extract license fees from Linux

users based on the UNIX System V copyrights.

Thus, far from establishing a realized or liquidated loss, SCO has established that the

intellectual property at issue in this case has retained its value notwithstanding any temporary

cloud on SCO's ability to license it.  Assuming SCO were to prevail on the underlying

substantive dispute and could establish title to the copyrights,[1] SCO will be in no better and no

worse position to recover royalties or damages from the Linux end-users who SCO contends

infringe the copyrights than it was before Novell challenged SCO's ownership.  Put another way,

SCO seeks to recover money from Novell that it will be in a position to seek from Linux users if

its "title" is cleared and it can establish infringement.  This would be a "double recovery" and it

is precluded by law.

SCO has failed to adduce the facts required to support a claim of special damages.  The

facts it has brought forward show that it cannot support that claim as a matter of law.  Novell is

thus entitled to summary judgment on SCO's slander of title claim for failure to prove an

essential element of the claim.

---

[1] Novell remains confident that it will prevail on the underlying issues of copyright
ownership, as well as on the other issues underlying the slander of title claim.  This motion,
nevertheless, is based on the fact that this claim fails as a matter of law *even* if SCO prevails on
its ownership claim.

III.    **STATEMENT OF UNDISPUTED FACTS**

Background Facts: the APA

1.    In 1995, Novell was engaged in the business of developing a line of software products known as UNIX and UnixWare, and was selling binary and source code licenses to various versions of these products.  (Declaration of Kenneth W. Brakebill In Support of Novell's Motion for Partial Summary Judgment on Special Damages, filed herewith ("Brakebill Decl."), Ex. 2 (APA) at 1 (Recital A).)[2]

2.    Novell and Santa Cruz entered into an Asset Purchase Agreement ("APA") on September 19, 1995.  Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business.  (Brakebill Decl., Ex. 2, Recital B.)  The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the transfer; and Schedule 1.1(b), which listed assets excluded from the transfer.

3.    The Schedule 1.1(b) list of "Excluded Assets" expressly excluded "All copyrights and trademarks, except for the trademarks UNIX and UnixWare" and "All Patents" from the sale.  (Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V.)

4.    In 2000, Santa Cruz entered into an agreement with Caldera Systems whereby Caldera would purchase the division of Santa Cruz that included Santa Cruz's UNIX-related business.  (Novell's Amended Counterclaims, filed September 25, 2006 ("NAC") at ¶¶ 28 -31;

---

[2] Novell submits the Brakebill Declaration, and the exhibits cited therein, in support of this motion, as well as three other concurrently-filed summary judgment motions: (1) Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claim in Its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; (2) Novell's Motion for Partial Summary Judgment on the Copyright Ownership Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; and (3) Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance.

SCO's Reply to Novell's Amended Counterclaims, filed October 16, 2006 ("Reply") at ¶¶ 28-31.)  In August 2002, Caldera announced that it would change its name to "SCO" and began doing business under that name.  (NAC ¶ 36; Reply ¶ 36.)

5.    SCO, the plaintiff in this action, claims to be the successor-in-interest to Santa Cruz's rights and obligations under the APA.  (SCO's Second Amended Complaint, filed February 3, 2006 ("SAC") at 22 (¶ 88).)  As set forth in greater detail below, in early 2003, SCO launched a campaign asserting that it owned the copyrights to UNIX System V, and that portions of the Linux operating system infringed those copyrights (the SCOsource initiative).

6.    On May 28, 2003, Novell's Chairman, President and CEO, Jack Messman announced publicly that Novell did not transfer the UNIX and UnixWare copyrights to SCO, and that SCO was not the owner of the copyrights.  (SAC at ¶ 37.)  SCO and Novell continued to dispute this issue publicly for the next several months, up until the filing of this lawsuit by SCO. (*Id.*)

7.    In June or July 2003, SCO registered certain copyrights in UNIX System V and UnixWare with the United States Copyright Office.  (NAC ¶ 41(d); Reply ¶ 41.)  In September and October 2003, Novell submitted certifications to the United States Copyright Office claiming to be the owner of the same UNIX System V and UnixWare copyrights.  (SAC ¶ 37(g).)

The SCOsource Program: SCO's Effort to Extract Licensing Fees Based on Linux

8.    Prior to the Santa Cruz acquisition, substantially all of Caldera's revenue was derived from sales of Linux products and services.  (NAC ¶ 31; Reply ¶ 31.)  Linux is the name of a computer operating system, which was developed as open-source software and has become a

popular alternative to proprietary operating systems.  (NAC ¶¶ 8, 9; Reply ¶ 8, 9.)  However, Caldera had been unsuccessful at creating a profitable Linux business.  (NAC ¶ 31; Reply ¶ 31.)

9.      In January 2003, the newly rebranded SCO launched the SCOsource initiative. (NAC ¶ 37; Reply ¶ 37.)  In connection with this announcement, SCO's CEO, Darl McBride, commented that "SCO owns much of the core UNIX intellectual property, and has full rights to license this technology and enforce the associated patents and copyrights."  (NAC ¶ 46; Reply ¶ 46.)  SCOsource was an effort to obtain license fees from Linux users based on claims to UNIX System V intellectual property.

10.     Under the SCOsource licensing program, SCO offered Intellectual Property Licenses to Linux end users ("Intellectual Property Licenses").  The purported purpose of these licenses is to allow UNIX vendors to use SCO's UNIX intellectual property and to permit Linux end users to "properly compensate us for our UNIX intellectual property as currently found in Linux."  One term of SCO's Intellectual Property Licenses for Linux is that licensees "will be held harmless against past and future copyright violations based on their use of SCO's intellectual property . . . in Linux distributions . . . ."  (NAC ¶ 47; Reply ¶ 47.)

11.     On or around May 12, 2003, SCO sent 1500 end-user corporations (including IBM and Novell) a letter threatening suit based on SCO's assertion that it owned the UNIX copyright.  In these letters, SCO asserted that it had evidence that Linux included portions of UNIX System V software code, and that "Linux infringes on our UNIX intellectual property and other rights."  (NAC ¶¶ 52-55; Reply ¶¶ 52-55.)

