MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant and Counterclaim-Plaintiff Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>    Plaintiff and Counterclaim-<br>    Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>    Defendant and Counterclaim-<br>    Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S OPPOSITION TO SCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S FIRST, SECOND, AND FIFTH CAUSES OF ACTION AND FOR SUMMARY JUDGMENT ON NOVELL'S FIRST COUNTERCLAIM (COPYRIGHT OWNERSHIP)**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................v

I.      STATEMENT OF ISSUES ......................................................................................1

II.     INTRODUCTION ...................................................................................................2

III.    STATEMENT OF FACTS .......................................................................................5

        A.     Santa Cruz's Conduct Following the Execution of the APA and
               Amendment No. 2 Demonstrates Its Understanding that No
               Copyrights Were Transferred. ....................................................................6

               1.     In 2001, Santa Cruz and SCO Acknowledged a Problem
                      with the "Chain of Title from Novell." ........................................6

               2.     In Early 2003, SCO Repeatedly Requested that Novell
                      Transfer the UNIX Copyrights to SCO. ........................................9

               3.     After the Execution of the APA, Santa Cruz and SCO
                      Distributed Copies of UNIX Code Bearing Joint SCO-
                      Novell Copyright Notices. ..........................................................11

        B.     Novell's Conduct After Signing the APA Is Consistent with Its
               Understanding that the APA Did Not Transfer the UNIX
               Copyrights. ................................................................................................12

               1.     Novell Took No Action to Send Santa Cruz the Physical
                      Copyright Registrations. .............................................................12

               2.     Novell Had No Knowledge that SCO Licenses Contained
                      Any Incorrect Representations and Warranties that SCO
                      Owned UNIX Copyrights. ...........................................................13

               3.     The Technology License Agreement Is Consistent With
                      the Fact that the APA Did Not Transfer the Copyrights............14

        C.     SCO's "Testimonial Evidence" Does Not Demonstrate an Intent
               to Transfer Copyrights. .............................................................................16

               1.     None of SCO's Witnesses Was Involved in the
                      Negotiation or Drafting the Intellectual Property
                      Provisions of the APA. ...............................................................16

2.      Those Directly Involved in the Drafting of the APA's
        Intellectual Property Provisions Confirm that Novell
        Deliberately Excluded Copyrights From the Transfer of
        Assets. ..................................................................................................25

D.      Amendment No. 2 Did Not Transfer the Copyrights Either. ..................................27

        1.      Amendment No. 2 Was Not Intended to Transfer All
                Copyrights Pertaining to UNIX to Santa Cruz. ..........................................27

        2.      SCO's Only Evidence Concerning the Intent of
                Amendment No. 2 Comes From Witnesses Who Had No
                Involvement in or Memory of Drafting or Negotiating that
                Amendment.................................................................................................29

        3.      SCO Has Presented No Evidence that Any Copyrights
                Were "Required for" the Operation of the UNIX-Related
                Business Contemplated by the APA. ..........................................................30

        4.      Novell's Statements Concerning Amendment No. 2 Are
                Entirely Consistent With Its Understanding that the
                Amendment Did Not Transfer Copyrights. .................................................33

IV.     ARGUMENT...........................................................................................................34

A.      The Plain Language of the APA Excluded Copyrights from the
        Assets to Be Transferred by Novell to Santa Cruz. ...............................................34

        1.      Schedule 1.1(b) Expressly Excluded "All Copyrights"
                From the Transfer of Assets........................................................................34

        2.      SCO Cannot Use Extrinsic Evidence About the Supposed
                Intent of the Parties to Rewrite the Plain Language of the
                APA...............................................................................................................36

B.      In Any Event, Extrinsic Evidence Would Simply Reinforce the
        Conclusion that the APA Intentionally Excluded Copyrights. .............................38

        1.      The Drafters of the APA's Intellectual Property Provisions
                Agree that the Exclusion of Copyrights Was Deliberate. ..........................38

        2.      SCO Presents No Evidence to the Contrary from Anyone
                Involved in the Negotiation of the Intellectual Property
                Provisions of the APA. ...............................................................................40

C.      Amendment No. 2 Did Not Transfer the UNIX and UnixWare
        Copyrights to Santa Cruz............................................................................................42

1.    Amendment No. 2 Is Not a Signed Instrument of
       Conveyance, and Hence Cannot Transfer Copyright
       Ownership Under the Copyright Act. ........................................................43

2.    In Any Event, Amendment No. 2 Was Never Intended to
       Transfer All Copyrights Pertaining to UNIX and
       UnixWare. ................................................................................................44

3.    No Copyrights Are "Required" for Santa Cruz to Run the
       UNIX-Related Business Contemplated by the APA. ...............................46

D.    Subsequent Conduct by the Parties Confirms that All Parties
       Understood Neither the APA Nor Amendment No. 2 Transferred
       the Copyrights. ...................................................................................................48

1.    Santa Cruz's and SCO's Actions Indicate a Recognition
       that No Transfer of Copyrights Occurred. ...............................................48

2.    Novell's Conduct Was Consistent with Its Understanding
       that It Still Owned the Copyrights. ..........................................................52

V.    CONCLUSION ...............................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994) ..................................... 46

*Bank of the West v. Resolution Trust Corp.*, No. C 95-4708 FMS, 1997 U.S. Dist. LEXIS 1581 (N.D. Cal. Feb. 13, 1997) ........................................................................................................ 36

*EPA Real Estate P'ship v. Kang*, 12 Cal. App. 4th 171 (1992) ..................................................... 38

*Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263 (1987) ................................. 37, 38

*GM Corp. v. Superior Court*, 12 Cal. App. 4th 435 (1993) .......................................................... 45

*Kingsrow Enterprises, Inc. v. Metromedia, Inc.*, 397 F. Supp. 879 (S.D.N.Y. 1975) .................. 53

*Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355 (9th Cir. 1994) .......................................................... 43

*La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195 (10th Cir. 2005) ......... 53

*Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388 (5th Cir. 2005) ................................. 44

*Pamiloff v. Giant Records, Inc.*, 794 F. Supp. 933 (N.D. Cal. 1992) ........................................... 44

*Relational Design & Tech., Inc. v. Brock*, No. 91-2452-EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) ........................................................................................................................ 35

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989) ......................................................... 35

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992) .................................. 35

*Shugrue v. Continental Airlines*, 977 F. Supp. 280 (S.D.N.Y. 1997) ........................................... 35

## Statutes

17 U.S.C. § 204(a) .................................................................................................................. 3, 43

17 U.S.C. § 401(b)(3) ................................................................................................................... 52

17 U.S.C. § 406(a) ........................................................................................................................ 52

**Other Authorities**

Berne Convention for the Protection of Literary and Artistic Works, Article 15, § 1.................. 52

**Treatises**

2-7 Nimmer on Copyright § 7.12[C][1]......................................................................................... 52

# I.    STATEMENT OF ISSUES

SCO has moved for complete summary judgment on Novell's First Counterclaim for slander of title on the basis that SCO purportedly owns the copyrights at issue.  In addition, SCO has moved for partial summary judgment on its slander of title (Claim I), breach of contract (Claim II), and unfair competition (Claim V) claims on the issue of whether SCO owns the copyrights at issue.[1]

SCO's motion mirrors Novell's motion for summary judgment on SCO's slander of title (Claim I) and specific performance (Claim III) claims.  Novell has moved for summary judgment on those claims on the ground that the plain language of the relevant contracts demonstrates that Novell, not SCO, owns the copyrights at issue.  (Memorandum in Support of Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance, filed April 20, 2007, PACER No. 286 ("Novell's Ownership MSJ No. 1").)[2]

SCO's motion presents two principal issues:

1.    Is SCO entitled to summary judgment that the 1995 Asset Purchase Agreement between Novell and Santa Cruz ("APA") transferred the UNIX and UnixWare copyrights to Santa Cruz despite the APA's express exclusion of "all copyrights" from the assets to be transferred?

---

[1] SCO's motion is a limited one.  SCO has moved for partial summary judgment on Claims I, II, and V on the issue of copyright ownership only, and has not presented any argument or evidence concerning other elements of those claims.  In addition, SCO has not moved for summary judgment on its claim for specific performance (Claim III).

[2] Novell has filed a separate motion for summary judgment on the copyright ownership portions of SCO's claims for breach of contract (Claim II) and unfair competition (Claim V) on the grounds that (1) SCO's allegations do not state a valid claim, even if assumed to be true; and (2) SCO cannot establish that Novell's assertion that SCO does not own the copyrights is false, which is a required element of SCO's claims.  (*See* Memorandum in Support of Novell's Motion for Summary Judgment on the Copyright Ownership Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition, filed April 20, 2007, PACER No. 272 ("Novell's Ownership MSJ No. 2").)

      2.      Is SCO entitled to summary judgment that Amendment No. 2 to the APA effectuated a transfer of the UNIX and UnixWare copyrights to Santa Cruz?

      Novell submits that both questions should be answered in the negative, for the reasons stated in Novell's Ownership MSJ No. 1 and for the additional reasons stated in this memorandum.  Novell agrees that the question of copyright ownership is appropriate for summary judgment, but such judgment should be entered in <u>Novell's</u> favor, not SCO's.

## II.    INTRODUCTION

      The APA expressly excludes "all copyrights" from the transfer of assets.  Throughout this litigation, SCO has vacillated between arguing that the transfer of copyrights was effectuated by the APA and contending that such transfer was effectuated instead by Amendment No. 2.  In this most recent motion, SCO appears to adopt an amalgamated approach, suggesting that the "all copyrights" exclusion "does not exist for purposes of construing the APA," because the APA was modified thirteen months later by Amendment No. 2.  (SCO's Ownership MSJ 4/9/2007, PACER No. 259, at 2.)  Yet the original APA is indisputably relevant because the "Bill of Sale" on which SCO relies as evidence of the alleged transfer was based on the APA, and not on Amendment No. 2 (which was not even executed until ten months later).  In any event, it does not matter which position SCO takes because neither the APA nor Amendment No. 2 transferred copyright ownership from Novell to Santa Cruz.

      The APA, signed by Novell and Santa Cruz on September 19, 1995, explicitly excluded "all copyrights" from the assets that Novell transferred to Santa Cruz.  SCO submits extrinsic evidence that purportedly demonstrates that "all copyrights" did not mean "all copyrights" but only "some copyrights."  That evidence is inadmissible under the parol evidence rule, as it seeks not to explain the meaning of the term "all copyrights" but rather to demonstrate a contradiction

between the plain language of the agreement and its supposed intent. SCO's evidence should be ignored and this Court should find, as a matter of law, that the APA did not transfer copyrights.

Because the plain language of the APA is clear, consideration of SCO's extrinsic evidence is both unnecessary and improper. However, even if this evidence were considered, it would not change the conclusion that the copyrights were not transferred. Novell has submitted documents and testimony from the specific individuals that drafted the "all copyrights" exclusion, who have all attested that the exclusion was deliberately inserted to protect Novell's ongoing interests in the UNIX business. SCO, in contrast, has submitted no admissible evidence from a single person involved in drafting the "all copyrights" exclusion, relying instead on testimony from persons who were not involved in drafting that exclusion and who did not participate in negotiations concerning the transfer of copyrights. These individuals have no personal knowledge of the intent of the "all copyrights" exclusion.

Amendment No. 2 did not transfer copyright ownership either. To transfer copyright ownership, the Copyright Act requires a signed "written instrument of conveyance" that makes evident precisely what rights are being transferred. 17 U.S.C. § 204(a). Amendment No. 2 does not meet that standard. It did not purport to "transfer" any copyrights. Nor did it identify with any specificity the copyrights, if any, to be transferred. Accordingly, the Court need not consider extrinsic evidence concerning the intent of Amendment No. 2, because Amendment No. 2 did not transfer the copyrights as a matter of law, regardless of what may or may not have been intended.

Even if this court were to consider extrinsic evidence of intent, the undisputed evidence establishes that Amendment No. 2 was not intended to transfer the copyrights. Novell expressly rejected Santa Cruz's proposed version of Amendment No. 2 that would have transferred all

copyrights pertaining to UNIX and UnixWare to Santa Cruz. Instead, Novell stated that it would agree only to a more limited amendment that exempted from the "all copyrights" exclusion those copyrights "required for" Santa Cruz to run the UNIX-related business contemplated by the APA. Novell understood that amendment as affirming Santa Cruz's license under the APA to use the UNIX and UnixWare copyrighted works. SCO has submitted no admissible evidence to the contrary. SCO relies on various witnesses who opine on the supposed meaning of Amendment No. 2, but none of those witnesses was involved in negotiating or drafting that amendment. Moreover, SCO has not submitted any evidence that outright ownership of any copyrights was "required" for Santa Cruz to run the UNIX-related business contemplated by the APA, when Santa Cruz already had a license under the APA to use the copyrighted works as needed to run that business.

SCO has asserted that the parties' conduct after the APA was signed shows that the copyrights were transferred to Santa Cruz. Once again, this extrinsic evidence is inadmissible. But if the Court were to examine additional evidence, it would simply confirm that Santa Cruz and SCO understood that no transfer of copyrights occurred. In distributing software in the late 1990s, Santa Cruz repeatedly used copyright notices indicating Novell's continued ownership of UNIX and UnixWare code. Moreover, in 2001, in an agreement assigning various UNIX intellectual property rights to SCO, Santa Cruz expressly acknowledged a problem with the "chain of title from Novell" and discussed obtaining a "global IP assignment" from Novell. Obviously, no such assignment would be necessary if the APA and Amendment No. 2 had transferred the copyrights to Santa Cruz. Then, in late 2002 and early 2003, SCO repeatedly contacted Novell to request to amend the APA to transfer SCO the copyrights, recognizing that

no such transfer had occurred under the APA and Amendment No. 2.  SCO's actions speak louder than its words:  SCO was well aware that no transfer of copyrights had occurred.

