## EXHIBIT A

## RESPONSE TO SCO'S STATEMENT OF FACTS

As a response to SCO's "Statement of Facts" in support of its Motion for Partial

Summary Judgment on Its First, Second, and Fifth Causes of Action and For Summary

Judgment on Novell's First Counterclaim, Novell submits a Response to SCO's Statement

of Facts. Below are the numbered paragraphs of SCO's Statement of Facts, followed by

Novell's responses. As discussed below, Novell disputes many of SCO's assertions.

Moreover, in many cases, SCO omits or ignores critical undisputed facts that are set forth

in the Undisputed Facts included in the Memorandum in Support of Novell's Motion for

Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for

Specific Performance, filed 4/20/07, PACER No. 286 ("Novell's Ownership MSJ No. 1

Facts"), and in Novell's Opposition to SCO's Motion for Partial Summary Judgment On

Its First, Second, and Fifth Causes of Action and For Summary Judgment on Novell's First

Counterclaim, filed 4/9/2007, PACER No. 259 ("Novell's Opposition Facts").

1.      Novell and Santa Cruz intended for the APA to transfer all of the UNIX and
UnixWare business to Santa Cruz. (Ex. 1, Recital B, § 1.3(a)(i).) Section 1.3(a)(i) of the
APA states:

> It is the intent of parties hereto that all of the Business and all
> of Seller's backlog, if any, relating to the Business be
> transferred to Buyer.

(Ex. 1 § 1.3(a)(i) (emphasis added).)

*Novell's Response*: Admitted that the APA contains the quoted language. Disputed

insofar as SCO suggests that this provision of the APA determines the assets transferred in

the APA. The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a),

which listed assets included in the transfer; and Schedule 1.1(b), which listed assets

excluded from the transfer. Further, as stated unambiguously in Section 1.1(a) of the APA,

"the Assets to be so purchased shall not include those assets (the 'Excluded Assets') set

forth on Schedule 1.1(b)." (Declaration of Kenneth W. Brakebill In Support of Novell's

Dockets.Justia.com

Motions for Summary Judgment, PACER No. 284 ("Brakebill Decl."), Ex. 2, Section

1.1(a), Schedules 1.1(a), 1.1(b).)

      2.     The first provision of the APA, Recital A as amended, defines the
"Business" that the parties intended to transfer:

> Seller is engaged in the business of developing a line of
> software products currently known as UNIX and UnixWare,
> the sale of binary and source code licenses to various
> versions of UNIX and UnixWare, the support of such
> products and the sale of other products ("Auxiliary
> Products") which are directly related to Unix and UnixWare
> (collectively, the "Business").

*(Id.* at 1; Ex. 2 ¶ A.)

*Novell's Response*: Admitted that the APA contains the quoted language. Disputed

insofar as SCO suggests that this provision of the APA determines the assets transferred in

the APA. The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a),

which listed assets included in the transfer; and Schedule 1.1(b), which listed assets

excluded from the transfer. Further, as stated unambiguously in Section 1.1(a) of the APA,

"the Assets to be so purchased shall not include those assets (the 'Excluded Assets') set

forth on Schedule 1.1(b)." (Brakebill Decl., Ex. 2, Section 1.1(a), Schedules 1.1(a),

1.1(b).)

      3.     Section 1.1(a) of the APA defines the assets transferred to Santa Cruz as
those identified in Schedule 1.1(a) of the APA:

> On the terms and subject to the conditions set forth in this
> Agreement, Seller will sell, convey, transfer, assign and
> deliver to Buyer and Buyer will purchase and acquire from
> Seller on the Closing Date (as defined in Section 1.7) <u>all of
> Seller's right, title, and interest in and to the assets and
> properties of Seller relating to the Business (collectively the
> "Assets")</u> identified on Schedule 1.1(a) hereto.
> Notwithstanding the foregoing, the Assets to be so purchased
> shall not include those assets (the "Excluded Assets") set
> forth on Schedule 1.1(b):

(Ex. 1 § 1.1 (emphasis added).)

*Novell's Response*: Admitted that the APA contains the quoted language. Disputed insofar as SCO suggests that the transfer of assets was determined solely by reference to Schedule 1.1(a). The last sentence of the portion of Section 1.1(a) quoted by SCO stated that, "Notwithstanding the foregoing [reference to Schedule 1.1(a)], the Assets to be so purchased <u>shall not include</u> those assets (the 'Excluded Assets') set forth in Schedule 1.1(b)." Thus, the APA explicitly provided that the Schedule 1.1(b) list of Excluded Assets carved out assets to be excluded from the Schedule 1.1(a) list of Included Assets. (Declaration of Tor Braham in Support of Novell's Ownership MSJ No. 1, PACER No. 281 ("Braham Decl.") ¶ 19.)

4.    Schedule 1.1(a), in turn, identifies seven categories of "assets and properties of Seller" transferred to Santa Cruz, including:

> I. <u>All rights and ownership of UNIX and UnixWare, including but not limited to</u> all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all appropriate technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, <u>including source code</u>, source documentation, source listings and annotations, engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include <u>without limitation</u>: Source Code Products . . . Binary Product Releases . . . and Products Under Development.
>
> II. All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.
>
> III. All of Seller's rights pertaining to UNIX and UnixWare under any [assignable] software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertains to the . . . :
>
> VI. All copies of UNIX and UnixWare, wherever located, owned by Seller.

(*Id.* Schedule 1.1(a), Items I-IV (emphasis added).) The assets identified in Item I include source code products, binary products, and products in development. (*Id.* Schedule 1.1(a), Item I.)

*Novell's Response*: Admitted that the APA contains the quoted language. Disputed insofar as SCO suggests that the quoted provisions are those that defined the intellectual property assets included in the transfer.

SCO has misleadingly failed to refer to Section V of the Schedule 1.1(a) list of included assets, which specified the "Intellectual Property" included in the category. Section V stated: "V. Intellectual Property — Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark)." (Brakebill Decl., Ex. 3, Section V.) Thus, the only "Intellectual Property" identified in the list of assets to be transferred were UNIX and UnixWare trademarks. Neither the "Intellectual Property" category, nor any other part of Schedule 1.1(a) identified copyrights in UNIX and UnixWare (or in any other product) as an asset to be transferred. (*Id.*)

Furthermore, the Schedule 1.1(b) list of "Excluded Assets" contained an "Intellectual Property" category that expressly excluded "all copyrights and trademarks, except for the trademarks UNIX and UnixWare" and "all patents." (Brakebill Decl., Ex. 4, Section V (emphasis added).)

5.     Through the APA Bill of Sale, executed on the Closing Date, Novell in fact transferred to Santa Cruz all of the Assets:

> In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, <u>does hereby transfer, convey, sell, assign and deliver to Buyer</u>, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, <u>all of the Assets</u>.

(Ex. 3 (emphasis added).)

*Novell's Response*: Admitted that the Bill of Sale contains the quoted language. Disputed insofar as SCO implies that UNIX and UnixWare copyrights were included in the

"Assets" transferred by the Bill of Sale. The Bill of Sale stated that all capitalized terms had the meanings set forth in "the Agreement," which was defined as "the Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995." (Brakebill Decl., Ex. 27.) As noted above, Section 1.1(a) of the APA defined the "Assets" to be transferred as the assets that were included in Schedule 1.1(a), and not excluded by Schedule 1.1(b). (Brakebill Decl., Ex. 2.) Schedule 1.1(a) did not include any copyrights, and Schedule 1.1(b) excluded "all copyrights." (Brakebill Decl., Exs. 3 and 4.) Therefore, the "Assets" transferred by the Bill of Sale indisputably did not include the UNIX and UnixWare copyrights.

