# EXHIBIT B

Westlaw.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)  
(Cite as: Not Reported in F.Supp.)

Page 1

**H**  
Relational Design & Technology, Inc. v. Brock  
D.Kan.,1993.  
Only the Westlaw citation is currently available.  
United States District Court, D. Kansas.  
RELATIONAL DESIGN & TECHNOLOGY, INC.,  
Plaintiff,  
v.  
Stuart BROCK, Wesley Brock, and Data Team Corporation, Defendants.  
Civ. A. No. 91-2452-EEO.

May 25, 1993.

John C. Eisele, George R. McGrew, John C. Eisele, Chartered, Overland Park, KS, Kirk D. Auston, Auston & Skinner, Overland Park, KS, for plaintiff.  
Richard P. Stitt, Michael Yakimo, Jr., D.A.N. Chase, Chase & Yakimo, Overland Park, KS, Karen D. Wedel, Kip D. Richards, Waltes, Bender & Strohbehn, Kansas City, MO, for defendants.

MEMORANDUM AND ORDER  
EARL E. O'CONNOR, District Judge.  
*1 This suit was filed by plaintiff Relational Design and Technology ("RDT") against defendants Data Team Corporation ("DTC"), and Stuart and Wesley Brock alleging copyright infringement, fraud, and breach of contract. DTC counterclaimed seeking a declaratory judgment on ownership of the copyright and alleging breach of contract, and breach of the duty of good faith and fair dealing. The trial of this case was bifurcated and the jury decided all of the claims except the copyright claims. The jury returned a verdict for the defendants on the fraud claim and awarded $52,700 to plaintiff RDT on the breach of contract claim. In deciding the copyright issue, the court, after considering all of the evidence and briefs submitted by the parties, makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

*Findings of Fact*

1. Plaintiff RDT was a corporation incorporated in Kansas in 1989. Gene Kubin was the president of RDT.

2. Defendant DTC was a corporation incorporated in Kansas in 1983.

3. At all relevant times, defendant Stuart Brock was the president of DTC and acted within the course and scope of his employment.

4. Defendant Wesley Brock is Stuart Brock's son who has been employed by DTC since graduation from college in 1989. During the course of his employment, Wesley was responsible for the day-to-day operations of DTC. These responsibilities included: programming, marketing, and administrative duties.

5. As early as 1983, DTC developed a software package called "Data Team DDS." This program was written in the Basic programming language for use with IBM and IBM compatible computers (the "Basic program"). The Basic program was marketed to dental offices as a dental office management program. "Data Team DDS" was a registered trademark for the DTC Basic program. The Basic program was designed to assist dental office personnel in preparing patient recall notices, patient billing statements, attending dentist statements, and insurance claim forms as well as various other internal office documents: patient information forms, daily sheets, summaries of dental procedures performed, and reports of accounts receivable balances.

6. The first version of the DTC Basic program was labeled as version 1.0. DTC paid Art Coleman $5,000 to write the original Basic Data Team DDS program. DTC registered the Basic program with the United States copyright office on April 9, 1985.

7. The Basic program language or source code was a third generation language. Program code consists of instructions having a syntax particular to the programming language used. The programmer writes the instructions to enable the program to perform a desired function. The programmer must use a particular syntax or the computer will not understand the instructions. The computer converts the instructions from written source code to object code which is intelligible by the computer, but not by the programmer. The object code enables the computer to execute the instructions. Basic language code must be written line by line by a programmer who is familiar with the Basic language because the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)  
**(Cite as: Not Reported in F.Supp.)**

Page 2

language is not user friendly and does not generate its own source code. Since 1983, the Basic program code had been updated periodically by employees of DTC. During his employment at DTC, Wesley Brock was responsible for these updates. With each significant update, the version number for the Basic program was changed-1.0 to 1.01 to 1.02 and so on with the most recent version being version 2.03.

*2 8. Since 1983, DTC had sold Data Team DDS programs and updates as well as preprinted forms and specialized programming services to dental offices. In September 1990, the Data Team DDS program was only available in the Basic language. The disadvantage to the Basic program was that it required the user to have a separate Basic program for each stand-alone computer. DTC became interested in adding network capabilities to the program to enable users to access the program from multiple terminals.

9. Gene Kubin of RDT contacted DTC about developing a link between RDT's general ledger program and DTC's dental management program. RDT wanted to increase sales by gaining access to DTC's customers.

10. The RDT general ledger program was written in the Clarion programming language using the Clarion Professional Developer, a user-friendly computer program used in programming. The Clarion Professional Developer actually wrote the source code. The Clarion language was a fourth generation: program source code was generated by the Clarion Professional Developer according to information entered by the user in response to message prompts on the screen.

