SCO Grp v. Novell Inc

Doc. 298 Att.

# EXHIBIT A

Dockets.Justia.com

LEXSEE 1989 U.S. DIST. LEXIS 16040


**GREYHOUND FINANCIAL CORPORATION, formerly known as GREYHOUND LEASING & FINANCIAL CORPORATION, a Delaware corporation; et al., Plaintiffs, vs. J. R. WILLYARD, et al., Defendants**


**No. 87-C-0811B**


**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**


*1989 U.S. Dist. LEXIS 16040*

**December 23, 1989**


**OPINION BY:** [*1]

BROOMFIELD

**OPINION:**

MEMORANDUM AND ORDER

On August 21, 1989, through August 25, 1989, the court heard various defendants' motions for summary judgment and related motions to strike. After extensive briefing and argument by the parties, and after a preliminary review of the material by the court, the court took all of these matters under advisement. The following memorandum and order decides all issues pending before the court, including previous motions for summary judgment and partial summary judgment filed by some of the defendants that remained under advisement at the time of the August hearings. Any remaining issues to be decided by the court at this stage of the litigation may be raised by the parties at a status conference set by the court at the conclusion of this memorandum and order.

I. INTRODUCTION

This court has worked with the many attorneys on this case since the inception of both this litigation and the court's tenure on the federal bench in the late Summer of 1985. At the present time of the filing of this memorandum and order, almost 5,000 separate docket entries are listed in the Clerk of the Court's docket sheet

for this case. This represents an estimated 120 [*2] linear feet of paper filed by the parties, all of which is presumably part of the record before the court at the present time. After extensive Rule 12 motion practice by defendants, several amendments to the pleading by plaintiffs, transfer of this action to the District Court for the District of Utah, and voluminous discovery practice by all sides, the court is now presented with defendants' Rule 56 motions and various motions to strike which relate to them. In toto, there are eighty-six motions before the court. The court will not attempt to estimate the height of the parties' motion papers except to say that the volume represents a considerable obstacle to the prompt and judicious determination of the pending motions.

However, it is an obstacle which the court must surmount both to maintain the integrity of the judicial system and in an effort to eventually resolve the parties' disputes. The court is able to complete this task only after careful consideration of the parties' positions on the facts and the law and after applying an ample dose of common sense. In this latter vein, the court will attempt to avoid further restriction of the Clerk of the Court's file drawers [*3] by limiting this memorandum to only those issues which necessarily must be discussed to resolve the pending motions. While it may have been perceived by many of the parties that their interests were best served by inundating the court with papers, this method of practice ends with the filing of this memorandum and order.

1989 U.S. Dist. LEXIS 16040, *3

## I. PROCEDURAL BACKGROUND

In the Fall of 1988, the court granted several defendants leave to file motions for partial summary judgment on certain discrete issues. After a full briefing by the particular parties involved, and after conducting oral argument on the matters, the court took some of these motions under advisement. These motions now pending before the court are: (1) Ronald S. Hanson's ("Hanson") motion for summary judgment (docket # 3900); (2) Hanson's motion to strike the affidavit of William B. Watkins (docket # 4134); (3) Argus Leasing Corporation's ("Argus") motion for partial summary judgment (docket # 4142); (4) Donald Timpson ("Timpson") and M. Scott Newbold's ("Newbold") motion for partial summary judgment (docket # 4140); and (5) plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s motion re: Zions Defendants' Second Set of Requests [*4] for Admissions with Interrogatories (docket # 4087).

At the beginning of 1989, the court also allowed each party the opportunity to file a single, consolidated motion for summary judgment designed to reach all issues perceived addressable by such a motion. A lengthy response and reply briefing period ensued and the parties eventually argued their motions before the court in August of this year. These dispositive motions pending before the court are: (1) First Interstate Bank of Utah, N.A.'s ("FI-Utah") motion for summary judgment (docket # 4412); (2) William Gurr's ("Gurr") motion for summary judgment (docket # 4343); (3) First Security Bank of Utah, N.A.'s ("FSB") motion for summary judgment (docket # 4352); (4) Zions First National Bank's ("ZFNB") motion for summary judgment (docket # 4354); (5) Zions Leasing Company's ("ZLC") motion for summary judgment (docket # 4356); (6) Argus' motion for summary judgment (docket # 4361); (7) Zion's Mortgage Company's ("ZMC") motion for summary judgment (docket # 4365); (8) Newbold's motion for summary judgment (docket # 4375); (9) Timpson's motion for summary judgment (docket # 4373); (10) Hanson's motion for summary judgment (docket # 4371); [*5] (11) First Security Financial's ("FSF") motion for summary judgment and for judgment on the pleadings (docket # 4348); (12) Richard A. Christenson's ("Christenson") motion for summary judgment and for judgment on the pleadings (docket # 4404); (13) George S. Diumenti's ("Diumenti") motion for summary judgment (docket # 4389); (14) William H. Lindsley and Diumenti & Lindsley's ("Lindsley") motion for summary judgment (docket # 4389); (15) Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's ("Allred") motion for summary judgment (docket # 4475); (16) William R. Stoddard's ("Stoddard") motion for summary judgment or for a pre-judgment writ of replevin (docket # 4347); (17) Vicki Roussin's motion for summary judgment (docket # 4339); (18) Michael R. Roussin's motion for summary judgment and dismissal (docket # 4338); (19) Thomas C. Mabey and The Consortium, Inc.'s ("Mabey") motion for summary judgment (docket # 4480); and (20) Syed A. Hasan's ("Hasan") motion for summary judgment (docket # 3600).

After receiving plaintiffs' responses in opposition to these motions for summary judgment, several defendants filed motions/joinders to strike various declarations, [*6] affidavits, deposition testimony, and sworn statements filed by GFC. The parties fully briefed these matters and argued them before the court at a hearing on August 21, 1989. Grouped according to subject matter, the following motions/joinders to strike are pending before the court: (1) Lindsley (docket # 4700), Diumenti (docket # 4700), and Allred's (docket # 4725) motions to strike the testimony and affidavit of Jeffrey Leyton; (2) Mabey (docket # 4716) and Allred's (docket # 4729) motions to strike the declaration of Robert H. Damm; (3) Allred (docket # 4731), FI-Utah (docket # 4657), FSB (docket # 4620), Diumenti (docket ## 4703 & 4810), Gurr (docket # 4694), and Mabey's (docket # 4715a) motions to strike the declaration of Robert W. Bertrand; (4) Allred (docket # 4728), FI-Utah (docket # 4610), FSB (docket # 4621); Diumenti (docket # 4705), and Mabey's (docket # 4718) motions to strike the declaration of Bruce H. Baum; (5) Gurr (docket # 4628), Allred (docket # 4732), FI-Utah (docket # 4658), FSB (docket # 4667), FSF (docket # 4636), Christenson (docket # 4714), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4683) motions to strike designated portions of [*7] the affidavits of William B. Watkins; (6) Allred (docket # 4726), FI-Utah (docket # 4608), FSB (docket # 4605), Diumenti (docket # 4706), FSF (docket # 4689), Mabey (docket # 4717), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4691) motions to strike the declaration of Robert M. Mathis; (7) plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s cross-motion to amend responses to FI-Utah's Seventh Set of Requests for Admissions (docket # 4680); (8) FI-Utah (docket # 4626), FSB (docket # 4635); Gurr

(docket # 4654); and Allred's (docket # 4733) motions to strike the affidavit of Gary A. Mathis; (9) Christenson (docket # 4672), Vicki Roussin (docket # 4737), Gurr (docket # 4673 Allred (docket # 4737); FI-Utah (docket # 4629), FSB (docket # 4619), Diumenti (docket # 4704), FSF (docket # 4640), Mabey (docket # 4715), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4785) motions to strike various affidavits, deposition testimony, and sworn statements of Sheldon Player ("Player"); and (10) Christenson (docket # 4892), Gurr (docket ## 4894 & 4909), FI-Utah (docket # 4861), FSB (docket # 4866), Diumenti (docket # 4882), Mabey (docket # 4897), [*8] Stoddard (docket # 4918), FSF (docket # 4880), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4899) motions to strike Player's August 4, 1989 sworn statement.

## III. FACTUAL BACKGROUND

The following factual summation of the case serves more as an effort to put the parties contentions into some semblance of order rather than as the court's conclusions concerning the legal sufficiency of the evidence thus far presented. To a large extent, the following factual setting is gleaned from the undisputed portions of the parties' statements of fact. Genuine disputes of material fact among the parties are discussed below by the court where they are specifically raised by the parties -- in the various motions to strike and motions for summary judgment. Thus, the parties are directed to the court's analysis of the specific facts underlying their respective motions for an in-depth discussion of the factual disputes involved in their particular case.

### A. The Parties

#### 1. Plaintiffs

Plaintiff Greyhound Financial Corporation ("GFC") is a Delaware corporation and a wholly-owned subsidiary of The Greyhound Corporation ("TGC"), also a Delaware Corporation. Plaintiff [*9] Greycas, Inc. ("Greycas"), is an Arizona corporation and a wholly-owned subsidiary of GFC. Unless otherwise indicated, GFC and Greycas will be referred to by the court as "GFC." During the time period relevant to this litigation, both GFC and Greycas were engaged primarily in the business of financing real and personal property. Each had a division which financed commercial personal property as well as one involved in commercial real estate financing. Although separate corporations, all or most of the officers and

employees at GFC were also employed in the same capacity by Greycas. Greycas's equipment finance division was engaged primarily in providing loans for the purchase, by its customers, of commercial property. Similarly, GFC's equipment finance department provided long-term and intermediate fixed rate leases for commercial equipment.

Leases and loans were both profitable methods of financing equipment for GFC. Under a lease, the lessor buys the equipment from an equipment vendor and leases it to the lessee for its own use or for sublease to an end user. Thus, while the lessor is the legal owner, the end user gets the full use of the equipment. Under a loan, the borrower [*10] purchases the equipment for its own use or lease to an end user. The borrower therefore holds title to the equipment, while the lender obtains a security interest in the equipment. In its leasing transactions, GFC obtained the tax benefits of depreciation and investment tax credits and passed these on to its parent company, TGC. In its secured loan transactions, these tax benefits remained with the borrower.

#### 2. Player and Player Entities/Partners

Until late 1984, when he moved his business operation to the Phoenix metropolitan area, Player was engaged in the machine tool and equipment business in Vernal, Utah. Vernal is a small community (population of approximately 10,000) located near the eastern Utah border, about 180 miles from Salt Lake City. While in Vernal, Player engaged in numerous lease and loan transactions with a variety of companies and also was involved to some extent in real estate development in the area. Player conducted his business through two primary business entities -- Alpine Machinery Sales, Inc. ("AMS"), a corporation, and Player & Willyard ("P&W"), a partnership with J. R. Willyard ("Willyard"). AMS bought and sold equipment while P&W acquired [*11] and developed real estate in Vernal, Utah, and eventually in Salt Lake City, Utah, and Phoenix, Arizona. Willyard and Player agreed that Willyard would handle real estate matters while Player took care of financial matters for the companies. AMS and P&W were often considered to be a single entity, and were treated as such by Player and Willyard as well as by various third parties.

Roussin began working for AMS and P&W in October of 1983, first as an accountant and then as a controller. From May of 1984 through August of 1985, Player employed Vicki Webb (who later married and

changed her name to Vicki Roussin) as a secretary for the P&W entities.

Stoddard formed a partnership with Edward Heintz doing business as Financial Conveyance Company ("FCC") in August of 1982 and continuing through August of 1985. When FCC was formed in 1982, it operated out of the offices of Cottonwood Thrift & Loan ("CTL"), used the bank's secretary and receptionist, and devoted approximately eighty percent of their work to CTL. Stoddard lost this major client when the bank was sold and he went to work for Player in February of 1984. FCC also moved into offices leased by P&W and used the services of [*12] P&W's secretary Vicki Roussin. According to Player, Stoddard was hired to organize the financial operations of the various Player entities.

Unknown to Player, Hasan had a history of engaging in fraudulent transactions in both England and the United States that dated back to the early 1970's. Typically, Hasan and his assistants would fraudulently represent that he was a trustee of a Middle Eastern trust which would fund a prospective borrower's project if certain initial conditions (i.e., fees and expenses) were met. This was the scenario Hasan utilized with Player and his assistants.

Player moved from Vernal, Utah, to Phoenix, Arizona in November of 1984. At approximately this same time period, Hasan, and Vicki and Michael Roussin also transferred their bases of operation to the Phoenix area.

### 3. Allred/Mabey/Diumenti/Lindsley

Allred first met Player in late 1982. He is Chairman and President of Triangle Oil, Inc. ("Triangle"), a Utah corporation. Allred owns ninety percent of the company. The remaining ten percent is held by various Allred family members. He is also general partner in Allred Family Investment Company ("AFIC"). This partnership is wholly owned by [*13] Allred, his wife Geraldine, and their two children. Unless otherwise designated, the court will refer to these three defendants as Allred.

Mabey is a civil engineer. In 1978, he founded The Consortium, Inc., an engineering consulting firm and a Utah corporation based in Bountiful, Utah. Mabey did not meet Player until late in 1982, when Diumenti introduced the two of them and they began discussions concerning the RRI project. Unless other designated, the court will refer to these two defendants as Mabey.

In 1982, when he first met Player, Diumenti was the managing partner of the Diumenti, Hayward & Nelson law firm. He was also a member of the Board of Directors of Rocky Mountain State Bank of Salt Lake City and the Rocky Mountain State Bank of Bountiful. Player and Diumenti became good friends. Since they first met in the mid-1970's, Allred and Mabey have also been friends of Diumenti. Diumenti acted as Allred and Mabey's personal attorney as well as the attorney for Triangle Oil, Inc., Allred's Company, and The Consortium, Inc., Mabey's company.

Lindsley has been employed by Diumenti's law firm since graduating from law school and since forming a partnership with Diumenti, [*14] Lindsley receives twenty percent of the gross profits of the firm. Unless otherwise noted by the court, Lindsley and the law firm of Diumenti & Lindsley will be referred to collectively as Lindsley.

The partnership of Diumenti, Mabey, Player & Willyard ("DMP&W") came into existence in the Spring of 1983. Allred was a "silent partner" in this partnership. The purpose of the DMP&W partnership was the acquisition, rebuilding, and eventual sale of the Riverdale Rodeway Inn ("RRI"). According to the partnership agreement submitted to GFC, Diumenti, Mabey, Player, and Willyard each shared twenty-five percent of the partnership contributions, liabilities, and profits.

Although not formally dissolved, DMP&W was succeeded within thirty days of its inception by the partnership of Allred, Diumenti, Mabey, Player & Willyard ("ADMP&W"). The purpose of this partnership was the acquisition and rebuilding of the RRI project and the Rodeway Inn in Ft. Collins, Colorado, as well as the acquisition of an aircraft and certain thrift and loans. The ADMP&W partnership also investigated a hotel project in Southern California as well as other real estate projects. This partnership remained in existence [*15] through 1984, although it was not formally dissolved. Instead, Allred and Diumenti were bought out by the remaining partners.

Thus, ADMP&W was succeeded by the partnership of Mabey, Player & Willyard ("MP&W") in late 1984 or early 1985. Although MP&W was never formally dissolved, Mabey too was bought out of the partnership. At approximately the same time, Mabey, Player, and Willyard formed Gulfstream Industries and other related entities. The primary function of Gulfstream Industries as

well as MP&W was to acquire and develop real estate. Gulfstream Industries was also in the business of purchasing and reselling oil field equipment.

4. The Financial Institution Defendants

FSB is a national banking association with its principal place of business in Salt Lake City, Utah. Player began his banking relationship with FSB in the late 1960's. During the course of Player's tenure as a FSB customer, he and his companies obtained more than 170 loans from, and opened at least eleven depository accounts at, FSB. Bill Gibson, and later on, Roger Ford, served as the Vernal branch managers.

In the mid-1970's, Dale Cameron ("Cameron"), the assistant manager of FSB's Vernal branch, [*16] took over primary responsibility for Player's accounts. While he was employed at FSB, Cameron occasionally socialized with Player and would join him on hunting and fishing trips as well as at dinner and lunch engagements. In June of 1981, Cameron left FSB to work for Player's company AMS. Cameron then returned to FSB in October of 1981. Cameron claims that he left AMS because he was not given any responsibility and because the salary and benefits were not as Player had initially represented them to be. Player claims that Cameron was fired at AMS because of a disagreement with Willyard.

In November of 1982, Cameron became an Assistant Vice President of FSB and held the same duties at the Vernal branch as when he left. As loan officer for the Player accounts, Cameron was responsible for processing Player's loan requests. Loans exceeding Cameron's lending authority had to be approved by the Vernal branch manager or FSB's division supervisors. During this period, Player was one of the largest customer's of FSB's Vernal branch. Cameron considered Player's accounts to be the largest in terms of loans and other banking activities with which he dealt during his employment at FSB. [*17]

FSB instituted a special investigation after Player leveled charges of bribery and assistance in his frauds on GFC, including provision of an FSB customer's signature card for forgery purposes, against Cameron. While the investigation was pending, Cameron was placed on a leave of absence with pay beginning in April of 1986. FSB was never able to confirm that Cameron accepted bribes from Player and Cameron steadfastly denies any such actions. On September 20, 1986, at the request of

FSB division supervisor Calvin Jeppson, Cameron resigned from his position with the bank. For the purposes of these motions, FSB concedes that there may exist a fact issue as to Cameron's involvement in Player's fraudulent activities. The court notes that Cameron is not one of the movants seeking summary judgment.

FSF was incorporated on December 9, 1982, and is a wholly-owned subsidiary of First Security Corporation ("FSC"), a bank holding company. FSF was established by the holding company to enter the thrift business and to effect the purchase of Murray First Thrift & Loan ("MFT"). MFT operated as an industrial loan company until July 22, 1982, when the State of Utah declared it insolvent and [*18] took possession it. Following state court approval, FSF acquired all of the assets and most of the liabilities of MFT and its sister corporation, MFT Leasing. Christenson was President of Capitol Thrift & Loan ("CT&L") from 1960 until December 10, 1982. On that date, FSF and CT&L entered into an agreement whereby FSF purchased CT&L's assets, assumed all of its liabilities, and hired CT&L's employees. Christenson was hired as President and Chief Operating Officer of FSF and began his duties in December of 1982. Early in 1983, Christenson first met Player.

At the end of its first year of operation, FSF was operating at an alarming loss. An extensive audit and examination was undertaken by FSF's auditing division. The auditors expressed concern about apparent incidents of self-dealing and conflicts of interest in upper level management, and about poor morale among lower echelon employees caused by a lack of confidence in upper management. Among other things, the final report by the auditors revealed several personal transactions between Christenson and Player in which Player purchased jewelry, three boats and trailers, and a fur coat from Christenson. In November of 1984, the [*19] Chairman of the Board for FSF, C. S. Cummins, and the Chairman of the Board for FSC, Spencer Eccles, met with Christenson after he was first given a copy of the 133-page audit report. They asked for Christenson's resignation, and by a letter dated November 26, 1984, Christenson obliged and formally resigned from FSF. Chairman Eccles claims that Christenson's relationship with Player had nothing to do with his decision to change FSF's management.

FI-Utah is a national banking association with its principal place of business in Salt Lake City, Utah. Gurr

was an Assistant Vice President (Vernal Branch Manager) of FI-Utah and was employed by the bank beginning in the mid-1970's. Player transacted business with Gurr as early as 1979. Between 1982 and 1984, Gurr and Player were partners in a business venture called "Lease Consultants." It is uncontested that Gurr's involvement in this venture violated FI-Utah's personnel policies and ultimately resulted in the termination of his services to the bank in October of 1986.

Player and his related companies became the largest customer of FI-Utah's Vernal Branch. According to the bank, Player, along with other good customers of the bank [*20] Player was regularly permitted to draw against uncollected funds on his accounts. Player also borrowed money regularly from FI-Utah. He was rarely out of debt and credit was extended at times when Player acknowledged cash flow problems and at times when certain FI-Utah credit analysts opined that Player's financial statements were inconsistent and unclear. It is undisputed that in response to credit reference inquiries, FI-Utah did not indicate that it had experienced any material problems with the Player accounts.

For example, in May of 1983 in relation to the RRI construction loan for $ 2.3 million, GFC's employee David Phillips ("Phillips") called Gurr and requested a credit reference for Player, Willyard, and their companies. The information that Phillips obtained from Gurr was included in the write-up on the RRI proposal, which stated, inter alia, that (1) FI-Utah had a five-year account relationship with Player and Willyard, (2) FI-Utah handled business as well as personal accounts, (3) Player and Willyard maintained checking accounts with average balances in the mid-six figures, (4) that Player and Willyard handled all accounts as agreed, and (5) that Gurr spoke highly [*21] of Player and Willyard and would entertain new business.

ZFNB is a national banking association with its principal place of business in Salt Lake City, Utah. ZFNB is a wholly-owned subsidiary of Zions Utah Bancorporation. Some of ZFNB's officers mentioned in the briefing process are: Roy Simmons ("Simmons"), Chief Executive Officer; Hanson, President; Noall Bennett ("Bennett"), Executive Vice President, Commercial Lending; Angus Belliston ("Belliston"), Senior Vice President, Southern Division Manager; James Anderson ("Anderson"), Vice President, Commercial Loan Officer; R. Kay Poulsen ("Poulsen"),

Vice President, Real Estate Department Manager; and J. Robert Bonnemort ("Bonnemort"), Commercial Loan Officer. From 1979 through 1984, ZFNB's senior loan committee approved seven loans to Player totalling in excess of $ 1.2 million. ZFNB's loan officers are instructed to refer potential lease customers to Argus if the dollar amount of the lease exceeds $ 100,000 and to ZLC for leases under this amount.

Argus is a Utah corporation established in 1974 and is a wholly-owned subsidiary of Zions Utah Bancorporation. In August of 1986, Argus changed its name to Zions Credit Corporation. [*22] The principal officers of Argus are: Richard Van Winkle ("Van Winkle"), President (until 1983); Bennett, President (1983-86); Bonnemort, Executive Vice President, Chief Operating Officer, and Manager (until 1978); and John Callis ("Callis"), Vice President and Manager (since 1978). Van Winkle, Bennett, and Callis together with Hanson also were directors of Argus. Argus supervises equipment leasing for ZFNB, including assistance to branch officers in negotiations with prospective customers, establishment of rates, terms, residual values, and documentation and administration of leases. Callis was authorized to arrange, inter alia, lease transactions, deal with the vendors of the equipment and the lessees, supervise collection efforts, monitor the transactions, and run the day to day affairs of Argus. ZFNB provided 99% of the funding for four of the five leases entered into by Argus with the Player companies.

ZLC is a Utah corporation established in 1961 (formerly Lockhart Leasing Corporation) and is also a wholly-owned subsidiary of Zions Utah Bancorporation. The principal officers of ZLC are: Van Winkle, President (until 1983); Max Barber ("Barber"), Vice President and Manager [*23] (until 1980); Timpson, Vice President and Manager (from 1980 through 1986); Newbold, Assistant Vice President and Assistant Manager. From approximately 1979 to 1983, Player engaged in numerous leasing transactions with ZLC.

Finally, ZMC is a Utah corporation and a wholly-owned subsidiary of Zions Utah Bancorporation. ZMC acts as an agent for ZFNB on all of its real estate loans.

B. The Player Frauds

Player actively did business with GFC over a six-year period beginning in the Summer of 1979. Over

the course of the next six years, GFC disbursed in excess of $ 74 million to Player through various loans and equipment leasing transactions. Under the equipment leasing transactions, GFC would purchase equipment which it would then lease to Player. Player, in turn, would sublease the equipment to the end-user. In many of these equipment leasing transactions, the equipment GFC purchased was to be shipped directly to the end-user by the vendor or manufacturer of the equipment. As a result, GFC never received or inspected the equipment it purportedly purchased. As noted by GFC's former President and Chief Executive Officer, Robert W. Bertrand, this was "the nature of the business." [*24]

Thus, in each of the GFC equipment leasing transactions with Player, either Player or one of his companies would submit an invoice to GFC for the equipment GFC had purchased. GFC would then issue a check made payable to whomever had submitted the invoice. Consequently, GFC always paid Player or an affiliated company for the equipment in question. Player also obtained five loans from Greycas for the purchase of equipment. Player would then either keep the equipment for use by one of his companies or lease the equipment to a third party.

During the Summer of 1984, Player and Michael Roussin also implemented a check kiting scheme which involved accounts at FI-Utah, FSB, and ZFNB. A check kite is the utilization of a demand deposit account to make payments to other banks through overdrafts or the use of checks that are drawn against uncollected or insufficient funds. According to GFC, such payments are, in effect, unsecured loans. GFC contends that the check kite operated by Player and Roussin provided the Player companies with cash to make timely, monthly payments to GFC in the absence of sufficient revenues from other sources.

The unraveling of the Player frauds began in the [*25] Spring of 1985 when GFC sought to conduct physical inspections of the equipment and machinery it thought was securing the various transactions. Player stalled GFC's efforts for some time, but as GFC continued to press for the inspections in the Summer of 1985, Player was finally forced to reveal the nature and extent of his fraudulent activities. Player admits that he defrauded GFC into entering into the equipment lease transactions and mislead GFC into believing that the equipment and subleases existed, and that the GFC funds

would be used towards equipment leases as intended by GFC. In virtually every case, the equipment did not exist. Rather, the sham transactions were designed to allow Player to obtain millions of dollars from GFC for use in his other business ventures.

It is undisputed that the various financial institution defendants, as well as defendants Gurr, Cameron, Christenson, Timpson, Newbold, and Hanson were aware that GFC was a major source of credit for Player and his companies. Proceeds from Player's transactions with GFC were often deposited at FI-Utah, FSB, and ZFNB. Moreover, Player often provided these banks and FSF with copies of GFC transaction documents [*26] to evidence his business relationship with GFC and to demonstrate the existence of a future source of income for his companies. Player defrauded GFC during much of the time that he maintained a banking relationship with FI-Utah, FSB, ZFNB, and FSF. Without exception, every former and present employee of the various financial institutions named as defendants in this action denies under oath having any knowledge that Player was defrauding GFC or that funds Player deposited or used to pay off loans from these institutions were the proceeds of these frauds. Portions of the above deposition testimony and affidavit statements are offered by the various defendants in support of their respective motions for summary judgment.

Besides the initiation of the underlying civil lawsuit, these fraudulent circumstances also resulted in four criminal convictions in the District Court for the District of Arizona. In March of 1986, Player entered into a plea of guilty before this court to two counts of interstate transportation of money taken by fraud, 18 U.S.C. § 2314, and one count of mail fraud, 18 U.S.C. § 1341. He was sentenced in December of 1988, and is presently serving his prison term. [*27] In June of 1988, following a mistrial on eleven counts of mail fraud, four counts of interstate transportation of money taken by fraud, and one count of conspiracy, 18 U.S.C. § 371, Player's former partner Willyard entered into a plea of guilty before another judge to two counts of mail fraud and one count of conspiracy to commit mail fraud. He too has been sentenced and is presenting incarcerated. In November of 1986, Roussin entered into a plea of guilty to two counts of wire fraud before this court and was subsequently sentenced to a term of probation. He has since relocated back to the Salt Lake City area with his wife Vicki. Finally, Hasan was convicted before another

judge of crimes related to his participation in the Player frauds against GFC. Specifically, Hasan was found guilty of one count of interstate transportation of money taken by fraud, and one count of perjury, 18 U.S.C. § 1623. He is presently serving his prison sentence as well.

C. The Litigation

GFC's original Complaint was filed on August 9, 1985. It asserted claims against twenty-seven defendants, including Player, various Player entities, Willyard, Michael and Vicki Roussin, Hasan, Diumenti, FI-Utah, [*28] and FSB. GFC's First Amended Complaint, filed three days later, added defendants ZFNB and FSF. One week later, GFC was granted leave to file its Second Amended Complaint. GFC also filed a Consent to Judgment by Player and certain Player entities. On September 19, 1985, the court granted GFC judgment against Player for $ 79,730,135 and for other relief. At the same time, Player also entered into a Cooperation Agreement with GFC and promised to assist GFC in the recovery of its losses associated with the Player frauds.

From the filing of the Second Amended Complaint until February of 1986, the court conducted a series of preliminary injunction hearings. During this period, several defendants stipulated to the entry of preliminary injunctions. The court also granted and denied a number of these preliminary injunctions at the time of the hearings. Early on in this litigation, the court was also confronted with a number of bankruptcy petitions pursued principally by Hasan. The court withdrew the references to the bankruptcy court and dismissed these petitions, pursuant to 11 U.S.C. § 305(a)(1), for a variety or reasons and in lieu of an Intercreditors' Agreement entered into [*29] by most of the parties. The Agreement attempted to resolve ownership problems related to the properties acquired by Player during the time he was perpetrating his fraudulent schemes on GFC.

GFC next sought leave to file the Third Amended Complaint adding Greycas as a plaintiff. The court rejected defendants' objections to this amendment and on February 11, 1987, GFC filed this slightly modified pleading as the Fourth Amended Complaint. Although FSB was dismissed from the Second Amended Complaint it was renamed as a defendant in the Third and Fourth Amended Complaints. Allred, Mabey, Lindsley, Gurr, Christenson, Cameron, Stoddard, ZMC, ZLC, Argus, Lockhart, Hanson, Timpson, and Newbold were also added as defendants in the Fourth Amended

Complaint.

The court previously noted that this amended pleading substantially altered the tenor and direction of the litigation. See Memorandum and Order of September 9, 1987, 8. In essence, a new lawsuit commenced almost a year and one-half after the filing of the original complaint. The principal architects of the Player Frauds are no longer defendants in this action, especially since Willyard entered into a Consent Judgment with GFC [*30] in December of 1988. Moreover, the various banking institutions, originally joined as stakeholder defendants, are alleged to be co-conspirators in, and direct beneficiaries of, the Player frauds.

Following the filing of the Fourth Amended Complaint, several defendants filed motions to dismiss/transfer and motions for summary judgment. After a lengthy briefing and hearing process, the court granted in part and denied in part the motions in its Memorandum and Order dated September 9, 1987. Although the court denied the motions to dismiss and motions for summary judgment, it did order the transfer of this matter to the District of Utah. It also ordered GFC to timely supplement its allegations concerning the Player RICO enterprise and mail/wire fraud. GFC filed its First Supplemental Pleading on September 23, 1987, and pursuant to further order of the court, also filed its Second Supplemental Pleading on February 12, 1988. Finally, the court dismissed the anti-tying claims, GFC's Sixteenth and Seventeenth Claims for Relief, against FSB and ZFNB.

Thus, GFC's current pleading in this litigation is a court-ordered, modified version of the Fourth Amended Complaint containing fourteen [*31] causes of action. These Claims for Relief are the subject of the pending motions for summary judgment. Overall, GFC's pleading seeks damages in excess of $ 79 million exclusive of interest, costs, and attorneys' fees. However, the court notes that GFC's Verified Amended General Damage Statement (docket # 4519) alleges total damages well in excess of this original amount. Damage discovery in this action remains to be concluded.

The court will briefly discuss the individual causes of action seriatim. GFC's First Claim for Relief is asserted against all defendants and alleges a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). GFC contends that the Player frauds were

perpetrated during the period from 1979 though August of 1985, and later in some instances. The frauds are generally broken down as follows: the June 1979, October 1980, March 1981, April 1982, September 1984, October 1984, and January 1985 Equipment Leasing Schemes; the Hotel Financing Scheme; the Check Kite and Money Laundering Schemes; the Shea Boulevard Scheme; the Bank Schemes to defraud in violation of public trust and fiduciary/statutory [*32] duties; and the Conspiracy to Commit Mail and Wire Fraud and Interstate Transportation and Receipt of Stolen Property.

The Equipment Leasing Schemes concern the fraudulent acquisition of loans from GFC for the purpose of purchasing and leasing machine tools and oil field equipment. This equipment was by and large never purchased by Player, or if it was purchased, it was sold and leased at substantially overinflated values. The Hotel Financing Scheme and Shea Boulevard Scheme are alleged to involve the fraudulent obtaining of GFC funds based on false representations of the value of the properties. The remaining Bank Schemes are directed at the financial institutions named as defendants in this action.

GFC's Second Claim for Relief alleges that all defendants took part in a conspiracy to commit mail fraud, wire fraud, and interstate transportation and receipt of stolen property in violation of § 1962(d) of the federal RICO statutes. This claim incorporates the various allegations of the First Claim for Relief and is based entirely on the schemes listed above.

The Third through Tenth Claims for Relief are premised on violations of § 1962(a) of the federal RICO statutes and are [*33] directed against the following defendants: Lindsley and Diumenti (Third); FSB (Fifth); FSF and Christenson (Sixth); ZFNB, ZLC, ZMC, Argus, Lockhart, Hanson, Timpson, and Newbold (Seventh); FI-Utah and Gurr (Eighth); Allred (Ninth); and Mabey (Tenth). Each of these claims for relief incorporates the preceding allegations of the complaint and further alleges that the named defendants received income from a pattern of racketeering activity and used or invested such income in the operation of one or more enterprises.

GFC's Eleventh Claim for Relief sounds in Utah and Arizona statutory racketeering law, *Utah Code Ann. § 76-10-1603* ("RICE") and *Ariz. Rev. Stat. §§ 13-2301D4* and 13-2312 ("AZRAC"), respectively. This state RICO claim is alleged against all defendants. It too incorporates

the preceding language of the Fourth Amended Complaint and further alleges that defendants committed violations of the state racketeering statutes "including theft, resale of realty with intent to defraud, schemes and artifices to defraud and conspiracy, solicitation, requesting, commanding, encouraging, or intentionally aiding another in the commission of the same." GFC's Fourth Amended Complaint, P253. [*34] Similarly, GFC's Twelfth Claim for Relief is directed against all defendants and sounds in common law fraud.

Finally, GFC's Thirteenth through Fifteenth Claims for Relief are directed against movants Diumenti, FSB, FSF, ZFNB, ZMC, Lockhart, Argus, FI-Utah, Christenson, Gurr, Allred, Mabey, Stoddard, Michael Roussin, Vicki Roussin, and Hasan. The Thirteenth Claim for Relief is based on the Uniform Fraudulent Conveyances Act. See *Utah Code Ann. §§ 25-1-1 to 25-1-16*; *Ariz. Rev. Stat. §§ 44-1001* to 1013. The Fourteenth Claim for Relief alleges that these defendants converted GFC's monies and properties and the Fifteenth Claim for Relief sounds in equity and seeks recovery under constructive trust and equitable lien theories.

Since the court's September 9, 1987 denial of defendants' motions to dismiss GFC's pleading in its entirety, the parties' discovery and motion practice has been governed by a series of scheduling orders set forth by the court. As all parties acknowledge, the parameters of the most recent phase of this litigation have been generous to all sides. The parties engaged in very extensive discovery concerning liability (concluded) and damages (yet to be concluded) [*35] issues. Player was deposed by the parties for seventy-three days and his deposition transcript totals 10,420 pages. In all, the parties have deposed 370 people, over seventy of whom are current employees of GFC. For the past two years the court conducted a monthly status conference in Salt Lake City, Utah, to hear and decide a wide range of motions filed by the parties. Over 300 motions and issues raised by the parties were decided by court at these monthly hearings, as well a specially set hearings in Phoenix, Arizona. Moreover, as detailed above, the parties have spent the better part of the past year briefing the pending motions for summary judgment allowed by the court's scheduling order.

In conclusion, the main allegation which runs throughout the statutory, common law, and equitable claims asserted in the Fourth Amended Complaint is that

defendants knew of Player's fraudulent activities and knowingly joined in them. While all defendants deny that they had any knowledge of the Player frauds, the court notes that several defendants concede that one could reasonably conclude from the state of GFC's evidence that many of the parties were in a position in which they could [*36] have discovered, or even should have discovered, the fraudulent nature of Player's operations. In fact, defendants would apply this same conclusion to the state of GFC's knowledge as well. These same defendants are quick to point out, however, that the possibility of specific knowledge is not the same as some proof of actual knowledge of the Player frauds. Thus, the central issue raised in the dispositive motions discussed below is whether there is sufficient evidence to reasonably infer that defendants did in fact know of the Player frauds and then consciously undertook to assist Player in perpetrating his schemes.

## IV. INITIAL QUESTIONS OF LAW

Several legal arguments raised by various defendants are best analyzed prior to the more fact-intensive, party-by-party approach adopted by the court in the final section concerning the motions for summary judgment. In a sense, many of these legal challenges to GFC's pleading are actually motions to dismiss the Fourth Amended Complaint for failure to state a particular cause of action. Of course, these same legal disputes also raise questions as to the sufficiency of GFC's evidence to support the pleading. As the majority of the [*37] dispositive motions raise, in one form or another, these same questions, judicial economy is best served by the court expressing its initial, legal conclusions on these key issues. Furthermore, because many defendants raise identical questions of law, the court will not generally attribute these positions to any particular defendant. Rather, the following analysis by the court will synthesize the parties' positions and apply the conclusions stated below to the specific facts raised in each defendants' motion for summary judgment.

### A. Choice of Federal Law (Ninth or Tenth Circuit)

This action was originally filed in the District of Arizona. Once GFC added new parties to the lawsuit, several defendants sought a transfer of this case to the District of Utah in the Tenth Circuit. The movants argued that venue was improper under the general venue statute, *28 U.S.C. § 1391*(b), and the specific RICO venue statute, *18 U.S.C. § 1965*(b). Movants also argued that pursuant to *28 U.S.C. § 1404*(a), the court should transfer the action to the District of Utah for the convenience of the parties and witnesses. The court granted the motion to transfer, in large part because it felt that [*38] a new lawsuit was begun with the filing of the Fourth Amended Complaint and the convenience of the parties required this result. Finally, the court also maintained jurisdiction over this action in the transferee district at the request of the Chief Judge for the District of Utah and by special appointment from the Chief Justice of the Supreme Court.

