Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone:  (801) 363-6363
Facsimile:   (801) 363-6666

David Boies (admitted pro hac vice)
Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone:  (914) 749-8200
Facsimile:   (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant/Counterclaim-Plaintiff. | **MEMORANDUM IN OPPOSITION TO NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S NON-COMPETE CLAIM IN ITS SECOND CLAIM FOR BREACH OF CONTRACT AND FIFTH CLAIM FOR UNFAIR COMPETITION** <br><br> **Civil No.:  2:04CV00139** <br><br> Judge Dale A. Kimball <br> Magistrate Brooke C. Wells |

**TABLE OF CONTENTS**

                                                                                                    **Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT ......................................................................................................................13

I.      SCO IS ENTITLED TO BRING A CLAIM FOR BREACH OF
        CONTRACT FOR NOVELL'S USE OF THE LICENSED
        TECHNOLOGY BEYOND THE SCOPE OF THE LICENSE .......................................13

        A.      Novell Presents a False Choice Between "License Limitations"
                and Covenants ...................................................................................................13

        B.      The APA and TLA Non-Compete Clauses Are Affirmative Covenants ..............16

                1.      The APA and TLA Non-Compete Clauses Are Covenants,
                        Not Conditions ........................................................................................16

                2.      Contractual Provisions Are Presumed to Be Covenants............................17

                3.      The Non-Compete Clauses Cannot Constitute Conditions Under
                        California Law .........................................................................................18

                4.      The APA and TLA in Their Entirety Show That the
                        Non-Compete Clauses Are Covenants.......................................................19

                5.      Novell's Reliance on the Sun Cases Exalts Form Over Substance and
                        Ignores the Structure of the APA and TLA in Their Entirety....................20

II.     SANTA CRUZ'S 2001 SALE OF ASSETS DID NOT TERMINATE THE
        COVENANTS AT ISSUE.................................................................................................22

        A.      The APA and TLA Must Be Read Together.............................................................23

        B.      With Respect to the Consequences of Certain Changes of Control,
                the Language of the APA and TLA Confirm SCO's Interpretation ......................25

        C.      If a Conflict is Perceived, There is a Factual Issue that Precludes
                Summary Judgment ................................................................................................27

i

     D.     The Extrinsic Evidence Supports SCO's Interpretation
of the APA and TLA................................................................................29

III.    SUMMARY JUDGMENT IS IMPROPER BECAUSE THE
COVENANTS AT ISSUE ARE NEITHER VOID NOR
UNENFORCEABLE UNDER CALIFORNIA LAW .......................................30

     A.     Section 16600 Does Not Require Technology Licensors to Give Up All of Their
Rights to Licensees ................................................................................30

     B.     Under California Law, Contractual Restrictions Within an Existing
Business Relationship Such As Set Forth in the APA Are Enforceable..............35

     C.     California Law Does Not Ban Partial Restraints on the Pursuit of a
Business Such As the License Restrictions at Issue Here.....................................37

     D.     Novell's Sale of Goodwill Under the APA and the Nature of the
License Restrictions at Issue Make Those Restrictions Enforceable...................42

     E.     Novell Would Be Unjustly Enriched if the Covenants Are Not Enforced............43

CONCLUSION.......................................................................................................44

RESPONSE TO NOVELL'S STATEMENT OF UNDISPUTED FACTS ................................45

## TABLE OF AUTHORITIES

### FEDERAL CASES

Campbell v. Board of Trustees,
    817 F.2d 499 (9th Cir. 1987) ...................................................................................35

Effects Associates, Inc. v. Cohen,
    908 F.2d 555 (9th Cir. 1990) ...................................................................................17

In re Fantastic Fakes, Inc. v. Pickwick International, Inc.,
    661 F.2d 479 (5th Cir. 1981) ...................................................................................16

General Commercial Packaging, Inc. v. TPS Package Engineering, Inc.,
    126 F.3d 1131 (9th Cir. 1997) ............................................................................35, 36

Graham v. James,
    144 F.3d 229 (2d Cir. 1998)....................................................................................17

Great Frame Up System, Inc. v. Jazayeri Enterprises, Inc.,
    789 F. Supp. 253 (N.D. Ill. 1992) ...........................................................................32

Grosso v. Miramax Film Corp.,
    383 F.3d 965 (9th Cir. 2004) ...................................................................................16

Harris Market Research v. Marshall Marketing & Comm'ns, Inc.,
    948 F.2d 1518 (10th Cir. 1991) ...............................................................................14

La Resolana Architects, PA v. Clay Realtors Angel Fire,
    416 F.3d 1195 (10th Cir. 2005) ...............................................................................14

Lockwood v. Wolf Corp.,
    629 F.2d 603 (9th Cir. 1980) ...................................................................................18

Marshall v. New Kids on the Block Partnership,
    708 F. Supp. 1005 (S.D.N.Y. 1991).........................................................................15

Microsoft Corp. v. Harmony Computers & Electronics, Inc.,
    846 F. Supp. 208 (E.D.N.Y. 1994) ..........................................................................15

Mularz v. Greater Park City Co.,
    623 F.2d 139 (10th Cir. 1980) .................................................................................17

NLRB v. International Union of Operating Engineers,
    323 F.2d 545 (9th Cir. 1963) ........................................................................27

Prestin v. Mobil Oil Corp.,
    741 F.2d 268 (9th Cir. 1984) .......................................................................23

RT Computer Graphics, Inc. v. United States,
    44 Fed. Cl. 747 (1999) .................................................................................17

Recursion Software, Inc. v. Interative Intelligence, Inc.,
    425 F. Supp. 2d 756 (N.D. Tex. 2006) .........................................................14

Shaklee U.S. Inc. v. Giddens,
    934 F.2d 324, 1991 WL 90003 (9th Cir. May 30, 1991) .............................32

Shoals v. Home Depot, Inc.,
    422 F. Supp. 2d 1183 (E.D. Cal. 2006).........................................................42

Sun Microsystems, Inc. v. Microsoft Corp.,
    188 F.3d at 1115 (9th cir. 1999) ........................................................... passim

Sun Microsystems, Inc. v. Microsoft Corp. ("Sun II"),
    81 F. Supp. 2d 1026 (N.D. Cal. 2000) ................................................. passim

In re United Air Lines, Inc.,
    438 F.3d 720 (7th Cir. 2006) .......................................................................23

Zajicek v. Koolvent Metal Awning Corp. of America,
    283 F.2d 127 (9th Cir. 1960) .......................................................................33

## STATE CASES

Arya Group, Inc. v. Cher,
    77 Cal. App. 4th 610 (2000) .................................................................42, 43

Asdourian v. Araj,
    38 Cal. 3d 276 (1985) ..................................................................................42

BMP Prop. Development v. Melvin,
    198 Cal. App. 3d 526 (1988) ..................................................................23, 28

Baker v. Aubry,
    216 Cal. App. 3d 1259 (1989) .....................................................................23

Black v. Kos, No. CIV 05-163 KBM/LCS,
  2005 WL. 4564587 (D.N.M. March 29, 2005) ...........................................................14

Boston Safe Deposit and Trust Co. v. Thomas,
  53 P. 472 (Kan. 1898) ..................................................................................................19

Boughton v. Socony Mobil Oil Co.,
  231 Cal. App. 2d 188 (1964) .......................................................................................35

Boyd v. Oscar Fisher Co.,
  210 Cal. App. 3d 368 (1989) ..................................................................................23, 28

Cadigan v. America Trust Co.,
  31 Cal. App. 2d 780 (1955) ....................................................................................23, 28

Corporate Express Office Products, Inc., v. Martinez, No. CV-SA02-87
  AHS(ANX),
  2002 WL. 31961458 (C.D. Cal. Mar. 8, 2002) ...........................................................35

Davenport & Co. v. Spieker,
  197 Cal. App. 3d 566 (1988) ..................................................................................42, 43

Dayton Time Lock Serv., Inc. v. The Silent Watchman Corp.,
  52 Cal. App. 3d 1 (1975) .............................................................................................32

Diepenbrock v. Luiz,
  115 P. 743 (Cal. 1911) ................................................................................................19

Division 9646(JFK),
  2006 WL. 3161467 (S.D.N.Y. Oct. 31, 2006) ............................................................18

Edwards v. Arthur Andersen LLP,
  47 Cal. Rptr. 788 (Ct. App. 2006) ...............................................................................35

Fowler v. Varian Associates, Inc.,
  196 Cal. App. 3d 34 (1987) .........................................................................................32

Frangipani v. Boecker,
  64 Cal. App. 4th 860 (1998) ........................................................................................27

Germaine Music v. Universal Songs of Polygram, 130 Fed. Appx. 153
  (9th Cir. 2005) .............................................................................................................16

v

Guthy-Renker Corp. v. Bernstein,
    39 Fed.Appx. 584 (9th Cir. 2002) ........................................................................16

Handyspot Co. of N. Cal. v. Buegeleisen,
    128 Cal. App. 2d 191 (1954) ...............................................................................38

Harrison v. Cook,
    213 Cal. App. 2d 527 (1963) ...............................................................................38

Hill Medical Corp. v. Wycoff,
    86 Cal. App. 4th 895 (2001) ................................................................................40

Kaplan v. Nalpak Corp.,
    158 Cal. App. 2d 197 (1958) ...............................................................................40

Kashani v. Tsann Kuen China Enterprise Co.,
    118 Cal. App. 4th 531 (2004) ..............................................................................42

Keating v. Baskin-Robbins USA, Co.,
    No. 5:99-CV-148-BR(3), 2001 WL. 407017 (E.D.N.C. Mar. 27, 2001) ....................32

King v. Gerold,
    109 Cal. App. 2d 316 (1952) ..........................................................................31, 36

Mayers v. Loew's, Inc.,
    35 Cal. 2d 822 (1950) .........................................................................................28

Meier v. Paul X. Smith Corp.,
    205 Cal. App. 2d 207 (1962) ..........................................................................23, 28

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung, No. CV 01-00659 CBM
    RCX, 2001 WL 283083 (C.D. Cal. 2001). ...........................................................35

Monogram Industrial, Inc. v. Sar Industrial, Inc.,
    64 Cal. App. 3d 692 (1977) ...........................................................................38, 40

Nevin v. Salk,
    45 Cal. App. 3d 331 (1975) .................................................................................23

Prudential Insurance Co. of America v. Fromberg,
    240 Cal. App. 2d 185 (1966) ...............................................................................23

Shaw v. Regents of the University of Cal.,
    58 Cal. App. 4th 44 (1997) ..................................................................................24

Smith v. San Francisco & N.P. Railway Co.,
    115 Cal. 584 (1897) ....................................................................................................31

Strategix, Ltd. v. Infocrossing W., Inc.,
    142 Cal. App. 4th 1068 (2006) ........................................................................38, 40, 41

Summerhays v. Scheu,
    10 Cal. App. 2d 574 (1935) .........................................................................................33

## STATE STATUTES

Cal. Civ. Code § 1434................................................................................................18, 22

Cal. Civ. Code §§ 1435-38 ..............................................................................................19

Cal. Civ. Code § 1642................................................................................................19, 23

## TREATISES

1 B.E. Witkin, Summary of California Law, Contracts § 778 (2006) ...............................16

13 Williston on Contracts §§ 38:5, 38:13...................................................................17, 18

Plaintiff, The SCO Group, Inc. ("SCO"), respectfully submits this memorandum in opposition to Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claim in its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition.

## PRELIMINARY STATEMENT

Novell's motion ignores key contractual language, the holdings of the very cases it cites, and the testimony of its own representatives who negotiated and signed the Asset Purchase Agreement ("APA") and Technology License Agreement ("TLA") on Novell's behalf.  For example, although Novell devotes more than ten pages to proving the undisputed fact that a change in the control of Santa Cruz occurred in 2001, Novell makes only a passing footnote mention of the key fact – there was a <u>two year limit</u> on the change of control restriction on which Novell relies.  The 2001 change occurred well outside the two-year period.  Novell also fails to mention that the provision at issue only applies if control passes to a company on a specific list, and that SCO is not on that list.

While the plain contractual language is so compelling that each of Novell's arguments can and should be rejected as a matter of law, the extrinsic evidence is even more conclusive, particularly the testimony of (1) Novell's own former Chairman of the Board, who signed the APA on Novell's behalf, (2) the person who was Novell's chief negotiator of the APA and the TLA, and (3) the person who signed the TLA on Novell's behalf.  All three of these individuals have testified unequivocally that Novell's proposed interpretation of the APA and TLA is contrary to the intent of the contracting parties.  Chairman Frankenberg candidly admitted that Novell breached the TLA by acquiring SuSE Linux (with $50 million of IBM funding) and distributing SuSE Linux:

Q. (By Mr. Singer)  With respect to the noncompete provision which you were asked about, and I think the question was stated in terms of Novell not going into the UNIX business, so I want to make clear in your understanding in distributing Linux, is Novell or its subsidiaries going into the UNIX business in violation of those divisions [sic]?

MR. JACOBS:  Objection, calls for a legal conclusion.

A. I'm not a lawyer, but yes.

(Declaration of Mark F. James (5/18/07 James Decl.) Ex. 7 at 157-58.)

## STATEMENT OF FACTS

### Promise Not to Use Such Technology in Competition With SCO

1.     Novell, Inc. and SCO were parties to an Asset Purchase Agreement entered into as of September 19, 1995.  (5/18/07 James Decl. Ex. 1.)

2.     Prior to entering into the APA, Novell was engaged in the UNIX and UnixWare business.  (5/18/07 James Decl. Ex. 1.)

