# EXHIBIT A

Dockets.Justia.com

130 Fed. Appx. 153, *; 2005 U.S. App. LEXIS 7840, **;
Copy. L. Rep. (CCH) P28,986



Analysis
As of: May 18, 2007

**GERMAINE MUSIC; GENERAL CROOK, Plaintiffs - Appellants, v. UNIVERSAL SONGS OF POLYGRAM; UMG RECORDINGS, INC.; BMI, Defendants - Appellees.**

**No. 03-17295**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**130 Fed. Appx. 153; 2005 U.S. App. LEXIS 7840; Copy. L. Rep. (CCH) P28,986**

**April 14, 2005, Argued and Submitted, San Francisco, California**
**May 3, 2005, Filed**

**NOTICE:** [**1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Nevada. D.C. No. CV-03-00047-PMP. Philip M. Pro, District Judge, Presiding. Germaine Music v. Universal Songs of Polygram, 275 F. Supp. 2d 1288, 2003 U.S. Dist. LEXIS 14133 (D. Nev., 2003)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant copyright holders sought judicial review of a decision by the United States District Court for the District of Nevada granting summary judgment in favor of appellee alleged infringers on their claims of copyright infringement, breach of contract, and theft by deception.

**OVERVIEW:** As to any claim involving collusion between the two alleged infringers and the catalog transfer issue as a basis for a copyright infringement claim, there was no issue of material fact. As to the copyright infringement claim and breach of contract claims that focused on non-payment of royalties, there was an issue of fact in dispute. Although it appeared that the credibility of one holder was at issue, it was not the place of the district court on summary judgment to weigh the evidence. Unfortunately, that was what the district court did. Additionally, the holders' motion to compel should have been seen by the district court as a motion for continu-

ance under Fed. R. Civ. P. 56(f). At the district court level, the holders were proceeding pro se, and the district court should have construed their pleadings and motions liberally. The holders met the standards of Rule 56(f). The district court did not error in denying the holders' motion for leave to file an amended complaint since any proposed amendments would have been futile.

**OUTCOME:** The judgment of the district court was affirmed in part, reversed in part, and remanded. It was affirmed as to the district court's grant of summary judgment as to the catalog transfer issue as a basis for a copyright infringement claim. It was reversed and remanded as to the copyright infringement claim and breach of contract claims. The dismissal of the theft by deception claim did not have to be disturbed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] A district court's grant of summary judgment is reviewed de novo.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Time Limitations*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN2] A district court's decision as to whether or not to permit additional discovery and delay summary judgment pursuant to Fed. R. Civ. P. 56(f) is reviewed for an abuse of discretion. However, if the district court fails to address a Rule 56(f) motion prior to granting summary judgment, the matter is reviewed de novo.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
[HN3] In reviewing a grant of summary judgment, an appellate court must determine whether there are any genuine issues of material fact, viewing the evidence in the light most favorable to the non-moving party.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4] It is not the place of a district court on summary judgment to weigh the evidence.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Summary Judgment > Time Limitations*
[HN5] In order to succeed on a Fed. R. Civ. P. 56(f) motion, the movant must show diligence in pursuing discovery previously, and must show how more discovery might preclude summary judgment. When the movant is proceeding pro se, those requirements must be viewed against the requirement that a court construe pro se pleadings and motions liberally.

**COUNSEL:** For GERMAINE MUSIC, GENERAL CROOK, Plaintiff - Appellants: Lisa A. Rasmussen, Esq., DIXON TRUMAM BANGERTER & FISHER, Las Vegas, NV; General Crook, North Las Vegas, NV.

For UNIVERSAL SONGS OF POLYGRAM, UMG RECORDINGS, INC., Defendant - Appellees: Jeffrey D. Goldman, Esq., Nicole L. Harris, Esq., MITCHELL SILBERBERG ET AL, LLP, Los Angeles, CA; Luke K. Rath, Esq., Mark A. Hutchison, Esq., HUTCHISON AND STEFFEN, LTD., Las Vegas, NV.

For BMI, Defendant - Appellee: Kenneth R. Myers, Esq., LIONEL, SAWYER AND COLLINS, Las Vegas, NV; Vincent C. Ferenbach, Esq., LIONEL, SAWYER & COLLINS, Las Vegas, NV.

**JUDGES:** Before: LAY,** B. FLETCHER, and HAWKINS, Circuit Judges.

** Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

**OPINION:**

[*154]  MEMORANDUM*

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

[**2]

Plaintiffs General Crook and his company Germaine Music, pro se before the district court but represented on appeal, appeal from the district court's grant of summary judgment on all counts. Plaintiffs brought this suit against defendants UMG Recordings, Inc. ("UMG") and Broadcast Music, Inc. ("BMI") for copyright infringement, breach of contract, and "theft by deception." All claims are generally related to an alleged failure to pay royalties on contracts allowing distribution of a song written by plaintiff Crook in the 1970s. The claims against BMI were dismissed in favor of arbitration and BMI is not a party to this appeal.

As the parties are familiar with the facts of the case, we do not recite them in detail here. Because there were issues of material fact, we reverse the district court's grant of summary judgment, and remand for further proceedings. We further conclude that the district court erred in its implicit denial of plaintiffs "Motion to Compel." Not only did the district court fail to recognize it as a motion for continuance pursuant to Fed. R. Civ. P. 56(f), it abused its discretion in denying the motion. On remand, the district [**3] court is directed to reopen discovery to allow plaintiffs to obtain answers to discovery requests propounded previously. The district court may choose, in its discretion, to allow further discovery if requested by either party.

I.

[HN1] A district court's grant of summary judgment is reviewed de novo. *Buono v. Norton, 371 F.3d 543, 545 (9th Cir. 2004).* [HN2]  A district court's decision as to whether or not to permit additional discovery and delay summary judgment pursuant to Fed. R. Civ. P. 56(f) is reviewed for an abuse of discretion. *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Souix Tribes, 323 F.3d 767, 773 (9th Cir. 2003).* However, if the district court fails to address a Rule 56(f) motion prior to granting summary judgment, the matter is reviewed de novo. *Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998).*

II.

[HN3] In reviewing a grant of summary judgment, we must determine whether there [*155] are any genuine issues of material fact, viewing the evidence in the light most favorable to the non-moving party. *Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir. 2004).*

As to any [**4] claim involving collusion between BMI and UMG and the "catalog transfer issue" as a basis for a copyright infringement claim, there is no issue of material fact, and plaintiffs do not seriously contend otherwise. We see no reason to disturb summary judgment on this issue.

As to the copyright infringement claim and breach of contract claims that focus on non-payment of royalties, n1 there is an issue of fact in dispute. UMG claims that all royalties owed were paid to Crook - the check for $ 940.21. During his deposition, plaintiff Crook admitted that the signature looked like his, but he did not have a recollection of receiving the check. In other papers submitted to the district court, Crook denied having ever received money from UMG (or affiliates such as Polygram records).

> n1 These theories of liability collapse into one. If UMG was using the song without paying royalties, it was likely both a breach of contract and a violation of the copyright.

Although it would appear that Crook's credibility may be at issue, [**5] [HN4] it is not the place of the court on summary judgment to weigh the evidence. Unfortunately, this is what the district court did. It credited the testimony of UMG's employees, in which they asserted that all royalties had been paid to Crook, over the testimony of Crook himself, who stated that he did not recall receiving the check, had not received any royalties from any of the entities, and did not have a bank account at the time the check was cashed. In order to grant summary judgment, the district court necessarily found that the signature on the back of the check was Crook's, although Crook denied that it was his. In any event, the amount of royalties due is in dispute. Summary judgment must be reversed.

### III.

[HN5] In order to succeed on a Rule 56(f) motion, the movant must show diligence in pursuing discovery previously, and must show how more discovery might preclude summary judgment. *Byrd v. Guess, 137 F.3d 1126, 1135 (9th Cir. 1998).* In this case, these requirements must be viewed against this circuit's repeated insistence that courts must construe pro se pleadings and

motions liberally. *Bernhardt v. Los Angeles County, 339 F.3d 920, 925 (9th Cir. 2003).* [**6]

Here, plaintiffs' motion to compel should have been seen as a motion for continuance under Rule 56(f). Plaintiffs explained that the parties had an agreement not to proceed with discovery until the court had ruled on the pending dispositive motions, and that although they had provided discovery to UMG after the discovery deadline, they had not received responses to their requests propounded after the deadline. This explains any lack of diligence on plaintiffs' part. Plaintiffs also explain that they pursued discovery once the court had denied the pending motions, albeit well after the discovery deadline. Plaintiffs were simply taking their cue from defense counsel, who were certainly pursuing discovery (including taking Crook's deposition) well after the deadline, although the requests were made before the deadline.

Next, while most of plaintiffs' discovery requests would not have been relevant to the issues on summary judgment, plaintiffs requested documentation for the number of copies of the album at issue in this case that were sold over time.

[*156] Construing plaintiffs' pro se pleadings liberally, we hold that the standards of Rule 56(f) have been met. On remand, the district court [**7] is directed to reopen discovery to allow plaintiffs to obtain answers to discovery requests propounded previously. The district court may, in its discretion, allow further discovery to be propounded by either party.

### IV.

We find no error in the district court's denial of plaintiffs' motion for leave to file a second amended complaint. Any proposed amendments would have been futile. We also find no error in the district court's decision to consider UMG's opposition to plaintiffs' motion for summary judgment as a cross-motion. We therefore find no reason to disturb the district court's dismissal of the "theft by deception" claim.

Each party shall bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# EXHIBIT B

39 Fed. Appx. 584, *; 2002 U.S. App. LEXIS 8369, **;
Copy. L. Rep. (CCH) P28,429

LEXSEE

**GUTHY-RENKER CORPORATION, a Delaware corporation, Plaintiff-counter-defendant-Appellee, v. GARY BERNSTEIN, an individual, d/b/a GARY BERNSTEIN PHOTOGRAPHY and GARY BERNSTEIN STUDIO PRODUCTIONS, Defendant-counter-claimant-Appellant. GUTHY-RENKER CORPORATION, a Delaware corporation, Plaintiff-counter-defendant-Appellant, v. GARY BERNSTEIN, an individual, d/b/a GARY BERNSTEIN PHOTOGRAPHY and GARY BERNSTEIN STUDIO PRODUCTIONS, Defendant-counter-claimant-Appellee.**

**No. 99-56759, No. 99-56829**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**39 Fed. Appx. 584; 2002 U.S. App. LEXIS 8369; Copy. L. Rep. (CCH) P28,429**

**April 11, 2002, Argued and Submitted, Pasadena, California
May 1, 2002, Filed**

**NOTICE:**  [**1]  RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeals from the United States District Court for the Central District of California. D.C. No. CV-97-09279-MRP, D.C. No. CV-97-09279-MRP. Mariana R. Pfaelzer, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Defendant copyright holder brought breach of contract and copyright infringement action. The United States District Court for the Central District of California found that the liquidated damages provision in the parties' licensing agreement was unenforceable, calculated damages for the breach of contract and copyright claims, and denied attorney's fees. The holder appealed. The corporation appealed the denial of its estoppel defense.

**OVERVIEW:** The licensing agreement required the corporation to include a credit when it used the holder's photograph and provided for payment of $ 5,000 as liquidated damages for each omission. An infomercial containing a photograph aired more than 9,000 times before the holder alerted the corporation to its breach of the agreement. The instant court found that it was not error to hold the liquidated damages provision to be an unreasonable and unenforceable penalty clause. It was not an abuse of discretion to find that $ 36,000 was a reasonable approximation of the damages on the breach of contract claim. Given the lack of evidence that the corporation profited from using the photo, it was not an abuse of discretion to apportion the holder a reduced percentage of the corporation's profits for copyright violations. As for the attorney's fees, it was not an abuses of discretion not to grant attorney's fees based on the limited success that the holder achieved on his claims. Finally, because there was insufficient evidence that the holder had agreed to the corporation's use of the photograph, it was not an abuse of discretion to reject the corporation's estoppel defense.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**


***Contracts Law > Contract Conditions & Provisions > General Overview***
***Contracts Law > Remedies > Foreseeable Damages > General Overview***
***Contracts Law > Remedies > Liquidated Damages***
[HN1] See Cal. Civ. Code § 1671(b).


***Contracts Law > Remedies > Foreseeable Damages > General Overview***
***Contracts Law > Remedies > Liquidated Damages***
[HN2] A liquidated damages clause will be considered "unreasonable," and hence unenforceable under Cal. Civ. Code § 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. Without this reasonable relationship, a liquidated damages provision must be construed as an unenforceable penalty.


***Contracts Law > Breach > General Overview***
***Contracts Law > Remedies > General Overview***
***Governments > Courts > Authority to Adjudicate***
[HN3] In a breach of contract action, when precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered.

*Copyright Law > Civil Infringement Actions > Remedies > Damages > Actual Damages*
*Copyright Law > Civil Infringement Actions > Remedies > Damages > Damage Computation*
*Copyright Law > Civil Infringement Actions > Remedies > Damages > Infringer Profits*
[HN4] Under 17 U.S.C.S. § 504(b), a copyright holder is entitled to an award of the infringer's profits attributable to the infringement. When an infringer's profits are only partially attributable to use of the infringing work, it is the district court's duty to make some apportionment of the profits.

