Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

David Boies (admitted pro hac vice)
Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br>a Delaware corporation,<br>        Plaintiff/Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC.,<br>a Delaware corporation,<br>        Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE AND THIRD CLAIM FOR SPECIFIC PERFORMANCE**<br><br>**FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]**<br><br>Civil No.: 2:04CV00139<br>Judge Dale A. Kimball<br>Magistrate Brooke C. Wells |

Dockets.Justia.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. i

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

I.    THE PLAIN LANGUAGE OF THE AMENDED APA TRANSFERRED THE
      UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ .......................................... 2

II.   OVERWHELMING TESTIMONY CONFIRMS THE TRANSFER OF THE
      UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ .......................................... 6

III.  THE PARTIES' PRIOR CONDUCT CONFIRMS THE TRANSFER OF THE
      UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ ........................................ 17

      A.    Conduct Contemporaneous with the APA ............................................. 17

      B.    The Transfer of the Copyrights on the Closing Date ............................ 18

      C.    The Transition of the Business to Santa Cruz ...................................... 20

      D.    The IBM Buyout ................................................................................... 23

      E.    The Microsoft Antitrust Proceedings .................................................... 24

      F.    Sale of the UNIX Business to Caldera International ............................. 27

      G.    Licensing and Distribution After the APA ............................................ 30

      H.    Novell's Recent Conduct ..................................................................... 30

IV.   THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY
      JUDGMENT ON SCO'S ALTERNATIVE CLAIM FOR SPECIFIC
      PERFORMANCE ..................................................................................... 32

      A.    The Plain Language of the APA Concerning Specific Performance ...... 32

B.     The Express Purpose and Intent of the APA. ..................................... 33

C.     Extrinsic Evidence of the Purpose and Intent of the APA. .................... 33

LEGAL STANDARD ON SUMMARY JUDGMENT .................................................. 34

ARGUMENT ............................................................................................................... 35

I.     THE GOVERNING LAW OF CONTRACT INTERPRETATION. ................... 35

II.    NOVELL'S POSITION CANNOT BE RECONCILED WITH THE
       LANGUAGE AND PURPOSE OF THE RELEVANT CONTRACTS. ........... 37

       A.     The Amended APA Plainly Provides for the Transfer. ........................... 37

       B.     Amendment No. 2 Clarified the Excluded Assets Schedule .................. 42

       C.     The APA Bill of Sale Exceeds the Requirements of the Copyright Act. ............ 44

       D.     In the Alternative, Amendment No. 2 Was a Ratifying Memorandum. ............... 46

       E.     The Record and Precedent Establish That Novell's "Implied License"
              Argument Is No Basis for Summary Judgment for Novell ................................... 47

       F.     Novell's Arguments and Inferences Regarding the Negotiation Of
              Amendment No. 2 Are No Bases for Summary Judgment. ................................ 51

       G.     Novell's Other Arguments Are Unavailing. ......................................... 55

III.   THE EXTRINSIC EVIDENCE DEFEATS NOVELL'S MOTION. ................ 60

       A.     Testimonial Evidence ......................................................................... 62

       B.     The Parties' Contemporaneous Conduct. ............................................ 67

       C.     Conduct Through the Years Following the Transition. .......................... 71

       D.     Novell's Recent Conduct. ................................................................... 73

IV.    THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY
       JUDGMENT ON SCO'S ALTERNATIVE CLAIM FOR SPECIFIC
       PERFORMANCE ..................................................................................................... 74

CONCLUSION ............................................................................................................. 76

# TABLE OF AUTHORITIES

## Cases

A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001) ............................................ 49

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................. 67

Arthur Rutenberg Homes, Inc. v. Drew Homes, 29 F.3d 1529 (11th Cir. 1994) ......................... 46

Atkins v. Fischer, 331 F.3d 988 (D.C. Cir. 2003)................................................................... 49, 50

Baker v. Aubry, 216 Cal. App. 3d 1259 (1989)..................................................................... 39, 40

Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183
    (10th Cir. 2000)................................................................................................................. 34

BMP Property Dev. v. Melvin, 198 Cal. App. 3d 526 (1988) ....................................................... 39

Boyd v. Oscar Fisher Co., 210 Cal. App. 3d 368 (1989).............................................................. 39

Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476 (D. Kan. 1996)........... 34

Cadigan v. Am. Trust Co., 31 Cal. App. 2d 780 (1955) ............................................................... 39

Cal. Sate Auto. Ass'n Inter-Ins. Bur. v. Superior Ct., 177 Cal. App. 3d 855 (1986) ................... 35

Crestview Cemetery Ass'n v. Dieden, 356 P.2d 171 (Cal. 1960) ................................................. 61

David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996)............................................ 34

Dean v. Burrows, 732 F. Supp. 816 (E.D. Tenn. 1989)................................................................. 45

Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043, 2004 WL 2967556 (N.D.
    Ill. Nov. 24, 2004)............................................................................................................ 44

Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384 (2006)....................................................... 35, 52

Dubuc v. Johnson, 201 F.3d 447 (10th Cir. 1999)........................................................................ 67

Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) ..................................... 45, 49, 50, 57

Foad Consulting Group, Inc. v. Musil Govan Azzalino, 270 F.3d 821 (9th Cir. 2001) ............... 50

Gen. Cas. Ins. v. Workers' Compensation Appeals Bd., 31 Cal. Rptr. 3d 740 (Ct. App.
    2005) .......................................................................................................... 39

Gillespie v. AST Sportswear, Inc., No. 97 Civ. 1911 (PKL), 2001 WL 180147 (S.D.N.Y.
    Feb. 22, 2001) ................................................................................................ 48

Hernandez v. Badger Constr. Equip. Co., 28 Cal. App. 4th 1791 (1994) ..................................... 61

Hicks v. City of Watonga, 942 F.2d 737 (10th Cir. 1991) ........................................................... 34

I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996).................................................................. 50

Imperial Residential Design, Inc. v. Palms Dev. Group, Inc., 70 F.3d 96 (11th Cir. 1995)......... 46

In re United Air Lines, Inc., 438 F.3d 720 (7th Cir. 2006).......................................................... 39

ITOFCA, Inc. v. Megatrans Logistics, Inc., 322 F.3d 928 (7th Cir. 2003) ................................... 44

John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26 (1st Cir. 2003)............ 49

Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc., 690 F. Supp. 298 (S.D.N.Y. 1988) .................. 44

Koningsberg Int'l, Inc. v. Rice, 16 F.3d 355 (9th Cir. 1994) ....................................................... 57

Lulirama, Ltd. v. Axcess Broad. Servs., Inc., 128 F.3d 872 (5th Cir. 1997)................................ 49

Meier v. Paul X. Smith Corp., 205 Cal. App. 2d 207 (1962) ....................................................... 39

Morey v. Vannucci, 64 Cal. App. 4th 904 (1998) ...................................................................... 35

Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505 (4th Cir. 2002)........................... 50

Nevin v. Salk, 45 Cal. App. 3d 331 (1975).............................................................................. 39

Pac. Gas & E. Co. v. G.W. Thomas Drayage. & Rigging Co., 69 Cal. 2d 33 (1968) .................. 35

Pamfiloff v. Giant Records, Inc., 794 F. Supp. 933 (N.D. Cal. 1992)............................................ 57

Prestin v. Mobil Oil Corp., 741 F.2d 268 (9th Cir. 1984) ........................................................... 39

Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922 (9th Cir. 1999). 44, 57

Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323 (D. Kan.
    May 25, 1993)................................................................................................................ 37

Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002)........................................................ 34, 47

S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081 (9th Cir. 1989) ........................................................ 37

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992)............................ 37, 48

Shaw v. Regents of the Univ. of Cal., 58 Cal. App. 4th 44 (1997) .............................................. 40

SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301 (S.D.N.Y. 2000) ..................... 48

Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280 (S.D.N.Y. 1997) .......................................... 37

SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms, Inc., 211 F.3d 21
    (2d Cir. 2000).............................................................................................................. 49

United States v. White, 68 Fed. Appx. 870 (10th Cir. 2003)....................................................... 67

Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co., 128 P.2d 665 (Cal. 1942)............................ 61

Zuchel v. Spinharney, 890 F.2d 273 (10th Cir. 1989) ................................................................. 67

## Other Authorities

Cal. Civ. Code § 1642................................................................................................................ 39

Fed. R. Civ. P. 613(b) ............................................................................................................... 67

Nimmer on Copyrights § 10.03[2] 2006...................................................................... 44

Nimmer on Copyrights § 10.03[3] 2006...................................................................... 46

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance.

