## II.    NOVELL'S POSITION CANNOT BE RECONCILED WITH THE LANGUAGE AND PURPOSE OF THE RELEVANT CONTRACTS.

### A.    The Amended APA Plainly Provides for the Transfer.

The APA provided for the transfer of the UNIX and UnixWare copyrights where it indisputably provided for the transfer of:

- All of Novell's "right, title, and interest in and to" the UNIX and UnixWare source code and products (¶¶ 3-4), and

- "All rights and ownership of UNIX and UnixWare," including "without limitation" the source code, source code products, binary products, and products in development (¶ 5).

Under the case law, each of these provisions provides for the transfer of the copyrights.

"In a non-consumer setting such as this, a transfer of all right, title and interest to computer programs and software can only mean the transfer of the copyrights as well as the actual computer program or disks." Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997) (transfer of "all right, title, and interest" unambiguously transferred copyrights); see also Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) (Ex. C) (concluding that "all rights in the program (including the copyright) were transferred" to purchaser because contract provided for transfer of "all rights" in the program); Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992) (copyrights transferred by wording leaving "little doubt" that seller sold "all the assets" of business); cf. S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989) (the phrase "all rights of ownership" plainly includes ownership of both software and associated copyrights).

Dockets.Justia.com

Under Section 1.1(a) of the APA, Novell and Santa Cruz agreed that on the Closing Date Novell would "sell, convey, transfer, assign and deliver" and Santa Cruz "purchase and acquire" at minimum "all right, title and interest in and to the assets and properties" identified in Schedule 1.1(a) of the APA. (¶ 4.) In turn, Schedule 1.1(a) identifies seven categories of "as assets and properties" transferred to Santa Cruz, including:

> "All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process) and all appropriate technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, including source code," source code products, binary products releases, and products under development.

(¶ 5.) The APA thus plainly provides for the transfer – without limitation – of all right, title, and interest in the UNIX and UnixWare source code and products, and all rights and ownership of UNIX and UnixWare, including a non-exhaustive list of express assets and properties. In providing for the transfer of all rights, Section 1(a) and Item I plainly include the copyrights.

There can be no question, moreover, that the transfer of the copyrights in fact took place. Section 1.1(a) of the APA defines the assets and properties to be transferred on the Closing Date as the "Assets." (¶ 4.) On the Closing Date, Novell and Santa Cruz executed the Bill of Sale, which provides:

> In accordance with [Section] 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets.

38

(¶ 6 (emphasis added).)  The Bill of Sale thus expressly effectuated the transfer, conveyance, sale, assignment, and delivery to Santa Cruz of "all of the Assets," in accordance with Section 1.1(a) of the APA.  (Id.)  As the Assets plainly included "all rights and ownership" of UNIX and UnixWare, including the copyrights, the Bill of Sale in fact transferred the copyrights to Santa Cruz on the Closing Date.

The TLA confirms that Novell transferred the copyrights to Santa Cruz on the Closing Date.  Section 1642 of the California Code provides:  "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  Cal. Civ. Code § 1642; see Gen. Cas. Ins. v. Workers' Compensation Appeals Bd., 31 Cal. Rptr. 3d 740, 761 (Ct. App. 2005) (citing cases); see also In re United Air Lines, Inc., 438 F.3d 720, 727-28 (7th Cir. 2006) (analyzing California law and finding that Section 1642 applies where the "structure of the relationship is such that one agreement cannot be understood in isolation from its counterpart"); Prestin v. Mobil Oil Corp., 741 F.2d 268, 272 & n.4 (9th Cir. 1984) (citing and applying Section 1642 and related precedent).  The contracts need not have been executed on the same day to be parts of substantially one transaction.  See Boyd v. Oscar Fisher Co., 210 Cal. App. 3d 368, 378 (1989) (citing cases); BMP Property Dev. v. Melvin, 198 Cal. App. 3d 526, 531-32 (1988); Nevin v. Salk, 45 Cal. App. 3d 331, 338 (1975); Meier v. Paul X. Smith Corp., 205 Cal. App. 2d 207, 217 (1962) (citing cases); Cadigan v. Am. Trust Co., 31 Cal. App. 2d 780, 784-86 (1955) (citing cases).

In addition, "Under California law, parties may validly incorporate by reference into their contract the terms of another document."  Baker v. Aubry, 216 Cal. App. 3d 1259, 1264 (1989).  The reference to the incorporated document must be "clear and unequivocal, the reference must

be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." Baker, 216 Cal. App. 3d at 1264 (quotations omitted); accord Shaw v. Regents of the Univ. of Cal., 58 Cal. App. 4th 44, 54 (1997) (citing cases). "The contract need not recite that it 'incorporates' another document, so long as it guides the reader to the incorporated document." Shaw, 58 Cal. App. 4th at 54 (citing cases).

The APA and TLA easily satisfy the foregoing standards. The same parties of course executed both documents. In addition:

- The APA calls for the execution of "a license" agreement and the terms thereof regarding the "Licensed Technology" addressed in the TLA. (¶ 7.)

- The TLA provides that its effective date is "the Closing Date of the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 at 1.)

- The first "Whereas" clause of the TLA provides that "pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licensed for Licensed Technology, including related documentation and support." (Id.)

- The TLA provides that the term "Licensed Technology," and several other terms, "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement." (Id.)

- The TLA provides that Novell shall have the license set out in the TLA "Effective upon the Closing Date and in connection with the transfer of the Assets by NOVELL to SCO pursuant to the Asset Purchase Agreement." (Id. § II.A.)

- The TLA provides that certain restrictions on Novell's license rights "shall not affect any rights specifically retained by NOVELL under the Asset Purchase Agreement." (<u>Id.</u> § II.A(2).)

- In the Section titled "ENTIRE AGREEMENT," the TLA provides: "This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter." (<u>Id.</u> § VIII.)

The APA and TLA thus relate to "the same matter," were part of "substantially one transaction," "cannot be understood in isolation" from each other, and refer to each other. Under California law, the two documents must be read together.

Section 1.6 of the APA expressly provided for a license back to Novell of the same UNIX and UnixWare technology indisputably transferred to Santa Cruz under the APA (the "Licensed Technology"). (¶ 7.) On the Closing Date, Santa Cruz granted that license to Novell in the TLA, subject to strict restrictions, specifying that "Ownership of the Licensed Technology shall reside in SCO." (<u>Id.</u>) Section 1.6 and the TLA would be senseless had Novell retained ownership of the copyrights. Novell would not have needed a license to the Licensed Technology, let alone agreed to a license subject to strict restrictions, and ownership of the Licensed Technology would have resided in Novell, not Santa Cruz. Simply put, Novell would have licensed the technology to Santa Cruz, not the other away around. In reading the APA in harmony with the plain language of the TLA, the Court may properly conclude, on this basis alone, that the APA transferred the copyrights to Santa Cruz.

Other touchstone provisions of the APA confirm the transfer of the copyrights. The first provision of the APA, Recital A as amended, explains:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products and the sale of other products ("Auxiliary Products") which are directly related to Unix and UnixWare (collectively, the "Business").

(¶ 3.) Recital B and Section 1.3(a)(i) then express the intent to transfer the entire Business to Santa Cruz through the APA. Recital B provides:

> The Board of Directors of each Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the "Acquisition").

(5/18/07 James Decl. Ex. 1, Recital B (emphasis added).) Similarly, Section 1.3(a)(i) expressly states that "It is the intent of parties hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer." (¶ 1.) Such provisions do not even suggest any limitation on the transfer of the Business and its assets. On the contrary, they expressly set forth Novell's intent to transfer the entire Business. There is no exclusion of copyrights.

