## Appendix A

### Response to Novell's Statement of Undisputed Facts[1]

A. **The APA Expressly Excluded "All Copyrights" from the Assets to be Transferred by Novell to Santa Cruz.**

1. Novell and Santa Cruz signed the APA on September 19, 1995. Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare business. (Declaration of Kenneth W. Brakebill In Support of Novell's Motions for Summary Judgment ("Brakebill Decl."), Ex. 2, Recital B.)

**Response:** The first sentence is undisputed. The second sentence is disputed in that, through the APA, Santa Cruz acquired more than just "certain of the assets comprising Novell's UNIX and UnixWare business." Instead, pursuant to Recital B of the APA, the provision that Novell misquotes, Santa Cruz acquired certain of the assets of Novell comprising the UNIX and UnixWare business. That is, Santa Cruz did not merely acquire some of the assets of the Business; Santa Cruz acquired those assets of Novell comprising the Business. Section 1.3(a)(i) of the APA confirms that "It is the intent of the parties hereto that <u>all of the Business</u> and all of Seller's backlog, if any, relating to the Business <u>be transferred to Buyer</u>." (Emphasis added.)

2. The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the transfer; and Schedule 1.1(b), which listed assets excluded from the transfer. In this regard, Section 1.1(a) of the APA stated:

> *Seller will sell*, convey, transfer, assign, and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7), all of Seller's right, title and interest in and to *the assets* and properties of Seller relating to the Business (collectively the "Assets") *identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b)*.

(*Id.*, Section 1.1(a) (emphasis added).)

---

[1] In citing its basis for disputing a Novell statement of fact, SCO cites herein either paragraphs in SCO's Statement of Facts above or directly to exhibits, or both.

**Response:** Undisputed.

3. The first paragraph of the Schedule 1.1(a) list of included assets referred to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare...." (Brakebill Decl., Ex. 3, Schedule 1.1(a), Section I.) This general reference was followed by more detailed, itemized lists of specific categories of assets. The "Intellectual Property" category stated:

> V. Intellectual Property – Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark).

(*Id.*, Section V.) Thus, the only "Intellectual Property" identified in the list of assets to be transferred were the UNIX and UnixWare trademarks. Neither the "Intellectual Property" category, nor any other part of Schedule 1.1(a) identified copyrights in UNIX and UnixWare (or in any other product) as an asset to be transferred. (*Id.*)

**Response:** Undisputed to the extent the statement correctly quotes in part selected portions of the original Schedule 1.1(a) of the APA. Disputed to the extent the statement fails to include amendments to the referenced provisions. Disputed in that the UNIX and UnixWare trademarks were not the only intellectual property identified in the list of assets to be transferred. The transfer of "All rights" plainly includes all copyrights, and the transfer of "All rights and ownership of UNIX and UnixWare" includes all intellectual property related to UNIX and UnixWare. In addition, depending on the use of the term "intellectual property," other items specifically listed in Schedule 1.1(a), such as source code, are intellectual property.

4. Similarly, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded the following "Intellectual Property" from the sale:

> V. Intellectual Property
>
>   A. *All copyrights* and trademarks, except for the trademarks UNIX and UnixWare.
>
>   B. All Patents

(Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V (emphasis added).) Thus, the intellectual property listed as included assets under Schedule 1.1(a) was consistent with the intellectual property excluded by Schedule 1.1(b): only the UNIX and UnixWare trademarks were included, and all patents, copyrights, and trademarks were excluded except for the UNIX and UnixWare trademarks.

**Response:** Disputed in that the two Intellectual Property provisions do not have the consistency or relationship that Novell proposes. Disputed in that the Item V.A of Schedule 1.1(b) no longer exists for purposes of construing the APA. Disputed in that the specific inclusion of the UNIX and UnixWare trademarks in the Assets Schedule serves merely as an instance of the categorical transfer of "All rights and ownership of UNIX and UnixWare and Auxiliary Products" and was not the only intellectual property identified in the list of assets to be transferred. The transfer of "All rights" plainly includes all copyrights, and the transfer of "All rights and ownership of UNIX and UnixWare" includes all intellectual property related to UNIX and UnixWare. In addition, depending on the use of the term "intellectual property," other items specifically listed in Schedule 1.1(a), such as source code, are intellectual property.

