**ADDENDUM:  RESPONSE TO SCO'S STATEMENT OF FACTS[*]**

1.      Novell, Inc. and SCO were parties to an Asset Purchase Agreement entered into as of September 19, 1995.  (5/18/07 James Decl. Ex. 1.)

**RESPONSE:**  Admitted.

2.      Prior to entering into the APA, Novell was engaged in the UNIX and UnixWare business.  (5/18/07 James Decl. Ex. 1.)

**RESPONSE:**  Admitted.

3.      SCO was a leader in UNIX System servers. (5/18/07 James Decl Ex. 8.)

**RESPONSE:**  Admitted that SCO has sold, at various times, UNIX System servers. Otherwise disputed on the ground that the allegation is vague as to the definition of "leader" and the time frame involved.

4.      The day after Novell and SCO entered into the APA, a press release was issued entitled "SCO ACQUIRES THE UNIX BUSINESS FROM NOVELL AND LICENSES NETWARE TECHNOLOGY."  (5/18/07 James Decl. Ex. 8.)

**RESPONSE:**  Admitted that SCO issued such a press release.  Disputed insofar as SCO claims the press release is accurate or was made with the knowledge or consent of Novell. Novell incorporates by reference Paragraph 9 of Novell's Response to SCO's Statement of Facts in Support of Its Motion For Partial Summary Judgment on Its First, Second, and Fifth Causes of Action and for Summary Judgment on Novell's First Counterclaim (Copyright Ownership), PACER No. 292-2.

5.      At the time of the execution of the APA, Novell was a leading networking software company.  Because it had developed its flagship networking product, NetWare, to work

---

[*] All facts not expressly admitted are disputed.

on the UNIX operating system, Novell needed and requested the right to distribute trivial

portions of the UNIX source code embedded in NetWare.  (See 5/18/07 James Decl. Ex. 13 at

226-27.)

      **RESPONSE:**  Admitted that at the time of the execution of the APA, Novell was a

leading networking software company.  Admitted that Novell developed NetWare to work on the

UNIX operating system.  Disputed insofar as SCO contends the execution of the TLA supports

the proposition that UNIX or UnixWare copyrights transferred to SCO.  Novell requested the

license because, although Novell would retain its copyright in the original UNIX and UnixWare

code, Novell would not have a right to use other technology (such as any trade secrets or

software know how) transferred in the APA and would not have a copyright to future

enhancements that it anticipated Santa Cruz would be making to the SVRX and UnixWare code.

(Declaration of Tor Braham ("Braham Decl.") ¶¶ 22-23, PACER No. 281.)

      6.      Accordingly, with the sole intent of accommodating these requests by Novell, the

parties to the APA agreed that Santa Cruz would license back to Novell "all the technology

included in the Assets" transferred by the APA, as well as "all derivatives of the technology

included in the Assets" (collectively, "the Licensed Technology"), subject to certain broad

limitations.  (5/18/07 James Decl. Ex. 1 § 1.6.)

      **RESPONSE:**  Admitted that the APA contains the quoted language, but otherwise

disputed.  Novell requested the license because, although Novell would retain its copyright in the

original UNIX and UnixWare code, Novell would not have a right to use other technology (such

as any trade secrets or software know how) transferred in the APA and would not have a

copyright to future enhancements that it anticipated Santa Cruz would be making to the SVRX

and UnixWare code.  (Braham Decl. ¶¶ 22-23.)

7.     To protect the value to Santa Cruz of the transferred UNIX and UnixWare assets, the APA and TLA each contained a non-compete provision, whereby Novell covenanted not to use the Licensed Technology to compete with SCO's core operating-system products.  (5/18/07 James Decl. Ex. 1 § 1.6, Ex. 4 § II.A.(2).)

**RESPONSE:**  Disputed, for the reasons stated in Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claim in Its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition and its accompanying declarations and exhibits.

8.     Section 1.6 of the APA provides in part:

> Seller agrees that it shall use the Licensed Technology only (i) for internal purposes without restriction or (ii) for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product.

(5/18/07 James Decl. Ex. 1 § 1.6.)

**RESPONSE:**  Admitted that the APA contains the quoted language.  Disputed insofar as SCO contends that this language has the legal effect of controlling the license language and limitations of the later-executed TLA.

