# EXHIBIT E

Dockets.Justia.com

LEXSEE 2004 CAL APP UNPUB LEXIS 3894

**CORNISH & CAREY COMMERCIAL, Plaintiff and Appellant, v. NAHUM GUZIK, Defendant and Respondent.**

**H025028**

**COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT**

*2004 Cal. App. Unpub. LEXIS 3894*

**April 20, 2004, Filed**

**NOTICE:** [*1] NOT TO BE PUBLISHED IN OF-FICIAL REPORTS CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

**PRIOR HISTORY:** Santa Clara County Super. Ct. No. CV799928.

**DISPOSITION:** The judgment is affirmed.

**JUDGES:** BAMATTRE-MANOUKIAN, ACTING P.J. WE CONCUR: WUNDERLICH, J., MIHARA, J.

**OPINION BY:** BAMATTRE-MANOUKIAN

**OPINION**

A real estate broker representing a prospective les-see appeals following summary judgment in favor of the owner of commercial property for lease. Although a lease contract executed by the owner and the prospective lessee provided for the payment of a commission, the lease was cancelled when the owner was unable to de-liver the premises at the time the lease was to commence. The lessee's broker contends he was entitled to a com-mission when the lease was executed, despite its subse-quent cancellation. We disagree and therefore we affirm the judgment.

**BACKGROUND**

Defendant Nahum Guzik was the owner of a 44,000 square foot commercial building at 4620 Fortran Drive in San Jose, [*2] where he operated his business. In 2000, contemplating moving to new quarters under construc-tion, he listed the property for lease with real estate bro-ker Colliers International (Colliers).

The exclusive listing agreement between Guzik and Colliers, by its agent Michael Burke, ran from June 1, 2000 through September 30, 2000. Under the listing agreement, Guzik agreed to pay Colliers a commission consisting of 6 percent of the rent for the first 36 months and 5 percent of the rent for the next 24 months. The obligation to pay a commission would arise when "a ten-ant is procured by or through [Colliers, Guzik], or any other person or entity (including but not limited to an-other real estate broker) and said tenant is ready, willing and able to lease the Property or any interest therein . . . ." The commission would be payable "one-half upon the mutual execution of a lease by [Guzik] and tenant; the balance, upon Tenant taking occupancy."

In July of 2000, Guzik entered into negotiations with Terayon Communication Systems (Terayon) for the lease of the property. Terayon was represented by plaintiff Cornish & Carey Commercial (Cornish), through its agent Jeff Arrillaga. A lease proposal [*3] was submit-ted to Terayon, dated July 27, 2000, setting forth terms that would be acceptable to Guzik. It provided for a seven-year lease commencing on December 1, 2000, with rent starting at $ 120,000 per month. In regard to the commission, the proposal provided: "Cornish & Carey Commercial represents the Lessee in this transaction and Colliers International represents the Lessor. The real estate commission to be split 50%/50% shall be paid by the Lessor as agreed upon in the Exclusive Listing Agreement between Lessor and Colliers International." The proposal further provided that it "shall not create any binding agreement" and that "only the full execution of a lease by, and the delivery to both parties, shall create a legal and binding agreement."

Terayon agreed to the lease proposal, whereupon a formal lease, dated August 2, 2000, was prepared and signed by both Guzik and Terayon. Terayon paid Guzik

2004 Cal. App. Unpub. LEXIS 3894, *

a security deposit of $ 892,800 and the first month's rent of $ 120,000.

In September of 2000, Cornish requested of Colliers that Guzik pay the brokers the first installment of the commission. No commission was paid.

In the ensuing months, Guzik apparently encountered delays in the [*4] construction of the new quarters where he was to move his business operations. In October of 2000, a meeting was attended by Guzik, Michael Burke, Jeff Arrillaga, a representative of Terayon, and Alex Fur, the project manager for the new construction. In a follow-up letter dated October 27, 2000, Burke estimated that 4620 Fortran Drive would be available for occupancy by February 15, 2001, or sooner. In a memo from Fur, dated November 7, 2000, Fur indicated that he believed construction at the new site would be completed prior to February 15, 2001. In mid-January, Burke informed Terayon that 4620 Fortran Drive would be available for Terayon's occupancy on February 9, 2001.

In their lease agreement, the parties had specifically provided for the possibility of a delay in possession. Paragraph 3.3 provided that if the lessor was unable to deliver possession of the premises by the commencement date of the lease, despite using his "best commercially reasonable efforts" to do so, the lessor would "not be subject to any liability therefore, . . ." This paragraph further provided that "if possession is not delivered within sixty (60) days after the Commencement Date, Lessee may, at its option, [*5] by notice in writing within ten (10) days after the end of such sixty (60) day period, cancel this Lease. . . ." Pursuant to paragraph 3.3, on January 30, 2001, Terayon notified Guzik by letter that Terayon was canceling the lease. Guzik promptly returned the $ 892,800 security deposit and the first month's rent of $ 120,000 to Terayon.

On January 31, 2001, Jeff Arrillaga, Cornish's Vice President, wrote to Michael Burke of Colliers, indicating that Cornish believed Guzik had an obligation to pay a commission to Colliers and to Cornish under the terms of the listing agreement. Burke communicated this to Guzik, who declined to pay any commission.

On July 16, 2001, Cornish filed this action against Guzik, seeking recovery of a commission and alleging two causes of action: the first for breach of the lease contract as a third party beneficiary under the lease, and the second for common count, money due and owing. Cornish sought 50 percent of both installments of the commission, notwithstanding that its client had never occupied the premises, in the total amount of $ 217,463.14, plus interest.

In April of 2002, both plaintiff and defendant filed motions for summary judgment. After a [*6] hearing

and further briefing, the court denied Cornish's motion for summary judgment and granted Guzik's motion. The court filed a written order on July 3, 2002. The court subsequently denied Cornish's motion to vacate the order or in the alternative to amend its complaint.

## DISCUSSION

### Standard of Review

The trial court's summary judgment ruling is subject to our independent review. (*Adams v. Explorer Ins. Co. (2003) 107 Cal.App.4th 438, 445.*) The analysis here turns on the interpretation and legal effect of the parties' writings, without reference to parol evidence, and thus involves a pure question of law. (*WYDA Associates. v. Merner (1996) 42 Cal.App.4th 1702, 1710.*) As to the court's denial of Cornish's motion to amend, that is reviewed for abuse of discretion. (*Thunderburk v. United Food & Commercial Workers' Union, Local 324 (2001) 92 Cal.App.4th 1332, 1343.*)

### The Complaint

As always, when reviewing a summary judgment, we start with the allegations of the complaint since these frame the causes of action by which plaintiff seeks to recover. (*AARTS Productions, Inc. v. Crocker National Bank (1986) 179 Cal. App. 3d 1061, 1064, 225 Cal. Rptr. 203.*) [*7]

Cornish's first cause of action alleged breach of the lease contract. Cornish alleged it was an express third party beneficiary of the lease and that it performed all of the conditions under the lease by procuring a tenant who executed the lease and was ready, willing and able to take occupancy of the premises at the time the lease period was to commence. Cornish further alleged that Guzik breached the lease by failing to deliver the premises and by failing to pay the commission due. Cornish alleged that because of this breach it was denied both installments of the commission owed it by Guzik, in the amount of $ 217,463.14, plus interest and legal expenses pursuant to the lease contract.

The second cause of action for money due and owing under a common count was dependent on the first cause of action and incorporated all of the allegations of the first cause of action.

In order to analyze the parties' arguments regarding the contract that is the subject of the breach of contract cause of action, we will set forth the pertinent provisions of the various writings.

### The Listing Agreement

The parties to the listing agreement were Guzik (Client) and Colliers (Broker).

[*8] Paragraph E describes Guzik's obligation to pay a commission: "Client shall pay, on demand, a commission to Broker according to the terms of this Authorization if, during the Agency Period or any extension thereof: (a) the Property or any interest therein is leased by or through Broker, Client or any other person or entity (including but not limited to another real estate broker); (b) a tenant is procured by or through Broker, Client or any other person or entity (including but not limited to another real estate broker) and said tenant is ready, willing and able to lease the Property or any interest therein, or (c) any contract for the lease of the Property or any interest therein is made directly or indirectly by Client."

Paragraph D provided for the amount of commission: 6 percent of the rent for the first 36 months, and 5 percent of the next 24 months. It further provided that "the foregoing leasing commissions shall be payable as follows: one-half upon the mutual execution of a lease by Client and tenant; the balance, upon Tenant taking occupancy."

*The Lease Proposal*

The lease proposal, accepted on July 31, 2000 by Terayon and countersigned on August 2, 2000 by [*9] Guzik, set forth the basic terms of the agreement to lease, and provided that a formal lease agreement would be prepared within 10 days of acceptance of the proposal. It also provided: "It is understood by both parties that acceptance of these terms and conditions shall not create any binding agreement. Both parties further agree only the full execution of a lease by, and the delivery to both parties, shall create a legal and binding agreement."

The terms contained in the proposal included term number 13, regarding "Commission and Representation." This term provided that "Cornish & Carey Commercial represents the Lessee in this transaction and Colliers International represents the Lessor. The real estate commission to be split 50%/50% shall be paid by the Lessor as agreed upon in the Exclusive Listing Agreement between Lessor and Colliers International."

*The Lease Agreement*

The formal lease agreement ran to 12 pages. The parties to this agreement were identified as Guzik and Terayon. The agreement was dated August 2, 2000. Both parties executed the agreement, although their signatures were not dated.

Paragraph 1.10(a) of the lease provided that Colliers, through [*10] Michael Burke, represented Guzik and that Cornish, through Jeff Arrillaga, represented Terayon.

Paragraph 1.10(b) provided that "upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to in their separate written agreement . . . ."

Paragraph 1.12 incorporated as a part of the lease "the accepted proposal letter," which was attached to the lease as Exhibit A.

Paragraph 3.3 was entitled "Delay in Possession" and provided as follows: "Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefore, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of the premises. If possession is not delivered within sixty (60) days after the Commencement Date, Lessee may, at its option, by notice in writing within ten (10) days after the end of such sixty (60) day period, cancel this Lease, in which event the Parties shall be discharged [*11] from all obligations hereunder."

Paragraph 15 was entitled "Brokers' Fee." Subparagraph 15.2 provided: "Each Broker shall be a third party beneficiary of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to a Broker any amounts due as and for commissions pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's broker when due, Lessee's broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within ten (10) days after said notice, Lessee shall pay monies to its Broker and offset such amounts against rent. In addition, Lessee's broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker."

Paragraph 22 provided that "this lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective."

Finally, Paragraph 31 provided for attorney's fees to any party, including the brokers, who was the prevailing party in a lawsuit to enforce the provisions [*12] of the lease.

*The Cross-Motions for Summary Judgment*

Both parties relied on these writings in their motions for summary judgment.

Guzik's motion for summary judgment was based on paragraph 3.3 of the lease, providing that in the event of cancellation by the lessee "the Parties shall be discharged

from *all* obligations hereunder." (Italics added.) Since he received no benefit from the lease, Guzik argued that it was both fair and reasonable that he be discharged from any further obligations under the lease, including the payment of commissions.

Cornish argued that under paragraph 15.2 it was expressly made a third party beneficiary of the lease contract, which provided for payment of a broker's fee "upon execution and delivery of this Lease." The obligation to pay the commission arose when the lease was executed, prior to the cancellation of the lease pursuant to Paragraph 3.3. Paragraph 3.3 was intended to relieve the *parties*, namely Guzik and Terayon as defined in the lease, of any further obligations to each other, but was not intended to relieve Guzik of a pre-existing obligation to pay a commission to the brokers.

### The Trial Court's Rulings

The [*13] parties argued their positions to the trial court on May 28, 2002, following which the court took the matter under submission. On June 7, 2002, the court issued an order requesting supplemental briefing from the parties as to the rules for resolving an ambiguity in a written agreement, and as to whether there was any extrinsic evidence to aid in resolving such ambiguity. Following further briefing and oral argument, the court issued its order granting summary judgment in favor of Guzik.

The trial court first found that there was an ambiguity in Paragraph 3.3 of the lease providing that upon cancellation by the lessee, " 'the Parties shall be discharged from all obligations hereunder' " in that this language could mean obligations of the parties to the lease as between each other, or obligations of the parties under the lease without regard to whom the obligation is made. The court found that resolution of the ambiguity was a question of law because there was no extrinsic evidence.

In resolving the ambiguity the court relied on the rule of construction that a court "must construe the ambiguous term in favor of the party it was designed to benefit." (See *Code Civ. Proc., § 1864* [*14] ; *Mitchell v. Exhibition Foods, Inc.* (1986) 184 Cal. App. 3d 1033, 1041-1042, 229 Cal. Rptr. 535.) The court reasoned that Paragraph 3.3 was intended to benefit the lessor in the event the lessee cancelled the lease, by relieving the lessor of all obligations of any kind under the lease. Guzik's failure to pay the commission described in the lease did not, therefore, constitute a breach of the lease. Thus the court ruled in favor of Guzik on Cornish's first cause of action for breach of the lease. Because the common count as alleged was dependent upon the validity of the first cause of action, this also failed.

Cornish moved to vacate the court's order granting summary judgment in favor of Guzik, or in the alternative to amend its pleadings. Cornish proposed to amend its complaint to add a common count cause of action based on the listing agreement and the lease proposal. The court denied the motion and filed a written order September 11, 2002. The court found that Cornish's reliance on the listing agreement and the lease proposal was unavailing. The listing agreement was between Guzik and Colliers. And the lease proposal, even though signed by both parties, expressly [*15] provided that it was not binding. Thus these writings did not provide an independent basis for a common count for money owed.

### Analysis of Legal Issues

#### 1. Breach of the Lease Agreement

As a general rule, a broker is entitled to a commission when he or she fulfills the terms of his or her employment. (*Twogood v. Monnette* (1923) 191 Cal. 103; *Steve Schmidt & Co. v. Berry* (1986) 183 Cal. App. 3d 1299, 228 Cal. Rptr. 689.) Thus if a broker is employed to procure a buyer who is ready, willing and able to purchase the seller's property on certain terms acceptable to the seller, or if the broker is employed to obtain a binding and valid contract for the sale of the property, the commission is earned when the buyer is procured or the contract is executed, even if the sale is ultimately not consummated. (*Twogood v. Monnette, supra,* 191 Cal. at p. 107; *Steve Schmidt & Co. v. Berry, supra,* 183 Cal. App. 3d at p. 1306; *Meyer v. Selggio* (1947) 80 Cal. App. 2d 161, 164.) This is because "the plaintiff [broker] did all that was required of him [or her] by the terms of his [or her] [*16] employment to entitle him [or her] to his [or her] commission, . . ." (*Twogood v. Monnette, supra,* 191 Cal. at p. 107; *Brion v. Cahill* (1917) 34 Cal.App. 258, 261.)

In the absence of an employment agreement, a broker's right to collect a commission is dependent upon the terms of the contract of sale, or as in this case the lease contract, between the two principals. (*Jennings v. Jordan* (1916) 31 Cal.App. 335; *Torelli v. J.P. Enterprises, Inc.* (1997) 52 Cal.App.4th 1250, 1254.) "The precise terms of [the] contract" control in determining a principal's liability for a commission. (*Jauman v. McCusick* (1913) 166 Cal. 517, 522.) Thus if the contract between the principals fails due to the failure of a condition expressly contained therein, the broker's right to a commission deriving from that contract also fails. For example in *Jennings v. Jordan, supra,* the broker, who did not have an employment agreement, brought together the parties and they entered into an exchange agreement. The exchange agreement provided that each would convey good title. It also provided that each party would [*17] pay the broker a certain sum of money as a commission.

