# EXHIBIT H

Dockets.Justia.com

LEXSEE 142 CAL. APP. 4TH 603

**RAYMOND EDWARDS II, Plaintiff and Appellant, v. ARTHUR ANDERSEN LLP,
Defendant and Respondent.**

B178246

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT,
DIVISION THREE**

*142 Cal. App. 4th 603; 47 Cal. Rptr. 3d 788; 2006 Cal. App. LEXIS 1320; 25 I.E.R.
Cas. (BNA) 29; 153 Lab. Cas. (CCH) P60,261; 2006-2 Trade Cas. (CCH) P75,482;
2006 Cal. Daily Op. Service 8268; 2006 Daily Journal DAR 11780*

**August 30, 2006, Filed**

**NOTICE:** NOT CITABLE--SUPERSEDED BY
GRANT OF REVIEW    [***1]    CERTIFIED FOR
PARTIAL PUBLICATION*

*Pursuant to California Rules of Court, rules
976(b) and 976.1, this opinion is certified for
publication with the exception of parts 1.e
through 2. of the Discussion.

**SUBSEQUENT HISTORY:** Modified by *Edwards v.
Arthur Andersen LLP, 2006 Cal. App. LEXIS 1488 (Cal.
App. 2d Dist., Sept. 26, 2006)*
Review granted, Depublished by *Edwards (Raymond) v.
Andersen (Arthur), LLP, 52 Cal. Rptr. 3d 86, 147 P.3d
1013, 2006 Cal. LEXIS 14181 (Cal., 2006)*
Later proceeding at *Edwards (Raymond) v. Arthur An-
dersen, LLP, 2006 Cal. LEXIS 15649 (Cal., Dec. 12,
2006)*
Later proceeding at *Edwards (Raymond) v. Arthur An-
dersen, LLP, 2007 Cal. LEXIS 376 (Cal., Jan. 17, 2007)*
Later proceeding at *Edwards v. Arthur Andersen Llp,
2007 Cal. LEXIS 1730 (Cal., Feb. 22, 2007)*

**PRIOR HISTORY:** Superior Court of Los Angeles
County, No. BC294853, Andria K. Richey, Judge.

**DISPOSITION:** The court affirmed the order that sus-
tained the employer's demurrer to the Cartwright Act
cause of action, otherwise reversed the judgment in favor
of the employer, and remanded for further proceedings.

Case in Brief   ( $ )

**SUMMARY:** CALIFORNIA OFFICIAL REPORTS
SUMMARY

The trial court dismissed an employee's claims
against his former employer for intentional interference
with prospective economic advantage and violation of
the Cartwright Act. A noncompetition agreement prohib-
ited the employee, for an 18-month period, from provid-
ing professional services to certain clients of the em-
ployer and also prohibited him from soliciting employ-
ment from such clients. The employee alleged that, when
the employer sold a portion of its business, his employ-
ment offer with the purchaser was withdrawn after he
refused to sign a release of the noncompetition agree-
ment and other claims against the employer. The trial
court ruled that both the noncompetition agreement and
the release were valid. (Superior Court of Los Angeles
County, No. BC294853, Andria K. Richey, Judge.)

The Court of Appeal affirmed the order that sus-
tained the employer's demurrer to the Cartwright Act
cause of action; otherwise reversed the judgment in favor
of the employer, and remanded for further proceedings.
The court held that the trial court erred in relying on the
"narrow restraint" exception to *Bus. & Prof. Code, §
16600*, as articulated by the Ninth Circuit, when it dis-
missed the claim for intentional interference with pro-
spective economic advantage. Noncompetition agree-
ments are invalid under *§ 16600* even if narrowly drawn,
unless they fall within statutory or trade secret excep-
tions. Moreover, a purported waiver of indemnity rights
under *Lab. Code, §§ 2802, 2804*, violated public policy
and was an independently wrongful act for purposes of
the interference claim. A nondisparagement provision in
the release did not violate *Lab. Code, § 1102.5*. (Opinion
by Aldrich, J., with Klein, P. J., and Croskey, J., concur-
ring.) [*604]

**HEADNOTES:** CALIFORNIA OFFICIAL REPORTS
HEADNOTES

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

Classified to California Digest of Official Reports

**(1) Interference § 7--Interference with Prospective Economic Advantage--Actions and Remedies--Elements.**--To establish a claim for intentional interference with prospective economic advantage, a plaintiff has the burden to prove the following elements: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act. The intentional act must be independently wrongful, that is, wrongful by some measure beyond the fact of the interference itself. In other words, the act must be proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard, rather than merely be a product of an improper, but lawful, purpose or motive, and must be independently actionable. The plaintiff need not prove that the defendant acted with the specific intent or purpose of disrupting the plaintiff's prospective economic advantage, as long as the defendant knew the interference was certain or substantially certain to occur as a result of its action.

**(2) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete.**--In many states, restraints on the practice of a profession, trade, or business are valid if reasonable. California, however, has rejected this approach. California's policy favoring open competition is embodied in *Bus. & Prof. Code, § 16600*, which provides that, subject to limited exceptions, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void. California courts have consistently declared *§ 16600* to be an expression of public policy which ensures that every citizen retains the right to pursue any lawful employment and enterprise of his or her choice. Thus, *§ 16600* sets forth the general rule in California: Covenants not to compete are void.

**(3) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Exceptions.**--Several statutory exceptions to *Bus. & Prof. Code, § 16600*, exist. *Bus. & Prof. Code, §§ 16601, 16602*, permit broad covenants not to compete in two narrow situations, that is, where a person sells the goodwill of a business and where a partner agrees not to compete in anticipation of dissolution of a partnership. *Bus. & Prof. Code, § 16601*, protects the purchaser of a business [*605] from subsequent competition from the seller, which would reduce the value of the property right acquired.

*Bus. & Prof. Code, § 16602*, protects partners from, inter alia, the risk that a partnership's goodwill will be diminished by competition from a withdrawing partner. *Bus. & Prof. Code, § 16602.5*, provides that a member of a limited liability company may, upon or in anticipation of dissolution of the company, agree not to carry on a similar business within a specified geographic area. Additionally, *Bus. & Prof. Code, § 16600*, does not invalidate covenants not to compete where necessary to protect the employer's trade secrets.

**(4) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Invalid Even Where Narrowly Drawn.**--The challenged clauses of a noncompetition agreement suffered from infirmities similar to those found in agreements ruled invalid in other cases. The agreement prohibited the employee from performing work for clients of any of the employer's offices for whom he had performed work, for specified periods. The prohibition applied even if the client approached the employee and requested his services. While the noncompetition clause was circumscribed in time and scope, it nonetheless restricted the employee's ability to practice his profession. The agreement did not fall within one of the statutory exceptions to *Bus. & Prof. Code, § 16600*. Absent a finding that the provisions fell within the trade secret exception, they were void.

[1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 205, 211, 579.]

**(5) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Invalid Even Where Narrowly Drawn.**--The Ninth Circuit's "narrow restraint" gloss on *Bus. & Prof. Code, § 16600*, is a misapplication of California law when applied to an employee's noncompetition agreement. *Section 16600* prohibits noncompetition agreements between employers and employees even where the restriction is narrowly drawn and leaves a substantial portion of the market available for the employee.

**(6) Statutes § 30--Construction--Language--Plain Meaning Rule--Reliable Indicator of Legislative Intent.**--When interpreting a statute, courts follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law. Courts first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.
[*606]

**(7) Statutes § 25--Construction--Exceptions and Provisos--Additional Exceptions Not Contemplated.**--The presence of express exceptions ordinarily implies that additional exceptions are not contemplated. Where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed unless a contrary legislative intent is evident.

**(8) Statutes § 42--Construction--Aids--Comments of California Code Commission.**--The comments of the California Code Commission are entitled to significant weight in construing a statute.

**(9) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Invalid Even Where Narrowly Drawn.**--Noncompetition agreements are invalid under *Bus. & Prof. Code, § 16600*, even if narrowly drawn, unless they fall within the statutory or trade secret exceptions.

**(10) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Coercing Employee into Forfeiting Rights.**--Conditioning employment on an employee's execution of a contract that violates public policy is against public policy. Using an invalid noncompetition agreement to coerce an employee into forfeiting rights is no less wrongful than terminating an employee who refuses to sign such an agreement.

**(11) Contracts § 15--Consideration--Sufficiency and Adequacy--Determining Adequacy.**--A contract is valid even if supported by insignificant consideration, and the giving up of a legal right may constitute sufficient consideration. However, something which is completely worthless cannot constitute a valid consideration. The adequacy of consideration is to be determined in light of the conditions existing at the time a contract is made.

**(12) Contracts § 11--Legality--Contracts in Restraint of Trade--Covenants Not to Compete--Severability Provisions.**--An employer cannot lawfully make an employee's signing of an employment agreement containing an unenforceable covenant not to compete a condition of continued employment, even if such agreement contains choice of law or severability provisions which would enable the employer to enforce the other provisions of the employment agreement.

**(13) Labor § 6--Regulation of Working Conditions--Indemnifying Employees for Work-related Losses.**--*Lab. Code, § 2802*, requires an employer to indemnify an employee for all expenses and losses incurred [*607] in direct consequence of the discharge of the employee's

duties. *Lab. Code, § 2804*, makes all contracts waiving the benefits of *Lab. Code, § 2802*, null and void.

**(14) Compromise, Settlement, and Release § 9--Compromise and Release--Construction, Operation, and Effect--Scope of Release.**--A broadly worded release covers all claims within the scope of the language, even if the particular claim is not expressly listed.

**(15) Labor § 6--Regulation of Working Conditions--Indemnifying Employees for Work-related Losses.**--*Lab. Code, §§ 2802, 2804*, articulate the fundamental public policy of California. The obvious purpose of *Lab. Code, § 2802*, is to protect employees from suffering expenses in direct consequence of doing their jobs. *Section 2802* shows a legislative intent that duty-related losses ultimately fall on the business enterprise, not on the individual employee. Numerous provisions of the California Labor Code were established to protect workers and hence have a public purpose. *Section 2802* inures to the benefit of the public generally, not merely to a particular employer or employee. Likewise, the indemnity requirement of *§ 2802* inures to the public benefit.

