# In The Matter Of:

## THE SCO GROUP, INC., v. INTERNATIONAL BUSINESS MACHINES CORPORATION

### CHRISTOPHER SONTAG
*December 21, 2005*

## LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

SONTAG, CHRISTOPHER - Vol. I



LEGALINK
A WORDWAVE COMPANY

SCON0023082

CHRISTOPHER SONTAG

Page 13

1  THE WITNESS: Other than emails that may
2  have been made in conjunction with our legal counsel
3  that would therefore be privileged, I'm not sure that
4  there would be any other emails that would have been
5  sent or received by Mr. McBride that would have been
6  responsive to Topic 7.
7      Q.   BY MR. DRAKE: How about emails that you
8  yourself might have sent or received that would be
9  responsive to Topic 7?
10     A.   I don't believe I would have sent or had
11 received any emails responsive to Topic 7 that would
12 have not been subject to privilege, having been
13 communications with -- in conjunction with our legal
14 counsel.
15     Q.   Okay. Is it your testimony then that you
16 don't recall sending any emails to any of the
17 recipients of the letters that we'll talk about in a
18 moment that you -- these so-called intent to sue or
19 license letters?
20     MR. NORMAND: Objection to form.
21     THE WITNESS: We may very well have had
22 email communications with companies that were
23 recipients of the, you know, the -- what we call the
24 Global 1500 letter and also the Unix licensee letter.
25 However, in no case would any of those

Page 14

1  correspondence have really been around our intent to
2  sue any of those companies.
3      Q.   BY MR. DRAKE: What about correspondence?
4  Do you recall sending any correspondence to any of the
5  recipients of the Global 1500 letter or the UnixWare
6  license letter?
7      MR. NORMAND: Objection to form. Last
8  question had the same issue, are we talking -- when
9  you're saying "you" at this point do you mean
10 Mr. Sontag?
11     MR. DRAKE: I mean him personally at this
12 point and then I'm going to expand it to your
13 knowledge of anyone on behalf of SCO.
14     Q.   So my question was in your individual
15 capacity do you recall sending any correspondence to
16 any of the recipients of either the Global 1500 letter
17 or the UnixWare license letter?
18     A.   No.
19     Q.   And again, to your knowledge did anyone
20 on behalf of SCO send correspondence to those
21 recipients?
22     A.   Other than the letters themselves?
23     Q.   Yes, sir.
24     A.   I do not believe so.
25     Q.   So back to your original answer, it is

Page 15

1  your belief then that Exhibit 92 is a comprehensive
2  list with respect to documents that SCO contends are
3  responsive to Topic 7; is that correct?
4      MR. NORMAND: Objection to form.
5      THE WITNESS: Yes, inasmuch as -- I mean,
6  it was a fairly extensive effort to attempt to
7  identify all of these documents.
8      MR. DRAKE: Yes, and that's just what I'm
9  trying to explore and establish with you, so I
10 appreciate your answer.
11     (Exhibit 315 was marked for identification.)
12     Q.   BY MR. DRAKE: I'd like to show you what
13 we'll mark as Exhibit 315 and ask you to identify
14 that, please.
15     A.   This was a spreadsheet prepared regarding
16 Topic 7 that contains a list of companies who received
17 our, what we call Fortune -- or Global 1500 letter as
18 well as a letter we sent to our Unix licensees.
19     (Exhibit 314 was marked for identification.)
20     Q.   BY MR. DRAKE: Before discussing
21 Exhibit 315 in more detail let me show you what we've
22 marked as Exhibit 314 to your deposition and ask you
23 to identify that if you can, please.
24     A.   This appears to be an email from myself
25 to Joanie Bingham and Kathy Martens back in

Page 16

1  December 22nd of 2003.
2      Q.   And can you identify the attachment to
3  that email that is part of Exhibit 314?
4      A.   It appears to be a listing of customers
5  that would be on the Global 1500 list.
6      Q.   What was the purpose of compiling the
7  list of the so-called Global 1500 companies?
8      MR. NORMAND: Objection to form. Scope.
9  And object to the extent that the answer would reveal
10 any attorney-client communications or any attorney
11 work product.
12     THE WITNESS: Certainly we wanted to have
13 a database to be able to record any follow up
14 responses from any of those companies. And if we made
15 any follow on communications with those companies we'd
16 have a location to be able to record that
17 communication.
18     Q.   BY MR. DRAKE: What was the purpose of
19 compiling the list in the first place?
20     MR. NORMAND: Objection to form. Asked
21 and answered.
22     Q.   BY MR. DRAKE: I mean, apart from having
23 a place to record information, what was the purpose of
24 identifying these companies?
25     MR. NORMAND: Objection to form and

