## EXHIBIT A

## RESPONSE TO SCO'S STATEMENT OF FACTS

Novell submits the following response to SCO's "Statement of Facts" in its

Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim

for Slander of Title and Third Claim for Specific Performance, filed 5/18/07. Below are the

numbered paragraphs of SCO's Statement of Facts, followed by Novell's responses. As

discussed below, none of SCO's assertions create a disputed issue of material fact.

      1.      Novell and Santa Cruz intended for the APA to transfer all of the UNIX and
UnixWare business to Santa Cruz. Section 1.3(a)(i) of the APA states:

> It is the intent of parties hereto that <u>all of the Business</u> and all of
> Seller's backlog, if any, relating to the Business <u>be transferred to
> Buyer</u>.

(5/18/07 James Decl. Ex. 1 § 1.3(a)(i) (emphasis added).)

      *Novell's Response:* Does not create a disputed issue of material fact. No dispute that the

quoted language appears in section 1.3(a)(i) of the APA. SCO's first sentence, characterizing the

meaning of the quoted language, is without evidentiary support and is incorrect as a matter of

law. (*See* Memorandum in Support of Novell's Opposition to SCO's Motion for Partial

Summary Judgment on SCO's First, Second, and Fifth Causes of Action and for Summary

Judgment on Novell's First Counterclaim (Copyright Ownership), Exhibit A "Response to

SCO's Statement of Facts," filed 5/14/2007, PACER No. 295, incorporated herein by reference

("Novell's Response to SCO's MSJ Facts"), Response No. 1.)

      2.      The second provision of the APA, Recital B, memorialized the mutual
understanding that the APA transferred the assets and liabilities of the Business:

> The Board of Directors of each Seller and Buyer believe it is in the
> best interests of each company and their respective stockholders
> that Buyer acquire certain of the assets of, and assume certain of

1

the liabilities of Seller comprising the Business (the
"Acquisition").

(Id. at 1.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

quoted language appears in the APA.  SCO's characterization of the meaning of the quoted

language, however, is without evidentiary support and is incorrect as a matter of law.  (*See*

Novell's Response to SCO's MSJ Facts, Response No. 2.)

    3.      The first provision of the APA, Recital A as amended, defines the "Business" that
the parties intended to transfer:

> Seller is engaged in the business of developing a line of software
> products currently known as UNIX and UnixWare, the sale of
> binary and source code licenses to various versions of UNIX and
> UnixWare, the support of such products and the sale of other
> products ("Auxiliary Products") which are directly related to Unix
> and UnixWare (collectively, the "Business").

(Id. at 1.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

quoted language appears in the APA.  SCO's characterization of the meaning of the quoted

language, however, is without evidentiary support and is incorrect as a matter of law.  (*See*

Novell's Response to SCO's MSJ Facts, Response No. 2.)

    4.      Section 1.1(a) of the APA defines the assets transferred to Santa Cruz as those
identified in Schedule 1.1(a) of the APA:

> On the terms and subject to the conditions set forth in this
> Agreement, Seller will sell, convey, transfer, assign and deliver to
> Buyer and Buyer will purchase and acquire from Seller on the
> Closing Date (as defined in Section 1.7) <u>all of Seller's right, title,
> and interest in and to the assets and properties of Seller relating to
> the Business (collectively the "Assets")</u> identified on Schedule
> 1.1(a) hereto.  Notwithstanding the foregoing, the Assets to be so
> purchased shall not include those assets (the "Excluded Assets")
> set forth on Schedule 1.1(b).

(5/18/07 James Decl. Ex. 1 § 1.1(a) (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. No dispute that the quoted language appears in the APA. Novell has repeatedly noted that Section 1.1(a) provides, "Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the 'Excluded Assets') set forth on Schedule 1.1(b)." SCO apparently agrees as well. Thus, this key fact is undisputed.

SCO's characterization of the meaning of the quoted language, however, is without evidentiary support and is incorrect as a matter of law. (*See* Novell's Response to SCO's MSJ Facts, Response No. 3.)

5.    Schedule 1.1(a), in turn, identifies seven categories of "assets and properties of Seller" transferred to Santa Cruz, including:

> I.  <u>All rights and ownership of UNIX and UnixWare, including but not limited to</u> all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all appropriate technical, design, development, installation, operations and maintenance information concerning UNIX and UnixWare, <u>including source code</u>, source documentation, source listings and annotations, engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare, such assets to include <u>without limitation</u>: Source Code Products . . . Binary Product Releases . . . and Products Under Development.
>
> II.  <u>All of Seller's claims arising after the Closing Date</u> against any parties relating to any right, property or asset included in the Business.
>
> III.  All of Seller's rights pertaining to UNIX and UnixWare under any [assignable] software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertains to the . . . :
>
> VI.  All copies of UNIX and UnixWare, wherever located, owned by Seller.

(Id. Schedule 1.1(a), Items I-VI (emphasis added).)  The assets identified in Item I include source code products, binary products, and products in development.  (Id. Schedule 1.1(a), Item I.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

quoted language appears in the APA.  SCO's characterization of the meaning of the quoted

language, however, is without evidentiary support and is incorrect as a matter of law.  (*See*

Novell's Response to SCO's MSJ Facts, Response No. 4.)

6.    Through the APA Bill of Sale, executed on the Closing Date, Novell in fact transferred to Santa Cruz all of the Assets:

> In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets.

(5/18/07 James Decl. Ex. 3 (emphasis added))

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

quoted language appears in the APA.  SCO's characterization of the meaning of the quoted

language, however, is without evidentiary support and is incorrect as a matter of law.  (*See*

Novell's Response to SCO's MSJ Facts, Response No. 5.)

7.    Section 1.6 of the APA provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the "Licensed Technology").  (5/18/07 James Decl. Ex. 1 § 1.6.)  On the Closing Date, the parties signed a Technology License Agreement ("TLA") whereby Santa Cruz granted that license to Novell, subject to strict restrictions.  (5/18/07 James Decl. Ex. 4 § II.A.)  The TLA also specified that "Ownership of the Licensed Technology shall reside in SCO."  (Id. § III.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

TLA stated that Novell retained a license to the Licensed Technology, subject to certain

limitations specified therein, or that the TLA contained the quoted language regarding ownership

of Licensed Technology.  SCO's suggestion that the Licensed Technology encompassed UNIX

4

and UnixWare copyrights, however, is without evidentiary support and is incorrect as a matter of

law.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 6.)

      8.      Section VIII of the TLA, entitled "Entire Agreement," provides:

> This Agreement and the Asset Purchase Agreement constitute the
> entire understanding between the parties with respect to its subject
> matter, and supersede all prior understandings, both written and
> oral, between them relating to such subject matter.

(Id. § VIII.)

    *Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

quoted language appears in the TLA.

      9.      Schedule 1.1(b) identifies assets excluded from the transfer to Santa Cruz.  Item

V.A. identifies "All copyrights and trademarks, except for the trademarks UNIX and UnixWare."

    *Novell's Response:* This key fact is undisputed.  (*See* Novell's Response to SCO's MSJ

Facts, Response No. 7.)

      10.      Amendment No. 2 to the APA, however, revised Schedule 1.1(b) so that Item

V.A. now reads:

> All copyrights and trademarks, <u>except for the copyrights and
> trademarks owned by Novell as of the date of the Agreement
> required for SCO to exercise its rights with respect to the
> acquisition of UNIX and UnixWare technologies</u>.  However, in no
> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

(5/18/07 James Decl. Ex. 5 § A (emphasis added).)

    *Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

Amendment No. 2 replaced Item V.A of Schedule 1.1(b) with the quoted language as of the

October 16, 1996 effective date.  SCO's implication that Amendment No. 2's change was

retroactive, however, is without evidentiary support and is incorrect as a matter of law.  (*See*

Novell's Response to SCO's MSJ Facts, Response No. 8.)

11.     Robert Frankenberg was the President and CEO of Novell at the time of the APA. (5/18/07 James Decl. Ex. 7 at 7.)  Mr. Frankenberg decided in late 1994 or early 1995 to sell the UNIX and UnixWare business, in their entirety.  (Id. at 9:1-11:23.)  On February 10, 2007, Mr. Frankenberg has testified:

> Q.  Was your initial intent in the transaction that Novell would transfer copyrights to UNIX and UnixWare technology to Santa Cruz?
>
> A.  Yes.
>
> Q.  Was that your intent at the time when the APA was signed?
>
> A.  Yes.
>
> Q.  Was it your intent when that transaction closed?
>
> A.  Yes.
>
> Q.  And did that remain your intent, as you view it, at all relevant times?
>
> A.  Yes.
>
> Q.  So that never changed?
>
> A.  No.

(Id. at 135.)  Mr. Frankenberg never contradicted that testimony.

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 10.)

12.     Indeed, Mr. Frankenberg understood that the APA's sale of all rights and ownership included the copyrights:

> Q.  Is it your understanding that that sale of all rights and ownership of UNIX and UnixWare would include copyrights associated with UNIX and UnixWare?
>
> MR JACOBS: Objection, calls for a legal conclusion.
>
> A.  I guess I have to answer the question?

6

(By Mr. Singer)  Yes, you should if you understand the question.

A.  Okay. I understand.  Yes.

Q.  Now, did you ever give any directions to the team that was negotiating the deal, including Mr. Thompson, Mr. Chatlos, that they should transfer all right and title and interest to UNIX and UnixWare but retain copyrights for UNIX and UnixWare from being sold?

A.  No.

Q.  Did you ever tell anyone at Santa Cruz Operation that copyrights for UNIX and UnixWare were not part of the technology being sold?

A.  No.

Q.  Did you ever authorize anyone at Novell to tell anyone at Santa Cruz that copyrights were not being sold as part of the transaction?

A.  No.

(Id. at 19.)

   *Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 11.)

   13     Ty Mattingly was the Vice President for Strategic Relations at Novell at the time of the APA. (5/18/07 James Decl. Ex. 9 at 10-11.)  He also participated in the APA negotiations as Mr. Frankenberg's personal liaison with the Novell negotiating team.  (Id.)

   *Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

does not state that Mattingly was Frankenberg's personal liaison with the Novell team.

Moreover, Mattingly testified that his involvement in negotiations was limited to "high-level

business strategy" and that he did not have any involvement in crafting provisions of the APA.

(*See* Novell's Response to SCO's MSJ Facts, Response No. 12.)

