Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

David Boies (admitted pro hac vice)
Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff, The SCO Group, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br>a Delaware corporation,<br>　　　Plaintiff/Counterclaim-Defendant,<br><br>　　　vs.<br><br>NOVELL, INC.,<br>a Delaware corporation,<br>　　　Defendant/Counterclaim-Plaintiff. | **SCO'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST, SECOND, AND FIFTH CAUSES OF ACTION AND FOR SUMMARY JUDGMENT ON NOVELL'S FIRST COUNTERCLAIM**<br><br>**Civil No.: 2:04CV00139**<br><br>Judge Dale A. Kimball<br>Magistrate Brooke C. Wells |

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 1

PRELIMINARY STATEMENT ....................................................................................... 2

ARGUMENT ................................................................................................................... 3

I.      THE PLAIN LANGUAGE OF THE AMENDED APA TRANSFERRED THE
UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ....................................... 3

      A.     The Plain Language of the Amended APA Includes the UNIX and
UnixWare Copyrights Among the Included Assets................................................. 3

      B.     The TLA Confirms That Novell Transferred the Copyrights to Santa
Cruz on the Closing Date....................................................................................... 6

      C.     Amendment No. 2 Clarified the Excluded Assets Schedule.................................. 7

II.     OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER
OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ....................... 12

      A.     SCO's Prior Conduct. ......................................................................................... 13

             1.     Novell's Evidence Creates No Material Factual Issues........................... 13

             2.     The Parties' Conduct Following the APA and Amendment No. 2
with Respect to Microsoft Confirms Transfer of the Copyrights. ............ 18

      B.     Novell's Conduct After the APA Confirms Transfer of the Copyrights. ............. 20

      C.     Novell's New Declarations Create No Material Factual Issues........................... 22

             1.     The Testimony of Attorneys David Bradford and Tor Braham
Regarding the Original APA Is Beside the Point..................................... 23

             2.     The Testimony of David Bradford Regarding His Supposed
Intent Does Not Bear Scrutiny................................................................. 23

3.  The New Testimony Regarding the Purported Reasons Behind Novell's Supposed Intent Does Not Bear Scrutiny................................... 24

4.  Mr. Braham's Testimony That Novell Clearly Communicated to Santa Cruz Novell's Alleged Intent To Exclude the Copyrights Does Not Bear Scrutiny. ......................................................................... 29

5.  The Testimony of Allison Amadia Regarding Her and Mr. Sabbath's Supposed Intent and Understanding Does Not Bear Scrutiny. ..................................................................................................... 34

D.  The Testimony SCO Has Presented Is Admissible and Directly Relevant. ......... 36

1.  The Testimony Regarding the APA............................................................ 36

2.  The Testimony Regarding Amendment No. 2.......................................... 41

E.  Novell's "Implied License" Argument Highlights More Evidence Confirming the Transfer of the Copyrights and Creates No Material Factual Issues. ...................................................................................................... 43

CONCLUSION.................................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
  68 Cal. App. 4th 445 (1998) ........................................... 39

La Resolana Architects, PA v. Clay Realtors Angel Fire,
  416 F.3d 1195 (10th Cir. 2005). ..................................... 19

Marin County v. Assessment Appeals Bd. Marin County,
  64 Cal. App. 3d 319 (1976) ........................................... 39

Morey v. Vannucci,
  64 Cal. App. 4th 904 (1998) ........................................... 39

S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.,
  74 Cal. App. 4th 1232 (1999) ......................................... 40

S.O.S., Inc. v. Payday, Inc.,
  886 F.2d 1081 (9th Cir. 1989) .......................................... 3

Schiller & Schmidt, Inc. v. Nordisco Corp.,
  969 F.2d 410 (7th Cir. 1992) .......................................... 46

Sy First Family Ltd. P'ship v. Cheung
  70 Cal App. 4th 1334 (1999) ......................................... 39

**Other Authorities**

Cal. Civ. Code § 1636........................................................... 39

Cal. Civ. Code § 1653........................................................... 39

Plaintiff, The SCO Group, Inc. ("SCO"), respectfully submits this Reply Memorandum in Further Support of Its Motion for Partial Summary Judgment on Its First, Second, and Fifth Causes of Action and for Summary Judgment on Novell's First Counterclaim.

## PRELIMINARY STATEMENT

The plain language of the Asset Purchase Agreement ("APA") as amended establishes that Novell, Inc. transferred to The Santa Cruz Operation, Inc. ("Santa Cruz") the copyrights in the UNIX and UnixWare products and documentation in 1995. In contending otherwise, Novell improperly relies on language in the APA that a subsequent amendment, Amendment No. 2, excised from the Agreement. In addressing Amendment No. 2, moreover, Novell avoids the plain language of the document and the rules of construction by which it and the APA operated to transfer the foregoing copyrights.

The requirements of Section 204 of the Copyright Act are easily met, because the APA as amended clearly conveys the copyrights as part of "all right, title and interest . . . without limitation" in the UNIX and UnixWare products, enumerated in the APA's Assets Schedule. Novell wrongly seeks to interpret the APA without regard to Amendment No. 2. Construed together, as they must be, the documents unambiguously convey the copyrights.

The extrinsic evidence confirming the foregoing establishes that the senior business executives and lead negotiators from both Novell and Santa Cruz intended the copyrights to be transferred. Novell submits declarations from lawyers charged with implementing the business deal, not changing it, and insofar as their work introduced confusion into the Excluded Assets Schedule of the APA, the parties removed that confusion in Amendment No. 2. The

explanations for that amendment that Novell now offers are ones to which the language of the amendment are not reasonably susceptible, and therefore must be rejected and fail to create any material factual issues.

## ARGUMENT

### I.    THE PLAIN LANGUAGE OF THE AMENDED APA TRANSFERRED THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

SCO demonstrated in its opening memorandum (at 20-25) that the amended APA transferred the copyrights in the UNIX and UnixWare products and documentation to Santa Cruz. Novell's primary argument in response (at 34-42) is that the Court should analyze the APA without regard to Amendment No. 2. The Court should not read the APA as though the parties had not signed and adopted an amendment as they did. The only reasonable reading of the documents is that Novell transferred the copyrights to Santa Cruz.[1]

### A.    The Plain Language of the Amended APA Includes the UNIX and UnixWare Copyrights Among the Included Assets.

Novell has relied on Item V.A of the Excluded Assets Schedule in the original APA, but that Item no longer exists. Amendment No. 2 revised Item V.A "to read" as follows:

> All copyrights and trademarks, except for <u>the copyrights</u> and trademarks owned by Novell as of the date of the Agreement <u>required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies</u>. However, in no

---

[1] On April 20, 2007, Novell filed a motion for summary judgment pertaining to these same issues. SCO demonstrated in its Memorandum in Opposition dated May 18, 2007, that both the plain language of the documents and the extrinsic evidence defeat Novell's Motion. SCO incorporates by reference its arguments therein and in several instances cites that memorandum herein. SCO cites herein to "Ex. __" where the exhibit was attached to the 4/9/07 Declaration of Edward Normand in support of SCO's opening memorandum and to "5/29/07 Suppl. Normand Decl. Ex. __" where the exhibit is attached to the Supplemental Declaration of Edward Normand in support of this reply memorandum.

> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

(Ex. 5 ¶ A (emphasis added).)  Paragraph A of Amendment No. 2 thus replaces the original Item

V.A with an exception to the excluded assets.  The APA and Amendment No. 2 are read

together.  (See Part I.B, below.)  The exception to the excluded assets confirms the assets the

parties intended to transfer, and the language of the Assets Schedule of the APA is of primary

relevance in assessing what the parties intended to transfer.

The APA provided for the transfer of the UNIX and UnixWare copyrights where it

provided for the transfer of all of Novell's "right, title, and interest in and to" the UNIX and

UnixWare source code and products; and "All rights and ownership of UNIX and UnixWare,"

including "without limitation" the source code, source code products, binary products, and

products in development.  (Ex. 1.)  Under the case law, cited in SCO's opening memorandum (at

20-21), each of these provisions provides for the transfer of the copyrights.[2]

Under Section 1.1(a) of the APA, Novell and Santa Cruz agreed that on the Closing Date

Novell would "sell, convey, transfer, assign and deliver" and Santa Cruz would "purchase and

acquire" at minimum "all right, title and interest in and to the assets and properties" identified in

Schedule 1.1(a) of the APA.  (Id.)   In turn, Schedule 1.1(a) identifies seven categories of "assets

and properties" transferred to Santa Cruz, including:

---

[2] Novell (at 35) seeks to distinguish those cases with reference to the language of the Excluded Assets
Schedule of the unamended APA, but as noted that language no longer exists.  The exception to the
exclusion set forth in Amendment No. 2 confirms the relevance of the precedent cited in SCO's opening
memorandum.  In asserting that S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081 (9th Cir. 1989), supports its
position because "a copyright owner should not be presumed to have transferred outright ownership of the
copyrights when it grants a license," Novell begs the question.  The plain language of the amended APA
establishes the transfer of copyrights to Santa Cruz, rather than the terms of any undefined "license."
(See Part II.E, below.)

> All rights and ownership of UNIX and UnixWare, including but
> not limited to all versions of UNIX and UnixWare and all copies of
> UNIX and UnixWare (including revisions and updates in process)
> and all appropriate technical, design, development, installation,
> operations and maintenance information concerning UNIX and
> UnixWare, including source code," source code products, binary
> products releases, and products under development . . . including,
> without limitation:

(Id. (emphasis added).)  The APA thus provides for the transfer – without limitation – of all

right, title, and interest in the UNIX and UnixWare source code and products, and all rights and

ownership of UNIX and UnixWare, including a non-exhaustive list of assets and properties.  In

providing for the transfer of all rights, Section 1(a) and Item I include the copyrights.

There can be no question that the transfer of the copyrights took place.  Section 1.1(a) of

the APA defines the assets and properties to be transferred on the Closing Date as the "Assets."

(Ex. 1.)  On the Closing Date, Novell and Santa Cruz executed the Bill of Sale, which provides:

> In accordance with [Section] 1.1(a) of the Agreement, Seller, for
> good and valuable consideration, the receipt and sufficiency of
> which is hereby acknowledged, does hereby transfer, convey, sell,
> assign and deliver to Buyer, without recourse, representation or
> warranty except as otherwise expressly provided in the Agreement,
> all of the Assets.

(Ex. 3 (emphasis added).)  The Bill of Sale thus effectuated the transfer, conveyance, sale,

assignment, and delivery to Santa Cruz of "all of the Assets."  (Id.)  As the Assets included "all

rights and ownership" of UNIX and UnixWare "without limitation," which clearly includes the

copyrights, the Bill of Sale transferred the copyrights to Santa Cruz on the Closing Date.

