# EXHIBIT 4

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

--oOo--

THE SCO GROUP, INC.,

    Plaintiff/Counterclaim Defendant,

vs.             No. 2:04CV00139

NOVELL, INC.,

    Defendant/Counterclaim Plaintiff,

_____/


Videotaped Rule 30 (b)(6) Deposition of

MICHAEL J. DANAHER

_____

Friday, April 27, 2007


Reported by:

Leslie Rockwood

CSR No. 3462

Job No. 193580

Page 1

---

INDEX OF EXAMINATION

Page

Examination by Mr. Normand      6


INDEX OF EXHIBITS

| Number | Description | Page |
|---|---|---|
| EX 1066 | SCO's Notice of Third Party Subpoena to Wilson Sonsini Goodrich & Rosati, PC, 2/09/07. | 7 |
| EX 1067 | Agreement and Plan of Reorganization, 8/01/00. | 19 |
| EX 1068 | Intellectual Property Assignment, 5/07/01. | 22 |
| EX 1069 | Exhibit 13.15D, Group Products. | 46 |
| EX 1070 | Exhibit 13.15A, Contributed Assets. | 46 |
| EX 1071 | Email from Greg Forman to Harrison Colter, 4/27/01. | 64 |
| EX 300 | Letter to Steven M. Sabbath from Barry E. Taylor, 9/01/95. | 91 |
| EX 301 | Email string from Shana M. Solomon to Steven Liu, 4/26/01. | 96 |
| EX 302 | Email string from Regan Grilli to Shana Solomon and others, 4/30/01. | 98 |

Page 3

---

APPEARANCES:

For the Plaintiff/Counterclaim Defendant:

    Edward Normand

      -and-

    Thomas Strong (paralegal)

    Boies, Schiller & Flexner, LLP

    333 Main Street

    Armonk, New York 10504

    (914) 749-8200


    Ryan E. Tibbitts

    The SCO Group, General Counsel

    355 South 520 West, Suite 100

    Linden, Utah 84042

    (801) 765-4999


For the Defendant/Counterclaim Plaintiff:

    Kenneth Brakebill

    Morrison & Foerster, LLP

    425 Market Street

    San Francisco, California 94105-2482

    (415) 268-7455


For The Witness:

    Mark Parnes

    Wilson Sonsini Goodrich & Rosati, PC

    650 Page Mill Road

    Palo Alto, California 94304-1050

    (650) 320-4878


The Videographer:  Marty Majdoub

Page 2

---

INDEX OF EXHIBITS (Continued)

| Number | Description | Page |
|---|---|---|
| EX 303 | Email from Shana Solomon to Regan Grilli and others, 5/03/01. | 98 |
| EX 304 | Letter to Ladies and Gentlemen, from Wilson Sonsini Goodrich & Rosati, PC, 5/07/01. | 98 |

--oOo--

Page 4

1 (Pages 1 to 4)

1  1995.
2      MR. PARNES:  That's fair.
3      THE WITNESS:  That's fair.
4      To my knowledge, no.  To my knowledge, no.
5      Q.  BY MR. NORMAND:  So to your knowledge, is
6  there any representation or warranty or statement in the
7  agreement and plan of reorganization that you believe is
8  inaccurate?
9      A.  To my knowledge, no.  No.
10     Q.  I take it you don't know the answer to that
11  question with respect to Mr. Liu's knowledge?
12     A.  Well, I'm sure that SCO and Steve Liu would
13  have done their best to be honest.  You do your best in
14  these reps and in the disclosure schedules that go with
15  them that have to be read together.  Right?  And you do
16  your best to present all the facts that you have because
17  if you fail to leave some out, maybe there's an escrow
18  claim or something.
19         So they would have tried to be accurate on
20  that, and for all kinds of reasons.  One is integrity,
21  and two, it's the right practice for protecting the
22  client and for SCO to protect itself.
23         So, you know -- so I'd be surprised if
24  anybody felt that the reps and warranties and disclosure
25  schedule were inaccurate.

Page 41

1      Q.  And as you sit here, do you have any reason
2  to believe that the reps and warranties and disclosure
3  schedules in the agreement and plan of reorganization are
4  inaccurate?
5      MR. BRAKEBILL:  Foundation.
6      THE WITNESS:  No, I'm not aware of any
7  inaccuracy.  I'm not aware of any claims that were
8  brought up during the claim period.  I'm not aware of
9  that.
10     Q.  BY MR. NORMAND:  Do you have a view as to
11  whether under the agreement and plan of reorganization
12  Santa Cruz intended to transfer to Caldera certain
13  intellectual property?
14     A.  I know at the general level that they
15  certainly intended to transfer intellectual property.
16  That was the bulk of the assets.  With respect to any
17  particular copyright or license, you know, that I can't
18  say because I didn't get involved in those details.
19     The -- it looks like --
20     MR. NORMAND:  Why don't you stop, actually.
21     THE VIDEOGRAPHER:  Do you want to go off the
22  record?
23     MR. NORMAND:  Let's give it 30 seconds.
24     (Interruption in proceedings.)
25     MR. NORMAND:  Do you want to take a break,

Page 42

1  Mark?
2      MR. PARNES:  No.  That was Aaron.  So he
3  didn't know when you guys were going to be ready for him.
4      THE WITNESS:  Sounds like he may have more
5  knowledge of use to you.  I'm afraid I'm not able to
6  address some of your questions.
7      Q.  BY MR. NORMAND:  What I was trying to get at
8  with my question was, at least part of what I'm trying to
9  get at is:  Do you have an understanding of the
10  intellectual property issue that I just asked you about
11  as a result of reading the agreements or do you have an
12  independent recollection of it being an issue or is it
13  somewhere in between?
14     MR. BRAKEBILL:  Vague and ambiguous,
15  compound.
16     THE WITNESS:  Yeah.
17     MR. BRAKEBILL:  You can answer.
18     THE WITNESS:  We were selling the business
19  and the intellectual property rights that went with the
20  business.  So at a high level, my understanding of the
21  transaction was SCO transferred whatever rights it had to
22  Caldera.  And I was not involved in any discussions about
23  any individual right within that basket of rights on
24  that.  But I think SCO wanted to transfer whatever it had
25  that was useful to that.

Page 43

1      Q.  BY MR. NORMAND:  There's a phrase that's been
2  bandied about in the litigation, and I'll use it, and
3  your counsel can object or you can tell me if you're not
4  comfortable with it.  But as you sit here, is it your
5  view that the agreement and plan of reorganization speaks
6  for itself?
7      MR. PARNES:  You can answer if you
8  understand.
9      THE WITNESS:  I think it probably does, but
10  maybe there's a paragraph or section here or there that's
11  not clear and people's memories might augment.  But I
12  think, you know, most corporate lawyers could pick this
13  up and come to an understanding of it.
14     Q.  BY MR. NORMAND:  And if I were to ask you the
15  same question regarding the intellectual property
16  assignment, what would your answer be?
17     A.  That it should speak for itself.
18     Q.  I had asked you a series of questions earlier
19  about the principal negotiators on both sides with
20  respect to the agreement and plan of reorganization.
21     A.  Uh-huh.
22     Q.  I want to ask those questions about the
23  intellectual property assignment.  Would your answers be
24  any different?
25     A.  I expect it would not have gone up to the

Page 44

11 (Pages 41 to 44)

1  Doug Michaels level. It would have been handled by Steve
2  Sabbath. That's my guess, but I don't recall discussions
3  on those.
4      Q. Do you have a view as to on the Caldera side
5  who would have been focused on the intellectual property
6  assignment?
7      A. Probably counsel, I think. And --
8      Q. You mean Brobeck?
9      A. The Brobeck and -- I don't know -- I don't
10  know who at Caldera they might have been working most
11  closely with.
12      Q. Do you recall whether there were any in-house
13  counsel at Caldera in connection with these transactions?
14      A. I was just asking myself that question, and
15  there may have been, but I don't remember. There may
16  well have been.
17      Q. And why do you say that the intellectual
18  property assignment would not have gone up to the Doug
19  Michaels level, or why do you offer that view?
20      A. I think Doug Michaels -- the high level
21  agreement is that we're transferring over this business
22  and all our rights that go with this business. That's
23  all that Doug needs to know with respect to that topic.
24  And then it's up to the attorneys and whatever to work
25  through the details of implementing that.

**Page 46**

1      So, you know, we weren't -- to my knowledge,
2  we weren't trying to retain rights. We weren't planning
3  to, you know, be in that business, anymore. So that
4  would have been an implementation thing.
5      Q. Apart from your discussions with counsel, do
6  you have any understanding of the litigation that brings
7  us here today?
8      A. No.
9      Q. Good for you.
10      A. Okay. I don't think I was aware of who the
11  parties were to the litigation until Wednesday when Mark
12  told me.
13      MR. BRAKEBILL: Can we take a break soon?
14      MR. NORMAND: Yeah, why don't we take a
15  break, then.
16      THE VIDEOGRAPHER: We are now going off the
17  video record. The time is 10:52 a.m.
18      (Recess.)
19      THE VIDEOGRAPHER: We are now back on the
20  video record. The time is 11:02 a.m.
21      (Exhibits 1069 and 1070 marked.)
22      Q. BY MR. NORMAND: The documents that have just
23  been marked Exhibits 1069 and 1070 are exhibits to the
24  agreement and plan of reorganization.
25      MR. BRAKEBILL: Which is 1069 and which is

**Page 47**

1  1070?
2      MR. NORMAND: 1069 is 13.15 D, group
3  products.
4      Q. So I don't want to take up too much of your
5  time with this. But I do want to take a shot at seeing
6  if I can refresh your recollection.
7      A. Sure.
8      Q. If you look at the agreement and plan of
9  reorganization.
10      A. Okay. Any particular page?
11      Q. Yes, sir, page 75, which is Section 13.15,
12  certain defined terms?
13      A. Uh-huh.
14      Q. And then if you turn the page --
15      A. Okay.
16      Q. -- to the definition of contributed assets?
17      A. Okay.
18      Q. That cross references Exhibit 13.15 A.
19      A. Uh-huh.
20      Q. Do you see that language?
21      A. Yeah.
22      Q. And then if you could turn your attention to
23  Exhibit 13.15 A, subtitled "Contributed Assets"?
24      A. Uh-huh.
25      Q. The language of paragraph 1 begins: "With

**Page 48**

1  the exception of third-party encumbrances as set forth in
2  Exhibit 13.15 E, all rights and ownership of UNIX,
3  UnixWare, and Open Server, including all versions of
4  UNIX, UnixWare, and Open Server, and all copies of UNIX,
5  UnixWare, and Open Server (including revisions, upgrades
6  and updates in process) all intellectual property rights
7  appurtenant thereto (excluding the UNIX trademark which
8  is owned by The Open Group)." And the language goes on.
9      Do you see that language?
10      A. Uh-huh.
11      Q. Does this language refresh your recollection
12  or confirm your recollection that among the contributed
13  assets that would be transferred to Caldera were the --
14  all of the intellectual property rights appurtenant to
15  UNIX, UnixWare, and Open Server?
16      A. This is consistent with my understanding of
17  the deal.
18      MR. BRAKEBILL: I was just going to object to
19  the use of the word "confirm." It mischaracterizes his
20  earlier testimony.
21      THE WITNESS: This is consistent in my
22  understanding of the transaction.
23      Q. BY MR. NORMAND: As you sit here, do you have
24  any reason to believe that all of the intellectual
25  property rights pertinent to UNIX, UnixWare, and Open

Case 2:04-cv-00139-DAK-BCW    Document 347-4    Filed 05/29/2007    Page 4 of 60

12 (Pages 45 to 48)

Esquire Deposition Services
216 E. 45th STREET   .   NEW YORK, NY 10017   .   1-800-944-9454

1 Doug Michaels left, Steve Sabbath left, and we were just
2 called on, you know, on occasion to help with this or
3 that, but our involvement was a lot less. So -- and then
4 the company was sold.
5     Q. The language we had walked through in the
6 intellectual property assignment a couple minutes ago --
7     A. Uh-huh.
8     Q. -- as you sit here, do you have any reason to
9 believe that any of that language I read into the record
10 is inaccurate?
11     A. Well --
12     MR. BRAKEBILL: Vague and ambiguous.
13     THE WITNESS: The language is what it is. I
14 think you have to read it as a whole. Your questions
15 have been more to did they own all of this or all of
16 that. And that's not exactly what the language is
17 saying. The language is saying you're getting all of our
18 right, title, and interest.
19     Q. BY MR. NORMAND: Let me make sure I'm clear.
20 I wasn't asking whether -- I wasn't re-asking my
21 question. My specific question was --
22     A. Do I have any reason to think it's
23 inaccurate? I'm sorry. I have no reason to think any of
24 it's inaccurate.
25     Q. And when you say "any of it," you mean the

Page 57

1 language I read into the record from the intellectual
2 property assignment?
3     A. Correct, correct. Now, taken as a whole, you
4 know, it's -- this is not a description of what the
5 rights were. It's a description of -- it's an
6 assignment. It's something that affects you get this.
7 But a description of what the rights were would have been
8 more what comes with the plan of reorganization and the
9 reps and warranties and disclosure schedule.
10     Q. And of course, I can't read all the language
11 of the plan -- maybe I should. But that language that I
12 did read into the record a few minutes ago, can you
13 recall whether you thought any of that language was
14 inaccurate?
15     MR. BRAKEBILL: Vague and ambiguous.
16     THE WITNESS: Yeah, how do I say this? That
17 language said, as a whole, SCO was transferring all it
18 owned in those categories, and that's what was happening.
19 SCO was transferring all that it owned.
20     Q. BY MR. NORMAND: But I take it when you heard
21 the language that I read into the record, you didn't
22 think any of it was inaccurate. Is that fair to say?
23     MR. BRAKEBILL: Vague and ambiguous.
24     MR. PARNES: Counsel, you've lost me. Which
25 language now are you talking about?

Page 58

1     MR. NORMAND: I mean the language from the
2 agreement and plan of reorganization.
3     THE WITNESS: So you read the definition and
4 then you read the -- was it 1.4? I can't remember.
5     Q. BY MR. NORMAND: Yeah, I read from this
6 document the definition of contributed assets or at least
7 pointed you to that language.
8     A. Yeah.
9     Q. And then we looked at the Exhibit 13.15 A
10 titled "Contributed Assets."
11     A. Okay. These are -- how to explain this? You
12 know, I think the document is not a representation of
13 what is. So if you asked a true-false question. It's a
14 representation of an agreement between the parties. So
15 I'm not -- I'm not used to the question you said accurate
16 or inaccurate. This is what we're giving you. And if
17 you pull out any particular clause and say is that
18 accurate or inaccurate, depends more on what the question
19 is, what's that pertaining to. It's not intended to be a
20 description of everything. Maybe I'm not being
21 informative enough there.
22     Q. Do you have a view, as you sit here, as to
23 whether Exhibit 13.15 A of the agreement and plan of
24 reorganization identifies all of the assets that Santa
25 Cruz intended to transfer to Caldera?

