# EXHIBIT 13

Dockets.Justia.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

--oOo--


THE SCO GROUP, INC.,

    Plaintiff/Counterclaim Defendant,

vs.                                No. 2:04CV00139

NOVELL, INC.,

    Defendant/Counterclaim Plaintiff
_____/




Videotaped Deposition of

STEVEN M. SABBATH

_____

Monday, February 12, 2007




Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 191637

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 22

```
09:55:10  1        A. Well, their chief negotiator, their
09:55:15  2   counterpart to our Geoff and Jim, was a fellow named Ed
09:55:21  3   Chatlos, who was stationed in New Jersey, worked for
09:55:26  4   Novell out of New Jersey. He was their project manager.
09:55:31  5   There were a few others from Utah that I met from time to
09:55:35  6   time. I can't recall their names or their titles. To
09:55:40  7   some extent, David Bradford, their general counsel, was
09:55:44  8   involved. He did appear in California at least once,
09:55:49  9   that I can recall and worked on the deal with us. And
09:55:52 10   then, of course, there were their Wilson Sonsini outside
09:55:59 11   counsel.
09:55:59 12        Q. Can you recall any of the attorneys from
09:56:00 13   Wilson that you dealt with?
09:56:02 14        A. Well, Tor Braham was their lead. He was Ed
09:56:07 15   Leonard's counterpart. Tor Braham, and I think his
09:56:13 16   number 2 would have Aaron Alter, who would have been
09:56:16 17   Scott Lester's counterpart on the Wilson side.
09:56:21 18        Q. Did you have occasion during the negotiations
09:56:23 19   of this potential transaction to review any draft
09:56:27 20   agreements embodying the transaction?
09:56:29 21        A. Well, the asset purchase agreement,
09:56:32 22   certainly. There were a lot of agreements and exhibits
09:56:35 23   and schedules, and I can't tell you I reviewed every
09:56:39 24   single one. That may not have been possible for anybody
09:56:41 25   to do. But the asset purchase agreement, certainly.
```

Page 23

```
09:57:16  1        Q. I'm handing you, Mr. Sabbath, what's
09:57:18  2   previously been marked as Exhibit 1 titled "Asset
09:57:22  3   Purchase Agreement By and Between The Santa Cruz
09:57:26  4   Operation, Inc., and Novell, Inc.," dated as of
09:57:28  5   September 19th, 1995.
09:57:30  6        Do you recognize the document?
09:57:31  7        A. I do, yes.
09:57:33  8        Q. I wanted to ask you about some language in
09:57:58  9   this agreement, Mr. Sabbath. I'm looking at the page
09:58:00 10   ending with the Bates Number 900 on the bottom right.
09:58:10 11        A. Okay.
09:58:12 12        Q. If you look at paragraph A, in the recitals?
09:58:18 13        A. Uh-huh.
09:58:19 14        Q. It says, "Sellers engage in the business of
09:58:22 15   developing a line of software products currently known as
09:58:26 16   UNIX and UnixWare, the sale of binary and source code
09:58:30 17   licenses to various versions of UNIX and UnixWare, the
09:58:35 18   support of such products and the sale of other products
09:58:37 19   which are directly related to UNIX and UnixWare,
09:58:40 20   collectively, the business."
09:58:41 21        Do you see that language?
09:58:42 22        A. I do.
09:58:43 23        Q. And then if you look down on that same page
09:58:46 24   at Section 1.1(a)?
09:58:48 25        A. Uh-huh.
```

Page 24

```
09:58:49  1        Q. The agreement says, "On the terms and subject
09:58:51  2   to the conditions set forth in this agreement, seller
09:58:55  3   will sell, convey, transfer, assign and deliver to buyer,
09:58:59  4   and buyer will purchase and acquire from seller on the
09:59:03  5   closing date as defined in Section 1.7 all of sellers
09:59:08  6   right, title, and interest in and to the assets and
09:59:11  7   properties of seller relating to the business,
09:59:14  8   collectively the assets, identified on Schedule 1.1(a)
09:59:18  9   hereto. Notwithstanding the foregoing, the assets to
09:59:22 10   so purchased shall not include those assets, the excluded
09:59:26 11   assets set forth on Schedule 1.1(b)."
09:59:29 12        Do you see that language?
09:59:30 13        A. I do, yes.
09:59:31 14        Q. Does this language refresh your recollection
09:59:34 15   at all as to the nature of the business that was being
09:59:37 16   sold under the APA?
09:59:41 17        A. Well, I mean, as I said before, it was the
09:59:44 18   entire UNIX business that Novell had was going to Santa
09:59:50 19   Cruz Operation.
09:59:52 20        Q. Was it ever your understanding during the
09:59:54 21   negotiations leading up to the APA or thereafter that
10:00:01 22   copyrights in the UNIX business were being excluded from
10:00:04 23   the assets transfer?
10:00:05 24        A. No, copyrights were going with the assets.
10:00:25 25        Q. I'm turning, Mr. Sabbath, to the schedule
```

Page 25

```
10:00:29  1   referred to in that Section 1.1(a), and that begins on
10:00:34  2   page Bates Number ending 950.
10:00:42  3        A. 950. Okay.
10:00:53  4        Q. Bates Number ending 950 is titled "Schedule
10:00:57  5   1.1(a), Assets."
10:00:59  6        A. Uh-huh.
10:01:00  7        Q. And Roman Numeral I -- let me just read it
10:01:03  8   for the record: "All rights and ownership of UNIX and
10:01:05  9   UnixWare, including but not limited to all versions of
10:01:08 10   UNIX and UnixWare and all copies of UNIX and UnixWare
10:01:13 11   including revisions and updates and process" --
10:01:15 12        A. Uh-huh.
10:01:15 13        Q. -- "and all technical design, development,
10:01:18 14   installation, operation and maintenance information
10:01:22 15   concerning UNIX and UnixWare, including source code,
10:01:28 16   source documentation, source listings and annotations,
10:01:34 17   appropriate engineering notebooks, test data and test
10:01:39 18   results, as well as all reference manuals and support
10:01:42 19   materials normally distributed by seller to end-users and
10:01:46 20   potential end-users in connection with the distribution
10:01:50 21   of UNIX and UnixWare, such assets to include without
10:01:53 22   limitation the following."
10:01:55 23        Do you see that language?
10:01:55 24        A. I do.
10:01:56 25        Q. Do you recall reviewing that language at the
```

Esquire Deposition Services
216 E. 45th STREET  .  NEW YORK, NY 10017  .  1-800-944-9454

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 34

10:14:09 1 copyrights, et cetera, went from Novell to Santa Cruz
10:14:15 2 Operation when Novell sold the UNIX business to Santa
10:14:19 3 Cruz Operation.
10:14:19 4 Q. Paragraph A says: "With respect to Schedule
10:14:23 5 1.1(b) of the agreement entitled 'Excluded Assets,'
10:14:27 6 Section V, subsection A shall be revised to read: 'All
10:14:32 7 copyrights and trademarks except for the copyrights and
10:14:35 8 trademarks owned by Novell as of the date of the
10:14:38 9 agreement required for SCO to exercise its rights with
10:14:45 10 respect to the acquisition of UNIX and UnixWare
10:14:47 11 technologies."
10:14:48 12 A. Uh-huh.
10:14:48 13 Q. "However, in no event shall Novell be liable
10:14:53 14 to SCO for any claim brought by any third party
10:14:55 15 pertaining to said copyrights and trademarks."
10:14:57 16 Do you see that language?
10:14:58 17 A. I do, yes.
10:14:59 18 Q. In your view, as of the execution of the APA,
10:15:02 19 what copyrights were required for SCO to exercise its
10:15:06 20 rights with respect to the acquisition of UNIX and
10:15:08 21 UnixWare technologies?
10:15:10 22 MR. JACOBS: Objection. Vague and ambiguous
10:15:11 23 calls for speculation, lacks foundation, ambiguous as to
10:15:15 24 time.
10:15:15 25 THE WITNESS: Well, you would need all of the

Page 35

10:15:19 1 copyrights.
10:15:20 2 Q. BY MR. NORMAND: And why do you say that?
10:15:21 3 A. To do the future development, you would need
10:15:26 4 the copyrights, to license the technology the way you saw
10:15:33 5 fit, you would need the copyrights. My gosh, if you
10:15:35 6 didn't own the copyrights, how could you even go after
10:15:38 7 somebody that's pirating your software? How could you
10:15:42 8 enforce your rights in the technology? So you would need
10:15:45 9 all of the copyrights and binaries and source code.
10:15:49 10 Q. At any time after the execution of Amendment
10:15:51 11 Number 2, did Santa Cruz ever have occasion to ask Novell
10:15:55 12 to transfer any UNIX or UnixWare copyrights to Santa
10:16:00 13 Cruz?
10:16:00 14 A. Not that I recall.
10:16:01 15 Q. Did you ever have an understanding during
10:16:10 16 your tenure at Santa Cruz that Santa Cruz was obligated
10:16:13 17 to ask Novell to transfer particular UNIX and UnixWare
10:16:16 18 copyrights?
10:16:17 19 A. No, no.
10:16:25 20 Q. No one from Santa Cruz ever told you that
10:16:28 21 that was the process in place that needed to be pursued
10:16:32 22 with Novell?
10:16:32 23 MR. JACOBS: Objection. Leading.
10:16:33 24 THE WITNESS: I don't recall that.
10:16:58 25 Q. BY MR. NORMAND: Do you know whether after

Page 36

10:16:59 1 the execution of the APA, Santa Cruz had occasion to
10:17:02 2 enter into source code licenses with any third parties in
10:17:06 3 which Santa Cruz licensed UNIX or UnixWare source code to
10:17:09 4 those third parties?
10:17:09 5 A. Well, I mean, we routinely licensed source
10:17:15 6 code to customers who needed it for development purposes,
10:17:18 7 for supporting their own customer base, what have you.
10:17:39 8 Q. And at the time, did you have a view as to
10:17:42 9 what gave Santa Cruz the right to enter into such
10:17:46 10 licenses?
10:17:47 11 A. We owned the technology, you know, lock,
10:17:49 12 stock, and barrel.
10:17:52 13 Q. Do you know whether at any time after the
10:18:05 14 execution of the APA, Novell entered into any UNIX or
10:18:09 15 UnixWare licenses with any third parties in which Novell
10:18:12 16 licensed UNIX or UnixWare source code to that third
10:18:16 17 party?
10:18:16 18 A. Well, are you referring to the IBM issue?
10:18:18 19 Q. No.
10:18:19 20 A. "No"? Other than that, I don't recall any
10:18:23 21 such case.
10:18:25 22 Q. And I understood your question to mean to
10:18:29 23 refer to the IBM issue that resulted in the paragraph B,
10:18:32 24 C, and D of Amendment Number 2?
10:18:35 25 A. That's correct.

