Affiliates are liable for income tax at the highest applicable corporate federal, state, local and/or foreign rates), SCO shall not be liable pursuant to such paragraph (a) with respect to such increase to the extent of such decrease. If, as a result of any action, suit, investigation, audit, claim, assessment or amended Tax Return, there is any change after the Closing Date in an increase in an item of income, gain, loss, deduction or credit that results in an increase in a Tax liability for which Newco would otherwise be liable pursuant to paragraph (c) of this Section 12.3, and such change results in a decrease in the Tax liability of SCO or any Affiliate or successor thereof (other than Newco) for any taxable year or period ending on or before the Closing Date or for the portion of any Straddle Period ending on the Closing date (other than by reason of a carryback of losses or deductions), Newco shall not be liable pursuant to such paragraph (c) with respect to such increase to the extent of such decrease.

(e)     For purposes of this Section 12.3, it shall be assumed that SCO and its Affiliates are liable for income tax at the highest applicable corporate federal, state, local and/or foreign rates, without reduction on account of net operating losses or other tax attributes.

12.4    Other Tax Matters.

(a)  SCO, Newco and Caldera will cooperate fully with each other in connection with the preparation of all returns and reports of Taxes, information returns, and all audit examinations of, or claims or assertions against, any member of the Contributed Company Group, in each case including but not limited to the furnishing or making available of records, books of account or other materials and appropriate personnel necessary or helpful to the defense against the assertions of any taxing authority.  SCO shall, within ninety days after the Effective Time, deliver to Newco a schedule listing the tax basis of each of the Contributed Stock and Assets, along with copies of supporting calculations, information and records.

(b)  Except as provided in Section 12.4(c), in the event and to the extent that SCO or any member of an affiliated group of corporations (as defined in Section 1504 of the Internal Revenue Code or otherwise) of which SCO is a member (other than any member of the Contributed Company Group) receives a refund or credit of Taxes for any taxable period that ends prior to the Effective Time or in respect of any period that includes, but does not end on, the Effective Time, the portion of such period ending on the Effective Time (the "*Pre-Closing Period*") which is attributable to the carry back of losses, credits or similar items from any Tax return of any member of the Contributed Company Group, and in any case, in respect of any taxable period that begins after the Effective Time or in respect of any period that includes, but does not end on the Effective Time, the portion of such period commencing on the day following the Effective Time (the "*Post-Closing Period*"), SCO shall pay to Newco, net of any additional Tax payable by SCO or its Affiliates by reason of such carryback, the amount of such refund or credit (including any interest received thereon) or Tax reduction.  In the event that any refund or credit of Taxes or Tax reductions for which a payment has been made pursuant to this Section 12.4(b) subsequently is reduced or disallowed, the Contributed Companies and Newco shall indemnify and hold harmless SCO and its Affiliates for any Tax liability, including interest and penalties, assessed by reason of such reduction or disallowance.

(c)  In the event that an indemnified party receives a refund or credit relating to Taxes for which the other party is required to indemnify the first party pursuant to

::ODMA\PCDOCS\DENLIB1\17279\17

68

SCO1269093

Section 12.3 of this Agreement (including, but not limited to VAT refunds), such indemnified party agrees to pay to the indemnifying party the amount of such refund or credit (including any interest received thereon). In the event that any refund or credit of Taxes for which a payment has been made pursuant to this Section 12.4(c) subsequently is reduced or disallowed, the indemnifying party shall indemnify and hold harmless the indemnified party for any Tax liability, including interest and penalties, assessed by reason of such reduction or disallowance.

(d) If any claim for Tax relating to the Group Business or the Contributed Company Group is asserted against SCO or any Affiliate for any Pre-Closing Period, SCO shall promptly notify Newco in writing of such fact. SCO and its duly appointed representatives shall have the sole right to negotiate, resolve, settle or contest any such claim for Tax; provided, however, that they shall deal fairly and in good faith with respect to any claim for Tax which would require a payment by Newco to SCO or its Affiliates under Section 12.3(c) or this Section 12.4 and provided further, that with respect to any claim which would require a payment by Newco or have a Material Adverse Effect on the Group Business, no settlement will be agreed to without Newco's prior written consent. Such consent shall not be unreasonably withheld. Newco shall bear the legal and accounting costs and expenses incurred in contesting a matter for which it has withheld its consent. If any claim for Tax relating to the Contributed Company Group for any Post-Closing Period comes to the attention of SCO, SCO will notify Newco promptly of such claims and will cooperate fully with Newco and the Contributed Company Group in the resolution of such claim. A failure to promptly notify pursuant to this Section 12.4(d) shall not preclude another party's indemnification obligation.

(e) SCO shall prepare any Tax returns (including any amendments thereto) of the members of the Contributed Company Group for all taxable periods that end, with respect to the Contributed Company Group, on or before the Effective Time (including any short period ending on the Effective Time) and which are due either before or after the Effective Time and shall deliver to Newco for signing by the appropriate party and filing, any Tax returns of the members of the Contributed Company Group (including any amendments thereto) with respect to any such period that have not been filed prior to the Effective Time. SCO shall deliver any such tax return or the portion thereof relating to the Group Business to Newco at least fifteen days prior to the date such tax return is due to be filed (taking into account any applicable extensions). SCO shall report for federal income tax purposes the operations of the Group Business and the Contributed Company Group for any short period ending on the Effective Time, and shall be responsible for the filing of, the consolidated tax returns of SCO's consolidated group which will include the income of the Group Business and the Contributed Company Group through the Effective Time and Newco will pay to SCO any amounts relating to such tax returns required by Section 12.3(c) prior to the filing of such tax returns. In order appropriately to apportion any taxes relating to a period that includes (but that would not, but for this Section 12.4(e) end on the Effective Time), the parties hereto will, to the extent permitted by applicable law, elect with the relevant taxing authority to treat for all purposes the Effective Time as the last day of a taxable period of any member of the Contributed Company Group. SCO shall, in respect of such returns, and Newco and the Contributed Company Group for returns with respect to the Post-Closing Period shall determine the income, gain, expenses, losses, deductions and credits of the Group Business and the Contributed Company Group in a manner (i) consistent with prior practice and actual operations in a manner that apportions such

CONFIDENTIAL                                          SCO1269094

income, gain, expenses, loss, deductions and credits equitably from period to period and (ii) consistent with prior years.