12.     In addition, SCO made many public statements asserting that end users of Linux are liable to SCO for infringement of the UNIX System V copyrights.  This Court has noted SCO's "barrage of public statements about pursuing [ ] infringers of its alleged intellectual

property rights." *The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK,

Memorandum Decision and Order at 5-6 (Feb. 9, 2005).  (NAC ¶ 56; Reply ¶ 56.)

13.    SCO has convinced several Linux end users to participate in its licensing

program.  In fiscal year 2004, for example, SCO generated revenue from its SCOsource

Intellectual Property licenses.  (NAC ¶ 59; Reply ¶ 59.)  The fees collected by SCO for its

SCOsource licenses were not                          **\* REDACTED \***

                    **\* REDACTED \***                          , SCO simply

demanded that Linux end-users pay an up-front fee based on          **\* REDACTED \***

**\* REDACTED \***   SCO charged $699 for a license to run Linux on a system with one CPU,

                    **\* REDACTED \***

                    (*See* Brakebill Decl., Ex. 54 at SCO1556051; Ex. 55 at

SCO1769410; Ex. 56 at SCO1463816; Ex. 63 (McBride Dep.) at 136, 220-21 (referring to "our

list price of $700").)

14.    Despite achieving successes with some licensees, the SCOsource licensing

campaign generated controversy that has impacted SCO's core software business.  As SCO has

acknowledged in its public SEC filings, "the assertion of our legal rights relating to our UNIX

ownership and related copyrights and our other legal actions have resulted in our becoming the

focus of a significant amount of negative publicity from various sources that has to some degree

hampered our ability to compete favorably."  (Brakebill Decl., Ex. 29 (SCO 2006 10K) at 5.)

Public Reaction to SCO's Claims: Litigation and Licensing Difficulties

15.    Even before the SCOsource initiative was launched, there were executives within

SCO who predicted that          **\* REDACTED \***          In December 2002, SCO's then

Senior Vice President for Marketing Jeffrey Hunsaker forwarded an email from a senior systems

engineer Buck Carhart to the SCO executive team regarding

**\* REDACTED \***

(Brakebill Decl. Ex. 30; Ex. 31 (Hunsaker Dep.) at 168:9-169:1.)  On

January 13, 2003, Geoff Seabrook, who had negotiated the APA on behalf of Santa Cruz, sent an

email to colleagues at SCO

**\* REDACTED \***

(Brakebill

Decl., Ex. 32; Ex. 33 (Mohan Dep.) at 212:1-23.)

16.    In fact, the public reaction to SCO's claim that Linux might require a UNIX

license was swift and hostile.  Almost immediately after SCO made its announcement in

January 2003, Mr. Hunsaker forwarded an article from

**\* REDACTED \***

(Brakebill Decl., Ex. 34; Ex. 31 (Hunsaker Dep.) at 188:23-

189:24.)

17.    The SCOsource initiative was also associated with high profile litigation

regarding the validity of SCO's infringement claim.  In March 2003, SCO filed a complaint

against IBM, alleging that IBM had breached its UNIX licenses by disclosing restricted

information in connection with Linux.  IBM counterclaimed in that action, seeking among other

things a declaration that Linux does not infringe the UNIX copyrights.  In August, 2003, Red

Hat, Inc. filed suit against SCO seeking a declaratory judgment that the Linux operating system

does not infringe UNIX intellectual property rights.  (Brakebill Decl., Ex. 29 (SCO 2006 10K) at

16-17.)

     18.    The trade press commented extensively on the SCOsource program and related

litigation.  For example,          **\* REDACTED \***

     **\* REDACTED \***     seven press reports on SCO's claims, including an interview with

Linus Torvaldson (the originator of Linux) challenging SCO's claims, an article by a developer

who reported on visiting SCO to examine SCO's infringement evidence (and who was not

impressed), and an article reporting that a leading open source advocate claimed to have

evidence undermining SCO's claims.  (Brakebill Decl. Ex. 35; Ex. 36 (Sontag Dep.) at 81:7-25.)

     19.    Industry analysts also freely opined on whether end users should take a

SCOsource license or not.

**\* REDACTED \***

    (Brakebill Decl., Ex. 37 (        **\* REDACTED \***

    **\* REDACTED \***    ); Ex. 38 (        **\* REDACTED \***

     **\* REDACTED \***     ); Ex. 39 (

**\* REDACTED \***

               ).)  Other analysts

offered similar opinions.  (*Id.,* Ex. 40 (TechNewsWorld Story "Split Decision of SCO Impact,

Response").)  A May 15, 2003 paper by Eric Raymond and Rob Landley of the Open Source

Initiative entitled

**\* REDACTED \***

(Brakebill Decl., Ex. 41 at page 2 of 23.)

**\* REDACTED \***

(*Id* at 18-20.)

20.    Public skepticism regarding SCO's infringement claims was reinforced by a

closely watched ruling in the SCO/IBM litigation.  In ruling on IBM's motion for summary

judgment in February 2005, this Court observed that given "SCO's plethora of public statements

concerning IBM's and others' infringement of SCO's purported copyrights to the UNIX software,

it is astonishing that SCO has not offered any competent evidence to create a disputed fact

regarding whether IBM has infringed SCO's alleged copyrights through IBM's Linux activities."

*The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK, Memorandum Decision

and Order at 10 (Feb. 9, 2005).

21.    Internal documents produced by SCO reveal that SCO's sales **\* REDACTED \***

**\* REDACTED \***

- On May 21, 2003,

**\* REDACTED \***

(Brakebill Decl. Ex. 42; Ex. 31 (Hunsaker

Dep.) at 208:3-21.)

9

- On August 5, shortly after SCOsource license terms were made available online,


**\* REDACTED \***


(Brakebill Decl. Ex. 43; Ex. 31 (Hunsaker Dep.)

at 221:12-224:15.)

- On December 11, 2003,


**\* REDACTED \***


(Brakebill Decl.,

Ex. 44; Ex. 45 at 112:13-113:11.)