Because neither the APA nor Amendment No. 2 transferred the copyrights to Santa Cruz, Novell, not SCO, owns the copyrights at issue.  Accordingly, summary judgment should enter in favor of Novell.  Moreover, SCO's motion should be denied, as Novell (at the very least) has shown a disputed issue of material fact as to SCO's purported ownership of the copyrights.

## III.    STATEMENT OF FACTS

Novell incorporates by reference its statement of undisputed facts in support of its motion for summary judgment ("Novell's Ownership MSJ No. 1 Facts"), as well as the evidence submitted in support of that motion.[3]  Key points established in Novell's statement of undisputed facts include:

- The APA expressly excluded "all copyrights" from the assets to be transferred (Novell's Ownership MSJ No. 1 Facts, ¶¶ 1-4);

- The Bill of Sale conveyed the assets described in the APA, as amended by Amendment No. 1 (*Id.*, ¶¶ 25-27); and

- Amendment No. 2 did not "transfer" any assets on its own and did not retroactively amend the Bill of Sale to convey assets described in Amendment No. 2 (*Id.*, ¶¶ 28-30).

---

[3] Novell's statement of facts in support of its summary judgment motion can be found at pages 3-16 of the Memorandum in Support of Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance, filed on April 20, 2007, PACER No. 286.  In support of that motion, Novell relied upon the Declarations of Allison Amadia (PACER No.  278), David Bradford (PACER No. 279), James R. Tolonen (PACER No. 280), Tor Braham (PACER No. 281), and Ken Brakebill (PACER No. 284), all filed on April 20, 2007, and the exhibits attached to those declarations.

In response to the arguments and evidence in SCO's motion, Novell also notes the following additional facts.[4] Because the plain language of the APA and Amendment No. 2 did not effectuate a transfer of copyrights, the Court need not consider the evidence related to these additional facts to decide SCO's motion for summary judgment or Novell's related motion. However, even if this evidence were considered, it simply reinforces the conclusion that that no transfer of copyrights occurred.

### A.    Santa Cruz's Conduct Following the Execution of the APA and Amendment No. 2 Demonstrates Its Understanding that No Copyrights Were Transferred.

#### 1.    In 2001, Santa Cruz and SCO Acknowledged a Problem with the "Chain of Title from Novell."

1.    In an agreement dated May 7, 2001 ("Assignment Agreement"), Santa Cruz assigned various items of intellectual property to SCO, which was then named Caldera. (Supplemental Declaration of Ken Brakebill in Opposition to SCO's Motion for Summary Judgment, filed herewith ("Supp. Brakebill Decl."), Ex. 1.)  That Assignment Agreement purported to transfer various UNIX and UnixWare copyrights.  (Supp. Brakebill Decl., Ex. 1, at Schedule C, WSGR 4450.)

2.    In the Assignment Agreement, Santa Cruz made various representations and warranties concerning the intellectual property rights being purportedly being transferred, but inserted a notable caveat regarding its "chain of title" from Novell:

> Assignor has no knowledge of any fact that would prevent
> Assignee's registration of any Rights related or appurtenant to the
> Inventions and Works or recording the transfer or Rights hereunder

---

[4] Novell also responds to each of SCO's numbered "Statement of Facts" in its Response to SCO's Statement of Facts, attached as Exhibit A to this memorandum.  In addition, Novell will separately file Evidentiary Objections to SCO's Summary Judgment Exhibits.

<u>(except that Assignor may not be able to establish a chain of title from Novell Inc</u>. but shall diligently endeavor to do so as soon as possible).

(*Id.* at ¶ 8(v), WSGR 4431 (emphasis added).)

       3.     Santa Cruz deliberately inserted the "chain of title" caveat as a result of its negotiations with Caldera.  In the Assignment Agreement, Caldera was represented by Brobeck Phleger & Harrison, and Santa Cruz was represented by Wilson Sonsini Goodrich & Rosati. (Supp. Brakebill Decl., Ex. 2, Danaher Dep. 13:16-14:3; Supp. Brakebill Decl., Ex. 3.)[5]  On April 26, 2001, Caldera's attorneys e-mailed a draft of the Assignment Agreement to Santa Cruz's attorneys.  That initial draft provided an unlimited representation and warranty from Santa Cruz: "Assignor has no knowledge of any fact that would prevent Assignee's registration of any Rights related or appurtenant to the Inventions and Works."  (Supp. Brakebill Decl., Ex. 5, at ¶ 8(v).)  In the cover e-mail transmitting the draft, Caldera's attorney proposed that Santa Cruz's assignment of intellectual property obtained from Novell would require the inclusion in the Assignment Agreement of "a single exhibit taken from the Novell/SCO Asset Purchase Agreement."  (*Id.* at 1.)

       4.     Four days later, on April 30, 2001, an in-house attorney at Santa Cruz responded with a redlined draft of the Assignment Agreement incorporating revisions and comments from Santa Cruz and its outside counsel, Wilson Sonsini.  Among other things, the redlined draft

---

[5] Different lawyers from Wilson Sonsini had previously represented Novell in its 1995 deal with Santa Cruz.  To avoid any conflict of interest, an ethical wall was erected that prevented the Wilson Sonsini lawyers on the Santa Cruz-Caldera deal from consulting the Wilson Sonsini lawyers who had worked on the 1995 Novell-Santa Cruz deal.  (Supp. Brakebill Decl. Ex. 4; Supp. Brakebill Decl. Ex. 2, Danaher Dep. 29:13-30:3.)  In its opinion letter for the Santa Cruz-Caldera deal, Wilson Sonsini made clear that its work was based entirely on Santa Cruz's representations, not on any pre-existing knowledge from the Novell-Santa Cruz deal. (Supp. Brakebill Decl. Ex. 3.)

added an exception to Santa Cruz's representation and warranty, inserting the underlined text

into Paragraph 8(v): "<u>Except for the inability to obtain third party acknowledgements to establish</u>

<u>a chain of title</u>, Assignor has no knowledge of any fact that would prevent Assignee's

registration of any Rights related or appurtenant to the Inventions and Works." (Supp. Brakebill

Decl., Ex. 6, at ¶ 8(v).)

     5.     On May 3, 2001, four days before the execution of the Assignment Agreement,

Caldera's outside counsel at Brobeck circulated a "final" draft of the agreement, stating in her

cover e-mail:

> SCO will sign the approximately 55 individual trademark
> assignments for recordation purposes next week, along with <u>trying</u>
> <u>to get Novell to sign a global IP assignment, for chain of title</u>
> <u>purposes</u>.  I understand that time is very short now, but this must
> happen as soon as possible after closing so we do not lose track of
> this.

(Supp. Brakebill Decl., Ex. 7, at  1 (emphasis added).)

     6.     In the redlined draft attached to the May 3, 2001 e-mail, Caldera's attorneys

deleted Santa Cruz's insertion of the qualifying phrase "[e]xcept for the inability to obtain third

party acknowledgements to establish a chain of title."  Instead, the draft inserted a new

qualifying phrase at the end of Paragraph 8(v) to limit chain of title questions to those involving

Novell.  The redlined version thus read:

> ~~Except for the potential inability to obtain third party~~
> ~~acknowledgements to establish a chain of title~~, Assignor has no
> knowledge of any fact that would prevent Assignee's registration
> of any Rights related or appurtenant to the Inventions and Works
> or recording the transfer or Rights hereunder, (<u>except that Assignor</u>
> <u>may not be able to establish a chain of title from Novell Inc. but</u>
> <u>shall diligently endeavor to do so as soon as possible</u>).

(*Id.* at ¶ 8(v) (emphasis added).)  That became the final language in the executed Assignment

Agreement.  (Supp. Brakebill Decl., Ex. 1, at ¶ 8(v), WSGR 4431.)

### 2.    In Early 2003, SCO Repeatedly Requested that Novell Transfer the UNIX Copyrights to SCO.

7.      Beginning in late 2002, Darl McBride, SCO's CEO, contacted Novell repeatedly

to seek copies of records concerning SCO's intellectual property rights to UNIX.  McBride

stated that he wanted this information to support possible efforts by SCO to assert claims against

end users of Linux.  (Declaration of Greg Jones, Supp. Brakebill Decl., Ex. 8, at ¶ 13; Supp.

Brakebill Decl., Ex. 9, at 1; Supp. Brakebill Decl., Ex. 10.)

8.      On January 4, 2003, McBride received an e-mail from Michael Anderer, a

consultant for SCO retained to examine its intellectual property.  Anderer stated that

                              * * REDACTED * *                    Anderer

noted that                    * * REDACTED * *

Anderer                       * * REDACTED * *

            (Supp. Brakebill Decl., Ex. 11, Anderer Dep. 9:2-17, 88:17-90:24; Supp.

Brakebill Decl., Ex. 12 at SCO 1272179.)

9.      On February 25, 2003, McBride called a Novell employee in business

development, David Wright, and said, "SCO needs the copyrights."  Wright passed McBride's

request to Novell's in-house legal department.  McBride's request was memorialized in an e-mail

written that day by a Novell in-house attorney, Greg Jones.  (Supp. Brakebill Decl., Ex. 13, at 1.)

McBride does not dispute that he made that statement in his phone call to Wright.  (Supp.

Brakebill Decl., Ex. 14, McBride Dep. 99:10-100:1.)

10.     In early 2003, McBride and Chris Sontag of SCO contacted Greg Jones at Novell

several times to request transfer of the UNIX copyrights.  (Supp. Brakebill Decl., Ex. 8, at ¶ 13;

Supp. Brakebill Decl., Ex. 15, Jones Dep. 181:2-182:22.)  McBride stated that "the asset

purchase agreement excluded copyrights from being transferred" and that this was a "clerical

error." (*Id.* at 181:2-182:22.) Sontag then requested that Jones sign a letter purportedly attempting to "clarify" that the APA did not transfer copyrights. (Supp. Brakebill Decl., Ex. 16 at Ex. 2.)

11.    On February 4, 2003, McBride contacted Christopher Stone, vice chairman of Novell, and stated that he wanted Novell to "amend" the APA to give SCO "the copyrights to UNIX." (Supp. Brakebill Decl., Ex. 17 at NOV 39458; Supp. Brakebill Decl., Ex. 18, Stone Dep. 108:22-109:10.).

12.    Again, in March 2003, McBride called Stone to ask him if Novell would "amend" or "change" the APA so SCO "could have the copyrights." (Supp. Brakebill Decl., Ex. 18, Stone Dep. 248:10-249:16.)

13.    Ralph Yarro, chairman of SCO, requested an in-person meeting with Stone. In that meeting, on May 14, 2003, Yarro told Stone that he "would like for Novell to make changes to the agreement to give them [i.e., SCO] the copyrights." Stone refused. (*Id.* at 135:23-136:5, 137:20-24, 140:3-19.) In June 2003, Stone made notes memorializing that conversation. (*Id.* at 174:5-9; Supp. Brakebill Decl., Ex. 17 at NOV 39460-61.)

14.    On May 19, 2003, McBride called Stone and Joe LaSala, Novell's general counsel, and again requested that Novell convey the copyrights to SCO. Specifically, McBride said, "We only need you to amend the contract so that we can have the copyrights." (Supp. Brakebill Decl., Ex. 19, LaSala Dep. 172:14-173:4, 176:12-177:12, 227:6-14; Supp. Brakebill Decl., Ex. 18, Stone Dep. 249:17-250:12.) Stone made notes in June 2003 memorializing that conversation. (*Id.* at 174:5-9; Supp. Brakebill Decl., Ex. 17, at NOV 39460.)

3.    **After the Execution of the APA, Santa Cruz and SCO Distributed Copies of UNIX Code Bearing Joint SCO-Novell Copyright Notices.**

15.    SCO contends that Novell failed to object to Santa Cruz's distribution of UnixWare software containing copyright notices in Santa Cruz's name.  In fact, the copyright notices distributed by Santa Cruz indicated Novell's continued ownership of the original UNIX and UnixWare code and SCO's ownership only of modifications to that code.  SCO submitted in support of its summary judgment motion copies of the labels on two UnixWare CDs released by Santa Cruz.  (Declaration of Edward Normand, filed 4/9/07, PACER No. 260 ("Normand Decl."), Exs. 27-28.)[6]

16.    The CDs were labeled "SCO UnixWare Release 2.1," "SCO UnixWare Release 2.1.3 Installation CD," and "SCO UnixWare Release 2.1.3 Supplemental CD."  (Declaration of James McKenna in Support of Novell's Opposition, filed herewith ("McKenna Decl.") ¶ 4.)  On the CDs labeled "SCO UnixWare Release 2.1" and "SCO UnixWare Release 2.1.3 Installation CD," the main installation directories contained, with slight variations, the following copyright notices:

> *(c) Copyright 1996 The Santa Cruz Operation, Inc.  All rights reserved.*
> *Copyright 1984-1995 Novell, Inc.  All Rights Reserved.*

(McKenna Decl., ¶ 5.)