6.       Section 1.6 of the APA provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the "Licensed Technology"). (Ex. 1 § 1.6.) On the Closing Date, the parties signed a Technology License Agreement ("TLA") whereby Santa Cruz granted that license to Novell, subject to strict limitations. (Ex. 4 § II.A.) The TLA also specified that "Ownership of the Licensed Technology shall reside in SCO." (*Id.* § III.)

*Novell's Response*: Admitted that the TLA stated that Novell "retained" a license to the Licensed Technology, as contemplated by section 1.6 of the APA, subject to certain limitations specified therein. Admitted that the TLA contained the quoted language regarding ownership of Licensed Technology. Disputed insofar as SCO suggests that the Licensed Technology owned by Santa Cruz included UNIX and UnixWare copyrights previously owned by Novell, which were transferred to Santa Cruz in the APA. In fact, as set forth above, "all copyrights" were explicitly excluded from "the Assets" transferred to Santa Cruz by the APA and the Bill of Sale.

7.       Schedule 1.1(b) identifies assets excluded from the transfer to Santa Cruz. Item V.A identifies "All copyrights and trademarks, except for the trademarks UNIX and UnixWare."

*Novell's Response*: Admitted. Thus, this key fact is undisputed.

8.       Amendment No. 2 to the APA, however, revised Schedule 1.1(b) so that Item V.A. now reads:

> All copyrights and trademarks, <u>except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies</u>. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

(Ex. 5 § A (emphasis added).)

*Novell's Response*: Admitted that Amendment No. 2 replaced Item V.A of Schedule 1.1(b) with the quoted language as of the October 16, 1996, effective date of Amendment No. 2. Disputed insofar as SCO suggests that Amendment No. 2 transferred copyrights or retroactively changed the assets transferred by the Bill of Sale that was executed ten months earlier on December 6, 1995.

Amendment No. 2 did not include any language transferring copyrights, and hence did not constitute the written instrument of conveyance required by 17 U.S.C. ¶ 204(a). Further, Novell did not execute a "Bill of Sale" or any similar document transferring copyrights from Novell to Santa Cruz in connection with Amendment No. 2. (Declaration of Allison Amadia in Support of Novell's Ownership MSJ No. 1, PACER No. 278 ("Amadia Decl."), ¶ 17.)

The Bill of Sale executed in connection with the APA transferred the "Assets," as defined in "the Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995." (Brakebill Decl., Ex. 27.) As noted above, Section 1.1(a) of the APA defined the "Assets" to be transferred as the assets that were included in Schedule 1.1(a), and not excluded by Schedule 1.1(b). (Brakebill Decl., Ex. 2.) "All copyrights" were expressly excluded from these "Assets."

Amendment No. 2's revision to Schedule 1.1(b) did not affect the "Assets" transferred by the Bill of Sale. Amendment No. 2 did not retroactively amend the APA as of the date the APA was signed or the transaction closed. Amendment No. 2 stated that the

APA was amended "[a]s of the 16th day of October, 1996," or about thirteen months after

the APA was executed on September 19, 1995, and ten months after the transaction closed

on December 6, 1995.  (Brakebill Decl., Ex. 28.)

       9.     The APA provided for the public disclosure of the transaction through a
"joint press release with respect to the subject matter of this Agreement."  (Ex. 1 § 4.7.)
Novell and Santa Cruz issued that press release on September 20, 1995.  (Ex. at 222; Ex. 7
at 22-23.)  It states in pertinent part:

> According to the terms of the agreement, SCO will acquire
> Novell's <u>UnixWare business and UNIX intellectual property</u>.

(Ex. 8 at 2 (emphasis added).)

    *Novell's Response*: Admitted that the APA provides for a joint press release.

Disputed that such a joint press release was ever issued and disputed that the press release

cited by SCO was a joint press release.  Novell's joint press releases with other companies

typically contain both companies' logos and information.  (Supplemental Declaration of

Ken Brakebill in Opposition to SCO's Motion for Summary Judgment, filed herewith

("Supp. Brakebill Decl."), Ex. 24, Jones Dep. 20:24-21:10.)  The press release on which

SCO relies does not contain Novell's logo, contact information, or company description,

but contains information only for SCO.  (Declaration of James R. Tolonen in Support of

Novell's Motion for Summary Judgment, PACER No. 280 ("Tolonen Decl."), Ex. 8.)

Greg Jones, testifying as Novell's 30(b)(6) deponent on the issue, stated that he had no

knowledge that such press release was ever approved by Novell.  (Supp. Brakebill Decl.,

Ex. 24, Jones Dep. 18:21-20:16.)

     SCO has presented no evidence that this press release was in fact "joint."  SCO

relies on testimony from Alok Mohan, Santa Cruz's then-CEO, to argue that the press

release upon which SCO relies was "joint."  But Mohan testified that he had no knowledge

of whether the press release was sent to Novell for approval.  (Supp. Brakebill Decl., Ex.

38, Mohan Dep. 249:3-251:11.)  SCO also relies on Robert Frankenberg, Novell's then-

CEO, who accepted SCO's counsel's description at deposition of the press release as

"jointly approved." But Frankenberg never testified to any personal knowledge of the press release being approved by Novell. (Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 22:20-23:5.)

Novell issued two press releases about the APA. (Supp. Brakebill Decl., Ex. 24, Jones Dep. 22:10-12.) Both press releases, which were issued in September 1995 and December 1995, are publicly available on Novell's website and have been produced to SCO in this litigation. Neither makes any mention of any transfer of copyrights or other intellectual property. (Supp. Brakebill Decl., ¶¶ 46-47 and Exs. 43-44.)

To the extent that the press release's reference to unspecified "intellectual property" is interpreted to mean that the APA transferred all forms of intellectual property relating to UNIX or UnixWare (including trademarks, patents, and trademarks), that statement is indisputably incorrect. The APA did transfer UNIX and UnixWare trademarks to Santa Cruz (to the extent owned by Novell), but explicitly excluded "all patents" and "all copyrights." (Brakebill Decl., Ex. 3, Section V; Brakebill Decl., Ex. 4, Section V.) The witnesses on which SCO relies have admitted that the APA did not transfer UNIX and UnixWare patents to Santa Cruz. Duff Thompson, a current member of SCO's Board and head of its litigation committee, admitted in the declaration submitted by SCO that patents were expressly excluded from the assets transferred to Santa Cruz. (Declaration of Edward Normand in Support of SCO's Motion for Summary Judgment, filed 4/9/07, PACER No. 260 ("Normand Decl."), Exs. 27-28, Ex. 10 ¶ 9). Similarly, Burt Levine, a former paid SCO litigation consultant who was represented by SCO's counsel at his deposition, testified that Novell's UNIX patents were not transferred to Santa Cruz. (Brakebill Decl., Ex. 25, Levine Dep. at 146:22 to 149:9, 185:9-23.)

Moreover, non-attorney employees at Novell in 1995 frequently referred to "intellectual property" in loose terms.  *  *  **REDACTED**  *  *

(Supp. Brakebill Decl., Ex. 45,

Bouffard Dep. 11:6-12:22, 39:12-40:18, 125:18-127:6, 169:1-14.)  To the extent that it is

interpreted to include all copyrights and patents, the press release is simply incorrect and

does not change the fact that copyrights and patents were excluded from the transfer.