11. Attracted by these enhanced features, Stuart Brock asked Gene Kubin if he could translate the Data Team DDS Basic program into the Clarion language using the Clarion Professional Developer. Kubin indicated that he could and prepared a contract to that effect which he presented to Stuart Brock. Stuart Brock suggested that they add a provision requiring RDT to return half of the price paid by DTC if the program was not completed on time or was not satisfactory to DTC. Kubin agreed and changed the contract as suggested by Stuart Brock and both DTC and RDT executed the contract on September 26, 1990 (the "original contract"). Kubin drafted all parts of the original contract.

12. The original contract required that RDT use the Clarion Professional Developer language in translating the Dental Team DDS Program into the Clarion language. The new Clarion program was to follow the specifications used in the existing Data Team DDS Basic program. The original contract stated a two-fold intent: 1) to obtain the "look, feel, and functions" of the Basic program so that existing Basic users could instinctively use the Clarion program; and 2) to enhance the existing features of the Basic program to increase the marketability of the new program. RDT projected 10 weeks to complete the program but promised to complete it within 16 weeks. The contract provided that DTC would pay RDT $50 per hour to a maximum of $20,000 for the completed program.

13. In return, RDT agreed to translate the Basic program into Clarion language, deliver the source code to the completed program, and provide some basic training in Clarion to DTC employees. Kubin was not responsible for maintaining the Clarion program once he delivered it to DTC. Pursuant to the original contract, DTC was to own "all rights to the completed program with no licensing or royalties fees due any other parties upon completion of the program." RDT agreed not to sell the program to any other party and not to "do anything that would be considered as competition in the dental field."

*3 14. The contract called for the following "enhancements": 1) multi-user code for file and record locking; 2) online held screens; 3) scrolling lookup lists; 4) scrolling reports to screen or printers; 5) unlimited file sizes; and 6) EGA and VGA support. The original contract also provided that other enhancements would be discussed on a weekly basis as the development process progressed.

15. The original contract provided for the development of a "data migration" program by RDT. This program, suggested by Gene Kubin, would convert existing Basic data files into the Clarion format thus eliminating the need to rekey the existing data. The data migration option was to be produced by RDT at no expense to DTC and offered along with the Clarion program to existing Data Team DDS users for a fee. DTC was to collect these fees and remit them to RDT. RDT assumed all liability for any data loss occurring and agreed to provide purchasers of the data migration program with any support necessary during the conversion process.

16. The final paragraph of the original contract provided, "[i]n the event that the programs are not completed, or not completed on a timely basis, or not completed to the satisfaction of Data Team Corp.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
(Cite as: Not Reported in F.Supp.)

then 50% of all monies paid shall be refunded, and source code shall become the sole property of Relational Design & Technology, Inc."

17. Kubin followed DTC's instructions about how the program was to "look and feel." Kubin delivered whatever he had completed of the Clarion program to DTC weekly. Those updates to the Clarion program were placed on DTC's computer. Wesley Brock then checked the program for programming problems, also known as "bugs." Wesley Brock discussed the bugs with Kubin and compiled an extensive list of requested edits specifically stating the errors found in the Clarion program and the corrections or modifications which were required.

18. Kubin "hand coded" portions of the program such as the patient ledger function because it was unique and complex. Hand coding required Kubin to write the source code himself instead of using the Clarion developer to write the source code.

19. By January 24, 1991, Kubin's records indicated that he had expended 400 hours on the program thus reaching the $20,000 original contract limit. RDT's billing statements indicate that the translation work was complete on January 24, 1991. Kubin delivered what he represented to be the completed program to DTC on January 29, 1991.

20. Upon reviewing the delivered program, Wesley Brock found that only part of the most recent list of requested edits had been completed. For example, the scrolling list for insurance transactions did not operate properly. Moreover, the following significant capabilities of the Basic program were not in the delivered Clarion program: 1) printing special insurance forms; 2) sorting patient billing statements by zip code; 3) printer configuration formats; 4) word-processing capabilities with mail merge; 5) alternate sub-directory data access; and 6) a patient archive routine. DTC felt that the delivered Clarion program was not in a form that could be marketed to DTC's customers.

*4 21. DTC asked RDT to address the problems listed on the edit list and the missing capabilities without further payment from DTC. Although DTC believed that the $20,000 maximum contract price set in the original contract covered the requested work, DTC eventually paid RDT $5,400 for "additional work."

22. Besides DTC's dissatisfaction with the programming bugs, DTC was concerned about how slowly the program operated and the large amount of memory the program required. Wesley Brock attended a Clarion Professional Developers seminar in Florida on September 21, 1991, to learn more about Clarion in an effort to address these concerns. Wesley Brock learned that an update to the Clarion Professional Developer was available which would eliminate the speed and memory problems. However, the update would not work on the Clarion Dental Management Program. Wesley Brock was advised that the only solution was to rewrite those hand-coded portions of the program which were causing the problems using the Clarion Professional Developer.