The issue presented to the court is whether Ninth or Tenth Circuit law controls the court's decisions regarding questions of federal law. GFC contends that the law of the transferor court prevails and relies upon the Supreme Court's decision in *Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)*. But the Court in Van Dusen held that, where defendants seek transfer, the transferee court must apply the state law of the transferor court. *Id. at 639, 84 S. Ct. at 821*. The court reasoned that the rights plaintiff enjoyed in the forum it selected should be preserved, and that the transfer should result in nothing more than a "change of courtrooms." *Id. at 636, 84 S. Ct. at 819*. Thus, the Court concluded that the state law of the transferor federal forum controls to prevent forum shopping [*39] by defendants and to preserve the principles of *Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938)*. See *Van Dusen, 376 U.S. at 637-38, 84 S. Ct. at 819-20*.

The Supreme Court has not directly addressed whether Van Dusen extends to conflicts of federal law between circuits. See *In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987)*, aff'd on other grounds sub nom., Chan v. Korean Air Lines, U.S. , S. Ct. , *104 L. Ed. 2d 1173 (1989)*. However, several courts have applied the Van Dusen approach to transfers involving federal law conflicts with little or no analysis. See, e.g., *In re Plumbing Fixtures, 342 F. Supp. 756, 758 (J.P.M.D.L. 1972)* ("It is clear that the substantive law of the transferor forum will apply after transfer); see generally Marcus, Conflicts Among Circuits and Transfers Within the Federal Judicial System, *93 Yale L.J. 677, 692 n.100 (1984)*(citing cases extending Van Dusen to federal conflicts of law).

Defendants contend that the law of the transferee court controls and rely upon the Court of Appeals for the District of Columbia's decision in *Korean Air Lines,*

[*40] *829 F.2d at 1172-73.* The court of appeals concluded that the transferee court in multidistrict litigation is obligated to apply its circuit's interpretation of federal law. See *id. at 1175* ("There is no room in the federal system of review for rote acceptance of the decision of a court outside the chain of direct review.") Defendants also contend that the Van Dusen holding should not be extended to questions of federal law in cases with federal question subject matter jurisdiction since the policy considerations present in diversity jurisdiction cases, as expressed in the Erie decision, are not present when a choice of federal law is at issue.

The court concludes that Tenth Circuit case law is controlling precedent on questions of federal common law. The court declines to apply the Van Dusen holding to litigation based on federal question subject matter jurisdiction. See *Satellite Financial Planning Corp. v. First National Bank of Wilmington, 633 F. Supp. 386, 393-94 (D. Del. 1986);* but see *In re Dow Co. Sarabond Products Liability Litigation, 666 F. Supp. 1466, 1468 (D. Colo. 1987),* aff'd in part, rev'd in part sub nom., *Chase v. Dow Chemical Co.,* [*41] *875 F.2d 278 (10th Cir. 1989).* The court also adopts as persuasive authority the Court of Appeals for the District of Columbia's holding in *Korean Airlines, 829 F.2d at 1175.*

The also court reaches this conclusion after considering the practical ramifications of GFC's position. The procedural background of this litigation is highly unusual in that the intra-circuit transfer of this case also resulted in the transfer of this court. The transferee court became the transferor court. This oddity serves to highlight the difficulties this court and any subsequent appellate court would have if GFC's position were adopted. No one disputes that the Court of Appeals for the Tenth Circuit would have jurisdiction over any subsequent appeal of this litigation. It would be an unworkable approach to expect the Court of Appeals for the Tenth Circuit to apply as controlling precedent the Ninth Circuit Court of Appeals' interpretation of federal law. The trial court will therefore not attempt to do so now.

B. General Elements of GFC's RICO Claims

RICO provides plaintiffs with a private action to recover treble damages for injury "by reason of a violation of section 1962." *18 U.S.C.* [*42] *§ 1964*(c). The civil RICO claims at issue here are based on alleged violations of §§ 1962(a), (c), and (d). The specific,

requisite elements for each of these statutory causes of action are detailed below in the court's analysis of GFC's three separate RICO claims. What immediately follows is a discussion of the general elements of a RICO claim, as acknowledged by all sides: knowledge, intent, and causation.

1. Knowledge/Intent

Proof of knowledge is an essential element of any RICO claim. See *United States v. Weisman, 624 F.2d 1118, 1123-24* (2d Cir.)(only willful conduct is punishable under RICO), cert. denied, *449 U.S. 871 (1980); Dan River, Inc. v. Ichan, 701 F.2d 278, 291 (4th Cir. 1983)* (criminal intent is necessary under RICO). This is so because the underlying predicate acts required to bring a § 1962(c) claim are criminal acts themselves, thus presupposing the requisite criminal mens rea. Furthermore, as will be discussed in greater detail below, GFC's RICO conspiracy claim under § 1962(d), like any conspiracy claim, requires knowing participation in the conspiracy. See *United States v. Markopoulos, 848 F.2d 1036, 1040 (10th Cir. 1988);* United [*43] *States v. McMahon, 562 F.2d 1192, 1196 (10th Cir. 1977).*

In the present litigation, GFC alleges defendants committed the predicate crimes of wire fraud, mail fraud, and transportation and receipt of stolen property. A successful claim of mail fraud requires proof of (1) a scheme or artifice to defraud; (2) the use of the United States mails in furtherance thereof; and (3) defendant's specific intent to deceive or defraud. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1469 (9th Cir. 1987); United States v. Washita Construction Co., 789 F.2d 809, 814 (10th Cir. 1986).* Similarly, a wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires in furtherance thereof; and (3) specific intent to deceive or defraud. *United States v. Louderman, 576 F.2d 1383, 1387-88 & n.3 (9th Cir.),* cert. denied, *439 U.S. 896, 99 S. Ct. 257, 58 L. Ed. 2d 243 (1978); United States v. O'Malley, 535 F.2d 589, 592 (10th Cir.),* cert. denied, *429 U.S. 960, 97 S. Ct. 383, 50 L. Ed. 2d 326 (1976).* The requirement of specific intent under these statutes may be established by [*44] 'the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *United States v. Green, 745 F.2d 1205, 1207* (9th Cir.)(quoting *United States v.*

*Bohonus, 628 F.2d 1167, 1172* (9th Cir.), cert. denied, *447 U.S. 928, 100 S. Ct. 3026, 65 L. Ed. 2d 1122 (1980)),* cert. denied, *474 U.S. 259, 106 S. Ct. 259, 88 L. Ed. 2d 266 (1985).* Under the mail and wire fraud statutes, it is not necessary to establish that the scheme was successful or that the intended victim suffered a loss or that defendants secured a gain. *O'Malley, 535 F.2d at 592.* Finally, as to the predicate acts of transportation and receipt of stolen property, to succeed on such a claim, it must be shown that defendants had knowledge that the goods were actually stolen. *United States v. Forest, 620 F.2d 446, 450 (5th Cir. 1980).*

Defendants raise a number of legal arguments related to the state of their knowledge of Player's fraudulent dealings with GFC as well as their specific intent to assist Player. First, defendants argue that under an aiding and abetting theory of RICO liability, [*45] GFC must demonstrate a high degree of specific criminal intent if alleged "inaction" by defendants is the premise for GFC's theory of secondary liability. Second, defendants also argue that evidence of regulatory violations cannot establish their knowing participation in the Player frauds. Third, defendants question the applicability of vicarious liability in a RICO action under the doctrine of respondeat superior. The court will consider each of these arguments in turn.

(a) Aiding and Abetting Liability and Alleged Inaction by Defendants

GFC's § 1962(c) Claim for Relief alleges defendants' liability on both primary and secondary bases. For example, GFC alleges that defendants associated with and participated in the affairs of an enterprise though a pattern of racketeering. See GFC's Fourth Amended Complaint, PP37-38. The court presumes these allegations against the named defendants are intended by GFC to assert primary liability against culpable "persons" under section 1962(c). Under this same Claim for Relief, however, GFC also alleges that each defendant is liable as an "aider and abettor" of violations of *18 U.S.C. §§ 1962*(c) and 2. See id., P38. GFC [*46] supports these allegations in its various responsive memoranda by interchangeably arguing both theories of liability. See, e.g., GFC's Response to FSB's Motion for Summary Judgment, 14. The court will thus focus its analysis on the standards governing this theory of secondary liability since failure on the part of GFC to prove secondary liability must logically preclude a finding of liability as a principal.

As the court in *United States v. Cook, 745 F.2d 1311, 1315 (10th Cir. 1984),* cert. denied, *469 U.S. 1220, 105 S. Ct. 1205, 84 L. Ed. 2d 347 (1985),* noted, *18 U.S.C. § 2* merely abolished the common law distinction between principal and accessory and does not itself create an independent crime. However, to be found culpable as an aider and abettor, one must share in the intent to commit the offense, as well as participate in some manner to assist its commission. *United States v. Smith, 838 F.2d 436, 441 (10th Cir. 1988)* (citing *United States v. Fischel, 686 F.2d 1082, 1087 (5th Cir. 1982)).* This does not mean that a defendant must commit all elements of the underlying offense, but only that he aided and abetted as to each element. Id.

Although some [*47] defendants contend that aiding and abetting liability is not appropriate in the civil RICO context, see, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, n.6, the parties for the most part focus on the applicable standards taken from analogous securities fraud cases. Moreover, the court notes that courts have in fact applied aiding and abetting theory to RICO liability. For example, the court in Armco Industrial Credit Corp. v. SLT Warehouse Co. held that "[t]o establish that [defendant] violated the mail fraud statute as an aider and abetter [sic], [plaintiff] must have proved that [defendant] was associated with the mailing of the bogus invoices, participated in it as something that he wished to bring about, and sought by his actions to make it succeed." *782 F.2d 475, 485 (5th Cir. 1986)* (citing *Nye & Nissen v. United States, 336 U.S. 613, 620, 29 S. Ct. 766, 770, 93 L. Ed. 2d 919 (1949));* see *Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356 (3d Cir. 1987)* ("if all of RICO's other requirements are met, an aider and abettor of two predicate acts can be civilly liable under RICO'); see also *Andreo v. Friedlander, Gaines, Cohen,* [*48] *Rosenthal & Rosenberg, 660 F. Supp. 1362, 1371 (D. Conn. 1987);* Laterza v. American Broadcasting Co., 581 Supp. 408, 412 (S.D.N.Y. 1984).

Thus, both sides cite a number of decisions which confronted aiding and abetting liability in the federal securities law field. See, e.g., *Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985),* cert. denied, *474 U.S. 1057, 106 S. Ct. 798, 88 L. Ed. 2d 774 (1986); Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 800 (3d Cir. 1978),* cert. denied, *439 U.S. 930, 99 S. Ct. 318,*

*58 L. Ed. 2d 323 (1979).* For example, in *Hamsen v. Smith, 693 F.2d 932 (9th Cir. 1982),* cert. denied, *464 U.S. 822, 104 S. Ct. 89, 78 L. Ed. 2d 97 (1983),* the court listed the following essential elements of an aiding and abetting claim in the securities fraud context as: "(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong." *693 F.2d at 943.* Because the parties focus on cases in the securities fraud field, and because the court finds merit in this analogous area of the law, the court [*49] concludes that this three prong test is applicable in the instant RICO context as well.

The first factor is obviously not the subject of the present motions -- all concede for the purposes of the pending motions that Player's frauds on GFC serve as an independent primary wrong. Although the second and third factors are themselves the subject of much dispute, and thus might warrant separate treatment, the court will discuss the parties' positions on knowledge and substantial assistance together. The reason for this is that case law discussing these elements demonstrates the interrelation between them. As the court in Metge pointed out, knowledge and substantial assistance are not to be considered in isolation since "the two factors vary inversely relative to one another." *762 F.2d at 624.* See *Stokes v. Lokken, 644 F.2d 779, 784 (8th Cir. 1981)* ("where there is a minimal showing of substantial assistance, a greater showing of scienter is required"); see also *Woodward v. Metro Bank of Dallas, 552 F.2d 84, 95 (5th Cir. 1975).*

However, as the court in Monsen noted, it is appropriate to begin with the alleged aider and abettor's state of mind or intent since "[c]ulpability [*50] of some sort is necessary to justify punishment of a secondary actor and mere unknowing participation in another's violation is an improper predicate to liability." *579 F.2d at 799* (citing Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, In Pari Delicto, Indemnification, and Contribution, *120 U. Pa. L.Rev. 597, 638 (1972));* see *United States v. Smith, 838 F.2d 436, 441 (10th Cir. 1988)* ("[t]o aid and abet one must share in the intent to commit the offense"); *Schneberger v. Wheeler, 859 F.2d 1477, 1480 (11th Cir. 1988)* ("knowledge of both the fraudulent scheme and one's own role in that scheme is required to satisfy the test for aider and abettor liability.") (citing *Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir.*

*1985)).*

The factual question of whether GFC has proffered sufficient evidence to demonstrate this requisite knowledge and intent will be addressed below in the individual defendants' motions for summary judgment. Furthermore, although the substantial assistance element will be briefly addressed below in the context of defendants' alleged inaction, the court notes that since the substantial assistance [*51] requirement is really a causation concept, see *Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 163-64 (3d Cir. 1973),* cert. denied, *416 U.S. 960, 94 S. Ct. 1979, 40 L. Ed. 312 (1974),* this element will also be discussed below in the portion of this memorandum and order concerning defendants' proximate causation arguments.

The court must, however, resolve the remaining legal question that arises when the substantial assistance alleged to have taken place by defendants actions consists not of affirmative misrepresentations but of "negative acquiescence" or inaction. Defendants contend that their inaction cannot as a matter of law be construed as substantial assistance of the Player frauds since they had no duty to disclose anything to GFC. See, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 88-89. They also contend that even if the court does not require some special duty owed to GFC, a higher level of knowledge or specific intent is nonetheless required before secondary liability may be imposed. The court finds no support from the cases cited by defendants for the first proposition and rejects it summarily. Although the Metge decision [*52] did state that "if the aider and abettor owes the plaintiff an independent duty to act to disclose, inaction can be a proper basis for liability under the substantial assistance test," *762 F.2d at 625* (citing *Clearly v. Perfectune, 700 F.2d 774, 777 (1st Cir. 1983)),* this holding does not foreclose aider and abettor liability absent a special duty. But see *United States v. Grey Bear, 828 F.2d 1286, 12293 (8th Cir. 1987)* (a successful criminal prosecution for "[a]iding and abetting, therefore, requires conduct of an affirmative nature; mere negative acquiescence in a crime is insufficient.") (citing *Johnson v. United States, 195 F.2d 673, 675 (8th Cir. 1952)).*

The court finds more merit in defendants' alternative argument that a higher level of knowledge and intent is required for aider and abettor liability premised upon alleged inaction. As the Metge court concluded, "in the absence of a duty to disclose, an aider-abettor case

predicated on inaction of the secondary party must meet a high standard of intent." *762 F.2d at 625.* This is the logical consequence of viewing the two elements as inversely related. To the extent that an aider and abettor's "actions" are [*53] inactions, it is necessary for GFC to demonstrate that the aider and abettor specifically intended this result. See *Monsen, 579 F.2d at 800* (inaction "may provide a predicate for liability where the plaintiff demonstrates that the aider and abettor consciously intended to assist in the perpetration of the wrongful act") (citing *Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 780 (3d Cir. 1976)); Metge, 762 F.2d at 625.* However, as the Metge court also noted, this requisite intent and knowledge may be shown by circumstantial evidence. Id. The court will discuss this evidence below in its later analysis of the individual defendants' motions for summary judgment.

(b) Regulatory Violations

GFC argues that the financial institution defendants violated federal banking regulations and their own internal policies when they failed to report to various government officials suspected check kiting and large currency transactions by Player. See, e.g., GFC's Response to FSB's Motion for Summary Judgment, 34. Specifically, GFC argues that various bank personnel failed to report kiting activity in Player's accounts pursuant to Office of the Comptroller [*54] of the Currency ("OCC") Interpretive Ruling § 7.5225, and by failing to file currency transaction reports pursuant to 31 C.F.R. § 301.22. Defendants spend a great deal of energy attacking the legal premise and factual bases for these claims. The court will attempt to simplify this matter by breaking GFC's arguments into primary and secondary grounds.

GFC first contends that these alleged regulatory violations are themselves predicate acts of racketeering activity. See, e.g., GFC's Response to FI-Utah's Motion for Summary Judgment, 117 ("FI-Utah's reporting schemes, involving as they do activity which itself is criminal, are clearly prosecutable mail and wire frauds."). The court assumes that GFC is relying upon that portion of its pleading alleging "The Bank Schemes to Defraud in Violation of Public Trust and Fiduciary and Statutory Duties." GFC's Fourth Amended Complaint, P,P177-79. Specifically, GFC alleges as follows:

In addition to constituting frauds upon GLFC, the actions of defendants First Security Bank, Zions Bank and First Interstate Bank constitute frauds in breach of their public trust and fiduciary and statutory duties as national banking associations. These [*55] banks had a duty not to stay silent or to continue to provide banking facilities in the face of knowledge that some of their customers were engaging in check-kiting and money laundering, submitting false financial statements and applications for credit and defrauding third parties, much less aid and abet such conduct and associate with such an enterprise for their own pecuniary advantage.

Id., P177.

Defendants vigorously dispute that these alleged regulatory violations fall within the predicate criminal acts specifically enumerated at *18 U.S.C. P1961*(1). See, e.g., FSB's Reply in Support of Motion for Summary Judgment, 38 ("even if FSB had consciously and repeatedly violated these requirements (which it did not), that would not constitute a pattern of racketeering activity on its part"). However, this argument misses the point and to the extent it may be construed as a motion to dismiss PP177-79 of GFC's pleading for failure to state a claim, it must be denied. The underlying predicate acts at issue in the "Bank Schemes" are mail fraud (P178) and wire fraud (P179). The court sees no legal reason why this particular scheme cannot entail the named defendants' alleged [*56] active participation in Player's check kiting activities and large currency transactions -- assuming use of the United States' mails and wire services is not at issue. See *Moreno v. Story, 694 F. Supp. 1557, 1558 (S.D. Fla. 1988)* (alleged failure to report currency transactions to Internal Revenue Service is "an intangible property loss . . . sufficient to support the 'deprivation of property or money' requirement in mail fraud cases") (citing Carpenter v. United States, U.S. , *108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)).* However, as previously discussed by the court, and as the very language of GFC's pleading indicates, these predicate acts still require defendants' actual knowledge of the Player frauds and specific intent to assist the frauds against GFC. In other words, this begs the issue of proving defendants' fraudulent intent.

Thus, the court construes GFC's secondary position to be that these regulatory violations are offered to rebut the financial institution defendants' position that no evidence exists supporting their actual knowledge of the Player frauds. As GFC phrases the issue, "[t]hese deliberate concealments to third parties in the face of

duties that required [*57] [the financial institution defendants] to speak are evidence of [their] intentional and knowing participation in Player's independent schemes." GFC's Response to FI-Utah's Motion for Summary Judgment, 123. Since these same defendants are the ones who have raised the issue of their lack of knowledge, the court sees nothing wrong with GFC's proffer of evidence on this point.

The real issue, however, is whether these alleged regulatory violations, standing alone are sufficient to establish a genuine issue of material fact on the issue of the financial institution defendants' knowledge of the Player frauds. Put another way, and as detailed below in the court's discussion of the applicable standards of review governing the pending dispositive motions, the court must determine whether a reasonable trier of fact could infer actual knowledge and specific intent solely from evidence of regulatory violations. The court concludes as a matter of law that this inferential leap is neither reasonable nor permissible absent other evidence demonstrating actual knowledge.

First, as defendants correctly point out, the bank regulations in question require banks to submit reports to government officials, [*58] not to other third-party financial institutions. See 31 C.F.R. § 103.47-103.49. As defendants also point out, violations of these banking regulations may occur whether the violator did so intentionally or negligently. Therefore, failure to comply with these regulatory requirements cannot in itself support a reasonable inference of specific criminal intent on the part of the financial institution defendants.

The court also reaches this conclusion after carefully distinguishing the various levels of legal culpability and corresponding evidence. Perhaps it is no more than a semantic difference, but rather than seeing GFC's evidence in terms of different categories or "boxes," see ZFNB's Reply in Support of Motion for Summary Judgment, 3, the court prefers to view GFC's arguments in terms of a pyramid of theories of liability and supporting evidence. The first and broadest tier is that of liability premised upon a negligence theory. Evidence of regulatory violations would surely be relevant to the trier of fact's determination as to whether the financial institution defendants breached some duty of care presumably owed to GFC. The intermediate level would be something [*59] akin to a recklessness, willfulness, or gross negligence theory. Again, this type of evidence

might very well support a reasonable inference that these defendants did not act prudently or were in some manner willful or wanton. However, the top of this pyramid -- requiring as it does specific criminal intent to violate RICO -- demonstrates that differences in degree eventually create differences in kind. In this instance, evidence of regulatory failures standing alone cannot support a reasonable inference of actual knowledge and specific criminal intent. See *United States v. Piepgrass, 425 F.2d 194, 199-200 (9th Cir. 1070)* (in criminal fraud context, "relationship between what [defendant] could have known and a specific intent has no rational basis"); see also *Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987)* ("reasonable inferences themselves must be more than speculation and conjecture"). Simply put, GFC is not asserting a negligence or securities fraud (recklessness) claim against defendants and RICO liability is premised upon much more than regulatory violations.

Since evidence of alleged regulatory violations is not in itself sufficient to [*60] establish defendant's specific intent to participate in the Player frauds, the court will assume for the purposes of the pending dispositive motions that this evidence is uncontroverted. The court will therefore focus its analysis below on other evidence offered by GFC in opposition to the motions for summary judgment. To the extent that GFC is unable to offer evidence of defendants' knowing and intentional participation in the Player frauds other than the alleged regulatory violations, then the court must grant these defendants' motions. As a final point, the court notes that this issue also arises in relation to several defendants' motions to strike various portions of the affidavit of William B. Watkins, GFC's banking expert. The parties are referred to the court's later discussion of these motions as well.

(c) Vicarious Liability

Although the separate, legal issue of the applicability of RICO liability premised upon the doctrine of respondeat superior might warrant attention from the court apart from the issue of defendants' knowledge/intent, the court will discuss this issue at this portion of the order and memorandum. This is appropriate since GFC would utilize [*61] this doctrine to either impute the knowledge of an employee to a defendant or, in essence, abolish the requirement as it pertains to the financial institution defendants. Thus, the

applicability of this common law doctrine to the instant RICO suit falls squarely within the court's analysis of the parties' requisite knowledge/intent.

This issue is raised by the financial institution defendants since GFC would hold them liable under its RICO claims for the acts of their employees/officers/agents. What is interesting to the court is that these defendants argue different legal theories as to the applicability of the doctrine of respondeat superior to this civil racketeering lawsuit. Some contrast common law standards with a higher level of scienter for a RICO claim. See, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 130-36. Others contend that the very concept of respondeat superior liability is antithetical to the requirements of actual knowledge and specific intent under RICO. See, e.g., ZFNB's Reply in Support of Motion for Summary Judgment, 106-08.

The court assumes two central facts for the purpose of this legal analysis. First, that [*62] GFC is unable to establish any facts -- taken from the depositions of the banks' officers and directors and the documents generated by these same bank personnel -- supporting a reasonable inference of actual knowledge on the part of a financial institution defendant. Second, the court assumes that GFC is able to establish a genuine issue of material fact concerning the knowledge and involvement of a particular employee, who is also a named defendant in this litigation. Under these circumstances, the court concludes as a matter or law that the doctrine of respondeat superior is unavailable to hold the financial institution defendants liable under RICO.

It is undisputed by the parties that the premise of respondeat superior is that one who is without fault may be held vicariously liable for the wrongdoing of another. See W. Prosser, Law of Torts 458 (4th ed. 1971). The rationale for this extension of liability is that "it would be unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment and the frailties of those working under his direction and for his benefit." Restatement [*63] (Second) of Agency § 219 comment a (1958). Using this common law standard, some of the parties would have the court apply the following two-pronged analysis and determine whether the employee's acts were (1) within the scope of employment, and (2) done with the intent to benefit the

principal or corporation. See FI-Utah's Reply in Support of Motion for Summary Judgment, 130; see, e.g.,, *United States v. Cincotta, 689 F.2d 238, 240-41* (1st Cir.), cert. denied, *459 U.S. 991, 103 S. Ct. 347, 74 L. Ed. 2d 387 (1982).* These same parties would also have the court focus on the requisite "intent to benefit" and require a showing of criminal mens rea. See FI-Utah's Reply in Support of Motion for Summary Judgment, 131.

This position is similar to the arguments presented to the Court of Appeals for the First Circuit in Schofield v. First Commodity Corporation of Boston:

Appellant apparently concedes that a wholesale adoption of the respondeat superior concept would conflict with the primary thrust of section 1962(c). In order to conform to Congress' obvious desire to insulate legitimate business from liability, she suggests that we could adopt a modified version [*64] of vicarious liability, perhaps requiring some level of scienter before imposing liability. For example, respondeat superior could be limited to acts of high corporate officials, whose actions may be deemed corporate policy, and thus would reflect corporate intent.

*793 F.2d 28, 33 (1st Cir. 1986);* see also *Dakis v. Chapman, 574 F. Supp. 757, 760 (N.D. Cal. 1983)* (rejecting "quantum leap" from securities violation to RICO offense where defendant/agent was a "low-level corporate executive acting without corporate sanction"); *Parnes v. Heinhold Commodities, 548 F. Supp. 20, 23-24 (N.D. Ill. 1982)* (concluding that plaintiffs failed "to reshape a conventional (alleged) fraud, perpetrated by lower-level corporate executives acting without corporate sanction (albeit conducting themselves within the scope of their authority for common law purposes) into a Section 1962(c) violation by the corporation").

However, the court concurs with the court of appeals in Schofield that the "flaw in this approach is that it is no more than a recasting of the argument for direct liability." Schofield, 793 at 33. Similarly, much of the confusion generated from the parties' [*65] arguments on the subject of respondeat superior arises when the distinction between direct and vicarious liability is blurred. For example, when GFC argues that the acts of Gurr, and his alleged knowledge of the Player frauds, are to be imputed to FI-Utah, the court sees this as an attempt to establish either vicarious or direct liability under RICO. Under the less stringent standards associated with the doctrine of

respondeat superior, the trier of fact might conclude that this employee was working within the scope of his employment, and also to benefit the bank (and possibly himself). However, in seeking to establish corporate knowledge and intent, any knowledge from this lower level employee, albeit an officer of the bank, may not automatically be imputed to the financial institution defendant. Cf. W. LaFave & A. Scott, Handbook on Criminal Law, § 3.10 (2d ed. 1986) ("the brain of the corporation" for purposes of establishing criminal mens rea, "consists only of those directors who supervise and manage the corporation"). As all parties acknowledge, a corporation may be a liable "person" under RICO, but this entity can only act, and hence sustain liability, [*66] through the actions of its agents, employees, officers, and directors. See *American Medical Association v. United States, 130 F.2d 233, 253 (D.C. Cir. 1942)* (a corporation has can act only through its agents, but has an identity and possible liabilities separate from those agents).

Furthermore, the court notes that most of the case law discussing the applicability of respondeat superior to RICO focuses upon the distinction between "persons" and "enterprises" under the RICO statutory scheme -- the subject of detailed discussion by the court below -- and on the congressional intent behind the racketeering activities prohibited by § 1962(c). The facts in this case are therefore unique to much of this case law: the principals/corporations in the instant litigation are specifically named as defendants or "persons" and not as the RICO "enterprise." In these other civil lawsuits, the principal/corporation was often named as the "enterprise" and the courts therefore attempted to distinguish between "aggressor" and "conduit" enterprises. See *Garbade v. Great Divide Mining & Milling Corp., 831 F.2d 212, 213 (10th Cir. 1987)* ("Section 1962(c) makes it unlawful for a 'person' [*67] to enter the activities of an 'enterprise' using racketeering activities. References are to 'employed by' and 'associated with.' The section does not relate to corporate or enterprise liability.") (citing *Schofield, 793 F.2d 28); Haroco v. American National Bank & Trust Co., 747 F.2d 384, 401 (7th Cir. 1984)* ("it would make little sense to hold a corporation liable under RICO for the misconduct of lower level employees, at least where it appears that the corporation is a passive instrument or even a victim of the racketeering activity"), aff'd, *473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985); Gruber v. Prudential-Bache Securities, Inc. 679 F. Supp. 165, 181 (D. Conn. 1987)* (holding that "a corporation may be found vicariously liable under

Section 1962(c) only where the corporation may fairly be said to be a 'central figure' (or 'aggressor') in the alleged scheme"); *Dakis, 574 F. Supp. at 760* ("it would be an anomalous result if, because [defendant] had misused his authority to trade the accounts, and had actually violated internal guidelines of the firms by so doing, the firms were nonetheless deemed 'aggressor' enterprises liable under RICO"); see generally [*68] Note, Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Corporate Liability, *65 B.U.L. Rev. 561 (1985)*.

Other courts have also interpreted the RICO statutory scheme to rule out vicarious liability in civil lawsuits. As noted above, the First Circuit Court of Appeals in Schofield rejected the application of the doctrine of respondeat superior. In doing so, the court of appeals concluded that

the concept of vicarious liability is directly at odds with the Congressional intent behind § 1962(c). Both the language of that subsection and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal "person" or "persons." Indeed, there is unlikely to be a situation, in the absence of an express statement, in which Congress more clearly indicates that respondeat superior is contrary to its intent.

*793 F.2d at 32.* But see *Bernstein v. IDT Corp., 582 F. Supp. 1079, 1083 (D. Del. 1984)* ("I perceive nothing in RICO or its legislative history which would suggest that the normal rules of agency law should not apply to civil liability created by that statute."). The [*69] Court of Appeals for the Eighth Circuit, citing the Schofield decision, also concluded that § 1962(c) was intended to foreclose vicarious liability, particularly where the principal is a victim of the agent's activities. *Luthi v. Tonka Corp., 815 F.2d 1229, 1230 (8th Cir. 1987).*

Thus, the courts of other circuits appear to have adopted this prohibition on the application of respondeat superior to RICO cases for reasons not directly analogous to the instant litigation. GFC named the various financial institutions as defendants, not the RICO enterprise. The court assumes GFC intends to establish these defendants' direct liability under RICO. It is only in the context of whether the principals/defendants can be held liable for the acts of the agents/defendants that the applicability of vicarious liability arises. However, this distinction does

not render the above authority useless. In fact, the court finds this case law helpful in reaching a similar conclusion in the instant lawsuit.

As many of these same courts noted, because there is no general, federal common law, *Erie R.R., 304 U.S. at 78, 58 S. Ct. at 822,* before common law doctrines may be applied to federal [*70] statutes, the court must first determine whether such an application would advance the goals of the federal statute. *American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556, 570, 102 S. Ct. 1935, 1944-45, 72 L. Ed. 2d 330 (1982)* (applying doctrine of "apparent authority" to anti-trust statutory scheme). As the opinions distinguishing "aggressor" enterprises from "victim" enterprises point out, RICO was designed to attack the person actually liable, the "violator" of RICO's statutory scheme. In a lawsuit factually apposite to the instant matter, the district court in Village of Fox Lake v. Waste Management of Illinois, Inc., No. 86- *C-4888 (N.D. Ill. March 2, 1987) (1987 WL 7494),* concluded that although "in this case Plaintiff alleges that the corporation in question is itself a liable 'person,' we do not think this changes the analysis as to whether that corporation can be held vicariously liable for acts of an employee -- in this case, another alleged liable 'person.'" Id. at 5. As the district court in Village of Fox Lane reasoned, liability is directed at the violator of the statutory scheme, and the "violator is the 'person' that has engaged [*71] in the unlawful conduct." Id. at 4. The court concurs that adopting the doctrine of respondeat superior to a civil RICO lawsuit would disrupt the explicit statutory scheme of § 1962(c). Moreover, the court also declines to impute the requisite specific, criminal intent from one defendant to another absent facts independently supporting such an inference as to each defendant. See O'Brien v. Dean Witter Reynolds, Inc., [1984 Transfer Binder]*Fed. Sec. L. Rep. (CCH) P91,509, at 98,562* (D. Ariz. March 26, 1984) (refusing to impute knowledge of one RICO defendant to another defendant via doctrine of respondeat superior).

Therefore, to the extent that GFC is unable to offer any evidence of defendants' knowledge of, and participation in, the Player frauds other than the acts of its employees -- other than its controlling officers and directors -- then the court must grant these defendants' motions for summary judgment. Thus, as an example only, the court may not deny FI-Utah's dispositive motion simply because it concludes that Gurr's motion is without merit. The court must still analyze GFC's evidence of corporate knowledge and actions pertaining to the Player [*72] frauds.

2. Causation

RICO liability is also predicated upon a finding that the victim was injured "by reason of" the alleged racketeering activity. Thus, under § 1962(c) and RICO's civil enforcement provision, *18 U.S.C. § 1964*(c), GFC is required to prove that there is a causal nexus between its injury and the predicate acts of racketeering allegedly committed by defendants. As the Supreme Court stressed in *Sedima, S.P.R.L. v. Imrex, 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985),* civil enforcement of RICO begins with the causal link between a defendant's racketeering activity and a plaintiff's injury:

[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated, "[a] defendant who violates § 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." . . . [T]he compensable injury necessarily is the harmed caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission [*73] of those acts in connection with the conduct of an enterprise. . . . Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Id. at 496-97, 105 S. Ct. at 3285* (citations omitted).

Furthermore, it is undisputed by the parties that RICO liability is predicated upon a finding of both factual and legal causation. See, e.g., *Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 744 (5th Cir. 1989)* ("person will be considered injured 'by reason of' a RICO violation if the predicate acts constitute (1) factual (but for) causation and (2) legal (proximate) causation of the alleged injury"). It is the latter issue which the parties focus upon since the court, similar to the court in *Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988),* decides this issue after assuming for the purposes of these pending motions that a RICO pattern (tantamount in this instance to factual causation) has sufficiently been alleged and proven. This is appropriate since while factual causation is ordinarily a question for the trier of fact, "the legal cause determination is properly one of law for the court, [*74] taking into consideration

such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Id. at 1189* (citing Restatement (Second) of Torts § 548A comments a & b (1977).

Looking to general tort liability principles, the Brandenburg decision articulates the proximate cause requirement for a RICO case as: "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Id. (quoting W. Prosser & G. Keeton, Torts § 42 at 272 (5th ed. 1984)). In an effort to further utilize general tort principles, several defendants direct the court's attention to the Restatement's qualification that "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts at § 548A. Moreover, the comment to this particular section states that:

Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused [*75] by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in light of its tendency to cause those losses and the likelihood that they might follow.

In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether.

Id. at comment b.

The court notes that defendants essentially put forth two arguments as to why GFC cannot demonstrate that defendants proximately caused GFC's injuries. First, they focus upon the their own alleged actions and argue either that no evidence exists to support GFC's allegations or that the alleged misrepresentations were not justifiably relied upon by GFC and thus could not have proximately caused the injuries. Second, they contend that GFC's own actions were the proximate cause for the Player frauds and any subsequent injuries. As Gurr succinctly phrases the issue, "[t]here are two principal legal causes of Greyhound's losses: Player's artful manipulations and Greyhound's artless (and even reckless) business decisions." Gurr's Reply in Support of Motion for Summary Judgment, 26. The court will discuss these [*76] two arguments seriatim.

(a) Player/Defendants' Actions

Defendants contend that their actions, as alleged in GFC's Fourth Amended Complaint, cannot be the legal cause of GFC's injuries sustained from the Player frauds. GFC puts forth two arguments to establish that defendants proximately caused GFC's losses: (1) defendants' direct misrepresentations and other fraudulent actions dictate defendants' legal responsibility for the Player frauds; and (2) defendants' actions aiding and abetting Player also suffice to legally cause GFC's injury.

Because the first argument assumes a sufficient showing of defendants' direct action/liability, this argument must await the court's analysis of the individual defendants' motions for summary judgment. It is also uncontested that a factual finding of direct actions, such as fraudulent misrepresentations, would mandate a finding that defendants proximately caused GFC's injuries. However, some defendants contend that even assuming (1) fraudulent behavior (misrepresentations) on the part of certain financial institution defendants' employees and (2) GFC's reliance upon this false information, defendants still did not proximately cause GFC's [*77] injuries because other events intervened. Specifically, FI-Utah suggests that

Player's creation of the phony $ 40 million purchase order from NL Industries, on which he was not assisted by any FI-Utah employee, clearly intervened between the credit references on the RRI loan and the later decisions by Greyhound to purchase $ 66 million in nonexistent equipment. Other intervening events of which FI-Utah had no role in creating included the changes in the tax laws, which prompted Greyhound to reinstitute its funding of equipment lease transactions, and the fact that Greyhound executives elected not to contact the proposed sublessees under the later (and much larger) transactions involving NL and Baker.