3.     SCO was a leader in UNIX System servers.  (5/18/07 James Decl Ex. 8.)

4.     The day after Novell and SCO entered into the APA, a press release was issued entitled "SCO ACQUIRES THE UNIX BUSINESS FROM NOVELL AND LICENSES NETWARE TECHNOLOGY."  (5/18/07 James Decl. Ex. 8.)

5.     At the time of the execution of the APA, Novell was a leading networking software company.  Because it had developed its flagship networking product, NetWare, to work on the UNIX operating system, Novell needed and requested the right to distribute trivial portions of the UNIX source code embedded in NetWare.  (See 5/18/07 James Decl. Ex. 13 at 226-27.)

2

6.      Accordingly, with the sole intent of accommodating these requests by Novell, the parties to the APA agreed that Santa Cruz would license back to Novell "all the technology included in the Assets" transferred by the APA, as well as "all derivatives of the technology included in the Assets" (collectively, "the Licensed Technology"), subject to certain broad limitations.  (5/18/07 James Decl. Ex. 1 § 1.6.)

7.      To protect the value to Santa Cruz of the transferred UNIX and UnixWare assets, the APA and TLA each contained a non-compete provision, whereby Novell covenanted not to use the Licensed Technology to compete with SCO's core operating-system products.  (5/18/07 James Decl.  Ex. 1 § 1.6, Ex. 4 § II.A.(2).)

8.      Section 1.6 of the APA provides in part:

> Seller agrees that it shall use the Licensed Technology only (i) for internal purposes without restriction or (ii) for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product.

(5/18/07 James Decl. Ex. 1 § 1.6.)

9.      The TLA implements the agreement between SCO and Novell described in Section 1.6 of the APA and states, under Section II.A.(2), that Novell is permitted to distribute and sublicense "such Licensed Technology and modifications thereof," provided that

> (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering.

(5/18/07 James Decl. Ex. 4 § II.A.(2).)

3

10.     The "core products" and "core application server offerings" referenced in the APA and TLA, respectively, refer to the UNIX and UnixWare operating systems owned by Santa Cruz upon the closing date.  Even before acquiring the UNIX source code, Santa Cruz had been primarily involved in the business of distributing UNIX in binary form, so that with the acquisition of the UNIX and UnixWare source code and copyrights, the UNIX and UnixWare operating systems undoubtedly represented Santa Cruz's "core products."  In addition, as of the closing date, Santa Cruz had no "application server offering" other than UNIX and UnixWare operating systems.  (5/18/07 James Decl. Ex. 13 at 226-27.)

11.     After the execution of the APA, Novell continued its business of developing and marketing its NetWare operating system, as it had contemplated in entering into the APA. (5/18/07 James Decl. Ex. 78 at 59).

<u>The APA and TLA Define the Rights Transferred in a Single Transaction</u>

12.     The APA and TLA refer to each other as part of the same transaction, as follows:

- The APA calls for the execution of "a license agreement" and the terms thereof regarding the "Licensed Technology" addressed in the TLA.  (5/18/07 James Decl. Ex. 1 § 1.6.)

- The TLA provides that its effective date is "the Closing Date of the Asset Purchase Agreement."  (5/18/07 James Decl. Ex. 4 at 1.)

- The first "Whereas" clause of the TLA provides that "pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licenses for Licensed Technology, including related documentation and support."  (5/18/07 James Decl. Ex. 4 at 1.)

4

- The TLA provides that the term "Licensed Technology," and several other terms, "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 at 1-2.)

- The TLA provides that Novell shall have the license set out in the TLA "Effective upon the Closing Date and in connection with the transfer of the Assets by NOVELL to SCO pursuant to the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 § II.A.)

- The TLA provides that certain covenants on Novell's license rights "shall not affect any rights specifically retained by NOVELL under the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 § II.A(2).)

- In the Section titled "ENTIRE AGREEMENT," the TLA provides: "This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter." (5/18/07 James Decl. Ex. 4 § VIII.)

13.     Section 1.6 of the APA also details how the TLA shall treat the rights of parties in the event of a "Change in Control" of Novell or SCO distinctly, as follows:

> The license agreement shall also provide Seller with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof…
>
> In the event of a Change of Control of Seller (as defined in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to Seller's products either developed or substantially developed as of the time of the Change of Control.

(5/18/07 James Decl. Ex. 1 § 1.6.)

14.    In Section 6.3(c), in turn, the APA makes clear that Novell will have an

"unlimited" license to the Licensed Technology only as follows:

> Expansion of Seller's Rights Relating to the Licensed Technology
> upon a Change of Control.  Until two (2) years from the Closing
> Date, in the event Buyer has merged with, sold shares representing
> 50% or more of the voting power of Buyer to, sold all or
> substantially all of Buyer's assets to, or engaged voluntarily in any
> other change of control transaction with, any party identified by
> Seller on Schedule 6.3(a) hereof, or in the event any party
> identified by Seller on Schedule 6.3(a) hereof, shall acquire shares
> representing 50% or more of the voting power of Buyer, Seller
> shall automatically have unlimited, royalty-free, perpetual rights to
> the Licensed Technology.

(5/18/07 James Decl. Ex. 1 § 6.3(c).)

15.    The TLA provides that Novell would obtain the "unlimited" rights to the Licensed

Technology "[i]n the event of a Change of Control of SCO," where the terms "Change of

Control" and others "shall have the respective meanings attributed to such terms in the Asset

Purchase Agreement."  (5/18/07 James Decl. Ex. 4 § I)

16.    Novell's chief business negotiator, Ed Chatlos, has confirmed that terms of the

TLA were intended to confirm the terms of the APA declaring that Novell would only obtain an

"unlimited" license to the "Licensed Technology" upon a Change of Control as described in

Section 6.3(c):

> As reflected in Section 1.6 of the APA, Novell intended to enter
> into a license agreement with Santa Cruz after the execution of the
> APA in which Novell would obtain a license to the "Licensed
> Technology" within the meaning attributed to that term in the APA.
> In addition, as also reflected in Section 1.6, Novell intended to
> obtain an "unlimited" license to the Licensed Technology upon the
> occurrence of a Change of Control as described in Section 6.3(c) of
> the APA.  In my view and based on my experience, Novell

6

> intended to implement the directives set forth in Section 1.6 of the
> APA in the TLA.  I did not possess any contrary intent, and I do
> not recall anyone on either side of the contracts saying or
> suggesting that anyone possessed any contrary intent.

(5/18/07 James Decl. Ex. 68 ¶ 3.)

17.    This view is similarly confirmed by Novell's signatory to the TLA, R. Duff

Thompson:

> I describe my education, work history, and involvement with the
> APA and TLA in my previous Declaration, which I incorporate
> and adopt here.  In the negotiations and discussions of the APA,
> the parties specifically contemplated and discussed the license
> agreement that became the TLA.  Section 1.6 of the APA reflects
> Novell's intent to enter into a license agreement with Santa Cruz
> after the execution of the APA in which Novell would obtain a
> license to the "Licensed Technology" within the meaning
> attributed to that term in the APA.
>
> I recall from the negotiations and discussions of the APA that
> Novell wanted to be free of the terms of the license agreement in
> the event that Santa Cruz entered into certain types of transactions
> with certain large companies in the same market or markets as
> Novell within a certain period of time after the closing of the deal.
> It is Section 1.6 of the APA that reflects Novell's intent to obtain
> an "unlimited" license to the Licensed Technology upon the
> occurrence of a Change of Control as described in Section 6.3(c) of
> the APA.

(5/18/07 James Decl. Ex. 69 ¶¶ 2-3.)

<u>The APA and TLA Non-Compete Provisions Were Intended to Protect Value of SCO's
Newly-Acquired Worldwide UNIX Business and Goodwill</u>

18.    SCO and Novell intended the non-compete provisions of the APA and TLA to

protect the value of the business SCO obtained from Novell under the APA, as Mr. Thompson,

who signed the TLA on behalf of Novell, explained to Alok Mohan, Santa Cruz's signatory:

> …we're not going to be going into that business of trying to sell a
> competitor to UnixWare.  That is not our business.  That is not our

7

intent.  We are selling the business not for the purpose of going
into competition with them.  We are selling them the business so
they can go take that business and make it grow.

. . . .

        So it just didn't make sense for Novell, and we in the
negotiations assured – and I think this is the part that I have fairly
clear recollection of, that we assured Alok and his team that it is
not Novell's intent to simply come in after the fact and jump back
on top of this market on top of you.  So that's the way I would get
to the question of noncompetition.  It was really that it was an
assurance that we gave them that wasn't our intent to simply jump
back on top of them.

. . . .  SCO was saying, well, okay.  We'll give you the license, but
there are some restrictions.  And those restrictions seemed
reasonable at the time, and we agreed to them.

(5/18/07 James Decl. Ex. 11 at 94-95.)

19.     Novell's CEO at the time of the execution of the APA and TLA confirmed this

intent, testifying that it was his "understanding was that we would not go into the UNIX business

and compete with SCO."  (5/18/07 James Decl. Ex. 7 at 118.)  He confirmed that as long as

Novell "didn't go into the UNIX business," Novell "could compete with SCO."  (Id.)  Mr.

Frankenberg testified that "my recollection is that SCO was very concerned about Novell

entering – being able to enter the business and compete with SCO using what we got out of the

license and also being able at some point in the future to sell that to other people to compete with

them.  And we said, no, that is not our intent.  We're not going to do that."  (Id. at 174.)

20.     In his deposition, Mr. Frankenberg admitted that Novell breached the TLA by

distributing SuSE Linux:

Q.  (By Mr. Singer)  With respect to the noncompete provision
which you were asked about, and I think the question was stated in
terms of Novell not going into the UNIX business, so I want to
make clear in your understanding in distributing Linux, is Novell

or its subsidiaries going into the UNIX business in violation of those divisions [sic]?

MR. JACOBS:  Objection, calls for a legal conclusion.

A.  I'm not a lawyer, but yes.

….

MR. JACOBS:  Now, you said in response to Mr. Singer's question that you thought that Novell was in violation of the TLA by distributing Linux.  What did you base that on?

A.  I remember that provision very well because it was a significant concession to SCO to allay their concern about us coming back around and competing with them in the marketplace.  And we had no intention of being in the UNIX business or businesses directly in competition with SCO, and that's what – – we memorialized that in that agreement.

Q.  And you believe that Linux competes with SCO?

A.  It would certainly – – it certainly did compete with SCO's products, yes.

Q.  But he asked about present day.  Do you believe that Linux competes with SCO today?  If you have no opinion on that, fine.  I'm just trying to clarify your answers to his questions.

A.  Yes, it does, because SCO still sells UNIX-based software.

Q.  And the mere fact that Novell distributes Linux, that's all – – and that Linux compete with UNIX, that's all you need to know to know that you're in violation of the TLA?

A.  Yes.

(5/18/07 James Decl. Ex. 7 at 157-58, 170-71; see also id. at 56-57 and 116-19.)

21.    The absence of any express geographic limitation in the APA reflects the parties' intent and the realities of the business at issue – namely, that the sales and marketing of the operating systems at issue occurred on a worldwide basis.  If Novell were permitted to sell or

market an operating system in violation of the terms of the license restriction where Santa Cruz was to be selling and operating the UNIX and UnixWare operating systems – that is, throughout the world – Novell's conduct would threaten to undercut Novell's sale of the UNIX and UnixWare businesses to Santa Cruz. (See 5/18/07 James Decl. Ex. 68 ¶ 4; Ex. 69 ¶ 4.)

22.     Because Novell's use of the UNIX or UnixWare technology transferred to SCO in competition with SCO would have threatened SCO's market for its products, SCO would not have agreed to license such technology to Novell without a promise from Novell that it would not use such technology in competition with SCO. (See 5/18/07 James Decl. Ex. 13 at 226-27; Ex. 7 at 56-57.)

23.     The APA expressly acknowledges "the intent of parties hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer." (5/18/07 James Decl. Ex. 1 § 1.3(a)(i).) This "Business" was defined as "the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare." (Id., Recital A.)

24.     The APA further states that the parties intended for Novell to sell and for Santa Cruz to acquire "all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business" identified on Schedule 1.1(a), excluding the "Excluded Assets in Schedule 1.1(b). (5/18/07 James Decl. Ex. 1 Schedule 1.1(a).) The opening description of the Assets transferred in Schedule 1.1(a), in turn, is extremely broad:

> All rights and ownership of UNIX and UnixWare, including but
> not limited to all versions of UNIX and UnixWare and all copies of

10

> UNIX and UnixWare (including revisions and updates in process),
> and all technical, design, development, installation, operation and
> maintenance information concerning UNIX and UnixWare,
> including source code, source documentation, source listings and
> annotations, appropriate engineering notebooks, test data and test
> results, as well as all reference manuals and support materials
> normally distributed by Seller to end-users and potential end-users
> in connection with the distribution of UNIX and UnixWare, such
> assets to include without limitation the following…

(5/18/07 James Decl. Ex. 1 Schedule 1.1(a) § I.)

25.    Goodwill is not listed among the "Excluded Assets" in Schedule 1.1(b) of the

APA. (5/18/07 James Decl. Ex. 1 Schedule 1.1(b).)

26.    The broad transfer of "[a]ll rights and ownership of UNIX and UnixWare"

included the goodwill Novell had developed in its UNIX and UnixWare business, as confirmed

in a letter dated November 16, 1995, from SCO's auditor Peat Marwick LLP, who wrote:

> Other property being sold includes business documentation such as
> customer lists, copies of contracts and agreements, employee lists
> and contracts, human resource materials, operating procedures
> manuals, accounting records, training materials, marketing
> materials and collateral, claims against third parties, and other
> items.  The sale includes goodwill, trade names, and other
> intangibles.