*Copyright Law > Civil Infringement Actions > Remedies > Damages > Actual Damages*
*Copyright Law > Civil Infringement Actions > Remedies > Damages > Damage Computation*
[HN5] In the context of damages pursuant to 17 U.S.C.S. § 504(b), royalty payments generally may be included as deductible expenses.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
[HN6] Attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion. In deciding whether to award fees, the most critical factor for the district court to examine is the degree of success obtained.

**COUNSEL:** For GUTHY-RENKER CORPORATION, Plaintiff-counter-defendant - Appellee (99-56759): Robert G. Badal, Esq., HELLER, EHRMAN, WHITE & McAULIFFE, Los Angeles, CA.

For GUTHY-RENKER CORPORATION, Plaintiff-counter-defendant - Appellee (99-56759): Robert J. Lauson, CISLO & THOMAS, Santa Monica, CA.

For GARY BERNSTEIN, Defendant-counter-claimant - Appellant (99-56759): David Eiseman, Samuel B. Shepherd, Esq., QUINN EMANUEL URQUHART OLIVER & HEDGES LLP, Los Angeles, CA.

For GARY BERNSTEIN, Defendant-counter-claimant - Appellant (99-56759): Samuel B. Shepherd, Esq., QUINN EMANUEL URQUHART OLIVER & HEDGES, Diane Hutnyan, QUINN, EMANUEL, URQUHART, OLIVER AND HEDGES, LLP, San Francisco, CA.

For GUTHY-RENKER CORPORATION, Plaintiff-counter-defendant - Appellant (99-56829): Robert G. Badal, Esq., HELLER, EHRMAN, WHITE [**2] & McAULIFFE, Los Angeles, CA.

For GUTHY-RENKER CORPORATION, Plaintiff-counter-defendant - Appellant (99-56829): Donald M. Cislo, Esq., Daniel M. Cislo, Esq., Robert J. Lauson, CISLO & THOMAS, Santa Monica, CA.

For GARY BERNSTEIN, Defendant-counter-claimant - Appellee (99-56829): Samuel B. Shepherd, Esq., MyKhanh P. Shelton, QUINN EMANUEL URQUHART OLIVER & HEDGES LLP, Los Angeles, CA.

For GARY BERNSTEIN, Defendant-counter-claimant - Appellee (99-56829): Diane Hutnyan, QUINN, EMANUEL, URQUHART, OLIVER AND HEDGES, LLP, San Francisco, CA.

**JUDGES:** Before: REINHARDT and GRABER, Circuit Judges, and HUNT, ** District Judge.

    ** The Honorable Roger L. Hunt, United States District Judge for the District of Nevada, sitting by designation.

**OPINION:** [*586]

    MEMORANDUM *

        * This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

Gary Bernstein appeals the district court's grant of summary judgment in favor [**3] of Guthy-Renker Corporation ("GRC") on the issue of whether the liquidated damages provision in the parties' licensing agreement was unenforceable. Bernstein also appeals the district court's calculation of damages for both his breach of contract and copyright claims and the court's denial of attorney's fees. GRC appeals the district court's denial of its estoppel defense. For the reasons stated herein, we affirm.

**Liquidated Damages Clause**

Under California law, [HN1] "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b). [HN2] A liquidated damages clause will be considered "unreasonable," and hence unenforceable under section 1671(b), "if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 953 P.2d 484, 488 (Cal. 1998). Without this reasonable relationship, a liquidated damages provision must be construed as [**4] an unenforceable penalty. *Id.*

The licensing agreement at issue required GRC to include a credit when it used a photograph taken by Bernstein and provided for payment of $ 5,000 as liquidated damages for each omission of a credit. GRC failed to include a screen credit on an infomercial that briefly contained a Bernstein photograph of television celebrity Victoria Principal. The infomercial aired more than 9,000 times before Bernstein alerted GRC to its breach of the licensing agreement. The district court found the liquidated damages provision in the contract to be an unenforceable penalty. We agree. Bernstein presented no evidence demonstrating that $ 5,000 per airing was a reasonable estimate of the amount of potential business he would lose as a result of GRC's failure to include a credit on the infomercial. In fact, Bernstein admitted that the amount specified in the liquidated damages provision could have just as easily been $ 10,000, $ 20,000, or even $ 100,000. The district court did not err in holding the liquidated damages provision to be an unreasonable and unenforceable penalty clause.

[*587] **Breach of Contract Damages**

Bernstein also claims that the district court erred [**5] in calculating damages for his breach of contract claim. The district court awarded Bernstein $ 36,000 in damages on his breach of contract claim, a sum the court calculated by trebling the $ 12,000 licensing fee that GRC paid Bernstein. Bernstein contends that the district court should have granted his request for replacement costs and should have awarded him a greater amount of actual damages. However, [HN3] "when precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001). The district court did not abuse its discretion in finding that $ 36,000 was a reasonable approximation of the damages that Bernstein suffered on his breach of contract claim.

**Copyright Infringement Damages**

Bernstein further alleges that the district court erred in calculating the damages award for copyright violations. Bernstein contends that the district court abused its discretion by awarding him only .5% of GRC's profits and by allowing GRC to deduct payments to Ms. Principal from the gross profit multiplier. [**6]

[HN4] Under 17 U.S.C. § 504(b), a copyright holder is entitled to an award of the infringer's profits attributable to the infringement. When an infringer's profits are only partially attributable to use of the infringing work, it is the district court's duty to make some apportionment of the profits. *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985) (per curiam). Bernstein asked the district court to award him 4.5% of GRC's profits from the infomercials because his photo appeared on the screen 4.5% of the time. However, Bernstein's photo was not the only image depicted on the screen during that time. Moreover, GRC presented evidence to the district court demonstrating that the appearance of Bernstein's photo in the infomercials had no measurable effect on the sale of GRC products. Given the lack of evidence that GRC profited from using Bernstein's photo, the district court did not abuse its discretion in apportioning Bernstein a reduced percentage of GRC's profits.

Bernstein additionally complains that the district court abused its discretion by allowing GRC to deduct payment of a percentage of profits to Ms. Principal [**7] from the gross profit multiplier used in calculating Bernstein's damage award. [HN5] Royalty payments generally may be included as deductible expenses. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985). Because the payment of a percentage of profits is akin to a royalty payment, the district court did not abuse its discretion by permitting GRC to deduct payments made to Ms. Principal.

**Attorney's Fees**

Bernstein additionally contends that the district court abused its discretion by not awarding him attorney's fees. [HN6] "Attorney's fees are to be awarded to prevailing parties *only as a matter of the court's discretion*." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 127 L. Ed. 2d 455, 114 S. Ct. 1023 (1994) (emphasis added). In deciding whether to award fees, the most critical factor for the district court to examine is the degree of success obtained. *Hensley v. Eckerhart*, 461 U.S. 424, 436, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).

Here the district court noted the limited success that Bernstein achieved on his claims and indicated that it was exercising its discretion not to grant attorney's fees. [*588] Therefore, [**8] the district court did not abuse its discretion. n1

> n1 The district court also denied the motion for fees on the alternative ground that the motion was untimely. We need not reach that question because we hold that the district court did not abuse its discretion in denying the fee motion on the merits.

**Estoppel**

Finally, GRC contends that the district court abused its discretion in denying GRC's estoppel defense. At trial, GRC argued that Bernstein should be estopped from seeking profits attributable to one of Bernstein's photos because he allegedly admitted giving GRC permission to use it. However, the district court found that there was insufficient evidence that Bernstein had agreed to GRC's use of the photograph. There is no evidence in the record that would convince us otherwise. Accordingly, the district court did not abuse its discretion in rejecting GRC's estoppel defense.

AFFIRMED.

# EXHIBIT C

210 Cal. App. 3d 368, *; 258 Cal. Rptr. 473, **;
1989 Cal. App. LEXIS 457, ***; 9 U.C.C. Rep. Serv. 2d (Callaghan) 69

LEXSEE



Caution
As of: May 18, 2007

**BENTON BOYD, JR., Plaintiff and Appellant, v. OSCAR FISHER COMPANY, INC., Defendant and Respondent**

**No. H002678**

**Court of Appeal of California, Sixth Appellate District**

**210 Cal. App. 3d 368; 258 Cal. Rptr. 473; 1989 Cal. App. LEXIS 457; 9 U.C.C. Rep. Serv. 2d (Callaghan) 69**

**May 10, 1989**

**NOTICE:** [***1]
Opinion certified for partial publication - Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 5 and 7.

**PRIOR HISTORY:** Superior Court of Santa Clara County, No. 535839, Homer B. Thompson, Judge.

**DISPOSITION:**

The postjudgment order awarding attorney fees, interest, and costs to manufacturer is modified to reflect a reduced award for expert computerization of $ 6,274.99, and is affirmed as so modified. Manufacturer is entitled to attorney fees and costs on appeal in an amount to be fixed by the trial court.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a dealer in photographic processing equipment, appealed from a post-judgment order of the Superior Court of Santa Clara County (California), which awarded defendant manufacturer damages, costs and attorney fees on a cross-complaint for unpaid invoices.

**OVERVIEW:** Plaintiff claimed that defendant had intentionally interfered with its customers and had breached a dealership agreement by repudiating it. Defendant filed a cross-complaint for unpaid invoices. The parties sought judicial arbitration. The arbitrator awarded damages to both parties. Rejecting that result, both parties requested trial de novo. The jury returned a verdict for defendant and awarded damages for the unpaid invoices, less labor and parts. Attorney fees and costs were awarded to defendant in a post-judgment order, from which plaintiff appealed. The appellate court affirmed the award of attorney fees, finding that the attorney fee provision on the manufacturer's invoices added such provision to the parties' original agreement absent any objections by plaintiff. The court modified the amount of costs.

**OUTCOME:** The court affirmed the award of attorney fees; however, the court modified the amount of costs.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN1] The court resolves factual conflicts and draws inferences in support of the verdict.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > General Overview*
[HN2] Cal. Civ. Code § 1717 provides that in any action on a contract, where the contract specifically provides that attorney fees and costs incurred to enforce that contract shall be awarded to one of the parties or to the prevailing party, then the party determined to have prevailed on the contract shall be entitled to reasonable attorney fees and other costs. Such fees shall be fixed by the court. Upon a motion for attorney fees, the trial court may have to determine whether that party prevailed "on

the contract." This may involve deciding whether a party prevailed on a contract or on a tort theory or on a combination of theories requiring allocation of fees. The court considers the pleaded theories of recovery, the theories asserted, the evidence produced at trial, and other evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Contracts Law > Contract Conditions & Provisions > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
[HN3] Courts will construe together several documents concerning the same subject and made as part of the same transaction, even though the documents were not executed contemporaneously and do not refer to each other. It is generally a factual question whether several documents were intended to govern the same transaction. Interpretation of a contract presents a question of law unless it depends on conflicting evidence, and an appellate court is not bound by a trial court's interpretation which does not depend on the credibility of extrinsic evidence.

*Contracts Law > Formation > Acceptance > General Overview*
*Contracts Law > Formation > Offers > General Overview*
*Contracts Law > Sales of Goods > Form, Formation & Readjustment > Formation > Additional & Different Terms*
[HN4] The Uniform Commercial Code definition of "contract" found in Cal. U. Com. Code § 1201(11) is "the total legal obligation which results from the parties' agreement as affected by this code and any other applicable rules of law." Cal. U. Com. Code § 2207 states that additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless the offer expressly limits acceptance to the terms of the offer; they materially alter it; or objection to them is given within a reasonable time. "Between merchants" is defined in Cal. U. Com. Code § 2104 as a transaction where both parties deal in or are otherwise knowledgeable about goods like those involved in the transaction. An attorney fee provision on manufacturer's invoices adds, under Cal. U. Com. Code § 2207(2), an attorney fee provision to the parties' original agreement.

*Civil Procedure > Trials > Bench Trials*

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN5] It is a question of law for the courts to determine whether an attorney fee provision is part of the parties' contract.

*Contracts Law > Contract Conditions & Provisions > General Overview*
[HN6] Cal. Civ. Code § 1717(a) states that where a contract provides for attorney fees, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN7] Cal. Code Civ. Proc. § 1141.20 provides that an arbitration award shall be final unless a request for a de novo trial is filed within 30 days after the date the arbitrator files the award with the court. Any party may elect to have a de novo trial, by court or jury, both as to law and facts. Cal. Code Civ. Proc. § 1141.21 provides that if judgment upon trial de novo is not more favorable in either the amount of damages awarded or the type of relief granted for the party electing the trial de novo than the arbitration award, the court shall order that party to pay nonrefundable costs and fees. On appeal the court applies the current versions of statutes providing for costs. Where two or more parties elect a trial de novo, each should be subject to the discouraging prospect of liability for costs if unsuccessful.

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*
*Evidence > Testimony > Experts > Court-Appointed Experts > Appointments*
*Evidence > Testimony > Experts > Court-Appointed Experts > Compensation*
[HN8] Cal. Code Civ. Proc. § 1141.21(a)(iii) specifically provides for recovery of the reasonable costs of the services of expert witnesses, who are not regular employees of any party, actually incurred or reasonably necessary in the preparation or trial of the case. Cal. Code Civ. Proc. § 1141.21(a)(iv) authorizes recovery of the compensation paid by the other party or parties to the arbitrator.