## PRELIMINARY STATEMENT

In the face of overwhelming evidence against its asserted ownership of the copyrights, including the plain language of the contracts, the testimony of ten witnesses including its own former CEO, and the conduct of the parties over years predating its ownership claims, Novell moves the Court for summary judgment relying on the statements of its former lawyers and a provision of the APA that no longer exists.

Novell explains that, at the height of its negotiations of the APA with Santa Cruz, and notwithstanding the intent of all the principals on both sides of the transaction, two of its lawyers specifically blocked the transfer of the copyrights by inserting them into the excluded assets schedule of the agreement. Relying on the plain language of that exclusion and a faulty grasp of the applicable law, Novell's lawyers today argue that relevant extrinsic evidence must be kept out of the case, and the plain language of other provisions ignored. Novell is wrong.

The amended APA provides for the transfer of all rights and ownership of UNIX and UnixWare to Santa Cruz. Such language plainly includes the UNIX and UnixWare copyrights. The APA Bill of Sale, in which Novell stated that it "does hereby transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets," effectuates the transfer in words that exceed the requirements of the Copyright Act.

Novell relies on language in the excluded assets schedule of the APA, but Amendment No. 2 to the APA expressly replaced that language to clarify that the UNIX and UnixWare

1

copyrights were <u>not</u> among the excluded assets. Accordingly, the amended APA provided for the transfer of the copyrights without any inconsistency with the Excluded Assets. In the alternative, Amendment No. 2 served as a memo that retroactively ratified the intended transfer of the APA. In either case, the only relevant and operative language lies in the amended APA, not in the defunct exclusion that Novell evokes. Novell cannot hide behind that exclusion to keep the extrinsic evidence from the judicial scrutiny.

Such evidence includes the testimony of ten witness, including the CEOs and lead negotiators from both sides of the transaction; the press release by Novell and Santa Cruz the day after the APA, announcing the transfer of UNIX intellectual property; documents revealing that Novell replaced its copyright notices with SCO's on its UnixWare products before handing the business to Santa Cruz; Novell's decision to pay Santa Cruz over one million dollars to settle a dispute Novell could have resolved by asserting its purported copyrights; Santa Cruz's filings with the SEC, DOJ, and EU professing to be the owner of the UNIX copyrights at a time when Novell occupied a seat on the Santa Cruz Board; and more. In contrast, Novell has not presented any of evidence that it asserted any rights or ownership in UNIX or UnixWare in the years that followed the APA.

SCO submits, for the reasons outlined above and described below, that Novell's Motion for Summary Judgment must fail.

## STATEMENT OF FACTS

### I. THE PLAIN LANGUAGE OF THE AMENDED APA TRANSFERRED THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

1.    Novell and Santa Cruz intended for the APA to transfer all of the UNIX and UnixWare business to Santa Cruz. Section 1.3(a)(i) of the APA states:

> It is the intent of parties hereto that <u>all of the Business</u> and all of Seller's backlog, if any, relating to the Business <u>be transferred to Buyer</u>.

(5/18/07 James Decl. Ex. 1 § 1.3(a)(i) (emphasis added).)

2. The second provision of the APA, Recital B, memorialized the mutual understanding that the APA transferred the assets and liabilities of the Business:

> The Board of Directors of each Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the "Acquisition").

(<u>Id.</u> at 1.)

3. The first provision of the APA, Recital A as amended, defines the "Business" that the parties intended to transfer:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the "Business").

(<u>Id.</u> at 1.)

4. Section 1.1(a) of the APA defines the assets transferred to Santa Cruz as those identified in Schedule 1.1(a) of the APA:

> On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7) <u>all of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets")</u> identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so

purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b):

(5/18/07 James Decl. Ex. 1 § 1.1(a) (emphasis added).)

     5.    Schedule 1.1(a), in turn, identifies seven categories of "assets and properties of Seller" transferred to Santa Cruz, including:

> I. <u>All rights and ownership of UNIX and UnixWare, including but not limited to</u> all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all appropriate technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, <u>including source code</u>, source documentation, source listings and annotations, engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include <u>without limitation</u>: Source Code Products . . . Binary Product Releases . . . and Products Under Development.

> II. <u>All of Seller's claims arising after the Closing Date</u> against any parties relating to any right, property or asset included in the Business.

> III. All of Seller's rights pertaining to UNIX and UnixWare under any [assignable] software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertains to the . . . :

> VI. All copies of UNIX and UnixWare, wherever located, owned by Seller.

(<u>Id.</u> Schedule 1.1(a), Items I-VI (emphasis added).)  The assets identified in Item I include source code products, binary products, and products in development.  (<u>Id.</u> Schedule 1.1(a), Item I.)

     6.    Through the APA Bill of Sale, executed on the Closing Date, Novell in fact transferred to Santa Cruz all of the Assets:

> In accordance with Article 1.1(a) of the Agreement, Seller, for
> good and valuable consideration, the receipt and sufficiency of
> which is hereby acknowledged, does hereby transfer, convey, sell,
> assign and deliver to Buyer, without recourse, representation or
> warranty except as otherwise expressly provided in the Agreement,
> all of the Assets.

(5/18/07 James Decl. Ex. 3 (emphasis added).)

      7.     Section 1.6 of the APA provided that, as part of the transaction, Santa Cruz would

license back to Novell the UNIX and UnixWare technology transferred under the APA (the

"Licensed Technology"). (5/18/07 James Decl. Ex. 1 § 1.6.) On the Closing Date, the parties

signed a Technology License Agreement ("TLA") whereby Santa Cruz granted that license to

Novell, subject to strict restrictions. (5/18/07 James Decl. Ex. 4 § II.A.) The TLA also specified

that "Ownership of the Licensed Technology shall reside in SCO." (Id. § III.)

      8.     Section VIII of the TLA, entitled "Entire Agreement," provides:

> This Agreement and the Asset Purchase Agreement constitute the
> entire understanding between the parties with respect to its subject
> matter, and supersede all prior understandings, both written and
> oral, between them relating to such subject matter.

(Id. § VIII.)

      9.     Schedule 1.1(b) identifies assets excluded from the transfer to Santa Cruz. Item

V.A identifies "All copyrights and trademarks, except for the trademarks UNIX and UnixWare."

      10.     Amendment No. 2 to the APA, however, revised Schedule 1.1(b) so that Item

V.A. now reads:

> All copyrights and trademarks, except for the copyrights and
> trademarks owned by Novell as of the date of the Agreement
> required for SCO to exercise its rights with respect to the
> acquisition of UNIX and UnixWare technologies. However, in no

event shall Novell be liable to SCO for any claim brought by any
third party pertaining to said copyrights and trademarks.

(5/18/07 James Decl. Ex. 5 § A (emphasis added).)

## II.  OVERWHELMING TESTIMONY CONFIRMS THE TRANSFER OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

11.     Robert Frankenberg was the President and CEO of Novell at the time of the APA.

(5/18/07 James Decl. Ex. 7 at 7.) Mr. Frankenberg decided in late 1994 or early 1995 to sell the

UNIX and UnixWare business, in their entirety. (Id. at 9:1-11:23.) On February 10, 2007, Mr.