### B. Amendment No. 2 Clarified the Excluded Assets Schedule.

Novell has relied on Item V.A of the Excluded Assets Schedule in the original APA, but that Item literally no longer exists. Amendment No. 2 to the APA revised Item V.A "to read" as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement

42

> required for SCO to exercise its rights with respect to the
> acquisition of UNIX and UnixWare technologies.  However, in no
> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

(¶ 10.)  To perpetuate the alleged exclusion of the UNIX and UnixWare copyrights in Item V.A,

Novell has read the original APA and Amendment No. 2 in isolation.  In fact, Section A replaces

the original Item V.A, clarifying that the Excluded Assets do not include those copyrights, which

were transferred with "all the Assets" under the APA and Bill of Sale.

Amendment No. 2 also clarified that the copyrights at issue were not Excluded Assets.

Section A states that the Excluded Assets do not include the copyrights "required for SCO to

exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (Id.)

Plainly the UNIX and UnixWare copyrights are so required.  SCO's rights with respect to its

acquisition of UNIX and UnixWare technologies include:

- The rights to develop, license, and support UNIX and UnixWare products to evolve the
  Business transferred under the APA.  (¶¶ 1-2.)  Absent a license, only the owner of the
  UNIX and UnixWare copyrights has such rights.  Those copyrights were plainly required
  for Santa Cruz to exercise its rights to run the Business.

- All rights and ownership in UNIX and UnixWare source code and products.  (¶¶ 3-5.)
  Only the owner of the UNIX and UnixWare copyrights has the authority to exercise such
  unlimited rights.  Those copyrights thus were clearly required for Santa Cruz to exercise
  its other, unlimited rights in the source code and products.

- Claims arising after the Closing Date against any parties relating to any right, property, or
  asset included in the Business.  (¶ 5.)  Without the copyrights, Santa Cruz could not have

pursued such claims for the unauthorized use and distribution of its UNIX and UnixWare code and products.

- All rights pertaining to UNIX and UnixWare under any assignable contract or license.
  (<u>Id.</u>) Because without the copyrights Santa Cruz would have been powerless to enforce covenants and conditions in such contracts or licenses, the copyrights were required for Santa Cruz to exercise those rights.

The copyrights at issue thus were required for Santa Cruz to exercise these and other rights it obtained with its acquisition of the UNIX and UnixWare technologies.

### C.   The APA Bill of Sale Exceeds the Requirements of the Copyright Act.

Under the case law, the transfer language in the Bill of Sale far exceeds the requirements of Section 204 of the Copyright Act.

"As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties.  Accordingly, even though a written instrument may lack the terms 'transfer' and 'copyright,' it still may suffice to evidence their mutual intent to transfer the copyright interest." <u>Nimmer on Copyrights</u> § 10.03[2] 2006 (collecting cases); <u>Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.</u>, 690 F. Supp. 298, 301 (S.D.N.Y. 1988) (invoice and short letter transferring ownership of products without mention of copyrights suffice).  No particular language or "magic words" are required.  <u>Radio Television Espanola S.A. v. New World Entm't, Ltd.</u>, 183 F.3d 922, 927 (9th Cir. 1999).  The word "copyright" is not required.  <u>See, e.g., ITOFCA, Inc. v. Megatrans Logistics, Inc.</u>, 322 F.3d 928, 931 (7th Cir. 2003) (transfer of "all assets" to a business suffices); <u>Dick Corp. v. SNC-Lavalin Constructors, Inc.</u>, No. 04 C 1043, 2004 WL 2967556, at *4 (N.D. Ill. Nov. 24, 2004) (Ex. A) (explaining that "a writing need not

use the term 'copyright' to effectuate a valid transfer"); <u>Dean v. Burrows</u>, 732 F. Supp. 816, 823

(E.D. Tenn. 1989) (endorsed check, with no mention of the word, "complies with the

requirements"); <u>see also Effects Assocs., Inc. v. Cohen</u>, 908 F.2d 555, 557 (9th Cir. 1990)

(explaining that "a one-line pro forma statement will do").

In this case, the APA provided for the transfer by Novell and acquisition by Santa Cruz

of the Assets, including all rights and ownership of UNIX and UnixWare. (¶¶ 3-5.) On the

Closing Date, the parties executed the Bill of Sale effectuating the transfer of all the Assets:

> In accordance with [Section] 1.1(a) of the Agreement, Seller, for
> good and valuable consideration, the receipt and sufficiency of
> which is hereby acknowledged, <u>does hereby transfer, convey, sell,
> assign and deliver to Buyer,</u> without recourse, representation or
> warranty except as otherwise expressly provided in the Agreement,
> <u>all of the Assets.</u>

(¶ 6.) Under the applicable authority, the language identifying the Assets by reference to Section

1.1(a) of the APA easily meets the statutory requirements and the language providing for the

transfer, conveyance, sale, assignment and delivery of the Assets far exceeds the requirements.

More to the point, the Bill of Sale manifests the intent to transfer <u>all rights</u> and ownership of

UNIX and UnixWare, including the copyrights.

The amended APA unambiguously provided for the transfer to Santa Cruz of all right,

title, and interest and all rights and ownership of UNIX and UnixWare. (¶¶ 3-10.) The Bill of

Sale unambiguously effectuated that transfer and complied with the Copyright Act. (¶ 6.) The

plain language of these agreements precludes summary judgment in Novell's favor.

D.  In the Alternative, Amendment No. 2 Was a Ratifying Memorandum.

Even if the amended APA and the Bill of Sale somehow failed to transfer the copyrights, Amendment No. 2 itself retroactively effectuated the transfer by ratifying the APA.  "[T]he requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer."  Arthur Rutenberg Homes, Inc. v. Drew Homes, 29 F.3d 1529, 1532 (11th Cir. 1994); Imperial Residential Design, Inc. v. Palms Dev. Group, Inc., 70 F.3d 96, 99 (11th Cir. 1995) ("[A] copyright owner's later execution of a writing which confirms an earlier oral agreement validates the transfer ab initio."); Nimmer, supra, § 10.03[3] ("[I]f a prior oral grant is subsequently confirmed in writing, it validates the grant ab initio as of the time of the oral grant.").  This rule applies with even greater force in this instance, where Amendment No. 2 confirms not only an oral agreement, but the written agreement in the APA to transfer all rights and ownership of UNIX and UnixWare.

To summarize, the amended APA and the Bill of Sale plainly provided for and effectuated the transfer of the UNIX and UnixWare copyrights under both contract and statutory law, the TLA confirmed the transfer, and Amendment No. 2 clarified and ratified the APA by removing the UNIX and UnixWare copyrights from the Excluded Assets Schedule.  Novell responds to this argument with several unavailing arguments.

46

E.    The Record and Precedent Establish That Novell's "Implied License"
      Argument Is No Basis for Summary Judgment for Novell.[2]

Novell argues (at 26-29) that Santa Cruz had "an implied license to use the copyrights as

needed to implement the transaction." This argument fails for several reasons.

First, Novell's argument is improperly based on a fundamental inference in its own favor.

See Rogers, 281 F.3d at 1113 (inferences drawn in favor of non-moving party). Novell (at 27-

28) asks the Court to infer that the sale of assets must have "conferred a license on Santa Cruz to

use the related copyrights as needed to carry out the business activities contemplated by the

APA." Given just the undisputed fact of Santa Cruz's right to "copy, modify, distribute and

sublicense the copyrighted code" after the APA, however, the Court could equally infer that

Santa Cruz had acquired the copyrights giving the company those rights.[3]

The facts that Novell excludes from its "implied license" analysis, moreover, show that

the inference of copyright transfer is far more reasonable than any "implied license." By way of

example, the APA is the "Asset Purchase Agreement"; Novell is called the "Seller" and Santa

Cruz is called the "Buyer"; the Agreement describes the "Acquisition"; and the "Acquisition"

comprises the "Purchase and Sale of Assets." The APA does not allude to any "license" except

---

[2]      SCO has retained G. Gervaise Davis III, an expert on the relevant custom and practice in the
industry regarding the sale and licensing of computer source code and related assets. In his expert report,
due May 25, 2007, Mr. Davis's opinions will include his testimony that, in light of such customs and
practices, the APA and related documents do not reflect a transaction in which Novell retained the UNIX
and UnixWare copyrights or in which Santa Cruz obtained merely an implied license to use such
copyrights. Notwithstanding that the deadline for expert reports is four days later, SCO will submit a
declaration from Mr. Davis summarizing his views on May 21, 2007.