### B. Novell Deliberately Excluded Copyrights from the Transferred Assets to Protect its Right to Receive SVRX and UnixWare Royalties and its Continuing Interest in the UNIX Business.

5. Novell's initial goal was to sell its UNIX assets for an all-cash payment. However, because Santa Cruz did not have sufficient cash to purchase all of Novell's UNIX assets, the deal was structured so that Novell would retain certain UNIX-related rights and would receive other forms of consideration. (Brakebill Decl., Ex. 21 (Deposition of Robert Frankenberg, February 10, 2007 ("Frankenberg Dep.") at 30:19 to 33:19, 61:23 to 64:21); Declaration of David Bradford, filed herewith ("Bradford Decl."), ¶ 7, 15, 16; Declaration of Tor Braham, filed herewith ("Braham Decl."), ¶ 7, 9-13, 18; Declaration of Jim Tolonen, filed herewith ("Tolonen Decl."), ¶ 5-6, 11-12.) In particular, Novell was entitled to receive 95% of "all royalties, fees, and other amounts" that were due under licenses to the Unix System V software Releases listed in Schedule 1.1(a) (the "SVRX Licenses"). (Brakebill Decl., Ex. 2, Sections 1.2(b), 4.16(a); Ex. 3, Section VI.) Novell's right to receive future SVRX revenues was an important part of the overall consideration for the APA; Novell had received $50 million in SVRX revenues in Fiscal Year 1995 alone. (Bradford Decl., ¶ 15, Ex. 2.) In contrast, the Santa

Cruz stock that Novell received under the APA had a value of approximately $50 million. (Braham Decl., ¶ 7.)

**Response:** The first sentence is disputed in that it lacks evidentiary support. The second and third sentences are disputed to the extent they suggest that Novell retained rights under the APA other than a contingent interest in the shipment and distribution of UnixWare products and the right to receive and protect the SVRX binary royalty stream as identified in SCO's pleadings in this litigation. Disputed in the term SVRX Licenses, as used in this statement and the APA, is vague and ambiguous. Disputed to the extent the rest of the statement purports to establish and compare the relative value of Novell's "SVRX revenues" and Santa Cruz's stock payment to Novell. Disputed to the extent the statement fails to include changes made to the referenced provisions by Amendment No. 1.

6. In addition to the right to receive future SVRX revenues, Novell also retained the right to require Santa Cruz to "amend, supplement, modify or waive any rights under" or "assign any rights to" the SVRX Licenses as directed by Novell. (Brakebill Decl., Ex. 2, Section 4.16(b).) One reason for this provision was to ensure that Novell could negotiate "buy-outs" of particular SVRX Licenses, in which the licensee made a substantial payment to obtain a "paid-up" license in which no future royalty payments were due. (Braham Decl., ¶¶ 6, 12, 13; Bradford Decl. ¶ 16; Brakebill Decl., Ex. 21, Frankenberg Depo. at 88:14 to 89:3.) Novell had already negotiated SVRX buyouts before the APA was signed, and wanted to be able to continue to enter buyouts after the APA was signed. (Braham Decl., ¶ 13; Brakebill Decl., Ex. 21, Frankenberg Dep. at 63:1 to 64:21.)

**Response:** Disputed to the extent the first sentence sets forth a legal conclusion rather than a statement of fact. Disputed to the extent the first sentence suggests that Novell retained a right to receive SVRX revenues other than the SVRX binary royalty stream identified in SCO's pleadings. (Ex. 7, 138-50.) Disputed in that the statement suggests that Novell's rights under Section 4.16 of the APA extend beyond the protection of its interests in the SVRX binary royalties. (Id.) Disputed in that the term SVRX Licenses, as used in this statement and the APA,

4

is vague and ambiguous. Disputed to the extent the statement suggests that the parties agreed that a reason for Section 4.16 rights was to ensure that Novell could negotiate buyouts; Santa Cruz did not believe that Novell could enter into SVRX buyouts without running afoul of the APA. (Id.) Disputed in that the cited sources do not support the proposition that a purpose of Section 4.16 (as opposed to Novell's subjective intent for the provision) was to permit Novell to enter into future buyouts.