9.     The TLA implements the agreement between SCO and Novell described in Section 1.6 of the APA and states, under Section II.A.(2), that Novell is permitted to distribute and sublicense "such Licensed Technology and modifications thereof," provided that

> (i) such technology and modifications may be sublicensed and/or distributed by NOVELL solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering.

(5/18/07 James Decl. Ex. 4 § II.A.(2).)

3

**RESPONSE:**  Admitted that the TLA contains the quoted language.  Disputed insofar as SCO contends that Section 1.6 of the APA has the legal effect of controlling the license language and limitations of the later-executed TLA.

10.    The "core products" and "core application server offerings" referenced in the APA and TLA, respectively, refer to the UNIX and UnixWare operating systems owned by Santa Cruz upon the closing date.  Even before acquiring the UNIX source code, Santa Cruz had been primarily involved in the business of distributing UNIX in binary form, so that with the acquisition of the UNIX and UnixWare source code and copyrights, the UNIX and UnixWare operating systems undoubtedly represented Santa Cruz's "core products." In addition, as of the closing date, Santa Cruz had no "application server offering" other than UNIX and UnixWare operating systems.  (5/18/07 James Decl. Ex. 13 at 226-27.)

**RESPONSE:**  Admitted that "core products" and "core application server offerings" refer to UnixWare operating systems sold by Santa Cruz as of the closing date.  Admitted that, before the closing date, Santa Cruz had been involved in the business of distributing UNIX in binary form.  Admitted that, as of the closing date, Santa Cruz had no application server offering other than UNIX and UnixWare operating systems.  Disputed insofar as SCO contends it obtained the right to distribute, without recompense to or approval by Novell, UNIX binary or source code.  Disputed insofar as SCO contends it acquired UNIX and UnixWare copyrights from Novell.  Both disputes are addressed in recently filed motions for summary judgment. (Novell's Motion for Partial Summary Judgment or Preliminary Injunction, PACER No. 147; Novell's Motion for Partial Summary Judgment on Its Fourth Claim for Relief, PACER No. 171; Novell's Motion for Partial Summary Judgment on the Copyright Ownership Portions of SCO's

Second Claim for Breach of Contract and Fifth Claim for Unfair Competition, PACER No. 286; and accompanying briefing, declarations and exhibits.)

11.     After the execution of the APA, Novell continued its business of developing and marketing its NetWare operating system, as it had contemplated in entering into the APA. (5/18/07 James Decl. Ex. 78 at 59).

**RESPONSE:** Admitted.

12.     The APA and TLA refer to each other as part of the same transaction, as follows:

- The APA calls for the execution of "a license agreement" and the terms thereof regarding the "Licensed Technology" addressed in the TLA.  (5/18/07 James Decl. Ex. 1 § 1.6.)

- The TLA provides that its effective date is "the Closing Date of the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 at 1.)

- The first "Whereas" clause of the TLA provides that "pursuant to the Asset Purchase Agreement, NOVELL shall be entitled to retain and to exercise, after the Closing Date, certain licenses for Licensed Technology, including related documentation and support." (5/18/07 James Decl. Ex. 4 at 1.)

- The TLA provides that the term "Licensed Technology," and several other terms, "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 at 1-2.)

- The TLA provides that Novell shall have the license set out in the TLA "Effective upon the Closing Date and in connection with the transfer of the Assets by NOVELL to SCO pursuant to the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 § II.A.)

- The TLA provides that certain covenants on Novell's license rights "shall not affect any rights specifically retained by NOVELL under the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 § II.A.(2).)

- In the Section titled "ENTIRE AGREEMENT," the TLA provides: "This Agreement and the Asset Purchase Agreement constitute the entire understanding between the parties with respect to its subject matter, and supersede all prior understandings, both written and oral, between them relating to such subject matter." (5/18/07 James Decl. Ex. 4 § VIII.)

**RESPONSE:** Admitted. Disputed insofar as SCO contends that the APA has the legal effect of controlling the license language and limitations of the later-executed TLA.

13.    Section 1.6 of the APA also details how the TLA shall treat the rights of parties in the event of a "Change in Control" of Novell or SCO distinctly, as follows:

> The license agreement shall also provide Seller with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof… In the event of a Change of Control of Seller (as defined in Section 6 hereof), the license granted pursuant to the license agreement shall be limited to Seller's products either developed or substantially developed as of the time of the Change of Control.