2004 Cal. App. Unpub. LEXIS 3894, *

When one party was unable to convey clear title the deal fell through. The court found that the provision in the contract for the payment of a commission "must be construed in its relation to the whole contract." (*Jennings v. Jordan, supra,* 31 *Cal.App. at p.* 337.) "The provision relating to such payment is not separable from the remainder of the contract; . . . when [one] party found himself unable to comply with its terms and consented to its cancellation . . ., the whole contract fell, the provision relating to [the broker's] compensation with the rest." (*Id. at p. 338.*)

*Brion v. Cahill, supra,* 34 *Cal.App.* 258 is similar. In that case the broker had an employment agreement with a property owner who listed the property for sale or exchange. The broker found an interested party and the two principals entered into an exchange agreement conditioned upon being able to convey good title. The agreement also provided for a commission to be paid to the broker by each party. The exchange was not consummated because the listing party could not convey clear title. The broker brought [*18] suit against the other party for the portion of the commission promised by him under the exchange agreement. The broker contended that the promise in the exchange agreement was akin to an enforceable promissory note signed by defendant to pay the broker for services rendered. The court disagreed. The court noted that the broker's rights to a commission from defendant, who had not employed him, were limited by the terms of the entire exchange agreement. The defendant's cancellation of the agreement after the other party could not convey title "relieved [defendant] of his obligations under the contract, one of which was his promise . . . to pay to the plaintiff a commission for his services. . . ." (*Id. at p. 261.*)

A further illustration of this principle is *Houghton v. Kuehnrich (1920) 46 Cal.App.* 469. In that case the broker, who had no independent contract for the payment of a commission, negotiated an exchange agreement between two parties that provided the broker would be paid a commission when he "received an acceptance to exchange the above properties." (*Id. at p.* 471.) The contract was accepted. However, it provided that if [*19] defendant inspected and did not approve of the property to be exchanged, defendant could cancel the contract. After defendant cancelled under this provision, the broker sued to recover his commission for his services in procuring the signed exchange agreement. The court found the broker was not entitled to a commission. "His right to any compensation was dependent upon and inseparably bound up with the agreement of exchange which contained a cancellation clause for the benefit of the defendant." (*Ibid.*) The court further found that this case was stronger in favor of the defendant than *Jennings* or *Brion* because the contract contained an express pro-

vision that it could be cancelled up to a certain time upon the occurrence of a certain condition. When the contract ceased to exist by its own terms, the broker could not sue upon it to recover a commission.

Applying the law in these cases to the facts before us, Cornish's suit for breach of the lease agreement to recover his commission must fail. Cornish did not have an employment contract with Guzik. Therefore his rights to a commission were only those that were conferred upon it by virtue of the lease contract between Guzik [*20] and Terayon. (*Brion v. Cahill, supra,* 34 *Cal.App. at p. 261.*) In contemplation of a possible delay in delivering the premises, the lease included a cancellation clause. Paragraph 3.3 provided that if Guzik, despite using commercially reasonable efforts, was unable to deliver the premises at the start of the designated lease period, Guzik would "not be subject to any liability therefore." In the event of such a delay, Terayon could cancel the agreement within ten days from the 60th day of the delay after the lease was to commence, and such cancellation would relieve the parties of "all obligations" under the lease contract.

We agree with the trial court that Paragraph 3.3 was intended primarily to benefit Guzik, and any ambiguity must be construed in his favor. (*Mitchell v. Exhibition Foods, Inc.* (1986) 184 *Cal. App. 3d* 1033, 1041-1042, 229 *Cal. Rptr.* 535.) Furthermore, the above case law supports the interpretation that the cancellation of the lease under Paragraph 3.3 relieved Guzik of the obligation to pay a commission. As in *Houghton v. Kuehnrich, supra,* even though the lease provided that the commission was due upon the execution [*21] of the agreement, another clause of the agreement specifically provided for its cancellation, and the subsequent exercise of the right to cancel negated the entire agreement. The broker, whose rights depended solely upon the contract, could not recover when the contract failed of its own terms.

Cornish raises several arguments against the application of these principles. Cornish contends that the case of *Weber v. Dobyns* (1961) 193 *Cal. App. 2d* 402, 14 *Cal. Rptr.* 103 is directly on point and is controlling law. In *Weber,* the plaintiff broker had a listing agreement, signed by defendant's wife, providing for a commission upon the sale of property. The broker found a party interested in an exchange of properties and negotiated an exchange agreement. The exchange agreement, signed by both husband and wife, provided that they agreed to pay the broker a certain commission "for services rendered to become due on the execution of this agreement by all parties hereto." (*Id. at p.* 404.) The exchange was never consummated, due to a problem with title that could not be resolved, and the parties abandoned the deal. The court found that the rescission of the [*22] exchange

Case 2:04-cv-00139-DAK-BCW    Document 333-4    Filed 05/25/2007    Page 7 of 34

Page 6
2004 Cal. App. Unpub. LEXIS 3894, *

agreement did not terminate the broker's right to a commission.

Cornish argues that *Weber* controls here because, as in *Weber*, Guzik agreed to pay a commission upon the execution of the lease. Thus the right to payment became vested and enforceable as of that time, and could not later be discharged. We find *Weber* distinguishable, however. First, in *Weber*, the party sued had initially employed the broker whereas Guzik did not employ Cornish. Furthermore, in the exchange agreement in *Weber*, the property owners' promise to pay a commission was unconditional. It therefore could be deemed to be "a sufficient memorandum" to permit the broker to enforce it even against the husband who had not signed the listing. (*Weber v. Dobyns, supra, at p.* 408.) There was no provision in the contract in *Weber*, as there was in *Houghton* and in the lease contract here, providing that it could be cancelled upon the occurrence of certain events, in which case *all* obligations would be discharged. Nor was the promise to pay a commission in *Weber* made dependent upon the parties consummating the deal by being able to convey clear title, as was the case [*23] in *Jennings v. Jordan* or *Brion v. Cahill*. In fact, the contract in *Weber* contained a provision that in the event of an error in title that could not be corrected, the exchange agreement would be null and void " 'except as to the payment of commissions.' " (*Id. at p.* 409.) Thus it expressly provided that the promise to pay a commission would survive the failure of the contract. In sum, the result in *Weber* does not control here, where the contract provided for cancellation and discharge of all obligations in the event of a delay.

*Jauman v. McCusick, supra, 166 Cal. 517,* relied upon by Cornish, is similarly distinguishable. That case also involved an exchange agreement where both parties promised to pay the brokers a certain sum "for their services *in securing the agreement for said exchange.*" (*Id. at p.* 522, italics in original.) When the parties did not go through with the transaction because they could not agree about certain tax payments, the court found this did not discharge the obligation to pay a commission because the brokers "had performed the exact service for which defendant undertook to pay them a commission. [*24] The performance of their obligation was complete and their rights could not be affected by the subsequent failure of either of the parties to carry out the agreement." (*Ibid.*) In *Jauman,* however, there were no conditions in the contract regarding good title or otherwise excusing performance. The parties' failure to agree on tax payments and to consummate the transaction therefore did not relieve them of their obligations under the contract to pay a commission.

Cornish next contends that Guzik's obligation to pay a commission stems from the listing agreement, which

expressly provided for participation by other brokers. Furthermore, the lease proposal, signed by Guzik, specifically identified Cornish as the participating broker, entitled to receive 50 percent of the commission. Cornish relies on *Steve Schmidt & Co. v. Berry, supra, 183 Cal. App. 3d 1299.* In that case the court found that a buyer's broker could seek recovery of a commission directly against the property owner, where the listing had expressly authorized the listing broker to appoint subagents, and the listing agent had later entered into an agreement with the buyer's broker to share a commission.

[*25] The agreements in our case cannot be similarly construed as creating an agency relationship between Guzik and Cornish. The listing agreement here was an exclusive authorization for Colliers to be the exclusive agent for obtaining a lease of the property. Unlike the listing agreement in *Schmidt,* it did not authorize Colliers to appoint subagents. It simply recognized that a commission would be due to Colliers whether Colliers produced a lessee, Guzik himself produced a lessee, or another person "including but not limited to another real estate broker" produced a lessee. (See, *Colbaugh v. Hartline (1994) 29 Cal.App.4th 1516.*) As *Schmidt* acknowledged, a "listing agreement is strictly construed according to its terms." (*Steve Schmidt & Co. v. Berry, supra, 183 Cal. App. 3d at p. 1305.*) On its face the listing agreement in our case did not create a right in other brokers besides Colliers to proceed directly against Guzik for a commission. Furthermore, the subsequent lease proposal was not similar to the written agreement between the two brokers in *Schmidt* as it was not a subagency agreement signed by the brokers but rather a lease proposal [*26] between the principals. And in any event it expressly provided that it was not intended to create "any binding agreement." In sum, in the absence of an employment agreement with Guzik, Cornish is left to rely solely on the lease agreement for recovery of a commission.

Cornish argues further, however, that the law provides that a broker may recover a commission under a contract between the principals if the failure of the contract is the result of the fault or arbitrary refusal of the party sued to consummate the transaction. For example, in *Coulter v. Howard (1927) 203 Cal. 17,* a seller repudiated the sale prior to the close of escrow so that she could sell to another party. The court found that the broker identified in the first sale was entitled to a commission: "the law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase." (*Id. at p.* 23.) Similarly in *Collins v. Vickter Manor, Inc. (1957) 47 Cal.2d 875,* the broker had an oral agreement with the seller, and the broker's right to a commission was later memorialized in the purchase contract. The [*27] sale

2004 Cal. App. Unpub. LEXIS 3894, *

fell through, but the court found that the broker was nonetheless entitled to a commission because the "consummation was prevented solely by the arbitrary refusal of [the seller] to proceed with the transaction. In those circumstances, the defendant will not be allowed to take advantage of their own remissness to defeat plaintiff's recovery." (*Id. at p. 881.*) In *Torelli v. J.P. Enterprises, Inc., supra,* 52 Cal.App.4th 1250, the seller tried to negotiate a deal directly with the buyer after the listing had expired, thus depriving the broker of the commission earned by procuring that buyer. These cases are based on the principle that in every contract there is an implied covenant to refrain from doing anything that injures the rights of another party to receive the benefits of the agreement. (*Id. at p. 1257.*)

Cornish's application of this principle in support of its claim for a commission is based on the assertion that Guzik's failure to deliver the leased premises on time was an arbitrary repudiation of the lease agreement. The record does not bear this out, however. The record shows that Guzik was unable to deliver the premises [*28] because construction was not complete on the new quarters where he was relocating his business. Furthermore the lease agreement reflects that the parties contemplated the possibility of just such a delay and expressly provided for it in Paragraph 3.3, entitled "Delay in Possession." This clause gave Terayon the right to cancel within a certain time period if Guzik, despite using "best commercially reasonable efforts to deliver possession of the Premises" on time, was "unable to deliver possession as agreed." There is no claim that Guzik proceeded in bad faith or that he had some other reason for not delivering the premises that did not fall within this provision. As in *Houghton,* the contract spelled out the circumstances by which it could be cancelled. "Neither party could be said to be in 'fault' when simply doing or omitting to do the very things which the contract specifies he might do or not do." (*Houghton v. Kuehnrich, supra,* 46 Cal.App. at p. 475.) We therefore reject the contention by Cornish that the commission was due because Guzik was at fault for the failure of the contract.

### 2. Motion to Amend

The second cause of action in Cornish & Carey's [*29] complaint was a common count for money owed, which was dependent upon the first cause of action for breach of the lease contract. Following the court's ruling on the summary judgment, Cornish sought to amend the complaint to include a common count based on the listing agreement and the lease proposal. The court denied the request.

We find no abuse of discretion. As noted above, the listing agreement authorized Colliers as Guzik's exclusive agent. Although it provided that a commission would be owed to Colliers if the eventual lessee were to be procured by any another person, including another broker, it did not authorize participating brokers as sub-agents. (See, e.g. *Steve Schmidt & Co. v. Berry, supra,* 183 Cal. App. 3d 1299; *Colbaugh v. Hartline, supra,* 29 Cal.App.4th 1516.) Therefore the listing agreement by itself does not bestow any right upon Cornish, as a participating broker, to seek reimbursement directly from Guzik. Furthermore, the lease provides that all "other prior or contemporaneous agreements or understandings" are ineffective and that the lease itself "contains all agreements between the Parties with respect to any matter mentioned [*30] herein." Independent of the lease, the listing agreement cannot provide a legal basis for recovery of a commission by Cornish.

Cornish argues that Guzik and Terayon later agreed in the lease proposal and in the lease agreement that Cornish was to receive 50 percent of the commission. But the lease proposal expressly provided that it was not binding and that only a formal lease agreement executed by the parties would be binding. The lease agreement does recite that the "Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker." However, any rights which accrued to Cornish as third party beneficiary of the listing agreement by virtue of the terms of the lease are also subject to all of the other provisions of the lease. (*Jennings v. Jordan, supra,* 31 Cal.App. 335; *Brion v. Cahill, supra,* 34 Cal.App. 258.) The listing agreement and lease agreement must be interpreted together as one contract. (*Civ. Code, § 1641; Freedland v. Greco (1957) 45 Cal.2d 462.*) To the extent that there is an inconsistency between the two writings, [*31] the later contract controls. (*Frangipani v. Boecker (1998) 64 Cal.App.4th 860, 863.*) Any obligation of Guzik to pay Cornish a commission pursuant to the listing agreement must be made subject to Paragraph 3.3 of the lease, providing that if the lessor is unable to deliver the premises on time, despite reasonable efforts to do so, the lessor "shall not be subject to any liability therefore," and further that in the event of cancellation under Paragraph 3.3, "the Parties shall be discharged from all obligations hereunder."

We conclude that Cornish cannot state a cause of action for money owed under the listing agreement and lease proposal. Therefore, the court did not abuse its discretion in refusing to allow an amendment to the complaint.

### DISPOSITION

The judgment is affirmed.

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

2004 Cal. App. Unpub. LEXIS 3894, *

WUNDERLICH, J.                    MIHARA, J.

# EXHIBIT F

LEXSEE 2003 CAL APP UNPUB LEXIS 2467

**MILTON GRUBER, Plaintiff and Appellant, v. FEDERAL NATIONAL MORT-GAGE ASSOCIATION, Defendant and Respondent.**

**B154703**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DI-VISION SEVEN**

*2003 Cal. App. Unpub. LEXIS 2467*

**March 13, 2003, Filed**

**NOTICE:**    [*1]  NOT TO BE PUBLISHED IN OF-FICIAL REPORTS -- CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPIN-IONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

**PRIOR HISTORY:**    APPEAL from a judgment of the Los Angeles County Superior Court. Los Angeles County Super. Ct. No. BC217920.  Robert L. Hess, Judge.

**DISPOSITION:**  Affirmed.

**COUNSEL:** Gruber & Kantor, Daniel S. Gruber and Joel A. Cohen for Plaintiff and Appellant.

The Wolf Firm, and Steven K. Linkon for Defendant and Respondent.