**(16) Labor § 6--Regulation of Working Conditions--Indemnifying Employees for Work-related Losses--Statutory Indemnity Rights Not Waivable.**--*Lab. Code, §§ 2802, 2804*, embody California's strong public policy favoring indemnification of employees for claims and liabilities arising from the employees' acts within the course and scope of their employment. Because employee indemnity rights under *Lab. Code, § 2802*, implement public policy and inure to the public benefit, forcing an employee to waive his or her statutory rights violates public policy. An employer cannot make an employee's future employment contingent on waiving the employee's statutorily mandated indemnity rights.

**(17) Labor § 3--Fair Employment Practices--Whistleblower Protection.**--Nondisparagement clauses appear to have become fairly common, both to protect employers and employees when an employment relationship ends. There is nothing inherently unlawful about a party generally agreeing not to disparage another. On the other hand, to the extent a nondisparagement clause can be understood to prohibit truthful comments, it cannot hinder an employee's cooperation with government officials.

**(18) Labor § 3--Fair Employment Practices--Whistleblower Protection.**--By its plain language, *Lab. Code, § 1102.5*, only prohibits an employer from making, adopting, or enforcing any rule, regulation, or [*608] policy preventing an employee from disclosing information (*§ 1102.5, subd. (a)*). A "policy" is a settled

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

or definite course or method adopted and followed by a government, institution, body, or individual. A "rule" is defined as, inter alia, a prescribed, suggested, or self-imposed guide for conduct or action: a regulation or principle, and an accepted procedure, custom or habit having the force of a regulation. A "regulation" is an authoritative rule or principle dealing with details of procedure. In short, § 1102.5, subd. (a), clearly refers to workplace rules and regulations meant to govern employees' conduct.

COUNSEL: Law Offices of Richard A. Love, Richard A. Love and Beth A. Shenfeld for Plaintiff and Appellant.

Latham & Watkins, Wayne S. Flick and Yury Kapgan for Defendant and Respondent.

JUDGES: Aldrich, J., with Klein, P. J., and Croskey, J., concurring.

OPINION BY: Aldrich

OPINION:

[**791] ALDRICH, J.--

INTRODUCTION

Plaintiff and appellant Raymond Edwards II (Edwards) was hired by Arthur Andersen LLP (Andersen) in 1997. At the time he was hired, Edwards was required by Andersen to execute a noncompetiton agreement, which prohibited him from working for or soliciting certain categories of Andersen clients for limited periods after his termination. Andersen eventually went out of business and sold its practice to various entities. Andersen's Los Angeles tax practice, of which Edwards was a part, was sold to HSBC, which hired Andersen's Los [***2] Angeles office personnel. As a condition of hire with HSBC, however, Andersen allegedly required that Edwards obtain a release of the 1997 noncompetition agreement. To do so, Edwards was required to execute a "Termination of Non-Compete Agreement" (TONC) drafted by Andersen. That document contained a broad release of claims against Andersen, as well as other terms favorable to Andersen. Edwards refused to sign and his employment offer with HSBC was withdrawn. He sued Andersen for, inter alia, intentional interference with prospective economic advantage and violation of the Cartwright Act. Andersen's demurrer to the Cartwright Act claim was sustained on the ground Edwards lacked standing to sue. The intentional [*609] interference claim was dismissed as a matter of law before trial,

based upon the trial court's ruling that both the 1997 noncompetition agreement and the 2002 TONC were valid.

We conclude a noncompetition agreement between an employee and employer, prohibiting the employee from performing services for certain former clients, is invalid under *Business and Professions Code section 16600* unless it falls within the statutory or "trade secret" exceptions [***3] to the statute. Such a noncompetition agreement is invalid even if the restraints imposed are narrow and leave a substantial portion of the market open to the employee. In so holding, we conclude the "narrow restraint" exception to *section 16600*, articulated by the Ninth Circuit, is not a proper application of California law. Because the 1997 noncompetition agreement was invalid and against public policy under *section 16600*, requiring Edwards to execute the TONC as consideration for release from the noncompetition agreement constituted an independently wrongful act for purposes of the elements of Edwards's intentional interference with prospective economic advantage claim.

n1 All further undesignated statutory references are to the Business and Professions Code.

[**792] We further hold that the TONC purported to waive Edwards's *Labor Code section 2802* indemnity rights. Because *Labor Code section 2802*'s indemnity provisions implement public policy, requiring Edwards to waive [***4] indemnity rights as a condition of continued employment violated public policy and constituted an independently wrongful act for purposes of the intentional interference with prospective economic advantage claim.

We reject Edwards's contention that a nondisparagement provision contained in the TONC violated *Labor Code section 1102.5*.

In the unpublished portion of the opinion, we reject Andersen's argument that, as a matter of law (1) Edwards lacked a prospective economic relationship with HSBC, and (2) HSBC, rather than Andersen, insisted that Edwards execute the TONC as a condition of employment. We further conclude Andersen's demurrer to Edwards's Cartwright Act cause of action was properly sustained.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Edwards's employment with Andersen and the noncompetition agreement.*

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

In January 1997, Edwards, a certified public accountant, was hired as a tax manager by Andersen's Los Angeles office. In that position, Edwards provided income, gift, and estate planning services to high net worth individuals [*610] and their enterprises. Andersen was, at the time, one of the five major public accounting firms providing accounting [***5] services in California. As a condition of employment Edwards signed Andersen's standard noncompetition agreement, which was required of all Andersen managers. The relevant provisions of that agreement were as follows:

"If you leave the Firm, for eighteen months after release or resignation, you agree not to perform professional services of the type you provided for any client on which you worked during the eighteen months prior to release or resignation. This does not prohibit you from accepting employment with a client.

"For twelve months after you leave the Firm, you agree not to solicit (to perform professional services of the type you provided) any client of the office(s) to which you were assigned during the eighteen months preceding release or resignation.

"You agree not to solicit away from the Firm any of its professional personnel for eighteen months after release or resignation."

2. *Sale of Andersen assets to HSBC, the TONC, and withdrawal of Edwards's employment offer with HSBC.*

In March 2002, Andersen was indicted for obstruction of justice in connection with the investigation of Enron Corporation by the Securities and Exchange Commission. (See generally *Arthur Andersen LLP v. United States (2005) 544 U.S. 696 [161 L. Ed. 2d 1008, 125 S. Ct. 2129].*) [***6] In June 2002, Andersen was found guilty. n2 In August 2002, Andersen announced it would cease practicing public accounting in the United States. Andersen's California accounting license was revoked in September 2002.

n2 That judgment was subsequently reversed for instructional error. (*Arthur Andersen LLP v. United States, supra, 544 U.S. at pp. 698, 708.*)

During this period, beginning in approximately April 2002, Andersen began selling portions of its practice to competitors. In May 2002, Andersen internally announced that HSBC, through a new subsidiary, Wealth and Tax Advisory Services [**793] (WTAS), would purchase a portion of Andersen's Los Angeles tax practice, including Edwards's group. As a condition of the HSBC transaction closing, Andersen required that all Andersen managers, including Edwards, execute the TONC in order to obtain employment with HSBC. The TONC was crafted by Andersen.

The TONC required employees to, inter alia, (1) voluntarily resign from Andersen; (2) release Andersen from [***7] "any and all" claims, including "claims [*611] that in any way arise from or out of, are based upon or relate to Employee's employment by, association with or compensation from" Andersen; (3) continue indefinitely to preserve confidential information and trade secrets except as otherwise required by a court or governmental agency; (4) refrain from disparaging Andersen or its related entities or partners; and (5) cooperate with Andersen in connection with any investigation of, or litigation against, Andersen. In exchange, Andersen would agree to accept Edwards's resignation, agree to Edwards's "employment by or affiliation with" HSBC, and release Edwards from the foregoing provisions of the 1997 noncompetition agreement.

HSBC extended an employment offer to Edwards. The offer was contingent upon Edwards executing the TONC. Edwards was informed by Andersen that he had to sign the TONC in order for him to be employed by HSBC. Edwards signed and returned HSBC's written employment offer, but refused to sign the TONC. Allegedly as a result, HSBC withdrew its employment offer.

3. *Edwards's lawsuit and the trial court's rulings.* [***8]

On April 30, 2003, Edwards filed a complaint against Andersen, HSBC, and WTAS. The complaint alleged, inter alia, causes of action for intentional interference with prospective economic advantage and anticompetitive business practices under the Cartwright Act (§ 16700 et seq.).

The trial court sustained defendants' demurrers to the Cartwright Act claim without leave to amend on the ground Edwards lacked standing to bring the claim.

The trial court denied Andersen's subsequent motion for summary adjudication on Edwards's intentional interference with prospective economic advantage claim, concluding triable issues of fact existed regarding "the meaning of the agreements," and whether the noncompetition agreement protected trade secrets. All remaining claims against Andersen were dismissed via summary adjudication and are not at issue here. Edwards settled with the remaining defendants prior to trial.

Shortly before trial, Andersen moved pursuant to *Code of Civil Procedure sections 598* and *1048, subdivi-*

*sion (b)*, to sever trial on the issue of the enforceability of the noncompetition agreement and the TONC. n3 Andersen urged [***9] that the enforceability of the agreements presented pure questions of [*612] law for adjudication by the trial court, and contended that the provisions of both the TONC and the 1997 noncompetition agreement were lawful.

> n3 Pursuant to *Code of Civil Procedure sections 598* and *1048, subdivision (b)*, respectively, a trial court may order trial of an issue to precede trial of another issue, and may order separate trials of separate issues. (See generally 1 Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2005) PP 4:342 to 4:352, 4:375, pp. 4-77 to 4-79, 4-84.) Issues of law must generally be tried by the court. (*Code Civ. Proc., §§ 591, 592.*)

Over Edwards's objection, the trial court granted the motion to sever and, at the [**794] same hearing, ruled in favor of Andersen on the merits. The trial court heard arguments from the parties, but did not take evidence. It determined, based primarily [***10] upon its interpretation of the contractual provisions, that as a matter of law (1) the noncompetition agreement fell within the "narrow restraint" exception to *section 16600*; (2) the noncompetition agreement provision prohibiting Edwards from soliciting Andersen employees was lawful; (3) the nondisparagement clause was not illegal; and (4) the TONC did not specifically release Edwards's indemnity rights. Accordingly, it granted judgment for Andersen. This appeal followed.