CHRISTOPHER SONTAG

Page 17

1  objection to the extent that it calls for
2  attorney-client privilege or attorney work product.
3       THE WITNESS: I really can't comment on
4  the reason why we -- we had prepared a list of large
5  companies that we felt it was important to send a
6  letter stating our, you know, understanding and -- and
7  wanted to make them aware of our concerns.
8       And so creating the Global 1500 list was
9  our mechanism to be able to put together a listing
10 that we could mail to what we felt were the largest
11 potential commercial users of -- of Linux who would
12 most likely have the greatest concern about issues
13 related to Linux and our possible intellectual
14 property issues.
15     Q.   When did SCO first decide to compile a
16 list of potential recipients of what came to be known
17 as the Global 1500 letter?
18     MR. NORMAND: Objection to form.
19     THE WITNESS: My best estimate of that
20 would be less than a month before we actually sent out
21 the Global 1500 letter.
22     Q.   BY MR. DRAKE: And who was involved,
23 apart from counsel, in putting together the list of
24 recipients for the Global 1500 letter?
25     A.   I don't think there was any real magic to

Page 18

1  the creation of the list. It was my understanding a,
2  you know, Fortune 1000 list of company names that were
3  easily obtained as well as a list of global companies
4  as well that were merged together which ultimately,
5  with some duplication, created a list of about 1500
6  largest companies worldwide.
7      Q.   And is that list in fact what ended up
8  being Exhibit 314?
9      MR. NORMAND: Objection to form.
10     THE WITNESS: Based on just a cursory --
11 cursory view of it it appears to be so.
12     Q.   BY MR. DRAKE: All right. And if I
13 understood your earlier answer, part of the intent was
14 to identify those companies who might be using Linux
15 in some significant manner; is that correct, or to
16 some significant extent, I should say?
17     MR. NORMAND: Objection to form.
18     THE WITNESS: I think our simple intent
19 was to make as many large commercial entities aware
20 that we felt there were issues related to intellectual
21 property in Linux and just to make them aware.
22     Q.   BY MR. DRAKE: Was there any attempt on
23 SCO's part to determine whether any of the companies
24 listed on Exhibit 314 were actually using Linux at the
25 time?

Page 19

1      MR. NORMAND: Objection to form.
2      THE WITNESS: Yes, I believe there was
3  some attempt made to identify users of Linux.
4      Q.   BY MR. DRAKE: And what was done in that
5  regard?
6      A.   I believe we had a number of our
7  salespeople take a look at public, you know, press
8  clippings or otherwise and help identify any public
9  press announcements or other types of statements from
10 any of these companies regarding their use of Linux,
11 and some of that was added to the information
12 regarding these companies.
13     MR. NORMAND: And I just want to object
14 to the scope of these line of questions. The topic,
15 as poorly drafted as it is, still relates only to
16 communications between SCO and any other person. IBM
17 defines SCO as including its employees, so I don't
18 think the topic covers communications within SCO
19 regarding these letters, but of course I'll let the
20 witness answer.
21     Q.   BY MR. DRAKE: What was the date that the
22 Global 1500 letter was sent out?
23     A.   Off the top of my head I don't remember.
24 I believe it was -- I think the date would be on here.
25 I believe it was December 23rd, 2003.

Page 20

1      Q.   Refer back to Exhibit 315, if you would,
2  please. And if I may let me just take a quick look at
3  it.
4      MR. NORMAND: Mr. Drake, do you want a
5  copy of that?
6      MR. DRAKE: I would love a copy. Thank
7  you.
8      Q.   Mr. Sontag, under Exhibit 315 in the
9  column "Company Name," is this intended to list the
10 name of each company that received the Global 1500
11 letter?
12     A.   Yes, I believe so.
13     Q.   And did all of the companies listed on
14 Exhibit 315 receive the same letter?
15     A.   Yes, I believe so.
16     Q.   And the two columns in the far right-hand
17 side of Exhibit 315 are labeled "Response 1" and
18 "Response 2" respectively. What is the column that's
19 labeled "Response 1" intended to signify?
20     A.   I believe it was intended to be a
21 repository for any initial response we received from
22 that particular company.
23     Q.   Okay. Would you turn to Page 3 of
24 Exhibit 315. In the column for "Advanced Integrated
25 Technologies, Inc.," in the column labeled