14.     In the summer of 1995, Mr. Mattingly and the rest of the Novell deal team met with Santa Cruz representatives, including Jim Wilt and Geoff Seabrook, for a series of meetings lasting "probably a month and a half to two months." (Id. at 20:1-14.)  He "was very heavily involved" in the negotiation of the APA, "interfacing between Bob Frankenberg and the SCO team and participating in the meetings that we would have at times with Alok Mohan and Doug Michaels." (Id. at 22-23.)  Mr. Mattingly testified:

> Q.  Do you know whether in this case Novell is asserting that the copyrights were not transferred?
>
> A.  Well, I mean, I have read enough about the case early on. I haven't stayed real current lately.  But I mean, obviously we're here today because Novell is asserting that the copyrights were not sold with the Unix business to SCO, and obviously SCO would assert that they purchased the Unix business from us lock, stock and barrel.
>
> Q.  And do you have a view as to the merits of Novell's assertion, such as you understand it?
>
> A.  I do.
>
> Q.  And what is your view?
>
> A.  Well, my firm belief is that we sold the Unix business to SCO, and that is why SCO paid us roughly 125 million dollars at that point because they bought the Unix business from us basically in its entirety. The only things that did not go with that was a kind of an agent relationship whereby SCO was collecting the SVRX royalties from existing OEMs at the time we sold that business and then giving the bulk of those moneys back to Novell.
>
> *       *       *
>
> Q.  Would it be fair to say that the transfer of the Unix copyrights to SCO was consistent with your view of this overall strategy?
>
> MR. BRAKEBILL:  Objection, mischaracterizes testimony.
>
> A.  So I can still answer?  Yeah. I mean, absolutely.  I believe that when they bought the business, when they paid us 125 million dollars, that the negotiations that we were involved with there was about selling them the entire business, the software, which would have included the copyrights.

(Id. at 29-32 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. The cited testimony is inadmissible under the parol evidence rule and, in any event, lacks foundation. (*See* Novell's Response to SCO's MSJ Facts, Response No. 12.)

15.     Duff Thompson was the Novell executive responsible under Mr. Frankenberg's direction for the sale of the UNIX and UnixWare business. (5/18/07 James Decl. Ex. 10 ¶ 4.) After the transaction closed, Novell appointed Mr. Thompson to serve as its representative on the Santa Cruz Board of Directors. (5/18/07 James Decl. Ex. 10 ¶ 6.)

*Novell's Response:* Does not create a disputed issue of material fact. The cited testimony does not state that Thompson was <u>the</u> Novell executive responsible for the sale of the UNIX and UnixWare business. Moreover, Thompson testified that he had no involvement in drafting the APA or in any discussions concerning copyrights or excluded assets in the APA. (*See* Novell's Response to SCO's MSJ Facts, Response No. 13.)

16.     Novell's instructions to Mr. Thompson were clear: "sell everything, from Bob Frankenberg to me, and sell UnixWare. So sell UNIX, sell UnixWare." (5/18/07 James Decl. Ex. 11 at 24-25.) He formed the Novell deal team and was personally involved in face-to-face negotiations with Santa Cruz officials Alok Mohan, Steve Sabbath, Jim Wilt, Geoff Seabrook and Kim Madsen. (5/18/07 James Decl. Ex. 10 ¶ 5.) Mr. Thompson testified:

> Q. And a bundle of rights you believed included – looking back on it, you believed the structure of the deal meant that the bundle of rights included the copyrights?
>
> A. No. At the time I believe <u>it included the bundle of the copyrights,</u> at the time.
>
> Q. Well, I'm a little confused because I thought you said this morning that you don't recall any specific discussion about copyrights.
>
> A. Yeah, but that doesn't mean that that's not what I understood we were doing at the time.
>
> Q. So you –
>
> A. So the fact that I may not have had a specific discussion that I can recall 11 and a half years later should not be taken to mean I don't recall what our intention was in selling the business. It is

impossible for me to parse in my mind the assignment that we
received to sell the – to sell the entire business, all of Unix and
UnixWare to SCO, and to somehow also in that same breath say,
except the copyrights.

I just – I don't understand that kind of thinking, and certainly I just
have to tell you that that kind of trick play was not something that
Bob Frankenberg would have directed, nor is it something he
would have stood for.  It's not something I would have done.  If we
had intended not to transfer the copyrights, we would have been
very careful to say, you don't get the copyrights.  And it wouldn't
have been an oblique reference.  It would have been, you get all
the business except the copyrights.  Not, you get all the business.

(5/18/07 James Decl. Ex. 11 at 132-33 (emphasis added).)

     *Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 13.)

     17.    Ed Chatlos was the Novell Senior Director for UNIX Strategic Partnerships and
Business Development at the time of the APA.  (5/18/07 James Decl. Ex. 12 ¶ 4.)  He was also
Novell's lead negotiator of the APA.  (Id. ¶ 6.)  He was the primary negotiator during the
"detailed discussions" with Geoff Seabrook and Jim Wilt that resulted in the APA, and
"negotiated and structured" Amendment No. 1 to the APA.  (5/18/07 James Decl. Ex. 11 at 11-
13.)  Mr. Chatlos explains:

It was always my understanding and intent, on behalf of Novell,
that the UNIX source code and its copyrights were part of the
assets SCO purchased.  I do not recall anyone else ever suggesting
that Novell would retain any copyright relating to UNIX, nor was I
present for any discussion, general or specific, during the
negotiations that contradicted my understanding of the transaction
described herein.  None of my superiors at Novell ever informed
me that Novell was not transferring the UNIX copyrights to SCO.
Likewise, I never communicated to SCO in any way that the UNIX
copyrights were not being sold to SCO.  Nor am I aware of any
instance in which anyone from Novell ever informed SCO in any
way that the UNIX copyrights were not being sold to SCO as part
of the transaction.

Given my central role in the negotiations, I believe I would have
known if the parties had agreed that Novell would retain UNIX
copyrights.  My intent and understanding as the lead negotiator for

> <u>Novell was that Novell was transferring the copyrights to SCO in</u>
> <u>the APA.</u>  At the time the transaction was signed and closed, I did
> not observe anyone at Novell or SCO stating or acting as if Novell
> had retained any UNIX copyrights.  If they had, it would have been
> contrary to the intent and structure of the deal as I understood it
> and communicated with SCO.  In fact, <u>from the time the APA</u>
> <u>transaction closed in 1995 until this day, it has been my</u>
> <u>understanding and belief that Novell sold the UNIX copyrights to</u>
> <u>SCO as of the time of the closing in 1995.</u>

(5/18/07 James Decl. Ex. 12 ¶¶ 9-10 (emphasis added).)  In his recent deposition in this case, Mr. Chatlos confirmed his views regarding the transfer of the copyrights.  (5/18/07 James Decl. Ex. 13 at 37-39.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 14.)

18.     Burt Levine was an attorney at Novell at the time of the APA.  (5/18/07 James Decl. Ex. 14 at 15-23.)  Mr. Levine reviewed and revised drafts of the APA.  (<u>Id</u>. at 163-64.)  Mr. Levine drafted "some of the provisions of the APA" and reviewed and revised drafts of the APA (<u>Id</u>. at 56, 163-64).  After the Business was transitioned to Santa Cruz in February 1996, Mr. Levine worked as an attorney for Santa Cruz.  (<u>Id</u>. at 22-23.)  Mr. Levine testified that under the APA the "intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright."  (<u>Id</u>. at 68.)  He further testified:

> Q.  Mr. Levine, from the time of the APA in 1995 until you left
> Santa Cruz in 2000, did you ever hear anyone whether inside or
> outside of Santa Cruz or inside or outside of Novell say that Novell
> had retained the UNIX or UnixWare copyrights?
>
> A.  No.
>
> Q.  If you had heard anyone make such a statement, would that
> have been a surprise to you?
>
> A.  Very much so, yeah.
>
> Q.  And why do you say "very much so"?
>
> A.  My personal experience with the couple of years that I spent at
> Novell was that it was a very ethical company and I, I was very
> impressed with that.

Q.  And how does that fact bear on your answer, the fact that you had the view that Novell was an ethical company?

A.  Was ethical and I believe that being an ethical company in its dealings with its partners or transferees or whatever it is that they would not resort to withholding information or trying to withhold something that <u>the transferee in this case would be entitled to</u>.

(<u>Id</u>. at 154-55 (emphasis added).)

Q.  In looking at the first paragraph Roman I of Schedule 1.1(a) of the Asset Schedule, and that language says, quote, All rights and ownership of UNIX and UnixWare, including, but not limited to all versions of UNIX and UnixWare, and all copies of UNIX and UnixWare, including revisions and updates and progress, dot, dot, dot, including source code, dot, dot, dot, such assets to include without limitation the following, and then there's a list of source code products, binary product releases, products under development and other technology, do you see that language?

A.  I do.

Q.  How does that language bear on your understanding at the time of the APA and today that the UNIX copyrights and UnixWare copyrights were among the assets transferred under the APA?

A.  Do you mean the fact that these are listed specifically as categories?

Q.  I mean to ask you about the scope of Roman I.

A.  Oh, the scope of Roman I with or without this listing, all rights and ownership of UNIX and UnixWare, that gives all the components of the business, including physical components and intellectual components, to my mind <u>will carry with it the transfer of any copyrights that apply to them</u>.

(<u>Id</u>. at 156-58 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. The cited testimony is inadmissible under the parol evidence rule and, in any event, lacks foundation. (*See* Novell's Response to SCO's MSJ Facts, Response No. 15.)

19.     Bill Broderick was a contract manager in the UNIX licensing group at Novell and Santa Cruz. (5/18/07 James Decl. Ex. 15 ¶¶ 6-7.)  He was also a member of the Novell APA Transition Team.  (Id. ¶ 10.)  Mr. Broderick states:

> My understanding of the sale of the UNIX assets from Novell to Santa Cruz was that the UNIX copyrights were transferred.  To the best of my knowledge, from the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights.

(Id. at ¶ 7 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 16.)

20.     Mr. Broderick has testified that his understanding is based on (among other things) Novell's explanation of the transaction during "company-wide meetings" as well as discussion in the "contracts transition team," including discussion about "changing the copyright notices in the source code to Santa Cruz Operation, Inc."  (5/18/07 James Decl. Ex. 16 at 48-51.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 17.)

21.     Alok Mohan was CEO of Santa Cruz at the time of the APA.  (5/18/07 James Decl. Ex. 6 at 8.)  Mr. Mohan has testified in this case:

> TIIE WITNESS:
>
> A.  My belief is that we bought the business, except for the revenue stream.  And when we bought the business everything came with it.
>
> BY MR BRAKEBILL:
>
> Q.  You believe that Santa Cruz got the Unix copyrights to through the APA; is that right?
>
> A.  I believe –

MR. NORMAND: Objection to form.