B.      The TLA Confirms That Novell Transferred the
        Copyrights to Santa Cruz on the Closing Date.

Under California law, the APA and TLA must be read together.  (SCO's Memorandum in

Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title

and Third Claim for Specific Performance (May 18, 2007), at 39-41.)

Section 1.6 of the APA provided for a license back to Novell of the same UNIX and

UnixWare technology transferred to Santa Cruz under the APA (the "Licensed Technology").

On the Closing Date, Santa Cruz granted that license to Novell in the Technology License

Agreement ("TLA"), subject to strict restrictions, specifying that "Ownership of the Licensed

Technology shall reside in SCO."  (Id.)  Section 1.6 and the TLA as drafted would be senseless

had Novell retained ownership of the copyrights.  Novell would not have needed a license to the

Licensed Technology, let alone agreed to a license subject to strict restrictions, and ownership of

the Licensed Technology would have resided in Novell, not Santa Cruz.  Simply put, Novell

would have licensed the technology to Santa Cruz, not the other away around.  As Novell's

General Counsel conceded, "it would be reasonable for someone to read the technology license

agreement as inconsistent with a reading of the APA that the UNIX copyrights were retained by

Novell."  (5/29/07 Suppl. Normand Decl. Ex. 27 at 95.)

Novell nonetheless argues (at 54-55) that the TLA was necessary for Novell to be able to

use the "trade secrets, software know-how, methods, and concepts and documentation" that were

transferred under the APA, but nothing Novell points to shows that this, rather than copyright-

protected source code, was even contemplated as pertinent.  The "Licensed Technology" to

which Novell obtained a license-back under the TLA included (among other things) "all of the

technology" included in the "UNIX Source Code Products," the "Binary Product Releases," the

"Products Under Development," and the "Other Technology" listed in the Assets Schedule of the APA, as well as in "All copies of UNIX and UnixWare, wherever located, owned by Seller." (Ex. 1 § 1.6; Schedule 1.1(a) §§ I, IV.)  Novell's alleged retention of the UNIX and UnixWare copyrights would have reserved for Novell the right to make copies of all the source code, and thus to use at least the vast majority of "the technology" in those products and copies.  If the license-back in the TLA had the scope that Novell now claims, the parties would have specified that Novell retained the right to use the "trade secrets, software know-how, methods, and concepts and documentation" in UNIX and UnixWare.  It is not reasonable to interpret the license-back set out in the TLA to be surpassingly overbroad and redundant of Novell's alleged rights, as Novell's interpretation makes it.

C.    Amendment No. 2 Clarified the Excluded Assets Schedule.

Amendment No. 2 clarified that the copyrights at issue were not Excluded Assets. Paragraph A states that the Excluded Assets do not include (confirming that the transferred assets do include) the copyrights "required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (Ex. 5 ¶ A.)  The UNIX and UnixWare copyrights are so required.  The APA and TLA make no reference to any "license" for Santa Cruz in this regard. (See Part II.E, below.)  SCO's rights with respect to its acquisition of UNIX and UnixWare technologies include:

- The rights to develop, license, and support UNIX and UnixWare products to evolve the Business.  (SCO's Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance (May 18, 2007), Statement of Facts ¶¶ 1-2.)  The owner of the UNIX

and UnixWare copyrights has such rights. Those copyrights were required for Santa Cruz to exercise its rights to run the Business.

- All rights and ownership in the enumerated UNIX and UnixWare source code and products. (Id. ¶¶ 3-5.) Only the owner of the UNIX and UnixWare copyrights has the authority to exercise such unlimited rights. Those copyrights thus were required for Santa Cruz to exercise its other, unlimited rights in the source code and products.

- Claims arising after the Closing Date against any parties relating to any right, property, or asset included in the Business. (Id. ¶ 5.) Without the copyrights, Santa Cruz could not have pursued such claims for the unauthorized use and distribution of its UNIX and UnixWare code and products.

- All rights pertaining to UNIX and UnixWare under any assignable contract or license. (Id.) Because without the copyrights Santa Cruz would have been powerless to enforce covenants and conditions in such contracts or licenses, the copyrights were required for Santa Cruz to exercise those rights.

The copyrights at issue thus were required for Santa Cruz to exercise these and other rights it obtained with its acquisition of the UNIX and UnixWare technologies.

Novell nevertheless argues (at 43-44) that Amendment No. 2 fails to satisfy Rule 204 of the Copyright Act because the amendment itself "contains no language 'transferring' or 'assigning' the copyrights, and because "the parties did not execute a Bill of Sale or other written instrument of transfer in connection with Amendment No. 2."[3] Novell thus asks the Court to

---

[3] Novell further argues (at 44-48) that the extrinsic evidence regarding Amendment No. 2 does not support SCO. SCO refutes that argument (and its asserted relevance to the grounds for SCO's Motion) in Part II.C, below.

read Amendment No. 2 without regard to the contract that it amends.  Amendment No. 2 revises the Excluded Assets Schedule of the APA, and thus operated as a clarification of what the parties intended under the APA – where the Excluded Assets Schedule is found.  The APA contains language transferring the Assets, and the Bill of Sale makes reference to the Assets so transferred pursuant to the APA.

Novell's counter (at 44) that "Amendment No. 2 did not purport to retroactively amend the Bill of Sale to transfer additional assets" presupposes a linguistic standard that neither any precedent nor rule of contract interpretation requires SCO to meet.  By excising language from the Excluded Assets Schedule of the APA, Paragraph A of Amendment No. 2 makes clear that the language to which the Bill of Sale relates is the new language in Paragraph A.  The amendment is no less a clarification just because the parties made the clarification "as of" a particular date.  Put another way, because Paragraph A revises the Excluded Assets Schedule of the APA, the only reasonable reading of the document is that it constitutes a clarification of the parties' intent as to the assets transferred under the APA.  The Bill of Sale, in turn, implements the parties' intent with respect to Assets transferred.

Novell's initial interpretation of Amendment No. 2 is telling.  On June 6, 2003, after Novell received a signed copy of the amendment, Novell took account of the entire language of the amendment and concluded, as it said in its press release that day, that the amendment "appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996."  (Ex. 38; 5/29/07 Suppl. Normand Decl. Ex. 24 at 34-40, 173-74.)  Novell admitted in its Rule 30(b)(6) deposition that it had in mind the first sentence of Paragraph A, concluding "that a reader of this language, you know – you know, might be able to conclude that

SCO's claim of ownership did transfer, that SCO's claim of ownership was supported by this language." (5/29/07 Suppl. Normand Decl. Ex. 24 at 39.)

Similarly, the testimony of Novell's former and current in-house counsel underscores Novell's inability even to settle on what Amendment No. 2 means if it does not clarify the transfer of the copyrights under the APA. Current Novell General Counsel Joseph LaSala testified that if Santa Cruz requested the transfer of certain copyrights under Amendment No. 2 and Novell simply disagreed, then "I guess there would not have been a transfer of the copyrights." (5/29/07 Suppl. Normand Decl. Ex. 27 at 40.) Novell in-house counsel Greg Jones, in contrast, testified that if SCO could "objectively demonstrate as a matter of law that this is required for my business," then Santa Cruz is "going to get it." (5/29/07 Suppl. Normand Decl. Ex. 20 at 142-43.) In her declaration that Novell submits, Ms. Amadia made no effort to describe how the purported process would work.

The current interpretation Novell gives to Paragraph A of Amendment No. 2 is unreasonable for other reasons. The premise of Novell's argument is that the copyrights and trademarks excluded from the Excluded Assets Schedule of the APA is potentially a null set – that perhaps no such copyrights and trademarks are "necessary" for SCO to have. In addition to the fact that Novell thus interprets Paragraph A to have a meaning that no other provision of the Assets or Excluded Assets Schedule has, Novell's reading ignores the second sentence of Paragraph A, which states:

> However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.

(Ex. 5.)  In conjunction with the sentence preceding it, the plain text reflects that as the owner of

the copyrights and trademarks, SCO may face claims brought by third parties pertaining to the

copyrights and trademarks.

In further arguing (at 43) that "Amendment No. 2 lacks sufficient specificity," Novell

again assumes that the amendment and the contract it amends are not to be read together.  The

Assets Schedule of the APA details the UNIX and UnixWare products transferred, referring to:

- "UNIX Source Code Products" (referring to product schedules and including UnixWare 2.0 and prior products, UNIX SVR4.1 ES and prior products, UNIX SVR4.0MP and prior products, and Ancillary SVRx Products).

- "Binary Product Releases" (including UnixWare 2.01 Product Family, UnixWare 2.0.x update releases, UnixWare 1.1 Product Family, and UnixWare 1.1.x update releases).

- "Products Under Development" (including UnixWare 2.1 (Eiger), UnixWare 2.1 Oracle Parallel Server, UnixWare 2.03, UnixWare 2.0.x/2.1 Enhanced Mode Merge, and UnixWare 2 Internet Server).

- "Other Technology" (including a variety of UnixWare-related technology, such as test suites and test specifications).

- "All copies of UNIX and UnixWare, wherever located, owned by Seller."

(Ex. 1, Schedule 1.1(a) §§ I, IV.)  The APA gives Santa Cruz "all rights of ownership" in such

products.  (Ex. 1, Schedule 1.1(a) § I.)  Amendment No. 2 refers to the copyrights in the

foregoing, specific products and the copyrights in the manuals and reference documentation

necessary to distribute and install such products.  As shown in SCO's opening memorandum (at

20-21), the foregoing level of specificity is more than sufficient to satisfy Rule 204.

## II.    OVERWHELMING EXTRINSIC EVIDENCE CONFIRMS THE TRANSFER OF THE UNIX AND UNIXWARE COPYRIGHTS TO SANTA CRUZ.

SCO bases its instant Motion on the plain language of the amended APA, but also illustrated in its opening memorandum (at 27-30) that overwhelming extrinsic evidence confirms that Novell intended to transfer and Santa Cruz intended to obtain the UNIX and UnixWare copyrights at the closing in 1995.  Novell's primary argument in response (at 36-38) is that SCO cannot rely on confirmatory extrinsic evidence to "rewrite the APA," but in making the argument Novell wrongly tries to isolate the APA from its amendments.[4]

Novell's reliance (at 37) on certain deposition testimony in advancing its primary argument confirms the foregoing error.  In their cited testimony, for example, both Santa Cruz founder Doug Michels and Santa Cruz General Counsel Steve Sabbath testified in response to questions regarding the unamended Excluded Assets Schedule in the unamended APA.  In response to even such artificial questions, both witnesses made clear that it was in the context of the other provisions of the unamended APA that the exclusion of copyrights "makes no sense," as Mr. Michels testified, and is "a little bit nonsensical," as Mr. Sabbath testified.  Such testimony confirms the point that even taken in isolation, the purported exclusion of the copyrights in the APA cannot reasonably be reconciled with the remainder of the Agreement.[5]

---

[4] As Novell in effect concedes (at 38 n.14), SCO's extrinsic evidence consistent with the language of the amended APA is relevant and admissible.