Page 59

1     A. As most good corporate attorneys do, they did
2 this as a catchall and then with specific things
3 identified. So the list itself of the specifics is
4 probably not universal. But the catchall was, you know,
5 all IP rights including the following. Does that answer
6 your question? The list of particulars is not
7 exhaustive.
8     Q. And you're saying that's -- you're saying
9 that is typical of what most good corporate attorneys do?
10 Is that what the beginning of your answer was?
11     A. Yeah, I think your question was: Does this
12 represent all of the assets they were transferring, you
13 know, in this category? And the answer is if you use the
14 catchall phrase, yes, it does. Just the specifics were
15 not exhaustive.
16     Q. And the view you just expressed, is that the
17 view of the law firm?
18     MR. PARNES: I'll object as vague. What
19 view?
20     Q. BY MR. NORMAND: Is it the view of the law
21 firm that Exhibit 13.15 A of the agreement and plan of
22 reorganization taken in its entirety --
23     A. Uh-huh.
24     Q. -- describes all of the assets that Santa
25 Cruz transferred to Caldera in connection with the

Page 60

15 (Pages 57 to 60)

1    A.  It was probably more on the corporate and
2  securities side of the transaction.  Helping with that
3  part of the process, helping make sure we handled
4  shareholder approvals and proxies and SEC process
5  altogether.  The -- that was a big part of it.
6    And as it turns out, I think the biggest
7  difficulty arose in the transaction was this thing
8  involving PWC and the SEC, and that had the potential to
9  derail the closing another six months, which would have
10  cost SCO an enormous amount of money given the ongoing
11  losses.  And the fact that we were able to help persuade
12  the SEC to avoid that consequence, that was a major
13  accomplishment for SCO.
14    Q.  In connection with the SCO Caldera
15  transaction, at the time of the transaction, did you
16  think it was possible that some of the representations
17  and warranties that Santa Cruz had made were inaccurate?
18    A.  I would have expected them to be highly
19  accurate, that the team there would have been very
20  careful about what they were putting down.  Steve and
21  Regan and Kim were -- you know, were a good team.
22    MR. NORMAND:  I have no further questions.
23    And Ken, I don't know if you do, so let me
24  say now that I'd like to take the step of holding the
25  deposition open.  It may be that I need to speak with

Page 81

1  Mr. Parnes about the nature of the deposition today, but
2  that's a subject for a later day.
3    MR. BRAKEBILL:  I do have some questions.
4    MR. NORMAND:  Do you want to sit here?
5    MR. BRAKEBILL:  That's what I was wondering.
6  Maybe it's better to switch.
7    THE VIDEOGRAPHER:  It's up to you.
8    MR. BRAKEBILL:  I don't care, but you won't
9  be looking at the videotape.
10    MR. NORMAND:  You've got a nice profile.
11    MR. PARNES:  Why don't we switch.
12    MR. BRAKEBILL:  Actually, I want to take just
13  a second, go off the record.
14    THE VIDEOGRAPHER:  We are now going off the
15  video record.  The time is 11:57 a.m.
16    (Brief interruption.)
17    THE VIDEOGRAPHER:  We are now back on the
18  video record.  The time is 11:59 a.m.
19    MR. BRAKEBILL:  I can still say good morning.
20    THE WITNESS:  Okay, good.
21    EXAMINATION BY MR. BRAKEBILL
22    Q.  I'll try to be quick.  I have a handful of
23  questions relating to some topics that Mr. Normand asked
24  you as well as just relating to the Caldera transaction
25  generally.

Page 82

1    You testified just a few moments ago that --
2  I believe that all of the schedules attached to the
3  agreements for the Santa Cruz Caldera transaction were
4  prepared by the Santa Cruz team; is that right?
5    MR. NORMAND:  Objection to form.
6    Q.  BY MR. BRAKEBILL:  I think you said by
7  Mr. Sabbath and team?
8    MR. NORMAND:  Same objection.
9    THE WITNESS:  All the schedules listing
10  assets and the like would have been prepared by Sabbath
11  and team.
12    Q.  BY MR. BRAKEBILL:  Just so the record is
13  clear, there was an Exhibit 1069 and 1070 that
14  Mr. Normand showed you?
15    A.  Uh-huh.
16    Q.  One of them is called "Group Products."
17  That's an Exhibit 13.15 D?
18    A.  Yeah.
19    Q.  And then there's an exhibit 13.15 A called
20  "Contributed Assets."  Do you see those?
21    A.  Yes.
22    Q.  Just so the record is clear, is it your view
23  that these two schedules were prepared by Mr. Sabbath and
24  company at Santa Cruz, and not Wilson Sonsini?
25    MR. NORMAND:  Objection to form.

Page 83

1    THE WITNESS:  Okay.  By the way, I don't mean
2  to exclude the possibility Caldera and their side might
3  have been involved, but the exhibit group products which
4  is the list of products, source code, other products
5  under development, and auxiliary products, that would
6  have been prepared by the client, and perhaps the Caldera
7  product people would have gotten involved to cross-check
8  against their list.
9    The exhibit contributed assets, I'm sure part
10  of the drafting was done by Brobeck.  But particularly
11  when you go down to the attachment to that, which is
12  the -- you know, two pages of fine print on the things
13  here, that would have been prepared by the client.
14    Q.  BY MR. BRAKEBILL:  And the client is Santa
15  Cruz; right?
16    A.  Santa Cruz, yeah.  And again, Novell may have
17  cross-checked this --
18    MR. PARNES:  Not Novell.
19    THE WITNESS:  Not Novell.  Pardon me,
20  Caldera.
21    Q.  BY MR. BRAKEBILL:  The schedule of
22  contributed assets was not prepared by Wilson Sonsini; is
23  that right?
24    A.  That's right.
25    Q.  For the contributed asset schedule, is it

Page 84

21 (Pages 81 to 84)

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
--oOo--

THE SCO GROUP, INC.,
    Plaintiff/Counterclaim Defendant,
vs.    No. 2:04CV00139
NOVELL, INC.,
    Defendant/Counterclaim Plaintiff,
_____/

Videotaped Rule 30 (b)(6) Deposition of

AARON J. ALTER

_____

Friday, April 27, 2007

Reported by:
Leslie Rockwood
CSR No. 3462
Job No. 193580B

Page 1

---

1         INDEX OF EXAMINATION
2                 Page
3 Examination by Mr. Normand     5, 142
4     by Mr. Brakebill       138
5
6
7
8
9         INDEX OF EXHIBITS
10 Number    Description      Page
11 EX 1072   Letter to Dear Sirs from Scott   137
         D. Lester, 5/01/96.
12
   EX 1073   Strategic Development Agreement   137
13       Between Novell, Inc., and The
       Santa Cruz Operation, Inc.
14
   EX 305    Exhibit 8, Filed 4/20/07.     138
15
   EX 306    Fax to Jeffrey P. Higgins from    140
16       Brobeck Phleger & Harrison,
       with attachment, 9/18/95.
17
            --oOo--
18
19
20
21
22
23
24
25

Page 3

---

1         APPEARANCES:
2
3 For the Plaintiff/Counterclaim Defendant:
4     Edward Normand
      -and-
5     Thomas Strong (paralegal)
      Boies, Schiller & Flexner, LLP
6     333 Main Street
      Armonk, New York 10504
7     (914) 749-8200
8
    Ryan E. Tibbitts
9     The SCO Group, General Counsel
      355 South 520 West, Suite 100
10    Linden, Utah 84042
      (801) 765-4999
11
12 For the Defendant/Counterclaim Plaintiff:
13    Kenneth Brakebill
      Morrison & Foerster, LLP
14    425 Market Street
      San Francisco, California 94105-2482
15    (415) 268-7455
16
17 For The Witness:
18    Mark Parnes
      Wilson Sonsini Goodrich & Rosati, PC
19    650 Page Mill Road
      Palo Alto, California 94304-1050
20    (650) 320-4878
21
22 The Videographer: Marty Majdoub
23
24
25

Page 2

---

1     BE IT REMEMBERED that on Friday, April 27, 2007,
2 commencing at the hour of 1:03 p.m., at the law offices
3 of Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road,
4 Palo Alto, California, before me, LESLIE ROCKWOOD, a
5 Certified Shorthand Reporter in the State of California,
6 personally appeared
7     AARON J. ALTER
8 called as a witness by the Plaintiff-Counterclaim
9 Defendant in the above-entitled action, who, having been
10 duly sworn, by the Certified Shorthand Reporter to tell
11 the truth, the whole truth and nothing but the truth,
12 testified under oath as follows:
13     --oOo--
14     THE VIDEOGRAPHER: Good afternoon. Here
15 begins Videotape Number 1 in the deposition of Aaron
16 Alter in the matter of SCO Group versus Novell, Inc., in
17 the United States District Court for the District of
18 Utah, case number 2:04CV00139.
19     Today's date is April 27th, 2007. The time
20 is 1:04 p.m. This deposition is being taken at 650 Page
21 Mill Road, Palo Alto, California. The videographer is
22 Marty Majdoub, here on behalf of Esquire Deposition
23 Services, 505 Sansome, Suite 502, San Francisco,
24 California.
25     Would all counsel please identify yourselves

Page 4

1 (Pages 1 to 4)

1      Q. You say insufficient consideration was being

2  paid. Wasn't the Novell interest in the revenue stream

3  designed to bridge the price gap?

4      MR. BRAKEBILL: Argumentative, foundation.

5      MR. PARNES: You can answer.

6      THE WITNESS: It was certainly intended to be

7  a -- a bridge. I don't know that it was a sufficient

8  bridge or that was viewed by Novell as sufficient.

9      Q. BY MR. NORMAND: Do you have a view on that

10  front on behalf of the Wilson Sonsini firm?

11      A. My view is that the rights that were

12  retained, including but not limited to the revenue

13  stream, including the equitable title, including the

14  patents, including everything that's set out at Exhibit

15  1.1(b) was exactly what the intention of the parties was,

16  was to retain these rights on behalf of Novell.

17      Q. Was it Novell's view that owning the

18  copyrights in the UNIX and UnixWare source code would

19  permit Novell to continue to have rights in the revenue

20  stream if Santa Cruz were to go bankrupt?

21      A. I can't speculate, and I'm not sure I even

22  understand the question.

23      MR. BRAKEBILL: By the way, I don't know if

24  it's intentional. You keep asking Novell's view. It's

25  clear, it is his view, not Novell's. We will be

Page 37

1  providing a Novell 30(b)(6) witness.

2      MR. NORMAND: Well, I think I'm entitled to

3  ask the Wilson Sonsini firm for its understanding of

4  Novell's view.

5      MR. BRAKEBILL: You are. True. I think the

6  question reflects that. I think that's implicit. I just

7  want to make the record clear.

8      Q. BY MR. NORMAND: I guess what I've understood

9  you to say is Novell would be in a better position to

10  claim the rights to the revenue stream if it retained

11  certain intellectual property in UNIX and UnixWare than

12  if it had not retained certain intellectual property

13  rights.

14      A. No, I don't think that's what I said. If I

15  said that, I may have misspoken. I think Novell --

16  Novell did retain the rights to the revenue stream and

17  the royalty payments, and it did retain other

18  intellectual property rights in the assets that were

19  transferred. They -- that was done in -- I wouldn't tie

20  the retention of the other intellectual property rights

21  to the specific exigency of maintaining rights to the

22  royalty stream in the event of a bankruptcy of SCO.

23      It was there was consideration of stock in

24  from SCO, of collection and payment of the royalty

25  stream, and retention of rights as three different

Page 38

1  categories of assets retained and consideration paid by

2  SCO in the transaction.

3      Q. Was it the view of the Wilson Sonsini law

4  firm that if Santa Cruz were to go bankrupt, that the

5  rights to the revenue stream would follow the

6  intellectual property that Novell had retained?

7      A. I don't -- I don't know what our view was at

8  the time, but I certainly don't -- I don't conceive now

9  of the linkage of those two.

10      Q. And why not?

11      A. Because I don't understand the theory that's

12  underlying the question.

13      Q. Was there any link, in the view of the law

14  firm, between Novell's decision to retain certain

15  intellectual property rights, on the one hand, and on the

16  other hand, the fact that the consideration being paid

17  was not cash?

18      MR. BRAKEBILL: Vague and ambiguous.

19      MR. PARNES: You can answer.

20      THE WITNESS: Okay.

21      I don't recall a distinction being drawn

22  between cash versus stock consideration. So I guess the

23  answer would be no.

24      Q. BY MR. NORMAND: So it wasn't cash. Let me

25  say that to myself. Was there any link, in the view of

Page 39

1  the law firm, between Novell's decision to retain certain

2  intellectual property rights, on the one hand, and the

3  fact that the value of the consideration being paid was

4  less than what Novell thought the value of the assets

5  were?

6      MR. PARNES: I think that's been asked and

7  answered, but you can answer.

8      THE WITNESS: That is my recollection.

9      Q. BY MR. NORMAND: And this will be a question

10  I guess I asked earlier. Let me try to make sure I

11  understand or twist it a little bit.

12      Is it the law firm's view that the Novell

13  interest in the revenue stream was not sufficient to

14  account for the full value of the assets as Novell saw

15  them?

16      A. I think my answer is "yes," that I view

17  the deal structure as giving Novell three different forms

18  of -- well, I don't know quite how to -- so the deal

19  structure had three aspects of it for Novell. One was

20  stock in from SCO; the second was retention of 95 percent

21  of the royalty payments from the USL licenses; and the

22  third was the underlying intellectual property assets

23  that had been acquired, or a portion of them that had

24  been acquired from USL. And that's why -- that's why

25  there's a long list of assets being transferred and those

Page 40

Esquire Deposition Services
216 E. 45th STREET  .  NEW YORK, NY 10017  .  1-800-944-9454

1  was transferred, the assets which were retained are
2  specified.  And of the assets that were transferred, they
3  constitute a sufficient bundle of rights to give SCO the
4  ability to use the technology and develop enhancements
5  and run their business and run the UnixWare business
6  going forward.
7         If you characterize it as a license, I don't
8  see language saying it's not a license.  I don't see
9  language saying it is a license.  I think we can parse
10  what a license is.  But I believe that the rights that
11  were granted were sufficient to enable SCO to run the
12  UNIX and UnixWare business going forward from the point
13  in time that that transaction was done.
14        You know, the only reference to a license I
15  recall -- and I'm just sort of refreshing my recollection
16  in 1.6 -- was that there was a specific license back of
17  the enhancements so that Novell wouldn't have to pay
18  additional consideration to the extent that SCO developed
19  additional improvements or enhancements on the UNIX and
20  UnixWare technology that was deemed licensed back to
21  Novell.
22        Q.  And in the view of the law firm, were the
23  rights, bundles of rights that Santa Cruz acquired, ones
24  that constituted a license?
25             MR. PARNES:  Objection.  Lacks foundation,

Page 53

1  but you can answer.
2        Q.  BY MR. NORMAND:  Well, they acquired a bundle
3  of rights; correct?
4        A.  Yes.
5        Q.  Okay.  In your view, were those bundle of
6  rights ones that constituted a license?
7        A.  Well, I -- you've characterized it as a
8  license.
9        Q.  No, I'm asking you.
10       A.  Okay.
11       Q.  I don't have a view that I'm articulating
12  today.  I just mean to ask you.
13       A.  Okay.  So I understand, but you've framed it
14  in terms of it being a license per se, and I'm -- you're
15  asking me -- perhaps, why don't you ask me the question
16  again.
17       Q.  So I thought we had just agreed that there
18  was some bundle of rights.
19       A.  Yes.
20       Q.  Everyone can argue about that, but there is
21  some bundle of rights that Santa Cruz acquired.
22       A.  Yes.
23       Q.  And I am using a label in the form of a
24  question and asking you as an attorney or as someone
25  involved with this, would you describe the bundle of