Page 37

10:18:50 1 Q. Did Santa Cruz have occasion to enter into
10:18:53 2 what's been described as Project Monterey with IBM at
10:18:56 3 some point in the late 1990s?
10:18:58 4 A. Yes, that's right.
10:18:59 5 Q. And I guess at a high level, what was your
10:19:03 6 understanding of Project Monterey?
10:19:06 7 MR. JACOBS: Objection. Can we go off the
10:19:08 8 record for a second because I think you and I can do
10:19:11 9 something more efficiently.
10:19:14 10 THE VIDEOGRAPHER: We are now going off the
10:19:16 11 record. The time is 10:20 a.m.
10:19:19 12 (Recess.)
10:35:45 13 THE VIDEOGRAPHER: We are now back on the
10:36:00 14 video record. The time is 10:37 a.m.
10:36:04 15 Q. BY MR. NORMAND: Before the break,
10:36:05 16 Mr. Sabbath, I had asked you what your understanding was
10:36:09 17 at a high level of what Project Monterey is.
10:36:14 18 A. Yeah, I can't recall the timing, but Project
10:36:19 19 Monterey was a -- was to be a joint venture between Santa
10:36:28 20 Cruz Operation and IBM to jointly develop future UNIX
10:36:32 21 products and to jointly market them globally. Santa Cruz
10:36:38 22 Operation, primarily through the distribution channels,
10:36:41 23 to small and medium business, and IBM primarily to big
10:36:45 24 companies.
10:36:46 25 I guess Santa Cruz Operation also to other

10 (Pages 34 to 37)

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 98

13:45:13 1    Q. How does that language comport with your
13:45:15 2  understanding today regarding the meaning and the
13:45:17 3  parties' intent under Amendment Number 2?
13:45:20 4    A. Well, the last sentence here, I don't know
13:45:25 5  whether they ever executed an instrument, I don't -- I
13:45:29 6  have no idea. I don't know why such an instrument would
13:45:32 7  have been required. The APA states that it transfers.
13:45:38 8  Going back up into this paragraph 26, actually, they may
13:45:45 9  have identified the copyrights and trademarks. I'm not
13:45:50 10  100 percent sure. But there may have been some exhibit
13:45:53 11  in the APA where they actually listed the copyrights and
13:45:57 12  trademarks.
13:45:57 13    But I mean, you know, keep in mind, the
13:46:01 14  trademark UNIX was actually -- had been sold by Novell to
13:46:04 15  X Open. So that trademark, the language here is a little
13:46:10 16  confusing and certainly isn't 100 percent accurate.
13:46:13 17    Q. When you say the language here, do you mean
13:46:15 18  the language --
13:46:16 19    A. In this paragraph 26, I'm sorry.
13:46:18 20    Q. -- of your declaration?
13:46:30 21    Is it your view that Amendment Number 2
13:46:32 22  created a process by which Santa Cruz would go to Novell
13:46:35 23  and specify the copyrights that Santa Cruz believed was
13:46:38 24  required to exercise its rights with respect to UNIX and
13:46:41 25  UnixWare technologies?

Page 99

13:46:42 1    A. No, no.
13:46:43 2    Q. If you look at paragraph 29 of your
13:47:07 3  declaration, you say: "It is my understanding based upon
13:47:12 4  my review of plaintiff's Amended Complaint that plaintiff
13:47:15 5  claims to have acquired all right, title, and interest in
13:47:18 6  and to UNIX System V operating system source code,
13:47:23 7  software and sublicensing agreements, together with
13:47:26 8  copyrights, additional licensing rights in and to UNIX
13:47:30 9  System V and claims against all parties breaching such
13:47:34 10  agreements. I understand that plaintiff also claims to
13:47:36 11  control the right of all UNIX vendors to use and
13:47:40 12  distribute UNIX System V. I believe that these claims
13:47:42 13  are incorrect. As described above in relation to the
13:47:45 14  related agreements and Amendment Number 2, Novell
13:47:49 15  retained certain rights under the UNIX System V licensing
13:47:53 16  agreements as well as certain UNIX System V intellectual
13:47:56 17  property as described above."
13:47:58 18    Do you see that language?
13:47:58 19    A. I do.
13:47:59 20    Q. How does that language comport with your view
13:48:03 21  today as to what, if any, UNIX System V intellectual
13:48:06 22  property rights Novell retained under the APA?
13:48:10 23    A. Well, the only thing I can think of is that
13:48:13 24  UNIX trademark, that bizarre transaction where it went to
13:48:17 25  X Open, and at the time we did the asset purchase

Page 100

13:48:21 1  agreement, it was -- I'm not sure exactly what that
13:48:24 2  transaction between Novell and X Open was all about, but
13:48:28 3  we were kind of midstream in some transition period of
13:48:31 4  that mark moving over to X Open. That's the only IP I
13:48:37 5  can think of that was in kind of limbo.
13:48:48 6    Q. To the extent this declaration could be read
13:48:58 7  to suggest your view that Novell had retained the UNIX
13:49:02 8  and UnixWare copyrights, is that an accurate reflection
13:49:09 9  of your understanding of that issue?
13:49:10 10    MR. JACOBS: Object to the form of the
13:49:13 11  question.
13:49:13 12    THE WITNESS: My understanding is that they
13:49:15 13  did not retain any copyrights pertaining to the UNIX
13:49:18 14  technology.
13:49:31 15    Q. BY MR. NORMAND: As you sit here today, are
13:49:33 16  you satisfied that this declaration accurately reflects
13:49:37 17  your views regarding the issues we've discussed?
13:49:40 18    A. Well, I mean, this declaration was a quick
13:49:43 19  and dirty, you know, done before the holidays over the
13:49:47 20  phone with an associate in -- somewhere in the East Coast
13:49:50 21  and me. And, I mean, it's, you know, close enough for
13:49:54 22  government work, if you want to use that phrase, but it's
13:49:57 23  a hundred percent accurate, no, not at all.
13:49:59 24    Q. Do you think the views that you've
13:50:01 25  communicated on these issues today are a reflection of

Page 101

13:50:04 1  your having spent more time thinking about the issues
13:50:07 2  addressed in this declaration?
13:50:08 3    A. Well, not only thinking about the issues, but
13:50:10 4  actually reading the documents.
13:50:21 5    MR. NORMAND: Michael, I'm going to take a
13:50:24 6  break now, and it may be that I'm done, but if not, I'll
13:50:27 7  have maybe five or ten minutes.
13:50:29 8    MR. JACOBS: Okay.
13:50:30 9    THE VIDEOGRAPHER: We are now going off the
13:50:32 10  video record. The time is 1:51 p.m.
13:50:35 11    (Recess.)
14:08:15 12    THE VIDEOGRAPHER: We are now back on the
14:08:25 13  video record. The time is 2:09 p.m.
14:08:28 14    Q. BY MR. NORMAND: Good afternoon, Mr. Sabbath
14:08:30 15  Do you recall from your participation in the negotiation
14:08:33 16  of the APA whether the issue of patents arose?
14:08:36 17    A. It did, yes.
14:08:38 18    Q. And in what way did it arise?
14:08:41 19    A. Somewhere in the negotiation, I'm pretty sure
14:08:46 20  it was Tor Braham, the Wilson Sonsini outside counsel,
14:08:51 21  told us that there were no patents that we were to
14:08:55 22  receive as part of the assets.
14:09:01 23    Q. And did you understand why Novell was making
14:09:03 24  that representation?
14:09:04 25    A. Well, we then tried to find out, you know,

26 (Pages 98 to 101)

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 210

16:40:49 1     A. That's correct.
16:40:49 2     Q. It's not hard to say "all" or "the" to convey
16:40:52 3 that intent; right?
16:40:52 4         MR. NORMAND: Objection to form.
16:40:54 5     Q. BY MR. JACOBS: Right?
16:40:54 6     A. I suppose so.
16:40:55 7     Q. And if you look at Amendment Number 2, it
16:40:59 8 doesn't say that, does it?
16:41:02 9         MR. NORMAND: Objection to form.
16:41:04 10        THE WITNESS: If you're saying the word "all"
16:41:05 11 isn't there, you're absolutely right.
16:41:07 12    Q. BY MR. JACOBS: And a simple expression like
16:41:07 13 "the UNIX copyrights" isn't there, either?
16:41:11 14        MR. NORMAND: Objection to form.
16:41:11 15        THE WITNESS: The UNIX copyrights.
16:41:12 16    Q. BY MR. JACOBS: I'm sorry, looking at Exhibit
16:41:15 17 Number 2, sir.
16:41:16 18    A. Oh, with respect -- well, it says "all
16:41:20 19 copyrights and trademarks."
16:41:22 20    Q. That's the exclusionary part.
16:41:24 21    A. Oh, let me read it.  Oh, except for the
16:41:32 22 copyrights and trademarks covered by Novell -- yeah, it
16:41:36 23 doesn't say "except for all the copyrights and
16:41:40 24 trademarks."  True.
16:41:43 25    Q. And when it says the copyrights necessary to