(f) The provisions of this Section 12 with respect to the consolidated groups or consolidated returns that include SCO or its Affiliates other than a Contributed Company shall apply mutatis mutandis with respect to combined or unitary groups or returns thereof.

(g) Newco and SCO shall make (or indemnify the payor against) payments of estimated taxes (including amounts due with extensions) for which they are responsible under this Agreement in a timely manner. A payment or indemnity obligation under this Section 12 which is not made or satisfied when due shall accrue interest at the rate applicable to late payments of the pertinent Tax. Notwithstanding anything in this Section 12 to the contrary, a party shall not have to bear the cost of a Tax liability more than once (e.g., a payment of an estimated tax shall be credited against any payment due when the return is filed).

(h) Except as provided in paragraph 12.4(e), for purposes of allocating a Tax for which a party is otherwise responsible under Section 12.3 or this Section 12.4, the portion of those Taxes that are attributable to the operations of the Group Business or of any member of the Contributed Company Group for a relevant period (the "*Interim Period*") shall be (i) in the case of a Tax that is not based on a net income, the total amount of such Tax for the Interim Period in question multiplied by a fraction, the numerator of which is the number of days in the Interim Period and the denominator of which is the total number of days in such period, and (ii) in the case of a Tax that is based on net income, the Tax that is due shall be an amount as equitably determined by the parties based upon a hypothetical closing of the books.

(i) If Newco, a Contributed Company or any of its respective Affiliates receive any notice of the assertion of any Tax liability relating to a member of the Contributed Company Group for which SCO may be liable under this Agreement, Newco shall give prompt written notice thereof to SCO.

(j) After the Closing, Newco and the Contributed Companies will provide reasonable access to all relevant Newco and Contributed Company Group books, records, agreements and memoranda, and provide such assistance to SCO as SCO and its Affiliates shall reasonably request, with respect to any federal, foreign, state, provincial or local Tax matters pertaining to the members of the Contributed Company Group for taxable periods or transactions on or prior to the Effective Time. Newco will notify SCO prior to disposition of such Tax records, if such disposition will take place within ten years after the Effective Time. After the Closing, the parties will provide reasonable access to all relevant SCO and Contributed Companies' books, records, agreements, memoranda and tax returns, and provide copies of such information and such assistance to the other party as it shall reasonably request, with respect to any federal, foreign, state, provincial or local Tax matters pertaining to the Contributed Assets and the Contributed Company Group for taxable periods or transactions on or prior to the Effective Time.

(k) Notwithstanding anything in this Agreement to the contrary, SCO and Newco covenant and agree (unless there has been a final determination as defined in

CONFIDENTIAL

SCO1269095

Section 1313(a) of the Code or any other event which conclusively establishes a contrary position) for all Tax purposes, including all Tax Returns and any Tax examinations, proceedings or controversies, to (and to cause any Affiliate or successor to its assets or businesses to) take each of the positions set forth below (and not to take any position inconsistent therewith) and to use good faith and reasonable best efforts to defend such positions.

(i)    The Merger (A) will qualify as a tax-free reorganization described in Section 368(a) of the Code and (B) when taken together with the SCO Transaction, will qualify as a tax free transfer of the stock of Caldera to Newco governed by Section 351(a) of the Code.

(ii)    The SCO Transaction will, when taken together with the Merger, qualify as a transfer of the Contributed Stock and Contributed Assets to Newco governed by Section 351 of the Code.

(l)    SCO and Newco agree to report to the other any communication from or with the Internal Revenue Service or any other Taxing Authority which relates in any way to the characterization of the transactions governed by this Agreement. Each of SCO and Newco will file with its Federal income tax return for the taxable year in which the Merger and SCO Transaction occurs (which tax return shall be timely filed) the information required by Treas. Reg. sec. 1.351-3 and 1.368-3 and to provide each other upon request with a statement to the effect that such party has complied with this requirement after filing. SCO, the Contributed Companies, and Newco also will maintain such permanent records as are required by Treas. Reg. sec. 1.351-3(c) and 1.368-3.

(m)    Neither Caldera nor Newco has any plan or intention to terminate the existence of Newco; to dispose of the assets contributed to Newco, except in the ordinary course of business or in a contribution to the capital of a wholly-owned subsidiary of Newco; to reacquire any stock to be issued in the transactions contemplated by this Agreement; or to take any other action that would reasonably be expected to cause the Merger and the SCO Transaction not to be treated as a tax-free exchange under Section 351 of the Code. Neither Caldera nor Newco knows of any plan or intention of any Caldera Significant Stockholder to dispose of any Newco shares issued in the transactions contemplated by this Agreement. SCO knows of no plan or intention to terminate the existence of Newco or to dispose of the assets contributed to Newco, except in the ordinary course of business or in a contribution to the capital of a wholly-owned subsidiary of Newco. SCO has no plan or intention to dispose of any Newco shares issued in the transactions contemplated by this Agreement, except for distributions of Newco stock to SCO's shareholders, or to take any other action that would reasonably be expected to cause the merger and the SCO Transaction not to be treated as an exchange under Section 351 of the Code.

12.5    Tax Representations.  Newco, Caldera and the Caldera Significant Stockholder covenant and represent that Caldera, Newco and the Caldera Significant Stockholder shall make such representations and covenants as their respective counsel shall reasonably request prior to the closing for purposes of establishing the qualification under Section 351 of the SCO Transaction and the qualification of the Merger as a Section 368 transaction. Any such representations shall be considered to be part of this Section 12.5(a).