22.    CEO Darl McBride testified that Mr. Gasparro maintained a log of contacts with

the companies SCO contacted as part of the SCOsource program.  (Brakebill Decl. Ex. 65

(McBride Dep.) at 137:20-140:10).  SCO has not specifically identified this log but it appears to

correspond to a spreadsheet SCO produced in discovery.  (Brakebill Decl., Ex. 46.)  There are

dozens if not hundreds of entries on the Gasparro log indicating that the target company was no

longer in business, or that SCO had the wrong address.  (*Id.*)  None of the entries indicate that the

target company mentioned Novell's ownership claim.  (*Id.*)  On or about April 21, 2004,

**\* REDACTED \***

(Brakebill Decl., Ex. 47.)

    23.      SCO has produced hundreds of pages of correspondence with target SCOsource

licensees in discovery that reveal         **\* REDACTED \***

A compilation of such letters is attached to the Brakebill Declaration at Exhibit 53, including:

- May 22, 2003 letter from         **\* REDACTED \***

        (SCO1512012-240);

- June 6, 2003 letter from

**\* REDACTED \***

    (SCO1448056);

- January 12, 2004 response from

**\* REDACTED \***

        (SCO1448008);

- January 15, 2004 letter from

**\* REDACTED \***

    (SCO1448031);

- January 23, 2004 email exchange with

**\* REDACTED \***

11

**\* REDACTED \***

(SCOR 7680-81);

- January 28, 2004 letter from

**\* REDACTED \***

(SCO1448027);

- January 29, 2004 letter from

**\* REDACTED \***

(SCO1512029-240);

- January 30, 2004 letter from

**\* REDACTED \***

(SCO1512007-240);

- February 6, 2004 letter from

**\* REDACTED \***

(SCO1512006-240);

- March 19, 2004 letter from

**\* REDACTED \***

(SCO1512015-240);

12

- March 23, 2004 letter from

**\* REDACTED \***

(SCO1512016-240);

- March 26, 2004 letter from

**\* REDACTED \***

(SCO1512021-240-1512022-240);

- May 21, 2004 email exchange with

**\* REDACTED \***

(SCO1765148-149).

SCO's Discovery Response Regarding Damages

24.    Although the focus of SCO's suit has always been its charge that Novell caused the SCOsource program to fail, SCO has not been forthcoming about the specific facts supporting its claim to damages.  On September 29, 2006, Novell propounded Interrogatory No. 15, in which Novell asked SCO to "[i]dentify all facts, bases, and evidence in support of SCO's claims for damages," including the amount of damage, the factual justification for such amount, and all documents that SCO contends support its damages claims.  (Brakebill Decl., Ex. 57.)  SCO refused to respond to this interrogatory, relying on the sole objection that "the information it seeks is properly the subject of expert discovery."  (Brakebill Decl., Ex. 58 at 29.)

25.     After Novell cited the body of case law requiring plaintiffs to disclose the bases for their damages claims,[3] SCO finally agreed to respond to Interrogatory No. 15.  SCO confirmed on March 19, 2007 that its response would "include the factual predicates for its damages claims," including "any facts concerning the alleged damage" and "a[ ] list of documents that SCO currently believes support its damages claims[.]"  (Brakebill Decl., Ex. 59.)

26.     On April 6, 2007, with just a few weeks of discovery remaining, SCO served its response.  SCO recited two specific ways in which Novell's statements supposedly caused it harm.  First, SCO maintained that Novell's actions "substantially impeded SCO's ability to make sales in [its SCOsource] business."  (Brakebill Decl., Ex. 60 at 11, ¶ 22.)  According to SCO, "[w]hile [it] was able to sell a limited number of SCOsource licenses . . . , prospective customers frequently identified the cloud over SCO's title to UNIX copyrights—created by Novell—as a reason not to purchase a SCOsource license."  (Brakebill Decl., Ex. 60 at 11, ¶¶ 22-23.)  SCO's response did not name these customers.  Second, SCO claimed that "[t]he significant damage to SCO from Novell's actions is reflected in the swift reaction of the market and the substantial decline in SCO's stock price[.]"  (*Id*. at 11, ¶ 23.)[4]

---

[3] *See* Brakebill Decl., Ex. 61; Ex. 59 (citing *Geer v. Cox*, Case No. 01-2583-JAR, 2003 U.S. Dist. LEXIS 9230, at *5, *10 (D. Kan. May 21, 2003) (attached hereto as Ex. 2); *Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc*., 175 F.R.D. 646, 650-52, n.1 (C.D. Cal. 1997); *Zapata v. IBP, Inc*., Civil Action No. 93-2366-EEO, 1995 U.S. Dist. LEXIS 6436, *5-6 (D. Kan. May 10, 1995) (attached hereto as Ex. 3); *King v. E.F. Hutton & Co*., 117 F.R.D. 2, 5-6 (D.D.C. 1987)).

[4] SCO also vaguely referred to "a backlash from Novell's actions in other aspects of its business" and suggested that it "suffered further losses in" its UNIX business.  (*Id*. at 12, ¶ 24.) These general allegations of consequential harm cannot constitute special damages, and Novell assumes that SCO does not seek recovery for them under this claim.

27.     SCO's response also listed 61 documents "supporting SCO's damages claims." (*Id*. at 17-20.)

**\* REDACTED \***

To the contrary, in response to Novell's questions about documentary evidence related to the deposition of the SCO executive who led the SCOsource division, SCO specifically referred Novell to its response to Interrogatory No. 15. (Brakebill Decl., Ex. 62.)

28.     However, in a reversal of SCO's prior representation that its interrogatory response would list the "documents that SCO currently believes support its damages claims," SCO indicated just three days ago that the list of documents in SCO's response to Interrogatory No. 15 is merely "a non-exhaustive list of such correspondence." (Brakebill Decl., Ex. 62.)

29.     As noted above, of the 61 documents SCO identified in support of its damages contentions, there is

**\* REDACTED \***

**\* REDACTED \***                                                                (Brakebill

Decl., Ex. 48.)