17.    On the CDs labeled "SCO UnixWare Release 2.1" and "SCO UnixWare Release 2.1.3 Installation CD," the documentation directories contained the following copyright notices:

---

[6] At Novell's repeated requests following SCO's April 9, 2003 summary judgment motion, SCO provided Novell with copies of the underlying CDs; only the labels of those CDs were referenced and submitted in SCO's motion.  (Supp. Brakebill Decl., Exs. 20 and 21.)

> *Copyright (c) 1994-1995 Novell, Inc.  All rights reserved.*
> *(c) Copyright 1996 The Santa Cruz Operation, Inc.  All rights*
> *reserved.*

(McKenna Decl., ¶ 6.)

18.    On the CD labeled "SCO UnixWare Release 2.1.3 Supplemental CD," the following text appeared:

> *COPYRIGHT=Copyright 1996-1998 The Santa Cruz Operation,*
> *Inc.  All Rights Reserved.*
>
> *COPYRIGHT=Copyright 1984-1995 Novell, Inc.  All Rights*
> *Reserved.*

(McKenna Decl., ¶ 8.)

### B.    Novell's Conduct After Signing the APA Is Consistent with Its Understanding that the APA Did Not Transfer the UNIX Copyrights.

#### 1.    Novell Took No Action to Send Santa Cruz the Physical Copyright Registrations.

19.    In SCO's Statement of Facts, SCO states that Santa Cruz "obtained physical possession of the UNIX copyright registrations from Novell," implying that Novell affirmatively took action to send the registrations to SCO.  (SCO Statement of Facts, ¶ 22.)  In fact, Novell did no such thing.  Burt Levine was an in-house attorney who worked in the UNIX unit in New Jersey.  Levine stayed in that unit in New Jersey as the business was sold from AT&T to UNIX System Laboratories to Novell to Santa Cruz.  (Normand Decl., Ex. 33, ¶¶ 2-6.)  Levine testified that the UNIX unit and its business files, including the copyright registrations, remained in New Jersey throughout the changes in ownership of the business.  (Supp. Brakebill Decl., Ex. 22, Levine Dep. 19:10-20:23.)  As a result of the APA, the UNIX facility in New Jersey became part of Santa Cruz.  The UNIX business files in New Jersey, including copyright registrations, continued to be kept in the same place.  Accordingly, Santa Cruz obtained physical possession of

those registrations. (*Id.* 24:16-25:8.) Chris Sontag, testifying as SCO's representative under Fed. R. Civ. P. 30(b)(6), confirmed Levine's account. (Supp. Brakebill Decl., Ex. 23, Sontag 30(b)(6) Dep. 5:10-13, 137:13-139:14.) Greg Jones, a Novell 30(b)(6) deponent questioned by SCO on the issue, also confirmed that Novell had no record of ever having moved the UNIX copyright registrations out of New Jersey or having taken action to send them to Santa Cruz after the execution of the APA. (Supp. Brakebill Decl., Ex. 24, Jones 30(b)(6) Dep. 177:13-179:5.)

          **2.**       **Novell Had No Knowledge that SCO Licenses Contained Any Incorrect Representations and Warranties that SCO Owned UNIX Copyrights.**

20.      SCO's Statement of Facts refers to three licenses executed after the APA between SCO and third-party vendors. SCO contends that those licenses represent and warrant that SCO owns the UNIX copyrights and that Novell failed to object to SCO's entering into such licenses. (SCO Statement of Facts, ¶ 24.)

21.      SCO has presented no evidence that Novell knew of those supposed agreements and thus had an opportunity to object. SCO's Director of Software Licensing, Bill Broderick, has attested that "[t]he terms and conditions of each UNIX licensee's use of the licensed UNIX software product were confidential." (Normand Decl., Ex. 33, at ¶ 23.)

22.      SCO has submitted no evidence that any of the three license agreements were shown to Novell for approval, as required by the APA for certain UNIX and UnixWare licenses. The first license agreement, with Integration Design, does not appear to involve UNIX or UnixWare, so it would not need to be submitted to Novell for approval. (Normand Decl., Ex. 30, at SCO 1041490). SCO has itself asserted that the remaining two licenses, with Lucent Technologies and Samsung Electronics, did not need to be shown to Novell for approval. (Supp.

Brakebill Decl., Ex. 25, SCO's Responses and Objections to Novell's Second and Third Sets of Interrogatories, Response No. 7 and Ex. A, pages 3-4.)[7]

23.     In any event, none of the three licenses contains any representation or warranty of SCO's copyright ownership.  The first license concerns products having nothing to do with UNIX or UnixWare, such as Netscape Navigator.  (Normand Decl., Ex. 30 at SCO 1041490). The second license states only that "[a]s between SCO and LICENSEE," ownership of the licensed product "shall remain" with SCO.  (Normand Decl., Ex. 31 § 2.4.)  The third license states only that SCO is not aware of any copyrights that are infringed through the use or copying of the licensed product and that SCO indemnifies the licensee against copyright infringement claims.  (Normand Decl., Ex. 32 § 7.02.)

### 3.     The Technology License Agreement Is Consistent With the Fact that the APA Did Not Transfer the Copyrights.

24.     SCO's Statement of Facts notes that, upon closing of the deal, Santa Cruz and Novell entered into a Technology License Agreement ("TLA") whereunder Novell retained a license to any UNIX and UnixWare technology transferred under the APA.  (SCO's Statement of Facts ¶ 6.)  SCO argues that Novell would not have needed such a license if Novell did not transfer copyrights to Santa Cruz under the APA.

―――――――――――――――

[7] During discovery in this litigation, Novell asked SCO to "identify" all "royalties" from "licensees of UNIX and/or UnixWare, for which SCO contends that it is entitled to retain 100% [of the income on the license] and is not required to pass through to Novell" for approval.  (Supp. Brakebill Decl., Ex. 26, Novell's Second Set of Interrogatories, Interrogatory No. 7.)  In response, SCO asserted that it had the right to retain 100% of royalties on the Lucent and Samsung licenses and was not required to show those licenses to Novell for approval.  (Supp. Brakebill Decl., Ex. 25, SCO's Responses and Objections to Novell's Second and Third Sets of Interrogatories, Response No. 7 and Ex. A, pages 3-4.)

25.    In fact, Novell requested that license because, although Novell would retain its copyright in the original UNIX and UnixWare code, Novell would not have a right to use other intellectual property (such as any software know how) transferred in the APA and would not have a copyright to future enhancements that it anticipated Santa Cruz would be making to the SVRX and UnixWare code.  (Declaration of Tor Braham in Support of Novell's Ownership MSJ No. 1, PACER No. 281 ("Braham Decl.") ¶¶ 21-23, Ex. 11 at NOV 39972-39973.)

26.    The TLA provided that Novell "retains" a license to the "Licensed Technology," which was defined in the APA as:

  (i)  all of the technology included in the Assets and

  (ii)  all derivatives of such technology included in the Assets,
      including the "Eiger" product release . . . .

(Normand Decl., Ex. 1, Section II.A.)

27.    The "Licensed Technology" in the TLA was intended to cover Santa Cruz improvements to the code, *i.e.*, the derivative works that Santa Cruz was to develop.  (Braham Decl., ¶ 23.)

28.    The "Licensed Technology" in the TLA was also intended to cover other technical information and intellectual property in UNIX and UnixWare, including any protectible trade secrets, software know-how, methods, and concepts and documentation.  Unlike copyrights, those items were not excluded from the assets transferred to Santa Cruz, so Novell needed a license to use them.  (Braham Decl., ¶ 23.)

29.    Duff Thompson, who was a Novell executive at the time and is now chair of SCO's litigation committee, confirmed that the "technology" licensed in TLA is "a broader category than copyrights" and "could include everything from patents, processes, customer lists that are proprietary."  (Supp. Brakebill Decl., Ex. 27, Thompson Dep. 147:9-148:25.)

15

**C.     SCO's "Testimonial Evidence" Does Not Demonstrate an Intent to Transfer Copyrights.**

**1.     None of SCO's Witnesses Was Involved in the Negotiation or Drafting the Intellectual Property Provisions of the APA.**

30.     The general thrust of the Novell-Santa Cruz transaction changed radically over the course of negotiations.  At the outset, Novell had hoped for an all cash deal to sell the UNIX assets outright.  (Declaration of David Bradford in Support of Novell's Ownership MSJ No. 1, PACER No. 279 ("Bradford Decl.") ¶ 7.)  As explained in more detail in Novell's Ownership MSJ No. 1, the transaction became significantly more complex when it became evident that Santa Cruz lacked the resources for such a purchase.  (*See* Novell's Ownership MSJ No. 1 Facts ¶¶ 5-10.)  In the end, Novell negotiated for specific contractual provisions to allow it to retain various rights and interests in UNIX.  (Bradford Decl., ¶ 7; Braham Decl., ¶¶ 7-11.)

31.     The contractual terms of the APA were negotiated over a period of approximately two weeks in September 1995.  That negotiation was "almost exclusively" between the parties' lawyers, including both in-house and outside counsel.  (Supp. Brakebill Decl., Ex. 28, Alter Dep. 8:14-22; Braham Decl., ¶ 24.) ¶

32.     SCO's motion does not rely on any testimony from any individuals involved in drafting the intellectual property provisions of the APA.  For Novell, those individuals were Tor Braham, Aaron Alter, and Shannon Whisenant of Wilson Sonsini Goodrich & Rosati.  (Braham Decl., ¶ 5; Supp. Brakebill Decl., Ex. 28, Alter Dep. 8:2-9:15)  For Santa Cruz, Jeff Higgins of Brobeck Phleger & Harrison was the recipient of drafts of Schedules 1.1(a) and 1.1(b), listing intellectual property to be included and excluded from the transfer of assets, which were sent to Santa Cruz by Novell.  (Supp. Brakebill Decl., Exs. 29.)  Braham, Alter, Whisenant, and Higgins were all on the "Project Sleigh Ride Working Party List," which listed persons to whom drafts of

the APA were circulated.   (Supp. Brakebill Decl., Ex. 30; Supp. Brakebill Decl., Ex. 31, Chatlos

Dep. 101:10-12.)

### a.    Robert Frankenberg

33.    SCO relies on the testimony of Robert Frankenberg, Novell's former CEO.  In

fact, Frankenberg testified that he did not draft provisions of the APA, but instead entrusted

others with drafting a document that protected Novell's ongoing interest in UNIX:

> Q.  And as a result, you <u>tasked your negotiating team</u> with making
> sure that the detailed draft of the Asset Purchase Agreement
> winded its way between the goal of selling the UNIX business to
> SCO but <u>retaining the rights necessary for Novell to protect its
> interest</u> in the ongoing UNIX revenue stream and the capitalization
> of that revenue stream?
>
> A.  Yes.

(Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 64:14-21 (emphasis added).)

34.    Frankenberg testified that he "directed the negotiating team to make sure that

[Novell's] rights to enter into buyouts after the acquisition closed were preserved."  (*Id.* at 63:1-

19.)  Frankenberg recalled "discussing" with the negotiation team the fact that "retaining the

UNIX copyrights would facilitate Novell's exercise of rights with respect to capitalizing the

SVRX revenue stream."  (*Id.* at 65:21-66:7.)

35.    Frankenberg signed the APA "on basis of the recommendation of his team" and

"did not review every item."  (*Id.* at 68:12-17.)

36.    Tor Braham, the principal person responsible for drafting the APA and

negotiating its contractual language on behalf of Novell, confirms that Frankenberg "was not

involved in the negotiation or drafting of the contract language of the APA."  (Braham Decl., ¶

24(f).)

17

### b.    Ty Mattingly

37.    SCO relies on the testimony of Ty Mattingly, Novell's former Vice President for Strategic Relations.  In fact, Mattingly testified that his role "related only to the high level business strategy" and that he was "not involved in the details of the legal document."  (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 66:11-19.)

38.    Mattingly was involved only "very superficially" in the "last two or three weeks before the contract was executed," which was "when the back and forth concerning the legal provisions was taking place."  (*Id.* at 68:22-69:22.)  He was "not involved in crafting or wordsmithing the contractual provisions."  (*Id.* 86:3-6.)

39.    Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, confirms that Mattingly "was not involved in negotiating or drafting the APA contract language."  (Braham Decl., ¶ 24(b).)

### c.    Duff Thompson

40.    SCO relies on the testimony of Duff Thompson, a former Novell executive who now chairs SCO's litigation committee.  In fact, Thompson was not involved in the drafting of the relevant APA provisions either.

> Q.  By the time of the asset purchase agreement you are no longer in a legal function?
>
> A.  No.  That's correct.
>
> Q.  And so this -- and so in the -- when you were involved in the asset purchase agreement negotiations, who were you relying on for the detailed drafting of the agreement?
>
> A.  Our counsel, Wilson Sonsini.
>
> Q.  Tor Braham in particular?

> A.  Tor and his team . . . .  [H]e had people within his firm who were specialists in these items that were probably doing the bulk of the actual drafting.

(Supp. Brakebill Decl., Ex. 27, Thompson Dep. 30:22-31:12)

41.    Tor Braham confirms that Thompson "was not involved in negotiating or drafting the APA contract language."  (Braham Decl., ¶ 24(a).)

42.    Thompson did not recall "any specific discussions around copyrights" or any "discussion with SCO about the excluded asset schedule" during negotiation of the deal.  (Supp. Brakebill Decl., Ex. 27, Thompson Dep. 86:1-20.)

43.    Ty Mattingly testified that Thompson was "not really involved in the details of the Novell, Santa Cruz transaction."  (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 70:17-71:1.) Thompson was "checked out" during the drafting of the agreement and was "not in the office that often."  (*Id.* 71:2-72:19.)