      10.    Robert Frankenberg was the President and CEO of Novell at the time of the
APA.  (Ex. 7 at 7.)  On February 10, 2007, Mr. Frankenberg testified:

> Q.  Was your initial intent in the transaction that Novell
> would transfer copyrights to UNIX and UnixWare
> technology to Santa Cruz?
>
> A.  Yes.
>
> Q.  Was that your intent at the time when the APA was
> signed?
>
> A.  Yes.
>
> Q.  Was it your intent when that transaction closed?
>
> A.  Yes.
>
> Q.  And did that remain your intent, as you view it, at all
> relevant times?
>
> A.  Yes.
>
> Q.  So that never changed?
>
> A.  No.

(*Id.* at 135.)  Mr. Frankenberg never contradicted that testimony.

     *Novell's Response*: Admitted that the quoted language appeared in Frankenberg's

testimony.  Disputed that such testimony is admissible.  Such testimony seeks to contradict

the APA's express exclusion of "all copyrights," and is therefore inadmissible under the

parol evidence rule.  *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006).  In

addition, Frankenberg lacks foundation to testify as to the meaning of the intellectual

property provisions of the APA because he did not draft provisions of the APA, but instead

entrusted others with drafting a document that protected Novell's ongoing interests in

UNIX:

> Q. And as a result, you <u>tasked your negotiating team</u> with making sure that the detailed draft of the Asset Purchase Agreement winded its way between the goal of selling the UNIX business to SCO but <u>retaining the rights necessary for Novell to protect its interest</u> in the ongoing UNIX revenue stream and the capitalization of that revenue stream?
>
> A. Yes.

(Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 64:14-21 (emphasis added).

Frankenberg signed the APA "on basis of the recommendation of his team" and "did not review every item." (*Id..* 68:12-17.) Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, confirms that Frankenberg "was not involved in the negotiation or drafting of the contract language of the APA." (Braham Decl. ¶ 24(f).)

11.    Indeed, Mr. Frankenberg understood that the APA's sale of all rights and ownership included the copyrights:

> Q. Is it your understanding that that sale of all rights and ownership of UNIX and UnixWare would include copyrights associated with UNIX and UnixWare?
>
> MR. JACOBS: Objection, calls for a legal conclusion.
>
> A. I guess I have to answer the question?
>
> (By Mr. Singer) Yes, you should if you understand the question.
>
> A. Okay. I understand. Yes.
>
> Q. Now, did you ever give any directions to the team that was negotiating the deal, including Mr. Thompson, Mr. Chatlos, that they should transfer all right and title and interest to UNIX and UnixWare but retain copyrights for UNIX and UnixWare from being sold?
>
> A. No.
>
> Q. Did you ever tell anyone at Santa Cruz Operation that copyrights for UNIX and UnixWare were not part of the technology being sold?

A. No.

Q. Did you ever authorize anyone at Novell to tell anyone at Santa Cruz that copyrights were not being sold as part of the transaction?

A. No.

(*Id.* at 19.)

*Novell's Response*: Admitted that the quoted language appeared in Frankenberg's testimony. Disputed that such testimony is admissible, for the reasons stated in the Novell's Response to SCO's Statement of Facts No. 10.

Also, disputed insofar as SCO suggests that Frankenberg did not authorize Novell's negotiating team to exclude copyrights. Frankberg testified that he "directed the negotiating team to make sure that [Novell's] rights to enter into buyouts after the acquisition closed were preserved." (Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 63:1-19.) Frankenberg recalled "discussing" with the negotiation team the fact that "retaining the UNIX copyrights would facilitate Novell's exercise of rights with respect to capitalizing the SVRX revenue stream." (*Id.* at 65:21-66:7.) Frankenberg testified that it was "possible" that the negotiation team excluded copyrights from the transfer of assets to "effectuate" his "direction to try to make sure that [Novell] could protect [its] right to do buyouts." (*Id.* at 85:8-15.)

12.    Ty Mattingly was the Vice President for Strategic Relations at Novell at the time of the APA. (Ex. 9 at 10-11.) He also participated in the APA negotiations as Mr. Frankenberg's personal liaison with the Novell negotiating team. (*Id.*) Mr. Mattingly testified:

Q. Do you know whether in this case Novell is asserting that the copyrights were not transferred?

A. Well, I mean, I have read enough about the case early on. I haven't stayed real current lately. But I mean, obviously we're here today because Novell is asserting that the copyrights were not sold with the Unix business to SCO, and obviously SCO would assert that they purchased the Unix business from us lock, stock and barrel.

11

Q. And do you have a view as to the merits of Novell's assertion, such as you understand it?

A. I do.

Q. And what is your view?

A. Well, my firm belief is that we sold the Unix business to SCO, and that is why SCO paid us roughly 125 million dollars at that point because they bought the Unix business from us basically in its entirety. The only things that did not go with that was a kind of an agent relationship whereby SCO was collecting the SVRX royalties from existing OEMs at the time we sold that business and then giving the bulk of those moneys back to Novell.

\*    \*    \*

Q. <u>Would it be fair to say that the transfer of the Unix copyrights to SCO was consistent with your view of this overall strategy?</u>

MR. BRAKEBILL: Objection, mischaracterizes testimony.

A. So I can still answer? <u>Yeah. I mean, absolutely.</u> I believe that when they bought the business, when they paid us 125 million dollars, that the negotiations that we were involved with there was about selling them the entire business, the software, which would have <u>included the copyrights.</u>

(*Id.* at 29-32 (emphasis added).)

*Novell's Response*: Admitted that the quoted language appeared in Mattingly's testimony. Disputed that Mattingly was Frankenberg's personal liaison with the Novell negotiating team. That is nowhere stated in the testimony cited. Also, disputed that the quoted testimony is admissible. Such testimony seeks to contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391.

In addition, Mattingly lacks foundation to testify as to the meaning of the intellectual property provisions of the APA because he did not draft provisions of the APA. Mattingly testified that his role "related only to the high level business strategy" and that

he was "not involved in the details of the legal document." (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 66:11-19.) Mattingly was involved only "very superficially" in the "last two or three weeks before the contract was executed," which was "when the back and forth concerning the legal provisions was taking place." (*Id.* 68:22-69:22.) He was "not involved in crafting or wordsmithing the contractual provisions." (*Id.* 86:3-6.) Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, confirms that Mattingly "was not involved in negotiating or drafting the APA contract language." (Braham Decl. ¶ 24(b).)

13.     Duff Thompson was the Novell executive responsible under Mr. Frankenberg's direction for the sale of the UNIX and UnixWare business. (Ex. 10 ¶ 4.) After the transaction closed, Novell appointed Mr. Thompson to serve as its representative on the Santa Cruz Board of Directors. (Ex. 11 at 6.) Mr. Thompson testified:

> Q.  And a bundle of rights you believed included -- looking back on it, you believed the structure of the deal meant that the bundle of rights included the copyrights?
>
> A.  No.  At the time I believe <u>it included the bundle of the copyrights,</u> at the time.
>
> Q.  Well, I'm a little confused because I thought you said this morning that you don't recall any specific discussion about copyrights.
>
> A.  Yeah, but that doesn't mean that that's not what I understood we were doing at the time.
>
> Q.  So you –
>
> A.  So the fact that I may not have had a specific discussion that I can recall 11 and a half years later should not be taken to mean I don't recall what our intention was in selling the business.  It is impossible for me to parse in my mind the assignment that we received to sell the -- to sell the entire business, all of Unix and UnixWare to SCO, and to somehow also in that same breath say, except the copyrights.
>
> I just -- I don't understand that kind of thinking, and certainly I just have to tell you that that kind of trick play

13

> was not something that Bob Frankenberg would have
> directed, nor is it something he would have stood for. It's
> not something I would have done. If we had intended not to
> transfer the copyrights, we would have been very careful to
> say, you don't get the copyrights. And it wouldn't have been
> an oblique reference. It would have been, you get all the
> business except the copyrights. Not, you get all the business.