23. DTC asked RDT to fix the program and threatened to exercise the refund option if RDT did not correct the problems with the Clarion program. In the end, DTC was not satisfied with the final program delivered by RDT. On August 2, 1991, DTC requested the return of $12,700, one half of the price paid to RDT.

24. On August 30, 1991, Kubin sent the following proposed written agreement to Stuart Brock:
This agreement between Data Team Corp. and Relational Design & Technology, Inc. dated this ___ day of _____, 1991 will constitute the completion of all terms and conditions of the attached contract dated Sept. 26, 1990.
In consideration of $12,700 dollars, to be paid by Relational Design & Technology, Inc., Data Team shall return all copies of source code that comprise the Dental Management System written in the Clarion Language by RDT, Inc, including any edits or changes made by Data Team.
Data Team shall surrender *all rights* to the returned source code but retains all rights to the original Data Team program written in the Basic language. RDT shall not market the returned source code as Data Team DDS.
Both parties agree to waive all obligations specified in the original contract and agree to hold each other harmless in all other dealings concerning the development and sales of the Dental Software, and any associated upgrades or modifications.
Upon payment of the amount specified above, Relational Design & Technology, Inc. will own all rights to the source code.

Plaintiff's Exhibit 6 (emphasis added). Stuart Brock did not sign the proposed contract. Instead, he notified Gene Kubin on September 3, 1991, that the August 30, 1991, proposed contract was, in effect, a new contract and that he, Brock, wished to proceed

Not Reported in F.Supp.  
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)  
**(Cite as: Not Reported in F.Supp.)**

Page 4

with the refund option under the September 26, 1990, original contract.

25. Kubin delivered a check for $12,700 to DTC on September 30, 1991. At that time, Stuart Brock copied the Clarion source code from DTC's computer onto a disk which he gave to Gene Kubin and deleted the source code from DTC's computer. DTC had a copy of the source code on disk and later reinstalled the program on the DTC computer.

*5 26. In exercising the refund option, DTC did not intend that RDT become the owner of the copyright in the Clarion program. Rather, the refund contemplated in the final paragraph of the contract was intended to provide for liquidated damages if RDT failed to complete the program on time or to DTC's satisfaction. DTC did not exercise the refund option in bad faith by falsely or unreasonably claiming dissatisfaction with the delivered Clarion program.

27. On October 12, 1991, RDT registered a program called "RDT Dental Management Program" in the United States Copyright Office. The registered program was the version of the Clarion program which Kubin delivered to DTC on June 16, 1991. The registration certificate indicates that the rights to the copyright in the Clarion program were obtained from DTC by contract.

*Conclusions of Law*

RDT's copyright infringement action was brought pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.* The court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

To establish liability for copyright infringement, the party claiming infringement must establish: 1) that it owned a valid copyright in an original work which was properly registered;[FN1] and 2) that the infringing party violated an exclusive right protected under the Copyright Act. An original work of authorship is one fixed in a tangible medium of expression and capable of being perceived, reproduced or otherwise communicated. *See* 17 U.S.C. § 102(a). Copyright protection does not extend to ideas, procedures, processes, systems, methods of operation, concepts, principles, or discoveries, "regardless of the form in which [they are] described, explained, illustrated, or embodied" in an otherwise copyrighted work. *Id.* at § 102(b).

The certificate of registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *Id.* at § 410(c). However, the statutory presumption of validity may be rebutted. *Wihtol v. Wells*, 231 F.2d 550 (7th Cir.1956). In the instant case, RDT holds a certificate of copyright registration for the Clarion Dental Management Program and is thus presumptively the owner of the copyright to that program. However, DTC rebutted this presumption by establishing that pursuant to the parties' original contract, DTC owned the rights in the Clarion Dental Management Program and thus RDT's registration is invalid.

"A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). The original contract was in writing and was signed by both Stuart Brock and Gene Kubin. Thus, regardless of who owned the copyright under the various authorship provisions of the Copyright Act,[FN2] to the extent that the parties provided for the transfer of ownership of the rights to the Clarion program, the original contract controls ownership of the copyright. *Id.*

*6 The original contract (page 2 paragraph 3) stated that DTC would own "all rights to the completed program with no licensing or royalties fees due." Thus, all rights in the program (including the copyright) were transferred to DTC upon delivery of the completed program by RDT. However, the final paragraph of the original contract states that upon payment of the 50% refund by RDT, the "source code shall become the sole property" of RDT.