FI-Utah's Reply in Support of Motion for Summary Judgment, 102-03 (citations to statement of facts omitted). However, the court cannot conclude as a matter of law that any of these "intervening events" prevent a finding of proximate causation. Assuming intentional, fraudulent conduct on the part of defendants, the court clearly cannot find that this is "too speculative" to support a finding of proximate causation. See *Community Bank v. Bank of Hallandale & Trust Co., 482* [*78] *F.2d 1124 (5th Cir. 1973).*

GFC's second argument premises legal responsibility upon aiding and abetting liability. This is not surprising since it is undisputed by the parties that the substantial assistance element discussed earlier by the court in relation to aiding and abetting liability can also be seen as a causation concept. See *Metge, 762 F.2d at 624* ("[plaintiff] had the burden of showing that the secondary party proximately caused the violation"); *Edwards & Hanly v. Wells Fargo Securities, 602 F.2d 478, 484 (2d Cir. 1979)* (but for -- factual -- causation is insufficient for aiding and abetting liability); *Woodward, 522 F.2d at 95* ("remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud"). Thus, as the court concluded above, if GFC's sole evidence of defendants' substantial assistance of the Player frauds concerns alleged inaction on the part of defendants, then GFC must also demonstrate that defendants had actual knowledge of the underlying fraud and intent to aid and abet a wrongful act. See *Woodward, 522 F.2d at 97* (requiring "high conscious-intent" under these circumstances).

A final [*79] legal dispute related to proximate causation and aiding and abetting liability arises when GFC contends that it need only establish "that any one predicate act comprising the pattern of racketeering caused it injury." GFC's Response to FI-Utah's Motion for Summary Judgment, 153. In support of this position, GFC cites to the holding of the district court in Virden v. Graphics One, that a RICO plaintiff "must demonstrate a causal nexus between his own injury and either (i) a predicate act of at least one RICO defendant or (ii) the pattern of racketeering activity by which at least one of the RICO defendants participated in the conduct of the enterprise's affairs." *623 F. Supp 1417, 1425 (C.D. Cal. 1985);* see also *Marshall & Ilsley Trust Co. v. Pate, 819 F.2d 806, 809 (7th Cir. 1987)* ("If a plaintiff proves a violation of section 1962 by showing, for example, a pattern of racketeering activity in furtherance of an enterprise, then the plaintiff should recover for whatever damages are directly caused by any part of the acts that add up to a violation.") (citing *Papangiannis v. Pontikis, 108 F.R.D. 177, 179 (N.D. Ill. 1985)); Deppe v. Tripp, 863 F.2d 1356, 1366-77 [*80] (7th Cir. 1988).*

Defendants contend that it would depart from proximate causation principles to find a defendant, who has committed no predicate acts actually causing GFC's injuries, nonetheless liable for RICO damages. See, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 109. The court disagrees. As the court in Marshall & Ilsey Trust Co. noted, "[a]t what targets the acts of racketeering activity are aimed goes to the question of whether a 'pattern' has been demonstrated." *819 F.2d at 809.* The court continued that "[o]nce a pattern is proven, however, a plaintiff must show only an injury 'resulting' from the violation. It would be illogical to require a plaintiff to show that all the acts adding up to a 'pattern' injured him, especially in view of the fact that many such acts may be somewhat distinct and separate in time." *Id. at 810.* Thus, if a particular defendant is legally responsible for any one of the predicate acts alleged by GFC, then assuming a pattern of such acts, this same defendant is legally responsible for the injuries GFC suffered.

(b) GFC's Actions

Typical of defendants' second argument which focuses on GFC's actions is Diumenti's [*81] claim that "the frauds were caused by plaintiffs' own gross negligence or their wholesale failure to follow the most rudimentary industry standards of due diligence." Diumenti's Reply in Support of Motion for Summary Judgment, 157. Numerous defendants point to the fact that GFC conducted little or no actual inspections of the equipment leased to Player. GFC responds to this argument by stating that this is merely a contributory negligence theory which must be rejected because of the well-settled principle that negligence is not a defense to fraud. See, e.g., GFC's Response to FI-Utah's Motion for Summary Judgment, 160-68. The court agrees with GFC's position and, as set forth below, finds that it cannot grant summary judgment on the issue of proximate causation.

First, the parties are in agreement that the court must look to general tort principles to decide this issue. In fact, one of the cases cited by several defendants, General Motors Acceptance Corp., reaffirms the general tort principle that "contributory negligence is not a defense to liability for an intentional tort." *733 F.2d at 782* (citing *Cenco v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir. 1982),* [*82] cert. denied, *459 U.S. 880, 103 S. Ct. 177, 74 L. Ed. 2d 145 (1982));* see *USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 509 (7th Cir. 1982)* ("contributory negligence is a defense only to unintentional torts and fraud is an intentional tort"), cert. denied, *462 U.S. 1107, 103 S. Ct. 2455, 77 L. Ed. 2d 1334 (1983).* Thus, assuming that GFC may go to the

jury with its argument that defendants assisted Player in carrying out his frauds on GFC, then the court cannot allow defendants to argue that "'because your negligence allowed me to defraud you, you should not be allowed to recover from me to the extent that a reasonable person would not have allowed me to defraud him.' Such a defense is patently unfair and unjustifiable as a matter or law." *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa, 585 F. Supp 245, 249 (S.D.N.Y. 1984)* (securities fraud context); cf. *United States v. Brien, 617 F.2d 299, 311* (1st Cir.) ("If a scheme to defraud has been or is intended to deceive, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts."), cert. denied, [*83] *466 U.S. 919, 100 S. Ct. 1854, 64 L. Ed. 2d 273 (1980).*

Second, even were the court to conclude that defendants can legally raise the issue of GFC's alleged lack of due diligence, there still exist factual disputes as to GFC's actions. Assuming that in certain circumstances, a fraud victim's gross negligence might be found to be the proximate cause of its own injuries, see, e.g., *General Motors Acceptance Corp. v. Central National Bank, 733 F.2d 771, 782 (7th Cir. 1985)* ("a company could embark on a course of foolhardy lending and then, after the debtor's collapse, attempt to place the burden of its irresponsibility on another creditor that, by chance, had supplied it with incorrect information -- however, that is not this case"), the court cannot conclude as a matter of law that GFC's actions were the proximate cause of the Player frauds. Put another way, the court cannot conclude as a matter of law that GFC's actions constitute gross negligence. While defendants argue that GFC has put forth no evidence of its own vigilance, the court disagrees. Questions of fact exist as to credit inquiries and telephone calls made by GFC employees, representations allegedly made by defendants, [*84] allegedly phony equity contribution checks and opinion letters, and purported violations of industry standards. Thus, even were the court to conclude that defendants' arguments were not legally barred, the court could still not grant summary judgment on this issue since disputes are raised which remain the ultimate province of the finder of fact.

C. Specific Elements of GFC's RICO Claims

1. § 1962(a)

GFC asserts claims against FSB, Cameron, FSF,

Christenson, Diumenti, Lindsley, FI-Utah, Gurr, Allred, Mabey, ZFNB, ZLC, ZMC, Argus, Hanson, Timpson, and Newbold based on *18 U.S.C. § 1962*(a). These causes of action, the Third and Fifth through Tenth Claims for Relief of GFC's Fourth Amended Complaint, correspond to Player's fraudulent schemes detailed in the pleading and the liability for which is alleged against all defendants. Section 1962(a) states in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation [*85] of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*18 U.S.C. § 1962*(a).

The requirement of alleging "investment injury" in order to plead a proper § 1962(a) claim was first raised in Timpson and Newbold's motion for partial summary judgment when they directed the court's attention to the law of this district, Huntsman-Christensen Corp. v. Mountain Fuel Supply Co., 5 RICO L. Rep. 424, 430 (D. Utah 1986), and the recent decision of the Tenth Circuit Court of Appeals in *Grider v. Texas Oil & Gas Corp., 868 F.2d 1147 (10th Cir. 1989),* petition for cert. filed, *58 U.S.L.W. 3022* (U.S. June 16, 1989) (No. 88-2045). The Grider court required a RICO plaintiff asserting a § 1962(a) claim to plead and demonstrate an "investment injury" as a result of defendant's "use" or "investment" of "racketeering proceeds." *868 F.2d at 1149-51*. The court of appeals concluded that the plain meaning of § 1962(a) mandates that there is no claim unless there is investment injury:

Significantly, the statute does not state that it is unlawful to receive racketeering income; rather, as the italicized language underscores, the statute [*86] prohibits a person who has received such income from using or investing it in the proscribed manner. As previously noted, § 1964(c) provides a civil damage remedy only to those persons injured "by reason of a violation of § 1962." It thus appears from the plain language of these two provisions that a plaintiff seeking civil damages for a violation of § 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income. Injury from the

racketeering acts themselves is not sufficient because § 1962(a) does not prohibit those acts.

*Id. at 1149.* In other words, § 1962(a) is not a blanket prohibition against the receipt of racketeering income. Rather, the statute prohibits such receipt only by a principal in the underlying racketeering activity. What § 1962(a) does make unlawful is the use or investment of income derived from a pattern of racketeering activity. Id.

As a procedural matter, the court notes that this investment injury issue was originally framed by the parties as a purely legal question. The briefing process for Timpson and Newbold's motion for partial summary judgment revealed that GFC did not intend to prove investment [*87] injury as part of its § 1962(a) claim against Timpson and Newbold. See GFC's Response to Timpson and Newbold's Motion for Partial Summary Judgment, 1-2. The court also notes that the identical investment injury language is contained in GFC's § 1962(a) claims against each defendant named in the pertinent portions of the Fourth Amended Complaint. The three uncontroverted material facts set forth by Timpson and Newbold in their motion for partial summary judgment are that neither defendant: (1) received any income derived from the alleged pattern of racketeering activity; (2) invested or used any part of such income in the operation of the "Zions enterprise;" and (3) caused GFC to suffer any "investment injury."

GFC contends that the court is not bound by the decision in Grider and that conflicting Ninth Circuit authority, *First Interstate Bank of Oregon v. Wilcox, 815 F.2d 522, 529 (9th Cir. 1987),* rejects the requirement of "investment injury." However, as the court previously concluded, Tenth Circuit authority on issues of federal common law is controlling precedent for the court in this litigation. In any event, the court doubts that it is confronted with a conflict [*88] of circuit precedent on this issue since the Wilcox decision did not address the investment injury requirement. The Wilcox court was presented with a case involving alleged violations of §§ 1962(a), (b), and (c). The Ninth Circuit Court of Appeals rejected the requirement of racketeering injury in the context of a § 1962(c) claim. *Wilcox, 815 F.2d at 531.* However, the court of appeals did not distinguish between the requirements for claims arising under each separate subsection of § 1962 and this court declines to derive the implicit holding proffered by GFC. The court therefore grants Timpson and Newbold's motion for

partial summary judgment on this issue and dismisses the Seventh Claim for Relief against these defendants. Because FSB, FSF, Christenson, Diumenti, Lindsley, FI-Utah, Gurr, Allred, Mabey, ZFNB, ZLC, ZMC, Argus, and Hanson also raised this issue in their motions for summary judgment, the court must also grant that portion of their motions and dismisses the Third, Fifth, Sixth, Eighth, Ninth, and Tenth Claims for Relief against these defendants.

### 2. § 1962(c)

GFC asserts a claim against all defendants based on § 1962(c). This RICO statute provides: [*89]

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962*(d). A violation of § 1962(c) thus requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, 473 U.S. at 499, 105 S. Ct. at 3285* (footnote omitted).

The first element is not generally the subject of legal challenges made by defendants since the parties focus on the requisite conduct in the factual determination to be made as to the alleged participation of defendants in the Player frauds. However, the legal issue of whether this conduct must be managerial in nature is raised by the parties and thus will be addressed by the court below. The second (pattern) and third (enterprise) elements are subject to several legal challenges by defendants and are therefore discussed below. Finally, the fourth element of activity is the subject of a limited legal challenge concerning whether conspiracy [*90] itself may serve as predicate acts under GFC's section 1962(c) claim. The remainder of defendants' attacks concerning racketeering activity are the subject of the court's factual determinations related to the underlying dispositive motions.

### (a) Conduct

Section 1962(c) prohibits any person within the meaning of the statute "to conduct or participate, directly or indirectly, in the conduct" of the enterprise's pattern of racketeering activity. *18 U.S.C. § 1962*(c). Defendants

1989 U.S. Dist. LEXIS 16040, *90

contend that this language in RICO requires that they be shown to have engaged in a "dominant, active ownership or managerial role" in the RICO enterprise. See, e.g., Diumenti's Motion for Summary Judgment, 31-35 (citing *Bennett v. Berg, 710 F.2d 1361, 1364* (8th Cir.) (en banc) ("defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the operation or management of the enterprise"), cert. denied, *464 U.S. 1008, 104 S. Ct. 527, 78 L. Ed. 2d 710 (1983); United States v. Mandel, 591 F.2d 1347, 1375 (4th Cir. 1979)* ("'conduct or participate' language in § 1962(c) require[s] some involvement in the operation or [*91] management of the business"), cert. denied, *445 U.S. 961, 100 S. Ct. 1647, 64 L. Ed. 2d 236 (1980)).* See also *Occupational-Urgent Care Health System v. Sutro & Co., 711 F. Supp. 1016, 1026-27 (E.D. Cal. 1989)* (citing Bennett v. Berg and requiring allegations that defendants participated in operation or management of enterprise); *Agristor Leasing v. Meuli, 634 F. Supp. 1208, 1223 (D. Kan. 1986)* ("violation of § 1962(c) occurs only when the racketeering activity is being used as an integral part of the management of the enterprise's affairs") (citing *Mandel, 591 F.2d at 1375; Bennett, 710 F.2d at 1364),* aff'd, *865 F.2d 1150 (10th Cir. 1988); John Peterson Motors, Inc. v. General Motors Corp., 613 F. Supp. 887, 900 (D. Minn. 1985)* (RICO defendant must play dominant, active ownership or managerial role in enterprise).

The court notes, however, that there is a split in the circuits on this issue. Although defendants would have the court adopt this managerial conduct rule as expressed by the Eighth and Fourth Circuit Court of Appeals, the court is bound to follow the Tenth Circuit -- and majority -- position rejecting this requirement. See *United States* [*92] *v. Killip, 819 F.2d 1542, 1549* (10th Cir.) ("in order to uphold the finding of a nexus between the illegal acts and the alleged RICO enterprise, . . . we need only find a relation between the predicate offenses and the affairs of the enterprise") (citing *United States v. Carter, 721 F.2d 1514, 1527* (11th Cir.), cert. denied, *469 U.S. 819, 105 S. Ct. 89, 83 L. Ed. 2d 36 (1984)),* cert. denied, U.S. , S. Ct. , *98 L. Ed. 2d 139 (1987);* see also *Sun Savings & Loan Association v. Dierdorff, 825 F.2d 187, 195 (9th Cir. 1987)* ("rather than requiring that the enterprise itself conduct the racketeering activity, RICO simply requires a 'nexus' between the enterprise and the racketeering activity") (citing *United States v. Scotto, 641 F.2d 47, 54 (2d Cir. 1980)* (to establish pattern it is enough to demonstrate that "the predicate offenses are

related to the activities of that enterprise"), cert. denied, *452 U.S. 961, 101 S. Ct. 3109, 69 L. Ed. 2d 971 (1981)); Bank of America National Trust & Savings Association v. Touche Ross & Co., 782 F.2d 966, 970 (11th Cir. 1986)* ("not necessary that a RICO defendant participate in the management or operation of the enterprise"); [*93] *Schact v. Brown, 711 F.2d 1343, 1360* (7th Cir.) (having 'little trouble in finding that defendants who are not managers or employees in the colloquial sense are nevertheless reached by § 1962(c)"), cert. denied, *464 U.S. 1002, 464 S. Ct. 1002, 78 L. Ed. 2d 698 (1983); Virden v. Graphics One, 623 F. Supp. 1417, 1428 (C.D. Cal. 1985)* (the statute does not require that the defendant participate in the operation or management of the enterprise").

Some defendants contend that the Tenth Circuit Court of Appeals -- and presumably appellate courts from several other circuits -- have "confuse[d] RICO's 'nexus' requirement with the additional requirement that a defendant conduct or participate in the enterprise's affairs." Diumenti's Reply in Support of Motion for Summary Judgment, 89. The court disagrees and notes that in any event, this argument could not persuade the court to avoid binding Tenth Circuit precedent. Rather, the court adopts the majority view as expressed by the district court in Virden:

This court holds that a RICO plaintiff pursuing a private cause of action under section 1962(c) need only prove that the predicate acts are related to the affairs of the [*94] RICO enterprise. In other words, there must be some nexus between the pattern of racketeering activity and the enterprise's affairs. This liberal standard follows from section 1962(c)'s language requiring that the defendant merely conduct or participate directly or indirectly in the affairs of the enterprise through a pattern of racketeering.

*623 F. Supp. at 1428-29.*

This holding also coincides with the policy considerations underlying RICO as expressed by the Fifth Circuit Court of Appeals in United States v. Elliot:

The substantive proscriptions of the RICO statute apply to insiders and outsiders -- those merely "associated with" an enterprise -- who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity. *18 U.S.C. § 1962*(c). Cf. *United States v. Forsythe, 560 F.2d 1127, 1135-36 (3d Cir.*

*1977)*. Thus, the RICO net is woven tightly to reap even the smallest fish, those peripherally involved with the enterprise.

*571 F.2d 880, 903 (5th Cir. 1978)*, cert. denied, *439 U.S. 933, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978)*. However, the court also notes that the requisite knowledge/specific intent under [*95] the RICO statutory scheme pertains to all defendants, even the "smallest fish." See *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 660 F. Supp. 1362, 1371 n.7 (D. Conn. 1987)* ("A construction of the terms 'conduct or participate' that would include those that assist a RICO enterprise without knowledge of its illegal activities would be inconsistent with the legislative intent of the Act.").

(b) Pattern

A "pattern of racketeering activity" is defined as two or more "acts of racketeering" occurring within ten years of each other, with at least one of those acts occurring after passage of the act." *18 U.S.C. § 1961*(5). Although at least two predicate acts are required to establish a "pattern," two acts are not necessarily sufficient. *Sedima, 473 U.S. at 486-490, 105 S. Ct. at 3297-3282*. The Supreme Court recently reviewed and reversed an Eighth Circuit decision adopting a "multiple scheme" pattern requirement. *H. J., Inc. v. Northwestern Bell Telephone Co., 829 F.2d 648, 650 (8th Cir. 1987)* ("to demonstrate the necessary continuity appellants must allege that Northwestern Bell 'had engaged in similar endeavors in the past or that [it was] engaged in [*96] other criminal activities'" because "[a] single fraudulent effort or scheme is insufficient"). The court notes that this decision was handed down after GFC filed its responsive memoranda to the underlying motions for summary judgment, but before defendants filed their respective reply briefs.

The Supreme Court in H. J., Inc. concluded that "pattern" under the RICO statutory scheme requires that the predicate acts pose a threat of continuing activity. The Court began by restating the rule enunciated in Sedima that defined "pattern" as "continuity plus relationship," and then went a step further by attempting to set requirements for proving "continuity". *Id. at , 109 S. Ct. at 2900* (citing *Sedima, 473 U.S. at 496, n.14, 105 S. Ct. at 3285 n.14*).

The Court then discerned in RICO's legislative history a congressional intent that the pattern of predicate acts "amount to or pose a threat of continued criminal activity." Id. The Court in H. J., Inc. thus concluded that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement: Congress was concerned with long-term criminal conduct." [*97] *Id. at , 109 S. Ct. at 2902*. Where the RICO action is brought before the required long-term continuity can be established, the threat of continuity must be shown. Id. Where the activity does not itself involve a threat, as where a hoodlum requires protection money, or the enterprise itself does not exist for criminal purposes, a threat of continuity may be shown if the predicate acts are a "regular way of conducting defendant's ongoing legitimate business" or of conducting a non-criminal RICO enterprise. Id.

The Court in H. J., Inc. also reaffirmed that a viable pattern allegation requires that the predicate acts be both continuous and "related," that is, that they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id. at , 109 S. Ct. at 2901*.

The court notes that this issue was originally raised as essentially a legal challenge by defendants. They contended in their underlying dispositive motions that GFC's pleading was defective because it failed to allege multiple schemes. See, e.g., Diumenti's Motion for Summary [*98] Judgment, 77. However, since the Supreme Court's decision in H. J., Inc., defendants now assert that GFC fails to establish sufficient facts -- commission of predicate acts and a pattern of such acts -- to prove defendants were engaged in any "long-term criminal conduct." See, e.g., FSB's Reply in Support of Motion for Summary Judgment, 60-61. As such, the court will focus on the factual allegations supporting GFC's pleadings in its analysis of each defendants' underlying dispositive motion.

(c) Enterprise

It is undisputed by the parties that identification of an "enterprise" is a jurisdictional element of a colorable § 1962(c) claim. The statutory language defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961*(4). A great deal of earlier motion practice by certain parties, most notably the various Zions defendants, focused on the enterprise allegations contained in GFC's pleading. After seeking

approval to file its Third and Fourth Amended Complaints, GFC argued to the court that it should be permitted to [*99] plead several alternative enterprises. Over the objections of various defendants, the court allowed GFC to plead several alternative theories of the Player entities enterprise and to proceed with discovery on this basis. However, following defendants' partially successful Rule 12 motions and discovery motion practice, GFC was required to supplement its pleading to further define the enterprise element in its pleading to include no more than two possible alternatives. GFC identified this enterprise to consist alternatively of either (1) AMS and P&W, and their successor in interest (separately identified as Player Industries, Inc. ("PII")) or (2) AMS; P[W] ADMP[W] DMP[W] and MP&W. GFC's Third Supplemental Pleading, P1.

GFC contends in its pleading that defendants perpetuated

the appearance that the Player entities enterprise was engaged in a sound and lawful business, which in truth and fact it was not, that the prior transactions with the Player entities enterprise, which in truth and fact were fraudulent, were legitimate and that the Player entities enterprise, which in truth and fact was hopelessly insolvent, was solvent.

GFC's Fourth Amended Complaint, P44. Thus, according [*100] to GFC the purpose of the various entities that comprised the association in fact enterprise was "to facilitate the execution and continuation of the fraudulent schemes and the secretion of proceeds of those schemes, which constituted a pattern of racketeering." GFC's Further Response to Zions Defendants Fourth Set of Consolidated Interrogatories, No. 17.

Defendants raise a number of legal arguments as to why GFC has not properly plead, or in any event cannot now prove, a viable "Player entities enterprise." First, defendants argue that GFC cannot put forth evidence to support the requisite distinction between the enterprise and the pattern elements of its RICO claim. Second, defendants contend that GFC has failed to demonstrate the requisite "enterprise continuity." Third, some defendants contend that GFC cannot properly distinguish the enterprise from the "person" as required under prevailing case law. Finally, defendants also argue that GFC's pleading is defective since an association in fact of partnerships or corporations cannot constitute a cognizable RICO enterprise and, that in any event, GFC is also unable to demonstrate that these entities existed simultaneously. As [*101] usual, each side disputes the prevailing legal standards governing these issues as well as the particular facts of this case as they apply to these issues. The court will analyze the legal questions seriatim and, where appropriate, also consider the factual questions raised by this portion of defendants' dispositive motions.

(1) Enterprise/Pattern Distinction

Two general elements are necessary to establish an enterprise within the meaning of §§ 1961(4) and 1962(c)-(d). First, there must be "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." *United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981).* Second, the Supreme Court also requires that the enterprise have an existence separate and apart from the pattern of racketeering activity in which it engaged. Id. Moreover, as to this second element, the Court noted the following:

The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of [*102] criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.

*Id. at 584, 101 S. Ct. at 2528-29* (citations omitted). See generally Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts -- Criminal and Civil Remedies, *53 Temp. L.Q. 1009, 1026 n.91 (1980)*("the concept 'enterprise' focuses on a group of people" while "[t]he concept 'pattern' focuses on the relationship between acts of racketeering").

Some courts have focused on the above language in the Turkette decision, adopted a three-pronged, structural test for determining the validity of a RICO enterprise, and concluded that an enterprise must have an ascertainable structure distinct from that inherent in the pattern of

racketeering activity. The court notes, however, that [*103] there is a conflict within the circuits on this issue. Compare *United States v. Flynn, 852 F.2d 1045, 1051 (8th Cir. 1988)* ("enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering"); *Montesano v. Seafirst Commercial Corp., 818 F.2d 423, 424 (5th Cir. 1987)* ("an enterprise 'is not a pattern of racketeering activity,' but must be 'an entity separate and apart from the pattern of activity in which it engages'")(quoting *Turkette 542 U.S. at 583, 101 S. Ct. at 2528)* and *United States v. Tillett, 763 F.2d 628, 631 (4th Cir. 1985)* ("government must prove that the association exists separate and apart from the pattern of racketeering activity in which it engages") and *United States v. Riccobene, 709 F.2d 214, 221-24* (3d Cir.) ("not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses"), cert. denied, *464 U.S.* [*104] *849, 104 S. Ct. 157, 78 L. Ed. 2d 145 (1983)* with *United States v. Weinstein, 762 F.2d 1522, 1537 n.13* (11th Cir.)("[o]ur cases have repeatedly rejected" the contention that a "RICO enterprise must possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity"), modified, *778 F.2d 673 (11th Cir. 1985),* cert. denied, *475 U.S. 1110, 106 S. Ct. 1519, 89 L. Ed. 2d 917 (1986)* and *United States v. Bagaric, 706 F.2d 42, 56* (2d Cir.) ("it is logical to characterize any associative group in terms of what it does, rather than by abstract analysis of its structure"), cert. denied, *464 U.S. 840, 104 S. Ct. 133, 78 L. Ed. 2d 128 (1983).*

The court notes that the Tenth Circuit Court of Appeals has not been presented with this question, and the Ninth Circuit Court of Appeals has thus far specifically declined to resolve this issue. See *United States v. Feldman, 853 F.2d 648, 660 (9th Cir. 1988).* Two district court decisions within the Tenth Circuit, however, require this distinction between enterprise and pattern. See *United States v. Rogers, 636 F. Supp. 237, 245 (D. Colo. 1986)* (" If the government [*105] were allowed to prove the enterprise element solely by evidence indicating an association to commit the pattern of racketeering activity, the statute's requirement of an enterprise would be effectively eliminated."); *Saine v. A.I.A., Inc., 582 F. Supp. 1299, 1305 (D. Colo. 1984)* (" if

the enterprise were merely the accumulation of the predicate acts of racketeering, RICO would be nothing more than a tool for combating recidivists").

GFC disputes that the language of the Turkette decision requires that an enterprise be separate and distinct from the pattern of racketeering activity. Not surprisingly, plaintiffs would have the court adopt the holdings of the Second and Eleventh Circuits on this issue. GFC also contends that, in any event, any distinctness requirement has been satisfied since "plaintiffs allege, and the facts clearly show that the enterprise is composed of companies with an identifiable structure separate and distinct from the mail and wire frauds and interstate transportation of stolen property which comprised the pattern of racketeering." GFC's Response to Diumenti's Motion for Summary Judgment, 39. Because the Tenth Circuit has yet to determine this issue, [*106] the court is reluctant to decide as a legal matter whether the court should apply the majority structural test or the minority interpretation of the Turkette decision.

However, under the facts of the present litigation, the court need not reach this issue since GFC avows that it has offered evidence distinguishing the pattern of racketeering acts from the existence of the enterprise. Thus, the court examines GFC's proffered evidence with the more stringent standard in mind. In doing so, the court concludes that GFC has adequately distinguished between the enterprise allegations and the alleged pattern of racketeering activity.

First, as a legal determination, the fact that the alternative enterprises consist of an association in fact of corporations and partnerships is sufficient to dispose of defendants' argument. As the Ninth Circuit Court of Appeals noted in the Feldman decision, an "individual corporation is in itself a legal entity and, alone, may be charged as the RICO enterprise." *853 F.2d at 655* (citing *United States v. Griffin, 660 F.2d 966, 999 (4th Cir. 1981),* cert. denied, *454 U.S. 1156, 102 S. Ct. 1029, 71 L. Ed. 2d 313 (1982)).* Thus, the court of [*107] appeals concluded that "corporate entities ha[ve] a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure." *Feldman, 853 F.2d at 660.*

Second, even under the case law cited by defendants and tentatively adopted by the court, requiring a showing of distinctiveness should not impact upon the underlying

dispositive motions since fact questions still remain. As the court in Riccobene commented, "[b]ecause the issues of ongoing organization, continuing membership and separate existence are questions of fact, they must be resolved in the first instance by the jury." *709 F.2d at 222.* Applying this structural analysis to the alternative enterprises pleaded by GFC, and the facts presented in opposition to the motions for summary judgment, the court concludes that genuine issues of material fact exist as to the issue of separate existence of the enterprise from the pattern of racketeering activity. The remaining issue in this structural analysis, enterprise continuity, will be discussed below.

(2) Enterprise Continuity

It is also essential that GFC demonstrate that the association [*108] in fact enterprise has a common purpose. This is "proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Turkette, 452 U.S. at 583, 101 S. Ct. at 2528.* The organizational (structural) requirement has been dealt with above by the court. However, defendants also raise issues concerning the "continuity" of the alleged enterprise. Specifically, defendants contend that there is insufficient evidence to warrant a trial on the question of enterprise continuity of structure and personnel. See, e.g., Diumenti's Motion for Summary Judgment, 20-27.

The court notes that this is essentially a factual dispute since neither side may stray from the language of the Turkette decision. The parties cite different lower courts' attempts to apply the fact patterns of particular cases to the Supreme Court's "continuity" language. See, e.g., *United States v. Leisure, 844 F.2d 1347* (8th Cir.) U.S. , *109 S. Ct. 324, 102 L. Ed. 2d 343 (1988); Foval v. First National Bank of Commerce, 841 F.2d 126 (5th Cir. 1988); United States v. Hewes, 729 F.2d 1302, 1310-11 (11th Cir. 1984),* cert. denied, [*109] *469 U.S. 1110, 105 S. Ct. 790, 83 L. Ed. 2d 183 (1985).* Thus, defendants do not present the court with a legal challenge concerning the sufficiency of GFC's enterprise pleading, but rather, attack GFC's factual basis supporting the alleged continuity of the alternative enterprises.

As an initial matter, it is clear that enterprise continuity is not synonymous with pattern continuity, a concept discussed below by the court. See Ocean Energy II, Inc., 868 at 749 ("Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status."); *Montesano, 818 F.2d at 247* ("'association-in-fact' enterprises, like corporate or partnership enterprises, must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts"); but see *United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989)* (en banc) ("relatedness and continuity are essentially characteristics of [the pattern of racketeering] activity rather than of enterprise"). Therefore, cases cited by the parties dealing with pattern continuity are not addressed in the court's instant analysis.

The [*110] court assumes that the parties cite the various appellate court decisions on this issue to demonstrate the legal continuum encompassing continuity of enterprise structure and personnel. In this vein, the Eighth Circuit Court of Appeals in Leisure contrasted its previous holding in *United States v. Bledsoe, 674 F.2d 647, 665* (8th Cir.)("The distinct structure [of an enterprise] might be demonstrated by proof that . . . it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure."), cert. denied, *459 U.S. 1040, 103 S. Ct. 456, 74 L. Ed. 2d 608 (1982),* with its holding in *United States v. Lemm, 680 F.2d 1193, 1200 (8th Cir. 1982)* ("This is not an instance of sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes."), cert. denied, *459 U.S. 1110, 103 S. Ct. 739, 74 L. Ed. 2d 960 (1983),* to support a jury finding of a RICO enterprise. *844 F.2d at 1363-64.*

Similarly, the court cannot conclude as a matter of law that GFC's alternative enterprises do not demonstrate sufficient continuity. Questions of fact [*111] remain for the jury to resolve, for example, as to whether the Player frauds were perpetrated on an ad hoc basis, as defendants' contend, and therefore lacked the requisite structural continuity. As the court concluded above in its analysis concerning the separate existence of pattern and enterprise concepts, GFC has met its initial burden of offering evidence to support its pleading. The factual determination of whether the alternative enterprises display continuity of personnel and structure is more properly directed at the ultimate trier of fact. *Riccobene, 709 F.2d at 222.*

(3) Enterprise/Person Distinction

There is also very little legal dispute among the

parties that, for purposes of § 1962(c) of RICO, the "enterprise" and culpable "persons" within the meaning of the statutory scheme must be separate and distinct. See *Garbade v. Great Divide Mining and Milling Corp., 831 F.2d 212, 213 (10th Cir. 1987); Schreiber Dist. Corp. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986); Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384, 400-02 (7th Cir. 1984),* aff'd, *473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985)*(per curiam); [*112] but see *United States v. Hartley, 678 F.2d 961, 988 (11th Cir. 1982)* (rejecting necessity of distinction), cert. denied, *459 U.S. 1170, 1183, 103 S. Ct. 815, 834, 74 L. Ed. 2d 1014, 1027 (1983).* Furthermore, as the district court in *Saine* noted, "[s]ection 1962(c) makes it unlawful for a 'person' to participate in the affairs of an enterprise through racketeering activity. It does not hold the 'enterprise' itself liable." *582 F. Supp. at 1306.* Another way of approaching this issue is that "[i]f the "person" were not separate from the "enterprise," the person could not conduct the affairs of the enterprise." *NL Industries, Inc. v. Gulf & Western Industries, Inc., 650 F. Supp. 1115, 1128 (D. Kan. 1986).*

Defendants contend that GFC has failed both in its pleading and presentation of evidence to distinguish the culpable persons from the enterprise. See, e.g., ZFNB's Reply in Support of Motion for Summary Judgment, 119-120. The court rejects this argument summarily. To the extent defendants' arguments are directed at GFC's pleadings, not one of the constituent entities of GFC's "Player entities enterprise" is named as the culpable person for purposes of GFC's [*113] § 1962(c) cause of action. See GFC's Fourth Amended Complaint, PP4-34. The court does not understand the relevance of the fact, offered by defendants, that these same entities were in earlier GFC pleadings listed as culpable persons. Defendants' dispositive motions are directed at the viability of GFC's current Fourth Amended Complaint, as supplemented. As to the factual argument raised by defendants, the court cannot conclude as a matter of law that the culpable/person defendants listed by GFC are somehow one and the same as the alternative enterprises. The two groups do not on their face overlap. Hence, in this instance, the pleadings are self-sufficient.

(4) Association in Fact Enterprises

Finally, as noted above, an enterprise "includes any individual, partnership, corporation, association, or legal entity, and any union, or group of individuals associated in fact although not a legal entity. . . ." *18 U.S.C. § 1961*(4). Although the Supreme Court concluded that this statutory language places "no restriction upon the associations embraced by the definition" of enterprise," *Turkette, 452 U.S. at 580, 101 S. Ct. at 2527,* defendants raise two issues concerning [*114] how to interpret the language referring to "individuals associated in fact." First, defendants argue that the "entities" referred to cannot constitute an enterprise. As a fall-back position, defendants also contend that even if entities can associate in fact, they must have existed simultaneously at some point in time. See, e.g., Diumenti's Reply in Support of Motion for Summary Judgment, 72. The court rejects both of these arguments.

Defendants' first argument requires only brief comment by the court. Referring to the above quoted statutory language, the Second Circuit Court of Appeals phrased the issue as follows: "The argument runs that since the term 'corporation' is in the singular, the only way a group of corporations may be an 'enterprise' within the meaning of the statute is if they come within the language, 'group of individuals associated in fact.'" *United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979),* cert. denied, *445 U.S. 927, 100 S. Ct. 1312, 63 L. Ed. 2d 759 (1980).* The *Huber* court concluded that this argument "makes nonsense of the statute." Id. The court agrees with this conclusion.

While some defendants may characterize this holding [*115] as "peculiar," see Diumenti's Reply in Support of Motion for Summary Judgment, 80, supporting case law would counsel otherwise. As defendants concede, a number of other circuit courts concur with the holding in *Huber.* See *United States v. Feldman, 853 F.2d 648, 655-56 (9th Cir. 1988)* ("enterprise charged in this indictment, consisting as it does of two individuals and seven corporations, is a 'group of individuals associated in fact' under *18 U.S.C. § 1961*(4)"); *United States v. Navarro-Ordas, 770 F.2d 959, 969 n.19 (11th Cir. 1985)* ("group of corporations can be a 'group of individuals associated in fact' within the meaning of the 'enterprise' definition"), cert. denied, *475 U.S. 1016, 106 S. Ct. 1200, 89 L. Ed. 2d 313 (1986); United States v. Aimone, 715 F.2d 822, 828 (3d Cir. 1983)* (four individuals and one corporation constitute an enterprise), cert. denied, *468 U.S. 1217, 104 S. Ct. 3585, 82 L. Ed. 2d 883 (1984); United States v. Thevis, 665 F.2d 616, 625-26 (5th Cir.)*(accepting viability of

enterprise described as "a group of individuals associated in fact with various corporations"), cert. denied, *456 U.S. 1008, 102 S. Ct. 2300, 73 L. Ed. 2d* [*116] *1303 (1982).*

Moreover, the single court opinion cited by defendants as contrary to this majority position, *United States v. McClendon, 712 F. Supp. 723 (E.D. Ark. 1988),* is inapposite as to the facts of the instant litigation. As the district court in McClendon explicitly stated, it "respectfully disagree[d]" with the conclusion reached by the court in Huber because "[e]ven if the language might, for civil purposes, permit such an interpretation, it is clearly too vague to support such a construction in the criminal law context." *712 F. Supp. at 730.*

Defendants' second argument requires only slightly more analysis by the court. Defendants would have the court adopt a special "simultaneity" requirement for cases involving entities which are associated-in-fact in an enterprise. As discussed above, defendants' "simultaneity requirement is merely another way of stating that an association in fact enterprise must have both continuity of structure and personnel." Diumenti's Motion for Summary Judgment, 25. Moreover, according to Diumenti, he does not contend that "the participants who associate with the enterprise cannot change, but only that an association-in-fact [*117] enterprise must exhibit structure in the first instance. Such structure obviously requires simultaneous existence of the constituent entities." Diumenti's Reply in Support of Motion for Summary Judgment, 70-71 (emphasis added)(footnote omitted).