(5/18/07 James Decl. Ex. 70 at SCO1230550 (emphasis added).)

27.    The APA further states as follows:

> In the event that any provision of this Agreement or the application
> thereof, becomes or is declared by a court of competent
> jurisdiction to be illegal, void, or unenforceable, the remainder of
> this Agreement will continue in full force and effect and the
> application of such provision to other persons or circumstances
> will be interpreted so as reasonably to effect the intent of the
> parties hereto.  The parties further agree to replace such void or
> unenforceable provision of this Agreement with a valid and
> enforceable provision that will achieve, to the extent possible, the

11

economic, business and other purposes of such void or
unenforceable provision.

(5/18/07 James Decl. Ex. 1 § 9.6.)

SCO Alleges That Novell Breached the APA and TLA Non-Compete Covenants

28.     On November 4, 2003, Novell announced its acquisition of SuSE Linux, one of
the world's leading distributors of Linux.  Since the closing of that acquisition in January 2004,
Novell has been distributing Linux worldwide.  (SCO Second Amended Complaint ¶ 46; see
generally http://www.novell.com/linux/ and related pages on Novell's website.)

29.     On December 22, 2005, SCO filed with the Court in the SCO v. IBM case a
compilation of 293 disclosures of technology which IBM has made to enhance Linux (in
violation of its agreements with SCO) with the stated objective of making Linux a more
enterprise-hardened operating system.  (5/18/07 James Decl. Ex. 75.)

30.     SCO alleges that Linux contains the Licensed Technology which, pursuant to
Section 1.6 of the APA and Section II.A.(2) of the TLA, Novell covenanted not to distribute in
an operating system.  (SCO Second Amended Complaint ¶ 48.)

31.     SCO alleges that Linux is "directly competitive" with SCO's core application
server offerings.  (SCO Second Amended Complaint ¶ 49.)

32.     SCO alleges that the measure of UNIX technology in Linux far exceeds the trivial
portions that the parties intended Novell was authorized to use, in Netware, pursuant to the TLA.
(SCO Second Amended Complaint ¶ 50.)  Whereas UNIX became enterprise-ready after decades
of development, Linux matured into a powerful enterprise-ready operating system in a few years,
due primarily to the UNIX technology wrongly contributed by IBM to Linux.  (SCO Second
Amended Complaint ¶ 50.)

33.    SCO alleges that Novell therefore breached Section 1.6 of the APA and Section

II.A.(2) of the TLA.  (SCO Second Amended Complaint ¶ 51.)

## ARGUMENT

SCO shows below that none of Novell's asserted bases for summary judgment warrants

such relief, because SCO may bring a claim for breach of contract for Novell's use of the

Licensed Technology beyond the scope of the license (Part I, below); Santa Cruz's sale of assets

did not terminate the license restrictions at issue (Part II, below); and the license restrictions are

not void or unenforceable under California law (Part III, below).

I.    **SCO IS ENTITLED TO BRING A CLAIM FOR BREACH OF CONTRACT FOR
       NOVELL'S USE OF THE LICENSED TECHNOLOGY BEYOND THE SCOPE
       OF THE LICENSE.**

Novell first argues (at 17-21) that the provisions of the TLA at issue are not "an

independent covenant not to compete," but rather "a limitation on the license" constituting a

"condition."  Novell then briefly contends (at 22) that the distinction is relevant because SCO

assertedly cannot bring a claim for breach of contract for Novell's conduct beyond the limitation

on the license.  Novell is mistaken.

A.    Novell Presents a False Choice Between "License
       Limitations" and Covenants.

Novell argues (at 17) that SCO cannot bring a breach of contract or unfair competition

claim based on Novell's use of Licensed Technology in violation of the APA and TLA non-

competition clauses because the clauses are "limitation[s] on the scope of Novell's license," not

"affirmative covenants."  Novell cites (at 18-22) to Sun Microsystems, Inc. v. Microsoft Corp.

("Sun I"), 188 F.3d 1115 (9th Cir. 1999), and Sun Microsystems, Inc. v. Microsoft Corp. ("Sun

II"), 81 F. Supp. 2d 1026 (N.D. Cal. 2000), in support of this false dichotomy between "license

13

limitations," which would allow SCO to bring a copyright infringement claim, and "affirmative covenants" which would allow SCO to bring a breach of contract claim.

Copyright infringement and breach of contract claims may arise from the same set of facts:  "[C]onduct that may give rise to a federal suit for copyright infringement may also give rise to a state law claim in tort for unfair competition, tortious interference, or breach of contract . . . [if such claim] requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display." La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 1199 n.2 (10th Cir. 2005) (internal citations omitted); see also Harris Market Research v. Marshall Mktg. & Comm'ns, Inc., 948 F.2d 1518, 1522-23 (10th Cir. 1991) (upholding jury verdict of copyright infringement and breach of license agreement).  Novell ignores this controlling case law, where its breach of the non-compete clauses of the APA and TLA clearly provide an "extra element, beyond mere copying, preparation of derivative works, performance, distribution or display."  Black v. Kos, No. CIV 05-163 KBM/LCS, 2005 WL 4564587, at *2-3 (D.N.M. Mar. 29, 2005) (holding that breach of contract claim meets "extra element" test); see also Recursion Software, Inc. v. Interative Intelligence, Inc., 425 F. Supp. 2d 756, 766 (N.D. Tex. 2006) (citing law from several circuits holding that breach of contract claims meet "extra element" test).

Novell does not cite a single case holding that a plaintiff cannot bring a breach of contract claim against a defendant who violates a non-competition clause, whether that clause is characterized as a covenant, condition, license limitation, or any other term of art.  Rather, Novell exclusively cites to opinions discussing whether a plaintiff can bring a copyright infringement claim.  For example, the issue before the Sun I and Sun II courts was not whether

the plaintiff could bring state law claims, but whether the plaintiff had asserted a valid copyright infringement claim and could therefore rely on the presumption of irreparable harm applicable when seeking a preliminary injunction in a copyright infringement case. See Sun I, 188 F.3d at 1117, 1119. When determining whether a plaintiff can bring a copyright infringement claim against a licensee, it makes sense to determine whether any provisions in the license are "license limitations," because the licensee's use of the licensed work can only constitute copyright infringement if such use is outside the scope of the license. See Sun I, 188 F.3d at 1119. However, as applied to the instant dispute, this case law is irrelevant to the question whether SCO has a valid contractual claim.[1]

The Sun courts simply were not asked to determine whether the plaintiff could have brought a breach of contract claim. See Sun I, 188 F.3d at 1119-23. Thus, even if language in Sun I or Sun II could somehow be read to suggest that a clause can only be a license limitation or a covenant, or that a licensor plaintiff can only bring a copyright infringement claim or a breach of contract claim, such language would merely be dicta and contrary to the square holdings of other Ninth Circuit cases. Indeed, the Ninth Circuit has repeatedly recognized that a defendant's

---

[1] Novell goes on to argue that the lack of a license "shield" cannot be used as a "sword" against Novell. As explained herein, this argument mischaracterizes the fundamental nature of the APA and TLA non-compete clauses. Novell does not merely lack a license to use SCO-owned technology in competitive products, it made a covenant not to sell such products and breached that covenant. Moreover, the cases Novell cites are inapposite and do not support its claim that SCO's only remedy is a copyright infringement claim. In Microsoft Corp. v. Harmony Computers & Electronics, Inc., 846 F. Supp. 208 (E.D.N.Y. 1994), the court explicitly states that there was no contract between the plaintiff and defendant, much less a non-compete agreement. See id. at 211, 214. The court therefore made no holding on whether a defendant who breaches a valid non-compete agreement can be sued only for copyright infringement. In Marshall v. New Kids on the Block Partnership, 708 F. Supp. 1005 (S.D.N.Y. 1991), the court addressed whether the plaintiff adequately plead a claim arising under the copyright laws for purposes of federal court jurisdiction, not whether the plaintiff could have asserted separate claims arising under state law. See id. at 1009. Indeed, the opinion acknowledges that a licensee's misconduct may give rise to claims under both the Copyright Act and state law. See id. (citing Kanakos v. MX Trading Corp., 216 U.S.P.Q. 1030 (S.D.N.Y. 1981)).

failure to comply with the terms of a license to use copyrighted material can give rise to both copyright infringement and breach of contract claims.  See, e.g., Germaine Music v. Universal Songs of Polygram, 130 Fed. Appx. 153, 155 n.1 (9th Cir. 2005) ("If [defendant] was using the song without paying royalties, it was likely both a breach of contract and a violation of the copyright.") (attached hereto as Exhibit A); Grosso v. Miramax Film Corp., 383 F.3d 965 (9th Cir. 2004) (reversing district court's holding that plaintiff could not bring a breach of contract claim in addition to copyright infringement claim); Guthy-Renker Corp. v. Bernstein, 39 Fed.Appx. 584, 587 (9th Cir. 2002) (upholding district court's damage award for breach of contract and copyright infringement) (attached hereto as Exhibit B); Rano v. Sipa Press, Inc., 987 F.2d 580, 586 (9th Cir. 1993) (stating that licensor could sue for copyright infringement and breach of contract).

B.    The APA and TLA Non-Compete Clauses Are Affirmative Covenants.

    1.    The APA and TLA Non-Compete Clauses Are Covenants, Not Conditions.

SCO is entitled to bring a breach of contract against Novell for its violation of the non-compete clauses contained in the APA and the TLA, because these clauses constitute Novell's affirmative covenants.  Courts evaluating whether a party's failure to comply with contractual provisions give rise to a claim for breach of contract (as opposed to a claim for copyright infringement) generally determine whether such provisions constitute either covenants or conditions.[2] 1 B.E. Witkin, Summary of California Law, Contracts § 778 at 867-68 (2006)

---

[2] This is also true where the contract at issue is a license to use copyrighted works.  See 3 Nimmer on Copyright § 10.15[A] at 10-115 (2006 ed.) (citing In re Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661

16

(distinguishing covenants and conditions); 13 <u>Williston on Contracts</u> § 38:5 at 382 (same, stating: "A promise is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify the promise in understanding that a commitment has been made, while a condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due.").  Breach of a covenant entitles a licensor to bring a breach of contract claim.  <u>Id.</u>  The premise underlying the non-compete provisions is that SCO <u>promised</u> to grant Novell a license in exchange for Novell's <u>promise</u> (that is, <u>covenant</u>) that it would not offer directly competitive products including the Licensed Technology.  Thus, Novell's violation of the non-compete provisions in the agreements establish that SCO is entitled to a breach of contract claim.

2.    <u>Contractual Provisions Are Presumed to Be Covenants.</u>

The presumption is that contractual provisions are covenants, not conditions.  <u>See</u> <u>Mularz v. Greater Park City Co.</u>, 623 F.2d 139, 142 (10th Cir. 1980) ("In cases of doubt as to the intention of the parties, courts resolve the doubt in favor of an interpretation making the engagement a promise rather than a condition."); 13 <u>Williston on Contracts</u> § 38:13 at 425 ("If it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise."); <u>see also</u> <u>Graham</u>, 144 F.3d at 237 (holding that royalty and author credit terms of copyright license were covenants, based on "legal presumption favoring covenants over conditions").  The language necessary to create a condition must be unambiguous.  <u>See</u> <u>Mularz</u>, 623 F.2d at 142 ("An intent to create a condition in a contract must appear expressly or by clear implication"); <u>Effects Assocs., Inc. v. Cohen</u>, 908 F.2d 555, 559 n.7 (9th Cir. 1990) ("Conditions

---

F.2d 479, 483-84 (5th Cir. 1981); <u>Graham v. James</u>, 144 F.3d 229, 236-37 (2d Cir. 1998); <u>RT Computer Graphics, Inc. v. United States</u>, 44 Fed. Cl. 747, 756 (1999)).

17

precedent are disfavored and will not be read into a contract unless required by plain,

unambiguous language."); 13 <u>Williston on Contracts</u> § 38:13 at 429-30 ("Contract conditions are

disfavored, and will not be found in the absence of unambiguous language indicating an

intention to create a conditional obligation."); <u>see also</u> <u>Ariel (UK) Ltd. v. Reuters Group PLC</u>,

No. 05 Div. 9646(JFK), 2006 WL 3161467, at *8 (S.D.N.Y. Oct. 31, 2006) (finding clauses were

not conditions precedent where license language made no mention of conditions under which

license would revert to either party, or under which either party would obtain right of rescission).

Indeed, "[c]ourts are especially loath to find a condition precedent when the alleged condition is

peculiarly within the control of one of the contracting parties."  <u>Lockwood v. Wolf Corp.</u>, 629

F.2d 603, 610 (9th Cir. 1980).

        3.      **The Non-Compete Clauses Cannot Constitute Conditions**
                    **Under California Law**.

Whether the non-compete language is a condition or a covenant must be resolved under

California law, which indisputably governs the interpretation of the APA and TLA.  California's

statutory definition of "conditional obligation" must be applied to determine the nature of the

language at issue.   According to Cal. Civ. Code § 1434 (emphasis added), an obligation is a

condition "when the rights or duties of any party thereto depend upon the occurrence of an

<u>uncertain event</u>."  A plain reading of the California Civil Code in connection with the APA and

TLA reveals that the non-compete clauses do not contemplate the "occurrence of an uncertain

event," because whether or not Novell offered a directly competitive product was completely

within Novell's control.  In other words, whether Novell chose to offer a directly competitive

product was by no means uncertain.  Novell could either adhere to its obligations under the TLA

and the corresponding provision in the APA, or it could not. The non-compete clauses therefore should not be interpreted as a condition to the contract under California law.[3]

> ### 4.    The APA and TLA in Their Entirety Show That the Non-Compete Clauses Are Covenants.