## SUMMARY: CALIFORNIA OFFICIAL REPORTS SUMMARY

The trial court granted a photographic equipment manufacturer's post-judgment motion for attorney fees and costs on the manufacturer's cross-complaint against its exclusive dealer for unpaid invoices, which it had brought in response to the dealer's complaint alleging unjustifiable termination of their exclusive dealership agreement. The parties initially stipulated to arbitration of the dispute but, after the award, each filed a request for a trial de novo. After trial before a jury, the jury awarded compensatory damages to the manufacturer, which it offset by an award to the dealer for labor and parts, resulting in a net recovery to the manufacturer. The trial court awarded the manufacturer attorney fees, as the prevailing party under Civ. Code, § 1717, in accordance with an attorney fee provision, which was contained in individual invoices submitted by the manufacturer to the dealer, but which was not included in the written dealership contract between them. The trial court also awarded the manufacturer costs representing its fees for the arbitrator, experts, and other witnesses, pursuant to Code Civ. Proc., § 1141.21. (Superior Court of Santa Clara County, No. 535839, Homer B. Thompson, Judge.)

The Court of Appeal modified the amount of the costs awarded to reflect a conceded computational error, but otherwise affirmed. It held that the award of attorney fees was proper, because the terms of the invoices were incorporated into the dealership contract by acceptance under Cal. U. Com. Code, § 2207, the manufacturer prevailed on a contract theory, and the amount of the award was not unreasonable nor limited by the terms of the contract. It also held that the dealer was liable for arbitrator and expert witness fees under Code Civ. Proc., § 1141.21, as a party requesting a trial de novo after stipulated arbitration, even though his request was subsequent to that of the manufacturer, since he failed to obtain a more favorable verdict after the trial de novo and failed to properly object to the other witness fees in his motion to tax costs. (Opinion by Agliano, P. J., with Premo, J., concurring. Separate concurring and dissenting opinion by Brauer, J.)

## HEADNOTES: CALIFORNIA OFFICIAL REPORTS HEADNOTES

Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 135--Factual Conflicts and Inferences.** --On appellate review, the court resolves factual conflicts and draws inferences in support of the verdict.

**(2a) (2b) Costs § 31--Attorney Fees--Who is Prevailing Party--Recovery on Contract Theory--Claim for Unpaid Invoices.** --The trial court did not err in implicitly concluding that a photographic equipment manufacturer prevailed under a contract theory of recovery in its cross-action against its exclusive equipment dealer, for purposes of entitlement to an award of attorney fees under Civ. Code, § 1717 (contract provision for recovery of fees), where the manufacturer did not seek to recover tort damages, but rather asserted competing breach of contract claims, on which the jury was instructed, and prevailed on a claim of unpaid invoices.

**(3a) (3b) Costs § 1--Governing Law on Appeal.** --On appeals involving awards of costs or attorney fees to a party, the version of the applicable statute in effect when the appellate court renders its opinion governs, rather than the one in effect at the time of motion in the trial court.

**(4) Costs § 25--Attorney Fees--Contract Provisions--Determination of Prevailing Party--Prevailing on Contract.** --Upon a party's motion for attorney fees under Civ. Code, § 1717, based on a contract clause, the trial court must determine whether the prevailing party prevailed on the contract, on a tort theory, or on a combination of theories requiring allocation of fees. Additional complications may arise when there are competing cross-claims, not all contractual. In resolving the motion, the court should consider the pleaded theories of recovery, the theories asserted in the evidence produced at trial, and any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery.

**(5a) (5b) Sales § 7--The Contract--Interpretation and Construction--Modification--Between Merchants--Acceptance of New Terms.** --An exclusive dealership agreement between a photographic equipment manufacturer and its dealer was subject to an attorney fee provision, even though the provision was found in the manufacturer's invoices to the dealer and not in the written dealership contract itself. Pursuant to Cal. U. Com. Code, § 2207, subd. (2), allowing terms to be added to a contract between merchants by their acceptance, the attorney fee provision was added to the dealership agreement by the subsequent invoices, where the written dealership contract was not alleged to have been intended as a final and exclusive expression of the parties' agreement and the dealer acknowledged receiving and reading the attorney fee provision on the invoices.

**(6) Contracts § 23--Construction of Several Documents Together.** --Courts will construe together several

documents concerning the same subject and made as part of the same transaction (Civ. Code, § 1642), even though the documents were not executed contemporaneously and do not refer to each other. It is generally a factual question whether several documents were intended to govern the same transaction.

**(7) Contracts § 25--Construction and Interpretation--Function of Courts--Questions of Law.** -- Interpretation of a contract presents a question of law unless it depends on conflicting evidence, and an appellate court is not bound by a trial court's interpretation which does not depend on the credibility of extrinsic evidence.

**(8) Franchise, Distribution, and Dealership Contracts § 3--Construction and Effect of Agreement--Law Governing.** --Distributorship and dealership contracts are governed by the sales provisions of the Uniform Commercial Code (Cal. U. Com. Code, §§ 2101-2801).

**(9) Costs § 30--Attorney Fees--Amount; Discretion--Contract Provision--Limitation to Collection Efforts.** --In an action by a photographic equipment manufacturer against its exclusive dealer for unpaid invoices, substantial evidence supported the trial court's determination of the amount of an award of attorney fees to the manufacturer, pursuant to a term in the invoices providing for the recovery of attorney fees incurred in collection efforts. There was no evidence that the trial court, in limiting the manufacturer's award to a fraction of the amount requested, failed to limit the attorney fees to those reasonably expended in collection efforts. Further, substantial evidence supported the trial court's implicit conclusion that any defensive efforts covered by the fee award were interrelated with the manufacturer's collection efforts. In any event, Civ. Code, § 1717, provides that an attorney fee provision in a contract be construed as applying to the entire contract.

**(10) Costs § 30--Attorney Fees--Amount; Discretion--Relation to Amount of Damages Recovered.** --In an action by a photographic equipment manufacturer against its exclusive dealer for unpaid invoices, the trial court's award of $ 38,730 for attorney fees was not unreasonably large, despite the manufacturer's net recovery of $ 21,699.71 in compensatory damages. Although the award was large in proportion to damages, it did not shock the conscience but was justified by other factors and, consequently, there was no abuse of discretion. While the amount of money involved in the litigation is an important factor in determining an award of attorney fees, it is not a controlling factor, since it is not necessarily related to such other factors as the amount of time spent on the case, the complexity of the litigation, and the skill and effort required of the attorneys.

**(11a) (11b) (11c) Costs § 9--Expert and Other Witness Fees--Trial De Novo After Arbitration.** --In a photographic equipment manufacturer's successful action against its exclusive dealer for unpaid invoices, which was tried before a jury upon the requests of both parties for a trial de novo following a stipulated arbitration, the trial court did not err in awarding the manufacturer costs representing the fees for the arbitrator to whom the dispute had been originally submitted, and for experts and other witnesses, pursuant to Code Civ. Proc., § 1141.21, which expressly provides for the recovery of such costs, as specified, when a judgment upon a trial de novo is not more favorable to the requesting party. Even though the manufacturer requested trial de novo first, the dealer's own subsequent request rendered him liable upon obtaining a less favorable verdict after trial, and he made only a bare objection that the requested expert fees were excessive and unnecessary.

**(12) Arbitration and Award § 24--Judicial Action on Award--Request for Trial De Novo--Effect of Related Cross-claims.** --Following stipulated arbitration of a photographic equipment dealer's complaint for breach of the dealership agreement, the equipment manufacturer's cross-complaint for unpaid invoices, and the dealer's purported cross-cross-complaint for labor and parts, the manufacturer's request for trial de novo, purporting to reject the arbitrator's award on "the complaint only," was an election calling for a trial de novo of all competing cross-claims due to their interrelationship. A party cannot elect limited trial de novo where there are related cross-claims.

**(13) Costs § 6--Motion to Tax Costs--Specificity of Grounds of Objection.** --A motion to tax costs must state the grounds of the objection. Any not stated are waived.

**COUNSEL:**

Marc G. Hynes for Plaintiff and Appellant.

David E. Newhouse for Defendant and Respondent.

**JUDGES:**

Opinion by Agliano, P. J., with Premo, J., concurring. Separate concurring and dissenting opinion by Brauer, J.

**OPINION BY:**

AGLIANO

OPINION:

[*372] [**474] 1. *Introduction*

Plaintiff Benton Boyd, Jr., doing business as Boyd's Photographic Processing Equipment Sales (dealer) appeals from a postjudgment order awarding defendant Oscar Fisher Company, Inc. (manufacturer) attorney fees of $ 38,730, prejudgment interest of 7 percent from the delinquent date of a number of invoices amounting to $ 8,652.89, and costs amounting to $ 17,876.65. Dealer brought this [***2] action alleging manufacturer had unjustifiably terminated an exclusive dealership agreement. Manufacturer cross-complained based on unpaid invoices. The jury awarded manufacturer $ 31,803.46 and gave dealer credit of $ 10,103.75 for labor and parts, yielding a total judgment for manufacturer of $ 21,699.71.

Dealer asserts the following alternative claims of error in the awards of fees, interest, and costs. Attorney fees are improper because manufacturer did not prevail on a contract, the contract did not provide for attorney fees, the terms of the contract limited recovery of attorney fees, and the fee award is unreasonable. Prejudgment interest is unwarranted because manufacturer's claims were unliquidated, and the trial court used the wrong method of computing interest. Fees for an arbitrator and expert witnesses are unauthorized because their basis, Code of Civil Procedure section 1141.21, is inapplicable. Witness fees were improperly awarded to manufacturer's [*373] agents. We conclude below none of these contentions is persuasive and affirm the order as modified.

2. *Trial evidence*

There is no issue of the sufficiency of the evidence to support the judgment, but [***3] a review is important to understanding the nature of the litigation and the basis for the subsequent award of fees, interest, and costs. **(1)** [HN1] "[W]e resolve factual conflicts and draw inferences in support of the verdict." ( *Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 536 [238 Cal.Rptr. 363].)

[**475] Dealer and manufacturer entered into a written agreement dated August 12, 1976, when dealer left manufacturer's employ in Newburgh, New York to relocate in the San Francisco, California area. In five years with manufacturer, dealer had gone from sales into management.

Oscar Fisher Company manufactures stainless steel photographic processing equipment including the Miniscomat, among other things. The Miniscomat, patented in 1969, develops images by pulling resin-coated paper over rolling drums which distribute chemical solutions over one side of the paper. The end result is a printed page. The Miniscomat is useful in photographic typesetting, an industry which grew rapidly in the late 1970's as "cold" type began to replace "hot" type printing. The Miniscomat was originally produced for use with a Merganthaler Linotype machine, but is also compatible [***4] with newer photo-typesetting machines.

In the August 1976 agreement, manufacturer granted dealer, as "distributor," an "exclusive franchise" to sell manufacturer's photographic processing equipment in an area with a 200-mile radius centered on San Francisco. Dealer was to receive a commission of 25 percent of the product's list price upon the customer's payment. In exchange, dealer promised, among other things, "Not to purchase, sell, distribute or deal in products which are in competition with the products prepared by" manufacturer. The agreement was in effect for five years, until the end of 1981.

In 1977, dealer sold a Miniscomat which he then used as a demonstration model for other potential customers. Dealer sold about 18 Miniscomats in 1978. Out of 60 Miniscomats manufacturer sold nationwide in 1979, dealer sold 27. Out of 56 Miniscomats manufacturer sold nationwide in 1980, dealer sold 30. Out of 56 Miniscomats manufacturer sold nationwide in 1981, dealer sold 44. Manufacturer had about 25 other distributors nationwide. Dealer also sold paper and chemical supplies not made by manufacturer but needed to operate Miniscomats.

[*374] Dealer and manufacturer entered [***5] into a second written agreement (dealership agreement) dated February 23, 1982, based on their earlier agreement. Manufacturer granted dealer "an exclusive Dealership to sell and service the Graphic Arts products of" manufacturer in the state of California. The main graphic arts product of manufacturer was the Miniscomat. Dealer was given a discount of 25 percent from list price on "all purchases made by the Dealer" and a credit limit of $ 35,000. In exchange, dealer promised, among other things, "Not to purchase, sell, distribute or deal in products which are in competition with the products of" manufacturer. Dealer also promised, "All invoices issued to the Dealer from [manufacturer] shall be paid within the terms of payment established by [manufacturer]. For the purpose of this agreement the terms of payment of all invoices shall be 1% 10 Net 45 calendar days." This meant if dealer paid within 10 days, he would get an additional 1 percent discount off the invoice.

Dealer requested that he be billed by manufacturer, rather than collecting his commission after manufacturer was paid. Manufacturer's standard invoice provided for payment within 30 days or imposition of a 1 1/2 [***6] percent per month service charge. The dealership

agreement extended the time for payment to 45 days to accommodate dealer. Dealer was aware manufacturer's standard invoice also provided: "If referral to a collection agency or an attorney becomes necessary as a result of non-payments cost of collection proceedings including reasonable attorneys fees shall be added to the amount due." Dealer received such invoices when he ordered Miniscomats from manufacturer.

Out of 61 Miniscomats sold by manufacturer nationwide in 1982, dealer sold 53. In early 1982, dealer also began selling a Mohr processor, the Mohrpro 14, which processes resin-coated paper and also film. (As appears below, manufacturer perceived this to be a competitive product.) Dealer's first Mohrpro sale was in April 1982. Over approximately the next 14 months, dealer sold 8 more Mohrs. Out of 44 Miniscomats manufacturer sold nationwide in 1983, dealer sold 20 during the first 9 months.