Frankenberg has testified:

> Q. Was your initial intent in the transaction that Novell would
> transfer copyrights to UNIX and UnixWare technology to Santa
> Cruz?
>
> A. Yes.
>
> Q. Was that your intent at the time when the APA was signed?
>
> A. Yes.
>
> Q. Was it your intent when that transaction closed?
>
> A. Yes.
>
> Q. And did that remain your intent, as you view it, at all relevant
> times?
>
> A. Yes.
>
> Q. So that never changed?
>
> A. No.

(Id. at 135.) Mr. Frankenberg never contradicted that testimony.

12.     Indeed, Mr. Frankenberg understood that the APA's sale of all rights and

ownership included the copyrights:

Q. Is it your understanding that that sale of all rights and ownership of UNIX and UnixWare would include copyrights associated with UNIX and UnixWare?

MR. JACOBS: Objection, calls for a legal conclusion.

A. I guess I have to answer the question?

(By Mr. Singer) Yes, you should if you understand the question.

A. Okay. I understand. Yes.

Q. Now, did you ever give any directions to the team that was negotiating the deal, including Mr. Thompson, Mr. Chatlos, that they should transfer all right and title and interest to UNIX and UnixWare but retain copyrights for UNIX and UnixWare from being sold?

A. No.

Q. Did you ever tell anyone at Santa Cruz Operation that copyrights for UNIX and UnixWare were not part of the technology being sold?

A. No.

Q. Did you ever authorize anyone at Novell to tell anyone at Santa Cruz that copyrights were not being sold as part of the transaction?

A. No.

(Id. at 19.)

13.    Ty Mattingly was the Vice President for Strategic Relations at Novell at the time of the APA. (5/18/07 James Decl. Ex. 9 at 10-11.) He also participated in the APA negotiations as Mr. Frankenberg's personal liaison with the Novell negotiating team. (Id.)

14.    In the summer of 1995, Mr. Mattingly and the rest of the Novell deal team met with Santa Cruz representatives, including Jim Wilt and Geoff Seabrook, for a series of meetings lasting "probably a month and a half to two months." (Id. at 20:1-14.) He "was very heavily involved" in the negotiation of the APA, "interfacing between Bob Frankenberg and the SCO team and participating in the meetings that we would have at times with Alok Mohan and Doug Michaels." (Id. at 22-23.) Mr. Mattingly testified:

7

Q. Do you know whether in this case Novell is asserting that the copyrights were not transferred?

A. Well, I mean, I have read enough about the case early on. I haven't stayed real current lately. But I mean, obviously we're here today because Novell is asserting that the copyrights were not sold with the Unix business to SCO, and obviously SCO would assert that they purchased the Unix business from us lock, stock and barrel.

Q. And do you have a view as to the merits of Novell's assertion, such as you understand it?

A. I do.

Q. And what is your view?

A. Well, my firm belief is that we sold the Unix business to SCO, and that is why SCO paid us roughly 125 million dollars at that point because they bought the Unix business from us basically in its entirety. The only things that did not go with that was a kind of an agent relationship whereby SCO was collecting the SVRX royalties from existing OEMs at the time we sold that business and then giving the bulk of those moneys back to Novell.

*                *                *

Q. <u>Would it be fair to say that the transfer of the Unix copyrights to SCO was consistent with your view of this overall strategy</u>?

MR. BRAKEBILL: Objection, mischaracterizes testimony.

A. So I can still answer? <u>Yeah. I mean, absolutely.</u> I believe that when they bought the business, when they paid us 125 million dollars, that <u>the negotiations that we were involved with there was about selling them the entire business, the software, which would have included the copyrights.</u>

(<u>Id.</u> at 29-32 (emphasis added).)

15.    Duff Thompson was the Novell executive responsible under Mr. Frankenberg's direction for the sale of the UNIX and UnixWare business. (5/18/07 James Decl. Ex. 10 ¶ 4.) After the transaction closed, Novell appointed Mr. Thompson to serve as its representative on the Santa Cruz Board of Directors. (5/18/07 James Decl. Ex. 10 ¶ 6.)

8

16.     Novell's instructions to Mr. Thompson were clear: "sell everything, from Bob

Frankenberg to me, and sell UnixWare. So sell UNIX, sell UnixWare." (5/18/07 James Decl.

Ex. 11 at 24-25.) He formed the Novell deal team and was personally involved in face-to-face

negotiations with Santa Cruz officials Alok Mohan, Steve Sabbath, Jim Wilt, Geoff Seabrook

and Kim Madsen. (5/18/07 James Decl. Ex. 10 ¶ 5.) Mr. Thompson testified:

> Q. And a bundle of rights you believed included -- looking back
> on it, you believed the structure of the deal meant that the bundle
> of rights included the copyrights?
>
> A. No. At the time I believe it included the bundle of the
> copyrights, at the time.
>
> Q. Well, I'm a little confused because I thought you said this
> morning that you don't recall any specific discussion about
> copyrights.
>
> A. Yeah, but that doesn't mean that that's not what I understood
> we were doing at the time.
>
> Q. So you –
>
> A. So the fact that I may not have had a specific discussion that I
> can recall 11 and a half years later should not be taken to mean I
> don't recall what our intention was in selling the business. It is
> impossible for me to parse in my mind the assignment that we
> received to sell the -- to sell the entire business, all of Unix and
> UnixWare to SCO, and to somehow also in that same breath say,
> except the copyrights.
>
> I just -- I don't understand that kind of thinking, and certainly I just
> have to tell you that that kind of trick play was not something that
> Bob Frankenberg would have directed, nor is it something he
> would have stood for. It's not something I would have done. If we
> had intended not to transfer the copyrights, we would have been
> very careful to say, you don't get the copyrights. And it wouldn't
> have been an oblique reference. It would have been, you get all
> the business except the copyrights. Not, you get all the business.

(5/18/07 James Decl. Ex. 11 at 132-33 (emphasis added).)

17.    Ed Chatlos was the Novell Senior Director for UNIX Strategic Partnerships and

Business Development at the time of the APA. (5/18/07 James Decl. Ex. 12 ¶ 4.)  He was also

Novell's lead negotiator of the APA. (Id. ¶ 6.)  He was the primary negotiator during the

"detailed discussions" with Geoff Seabrook and Jim Wilt that resulted in the APA, and

"negotiated and structured" Amendment No. 1 to the APA. (5/18/07 James Decl. Ex. 11 at 11-

13.) Mr. Chatlos explains:

> It was always my understanding and intent, on behalf of Novell,
> that the UNIX source code and its copyrights were part of the
> assets SCO purchased.  I do not recall anyone else ever suggesting
> that Novell would retain any copyright relating to UNIX, nor was I
> present for any discussion, general or specific, during the
> negotiations that contradicted my understanding of the transaction
> described herein.  None of my superiors at Novell ever informed
> me that Novell was not transferring the UNIX copyrights to SCO.
> Likewise, I never communicated to SCO in any way that the UNIX
> copyrights were not being sold to SCO.  Nor am I aware of any
> instance in which anyone from Novell ever informed SCO in any
> way that the UNIX copyrights were not being sold to SCO as part
> of the transaction.
>
> Given my central role in the negotiations, I believe I would have
> known if the parties had agreed that Novell would retain UNIX
> copyrights.  My intent and understanding as the lead negotiator for
> Novell was that Novell was transferring the copyrights to SCO in
> the APA.  At the time the transaction was signed and closed, I did
> not observe anyone at Novell or SCO stating or acting as if Novell
> had retained any UNIX copyrights.  If they had, it would have been
> contrary to the intent and structure of the deal as I understood it
> and communicated with SCO.  In fact, from the time the APA
> transaction closed in 1995 until this day, it has been my
> understanding and belief that Novell sold the UNIX copyrights to
> SCO as of the time of the closing in 1995.