[3] Novell's reliance (at 28-29) on Burt Levine's testimony is illustrative. Only by having Mr. Levine
assume "that the copyrights had been retained by Novell in the transaction" did Novell elicit his testimony
that Santa Cruz would then have "a license to use those copyrights in the business." Mr. Levine testified
that it was not his view that Santa Cruz had obtained merely a license of the right to use the UNIX and
UnixWare copyrights. (See 5/18/07 James Decl. Ex. 14 at 158.)

for the "license" described in Section 1.6 and the existing SVRX "licenses" that Novell was

transferring. The only references to "licensee" in the APA refer to parties to the existing licenses

to which Novell and Santa Cruz were parties. (See APA §§ 2.10, 2.14, 4.1, 4.2, 4.16.)

Novell also cites in another memorandum its January 1996 "Tuxedo" transaction with

BEA Systems, Inc. as an example of one in which it sold certain assets and retained copyrights,

but the agreement in that transaction was title "TUXEDO License and Distribution Agreement."

The contemporaneous agreement and related documents thus illustrate that Novell knew how to

specify when it intended to "license" technology at issue. Indeed, the case law confirms that the

Court should <u>not</u> infer (or "lightly assume") that the parties intend to segregate the copyrights

and the ownership of the property in which the copyrights exist. <u>Schiller & Schmidt, Inc. v.</u>

<u>Nordisco Corp.</u>, 969 F.2d 410, 413 (7th Cir. 1992).

<u>Second</u>, Novell's argument fails under well-established law. "While a written license

may be either exclusive or non-exclusive, an oral license and an implied license can only be non-

exclusive." <u>Gillespie v. AST Sportswear, Inc.</u>, No. 97 Civ. 1911 (PKL), 2001 WL 180147, at *7

(S.D.N.Y. Feb. 22, 2001) (Ex. B) (citing 17 U.S.C. § 204(a)); <u>accord</u> <u>SHL Imaging, Inc. v.</u>

<u>Artisan House, Inc.</u>, 117 F. Supp. 2d 301, 316 (S.D.N.Y. 2000). Unless it conflicts with such

precedent, therefore, Novell's argument must be that all of SCO's rights under its "implied

license" were <u>also</u> rights that Novell retained. The Court cannot reasonably draw any such

inference from the record. If the "central purpose" of the APA warrants the inference that Santa

Cruz had the right to "copy, modify, distribute, and sublicense the copyrighted code in Novell's

UnixWare products," how could it follow that Novell had itself retained those same rights?

48

Novell's argument thus reduces to the unreasonable proposition that the "central purpose" of the APA was to provide that Santa Cruz "also" had the right copy, modify, distribute, and sublicense the copyrighted UnixWare and UNIX source code. Indeed, asked whether "Novell remained in the business after the execution of the APA of developing and selling the UnixWare operating system," Novell's Rule 30(b)(6) witness testified: "I wouldn't describe Novell as having continued in that business," because "I guess just based on all the documents that I've read and press releases characterizing the transaction and so forth that the entire intent was for the UnixWare business to be transitioned to SCO." (Id. (emphasis added).)

Third, Novell's "implied license" argument finds no support in the case law. The courts across jurisdictions have cautioned that implied licenses will be found "only in narrow circumstances where one party had created a work at the [other's] request and handed it over, intending that [the other] copy and distribute it." SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms, Inc., 211 F.3d 21, 25 (2d Cir. 2000); accord John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40-41 (1st Cir. 2003); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001); Effects, 908 F.2d at 558 ; see also Lulirama, Ltd. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 879 (5th Cir. 1997) (an implied license arises when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work"); accord Atkins v. Fischer, 331 F.3d 988 (D.C. Cir. 2003); Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514-

15 (4th Cir. 2002); I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).[4]  In these contexts,

"the existence of an implied license is an affirmative defense to infringement," and "the alleged

infringers have the burden of establishing an implied license."  Atkins, 331 F.3d at 991; accord

Shaver, 74 F.3d at 775.

     Novell's argument for an "implied license" finds no basis in this precedent.  The APA

indisputably does not embody a transaction in which Santa Cruz had asked Novell to create a

work, Novell created it, and Novell expected Santa Cruz to distribute the work.  Nor is this an

instance in which Novell asserts the existence of any implied license in its favor as a defense to

any claim of infringement by SCO.  In Foad Consulting Group, Inc. v. Musil Govan Azzalino,

270 F.3d 821 (9th Cir. 2001), an architect was hired to perform a discrete assignment (to develop

a "plot plan" for a shopping center) and the putative licensee expected to have the use of the

fruits of the assignment.  In Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990), a

special effects company created film footage at the defendant film producer's request and handed

it over with the intent that the producer use it in his movie.  See id. at 558.  These cases do not

present facts comparable to those necessary to construe the APA and the rights conferred

thereunder.  To the contrary, they confirm that the doctrine of "implied license" does not apply to

the detailed, long-term business relationship set forth in the APA and its amendments.

     Novell finally argues (at 28) that Santa Cruz must have had an implied license to the

UNIX and UnixWare copyrights because Santa Cruz did not acquire ownership of Novell's

"UNIX-related patents."  The main factual premise of Novell's argument, however, is disputed.

Novell says that "Santa Cruz needed to use these patents to be able to distribute and modify

---

[4] No court in the Tenth Circuit appears to have addressed the issue of "implied license" under the
copyright law.

UNIX products," but in fact at that time patents on software were rare and speculative in nature (as SCO expert G. Gervaise Davis III explains in his forthcoming expert declaration and report). It therefore was not at all clear that Santa Cruz needed the patents (or that Novell had needed them) in operating the UNIX and UnixWare business, and Mr. Levine took no position on whether any right to use such patents actually was necessary for Santa Cruz to conduct its business.

F.     <u>Novell's Arguments and Inferences Regarding the Negotiation Of Amendment No. 2 Are No Bases for Summary Judgment.</u>

Novell argues (at 36-37) that Amendment No. 2 does not pertain to any copyright transfer and to support that argument cites the testimony of Alison Amadia, an attorney at Novell in 1996, and Jim Tolonen, the Novell executive who signed the Amendment. That evidence gives no reasonable meaning to the plain language of Amendment No. 2, and is flatly contradicted by the testimony of the numerous witnesses who testified that the parties intended for Novell to transfer the copyrights to Santa Cruz.

Novell declines to confront the issue in its Motion, but its argument necessarily raises the question of what purpose Novell believed Amendment No. 2 served if it did not pertain to the transfer of copyrights. The answer lies in the declaration of Ms. Amadia, who testified that the Amendment (1) "affirmed that Santa Cruz had a license under the Original APA to use Novell's UNIX and UnixWare copyrighted works in its business," and (2) set forth a process by which, if Santa Cruz believed "it needed ownership of any particular UNIX or UnixWare copyright rights," then "Santa Cruz would have to have made such a request to Novell." (Amadia Decl. ¶ 14.) These positions would have to bear scrutiny to support Novell's motion, but they do not.