7.  Another important consideration for Novell's sale of UNIX assets was Santa Cruz's commitment to develop enhanced UnixWare products that were compatible with Novell's NetWare product. The APA required Santa Cruz to use "commercially reasonable efforts" to develop a "Merged Product" that would combine Novell's version of the UNIX operating system (UnixWare 2.1, or "Eiger") with Santa Cruz's flavor of UNIX ("OpenServer Release 5.1," or "Comet"). (Brakebill Decl., Ex. 2, § 4.18.) Development of this Merged Product was the detailed subject of a separate "Operating Agreement," which was executed by Novell and Santa Cruz upon the Closing. (Brakebill Decl., Ex. 22 (further detailing SCO's obligation to develop the Merged Product).)

**Response:** The first sentence is disputed in that it lacks evidentiary support. Disputed to the extent the statement suggests that Novell did not have obligations related to the development of the Merged Product as a partner with Santa Cruz going forward. (Ex. 31.)

8.  Novell and Santa Cruz hoped that the Merged Product, which was designed to run on Intel 32-bit processors, would provide a commercially successful alternative to Microsoft Windows. (Braham Decl., ¶ 8.) This was a very important consideration for Novell, because Novell's flagship "NetWare" product needed an alternative operating system if it was to compete successfully with Microsoft. Thus, if the Merged Product successfully penetrated the Intel 32-bit market, this would likely lead to increased sales of NetWare as well. (Braham Decl., ¶ 8.) Moreover, Novell also had a direct financial interest in Santa Cruz's future sale of UnixWare products, as the APA entitled Novell to receive revenues on such sales. (Brakebill Decl., Ex. 2, § 1.2(b) and Schedule 1.2(b).)

**Response:** The second sentence is disputed for lack of evidentiary support. The rest of the statements is disputed to the extent it suggests that Santa Cruz undertook to create the Merged Product for the benefit of Novell as part of the consideration paid by Santa Cruz to

5

Novell under the APA. (Ex. 1, Ex. 31.) The last sentence is disputed to the extent it fails to state that Novell's interest in UnixWare revenues was limited and contingent. (Ex. 1, Schedule 1.2(b).)

9.  Novell also had a strong interest in the development of a commercially successful UNIX operating system that would run on Intel's next generation, 64-bit processors, as this would further expand the market for Novell's NetWare product. (Braham Decl., ¶ 13-14; Bradford Decl., Ex. 1 at 1; Tolonen Decl., ¶ 12.) Novell discussed development of a 64-bit UNIX operating system with several companies, including Santa Cruz and Hewlett-Packard. (Bradford Decl., Ex. 1 at 1, 3.)

**Response:** Undisputed.

10.  In sum, although Novell sold certain UNIX-related assets to Santa Cruz, Novell retained significant rights and commercial interests in the UNIX business, including (a) the right to collect 95% of "all" revenues due under "all" SVRX Licenses; (b) the right to negotiate buy-outs of the SVRX Licenses; (c) the right to require Santa Cruz to develop a unified UNIX operating system for Intel 32-bit processors; (d) the right to receive revenues on Santa Cruz's sales of UnixWare products; and (e) an interest in development of a UNIX operating system for Intel 64-bit processors by Santa Cruz, Hewlett-Packard, or someone else.

**Response:** Disputed to the extent the statement sets forth a legal conclusion. Disputed to the extent the phrase "retained significant rights and commercial interests" is vague and ambiguous. 10(a) is disputed in that Section 1.2(e) of the APA, as amended by Amendment No. 1, makes clear that Novell retained an interest only in the residual SVRX binary royalties. 10(b) is disputed because it lacks evidentiary support; the APA does not contain any provision preserving the right go grant buyouts. (Ex. 7, 138-50.) 10(c) is disputed in that it calls for a legal conclusion. 10(d) is disputed in that Schedule 1.2(b) of the APA makes clear that Novell retained only a contingent interest in UnixWare sales; 10(e) is disputed in that use of the word "interest" is vague and ambiguous; the APA did not provide any financial interest of this sort.