(5/18/07 James Decl. Ex. 1 § 1.6.)

**RESPONSE:** Admitted that the APA contains substantially the quoted language (the text above contains minor typographic errors). Disputed insofar as SCO contends Section 1.6 has the legal effect of controlling the license language and limitations of the later-executed TLA.

14.    In Section 6.3(c), in turn, the APA makes clear that Novell will have an "unlimited" license to the Licensed Technology only as follows:

> Expansion of Seller's Rights Relating to the Licensed Technology upon a Change of Control. Until two (2) years from the Closing Date, in the event Buyer has merged with, sold shares representing 50% or more of the voting power of Buyer to, sold all or substantially all of Buyer's assets to, or engaged voluntarily in any other change of control transaction with, any party identified by Seller on Schedule 6.3(a) hereof, or in the event any party identified by Seller on Schedule 6.3(a) hereof, shall acquire shares representing 50% or more of the voting power of Buyer, Seller shall automatically have unlimited, royalty-free, perpetual rights to the Licensed Technology.

(5/18/07 James Decl. Ex. 1 § 6.3(c).)

**RESPONSE:**  Admitted that the APA contains the quoted language.  Disputed insofar as SCO contends Section 6.3(c) has the legal effect of controlling the license language and limitations of the later-executed TLA.

15.    The TLA provides that Novell would obtain the "unlimited" rights to the Licensed Technology "[i]n the event of a Change of Control of SCO," where the terms "Change of Control" and others "shall have the respective meanings attributed to such terms in the Asset Purchase Agreement." (5/18/07 James Decl. Ex. 4 § I)

**RESPONSE:**  Admitted.

16.    Novell's chief business negotiator, Ed Chatlos, has confirmed that terms of the TLA were intended to confirm the terms of the APA declaring that Novell would only obtain an "unlimited" license to the "Licensed Technology" upon a Change of Control as described in Section 6.3(c):

> As reflected in Section 1.6 of the APA, Novell intended to enter into a license agreement with Santa Cruz after the execution of the APA in which Novell would obtain a license to the "Licensed Technology" within the meaning attributed to that term in the APA.  In addition, as also reflected in Section 1.6, Novell intended to obtain an "unlimited" license to the Licensed Technology upon the occurrence of a Change of Control as described in Section 6.3(c) of the APA.  In my view and based on my experience,

> Novell intended to implement the directives set forth in Section 1.6
> of the APA in the TLA.  I did not possess any contrary intent, and I
> do not recall anyone on either side of the contracts saying or
> suggesting that anyone possessed any contrary intent.

(5/18/07 James Decl. Ex. 68 ¶ 3.)

**RESPONSE:**  Admitted that the quoted language appeared in Chatlos's declaration.

Disputed that Chatlos was Novell's chief negotiator of the specific provisions of the APA and

TLA at issue.  In fact, Tor Braham was the "primary representative of Novell in negotiating the

legal terms of the contract between Novell and Santa Cruz."  (Braham Decl. ¶ 5.)  Chatlos

admitted that "a lawyer for Novell" "drafted the Asset Purchase Agreement itself" and that

Chatlos lacked the "legal background" to do so himself.  (Supplemental Brakebill Declaration

("Supp. Brakebill Decl."), PACER No. 296, Ex. 34, Chatlos IBM Dep. 82:11-83:5.)  Tor Braham

confirms that Chatlos "did not draft the APA" and that Chatlos was not "the Novell business

person directing the drafting of the contract."  Braham "reported to and received instructions

from David Bradford [Novell's general counsel], not from Mr. Chatlos."  (Braham Decl.

¶ 24(c).)  The testimony should therefore be excluded for lack of foundation.

Disputed also that such testimony is admissible.  Such testimony seeks to contradict the

plain terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.

*Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006).