**JUDGES:** MUNOZ (AURELIO), J.* We concur: PER-LUSS, P. J. JOHNSON, J.

    *  Judge of the Los Angeles Superior Court, as-signed by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** AURELIO MUNOZ

**OPINION**

    In this action, plaintiff Milton Gruber sued to re-cover a $ 15,006 "consent fee" which Gruber paid to defendant Federal National Mortgage Association (Fan-nie Mae) in connection with Fannie Mae's consent to assumption of a loan. Gruber appeals from judgment on

the pleadings in favor of Fannie Mae. We conclude [*2] the trial court properly concluded that the $ 15,006 fee was permitted pursuant to the parties' written agreements and did not violate *Business and Professions Code sec-tion 17200 et seq.* (UCL; or unfair competition law).

PLEADINGS AND PROCEDURAL BACKGROUND

    In 1987, Coast Savings and Loan (Coast) loaned about $ 1.79 million to Gruber and two other individuals as tenants in common; the loan was evidenced by an Ad-justable Mortgage Loan Note (Note), with an initial in-terest rate of 8.75 percent, and was secured by a deed of trust on commercial real property. [1]  Sometime before August 1999, Coast merged with Washington Mutual Bank, which became the beneficiary of the Note; Wash-ington Mutual assigned the Note to Fannie Mae. Wash-ington Mutual serviced the loan for Fannie Mae.

>     1   Although the deed of trust was mentioned in the complaint and other exhibits thereto, it was not attached as an exhibit to the complaint. In connection with Gruber's opposition to Fannie Mae's motion for judgment on the pleadings, Gruber asked the court to take judicial notice of the trust deed, and the trial court took such notice.

    [*3]  In August 1999, the other two owners of the property with Gruber sought to transfer their undivided two-thirds interest in the property to other individuals (hereinafter, "purchasers," who included Victor Gruber and Daniel Gruber, not parties to this appeal). [2]  Gruber and the purchasers determined that it was in their best interests to assume the Note; the credit of the purchasers was superior to that of the original debtors.

>     2   Although Victor Gruber was a plaintiff be-low, the notice of appeal is filed only by Milton Gruber.

2003 Cal. App. Unpub. LEXIS 2467, *

Washington Mutual required the purchasers and Gruber to pay a one percent assumption fee of $ 15,006 on the outstanding loan balance, and to sign a general release in favor of Washington Mutual and Fannie Mae. In addition to the transfer fee, Gruber also paid actual costs incurred in the transfer.

Gruber alleged that he and the purchasers signed the release under financial duress, coercion, and protest; however, there is no allegation that they ever expressed such protest [*4] to Washington Mutual or Fannie Mae. Gruber further alleged that although the Assumption and Release Agreement (Assumption Agreement) required him to pay a $ 15,006 "transfer fee," such fee was not permitted under the terms of the original Note and deed of trust. However, there is no allegation that Gruber or the purchasers expressed any objection to the $ 15,006 transfer fee to Fannie Mae prior to or at the time of execution of the Assumption Agreement in August 1999; in fact, the fee was paid to Fannie Mae. In describing the nature of the alleged coercion, Gruber asserted that "The coercion was a threat that the defendants and each of them would reject the application for assumption unless he signed the Assumption Agreement. If the parties to the transaction went ahead with the deal, without the consent of the lender, they knew the loan would be called. The parties knew if the Note was called a new note on the same or similar terms could not be obtained at that time."

In October 1999, Gruber and another purchaser filed the instant action. The third amended complaint (complaint) asserted causes of action for breach of contract and unfair competition in violation of *Business and Professions* [*5] *Code section 17200 et seq. (section 17200).* Both claims were based on the allegations that Fannie Mae breached the terms of the loan agreement by charging the transfer fee of $ 15,006, which allegedly bore no relation to the actual costs associated with the assumption of the loan; the transfer fees, as well as actual costs were itemized and paid through the escrow dealing with the assumption. [3] Gruber alleged that the transfer fee was unconscionable and also constituted a penalty; such fee was never disclosed to Gruber at the time he entered into the original loan; and the fee was not permitted by the terms of the Note. Gruber claimed that the terms of the Assumption Agreement were "not in conformity with the original Note."

---

3    According to the Assumption Agreement, the principal amount of the original loan was $ 1,792,000; in August 1999, the unpaid principal balance was $ 1,500,612.90. Hence, the transfer fee was one percent of the unpaid balance.

The Note, executed in 1987, contained in paragraph [*6] 7 an acceleration clause, which stated that the bene-

ficiary [Fannie Mae] "shall have the right, at its option, to declare any indebtedness . . . immediately, without demand or notice, due and payable if, prior to and without Beneficiary's written consent, . . . Trustor . . . sells, enters into a contract of sale, conveys or alienates such property . . . ." The Note also provided in paragraph 7: "Beneficiary shall consent to a sale or transfer of such property and allow the transferee . . . to assume the existing indebtedness under the existing terms of said note or notes if: (1) Trustor causes to be submitted to Beneficiary information required by Beneficiary to evaluate the transferee as if a new loan were being made to the transferee; (2) Beneficiary reasonably determines that Beneficiary's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement . . . is acceptable, and (3) the transferee signs an assumption agreement that is acceptable to Beneficiary and that obligates the transferee to keep all the promises and agreements made in such note . . . . To the extent permitted by applicable law, Beneficiary also may charge a fee [*7] as a condition to Beneficiary's consent to the loan assumption."

The deed of trust, also executed in 1987, provided: "To protect the security of this deed of trust, trustor agrees: . . . [P] (30) **Administrative Charges.** Beneficiary or Trustee may charge other fees reasonably related to services performed in connection with the administration of any loan evidenced by any note secured hereby, and Trustor covenants and agrees to pay said fees."

The Assumption Agreement, executed by Gruber and the purchasers in August 1999, provided: "8. Costs. The Transferee and the Transferor agree to pay all fees and costs (including attorneys' fees) incurred by Fannie Mae and the Servicer [Washington Mutual Bank] in connection with Fannie Mae's consent to and approval of the transfer of the Property and a transfer fee of $ 15,006.00 in consideration of the consent to the transfer." [4] The Assumption Agreement in paragraph 12(g) also provided that "This written agreement and the other loan documents, as amended, represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten [*8] oral agreements between the parties."

---

4    In the Assumption Agreement, Gruber was included among both the Transferees and the Transferors.

Paragraph 2(d) of the Assumption Agreement further stated that transferor represented and warranted to Fannie Mae that "There are no defenses, offsets or counterclaims to the Note, the Security Instrument or the other Loan Documents."

2003 Cal. App. Unpub. LEXIS 2467, *

Paragraph 11 of the Assumption Agreement contained a release, by which Gruber agreed to release Fannie Mae from all claims in connection with the transfer of interests in the property, including "any charging, collecting or contracting for prepayment premiums, transfer fees, or assumption fees . . . ."

After answering the complaint, Fannie Mae filed motion for judgment on the pleadings, contending that as a matter of law, there was no breach of the loan agreement and no unlawful practice or unfair competition because the assumption fee was expressly permitted by the Note.

In opposition, Gruber sought the court to take judicial notice [*9] of the deed of trust, which contained language which Gruber asserted limited the permissible fees upon an assumption of the loan to those costs "reasonably related to the services performed in connection with the administration of any loan evidenced by any note secured hereby." Gruber also argued below that the transfer fee was an unreasonable restraint on alienation; however this point has been abandoned on appeal. However, neither in his written opposition, nor in oral argument in opposition to the motion, did Gruber address the theory of liability premised on the UCL, or dispute the argument in Fannie Mae's motion that no cause of action was stated under the UCL.

After hearing, the court granted the motion. The court stated that construing the documents as a whole, paragraph 30 of the deed of trust, dealing with administrative charges, did not limit the assumption fee, which was a "different animal" than the fees incurred in connection with loan administration. The court also found that there were no oral or written representations which would limit Fannie Mae's ability to impose the fee. The court also found that the imposition of the fee did not violate the provisions [*10] of *Business and Professions Code section 17200.*

Gruber filed timely notice of appeal from the judgment. He contends that the transfer fee was an illegal penalty and void; the fee also was unfair, deceptive, and unconscionable within the meaning of the UCL. Gruber also contends that properly construed together, the Note and deed of trust require that the assumption fee relate to actual costs or expenses incurred; because those actual costs were itemized and paid separately, the entire transfer fee of $ 15,006 was improper and not permitted by the terms of the Note and deed of trust.

DISCUSSION

A. Standard of Review.

Analogous to review of a general demurrer, we independently review the order granting the motion for judgment on the pleadings to determine whether or not the factual allegations of the complaint are sufficient to constitute a cause of action. (*Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468, 515.*)

California recognizes the objective theory of contracts; it is the objective intent, as evidenced by the words of the contract, rather than the undisclosed subjective intent of one of the parties, that controls interpretation. (*Berman v. Bromberg (1997) 56 Cal.App.4th 936, 948.*) [*11]

Whether a contract provision is clear and unambiguous is a question of law. (*Sanchez v. Bally's Total Fitness Corp. (1998) 68 Cal.App.4th 62, 69.*) Where a complaint is based on a written contract which it sets out in full, a general demurrer to the complaint admits not only the contents of the instrument but also any pleaded meaning to which the instrument is reasonably susceptible. (*Aragon-Haas v. Family Security Ins. Services, Inc. (1991) 231 Cal. App. 3d 232, 239, 282 Cal. Rptr. 233.*) Where parties to a written contract have agreed to it as an integration, i.e., a complete and final embodiment of the terms of an agreement, parol evidence cannot be used to add to or vary its terms. (*Id., at p. 240.*) However, extrinsic evidence is admissible to explain what the parties meant by the language they used. (*Ibid.*) Where, as here, there are no allegations of extrinsic evidence bearing on the terms of the contract, construction of the contract is a question of law and the appellate court will independently construe the writing. (*Sanchez v. Bally's Total Fitness Corp., supra, 68 Cal.App.4th 62, 69.*)

Where a general [*12] and a particular provision of a written instrument are inconsistent, the particular controls the general. (*McNeely v. Claremont Management Co. (1962) 210 Cal. App. 2d 749, 753, 27 Cal. Rptr. 87; see also Code Civ. Proc., § 1859.*)

"Several documents concerning the same subject and made as part of the same transaction will be construed together even if the documents were not executed contemporaneously." (*Myers Building Industries, Ltd. v. Interface Technology, Inc. (1993) 13 Cal.App.4th 949, 967.*) Thus, a note, mortgage, and agreement of sale are construed together as one contract where they are part of the same transaction. (*Huckell v. Matranga (1979) 99 Cal. App. 3d 471, 481, 160 Cal. Rptr. 177.*) In addition, where there is an inconsistency between two agreements, "both of which are executed by all of the parties, the later contract supersedes the former. Thus, '. . . the terms of the escrow instructions control to the extent that they are inconsistent with the prior contract.' [Citation.]" (*Frangipani v. Boecker (1998) 64 Cal.App.4th 860, 863.*)

Moreover, the latter rule giving effect to a later contract is consistent [*13] with the rule that the practical interpretation of the contract by one party, evidenced by

2003 Cal. App. Unpub. LEXIS 2467, *

his words or acts, can be used against him on behalf of the other party. (*Southern Cal. Edison Co. v. Superior Court (1995) 37 Cal.App.4th 839, 851.*) Although the conduct of one party to the contract is by no means conclusive evidence as to the meaning of the contract, it is relevant to show the contract is reasonably susceptible to the meaning evidenced by that party's conduct. (*Ibid.*) Accordingly, although an agreement may be uncertain in its inception, the subsequent performance of the parties will be considered in determining its meaning as they are least likely to be mistaken as to the intent. (*Oceanside 84, Ltd. v. Fidelity Federal Bank (1997) 56 Cal.App.4th 1441, 1449.*)

B. Breach of Contract Cause of Action.

In this case, there are no allegations that the parties discussed or made representations concerning the meaning of pertinent terms of the Note, deed of trust, or Assumption Agreement. Accordingly, the interpretation of the contractual provisions here presents a question of law for the trial court and for this court. (*Oceanside 84, Ltd. v. Fidelity Federal Bank, supra, 56 Cal.App.4th 1441, 1448.*) [*14]

1. In determining whether there has been a breach all three documents must be construed together

Gruber contends that construing the Note and deed of trust together, the deed of trust was "'certain and unambiguous' in its requirement that fee charges, including the assumption fee, must relate to costs incurred in the performance of a service. . . . [P] The contract language evidences an intent that the beneficiary would be entitled to recover, and the borrower would be obligated to pay, expenses actually incurred by the beneficiary under the contract. There is no language in the contract evidencing an intent to distinguish between types of fee charges, some of which relate to actual expenses and some of which do not." While Gruber claims that the Assumption Agreement's "new consent provision contradicted the terms of the original loan documents," he maintains that such constitutes a "repugnancy" which must be reconciled by interpreting the Assumption Agreement consistent with the prior Note and deed of trust.

While we agree with Gruber's claim that the documents must be construed together, we believe that principles of contract construction require that we construe all three [*15] documents together, and not just the two considered by Gruber. When all are considered together, we are required by rules of construction to resolve any inconsistencies or ambiguities by giving effect to the last contract executed by the parties, and also to the most specific provision. Both of those rules require that we give effect to the transfer fee provision in the Assumption Agreement. We would also be required to give ef-

fect to the transfer fee provision in the Assumption Agreement because Gruber's conduct in executing the Assumption Agreement may be taken as an indication that his practical interpretation of the terms of the Note and deed of trust permitted, or were indeed consistent with, the provisions of the Assumption Agreement. [5]

> 5    Contrast the assumption agreement here with that in *Cherry v. Home Sav. & Loan Assn. (1969) 276 Cal. App. 2d 574, 81 Cal. Rptr. 135* (disapproved on a related point *in Wellenkamp v Bank of America* (1978) *21 Cal.3d 943, 953, 148 Cal. Rptr. 379, 582 P.2d 970*), a declaratory relief action where the appellant Cherry, who assumed the loan, "entered into the assumption agreement under protest, the agreement incorporating by reference a letter from appellant's attorney to respondent which stated that the assumption agreement was accepted subject to a declaration of appellant's rights by the Superior Court of Los Angeles County." (*Id., at p. 576.*) There is no allegation or indication in this case that Gruber informed Fannie Mae prior to or at the time of execution of the Assumption Agreement that he was entering into the agreement under protest. In fact, the release provision of the Assumption Agreement is contrary to such a scenario.

[*16] Viewing only the Note and deed of trust, we would also conclude that the transfer fee was consistent with the terms of those documents. As between the Note and deed of trust, the more specific provision is the provision of the Note providing that as permitted by applicable law, the beneficiary "may charge a fee as a condition to Beneficiary's consent to the loan assumption." As the more specific provision, the latter would control over the more general provision of the deed of trust dealing with administrative charges in general.

Contrary to Gruber's claims of inconsistency, we construe paragraph (30) of the deed of trust to be consistent with the Assumption Agreement. The deed of trust permits the beneficiary to charge "other fees reasonably related to services performed in connection with the administration of any loan evidenced by any note secured hereby." Even if paragraph (30) is considered in isolation, and the reference to "other fees" reasonably can be construed to include a consent or transfer fee, then the provision still requires that such fee be "reasonably related to services performed in connection with the administration of [the] loan." Even if the word "reasonable" [*17] is construed to modify the phrase "other fees," no language in paragraph (30) requires that the amount of the fee be limited to the beneficiary's actual costs. [6] Without any contractual limitation on the amount of such fee in the Note and deed of trust, the one percent transfer

Case 2:04-cv-00139-DAK-BCW   Document 333-4   Filed 05/25/2007   Page 15 of 34

Page 5
2003 Cal. App. Unpub. LEXIS 2467, *

fee required by the Assumption Agreement is entirely consistent with the provisions of the loan documents.