DISCUSSION

1. *The intentional interference with prospective economic advantage claim.*

a. *Standard of review.*

The parties agree that this court must independently review the trial court's ruling on the prospective economic advantage claim, in that it was decided as a matter of law and turned on analysis of whether certain provisions of the noncompetition agreement and the TONC were valid and enforceable. (See, e.g., *Application Group, Inc. v. Hunter Group, Inc. (1998) 61 Cal.App.4th 881, 893, fn. 6 [72 Cal. Rptr. 2d 73]* ["it is essentially a pure question of law whether [defendant's] covenant not to compete is enforceable ... ."]; *Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865-866 [44 Cal. Rptr. 767, 402 P.2d 839]*; [***11] *McCrary Construction Co. v. Metal Deck Specialists, Inc. (2005) 133 Cal.App.4th 1528, 1535 [35 Cal. Rptr. 3d 624]* [it is solely a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence]; *Timney v. Lin (2003) 106 Cal.App.4th 1121, 1126 [131 Cal. Rptr. 2d 387]* [whether a contract is illegal is generally a question of law].)

b. *The elements of intentional interference with prospective economic advantage and contentions of the parties.*

(1) The elements of a claim for intentional interference with prospective economic advantage are not in dispute. To establish such a claim, the plaintiff [*613] has the burden to prove the following elements: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act. (*Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1153-1154 [131 Cal. Rptr. 2d 29, 63 P.3d 937]*; *Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc. (2006) 138 Cal.App.4th 1215, 1220 [42 Cal. Rptr. 3d 235]* [***12] (*Stevenson*).) The intentional act must be "independently wrongful," i.e., wrongful by some measure beyond the fact of the interference itself. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc. (1995) 11 Cal.4th 376, 392-393 [45 Cal. Rptr. 2d 436, 902 P.2d 740]*; *Stevenson, supra, at p. 1220.*) In other words, the act must be proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard, rather than merely be a product of an improper, but lawful, purpose or motive (*Korea Supply Co., supra, at p. 1159 & fn. 11*; *Reeves v. Hanlon (2004) 33 Cal.4th 1140, 1145 [17 Cal. Rptr. 3d 289, 95 P.3d 513]*; *Stevenson, supra, at p. 1220*) and must be " 'independently actionable.' " (*Stevenson, supra, at p. 1220.*) The plaintiff need not prove that the defendant acted with the specific intent or purpose of disrupting the plaintiff's prospective economic [**795] advantage, as long as the defendant knew the interference was certain or substantially certain to occur as a result of its action. (*Korea Supply Co., supra, at p. 1153.*)

At issue here is the third element of the tort. Edwards contends that the wrongful act requirement [***13] was met in three respects. First, he asserts that

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

the noncompetition agreement was illegal under *section 16600*. Thus, he urges, Andersen's demand for consideration to release him from an illegal covenant not to compete violated public policy and satisfied the wrongful act requirement.

Second, Edwards asserts that two aspects of the TONC violated California law: (1) the TONC's broad release of Andersen amounted to a waiver of his indemnity rights in violation of *California Labor Code sections 2802, 2804*, and *432.5*; and (2) the TONC's nondisparagement provision violated *Labor Code section 1102.5*.

Andersen, on the other hand, contends both the TONC and noncompetition agreements were lawful. Further, Andersen urges, one provision of the noncompetition agreement--the provision prohibiting Edwards from "raiding" Andersen employees--was and is not challenged as unlawful. Therefore, Andersen argues, it could lawfully demand execution of the TONC as consideration for release from that single covenant, even if the remaining portions of the noncompetition agreement were void. We consider these contentions seriatim. [*614]

c. *The noncompetition [***14] agreement was invalid under section 16600 and therefore requiring consideration to release Edwards from it was an independently wrongful act.*

(i) *California's policy against restraint on the practice of a profession, trade, or business.*

(2) In many states, restraints on the practice of a profession, trade, or business are valid if reasonable. (See *Hill Medical Corp. v. Wycoff (2001) 86 Cal.App.4th 895, 900-901 [103 Cal. Rptr. 2d 779]; Bosley Medical Group v. Abramson (1984) 161 Cal. App. 3d 284, 288 [207 Cal. Rptr. 477]*.) California, however, rejected this approach in 1872, upon enactment of the Civil Code. (*Hill Medical Corp. v. Wycoff, supra, at p. 901; Bosley Medical Group v. Abramson, supra, at p. 288*.) California's policy favoring open competition is embodied in *section 16600* (formerly Civ. Code, § 1673) which provides that, subject to limited exceptions, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

California courts have consistently declared *section 16600* to be an expression of public policy which ensures that every citizen retains [***15] the right to pursue any lawful employment and enterprise of his or her choice. (*Kelton v. Stravinski (2006) 138 Cal.App.4th 941, 946*

[*41 Cal. Rptr. 3d 877*]; *Metro Traffic Control, Inc. v. Shadow Traffic Network (1994) 22 Cal.App.4th 853, 859 [27 Cal. Rptr. 2d 573]; D'Sa v. Playhut, Inc. (2000) 85 Cal.App.4th 927, 933 [102 Cal. Rptr. 2d 495]; KGB, Inc. v. Giannoulas (1980) 104 Cal. App. 3d 844, 848 [164 Cal. Rptr. 571]; Application Group, Inc. v. Hunter Group, Inc., supra, 61 Cal.App.4th at p. 900*.) Thus, *section 16600* sets forth the general rule in California: Covenants not to compete are void. (*Kelton v. Stravinski, supra, at p. 946; Hill Medical Corp. v. Wycoff, supra, at p. 901*.)

(3) Several statutory exceptions to *section 16600* exist. *Sections 16601* and *16602* (derived from Civ. Code, §§ 1674 & 1675) "permit broad covenants not to compete in [**796] two narrow situations, i.e., where a person sells the goodwill of a business and where a partner agrees not to compete in anticipation of dissolution of a partnership. [Citation.]" (*Kelton v. Stravinski, supra, 138 Cal.App.4th at p. 946; see Bosley Medical Group v. Abramson, supra, 161 Cal. App. 3d at p. 288; [***16] Kolani v. Gluska (1998) 64 Cal.App.4th 402, 407 [75 Cal. Rptr. 2d 257]; Hill Medical Corp. v. Wycoff, supra, 86 Cal.App.4th at pp. 901-902*.) *Section 16601* protects the purchaser of a business from subsequent competition from the seller, which would reduce the value of the property right acquired. (*Monogram Industries, Inc. v. Sar Industries, Inc. (1976) 64 Cal. App. 3d 692, 701 [134 Cal. Rptr. 714]*.) *Section 16602* protects partners from, inter alia, the risk that a partnership's goodwill will be [*615] diminished by competition from a withdrawing partner. (*South Bay Radiology Medical Associates v. Asher (1990) 219 Cal. App. 3d 1092, 220 Cal. App. 3d 1074, 1083-1084 [269 Cal. Rptr. 15]*.) *Section 16602.5*, enacted in 1994, provides that a member of a limited liability company may, upon or in anticipation of dissolution of the company, agree not to carry on a similar business within a specified geographic area.

Additionally, it has long been recognized that *section 16600* does not invalidate covenants not to compete where necessary to protect the employer's trade secrets. (See *Muggill v. Reuben H. Donnelley Corp. (1965) 62 Cal.2d 239, 242 [42 Cal. Rptr. 107, 398 P.2d 147] [§ 16600* "invalidates [***17] provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment or imposing a penalty if he does so [citations], unless they are necessary to protect the employer's trade secrets [citation]"]; *Gordon v. Landau (1958) 49 Cal.2d 690, 694 [321 P.2d 456]; Empire Steam Laundry v. Lozier (1913) 165 Cal. 95, 100 [130 P. 1180]* ["That equity will always protect against the unwarranted disclosure of trade secrets and confidential communications and the like is, of course, settled beyond peradventure."]; *ReadyLink Healthcare v. Cotton (2005) 126 Cal.App.4th 1006, 1022*

[24 Cal. Rptr. 3d 720] [California courts recognize a judicially created exception to *section 16600*, and will enforce a restrictive covenant, when a former employee uses trade secrets or commits unfair competition]; *Whyte v. Schlage Lock Co. (2002) 101 Cal.App.4th 1443, 1462, 1464 [125 Cal. Rptr. 2d 277]; D'Sa v. Playhut, Inc., supra, 85 Cal.App.4th at p. 935; Loral Corp. v. Moyes (1985) 174 Cal. App. 3d 268, 275 [219 Cal. Rptr. 836]* ["The misuse of trade secrets may include solicitation of an employer's customers when confidential information [***18] is employed."]; see generally Civ. Code, § 3426 et seq. [Uniform Trade Secrets Act]; 2 Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2005) PP 14:310, 14:439, pp. 14-33, 14-45.)

Andersen does not contend any of the statutory exceptions apply, nor did the trial court conclude the noncompetition agreement was necessary to protect Andersen's trade secrets. Whether the trade secret exception applied was not resolved below and, on the facts presented here, could not properly have been resolved adversely to Edwards without the evaluation of evidence. (See generally *Thompson v. Impaxx, Inc. (2003) 113 Cal.App.4th 1425, 1430 [7 Cal. Rptr. 3d 427]*.) Therefore, we consider whether the noncompetition agreement violated *section 16600*.

True to the statute's mandate, California courts have held a variety of noncompetition agreements invalid under *section 16600*. (See, e.g., *D'Sa v. Playhut, Inc., supra, 85 Cal.App.4th at pp. 930-931* [agreement not to render services to any person or entity in connection [**797] with competing products for [*616] one year]; *Metro Traffic Control, Inc. v. Shadow Traffic Network, supra, 22 Cal.App.4th at pp. 859-860* [***19] [covenant by traffic reporters not to provide traffic reporting services or related activities]; *Kolani v. Gluska, supra, 64 Cal.App.4th at pp. 405-407* [prohibition on competing with employer for one year within a 40-mile radius or soliciting former employer's past, current, or potential customers]; *Bosley Medical Group v. Abramson, supra, 161 Cal. App. 3d at p. 292* [agreement by physician not to open a competitive practice].)