CHRISTOPHER SONTAG

Page 149

1  I'm not sure if you guys are on the same page as to
2  how that was answered.
3      If you want to read the question again
4  and think about your answer.
5      MR. DRAKE: Go ahead and read it back.
6      (The requested testimony was read back.)
7      THE WITNESS: I'll just add that I
8  believe we were -- my discussion with Mr. Campbell was
9  simply making him aware that we were going to be
10  announcing publicly a SCOsource program in the next
11  month, January of 2003.
12      We did not have any licensing program in
13  place at that time, so therefore it would have been
14  very difficult to discuss and negotiate that.
15      Q.  BY MR. DRAKE: Did SCO ever have
16  discussions with Hewlett-Packard about HP's obtaining
17  the SCOsource or intellectual property license?
18      A.  Yes.
19      Q.  When did those discussions begin?
20      A.  Beginning of June of 2003.
21      Q.  Do you know why Mr. McBride placed a call
22  to Carlton Fiorino on May 12th, 2003, as he had done
23  the same day to Mr. McNealy at Sun?
24      A.  The exact nature of that conversation,
25  since I was not involved in that call, but Mr. McBride

Page 150

1  occasionally picks up the phone and calls other CEOs
2  of public companies and other large commercial
3  organizations with the desire of making them aware of
4  things, talking to them about possible business
5  together, which I think likely was the nature of that
6  communication.
7      Q.  And you don't think it had anything to do
8  with the Global 1500 license; is that correct?
9      A.  I do not believe so, not specifically.
10      Q.  Did Hewlett-Packard ever obtain a
11  SCOsource, or intellectual property license from SCO?
12      A.  No.
13      Q.  Why not, if you know?
14      A.  We had negotiations regarding a SCOsource
15  license for use by Hewlett-Packard for their
16  customers, and we were unable to come to terms.
17      Q.  Did Hewlett-Packard ever express to SCO
18  why it chose not to obtain the license, or why they
19  wouldn't agree to your terms?
20      A.  No.
21      Q.  So you don't know if their reason was
22  money, principle, language of an agreement, or
23  anything of the above?
24      A.  Well, you're making the assumption that
25  it was Hewlett-Packard that made the decision not to

Page 151

1  enter into the license.
2      I believe the reason we didn't enter into
3  the license was because SCO determined it was not in
4  our business interest to make a -- enter into a
5  license with Hewlett-Packard.
6      Q.  So is it your testimony that
7  Hewlett-Packard was ready, willing, and able to enter
8  into an agreement, and SCO said no?
9      MR. NORMAND: Objection. Form.
10      A.  Yes.
11      Q.  BY MR. DRAKE: And the reason SCO
12  declined to enter into the agreement was what, again?
13      MR. NORMAND: You can answer to the
14  extent that it was business reasons.
15      A.  Ultimately it was financial amount, but
16  most of the reason why was due to legal concerns for
17  which I can't provide any more answer.
18      Q.  BY MR. DRAKE: You said business reasons,
19  Mr. Sontag; that's not legal. What were the business
20  reasons that SCO declined to enter into an agreement
21  with Hewlett-Packard?
22      A.  A financial amount we didn't deem to be
23  sufficient for the type of license Hewlett-Packard
24  sought.
25      Q.  What are we talking about? What are the

Page 152

1  numbers?
2      A.  It was on the order of -- 30 to 50
3  million dollars was going to be the size of the
4  license. We didn't believe that was enough.
5      Q.  Was that the price you demanded or was
6  that the price that Hewlett-Packard offered to pay?
7      MR. NORMAND: Objection to form.
8      A.  That was the price they offered.
9      Q.  BY MR. DRAKE: What price would SCO have
10  accepted?
11      MR. NORMAND: Objection, form. Objection
12  to the extent it calls for speculation. Objection to
13  scope.
14      THE WITNESS: Are you through?
15      MR. DRAKE: Come on.
16      THE WITNESS: I don't have anything more
17  I can add.
18      Q.  BY MR. DRAKE: Well, did SCO have a
19  number in mind or not? You said the deal fell apart
20  because you couldn't reach an agreement.
21      MR. NORMAND: Objection to form.
22      A.  I don't think we had a specific number in
23  mind.
24      Q.  BY MR. DRAKE: Is there any documentation
25  that exists of the negotiations between SCO and

CHRISTOPHER SONTAG

Page 173

1    Reporter's Certificate
2  State of Utah      )
   County of Salt Lake )
3
4        I, Ariel Mumma, Certified Shorthand
5  Reporter, Registered Professional Reporter, and Notary
6  Public for the State of Utah, do hereby certify:
7        THAT the foregoing proceedings were taken
8  before me at the time and place set forth herein; that
9  the witness was duly sworn to tell the truth, the
10 whole truth, and nothing but the truth; and that the
11 proceedings were taken down by me in shorthand and
12 thereafter transcribed into typewriting under my
13 direction and supervision;
14       THAT the foregoing pages contain a true
15 and correct transcription of my said shorthand notes
16 so taken.
17       IN WITNESS WHEREOF, I have subscribed my
18 name and affixed my seal this _____ day of
19 _____, 2005.
20
   
21         Notary Public
22
   My commission expires
23 November 15, 2009.
24
25

LEGALINK MANHATTAN
800-325-3376  www.legalink.com

44 (Page 173)

SCON0023124