THE WITNESS:

A.  <u>I believe I bought the whole business.  That includes all kinds of stuff.  And – and you know, that's the answer, I think we bought – we got the whole thing</u>.

BY MR. BRAKEBILL:

Q.  Okay.  But you haven't – you haven't confirmed – is – is part of the –

A.  Yes, they are –

Q.  Is Unix copyrights part of the Unix business?

A.  Absolutely.

Q.  Okay.  So you believe that Santa Cruz got the Unix copyrights?

A.  Santa —

MR NORMAND: Objection to form.

THE WITNESS:

A.  <u>Santa Cruz got the whole business.  Includes lots of things. Copyrights are part of it</u>.

*        *        *        *

Q.  What is the basis of your opinion that Santa Cruz got the business?

MR. NORMAND: Objection to form.

THE WITNESS:

A.  That – that's — <u>that was the whole discussion and intent, negotiations.  That's my recollection of what we were doing</u>.

(<u>Id</u>. at 138-40 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. The cited testimony is inadmissible under the parol evidence rule and, in any event, lacks foundation. (*See* Novell's Response to SCO's MSJ Facts, Response No. 18.)

22. Doug Michels founded Santa Cruz and was its Senior Vice President at the time of the APA. (5/18/07 James Decl. Ex. 177 ¶¶ 2-3.) He was "very involved" in the "initiation" of the APA, "the strategy behind it," and he "was very involved in the high level structure of the agreement," and "seas involved in supervising pretty directly the people who were negotiating the details of the agreement." (5/18/07 James Decl. Ex. 18 at 9.) He states:

> In connection with the 1995 purchase from Novell, the parties agreed that (as is accurately explained by both Mr. Wilt and Ms. Madsen) Novell could retain the existing binary royalty stream even though <u>the entire UNIX business, source code and related assets, including copyrights, were transferred to Santa Cruz</u>.

(<u>Id</u>. ¶ 9 (emphasis added).) Mr. Michels has repeatedly confirmed that the parties to the APA intended for Novell to transfer and for Santa Cruz to acquire the UNIX and UnixWare copyrights:

> Q. To the extent that you did, what did you mean by that?
>
> A. <u>Well, I meant that the only way that I know of, and anyone on my team knew of to buy a software business is to buy the copyrights, and there's no way we would have ever done a deal to buy a software business where we didn't get the copyrights</u> and all the other intellectual property. That's what you're buying. And especially in the case of UNIX, with its convoluted intellectual property history, and whatnot, to not get that stuff would be to not do the deal. And so it was implicit in everything we did, everything we thought <u>Every single person on my team understood that. The lawyers understood. The business development people understood it. The people at Novell understood it</u>.
>
> I mean, it — it's just so essential. It's – you know, it's like breathing oxygen, you know, I mean, you just — <u>there's no way that deal could have happened without getting the copyrights</u>.
>
>         *    *    *    *
>
> A. I know that <u>everybody involved in this negotiation knew the copyrights were being transferred</u>. I know that.
>
> Q. How do you know that?

A.  Because I was there and I know it.  That's -- I -- I know what --
I know there were discussions.  I know there was shared vision.  I
know we all understood what it meant to buy a software company.
You know, I've known these people for many years.  It -- it just
wasn't ambiguous.  It wasn't something that was ambiguous.

(5/18/07 James Decl. Ex. 18 at 134-38 (emphasis added))

*Novell's Response:*  Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 19.)

    23.    Jim Wilt was the lead negotiator for Santa Cruz.  (5/18/07 James Decl. Ex. 19
¶ 7.)  Mr. Wilt testified with respect to his declaration executed on November 23, 2004:

Q.  You say in paragraph 8, quote, "It was my understanding and
intent during those negotiations that SCO would acquire Novell's
entire UNIX and UnixWare business, including the copyrights.  I
do not recall and do not believe that there ever was any instance in
which anyone at SCO or Novell ever stated or exhibited any
contrary intent or understanding to me or anyone else."  Is that an
accurate statement?

A.  That's an accurate statement

Q.  You say in the back half of paragraph 9, quote, "It was my
intent on behalf of SCO to acquire, through the APA, Novell's
entire UNIX and UnixWare business, including the UNIX and
UnixWare source code and all associated copyrights, and I
believed then, open parens, as now, close parens, that Novell's
intent was to sell all of those assets and rights."  Is that an accurate
statement?

A.  Yes, that's an accurate statement.  You wouldn't have had a
business without having the copyrights and trademarks.

Q.  You say in paragraph 12, quote, "I do not recall anyone on
either side of the negotiations or transaction ever suggesting that
Novell would retain a copyright relating to UNIX or UnixWare.  I
am not aware of any discussions, whether general or specific,
during the negotiations that contradict my understanding of the
transaction as set forth in this declaration."  Is that an accurate
statement?

A.  That is an accurate statement.

(5/18/07 James Decl. Ex. 20 at 76-78.)  Independent of his previous declaration, moreover, Mr. Wilt repeatedly testified to the parties' intent under the APA was for Novell to transfer and Santa Cruz to acquire the UNIX and UnixWare copyrights.  (Id. at 28-29.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony

is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 20.)

24.    Kimberlee Madsen was a member of the Santa Cruz legal department at the time of the APA and Amendment No. 2 and assisted in the negotiations.  (5/18/07 James Decl. Ex. 21 ¶¶ 3-4.)  She "participated in meetings, negotiations, a review of the asset purchase agreement, and possibly preparation of some of the schedules."  (5/18/07 James Decl. Ex. 21 at 33:25-34:2.)  She explains:

> It was always my understanding that the UNIX source code and its copyrights were part of the assets Santa Cruz purchased and were transferred to Santa Cruz at the closing in December 1995.

> I do not recall anyone in the negotiation teams ever saying, or suggesting, that Novell would retain any UNIX copyrights.  The negotiation team for Santa Cruz never discussed the possibility, as far as I am aware, that Novell sought to retain any UNIX copyright.

> Since the transaction closed in 1995 until Novell publicly announced in 2003 that it still owned the UNIX copyrights, it was my understanding and belief that neither party disputed that Santa Cruz had acquired the UNIX copyrights in 1995.

> *            *            *            *

> My understanding from the negotiations and discussions leading up to the Amendment was that Amendment No. 2 was intended to confirm, among other things, the parties' intent and agreement that Santa Cruz had obtained ownership of the UNIX copyrights under the APA and that Novell had received no rights with respect to UNIX source code under the APA.

(Id. ¶¶ 9-11 (emphasis added).)  In her recent deposition in this case, Ms. Madsen confirmed that the parties' intent and understanding at the time of negotiations was that the APA transferred the copyrights to Santa Cruz.  (5/18/07 James Decl. Ex. 22 at 73-75, 81.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony is inadmissible under the parol evidence rule and, in any event, lacks foundation.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 21.)

25.    In his deposition, Novell General Counsel Joseph LaSala agreed that "it would be reasonable for someone to read the technology license agreement as inconsistent with a reading of the APA that the UNIX copyrights were retained by Novell."  (5/18/07 James Decl. Ex. 40 at 95.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony is inadmissible under the parol evidence rule, as SCO seeks to admit it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition, the cited testimony is inadmissible because LaSala lacks foundation to opine on the meaning of the APA or TLA.  LaSala was not involved in any way with the negotiation or drafting of the APA or the TLA.  (5/18 James Decl. Ex. 40 at 8:5-7 (noting that LaSala first read the APA in 2003).)

26.    The APA provided for the public disclosure of the transaction through a "joint press release with respect to the subject matter of this Agreement" (5/18/07 James Decl. Ex. 1 § 4.7.)  Novell and Santa Cruz issued that press release on September 20, 1995.  (5/18/07 James Decl. Ex. 6 at 222; Ex. 7 at 22-23.)  It states in pertinent part:

> According to the terms of the agreement, SCO will acquire
> Novell's UnixWare business and UNIX intellectual property.

(5/18/07 James Decl. Ex. 8 at 2.)  During his deposition, Mr. Frankenberg, Novell's CEO at the time of the APA, recognized the above-cited announcement as the "joint press release" contemplated by the APA and issued by the parties on September 20, 1995.  (5/18/07 James Decl. Ex. 7 at 22-23.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited testimony is inadmissible under the parol evidence rule.  Moreover, the cited testimony does not establish that the press release was joint or that the term "intellectual property" was intended to suggest

that all of Novell's intellectual property in UNIX and UnixWare, including patents and

copyrights, had transferred.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 9.)

27.    The investment-banking firm of Hambrecht & Quist represented Santa Cruz in the
APA transaction.  (5/18/07 James Decl. Ex. 85.)  In a presentation entitled "Project Sleigh Ride"
transmitted to Santa Cruz on the very date on the APA, Hambrecht & Quist stated with respect to
the APA:

> The agreement provides that Santa will obtain the IP for
> SleighRide, Sleigh Ride Ware in addition to all of its related
> products.

(5/18/07 James Decl. Ex. 85 at Recall 0005641.)

*Novell's Response:* Does not create a disputed issue of material fact.  The quoted

language is inadmissible under the parol evidence rule because SCO seeks to use it to contradict

the plain language of the APA, which excludes "all copyrights" from the transfer of assets.  The

quoted language is also inadmissible for lack of foundation.  SCO submits no evidence that

Hambrecht & Quist had any involvement in the negotiation of any particular provisions of the

APA, let alone the intellectual property provisions or the "all copyrights" exclusion.

Furthermore, SCO should not be permitted to rely on this document, given the

representations that it has made in discovery.  Novell asked SCO in an interrogatory to "state all

facts, evidence, and bases" in support of their allegation that the parties intended the APA to

transfer the copyrights.  (Second Supplemental Declaration of Kenneth Brakebill ("2nd Supp.

Brakebill Decl."), filed 5/25/07, Ex. 10, Interrogatory No. 9.)  SCO's response did not identify

this document.  (*Id.*, Response No. 9)  SCO should not be permitted to rely upon it now.

In any event, even if admissible, the quoted language does not create a disputed issue of

material fact.  "[T]he IP" cannot be intended to refer to <u>all</u> of Novell's intellectual property.