[5] Novell also cites (at 37) the testimony of Allison Amadia for the proposition that Mr. Sabbath allegedly said in 1996 that "he believed 'the Original APA explicitly excluded copyrights to UNIX and UnixWare as assets being sold by Novell to Santa Cruz and that it shouldn't have.'"  Mr. Sabbath's testimony contradicts this assertion.  (See Part II.C.5, below.)  In addition, the statement attributed to Mr. Sabbath reflects nothing more than his view that any UNIX or UnixWare copyright exclusion in the unamended APA was a mistake.  Novell's arguments on these fronts are far removed from the plain language of the amended APA that is the basis for SCO's Motion and fail to create any material factual disputes.

A.      SCO's Prior Conduct.

Novell argues (at 48-52) that certain conduct on the part of Santa Cruz and SCO "confirms their understanding that no copyrights were transferred." The evidence Novell cites does not support that assertion and fails to create any fact issue on the plain meaning of the APA and Amendment No. 2 with respect to the transfer of the copyrights.

1.      Novell's Evidence Creates No Material Factual Issues.

Chain of Title. On August 1, 2000, Santa Cruz entered into the Assignment and Plan of Reorganization ("APR") whereby Santa Cruz agreed to transfer to Caldera International "all rights and ownership of UNIX and UnixWare," including "all intellectual property rights appurtenant" to UNIX and UnixWare. (5/29/07 Suppl. Normand Decl. Ex. 15.) On May 7, 2001, through the Intellectual Property ("IP") Assignment, Santa Cruz in fact assigned, transferred, and conveyed those rights, including "all copyrights," to Caldera International (now SCO). (5/29/07 Suppl. Normand Decl. Ex. 16.)

The IP Assignment defines the "Invention and Works" as those listed in Schedules A-C. (Id. Recitals.) In the IP Assignment, Santa Cruz transferred all copyrights the SVRX and UnixWare "Source Code Products" and "prior products," as well as the UnixWare "Binary Products" and "Products Under Development." (Id. Schedule C.) In Section 8 of the IP Assignment, entitled "Representations and Warranties," Santa Cruz warranted that it had the full power and authority necessary to do so. (Id. § 8(i).)

Section 8(v) of the IP Assignment further warrants that "Assignor has no knowledge of any fact that would prevent Assignee's registration of any Rights related or appurtenant to the Inventions and Works or recording the transfer of Rights hereunder (except that Assignor may

not be able to establish a chain of title from Novell Inc. but shall diligently endeavor to do so as soon as possible." (Id. § 8(v).)  The law firm of Brobeck Phleger & Harrison ("Brobeck"), which represented Santa Cruz in the APA transaction, represented Caldera International in the APR transaction and IP Assignment; the law firm of Wilson Sonsini represented Santa Cruz in the transaction.  (5/29/07 Suppl. Normand Decl. Ex. 17 ¶ 7.)  Troy Keller, one of the Brobeck attorneys who represented Caldera in the acquisition from Santa Cruz, states:

> After review of the APA and Amendment No. 2 thereto, the transaction team, including the Brobeck lawyers, lawyers from Parsons, Behle & Latimer ("PB&L"), which also represented the Caldera entities, in house counsel for the Caldera entities, and in house counsel for Santa Cruz, and Wilson Sonsini discussed and concluded that Santa Cruz had acquired the ownership of the UNIX and UnixWare copyrights (including those that came to be listed on Schedule C to the May 2001 IP Assignment) from Novell under the APA in 1995, as amended, and that Santa Cruz consequently had the ownership, right and authority to transfer the ownership of those copyrights as part of the Intellectual Property Assignment in 2001.

(Id. ¶ 6.)  Mr. Keller also states:

> In Section 8(v) of the Intellectual Property Assignment, Santa Cruz also represented that it had no knowledge of any fact that would prevent Caldera International from registering the rights it acquired under the Intellectual Property Assignment.  During the due diligence process, a question arose regarding the copyright registrations and the location of the registration certificates and whether certain UNIX copyrights had been previously registered in the name of The Santa Cruz Operation, Inc.  The parenthetical language in Section 8 (v) relates only to the question about the location and transfer of the copyright registrations.  That language does not relate to, and was not intended to relate to Santa Cruz's ownership of the copyrights, Novell's sale of the UNIX and UnixWare copyrights to Santa Cruz or Santa Cruz's power, authority, and right to transfer those copyrights to Caldera International.

(Id. ¶ 10.)  The evidence thus establishes that the "chain of title" reference in the Santa Cruz-Caldera transaction is consistent with the conclusion – one that counsel to that transaction reached themselves – that Santa Cruz had acquired the copyrights from Novell.

Indeed, in its Rule 30(b)(6) deposition, Wilson Sonsini admitted that it knows of no representation or warranty or statement in the APR that the firm believes is inaccurate, and would be "surprised if anybody felt that the reps and warranties and disclosure schedule were inaccurate."  (5/29/07 Suppl. Normand Decl. Ex. 4 at 41-42.)  Similarly, it was consistent with Wilson Sonsini's recollection that "among the contributed assets that would be transferred to Caldera were the – all of the intellectual property rights appurtenant to UNIX, UnixWare, and OpenServer."  (Id. at 46-48.)  The firm has no reason to think any of those terms of the deal are inaccurate.  (Id. at 57-58.)  The firm "would have expected them to be highly accurate."  (Id. at 81.)[6]

Novell-SCO Communications.  Novell has to acknowledge (at 50) that in early 2003, SCO sent a letter to Novell seeking only to "clarify" the APA on the issue of the transfer of copyrights.  (5/29/07 Suppl. Normand Decl. Ex. 22.)  The testimony of SCO representatives Darl McBride and Ralph Yarro is consistent with the text of the letter.  In his declaration dated November 10, 2006, Mr. McBride states:

> I understand that in his declaration, Mr. Jones states that I repeatedly contacted Novell, requested that Novell transfer the UNIX copyrights to SCO, and asked Novell to amend the

---

[6] Novell cites (at 49) the hearsay statement in an e-mail sent by Caldera's counsel that Santa Cruz was "trying to get Novell to sign a global IP assignment, for chain of title purposes," and argues that the allusion must mean that there had been no transfer of copyrights between Novell and Santa Cruz.  Novell is wrong.  Read in light of the language that the parties (and their attorneys) agreed to for purposes of the relevant contract, the attribution in the e-mail (if even accurate) means that Santa Cruz sought "acknowledgement" from Novell of the prior transfer.

> agreement to transfer the copyrights to SCO.  I disagree with Mr.
> Jones' account of the events.  At no point did I or anyone on
> SCO's behalf request that Novell transfer UNIX copyrights to
> SCO.  Nor did I ask Novell to amend the APA to give SCO the
> copyrights.

(Ex. 37 ¶ 16.)  Mr. Yarro's sworn testimony also belies Novell's version of events.  In his

declaration dated May 17, 2007, he states (among other things):

> I never told Mr. Stone (contrary to what I understand Mr.
> Stone claims) that I "would like for Novell to make changes to the
> agreements to give them the copyrights" or any words to that
> effect.  It was not my view at the time of my conversations with
> Mr. Stone that SCO needed in any way for Novell to transfer the
> copyrights at issue.  Instead, it was my understanding as Chairman
> of the Board that The SCO Group had acquired all of the Unix
> copyrights when it purchased to two Unix divisions from The
> Santa Cruz Operation, Inc. in 2001.

(5/29/07 Suppl. Normand Decl. Ex. 18 ¶ 3.)

Indeed, Novell's current account of its conversations with SCO bears little resemblance

to the testimony of its lead witness on the subject.  Novell Associate General Counsel Greg Jones

– the point person for the company in its discussions with SCO in late 2002 and early 2003 –

admitted at deposition that SCO's request had been for "documents" or "due diligence" that

would clarify what SCO considered to be "a clerical error" in the Excluded Assets Schedule of

the APA.  (5/29/07 Suppl. Normand Decl. Ex. 26 at 182-83.)  Mr. Jones admitted that he

understood that SCO believed that the clerical error could not be "what was intended" by the

APA.  (Id.)  Mr. Jones acknowledged that SCO requested documents that would clarify the APA

"so that, you know, the intent of the parties to the APA would be clearly reflected" in the

agreement.  (Id. at 184.)  That is, SCO never even told Mr. Jones that it believed that the APA

had not transferred, or intended to transfer, the copyrights, let alone asked Mr. Jones for a

transfer.  (Id.)

In addition, although he participated in multiple conversations with SCO over a period of several months, Mr. Jones never asserted Novell's purported ownership of the copyrights in response to SCO's requests.  (Id. at 202-04)  Mr. Jones testified that he told SCO that its request for documents would not help Novell's financial interests or relationships with customers, but he did not recall offering any other reason for denying the request.  (Id. at 204.)

Novell has relied on the declaration Mr. Jones submitted "On Behalf of Novell, Inc." making statements "based on Novell's knowledge and understanding of the matters described" therein.  (5/29/07 Suppl. Normand Decl. Ex. 25 ¶ 3.)  That declaration offers a different account of his conversations with SCO.  In contrast to his testimony based on his "personal knowledge," Mr. Jones declares that SCO asked Novell to transfer the copyrights.  (Id. ¶ 14.)  But his deposition makes clear he has no personal knowledge of any such request.  Instead, as he admitted in his deposition, the allegation that SCO made that request is the result of conversations among Novell's lawyers.  (5/29/07 Suppl. Normand Decl. Ex. 26 at 175.)  Even without considering the vast extrinsic evidence of the parties' course of conduct during the seven years that predated the SCO-Novell conversations at issue, a juxtaposition of Mr. Jones's declaration, which is "based on Novell's knowledge and understanding," and his testimony relied upon by Novell is thus inadmissible.

The foregoing record thus defeats Novell's assertion that SCO ever requested in 2002 or 2003 that Novell "transfer" the copyrights at issue, and in addition none of Novell's arguments on this point creates any genuine dispute of any material fact.

17

Copyright Notices in UnixWare.  Novell argues (at 51-52) with respect to the UnixWare software that the "copyright notices used by Santa Cruz on its new releases indicate that Santa Cruz understood that Novell continued to own the copyright to the original code."  In fact the undisputed evidence shows that Novell understood SCO to own the UNIX copyrights following the APA.  (SCO's Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance (May 18, 2007), at 69-71.)

In addition, the October 1995 document titled "SCO/Novell Documentation Transition Issues (10/16/95)" addressed the issue of copyright notices for "online and printed books" relating to UnixWare.  The document specified with reference to "Online Books":  "Only the notice that appears when each book is opened will be changed.  SCO will replace Novell as the Copyright owner."  (5/29/07 Suppl. Normand Decl. Ex. 2 at SCO1605019 (emphasis added).)  The document specified with reference to "Copyright Notice" for "Disclaimer Page – Printed Books":  "Shelly [Laschkewitsch, of Novell] requested that date format be of the form '1992-1996' and that SCO be shown as the copyright owner for those years."  (Id.)  SCO did in fact replace Novell as the copyright owner in the UnixWare online books as early as January 1996. (5/29/07 Suppl. Normand Decl. Ex. 3 ¶¶ 2-5.)