Page 54

1  rights as a license to Santa Cruz?
2             MR. BRAKEBILL:  Vague and ambiguous.
3             MR. PARNES:  You can answer.
4             THE WITNESS:  I would describe it as a
5  transfer of assets to enable Santa Cruz to run a business
6  that Novell sought to sell.
7        Q.  BY MR. NORMAND:  And did Novell intend to
8  retain the right to develop UNIX and UnixWare source
9  code?
10       A.  I don't know what the intention was in
11  retaining these rights beyond what I've already testified
12  to.  I'll stop at that.
13       Q.  In the firm's view, following the execution
14  of the APA, would Novell have had the right to develop
15  the UNIX and UnixWare source code under the terms of the
16  APA?
17             MR. BRAKEBILL:  Calls for a legal conclusion.
18             MR. PARNES:  Also calls for speculation.  But
19  you can, if you understand the question, you can --
20             THE WITNESS:  Could I ask you to repeat the
21  question, please.
22       Q.  BY MR. NORMAND:  The question is whether
23  following the execution of the APA, in the view of the
24  Wilson Sonsini law firm, would Novell have been within
25  its rights in developing the UNIX and UnixWare source

Page 55

1  code?
2        A.  Yes, insofar as they retained those as
3  assets.
4        Q.  But you don't know whether that was
5  specifically part of Novell's intent?
6        A.  That's right.  I do not know.  I have no
7  reason to believe that was an intention in retaining
8  those rights.
9        Q.  And similarly, after the execution of the
10  APA, in the view of the law firm, would Novell have been
11  within its rights in making copies of the UNIX and
12  UnixWare source code?
13       A.  Yes.
14       Q.  And do you know whether that was among the
15  reasons that Novell intended to retain certain of the
16  intellectual property in UNIX and UnixWare?
17       A.  I don't know.
18       Q.  And similarly, in your view or the view of
19  the firm, following execution of the APA, would Novell
20  have been within its rights in distributing copies of the
21  UNIX and UnixWare source code?
22       A.  I don't recall a prohibition against their
23  doing that in the asset purchase agreement.
24       Q.  And do you know whether the right to
25  distribute copies of the UNIX and the UnixWare source

Page 56

14 (Pages 53 to 56)

1  code was among the reasons that Novell intended to retain
2  certain intellectual property?
3      A.  I do not know that.
4      Q.  In 1995, did Novell convey to Santa Cruz its
5  intent to retain the UNIX and UnixWare copyrights?
6      MR. PARNES:  I'm sorry.
7      (The record was read by the reporter as
8      follows:
9      "QUESTION:  In 1995, did Novell convey to
10     Santa Cruz its intent to retain the UNIX and
11     UnixWare copyrights?")
12     THE WITNESS:  It's -- on the face of the
13  agreement they are retained.  So absent that, I don't
14  know what else -- how else to answer.  Or aside from
15  that, I should say.
16     Q.  BY MR. NORMAND:  In 1995, did Wilson Sonsini
17  convey to Santa Cruz Novell's intent to retain the UNIX
18  and UnixWare copyrights?
19     A.  I would answer the same way, Ted, that
20  it's -- in my judgment, clear on its face and evidenced
21  in the document.
22     Q.  And apart from that, if there were some other
23  manner in which Novell's intent was communicated, you're
24  not aware of that; is that what you would say?
25     A.  That's correct.

Page 57

1      Q.  I'd like to direct your attention to
2  Section 1.7 of the APA, and in particular 1.7 C, which is
3  on page 6 of the APA.  That section is titled "Taking of
4  Necessary Action; Further Action," and states:  "If at
5  any time after the closing date any further action is
6  necessary or desirable to carry out the purposes of this
7  agreement, the parties agree to take and will take all
8  such lawful and necessary and/or desirable action."
9      Do you see that language?
10     A.  I do.
11     Q.  Do you have a view as to the purpose of
12  Section 1.7 C of the APA?
13     A.  I would say that it's a fairly standard
14  provision in asset transactions and mergers where if
15  there was a loose end or something that clearly was
16  intended by the parties to be -- to be done prior to the
17  closing date, but subsequent to the transaction, there
18  was no binding obligation, this would -- this would spur
19  the parties to take such actions to the extent that there
20  was an agreement between the parties to do so.
21     Q.  If you look at page 22 of the APA, there's a
22  Section 4.9.  And let me just ask you to read that to
23  yourself.  And let me know when you're done.
24     A.  Okay.  I'm done.
25     Q.  Same general question.  I know it's a general

Page 58

1  one.  What is the purpose of that section?
2      A.  So that section is part of Article 4, and the
3  covenants relate primarily to obligations between signing
4  and closing and then to certain ongoing obligations like
5  bulk sales filing under the commercial code or tax --
6  who's going to do the tax returns and taking positions on
7  the tax returns that are consistent.
8      That is also meant as a fairly standard
9  catchall provision to capture that which is not
10  specifically set out as a covenant.  And from the
11  language, you can see it extends to obtaining consents
12  and approvals from third parties as well.
13     Q.  There's a Section 4.12 as well.
14     A.  Yes.
15     Q.  Do you see any difference between 4.9 and
16  4.12, or what is the purpose of 4.12?
17     A.  I think 4.12 refers with some specificity to
18  the execution of instruments and documents to effect the
19  purposes whereas I read 4-9, which may be a superset of
20  4-12 to be focused on taking actions and obtaining
21  documents from third parties as opposed to agreements
22  between the two parties in 4-12.
23     Q.  Do you think the sections we've just looked
24  at, 1.7 C, 4.9, 4.12, would apply in a situation where
25  the agreement did not reflect the intent of the parties?

Page 59

1      MR. BRAKEBILL:  Calls for a legal conclusion,
2  speculation.
3      MR. PARNES:  You can answer.
4      THE WITNESS:  Ted, can I ask you to
5  clarify -- so is it -- I would say that if the parties
6  had an agreement and there were actions that needed to be
7  taken to reflect that agreement, one could -- one party
8  could turn to the other party and say take these
9  provisions, we'd like you to execute this document, the
10  certification, send us a copy of the tax return to carry
11  out the intention as manifest in this agreement.  So if
12  that's -- is that responsive?
13     Q.  BY MR. NORMAND:  It is.  And it is, you know,
14  a hypothetical so there is some speculation involved, but
15  I'm just asking your view as to if the parties had come
16  to a landing and decided that the agreement didn't
17  reflect something they had agreed on, would these
18  provisions apply where the parties were trying to now
19  have that agreement reflected?
20     MR. BRAKEBILL:  Same objections.
21     MR. PARNES:  I'll join.
22     If you understand the question.
23     THE WITNESS:  I think I do.  I -- I should --
24  I have to respond.
25     MR. PARNES:  I mean, if you understand what

Page 60

15 (Pages 57 to 60)

# EXHIBIT 6



TELEPHONE: (415) 442-0900
FACSIMILE: (415) 442-1010
WRITER'S DIRECT DIAL:
(415) 442-1322

**BROBECK
PHLEGER &
HARRISON**
LLP
ATTORNEYS AT LAW

SPEAR STREET TOWER
ONE MARKET
SAN FRANCISCO
CALIFORNIA 94105

September 19, 1996

**PRIVILEGED & CONFIDENTIAL
CONTAINS BUSINESS SECRETS**

John Greaney, Esq.
Scott N. Sacks, Esq.
U.S. Department of Justice
Antitrust Division
Computer & Finance Section
600 E. Street, N.W.
Washington, D.C. 20530-3001

Re:     Santa Cruz Operation/Microsoft

Dear Messrs. Greaney and Sacks:

We are writing to you on behalf of The Santa Cruz Operation, Inc. ("SCO") in advance of our meeting scheduled for 9:30 a.m. October 9. This briefing memorandum contains highly sensitive confidential business information of SCO and should be maintained as a confidential document by the Department.

SCO is a software company headquartered in Santa Cruz, California, which is located twenty-five miles south of the Silicon Valley. SCO's principal product is "SCO OpenServer" ("SCOOS"). SCOOS is a PC operating system based upon UNIX which is designed to operate on computers employing Intel processors. Intel processors and processors conforming to the Intel instruction set (so-called Intel "clones" such as those offered by AMD and Cyrix) comprise the vast majority of the PC market. Approximately 90% of all PC's utilize such Intel or Intel clone processors (we refer to both Intel and Intel clones as "Intel PC's").

UNIX is an operating system originally developed by AT&T thirty years ago for what were then known as minicomputers. From its inception, UNIX was promoted as a non-proprietary "open operating system" and was freely licensed by AT&T throughout the computer industry. Unlike proprietary operating systems which were unique to particular hardware vendors such as IBM's MVS or Digital Equipment's VMS,

BPHSF3\JSK\0141526.WP

SAN FRANCISCO    PALO ALTO    LOS ANGELES    ORANGE COUNTY    SAN DIEGO    NEW YORK    AUSTIN    DENVER    LONDON*
*BROBECK HALE AND DORR INTERNATIONAL OFFICE

Recall 0002629

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 2

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

UNIX was offered by many hardware vendors and afforded the customer a degree of freedom to migrate among different hardware platforms, all employing UNIX as the operating system, while retaining existing UNIX applications with only small changes. As it has evolved, UNIX has become an extremely advanced operating system providing true multitasking (that is, allowing the processor to work on more than one program at a time); multiple user capabilities (allowing multiple users to access a single processor), tight security (allowing different classes of users to a single computer different degrees of access); advanced networking and communication capabilities; and robustness (low rates of failure or system crashes). Indeed, UNIX was the program standard around which the Internet was originally developed. SCOOS adapts UNIX, originally developed for large systems, and enables it to function as the operating system for an Intel PC.

SCO offers a second UNIX based PC operating system known as "UnixWare." Like SCOOS, UnixWare brings UNIX to the Intel PC platform. SCO acquired the rights to UnixWare in a recent transaction with the original developer of the program, Novell. Because SCOOS and UnixWare have certain differences between them, SCO has plans to merge the two operating systems into one program, known currently by the code name "Gemini."

SCOOS and UnixWare compete with the other operating systems offered on the market for Intel PC's including Windows 95, Windows 3.1, Windows NT, IBM's O/S 2 and Novell's NetWare.

SCO's rights to create, distribute and sell UNIX software code at the time it developed SCOOS were acquired through a license chain from (1) AT&T to Microsoft and (2) Microsoft to SCO. Microsoft had acquired a non-exclusive sublicensable license to UNIX from AT&T. Pursuant to its license from AT&T, Microsoft adapted UNIX to function on Intel PC's which used the 286 processor, naming the resulting program "XENIX." XENIX is thus a derivative work of UNIX. Later, in 1987 as a result of a 1987 agreement between Microsoft and AT&T described below, Microsoft developed another version of UNIX for Intel PC's using 386 processors based upon the then current release of UNIX (System V) and XENIX. This product was named "System V/386 Rel. 3.2." System V/386 Rel. 3.2, is also a derivative work of UNIX, dependent upon AT&T's UNIX license to Microsoft. In 1988, Microsoft granted SCO a license to SystemV/386 Rel. 3.2. Under this license agreement, SCO was permitted to copy SystemV/386 Rel. 3.2, which of course was almost entirely UNIX code, and to modify

BPHSF3\JSK\0141526.WP

Recall 0002630

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 3

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

that code into new products. SCOOS represents years of additions and improvements to the System V/386 Rel. 3.2 software originally licensed to SCO by Microsoft. Among other things, SCO has evolved the System V/386 Rel. 3.2 code to function with modern Intel processors. XENIX and System V/386 Rel. 3.2 were 1987 vintage programs which were designed to permit UNIX to function with Intel 286 and 386 processors. (Both 16-bit processors). SCO has written SCOOS to function with the Intel Pentium, a 32-bit processor, two generations more advanced than the processor for which System V/386 Rel. 3.2 was written. So fundamental are the changes made by SCO, that SCOOS dwarfs in size System V/386 Rel. 3.2 UNIX program licensed from Microsoft. Indeed, SCO's contains nearly five times more code than the System V/386 Rel. 3.2. SCO has converted the program from a character based program to one employing a graphical user interface; added modern networking, Internet, and multiprotocol facilities; and added security features and modern device drivers.

As a result of a chain of several transactions described below, SCO has now acquired ownership of the UNIX program itself. In November 1989, AT&T, the original developer of the UNIX Operating System, spun off the UNIX division as a separate company then known as UNIX System Laboratories, Inc. ("USL"). In June 1993, Novell, the vendor of the NetWare Operating System, acquired USL and hence became the owner of the UNIX program. In turn, in December 1995, Novell sold the ownership of UNIX to SCO. As a result, SCO now enjoys the right, as the owner of the UNIX program, to exploit that program without the necessity of a license from any other party.

It is SCO's intention to develop a new highly advanced UNIX based operating system for the next generation of Intel processors. Currently, the most advanced Intel processor on the market is known as the "P6." This processor, now only at the start of its product life-cycle, is being sold in very small volumes at extremely high prices. Although they are not the most advanced processor chips currently offered for sale by Intel, various versions of the P5 processor, known as the "Pentium" account for overwhelming portions of current sales. Virtually all Intel PC's sold currently employ Pentium processors. Although SCO's new product, envisioned for the P7 processor, is technically speaking only one generation ahead of the P6, in reality it is two generations ahead of the main stream Intel PC's being sold. SCO's work to create a new UNIX operating system for Intel's P7 based PC's will be a tremendous undertaking, which will

BPHSF3\JSK\0141526.WP

Recall 0002631

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 4

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

involve thousands of man years of engineering time. The new product, code named
"NGOS" (Next Generation Operating System), will be developed from the ground up,
and will be based not upon XENIX or the SCO 1988 licensing agreement with Microsoft
(System V/386 Rel. 3.2) but from UNIX itself which SCO now owns.

### The 1987 Microsoft/AT&T Agreement

In 1987, Microsoft and AT&T entered into an agreement entitled
"Development and License Agreement for Convergence of AT&T's UNIX® System V
and Microsoft's XENIX® Operating System on Intel Microprocessors" (hereinafter the
"1987 MS Agreement"). Pursuant to the 1987 MS Agreement, Microsoft was to create a
version of UNIX to run on the Intel 386 processor and to be compatible with 286
processors and programs written for the 286 PC's. (The Intel 386 processor is two
generations behind the current main stream Pentium. Time has passed it by. It is
obsolete and no longer being sold. The 286 is at this point but a historical curiosity.
Few 286 PC's even remain in use.) The resulting adaptation of UNIX to run on the
Intel 386 was termed under the 1987 MS Agreement "Merged Product." (That "Merged
Product" is the System V/386 Rel. 3.2 that Microsoft licensed to SCO in 1988.) The
1987 MS Agreement contemplated that both AT&T and Microsoft would sell the
resulting Merged Product. As well it provided for the two companies to develop future
evolutions of the first Merged Product (the 386 version) for future releases of UNIX and
for future generations of Intel processors. Those future products were never developed
pursuant to the 1987 MS Agreement.

Notwithstanding the absence of evolution of the original Merged Product,
the 1987 MS Agreement imposes significant restrictions on competition. It prohibits
AT&T and its successors from selling any UNIX software for Intel processors (in either
executable binary form or source code form) which is not a Product under the 1987 MS
Agreement for as long as the 1987 MS Microsoft Agreement remains in force. The
restriction on selling executable versions of UNIX for Intel PC's is found at Section 2(c)
which reads:

BPHSF3\JSK\0141526.WP

Recall 0002632

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 5

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

(c)    *As to UNIX System Code, or a derivative work thereof, in*
*Executable File form, after one year from acceptance of the*
*initial Merged Product, MS and AT&T shall, except as*
*hereinafter provided, market and distribute only Binary*
*Compatible Product for Intel Microprocessor Based General*
*Business Computer Systems.*

"Binary Compatible Product" is defined in the Agreement as a "Product" which, in turn, is
defined as the "Merged Product" or derivative works thereof which are governed by the
1987 MS Agreement. Binary Compatible Products are also required to run and support
a listed group of application programs written for 286 Intel processor machines.