Page 211

16:41:48 1 carry on the business -- do you want to read that
16:41:50 2 expression again?
16:41:52 3     A. Okay.  "Except for the copyrights and
16:41:56 4 trademarks owned by Novell as of the date of the
16:41:58 5 agreement, required for SCO to exercise its rights with
16:42:03 6 respect to the acquisition of UNIX and UnixWare
16:42:07 7 technologies."
16:42:09 8     Q. So it's -- refers to the exercise of rights;
16:42:13 9 correct?
16:42:13 10        MR. NORMAND: Objection.  Form.
16:42:14 11        THE WITNESS: Yes.
16:42:16 12    Q. BY MR. JACOBS: And up until the time that
16:42:20 13 you left Santa Cruz/Tarantella, what copyright rights in
16:42:28 14 UNIX did Santa Cruz need in order to carry on the
16:42:33 15 business contemplated by the Asset Purchase Agreement?
16:42:36 16        MR. NORMAND: Objection.  Asked and answered.
16:42:37 17        THE WITNESS: Well, once we sold the business
16:42:39 18 to Caldera, now The SCO Group, and became Tarantella, we
16:42:46 19 didn't need those rights.  Up until then, you would need
16:42:50 20 all rights to run your business.  You don't know what
16:42:53 21 you're going to be doing day-to-day, what kinds of
16:42:56 22 situations you'll find yourself in with potential
16:42:59 23 partners, with potential customers.  So you want all
16:43:03 24 rights to do anything that you deem fit with the
16:43:06 25 technology.

Page 212

16:43:07 1     Q. BY MR. JACOBS: SCO wasn't going to enter
16:43:10 2 into new SVRX licenses; correct?
16:43:12 3     A. Right.  We didn't want to do that, anyway.
16:43:14 4     Q. So you didn't need the copyright necessary to
16:43:16 5 enter into new SVRX licenses?
16:43:18 6         MR. NORMAND: Objection to form.
16:43:19 7         THE WITNESS: But we did need to protect the
16:43:23 8 technology.  We didn't want somebody to be able to go off
16:43:27 9 and pirate it, for example, so we needed the copyright in
16:43:31 10 order to defend the property.
16:43:32 11    Q. BY MR. JACOBS: Did you ever take such a step
16:43:35 12 while you were at Santa Cruz?
16:43:36 13    A. Well, with respect to SVRX?
16:43:39 14    Q. Correct.
16:43:39 15    A. I don't recall that.
16:43:40 16    Q. And with respect to the code that you
16:43:42 17 developed at UnixWare, we established -- the UnixWare
16:43:45 18 code that Santa Cruz developed, we established earlier
16:43:48 19 that you would own that by virtue of the operation of
16:43:52 20 copyright law; correct?
16:43:53 21        MR. NORMAND: Objection to form.
16:43:54 22        THE WITNESS: Yeah, it may not be that
16:43:57 23 simple, but if what you're getting at is anything we
16:44:00 24 developed, we would hold a copyright in, true, but there
16:44:04 25 might be some other older UNIX code in it, okay?  Which

Page 213

16:44:08 1 could be a problem if you don't own the copyright to it.
16:44:10 2     Q. BY MR. JACOBS: Well, the specific right you
16:44:12 3 need in order to effectuate that, based on your knowledge
16:44:15 4 and experience in the software industry, is the right to
16:44:18 5 create a derivative work; correct?
16:44:20 6         MR. NORMAND: Object to form.
16:44:21 7         THE WITNESS: Well, you definitely need that,
16:44:23 8 but you can do that as a licensee.
16:44:25 9     Q. BY MR. JACOBS: In fact, what you really need
16:44:26 10 from Novell is an explicit or implied license in order to
16:44:28 11 evolve the UnixWare product as contemplated by the Asset
16:44:30 12 Purchase Agreement; correct?
16:44:31 13        MR. NORMAND: Objection to the form.
16:44:32 14        THE WITNESS: That would have been a
16:44:34 15 different form of transaction.  It's not -- you know, we
16:44:38 16 were already a licensee.  It's not what we wanted to do.
16:44:42 17 We wanted to own the technology.
16:44:45 18    Q. BY MR. JACOBS: But in order to carry out the
16:44:47 19 business contemplated by the Asset Purchase Agreement,
16:44:50 20 we've established that that business did not include new
16:44:53 21 SVRX licenses; correct?
16:44:55 22        MR. NORMAND: Objection to form.
16:44:56 23        THE WITNESS: That's right.
16:44:58 24    Q. BY MR. JACOBS: It did include creating this
16:45:00 25 unified UNIX, and more particularly, the Eiger and UNIX

54 (Pages 210 to 213)

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 218

16:52:44 1  leave the deposition open.
16:52:45 2         From our standpoint, until that's resolved.
16:52:49 3  I hope we won't need to get further in touch with you.
16:52:52 4         THE WITNESS:  Okay.  I have no idea what
16:52:53 5  you're talking about, and that's probably a good thing.
16:52:56 6         MR. NORMAND:  I have a few questions.
        7         FURTHER EXAMINATION BY MR. NORMAND
16:52:59 8  Q. With respect to Exhibit 49, Mr. Sabbath?
16:53:03 9  A. Uh-huh.
16:53:07 10  Q. I take it that in contacting Mr. Swartz,
16:53:12 11  you're working on the assumption that you had the right
16:53:14 12  to enforce UNIX copyrights.  Is that a fair statement?
16:53:17 13         MR. JACOBS:  Objection.  Leading.
16:53:19 14         THE WITNESS:  Oh, certainly.
16:53:20 15  Q. BY MR. NORMAND:  Was there ever a time at
16:53:30 16  your tenure at Santa Cruz when you believe you did not,
16:53:33 17  meaning Santa Cruz, own the UNIX or UnixWare copyrights?
16:53:36 18  A. I don't recall such a time.
16:53:38 19  Q. Do you recall anyone at Santa Cruz suggesting
16:53:40 20  to you that Santa Cruz did not own the UNIX or UnixWare
16:53:44 21  copyrights during your tenure there?
16:53:46 22  A. I don't recall that.
16:53:47 23  Q. Can you recall anyone from Novell suggesting
16:53:49 24  to you that Santa Cruz didn't own the UNIX or UnixWare
16:53:53 25  copyrights during your tenure at Santa Cruz?

Page 219

16:53:56 1  A. I don't recall that.
16:54:07 2  Q. If you look at Amendment Number 2, the
16:54:10 3  language in paragraph A, you've spoken with both me
16:54:16 4  and Mr. Jacobs regarding this language copyrighted is a
16:54:22 5  trademark owned by Novell at the date of the agreement
16:54:24 6  required from SCO to exercise its rights with respect to
16:54:27 7  the acquisition of UNIX and UnixWare technologies.
16:54:30 8         Now, did you have any understanding at the
16:54:31 9  time as to whether SVRX source code was part of UNIX and
16:54:37 10  UnixWare?
16:54:38 11  A. There was an assumption that SVRX was part of
16:54:41 12  UNIX, sure.  UNIX would have been, you know, all
16:54:46 13  releases, all forms of the UNIX operating system.
16:54:49 14  Q. Was it your understanding under the APA that
16:54:52 15  Santa Cruz had the right to develop the UnixWare
16:54:54 16  business?
16:54:54 17  A. Well, certainly that was the primary intent.
16:54:59 18  Q. Was it your understanding at the time of the
16:55:02 19  execution of the APA that in order to develop the
16:55:05 20  UnixWare business, Santa Cruz would have to copy and
16:55:08 21  reproduce UNIX source code?
16:55:10 22  A. Sure.  And modify it, certainly.
16:55:12 23  Q. Does it follow that in order to develop the
16:55:16 24  UnixWare business, it was your understanding that Santa
16:55:19 25  Cruz would need to copy and reproduce the SVRX source

Page 220

16:55:24 1  code?
16:55:24 2         MR. JACOBS:  Objection.  Leading.
16:55:26 3         THE WITNESS:  You know, I'm not technical
16:55:28 4  enough to know if that's the case.  I think, but I don't
16:55:31 5  know.
16:55:31 6  Q. BY MR. NORMAND:  Would that statement be true
16:55:34 7  if SVRX source code was part of UNIX and UnixWare source
16:55:37 8  code?
16:55:37 9  A. If that were the case, then it's probably so
16:55:40 10  that we would have to modify, reproduce, so forth, the
16:55:45 11  SVRX code as well.
16:55:45 12  Q. Is it your view that under the Asset Purchase
16:55:50 13  Agreement, Santa Cruz licensed from Novell the UNIX and
16:55:54 14  UnixWare source code?
16:55:54 15  A. No.  I mean, the purpose of the Asset
16:55:58 16  Purchase Agreement was that we would acquire, we would
16:56:01 17  buy and own all of the UNIX business, all of the UNIX
16:56:05 18  technology.  We were already a licensee.
16:56:09 19         MR. JACOBS:  Objection.  Move to strike.
16:56:11 20  Q. BY MR. NORMAND:  Mr. Jacobs asked you earlier
16:56:13 21  about paragraph A of Amendment Number 2, and he used the
16:56:16 22  phrase "nunc pro tunc."
16:56:18 23         Do you remember that?
16:56:19 24  A. Vaguely.
16:56:20 25  Q. "Nunc pro tunc" is Latin for "now for then"?