CONFIDENTIAL

SCO1269096

**13. Miscellaneous.**

**13.1    Governing Law; Venue.**

(a)    Governing Law.  The internal laws of the State of New York (irrespective of its choice of law principles) will govern the validity of this Agreement, the construction of its terms and the interpretation and enforcement of the rights and duties of the parties hereto, except that the fiduciary duties of the directors and managers of parties hereto and its Affiliates shall be governed by the law of the jurisdiction of such company's formation.

(b)    Venue.  The parties agree that any dispute regarding the interpretation or validity of, or otherwise arising out of this Agreement, shall be subject to the exclusive jurisdiction of the California State Courts in and for Santa Clara County, California or, in the event of federal jurisdiction, the United States District Court for the Northern District of California sitting in Santa Clara County, California, and each party hereby agrees to submit to the personal and exclusive jurisdiction and venue of such courts and not to seek the transfer of any case or proceeding out of such courts.

**13.2    Assignment; Binding upon Successors and Assigns.**  None of the parties hereto may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto; provided, however, that the sale or other transfer of the stock of any Contributing Company shall not be deemed an assignment provided that this Agreement remains enforceable against the Contributing Company after such stock sale or transfer.  Subject to the preceding sentence, this Agreement will be binding upon and inure to the benefit of the parties hereto and its respective successors and permitted assigns.

**13.3    Severability.**  If any provision of this Agreement, or the application thereof, will for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purposes of the void or unenforceable provision.

**13.4    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be an original as regards any party whose signature appears thereon and all of which together will constitute one and the same instrument.  This Agreement will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all the parties reflected hereon as signatories.

**13.5    Other Remedies.**  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy will not preclude the exercise of any other.  The parties agree that specific performance is an appropriate remedy for a breach of its respective obligations under this Agreement.

CONFIDENTIAL                                              SCO1269097

13.6   <u>Amendment and Waivers</u>. Any term or provision of this Agreement may be amended by the parties hereto at anytime by execution of an instrument in writing signed on behalf of each of SCO and Caldera. At any time prior to the Closing, the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party or parties to be bound thereby. The waiver by a party of any breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding breach or default. Delay in exercising any right under this Agreement shall not constitute a waiver of such right. This Agreement may be amended by the parties hereto at any time before or after approval of such party's stockholders, but, after such approval, no amendment will be made which by applicable law requires the further approval of a party's stockholders without obtaining such further approval.

13.7   <u>Expenses</u>. Except as herein expressly provided to the contrary in this Agreement or the Ancillary Agreements, each party will bear its respective fees and expenses incurred with respect to the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby.

13.8   <u>Attorneys' Fees</u>. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party will be entitled to recover, as an element of the costs of suit and not as damages, reasonable attorneys' fees to be fixed by the court (including, without limitation, costs, expenses and fees on any appeal). The prevailing party will be entitled to recover its costs of suit, regardless of whether such suit proceeds to final judgment.

13.9   <u>Notices</u>. All notices and other communications pursuant to this Agreement shall be in writing and deemed to be sufficient if contained in a written instrument and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following address (or at such other address for a party as shall be specified by like notice):

|  |  |
|---|---|
| If to SCO to: | The SCO, Inc.<br>425 Encinal<br>Santa Cruz, California<br><br>Attention:  Chief Executive Officer<br>and Law and Corporate Affairs<br>Telecopier:  (831) 427-5454 |
| With a copy to: | Wilson, Sonsini, Goodrich & Rosati<br>650 Page Mill Road<br>Palo Alto, California  94304<br>Attention: Michael Danaher<br>Telecopier:  (650) 493-6811 |

CONFIDENTIAL

SCO1269098

And if to Caldera or Newco to:

Caldera Systems, Inc.
240 West Center Street
Orem, Utah 84057
Attention: Chief Executive Officer
Telecopier: (801) 765-1313

With a copy to:

Brobeck, Phleger & Harrison LLP
370 Interlocken Boulevard, Suite 500
Broomfield, Colorado 80021
Attention: John E. Hayes, III
Telecopier: (303) 410-2199

All such notices and other communications shall be deemed to have been received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of a telecopy, when the party receiving such copy shall have confirmed receipt of the communication, (c) in the case of delivery by nationally-recognized overnight courier, on the business day following dispatch, and (d) in the case of mailing, on the third business day following such mailing.

13.10  Construction of Agreement.  This Agreement has been negotiated by the respective parties hereto and its attorneys and the language hereof will not be construed for or against either party.  A reference to a Section or an exhibit will mean a Section in, or exhibit to, this Agreement unless otherwise explicitly set forth.  The titles and headings herein are for reference purposes only and will not in any manner limit the construction of this Agreement which will be considered as a whole.

13.11  No Joint Venture.  Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between any of the parties hereto.  No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party.  No party will have the power to control the activities and operations of any other and its status is, and at all times, will continue to be, that of independent contractors with respect to each other.  No party will have any power or authority to bind or commit any other.  No party will hold itself out as having any authority or relationship in contravention of this Section.

13.12  Further Assurances.  Each party agrees to cooperate fully with the other parties and to execute such further instruments, documents and agreements and to give such further written assurances as may be reasonably requested by any other party to evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intents and purposes of this Agreement and the Ancillary Agreements.

13.13  Absence of Third Party Beneficiary Rights.  Except as provided in Sections 5.17 and 5.18, no provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights of any kind in any holder of the stock of Caldera, Newco, any Contributing Company or a member of the Contributed Company Group or any Employee, client, customer, Affiliate, stockholder, partner or any party hereto or any other person or entity, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement and no other person or entity shall have any cause of action as a third party beneficiary of this Agreement.

::ODMA\PCDOCS\DENLIB1\17279\17

74

13.14  Public Announcement. Upon execution of this Agreement, Caldera and SCO promptly will issue a joint press release approved by both parties announcing the Merger and the SCO Transaction. Thereafter, Caldera or SCO may issue such press releases, and make such other disclosures regarding the Merger and the SCO Transaction, as they may each determine (after consultation with legal counsel) to be required under applicable securities laws or the rules of the Nasdaq Stock Market. Caldera and SCO shall confer with the other party prior to any press release or disclosure relating to the Merger or SCO Transaction.