     <u>Other Evidence Regarding Damages</u>

     30.     In addition to the broad allegations in its interrogatory response, SCO witnesses

have testified that potential licensees cited Novell's challenge to SCO's ownership of the

copyrights as a reason for their failure to sign up immediately for a SCOsource license. But

these SCO executives have also admitted that potential licensees (most of whom remain

unidentified) acknowledged that they would continue their licensing talks with SCO once SCO

resolved its disputes over rights. For example:

     (a) Chris Sontag. On March 14, 2007, SCO's Vice President of Business Development

and the executive in charge of the SCOsource program, Chris Sontag, testified that he "was

aware of a number of situations and times where the [potential licensee] was right in front of me

saying 'well, there's questions about who even owns the copyrights so therefore I don't feel like I

need to take a license for your SCO UNIX intellectual property or the right to use a license <u>until

that's resolved</u>.'"  (Brakebill Decl., Ex. 36 (Sontag Dep.) at 116-17 (emphasis added).)

Mr. Sontag claims that he "would do [his] best to try and explain that I thought it was a baseless

set of statements on the part of Novell. But in many cases, people I talked to say 'well, <u>until it is

resolved, I'm still not going to act upon this</u>.'"  (*Id.* (emphasis added).)  The only companies

Mr. Sontag could specifically identify as having cited Novell's assertions as a reason for

deferring their decision on whether to take a license were Google and Morgan Stanley or

"another Wall Street firm." (*Id.* at 119-20.)

     (b) Darl McBride. On March 27, 2007, SCO's CEO Darl McBride testified that SCO

was in negotiations with HP over a SCOsource license, but that the negotiations stalled when

HP, indirectly, indicated that Novell's copyright ownership claim was a concern.  Mr. McBride

stated that HP said, "Novell is making these claims.  <u>You guys don't have that resolved yet</u>, so

it's hard for us to pay more than that."  (Brakebill Decl., Ex. 63 (McBride Dep.) at 130-34

(emphasis added).)  He also recalled a similar interaction with Google.  Mr. McBride reported

that there were "multiple levels of discussions with them," but that Google ultimately said,

"<u>Until you get some court rulings</u> on the ownership side, <u>and</u> on the infringement side, we can't

move forward with you."  (<i>Id</i>. at 135-36 (emphasis added).  <i>See also id</i>. at 219-20 (SCO stopped

actively pursuing SCOsource licenses because, "given where Novell was coming from, [ ] we

basically said we've got to table this <u>until we get through with our litigation with them</u>").)

In addition to HP and Google, Mr. McBride stated that potential licensees such as

Morgan Stanley (or Lehman Brothers or Merrill Lynch), Windham Hotels, Regal Entertainment,

Just U.S.A. Sports [sic], and The Pentagon also raised the Novell ownership dispute during their

discussions with SCO.  (<i>Id</i>. at 136-37.)  But he did not testify as to any specific discussions with

them.

(c) Jeff Hunsaker.  On March 30, 2007, SCO's current Senior Vice President of Mobile

Services, Jeff Hunsaker, testified that

**\*  REDACTED  \***

(Brakebill Decl., Ex. 31 (Hunsaker Dep.) at 229-31.)

**\*  REDACTED  \***

-               **\*  REDACTED  \***           (<i>Id</i>. at 150-51 (emphasis

added).)

17

- **\* REDACTED \***

  (*Id*. at 162-63 (emphasis added).)

- **\* REDACTED \***

  (*Id*. at 205-06 (emphasis added).)

- **\* REDACTED \***

  (*Id*. at 229-31 (emphasis added).)

- **\* REDACTED \***

  (*Id*. at 236-37 (emphasis added).)

31.    In addition to the                    **\* REDACTED \***

**\* REDACTED \***    , Novell itself undertook a search of documents produced by SCO and third parties to identify documents that reference claims by Novell in response to SCO's license offer.

**\* REDACTED \***

For example:

a.  On June 12, 2003,

**\* REDACTED \***

18

**\*  REDACTED  \***

(Brakebill Decl.,

Ex. 49.)

    b.  On March 24, 2004,

**\*  REDACTED  \***

(Brakebill Decl., Ex. 50.)

    c.  On April 14, 2004,

**\*  REDACTED  \***

19

**\*  REDACTED  \***

(Brakebill Decl., Ex. 51.)

    d.  On May 21, 2004,

**\*  REDACTED  \***

\* **REDACTED** \*

(Brakebill Decl., Ex. 52.)

**IV.    ARGUMENT**

SCO began this litigation with a single claim: slander of title.  The gravamen of SCO's suit has always been the allegation that Novell was responsible for the failure of SCO's efforts to impose a UNIX license upon LINUX users.  SCO's recent interrogatory response setting forth its damage contentions confirms that SCO seeks damages for the failure to date of its licensing program, as well as for the devaluation of its stock after Novell challenged SCO's assertion of the copyrights against Linux end-users.  (*See* Ex. 60 at ¶ 23.)  These are not, however, cognizable as special damages.

> **A.    SCO Cannot Establish Special Damages to Support the Slander of Title Claim By Pointing to Harm to Its Licensing Program**

A slander of title action, by its very nature, is an action to recover for damage to specific property, and establishing special damages is an element of the cause of action itself.  *See, e.g., SCO I*; *Valley Colour, Inc.*, 944 P.2d at 364.  As the Supreme Court of Utah observed in *Bass v. Planned Mgmt. Servs.*:

> Slander of title actions are based only on palpable economic injury and require a plaintiff to prove special damages, whereas injury to personal reputation may be based on both tangible and intangible losses and give rise to presumed and general damages.  There are no general or presumed damages in slander of title actions.  Special damages are ordinarily proved in a slander of title action by evidence of a lost sale or the loss of some pecuniary advantage. *Absent a specific monetary loss flowing from a slander affecting the salability or use of the property, there is no damage.*

761 P.2d 566, 568 (Utah 1988) (emphasis added) (reversing judgment for slander of title where plaintiff produced no evidence of lost sale).  Thus, an essential feature of a claim for special

21

damages is its specificity and particularity. Special damages are "out-of-pocket losses" that must be "proven by specific evidence as to the time, cause and amount." *Cont'l Casualty Co. v. Southwestern Bell Tel. Co.,* 860 F.2d 970, 976 (10th Cir. 1988); *see also Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.,* No. 00 CV 1164, 2003 U.S. Dist LEXIS 1652, at **13-14 (N.D. Ill. Feb. 4, 2003) (special damages "are such as really took place" and "are not to be implied but are to be specifically proved") (attached hereto as Ex. 4). Special damages must meet two other criteria as well: they must be the "direct and immediate" result of the alleged slander, and they must be "realized and liquidated" pecuniary harm. Neither criterion can be met here.