### d.    Ed Chatlos

44.    SCO relies on the testimony of Ed Chatlos, a former Novell employee.  But Chatlos did not draft the intellectual property provisions at issue.  Chatlos admitted that

**\* \* REDACTED \* \***

(Supp. Brakebill Decl., Ex. 34, Chatlos IBM Dep. 82:11-83:5.)

45.    Chatlos testified that he was not involved in any negotiations concerning either including or excluding copyrights from the transaction.  (Supp. Brakebill Decl., Ex. 31, Chatlos Dep. 124:5-14.)

46.    Tor Braham confirms that Chatlos "did not draft the APA" and that Chatlos was not "the Novell business person directing the drafting of the contract."  Braham "reported to and

received instructions from David Bradford [Novell's general counsel], not from Mr. Chatlos."
(Braham Decl., ¶ 24(c).)

### e.    Burt Levine

47.    SCO relies on the testimony of Burt Levine, a former Novell in-house attorney.
Levine testified that he "may have" worked on some "early drafts" the APA but does not
remember which specific provisions, if any.  (Supp. Brakebill Decl., Ex. 35, Levine IBM Dep.
179:3-8, 180:2-12.)  He testified that he has no "understanding as to specifically what intellectual
property, if any, was or wasn't transferred" under the APA.  (*Id.* 180:21-181:13.)

48.    Levine testified that during APA negotiations, he had reviewed and marked up
drafts of Schedules 1.1(a) and (b) of the APA, which listed Included and Excluded Assets.  He
revised the list of included assets, but did not add copyrights.  He left the exclusion of "all
copyrights" intact while making other revisions to intellectual property provision of the Excluded
Assets schedule.  He then faxed his markup to Wilson Sonsini.  (Supp. Brakebill Decl., Ex. 22,
Levine Dep. 71:19-77:18; Supp. Brakebill Decl., Ex. 36.)

49.    Wilson Sonsini then passed on Levine's comments to Santa Cruz's outside
counsel, Brobeck.  (Supp. Brakebill Decl., Ex. 29; Supp. Brakebill Decl., Ex. 22, Levine Dep.
80:19-81:12.)

50.    However, Levine recalled nothing further about his review and markup of
Schedules 1.1(a) and (b).  (*Id.* at 71:13-18; 72:14-18.)

51.    Tor Braham received Levine's comments on Schedules 1.1(a) and (b), but does
not recall Levine ever participating in APA negotiations with Santa Cruz.  (Braham Decl., ¶
24(g).).

### f.     Bill Broderick

52.     SCO relies on the testimony of Bill Broderick, SCO's Director of Software Licensing.  (Normand Decl., Ex. 15 ¶ 2.)  Broderick "did not" have "any involvement at all in negotiating the APA."  (Supp. Brakebill Decl., Ex. 37, Broderick Dep. 158:5-7.)

53.     Broderick, who participated in the APA transition team, testified that he did not recall any specific discussion about the transfer of copyrights during APA transition meetings. (*Id.* 49:15-51:16.)

54.     Tor Braham has never heard of Broderick and confirms that Broderick "was not involved in the APA negotiations or drafting."  (Braham Decl., ¶ 24(d).).

### g.     Alok Mohan

55.     SCO relies on the testimony of Alok Mohan, Santa Cruz's former CEO.  Mohan testified that he was involved in the negotiations "only at a high level."  (Supp. Brakebill Decl., Ex. 38, Mohan Dep. 10:17-20.)  Mohan "was not involved" in "specific drafting of the documents."  (*Id*. 16:9-17:6)

56.     Mohan testified that "the issue of copyrights in or out was not discussed with me."  He testified, "[Novell] did not tell me that they'd kept it.  They did not tell me they'd given it to us."  (*Id*. 261:7-262:2.)

57.     Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, has never met Alok Mohan.  (Braham Decl., ¶ 24(e).).

### h.    Doug Michels

58.    SCO relies on the testimony of Doug Michels, Santa Cruz's founder.  Michels was involved in only two or three meetings with Novell after the initial discussion about the deal.  (Supp. Brakebill Decl., Ex. 39, Michels Dep. 11:18-12:1.)  Michels did not "draft any language of the Asset Purchase Agreement" or "review drafts" of it and does not recall "even vaguely" any debates in which he participated regarding the drafting of the APA.  (*Id.* at 12:14-13:7.)

59.    Michels testified that he did not recall any discussion by anyone at either Novell or SCO regarding whether UNIX copyrights were being transferred as part of the APA.  (*Id.* 50:20-52:5.)

60.    Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, was not aware of "any involvement" by Michels in the negotiation and drafting of APA contract language.  (Braham Decl., ¶ 24(h).).

### i.    Jim Wilt

61.    SCO relies on the testimony of Jim Wilt, a business development executive at Santa Cruz during the negotiation of the APA.  (Supp. Brakebill Decl., Ex. 40, Wilt Dep. 10:17-11:2.)  Wilt does not recall drafting "any of the language of the Asset Purchase Agreement" and believes that "the lawyers" did the drafting.  (*Id.* 20:19-21:7.)

62.    Ed Chatlos, on whose testimony SCO relies, testified that

                         * *  **REDACTED** * *        (Supp.  Brakebill  Decl.,  Ex.  34, Chatlos  IBM  Dep.  184:12-185:7.)    Wilt  concurs  that  he  was  "less  active  at  the  end  of  the negotiations,"  when  the  APA  was  being  drafted.  (Supp.  Brakebill  Decl.,  Ex.  40,  Wilt  Dep. 20:12-15.)

63.    Wilt testified that he did not recall anyone from Novell stating that copyrights were being transferred.  (*Id.* 57:10-59:17.)

64.    Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, was not aware of "any involvement" by Wilt in the negotiation and drafting of APA contract language.  (Braham Decl., ¶ 24(i).).

### j.    Kim Madsen

65.    SCO relies on the testimony of Kim Madsen, a Santa Cruz paralegal.   (Supp. Brakebill Decl., Ex. 41, Madsen Dep. 6:24-7:2.)  Madsen had no recollection of negotiating the relevant intellectual property provisions of the APA, though:

> Q. Was it your testimony earlier that you did not recall being involved in negotiating any specific provisions of the asset purchase agreement?
>
> A. I don't recall negotiating specific provisions.
>
> Q. As you sit here today do you recall negotiating any provisions relating to the UNIX copyrights in the asset purchase agreement.
>
> A. No.

(*Id*. 58:7-15.)  She did not recall providing feedback on "specific provisions" either.  (*Id.*  39:16-42:19.)

66.    Madsen testified, "I don't recall any conversations with Novell pertaining to copyrights."  (*Id*. 79:16-22.)  She does not recall Santa Cruz ever asking for the copyrights.  (*Id.* 79:24-80:5.)  Rather, she testified that she and the Santa Cruz team were simply "assuming" the copyrights were transferring.  (*Id.* 81:10-15.)

67.    Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, does not recall any specific interactions with Madsen regarding the APA contractual provisions at issue.  (Braham Decl., ¶ 24(j).).

### k.    "Joint" press release

68.    SCO also relies on a supposedly "joint" press release stating that under the APA, "SCO will acquire Novell's UnixWare business and UNIX intellectual property."  (SCO's Statement of Facts ¶ 9.)  Novell's joint press releases with other companies typically contain both companies' logos and information.  (Supp. Brakebill Decl., Ex. 24, Jones 30(b)(6) Dep. 20:24-21:10.)  The press release on which SCO relies does not contain Novell's logo, contact information, or company description, but contains information only for SCO.  (Tolonen Decl., Ex. 8.)  Greg Jones, a Novell 30(b)(6) deponent questioned by SCO about the press release, stated that he had no knowledge that such press release was ever approved by Novell.   (Supp. Brakebill Decl., Ex. 24, Jones 30(b)(6) Dep. 18:21-20:16.)

69.    SCO has no evidence that this press release was in fact "joint."  SCO relies on testimony from Alok Mohan, Santa Cruz's then-CEO, to argue that the press release upon which SCO relies was "joint."  But Mohan testified that he had no knowledge of whether the press release was sent to Novell for approval.  (Supp. Brakebill Decl., Ex. 39, Mohan Dep. 249:3-251:11.)  SCO also relies on Robert Frankenberg, Novell's then-CEO, who accepted SCO's counsel's description at deposition of the press release as "jointly approved."  But Frankenberg never testified to any personal knowledge of the press release being approved by Novell.  (Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 22:20-23:5.)

70.    In fact, Novell did issue press releases about the APA.  (Supp. Brakebill Decl., Ex. 24, Jones 30(b)(6) Dep. 22:10-12.)  Both press releases, which were issued in September

1995 and December 1995, are publicly available on Novell's website and have been produced to SCO in this litigation. Neither makes any mention of any transfer of copyrights or other intellectual property. (Supp. Brakebill Decl., ¶¶ 46-47 and Exs. 43, 44.)

71. In any event, the press release relied upon by SCO provides little information in its reference to unspecified "intellectual property." The APA undisputedly did not transfer patents to Santa Cruz. Duff Thompson, a current member of SCO's Board and head of its litigation committee, admitted in the declaration submitted by SCO that patents were expressly excluded from the assets transferred to Santa Cruz. (Normand Decl., Ex. 10 ¶ 9). Similarly, Burt Levine, a former paid SCO litigation consultant who was represented by SCO's counsel at his deposition, testified that Novell's UNIX patents were not transferred to Santa Cruz. (Declaration of Ken Brakebill in Support of Novell's Ownership MSJ No. 1, PACER No. 284 ("Brakebill Decl."), Ex. 25, Levine Dep. at 146:22 to 149:9, 185:9-23.)

72. Moreover, non-attorney employees at Novell in 1995 frequently referred to "intellectual property" in loose terms.

**\* \* REDACTED \* \***

(Supp. Brakebill Decl., Ex. 45, Bouffard Dep. 11:6-12:22, 39:12-40:18, 125:18-127:6, 169:1-14.)

    **2.    Those Directly Involved in the Drafting of the APA's Intellectual Property Provisions Confirm that Novell Deliberately Excluded Copyrights From the Transfer of Assets.**

73. Tor Braham was the principal drafter of the APA. (Braham Decl., ¶ 5.) Braham and others on Novell's legal team have explained that Novell deliberately excluded copyrights from the transfer of assets to protect Novell's ongoing interests in the UNIX business. Among other things, Novell excluded copyrights from the transfer to protect its ability to "buy out"

25

SVRX licenses.  Such "buyouts" occur when the licensee makes a substantial payment to obtain

a "paid up" license on which no future royalty payments are due.  (Novell's Ownership MSJ

No. 1 Facts ¶¶ 5-14.)

74.    Robert Frankenberg, Novell's then-CEO, testified that he "directed the

negotiating team to make sure that [Novell's] rights to enter into buyouts after the acquisition

closed were preserved."  (Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 63:1-19.)

Frankenberg recalled "discussing" with the negotiation team the fact that "retaining the UNIX

copyrights would facilitate Novell's exercise of rights with respect to capitalizing the SVRX

revenue stream."  (*Id.* at 65:21-66:7.)  Frankenberg testified that it was "possible" that the

negotiation team excluded copyrights from the transfer of assets to "effectuate" his "direction to

try to make sure that [Novell] could protect [its] right to do buyouts."  (*Id*. at 85:8-15.)

75.    That is precisely what happened, according to Novell's then-general counsel

David Bradford.  Bradford instructed Tor Braham to retain Novell's intellectual property in

UNIX and UnixWare to protect Novell's SVRX revenue stream.  (Bradford Decl., ¶¶ 6-9;

Braham Decl., ¶ 14.)  Among other things, Schedule 1.1(b) was revised to exclude "all

copyrights" from the transfer of assets.  (Braham Decl., ¶ 15.)  That exclusion was reviewed and

left intact by Novell representatives, including Tor Braham, David Bradford, Aaron Alter, and

Burt Levine.  (*Id.* ¶ 16; Supp. Brakebill Decl., Ex. 28, Alter Dep. 138:16-140:17.); Supp.

Brakebill Decl., Ex. 29.). At least one draft of that exclusion was sent to Santa Cruz

representatives before the execution of the APA.  (Braham Decl. at ¶ 17; Supp. Brakebill Decl.,

Ex. 28, Alter Dep. 141:20-142:14; Supp. Brakebill Decl., Ex. 29.)

76.     The day before the APA was signed, it was presented to Novell's Board of

Directors for approval.  Bradford reviewed the terms of the APA with the Board.  The minutes

from that board meeting state:

> RESOLVED:
> . . .
> Pursuant to the Asset Purchase Agreement, . . . Novell will retain
> all of its patents, copyrights and trademarks (except for the
> trademarks UNIX and UnixWare) . . . .

(Bradford Decl., ¶ 13, Ex. 1 at 2.)

### D.     Amendment No. 2 Did Not Transfer the Copyrights Either.

#### 1.     Amendment No. 2 Was Not Intended to Transfer All Copyrights Pertaining to UNIX to Santa Cruz.

77.     As explained in greater detail in Novell's Ownership MSJ No. 1, Novell and

Santa Cruz executed Amendment No. 2 to the APA on October 16, 1996.  (*See* Brakebill Decl.,

Ex. 28; Novell's Ownership MSJ No. 1 Facts ¶¶ 31-36.)  Amendment No. 2 revised the

definition of "Excluded Assets" in Section V.A of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and
> trademarks owned by Novell as of the date of the Agreement
> required for SCO to exercise its rights with respect to the
> acquisition of the UNIX and UnixWare technologies.