(*Id.* at 132-133 (emphasis added).)

*Novell's Response*: Admitted that the quoted language appeared in Thompson's testimony. Disputed that Thompson was the Novell executive responsible under Mr. Frankenberg's direction for the sale of the UNIX and UnixWare business. Ty Mattingly testified that Thompson was "not really involved in the details of the Novell, Santa Cruz transaction." (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 70:17-71:1.) Thompson was "checked out" during the drafting of the agreement and was "not in the office that often." (*Id.* 71:2-72:19.)

Also, disputed that the cited testimony is admissible. Such testimony seeks to contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391. Also, the testimony should be excluded for lack of foundation. Thompson testified that he had no involvement in drafting the contract that effectuated the sale:

> Q. By the time of the asset purchase agreement you are no
> longer in a legal function?
>
> A. No. That's correct.
>
> Q. And so this -- and so in the -- when you were involved in
> the asset purchase agreement negotiations, who were you
> relying on for the detailed drafting of the agreement?
>
> A. Our counsel, Wilson Sonsini.
>
> Q. Tor Braham in particular?
>
> A. Tor and his team . . . . [H]e had people within his firm
> who were specialists in these items that were probably doing
> the bulk of the actual drafting.

(Supp. Brakebill Decl., Ex. 27, Thompson Dep. 30:22-31:14.) Nor did Thompson recall

participating in "any specific discussions around copyrights" or any "discussion with SCO

about the excluded asset schedule" during negotiation of the deal. (*Id.* 86:1-20.) Tor

Braham confirms that Thompson "was not involved in negotiating or drafting the APA

contract language." (Braham Decl. ¶ 24(a).)

      14.    Ed Chatlos was the Novell Senior Director for UNIX Strategic Partnerships
and Business Development at the time of the APA. (Ex. 12 ¶ 4.) He was also Novell's
chief negotiator of the APA. (*Id.* ¶ 6.) Mr. Chatlos explains:

> It was always my understanding and intent, on behalf of
> Novell, that the UNIX source code and its copyrights were
> part of the assets SCO purchased. I do not recall anyone else
> ever suggesting that Novell would retain any copyright
> relating to UNIX, nor was I present for any discussion,
> general or specific, during the negotiations that contradicted
> my understanding of the transaction described herein. None
> of my superiors at Novell ever informed me that Novell was
> not transferring the UNIX copyrights to SCO. Likewise, I
> never communicated to SCO in any way that the UNIX
> copyrights were not being sold to SCO. Nor am I aware of
> any instance in which anyone from Novell ever informed
> SCO in any way that the UNIX copyrights were not being
> sold to SCO as part of the transaction.
>
> Given my central role in the negotiations, I believe I would
> have known if the parties had agreed that Novell would
> retain UNIX copyrights. My intent and understanding as the
> lead negotiator for Novell was that Novell was transferring
> the copyrights to SCO in the APA. At the time the
> transaction was signed and closed, I did not observe anyone
> at Novell or SCO stating or acting as if Novell had retained
> any UNIX copyrights. If they had, it would have been
> contrary to the intent and structure of the deal as I
> understood it and communicated with SCO. In fact, from the
> time the APA transaction closed in 1995 until this day, it has
> been my understanding and belief that Novell sold the UNIX
> copyrights to SCO as of the time of the closing in 1995.

(*Id.* ¶¶ 9-10 (emphasis added).) In his recent deposition in this case, Mr. Chatlos
confirmed his views regarding the transfer of the copyrights. (Ex. 13 at 37-39.)

*Novell's Response*: Admitted that Chatlos's declaration contained the quoted language. Disputed that Chatlos was Novell's chief negotiator of the specific provisions of the APA at issue. In fact, Tor Braham was the "primary representative of Novell in negotiating the legal terms of the contract between Novell and Santa Cruz." (Braham Decl. ¶ 5.) Chatlos admitted that                    * * REDACTED * *

(Supp. Brakebill Decl., Ex. 34, Chatlos IBM Dep. 82:11-83:5.) Chatlos testified that he was not involved in any negotiations concerning either including or excluding copyrights from the transaction. (Supp. Brakebill Decl., Ex. 31, Chatlos Dep. 124:5-14.) Tor Braham confirms that Chatlos "did not draft the APA" and that Chatlos was not "the Novell business person directing the drafting of the contract." Braham "reported to and received instructions from David Bradford [Novell's general counsel], not from Mr. Chatlos." (Braham Decl. 24(c).) Also, disputed that the cited testimony is admissible. Such testimony seeks to contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391. Also, the testimony should be excluded for lack of foundation. Chatlos did not draft or discuss the relevant provisions of the APA, as noted above.

15.    As he testified at his deposition in this matter, Burt Levine was an attorney at Novell at the time of the APA. (Ex. 14 at 15-23.) Mr. Levine reviewed and revised drafts of the APA. (*Id.* at 163-64.) After the Business was transitioned to Santa Cruz in February 1996, Mr. Levine worked as an attorney for Santa Cruz. (*Id.* at 22-23.) Mr. Levine testified that under the APA the "intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright." (*Id.* at 68.) He further testified:

Q. Mr. Levine, from the time of the APA in 1995 until you left Santa Cruz in 2000, did you ever hear anyone whether inside or outside of Santa Cruz or inside or outside of Novell say that Novell had retained the UNIX or UnixWare copyrights?

A. No.

Q. If you had heard anyone make such a statement, would that have been a surprise to you?

A. Very much so, yeah.

Q. And why do you say "very much so"?

A. My personal experience with the couple of years that I spent at Novell was that it was a very ethical company and I, I was very impressed with that.

Q. And how does that fact bear on your answer, the fact that you had the view that Novell was an ethical company?

A. Was ethical and I believe that being an ethical company in its dealings with its partners or transferees or whatever it is that they would not resort to withholding information or trying to withhold something that <u>the transferee in this case would be entitled to</u>.

(*Id.* at 154-55 (emphasis added).)

Q. In looking at the first paragraph Roman I of Schedule 1.1(a) of the Asset Schedule, and that language says, quote, All rights and ownership of UNIX and UnixWare, including, but not limited to all versions of UNIX and UnixWare, and all copies of UNIX and UnixWare, including revisions and updates and progress, dot, dot, dot, including source code, dot, dot, dot, such assets to include without limitation the following, and then there's a list of source code products, binary product releases, products under development and other technology, do you see that language?

A. I do.

Q. How does that language bear on your understanding at the time of the APA and today that the UNIX copyrights and UnixWare copyrights were among the assets transferred under the APA?

A. Do you mean the fact that these are listed specifically as categories?

Q. I mean to ask you about the scope of Roman I.

A. Oh, the scope of Roman I with or without this listing, all rights and ownership of UNIX and UnixWare, that gives all

> the components of the business, including physical
> components and intellectual components, to my mind <u>will
> carry with it the transfer of any copyrights that apply to
> them</u>.

(*Id.* at 156-58 (emphasis added).)

*Novell's Response*: Admitted that the quoted language appeared in Levine's

testimony. Disputed that such testimony is admissible. Such testimony seeks to contradict

the APA's express exclusion of "all copyrights," and is therefore inadmissible under the

parol evidence rule. *Dore*, 39 Cal. 4th at 391. In addition, Levine lacks foundation to

testify as to the meaning of the intellectual property provisions of the APA. Levine

testified that he "may have" worked on some "early drafts" the APA but does not

remember which specific provisions, if any. (Supp. Brakebill Decl., Ex. 35, Levine IBM

Dep. 179:3-8, 180:2-12.) He testified that he has no "understanding as to specifically what

intellectual property, if any, was or wasn't transferred" under the APA. (*Id.* 180:21-

181:13.)