Significantly, the tangible source code of a program and the intangible copyrights to that program are separate and distinct concepts. 17 U.S.C. § 202. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.... Transfer of ownership in any material object ... does not of itself convey any rights in the copyrighted work embodied in the object." *Id.*

This fundamental copyright principle has been repeated many times in various other contexts. *Salinger v. Random House, Inc.*, 811 F.2d 90, 94-95 (2d Cir.1987); *Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir.1984); *NIKA Corp. v. City of Kansas City*, 582 F.Supp. 343, 367-68

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 5
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)
(Cite as: Not Reported in F.Supp.)

(W.D.Mo.1983) (the owner of a copyright may limit the use of physical property embodying the copyright, regardless of ownership of the physical property); *Walt Disney Prod. v. United States,* 327 F.Supp. 189, 192 (C.D.Ca.1971) (distinguishing between tangible and intangible property under federal tax laws). The court in *Salinger v. Random House, Inc.,* held that author J.D. Salinger's ownership of the copyright in his unpublished letters was separate and distinct from the recipient's rights in the actual letters. 811 F.2d at 94-95. Similarly, in *Harris v. Emus Records Corp.,* the court held that singer Emmylou Harris retained the copyrights to her compositions even though the master tapes of the performances were the sole property of the record company. 734 F.2d at 1336 n. 6.

Kansas law presumes that the parties incorporated the laws existing at the time of contracting as a part of the contract unless the parties include a provision in the contract expressly declaring otherwise. *See Steele v. Latimer,* 521 P.2d 304, 309-10 (Kan.1974). The original contract is devoid of any language excluding copyright law. Thus, the court presumes that the parties incorporated the distinction between the right to the intangible copyright and the right to the tangible source code as a part of the original contract in this case.

Interpreted accordingly, the original contract was, at best (for RDT), ambiguous about what effect, if any, the refund provision in the final paragraph of the contract had on the rights to the copyright in the Clarion program.[FN3] Ambiguities in a contract should be construed against the drafter. *Thomas v. Thomas,* 824 P.2d 971, 977 (Kan.1992). Construing the original contract against the drafter, RDT, the court finds that RDT's payment of the refund did not transfer ownership in the copyright to the Clarion program to RDT. Instead, RDT merely acquired sole ownership of the source code which was the material object embodying the Clarion program. *See* 17 U.S.C. § 202.

*7 RDT must have understood the limitations of the original contract because, prior to refunding the $12,700, Kubin sent a proposed second contract to DTC. The proposed contract provided that RDT would transfer "all rights" in the Clarion program to RDT upon payment of the refund by RDT. Notably, this second contract was never signed or agreed to by DTC.

The refund provision of the final paragraph was merely a liquidated damages clause available if RDT failed to complete the program on time or to DTC's satisfaction. To construe the provision otherwise would leave DTC paying $12,700 without receiving anything of value in return.

The court therefore concludes that, pursuant to the parties' original contract, DTC owned the copyright in the Clarion program upon delivery of the completed program by RDT. RDT's claim for copyright infringement will therefore be dismissed. *See* 17 U.S.C. § 501(b) (ownership of the copyright is a prerequisite to an action for infringement).

Having decided that, pursuant to the parties' original contract and 17 U.S.C. § 204(a), the rights to the Clarion Dental Management Program belonged to DTC, we need not discuss the parties' alternative arguments on the copyright issue. In closing, we note that the court's decision that DTC owned the rights to the Clarion program is not inconsistent with the jury's determination that DTC breached the contract. The only theory of breach of contract by DTC about which the jury was instructed was that DTC breached the contract, if at all, by failing to market RDT's data migration program and remit the proceeds. Ownership of the copyright was unrelated to the parties' contractual agreement that DTC would market RDT's data migration program.

IT IS THEREFORE ORDERED that plaintiff RDT's claim for copyright infringement is dismissed.

IT IS FURTHER ORDERED that declaratory judgment be entered to the effect that defendant DTC is the owner of the copyright in the Clarion Dental Management Program and that RDT's certificate of copyright registration is invalid.

IT IS FURTHER ORDERED that each party will bear their own costs and attorney's fees.

> FN1. Registration is a jurisdictional prerequisite for a copyright infringement action. 17 U.S.C. § 411(a); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1488 (11th Cir.1990).
>
> FN2. *See, e.g.,* 17 U.S.C. §§ 102(a) (original works of authorship) and 101, 201 (works made for hire).
>
> FN3. The other possible interpretation is that the contract was not ambiguous and thus, is enforceable as written. Under either

Not Reported in F.Supp.  
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)  
**(Cite as: Not Reported in F.Supp.)**

Page 6

      analysis, the court would reach the same result.

D.Kan.,1993.  
Relational Design & Technology, Inc. v. Brock  
Not Reported in F.Supp., 1993 WL 191323 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.