Thus, defendants urge the court to create an exception to the case law construing enterprise continuity and conclude that the enterprise could not begin until the entities listed by GFC were simultaneously in existence. In support of this position, defendants offer the following language from the McClendon opinion: "Under the clear allegations of the Indictment, the two corporations and the partnership 'together' constituted the RICO enterprise. It follows that until the last of these three legal entities was formed, the 'enterprise' charged in the indictment could not have come into existence." *725 F. Supp. at 725.*

The court does not find this proposition persuasive. The district court in McClendon offered no citation of authority to support this legal proposition nor has any been offered by defendants. As previously noted by the court, the Ninth Circuit Court of Appeals has specifically rejected this proposition. See [*118] *Feldman, 853 F.2d at 659* (entities "need not participate in [the enterprise] from beginning to end). Moreover, as the court discussed in its analysis of enterprise continuity, a number other circuits have concluded that the language in Turkette does not require participation of all the individuals associated in fact in an enterprise throughout the life of the enterprise. See, e.g., *Hewes, 729 F.2d at 1310-11.* The court finds the holding in Feldman persuasive and, in any event, is unpersuaded by defendants' arguments that the case law concerning enterprise continuity should be disregarded because the "Player entities enterprise" consists of partnerships and corporations.

(d) Activity

The statute defines "racketeering activity" to include, among other things, any act "indictable" under numerous federal criminal provisions, including those alleged in the instant lawsuit: mail fraud, *18 U.S.C. § 1341,* wire fraud, *18 U.S.C. § 1343,* and interstate transportation of fraudulently obtained funds, *18 U.S.C. § 2314* (the so-called predicate acts as alleged in GFC's Fourth Amended Complaint). See *18 U.S.C. § 1961*(1). The issue raised by several defendants is whether [*119] conspiracies to commit mail fraud, wire fraud, and transportation and receipt of stolen property may serve as predicate acts under GFC's § 1962(c) claim.

GFC's Fourth Amended Complaint alleges that defendants took part in a number of conspiracies which also serve as RICO predicate acts. Specifically, GFC states that defendants conspired to commit mail fraud, wire fraud, and interstate transportation and receipt of property taken by fraud, *18 U.S.C. §§ 1341,* 1343, and 2314-15, respectively. GFC's Fourth Amended Complaint, P180. While these three crimes are specifically listed in *18 U.S.C. § 1961*(1)(B) as viable predicate offenses under RICO, several defendants contend that conspiracies to commit these crimes are not so enumerated under the statutory scheme and thus cannot serve as predicate acts of racketeering activity -- either to support GFC's § 1962(c) claim or GFC's § 1962(d) claim. See, e.g., FSB's Motion for Summary Judgment, 75-76. GFC responds that "the mail and wire frauds are in effect conspiracy statutes" and that even if these acts are not proper predicate offenses under RICO, "there remains ample evidence from which a jury could find that [defendants] committed [*120] numerous other predicate acts and aided and abetted others and that [they] engaged in a pattern of racketeering activity." GFC's

Response to Diumenti's Motion for Summary Judgment, 110.

It will be necessary for GFC to present evidence on its fall-back position since the court agrees with defendants that these allegations of conspiracy cannot stand as predicate offenses under RICO. In reaching this conclusion the court adopts the reasoning of the district court in Allington v. Carpenter, which, when confronted with this same issue as to a wire fraud conspiracy claim, concluded as follows:

A conspiracy to violate § 1343 cannot serve as a predicate act for a RICO claim. Conspiracy may properly be charged as a predicate act for offenses listed in § 1961(1)(A) and (D), see *United States v. Licavoli, 725 F.2d 1040 (6th Cir. 1984)* (subsection A) [;] *United States v. Weisman, 624 F.2d 1118* (2d Cir.), cert. denied, *449 U.S. 871, 101 S. Ct. 209, 66 L. Ed. 2d 91 (1980)* (subsection D), but conspiracies can serve as racketeering activities under § 1961(1)(B) only when the enumerated statute includes conspiracy as an indictable offense. See *Weisman, 624 F.2d at 1124* ("subsections [*121] B and C, which list most of the other predicate acts chargeable under RICO, conspicuously lack the broad "any offense involving" language of subsection D and, in fact, require that the act be indictable under specifically enumerated sections of the criminal code"). Cf. *United States v. Brooklier, 685 F.2d 1208 (9th Cir. 1982)* (conspiracy could serve as predicate act because offenses indictable under § 1951 include conspiracy to obstruct commerce by physical violence).

*619 F. Supp. 474, 477 n.2 (C.D. Cal. 1985).* Similarly, although "[s]ection 1961(1)(B) lists mail fraud as a predicate offense; conspiracy to commit mail fraud is not included and is therefore not a predicate act." *United States v. Martino, 648 F.2d 367, 400 (5th Cir. 1981),* cert. denied, *456 U.S. 943, 102 S. Ct. 2006, 72 L. Ed. 2d 465 (1982).* The court applies an identical analysis to GFC's claims of conspiracy to commit interstate transportation and receipt of property taken by fraud. The court therefore grants this portion of defendants' motions for summary judgment and will not consider the conspiracy predicate acts alleged by GFC.

### 3. § 1962(d)

GFC also asserts a RICO conspiracy claim, pursuant [*122] to § 1962(d) against all defendants. The Fourth Amended Complaint alleges that defendants "each agreed to conduct or participate, directly or indirectly, in the affairs of the Player entities enterprise through a pattern of racketeering activity." GFC's Fourth Amended Complaint, P217. GFC also alleges that "[e]ach of the defendants also agreed, as alleged above, to participate in at least two of the activities constituting predicate offenses under *18 U.S.C. §§ 1341,* 1343, 2314, 2315 and 2." Id., P218.

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of *[18 U.S.C. § 1962]." 18 U.S.C. § 1962*(d). The Supreme Court defined the gravamen of a conspiracy charge under federal law as follows: "[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is, in either case, that agreement which constitutes the conspiracy which the statute punishes." *Braverman v. United States, 317 U.S. 49, 53, 63 S. Ct. 99, 102, 87 L. Ed. 23 (1942).* [*123]

It is uncontested by the parties that other tenets of conspiracy law also apply in the RICO context. First, "[p]roof of an agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases." *Riccobene, 709 F.2d at 225.* Second, it is uncontested that one conspirator need not know the identities of all his co-conspirators, nor be aware of all details of the conspiracy in order to be found to have agreed to participate in it. *Blumenthal v. United States, 332 U.S. 539, 557-58, 68 S. Ct. 248, 256, 92 L. Ed. 154 (1947).*

The Ninth Circuit Court of Appeals also noted that "[t]he essence of a RICO conspiracy is not an agreement to commit racketeering acts, but an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering." *United States v. Brooklier, 685 F.2d 1208, 1216 (9th Cir. 1982)* (citing *United States v. Zemek, 634 F.2d 1159, 1170 n.15 (9th Cir. 1980)),* cert. denied, *459 U.S. 1206, 103 S. Ct. 1194, 75 L. Ed. 2d 439 (1983); see also Schroeder v. Volcker, 864 F.2d 97, 98 (10th Cir. 1988)* (quoting *United States v. Hampton, 786 F.2d 977, 978* [*124] *(10th Cir. 1986)* ("object of a RICO conspiracy must be to violate a substantive RICO provision")). Thus, because a RICO conspiracy claim must prove the requisite agreement to commit a statutorily defined RICO violation, this of necessity

assumes defendant's "knowledge of the conspiracy and intent to join or further the objectives of the conspiracy." *Lochhead v. Alacano, 697 F. Supp. 406, 415 n.6 (D. Utah 1988).*

Three legal issues are raised by the parties regarding GFC's RICO conspiracy claim: (1) whether a § 1962(d) claim depends upon a viable § 1962(c) cause of action; (2) whether GFC must show that the particular defendant/co-conspirator agreed to commit personally two predicate crimes in furtherance of the RICO conspiracy; and (3) whether proof of an overt act is required. The court will discuss these issues seriatim.

(a) Relationship of § 1962(d) with § 1962(c)

The parties cite the same case law on this first issue yet appear to reach opposite conclusions. Defendants contend that if a RICO plaintiff is unable to prove a violation of the substantive subsection of the statute -- here, subsection (c) -- then the RICO conspiracy claim based on subsection (d) must [*125] fail as well. See, e.g., ZFNB's Reply in Support of Motion for Summary Judgment, 138 (citing *Condict v. Condict, 826 F.2d 923, 927 (10th Cir. 1987)* ("any claim under § 1962(d) based on a conspiracy to violate the provisions of *18 U.S.C. § 1962*(a), (b), or (c) must necessarily fall if the substantive claims are themselves deficient"); *Torwest DBC, Inc. v. Dick, 810 F.2d 925, 927 n.2 (10th Cir. 1987)* (since "only RICO conspiracy alleged was the one to commit the substantive violation of § 1962(c)" then "resolution of the § 1962(c) claim is dispositive of the conspiracy claim as well").

GFC contends, on the other hand, that the courts in Condict and Torwest were not confronted with a situation in which summary judgment is granted on a § 1962(c) claim for failure to prove an element not required in a § 1962(d) claim. For example, GFC points to the holding in *United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986),* and hypothesizes that "if summary judgment were granted because a particular defendant was found not to have personally committed acts of racketeering, as either a principal or an aider and abettor, there is still sufficient evidence from which [*126] a jury could find that the defendant agreed to the commission of such acts. . . ." GFC's Response to Diumenti's Motion for Summary Judgment, 111.

The court concludes that because the parties are engaged in an "apples and oranges" argument, both sides

citation to the case law and the conclusions drawn therefrom are correct. As in Condict and Torwest, if the court concludes that GFC's § 1962(c) claim must be dismissed for failure to prove a necessary element of that cause of action, then the court will apply this same factual and legal conclusion to the accompanying § 1962(d) claim. If the prior conclusion also proves fatal to the RICO conspiracy claim, then that claim must also be dismissed. If, on the other hand, a factual situation such as the one in Joseph is presented, then the court cannot summarily dismiss the § 1962(d) claim but must decide the various other issues raised by the parties with respect to this cause of action. Cf. *United States v. Alonso, 740 F.2d 862, 872 (11th Cir. 1984)* ("We hold only that conviction of substantive RICO offenses is not an absolute prerequisite to conviction under the RICO conspiracy provisions.").

(b) Agreement to Personally [*127] Commit Predicate Crimes

Several defendants contend that in order to succeed on its RICO conspiracy claim, GFC must demonstrate that a defendant/co-conspirator agreed to commit personally two predicate crimes in furtherance of the RICO conspiracy. See, e.g., Diumenti's Reply in Support of Motion for Summary Judgment, 161. As the First Circuit Court of Appeals framed the issue before the court:

The statute, however, does not make clear the extent of the activity in which each defendant must engage to be culpable as RICO conspirators: must each RICO conspiracy defendant agree that someone in the enterprise will commit two predicate crimes, must each member agree to commit two such acts individually, or must each member actually commit two such acts individually?

*United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981).*

Since under the statutory scheme, the agreement among the co-conspirators is to further the pattern of racketeering activity, defendants argue that it also follows that the two predicate acts requirement of § 1961(5) should also control in the conspiracy charge. GFC argues to the contrary that "a finding of conspiracy under RICO does not require [*128] that a defendant have agreed to personally commit two or more predicate acts or that he actually committed two such acts, although such proof is present in this case as to each defendant." GFC's

Response to Diumenti's Motion for Summary Judgment, 100.

GFC also contends that it has demonstrated sufficient evidence of each defendant's agreement to participate -- in fact, participation itself -- in at least two predicate crimes. To the extent that GFC's evidence may reasonably be construed to establish direct or indirect commission of these acts, so much the better for plaintiffs since the inference that defendants agreed to violate RICO in that instance is more than reasonable. See *United States v. O'Malley, 796 F.2d 891, 895 (7th Cir. 1986)* ("When a defendant has personally committed several acts of racketeering in furtherance of the enterprise's affairs, 'the inference of an agreement [to join the conspiracy] is unmistakable.'") (quoting *United States v. Elliot, 571 F.2d 880, 903* (5th Cir.), cert. denied, *439 U.S. 953, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978)*).

The parties agree, however, that there is a conflict among the circuits on this issue. Compare *United States, [*129] v. Ruggiero, 726 F.2d 913, 921* (2d Cir.) ("for the government to convict on a RICO conspiracy it must prove that defendant himself at least agreed to commit two predicate crimes"), cert denied, *469 U.S. 831, 105 S. Ct. 118, 83 L. Ed. 2d 60 (1984)* and *United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981)* ("RICO conspiracy count must charge as a minimum that each defendant agreed to commit two or more specified predicate crimes in addition to charging an agreement to participate in the conduct of an 'enterprise's' affairs through a 'pattern of racketeering activity'"), cert. denied, *460 U.S. 1011, 103 S. Ct. 1250, 75 L. Ed. 2d 479 (1983)* with *United States v. Neopolitan, 791 F.2d 489, 498* (7th Cir.) ("only necessary that the defendant agree to the commission of the two predicate acts on behalf of the conspiracy"), cert. denied, U.S. , *107 S. Ct. 421, 93 L. Ed. 2d 371 (1986)* and *United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986)* ("it is not necessary to prove that the defendant agreed to personally commit the requisite acts, but only that he agreed that another violate § 1962(c) by committing two acts of racketeering activity") and *United States [*130] v. Adams, 759 F.2d 1099, 1116 (3d Cir.)* ("defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts"), cert. denied, *474 U.S. 906, 106 S. Ct. 275, 88 L. Ed. 2d 236 (1985)* and *United States v. Tille, 729 F.2d 615, 619* (9th Cir.) ("Proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d)."), cert. denied, *469 U.S. 845, 105 S. Ct. 156, 83 L. Ed. 2d 93 (1984)* and *United States v. Carter, 721 F.2d 1514, 1531* (11th Cir.) ("when a defendant agrees to become a member of a conspiracy with the essential RICO objective, further proof that the defendant agreed to personally commit two predicate acts is not necessary"), cert. denied, *469 U.S. 819, 105 S. Ct. 89, 83 L. Ed. 2d 36 (1984)*.

Moreover, the court notes that although the Tenth Circuit Court of Appeals has declined to decide this issue, see *United States v. Killip, 819 F.2d 1542, 1548 (10th Cir. 1987)*, the District Court for the District of Utah has adopted this two predicate acts requirement [*131] for conspiracy cases. See *Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank, 558 F. Supp. 1042, 1047 (D. Utah 1983)* ("under RICO, a civil conspiracy charge requires an allegation that a party agreed to commit two predicate crimes in furtherance of the conspiracy"). Because the Tenth Circuit has yet to determine this issue as well, the court is somewhat reluctant to decide as a legal matter whether GFC must prove that each defendant agreed to personally commit at least two predicate crimes. However, the court adopts the scholarly approach and conclusion of the Seventh Circuit Court of Appeals in *United States v. Neopolitan, 791 F.2d at 496-99*, and require only that GFC demonstrate that defendants agreed to participate in the racketeering affairs of the enterprise. Not only does the Neopolitan decision contain a very persuasive analysis of the case law and legislative history in this area, it also expresses the majority view. The court will therefore not require GFC to demonstrate that each alleged co-conspirator personally agreed to commit at least two predicate acts.

(c) Overt Act

There is also a dispute by the parties as to whether a RICO conspiracy claim [*132] requires proof of an overt act and, if so, whether defendant must have personally committed the overt act. However, the parties do not contest that the overt act need not itself be a RICO predicate act or crime. Compare GFC's Response to Diumenti's Motion for Summary Judgment, 105 n.** with Diumenti's Reply in Support of Motion for Summary Judgment, 164 n.95. See *United States v. Zemek, 634 F.2d 1159, 1173 n.18 (9th Cir. 1980)*.

Defendants contend that a viable RICO conspiracy claim requires proof of an overt act personally committed

by a defendant/co-conspirator in furtherance of the conspiracy. See, e.g., Diumenti's Motion for Summary Judgment, 112. In support of this position, defendants cite the holding in Medallion TV Enterprises v. SelecTV of California, Inc. that "in order for a plaintiff to have a private cause of action under *18 U.S.C. § 1962*(d), there must at the very least be one or more overt acts causing injury to the plaintiff or his 'business or property' under *18 U.S.C. § 1964*(c)." *627 F. Supp. 1290, 1298 (C.D. Cal. 1986),* aff'd, *833 F.2d 1360 (9th Cir. 1987).* See also *NL Industries, Inc. v. Gulf & Western Industries, Inc., 650* [*133] *F. Supp. 1115, 1128 (D. Kan. 1986)* ("A RICO conspiracy allegation requires at least the pleading of the existence of one or more overt acts by the defendant in furtherance of the conspiracy and the assent of each defendant to the conspiracy.") (citing *Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984)); Saine, 582 F. Supp. at 1306* ("At a minimum, a conspiracy requires proof of one overt act by one defendant in furtherance of the conspiracy, and the assent of each defendant to the operation of the conspiracy.") (citing *United States v. Sutherland, 656 F.2d 1181 n.4 & 1193 (5th Cir. 1981),* cert. denied, *455 U.S. 949, 102 S. Ct. 1451, 71 L. Ed. 2d 638 (1982)).*

GFC contests defendants' legal conclusions and cites, inter alia, the holding of the Second Circuit Court of Appeals in United States v. Barton, that "[w]hile the general conspiracy statute *[18 U.S.C. § 371],* requires proof of an overt act, the RICO conspiracy does not." *647 F.2d 224, 237 (2d Cir. 1981),* cert. denied, *454 U.S. 857, 102 S. Ct. 307, 70 L. Ed. 2d 152 (1981).* See also *United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983)* (the "Second Circuit holding [*134] [in Coia] is both eminently reasonable and consistent with the Supreme Court's holding in *Singer v. United States, 323 U.S. 338, 340-42, 65 S. Ct. 282, 283-84, 89 L. Ed. 285 (1945)"),* cert. denied, *466 U.S. 973, 104 S. Ct. 2349, 80 L. Ed. 2d 822 (1984).* Plaintiffs also contend that even if the court were to require proof of an overt act, "there is ample evidence of overt acts by each of the defendants." GFC's Response to Diumenti's Motion for Summary Judgment, 106.

The court concludes that for the present time, it will adopt the more stringent standard offered by defendants and require that GFC demonstrate at least one overt act committed by each defendant in furtherance of the alleged conspiracy to violate § 1962(c). The court reaches this tentative conclusion because although one district

court within this circuit has adopted this approach, the Court of Appeals for the Tenth Circuit has yet to decide this issue. Moreover, this resolution seems appropriate since GFC is prepared to meet these requirements.

V. MOTIONS TO STRIKE

A. Standards for Motion to Strike

Defendants seek an order from the court striking various portions of the evidence offered by [*135] GFC in opposition to the motions for summary judgment. Defendants rationale varies with the particular facts of the different motions, but all these motions are generally based on the federal rules of civil procedure and the case law that has built up around the admissibility of evidence offered at the summary judgment stage of litigation. Thus, the initial standards guiding the court are found in those portions of Rule 56 which pertain to evidence offered in support or opposition to a summary judgment motion.

Rule 56(e) provides in pertinent part: "Supporting and opposing affidavits . . . shall set forth such facts as would be admissible in evidence. . . ." *Fed. R. Civ. P. 56(e).* This language has been construed as follows:

Turning to the requirements for affidavits filed on summary judgment motions, the first question to be addressed is whether the information they contain (as opposed to the affidavits themselves) would be admissible at trial. Thus, ex parte affidavits, which are not admissible at trial, are appropriate on a summary judgment hearing to the extent they contain admissible information.

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure [*136] § 2738 at 470-73 (2d ed. 1983) (footnotes omitted). Pursuant to Rule 56(e), affidavits must also be made on the personal knowledge of the affiant and must show that the affiant possess the knowledge asserted. See, e.g., *Noblett v. General Electric Credit Corp., 400 F.2d 442, 445 (10th Cir. 1968).*

The same principles apply to deposition testimony and other forms of evidence approved for use on summary judgment by Rule 56(c) since the rule "expressly provides that the court may make use of depositions on a summary judgment motion. Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary

judgment motion, however. Id. § 2722 at 48-50. See, e.g., Miller v. United States, F. Supp. , , *1989 WL 123301 at 5* (D. Ariz. Oct. 19, 1989) ("inadmissible hearsay evidence may not be considered by the court in determining whether a genuine issue of material fact exists which precludes summary judgment") (citing *Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 667 (9th Cir. 1980))*.

Moreover, while GFC is correct that the Supreme Court has stated that the non-moving party is not required to produce evidence in a form [*137] that would be admissible at trial, see *Celotex v. Catrett, 477 U.S. 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*, the Supreme Court also concluded that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), . . . ." Id. Hence, the court must focus on the admissibility of the substance of the evidence offered by the non-moving party to defeat a summary judgment motion. See, e.g., *Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987)* ("The Celotex court, however, was referring to the other means enumerated in Rule 56(c) for persuading the court that summary judgment is inappropriate including affidavits, which are evidence produced in a form that would not be admissible at trial."). Reading *Fed. R. Civ. P. 56(c)* & (e) in conjunction with the Supreme Court's analysis in Celotex, it is clear that "only admissible evidence may be considered by the court in ruling on a motion for summary judgment." *Beyene v. Coleman Security Systems Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)*.

This ruling also dove-tails with the Supreme Court's [*138] recently enunciated standards concerning summary judgment discussed by the court below. In short, the trial court faced with a Celotex-type motion is required to take part in a fiction. The trial court is asked to assume that all of the evidence presented by the non-movant (plaintiff) in opposition to the motion for summary judgment has actually been presented to the trier of fact at the time of trial in the non-movant's case in chief. The court is then asked to assume the movant (defendant) now seeks a directed verdict at the close of plaintiff's presentation of this evidence. By implication, the court would have already made countless rulings during the course of plaintiff's case concerning the admissibility of plaintiff's evidence. While this evidentiary and procedural posture is the logical corollary

to summary judgment standards as set forth by the Supreme Court, it obviously places a great burden on the court when a case as massive as the present litigation is sought to be disposed of by summary judgment. In essence, the court is asked to make the countless evidentiary rulings in advance of the lengthy presentation of the evidence which would surely happen were this [*139] matter to go to trial. The court will endeavor to do so because of the implications of the trial of this matter on all parties.

Fortunately, this task is made considerably easier by the movants specific objections as to admissibility of certain evidence and GFC's opportunity to respond both in written and oral form to the particular motions to strike. In this instance, the motions to strike before the court serve to give both sides a fair opportunity to argue the proper evidentiary standards governing the admissibility of selected portions of GFC's evidence. The court also notes that although the number and size of the motions to strike were not invited by the court, it will nonetheless go through the laborious process of analyzing these issues before reaching the dispositive motions. This is so because these motions bring to light the very issues which the court had hoped the parties' contrasting statements of fact would focus upon -- the genuineness and materiality of the parties' purported factual disputes.

As discussed in more detail below, the court's analysis of defendants' dispositive motions must center on genuine issues of material fact. The court would deny these [*140] motions only if a genuine issue of material fact exists and defendants' legal positions are well taken. By implication, the fact the defendants seek an order striking portions of GFC's evidence offered in opposition to the dispositive motions indicates to the court that defendants are concerned that these same portions might prove fatal to their attempts to obtain summary judgment. Since in ruling on motions for summary judgment "[f]actual disputes that are irrelevant or unnecessary will not be counted," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2515, 91 L. Ed. 2d 202 (1986)*, the court assumes that they will also not be the subject of motions to strike. In other words, defendants' motions to strike should presumably assist the court in wading through the voluminous statements of fact and focus the court's attention on GFC's strongest evidence or, as the popular phrase goes, defendants' "smoking guns."

Finally, the parties will notice that in the following resolution of the parties' motions to strike and motions for summary judgment, the court quotes extensively from the record offered by both sides. The reason for this is that the parties' statements [*141] of fact often contained as much inference as fact. Rather than fall into the trap of citing or adopting one side or the other's "spin" on a particular portion of the record, the court will simply place the quoted material in its proper, albeit somewhat lengthy, context.

B. Motions to Strike the Testimony and Affidavit of Jeffrey Leyton

Lindsley, Diumenti, and Allred seek an order from the court striking certain court and deposition testimony as well as the subsequent affidavit of Jeffrey Leyton. Defendants contend this evidence is inadmissible because: (1) Leyton's testimony is not properly authenticated; and (2) Leyton's affidavit contradicts his prior testimony and cannot be used to create "sham facts." The court concludes that neither of these bases have merit and therefore denies the motions to strike.

(1) Courtroom and Deposition Testimony

According to movants, "Greyhound's entire case against Lindsley, and to a great extent, Diumenti, rests on testimony by Jeff Leyton to the effect that he had 'telephone conversations' with 'Diumenti and/or Lindsley' regarding the content of lease transactions in the fall of 1984 and early January of 1985." Lindsley & Diumenti's [*142] Motion to Strike Leyton Testimony and Affidavit, 1. According to Leyton, an attorney for GFC at the time of the Player frauds, he placed these telephone calls to the Diumenti & Lindsley law office on a number obtained from the law firm's stationary. See Court Proceedings of 8/20/85 at 62:19-65:17; Court Proceedings of 9/3/85 at 25:25-26:19. Leyton also states he confirmed the number with the telephone company information service. Id. On each occasion, Leyton states, he was greeted by a receptionist and put through to either Diumenti or Lindsley, who identified themselves as such; Lindsley himself was introduced by Diumenti. See Court Proceedings of 8/20/85, 31:9-15 & 88:11-14. Leyton also recounts that Diumenti and Lindsley acknowledged their representation of Player and the sublessee in the $ 40 million NL transaction, acknowledged the opinion letters received by Leyton, and discussed the need to issue, reissue, or amend the opinion letters. See id. at 31:1-41:24. Movants deny that any such contacts or

conversation ever took place.

The relevant portions of the Federal Rules of Evidence state as follows:

(a) General provision. The requirement of authentication [*143] or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support of finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(5) Voice identification. Identification of a voice, whether heard first hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business and the conversation related to business reasonably transacted over the telephone.

*Fed. R. Evid. 901*. Furthermore, as one commentator has noted,

in admitting the conditioned evidence, the judge determines only that there [*144] is sufficient evidence of the allied or conditioning fact to permit a reasonable jury to find its existence. The judge does not make a conclusive determination; the final responsibility for determining fact is left to the jury.

J. Lilly, An Introduction to the Law of Evidence (West 1978) § 96 at 365 (footnote omitted).

The court concludes that GFC has offered sufficient "conditioning facts" to permit a reasonable trier of fact to consider Leyton's testimony. GFC's evidence conforms with the authentication requirements of *Fed. R. Evid. 901(b)(6)(A)* & (B). Leyton claims that both Diumenti and Lindsley identified themselves. Movants vigorously dispute this, but that does not provide a legitimate basis

to strike this evidence. Moreover, the court also concludes that the disputed testimony also complies with *Fed. R. Evid. 901(b)(5)* since Leyton claims that he became familiar with Diumenti and Lindsley's respective voices. See Leyton Affidavit, P4. Again, while movants argue that this is implausible and simply a post facto rationalization, this argument is better offered to the ultimate trier of fact. Moreover, as the very language of Rule 901(b)(5) makes [*145] clear, aural identification may be acquired after the telephone conversations.

Movants also make the rather curious argument that the court should draw certain "inferences" from the state of the present evidence, or lack thereof, in order to grant the motions to strike (and presumably the accompanying motions for summary judgment). Specifically, movants contend that "[b]ecause of Lindsley's late addition to this lawsuit, and Greyhound's failure to produce admissible documentation reflecting the calls, Lindsley is entitled to an inference that Leyton's calls did not take place." Lindsley's Reply in Support of Motion to Strike Leyton Testimony and Affidavit, 7. While this may or may not be true, it is for the trier of fact to draw such inferences. This is clearly not the proper basis for a motion to strike, let alone a motion for summary judgment. Similarly, movants also contend that Leyton's "inherent untrustworthiness" mandates an order striking this testimony. Id., 9. This argument must also be summarily rejected as it is directed at the weight, and not the admissibility, of the evidence. See *United States v. Watson, 594 F.2d 1330, 1335 (10th Cir. 1979)* ("all questions [*146] of weight and credibility [are] for the jury"). Finally, movants argue that *Fed. R. Evid. 403* enables this court to strike the offending evidence because of its prejudicial nature. Lindsley & Diumenti's Motion to Strike Leyton Testimony and Affidavit, 12. The court declines to comment on this argument other than to note that the prejudice to which movants allude appears to be the defeat of their accompanying motions for summary judgment. Thus, this portion of the motions to strike must be denied.

### (2) Affidavit Statements

Movants next argue that Leyton's affidavit should be stricken because it: (1) lacks an affirmation that it was made upon personal knowledge; (2) "does not otherwise indicate that Leyton met, knew, or recognized Lindsley's voice;" (3) contains "nothing but self-serving hearsay and conclusory language;" and (4) contradicts his prior

testimony. Id. at 15-16. The court rejects the first three arguments summarily and focuses upon the brunt of movants' dispute: whether the affidavit contradicts prior deposition statements.

Movants apparently take issue with the following portions of Leyton's affidavit:

3. As I have testified in court hearings and deposition, [*147] I made a number of phone calls to George Diumenti and William Lindsley in Utah regarding the opinions of counsel they were providing on behalf of P&W and NL Industries. During those phone conversations, which extended over multiple drawdowns, Mr. Diumenti and Mr. Lindsley represented to me that they were counsel to NL industries, a party to the transaction by its consent to the assignment of sublease. I relied upon those representations from attorneys in going forward with the master lease and drawdowns. Messrs. Diumenti and Lindsley never expressed any doubt or hesitancy in our discussions; on the contrary, they affirmed their representation of the sublease.

4. I also worked on closings for the $ 50 million master lease with P&W involving Baker International. I received opinion letters from Mr. Diumenti as counsel for Baker International. After my prior personal communications with Mr. Diumenti, which were frequent enough that I came to recognize his voice, I had every reason to believe that his representations on behalf of Baker International were also legitimate.

6. Nevertheless, I believe that I acted prudently in closing the NL Industries and Baker International master [*148] lease and drawdowns by making personal contact with representatives of the sublesees [sic], including outside legal counsel.

Leyton Affidavit of 5/10/89, PP3-4 & 6.

It is undisputed by the parties that district courts should disregard a declaration that is contrary to a deposition statement "when they conclude that [the declaration] constitutes an attempt to create a sham fact issue." *Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986);* see *Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983)* ("If testimony under oath, however, can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."); *Radobenko v. Automated Equipment Corporation, 520 F.2d 540, 544*

*(9th Cir. 1975)* ("The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial."); *Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)* ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting [*149] his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). However, there is nothing "inherently inconsistent" between a failure to recall at one point and a recollection refreshed by a document at another point in time. *Kennett-Murray Corp. v. Bone, 622 F.2d 887, 844 (5th Cir. 1980).* As the Eleventh Circuit Court of Appeals stated in affirming a summary judgment granted by a trial court: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given testimony." *Van T. Junkins & Assoc., Inc. v. U.S. Indust., Inc., 736 F.2d 656, 657 (11th Cir. 1984).*

However, this doctrine does not apply to the facts before the court in the instant motion. The court does not find that the fact that Leyton "came to recognize" Diumenti's voice in the course of his telephone conversations is inconsistent -- let alone directly contradictory -- with Leyton's testimony in open court. See Transcript of 8/20/85 at [*150] 32, 46, 66, and 88. Moreover, the court concurs with GFC that in the deposition testimony cited by movants, Leyton was asked only about his familiarity with Diumenti's voice prior to the first call. Thus, Leyton's affidavit does not fall within the "sham fact" doctrine and the remainder of Diumenti, Lindsley, and Allred's motion to strike must also be denied.

C. Motions to Strike the Declaration of Robert H. Damm

Mabey and Allred seek a court order striking a portion of the affidavit of Robert H. Damm ("Damm"), the former Executive Vice President at GFC and Greycas. They contend that this evidence should be stricken pursuant to the "best evidence rule," Red. R. Evid. 1002, and because the declaration "is in part hearsay." Mabey's Motion to Strike the Damm Declaration; Allred's Joinder

in Motion to Strike Damm Declaration, 3. The court finds no merit in movants' positions and must therefore deny the motion.

Movants object to a specific portion of Damm's affidavit, which reads as follows:

4. In reviewing [the $ 325,000 loan, $ 40 million master lease, and $ 50 million master lease] the creditworthiness of Player & Willyard was a consideration. The front of every write-up [*151] contained a section on the company's prior credit history with the customer. In each of the three write-ups referred to above, this section featured the fact that Player and Willyard had a $ 2.35 million construction loan that matured in the fall of 1984 and for which there was a take-out commitment from Zions First National Bank. If I knew the customer was in default or about to go into default on a $ 2.35 million loan, I would not have voted to recommend involving Player and Willyard.

Damm Affidavit of 5/10/89, P4.

Movants' arguments regarding Fed. R. Civ. P. 1002 & 802 must fail because copies of these three writeups are already before the court. See GFC's SOF to ZFNB's Motion for Summary Judgment, SOF P368 & Exhibit 163, PSOF 387 & Exhibit 172, PSOF 432 & Exhibit 184. Moreover, it is clear from the context of the declaration that it is not being used as a vehicle to put the actual writings into evidence. The disputed portion of Damm's declaration puts forth a particular fact relating to GFC's reliance: "If I knew the customer was in default on a $ 2.35 million loan, I would not have voted to recommend involving Player and Willyard." Finally, while Mabey also disputes [*152] that the RRI loan was ever about to go into default, this argument is better directed at the trier of fact. In other words, GFC has produced sufficient foundational evidence on this point as well. See GFC's SOF PP1265 & 1267.

D. Motions to Strike the Declaration of Robert W. Bertrand

FI-Utah, FSB, Gurr, Diumenti, Allred, and Mabey seek a court order striking various portions of the declaration of Robert W. Bertand ("Bertrand"), the former President and Chief Executive Officer of GFC and Greycas. Movants filed various joinders and separate motions objecting to a total of six paragraphs of the Bertrand declaration. They contend that the court must

strike these portions of GFC's evidence pursuant to the "sham fact" doctrine. The court concludes that these portions of the Bertrand declaration do not directly contradict his earlier deposition statements and must therefore deny these motions.

The following portions of the Bertrand declaration are the subject of these motions to strike:

3. In each instance [of the four major GFC loans/leases to P&W], the primary credit was a Fortune 500 company, either NL Industries or Baker International. Player & Willyard was a secondary [*153] credit. However, "secondary" does not mean immaterial. I looked at the credit of all parties, including Player & Willyard, in passing on these proposals. If the credit of any of the parties had been unsatisfactory, I would not have approved and forwarded the proposals to the parent.

4. In fact, the credit of Player & Willyard, as represented to us, appeared to be a successful business with good banking and financing relationships with the largest banks in Utah (that is, First Interstate Bank, First Security Bank and Zions First National Bank) and had an excellent payment record with us. As of December 31, 1982, as I noted in my recommendation to the parent, Player & Willyard had a fair market net worth of approximately $ 15.5 million. Two years later, as I noted in a written recommendation, Player & Willyard's net worth was represented to be $ 22.3 million. I certainly never thought of Player & Willyard as a broker, and we did not enter into the transactions on this basis or deal with Player & Willyard as such. Player & Willyard was a customer to whom GFC had recourse under all the loans and leases.

5. I have since learned that Player & Willyard's financial condition was [*154] completely misrepresented. If I had learned that my understanding was based on false representations, I would not have recommended any loans or leases to Player & Willyard for approval, regardless of the soundness of the sublessee.

7. In reviewing the writeup [of the RRI construction loan] submitted and thereafter, I also considered the favorable credit reference that Player & Willyard received from First Interstate Bank of Utah. First Interstate represented that Player & Willyard maintained checking accounts with average balances of $ 400,000-$ 600,000, that its accounts were paid as agreed, and that, in general, First Interstate regarded Player & Willyard

highly and would entertain new business from it. Thus, my understanding was that P&W was a highly creditworthy business in the eyes of its major bank reference.

8. My favorable understanding of Player & Willyard's creditworthiness was further strengthened when Player & Willyard promptly paid off the construction loan in the Fall of 1984. In passing on the loan and lease to Player & Willyard in September and October 1984 and thereafter, I took into account the fact that Player & Willyard had a commitment for a long term [*155] financing on its hotel from Zions First National Bank. Similarly, the fact that Player & Willyard had paid off a loan from us of $ 2.35 million was important especially at the time I considered the $ 50 million master lease involving Baker International.

9. My personal contact with Mr. Player was limited, but grew somewhat as he became a major customer. Thus, in May 1985, a luncheon and golf engagement with Mr. Player and senior GLFC executives including myself was arranged. On that occasion I met Mr. Diumenti. Mr. Player came to cancel the golf engagement, accompanied by Mr. Diumenti, who was introduced as Mr. Player's attorney. According to Mr. Player, he and Mr. Diumenti were being called away unexpectedly to the Middle East to conduct further business with NL Industries. Mr. Diumenti was present for Mr. Player's explanation and said nothing inconsistent. On the contrary, he offered us the use of his yacht in his absence. This story, which I now realize to have been a complete fabrication, at the time lent credence to Mr. Player's continuing drawdowns pursuant to his sublease with NL Industries, and to the interest he was expressing at that time in our portfolio of repossessed [*156] oil drilling equipment.