As Novell concedes (at 20), to interpret whether a contractual provision is a covenant or a condition, the whole of a contract must be examined to determine the intent of the parties.[4] Under Cal. Civ. Code § 1642, several contracts that relate to the same matters between the same parties "and made as parts of substantially one transaction, are to be taken together." Following this approach, the language of the TLA on which Novell focuses must be read in connection with corresponding language in the APA. Section 1.6 of the APA clarifies any ambiguity regarding placement of the non-compete clause in the TLA, which is merely a codification of Section 1.6 of the APA. (See Part II, below.) The express language of Section 1.6 also constitutes unequivocal language of promise or covenant between the parties ("Buyer shall" and "Seller agrees"), rather than a limitation on the license or a condition. (APA § 1.6 (emphasis added).)

Moreover, Novell's argument (at 21) that the language of Section 1.6 of the APA is not a covenant because it was not expressly placed in the Article IV of the APA entitled "Certain

---

[3] California law recognizes the three traditional types of conditions: conditions precedent, conditions concurrent, and conditions subsequent. See Cal. Civ. Code §§ 1435-38. Viewed as a whole, the non-compete language in the APA and the TLA does not fit any of these types of conditions.

[4] Despite this, Novell primarily seizes (at 17) on the TLA language stating that Novell would have a license "provided, however, that" Novell agreed not to distribute a Composite Offering that would be directly competitive with SCO's offerings in support of its argument that the non-compete clause is a limitation on the scope of the license (i.e., a condition). However, language alone is not determinative of whether a clause is a condition or a covenant. As discussed by The Supreme Court of California, the term "provided" may or may not indicate a condition, noting that "'there is no magic in the term ["provided"], and the clause in a contract is to be construed from the words employed and from the purpose of the parties, gathered from the whole instrument.'" Diepenbrock v. Luiz, 115 P. 743, 744 (Cal. 1911) (quoting Boston Safe Dep. and Trust Co. v. Thomas, 53 P. 472 (Kan. 1898) (finding that, based on a reading of an entire provision, a clause containing "provided, that" was not a condition)).

Covenants" is misguided.[5]  The APA effected the sale of the entire UNIX business from Novell to SCO.  (See APA Recitals.)  The license-back arrangement represents an important part of the APA, which is why it was included in Article I addressing the major agreements surrounding SCO's acquisition of certain Novell assets, and not buried in Article IV, which primarily consists of boilerplate covenants.  The non-compete clause, which was a "significant concession to SCO" by Novell (5/18/07 James Decl. Ex. 7 at 171), specifically applies to the license-back arrangement, which is why it is included in Section 1.6 and not elsewhere in the APA.

Because the non-compete clause is essential to the entire agreement between Novell and SCO, it would be illogical to consider any part of the clause to be a condition.  If Novell would not have agreed to the non-compete provision, SCO would not have agreed to a license-back arrangement; if SCO had not agreed to a license-back arrangement, then Novell would not have entered into an agreement with SCO.  (See generally Part III, below.)  As discussed above, the parties exchanged these crucial promises in order to come to a workable agreement, further indicating that the non-compete language in both the APA and the TLA represents a covenant. Thus, in the context of the contract as a whole (that is, the APA and the TLA), the language at issue is clearly language of promise or obligation (that is, a covenant) rather than language of condition, or, as Novell argues, language that limits the scope of the license.

> 5.    Novell's Reliance on the Sun Cases Exalts Form Over Substance and Ignores the Structure of the APA and TLA in Their Entirety.

As noted above, Sun I and Sun II, which did not even involve breach of contract claims, have no relevance to this case.  In any event, to make its argument that the non-compete

---

[5] In fact, under Novell's own line of logic, then Section 1.6 is a covenant rather than a condition because it was not expressly placed in Article V of the APA entitled "Conditions to the Acquisition."

provisions of the APA and TLA are not covenants, Novell argues (at 20) that the Court should

rely on Sun II, but should draw exactly the opposite conclusion drawn by that court.  In this

regard, Novell exalts the form of the APA and the TLA over actual substance and meaning.

Novell's reasoning is based on the court's finding of a covenant in Sun II because compatibility

was addressed in a separate section from the license grant sections, whereas in the APA and the

TLA, the non-compete language is contained in the same section as the license grant.  In fact, the

only section in the APA to squarely address the license back grant to Novell is Section 1.6 of the

APA.  The reason for such placement is discussed above.  SCO was concerned that the Licensed

Technology it licensed back to Novell would be used to create and distribute products that would

directly compete with SCO's products.  For this reason, it would have been illogical to include a

non-compete provision elsewhere in the APA because the non-compete agreement specifically

applied to the license-back arrangement.  Moreover, whereas the agreement at issue in Sun I and

Sun II dealt solely with a license to use Java technology, Sun I, 188 F.3d at 1117, the APA

concerned the transfer of Novell's entire UNIX business.  (APA Recitals.)  Accordingly, it

makes sense to state terms regarding Novell's competitive use of licensed technology in the

section of the APA that deals with such technology, rather than a generic "covenants" section,

and such placement does not indicate that such terms were not intended to be covenants.

       In addition, Novell misinterprets the use of the word "limitation" by the Sun court.  A

breach of contract claim depends on whether a promise contained in the underlying agreement

has been breached.  Regardless of whether the non-compete clause is a limitation on the scope of

Novell's license, SCO is entitled to damages for Novell's breach of its promise.  The non-

compete clause is central to the agreement, it is a promise, a covenant, not a condition.  It goes to

21

the heart of the agreement because SCO would not have agreed to license back use of the Licensed Technology to Novell if Novell were to be allowed to create and distribute directly competing products. This would have limited or destroyed SCO's market for its own products.

As discussed above, and based on the plain language of Cal. Civ. Code § 1434, the non-compete language should be regarded as a covenant by Novell that it would not introduce directly competing products. As such, Novell's development and sale of directly competitive products was a breach of this covenant that entitles SCO to pursue its breach of contract claim.

## II.    SANTA CRUZ'S 2001 SALE OF ASSETS DID NOT TERMINATE THE COVENANTS AT ISSUE.

Novell's change of control argument is meritless because Section 1.6 of the APA plainly and unambiguously provides that the license restrictions termination proviso expired before 2001, and in any event did not encompass a change of control to SCO. The entire proviso was based on a "Change of Control of the Buyer as described in Section 6.3(c)" (APA § 1.6) and thus was only effective "[until two (2) years from the Closing Date," and even then it only applied if the acquirer was someone listed "on Schedule 6.3 hereof" (APA § 6.3(c).) SCO was not listed in Schedule 6.3, the second anniversary of the Closing Date was in 1997, and therefore the provision upon which Novell relies is completely inapplicable.

Novell does not dispute this. In fact, Novell mentions the two-year limitation only briefly in a footnote (at 24 n.7), and it does not mention the Schedule 6.3 limitation at all. Novell's sole argument appears to be that the TLA "replaces and overrides Section 1.6 of the APA to the extent there is any conflict," and that there is a conflict because the TLA does not expressly mention the two-year term or the Schedule 6.3 list (at 26). Novell does not even suggest any reason why the parties might have intended such a drastic change in meaning, and in fact there is

22

none.  The two agreements must be read together and are easily harmonizable.  Even if a

potential conflict could be perceived, the relevant extrinsic evidence, including the testimony of

Novell's own people, supports SCO's interpretation.  Thus, at the very least there are factual

issues precluding summary judgment.

A.    The APA and TLA Must Be Read Together.

Section 1642 of the California Code provides:  "Several contracts relating to the same

matters, between the same parties, and made as parts of substantially one transaction, are to be

taken together."  Cal. Civ. Code § 1642; Prudential Ins. Co. of Am. v. Fromberg, 240 Cal. App.

2d 185, 189 (1966) ("It is the rule that when written instruments all relate to one single

transaction, they should be construed together."); see also In re United Air Lines, Inc., 438 F.3d

720, 727-28 (7th Cir. 2006) (analyzing California law and finding that Section 1642 applies

where the "structure of the relationship is such that one agreement cannot be understood in

isolation from its counterpart"); Prestin v. Mobil Oil Corp., 741 F.2d 268, 272 & n.4 (9th Cir.

1984) (citing and applying Section 1642 and related precedent).  The contracts need not have

been executed on the same day to be parts of substantially one transaction.  See Boyd v. Oscar

Fisher Co., 210 Cal. App. 3d 368, 378 (1989) (citing cases) (attached hereto as Exhibit C); BMP

Prop. Dev. v. Melvin, 198 Cal. App. 3d 526, 531-32 (1988); Nevin v. Salk, 45 Cal. App. 3d 331,

338 (1975); Meier v. Paul X. Smith Corp., 205 Cal. App. 2d 207, 217 (1962) (citing cases);

Cadigan v. Am. Trust Co., 31 Cal. App. 2d 780, 784-86 (1955) (citing cases).

In addition, "Under California law, parties may validly incorporate by reference into their

contract the terms of another document."  Baker v. Aubry, 216 Cal. App. 3d 1259, 1264 (1989).

The reference to the incorporated document must be "clear and unequivocal, the reference must

23

be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." Baker, 216 Cal. App. 3d at 1264 (quotations omitted); accord Shaw v. Regents of the Univ. of Cal., 58 Cal. App. 4th 44, 54 (1997) (citing cases). "The contract need not recite that it 'incorporates' another document, so long as it guides the reader to the incorporated document." Shaw, 58 Cal. App. 4th at 54 (citing cases).

       The APA and TLA easily satisfy the foregoing standards. The same parties of course executed both documents. In addition:

- The APA calls for the execution of "a license" agreement and the terms thereof regarding the "Licensed Technology" addressed in the TLA. (APA § 1.6.)

- The TLA provides that its effective date is "the Closing Date of the Asset Purchase Agreement." (TLA at 1.)

- The first "Whereas" clause of the TLA provides that "pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licensed for Licensed Technology, including related documentation and support." (TLA at 1.)

- The TLA provides that the term "Licensed Technology," and several other terms, "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement."

- The TLA provides that Novell shall have the license set out in the TLA "Effective upon the Closing Date and in connection with the transfer of the Assets by NOVELL to SCO pursuant to the Asset Purchase Agreement." (TLA § II.A.)

24

- The TLA provides that certain covenants on Novell's license rights "shall not affect any rights specifically retained by NOVELL under the Asset Purchase Agreement." (TLA § II.A(2).)

- In the Section titled "ENTIRE AGREEMENT," the TLA provides: "This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter." (TLA § VIII.)

The APA and TLA thus relate to "the same matter," were part of "substantially one transaction," "cannot be understood in isolation" from each other, and refer to each other. Under California law, the two documents must be read together.

      B.     With Respect to the Consequences of Certain Changes of Control,
              <u>the Language of the APA and TLA Confirm SCO's Interpretation</u>

The APA details the terms of the "license agreement" that Santa Cruz "shall execute" in which Santa Cruz "shall grant to Seller a royalty-free, perpetual, worldwide license" to the "Licensed Technology" as defined therein. (APA § 1.6.) Section 1.6 of the APA further states:

> The license agreement shall also provide Seller with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof.

(<u>Id.</u>) Section 1.6 goes on to provide as follows:

> In the event of a Change of Control of Seller (as defined in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to Seller's products either developed or substantially developed as of the time of the Change of Control.

25

(Id.)  The APA thus draws a plain distinction between the consequences of such a Change of Control (with reference to Section 6.3(c) of the APA) and a Change of Control with respect to the Seller (with reference to Section 6.6 of the APA).

In Section 6.3(c), in turn, the APA makes clear that Novell will have the "unlimited" license to the Licensed Technology only as follows:

> *Until two (2) years from the Closing Date*, in the event Buyer has merged with, sold shares representing 50% or more of the voting power of Buyer to, sold all or substantially all of Buyer's assets to, or engaged voluntarily in any other change of control transaction with, *any party identified by Seller on Schedule 6.3(a) hereof*, or in the event any party identified by Seller on Schedule 6.3(a) hereof, shall acquire shares representing 50% or more of the voting power of Buyer, Seller shall automatically have unlimited, royalty-free, perpetual rights to the Licensed Technology.

(APA § 6.3(c) (emphasis added).)  The APA thus provides that Novell would obtain the "unlimited" rights to the Licensed Technology only with respect to "change of control transactions" that involved the parties identified in Schedule 6.3(a), and that occurred within two years of the Closing Date.  It is undisputed that the 2001 transaction was more than two years after the Closing Date, and that, in any event, SCO was not among the parties listed in Schedule 6.3(a).  Thus, if the APA were read alone, Novell would have no "change of control" issue at all.

The entire purpose of the TLA was to codify the license agreed on by the parties in the APA.  The TLA provides that Novell would obtain the "unlimited" rights to the Licensed Technology "[i]n the event of a Change of Control of SCO."  The term "Change of Control" and other specified terms "have the respective meanings attributed to such terms in the Asset Purchase Agreement."  The only reasonable reading of the foregoing TLA provisions is that the "meaning attributed" to the term "Change of Control" in the TLA, with respect to the

26

circumstances in which Novell would obtain the "unlimited" license, is the meaning set forth in Section 6.3(c) of the APA.