[**476] Dealer did not always pay manufacturer within 45 days of an invoice. He was in constant telephone contact with Robin Horner, manufacturer's sales manager, or Gary Gogerty, manufacturer's assistant sales manager. Dealer sometimes told [***7] manufacturer before it shipped a Miniscomat he would be unable to pay in 45 days. On one occasion, dealer sold 22 pieces of equipment at a national graphic arts convention. On other occasions, customers were unsatisfied and would not pay until a Miniscomat was operating properly. Manufacturer frequently complained about late payments. There was no evidence manufacturer ever insisted on receiving interest on dealer's late payments. Complicating their accounting was a substantial amount of [*375] credits due dealer for parts returned to manufacturer. Ordinarily, dealer told manufacturer to which invoice a payment or credit related.

Once in December 1982, when Horner was due to visit from New York, dealer told an employee, Michael Keen, to disassemble a Mohrpro 14 and put it in a dark room at dealer's warehouse.

In February 1983, manufacturer sent a letter to dealer detailing his outstanding account. Manufacturer reviewed dealer's account at the end of its fiscal year on May 31, 1983. In order to bring dealer's account current, manufacturer told dealer to pay for two machines in order to receive one. Dealer did so in June and early July.

In August 1983, dealer advised two [***8] potential customers either a Mohrpro 14 or a Miniscomat would suit them.

Dealer's selling of the Mohr processor came to manufacturer's attention in early August when dealer sought reimbursement for advertising in a trade journal. One of the ads identified dealer as selling "two proces-

sors that stand above all the rest," namely "the Oscar Fisher Miniscomat RC Processor" for $ 6,800 and "the Mohrpro 14 RC Processor" for $ 4,950. Manufacturer's first response in a letter dated August 10, 1983, was to disallow dealer's claim for reimbursement "now that [dealer] is marketing products that are in direct competition of [sic] those manufactured by" manufacturer.

On September 23, 1983, manufacturer sent dealer a letter terminating his exclusive dealership due to "dealing in products which are in competition with the products of" manufacturer and "[f]ailure to stay within credit terms as established in Paragraph 2" of the dealership agreement.

On October 17, 1983, dealer sent manufacturer three invoices claiming a total due of $ 10,103.75, representing 283 hours of labor spent installing a Process-all made by manufacturer at one site, 176 hours of labor spent installing a Miniscomat at [***9] another site, and $ 350 for 7 circuit breakers replaced by dealer. Dealer could not attribute these circuit breakers to any particular machines or invoices of manufacturer.

In March 1984 in response to request for admission number 19, dealer admitted owing manufacturer $ 31,803.87 on unpaid invoices.

There was a conflict in testimony by dealer, dealer's employee, and others experienced in the graphic arts field about whether the Mohrpro 14 was in competition with the Miniscomat.

[*376] 3. *Procedural History*

Dealer commenced this action with a complaint filed October 17, 1983, alleging manufacturer breached the dealership agreement by repudiating it and also breached an oral agreement of July 1980 to reimburse dealer for advertising and convention expenses. Dealer also alleged manufacturer was intentionally interfering with dealer's contracts and prospective economic relationships by enticing Miniscomat customers away and was unfairly competing by informing potential customers there was another exclusive Miniscomat dealer and dealer would be unable to provide spare parts. Dealer requested compensatory damages, including lost profits, and also injunctive relief.

Manufacturer [***10] filed a complaint on cross-complaints, on November 28, 1983, claiming dealer owed $ 32,326.97 on unpaid invoices for breach of [**477] their contract and on an open book account as well as lost profits on competing sales. Dealer filed a purported "cross-complaint" against manufacturer on December 16, 1983, claiming uncompensated labor and parts valued at $ 10,103.75.

The parties on January 4, 1985, filed a stipulation for judicial arbitration pursuant to Code of Civil Procedure section 1141.10 et seq. which waived the award limit of $ 25,000. On August 5, 1985, the arbitrator filed an award awarding dealer $ 57,088.45 plus statutory costs, denying dealer any recovery for labor and parts, and awarding manufacturer $ 31,803.36 plus 7 percent interest from September 23, 1983, and attorney fees attributable to manufacturer's cross-complaint. On August 15, manufacturer filed a request for trial de novo, purporting to reject the arbitrator's award on "the Complaint only." On August 30, dealer filed a request for trial de novo, rejecting the arbitrator's award "on the Complaint, Cross-Complaint and Cross-Cross-Complaint."

After six days of trial, dealer elected to submit only a breach of contract [***11] claim to the jury. The parties stipulated the court would determine a claim for attorney fees by way of posttrial motion. On October 17, 1986, the jury returned the verdict described above and, on October 20, a corresponding judgment was entered.

Manufacturer filed a motion for attorney fees and cost memoranda requesting attorney fees of $ 60,417 and costs of over $ 22,000. Manufacturer also filed a motion for an award of prejudgment interest. Dealer opposed these requests. At a hearing on November 26, 1986, the court made the above-described awards of fees and costs.

[*377] 4. *Award of attorney fees*

A. *Did manufacturer prevail on a contract?*

(2a) Dealer contends attorney fees under Civil Code section 1717 are unavailable because manufacturer did not recover on a contract.

[HN2] Section 1717 currently provides in part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract [***12] or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . . [para.] Reasonable attorney's fees shall be fixed by the court. . . . [para.] (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section . . . ." (3a) (The law appears to require our application of the current version of the statute, rather than the one in effect when manufacturer moved for fees in the trial court. (*Bank of Idaho v. Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 11-13 [186 Cal.Rptr. 695].))

(4) Recent amendments to section 1717 clarify that upon a party's motion for attorney fees the trial court

may have to determine whether the prevailing party prevailed "on the contract." This determination may involve deciding whether a party prevailed on a contract or on a tort theory ( *Stout v. Turney* (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637, 586 P.2d 1228], and cases there cited; *Perry v. Robertson* (1988) 201 Cal.App.3d 333, 344 [247 Cal.Rptr. 74]) or on a combination of theories requiring [***13] allocation of fees ( *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130 [158 Cal.Rptr. 1, 599 P.2d 83]). Additional complications may arise when there are competing claims on cross-complaints, not all contractual. (Compare *Hughes Tool Co. v. Max Hinrichs Seed Co.* (1980) 112 Cal.App.3d 194, 203 [169 Cal.Rptr. 160]; and *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 37 [161 Cal.Rptr. 516]; with *Plemon v. Nelson* (1983) 148 Cal.App.3d 720, 724 [196 Cal.Rptr. 190]; cf. Civ. Code, § 1717, subd. (c).) In resolving a motion for attorney fees, the court should consider the pleaded theories of recovery, the theories asserted and the evidence produced at trial, if any, and also any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery. (Cf. *Leach v. Home Savings & Loan Assn.* (1986) 185 Cal.App.3d 1295, 1307 [**478] [230 Cal.Rptr. 553]; but cf. *Jones v. Drain* (1983) 149 Cal.App.3d 484, 487 [196 Cal.Rptr. 827]; [***14] *Manier v. Anaheim Business Center Co.* (1984) 161 Cal.App.3d 503, 508 [207 Cal.Rptr. 508].)

[*378] (2b) Dealer contends this case is like *McKenzie v. Kaiser-Aetna* (1976) 55 Cal.App.3d 84 [127 Cal.Rptr. 275], where the trial and appellate courts could not say, absent special jury findings, whether a party prevailed on contract or tort theories. Dealer points out the jury was given instructions on fraud. As manufacturer correctly replies, the fraud instructions related to its contention that its cancellation of the dealership agreement was justified by dealer's false promise not to sell competing products and concealment of so doing. ( Civ. Code, § 1689.) Manufacturer did not seek or recover damages for fraud. The jury was instructed on competing breach of contract claims. Manufacturer prevailed on a claim of unpaid invoices and therefore was not required to allocate attorney fees to noncontractual causes of action. The trial court did not err in implicitly concluding manufacturer prevailed "on the contract."

B. *Did the contract contain an attorney fee provision?*

(5a) Dealer contends "the contract" contained [***15] no attorney fee provision. The attorney fee provision is found in manufacturer's invoices to dealer and not in their dealership agreement. Dealer's premise is that the invoices are not part of the parties' agreement.

**(6)** [HN3] Courts will construe together several documents concerning the same subject and made as part of the same transaction ( Civ. Code, § 1642; *Mayers v. Loew's, Inc.* (1950) 35 Cal.2d 822, 827 [221 P.2d 26]) even though the documents were not executed contemporaneously ( *Berg Metals Corp.* v. *Wilson* (1959) 170 Cal.App.2d 559, 567 [339 P.2d 869], and cases there cited) and do not refer to each other ( *Cadigan* v. *American Trust Co.* (1955) 131 Cal.App.2d 780, 786-787 [281 P.2d 332], and cases there cited). It is generally a factual question whether several documents were intended to govern the same transaction. ( *Id.* at p. 786; *Nevin* v. *Salk* (1975) 45 Cal.App.3d 331, 338 [119 Cal.Rptr. 370].) **(7)** However, "[i]nterpretation of a contract presents a question of law unless it depends on conflicting evidence, and [***16] an appellate court is not bound by a trial court's interpretation which does not depend on the credibility of extrinsic evidence." ( *Summit Industrial Equipment, Inc.* v. *Koll/Wells Bay Area* (1986) 186 Cal.App.3d 309, 319 [230 Cal.Rptr. 565]; cf. *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].)

**(8)** Dealer does not dispute manufacturer's contention that their relationship was governed by California's Uniform Commercial Code Sales provisions, Uniform Commercial Code sections 2101 through 2801. Indeed, the majority view is that distributorship and dealership contracts are governed by the Uniform Commercial Code. ( *Sally Beauty Co.* v. *Nexxus Products Co., Inc.* (7th Cir. 1986) 801 F.2d 1001, 1005-1006, and cases there [*379] cited; see Annot. (1981) 4 A.L.R.4th 85, § 10, pp. 101-102 and current supp.)

**(5b)** There is no question the attorney fee provisions apply if each invoice is viewed as a separate contract unrelated to the dealership agreement. (E.g., *Cavalier Mobile Homes* v. *Liberty Homes, Inc.* (1983) 53 Md.App. 379 [454 A.2d 367, 377]; [***17] see [HN4] *Malverne Distributors* v. *Profile Records* (1987) 135 A.D.2d 478 [522 N.Y.S.2d 569, 570].) The Uniform Commercial Code definition of "contract," however, is "the total legal obligation which results from the parties' agreement as affected by this code and any other applicable rules of law." (Cal. U. Com. Code, § 1201, subd. (11).) We therefore consider how the invoices relate to the dealership agreement.

Dealer does not suggest the dealership agreement was intended to be a final and exclusive expression of their agreement. (Cal. U. Com. Code, § 2202.) Uniform Commercial Code section 2207 allows for terms to be added to a contract by its acceptance. "(2) The additional terms are to be construed as proposals for addition to the contract. [**479] Between merchants such terms become part of the contract unless: [para.] (a) The offer expressly limits acceptance to the terms of the offer;

[para.] (b) They materially alter it; or [para.] (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received." "Between merchants" means a transaction where both parties deal in or are otherwise [***18] knowledgeable about goods like those involved in the transaction. (Cal. U. Com. Code, § 2104.)

Substantial evidence supports implicit conclusions that the parties were merchants who added terms to the dealership agreement by subsequent invoices. In the agreement, dealer agreed to pay invoices on terms established by manufacturer. While the agreement gave dealer more time to pay than did the standard invoice, there is nothing in the agreement precluding a supplemental agreement on attorney fees. Dealer acknowledged receiving and reading the attorney fee provision on manufacturer's invoices. Pursuant to Uniform Commercial Code section 2207, subdivision (2), the invoices thus added an attorney fee provision to the parties' original agreement. (Cf. *Kawasho Internat., U.S.A., Inc.* v. *Lakewood Pipe Service, Inc.* (1983) 152 Cal.App.3d 785, 791-793 [201 Cal.Rptr. 640] -- interest provision added by sales contracts and invoices; accord, *South Bay Transportation Co.* v. *Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 660 [253 Cal.Rptr. 753] -- attorney fee provision added to carrier's contract by signed bills of lading.) [***19]

Dealer reads too much into the jury's denial of manufacturer's request to award 18 percent annual interest as its invoices provided. Even if the jury implicitly found this part of the invoices waived by manufacturer's failure [*380] to ask for interest on late payments before this litigation, there is no indication the jury made any implicit finding on the invoice's attorney fee provision. There was no conflicting evidence concerning the meaning of these fee provisions. Under the circumstances, it was and [HN5] is a question of law for the courts to determine whether the attorney fee provision was part of the parties' contract. We agree with the trial court's implicit conclusion the documents were so related.

### C. *Does the contract limit recovery of attorney fees?*

**(9)** Dealer contends manufacturer's recovery should be limited by the invoice terms to its attorneys' collection efforts and not, for example, to successful efforts to defend against dealer's claims. Although manufacturer's attorneys extensively documented their fee claim, dealer does not identify any particular amount as not involved in manufacturer's collection efforts. We note the trial court awarded $ 38,730 when over [***20] $ 60,000 was requested. Dealer cites no evidence showing this was not an attempt by the trial court to limit manufacturer's attorney fees to those reasonably expended in col-

lection efforts. Further, substantial evidence supports the trial court's implicit conclusion that any defensive efforts covered by the fee award were interrelated with manufacturer's collection efforts. ( *Wagner* v. *Benson, supra,* 101 Cal.App.3d 27, 37.)