10

(5/18/07 James Decl. Ex. 12 ¶¶ 9-10 (emphasis added).) In his recent deposition in this case, Mr. Chatlos confirmed his views regarding the transfer of the copyrights. (5/18/07 James Decl. Ex. 13 at 37-39.)

18.   Burt Levine was an attorney at Novell at the time of the APA. (5/18/07 James Decl. Ex. 14 at 15-23.) Mr. Levine reviewed and revised drafts of the APA. (Id. at 163-64.) Mr. Levine drafted "some of the provisions of the APA" and reviewed and revised drafts of the APA (Id. at 56, 163-64). After the Business was transitioned to Santa Cruz in February 1996, Mr. Levine worked as an attorney for Santa Cruz. (Id. at 22-23.) Mr. Levine testified that under the APA the "intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright." (Id. at 68.) He further testified:

> Q. Mr. Levine, from the time of the APA in 1995 until you left Santa Cruz in 2000, did you ever hear anyone whether inside or outside of Santa Cruz or inside or outside of Novell say that Novell had retained the UNIX or UnixWare copyrights?
>
> A. No.
>
> Q. If you had heard anyone make such a statement, would that have been a surprise to you?
>
> A. Very much so, yeah.
>
> Q. And why do you say "very much so"?
>
> A. My personal experience with the couple of years that I spent at Novell was that it was a very ethical company and I, I was very impressed with that.
>
> Q. And how does that fact bear on your answer, the fact that you had the view that Novell was an ethical company?
>
> A. Was ethical and I believe that being an ethical company in its dealings with its partners or transferees or whatever it is that they would not resort to withholding information or trying to withhold something that the transferee in this case would be entitled to.

(Id. at 154-55 (emphasis added).)

11

Q. In looking at the first paragraph Roman I of Schedule 1.1(a) of the Asset Schedule, and that language says, quote, All rights and ownership of UNIX and UnixWare, including, but not limited to all versions of UNIX and UnixWare, and all copies of UNIX and UnixWare, including revisions and updates and progress, dot, dot, dot, including source code, dot, dot, dot, such assets to include without limitation the following, and then there's a list of source code products, binary product releases, products under development and other technology, do you see that language?

A. I do.

Q. How does that language bear on your understanding at the time of the APA and today that the UNIX copyrights and UnixWare copyrights were among the assets transferred under the APA?

A. Do you mean the fact that these are listed specifically as categories?

Q. I mean to ask you about the scope of Roman I.

A. Oh, the scope of Roman I with or without this listing, all rights and ownership of UNIX and UnixWare, that gives all the components of the business, including physical components and intellectual components, to my mind <u>will carry with it the transfer of any copyrights that apply to them.</u>

(<u>Id.</u> at 156-58 (emphasis added).)

19.    Bill Broderick was a contract manager in the UNIX licensing group at Novell and Santa Cruz. (5/18/07 James Decl. Ex. 15 ¶¶ 6-7.) He was also a member of the Novell APA Transition Team. (<u>Id.</u> ¶ 10.) Mr. Broderick states:

My understanding of the sale of the UNIX assets from Novell to Santa Cruz was that <u>the UNIX copyrights were transferred.</u> To the best of my knowledge, from the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights.

(<u>Id.</u> ¶ 7 (emphasis added).)

12

20.    Mr. Broderick has testified that his understanding is based on (among other things) Novell's explanation of the transaction during "company-wide meetings" as well as discussion in the "contracts transition team," including discussion about "changing the copyright notices in the source code to Santa Cruz Operation, Inc." (5/18/07 James Decl. Ex. 16 at 48-51.)

21.    Alok Mohan was CEO of Santa Cruz at the time of the APA. (5/18/07 James Decl. Ex. 6 at 8.) Mr. Mohan has testified in this case:

> THE WITNESS:
>
> A. My belief is that we bought the business, except for the revenue stream. And when we bought the business everything came with it.
>
> BY MR. BRAKEBILL:
>
> Q. You believe that Santa Cruz got the Unix copyrights to through the APA; is that right?
>
> A. I believe –
>
> MR. NORMAND: Objection to form.
>
> THE WITNESS:
>
> A. I believe I bought the whole business.  That includes all kinds of stuff.  And -- and, you know, that's the answer, I think we bought -- we got the whole thing.
>
> BY MR. BRAKEBILL:
>
> Q. Okay. But you haven't -- you haven't confirmed -- is -- is part of the –
>
> A. Yes, they are –
>
> Q. Is Unix copyrights part of the Unix business?
>
> A. Absolutely.
>
> Q. Okay. So you believe that Santa Cruz got the Unix copyrights?
>
> A. Santa –
>
> MR. NORMAND: Objection to form.
>
> THE WITNESS:

> A. <u>Santa Cruz got the whole business. Includes lots of things.</u>
> <u>Copyrights are part of it.</u>
>
>     *      *      *      *
>
> Q. What is the basis of your opinion that Santa Cruz got the business?
>
> MR. NORMAND: Objection to form.
>
> THE WITNESS:
>
> A. That -- that's -- <u>that was the whole discussion and intent,</u>
> <u>negotiations. That's my recollection of what we were doing.</u>

(<u>Id.</u> at 138-40 (emphasis added).)

22.     Doug Michels founded Santa Cruz and was its Senior Vice President at the time of the APA. (5/18/07 James Decl. Ex. 177 ¶¶ 2-3.) He was "very involved" in the "initiation" of the APA, "the strategy behind it," and he "was very involved in the high level structure of the agreement," and "was involved in supervising pretty directly the people who were negotiating the details of the agreement." (5/18/07 James Decl. Ex. 18 at 9.) He states:

> In connection with the 1995 purchase from Novell, the parties agreed that (as is accurately explained by both Mr. Wilt and Ms. Madsen) Novell could retain the existing binary royalty stream even though <u>the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz.</u>

(<u>Id.</u> ¶ 9 (emphasis added).) Mr. Michels has repeatedly confirmed that the parties to the APA intended for Novell to transfer and for Santa Cruz to acquire the UNIX and UnixWare copyrights:

> Q. To the extent that you did, what did you mean by that?
>
> A. <u>Well, I meant that the only way that I know of, and anyone on</u>
> <u>my team knew of to buy a software business is to buy the</u>
> <u>copyrights, and there's no way we would have ever done a deal to</u>
> <u>buy a software business where we didn't get the copyrights</u> and all
> the other intellectual property. That's what you're buying. And

14

especially in the case of UNIX, with its convoluted intellectual property history, and whatnot, to not get that stuff would be to not do the deal. And so it was implicit in everything we did, everything we thought. <u>Every single person on my team understood that. The lawyers understood. The business development people understood it. The people at Novell understood it.</u>

I mean, it – it's just so essential. It's -- you know, it's like breathing oxygen, you know, I mean, you just – <u>there's no way that deal could have happened without getting the copyrights.</u>

       *      *      *      *

A.  I know that <u>everybody involved in this negotiation knew the copyrights were being transferred</u>.  I know that.

Q.  How do you know that?

A.  Because I was there and I know it.  That's -- I -- I know what -- <u>I know there were discussions.  I know there was shared vision</u>.  I know we all understood what it meant to buy a software company.  You know, I've known these people for many years.  It -- it just wasn't ambiguous.  It wasn't something that was ambiguous.

(5/18/07 James Decl. Ex. 18 at 134-38 (emphasis added).)