The language of Paragraph A of Amendment No. 2 is not "reasonably susceptible" of the foregoing meaning. Dore, 39 Cal. 4th at 391. If the parties had intended for Amendment No. 2 to reflect the existence of any "license" they would have said so; they would not have amended the Excluded Asset Schedule of the APA. No language in Paragraph A refers to any "license," to any rights that Santa Cruz supposedly already had, or to any license rights that were being "affirmed." Instead, the language expressly sets forth an exception to the "Excluded Assets" schedule of the APA. (¶ 10.) Indeed, no language in the Paragraph describes any process that Santa Cruz or Novell supposedly would follow or even suggests how the parties would address or resolve any supposed subsequent communications regarding the identification of specific copyrights. (Id.) In addition, no other language in any part of the Included Assets or Excluded Assets Schedules of the APA sets forth any process by which assets would subsequently be transferred in the future upon further efforts by either one of the parties.

Under Novell's interpretation, moreover, Amendment No. 2 would have accomplished nothing for Santa Cruz. If Amendment No. 2 did not clarify the transfer of copyrights, and instead merely created a completely undefined process by which Santa Cruz could ask Novell to transfer the copyrights but Novell had no obligation to do so, Santa Cruz would have been left in the same position it was in before the Amendment was executed. If (contrary to SCO's argument and the evidence) the APA did not transfer the copyrights but Novell thereafter acknowledged that some copyrights might be necessary for SCO to have, the APA already gave Santa Cruz the means of asking Novell to transfer such copyrights to effectuate the goals of the deal. (See, e.g., 5/18/07 James Decl. Ex. 1 §§ 4.9, 4.12.) The reasonable inference is that Santa

Cruz would not have negotiated and agreed to language in Amendment No. 2 that gave the company no more rights than it already possessed.

In addition, the relevant extrinsic evidence precludes summary judgment. The difference between the language in an initial draft of Paragraph A and the final version does not bear out the significance Novell gives to it. Ms. Amadia claims to have had conversations with Steve Sabbath of Santa Cruz in which she claimed to have conveyed her view that Santa Cruz already had a license and declined to confirm the transfer of or to transfer any copyrights, but Mr. Sabbath's testimony creates an unavoidable factual issue. Mr. Sabbath testified that it was never his understanding during the negotiations or leading up to the APA or thereafter "that copyrights in the UNIX business were being excluded from the assets transfer" (5/18/07 James Decl. Ex. 120 at 24); that it was never his understanding "that Santa Cruz was obligated to ask Novell to transfer particular UNIX and UnixWare copyrights" (id. at 35); that it was not his view that Amendment No. 2 "created a process by which Santa Cruz would go to Novell and specify the copyrights that Santa Cruz believed was required to exercise its rights with respect to UNIX and UnixWare technologies" (id. at 98-99); that with respect to the APA and Amendment No. 2 his understanding regarding Novell was "that they did not retain any copyrights pertaining to the UNIX technology" (id. at 100; see also id. at 227); that it was not his view that Santa Cruz had merely licensed from Novell the UNIX and UnixWare source code or copyrights (id. at 220); and that he understood Amendment No. 2 to constitute a clarification the transfer of the UNIX and UnixWare copyrights to Santa Cruz under the APA (id. at 221-22.). This testimony runs directly counter to Ms. Amadia's testimony about what she claims to have told Mr. Sabbath, and demonstrates that Mr. Sabbath did not give to the difference in language between the drafts of

Amendment No. 2 the significance that Novell improperly asks the Court to infer from that language.[5]

The language in the final version of Paragraph A of Amendment No. 2, moreover, is entirely consistent with the intent Mr. Sabbath attributed to that language at the time. Novell means to argue that if the parties had intended to clarify a transfer of copyrights they would have just said "the UNIX and UnixWare copyrights," but such language was insufficient. As the testimony of Santa Cruz senior executive Doug Michels revealed, the draft Amendment No. 2 language would not have clearly encompassed the copyrights in the documentation, training material and brochures necessary for running the UNIX and UnixWare business. (5/18/07 James Decl. Ex. 18 at 126-28.) In addition, Amendment No. 1 to the APA specified that any reference to "UNIX and UnixWare" in the APA's Included Assets Schedule was to be changed to read "UNIX, UnixWare and Auxiliary Products." (5/18/07 James Decl. Ex. 2 § K.1(i).) Attachment A of Amendment No. 1, in turn, lists well over one hundred of the defined "Auxiliary Products." (Id. Attachment A.) The final language of Paragraph A of Amendment No. 2 encompasses the copyrights in such products; the draft language of Paragraph A plainly did not.

Finally, on this issue, Ms. Amadia singles out the language in the initial draft of Paragraph A of Amendment No. 2 in which the exception to the Excluded Assets Schedule of the APA was phrased as follows: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder . . . ." (Amadia Decl., Exh. 1 at

_____

[5] Mr. Sabbath did not claim to recall the specifics of any conversations with Ms. Amadia or the specific exchange of documents regarding proposed language; that testimony hardly renders irrelevant his clear and repeated testimony regarding his intent and understanding in connection with both the APA and Amendment No. 2 and the course of performance thereafter.

1.) Novell ignores the fundamental inferences the Court can and should draw in SCO's favor based on the changes in language. Whereas (for example) the draft language referred to "the copyrights and trademarks owned by Novell as of the date of this Amendment," the final language referred to "the copyrights and trademarks owned by Novell as of the date of the Agreement." The reasonable inference is that the parties agreed that Novell did not own the copyrights and trademarks as of the date of the Amendment. In addition, whereas the draft language purported to amend the Excluded Assets Schedule of the APA with language referring to "this Amendment," the final language makes reference to "the Agreement." The reasonable inference is that the draft language was literally wrong (the Excluded Assets Schedule could not sensibly be revised to contain a reference to an Amendment occurring a year later), and that the parties intended for Amendment A to relate back to the date and execution of the APA. Finally, the draft language referred to the copyrights that SCO "has acquired hereunder" without making clear that "hereunder" referred to the APA, not the Amendment itself. The final language makes clear that Paragraph A operates as a revision to the language of the APA itself.

G. Novell's Other Arguments Are Unavailing.

First, Novell continues to rely (at 23-30) on Item V.A of the Excluded Assets Schedule. Novell explains at length that the provision was allegedly negotiated and inserted by its lawyers with the intent of excluding the UNIX and UnixWare copyrights. Novell lists (at 25-26) interests it purportedly sought to protect by the alleged exclusion. But Novell's arguments are of no consequence, because Amendment No. 2 expressly replaced the language that Novell invokes in Item V. The alleged negotiation, purpose, language, and scope of the original provision are irrelevant because it no longer exists for purposes of construing the APA.

Second, Novell argues (at 31-32) that the TLA does not support SCO's position for two reasons. Novell first points out, without any factual or legal support, that "Technology is a broad concept, which encompasses trade secrets and know-how, in addition to copyrights and patents." Novell then points out that the Licensed Technology was defined in the APA to encompass "derivatives" of the technology included in the assets. Novell's argument does not square with the language of the contracts.

Nothing in the APA or TLA even suggests that the license-back was limited to trade-secrets, know-how, or derivatives. Rather, the license provides Novell rights to "all of the technology included in the Assets" and "all derivatives of such technology." (5/18/07 James Decl. Ex. 4.) In addition, the APA and TLA plainly impose strict restrictions on Novell's use and distribution of the Licensed Technology as a whole – not only its trade secrets, know-how, and derivatives. Novell does not explain why it would have accepted such restrictions if it retained ownership of the copyrights.

Third, Novell argues (at 35) that Amendment No. 2 does not constitute an instrument of conveyance under the Copyright Act. But that is beside the point. It is the amended APA, not Amendment No. 2, that constitutes a sufficient instrument of conveyance under Section 204(c). By removing the copyrights from the Excluded Asset Schedule of the APA, Amendment No. 2 erased any inconsistency between the two Schedules to the APA. Accordingly, given the broad rights granted under Schedule 1.1(a), the amended APA qualified as an instrument of conveyance under the Act.