11. Robert Frankenberg, the CEO of Novell, directed his team to take steps to protect Novell's UNIX-related rights and interests under the APA. (Brakebill Decl., Ex. 21 (2/10/2007 Frankenberg Dep. at 63:10 to 64:21).) Novell had a specific concern about entrusting the future of UNIX to Santa Cruz. In particular, Santa Cruz was not the most financially stable company and Novell had concerns about Santa Cruz's viability as a company. (Braham Decl., ¶ 7; Bradford Decl., ¶ 8; Tolonen Decl., ¶ 12.) After a series of executive-level discussions during the summer of 1995, David Bradford, Novell's Senior Vice-President and General Counsel, was then entasked with overseeing the negotiation and drafting of the contract between Novell and Santa Cruz to protect Novell's interests. (Bradford Decl. ¶ 4, Tolonen Decl., ¶ 8.)

**Response:** The First sentence is disputed to the extent the phrase "rights and interests under the APA" are those not provided for by the APA. The second sentence is disputed because it lacks evidentiary support. The third sentence is disputed in that Duff Thompson was entasked with that responsibility for the deal and Ed Chatlos with negotiations. (Ex. 7, 10-12, 136-139.)

12. Pursuant to Mr. Frankenberg's and then Mr. Bradford's instruction, Novell's legal team took several steps to protect Novell's UNIX-related interests. First, Novell inserted a provision that "Seller is retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to Buyer pursuant hereto, and that Buyer only has legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code." (Brakebill Decl., Ex. 2, Section 1.2(b); Braham Decl. ¶ 10.) Novell added this provision to decrease the risk that if Santa Cruz went into bankruptcy, this would interfere with Novell's receipt of SVRX revenues. (Braham Decl., ¶ 10, Tolonen Decl. ¶ 12.)

**Response:** Disputed in that Mr. Bradford was not instructed or authorized to take the actions described. (Ex. 7, 10-12, 136-139.) Disputed in that Mr. Bradford had very limited involvement with the APA. (Ex. 113.)

13. Second, Novell expressly excluded "all copyrights" from the assets to be transferred to Santa Cruz, as reflected in Schedules 1.1(a) and 1.1(b) to the APA. (Braham Decl., ¶¶ 18-19; Bradford Decl., ¶¶ 11-12; Tolonen Decl. ¶ 11.) This exclusion ensured that if Santa Cruz went into bankruptcy, the UNIX and UnixWare copyrights would not be part of the bankruptcy estate, decreasing the risk that the bankruptcy trustee would assert an interest in the future SVRX revenues due to Novell under the APA. (Braham Decl., ¶ 14; Bradford Decl., ¶ 9; Tolonen Decl. ¶ 12; *see also* Brakebill Decl., Ex. 23, ¶ 45.)

7

**Response:** Disputed in that these actions, if taken, were not authorized by Novell. (Ex. 113; Ex. 7, 10-12, 19-20, 136-139.)

14. Excluding copyrights from the transferred assets also protected Novell's other UNIX-related interests. Retaining ownership of the copyrights strengthened Novell's rights to negotiate buy-outs of the SVR.X Licenses and to receive future revenues. (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12.) Retaining ownership of the copyrights also put Novell in a better position to ensure successful development of future versions of the UNIX operating system by Santa Cruz, Hewlett-Packard, or other companies. (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12; see Bradford Decl., ¶¶ 9, 16.)

**Response:** First sentence disputed for lack evidentiary support. The rest of statement is disputed. (Ex. 7.)

### C. The Lists of Transferred Assets Were Revised to Include a Copyright Exclusion and Then Exchanged By the Parties Before the APA Was Signed.

15. The correspondence between Novell and Santa Cruz shows that, before the APA was signed on September 19, 1995, several significant revisions were made to the lists of included and excluded assets.