17.    This view is similarly confirmed by Novell's signatory to the TLA, R. Duff

Thompson:

> I describe my education, work history, and involvement with the
> APA and TLA in my previous Declaration, which I incorporate
> and adopt here.  In the negotiations and discussions of the APA,
> the parties specifically contemplated and discussed the license
> agreement that became the TLA.  Section 1.6 of the APA reflects
> Novell's intent to enter into a license agreement with Santa Cruz
> after the execution of the APA in which Novell would obtain a

license to the "Licensed Technology" within the meaning
attributed to that term in the APA.  I recall from the negotiations
and discussions of the APA that Novell wanted to be free of the
terms of the license agreement in the event that Santa Cruz entered
into certain types of transactions with certain large companies in
the same market or markets as Novell within a certain period of
time after the closing of the deal.  It is Section 1.6 of the APA that
reflects Novell's intent to obtain an "unlimited" license to the
Licensed Technology upon the occurrence of a Change of Control
as described in Section 6.3(c) of the APA.

(5/18/07 James Decl. Ex. 69 ¶¶ 2-3.)

  **RESPONSE:**  Admitted that the quoted language appeared in Thompson's declaration.

Disputed that the cited testimony is admissible.  Such testimony seeks to contradict the plain

terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.  *Dore*, 39

Cal. 4th at 391.

  Also, the testimony should be excluded for lack of foundation.  Thompson testified that

he had no involvement in drafting the contract that effectuated the sale:

> Q.  By the time of the asset purchase agreement you are no longer
> in a legal function?
>
> A.  No.  That's correct.
>
> Q.  And so this — and so in the — when you were involved in the
> asset purchase agreement negotiations, who were you relying on
> for the detailed drafting of the agreement?
>
> A.  Our counsel, Wilson Sonsini.
>
> Q.  Tor Braham in particular?
>
> A.  Tor and his team . . . .  [H]e had people within his firm who
> were specialists in these items that were probably doing the bulk of
> the actual drafting.

(Supp. Brakebill Decl., Ex. 27, Thompson Dep. 30:22-31:14.)  Nor did Thompson recall

participating in "any specific discussions around copyrights" or any "discussion with SCO about

the excluded asset schedule" during negotiation of the deal.  (*Id*. 86:1-20.)  Tor Braham confirms

that Thompson "was not involved in negotiating or drafting the APA contract language."

(Braham Decl. ¶ 24(a).)  Ty Mattingly likewise testified that Thompson was "not really involved

in the details of the Novell, Santa Cruz transaction."  (Supp. Brakebill Decl., Ex. 33, Mattingly

Dep. 70:17-71:1.)  Thompson was "checked out" during the drafting of the agreement and was

"not in the office that often."  (*Id*. 71:2-72:19.)

18.     SCO and Novell intended the non-compete provisions of the APA and TLA to

protect the value of the business SCO obtained from Novell under the APA, as Mr. Thompson,

who signed the TLA on behalf of Novell, explained to Alok Mohan, Santa Cruz's signatory:

> …[W]e're not going to be going into that business of trying to sell
> a competitor to UnixWare.  That is not our business.  That is not
> our intent.  We are selling the business not for the purpose of going
> into competition with them.  We are selling them the business so
> they can go take that business and make it grow. . . . . So it just
> didn't make sense for Novell, and we in the negotiations assured –
> and I think this is the part that I have fairly clear recollection of,
> that we assured Alok and his team that it is not Novell's intent to
> simply come in after the fact and jump back on top of this market
> on top of you.  So that's the way I would get to the question of
> noncompetition.  It was really that it was an assurance that we gave
> them that wasn't our intent to simply jump back on top of them. . .
> . . SCO was saying, well, okay.  We'll give you the license, but
> there are some restrictions.  And those restrictions seemed
> reasonable at the time, and we agreed to them.

(5/18/07 James Decl. Ex. 11 at 94-95.)

**RESPONSE:**  Admitted that the quoted language appeared in Thompson's testimony.

Disputed that the cited testimony is admissible.  Such testimony seeks to contradict the plain

terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.  *Dore*, 39

Cal. 4th at 391.  Disputed insofar as SCO contends the APA or TLA contain "non-compete

provisions."  (Novell's Motion for Partial Summary Judgment on the Copyright Ownership

Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition, PACER No. 286, and accompanying briefing, declarations and exhibits.)

Also, the testimony should be excluded for lack of foundation.  Thompson testified that he had no involvement in drafting the contract that effectuated the sale:

> Q.  By the time of the asset purchase agreement you are no longer in a legal function?
>
> A.  No.  That's correct.
>
> Q.  And so this — and so in the — when you were involved in the asset purchase agreement negotiations, who were you relying on for the detailed drafting of the agreement?
>
> A.  Our counsel, Wilson Sonsini.
>
> Q.  Tor Braham in particular?
>
> A.  Tor and his team . . . .  [H]e had people within his firm who were specialists in these items that were probably doing the bulk of the actual drafting.