   6   A reasonable construction is that the phrase "reasonably related" was intended to describe the nature of the correlation between the "other fees" and the services performed in connection with loan administration. Thus, the provision reasonably is interpreted as placing a limitation on the type of fees that may be charged. No express language in paragraph (30) indicates that the word "reasonably" was intended to convey the requirement that the "other fees" be limited to actual costs or expenses incurred by the beneficiary. As explained in more detail below, even if the contractual language here permits some ambiguity on the point, California law does not require that the instant language be construed to limit fees to actual costs or expenses incurred by Fannie Mae.

[*18] Paragraph (30) is not only entirely consistent with the Assumption Agreement, but with the terms of the Note as well. Because the Note contains a specific provision dealing with a loan assumption fee, the phrase "other fees" in paragraph (30) reasonably can be understood to refer only to those fees as to which no other provision is made. As there is another specific provision for a loan assumption fee, (in paragraph 7 of the Note), paragraph (30) does not apply to such fee. Thus, the transfer fee provision in the Assumption Agreement is effective.

   2. *Wellenkamp v Bank of America (1978) 21 Cal.3d 943, 148 Cal. Rptr. 379, 582 P.2d 970* does not bar transfer fees

In *Wellenkamp v. Bank of America (1978) 21 Cal.3d 943, 953, 148 Cal. Rptr. 379, 582 P.2d 970,* the court held that "a due-on clause contained in a promissory note or deed of trust cannot be enforced upon the occurrence of an outright sale unless the lender can demonstrate that enforcement is necessary to protect against impairment to its security or the risk of default." (*Id., at p. 953,* fn. omitted.) The *Wellenkamp* court further remarked that "We note that lenders have [*19] utilized the exercise of a due-on clause for other purposes in addition to maintaining their loan portfolios at current rates of interest. The clause has also been used as a lever to exact substantial consideration from the buyer in the form of assumption and waiver fees. (See *Cherry v. Home Sav. & Loan Assn. (1969) 276 Cal. App. 2d 574, 81 Cal. Rptr. 135 . . .; Hellbaum v. Lytton Sav. & Loan Assn. (1969) 274 Cal. App. 2d 456, 79 Cal. Rptr. 9. . . .)*" (*Wellenkamp v. Bank of America, supra, 21 Cal.3d 953, fn. 11.*)

In 1982, Congress essentially abrogated the *Wellenkamp* holding by enacting the Garn-St. Germain Depository Institution Act of 1982, (the Garn Act; *12 U.S.C.A. § 1701j-3*) which preempts all state statutes and judicial decisions that restrict the enforcement of due-on-sale clauses in real property loans. Gruber, citing a treatise by Miller and Starr, suggests that *Wellenkamp* still retains vitality and the language in paragraph (30) must be construed to be consistent with California law. "The Garn Act has no provision or regulations for an assumption fee upon the buyer's formal assumption [*20] of a loan. Presumably state law governs this subject, and the California Supreme Court has expressed antipathy to a lender who uses the threat of acceleration 'as a lever to exact substantial consideration from the buyer in the form of assumption or waiver fees.' An unreasonable fee in excess of reasonable administrative costs may be unenforceable." (4 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 10:108, pp. 311, 318; fns. omitted.) [7] Using this quotation as a basis, Gruber argues California law requires that "other fees" must be reasonable and must be limited to actual costs or expenses incurred by the beneficiary.

   7   A comment by Miller and Starr acknowledges that "The Garn Act does not affect other rights of the lender that may be *provided expressly by the contractual terms* of the note and deed of trust when there is a transfer. Thus, for example, a lender may want a higher interest rate if the property is sold. Therefore, upon a transfer the lender could condition a waiver of the right to accelerate upon an increase in the rate of interest if expressly permitted by the loan documents." (4 Miller & Starr, Cal. Real Estate, *supra,* § 10:108, pp. 311-312.)

[*21] However, both before and after *Wellenkamp,* our courts have permitted similar fees greater than one percent without a showing they were actual costs. [8] In the case of a prepayment fee, the court in *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn., supra,* 22 Cal. App. 3d 303 (*Lazzareschi*), upheld a fee more than three percent: "In this case, the charge of $ 9,130.22 was 3.0403 percent of the original loan of $ 300,000. It was 3.0883 percent of the unpaid principal of $ 295,626.05. (Six months' interest on the unpaid principal would have been a higher amount than $ 9,130.02 because of the provision in the note that 20 percent of the original loan, that is, $ 60,000, shall be deducted for computing the prepayment charge." In the absence of any statute or authorized regulation, and in the absence of any evidence . . ., we know of no means by which a court could come to the conclusion that the charge which appellant agreed to pay was exorbitant or out of line with that customarily provided in loan agreements. Indeed,

plaintiff does not in its complaint or in its declaration in opposition to the motion for summary judgment, make the point [*22] that the charge exceeds that which is usual." (*Id., at p.* 310.)

8    The court in *Hellbaum v. Lytton Sav. & Loan Assn., 274 Cal. App. 2d 456, 459, 79 Cal. Rptr. 9* which was disapproved on another ground in *Wellenkamp v. Bank of America, supra,* indicated a prepayment penalty might be so large as to be unreasonable. "The Continuing Education of the Bar treatise [Cal. Real Estate Secured Transactions (Cont.Ed.Bar) § 4.72, p. 196] comments on the *Hellbaum* dictum: 'However, it is entirely possible that a court, examining a prepayment charge so exorbitant as to shock the judicial conscience and entirely incompatible with customs of the trade, will reject the freedom of contract analysis and declare it an invalid penalty.'" (*Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn. (1971) 22 Cal. App. 3d 303, 308, 99 Cal. Rptr. 417.*)

In another case upholding a prepayment fee imposed on a commercial borrower, the court in *Sacramento Sav. & Loan Assn. v. Superior Court (1982) 137 Cal. App. 3d 142, 186 Cal. Rptr. 823* [*23] stated: "In this case the fee amounted to six months' interest if more than 20 percent of the original principal amount were prepaid in one year. This amounted to a prepayment fee of $ 51,000 on loans apparently totaling in excess of $ 2 million. The formula used to arrive at this figure has been called 'typical' and was the same formula found to be reasonable in *Lazzareschi*. The same formula has been established by the Legislature as the amount of prepayment penalty which may be charged for prepayment of a loan on a single-family, owner-occupied dwelling during the initial seven years of the loan. (*Bus. & Prof. Code, § 10242.6*.) The inference to be drawn from the legislative approval of this prepayment formula is that since the Legislature has determined the formula to be reasonable when applied to a purchaser of a home, it is certainly reasonable when applied to commercial borrowers such as the real parties in interest." (*137 Cal. App. 3d at pp.* 146- 147; fn. omitted.)[9]

9    "It is mere dicta in *Lazzareschi* and *Hellbaum* that there is a limitation of reasonableness on prepayment penalties." (*Williams v. Fassler (1980) 110 Cal. App. 3d 7, 12, 167 Cal. Rptr. 545.*)

[*24] In the instant case, the parties have not brought to our attention any statute or regulation which applies to assumption fees. As pointed out by the court in a case involving the issue of whether a check processing

service fee was invalid for unconscionability under the UCL: "This case implicates a question of economic policy: whether service fees charged by banks are too high and should be regulated. 'It is primarily a legislative and not a judicial function to determine economic policy.'" (*California Grocers Assn. v. Bank of America (1994) 22 Cal.App.4th 205, 218.*) "Another court, in a different context, pointed out the general preference for legislative or administrative regulation in the field of price control: 'The control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases.'" (*Ibid*; citing *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn., supra, 22 Cal. App. 3d 303, 311*; [*25] see also *Freeman v. San Diego Assn. of Realtors (1999) 77 Cal.App.4th 171, 203, fn. 35.*)[10]

10    Along these lines, we point out that there are insufficient facts in the complaint to support Gruber's legal conclusions that the assumption fee here was unreasonable, arbitrarily high, and far beyond Fannie Mae's actual costs incurred in the transaction. There are no allegations dealing with the issue of the economic impact of the assumption on Fannie Mae. Although the complaint alleged that the fee was grossly disproportionate to Fannie Mae's "overhead, time and manpower costs arising out of the transaction," the latter costs may not be the only economic impacts of the loan assumption.

In light of the foregoing authorities, and in the absence of any claim by the parties that the matter of assumption fees is a subject of legislative or administrative regulation, we conclude there is no support for the proposition that the one percent assumption fee is unreasonable as a matter of law. [*26] We also decline Gruber's invitation to construe the instant loan documents as requiring that the assumption fee be limited to Fannie Mae's actual expenses and costs. To do so, we would also contravene the principle that an implied contractual term (i.e., that the assumption fee is limited to actual costs and expenses) should not be read to vary an express term (here, the specification in the Assumption Agreement for a transfer fee of $ 15,006). (*California Grocers Assn. v. Bank of America, supra, 22 Cal.App.4th 205, 217.*) "Implied covenants are disfavored at law. The courts will not imply a better agreement for parties than they themselves have been satisfied to enter into, or rewrite contracts whenever they operate harshly. There can be no implied covenant where the subject matter is completely covered by the existing contract." (*Vikco Ins. Ser-*

*vices, Inc. v. Ohio Indemnity Co. (1999) 70 Cal.App.4th 55, 70.)*

Applying the above principles of contract interpretation, we conclude the instant contracts to be clear and unambiguous in permitting the $ 15,006 transfer fee; indeed, the transfer fee provision of the Assumption Agreement could not be clearer.

[*27] Gruber faults the trial court for failing to construe uncertainties and ambiguities in his favor. However the rule that ambiguities in a form contract are to be resolved against the drafter does not operate to the exclusion of all other rules of contract interpretation; rather, it is used when none of the canons of construction succeed in dispelling the uncertainty. (*Oceanside 84, Ltd. v. Fidelity Federal Bank, supra, 56 Cal.App.4th 1441, 1448.*) As other rules of construction have resolved the matter, we have no occasion to resort to the rule urged by Gruber.

Because the pleadings and exhibits thereto establish as a matter of law that the $ 15,006 transfer fee did not constitute a breach of contract, the trial court did not err in granting judgment on the pleadings on the breach of contract cause of action.

C. Violation of Unfair Competition Law (UCL). [11]

11  "The Legislature has given *section 17200 et seq.* no official name. Accordingly, we are now using the label 'unfair competition law.'" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 169, fn. 2, 973 P.2d 527.*)

[*28] The cause of action for violation of the UCL alleged that Fannie Mae committed acts of unfair competition by coercing borrowers and assuming parties into accepting changes to loan agreements without consideration and without mutuality, and by charging improper, unreasonable and arbitrary fees in connection with loan assumptions, which fees were not permitted under the terms of the loan agreements and were far beyond the actual costs incurred by the lender. Gruber further alleged that Fannie Mae's conduct was misleading and therefore fraudulent within the meaning of the UCL because borrowers were likely to be deceived into believing that neither they nor their transferees would be charged an unreasonable and arbitrary fee. [12] The complaint sought both injunctive relief and restitution of the allegedly unlawful transfer fee. [13]

12  Some of the pleaded theories appear to have been abandoned on appeal, while in his appellate briefs, Gruber has raised new theories (i.e., unconscionability) that may not be expressly stated

in the pleadings. Although respondent points out that the unconscionability theory is being raised for the first time on appeal, respondent addresses the point on its merits. Because the issue of whether Gruber has pleaded an adequate cause of action is one of law, we address his appellate contentions on their merits.

[*29]
13  "Because the remedies available under the UCL, namely injunctions and restitution, are equitable in nature, courts have the discretion to abstain from employing them. Where a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy." (*Desert Healthcare Dist. v. PacifiCare FHP, Inc. (2001) 94 Cal.App.4th 781, 795;* see also *California Grocers Assn. v. Bank of America, supra, 22 Cal.App.4th 205, 218* [bank's $ 3 check processing fee not unconscionably high.) While Fannie Mae's motion for judgment on the pleadings cited *California Grocers Assn.*, and argued that judicial intervention was inappropriate in this case, this point is not raised by Fannie Mae on appeal.

In his appellate briefs, Gruber contends that the assumption fee violated the UCL because it was unlawful, as an illegal penalty, and because it was unfair, as an unconscionable provision.

The UCL "does not proscribe specific [*30] practices. Rather, as relevant here, it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' ( *§ 17200.*) . . . By proscribing 'any unlawful' business practice, '*section 17200* "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163, 180.*)

Gruber fails to provide persuasive authority establishing that the transfer fee in the instant contract constitutes a penalty. He misplaces reliance on *Garrett v. Coast & Southern Fed. Sav. & Loan Assn. (1973) 9 Cal.3d 731, 108 Cal. Rptr. 845, 511 P.2d 1197 (Garrett).* [14] *Garrett* held that a provision in a promissory note assessing late payment charges of two percent per annum on the unpaid principal balance for the period of delinquency constituted a liquidated damages assessment which was invalid because it did not meet the requirements of *Civil Code section 1671*, and therefore must be construed as a penalty. (*Id., at pp. 738, 739.*) The court in *Garrett* explained [*31] that "'The validity of a clause for liquidated damages requires that the parties to the

contract "agree therein upon an amount which shall be presumed to be the amount of damages sustained by a breach thereof . . . ." (*Civ. Code, § 1671*.) This amount must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained. [Citations.]' . . . . It is abundantly apparent for the reasons which follow that the parties here have made no 'reasonable endeavor . . . to estimate a fair average compensation for any loss that [might] be sustained' by the delinquency in the payment of an installment. They have, in fact, contracted for the imposition of an additional sum to be paid by the borrower under the guise of an interest charge but which, in the absence of a showing that the same bore a relationship to any loss which may be suffered, must be construed as a penalty. [P] The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." (*9 Cal.3d at pp. 738-739.*)

14    In response to *Garrett*, the Legislature enacted *Civil Code section 2954.4*, which limits the amount of a late fee on a delinquent home loan to six percent of the installment due or $ 5, whichever is greater. (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.app.4th 1158, 1171.)

[*32] *Garrett* is inapposite because the instant case does not involve any default or breach of contract by the borrower; the transfer fee was not assessed as damages for any breach of contract, and *Civil Code section 1671* is simply inapplicable. [13] As stated in the Assumption Agreement, the transfer fee was "in consideration of [Fannie Mae's] consent to the transfer." Thus, as argued by Fannie Mae, the fee is "a voluntary payment made in exchange for a waiver of the due-on-sale clause." Accordingly, the instant transfer fee is more like the contractual charge for prepayment of the loan principal. "In contrast to late payment fees, contractual charges for *prepayment* of the loan principal are generally considered valid provisions for alternative performance, rather than penalties or liquidated damages for breach. Payment before maturity is not a breach of the contract, but simply an alternative mode of performance on the borrower's part; the prepayment charge is not a penalty imposed for default, but an agreed form of compensation to the lender for interest lost through prepayment, additional tax liability or other disadvantage. [Citations] [P] Thus the court in *Lazzareschi* [*33] , rejecting a buyer's argument that a prepayment fee was excessive as it bore no reasonable relationship to any damage sustained by virtue of the prepayment, reasoned: 'But the *Freedman* [v. The Rector (1951) 37 Cal.2d 16] case and all of those which have been based on it are concerned with breach of a contract in some manner. In the instant case, there has been no breach. The borrower had the option, clearly spelled out

in the promissory note, of making one or more prepayments. . . . This is not a situation of liquidated damages. Although the word "penalty" is used, and perhaps properly so in that a charge is made which is equivalent to unearned interest, there is no penalty in the sense of retribution for breach of an agreement, nor is there provision for liquidated damages . . . .'" (*Ridgley v. Topa Thrift & Loan Assn., supra,* 17 Cal.4th 970, 978-979.) [16]

15    As acknowledged by the court in *Ridgley v. Topa Thrift & Loan Assn. (1998) 17 Cal.4th 970, 982, 953 P.2d 484:* "A forfeiture or unreasonable penalty, imposed only upon the other party's default, is unenforceable even though the same money, property or other consideration might have validly been bargained for as a form of contractual performance." The latter is precisely what occurred in this case.