Likewise, covenants that penalize employees for competing with a former employer are invalid under *section 16600*. (*Muggill v. Reuben H. Donnelley Corp., supra, 62 Cal.2d at pp. 242-243* [forfeit of pension benefits if retiree worked for competitor]; *Gordon Termite Control v. Terrones (1978) 84 Cal. App. 3d 176, 178 [148 Cal. Rptr. 310]* [contract requiring a former employee to pay $ 50 per account if he solicited former customers]; see also 2 Chin et al., Employment Litigation, supra, P 14:280, at p. 14-30.)

(ii) *The noncompetition agreement was invalid under section 16600.*

Applying these principles here, we conclude the noncompetition agreement was invalid. The first challenged [***20] clause n4 prohibited Edwards, for an 18-month period, from performing professional services of the type he had provided while at Andersen, for any client on whose account he had worked during 18 months prior to his termination. The second challenged clause prohibited Edwards, for a year after termination, from "soliciting," defined by the agreement as providing professional services to any client of Andersen's Los Angeles office.

> n4 Edwards does not contend the provision of the noncompetition agreement prohibiting him from soliciting Andersen's employees violated *section 16600*, and we do not consider the issue.

Similar clauses have been held invalid under *section 16600*. In *Morris v. Harris (1954) 127 Cal. App. 2d 476 [274 P.2d 22]*, an employee agreed not to solicit, or accept business from, any of the employer's clients for a period of 10 years. The contract provided for liquidated damages of $ 20 per month if the employee violated its terms. *Morris* explained the contract was "a partial restraint on [the [***21] former employee's] right to engage in a 'lawful ... trade or business,' " and therefore was invalid under *section 16600*. The court reasoned, " 'The statute makes no exception in favor of contracts only in partial restraint of trade.' " (*Morris, supra, at p. 478* [quoting *Chamberlain v. Augustine (1916) 172 Cal. 285, 289 [156 P. 479]*]; see *Continental Car-Na-Var Corp. v. Moseley (1944) 24 Cal.2d 104, 110 [148 P.2d 9]* ["A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of [*617] those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. [Citation.]"]; *Reeves v. Hanlon, supra, 33 Cal.4th at p. 1149* [same].)

In *Thompson v. Impaxx, Inc., supra, 113 Cal.App.4th 1425*, an employer terminated an employee who refused to sign a noncompetition covenant. The agreement would have prohibited the employee, for one year following termination, from calling on, soliciting, or taking away any of the employer's customers or potential customers with whom the employee had had dealings. [***22] (*Id. at p. 1427*.) [**798] The employer argued that the agreement was not a true covenant not to compete, but a "mere limited restrictive covenant not to solicit," which, the employer urged, did not run afoul of *section 16600*. (*Thompson, supra, at p. 1428*.) In the

employer's view, it "did not prevent appellant from continuing in his profession or trade, or from working for a competitor or former customer, or from accepting the business of former customers if they solicited him, or from soliciting former customers with whom he had no dealings while he was respondents' employee." (*Ibid.*) *Thompson* rejected these arguments, reasoning: "This clause is less restrictive, and less anticompetitive, than the broad, traditional anticompetitive clauses [respondents] compare it to. It is nevertheless anticompetitive--why else would they ask employees to sign it?" (*Id. at p. 1429.*) *Thompson* distinguished cases involving trade secrets, finding them inapplicable. (*Id. at pp. 1429, 1431* [distinguishing, inter alia, "trade route" cases and *Loral Corp. v. Moyes, supra, 174 Cal. App. 3d 268*].) The court reiterated the rule [***23] that nonsolicitation clauses are "allowable only when they protect trade secrets or confidential proprietary information." (*Thompson v. Impaxx, Inc., supra, at p. 1431.*)

(4) The challenged clauses of Andersen's noncompetition agreement suffer from similar infirmities. The agreement prohibited Edwards from performing work for clients of Andersen's Los Angeles office and clients of any Andersen office for whom he had performed work, for specified periods. The prohibition applied even if the client approached Edwards and requested his services. While the noncompetition clause was circumscribed in time and scope, it nonetheless restricted Edwards's ability to practice his profession. (See *Thompson v. Impaxx, Inc., supra, 113 Cal.App.4th at p. 1429.*) The agreement did not fall within one of the statutory exceptions to *section 16600*. Absent a finding that the provisions fell within the trade secret exception, they were void. (*Thompson v. Impaxx, Inc., supra, at p. 1429.*)

(iii) *The "narrow restraint" exception.*

In concluding the noncompetition agreement was valid, however, the trial court relied on a different theory, i.e., the "narrow [***24] restraint" exception to [*618] *section 16600* developed primarily by the Ninth Circuit. That exception, in essence, provides that a noncompetition agreement does not violate *section 16600* as long as the restriction imposed is limited and leaves a substantial portion of the market available to the employee. (*General Commercial Packaging v. TPS Package (9th Cir. 1997) 126 F.3d 1131, 1134* (*General Commercial*).) In the trial court's view, Andersen's noncompetition agreement fell within this exception: It placed only a narrow restriction on Edwards's ability to engage in his profession. The trial court pointed out that "there were more than enough of these wealthy folks ... in L.A. for all CPA's to do the kind of work [Edwards]

was doing. So there wasn't any significant restriction on his ability to work. There wasn't even perhaps any minimal restriction on his ability to work." Andersen argues that the narrow restraint doctrine is viable, the noncompetition agreement was narrowly tailored, and the trial court's ruling was correct.

To address Andersen's argument, we must briefly trace the genesis of the narrow restraint doctrine. The origin of the Ninth [***25] Circuit approach lies primarily in two California cases, *King v. Gerold (1952) 109 Cal. App. 2d 316 [240 P.2d 710]*, and *Boughton v. Socony Mobil Oil Co. (1964)* [**799] *231 Cal. App. 2d 188 [41 Cal. Rptr. 714]*. In *King*, the plaintiff invented a particular house trailer and licensed Gerold to manufacture and sell such trailers for a six month period. The contract provided that if the license was not renewed, Gerold was required to cease production. (*King, supra, at p. 317.*) The agreement expired, but Gerold nonetheless continued producing trailers of a substantially similar design. *King* concluded the contract was not invalidated by *section 16600*. Gerold was not prohibited from carrying on his lawful business of manufacturing trailers, but was barred only from manufacturing and selling trailers of the particular design and style invented by King, who had granted the license in the first place. (*King, supra, at p. 318.*)

Subsequently, *Boughton v. Socony Mobil Oil Co., supra, 231 Cal. App. 2d 188*, addressed whether a restriction on the use of land violated *section 16600*. The agreement there prohibited the plaintiff from [***26] using a parcel of land as a gasoline service station. *Boughton* concluded the agreement was not void under *section 16600*. (*Boughton, supra, at p. 190.*) First, the single restriction was imposed, "not personally on [the] plaintiffs restraining them from engaging or carrying on any profession, trade or business but, on the use of the land ... ." (*Ibid.*) *Boughton* went on to reason, "while the cases are uniform in refusing to enforce a contract wherein one is restrained from pursuing an entire business, trade or profession, as falling within the ambit of *section 16600* [citations], where one is barred from pursuing only a small or limited part of a business, trade or profession, the contract has been upheld as valid." (*Boughton, supra, at p. 192.*) The plaintiffs in *Boughton* were not prohibited from carrying on the business of selling petroleum products or [*619] operating a service station, except on the single piece of property, and then only for a period of years. (*Ibid.*)

In *Campbell v. Trustees of Leland Stanford Jr. Univ. (9th Cir. 1987) 817 F.2d 499*, the plaintiff was a psychologist who had been employed by Stanford [***27] to revise and develop a well-known vocational interest test. He challenged a noncompetition clause that prohibited him from preparing or publishing any similar work

that might injure sales of the test. (*Id. at pp. 501-502.*) Relying on *Boughton,* the Ninth Circuit reasoned, "Even though the California Legislature rejected the common-law rule that 'reasonable' restraints of trade are generally enforceable, it did not make all restrictions unenforceable. *Section 16600* only makes illegal those restraints which preclude one from engaging in a lawful profession, trade, or business." (*Id. at p. 502.*) It was a question of fact whether the clause completely precluded the plaintiff from preparing vocational interest exams. (*Id. at p. 503.*) He was therefore entitled to a trial on that issue. (*Id. at pp. 502-503.*)

Ten years later, in *General Commercial, supra, 126 F.3d 1131,* General Commercial Packaging (GCP) sub-contracted with TPS to work for GCP's major customer, the Walt Disney Companies. TPS agreed that for one year after termination of the contract, it would not to work directly for, or solicit, Disney [***28] or any other company which GCP had introduced and contracted to TPS. The Ninth Circuit concluded the contract was "valid unless it 'completely restrain[s]' TPS from plying its trade or business. [Citations.]" (*Id. at p. 1134.*) The court recognized that a "contract does not have to impair a party's access to every potential customer to contravene *section 16600.* Because most businesses cannot succeed with only a handful of customers, a contract can effectively destroy a signatory's ability to conduct a trade or [**800] business by placing a substantial segment of the market off limits." (*Ibid.*) The agreement at issue in *General Commercial* did not violate *section 16600* because it allowed TPS to work for any firm with which it had a preexisting relationship, and limited TPS's access to only a "narrow segment" of the market. (126 F.3d at p. 1134.)

This line of reasoning was continued in *International Business Machines Corp. v. Bajorek (9th Cir. 1999) 191 F.3d 1033 (Bajorek)* and *Latona v. Aetna U.S. Healthcare Inc. (C.D.Cal. 1999) 82 F. Supp. 2d 1089.* In *Bajorek,* the agreement at issue required that an employee forfeit his stock option [***29] profits if he worked for a competitor within six months after leaving IBM. (*Bajorek, supra, at p. 1035.*) *Bajorek* concluded the provision excluded the employee from "one small corner of the market" because the restriction was limited only to competitors, for a six month period. Therefore, it did not violate *section 16600.* (*Bajorek, supra, at p. 1041.*) *Bajorek* mentioned *Muggill v. Reuben H. Donnelley Corp., supra, 62 Cal.2d 239, 243* in which [*620] our Supreme Court held *section 16600* invalidated a similar provision. *Bajorek* nonetheless concluded the issue was controlled by its own decisions in, inter alia, *General Commercial* and *Campbell. Latona* applied the narrow restraint standard, but concluded that the noncompetition agreement at issue was not narrowly drawn. (*Latona v. Aetna U.S. Healthcare Inc., supra, at pp. 1094-1095.*)

(5) We believe the Ninth Circuit's "narrow restraint" gloss on *section 16600* is a misapplication of California law when applied to an employee's noncompetition agreement. In our view, *section 16600* prohibits noncompetition agreements between employers and employees even where the restriction [***30] is narrowly drawn and leaves a substantial portion of the market available for the employee.