SCO has conceded that the parties did not intend to transfer the Excluded Assets in Schedule

1.1(b), which undisputedly contained the "all copyrights" exclusion.  *See* Opp'n at 9 ("Schedule

1.1(b) identifies assets excluded from the transfer to Santa Cruz."); SCO's Memorandum in

Opposition to Novell's Motion for Partial Summary Judgment on SCO's Noncompete Claim in

Its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition, filed 5/18/07,

PACER No. 301, at 38-39 ("The parties intended for Novell to sell and for Santa Cruz to acquire

'all of Seller's right, title and interest in and to the assets and properties of Seller relating to the

Business' identified on Schedule 1.1(a), excluding the 'Excluded Assets' in Schedule 1.1(b)."

(emphasis added).  Moreover, SCO's witnesses have also conceded that, pursuant to the

Excluded Assets schedule, patents did not transfer either.  (Declaration of Edward Normand in

Support of SCO's Motion for Summary Judgment, filed 4/9/07, PACER No. 260 ("Normand

Decl."), Exs. 27-28, Ex. 10 ¶ 9; Declaration of Kenneth W. Brakebill In Support of Novell's

Motions for Summary Judgment, PACER No. 284 ("Brakebill Decl."), Ex. 25, Levine Dep. at

146:22 to 149:9, 185:9-23.)

28.     During the negotiations, Novell and Santa Cruz used the code name "Project
Sleigh Ride" for the APA transaction.  (5/18/07 James Decl. Ex. 85.)  In keeping with the
metaphor, the parties also used the terms "Santa" for Santa Cruz and "SleighRide" for UNIX.
(5/18/07 James Decl. Ex. 85.)  Decoded, the Hambrecht & Quist presentation thus reads:

> The agreement provides that Santa Cruz will obtain the IP for
> UNIX, UnixWare in addition to all of its related products.

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons

explained in Response No. 27.  Moreover, nowhere does the cited evidence state that the code

names mean what SCO says.  SCO's "decoded" version of the quoted language is pure

speculation.

29.     In the Bill of Sale executed by the parties on the Closing Date, Novell stated that
it "does here by transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets."
(5/18/07 James Decl. Ex. 3 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the

Bill of Sale contains the quoted language.  To the extent SCO implies that UNIX and UnixWare

copyrights were included in the "Assets" transferred by the Bill of Sale, that point is without

evidentiary support and is incorrect as a matter of law.  (*See* Novell's Response to SCO's MSJ

Facts, Response No. 5.).  Copyrights and patents were undisputedly listed on the Excluded

Assets schedule, and SCO concedes that the parties did not intend to transfer items on that

schedule.  (*See* Response No. 27, *supra*.)

30.    With the execution of the Bill of Sale, Santa Cruz obtained physical possession of
UNIX copyright registrations from Novell, and those registrations remain in SCO's possession to
this day.  (See, e.g., 5/18/07 James Decl. Exs. 23-25.)

*Novell's Response:* Does not create a disputed issue of material fact.  That evidence is

inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.  Moreover,

even if admissible, this evidence is irrelevant.  Physical possession of a copyright registration is

legally irrelevant to ownership, and in any event, Novell took no affirmative action to send the

registrations to Santa Cruz.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 22.).

31.    Novell relies on a declaration of David Bradford, who was General Counsel for
Novell at that time.  Yet on October 4, 1995, a mere two weeks after the signing of the APA and
a few weeks before the Closing Date, Mr. Bradford certified a Notification and Report Form to
the Federal Trade Commission.  (5/18/07 James Decl. Ex. 84.)  In that Form, Novell stated:

> Novell, Inc., a Delaware corporation ("Novell"), and The Santa
> Cruz Operation, Inc. ("SCO") have entered into an Asset Purchase
> Agreement dated as of September 19, 1995, and attached hereto as
> Documentary Attachment I (the "Agreement"), whereby, as
> described herein, <u>SCO will acquire certain assets of, and assume
> certain liabilities of Novell, compromising Novell's business</u> of
> developing a line of software products currently known as UNIX
> and UnixWare, the sale of binary and source code licenses to
> various versions of Unix and UnixWare, the support of such

> products, and the sale of other products which are directly related
> to Unix and UnixWare (collectively, the "Business").

(Id. at NOV 000040747.)

*Novell's Response:* Does not create a disputed issue of material fact. That evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.

Furthermore, SCO should not be permitted to rely on this document, given the representations that it has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights. (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.) Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.) SCO did not identify this document in response to either interrogatory. (*Id.*, Response Nos. 9-10.) SCO should not be permitted to rely upon it now.

Moreover, even if admissible, that evidence is irrelevant. That document states only that Santa Cruz acquired "certain assets" comprising Novell's UNIX and UnixWare business. There is no suggestion that copyrights were included in those assets.

32.     In the section of the same Form entitled "Assets to be Acquired" and reserved "only for assets acquisitions," Novell stated:

> The Assets to be acquired by SCO are described with particularity
> in Schedule 1.1(a) of the Agreement.

(Id. at NOV 000040748.) The Form then lists the general categories of assets found in Schedule 1.1(a), including "All rights and ownership of UNIX and UnixWare" and "All of Novell's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business." (Id.)

*Novell's Response:* Does not create a disputed issue of material fact. That evidence is inadmissible for the same reasons as described above. (*See* Response No. 31.)

Moreover, the cited document supports Novell's position, not SCO's, so does not create a disputed issue of material fact. The document makes no mention of copyrights in listing the assets to be transferred, but specifically mentions "trademarks." In addition, the document refers the reader to Schedule 1.1(a), which omits any mention of copyrights in the section describing the "Intellectual Property" to be transferred. Section V of Schedule 1.1(a) stated:

"V. Intellectual Property — Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark)." (Brakebill Decl., Ex. 3, Section V.) Thus, the only "Intellectual Property" identified in the list of assets to be transferred were UNIX and UnixWare trademarks. Neither the "Intellectual Property" category, nor any other part of Schedule 1.1(a) identified copyrights in UNIX and UnixWare (or in any other product) as an asset to be transferred. (*Id.*) Moreover, Schedule 1.1(a) provides that "the Assets to be so purchased shall not include those assets (the 'Excluded Assets') set forth on Schedule 1.1(b)." (Brakebill Decl., Ex. 2, Section 1.1(a), Schedules 1.1(a), 1.1(b).) Copyrights were undisputedly listed on the Excluded Assets schedule, and SCO concedes that the parties did not intend to transfer items on the Excluded Assets schedule. (*See* Response No. 27, *supra.*)

33.     The APA provided that, as part of the transaction, Santa Cruz would license back to Novell the UNIX and UnixWare technology transferred under the APA (the "Licensed Technology"). (5/18/07 James Decl. Ex. 1 § 1.6.) On the Closing Date, the parties signed a Technology License Agreement ("TLA") that granted such a license back to Novell. (5/18/07 James Decl. Ex. 4 § II.A.)

The TLA imposed strict restrictions on Novell's use of the Licensed Technology, including the condition that Novell not use the technology in a general-purpose operating system

in competition with Santa Cruz.  (*Id*. § II.A.(2).)  The TLA also specified that "Ownership of the Licensed Technology shall reside in SCO."  (*Id*. § III.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that the TLA stated that Novell retained a license to the Licensed Technology, subject to certain limitations specified therein, or that the TLA contained the quoted language regarding ownership of Licensed Technology.  SCO's suggestion that the Licensed Technology encompassed UNIX and UnixWare copyrights, however, is without evidentiary support and is incorrect as a matter of law.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 6.)  Copyrights were undisputedly listed on the Excluded Assets schedule, and SCO concedes that the parties did not intend to transfer items on that schedule.  (*See* Response No. 27, *supra*.)

35.    In its 1996 Annual Report, Santa Cruz stated:

UNIX Business - In December 1995, the Company acquired certain assets related to the UNIX business including the core intellectual property from Novell.

(5/18/07 James Decl. Ex. 82 at Recall 0007279.)

*Novell's Response:* Does not create a disputed issue of material fact.  The quoted language is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.

Furthermore, SCO should not be permitted to rely on this document, given the representations that it has made in discovery.  Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of their allegation that the parties intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights."  (*Id.*, Interrogatory

No. 10.)  SCO did not identify this document in response to either interrogatory.  (*Id.*, Response

Nos. 9-10.)  SCO should not be permitted to rely upon it now.

Moreover, the quoted language is irrelevant.  To the extent that SCO suggests that the

"core intellectual property" must include all intellectual property owned by Novell in UNIX and

UnixWare, including copyrights and patents, that is clearly wrong.  Copyrights and patents were

undisputedly listed on the Excluded Assets schedule, and SCO concedes that the parties did not

intend to transfer items on that schedule.  (*See* Response No. 27, *supra*.)

36.     In December 1996, Novell engineers placed the Santa Cruz copyright notice on
Novell's pre-existing UNIX and UnixWare code.  (5/18/07 James Decl. Ex. 89.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited

declaration and its attached exhibits are inadmissible under the parol evidence rule, because SCO

seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from

the transfer of assets.

Furthermore, SCO should not be permitted to rely on this declaration or its exhibits,

given the representations that it has made in discovery.  Novell asked SCO in an interrogatory to

"state all facts, evidence, and bases" in support of its allegation that the parties intended the APA

to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also

requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct

evinced their understanding that the APA had transferred . . . the copyrights."  (*Id.*, Interrogatory

No. 10.)  SCO did not identify the declarant, Sandeep Gupta, as a knowledgeable witness in

response to either interrogatory.  (*Id.*, Response Nos. 5, 9-10; 2nd Supp. Brakebill Decl., Ex. 11.)

Nor did SCO identify the exhibits to Gupta's declaration as evidence upon which it planned to

rely.  Indeed, SCO has never produced the exhibits attached to Gupta's declaration, as shown by

the lack of any Bates label on the exhibits.  SCO should not be permitted to rely upon this evidence now.

In any event, the evidence cited does not support SCO's position and thus does not create a disputed issue of material fact.  The APA contemplated that Santa Cruz would create derivative works, including a "Merged Product" that was an enhanced version of Novell's UnixWare product.  (Brakebill Decl., Ex. 2, § 4.18; Brakebill Decl., Ex. 22; Braham Decl. ¶ 8.)  Thus, the transition team needed to change the copyright notices to reflect Santa Cruz's future ownership of a copyright in the derivative work to be created the following year in 1996 as well as Novell's continued ownership in the copyright to the original version of the UnixWare.  That is precisely what it did here.