       2.      The Parties' Conduct Following the APA and Amendment No. 2 with Respect to Microsoft Confirms Transfer of the Copyrights.

Pursuant to the APA, Novell held a seat on the Santa Cruz Board of Directors until 1999, when it divested its equity position in Santa Cruz.  Novell's representative attended meetings and reported back to the company regarding developments at Santa Cruz.  (Exs. 1, 11.)  In its Form 10-K filing for the fiscal year ending September 30, 1996, Santa Cruz stated:  "In December

18

1995, the Company acquired contain assets related to the UNIX business including the <u>core</u> <u>intellectual property</u> from Novell." (5/29/07 Suppl. Normand Decl. Ex. 34 (emphasis added).)

In 1996, Santa Cruz accused Microsoft of anticompetitive activities harmful to the UNIX business. In a letter dated September 19, 1996, Santa Cruz represented to the Justice Department that it had acquired the rights and ownership of the UNIX software from Novell, and that, as a result, "SCO now enjoys the right, as the owner of the UNIX program, to exploit the program without the necessity of a license from any other party." (5/29/07 Suppl. Normand Decl. Ex. 6 at 3.) On January 31, 1997, Santa Cruz reiterated and expanded upon those statements in a complaint filed with the European Union. (5/29/07 Suppl. Normand Decl. Ex. 7.) In that action, one of the firms that represented Santa Cruz was the Brobeck firm, which had represented Santa Cruz in connection with the APA. (<u>See, e.g., id.</u> at Recall 0001834.) Santa Cruz referred to itself as "the copyright owner of UNIX." (5/29/07 Suppl. Normand Decl. 7.) Ex. Santa Cruz's proceedings against Microsoft in the EU received wide publicity over the subsequent months. (<u>See, e.g.,</u> 5/29/07 Suppl. Normand Decl. Exs. 8-10.)

The provisions of the 1987 Microsoft Agreement that Santa Cruz alleged to be anticompetitive applied only to the owner of the UNIX copyrights. (5/29/07 Suppl. Normand Decl. Ex. 7.) Had Novell believed in 1996 and 1997 that it owned the copyrights, then Novell, not Santa Cruz, would have had the interest and standing to complain to the antitrust authorities. Indeed, in 1993, when Novell <u>did</u> own the copyrights, it complained internally about anticompetitive provisions of the 1987 Microsoft Agreement and contemplated bringing its own action. (5/29/07 Suppl. Normand Decl. Ex. 11.) There is no evidence that Novell was ever

concerned about the 1987 Microsoft Agreement after the APA or ever purported to correct SCO's assertion of copyright ownership.

        B.      <u>Novell's Conduct After the APA Confirms Transfer of the Copyrights.</u>

Novell disputes (at 52-56) the relevance and significance of its prior conduct cited in SCO's opening memorandum.  Novell's arguments are unavailing.

<u>First</u>, Novell mischaracterizes the law regarding physical possession of the UNIX copyright registrations.  The precedent Novell cites does not support its assertion that such possession is "legally irrelevant."  The registrations are prima facie evidence of the validity of the copyrights for purposes of enforcement in court.  <u>La Resolana Architects, PA v. Clay Realtors Angel Fire</u>, 416 F.3d 1195, 1202-03 (10th Cir. 2005).  The fact that Novell made no effort whatsoever to retain such presumptive evidence in its favor for any potential infringement action is not only relevant, but quite telling.  Novell permitted Santa Cruz to take physical possession and control of the copyright registrations when Santa Cruz moved into Novell's former office space.  That fact undercuts Novell's assertion that it intended to retain the UNIX and UnixWare copyrights and instead give Santa Cruz only a license to use those copyrights.  It would have been simple for Novell to request and take possession of the registrations; the fact that it did not compels the conclusion that Novell did not have the intent it now says it did.

<u>Second</u>, the representations set forth in SCO's license agreements evidence SCO's belief that it owned the UNIX and UnixWare copyrights.  In its "SCO UnixWare OEM Reseller Source for Support Agreement" with Lucent Technologies, Inc., for example, SCO specifies that "ownership of SCO UNIXWARE SOURCE PRODUCT(s) including all UPDATES and MODIFICATIONS made by LICENSEE (and any intellectual property rights embodied in any

such software) is and shall remain in SCO."  (Ex. 31 § 2.4.)  SCO could not have made the

foregoing statement unless it believed that it owned the intellectual property rights in the

UnixWare source code, including the copyrights.  Novell says it was not aware of such

statements in SCO's licenses, but if Novell believed it owned the copyrights, it would have tried

to take steps to monitor the terms of SCO's licenses for statements allegedly inconsistent with

Novell's asserted rights.  There is no evidence it did.

Third, the press release referenced in SCO's opening memorandum also shows that the

parties intended to transfer the copyrights under the APA.  Novell says (at 55) that SCO presents

no evidence that the press release was "joint," but Mr. Frankenberg, Novell's CEO at the time of

the APA, recognized it as the "joint press release" contemplated by the APA and issued by the

parties on September 20, 1995.  (5/29/07 Suppl. Normand Decl. Ex. 28 at 22-23.)  Novell admits

that the language at the end of the press release describing Novell's business is "an element of

what a joint press release would include."  (5/29/07 Suppl. Normand Decl. Ex. 20 at 24-25.)

Novell's insistence that it is irrelevant whether Mr. Frankenberg, on behalf of Novell, reviewed

and approved the press release is not reasonable.  (Id. at 20-21.)

The press release states that under the APA, SCO will acquire Novell's "UNIX

intellectual property."  Novell now tries to weaken the statement in its brief, but Novell's

corporate representative conceded at deposition that as to the statement in the press release, "it's

not accurate.  It's really inconsistent with what we just read out of the Asset Purchase

Agreement."  (Id. at 21.)  Yet although the substance of the press release was reported in the

Wall Street Journal (5/29/07 Jam Suppl. Normand es Decl. Ex. 29), Novell never objected to the

release.  The core intellectual property in UNIX is the copyrights.  (See, e.g., 5/29/07 Normand

Suppl. Decl. Ex. 19 at 137-38.)  The press release thus reflects the parties' understanding that Santa Cruz acquired such copyrights under the APA.

The conduct of Novell's CEO following the APA also is telling.  Jim Sullivan was Vice President of North American Sales at Novell at the time of the APA.  (5/29/07 Suppl. Normand Decl. Ex. 28 at 27-28.)  Shortly after the APA transaction, Mr. Sullivan delivered UNIX source code to IBM.  (Id. at 28.)  When Mr. Frankenberg learned that Mr. Sullivan had done so, he became "very unhappy" because he believed that the source code "had been conveyed to Santa Cruz as part of the transaction that the Asset Purchase Agreement reflected" and, as a result, he "didn't think we had the right to deliver source code to IBM."  (Id.)  Mr. Frankenberg's reaction confirms Novell's belief at the time that it was no longer authorized to distribute the source code.  If Novell retained the copyrights, there would have been no reason for Mr. Frankenberg to become upset with the delivery of the code to IBM.

      C.     Novell's New Declarations Create No Material Factual Issues.

Novell argues (at 38-40) that in "a short two-week" period (actually ten days) the lawyers for Novell and Santa Cruz decided to exclude the UNIX and UnixWare copyrights from the transfer of assets, even though (as Novell now concedes) in the previous months of negotiations the principal negotiators and decision-makers from both sides, including the CEOs of each company, had agreed that in buying the UNIX business from Novell, Santa Cruz would be obtaining all right, title, and interest in the business, which included the copyrights.

SCO's Motion is based on the plain language of the APA as amended.  Nonetheless, the position Novell now takes is extraordinary.  Novell claims that after the lead negotiators from each side had negotiated for months over this transaction and had agreed that Santa Cruz would

acquire assets that included the copyrights, Novell's lawyers decided to effect a major change in the deal by inserting language into a draft schedule to the APA. Ultimately, the confusion so engendered was removed by Amendment No. 2, which renders Novell's declarations irrelevant and leaves no genuine disputes of material facts.

   1.  The Testimony of Attorneys David Bradford and Tor Braham
       <u>Regarding the Original APA Is Beside the Point.</u>

  The testimony of Messrs. Bradford and Braham relates to the language in the Excluded Assets Schedule of the APA that the parties replaced via Amendment No. 2, and is thus irrelevant. (<u>See</u> Part I.A, above.[7]) Because the language relied upon by Messrs. Bradford and Braham was replaced, their testimony as to what they sought to accomplish by the supplanted language is of no import, and fails to create any genuine dispute of material fact.

   2.  The Testimony of David Bradford Regarding
       <u>His Supposed Intent Does Not Bear Scrutiny.</u>

  Whereas Mr. Bradford now claims a clear recollection of the intent he possessed at the time and the directives he supposedly gave to Novell's outside counsel, contemporaneous documents that he authored evidence no such intent and he has previously made contradictory statements. (SCO's Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance (May 18, 2007), at 66-67.) In addition, the memorandum that Mr. Bradford sent to Novell's Board outlining the transaction shortly before the APA was signed makes no mention of Novell retaining the copyrights, even though it does reference, with emphasis, the royalties that Novell

---

[7] Ms. Amadia claims to have spoken with Mr. Braham in connection with her work on Amendment No. 2, but she attributes no statements to him, and Mr. Braham makes no such statement in his declaration.

would be retaining.  (Bradford Decl. Ex. 3.)  If he had decided that Novell would retain the

copyrights under the APA – a decision that both he and Mr. Braham characterize as an important

decision for Novell for a variety of purported reasons – it is incongruous that he makes no

mention of the copyrights in the memo.  In addition, the testimony he offers does not create any

genuine dispute of material fact, where the language to which he refers was removed from the

APA by Amendment No. 2.

       3.      The New Testimony Regarding the Purported Reasons
                    Behind Novell's Supposed Intent Does Not Bear Scrutiny.

In their declarations, Messrs. Bradford, Braham and Tolonen offer a menu of purported

reasons for Novell's supposed intent to retain the UNIX and UnixWare copyrights.  The asserted

reasons the witnesses collectively identify are the following:

- Such ownership meant that if Santa Cruz went bankrupt, the rights to the SVRX License revenue would follow the copyrights to Novell.  All three witnesses assert this rationale.  (Bradford Decl. ¶ 9; Braham Decl. ¶ 14; Tolonen Decl. ¶ 12(d).)

- Such ownership would aid in Novell's interest in the development of UNIX on 64-bit Intel processors.  Mr. Braham and Mr. Tolonen assert this rationale; Mr. Bradford does not.  (Braham Decl. ¶ 14; Tolonen Decl. ¶ 12(c).)