The restriction on source code distribution is similar and found at Section
2(d):

(d)    *After ninety (90) days from acceptance of the initial Merged Product,*
*any source code license granted by AT&T for UNIX System Code for*
*an Intel Microprocessor, or any source code license granted by MS for*
*a derivative work of UNIX System Code for an Intel Microprocessor,*
*shall be for Product only. Source code licenses granted by either party*
*prior to the ninety first (91st) day after acceptance of the initial Merged*
*Product shall continue in full force and effect.*

Again, "Product" is a defined term in the Agreement which covers the "Merged Product"
and derivative works thereof.

As a consequence of these restrictions, AT&T and its successors are
prevented from offering <u>any</u> UNIX product for Intel PC's that is not based upon the
original Microsoft "Merged Product" developed under the 1987 MS Agreement. That is
to say, these restrictions compel AT&T and its successors to sell only Merged Product or
derivative works based upon the 1987 Merged Product for so long as the contract
remains in force.

BPHSF3\JSK\0141526.WP

**Recall 0002633**



BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 6

**PRIVILEGED & CONFIDENTIAL
CONTAINS BUSINESS SECRETS**

The consequences of these restrictions on competition are enormous. First, they stifle innovation in the development of new forms of UNIX for Intel PC's free of the structure, facilities and code created for 16 bit processors and application programs no longer being sold and which are as many as <u>five</u> generations behind the 64 bit P7. Incorporating these facilities in a program is both unnecessary and costly. Indeed, some of the programs required to be supported have not been sold for nearly a decade. Second, they compel the payment of royalties to Microsoft where none is needed or deserved. Under the 1987 MS Agreement, Microsoft established a continuing obligation to have paid to it a $15 per copy royalty for each copy of a program covered by the 1987 MS Agreement which was sold by AT&T or its downstream licensees. By restricting competition in the development and sale of an alternative UNIX based Intel PC program, Microsoft insured that all such software would be subject to a royalty to it. In effect, the provision operates like the per processor license agreements which were the subject of the Department's earlier proceedings against Microsoft. The 1987 MS Agreement forces use of Microsoft code in circumstances where it is not needed or desired and it provides Microsoft a royalty for an unnecessary product. Of course, the technical means to develop a new independent UNIX or Intel PC program have been available at all times; the restriction on pursuing that course insures that all such software remains under Microsoft's foot.

The anti-competitive effect of these restrictions is magnified by the term provisions of the Agreement which keep the Agreement in force, and thus the restrictions and royalty provisions in force, until such time as <u>neither</u> party (AT&T and its successors or Microsoft) has commercially released a new generation product for a new Intel processor or new release of UNIX for a period of two years. (See Section 14) The 1987 MS Agreement in every practical respect is thus evergreen. It will continue with its restrictions in force under its express terms forever unless <u>both</u> parties have failed to offer products for new Intel processors or new variations of UNIX. A two year hiatus in the offer of new UNIX software products for new Intel processors or new releases of UNIX, necessary to release AT&T or its successors from the 1987 MS Agreement, is in all commercial respects equivalent to termination of business. It is well known in the electronics industry that such a failure to advance product offerings would cause the customer base to migrate irrevocably to other competitive up-to-date operating system products -- in this circumstance undoubtedly those offered by Microsoft.

BPHSF3\JSK\0141526.WP

**Recall 0002634**

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 7

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

**Effect on SCO**

The anti-competitive restrictions in the 1987 MS Agreement significantly imperil SCO's development of NGOS. First, the restrictions by their express terms prevent effective product innovation to create a new product for the 64 bit P7 processors. Rather than being free to take the UNIX software that it now owns and develop a revolutionary new UNIX operating system to run on the P7 processor, the terms of the 1987 MS Agreement constrain SCO to manipulate and adapt Microsoft's original work done for 16 bit processors. The effect hobbles innovation since it compels continued use of features and constructs no longer relevant ten years after the 1987 MS Agreement was made.

By handcuffing all future product evolution of UNIX for Intel PC's to its original work done for the 386 chip in 1987, Microsoft seeks for itself a competitive advantage in its offer of its own programs Windows 95 and Windows NT which compete with UNIX. Although, in theory, Microsoft is subject to the same restrictions under the terms of the 1987 MS Agreement -- it, too, can only offer UNIX for Intel PC's which is based upon or a derivative work of Merged Product -- the restrictions have no meaning in reality for Microsoft. After it developed the so-called Merged Product for the 386, Microsoft decided not to bring it to market. It has not offered for sale any UNIX for Intel PC product for years. Hence it is not restricted at all. The restriction operates only upon Microsoft's competitor SCO and upon programs that compete with Windows.

The restrictions in the 1987 MS Agreement significantly impact SCO's NGOS in a second way. By undertaking the expense and burden of developing a new product, SCO should not be subject to payment of royalty to Microsoft. By enforcing a provision which requires that new products continue to be a derivative work of the Microsoft 386 "Merged Product," and therefore subject to royalty, no matter how irrelevant the 386 program version is four chip generations and ten years in the future, Microsoft imposes a significant financial penalty on a competitor and, thereby, a competitive price advantage for its Windows operating system products.

By restricting the development of a PC operating system that directly competes with its products and saddling competitive product offerings with unnecessary links to old software and making them subject to an unnecessary royalty, Microsoft acts unfairly to perpetuate its monopoly in the supply of PC operating systems.

BPHSF3\JSK\0141526.WP

Recall 0002635

John Greaney
Scott Sacks

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

September 19, 1996
Page 8

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

We noted above the manner in which the restrictions in the 1987 MS Agreement operate with similar effect as the per processor agreements which were the subject of the Department's prior actions and resulting consent decree. Both the per processor agreements and the 1987 MS Agreement force unwilling parties to license MS software under circumstances where it is not wanted and increase the financial cost of any non-Windows operating system alternative.

The 1987 MS Agreement as well has effects which duplicate, in this UNIX setting, other past anti-competitive DOS/Windows practices, covered by the previous action and Consent Decree. Section IV B of the Consent Decree prohibits Microsoft from entering into license agreements which restrict OEM's from sale or distribution of non-Microsoft operating systems. The 1987 MS Agreement has exactly this effect. SCO, under its terms, would be prohibited from offering new UNIX products free of the obsolete Microsoft code. The entire field of UNIX for Intel PC's, thus, becomes one where every product is a product subject to Microsoft royalty payments. Indeed the provisions of the 1987 MS Agreement are even more pernicious than those covered by the previous decree covering DOS and Windows because in this case the prohibition against using non-Microsoft software both stifles innovation for competitive UNIX products and forces inclusion of obsolete Microsoft software making UNIX products less desirable.

The term of the restrictions in the 1987 MS Agreement similarly runs afoul of the spirit of the Consent Decree in Section IVA. There Microsoft is prohibited from license agreements with terms longer than one year. Here Microsoft has created a structure, that in theory is perpetual. Indeed, the 1987 MS's prohibition against new product development is far worse than that found to be copyright misuse in Lasercomb America, Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990). There imposition of a 99 year restriction on development of competitive software, as a condition of the grant of a software license, was found to be a form of copyright misuse. The circumstances here are threefold more exaggerated in their anti-competitive effects: (i) Microsoft possesses monopoly power which was not the case with the Lasercomb licensor; (ii) the "license" of Microsoft software is not desired by the licensee for new products, but is forced; and (iii) the term of the restriction is potentially longer.

In addition to the operation of the 1987 MS Agreement so as to enhance Microsoft's monopoly power in the market for PC operating systems, it can easily be

BROBECK
PHLEGER &
HARRISON
LLP
ATTORNEYS AT LAW

John Greaney
Scott Sacks

September 19, 1996
Page 9

**PRIVILEGED & CONFIDENTIAL**
**CONTAINS BUSINESS SECRETS**

seen that there is no efficiency enhancing integration of economic activity which flows from the Agreement. For purposes of developing a common version of UNIX, an agreement between AT&T and Microsoft to create such a work together, simpliciter, would have sufficed. Extending the arrangement beyond that boundary, so as to bar creation of competing works, does not legitimately further that purpose. On that ground alone the arrangement violates the antitrust laws. More than that, the 1987 MS Agreement actually operates to suffocate the "common" version of UNIX. Where Microsoft does not sell the "common" UNIX product, but competes against it with Windows, saddling all future versions with useless code and an unnecessary royalty furthers the demise of the "common" UNIX product to the benefit of Microsoft's own products. Under the present circumstances, Microsoft derives greater profit from the failure of UNIX for PC's in the marketplace, than success of any "common" UNIX product. Thus, the 1987 MS Agreement is in reality less of a common product agreement than it is a blunt instrument to keep UNIX competition in check clearing the field for Windows.

We look forward to our meeting on October 9 to discuss these matters further.

Respectfully submitted,

Jeffrey S. Kingston

JSK:nm

BPHSF3\JSK\0141526.WP

Recall 0002637

# EXHIBIT 7

31. JAN. 1997 19:22     ALLEN & OVERY                    NO. 7690   P. 4/22

# Application for the initiation of proceedings pursuant to Article 3 of Regulation 17/62 to establish the existence of infringements of Articles 85 and 86 of the Treaty of Rome

filed by

## *The Santa Cruz Operation, Inc.*

on

31st January, 1997

## CONFIDENTIAL VERSION

Recall 0001816

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Section 1 | The Undertakings | 1 |
| Section 2 | The Products | 1 |
| Section 3 | The Microsoft Licences | 2 |
| Section 4 | The Microsoft/AT&T Agreement | 4 |
| Section 5 | The effect on SCO | 6 |
| Section 6 | The Relevant Market | 7 |
| Section 7 | Microsoft's Dominance | 7 |
| Section 8 | Microsoft's Infringements of Articles 85 and 86 | 9 |
|  | 8.1  Infringements of Article 85 | 9 |
|  | 8.2  Infringements of Article 86 | 14 |
| Section 9 | The Remedies | 16 |

**ANNEXES**

| Annex 1 | A copy of the 1987 MS Agreement |
| Annex 2 | A copy of the 1988 Microsoft/SCO licence |
| Annex 3 | A copy of SCO's letter to Microsoft dated 20th September, 1996 |
| Annex 4 | A copy of Microsoft's letter to SCO dated 21st October, 1996 |

Recall 0001817

THE SANTA CRUZ OPERATION, INC.'S COMPLAINT
AGAINST MICROSOFT CORPORATION

This is an application respectfully submitted by The Santa Cruz Operation Inc. ("SCO") under Article 3 of Council Regulation No. 17 of 1962 that the Commission should by decision find that the Agreement made between the Microsoft Corporation ("Microsoft") and AT&T in January 1987 contains restrictions on competition which infringe Articles 85 and 86 and thereupon order the parties thereto to bring such infringements to an end. A copy of this agreement is attached as Annex 1.

1.    THE UNDERTAKINGS

1.1   SCO is a software company headquartered in Santa Cruz, California, which is located forty kilometres south of the Silicon Valley. SCO has subsidiaries located in France, Germany, Italy and the UK and employs well in excess of 400 people in the European Union. In addition to sales offices located in France, Germany, Italy, the UK, Spain, Denmark, and Sweden, it maintains significant research and product development facilities in Watford, Cambridge and Leeds in the UK.

1.2   As described in more detail below, SCO's principal products consist of UNIX based operating system software designed to run on PCs which utilise Intel processors. SCO's yearly turnover for the financial year 1995 was approximately $200 million with approximately $93 million generated in the EU.

1.3   SCO also maintains significant customer relations within the EU selling to distributors, value added resellers and OEM.

1.4   Microsoft is well known to the Commission. It is the world's largest vendor of computer software and one of the most profitable undertakings in the computer industry. Its 1996 worldwide turnover was $ 8.7 billion which earned Microsoft a profit, after taxes of $ 2.2 billion.

1.5   In 1980 Microsoft licensed from another company a PC operating system which it modified and introduced in 1981 as the Microsoft Disk Operating System ("MS-DOS"). Since the mid-1980's, it has been the world's largest vendor of operating systems for PCs (and in particular Intel PCs, as defined below). More than 170 million PCs worldwide employ Microsoft operating systems.

1.6   Microsoft's PC operating system products currently consist of DOS, Windows 3.1x, Windows 95 and Window NT.

2.    THE PRODUCTS

2.1   SCO's principal product is "SCO OpenServer" ("SCOOS"). SCOOS is a PC operating system based upon UNIX which is designed to operate on computers employing Intel processors. Intel processors and compatible processors which conform to the Intel instruction set (so-called Intel "clones" such as those offered by AMD and Cyrix) comprise the vast majority of the PC

Recall 0001818

Stri    Private & Confidential
Contains Business Secrets

2

market. Approximately 90% of all PCs utilise such Intel or Intel clone processors (we refer to both PCs using Intel processors and PCs using Intel clone processors as "Intel PCs").

2.2    UNIX is an operating system originally developed by AT&T thirty years ago for what were then known as minicomputers. From its inception, UNIX was promoted as a non-proprietary "open operating system" and was freely licensed by AT&T throughout the computer industry. Unlike proprietary operating systems which were unique to particular hardware vendors such as IBM's MVS or Digital Equipment's VMS, UNIX was offered by many different hardware vendors and afforded the customer a degree of freedom to migrate among these different hardware platforms, which used UNIX as the operating system thus permitting existing UNIX applications to be retained with only small changes. As it has evolved, UNIX has become an extremely advanced operating system providing true multitasking (that is, allowing the processor to work on more than one program at a time); multiple user capabilities (allowing multiple users to access a single processor); tight security (allowing different classes of users to a single computer different degrees of access), advanced networking and communication capabilities; and robustness (low rates of failure or system crashes). Indeed, UNIX was the program standard around which the Internet was originally developed.

2.3    SCOOS adapts UNIX, originally developed for large systems, and enables it to function as the operating system for an Intel PC.

2.4    SCO also offers a second UNIX based PC operating system known as "UnixWare". Like SCOOS, UnixWare brings UNIX to the Intel PC platform. SCO acquired the rights to UnixWare in a recent transaction with Novell, the original developer of the program. Because SCOOS and UnixWare have certain differences between them, SCO has plans to merge the two operating systems into one program known currently by the code name "Gemini".

2.5    Sun Microsystems has sub-licensed UNIX from Microsoft. Using its sub-licence it also offers a UNIX for Intel PC operating system known as "Solaris X86". Solaris X86 has differences when compared to SCOOS and UnixWare such that a user of Solaris X86 has no assurance that an application program developed for it will operate with SCOOS or UnixWare.

2.6    SCOOS and UnixWare thus compete with the other operating systems offered on the market for Intel PCs including Windows 95, Windows 3.1, Windows NT, Solaris X86 and Novell's NetWare.

3.    THE MICROSOFT LICENSES

3.1    SCO's rights to create, distribute and sell UNIX software code at the time it developed SCOOS were acquired through a license chain from (i) AT&T to Microsoft (wherein AT&T as the new owner of UNIX granted a license for UNIX to Microsoft) and then (ii) Microsoft to SCO. Microsoft's original rights to UNIX were thus acquired through its non-exclusive sub-licensable license from AT&T. Pursuant to its license from AT&T, Microsoft had adapted UNIX to function on Intel PCs, naming the resulting program "XENIX". XENIX is thus a derivative work of UNIX. Later, in 1987 as a result of the agreement made that year between Microsoft and AT&T, which is described in Section 4 below, Microsoft developed another version of UNIX for Intel PCs using 386 processors based upon the then current release of UNIX, System V, and XENIX known as "System V/386 Rel. 3.2". System V/386 Rel. 3.2, also a derivative work of UNIX, depended upon AT&T's UNIX license to Microsoft.