Page 221

16:56:25 1  A. Uh-huh.
16:56:25 2  Q. Did you understand paragraph A of the
16:56:28 3  Amendment 2 to amend the excluded asset schedule of the
16:56:32 4  APA?
16:56:33 5  A. No, I took this as a clarification, not
16:56:36 6  actually an amendment.  And whether it was effective way
16:56:42 7  back when, or 16 October, '96, to be honest with you, I
16:56:46 8  failed to see any significance.  But maybe I'm missing
16:56:50 9  some fine point that is a contention between you two.
16:56:56 10  Q. Well, to the extent paragraph A clarifies a
16:57:00 11  schedule to the APA --
16:57:02 12  A. Uh-huh.
16:57:02 13  Q. -- is it fair to say that Amendment Number 2,
16:57:05 14  paragraph A, was effective as of the execution of the
16:57:08 15  APA?
16:57:08 16         MR. JACOBS:  Objection.  Leading.
16:57:10 17         THE WITNESS:  And I can only say I suppose
16:57:15 18  so.
16:57:15 19  Q. BY MR. NORMAND:  And why is that?
16:57:17 20  A. Because I don't really speak very good Latin.
16:57:21 21         No, what I meant is I don't understand the
16:57:29 22  rules pertaining to that legal principle.
16:57:32 23  Q. There is language in paragraph A of Amendment
16:57:35 24  Number 2 that says "With respect to Schedule 1.1(d) of
16:57:39 25  the agreement, titled 'Excluded Assets,' Section 5,

56  (Pages 218 to 221)

dc7a7597-db8b-4fd1-bc50-118c5c787b27

Page 222

```
16:57:42  1   subsection A shall be revised to read."
16:57:45  2        Do you see that language?
16:57:46  3        A.  Yes, I do.
16:57:48  4        Q.  To the extent that the excluded asset
16:57:51  5   schedule of Amendment A was revised, does that affect
16:57:54  6   your view one way or the other as to whether copyrights
16:57:57  7   were deemed transferred under this Amendment Number 2 as
16:58:03  8   of the time of the APA?
16:58:04  9        A.  No.  I mean, you know, again, I was told --
16:58:07 10   we understood this to be a clarification, not a revision.
16:58:25 11        Q.  Mr. Jacobs asked you about Scott Lester's
16:58:28 12   involvement in certain negotiations --
16:58:30 13        A.  Yeah.
16:58:30 14        Q.  -- under the APA.  Do you recall that
16:58:32 15   question?
16:58:32 16        A.  Yes.
16:58:33 17        Q.  Was Mr. Lester part of any negotiations in
16:58:38 18   which outside counsel for the other side was not
16:58:42 19   involved?
16:58:44 20        A.  I suspect not.  Nor do I think Ed Leonard was
16:58:50 21   probably meeting with the other side without their
16:58:53 22   outside counsel.
16:59:37 23        Q.  I wanted to direct your attention to
16:59:39 24   Exhibit 46, which was one of the email chains.
16:59:43 25        A.  Okay.  Got it.
```

Page 223

```
17:00:15  1        Q.  Do you see on the first page of the document
17:00:20  2   in the email to John Maciaszek from Scott McGregor
17:00:29  3   beginning, "John, Alok and I spoke about this, and here's
17:00:34  4   the status"?  First page of the document?
17:00:40  5        A.  Oh.  Okay.  Yeah.
17:00:42  6        Q.  And the language says:  Alok spoke with
17:00:45  7   Frankenberg last Friday, and Novell thinks they have the
17:00:49  8   right to do this.  On the other hand, Geoff Seabrook, who
17:00:53  9   negotiated the deal from our end, is adamant that they
17:00:57 10   don't or at least the intent is that they don't."
17:00:57 11        Do you see that language?
17:00:59 12        A.  I do.
17:01:00 13        Q.  Do you know whether Mr. Seabrook was relying
17:01:03 14   on Section 4.16(c) in reaching the conclusion that's
17:01:06 15   attributed to him here?
17:01:08 16        A.  I have no idea.  You know, when I saw this
17:01:11 17   email thread today, I had no recollection whatsoever of
17:01:18 18   it.
17:02:03 19        Q.  I'm handing you, Mr. Sabbath, what's been
17:02:06 20   marked as Exhibit 1050, a letter dated May 1st, 1996
17:02:14 21   under Brobeck, Phleger & Harrison letterhead to Novell,
17:02:19 22   attention David Bradford, signed by Scott Lester?
17:02:23 23        A.  Yes.
17:02:25 24        Q.  In which Mr. Lester states in the first page,
17:02:30 25   paragraph 3:  "This letter constitutes notice on behalf
```

Page 224

```
17:02:34  1   of SCO that the execution of the amendment by Novell
17:02:38  2   constitutes a breach of the Asset Purchase Agreement and
17:02:40  3   represents an invalid exercise of Novell's authority.
17:02:44  4   The amendment purports to grant certain rights to IBM and
17:02:48  5   to modify preexisting license agreements in a manner that
17:02:53  6   contravenes the provisions of the asset purchase
17:02:54  7   agreement and potentially causes substantial harm and
17:02:57  8   damages to SCO."
17:02:58  9        Do you see that language?
17:02:59 10        A.  Yes, I do.
17:03:00 11        Q.  Is it your view that in writing this letter,
17:03:03 12   Mr. Lester meant to refer only to Section 4.16(c) of the
17:03:08 13   APA?
17:03:08 14        MR. JACOBS:  Objection.  Calls for
17:03:10 15   speculation, lacks foundation.
17:03:13 16        THE WITNESS:  And I have no idea.
17:03:22 17        Q.  BY MR. NORMAND:  Do you recall you had a
17:03:23 18   series of questions and answers with Mr. Jacobs regarding
17:03:29 19   Novell's rights to enter into buyouts on behalf of Santa
17:03:32 20   Cruz in 1996?  Do you recall those questions and answers?
17:03:35 21        A.  Vaguely.
17:03:36 22        Q.  And do you recall my asking you this morning
17:03:41 23   about Amendment Number X?
17:03:43 24        A.  What about Amendment Number X?
17:03:47 25        Q.  Do you recall me asking you questions about
```

Page 225

```
17:03:51  1   it?
17:03:51  2        A.  Oh, sure.  Sure.
17:03:52  3        Q.  Is it your view that following the execution
17:03:56  4   of Amendment Number X, Novell was entitled to enter into
17:04:00  5   buyouts unilaterally on behalf of Santa Cruz?
17:04:02  6        MR. JACOBS:  Object to the form of the
17:04:04  7   question.
17:04:04  8        THE WITNESS:  Well, Amendment Number X was
17:04:07  9   the three-way between IBM, Novell, and SCO.  There was
17:04:12 10   another amendment -- well, Amendment Number 2,
17:04:16 11   actually --
17:04:17 12        Q.  BY MR. NORMAND:  It's really more a question
17:04:19 13   to time.  Amendment Number 2 and Amendment Number X,
17:04:24 14   following the execution of those documents, do you have a
17:04:27 15   view as to whether Novell was entitled to enter into
17:04:30 16   buyouts unilaterally for Santa Cruz?
17:04:32 17        A.  I do have a view.  I think that really nailed
17:04:35 18   down the clarification that Novell would not have the
17:04:38 19   ability to do a buyout on our behalf or on anybody's
17:04:41 20   behalf.
17:05:34 21        Q.  Do you have any understanding, Mr. Sabbath,
17:05:36 22   as to whether following the execution of the APA, Santa
17:05:41 23   Cruz had occasion to enter into UnixWare licenses in
17:05:45 24   which it licensed SVRX source code to a third party?
17:05:49 25        MR. JACOBS:  Objection.  Asked and answered.
```

57 (Pages 222 to 225)

Page 226

17:05:50 1          THE WITNESS: I don't know.
17:06:04 2          Q. BY MR. NORMAND: Mr. Jacobs directed you to
17:06:05 3 Section 2.10 of the Asset Purchase Agreement.
17:06:13 4          A. 2.10 of technology?
17:06:18 5          Q. Correct. And that's the section in which
17:06:22 6 Novell as the seller makes certain representations
17:06:26 7 regarding a list of seller intellectual property rights?
17:06:30 8          A. Yes.
17:06:31 9          Q. Now, do you have any explanation as to why
17:06:36 10 copyrights would have been included in those seller
17:06:39 11 intellectual property rights, and representations would
17:06:41 12 have been made about such copyrights in Section 2.10 if
17:06:46 13 Novell were not transferring those copyrights?
17:06:49 14          A. No, I don't know why it would be there if
17:06:53 15 that were not the case.
17:07:02 16          Q. Do you have any reason to believe that you
17:07:05 17 ever told Allison Lisbonne or Allison Amadia that UNIX or
17:07:09 18 UnixWare copyrights had not been transferred under the
17:07:13 19 APA?
17:07:13 20          A. I sure don't recall that.
17:07:15 21          Q. Do you have any reason to believe you would
17:07:17 22 have made such a statement?
17:07:17 23          A. Well, I mean, it could be that she brought it
17:07:20 24 up or -- I mean, not me, but her. I don't recall that.
17:07:25 25 It could be somebody brought up the fact that maybe there

Page 227

17:07:28 1 needed to be a clarification on the language in the APA.
17:07:32 2 I don't recall that.
17:07:38 3          Q. Was it ever your understanding after the
17:07:40 4 execution of the APA that Novell had retained UNIX or
17:07:43 5 UnixWare copyrights?
17:07:44 6          A. No.
17:07:57 7          Q. Mr. Jacobs pointed you in the technology
17:08:00 8 license agreement to the top of page 2 --
17:08:04 9          A. Top of page 2.
17:08:09 10          Q. -- which certain definitions in the APA are
17:08:12 11 incorporated.
17:08:13 12          A. Yes.
17:08:13 13          Q. And including the word "assets"?
17:08:17 14          A. Okay. I see assets.
17:08:21 15          Q. I take it from our discussion this morning
17:08:40 16 that it was your understanding that the UNIX and UnixWare
17:08:48 17 licenses were among the assets transferred, is that fair
17:08:52 18 to say, under the APA?
17:08:53 19          A. The licenses, what licenses specifically?
17:08:57 20          Q. That UNIX and UnixWare licenses were among
17:09:01 21 the assets transferred under the APA?
17:09:03 22          A. You mean the licenses that Novell had entered
17:09:06 23 into with its customers?
17:09:08 24          Q. Correct.
17:09:08 25          A. Yes, of course.