13.15  Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"2000 Group Balance Sheet" is defined in Section 2.4(c).

"Affiliate" means, with respect to a specified person, any other person that directly or indirectly controls, is controlled by, or is under common control with, such specified person or which hold at least a 10% ownership interest in said person.

"Agreed Amount" is defined in Section 10.5(c).

"Ancillary Agreements" means, collectively, the Stockholder Agreement, the Escrow Agreement, the Bills of Transfer, the Sales Representative and Support Agreement, the agreements relating to the Patent Assignment, the Copyright Assignment and the Trademark Assignment, the Web-Top Sublicense and the Voting Agreements.

"Assumed Liabilities" is defined in Section 1.4(c)(i).

"Bills of Transfer" means each of the Bills of Transfer for each respective jurisdiction for the Contributed Assets and Contributed Companies (or other documents of transfer) to be executed and delivered by the holders of such Contributed Assets and Newco or its subsidiaries at the Effective Time in the forms reasonably acceptable to SCO and Newco.

"CERCLA" is the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended.

"Certificate of Merger" is defined in Recital A.

"Claim Notice" is defined in Section 10.5(a).

"Claimed Amount" is defined in Section 10.5(a).

"Closing" has the meaning specified for such term in Section 1.5.

"Closing Date" is defined in Section 1.5.

"Closing Group Account" is defined in Section 4.21.

"COBRA" is defined in Section 2.8(c).

CONFIDENTIAL

SCO1269100

"Conduct of the Group Business" means the conduct in all material respects of the Group Business as conducted on the date hereof and at Closing.

"Contested Amount" is defined in Section 10.5(b).

"Contributed Assets" shall mean those assets, including real property assets, that are owned, leased or licensed by the Contributing Companies that are (a) listed on Exhibit 13.15A attached hereto, (b) Intellectual Property Rights used in the production, development, support or marketing of the Group Products, or (c) used in the Group Business, and (d) all Contributed Contracts to which any of the Contributing Companies is a party, but in all cases excluding the Excluded Assets.

"Contributed Companies" means The Santa Cruz Operation Limited; The Santa Cruz Operation (France) SARL; The Santa Cruz Operation (Deutschland) GmbH; The Santa Cruz Operation (Italia) Srl; The Santa Cruz Operation Pty. Limited; SCO Canada, Co.; The Santa Cruz Operation de México, S. De R.L. De C. V.; The Santa Cruz Operation (Asia) Ltd.; SCO Foreign Sales Corporation; SCO, Kabushiki Kaisha; The Santa Cruz Operation Latin America, Inc.; Nihon SCO Limited; SCO do Brazil Limitada; SCO Software (China) Company, Ltd.; and Unix System Technologies China Company, Ltd. (USTC).

"Contributed Company Group" has the meaning in Section 1.4(c)(i).

"Contributed Company Property" shall mean all of the assets, real, personal, tangible and intangible, owned, leased, licensed or otherwise held by any member of the Contributed Company Group.

"Contributed Contracts" means all agreements, contracts, understandings, arrangements, commitments, mortgages, indentures, leases, licenses, permits, franchises, instruments, notes, bonds, indemnities, guarantees, loan agreements, credit agreements, representations, warranties, deeds, assignments, powers of attorney, certificates, purchase orders, work orders, insurance policies, benefit plans, covenants, assurances or undertakings of any nature which are used in the Group Business including but not limited to those listed on Exhibit 13.15B attached hereto subject in the case of Joint Contributed Agreements to the provisions of Section 4.17, excluding the Excluded Assets.

"Contributed Stock" means all of the capital stock of the Contributed Companies.

"Contributed Subsidiaries" means the direct or indirect subsidiaries of the Contributed Companies identified in Exhibit 13.15C attached hereto.

"Contributing Companies" means SCO and any subsidiary of SCO (other than the Contributed Companies) which may own any interest in the Contributed Stock and Assets to be conveyed to Newco or that is liable for any Assumed Liability to be assumed by Newco under the term of this Agreement.

"Copyright Assignment" means a form of assignment mutually acceptable to Caldera and SCO assigning all copyrights included in the Contributed Assets.

CONFIDENTIAL                                            SCO1269101

"Caldera Assets" are the tangible and intangible, real and personal assets owned, leased or licensed by Caldera.

"Caldera Balance Sheet" is defined in Section 3.14.

"Caldera Business" is the business of Caldera as carried on immediately prior to the SCO Transaction, including without limitation Caldera's business of developing, manufacturing, marketing, licensing, distributing, using, operating, installing, servicing, supporting, maintaining, repairing or otherwise using or commercially exploiting all or any aspect of any or all of the Caldera Products or Caldera Assets.

"Caldera Closing Price" means the average closing price that Caldera Common Stock for the five day period ending on the trading day prior to the Closing.

"Caldera Common Stock" is defined in Section 1.2(a).

"Caldera Contracts" means all agreements, contracts, understandings, arrangements, commitments, mortgages, indentures, leases, licenses, permits, franchises, instruments, notes, bonds, indemnities, guarantees, loan agreements, credit agreements, representations, warranties, deeds, assignments, powers of attorney, certificates, purchase orders, work orders, insurance policies, benefit plans, covenants, assurances or undertakings of any nature to which Caldera or the Caldera Subsidiaries are a party.

"Caldera Disclosure Letter" is defined in the preamble of Section 3.

"Caldera Employees" are the employees of Caldera.

"Caldera Employee Plans" is defined in Section 5.16(a).

"Caldera Financial Statements" is defined in Section 3.4(b).

"Caldera Financial Statements Balance Sheet Date" is defined in Section 3.4(b).

"Caldera Group" is defined in the Preamble of Section 3.

"Caldera IP Rights" is defined in Section 3.15(a).

"Caldera IP Rights Agreements" is defined in Section 3.15(c).