### 1. SCO Cannot Establish That the Failure of SCOsource Was a Direct and Immediate Result of Novell's Ownership Claim

Evidence of special damages must, first, establish harm that resulted "*directly and immediately* from the falsehood's effect on the conduct of third persons." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268-69 (S.D. Fla 2004) (emphasis in original), citing *Bothmann v. Harrington,* 458 So. 2d 1163, 1170 (Fla. Ct. App. 1984); *see also Stoody Co. v. Royer*, 374 F.2d 672, 680 (10th Cir. 1967) (lost sales of bundled product could not be traced "directly and immediately" to loss of vendibility of the slandered product and thus were not recoverable as special damages). The burden is on the plaintiff in a slander of title action to establish that the harm complained of "resulted from the 'slander' and not from other factors." *Macia v. Microsoft Corp.,* 152 F. Supp. 2d 535, 541 (D. Vt. 2001) (internal quotations omitted).

SCO witnesses have testified that potential licensees cited Novell's claim and the need to resolve them as reasons that there was no need to negotiate a license. (*See* Brakebill Decl., Ex. 63 (McBride Dep.) at 130-37;                    **\* REDACTED \***

22

Ex. 36 (Sontag Dep.) at 116-20.)[5]  However, unrefuted testimony and other discovery in

the case also establishes that                    **\* REDACTED \***

          **\* REDACTED \***                    (*See supra*, pages 11-13, ¶ 23; Brakebill Decl.,

Ex. 53.)                    **\* REDACTED \***                    (*See*

*supra*, pages 10-11, ¶ 22.)  SCO's claim that Linux users would need to pay a license fee for an

operating system founded on the concept of "open source" garnered intense public hostility.

(*See supra*, pages 6-9, ¶¶ 14-19.)  And, last but not least,          **\* REDACTED \***

                    **\* REDACTED \***                    (*See*

*supra*, pages 8-10, ¶¶ 17-21.)  Indeed, SCO's public statements to the SEC acknowledge that its

ability to license under the SCOsource program is partially dependent on "the strength of our

claim that unauthorized UNIX source code and derivative works are contained in Linux."

(Brakebill Decl., Ex. 29 (SCO 2006 10K).)




                    **\* REDACTED \***




                    (Brakebill Decl., Exs. 48-53.)                    **\* REDACTED \***

---

[5] These SCO accounts of what potential licensees allegedly said are inadmissible hearsay.
Novell is entitled to summary judgment even if this evidence is admitted, however, and
accordingly does not object to the evidence for purposes of this motion.  Novell reserves its right
to object to SCO's hearsay evidence in any further proceedings.

**\* REDACTED \***      .[6]

This evidence precludes characterizing the failure of the SCOsource licensing program as special damages, because SCO cannot meet its burden of establishing that the harm "resulted from" Novell's statements, and not from other factors. *Macia,* 152 F. Supp. 2d at 541; *see e.g., First Security Bank of Utah, N.A. v. Banberry Crossing*, 780 P.2d 1253, 1257-58 (Utah 1989) (affirming directed verdict for defendant on slander of title claim where evidence showed that some sales were made even after alleged slander, and the reason for the failure of other sales was never satisfactorily established); *Ruiz v. Varan,* 797 P.2d 267 (N.M. 1990) (where evidence of harm showed that property could not be exploited for several reasons, including lack of water and other services, plaintiff could not show loss due to slander of title).

**\* REDACTED \***

It is true, as SCO will undoubtedly argue, that where the slanderous statement was widely published and the plaintiff cannot identify a particular lost sale, the law permits the plaintiff to establish special damages through circumstantial evidence of lost market share. Restatement of

---

[6] *See, for example,* letters from

**\* REDACTED \***

"While silence can be assertive conduct in limited situations, the failure to say something is simply not a statement for the purposes of Rule 801." *Howe v. Hull,* 873 F. Supp. 70, 72 (N.D. Ohio 1994) (declaration admissible where it attested to what third party did not say). *See also United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 21 F. Supp. 2d 1247, 1254 (D. Kan. 1998) (court allowed testimony "that Mr. Hibbard did not object to United's claim of ownership over the Quick-Phos mark" but "excluded as hearsay all assertive comments by Mr. Hibbard regarding ownership of the mark").

the Law (Second) § 633.  As the Restatement itself notes, however, the burden on the plaintiff

then increases, to "*eliminat[e] all other reasonably likely causes*, such as new competition, a

general decline in the market for such goods or defects in the goods themselves."  *Id.*, comment h

(emphasis added); *compare* § 632, comments b. and c. (when showing that slander of title caused

a *specific* lost sale, burden is on plaintiff to show that slander was a "substantial factor" in the

third party's action).

SCO *cannot* eliminate these "other reasonably likely causes" for the failure of its

licensing program;

**\*  REDACTED  \***

SCO cannot establish that Novell's statements were the "direct and

immediate" cause of the failure of SCOsource because

**\*  REDACTED  \***

### 2.     SCO Cannot Produce Evidence of Realized and Liquidated Loss Based on the Failure of the SCOsource Program

Evidence of special damages also must be based on a "realized or liquidated" loss.  *See*

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, Case No. 1:00 CV 98 K, 2001 U.S.