(*Id.*, Paragraph A.)

78.     Amendment No. 2 was negotiated primarily through communications between

two in-house lawyers, Allison Amadia of Novell and Steve Sabbath of Santa Cruz.  (Novell's

Ownership MSJ No. 1 Facts, ¶¶ 31-36; Declaration of Allison Amadia in Support of Novell's

Ownership MSJ No. 1, PACER No. 278 ("Amadia Decl."), ¶¶ 4-6.)  During the summer of 1996,

Sabbath telephoned Amadia and stated that the original APA explicitly excluded copyrights to

UNIX and UnixWare and that he wanted to amend the original APA to give Santa Cruz those

copyrights.  (*Id*.)

79.    Sabbath proposed to revise Section V of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and
> trademarks owned by Novell as of the date of this Amendment No.
> 2, which pertain to the UNIX and UnixWare technologies and
> which SCO has acquired hereunder. . .

(Amadia Decl., Ex. 1, Paragraph A.)  Amadia rejected that draft, stating that Novell would not

transfer ownership of any copyrights.   (*Id.*, ¶ 10.)

80.    Ultimately the parties agreed on much narrower language that became

Amendment No. 2.  Amadia understood that the final version of Amendment No. 2 did not

transfer ownership of any UNIX or UnixWare copyrights but instead merely affirmed Santa

Cruz's license to use Novell's UNIX and UnixWare copyrighted works.   (*Id.* at ¶ 14.)

81.    Jim Tolonen, the Novell executive who signed Amendment No. 2, confirms that it

was never Novell's intent to transfer copyrights by way of Amendment No. 2 (or the APA), and

that he would not have signed Amendment No. 2 had he believed it would do so.  (Declaration of

James R. Tolonen in Support of Novell's Ownership MSJ No. 1, PACER No. 280 ("Tolonen

Decl.") ¶ 13-16.)

82.    SCO has not submitted any evidence from Sabbath concerning his negotiation or

signing of Amendment No. 2 on Santa Cruz's behalf.  At his recent deposition in this case,

Sabbath testified that he did not recall "negotiating to any extent" "Paragraph A of Amendment

No. 2," the portion that refers to copyrights.  He did not recall "focusing on paragraph A to any

extent."  (Supp. Brakebill Decl., Ex. 46, Sabbath Dep. 33:11-20.)

      2.      **SCO's Only Evidence Concerning the Intent of Amendment No. 2 Comes From Witnesses Who Had No Involvement in or Memory of Drafting or Negotiating that Amendment.**

83.      SCO relies on the testimony of Robert Frankenberg and Ed Chatlos regarding Amendment No. 2. However, both left Novell before Amendment No. 2 was negotiated, so they had no involvement with the amendment. (Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 86:12-16; Supp. Brakebill Decl., Ex. 31, Chatlos Dep. 41:13-19.)

84.      SCO relies on the testimony of Ty Mattingly, Burt Levine, Bill Broderick, Alok Mohan, Doug Michels, and Jim Wilt. However, all testified that they had no involvement with Amendment No. 2. (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 85:1-10; Supp. Brakebill Decl., Ex. 22, Levine Dep. 190:11-22; Supp. Brakebill Decl., Ex. 37, Broderick Dep. 144:12-16; Supp. Brakebill Decl., Ex. 38, Mohan Dep. 200:6-15; Supp. Brakebill Decl., Ex. 39, Michels Dep. 19:25-20:4.)

85.      SCO relies on the testimony of Jim Wilt. But Wilt was not involved in drafting or negotiating Amendment No. 2. (Supp. Brakebill Decl., Ex. 40, Wilt Dep. 40:10-17.) Wilt did participate in some internal SCO discussions relating to Amendment No. 2 but had no memory of what was said. (*Id*. 41:14-25.)

86.      SCO relies on the testimony of Duff Thompson. At the time Amendment No. 2 was being negotiated, Duff Thompson had left Novell and was serving as Novell's appointee to the Santa Cruz board. (Supp. Brakebill Decl., Ex. 27, Thompson Dep. 19:22-20:7.) Thompson "recused" himself from any discussion about Amendment No. 2 and "was not given any information by either party, by either side as to how it was being negotiated." (*Id*. 21:8-23:6.)

87.      Kim Madsen has submitted a declaration on what she believes to be the intended meaning of Amendment No. 2. That declaration incorporates by reference an earlier declaration

by Madsen in the *SCO v. IBM* case, in which she claims that her understanding of Amendment

No. 2 is based on "negotiations and discussions leading up to the Amendment." (Supp. Brakebill

Decl., Ex. 41, ¶ 16.) However, in her recent deposition, Madsen conceded, "I cannot recall any

specific conversations regarding amendment 2." (Supp. Brakebill Decl., Ex. 42, Madsen Dep.

202:15-19.)

> ### 3.    SCO Has Presented No Evidence that Any Copyrights Were "Required for" the Operation of the UNIX-Related Business Contemplated by the APA.

88.    Although the APA did not expressly use the word "license," the APA had the

legal effect of granting SCO a license to the copyrights insofar as necessary to exercise its rights

under the APA. (Braham Decl., ¶ 20; *see also* Novell's Ownership MSJ No. 1 at 26-29.) Burt

Levine testified that the APA "convey[ed] enough of a patent license under Novell's patents that

would be necessary for SCO to conduct its business." (Brakebill Decl., Ex. 25, Levine Dep. at

185:17-23; *see id.* at 7-24, 148-49.) Similarly, Levine testified that if copyrights were not

transferred, the APA also conveyed a copyright license:

> Q.    Assuming that the copyrights had been retained by Novell
> in the transaction, SCO would have had a license to use
> those copyrights in the business, correct?
>
> A.    Correct.

(*Id.* at 89:7-11; *see id.* at 88:5-89:2 (Santa Cruz "absolutely, absolutely" would have had a

license to use copyrights in its business; there would be an "inherent" license to do "anything

necessary to practice the copyright in the transferred asset").) Levine testified further: "My

understanding is similarly to my stand on copyrights that the grant of the whole business carries

with it at least licenses under the patents needed to carry on the business to the extent that Novell

had them." (*Id.* at 87:2-6; *see also id.* at 185:9-23.)

30

89.    SCO had been operating the UNIX and UnixWare business for thirteen months prior to the execution of Amendment No. 2 on October 16, 1996, based on that license and without ownership of any of the copyrights.  (Tolonen Decl., ¶ 16; Brakebill Decl., Ex. 28.)

90.    SCO designated Chris Sontag as its Rule 30(b)(6) deponent on what "copyright SCO alleges that Novell transferred to SCO."  (Supp. Brakebill Decl., Ex. 23, Sontag 30(b)(6) Dep. 121:10-122:2.)  Sontag could identify no facts demonstrating that any of the copyrights at issue are "required for" SCO's operation of the UNIX-related business contemplated by the APA:

> Q.   And how do you know -- what is SCO's view on how one knows whether a copyright was required for, say, the UNIX business?
>
> A.   I believe that's laid out in our filings and our pleadings.
>
> …
>
> Q.   Is the answer to the question, "Where can I find out all of SCO's views on the question of 'required for,'" is the answer to that question, "Look at what we filed in litigation"?
>
> A.   Yes.

(*Id.*, at 121:3-18.)  Sontag testified that he had "no testimony over and above that." (*Id.*)  SCO's filings contain only allegations concerning which copyrights are required, not any deposition testimony or declarations on that issue.  (*See* SCO's Ownership MSJ at 24-25.)  When directly confronted about whether a license, rather than outright ownership of the copyrights, would be sufficient for SCO to operate the UNIX and UnixWare business, Sontag again provided no facts supporting SCO's position.  (*Id.*, Sontag 30(b)(6) Dep. 130:1-131:9.)

91.    Christopher Stone, who was vice chairman of Novell and has been for the last two years CEO of a software company in Boston, testified that no copyrights were required for SCO

to operate the UNIX-related business contemplated by the APA.  (Supp. Brakebill Decl., Ex. 18, Stone Dep. 72:18-73:6, 217:15-218:9.)  Stone testified that "You don't need the copyrights to be transferred" to sell UNIX.  (*Id.*)  He noted, "There are many examples where that has taken place in the industry.  I gave you an example earlier of my current business where I have licensed source code from IBM for printer technologies, and I don't own the copyrights."  (*Id.* at 218:10-15.)  He testified:

> Q.  I mean if Santa Cruz were licensing source code to a third party --
>
> A.  You don't need the copyrights.
>
> Q.  Why is that?
>
> A.  You don't need them.  That third party doesn't necessarily need them either.  You're just licensing a right to use the software.  That's all it is.  That's how the software business works.  We're letting you use it for a period of time.  You're not -- it's not like buying a piece of hardware.  You're licensed a right to use it.
>
> Q.  If in that example Santa Cruz were to make a copy of the source code and put it on a disk and send it to the third party, where would Santa Cruz's right to copy that source code and put it on the disk come from?
>
> A.  The license.

(*Id.* at 218:16-219:9.)

92.    Other companies have bought parts of Novell's software business without obtaining ownership of the copyrights for the underlying software.  (Bradford Decl., ¶ 18.)  On January 24, 1996, Novell entered into an agreement with BEA Systems, Inc., in which Novell transferred certain assets relating to its TUXEDO software business, but specifically retained the copyrights in the TUXEDO software. (*Id.*)

**4.    Novell's Statements Concerning Amendment No. 2 Are Entirely Consistent With Its Understanding that the Amendment Did Not Transfer Copyrights.**

93.    Novell issued a press release on May 28, 2003 announcing that it, not SCO, owned the UNIX copyrights.[8]

94.    SCO makes much of a June 6, 2003 press release from Novell.  That press release stated simply that Amendment No. 2 "appears to support" SCO's claim of copyright ownership.  (SCO Statement of Facts ¶ 30.)  Novell did not elaborate any further on the subject in that press release.  Novell' statement was based solely on its review the night before.  On the evening of June 5, 2003, SCO had surprised Novell with an executed copy of Amendment No. 2, which Novell had not realized existed and had found in its files only in an unsigned version.  Novell felt compelled to respond immediately, as it began to receive calls from the press and SCO announced the next morning that it would be holding a press call at 11:00 a.m.  (Supp. Brakebill Decl., Ex. 47, Messman IBM Dep. 212:22-214:20; Supp. Brakebill Decl., Ex. 48, Messman Dep. 60:16-63:5; Supp. Brakebill Decl., Ex. 49, LaSala Dep. 113:8-118:10, 124:3-125:18.)

95.    Novell explained its position further in a letter to SCO, dated June 26, 2003:

> Upon closer scrutiny, … Amendment No. 2 raises as many questions about copyright transfers as it answers.  Indeed, what is most certainly *not* the case is that "any question of whether UNIX copyrights were transferred to SCO as part of the Asset Purchase Agreement was clarified in Amendment No. 2" (as SCO stated in its June 6 press release).

---

[8] SCO claims in its introduction (but not its Statement of Facts) that Novell's Vice Chairman Chris Stone told a journalist named Maureen O'Gara that Novell timed that press release to coincide with SCO's earnings report.  Stone testified, however, that O'Gara asked him if Novell's press release was related to SCO's earnings announcement and that he replied that he "didn't even know SCO was having an earnings announcement."  (Supp. Brakebill Decl., Ex. 18, Stone Dep. 140:20-143:6.)

(Supp. Brakebill Decl., Ex. 50.)  Novell later published that June 26, 2003 letter on its website.

(Supp. Brakebill Decl., Ex. 51, ¶ 6.)

96.    Novell addressed its position in a subsequent letter, dated August 4, 2003, that

"under the Asset Purchase Agreement and Amendment No. 2, copyrights were not transferred to

Santa Cruz Operation unless SCO could demonstrate that such a right was 'required for [Santa

Cruz Operation]' to exercise the rights granted to it in the APA.  Santa Cruz Operation has never

made such a demonstration . . . ."  (Supp. Brakebill Decl., Ex. 52 (emphasis added).)  Novell

later published that August 4, 2003 letter on its website.  (Supp. Brakebill Decl., Ex. 51, ¶ 7.)

## IV.    ARGUMENT

### A.    The Plain Language of the APA Excluded Copyrights from the Assets to Be Transferred by Novell to Santa Cruz.

#### 1.    Schedule 1.1(b) Expressly Excluded "All Copyrights" From the Transfer of Assets.

As this Court noted in its June 9, 2004 Order, "the APA specifically excluded all

copyrights from the assets transferred from Novell to SCO's predecessor."  (Order Denying

Motion to Dismiss, June 9, 2004, PACER No. 29.)  The APA defined the assets to be transferred

by Novell to Santa Cruz by reference to lists of included and excluded assets.  (Novell's

Ownership MSJ No. 1 Facts, ¶ 2.)[9]  The only "Intellectual Property" identified in the Schedule

1.1(a) list of Included Assets were UNIX and UnixWare trademarks.  (Novell's Ownership MSJ

No. 1 Facts, ¶ 3.)  The UNIX and UnixWare copyrights were not listed as Included Assets.  (*Id.*)

Conversely, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded from the

_____

[9] The Statement of Facts in this brief will be cited as "Novell Opposition Facts."  The Statement of Undisputed Facts from Novell's Ownership MSJ No. 1 will continue to be cited as "Novell's Ownership MSJ No. 1 Facts."

transferred assets "[a]ll copyrights and trademarks, except for the trademarks UNIX and

UnixWare."  (Novell's Ownership MSJ No. 1 Facts, ¶ 4 (emphasis added).)