Levine testified that during APA negotiations, he had reviewed and marked up

drafts of Schedules 1.1(a) and (b) of the APA, which listed Included and Excluded Assets.

He revised the list of included assets, but did not add copyrights. He left the exclusion of

"all copyrights" intact while making other revisions to intellectual property provision of

the Excluded Assets schedule. He then faxed his markup to Wilson Sonsini. (Supp.

Brakebill Decl., Ex. 22, Levine Dep. 71:19-77:18; Supp. Brakebill Decl., Ex. 36.) Wilson

Sonsini then passed on Levine's comments to Santa Cruz's outside counsel, Brobeck.

(Supp. Brakebill Decl., Ex. 29; Supp. Brakebill Decl., Ex. 22, Levine Dep. 80:19-81:12.)

However, Levine recalled nothing further about his review and markup of Schedules 1.1(a)

and (b). (Supp. Brakebill Decl., Ex. 22, Levine Dep. 71:13-18; 72:14-18.) Levine testified

that he did not believe Novell did anything to hide the exclusion of copyrights or otherwise

acted unethically. (*Id.* 183:1-21.)

Tor Braham received Levine's comments on Schedules 1.1(a) and (b), but does not recall Levine ever participating in APA negotiations with Santa Cruz. (Braham Decl. ¶ 24(g).).

16.    Bill Broderick was a contract manager in the UNIX licensing group at Novell and Santa Cruz. (Ex. 15 ¶¶ 6-7.) He was also a member of the Novell APA Transition Team. (*Id.* ¶ 10.) Mr. Broderick states:

> My understanding of the sale of the UNIX assets from Novell to Santa Cruz was that the UNIX copyrights were transferred. To the best of my knowledge, from the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights.

(*Id.* ¶ 7 (emphasis added).).

*Novell's Response*: Admitted that the quoted language appeared in Broderick's declaration. Disputed that such testimony is admissible. Such testimony seeks to contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391. In addition, Broderick lacks foundation to testify as to the meaning of the APA. Broderick "did not" have "any involvement at all in negotiating the APA." (Supp. Brakebill Decl., Ex. 37, Broderick Dep. 158:5-7.) Tor Braham has never heard of Broderick and confirms that Broderick "was not involved in the APA negotiations or drafting." (Braham Decl. ¶ 24(d).).

17.    In his recent deposition, Mr. Broderick testified that his understanding is based on (among other things) Novell's explanation of the transaction during "company-wide meetings" as well as discussion in "contracts transition team," including discussion about "changing the copyright notices in the source code to Santa Cruz Operation, Inc." (Ex. 16 at 48-51.)

*Novell's Response*: Disputed insofar as SCO implies that there was any specific discussion about the transfer of copyrights at APA transition meetings. Broderick testified that he did not recall any specific discussion about the transfer of copyrights during APA transition meetings. (Supp. Brakebill Decl., Ex. 37, Broderick Dep. 49:15-51:16.) Nor can any implication be drawn from the changing of copyright notices. The APA contemplated

that Santa Cruz would create derivative works, including a "Merged Product" that was an

enhanced version of Novell's UnixWare product. (Brakebill Decl., Ex. 2, § 4.18; Brakebill

Decl., Ex. 22; Braham Decl. ¶ 8.)  SCO would have needed to change the copyright notices

to show that it owned a copyright in the derivative work created for subsequent releases.

      18.     Alok Mohan was CEO of Santa Cruz at the time of the APA.  (Ex. 6 at 8.)
Mr. Mohan has testified in this case:

> THE WITNESS:
>
> A.  My belief is that we bought the business, except for the
> revenue stream.  And when we bought the business
> everything came with it.
>
> BY MR. BRAKEBILL:
>
> Q.  You believe that Santa Cruz got the Unix copyrights to
> through the APA; is that right?
>
> A.  I believe –
>
> MR. NORMAND:  Objection to form.
>
> THE WITNESS:
>
> A.  <u>I believe I bought the whole business.  That includes all
> kinds of stuff.  And -- and, you know, that's the answer, I
> think we bought -- we got the whole thing.</u>
>
> BY MR. BRAKEBILL:
>
> Q.  Okay.  But you haven't -- you haven't confirmed -- is --
> is part of the –
>
> A.  Yes, they are –
>
> Q.  Is Unix copyrights part of the Unix business?
>
> A.  Absolutely.
>
> Q.  Okay.  So you believe that Santa Cruz got the Unix
> copyrights?
>
> A.  Santa –

MR. NORMAND:  Objection to form.

THE WITNESS:

A.  <u>Santa Cruz got the whole business.  Includes lots of
things.  Copyrights are part of it</u>.

*   *   *   *

Q.  What is the basis of your opinion that Santa Cruz got the
business?

MR. NORMAND:  Objection to form.

THE WITNESS:

A.  <u>That -- that's -- that was the whole discussion and intent,
negotiations.  That's my recollection of what we were doing</u>.

(*Id.* at 138-40 (emphasis added).)

*Novell's Response*: Admitted that the quoted language appeared in Mohan's

testimony.  Disputed that such testimony is admissible.  Such testimony seeks to contradict

the APA's express exclusion of "all copyrights," and is therefore inadmissible under the

parol evidence rule.  *Dore*, 39 Cal. 4th at 391.  In addition, Mohan lacks foundation to

testify as to the meaning of the intellectual property provisions of the APA.  Mohan

testified that he was involved in the negotiations "only at a high level."  (Supp. Brakebill

Decl., Ex. 38, Mohan Dep. 10:17-20.)  Mohan "was not involved" in "specific drafting of

the documents."  (*Id.* 16:9-17:6)  Mohan testified that "the issue of copyrights in or out

was not discussed with me."  He testified, "[Novell] did not tell me that they'd kept it.

They did not tell me they'd given it to us."  (*Id.* 261:7-262:2.)  Tor Braham, the principal

person responsible for drafting the APA and negotiating its contractual language on behalf

of Novell, has never met Alok Mohan.  (Braham Decl. ¶ 24(e).)

19.     Doug Michels founded Santa Cruz and was its Senior Vice President at the
time of the APA.  (Ex. 17 ¶¶ 2-3.)  He states:

> In connection with the 1995 purchase from Novell, the
> parties agreed that (as is accurately explained by both
> Mr. Wilt and Ms. Madsen) Novell could retain the existing

binary royalty stream even though the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz.

(*Id.* ¶ 9 (emphasis added).) In his recent deposition, Mr. Michels repeatedly confirmed that the parties to the APA intended for Novell to transfer and for Santa Cruz to acquire the UNIX and UnixWare copyrights:

Q. To the extent that you did, what did you mean by that?

A. Well, I meant that the only way that I know of, and anyone on my team knew of to buy a software business is to buy the copyrights, and there's no way we would have ever done a deal to buy a software business where we didn't get the copyrights and all the other intellectual property. That's what you're buying. And especially in the case of UNIX, with its convoluted intellectual property history, and whatnot, to not get that stuff would be to not do the deal. And so it was implicit in everything we did, everything we thought. Every single person on my team understood that. The lawyers understood. The business development people understood it. The people at Novell understood it.

I mean, it – it's just so essential. It's -- you know, it's like breathing oxygen, you know, I mean, you just – there's no way that deal could have happened without getting the copyrights.