Bertrand Declaration of 5/11/89, PP3-5 & 7-9.

As to paragraphs three, four, five, seven, and eight, movants contend that

Bertrand's declaration completely contradicts his deposition testimony, which took place over the course of at least three days. Throughout his deposition testimony, Bertrand consistently emphasized, under exhaustive questioning and with the opportunity for cross-examination, that Player's credit strength had no influence on his recommendation. He also testified that the banking relationship with the three Utah bank defendants was not a factor in his recommendation.

FSB's Motion to Strike Bertrand Declaration, 3. They therefore seek an order striking this portion of the declaration under the "sham fact" doctrine discussed earlier by the court in relation to the motion to strike the testimony and affidavit of Leyton. In support of this argument, movants cite the court to various portions of Bertrand's prior deposition testimony.

Q. Would it be distressful to you as the president of the company to find out that you never obtained ever an audited financial statement from [P&W]?

MR. CAMPBELL: I object to the form of this question, [*157] again, calling for a statement of an emotional state of mind about a hypothetical set of facts.

THE WITNESS: Not necessarily.

Q. Why not?

A. Because we were not relying on Player & Willyard as the principal string underlying the transaction.

Q. And what you were relying upon was what?

A. We were relying on a variety of things, the credit of NL and Baker, the leases or subleases between NL and Player & Willyard. We were relying on the collateral. We were relying on the long-standing relationship we had with him. Those were the things we were relying on. And the financial strength of Player & Willyard as an entity was not of overwhelming importance. On the contrary, financial strength of Player & Willyard as we have already discussed was not particularly important. So not having an audited financial statement on Player & Willyard was not in my opinion a sign of bad judgment or mistake.

Bertrand Deposition of 8/11/87, 559:10-560:12.

Q. In the Player & Willyard deals, though, you didn't pay any attention to the Player & Willyard financial statements because you were looking to NL & Baker as the credits. Correct?

A. Yes.

Q. That was the creditworthiness that you [*158] were examining, not Player's?

A. That's correct.

Bertrand Deposition of 7/1/89, 919:16-23.

Q. The fact of the matter is, sir, that Mr. Player's banking relationship with First Interstate Bank of Utah played no part in your decision to recommend those transactions for your company?

A. I don't know that I can say that because I am not sure what the relationship was whether I knew about and whether if I knew about it that may have played a role in my being more favorably inclined to do business with Mr. Player.

Q. As you sit here today, sir, you cannot give me one example of a transaction with Mr. Player in which your knowledge, if there was any, of his relationship with First Interstate Bank of Utah played a role in your decision to approve transactions. Correct?

A. That's correct.

Id., 944:20-945:11.

Q. Are you aware of anything that First Interstate Bank did that led your company to enter into the transaction involving the Riverdale Roadway?

A. Not specifically, no.

Q. You approved that transaction, didn't you?

A. I may have. I don't recall.

Bertrand Deposition of 6/30/88, 799:1-6

The court concludes that the above quoted deposition testimony does [*159] not directly contradict the Bertrand declaration offered in opposition to the motions for summary judgment. While movants dispute the validity of Bertrand's later explanation of "primary" and "secondary" credit, this does not convince the court that Bertrand's declaration "completely contradicts" his deposition testimony. Taken as a whole, this deposition testimony may have been less than illuminating for defendants, but it does not as a matter of law foreclose Bertrand's later declaration. To the extent that defendants find it at odds with Bertrand's deposition testimony, these inconsistencies should be pointed out the trier of fact.

Furthermore, movants also point out that GFC uses

this portion of the Bertrand declaration to support their statement of fact regarding GFC's reliance on information supplied from the financial institution defendants. These same movants also correctly note that the declarant does not go so far as to state that he "relied" on this information, as that would be in direct conflict with his prior deposition testimony. The court agrees with this point, but does not believe that it is the proper basis for a motion to strike. Rather, the court interprets [*160] this argument as a request to disregard or discredit this particular statement of fact when considering the underlying motion for summary judgment. This the court will do.

Finally, as to paragraph nine of the Bertrand declaration, movant Diumenti contends that "[p]laintiffs have obviously concocted this paragraph in an attempt to establish that Mr. Diumenti actually heard and/or in some fashion confirmed Player's alleged statement to GFC officials that he was traveling to the Middle East for business dealings with NL Industries." Diumenti's Joinder in Motion to Strike Bertrand Declaration, 3-4. The court will quote at length from Bertrand's previous deposition testimony, cited by Diumenti, because it speaks for itself. The following statements are alleged to "directly contradict" the declaration before the court:

Q. Did Mr. Player introduce you to Mr. Diumenti as soon as they came into the country club?

A. As best I can recall, yes.

Q. What did he say to you in regard to Mr. Diumenti?

A. He introduced Mr. Diumenti and said that Mr. Diumenti was his attorney and friend and that they were on a trip or about to go an a trip to the Middle East to do business related to N, [*161] L Industries; that they were flying to New York as I recall that afternoon, and that it was a continuation of the business that Sheldon and Mr. Diumenti somehow had been involved in involving N, L Industries.

Bertrand Deposition of 12/31/86, 123:2-22.

Q. Where was Mr. Diumenti when Mr. Player was informing you of who Mr. Diumenti was and telling you that he and Mr. Diumenti were going to the Middle East?

A. He was present at the table.

Q. Who else was present at that table?

A. Mr. Damm, and I believe, Mr. Vance.

Q. So at the time Mr. Player was introducing Mr. Diumenti, you were all seated at a table, correct?

A. That's correct.

Id., 124:7-15.

Q. Do you recall any discussion regarding a boat Mr. Diumenti owned in San Diego?

A. Yes, I do.

Q. What do you recall in that regard?

A. I recall Mr. Diumenti indicating that he had a boat, fishing boat, I believe, in San Diego. In fact, I remember him stating that he and Mr. Player had used that boat and somehow offered to make it available to us or invited us to join them at some time in the future on that boat.

Q. Did Mr. Diumenti ever say during the time that you were seated at this table that he was going [*162] to the Middle East with Mr. Player with regard to some N, L Industries business?

A. That is my recollection.

Q. It was Mr. Diumenti who said that?

A. I can't recall if it was Mr. Diumenti or Mr. Player who said they were both going. It was either Mr. Player said they were both going in the presence of Mr. Diumenti and Mr. Diumenti indicated he was going or Mr. Diumenti said he was going. I'm not sure.

Q. Was anything else discussed during that luncheon?

A. I can't recall.

Q. Did Mr. Diumenti or Mr. Player describe the particulars of this N, L Industries trip?

A. By particulars you mean what?

Q. What they were going to do with regard to the N, L Industries business?

A. I can't recall other than I believe it had something to do with some of the equipment transactions, machine tools and other types of equipment.

Q. But they said they were going to the Middle East?

A. That's correct.

Q. During the luncheon did anyone discuss the leasing transactions that Mr. Player had with Greyhound?

A. I don't recall.

Q. One way or the other?

A. One way or the other.

Q. Did anyone discuss with Mr. Diumenti during that luncheon the letters that had been submitted to [*163] Greyhound Leasing that purportedly bore his signature?

MR. EHRENBARD: Object to form.

THE WITNESS: I don't recall.

Q. Did anyone discuss with Mr. Diumenti in what capacity he was Mr. Player's attorney?

MR. EHRENBARD: Object to form.

THE WITNESS: I don't recall.

Q. Did Mr. Diumenti tell anyone during that conversation what his role in this N, L Industries trip was?

A. My only recollection is that he was somehow involved in it and was accompanying Mr. Player on the trip.

Q. But you don't know whether that impression came from what Mr. Player said or what Mr. Diumenti said?

MR EHRENBARD: Object to form.

THE WITNESS: I recall that Mr. Diumenti acknowledged somehow that he was going on that trip.

Q. But you don't know how he acknowledged it?

A. I don't remember precisely how he acknowledged it, but I have a distinct recollection that he acknowledged that he was going on that trip.

Id., 126:7-128:23.

The court concludes that a simple comparison of the Bertrand declaration and deposition testimony refutes any need to apply the "sham fact" doctrine. The court finds nothing directly inconsistent between these two sworn statements that requires such a court order. [*164] Moreover, while movant Diumenti may wish to argue that these statements are "irrelevant" because Player "made these statements only to avoid a golf game with GFC officials, not to further any fraudulent activity," Diumenti's Reply in Support of Motion to Strike Bertrand Declaration, 3 n.2, this argument does not support a motion to strike. While it is true that irrelevant evidence is inadmissible, *Fed. R. Evid. 401*, and thus the possible target of a motion to strike, the court notes that irrelevant evidence by its very nature cannot create material issues of fact that would foreclose summary judgment. As the court will discuss in more detail below, in relation to Diumenti's motion for summary judgment, Diumenti's arguments concerning the golf outing meeting are more appropriately placed before the ultimate trier of fact. The court must therefore deny the remainder of the motions to strike the Bertrand declaration.

E. Motions to Strike the Declaration of Bruce H. Baum

FI-Utah, FSB, Allred, Diumenti, and Mabey seek an order from the court striking certain portion of the declaration of Bruce H. Baum ("Baum"), a lay witness working for GFC since 1981. The Baum declaration [*165] is offered by GFC to help establish that funds used by Player to purchase time certificates of deposit ("TCD") were ultimately received by various defendants as loan repayments when Player cashed the TCDs. As will also be noted in relation to the motions to strike the declaration of Robert Mathis, receipt of such funds by defendants is a necessary element of GFC's RICO claims based on racketeering acts of receipt of stolen property, as well as to GFC's fraudulent conveyance, conversion, and constructive trust claims. Movants contest the admissibility of seven paragraphs of the Baum declaration on the grounds that they violate Rule 56(e) because they: (1) are not made on personal knowledge; (2) do not set forth only facts as would be admissible in evidence; and (3) do not affirmatively show that Mr. Baum is competent to testify to the matters stated therein. See, e.g., FI-Utah's Reply in Support of Motion to Strike Baum Declaration, 1; *Fed. R. Civ. P. 56(e)*.

Although movants seek an order from the court striking the entire Baum declaration, the court notes that it is only certain portions of certain paragraphs of the declaration which are disputed by the parties. Close review [*166] of the parties' briefs on this issue reveal that little is actually contested in this motion. GFC and movants both agree that certain portions of Baum's declaration contain statements which are in fact "inferences." See GFC's Response to FI-Utah's Motion to Strike Baum Declaration, 4 & 7-8. Other unobjectionable portions serve as a vehicle for introducing various exhibits into the record before the court. However, the court finds that while Baum may indeed be articulating inferences for the court's benefit, this method of proof is not sanctioned by *Fed. R. Civ. P. 56(e)*.

Rather than strike the entire declaration, the court will grant the motion to the extent that it excises these disputed inferences. Thus, the appropriate remedy for these failures is that "Baum's declaration should be limited to an introduction of exhibits without added impermissible comments which plaintiffs attempt to sneak into the record as 'evidence'." FSB's Reply in Support of Motion to Strike Baum Declaration, 6. Although these inferences are indeed stricken from the factual record before the court, GFC's counsel are still free to argue the reasonableness of such inferences as they relate to the underlying [*167] motions for summary judgment. Inferences are for the parties to argue and for the court to accept or reject.

The court therefore grants the motions to strike portions of the Baum declaration. In order to state a clear resolution of this motion, the court quotes below all portions of the declaration at issue, and underscores the statements to be stricken from the record:

4. a. As set forth in paragraph 11A of his Declaration, Robert Mathis traced GFC funds to AMS' check no. 1023, payable to FI-Utah. AMS' check was used on or about July 31, 1979, for the purchase of a time certificate of deposit ("TCD") at FI-Utah, #50071, in the amount of $ 200,000 in the name of Sheldon G. and Brenda Jill Player. This TCD had a one-year maturity and appears to have been cashed on July 30, 1980. (A copy is attached as Exhibit 1).

b. On January 28, 1980, AMS obtained a loan from FI-Utah in the amount of $ 130,000, which was purportedly collateralized by Player's $ 200,000 TCD #50071. On February 5, 1980, AMS obtained a loan from

FI-Utah in the amount of $ 30,000, which was also purportedly collateralized with Player's $ 200,000 TCD #50071. These two loans were combined and renewed by [*168] FI-Utah on February 29, 1980. The maturity date for the renewed loan was July 30, 1980. (A copy is attached as Exhibit 2).

c. On February 19, 1980, AMS obtained a loan from FI-Utah in the amount of $ 40,000, which also purportedly collateralized by Player's $ 200,000 TCD #50071. This loan was renewed on May 18, 1980, and the maturity date extended until July 29, 1980. (A copy is attached as Exhibit 3).

d. On July 30, 1980, the loans to AMS described in subparagraphs b and c were repaid. It appears the repayment of these loans were from the proceeds of the Player $ 200,000 TCD #50071 were received by FI-Utah via repayment of the loans it granted AMS.

e. Thus, GFC's proceeds, which have been traced by Mathis to the check used to purchase the Player $ 200,000 TCD #50071 were received by FI-Utah via the repayment of the loans it granted AMS.

5. a. As set forth in paragraph 11B of his Declaration, Mathis traced a GFC drawdown check to FI-Utah. The check proceeds were used on or about June 16, 1982, for the purchase of a $ 200,000 TCD at FI-Utah, #122411, in the name of AMS. The TCD was cashed on August 17, 1982. (A copy is attached as Exhibit 4).

b. On July 30, [*169] 1982, AMS obtained a loan from FI-Utah in the amount of $ 200,000 which was purportedly collateralized by AMS' $ 200,000 TCD #122411. This loan was to mature on August 9, 1982. This loan was not renewed or extended.

c. It appears that this loan was paid on August 17, 1982. (A copy is attached as Exhibit 5). It also appears the repayment came from the proceeds of the AMS TCD #122411 cashed that same day.

d. Thus, GFC's proceeds which have been traced by Mathis to the purchase of AMS' $ 200,000 TCD #122411 were received by FI-Utah via repayment of the loan it granted to AMS.

6. a. As set forth in paragraph 12B of his Declaration, Mathis traced GFC's funds to the purchase

of a $ 1,230,000 TCD at FSB, #746363, in the name of AMS on or about November 12, 1980. This TCD was cashed by FSB on May 11, 1981. (A copy is attached as Exhibit 6).

b. On or about December 3, December 4, and December 12, 1980, AMS obtained three loans from FSB totalling $ 1,230,000. These loans were purportedly collateralized by AMS' $ 1,230,000 TCD #746363 and had a maturity date of May 1, 1981. (A copy is attached as Exhibit 7).

c. On May 11, 19981, when AMS' $ 1,230,000 TCD #746363 [*170] was cashed, FSB applied the proceeds of the TCD as payment of its three loans to AMS maturing that same day.

d. Thus, GFC's proceeds which have been traced by Mathis to the check used to purchase the AMS TCD were received by FSB via repayment of the three loans it granted AMS.

7. a. As set forth in paragraph 12D of his Declaration, Mathis traced GFC funds to the negotiation of GFC check #1722 dated July 1, 1982, in the amount of $ 301,098 at FSB. (A copy is attached as Exhibit 9).

b. On or about July 6, 1982, AMS purchased a $ 301,098 TCD # 784243 at FSB which had a maturity date of August 5, 1982. (A copy is attached as Exhibit 10).

c. On or about July 22, 1982, AMS obtained a loan in the amount of $ 301,098. This loan was purportedly collateralized by the TCD in subparagraph b. The loan had a maturity date of August 5, 1982. (A copy is attached as Exhibit 11).

d. It appears that on August 5, 1982, when AMS' $ 301,098 TCD #784243 was cashed, FSB applied the proceeds of the TCD as repayment of its loan to AMS.

e. Thus, GFC's proceeds which have been traced by Mathis to the purchase of the TCD were received by FSB as repayment of its loan to AMS.

8. [*171] a. As set forth in paragraph 12C of his Declaration, Mathis traced GFC funds to FSB's $ 1,200,000 debit memo dated December 3, 1984.

b. FSB admitted in its response to GFC's Seventh Set of Interrogatories to FSB, Interrogatory No. 41, that the proceeds of this debt memo were used as repayment of its

$ 1,200,000 loan to AMS/P&W, originally granted on or about June 1, 1984. (A copy is attached as Exhibit 12).

c. Thus, GFC's proceeds which have been traced by Mathis to this debit memo were received by FSB via repayment of its loan to AMS.

13. From this review [of the AMS and P&W checking accounts at FSB], after September 1978 the AMS and P&W FSB account records contained a daily balance listing which indicated the amount of funds in the account or, as was commonly the case, the extent to which the account was overdrawn. Prior to September 1978, the AMS account records did not indicate the daily balance on the monthly statements; however, there were numerous Return Check Notices in the AMS account, many or which revealed a negative account balance on specific days. From this information, a chart was created which chronicles the overdrafts in these accounts, for use in GFC's [*172] Statement of Facts in opposition to FSB's Motion for Summary Judgment.

14. For the years 1980 through 1982, every check and deposit in the AMS and P&W accounts at FSB was reviewed in order to determine the aggregate amount of overdraft advances that were being made in the accounts. The dates on the account statement were used to determine the clearing date of checks and deposits. For each day, deposits, if any, were first added to the account, to increase the balance in the account from the prior day, or, as was often the case, to reduce the outstanding overdraft. Thereafter, the day's checks, if any, were deducted, to determine the amount of overdraft advances, if any, made that day. By using this method, FSB was given the benefit of the doubt, by disregarding any daylight overdrafts -- that is, funds advanced by FSB that were repaid with a deposit made later that same day. The information collected in this fashion was also used in GFC's Statement of Facts in opposition to FSB's Motion for Summary Judgment.

Baum Declaration of 5/8/89, PP4-8 & 13-14.

F. Motions to Strike the Declaration of Robert M. Mathis and GFC's Cross-Motion to Amend Responses to FI-Utah's Seventh [*173] Set of Requests for Admissions

GFC submits the declaration of Robert M. Mathis, a partner at Price Waterhouse and GFC's "tracing" expert, in an attempt to trace proceeds of Player's frauds to

various defendants. It is uncontested that tracing funds to the specific defendants is a necessary element of GFC's receipt of stolen property allegations asserted as predicate acts in GFC's RICO claims, as well as its fraudulent conveyance, conversion, and constructive trust claims. FI-Utah, FSB, FSF, Diumenti, Mabey, Allred, and the Zions Defendants contest the admissibility of various portions of the affidavit of Robert Mathis, dated January 9, 1989, and the declaration of Robert Mathis, dated May 8, 1989. Because GFC has also filed a cross-motion concerning a portion of contested declaration (PP8-10 of the declaration), the court will resolve this cross-motion before considering defendants' respective positions.

(a) GFC's Cross-Motion to Amend

GFC seeks an order granting GFC leave to amend its responses to Requests 63, 78, and 80 of FI-Utah's Seventh Set of Requests for Admission. According to GFC, in the course of preparing its papers in response to FI-Utah's motion for summary [*174] judgment, GFC came across three errors among the responses to a set of 142 Requests for Admissions concerning GFC's constructive trust claims. Robert Mathis attempted to "correct these errors" in his declaration submitted in response to FI-Utah's dispositive motion. Because these three paragraphs are also the subject of the pending motions to strike, GFC filed an alternative cross-motion seeking leave to amend these responses pursuant to *Fed. R. Civ. P. 36(b)*.

The applicable rule gives the court discretion to consider the withdrawal or amendment of admissions "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." *Fed. R. Civ. P. 36(b)*. It is undisputed by the parties that the court may exercise its discretion only after both of the rules prerequisites are met. See, e.g., *Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983)* ("the court has the power to make exceptions to the Rule only when (1) the presentation of the merits will be aided and (2) no prejudice to the [*175] party obtaining the admission will result"). FI-Utah contends that neither element of Rule 36(b) has been established and the court is therefore without the power to grant GFC's cross-motion. The court disagrees.

The court concludes that since the three transfers at issue in 7:63, 7:78, and 7:80 are not unique, it would serve a presentation of the merits for GFC to be able to amend these three responses to be consistent with the evidence and its theory of the case. As the Mathis declaration points out, these transfers at issue are but three instances among thirty-two alleged transfers by FI-Utah. Robert Mathis Declaration of May 8, 1989 at P11. Moreover, the amendments to these three responses do not prejudice FI-Utah in relation to its summary judgment papers. Rather, the amended responses merely change the applicable argument as these three transfers. Also persuasive is the fact that the original responses came at the close of discovery, thus obviating the possibility of further discovery on these transfers. The court therefore grants GFC's cross-motion to amend responses 7:63, 7:78, and 7:80 and denies the corresponding portion of FI-Utah's motion to strike the Mathis declaration. [*176]

(b) Defendants Motions to Strike

Movants object to the admissibility of the following portions of Robert Mathis' declaration: PP2; 3-7; 8-10; 11-11AF; 12-12AH; 13-13T; 16-16D; 17-21; and 23. The objections to the admissibility of PP8-10 have already been rejected above. The remaining portions of the declaration may be discussed in two general categories: (1) those portions objected to on the grounds that the affiant lacks personal knowledge and speculates based on hearsay and surmise; and (2) those portions based upon the use of an improper and legally barred methodology. The court will discuss these arguments seriatim.

Movants first object to the admissibility of P2 of Robert Mathis' declaration. This portion of the declaration states in full:

In some instances, plaintiffs' complaint alleged transfers to a bank defendant, which, upon our examination of the relevant documentation, we determined in fact went to the purchase of a cashier's check or certificate of deposit ("TCD"), or for some other reason did not go to the bank. In such instances, we usually removed those checks from our calculation of transfers to the bank defendant. In a few instances, however, [*177] plaintiffs have determined from their examination of bank records that the TCD was later cashed in to pay a loan to the bank. In those instances, we continued to count the checks as transfers, since the bank did in fact receive funds traced to GFC. See Declaration of Bruce H. Baum.

Robert Mathis Declaration of 5/8/89, P2 (emphasis added).

Consistent with the court's holding on defendants' motions to strike the Baum declaration, the court also grants defendants' motions to strike the above underscored portion of the declaration of Robert Mathis. However, the court notes that just as the trier of fact may draw the inferences posited in Baum's declaration, so too may GFC's tracing or banking expert draw these same inferences. Thus, even though as a technical matter the above portion of the declaration of Robert Mathis cannot incorporate stricken material, this ruling is not to be construed as ban on the same inferences at the time of trial.

Movants also object to the admissibility of PP3-7; 11-11AF; 12-12AH; 13-13T; 16-16D; 17-21; and 23 on the ground that Robert Mathis' "moving average" methodology is legally barred. GFC's tracing expert describes the moving average methodology [*178] in the context of tracing funds as follows:

If I deposit a check of $ 100.00 written to me by third party "A" into my new bank account, the bank credits my account $ 100. If I then write a check for $ 50.00 to another third party, "B," funds from "A" have flowed through my account to "B" even though no bank notes physically moved anywhere. If I then deposit another check for $ 50.00 from "C" and write a check for $ 30.00 to "D," there arises the question of how to account for the source of the $ 30.00 to "D" as between "A" and "C." I determined that it made most sense to employ a "moving average" methodology, one that treats all deposits in an account on any given day as fungible and so recalculates the average each day there is a new deposit. To follow my example, the moving average methodology treats the $ 30.00 to "D" as being traceable to "A" and "C" proportionately, in this case 50% "A" and 50% "C."

Robert Mathis Affidavit of 1/9/89, P5.

Movants contend that, as a matter of law, the moving average tracing methodology cannot be used to establish the "stolen property" element of GFC's alleged receipt and transportation offenses. See, e.g., FI-Utah's Motion to Strike [*179] Declaration of Robert Mathis, 2-3. According to movants, this pro rata tracing methodology will always result in the imposition of liability and, thus,

the only reliable tracing methodology is the lowest balance theory. Id. (citing *United States v. Poole, 557 F.2d 531, 534-36 (5th Cir. 1977)).* GFC contests the legal argument raised by defendants and argues that its expert witness may use either methodology to arrive at his opinions.

However, the court finds that it need not reach this issue at the present time since the briefing process reveals that under either theory, GFC has demonstrated at least two predicate acts per movant, with the one exception being Argus. Specifically, GFC contends that even under movant's lowest intermediate balance theory the following number of predicate violations of §§ 2314-15 have been demonstrated: (1) ten instances against FSF, see Robert Mathis Declaration of 7/28/89, PP2-12; (2) twenty instances against FSB, see Robert Mathis Declaration of 7/25/89, PP3a-AC & 3AG; (3) two instances against ZLC, see Robert Mathis Declaration of 8/1/89, PP3-5; (4) one instance against Argus, see Robert Mathis Declaration of 8/1/89, [*180] P7; (5) three instances against ZFNB, see Robert Mathis Declaration of 8/1/89, PP9-12; thirteen instances against FI-Utah, see Robert Mathis Declaration of 7/17/89, P9; (6) five instances against Allred, see Robert Mathis Declaration of 8/15/89, PP3-5 & 7-10; and (7) two instances against Diumenti, see Robert Mathis Declaration of 7/28/89, PP3-4. Thus, defendants' motion does not go to a material issue, i.e., defendants' actual liability, but rather focuses on the extent of defendants' liability or, perhaps, the extent of GFC's damages. In any event, a determination either way does not affect the underlying motions for summary judgment. Nor does the court feel compelled to ignore the alternative theories of GFC's tracing expert simply because he is willing to adopt defendants' methodology for the purposes of the pending motions.

Moreover, this change in testimony is not what the court had in mind when it entered the scheduling order requiring all expert witnesses to testify in their depositions as if they were at trial. Striking the supplemental affidavits offered by Robert Mathis on such a basis would be inequitable since it was movants' position that forced [*181] the issue. The court therefore assumes for the purposes of the present motions to strike, and the underlying motions for summary judgment, that GFC's tracing expert is confined to utilizing the lowest intermediate balance methodology.

G. Motions to Strike Designated Portions of the

Affidavits of William B. Watkins

Gurr, FI-Utah, FSB, Allred, FSF, Christenson, and the Zions Defendants seek an order from the court striking certain portions of the affidavits of William B. Watkins ("Watkins"), a former national bank examiner for the OCC and GFC's expert witness on banking issues. Watkins' 196 page affidavit, submitted by GFC on May 14, 1989, is the subject of numerous legal challenges -- too many, in fact, for the court to list the specific paragraphs challenged by movants. However, in an effort to simplify these pending motions, the court adopts structure of Gurr's analysis and groups Watkins' opinions into the following four general categories: (1) Watkins' expert opinions regarding defendants' subjective state of mind (actual knowledge) which are not based upon perceptions of defendants' actual conduct; (2) Watkins' conclusions regarding the alleged violations of certain [*182] statutes and regulations; (3) Watkins' opinions in fields in which defendants claim he lacks expertise; and (4) Watkins' alleged recantation of prior deposition testimony. See Gurr's Motion to Strike Portions of Watkins Affidavit, 2. The court notes that Hanson's earlier motion to strike the Watkins affidavit of November 10, 1988, raised similar legal arguments. Thus, the court will consider this previous motion as well in ruling on the motions to strike the latest Watkins affidavit.

(1) Opinions Regarding Defendants' Knowledge

Movants first argument addresses the bulk of the disputed portions of the Watkins affidavit, those regarding defendants' alleged knowledge of the Player frauds. Watkins gives a general overview of his opinions on this subject early on in his affidavit:

12. Set forth below, and in my previous Affidavit, are certain facts and opinions regarding transactions between the Player companies and the bank defendants. While the specifics of the Player companies' transactions with each of the banks differ in some respects, there are certain common threads to each of the bank's relationship with the Player companies which become apparent, in my opinion, [*183] in reviewing the relevant transactional documents and sworn statements. Some of these common threads are:

i. Each of the banks knew relatively early on in their relationship with the Player companies -- from the nature, frequency and amount of financings, the performance on

these financings, the manner in which the Player companies maintained and utilized their accounts and/or the banks own credit analyses -- that the Player companies were in poor financial condition, if not insolvent;

ii. Each of the banks knew that the Player companies were short of cash and relying heavily on bank or other financing in the continuation of their operations;

iii. Each of the banks knew -- from the A&I audit, credit analyses, transactions with affiliates and/or loan kiting, CD kiting or check kiting -- that the Player companies had submitted false financial information and were engaged in fraud;

iv. Each of the banks continued, notwithstanding the foregoing, to extend substantial sums of money to the Player companies;

v. Each of the banks knew -- given the financial condition of the Player companies, the submission of false information by the Player companies and the fraudulent conduct [*184] on the Player companies -- that they could not enter into legitimate transactions with the Player companies and that repayment could only come from illegal activity.

Watkins Affidavit of 5/14/89, P12.

Defendants first attack these conclusions on the grounds that certain portions of the affidavit are "not based on personal knowledge but rather upon inference, presumption and surmise." Gurr's Motion to Strike Portion of Watkins Affidavit, 14. The court, however, finds no merit to this argument. As GFC correctly points out, expert witnesses are allowed to base their opinions on information other than that gained by personal knowledge or observation. The governing rules of evidence expressly contemplate such a use of data by an expert witness:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*Fed. R. Evid. 703*; see *Mannino v. International*

*Manufacturing Company, 650 F.2d 846,* [*185] *851 (6th Cir. 1981)* ("The purpose of Rule 703 is to make available to the expert all of the kinds of things an expert would normally rely upon in forming an opinion, without requiring that these be admissible in evidence."). Indeed, pursuant to the Notes of the Advisory Committee on the Federal Rules of Evidence, there are three ways an expert may garner facts upon which to base an opinion:

First, the expert may gather information by means of firsthand observation. Second, the expert may base his or her testimony upon facts presented at trial, either in the form of hypothetical questions propounded by counsel or evidence before the court. Third, the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely in forming opinions.

*Ramsey v. Culpepper, 738 F.2d 1092, 1101 (10th Cir. 1984).*

Thus, for example, the following contested paragraph of the Watkins affidavit need not be based upon the affiant's personal knowledge since it is based upon, among other things, various bank documents provided during the course of discovery:

My review of the FI-Utah transaction documents revealed that FI-Utah [*186] started making loans to the Player companies in 1977, and continued to do so through September 1984. With the exception of a $ 3.5 million real estate loan to Player and Willyard ("P&W") in August 1983 relating to the Vernal Sheraton Hotel, the loan requests which I discuss in this Affidavit involved Bill Gurr. Mr. Gurr was the manager of FI-Utah's branch located in Vernal, Utah. Sherman Fuller, Mr. Gurr's superior and an executive officer in FI-Utah's "Branch Administration" (located in Salt Lake City), either approved himself, or approved as a member of FI-Utah's Senior Loan Committee, most of the Player company loans.

Watkins Affidavit of 5/14/89, P13. This data is clearly contemplated by Rule 703 as a proper basis for an expert's opinion. GFC has responded to defendants' dispositive motions by offering the opinions of its expert witness in affidavit form. This should not preclude the affiant from relying upon the same evidence he would base his opinions on at the time of trial. Rather, the court reads the requirements of *Fed. R. Civ. 56(e)* in conjunction with the language and intent of *Fed. R. Evid. 703.*

Defendants second legal argument is that Watkins' conclusions are [*187] based upon the "impermissible pyramiding of inferences." See, e.g., Gurr's Motion to Strike Portions of Watkins Affidavit, 17. Movants point to the following paragraph as an example of this legal flaw:

I also believe my experience as a National Bank Examiner and, subsequently, a senior executive officer with a bank and its holding company will assist the trier of fact to understand the evidence and determine the facts in issue in this litigation. For example, the issue of knowledge, i.e., whether particular bankers knew certain things and/or saw certain documents, is in my experience not a matter which is often expressly acknowledged or admitted on the face of documents, particularly when such knowledge might lead to civil or criminal liability. Unfortunately, such knowledge can too readily and easily be denied. However, determining the meaning and effect of documents and the significance of other events and circumstances is part of the function of bank examiners and senior bank officers. In my experience, the examination and analysis of documents, events and circumstances can often provide an adequate and reasonable basis for an opinion as to whether individuals have [*188] knowledge of particular matters. Given the specialized and often technical nature of banking, I believe the type of expertise I have is essential to and will assist the trier of fact in understanding the documents, events and circumstances present in this case.

Watkins Affidavit of 5/14/89, P6. Movants would recharacterize the methodology utilized by Watkins in ferreting out defendants' knowledge as follows: "Mr. Watkins begins with specific facts (the contents of bank documents), draws an inference (interpretation of how they might be construed)[,] adds a presumption (custom and practice of bankers who might share this interpretation), and draws another inference (knowing and intentional conduct)." Gurr's Motion to Strike Portions of Watkins Affidavit, 18. In support of this argument, movants cite the court to two Tenth Circuit Court of Appeals decisions, *New Mexico Savings & Loan Assoc. v. United States Fidelity & Guaranty Co., 454 F.2d 328 (10th Cir. 1972)* and *Frase v. Henry, 444 F.2d 1228 (10th Cir. 1971).*

However, a review of these precedents reveals that the appellate court in each case simply reaffirmed the principles embodied in Rules 702 and 704. Rule 702 [*189] provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Fed. R. Evid. 702*. Furthermore, the rules also provide that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Fed. R. Evid. 704(a)*. Thus, the court in Frase concluded:

While an expert witness may opine on the ultimate issue, he may do so only insofar as the witness aids the jury in the interpretation of technical facts or to assist in understanding the material in evidence. When the normal experience and qualifications of laymen jurors are sufficient for then to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper.

*444 F.2d at 1231* (citations omitted). Similarly, in upholding the trial court's ruling that an expert could not express an opinion as to whether an accounting concealment was indicated [*190] by the books and records of the plaintiff, the appellate court in New Mexico reasoned:

While the trial court observed that the expressions of [the expert's] opinion would invade the province of the jury, it seems to us that the court was actually determining that the jury, assisted by [the expert's] description of how the books were kept, and evidence as to all these matters, did not need expert help in deciding what [the bank's employee's] state of mind was at the time. As the court said, in up-holding the objections, ". . . the jury is very intelligent here, they know the answer without your interrogating the witness." We hold that, in so determining that the matter under inquiry was not properly the subject of expert testimony, the trial court did not abuse its discretion.

*454 F.2d at 335.*

As the court interprets the above opinions and the applicable rules of evidence, the contested portions of Watkins affidavit -- even those embracing "ultimate

issues" such as knowledge and specific intent -- are admissible, and not the proper subject of a motion to strike, if they (1) assist the trier of fact in understanding the evidence, and (2) are otherwise admissible. It appears [*191] to the court that Watkins' "synthesis" of the evidence would probably assist the trier of fact in understanding customary bank practices as it relates to the voluminous evidence in this litigation. However, as the court noted earlier in its analysis of defendants' alleged regulatory violations, this is not a lawsuit directed at the financial institution's purported negligence under some theory sounding in tort. Thus, the court construes movants' primary argument to be that the conclusions Watkins is prepared to offer concerning defendants' knowledge of the Player frauds are not "otherwise admissible" because they are based on irrelevant data. As the court noted earlier in relation to the motions to strike the Leyton testimony, while irrelevant evidence is indeed inadmissible, the court interprets this type of argument at the motion to strike stage to be a cautionary note to the court: do not deny the underlying summary judgment motions on questions of immaterial (irrelevant) facts.

Thus, the court will consider below key issue raised by all of movants arguments: whether Watkins' opinions on customary practice are relevant to the issues raised by the financial institution defendants' [*192] dispositive motions. This issue is also expressed by movants in their contention that Watkins' may not offer opinions regarding alleged violations of certain statutes and regulations by the financial institution defendants.

(2) Opinions Regarding Statutory/Regulatory Violations

Defendants argue that portions of the Watkins affidavit should be stricken because GFC's expert merely expresses "legal conclusions" by parroting the language of various statutes and regulations. It is clear that portions of the Watkins affidavit do indeed contain references to defendants' purported "violations" of the regulatory and statutory guidelines governing financial institutions. GFC offers the following, telling response to movants' position:

Defendants' objections with regard to legal conclusions go so far as to include Mr. Watkins' opinion that in failing to report Player's check kite, the banks violated 12 C.F.R. 7.5225 (P187), as well as his explanation of the regulations under the Bank Secrecy Act regarding who can be exempted from its reporting

requirements and his conclusion that FSB violated it when it exempted AMS (P260). Mr. Watkins' recitation and explanation of and conclusions [*193] regarding violations of these as well as other regulations such as *18 U.S.C. §§ 1001* and *1014* are clearly useful to and will assist the trier of fact. Violations of regulations such as these, particularly when there are numerous violations over the course of an extended period of time, as in this case, are by themselves probative of the bank's knowledge of Player's frauds.