Novell's assertion is that Section 6.3(c) is irrelevant and that the definition of "Change of Control" as referred to in Section 6.6 of the APA must be the sole "meaning attributed" to that term in the TLA. Novell's position is baseless. The parties gave no indication whatever in the TLA that they intended to deviate from the express directions provided in the APA regarding the consequences of Changes of Control. In addition, since the APA and TLA must be read together, Novell's interpretation would render meaningless a substantial portion of Section 1.6 of the APA and the entirety of Section 6.3(c)), without any logic or business reason for this drastic change.

C.    If a Conflict is Perceived, There Is a Factual Issue That Precludes
      Summary Judgment.

At a minimum, Novell's interpretation creates an internal inconsistency between the APA and the TLA. The TLA itself makes clear that neither document overrides or supersedes the other. In the Section titled "ENTIRE AGREEMENT," as noted above, the TLA provides: "This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter." (TLA § VIII.) The foregoing language alone defeats Novell's argument (at 26-27) that the terms of the TLA "replaces and overrides" Section 1.6 of the APA. In addition, where (as shown above) the documents must be read together, neither "replaces" or "overrides" the other.

The two cases that Novell cites on this point do not suggest otherwise. In Frangipani v. Boecker, 64 Cal. App. 4th 860, 863 (1998), and NLRB v. International Union of Operating Engineers, 323 F.2d 545, 548 (9th Cir. 1963), there was no finding or even argument that the two

contracts at issue were to be read together under the doctrine set forth in Part II.A, above.  Indeed, to rely on an inconsistent provision in the subsequent document would defeat the doctrine that the documents be "read together."  In addition, in neither case did the subsequent contract expressly incorporate the prior contract in its integration clause to specify that <u>both</u> contracts constitute the parties' understandings with respect to the subject matter of the contracts.  Just as fundamentally, those case do not concern a situation in which the first contract calls for a subsequent contract specifically to set forth certain enumerated terms but in which the subsequent contract arguably fails to do so.  As noted, moreover, the parties give no indication whatever in the TLA that they intend to deviate from the express directions provided in the APA regarding the consequences of Changes of Control.

If the contracts read together are deemed "internally inconsistent" and the relevant terms "furnish no clear answer" to the question at issue, extrinsic evidence as to the parties' intent is admissible and the meaning of the provisions at issue is a question of fact inappropriate for summary judgment.  <u>Cadigan</u>, 31 Cal. App. 2d at 784-86; <u>accord</u> <u>Mayers v. Loew's, Inc.</u>, 35 Cal. 2d 822, 827-29 (1950) (reversing trial court's exclusion of such evidence under the circumstances); <u>see also</u> <u>Boyd</u>, 210 Cal. App. 3d at 378-80 (interpretation of multiple contracts constituting one transaction is a question of fact where there is conflicting evidence of the parties' intent); <u>Meier</u>, 205 Cal. App. 2d at 217-18 (approving of trial court's receipt of extrinsic evidence during nonjury trial on issue of whether multiple contracts were intended to be read together); <u>cf.</u> <u>BMP</u>, 198 Cal. App. 3d at 531-32 (record supported referee's findings).

D.    The Extrinsic Evidence Supports SCO's Interpretation of the APA
      And TLA.

In this case, the relevant extrinsic evidence includes the testimony of Novell's chief

business negotiator of the APA and the related documents, Ed Chatlos. Mr. Chatlos explains:

> As reflected in Section 1.6 of the APA, Novell intended to enter
> into a license agreement with Santa Cruz after the execution of the
> APA in which Novell would obtain a license to the "Licensed
> Technology" within the meaning attributed to that term in the APA.
> In addition, as also reflected in Section 1.6, Novell intended to
> obtain an "unlimited" license to the Licensed Technology upon the
> occurrence of a Change of Control as described in Section 6.3(c) of
> the APA. In my view and based on my experience, Novell
> intended to implement the directives set forth in Section 1.6 of the
> APA in the TLA. I did not possess any contrary intent, and I do
> not recall anyone on either side of the contracts saying or
> suggesting that anyone possessed any contrary intent.

(5/18/07 James Decl. Ex. ¶ 3.) Novell's signatory to the TLA, R. Duff Thompson, gives

substantially the same testimony:

> I describe my education, work history, and involvement with the
> APA and TLA in my previous Declaration, which I incorporate
> and adopt here. In the negotiations and discussions of the APA,
> the parties specifically contemplated and discussed the license
> agreement that became the TLA. Section 1.6 of the APA reflects
> Novell's intent to enter into a license agreement with Santa Cruz
> after the execution of the APA in which Novell would obtain a
> license to the "Licensed Technology" within the meaning
> attributed to that term in the APA.
>
> I recall from the negotiations and discussions of the APA that
> Novell wanted to be free of the terms of the license agreement in
> the event that Santa Cruz entered into certain types of transactions
> with certain large companies in the same market or markets as
> Novell within a certain period of time after the closing of the deal.
> It is Section 1.6 of the APA that reflects Novell's intent to obtain
> an "unlimited" license to the Licensed Technology upon the
> occurrence of a Change of Control as described in Section 6.3(c) of
> the APA.

(5/18/07 James Decl. Ex. ¶¶ 2-3; <u>see also</u> <u>id.</u> Ex. 7 at 157-58, 170-71 (testifying that he believed Novell breached the non-compete covenants by distributing Linux).)

In sum, although SCO submits that its interpretation of the APA and TLA on the question of the operation of certain Changes of Control is the only reasonable one, at a minimum the relevant language of the contracts and the foregoing extrinsic evidence precludes the summary judgment that Novell seeks on the issue.

## III.    SUMMARY JUDGMENT IS IMPROPER BECAUSE THE COVENANTS AT ISSUE ARE NEITHER VOID NOR UNENFORCEABLE UNDER CALIFORNIA LAW.

Novell invokes section 16600 of the California Business and Professions Code and argues (at 31) that as a matter of law the covenants at issue are unenforceable.  SCO shows below that Novell's argument fails for the following five independently sufficient reasons: (a) the statute does not apply to limitations on grants of rights that Novell otherwise would not have at all; (b) the business relationship is ongoing; (c) the non-compete only affects a portion of Novell's business; (d) the non-compete is necessary is necessary to protect the goodwill acquired by SCO; and (e) Novell will be unjustly enriched if section 16600 is applied.

### A.    Section 16600 Does Not Require Technology Licensors <u>To Give Up All of Their Rights to Licensees.</u>

If Novell's unsupported interpretation of section 16600 were to be adopted, it would mean that no software license, indeed no intellectual property license, and no sale, lease or use agreement of <u>any</u> nature, could contain <u>any</u> usage limitations whatsoever.  Such restrictions would restrain the licensee from "from engaging in a lawful profession, trade, or business of any kind" and would, under Novell's theory, be invalid.  But that is not what section 16600 is about. It prohibits one contracting party from taking away the other's right to do something he

30

otherwise has the right to do (e.g., right to start a competing business), but it does not obligate a contracting party to give the other party rights to which he otherwise has no entitlement (e.g., rights to use copyrighted technology beyond the scope of the license).

Thus, for example, in Smith v. San Francisco & N.P. Ry. Co., 115 Cal. 584, 605 (1897), a contract for the sale of shares imposed certain voting requirements on the buyer. The buyer complained that these restrictions of the usage of the shares were void under 16600's predecessor, but the California Supreme Court disagreed: "As the owner of property has the right to withhold it from sale, he can also, at the time of its sale, impose conditions upon its use without violating public policy." Similarly, in King v. Gerold, 109 Cal. App. 2d 316, 318 (1952), section 16600 did not apply to license agreement that "barred merely from manufacturing and selling trailers of the particular design and style invented by respondent who in the first instance licensed appellant to use such design."

The licensor-licensee relationship between SCO and Novell continues to this day. Without the license, Novell undisputedly would not legally be able to distribute its traditional NetWare line of products. Nothing in section 16600 prohibited SCO and Novell, or the parties to any type of license agreement, from agreeing to limitations on the scope of the license.

      B.     Under California Law, Contractual Restrictions Within an Existing Business Relationship Such As Set Forth in the APA Are Enforceable.

Even if section 16600 has some application to usage restrictions in a licensing agreement, it does not apply where, as here, the relationship is ongoing. Under California law, contractual noncompetition restrictions within an existing business relationship such as the one set out in the APA and TLA do not violate section 16600. "California cases clearly establish that contractual

prohibitions against current employees' competing with their employers do not violate section 16600." <u>Shaklee U.S. Inc. v. Giddens</u>, 934 F.2d 324, 1991 WL 90003, at **3 (9th Cir. May 30, 1991) (attached hereto as Exhibit D); <u>cf.</u> <u>Fowler v. Varian Assocs., Inc.</u>, 196 Cal. App. 3d 34, 44 (1987) ("In its typical application, section 16600 invalidates certain far-reaching post employment covenants not to compete."). In <u>Shaklee,</u> the Ninth Circuit held that the "reasoning of those cases applies equally to supplier-distributor relationships" where a distributor is precluded from promoting other companies that compete with the company for which the distributor works. 1991 WL 90003, at **3.

Other California cases have held that a noncompetition clause in a contract between franchisor and franchisee "remains in effect during the life of the franchise." <u>Dayton Time Lock Serv., Inc. v. The Silent Watchman Corp.</u>, 52 Cal. App. 3d 1, 6-7 (1975) (holding that such a clause falls outside section 16600 and would have to be analyzed based on "knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market"). One court analyzing California law described such cases as supporting the "distinction between in-term restrictions and post-term restrictions." <u>Great Frame Up Sys., Inc. v. Jazayeri Enters., Inc.,</u> 789 F. Supp. 253, 255-56 (N.D. Ill. 1992) (citing and analyzing relevant cases and holding that a non-competition restriction during the term of an existing franchise would not be void under California law); <u>see also</u> <u>Keating v. Baskin-Robbins USA, Co.</u>, No. 5:99-CV-148-BR(3), 2001 WL 407017, at *13 (E.D.N.C. Mar. 27, 2001) (citing cases and acknowledging distinction between in-term and post-term restrictions under California law and section 16600).[6]

---

[6] Additionally, the cases Novell cites (at 29) for the proposition that California's non-compete rules have been discussed in the context of intellectual property licensing or sale are inapplicable to the particular facts of this case. Whereas the present case focuses on a license in effect during an ongoing business

The foregoing precedent establishes that in an ongoing business relationship where one party is entitled to a level of control over its contractual counterparty with respect to the subject matter of the noncompetition provision, the provision falls outside section 16600. The ongoing licensor-licensee relationship between SCO and Novell under the APA and TLA with respect to the Licensed Technology is directly analogous to the employer-employee, supplier-distributor, and franchisor-franchisee relationships in which "in-term" restrictions on competition do not violate section 16600. Just as a franchisor, for example, may employ a noncompetition provision to promote and protect the franchise as part of the franchisor's control over the franchise, Dayton, 52 Cal. 3d App. at 6-7, so is a licensor permitted to impose restrictions that protect the value of the technology it has just acquired from the licensee.

The parties here indisputably intended the license restrictions at issue to protect the value of the business Santa Cruz had acquired and of the technology that Santa Cruz controlled but had agreed to license back to Novell. Novell's signatory to the TLA, Mr. Thompson, explained to Santa Cruz's signatory to the APA and TLA, Alok Mohan, that after the execution of the APA and TLA

> we're not going to be going into that business of trying to sell a competitor to UnixWare. That is not our business. That is not our intent. We are selling the business not for the purpose of going into competition with them. We are selling them the business so they can go take that business and make it grow.

---

relationship, Zajicek v. Koolvent Metal Awning Corp. of Am., 283 F.2d 127 (9th Cir. 1960), involved a non-compete provision that prohibited a licensee from engaging in a competing business in the licensed territory for two years after the termination of the license. While the court called the non-compete restriction "undisputedly" illegal, the court's discussion is limited and without detail, nor does it examine whether one of the exceptions applied. Similarly, the second case cited by Novell, Summerhays v. Scheu, 10 Cal. App. 2d 574 (1935), contains limited discussion by the court as to the non-compete agreement. Notably, the non-compete agreement was made orally, so the court actually barred it based on the Statute of Frauds. It is only as a mere passing statement that the court thereafter noted that the agreement would also be void as a restraint of trade unless it fell under one of the exceptions.

> . . . .
>
> So it just didn't make sense for Novell, and we in the negotiations assured – and I think this is the part that I have fairly clear recollection of, that we assured Alok and his team that it is not Novell's intent to simply come in after the fact and jump back on top of this market on top of you.  So that's the way I would get to the question of noncompetition.  It was really that it was an assurance that we gave them that wasn't our intent to simply jump back on top of them.
>
> . . . .  SCO was saying, well, okay.  We'll give you the license, but there are some restrictions.  And those restrictions seemed reasonable at the time, and we agreed to them.

(5/18/07 James Decl. Ex. 11 at 94-95.)

Novell's CEO at the time of the execution of the APA and TLA, Robert J. Frankenberg, confirmed the foregoing intent.  Mr. Frankenberg testified that it was his "understanding was that we would not go into the UNIX business and compete with SCO."  (5/18/07 James Decl. Ex. 7 at 118.)  He confirmed that as long as Novell "didn't go into the UNIX business," Novell "could compete with SCO."  (Id.)  Mr. Frankenberg testified that "my recollection is that SCO was very concerned about Novell entering – being able to enter the business and compete with SCO using what we got out of the license and also being able at some point in the future to sell that to other people to compete with them.  And we said, no, that is not our intent.  We're not going to do that."  (Id. at 174.)