Dealer's attempt to limit recovery of attorney fees to manufacturer's collection efforts finds support in the narrow application given an attorney fee provision in *Sciarrotta* v. *Teaford Custom Remodeling, Inc.* (1980) 110 Cal.App.3d 444, 450-452 [167 Cal.Rptr. 889]. However, the Legislature restricted such narrow readings by enacting the following provision of [HN6] Civil Code section 1717. "(a) . . . [para.] Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." [***21] (Stats. 1983, ch. 1073, § 1, p. 3785; see Legis. Counsel's Dig., Sen. Bill No. 886, Stats. 1983 (Reg. Sess.) Summary Dig., p. 380.) Though this amendment postdates the invoices at issue here, as noted above in part 4A, the current version of section 1717 is applicable. This liberal rule of construction [**480] furnished an additional ground for the trial court to award manufacturer's attorneys two-thirds of the fees they requested.

D. *Is the fee award unreasonably large?*

**(10)** Dealer contends the award of $ 38,730 for attorney fees is unreasonably large in view of manufacturer's net recovery of $ 21,699.71. We adopt [*381] the reasoning in *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485 [234 Cal.Rptr. 779], rejecting a similar argument where a fee award of $ 10,000 was made after a damage award of $ 9,455. "While the amount of money involved in the litigation is an important factor in determining an award of attorneys' fees, [dealer] cites no authority for the proposition it is a controlling factor. It is not necessarily related to such other factors as the amount of time spent on the case, the complexity of the litigation, the skill and effort [***22] required of the attorneys. . . . [para.] . . . Although the award is large in proportion to the amount of damages awarded, it does not shock the conscience but is justified by other factors. Consequently, there was no abuse of discretion in the award." ( *Id.* at pp. 1507-1508.)

5. *Award of prejudgment interest* *

* See footnote, *ante*, page 368.

. . .

6. *Costs awarded after rejection of arbitration award*

**(11a)** Dealer contends the trial court erred by failing to tax several items of costs awarded solely pursuant to various subdivisions of Code of Civil Procedure section 1141.21, namely arbitrator's fees of $ 1,900, expert witness fees of $ 653, and an expert's fee for computerizing its invoices of $ 6,695.37. Manufacturer concedes the order erroneously includes $ 430.38 disallowed by the court and the latter amount should be only $ 6,274.99.

Code of Civil Procedure sections 1141.10 through 1141.31 provide for judicial arbitration, to which the parties here stipulated. [HN7] Section 1141.20 [***23] provides: "An arbitration award shall be final unless a request for a de novo trial is filed within 30 days after the date the arbitrator files the award with the court. [para.] (b) Any party may elect to have a de novo trial, by court or jury, both as to law and facts. . . ." Section 1141.21 provides: "(a) If the judgment upon the trial de novo is not more favorable in either the amount of damages awarded or the type of relief granted for the party electing the trial de novo than the arbitration award, the court shall order that party to pay the following nonrefundable costs and fees . . . ." **(3b)** (Like Civ. Code, § 1717 above, on appeal we apply the current versions of statutes providing for costs. ( *Hogan* v. *Ingold* (1952) 38 Cal.2d 802, 814-816 [243 P.2d 1, 32 A.L.R.2d 834]; *Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 477 [304 P.2d 7].))

**(11b)** Dealer argues his election of a trial de novo 25 days after the arbitration award was filed did not trigger these provisions because [*382] manufacturer had already elected a trial de novo. **(12)** We are inclined to agree with dealer's premise that [***24] manufacturer's election called for a trial de novo of all competing cross-claims due to their interrelationship and not merely "on the Complaint only" as it purported to do. (Compare *Trump* v. *Superior Court* (1981) 118 Cal.App.3d 411, 417 [173 Cal.Rptr. 403] [party could not elect limited trial de novo where related claims on cross-complaints], with *Demirjian* v. *Superior Court* (1986) 187 Cal.App.3d 372, 376-378 [231 Cal.Rptr. 698] [party could elect limited trial de novo on independent claim].) **(11c)** However, it does not follow that dealer's subsequent election of a trial de novo should be ignored. Nothing in the judicial arbitration statutes precludes more than one party per arbitration from electing a trial de novo. Where two or more do so, each should be subject to the discouraging prospect of liability for costs if unsuccessful in the trial de novo. (Cf. *Demirjian, supra,* at p. 376.)

Dealer relies on *Rabinowitch* v. *Cal. Western Gas Co.* (1967) 257 Cal.App.2d 150 [65 Cal.Rptr. 1], as bar-

ring recovery for an audit of manufacturer's invoices. At [***25] the time of that decision, there was no [**481] statutory definition of costs and precedent had established only a court-appointed expert's fees were recoverable. ( [HN8] *Id.* at pp. 161-162.)

Code of Civil Procedure section 1141.21, subdivision (a)(iii), enacted in 1978, specifically provides for recovery of "the reasonable costs of the services of expert witnesses, who are not regular employees of any party, actually incurred or reasonably necessary in the preparation or trial of the case." Subdivision (a)(iv) authorizes recovery of "the compensation paid by the other party or parties to the arbitrator." These subdivisions provide a statutory basis for manufacturer's recovery of expert fees and payment to the arbitrator. Dealer recognizes, "The nonrefundable costs and fees identified in CCP § 1141.21 are in excess of those normally allowed under CCP § 1032 . . . ."

Dealer further contends manufacturer failed to sustain its burden of proving these costs, citing *State of California* v. *Meyer* (1985) 174 Cal.App.3d 1061, 1075 [220 Cal.Rptr. 884]. Since manufacturer provided sufficient evidence its computerization expert charged [***26] $ 6,000 for his services, the trial court need not have been detained by dealer's bare objection such fees were excessive and unnecessary.

**(13)** Dealer also contends the trial court erred in not taxing $ 6,665 in witness fees and mileage for Gary Gogerty, Robin Horner, Oscar Fisher, and Michael Keen. Keen was originally dealer's serviceman, later an independent contractor, and later dealer's replacement as manufacturer's exclusive dealer. The others are manufacturer's officers.

[*383] On appeal, dealer acknowledges it is appropriate to award witness fees to employees and officers of a corporate party who do not have a personal interest in the litigation ( *Trussell* v. *City of San Diego* (1959) 172 Cal.App.2d 593, 617 [343 P.2d 65]; *County of Kern* v. *Ginn* (1983) 146 Cal.App.3d 1107, 1112 [194 Cal.Rptr. 512]), but asserts the above-named witnesses do not fit into this category. The law seems to allow costs where corporate agents are more like witnesses and not where they are more like parties. (See generally Annot. (1958) 57 A.L.R.2d 1243.)

This contention is not properly before us. In the trial court, [***27] dealer only objected to manufacturer's claim for witness fees to the extent they exceeded the statutory amount and the court taxed them accordingly. ( Code Civ. Proc., §§ 1033.5, subd. (a)(7), 1141.21, subd. (a)(ii); Gov. Code, § 68093.) "The law is clear that a motion to tax costs must state the grounds of the objection; any not stated are waived. (*Mojave and Bakersfield Railroad Company* v. *Cuddeback* (1915) 28 Cal.App.439,

441-442 . . . .)" ( *Staples* v. *Hoefke* (1987) 189 Cal.App.3d 1397, 1409 [235 Cal.Rptr. 165]; cf. *Pratt* v. *Robert S. Odell & Co.* (1944) 63 Cal.App.2d 78, 83 [146 P.2d 504].)

Dealer has identified no trial court error in the award of fees for the arbitrator, experts, or other witnesses.

7. *Effect of bankruptcy* *

\* See footnote, *ante*, page 368.

. . .

8.

The postjudgment order awarding attorney fees, interest, and costs to manufacturer is modified to reflect a reduced award for expert computerization of $ 6,274.99, [***28] and is affirmed as so modified. Manufacturer is entitled to attorney fees and costs on appeal in an amount to be fixed by the trial court.

**CONCUR BY:**

BRAUER

**DISSENT BY:**

BRAUER

**DISSENT:**

**BRAUER, J.,** Concurring and Dissenting. -- I join in the opinion of the court except as to part 6. My disagreement with that part also affects the disposition.

The cross-complaints in this case were clearly compulsory ones as they arose "out of the same transaction, occurrence, or series of transactions or [*384] occurrences" as plaintiff's causes of action ( Code Civ. Proc., §§ 426.10, subd. (c), 426.30). Therefore, [**482] manufacturer's demand for trial de novo after arbitration "on the complaint only" resulted in the submission of the entire cause to judicial re-evaluation. ( *Trump* v. *Superior Court* (1981) 118 Cal.App.3d 411, 417 [173 Cal.Rptr. 403].) It follows that dealer's subsequent demand was an idle and superfluous act; and Code of Civil Procedure section 1141.21, subdivision (a) did not come into play because dealer was not "the party electing the trial de novo." I would hold that the trial court should have taxed the cost items attributable to the arbitration. [***29]

# EXHIBIT D

934 F.2d 324 (Table)                                                                                    Page 1
934 F.2d 324 (Table), 1991 WL 90003 (9th Cir.(Cal.))
**Unpublished Disposition**
**(Cite as: 934 F.2d 324, 1991 WL 90003 (9th Cir.(Cal.)))**

NOTICE:  THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Ninth Circuit.
SHAKLEE U.S. INC., Plaintiff-Appellee,
v.
Robert G. GIDDENS, Jr., Defendant-Appellant.
**No. 90-15498.**

Argued and Submitted May 16, 1991.
Decided May 30, 1991.

Appeal from the United States District Court for the Northern District of California, No. CV-88-1382-WWS;  William W. Schwarzer, District Judge, Presiding.

N.D.Cal.

AFFIRMED.

Before GOODWIN, SKOPIL and CANBY, Circuit Judges.

MEMORANDUM [FN*]

**\*\*1** Robert Giddens appeals the district court's grant of summary judgment in favor of Shaklee, Inc. on Shaklee's claim and Giddens' counterclaim for breach of contract.  Giddens also appeals the district court's grant of summary judgment against Giddens on his claim of intentional interference with advantageous business relationships, and its denial of Giddens' motion to file a second amended counterclaim.  We affirm.

*Background*

Giddens acted as a distributor for Shaklee from 1970 until 1988, pursuant to a distributor agreement providing, inter alia, that "[i]f this agreement or any Company rule is violated, Shaklee products may cancel this distributorship...."

In 1988 Shaklee terminated Giddens' distributorship after Giddens recruited other Shaklee distributors to become distributors for other non-competing direct sales companies.  That termination was based on

Giddens' violation of section 4 of Shaklee's "Statement of Privileges and Responsibilities" ("P & R"), prohibiting Shaklee distributors from promoting another direct selling company "while remaining a Shaklee Family Member."  That same provision expressly enumerates termination as a sanction for violation of section 4.

Shaklee brought this action seeking declaratory and injunctive relief against Giddens' continued promotion of other direct sale companies by recruiting other Shaklee distributors while remaining a Shaklee distributor himself.  While this action was pending, Shaklee terminated Giddens.  It then amended its action, seeking declaratory relief and damages for breach of contract.  The district court granted summary judgment in favor of Shaklee on Shaklee's claims that Giddens had breached the distributor contract, and that Shaklee was authorized by that contract to terminate Giddens' distributorship.  The district court denied summary judgment on contract damages, however, ruling that the amount of damages was too speculative to determine on the state of the record at that time.  After the district court certified its summary judgments under Fed.R.Civ.P. 54(b), Giddens appealed the grant of summary judgment on the breach of contract claims.

Shaklee also claimed damages for intentional interference with advantageous business relationships and sought recovery of moneys for failure of consideration.  The district court granted summary judgment in favor of Giddens on those charges, and those rulings have not been appealed.

Giddens counterclaimed for breach of contract, breach of fiduciary duty and the duty of good faith and fair dealing, conversion, fraud, intentional interference with advantageous business relationships, and unjust enrichment. The district court granted summary judgment against Giddens on all of his counterclaims, except his claim for conversion, for which it granted Giddens summary judgment, awarding him approximately $12,000.  Giddens appeals the summary judgment awards on the breach of contract and tortious interference counterclaims.

**\*\*2** Giddens sought leave to file a second amended counterclaim, which the district court denied. Giddens appeals that ruling.

*Discussion*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

934 F.2d 324 (Table)                                                                     Page 2
934 F.2d 324 (Table), 1991 WL 90003 (9th Cir.(Cal.))
**Unpublished Disposition**
**(Cite as: 934 F.2d 324,  1991 WL 90003 (9th Cir.(Cal.)))**

*1. Breach of contract*

 The District court properly ruled that Giddens was contractually bound to the provision in section 4 of the "1985 version of the P & R, entitled "Unfair Competitive Activity," which states that "[a] Shaklee Family Member may not promote ... another direct selling company ... while remaining a Shaklee Family Member."   That conclusion rests both on the provision in Giddens' original employment contract, binding him to "any company rule," and on Giddens' acceptance of that rule by continuing to perform and receive compensation after the promulgation of the rule and by complying with an enforcement of the rule against his earlier recruiting of other distributors for a different direct-sale company.   Calif.Civil Code § 1621;   *Caron v. Andrews,* 133 Cal.App.2d 412, 416-17 (1955).

 There was no genuine issue of material fact as to whether the rule was a binding contractual term, nor was there any dispute that the rule prohibits recruiting other Shaklee distributors for other direct selling companies, and that Giddens knowingly violated the rule.   Giddens has offered no evidence sufficient to raise factual questions on these points.  Thus, Shaklee was within its contractual rights in terminating Giddens' distributorship for breach of contract.   Calif.Civil Code § 1689(b)(2);   *Pennel v. Pond Union School Dist.,* 29 Cal.App.3d 832, 838 (1973).