23.     Jim Wilt was the lead negotiator for Santa Cruz.  (5/18/07 James Decl. Ex. 19

¶ 7.)  Mr. Wilt testified with respect to his declaration executed on November 23, 2004:

Q.  You say in paragraph 8, quote, "<u>It was my understanding and intent during those negotiations that SCO would acquire Novell's entire UNIX and UnixWare business, including the copyrights</u>.  I do not recall and do not believe that there ever was any instance in which anyone at SCO or Novell ever stated or exhibited any contrary intent or understanding to me or anyone else."  Is that an accurate statement?

A.  That's an accurate statement.

Q.  You say in the back half of paragraph 9, quote, "It was my intent on behalf of SCO to acquire, through the APA, Novell's entire UNIX and UnixWare business, including the UNIX and UnixWare source code and all associated copyrights, and I believed then, open parens, as now, close parens, that <u>Novell's intent was to sell all of those assets and rights</u>."  Is that an accurate statement?

> A. Yes, that's an accurate statement. You wouldn't have had a business without having the copyrights and trademarks.
>
> Q. You say in paragraph 12, quote, "I do not recall anyone on either side of the negotiations or transaction ever suggesting that Novell would retain a copyright relating to UNIX or UnixWare. I am not aware of any discussions, whether general or specific, during the negotiations that contradict my understanding of the transaction as set forth in this declaration." Is that an accurate statement?
>
> A. That is an accurate statement.

(5/18/07 James Decl. Ex. 20 at 76-78.) Independent of his previous declaration, moreover, Mr. Wilt repeatedly testifed to the parties' intent under the APA was for Novell to transfer and Santa Cruz to acquire the UNIX and UnixWare copyrights. (Id. at 28-29.)

24.    Kimberlee Madsen was a member of the Santa Cruz legal department at the time of the APA and Amendment No. 2 and assisted in the negotiations. (5/18/07 James Decl. Ex. 21 ¶¶ 3-4.) She "participated in meetings, negotiations, a review of the asset purchase agreement, and possibly preparation of some of the schedules." (5/18/07 James Decl. Ex. 21 at 33:25-34:2.) She explains:

> It was always my understanding that the UNIX source code and its copyrights were part of the assets Santa Cruz purchased and were transferred to Santa Cruz at the closing in December 1995.
>
> I do not recall anyone in the negotiation teams ever saying, or suggesting, that Novell would retain any UNIX copyrights. The negotiation team for Santa Cruz never discussed the possibility, as far as I am aware, that Novell sought to retain any UNIX copyright.
>
> Since the transaction closed in 1995 until Novell publicly announced in 2003 that it still owned the UNIX copyrights, it was my understanding and belief that neither party disputed that Santa Cruz had acquired the UNIX copyrights in 1995.

16

\*    \*    \*    \*

> My understanding from the negotiations and discussions leading
> up to the Amendment was that <u>Amendment No. 2 was intended to
> confirm, among other things, the parties' intent and agreement that
> Santa Cruz had obtained ownership of the UNIX copyrights under
> the APA</u> and that Novell had received no rights with respect to
> UNIX source code under the APA.

(<u>Id.</u> ¶¶ 9-11 (emphasis added).)  In her recent deposition in this case, Ms. Madsen confirmed that

the parties' intent and understanding at the time of negotiations was that the APA transferred the

copyrights to Santa Cruz.  (5/18/07 James Decl. Ex. 22 at 73-75, 81.)

25.    In his deposition , Novell General Counsel Joseph LaSala agreed that "it would be

reasonable for someone to read the technology license agreement as inconsistent with a reading

of the APA that the UNIX copyrights were retained by Novell." (5/18/07 James Decl. Ex. 40 at

95.)

## III.    THE PARTIES' PRIOR CONDUCT CONFIRMS THE TRANSFER OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

A.    <u>Conduct Contemporaneous with the APA.</u>

26.    The APA provided for the public disclosure of the transaction through a "joint

press release with respect to the subject matter of this Agreement." (5/18/07 James Decl. Ex. 1

§ 4.7.) Novell and Santa Cruz issued that press release on September 20, 1995.  (5/18/07 James

Decl. Ex. 6 at 222; Ex. 7 at 22-23.)  It states in pertinent part:

> According to the terms of the agreement, SCO will acquire
> Novell's UnixWare business and UNIX intellectual property.

(5/18/07 James Decl. Ex. 8 at 2.)  During his deposition, Mr. Frankenberg, Novell's CEO at the

time of the APA, recognized the above-cited announcement as the "joint press release"

contemplated by the APA and issued by the parties on September 20, 1995. (5/18/07 James

Decl. Ex. 7 at 22-23.)

27.     The investment-banking firm of Hambrecht & Quist represented Santa Cruz in the

APA transaction. (5/18/07 James Decl. Ex. 85.) In a presentation entitled "Project Sleigh Ride"

transmitted to Santa Cruz on the very date on the APA, Hambrecht & Quist stated with respect to

the APA:

> The agreement provides that Santa will obtain the IP for
> SleighRide, Sleigh RideWare in addition to all of its related
> products.

(5/18/07 James Decl. Ex. 85 at Recall 0005641.)

28.     During the negotiations, Novell and Santa Cruz used the code name "Project

Sleigh Ride" for the APA transaction. (5/18/07 James Decl. Ex. 85.) In keeping with the

metaphor, the parties also used the terms "Santa" for Santa Cruz and "SleighRide" for UNIX.

(5/18/07 James Decl. Ex. 85.) Decoded, the Hambrecht & Quist presentation thus reads:

> The agreement provides that <u>Santa Cruz will obtain the IP</u> for
> UNIX, UnixWare <u>in addition to</u> all of its related products.

B.     <u>The Transfer of the Copyrights on the Closing Date.</u>

29.     In the Bill of Sale executed by the parties on the Closing Date, Novell stated that

it "does here by transfer, convey, sell, assign and deliver" to Santa Cruz "<u>all</u> of the Assets."

(5/18/07 James Decl. Ex. 3 (emphasis added).)

30.     With the execution of the Bill of Sale, Santa Cruz obtained physical possession of

UNIX copyright registrations from Novell, and those registrations remain in SCO's possession to

this day. (<u>See, e.g.</u>, 5/18/07 James Decl. Exs. 23-25.)

31.     Novell relies on a declaration of David Bradford, who was General Counsel for Novell at that time.  Yet on October 4, 1995, a mere two weeks after the signing of the APA and a few weeks before the Closing Date, Mr. Bradford certified a Notification and Report Form to the Federal Trade Commission.  (5/18/07 James Decl. Ex. 84.)  In that Form, Novell stated:

> Novell, Inc., a Delaware corporation ("Novell"), and The Santa Cruz Operation, Inc. ("SCO") have entered into an Asset Purchase Agreement dated as of September 19, 1995, and attached hereto as Documentary Attachment I (the "Agreement"), whereby, as described herein, SCO will acquire certain assets of, and assume certain liabilities of Novell, compromising Novell's business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products, and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business").

(Id. at NOV 000040747.)

32.     In the section of the same Form entitled "Assets to be Acquired" and reserved "only for assets acquisitions," Novell stated:

> The Assets to be acquired by SCO are described with particularity in Schedule 1.1(a) of the Agreement.

(Id. at NOV 000040748.)  The Form then lists the general categories of assets found in Schedule 1.1(a), including "All rights and ownership of UNIX and UnixWare" and "All of Novell's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business."  (Id.)

33.     The APA provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the "Licensed Technology").  (5/18/07 James Decl. Ex. 1 § 1.6.)  On the Closing Date, the parties signed a

Technology License Agreement ("TLA") that granted such a license back to Novell. (5/18/07 James Decl. Ex. 4 § II.A.)

34.     The TLA imposed strict restrictions on Novell's use of the Licensed Technology, including the condition that Novell not use the technology in a general-purpose operating system in competition with Santa Cruz. (Id. § II.A.(2).) The TLA also specified that "Ownership of the Licensed Technology shall reside in SCO." (Id. § III.)