Novell cites four cases (at 34-38) purportedly in support of its assertion that Amendment No. 2 fails as an instrument of conveyance. But Novell cites them for broad policy propositions,

56

not for any specific rules or facts that useful in drawing the line between a sufficient and insufficient instrument. In fact, one of Novell's cases actually helps SCO's position, while the other three are easily distinguishable.

In <u>Pamfiloff v. Giant Records, Inc.</u>, 794 F. Supp. 933 (N.D. Cal. 1992), the Court found that a recording agreement which made no reference to any transfer of ownership rights, and which clearly granted plaintiffs only limited recording rights, satisfied the requirements of Section 204. <u>Id.</u> at 935. This case actually supports SCO's position because here, by contrast, the amended APA is a formally signed agreement that clearly transfers broad ownership rights set forth in an assets schedule.

Novell cites three cases where the Court did find that the writing in question was insufficient, but those cases do not even satisfy the basic signature requirement of the Act and have no resemblance to this case. In <u>Effects</u>, 908 F.2d at 555, for example, the issue was "whether a transfer of copyright <u>without a written agreement</u>, an arrangement apparently not uncommon in the motion picture industry, conform[ed] with the requirements of the Copyright Act." <u>Id.</u> at 555 (emphasis added). Novell also cites <u>Koningsberg Int'l, Inc. v. Rice</u>, 16 F.3d 355 (9th Cir. 1994), but in that case the parties had not even settled on the final terms or signed the agreement that was alleged to be an instrument. <u>Id.</u> at 356. Finally, in <u>Radio Television Espanola S.A. v. New World Entm't, Ltd.</u>, 183 F.3d 922 (9th Cir. 1999), the defendant never signed the proposed licensing contracts, and the Court disagreed that negotiation-related faxes and internal deal memos satisfied the writing requirement of Section 204. <u>Id.</u> at 928.

<u>Fourth</u>, Novell argues also argues that Amendment No. 2 fails as a transfer writing because, according to Novell, no copyrights are "required" by SCO. Novell argues (at 38) that

SCO does not require any copyrights because it already has an implied license to the technology. SCO has responded to this argument in Part II.E, above. Novell also contends (at 46) that SCO has not met its alleged burden of proving what copyrights were required to operate the Business.

Novell's assertion (at 47) that "SCO has not presented any evidence" that copyrights were "required for" the operation of the UNIX business is false. In his capacity as SCO's 30(b)(6) witness, Chris Sontag, repeatedly answered Novell's calls to provide factual bases that the copyrights were required. See 5/18/07 James Decl. Ex. 64 at 126 (the business required "all of the copyrights. . . . That was the way the business was set up."); Id. at 127 (SCO and all its predecessors licensed "the previous versions of the product when licensing the most recent version," requiring ownership of all previous copyrights); Id. at 129 ("it would be impossible for SCO to produce, copy, and distribute the UnixWare product without the full rights of the copyrights"). The record is replete with testimony of witnesses, including former Novell employees, who stated that the UNIX and UnixWare copyrights were indeed 'required for' the operation of the business. Examples include:

- Steve Sabbath, the attorney whom Novell refers to as Santa Cruz's primary negotiator of Amendment No. 2:

  Q. In your view, as of the execution of the APA, what copyrights were required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies?
  . . .

  A. Well, you would need all of the copyrights.

  Q. And why do you say that?

  A. To do the future development, you would need the copyrights, to license the technology the way you saw fit, you would need the copyrights. My gosh, if you didn't own the copyrights, how could you even go after somebody that's pirating

your software?  How could you enforce your rights in the technology?  So you
would need all of the copyrights and binaries and source code.

(5/18/07 James Decl. Ex. 120 at 34-35; see also id. 211 (until it sold the business to Caldera,
Santa Cruz needed "all rights to run your business.  You don't know what you're going to be
doing day-to-day, what kinds of situations you'll find yourself in with potential partners, with
potential customers.  So you want all rights to do anything that you deem fit with the
technology"); 212 ("[W]e did need to protect the technology.  We didn't want somebody to be
able to go off and pirate it, for example, so we needed the copyright in order to defend the
property.").)

- <u>Ed Chatlos</u>, the lead negotiator of the APA on behalf of Novell:

  Q:   Is it your view that Santa Cruz needed the same copyrights that Novell
  owned in UNIX and UnixWare in order to operate the businesses that Novell had?
  . . .

  A:   Yes.

(5/18/07 James Decl. Ex. 13 at 43.)

- <u>Doug Michels</u>, former Santa Cruz CEO:

  Q.  Do you have a view as to the copyrights that Novell owned as of the date of
  the APA that were required for SCO to exercise its rights with respect to the
  acquisition of UNIX and the UnixWare technologies?

  A.  Well, it would have been all the copyrights regarding the intellectual property
  we bought.
  . . .

  Q.  Let me ask a very fundamental question that I probably didn't capture clearly
  in my previous question. Why, in your view, was it necessary or required for
  Santa Cruz to have the copyrights in order to exercise its rights with respect to
  UNIX and UnixWare technologies?
  . . .

  A:  I mean, in the software business the products are, you know, effectively,
  source code and documentation and screens, all of which are governed by
  copyrights.  That's what -- that's what you own.  That's the intellectual property
  of a source code product.  It would be meaningless to own it if you didn't own the
  copyrights.  I mean, that's -- that's what you would have to have.

(5/18/07 James Decl. Ex. 18 at 101-02; see also id. 104 (had Santa Cruz employee or attorney told him that the company was obligated to go back to Novell and make a case as to why a particular copyright was required, "I think I would have laughed them out of my office").)

- <u>Ty Mattingly</u>, former Novell board member:

  I believe that, given the level of consideration transferred from SCO to Novell, that there is absolutely the strategic intent as well as the rationale for this to be a viable business for SCO to create and unify people around UNIX on Intel, that if [copyright] was not transferred at that moment in time, the entire exercise was pointless.

(5/18/07 James Decl. Ex. 9 at 108.)

- <u>Kim Madsen</u>, Santa Cruz Legal Department: "copyrights were essential to the business" of Santa Cruz's server division.  (5/18/07 James Decl. Ex. 22 at 232.)

- <u>Darl McBride</u>, CEO, The SCO Group, Inc.: "You have a company that has acquired a product, and the product requires you to make copies and to distribute the core source code of that." (5/18/07 James Decl. Ex. 6 at 234.)  As to what copyrights are required to operate the business, Mr. McBride stated, "Well, the answer is all of it.  It was obvious to anybody who read [Amendment No. 2]." (<u>Id.</u> at 234-35.)

## III.    THE EXTRINSIC EVIDENCE DEFEATS NOVELL'S MOTION.

The extrinsic evidence, including testimony of the principals responsible for the

transaction and the parties' conduct during the years that followed the APA, confirms SCO's

position.

The California Supreme Court and lower courts have emphasized the relevance of

various forms of extrinsic evidence:

As an aid in discovering the all important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement, including the object, nature and subject matter of the writing, and the preliminary negotiations between the parties, and thus place itself in the same situation in which the parties found themselves at the time of

> contracting. Also applicable here is the familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court.

Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co., 128 P.2d 665, 671-72 (Cal. 1942) (citations

omitted); accord Crestview Cemetery Ass'n v. Dieden, 356 P.2d 171, 176-77 (Cal. 1960);

Hernandez v. Badger Constr. Equip. Co., 28 Cal. App. 4th 1791, 1814-15 (1994). The court in

Universal Sales emphasized that "a practical construction placed by the parties upon the

instrument is the best evidence of their intention." 128 P.2d at 672; accord Crestview, 356 P.2d

at 176-77. The court in Universal Sales reasoned:

> Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it.