**Response:** Disputed for lack of evidentiary support.

16. After receiving David Bradford's business direction to retain Novell's intellectual property rights in UNIX and UnixWare, Novell's outside legal team revised an early draft of a Schedule of Assets that had included patents, copyrights and trademarks. (Braham Decl. ¶ 15.) Unlike the final version of Schedule 1.1(a), this early draft of Schedule 1.1(a), which Novell's outside counsel faxed to Santa Cruz's legal representatives on September 8, 1995, included "all patents, patent applications, copyrights…and all other intellectual property…that pertain to Unix or UnixWare." (Braham Decl. ¶ 15, Ex. 6 at NOV 31783.)

**Response:** Disputed to the extent it sets forth a legal conclusion. Disputed in that Mr. Bradford did not play a significant role in the APA and did not have the authority to give the instructions alleged. (Ex. 113; Ex. 19-20, 136-139)

8

17.     Novell's outside counsel drafted a new schedule of assets to be included in the asset transfer, as well as a schedule of assets to be excluded from the transfer. (Braham Decl. ¶ 15, Ex. 7; *see generally* Tolonen Decl. ¶ 9 (discussing Braham role).) The new Schedule 1.1(a) deleted "copyrights," "patents," and "all other intellectual property" from the list of assets to be transferred. It revised Schedule 1.1(a) so that the UNIX and UnixWare trademarks were the only "Intellectual Property" included in the transaction. The new Schedule 1.1(b) made clear that patents and copyrights were not included as assets; instead they were specifically excluded. (*Id.*)

**Response:** Disputed to the extent the statement suggests that the alleged changes reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.)

18.     During the negotiations, Novell transmitted drafts of Schedules 1.1(a) and 1.1(b) to Santa Cruz, including the Schedule 1.1(b) that explicitly excluded "all patents" and "all copyrights." (Braham Decl. ¶ 17 and Ex. 4 thereto.) On September 18, 1995, for example, Novell's outside counsel sent revised Schedules 1.1(a) and 1.1(b) to Santa Cruz's legal representatives. (Braham Decl. ¶ 17 and Ex. 4 thereto.) Novell proposed to alter the prior version of Intellectual Property assets to be included in the transfer – previously limited to "Trademarks UNIX and UnixWare as held by Seller" – to also include the below, underlined language:

> V.     Intellectual property – Trademarks UNIX and UnixWare as <u>and to the extent</u> held by Seller (<u>excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark</u>).

(*Id.* at NOV 40410.) Novell also proposed several other changes to the Schedule 1.1(a) list of included assets and the Schedule 1.1(b) list of excluded assets. (*Id.*, Schedule 1.1(a), at 1, 2, 4; Schedule 1.1(b), at 2.)

**Response:** Disputed to the extent the statement suggests that the alleged changes reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.)

Disputed to the extent the statement suggests that Santa Cruz or its agents received, reviewed, or agreed to the alleged revisions, as there is no evidentiary support for those propositions.

Disputed to the extent the documents cited do not reveal the sequence, order, or timing of the alleged revisions.

9

19.     The draft of Schedule 1.1(b) that Novell sent to Santa Cruz on September 18, 1995, expressly excluded from the assets to be transferred "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." (*Id.*, Schedule 1.1(b).) Santa Cruz accepted this exclusion. Thus, the final version of the APA, signed on September 19, 1995, excludes "all copyrights" from the transferred assets. (Brakebill Decl., Ex. 4, Section V.)

**Response:** Disputed to the extent the statement suggests that the alleged changes reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.) Disputed to the extent the statement suggests that Santa Cruz or its agents received, reviewed, or agreed to the alleged revisions, as there is no evidentiary support for those propositions. Disputed to the extent the documents cited do not reveal the sequence, order, or timing of the alleged revisions.

20.     During the APA negotiations, several representatives of Novell reviewed and approved the language in the Excluded Assets provision excluding copyrights from the asset transfer: David Bradford, Tor Braham, Aaron Alter and Burt Levine. (Braham Decl. ¶ 16.)

**Response:** Disputed to the extent the statement suggests that the alleged changes reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.) Disputed to the extent the statement suggests that Mr. Levine understood or agreed that the Schedule to exclude the UNIX and UnixWare copyrights, as he did not. (Ex. 14 at 67-69.)