(Supp. Brakebill Decl., Ex. 27, Thompson Dep. 30:22-31:14.)  Nor did Thompson recall participating in "any specific discussions around copyrights" or any "discussion with SCO about the excluded asset schedule" during negotiation of the deal.  (*Id.* 86:1-20.)  Tor Braham confirms that Thompson "was not involved in negotiating or drafting the APA contract language." (Braham Decl. ¶ 24(a).)  Ty Mattingly likewise testified that Thompson was "not really involved in the details of the Novell, Santa Cruz transaction."  (Supp. Brakebill Decl., Ex. 33, Mattingly Dep. 70:17-71:1.)  Thompson was "checked out" during the drafting of the agreement and was "not in the office that often."  (*Id.* 71:2-72:19.)  Instead, Tor Braham was the "primary representative of Novell in negotiating the legal terms of the contract between Novell and Santa Cruz," and he accurately characterizes the purposes of the TLA.  (Braham Decl. ¶¶ 5, 22-23.)

19.    Novell's CEO at the time of the execution of the APA and TLA confirmed this intent, testifying that it was his "understanding was that we would not go into the UNIX business and compete with SCO." (5/18/07 James Decl. Ex. 7 at 118.) He confirmed that as long as Novell "didn't go into the UNIX business," Novell "could compete with SCO." (*Id.*) Mr. Frankenberg testified that "my recollection is that SCO was very concerned about Novell entering – being able to enter the business and compete with SCO using what we got out of the license and also being able at some point in the future to sell that to other people to compete with them.  And we said, no, that is not our intent.  We're not going to do that." (*Id.* at 174.)

**RESPONSE:**  Admitted that the quoted language appeared in Frankenberg's testimony. Disputed that such testimony is admissible.  Such testimony seeks to contradict the plain terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.  *Dore*, 39 Cal. 4th at 391.  In addition, Frankenberg lacks foundation to testify as to the meaning of the APA and TLA language in question because he did not draft those provisions, but instead entrusted others with drafting documents that protected Novell's ongoing interests in UNIX:

> Q.  And as a result, you <u>tasked your negotiating team</u> with making sure that the detailed draft of the Asset Purchase Agreement winded its way between the goal of selling the UNIX business to SCO but <u>retaining the rights necessary for Novell to protect its interest</u> in the ongoing UNIX revenue stream and the capitalization of that revenue stream?
>
> A.  Yes.

(Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 64:14-21 (emphasis added).  Frankenberg signed the APA "on basis of the recommendation of his team" and "did not review every item." (*Id.*. 68:12-17.)  Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, confirms that Frankenberg "was not

involved in the negotiation or drafting of the contract language of the APA." (Braham Decl.

¶ 24(f).)

      20.     In his deposition, Mr. Frankenberg admitted that Novell breached the TLA by

distributing SuSE Linux:

> Q. (By Mr. Singer) With respect to the noncompete provision
> which you were asked about, and I think the question was stated in
> terms of Novell not going into the UNIX business, so I want to
> make clear in your understanding in distributing Linux, is Novell
> or its subsidiaries going into the UNIX business in violation of
> those divisions [sic]?
>
> MR. JACOBS: Objection, calls for a legal conclusion.
>
> A. I'm not a lawyer, but yes.
>
> ….
>
> MR. JACOBS: Now, you said in response to Mr. Singer's question
> that you thought that Novell was in violation of the TLA by
> distributing Linux.  What did you base that on?
>
> A. I remember that provision very well because it was a significant
> concession to SCO to allay their concern about us coming back
> around and competing with them in the marketplace.  And we had
> no intention of being in the UNIX business or businesses directly
> in competition with SCO, and that's what – – we memorialized
> that in that agreement.
>
> Q. And you believe that Linux competes with SCO?
>
> A. It would certainly – – it certainly did compete with SCO's
> products, yes.
>
> Q. But he asked about present day. Do you believe that Linux
> competes with SCO today? If you have no opinion on that, fine.
> I'm just trying to clarify your answers to his questions.
>
> A. Yes, it does, because SCO still sells UNIX-based software.
>
> Q. And the mere fact that Novell distributes Linux, that's all – –
> and that Linux compete with UNIX, that's all you need to know to
> know that you're in violation of the TLA?