[*34]

16    In *Ridgley*, the plaintiffs sold the property before the loan matured; defendant demanded the plaintiffs repay the loan principal, together with a prepayment fee of about $ 113,000, equal to 6 months' interest; the loan agreement required the plaintiffs to pay a prepayment fee at the time of sale only if plaintiffs had been more than 15 days late with any scheduled payment or had defaulted; the fee was imposed because plaintiffs had been late with an interest payment. The court in *Ridgley* concluded that if the contractual provision could fairly be characterized simply as a prepayment charge, then the clause would be valid; however, because the charge was also a penalty for late payment of interest, "the clause has to meet the reasonableness standard of [*Civil Code] section 1671*, and must be deemed unreasonable, and unenforceable as a penalty, under *Garrett.*" (*17 Cal.4th 970, 979.*)

Unlike *Ridgley*, there is no allegation here that the transfer fee was imposed because of any breach or default by the borrowers.

In the instant case, we conclude that the transfer [*35] fee was bargained for as a form of contractual performance, and should be considered to be valid as was the prepayment fee in *Lazzareschi*. Because Gruber fails to establish that the transfer fee here constituted an illegal penalty, he has failed to state a claim for violation of the UCL on the basis of unlawfulness.

Gruber also fails to establish that the transfer fee was unfair within the meaning of the UCL. Gruber argues that the transfer fee was unconscionable, as that doctrine is codified in *Civil Code section 1670.5*, because the fee allegedly had no connection to any actual cost incurred by Fannie Mae. Gruber also claims he had

no meaningful choice on whether to accept the "new contractual term" because a new note on the same or similar terms was not available elsewhere.

As a preliminary matter, we question whether Gruber has stated a claim under the "unfair" standard of *section 17200*, given that the gravamen of his claim is the purported unfairness of a contractual term. "'In general, the "unfairness" prong "has been used to enjoin deceptive or sharp practices. . . ."'" [Citation.] However, the 'unfairness' prong of *section 17200* 'does not give the courts a general license [\*36] to review the fairness of contracts . . . .'" (*South Bay Chevrolet v. General Motors Acceptance Corp. (1999) 72 Cal.App.4th 861, 887*; see also *Searle v. Wyndham Internat., Inc. (2002) 102 Cal.App.4th 1327, 1334.*) Moreover, although Gruber's complaint seeks injunctive relief on behalf of the general public, there are no allegations establishing that any other person was subject to an assumption agreement with the same type of transfer fee. "[A] UCL action based on a contract is not appropriate where the public in general is not harmed by the defendant's alleged unlawful practices." (*Rosenbluth Internat., Inc. v. Superior Court (2002) 101 Cal.App.4th 1073, 1077.*)

Assuming arguendo that Gruber's action under the "unfairness" prong of the UCL is not barred by the considerations articulated in *South Bay Chevrolet* and *Rosenbluth*, we proceed to address the merits of Gruber's contention regarding the doctrine of unconscionability.

"The doctrine of unconscionability has historically provided only a defense to enforcement of a contract, and normally cannot be used offensively to obtain mandatory injunctive relief. As embodied in [\*37] *Civil Code section 1670.5*, the doctrine is phrased in defensive terms: a court 'may refuse to enforce' an unconscionable contract or 'may enforce the remainder' of a contract without an unconscionable clause. (*Civ. Code, § 1670.5, subd. (a).*) The statute does not in itself create an affirmative cause of action but merely codifies the defense of unconscionability. [Citation.] [P] An affirmative cause of action for unconscionability may be provided by statute. . . . [P] The statutory law of unfair competition (*Bus. & Prof. Code, § 17200 et seq.*), on which the present judgment is based, includes no similar express authorization of an affirmative cause of action for unconscionability. The law does, however, generally prohibit an 'unfair' business practice (*Bus. & Prof. Code, § 17200*), which 'may be enjoined in any court of competent jurisdiction' (*Bus. & Prof. Code, § 17203*)." (*California Grocers Assn. v. Bank of America, supra, 22 Cal.App.4th 205, 217-218.*) While the court in *California Grocers Assn.* declined to decide the issue of whether the UCL authorized an affirmative claim for unconscionability, the court did hold that even if such a claim was stated, [\*38] the authority to grant injunctive relief was still discretionary,

and the trial court abused its discretion by intervening in a case that implicated a question of economic policy, to wit, whether service fees charged by banks are too high and should be regulated. (*Id., at p. 218.*)

Assuming the doctrine of unconscionability can be used affirmatively as the predicate for an "unfair" business practice under the UCL, we conclude that as a matter of law, the allegations in the instant case do not establish a viable claim under this doctrine. Unconscionable agreements typically involve provisions which operate in a harsh and one-sided manner without any justification. (*Olsen v. Breeze, Inc. (1996) 48 Cal.App.4th 608, 621.*) They have both a procedural and a substantive element. The procedural element focuses on the factors of oppression (i.e., inequality of bargaining power resulting in an absence of meaningful choice) and surprise (i.e., the extent to which the contractual terms are hidden in a "prolix printed form"); substantive unconscionability inquires into whether the one-sidedness of the agreement is objectively justified. (*Ibid.*)

Unconscionability [\*39] has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. (*Shadoan v. World Savings & Loan Assn. (1990) 219 Cal. App. 3d 97, 102, 268 Cal. Rptr. 207.*) An agreement which adequately informs the plaintiff of his rights and options affords the party a meaningful choice and is not unconscionable. (See *Shvarts v. Budget Group, Inc. (2000) 81 Cal.App.4th 1153, 1159* [car rental agreement afforded renter a meaningful choice and was not unconscionable because it adequately informed renters that if they reject the fuel purchase option and return car with a full tank they will pay no fuel service charge].)

Gruber's claim that the Assumption Agreement was unfair because it imposed "a new condition at the last minute" is contradicted by the terms of the Note, which informed Gruber in unambiguous terms that the beneficiary could impose a fee as a condition of its consent to a loan assumption. That the precise amount of the fee charged could not be determined or known until the time of the assumption transaction also does not constitute [\*40] deception or surprise; the amount of the transfer fee was clearly stated in the Assumption Agreement. (*Shvarts v. Budget Group, Inc., supra, 81 Cal.App.4th 1153, 1160*; see also *Olsen v. Breeze, Inc., supra, 48 Cal.App.4th 608, 621-622.*) This case thus does not meet the "procedural" element of unconscionability.

Nor does this case meet the substantive element of unconscionability. As stated by the court in *Shadoan v. World Savings & Loan Assn., supra, 219 Cal. App. 3d 97*, involving both a prepayment penalty and unilateral call clause in the loan document, "we do not believe that

a combination of prepayment and unilateral call clauses in a single loan document is either objectively unreasonable or unexpected. The type of risk allocation generally found to be unconscionable is that where the stronger party shifts the risk of its own negligence or the defectiveness of its product onto the weaker party. [Citations.] It is simply less disturbing and less unexpected that a lender would shift the risk of market fluctuation to the party using the lender's money." (*Id., at pp. 105-106*; see also *Cherry v. Home Sav. & Loan Assn., supra, 276 Cal. App. 2d 574, 579*.) [*41]

*Perdue v. Crocker National Bank (1985) 38 Cal.3d 913, 216 Cal. Rptr. 345, 702 P.2d 503,* cited by Gruber, is distinguishable and thus inapposite. *Perdu,* a class action, involved the issue, inter alia, of the unconscionability of a $ 6 bank charge for processing checks drawn on accounts with insufficient funds (i.e., an NSF charge), where the depositor was required to sign a signature card which contained in extremely small (six point) type a contract obligating the depositor to pay all applicable charges and stating the depositor is bound by the bank's rules and regulations; however, the bank did not furnish the depositor with a copy of its rules and regulations or with notice of the amount of its charges for NSF checks.

The court in *Perdue* reversed the judgment entered after demurrers were sustained without leave to amend; the court rejected the bank's argument that "the $ 6 charge is so obviously reasonable that no inquiry into its basis or justification is necessary." (*38 Cal.3d 913, 927*.) After noting that the cost of processing NSF checks is only 30 cents per check, which meant the $ 6 charge produced a 2,000 percent profit, the court stated [*42] that while such profit percentages may not be automatically unconscionable, "they indicate the need for further inquiry." (*Id., at p. 928*.) Thus, the court concluded that under *Civil Code section 1670.5,* "the parties should be afforded a reasonable opportunity to present evidence as to the commercial setting, purpose, and effect of the signature card and the NSF charge in order to determine whether that charge is unconscionable." (*Id., at pp. 928-929*.) The court also concluded that plaintiff should be allowed leave to amend to clarify the claims of unfair competition: "If plaintiff can show that the [signature] card or the manner in which it is presented to the cus-

tomer is deceptive and misleading, he can prove a cause of action for unfair competition." (*Id., at p. 929*.)

The NSF charge involved in *Perdue* cannot be considered to be analogous to the transfer fee in the instant case. There is no allegation in this case that there was not full disclosure of all contract terms. Moreover, the court in *Perdue* noted that the bank charged the same fee whether it honored or rejected an NSF check; the fee, consequently, "cannot be [*43] intended as compensation for the credit risk arising from paying such a check, or for the interest on the amount loaned." (*Perdue v. Crocker National Bank, supra, 38 Cal.3d 913, 928, fn. 15*.) Here, the Note expressly permitted the beneficiary to charge a fee as a condition to consent to the loan assumption, and the Assumption Agreement expressly stated that the fee was in consideration of the consent to the assumption. Thus, the transfer fee was clearly intended as consideration to Fannie Mae for any risks arising from the transfer and assumption of the loan. Moreover, unlike the depositors in *Perdue,* Gruber was informed of the amount of the transfer fee prior to his execution of the Assumption Agreement. For all of the foregoing reasons, *Perdue* is not dispositive here.

Because we conclude that the complaint fails to state viable claims for breach of contract and for violation of the UCL under state law principles, it is unnecessary to address the issues of federal preemption and whether Gruber's action is barred by the release provision of the Assumption Agreement.

DISPOSITION

The judgment is affirmed. Fannie Mae is entitled to costs on appeal.

[*44] MUNOZ (AURELIO), J.**

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

We concur:

PERLUSS, P. J.

JOHNSON, J.

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

C
Keating v. Baskin-Robbins USA Co.
E.D.N.C.,2001.
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina.
Robert S. KEATING, et al. Plaintiffs,
v.
BASKIN-ROBBINS USA, CO., a California
Corporation, et al. Defendants.
BASKIN-ROBBINS USA, CO., et al.
Counterplaintiffs,
v.
Robert S. KEATING, et al. Counterdefendants.
No. 5:99-CV-148-BR(3).

March 27, 2001.

*ORDER*

BRITT, Senior J.
**\*1** Defendant-counterplaintiffs **Baskin-Robbins**
USA, Co., **Baskin-Robbins** Incorporated, Dunkin'
Donuts Incorporated, and Allied Domecq QSR
(collectively referred to hereafter as the "**Baskin
Robbins**" defendants) have submitted a motion for
summary judgment on their claims as well as a
motion for summary judgment on plaintiffs' amended
complaint.

On 2 February 1999, many franchisees [FN1] filed a
complaint in the Superior Court of Wake County
against the **Baskin-Robbins** defendants, David
Ohlin, Ralph Gabellieri, and Ron Piunti, alleging
breach of contract, breach of the implied covenant of
good faith and fair dealing, unfair and deceptive trade
practices, fraud, and negligent misrepresentation
arising out of the franchise agreements and licensing
relationships between the parties. **Baskin-Robbins**
removed the action to federal court on 4 March 1999
and filed an answer on 11 March 1999.

  FN1. The complete list of plaintiffs who
  have participated in this action follows:
  Robert S. **Keating**, Andrea **Keating**, The
  **Keating** Company, Ivan Goodson, George
  Golde, Joan E. Golde, Burhan Ghanayem,
  Marwan Ghanayem, NC Subs, Inc., Betsy
  Wood, James Wood, Simon Estroff, Samuel
  Watkins, Patricia Watkins, and JLA Ice
  Cream, Inc. As explained below, many of

these plaintiffs have been dismissed as the
action has proceeded.

On 12 October 1999, in response to plaintiffs' motion
to amend, Magistrate Judge Alexander B. Denson
permitted plaintiffs to add the **Keating** Company,
Joan E. Golde, NC Subs, Inc., and JLA Ice Cream
Inc. as plaintiffs and **Baskin-Robbins** Inc. as a
defendant, but refused plaintiffs' request to add a
RICO claim. Plaintiffs filed their amended complaint
on 12 November 1999. On 2 December 1999,
defendants filed an answer to the amended complaint.

On 29 February 2000, following a hearing, this court
allowed defendants' motion to amend their
counterclaims and declared defendants' motion for a
preliminary injunction moot. The court further
directed that plaintiffs' motions for sanctions and
contempt should be presented as added claims in the
case and instructed counsel to file a motion to amend
with respect to such claims. In an Order
memorializing the foregoing rulings, this court
appointed Magistrate Judge Webb as Settlement
Master.

On 22 August 2000, the parties entered a stipulation
of dismissal with prejudice as to Ivan Goodson,
James Wood, Betsy Wood and JLA Ice Cream, Inc.,
and those parties were subsequently dismissed. On 27
September 2000, the parties stipulated to the
dismissal with prejudice of the plaintiffs' claims
concerning defendants Ronald Piunti, Ralph
Gabellieri and David Ohlin, and those parties
were dismissed. On 11 December 2000, the parties
submitted a partial stipulation of dismissal as to
George and Joan Golde, and the Goldes were
dismissed. On 15 March 2001, the parties stipulated
to the dismissal with prejudice of all claims
concerning the Ghanayems and NC Subs, Inc., and
these parties will be dismissed from the action. At
this point, the remaining plaintiffs are the **Keatings**
and The **Keating** Company, Simon Estroff, and the
Watkins.

In the interim, on 28 August 2000, **Baskin-Robbins**
filed a motion for summary judgment regarding their
claims against plaintiff counter-defendants, the
**Keatings**, along with a supporting memorandum and
exhibits.[FN2] On that date, **Baskin-Robbins** also
submitted a motion for summary judgment as to all of
the claims set forth in plaintiffs' amended complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

along with a memorandum and exhibits. Plaintiff counter-defendants responded to both motions on 20 September 2000, and **Baskin-Robbins** filed replies on 10 October 2000. Plaintiff-counter-defendants filed a supplemental memorandum in support of their opposition to defendants' motion for summary judgment on plaintiffs' amended complaint with the permission of this court. Although permitted to do so, defendants did not file a supplemental memorandum. The motions for summary judgment are now ripe for review.

> FN2. The motion also pertained to the Goldes who have since been dismissed from this action.

*2 On 5 February 2001, this court entered an Order resetting the trial in this matter for 4 June 2001 in Raleigh, North Carolina and denying defendants' request for oral argument.