(6) When interpreting a statute, we " ' "follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law ... ." ' " (*Stephens v. County of Tulare (2006) 38 Cal.4th 793, 801 [43 Cal. Rptr. 3d 302, 134 P.3d 288].*) " 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.]" (*Fitch v. Select Products Co. (2005) 36 Cal.4th 812, 818 [31 Cal. Rptr. 3d 591, 115 P.3d 1233].*) Here, the statutory language is unambiguous, stating: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (*§ 16600.*) If the Legislature had intended *section 16600* to apply only to restraints which were unreasonable or overbroad, it could certainly have included language to that effect.

Nor do the analyses in *King v. Gerold, supra, 109 Cal. App. 2d 316,* and *Boughton v. Socony Mobil Oil Co., supra, 231 Cal. App. 2d 188,* [***31] the cases upon which the narrow restraint doctrine was originally based, provide persuasive support for it. While not expressly based upon the trade secret exception, *King v. Gerold* obviously falls within its reach; the appellant's transgression in that case was not simply manufacturing house trailers, but manufacturing trailers using a design substantially similar to the respondent inventor's. (*King v. Gerold, supra, at p. 318.*)

In *Boughton,* the restriction was not upon the plaintiff's practice of a profession or trade, but on the use of the *land,* a distinction which formed the crux of the court's holding. (*Boughton v. Socony Mobil Oil Co., supra, 231 Cal. App. 2d at p.* [**801] *190.*) As support for its alternative holding that a covenant not to compete is not invalid if the prohibition is only upon "a small or limited part of a business, trade or profession" (*id. at p. 192*), *Boughton* relied [*621] upon *King v. Gerold.* But, as noted, *King* does not stand for such a broad proposition. To the contrary, as applied to an employee's noncompetition agreement *Boughton's* analysis contradicts *Chamberlain v. Augustine, supra, 172 Cal. 285.* [***32] In *Chamberlin,* a foundry employee sold stock n5 and, as part of the sale agreement, covenanted not to become directly or indirectly interested in any similar foundry

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

business, except as a molder or laborer. (*Id. at pp. 286-287.*) The appellants contended the contract was not void under former Civil Code section 1673 (the predecessor to *section 16600*) because it permitted the defendant to work as a foundry laborer or molder. *Chamberlain* reasoned, "The obvious answer to this is the very language of *section 1673* ... ." (*Chamberlin, supra, at p. 288.*) "The statute makes no exception in favor of contracts only in partial restraint of trade." (*Id. at p. 289.*)

    n5 In 1916, when *Chamberlain* was decided, the statutory exception now embodied in *section 16601* applied only to the sale of a business, not a stock sale. It was amended in 1945 to apply when a shareholder sells or disposes of all his or her shares in a corporation. (See generally *Hill Medical Corp. v. Wycoff, supra,* 86 Cal.App.4th at pp. 902-903; *Bosley Medical Group v. Abramson, supra,* 161 Cal.App.3d at pp. 288-289.) The statute was amended in 2002 to substitute, inter alia, "ownership interest" for "shares."

[***33]

    (7) Further, "the presence of express exceptions ordinarily implies that additional exceptions are not contemplated. '[W]here exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed' unless a contrary legislative intent is evident. [Citation.]" (*People v. Standish (2006) 38 Cal.4th 858, 870 [43 Cal. Rptr. 3d 785, 135 P.3d 32];* *Rojas v. Superior Court (2004) 33 Cal.4th 407, 424 [15 Cal. Rptr. 3d 643, 92 P.3d 260].*) The Legislature has created three express statutory exceptions to *section 16600,* suggesting it did not intend to create a fourth implied exception for reasonable, partial, or narrow restraints. (*Kolani v. Gluska, supra,* 64 Cal.App.4th at p. 407 [the statutory exceptions contained in §§ 16601 and 16602 "reinforce the conclusion that covenants not to compete in contracts *other than* for sale of goodwill or dissolution of partnership are void"]; *Thompson v. Impaxx, Inc., supra,* 113 Cal.App.4th at p. 1428 [same].) The sole nonstatutory exception, for trade secrets, was originally rooted in equity. (*Empire Steam Laundry v. Lozier, supra,* 165 Cal. at pp. 100-102; *Morris v. Harris, supra,* 127 Cal. App. 2d at p. 478 [***34] ["Equity recognizes a fiduciary duty of an employee after leaving [an] employer's service not to take an unfair advantage of trade secrets and customers' lists."].) No such considerations apply to allow an employer--who is generally in a far superior bargaining position than a prospective or terminated employee--to impose restrictions on the employee's future livelihood. To the contrary, "public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by

negative covenants upon their part to the contrary, to follow any of the common occupations of life." (*Continental Car-Na-Var Corp. v. Moseley, supra,* 24 Cal.2d at p. 110.) " 'The interests of [*622] the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal [**802] act accompanying the employment change.' [Citation.]" (*Reeves v. Hanlon, supra,* 33 Cal.4th at p. 1151.)

    In fact, policy concerns strongly militate against adoption of the Ninth Circuit's approach. Under the narrow restraint doctrine, employers [***35] have an incentive to draft noncompetition agreements that push the envelope of the "narrowness" requirement. Noncompetition agreements burden a terminated employee with the task of guessing, at his or her peril, whether a court might find particular restrictions sufficiently narrow or overly broad. The question of whether a limited restriction falls within the narrow restraint rule will often be highly fact specific, depending upon the economics of particular industries and markets. It is not difficult to imagine situations in which making only a few clients off limits would greatly limit competition, whereas under different circumstances a much broader restriction could leave a substantial portion of the market open. Employees are likely to assume contractual terms proposed by their employer are legal and, in any event, will be reluctant to commit the energy and resources to challenging a noncompetition agreement in court. (See *Latona v. Aetna U.S. Healthcare Inc., supra,* 82 F. Supp. 2d at p. 1096; *D'Sa v. Playhut, Inc., supra,* 85 Cal.App.4th at p. 935 [" 'We foresee situations where the uninformed ... employee will forego legitimate [employment] [***36] rather than assume the risk of expensive, time-consuming litigation [by the former employer].' "]; *Baker Pacific Corp. v. Suttles (1990) 220 Cal. App. 3d 1148, 1155 [269 Cal. Rptr. 709].*) Perhaps most troubling, prospective future employers may be reluctant to hire an employee who has signed a questionable noncompetition agreement, in order to "avoid the expense and energy of defending a lawsuit in which they are likely to be joined. [Citations.]" (*Latona v. Aetna U.S. Healthcare Inc., supra, at pp. 1096-1097.*)

    Finally, if further support for rejection of the narrow restraint doctrine was necessary, it is found in the historical context surrounding enactment of former Civil Code section 1673, the precursor to current *section 16600. Wright v. Ryder (1868) 36 Cal. 342,* explained the common law rule as it stood a few years before enactment of former Civil Code section 1673. *Wright* explained that under the early English common law, as a matter of public policy, "all contracts were void which in any degree tended to the restraint of trade, even in a par-

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

ticular, circumscribed locality, either for a definite or unlimited period." [***37] (*Wright v. Ryder, supra, at p. 357.*) Later, after competition had become more robust, the stringent rule was relaxed; "[i]nstead of denouncing as void all contracts in restraint of trade, the rule, as relaxed, tolerated such as were restricted in their operations within reasonable limits." (*Ibid.*) Thus, prior to enactment of former Civil Code section 1673, [*623] " 'an agreement in *partial* restraint of trade, restricting it within certain reasonable limits or times, or confining it to particular persons, would, if founded upon a good and valuable consideration, be valid.' " (*Wright v. Ryder, supra, at p. 358.*)

(8) Four years later, the Legislature enacted former Civil Code sections 1673, 1674, and 1675, the precursors to *sections 16600, 16601,* and *16602.* The Code Commissioner's comment to former Civil Code section 1673 observed, "*Contracts in restraint of trade have been allowed by modern decisions to a very dangerous extent.*" (Italics added.) As an example, the Code Commissioner cited *Dunlop v. Gregory (1851) 10 N.Y. 241,* a New York case which had [**803] held a contract not to exercise a trade or carry on a business in a particular [***38] place might be upheld if it was "reasonable and useful," and the restraint was no larger than necessary for the protection of the covenantee. (*Id. at p. 244.*) The Code Commissioner's comments suggest the Legislature, in enacting former Civil Code section 1673, intended to apply a more stringent standard than that described by the *Wright v. Ryder* court. n6 The comments of the Code Commission are entitled to significant weight. (*Dieckmann v. Superior Court (1985) 175 Cal. App. 3d 345, 353 [220 Cal. Rptr. 602].*)

n6 California courts and commentators have made a variety of observations about the nature of the common law rule and the effect of enactment of former Civil Code sections 1673 through 1675, now *sections 16600 through 16602.* (See, e.g., *South Bay Radiology Medical Associates v. Asher, supra,* 220 Cal.App.3d at p. 1080 [§ *16600* embodies the common law prohibition against restraints on trade]; *Hill Medical Corp. v. Wycoff, supra,* 86 Cal.App.4th at pp. 900-901 [at common law restraints on the practice of a profession were valid if reasonable; California rejected the common law rule of reasonableness in 1872, upon enactment of former Civ. Code, § 1673]; *Bosley Medical Group v. Abramson, supra,* 161 Cal.App.3d at p. 288 [same]; *Vacco Industries, Inc. v. Van Den Berg (1992) 5 Cal.App.4th 34, 47-48 [6 Cal. Rptr. 2d 602]* [at common law, restraints against competition were valid to the extent they reasonably protected a