The document to which SCO refers indicates that, in November 1995, the APA transition team <u>added</u> Santa Cruz to the copyright notices in the UnixWare code, while keeping Novell's copyright notice intact.  Thus, the copyright notices were changed to read:

> *(C) Copyright 1996 The Santa Cruz Operation, Inc.  All rights reserved.*
> *Copyright 1984-1995 Novell, Inc.  All rights reserved.*

(5/18/07 James Decl. Ex. 89.)  That form of notice was consistent with notices later used by SCO in its UnixWare Releases 2.1 and 2.1.3.  (Declaration of James McKenna in Support of Novell's Opposition, filed 5/14/07, PACER No. 293, ¶¶ 4-8.)  Such copyright notice indicated Novell's continued ownership of the copyright to the original UnixWare code and SCO's ownership only of the copyright to modifications to that code to be made the following year in 1996.

If Santa Cruz owned the copyright to both the original code and the derivative work, the copyright notice would not have mentioned Novell at all.  17 U.S.C. § 401(b)(3) (copyright notice "shall" list "the name of the owner of copyright").  The notice would have been in Santa

Cruz's name alone.  By contrast, where the publisher owns the derivative work, but not the

copyright to the original work, it is "the existing practice of many publishers to include earlier

copyright notices as well as a notice for the newly published derivative or collective work."  2-7

Nimmer on Copyright § 7.12[C][1].

37.    As illustrated in this section below, Novell's own statements during the transition
period reflected its belief that the APA provided for the transfer of the copyrights to Santa Cruz.

*Novell's Response:* Does not create a disputed issue of material fact.  No evidence is cited

in support of this proposition.

38.    Under Exhibit 5.1(c) to the APA, Novell agreed to "use its reasonable commercial
efforts to continue development of the Eiger product" which was the code name for UnixWare
2.1.  (5/18/07 James Decl. (Ex. 1; Ex. 31 § 2(b).)  In December, 1995, just a few days after the
Closing Date, Novell and Santa Cruz signed a Statement of Work ("SOW") summarizing
Novell's "work activities related to UnixWare 2.1" during the transition period.  In the SOW,
Novell reported:

> In addition to the changes approved by the [Product Change
> Board] throughout the development process, <u>the following changes
> have been made at the request of SCO</u>:
>
> - Licensing mechanism replaced with SCO licensing scheme
>   (see Attachment H) . . .
>
> - <u>SCO copyrights added to documentation and software</u>
>
> - SCO disclaimers added to printed documentation
>
> - <u>References to Novell in documentation removed</u> (except in
>   a small number of cases, such as screens and other
>   graphics, and references to Novell products)

(5/18/07 James Decl. Ex. 91 at NOV 000002539 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.

Furthermore, SCO should not be permitted to rely on this document, given the representations that it has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights. (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.) Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.) SCO did not identify this document in response to either interrogatory. (*Id.*, Response Nos. 9-10.) SCO should not be permitted to rely upon this document now.

In any event, the evidence cited does not support SCO's position because, as explained above, the <u>addition</u> of SCO to the copyright notices reflected Novell's continued ownership in the copyright in the original version of the APA and Santa Cruz's future ownership of a copyright in the derivative work to be created the following year in 1996. (*See* Response No. 37, *supra*.)

     39.

**REDACTED**

(5/18/07 James Decl. Ex. 92 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. The cited statement is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets. In addition, Jonas's statement is inadmissible for lack of foundation to the extent SCO attempts to use it to

demonstrate the intent of the APA.  SCO has submitted no evidence that Jonas was involved in any way in the negotiation or drafting of the contractual provisions of the APA.

Furthermore, SCO should not be permitted to rely on this document, given the representations that it has made in discovery.  Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.)  SCO did not identify this document in response to either interrogatory.  (*Id.*, Response Nos. 9-10.)  SCO should not be permitted to rely upon this document now.

Moreover, Jonas's statement is irrelevant.  Novell did not have a right to sell UnixWare because the Operating Agreement forbade it from doing so, not because Novell had transferred any copyrights.  The Operating Agreement, executed in connection with the APA and on the same day as the APA, provides:

> As of the Closing Date, SCO will begin to distribute, offer, promote and market UnixWare through existing UnixWare distributor and reseller channels as well as through SCO's existing reseller channels.  Novell will cease distributing all UnixWare product through its indirect channel and will also cease signing any new distribution agreements the day after the Closing Date, and will begin a migration of OEM and MLA/VLA/CLA UnixWare contracts to SCO to be completed by the end of the Transition Period.

(Brakebill Decl., Ex. 22, § 5(b)(i), at NOV 10144.)

40.

**REDACTED**

**REDACTED**

(5/18/07 James Decl. Ex. 93.)

     *Novell's Response:* Does not create a disputed issue of material fact.  The cited statement

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition,

Bouffard's statement has no foundation to the extent SCO attempts to use it to demonstrate the

intent of the APA.  Bouffard testified that                                         **REDACTED**

    **REDACTED**            (2nd Supp. Brakebill Decl., Ex. 12, Bouffard Dep. at 27:13-18.)

     Moreover, Bouffard's e-mail is irrelevant.  Novell was to cease selling UnixWare

because the Operating Agreement forbade it from doing so, not because Novell had transferred

any copyrights.  (*See* Response No. 39, *supra*.)  Also, to the extent that SCO seeks to interpret

Bouffard's e-mail as                                **REDACTED**                                that

is plainly incorrect as a matter of law.  Copyrights and patents were undisputedly listed on the

Excluded Assets schedule, and SCO concedes that the parties did not intend to transfer items on

that schedule.  (*See* Response No. 27, *supra*.)

    41.

**REDACTED**

                                   (5/18/07 James Decl. Ex. 94 at
SCO1299982.)

     *Novell's Response:* Does not create a disputed issue of material fact.  The cited statement

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition,

Ackerman's statement has no foundation to the extent SCO attempts to use it to demonstrate the intent of the APA.  SCO submits no evidence that Ackerman was involved in any way in the negotiation of the contractual provisions of the APA.

  Moreover, Ackerman's e-mail is irrelevant.  The cited exhibit indicates that

<strong>REDACTED</strong>

(5/18/07 James Decl. Ex. 94 at SCO 1299952.)  The exhibit notes that,

<strong>REDACTED</strong>

(<em>Id.</em>)

Novell's need for  **REDACTED**  had nothing to do with copyrights or copyright ownership.

  42.

<strong>REDACTED</strong>

(5/18/07 James Decl. Ex. 94 at

SCO1299952.)

  *Novell's Response:* Does not create a disputed issue of material fact.  The cited statement is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition, Jonas's statement has no foundation to the extent SCO attempts to use it to demonstrate the intent of the APA.  SCO submits no evidence that Jonas was involved in any way in the negotiation of the contractual provisions of the APA.

  Moreover, Jonas's e-mail is irrelevant.  Novell's need for  **REDACTED**

had nothing to do with copyrights or copyright ownership.  Jonas's e-mail specifically notes that    **REDACTED**

31

**REDACTED** (5/18/07)

James Decl. Ex. 94 at SCO 1299952.)

43.     Novell relies on the statements of Mike DeFazio in the IBM Litigation.  Yet, in January, 1996, a few weeks after Closing Date, Mr. DeFazio wrote a letter to Microsoft calling Santa Cruz "the owner" of the UNIX software.  (5/18/07 James Decl. Ex. 119.)  Mr. DeFazio also stated:

> As you may know, <u>Novell transferred to The Santa Cruz Operation, Inc. ("SCO") its existing ownership interest in UNIX</u> System-based offerings and related products as listed in Attachment A of this letter (collectively "Transferred Products").

(<u>Id</u>. at 1.)  In early 1996, Novell sent other letters containing those exact same statements to a number of other companies.  (<u>See, e.g.</u>, 5/18/07 James Decl. Exs. 110-112.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition, the statements in the letters have no foundation to the extent SCO attempts to use those statements to demonstrate the intent of the APA.  SCO submits no evidence that the authors of the letters were involved in any way in the negotiation of the contractual provisions of the APA.

Furthermore, SCO should not be permitted to rely on these letters, given the representations that SCO has made in discovery.  Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.)  SCO did not identify these letters in response to either interrogatory.  (*Id.*, Response Nos. 9-10.)  SCO should not be permitted to rely upon these letters now.

In any event, the letters do not help SCO create any disputed issue of material fact.  The

letters simply state that Novell transferred "its existing ownership interest" in "UNIX System-

based offerings and related products."  That states only that Novell transferred its ownership of

<u>products</u>, not of any intellectual property.  Nowhere do the letters state that Novell transferred

copyrights.  Moreover, SCO's interpretation — that Novell somehow meant that it was

transferring <u>all</u> of its intellectual property in UNIX under the APA — cannot be correct.

Copyrights and patents were undisputedly listed on the Excluded Assets schedule, and SCO

concedes that the parties did not intend to transfer items on that schedule.  (*See* Response No. 27,

*supra*.)

    44.

**REDACTED**

(5/18/07 James Decl. Ex. 99 at 1 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition,

Mohan's letter lacks foundation to the extent SCO attempts to use it to demonstrate the intent of

the intellectual property provisions of the APA.  Mohan testified that he was involved in

negotiating the APA only at a very "high level" and was not involved in the drafting of any provisions, let alone the "all copyrights" exclusion.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 18.)

    In any event, Mohan's letter is irrelevant.  Although Mohan states that    **REDACTED**

    **REDACTED**    Mohan nowhere states that this is because SCO owns the copyrights to the UNIX source code.  Rather, Mohan states that

**REDACTED**

    (5/18/07 James Decl. Ex. 99, at 1.)

    45.
**REDACTED**

    (5/18/07 James Decl. Ex. 100.)    **REDACTED**
**REDACTED**
(5/18/07 James Decl. Exs. 95-101.)

    *Novell's Response:*  Does not create a disputed issue of material fact.  The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition, Frankenberg lacks foundation to opine on the intent of the intellectual property provisions of the APA, as he had no involvement in drafting or negotiating those provisions.  (*See* Novell's Response to SCO's MSJ Facts, Response No. 18.)

    In any event, Frankenberg's letters are irrelevant.  SCO argues that Frankenberg should have asserted copyright ownership in his letters.  But he had no reason to do that.  Novell's position was that it had the right to modify IBM's license to grant IBM a buyout pursuant to section 4.16(b) of the APA, which required Santa Cruz to "amend, supplement, modify, or waive

any right under . . .  any SVRX License to the extent so directed in any manner or respect" by

Novell.  (Brakebill Decl., Ex. 2, § 4.16(b).)  Santa Cruz's response was that

**REDACTED**

(5/18/07 James Decl. Ex. 99, at 1.)

That disagreement had nothing to do with copyright ownership, so Novell had no reason to raise

that issue.