- Such ownership would aid in Novell's negotiation of buy-outs of SVRX Licenses. Mr. Braham asserts this rationale; Mr. Bradford and Mr. Tolonen do not. (Braham Decl. ¶ 14.)

- Such ownership was important to ensure that Novell could continue with its remaining business regardless of any continuing overlap between UNIX and Novell's other products.  Mr. Tolonen asserts this rationale; Mr. Bradford and Mr. Braham do not.  (Tolonen Decl. ¶ 12(b).)

- Such ownership reflected the fact that Santa Cruz had been unable to pay cash up-front for what Novell regarded as the full value of the assets.  Mr. Tolonen appears to draw such a direct link between the amount of the purchase price and

the retention of assets; Mr. Bradford and Mr. Braham do not.  (Tolonen Decl. ¶¶ 5-6.[8])

None of the witnesses claims to have discussed any of the foregoing purported rationales with anyone from or representing Santa Cruz.[9]

In addition to such inconsistencies, the evidence does not bear out these purported mix of rationales, and in crucial respects the evidence is inconsistent with them.  By way of example:

First, none of the witnesses explains how or why the rights to the SVRX License revenue would allegedly "follow the copyrights" to Novell in the event of Santa Cruz's bankruptcy. Novell had no explanation for that purported rationale in its Rule 30(b)(6) deposition, and could offer no explanation for why such revenue would not "follow" the trade secrets, know-how or methods and concepts in UNIX and UnixWare that Novell concedes (at 55) it transferred under the APA.  (5/29/07 Suppl. Normand Decl. Ex. 20 at 38.)  The Wilson Sonsini law firm's own Rule 30(b)(6) representative in this case testified:

> Q.    Was it the view of the Wilson Sonsini law firm that if Santa Cruz were to go bankrupt, that the rights to the revenue stream would follow the intellectual property that Novell had retained?
>
> A.    I don't – I don't know what our view was at the time, but I certainly don't – I don't conceive now of the linkage of those two.
>
> Q.    And why not?

---

[8] In its Rule 30(b)(6) deposition, Novell also testified that Novell had retained the copyrights because Santa Cruz had been unable to pay cash up-front for what Novell regarded as the full value of the assets. (5/29/07 Suppl. Normand Decl. Ex. 20 at 236-38.)

[9] The Wilson Sonsini law firm acknowledged in its Rule 30(b)(6) deposition that apart from the language of the document, the firm knows of no other manner in which Novell conveyed to Santa Cruz Novell's alleged intent to retain the UNIX and UnixWare copyrights.  (5/29/07 Suppl. Normand Decl. Ex. 5 at 56-57.)

> A.    Because I don't understand the theory that's underlying the question.

(5/29/07 Suppl. Normand Decl. Ex. 5 at 39.)  Mr. Braham explains at length that Novell proposed separate, specific language for the APA pertaining to Novell's "equitable interest" in the SVRX revenue so that "In case Santa Cruz declared bankruptcy, the SVRX Royalties would be protected from the bankruptcy estate and Novell would continue to receive them."  (Braham Decl. ¶ 10.)  Neither Mr. Braham nor any other Novell witness seeks to explain what the retention of copyrights could add to the foregoing provision on the issue of Novell's interest in retaining the SVRX Royalties in the event of a Santa Cruz bankruptcy.[10]

Second, the claim that Novell sought to reserve the right to develop UNIX (whether on 64-bit Intel processors or otherwise) is inconsistent with the overwhelming evidence that Novell intended to get out of the UNIX business.  Novell CEO Robert Frankenberg decided in late 1994 or early 1995 to sell the UNIX and UnixWare business, in their entirety.  (5/29/07 Suppl. Normand Decl. Ex. 28 at 9-11.)  The instructions under which Novell executive Duff Thompson operated in negotiating the proposed deal with Santa Cruz were to "sell everything, from Bob Frankenberg to me, and sell UnixWare.  So sell UNIX, sell UnixWare."  (5/29/07 Suppl. Normand Decl. Ex. 30 at 24-25.)  Mr. Thompson formed the Novell deal team and was personally involved in face-to-face negotiations with Santa Cruz officials Alok Mohan, Steve Sabbath, Jim Wilt, Geoff Seabrook, and Kim Madsen.  (Ex. 10 ¶ 5.)

---

[10] Mr. Tolonen also appears to assert that such ownership was allegedly important to insure Novell's entitlement to the SVRX License revenue even independent of any Santa Cruz bankruptcy.  (Tolonen Decl. ¶ 12(a).)  He offers no explanation for that purported rationale or what copyright ownership could add to the myriad provisions of the APA that, as Novell's own witnesses have testified, led Novell to believe that it had absolute rights to that revenue and to enforce its collection.

The claim that Novell sought to reserve the right to develop UNIX also is inconsistent with Novell's admission that "the entire intent" was for Novell to transfer the UNIX-related business to SCO.  (5/29/07 Suppl. Normand Decl. Ex. 20 at 60.)  Novell has presented no evidence that it made any subsequent effort to develop UNIX at all, nor does Novell offer any explanation for how it could have done so following the transfer of the entire business and its infrastructure to Santa Cruz.  Nothing in the APA gives Novell that right, and it is clear from the APA and TLA that SCO owned "all rights" to the Licensed Technology and that Novell's right to use that technology was limited.

Third, the claim that the retention of the copyrights would somehow aid in Novell's negotiation of buy-outs of SVRX Licenses is inconsistent with these same witnesses' testimony that Novell's view was that it had secured for itself an "unqualified" right of "control" that allowed Novell unilaterally to enter into such buy-outs pursuant to Section 4.16 of the APA. (Bradford Decl. ¶ 16; Braham Decl. ¶¶ 12-13.)  Novell's Rule 30(b)(6) witness Greg Jones confirmed that Novell viewed its Section 4.16 rights as "absolute."  (5/29/07 Suppl. Normand Decl. Ex. 20 at 68.[11])  Mr. Braham offers no explanation for what the retention of copyrights could add to Novell's allegedly unqualified and absolute rights under Section 4.16 of the APA with respect to buy-outs.  Mr. Bradford discusses the scope of those Section 4.16 rights without any reference to how the retention of copyrights could augment then in any way.  Indeed, when the issue of Novell's rights unilaterally to undertake such buy-outs became a point of dispute between Novell and Santa Cruz throughout most of 1996, shortly after the APA and when it was

---

[11] To be clear, SCO disputes Novell's interpretation of the nature and scope of its rights under Section 4.16.  The point is that where Novell purportedly believed that it had secured for itself such an "absolute" right, that belief contradicts a proposed rationale for the alleged need for retaining the copyrights.

fresh on everyone's mind, there is no evidence that Novell ever even <u>mentioned</u> to Santa Cruz (or even internally) its purported retention of the UNIX and UnixWare copyrights. To the contrary, the Novell executive who initiated the Novell unilateral buy-outs in early 1996, Larry Bouffard, concedes that Novell's view at the time was that it was "on thin ice" in undertaking such conduct. (5/29/07 Suppl. Normand Decl. Ex. 21 at 67.) Novell admits that, apart from the negotiations of Amendment No. 2, the company knows of no other internal communications at Novell regarding the UNIX or UnixWare copyrights in 1996. (5/29/07 Suppl. Normand Decl. Ex. 20 at 198-99.)

<u>Fourth</u>, the claim that the retention of the copyrights would somehow ensure that Novell could continue with its remaining business regarding any continuing overlap between UNIX and Novell's other products is inconsistent with the undisputed rationale and terms of the license-back that Novell obtained in the APA and TLA. Under the APA and TLA, Novell secured for itself the right to use both the Licensed Technology (as defined in the APA) and the modifications that Santa Cruz developed based on that technology in Novell's own products, subject to the limitations set forth in the APA and TLA. Mr. Tolonen offers no explanation for what the retention of copyrights could add to the APA and TLA's resolution of the "continuing overlap between UNIX and Novell's other products." It would defeat the entire purpose of the APA and TLA on that front if Mr. Tolonen means to suggest that the retention of copyrights gave Novell any greater rights to use UNIX and UnixWare technology in Novell's own products than was set forth in the APA and TLA. His position is incredible on its face and inconsistent with the plain language of the agreements.

Fifth, any claim that the retention of copyrights reflected the up-front money that Santa Cruz paid is inconsistent with the wealth of testimony from witnesses such as Duff Thompson and Ed Chatlos of Novell and Doug Michels and Jim Wilt of Santa Cruz that it was Novell's interest in the SVRX Royalties stream that "bridged the price gap" between what Santa Cruz could pay at that time and what Novell regarded the value of the UNIX and UnixWare assets to be. (See SCO's Memorandum in Opposition to Novell's Motion for Partial Summary Judgment on Its Fourth Counterclaim for Relief, and in Support of SCO's Cross Motion for Partial Summary Judgment (Jan. 17, 2007) ¶¶ 18-23.) Surely Novell does not mean to suggest that when its lawyers became involved in September 1995, they somehow changed the rationale for the SVRX Royalties in relation to the up-front purchase price.

> 4.  Mr. Braham's Testimony That Novell Clearly
>     Communicated to Santa Cruz Novell's Alleged Intent
>     To Exclude the Copyrights Does Not Bear Scrutiny.

The linchpin of Mr. Braham's declaration (at paragraphs 14-17) is his testimony that the Wilson Sonsini law firm communicated Novell's intent to exclude the UNIX and UnixWare copyrights by amending asset schedules to the APA. Upon close review, however, the mark-ups are not clear at all and, if anything, support the testimony of Robert Frankenberg, Ty Mattingly and Ed Chatlos that the copyrights referenced in the Excluded Assets Schedule referred to NetWare and other products Novell retained, not UNIX. The mark-ups also have no bearing on the plain language of the APA as amended.

Mr. Braham attaches to his declaration a draft of the APA dated September 8, 1995 (the "9/9/95 draft"), that includes a one-page sheet at the front of the draft titled "Schedule 1.1(a)." (Braham Decl. Ex. 6.) That page follows a page titled "Index of Schedules," listing "Schedule

1.1(a) ('Assets'), "Schedule 1.1(b) ('Excluded Assets')," and "Schedule 1.1(c) ('Assumed

Liabilities')." (Id.) Although the draft contains the foregoing Index, there is no Schedule 1.1(b)

or Schedule 1.1(c) in the draft. The "Schedule 1.1(a)" sheet includes, as Mr. Braham

acknowledges, entries for "all copyrights" and a laundry list of intellectual property and other

rights (Id.)

     Mr. Braham then says that the Wilson Sonsini firm "drafted a new schedule of assets to

be included in the asset transfer, as well as a schedule of assets to be excluded from the transfer."