Recall 0001819

Stk    Private & Confidential
Contains Business Secrets

3

3.2    In 1988, Microsoft granted SCO a license to use System V/386 Rel. 3.2. Under this license agreement (a copy of which is attached as Annex 2), SCO was permitted to copy System V/386 Rel. 3.2, which largely consisted, of course, of UNIX code, and to modify that code, without restriction, into new products. Under the terms of this 1988 Agreement, SCO has to pay Microsoft a royalty for products sold under the Agreement.

3.3    SCOOS now contains the many additions and improvements which have been made over the years to the System V software originally licensed to SCO by Microsoft. Among other things, SCO has undertaken the major task of adapting the System V code to function with modern Intel processors. XENIX and System V/386 Rel. 3.2 were 1987 vintage programs designed to permit UNIX to function with Intel 286 and 386 processors (both 16-bit processors). SCO has now written SCOOS to function with the Intel Pentium, two generations more advanced than the processor for which System V/386 Rel. 3.2 was written. So fundamental are the changes made by SCO, that SCOOS dwarfs in size the System V/386 Rel 3.2 UNIX program licensed from Microsoft. Indeed, SCO's SCOOS contains nearly five times more code than the System V/386 Rel. 3.2. SCO has converted the program from a character based program to one employing a graphical user interface. In addition, SCO has added modern networking, Internet, and multiprotocol facilities, as well as security features and modern device drivers.

3.4    As a result of the chain of transactions described below, SCO has now acquired ownership of the UNIX program itself so that it no longer requires a license from anyone to produce UNIX products. In November 1989, AT&T, the original developer of the UNIX Operating System, had spun off the UNIX division as a separate company then known as UNIX System Laboratories, Inc. ("USL"). In June 1993, Novell, the vendor of the NetWare Operating System, acquired USL and hence became the owner of the UNIX program. In turn, in December 1995, Novell sold the ownership of UNIX to SCO. As a result, SCO now enjoys the right, as the owner of the UNIX program, to exploit that program without the necessity of a license from any other party. In particular, if SCO chooses to develop products based on UNIX, without any lines of Microsoft developed code, SCO will not have further need to license such products under the 1988 Agreement with Microsoft or pay royalties, thereunder, to Microsoft.

3.5    It is SCO's intention to develop a new highly advanced UNIX based operating system for the next generation of Intel processors. Currently, the most advanced Intel processor on the market is known as the "P6". This processor, now only at the start of its product life-cycle, is being sold in very small volumes at extremely high prices. Although they are not the most advanced processor chips currently offered for sale by Intel, various versions of the P5 processor, known as the "Pentium", account for overwhelming portions of current sales. Virtually all Intel PCs sold currently employ Pentium processors. Although SCO's new product, envisioned for the P7 processor, is technically speaking only one generation ahead of the P6, in reality it is two generations ahead of the main stream Intel PCs currently being sold. SCO's work to create the new UNIX for Intel's P7 based PCs will be a tremendous undertaking, which will involve thousands of man years of engineering time. The new product code, named "NGOS" (Next Generation Operating System), will be developed from the ground up, and will be based not upon XENIX or the SCO 1988 licensing agreement with Microsoft (System V/386 Rel. 3.2) but from UNIX itself which SCO now owns.

Stri▪   Private & Confidential
Contains Business Secrets

4

**4.    THE MICROSOFT/AT&T AGREEMENT**

4.1    In 1987, Microsoft and AT&T entered into an agreement entitled "Development and License Agreement for Convergence of AT&T's UNIX® System V and Microsoft's XENIX® Operating System on Intel Microprocessors" (hereinafter the "1987 MS Agreement").

4.2    The overt objective of this agreement was to enable Microsoft to create a version of UNIX to run on the Intel 386 processor and to be compatible with 286 processors and programs written for the 286 PCs. However, the Intel 386 processor is now two generations behind the current main stream Pentium and is obsolete. It is in fact no longer sold. The 286 uses even older technology and has no commercial value at all. Few 286 PCs even remain in use. The resulting adaptation of UNIX to run on the Intel 386 was termed under the 1987 MS Agreement "Merged Product". The 1987 MS Agreement contemplated that both AT&T and Microsoft would sell the resulting Merged Product. In addition, it provided for the parties to develop future evolutions of the first Merged Product (the 386 version) for future releases of UNIX and for future generations of Intel processors. However, no such products were ever developed pursuant to the 1987 MS Agreement.

4.3    Notwithstanding the absence of evolution of the original Merged Product, the 1987 MS Agreement imposes significant restrictions on competition. It prohibits AT&T and its successors from selling any UNIX software for Intel processors, in either executable binary form or source code form which is not a Product under the 1987 MS Agreement for as long as the 1987 MS Microsoft Agreement remains in force.

4.4    The restriction on selling executable versions of UNIX for Intel PCs is found at paragraph 2(c) which reads:

(c)     *as to UNIX System Code, or a derivative work thereof, in Executable File form, after one year from acceptance of the initial Merged Product. MS and AT&T shall, except as hereinafter provided, market and distribute only Binary Compatible Product for Intel Microprocessor Based General Business Computer Systems.*

"Binary Compatible Product" is defined in the Agreement as a "Product" which, in turn, is defined as the "Merged Product" or derivative works thereof which are governed by the 1987 MS Agreement. Binary Compatible Products are also required to run and support a listed group of application programs written for 286 Intel processor machines.

4.5    The restriction on source code distribution is similar and found at paragraph 2(d):

(d)     *After ninety (90) days from acceptance of the initial Merged Product, any source code license granted by AT&T for UNIX System Code for an Intel Microprocessor, or any source code license granted by MS for a derivative work of UNIX System Code for an Intel Microprocessor, shall be for Product only. Source code licenses granted by either party prior to the ninety first (91st) day after acceptance of the initial Merged Product shall continue in full force and effect.*

Again, "Product" is a defined term in the Agreement which covers the "Merged Product" and derivative works thereof.

**Recall 0001821**

Strictly Private & Confidential
Contains Business Secrets

5

4.6    As a consequence of these restrictions, AT&T and its successors are prevented from offering any UNIX product for Intel PCs that is not based upon the original Microsoft "Merged Product" developed under the 1987 MS Agreement and that is not "Binary Compatible." That is to say, these restrictions compel AT&T and its successors to sell only Merged Product or derivative works based upon the 1987 Merged Product for so long as the contract remains in force and to ensure that it is Binary Compatible and capable of supporting old 286 application software.

4.7    The consequences of these restrictions on competition are enormous. First, they stifle innovation in the development of new forms of UNIX for Intel PCs free of the structures, facilities and code created for 16 bit processors and application programs no longer being sold and which are as many as five generations behind the 64 bit P7. Incorporating these facilities in a program is both unnecessary and costly. Indeed, some of the programs required to be supported have not been sold for nearly a decade. Second, they compel the payment of royalties to Microsoft where none is needed or deserved. Under the Agreement, Microsoft was to be paid a $15 per copy royalty for each copy of a program covered by the Agreement which was sold by AT&T or its downstream licensees. By restricting competition in the development and sale of an alternative UNIX based Intel PC program, Microsoft ensured that all such software would be subject to a royalty payable to it. In effect, the provision operates like the per processor license agreements which were the subject of the Commission's earlier proceedings against Microsoft. The 1987 MS Agreement forces use of obsolete and redundant Microsoft code in circumstances where it is neither needed nor desired and it provides Microsoft with a royalty for an unnecessary product. Of course, the technical means to develop a new independent UNIX for Intel PC programs have been available at all times; the restriction on pursuing that course ensures that all such software remains under Microsoft's control.

4.8    The anti-competitive effect of these restrictions is magnified by the term provisions of the Agreement which keep the Agreement in force, and thus the restrictions and royalty provisions in force, until such time as neither party (AT&T and its successors or Microsoft) has commercially released a new generation product for a new Intel processor or new release of UNIX for a period of two years. The 1987 MS Agreement in every practical respect is thus everlasting. It will continue with its restrictions in force under its express terms forever unless both parties have failed to offer products for new Intel processors or new variations of UNIX. Under the terms of this provision, if AT&T's successors wished to be removed from the 1987 MS Agreement, they would be required to forego offering new products to meet the market for two years. Such a two year hiatus in the offer of new UNIX software products for new Intel processors or new releases of UNIX is in all commercial respects equivalent to termination of business. In the electronics business products must advance continually or they will be spurned by the market.

4.9    Microsoft's 1988 Agreement with SCO does not affect the issues concerning the anti-competitive restraints created by the 1987 MS Agreement. Because it has acquired ownership of the copyright to UNIX from AT&T, SCO should be free to develop new UNIX based works without the necessity of a license from anybody. The 1988 license between Microsoft and SCO is no longer commercially viable as a basis for SCO to develop new UNIX products since paying a royalty to Microsoft to obtain UNIX rights free of development restraints is, in effect, a double payment: SCO owns UNIX, has paid for such ownership and would be placed at a competitive disadvantage were it to nonetheless proceed under a royalty bearing license that it does not need.

**Recall 0001822**

Stri.    Private & Confidential
Contains Business Secrets

6

## 5.    THE EFFECT ON SCO

5.1    Following the acquisition of UNIX from Novell, SCO wrote to Microsoft on 20th September, 1996 (copy of letter attached as Annex 3), in an effort to persuade Microsoft not to enforce the provisions of the 1987 MS Agreement. In response to SCO's letter, Paul Maritz, Group Vice President of Microsoft, wrote on 21st October, 1996 (copy of letter attached as Annex 4) that "Microsoft expects SCO to adhere to the terms of the 1987 Agreement" and expressly acknowledged Microsoft's position that "the 1987 Agreement was explicitly negotiated to be perpetual."

SCO contacted Microsoft again on 17th January, 1996, by telephone to discuss Microsoft's position. Mr Maritz of Microsoft refused to alter the decision set forth in the October 21 letter and re-affirmed its intent to enforce the restraints and that the term of the agreement was explicitly negotiated to be perpetual.

5.2    The anti-competitive restrictions in the 1987 Microsoft Agreement significantly imperil SCO's development of NGOS. First, the restrictions by their express terms prevent effective product innovations to create a new product for the 64-bit P7 processors. Rather than being free to take the UNIX software that it has paid for and now owns and develop a revolutionary new UNIX operating system to run on the P7 processor, the terms of the 1987 MS Agreement constrain SCO to manipulate and adapt Microsoft's original work done for 8 and 16 bit processors. The effect impedes innovation since the requirement that AT&T and its successors utilise "Merged Product" and make products "Binary Compatible" obliges SCO to continue to incorporate obsolete software in its product offerings and to pay a royalty for the use of such unnecessary material.

5.3    By binding all future product evolution of UNIX for Intel PCs to its original work done for the 386 chip in 1987, Microsoft effectively secures for itself a competitive advantage for Windows 95 and Windows NT products which compete with UNIX. Although, in theory, Microsoft is subject to the same restrictions under the terms of the 1987 MS Agreement it, too, can only offer UNIX for PC software which is based upon or a derivative work of Merged Product – the restrictions have no meaning in reality for Microsoft. After it developed the so called Merged Product for the 386, Microsoft decided not to bring it to market. It has not offered for sale any UNIX for Intel PC product for years. Hence it is not restricted at all. The restriction operates only upon Microsoft's competitors like SCO who seek to sell UNIX based systems which would compete with Windows 95 and Windows NT.

5.4    The restrictions in the 1987 MS Agreement significantly impact SCO's NGOS in a second way. By undertaking the expense and burden of developing a new product and having paid to acquire ownership of UNIX itself, SCO should not be subject to payment of royalty to Microsoft. By enforcing a provision which requires that new products continue to be a derivative work of the Microsoft 386 Merged Product, and therefore subject to royalty, irrespective of the fact that the 386 program version is now completely obsolete, Microsoft imposes a significant technical impediment as well as a financial penalty on all its competitors and thereby achieves a competitive technical and competitive price advantage for its Windows operating system products.

**Recall 0001823**

Strl    Private & Confidential
Contains Business Secrets

7

## 6.    THE RELEVANT MARKET

6.1    SCO submits that the relevant market must be that for the supply of operating systems for Intel PCs.

6.2    PC operating systems control the operation of a computer by managing the interaction between the computer's microprocessor, memory and attached devices such as keyboards, display screens, disk drives, and printers. A PC operating system functions as the "central nervous system" of the PC. PC operating system software is designed to work with specific microprocessors, the integrated circuits that function as the "brain" of the computer.

6.3    The overwhelming majority of the PCs in the world today use the x86 class of microprocessors originally designed by Intel Corporation. The x86 class currently has included the Intel 286, 386, 486, Pentium (P5) and P6 as well as microprocessors manufactured by other companies that use a substantially similar architecture and instruction set ("Intel clones"). Intel has released specifications for the generation of microprocessor to succeed the P6, known, as would be expected, as the P7 and also known by the code name "Merced".

6.4    Because operating systems written for other types of microprocessors will not work with Intel PCs, PC manufacturers who sell Intel PCs and customers who buy such machines only use an operating system which is compatible with the architecture and instruction set of the Intel or Intel-clone microprocessor. At present there are only four suppliers of such operating system software who possess anything other than a negligible market share: (i) Microsoft with its Windows 95, Windows NT, Windows 3.1 and DOS products; (ii) IBM with its OS/2 product; (iii) SCO with its SCOOS and UnixWare products; and (iv) Novell with Netware (Netware, however, is only used in PC server environments).

## 7.    MICROSOFT'S DOMINANCE

7.1    Microsoft enjoyed a dominant position in the relevant market since at least the mid-80s, retaining a market share of at least 70%, and no other competitor has had a share greater than 10%.