Page 228

17:09:12 1          Q. If you look at Schedule 1.1(a) of the APA.
17:09:17 2 That's the Bates number ending 950?
17:09:19 3          A. Okay.
17:09:29 4          Q. Paragraph 1, among the assets transferred was
17:09:32 5 the UNIX and UnixWare source code; correct?
17:09:35 6          A. Right. Right.
17:09:48 7          Q. And if you see at the top of the Amendment
17:09:50 8 Number 2, the phrase "licensed technology"?
17:09:54 9          A. I'm sorry, where is that?
17:09:55 10          Q. At the top of page 2 of Amendment Number 2?
17:09:58 11          A. Other technology? Yes.
17:10:01 12          Q. I'm sorry, licensed technology.
17:10:04 13          A. Like what page of the footer on the bottom
17:10:09 14 right?
17:10:09 15          Q. The top of page 2 of the Technology License
17:10:12 16 Agreement?
17:10:12 17          A. Oh, I'm looking at the wrong agreement.
17:10:23 18 License technology, right.
17:10:26 19          Q. And if you look in paragraph Roman Numeral II
17:10:30 20 A 2 of the Technology License Agreement?
17:10:35 21          A. Subject to paragraphs B and C of this
17:10:39 22 Section 2?
17:10:40 23          Q. Novell was given with the consent of SCO a
17:10:42 24 non-exclusive, non-terminable, worldwide fee-free license
17:10:46 25 to use, reproduce, and modify and authorize its customers

Page 229

17:10:52 1 to use, reproduce, and modify licensed technology."
17:10:56 2          Do you see that?
17:10:56 3          A. I do.
17:10:57 4          Q. Did you understand such licensed technology
17:11:00 5 to include the UNIX and UnixWare source code?
17:11:05 6          A. No.
17:11:12 7          Q. Well, let's look at the definition of
17:11:14 8 licensed technology in the APA.
17:11:17 9          MR. JACOBS: 1.6.
17:11:22 10          MR. NORMAND: I'm sorry?
17:11:23 11          MR. JACOBS: 1.6.
17:11:36 12          Q. BY MR. NORMAND: If you look at Section 1.6
17:11:39 13 of the APA, Mr. Sabbath.
17:11:40 14          A. I'm sorry, Section 1.6? License back of
17:11:52 15 assets, okay.
17:11:53 16          Q. It says: "Concurrent with the closing, buyer
17:11:56 17 shall execute a license agreement under which it shall
17:11:58 18 grant the seller a royalty-free perpetual worldwide
17:12:02 19 license to all of the technology included in the assets."
17:12:05 20          A. Uh-huh.
17:12:06 21          Q. Do you remember we looked at the definition
17:12:08 22 of "assets"?
17:12:09 23          A. Uh-huh.
17:12:09 24          Q. It is your understanding that UNIX and
17:12:11 25 UnixWare source code were among the assets?

58  (Pages 226 to 229)

dc7a7597-db8b-4fd1-bc50-118c5c787b27

# EXHIBIT 14

Page 1

IN THE UNITED STATES DISTRICT COURT

   FOR THE DISTRICT OF UTAH

   THE SCO GROUP, INC.,

Plaintiff/Counterclaim defendant,

vs.                  CASE NO. 2:04CV00139

NOVELL, INC.,

   Defendants/Counterclaim-Plaintiff

DEPOSITION OF KIM MADSEN

Februrary 13, 2007

Pages 1 - 242

:

REPORTED BY

 LAWRENCE PAUL NELSON, CSR 12144

 JOB NO 191725

81afa2c8-43d2-4992-aff6-356a337d84e5

Page 30

1    Q. Including UNIX copyrights; correct?    10:33:13
2    A. Including the UNIX copyrights.    10:33:16
3    Q. And that particular paragraph Santa Cruz    10:33:18
4 did not claim to own UNIX copyrights; correct?    10:33:22
5    MR. NORMAND: Objection to form, asked and    10:33:26
6 answered.    10:33:29
7    THE WITNESS: Yes.    10:33:29
8 BY MR. BRAKEBILL:    10:33:37
9    Q. Yes, they did not claim to own the UNIX    10:33:37
10 copyrights?    10:33:40
11    A. That's correct.    10:33:41
12    Q. Do you know when this Santa Cruz-Caldera    10:33:43
13 deal closed?    10:33:49
14    MR. NORMAND: Objection to form.    10:33:56
15 BY MR. BRAKEBILL:    10:33:57
16    Q. Approximately.    10:33:58
17    A. I do not recall when it closed, sometime    10:34:07
18 late in 2003, I believe.    10:34:17
19    Q. I'll represent for the record, and Ted,    10:34:18
20 correct me if I need be, but I'll represent for the    10:34:21
21 record that it closed in 2001.    10:34:24
22    A. I'm sorry. What did I just say?    10:34:27
23    Q. 2003.    10:34:28
24    A. Oh, I'm sorry.    10:34:30
25    Q. Just in case it impacts the time frame for    10:34:31

Page 31

1 questions.    10:34:34
2    A. Yes, yes.    10:34:34
3    Q. Does that sound correct to you that the    10:34:35
4 transaction closed in approximately 2001?    10:34:37
5    A. Yeah, February or March, I believe, now    10:34:42
6 that I think about it.    10:34:46
7    Q. Did you stay with Santa Cruz after the    10:34:54
8 Santa Cruz-Caldera transaction closed?    10:34:59
9    A. Yes.    10:35:01
10    Q. And on or around the closing of the Santa    10:35:09
11 Cruz-Caldera transaction in 2001 did the remaining    10:35:15
12 business become Tarantella?    10:35:20
13    A. Yes.    10:35:26
14    Q. And so you stayed in Tarantella's legal    10:35:27
15 department beginning in March or so of 2001?    10:35:34
16    A. Yes.    10:35:36
17    Q. And then you stayed in Tarantella's legal    10:35:38
18 department until approximately August of 2004?    10:35:42
19    A. Yes.    10:35:46
20    Q. Are you aware that in 2005 Tarantella was    10:35:56
21 purchased by Sun Microsystems?    10:36:01
22    A. Yes.    10:36:03
23    Q. So is it fair to say that at the time of    10:36:04
24 the Sun purchase of Tarantella in 2005 that all of    10:36:31
25 the assets comprising the original Santa Cruz    10:36:38

Page 32

1 Operation at the time of the Novell-Santa Cruz deal    10:36:42
2 had been sold off to other entities?    10:36:45
3    MR. NORMAND: Objection to form.    10:36:49
4    THE WITNESS: I don't know the particulars    10:36:53
5 of the transaction with Sun, so I can't answer that    10:36:54
6 question.    10:36:59
7 BY MR. BRAKEBILL:    10:37:04
8    Q. As you sit here today do you have any    10:37:05
9 understanding as to whether or not any Tarantella    10:37:06
10 business was not purchased by Sun Microsystems in    10:37:08
11 2005?    10:37:13
12    A. No, I have no understanding of that.    10:37:13
13    Q. Did Mr. Sabbath stay at Tarantella after    10:37:17
14 the Santa Cruz-Caldera transaction?    10:37:22
15    A. Yes.    10:37:24
16    Q. Do you know how long he stayed at    10:37:24
17 Tarantella?    10:37:27
18    A. He stayed until December of 2003, I    10:37:37
19 believe.    10:37:37
20    Q. Do you know what he did upon his departure    10:37:42
21 from Tarantella?    10:37:44
22    A. I believe he's happily retired.    10:37:48
23    Q. Now, you were involved in 2001 in    10:37:55
24 corresponding with IBM concerning the Caldera    10:38:41
25 acquisition of Santa Cruz assets; is that right?    10:38:47

Page 33

1    MR. NORMAND: Objection to form,    10:38:51
2 foundation.    10:38:52
3    THE WITNESS: I don't know.    10:38:58
4 BY MR. BRAKEBILL:    10:39:09
5    Q. As you sit here today you don't recall one    10:39:09
6 way or another whether you were involved in    10:39:10
7 correspondence with IBM in 2001 concerning Caldera's    10:39:13
8 acquisition of Santa Cruz assets?    10:39:20
9    A. I believe that I sent a letter to them. I    10:39:23
10 may have had phone conversations. I don't remember    10:39:28
11 the particulars.    10:39:32
12    MR. BRAKEBILL: Are you going to want to    10:40:48
13 take a break soon? I can keep going. This is a    10:40:50
14 convenient spot. Do you want to keep going?    10:40:53
15    THE WITNESS: Yeah, I can go a little    10:40:56
16 longer.    10:40:58
17    MR. BRAKEBILL: All right.    10:40:59
18 BY MR. BRAKEBILL:    10:41:02
19    Q. Did you have a role in the negotiation of    10:41:17
20 the asset purchase agreement between Novell and    10:41:22
21 Santa Cruz in 1995?    10:41:25
22    A. Yes.    10:41:27
23    Q. Well, how would you characterize that role    10:41:28
24 as you sit here today?    10:41:34
25    A. I participated in meetings, negotiations,    10:41:36