"Caldera's Knowledge" or "Known to Caldera". A particular fact or other matter shall be deemed to be within "Caldera's Knowledge" or "Known to Caldera" if any officer of Caldera has current actual knowledge of such fact or other matter.

"Caldera Options" is defined in Section 1.2(b)(i).

"Caldera Percentage Interest" means 72% of the fully diluted equity interest in Newco (taking into account all options, warrants and convertible debentures on an as-converted basis).

CONFIDENTIAL

SCO1269102

"Caldera Permitted Encumbrance" means Encumbrances (a) as disclosed as an Encumbrance in the Caldera Disclosure Schedule (b) Encumbrances for liabilities reflected in the Caldera Financial Statements, (c) liens for current taxes not yet delinquent, (d) liens imposed by law and incurred in the ordinary course of business to carriers, warehousemen, laborers, material men and the like not yet due, (e) immaterial imperfections of title set forth in the Caldera Disclosure Letter (f) Encumbrances which are not material in amount or which will not materially interfere with the use of the Caldera Assets for the Conduct of the Caldera Business.

"Caldera Plans" is defined in Section 1.2(b)(i).

"Caldera Products" means the operating system software and other products marketed or sold by Caldera and all of software products currently under development by or for Caldera or for use or sale or license by Caldera (in each case together with all of the software, products, and other items listed on Caldera's products price list) and all derivative works, upgrades, modifications, enhancements and configurations of any of the foregoing and all software and components included in any configuration of any of the foregoing, and all development tools, utilities and diagnostics used to develop any of the foregoing in each case (whether or not ever commercially offered or price-listed, and whether or not in development).

"Caldera Ratio" is defined in Section 1.2(a).

"Caldera Restrictive Agreements" is defined in Section 3.23.

"Caldera SEC Documents" is defined in Section 3.4(a).

"Caldera Significant Stockholder" means Ray Noorda, The Canopy Group, Inc. And MTI Technology Corporation.

"Caldera Stock Purchase Plan" is defined in Section 1.2(b)(ii).

"Caldera Stock Purchase Plan Rights" is defined in Section 1.2(b)(ii).

"Caldera Stockholder Approval" is defined in Section 5.20(b).

"Caldera Subsidiary" shall mean any direct or indirect subsidiary of Caldera listed on Exhibit 13.15G attached hereto.

"Caldera Surviving Corporation" is defined in Section 1.9.

"Delaware Law" means the Delaware General Corporation Law, as in effect from time to time.

"Disposal," "release," and "threatened release" shall have the definitions assigned thereto by the CERCLA.

"Dollars" or "$" means U.S. dollars.

CONFIDENTIAL

SCO1269103

"Effective Time" shall mean the effective time and date that the Certificate of Merger is deemed filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the Delaware Law.

"Employee" and "Employees" is defined in Section 11.1(a).

"Employee Benefit Plan" is defined in Section 2.8(a).

"Encumbrance" means any pledge, lien, collateral assignment, security interest, mortgage, deed of trust, title retention, conditional sale or other security arrangement, or any charge, adverse claim of title, ownership or use, or any other encumbrance of any kind.

"Environmental Damage" means any actual or alleged Liability (including without limitation Liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or relating to (i) the presence, discharge, emission or release into the environment of any Hazardous Substance or (ii) facts or circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"Environmental Laws" means all federal, state, provincial, local and international laws and regulations relating to pollution, the protection of human health or the environment (including without limitation ambient air, surface water, ground water, land surface or subsurface strata), including without limitation laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Substances, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rulings and regulations promulgated thereunder.

"Escrow Agreement" is defined in Section 1.3(b).

"Escrow Shares" is defined in Section 1.3(b).

"Exchange Act" is the Security Exchange Act of 1934, as amended.

"Excluded Assets" is defined in Section 1.4(b).

"Excluded Liabilities" is defined in Section 1.4(c)(ii).

"Final Date" is defined in the last paragraph of Section 8.1.

"Final List" is defined in Section 12.1(a).

"First SCO Certificate" is defined in Section 1.3(a)(i).

"Foreign Employee Plans" is defined in Section 2.8(h).

"Form S-4" is defined in Section 1.14.

CONFIDENTIAL

SCO1269104

"Form S-8" is defined in Section 1.7.

"Former Employees" is defined in Section 11.2(b).

"GAAP" means United States generally accepted accounting principles and practices as in effect from time to time and applied consistently throughout the periods involved.

"Governmental Antitrust Authority" means any federal, state, local or non-U.S. governmental or quasi-governmental authority charged with the administration or enforcement of antitrust, competition or merger control laws or regulations.

"Governmental Permits" means all municipal, state, local, federal and other governmental franchises, permits, licenses, agreements, waivers and authorizations from, issued or granted by, any jurisdiction.

"Group Assets" shall mean the Contributed Assets and all Contributed Company Property, considered collectively.

"Group Benefit Arrangements" is defined in Section 2.8(a).

"Group Business" means the business of SCO and its direct and indirect subsidiaries with respect to (i) the Group Products, as reflected in the 2000 Group Balance Sheet, including without limitation the business of developing, manufacturing, marketing, licensing, distributing, using, operating, installing, servicing, supporting, maintaining, repairing or otherwise using or commercially exploiting all or any aspect of any or all of the Group Products or of any Intangible Assets or Intellectual Property Rights related to any of the Group Products, and (ii) the professional services division, but excluding the SCO Retained Business.

"Group Employee Plans" is defined in Section 2.8(a).

"Group Financial Statements" has the meaning given in Section 2.4(c).

"Group Financial Statements Balance Sheet Date" is defined in Section 2.4(c).

"Group Governmental Permits" means those Governmental Permits required for the Conduct of the Group Business (including without limitation the manufacture or sale of the Group Products) that are held by any member of the Contributed Company Group or held, in whole or in part, primarily by a Contributing Company and required for the Conduct of the Group Business, or necessary for the use or operation of any of the Group Assets (including without limitation the Real Property Assets) or the manufacture or sale of any of the Group Products, to the extent legally transferable in accordance with this Agreement.