Dist. LEXIS 24905, at \*11 (D. Utah Mar. 28, 2001) (lost market capitalization alleged to result

from libel is "only conjecture and do[es] not result in the realized and liquidated losses required

under Utah law" to prove special damages) (attached hereto as Ex. 5); *aff'd* 312 F.3d 1292 (10th

Cir. 2002).  Indeed, as the Utah Supreme Court has affirmed, a cause of action for slander of title

does not even begin to accrue until damage to the property has been realized.  *Valley Colour,*

*Inc.*, 944 P.2d at 364.  Evidence of harm that rests on speculation or contingent events is not

evidence of special damages. *See Marseilles*, 2003 U.S. Dist. LEXIS, at *16 ("[p]otentially higher financing costs in the future" do not constitute special damages "as such damages are both contingent and speculative"). Evidence of loss of business value is irrelevant to a slander of title claim. *See Valley Colour*, 944 P.2d at 364 (it is not enough to show that the value of certain property has dropped, "as this is general damage, not a realized or liquidated loss").

SCO's evidence that potential licensees have thus far declined to take a license is not evidence of a "realized and liquidated" loss.                   **\* REDACTED \***

              **\* REDACTED \***          , there is no evidence that SCO has irrevocably lost any particular amount of revenue through its licensing program as a whole.

To the contrary, the evidence on which SCO purports to rely fails to establish any "loss" at all. Far from showing that licensing opportunities have been "lost," the evidence demonstrates that legitimate licensing opportunities, if any, have at most been *deferred*. SCO has repeatedly admitted that the targeted licensees who identified Novell's claim in declining to take a license have also stated that they will revisit the license issue if the intellectual property issues

              **\* REDACTED \***          are resolved. Even if delay could provide a basis for special damages (and in this case, because of the nature of the "property" at issue, it cannot), SCO has not pled or adduced any evidence of a realized and liquidated pecuniary loss resulting from the delay.

### a. Novell's Statements Could Not Have Any Residual Effect on the Copyrights

The requirement that a loss be "realized and liquidated" to constitute special damages precludes claiming a sale or business opportunity that has only been delayed and not "irreparably diminished." *Marseilles*, 2003 U.S. Dist. LEXIS 1652, at * 20 (to adequately plead special

damages for loss of property value, plaintiff would have to allege that slander caused actual lost

sale or "had a damaging residual effect on the vendibility . . . of the property"). Indeed, where

the property remains "vendible" after the cloud is removed, the plaintiff cannot obtain special

damages for "lost sales" if the value of the property did not decrease as a result of the temporary

cloud on title. *See G.O. Reaugh v. McCollum Exploration Co.*, 163 S.W.2d 620, 622

(Tex. 1942); *Ostarly v. Johnson*, 700 S.W.2d 643, 644 (Tex. Ct. App. 1985) (proof of special

damages does not end with showing of lost sale; plaintiff must show difference between the price

which would have been realized had the sale not been frustrated and the market value of the land

at the time of trial with the cloud on the title removed). In *Reaugh*, for example, the Texas

Supreme Court held that a judgment for slander of title must be reversed where the evidence

showed that the property was worth more after the title was cleared than it was before.

In this case, the property at issue is not a wasting asset or a product that loses value if it is

not sold. Compare, for example, *Continental Nut Co. v. Robert L. Berner Co.*, 345 F.2d 395, 397

(7th Cir. 1967) (defendant's harmful statements about quality of plaintiff's nuts led to immediate

drop in sales). Rather, the property at issue is a set of copyrights that give their owner a right to

"exclusivity" over certain works—a right that in this case translates into the opportunity to

demand royalties or threaten a lawsuit for copyright infringement. By SCO's own admission,

that opportunity has not been "lost" here. If SCO's ownership claim is resolved in SCO's favor

(which is itself a necessary but not sufficient precondition for its slander of title claim), the

licensing opportunity SCO sought to exploit will be in the same condition as it was before SCO

could demand the same amounts from willing licensees[7]—and could seek the same damages if it brings an infringement suit[8]—as it could before Novell's statements (subject, of course, to the licensees' own defenses to SCO's claims).

*   **REDACTED**   *

SCO witnesses report that the potential licensees did not turn SCO down flat; rather, they made statements indicating that    *   **REDACTED**   *

*   **REDACTED**   *                    (*See supra*, ¶ 31 and Exhibits 48-52.)  SCO's CEO and other senior executives have acknowledged it too.  (*Id*., ¶ 30 and testimony cited therein.)

SCO may argue that the delay in its ability to license has caused it to lose the use of revenue that it otherwise would have had, and that its business has suffered as a result.  But this kind of harm is not special damages.  *Valley Colour*, 944 P.2d at 364 (evidence showing that value has dropped while title in question is not a realized or liquidated loss); *see also Bothmann*, 458 So. 2d at 1170-71 (special damages for slander of title "do not include any loss resulting

---

[7]                    *   **REDACTED**   *
, SCO historically demanded that Linux end-users pay $699 for a system with one CPU running Linux,    *   **REDACTED**   *
*   **REDACTED**   *                    (*See* Ex. 55 at SCO1556051; Ex. 56 at SCO1769410; Ex. 63 at SCO1463816; Ex. 63 (McBride Dep.) at 220-21 (referring to "our list price of $700").)  Assuming SCO is able to prevail on its copyright ownership claim, and assuming SCO once again seeks licenses from these third parties, then it will be able to ask the same or an equivalent paid up royalty as it was attempting to charge before this litigation.

[8] If SCO is successful with its ownership claims here but is required to litigate its infringement claims against third parties, it can seek actual damages for copyright infringement under 17 U.S.C. § 504(b) or statutory damages under 17 U.S.C. § 504(c).  Prejudgment interest may also be available as a remedy in the Tenth Circuit to successful copyright plaintiffs.  *See Kleier Advertising, Inc. v. Premier Pontiac, Inc*., 921 F.2d 1036, 1040-41 (10th Cir. 1990).

from the plaintiff's failure to make an advantageous use of money that he would have (or might have) made if a prospective sale had been consummated, or in this case, consummated at an earlier date"). As the Restatement recognizes, lost opportunity costs are not recoverable in a slander of title action because far from being the direct and immediate consequences of the falsehood, they depend "upon the situation of the disappointed vendor and the particular purposes for which it would have been necessary or advantageous for him to apply the purchase money." Restatement (Second) of Torts § 633, comment i (1977). Delay costs are not an element of special damages and delay is all that SCO can prove here.