SCO contends that this exclusion should be ignored because the APA transferred the

"right, title, and interest" in UNIX and UnixWare.  (SCO's Ownership MSJ at 20-21.)  SCO cites

a series of cases purportedly holding that those magic words automatically transfer all

copyrights.  In fact, those cases support Novell's position, not SCO's, because those cases

specifically distinguish the situation where the agreement expressly excludes copyrights.  SCO

principally relies on *Shugrue v. Continental Airlines*, 977 F. Supp. 280 (S.D.N.Y. 1997).  There,

the court found that the sale of "all right, title, and interest" in all of the seller's computer

software transferred the copyrights in that software because "[n]o exception was carved out for

copyrights" and "no rights, titles, or interests were retained."  *Id.* at 285.  Similarly, both of the

other cases on which SCO relies specifically note the lack of any specific provisions excluding

or discussing copyrights.  *Relational Design & Tech., Inc. v. Brock*, No. 91-2452-EEO, 1993 WL

191323, at *6 (D. Kan. May 25, 1993)[10] ("The original contract is devoid of any language

excluding copyright law"); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th

Cir. 1992) (noting that "the agreement does not mention the word 'copyright'").[11]  SCO cannot

escape the plain language of the APA, which excludes "all copyrights."

---

[10] Pursuant to DUCivR 7-2, a copy of *Relational Design & Tech., Inc. v. Brock*, No. 91-2452-EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) is attached hereto as Exhibit B.

[11] SCO also cites *S.O.S., Inc. v. Payday, Inc*., 886 F.2d 1081 (9th Cir. 1989).  That case holds that a copyright owner should not be presumed to have transferred outright ownership of the copyrights when it grants a license.  *Id.* at 1088.  That supports Novell's position, not SCO's. Novell retained "all copyrights," while granting a license to copy, use, and otherwise carry out the UNIX business to Santa Cruz.

**2.    SCO Cannot Use Extrinsic Evidence About the Supposed
Intent of the Parties to Rewrite the Plain Language of the APA.**

SCO asserts that even though the APA excluded "all copyrights" from the assets to be transferred, the APA intended to instead to <u>include</u> all copyrights pertaining to UNIX and UnixWare. That attempt to rewrite the APA should be rejected because it is contrary to the APA's plain language.

As explained in Novell's Ownership MSJ No. 1,[12] black-letter California law holds that extrinsic evidence is not admissible to vary or contradict the terms of an integrated agreement. (Novell's Ownership MSJ No. 1 at 19-23.) Such evidence is admissible only if relevant to prove a meaning to which the terms are reasonably susceptible. The same rule applies to evidence of parties' conduct after signing the contract. *See Bank of the West v. Resolution Trust Corp.*, No. C 95-4708 FMS, 1997 U.S. Dist. LEXIS 1581 (N.D. Cal. Feb. 13, 1997)[13] (excluding evidence of the parties' subsequent conduct under California law).

The extrinsic evidence offered by SCO does not advance an interpretation of "all copyrights" of which the phrase is reasonably susceptible. Instead, SCO seeks to demonstrate a <u>contradiction</u> between the supposed intent of the parties and the language of the contract. Indeed, the witnesses upon whom SCO relies admit that Schedule 1.1(b)'s explicit exclusion of "all copyrights" is wholly incompatible with any intent to transfer copyrights.

--------------------------------

[12] Novell hereby incorporates by reference all of the arguments made in its Memorandum in Support of its Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance, filed June 20, 2007, PACER No. 276.

[13] Pursuant to DUCivR 7-2, a copy of *Bank of the West v. Resolution Trust Corp.*, No. C 95-4708 FMS, 1997 U.S. Dist. LEXIS 1581 (N.D. Cal. Feb. 13, 1997) is attached hereto as Exhibit C.

Doug Michels, Santa Cruz's founder, could not square the exclusion with an intent to

transfer the copyrights:

> Q.  Did you have any opinion on the meaning of the exclusion here -- this is V(A) again, "All copyrights" --
>
> A.  I mean, it clearly makes no sense in the context of the agreement.  I assume it was an error.

(Supp. Brakebill Decl., Ex. 39, Michels Dep. 76:25-77:3.)

Steve Sabbath, Santa Cruz's lead in-house counsel on the deal, concurred that "Roman

Numeral V(a)" of Schedule 1.1(b), which contained the copyright exclusion, was "just screwed

up."  (Supp. Brakebill Decl., Ex. 45, Sabbath Dep. 131:16-132:1.)  Sabbath testified:

> Q.  And that's the truth, isn't it?  As you sit here today, <u>you don't know why Section [V](a) is the way it is</u>, do you?
>
> MR. NORMAND:  Objection to form.
>
> THE WITNESS:  Yes, because all the sudden here pops up UNIX and UnixWare.  <u>It's a little bit nonsensical.</u>

(*Id.* 132:2-8 (emphasis added).)  Allison Amadia, then Novell's in-house counsel, confirms that

Sabbath told her in the summer of 1996, approximately nine months after the execution of the

APA, that he believed "the Original APA explicitly excluded copyrights to UNIX and UnixWare

as assets being sold by Novell to Santa Cruz and that it shouldn't have."  (Amadia Decl., ¶ 6.)

California courts have specifically held that extrinsic evidence may not be used for this

purpose: *i.e.*, to show that the parties intended a result contrary to the express terms of the

contract.  In *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263 (1987), <u>all</u> parties

testified that they intended a contract allowing termination "for <u>any</u> reason" to mean "for any

<u>good</u> reason."  *Id.* at 273 (emphasis added).  The California Court of Appeal held that such

evidence should have been excluded: "Testimony of intention which is contrary to a contract's

express terms . . . does not give meaning to the contract: rather it seeks to substitute a different

meaning." *Id.*

### B.  In Any Event, Extrinsic Evidence Would Simply Reinforce the Conclusion that the APA Intentionally Excluded Copyrights.

The APA did not transfer the copyrights, as a matter of law, because of its plain language

excluding "all copyrights."  Accordingly, the Court need not and should not consider SCO's

extrinsic evidence regarding the intent of the APA.  If this Court were to examine that evidence,

though, the evidence is that the APA deliberately retained the copyrights for Novell.

### 1.  The Drafters of the APA's Intellectual Property Provisions Agree that the Exclusion of Copyrights Was Deliberate.

Following preliminary business negotiations, the contractual terms of the APA were

drafted and negotiated by both sides' lawyers over a short two-week period.  (Novell's

Opposition Facts, ¶ 31.)  The key players in that intensive drafting process have confirmed that

the exclusion of copyrights was deliberate.  Prior drafts of the APA also confirm this point.[14]

Tor Braham, outside counsel for Novell at Wilson Sonsini, was the principal drafter of

the APA.  (Novell's Opposition Facts, ¶ 73.)  Braham has submitted a declaration explaining in

detail why he and his legal team deliberately excluded copyrights from the transfer of assets to

protect Novell's ongoing interests in the UNIX business.  (Novell's Ownership MSJ No. 1 Facts,

---

[14] Extrinsic evidence is inadmissible to contradict the plain language of an integrated contract, but is admissible where <u>consistent</u> with the terms.  *EPA Real Estate P'ship v. Kang*, 12 Cal. App. 4th 171, 176-77 (1992).  Because the APA explicitly excludes "all copyrights," the Court need not consider extrinsic evidence to decide the parties' summary judgment motion. However, the extrinsic evidence presented by Novell is consistent with the APA and hence may properly be considered by the Court.  By contrast, SCO's extrinsic evidence improperly seeks to contradict the plain language of the APA and is therefore inadmissible as a matter of law.

¶¶ 5-14.)  As explained in Novell's Ownership MSJ No. 1, the exclusion of copyrights allowed

Novell, among other things, to protect its SVRX revenue stream if Santa Cruz were to go

bankrupt and to preserve Novell's ability to buy out SVRX licenses. (*Id.*)

The paper trail confirms Braham's account.  Novell, through Wilson Sonsini, sent Santa

Cruz an earlier draft of the APA that listed as Included Assets under Schedule 1.1(a) "all patents,

patent applications, copyrights . . . and all other intellectual property . . . that pertain to Unix or

UnixWare" on September 8, 1995.  (*Id.* ¶ 16.)  Wilson Sonsini <u>deleted</u> that language from the

Included Assets, so that the UNIX and UnixWare trademarks were the only intellectual property

assets mentioned.  Wilson Sonsini then added an exclusion of "all copyrights" to the Excluded

Assets in Schedule 1.1(b).  (*Id.* ¶ 17.)  Drafts of the new schedules were transmitted to Santa

Cruz before the APA was executed.  (*Id.*  ¶ 18.)  Aaron Alter, a member of Braham's Wilson

Sonsini team, confirmed that he reviewed the exclusion of "all copyrights," left it intact, and sent

it to Santa Cruz.  (Novell's Opposition Facts, ¶ 75.)  Alter's notes also provide contemporaneous

corroborating evidence that the exclusion of copyrights was no accident.  Alter marked up a term

sheet with the handwritten notation "already excluded" next to a Section including "Intellectual

Property . . . Copyrights, trademarks  . . . ."  (Novell's Ownership MSJ No. 1 Facts, ¶ 21.)

In excluding all copyrights from the transfer, Braham and his team acted with the direct

authorization of Novell.  David Bradford, Novell's Senior Vice President, General Counsel, and

Corporate Secretary, instructed the Novell legal team to retain Novell's intellectual property in

UNIX and UnixWare to protect Novell's ongoing interest in SVRX revenues.  (Novell's

Opposition Facts, ¶ 75.)  Robert Frankenberg, the CEO of Novell at the time, testified that he

"directed the negotiating team to make sure that [Novell's] rights to enter into buyouts after the

acquisition closed were preserved."  (*Id.* ¶ 74.)  Frankenberg recalled "discussing" with the

Novell team the fact that "retaining the UNIX copyrights would facilitate Novell's exercise of rights with respect to capitalizing the SVRX revenue stream." (*Id.*)

Moreover, Novell's Board of Directors specifically ratified the exclusion of copyrights. The day before the execution of the APA, Bradford explained the terms of the APA to the Board and the Board approved the transaction. (Novell's Opposition Facts, ¶ 76.) The Board minutes specifically note the exclusion of copyrights, stating: "<u>RESOLVED</u>: Pursuant to the Asset Purchase Agreement, . . . Novell will retain all of its patents, copyrights and trademarks (except for the trademarks UNIX and UnixWare) . . . ." (*Id.*)

> **2. SCO Presents No Evidence to the Contrary from Anyone Involved in the Negotiation of the Intellectual Property Provisions of the APA.**

SCO does not provide contrary testimony from a single witness involved in drafting or negotiating the intellectual property provisions of the APA. The persons involved in drafting and negotiating those provisions for Novell were Tor Braham, Aaron Alter, and Shannon Whisenant. (Novell's Opposition Facts, ¶ 32.) Jeff Higgins, of Brobeck Phleger & Harrison, represented Santa Cruz in APA contract negotiations and received at least one draft of the Included and Excluded Assets schedules, in which copyrights were omitted from the Included Assets and expressly listed as Excluded Assets. (*Id.*)

Instead, SCO relies on testimony of those who had no involvement in the negotiation or drafting of the contractual language at issue:

- Robert Frankenberg, Novell's former CEO, testified that he delegated the drafting of the APA to the negotiation team and relied on their recommendation in signing it. (Novell's Opposition Facts, ¶¶ 33-36.)

- Ty Mattingly, Novell's former Vice President for Strategic Relations, testified his role was limited to "high level business

strategy" and had no involvement in the wording of the APA. (*Id.* ¶¶ 37-39.)

- Duff Thompson, who worked at Novell and is now chair of SCO's litigation committee, admitted the he relied on Tor Braham and the Wilson Sonsini team to draft the APA.  (*Id.* ¶¶ 40-43.)

- Ed Chatlos, a former Novell employee, admitted that
  ## * * REDACTED * *
  (*Id.* ¶¶ 44-46.)

- Burt Levine, a former Novell in-house attorney, has no "understanding as to specifically what intellectual property, if any, was or wasn't transferred."  He reviewed the Included and Excluded Assets schedules for Novell during APA negotiations, and left the copyright exclusion intact.  But he has no memory of what he was thinking during that review.  (*Id.* ¶¶ 47-51.)

- Bill Broderick, SCO's Director of Software Licensing, admitted that he had no involvement at all in negotiating or drafting the APA.  (*Id.* ¶¶ 52-54.)

- Alok Mohan, Santa Cruz's former CEO, said he was involved in negotiations "only at a high level" and was not involved in "specific drafting of documents."  (*Id.*¶¶ 55-57.)

- Doug Michels, Santa Cruz's founder, did not draft any portions of the APA and did not review any drafts of the APA.  (*Id.*¶¶ 58-60.)

- Jim Wilt, a Santa Cruz business development executive, testified that he did not draft any of the APA but left that to "the lawyers."  He was "less active" in the latter part of the negotiations, when the APA provisions were being negotiated.  (*Id.* ¶¶ 61-64.)

- Kim Madsen, a Santa Cruz paralegal, did not recall "negotiating any provisions relating to the UNIX copyrights in the asset purchase agreement."  (*Id.* ¶¶ 65-67.)

None of those persons has personal knowledge of the drafting and negotiation of the Included

and Excluded Assets schedules.  Accordingly, none of those witnesses has the necessary

foundation to testify as to the key issue: that is, what was meant by the listing of "all copyrights" on the Excluded Assets schedule and what was meant by the omission of copyrights from the "Intellectual Property" in the Included Assets schedule.