\*    \*    \*    \*

A. I know that everybody involved in this negotiation knew the copyrights were being transferred. I know that.

Q. How do you know that?

A. Because I was there and I know it. That's -- I -- I know what -- I know there were discussions. I know there was shared vision. I know we all understood what it meant to buy a software company. You know, I've known these people for many years. It -- it just wasn't ambiguous. It wasn't something that was ambiguous.

(Ex. 18 at 134-38 (emphasis added).)

*Novell's Response*: Admitted that the quoted language appeared in Michels's testimony and declaration. Disputed that such testimony is admissible. Such testimony

seeks to contradict the APA's express exclusion of "all copyrights," and is therefore

inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391. In addition, Michels

lacks foundation to testify as to the meaning of the intellectual property provisions of the

APA. Michels was involved in only two or three meetings with Novell after the initial

discussion about the deal. (Supp. Brakebill Decl., Ex. 39, Michels Dep. 11:18-12:1.)

Michels did not "draft any language of the Asset Purchase Agreement" or "review drafts"

of it and does not recall "even vaguely" any debates in which he participated regarding the

drafting of the APA. (*Id.* at 12:14-13:7.) Michels testified that he did not recall any

discussion by anyone at either Novell or SCO regarding whether UNIX copyrights were

being transferred as part of the APA. (*Id.* 50:20-52:5.) Tor Braham, the principal person

responsible for drafting the APA and negotiating its contractual language on behalf of

Novell, was not aware of "any involvement" by Michels in the negotiation and drafting of

APA contract language. (Braham Decl. ¶ 24(h).).

      20.     Jim Wilt was the lead negotiator for Santa Cruz. (Ex. 19 ¶ 7.) Mr. Wilt
testified with respect to his declaration executed on November 23, 2004:

> Q. You say in paragraph 8, quote, "It was my understanding
> and intent during those negotiations that SCO would acquire
> Novell's entire UNIX and UnixWare business, including the
> copyrights. I do not recall and do not believe that there ever
> was any instance in which anyone at SCO or Novell ever
> stated or exhibited any contrary intent or understanding to
> me or anyone else." Is that an accurate statement?
>
> A. That's an accurate statement.
>
> Q. You say in the back half of paragraph 9, quote, "It was
> my intent on behalf of SCO to acquire, through the APA,
> Novell's entire UNIX and UnixWare business, including the
> UNIX and UnixWare source code and all associated
> copyrights, and I believed then, open parens, as now, close
> parens, that Novell's intent was to sell all of those assets and
> rights." Is that an accurate statement?

A. Yes, that's an accurate statement. You wouldn't have
had a business without having the copyrights and
trademarks.

Q. You say in paragraph 12, quote, "I do not recall anyone
on either side of the negotiations or transaction ever
suggesting that Novell would retain a copyright relating to
UNIX or UnixWare. I am not aware of any discussions,
whether general or specific, during the negotiations that
contradict my understanding of the transaction as set forth in
this declaration." Is that an accurate statement?

A. That is an accurate statement.

(Ex. 20 at 76-78.) Independent of his previous declaration, moreover, Mr. Wilt repeatedly
testifed [sic] to the parties' intent under the APA was for Novell to transfer and Santa Cruz
to acquire the UNIX and UnixWare copyrights. (*Id.* at 28-29.)

*Novell's Response*: Admitted that the quoted language appears in Wilt's testimony.

Disputed that Wilt was the lead negotiator for Santa Cruz as to the contractual provisions

at issue. Wilt does not recall drafting "any of the language of the Asset Purchase

Agreement" and believes that "the lawyers" did the drafting. (Supp. Brakebill Decl., Ex.

25, Wilt Dep.20:19-21:7.) Ed Chatlos, on whose testimony SCO relies, testified that

**\* \* REDACTED \* \***                    (Supp.

Brakebill Decl., Ex. 34, Chatlos IBM Dep. 184:12-185:7.) Wilt concurs that he was "less

active at the end of the negotiations," when the APA was being drafted. (Supp. Brakebill

Decl., Ex. 40, Wilt Dep. 20:12-15.) Wilt testified that he did not recall anyone from

Novell stating that copyrights were being transferred. (*Id.* 57:10-59:17.) Tor Braham, the

principal person responsible for drafting the APA and negotiating its contractual language

on behalf of Novell, was not aware of "any involvement" by Wilt in the negotiation and

drafting of APA contract language. (Braham Decl. ¶ 24(i).).

Also disputed that Wilt's testimony is admissible. Such testimony seeks to

contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible

under the parol evidence rule. *Dore*, 39 Cal. 4th at 391. In addition, Wilt's testimony

lacks foundation as to the meaning of the intellectual property provisions of the APA. As

noted above, Wilt was not involved in drafting or negotiating the language in those provisions.

21.    Kimberlee Madsen was a member of the Santa Cruz legal department at the time of the APA and Amendment No. 2 and assisted in the negotiations.   (Ex. 21 ¶¶ 3-4.) She explains:

> It was always my understanding that the UNIX source code and its copyrights were part of the assets Santa Cruz purchased and were transferred to Santa Cruz at the closing in December 1995.
>
> I do not recall anyone in the negotiation teams ever saying, or suggesting, that Novell would retain any UNIX copyrights.  The negotiation team for Santa Cruz never discussed the possibility, as far as I am aware, that Novell sought to retain any UNIX copyright.
>
> Since the transaction closed in 1995 until Novell publicly announced in 2003 that it still owned the UNIX copyrights, it was my understanding and belief that neither party disputed that Santa Cruz had acquired the UNIX copyrights in 1995.
>
> *    *    *    *
>
> My understanding from the negotiations and discussions leading up to the Amendment was that Amendment No. 2 was intended to confirm, among other things, the parties' intent and agreement that Santa Cruz had obtained ownership of the UNIX copyrights under the APA and that Novell had received no rights with respect to UNIX source code under the APA.

(*Id.* ¶¶ 9-11 (emphasis added).)  In her recent deposition in this case, Ms. Madsen confirmed that the parties' intent and understanding at the time of negotiations was that the APA transferred the copyrights to Santa Cruz.  (Ex. 22 at 73-75, 81.)

*Novell's Response*: Admitted that the quoted language appeared in Madsen's declaration and that Madsen opined on the parties' intent and understanding of the APA in her deposition.  Disputed that such testimony is admissible.  Such testimony seeks to contradict the APA's express exclusion of "all copyrights," and is therefore inadmissible under the parol evidence rule. *Dore*, 39 Cal. 4th at 391.  In addition, Madsen's testimony

lacks foundation as to the meaning of the intellectual property provisions of the APA.

Madsen was a Santa Cruz paralegal.  (Supp. Brakebill Decl., Ex. 41, Madsen Dep. 6:24-

7:2.)  Madsen had no recollection of negotiating the relevant intellectual property

provisions of the APA:

> Q. Was it your testimony earlier that you did not recall being
> involved in negotiating any specific provisions of the asset
> purchase agreement?
>
> A. I don't recall negotiating specific provisions.
>
> Q. As you sit here today do you recall negotiating any
> provisions relating to the UNIX copyrights in the asset
> purchase agreement.
>
> A. No.

(*Id.* 58:7-15.)  She did not recall providing feedback on "specific provisions" either.  (*Id.*

39:16-42:19.)  Madsen testified, "I don't recall any conversations with Novell pertaining to

copyrights."  (*Id.* 79:16-22.)  She does not recall Santa Cruz ever asking for the copyrights.