GFC's Response to Motions to Strike Watkins Affidavit, 31. The court disagrees with GFC's premise. As the court previously held, such regulatory violations are not, by themselves, probative of the financial institution's actual knowledge of the Player frauds and specific intent to further these schemes to defraud GFC. See *Andreo, 660 F. Supp. at 1370* ("Mere reckless disregard of the truth when drafting documents does not justify a finding of RICO civil liability on the basis that the party participated in the illegal enterprise."); O'Brien, [1984 Transfer Binder]Fed. Sec. L. Rep. at P98,562 ("Civil liability under RICO requires knowing or intentional participation and not mere negligence or recklessness."); *Moss v. Morgan Stanley, Inc., 553 F. Supp. 1347, 1362* (S.D.N.Y.) (no participation in [*194] RICO scheme where defendant was allegedly negligent or reckless in aiding and abetting), aff'd on other grounds, *719 F.2d 5 (2d Cir. 1983),* cert. denied, *465 U.S. 1025, 104 S. Ct. 1280, 79 L. Ed. 2d 684 (1984).* In support of its position, GFC cites the court to decisions regarding securities fraud. However, these decisions are inapposite to the instant litigation as the scienter requirement of these cases encompasses willful or reckless behavior. See, e.g., *Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 596 (10th Cir. 1972)* (failure to comply with Federal Reserve regulations supported finding of securities fraud scienter since all that is required is that "one should have been aware of the improper goings-on in an investment firm") (citing *Stead v. SEC, 444 F.2d 713, 716 (10th Cir. 1971),* cert. denied, *404 U.S. 1059, 92 S. Ct. 739, 30 L. Ed. 2d 746 (1972)).*

Thus, the most manageable way to resolve this issue and rule on the pending motions to strike the Watkins affidavit is as follows: (1) to the extent that a particular motion for summary judgment would be granted on the preliminary issue of defendants' lack of knowledge; (2) but for Watkins' assertion that [*195] the particular defendant "knew" of the Player frauds; (3) the court will

carefully examine the basis for this conclusion; and (4) if the Watkins' opinion is based solely upon perceived regulatory and statutory violations; then (5) his conclusion is obviously irrelevant to the issue of defendant's criminal intent. In sum, since the court is unwilling to allow the ultimate trier of fact to make the speculative leap from negligent or reckless behavior to criminal behavior, it is also unwilling to allow GFC's expert witness to similarly speculate, let alone offer this speculation to the jury as "evidence."

(3) Qualifications of Watkins

Defendants object to a few paragraphs of the Watkins' affidavit on the ground that he is unqualified to render some of the opinions expressed therein. As Watkins meets the threshold to be able to offer expert testimony, the court concludes that movants' arguments actually goes to the weight of the evidence and not its admissibility. The court therefore rejects this argument summarily.

(4) Recantation of Prior Testimony

Finally, defendants' fourth argument focuses on the following introductory language contained in the Watkins affidavit: "None [*196] of the opinions expressed herein or in my previous Affidavit are based either in whole or in part on the assessment, if any, I have made of the credibility of any person." Watkins Affidavit of 5/14/89, P4. Various defendants point to previous deposition testimony by the affiant and argue that the court should invoke the "sham fact" doctrine. The court finds little merit in these arguments. The deposition statements referred to by movants involve questions asked by defendants' counsel. Watkins simply stated the logical corollary to his conclusions regarding defendants' knowledge of the Player frauds -- if defendants deny such knowledge then they are not telling the truth. Watkins affidavit does not contain any such credibility questions because he states they are unnecessary to reach the conclusions he proffers to the court. The court can see no reason to strike this statement as a "sham fact."

H. Motions to Strike the Affidavit of Gary A. Mathis

FI-Utah, Gurr, FSB, and Allred seek an order from the court striking the May 30, 1987 affidavit of Gary A. Mathis, a former installment loan officer at FI-Utah's Vernal branch. Movants object to various portions of the affidavit [*197] on the ground that it is not based upon

the affiant's personal knowledge and that Gary Mathis "recanted" much of these statements in a later deposition. They seek an order striking the entire affidavit, however, because the allegedly inadmissible matter is "so interwoven or inextricably combined with the admissible portions that it is impossible, in the practical sense, to separate them." *Southern Concrete Co. v. United States Steel Corp., 394 F. Supp. 362, 380-81 (N.D. Ga. 1975)*, aff'd, *535 F.2d 313 (5th Cir. 1976)*, cert. denied, *429 U.S. 1096, 97 S. Ct. 1113, 51 L. Ed. 2d 543 (1977)*.

Movants present the court with an interesting converse to the usual "sham fact" scenario. Essentially, defendants contend that Gary Mathis signed off on an affidavit which was the product of GFC's attorneys' overreaching. They then contend that his later deposition tells the true story, from the affiant's mouth and not the attorney's pen. Movants would have the court strike the earlier affidavit of Gary Mathis and have the record before the court reflect only these deposition statements. However, the court concludes that all this evidence is before the court and that the affidavit [*198] should not be stricken in its entirety. To the extent that the two conflict, this goes to the credibility of the witness and thus the weight of GFC's evidence. As such, this is the province of the trier of fact.

As with the court's resolution of the motions relating to the Watkins affidavit, the court finds the only manageable resolution of the pending issue to be that the parties trust the court's ability to go beyond the mere excerpted conclusion that a particular defendant "knew" of the Player frauds upon GFC. Should the contested fact of "knowledge" hang upon the affiant's conclusion, the court will scrutinize the language and context of the affidavit statement and the corresponding deposition to find a reasonable foundation for such a damning statement. To the extent that no reasonable foundation exists, then Gary Mathis' affidavit statement does not create a genuine issue of material fact.

Finally, the court notes that FSB, among other movants, also specifically objects to the following portion of Gary Mathis' affidavit:

No later than 1984 it was general knowledge in the Vernal banking community and in FIB's Vernal branch that Mr. Player was dishonest, could not be [*199] trusted and that his companies operated in a shady manner. In fact, Dale Cameron, Assistant Manager of the Vernal branch of First Security Bank, who had previously

worked for Mr. Player and Mr. Willyard, told me after he stopped working for them, that Mr. Player was dishonest and could not be trusted. I related Mr. Cameron's statement to Mr. Gurr. Debbie McCarrell, Mr. Gurr's secretary, also told me that she believed Mr. Player was dishonest.

Gary Mathis Affidavit of 5/30/87, P4. FSB contends that the portions of the above quoted affidavit paragraph concerning what defendant Cameron allegedly said are inadmissible hearsay and lack foundation. The court finds no merit in either argument since Gary Mathis is not required to supply foundation for the alleged statements of Cameron, which are, in any event, not hearsay since they constitute an admission of a party opponent. See *Fed. R. Evid. 801(d)(2)(A)* & (D).

I. Motions to Strike the August 4, 1989 Sworn Statement of Sheldon Player

On August 9, 1989, GFC filed a "Notice of Filing and Service of Sworn Statement of Sheldon G. Player Dated August 4, 1989." The notice accompanying the eighty-nine page sworn statement [*200] announced that it was being filed and served: (1) in response to Gurr and FI-Utah's motions to strike Player's predeposition statements; (2) in opposition to various defendants' motions for summary judgment, pursuant to *Fed. R. Civ. P. 56(c)*; and (3) in opposition to various defendants' motions to strike Player's testimony, pursuant to *Fed. R. Civ. P. 6(d)*. FI-Utah, Gurr, Diumenti, FSB, Mabey, Stoddard, FSF, Christenson, ZFNB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson seek an order from the court striking this sworn statement in its entirety. Movants offer procedural (timeliness) and substantive ("sham fact" doctrine) grounds for striking this document. The court denies the motions to strike on both bases.

First, defendants argue that the August 4, 1989 sworn statement is untimely and prejudicial since it was filed long after liability discovery in this matter was halted and virtually on the eve of the summary judgment motion hearing dates. While the court is concerned with the timing of the filing of this statement -- and inquired of GFC's counsel about this at the time of the hearings -- the court nonetheless concludes that the filing of this sworn statement is in compliance [*201] with the court's scheduling order and the Federal Rules of Civil Procedure. The court has noted before to the parties that the close of discovery does not abate the parties' ability to

marshall the evidence in support of their respective positions. In this vein, the taking of the sworn statement did not violate the discovery cut-off deadline as all parties are free to interview witnesses, including Player, provided that they do not seek the powers of the court to do so.

Further, the filing of this sworn statement was in compliance with the governing federal rules as it was timely filed in response to FI-Utah and Gurr's motions to strike, and also filed at least one day prior to the motions to strike and the other defendants' motions for summary judgment. See *Fed. R. Civ. P. 56(c)* & *6(d)*. The court declines to read out the policy provisions behind these rules simply because the sworn statement, acknowledged by Player as taken under oath, is not technically in affidavit form. The court also reaches the same conclusion regarding FI-Utah's oral motion to strike GFC's errata sheet for statement of facts in opposition to FI-Utah motion for summary judgment. In fact, the Player [*202] sworn statement falls within the ambit of statutory provisions allowing such documents in lieu of an affidavit, since it is acknowledged by Player to be taken under oath, before a sworn court reporter, and since he waived the requirement of his signature. See *18 U.S.C. 1746.*

Movants' second argument is directed at the substance of the August 4, 1989 sworn statement. They contrast portions of Player's latest statement with portions of his earlier deposition testimony. They then urge the court to strike this latter document pursuant to the "sham fact" doctrine discussed earlier by the court. The court concludes that the information contained within the August 4, 1989 sworn statement does not warrant invocation of this rather narrow doctrine. The court reaches this conclusion after placing this sworn statement in context with the motions to strike various Player testimony.

GFC's counsel was faced with a multitude of motions to strike portions of Player's prior affidavits, sworn statements, and deposition testimony. As will be discussed below in the court's analysis of these pending motions, many of the parties' contentions were directed at the speculative nature of Player's [*203] "beliefs" and conclusions about defendants' state of knowledge. It is clear to the court that among other reasons GFC's counsel probably traveled to Lompoc, California, was to have Player shore up his prior testimony by providing specific references to the contested statements. This they did in good measure.

For example, at least two such exchanges, quoted at length below, are indicative of GFC's attempt to defeat the motions to strike for lack of foundation and improper speculation:

MR. CAMPBELL: Okay. Why don't you please review Exhibit 2. And specifically, I'd like to direct your attention to the bottom of page 5851, going over to page 5852 from your deposition of June 2.

Do you see that?

A. Yes.

Q. And it says -- you refer to the question that it was your belief that Mr. Gurr knew about your fraudulent conduct by determining that there were no checks going to equipment suppliers, and that there were several conversations with Mr. Gurr along those lines.

Do you see that?

A. Yes.

Q. And, in fact, did you have conversations with Mr. Gurr about that topic?

A. Yes.

Q. Is there an explanation behind your use of the phrase "belief" in -- if you look specifically at [*204] 5852, line 2?

A. Could you rephrase the question?

Q. Sure. Why did you say that it was your belief that Mr. Gurr knew about your fraudulent conduct from talking to you about there being no checks going to equipment suppliers?

A. He knew of the fraudulent nature of the leases, based upon the facts that he had noted there were no checks going to equipment suppliers and that his bank received a total amount as funded by Greyhound Leasing.

Q. And when you say that his bank received a total amount, what are you referring to?

A. Initially, through a deposit of the proceeds check from Greyhound and, ultimately, a purchase of a time

certificate of deposit, in many cases at his institution.

Q. And was your testimony that he had conversations about there being no checks going to equipment suppliers a specific fact that you recall?

A. Yes.

Q. It's not an opinion or conjecture; is that correct?

A. That's correct.

Q. Would you please tell me where that conversation or an example of that type of conversation occurred?

A. One such conversation occurred in approximately June of 1983. There were others.

Q. And where were you when the conversations occurred?

A. In his office [*205] at First Interstate Bank in Vernal, Utah.

Q. And who was present?

A. Myself and Mr. Gurr.

Q. And were there any occasions when the proceeds of these equipment leases from Greyhound went as repayments of loans to F.I. Utah?

A. Yes.

Q. And did you have any conversations with Mr. Gurr regarding the cash stream from the sublessees, N.L. and Baker?

A. Yes.

Q. When did you have those conversations?

A. As early as 1982. Possible before.

Q. And where were you when Mr. -- who did you have the conversations with? Mr. Gurr?

A. Mr. Gurr, yes.

Q. Where were you when you had those conversations?

A. In his office at First Interstate Bank.

Q. And what did you say to him and what did he say to you?

A. Mr. Gurr, after analyzing our deposit account, made note of the fact that we had no lease income payments from N.L. and Baker International.

Player Sworn Statement of 8/4/89, 7:15-10:15.

Q. BY MR. CAMPBELL: And let me show you the exhibit and direct you attention to the testimony that you gave on page 5857, starting at line 17, in which you were asked whether Mr. Gurr indicated to you indirectly that he understood transactions were fraudulent.

And you answered that [*206] you could -- "I can say that at that time I believed that, based on the situation, based on conversations, that that was true.

"Q. And these were conversations that occurred with Mr. Gurr, were they?"

And you answered, "that's correct."

I'd like to ask you, and if you would, please, elaborate upon any particular conversation that you had with Mr. Gurr to which you were referring to his testimony.

A. There was a conversation on or about September of 1984, whereby upon my issuing to Mr. Gurr a master lease document from Greyhound Leasing Company committing $ 40,000,000 of lease-funding money to our company, that I discussed with Mr. Gurr some details of the transaction. Also, prior to issuing him that document, I issued him the phony N.L. commitment letter of an equal amount of $ 40,000,000, whereby he had expressed to me his concern about knowledge that letter was phony and wanted to know how I intended to cover the letter and cover the phony purported commitment from N.L. It was one such conversation that led me to testify as I did in Exhibit Number 4.

Q. Now, this N.L. document was phony; correct?

A. That's correct.

Q. And it purported to be signed by Craig Rogers? [*207]

A. That's correct.

Q. Who was Craig Rogers?

A. Craig Rogers was a vice president of N.L. Industries.

Q. And a friend of yours?

A. Yes.

Q. And he, in fact, had not signed the letter?

A. That's correct.

Q. And N.L. Industries, in fact, had not agreed to purchase up to $ 40,000,000 of equipment at that time?

A. That's correct.

Q. And, in fact, it did not agree to purchase any equipment from you as represented by the Craig Rogers letter?

A. That's correct.

Q. And with respect to the G.F.C. master lease, did Mr. Gurr -- excuse me. Let me back up.

With respect to the G.F.C. master lease, had you told him that Greyhound was going to fund money based on the Rogers letter?

A. Yes.

Q. And did he ask you what would happen if Greyhound called Craig Rogers?

A. Yes.

Q. And where were you and he when that conversation occurred?

A. In my office in Vernal, Utah.

Q. And was this at the same time?

A. Yes.

Q. And what did you tell him?

A. I told him that I would telephone Craig Rogers, as I had been trying to get a hold of him and hadn't by that point in time, and ask Craig to cover the situation if anybody called and wanted to know if the commitment was good [*208] or not.

Q. And did you say anything else to Mr. Gurr at that time about Mr. Rogers receiving anything?

A. I told him that I would take care of Mr. Rogers financially as I had done in the past. And I did so.

Q. And how much did you give Mr. Rogers?

A. It was approximately $ 30,000.

Q. And did Mr. Gurr indicate to you whether he had spoken to someone from American Savings about the phony N.L. letter?

A. Yes. Mr. Gurr indicated that he had spoken with a Mr. Lowell Mielke, M-i-e-l-k-e, from American Savings, who had indicated to Mr. Gurr that he had also received a copy of the phony N.L. letter from me and he was advising Mr. Gurr that he had telephoned Mr. Rogers and had determined from the conversation with Mr. Rogers that the letter was phony. And he was apprising Mr. Gurr of that conversation with Mr. Rogers.

Q. And when you say that he was apprising him of that, I take it that Mr. Gurr did not say Mr. Mielke had told him literally, in the exact words, quote unquote, the Craig Rogers letter is a forgery; is that correct?

A. That's correct.

Q. As best you can recall the conversation that you had with Mr. Gurr about Mr. Mielke, can you tell me what words he did [*209] use?

A. To the best that I can recall, he used the words "fake," "that was a fake equipment deal."

Id. at 39:25-43:25.

GFC also used this sworn statement to put forth a new wrinkle in an old dispute concerning Player's beliefs and defendants' knowledge. Throughout the course of this litigation, both sides have accused the various attorneys of overreaching, "wood shedding," and, in at least one instance, subornation of perjury in relation to developing Player's testimony. GFC has argued for some time that much of the haziness of Player's conclusory beliefs can be attributed to the advice of his former counsel, Loni DeLand ("DeLand"). The court raises this point now to put GFC's arguments into perspective and not to lend credence one way or the other on this issue.

Major portions of the August 4, 1989 sworn statement concern the purported advice DeLand and some defense counsel gave Player regarding what facts constitute knowledge and the need for a "mutual exchange of confessions." The following excerpt of the sworn statement is typical in this regard:

Q. Well, let me just try, by way of example with anything in particular, and see if that jogs your recollection.

Did [*210] you have conversations with Mr. Gurr about the N.L. purchase order in 1984 and it being funded?

A. Yes.

Q. Were those face to face?

A. Yes.

Q. When did that occur, as best you can recall it?

A. That occurred approximately September of 1984.

Q. Okay. And where were you and where was Mr. Gurr?

A. We were in my office in Vernal, Utah.

Q. Okay. Was this before or after the September 4th, 1984, meeting in Salt Lake City with F.I. Utah officials?

A. It was before the meeting.

Q. Now, let's start with that. If you had that conversation with him, as you understood defense counsel and Mr. DeLand, even though Mr. Gurr talked to you about a phony N.L. Letter, you couldn't say that he knew about the fraud that you were implementing with Greyhound because he didn't acknowledge quoting that you are defrauding Greyhound with this phony letter?

A. Yes.

Q. Is that right?

A. That's correct.

Q. And that would be so, despite the fact that you had independently indicated to him that you were using this letter in connection with equipment leases at Greyhound?

A. Yes.

Q. So you could tell him part of this advice was, even if you told somebody what you were doing in conjunction [*211] with the fraud, it wasn't sufficient to say that they knew, even if you were present at these conversations, unless they responded by verbally acknowledging that they knew exactly, in literal terms, what you were doing?

A. That's correct.

Q. Am I overstating this in any way?

A. No.

Q. Did they use any examples in conjunction with Mr. Gurr about Mr. Gurr not knowing that Mr. DeLand was involved in phony opinion letters?

Q. I believe you're speaking of Mr. Diumenti

Q. Yeah. Excuse me.

A. Could you restate that?

Q. Yeah. Did they use any examples in conjunction with Mr. Diumenti about -- to argue with you that even though you knew this fact and that fact and this other fact and had this conversation, nevertheless, you couldn't say that Mr. Diumenti knew?

A. Yes.

Q. Can you give me an example?

A. Yes. One example was that, in September of 1984, Mr. Diumenti's office generated a legal opinion for the benefit of Greyhound Leasing, which was a fraudulent lease transaction or loan transaction, and that just because when I -- when this was mentioned to Mr. DeLand that, just because that opinion letter was used, did not constitute Mr. Diumenti having knowledge of the [*212] full scope of the Greyhound fraud or scheme.

Also, there was another example. Earlier in 1984, approximately May or April of 1984, Mr. Diumenti's office also generated an opinion letter on a similar fraudulent lease transaction with Armco Financial Services, and just because that was generated by Mr. Diumenti, did not constitute the fact that he knew of the fraudulent nature of the business I was transacting. My

argument was that it did. My advice from counsel was that it did not.

Q. So in other words, here's an example where you have pointed to a specific fact where Mr. Diumenti personally created a false document that was used in obtaining money by fraud; right?

A. Yes.

Q. And Mr. Diumenti knew that that document was false when he created it because there was no equipment and the deal was phony; correct?

A. Correct.

Q. And you pointed that out to counsel and their response was, you can't say that he knew because he only knew about this particular document, it doesn't mean that he knew about every other detail of the fraud?

A. That's correct.

Id. at 23:15-27:8.

Movants label this issue a "red herring" and argue that it is utilized by GFC as a pretext to amend [*213] their opposition papers. They point to Player's earlier deposition statements concerning various defendants' knowledge of the frauds and argue that while GFC might have focused on Player's beliefs, defense counsel were stymied in their efforts to get Player to divulge the factual underpinnings of his beliefs. Thus, in regard to the sham fact issue, they contend that this eleventh hour, sworn statement puts forth specific facts of which Player earlier denied any knowledge. The court disagrees. A close reading of Player's latest sworn statement leads the court to conclude that any arguments regarding the pretextual nature of this document and Player's explanations are better directed at the ultimate trier of fact. Although movants are correct that in many instances Player declined to give to them the specific examples he swears to in his August 4th statement, the court does not find that these are "sham fact."

The court is careful not to adopt any of the statements made by Player concerning certain defense counsels' purported dealings and conversations with Player. However, were the trier of fact to accept this evidence, it might also accept the veracity of the other portions [*214] of Player's sworn statement. This reason alone brings the facts of the instant document outside the ambit of the "sham fact" doctrine.

Finally, the court points out that at various times throughout this litigation, both sides have labeled Player a hostile witness or, at the very least, not a friendly witness. It is clear to the court that Player has indeed occupied both sides of the aisle in this matter. The court makes this point because it goes to the policy rationale behind the "sham fact" doctrine. The cases discussed by the parties all revolve around the following scenario: (1) defendant obtains in some form a fatal concession from plaintiff; (2) defendant seeks summary judgment based on the legitimate fruits of the discovery process; (3) plaintiff then attempts to circumvent the process by offering directly contradicting testimony; and (4) the court enforces the letter and intent of the rules by rejecting the sham affidavit. Thus, the instant situation differs since it is non-party Player, albeit through plaintiffs' efforts, who now comes forward with more evidence. Defendants would no doubt claim that GFC somehow "controls" the product of the declarant. However, even [*215] if this were true at the present time, it is also true that this has not always been the case. Thus, the court is left with the impossible task of deciding in whose camp Player was in at the time he made his myriad statements and then somehow applying them to the sham fact doctrine. It declines movants' invitation to usurp the trier of facts' role in weighing the credibility of witnesses and therefore must deny the motions to strike.

J. Motions to Strike Various Affidavits, Deposition Testimony, and Sworn Statements of Sheldon Player

FSB, FI-Utah, Gurr, Allred, Mabey, Diumenti, FSF, Christenson, Vicki Roussin, ZFNB, ZLC, Argus, Lockhart, ZMC, Hanson, Newbold, and Timpson seek orders from the court striking various portions of Player's affidavits, sworn statements, and deposition testimony. Different defendants attack different portions of the Player evidence. For example, some defendants seek to have Player's "pre-deposition" statements stricken and allow only his deposition statements into evidence. See, e.g., Gurr's Motion to Strike Player's Pre-Deposition Statements. Other defendants, because only Player deposition statements are offered against them, seek an order [*216] striking certain portions of the Player deposition. See, e.g., FSB's Motion to Strike Player Testimony. Not surprisingly, a number of movants join in

both of these efforts and seek an outright ban on all Player testimony. See, e.g., Diumenti's Motion to Strike. The court will comment on this last argument first.

At the August 21, 1989 hearing on defendants' motions to strike, the court was told repeatedly that "Sheldon Player blows like the wind" and that "he is a 180 degree turn." Thus, defendants initially ask the court to recognize the inherent credibility problems associated with this convicted felon and urge that it not consider any of this evidence. As counsel for FSB so colorfully suggested, the court should lock-up in another room all 10,400 pages of the Player deposition. These arguments, however, sound to the court like counsels' summations of evidence to the jury. Although this might be the easiest solution to the pending motions to strike, such a decision is for the trier of fact. As the jury would no doubt be instructed by this court at some later trial, it may credit the veracity of all, some, or none of a witness' testimony.

The court also concludes [*217] that it cannot strike portions of the Player deposition testimony simply because it conflicts with other portions. For example, Allred makes the unusual argument that Player's testimony should be stricken because it is not "believable." See Allred's Reply in Support of Motion for Summary Judgment, 12 n.10 ("it should be noted that for every piece of apparently damaging testimony, Sheldon Player has given and on which Plaintiffs rely, there is a contradictory piece of testimony by Sheldon Player"). This again is an issue of witness credibility reserved for the trier of fact. In fact, much of the purported conflict in testimony arises from leading questions placed before the witness by both sides in this matter. As the court noted earlier, Player's role as a hostile witness fluctuated throughout his lengthy deposition. It is for the trier of fact to determine whether this testimony is internally inconsistent in whole or in part.

The final issue before the court raises the same legal questions discussed above in relation to defendants' motions to strike affidavits of Watkins and Gary Mathis. First, Player's pre-deposition statements contain several conclusory statements regarding [*218] various defendants' knowledge of the frauds perpetrated upon GFC. As with the court's resolution of the Watkins and Gary Mathis motions, the only manageable way to resolve this issue is to assume that the court will look behind this conclusion and demand a reasonable foundation for such a statement. Where none exists, the

statement cannot be relied upon to create a genuine issue of material fact. Second, Player's deposition statements will also be considered as they relate to his pre-deposition statements and conclusions. To the extent that he explicitly retracts a portion of these statements, then the court will not consider this evidence in resolving the pending motions for summary judgment.

Thus, for a resolution of these motions to strike the Player evidence, the court directs movants' attention to its analysis below of the summary judgment motions. Before doing so, however, the court points out that at oral argument on these motions, several defendants contended that Player is an essential ingredient to GFC's case, and that his absence would be fatal to GFC's efforts. While not wishing to appear to argue GFC's case, it seems to the court that this somewhat overstates the [*219] issue. Player's admissible testimony does indeed simplify the court's task of ruling on some of the pending dispositive motions as the court need not consider other evidence once a genuine issue of material fact arises. But in those instances where Player's conclusions lack foundation or personal knowledge and are thus stricken, the court must still carefully scrutinize GFC's other layers of evidence to determine whether this matter should be sent to a jury.

VI. MOTIONS FOR SUMMARY JUDGMENT

A. Motion for Summary Judgment Standards

The parties expend a great deal of time and effort arguing the exact standards which they contend govern the court's analysis of the pending dispositive motions. Much of this argument needlessly added to the bulk of the materials placed before the court. In an effort to set forth a concise overview of the controlling summary judgment standards, the court posits the following conclusions.

To grant summary judgment, the court must hold that the record clearly establishes "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In determining whether summary judgment [*220] should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Matsushita Electric Industrial Co., v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356-57, 89 L. Ed. 2d 538*

*(1986)*. The moving party may discharge this burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*. The party opposing a motion for summary judgment cannot rest upon mere allegations or denials of the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2515, 91 L. Ed. 2d 202 (1986)*.

Under the standards as set forth by the Supreme Court, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of [*221] material fact. *Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2514*. A material fact is any factual issue which might affect the outcome of the case under the governing substantive law. A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id. at 248, 106 S. Ct. at 2510*.

At this summary judgment stage, it is the court's function to determine whether there is a genuine issue for trial. There is no issue for trial unless there exists sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id. at 249-50, 106 S. Ct. at 2511*. As the Supreme Court emphasized in the Anderson decision:

[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask [*222] himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id. at 252, 106 S. Ct. at 2513*.

This last point warrants emphasis. For the past year, the court and the parties have discussed this phase of the litigation in terms of the requirements under the Celotex decision. The court specifically set forth the parameters and burdens upon the moving and non-moving parties before the briefing process occurred -- to the point of creating a hybrid local rule melded from the summary judgment requirements mandated by the Districts of Utah and Arizona. After close review of the parties' lengthy statements of fact, and after almost an entire week of oral argument on the matter, it should surprise no one that the pivotal issue before the court is the reasonableness of the inferences which GFC would have a future trier of fact draw from the evidence thus far presented. [*223] If a reasonable juror could not draw such an inference, then summary judgment is warranted. See *Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987); Neely v. St. Paul Fire & Marine Ins. Co., 584 F.2d 341, 345-46 (9th Cir. 1978)*. Conversely, if a reasonable juror could draw the inference which GFC proffers as fact, then summary judgment must be denied and the matter must await resolution by the trier of fact.

Moreover, this reasonableness standard of necessity requires the court to apply the governing rules of evidence and the standards of the applicable substantive law. As the Supreme Court made clear in the Anderson decision:

Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id. at 254-55*, [*224] *106 S. Ct. at 2516*. The rules governing summary judgment motions also requires that this evidence be viewed in the light most favorable to the non-movant, *Gray v. Phillips Petroleum Co., 858 F.2d 610, 613 (10th Cir. 1988)*, in this case, GFC.

When the court began this memorandum by referring to reliance upon common sense, it was not simply bemoaning the need for brevity of argument. Whether defendants wish to label GFC's assertions of fact as illogical, illegitimate, or impermissible, it is the reasonableness of these inferences which is at issue and

upon which the success of defendants' dispositive motions depends. In arriving at whether GFC's inferences are reasonable, the court can only consider that evidence which would be admissible and which convinces the court through its quantity and quality that a reasonable juror could reach the same conclusions asserted by GFC.

B. Hanson's Motions for Summary Judgment

GFC alleges that Hanson joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, P198. According to plaintiffs, Hanson "aided and abetted the schemes among other ways by transferring cash or extending credit as part of the execution of [*225] the schemes. These actions induced GLFC into advancing funds, which the defendants knew would not be used for the represented purposes, but to enrich themselves." Id., P156. For example, GFC claims that Hanson participated and aided and abetted the Player frauds in the Fall of 1984 when he provided Player a fully secured loan in the amount of $ 3,850,000. Id., P200. In total, GFC alleges that Hanson "wilfully, knowingly and fraudulently induced GLFC to advance a total of $ 40,501,175, over nine separate but related episodes from February though June 1985." Id., P158.

In the Fall of 1988, the court granted Hanson leave to file an early dispositive motion. Hanson's moving papers focused on the central issue of his purported knowledge of the Player frauds. The matter was fully briefed and argued by the parties and taken under advisement by the court. Because GFC has failed to raise any genuine issue of material fact on the subject of Hanson's lack of knowledge of the Player frauds, the court must grant Hanson's motion for summary judgment.

GFC relies upon portions of Player's April 14, 1987 affidavit to prove Hanson's knowledge. See GFC's Response to Hanson's [*226] Motion for Summary Judgment, 7-9, 24, 75, 78. In all, this Player affidavit mentions Hanson four times. The court quotes below all relevant portions of this affidavit:

In various ways, Zions First National Bank ("Zions Bank"), Zions Leasing Company ("Zions Leasing"), and Argus Leasing Corporation ("Argus Leasing") participated in, encouraged, and benefited from my schemes to defraud a number of people, including GLFC and Greycas. Among other things, these entities and their officers including Ronald Hanson, Donald Timpson [sic] and M. Scott Newbold knowingly helped bail my

companies out by providing financing when the financial pressures on my companies were increasing. These entities received, as repayments of loans, funds which they knew or could not help knowing were obtained fraudulently from GLFC and Greycas.

Player Affidavit of 4/14/87, 30:2-13.

Over the term of the [1979-84 equipment] lease transactions with Zions Leasing referred to above, Mr. Timpson and Mr. Newbold pressured me to make payments on transactions where I had no obligation to do so. During the Summer of 1984, Mr. Timpson and Mr. Newbold of Zions Leasing, and Ronald Hanson of Zions Bank requested that [*227] I pay off the leases and they charged amounts that were higher than I understood were owed under the leases. In November 1984, I paid Zions Leasing more than $ 147,000 as final payment on several transactions. Zions Leasing and Zions Bank knew that I was using funds fraudulently obtained from GLFC to make these payments.

Id., 31:6-16.

In 1984, I applied to Zions Bank for a loan to repay GLFC's construction loan on the RRI. This loan was initially approved and R. Kay Poulsen of Zions Bank informed GLFC of this by a copy of a letter. Subsequently, Mr. Poulsen informed me that the loan had been considered and rejected by the Executive Committee of Zions Bank. After Zions Bank rejected the loan, I personally negotiated with Mr. Hanson, Paul Williams, Mr. Poulsen, and other officers and representatives of Zions Bank in an effort to obtain the loan. In the course of these negotiations, Mr. Hanson indicated that he needed $ 1,000,000 in cash as part of the collateral for the loan. I explained to him that I did not have the money and that the entire proceeds of the loan were needed to repay obligations owed in connection with the RRI. In response, Mr. Hanson stated that I [*228] should get the funds from Greyhound.

Because I needed the RRI loan, I ultimately agreed to a $ 500,000 deposit as collateral for the loan. I also agreed to pay more than $ 147,000 for leases with Zions Leasing. At the time I agreed to these terms, I believe officers of Zions Bank, Zions Leasing and Argus Leasing knew that I had entered into the fraudulent NL Industries lease transaction with GLFC. Zions Bank, Zions Leasing and Argus Leasing knew that the payments I made from

November 1984 forward were made with funds which I fraudulently obtained from GLFC.

Id., 32:21-33:16.

First, the statement that Hanson "knowingly helped bail my companies out" provides no factual foundation for the ambiguous reference to Hanson's knowledge. There is no statement as to what Hanson knew nor any facts offered to justify any inference on this issue. Second, the statement that Hanson requested payments "higher than I understood were owed under the leases," offers no facts to indicate the basis for any understanding nor does it state that the amounts requested were higher than the amounts owed. Third, the statement that Hanson told Player to "get the money from Greyhound" was put in its [*229] proper context by the affiant at his deposition on February 11, 1988. As to this specific portion of the affidavit, Player testified as follows:

Q. Were you bothered by that particular statement as it pertained to Mr. Hanson?

A. Yes.

Q. What was it that bothered you about the statement?

A. What bothered me and what still does bother me is that, again, I will say it for -- I will repeat again -- I don't know how many times I have repeated it but I will say it again.

If I were to have drafted this document, I would have made a fuller explanation, particularly in regards to Mr. Hanson. We did have this discussion as appears at the bottom of page 32, top of page 33. There was mention of Greyhound. Mr. Hanson was informed of who the underlying first mortgage lender was, meaning Greyhound.

The statement that Mr. Hanson stated I should get the funds from Greyhound, is not in any way, shape or form the way I would have worded what took place that day. It was simply that possibly the funds could be advanced from Greyhound on a step-up construction loan because they, being the underlying lender -- that was a practice that -- you know -- was commonly done by construction lenders. [*230]

That was the type of conversation that was taking place. This is just another example how very, very technically this sentence is, I suppose, to a degree, correct to an outsider looking in, to someone that might assume that Greyhound did not have, for example, a real estate lending division of Greyhound Leasing & Financial, one could derive from this statement without a further explanation that Mr. Hanson was referring to getting money from Greyhound Leasing in the manner in which I had been getting it from them.

So this just goes back to my testimony on February [sic] 18 whereby I tried to portray that this is not -- because of the way this thing is written, it can be misleading without a full explanation of everything. It very easily could and probably in many respects would be misleading.

I don't know if that answers your question. It certainly wasn't a "yes/no" answer, I realize that.

Q. I take it that you are suggesting here that you have no reason to believe or had any knowledge or information that Mr. Hanson of Zions First National Bank had any knowledge with respect to any fraudulent dealings that you have had with Greyhound Leasing?

A. At the time of our meeting? [*231]

Q. Yes.

A. That's correct.

Q. The response that you are referring to was in the context that Greyhound was the construction lender and this was a discussion about a take-out of the construction lender.

A. That's correct.

Player Deposition of 2/11/88, 1647:12-1649:16. Thus, these portions of Player's April 14, 1987 affidavit do not support GFC's position that Hanson had knowledge of the Player frauds.

In opposition to the Hanson motion, and in response to the above quoted Player deposition statement, GFC cites the following lengthy portion of Player's deposition:

Q. And when you also spoke to Mr. Hanson when you were negotiating with him on the Zions loan, that was at a point subsequent to the conversations where you had been threatened by Mr. Timpson and Mr. Newbold,

correct?

A. That's correct.

Q. And, in fact, in the negotiations you had with Mr. Hanson he indicated to you that he had spoken to Mr. Timpson and/or Mr. Newbold about Zions Leasing transactions; is that right?

A. That's correct.

Q. And Mr. Hanson, in fact, in the course of the discussion you had with him was following up or conversations that Mr. Newbold and Mr. Timpson had had earlier with you [*232] on those lease transactions; is that right?

A. I would characterize it as such, yes.

Q. And the reason that you would characterize it as such is because Mr. Hanson, in fact, spoke to you about repayment of the Green River and other lease transactions at Zions Leasing; is that right?

A. That's correct.

Q. In connection with the discussions on the million dollars for cash security for the Zions loan when Mr. Hanson told you to get the money from Greyhound, that was in connection with a fraudulent lease transaction at Greyhound, correct?

A. I'll say I don't know what he was thinking at the time, but I'll say by that point in time I felt that was a possibility.

Q. Well, and one of the reasons you felt that was -- one of the reasons that you felt that Mr. Hanson was referring to getting the money through a fraudulent lease transaction from Greyhound was that you couldn't get that kind of money on a legitimate lease transaction, right?

A. That's correct.

Q. In fact, if you entered into a legitimate transaction -- lease transaction with Greyhound you would have to use the proceeds to buy whatever the equipment was and you wouldn't have any left over for Zions Bank, correct? [*233]

A. That would be correct.

Q. And Mr. Hanson also wasn't, as you understood it, referring to any additional loan on the hotel because you had informed him that you couldn't get anymore financing on that property from Greyhound, is that right?

A. I had informed him that we had drawn the maximum on that loan.

Q. And all the proceeds on that loan including interest reserve that we discussed a moment ago, you had already spent those funds, correct?

A. That's correct.

Q. Now, you indicate in earlier testimony that you did not know -- well, your exact testimony was: I do not know that he knew about the Greyhound fraud, referring to Mr. Hanson, and that was in your deposition of February 11th at pages 1660 and 1661. And do you recall that testimony?

A. Somewhat, yes?

Q. And when you said that you did not know that Mr. Hanson knew about the Greyhound fraud, you said that and that was your testimony because you did not have a conversation with him where you told him about the Greyhound's frauds and he acknowledged you knowing about those frauds; is that right?

A. That's correct.

Q. But short of that specific conversation, you did have a number of conversations and discussions [*234] with Mr. Hanson about your finances and where you are getting your money and your lease transactions where you understood that he was aware of your fraudulent lease transactions with Greyhound; is that right?