In sum, the trade-off between the benefits received by both Santa Cruz and Novell involving the license restrictions at issue is directly analogous to the trade-offs at issue in the ongoing business relationships in the foregoing precedent.  On this initial, independently sufficient basis, the license restrictions at issue do not violate section 16600.

C.    California Law Does Not Ban Partial Restraints on the Pursuit of a
      Business Such As the License Restrictions at Issue Here.

Only restrictive covenants that prohibit an individual from pursuing "an *entire* business, trade or profession" are invalid under section 16600. Boughton v. Socony Mobil Oil Co., 231 Cal. App. 2d 188, 192 (1964) (emphasis added) (citing cases); accord Corporate Express Office Prods., Inc., v. Martinez, No. CV-SA02-87 AHS(ANX), 2002 WL 31961458, at *4 (C.D. Cal. Mar. 8, 2002) ("Under Cal. Bus. & Prof. Code Section 16600, a contract is valid, despite a restriction on competition, if the promisor is barred from pursuing only a small or limited part of the business, trade or profession." (citing cases)).

Under section 16600, the promisor must prove that the contract at issue "entirely precludes" the promisor "from pursuing its trade or business," Gen. Commercial Packaging, Inc. v. TPS Package Eng'g, Inc., 126 F.3d 1131, 1133-34 (9th Cir. 1997) (citing cases), or "completely restrained" the promisor from doing so, Campbell v. Bd. of Trustees, 817 F.2d 499, 502 (9th Cir. 1987) (citing cases); cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung, No. CV 01-00659 CBM RCX, 2001 WL 283083, at *5-6 (C.D. Cal. Feb. 2, 2001) (citing Boughton and imposing injunction that would permit defendants to pursue significant part of their business).[7] The foregoing precedent is consistent with the plain language of section 16600, which provides subject to the statutory exceptions that "every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." The section thus alludes to a profession, trade, or business "of any kind," but plainly does

---

[7] In Edwards v. Arthur Andersen LLP, 47 Cal. Rptr. 788 (Ct. App. 2006), the court declined to recognize any exception for restraints that "leave a substantial portion of the market open to the employee" and held that there is no exception to section 16600 "when applied to an employee's noncompetition agreement." Id. at 791, 800. The decision is not controlling and its holding pertains to a distinct type of contract, and SCO further submits that the decision misinterprets the relevant precedent.

<u>not</u> allude to a restraint "to any extent" or "of any sort."  A party restrained from competing in part of a business is not restrained from engaging in "a business."

The California courts thus have repeatedly held that section 16600 does not invalidate contractual restrictions that allow a party to pursue its general business but not certain aspects of that business.  In <u>TPS Package</u>, for example, the court enforced a contract to which defendant TPS was a party that "only limits TPS's access to a narrow segment of the packaging and shipping market."  126 F.3d at 1134.  In <u>Chung</u>, the court imposed an injunction that permitted the defendants to continue "their employment in the securities industry" and other business activities, but barred them from soliciting clients whose accounts they serviced or whose names they learned while employed by the plaintiff.  2001 WL 283083, at *5-6.  In <u>King v. Gerald</u>, 109 Cal. App. 2d 316 (1952), the court enforced an agreement that permitted the defendant to carry on his "lawful business of manufacturing trailers" but barred him from "manufacturing and selling trailers of the particular design and style" that the plaintiff had developed.  <u>Id.</u> at 318.

The license restrictions here plainly restricted Novell from engaging in only a limited part of its business.  Under the plain terms of the APA and TLA, Novell remained free to continue its business of developing and licensing operating systems generally and even to develop and license operating systems that contained the Licensed Technology.   Novell would run afoul of the restrictions only if it distributed products "directly competitive with core application server offerings of SCO" or if the Licensed Technology became "a primary portion of the value" of a Novell operating system or other product.  Indeed, after the execution of the APA, Novell continued in the profitable business of developing and marketing its NetWare operating system, as it had contemplated in entering into the APA.

Novell went into direct competition with SCO only after IBM furnished Novell $50 million to acquire SuSE and become a distributor of SuSE Linux, which undisputedly competes with SCO's core products. The APA and TLA non-competes have no impact at all on Novell's traditional business.

On this second, independently sufficient basis, Novell's reliance on section 16600 is no basis for the summary judgment Novell seeks.

D.    Novell's Sale of Goodwill Under the APA and the Nature of the
      License Restrictions at Issue Make Those Restrictions Enforceable.

The license restrictions at issue here also satisfy one of the statutory exceptions to section 16600. Section 16601 of the California Business and Professions Code provides in relevant part:

> Any person who sells the goodwill of a business . . . or any owner
> of a business entity that sells . . . all or substantially all of the
> operating assets of a division . . . of the business entity together
> with the goodwill of that division . . . may agree with the buyer to
> refrain from carrying on a similar business within a specified
> geographic area in which the business so sold, or that of the
> business entity [or] division . . . has been carried on, so long as the
> buyer . . . carries on a like business therein.

Ca. Bus. & Prof. § 16601. For purposes of the section, "business entity" include "any owner of capital stock, in the case of a business entity that is a corporation." Id.

The California courts have repeatedly acknowledged the fundamental nature of the "goodwill" exception to section 16600:

> Section 16601's exception serves an important commercial
> purpose by protecting the value of the business acquired by the
> buyer. In the case of the sale of the good will of a business it is
> unfair for the seller to engage in competition which diminishes the
> value of the asset he sold. Thus, the thrust of section 16601 is to
> permit the purchaser of a business to protect himself or itself
> against competition from the seller which competition would have
> the effect of reducing the value of the property right that was

37

> acquired.  One of the primary goals of section 16601 is to protect
> the buyer's interest in preserving the good will of the acquired
> corporation.

Strategix, Ltd. v. Infocrossing W., Inc., 142 Cal. App. 4th 1068, 1073 (2006) (citations,

quotations, brackets, and ellipsis omitted) (citing cases).

Novell briefly argues otherwise (at 31), but the record and precedent make clear that

Novell sold the goodwill in the UNIX and UnixWare businesses under the APA.  At the very

least, there are factual issues as to whether the goodwill was sold.  As an initial matter, "Where a

covenant not to compete is executed as an adjunct of sale of a business there is an inference that

the business had a 'goodwill' and that it was transferred."  Monogram Indus., Inc. v. Sar Indus.,

Inc., 64 Cal. App. 3d 692, 701 (1977) (citation omitted); accord Harrison v. Cook, 213 Cal. App.

2d 527, 530 (1963) (citing cases); Handyspot Co. of N. Cal. v. Buegeleisen, 128 Cal. App. 2d

191, 195 (1954) (same).  On the basis of this inference alone, where on Novell's motion all

inferences must be drawn in SCO's favor, Novell's argument that it did not sell goodwill under

the APA fails.

In addition, both the language of the APA and the relevant extrinsic evidence confirm

that Novell did sell such goodwill.  The APA expressly acknowledges "the intent of parties

hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be

transferred to Buyer."  (APA § 1.3(a)(i).)  The "Business" is defined as "the business of

developing a line of software products currently known as Unix and UnixWare, the sale of

binary and source code licenses to various versions of Unix and UnixWare, the support of such

products and the sale of other products which are directly related to Unix and UnixWare."  (Id.,

Recital A.)  The parties intended for Novell to sell and for Santa Cruz to acquire "all of Seller's

38

right, title and interest in and to the assets and properties of Seller relating to the Business"

identified on Schedule 1.1(a), excluding the "Excluded Assets in Schedule 1.1(b). (Id. § 1.1(a).)

The opening description of the Assets transferred in Schedule 1.1(a), in turn, is extremely broad:

> All rights and ownership of UNIX and UnixWare, including but
> not limited to all versions of UNIX and UnixWare and all copies of
> UNIX and UnixWare (including revisions and updates in process),
> and all technical, design, development, installation, operation and
> maintenance information concerning UNIX and UnixWare,
> including source code, source documentation, source listings and
> annotations, appropriate engineering notebooks, test data and test
> results, as well as all reference manuals and support materials
> normally distributed by Seller to end-users and potential end-users
> in connection with the distribution of UNIX and UnixWare, such
> assets to include without limitation the following:

(APA, Schedule 1.1(a) § I.)  The reference to "all rights and ownership of UNIX and UnixWare"

could not be broader, and the reference to what such assets would "include without limitation"

cannot reasonably be read to limit the assets to those specifically set forth in the language of the

Schedule following the extremely broad opening paragraph.

The appropriate question therefore is not whether Schedule 1.1(a) says "goodwill" – the

opening provision could not have been written more broadly – but rather whether Schedule

1.1(b) identifies "goodwill" as an excluded asset.  It does not.  If there were any doubt, in

analyzing and summarizing the transaction in a letter dated November 16, 1995, SCO's auditor

Peat Marwick LLP stated:

> Other property being sold includes business documentation such as
> customer lists, copies of contracts and agreements, employee lists
> and contracts, human resource materials, operating procedures
> manuals, accounting records, training materials, marketing
> materials and collateral, claims against third parties, and other
> items.  The sale includes goodwill, trade names, and other
> intangibles.

(5/18/07 James Decl. Ex. 70 at SCO1230550) (emphasis added).)  The record thus defeats

Novell's contention that goodwill was not transferred, and of course precludes any finding in

Novell's favor on that issue as a matter of law.[8]

      With respect to the next part of section 16601, in turn, the permissible "geographic

scope" of a noncompetition covenant is "the area where the sold company carried on business."

Strategix, 142 Cal. App. 4th at 1073 (citing cases).  The permissible area covered by the

covenant need not be synonymous with the area in which the seller enjoyed "goodwill."

Monogram, 64 Cal. App. 3d at 701-02.  The territory can be "co-extensive with the entire area in

which the parties conducted all phases of their business including production, promotional and

marketing activities as well as sales."  Monogram, 64 Cal. App. 3d at 702 (enforcing agreement

not to compete in the United States, Puerto Rico, the Virgin Islands and Canada); see also

Kaplan v. Nalpak Corp., 158 Cal. App. 2d 197, 200-01 (1958) (recognizing that the areas where

the corporation's business "has been carried on" under section 16601 "are not necessarily limited

---

[8] Thus, unlike Hill Medical Corp. v. Wycoff, 86 Cal. App. 4th 895 (2001), which Novell cites (at 28-31) in its discussion of the goodwill exception found in section 16601, the APA and the circumstances surrounding this transaction clearly contemplated the transfer of goodwill.  In Hill, because the "amended and restated employment agreement" and "stock redemption agreement" between Hill Medical and Dr. Wycoff did not specifically address payment for goodwill, and because the actual repurchase price of Hill's shares was far below fair market value, the court held that the non-compete agreement was invalid and was not covered by the exception found in § 16601.  See id. at 906-07.  However, the court emphasized that the full set of circumstances surrounding a transaction must be evaluated.  In discussing situations where sellers transfer corporate shares, the court notes:

> We can foresee situations in which the parties have not allocated a
> specific portion of the purchase price to goodwill, and yet the parties
> recognized that goodwill was part and parcel of the transaction involving
> a substantial corporate interest. . . . In such situations, the transaction
> would meet the requirements of section 16601.  In analyzing whether
> parties had intended goodwill to be a part of the consideration in the sale
> of stock, all aspects of the sales arrangement should be evaluated.  For
> example, the entire structure of the transaction, including the sales price,
> might suggest that it can be said that goodwill had transferred.

Id. at 904.

to those in which it has maintained plants, warehouses, stores or other physical structures," and that section 16601 reflects "the logical relationship between the permissible territorial scope of the restriction and the limits of the area in which the good will of the business had been established"). The permitted scope is that necessary to address the "threat of undercutting" the business or company sold to the buyer. <u>Strategix</u>, 142 Cal. App. 4th at 1073.

The absence of any express geographic limitation in the APA reflects the parties' intent and the realities of the business at issue – namely, that the sales and marketing of the operating systems at issue occurred on a worldwide basis. Novell negotiators Ed Chatlos and Duff Thompson confirm that the license restrictions at issue were expressly drafted to reflect that fact. If Novell were permitted to sell or market an operating system in violation of the terms of the license restriction where Santa Cruz was to be selling and operating the UNIX and UnixWare operating systems – that is, throughout the world – Novell's conduct would threaten to undercut Novell's sale of the UNIX and UnixWare businesses to Santa Cruz. (<u>See</u> 5/18/07 James Decl. Ex. 68 ¶ 4, James Decl. Ex. 69 ¶ 4.) The absence of a geographic limitation in the APA and TLA thus complies with the purpose and rationale of section 16601.[9]

---

[9] In addition, the APA provides in pertinent part as follows:

> In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void, or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

On this third, independently sufficient basis, Novell's reliance on section 16600 is no basis for the summary judgment Novell seeks.

E.    Novell Would Be Unjustly Enriched if the Covenants Are Not Enforced.

Although generally a contract made in violation of a statute is void, "the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances.  A wide range of exceptions has been recognized."  Asdourian v. Araj, 38 Cal. 3d 276, 291 (1985).  One such exception is that "illegal contracts will be enforced to avoid unjust enrichment to the defendant at the expense of the plaintiff."  Asdourian, 38 Cal. 3d at 291; accord Shoals v. Home Depot, Inc., 422 F. Supp. 2d 1183, 1188-89 (E.D. Cal. 2006); Kashani v. Tsann Kuen China Enter. Co., 118 Cal. App. 4th 531, 541 (2004); Arya Group, Inc. v. Cher, 77 Cal. App. 4th 610, 614-15 (2000) (attached hereto as Exhibit E); Davenport & Co. v. Spieker, 197 Cal. App. 3d 566, 569-70 (1988) (attached hereto as Exhibit F).  "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts."  Asdourian, 38 Cal. 3d at 292 (quotations and citation omitted); accord Arya, 77 Cal. App. 4th at 614-15.