 Giddens' argument that this rule is too ambiguous to be enforced is contradicted both by the language of the rule, and by Giddens' knowledge of its meaning and consequences.   Giddens focuses on the "should resign" language of the rule as suggesting that the provision was merely precatory.   That language, however, precedes the following unambiguous terms: "A Shaklee Family Member *may not* promote, directly or indirectly, another direct selling company or its products while remaining a Shaklee Family Member."   (Emphasis added).  Section 4 concludes with the provision that "[v]iolation of the provisions of this Section by any Shaklee Family Members may subject their distributorship to any sanction specified in Section 5, including termination of their distributorship for cause."   Giddens' other argument that the rule quoted above was merely prefatory to other more specifically enumerated rules, which could be enforced by termination, is contradicted by the plain language of section 4.

 Finally, any ambiguity regarding those terms is contradicted by Shaklee's prior enforcement of the rule against Giddens regarding Giddens' promotion of K-Comp, with which Giddens complied, and Shaklee's repeated attempts, short of termination, to enforce the rule against his promotion of ATR and Eagle Shield.  [FN1]

*2. Tortious Interference*

 The district court granted summary judgment against Giddens on his counterclaim of intentional interference with advantageous business relationships, because the requisite showing of intent was lacking. Additionally, the district court ruled that Giddens' allegations failed to establish the requisite showing that interference be either unlawful or lacking in sufficient justification.   We agree.

 **3 Giddens insists that there is a disputed issue of fact as to Shaklee's intent in terminating his distributorship, yet he offers no relevant evidence, other than bare allegations, that the intent of Shaklee was anything other than to enforce its contractual right to prevent its distributors from recruiting other Shaklee distributors for other direct sales operations.

 As we have already noted, an alleged intent to terminate Giddens as a reprisal for his criticism of Shaklee's management or policies does not deprive Shaklee of the right to enforce its contract terms.  Neither does it render the disruption of Giddens' relationship with his downline distributors unlawful or lacking in sufficient justification to make out a claim of tortious interference.   "The exercise of a contractual right cannot be the basis for a claim of tortious interference."   *Computer Place, Inc. v. Hewlett-Packard Co.,* 607 F.Supp. 822, 835 (N.D.Cal.1984), *aff'd* 779 F.2d 56 (9th Cir.1985); *Accord Rickel v. Schwinn Bicycle Co.,* 144 Cal.App.3d 648, 660 (1983).

*3. Denial of Leave to Amend*

 Giddens sought leave to file a second amended counterclaim, adding two allegations.   First, Giddens' proposed second amended counterclaim alleged that section 4 of the P & R violates the public policy set forth in California Business and Professions Code, section 16600, which provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."   Second, Giddens' proposed second amended counterclaim alleged entitlement to vested "retirement benefits."   The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

934 F.2d 324 (Table)                                                                                        Page 3
934 F.2d 324 (Table), 1991 WL 90003 (9th Cir.(Cal.))
**Unpublished Disposition**
**(Cite as: 934 F.2d 324, 1991 WL 90003 (9th Cir.(Cal.)))**

district court denied leave to amend because such amendment would be futile. We agree.

*a. Section 16600*

California cases clearly establish that contractual prohibitions against current employees' competing with their employers do not violate section 16600. *See, e.g. Fowler v. Varian Assoc's Inc., 196 Cal.App.3d 34, 44 (1987).* The reasoning of those cases applies equally to supplier-distributor relationships such as that between Giddens and Shaklee, and Giddens has provided no authority suggesting otherwise. The relationship between section 16600 and post-termination anti-competition agreements is less clear, but that issue is not presented here. Amending Giddens counterclaim to add this allegation would have been futile.

*b. Retirement benefits*

Adding an allegation that Giddens was entitled to "retirement benefits" would also have been futile. The benefits to which Giddens claims entitlement are characterized in the 1985 P & R as "Residual Bonuses," and are described in section 39 of that document as "extended bonuses paid on the continuing performance of [downline distributors] after the Senior Coordinatorship has been approved for reduced activity status." ER 10 at 38. Section 29 goes on to provide that

[p]articipation in the residual bonus program is available only to [those eligible, who] continue to meet the following qualifications:

**4** Comply with Shaklee rules and regulations; ...

* * *

Continue to comply with all the provisions of Sections 3 and 4 throughout the duration of their special reduced activity status."

Finally, Section 39 states that

[r]esidual bonuses will cease if any member of the distributorship on reduced activity status violates Section 3 or 4, or enters into any business that conflicts with Shaklee, or engages in activities that discredit the Shaklee name or undermine the morale of other Shaklee distributors.

Giddens was bound by the terms of the 1985 P & R. He was in violation of Section 4. The express terms

of the P & R thus demonstrate that amending Giddens' complaint to seek entitlement to these residual benefits would be futile. The district court did not abuse its discretion in denying leave to amend.

*Conclusion*

The rulings of the district court are AFFIRMED.

> FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3.

> FN1. Giddens' claims of retaliatory motive and uneven enforcement of the contract are irrelevant. Giddens cites no authority for the proposition that a materially breaching contract party may maintain as a defense against termination that the terminating party had a subjective motivation of animosity or reprisal towards the breaching party. *Toussaint v. Blue Cross & Blue Shield, 292 N.W.2d 880 (Mich.1980),* is inapposite. The present case does not involve a factual determination whether general "good cause" existed for an employee's termination. Rather, this case involves contractual termination between a supplier and an independent distributor based on a breach of an express contract term, for which the contract expressly provided termination as a remedy.

934 F.2d 324 (Table), 1991 WL 90003 (9th Cir.(Cal.)), Unpublished Disposition

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

77 Cal. App. 4th 610, *; 91 Cal. Rptr. 2d 815, **;
2000 Cal. App. LEXIS 21, ***; 2000 Cal. Daily Op. Service 390

LEXSEE



Caution
As of: May 18, 2007

**ARYA GROUP, INC., Plaintiff and Appellant, v. CHER et al., Defendants and Respondents.**

**No. B128557.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION TWO**

**77 Cal. App. 4th 610; 91 Cal. Rptr. 2d 815; 2000 Cal. App. LEXIS 21; 2000 Cal. Daily Op. Service 390; 2000 Daily Journal DAR 505**

**January 13, 2000, Decided**

**NOTICE:** [***1] Opinion certified for partial publication. *

    * Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of footnote 2 and parts II. through VI. of the Discussion.

**PRIOR HISTORY:** APPEAL from orders of the Superior Court of Los Angeles County. Super. Ct. No. BC182770. Ronald E. Cappai, Judge.

**DISPOSITION:** The orders sustaining respondents' demurrers are reversed as to the first, third, eighth and ninth causes of action, and affirmed as to all other causes of action. The award of costs to respondents in the amount of $ 883 is also reversed. The parties shall bear their own costs on appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff appealed orders of the Los Angeles County Superior Court (California), which dismissed its action against defendants after demurrers to plaintiff's second amended complaint were sustained without leave to amend, under Cal. Civ. Proc. Code § 581(f)(1).

**OVERVIEW:** Plaintiff and defendant negotiated an oral agreement, whereby plaintiff was to design and construct a house. The oral agreement was memorialized in writing, but defendant never signed the contract, despite her promise to do so. Defendant terminated her agreement with plaintiff, without paying the balance then due plaintiff, and plaintiff sued defendant for, inter alia, breach of contract. Plaintiff claimed that trial court's rulings dismissing its action constituted an abuse of discretion. The court reversed, declining to hold that plaintiff's noncompliance with Cal. Bus. & Prof. Code § 7164 absolutely foreclosed it from seeking to enforce the oral agreement it purportedly made with defendant. Plaintiff could seek to enforce its contract claim against defendant to the extent defendant would otherwise have been unjustly enriched as a result of her failure to compensate plaintiff for the reasonable value of its work on the construction project.

**OUTCOME:** Orders reversed; plaintiff's noncompliance with statute requiring contractor to secure signed, written contract for construction of single-family residence did not absolutely foreclose it from seeking to enforce oral agreement it purportedly made with defendant.

**LexisNexis(R) Headnotes**

*Contracts Law > Formation > Execution*
*Contracts Law > Statutes of Frauds > General Overview*
[HN1] See Cal. Bus. & Prof. Code § 7164.

*Antitrust & Trade Law > Consumer Protection > Home Solicitation*
*Contracts Law > Formation > Execution*
*Contracts Law > Statutes of Frauds > General Overview*
[HN2] Single-family dwelling contracts, like home improvement contracts, must be in writing and signed by both parties and must contain certain specified information, including a notice stating that the owner has the right to require the contractor to have a performance and payment bond, the expense of which may be borne by the owner.

**SUMMARY: CALIFORNIA OFFICIAL REPORTS SUMMARY**

A general contractor and designer brought an action, alleging breach of contract and other causes of action, against an individual to enforce an oral agreement whereby plaintiff was to design and construct a house on defendant's property. The agreement was memorialized in an unsigned written contract. The trial court entered an order dismissing the action after sustaining defendant's demurrer without leave to amend. (Superior Court of Los Angeles County, No. BC182770, Ronald E. Cappai, Judge.)

The Court of Appeal reversed the order sustaining defendant's demurrer to several of the causes of action and otherwise affirmed. The court held that plaintiff was not precluded under Bus. & Prof. Code, § 7164 (construction contracts must be evidenced in writing signed by both parties), from pursuing a breach of contract claim as a result of its failure to secure a signed written contract for the construction of the house, to the extent that defendant would otherwise be unjustly enriched as a result of her failure to compensate plaintiff for the reasonable value of its work on the construction project. It appeared that defendant was a highly sophisticated homeowner with previous involvement in residential construction projects, that her legal representative assisted her in negotiating the agreement with plaintiff, that plaintiff had already completed a substantial amount of the work it contracted to perform when defendant terminated the parties' agreement, and that defendant would be unjustly enriched if she were not required to compensate plaintiff for the reasonable value of its work. (Opinion by Mallano, J., + with Boren, P. J., and Cooper, J., concurring.)

> + Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## HEADNOTES: CALIFORNIA OFFICIAL REPORTS HEADNOTES

Classified to California Digest of Official Reports

**(1) Building and Construction Contracts § 6--Actions--Necessity for Signed Written Contract--Exceptions--Unjust Enrichment.** --In a breach of contract action brought by a general contractor and designer against an individual to enforce an oral agreement whereby plaintiff was to design and construct a house on defendant's property, the trial court erred in sustaining defendant's demurrer without leave to amend. Plaintiff was not precluded under Bus. & Prof. Code, § 7164 (construction contracts must be evidenced in writing signed by both parties), from pursuing a breach of contract claim as a result of its failure to secure a signed written contract for the construction of the house, to the extent that defendant would otherwise be unjustly enriched as a result of her failure to compensate plaintiff for the reasonable value of its work on the construction project. Although, generally, a contract made in violation of a regulatory statute is void, the rule is not inflexible. In compelling cases, illegal contracts will be enforced in order to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff. In this case, it appeared that defendant was a highly sophisticated homeowner with previous involvement in residential construction projects, that her legal representative assisted her in negotiating the agreement with plaintiff, that plaintiff had already completed a substantial amount of the work it contracted to perform when defendant terminated the parties' agreement, and that defendant would be unjustly enriched if she were not required to compensate plaintiff for the reasonable value of its work.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 316.]

**COUNSEL:** Castle & Lax, Nomi L. Castle and Julie Fleming for Plaintiff and Appellant.

Mandel & Norwood, S. Jerome Mandel and Lilly Lewis for Defendants and Respondents.

**JUDGES:** Opinion by Mallano, J., * with Boren, P. J., and Cooper, J., concurring.

> * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** MALLANO

OPINION: [*612] [**816]

**MALLANO, J.** * --Arya Group, Inc. (Arya) appeals from the orders dismissing its action [***2] against the respondents herein, Cher, the Inshallah Trust, Janet L. Bussell, Tutt Design Group, Inc. (Tutt) and Hawthorne Savings, F.S.B., after demurrers to Arya's second amended complaint were sustained [**817] without leave to amend. ( Code Civ. Proc., § 581, subd. (f)(1).) Arya contends the trial court's rulings constituted an abuse of discretion because the factual allegations in Arya's second amended complaint show Arya "is entitled to relief under legal theories of breach of contract, promissory estoppel, quantum meruit and unjust enrichment, account stated, fraud, intentional interference with economic relationship, conversion, and violation of Civil Code [section] 1719."


* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


THE COMPLAINT

The material allegations of Arya's second amended complaint, which we assume to be true for purposes of reviewing a ruling [***3] sustaining a demurrer without leave to amend ( *Mirkin v. Wasserman* (1993) 5 Cal. 4th 1082, 1087 [23 Cal. Rptr. 2d 101, 858 P.2d 568]), may be summarized as follows. Cher is the beneficiary and trustor of the Inshallah Trust, which is the record owner of real property located in Malibu. In June 1996, representatives of Cher and the Inshallah Trust (hereafter referred to collectively as Cher) negotiated an oral agreement with Arya, whereby Arya was to design and construct a house on the Malibu property. Cher consented to pay Arya the sum of $ 4,217,529 for Arya's provision of design, construction, general contracting and supervision services. She further agreed that Arya would "be paid progress payments upon periodic percentages of project completion." The parties' oral agreement was subsequently memorialized in a written contract bearing an August 1997 date, which was delivered to Cher in early October 1997. Cher never signed the contract, despite her promise to do so.