35.     In its 1996 Annual Report, Santa Cruz stated:

> UNIX Business - In December 1995, the Company acquired certain assets related to the UNIX business including the core intellectual property from Novell.

(5/18/07 James Decl. Ex. 82 at Recall 0007279.)

C.     The Transition of the Business to Santa Cruz.

36.     In December 1996, Novell engineers placed the Santa Cruz copyright notice on Novell's pre-existing UNIX and UnixWare code. (5/18/07 James Decl. Ex. 89.)

37.     As illustrated in this section below, Novell's own statements during the transition period reflected its belief that the APA provided for the transfer of the copyrights to Santa Cruz.

38.     Under Exhibit 5.1(c) to the APA, Novell agreed to "use its reasonable commercial efforts to continue development of the Eiger product" which was the code name for UnixWare 2.1. (5/18/07 James Decl. (Ex. 1; Ex. 31 § 2(b).) In December, 1995, just a few days after the

REDACTED

REDACTED

39.      In an internal email dated December 4, 1995, to other members of the Novell

transition team, including Novell attorney Burt Levine, Novell Senior Product Manager Skip

Jonas explained:

> As of the Closing Date (now set for 12/6), all UNIX & UW
> agreements transfer to SCO . . . including the Distributor
> Agreements.  <u>Novell is out of the UNIX/UW business after the</u>
> <u>Closing and does not have the right to sell UW</u>.  So if Novell has
> any inventory of UW after the Closing, I believe that Novell has
> only 2 choices:  sell it to SCO or destroy it.

(5/18/07 James Decl. Ex. 92 (emphasis added).)

40.      On October 18, 1995, Larry Bouffard, Novell's Worldwide Sales Director for

UNIX Products and another participant in the transition team, stated in an internal Novell

document:

> We are obligated to give SCO all information, contracts, assets etc.
> pertaining to the UnixWare business and the old UNIX source
> code business.  <u>They have bought it lock, stock and barrel</u>.  Once

21

the transaction is closed (Nov.-Dec.) <u>we will have no more involvement with this business</u>.

(5/18/07 James Decl. Ex. 93.)

41.    In an email to Santa Cruz dated November 8, 1995, Novell transition-team member Lou Ackerman proposed a Statement of Work for licensing and contract management permitting Novell to "Act as SCO's worldwide agent for UnixWare (*) and SVRx (and any other Novell source code products being transferred to SCO) licensing activities with OEM, Commercial, Government and Educational customers," such delegation to include "Executing new agreements (including product supplements) with customers" and "Responding to customer inquiries about the products and transfer of ownership to SCO." (5/18/07 James Decl. Ex. 94 at SCO1299982.)

42.    In an email from Mr. Jonas to other members of the transition team, Mr. Jonas explained that Novell needed a "delegation" or "agency" agreement from SCO "in order for the Licensing group to continue their work after the closing." (5/18/07 James Decl. Ex. 94 at SCO1299952.)

43.    Novell relies on the statements of Mike DeFazio in the IBM Litigation. Yet, in

REDACTED

22

(Id. at 1.)  In early 1996, Novell sent other letters containing those exact same statements to a number of other companies.  (See, e.g., 5/18/07 James Decl. Exs. 110-112.)

D.   The IBM Buyout.

44.     In April 1996, just four months after the Closing Date, Novell CEO Robert Frankenberg and Santa Cruz CEO Alok Mohan exchanged a number of letters regarding Novell's attempt at that time to grant IBM a buyout of its SVR 3.2 binary-royalty obligations. (5/18/07 James Decl. Exs. 95-101.)  In a letter dated April 23, 1996, Mr. Mohan stated:

> I am also troubled by the fact that the proposed IBM buyout gives IBM broader rights to the UNIX intellectual property than their current license provides.  It is my understanding that our agreements provide SCO with ownership and exclusive rights to license the UNIX source code.  The proposed grant of additional source rights and relaxation of the anti-pyramiding provisions, rights which Novell (and formerly USL and AT&T) historically refused to grant to SCO and others at any price, can only be granted directly by SCO.  If IBM requires these rights, I would request that they negotiate these directly with us.

(5/18/07 James Decl. Ex. 99 at 1 (emphasis added).)

45.     In his response of April 29, 1996, Mr. Frankenberg did not dispute Mr. Mohan's assertions, but instead attempted to persuade Mr. Mohan that the buyout agreement, which Novell had executed in the interim, "expressly prohibited such a situation, without any limitation on the term of this prohibition."  (5/18/07 James Decl. Ex. 100.)  In this and other letters that were part of this correspondence, Novell never asserted that owned any UNIX copyrights. (5/18/07 James Decl. Exs. 95-101.)

46.     Instead, on October 16, 1996, Novell and Santa Cruz jointly granted IBM a buyout through Amendment No. X, which expressly replaced the April 1996 agreement between

Novell and IBM. (5/18/07 James Decl. Ex. 102.) On the same date, Novell and Santa Cruz also

executed Amendment No. 2 to the APA and a General Release of Claims Agreement. (5/18/07

James Decl. Exs. 5, 30.) Through the latter Novell agreed to pay Santa Cruz $1.5 million for the

release of claims related to its unauthorized April 1996 agreement with IBM. (5/18/07 James

Decl. Ex. 30 at SCO1579207; Ex. 102.)

     E.    The Microsoft Antitrust Proceedings.

    47.    As part of the APA transaction, Novell received a 17% interest in Santa Cruz

stock, as well as a seat on the Santa Cruz Board of Directors. (5/18/07 James Decl. Ex. 1.)

Novell appointed the senior executive responsible for the APA transaction, Duff Thompson, to

serve on the Santa Cruz Board. (5/18/07 James Decl. Ex. 11 at 6.) As Novell's representative,

Mr. Thompson regularly reported back to Novell about developments at Santa Cruz. (Id.)

    48.    As early as September, 1996, just weeks before Novell and Santa Cruz executed

Amendment No. 2 to the APA, Santa Cruz challenged certain anticompetitive provisions in a

1987 agreement between AT&T and Microsoft (the "1987 MS Agreement") that were binding

on Santa Cruz as AT&T's successor to UNIX. (5/18/07 James Decl. Ex. 103.) In a letter to the

Antitrust Division of the United States Justice Department dated September 19, 1996, Santa Cruz

stated:

> As a result of the chain of transactions described below, SCO has
> now acquired ownership of the UNIX program itself. In
> November 1989, AT&T, the original developer of the UNIX
> Operating System, spun off the UNIX division as a separate
> company then known as UNIX System Laboratories, Inc. ("USL").
> In June 1993, Novell, the vendor of the NetWare Operating
> System, acquired USL and hence became the owner of the UNIX
> program. In turn, in December 1995, Novell sold the ownership of
> UNIX to SCO. As a result, SCO now enjoys the right, as the

<u>owner of the UNIX program, to exploit that program without the
necessity of a license from any other party.</u>

(5/18/07 James Decl. Ex. 103 at 3.)  Santa Cruz also stated in the letter that "SCO acquired the

rights to UnixWare in a recent transaction with the original developer of the program, Novell."

(<u>Id.</u> at 2.)

     49.    On January 31, 1997, less than three months after date of Amendment No. 2,

Santa Cruz filed an Application with the European Commission (the "EU Complaint")

requesting a finding that the 1987 MS Agreement violated the Rome Treaty.  (5/18/07 James

Decl. Ex. 32.)  In the EU Complaint, Santa Cruz reiterated and expanded upon its statements to

the Justice Department:

> 3.4    As a result of the chain of transactions described below,
> <u>SCO has now acquired ownership of the UNIX program itself so
> that it no longer requires a license from anyone to produce UNIX
> products.</u>  In November 1989, AT&T, the original developer of the
> UNIX Operating System, had spun off the UNIX division as a
> separate company then known as UNIX System Laboratories, Inc.
> ("USL").  In June 1993, Novell, the vendor of the NetWare
> Operating System, acquired USL and hence became the owner of
> the UNIX program.  <u>In turn, in December 1995, Novell sold the
> ownership of UNIX to SCO.  As a result, SCO now enjoys the
> right, as the owner of the UNIX program, to exploit that program
> without the necessity of a license from any other party.</u>  In
> particular, if SCO chooses to develop products based on UNIX,
> without any lines of Microsoft developed code, SCO will not have
> further need to license such products under the 1988 Agreement
> with Microsoft or pay royalties, thereunder, to Microsoft.