Id.; accord Crestview, 356 P.2d at 176-77; S. Cal. Edison, 37 Cal. App. 4th at 850-51 (further

explaining that one party's practical interpretation of the contract is relevant extrinsic evidence in

addition to the "joint conduct of the parties in the course of performance of the contract");

Hernandez, 28 Cal. App. 4th at 1814-15 & n.19.

SCO shows below that the substantial evidence falling into the foregoing categories

plainly and uniformly precludes Novell's interpretation and motion for summary judgment.

Novell seeks to exclude such overwhelming evidence by focusing again on Item V.A of

the Excluded Assets Schedule. Novell argues (at 21-23) that SCO relies on a reading of that

provision that limits the phrase "all copyrights" to "Netware copyrights." Novell rejects (at 23)

that interpretation as "far-fetched" and "bizarre," and contends that extrinsic evidence cannot be admitted because Item V.A is not reasonably susceptible to that interpretation. Where Item V.A has been read out of the APA, however, SCO does not rely on any interpretation of Item V.A. Instead, SCO relies on Section 1.1(a) and Schedule 1.1(a) of the APA and Paragraph A of Amendment No. 2. Novell's arguments for the exclusion of extrinsic evidence are therefore unavailing.

### A. Testimonial Evidence.

The Novell business executives who were responsible for and negotiated the APA have given consistent accounts of the Novell's intentions in the transaction.

Novell's own CEO at the time of the APA, Robert Frankenberg, testified that it was his intent, at all relevant times, that Novell would transfer the UNIX and UnixWare copyrights to Santa Cruz. (¶¶ 11-12.) Mr. Frankenberg understood that the sale of "all right and ownership of UNIX and UnixWare" included the UNIX and UnixWare copyrights. (Id.) He never gave any directions to the Novell negotiating team, including Ed Chatlos and Duff Thompson, to transfer "all right, title and interest" but retain copyrights. (Id.) He also never told anyone at Santa Cruz that copyrights were excluded from the deal. Mr. Frankenberg's testimony, coming as it does from Novell's former CEO, represents powerful evidence of Novell's intent for the APA. (Id.)

Mr. Frankenberg's testimony harmonizes with the testimony of his former colleagues who were also responsible for the negotiations. Duff Thompson, whom Mr. Frankenberg appointed as the executive ultimately responsible for the sale, testified that his assignment was to sell the entire business, including the copyrights. (¶¶ 15-16.) Likewise, Ty Mattingly, who served as Mr. Frankenberg's personal liaison with the Novell negotiating team, testified that the

62

transfer of the copyrights to Santa Cruz was absolutely consistent with his view of the overall strategy of the transaction. (¶¶ 13-14.) These witnesses confirm that Novell's intent was to divest itself of the UNIX and UnixWare business, including the technology and copyrights.

Burt Levine, a former Novell attorney who reviewed and revised drafts of the APA, confirmed both Novell's intent and interpretation of the APA. (¶ 16.) He testified that, under the APA, "the intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright." (Id.) Like Mr. Frankenberg, Mr. Levine understood that the transfer of "all rights and ownership" would include copyrights. (Id.)

Ed Chatlos, who was the lead negotiator for Novell in the APA transaction, testified regarding his intent as company representative:

> It was always my understanding and intent on behalf of Novell that the UNIX source code and its copyrights were part of the assets SCO purchased.

> *    *    *

> My intent and understanding as the lead negotiator for Novell was that Novell was transferring the copyrights to SCO in the APA.

(Id.) Mr. Chatlos's testimony reveals that he shared the same intent for the deal as Mr. Frankenberg and the other involved officers. (Id.) The testimony also confirms that the strategy and intent of senior management drove the negotiations with Santa Cruz. (Id.)

Bill Broderick was a contract manager in the UNIX licensing group at Novell. (¶ 19.) Based on the instruction he received at company meetings announcing and implementing the

63

transaction, Mr. Broderick understood that the UNIX copyrights were transferred to Santa Cruz. (¶¶ 19-20.)

The testimony of the foregoing witnesses shows that executives at every level who were involved with the transaction shared a common understanding of Novell's intent. They commonly understood that Novell sought to sell the UNIX and UnixWare business, including the copyrights.

Similarly, all the witnesses on the Santa Cruz side have testified that Santa Cruz intended to acquire the entire UNIX and UnixWare business, including the copyrights. Alok Mohan, the CEO of Santa Cruz at the time of the APA, testified that he believed he "bought the whole business." (¶ 21.) He added that "the whole discussion and intent" was for Santa Cruz to acquire the whole business, including the copyrights. (Id.) Doug Michels, who founded Santa Cruz and was later its CEO, testified that the parties agreed that "the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz." (¶ 22.)

Jim Wilt was the lead negotiator for Santa Cruz. Mr. Wilt testified that it was always his intent on behalf of Santa Cruz to acquire, through the APA, Novell's entire UNIX and UnixWare business, including source code and all associated copyrights. (¶ 23.) Kim Madsen likewise testified that "copyrights were part of the assets Santa Cruz purchased and were transferred to Santa Cruz at the closing in December 1995." (¶ 24.)

Thus, to date, no fewer than ten witnesses have given sworn testimony in support of SCO's position. (¶¶ 11-24.) Whether from Novell or Santa Cruz, these witnesses tell a common story about the intent and purpose of the APA transaction.

In the face of such overwhelming testimony regarding the intent of the APA by the principals who actually negotiated, were responsible for, and implemented the agreement, Novell submits the testimony of two of its former attorneys, David Bradford and Tor Braham. Messrs. Bradford and Braham state that, in keeping with Mr. Frankenberg's alleged instruction to protect Novell's interests, they decided <u>on their own</u> to exclude the copyrights from the transaction. (Braham Decl. ¶ 14; Bradford Decl. ¶ 9.) But those statements are contradicted by the testimony of Mr. Frankenberg, who stated that it was never his intent for Novell to retain the UNIX and UnixWare copyrights and that he never authorized anyone to so. (¶¶ 11-12.)

Even if Messrs. Bradford's and Braham's testimony that they purposely excluded the UNIX and UnixWare copyrights were deemed credible, it would not remotely entitle Novell to summary judgment. The alleged exclusion is of no consequence today because Amendment No. 2 expressly replaced the exclusionary language. The exclusion no longer exists for purposes of construing the contract.

Even if the original Item V.A were still of consequence in the case, Novell would not inch any closer to summary judgment. First, given that six other Novell witnesses, including its former CEO, have testified that the intent of the APA was to include the copyrights in the transfer, there would be at minimum a question of fact as to whether the actions of Messrs. Bradford and Braham even reflected Novell's intent and agreement at the time. (¶¶ 11-20.) Second, the witnesses on the Santa Cruz side have uniformly testified that it was their intent and belief that the APA provided for the transfer of the UNIX and UnixWare copyrights. (¶¶ 20-24.) In view of such testimony, Messrs. Bradford's and Braham's statements say nothing about

whether Santa Cruz even understood, let alone agreed to, their alleged exclusion of those copyrights.[6]

---

Novell also now relies on the declaration of David Bradford, Novell's general counsel in 1995, who claims to have directed his outside counsel to draft the APA to retain the UNIX and UnixWare copyrights for Novell. In addition to the crucial fact that Mr. Bradford offers testimony regarding language that was indisputably eliminated from the APA in Amendment No. 2, the evidence calls into question the reliability of his testimony. Whereas Mr. Bradford now claims a clear recollection of the intent he possessed at the time and the directives he supposedly gave to Novell's outside counsel, he has previously made contradictory statements. The evidence shows:

- Since 2003, with reference to the APA, Mr. Bradford has repeatedly told a long-time personal friend that "he was not significantly involved in that transaction and did not know much about it." (5/18/07 James Decl. Ex. 113 ¶ 6.)