21.     Aaron Alter of the Wilson firm specifically edited the Intellectual Property provisions of Schedules 1.1(a) and 1.1(b), confirming that only certain UNIX and UnixWare trademarks would be transferred to Santa Cruz and leaving the copyright exclusion intact. (Braham Decl. ¶ 16(c), Ex. 8.) Mr. Alter had also marked up an early term sheet, adding the handwritten notation, "already excluded," next to a Section including "Intellectual Property Copyrights, trademarks ... ." (Braham Decl., ¶ 16(c), Ex. 9 at NOV 39798.)

**Response:** Disputed to the extent the statement suggests that the alleged edits reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.) Disputed to the extent statement suggests that Mr. Alter had the authority to make these particular edits. (Ex. 7, 15-20.)

22. Burt Levine, a lawyer for AT&T, Unix Systems Laboratories ("USL") and Novell who then joined Santa Cruz in early 1996, also reviewed and edited the Intellectual Property provisions in Schedules 1.1(a) and 1.1(b) during the APA negotiation period. He kept UNIX and UnixWare trademarks as a category of intellectual property to be included as an asset. He did not add UNIX or UnixWare copyrights as included assets. He left intact the copyright exclusion. (Braham Decl., ¶ 16(d), Ex. 10; Brakebill Decl., Ex. 25, Levine Dep. at 74:1-75:1, 76:10-77:7.) Further, Mr. Levine's comments on Schedules 1.1(a) and 1.1(b) – including the identification of "all copyrights" as an excluded asset – were transmitted to Santa Cruz's legal representatives during the negotiations. (Braham Decl., ¶ 17, Ex. 4; Brakebill Decl., Ex. 25, Levine Dep. at 83:20-85:9, 184:5-19.)

**Response:** First sentence is disputed for lack of evidentiary support. Second sentence disputed for same reason. Rest of statement: Disputed to the extent the statement suggests that the alleged changes reflected the intent of Novell or were authorized by Novell. (Ex. 113; Ex. 7 generally.) Disputed to the extent the statement suggests that Mr. Levine understood or agreed that the exclusion to include the UNIX and UnixWare copyrights, as he did not. (Ex. 14 at 67-69.)

D.  **Amendment No. 1 Made Further Revisions to the Lists of Transferred Assets, But Not to the Copyright Exclusion.**

23. After the APA was signed on September 19, 1995, Novell and Santa Cruz had discussions about clarifying certain provisions in the APA in the form of an Amendment No. 1. (Brakebill Decl., Ex. 17 (Madsen Dep. at 154:7-16.)

**Response:** Undisputed.

24. Novell and Santa Cruz signed Amendment No. 1 on December 6, 1995, which is the date that the transaction closed. (*See* Brakebill Decl., Ex. 26, Amendment 1.) Amendment No. 1 made several clarifying amendments, including specific revisions to the Schedule 1.1(a) and Schedule 1.1(b) lists of included and excluded assets. (*Id.*, § K, L.) Amendment No. 1 did not, however, change the description of the Intellectual Property that was included and excluded from the transferred assets by Section V of Schedules 1.1(a) and 1.1(b). (*Id.*)

**Response:** Undisputed.

### E. The Bill of Sale Transferred Only the Assets Identified in the APA and Amendment No. 1, Which Did Not Include Copyrights.

25. The APA did not, itself, transfer any assets. Rather, it described the assets that would be transferred in the future when the transaction was closed. (*See* Brakebill Decl., Ex. 2, § 1.1(a).) Thus, the APA contemplated that at the Closing, Novell would deliver a "bill of sale" transferring Novell's title to the "Assets" described in the APA to Santa Cruz. (*Id.*, § 1.7(b)(iii).)

**Response:** First sentence is disputed to the extent it states a legal conclusion. Undisputed except disputed in that the Bill of Sale was meant to transfer, sell, assign, and convey all right, title and interest to the Assets identified without limitation in Schedule 1.1(a).