A. Yes.

(5/18/07 James Decl. Ex. 7 at 157-58, 170-71; *see also id.* at 56-57 and 116-19.)

**RESPONSE:**  Admitted that the quoted language appeared in Frankenberg's testimony. Disputed that such testimony is admissible.  Such testimony seeks to contradict the plain terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.  *Dore*, 39 Cal. 4th at 391.  In addition, Frankenberg lacks foundation to testify as to the meaning of the APA and TLA language in question because he did not draft those provisions, but instead entrusted others with drafting documents that protected Novell's ongoing interests in UNIX:

> Q.  And as a result, you <u>tasked your negotiating team</u> with making
> sure that the detailed draft of the Asset Purchase Agreement
> winded its way between the goal of selling the UNIX business to
> SCO but <u>retaining the rights necessary for Novell to protect its
> interest</u> in the ongoing UNIX revenue stream and the capitalization
> of that revenue stream?
>
> A.  Yes.

(Supp. Brakebill Decl., Ex. 32, Frankenberg Dep. 64:14-21 (emphasis added).  Frankenberg signed the APA "on basis of the recommendation of his team" and "did not review every item." (*Id.*. 68:12-17.)  Tor Braham, the principal person responsible for drafting the APA and negotiating its contractual language on behalf of Novell, confirms that Frankenberg "was not involved in the negotiation or drafting of the contract language of the APA."  (Braham Decl. ¶ 24(f).)

21.    The absence of any express geographic limitation in the APA reflects the parties' intent and the realities of the business at issue — namely, that the sales and marketing of the operating systems at issue occurred on a worldwide basis.  If Novell were permitted to sell or market an operating system in violation of the terms of the license restriction where Santa Cruz was to be selling and operating the UNIX and UnixWare operating systems — that is, throughout

the world — Novell's conduct would threaten to undercut Novell's sale of the UNIX and UnixWare businesses to Santa Cruz. (See 5/18/07 James Decl. Ex. 68 ¶ 4; Ex. 69 ¶ 4.)

**RESPONSE:** Admitted that the APA does not contain any geographic limitation. Admitted that at the execution of the APA, the sales and marketing of UNIX and UnixWare occurred on an essentially worldwide basis. Disputed insofar as the text presents a hypothetical and not a factual allegation ("If Novell were to . . . Novell's conduct would . . . ."). Disputed insofar as SCO claims either Chatlos or Thompson are competent to testify as to the meaning of particular language of the APA.

Tor Braham confirms that Chatlos "did not draft the APA" and that Chatlos was not "the Novell business person directing the drafting of the contract." Braham "reported to and received instructions from David Bradford [Novell's general counsel], not from Mr. Chatlos." (Braham Decl. ¶ 24(c).)

Thompson testified that he had no involvement in drafting the contract that effectuated the sale:

> Q.  By the time of the asset purchase agreement you are no longer in a legal function?
>
> A.  No.  That's correct.
>
> Q.  And so this -- and so in the -- when you were involved in the asset purchase agreement negotiations, who were you relying on for the detailed drafting of the agreement?
>
> A.  Our counsel, Wilson Sonsini.
>
> Q.  Tor Braham in particular?
>
> A.  Tor and his team . . . .  [H]e had people within his firm who were specialists in these items that were probably doing the bulk of the actual drafting.

(Supp. Brakebill Decl., Ex. 27, Thompson Dep. 30:22-31:14.)  Nor did Thompson recall

participating in "any specific discussions around copyrights" or any "discussion with SCO about

the excluded asset schedule" during negotiation of the deal.  (*Id*. 86:1-20.)  Tor Braham confirms

that Thompson "was not involved in negotiating or drafting the APA contract language."

(Braham Decl. ¶ 24(a).)  Ty Mattingly likewise testified that Thompson was "not really involved

in the details of the Novell, Santa Cruz transaction."  (Supp. Brakebill Decl., Ex. 33, Mattingly

Dep. 70:17-71:1.)  Thompson was "checked out" during the drafting of the agreement and was

"not in the office that often."  (*Id.* 71:2-72:19.)