### I. Facts

Plaintiffs are current and former franchisees of **Baskin-Robbins** and Dunkin' Donuts stores located in North Carolina. Dunkin' Donuts and **Baskin-Robbins** Inc. are Delaware corporations with principal places of business in Massachusetts, and **Baskin-Robbins** USA, Co. is a California corporation with its principal place of business in Massachusetts. Allied Domecq Retailing USA is an unincorporated division of Allied Domecq PLC, a United Kingdom corporation and the parent corporation of Dunkin' Donuts Inc. and **Baskin-Robbins** Inc. (Def.s' Mem. at 2.) In July 1999, after this suit was filed, Allied Domecq Retailing USA changed its name to Allied Domecq Quick Service Restaurants.[FN3]

> FN3. Defendants have recently filed a motion to dismiss defendant Allied Domecq Retailing USA from this action on the grounds that, as an unincorporated division of a larger company, it is not an entity capable of being sued. Subsequently, plaintiffs filed a motion to add Allied Domecq PLC as a defendant. The court finds these issues moot in light of its decision to award summary judgment in defendants' favor on plaintiffs' claims. Accordingly, defendants' motion to dismiss Allied Domecq Retailing USA and

plaintiffs' motion to add Allied Domecq PLC as a defendant will be denied.

The facts pertaining to the **Keatings** and their **Baskin-Robbins** franchises that are relevant to the disposition of **Baskin-Robbins'** motion for summary judgment on its counterclaims follow. The **Keatings** held two **Baskin-Robbins** franchises, one located at 151 Cary Parkway, and the other at 968 High House Road in Cary, North Carolina. The **Keatings'** opened the Cary Parkway store (also known as the Kildaire store) pursuant to a franchise agreement dated 5 February 1992, and they subsequently signed a new franchise agreement with respect to that store on 23 May 1996.[FN4] The **Keatings** opened the High House Road store (also known as the Preston Corners store) in January 1996 pursuant to a franchise agreement signed 12 December 1995. They ceased operating as a **Baskin-Robbins** franchisee at the Preston Corners location on or about 31 December 1999, and, on 10 January 2000, began selling Edy's ice cream at the Preston Corners shop. (Keating Dep., Ex. 2A at 15-16.) **Baskin-Robbins** terminated the Cary Parkway franchise agreement on 11 January 2000 because **Baskin-Robbins** believed that the **Keatings** had violated the in-term covenant not to compete contained in that agreement by selling Edy's ice cream at the Preston Corners location. The **Keatings** closed the Cary Parkway store on 31 January 2000.

> FN4. The **Keatings** signed the 1992 franchise agreement in the name of The **Keating** Company. The 1996 agreement was signed by Robert and Andrea **Keating**, and The **Keating** Company was no longer a franchisee. (Keating Dep. Ex. 2A at 13-14.)

The facts pertinent to the resolution of the issues presented by defendants' motion for summary judgment on plaintiffs' amended complaint are set forth in some detail below. Plaintiffs' amended complaint includes the following claims: breach of contract (Count One); breach of the implied covenant of good faith and fair dealing (Count Two); unfair and deceptive trade practices (Count Three); fraud (Count Four); and negligent misrepresentation (Count Five).

### II. Summary Judgment

Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact, and in which it appears that the moving party is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4 th Cir.1993). Summary judgment should be granted in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." *Id.* In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate ." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4 th Cir.1991).

*3 While this court must take the evidence in the light most favorable to plaintiff for purposes of defendants' summary judgment motion, the court need not " 'accept unreasonable inferences based on conjecture or speculation." ' *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Town of Randolph*, 932 F.2d 89, 92 (1 st Cir.1991)(quoting *Santiago-Negron v. Castro-Davila*, 865 F.2d 431, 445 (1st Cir.1989)). As the Fourth Circuit has explained,
[O]nly "reasonable" inferences from the evidence need be considered by the court.... Whether an inference is reasonable cannot be decided in a vacuum; it must be considered "in light of the competing inferences" to the contrary.... In the end, the non-moving party must do more than present a "scintilla" of evidence in its favor.... Rather, the non-moving party must present sufficient evidence such that "reasonable jurors could find by a preponderance of the evidence" for the non-movant, ... "for an apparent dispute is not 'genuine' within the contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor." ... Thus, if the evidence is "merely colorable" or "not significantly probative," a motion for summary judgment may be granted.

*Sylvia Development Corp. v. Calvert County, Maryland*, 48 F.3d 810, 818 (4 th Cir.1995) (citations omitted).

The Franchise Agreements signed by the **Keatings**, Estroff, and the Watkins are governed by California law. (Def.'s Mem. re Amended Compl. at 12.)

III. Discussion

*Motion for Summary Judgment on Plaintiffs' Amended Complaint*

Defendant counter-plaintiffs argue that they are entitled to summary judgment on the claims in plaintiffs' amended complaint.[FN5] First, they contend that most of plaintiffs' claims are barred by the contractually established one-year period within which either party may sue the other for violation of the franchise agreement. Accordingly, before addressing the merits of the allegations in this case, it is necessary to determine whether plaintiffs' claims are time-barred.

> FN5. Plaintiffs contend that defendants' motion for summary judgment should be denied because the certifications offered in support of their motion are not affidavits as required by Rule 56 and because they contain hearsay. Plaintiffs' argument is not persuasive. *See* 28 U.S.C. § 1746; *Willard v. Internal Revenue Service*, 776 F.2d 100, 102, n. 3 (4 th Cir.1985)(unsworn declarations in support of the motion for summary judgment, made under penalty of perjury, are permitted in lieu of affidavits).

A. One Year Contractual Limitations Clause in Franchise Agreements

Paragraph 30 of each Agreement states that any claim brought by either party under the Franchise Agreement must be commenced within one year from the discovery of facts giving rise to any claim or that claim is barred. (Mem. at 12, citing Exs. 1.A-B, 1.D-F ¶ 30.)
Any and all claims and actions arising out of or relating to this agreement, the relationship of franchisee, **Baskin-Robbins** or the franchisee's operation of the retail unit, brought by any party hereto against the other, shall be commenced within one (1) year from the discovery of facts giving rise to any such claim or action, or such claim or action shall be barred, except for any unperformed financial obligations by franchisee to **Baskin-Robbins**.

*4 As parties to an agreement, plaintiffs and defendants were free to contractually limit the period within which claims could be asserted to one year. A period of one year is reasonable, valid and enforceable. See *Han v. Mobil Oil Corp.*, 73 F.3d 872 (9 th Cir.1995)(affirming district court's award of summary judgment to defendant on plaintiff's claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

for breach of contract, bad faith denial of the existence of contract, and contractual breach of the covenant of good faith and fair dealing based on the 12-month contractual limitations period contained in the parties' franchise agreement); _Hays v. Mobil Oil Corp., 930 F.2d 96, 100_ (1 st Cir.1991); _Campanelli v. Allstate Insurance Co., 97 F.Supp.2d 1211, 1214 (C.D.Cal.2000)_(citing _Han_ ); _H.P.S. Capitol, Inc. v. Mobil Oil Corp., 186 A.D.2d 98, 99, 588 N.Y.S.2d 29 (N.Y.App.Div.1992)_(12-month limitation period reasonable, valid and enforceable).

Specifically,
California permits contracting parties to agree upon a shorter limitations period for bringing an action than that prescribed by statute, so long as the time allowed is reasonable.... A contractual limitations period requiring a plaintiff to commence an action within 12 months following the event giving rise to a claim is a reasonable limitation which generally manifests no undue advantage and no unfairness.

_Han,_ 73 F.3d at 877.

Defendants have asserted that the "vast majority" of plaintiffs' claims are barred by the contractual limitations period. (Def.s' Mem. at 12-13.) Beyond that, defendants have not stated in detail which claims are barred and which are not. Plaintiffs have not contradicted defendants' assertions that they knew about the facts giving rise to their claims by 1997. In fact, plaintiffs have not made any response to defendants' contractual limitations argument beyond the mere assertion that the limitations provision is an unconscionable clause of the franchise agreements, which they characterize as contracts of adhesion.

Plaintiffs' argument that the contractual one-year limitations period renders the franchise agreements unconscionable is unpersuasive. The contractual language indicates that the one-year limitation period is equally applicable to both parties. Only one class of claims, that regarding unperformed financial obligations owed to **Baskin-Robbins**, is exempted from the limitation. Such a limited exception does not render the clause, or the agreement as a whole, unconscionable.[FN6]

FN6. Plaintiffs' attempts to distinguish cases cited by defendants are unavailing, and plaintiffs have not submitted any authority on point in support of their argument regarding the one-year limitations period.

To determine whether plaintiffs' claims are barred by the contractual limitations period, the court must consider the nature of each claim and determine the date by which plaintiffs became aware of the facts underlying those claims. Plaintiffs filed suit on 2 February 1999. If plaintiffs were aware of the facts underlying any of the asserted claims before 2 February 1998, their claims are precluded by the limitations clause.

1. Ice Cream Prices

Plaintiffs have alleged that **Baskin-Robbins** has charged and continues to charge plaintiffs higher prices for ice cream and other ice cream products than **Baskin-Robbins** has charged other franchise owners, including franchise owners in competition with plaintiffs. (Am.Compl.¶ 17.) Most of the plaintiffs testified that they knew that other **Baskin-Robbins** franchisees paid less for ice cream than they did by 1997. (Estroff Dep., Ex. 2.B. at 92-93 (discovered price differential in 1989); **Keating** Dep. Ex.2A at 84-85 (learned of differential in 1993); and Watkins Dep., Ex. 2C at 55-56 (learned of differential from other franchisees approximately 2 1/2 years before June 2000).) Each of these plaintiffs' claims based on the price of ice cream sold by **Baskin-Robbins** is barred by the one-year contractual limitations period.

2. Marketing

*5 Defendants allegedly have made substantial changes in the allocation of advertising and marketing resources by providing different levels of advertising support for stores in different geographical areas, resulting in greatly reduced advertising in plaintiffs' markets. These changes allegedly eliminated standardized advertising and marketing, which is ostensibly an integral part of the System, in breach of the agreements and to plaintiffs' detriment. (Am.Compl.¶ 23.)

The Tier Marketing system to which plaintiffs refer in their amended complaint was a media plan in effect from 1 September 1996 through 31 August 1998. (Def.'s Mem. at 6.) The program was announced to all **Baskin-Robbins** franchisees in a memorandum dated 11 July 1996. (Def.'s Mem. at 6, 18.) Each of the plaintiffs confirmed that he or she was aware of the tier marketing program by 1997 at the latest. (Estroff Ans. to Int., Ex. 2H ¶ 12; **Keating** Dep., Ex. 2A at 152-53, **Keating** Ans. to Int., Ex 2I ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

12, and Ex. 2P; Watkins Dep., Ex 2C at 77, 80;
Watkins Ans. to Int., Ex. 2G ¶ 12.) Because
plaintiffs were aware of the facts underlying their
claims regarding the tier marketing system as early as
1997, the one-year limitations period contained in the
Agreements precludes them from bringing claims
based on that system in this suit.

In addition, some of the plaintiffs allege that
defendants have unreasonably refused to approve or
have otherwise restricted their local marketing
efforts. (Am.Compl.¶ 20.) Specifically, **Keating**
asserts that **Baskin-Robbins** effectively made it
impossible for him to sell ice cream at a permanent
installation at the Carolina Mudeats' ballpark because
**Baskin-Robbins** would have charged him an
additional $15,000 franchise fee to do so. In 1994,
**Baskin-Robbins** refused to pay the $6,000-8,000
advertising fee that Alltel Pavilion would have
required to allow **Keating** to sell ice cream at the
amphitheater. Both incidents occurred several years
before **Keating** filed this suit. Estroff asserts that
defendants unreasonably refused to approve his
numerous requests to reinstate television advertising
in his market area although he repeatedly made this
request to Susan Hale at marketing meetings
sponsored by defendants. (Estroff Ans. to Int. Ex. 2H
¶ 7.) To the extent that Estroff's allegations are
offered in support of the claim regarding the
restriction of local marketing efforts, the facts
underlying his complaint were known before
1997.[FN7] The Watkins do not make specific claims
that **Baskin-Robbins** interfered with their local
marketing efforts. (Watkins Ans. to Int. Ex. 2G ¶ 7.)

> FN7. In his deposition, Estroff seems to
> assert that his complaints regarding the
> elimination of television advertising in the
> Charlotte area predated the tier marketing
> scheme. Whether the complaints predated
> **Baskin-Robbins'** tier marketing scheme or
> whether Estroff's allegation actually stems
> from **Baskin-Robbins'** implementation of
> tier marketing, Estroff was aware of the
> facts before 1997.

3. Royalties, Other Franchise Requirements and Non-
traditional Outlets

Plaintiffs also allege that all or some of the
defendants permitted and continue to permit some
vendors to sell **Baskin-Robbins** ice cream without
paying the same royalties as plaintiffs. (Am.Compl.¶
18.) Moreover, plaintiffs allege that defendants allow

non-franchisees, including operations in competition
with plaintiffs, to sell **Baskin-Robbins** brand
products and services free of the training, financial,
and supervisory requirements imposed on plaintiffs,
and that, in doing so, defendants have damaged the
goodwill associated with the brand name to plaintiffs'
detriment. (Am.Compl.¶ 22.) Plaintiffs also state that
defendants' marketing of ice cream products through
non-traditional outlets at different prices and without
requiring the same (or any) franchise fees,
advertising fees, or royalty payments violates the
North Carolina Unfair and Deceptive Trade Practices
Act and breaches the implied covenant of good faith
and fair dealing. (Pl.'s Supp. Mem. at 13.)

*6 The specific circumstances that appear to have
given rise to the foregoing allegations concern
**Baskin-Robbins'** decision to market ice cream in
alternative fora, such as Duke University Hospital
and Denny's and Show Mars restaurants. As
defendants explain in their memorandum, **Baskin-
Robbins** sold ice cream through a non-traditional
operator, i.e., a non-franchisee, at Duke University
Hospital. Based on plaintiffs' supplemental
memorandum, it appears that the non-traditional
**Baskin-Robbins** store at the Duke University
Hospital was operated pursuant to a Test License
Agreement between Marriott Management Services
(MMS) and **Baskin-Robbins** USA dated 19 April
1995. (Pl.s' Supp. Mem. at 13.) Defendants
acknowledge that **Baskin-Robbins** ice cream was
also test marketed at selected Denny's restaurants. To
the extent that plaintiffs' claims regarding royalties
and different training, financial, and supervisory
requirements rest on **Baskin-Robbins'** decision to
sell ice cream in alternative fora, each plaintiff had
knowledge of these circumstances during 1997 or
before. (Estroff Dep., Ex.2B at 101(Duke) and 98-99
(Denny's) and 104-107 (Show Mars restaurants);
**Keating** Dep., Ex.2A at 93 (Duke) and 102 (Denny's)
and 141-44, 150 (Wal-Mart), Ex. 2M (Duke);
Watkins Dep. Ex 2C at 57 (Duke) and 58 (Denny's);
Watkins Ans. to Int. Ex. 2G ¶ 5 (Duke).)
Accordingly, plaintiffs' claims based on defendants'
marketing of **Baskin-Robbins** ice cream in
alternative fora such as Duke University Hospital,
Denny's, and Show Mars restaurants are barred by the
one-year contractual limitations period.