valid interest of the party in whose favor the restraint ran; §§ *16600* and *16601* are codifications of the common law]; *Centeno v. Roseville Community Hospital (1979) 107 Cal.App.3d 62, 68 [167 Cal. Rptr. 183]* [§ *16600* is basically a codification of the common law relating to contracts in restraint of trade]; *Monogram Industries, Inc. v. Sar Industries, Inc., supra,* 64 Cal.App.3d at p. 698 [§ *16601* is a codification of the rule of reasonableness in connection with the sale of a business]; *Kaplan v. Nalpak Corp. (1958) 158 Cal.App.2d 197, 200 [322 P.2d 226]* [at common law a contractual restriction upon competition was valid where it was incident to the sale of a business and reasonable in duration and territorial scope]; *Howard v. Babcock (1993) 6 Cal.4th 409, 416 [25 Cal. Rptr. 2d 80, 863 P.2d 150]* [common law "rule of reason" applies to evaluate noncompetition agreements under the § *16602* exception]; *Swenson v. File (1970) 3 Cal.3d 389, 396 [90 Cal. Rptr. 580, 475 P.2d 852]* [the § *16602* exception embodies the common law concept of reasonableness]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 579, pp. 634-635 [§ *16600* is basically a codification of the common law].) These authorities may easily be harmonized. As we have observed, the common law rule changed over time. (*Wright v. Ryder, supra, 36 Cal. at p. 357.*) Fairly read, the foregoing authorities suggest *section 16600* embodies the original, strict common law antipathy toward restraints of trade, while the *section 16601* and *16602* exceptions incorporated the later common law "rule of reasonableness" in instances where those exceptions apply.

We also observe that in the context of construing exclusivity contracts, courts have stated that *section 16600* and similar statutes should be construed " ' "In the light of reason and common sense" so as to uphold reasonable limited restrictions. [Citations.]' " (*Centeno v. Roseville Community Hospital, supra,* 107 Cal.App.3d at pp. 68-70 & fn. 2 [hospital contract to exclusively use one radiology group did not violate § *16600*]; *Keating v. Preston (1940) 42 Cal.App.2d 110, 122-123 [108 P.2d 479]* [lease providing for lessee's exclusive right to operate a restaurant in a hotel did not violate former Civ. Code, § 1673].) These cases did not involve employee noncompetition contracts and are not germane to our analysis. We express no opinion on the operation of *section 16600* outside the context of employee noncompetition agreements.

[***39] [*624]

(9) In sum, we conclude the "narrow restraint" doctrine is a misapplication of California law. Noncompetition agreements are invalid under *section 16600* even if narrowly drawn, unless they fall within the statutory or trade secret exceptions. Thus, the noncompetition agreement at issue here was invalid and violated California's public policy, unless, on remand, Andersen proves the trade secret exception applies. [**804]

(iv) *Requiring execution of the TONC as consideration for release from the noncompetition agreement violated public policy and constituted an independently wrongful act for purposes of the third element of Edwards's intentional interference claim.*

Having concluded the noncompetition agreement was invalid, we further hold Andersen's action of demanding execution of the TONC as consideration for release of the noncompetition agreement was an independently wrongful act for purposes of the third element of Edwards's intentional interference with prospective economic advantage claim. n7 We have previously held that an employer "cannot lawfully make the signing of an employment agreement, which contains an unenforceable covenant not to compete, a condition of continued employment [***40] ... . [A]n employer's termination of an employee who refuses to sign such an agreement constitutes a wrongful termination in violation of public policy." (*D'Sa v. Playhut, Inc., supra,* 85 Cal.App.4th at p. 929.) In *D'Sa,* the employer fired an employee because he refused to sign a confidentiality agreement that contained an illegal covenant not to compete. (*Id. at p.* 929.) We reasoned, "California law would protect plaintiff if defendants sought to overreach by trying [to] enforce the covenant not to compete, and California ... law will [*625] also protect him from a termination of his employment brought on by his refusal to sign an agreement containing the illegal covenant." (*Id. at pp.* 931-932.)

n7 Andersen argues that it did not require HSBC to insist on the TONC as a condition of hiring Edwards. Instead, Andersen posits, it was HSBC that insisted on releases from the noncompetition agreement before hiring Andersen personnel. Andersen may or may not be correct, but as we discuss further in the unpublished portion of the opinion, the answer to this question is one of disputed fact that could not have been, and was not, decided by the trial court in the procedural framework used below.

[***41]

Similarly, in *Baker Pacific Corp. v. Suttles, supra,* 220 Cal. App. 3d 1148, asbestos removal workers were required, as a condition of employment, to sign a document releasing the building owner from liability. Workers who refused to sign were denied employment. (*Id. at pp. 1150-1151.*) *Baker* held the release violated public policy in that it purported to exempt the employer from responsibility for fraud and intentional acts in contravention of *Civil Code section 1668.* n8 (*220 Cal.App.3d at p. 1154.*) Because the release violated *Civil Code section 1668* and public policy, requiring prospective workers to sign it as a condition of employment was contrary to law. (*220 Cal.App.3d at p. 1154.*)

n8 *Civil Code section 1668* provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[***42]

(10) Here, of course, Edwards was not terminated for refusing to sign a noncompetition agreement. Instead, he allegedly was required by Andersen, as a condition of his new employment with the purchaser of Andersen's Los Angeles tax practice, to execute a broad release of claims against Andersen as consideration for Andersen's release of the invalid noncompetition agreement. In essence, Andersen enforced the noncompetition agreement by demanding consideration for it. While the chain of events is more complicated and attenuated than in *D'Sa* and *Baker Pacific Corp.,* this circumstance makes no difference to our analysis. Those authorities [**805] stand for the proposition that conditioning employment on an employee's execution of a contract that violates public policy is against public policy. Using the invalid noncompetition agreement to coerce Edwards into forfeiting rights was no less wrongful than terminating an employee who refuses to sign such an agreement. To hold otherwise would be to elevate form over substance and ignore the practical realities of the situation.

Andersen argues that one clause of the noncompetition agreement was not and is not challenged, i.e., Edwards's agreement [***43] "not to solicit away from the Firm any of its professional personnel for eighteen months after release or resignation," (the "anti-raiding" provision). n9 (See generally *Loral Corp. v.* [*626] *Moyes, supra,* 174 Cal. App. 3d at p. 280 [anti-raiding provision was not invalid under *section 16600*].) Andersen's theory is that it was entitled to consideration for releasing Edwards from the anti-raiding provision, even if the noncompetition provisions were invalid; therefore

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

its insistence on the TONC was proper. Andersen points out that the trial court concluded "that while Andersen was out there trying to sell a portion of its businesses to folks, [the anti-raiding] provision still had some value. Not much, I don't know, but some." Andersen rhetorically asks, "Must Andersen have relinquished concededly valid rights in exchange for nothing from Edwards?"

n9 Andersen states that "other provisions" of the noncompetition agreement were admittedly lawful. However, the noncompetition agreement contained only two provisions in addition to the noncompetition clauses: the anti-raiding provision, and Edwards's agreement not to remove, retain, copy, or use Andersen's or clients' property or confidential, privileged, or proprietary information. The TONC did not purport to release Edwards from the latter provision. Therefore, the confidentiality provision does not figure into our analysis.

[***44]

(11) We are not entirely persuaded that the trial court's assumption about the value of the anti-raiding provision, made in an evidentiary vacuum, was correct. A contract is valid even if supported by insignificant consideration, and the giving up of a legal right may constitute sufficient consideration. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 205, 211, pp. 239-240, 246-247.) However, "[i]t is well settled that something which is completely worthless cannot constitute a valid consideration. [Citations.]" (*Grant v. Aerodraulics Co.* (1949) 91 Cal. App. 2d 68, 76 [204 P.2d 683]; see *Walters v. Calderon* (1972) 25 Cal. App. 3d 863, 874 [102 Cal. Rptr. 89]; 1 Witkin, *supra*, § 205, pp. 239-240.) Andersen was going out of business and selling off its practice groups. As it was ceasing operations, it is unclear whether the anti-raiding provision retained any value. (See generally *Cubic Corp. v. Marty* (1986) 185 Cal. App. 3d 438, 448 [229 Cal. Rptr. 828] [the adequacy of consideration is to be determined in light of the conditions existing at the time a contract is made].)

(12) But assuming for purposes of argument that the anti-raiding provision [***45] retained some minimal value at the relevant time period, Andersen's argument is nonetheless unpersuasive. Andersen's argument implicitly rests on the assumption that the invalid noncompetition provisions can be severed from the anti-raiding provision. We and other courts have rejected this approach. As we have explained, an employer cannot lawfully make an employee's signing of an employment agreement containing an unenforceable covenant not to com-

pete a condition of continued employment, "even if such agreement contains choice of law or severability provisions which would enable the employer to enforce the other provisions of the employment [**806] agreement." (*D'Sa v. Playhut, Inc., supra*, 85 Cal.App.4th at p. 929; see also *Latona v. Aetna U.S. Healthcare Inc., supra*, 82 F. Supp. 2d at p. 1097.)

Andersen argues this principle should not apply under the facts presented here, where the employee had already signed the agreement. However, such an approach ignores the realities of the situation. As we have observed, the anti-raiding provision had minimal value, given Andersen's rapid demise. Certainly HSBC, the purchaser of Andersen's Los Angeles tax practice, [***46] could [*627] have had no real interest in Andersen employees being released from the anti-raiding provision. That clause applied only to prevent a former Andersen employee from soliciting current *Andersen* employees, not HSBC employees. Yet, HSBC could, and allegedly did, have an interest in its prospective employees being released from the noncompetition provisions. By using the TONC as the instrument to release *both* the noncompetition and anti-raiding provisions, Andersen could ensure it would be able to insist on the TONC as a condition of the sale. Severing the noncompetition and anti-raiding provisions under these circumstances would not effectuate the public policy contained in *section 16600.*

In any event, Andersen never offered to release Edwards from the invalid provisions of the noncompetition agreement without consideration. Edwards was required to sign the TONC in order to free him from the noncompetition provisions, as well as the anti-raiding provision. Andersen cannot now be relieved of liability on the ground that if it had sought consideration for the anti-raiding provision only, Edwards would have no grounds to object. (Cf. *Latona v. Aetna U.S. Healthcare Inc., supra*, 82 F. Supp. 2d at p. 1097; [***47] *Thompson v. Impaxx, Inc., supra*, 113 Cal.App.4th at p. 1431.)

d. *Validity of the TONC's release and nondisparagement provisions.*

Edwards next contends that two provisions of the TONC violated California law, and requiring him to execute the TONC as a condition of his hire with HSBC was an independently wrongful act for purposes of the third element of his intentional interference with prospective economic advantage claim.