       46.      Instead, on October 16, 1996, Novell and Santa Cruz jointly granted IBM a
buyout through Amendment No. X, which expressly replaced the April 1996 agreement between
Novell and IBM.  (5/18/07 James Decl. Ex. 102.)  On the same date, Novell and Santa Cruz also
executed Amendment No. 2 to the APA and        **REDACTED**        (5/18/07
James Decl. Exs. 5, 30.)         **REDACTED**
        **REDACTED**        (5/18/07 James
Decl. Ex. 30 at SCO1579207; Ex. 102.)

    *Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.

    In addition, SCO has no evidentiary support for the statement that

**REDACTED**

(5/18/07 James Decl. Ex. 30.)  In any event, the Federal Rule of

Evidence 408 bars SCO's attempt to

**REDACTED**

35

Furthermore, SCO should not be permitted to rely on the    REDACTED

REDACTED  given the representations that it has made in discovery.  Novell asked SCO in an

interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties

intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory

No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties'

"course of conduct evinced their understanding that the APA had transferred . . . the copyrights."

(*Id.*, Interrogatory No. 10.)  SCO did not identify this document in response to either

interrogatory.  (*Id.*, Response Nos. 9-10.)  SCO should not be permitted to rely upon this

document now.

In any event, even if the **REDACTED** were admissible to demonstrate the **REDACTED**

**REDACTED** the **REDACTED** is still irrelevant to the issue of copyright ownership.

**REDACTED** was an issue of the proper interpretation of sections 4.16(b) and (c) of the APA.

(*See* Response No. 45, *supra*.)  Copyright ownership was not at issue.

47.    As part of the APA transaction, Novell received a 17% interest in Santa Cruz
stock, as well as a seat on the Santa Cruz Board of Directors.  (5/18/07 James Decl. Ex. 1.)
Novell appointed the senior executive responsible for the APA transaction, Duff Thompson, to
serve on the Santa Cruz Board.  (5/18/07 James Decl. Ex. 11 at 6.)  As Novell's representative,
Mr. Thompson regularly reported back to Novell about developments at Santa Cruz.  (Id.)

*Novell's Response:* Does not create a disputed issue of material fact.  No dispute that

Novell received an interest in Santa Cruz and a seat on Santa Cruz's board, or that Thompson

was appointed to that seat.  SCO, however, has no evidentiary support for the claim that

Thompson reported back on developments where Novell's interests were at issue or were in

conflict with SCO's.  Thompson testified that he would "recuse" himself "whenever some . . .

Novell issues were discussed at the SCO board."  (5/18/07 James Decl. Ex. 11 at 21:8-23.)

48.     As early as September, 1996, just weeks before Novell and Santa Cruz executed Amendment No. 2 to the APA, Santa Cruz challenged certain anticompetitive provisions in a 1987 agreement between AT&T and Microsoft (the "1987 MS Agreement") that were binding on Santa Cruz as AT&T's successor to UNIX (5/18/07 James Decl. Ex. 103.)  In a letter to the Antitrust Division of the United States Justice Department dated September 19, 1996, Santa Cruz stated:

> As a result of the chain of transactions described below, <u>SCO has now acquired ownership of the UNIX program itself</u>.  In November 1989, AT&T, the original developer of the UNIX Operating System, spun off the UNIX division as a separate company then known as UNIX System Laboratories, Inc. ("USL"). In June 1993, Novell, the vendor of the NetWare Operating System, acquired USL and hence became the owner of the UNIX program.  <u>In turn, in December 1995, Novell sold the ownership of UNIX to SCO.  As a result, SCO now enjoys the right, as the owner of the UNIX program, to exploit that program without the necessity of a license from any other party</u>.

(5/18/07 James Decl. Ex. 103 at 3.)  Santa Cruz also stated in the letter that "SCO acquired the rights to UnixWare in a recent transaction with the original developer of the program, Novell." (<u>Id</u>. at 2.)

*Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets.

In addition, to the extent that SCO seeks to use this evidence to argue that Amendment No. 2 effectuated a transfer of copyrights, the evidence is not relevant.  The Copyright Act requires a written instrument of conveyance to transfer copyright ownership, and Amendment No. 2 does not satisfy that requirement.  (Novell's Reply in Support of Its Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance ("Reply Br."), filed 5/25/07, at 9-11.)  Evidence of intention, whether through testimonial evidence or subsequent course of conduct, does not allow a party to bypass the Copyright Act's requirement of a written conveyance.  (*Id.* at 13-14.)

Furthermore, SCO should not be permitted to rely on Santa Cruz's letter to the Department of Justice, given the representations that SCO has made in discovery.  Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights."  (*Id.*, Interrogatory No. 10.)  SCO did not identify this document in response to either interrogatory.  (*Id.*, Response Nos. 9-10.)  SCO should not be permitted to rely upon this document now.

In any event, Santa Cruz's letter is irrelevant to the issue of copyright ownership.  Santa Cruz submits no evidence that Novell knew of its letter, let alone had any kind of obligation to object to the letter.  Moreover, Novell would have had no reason to object to Santa Cruz's letter. The letter does not state that Santa Cruz obtained ownership of the copyrights.  It states that Santa Cruz obtained ownership of the "UNIX program itself."  That is entirely consistent with Novell's interpretation of the APA.  The UNIX source code itself was included as part of the Included Assets in Schedule 1.1(a) and was not excluded from the transfer in Schedule 1.1(b). (Brakebill Decl., Ex. 2, Schedules 1.1(a) and 1.1(b).)  By contrast, copyrights were not included and were expressly excluded from the transfer of assets.  (*Id.*)  The letter also states that Santa Cruz does not require a license from "any other party" to exploit UNIX.  That too is entirely consistent with Novell's position, which is that the APA provided Santa Cruz the inherent right to exploit UNIX as contemplated by the APA.

49.     On January 31, 1997, less than three months after date of Amendment No. 2, Santa Cruz filed an Application with the European Commission (the "EU Complaint") requesting a finding that the 1987 MS Agreement violated the Rome Treaty.  (5/18/07 James

Decl. Ex. 32.)  In the EU Complaint, Santa Cruz reiterated and expanded upon its statements to the Justice Department:

> 3.4    As a result of the chain of transactions described below, <u>SCO has now acquired ownership of the UNIX program itself so that it no longer requires a license from anyone to produce UNIX products</u>.  In November 1989, AT&T, the original developer of the UNIX Operating System, had spun off the UNIX division as a separate company then known as UNIX System Laboratories, Inc. ("USL").  In June 1993, Novell, the vendor of the NetWare Operating System, acquired USL and hence became the owner of the UNIX program.  <u>In turn, in December 1995, Novell sold the ownership of UNIX to SCO.  As a result, SCO now enjoys the right, as the owner of the UNIX program, to exploit that program without the necessity of a license from any other party</u>.  In particular, if SCO chooses to develop products based on UNIX, without any lines of Microsoft developed code, SCO will not have further need to license such products under the 1988 Agreement with Microsoft or pay royalties, thereunder, to Microsoft.
>
> *       *       *
>
> 4.9    Microsoft's 1988 Agreement with SCO does not affect the issues concerning the anticompetitive restraints created by the 1987 MS Agreement.  <u>Because it has acquired ownership of the copyright to UNIX from AT&T, SCO should be free to develop new UNIX based works without the necessity of a license from anybody.</u>  The 1988 license between Microsoft and SCO is no longer commercially viable as a basis for SCO to develop new UNIX products since paying a royalty in Microsoft to obtain UNIX rights free of development restraints is, in effect, a double payment:  <u>SCO owns UNIX, has paid for such ownership</u> and would be placed at a competitive disadvantage were it to nonetheless proceed under a royalty bearing license that it does not need.

(<u>Id</u>. §§ 3.4, 4.9 (emphasis added).)

    *Novell's Response:* Does not create a disputed issue of material fact.  The cited evidence

is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain

language of the APA, which excludes "all copyrights" from the transfer of assets.  In addition, to

the extent that SCO seeks to use this evidence to argue that Amendment No. 2 effectuated a transfer of copyrights, the evidence is not relevant. (*See* Response No. 48, *supra*.)

Furthermore, SCO should not be permitted to rely on Santa Cruz's complaint to the EU, given the representations that SCO has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights. (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.) Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.) SCO did not identify this document in response to either interrogatory. (*Id.*, Response Nos. 9-10.) SCO should not be permitted to rely upon this document now.

In any event, the quoted language in Santa Cruz's EU complaint is irrelevant to the issue of copyright ownership, for the same reasons as applied to Santa Cruz's letter to the Department of Justice. (*See* Response No. 48, *supra*.)

50.    In the EU Complaint, Santa Cruz also repeatedly referred to itself as "the copyright owner of UNIX." (See, e.g., id. § 8.1.)

*Novell's Response:* Does not create a disputed issue of material fact. Santa Cruz's EU complaint is inadmissible for the reasons described above. (*See* Response No. 49, *supra*.) Moreover, Santa Cruz's claim that it referred to itself as the copyright owner of UNIX is without evidentiary support. In fact, the only reference to copyright ownership in the cited section of Santa Cruz's complaint is the following statement:

> SCO submits that the 1987 MS Agreement infringes Article 85(1) in three ways: (i) it requires the copyright owner of UNIX, which is one of only two viable competitors to Microsoft's products to include unwanted and unnecessary code and facilities in new versions of UNIX . . . , (ii) it forces the copyright owner of UNIX

> to pay royalties for the foregoing unwanted, unnecessary and
> undesirable code and facilities . . . .

Nothing in that statement indicates that <u>Santa Cruz</u> is the copyright owner of UNIX. Indeed, that statement suggests the opposite, as Santa Cruz refers to the "copyright owner of UNIX" in the third person rather than the first person.

51.    Santa Cruz's antitrust action against Microsoft received wide publicity in the industry. (<u>See, e.g.</u>, 5/18/07 James Decl. Exs. 116-18.)

*Novell's Response:* Does not create a disputed issue of material fact. Santa Cruz's "evidence" concerning its EU complaint is inadmissible for the reasons described above. (*See* Response No. 49, *supra*.) Moreover, none of the publicity at issue contained any statements regarding any purported copyright ownership of UNIX or UnixWare by Santa Cruz. Novell had no reason (as well as no obligation) to object to Santa Cruz's actions.

52.    Despite the public nature of the action, and even though Novell had a representative on the Santa Cruz Board who reported back to Novell on developments at Santa Cruz, there is no evidence that Novell ever objected to Santa Cruz's position regarding the ownership of UNIX and its copyrights.

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response Nos. 47-51.)