(Braham Decl. ¶ 15 & Ex. 7 thereto.) Mr. Braham then says of the revision of September 15,

1995 (the "9/15/95 draft"):

> Both schedules specifically addressed how intellectual property
> rights in UNIX and UnixWare would be treated in the deal.
> Patents and copyrights were not included as assets; instead patents
> and copyrights were specifically excluded. Only certain UNIX and
> UnixWare trademarks were identified as included assets.

(Id.) Yet, Novell's own concessions belie Mr. Braham's testimony that the 9/15/95 draft

"specifically addressed how intellectual property rights in UNIX and UnixWare would be treated

in the deal." Those concessions underscore the ambiguity inherent in the revisions.

     The 9/15/95 draft eliminated Section I from the "Assets" identified in the 9/8/95 draft,

left the paragraph identifying Santa Cruz's acquisition of "All rights and ownership of Unix and

UnixWare," and added to the end of that paragraph the language "such assets to include without

limitation the following." (Braham Decl. Ex. 7 (emphasis added).) The "without limitation"

phrase was taken from the first paragraph of the 9/8/95 Assets Schedule, which paragraph (as

also noted below) addressed "intellectual property." The 9/15/95 draft thus did not amend any

preexisting Excluded Assets Schedule at all, but rather created one for the first time. In the two

draft Excluded Assets Schedules included in Exhibit 7 to Mr. Braham's declaration, the first four Roman Numerals, all on the first page of the Schedule, relate to the NetWare assets that Novell was retaining. The 9/15/95 draft Excluded Assets Schedule thus preserved the structure of the final Excluded Assets Schedule that APA negotiators and signatories such as Robert Frankenberg, Ed Chatlos, and Ty Mattingly of Novell and Jim Wilt of Santa Cruz identified as appearing to relate to the retained Netware assets. (5/29/07 Suppl. Normand Decl. Exs. 28 at 21-22; 31 at 40-41; 32 at 52; 33 at 29-30, 35.[12]) The confirmation that Santa Cruz was receiving "all rights of ownership of Unix and UnixWare . . . without limitation" clearly meant the inclusion of the copyrights.

Mr. Braham asserts that attorney Burt Levine of Novell reviewed and edited what appears to be a draft of portions of the Assets and Excluded Assets Schedules from a draft of September 16, 1995, and "left the copyright exclusion intact" (Braham Decl. ¶ 16(d)), but Mr. Levine's testimony confirms that he did not give the drafts the meaning that Mr. Braham gives to them. Mr. Levine testified, for example, that under the APA the "intention was to convey all of these ownership and auxiliary ownership rights to the asset including copyright." (5/29/07 Suppl. Normand Decl. Ex. 23 at 68.) Asked whether it would have surprised him if, "from the time of the APA in 1995 until you left Santa Cruz in 2002," anyone inside or outside of Santa Cruz or

---

[12] The same ambiguity inheres in Novell's reliance (at 40) on board minutes stating that pursuant to the APA, "Novell will retain all of its patents, copyrights and trademarks (except for the trademarks UNIX and UnixWare)." Novell executives Bob Frankenberg, Duff Thompson, and Ty Mattingly all testified that they understood the minutes to refer to Novell's intent to retain its copyrights in NetWare. In the same sentence in the board minutes where the reference is made to copyrights, it is also stated that Novell was retaining a license to UNIX and UnixWare. That reference is nonsensical if Novell was retaining the copyrights and simply granting Santa Cruz a license, as Novell now claims. (See 5/29/07 Suppl. Normand Decl. Exs. 28 at 83-84, 170; 30 at 130; 32 at 50-51.)

Novell had said "that Novell had retained the UNIX and UnixWare copyrights," Mr. Levine

testified:  "Very much so, yeah."  (Id. at 154.)

Just as fundamentally, and contrary to Mr. Braham's assertion, the 9/15/95 draft does not

enumerate the intellectual property rights in UNIX and UnixWare in the "Intellectual Property"

sections of the Assets and Excluded Assets Schedules.  The Assets Schedule of the 9/8/95 draft

had included the following language:

> All patents, patent applications, copyrights, trademarks, service
> marks, trade names, trade secrets, proprietary information,
> technology rights and licenses, proprietary rights and processes,
> know-how, research and development in progress, and any all
> other intellectual property including, without limitation . . . .

(Braham Decl. Ex. 6.)  The language thus listed the foregoing forms of "intellectual property"

and used the "without limitation" phrase that was later incorporated into the new "All rights of

ownership" paragraph in the 9/15/95 draft Assets Schedule.

In addition, the "Intellectual Property" section of the 9/15/95 draft Assets Schedule did

not identify UNIX and UnixWare intellectual property transferred to Santa Cruz.  Novell

concedes (at 55) that the "trade secrets" and "know-how" in UNIX and UnixWare, as well as the

"methods and concepts" therein, were among the assets transferred.  Yet the "Intellectual

Property" section of the 9/15/95 draft Assets Schedule, as well as the final version of the Assets

Schedule, says only "Trademarks Unix and UnixWare."  (Braham Decl. Ex. 7.)  It necessarily

follows that the "All rights of ownership . . . without limitation" language in the first paragraph

of the Assets Schedule of the 9/15/95 draft, as well as the final version of the Assets Schedule of

the APA, includes such intellectual property in UNIX and UnixWare.  The two "Intellectual

Property" sections of the Assets and Excluded Assets Schedule of the 9/15/95 draft, as well as

the final APA, thus did not single out the UNIX and UnixWare intellectual property. Instead, these drafts and Novell's arguments confirm that the Assets Schedule of the APA includes the UNIX and UnixWare intellectual property, a crucial fact in the Court's assessment of the revision to the Excluded Assets Schedule reflected in Amendment No. 2. (See Part I, above.)

There are other crucial additions to the 9/15/95 draft of the Assets Schedule that undercut Mr. Braham's assertion that Novell's attorneys' alleged intent was clearly communicated to Santa Cruz. The Assets Schedule in the 9/8/95 draft did not specify the UNIX or UnixWare products and releases to be transferred, making reference instead to the "copies" of UNIX and UnixWare. (Braham Decl. Ex. 6.) In contrast, the Assets Schedule in the 9/15/95 draft detailed the UNIX and UnixWare products transferred, immediately after the "without limitation" representations, referring to:

- "UNIX Source Code Products" (referring to product schedules and including UnixWare 2.0 and prior products, UNIX SVR4.1 ES and prior products, UNIX SVR4.0MP and prior products, and Ancillary SVRx Products).

- "Binary Product Releases" (including UnixWare 2.01 Product Family, UnixWare 2.0.x update releases, UnixWare 1.1 Product Family, and UnixWare 1.1.x update releases).

- "Products Under Development" (including UnixWare 2.1 (Eiger), UnixWare 2.1 Oracle Parallel Server, UnixWare 2.03, UnixWare 2.0.x/2.1 Enhanced Mode Merge, and UnixWare 2 Internet Server).

- "Other Technology" (including a variety of UnixWare-related technology, such as test suites and test specifications).

(Braham Decl. Ex. 7.) The Assets Schedule of the 9/15/95 draft thus identified as Assets "All rights of ownership . . . without limitation" (including intellectual property) in the foregoing products in detailed ways that the Assets Schedule of the 9/8/95 draft had not.

There is thus little wonder that Mr. Frankenberg and other executives at Novell all understood this to mean exactly what all the other negotiators (on both sides of the deal) thought: the UNIX and UnixWare copyrights were transferred to Santa Cruz. All of the Source Code and Binary products were added to that section and identified with specificity. The specification could reasonably mean nothing other than the transfer of the copyrights to Santa Cruz, and does not create any genuine dispute of material fact.

     5.     The Testimony of Allison Amadia Regarding Her and Mr. Sabbath's <u>Supposed Intent and Understanding Does Not Bear Scrutiny.</u>

Ms. Amadia claims to have had conversations with Mr. Sabbath in which she claimed to have conveyed her view that Santa Cruz already had a license and declined to confirm the transfer of any copyrights. Her testimony does not give Amendment No. 2 a meaning to which it is reasonably susceptible, and if the Court were inclined to consider her testimony, Mr. Sabbath's testimony contradicts it.

Mr. Sabbath stated in his November 2004 declaration that Amendment No. 2 "was intended to confirm, among other things, the parties' intent that SCO would obtain ownership of the UNIX copyrights under the APA." (5/29/07 Suppl. Normand Decl. Ex. 12 ¶ 6.) Mr. Sabbath testified at deposition that it was never his understanding during the negotiations or leading up to the APA or thereafter "that copyrights in the UNIX business were being excluded from the assets transfer" (5/29/07 Suppl. Normand Decl. Ex. 13 at 24.); that it was never his understanding "that Santa Cruz was obligated to ask Novell to transfer particular UNIX and UnixWare copyrights" (<u>id.</u> at 35); that it was not his view that Amendment No. 2 "created a process by which Santa Cruz would go to Novell and specify the copyrights that Santa Cruz believed was required to exercise its rights with respect to UNIX and UnixWare technologies" (<u>id.</u> at 98-99); that with

respect to the APA and Amendment No. 2 his understanding regarding Novell was "that they did

not retain any copyrights pertaining to the UNIX technology" (id. at 100; see also id. at 227);

that it was not his view that Santa Cruz had merely licensed from Novell the UNIX and

UnixWare source code or copyrights (id. at 220); and that he understood Amendment No. 2 to

constitute a clarification of the transfer of the UNIX and UnixWare copyrights to Santa Cruz

under the APA (id. at 221-22.).  This testimony runs directly counter to Ms. Amadia's testimony

about what she claims to have told Mr. Sabbath, and demonstrates that Mr. Sabbath did not give

the significance to the difference in language between the drafts of Amendment No. 2 that

Novell asks the Court to infer from that language.[13]  In addition, Ms. Amadia's declaration gives

Amendment No. 2 a meaning to which its language is not reasonably susceptible, and therefore

is no basis for Novell's opposition.

The language in the final version of Paragraph A of Amendment No. 2, moreover, is

entirely consistent with the intent Mr. Sabbath attributed to that language at the time.  Novell

appears to argue that if the parties had intended to clarify a transfer of copyrights they would

have just said "the UNIX and UnixWare copyrights," but such language was insufficient.  As the

testimony of Santa Cruz senior executive Doug Michels showed, the draft Amendment No. 2

language would not have clearly encompassed the copyrights in the documentation, training

material and brochures necessary for running the UNIX and UnixWare business.  (5/29/07

Suppl. Normand Decl. Ex. 19 at 126-28.)  In addition, Amendment No. 1 to the APA specified

that any reference to "UNIX and UnixWare" in the APA's Assets Schedule was to be changed to

---

[13] Mr. Sabbath did not claim to recall the specifics of any conversations with Ms. Amadia or the specific exchange of documents regarding proposed language; that testimony does not render irrelevant his clear and repeated testimony regarding his intent and understanding in connection with both the APA and Amendment No. 2 and the course of performance thereafter.

read "UNIX, UnixWare and Auxiliary Products."  (Ex. 2 § K.1(i).)  Attachment A of

Amendment No. 1, in turn, lists well over one hundred of the defined "Auxiliary Products."  (Id.