7.2    In the year Microsoft concluded the 1987 MS Agreement with AT&T, Microsoft's share for its DOS products in the relevant market measured in units shipped was 70%. Microsoft's total market share for all of its products was larger still owing to its sales of the XENIX product. The table below lists worldwide shipments by year of Intel PC operating system software from 1987 through 1996.

| Worldwide Shipments of Intel PC Operating System Software (in 000s) | | | | | | |
|---|---|---|---|---|---|---|
|        | 1987   | 1988   | 1989   | 1990   | 1991   | 1992   |
| MS-DOS | 8,228  | 9,847  | 10,961 | 11,596 | 12,325 | 11,735 |
| OS/2   | 25     | 65     | 124    | 800    | 1,500  | 3,000  |
| Unix   | 165    | 282    | 440    | 625    | 908    | 1,250  |
| Other  | 3,527  | 3,120  | 1,735  | 1,131  | 610    | 300    |
| Total  | 11,945 | 13,314 | 13,260 | 14,152 | 15,343 | 16,285 |

Recall 0001824

31. JAN. 1997 19:26    ALLEN & OVERY                    NO. 7690   P. 13/22

Strit Private & Confidential
Contains Business Secrets

8

| Worldwide Shipments of Intel PC Operating System Software *Market Share Percentage* | | | | | | |
|---|---|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 |
| MS | 69% | 74% | 63% | 82% | 80% | 72% |
| Unix | 1.4% | 2.1% | 3% | 5.4% | 5.9% | 7.7% |

| Worldwide Shipments of Intel PC Operating System Software (in 000s) | | | |
|---|---|---|---|
| | 1994 | 1995 | 1996 |
| MS-DOS | 7,800 | 3,451 | 2,502 |
| MS Win 3.x | 36,500 | 33,527 | 13,000 |
| MS Win 95 | | 19,500 | 47,088 |
| MS Win NT | 325 | 958 | 3,005 |
| OS/2 | 3,113 | 4,504 | 2,840 |
| SCOOS | 205 | 232 | 232 |
| UnixWare | 12 | 13 | 23 |
| Netware | 760 | 885 | 967 |
| Sunsoft Solaris XR6 | 10 | 17 | 20 |
| Other incl. NextStep and other Unix | 1,650 | 2,350 | 2,993 |
| Total | 50,375 | 65,437 | 72,670 |

| Worldwide Shipments of Intel PC Operating System Software *Market Share Percentage* | | | |
|---|---|---|---|
| | 1994 | 1995 | 1996 |
| MS OS Products | 89% | 86% | 90% |
| SCO OS Products | 0.40% | 0.40% | 1.40% |

7.3    Within the EU, Microsoft's overwhelming dominance in the supply of Intel PC operating systems is similar.

| Western Europe Operating System Shipments (in 000s) | | | |
|---|---|---|---|
| | 1994 | 1995 | 1996 |
| MS-DOS | 2,184 | 759 | 286 |
| MS Win 3.x | 9,490 | 8,046 | 2,695 |
| MS Win 95 | | 6,533 | 11,827 |
| MS Win NT | 55 | 147 | 752 |
| OS/2 | 1,304 | 1,901 | 1,803 |
| Unix | 111 | 118 | 123 |
| Total | 13,144 | 17,504 | 17,486 |

**Recall 0001825**

Stric... Private & Confidential
Contains Business Secrets

9

| Western Europe Operating System Shipments *Market Share Percentage* | | | |
|---|---|---|---|
|  | 1994 | 1995 | 1996 |
| MS OS Products | 89% | 88% | 89% |
| Unix | 0.8% | 0.7% | 0.7% |

7.4     Substantial barriers to entry and expansion exist in the relevant market. One barrier to entry and expansion is the considerable time and expense required to develop, test, and market and new PC operating system. Other interrelated barriers to entry and expansion include:

(a)     the absence of a variety of high quality applications that run on a new operating system, and the difficulty of convincing independent software vendors ("ISVs") to develop such applications;

(b)     the lack of a sizeable installed base of users; and, of course

(c)     the difficulty in convincing computer vendors to offer and promote a non Microsoft PC operating system, particularly one with a small installed base and relatively few applications designed to run on it.

(d)     for SCO the constraints imposed by the 1987 Agreement.

7.5     These barriers magnify and reinforce each other because the value of an operating system to a consumer is directly related to two factors: the availability of a variety of high quality applications that run on that system, and the number of users who use that operating system and thus are able to share information and work with the system without additional training. ISVs, in turn, tend to develop applications for operating systems with a large installed base of users, and consumers gravitate towards operating systems with a large base of applications.

8.      MICROSOFT'S INFRINGEMENT OF ARTICLES 85 AND 86

8.1     Infringements of Article 85

Article 85(1) prohibits, inter alia, all agreements between undertakings which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market. In particular, Article 85(1) expressly prohibits agreements which:

•     directly or indirectly fix purchase or selling prices or any other trading conditions;

•     limit or control production, markets, technical development or investment; or

•     make the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts.

Recall 0001826

Strictly Private & Confidential
Contains Business Secrets

10

SCO submits that the 1987 MS Agreement infringes Article 85(1) in three ways: (i) it requires the copyright owner of UNIX, which is one of only two viable competitors to Microsoft's products, to include unwanted and unnecessary code and facilities in new versions of UNIX for Intel PC products which are costly to create and maintain. This constitutes a impediment to development and places such products at a competitive technical disadvantage to Microsoft's Windows products, (ii) it forces the copyright owner of UNIX to pay royalties for the foregoing unwanted, unnecessary and undesirable code and facilities, placing UNIX products at a competitive price disadvantage to Microsoft's Windows products, and (iii) the imposition of these competitive restraints is perpetual. Each of these infringements is discussed below.

### 8.1.1    The Infringements

### (1)    The restriction on technical development

As explained at Paragraph 4 above, the effect of paragraphs 2(a) and 2(c) of the 1987 MS Agreement is that AT&T and its licensees and successors are prevented from offering any UNIX products for Intel PCs that are not "Binary Compatible" and not based upon the original Microsoft "Merged Product" or derivative works based upon the 1987 Merged Product for so long as the 1987 MS Agreement remains in force. The practical effect of this Clause is that all UNIX products for Intel PCs must be compatible with application programs written for the obsolete 286 and 386 Intel processors.

A similar restriction was considered by the Commission in the Video Cassette Recorders[1] case which involved a number of German undertakings which had agreed that in manufacturing and distributing video cassette recorders and video cassettes they would observe exclusively the technical standards applicable to the VCR system developed by Philips and would refrain from offering other systems. In defending its agreement, Philips asserted that the requirement that its standard be exclusively adopted was the "quid pro quo" for the royalty free licenses it granted, and the only way that the VCR system could be assured of a firm foothold on the market was to make it impossible for its licensees to change over to another manufacturer's system while the agreement was in force.

In assessing the case the Commission held:

> "Paragraph 2 of the basic agreement required the parties to observe the technical standards laid down in Annex 1 for the manufacture and distribution of video cassette recorder[s and video cassettes. As these standards were for the manufacture of VCR equipment, the parties were obligated to manufacture and distribute only cassettes and recorders conforming to the VCR system licensed by Philips. They were prohibited from changing to manufacturing and distributing other video cassette systems, Sony's U-MATIC for example, as long as these obligations continued. They were not even allowed to use other systems at the same time. This constituted a restriction of competition under Article 85(1)(b) which was designed to limit the technical development, production and sale of other video cassette systems."

(emphasis supplied)

The Commission's reasoning in the Video Cassette Recorders case may be similarly applied to the limitation on technical development under the 1987 MS Agreement. In the Video Cassette Recorders case, for example, parties were obliged to manufacture and distribute only cassettes and recorders conforming to the VCR standard licensed by Philips; similarly, under the 1987 MS Agreement a standard for all Intel PC UNIX software is imposed by the requirements that such software offered be

---

1       OJ 1978 L47/12 [1978] 2 CMLR 160

Recall 0001827

Strictly Private & Confidential
Contains Business Secrets

11

the UNIX copyright holder or its successors be based upon "Merged Product" and be "Binary Compatible". Furthermore, in the Video Cassette Recorders case the Commission commented that the restrictions of competition were particularly marked in view of the pre-eminent market position held by Philips. Such a consideration must equally apply to Microsoft given its undisputed dominance of the market for operating systems since at the time it entered the 1987 MS Agreement with AT&T it possessed a 70% share of the relevant market and now enjoys a share of nearly 90% of the market.

In addition, it should be noted that, having limited the technical development of all UNIX for Intel PC software, Microsoft decided to abandon its own original Merged Product (XENIX), an action which the Commission may view as aggravating an already serious restriction of competition.

SCO further asserts that, even ignoring the fact that the 1987 MS Agreement was never notified and cannot therefore qualify for an exemption pursuant to article 85(3), the technical development limitation included in the 1987 MS Agreement could not benefit from an exemption pursuant to Article 85(3) for the same reasons as those given by the Commission in the Video Cassette Recorders case. In considering the applicability of Article 85(3) to the Philips agreement, the Commission concluded:

> [N]o significant improvement in production or distribution was achieved since compliance with the VCR standards led to the exclusion of other, perhaps better, systems. Such an exclusion was particularly serious in view of the pre-eminent market position enjoyed by Philips.

Similarly, no benefit can be said to flow to the consumer from the 1987 MS Agreement. Even at the time that the limitations on technical progress were imposed, such limitations were unnecessary and not at all indispensable for the development of a common Merged Product for the two original undertakings. If the object was to jointly develop a common merged product, a simple joint development agreement would have sufficed. It was unnecessary to the achievement of that goal to impose a perpetual covenant not to develop a separate competing product. In any event, there has been no economic or technical advantage gained from the restraints contained in the 1987 MS Agreement. To the extent that the restrictions were designed to create a single version of UNIX for Intel PCs, so as to prevent incompatible different versions from being offered by different vendors, that has not occurred. Microsoft itself ceased selling its XENIX program shortly after the 1987 MS Agreement was concluded. Accordingly, it lost its commercial interest in insuring that its XENIX program would be compatible with AT&T's UNIX program for Intel PCs. Moreover, Microsoft itself sub-licensed its version of UNIX for Intel PCs, XENIX, without imposing conditions that would prevent its sub-licensees from modifying the program, so as to make it incompatible with XENIX. For example, Microsoft licensed Sun Microsystems, as a sub-licensee, to UNIX for Intel. The resulting Sun product, Solaris X86 has no assured compatibility with other UNIX for Intel PC operating systems. In similar fashion, Microsoft's 1988 license agreement with SCO contains no restrictions of any kind on future changes or modifications that the licensee, SCO, may make in the program. SCO is thus left free under the 1988 license to change the licensed program to one which is incompatible with XENIX (and hence one which no longer would be a "Merged Product" or "Binary Compatible" under the 1987 MS Agreement). As follows, SCOOS, UnixWare and Solaris X86 (all UNIX for Intel PC products) do not have insured compatibility with each other. Thus, Microsoft's own licensing practice with companies, other than AT&T, permits those undertakings to diverge from "Merged Product" and "Binary Compatible" products. The only party restrained is AT&T and its successors. Accordingly, there is no UNIX compatibility or standardisation purpose achieved by the 1987 MS Agreement restraints.

Recall 0001828

Strictly Private & Confidential
Contains Business Secrets

12

The only effect of the continued enforcement of the restraints in the 1987 MS Agreement is to place Intel PC UNIX products at a competitive disadvantage when compared to Windows 95 and Windows NT. Whereas Microsoft is free to innovate and change its Windows product line as it sees fit and price them as it chooses, the copyright owner of UNIX is required to include unnecessary features for a common product that no longer exists and bear a royalty charge for the required inclusion of such features.

For these reasons the 1987 MS Agreement can be distinguished from the X/Open Group case[2] where the Commission's decision to exempt an agreement which sought to establish an open industry standard was based largely on the benefits which flowed to the consumer from the notified agreement. Unlike the 1987 Microsoft Agreement, the X/Open agreement merely allowed the competitive undertakings to develop a common, standard product. There were no restraints which prevented the parties from developing products outside the agreement.

(2)    *The forced royalty payment*

The terms of the 1987 MS Agreement compel the payment of royalties to Microsoft for the use of Microsoft code which SCO does not desire to use. Under the Agreement, Microsoft was to be paid a $15 per copy royalty for each copy of a program covered by the Agreement which was sold by AT&T or its downstream licensees. By restricting competition in the development and sale of an alternative UNIX based Intel PC program, Microsoft ensured that all such software would be subject to a royalty to it. Of course, the technical means to develop a new independent UNIX for Intel PC program[s] have been available at all times but the restriction on pursuing that course ensures that all such software remains under Microsoft's control.

The principle that royalties should only relate to products which a licensee desires to use in order to gain some form of advantage was alluded to in the Windsurfing International Decision[3] where the Commission made the following statement:

> "*If the calculation of royalties, when payable on the basis of individual sales, is not linked to the products covered by the licensed invention, there is a danger of the licensee's production, as compared with that of competitors, having to bear costs for which the licensee is not compensated through the advantages conferred by exploitation of the product.*"

Although this statement refers to the method used by Windsurfing International for calculating the royalties, the principle is clear that the royalties must relate to the advantages conferred by exploitation of the product so that a party is not hindered by unnecessary costs not faced by competitors. SCO believes that the 1987 MS Agreement breaches this principle in two ways. First, there are no current advantages to using the Microsoft code in UNIX products. Indeed, as explained at Paragraph 8.1.1(1) above, the forced inclusion of the Microsoft code in UNIX products is a technical liability, and secondly, the royalty of US$ 15/copy charged to publishers of UNIX products for a "product" which brings with it no advantage (i.e. Microsoft code), is not one borne by developers of products competing with the UNIX operating system. Indeed, there is one competitor to UNIX operating systems, Microsoft, which rather than being hindered by the forced royalty, is the beneficiary of its income.

---

2    OJ 1987 L35/36 [1988] 4 CMLR 542
3    OJ 1983 L229/1 [1984] 1 CMLR 1

Recall 0001829

Strict. Private & Confidential
Contains Business Secrets

13

*(3)    The perpetual term of the Agreement*

The anti-competitive effect of the restrictions imposed on SCO in limiting the technical development of UNIX products and imposing a forced royalty payment is reinforced by the term provisions of the 1987 MS Agreement which keeps it in force until such time as neither party (AT&T and its successors nor Microsoft) has commercially released a new generation product for a new Intel processor or new release of UNIX for a period of two years. The 1987 MS agreement thus in every practical respect is permanent. A two year hiatus in the offer of new UNIX software products for new Intel processors or new releases of UNIX, necessary to release AT&T or its successors from the 1987 MS Agreement, is in all commercial respects equivalent to termination of business. It is well known in the electronics industry that such a failure to advance product offerings would cause the customer base to migrate irrevocably to other competitive up-to-date operating system products, in this circumstance undoubtedly those offered by Microsoft.

SCO submits that the 1987 MS Agreement contains restrictions which must be viewed as perpetual in that Microsoft, in correspondence with SCO, has acknowledged that the provisions were intended to be so.

*8.1.2    Non-applicability of the relevant block exemption*

The 1987 MS Agreement does not benefit from any block exemption regulation, and in particular falls outside the know-how Block Exemption Regulation (Regulation 556/89) which was in force at the time the 1987 MS Agreement was entered into, and the new Technology Transfer Block Exemption Regulation (Regulation 240/96), which replaced Regulation 556/898 when it came into force on April 1, 1996. Although the agreements in question may have fallen outside the ambit of these Regulations, the general principles set out therein must be applicable in the assessment of similar types of licence agreement.

*(1)    Block Exemption Regulation 556/89*

Article 3 of Regulation 556/89 sets out a list of obligations, the inclusion of any or more of which in a licence agreement, will render the block exemption inapplicable. This list includes a prohibition under Article 3(10) of agreements, such as the 1987 MS Agreement, whose initial duration is automatically prolonged by the inclusion of new improvements.

*(2)    Block Exemption Regulation 240/96*

Article 3(10) of Regulation 556/89 is repeated in Article 3(7) of the new Technology Transfer Block Exemption Regulation, which came into force on April 1, 1996.

*8.1.3    Non-notification of the Agreement*

Although the 1987 MS Agreement contains several provisions which SCO submits must fall within the scope of Article 85(1) and require individual exemption under Article 85(3), no such notification appears to have ever been made. It should be noted that SCO was never at any time a direct party to any agreement with respect to the restrictive provisions entered into, nor the infringements of Article 85 created by the 1987 MS Agreement. The duty to notify the agreement to obtain an exemption was on the parties to it and SCO was not a party to the 1987 MS Agreement.

Recall 0001830

Strl. _ Private & Confidential
Contains Business Secrets

14

### 8.1.4  Effect of non-notification on the 1987 MS Agreement

Since, as explained above, certain provisions of the 1987 MS Agreement infringe Article 85(1) and it does not fall within the scope of any of the Commission's block exemptions, the anti-competitive provisions of the 1987 MS Agreement are automatically void pursuant to Article 85(2) and the Commission is entitled to impose fines on the participating undertakings and third parties are able to sue in the national courts for damages, an injunction or both.

However, although SCO believes that the anti-competitive provisions of the 1987 MS Agreement are automatically void pursuant to Article 85(2), there is nevertheless a strong Community interest for the Commission adopting a formal Decision in this case.