9  (Pages 30 to 33)

81afa2c8-43d2-4992-aff6-356a337d84e5

Page 34

1 a review of the asset purchase agreement, and    10:41:43
2 possibly preparation of some of the schedules.    10:41:50
3     Q. Who was part of the legal team, in-house    10:42:07
4 legal team at Santa Cruz participating in the    10:42:10
5 negotiation of the APA?    10:42:15
6     A. Primarily Steve Sabbath and myself.    10:42:17
7     Q. I take it Steve Sabbath was the lead    10:42:22
8 in-house lawyer for Santa Cruz on the APA    10:42:26
9 transaction?    10:42:29
10     A. Yes, I believe he was the only lawyer at    10:42:31
11 the Santa Cruz Operation at that time.    10:42:34
12     Q. Now, you mentioned that you believe you    10:42:47
13 were part of meetings concerning the asset purchase    10:42:50
14 agreement. What meetings in particular do you have    10:42:54
15 in mind?    10:42:57
16     A. We had internal meetings with Geoff    10:42:59
17 Seabrook and Jim Wilt, who were the lead business    10:43:07
18 negotiators as well as meetings with Doug Michaels    10:43:13
19 and Aluc Mohan, as well as meetings with Novell. Ed    10:43:20
20 Chatlos I remember in particular meetings with Ed.    10:43:27
21     Q. As you sit here today what specific    10:43:31
22 meetings do you recall having with Novell prior to    10:43:34
23 the execution of the asset purchase agreement on    10:43:36
24 September 19th, 1995?    10:43:40
25     MR. NORMAND: Objection to form, calls for    10:43:43

Page 35

1 a narrative.    10:43:48
2     THE WITNESS: I'm sorry. Can you repeat    10:43:48
3 the question?    10:43:49
4 BY MR. BRAKEBILL:    10:43:50
5     Q. You said you recall having meetings with    10:43:50
6 Novell prior to the execution of the asset purchase    10:43:52
7 agreement?    10:43:56
8     A. Yes.    10:43:57
9     MR. NORMAND: Are you transcribing these    10:43:58
10 objections or do I need to speak louder?    10:43:58
11     THE COURT REPORTER: No, I'm getting it.    10:43:58
12     MR. NORMAND: Okay.    10:44:11
13 BY MR. BRAKEBILL:    10:44:11
14     Q. When's the first meeting that you recall    10:44:12
15 having with Novell prior to the execution of the    10:44:14
16 asset purchase agreement?    10:44:17
17     A. I don't remember the dates. I remember Ed    10:44:22
18 Chatlos, and there may have been other employees    10:44:30
19 from Novell that accompanied him coming to Santa    10:44:33
20 Cruz and having meetings in Santa Cruz as well as    10:44:38
21 Steve and myself going to New Jersey on a couple of    10:44:42
22 occasions and meeting to discuss the transaction,    10:44:48
23 the contemplated transaction.    10:44:52
24     Q. Aside from Ed Chatlos, who from Novell do    10:45:02
25 you recall meeting with from Novell in Santa Cruz    10:45:07

Page 36

1 prior to the execution of the asset purchase    10:45:16
2 agreement?    10:45:18
3     A. I can't be certain of who -- there are    10:45:27
4 names that are familiar to me but I can't be certain    10:45:32
5 who came to Santa Cruz and who didn't. Ed is the    10:45:35
6 person who sticks out most clearly in my mind.    10:45:38
7     Q. You reference, if you will, two sets of    10:45:42
8 meetings, some meetings in Santa Cruz that you had    10:45:46
9 with Novell and some meetings that you had with    10:45:48
10 Novell in New Jersey. Is that fair?    10:45:51
11     A. Yes.    10:45:53
12     Q. Did you have any meetings with Novell    10:45:54
13 aside from those in Santa Cruz and those in New    10:45:56
14 Jersey?    10:45:59
15     A. Yes. While we were getting the asset    10:45:59
16 purchase agreement we had several meetings at -- I    10:46:03
17 believe most of the meetings were at the Brobeck law    10:46:11
18 firm and they might have been at Wilson Sonsini's    10:46:15
19 facilities, but we had several meetings at the    10:46:21
20 lawyers who were representing the two parties.    10:46:25
21     Q. Let's talk about the Santa Cruz meetings    10:46:29
22 with Novell first. Is it fair to say you don't    10:46:33
23 recall anyone in particular from Novell that was    10:46:36
24 part of those meetings aside from Ed Chatlos?    10:46:38
25     A. I don't remember anything in particular.    10:46:42

Page 37

1 I remember there were other people from Novell but I    10:46:45
2 couldn't say with certainty as to who they were.    10:46:49
3     Q. Do you recall when these meeting took    10:46:52
4 place in Santa Cruz?    10:46:54
5     A. No, I can't recall the dates.    10:47:00
6     Q. Do you recall that those meetings were    10:47:04
7 prior to the execution of the original asset    10:47:07
8 purchase agreement?    10:47:10
9     A. Yes.    10:47:11
10     Q. You also mentioned some meetings in New    10:47:13
11 Jersey with Novell? I believe you said you and    10:47:17
12 Steve Sabbath went to New Jersey?    10:47:20
13     A. Yes.    10:47:22
14     Q. How many meetings do you recall having    10:47:22
15 with people from Novell in New Jersey prior to the    10:47:25
16 execution of the asset purchase agreement?    10:47:28
17     A. There were numerous meetings over a couple    10:47:35
18 days, a few days.    10:47:42
19     Q. Who do you recall meeting with from    10:47:44
20 Novell?    10:47:46
21     A. I primarily remember meeting with Ed    10:47:48
22 Chatlos. Burt Levine may have been involved in    10:47:59
23 meetings. Ty Mattingly may have been involved in    10:48:03
24 meetings. I remember speaking with him on the phone    10:48:10
25 but I can't be certain whether or not he was    10:48:13

10  (Pages 34 to 37)

81afa2c8-43d2-4992-aff6-356a337d84e5

Page 70

1    Q. Why don't you turn to Exhibit 51, which is    11:56:28
2  your declaration, and I'll ask you to look at    11:56:31
3  whatever you feel comfortable to look at, but I    11:56:47
4  believe that paragraphs 8 -- 8 through 12 relate to    11:56:50
5  your beliefs concerning UNIX ownership.    11:57:03
6    A. Yes.    11:57:08
7      MR. NORMAND: Objection to form.    11:57:09
8  BY MR. BRAKEBILL:    11:57:16
9    Q. Is it a fair statement that -- well, let    11:57:17
10  me ask it this way. What, if any, other provisions    11:57:21
11  in the asset purchase agreement did you rely upon in    11:57:25
12  your belief in this declaration that UNIX copyrights    11:57:27
13  did transfer from Novell to Santa Cruz?    11:57:30
14    A. I don't know. I don't remember which    11:57:39
15  specific provisions. And I'd be happy to take the    11:57:41
16  time to review this document if you want me to do    11:57:46
17  that.    11:57:50
18    Q. I'll give you the opportunity in due    11:57:53
19  course. I'm trying to test your memory aside from    11:57:56
20  having the document in front of you right now. You    11:57:59
21  gave the declaration on UNIX ownership two months    11:58:02
22  ago; is that right?    11:58:06
23      MR. NORMAND: Asked and answered.    11:58:08
24      THE WITNESS: November 4th.    11:58:10
25  BY MR. BRAKEBILL:    11:58:11

Page 71

1    Q. In the last two to three months you gave a    11:58:11
2  declaration in which it was your personal belief    11:58:14
3  that UNIX copyrights did transfer from Novell to    11:58:17
4  Santa Cruz as part of is the asset purchase    11:58:21
5  agreement; correct?    11:58:23
6    A. Correct.    11:58:24
7    Q. And what provisions, if any, were you    11:58:24
8  relying upon for your personal belief that the UNIX    11:58:28
9  copyrights did transfer?    11:58:31
10    A. Well, I relied on the description of the    11:58:33
11  business in 1.1(a) and the recital A. I don't    11:58:39
12  recall which other provisions I may have relied on,    11:58:48
13  but I also relied on my recollection of the    11:58:54
14  transaction and the negotiations surrounding the    11:58:59
15  transaction, the conversations with Novell as to    11:59:03
16  what they were conveying and the internal    11:59:06
17  conversations as to what we believed we were buying.    11:59:09
18    Q. So to make sure that I understand your    11:59:16
19  testimony, the provisions that you right now can    11:59:19
20  point to in support of your belief that UNIX    11:59:26
21  copyrights did transfer from Novell to Santa Cruz    11:59:30
22  are recital A in section 1.1(a) of the asset    11:59:33
23  purchase agreement; is that correct?    11:59:39
24      MR. NORMAND: Objection to form.    11:59:42
25      THE WITNESS: The provisions that I can    11:59:46

Page 72

1  point to in the absence of reading the agreement    11:59:49
2  afresh, yes.    11:59:53
3  BY MR. BRAKEBILL:    11:59:56
4    Q. And how, if at all, do you believe that    12:00:07
5  recital A and section 1.1(a) of the asset purchase    12:00:09
6  agreement --    12:00:14
7    A. And schedule 1.1(a), which is referenced    12:00:15
8  in section 1.1(a).    12:00:20
9    Q. How do you believe that recital A, section    12:00:23
10  1.1(a), and schedule 1.1(a) influenced your personal    12:00:27
11  belief that UNIX copyrights did transfer from Novell    12:00:34
12  to Santa Cruz?    12:00:44
13    A. Because all right, title, and interest --    12:00:44
14  let me get the language here, in and to the assets    12:00:48
15  relating to the business, which is UNIX and    12:00:52
16  UnixWare, were being conveyed to SCO. And included    12:00:58
17  in that would have, of course, been the copyrights.    12:01:03
18    Q. And did you understand that in section    12:01:07
19  1.1(a) of the asset purchase agreement that -- I'll    12:01:10
20  refer you to the last sentence, that notwithstanding    12:01:16
21  schedule 1.1(a) the assets so purchased shall    12:01:21
22  not include the assets set forth on the schedule    12:01:24
23  1.1(b)?    12:01:28
24      MR. NORMAND: Objection to form.    12:01:29
25      THE WITNESS: Yes.    12:01:30