"Group Permitted Encumbrance" means Encumbrances (a) as disclosed as an encumbrance in Exhibit 13.15E attached hereto (b) Encumbrances for Liabilities reflected in the Group Financial Statements, (c) liens for taxes not yet delinquent, (d) liens imposed by law and incurred in the ordinary course of business to carriers, warehousemen, laborers, material men and the like not yet due and payable, (e) immaterial imperfections of title set forth in the SCO

CONFIDENTIAL

SCO1269105

Disclosure Letter (f) Encumbrances which are not material in amount or which will not materially interfere with the use of the Group Assets for the Conduct of the Group Business.

"Group Persons" is defined in Section 5.18(a).

"Group Products" means the operating system software and other products listed in the Group product list attached hereto as Exhibit 13.13D marketed or sold by any member of the Contributed Company Group or the Contributing Companies and all software under development for or licensed by the Group Business (together with all derivative works, upgrades, modifications, enhancements and configurations of any of the foregoing now existing or under development and all software and components included in any configuration of any of the foregoing, and all development and QA tools, utilities and diagnostics used to develop any of the foregoing, in each case whether or not ever commercially offered or price-listed, and whether or not in development).

"Group Restrictive Agreements" is defined in Section 2.23.

"Hazardous Materials" means: (i) any pollutant, contaminant, toxic, hazardous or noxious substance or waste which is regulated by the laws of any state, local, provincial, federal or other governmental authority or jurisdiction, and includes but is not limited to (a) any oil or petroleum compounds, flammable substances, explosives, radioactive materials, or any other materials or pollutants which pose a hazard to persons or cause any real property to be in violation of any Environmental Laws, (b) to the extent so regulated, asbestos or any asbestos-containing material of any kind or character, (c) polychlorinated biphenyls, as regulated by the Toxic Substances Control Act, 15 U.S.C. sec. 2601 et seq., (or equivalent or similar legislation in other relevant jurisdictions) (d) any material or substances designated as "hazardous substances" pursuant to (1) Section 311 of the Clean Water Act, 33 U.S.C. sec. 1251 et seq., (or equivalent or similar legislation in other relevant jurisdictions) or (2) Section 101 of CERCLA, (or equivalent or similar legislation in other relevant jurisdictions) (e) "chemical substance," "new chemical substance," or "hazardous chemical substance or mixture" pursuant to Sections 3, 6 and 7 of the Toxic Substances Control Act, 15 U.S.C. sec. 2601 et seq., (or equivalent or similar legislation in other relevant jurisdictions) and (f) any "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. sec. 6901 et seq. (or equivalent or similar legislation in other relevant jurisdictions)

"HSR ACT" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indemnified Parties" is defined in Section 5.17(c).

"Indemnitee" is defined in Section 10.5(a).

"Insolvency Action" means, with respect to a person, any or all of the following: (i) the voluntary or involuntary filing, with respect to such person, of a petition for relief, or any other effort to seek relief, under any Insolvency Proceeding; (ii) such person or any of its assets otherwise becoming the subject of an Insolvency Proceeding; (iii) the formal or informal dissolution, liquidation or winding up of such person, or any efforts to initiate or carry out such dissolution, liquidation or winding up; (iv) the appointment of (or efforts or attempts to appoint)

CONFIDENTIAL                SCO1269106

a receiver, liquidator, sequestrator, trustee, custodian or other similar officer with respect to such person or any part of its assets or properties; or (v) any composition of the indebtedness of such person or any assignment for the benefit of such person's creditors.

"Insolvency Proceeding" means any or all of the following actions, events or proceedings: (i) any voluntary or involuntary case, contested matter or other proceeding under the United States Bankruptcy Code, as amended, and any successor law or laws thereto; or (ii) any case, action or other proceeding under any bankruptcy, insolvency, debt reorganization or similar law (whether now or hereafter in effect) of any state, country or other jurisdiction.

"Intangible Assets" means, collectively, all intangible assets, properties and rights required for the development of the Group Products, constituting software (in both source code and binary code form), technology, works of authorship, manuals, logbooks, notebooks, user's guides, programmers' notes, documentation, know-how, trade secrets and training materials (for both training of customers and of service personnel).

"Intellectual Property Rights" means, collectively, all of the following worldwide intangible legal rights including those existing or acquired by ownership, license or other legal operation, whether or not filed, perfected, registered or recorded and whether now or hereafter existing, filed, issued or acquired: (i) patents, patent applications, and patent rights, including any and all continuations, continuations-in-part, divisions, reissues, reexaminations or extensions thereof; (ii) inventions (whether patentable or not in any country), invention disclosures, industrial designs, improvements, trade secrets, proprietary information, know-how, technology and technical data; (iii) rights associated with works of authorship (including without limitation audiovisual works), including without limitation copyrights, copyright applications and copyright registrations, moral rights, database rights, mask work rights, mask work applications and mask work registrations; (iv) rights in trade secrets (including without limitation rights in industrial property, customer, vendor and prospect lists and all associated information or databases and other confidential or proprietary information), and all rights relating to the protection of the same including without limitation rights under nondisclosure agreements; (v) any other proprietary rights in technology, including software, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including, without limitation, manuals, memoranda, records, business information, or trade marks, trade dress or names, anywhere in the world; (vi) any rights analogous to those set forth in the preceding clauses and any other proprietary rights relating to intangible property, including without limitation brand names, trademarks, service marks, domain names, trademark and service mark registrations and applications therefor, trade names, rights in trade dress and packaging and all goodwill associated with the same; and (vii) all rights to sue or make any claims for any past, present or future infringement, misappropriation or unauthorized use of any of the foregoing rights and the right to all income, royalties, damages and other payments that are now or may hereafter become due or payable with respect to any of the foregoing rights, including without limitation damages for past, present or future infringement, misappropriation or unauthorized use thereof; and (viii) rights under license agreements for the foregoing.