### b.   Allowing SCO to Claim SCOsource Royalties As Special Damages Would Constitute Double Recovery

SCO's initial licensing plan stalled, at least in part, due to        * REDACTED *

        * REDACTED *            In essence, SCO seeks to obtain revenue from this suit that it would be hard pressed to obtain from licensees, even if SCO did own the copyrights. Nonetheless, SCO has made it clear that it will renew its licensing efforts if it succeeds in its claim to own the copyrights.

Whatever the merits of SCO's claims, however, a loss based on alleged slander of title is not "realized or liquidated" if the property owner retains the subject property and can still exploit it. The law of special damages forbids "allowing the plaintiffs to 'have their cake and eat it too.'" *Reaugh,* 163 S.W.2d at 622 (stating that it is "readily apparent that to allow the plaintiffs to recover the full amount for which they could and would have sold the lease, and to permit them to retain the land with the cloud removed therefrom, would be to allow them to recover more than they were actually damaged"); *see also, e.g., Childers v. Commerce Mortgage Investors*, 579 N.E.2d 219, 222 (Ohio Ct. App. 1989) (reversing judgment permitting plaintiffs to

recover entire value of lost house sale while also keeping house, which gave plaintiffs improper "double recovery").

Nor can SCO avoid this result by asserting that it will not seek licensing royalties if it recovers damages from Novell in this action instead. A plaintiff cannot substitute a slander of title claim for an action to enforce the obligations of third parties. For example, there has long been a rule that "it does not suffice to allege and prove that one has been damaged because a third party has failed to fulfill his responsibilities under an existing contract to buy land." *Frank Pisano & Assocs. v Taggart*, 29 Cal. App. 3d 1, 26 (Cal. Ct. App. 1972); *see also Dent v. Balch*, 213 Ala. 311, 312 (1925) ("[t]he law is well settled that if there is in existence, before the perpetration of the alleged slander of title, a valid and enforceable contract for the sale of the land in question, no recovery can be had against the slanderer for the damage resulting from the executory purchaser's breach of his contract to purchase. In such a case, the law presumes that the vendor can recover any resulting loss from the defaulting purchaser, and he is left to that remedy"); *Stiles v. Kuriloff*, 6 N.J. Misc. 271, 272-73 (Cir. Ct. 1928) (same).

Although not directly on point, the premise of this rule as explained in the *Pisano* case illustrates why forgoing a claim against a third party cannot give rise to special damages:

> In the present case all that the evidence adduced discloses is that Hamilton refused to fulfill its contract in consequence of the alleged disparagement of the Hymans' title. If the Hymans have released Hamilton from the obligations of his contract or if they do not desire to enforce the same, whatever damage they have suffered is the result of their own voluntary act and they may not visit such damages on plaintiffs.

29 Cal. App. 3d at 26. By definition, this is not special damages, because it is not a realized loss caused by the alleged slander of title. If SCO declines to pursue alleged third party infringers—

assuming it establishes that it has a legitimate right to do so—then that loss will be a result of SCO's acts rather than Novell's previous statements on copyright ownership.

SCO has not shown and cannot show a realized or liquidated loss in its licensing revenues because the evidence shows that SCO can continue to seek those revenues from third parties if it has a right to do so.  As such, it cannot show that it has suffered a "loss" for purposes of establishing special damages.

### B.     SCO's Allegation That Its Stock Lost Value Is a Claim for General, Not Special Damages

SCO's interrogatory response states that "significant damage to SCO from Novell's actions is reflected in the swift reaction of the market and the substantial decline in SCO's stock price—particularly in light of the fact that SCO's earning announcement on May 28 should have <u>increased</u> SCO's market cap."  (Brakebill Decl., Ex. 60 at ¶ 23.)  This decline in the stock price, whatever its cause, cannot be classified as special damages and thus cannot support the slander of title claim.

As this Court has found, allegations regarding the loss of stock value "are only conjecture and do not result in the realized and liquidated losses required under Utah law." *Computerized Thermal Imaging, Inc.*, 2001 U.S. Dist. LEXIS 24905 at *11.  In *Computerized Thermal Imaging,* the Court concluded that defendant's statements about plaintiff's stock pricing were false and defamatory, but nonetheless dismissed the claim on the grounds that the only damages alleged, "vague and overreaching loss of stock value, the holding up of several 'potential' business transactions, and CTI's future listing on NASDAQ—are in fact, general and speculative and are not the type recoverable under Utah's special damages law." *Id.* at *9.  Other courts have rejected similar efforts to claim lost stock value as special damages. *See Salit v. Ruden,*

*Mcclosky, Smith, Schuster & Russell*, 742 So. 2d 381, 388 (Fla. Ct. App. 1999) (pleading that claims loss of stock value "does not reveal any 'realized loss,' that characteristic of 'special damage' that is a crucial element of the cause of action); *Falic,* 347 F. Supp. 2d at 1269 (loss of stock value is not "realized loss" unless the shareholder shows it actually sold stock at a loss).

SCO's allegations that it lost market capitalization as a result of Novell's statement do not provide evidence of a realized and liquidated loss. Stock losses do not constitute special damages and cannot support the slander of title claim as a matter of law.

### C.    SCO Cannot Claim Its Costs and Fees in this Action as Special Damages

SCO's interrogatory response does not contend that SCO's costs and attorneys fees to clear its title are an element of damages in this case. In its complaint, however, SCO alleges that it "has also incurred significant attorneys' fees and costs in attempting to remove the cloud Novell has placed on SCO's title," including attorneys fees incurred in "prosecuting this and other actions to protect SCO's title to UNIX and UnixWare and related rights." (SAC ¶ 94.)

SCO's fees and costs in prosecuting this action are *not* recoverable as special damages. *See, e.g., Computerized Thermal Imaging,* 2001 U.S. Dist LEXIS 24905 at *12 (this Court is "unaware of any Utah case law in which the attorneys fees and costs incurred in bringing a defamation action were, without more, sufficient to satisfy the 'special damages' rule;" and "such a rule would eviscerate the requirement that special damages must be pleaded and proven because every plaintiff necessarily incurs attorneys fees and costs in pursuing a lawsuit"); *Macia,* 152 F. Supp. 2d at 542 (noting that "[a]ccording to the majority view, special damages may also include 'expenses incurred in removing the effects of the slander' (although not the costs of litigation in the action for slander of title itself)"; *Colquhoun v. Webber*, 684 A.2d 405, 411 (Me.