Moreover, SCO's evidence indicates that the lawyers who drafted the APA and negotiated its terms are the <u>only</u> ones who had any substantive exchange about copyrights during the negotiations. SCO submits no evidence that any of the witnesses upon which it relies participated in any discussion of copyrights. Indeed, most of the witnesses upon whom SCO relies, including Duff Thompson, Ed Chatlos, Alok Mohan, Doug Michels, Jim Wilt, and Kim Madsen, affirmatively stated that they could remember no discussions on the subject of copyrights being included or excluded during the negotiations in which they participated. (Novell's Opposition Facts, ¶¶ 42, 45, 56, 59, 63, 66.) By contrast, the lawyers who drafted the APA actually exchanged drafts specifically addressing copyrights. Their testimony that the exclusion of copyrights was deliberate is controlling.

### C.    Amendment No. 2 Did Not Transfer the UNIX and UnixWare Copyrights to Santa Cruz.

Unable to show that the APA transfers copyrights, SCO falls back on arguing that the Amendment No. 2 intended to effectuate such a transfer. That amendment revised the definition of "Excluded Assets" in Schedule 1.1(b) to exclude "[a]ll copyrights and trademarks, except for copyrights and trademarks . . . required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (Novell's Opposition Facts, ¶ 77.) SCO's evidence about the intent of Amendment No. 2 is incompetent and irrelevant. Even if Amendment No. 2 intended to transfer the copyrights, it failed to do so because the Copyright Act requires the execution of written instrument of conveyance to transfer copyrights and no

such instrument was ever signed by the parties.  And, in any event, the undisputed evidence is that Amendment No. 2 was never intended to transfer copyrights, and that no copyrights were "required for" SCO to run the UNIX-related business contemplated by the APA.

>    1.    **Amendment No. 2 Is Not a Signed Instrument of Conveyance, and Hence Cannot Transfer Copyright Ownership Under the Copyright Act.**

As explained in greater detail in Novell's Ownership MSJ No. 1, the Copyright Act requires a signed "written instrument of conveyance" to transfer ownership of copyrights.  17 U.S.C. § 204(a).  (*See* Novell's Ownership MSJ No. 1, at 34-37.)  Although SCO correctly notes that no "magic words" are required for this transfer (SCO's Ownership MSJ, at 25-26), the law requires that a written conveyance be sufficiently specific in order to "force[] a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred."  *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) (emphasis added).  Amendment No. 2 fails those requirements.

Amendment No. 2 contains no language "transferring" or "assigning" the copyrights because Novell rejected such language.  (Novell's Ownership MSJ No. 1 Facts, ¶ 31-36.)  Moreover, Amendment No. 2 nowhere identifies the specific copyrights, if any, to be transferred.  Which copyrights in the many releases of UNIX are "required for" the UNIX business contemplated by the APA?  And for which of those copyrights is outright ownership, rather than a license or partial right under copyright, necessary?  Amendment No. 2 provides no answers.

Because Amendment No. 2 lacks sufficient specificity to transfer any copyrights, such a transfer could occur only if the parties executed a further document listing the specific copyrights to be transferred pursuant to the amendment.  In the case of the original APA, the parties did execute a "Bill of Sale" that explicitly transferred "the Assets," as defined in the APA and

Amendment No. 1.  (Novell's Ownership MSJ No. 1 at 33-34; Novell's Ownership MSJ No. 1

Facts, ¶¶ 25-27.)  However, the parties did not execute a Bill of Sale or other written instrument

of transfer in connection with Amendment No. 2.  (Novell's Ownership MSJ No. 1 at 36;

Novell's Ownership MSJ No. 1 Facts, ¶ 30.)  Moreover, Amendment No. 2 did not purport to

retroactively amend the Bill of Sale to transfer additional assets; on the contrary, it explicitly

became effective as of the date of its execution, which was ten months after the Bill of Sale.

(*Id.*)

      Because Amendment No. 2 did not constitute a written conveyance sufficient to

effectuate a transfer of copyrights, SCO's extrinsic evidence concerning the "intent" of

Amendment No. 2 is legally irrelevant.  Evidence of intention, whether through testimonial

evidence or subsequent course of conduct, does not allow a party to bypass the Copyright Act's

requirement of a written conveyance.  *See Pamiloff v. Giant Records, Inc.*, 794 F. Supp. 933,

935, 937 (N.D. Cal. 1992) (granting summary judgment for failure to satisfy the written

conveyance requirement despite plaintiffs' argument that the parties "intended" to transfer

copyright ownership and treated the copyrights as having transferred); *see also Lyrick Studios,*

*Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 396 (5th Cir. 2005) (irrelevant that "parties acted as if

they had a deal for several years" because "Section 204(a) requires a writing" and there was no

satisfactory writing).

        **2.**    **In Any Event, Amendment No. 2 Was Never Intended to**
              **Transfer All Copyrights Pertaining to UNIX and UnixWare.**

      Even if this Court were to examine the intent behind Amendment No. 2, the undisputed

evidence is that there was no intention to transfer all copyrights pertaining to UNIX or

UnixWare.

As explained in Novell's Ownership MSJ No. 1, both Allison Amadia, who negotiated Amendment No. 2, and Jim Tolonen, who signed the amendment on behalf of Novell, understood the amendment would not transfer ownership of any copyrights.  (Novell's Ownership MSJ No. 1, Facts ¶ 36.)  Indeed, Novell expressly rejected a draft amendment that would accomplish precisely what SCO now seeks:  the removal of any exclusion of "copyrights . . . which pertain to the UNIX and UnixWare technologies" and the declaration that "SCO has acquired hereunder" those copyrights.  (*Id.* ¶¶ 31-35.)  Instead, Novell negotiated for language that did not mention any "acquisition" or "transfer" of copyright ownership, but instead merely affirmed Santa Cruz's license to use Novell's UNIX and UnixWare copyrighted works as "required for" the business.  (*Id.* ¶ 36.)

SCO does not submit any admissible evidence to the contrary.  With the exception of Kim Madsen, <u>all</u> of the witnesses upon whom SCO relies admit that they had no involvement whatsoever in the drafting or negotiation of Amendment No. 2.  (Novell's Opposition Facts, ¶¶ 83-86.)  As such, their testimony is without foundation, as they have no personal knowledge of the intent of the parties at the time the amendment was executed.  *See GM Corp. v. Superior Court*, 12 Cal. App. 4th 435, 442 (1993) (testimony of witness "was not competent evidence to raise a triable issue of fact regarding the interpretation of the release agreement" because the witness "was not involved in the negotiations which resulted in the execution of the release so that he had no personal knowledge regarding the intent of the parties at the time the release was executed").

Madsen's testimony is not admissible either.  Madsen submitted a declaration opining on the meaning of Amendment No. 2, purportedly based on her participation in "negotiations and discussions leading up to the Amendment."  (Novell's Opposition Facts, ¶ 87.)  However, in her

deposition, Madsen conceded that she had no recollection of any conversations regarding Amendment No. 2.  (*Id*.)

Moreover, even if the testimony upon which SCO relies were admissible, the undisputed negotiation history of Amendment No. 2 renders such testimony irrelevant.  Novell expressly rejected a proposed draft of Amendment No. 2 that transferred all copyrights pertaining to UNIX and UnixWare from Novell to Santa Cruz.  That alone is sufficient to establish that Amendment No. 2 could not have been intended to effectuate such a transfer.  *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1440-41 (9th Cir. 1994) (where "Apple tried to limit Microsoft's license to Windows 1.0" by proposing a draft agreement to that effect, and "Microsoft . . . rejected this limitation," there could be "no basis for construing the Agreement to grant the narrow license that Apple bargained for but gave up") (applying California law).

### 3.    No Copyrights Are "Required" for Santa Cruz to Run the UNIX-Related Business Contemplated by the APA.

Even assuming that the written conveyance requirement under the Copyright Act is satisfied, and even assuming the parties intended to transfer such copyrights despite all evidence to the contrary, SCO still cannot show that it owns the copyrights.  Amendment No. 2 states that copyrights "<u>required for</u> SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies" are no longer excluded from the transfer of assets.  (Novell's Opposition Facts, ¶ 77 (emphasis added).)  It is SCO's burden, as the plaintiff, to present evidence of what copyrights, if any, were "required for" Santa Cruz to exercise its rights.  It is not enough for SCO to show that some copyrights "relate to" or "pertain to" UNIX and UnixWare.  SCO must demonstrate that outright ownership of the copyrights it claims was "<u>required for</u>" Santa Cruz to run the UNIX-related business contemplated by the APA.

SCO has not presented any evidence to meet its burden. SCO simply asserts in its motion that it needed complete ownership of the copyrights to operate the business, without citing any deposition testimony or declaration from anyone involved in the UNIX or UnixWare business. In fact, the undisputed evidence is that SCO did not need ownership of any copyrights to operate that business.

The APA already granted SCO a license to use the UNIX and UnixWare copyrights as necessary to exercise its rights under the APA. (Novell's Opposition Facts, ¶ 88.)  As noted by Jim Tolonen, who signed Amendment No. 2 for Novell, SCO had already been operating the UNIX-related business contemplated by the APA for thirteen months before the execution of Amendment No. 2, pursuant to that license. (*Id.* ¶ 89.) SCO has no explanation as to why copyright ownership was unnecessary in those thirteen months, but is now suddenly "required for" the operation of the business.

SCO's designated 30(b)(6) witness on copyright ownership could not name a single fact that supports SCO's position that a license is insufficient. (*Id.* ¶ 90.) Chris Stone, a former Novell employee who now runs his own software business in Boston testified that no ownership of copyrights was required to operate the UNIX or UnixWare business. (*Id.* ¶ 91.)

Indeed, it is common in the software industry to operate a business based on a copyright license, rather than outright ownership of the copyrights. Stone noted that his new company in Boston had done that. (*Id.*) And other corporations have bought parts of Novell's software business without obtaining ownership of the copyrights for the underlying software. On January 24, 1996, Novell sold BEA Systems part of its TUXEDO software business, but specifically retained the copyrights in the TUXEDO software. (*Id.* ¶ 92.)

SCO has not shown that any copyrights are "required for" its operation of the UNIX and UnixWare business.  Accordingly, its argument that Amendment No. 2 effectuated a transfer of all copyrights pertaining to UNIX and UnixWare must fail.

### D.    Subsequent Conduct by the Parties Confirms that All Parties Understood Neither the APA Nor Amendment No. 2 Transferred the Copyrights.

SCO has argued that this Court should look to evidence of subsequent conduct to determine the meaning of the APA and Amendment No. 2.  Again, the Court need not and should not consider evidence of subsequent conduct because the APA's plain language excluded "all copyrights" from the transfer of assets and SCO has not shown that Amendment No. 2 transferred those copyrights.  However, even if this Court were to examine such evidence, the conduct of the parties following the execution of the APA and Amendment No. 2 simply confirms their understanding that no copyrights were transferred.

### 1.    Santa Cruz's and SCO's Actions Indicate a Recognition that No Transfer of Copyrights Occurred.

Santa Cruz and SCO repeatedly acknowledged Novell's ownership of the copyrights by (1) expressly noting a problem with the "chain of title from Novell" in the representations and warranties in Santa Cruz's assignment of its intellectual property in UNIX to SCO, which was at that time named Caldera, in 2001; (2) asking Novell on numerous occasions in late 2002 and early 2003 to transfer Novell's copyrights in UNIX to SCO; and (3) distributing software with copyright notices indicating Novell's continued copyright in the original UNIX works and Santa Cruz's copyright in modifications that it made to those works.

       **a.**     **In 2001, SCO and Santa Cruz Acknowledged that Santa Cruz "May Not Be Able to Establish Chain of Title from Novell" as to UNIX Intellectual Property.**

In May 2001, Santa Cruz purported to assign its intellectual property in UNIX to SCO, which at that time was named Caldera. (Novell's Opposition Facts, ¶ 1.) During the negotiations regarding that assignment, Caldera sought a representation and warranty that Santa Cruz had "no knowledge of any fact that would prevent [Caldera's] registration of any Rights" being transferred. (*Id.* ¶ 3.) Santa Cruz refused. Instead, Santa Cruz proposed a more limited provision stating that Santa Cruz had "no knowledge" of such facts, "[e]xcept for the inability to obtain third party acknowledgments to establish a chain of title." (*Id.* ¶ 4.)

Both Caldera and Santa Cruz understood the chief problem to be establishing Novell's transfer of intellectual property to Santa Cruz. In an e-mail responding to Santa Cruz's proposed limitation, Caldera's counsel noted that Santa Cruz was "trying to get Novell to sign a global IP assignment, for chain of title purposes." (*Id.* ¶ 5.) Obviously, if the APA and Amendment No. 2 in fact transferred all copyrights pertaining to UNIX and UnixWare, as SCO now claims, no such global IP assignment would be necessary. Indeed, at least as to copyrights, such an assignment would be impossible if the copyrights had been transferred to Santa Cruz six years earlier, since Novell would not longer own them and thus be unable to assign them.

Both Caldera and Santa Cruz concluded that Santa Cruz would not be able to establish a chain of title from Novell quickly enough for the Caldera-Santa Cruz deal to close as planned. (*Id.* ¶ 6.) Establishing a chain of title would require a further agreement from Novell transferring rights that had been excluded from transfer under the APA. Caldera and Santa Cruz eventually agreed that Santa Cruz would represent and warrant only that it had "no knowledge" of anything preventing registration of the copyrights "except that [Santa Cruz] may not be able to establish a

chain of title from Novell, but shall diligently endeavor to do so as soon as possible." (*Id.* ¶¶ 2, 7.) That agreement makes clear that Santa Cruz understood it could not show it had obtained a transfer of copyrights from Novell and that SCO was aware of that problem.