(*Id.* 79:24-80:5.)  Rather, she testified that she and the Santa Cruz team were simply

"assuming" the copyrights were transferring.  (*Id.* 81:10-15.)  Tor Braham, the principal

person responsible for drafting the APA and negotiating its contractual language on behalf

of Novell, does not recall any specific interactions with Madsen regarding the APA

contractual provisions at issue.  (Braham Decl. ¶ 24(j).).

22.    Shortly after the closing of the APA in 1995, Santa Cruz obtained physical
possession of UNIX copyright registrations from Novell; those registrations remain in
SCO's possession to this day.  (*See, e.g.*, Exs. 23-25.)

*Novell's Response*: Admitted that Santa Cruz possesses the physical copies of the

UNIX copyright registrations.  Disputed that Novell took any affirmative act to transfer

those copies to Santa Cruz after the APA.  Burt Levine was an in-house attorney who

worked in the UNIX unit in New Jersey, and stayed in that unit as it changed ownership

from AT&T to UNIX System Laboratories to Novell to Santa Cruz.  (Normand Decl., Ex.

33, ¶¶ 2-6.) Levine testified that the UNIX unit and its business files, including the

copyright registrations, remained in New Jersey throughout the changes in ownership.

(Supp. Brakebill Decl. Ex. 22, Levine Dep. 19:10-20:23.) As a result of the APA, the

UNIX facility in New Jersey became part of Santa Cruz. The UNIX business files in New

Jersey, including copyright registrations, continued to be kept in the same place.

Accordingly, Santa Cruz obtained physical possession of those registrations. (*Id.* 24:16-

25:8.) Chris Sontag, testifying as SCO's representative under Fed. R. Civ. P. 30(b)(6),

confirmed Levine's account. (Supp. Brakebill Decl. Ex. 23, Sontag 30(b)(6) Dep. 5:10-13,

137:13-139:14.)

23.    Since 1995, without objection from Novell, Santa Cruz and SCO shipped
countless UNIX-related products with copyright notices affixed to them. (*See, e.g.,* Ex. 26
¶ 3; Exs. 27-28.)

*Novell's Response*: Admitted that Santa Cruz and SCO shipped at least some

products with copyright notices. Disputed to the extent that this is intended to imply that

Santa Cruz and SCO gave notice to Novell of the contents of any copyright notices, or that

Novell had any legal duty to object to those notices. In fact, SCO has asserted that the

code containing the copyright notices is "confidential." (Supp. Brakebill Decl., Ex. 53.) If

that is so, SCO cannot expect Novell to have been aware of those notices and objected to

them.

Also disputed to the extent that this is intended to imply that the copyright notices

referred solely to Santa Cruz and/or SCO, and did not refer to Novell. In fact, the

copyright notices distributed by Santa Cruz continued to bear Novell's name in addition to

Santa Cruz's, reflecting Novell's continued ownership of the original UnixWare code and

SCO's ownership only of modifications to that code. (*See* Novell's Opposition Facts, ¶¶

15-18.) If Santa Cruz believed that it owned the copyright to both the original code and

the derivative work, the copyright notice should not have mentioned Novell at all. 17

U.S.C. § 401(b)(3) (copyright notice "shall" list "the name of the owner of copyright").

The notice should have been in Santa Cruz's name alone. Instead, Santa Cruz used the

format commonly employed where the publisher owns the derivative work, but not the

copyright to the original work. In that situation, it is "the existing practice of many

publishers to include earlier copyright notices as well as a notice for the newly published

derivative or collective work." 2-7 Nimmer on Copyright § 7.12[C][1].

24.    Since 1995, without objection from Novell, Santa Cruz and SCO entered
into hundreds of license agreements for UNIX products that not only contain express
representations and warranties of SCO's rights and ownership in the intellectual property
required to provide the licensed product, but also indemnify licensees against any third-
party claims for copyright infringement. (*See, e.g.,* Ex. 30 §§ 13-14; Ex. 31 § 2.4; Ex. 32
§ 7.02; Ex. 33 ¶ 28.)

*Novell's Response*: Disputed as to the implication that Novell knew of those

supposed agreements and had an opportunity and a duty to object. SCO has submitted no

evidence to that effect. SCO's Director of Software Licensing, Bill Broderick, has attested

to the fact that "[t]he terms and conditions of each UNIX licensee's use of the licensed

UNIX software product were confidential." (Normand Decl., Ex. 33, at ¶ 23.) SCO has

also submitted no evidence that any of the three license agreements were shown to Novell

for approval, as required by the APA for certain UNIX and UnixWare licenses. The first

license agreement, with Integration Design, does not appear to involve UNIX or

UnixWare, so it would not need to be submitted to Novell for approval. (Normand Decl.,

Ex. 30, at SCO 1041490). SCO has itself asserted that the remaining two licenses, with

Lucent Technologies and Samsung Electronics, did not need to be shown to Novell for

approval. (Supp. Brakebill Decl., Ex. 25, SCO's Responses and Objections to Novell's

Second and Third Sets of Interrogatories, Response No. 7 and Ex. A, pages 3-4.)[1]

---

[1] Novell asked SCO to "identify" all "royalties" from "licensees of UNIX and/or
UnixWare, for which SCO contends that it is entitled to retain 100% [of the income on the
license] and is not required to pass through to Novell" for approval. (Supp. Brakebill
Decl., Ex. 25, Novell's Second Set of Interrogatories, Interrogatory No. 7.) In response,
SCO asserted that it had the right to retain 100% of royalties on the Lucent and Samsung
licenses and was not required to show those licenses to Novell for approval. (Supp.
Brakebill Decl., Ex. 25, SCO's Responses and Objections to Novell's Second and Third
Sets of Interrogatories, Response No. 7 and Ex. A, pages 3-4.)

Disputed that any of the licenses upon which SCO relies contain any representation or warranty of SCO's copyright ownership. The first license concerned products having nothing to do with UNIX or UnixWare, such as Netscape Navigator. (Normand Decl., Ex. 30, at SCO 1041490). The second license states only that "[a]s between SCO and LICENSEE," ownership of the licensed product "shall remain" with SCO. (Normand Decl., Ex. 31 § 2.4.) The third license states only that SCO is not aware of any copyrights that are infringed through the use or copying of the licensed product and that SCO indemnifies the licensee against copyright infringement claims. (Normand Decl., Ex. 32 § 7.02.)

Further disputed that "hundreds" of license agreements contain these representations and warranties. SCO has submitted only three license agreements. SCO also submits a declaration stating that "warranties for intellectual property protection and indemnification in Exhibits 124 and 127 [from the *SCO v. IBM* litigation] are the same ones that Santa Cruz and SCO have used in hundreds" of other agreements. (Normand Decl., Ex. 33 ¶ 28.) That statement is inadmissible. Those agreements speak for themselves; if SCO wishes to rely on them, SCO should submit copies of those agreements, so Novell can determine what warranties are in fact provided. SCO did not submit a copy of "Exhibits 124 or 127" with that declaration, let alone a copy of the "hundreds" of agreements to which the declaration refers.

25.    Before May 28, 2003, Novell never contested SCO's public statements and conduct asserting ownership of the UNIX copyrights. (Ex. 33 ¶ 7; Ex. 34 ¶ 7.)

*Novell's Response*: Disputed. SCO has submitted no evidence that it publicly asserted ownership of the UNIX copyrights until early 2003. Novell had no legal duty to dispute SCO's position immediately in public, and its communications with SCO are consistent with Novell's retention of ownership. (*See* Novell's Opposition Facts, ¶¶ 93-96.) And, in any event, equitable defenses, such as waiver, cannot establish a transfer of

copyrights absent a written conveyance providing for such a transfer. *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992).