A. I believe he certainly could have been.

Q. And you knew by that point that Mr. Hanson had spoken to people who you believed knew about the Greyhound frauds including Mr. Timpson and Mr. Newbold; is that right?

A. That's correct.

Q. And Mr. Hanson acknowledged that he heard about your fraudulent transactions was something that he conveyed to you indirectly; is that right?

A. That's one way of characterizing it, yes.

Q. And that's one way of characterizing it, because in the course of you discussions he said -- in words of substance he referred to transactions that other people at Zions, with whom he had spoken, knew were fraudulent; is that right?

A. That's the basis for my belief of the characterization, yes.

Q. And given the circumstances in the conversations you had with Mr. Hanson, that's a fair characterization; is that right?

A. That's correct.

Q. Now, in your testimony again on February 11, '88 you indicated: I might also reserve my beliefs, but I [*235] do not know that he knew about the Greyhound frauds, speaking about Mr. Hanson. With respect to your -- the beliefs that you reserved, one of those beliefs was that you believed and understood that he did know about the Greyhound frauds; is that right?

A. I believed it.

Q. And your belief on -- your belief that he knew about the Greyhound frauds was based on what he said?

A. In part, yes.

Q. And in part because he indicated to you that you should obtain money put up as security for the Zions loan from Greyhound; is that right?

A. In part, yes.

Q. And also in part your belief was based on the fact that Mr. Hanson took up where Mr. Newbold and Mr. Timpson had left off in trying to get you to repay obligations on lease transactions with Zions Leasing that were fraudulent?

A. That's correct.

Q. And your belief is also based on the fact that Mr. Hanson made some veiled references to your fraudulent conduct; isn't that right?

A. That's a way of characterizing the conversation.

Q. And that's a fair way of characterizing it and was

how you viewed the conversation; is that right?

A. That's correct.

Q. And, in fact, that's how you operated in trying to deal with the [*236] situation; that is, with the understanding that Mr. Hanson knew about your Greyhound frauds?

A. That's correct.

Q. And, in fact, that's also a fair way of characterizing it because that's exactly what happened; that is, you obtained the money from Greyhound for fraudulent transactions; is that right?

A. That's correct.

Q. Now, ultimately you did receive a loan from Zions Bank on the Riverdale Rodeway Inn property, correct?

A. That's correct.

Q. And you paid off the Greyhound construction loan with proceeds from that loan; is that right?

A. That's correct.

Q. You also paid off other obligations on the Riverdale Rodeway Inn property with that loan; is that correct?

A. That's correct.

Q. And by obtaining that loan from Zions Bank you were able to clear the way for the fraudulent lease transactions of $ 40 and $ 50 million that you conducted with Greyhound in 1984 and 1985; is that right?

A. That's correct.

Q. And the loan from Zions Bank on the Riverdale Rodeway Inn bailed you out of the biggest single obligation you had in a period when your companies were on the verge of insolvency or actually insolvent; isn't that right?

A. That's correct.

Player Deposition [*237] of 6/22/88, 6444:7-6451:12.

The court concludes that the above passage further

bolsters the court's findings regarding the April 14, 1987 Player affidavit. As the court has pointed out in previous orders, Player's "beliefs" alone will not be enough to defeat a motion for summary judgment. See Court Order of 9/9/87, 34. GFC must put forth evidence from which a reasonable trier of fact could reach this same inferential belief. In this instance, the only remaining issue raised by GFC's evidence is whether Hanson's contact with other ZFNB and ZLC employees and officers can somehow create a reasonable inference of Hanson's knowledge of the Player frauds. This same issue also raises and resolves the reference in Player's deposition testimony above to Hanson's "veiled threat."

The alleged knowledge of Timpson and Newbold is thus raised by GFC to defeat Hanson's motion. Timpson and Newbold also seek summary judgment and the court will discuss below the evidence offered by GFC against these motions. However, for the purposes of the present motion, the court will assume that GFC's evidence creates a material issue of fact as to Timpson and Newbold's knowledge of, and participation [*238] in, the Player frauds. Even under this scenario, the court finds that GFC offers no evidence from which a reasonable juror could impute the knowledge of Timpson and Newbold to Hanson. The following excerpt of the Player deposition demonstrates GFC's inability to fill in this crucial link:

Q. And what were, why was it that Mr. Hanson was speaking to Mr. Murdock?

A. Apparently Mr. Hanson had been doing some investigative work in regards to the Riverdale Roadway [sic] Inn loan, and had occasion to speak to Mr. Murdock, and Mr. Murdock at least reported saying good things about us.

Q. Why was Mr. Murdock undertaking an investigation into you in connection with the Riverdale Roadway [sic] Inn?

A. You mean Mr. Poulson [sic], or excuse me, Mr. Hanson?

Q. I am sorry, did I say Mr. Murdock? I meant to say Mr. Hanson.

A. That was at a time when we had demanded that they, meaning Zion's [sic] Bank, make good on their commitment to issue us a loan. So I believe he was doing further investigative work.

Q. Did word get back to you from people associated with Zion's [sic] Bank or Zion's [sic] Leasing that he had in the course of this investigation made inquiry about the outstanding [*239] leases?

A. Yes.

Q. And where did that come from?

A. Actually it had come from Mr. Hanson himself. I do recall him telling me that he had been advised and was aware and wanted to discuss the matter about outstanding leases.

Q. And when did he make that statement to you?

A. That statement was made at a meeting with him and Mr. Stoddard I believe on or around this time, maybe possibly earlier.

Q. Where did it occur?

A. In his office at Zion's [sic] Bank.

Q. Was anyone else there?

A. Yes, Mr. Bill Stoddard.

Q. Did he allude to problems that existed with the outstanding leases?

A. Yes.

Q. And specifically what did he say about them?

A. At least he said that he was aware of our agreement to clear off, meaning pay off the outstanding leases that were bad with Zion's Leasing, and that we had at least in part agreed to do this for Zion's [sic] Leasing.

Q. Why did that topic come up in the conversation?

A. I believe that it came up as a matter of condition or precondition that he wanted in order to fund this Riverdale Roadway [sic] project.

Q. Who did he say he had spoken to about the leases?

A. I believe he said he had spoken to Mr. Timpson, if I am not mistaken.  [*240]

Q. Did he say that Mr. Timpson had informed him

about all of the problems that existed with the underlying leases?

A. I guess I don't recall for sure. Only that they were, that he mentioned that they were bad leases.
Player Deposition of 10/4/88, 9026:10-9028:21.

This deposition testimony in no way supports an inference that Hanson was told of the Player frauds by Timpson or Newbold and used this as a "veiled threat" against Player in his negotiations on the RRI loan. Rather, it simply supports the other evidence offered by the parties which demonstrates that Hanson was told by these Zions Leasing officers that Player agreed to pay on a ZLC lease. This is evident from a reading of the October 3, 1984 memorandum from Hanson to Poulsen:

I have been advised by Scott Newbold of Zions Leasing that they have been working with Sheldon Player to pay them approximately $ 60,000.00 on a piece of equipment which Player agreed to sell for Zions Leasing. Up until this time Player has not performed by paying for the equipment or remitting the sales proceeds to Zions Leasing. At the time we were negotiating the loan on the Roy motel Player indicated to Newbold that payment would be made [*241] to them when our mortgage loan is closed.

Zions Leasing would appreciate it very much if you would protect their interest in this matter at the time the proceeds of the loan to Player and Willyard are disbursed, if in fact, that loan is actually made and closed.

Hanson's Reply in Support of Motion for Summary Judgment, Exhibit C.

The court concludes that GFC has failed to meet its burden of establishing a genuine issue of material fact as to Hanson's knowledge of the Player frauds upon GFC. A close examination of all evidence offered by GFC, no matter how tangential, leads the court to the conclusion that a reasonable trier of fact could not conclude that Hanson knew of the Player frauds upon GFC. This ruling also includes granting GFC's motion re: Zions Defendants' Second Set of Requests for Admissions with Interrogatories and thus considering this accompanying evidence. Therefore, the court grants Hanson's initial motion for summary judgment on this issue as well as his later motion for summary judgment. Because GFC cannot establish the essential elements of knowledge and intent, Hanson is granted summary judgment on GFC's RICO

claims based upon §§ 1962(c) & (d). The court [*242] also declines to exercise pendent jurisdiction over the remaining state law claims, see *United Mine Workers v. Gibbs, 383 U.S. 715, 725-26, 86 S. Ct. 1130, 1138-39, 16 L. Ed. 2d 218 (1966),* and the remainder of GFC's Fourth Amended Complaint asserted against Hanson must therefore be dismissed.

C. Gurr's Motion for Summary Judgment

GFC alleges that Gurr knowingly transferred cash and extended credit in furtherance of the Player frauds beginning no later than 1979. GFC's Fourth Amended Complaint, P202. GFC further contends that FI-Utah aided and abetted the Player frauds by providing the Player companies with cash transfers and credit extensions and by allowing Player to maintain bank accounts with FI-Utah. Id. In summing up the allegations of GFC's pleading and the core issues before the court, Gurr concludes that "[i]n eight different ways, Greyhound has alleged that Mr. Gurr knowingly and intentionally participated in fraudulent activity that caused plaintiffs to lose money." Gurr's Motion for Summary Judgment, 11 (footnote omitted). Hence, it is not surprising that, similar to other defendants' motions for summary judgment, Gurr would have the court focus upon [*243] the issue of knowledge and intent.

Gurr contends that GFC has not brought forth sufficient evidence to raise a genuine issue of material fact as to Gurr's knowledge of the Player frauds. The court disagrees. In fact, the court need look no further than the above quoted portions of Player's August 4, 1989 sworn statement to find an issue for the trier of fact. The court reaches no conclusions as to the veracity of Player's statements about Gurr's knowledge and participation in the frauds perpetrated upon GFC. It is enough at this point to conclude that a genuine issue of material fact exists on this element running throughout of GFC's claims.

Gurr raises other legal arguments relating to GFC's pleading which have been already addressed by the court. None of these arguments warrants granting summary judgment in Gurr's favor on GFC's §§ 1962(c) & (d) claims. However, it is apparent from GFC's responsive memorandum that plaintiffs have abandoned their fraudulent conveyance, conversion, and constructive trust claims asserted against Gurr. See GFC's Response to Gurr's Motion for Summary Judgment, 19. The court therefore grants Gurr's motion for summary judgment

directed at [*244] these claims and dismisses GFC's Thirteenth through Fifteenth Claims for Relief against Gurr.

D. FI-Utah's Motion for Summary Judgment

GFC alleges that FI-Utah knowingly transferred cash and extended credit in furtherance of the Player frauds beginning no later than 1979. GFC's Fourth Amended Complaint, s P202. GFC further contends that FI-Utah aided and abetted the Player frauds by providing the Player companies with cash transfers and credit extensions and by allowing Player to maintain bank accounts with FI-Utah. Id. FI-Utah, like other movants, focuses the court's initial attention on GFC's evidence offered to support a reasonable inference of FI-Utah's actual knowledge of, and specific intent to further, the Player frauds. Because the court concludes that GFC has failed to raise a genuine issue of material fact on this essential element of its RICO claims, the court will grant FI-Utah's motion for summary judgment.

FI-Utah accurately categorizes GFC's evidence of the bank's knowledge and intent as follows:

As to the scienter element, Greyhound argues that actual knowledge by FI-Utah employees that Player's equipment deals were fraudulent, and an intent to further [*245] such fraud, can be inferred from: (1) certain Bank employees' suspicions of Player's dishonesty and "shady dealings" in other circumstances; (2) certain testimony by Player and others concerning what Bill Gurr, FI-Utah's former Vernal Branch Manager, knew about Player's equipment dealings; (3) FI-Utah's ability to review, and actual monitoring of, Player's checking accounts; (4) certain internal FI-Utah loan reports referring to Greyhound funding as a source of repayment for Bank loans to Player; (5) FI-Utah's receipt and review of an audited financial statement for AMS (the "A&I Audit"); (6) the Bank's internal analyses of Player's unaudited financial statements; (7) Player's history of continuous borrowings from FI-Utah; (8) Player's banking account activity, including drawings on uncollected funds, overdrafts and kiting; and (9) the presence of a motive to assist Player in obtaining funds from Greyhound so that Player's Bank loans could be repaid and the Bank could generate income. (See GFC Memo, at 3-7.)

FI-Utah's Reply in Support of Motion for Summary Judgment, 9-10.

Many of these categories of GFC evidence have previously been analyzed and rejected by the court. For [*246] example, the court has already concluded that evidence of FI-Utah's failure to spot and properly report instances of Player's check kiting and large currency transactions cannot, as a matter of law, support an inference of actual knowledge of the equipment frauds and the necessary criminal intent to further Player's schemes. Thus, while much of GFC's evidence might permit a reasonable trier of fact to find FI-Utah negligent or even reckless, these are not the standards of knowledge and intent governing this racketeering lawsuit. The court will discuss the remaining evidence offered by GFC to demonstrate FI-Utah's actual knowledge of the Player frauds.

First, although the court concludes that genuine issues of fact exist as to Gurr's alleged knowledge of, and participation in, the Player frauds, the court also holds that this does not establish FI-Utah's liability for GFC's RICO claims under the doctrine of respondeat superior. As the court pointed out above, such a finding of vicarious liability, absent evidence of knowledge and intent from officers and directors of FI-Utah, would be anathema to the requirement of specific criminal intent under the RICO statutory scheme. Phrased [*247] differently, the court's factual conclusions as to GFC's evidence offered against Gurr do not necessarily prove fatal to FI-Utah's efforts to obtain summary judgment. The court must look beyond this evidence to determine whether other evidence offered by GFC establishes a genuine issue of material fact.

Second, the court has already discussed Gary Mathis' statements regarding the Vernal banking community's "general knowledge" that Player was dishonest and operated his companies in a "shady manner." It is uncontested that sometime prior to August of 1984, Gary Mathis also called the main office in Salt Lake City and informed DeVere Watkins, the head of branch administration, that Player was involved in a check kite. FI-Utah's Motion for Summary Judgment, 17; FI-Utah's SOF P435. Moreover, it FI-Utah's head of branch administration was further informed that

we've got a situation going on out here that because of the suspicion of fraud?

A. I believe that's correct, yes.

Q. Now, do you agree they did not qualify their

opinion based on the suspicion of fraud?

A. Not -- not expressly, yes, I agree with that.

William    Watkins    Deposition    of    9/15/88,
2258:20-2259:22.

The court [*248] concludes that the trier of fact could not reasonably infer knowledge of the Player frauds on the part of FI-Utah officers -- even if the court were to assume that these unnamed bank officials actually read this audit. The language of the audit does not support such a conclusion. Moreover, the leap from the express language of the document to the inferences GFC's expert would have the trier of fact draw does not fulfill plaintiffs' burden. This is so because the inferences to be drawn from the A&I audit do not go to the Player frauds perpetrated upon GFC, but rather to the more general conclusion that "its description of AMS' conduct indicates a high probability that AMS is engaged in wrongful and fraudulent activities." Watkins Affidavit of 5/14/89, P41. This inferential reasoning is much too tenuous to defeat the present motion for summary judgment.

Finally, GFC argues that FI-Utah's own analyses of Player entities' financial statements establishes that the bank knew of the fraudulent nature of the GFC equipment leases. GFC's Response to FI-Utah's Motion for Summary Judgment, 24-27. For example, GFC cites to a September 13, 1982 inter-office memo from Miller to Gurr regarding [*249] various deficiencies P&W's financial statements. At the bottom of the form letter advising Gurr that P&W's financial statements for 1981 were being rejected by FI-Utah's credit department, Miller concluded as follows:

Of course the killer is that real estate is probably carried at "market" rather than at historical cost as is required by standard accepted accounting principles. This "market" valuation grossly overstated equity. In this case equity is probably overdrawn substantially. As it is, using the statements is like trying to build a house with wet tissue paper in a hurricane.

FI-Utah's Reply in Support of Motion for Summary Judgment, Exhibit 96. However, as FI-Utah correctly points out, it is undisputed that GFC itself was privy to Player's company-prepared statements and, in fact, reviewed them. FI-Utah's SOF PP133 & 177. This simply points out that while FI-Utah's analysts may have raised

questions as to the Player entities financial stability, as did the A&I audit, this alone does not suppport a reasonable inference that these same bank officials knew that Player's equipment deals were phony. The court finds that none of the bank's internal analyses proffered [*250] by GFC, see GFC's SOF PP764-73, 794-96, 843, 975-81, 1523-55, 1578-79, 1581-90, 1592-1600 & 16404-22, support a reasonable inference of FI-Utah's knowledge of the Player equipment frauds perpetrated upon GFC.

The court therefore concludes that GFC has failed to raise a genuine issue of fact as to FI-Utah's alleged knowledge of the Player frauds. As such, the court grants FI-Utah's motion for summary judgment on GFC's remaining RICO claims, §§ 1962(c) & (d). Furthermore, as discussed above in relation to the Hanson motion for summary judgment, the court declines to exercise pendent jurisdiction over GFC's remaining state law claims. The court therefore dismisses these pendent claims as well and grants FI-Utah's motion in its entirety.

E. Christenson's Motion for Summary Judgment

GFC alleges that Christenson aided and abetted the Player frauds by extending credit and transferring cash to keep the fraudulent schemes going beginning no later than May of 1983. GFC's Fourth Amended Complaint, P195. GFC also claims that Christenson "induced Player to use part of what purported to be equipment loan proceeds disbursed to the Player entities enterprise to purchase land owned [*251] by an entity controlled by defendant Christenson." Id., P196.

Christenson joins in FSF's motion for summary judgment, legal arguments, and accompanying statements of facts, with the following specific reservation:

FSF is clearly attempting to distance itself from its former president by painting itself as a victim of his actions. Christenson expressly denies FSF's conclusory allegations that he intended to defraud or manipulate FSF. He further denies any such similar conclusions drawn by Richard Passman or Bryon Larsen in their audit of FSF. Christenson specifically denies that he defrauded FSF, that he manipulated any of the transactions to his own benefit, or that he ever acted in his own interest contrary to the interest of FSF.

Christenson's    Motion    for    Summary    Judgment,    4. However, the court notes that Christenson contends that even if he did intentionally defraud his employer, he still

is not liable to GFC in the present lawsuit. As with many other defendants to this action, Christenson focuses his legal arguments on the issue of knowledge. Thus, according to Christenson, "it does not follow that, if Christenson did engage in self-dealing in an effort to defraud [*252] FSF, that he thereby knew that Player was defrauding plaintiffs." Id., 5.

While the court agrees with the logic of Christenson's argument, it also finds it irrelevant when compared with the evidence offered by GFC. GFC argues that Player has stated that Christenson knew of the Player frauds perpetrated upon GFC. A careful review of Player's testimony on this matter leads the court to conclude that it is more accurate to say that a reasonable juror could infer that Christenson knew of the Player frauds. Thus, the following deposition testimony alone raises a material question of fact on this issue:

Q. Now, you described Skip Christenson as a fairly sophisticated banker, right?

A. Yes.

Q. Fairly slick?

A. I would say that, yes.

Q. Not the kind to come out and say something out right if he didn't have to?

A. That's true.

Q. So he'd tell you things like I spoke to these people, they told me the way you do business?

A. That's true.

Q. The way he said it, you understood that he was saying he knew that if you were committing frauds?

A. I would say at a point, that's a true statement.

Q. Mr. Christenson would never go right out on the line and say that out right? [*253]

A. That's true.

Q. He was too slick for that?

A. That's true.

Q. But by the way he told you that he spoke to these people and they told him how you did business, that was the impression he was trying to convey, at least as you understood it?

A. I would amend that to say not only in his speech, but also in his actions.

Q. In the timing of them?

A. Timing and the things, the requests that he made of me to purchase items from him, that type of business.

Q. In other words, when he asked you to buy things, that was when he would drop little hints, isn't it?

A. That's correct.

Player Deposition of 6/1/88, 5714:7-5715:15. Other such deposition testimony also raises similar inferences of knowledge. See id., 5795:9-5796:22. Therefore, with the exception of GFC's § 1962(a) claim, the court therefore denies Christenson's motion for summary judgment in its entirety.

F. FSF's Motion for Summary Judgment

GFC alleges that FSF aided and abetted the Player frauds by extending credit and transferring cash to keep the fraudulent schemes going beginning no later than May of 1983. GFC's Fourth Amended Complaint, P195. GFC also claims that FSF "induced Player to use [*254] part of what purported to be equipment loan proceeds disbursed to the Player entities enterprise to purchase land owned by an entity controlled by defendant Christenson." Id., P196. Hence, according to GFC. "a deal was struck -- FSF would provide the funds necessary to keep Player's enterprise 'afloat,' and Player would assist FSF and Christenson by purchasing the interests that FSF wanted Christenson to divest." GFC's Response to FSF's Motion for Summary Judgment, 6.

FSF seeks summary judgment based on many of the same legal arguments offered by the other financial institutions. The court has previously dealt with these arguments and will not consider them further here other than to say that they do not counsel granting summary judgment in FSF's favor. What makes FSF unique from these other financial institution defendants is that FSF's dealings with Player center around only four loans spanning a relatively short period of time -- GFC does not allege any contact or misrepresentations from FSF. Thus,

the core of GFC's action against FSF is the "appearance of solvency and legitimacy" theory discussed elsewhere by the court. FSF, like other movants, focuses upon the requirement [*255] of knowledge which runs throughout GFC's federal RICO and pendent claims. Among other factual reasons put forth by this financial institution, it seeks summary judgment on this issue and challenges GFC to demonstrate that FSF knew of the Player frauds. Because the court concludes that GFC has met this burden, the court must deny the motion.

As set forth above in the court's discussion of Christenson's motion for summary judgment, a genuine issue of material fact exists concerning Christenson's knowing participation in the Player frauds on GFC. The court concludes that it need go no further with respect to FSF's purported liability in this present lawsuit. Christenson was the president, a director, and the highest officer of FSF at the time of the Player frauds. Christenson was there at the inception of FSF and it is undisputed that he had full power to run the company and did so as it pleased him. As the court concluded earlier in response to the financial institution defendants legal arguments, the doctrine of respondeat superior is not appropriate in the RICO setting. However, as the court also pointed out, any consideration of corporate liability must involve applying [*256] theories of derivative or vicarious liability because a corporation can only act through the actions of its employees, agents, officers, and directors. Thus, the court imputes the liability of FSF not under respondeat superior principles, but rather through the direct liability it incurred from the actions of its highest officer.

The court has also scrutinized FSF's arguments in relation to the pendent claims put forth by GFC and concludes that summary judgment is not warranted on any of these state law claims. Thus, with the exception of GFC's § 1962(a) claim asserted against FSF, the court denies FSF's motion for summary judgment in its entirety.

### G. FSB's Motion for Summary Judgment

GFC alleges that FSB and Cameron joined the Player frauds not later than 1979 and continued to participate in them until at least 1985. GFC's Fourth Amended Complaint, § 191. GFC claims that FSB induced Player to defraud GFC and thus received transfers of funds which it knew were fraudulently obtained by Player from GFC. Id., P 192. The complaint further alleges that FSB

and Cameron aided and abetted the frauds perpetrated on GFC by transferring cash and extending credit to the [*257] Player companies and by allowing Player to maintain bank accounts at FSB. Id., P191.

The thrust of FSB's motion for summary judgment, similar to other defendants, is that the financial institution had no knowledge of the Player frauds and thus cannot be liable under GFC's RICO claims. In Player's April 14, 1987 affidavit, which has been the subject of much dispute in this litigation, Player stated that "[a]mong other things, First Security Bank knowingly assisted my check-kite schemes and misrepresentations to GLFC and Greycas, helped bail my companies out by lending them money especially at times of severe cash shortages, and received as repayments of loans money which it knew or could not help knowing was obtained fraudulently from GLFC or Greycas." Player Affidavit of 4/14/87, 15. The present issue before the court is whether GFC has produced any evidence to support Player's conclusory statements as to FSB's knowledge of the Player frauds. Because the court concludes that GFC has failed to raise a genuine issue fact as to this crucial element of its RICO claims, the court grants FSB's motion for summary judgment.

As an initial matter, the court finds that, consistent [*258] with the above analysis of FI-Utah and Gurr's motions for summary judgment, FSB cannot be held liable for GFC's RICO claims under the doctrine of respondeat superior. Thus, although the parties agree that genuine issues of fact arise over assistant branch manager Cameron's knowledge of, and participation in, the Player frauds, this does not prove fatal to FSB's dispositive motion. The court must therefore examine the evidence proffered by GFC to determine whether a reasonable inference of knowledge on the part of FSB may be drawn by the trier of fact. Furthermore, the court also notes that GFC attempts to establish FSB's knowledge of the Player frauds by evidence of Player's check kiting activities and FSB's purported violations of statutory and regulatory provisions. As the court concluded above, however, this evidence cannot support a reasonable inference of specific criminal intent. Thus, this evidence is also not sufficient to defeat FSB's motion for summary judgment.

In further support of its position that FSB knew of the Player frauds, GFC asserts that FSB employees (aside from Cameron) Bill Gibson ("Gibson"), Roger Ford ("Ford"), Thomas Haymond ("Haymond"), Calvin

Jeppson [*259] ("Jeppson"), Vard Openshaw ("Openshaw"), Ronald Schulthies ("Schulthies"), Ronald Eliason ("Eliason"), and Louis Harris ("Harris") knew of Player's frauds on GFC prior to the commencement of this litigation. FSB's SOF P151 (citing GFC's Supplemental Answers to FSB's Fourth Set of Interrogatories, No. 4). The court will examine below the evidence offered by GFC of the various FSB officer's knowledge of the Player frauds.

As mentioned in this memorandum's opening statement of facts, Gibson was Vice President and Manager of the Vernal Branch from 1976 until early 1983. Thereafter, Ford was Vice President and manager of the Vernal branch from 1983 through 1985. Player dealt with Gibson prior to 1983 on a bi-monthly basis. Player Deposition of 2/22/88, 2225:8-2226:4. Player never told Gibson that he had procured money from GFC through fraudulent equipment leasing transactions nor did Gibson ever say anything to Player indicating that he knew of Player's fraudulent activities. Player Deposition of 11/21/88, 10181:12-10182:2. Player dealt with Ford several times each month from 1983 through 1984. Player Deposition of 2/22/88, 2224:5-225:7. Player never told Ford he had procured [*260] money from GFC through the fraudulent equipment lease transactions. Id.

Openshaw, along with Cameron, was an assistant branch manager at FSB's Vernal branch. Player dealt with Openshaw on a weekly basis in connection with Player's account activity at FSB's Vernal branch. The two never spoke of the fraudulent leasing transactions and Openshaw never said anything to Player which indicated the bank employee's knowledge of the frauds. See id., 2223:7-2224:4.

Haymond was from 1979 through 1985, Vice President of FSB and the commercial credit manager of the division containing the Vernal branch. Player recalled speaking to Haymond about "half a dozen times," but the two never discussed the fact that Player procured funds from GFC through fraudulent leasing transactions. Id., 2221:6-21. In fact, Haymond never said anything at all which indicated to Player that Haymond was aware of any of Player's fraudulent activities. See id.

Jeppson was Senior Vice President of FSB and the supervisor of the division containing the Vernal branch from 1977 through 1985. Player also met with Jeppson, "maybe as many times as Mr. Haymond," and admits he never told Jeppson of the [*261] fraudulent GFC leasing

transactions. Id., 2221:22-25; see id., 2222:13-2223:3. Harris was from 1982 to 1985 Executive Vice President and Director of FSB. From 1983 to 1985, Harris was chairman of the FSB senior loan committee.

Schulthies was from July 1983 forward, a Director and Senior vice President of FSB, and the vice chairman of the senior loan committee. One of his assistants was Eliason, a Vice President in the commercial banking division. Player met Schulthies, at most, two times. See id., 2220:4-17. Player never told Schulthies that he had procured funds from GFC through fraudulent equipment leasing transactions; Schulthies never said anything to Player which indicated he was aware of the Player frauds. See id. Moreover, Player met Eliason only once and never discussed the fact that Player had procured money from GFC through fraudulent leases. Id., 2219:4-19.

It is clear from the above recitation of undisputed facts that GFC does not rely upon the testimony of Player to impute fraudulent knowledge upon FSB. Rather, similar to the arguments directed against FI-Utah, GFC argues that the kiting activity, loan documents, and analyses generated by [*262] the bank (in fact, revolving around the same A&I audit) all support a reasonable inference of FSB's knowledge of the Player frauds. The court disagrees and will not repeat its analysis as to this evidence. It is enough to conclude that this evidence is much too tenuous to support a reasonable inference of the requisite knowledge and intent. Because GFC has failed to establish a genuine issue of material fact, the court grants FSB's motion for summary judgment against plaintiffs' RICO claims. The court also declines to exercise its pendent jurisdiction over the remaining state law claims and therefore dismisses the remainder of GFC's Fourth Amended Complaint against FSB.

## H. Argus' Motions for Partial Summary Judgment and for Summary Judgment

GFC alleges that Argus joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, P198. According to plaintiffs, Argus "aided and abetted in the commission of the schemes by transferring cash and extending credit with knowledge of the fraud to other co-defendants, providing or using fraudulent documents or information or allowing the Player entities enterprise to maintain bank accounts." Id., P185. For example, [*263] GFC claims that Argus "knowing that Player was involved in schemes to defraud, providing financing to non-creditworthy customers of the Player entities

enterprise for the ostensible purpose of purchasing equipment." Id., P198. All told, GFC alleges that Argus "wilfully, knowingly and fraudulently induced GLFC to advance a total of $ 40,501,175, over nine separate but related episodes from February though June 1985." Id., P158.

In the Fall of 1988, the court granted Argus leave to file an early dispositive motion similar to the motion filed by Hanson. Argus' moving papers also focused on the central issue of this defendant's purported knowledge of the Player frauds. The matter was fully briefed and argued by the parties and taken under advisement by the court. Because GFC has failed to raise any genuine issue of material fact on the subject of Argus' proclaimed lack of knowledge of the Player frauds, the court must grant Argus' motion for partial summary judgment.

In opposition to Argus' motion, GFC first cites the court to portions of: (1) Player's April 14, 1987 affidavit; (2) Player's November 1, 1986 sworn statement; and (3) Kenneth Gabel's ("Gabel") "Death Spiral" [*264] manuscript. Plaintiffs also contend, in connection with the April 14, 1987 Player affidavit, that Argus' knowledge of the Player frauds is also demonstrated by evidence that Callis, Bennett, Van Winkle, Bonnemort, and Welling had knowledge of the frauds. The court will examine this evidence in turn.

First, Player's April 14, 1987 affidavit contains five paragraphs that specifically refer to Argus. Besides those portions regarding Player's "belief" that Argus knew, already quoted by the court in connection with the Hanson motion and which are insufficient on their face, Player's affidavit makes the following three references to Argus:

During 1977 I arranged for funding by Argus Leasing to Alpine Machinery Sales, Inc. and Anchor Enterprises Inc. for equipment leases. In obtaining these leases, I "bumped" the price of the equipment significantly by inflating the actual price of the equipment. Based on my discussions with John Callis of Argus Leasing, it became apparent that he had discovered the bumping and he requested additional security. Subsequently, I learned from Ray Welling, formerly employed by Argus Leasing, that Callis knew that the Anchor lease transaction was bumped. [*265]

Player Affidavit of April 14, 1987, 30:14-23.

On several occasions, Zions Bank, in conjunction with Zions Leasing and Argus Leasing, conditioned approval of loans I requested, on my leasing equipment owned or repossessed by them or on my payment of outstanding obligations owed by others to them. From speaking to many other customers of Zions Bank over the years, I am not aware of any instance where Zions Bank conditioned approval of loans to any other customers upon their lease of other property or payment of outstanding obligations owed by others.

In April 1984, I obtained an equipment loan in the amount of $ 300,000 from Zions Bank through its loan officer James Anderson. Prior to the approval of the loan, Mr. Anderson told me that the loan would be approved if I agreed to lease certain equipment which had been repossessed by Argus Leasing. In accordance with Mr. Anderson's instructions, I spoke to Mr. Callis and agreed to lease the equipment repossessed by Argus Leasing even though the price he wanted was excessive. Zions Bank then approved the loan.

Id., 31:26-32:15.

These portions of GFC's proof offer no reasonable inference that Argus knew of the Player equipment [*266] leasing frauds perpetrated upon GFC. Rather, the alleged prior knowledge of Player's bumping practices by Van Winkle, Bonnemort, Callis, and Welling is much too tenuous to defeat the pending motion. Although these inferences are hotly contested, even if the court were to assume that these Argus officers knew about the "bump" of the Anchor lease, this would not be enough to raise a genuine issue of material fact. Apparently referring to this pre-GFC frauds transaction, GFC makes the argument that "even if there was no evidence of Argus' knowledge of the GFC frauds, Argus' knowledge of the other racketeering acts suffices to raise a genuine issue of material fact on knowledge." GFC's Opposition to Argus' Motion for Partial Summary Judgment, 8. The court declines this invitation to reform RICO's statutory scheme and thus eliminate the need to prove actual knowledge and specific intent. As the court pointed out in relation to GFC's proffer of FI-Utah officers Sandberg and Varoz's alleged knowledge, this type of evidence cannot support the leap GFC would have the court and the trier of fact make. Again, this evidence does not support a reasonable inference of actual knowledge and [*267] specific intent.

Next, GFC also cites Player's November 1, 1986 sworn statement in opposition to Argus' motion. This sworn statement contains the following two references to Argus or Argus officers:

Q. Did Jim Anderson and John Callis come to learn about the $ 40,000,000 transaction that you had with NL?

A. Yes.

Q. Or purported to have with NL?

A. Yes.

Q. They came to learn about it because you discussed it with them, right?

A. Yes.

Player's Sworn Statement of 11/1/86, 21:8-16.

Q. Did Zions Bank, Zions Leasing and Argus Leasing know they were getting paid off by you with funds fraudulently obtained from Greyhound Leasing?

A. Yes.

Q. Just to make it clear, let me restate that question. Did Zions Bank, Zions Leasing and Argus Leasing know they were getting paid off by you with funds fraudulently obtained from Greyhound Leasing?

A. Yes.

Id., 22:11-20. Similar to the court's conclusions regarding the conclusory beliefs expressed by Player in his April 14, 1987 affidavit, the court finds that the above portions of Player's November 1, 1986 sworn statement fail to raise a genuine issue of material fact as to Argus' knowledge of the Player frauds. Player's [*268] conclusion is unsupported by any foundational facts and is clearly insufficient to defeat Argus' motion for partial summary judgment.

Finally, the court notes that it need not even bother to quote the proffered portion of the "Death Spiral" manuscript as this document quite clearly contains the hearsay statement of what Gabel contends Player said to him. In any event, the court finds no value in this portion of the manuscript since absolutely no mention is made of Argus. Thus, this evidence fails to raise a genuine issue of material fact as to Argus' knowledge of the Player

frauds.

The court therefore grants Argus' motion for partial summary judgment on the issue of its lack of knowledge of the Player frauds. GFC's RICO causes of action asserted against this defendant must therefore fall. Because the court declines to exercise its jurisdiction over GFC's remaining pendent claims, these state law claims must also be dismissed. Finally, the court also grants Argus' later motion for summary judgment on the same grounds stated above.

I. ZFNB's Motion for Summary Judgment

GFC alleges that ZFNB joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, [*269] P198. GFC further alleges that ZFNB aided and abetted the Player frauds in the Spring of 1984 by extending credit to Player with knowledge of his companies' insolvency and that the monies were being used for the Player frauds. Id., P200. GFC also claims that ZFNB participated and aided and abetted the Player frauds in the Fall of 1984 when it provided Player a fully secured loan in the amount of $ 3,850,000. Id.

ZFNB seeks summary judgment, among other reasons, because it contends that GFC has failed to put forth any evidence of the bank's knowledge of the Player frauds. GFC argues that ZFNB's knowledge of the Player frauds is found in the "composite knowledge" of the following bank officers and employees: Hanson, Bennett, Van Winkle, Belliston, Swegle, Poulsen, Anderson, Stillings, Acord, and Hall. GFC's Response to Zions Defendants' Motions for Summary Judgment, 21. Because the court concludes that GFC has failed to raise a genuine issue of material fact as to ZFNB's knowledge of the Player frauds, the court will grant ZFNB's motion for summary judgment.

Much of GFC's evidence has already been raised and analyzed by the court in relation to the other pending dispositive [*270] motions of Hanson, Argus, FI-Utah, and FSB. The court has already concluded that a reasonable trier of fact could not infer Hanson's knowledge of the Player frauds. Similarly, the court also concludes that the presence of the A&I audit somewhere within the files of this financial institution does not support a reasonable inference of actual knowledge of the Player frauds. The remainder of GFC's evidence relating to the other ZFNB officers and employees concerns the alleged regulatory and statutory violations previously

dismissed by the court as insufficient to raise a reasonable inference of the requisite knowledge and intent under the RICO statutory scheme. The court therefore grants ZFNB's motion for summary judgment in its entirety.

### J. ZMC's Motion for Summary Judgment

GFC alleges that ZMC also joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, P198. GFC further states that ZMC participated and aided and abetted the Player frauds in the Fall of 1984 when it provided Player a fully secured loan in the amount of $ 3,850,000. Id., P200. However, on August 30, 1988, the court granted ZMC's motion for partial summary judgment and dismissed [*271] GFC's federal and state racketeering claims, as well as GFC's common law fraud claim. See Court Order of 8/30/88, 2-3. The order was based on GFC's failure to produce evidence of ZMC having any culpable knowledge of the Player frauds. Because the court declines to exercise its pendent jurisdiction over GFC's remaining claims against ZMC, the court grants ZMC's pending motion for summary judgment and dismisses GFC's conversion, fraudulent conveyance, and constructive trust claims.