The factors that the Court can consider from the record at this time favor SCO, and the stay of certain discovery in this case precludes the Court from evaluating other crucially relevant factors under the foregoing doctrine.  With respect to the policy of section 16600, the relevant provisions of the APA and TLA restrict Novell's capacity to compete with SCO's product in a

_____

(APA § 9.6.)  Accordingly, to the extent the Court were to hold that a geographic restriction is necessary to make the license restrictions comply with section 16601, the parties would be obligated to reach agreement on a geographic restriction that would both comply with section 16601 and protect the "economic, business and other purposes" served by the absence of any geographic restriction in the APA and TLA as written.

limited way that cannot be said to work a substantial detriment to consumers: Novell was precluded solely from marketing and distributing a UNIX-derivative operating system of the sort that were being marked at the time by multiple UNIX licensees. The noncompetition provisions, moreover, are not "*malum in se*. They were not immoral in character, inherently inequitable or designed to further a crime or obstruct justice." Asdourian, 38 Cal. 3d at 293 (citing cases); Spieker, 197 Cal. App. 3d at 570. There was nothing "intrinsically illegal," Asdourian, 38 Cal. 3d at 293 (citing cases); Spieker, 197 Cal. App. 3d at 570, about the restrictions.

As to the "particular facts" in this case warranting application of the exception, the Court's stay and the parties' subsequent agreement regarding the scope of that stay with respect to discovery preclude the Court from evaluating such facts. See Arya, 77 Cal. App. 4th at 615 (holding that the "issue of whether instant matter is truly a 'compelling case' within the meaning of *Asdourian* cannot be definitively resolved at the demurrer stage" and nothing that "application of the principles and considerations identified in *Asdourian* to the facts established by Arya's second amended complaint persuades us that this case is one in which Arya might be entitled to some relief"). On these issues, there is no factual "record" yet for the Court to consider. Spieker, 197 Cal. App. 3d at 571. Most fundamentally, the restrictions on discovery preclude SCO from presenting evidence of the extent to which Novell would be unjustly enriched by virtue of its breach of the relevant provisions of the APA and TLA through its distribution of SuSE Linux, and the extent to which such conduct came at SCO's expense, as alleged, e.g., in paragraphs 96-100 and 116-119 of SCO's Second Amended Complaint. See Asdourian, 38 Cal. 3d at 293. Accordingly, under the foregoing precedent, Novell's request for summary judgment with

respect to the supposed illegality of the relevant provisions of the APA and TLA with respect to

SuSE Linux is premature and improper.

<u>**CONCLUSION**</u>

SCO respectfully submits, for the foregoing reasons, that the Court should deny Novell's

Motion for Partial Summary Judgment on SCO's Non-Compete Claim in Its Second Claim for

Breach of Contract and Fifth Claim for Unfair Competition.

DATED this 18th day of May, 2007.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
David Boies
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

DORSEY & WHITNEY LLP
Devan V. Padmanabhan

*Counsel for The SCO Group, Inc.*

By:    _____/s/ Edward Normand_____

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing **MEMORANDUM IN OPPOSITION TO NOVELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S NON-COMPETE CLAIM IN ITS SECOND CLAIM FOR BREACH OF CONTRACT AND FIFTH CLAIM FOR UNFAIR COMPETITION** was served on Defendant, Novell, Inc., on this 18th day of May, 2007, via CM/ECF, email, and/or hand-delivery, to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-248

_____/s/  Edward Normand_____
Edward Normand

45

### ADDENDUM

### RESPONSE TO NOVELL'S STATEMENT OF UNDISPUTED FACTS[10]

**A.    The APA Transferred Certain Assets of Novell's UNIX and UnixWare Business to Santa Cruz, But Did Not Transfer Novell's Copyrights, Goodwill, or NetWare Product.**

1.    In 1995, Novell was a leading networking software company, which had developed its flagship networking product, Netware, to work together with the UNIX operating system.  (Declaration of Kenneth W. Brakebill, filed herewith ("Brakebill Decl."), Ex. 1, Second Amended Complaint, ¶ 40.)  Novell also had a business relating to the UNIX and UnixWare operating systems.  (Brakebill Decl. Ex. 2 at 008, APA, Recital A.)

RESPONSE:  Admitted.

2.    On September 19, 1995, the APA was signed by Novell and Santa Cruz. Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business.  (Id., Recital B, Section 1.1(a).)

RESPONSE:  Admitted.

3.    The APA initially defined the assets to be acquired by Santa Cruz by reference to the attached Schedule 1.1(a).  (Id., Section 1.1(a).)  Schedule 1.1(a) generally referred to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare...."  (Brakebill Decl., Ex. 3, Schedule 1.1(a), Item I.)  However, Schedule 1.1(a) specifically limited the "Intellectual Property" assets included in the purchase to "Trademarks UNIX and UnixWare as and to the extent held by Seller ..."  (Id., Item V.)  Schedule 1.1(a) did not list copyrights or "goodwill" as assets included in the sale, nor did it refer to any Linux products.  (Id., Schedule 1.1(a).)

RESPONSE:  Disputed.  Amendment No. 2 revised Schedule 1.1(b) to make clear that "copyrights and trademarks owned by Novell as of the date of the Agreement [i.e., Sept. 19, 1995] required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies" transferred to SCO from Novell.  (5/18/07 James Decl. Ex. 5.)  Also, Item 1 of Schedule 1.1(a) as set forth is incomplete.  (5/18/07 James Decl. Ex. 1.)

---

[10] In citing its basis for disputing a Novell statement of fact, SCO cites herein either paragraphs in SCO's Statement of Facts above or directly to exhibits, or both.

4.    The APA further defined the assets to be transferred by reference to Schedule 1.1(b), which listed assets that were excluded from the sale, referred to as the "Excluded Assets." (Brakebill Decl., Ex. 2 at 008, APA, Section 1.1(a).)  Among the "Excluded Assets" in Schedule 1.1(b) were Novell's "NetWare" operating system, as well as "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare."  (Brakebill Decl., Ex. 4, Schedule 1.1(b), Items II, IV, and V.)

RESPONSE:  Disputed.  Amendment No. 2 revised Schedule 1.1(b) to make clear that

"copyrights and trademarks owned by Novell as of the date of the Agreement [i.e., Sept. 19,

1995] required for SCO to exercise its rights with respect to the acquisition of UNIX and

UnixWare technologies" transferred to SCO from Novell.  (5/18/07 James Decl. Ex. 5.)

**B.    The APA Required Santa Cruz to Execute a Separate License to Novell to the Technology Included in the Assets Acquired by Santa Cruz.**

5.    The APA contemplated that the Closing of the transaction would take place two business days after the satisfaction or waiver of the last of the conditions to Closing set forth in Article IV of the APA, or at such other time and date as agreed by the Parties.  (Brakebill Decl., Ex. 2 at 012, APA, Section 1.7(a).)

RESPONSE:  Admitted.

6.    The APA required the Buyer (Santa Cruz) to execute, concurrent with the Closing, a separate "royalty-free, perpetual worldwide license" to the Seller (Novell) of the technology included in the Assets acquired by Santa Cruz and derivatives thereof (referred to collectively as "Licensed Technology").  (Id., Section 1.6.)

RESPONSE:  Disputed.  The APA and the TLA define the rights in a single transaction.

The TLA is not a separate license.  (5/18/07 James Decl. Ex. 1 at § 1.6, SCO Statement of Facts

¶¶ 7-9, 12.)

7.    The APA stated that this separate license would allow Novell to use the Licensed Technology "for internal purposes without restriction."  (Id.)

47

RESPONSE: Disputed. The APA and the TLA define the rights in a single transaction. The TLA is <u>not</u> a separate license. (SCO Statement of Facts ¶¶ 7-9, 12; 5/18/07 James Decl. Ex. 1 at § 1.6.)

8.      The APA stated that this separate license would allow Novell to use the Licensed Technology "for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product." (<u>Id.</u>)

RESPONSE: Disputed. The APA and the TLA define the rights in a single transaction. The TLA is <u>not</u> a separate license. (SCO Statement of Facts ¶¶ 7-9, 12; 5/18/07 James Decl. Ex. 1 at § 1.6.)

9.      The APA further stated that the separate license shall provide Novell "with an unlimited royalty-free, perpetual worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof." (<u>Id.</u>)

RESPONSE: Disputed. The APA and the TLA define the rights in a single transaction. The TLA is not a separate license. (<u>See</u> SCO Statement of Facts ¶¶ 12-17.)

10.      The APA lists numerous "Covenants" agreed to by Novell and Santa Cruz in Article IV, Sections 4.1 to 4.19. None of these covenants prohibit Novell from distributing competing products. (<u>Id.</u> at 027-032, Sections 4.1 to 4.19.)

RESPONSE: Disputed. Article IV lists "Certain Contents," with other covenants listed in other Articles including the non-compete covenants listed in Article I (Section 1.6). (SCO Statement of Facts ¶¶ 7-8; 5/18/07 James Decl. Ex. 1 at § 1.6.)

C.      **The TLA Implements the License Contemplated by the APA.**

11.      After the APA was signed, Novell and Santa Cruz negotiated the terms of the TLA, which was signed by Novell and Santa Cruz on December 6, 1995. (Brakebill Decl., Ex. 5, TLA at 5.)

RESPONSE: Disputed. The TLA implements the agreement between SCO and Novell described in Section 1.6 of the APA. (SCO Statement of Facts ¶ 9.)

48

12.     The preamble of the TLA recites:  "Whereas, pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licenses for Licensed Technology, including related documentation and support."  (Id. at 1.)  As indicated by this recital and confirmed by the content of the TLA, the TLA is the separate license contemplated by Section 1.7(a) of the APA.

RESPONSE:  Disputed.  The APA and the TLA define the rights in a single transaction.

The TLA is not a separate license.  (SCO Statement of Facts ¶¶ 9-12.)

> **D.     The Clause in the TLA Regarding "Competitive" Products Is a Limitation on the Scope of the License, and Not an Affirmative Prohibition Against Selling Competing Products.**

13.     Under the TLA, Novell retained a "non-exclusive, non-terminable, worldwide, fee free license" to Licensed Technology, under certain conditions.  (Id., Section II.A.)

RESPONSE:  Disputed.  The non-compete requirements are covenants not conditions.

Also, the TLA and the APA define the rights granted to Novell.  Also, the TLA and the APA

define the rights granted to Novell.  (SCO Statement of Facts ¶¶ 7-9, 12, 18-21.)

14.     First, with regard to internal use, the TLA granted Novell an unrestricted license to "use, reproduce and modify, and authorize its customers to use, reproduce and modify, Licensed Technology (including related documentation) in their respective internal business operations."  (Id., Section II.A(l).)

RESPONSE:  Disputed.  The TLA and the APA define the rights granted to Novell.

(SCO Statement of Facts ¶¶ 7-9, 12.)

15.     Second, with regard to external use, the TLA granted Novell a license to "sublicense and distribute, and authorize its customers to sublicense and distribute, such Licensed Technology and modifications thereof, in source and binary form...."  (Id., Section II.A(2).)  This license was subject to the following limitation:  "provided, however, that (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering."  (Id.)

RESPONSE:  Disputed.  The three promises made by Novell were covenants, not

conditions.  Also, the TLA and the APA define the rights granted to Novell.  (SCO Statement of

Facts ¶¶ 7-9, 12, 18-21.)

16.    Thus, the TLA granted Novell an unrestricted license to use Licensed Technology
for internal purposes, but limited Novell's license to sublicense and distribute such technology to
Licensed Technology that is part of a "Composite Offering" that is not "directly competitive with
core application server offerings" of Santa Cruz, and for which the Licensed Technology does
not constitute "a primary portion of the value of such Composite Offering."  (Id., Sections II.A(l)
and (2).)

RESPONSE:  Disputed.  The promises regarding the "Composite Offering" were

covenants not conditions.  Also, the TLA and the APA define the rights granted to Novell.  (SCO

Statement of Facts ¶¶ 7-9, 12, 18-21.)

17.    The TLA does not include any provisions regarding "competitive" products other
than the limitation on the scope of Novell's license to sublicense and distribute the Licensed
Technology that is set forth in Section II.A(2).  (Id.)

RESPONSE:  Disputed.  The provision regarding "competitive" products are covenants

not conditions.  Also, the TLA and the APA define the rights granted to Novell.  (SCO Statement

of Facts ¶¶ 7-9, 12.)

**E.    The TLA Restrictions on the Sublicense and Distribution of Licensed Technology "Cease to Exist" Upon a "Change of Control," Meaning a Sale of "All or Substantially All Assets."**

18.    The TLA expressly provides that:  "In the event of a Change of Control of SCO
[Santa Cruz], and commencing with the effective date of such Change of Control, the proviso in
subparagraph II.A(2) setting forth restrictions on the sublicense and/or distribution of Licensed
Technology and modifications thereof shall cease to exist."  (Id., Section II.B.)

RESPONSE:  Disputed.  The TLA and the APA define the rights of Novell.  (SCO

Statement of Facts ¶¶ 12-15.)

19.    The TLA states that "Change of Control" and "Licensed Technology" "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement." (Id., Section I.)

RESPONSE:  Admitted.

20.    The APA defines "Change of Control" as follows:

> For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i) there shall be consummated…(2) any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of such party[.]

(Brakebill Decl., Ex. 2 at 048, APA, Section 6.6(c).)