Between June 1996 and November 1997, Cher assured Arya that the contract would be honored and that Arya would receive full compensation for the construction services it provided under the contract. [***4] In fact, Arya did receive payment from Cher for a number of services it discharged under the contract, e.g., reviewing and revising construction plans, performing site stabilization, preparing a set of plans and specifications sufficient to obtain and maintain new permits for the property, setting up facilities and site supervision on the property, commencing construction on the project and "making substantial progress in several areas, including concrete, structural [*613] steel, framing, grading, and the pool," and hiring licensed architects to perform design services.

Commencing in August 1997 and continuing through November 1997, Cher requested that Arya meet with Bussell, a designer who owned and managed Tutt, a Florida corporation, and who had previously worked with Cher on "speculative residential projects" in Florida. In the course of meeting with Bussell, Arya showed Bussell the plans and designs for the Malibu property and introduced her to various of Arya's subcontractors and suppliers. Unbeknownst to Arya, the meetings with Bussell were part of a plan by Cher (who had never intended to sign the contract with Arya or honor its terms) to induce Arya to divulge proprietary [***5] information relating to the Malibu property so Cher could terminate her contract with Arya without paying Arya for all of the services it had provided, and replace Arya as the general contractor and designer.

In November 1997, Cher terminated her agreement with Arya, without paying the $ 415,169.41 balance then due Arya, and "stopped payment on an order for the payment of money to Arya for services [it had] provided . . . under the Contract." In addition, Cher, Bussell, and Tutt contacted several of Arya's subcontractors in an effort to induce them to breach their contracts with Arya and work directly with Cher, misappropriated for their own use the plans, designs and drawings Arya had prepared, and had the permits obtained by and issued to Arya transferred to Cher's name. They also spread "false and damaging rumors about Arya," which included statements that "Arya and its principals were thieves, wrongfully abandoned a job, breached contracts, could not pay its bills, [**818] engaged in dishonest billing practices, and performed substandard work."

DISCUSSION

I. *First Cause of Action: Breach of Contract*

**(1)** We are initially called upon to decide a very narrow question [***6] of first impression, whether, as a matter of law, Arya is precluded under Business and Professions Code section 7164 from pursuing a breach of contract claim as a result of its failure to secure a signed written contract for the construction of Cher's residence. n1 [HN1] Section 7164 reads: "(a) Notwithstanding Section 7044 [owner-builder exemption], every contract and any changes in a contract, between an owner and a contractor, for the construction of a single-family dwelling to be retained by the owner for at least one year shall be [*614] evidenced in writing signed by both parties. [P] (b) The writing shall contain the following: [P] (1) The name, address, and license number of the contractor. [P] (2) The approximate dates when the work will begin and be substantially completed. [P] (3) A legal description of the location where the work will be done. [P] (4) The language of the notice required pursuant to Section 7018.5. [P] The writing may also contain other matters agreed to by the parties to the contract. The writing shall be legible and shall [***7] clearly describe any other document which is to be incorporated into the contract. Prior to commencement of any work, the owner shall be furnished a copy of the written agreement, signed by the contractor. The provisions of this section are not exclusive and do not relieve the contractor from compliance with all other applicable provisions of law. [P] (c) Every contract subject to the provisions of this section shall contain, in close proximity to the signatures of the owner and contractor, a notice in at least 10-point bold type or in all capital letters, stating that the owner has the right to require the contractor to have a performance and payment bond and that the expense of the bond may be borne by the owner."2*

n1 Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

* See footnote, *ante*, page 610.

It is evident from the various legislative documents dealing with section 7164 furnished by the Legislative Intent Service that the statute [***8] was intended to afford consumers who contract for the construction of a single-family dwelling (which will be retained by the owner for at least one year) safeguards already available under section 7159 to consumers who contract for "home improvement" work. n3 For example, [HN2] single-family dwelling contracts, like home improvement contracts, must be in writing and signed by both parties and must contain certain specified information, including a notice stating that the owner has the right to require the contractor to have a performance and payment bond, the expense of which may be borne by the owner.

n3 At Arya's request, we have taken judicial notice of the materials provided by the Legislative Intent Service. ( Evid. Code, § 452, subd. (c), 459; *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal. 3d 211, 218, fn. 9 [185 Cal. Rptr. 270, 649 P.2d 912].) While the language of section 7164 is not ambiguous per se, it is certainly inconclusive regarding the intended consequences of a violation of the statute. Inasmuch as the " 'general object of the legislation . . ., and the mischiefs sought to be remedied' " ( *Parr v. Municipal Court* (1971) 3 Cal. 3d 861, 866 [92 Cal. Rptr. 153, 479 P.2d 353]) may shed some light on this question, we deem it appropriate to consider the legislative history with this prospect in mind.

[***9]

The similarities between sections 7159 and 7164 are helpful because the effect of noncompliance with section 7159 is an issue which was considered by the California Supreme Court in *Asdourian v. Araj* (1985) 38 Cal. 3d 276 [211 Cal. Rptr. 703, 696 P.2d 95] (*Asdourian*). (See also *Davenport & Co. v. Spieker* (1988) 197 Cal. App. 3d 566 [242 Cal. Rptr. 911].) In *Asdourian*, [**819] a [*615] contractor sought compensation from two property owners for remodeling work performed pursuant to oral contracts. The owners contended that since any agreements between the parties were oral, they violated section 7159 and were thus void.

Although the Supreme Court acknowledged that, generally speaking, "a contract made in violation of a regulatory statute is void," it stressed that " 'the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances' " and " '[a] wide range of exceptions has been recognized.' " (*Asdourian, supra,* 38 Cal. 3d at p. 291.) By way of example, the court pointed out that "the rule will not be applied where the penalties imposed by the Legislature exclude by implication the [***10] additional penalty of holding the contract void. [Citations]" (*Ibid.*) In addition, the court noted that "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a de-

fendant and a disproportionately harsh penalty upon the plaintiff.' [Citation.]" (*Id.* at p. 292.) The court explained, " ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Ibid.*)

The court stated that the policy underlying section 7159 "is to encourage written contracts for home improvements in order to protect unsophisticated consumers." (*Asdourian, supra*, 38 Cal. 3d at p. 292.) In reviewing the evolution of section 7159, the court determined the Legislature intended neither that the express misdemeanor penalty provision of the statute would be exclusive nor that all contracts made in violation of the statute would be void, thereby opening the door to enforcement of nonconforming contracts in appropriate cases. (*Asdourian, supra*, 38 Cal. 3d at p. 292.) The court concluded *Asdourian* [***11] was just such a case, citing the fact that (1) the defendants were not members of the group primarily in need of the statute's protection, i.e., unsophisticated consumers, (2) contracts made in violation of section 7159 are not " 'intrinsically illegal,' " and (3) if the defendants were allowed to retain the value of the benefits bestowed by the plaintiff without compensating him, they would be unjustly enriched. (38 Cal. 3d at pp. 292-293.)

The issue of whether the instant matter is truly a "compelling case" within the meaning of *Asdourian* cannot be definitively resolved at the demurrer stage. However, application of the principles and considerations identified in *Asdourian* to the facts established by Arya's second amended complaint persuades us that this case is one in which Arya *might* be entitled to some relief. It appears from the operative pleading that Cher is a highly sophisticated homeowner with previous involvement in residential construction [*616] projects, that her legal representatives assisted her in negotiating the Malibu construction project agreement with Arya, that Arya had already completed a substantial amount of the work it contracted [***12] to perform when Cher terminated the parties' agreement, and that Cher would be unjustly enriched if she were not required to compensate Arya for the reasonable value of its work. Under these circumstances, we decline to hold that Arya's noncompliance with section 7164 absolutely forecloses it from seeking to enforce the oral agreement it purportedly made with Cher, which was allegedly memorialized in an unsigned written contract. On the other hand, should it become apparent in the course of a motion for summary judgment or trial that "the facts are otherwise than as alleged and are such as to place the case outside the exceptions to the general rules regarding enforceability of illegal contracts," our holding here would not preclude Cher from reasserting her position [**820] about the illegality and unenforceability of any agreement between her and Arya in the absence of a signed written contract. ( *Calwood Structures, Inc. v. Herskovic* (1980) 105 Cal. App. 3d 519, 523, fn. 2 [164 Cal. Rptr. 463], disapproved on another point in *Asdourian, supra*, 38 Cal. 3d at p. 293, fn. 11.)

In deciding that "upon the facts recited [Arya] has stated a cause of action [***13] which on its face should not have been dismissed" ( *Calwood Structures, Inc. v. Herskovic, supra*, 105 Cal. App. 3d at p. 523, fn. 2), we recognize that the absence of a criminal penalty distinguishes section 7164 from section 7159, and also acknowledge the *Asdourian* court's observation that the misdemeanor penalties sufficed to serve the underlying legislative policy of that statute. (*Asdourian, supra*, 38 Cal. 3d at p. 292.) Nonetheless, this distinction does not persuade us the Legislature intended that any and all construction contracts which fall within the scope of section 7164 must be deemed void and wholly unenforceable if they are not "evidenced in writing signed by both parties," as required by the statute. The Legislature has shown it is perfectly capable of drafting a statute which limits a party's ability to sue, where that is its intent. Within the Contractors' State License Law itself, the Legislature has generally precluded an unlicensed contractor from "bring[ing] or maintain[ing] any action, or recover[ing] in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act [***14] or contract for which a license is required . . ., regardless of the merits of the cause of action brought by the person . . . ." (§ 7031, subd. (a).) In light of the clear statutory policy of deterring unlicensed contract work, the California Supreme Court has steadfastly held that unlicensed contractors are not only barred from pursuing breach of contract actions, but may not urge equitable theories of recovery, such as unjust enrichment or fraud based on a false promise to pay for unlicensed construction work. ( *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal. 3d [*617] 988, 997-1002 [277 Cal. Rptr. 517, 803 P.2d 370] (*Hydrotech*); *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal. 2d 141, 150-152 [308 P.2d 713].) In contrast, in the context of contracts made in violation of section 7159, the court held, "Absent an express statutory *prohibition*, other exceptions to the general rule that illegal contacts are unenforceable may be applied." (*Asdourian, supra*, 38 Cal. 3d at p. 292, original italics.)

We cannot accept respondent's suggestion that "*Asdourian* has been seriously eroded, if not altogether superseded" by [***15] the California Supreme Court's more recent decisions in *Phillippe v. Shapell Industries* (1987) 43 Cal. 3d 1247 [241 Cal. Rptr. 22, 743 P.2d 1279] (*Phillippe*) and *Hydrotech, supra*, 52 Cal. 3d 988. At issue in *Phillippe* was the provision of California's statute of frauds dealing with brokerage commissions (currently subd. (a)(4) of Civ. Code, § 1624), which declares that oral agreements "authorizing or employing an agent, broker, or any other person to purchase or sell real estate . . . for compensation or a commission" are invalid. Our high court has repeatedly withheld traditional

equitable remedies from licensed real estate brokers whose commission agreements fail to adhere to the statute of frauds and, in *Phillippe*, the court rejected the notion that a licensed real estate broker can assert equitable estoppel against a statute of frauds defense to an oral commission agreement in the absence of a showing of actual fraud. (43 Cal. 3d at pp. 1260-1264.) In so doing, the court reaffirmed the soundness of the *Asdourian* decision in the context of home improvement contracts, observing in pertinent part, "There [***16] are significant differences between home improvements and brokerage commissions. Home improvements are tangible and can be relatively easily verified and appraised to determine [**821] their reasonable value. Such was the case in *Asdourian*, in which the contractor recovered the reasonable value of his services. A broker's services do not result in a tangible product so it is more likely that there will be disputes as to what the broker has done and what such services may be worth. As in *Asdourian*, a home improvement dispute will typically involve only a single contractor seeking to recover. Due to the nature of the real estate business, however, several competing brokers may claim a commission for a single transaction. Written contracts help minimize such confusion." (*Phillippe, supra*, 43 Cal. 3d at p. 1266, fn. 12.)

In *Hydrotech*, the California Supreme Court simply reaffirmed what is obvious from reading section 7031, that "[r]egardless of the equities, section 7031 bars all actions, however they are characterized, which effectively seek 'compensation' for illegal unlicensed contract work." (*Hydrotech, supra*, 52 Cal. 3d at p. 997.) However, section [***17] 7031 has no application to the facts of this case, and as we have previously indicated, the unequivocal language of section 7031 differs markedly from that of section 7164. [*618]

Consequently, we hold that Arya may seek to enforce its contract claim against Cher to the extent Cher would otherwise be unjustly enriched as a result of her failure to compensate Arya for the reasonable value of its work on the Malibu construction project. n4 In light of our holding, we of necessity conclude that the trial court erred in sustaining Cher's demurrer to Arya's first cause of action without leave to amend.

n4 This court's interpretation of section 7164 will not render the mandate of the statute a nullity since contracts made in violation of the statute will not be enforced where a compelling case is not made. Moreover, even where enforcement is warranted, a contractor will be permitted to recover for the reasonable value of the work performed only to the extent that the owner would be unjustly enriched at the expense of the contractor if enforcement were denied. If, for whatever reason, failure to compensate the contractor will not result in the unjust enrichment of the owner, there will be no recovery, regardless of what the contractor might have been entitled to collect under a contract which conformed with the requirements of section 7164.

[***18]

II.-VI. *

* See footnote, *ante*, page 610.