>          *        *        *

> 4.9    Microsoft's 1988 Agreement with SCO does not affect the
> issues concerning the anticompetitive restraints created by the
> 1987 MS Agreement.  <u>Because it has acquired ownership of the
> copyright to UNIX from AT&T, SCO should be free to develop
> new UNIX based works without the necessity of a license from</u>

> <u>anybody</u>. The 1988 license between Microsoft and SCO is no
> longer commercially viable as a basis for SCO to develop new
> UNIX products since paying a royalty in Microsoft to obtain UNIX
> rights free of development restraints is, in effect, a double
> payment: <u>SCO owns UNIX, has paid for such ownership</u> and
> would be placed at a competitive disadvantage were it to
> nonetheless proceed under a royalty bearing license that it does not
> need.

(<u>Id.</u> §§ 3.4, 4.9 (emphasis added).)

50.    In the EU Complaint, Santa Cruz also repeatedly referred to itself as "the copyright owner of UNIX." (<u>See, e.g.</u>, <u>id.</u> § 8.1).

51.    Santa Cruz's antitrust action against Microsoft received wide publicity in the industry. (<u>See, e.g.</u>, 5/18/07 James Decl. Exs. 116-18.)

52.    Despite the public nature of the action, and even though Novell had a representative on the Santa Cruz Board who reported back to Novell on developments at Santa Cruz, there is no evidence that Novell ever objected to Santa Cruz's position regarding the ownership of UNIX and its copyrights.

53.    More obviously, the provisions of the 1987 MS Agreement which Santa Cruz deemed anticompetitive applied only to the owner of the UNIX copyrights. (5/18/07 James Decl. Ex. 32.) Had Novell believed in 1996-97 that it owned the copyrights, then Novell, and not Santa Cruz, would have the interest and standing to complain to the antitrust authorities. Indeed, in 1994, when Novell <u>did</u> own the copyrights, it complained internally about anticompetitive provisions of the 1987 MS Agreement and contemplated bringing its own antitrust action. (5/18/07 James Decl. Ex. 83.) There is no evidence that Novell was ever concerned about the 1987 MS Agreement after the APA.

F.    Sale of the UNIX Business to Caldera International.

54.    On August 1, 2000, Santa Cruz entered into an Agreement and Plan of Reorganization ("APR"), whereby Santa Cruz agreed to transfer to Caldera International "all rights and ownership of UNIX and UnixWare," including "all intellectual property rights appurtenant" to UNIX and UnixWare. (5/18/07 James Decl. Ex. 104.)

55.    On May 7, 2001, through an Intellectual Property Assignment ("IP Assignment"), Santa Cruz in fact assigned, transferred, and conveyed those rights, including "all copyrights," to Caldera International. (5/18/07 James Decl. Ex. 104.) In 2002, Caldera International changed its name to The SCO Group, Inc. (5/18/07 James Decl. Ex. 104.)

56.    The IP Assignment defines the "Invention and Works" as those listed in Schedules A-C. (Id. Recitals.) Entitled "Assigned Copyrights and Technology," Schedule C to the Intellectual Property Assignment identifies, under the heading "Copyrights," the SVRX and UnixWare "Source Code Products" and "prior products,", as well as the UnixWare "Binary Products" and "Products Under Development." (Id. Schedule C.)

57.    Section 1 of the IP Assignment states:

> Assignment. Assignor hereby assigns, transfers and conveys to Assignee, and Assignee accepts, all of Assignor's right, title, and interest throughout the world in and to the Inventions and Works, including, but not limited to, any of the following appurtenant or related to the Inventions and Works: (i)all patents and patent applications and any and all patents that are or may be granted therefrom whether in the United States or any other country, including, without limitation, any extensions, continuations, continuations-in-part, divisions, reissues, reexaminations, and renewals thereof, or other equivalents thereof; (ii) all copyrights and all necessary and appropriate renewals and extensions thereof (iii) all trademarks, service marks, trade names, domain names, logos, trade dress, get up and product aesthetic features, including, without limitation, all registrations, applications for registration

27

and common law rights thereto and all goodwill associated therewith; (iv) all design rights, whether registered, unregistered, patented, patentable or otherwise; (v) all trade secret rights and rights to enforce confidentiality or similar obligations in relation to the Inventions and Works; (vi)any and all other forms of intellectual property or proprietary right recognized anywhere in the world; and (vii) all rights and privileges pertaining to (i) through (vi), including without limitation, the right, if any, to sue or bring other actions for past, present and future infringement thereof ((i) through (vii) hereinafter collectively referred to the "Rights").

(Id. § 1 (emphasis added).)

58.    In Section 8 of the IP Assignment, entitled "Representations and Warranties,"

Santa Cruz stated:

(i) Assignor has the full power, authority and all rights necessary to transfer and assign Assignor's Rights in the Inventions and Works to Assignee and to carry out the terms and provisions of this Agreement.

(Id. § 8(i).)

59.    Section 8(v) of the IP Assignment further warrants:

Assignor has no knowledge of any fact that would prevent Assignee's registration of any Rights related or appurtenant to the Inventions and Works or recording the transfer of Rights hereunder (except that Assignor may not be able to establish a chain of title from Novell Inc. but shall diligently endeavor to do so as soon as possible)

(Id. § 8(v).)

60.    The law firm of Wilson Sonsini Goodrich & Rosati ("WSGR"), which had

represented Novell in the APA transaction in 1995, represented Santa Cruz in the APR

transaction and IP Assignment with Caldera International in 2000-01. (5/18/07 James Decl. Ex.

106.)  The law firm of Brobeck Phleger & Harrison ("Brobeck"), which represented Santa Cruz

in the APA transaction, represented Caldera International in the APR transaction and IP

Assignment.  (<u>Id.</u>)  In each instance, WSGR represented the seller, and Brobeck the buyer.  (<u>Id.</u>)

REDACTED

(Id. ¶ 10.)

    G.    <u>Licensing and Distribution After the APA.</u>

    63.    Since 1995, without objection from Novell, Santa Cruz and SCO shipped countless UNIX-related products with copyright notices affixed to them.  (<u>See, e.g.</u>, 5/18/07 James Decl .Ex. 27 ¶ 3; Ex. 28.)  Such notices were affixed to the compact discs containing the products, providing notice that the products as a whole were copyrighted by Santa Cruz or SCO. (Id.)  Since 1995, without objection from Novell, Santa Cruz and SCO entered into hundreds of license agreements for UNIX products.  Those agreements not only warrant and represent that SCO has the rights and ownership in the intellectual property required to provide the licensed product, but also indemnify licensees against any third-party claims for copyright infringement. (<u>See, e.g.</u>, 5/18/07 James Decl. Ex. 30 §§ 13-14; Ex. 31 § 2.4; Ex. 32 § 7.02; Ex. 33 ¶ 28.)

    64.    Before May 28, 2003, Novell never contested SCO's public statements and conduct asserting ownership of the UNIX copyrights.  (5/18/07 James Decl. Ex. 33 ¶ 7; Ex. 34 ¶ 7.)

    65.    There is no evidence that Novell publicly asserted ownership of UNIX copyrights between the date of the APA and May 28, 2003.