- On various occasions he said that he was "too busy on much larger matters for Novell," that "he had other people handle that transaction," or that he was only "somewhat involved" in that transaction. (Id.)

- On more than one occasion, asked whether Novell kept the UNIX copyrights from Santa Cruz in the 1995 transaction, Mr. Bradford repeatedly stated that he did not know the answer to that question because, again, he "was not really that involved in that transaction and was busy on more important matters." (Id. ¶ 7.)

---

[6]     Nor do Novell's declarants even attempts to reconcile Novell's interpretation with the license-back to Novell under the TLA. On the contrary, Novell General Counsel Joseph LaSala recently agreed in his deposition in this case that "it would be reasonable for someone to read the technology license agreement as inconsistent with a reading of the APA that the UNIX copyrights were retained by Novell." (¶ 25.)

- Mr. Bradford subsequently explained that he did not remember the details regarding the negotiation of the APA "but he had gone back and read the agreements a few times and concluded that this must have been what happened." (Id. ¶ 9.)

- Even after Mr. Bradford signed his declaration, he confirmed "that his recent change of position was because he had reread the documents and concluded that his explanation as is set forth in his declaration must have been what happened." (Id. ¶ 11.)

This testimony compels the inference that Mr. Bradford does not remember the events at issue but instead has now convinced himself that this is what happened. (See id. ¶¶ 9-10.) His declaration is directly at odds with what he repeatedly told his personal friend. (Id.) The foregoing evidence thus puts the reliability of Mr. Bradford's testimony directly at issue, raising an issue inappropriate for resolution on summary judgment. See Fed. R. Civ. P. 613(b); United States v. White, 68 Fed. Appx. 870, 873 (10th Cir. 2003) (relevant impeachment evidence) (citing cases); Dubuc v. Johnson, 201 F.3d 447 (10th Cir. 1999) (assessment of credibility of witness on summary judgment is inappropriate); Zuchel v. Spinharney, 890 F.2d 273, 275-6 (10th Cir. 1989) (same) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

B. The Parties' Contemporaneous Conduct.

The parties' conduct at the time of the APA and in the months that followed confirms the transfer of the copyrights under the APA and belies Novell's current litigation position.

The parties' conduct at the time of the APA expressly confirmed their intent to transfer the copyrights under the agreement. On September 20, 1995, the day after they signed the APA, the parties announced in a press release that Santa Cruz was going to acquire "Novell's UNIX business and UNIX intellectual property." (¶ 26.) This admission by Novell alone should suffice to defeat its summary judgment motion. The announcement constitutes direct

contemporaneous evidence that Novell understood at the time that the transaction included the UNIX intellectual property owned by Novell. That admission cannot be squared with Novell's current position that it intended to exclude "all intellectual property."

Furthermore, the evidence shows that, in the weeks before the Closing, Novell fully expected that the transfer would include all rights to UNIX and UnixWare. On October 4, 1995, Mr. Bradford signed a Notification Form for the Federal Trade Commission, certifying that "the Assets to be acquired by SCO are identified with particularity in Schedule 1.1(a)" of the APA. (¶ 31.) Quoting the Schedule, Novell stated that the acquisition would include "All rights and ownership of UNIX and UnixWare." Nowhere in the nineteen-page Form did Novell even suggest that copyrights, or any rights, would be retained. (Id.)

The evidence also shows that Novell executives understood that Novell's copyrights would pass to Santa Cruz on the Closing Date. Skip Jonas, for example, told Novell attorney Burt Levine that after the Closing "Novell is out of the UNIX/UW business" and "does not have the right to sell UW." (¶ 39.) Larry Bouffard wrote that Santa Cruz bought the UNIX business "lock, stock, and barrel" and that Novell would have "no more involvement with" the business. Lou Ackerman asked Santa Cruz for a Statement of Work authorizing Novell to act as SCO's agent for UNIX licensing after the Closing. (¶ 40.) These statements by persons charged with implementing the APA illustrate how Novell knew that its ownership of the copyrights would end on the Closing Date.

In turn, Novell's conduct after the Closing reflects its understanding that it in fact had transferred the copyrights to Santa Cruz. On the Closing Date, Novell took back a license from Santa Cruz for the same UNIX and UnixWare technology transferred under the APA. (¶¶ 33-

68

35.)  Had Novell retained the copyrights it would have been utterly senseless for it take a license from Santa Cruz.  Novell's execution of the TLA represents another independently sufficient reason for denying Novell's motion.

REDACTED

This document leaves little doubt that, after the Closing Date, Novell considered Santa Cruz to be the copyright owner for UnixWare.

Novell has relied on the testimony of Mike DeFazio, but in January, 1996, Mr. DeFazio

REDACTED

On the other side of the table, Santa Cruz also understood that the APA provided for the transfer of the copyrights.  On September 19, 1995, the very date of the APA, the investment bankers for Santa Cruz sent the company a summary of the terms of the APA, stating in coded words that "the agreement provides that Santa Cruz will obtain the IP for UNIX, UnixWare in addition to its related products." (¶ 31.)  In its 1996 Annual Report, Santa Cruz reported that it had in fact acquired "certain assets related to the UNIX business including the core intellectual property from Novell." (¶ 35.)  Without even considering the evidence of Novell's intent, such evidence of Santa Cruz's intent gives rise to triable issues about the intent of the APA.

69

The evidence shows that Novell understood SCO to own the UNIX copyrights following the APA. In November 1995, SCO made "a request for Novell engineers to modify the copyright notice in UnixWare 2.1 (code-named Eiger) to reflect the change in ownership of the copyrights in UNIX and UnixWare from Novell to SCO." (5/18/07 James Decl. Ex. 89 ¶¶ 5-6.) Novell engineers changed the UNIX and UnixWare packages to contain a SCO copyright. (Id. ¶ 8.) The change to the copyright notice was "made on preexisting UNIX and UnixWare code." (Id.)                                         REDACTED

                                                                                                                      It thus follows, for example, that the registration of a copyright for UNIX System V Release 4.2 MP that Novell filed in 2003 flatly contradicts Novell's own prior conduct. (Id. ¶¶ 3-6, 8.) This evidence further establishes that SCO is the owner of the UNIX and UnixWare copyrights and that, contrary to the positions it has taken in this litigation, Novell knew that SCO was the owner of the UNIX and UnixWare copyrights.

The copyright notices that Novell cites do not suggest any contrary result or understanding by the parties. Mr. McKenna from Novell describes certain copyright notices that he found in the source code on three CDs containing SCO UnixWare Release 2.1, SCO UnixWare Release 2.1.3 Installation CD, and SCO UnixWare Release 2.1.3; Mr. McKenna concludes that several copyright notices alluding to "Novell, Inc." appear in the source code that he has examined. (5/18/07 James Decl. Ex. 114 ¶ 5.)

The evidence shows that when SCO obtained the UnixWare source code from Novell as a result of the parties' 1995 transaction, with one exception, SCO did not remove any copyright notices. (Id. ¶ 6.) SCO did not add any "Novell" copyright notices to any of its source code

70

products; those notices were in the UnixWare source code that SCO received from Novell. (Id.) SCO's foregoing practice and conduct reflects SCO's view that the purpose of the copyright notice in the source code is to reflect the current owner of the copyrights in the source code, and that it was not necessary (for any legal or other reason) to remove the preexisting copyright notices. Novell itself added Santa Cruz copyright notices in UnixWare 2.1, and Santa Cruz also added such notices in subsequent versions of UnixWare. (Id. ¶ 7.)