26. Novell and Santa Cruz executed a "Bill of Sale" when the transaction was closed on December 6, 2005, which is the same day that Amendment No. 1 was signed. (*See* Brakebill Decl., Ex. 27.) The Bill of Sale stated that Novell "does hereby transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets." (*Id.*) The Bill of Sale further stated that all capitalized terms had the meanings set forth in "the Agreement," which was defined as "the Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995." (*Id.*)

**Response:** Undisputed.

27. As noted above, Section 1.1(a) of the APA defined the "Assets" to be transferred as the assets that were included in Schedule 1.1(a), and not excluded by Schedule 1.1(b). Schedule 1.1(a) did not include any copyrights, and Schedule 1.1(b) excluded "all copyrights." Thus, the Bill of Sale did not transfer any UNIX or UnixWare copyrights to Santa Cruz.

**Response:** Disputed in that the transfer of "All rights" in Schedule 1.1(a) plainly includes all copyrights, and the transfer of "All rights and ownership of UNIX and UnixWare" includes all intellectual property related to UNIX and UnixWare. In addition, depending on the use of the term "intellectual property," other items specifically listed in Schedule 1.1(a), such as source code, are intellectual property. Therefore disputed to the extent the last sentence sets forth a legal conclusion about whether the transfer occurred by the Bill of Sale.

F.  **Amendment No. 2 Revised the "Excluded Assets" Provision, But Did Not Transfer Ownership of Copyrights or Specify Which Copyrights Might Be "Required" for the UNIX Business.**

28.  On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. (*See* Brakebill Decl., Ex. 28.) Amendment No. 2 revised the definition of "Excluded Assets" in Section V.A of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies.

(*Id.*, Paragraph A.)

**Response:** Disputed in that the quoted portion of Amendment No. 2 revised Section V.A of the cited Schedule.

29.  Amendment No. 2 did not specify which copyrights, if any, were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (*Id.*) Amendment No. 2 also did not contain any provision transferring ownership of copyrights or other assets from Novell to Santa Cruz. (*Id.*)

**Response:** The first sentence is disputed in that (1) there was no obligation or need for greater specificity than provided in the Amendment; (2) the amendment was specific enough to identify the copyrights; (c) the copyrights so required are all the copyrights in UNIX, UnixWare, and the Auxiliary Products. (Ex. 64 at 121-22.) The second sentence is disputed to the extent it sets forth or calls for a legal conclusion.

30.  Amendment No. 2 stated that the APA was amended "[a]s of the 16th day of October, 1996," or about thirteen months after the APA was executed on September 19, 1995, and ten months after the transaction closed on December 6, 1995. (*Id.*) Thus, by its own terms, Amendment No. 2's revision to Schedule 1.1(b) did not retroactively amend the APA as of the date the APA was signed or the transaction closed. Moreover, Novell did not execute a "Bill of Sale" or any similar document transferring copyrights from Novell to Santa Cruz in connection

13

with Amendment No. 2. (Declaration of Allison Amadia, filed herewith ("Amadia Decl."), ¶ 17.)

**Response:** The first sentence is undisputed. The second sentence is disputed to the extent it sets forth or calls for a legal conclusion. The third sentence is admitted to the extent to the extent it refers to documents other than Amendment No. 2, with respect to which the statement is disputed in that Amendment No. 2 served as a ratifying memo with respect to the APA, so that the amended APA then provided for the transfer without any inconsistency with Schedule 1.1(b).

### G. The Negotiation History of Amendment No. 2 Confirms that It Was Not Intended to Transfer Ownership of UNIX and UnixWare Copyrights.

31. Amendment No. 2 was negotiated primarily through communications between two in-house lawyers, Allison Amadia (then Allison Lisbonne) of Novell, and Steve Sabbath of Santa Cruz. (Amadia Decl., ¶¶ 4-5.) During the summer of 1996, Mr. Sabbath telephoned Ms. Amadia and raised an issue relating to the UNIX and UnixWare copyrights. He told Ms. Amadia that the Original APA explicitly excluded copyrights to UNIX and UnixWare as assets being sold by Novell to Santa Cruz and that it should not have. He wanted Novell to amend the original APA to explicitly give Santa Cruz rights to copyrights in UNIX and UnixWare. (*Id.*, ¶ 6.) Mr. Sabbath was not seeking a clarification that the APA gave copyright ownership to Santa Cruz. Rather, he wanted Novell to change the original APA to give Santa Cruz ownership of copyrights in UNIX and UnixWare because the original APA did not so provide. (*Id.* ¶ 18.)