Disputed also that such testimony is admissible.  Such testimony seeks to contradict the

plain terms of the APA and TLA and is therefore inadmissible under the parol evidence rule.

*Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006).

22.    Because Novell's use of the UNIX or UnixWare technology transferred to SCO in

competition with SCO would have threatened SCO's market for its products, SCO would not

have agreed to license such technology to Novell without a promise from Novell that it would

not use such technology in competition with SCO.  (See 5/18/07 James Decl. Ex. 13 at 226-27;

Ex. 7 at 56-57.)

**RESPONSE:**  Disputed, for the reasons stated in Novell's Motion for Partial Summary

Judgment on SCO's Non-Compete Claim in Its Second Claim for Breach of Contract and Fifth

Claim for Unfair Competition and its accompanying declarations and exhibits.  SCO did, in fact,

agree that Novell could retain a license to UNIX and UnixWare technology without any

"promise" from Novell that Novell would not use such technology in competition with SCO.

SCO instead agreed that Novell would retain such a license subject to certain conditions

identified in the TLA.

16

23.    The APA expressly acknowledges "the intent of parties hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer." (5/18/07 James Decl. Ex. 1 § 1.3(a)(i).) This "Business" was defined as "the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare." (Id., Recital A.)

**RESPONSE:**  Admitted that the APA contains the quoted language.  Disputed insofar as SCO contends that this provision of the APA determines the assets transferred in the APA.  The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the transfer; and Schedule 1.1(b), which listed assets excluded from the transfer. Further, as stated unambiguously in Section 1.1(a) of the APA, "the Assets to be so purchased shall not include those assets (the 'Excluded Assets') set forth on Schedule 1.1(b)."  (Declaration of Kenneth W. Brakebill In Support of Novell's Motions for Summary Judgment, PACER No. 284 ("Brakebill Decl."), Ex. 2, Section 1.1(a), Schedules 1.1(a), 1.1(b).)  Disputed insofar as SCO contends this language has the legal effect of controlling the license language and limitations of the later-executed TLA.

24.    The APA further states that the parties intended for Novell to sell and for Santa Cruz to acquire "all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business" identified on Schedule 1.1(a), excluding the "Excluded Assets in Schedule 1.1(b).  (5/18/07 James Decl. Ex. 1 Schedule 1.1(a).) The opening description of the Assets transferred in Schedule 1.1(a), in turn, is extremely broad:

> All rights and ownership of UNIX and UnixWare, including but
> not limited to all versions of UNIX and UnixWare and all copies of
> UNIX and UnixWare (including revisions and updates in process),
> and all technical, design, development, installation, operation and
> maintenance information concerning UNIX and UnixWare,
> including source code, source documentation, source listings and
> annotations, appropriate engineering notebooks, test data and test
> results, as well as all reference manuals and support materials
> normally distributed by Seller to end-users and potential end-users
> in connection with the distribution of UNIX and UnixWare, such
> assets to include without limitation the following…

(5/18/07 James Decl. Ex. 1 Schedule 1.1(a) § I.)

**RESPONSE:** Admitted that the APA contains the quoted language. Disputed insofar as SCO contends that the transfer of assets was determined solely by reference to Schedule 1.1(a). The last sentence of the portion of Section 1.1(a) quoted by SCO stated that, "Notwithstanding the foregoing [reference to Schedule 1.1(a)], the Assets to be so purchased <u>shall not include</u> those assets (the 'Excluded Assets') set forth in Schedule 1.1(b)." Thus, the APA explicitly provided that the Schedule 1.1(b) list of Excluded Assets carved out assets to be excluded from the Schedule 1.1(a) list of Included Assets. (Braham Decl. ¶ 19.) Disputed insofar as SCO contends this language has the legal effect of controlling the license language and limitations of the later-executed TLA.

25. Goodwill is not listed among the "Excluded Assets" in Schedule 1.1(b) of the APA. (5/18/07 James Decl. Ex. 1 Schedule 1.1(b).)

**RESPONSE:** Admitted that the word "goodwill" is not mentioned in Schedule 1.1(b). Disputed insofar as SCO suggests that goodwill was not excluded from transfer. Schedule 1.1(b) further provides that "[a]ny asset not listed on Schedule 1.1(a)" is excluded from transfer. Goodwill is not listed on Schedule 1.1(a).