4. Equipment and Supplies

Plaintiffs assert that defendants required and continue
to require plaintiffs to purchase equipment and
supplies without demonstrated economic benefit to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

the franchisees and that defendants require them to purchase such equipment from vendors selected by defendants when equivalent or similar equipment is available for a lower price from other sources. (Am.Compl.¶ 19.) All of the claims pertaining to overpriced equipment appear to be based upon purchases made before 1997 (often in association with the opening of the various franchises) and thus the claims are barred by the contractual limitations period. (**Keating** Dep., Ex. 2A at 119, 122-25 (topping center in 1995) and 119-23 (yogurt machine in 1995) and 115-20 (plumbing fixture in 1996); Watkins Dep., Ex. 2C at 65-69 (blenders and associated containers in 1995) and 65 (ice maker in 1995).)

### 5. Business Support

Defendants have allegedly failed to provide the business support and assistance contemplated by the Agreements. (Am.Compl.¶ 24.) While Estroff and Watkins do not appear to assert claims based on lack of business support, (Estroff Ans. to Int., Ex. 2H ¶ 13, Watkins Ans. to Int., Ex. 2G ¶ 13), the **Keatings** developed the belief that they were not receiving appropriate levels of support by 1997. (**Keating** Dep., Ex. 2A at 206-29, Ex. 2O (Letter from **Keating** to Gioia, Pres. of **Baskin-Robbins** USA Co., dated 26 February 1997).) Specifically, **Keating** testified in his deposition that **Baskin-Robbins** began providing inadequate levels of support in the summer of 1994 when **Baskin-Robbins** employees were terminated and Dunkin' Donuts employees took their posititons and Raleigh-Durham became a test market for combo stores. (**Keating** Dep., Ex. 2A at 209-210, 227-28.) Accordingly, the lack of business support claims are barred by the one-year contractual limitations period.

### 6. Allegedly Fraudulent Inducements to Build and Buy Franchises

**\*7** Plaintiffs also allege that defendants made certain inaccurate representations that consumer demand would support the opening of various stores and that plaintiffs obtained new franchises in reliance upon those representations. Plaintiffs assert that they were also induced to open new stores when defendants threatened to allow others to open new stores in competition with their existing stores. (Am.Compl.¶ 21.)

These particular allegations seem to be based primarily on **Keating's** experience with **Baskin-** **Robbins** in 1994 and 1995 with respect to the opening of a second store. (**Keating** Ans. to Int. 2I ¶ 8.) While the communication between the parties regarding that new store seems to have been anything but clear, the events complained of nevertheless occurred in 1994 and 1995 and therefore cannot be the basis of a claim asserted against **Baskin-Robbins** in 1999. The remaining plaintiffs do not assert facts supporting the allegations of fraudulent inducement and threats by **Baskin-Robbins.** (Watkins Ans. to Int. 2G ¶ ¶ 8-10; Estroff Ans. to Int. 2H, ¶ ¶ 8-10.)

### 7. Interference with Franchisees' Ability to Sell

Plaintiffs claim that defendants have interfered with their efforts, as well as the efforts of franchisees in other states, to sell their stores by discouraging prospective buyers from purchasing and by failing to respond to or unreasonably denying requests for approval of prospective purchasers. (Am.Com pl.¶ ¶ 25-26.)

Specifically, **Keating** explained that his problems with the **Baskin-Robbins** USA Corporation began in 1995 when he invested in his second store. By 1997 he had decided to sell, and he met with Dave Ohlin regarding the details of the sales and **Baskin-Robbins'** assistance with those sales. Despite Ohlin's expressed belief that **Baskin-Robbins** could work with **Keating** on the sales, Ohlin subsequently refused to confirm or verify his conversation with **Keating** pertaining to the sales. (**Keating** Dep., Ex, 2A at 160-163; **Keating** Ans. to Int. Ex. 2I ¶ 8.) Because **Keating** knew of **Baskin-Robbins'** alleged interference with his ability to sell his stores in 1997, his action is barred by the one-year contractual limitations period.

The Watkins explain that, in the Spring of 1998, they attempted to sell their franchise to a gentleman named Mr. Lee and that **Baskin-Robbins** refused to approve Lee's purchase of the store because Lee did not speak English well. In fact, Lee had been attempting to buy the store for his son who was fluent in English. (Watkins Ans. to Int. Ex. 2G ¶ 14; Watkins Dep., Ex. 2C at 90, 99, 105.) The Watkins also attempted to sell their store in 1999 and 2000. (Watkins Dep., Ex. 2C at 90.) The Watkins' claim based on alleged interference with their attempts to sell their franchise is not barred by the contractual limitations period.

Estroff successfully sold his store without any interference by **Baskin-Robbins,** so the interference

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

claim is not applicable to him. (Estroff Dep., Ex. 2B at 191-205 and 216, Estroff Ans. to Int., Ex. 2H ¶ 14.)

*8 Plaintiffs have also asserted that defendants have implemented a rating system, undisclosed to their franchisees, that has placed many plaintiffs in an undesirable and potentially unmarketable category for purposes of resale. (Am.Compl.¶ 27.) Estroff and Watkins learned of the rating system as early as 1997 because they signed rating forms after their stores were evaluated on 29 August 1997 and 8 September 1997, respectively. (Estroff Dep., Ex. 2Q, Ex. 2B at 207-212; Watkins Dep., Ex. 2C at 111-116, Ex. 2R.) The parties have not discussed, nor has the court been able to locate in his deposition, any mention by **Keating** of the effect of the rating system on his business or his ability to sell his stores.

8. Summary

To the extent that the court has held that plaintiffs' specific claims are barred by the contractual limitations period, that holding applies to all counts asserted by plaintiffs in their amended complaint: breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the unfair and deceptive trade practices act,[FN8] fraud and negligent misrepresentation.[FN9] This is so because the contractual limitations period explicitly limits to one year the time within which a franchisee or franchisor can bring *"[a]ny and all claims and actions arising out of or relating to this agreement, the relationship of franchisee, Baskin-Robbins or the franchisee's operation of the retail unit."* See generally, *Cange v. Stotler and Company, Inc.,* 826 F.2d 581, 584-585 (7th Cir.1987)(explaining that plaintiff had failed to demonstrate how enforcing a reasonable, contracted-for limitations period is contrary to the public policy of Illinois against fraudulent business practices and relying on plaintiff's inability to cite any pertinent authority condemning a shorter limitations provision, court affirmed application of contractual one-year limitations period to state law claims, including those asserted under the Illinois Consumer Fraud and Deceptive Business Practices Act, which contained a three-year limitations period); *Reynolds Industries Inc. v. Mobil Oil Corp.,* 618 F.Supp. 419, 422 (D.Mass.1985)(holding that both breach of contract and statutory causes of action were barred by contractual provision requiring plaintiff to commence action on any claim "based on or arising out of" the contract within one year where the statutory claim arose from a dispute concerning the proper interpretation of the quantity term in the retail dealer contract).[FN10]

FN8. The unfair and deceptive trade practices plaintiffs complain of include: full-line forcing, tying, interference with the right to contract, and other illegal restraints of trade. (Pl.s' Amended Compl. ¶ 37.) All of these claims arise from plaintiffs' dissatisfaction with various requirements contained in their franchise agreements, particularly those pursuant to which plaintiffs must buy equipment and ice cream from **Baskin-Robbins**.

FN9. Plaintiffs' fraud and negligent misrepresentation claims appear to be based on defendants' allegedly false and misleading representations to franchise owners regarding the market demand for additional stores, the allocation of advertising and marketing funds, and the economic benefit of required purchases or promotions. (Amended Compl. at ¶ ¶ 7-8.) Again, these claims arise out of defendants' enforcement of specific provisions of the franchise agreements between the parties.

FN10. Although the franchise agreements signed by plaintiffs in this case are not technically contracts for the sale of goods, it is worthy of note that the Uniform Commercial Code, as adopted by North Carolina, also provides that parties to a contract may shorten the applicable limitations period: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." N.C. Stat. § 25-2-725.

The Watkins' claim that **Baskin-Robbins** interfered with their ability to sell their store to potential purchasers like Mr. Lee is the only claim not barred by the contractual limitations period and is, therefore, the only remaining claim in plaintiffs' action. The court will discuss this claim in the context of each of plaintiffs' counts: breach of contract, breach of the implied covenant of good faith and fair dealing, unfair and deceptive trade practices, fraud and negligent misrepresentation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

### B. Watkins' Interference with Sale Claim

#### 1. Breach of Contract

**\*9** Plaintiffs argue that defendants' motion for summary judgment on the Watkins' claim regarding interference with their ability to sell their store must be denied because a genuine issue of material fact exists as to why Mr. Lee was summarily rejected as a prospective purchaser without being given an English test. (Pls.' Mem. at 10.) Pursuant to Section 18.5 of the Watkins' Franchise Agreement, however, **Baskin-Robbins** may withhold consent to a transfer of the franchisee's interest in the franchise agreement "arbitrarily and for any reason whatsoever or may condition any consent in their sole discretion." (Def.s' Ex. 1E ¶ 18.5.) See *Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir.1994)(finding contract clause vesting absolute discretion in one party valid and enforceable).

**Baskin-Robbins** does not dispute plaintiffs' allegation that Mr. Lee, the Watkins' prospective purchaser, was denied approval based on his inability to speak English fluently. The Watkins assert that the potential franchisee was not even permitted to take the English language proficiency test that **Baskin-Robbins** uses to evaluate new franchisees before being denied and that Mr. Lee was, in fact, attempting to purchase the franchise for his son, a graduate of the University of North Carolina. While the Watkins correctly allege that Mr. Lee was denied on the telephone before he was interviewed and given an opportunity to take the test, there is nothing in the agreement that required **Baskin-Robbins** to administer a proficiency test before denying approval. The Agreement explicitly states that **Baskin-Robbins'** denial of a potential franchisee may be based on any reason whatsoever. In any event, as noted by plaintiffs, "bad faith is not synonymous with erroneous judgment." *In re Sizzler Restaurant Int'l, Inc.*, 225 B.R. 466, 475 (Bankr.C.D.Cal.1998) (citations omitted). Accordingly, **Baskin-Robbins'** conduct, as described by the Watkins, does not constitute a breach of contract.

#### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Whether **Baskin-Robbins'** conduct constitutes a breach of the implied covenant of good faith and fair dealing is a separate issue. The doctrine of good faith

and fair dealing "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 372, 826 P.2d 710, 726 (Cal.S.C.1992). When matters are left to a party's discretion, the party must exercise that discretion reasonably and must not act in bad faith. See *In re Sizzler*, 225 B.R. at 473 (to defeat a motion for summary judgment on a claim asserting breach of implied covenant of good faith and fair dealing, plaintiff had to offer evidence that defendant acted dishonestly, outside of accepted commercial practices, with an improper motive, or in an unreasonable manner that was arbitrary, capricious or inconsistent with the reasonable expectations of the parties).

**\*10** An exception to this doctrine applies in this case, however.
Although the doctrine is generally implied for all contract provisions, it is irrelevant where the contract is drawn so as to leave a decision to the *"uncontrolled* discretion" of one of the parties.... In such a case, the parties contracted to allow one of them the unconditional right to act, and an implied promise to deal fairly has no purpose.

*Flight Concepts*, 38 F.3d at 1157 (emphasis added).It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.... We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms.... "The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.... [I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach."

*Carma*, 826 P.2d at 727-728 (citations omitted). Consequently, the Watkins' assertion of a breach of the implied covenant of good faith and fair dealing must fail because that covenant cannot be relied upon to override the express terms of the Agreement. *In re Sizzler*, 225 B.R. at 473 (implied covenant of good faith and fair dealing cannot override express

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

contractual provisions); *Dunkin' Donuts Inc. v. Panagakos,* 5 F.Supp.2d 57, 64 (D.Mass.1998)(same). Section 18.5 expressly allows **Baskin-Robbins** to withhold consent to a transfer of the franchisee's interest in the franchise agreement "arbitrarily and for any reason whatsoever." As such, an implied promise to deal fairly has no relevance in this context.

### 3. Fraud, Negligent Misrepresentation and Unfair and Deceptive Trade Practices

The Watkins' grievances pertaining to the manner in which **Baskin-Robbins** has executed its contractual responsibilities cannot be parlayed into tort claims. *Broussard v. Meineke Discount Muffler Shops. Inc.,* 155 F.3d 331, 346 (4 th Cir.1998) (noting that the district court had ignored North Carolina law limiting the circumstances under which an ordinary contract dispute can be transformed into a tort action, court held that the crux of the matter was and always had been a contract dispute and that the lower court erred by allowing plaintiffs to advance tort and UTPA counts paralleling their breach of contract claims). See also *Strum v. Exxon Company,* 15 F.3d 327, 329 (4th Cir.1994)(attempt by the plaintiff to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim is inconsistent both with North Carolina law and sound commercial practice). Accordingly, to the extent they are based on the potential sale of the Watkins' store to Mr. Lee and are not barred by the one-year limitations period in the Agreement, the Watkins' claims for fraud and negligent misrepresentation are barred because they are, at bottom, contract claims.

**\*11** Specifically with respect to North Carolina's Unfair and Deceptive Trade Practices Act, the Fourth Circuit has explained:
It has been said that because "[p]roof of unfair or deceptive trade practices entitles a plaintiff to treble damages," a UTPA count "constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina." ... To correct this tendency, and to keep control of the extraordinary damages authorized by the UTPA, North Carolina courts have repeatedly held that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1," ... Even though "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted," ..., North Carolina law requires a

showing of "substantial aggravating circumstances" to support a claim under the UTPA.... And "the courts have consistently recognized that § 75-1.1 does not cover every dispute between two parties. The courts differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law."

*Broussard,* 155 F.3d at 347 (citations omitted). As the court noted in *Strum,* "it [is] unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." *Strum,* 15 F.3d at 333. Given the contractual center of plaintiffs' dispute with **Baskin-Robbins**, plaintiffs' UTPA claims are out of place. The court cannot conclude that plaintiffs have offered evidence of "substantial aggravating circumstances" that would enable them to state a claim under this act. Defendants' motion for summary judgment as to the Watkins' claims will be allowed.

### Motion for Summary Judgment on Defendants' Counterclaims

### A. The Keatings' Breach of the In-Term Non-Compete Covenant and Baskin-Robbins' Termination of the Cary Parkway Franchise Agreement

Beginning on 9 January 2000, the **Keatings** simultaneously operated a **Baskin-Robbins** ice cream store and a store offering Edy's ice cream.

#### 1. The Agreement and the Sublease

The **Baskin-Robbins** franchise agreement signed by the **Keatings**, which authorized them to sell ice cream at the Cary Parkway location, contains the following provision:
15.2 FRANCHISEE acknowledges that, pursuant to this Agreement, FRANCHISEE will receive valuable specialized training and trade secrets, including, without limitation, confidential information regarding the operational, sales, promotional and marketing methods and techniques of **BASKIN-ROBBINS** and the System. FRANCHISEE covenants that, except as otherwise approved in writing by **BASKIN-ROBBINS**, FRANCHISEE shall not, during the term

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

of his Agreement, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation:
*12 15.2.3. own, maintain, operate, engage in, or have any interest in any business which is the same or similar to the Retail Unit. Same or similar to shall mean more than five percent (5%) of the gross revenue is derived from the sale of frozen dairy desserts.