(i) *The TONC wrongfully required release of Edwards's statutory right to indemnity, in violation of public policy.*

As noted, the TONC contained a broad release in favor of Andersen. Subdivision (1)(d) of the TONC provided that Edwards released and discharged Andersen from "any and all actions, causes of action, claims, demands, debts, damages, costs, losses, penalties, attorneys' fees, obligations, judgments, expenses, compensation or liabilities of any nature whatsoever, in law or equity, whether known or unknown, contingent or otherwise, that Employee now has, may have ever had in the past or may have in the future against any of the Released Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, [***48] condition, harm, matter, cause or thing that has occurred from the beginning of time up to and including the date hereof, including, without limitation, claims that in any way arise from or out of, are based upon or relate to Employee's employment by, association with or compensation from [Andersen] or any of its affiliated firms, except [*628] for claims (i) arising out of [Andersen's] obligations set forth in this Agreement or (ii) for any accrued and unpaid salary or other employee benefit or compensation owing to Employee as of the date hereof."

The trial court concluded, "On the issue of the waiver of indemnity, the release is a [**807] typical broad release. It doesn't specifically anywhere request that [indemnity rights] be waived. And ... the Labor Code pretty much tells us that right can't be waived. As a matter of law, any provision in the release that attempts to waive it would be void, but I don't even think we have to reach it because I don't interpret the release to be requiring Mr. Edwards to give up his rights as a matter of law." Andersen argues that the trial court was correct, and the TONC did not purport to waive Edwards's indemnity rights.

*Discussion.*

(13) *Labor Code section 2802*, [***49] *subdivision (a)*, provides for an employee's right to indemnity. That subdivision reads: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." *Labor Code section 2802* "requires an employer to indemnify an employee for all expenses and losses incurred 'in direct consequence of the discharge of his duties.' " (*Jacobus v. Krambo Corp. (2000) 78 Cal.App.4th 1096, 1100 [93 Cal. Rptr. 2d 425]*; see also *Devereaux v. Latham &*

*Watkins (1995) 32 Cal.App.4th 1571, 1583 [38 Cal. Rptr. 2d 849]*; *Plancarte v. Guardsmark (2004) 118 Cal.App.4th 640, 647-648 [13 Cal. Rptr. 3d 315]*; *Grissom v. Vons Companies, Inc. (1991) 1 Cal.App.4th 52, 55 [1 Cal. Rptr. 2d 808].*)

*Labor Code section 2804* makes all contracts waiving the benefits of *Labor Code section 2802* null and void. (*Liberio v. Vidal (1966) 240 Cal. App. 2d 273, 276, fn. 1 [49 Cal. Rptr. 520]*; [***50] 1 Chin et al., Employment Litigation, *supra*, P 3:47, at p. 3-6.1.) It provides: "Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, is null and void, and this article shall not deprive any employee or his personal representative of any right or remedy to which he is entitled under the laws of this State."

(14) We respectfully disagree with the trial court's conclusion that the TONC's release did not waive Andersen's *Labor Code section 2802* indemnity rights. The plain language of the TONC clearly purports to do so. It covers "any and all actions, causes of action, claims, demands, debts, damages, costs, losses, penalties, attorneys' fees, obligations, judgments, [*629] expenses, compensation or liabilities of any nature whatsoever," whether "known or unknown," past, present, and future. It expressly applies to all "claims that in any way arise from or out of, are based upon or relate to Employee's employment." The provision did not expressly reference indemnity rights, but it did not have to: They were necessarily encompassed within the clear terms of the broad release. A broadly worded release [***51] covers all claims within the scope of the language, even if the particular claim is not expressly listed. (See *Bardin v. Lockheed Aeronautical Systems Co. (1999) 70 Cal.App.4th 494, 505 [82 Cal. Rptr. 2d 726].*) Indeed, *Labor Code section 2802* requires indemnification for "all necessary *expenditures or losses* incurred by the employee in direct consequence of the discharge of his or her duties" (italics added). Losses, costs, and expenses "of any nature whatsoever" are expressly listed in the release. It is difficult to imagine a theory under which indemnity rights would *not* be covered, given this broad language.

Nor does the provision except indemnity rights, as suggested by Andersen. The only items excepted were claims arising out of Andersen's obligations under the TONC, and for "any accrued and unpaid salary or other employee benefit or compensation owing to Employee as of the [**808] date hereof." An indemnity right simply cannot be characterized as accrued and unpaid salary. Indemnification does not fit neatly into the category of an employment benefit. (See generally *City and County of San Francisco v. Callanan (1985) 169 Cal. App. 3d 643, 648 [215 Cal. Rptr. 435]* [***52] ["A conventional definition of the colloquial phrase [fringe benefit] gener-

ally means 'an employment benefit (as a pension, a paid holiday, or health insurance) granted by an employer that involves a money cost without affecting basic wage rates.' [Citation.]") Assuming arguendo that indemnity was encompassed within "compensation," the exception was limited to compensation owing as of the date the TONC was executed, improperly excluding any future indemnity claims. (See *County of Riverside v. Loma Linda University (1981) 118 Cal. App. 3d 300, 315-316 [173 Cal. Rptr. 371]* ["A cause of action for indemnity does not accrue or come into existence until the indemnitee has suffered actual loss for which he is entitled to indemnity, either through payment of a court judgment or through settlement."]; *Lincoln v. Narom Development Co. (1970) 10 Cal. App. 3d 619, 627 [89 Cal. Rptr. 128].*) Further, as noted, the release expressly exempted two types of claims but did not contain a similar exception for indemnification, suggesting no additional exceptions were intended.

(15) It is axiomatic that *Labor Code sections 2802* and *2804* [***53] articulate the fundamental public policy of California. The "obvious purpose" of *Labor Code section 2802* is "to protect employees from suffering expenses in direct consequence of doing their jobs." (*Grissom v. Vons Companies, Inc., supra, 1 Cal.App.4th at pp. 59-60.*) *Labor Code section 2802* "shows a legislative intent that duty-related losses ultimately fall on the business enterprise, not on [*630] the individual employee." (*Janken v. GM Hughes Electronics (1996) 46 Cal.App.4th 55, 74, fn. 24 [53 Cal. Rptr. 2d 741].*) Numerous provisions of the Labor Code were established to protect workers and hence have a public purpose. (*Henry v. Amrol, Inc. (1990) 222 Cal.App.3d Supp. 1, 6 [272 Cal. Rptr. 134]*; cf. *Grier v. Alameda-Contra Costa Transit Dist. (1976) 55 Cal. App. 3d 325, 335 [127 Cal. Rptr. 525]* [full payment of wages is an important state policy enacted for the protection of employees generally].) Clearly, *Lab. Code, § 2802* inures to the benefit of the public generally, not merely to a particular employer or employee. (Cf. *Mannetter v. County of Marin (1976) 62 Cal. App. 3d 518, 525 [133 Cal. Rptr. 119]* [***54] [there is a strong public policy to indemnify employees for loss resulting from industrial injury]; *Sav-On Drug Stores, Inc. v. Superior Court (2004) 34 Cal.4th 319, 340 [17 Cal. Rptr. 3d 906, 96 P.3d 194] [Lab. Code, § 1194,* providing that an employee who agrees to work for less than the minimum wage may recover in a civil action, confirms a clear public policy for the benefit of workers]; *Fittante v. Palm Springs Motors, Inc. (2003) 105 Cal.App.4th 708, 715-716, 718 [129 Cal. Rptr. 2d 659] [Lab. Code, § 970,* prohibiting an employer from fraudulently inducing an employee to move to accept employment, was enacted to vindicate a public policy].) Likewise, *Labor Code section 2802*'s indemnity requirement inures to the public benefit.

(16) That *Labor Code section 2802* implements public policy is further demonstrated by *Labor Code section 2804,* which voids any agreement to waive the protections of *Labor Code section 2802.* "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a [***55] private agreement." (*Civ. Code, § 3513.*) By declaring a contract to waive the rights given by *Labor Code section 2802* void, the Legislature adopted a rule of public policy. (See generally [**809] *South Bay Radiology Medical Associates v. Asher, supra, 220 Cal. App. 3d at p. 1080.*) In short, *Labor Code sections 2802* and *2804* embody California's strong public policy favoring indemnification of employees for claims and liabilities arising from the employees' acts within the course and scope of their employment. (See 1 Chin et al., Employment Litigation, *supra,* P 3:1, at p. 3-1.) Because employee indemnity rights under *Labor Code section 2802* implement public policy and inure to the public benefit, forcing an employee to waive his or her statutory rights violates public policy. (Cf. *D'Sa v. Playhut, Inc., supra, 85 Cal.App.4th at p. 929; Baker Pacific Corp. v. Suttles, supra, 220 Cal. App. 3d at p. 1154.*)

According to Edwards's theory, he was prohibited by Andersen from obtaining employment with HSBC because he refused to sign [***56] the TONC. Andersen could not make Edwards's future employment contingent on his waiving his statutorily mandated indemnity rights. (See *D'Sa v. Playhut, Inc., supra, 85 Cal.App.4th at pp. 929-934* [an employer cannot lawfully make the signing of a contract that violates public policy a condition of continued [*631] employment]; *Baker Pacific Corp. v. Suttles, supra, 220 Cal. App. 3d at p. 1154* ["requiring prospective employees to sign an illegal agreement as a condition of employment is contrary to law"].) Accordingly, Edward's insistence upon the indemnity waiver as a condition of Edwards's future employment violated public policy and was an independently wrongful act for purposes of the third prong of Andersen's intentional interference with prospective economic advantage claim. n10