53.    More obviously, the provisions of the 1987 MS Agreement which Santa Cruz deemed anticompetitive applied only to the owner of the UNIX copyrights. (5/18/07 James Decl. Ex. 32.) Had Novell believed in 1996-97 that it owned the copyrights, then Novell, and not Santa Cruz, would have the interest and standing to complain to the antitrust authorities. Indeed, in 1994, when Novell <u>did</u> own the copyrights, it complained internally about anticompetitive provisions of the 1987 MS Agreement and contemplated bringing its own antitrust action. (5/18/07 James Decl. Ex. 83.) There is no evidence that Novell was ever concerned about the 1987 MS Agreement after the APA.

*Novell's Response:* Does not create a disputed issue of material fact. The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets. In addition, to

the extent that SCO seeks to use this evidence to argue that Amendment No. 2 effectuated a transfer of copyrights, the evidence is not relevant.  (*See* Response No. 48, *supra*.)

Furthermore, SCO should not be permitted to rely on Novell's internal memorandum regarding the 1987 MS Agreement, given the representations that SCO has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights.  (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.)  Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights."  (*Id.*, Interrogatory No. 10.)  SCO did not identify this document in response to either interrogatory.  (*Id.*, Response Nos. 9-10.)  SCO should not be permitted to rely upon this document now.

In any event, Novell had no obligation to bring an antitrust suit against Microsoft merely because Novell owned the copyrights.  Novell's internal memorandum on this issue is irrelevant. Although that memorandum indicates that Novell had an internal discussion concerning the 1987 MS Agreement, the topic of that discussion was whether Microsoft was "in breach of contract" as to the Agreement, not whether the terms were anticompetitive.  (5/18/07 James Decl. Ex: 83.) Novell's internal memorandum noted that a suit against Microsoft on that basis would be a "tough case" and that one estimate had Novell's chances of success at "35 percent or less."  (*Id.*) That Novell did not bring a suit against Microsoft after that discussion is hardly surprising.

54.

**REDACTED**

(5/18/07 James Decl. Ex. 104.)

*Novell's Response:* Does not create a disputed issue of material fact. The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets. In addition, to the extent that SCO seeks to use this evidence to argue that Amendment No. 2 effectuated a transfer of copyrights, the evidence is not relevant. (*See* Response No. 48, *supra*.)

Furthermore, SCO should not be permitted to rely on this **REDACTED** given the representations that SCO has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights. (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.) Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.) SCO did not identify this document in response to either interrogatory. (*Id.*, Response Nos. 9-10.) SCO should not be permitted to rely upon this document now.

In any event, the **REDACTED** supports Novell's position, not SCO's. Santa Cruz refused to agree to a representation and warranty in that IP Assignment stating that it had "no knowledge of any fact that would prevent [Caldera's] registration of any Rights" being transferred. (Novell's Opposition to SCO's Motion for Partial Summary Judgment On Its First, Second, and Fifth Causes of Action and For Summary Judgment on Novell's First Counterclaim, filed 4/9/2007, PACER No. 259, at Statement of Facts ("Novell's Opposition Facts"), at ¶¶ 3-4.) Ultimately, Caldera and Santa Cruz eventually agreed that Santa Cruz would represent and warrant only that it had "no knowledge" of anything preventing registration of the copyrights "except that [Santa Cruz] may not be able to establish a chain of title from Novell, but shall diligently endeavor to do so as soon as possible." (*Id.* ¶¶ 2, 7.) Caldera's counsel noted that

Santa Cruz was "<u>trying to get Novell to sign a global IP assignment, for chain of title purposes.</u>"

(*Id.* ¶ 5.)  Obviously, if the APA and Amendment No. 2 in fact transferred all copyrights pertaining to UNIX and UnixWare, as SCO now claims, no such global IP assignment would be necessary.  Indeed, at least as to copyrights, such an assignment would be impossible if the copyrights had been transferred to Santa Cruz six years earlier, since Novell would not longer own them and thus be unable to assign them.

55.    On May 7, 2001, through an Intellectual Property Assignment ("IP Assignment"), Santa Cruz in fact assigned, transferred, and conveyed those rights, including "all copyrights," to Caldera International.  (5/18/07 James Dec1. Ex. 104.)  In 2002, Caldera International changed its name to The SCO Group, Inc. (5/18/07 James Decl. Ex. 104.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Response No.

55, *supra*.)

56.    The IP Assignment defines the "Invention and Works" as those listed in Schedules A-C.  (<u>Id</u>. Recitals.)  Entitled "Assigned Copyrights and Technology," Schedule C to the Intellectual Property Assignment identifies, under the heading "Copyrights," the SVRX and UnixWare "Source Code Products" and "prior products,", as well as the UnixWare "Binary Products" and "Products Under Development"  (<u>Id</u>. Schedule C.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Response No.

55, *supra*.)

57.    Section 1 of the IP Assignment states:

> <u>Assignment</u>.  Assignor hereby assigns, transfers and conveys to Assignee, and Assignee accepts, <u>all of Assignor's right, title, and interest throughout the world in and to the Inventions and Works, including, but not limited to, any of the following appurtenant or related to the Inventions and Works</u>:  (i) all patents and patent applications and any and all patents that are or may be granted therefrom whether in the United States or any other country, including, without limitation, any extensions, continuations, continuations-in-part, divisions, reissues, reexaminations, and renewals thereof, or other equivalents thereof; (ii) <u>all copyrights and all necessary and appropriate renewals and extensions thereof</u> (iii) all trademarks, service marks, trade names, domain names, logos, trade dress, get up and product aesthetic features, including,

without limitation, all registrations, applications for registration and common law rights thereto and all goodwill associated therewith; (iv) all design rights, whether registered, unregistered, patented, patentable or otherwise; (v) all trade secret rights and rights to enforce confidentiality or similar obligations in relation to the Inventions and Works; (vi) <u>any and all other forms of intellectual property</u> or proprietary right recognized anywhere in the world; and (vii) <u>all rights and privileges pertaining to (i) through (vi), including without limitation, the right, if any, to sue or bring other actions for past, present and future infringement</u> thereof ((i) through (vii) hereinafter collectively referred to the "Rights").

(<u>Id</u>. § 1 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response No. 55, *supra*.)

58.     In Section 8 of the IP Assignment, entitled "Representations and Warranties," Santa Cruz stated:

(i) Assignor has the full power, authority and all rights necessary to transfer and assign Assignor's Rights in the Inventions and Works to Assignee and to carry out the terms and provisions of this Agreement.

(<u>Id</u>. § 8(i).)

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response No. 55, *supra*.)

59.     Section 8(v) of the IP Assignment further warrants:

Assignor has no knowledge of any fact that would prevent Assignee's registration of any Rights related or appurtenant to the Inventions and Works or recording the transfer of Rights hereunder (except that Assignor may not be able to establish a chain of title from Novell Inc. but shall diligently endeavor to do so as soon as possible).

(<u>Id</u>. § 8(v).)

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response No. 55, *supra*.)

60.    The law firm of Wilson Sonsini Goodrich & Rosati ("WSGR"), which had represented Novell in the APA transaction in 1995, represented Santa Cruz in the APR transaction and IP Assignment with Caldera International in 2000-01. (5/18/07 James Decl. Ex. 106.) The law firm of Brobeck Phleger & Harrison ("Brobeck"), which represented Santa Cruz in the APA transaction, represented Caldera International in the APR transaction and IP Assignment. (Id.) In each instance, WSGR represented the seller, and Brobeck the buyer. (Id.)

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response No. 55, *supra*.) Moreover, to the extent that SCO suggests that Wilson Sonsini drew upon its knowledge from its representation of Novell in the APA negotiations and somehow concluded from that knowledge that the copyrights had transferred in the APA, the undisputed evidence is otherwise. Different lawyers from Wilson Sonsini had previously represented Novell in its 1995 deal with Santa Cruz. To avoid any conflict of interest, an ethical wall was erected that prevented the Wilson Sonsini lawyers on the Santa Cruz-Caldera deal from consulting the Wilson Sonsini lawyers who had worked on the 1995 Novell-Santa Cruz deal. (Supp. Brakebill Decl. Ex. 4; Supp. Brakebill Decl. Ex. 2, Danaher Dep. 29:13-30:3.) In its opinion letter for the Santa Cruz-Caldera deal, Wilson Sonsini made clear that its work was based entirely on Santa Cruz's representations, not on any pre-existing knowledge from the Novell-Santa Cruz deal. (Supp. Brakebill Decl. Ex. 3.) In addition, Wilson Sonsini undertook no analysis of the APA as part of the Santa Cruz-Caldera deal because Santa Cruz did not request it and Wilson Sonsini viewed such an analysis as raising a potential conflict of interest. (2d Supp. Brakebill Decl. Ex. 9, Danaher Dep. 76:3-78:23.)

61.    Troy Keller, one of the Brobeck attorneys who represented Caldera in the its acquisition of the Business from Santa Cruz, states:

> After review of the APA and Amendment No. 2 thereto, the transaction team, including the Brobeck lawyers, lawyers from Parsons, Behle & Latimer ("PB&L"), which also represented the Caldera entities, in house counsel for the Caldera entities, and in house counsel for Santa Cruz, and Wilson Sonsini discussed and concluded that Santa Cruz had acquired the ownership of the UNIX and UnixWare copyrights (including those that came to be listed on Schedule C to the May 2001 IP Assignment) from Novell under the APA in 1995, as amended, and that Santa Cruz consequently had the ownership, right and authority to transfer the ownership of those copyrights as part of the Intellectual Property Assignment in 2001.

(Id. ¶ 6.)

*Novell's Response:* Does not create a disputed issue of material fact. The cited evidence is inadmissible under the parol evidence rule, because SCO seeks to use it to contradict the plain language of the APA, which excludes "all copyrights" from the transfer of assets. In addition, to the extent that SCO seeks to use this evidence to argue that Amendment No. 2 effectuated a transfer of copyrights, the evidence is not relevant. (*See* Response No. 48, *supra*.)

Furthermore, SCO should not be permitted to rely on testimony from Troy Keller, given the representations that SCO has made in discovery. Novell asked SCO in an interrogatory to "state all facts, evidence, and bases" in support of its allegation that the parties intended the APA to transfer the copyrights. (2nd Supp. Brakebill Decl., Ex. 10, Interrogatory No. 9.) Novell also requested that SCO "state all facts, evidence, and bases" that the parties' "course of conduct evinced their understanding that the APA had transferred . . . the copyrights." (*Id.*, Interrogatory No. 10.) SCO did not identify Keller as a relevant witness in response to either of those interrogatories. (*Id.*, Response Nos. 5, 9-10; 2nd Supp. Brakebill Decl., Ex. 11.) SCO should not be permitted to rely upon Keller's testimony now.