Attachment A.)  The final language of Paragraph A of Amendment No. 2 encompasses the

copyrights in such products; the draft language of Paragraph A did not.  Among the other direct

evidence that Amendment No. 2 does not mean what Ms. Amadia claims is that months before

the parties even conceived of the Amendment, Novell had placed Santa Cruz copyright notices

on the UnixWare source code it had transferred to Santa Cruz.  (See Part II.A.1, above.)

        D.      The Testimony SCO Has Presented Is Admissible and Directly Relevant.

Notwithstanding the overwhelming testimonial evidence SCO has presented regarding

the parties' intent and negotiations, Novell now argues (at 40-42 and in its Appendix A) that the

testimony is irrelevant and inadmissible.  Novell is wrong for numerous reasons.

        1.      The Testimony Regarding the APA.

First, Novell adopts a mistaken view of the "key" issues.  Novell argues (at 41-42) that

the "key issue" is "what was meant by the listing of 'all copyrights' on the Excluded Assets

schedule and what was meant by the omission of copyrights from the 'Intellectual Property' in

the Included Assets schedule."  It cannot be that the "key issue" concerns the language in the

Excluded Assets Schedule that no longer even exists, by virtue of its elimination through

Amendment No. 2.  (See Part I.A, above.)

In addition, the negotiations and understandings among the business negotiators whose

testimony SCO has cited establishes (as Novell now concedes through its reliance on the

declaration of Tor Braham) that as of ten days before the execution of the APA, on September 8,

1995, the parties indisputably were in agreement that Novell intended to transfer all of the UNIX

and UnixWare copyrights.  (See Part II.D, above.)  In the event the Court is inclined to consider

the negotiations of the language eliminated by Amendment No. 2, the foregoing undisputed

agreement between the parties is a crucial fact for at least two main reasons.

One, with respect to the APA, the fact that the parties were indisputably in

agreement at that time that Novell intended to transfer all the UNIX and UnixWare

copyrights reframes issues such as (1) whether the parties' outside counsel properly

revised a fundamental aspect of the deal without the knowledge of the parties' principals

and business negotiators, (2) the credibility of Novell's attorneys' asserted reasons for

seeking to retain the copyrights, and (3) the extent to which Novell clearly communicated

to Santa Cruz in the few business days before the execution of the APA that Novell now

allegedly intended to retain the UNIX and UnixWare copyrights and not just the NetWare

copyrights.

Two, with respect to Amendment No. 2, the fact that the parties agreed that UNIX

and UnixWare copyrights would be transferred shortly before the execution of the APA

by virtue of agreement among the parties' principals and negotiators bears directly on the

parties' state of mind in negotiating and entering into Amendment No. 2.  That is

particularly true where the witnesses whom Novell touts (at 40) as the only relevant

witnesses regarding the APA (Tor Braham, Aaron Alter, Shannon Whisenant, and Jeff

Higgins) were not involved in negotiating or drafting the Amendment.

The extensive testimony that SCO has cited thus bears in direct and important ways on crucial

issues regarding the negotiations of both the APA and Amendment No. 2.  Such testimony is not

even relevant, in the first instance, in light of the plain language of the APA and Amendment No. 2.  (See Part I, above.)

Second, Novell's interpretation of what constituted the negotiation of the APA is far too narrow.  Alluding to witnesses whose testimony SCO has cited, Novell asserts (at 41):  "None of those persons has personal knowledge of the drafting and negotiations of the Included and Excluded Assets schedules."  The witnesses have personal knowledge of the negotiation of the fundamental terms of the deal.  Indeed, in its own Rule 30(b)(6) testimony, Novell identified Ed Chatlos and Ty Mattingly as individuals from Novell who "spent a lot of time" on the deal that was set forth in the APA, and "to some extent possibly even Bob Frankenberg."  (5/29/07 Suppl. Normand Decl. Ex. 20 at 10.)  In addition to the foundational testimony cited in SCO's opening memorandum, for example, the evidence shows the following:

- Novell CEO Robert Frankenberg decided in late 1994 or early 1995 to sell the UNIX and UnixWare business, in their entirety.  (5/29/07 Suppl. Normand Decl. Ex. 28 at 9-11.)

- In the summer of 1995, Novell executive Ty Mattingly and the rest of the Novell deal team met with Santa Cruz representatives, including Jim Wilt and Geoff Seabrook, for a series of meetings lasting "probably a month and a half to two months."  Mr. Mattingly "was very heavily involved" in the negotiation of the APA, "interfacing between Bob Frankenberg and the SCO team and participating in the meetings that we would have at times with Alok Mohan and Doug Michaels."  (5/29/07 Suppl. Normand Decl. Ex. 32 at 20, 22-23.)

- The instruction under which Novell executive Duff Thompson operated in negotiating the proposed deal with Santa Cruz were clear:  "sell everything, from Bob Frankenberg to me, and sell UnixWare.  So sell UNIX, sell UnixWare."  Mr. Thompson formed the Novell deal team and was personally involved in face-to-face negotiations with Santa Cruz officials Alok Mohan, Steve Sabbath, Jim Wilt, Geoff Seabrook and Kim Madsen.  (5/29/07 Suppl. Normand Decl. Ex. 30 at 24-25; Ex. 10 ¶ 5.)

- Novell attorney Burt Levine drafted "some of the provisions of the APA" and reviewed and revised drafts of the APA. (5/29/07 Suppl. Normand Decl. Ex. 23 at 56, 163-64.)

- Santa Cruz executive Doug Michels was "very involved" in the "initiation" of the APA, "the strategy behind it," and he "was very involved in the high level structure of the agreement," and "was involved in supervising pretty directly the people who were negotiating the details of the agreement." (5/29/07 Suppl. Normand Decl. Ex. 19 at 9.)

- Kim Madsen of Santa Cruz's legal department "participated in meetings, negotiations, a review of the asset purchase agreement, and possibly preparation of some of the schedules." (5/29/07 Suppl. Normand Decl. Ex. 14 at 33-34.)

These witnesses were thus involved in all aspects of the negotiation of the APA, from the very beginning of the discussions to the creation and review of the final wording.

If extrinsic evidence is to be considered at all, it is relevant to consider how the Assets and Excluded Assets Schedules incorporate and reflect the deal that the parties' principals had negotiated over many weeks and had agreed to as of a few business days before the execution of the APA. Novell thus improperly assumes to be true issues such as whether Novell's outside counsel was free to renegotiate a fundamental aspect of the agreed-upon deal, and to do so without ever discussing that aspect of the deal with anyone from or representing Santa Cruz. (See Part II.C.3, above.)

Third, Novell asserts (at 42) that "SCO submits no evidence that any of the witnesses upon which it relies participated in any discussion of copyright." The extensive testimony from the principals and business negotiators that they could recall no specific discussion about copyrights shows the deal did not involve any exclusion of "copyrights" from among the sale of the UNIX and UnixWare businesses. Similarly, Novell errs in arguing that the witness testimony is irrelevant because they did not recall any specific discussion of the inclusion of "copyrights,"

because the copyrights were indisputedly part of the UNIX and UnixWare assets that Novell

owned and that SCO's witnesses affirmatively recalled the parties intended to transfer.

Fourth, Novell's arguments find no support in the relevant precedent. Novell cites no

case, and SCO has found none, holding or even suggesting that the only relevant extrinsic

evidence of the negotiation of a deal embodied in a written contract is the testimony of the

attorneys who drafted the language of the contract – let alone where the particular attorney-

drafted language at issue was excised from the contract by amendment.

Instead, the relevant precedent confirms that testimony regarding the negotiations among

the principals of the companies to the contract at issue is relevant extrinsic evidence. The goal of

contract interpretation is to give effect to the mutual intention of the parties. See Cal. Civ. Code

§ 1636; City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445,

473 (1998). The contract may be explained by reference to the circumstances under which it was

made. See Cal. Civ. Code § 1647. The "particular clauses of a contract are subordinate to its

general intent," Cal. Civ. Code § 1650, and "words in a contract which are wholly inconsistent

with its nature, or with the main intention of the parties, are to be rejected." Cal. Civ. Code §

1653; accord Sy First Family Ltd. P'ship v. Cheung 70 Cal App. 4th 1334, 1342 (1999); Marin

County v. Assessment Appeals Bd. Marin County, 64 Cal. App. 3d 319, 325 (1976).

Where (contrary to here) the plain language does not resolve the issue, among the

relevant extrinsic evidence the courts review to determine such "mutual intention" is "the

surrounding circumstances under which the parties negotiated or entered into the contract" and

"the object, nature and subject matter of the contract." Morey v. Vannucci, 64 Cal. App. 4th

904, 912 (1998). As illustrated above and in SCO's opening memorandum, the witnesses whose

testimony SCO cited have given extensive testimony on those very issues.  See, e.g., S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc., 74 Cal. App. 4th 1232, 1241-42 (1999) (court erred in excluding the testimony of a railroad general manager who was involved in negotiating the agreements at issue and whose testimony was admissible to prove the parties' mutual intent).[14]

2.       The Testimony Regarding Amendment No. 2.

Novell in effect concedes that the testimony of Santa Cruz's signatory to Amendment No. 2 (Steve Sabbath) is relevant, if extrinsic evidence is to be considered, because Novell relies on the declaration of Novell's signatory to Amendment No. 2 (James Tolonen).  It also follows that Novell regards as relevant the signatories' understanding of Amendment No. 2, because Mr. Tolonen does not claim to have discussed or negotiated Amendment No. 2 with anyone from Santa Cruz, and does not claim to have drafted any of the language of Amendment No. 2.  (See Tolonen Decl. ¶¶ 13-16.)

Mr. Sabbath's testimony defeats Novell's heavy reliance (at 46) on the "negotiation history" of Amendment No. 2.  Mr. Sabbath's testimony establishes that he did not interpret the language that Novell proposed for Amendment No. 2 to mean what Novell now says it means. (See Part II.D.5, above.)  Novell cites part of Mr. Sabbath's testimony where he acknowledges that he does not recall details regarding the negotiation of Amendment No. 2, for example, but fails to cite Mr. Sabbath's subsequent and clear statement regarding the Amendment that it was

---

[14] Novell also argues that extrinsic evidence is inadmissible under the "Best Evidence Rule" where "the agreements themselves are the best evidence of their contents," but cites no case (and SCO has found none) applying any such rule to render extrinsic evidence inadmissible.  Any such application of Rule 1002 would improperly swallow all of the rules and precedent specific to the relevance and admissibility of extrinsic evidence.  Novell also says that the Court should disregard any subsequent declaration that contradicts any deposition testimony, but gives no examples of any such alleged "sham fact issue."

never his understanding during the negotiations or leading up to the APA or thereafter "that copyrights in the UNIX business were being excluded from the assets transfer" (5/29/07 Suppl. Normand Decl. Ex. 13 at 24), and "we understood this to be a clarification" that the copyrights had transferred (id. at 221-22). Novell also declines to cite Mr. Sabbath's testimony in his November 2004 declaration that Amendment No. 2 "was intended to confirm, among other things, the parties' intent that SCO would obtain ownership of the UNIX copyrights under the APA." (5/29/07 Suppl. Normand Decl. Ex. 12 ¶ 6.) Ms. Madsen's testimony directly corroborates Mr. Sabbath's, where Ms. Madsen worked directly with Mr. Sabbath at the time, was involved with him in the negotiations and discussions regarding the Amendment, and always understood the Amendment to clarify that Santa Cruz had acquired the copyrights through the APA. (Ex. 21 ¶¶ 3-4; 5/29/07 Suppl. Normand Decl. Ex. 14 at 73-75, 81.)