### 8.1.5  The 1987 MS Agreement falls outside of the spirit of the EC Undertaking and the US Consent Decree

In addition to the apparent infringements of Article 85, the 1987 MS Agreement appears to be in breach of, if not the terms, at least the spirit of the undertaking that Microsoft gave the EC Commission and the Department of Justice in 1994 (the "Undertaking")

The Undertaking applies specifically to Microsoft's unfair practice of making its MS-DOS and Windows technology available on a "per processor" basis which required PC manufacturers to pay a fee to Microsoft for each computer shipped, regardless of whether or not the computer contained Microsoft operating system software. The Commission alleged that this arrangement gave Microsoft an unfair advantage by causing a manufacturer selling a non-Microsoft operating system to pay at least two royalties - one to Microsoft and one to its competitors - thereby making a non-Microsoft unit more expensive. The Commission concluded that the effect of such an arrangement was that, "the ability of rival operating systems to compete has been impeded, innovation has been slowed and consumer choices have been limited". Consequently, under the Undertaking Microsoft is prohibited from entering into any per processor licenses.

The forced purchase of unwanted Microsoft code under the 1987 MS Agreement has much the same effect as the per processor licenses: licensees are forced to pay a royalty for code they do not wish to use and which constitutes a limitation on the innovative development of the products and, because of the mandatory royalty payment, makes a non-Microsoft product more expensive. The 1987 MS Agreement thus breaches the spirit of the ban on per processor licenses.

Similarly, the Department of Justice and EC Commission alleged in their joint investigation into Microsoft's practices that its contracts were too long, and therefore prohibited Microsoft from entering into any licenses with terms longer than one year, although licensees may renew their licenses for another year on the same terms. The term of the 1987 MS Agreement is, as explained above, perpetual and thus also appears to breach the spirit, if not under the exact terms of the Undertaking.

### 8.2  Article 86

Article 86 provides that any abuse by one or more undertakings of a dominant position within the Commission market or in a substantial part of it shall be prohibited as incompatible with the Common Market insofar as it may affect trade between Member States. In particular Article 86 states that, inter alia, the following practices may constitute abuse:

**Recall 0001831**

Stric. ..rivate & Confidential
Contains Business Secrets

15

- directly or indirectly imposing unfair purchase or selling prices or other unfair trading conditions;

- limiting production, markets or technical development to the prejudice of consumers;

- applying dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage; and

- making the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts.

It is SCO's assertion that Microsoft's behaviour towards SCO infringes Article 86.

### 8.2.1   Microsoft's dominance of the relevant markets

The relevant market is that for the supply of operating systems for PCs Microsoft possesses overpowering dominance, with nearly a 90% market share. Moreover, as shown in the tables set out under Sections 7.2 and 7.3 above, Microsoft's dominance has been increasing: in 1994 its share was 89% and in 1995 86%, whilst SCO's products accounted in 1994 for 1.40% of the market, having risen from a 0.40% market share in 1995. As indicated above, it has already been recognised that Microsoft occupies a dominant position in the relevant market. In its press release of July 15, 1994, the Commission stated that Microsoft enjoyed "a virtual unchallenged leadership" in the above market.

### 8.2.2   Microsoft's abuse of its dominant position

The concept of abuse for the purposes of Article 86 was defined in Hoffman LaRoche[4] as:

> "[A]n objective concept relating to the behaviour of an undertaking in a dominant position which is such as to influence the structure of a market where, as a result of the very presence of the undertaking in question, the degree of competition is weakened and which, through recourse to methods different from those which condition normal competition in products or services on the basis of transactions of commercial operators has the effect of hindering the maintenance of the degree of competition still existing in the market or the growth of that competition."

Under this definition, as well as the express prohibitions set out in Article 86, Microsoft's behaviour towards SCO also serves to strengthen its existing dominant position by permanently excluding the owner of the UNIX copyright from competing with Microsoft's own products.

### (1)   Maintenance of the 1987 MS Agreement

The Agreement in question constitutes a severe limitation on the technical development of all UNIX software for Intel PCs since they require that all such UNIX products be Binary Compatible and be based upon Merged Product. Such limitation imposed on its licensees by a dominant undertaking falls clearly within the express prohibition of Article 86(b). The effect of these provisions of the 1987 MS Agreement, which are expressly referred to in Hoffman LaRoche, is that it has enabled Microsoft to reinforce its dominant position in the market for the supply of operating systems while at the same time

---

4     Case 85/75 ECR 461

Recall 0001832

Stri.. Private & Confidential
Contains Business Secrets

16

imposing a technical disability upon one of only two real competitors to Microsoft in the relevant market.

Similarly, the obligation of SCO to use Microsoft code in its products for which it then becomes obligated to pay Microsoft a royalty infringes the express prohibition under Article 86(a) on directly or indirectly imposing unfair purchase or selling prices or other unfair trading conditions on competitors. As explained under Section 4 above, SCO does not wish to use the Microsoft code in its UNIX for Intel PC products and gains no advantage in doing so. Instead the royalty it is obliged to pay to Microsoft merely forces SCO to sell its products at a higher price than would be necessary if the Microsoft royalty was not payable.

(2)    *Refusal to waive the anti-competitive provisions of the 1987 MS Agreement*

SCO has endeavoured to persuade Microsoft to forego enforcing the anti-competitive restraints found in the 1987 MS Agreement. Not only did Microsoft re-affirm its intent to impose the Agreement's technical and price restraints, but it acknowledged that it intended that these restraints continue in perpetuity.

(3)    *Microsoft's position on SCO's Board*

Not only does Microsoft hold a 10% share of SCO but one of its officers also occupies a place on SCO's board of directors. Although Microsoft's director is excluded from discussion at SCO relating to competing products, he nevertheless has access to a broad range of information which SCO would not wish to be disclosed to a competitor and it is therefore arguable whether his mere presence on the SCO board constitutes an "abuse" especially when one considers the conflicting fiduciary duties he faces as a director both of Microsoft and of SCO.

However, the "abuse" is most apparent from the way that Microsoft has sought in the past to use its shareholding in SCO. For example, Microsoft has in the past threatened to force SCO to buy back Microsoft's 10% shareholding at a time SCO did not have the funds available to make such a purchase. When informed that SCO did not have the available funds to make the purchase, Microsoft threatened to dump SCO's stock in the market, an action which would have been likely to needlessly depress the share price of SCO's stock so as to harm SCO's other shareholders. The threat was only withdrawn at the eleventh hour.

9.    THE REMEDIES

SCO seeks the following remedies from the Commission:

- a Decision declaring that the 1987 MS Agreement is caught by 85(1) and was not notified and that its requirements with respect to the future UNIX for Intel PC products are therefore automatically void pursuant to Article 85(2) and the issuance of a permanent cease and desist order to prevent the imposition and enforcement of these or similar provisions; and

**Recall 0001833**

31. JAN. 1997 19:32    ALLEN & OVERY    NO. 7690   P. 22/22

Strictly Private & Confidential
Contains Business Secrets

17

- A declaration that the existence of the 1987 MS Agreement strengthens Microsoft's dominance in Intel PC operating system market and is therefore abusive, which is further evidenced, as discussed above, by Microsoft's refusal/failure to waive the restrictive provisions of the 1987 MS Agreement on request; and that Microsoft should be enjoined from taking any action legal or otherwise to enforce the restrictive provisions of the 1987 MS Agreement.

SCO is at the disposal of the Commission to furnish any further information that it may require.

31st January, 1997
Brobeck Phleger & Harrison

31st January, 1997
Allen & Overy, Brussels

Sznuomu\bb08.dou

Recall 0001834

# EXHIBIT 8

# Microsoft

## Microsoft Applauds European Commission Decision to Close Santa Cruz Operation Matter
### Decision upholds Microsoft's right to receive royalties if SCO utilizes Microsoft's technology

**REDMOND, Wash., November 24, 1997** — Microsoft Corporation today applauded the decision of the European Commission to close the file and take no further action on a dispute between Microsoft and Santa Cruz Operation (SCO) involving a 1987 contract. The Commission's decision follows progress by Microsoft and SCO to resolve a number of commercial issues related to the contract, and upholds Microsoft's right to receive royalty payments from SCO if software code developed by Microsoft is used in SCO's UNIX products.

"We are gratified that the European Commission rejected SCO's request for further action and approved our request to close the file on this case," said Brad Smith, Microsoft's associate general counsel, international.

"We were prepared to address SCO's concerns as long as our intellectual property royalty rights could be protected at the same time. The unique nature of the original 1987 contract made it difficult, but we were able to find a workable solution that resolves SCO's major concerns and still protects Microsoft's intellectual property rights," Smith said.

SCO's complaint concerned a contract originally negotiated in 1987 between Microsoft and AT & T for the development of the UNIX operating system. A principal goal of that contract was to help AT & T reduce fragmentation in the UNIX marketplace by creating a single merged UNIX product. To accomplish this goal, under the contract Microsoft developed for AT & T a new Intel-compatible version of UNIX that improved the program's performance and added compatibility with Microsoft's popular XENIX® operating system, which was at the time the most popular version of UNIX on any hardware platform. When completed in 1988, the merged product created by Microsoft was named "Product of the Year" by UnixWorld Magazine.

To prevent further UNIX fragmentation and at AT & T's behest, the contract obligated the parties to ensure that any future versions of UNIX they developed for the Intel platform would be compatible with this new version of UNIX.

As compensation for Microsoft's technology and for its agreement to give up its leadership position with XENIX, AT & T agreed to pay Microsoft a set royalty for the future copies of UNIX it shipped. AT & T subsequently transferred its rights and obligations under the contract to Novell, which transferred the contract to SCO in 1995.

The code developed by Microsoft under the 1987 contract continues to play an important role in SCO's OpenServer UNIX product. This includes improvements Microsoft made in memory management and system performance, development of a multi-step bootstrap sequence, numerous bug fixes, and the addition of new functions originally developed for XENIX and still documented today by SCO for use by current application developers.

SCO complained to the EC that the provisions in the 1987 contract restricted the manner in which it could develop a future version of UNIX (code-named "Gemini" ) for the 64-bit generation of Intel processors. After reviewing the matter, Microsoft modified the contract to waive SCO's backward compatibility and development obligations, but insisted on continued payment of royalties for any UNIX versions that include Microsoft's technology. Microsoft then requested that the Commission close the file on the case and take no further action, and the Commission agreed to do so. SCO therefore withdrew its complaint.

Microsoft's Smith said there were basically three issues in the contract that needed to be resolved: (1) the backward compatibility requirement, (2) a development requirement designed to reduce UNIX fragmentation under which each new version of UNIX would be built on the previous versions, and (3) royalty payment

obligations for Microsoft's intellectual property rights.

"Microsoft was willing to waive the backward compatibility and development requirements, which were included in the 1987 agreement at AT & T's behest, but we needed to preserve our intellectual property royalty rights, which are fundamental to the software industry as a whole," he noted. "Unfortunately, the old contract was written in a way that made it difficult to separate the development requirement from the royalty rights, but we were able to find a solution that gave SCO what it wanted but protected our intellectual property rights."

Microsoft first learned of SCO's complaint to the European Commission in late March. In a May 22 submission to European Commission officials, Microsoft affirmed that it was willing to waive the backward compatibility requirement in the contract, as long as Microsoft's right to receive royalty payment for use of its copyrighted technology was preserved. On May 26, before receiving Microsoft's submission, the Commission provided Microsoft with a Statement of Objections. This is a preliminary step in the EC process that identifies issues for further deliberation and provides a company an opportunity to present its position in person at an internal hearing. Microsoft reiterated its willingness to waive the backward compatibility requirements in an August 1 filing with the European Commission. Microsoft also requested that the Commission hold a hearing, so that Microsoft could document the various ways in which Microsoft's intellectual property is contained in SCO's present UNIX products.

On November 4, after discussions with SCO were unsuccessful in resolving the matter, Microsoft informed SCO that it was unilaterally waiving the compatibility and development requirements of the contract, but retaining the requirement that SCO pay a royalty to Microsoft when it ships product that utilizes Microsoft's intellectual property rights. Upon receiving Microsoft's waiver, the Commission canceled the hearing, which was scheduled for November 13. Despite Microsoft's action to address SCO's concerns, SCO continued to ask for further action by the European Commission. However, the Commission rejected SCO's request and decided to close the case. SCO therefore withdrew its complaint.

"We're pleased that we were able to resolve these issues to the satisfaction of everyone involved, and we're particularly pleased that the EC upheld our right to collect royalties for the use of our technology. This principle is fundamental to the entire software industry," said Smith.

Founded in 1975, Microsoft (NASDAQ "MSFT" ) is the worldwide leader in software for personal computers. The company offers a wide range of products and services for business and personal use, each designed with the mission of making it easier and more enjoyable for people to take advantage of the full power of personal computing every day.

Microsoft and XENIX are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. Other products and company names mentioned herein may be the trademarks of their respective owners.

*Note to editors:* If you are interested in viewing additional information on Microsoft, please visit the Microsoft Web page at http://www.microsoft.com/presspass/ on Microsoft's corporate information pages.

↑ Top of page

Manage Your Profile

© 2007 Microsoft Corporation. All rights reserved. Terms of Use | Trademarks | Privacy Statement

# EXHIBIT 9



# MSBC NewsSource

### Still more legal battles, CCIA & Dole back the DoJ and a Ms-owned company sues itself.

The Continuing Crisis

•The Microsoft vs DoJ battle went on as usual last week. The government investigators produced evidence - in the form of interoffice e-mails - that Microsoft had no intention to integrate a web browser with Windows when the 1994 antitrust agreement was signed. "We view Microsoft as saying they can bundle anything they want, that they 'can sell Windows 95 and a ham sandwich' and it would be an integrated product," Justice Department officials said at a news briefing. Microsoft continued to deny all charges of wrongdoing and spewed their usual 'the government doesn't know anything about technology' and 'the government knew we were going to integrate a browser' lines. There will be a district court hearing on this case Friday, so expect a lot more news next week. ■■

•In related events, Thursday before last an employee of Microsoft PR firm Edelman Public Relations was caught sneaking into a Department of Justice press-only briefing on the investigation. DoJ officials escorted the man out without incident after it was revealed that he didn't have a press pass. "I think he knew that he was someplace he wasn't supposed to be," DoJ spokesman Michael Gordon later commented. We were unable to confirm if this was the same PR company that staged a protest outside the Appraising Microsoft conference almost 3 weeks ago. ■

•The Computer and Communications Industry Association (CCIA) has charged Microsoft with extortion in its attempts to control the internet. Edward Black, head of the CCIA, said Microsoft was telling computer makers they must use its Web brower "or else." The association also filed a brief supporting the DoJ's investigation of the behemoth's business practices. The brief said Microsoft was using its monopoly position "to gain an unfair competitive advantage against other providers of Internet browsers." Association officials said they hope their brief will help convince Judge Thomas Penfield Jackson to rule in favor of the government this Friday. Ms

executives defended the company by claiming the CCIA is just an
extension of long-time Microsoft opponents Sun Microsystems and
AT&T, forgetting about the hundreds of other organization
members.