Page 73

1  BY MR. BRAKEBILL:    12:01:31
2    Q. And notwithstanding the excluded assets    12:01:32
3  provision from section 1.1(a), is it still your    12:01:36
4  personal belief that the UNIX copyrights did    12:01:40
5  transfer?    12:01:42
6    A. Yes.    12:01:43
7    Q. From Novell to Santa Cruz?    12:01:44
8    A. Yes.    12:01:46
9    Q. And why is that?    12:01:46
10      MR. NORMAND: Objection to form, asked and    12:01:55
11  answered.    12:01:58
12      THE WITNESS: Because it's clear --    12:01:58
13  BY MR. BRAKEBILL:    12:01:58
14    Q. Let me put it this way. Aside from    12:02:02
15  recital A --    12:02:06
16    A. Yes.    12:02:06
17    Q. -- aside from section 1.1(a) in schedule    12:02:07
18  1.1(a), is there any other reason for why you    12:02:11
19  believe that the assets to be so purchased shall not    12:02:14
20  include the assets set forth in schedule 1.1(b)?    12:02:16
21    A. I didn't understand the question.    12:02:23
22    Q. Aside from recital A, aside from section    12:02:24
23  1.1(a), and aside from schedule 1.1(a), is there any    12:02:28
24  other basis for your opinion that schedule 1.1(b)    12:02:36
25  does not operate -- that schedule 1.1(b) does not    12:02:42

19  (Pages 70 to 73)

Page 74

1  excluded UNIX copyrights from the assets to be sold?  12:02:47
2      MR. NORMAND: Objection to form, asked and  12:02:51
3  answered.  12:02:55
4      THE WITNESS: Yes. As I said before, I  12:02:55
5  also recall the conversations and discussions with  12:02:59
6  Novell as to what the intent of the transaction was,  12:03:03
7  what they intended to convey, what SCO intended to  12:03:13
8  purchase.  12:03:18
9  BY MR. BRAKEBILL:  12:03:20
10      Q. And what did Novell convey to you  12:03:21
11  regarding what was going to be conveyed to Santa  12:03:24
12  Cruz with regard specifically to UNIX copyrights?  12:03:28
13      MR. NORMAND: Objection to form.  12:03:32
14      THE WITNESS: I do not recall a specific  12:03:36
15  conversation regarding copyrights, but Novell  12:03:39
16  conveyed that they were clearly divesting themselves  12:03:47
17  of the UNIX business. They had no interest in the  12:03:52
18  UNIX business in retaining any interest in the UNIX  12:03:59
19  business except to the extent that it related to  12:04:02
20  Netware.  12:04:02
21      And they were very clear about what they  12:04:08
22  were not conveying, which were the patents. And  12:04:16
23  they were clear about a transaction that they had  12:04:26
24  entered into with X/Open regarding the trademark so  12:04:29
25  at no point did they say, "Oh, by the way, we're not  12:04:34

Page 75

1  giving you the copyrights."  12:04:39
2      Q. At any point in time did Novell, anyone  12:04:40
3  from Novell, say to you, "We're going to transfer  12:04:43
4  the UNIX copyrights to Santa Cruz"?  12:04:47
5      A. No I don't recall that. It was assumed by  12:04:52
6  everyone that, of course, the copyrights were  12:04:55
7  accompanying.  12:04:59
8      Q. There were no express words from anyone  12:05:00
9  from Novell to you saying Novell is going to  12:05:03
10  transfer the UNIX copyrights to Santa Cruz; correct?  12:05:08
11      MR. NORMAND: Objection, asked and  12:05:13
12  answered.  12:05:14
13      THE WITNESS: That's correct.  12:05:14
14  BY MR. BRAKEBILL:  12:05:16
15      Q. Now, you mentioned patents. If you could  12:05:17
16  turn to schedule 1.1(b) of Exhibit 1 and look at  12:05:22
17  Roman V on Exhibit 2. Roman V(b) says "all  12:05:47
18  patents." Do you see that? Is it your  12:05:51
19  understanding that that relates to all UNIX patents?  12:05:53
20      MR. NORMAND: Objection to form.  12:05:57
21      THE WITNESS: I don't remember which  12:06:00
22  patents there were. I remember a conversation with  12:06:02
23  Ed Chatlos and I believe Burt Levine that they would  12:06:07
24  not be transferring any patents. And there was an  12:06:11
25  issue because, you know -- SCO wasn't interested in  12:06:20

Page 76

1  the patents to begin with, but I remember them  12:06:25
2  taking the pains that they wouldn't be transferring  12:06:29
3  patents. And some of the patents had been retained  12:06:30
4  by AT&T, the original owner of the UNIX technology,  12:06:32
5  so they weren't Novell's to transfer.  12:06:38
6  BY MR. BRAKEBILL:  12:06:42
7      Q. Do you believe that Novell had no rights  12:06:42
8  in UNIX patents at the time it was entered into the  12:06:44
9  Novell-Santa Cruz transaction?  12:06:48
10      MR. NORMAND: Objection to form.  12:06:49
11      THE WITNESS: I don't know. I know that  12:06:50
12  some were retained by AT&T but I don't know that  12:06:52
13  some may have been transferred to Novell. I don't  12:06:55
14  recall that.  12:06:58
15  BY MR. BRAKEBILL:  12:06:58
16      Q. But it is your understanding that no UNIX  12:06:59
17  patents were being transferred from Novell to Santa  12:07:01
18  Cruz?  12:07:06
19      MR. NORMAND: Objection to form,  12:07:06
20  mischaracterizes her testimony.  12:07:09
21      THE WITNESS: I'm not sure what you mean by  12:07:09
22  patents. No patents relating to specific areas of  12:07:11
23  the UNIX technology. There is no, to my knowledge  12:07:16
24  no broad patent over all of UNIX. It wouldn't be  12:07:19
25  patentable, I don't believe, but there were no  12:07:23

Page 77

1  patents relating to the UNIX assets being  12:07:27
2  transferred, being conveyed to SCO.  12:07:32
3  BY MR. BRAKEBILL:  12:07:37
4      Q. If someone were to make a statement that  12:07:37
5  Novell transferred all UNIX intellectual property to  12:07:40
6  Santa Cruz, is it your understanding that that  12:07:43
7  statement would be incorrect?  12:07:45
8      A. I'm sorry?  12:07:47
9      Q. If someone were to make the statement that  12:07:48
10  Novell transferred all UNIX intellectual property to  12:07:52
11  Santa Cruz, would that be an incorrect statement?  12:07:57
12      MR. NORMAND: Objection to form, calls for  12:08:02
13  speculation.  12:08:13
14      THE WITNESS: I don't understand the  12:08:13
15  question.  12:08:14
16  BY MR. BRAKEBILL:  12:08:16
17      Q. If someone were to say that Novell  12:08:16
18  transferred all intellectual property relating to  12:08:21
19  UNIX to Santa Cruz, do you have a view as to whether  12:08:25
20  or not that statement would be correct?  12:08:29
21      MR. NORMAND: Objection to form, calls for  12:08:31
22  speculation.  12:08:51
23      THE WITNESS: I don't think I can answer  12:08:51
24  that question. I don't know which patents there may  12:08:52
25  have been. So if you're including that in your  12:09:02

81afa2c8-43d2-4992-aff6-356a337d84e5

Page 78

1  definition of intellectual property, then that would    12:09:05
2  have been excluded.  But I believe Novell also, we    12:09:08
3  licensed back to them certain rights.    12:09:13
4      So I don't know if that fits into your    12:09:17
5  definition of conveyance of intellectual property.    12:09:19
6  So I'm sorry.  I can't answer that.    12:09:22
7  BY MR. BRAKEBILL:    12:09:28
8      Q. Is it your understanding that the business    12:09:28
9  that was being sold was a UNIX business?    12:09:30
10     A. Yes.    12:09:32
11     Q. And could you turn to attachment D of    12:09:33
12  Exhibit 1?  It ends in the number on the right-hand    12:09:44
13  corner 977.    12:09:50
14     A. Uh-huh.    12:10:06
15     Q. Do you see that this is a document    12:10:07
16  entitled "Seller's Patents and Patent Applications    12:10:10
17  Affecting the Business"?    12:10:13
18     A. Uh-huh.    12:10:14
19     Q. Do you have any understanding as to    12:10:14
20  whether these are patents or patent applications    12:10:16
21  affecting the UNIX business that was being sold to    12:10:19
22  Santa Cruz?    12:10:23
23     MR. NORMAND: Objection to form.    12:10:27
24     THE WITNESS: Yes, I believe they were.  I    12:10:32
25  don't have any specific recollection about the    12:10:36