"Intercompany Accounts" means the net amounts payable by or owing to the Group Business as of the Effective Time as a consequence of the Conduct of the Group

CONFIDENTIAL

SCO1269107

Business, in the ordinary course, (i) pursuant any general services agreement between the Contributed Company Group, on the one hand, and SCO and its direct or indirect subsidiaries (other than the Contributed Company Group) on the other hand, or (ii) as a consequence of reimbursements by SCO of amounts paid by it for the Conduct of the Business in the ordinary course; provided, however that in no event shall the Group Business be responsible for amounts attributable to the SCO Retained Business.

"Interim Period" is defined in Section 12.5(h).

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and the rulings and regulations promulgated thereunder.

"Joint Contributed Agreements" is defined in Section 4.17.

"Key Employees" means those individuals identified in Exhibit 4.18A attached hereto.

"Key Employee Term Sheets" means the Key Employee Term Sheets in the form attached hereto as Exhibit 4.18B.

"Liabilities" (or when used with reference to a single item described below, "Liability") means debts, liabilities and obligations (whether pecuniary or not, including without limitation obligations to perform or forbear from performing acts or services), fines or penalties, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, known or unknown, including without limitation those arising under any law, action or governmental order, liabilities for Taxes and those arising under any contract, agreement, arrangement, commitment or undertaking of any kind whatsoever (whether written or oral, express or implied), including, without limitation, those arising under any Contributed Contract.

"Loss" means and includes any and all Liability, loss, damage, claim, expense, cost, fine, fee, penalty, obligation, or injury, including, without limitation, those resulting from any and all claims, actions, suits, demands, assessments, investigations, judgments, orders, awards, arbitrations, settlements or other proceedings, together with reasonable costs and expenses, including the reasonable attorneys' and experts' fees, court costs, arbitration costs, filing fees and other legal costs and expenses relating thereto, together with interest accrued on each of the foregoing amounts from the date the same was incurred at the lower of (i) the prime rate as published by *The Wall Street Journal* or (ii) the highest rate of interest permitted under applicable law; provided, however, that in determining the amount of any Loss, there shall be deducted any Tax overlaps attributable to the events giving rise to the Loss.

"Material Adverse Effect on Caldera" means any event, change or effect would have a material adverse effect on the business, tangible and intangible assets, financial condition, and results of operations of Caldera and the Caldera Subsidiaries, Caldera together with the Caldera Subsidiaries, as a whole, or prevent in any material respect the performance by Caldera and its subsidiaries of the actions anticipated by this Agreement and the Ancillary Agreements to be taken by them on or before the Closing; provided however that none of the following shall be deemed to be a Material Adverse Effect on Caldera: (i) changes in market price or trading

CONFIDENTIAL                                    SCO1269108

volume of Caldera common stock or (b) changes attributable to the public announcement or pendency of the transactions contemplated hereby.

"Material Adverse Effect on Newco" means any event, change or effect would have a material adverse effect on the business, tangible and intangible assets, financial condition and future operations of Newco and its subsidiaries, Newco together with its subsidiaries as a whole, after the Effective Time or prevent in any material respect Newco from taking the actions anticipated by this Agreement and the Ancillary Agreements to be taken by Newco and its subsidiaries on and after the Effective Time.

"Material Adverse Effect on the Group Business" means any event, change or effect which would have a material adverse effect on the business, tangible and intangible assets, financial condition, and results of operations of the Group Business, taking such Group Business as a whole, or prevent in any material respect the performance by SCO and its subsidiaries of the actions anticipated by this Agreement and the Ancillary Agreements to be taken by them on or before the Closing; provided however that none of the following shall be deemed to be a Material Adverse Effect on the Group Business: (i) changes in market price or trading volume of SCO common stock or (b) changes attributable to the public announcement or pendency of the transactions contemplated hereby.

"Material Contributed Contracts" is defined in the Preamble of Section 2.11.

"Material Caldera Contracts" is defined in Section 3.11.

"Merger" is defined in Recital A.

"Merger Sub" is defined in Recital A.

"Multiemployer Plan" is defined in Section 2.8(b).

"Multiple Employer Plan" is defined in Section 2.8(b).

"Newco" means Caldera Holding Inc., a Delaware corporation.

"Newco Common Stock" is defined in Recital A.

"Newco Offer" is defined in Recital A.

"Newco Options" is defined in Recital A.

"Newco Plans" is defined in Section 1.6.

"Newco Rights Agreement" is defined in Section 1.12.

"Nondisclosure Agreement" is defined in Section 4.9.

"Omitted Balance Sheet Liabilities" is defined in Section 10.1(e).

"Optionees" is defined in Recital A.

CONFIDENTIAL

SCO1269109

"Patent Assignment" is defined in Section 7.15.

"Person" means any individual, partnership, limited liability company, firm, corporation, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Post-Closing Period" is defined in Section 12.5(b).

"Potential Employee" is defined in Section 11.1.

"Pre-Closing Period" is defined in Section 12.5(b).

"Preliminary List" is defined in Section 11.1(a).

"Prospectus" is defined in Section 5.6.

"Prospectus/Proxy Statement" is defined in Section 1.14.

"Real Property Assets" shall mean all real property assets required for the Conduct of the Group Business.

"Representing SCO Entities" is defined in the Preamble of Section 2.

"Response Notice" is defined in Section 10.5(b).

"Returns" is defined in Section 12.1.

"SEC" is the Securities and Exchange Commission.

"Securities Act" is the Securities Act of 1933, as amended.

"Shared Contributed Contracts" is defined in Section 4.17.

"Solvent" shall mean, with respect to any person on a particular date, that on such date (a) the fair value of the property of such person is greater than the total amount of liabilities, including contingent liabilities, of such person; (b) the present fair salable value of the assets of such person is not less than the amount that will be required to pay the probable liability of such person on its debts as they become absolute and matured; (c) such person does not intend to, and does not believe that it will, incur debts or liabilities beyond such person's ability to pay as such debts and liabilities mature; and (d) such person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such person's property would constitute an unreasonably small capital. The amount of contingent liabilities (such as litigation, guarantees and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Stock Rights" is defined in Section 1.7.