1996) (holding that "[t]he prevailing party in a slander of title action may recover as special damages those attorney fees and expenses incurred to remove the cloud on the title but not those incurred to prosecute the slander of title action").

Thus, courts routinely refuse to award as special damages attorneys' fees arising from the slander of title suit itself. This is true even where, as here, the claim to settle the ownership issue is brought in the same action as the slander of title claim. *See C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 695-96 (5th Cir. 2001) (refusing to recognize attorneys' fees as a valid form of pecuniary loss in a business disparagement case); *Lee v. Washington Square Homeowners' Ass'n*, 273 Ga. App. 392, 397 (2005) (affirming grant of slander of title defendant's motion for summary judgment for lack of damages, noting that "costs of litigation and attorney fees arising from slander of title do not constitute such special damages"); *Sannerud v. Brantz*, 879 P.2d 341, 345 (Wyo. 1994) (reversing trial court's judgment of defamation of title for lack of special damages, and noting that the Wyoming Supreme Court has suggested that attorney's fees are not recoverable in an action for defamation of title); *Hicks v. McLain's Bldg. Materials, Inc.,* 209 Ga. App. 191, 192 (1993) (holding "costs of litigation and attorney fees cannot constitute the required special damage, as such costs and fees will be present in any suit and treating them as special damage would render the special damage requirement meaningless"). SCO's litigation costs stemming from the current action against Novell cannot be recovered as special damages and cannot support SCO's slander of title claim.

### D.    SCO Has Not Produced Evidence to Support Special Damages for Researching Copyright Registrations or for Correcting Public Statements

SCO's complaint further alleges that SCO has suffered damages including "attorneys' fees incurred in researching and reviewing Novell's improper copyright registrations, [and] attempting to mitigate damages by correcting and responding to Novell's false representations made to third parties." (SAC at ¶ 94.)  Novell does not dispute that these amounts, if proven, could constitute special damages to support SCO's slander of title claim.

However, document discovery is now closed and SCO has not adduced a shred of evidence to support a realized or liquidated amount of such damages.  SCO bore the burden of providing evidence to support this damage claim as well, and it has failed to meet that burden.  *First Sec. Bank*, 780 P.2d at 1258 (holding that slander of title claim where plaintiff failed to bring forth enough evidence to "sufficiently establish[]" special damages resulting from defendant's alleged acts).

Of course, it is possible that SCO will try to come forward with evidence regarding costs of corrective measures and copyright registration it has incurred and possible that SCO would be granted leave to introduce it.  Although this evidence would be untimely and permitting SCO to rest on it would be unfair, such evidence would not affect the merits of the rest of this motion.  In other words, if SCO were to come forward with evidence of these costs as "special damages," it should be limited to these amounts at trial, and SCO should be precluded from claiming losses due to its SCOsource licensing program, its stock price decline, or its attorneys' fees in this case.

Federal Rule of Civil Procedure 56(d) provides that the Court "shall, if practicable, ascertain . . . what material facts are actually in good faith controverted . . . [and] thereupon make an order specifying the facts that appear without substantial controversy, including the extent to

which the amount of damages or other relief is not in controversy . . . [and] the trial shall be conducted accordingly."  Indeed, courts encourage the use of partial summary adjudication as to damages to narrow the issues for trial and enhance the parties' ability to intelligently litigate the case.  *See, e.g., Ams. Disabled for Accessible Pub. Transp. v. Skywest Airlines, Inc.,* 762 F. Supp. 320, 324 (D. Utah 1991) (holding that because "the effect of a partial summary adjudication is to narrow the issues for trial" it is the proper mechanism to decide whether the "punitive damages, emotional distress damages and injunctive relief" are available); *Prof'l Asset Mgmt. v. Penn Square Bank, N.A.,* No. CIV-82-1357-W, CIV-83-1583-W, 1984 U.S. Dist. LEXIS 15230, at **6-7 (D. Okla. July 5, 1984) (granting partial summary adjudication as to certain general damages, but not other general and special damages in same lawsuit) (attached here as Ex. 6). Novell is entitled to summary judgment for SCO's slander of title claim on the grounds that SCO cannot establish the special damages that are a requirement of the claim.  At a minimum, if this claim is permitted to proceed to trial, SCO should be limited to the only special damages that can be realized or liquidated based on the facts of this dispute:  the costs incurred in researching copyright registration and attempting to respond to Novell's representation.

## V.    CONCLUSION

SCO's claim that its licensing business was harmed by the dispute over SCO's rights does not rest on evidence of actual pecuniary loss, much less a pecuniary loss that can be directly and immediately traced to Novell's claim.  To the contrary, the evidence adduced by SCO makes it clear that Novell's claims were only                      **\* REDACTED \***

**\* REDACTED \***    Assuming Novell's claims are resolved in SCO's favor, SCO's ability to extract license revenues from Linux users will be no weaker than they are now.

SCO's claim also requires an assumption that SCO would have had certain revenues or a certain stock price but for Novell's actions; there is no evidence of actual pecuniary loss. By definition, these are not special damages, and by definition they cannot support SCO's first cause of action.

SCO cannot show that it has suffered special damages and Novell is entitled to summary judgment on SCO's claim for slander of title.

DATED:   April 25, 2007

ANDERSON & KARRENBERG


By: _____ */s/ Heather M. Sneddon* _____

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
David E. Melaugh (pro hac vice)

**Attorneys for Defendant and
Counterclaimant Novell, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of April, 2007, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE BASED ON FAILURE TO ESTABLISH SPECIAL DAMAGES** *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]* to be served to the following:

*Via CM/ECF*:  Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

Stuart H. Singer
William T. Dzurilla
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301

David Boies
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504

Devan V. Padmanabhan
John J. Brogan
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55401

*Via U.S. Mail, postage prepaid*:

Stephen Neal Zack
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131

_____ */s/  Heather M. Sneddon* _____