### b.    In Early 2003, SCO Repeatedly Requested that Novell Transfer the UNIX Copyrights to SCO.

SCO's repeated requests for the transfer of the UNIX copyrights demonstrate that it understood Novell still owned those copyrights after the execution of the APA and Amendment No. 2. In late 2002, SCO began a series of repeated calls to Novell regarding the copyrights. (Novell's Opposition Facts, ¶ 7.) At around the same time, SCO hired a consultant to examine its intellectual property in UNIX. That consultant's findings were memorialized in a January 4, 2003 e-mail to SCO's CEO, Darl McBride, concluding that

**\* REDACTED \* \*** The consultant

**\* \* REDACTED \* \*** (*Id.* ¶ 8.)

After receiving that e-mail, McBride called at least three different individuals at Novell in early 2003 to ask for the copyrights. SCO sent a letter to Novell purporting to seek only to "clarify" the APA. (*Id.* ¶ 10.) McBride's conversations, however, tell a different story. In those conversations, McBride stated that "the asset purchase agreement excluded copyrights from being transferred" and that this was a "clerical error." He requested that Novell "amend" or "change" the APA so SCO "could have the copyrights." In a conversation memorialized in a contemporaneous e-mail, McBride said, "SCO needs the copyrights." (*Id.* ¶¶ 9-12.) All of those statements are inconsistent with any belief that the APA had already transferred the copyrights eight years earlier.

SCO redoubled its efforts to obtain a transfer of copyrights from Novell in May 2003. SCO's chairman, Ralph Yarro, requested an in-person meeting with Christopher Stone, Novell's vice chairman, and told Stone that he "would like for Novell to make changes to the agreement to give them [i.e., SCO] the copyrights." (*Id.* ¶ 13.)  A few days later, McBride called Stone and Joe LaSala, Novell's general counsel, to reiterate SCO's request that Novell "amend the contract so that we can have the copyrights." (*Id.* ¶ 14.)  Both Yarro's meeting with Stone and McBride's call were memorialized in notes made by Stone in June 2003.  (*Id.* ¶¶ 13-14.)  Again, those conversations reflected SCO's understanding that it could not document a transfer of copyright ownership from Novell to Santa Cruz.

### c.  Santa Cruz Distributed New Releases of UnixWare Software with Copyright Notices that Acknowledged Novell's Continued Ownership.

In inserting the "all copyrights" exclusion, Novell had contemplated that it would retain the copyright in the original UnixWare code sold to Santa Cruz in the APA, and that Santa Cruz would own the copyright in the derivative work created by improvements that Santa Cruz would add to the original code.  (Braham Decl., ¶¶ 20-21.)  After the execution of the APA and Amendment No. 2, Santa Cruz began to distribute new releases of the UnixWare software, which contained the UnixWare code bought from Novell along with improvements made by Santa Cruz.  The copyright notices used by Santa Cruz on its new releases indicate that Santa Cruz understood that Novell continued to own the copyright to the original code.

The copyright notices on the main installation directories for Santa Cruz's new release CDs for UnixWare Version 2.1 and 2.1.3 state, with minor variations:

> *(c) Copyright 1996 The Santa Cruz Operation, Inc.  All rights reserved.*
> *Copyright 1984-1995 Novell, Inc.  All Rights Reserved.*

(Novell's Opposition Facts, ¶¶ 15-16, 18.)  Similar notices were affixed to the documentation

directories for those releases of UnixWare.  (*Id.* ¶ 17.)

     If Santa Cruz believed that it owned the copyright to both the original code and the

derivative work, the copyright notice should not have mentioned Novell at all.  17 U.S.C. §

401(b)(3) (copyright notice "shall" list "the name of the owner of copyright").  The notice should

have been in Santa Cruz's name alone.  Instead, Santa Cruz used the format commonly

employed where the publisher owns the derivative work, but not the copyright to the original

work.  In that situation, it is "the existing practice of many publishers to include earlier copyright

notices as well as a notice for the newly published derivative or collective work."  2-7 Nimmer

on Copyright § 7.12[C][1].[15]

    **2.    Novell's Conduct Was Consistent with Its Understanding that It Still Owned the Copyrights.**

        **a.    Novell Did Not Take Any Action to Physically Send Santa Cruz the Copyright Registrations in Its Files.**

     SCO makes much of the fact that Santa Cruz apparently had physical possession of the

UNIX copyright registrations.  (SCO's Ownership MSJ at 29.)  The physical possession of

---

[15] Proper copyright notice is an important issue.  Where "the person named in a copyright . . . is not the owner of the copyright , . . . any person who innocently begins an undertaking that infringes the copyright has a <u>complete defense to any action for such infringement</u> if such person proves that he or she was misled by the notice and began the undertaking in good faith under a purported transfer or license."  17 U.S.C. § 406(a) (emphasis added); *see also* Berne Convention for the Protection of Literary and Artistic Works, Article 15, § 1 ("In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be <u>entitled to institute infringement proceedings</u> in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner.") (emphasis added).

copyright papers is legally irrelevant. "[T]he possessor of a copyright certificate is not ipso facto

the copyright owner. The valuable federal right is not transferred by mere physical delivery, or

other acquisition, of the certificate. The owner may, of course, assign the copyright. But this is to

be done 'by an instrument in writing signed by the proprietor of the copyright.'" *Kingsrow*

*Enterprises, Inc. v. Metromedia, Inc.*, 397 F. Supp. 879, 881 (S.D.N.Y. 1975) (possession of the

actual papers is "immaterial" to the question of copyright ownership); *see also La Resolana*

*Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1202-1203 & n.7 (10th Cir. 2005)

(holding that physical possession of a "registration is separate from the issuance of a

registration" and that a rule placing emphasis on physical possession of registration papers is

"hard to imagine considering the fact that a certificate could easily be lost").

    SCO suggests that Santa Cruz's possession of the registrations is relevant here to show

Novell's supposed intent to transfer the copyrights. But the undisputed evidence is that Novell

took no such affirmative action. The UNIX registrations simply stayed in the same office in

New Jersey through the ownership changes from AT&T to USL to Novell to Santa Cruz.

(Novell's Opposition Facts, ¶ 19.)

        **b.**    **Novell Did Not Object to SCO's Licenses Because Those**
              **Licenses Carefully Avoided Representing that SCO**
              **Owned the Copyrights and, in Any Event, Novell Was**
              **Not Aware of Those Licenses.**

    SCO also makes much of Novell's failure to object to licenses between SCO and third

parties that purportedly "contain express representations and warranties of SCO's rights and

ownership in the intellectual property." (SCO's Ownership MSJ at 29.) In fact, Novell had no

reason to object to those licenses because those licenses were never shown to Novell and, in any

event, do not contain any such representations or warranties.

SCO has no evidence that Novell had any knowledge of the terms of SCO's licenses with third parties. SCO's Director of Software Licensing, Bill Broderick, has attested that the terms of the licenses are "confidential." (Novell's Opposition Facts, ¶ 21.) SCO cites no evidence that it showed Novell any of the licenses. The first license did not involve UNIX or UnixWare, so it would not need to be approved by Novell under the APA. SCO has elsewhere asserted that the second and third licenses did not need to be shown to Novell for approval. (*Id.* at ¶ 22.) Novell cannot be expected to object to the terms of licenses if it had no knowledge of them.

Moreover, SCO's licenses appear carefully worded to <u>avoid</u> any representation or warranty that SCO owns the UNIX or UnixWare copyrights. None of the three licenses submitted by SCO even comes close to making a representation and warranty of outright copyright ownership. The first license does not even involve UNIX or UnixWare, so any representations therein are irrelevant. (*Id.* ¶ 23.) The second license stated only that "<u>[a]s between SCO and the licensee</u>" the ownership of the licensed product "shall remain" with SCO. (*Id.*) The third license states only that SCO is not aware of any copyrights infringed by the product and that the licensee is indemnified against copyright infringement claims. (*Id.*) Novell had no reason to object to any of those provisions.

> ### c.    Section 1.6 and the Technology License Agreement do not demonstrate that "all copyrights" means "NetWare copyrights only."

Finally, SCO contends that the "license back" contemplated by Section 1.6 of the APA and implemented by the Technology License Agreement implies that Novell transferred the UNIX and UnixWare copyrights to Santa Cruz, because this license would have been unnecessary if Novell retained ownership of the UNIX and UnixWare copyrights. (SCO's Ownership MSJ at 22.)

In fact, as noted in Novell's Ownership MSJ No. 1, Novell sought the license to fill two important holes in its rights to UNIX, despite its ownership of the copyrights.  (Novell's Ownership MSJ No. 1 at 31-32.)  First, although Novell still owned the copyrights to the original UNIX and UnixWare code, Novell did not have any rights in future enhancements that the parties anticipated Santa Cruz would be developing, so Novell needed the license to use that code.  (Novell's Opposition Facts, ¶¶ 25, 27.)  Second, although copyrights were excluded from the transfer of assets from Novell to Santa Cruz, some intellectual property and technical information concerning UNIX and UnixWare was not excluded, including trade secrets, software know-how, methods, and concepts and documentation.  Novell needed a license to use those. (*Id.* ¶¶ 25, 28.)  Tor Braham, Novell's outside counsel, thus requested the Technology License Agreement to address those concerns.  (*Id.*)

### d.    SCO's reliance on a purported "joint" press release referring to "UNIX intellectual property" is misplaced.

SCO asserts that an intention to transfer copyrights can be gleaned from a purportedly "joint" press release announcing that "SCO will acquire Novell's UnixWare business and UNIX intellectual property."  (SCO's Statement of Facts, ¶ 9.)

SCO, however, has presented no evidence that this press release was in fact "joint." Typically, Novell's joint press release include the logo, contact information, and company description for both companies.  The press release on which SCO relies, however, contains information only for SCO, not for Novell.  (Novell's Opposition Facts, ¶ 68.)  Alok Mohan, upon whom SCO relies, testified that he does not know if Novell ever approved the press release.  (*Id.* at ¶ 69.)  Robert Frankenberg accepted at deposition SCO's counsel's use of the term "jointly approved press release," but never testified to any personal knowledge that Novell approved the

press release.  (*Id.*)  In fact, Novell published its own separate press releases concerning the APA in September 1995 and December 1995, both of which were produced to SCO and are publicly available on Novell's website.  Neither of those press releases mentions any transfer of intellectual property or copyrights.  (*Id.* at ¶ 70.)

To the extent that the press release's reference to unspecified "intellectual property" is interpreted to mean that the APA transferred <u>all</u> forms of intellectual property relating to UNIX or UnixWare (including trademarks, patents, and copyrights), that statement is indisputably incorrect.  The APA did transfer UNIX and UnixWare trademarks to Santa Cruz (to the extent owned by Novell), but explicitly excluded "all patents" and "all copyrights."  The witnesses on which SCO relies have admitted that the APA did not transfer UNIX and UnixWare patents to Santa Cruz.  (*Id.* ¶ 71.)  Moreover, Novell employees at the time used the term "intellectual property" to refer to                 **\*  \*  REDACTED \*  \***

            (*Id.* ¶ 72.)  To the extent that the press release is interpreted to include all copyrights and patents, the press release is simply incorrect and does not change the fact that copyrights and patents were excluded from the transfer.

## V.    CONCLUSION

        The APA explicitly excluded "all copyrights" from the assets to be transferred by Novell to Santa Cruz.  SCO's attempt to rewrite "all copyrights" as "some copyrights" fails because it is contrary to the plain language and to the parol evidence rule.  It is also contrary to the intent of the parties, as described by those actually involved in the drafting and negotiation of the "all copyrights" language.  SCO's reliance on Amendment No. 2 is also misplaced, because outright copyright ownership is not "required for" SCO to operate the UNIX and UnixWare business.

Moreover, Amendment No. 2 did not transfer ownership of any copyrights and was never intended to do so.

For all of these reasons, Novell requests that the Court deny SCO's motion for partial summary judgment on its First, Second, and Fifth Causes of Action and its motion for summary judgment on Novell's First Counterclaim.

DATED:   May 14, 2007

ANDERSON & KARRENBERG

By:    _/s/  Heather M. Sneddon_
            Thomas R. Karrenberg
            John P. Mullen
            Heather M. Sneddon

            -and-

            MORRISON & FOERSTER LLP
            Michael A. Jacobs (pro hac vice)
            Kenneth W. Brakebill (pro hac vice)
            Grant L. Kim (pro hac vice)

            **Attorneys for Defendant and
            Counterclaim-Plaintiff Novell, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of May, 2007, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF NOVELL'S OPPOSITION TO SCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S FIRST, SECOND, AND FIFTH CAUSES OF ACTION AND FOR SUMMARY JUDGMENT ON NOVELL'S FIRST COUNTERCLAIM (COPYRIGHT OWNERSHIP)** *[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*to be served to the following:

*Via CM/ECF*:

Brent O. Hatch
Mark F. James
HATCH JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101

Stuart H. Singer
William T. Dzurilla
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301

David Boies
Edward J. Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504

Devan V. Padmanabhan
John J. Brogan
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55401

*Via U.S. Mail, postage prepaid*:

Stephen Neal Zack
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida  33131

_____/s/  Heather M. Sneddon_____