Moreover, Novell had no reason to tell SCO that SCO did not own the copyrights, because SCO appeared to already understand that. In early 2003, SCO's CEO repeatedly contacted Novell to seek a transfer of copyrights, stating that "SCO needs the copyrights," that "the asset purchase agreement excluded copyrights from being transferred" and that this was a "clerical error," and that Novell should "amend" or "change" the APA so SCO "could have the copyrights." (Novell's Opposition Facts, ¶¶ 7-14.) That conduct was a continuation of Santa Cruz's earlier statements evidencing a similar belief that Novell continued to own the copyrights. In the summer of 1996, Steve Sabbath, an in-house lawyer at Santa Cruz, called Allison Amadia, an in-house lawyer at Novell, and stated that the Original APA explicitly excluded copyrights to UNIX and UnixWare as assets being sold by Novell to Santa Cruz and that it should not have. (Amadia Decl., ¶¶ 4-6.) Mr. Sabbath proposed an amendment, which was rejected by Amadia, transferring the copyrights. (*Id.* ¶¶ 8-10.)

26.    There is no evidence that Novell publicly asserted ownership of UNIX copyrights between the date of the APA and May 28, 2003.

*Novell's Response*: Disputed. The APA itself reflected Novell's ownership of the UNIX copyrights, as explained above. Further, as noted in response to #25 above, Novell rejected requests of Santa Cruz in 1996 and SCO in early 2003 to transfer ownership of the copyrights. Novell's rejections put Santa Cruz and SCO on notice that Novell's position was that it owned the copyrights. These communications were "public," in the sense that they were communicated to Santa Cruz and SCO. If SCO's assertion is intended to imply that Novell had a legal duty to make a press release to the general public regarding its ownership of UNIX copyrights, Novell denies that there was any such duty and notes that SCO has presented no argument establishing that such a duty existed, especially since SCO and Santa Cruz were already on notice of Novell's position.

27.    On March 6, 2003, SCO filed its lawsuit against IBM alleging, among other things, that IBM had violated its UNIX Software and Sublicensing Agreements by disclosing UNIX-derivative source code. (Ex. 35 at 32-50.)

*Novell's Response*: Admitted that this lawsuit was filed and included these allegations. Disputed to the extent that this is intended to imply that SCO's claims have merit.

28.    On May 28, 2003, Novell publicly announced that it, and not SCO, is the owner of the UNIX copyrights. In a letter to SCO CEO Darl McBride that Novell published to the world, Novell CEO Jack Messman stated:

> Importantly, and contrary to SCO's assertions, SCO is not the owner of the UNIX copyrights. Not only would a quick check of U.S. Copyright Office records reveal this fact, but a review of the asset transfer agreement between Novell and SCO confirms it. To Novell's knowledge, the 1995 agreement governing SCO's purchase of UNIX from Novell does not convey to SCO the associated copyrights. We believe it unlikely that SCO can demonstrate that it has any ownership interest whatsoever in those copyrights.

(Ex. 36 at NOV 000043054.)

*Novell's Response*: Admitted. That letter also noted that SCO had been coming to Novell to request the copyrights.

29.    The Novell executives who negotiated or were primarily responsible for the APA in 1995, including Messrs. Frankenberg, Mattingly, Thompson, Chatlos, and Levine, were no longer with Novell in 2003. (Ex. 39 at 219-221.) Novell did not consult with them before announcing its alleged ownership of the copyrights. (Ex. 40 at 27, 60; Ex. 41 at 90-91.)

*Novell's Response*: Admitted that those persons were no longer with Novell in 2003. Disputed that those persons were those who negotiated or were primarily responsible for drafted or negotiated the specific terms of the APA, for the reasons stated in Novell's Response to SCO's Statement of Facts Nos. 10-15. Disputed that Novell would have needed to consult with any of those persons, given the plain language of the APA and Amendment No. 2.

30.    A few days after its May 28, 2003, announcement, Novell received from SCO a copy of Amendment No. 2, which Novell had said it did not have in its files and had not reviewed. (Ex. 37 ¶ 13.) On June 6, 2003, Novell stated in a press release:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase
> Agreement was sent to Novell last night by SCO. To
> Novell's knowledge, this amendment is not present in
> Novell's files. The amendment appears to support SCO's
> claim that ownership of certain copyrights for UNIX did
> transfer to SCO in 1996.

(Ex. 38 at NOV 000043059.)

*Novell's Response*: Admitted that such statement was included in a press release from Novell on that date. Disputed insofar as SCO mistakenly implies that Novell had made a determination that SCO owned the copyrights. That press release indicates only that Amendment No. 2 "appears to support" SCO's claim of copyright ownership. (SCO Statement of Facts, ¶ 30.) Novell did not elaborate any further on the subject in that press release.

Novell's statement was based solely on its review of Amendment No. 2 the night before. On the evening of June 5, 2003, SCO had surprised Novell with an executed copy of Amendment No. 2, which Novell had not realized existed and had found in its files only in an unsigned version. Novell felt compelled to respond immediately, as it began to receive calls from the press and SCO announced the next morning that it would be holding a press call at 11:00 a.m. (Supp. Brakebill Decl. Ex., 47, Messman IBM Dep. 212:22-214:20; Supp. Brakebill Decl. Ex., 48, Messman Dep. 60:16-63:5; Supp. Brakebill Decl. Ex. 49, LaSala Dep. 113:8-118:10, 124:3-125:18.)

Novell explained its position further in a letter to SCO, dated June 26, 2003:

> Upon closer scrutiny, … Amendment No. 2 raises as many
> questions about copyright transfers as it answers. Indeed,
> what is most certainly not the case is that "any question of
> whether UNIX copyrights were transferred to SCO as part of
> the Asset Purchase Agreement was clarified in Amendment
> No. 2" (as SCO stated in its June 6 press release).

(Supp. Brakebill Decl., Ex. 50.)  Novell later published that June 26, 2003 letter on its website.  (Supp. Brakebill Decl., Ex. 51, ¶ 6.)

Novell sent a subsequent letter to SCO, dated August 4, 2003, stating that "under the Asset Purchase Agreement and Amendment No. 2, copyrights were not transferred to Santa Cruz Operation unless SCO could demonstrate that such a right was 'required for [Santa Cruz Operation]' to exercise the rights granted to it in the APA.  Santa Cruz Operation has never made such a demonstration . . . ."  (Supp. Brakebill Decl., Ex. 52 (emphasis added).)  Novell later published that August 4, 2003 letter on its website.  (Supp. Brakebill Decl., Ex. 51, ¶ 7.)

31.    Novell has admitted that Amendment No. 2 was present in its files prior to May 28, 2003.  (Ex. 41 at 82-83.)

*Novell's Response*: Admitted that Novell discovered a signed copy of Amendment No. 2 in its files subsequent to June 6, 2003.  Disputed insofar as SCO implies that Novell was aware that it had such a copy or that Novell had reviewed that copy at the time it issued the May 28, 2003 or June 6, 2003 press releases.   The cited testimony provides no evidence of that.  In fact, as noted in Novell's Response to SCO's Statement of Facts No. 30, on the evening of June 5, 2003, SCO had surprised Novell with an executed copy of Amendment No. 2, which Novell had not realized existed and had found in its files only in an unsigned version.  (Supp. Brakebill Decl. Ex., 47, Messman IBM Dep. 212:22-214:20; Supp. Brakebill Decl. Ex., 48, Messman Dep. 60:16-63:5; Supp. Brakebill Decl. Ex. 49, LaSala Dep. 113:8-118:10.)