### K. Newbold's Motion for Summary Judgment

Newbold seeks summary judgment on a number of grounds, the most prominent of which is that he had no knowledge of the Player frauds. He therefore argues in his moving and reply papers that GFC has failed to put forth any evidence from which a trier of fact could reasonably infer such knowledge and intent. The court disagrees and need look no further than portions of Player's April 14, 1987 affidavit quoted above in relation to Hanson's motion for summary judgment. Player's Affidavit of 4/14/87, 31 (Mr. Timpson and Mr. Newbold pressured me to make payments on transactions where I had no obligation to do so"). Moreover, the court concludes that genuine [*272] issues of fact -- as to Newbold's knowledge -- are raised by Player's statements regarding alleged conversations and phone calls he had with both Newbold and Timpson on this same subject. In this regard, Player's deposition testimony is also sufficiently specific to raise these same questions of fact. See Player Deposition of 6/22/88, 6383:9-6384:19; Player Deposition of 8/23/88, 8817:3-22.

The court has also reviewed the other arguments presented in support of Newbold's motion and concludes

that none of these legal or factual arguments warrants summary judgment in defendant's favor. With the exception of GFC's failed § 1962(a) claim, the court therefore denies Newbold's motion in its entirety.

### L. Timpson's Motion for Summary Judgment

Timpson offers similar reasons in support of his motion for summary judgment as Newbold, and the court reaches a similar result. Player's April 14, 1987 affidavit, as well as subsequent deposition testimony, see Player Deposition of 6/22/88, 6358:10-20; 6367:12-6369:12; 6386:4-22; 6387:2-17, raise genuine issues of material fact which preclude granting Timpson's motion for summary judgment. Therefore, with the exception of GFC's [*273] previously dismissed § 1962(a) claim, the court denies Timpson's motion in its entirety.

### M. ZLC's Motion for Summary Judgment

ZLC seeks summary judgment, inter alia, on the ground that GFC has put forth no evidence of its knowing participation in the Player frauds. The court disagrees. Consistent with the court's rationale for denying FSF's motion for summary judgment, the court concludes that its rulings regarding Timpson and Newbold's motions for summary judgment preclude granting ZLC's dispositive motion. The inferences regarding the knowledge of the officers of this relatively small company allow the court to impute this same knowledge to ZLC. Thus, with the exception of GFC's dismissed § 1962(a) cause of action, the court denies ZLC's motion in its entirety.

### N. Diumenti's Motion for Summary Judgment

GFC alleges that Diumenti and Lindsley participated in the Player frauds by, inter alia, authorizing the signing of and actually signing fraudulent opinion letters on phony equipment transactions. GFC's Fourth Amended Complaint, P204. According to Diumenti, "Plaintiffs' 'factual' presentation concerning Mr. Diumenti's alleged involvement in Player's equipment [*274] leasing frauds contains no admissible evidence demonstrating that Mr. Diumenti knowingly assisted in the frauds." Diumenti's Reply in Support of Motion for Summary Judgment, 113. The court disagrees. The Leyton, Bertrand, and Player evidence already quoted and discussed at length by the court raise numerous genuine issues of fact as to this material element of GFC's claims. The court need look no further at the present time. Moreover, because none of the legal arguments presented by Diumenti are persuasive

grounds for summary judgment, the court denies this motion in its entirety.

O. Lindsley's Motion for Summary Judgment

According to Lindsley, GFC's entire case centers around "two isolated instances:" (1) Leyton's testimony regarding alleged telephone calls with Lindsley; and (2) Lindsley's signature affixed to opinions of counsel which were not submitted to GFC nor discovered by plaintiffs until after the filing of the pending lawsuit. See Lindsley's Motion for Summary Judgment, 3. Lindsley contends that neither portion of GFC's evidence would allow a reasonable trier of fact to infer Lindsley's knowledge of Player's frauds. The court disagrees and therefore denies [*275] Lindsley's motion.

The court has previously discussed the Leyton testimony as it relates to both Lindsley and his law partner Diumenti. Although these defendants argue against the "plausibility" of Leyton's testimony, a review of the evidence presented by GFC compels the court to conclude that this argument is not a proper basis for granting either the previous motion to strike or the pending motion for summary judgment. The court also finds that the five Lindsley letters further support an inference of Lindsley's knowledge of the Player frauds. Lindsley argues at some length that GFC could not have relied upon the Lindsley letters because they were not discovered until after the pending lawsuit was commenced. See id., 13-14. While this may form the basis for a successful legal challenge on causation grounds as to these particular letters, the court understands this evidence to be offered to demonstrate Lindsley's knowledge and intent of the Player frauds. The court therefore concludes that genuine issues of material fact preclude granting Lindsley's motion for summary judgment.

Lindsley also raises many of the legal arguments (pattern, enterprise, and causation) analyzed [*276] above by the court. None of these arguments warrant a grant of summary judgment as to any of the RICO or pendent claims asserted against Lindsley or the law firm of Diumenti & Lindsley. As to this latter defendant, the court notes that both sides cite provisions of the Uniform Partnership Act, *Utah Code Ann. §§ 48-1-1* to 1-40; Ariz. Rev. Stat. §§ 29-201 to 244, to support their respective positions regarding the liability of the partnership for the alleged conduct of the two partners. Because a determination by the court of which alleged actions were

within the scope of the partnership is dependent upon the same issues of fact discussed above, the court cannot grant this portion of the motion for summary judgment either.

P. Allred's Motion for Summary Judgment

According to Allred, GFC's best case scenario pursuant to its pleading and the discovery obtained in this action is as follows: (1) Allred became involved with Player in the RRI partnership after DMP&W was formed; (2) Allred, according to Player, was informed about the GFC equipment frauds; (3) Allred agreed thereafter to lend Player money to cover Player's companies' overdrafts; (4) Player bought out Allred interests [*277] in the RRI project because he feared what Allred knew about the GFC frauds; and (5) thereafter, Allred talked with Player about investing in various pieces of real estate in the Phoenix area, including the piece of property known as the Shea Boulevard transaction. See Allred's Reply in Support of Motion for Summary Judgment, 8-11. Allred then concludes that, assuming the above scenario is supported by admissible evidence, these facts "fall short of establishing any knowing joinder of the Allred Defendants with Sheldon Player in his fraud on Greyhound, much less in a RICO enterprise." Id., 12.

The court concludes that while Allred may be correct, this argument is more properly directed at the trier of fact. Numerous factual disputes do not allow the court to grant the motion for summary judgment. For example, GFC offers the testimony of Player regarding an alleged conversation between Allred and Player at the Club Cabana, a restaurant in Salt Lake City, to demonstrate Allred's knowledge of the Player frauds:

Q. And the one [conversation] at the Club Cabana, who was there?

A. Myself, Mr. Allred, and Mr. Diumenti.

Q. And what did each of you say?

A. Well, basically [*278] Mr. Diumenti had directed the conversation and he basically run over how the idea of leasing worked, which I had been involved in and basically inflating the equipment and the fact that it was a neat way to get money, which Mr. Allred related to because of prior conversations that I had had directly with Mr. Allred between he and myself concerning leases in effect, which he had done purportedly with a company

or for a company or with a company that he had an ownership position in or represented to have. So it wasn't -- it was very clear to him what was going on.

Q. And what did Mr. Diumenti say about that?

A. You mean, Mr. Allred?

Q. Was it Mr. Allred? Was it just between you and Mr. Allred, or was this conversation between you and Mr. Allred and Mr. Diumenti?

A. This one I just described was between -- or among the three of us.

Q. About the neat way to make money?

A. Yes.

Q. And sticking just with that conversation, that's at the Club Cabana?

A. Yes.

Q. And is that in 1983?

A. I believe that was '84.

Q. Can you relate it to events that were going on at the same time?

A. I believe it was prior to the events of the -- well, certainly to the events of the buy [*279] out. Prior to the events of the buy out, other current events, I'm not clear?

Q. Okay. Just sticking with that Club Cabana meeting with the three of you, what did Mr. Allred say and what did Mr. Diumenti say?

A. Well, as I've testified, Mr. Diumenti pretty much was showing Mr. Allred how the thing worked and it was not something that -- Mr. Allred didn't fall off a turnip truck. It was a very simple explanation. Mr. Allred had reiterated, as he had in prior conversations, that he understood from my financial statements that -- you know, how I got money from lease companies.

And basically I would say that he -- there's no question about the fact that it was pretty well understood how I got my money. Therefore, at least during the subsequent negotiations for the buy out there's no question about the fact that I felt, to a certain degree, that Mr. Allred was buying to a large degree of pressure to get

the money he wanted.

Player Deposition of 6/23/88, 6646:22-6648:22. Several other portions of the Player deposition also raise issues of fact as to Allred's knowledge of, and participation in, the Player frauds. See Player Deposition of 4/3/88, 4156:11-21 & 4159:7-23; [*280] Player Deposition of 6/24/88, 6735:22-6736:15 & 6670:13-6673:5.

However, in his papers and at oral argument, Allred stressed that even if genuine issues of material fact exists as to the state of his knowledge, summary judgment was nonetheless appropriate. In support of this position, Allred pressed the legal arguments adopted by other defendants concerning causation and the technical requirements of RICO pleading. With one exception concerning AFIC, the court rejects all of these arguments.

It is undisputed that AFIC is alleged to have committed only one predicate act -- a single act of receiving stolen property in the form of the lump sum which Allred directed Player to pay to AFIC in June 1985. Thus, GFC's allegations as to AFIC are fatally defective on their face as to the § 1962(c) claim. GFC contends that it is not "accurate" to conclude that AFIC committed only one predicate act because "there is evidence that AFIC is the alter ego of Allred, and that Allred has used AFIC regularly as a vehicle for fraud; in particular, the secretion of fraudulent proceeds of the removal of assets from judgment creditors." GFC's Response to Allred's Motion for Summary Judgment, 14.

The [*281] court rejects GFC's argument for two reasons. First, AFIC's motion for summary judgment is directed at GFC's current pleading before the court, plaintiffs' Fourth Amended Complaint. The pleading speaks for itself and alleges one predicate act against AFIC. Second, the court agrees with AFIC that under the alter ego doctrine, it is the business entity's existence that is disregarded by the court in order to reach the individual, not the other way around. GFC offers no citation in support of its theory and the court declines to adopt it.

The court therefore grants AFIC's motion for summary judgment as to plaintiffs' § 1962(c) cause of action. However, consistent with the court's earlier legal analysis, GFC's § 1962(d) claim asserted against AFIC is not necessarily defective as well. See *Joseph, 781 F.2d at 554.* In fact, the court concludes that genuine issues of material fact preclude summary judgment on this

remaining RICO conspiracy claim since GFC has offered evidence from which a reasonable trier of fact could infer AFIC's agreement to participate in the affairs of the enterprise. The court also declines to grant summary judgment regarding the remaining pendent claims [*282] asserted against AFIC.

Q. Stoddard's Motion for Summary Judgment or for Writ of Replevin

GFC alleges that Stoddard aided and abetted the Player frauds by finding real estate and other investments for the monies which he knew had been fraudulently taken from GFC. GFC's Fourth Amended Complaint, P214. Stoddard filed a counterclaim alleging GFC's conversion of the 1,000 shares of Robotool stock which have been the subject of previous motions by Stoddard. Stoddard seeks summary judgment in his favor on both GFC's complaint and his counterclaim. The court concludes that genuine issues of fact preclude the granting of summary judgment on either pleading.

Stoddard seeks summary judgment on GFC's §§ 1962(c) & (d) causes of action. Unlike the other movants, Stoddard concedes that there is a material issue of fact as to his knowledge of the Player frauds upon GFC. Instead, he focuses upon when he allegedly learned of the frauds as well as the motive behind his subsequent actions:

According to Sheldon Player, after Stoddard learned that Player had defrauded Greyhound (there is a factual dispute about when Stoddard learned about the frauds) Stoddard had only one role in performing [*283] subsequent consulting services for Player: Stoddard was to manage existing investments over which Stoddard had some responsibility, and to find new investments that could be purchased refinanced and sold for a gain, for the single and express purpose of helping Player pay Plaintiffs back for what he had taken.

Stoddard's Motion for Summary Judgment and/or Writ of Replevin, 21-22.

However, a review of the pleading and brief in opposition to Stoddard's motion reveals that GFC asserts Stoddard's participation in "at least 34 counts of mail and wire fraud as well as the substantial assistance he lent to the pattern of racketeering." GFC's Response to Stoddard's Motion for Summary Judgment and/or Writ of Replevin, 3 (citing GFC's SOFs 64-73). Moreover, while Stoddard may contend that he was attempting to pay GFC

back and is thus somehow immune to suit under RICO because of this motive, this is simply a jury argument. GFC contends that Stoddard's investments allowed Player to continue "lulling payments" to its victim. GFC thus argues that these investment efforts themselves constitute predicate acts of interstate transportation and receipt of property taken by fraud. Plaintiffs [*284] put forth evidence to support their claim that Stoddard urged Player to increase the drawdowns in the face of GFC's inspection efforts. GFC's SOF 82. While Stoddard contest these statements made by Player in his deposition, this simply raises an issue of fact for the jury to decide. The court must therefore deny this portion of Stoddard's motion for summary judgment.

Stoddard also seeks summary judgment on his counterclaim. Essentially, Stoddard is suing over the 1,000 shares of Robotool stock he claims GFC converted. It is uncontested that the reason GFC controls the share certificate is because Stoddard sent it to GFC. However, the parties do dispute why Stoddard gave the certificate to GFC. GFC asserts that Stoddard gave it the stock without any promises on GFC's part and because it constituted partial restitution of GFC's property. Stoddard, of course, contends that he sent GFC the Robotool stock "in exchange for plaintiffs' concession that they would take care of the 'good guys'. . . ." Court Order of 9/9/87, 35. This dispute is clearly material to the question of GFC's liability for Stoddard's counterclaim sounding in conversion. Thus, the court also cannot grant [*285] summary judgment on Stoddard's counterclaim.

R. Vicki Roussin's Motion for Summary Judgment

GFC alleges that Vicki Roussin used the cash and credit provided by the various banks doing business with Player "to create the false impression that the Player entities enterprise was legitimate, sound and solvent, when in fact it was a sham business hopelessly insolvent, and to lull plaintiffs into a false sense of security that its representations could be relied upon and that its obligations would be honored and paid." GFC's Fourth Amended Complaint, P185. Among other evidence offered to defeat Vicki Roussin's motion for summary judgment are the following statements from Player:

4. With respect to the fraudulent NL Industries and Baker International lease transactions, both Michael and Vicki Roussin assisted in the execution of the fraud. They both assisted in the preparation of false documents which were submitted as part of the scheme. At times, Michael

Roussin composed the text of documents which Vicki Roussin typed onto stationary with fake letterhead. They called me over to the condominium in which they lived at 7611 East Pleasant Run in Scottsdale where they saw me sign [*286] other people's names to these documents. Vicki Roussin personally delivered the documents to GLFC and picked up disbursement checks.

5. Also, in the Summer of 1984, Michael Roussin assumed control of a check-kiting scheme which was employed to provide cash in the absence of revenues from other sources. From our offices in Vernal, Utah, Michael Roussin used to call Vicki Roussin, who at that time worked for the P&W entities at an office in Salt Lake City, and coordinated with her the deposit of checks drawn on certain accounts in certain amounts to certain payees. She either filled in a blank check which I had already signed or else signed my name to a blank check. She then deposited the checks at a Salt Lake City bank on the same day as Michael Roussin deposited a corresponding check at a Vernal bank. Due to the 'float,' the P&W entities were able to utilize money that did not exist. I believe Vicki Roussin knew that the accounts were overdrawn because I told her as much.

Player Affidavit of 2/12/86, PP4-5.

Vicki Roussin does not dispute that she performed various functions for Player and Michael Roussin that may now be construed as acts in furtherance of the frauds perpetrated [*287] upon GFC. However, she contends that "there is absolutely no evidence that VICKI ROUSSIN, a high school graduate and a secretary, ever had knowledge that the acts she was performing upon request or instruction were fraudulent or in furtherance of a massive fraud perpetrated on Plaintiff." Vicki Roussin's Motion for Summary Judgment, 4.

The court concludes that genuine issues of material fact preclude summary judgment in favor of Vicki Roussin. Indeed, Vicki Roussin's arguments are rife with questions of fact. Regardless of whether Player's beliefs are admissible or inadmissible, the court finds that a reasonable juror is entitled to make similar inferences. For example, the following argument points out the flaw in this motion for summary judgment:

Plaintiffs rely on Sheldon Player's testimony that Vicki Roussin typed letters for him on fake letterhead. While this act in itself may not be speculation or surmise on the part of Sheldon Player, it most certainly is

speculation or surmise that Vicki Roussin knew the corporations themselves were fake. Simply because she carried out her secretarial duties by typing letters on stationary of a corporation owned by Sheldon Player, [*288] it cannot be inferred that she was aware that the corporation was a fake. This is the very type of 'inference built upon an inference' that the Supreme Court has expressly disallowed.

Vicki Roussin's Reply in Support of Motion to Strike Player Testimony, 1-2. The court disagrees with Vicki Roussin's conclusion. Put in terms of the pending motions for summary judgment, a reasonable juror could conclude that someone typing stationary containing a letterhead and signature line other then her employer's had knowledge of the fraudulent nature of her acts. In this instance, it is not affiant/deponent Player who is speculating. The uncontroverted, direct evidence speaks for itself and movant should direct her arguments regarding inferences at the trier of fact. The court therefore denies this motion for summary judgment.

S. Michael Roussin's Motion for Summary Judgment

Michael Roussin appears pro se in this matter. The bases asserted in support of his motion for summary judgment appear to be the following affirmative defenses: (1) unclean hands; (2) accord and satisfaction; and (3) fraud on the court. The court concludes that this motion must be denied in its entirety. [*289] Even if the court were to conclude that these three legal arguments are available to movant in this action, there exist genuine disputes of material fact which bar entry of summary judgment. As to movant's unclean hands theory, fact questions abound as he himself concedes that "[t]he conduct of the Plaintiffs in their business dealings with Player is questionable at best." Michael Roussin's Reply in Support of Motion for Summary Judgment and Dismissal, 3. Michael Roussin's accord and satisfaction defense is premised on the allegations that GFC entered into the July Purchase Agreement with knowledge that the equipment did not exist. GFC disputes this conclusory allegation. Finally, movant's fraud on the court arguments are based on the much contested assertion that GFC's counsel "have knowingly tampered with witness testimony for the purpose of falsely incriminating innocent parties in this matter." Id. at 4 (footnote omitted). The court therefore denies Michael Roussin's motion for summary judgment.

T. Mabey's Motion for Summary Judgment

The central allegations in GFC's pleading leveled against Mabey concern the RRI loan, listed in the complaint as the "Hotel Financing [*290] Scheme." GFC alleges that in September of 1983, Mabey and others "fraudulently induced GLFC to advance approximately $ 2,350,000 in eight separate drawdowns between October 1983 and June 1984 to the partnership of Diumenti, Mabey, Player & Willyard ostensibly for the construction costs of a hotel in Riverdale, Utah, that became the Riverdale Rodeway Inn." GFC's Fourth Amended Complaint, P112. Specifically, Mabey and his partners Diumenti, Player, and Willyard are alleged to have misrepresented their individual equity contributions (each for $ 71,000) in the form of bogus documents to GLFC. Id., P116. Mabey is also alleged to have "provided GLFC with false and fraudulent photocopies of checks in the amounts of approximately $ 21,4000 and $ 2,000 purporting to represent other equity contributions of his to the partnership." Id.

Mabey's moving papers raise many of the legal arguments brought forth by the other defendants -- lack of causation and lack of duty -- as well as the factual argument that he lacked knowledge of the Player frauds. Moreover, in his reply memorandum and at oral argument Mabey concentrated his efforts on demonstrating to the court that no "bump" existed [*291] on the RRI loan transaction. See, e.g., Mabey's Reply in Support of Motion for Summary Judgment, 19 ("Plaintiffs have no evidence to prove a 'bump' and their claims respecting the RRI must be dismissed."). The court has already discussed and rejected Mabey's legal arguments concerning the sufficiency of GFC's pleading.

The court also concludes that numerous, genuine issues of material fact exist regarding Mabey's purported lack of knowledge of the Player frauds as well as the existence of the RRI "bump." As to Mabey's knowledge of the Player frauds, the court need go no further than Player's deposition testimony regarding alleged conversations between Mabey and Player:

Q. What did Mr. Mabey say?

A. Well, he expressed his -- also his discontent over the whole situation and the fact that he felt exactly the same way pretty much, but then he also went off with about $ 700,000 too, because he felt like he'd stayed in a little longer. He had about three times as much coming which makes sense, I guess.

Q. And during these conversations what did Mr. Mabey say about the Greyhound frauds?

A. Well, basically I don't recall at that point in time the particular Greyhound frauds [*292] being mentioned, only that he was aware that I got -- that I was getting plenty of money and he just basically wanted a bunch of money and to get lost.

Q. He knew in addition that you'd gotten the money and the -- by the manner of committing frauds on Greyhound, correct?

A. I believe that, yes.

Q. And you believe that because you talked to him about that?

A. I did talk to him at certain points in time, yes.

Q. And where did those conversations occur?

A. At least the initial conversation took place back in 1983 in Salt Lake City.

Q. Can you tell me where you were?

A. We'd gone to dinner at some restaurant and actually the conversation that, in fact, took place was not at the restaurant. As I remember, it was as we were walking down the street after having dinner, so it was --

Q. Who else was at the dinner?

A. Actually at that particular dinner Mr. Mabey had invited Mr. Diumenti's secretary, Cheryl Green, to have dinner with us, so she was at the dinner and then she left. We went for a walk, discussed that situation.

Q. Who did you go for -- and was it you, Diumenti, and Mabey went for a walk?

A. No. Actually it was Mr. Mabey and myself.

Q. And what did [*293] you say when you went on the walk?

A. Well, that was at a time when we had, of course, made a couple of attempts at getting construction financing for the Riverdale Rodeway Inn and I disclosed to Mr. Mabey that there were other ways of getting the

money if we couldn't come up with construction financing and basically discussed the method of obtaining lease money from basically bumping up leases and that we were in a position to do that and had done so because of having an equipment -- being an equipment vendor.

Q. And did you tell him how you'd done that with Greyhound?

A. I believe not that conversation.

Q. In subsequent conversations?

A. In subsequent conversations.

Q. Now, did you explain to him how you went about that, how you went about getting the money from the lease company?

A. I went through pretty much the mechanics of the situation, because it -- at a subsequent time in a conversation where Mr. Diumenti was -- or Mr. Mabey was quite inquisitive as to the actual mechanics and details because he suggested -- we hadn't been successful. We had been turned down, or at least had not been shown any interest per se by any financial institutions to fund the Riverdale [*294] Rodeway.

Mr. Mabey was getting quite discouraged and he made the suggestion, maybe its time to do one of these lease transactions so we can get going.

Q. And before I get to that later conversations you want to stick with this earlier one you were telling me about? When did that later conversation occur and who was present for that?

A. Mr. -- just Mr. Mabey and myself. As I recall, we were in his office in Bountiful. It was again about spring, late spring of '83, and we had contacted, as I said, a couple of different financial institutions. Mr. Mabey had contacted a couple of them quite without success and so he -- he made the suggestion that we do that.

In actuality that's how the topic of Greyhound got started, because I had mentioned to him Greyhound and that we had some leases of that nature and that actually initiated my call to Mr. Mayne in Salt Lake City. And during the course of the call, which I know I've testified about this many times, I did learn that Greyhound did have a real estate entity or had started a real estate branch of Greyhound at least in Salt Lake. I at least thought I

would run it by them to give it a try that way first.

Q. And going back to [*295] the first conversation -- the second conversation was a meeting somewhere in Salt Lake you said?

A. I believe that was Mr. Mabey's office.

Player Deposition of 6/23/88, 6598:17-6602:11.

The court also concludes that genuine issues of material fact exist regarding the RRI transaction and the parties' characterization of that project. Mabey as well as other defendants most notably Diumenti, insist that no "bump" occurred and that the entire project was legitimate. GFC disputes this claim and points to the disparity between the initial RRI figures adopted by the RRI partners and the eventual proceeds received from GFC. Mabey and others argue that the initial figures represent estimates only and that GFC fails to support its "bump" allegations with specific figures. While Mabey's argument may be correct, it is better directed at the ultimate trier of fact. As was made clear at oral argument on these issues, Mabey and GFC differed on the total amount of any "bump" and not on the fact that such a discrepancy exists. Moreover, while GFC acknowledges that it received back its money on this project, according to plaintiffs this simply supports its theory that the larger NL and [*296] Baker frauds would not have taken place but for these "lulling" payments. While movant may deem this argument to be meritless, this too is reserved for resolution by the trier of fact.

The court has also carefully reviewed Mabey's arguments, similar to those asserted by other defendants, directed at GFC's pendent claims. Because genuine issues of material fact also exist as to these claims, revolving around the same disputed facts noted above, the court cannot grant this portion of Mabey's motion. The court therefore denies Mabey's motion for summary judgment.

U. Hasan's Motion for Summary Judgment

GFC alleges that Hasan "encouraged the commission of, joined in and/or directed the October 1984 and January 1985 schemes to defraud GLFC, with knowledged that some of the other defendants had perpetrated the above-alleged schemes and had wrongfully diverted substantial monies of plaintiffs." GFC's Fourth Amended Complaint, P208. GFC also claims that Hasan aided and abetted the secreting of GFC

monies and proceeds. Id., PP208, 212, and 213.

Hasan appears pro se in this matter and seeks summary judgment because "plaintiffs have produced no evidentiary facts supporting [*297] any conclusion that 'Hasan', and 'Waxiss' had knowledge of any illegal or fraudulent activity committed or conducted by Sheldon Player or the alleged 'Player entities enterprise.'". Hasan's Motion for Summary Judgment, 2. The court denies this motion because obvious issues of material fact make such an order impossible. The court will not waste the time of the parties by citing to all the evidence offered by GFC in opposition to Hasan's motion. Suffice it to say that contrary to Hasan's argument, the record in this action, as well as the record of the criminal proceeding which resulted in his conviction, demonstrate that he had knowledge of and participated in the frauds perpetrated against GFC. This motion as well as Hasan's motion to strike plaintiffs' response to the motion for summary judgment are therefore denied in their entirety.

## VII. CONCLUSION

Finally, the court expressly determines, pursuant to *Fed. R. Civ. P. 54(b)*, that there is no just reason for delay in the entry of judgment in this matter as to defendants Hanson, ZFNB, Argus, ZMC, FI-Utah, and FSB. The court reaches this conclusion for three reasons. First, the nature of the racketeering allegations leveled [*298] at these defendants, and the public affect these allegations may have had on them, makes this determination prudent. Second, the court notes that damage discovery and other pre-trial matters remains to be completed in this matter. Third, the voluminous nature of this litigation also counsels toward a swift resolution of the parties' respective positions. In all respects, the court determines that the entry of judgment as to these successful movants serves the interests of justice.

In a somewhat related vein, the court also notes that throughout this litigation several parties have alluded to future, collateral litigation seeking sanctions. The court concludes that no party shall be allowed to file any motion pursuant *Fed. R. Civ. P. 11* until the conclusion of the remainder of the litigation now pending before this court. The parties are advised not to construe this procedural ruling as an indication by the court of the ultimate success of any such motion. The court expressly takes no position on this issue and this ruling is not intended to be an invitation to further motion practice in this regard. Rather, the court so holds in the hopes that

the remainder of this litigation [*299] can be brought before the trier of fact in as swift a manner, and with as little rancor, as possible.

For all the foregoing reasons:

IT IS ORDERED denying defendants William H. Lindsley and Diumenti & Lindsley's motion (docket # 4700) to strike the testimony and affidavit of Jeffrey Leyton.

IT IS FURTHER ORDERED denying defendant George S. Diumenti's motion (docket # 4700) to strike the testimony and affidavit of Jeffrey Leyton.

IT IS FURTHER ORDERED denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4725) to strike the testimony and affidavit of Jeffrey Leyton.

IT IS FURTHER ORDERED denying defendants Thomas J. Mabey and The Consortium, Inc.'s motion (docket # 4716) to strike the declaration of Robert H. Damm.

IT IS FURTHER ORDERED denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4729) to strike the declaration of Robert H. Damm.

IT IS FURTHER ORDERED denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4731) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED denying [*300] defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4657) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED denying defendant First Security Bank of Utah, N.A.'s motion (docket # 4620) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED denying defendant George S. Diumenti's motions (docket ## 4703 & 4810) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED denying defendant William Gurr's motion (docket # 4694) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED denying defendant Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4715a) to strike the declaration of Robert W. Bertrand.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4728) to strike the declaration of Bruce H. Baum.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4610) to strike the declaration of Bruce H. Baum.

IT IS FURTHER ORDERED granting in [*301] part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N.A.'s motion (docket # 4621) to strike the declaration of Bruce H. Baum.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket # 4705) to strike the declaration of Bruce H. Baum.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4718) to strike the declaration of Bruce H. Baum.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4726) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4608) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of [*302] Utah, N.A.'s motion (docket # 4605) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket # 4706) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket # 4689) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4717) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket # 4691) to strike the declaration of Robert M. Mathis.

IT IS FURTHER ORDERED granting plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s cross-motion (docket # 4680) to amend responses to defendant [*303] First Interstate Bank of Utah, N.A.'s Seventh Set of Requests for Admissions.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant William Gurr's motion (docket # 4628) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4732) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4658) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum,

defendant First Security Bank of Utah, N.A.'s motion (docket # 4667) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion [*304] (docket # 4636) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant Richard A. Christenson's motion (docket # 4714) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant Ronald S. Hanson's motion (docket # 4134) to strike the affidavit of William B. Watkins.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket # 4683) to strike designated portions of the affidavits of William B. Watkins.

IT IS FURTHER ORDERED denying defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4626) to strike the affidavit of Gary A. Mathis.

IT IS FURTHER ORDERED denying defendant First Security Bank of Utah, N.A.'s motion (docket # 4635) to strike the affidavit of Gary A. Mathis.

IT IS FURTHER ORDERED denying defendant [*305] William Gurr's motion (docket # 4654) to strike the affidavit of Gary A. Mathis.

IT IS FURTHER ORDERED denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4733) to strike the affidavit of Gary A. Mathis.

IT IS FURTHER ORDERED denying defendant Richard A. Christenson's motion (docket # 4892) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant

William Gurr's motions (docket ## 4894 & 4909) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4861) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant First Security Bank of Utah, N.A.'s motion (docket # 4866) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant George S. Diumenti's motion (docket # 4882) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4897) to strike the August 4, 1989 sworn statement [*306] of Sheldon Player.

IT IS FURTHER ORDERED denying defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket # 4899) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant William R. Stoddard's motion (docket # 4918) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant First Security Financial's motion (docket # 4880) to strike the August 4, 1989 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED denying defendant First Interstate Bank of Utah, N.A.'s oral motion of August 21, 1989, to strike plaintiffs' Greyhound Financial Corporation and Greycas, Inc's errata sheet for statement of facts in opposition to First Interstate Bank of Utah, N.A.'s motion for summary judgment (docket # 4911).

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant Richard A. Christenson's motion (docket # 4672) to strike affidavit and deposition testimony of Sheldon Player.

IT IS FURTHER ORDERED granting in part and

[*307] denying in part, consistent with the above memorandum, Vicki Roussin's motion (docket # 4737) to strike the affidavits, deposition testimony, and sworn statements of Sheldon Player.

IT IS FURTHER ORDERED denying defendant William Gurr's motion (docket # 4673) to strike designated portions of the pre-deposition statements of Sheldon Player.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4737) to strike various portions of Sheldon Player's deposition testimony and affidavits.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4629) to strike the April 14, 1987 affidavit and November 1, 1986 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N.A.'s motion (docket # 4619) to strike certain deposition testimony of Sheldon Player.

IT IS FURTHER ORDERED granting in part and denying in part, consistent [*308] with the above memorandum, defendant George S. Diumenti's motion (docket # 4704) to strike deposition testimony, affidavits, and sworn statements of Sheldon Player.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket # 4640) to strike affidavit and deposition testimony of Sheldon Player.

IT IS FURTHER ORDERED granting in part, and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4715) to strike the affidavits, deposition testimony, and sworn statements of Sheldon Player.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket # 4785) to strike the April 14, 1987 affidavit and November 1, 1986 sworn statement of Sheldon Player.

IT IS FURTHER ORDERED granting defendant Ronald S. Hanson's motions (docket ## 3900 & 4371) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs [*309] Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Ronald S. Hanson.

IT IS FURTHER ORDERED granting defendant Argus Leasing Corporation's motion (docket # 4142) for partial summary judgment.

IT IS FURTHER ORDERED granting defendant Argus Leasing Corporation's motion (docket # 4361) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Argus Leasing Corporation.

IT IS FURTHER ORDERED granting defendants Donald Timpson and M. Scott Newbold's motion (docket # 4140) for partial summary judgment.

IT IS FURTHER ORDERED granting plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s motion (docket # 4087) re: Zions Defendants' Second Set of Requests for Admissions with Interrogatories.

IT IS FURTHER ORDERED granting defendant First Interstate Bank of Utah, N.A.'s motion (docket # 4412) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant First Interstate Bank of Utah, N.A.

IT IS FURTHER ORDERED granting in part and denying in part, [*310] consistent with the above memorandum, defendant William Gurr's motion (docket # 4343) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s

Eighth, Thirteenth, Fourteenth, and Fifteenth Claims for Relief against defendant William Gurr.

IT IS FURTHER ORDERED granting defendant First Security Bank of Utah, N.A.'s motion (docket # 4352) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant First Security Bank of Utah, N.A.

IT IS FURTHER ORDERED granting defendant Zions First National Bank's motion (docket # 4354) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Zions First National Bank.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant Zions Leasing Company's motion (docket # 4356) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant Zions Leasing [*311] Company.

IT IS FURTHER ORDERED denying defendant Zions Mortgage Company's request for entry of order presented to the court on August 23, 1989.

IT IS FURTHER ORDERED granting defendant Zions Mortgage Company's motion (docket # 4365) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Zions Mortgage Company.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant M. Scott Newbold's motion (docket # 4375) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant M. Scott Newbold.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with this memorandum, defendant Donald Timpson's motion (docket # 4373) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant Donald Timpson.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant Richard A. Christenson's [*312] motion (docket # 4404) for summary judgment and for judgment on the pleadings.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Sixth Claim for Relief against defendant Richard A. Christenson.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket # 4348) for summary judgment and for judgment on the pleadings.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Sixth Claim for Relief against defendant First Security Financial.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket # 4389) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Third Claim for Relief against defendant George S. Diumenti.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants William H. Lindsley and Diumenti & Lindsley's motion (docket # 4389) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs [*313] Greyhound Financial Corporation and Greycas,

Inc.'s Third Claim for Relief against defendants William H. Lindsley and Diumenti & Lindsley.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred and Triangle Oil, Inc.'s motion (docket # 4475) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Ninth Claim for Relief against defendants Douglas J. Allred and Triangle Oil, Inc.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, Allred Family Investment Company's motion (docket # 4475) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Second and Ninth Claims for Relief against defendant Allred Family Investment Company.

IT IS FURTHER ORDERED denying defendant William R. Stoddard's motion (docket # 4347) for summary judgment or for a pre-judgment writ of replevin.

IT IS FURTHER ORDERED denying defendant William R. Stoddard's motion (docket # 4615) to strike and objection to evidence.

IT IS FURTHER ORDERED denying defendant Vicki Roussin's [*314] motion (docket # 4339) for summary judgment.

IT IS FURTHER ORDERED denying defendant Michael R. Roussin's motion (docket # 4338) for summary judgment and dismissal.

IT IS FURTHER ORDERED granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4480) for summary judgment.

IT IS FURTHER ORDERED dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Tenth Claim for Relief against defendants Thomas C. Mabey and The Consortium, Inc.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's motion (docket # 3600) for summary judgment.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's motion (docket # 4688) to strike plaintiffs' response to defendants' motions for summary judgment.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's supplemental motion (docket # 4440) to incorporate defendants' summary judgment motions.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's motion (docket # 3601) to proceed in forma pauperis and for appointment of counsel.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's request (docket # 3766) for photo copying by the [*315] Clerk of the Court.

IT IS FURTHER ORDERED denying defendant Syed A. Hasan's motion (docket # 3632) to alter judgment.

IT IS FURTHER ORDERED directing the Clerk of the Court to enter judgment in favor of First Interstate Bank of Utah, N.A., First Security Bank of Utah, N.A., Ronald S. Hanson, Zions First National Bank, Argus Leasing Corporation, and Zions Mortgage Company.

IT IS FINALLY ORDERED scheduling a status conference with the parties to discuss a final scheduling order for the remaining phases of this litigation (including, inter alia, the conclusion of damage discovery, preparation of a pre-trial order, and the trial of this matter) on February 2, 1990, at 9:30 a.m. in the Federal Courthouse, Salt Lake City, Utah. The parties are requested to submit to the court at least ten days prior to the status conference any matters they wish the court to address at this hearing. Thereafter, the court will send out an agenda for this status conference at least three days prior to the hearing.

DATED this day of December, 1989.