RESPONSE:  Disputed.  The definition is incomplete.  Also, APA Sections 1.6 and

6.3(c) help interpret "Change of Control."  (SCO Statement of Facts ¶¶ 13-16.)

21.    Thus, the TLA restrictions on the sublicense and distribution of Licensed Technology set forth in subparagraph II.A(2) shall "cease to exist" if Santa Cruz undergoes a "Change of Control," which includes a sale or transfer of "all or substantially all" of Santa Cruz's assets.

RESPONSE:  Disputed.  (SCO Statement of Facts ¶¶ 12-17.)

**F.    Santa Cruz's Sale of Substantially All of its Assets to Caldera in 2001 Constituted a "Change of Control" as Defined by the APA.**

**1.    In May 2001, Caldera acquired Santa Cruz's Server Software and Professional Services Divisions.**

22.    On August 2, 2002, Caldera Systems, Inc. ("Caldera") and Santa Cruz jointly announced that Caldera had entered into an agreement to acquire Santa Cruz's "Server Software Division" and "Professional Services Division" in consideration for a cash payment of $7 million, a loan of $18 million, and 17.54 million shares of Caldera stock, or about 28% of its total stock.  (Brakebill Decl., Ex. 6, at 1.)

RESPONSE:  Admitted.

23.    On February 9, 2001, Caldera and Santa Cruz announced that they had agreed to expand Caldera's acquisition of Santa Cruz's Server Software and Professional Services Divisions to include Santa Cruz's "SCO OpenServer product line," thereby "giving Caldera

complete ownership of SCO's operating system products." The amended agreement required Caldera to make a cash payment of $23 million upon closing the transaction, plus a note for $8 million and 16 million shares of the resulting company, Caldera International, Inc. (Brakebill Decl., Ex. 7, at 1.)

RESPONSE: Admitted.

24.    On May 7, 2001, Caldera announced its completion of the acquisition of Santa Cruz's Server Software and Professional Services divisions, including the UnixWare and Open Server technologies. (Brakebill Decl., Ex. 8, at 1.)

RESPONSE: Admitted.

25.    SCO explained in a Form 10-Q submitted to the SEC that it had "formed a new holding company under the name of Caldera International, Inc. ('Caldera') to acquire substantially all of the assets and operations of the server and professional services groups of Tarantella Inc., formerly known as The Santa Cruz Operation, Inc, pursuant to an Agreement and Plan of Reorganization, dated August 1, 2000 as subsequently amended." (Brakebill Decl., Ex. 9, at 20.) SCO also explained that it had changed its name from Caldera to "The SCO Group, Inc." in 2003, "in response to the continuing brand recognition related to the SCO OpenServer and SCO UNIXWare product lines." (Id.)

RESPONSE: Admitted.

### 2.    The assets acquired by Caldera accounted for 100% of Santa Cruz's operating income and 94.7% of its net revenues.

26.    Before Caldera acquired the Server Software and Professional Services Divisions in May 2001, Santa Cruz was comprised of three independent divisions: Server Software, which was "a leading provider of UNIX server operating systems"; Professional Services, which "help[ed] organizations create and deploy personalized IT strategies"; and "Tarantella," which promoted web-related software technologies and products. (Brakebill Decl., Ex. 7, at 1.)

RESPONSE: Admitted.

27.    The Server Software and Professional Services Divisions were responsible for substantially all of Santa Cruz's net revenues before they were acquired by Caldera in May 2001. The Joint Proxy Statement and Prospectus issued by Santa Cruz and Caldera on March 26, 2001 stated that these two divisions generated net revenues of more than $162 million, $214 million, and $139 million in the fiscal years ending in 1998, 1999, and 2000. (Brakebill Decl., Ex. 10, at 104, "Selected Financial Data of the Server and Professional Services Groups.") This constituted an average of 94.7% of Santa Cruz's total net revenues during this same period, as summarized in the following chart (Id. at 103-04):

**Dollar amounts in thousands**

|  | **1998** | **1999** | **2000** | **Total** |
|---|---|---|---|---|
| **Net Revenues of Server & Professional Services Divisions** | $162,720 | $214,083 | $139,632 | $889,339 |
| **Santa Cruz's Total Net Revenues** | $171,900 | $223,624 | $148,923 | $945,997 |
| **Percentage of Total Revenues from Server & Prof'l Services** | 94.7% | 95.7% | 93.8% | **94.7%** |

RESPONSE:  Admitted.

28.    The Form S-4 Registration Statement filed by Caldera International with the SEC on March 26, 2001, emphasized that the sale of the Server Software and Professional Services Divisions would result in a "dramatic decline" in Santa Cruz's revenues:

> Historically, revenues generated by the server business and professional services have been a significant portion of SCO's total revenues.  *The sale of the server and professional services groups ...will lead to a dramatic decline in SCO's revenues.*  For the year ended September 30, 2000, revenues generated by these two divisions were 93.8% of SCO's total revenues.  For the fiscal years 1999 and 1998, revenues generated by these two divisions were 95.7% and 94.7% of total revenues, respectively.

(Brakebill Decl., Ex. 11, at 31.)

RESPONSE:  Admitted.

29.    Steven M. Sabbath, a Santa Cruz executive who was Santa Cruz's "principal in-house attorney" for the "sale of Santa Cruz's Software and Professional Services Divisions," confirmed in a declaration submitted in the *SCO v. IBM* case that these divisions accounted for almost all of Santa Cruz's revenues.  (Brakebill Decl., Ex. 12, Declaration of Steven M. Sabbath, dated December 22, 2003, ¶¶ 2, 4, 32.)  Sabbath relied on financial information in the Form 10-K that Tarantella (the new name of Santa Cruz after the sale) submitted to the SEC for the year ending September 30, 2001, which showed that:

> [T]he Server Software and Professional Services Divisions accounted for approximately 95% of Santa Cruz's total revenues in fiscal 1999 and 92% in fiscal 2000, the two full fiscal years

53

> preceding the sale.  Furthermore, the Server Software division was
> the only division of Santa Cruz that generated operating income in
> either of the two full fiscal years preceding the sale.

(Id., ¶ 36; *see* Brakebill Decl., Ex. 13, Tarantella's Form 10-K for Fiscal Year Ended September 30, 2001, Note 16, at 49-50.)

RESPONSE:  Admitted.

### 3.    The assets acquired by Caldera included all of Santa Cruz's UNIX assets, including the UNIX assets that Santa Cruz bought from Novell under the APA.

30.    Under the agreement announced in August 2000, Caldera's acquisition of Santa Cruz's Server Software Division included "[e]mployees, the UNIX and related intellectual properties, including UnixWare, facilities, legal entities, customer relationships, channel relationships and all products except for OpenServer intellectual property rights (IP)."  (Brakebill Decl., Ex. 14, October 31, 2000 Caldera newsletter, "The Caldera Connection," at SCO 1337711.)  Thus, the transaction meant that "[w]ith the exception of SCO OpenServer, the UNIX technologies move to Caldera International, Inc."  (Id. at SCO 1337712.)

RESPONSE:  Disputed.  The quote speaks for itself, and the concluding sentence is not

consistent with the quoted language.

31.    Under the expanded agreement announced in February 2001, Caldera also purchased Santa Cruz's "OpenServer product line," thus "giving Caldera complete ownership of SCO's operating system products."  (Brakebill Decl, Ex. 7, at 1.)

RESPONSE:  Admitted.

32.    William M. Broderick, SCO's current director of Software Licensing and a former employee of Santa Cruz, submitted a declaration in the *SCO v. IBM* case that described how the UNIX business and assets were transferred between successive companies.  (Brakebill Decl., Ex. 15, Declaration of William M. Broderick, dated October 21, 2005, ¶¶ 1, 4-9.)  Broderick noted that his career "has followed the UNIX business as it has been transferred successively from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO)."  (Id., ¶ 9.)  He further asserted that the transfer from Santa Cruz to Caldera (as well as the preceding transfers) included all of the UNIX assets and business, stating as follows:

- "In each instance (USL to Novell, Novell to Santa Cruz, and Santa Cruz to Caldera), the company selling the UNIX technology also transferred *control* of the commercial enterprise that developed, marketed and licensed that technology (the UNIX business).  In each instance, the makeup and operation of the UNIX

business continued as constituted through and after each transition." (Id., ¶ 10.)

- "In each instance, the transferred UNIX business included without limitation the UNIX source code, binary code, and intellectual property, licenses and other agreements; and the rights, liabilities, and claims related to that business." (Id., ¶ 11.)

- "In each instance, the transferred UNIX business also included all or many of the people who managed and operated the business, including senior-level managers, engineers, sales people, support staff, and other employees. It also included customer, supplier, and vendor relationships." (Id., ¶ 12.)

- "In each instance, the transferred UNIX business also included office space, leaseholds, furniture, and equipment." (Id., ¶ 13.)

- "In short, through and after each transaction, my colleagues and I almost universally kept doing the same work, with the same people, from the same offices and buildings, developing and delivering the same UNIX products and services to the same customers. We also continued to develop the same technology, service the same contracts, and collect revenues under those contracts." (Id., ¶ 14.)

- "In each instance, after each transaction, neither the seller nor its employees remained involved in managing or operating the business. The buyer (mainly through its newly acquired employees) took over those responsibilities." (Id., ¶ 15.)

RESPONSE: Admitted.

33.    Consistent with Mr. Broderick's testimony, Darl McBride, SCO's current CEO, admitted at his deposition in the *SCO v. IBM* case that "in the 2001 timeframe, Santa Cruz transferred substantially the UNIX business to Caldera International." (Brakebill Decl., Ex. 16, December 2, 2005, Deposition of Darl McBride at 202:16-18.)

RESPONSE: Admitted.

34.    Similarly, Kim Madsen, a member of Santa Cruz's legal department who was involved in the Santa Cruz-Caldera transaction and participated in the negotiations, testified that all of Santa Cruz's UNIX assets were transferred to Caldera (including both the UNIX assets that Santa Cruz had previously bought from Novell and its additional UNIX assets such as SCO OpenServer), as well as a substantial portion of SCO's assets at that time. (Brakebill Decl., Ex. 17, at 11:14-12:16, 13:16-23.)

RESPONSE: Admitted.

35.     Further, Alok Mohan, Santa Cruz's former CEO and then member of the Santa Cruz Board of Directors, testified that Santa Cruz sold "everything" of its UNIX business to Caldera, including the UNIX business it had purchased from Novell and also its SCO OpenServer product, which "comprised the significant part of [Santa Cruz's] revenue stream" and was "the largest" and "the dominant part" of Santa Cruz's business. (Brakebill Decl., Ex. 33, at 123:125:23.)

RESPONSE: Admitted.

**4.     The official statements and conduct of Santa Cruz and Caldera confirm that the transaction included substantially all of Santa Cruz's assets, and thus constituted a "Change of Control."**

36.     The official statements and conduct of Santa Cruz and Caldera confirm that the transaction included substantially all of Santa Cruz's assets, and thus triggered the legal protections that apply upon a "Change of Control."

RESPONSE: Disputed. (SCO Statement of Facts ¶¶ 12-17.)

37.     The Joint Proxy Statement and Prospectus of Santa Cruz and Caldera, issued March 26, 2001 ("Joint Proxy Statement"), stated that Santa Cruz "will provide change-of-control benefits to its current executive officers." (Brakebill Decl., Ex. 10 at 4, "Interests of Persons in the Combination.")

RESPONSE: Admitted.

38.     The Joint Proxy Statement further stated that approval of a majority of the shareholders of Santa Cruz was required for the asset sale. (Id. at 4, "Vote Required.") Santa Cruz was a California corporation, governed by California law. (Brakebill Decl., Ex. 18, Form 10-K of The Santa Cruz Operation, for the Fiscal Year Ending September 30, 1994.)

RESPONSE: Admitted.

39.     Finally, Santa Cruz determined that if holders of 5% or more of its outstanding stock voted against the transaction and demanded dissenters' rights, those shareholders would be entitled to exercise dissenters' rights under Chapter 13 of the California Corporations Code, including the right to be paid the fair market value of their stock. (Brakebill Decl., Ex. 10, Joint Proxy Statement, at 4, 39.)

RESPONSE: Admitted.

### 5. SCO has failed to explain why Caldera's purchase of Santa Cruz's assets did not constitute a "Change of Control" that terminated any non-compete obligations.

40.　　On October 7, 2003, Novell sent a letter to SCO regarding SCO's plan to "invoice" Linux users based on SCO's claim that Linux contains UNIX code. Novell pointed out that Section II.A(2) of the TLA authorizes Novell to sublicense and distribute Licensed Technology, and to authorize its customers to sublicense and distribute such technology. (Brakebill Decl., Ex. 19, October 7, 2003, Letter from Joseph A. LaSala to Ryan E. Tibbitts.) Novell noted that Section II.B of the TLA states that the restrictions on the sublicense and distribution of Licensed Technology cease to exist upon a "Change of Control" as defined in Section 6.6(c) of the APA. Novell concluded that the transactions by which SCO had acquired the UNIX assets constituted a "Change of Control," and therefore "the restrictions on Novell's sublicensing and distribution of Licensed Technology are no longer applicable." (Id.)

RESPONSE: Admitted.

41.　　On October 9, 2003, SCO replied to Novell's letter by asserting that Novell's "analysis of the Technology License Agreement is not a supportable interpretation of the transaction between Novell and SCO." However, SCO provided no explanation of the basis for this assertion. (Brakebill Decl., Ex. 20, October 9, 2003, Letter from Ryan E. Tibbitts to Joseph A. LaSala.)

RESPONSE: Disputed. The letter speaks for itself.