. . . .

DISPOSITION

The orders sustaining respondents' demurrers are reversed as to the first, third, eighth and ninth causes of action, and affirmed as to all other causes of action. The award of costs to respondents in the amount of $ 883 is also reversed. The parties shall bear their own costs on appeal.

Boren, P. J., and Cooper, J., concurred.

# EXHIBIT F

197 Cal. App. 3d 566, *; 242 Cal. Rptr. 911, **;
1988 Cal. App. LEXIS 5, ***

LEXSEE



Analysis
As of: May 18, 2007

**DAVENPORT & CO., INC., Plaintiff and Respondent, v. WARREN EDWARD
SPIEKER, JR., et al., Defendants and Appellants**

**No. A036948**

**Court of Appeal of California, First Appellate District, Division Three**

**197 Cal. App. 3d 566; 242 Cal. Rptr. 911; 1988 Cal. App. LEXIS 5**

**January 4, 1988**

**NOTICE:** [***1]

Certified for partial publication - Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

**PRIOR HISTORY:** Superior Court of San Mateo County, No. 301994, Walter P. Capaccioli, Judge.

**DISPOSITION:**

    The judgment is affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant homeowners challenged the decision of the Superior Court, San Mateo County (California), which awarded damages to respondent contractor for breach of a construction contract.

**OVERVIEW:** Appellant homeowners and respondent contractor entered into a written contract for the construction of a cabana and a garage on appellants' property. Certain oral changes were made to the contract for additional work. The contract did not require change orders to be in writing. Respondent brought an action for unpaid extra work performed on appellants' property. The trial court awarded respondent damages. On appeal, the court affirmed. The court held that respondent's failure to comply with Cal. Bus. & Prof. Code § 7159, which requires that contracts for home improvements and changes to those contracts be in writing, did not preclude recovery in the case. The court found that the contract for the extras was merely voidable and not void. Respondent's noncompliance did not violate public policy because appellants were not unsophisticated consumers. Also, this was not an inherently illegal contract, and there was no indication that appellants were unsatisfied with the work. Therefore, appellants could not retain the benefits of the oral changes without paying respondent therefor.

**OUTCOME:** The court affirmed the award of damages to respondent contractor for unpaid additional work performed, even though the extras were not in writing as required under the business and professional code, because the contract was merely voidable. Absent any inherent illegality of the remodeling contract or dissatisfaction with respondent's work, appellant homeowners were not allowed to be unjustly enriched.

**LexisNexis(R) Headnotes**

*Contracts Law > Formation > Execution*
*Contracts Law > Statutes of Frauds > General Overview*
*Contracts Law > Types of Contracts > Bilateral Contracts*
[HN1] Pursuant to Cal. Bus. & Prof. Code § 7159, home improvement contracts for work in excess of $ 500 and any changes in such contracts, between a licensed contractor and an owner or tenant, must be evidenced by a writing and signed by all the parties. A violation of this provision by the licensee is a misdemeanor.

*Antitrust & Trade Law > Consumer Protection > Home Solicitation*
*Contracts Law > Statutes of Frauds > General Overview*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN2] An oral contract in violation of Cal. Bus. & Prof. Code § 7159 is merely voidable and not void.

*Contracts Law > Defenses > Illegal Bargains*
[HN3] Although there is a general rule that contracts made in violation of a regulatory statute are void, courts will not apply such rule in certain situations. The rule will not be applied where the statutory penalties exclude by implication the additional penalty of holding the contract void. In addition, in compelling cases, where the defendant's unjust enrichment will result at the plaintiff's expense, courts will enforce illegal contracts.

**SUMMARY: CALIFORNIA OFFICIAL REPORTS SUMMARY**

A licensed general contractor brought an action for damages against homeowners for whom it had built a cabana and garage. The contractor and the homeowners had signed a written agreement for the work, but the contractor claimed he had not been paid for extra work he had carried out pursuant to the homeowners' oral orders. The trial court awarded the contractor $ 14,350 plus interest for the extra work. (Superior Court of San Mateo County, No. 301994, Walter P. Capaccioli, Judge.)

The Court of Appeal affirmed, holding that the contract and the oral modifications to it were enforceable, notwithstanding that under Bus. & Prof. Code, § 7159, home improvement contracts for work in excess of $ 500 and any changes in such contracts must be in writing and signed by all parties. (Opinion by Merrill, J., with White, P. J., and Barry-Deal, J., concurring.)

**HEADNOTES: CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Building and Construction Contracts § 6--Actions--Home Improvement Contracts--Requirement of Writing.** --In an action against homeowners by a licensed general contractor for breach of a construction contract, the trial court did not err in awarding the contractor $ 14,350 plus interest for extra work performed pursuant to oral agreement between the parties, notwithstanding that under Bus. & Prof. Code, § 7159, home improvement contracts for work in excess of $ 500 and any changes in such contracts must be in writing and signed by all parties. One of the homeowners was a general partner of a real estate investment development firm and thus was not a member of the group of unsophisticated consumers § 7159 was designed to protect. The contract was not automatically void, since an agreement to perform residential remodeling work is not inherently illegal or immoral. Further, it would have been unfair for the homeowners to retain the benefits of the oral change orders without compensating the contractor.

**COUNSEL:**

David Buoncristiani and Thelen, Marrin, Johnson & Bridges for Defendants and Appellants.

William D. Esselstein, Nancy T. Templeton and Robertson, Alexander, Luther, Esselstein, Shiells & Wright for Plaintiff and Respondent.

**JUDGES:**

Opinion by Merrill, J., with White, P. J., and Barry-Deal, J., concurring.

**OPINION BY:**

MERRILL

**OPINION:**

[*567] [**911] The Spiekers, Mr. and Mrs. Warren Edward [**912] Spieker, Jr., n1 appeal from a judgment awarding damages in the sum of $ 14,350, plus interest, to Davenport & Co., Inc. (Davenport) for breach of a construction contract.

n1 The record fails to disclose the first name of Mrs. Spieker.

I

The parties entered into a written contract which provided that Davenport, a licensed general contractor, would construct a cabana and a garage on the Spiekers' [***2] residential property. The contract provided that Davenport was to perform the work in accordance with drawings prepared by the Spiekers' architect and changes to those drawings made by the Spiekers. Some changes to the drawings were excluded from the contract price and [*568] would be charged to the Spiekers as "extras." The parties agreed that the price for the work specified in the contract would be on a

time and material basis, plus a 15 percent fee, not exceeding $ 130,000.  In the event that the work described in the contract cost less than $ 130,000, the Spiekers would only be billed the actual cost plus 15 percent.  Any changes or additions to the contract would be charged as extras.  The contract also provided that changes would not be made without the Spiekers' approval.  There was no explicit provision in the contract requiring change orders to be in writing.

Davenport began construction on the Spiekers' home in October 1984 and completed it in May 1985.  During the construction, the Spiekers made substantial changes which increased the scope of the work to be performed and the compensation due Davenport.  They ultimately paid Davenport a total of $ 178,623 for the [***3] work performed pursuant to the initial contract and for the extras.  However, Davenport claimed that $ 37,331 was still unpaid for extra work performed on the Spiekers' residence.

At the court trial in this action, evidence was presented as to the cost of the contract work and the cost of the extras.  Copies of the weekly invoices mailed to the Spiekers, indicating the costs for all materials, suppliers, subcontractors, labor and miscellaneous services provided, were admitted into evidence.  Also admitted into evidence was a compilation of the costs incurred as of April 4, 1985, and a projection of costs yet to be incurred.  The Spiekers requested further delineation of the cost of extra work, so an additional document was prepared outlining all the changes performed and their respective costs.  Such document was also received in evidence.  Mike McInnis, the job supervisor, and Mac McInnis, Davenport's president, prepared the document from the following: Mike McInnis's daily record of each change requested by the Spiekers, material invoices, subcontractor invoices, and employee timecards.  The labor cost for each item of extra work was determined by a review of the timecards and  [***4]  by multiplication of the number of man-hours by the average labor rate.  In those instances where the carpenter or laborer failed to designate the amount of time spent on the extra work, Mac McInnis estimated the labor cost.  He testified that he had 10 years of construction experience and that he provides estimates for all the jobs on which Davenport submits bids.

In July 1985, upon the Spiekers' request, a second cost breakdown for the extra work was prepared.  Again, the McInnises relied on material invoices, subcontractor invoices and timecards.  However, as the July cost breakdown was compiled after the job was complete, it set forth a more accurate total price for the extra work performed.

The court determined that the actual cost of the contract work, exclusive of extras, was less than the $ 130,000 guaranteed maximum contract price  [*569]  agreed upon by the parties.  Further, the court found certain extra charges were not justified and awarded Davenport the sum of $ 14,350 plus interest.

II

 (1) The Spiekers argue that Davenport's failure to comply with a provision of the Business  [**913]  and Professions Code, n2 which requires all home improvement contracts and changes thereto to be [***5]  in writing, precludes its recovery for unwritten changes.  We disagree.

n2 All further statutory reference is to the Business and Professions Code unless otherwise noted.

 [HN1] Pursuant to section 7159, home improvement contracts for work in excess of $ 500 and any changes in such contracts, between a licensed contractor and an owner or tenant, must be evidenced by a writing and signed by all the parties.  A violation of this provision by the licensee is a misdemeanor.

The question of the effect of noncompliance with section 7159 was considered by our Supreme Court in *Asdourian v. Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95].  In that case, a contractor sued the owner for the balance due on remodeling work performed on the owner's property.  The owner argued that the contractor was barred by section 7159 from recovering for the completed work as it was done pursuant to oral agreements.  The court rejected this argument, holding that  [HN2] an oral contract in violation [***6]  of section 7159 is merely voidable and not void.

The court stated that the public policy interest underlying section 7159 is to encourage written contracts for home improvements in order to protect unsophisticated consumers.  ( *Asdourian* v. *Araj, supra,* 38 Cal.3d at pp. 290, 292.)  Further,  [HN3] although there is a general rule that contracts made in violation of a regulatory statute are void, courts will not apply such rule in certain situations.  For example, the rule will not be applied where the statutory penalties exclude by implication the additional penalty of holding the contract void. In addition, in compelling cases, where the defendant's unjust enrichment will result at the plaintiff's expense, courts will enforce illegal contracts.  ( *Id.,* at pp. 291-292.)

The *Asdourian* court reasoned that although the present statute only makes violation punishable as a misdemeanor, the apparent legislative intent was that such penalty was not exclusive of others. The original version of section 7159 included the provision that "'[contracts] which fail to comply with the provisions of this section [***7] shall *not* be deemed to be invalid [*570] solely because of noncompliance.'" ( *Id.*, at p. 292, italics added, quoting Stats. 1969, ch. 1583, § 15, pp. 3220-3221.) As this express provision was deleted by subsequent amendment, it must be presumed that the Legislature intended to change the law. The court concluded that the Legislature did not intend the express penalty provisions of section 7159 to be exclusive. ( *Id.*, at p. 292.)

The court stated: "Although the penalties provided by section 7159 are no longer exclusive, there is no indication that the Legislature intended that *all* contracts made in violation of section 7159 are void. Absent an express statutory *prohibition*, other exceptions to the general rule that illegal contracts are unenforceable may be applied." ( *Asdourian* v. *Araj, supra*, 38 Cal.3d at p. 292.)

The *Asdourian* court concluded that the factors of that particular case supported the enforcement of the violative contracts. First, the defendants in that case were not members of the group primarily in need of the [***8] statute's protection, i.e., unsophisticated consumers. For this reason, the statutory policy would not be defeated by permitting recovery. Second, the court considered that a contract made in violation of section 7159 does not involve the type of illegality which automatically renders a contract void. It is merely malum prohibitum, and not malum in se. The oral contracts to remodel the residential property in *Asdourian* were not intrinsically illegal, and therefore only voidable. Finally, the court reasoned that if the contract was not enforced, defendants would be permitted [**914] to retain the value of the benefits bestowed by plaintiff without compensating him. ( *Asdourian* v. *Araj, supra*, 38 Cal.3d at p. 293.)

Application of these principles to the instant case leads us to the conclusion that Davenport's noncompliance with section 7159 does not preclude its recovery for work performed on Spiekers' property pursuant to unwritten change orders. The record demonstrates that Mr. Spieker, who negotiated the extra work requests, is a general partner of Trammell Crow Company, a real estate investment and development firm. He testified [***9] that he had been involved in the construction business for 20 years. Like the defendant in *Asdourian*, Mr. Spieker is not a member of the group of unsophisticated consumers which section 7159 is intended to protect. Thus, recovery for work pursuant to unwritten change orders would not contravene the public policy interest behind section 7159.

In addition, there is nothing about the nature of the contract in this case which makes it automatically void. An agreement to perform residential remodeling work is not an inherently illegal or immoral contract.

[*571] Finally, the particular facts of this case support the conclusion that Davenport should be compensated for the work performed pursuant to the unwritten change orders. Mr. Spieker, as general partner of a real estate investment and development company, was not an unsophisticated homeowner. He had the opportunity and communicative abilities to insist that written change orders be presented to him for signature prior to the performance of the work. Instead, the Spiekers made many changes and additions to the written contract in an informal fashion. There is no indication in the record that the Spiekers were dissatisfied [***10] with the work performed on their residence. They cannot be permitted to retain the benefits of the oral change orders without compensating Davenport.

III, IV [Text omitted.] NOT CERTIFIED FOR PUBLICATION.

V

The judgment is affirmed.