    H.    <u>Novell's Recent Conduct.</u>

    66.    On March 6, 2003, SCO filed its lawsuit against IBM alleging, among other things, that IBM had violated its UNIX Software and Sublicensing Agreements by disclosing UNIX-derivative source code.  (5/18/07 James Decl. Ex. 35 at 32-50.)

67.     On May 28, 2003, Novell publicly announced that it, and not SCO, is the owner of the UNIX copyrights. In a letter to SCO CEO Darl McBride that Novell published to the world on its website, Novell CEO Jack Messman stated:

> Importantly, and contrary to SCO's assertions, SCO is not the owner of the UNIX copyrights. Not only would a quick check of U.S. Copyright Office records reveal this fact, but a review of the asset transfer agreement between Novell and SCO confirms it. To Novell's knowledge, the 1995 agreement governing SCO's purchase of UNIX from Novell does not convey to SCO the associated copyrights. We believe it unlikely that SCO can demonstrate that it has any ownership interest whatsoever in those copyrights.

(5/18/07 James Decl. Ex. 36 at NOV 000043054.)

68.     The Novell executives who negotiated or were primarily responsible for the APA in 1995, including Messrs. Frankenberg, Mattingly, Thompson, Chatlos, and Levine, were not with Novell in 2003. (5/18/07 James Decl. Ex. 39 at 219-221.) Novell did not consult with them before announcing its alleged ownership of the copyrights. (5/18/07 James Decl. Ex. 40 at 27, 60; Ex. 41 at 90-91.)

69.     A few days after its May 28, 2003, announcement, Novell received from SCO a copy of Amendment No. 2, which Novell had said it did not have in its files and had not reviewed. (5/18/07 James Decl. Ex. 81 ¶ 13.) On June 6, 2003, Novell stated in a press release:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(5/18/07 James Decl. Ex. 38 at NOV 000043059.)

70.    Novell has admitted that Amendment No. 2 was present in its files prior to May

28, 2003.  (5/18/07 James Decl. Ex. 41 at 82-83.)

**IV.    THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY JUDGMENT ON SCO'S ALTERNATIVE CLAIM FOR SPECIFIC PERFORMANCE**

A.    The Plain Language of the APA Concerning Specific Performance.

71.    The parties to the APA repeatedly covenanted to take further actions necessary to

consummate the transfer of the Business.

72.    Section 1.7(c) of the APA provides:

(c)    Taking of Necessary Action: Further Action.  If, at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement the parties agree to take, and will take, all such lawful and necessary and/or desirable action.

(5/18/07 James Decl. Ex. 1 § 1.7(c) (emphasis added).)

73.    Section 4.9 of the APA provides in part:

4.9    Commercially Reasonable Efforts.  Subject to the terms and conditions provided in this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take promptly, or cause to be taken all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby. . . .

(Id. § 4.9 (emphasis added).)

74.    Section 4.12 of the APA provides:

4.12    Additional Documents and Further Assurances.  Each party hereto, at the request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

32

(Id. § 4.12 (emphasis added).)

B.    The Express Purpose and Intent of the APA.

75.    The APA expressly sets forth its purpose and intent. Section 1.3(a)(i) of the APA

states:

> It is the intent of parties hereto that all of the Business and all of
> Seller's backlog, if any, relating to the Business be transferred to
> Buyer.

(Id. § 1.3(a)(i) (emphasis added).)

76.    Recital B expresses the intent of the parties that Santa Cruz acquire the assets and

liabilities comprising the Business:

> The Board of Directors of each Seller and Buyer believe it is in the
> best interests of each company and their respective stockholders that
> Buyer acquire certain of the assets of, and assume certain of the
> liabilities of Seller comprising the Business (the "Acquisition").

(Id. at 1 (emphasis added).)

C.    Extrinsic Evidence of the Purpose and Intent of the APA.

77.    The overwhelming testimony of the Novell executives who were responsible for

and negotiated the APA confirms that the purpose and intent of the APA was to transfer the

Business, including the copyrights to UNIX and UnixWare, to Santa Cruz. (See Part II, above.)

78.    The testimony of the Santa Cruz executives who were responsible for and

negotiated the APA uniformly confirms that the purpose and intent of the APA was to transfer

the Business, including the copyrights to UNIX and UnixWare, to Santa Cruz. (See id.)

33

79.     All these witnesses agree that the transaction contemplated by APA included the transfer of the UNIX and UnixWare copyrights to Santa Cruz. (See id.)

80.     The other extrinsic evidence SCO submits herewith also confirms that the transaction contemplated by the APA included the transfer of the UNIX and UnixWare copyrights to Santa Cruz. (See Part III, above.)

## LEGAL STANDARD ON SUMMARY JUDGMENT

"Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law." Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000).

It is axiomatic that the "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment," and that "the court must review the record in the light most favorable to the opposing party." Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Thus, the Court "must resolve factual disputes and draw inferences" in favor of the non-moving party, Rogers v. United States, 281 F.3d 1108, 1113 (10th Cir. 2002), and the Court may not "act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences." Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476, 484 (D. Kan. 1996). In short, summary judgment may not be granted unless "the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." David v. City & County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996)

In this case, both the relevant contracts and extrinsic evidence confirm that Novell transferred the UNIX and UnixWare copyrights to Santa Cruz. At minimum, when viewed in

34

the light most favorable to SCO, resolving all factual issues and drawing all inferences in favor of SCO, the evidence reveals a host of issues of material fact.

**ARGUMENT[1]**

**I.     THE GOVERNING LAW OF CONTRACT INTERPRETATION.**

In <u>Dore v. Arnold Worldwide, Inc.</u>, 39 Cal. 4th 384 (2006), the California Supreme Court confirmed the relevance of extrinsic evidence in exposing contractual ambiguities.  Addressing the existing California law of contracts, the court first confirmed the precedent providing that the "'meaning of language is to be found in its applications.  An indeterminacy in the application of language signals its vagueness or ambiguity.  An ambiguity arises when language is reasonably susceptible of more than one application to material facts.'" <u>Id.</u> at 391 (<u>quoting</u> <u>Cal. Sate Auto. Ass'n Inter-Ins. Bur. v. Superior Ct.</u>, 177 Cal. App. 3d 855, 859 n.1 (1986)).  Further confirming the precedent, the court further explained:

> Accordingly, "even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."

<u>Id.</u> (brackets omitted) (<u>quoting</u> <u>Morey v. Vannucci</u>, 64 Cal. App. 4th 904, 912 (1998), and <u>Pac. Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co.</u>, 69 Cal. 2d 33, 37 (1968)).

---

[1] The facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing Statement of Undisputed Facts, or to the relevant document.

If the Court were to decide that the relevant contract language does not plainly support SCO's interpretation, <u>Dore</u> and the precedent endorsed therein make clear that extrinsic evidence is relevant and admissible on, for example, the following areas involving the application of contractual language to the facts:

- The transfer of "All right, title, and interest" and "All rights and ownership of UNIX and UnixWare" includes the UNIX and UnixWare copyrights.

- The Bill of Sale effectuated the transfer to Santa Cruz of all of the Assets, including the UNIX and UnixWare copyrights.

- Amendment No. 2 clarified that Item V.A of Schedule 1.1(b) did not include the UNIX and UnixWare copyrights.

- Amendment No. 2 ratified a prior agreement to transfer the copyrights.

- The copyrights required by Santa Cruz to exercise its rights with respect to it acquisition of UNIX and UnixWare technologies includes all the copyrights related to UNIX, UnixWare, and the Auxiliary Products.

- The purpose of the APA and the transaction contemplated therein included the transfer of the UNIX and UnixWare copyrights to Santa Cruz.

SCO therefore sets forth below both its interpretation of the plain language of the relevant contracts as well as the overwhelming extrinsic evidence confirming that interpretation.

36