In addition, UnixWare 2.1 contained Novell NetWare source code (which was not transferred to SCO under the 1995 transaction) that SCO agreed to ship as part of UnixWare as part of the 1995 transaction. SCO's understanding was that the presence of such code in UnixWare required Novell's copyright notice. The date range of the Novell copyright notices ("1984-1995") reflects that the notices pertain to NetWare, where it is undisputed that Novell did not acquire the UNIX and UnixWare source code until the early 1990s but had begun developing the NetWare source code in the mid-1980s. Indeed, the current version of UnixWare, Version 7.1.4, does not contain the Novell copyright notices to which Mr. McKenna alludes (that is, the installation copyright notices). SCO believes that is because, per an agreement with Novell, SCO removed the explicit NetWare source code from UnixWare Version 7. (Id. ¶ 7.)

C. Conduct Through the Years Following the Transition.

The parties' course of performance in the IBM-buyout dispute also confirms the transfer of the copyrights. On April 23, 1996, Santa Cruz CEO Alok Mohan complained to Novell CEO Robert Frankenberg that Santa Cruz had "ownership and exclusive rights to license the UNIX source code." (¶ 44.) Novell did not challenge Mr. Mohan's assertions, but rather negotiated a settlement that included a payment of $1.5 million to Santa Cruz for releasing claims based on

Novell's licensing of the UNIX source code to IBM. (¶ 46.) Novell has not explained why it paid that money instead of resolving the dispute by asserting its purported copyrights.

Pursuant to the APA, Novell held a seat on the Santa Cruz Board of Directors until 1999 when it divested its equity position in Santa Cruz. Novell's representative reported back to the company regarding developments at Santa Cruz. (¶ 47.)

In 1996, Santa Cruz accused Microsoft of anticompetitive activities harmful to the UNIX business. In a letter dated September 19, 1996, Santa Cruz represented to the Justice Department that it had acquired the rights and ownership of the UNIX software from Novell, and that, as a result, "SCO now enjoys the right, as the owner of the UNIX program, to exploit the program without the necessity of a license from any other party." (¶ 48.) On January 31, 1997, Santa Cruz reiterated and expanded upon those statements in a complaint filed with the European Commission. (¶ 49.) Santa Cruz also repeatedly referred to itself as "the copyright owner of UNIX." Santa Cruz's proceedings against Microsoft in the EU received wide publicity over the subsequent months. (¶¶ 48-53.)

The provisions of the 1987 MS Agreement which Santa Cruz deemed anticompetitive applied only to the owner of the UNIX copyrights. Had Novell believed in 1996-97 that it owned the copyrights, then Novell, and not Santa Cruz, would have had the interest and standing to complain to the antitrust authorities. Indeed, in 1994, when Novell did own the copyrights, it complained internally about anticompetitive provisions of the 1987 MS Agreement and contemplated bringing its own action. (5/18/07 James Decl. Ex. 53.) There is no evidence that Novell was ever concerned about the 1987 MS Agreement after the APA.

On August 1, 2000, Santa Cruz agreed to transfer to SCO "all rights and ownership of UNIX and UnixWare" including all appurtenant intellectual property rights. (¶ 54.) On May 7, 2001, Santa Cruz in fact transferred those rights to SCO, including expressly "all copyrights." (¶ 55.) Santa Cruz also warranted that it had "the full power, authority and all rights necessary to transfer and assign" the assigned rights. (¶ 58.)

During the years that followed the APA, Santa Cruz and then SCO openly licensed and distributed UNIX products throughout the world. Since 1995, without objection from Novell, Santa Cruz and SCO shipped countless such products with a Santa Cruz or SCO copyright notice affixed. (¶ 63.) Since 1995, also without objection from Novell, Santa Cruz and SCO also entered into numerous UNIX license agreements that not only contain express representations and warranties of SCO's rights and ownership in the intellectual property required to provide the licensed product, but that also indemnify licensees against any third-party claims for copyright infringement. (¶ 63.) Before May 28, 2003, Novell did not contest Santa Cruz's or SCO's statements and conduct asserting ownership of the copyrights. (¶ 64.) Indeed, Novell has not presented, nor has SCO found, any evidence that Novell publicly asserted ownership of UNIX or UnixWare copyrights between the Closing Date and May 28, 2003.

D. Novell's Recent Conduct.

On May 28, 2003, for the first time since the execution of the APA, Novell asserted ownership of the copyrights at issue. (¶ 67.) Novell made those claims without consulting the Novell executives who had actually negotiated or been responsible for the APA in 1995. (¶ 68.) Novell also made those claims even though it had within its possession at least unsigned copies of Amendment No. 2. (¶ 69.) Novell's failure to perform due diligence on the issue suggests

73

that Novell minted its ownership claim anew in 2003, based language in Item V of the Excluded

Assets Schedule that was replaced by Amendment No. 2.

On June 6, 2003, after SCO had found and sent to Novell a copy of Amendment No. 2,

Novell candidly admitted:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase
> Agreement was sent to Novell last night by SCO. To Novell's
> knowledge, this amendment is not present in Novell's files. The
> amendment appears to support SCO's claim that ownership of
> certain copyrights for UNIX did transfer to SCO in 1996.

(¶ 69.) This admission alone defeats Novell's Motion because it establishes that Amendment

No. 2 is at least reasonably susceptible to the interpretation SCO proposes.

Should the Court decide that the plain language of the amended APA and Bill of Sale did

not transfer the copyrights to Santa Cruz, the Court should resort to extrinsic evidence to expose

or resolve any ambiguity. As shown here, that evidence even individually defeats Novell's

Motion. Collectively, the extrinsic evidence utterly forecloses summary judgment for Novell.

## IV.    THE APA AND EXTRINSIC EVIDENCE PRECLUDE SUMMARY JUDGMENT ON SCO'S ALTERNATIVE CLAIM FOR SPECIFIC PERFORMANCE

Novell argues (at 40) that it is entitled to summary judgment on SCO's alternative claim

for specific performance "because SCO cannot establish that Santa Cruz had the right to obtain

title to the copyrights." Novell's reasoning is flawed. Pursuant to the plain language of the

APA, SCO brings an alternative claim seeking specific performance precisely in the event that

the Court finds that the amended APA failed to transfer the copyrights notwithstanding the

parties' intent. In that event, the APA requires that Novell take the actions necessary to

effectuate the purpose of the APA.

74

Novell and Santa Cruz repeatedly covenanted in the APA to take such actions. Section 1.7(c) requires that the parties take "any further action" that is necessary to "carry out the purposes" of the APA. (¶ 72.) Sections 4.9 and 4.12 require that the parties take all necessary and desirable actions under the law, including the execution of any necessary instruments, to consummate and make effective the transaction contemplated by the APA. (¶¶ 73-74.)

Section 1.3(a)(i) expressly identifies the purpose of the APA, namely, to transfer "all of the Business" to Santa Cruz. (¶ 75.) Recital B memorialized the transaction contemplated by the parties:

> The Board of Directors of each Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the "Acquisition").

(¶ 76.) Together, these two provisions make clear the purpose of the APA was to transfer the entire UNIX and UnixWare business, including copyrights, to Santa Cruz.

Even if these provisions were deemed to be ambiguous, the overwhelming witness testimony cited above at minimum creates an issue of fact as to whether the parties intended, but somehow failed, to transfer the copyrights under the APA. Accordingly, the Court should deny Novell's motion for summary judgment on SCO's claim for specific performance.

75

## CONCLUSION

SCO respectfully submits, for the foregoing reasons, that the Court should deny Novell's

Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for

Specific Performance.

DATED this 18th day of May, 2007.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
David Boies
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

DORSEY & WHITNEY LLP
Devan V. Padmanabhan

*Counsel for The SCO Group, Inc.*

By: _____

**CERTIFICATE OF SERVICE**

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on this 24th day of May, 2007, via CM/ECF to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-2482

/s/ Edward Normand