**Response:** Disputed to the extent the word "primarily" renders the first sentence vague and ambiguous. Each sentence which is not supported by evidentiary citation or is supported by a source that does not support the sentence or proposition is disputed. Dispute the fourth and last sentence. (Ex. 120 at 24, 25, 98-99.)

32. Ms. Amadia was not involved in the negotiation and drafting of the original APA. Accordingly, after her conversation with Sabbath, Amadia undertook to find out the intent of the original APA concerning copyrights. She confirmed that ownership of the UNIX and UnixWare

copyrights did not transfer by reviewing the APA and by contacting Novell's outside counsel, Tor Braham, who was the principal drafter of the APA. (*Id.*, ¶ 7.)

**Response:** First sentence is undisputed. Second sentence is disputed for lack evidentiary support. Disputed to the extent statement calls for or sets forth a legal conclusion.

33. Mr. Sabbath later sent Ms. Amadia a first draft of Amendment No. 2. (*Id.*, ¶ 8, Ex. 1 thereto.) Santa Cruz proposed to revise Section V of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder...

(*Id.*, Ex. 1, Paragraph A.)

**Response:** Disputed.

34. Santa Cruz's initial Amendment No. 2 proposal created a blanket exception for copyrights and trademarks "owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder." (*Id.* (emphasis added).) Thus, insofar as the UNIX and UnixWare copyrights were concerned, Santa Cruz's draft acknowledged that Novell owned them "as of the date of the amendment," and proposed that all of them were to be transferred to Santa Cruz. Moreover, Santa Cruz's reference to copyrights "which SCO has acquired hereunder," indicated that its proposed amendment was intended to transfer ownership of the UNIX and UnixWare copyrights to Santa Cruz. (*Id.*)

**Response:** Disputed to the extent the phrase blanket exception does not accurate reflect the document and calls for a legal conclusion; other wise the first sentences is not disputed to the extent it quotes the referenced document correctly. The rest of the statement is disputed because it sets forth and calls for legal conclusions. Disputed to the extent the statement speculates and asks for speculations.

35. Novell rejected Santa Cruz's proposed amendment. Ms. Amadia told Mr. Sabbath that while Novell was willing to affirm that Santa Cruz had a license under the APA to use Novell's UNIX and UnixWare copyrighted works in its business, Novell was not going to

transfer ownership of any copyrights to Santa Cruz through Amendment No. 2. (Amadia Decl., ¶ 10.)

**Response:** First sentence is disputed for lack of evidentiary support. The second is disputed. (Ex. 120 at 226-27.)

36.    After further negotiations, Novell and Santa Cruz agreed to the narrower exception in the final version of Amendment No. 2. Instead of a blanket exception for copyrights that "pertain to the UNIX and UnixWare technologies," the final version was limited to copyrights that were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (Amadia Decl., ¶ II, Ex. 2, Paragraph A.) In addition, the final version did not include Santa Cruz's proposed reference to copyrights "which SCO has acquired hereunder," nor did it include any other reference to an "acquisition" or transfer of copyrights. (*Id.*) Accordingly, Jim Tolonen, the Novell executive who signed Amendment No. 2, confirms that it was never Novell's intent to transfer copyrights by way of Amendment No. 2 (or the APA), and that he would not have signed Amendment No. 2 had he believed it would do so. (Tolonen Decl. ¶ 13-16.)

**Response:** First sentence is disputed in that it sets forth and calls for a legal conclusion; it is also disputed to the extent it assumes that one version is narrower than another. The second is disputed for the same reasons as the first, particularly in that it assumes that the final version of the referenced provision is narrower than the other. (Ex. 64 at 120-23.) The third sentence is undisputed to the extent it sets forth statements that are "according to Mr. Tolonen."