26.    The broad transfer of "[a]ll rights and ownership of UNIX and UnixWare" included the goodwill Novell had developed in its UNIX and UnixWare business, as confirmed in a letter dated November 16, 1995, from SCO's auditor Peat Marwick LLP, who wrote:

> Other property being sold includes business documentation such as customer lists, copies of contracts and agreements, employee lists and contracts, human resource materials, operating procedures manuals, accounting records, training materials, marketing materials and collateral, claims against third parties, and other items.  The sale includes goodwill, trade names, and other intangibles.

(5/18/07 James Decl. Ex. 70 at SCO1230550 (emphasis added).)

**RESPONSE:**  Admitted that Exhibit 70 contains the quoted language.  Disputed that such exhibit is admissible in support of SCO's Opposition.  The letter consists of out-of-court statements offered for their truth.  Disputed insofar as SCO contends this letter establishes that goodwill was transferred by the APA.  The terms of the APA and its schedules control the scope of assets transferred.

27.    The APA further states as follows:

> In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void, or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

(5/18/07 James Decl. Ex. 1 § 9.6.)

**RESPONSE:** Admitted that the APA contains the quoted language. Disputed insofar as SCO contends this language has the legal effect of controlling the license language and limitations of the later-executed TLA.

28.     On November 4, 2003, Novell announced its acquisition of SuSE Linux, one of the world's leading distributors of Linux. Since the closing of that acquisition in January 2004, Novell has been distributing Linux worldwide. (SCO Second Amended Complaint ¶ 46; see generally http://www.novell.com/linux/ and related pages on Novell's website.)

**RESPONSE:** Admitted.

29.     On December 22, 2005, SCO filed with the Court in the *SCO v. IBM* case a compilation of 293 disclosures of technology which IBM has made to enhance Linux (in violation of its agreements with SCO) with the stated objective of making Linux a more enterprise-hardened operating system. (5/18/07 James Decl. Ex. 75.)

**RESPONSE:** Admitted that SCO filed disclosures in *SCO v. IBM* on December 22, 2005, which speak for themselves. Disputed insofar as SCO contends this document actually discloses "technology which IBM has made to enhance Linux (in violation of its agreements with SCO) with the stated objective of making Linux a more enterprise-hardened operating system," a subject of extended briefing in the *SCO v. IBM* litigation. Novell notes also that the considerable bulk of these disclosures were struck by the Court in its June 30, 2006 Order Granting in Part IBM's Motion to Limit SCO's Claims, PACER No. 719, because SCO was not able to offer competent evidence to support such disclosures.

30.     SCO alleges that Linux contains the Licensed Technology which, pursuant to Section 1.6 of the APA and Section II.A.(2) of the TLA, Novell covenanted not to distribute in an operating system. (SCO Second Amended Complaint ¶ 48.)

**RESPONSE:**  Admitted that SCO so alleges.  Novell disputes this allegation and will address it if and when the Court lifts the stay imposed by its August 21, 2006 Order.

31.    SCO alleges that Linux is "directly competitive" with SCO's core application server offerings.  (SCO Second Amended Complaint ¶ 49.)

**RESPONSE:**  Admitted that SCO so alleges.  Novell disputes this allegation and will address it if and when the Court lifts the stay imposed by its August 21, 2006 Order.

32.    SCO alleges that the measure of UNIX technology in Linux far exceeds the trivial portions that the parties intended Novell was authorized to use, in Netware, pursuant to the TLA. (SCO Second Amended Complaint ¶ 50.) Whereas UNIX became enterprise-ready after decades of development, Linux matured into a powerful enterprise-ready operating system in a few years, due primarily to the UNIX technology wrongly contributed by IBM to Linux.  (SCO Second Amended Complaint ¶ 50.)

**RESPONSE:**  Admitted that SCO so alleges.  Novell disputes this allegation and will address it if and when the Court lifts the stay imposed by its August 21, 2006 Order.

33.    SCO alleges that Novell therefore breached Section 1.6 of the APA and Section II.A.(2) of the TLA.  (SCO Second Amended Complaint ¶ 51.)

**RESPONSE:**  Admitted that SCO so alleges.  Novell disputes this allegation and will address it if and when the Court lifts the stay imposed by its August 21, 2006 Order.