(Ex. 1A ¶ ¶ 15.2, 15.2.3.) **Baskin-Robbins** refers to this provision as an "in-term covenant not to compete." Pursuant to Sections 16.3 and 16.3.8 of the Cary Parkway Franchise Agreement, the franchisee shall be "deemed to be in default under this Agreement ... and **BASKIN-ROBBINS** may, at its option, terminate this Agreement and all rights granted to FRANCHISEE hereunder, without affording FRANCHISEE any opportunity to cure the default, effective immediately upon written notice from **BASKIN-ROBBINS**" if and when the franchisee fails to comply with the interm covenant not to compete set forth in Paragraph 15. Moreover, Section 15.7 of the Cary Parkway Franchise Agreement provides that the **Keatings** shall pay **Baskin-Robbins** all costs and expenses, including attorneys' fees, incurred by **Baskin-Robbins** in its efforts to enforce the **Keatings'** covenants under Section 15 of the Agreement.

The Agreement signed by the **Keatings** explicitly sets forth their post-termination obligations to **Baskin-Robbins**.
17.1.2 FRANCHISEE shall immediately cease to operate the Retail Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of **BASKIN-ROBBINS**.
17.1.3 FRANCHISEE shall immediately and permanently cease to use, in any manner whatsoever, the System, including, without limitation, methods, procedures and techniques associated therewith, and all Proprietary Names and Marks and distinctive forms, slogans, symbols and devices associated with the System or the Products. In particular, FRANCHISEE shall cease to use, without limitation, all signs, advertising materials, displays, stationary, forms, and any other articles which display the Proprietary Names and Marks.

The **Keatings** are obligated under Section 17.1.9 of the Agreement to pay all costs and expenses, including attorneys' fees, associated with **Baskin-Robbins'** attempt to enforce the **Keatings'** post-termination contractual obligations.

The **Keatings** leased the Cary Parkway store from **Baskin-Robbins** pursuant to a sublease dated 23 May 1996 (the Sublease). Section 9 of that Sublease provides:
It is understood that Lessee has entered into a **Baskin-Robbins** Franchise Agreement with respect to Lessee's conduct of its business at the subleased premises. In the event that said **Baskin-Robbins** Franchise Agreement shall be canceled or terminated by either party for any reason whatsoever, Lessor shall have the right at its election, to terminate this Sublease and all rights granted to Lessee hereunder, without affording the Lessee any opportunity to cure, effective upon written notice to Lessee and Lessor shall be entitled to immediate recovery of possession of the subleased premises and all appurtenances and Lessor shall have the right against Lessee to all remedies on default, as provided herein.

*13 (Laudermilk Cert., Ex. 1C 9; Counterclaims ¶ 13.) Section 17 of the Sublease requires the **Keatings** to pay **Baskin-Robbins'** attorneys' fees and costs incurred in connection with the enforcement of the terms of the sublease.

### 2. Facts

**Baskin-Robbins** learned that the **Keatings** were offering Edy's ice cream for sale at the High House Road location on 11 January 2000. Plaintiffs do not dispute that the Edy's store derives more than 5% of its gross revenues from the sale of frozen dairy desserts. Because the **Keatings'** sale of Edy's ice cream at the High House Road location constituted a violation of the Cary Parkway Franchise Agreement, **Baskin-Robbins** sent the **Keatings** a notice of termination, terminating the Franchise Agreement and the Sublease for the Cary Parkway location on 11 January 2000. The notice demanded that the **Keatings** "quit the premises and immediately deliver up possession thereof" to **Baskin-Robbins** and required that the **Keatings** immediately comply with all post-termination obligations under the Agreement and Sublease. (Counterclaims ¶ 17; Letter from Worthen to Unti dated 11 January 2000.) Among other things, the **Keatings** were required to cease using any methods associated with **Baskin-Robbins**, cease using any or all of the proprietary marks of **Baskin-Robbins**, and return all manuals to **Baskin-Robbins**. (Id.) The letter also explained that, if they contested the claimed defaults, i.e., contested **Baskin-Robbins'** assertion that they were operating a competing ice cream business at the High House

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Road location, **Baskin-Robbins** would not enforce the action by itself but would, instead, submit the matter to a court for judicial termination.

The **Keatings** initially refused to cease operating their **Baskin-Robbins** franchise. Indeed, their counsel wrote **Baskin-Robbins** a letter dated 13 January 2000 stating that the **Keatings** contested the termination and that the "**Keatings** will not quit the premises at 151 Cary Parkway and will continue to operate their business at that location." (Id. at 18.) Ultimately, however, the **Keatings** ceased operations at the Cary Parkway location on 31 January 2000 and closed the store. (Pl.s' Opp. at 3.)

### 3. Count I-Breach of the Franchise Agreement's In-Term Covenant not to Compete

Defendants seek a judicial declaration that the Cary Parkway Franchise Agreement was properly terminated pursuant to the 11 January 2000 Notice of Termination, which was based on the **Keatings'** operation of a competing ice cream store while the Cary Parkway Franchise Agreement was still valid. As defendants have explained, this is a clear violation of the Agreement's in-term covenant not to compete. Plaintiffs have made a brief argument pertaining to a post-termination covenant not to compete,[FN11] which is not at issue in this case, and plaintiffs have failed to cite any authority for the proposition that an in-term covenant not to compete is void as against public policy.

> FN11. The Agreement does contain a geographically limited, two-year post-termination covenant not to compete at Paragraph 15.3. The specifics of that provision are not at issue in this case.

As defendants point out, the covenant is temporally limited by its very terms-the covenant is relevant and applicable only during the term of the franchise agreement. It is beyond cavil that an ice cream franchise may reasonably require a franchisee not to operate a competing ice cream store during the term of its franchise agreement. While California Business and Professions Code 16600 has been interpreted to bar enforcement of certain post-termination covenants not to compete, the Ninth Circuit has held that "California cases clearly establish that contractual prohibitions against current employees' competing with their employers do not violate 16600." *Shaklee U.S. Inc. v. Giddens*, 934 F.2d 324

(Table), 1991 WL 90003,*3 (9 [th] Cir.1991), cert. denied, 502 U.S. 1033 (1992); *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*, 124 Cal.Rptr. 678, 681-82 (Cal.App.1975)(upholding enforcement against a franchisee of in-term covenant not to compete). See also *Deutchland Enterprises, Ltd. v. Burger King Corp.*, 957 F.2d 449, 452-53 (7 [th] Cir.1992)(affirming district court ruling enforcing in-term covenant not to compete with no geographical limitation); *McDonald's System Inc. v. Sandy's, Inc.*, 195 N.E.2d 22 (Ill.App.1963)(territory is not a factor in determining the validity of an in-term covenant).

**\*14** Because the **Keatings'** breached their Cary Parkway Franchise Agreement by selling Edy's ice cream at the Preston Corners location while operating as a **Baskin-Robbins** franchisee at the Cary Parkway location, termination of their franchise agreement was warranted, and **Baskin-Robbins** is entitled to partial summary judgment on Count I of its Amended Counterclaim.

Within Count I of their Counterclaims, defendants assert that, as a direct and proximate result of the **Keatings'** breach, **Baskin-Robbins** has incurred damages and attorneys' fees and is likely to incur substantial and irreparable injury to the goodwill associated with the **Baskin-Robbins** trade name and trademarks. (Counterclaims ¶ 23.) Despite the notice of termination they received on January 11, plaintiffs did not cease operating as a **Baskin-Robbins** store until January 31 in violation of Section 17 of their Agreement. Because the **Keatings** did not cease operations immediately upon notice of termination, the **Keatings** may be required to pay **Baskin-Robbins** damages incurred by **Baskin-Robbins** in its effort to enforce the **Keatings'** post-termination obligations. Indeed, the **Keatings**, through their counsel, informed **Baskin-Robbins** on 13 January 2000, that they would not quit the premises and that they would continue to operate the business at that location. (Worthen Cert., Ex. 3 ¶ 3.)

Although **Baskin-Robbins** appears to be entitled to damages under the terms of the Agreement, and it is conceivable that damages were incurred as a result of the **Keatings'** continued and unauthorized operation of the Cary Parkway store from 11 January 2000 through 31 January 2000, defendants have not quantified their damages flowing from the **Keatings'** breach of the Agreement, and this court cannot make such an award under Count I at this time. The issue of damages as they pertain to Count I will be reserved for determination at a later time.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

#### 4. *Count II-Breach of the Sublease*

Defendants are also entitled to partial summary judgment on Count II of their amended counterclaim, which asserts breach of the Sublease, because, in accordance with the terms of the Sublease, **Baskin-Robbins** is entitled to possession of the Cary Parkway premises upon termination of plaintiffs' franchise agreement.

9. Use of Premises The subleased premises shall be used solely for the purpose of conducting therein a **Baskin-Robbins** Store, in accordance with the provisions of the **Baskin-Robbins** Franchise Agreement pertaining to the subleased premises.... In the event that said ... Agreement shall be ... terminated, by either party or for any reason whatsoever, Lessor shall have the right, at its election, to terminate this Sublease and all rights granted Lessee hereunder, without affording Lessee any opportunity to cure, effective upon written notice to Lessee[,] and Lessor shall be entitled to immediate recovery of possession of the subleased premises and all appurtenances[,] and Lessor shall have the right against Lessee to all remedies on default, as provided herein.

**\*15** (**Keating** Sublease at 5.) The Sublease also provides that, in the event of Lessee's breach of any agreement or covenant under the sublease "and upon five (5) days written notice thereof by Lessor to Lessee.... Lessor may reenter or take possession of the subleased premises, or any part thereof, and expel or remove Lessee ... using such force as may be necessary to do so, if permitted by law, and such rights shall be in addition to any other remedies which may be provided by law or contained in this Sublease." (**Keating** Sublease at 7-8.)

In Count II, defendants assert that, as a direct and proximate result of the **Keatings'** breach, **Baskin-Robbins** has incurred damages and attorneys' fees and is likely to incur substantial and irreparable injury to the goodwill associated with the **Baskin-Robbins** trade name and trademarks. (Counterclaims ¶ 27.) While defendants have pursued their claims for attorneys' fees and costs, defendants have not quantified the damages to which they are entitled under Count II. Accordingly, the court cannot award damages under Count II at this time.

The court notes that defendants have also requested an award of "such exemplary or punitive damages against the **Keatings** as are deemed appropriate because of the wilful, intentional and malicious

nature of the **Keatings'** conduct." (Counterclaims at ¶ 17.g.) The Franchise Agreement, however, provides, at Paragraph 25.3, that "[n]o punitive or exemplary damages shall be awarded against either **Baskin-Robbins**, or Franchisee, or entities affiliated with any of them, and are hereby waived." Accordingly, the court must conclude that an award of exemplary or punitive damages would not be "appropriate" under the terms of the Agreement.

#### 5. *Counts I and II-Attorneys' Fees and Costs*

Elaborating upon the "damages" that they are seeking in the context of the memoranda, defendants assert that they are entitled to attorneys' fees and costs incurred in enforcing the termination of the Cary Parkway Franchise Agreement based on three separate and independent contractual grounds: Section 15.7, Section 17.1.1, and Section 17.1.9. (Def.s' Reply re Mtn. for Summ. Judg. on their Claims at 3-4.) In accordance with Section 15.7 of the Agreement, the **Keatings** are required to pay **Baskin-Robbins'** attorneys' fees and costs associated with **Baskin-Robbins'** attempts to enforce the **Keatings'** covenants under Section 15 of the Agreement. Because the **Keatings** did not cease operations immediately upon notice of termination, the **Keatings** will also be required to pay **Baskin-Robbins** costs and expenses, including attorneys' fees, incurred by **Baskin-Robbins** in its effort to enforce the **Keatings'** post-termination obligations set forth in Section 17. See Sections 17.1.1 [FN12] and 17.1.9 (requiring franchisee to pay all damages, costs and expenses, including attorneys' fees incurred by **Baskin-Robbins** in obtaining injunctive or other relief for the enforcement of Section 17).

> FN12. Upon termination of the Agreement, "FRANCHISEE shall promptly pay all sums owing to **BASKIN-ROBBINS**.... In the event of termination for any default of FRANCHISEE, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by **BASKIN-ROBBINS**." Section 17.1.1.

**\*16 Baskin-Robbins** has also made an argument that it is entitled to fees and costs for its defense of the action initiated by plaintiffs based on the alleged violations of their franchise agreements. (Answer at ¶ 9 and Counterclaim at ¶ 17.) The Agreement provides as follows:
25.6 If **BASKIN-ROBBINS** should bring an action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

against FRANCHISEE, or if FRANCHISEE should bring an action against **BASKIN-ROBBINS**, with respect to the subject matter of this Agreement, the prevailing party shall be entitled to recover from the other(s) all of the legal expenses of the prevailing party, including reasonable attorney's fees, and to have the same awarded as a part of the judgment in the proceeding in which such legal expenses and attorney's fees were incurred. In the event that **BASKIN-ROBBINS**[ ] should incur any costs and expenses, including attorney's fees, in enforcing any of the provisions of, or their rights under, this Agreement, they or either of them shall be entitled to recover from FRANCHISEE all such costs and expenses.

(**Keating** Franchise Agreement ¶ 25.6.)

Although the court will grant summary judgment in favor of defendants on plaintiffs' claims and partial summary judgment for defendants on their counterclaims, the issue of damages remains to be determined in this matter along with Counts III and IV of defendants' Counterclaims, which deal with federal trademark infringement and federal unfair competition respectively, and which were not addressed in defendants' motion for summary judgment. Defendants' attorneys' fees, costs and related expenses are therefore ongoing. Accordingly, the submission of a fee petition at this point would be premature. Accordingly, this Order does not dispose of Counts III and IV of defendants' counterclaims, defendants' claims for damages, or defendants' request for attorneys' fees.

IV. Conclusion

Defendants' motion for summary judgment on plaintiffs' amended complaint is ALLOWED, and plaintiffs' claims are DISMISSED. Defendants' motion for summary judgment on their amended counterclaims is ALLOWED in part. The court hereby DECLARES that the **Keatings'** conduct violated the terms of their Cary Parkway Franchise Agreement and Sublease, and that the **Keatings'** conduct provided a legitimate basis for **Baskin-Robbins'** termination of the Agreement and the Sublease. It is HEREBY ORDERED, ADJUDGED and DECREED that **Baskin-Robbins** is in rightful possession of the Cary Parkway premises in accordance with the sublease signed by the **Keatings**. The **Keatings** are DIRECTED to comply with their post-termination obligations under the Franchise Agreement and Sublease. The court will RESERVE

JUDGMENT on defendants' motion for summary judgment to the extent defendants request damages as to Counts I and II, and those claims are reserved for trial. Counts III and IV of defendants' motion are also RESERVED for trial.

On 29 January 2001, defendants submitted a motion to dismiss defendant Allied Domecq Retailing USA (Allied Domecq QSR) as an entity incapable of being sued. On 2 February 2001, defendants submitted an additional motion to strike Robert Justis as an expert witness and a motion in limine to exclude Justis's testimony at trial with a supporting memorandum. Finally, on 21 February 2001, plaintiffs submitted a response to defendants' 29 January 2001 motion and a motion to join Allied Domecq PLC as a party defendant. Because defendants' motion for summary judgment has been allowed as to plaintiffs' amended complaint, defendants' motions regarding Allied Domecq Retailing USA, now known as Allied Domecq QSR, and the testimony of Robert Justis, are DENIED as MOOT. Plaintiffs' motion to join Allied Domecq PLC as a party defendant is also DENIED as MOOT.

E.D.N.C.,2001.
Keating v. Baskin-Robbins USA Co.
Not Reported in F.Supp.2d, 2001 WL 407017 (E.D.N.C.)

END OF DOCUMENT