> n10 Edwards urges that Andersen's conduct constituted an independently wrongful act because it violated *Labor Code section 432.5.* We are unpersuaded. *Section 432.5* provides, "No employer, or agent, manager, superintendent, or officer thereof, shall require any employee or applicant for employment to agree, in writing, to any term or condition which is known by such employer, or agent, manager, superintendent, or officer thereof to be prohibited by law." Violation of *Labor Code section 432.5* is a misdemeanor. (*Lab. Code, § 433.*) Penal statutes are strictly

construed. (*Smith v. Superior Court (2006) 39 Cal.4th 77, 92 [45 Cal. Rptr. 3d 394, 137 P.3d 218]*; *People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 312-313 [58 Cal. Rptr. 2d 855, 926 P.2d 1042]*; *Wooten v. Superior Court (2001) 93 Cal.App.4th 422, 429 [113 Cal. Rptr. 2d 195]*.) *Labor Code section 432.5* is such a statute, in that violation is punishable by imprisonment in a county jail not exceeding six months, or a fine not exceeding $ 1,000, or both. (*Lab. Code, § 23.*) By its express terms, *Labor Code section 432.5* applies only where the term or condition is "prohibited by law." *Labor Code section 2804* makes a contract to waive indemnity rights "null and void." "Void" means "of no legal effect; null." (Black's Law Dictionary (8th ed. 2004) p. 1604.) "Prohibit" means "to forbid by law." (*Id.* at p. 1248.) *Labor Code section 2804* does not "forbid" a purported waiver of an employee's indemnity rights; it makes such a waiver void as against public policy. Thus, although we hold that conditioning employment on an employee's purported waiver of his or her *Labor Code section 2802* indemnity rights violates public policy and is a wrongful act, such a waiver is not "prohibited" within the narrow meaning of *Labor Code section 432.5*.

[***57]

Andersen contends the release clause was not wrongful because any waiver of Edwards's right to indemnification would have been ineffective as a matter of law. While Andersen is correct that a release of Edwards's indemnity rights would have been void, courts have rejected the view that requiring an employee to sign an ineffective agreement is not wrongful simply because the provision would not be enforced. (*Baker Pacific Corp. v. Suttles, supra, 220 Cal. App. 3d at p.* 1154 [finding argument "circular and unintelligible"].) As *Latona v. Aetna U.S. Healthcare Inc., supra, 82 F. Supp. 2d 1089* [**810] cogently explained in the context of noncompetition agreements, "defendant's argument, that the Agreement cannot violate public policy because ... it is simply a nullity, ignores the realities of the marketplace. As between [the employer] and an individual employee, the company is in an infinitely better position to acquaint itself with the applicable laws, and to know whether the non-compete clause violates *section 16600*. Employees, having no reason to familiarize themselves with the specifics of California's employment law, will tend to assume that the contractual [***58] terms proposed by their employer (especially one of Aetna's magnitude) are legal, if draconian. Furthermore, even if they strongly suspect that a non-compete clause is unenforceable, such employees will be reluctant to challenge the legality of

the contractual [*632] terms and risk the deployment of Aetna's considerable legal resources against them. Thus, the *in terrorem* effect of the Agreement will tend to secure employee compliance with its illegal terms in the vast majority of cases." (*Latona, supra, at p.* 1096; see also *Baker Pacific Corp. v. Suttles, supra, at p.* 1155 ["We cannot expect workers generally to be cognizant of judicial decisions concerning the interpretation of exculpatory provisions within releases. We reject the concept that a worker, compelled by economic necessity to secure employment, can be thus coerced into signing sweeping agreements exculpating various responsible entities" in the "uninformed hope the agreement will not be enforced by the courts."].)

*(ii) The TONC's nondisparagement provision did not violate Labor Code section 1102.5.*

Edwards next contends that the TONC's nondisparagement provision [***59] was likewise void as against public policy. Paragraph 1(c) of the TONC provided: "Employee shall not disparage [Andersen] or any of its affiliated firms or any of their respective present or former partners, managers or employees ('AA Party'); provided, however, that this Section 1(c) shall not prevent Employee from (i) responding to comments made by any AA Party about Employee if Employee reasonably believes such comments were disparaging to Employee or (ii) making statements about an AA Party in connection with the defense of a claim made against Employee by a third party." (Underscoring omitted.)

Edwards contends the nondisparagement clause violated *Labor Code section 1102.5*. That section, a whistleblower protection provision, provides, in pertinent part, "An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (*Lab. Code, § 1102.5,* [***60] *subd. (a).*) Subdivision (b) of the statute prohibits retaliation against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe the information discloses a violation of state or federal law.

The trial court concluded that the TONC's nondisparagement clause was not unlawful, in that it did not require any illegal conduct on Edwards's part, did not preclude him from responding to governmental inquiries, and did not preclude him from reporting crimes to the government.

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

Edwards contends the TONC's nondisparagement provision violated *Labor Code section 1102.5* because it would have chilled employee disclosures of wrongdoing by Andersen and would have precluded employees from reporting illegal conduct to the government. Therefore, he urges, Andersen's [*633] alleged conduct of requiring [**811] that he sign the TONC as a condition to his hire by HSBC amounted to an independently wrongful act for purposes of his intentional interference with prospective economic advantage claim. Andersen counters that such clauses are commonplace and innocuous, and cannot be construed to prevent an employee's cooperation [***61] with the government.

(17) As Andersen suggests, nondisparagement clauses appear to have become fairly common, both to protect employers and employees when an employment relationship ends. (See *E.E.O.C. v. Severn Trent Services, Inc.* (7th Cir. 2004) 358 F.3d 438, 440; *Cooper Tire & Rubber Co. v. Farese* (5th Cir. 2005) 423 F.3d 446, 457.) Certainly, we discern nothing inherently unlawful about a party generally agreeing not to disparage another.

On the other hand, to the extent a nondisparagement clause can be understood to prohibit truthful comments, it cannot hinder an employee's cooperation with government officials. For example, such an agreement cannot trump a subpoena. (*E.E.O.C. v. Severn Trent Services., Inc., supra,* 358 F.3d at pp. 442-443 [suits attempting enforcement of nondisparagement clauses as against government subpoenas would be "beyond frivolous; they would be obstructions of justice"].) Further, attempted enforcement of such an agreement to prevent employees from voluntarily approaching a government or law enforcement agency to report a violation of law as delineated in *Labor Code section 1102.5* [***62] would be against public policy. (See *Cooper Tire & Rubber Co. v. Farese, supra,* 423 F.3d at p. 457 ["Arguably, it would be against public policy for an employer to sue a former employee for violating a nondisparagement clause by disclosing the employer's illegal activities."].) *Labor Code section 1102.5* "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal. Rptr. 2d 16, 960 P.2d 1046]; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301-1302, fn. 1 [130 Cal. Rptr. 2d 347].) Indeed, an uncodified preamble to a 2003 amendment to *Labor Code section 1102.5* n11 provides, "The Legislature finds and declares that unlawful activities of private corporations may result in damages not only to the corporation and its shareholders and investors, but also to employees of the corporation and the public at large. The damages caused by unlawful activities may be prevented by the early detection of cor-

porate wrongdoing. The employees of a corporation are in a unique position to report corporate wrongdoing [***63] to an appropriate government or law enforcement agency. [P] The Legislature finds and declares that it is the public policy of the State of California to encourage [*634] employees to notify an appropriate government or law enforcement agency when they have reason to believe their employer is violating laws enacted for the protection of corporate shareholders, investors, employees, and the general public." (Stats. 2003, ch. 484, § 1; see generally *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925 [44 Cal. Rptr. 3d 223, 135 P.3d 637] [an uncodified section is part of the statutory law and may be used as an aid in construing a statute].)

n11 *Labor Code section 1102.5* was amended in 2003 "to add a number of whistle-blower-related provisions and additional penalties." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 329, fn. 5 [25 Cal. Rptr. 3d 320, 106 P.3d 976]; Stats. 2003, ch. 484, §§ 2, 7.)

(18) Despite the strong public policies which *Labor Code section 1102.5* [***64] was clearly meant to vindicate and the breadth of the nondisparagement provision at issue, we [**812] conclude *Labor Code section 1102.5* has no application here. This is not an action to enforce an overbroad, nondisparagement agreement, and there is no claim Edwards was retaliated against for disclosing information. By its plain language, *Labor Code section 1102.5* only prohibits an employer from making, adopting, or enforcing any "rule, regulation, or policy preventing an employee from disclosing information ... ." (*Lab. Code, § 1102.5, subd. (a)*.) The TONC provision cannot reasonably be described as a rule, regulation, or policy within the meaning of the statute. A "policy" is a " 'settled or definite course or method adopted and followed by a government, institution, body, or individual.' " (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 485-486 [171 P.2d 21] [construing identical "rule, regulation or policy" language contained in *Lab. Code, § 1101*].) A rule is defined as, inter alia, a "prescribed, suggested, or self-imposed guide for conduct or action: a regulation [***65] or principle" and "an accepted procedure, custom or habit having the force of a regulation." (Webster's 3d New Internat. Dict. (2002) p. 1986.) A "regulation" is "an authoritative rule or principle dealing with details of procedure." (*Id.* at p. 1913.)

In short, *Labor Code section 1102.5, subdivision (a)* clearly refers to workplace rules and regulations meant to govern employees' conduct. The TONC, on the other hand, was an instrument proposed at the end of Ed-

142 Cal. App. 4th 603, *; 47 Cal. Rptr. 3d 788, **;
2006 Cal. App. LEXIS 1320, ***; 25 I.E.R. Cas. (BNA) 29

wards's tenure with Andersen, and did not constitute a rule or policy governing his conduct as an Andersen employee. Therefore, by allegedly insisting Edwards sign the TONC as a condition of hire with HSBC, Andersen did not violate *Labor Code section 1102.5.* Inclusion of the nondisparagement provision in the TONC did not constitute an independently wrongful act for purposes of Edwards's intentional interference with prospective economic advantage claim.

1.e.-2.* [NOT CERTIFIED FOR PUBLICATION]

*See footnote, *ante,* page 603.

[*635]

DISPOSITION

The order sustaining, without leave to amend, Andersen's demurrer to the Cartwright Act cause of action is affirmed. The judgment in favor of Andersen is otherwise reversed, [***66] and the matter is remanded for further proceedings consistent with the opinions expressed herein. Each party shall bear its own costs on appeal.

Klein, P. J., and Croskey, J., concurred.