SCO should also be barred from offering Keller's testimony because SCO asserted privilege over the subject matter of his declaration. In Novell's 30(b)(6) deposition of SCO, SCO repeatedly instructed its witness not to answer questions concerning the views of Caldera's attorneys concerning the Caldera-Santa Cruz intellectual property assignment, on grounds of privilege. (5/18/07 James Decl., Ex. 64, Sontag Dep. at 108:13-110:24, 189:10-190:14.) Having prevented Novell's discovery on those issues based on assertions of privilege, SCO cannot now offer those attorneys' views in support of its own position.

Moreover, Keller's testimony is without any foundation. Keller's declaration concedes that he "did not have primary responsibility for the intellectual property issues in the transaction." (5/18/07 James Decl. Ex. 106, ¶ 3.) Although he states that he was involved in "many discussions of intellectual property matters with IP specialists" (whom he does not identify), Keller notably omits any statement that he was present at the conversation he describes in the section quoted above. (*Id.*, ¶¶ 3, 6.) Even if Keller had been present, Keller has no foundation upon which to speculate, as he does, about what all the parties and lawyers in the Santa Cruz-Caldera transaction (including Santa Cruz and its attorneys at Wilson Sonsini) believed and "concluded" about the transfer of copyrights in the Novell-Santa Cruz transaction. Indeed, Wilson Sonsini has stated that it did not undertake any analysis of the APA documents to determine if copyrights had been transferred. (*See* Response No. 60, *supra*.) Furthermore, any testimony that Keller seeks to submit about what he heard other attorneys say about their views on the APA is inadmissible hearsay.

In any event, even if Keller had foundation to testify as to the opinions of the lawyers in the Santa Cruz-Caldera deal about the meaning of the APA and Amendment No. 2, and even if such testimony were not excluded as hearsay, the opinions of those lawyers are improper lay

opinion testimony and are not in any way based on personal knowledge. SCO submits no evidence that any of those lawyers were in any way involved in the negotiation of the APA or Amendment No. 2. To the contrary, Wilson Sonsini deliberately excluded any lawyers involved in the APA from participating in the Santa Cruz-Caldera deal. (*See* Response No. 60, *supra*.) Accordingly, those lawyers' opinions are not based on any applicable personal knowledge and are inadmissible.

> 62. Mr. Keller also states:

> > In Section 8(v) of the Intellectual Property Assignment, Santa Cruz also represented that it had no knowledge of any fact that would prevent Caldera International from registering the rights it acquired under the Intellectual Property Assignment. During the due diligence process, a question arose regarding the copyright registrations and the location of the registration certificates and whether certain UNIX copyrights had been previously registered in the name of The Santa Cruz Operation, Inc. The parenthetical language in Section 8 (v) relates only to the question about the location and transfer of the copyright registrations. That language does not relate to, and was not intended to relate to Santa Cruz's ownership of the copyrights, Novell's sale of the UNIX and UnixWare copyrights to Santa Cruz or Santa Cruz's power, authority, and right to transfer those copyrights to Caldera International.

(Id. ¶ 10.)

*Novell's Response:* Does not create a disputed issue of material fact. (*See* Response No. 61, *supra*.) Moreover, Keller's account does not make sense. During the negotiations, Caldera's counsel noted in an e-mail that Santa Cruz was "<u>trying to get Novell to sign a global IP assignment, for chain of title purposes.</u>" (Novell's Opposition Facts ¶ 5.) If Santa Cruz's only goal were to locate copyright registration certificates, no such global IP assignment would be necessary.

> 63. Since 1995, without objection from Novell, Santa Cruz and SCO shipped countless UNIX-related products with copyright notices affixed to them. (<u>See, e.g.</u>, 5/18/07

James Decl. Ex. 27 ¶ 3; Ex. 28.)  Such notices were affixed to the compact discs containing the products, providing notice that the products as a whole were copyrighted by Santa Cruz or SCO. (Id.)  Since 1995, without objection from Novell, Santa Cruz and SCO entered into hundreds of license agreements for UNIX products.  Those agreements not only warrant and represent that SCO has the rights and ownership in the intellectual property required to provide the licensed product, but also indemnify licensees against any third-party claims for copyright infringement. (See, e.g., 5/18/07 James Decl. Ex. 30 §§ 13-14; Ex. 31 § 2.4; Ex. 32 § 7.02; Ex. 33 ¶ 28.)

   *Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response Nos. 23-24.)

   64.    Before May 28, 2003, Novell never contested SCO's public statements and conduct asserting ownership of the UNIX copyrights.  (5/18/07 James Decl. Ex. 33 ¶ 7; Ex. 34 ¶ 7.)

   *Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 25.)

   65.    There is no evidence that Novell publicly asserted ownership of UNIX copyrights between the date of the APA and May 28, 2003.

   *Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 26.)

   66.    On March 6, 2003, SCO filed its lawsuit against IBM alleging, among other things, that IBM had violated its UNIX Software and Sublicensing Agreements by disclosing UNIX-derivative source code.  (5/18/07 James Decl. Ex. 35 at 32-50.)

   *Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 27.)

   67.    On May 28, 2003, Novell publicly announced that it, and not SCO, is the owner of the UNIX copyrights.  In a letter to SCO CEO Darl McBride that Novell published to the world on its website, Novell CEO Jack Messman stated:

>        Importantly, and contrary to SCO's assertions, SCO is not the
>        owner of the UNIX copyrights.  Not only would a quick check
>        of U.S. Copyright Office records reveal this fact, but a review of
>        the asset transfer agreement between Novell and SCO confirms it.
>        To Novell's knowledge, the 1995 agreement governing SCO's
>        purchase of UNIX from Novell does not convey to SCO the
>        associated copyrights.  We believe it unlikely that SCO can

demonstrate that it has any ownership interest whatsoever in those copyrights.

(5/18/07 James Decl. Ex. 36 at NOV 000043054.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 28.)

68.     The Novell executives who negotiated or were primarily responsible for the APA in 1995, including Messrs. Frankenberg, Mattingly, Thompson, Chatlos, and Levine, were not with Novell in 2003.  (5/18/07 James Decl. Ex. 39 at 219-221.)  Novell did not consult with them before announcing its alleged ownership of the copyrights.  (5/18/07 James Decl. Ex. 40 at 27, 60; Ex. 41 at 90-91.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 29.)

69.     A few days after its May 28, 2003, announcement, Novell received from SCO a copy of Amendment No. 2, which Novell had said it did not have in its files and had not reviewed.  (5/18/07 James Decl. Ex. 81 ¶ 13.)  On June 6, 2003, Novell stated in a press release:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO.  To Novell's knowledge, this amendment is not present in Novell's files.  The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(5/18/07 James Decl. Ex. 38 at NOV 000043059.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 30.)

70.     Novell has admitted that Amendment No. 2 was present in its files prior to May 28, 2003.  (5/18/07 James Decl. Ex. 41 at 82-83.)

*Novell's Response:* Does not create a disputed issue of material fact.  (*See* Novell's

Response to SCO's MSJ Facts, Response No. 31.)

71.     The parties to the APA repeatedly covenanted to take further actions necessary to consummate the transfer of the Business.

*Novell's Response:* Does not create a disputed issue of material fact. SCO cites no

evidence in support of this assertion.

72.     Section 1.7(c) of the APA provides:

(c)     <u>Taking of Necessary Action: Further Action</u>. If, at any
time after the Closing Date, any further action is necessary or
desirable to <u>carry out the purposes of this Agreement</u> the parties
agree to take, and will take, all such lawful and necessary and/or
desirable action.

(5/18/07 James Decl. Ex. 1 § 1.7(c) (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact. No dispute that the

quoted language appears in the APA.   SCO relies on this provision to argue that SCO's specific

performance claim could somehow survive a finding that the APA, Bill of Sale, and Amendment

No. 2 did not transfer ownership of the copyrights to Santa Cruz. That argument fails for the

reasons explained in the Novell's reply brief.  (Reply Br. at 24.)

73.     Section 4.9 of the APA provides in part:

4.9     <u>Commercially Reasonable Efforts</u>. Subject to the terms
and conditions provided in this Agreement, each of the parties
hereto shall use its commercially reasonable efforts to take
promptly, or cause to be taken all actions, and to do promptly, or
cause to be done, all things necessary, proper or advisable under
applicable laws and regulations <u>to consummate and make effective
the transactions contemplated hereby</u> . . . .

(<u>Id</u>. § 4.9 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons

as articulated in Response No. 72.

74.     Section 4.12 of the APA provides:

4.12     <u>Additional Documents and Further Assurances</u>. Each party
hereto, at the request of another party hereto, shall execute and
deliver such other instruments and do and perform such other acts
and things as may be necessary or desirable for <u>effecting</u>

52

> completely the consummation of this Agreement and the
> transactions contemplated hereby.

(Id. § 4.12 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response No. 72.

75.    The APA expressly sets forth its purpose and intent.  Section 1.3(a)(i) of the APA states:

> It is the intent of parties hereto that all of the Business and all of
> Seller's backlog, if any, relating to the Business be transferred to
> Buyer.

(Id. § 1.3(a)(i) (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 1 and 72.

76.    Recital B expresses the intent of the parties that Santa Cruz acquire the assets and liabilities comprising the Business:

> The Board of Directors of each Seller and Buyer believe it is in the
> best interests of each company and their respective stockholders
> that Buyer acquire certain of the assets of, and assume certain of
> the liabilities of Seller comprising the Business (the
> "Acquisition").

(Id. at 1 (emphasis added).)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 2 and 72.

77.    The overwhelming testimony of the Novell executives who were responsible for and negotiated the APA confirms that the purpose and intent of the APA was to transfer the Business, including the copyrights to UNIX and UnixWare, to Santa Cruz.  (See Part II, above.)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 11-25.

78.    The testimony of the Santa Cruz executives who were responsible for and negotiated the APA uniformly confirms that the purpose and intent of the APA was to transfer the Business, including the copyrights to UNIX and UnixWare, to Santa Cruz.  (See id.)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 11-25.

79.    All these witnesses agree that the transaction contemplated by APA included the transfer of the UNIX and UnixWare copyrights to Santa Cruz.  (See id.)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 11-25.

80.    The other extrinsic evidence SCO submits herewith also confirms that the transaction contemplated by the APA included the transfer of the UNIX and UnixWare copyrights to Santa Cruz.  (See Part III, above.)

*Novell's Response:* Does not create a disputed issue of material fact, for the same reasons as articulated in Response Nos. 26-70.