Novell here singles out the language in the initial draft of Paragraph A of Amendment No. 2 in which the exception to the Excluded Assets Schedule of the APA was phrased as follows: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder . . . ." (Amadia Decl., Ex. 1 at 1.) This does not create a factual dispute, and favors SCO. Whereas (for example) the draft language referred to "the copyrights and trademarks owned by Novell as of the date of this Amendment," the final language referred to "the copyrights and trademarks owned by Novell as of the date of the Agreement." The parties thus agreed that Novell did not own the copyrights and trademarks as of the date of the Amendment. In addition, whereas the draft language purported to amend the Excluded Assets Schedule of the APA with language referring to "this Amendment," the final

42

language makes reference to "the Agreement."  The conclusion that follows is that the draft

language was literally wrong (the Excluded Assets Schedule could not sensibly be revised to

contain a reference to an amendment occurring a year later), and that the parties intended for

Paragraph A of Amendment No. 2 to relate back to the date and execution of the APA.  Finally,

the draft language referred to the copyrights that SCO "has acquired hereunder" without making

clear that "hereunder" referred to the APA, not the amendment itself.  The final language makes

clear that Paragraph A operates as a revision to the language of the APA itself.

> E.    Novell's "Implied License" Argument Highlights More
>        Evidence Confirming the Transfer of the Copyrights
>        and Creates No Material Factual Issues.

Novell argues (at 46-48) that at the time of Amendment No. 2, the "APA already granted

SCO a license to use the UNIX and UnixWare copyrights as necessary to exercise its rights

under the APA," and therefore Amendment No. 2 cannot mean what SCO has asserted it to

mean.  First of all, there is not one word about a license to SCO of the copyrights or anything

else relating to UNIX in the APA.  It is inconceivable that the core intellectual property rights in

the transaction would not be transferred as part of all right, title and interest but would instead be

"licensed" sub silentio.

In addition, Novell's argument concedes that SCO could not exercise its rights in the

UNIX and UnixWare technologies without the rights to copy, modify, distribute and sublicense

the copyrighted code.  (See also Novell's Memorandum in Support of Its Motion for Summary

Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance at

26-29.)  Novell thus also concedes that where SCO did not have any "license" at the time of

Amendment No. 2, the language in the Amendment would have to be reasonably read as

referring to transferred copyrights, because only such copyrights would give Santa Cruz the right to copy, modify, distribute and sublicense the copyrighted code.[15]

Novell's own General Counsel (Joseph LaSala) agreed with the "logic" of the foregoing line of reasoning.  (5/29/07 Suppl. Normand Decl. Ex.  27 at 48-51.)  Like Mr. LaSala, Novell attorney Greg Jones acknowledged that such reasoning "seems logical."  (5/29/07 Suppl. Normand Decl. Ex. 20 at 133-34.)  Neither Mr. Bradford's memo to the board nor any board minutes mention any license to Santa Cruz.  The evidence belies Novell's assertion that it had always taken the view that Santa Cruz had any implied license under the APA.  As recently as February 2007, Mr. LaSala testified that the APA does not give SCO "the right to use and make copies of UNIX or UnixWare source code in order to evolve that business."  (Id. at 48.[16])

SCO has shown that Novell's "license" argument fails for a multitude of reasons and serves to highlight more extrinsic evidence in SCO's favor regarding the meaning of Amendment No. 2.  (SCO's Memorandum in Opposition to Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific Performance (May 18, 2007), at 47-51.)  Other facts compel the same conclusion.

---

[15] Novell's "license" argument embodies an even further concession – namely, that where Mr. Sabbath of Santa Cruz in negotiating Amendment No. 2 did not believe that Santa Cruz had any such license, he reasonably understood the language in the Amendment to refer to transferred copyrights giving Santa Cruz the right to copy, modify, distribute and sublicense the copyrighted code.  (See Part II.B.5, above.) Novell (at 47) attributes to SCO the position that "a license in insufficient," but SCO's position is that there was not a license under either the APA or Amendment No. 2, as explained in more detail below. Novell also claims that SCO's Rule 30(b)(6) witness Chris Sontag was unable to answer certain questions, but the fact is that both parties had agreed that such witnesses could cross-reference the parties' existing and prospective filings on particular issues, and that is what Mr. Sontag did.

[16] After a break in the deposition, he testified:  "My assumption is there's a license for them to use UNIX copyrights, a license, an implied license to use it."  (5/29/07 Suppl. Normand Decl. Ex. 27 at 65-66.)

First, multiple witnesses from both SCO and Novell – including Robert Frankenberg, Ed Chatlos, Ty Mattingly, Steve Sabbath, and Kim Madsen – have testified that the UNIX and UnixWare copyrights were necessary and required for SCO's operation of the UNIX and UnixWare businesses.  (5/29/07 Suppl. Normand Decl. Exs. 13 at 34-35, 211-12; 14 at 126-29; 31 at 43; 32 at 108; 19 at 101-02, 104; 14 at 232; 37 at 234-35.)

Second, Novell's reliance (at 47) on Santa Cruz's conduct of its business between the execution of the APA and the execution of Amendment No. 2 is inexplicable.  No one has suggested that Santa Cruz had been or was as of late 1996 physically unable to make copies of the UNIX and UnixWare source code.  Nor has Novell submitted any evidence suggesting that anyone had tried to stop Santa Cruz from undertaking such activities.  The issue between the parties as of late 1996 concerned the legal rights and entitlements necessary for Santa Cruz lawfully to copy, modify, distribute and sublicense the copyrighted code and otherwise to take the steps it had been taking in operating the business it had acquired.  It is of no moment that after the execution of the APA, Santa Cruz had undertaken to operate the business it had acquired.

Third, other plain text of the APA and related agreements further compel the conclusion that Santa Cruz did not obtain the implied license that Novell now proposes.  The Excluded Assets Schedule of the APA identifies the "Licensed technology" that Novell was not transferring to Santa Cruz but that instead was being "licensed" to Santa Cruz for continued use in the UNIX and UnixWare products it was acquiring.  (Ex. 1, Schedule 1.1(b) § IV.)  The APA also defines the "NetWare Portion" of future release of UnixWare and provides that "Seller and Buyer shall enter into a license agreement with respect to the NetWare Portion."  (Ex. 1 § 4.19.)

45

That text demonstrates not only that the parties knew how to refer to and provide for a "license" when they wanted such an arrangement, but also – and even more specifically – that they knew how to refer to and provide for such a "license" for technology that was <u>not</u> included in the Assets Schedule. The fact that there <u>was</u> such a license to Santa Cruz for the NetWare-related technology but <u>not</u> for the UNIX and UnixWare copyrights compels the conclusion that the parties intended for a license with respect to the former technology but not the latter, because no license was necessary in the latter scenario.

The Strategic Development Agreement between Novell and Santa Cruz, effective December 6, 1995, illustrates the same point. The "Statement of Work No. 1 for NetWare Software" appended to that Agreement provides in pertinent part:

> <u>Netware Software</u> – The software and programs set forth on Exhibit A which are being licensed to SCO pursuant to this State of Work in both source code and binary code forms, unless otherwise noted, for integration into UnixWare and porting to other Platforms for use with UnixWare. . . .
>
> . . . .
>
> <u>Novell Grant</u>.  Subject to the terms and conditions specified in this Agreement, Novell hereby grants, and SCO hereby accepts, a non-exclusive, world-wide, non-transferable (except as otherwise provided herein) Confidential Full Source License in the NetWare Software.  SCO's rights under the foregoing license is limited to a grant for use of the NetWare Software in connection with SCO's marketing and licensing of UnixWare. . . .

(5/29/07 Suppl. Normand Decl. Ex. 1 (Statement of Work No. 1 for Netware Software) §§ 2.8, 3.1.)  The parties included no such language in the APA with respect to either UNIX or UnixWare.

Similarly, Novell cites (at 47) its January 1996 "Tuxedo" transaction with BEA Systems, Inc. as an example of one in which it sold certain assets and retained copyrights, but the agreement in that transaction was title "TUXEDO License and Distribution Agreement." Novell admits that the deal with Tuxedo was "described as a license" in the transaction documents. (5/29/07 Suppl. Normand Decl. Ex. 20 at 240-41.) The contemporaneous agreement and related documents thus illustrate that Novell knew how to specify when it intended to "license" technology at issue. Indeed, the case law confirms that the Court should <u>not</u> infer (or "lightly assume") that the parties intend to segregate the copyrights and the ownership of the property in which the copyrights exist. <u>Schiller & Schmidt, Inc. v. Nordisco Corp.</u>, 969 F.2d 410, 413 (7th Cir. 1992).

## <u>CONCLUSION</u>

SCO respectfully submits, for the reasons set forth above and in SCO's opening memorandum, that the Court grant SCO's Motion for Partial Summary Judgment on its First, Second, and Fifth Causes of Action and for Summary Judgment on Novell's First Counterclaim.

DATED this 29th day of May, 2007.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
David Boies
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

DORSEY & WHITNEY LLP
Devan V. Padmanabhan

*Counsel for The SCO Group, Inc.*

By:    _____/s/ Edward Normand_____

48

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the

foregoing SCO's Reply Memorandum in Further Support of Its Motion for Partial Summary

Judgment on Its First, Second, and Fifth Causes of Action and for Summary Judgment on

Novell's First Counterclaim was served on Defendant, Novell, Inc., on this 29th day of May,

2007, via CM/ECF to the following:

>       Thomas R. Karrenberg
>       John P. Mullen
>       Heather M. Sneddon
>       ANDERSON & KARRENBERG
>       700 Bank One Tower
>       50 West Broadway
>       Salt Lake City, UT 84101
>
>       Michael A. Jacobs
>       Matthew I. Kreeger
>       Kenneth W. Brakebill
>       MORRISON & FOERSTER
>       425 Market Street
>       San Francisco, CA 94105-248

>                       /s/ Edward Normand