Retired US Senator Bob Dole also gave the government
investigation his backing last week in an LA Times opinion column.
In the column Senator Dole stated that his instincts usually lean
away from government intervention, but in this case he makes an
exception. "When a dominant company artificially dictates how,
where, and even if consumers have choice in the online
marketplace, it is time for the government to step in and enforce the
antitrust laws," the former Republican presidential candidate wrote.
Dole predicted that the internet will take a dominant role in the
future of commerce and investing, and as such no company should
have a monopoly to its access. ■■

•Last week, Unix developer Santa Cruz Operation (SCO) was
released from a decade-old licensing agreement with Microsoft. The
agreement, which required SCO to add useless Microsoft code to its
OSes and pay royalties "in perpetuity," was found to be
anticompetitive by the European Union. Following that ruling, Ms
released SCO from the contract. The agreement was originally made
10 years ago and required SCO to make all its applications and
OSes backwards-compatable with Microsoft's short-lived Un*x
clone, Xenix. Termination of the contract should save SCO $6
million per year and add between 5 and 9 cents per share to its stock
price. However, since Microsoft owns part of SCO, it will make part
of the licensing money back with its stock holdings. That makes the
story even weirder, as SCO is comtemplating suing Ms to get back
the royalties it wrongly paid over the last 8 or 9 years. Like we've
said before, when they start fighting amongst themselves the end is
near.. ■■

```
Microsoft Stock Track

   MSFT Stock Price·        142.6

   Bill Gates' Worth      $40.2 Billion

     *As Of Closing, 12/04/97
   Thanks to Bill Gates Personal Wealth Clock.

Other News From The Wires
```

◁ Win 98 plays second fiddle

◁ Satellite War Ends

◁ Microsoft fixes "redirect" bug

◁ Users face precarious upgrade to NT 5

◁ MSN to drop service in Europe

◁ PC 98 spec raises vendors' ire

HOME   NEWSSOURCE   ALTERNATIVE   SUMISSON   BULLETIN   ABOUT US   COMMUNITY   SEARCH

Saturday, 16-Nov-2002 17:22:42 EST

# EXHIBIT 10

say no to monopolies

# BOYCOTT MICROSOFT

## TOP 05

> Home
> Keynote
> Manifesto
> Lead Article
> Site News
> Bookstore
> BMS Forum
> Bumper Stickers
> NT Files
> Dirty Tricks
> Feature Articles
> Departments
> Site Credits

## FEATURE ARTICLE

# A Tale of Two Press Releases

by Mitch Stone, Editor/Publisher

*It was the best of times, and it was the best of times.*

    -- Charles Dickens (corrupted)

Good morning, class, and welcome to Microsoft Literature 101. Today, we will be examining a short story from the points of view of both the protagonist and the antagonist, and considering how these two characters in a story react to the same events, and what this may reveal about their personalities.

The protagonist in our narrative is a small software company called SCO, otherwise known as the Santa Cruz Operation. The antagonist is the software giant, Microsoft. First, we should sketch out the storyline.

SCO sells a version of the Unix operating system, a product they purchased from Novell, Inc. in 1995. Novell had acquired it from AT&T, the fathers of Unix, two years earlier. Looking further back to 1980, we find Microsoft developing a commercial version of Unix called Xenix under license from AT&T. Actually, Microsoft didn't develop Xenix, though they did obtain a license from AT&T to do so -- and subcontracted the actual coding to SCO. But we digress.

In 1987 Microsoft became worried that AT&T's newly-developed personal computer version of Unix might not run software applications originally written to run under Microsoft Xenix, so they asked AT&T to add some Xenix code to AT&T Unix in order to assure future compatibility. A deal was struck between the companies: AT&T agreed to include the Microsoft code, and to pay Microsoft a royalty for its use. Novell, and then SCO, inherited these terms when they purchased AT&T Unix.

By the time SCO acquired it, the archaic Xenix code

## QUOTABLE

Microsoft is going to argue that since most users are now familiar with the way a Web browser works, the browser will be an easier interface for novices to use in finding stuff on their own computers. And that might be true. But if it is true, it's an admission of awful truth for Microsoft: It's saying, "After all these years and versions of Windows we still haven't figured out how to make personal computing easy enough for an intelligent person to learn easily."

SCOTT ROSENBERG, Salon Magazine

had more than outlived its technical usefulness. SCO announced its desire to be discharged from the obligation of including it with their products, and a deliverance from the liability of paying royalties to Microsoft for distributing it. And with the release of Windows NT, a product aimed squarely at the Unix market, SCO felt that Microsoft should not be meddling directly in the products of a competitor, let alone be permitted to extract a royalty for doing so.

In September of 1996, SCO formally requested that Microsoft release them from the terms of the old contract. In its letter to Microsoft, SCO suggested that including the code was "no longer appropriate or commercially desirable," and that continuing to do so "would impose unnecessary cost, lower reliability, add complexity and extend the development time for any Unix operating system for modern Intel processors. Overall, the effect would be to reduce SCO's ability to compete in the marketplace with the resulting product."

Not surprisingly, Microsoft's reply to it competitor's plea was "no."

SCO took a complaint to the European Commission, enforcer of European Union competition regulations, in January 1997, while also seeking relief from the antitrust division of the U.S. Department of Justice. Four months later, the Commission ruled that an indelible agreement tying Microsoft to SCO's products violated European laws by restraining advances in technology and hindering SCO's competitiveness, particularly against Microsoft's rival product, Windows NT.

In its statement, the European Commission declared that SCO could "now design its future Unix products as it wishes, is not obliged to use any Microsoft intellectual property in future Unix products, and has the option ... to use the Microsoft IP involved at a set royalty." With a single stroke, the European Commission had lifted a formidable technological and fiscal burden from SCO. In the face of this finding, Microsoft relented, settling with SCO and canceling a scheduled hearing before the EC.

A company liberated from an unusual and onerous commitment, SCO was jubilant. And why not? It was a clear victory for our protagonists. "Now that we are legally able to remove the outdated Microsoft code from both our ... products we will do so as soon as

possible," said Doug Michels, SCO's executive vice president and chief technical officer in a press release. "We are excited about the positive impact the lifting of this burden will have on SCO."

Now, for the antagonist's view of these events.

Microsoft's simultaneous press release trumpets, "the [European] Commission's ... decision ... upholds Microsoft's right to receive royalty payments from SCO if software code developed by Microsoft is used in SCO's Unix products," and insists, rather oddly, that the old Unix code SCO went to such lengths to be free of, "continues to play an important role in SCO's OpenServer Unix product." How could this be, in the face of the fact that SCO expressed such blessed relief at the ability to finally consign this code to the bit bucket?

At no point within this press release does Microsoft directly acknowledge the European Commission's ruling against them. Instead, they attempt to cloud the issue, stating that "the European Commission rejected SCO's request for further action and approved our request to close the file on this case," though it is never clear what further action SCO had requested. We also learn of Microsoft's 1988 award from UnixWorld Magazine, a highly relevant tidbit.

Why is it so important for Microsoft to play these public relations games over an otherwise obscure contest involving mere fragments of Unix code? This entire affair is scarcely a matter of banner headlines, and the outcome, though important in some quarters, is unlikely to have a major impact on the future of computing. So why does Microsoft trouble themselves with these nearly farcical face-saving efforts?

The apparent answer: Consistency.

In examining Microsoft's public reaction to this and other similar events, a somewhat tortured company personality profile begins to emerge. When faced with criticism, they lash out at the critics. When faced with difficult questions, they dismiss the questioner. When accused of misdeeds, they produce baroque and fantastical explanations. When faced with a loss, they unilaterally declare victory.

This consistent pattern of self-aggrandizement,

misdirection, doublespeak and deception evokes the impression of a company that cannot contend with the reality, or even the perception, of error. They evidently have come to view themselves as infallible, and cannot comprehend why everyone else does not see them in precisely the same light. Microsoft appears to have constructed a kind of alternate universe for itself, where Microsoft never loses, and all are eternally indebted to their vast wisdom and largess.

Consistency, observed Oscar Wilde, is the last refuge of the unimaginative. But at what point, we must ask ourselves, do efforts to delude others spring less from a lack of imagination and more nearly from a pathological variety of self-deception?

Alas, we have run out of time, and we must leave the class to contemplate this troubling literary question on its own. But consider it well -- this material is almost certain to appear on the final exam.

Published: 25 November 1997



©1999 Moral Highground Productions

# EXHIBIT 11



**Confidential - Attorney Work Product**
Privileged & Confidential/Attorney-Client Communication

## Novell, Inc.
# Internal Legal Memorandum

| | |
|---|---|
| To: | Kanwal Rekhl |
| From: | David R. Bradford |
| Re: | Avoidance of $15.00 Per Copy Royalty to Microsoft |
| Date: | November 19, 1993 |
| Copies: | Ray Noorda, Sandy Tannenbaum |
| Enclosure: | Yes |
| Via: | Hand Delivery and Fax |

Dear Kanwal:

As a follow up to our conversation the other day, I have been reviewing the possible legal bases upon which Novell would have a legitimate reason to refuse providing Microsoft a $15.00 per copy fee for each copy of UNIXWare sold on the Intel platform. I have had conversations with Sandy Tannenbaum about these issues. Subsequently, Sandy sent me a copy of a memorandum he wrote approximately 2½ years ago analyzing these very issues. The memorandum was extensive so let me summarize it with the following points:

■  In the February 1987 development and license agreement between USL and Microsoft, Microsoft agreed that binary versions of UNIX System V (or derivatives thereof) marketed and distributed by Microsoft for Intel based computers must be "binary compatible." USL could argue that the $15.00 payment was especially conditioned on the marketing obligation by Microsoft to assure binary compatibility, and that Microsoft has breached this obligation. Microsoft violated its contractual obligations by: (1) not making available a binary compatible product offering; and (2) permitting Santa Cruz Operations (SCO), as the Microsoft value added distributer responsible for the shipment of 80X86 implementations of UNIX System V, to modify their product in a manner that destroyed binary compatibility.

■  Microsoft has some counter arguments that the primary purpose of the Microsoft/USL agreement and AT&T's agreement to pay Microsoft $15.00 was in exchange for the Xenix source code and that the Microsoft agreement to market a binary compatible product was not material to the contract. Sandy believed at the time that USL's chances of success based on a breach of contract theory against Microsoft were 35 percent or less. I feel the chances of success on such a theory are somewhat higher but that it would clearly be a tough case. Perhaps you have some thoughts on what Microsoft and SCO have done in the Intel platform over the last 2½ years which would shed further light on the degree to which Microsoft actually has continued to be in

**Recall 0001164**

breach of the 1987 contract.

Assuming for one second that Novell determined that it was on solid legal ground in claiming that Microsoft is in breach of contract, what are our alternatives?  Sandy's memo cites four:

1. Litigation (either initiated by USL or Microsoft);
2. Negotiation;
3. Novell could develop a Xenix-free substitute for its UNIX Operating System: however, Sandy seems to indicate that even if we ship a Xenix-free substitute for the UNIX Operating System on the 80X86 platform, the royalty obligation is still owed to Microsoft;
4. Allow the development and licensing agreement to expire.

As Sandy points out, any attempt on our part to repudiate our payment obligations under the agreement by stopping payment of the $15.00 fee, would force Microsoft to consider filing a lawsuit. However, since Microsoft nets these payments against the royalties they owe USL it would be a pragmatic problem in stopping payment of the $15.00 per copy fees. On the other hand, if we don't care about ever receiving payments again from SCO, the netting issue might go away.

With respect to the possible expiration of the $15.00 obligation, section 14a of the agreement permits the agreement to expire if AT&T or its successor fails to distribute a binary compatible 80386 or 80486 binary implementation until at least two years after the date of commercial availability of such microprocessors. However, I believe we are already distributing such an implementation and therefore the "expiration theory" is not a likely winner.

Given the foregoing, I tend to believe that our best argument is the one which says that Microsoft originally breached its obligations under the 1987 agreements by permitting (and perhaps encouraging) SCO to market a non-compatible binary product, on which Microsoft itself receives a royalty. This in turn, deprived AT&T, USL and now Novell of the benefits of a unified UNIX market.

I have asked Sandy Tannenbaum to analyze his 1991 memorandum in light of recent events to determine that there is another legal basis upon which we can refuse royalty payments to Microsoft. Such a current analysis would have to include the fact that Microsoft is now marketing NT which Bill Gates himself has called "A Disciplined UNIX" and that this product has failed to be "binary-compatible" resulting in further splintering of the UNIX market place. Also, the NT product itself may be violative of certain UNIX copyrighted code. We are attempting to obtain some NT source code in order to analyze it based on possible copyright infringement.

I recognize that this is a key issue for Novell moving forward and we are anxious to work with you closely in aggressively asserting Novell's rights.

Sandy:  Can you provide to me an update on your analysis.  The 1991 paper was great but I would like to know your views given today's market place.

Thank you,
David.

---

Recall 0001165

# EXHIBIT 12

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307

*Attorneys for Plaintiff*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| THE SCO GROUP, | ) | Case No. 2:03CV0294DAK |
| | ) | |
| Plaintiff, | ) | Hon. Dale A. Kimball |
| | ) | Magistrate Judge Brooke C. Wells |
| v. | ) | |
| | ) | |
| INTERNATIONAL BUSINESS | ) | **DECLARATION OF** |
| MACHINES CORPORATION, | ) | **STEVEN SABBATH** |
| | ) | |
| Defendant. | ) | |

I, STEVEN SABBATH, declare as follows:

1.       I submit this Declaration in connection with the lawsuits entitled *The SCO Group v. IBM* and *The SCO Group v. Novell, Inc.*

2.       From in or about January 1991 until in or about November 2003, I was employed by The Santa Cruz Operation, Inc. ("Santa Cruz"), which was subsequently renamed Tarantella, Inc.  In 1995 and 1996, my position at Santa Cruz was Vice President of Law and Corporate Affairs.

3.       In that capacity, I participated with others in numerous meetings and discussions leading up to the 1995 Asset Purchase Agreement (the "APA") whereby Novell sold its UNIX business to Santa Cruz.  Those individuals included Jim Wilt, Geoff Seabrook, and Doug Michaels, who represented Santa Cruz in the negotiations; Ed Chatlos, the principal negotiator for Novell; and in-house and outside counsel for Novell.

4.       Based on my involvement with the APA, I understand that the parties' intent and purpose in executing the APA was to transfer to Santa Cruz Novell's entire UNIX-related business, including all rights to UNIX and UnixWare and the UNIX copyrights; that the parties agreed to permit Novell to retain an interest in future System V binary royalties to enable SCO to afford the asset purchase; and that the parties never intended to give Novell any right with respect to any of Santa Cruz's future source code interests in UNIX and UnixWare, including under the SVRX licenses.

5.       I understand that IBM has argued that Section 4.16(b) of the APA gave Novell the right to require Santa Cruz to waive any breach of the intellectual property protections provided in the SVRX licenses.  That argument is contrary to the intent of Paragraph 4.16(b) as I understood it.  Indeed, Santa Cruz would never have agreed to

give Novell the right under the APA to waive such protections under the SVRX licenses because such a right could have eviscerated the entire purpose of the APA and the value of the assets transferred to Santa Cruz under the APA.

6.      In October 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. I was involved the discussions leading up to Amendment No. 2, and I signed Amendment No. 2 on behalf of Santa Cruz. Amendment No. 2 arose as a result of a dispute between Novell and SCO concerning Novell's attempt to execute, on Santa Cruz's behalf, a royalty buy-out with IBM. That dispute was ultimately resolved through an amendment to IBM's SVRX license that was jointly executed by Santa Cruz, Novell, and IBM. Amendment No. 2, however, was intended to confirm, among other things, the parties' intent that SCO would obtain ownership of the UNIX copyrights under the APA and that Novell had received no rights with respect to UNIX source code under the APA. Paragraph B.5 of Amendment No. 2 was specifically intended to make clear that Novell had no right to increase any SVRX licensee's rights to SVRX source code, no right to grant any new SVRX source code licenses, and no right to prevent Santa Cruz from exercising the rights it obtained under the APA with respect to SVRX source code.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed: 19 Nov 2004

Santa Cruz County, California

Steven Sabbath