Page 79

1  individual patents, though.    12:10:39
2  BY MR. BRAKEBILL:    12:10:42
3      Q. I take it you would agree that none of    12:10:42
4  these patents were transferred to Santa Cruz as part    12:10:44
5  of the deal?    12:10:48
6      MR. NORMAND: Objection to form.    12:10:49
7      THE WITNESS: I believe that's correct.    12:10:53
8  BY MR. BRAKEBILL:    12:11:25
9      Q. Now, in your declaration which is on    12:11:27
10  Exhibit 51 --    12:11:29
11     A. Uh-huh.    12:11:30
12     Q. -- in paragraph 8 you say, "It was never    12:11:34
13  agreed or even discussed that Novell would be    12:11:39
14  retaining any copyrights to UNIX."  Do you see that?    12:11:42
15     A. Yes.    12:11:45
16     Q. Again, you didn't have any discussions    12:11:46
17  with anyone at Novell where they told you that UNIX    12:11:48
18  copyrights were being transferred; correct?    12:11:51
19     MR. NORMAND: Objection to form and asked    12:11:54
20  and answered.    12:11:58
21     THE WITNESS: I don't recall any    12:11:58
22  conversations with Novell pertaining to copyrights.    12:12:00
23  BY MR. BRAKEBILL:    12:12:17
24     Q. Were you part of any conversation between    12:12:17
25  Santa Cruz representatives and Novell    12:12:23

Page 80

1  representatives where Santa Cruz put the question to    12:12:25
2  Novell, "Can you transfer the UNIX copyrights to    12:12:28
3  us?"    12:12:33
4      MR. NORMAND: Objection to form.    12:12:35
5      THE WITNESS: No, I don't recall that.    12:12:42
6  BY MR. BRAKEBILL:    12:12:45
7      Q. Are you aware of any conversations that    12:13:18
8  may have taken place between Santa Cruz    12:13:23
9  representatives and Novell representatives where    12:13:25
10  anyone from Santa Cruz asked Novell to give them the    12:13:29
11  UNIX copyrights as part of this deal?    12:13:37
12     MR. NORMAND: Objection to form.    12:13:42
13     THE WITNESS: No, I do not recall any    12:13:44
14  conversation regarding the copyrights.  It was    12:13:47
15  assumed that the copyrights came with the business,    12:13:51
16  but I do not have any specific recollection about a    12:13:57
17  conversation regarding copyrights.    12:14:01
18  BY MR. BRAKEBILL:    12:14:03
19     Q. So it's fair to say that you were assuming    12:14:03
20  that the UNIX copyrights were being transferred?    12:14:05
21     MR. NORMAND: Objection to form.    12:14:07
22     THE WITNESS: I don't believe that was my    12:14:09
23  assumption alone, but yes, I was assuming that.    12:14:11
24  BY MR. BRAKEBILL:    12:14:15
25     Q. And I take it it's your view that other    12:14:22

Page 81

1  members of the Santa Cruz negotiating team were    12:14:26
2  assuming that the UNIX copyrights were being    12:14:28
3  transferred to Santa Cruz; is that correct?    12:14:31
4      MR. NORMAND: Objection to form, calls for    12:14:34
5  speculation.    12:14:37
6      THE WITNESS: I believe it was the    12:14:37
7  understanding of SCO and Novell that the copyrights    12:14:38
8  would follow with the business.    12:14:41
9  BY MR. BRAKEBILL:    12:14:41
10     Q. I'm just asking about Santa Cruz right    12:14:44
11  now, okay?  Is it fair to say that it's your view    12:14:46
12  that other members of the Santa Cruz negotiation    12:14:53
13  team were assuming that the UNIX copyrights were    12:14:56
14  being transferred to Santa Cruz?    12:15:00
15     A. Yes, that's my understanding.    12:15:02
16     Q. Now, are you aware that Santa Cruz    12:15:20
17  before -- -- strike that.    12:15:24
18     At the time of the asset purchase agreement,    12:15:25
19  Santa Cruz had an SVRX license with Novell?    12:15:30
20     MR. NORMAND: Objection to form.    12:15:36
21     THE WITNESS: No.    12:15:43
22  BY MR. BRAKEBILL:    12:15:44
23     Q. So is it your understanding that prior to    12:15:48
24  the execution of the asset purchase agreement, Santa    12:15:52
25  Cruz had no rights relating to UNIX System V?    12:15:56

Esquire Deposition Services
216 E. 45th STREET   .   NEW YORK, NY 10017   .   1-800-944-9454

81afa2c8-43d2-4992-aff6-356a337d84e5

Page 126

1    A. Yes.                          15:02:42
2    Q. Okay. Did you have an understanding at    15:02:43
3  the time preceding the execution of the asset    15:02:58
4  purchase agreement in September 1995 that there were    15:02:59
5  restrictions that were being inserted into the asset    15:03:12
6  purchase agreement concerning Santa Cruz' rights    15:03:16
7  under SVRX licenses?                15:03:20
8        MR. NORMAND: Objection to form.    15:03:24
9        THE WITNESS: I'm not sure I would use the    15:03:38
10  term "restrictions."                15:03:41
11  BY MR. BRAKEBILL:                15:03:44
12    Q. What word would you use?        15:03:44
13    A. Novell was retaining a royalty stream    15:03:49
14  related to the SVRX binary licenses because the    15:03:55
15  Santa Cruz Operation was unable to pay the entire    15:03:59
16  purchase price that Novell was asking, so this was    15:04:05
17  really a payment mechanism.        15:04:08
18        Novell had wanted to convey the binary    15:04:12
19  royalty stream to the SVRX licenses to the Santa    15:04:18
20  Cruz Operation and that was the, you know,    15:04:24
21  original -- that was how the transaction was    15:04:29
22  originally contemplated. But unfortunately, the    15:04:33
23  Santa Cruz Operation just couldn't afford that, so    15:04:36
24  this was used as a mechanism to try and achieve the    15:04:38
25  purchase price.                    15:04:41

Page 127

1        MR. BRAKEBILL: Move to strike as    15:04:43
2  nonresponsive to the question.        15:04:45
3  BY MR. BRAKEBILL:                15:04:46
4    Q. Are you aware, Ms. Madsen, that a    15:04:55
5  provision was inserted into section 4.16 providing    15:04:58
6  that Santa Cruz would not have the authority to    15:05:03
7  amend, modify, or waive any right or assign any SVRX    15:05:05
8  license without the prior written consent of Novell?    15:05:10
9        MR. NORMAND: Object to the form.    15:05:14
10        THE WITNESS: I am aware of that.    15:05:19
11  BY MR. BRAKEBILL:                15:05:21
12    Q. Are you aware, Ms. Madsen, that a    15:05:31
13  provision was inserted in the provision 4.16    15:05:34
14  concerning Novell's sole discretion and Novell's    15:05:43
15  direction to have Santa Cruz amend, supplement,    15:05:49
16  modify, or waive any rights under or any rights to    15:05:52
17  any SVRX license to the extent so directed by    15:05:57
18  Novell?                        15:06:02
19        MR. NORMAND: Objection to form.    15:06:03
20        THE WITNESS: I'm sorry. I missed what the    15:06:04
21  question was in that.                15:06:07
22  BY MR. BRAKEBILL:                15:06:08
23    Q. I'll repeat the question for you.    15:06:09
24        Are you aware, Ms. Madsen, that there was a    15:06:10
25  provision inserted into 4.16 of the asset purchase    15:06:14

Page 128

1  agreement concerning Novell's sole discretion and    15:06:19
2  Novell's direction to have Santa Cruz amend,    15:06:25
3  supplement, modify, or waive any rights under or any    15:06:25
4  rights to any SVRX license to the extent so directed    15:06:30
5  by Novell?                        15:06:36
6        MR. NORMAND: Object to the form.    15:06:36
7        THE WITNESS: I have a general recollection    15:06:38
8  of that and I see the document in front of me,    15:06:41
9  although this is the draft, so I would need to    15:06:45
10  compare it to the final to see if that was indeed    15:06:47
11  what the APA says.                15:06:51
12  BY MR. BRAKEBILL:                15:06:54
13    Q. Let's refer to Exhibit 1 at page 24, which    15:06:54
14  was the Bates page 954 in the lower right-hand    15:07:05
15  corner.                        15:07:10
16    A. Uh-huh.                    15:07:10
17    Q. And I'd ask you to look at the second    15:07:10
18  sentence of section 4.16(b) where it says, and I    15:07:15
19  quote, "In addition, at seller's sole discretion and    15:07:22
20  direction buyer shall amend, supplement, modify, or    15:07:27
21  waive any rights under or shall assign any rights to    15:07:32
22  any SVRX license to the extent so directed in any    15:07:35
23  manner or respect by seller."        15:07:42
24        Do you see that language?        15:07:45
25    A. Yes, I see that language.        15:07:46

Page 129

1    Q. Does that refresh your recollection that a    15:07:48
2  provision was inserted into section 4.16 providing    15:07:53
3  that Novell's sole discretion and direction Santa    15:07:58
4  Cruz need take certain actions as so directed by    15:08:07
5  Novell?                        15:08:13
6        MR. NORMAND: Objection to the form.    15:08:14
7        THE WITNESS: Yes.                15:08:16
8  BY MR. BRAKEBILL:                15:08:17
9    Q. And following that sentence it says, "In    15:08:34
10  the event that buyer shall fail to take any such    15:08:39
11  action concerning the SVRX licenses as required    15:08:43
12  therein, seller shall be authorized and is hereby    15:08:47
13  granted the rights to take any action on buyer's own    15:08:51
14  behalf."                        15:08:55
15        Do you see that?                15:08:56
16    A. Yes.                        15:08:59
17    Q. Does that refresh your recollection that a    15:08:59
18  provision was inserted into section 4.16 providing    15:09:04
19  that should Santa Cruz fail to take any such action    15:09:10
20  concerning SVRX licenses that Novell is authorized    15:09:13
21  and granted the right to take any such action on    15:09:18
22  Santa Cruz' behalf?                15:09:21
23        MR. NORMAND: Objection to form.    15:09:23
24        THE WITNESS: Yes, I recall that these    15:09:24
25  provisions were inserted to protect Novell's SVRX,    15:09:27

33 (Pages 126 to 129)

81afa2c8-43d2-4992-aff6-356a337d84e5