CONFIDENTIAL

SCO1269110

"Stockholder Agreement" is defined in Section 4.18.

"SCO" means The SCO, Inc., a Delaware corporation.

"SCO Alternative Proposal" is defined in Section 4.14(a).

"SCO Closing Price" means the average closing price of SCO Common Stock for the five day period ending on the trading day prior to the Closing.

"SCO Consolidated Financial Statements" is defined in Section 2.4(b).

"SCO Consolidated Financial Statements Balance Sheet" is defined in Section 2.4(b).

"SCO Disclosure Letter" is defined in Section 2.

"SCO IP Rights" is defined in Section 2.15(a).

"SCO IP Rights Agreements" is defined in Section 2.15(c).

"SCO's Knowledge" or "Known to SCO." A particular fact or other matter shall be deemed to be within "SCO's Knowledge" or "Known to SCO" if any executive officer of SCO or a Contributed Company or any executive officer of SCO responsible for the Group Business has current actual knowledge of such fact or other matter after reasonable investigation.

"SCO Options" is defined in Section 1.3(ii).

"SCO Per Share Value" is defined in Section 1.3(a)(ii).

"SCO Percentage Interest" means a fully diluted equity interest in Newco (taking into account all options, warrants and convertible debentures on an as-converted basis) equal to 100% less the Caldera Percentage Interest.

"SCO Ratio" is defined in Section 1.3(a)(ii).

"SCO Retained Business" means the business of SCO that does not constitute the Group Business consisting of the Tarantella business.

"SCO SEC Documents is defined in Section 2.4(a).

"SCO Stockholder Rejection" is defined in Section 8.1(h).

"SCO Transaction" shall have the meaning described in Recital A hereto.

"Tax" or "Taxes" means all taxes of any kind whatsoever (whether payable directly or by withholding), including without limitation franchise, income, gross receipts, personal property, real property, ad valorem, value added, sales, use, documentary, stamp, intangible personal property, withholding or other taxes, together with any interest and penalties, additions to tax or additional amounts with respect thereto imposed by any taxing authority.

CONFIDENTIAL

SCO1269111

"Termination Fee" is defined in <u>Section 8.4(a)(i)</u>.

"Threshold Amount" is defined in <u>Section 10.1(e)</u>.

"Trademark Assignment" is defined in <u>Section 7.15</u>.

"Transaction Taxes" is defined in <u>Section 12.1</u>.

"UK" means the United Kingdom of Great Britain and Northern Ireland.

"Unforeseen Tax Liabilities" is defined in <u>Section 10.1(e)</u>.

"Voting Agreement" is defined in <u>Section 5.15</u>.

"WebTop Sublicense" means a mutually agreeable license agreement between SCO and Caldera providing for the license of the WebTop Product from Caldera to SCO.

13.16  <u>Entire Agreement</u>.  This Agreement and the exhibits hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect hereto other than the Nondisclosure Agreement, which shall remain in full force and effect.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

[REMAINDER OF PAGE LEFT BLANK]

CONFIDENTIAL

SCO1269112

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Plan of Reorganization as of the date first above written.

THE SANTA CRUZ OPERATION, INC.
a California corporation

By: _____

    Douglas Michels
    President and Chief Executive Officer

CALDERA SYSTEMS, INC.
a Delaware corporation

By: _____

    Ransom Love
    President and Chief Executive Officer

CALDERA HOLDING INC.
a Delaware corporation

By: _____

    Ransom Love
    President and Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF REORGANIZATION]

CONFIDENTIAL                                                SCO1269113

1/01/00  TUE 17:07 FAX 801 785 1313        CALDERA                                    ✉002
ug-01-00  04:14P Avis Rent-a-Car, Page AZ   520 645-0258                      P.02

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Plan of Reorganization as of the date first above written.

THE SANTA CRUZ OPERATION, INC.
a California corporation

By: _____
    Douglas Michels
    President and Chief Executive Officer

CALDERA SYSTEMS, INC.
a Delaware corporation

By: _____
    Ransom Love
    President and Chief Executive Officer

CALDERA, INC.
a Delaware corporation

By: _____
    Ransom Love
    President and Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF REORGANIZATION]

CONFIDENTIAL

SCO1269114

## EXHIBIT 1.4(b)

## EXCLUDED ASSETS

CONFIDENTIAL

SCO1269115

**EXHIBIT 1.4(c)(I)(B)**

**ASSUMED LIABILITIES**

CONFIDENTIAL

SCO1269116

**EXHIBIT 1.13(b)**

**OFFICERS**

CONFIDENTIAL

SCO1269117

**EXHIBIT 1.4(a)(i)**

**NON US-CONTRIBUTED COMPANIES AND CONTRIBUTED ASSETS**

CONFIDENTIAL

SCO1269118

# EXHIBIT 4.11B

## SCO AFFILIATES WHO EXECUTED VOTING AGREEMENTS

CONFIDENTIAL

SCO1269119

**EXHIBIT 4.18A**

**SCO KEY EMPLOYEES**

CONFIDENTIAL                    SCO1269120

**EXHIBIT 5.13B**

**CALDERA AFFILIATES WHO EXECUTED VOTING AGREEMENTS**

::ODMA\PCDOCS\DENLIB1\17279\17

CONFIDENTIAL

SCO1269121

## EXHIBIT 13.15A

### CONTRIBUTED ASSETS

CONFIDENTIAL

# EXHIBIT 13.15B

## CONTRIBUTED CONTRACTS

CONFIDENTIAL

SCO1269123

**EXHIBIT 13.15C**

**CONTRIBUTED SUBSIDIARIES**

::ODMA\PCDOCS\DENLIB1\17279\17

SCO1269124

**EXHIBIT 13.15D**

**GROUP PRODUCTS**

CONFIDENTIAL

SCO1269125

**EXHIBIT 13.15E**

**PERMITTED ENCUMBRANCES**

DENLIBAIMCV2279.17(DB2479.DOC)

CONFIDENTIAL

SCO1269126