# EXHIBIT 20

Dockets.Justia.com

THE SCO GROUP, INC. v. NOVELL, INC.

May 10, 2007                                    GREGORY JONES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,        )
                            )   Case No. 2:04CV00139
        Plaintiff,          )
                            )
        vs.                 )   Videotaped Deposition of:
                            )
                            )   GREGORY JONES
NOVELL, INC.,               )
                            )
                            )
        Defendant.          )

May 10, 2007

9:53 a.m.

Hatch, James & Dodge

10 West Broadway, Suite 400

Salt Lake City, UT  84111

Sharon Morgan, CSR, RPR, CRR

Notary Public in and for the State of Utah

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                                    GREGORY JONES

Page 10

1    out from what I was reviewing.
2        Q.   (By Mr. Normand)  Do you know if anyone else
3    was involved?
4        A.   I think there were others.  I can't remember
5    them all by name.
6        Q.   Does the name Jim Wilt?
7        A.   No, that doesn't ring a bell, but --
8        Q.   And putting aside outside counsel for the
9    moment, who were the principal negotiators of the deal
10   that became set forth in the APA from the Novell side?
11       MR. BRAKEBILL:  Form.
12       A.   Well, I know that -- I know that Ed Chatlos
13   and Ty Mattingly spent a lot of time on it.  Others
14   involved seemed to be David Bradford, Jim Tolonen, and
15   to some extent possibly even Bob Frankenberg.
16       Q.   (By Mr. Normand)  And what is your basis for
17   your view as to who was involved in these
18   negotiations, documents you've reviewed or the people
19   you've spoken with, anything in particular as a source
20   for that information?
21       A.   Documents I've reviewed.  I think the
22   declarations, for example, that we just saw.  Some of
23   the documents produced had correspondence -- you know,
24   internal correspondence or correspondence between
25   Santa Cruz and Novell, materials like those.

Page 11

1        MR. BRAKEBILL:  Are you on Topic 1?
2        MR. NORMAND:  I am.  And if you want to --
3        MR. BRAKEBILL:  This might be helpful.
4        MR. NORMAND:  Why don't we mark this as an
5    exhibit.
6        (Exhibit No. 1087 marked.)
7        Q.   (By Mr. Normand)  We've had marked as Exhibit
8    1087 a five-page sheet that Mr. Brakebill has handed
9    me that is entitled SCO's 30(b)(6) Topic No. 1 and
10   then a parenthetical (Includes Topics 8, 11 and 18.)
11       I take it, Mr. Jones, you're familiar with
12   this document?
13       A.   Yes.
14       Q.   And I take it that with respect to the table
15   marked Filings, whatever the content of those filings,
16   that content reflects Novell's views on the subject
17   matter addressed in those filings?
18       A.   Correct.
19       Q.   And to the best of your knowledge, is there
20   any exception to the statement that I just made?  Is
21   there any inaccurate statement in any of those
22   filings?
23       A.   I don't know of any.
24       MR. BRAKEBILL:  Just so the record is clear,
25   and this might come up in questioning, there might be

Page 12

1    additional filings in the future that may reflect that
2    also.
3        MR. NORMAND:  Understood.
4        MR. TIBBITTS:  Might be?
5        MR. BRAKEBILL:  I'm pretty sure there will
6    be.  There will be.
7        Q.   (By Mr. Normand)  With respect to the second
8    table in Exhibit 1087 called Example Evidence, could
9    you or your counsel explain to me what that table is?
10       A.   I'll defer to counsel if he wants to answer.
11       MR. BRAKEBILL:  These are documents -- these
12   are -- Greg mentioned that he had in his preparation
13   reviewed a number of documents, and these are
14   documents that in the course of his preparation
15   related to Topic No. 1.
16       MR. NORMAND:  I take it --
17       MR. BRAKEBILL:  And form -- they are evidence
18   in forming views.  It doesn't mean the documents
19   themselves are the views, but they are evidence in
20   forming the viewpoints.  For example, you asked him a
21   question about who was involved in certain things.
22   These would be among documents that he had reviewed in
23   his preparation of the course of -- you could ask him
24   about that.  These inform the views.  Are there other
25   documents?  Yes, he's seen -- you can ask him -- he's

Page 13

1    seen a lot of documents in his 50 plus hours of
2    preparation.
3        MR. NORMAND:  Okay.  Thank you.
4        MR. BRAKEBILL:  It's an effort to simplify
5    and expedite the deposition.
6        MR. NORMAND:  All those other good verbs?
7        MR. BRAKEBILL:  Yes.
8        MR. NORMAND:  Okay.  Thank you.
9        Q.   (By Mr. Normand)  I think Mr. Bradford
10   describes his role in the negotiations in his
11   declaration.  Let me just ask you in Novell's view,
12   what was Mr. Bradford's role in that negotiation of
13   the deal or the document set forth in the APA?
14       A.   Well, I think Novell would agree with what he
15   described in his declaration, so that would be the
16   view.  And generally my understanding from his
17   declaration is that he was tasked with making sure
18   that the contract was negotiated to protect Novell's
19   interests.
20       Q.   Do you know whether he was involved in the
21   drafting of any particular language in the APA?
22       A.   From his declaration it's -- and from other
23   declarations, it's clear that he gave directions with
24   respect to the drafting.  Whether he actually crafted
25   any sentences or actually did wordsmithing, I don't

4 (Pages 10 to 13)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.

May 10, 2007                                                    GREGORY JONES

Page 18

1   trademarks in UnixWare and all patents were
2   extended --
3       THE REPORTER:  I'm sorry?
4       A.  Sorry.  All copyrights and trademarks except
5   for the trademarks in Unix and UnixWare were excluded
6   and all patents were excluded, Schedule 1.1(b).
7       Q.  (By Mr. Normand)  Is it Novell's view that
8   apart from that intellectual property that you've just
9   identified, any other intellectual property in Unix
10  and UnixWare was transferred under the APA?
11      A.  Yes.  I believe that's Novell's view.
12      Q.  Do you have a view as to whether trade
13  secrets in Unix and UnixWare were among the
14  intellectual property assets that were transferred
15  under the APA?
16      MR. BRAKEBILL:  Foundation.
17      A.  If there were trade secrets -- certainly
18  trade secrets as a category was not excluded so if
19  there were any trade secrets in those technologies,
20  they would have been transferred.
21      Q.  (By Mr. Normand)  If you look at Section 4.7
22  of the APA on page 22 of the APA, that section says,
23  "Buyer and seller shall issue a joint press release
24  with respect to the subject matter of this agreement,"
25  end quote.  Do you see that language?

Page 19

1       A.  Yes.
2       Q.  Do you know whether such a press release was
3   issued?
4       A.  I don't believe that one was.
5       Q.  I'm handing you what has been marked
6   previously as Exhibit 1028, which is a document
7   entitled Press Release under the SCO symbol in the top
8   right of the document.  Do you recognize this
9   document?
10      A.  Yes, I've seen this before.
11      Q.  So is it Novell's view that this press
12  release is not a joint press release as referred to in
13  Section 4.7 of the APA?
14      A.  Yes.
15      Q.  And did anyone from Novell have occasion to
16  review and approve this press release before it was
17  issued?
18      A.  I don't know.
19      Q.  Do you see on page 2 of the press release
20  there's a quote from Robert J. Frankenberg, chairman
21  and CEO of Novell?  Do you see that language?
22      A.  Which paragraph is that?
23      Q.  Top paragraph.
24      A.  Top paragraph?  Okay.
25      Q.  Do you think it's reasonable to infer from

Page 20

1   the fact that that quote appears there that someone
2   from Novell reviewed and approved this press release?
3       MR. BRAKEBILL:  Form.
4       A.  Well, I hope that at least Bob Frankenberg
5   reviewed it.  But I've actually seen -- I've actually
6   had occasion where, you know, press releases go out
7   with a quote and it hasn't received corporate review.
8   So someone might draw that inference, but I wouldn't
9   necessarily, based on my experience.
10      Q.  (By Mr. Normand)  But would Mr. Frankenberg's
11  review and approval not have constituted Novell's
12  review and approval of the press release?
13      MR. BRAKEBILL:  Scope, form, speculation.
14      A.  I don't know what he would have seen.  I
15  just -- I don't know whether he saw this entire press
16  release.  I just don't know what he would have seen.
17      Q.  (By Mr. Normand)  Is it Novell's position
18  that if Mr. Frankenberg had reviewed and approved this
19  press release marked as Exhibit 1028 that that review
20  and approval would not have constituted Novell's
21  review and approval of the press release?
22      MR. BRAKEBILL:  Scope, speculation.
23      A.  I would be speculating.
24      Q.  (By Mr. Normand)  Does it matter to Novell's
25  view as to whether this was the press release referred

Page 21

1   to in Section 4.7 of the APA?  Does it matter to that
2   view whether Mr. Frankenberg did review and approve
3   this press review?
4       A.  No.
5       Q.  And why not?
6       A.  Well, a joint press release -- we do joint
7   press releases and they will have the appearance of
8   coming from both companies, the logos from both
9   companies, et cetera.  This is simply not a joint
10  press release, it's a SCO press release.
11      Q.  If you look on page 2, second paragraph, it
12  begins, quote, "According to the terms of the
13  agreement, SCO will acquire Novell's UnixWare business
14  and Unix intellectual property."  Do you see that
15  language?
16      A.  Yes.
17      Q.  In Novell's view, is that statement accurate?
18      A.  I don't think it's -- I don't think -- it's
19  not accurate.  It's really inconsistent with what we
20  just read out of the Asset Purchase Agreement.  It's
21  also somewhat vaguely worded.
22      Q.  In what respects in your view is it not
23  correct?
24      A.  Well, one reading in 7 says that SCO will
25  acquire Novell's UnixWare and Unix intellectual

6 (Pages 18 to 21)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.

May 10, 2007                                          GREGORY JONES

Page 22

1   property. And so if you take intellectual property as
2   being the whole -- every form of intellectual
3   property, you know, we just read in the Asset Purchase
4   Agreement that three forms of intellectual property
5   were carved out and were not transferred. So that
6   would be the inconsistency and the inaccuracy.
7       Q. Is the portion of the statement saying that
8   SCO will acquire Novell's UnixWare business accurate?
9       A. I think generally.
10      Q. Do you know if Novell ever issued its own
11  press release regarding the APA?
12      A. Yeah, I believe Novell did.
13      Q. Do you know whether that document has been
14  produced in this litigation?
15      A. I don't know whether it has been produced.
16      Q. Do you recall if you had occasion to review
17  any Novell press release in connection with your
18  preparation for your deposition today?
19      A. You know, yes, I have reviewed the press
20  releases, yes.
21      Q. And do you recall what, if anything, the
22  Novell press release or press releases said about the
23  issue of Unix or UnixWare intellectual property?
24      A. I know they didn't say this. I reviewed a
25  lot of documents, obviously, but the press releases

Page 23

1   just generally describe the transaction, and it was a
2   way that, with respect to intellectual property, was
3   consistent with what I understand the Asset Purchase
4   Agreement to provide. But I reviewed a lot of
5   documents so...
6       Q. Do you know whether those Novell press
7   releases are publicly available?
8       A. They should be. They're -- they have always
9   been publicly available in the past. I know that,
10  back to, say, like through '95 or so, they are on the
11  Web site. So I -- you know, so this just gets into
12  what the Web masters have done and all of that, but,
13  generally speaking, all of our press releases are
14  there. There is a certain time after '94 and '95 when
15  the older ones aren't there anymore, and I just don't
16  know the exact cutoff date.
17      Q. So to the extent they are available, they
18  would be available through Novell's current Web site;
19  is that right?
20      A. That's one source.
21      Q. Do you know of any other sources?
22      A. No, just -- they were press releases at one
23  point and there may be some -- whoever keeps old press
24  releases might have them, but I --
25      Q. Pressrelease.com?

Page 24

1       A. I just don't -- I don't know.
2       Q. Okay. Do you recall in your review of those
3   press releases reading anything with respect to the
4   APA that is inconsistent with Novell's views regarding
5   the APA now?
6       A. I can't recall anything inconsistent.
7       Q. And I may have asked you this, but do you
8   recall anything, generally or specifically, on the
9   issue of intellectual property being addressed by
10  Novell in those press releases?
11      A. I can't remember whether it actually speaks
12  in terms of intellectual property. I just know that
13  there wasn't anything on that topic that contradicted
14  my understanding of the transaction.
15      Q. If you look at the last page of the press
16  release that I've handed you, second to the last
17  paragraph, it says, "The business of Novell, Inc. is
18  connecting people with other people and the
19  information they need, enabling them to act on it any
20  time, any where. Novell is the world's leading
21  network software provider. The company's software
22  products provide the distributed infrastructed,
23  network services, advanced network access and network
24  applications required to make networked information
25  and computing an integral part of everyone's daily

Page 25

1   life." Do you see that?
2       A. Yes.
3       Q. Isn't such language regarding Novell
4   consistent with the form of a joint press release
5   between Novell and Santa Cruz?
6       A. It's probably --
7           MR. BRAKEBILL: Objection to form,
8   argumentative, speculation.
9       A. There's probably an element of what a joint
10  press release would include, but I think that's all it
11  is.
12      Q. (By Mr. Normand) Do you know whether in any
13  of the press releases you reviewed Novell undertook to
14  correct any aspect of this press release marked as
15  Exhibit 1028?
16          MR. BRAKEBILL: Foundation.
17      A. I don't know one way or another on that.
18      Q. (By Mr. Normand) Does Novell have a view as
19  to whether following the execution of the APA the
20  market's belief was that Santa Cruz had acquired the
21  Unix and UnixWare intellectual property from Novell?
22          MR. BRAKEBILL: Form, speculation.
23      A. I don't know of a Novell view to that effect.
24      Q. (By Mr. Normand) I'll direct your attention
25  to the Included Assets Schedule of the APA.

7 (Pages 22 to 25)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.

May 10, 2007                                    GREGORY JONES

---

Page 38

1  the excluded forms of intellectual property, yes.
2      Q.  Again, I may be beyond what you know, but if
3  Santa Cruz were to go bankrupt, why wouldn't the
4  rights to the revenue stream follow the trade secrets
5  and the software know-how and the methods and concepts
6  as opposed to the copyrights?
7      A.  Yeah, and, here again, I just go back to that
8  the measure of the copyright ownership was understood
9  to be what the bankruptcy law called for, and that's
10 the extent of my understanding.
11     Q.  So if I were to ask why didn't Novell seek to
12 retain the trade secrets and know-how and methods and
13 concepts in Unix and UnixWare, would it be fair to say
14 that your understanding is Novell didn't need to do
15 that under the bankruptcy law in order to retain its
16 equitable interest in the revenue stream?
17         MR. BRAKEBILL:  Speculation.
18     A.  On that I would be speculating as to why that
19 wasn't excluded as well.
20     Q.  (By Mr. Normand)  Did the Wilson Sonsini firm
21 advise Novell in 1995 that owning the copyrights in
22 Unix source code would permit Novell to continue to
23 have rights to a revenue stream from the Unix and
24 UnixWare source code if Santa Cruz were to go
25 bankrupt?

---

Page 39

1          MR. BRAKEBILL:  Foundation.
2      A.  That's my -- after everything that I have
3  reviewed, that is -- that's my understanding.  And --
4  yeah.
5      Q.  (By Mr. Normand)  What -- do you know what
6  advice the Wilson Sonsini firm gave Novell in 1995
7  regarding the prospect of retaining some of the
8  intellectual property in Unix and UnixWare?
9          MR. BRAKEBILL:  Repeat that one more time.
10     Q.  (By Mr. Normand)  Do you know what advice
11 Wilson Sonsini gave Novell in 1995 regarding the
12 prospect of retaining some of the intellectual
13 property in Unix and UnixWare?
14     A.  Yeah --
15         MR. BRAKEBILL:  Foundation.
16     A.  I'm not clear as to prospect.  Do you mean the
17 possibility or -- that would simply be --
18     Q.  (By Mr. Normand)  I take it at some point,
19 just to help out your answer, at some point Novell and
20 Wilson Sonsini contemplated whether to retain some
21 intellectual property in Unix and UnixWare with
22 respect to the APA.  Is that fair to say?
23     A.  Yeah, at some point in David Bradford's
24 declaration he talks about, you know, directing in --
25 and Tor Braham talks about being directed in that

---

Page 40

1  area, so --
2      Q.  Do you know what advice anyone from Wilson
3  Sonsini gave anyone from Novell on whether and why to
4  retain some of the intellectual property in Unix and
5  UnixWare?
6          MR. BRAKEBILL:  Why don't you ask the
7  foundation question first.
8      Q.  (By Mr. Normand)  Do you know whether Wilson
9  Sonsini gave anyone from Novell any advice on whether
10 to retain the Unix and UnixWare -- some of the Unix
11 and UnixWare intellectual property?
12     A.  I know that -- my understanding is that David
13 Bradford initiated that and then what advice -- what's
14 given as to whether that could be done, I'm not aware
15 of that type of a conversation taking place between
16 Wilson Sonsini and Novell, if I'm understanding your
17 question correctly.
18     Q.  What I need to ask is whether you know if
19 anyone from Wilson Sonsini gave anyone from Novell
20 advice on what rights under the law Novell could
21 secure for itself by retaining some of the
22 intellectual property rights in Unix and UnixWare.
23     A.  The only -- the only extent to which I know
24 that occurred goes back to the conversation we've just
25 been having about the bankruptcy code and the benefits

---

Page 41

1  of retaining copyrights for that particular reason.
2  Beyond that I don't know what discussions did or
3  didn't happen.
4          MR. NORMAND:  Why don't we take a break.
5          THE VIDEOGRAPHER:  Going off the record.  The
6  time is 10:50.  This is the end of tape No. 1.
7          (Recess.)
8          THE VIDEOGRAPHER:  We're going back on the
9  record.  The time is 11:05.  This is the beginning of
10 tape No. 2.
11     Q.  (By Mr. Normand)  Mr. Jones, I asked you
12 earlier about discussions and you drew a distinction
13 between discussions and communications.  I think in
14 your mind discussions was verbal discussions, and I
15 asked you that question regarding copyrights.  Do you
16 remember that generally?
17     A.  You know, my memory has already faded.  I
18 do -- I just know on one of the topics I was trying to
19 understand what you were talking about speech as
20 opposed to written.
21     Q.  I just mean that by way of introduction.  Do
22 you know whether there were express discussions as
23 opposed to communications in the form of proposed
24 assets schedules or excluded asset schedules?  Do you
25 know if there were express discussions between the

---

11 (Pages 38 to 41)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.

May 10, 2007                                              GREGORY JONES

Page 46

1  there he did indicate that the copyrights were being
2  excluded from -- they were being retained, and
3  certainly Bob Frankenberg was a member of the board
4  and those board minutes indicate what other executives
5  were present in the meeting. So we would have to look
6  to that document to see who else was in that meeting,
7  but I know that that's -- I don't know that other
8  communications weren't made, but that's the only
9  specific one I'm aware of.
10   Q. (By Mr. Normand) So I take it you don't know
11  if there were memos or other notes or e-mails
12  communicating from any member of the Novell legal
13  department and Novell executive that the Unix and
14  UnixWare copyrights were being retained?
15   A. I mean, I know -- I know of executives who
16  had knowledge of it. How they came to have the
17  knowledge, I'm not -- after having reviewed all these
18  documents, I'm not sure which ones tell how they came
19  to have the knowledge and who would have spoken to
20  them, so...
21   Q. When you say you know of executives who have
22  knowledge of it, who were the executives you have in
23  mind?
24   A. Well, again, Mike DeFazio and Jim Tolonen,
25  and then -- you know, and then Bob Frankenberg was at

Page 47

1  that board meeting and the board memo said that David
2  Bradford indicated the copyrights were being retained.
3   Q. Do you know whether the board minutes specify
4  whether the, quote, copyrights were being retained or
5  whether the, quote, Unix copyrights were being
6  retained?
7   A. Yeah, the exact language, I don't know. I
8  know it mentions copyrights in the context of this
9  transaction are being retained by Novell.
10   Q. In the APA, did Novell intend to give Santa
11  Cruz the right to make copies of the Unix and UnixWare
12  source code?
13   A. I think the APA does that.
14   Q. Do you have any particular language in mind?
15   A. Well, the obligations that SCO has under the
16  APA would basically assume that they are going to be
17  making copies and so forth.
18   Q. What are SCO's obligations that you're
19  referring to in your answer?
20   A. It's -- you know, it was contemplated that
21  SCO was going to be carrying forward the business,
22  right, and developing future versions of products, and
23  I'm trying to recall the aspects of the APA that deal
24  with that. And certainly the activities contemplated
25  by the operating agreement and I think the Asset

Page 48

1  Purchase Agreement certainly contemplated that. I'll
2  assume that SCO was going to be engaged in those type
3  of activities.
4   Q. The operating agreement is a later document
5  the parties executed pertaining to the APA?
6   A. Right.
7   Q. So as you sit here, can you tell me where
8  Santa Cruz's right to make copies of the Unix and
9  UnixWare source code is set forth in the APA?
10   A. It's basically set forth in the combination
11  of the list of assets being transferred with the
12  carveout of the IP coupled with the obligations that
13  SCO was going to be undertaking. Those things taken
14  together basically are what authorize SCO to be
15  engaged in copying and so forth.
16   Q. When you say obligations, maybe I just don't
17  understand. An obligation owed to whom?
18   A. I believe to the other party of the
19  agreement, to Novell. I believe in the operating
20  agreement that SCO had obligations to Novell to
21  perform certain development and other activities.
22   Q. Of the Unix and UnixWare business?
23   A. Well, of the -- I think of the merged
24  product. The operating agreement, I'm not sure to
25  what -- I think it related to the merged -- so-called

Page 49

1  merged product.
2   Q. Do you have an understanding of what the
3  merged product is or was to be?
4   A. Well, you know, so Novell had -- that's my
5  general understanding, and the operating agreement
6  would be the source for it, you know, because SCO had
7  a -- I don't know what it was called -- whatever
8  variant of Unix they had and Novell had UnixWare and
9  it was going to be a follow on. But the operating
10  agreement would really be the -- I just pointed to
11  that and that would say exactly what it is.
12   Q. Do you know whether under the APA SCO had the
13  right to develop the UnixWare business independent of
14  a merged product?
15   A. Well, developed -- developed the business?
16  Is that what you mean?
17   Q. Do you know whether the parties contemplated
18  that Santa Cruz could develop and sell a version of
19  UnixWare that was different than whatever the merged
20  product became?
21   A. I guess in this area, notwithstanding my
22  preparation being a little bit weak, I think, in terms
23  of understanding all the different products that may
24  have been contemplated.
25    MR. BRAKEBILL: I would refer you to the

13 (Pages 46 to 49)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                                          GREGORY JONES

Page 58

1    Q.  That's the section titled License Back of
2  Assets?
3    A.  Right.
4    Q.  And it's your view that Section 1.6 gives
5  Novell the right to develop Unix and UnixWare source
6  code?
7    A.  Well, yeah, it gives -- that is a section
8  that provides for certain -- it would allow
9  development type activities.
10    Q.  Is it Novell's view that after the execution
11  of the APA, Novell had the right to continue to
12  develop and distribute the UnixWare source code?
13    A.  Well, to the -- yes, to the extent allowed by
14  the terms of the APA.
15    Q.  And what is your view on the extent to which
16  the APA did allow Novell to do that?
17    A.  Well, it's -- if you look at Section 1.6, it
18  describes the extent to which Novell could do that if
19  you assume -- you know, there's some facts here that I
20  just don't have to completely answer your question.
21  For example, if you assume that Unix has trade secrets
22  and so forth, then some bounds on Novell's activities
23  are going to be by the constraints of 1.6 because
24  Novell is going to need a license under those
25  intellectual properties that are owned by Santa Cruz.

Page 59

1  So 1.6 in the TLA that was executed to implement 1.6,
2  that would -- those documents would speak for
3  themselves and would describe the scope of Novell's
4  rights.  I really couldn't -- you know, the further
5  explanation of that would have to take into account
6  the language of those documents and factual
7  information about the technologies themselves, so I
8  don't know if I can go much further than that.
9    Q.  At the time the parties began to negotiate
10  the APA, Novell was involved in the business of
11  developing and selling operating systems, among other
12  businesses, correct?
13    A.  Correct.
14    Q.  And among the operating systems that Novell
15  was in the business of selling was UnixWare and
16  NetWare, correct?
17    A.  That's correct.
18    Q.  And among the operating systems that Novell
19  was in the business of developing and selling was Unix
20  operating systems; is that correct?
21    A.  Yes.
22    Q.  After the execution of the APA, Novell
23  remained involved in the business of developing and
24  selling the NetWare operating system, correct?
25    A.  Yes.

Page 60

1    Q.  And I take it Novell's view is Novell had the
2  right after the execution of the APA to remain in the
3  business of developing and selling the NetWare
4  operating system?
5    A.  Yes.
6    Q.  Is it Novell's view that after the execution
7  of the APA, it had the right to remain in the business
8  of developing and marketing the UnixWare operating
9  system?
10    A.  I guess I can only answer that as to the
11  extent allowed by the terms of the Asset Purchase
12  Agreement and the Technology License Agreement, to the
13  extent -- to that extent.
14    Q.  Do you know whether Novell remained in the
15  business after the execution of the APA of developing
16  and selling the UnixWare operating system?
17    A.  I wouldn't describe it -- I wouldn't describe
18  Novell as having continued in that business.
19    Q.  And why not?
20    A.  I guess just based on all the documents that
21  I've read and press releases characterizing the
22  transaction and so forth that the entire intent was
23  for the UnixWare business to be transitioned to SCO.
24    Q.  Do you know -- this is probably out of scope,
25  but do you know whether -- do you have a view as to

Page 61

1  whether the NetWare and UnixWare operating system
2  businesses were in competition?
3      MR. BRAKEBILL:  Scope.
4    A.  Yeah, I am probably not going to answer that
5  one.
6    Q.  (By Mr. Normand)  And that's because you
7  don't know the answer?
8    A.  Yeah, I don't -- I would just be giving you a
9  guess.
10    Q.  Section 1.6 of the APA that you referred to
11  says, so we can get it into the record in the
12  beginning, "Concurrent with closing, buyer shall
13  execute a license agreement under which it shall grant
14  to seller a royalty-fee, perpetual, worldwide license
15  to (i) all of the technology included in the assets,
16  and (ii) all derivatives of the technology included in
17  the assets, including the "Eiger" product release
18  (such licensed back technology to be referred to
19  collectively as 'Licensed Technology').  Seller agrees
20  that it shall use the Licensed Technology only (i) for
21  internal purposes without restriction or (ii) for
22  resale in bundled or integrated products sold by
23  seller which are not directly competitive with the
24  core products of buyer and in which the Licensed
25  Technology does not constitute a primary portion of

16 (Pages 58 to 61)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                          GREGORY JONES

Page 66

1    Q.  (By Mr. Normand) So does Novell take the
2  position that an SVRX license is any contract relating
3  to any implementation listed in item VI?
4    A.  I'd just have to refer you to the filings,
5  because I'm sure the filings are going to give you the
6  information that you're seeking.
7    Q.  And the filings are your source of knowledge?
8    A.  Yes.
9    Q.  Apart from what's set forth in the filings,
10  it's not a question you could answer?  Because I can't
11  cross-examine the filings.
12    A.  Yeah, I guess I would say your best answer is
13  going to be in the filings.  I'll put it that way.
14    Q.  Do you know if there's any distinction in the
15  licensing of SVRX or Unix or UnixWare, if there's any
16  distinction between the software agreement on the one
17  hand and the supplement or the schedule to the
18  software agreement on the other hand?
19    A.  Yeah, I'm generally familiar with the two
20  different types of documents.
21    Q.  Do you know what is the extent of your
22  knowledge with respect to what a software agreement
23  is?
24    A.  Very limited.  I regard the software
25  agreement to things like -- kind of like the umbrella

Page 67

1  agreement the customer would sign.  A supplement is
2  something more specific.  That's about it.
3    Q.  Do you have a view as to whether a software
4  agreement refers to any particular product?
5    A.  I don't know whether any of those software
6  agreements identify specific products or not.
7    Q.  Do you have a view as to whether any software
8  agreement is an SVRX license?
9    A.  How those two terms match up with each other?
10    Q.  Uh-huh (affirmative).
11    A.  I'm sure that's going to be in the filings.
12  If you're just -- I'll just refer you there.
13    Q.  Would your answer be the same if I were to
14  ask you about a sublicensing agreement?
15    A.  Yes.
16    Q.  Do you have a view as to whether the software
17  agreement is the agreement that sets forth the
18  licensee's rights to use and distribute the licensed
19  source code?
20    A.  No.  I can refer you to the filings on all of
21  this.
22    Q.  In the APA, did Novell intend to have the
23  right to direct Santa Cruz to increase any SVRX
24  licensing source code rights that Novell chose?
25    A.  I guess I would just say that the Section

Page 68

1  4.16 affords Novell rights to direct such things and
2  I'm sure the filings speak more broadly to it.
3    Q.  Do you have a view as to whether under
4  Section 4.16 Novell was obligated to exercise its
5  rights in good faith?
6    A.  I think the right under 4.16 was an absolute
7  right.
8    Q.  So the answer to my question is --
9    A.  I don't know of any -- I don't know of any --
10  any such condition being placed on the exercise of
11  that right.
12    Q.  Is it Novell's position that it had full
13  rights of control over the Unix and UnixWare licenses
14  that it had just transferred to Santa Cruz?
15      MR. BRAKEBILL:  Objection, vague and
16  ambiguous.
17    A.  Yeah, I think this is addressed in the
18  filings again, and there is -- your question is a
19  little vague, but I take it to mean, for example,
20  Section 4.16(c) which somehow constrained Novell in
21  actions it might take.
22    Q.  How would Section 4.16(c) constrain Novell?
23    A.  The filings would completely explain that.
24    Q.  What did you have in mind when you said it?
25    A.  Well, 4.16(c), you know, says that seller --

Page 69

1  yes, "Seller further covenants that immediately
2  following the closing date neither it, nor any of its
3  officers, directors or employees shall (i) take any
4  material action designed to promote the sale of SVRX
5  products or (ii) provide material compensation to any
6  employee designed and intended to incentivize such
7  employee to promote the sell of SVRX products, except
8  for actions incidental to unrelated business
9  activities of seller."
10      So Novell would have to take that into
11  account as it would exercise its rights under 4.16(b).
12  That's what I had in mind.
13    Q.  Can you give me an example of how Section
14  4.16(c) might constrain Novell's rights under Section
15  4.16(b)?
16      MR. BRAKEBILL:  Form, scope.
17    A.  Well, so if Novell took directed action in
18  4.16(b).
19      THE REPORTER:  I'm sorry, if Novell what?
20    A.  Took action -- well, I can't remember.  But
21  if Novell directed SCO to take action under 4.16(b),
22  it would basically result in promoting the sale of
23  SVRX products, and then SCO provides compensation to a
24  Novell employee incentivizing that employee to have
25  directed SCO to do that.  I mean, that's -- I guess

18  (Pages 66 to 69)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                          GREGORY JONES

Page 130

1  Novell to transfer those particular copyrights?
2       MR. BRAKEBILL: Form.
3       A.  I think, yeah -- so I think she tracks the
4  language more closely of Section A there in Amendment
5  2, but she does seem to suggest something like that in
6  her declaration.
7       Q.  (By Mr. Normand) And is it Novell's position
8  that this paragraph A of Amendment No. 2 sets up the
9  process that Santa Cruz would have to follow in order
10 to obtain any Unix or UnixWare copyrights?
11      A.  I guess I wouldn't characterize it as
12 anything beyond what Allison had written and what it
13 provides here.
14      Q.  She sort of, in my view, leaves it hanging as
15 to how exactly paragraph A of Amendment No. 2 is
16 supposed to operate, but if you're telling me you have
17 no understanding other than what she says, then --
18      A.  Really, yeah, beyond what she says, yeah.
19      Q.  Do you have Ms. Amadia's declaration in front
20 of you among that pile?
21      A.  I believe I do.
22      Q.  Looking at paragraph 15 of the declaration on
23 page 4, Ms. Amadia says, quote, "Should, after
24 Amendment No. 2, Santa Cruz believe its license to use
25 Novell's copyrighted works was insufficient and that

Page 131

1  it needed ownership of any particular Unix or UnixWare
2  copyright rights because ownership of such copyrights
3  was "required" to run its business, I believe Santa
4  Cruz would have to have made such a request to
5  Novell."
6       Do you see that language?
7       A.  Yes.
8       Q.  Does Ms. Amadia's belief reflect Novell's
9  views in this litigation as to Amendment No. 2?
10      A.  I believe that it does.
11      Q.  And do you --
12      MR. BRAKEBILL: You mean referring to that
13 specific belief?
14      MR. NORMAND: Yeah, I don't mean to say this
15 is everything she has said on Amendment No. 2.
16      Q.  (By Mr. Normand) In Novell's view, would
17 Novell have had any obligations of good faith in
18 responding to any such request from Santa Cruz?
19      A.  I don't know.  That's just something I
20 haven't -- I haven't considered.
21      Q.  Have you considered what would have happened
22 if Novell disagreed with Santa Cruz's view that it
23 needed a particular copyright?
24      A.  Well, I just considered to the point where if
25 it's not required, then it's not required, but beyond

Page 132

1  that I don't know that I've given it consideration.
2       Q.  Well, does Novell have a view as to how
3  Amendment No. 2, paragraph A, would have worked if the
4  parties had disagreed on whether a copyright was
5  necessary or not?
6       A.  I don't -- I don't have anything specific to
7  say beyond just, you know, at times people disagree on
8  the application of some contract terms to a fact
9  situation.  I don't -- you know, there are various
10 ways that those things can be resolved and I haven't
11 thought through that in this context.
12      Q.  There's no language in Amendment No. 2 that
13 addresses that issue, right?
14      MR. BRAKEBILL: Form.
15      A.  There's no express language that talks about,
16 you know, in the event the parties disagree about
17 whether it's required.  There's nothing expressed
18 along those lines.
19      Q.  (By Mr. Normand) Now, Ms. Amadia refers to,
20 in the language I read into the record, refers to
21 Santa Cruz's, quote, "license to use Novell's
22 copyrighted works," end quote.  Do you see that
23 language?
24      A.  Yes.
25      Q.  I take it that phrase is consistent with

Page 133

1  Novell's view that under the APA Santa Cruz obtained a
2  license to use Novell's copyrighted works?
3       A.  Yes.
4       Q.  To the extent that Santa Cruz did not obtain
5  under the APA a license to use Novell's copyrighted
6  works, would the copyrights in Unix and UnixWare have
7  been necessary for Santa Cruz to have to exercise its
8  rights with respect to its acquisition of Unix and
9  UnixWare?
10      MR. BRAKEBILL: Form, scope.  Do you have a
11 personal view on that?
12      A.  My personal view is I can't imagine a gap,
13 because the -- if there were copyrights relating to
14 the -- to the assets and the Asset Purchase Agreement,
15 then those would have been licensed.  And so I -- I
16 can't envision a gap between where the activities of
17 Santa Cruz would be broader than the license afforded.
18 The activities for which they should expect to be able
19 to engage with respect to Novell copyrighted works,
20 that there be a gap there, I can't envision that.
21      Q.  (By Mr. Normand) What if Santa Cruz in
22 negotiating the APA did not believe that it had a
23 license to use Novell's copyrighted works, would it
24 follow that Santa Cruz believed that it needed all of
25 the copyrights in Unix and UnixWare in order to

34 (Pages 130 to 133)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                              GREGORY JONES

Page 134

1  exercise its rights with respect to the acquisition of
2  those businesses?
3      MR. BRAKEBILL: Form, scope. If you have a
4  personal view, you can answer.
5      A. If the question is, you know, if they
6  believed X, would they also believe Y? If they
7  believed they didn't have a license, would they
8  believe they required, you know, ownership, then that
9  seems logical. I don't know if they would actually
10 think that way. Of course, the test, as I read
11 Amendment 2 is whether the copyrights are actually
12 required.
13     Q. (By Mr. Normand) If you didn't have a
14 license to use Novell's copyrighted works, what other
15 source of rights would Santa Cruz have to make copies
16 of Unix and UnixWare and to distribute copies of Unix
17 and UnixWare?
18     MR. BRAKEBILL: Form, scope. Do you have a
19 personal view?
20     A. Well, yeah, I think it's a hypothetical
21 that's just kind of divorced from the business
22 circumstance that I've seen so I haven't considered
23 it.
24     Q. (By Mr. Normand) We are now surrounding
25 these questions with -- first of all, it's not a

Page 135

1  hypothetical. Second of all, it's on topic, so I'm
2  not asking for your personal view. I'm asking for
3  Novell's views of whether the copyrights would be
4  necessary if, in fact, Santa Cruz did not have a
5  license to use the copyrighted works.
6      A. Well --
7      MR. BRAKEBILL: Novell's view, as he stated,
8  was that there was a license.
9      MR. NORMAND: That's bucking the hypo.
10     A. Can you reload the hypo so I can --
11     Q. (By Mr. Normand) Mr. Sabbath, I'll represent
12 to you, has testified in this case that his
13 understanding of the APA was that it was not a license
14 of any Novell copyrighted works to Santa Cruz. So
15 taking this hypothetical, if you want to call it that,
16 that in Santa Cruz's view it did not have a license to
17 use Novell copyrighted works, my question is apart
18 from such a license, what other source of rights would
19 Santa Cruz have to make copies of and distribute
20 copies of Unix and UnixWare but for the copyrights in
21 Unix and UnixWare?
22     MR. BRAKEBILL: Same objections,
23 mischaracterizes Mr. Sabbath's testimony in that it's
24 incomplete.
25     A. Well, so just -- so if he believes -- if he

Page 136

1  believes that SCO did not have a license and they
2  wanted to make sure -- well, I suppose they have
3  various defenses available to them. I believe since
4  they have been using the technologies for years, they
5  could rely on estoppel and Lachey's theory, for
6  example.
7      So, I mean, just if -- you want me to really
8  add quite an extreme hypothetical so I guess it kind
9  of yields extreme answers, which is, you know, they
10 have been in this business for years and Novell hasn't
11 tried to stop them. So if Novell, the copyright -- if
12 you say we need to be able to do these activities and
13 not have the copyright owner stop us from doing it, as
14 I understand the situation to be, you would say, well,
15 we've been -- we've actually been doing these things
16 for years. Novell has never tried to stop us from
17 doing it. If they ever tried to assert their patents
18 against us, even if there is no license in the terms
19 of the Asset Purchase Agreement, we would have
20 numerous defenses, detrimental reliance, estoppel and
21 so forth. So, I mean, that's -- like I said, it's an
22 extreme hypothetical. Maybe it seems a rather extreme
23 response, but I think the hypothetical yields that
24 type of analysis.
25     Q. (By Mr. Normand) Amendment No. 2 was signed

Page 137

1  on October 16th, 1996, correct? Look on the front
2  page.
3      A. Yes.
4      Q. As of October 16th, 1996, in Novell's view
5  was there any other source of right for Santa Cruz to
6  make copies of and distribute copies of Unix and
7  UnixWare other than what Novell regards as Santa
8  Cruz's license to Novell's copyrighted works?
9      A. I guess I would just say yes in the sense
10 that if Novell attempted to assert its copyrights
11 against Santa Cruz for engaging in Unix and UnixWare
12 business, Novell would have failed given the nature of
13 this transaction. So whether Santa Cruz --
14     Q. Santa Cruz failed because, in your view,
15 there was a license back to Santa Cruz?
16     A. Well, however you characterize it. So if
17 someone doesn't want to characterize it -- if they say
18 I didn't have a license, so whatever the terminology
19 is or whatever the legal structure is, Novell is not
20 going to be able to stop them from moving forward
21 without Unix and UnixWare business.
22     So it seems like it puts potentially a form
23 over substance question in terms of is there a
24 license. And any practical view of this, Santa Cruz
25 is going to be able to move forward with its business

35 (Pages 134 to 137)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                                    GREGORY JONES

Page 142

1  entitled to something by contract and they are
2  deprived of it, you know, the contract doesn't
3  necessarily say when you guys disagree this is exactly
4  how we're going to resolve it, but there are means
5  available for resolving it.
6      Q.  But in this sense, paragraph A doesn't add
7  anything more to what Santa Cruz could have done by
8  just going back to Novell and saying we think the APA
9  needs to be amended and we know you may disagree?
10     A.  I've answered your question on this one, I
11  think.
12     Q.  So how is it again that paragraph A creates a
13  different scenario after the execution of Amendment
14  No. 2 than a scenario in which Santa Cruz would just
15  go to Novell and ask them to amend?  How are Novell's
16  obligations in the one instance different from its
17  obligations in the other instance?
18         MR. BRAKEBILL:  Asked and answered.
19     A.  I'll answer once more.  So let's say there's
20  copyright X, and I am -- who am I?  I'm SCO.
21     Q.  (By Mr. Normand)  I can ask it a different
22  way.
23     A.  No, no, I mean, I'm trying to answer.
24     Q.  I'm not trying to be redundant.
25     A.  No, no, that's fine.  So let's say that

Page 143

1  there's copyright X.  I'm SCO.  I think that I -- I
2  think that I require this to be able to engage in the
3  Unix and UnixWare business.  It's required or I can't
4  do it.  The ownership is required for whatever reason.
5         And I go to Novell and I say, you know, I
6  require this, and Novell says we're not transferring
7  it to you.  If I'm able to -- you know, so at that
8  point whether we -- whether we engage in arbitration,
9  which it's not called out, whether it's a lawsuit,
10  whatever, I have -- without Novell having to agree, if
11  I can objectively demonstrate as a matter of law that
12  this is required for my business, I'm going to get it.
13  So that's with the change.
14         Without the change, I go to Novell and I say,
15  I require copyright X.  Novell, transfer it to me.
16  Novell says, no, we don't want to.  Full stop.
17  There's nowhere for me to go.
18     Q.  But the APA has several provisions that gives
19  you a place to go in that kind of situation.  We can
20  go over those.  Do you have the APA in front of you?
21     A.  Uh-huh (affirmative).  Maybe I can find the
22  language I'm thinking of.
23     Q.  Look at Section 1.1(c).  It says, quote, "If
24  at any time after the closing date any further action
25  is necessary or desirable to carry out the purposes of

Page 144

1  this agreement, the parties agree to take and will
2  take all such lawful and necessary and/or desirable
3  action," end quote.  Do you see that language?
4      A.  Yes.
5      Q.  I don't know if you've thought about this
6  language, but wouldn't this encompass a situation
7  where you would say to Novell, it is necessary for us
8  to amend this APA for us to get this copyright, and if
9  Novell says no, we disagree, can't you then have an
10  argument that Novell isn't complying with Section
11  1.7(c)?
12     A.  Well, it's an argument.  I would rather have
13  Amendment 2, Section A, which deals specifically with
14  that subject as opposed to having some general
15  provision of this nature.
16     Q.  Look at Section 4.12, paragraph -- sorry,
17  page 23 of the APA.
18     A.  Which page?
19     Q.  23.  It says, quote, "Each party hereto, at
20  the request of another party hereto, shall execute and
21  deliver such other instruments and do and perform such
22  other acts and things as may be necessary or desirable
23  for effecting completely the consummation of this
24  Agreement and the transactions contemplated hereby,"
25  end quote.  Do you see that language?

Page 145

1      A.  Yes.
2      Q.  Could you make the same arguments with
3  respect to that section?
4         MR. BRAKEBILL:  Form, vague and ambiguous.
5      A.  I think it's a weaker argument than the
6  earlier section you cited.
7      Q.  (By Mr. Normand)  I should have stopped with
8  that sentence?
9      A.  And I still prefer Amendment 2, Section A, to
10  those.
11     Q.  So just to use a phrase that we used earlier
12  with respect to 4.16(b), is it Novell's view that it
13  had the right in its sole discretion to decline the
14  transfer of any copyrights that Santa Cruz may have
15  come back and identified with respect to paragraph A
16  of Amendment No. 2?
17         MR. BRAKEBILL:  Form.
18     A.  The only standard that I see in Section A is
19  a standard of required.  I don't -- I don't see -- you
20  know, the language 4.16(b) has the language of
21  seller's sole discretion and direction, and I don't
22  see that type of language in Amendment 2, Section A.
23     Q.  (By Mr. Normand)  Let me ask you a slightly
24  different question.  What if Santa Cruz succeeded in
25  this case in convincing either the court or the jury

37 (Pages 142 to 145)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                    GREGORY JONES

Page 198

1  Fujitsu example that you can think of where there were
2  communications between Novell and a third party
3  involving issues of copyrights?
4      A.  Not really.  I mean, if you -- you know,
5  anything in connection with Amendment 2 I suppose you
6  could put in that category, but we've talked about
7  that so much.  So I've -- no.
8      Q.  And does the reference to written
9  communications in this Exhibit 1095 encompass written
10 communications internal to Novell in which the issue
11 of copyrights came up?
12     A.  It should be comprehensive, whether it's
13 internal or with third parties.
14     Q.  Okay.  And can you recall any specific
15 internal communication at Novell regarding the issue
16 of copyrights apart from what's identified elsewhere
17 in Exhibit 1095?
18     A.  Well, yeah -- no -- let me see.  Well, you
19 know, so, for example, we've talked earlier today
20 about the board meeting where David Bradford spoke
21 about retaining copyrights, so there's an actual memo
22 that gets sent out.  So that's a communication on that
23 topic.  And I'm just -- there may be others, and right
24 now I'm just not -- I'm not remembering well.
25     Q.  Do you know whether the issue of copyrights

Page 199

1  ever came up internal to Novell during the course of
2  the negotiations of what became Amendment No. X?
3      A.  Well, I guess -- my understanding is that
4  Amendment X and Amendment No. 2 were being done
5  contemporaneously, so to the extent Steve Sabbath
6  raised the issue of copyright ownership, you could say
7  it's kind of in that context because they are
8  happening at the same time.
9      Q.  Apart from that, are you aware of any other
10 internal communications at Novell regarding the
11 copyrights in 1996?
12         MR. BRAKEBILL:  Other than what's listed
13 here, you mean?
14         MR. NORMAND:  Yes.
15     A.  No.
16     Q.  (By Mr. Normand)  Do you know of any
17 communications between Novell and any of its outside
18 counsel regarding the issue of copyrights apart from
19 Amendment No. 2 between 1996 and 2002?
20     A.  I'm not aware of any written communication
21 with outside counsel about the issue of copyrights.
22     Q.  Or any discussions, if you're aware of any
23 with outside counsel regarding the issue of
24 copyrights.
25         MR. BRAKEBILL:  Again, we're setting aside

Page 200

1  1095, just so the record is clear?
2          MR. NORMAND:  Yes.
3      A.  Yeah, I -- I don't think so.  I would have
4  had occasion to consult on the TLA terms and so forth,
5  so in that sense it kind of relates to all of that,
6  but I don't have a specific recollection of having
7  consulted on the copyright issues.  So I just -- I
8  don't remember anything like that.
9      Q.  (By Mr. Normand)  Just so I have an
10 understanding as to -- if I could take that -- Exhibit
11 1087, when you say you don't think the Fujitsu
12 communication that you recall or seem to recall was
13 listed here -- I understand this is a list of
14 examples -- do you know why it would not be listed
15 here, that selection process?
16     A.  I didn't prepare the example evidence.
17     Q.  Okay.  Do you know whether from 1996 to 2002
18 any third party undertook to assess Novell's assets at
19 any point?
20         MR. BRAKEBILL:  Scope.  Do you have a
21 personal understanding?
22     A.  To -- could you say that again?
23     Q.  (By Mr. Normand)  Undertake to assess
24 Novell's assets.  I'm wondering if there's any
25 communications involving Novell and any such third

Page 201

1  party in which the issue of copyrights arose.  In
2  other words, any third party undertaking an inquiry
3  into Novell's assets or assessing Novell's assets.
4      A.  I'm not aware of any such exercise with a
5  third party that would go to that level.
6      Q.  Do you know of any internal communications at
7  Novell regarding the ownership of copyrights in Unix
8  or UnixWare in 2002?
9          MR. BRAKEBILL:  Let me just say one thing for
10 clarity.  To the extent that there began at some point
11 late in 2002, as the record reflects, communications
12 back and forth between SCO and Novell, that topic is
13 going to be deferred until next week.
14         MR. NORMAND:  In 2002?
15         MR. BRAKEBILL:  Yes, in the late 2002 time
16 frame when the SCO -- just for ease of questioning,
17 rather than having two witnesses speak on the same
18 topic, Mr. LaSala will be speaking to the time period
19 late in 2002 when communications began from SCO to
20 Novell concerning Unix, if you know what I'm saying.
21         MR. NORMAND:  I do.
22     Q.  (By Mr. Normand)  So prior to the time --
23         MR. BRAKEBILL:  Prior to the fall of 2002.
24     Q.  (By Mr. Normand)  Prior to the fall of 2002
25 when I think you ended up in conversations with

51 (Pages 198 to 201)

d910ada0-2438-4866-baf3-d20fae8a6372

THE SCO GROUP, INC. v. NOVELL, INC.
May 10, 2007                                    GREGORY JONES

Page 238

1    Q.  (By Mr. Normand) And in your view, the
2  retention of Unix and UnixWare intellectual property
3  was another such measure?
4    A.  Yes.
5    Q.  I don't mean to bounce you around like this,
6  but the Tor Braham declaration, Exhibit 1084, where he
7  said in paragraph 14, "During the negotiations" -- I
8  read this before, but "David Bradford indicated to me
9  that Novell was unwilling to transfer intellectual
10  property rights in Unix and UnixWare, including
11  patents and copyrights," end quote.  Do you see that
12  language?
13    A.  Yes.
14    Q.  Do you know how it was that Novell came to be
15  willing to transfer some intellectual property rights
16  in Unix and UnixWare?
17    A.  You asked me a similar question earlier, and
18  I don't know.
19    Q.  I probably did.
20    A.  Yeah, I don't know.
21    Q.  In Ms. Amadia's declaration, Exhibit 1086,
22  she says in paragraph 14, and I quote, "Amendment
23  No. 2 was not intended to alter the original APA's
24  copyright ownership exclusion," end quote.  Do you see
25  that language?

Page 239

1    A.  Yes.
2    Q.  Does that statement reflect Novell's views?
3    A.  Yes, it does.
4    Q.  How can that statement be reconciled with the
5  opening language of paragraph A of Amendment No. 2?
6    MR. BRAKEBILL:  Foundation.
7    A.  The developing paragraph being the language
8  "with respect to"?
9    Q.  (By Mr. Normand) Yes.
10    A.  Yeah, I guess I don't see the conflict.  As I
11  read her declaration she says this confirms there was
12  a license that does provide, you know, the standard
13  where if SCO demonstrates that copyrights are
14  required, that the required copyrights can be
15  transferred.  Let me see Section 14.
16    You know, so I suppose the way I would -- if
17  you had to reconcile them, I would reconcile them by
18  saying that when this was executed, the status quo
19  that she describes of there being a license situation
20  remained in place and that there was no -- there were
21  no required copyrights that anybody was aware of or
22  that were subsequently identified.  So that's how --
23  if I had to reconcile them, I would say that, although
24  I don't know if they need to be.
25    Q.  (By Mr. Normand) But it's not Novell's

Page 240

1  position that Amendment No. 2 did not revise the
2  Excluded Asset Schedule of the APA; is that right?
3    A.  Oh, yeah, I mean -- yes, there's no doubt
4  that the literal language of the Amendment 2 basically
5  says that the text of that schedule is going to -- is
6  altered, "shall be" -- "shall be revised to read."
7    Q.  Do you know whether -- let me ask it this
8  way.  Does Novell regard its retention of the Unix and
9  UnixWare copyrights under the APA as analogous to a
10  deal it did with Tuxedo in or around that time?
11    MR. BRAKEBILL:  Scope.  If you have a
12  personal understanding, you can testify.
13    A.  I guess -- I guess it is an element that the
14  two transactions have in common.  I guess I would say
15  it that way.
16    Q.  (By Mr. Normand) The element being the
17  copyrights were not transferred, in your view?
18    A.  Right.
19    Q.  Do you know whether the deal with Tuxedo was
20  described in the documents as a license?
21    MR. BRAKEBILL:  Same objection as earlier.
22    A.  In the -- the documents meaning the
23  transaction documents?
24    Q.  (By Mr. Normand) Yes.
25    A.  That one -- yes, there is a -- it is

Page 241

1  described as a license.
2    Q.  Mr. Tolonen in his declaration -- I'm sorry,
3  I'm testing your ability to move in and out of these
4  exhibits -- says in paragraph 16 of his declaration
5  that "Amendment No. 2 confirmed that Santa Cruz would
6  be allowed to continue to use the Novell-retained
7  copyrights - as it had been doing for the 13 prior
8  months - only as required to exercise its rights under
9  the Asset Purchase Agreement.  However, Novell would
10  continue to own those copyrights."
11    This may be a semantic issue, but is there a
12  distinction between -- well, is it Novell's view that
13  SCO had retained the right to use the copyrights or
14  that Novell had a license to use Novell's copyrighted
15  works?
16    A.  Could you state that again?
17    Q.  Is it Novell's view that under the APA Santa
18  Cruz had obtained the right to use the Unix and
19  UnixWare copyrights, on the one hand, or that Santa
20  Cruz had obtained the license to use the Unix and
21  UnixWare copyrighted works?  What I'm getting at is I
22  don't really understand the phrasing that Mr. Tolonen
23  has used here.  Maybe --
24    A.  Yeah, the fact that he talks about -- which
25  aspect of his phrasing?

61 (Pages 238 to 241)

d910ada0-2438-4866-baf3-d20fae8a6372

# EXHIBIT 21

CONF'L SUBJECT TO PROTECTIVE ORDER

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


THE SCO GROUP, INC., a
Delaware corporation,

Plaintiff/Counterclaim-Defendant,

vs.                                No. 2:04CV00139DAK

NOVELL, INC.,

Defendant/Counterclaim-Plaintiff,
_____/




Videotaped Deposition of

LAWRENCE BOUFFARD

February 16, 2007




Pages 1-197


Reported by:
SHARON LANCASTER
CSR No. 5468



SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California 94010-1204
(415) 402-0004
(650) 692-8900
FAX:  (650) 692-8909

CONF'L SUBJECT TO PROTECTIVE ORDER

1          Personally, as I mentioned earlier, I always

2    had some reservations.  I mean, we pretty much knew

3    we were treading on thin water here -- thin ice here.

4    So --

5    BY MR. JACOBS:

6        Q.  Does this memo refresh your recollection at

7    all about paid-up license discussions with HP around

8    this time frame?

9        A.  It did, yes.  There was a project, a

10   three-way project between HP, SCO, and Novell, and it

11   required HP to do some work we didn't have engineers

12   for, and we were working out a compensation for them.

13   And the compensation was waiver of a year's worth of

14   royalties.  And then it was an annual basis thing,

15   and it was intended to be a three-way discussion.

16   And it was just simply helping pay for the work that

17   HP was doing.  It was not a modification to their

18   license.

19       Q.  Did you ever hear that one of the purposes

20   behind Section 4.16(b) of the Asset Purchase

21   Agreement was to ensure that Novell's interests in

22   furthering the project with Hewlett-Packard were

23   protected?

24       A.  Oh, no.  I never heard that.

25       Q.  Then in the second paragraph, allegation

# EXHIBIT 22

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER

Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br>     Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br>     Defendant/Counterclaim-Plaintiff. | **DECLARATION OF CHRISTOPHER S. SONTAG** <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

1.     I submit this declaration in connection with <u>The SCO Group, Inc. v.</u> <u>International Business Machines Corporation</u>, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003), and <u>The SCO Group v. Novell, Inc.</u>, Civil Action No. 2:04CV00139 DAK (D. Utah 2004). I make this declaration based upon personal knowledge.

2.     I am Senior Vice President of the SCO Group, Ltd. I have been with the SCO Group since October 11, 2002.

3.     In late 2002 and early 2003, SCO began researching the intellectual property surrounding Linux. We learned that customers were using its proprietary UNIX libraries with Linux, but without the license necessary to use UNIX for this purpose. We began exploring licensing programs designed to protect our UNIX and Unixware assets from further dilution.

4.     SCO presented its library licensing plan to multiple partners, including Oracle, Intel, Computer Associates, and Hewlett Packard, and was met with a favorable or ambivalent response. IBM, however, was opposed to the plan, and discouraged SCO from proceeding with the program. IBM was the only company to express such disapproval when the plan was first presented.

5.     In December of 2002, I was a participant on a phone call between SCO executives and counsel and several IBM executives and attorneys. The IBM representative tried to persuade SCO not to issue the anticipated press release announcing the library licensing program or to begin its program.

6.     I was also a participant in the phone call between Mr. McBride and Novell executive Greg Jones in November 2002. Mr. McBride expressed SCO's understanding that the intent of the Asset Purchase Agreement (APA) was that the copyrights to Unix

and Unixware had been transferred to SCO. Mr. Jones agreed with Mr. McBride. Mr.

McBride then asked whether Mr. Jones was aware of any paperwork which reflected their

understanding of the Asset Purchase Agreement. Mr. Jones said he would check.

7.      Sometime thereafter, Mr. Jones called and explained that the documents

relating to the APA were in storage and would be difficult to access. Instead, Mr. Jones

proposed that someone at Novell simply sign a statement or letter confirming their

mutual understanding that SCO had acquired the UNIX copyrights, rather than trying to

find the old documents in storage.

8.      I spoke with Mr. Jones in February of 2003 and asked him to sign a letter

consistent with our previous conversations, clarifying and stating that it was our mutual

understanding of the APA agreement that the copyrights had in fact been transferred

pursuant to the APA Agreement. Following that phone call, I emailed to Mr. Jones a

letter, which was prepared for his signature, clarifying that all right, title and interest in

and to the SVRX copyrights had been transferred to SCO in the Asset Purchase

Agreement. A redacted copy of that email and the letter I sent are attached hereto as

exhibits 1 and 2, respectively.

9.      At the time I discussed this clarification from Novell, I was not aware of

Amendment No. 2 of the APA, which unequivocally states that the copyrights were

among the assets transferred to SCO in the APA. If I had been familiar with Amendment

No. 2, I would not have thought it necessary to seek any clarification from Novell.

10.     I understand that Mr. Greg Jones has submitted a declaration in support of

IBM's motion for summary judgment, in which he states that SCO repeatedly contacted

Novell requesting that Novell transfer the UNIX copyrights to SCO. I strongly disagree

3

with Mr. Jones. I did not, at any time, ask him or Novell to transfer those rights to SCO or to amend the Asset Purchase Agreement (APA).

11.    At no time in these conversations did Mr. Jones state or imply that SCO did not own the Unix and Unixware copyrights, and in fact consistently agreed that the copyrights had transferred to SCO.

12.    In early 2003, Mr. Jones contacted us and said that Novell would not issue the clarification we had discussed. Mr. Jones said that it was not that Novell did not agree with SCO's position, but that they did not want to be involved or to take any position. Mr. Jones further said that Novell was "not interested in Unix anymore."

13.    From July 21, 2003 to August 31, 2004, I supervised Gregory Blepp, and ultimately terminated his employment.

14.    I understand that Mr. Blepp is quoted as saying "you don't put everything on the table at the start, but instead you bring out arguments and evidence piece by piece" (IBM Ex. 375).

15.    If Mr. Blepp in fact said this, it is not accurate. His statement is not consistent with anything Mr. Blepp was instructed by me or by SCO, and does not reflect SCO's position or strategy at this time or any time.

16.    Furthermore, Mr. Blepp is from Munich, and was a SCO sales person in Germany. Mr. Blepp was not familiar with the American legal system.


I declare under penalty of perjury that the foregoing is true and correct.

November 4, 2006

Christopher Sontag

4

# EXHIBIT 1

# REDACTED

-----Original Message-----
From: Chris Sontag [mailto:csontag@sco.com]
Sent: Thursday, February 20, 2003 10:36 AM
To: Greg Jones (gsjones@novell.com)
Subject:

Greg,

Attached is a first cut at a side letter to clarify the issues that we discussed yesterday. I will give you a call later, or feel free to call me on my cell at 801-918-8549.

Regards,

Chris Sontag

2/16/2006

# EXHIBIT 2

[SCO letterhead]

February 10, 2003

NOVELL, Inc.

Re:   Asset Purchase Agreement by and Between
      the Santa Cruz Operation, Inc. and Novell, Inc.
      dated as of September 19, 1995

Dear: _____

This letter clarifies the intent of the parties with respect to the above-captioned transaction.

It is our understanding that the Asset Purchase Agreement by and Between the Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995 (the "Asset Purchase Agreement") transferred all of the rights and obligations under the various AT&T SVRX Software Agreements and Sublicensing Agreements (the "AT&T SVRX Agreements") from Novell to SCO, excepting only the ongoing right to receive royalty payment streams according to the terms specified in the Asset Purchase Agreement.

We wish to clarify the following:

1.  That all right, title and interest in and to copyrights associated with the AT&T SVRX Agreements held by Novell at the time of the Asset Purchase Agreement were intended to be part of the Included Assets identified in Schedule 1.1 (a);

2.  That no right title or interest in and to copyrights associated with the AT&T SVRX Agreements otherwise held by Novell at the time of the Asset Purchase Agreement were intended to be part of Excluded Assets identified in Schedule 1.1 (b); and

3.  That no right title or interest whatsoever in and to the trademark "UNIX" was intended to be part of the Included Assets identified in Schedule 1.1 (a).

Please confirm your concurrence with the above by countersigning this side letter of understanding in the space provided below.

Sincerely yours,                          Agreed and accepted:

**The SCO Group**                         **Novell, Inc.**


Christopher S. Sontag                      Name: _____
Senior Vice President                      Title: _____
Operating Systems Division                 Date: _____

Confidential

# EXHIBIT 23

```
                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,            )
                                )
          Plaintiff/            )   2:04CV00139
          Counterclaim-Defendant, )
                                )
      vs.                       )
                                )
NOVELL, INC.,                   )
                                )
          Defendant/            )
          Counterclaim-Plaintiff. )
--------------------------------*
```

                        Friday, March 23, 2007
                        Elizabeth, New Jersey
                        10:01 a.m.


          Videotaped Deposition of BURT LEVINE,

taken by Defendant/Counterclaim-Plaintiff, pursuant

to Notice, held at the Sheraton Four Points Hotel,

901 Spring Street, Elizabeth, New Jersey, on Friday,

March 23, 2007 at 10:01 a.m. before Josephine H.

Fassett, a Certified Shorthand Reporter and Notary

Public of the State of New York.


                   SHARI MOSS & ASSOCIATES
                 Certified Shorthand Reporters
                   877 Cowan Road, Suite A
                 Burlingame, California 94010
                      (415) 402-0004

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

Page 54

1    A    Yes.
2    Q    Do you have any understanding that
3  Novell -- well, scratch that.
4        Do you have any understanding as to
5  who within Novell in the Legal Department was
6  working on this contract?
7    A    I recall that I worked on it and I
8  don't -- there were attorneys in Utah who also had
9  input to this as far as I remember.
10    Q    Do you recall the name David
11  Bradford?
12    A    Yes.
13    Q    Do you know who David Bradford is?
14    A    He was the head of the legal
15  department in -- of Novell in Utah I think at that
16  time.
17    Q    Mr. Bradford was the general counsel
18  of Novell at the time of this agreement; is that
19  right?
20        MR. NORMAND:  Object to the form.
21    A    I don't remember if that's true or
22  not, I believe it was.
23    Q    Do you recall who, if anyone else in
24  the Novell Legal Department had any role in the
25  September 1995 contract?

Page 55

1    A    I don't remember which of his
2  attorneys would have worked on this, if that's
3  your question.
4    Q    Do you have any understanding as to
5  whether Novell hired outside lawyers to help in
6  the negotiation and drafting of this contract?
7    A    I believe we did, yeah.
8    Q    And do you have an understanding
9  that Novell hired the law firm of Wilson Sonsini
10  Goodrich & Rosati to help negotiate and draft this
11  contract?
12    A    I believe that's correct.
13    Q    You had worked with Wilson Sonsini
14  before in your transactional experience at
15  USL-Novell; isn't that right?
16    A    I don't know that I did, maybe the
17  Tannenbaum did.
18    Q    Did you work in any way on the
19  USL-Novell transaction?
20    A    I don't recall.
21    Q    In any event, you do recall that
22  Novell had hired Wilson Sonsini to negotiate and
23  draft this contract?
24    A    Yes.
25    Q    Do you know the name Tor Braham?

Page 56

1    A    I've heard the name, yes.
2    Q    Do you know who Tor Braham is?
3    A    I've never met him, no.  I've heard
4  the name, that's about it.
5    Q    Do you understand that he is a
6  lawyer from Wilson Sonsini that Novell had hired
7  to work on this contract?
8    A    I've heard it, I don't know that on
9  my own.
10    Q    Do you know the name Aaron Alter?
11    A    Excuse me?
12    Q    Do you know the name Aaron Alter?
13    A    No.
14    Q    As you sit here today, do you recall
15  what involvement, if any, you had in drafting or
16  contributing any portion of this particular
17  agreement dated September 19th, 1995?
18    A    I know that I worked on drafting
19  some of the provisions, I don't know which ones in
20  particular.
21    Q    And how is it that you recall that
22  you were involved in drafting some provisions?
23    A    I was asked to do it by the
24  negotiators for Novell.
25    Q    And as you sit here today are you

Page 57

1  sure that any drafting that you did relating to
2  the Novell-Santa Cruz deal was in connection with
3  this particular September 19, 1995 contract as
4  opposed to an amendment to this contract?
5    A    No, I can't recall specifically, you
6  know, what work I did on one versus the other.
7    Q    Now do you -- you have read this
8  September 19, '95 Agreement I take it at some
9  point in time?
10    A    Eleven, twelve years ago.
11    Q    That was a long time ago?
12    A    Yeah.
13    Q    Do you remember any particular
14  provisions in this contract as you sit here today?
15    A    No.
16    Q    Memories can fade over time?
17    A    Yes.
18    Q    And as an experienced lawyer would
19  you agree with me that if you wanted to go back
20  after the fact and find out what the parties'
21  rights and obligations were under this contract
22  you could go read the contract?
23        MR. NORMAND:  Objection to form.
24    A    Well, that would be one source,
25  yeah.

15 (Pages 54 to 57)

SHARI MOSS & ASSOCIATES                    (415 )  402-0004

e463c127-8ffd-49b9-80e6-fe34f2330dd0

Page 66

1   that right?
2       A    Eight Roman numerals, yes.
3       Q    Right.  And those are assets of
4   substance; isn't that right?
5            MR. NORMAND:  Objection to form.
6       A    Intellectual property, yes,
7   definitely.
8       Q    Okay.  And if you look at Roman V it
9   is entitled Intellectual Property, correct?
10      A    Right.
11      Q    And it lists two types of excluded
12  intellectual property, one, all copyrights and
13  trademarks except for the trademarks UNIX and
14  UnixWare, and two, all patents; do you see that?
15      A    I see that.
16      Q    Okay.  What is listed is (a) and (b)
17  of Roman V are specifically excluded assets under
18  this contract, would you agree with me?
19      A    Specifically listed assets, yes.
20      Q    Specifically listed as excluded --
21      A    Right.
22      Q    -- assets, correct?
23           MR. NORMAND:  Objection to form.
24  BY MR. BRAKEBILL:
25      Q    In reading this do you understand

Page 67

1   that Novell is excluding all patents from this
2   asset transfer?
3       A    I understand what the agreement
4   says, I understand what the exclusions are in the
5   document.
6       Q    Okay.  And based on reading this
7   exclusion in the contract do you understand that
8   all copyrights and trademarks except for the
9   trademarks UNIX and UnixWare are excluded from
10  this asset transfer?
11      A    No, I don't.
12           MR. NORMAND:  Objection to form.
13      Objection to the extent it calls for a
14      legal conclusion.
15  BY MR. BRAKEBILL:
16      Q    You disagree with the language in
17  this schedule; is that right?
18           MR. NORMAND:  Objection to form.
19      A    No, I don't disagree that these are
20  listed here, I disagree that in the context of
21  this agreement that this is, that this is the
22  whole story.
23      Q    Do you disagree that the contract on
24  September 19th, 1995 specifically excluded all
25  copyrights and trademarks except for the

Page 68

1   trademarks UNIX and UnixWare?
2            MR. NORMAND:  Objection to form.
3       Objection to the extent it calls for a
4       legal conclusion.
5       A    I cannot answer that Yes or No.
6       Q    Why can't you answer that Yes or No?
7       A    Because there's a premise that
8   hasn't been stated here, we're talking about a
9   written document and we're talking about the
10  party's intent.
11      Q    Is this document, Schedule 1.1(b),
12  unclear to you?
13      A    Yes.
14      Q    How is it unclear to you?
15      A    The asset that purports to be
16  transferred from Novell to SCO in the intent of
17  the parties will ex -- will include, to my reading
18  or to my knowledge, even though I don't remember
19  the specific terms of this agreement, the
20  intention was to convey all of these ownership and
21  auxiliary ownership rights to the asset including
22  copyright.  And the fact that there is this kind
23  of an exclusion there tells me that there is an
24  ambiguity in this agreement or a mutual mistake
25  which wipes out any kind of an integration clause.

Page 69

1   I don't agree that that's what the agreement
2   means.
3       Q    Can you tell me in your view what is
4   ambiguous about the exclusion on Schedule 1.1(b)
5   of, quote, all copyrights and trademarks except
6   for the trademarks UNIX and UnixWare?
7            MR. NORMAND:  Objection to form.
8       Mischaracterizes his testimony.
9       A    Can you repeat that question,
10  please?
11      Q    Can you tell me in your view what is
12  ambiguous about the exclusion on Schedule 1.1(b)
13  of, quote, all copyrights and trademarks except
14  for the trademarks UNIX and UnixWare?
15      A    I don't think you can exclude a
16  copyright in this kind of an asset transfer.  I
17  think you can exclude a copyright if you're
18  transferring the physical manifestation of the
19  asset, but when you purport to transfer the whole
20  asset and all the business and everything else I
21  think inherent in that is going to be the
22  copyright and it's a contradiction in terms for
23  the copyright to be excluded like this.
24      Q    So I take it if you had seen this in
25  the course of the negotiations you would have

18 (Pages 66 to 69)

e463c127-8ffd-49b9-80e6-fe34f2330dd0

1        MR. BRAKEBILL:  Objection to form.
2    Foundation.  Calls for speculation.
3        A    Well, in my mind this is, this is
4    confirmatory of my view that the, the copyrights
5    that are now specified in this amendment would
6    have been transferred in any event because of the
7    scope of the rights in the transfer of the assets,
8    and this is confirmatory of that.  This leaves no
9    doubt on black and white that, that this is what
10    was intended.
11        Q    I'd like to ask you, Mr. Levine,
12    about Exhibit 202 which should be in your pile
13    somewhere.
14            Exhibit 202 has the fax cover sheet
15    indicating that it's from Burt Levine, yourself,
16    to Aaron Alter.
17        A    Okay.
18        Q    Dated September 18th, 1995.  And --
19        A    Yes.
20        Q    -- attached to the fax cover sheet
21    is I believe your markup of Schedule 1.1(a) and
22    the Seller Disclosure Statement, do you see that?
23        A    Yes.
24        Q    Do you remember reviewing the
25    document earlier?

1        A    Yes.
2        Q    At any time when you were reviewing
3    this document in 1995 was it your view that Novell
4    was intending to retain the UNIX or UnixWare
5    copyrights under the APA?
6        MR. BRAKEBILL:  Form.
7        A    Not in the least, no.
8        THE REPORTER:  I'm sorry, I didn't
9    hear your answer.
10        THE WITNESS:  "Not in the least,
11    no."
12    BY MR. NORMAND:
13        Q    At any time when you were reviewing
14    the schedule attached as part of Exhibit 202, was
15    it your view that the language of the APA served
16    to retain for Novell the UNIX or UnixWare
17    copyrights?
18        MR. BRAKEBILL:  Form.
19        A    Do you mean the APA in its original
20    form?
21        Q    In the form that you were reviewing
22    it in the markup reflected in Exhibit 202.
23            You want the question read back?
24        A    Please.
25        Q    At any time when you were reviewing

1    the schedule attached as part of Exhibit 202, was
2    it your view that the language of the APA served
3    to retain for Novell the UNIX or UnixWare
4    copyrights?
5        MR. BRAKEBILL:  Form.
6        A    No.  No.
7        Q    I'm going to show you, Mr. Levine,
8    or have you turn your attention to Exhibit 203.
9        A    (Complies.)
10        Q    Exhibit 203 is the document with a
11    telecopy cover sheet under Wilson Sonsini
12    letterhead to you from Shannon Whisenant dated
13    September 18th, 1995, and attached to the cover
14    sheet is a version of Schedule 1.1(a) of the APA,
15    and it's stamped Draft on each page.
16        A    Okay.
17        Q    And the same is true for Schedule
18    1.1(b).  Do you remember reviewing this document
19    this morning?
20        A    Yes.
21        Q    Was it ever your view in reviewing
22    the document attached as part of Exhibit 203 that
23    Novell intended to retain the UNIX or UnixWare
24    copyrights under the APA?
25        A    No.

1        MR. BRAKEBILL:  Form.
2    BY MR. NORMAND:
3        Q    Was it ever your view when reviewing
4    the language of the document attached as Exhibit
5    203 that the language of the APA served to retain
6    for Novell the UNIX or UnixWare copyrights?
7        MR. BRAKEBILL:  Form.
8        A    No.
9        Q    I direct your attention, Mr. Levine,
10    to Exhibit 204.
11        A    (Complies.)
12        Q    Exhibit 204 is the document with the
13    cover sheet under Novell's letterhead dated
14    September 15th, 1995 from you to Shannon
15    Whisenant, and attached to the document, among
16    other things, is your markup of the Seller
17    Disclosure Schedule and towards the back half of
18    the document your handwriting appears?
19        A    Yes.
20        Q    Do you remember reviewing this
21    document this morning?
22        A    Yes.
23        Q    Or this afternoon?
24        A    Yes.
25        Q    Was it your view at any time in

42 (Pages 162 to 165)

e463c127-8ffd-49b9-80e6-fe34f2330dd0

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

C.A. No. 2:04CV00139


THE SCO GROUP, INC., a Delaware

corporation

                    Plaintiff and

                    Counterclaim Defendant

V.

NOVELL, INC., a Delaware corporation

                    Defendant and

                    Counterclaim Plaintiff


                - - - - - - - -

          30(b)(6) Notice to Novell, Inc.

        Deposition of Joseph A. LaSala, Jr.

            Wednesday, May 16, 2007

                 9:41 a.m.

               Ropes & Gray

          One International Place

          Boston, Massachusetts

                - - - - - - - -

        Reporter:  Deborah Roth, RPR/CSR

22:15:09 1  subject of this press release, otherwise I
22:15:11 2  will just ask him if what he said at
22:15:12 3  deposition reflects the company's views?
22:15:21 4  Obviously you I don't need to commit --
22:15:23 5         MR. BRAKEBILL:  Yes, I don't
22:15:24 6  believe so, but I can't be a hundred percent
22:15:26 7  positive without looking at it.
22:15:28 8         The only thing I would caution is I
22:15:30 9  think there was a lot of testimony about it,
22:15:32 10 meaning a number of pages.  So a blanket
22:15:36 11 question, I would be make an objection.  I
22:15:38 12 think it would be overbroad without having the
22:15:40 13 deposition testimony so that he can look at it
22:15:43 14 and can adopt everything.  So I would caution
22:15:43 15 that --
22:15:46 16 BY MR. NORMAND:
22:15:46 17     Q.  Let me ask you a couple of questions
22:15:49 18 that I think will be redundant of what I asked
22:15:51 19 you before, and I am not trying to set up an
22:15:53 20 inconsistencies but --
22:15:54 21     A.  I appreciate -- I appreciate that.
22:15:55 22         MR. BRAKEBILL:  And don't mean you
22:15:57 23 have to walk through everything again either.
22:15:58 24     Q.  So to try to use the language you used

22:16:00 1  in an earlier answer, you make the statement
22:16:02 2  in this press release that, "The amendment
22:16:05 3  appears to support SCO's claim that ownership
22:16:08 4  of certain copyrights for UNIX did transfer to
22:16:12 5  SCO in 1996."
22:16:15 6         Do you see that sentence?
22:16:16 7     A.  I do.
22:16:17 8     Q.  In your view, does that sentence or any
22:16:20 9  other language in this press release reflect
22:16:23 10 Novell's view that the UNIX copyrights were
22:16:26 11 not transferred by virtue of Amendment No. 2?
22:16:32 12     A.  Yes.
22:16:35 13     Q.  And how so?
22:16:36 14     A.  Well, nowhere in the press release do
22:16:41 15 we in any way suggest that it is our view that
22:16:46 16 Amendment No. 2 did transfer the copyrights to
22:16:51 17 SCO in 1996.
22:16:53 18         So by its absence, there is nothing
22:16:56 19 here that suggests that it was our view that
22:16:58 20 they did transfer.
22:16:59 21     Q.  Is it Novell's view today that
22:17:03 22 Amendment No. 2 appears to support SCO's claim
22:17:05 23 that ownership of certain copyrights for UNIX
22:17:08 24 did transfer to SCO in 1996?

22:17:10 1     A.  Is it our view today?
22:17:17 2     Q.  Yes, sir.
22:17:18 3     A.  I would say no.  It's not our view
22:17:22 4  today.  It was our view on that day.
22:17:30 5     Q.  Did Novell receive any feedback from
22:17:33 6  third parties such as the press or analysts as
22:17:38 7  to what these statements in this press release
22:17:44 8  meant with respect to the issue of copyright
22:17:47 9  ownership?
22:17:48 10     A.  I can't recall that we did.
22:17:55 11     Q.  As you look at this press release
22:17:59 12 today, in Novell's view, does it clearly
22:18:09 13 convey Novell's position that Amendment No. 2
22:18:12 14 did not affect the transfer of the UNIX
22:18:15 15 copyrights?
22:18:20 16         MR. BRAKEBILL:  Form.
22:18:21 17     A.  No.  We could have been clearer, but
22:18:26 18 under the circumstances that we were operating
22:18:29 19 at the time, which relate to matters that we
22:18:36 20 talked about in my deposition in February,
22:18:38 21 pretty much the business exigencies that
22:18:42 22 existed at the time, when we felt that we
22:18:44 23 needed to get a statement out in fairly short
22:18:47 24 order, the morning of June the 6th, because

22:18:50 1  Mr. McBride had advised us that he was holding
22:18:53 2  a press conference at eleven o'clock that
22:18:55 3  morning, and we had just received the executed
22:18:57 4  copy of Amendment No. 2, I think it was the
22:19:01 5  preceding evening.  Under the circumstances,
22:19:04 6  this was the statement that we put out, for
22:19:07 7  all of the reasons that we have talked about
22:19:08 8  before.
22:19:12 9         My recollection is that when we put
22:19:14 10 this statement out, we hadn't yet had the
22:19:17 11 opportunity to consult with counsel about the
22:19:20 12 meaning of Amendment No. 2; and, so, as I
22:19:25 13 said, under the circumstances, we included the
22:19:28 14 word "appears" intentionally as a qualifier in
22:19:32 15 this sentence; and as you know, we took it
22:19:36 16 upon ourselves to provide clarity to our
22:19:40 17 position in subsequent letters with SCO.
22:19:46 18     Q.  Let me mark or hand you Amendment
22:19:50 19 No. 2, so we can be working off that the same
22:19:53 20 language.
22:20:01 21         I am handing you, Mr. LaSala,
22:20:03 22 Amendment No. 2, which has been marked as
22:20:05 23 Exhibit 1009, and taking what I understand to
22:20:13 24 be your testimony, as of June 6th, 2003, what

22:20:22 1  about Amendment No. 2, in Novell's view, gave
22:20:27 2  the appearance that it supported SCO's claim
22:20:32 3  that ownership of certain copyrights for UNIX
22:20:35 4  had transferred to SCO in 1996?
22:20:37 5      MR. BRAKEBILL:  Just before you
22:20:39 6  answer that, I just want to go on the record
22:20:41 7  here to say that at least in part Novell's
22:20:44 8  view is informed by the testimony of Greg
22:20:46 9  Jones from last week.
22:20:48 10     MR. NORMAND:  Okay.  Okay.
22:20:55 11     MR. BRAKEBILL:  Mr. LaSala can
22:20:55 12  supplement that, to extent he is asked --
22:20:55 13     Q. For this question --
22:20:57 14     MR. BRAKEBILL:  -- in terms of
22:20:58 15  2003.
22:20:59 16     Q. For this question I am asking, for
22:21:02 17  purposes of this specific statement in this
22:21:03 18  press release, if you can recall or if you can
22:21:08 19  articulate Novell's view -- and understanding
22:21:11 20  that you were on the short tame frame that you
22:21:13 21  were talking -- but what about Amendment No. 2
22:21:17 22  gave the appearance of supporting SCO's claims
22:21:20 23  that ownership of certain copyrights for UNIX
22:21:23 24  did transfer to SCO in 1996?

22:21:25 1      A. Yeah, I think it was the --
22:21:26 2      MR. BRAKEBILL:  Form.
22:21:28 3      THE WITNESS:  I beg your pardon?
22:21:30 4      MR. BRAKEBILL:  I said, "form."
22:21:31 5      A. I think it was the exception language
22:21:34 6  that is in Amendment No. 2, the language which
22:21:34 7  reads, "Except for the copyrights and
22:21:34 8  trademarks owned by Novell as of the date of
22:21:40 9  the agreement required for SCO to exercise its
22:21:42 10  rights with respect to the acquisition of UNIX
22:21:43 11  and UnixWare technologies."
22:21:46 12     Q. And how did that language, in Novell's
22:21:48 13  view, give the appearance of supporting SCO's
22:21:51 14  claim?
22:21:51 15     A. Well, it was -- it was new language to
22:21:54 16  the agreement, and it modified language that
22:21:59 17  certainly there was no ambiguity about; and it
22:22:06 18  was our view at the time that a reader of this
22:22:10 19  language, you know -- you know, might be able
22:22:22 20  to conclude that SCO's claim of ownership did
22:22:27 21  transfer, that SCO's claim of ownership was
22:22:31 22  supported by this language.
22:22:33 23     Q. And just for foundation -- I frankly
22:22:37 24  don't recall if we talked about this last time

22:22:38 1  -- the discussions -- I assume there were some
22:22:41 2  discussions within the Novell prior to this
22:22:44 3  press release.  Did those involve counsel or
22:22:47 4  business discussions?
22:22:48 5      A. They involved --
22:22:49 6      Q. They involved you, I guess.
22:22:51 7      A. Right.  Yes.  So they involved me, and
22:22:52 8  they did involve discussions with business
22:22:57 9  people that are probably privileged.
22:23:00 10     So I guess since they involved me,
22:23:03 11  they involved counsel.  They did not involve
22:23:07 12  communications with our outside counsel for
22:23:11 13  the reasons that we have stated.
22:23:12 14     Q. So to the extent that you were involved
22:23:14 15  in any discussions about the release of this
22:23:18 16  press release on June 6th, 2003 --
22:23:18 17     A. Yeah.
22:23:22 18     Q. -- you were giving legal advice, that's
22:23:24 19  Novell's position?
22:23:25 20     A. Yes.
22:23:26 21     Q. Okay.  Was there any aspect of these
22:23:32 22  discussions within Novell after receipt of the
22:23:35 23  signed version of Amendment No. 2 and before
22:23:37 24  this press release was issued in which you

22:23:41 1  regarded yourself as operating only in a
22:23:43 2  business advisory role?
22:23:45 3      A. No.
22:23:47 4      Q. When did Novell's view of the
22:24:16 5  significance, or not, of this language in
22:24:19 6  Amendment No. 2, change at all from the view
22:24:22 7  it had formulated prior to the issuance of
22:24:26 8  this June 6th press release?  And I think we
22:24:31 9  are going to start to thread on maybe --
22:24:34 10     A. Yeah.
22:24:35 11     Q. I just asked about timing.
22:24:37 12     A. I don't think --
22:24:39 13     MR. NORMAND:  Well there is a
22:24:40 14  foundation question in there.
22:24:41 15     Q. I thought you had said Novell's view --
22:24:45 16  maybe you didn't use the word "evolved" -- but
22:24:47 17  Novell's view evolved or changed --
22:24:47 18     A. Yeah.
22:24:49 19     Q. -- is that true, at some point?
22:24:50 20     A. Actually, I don't think it did change.
22:24:52 21     I think our view has been consistent
22:24:54 22  throughout that Amendment No. 2 did not affect
22:24:58 23  the transfer of copyrights to SCO.
22:24:59 24     Q. I should be clear.  Has Novell's view

Page 170

15:29:04 1    A. I think that's correct.
15:29:06 2    Q. Okay.
15:29:09 3    A. Yes.
15:29:10 4    Q. We had referred earlier to the
15:29:14 5  Supplemental Topic No. 3, the internal
15:29:16 6  projections or accountings.
15:29:18 7    A. Yes.
15:29:18 8    Q. And that was the one, where, as I
15:29:21 9  recall, you said that you could find no record
15:29:26 10 of any such projections or accountings.
15:29:29 11   A. Yes.
15:29:30 12   Q. Is that your recollection?
15:29:31 13   A. It is.
15:29:32 14   Q. Okay. And --
15:29:36 15        MR. BRAKEBILL: "You" meaning
15:29:38 16 Novell?
15:29:39 17   Q. "You" meaning Novell?
15:29:40 18   A. Correct.
15:29:41 19   Q. Can I ask you what you did to undertake
15:29:44 20 if there were any such projections or
15:29:46 21 accountings?
15:29:46 22   A. It wasn't me, but the company, as I
15:29:53 23 understand it, made an inquiry of individuals
15:29:56 24 in our finance organization who would be aware

Page 171

15:30:01 1  of those -- of records of that sort, had they
15:30:06 2  existed, and one of them was the current
15:30:08 3  controller of the company, and another was the
15:30:12 4  former controller of the company, who is now
15:30:14 5  the CFO of the company.
15:30:16 6        And so I guess I would have a high
15:30:19 7  level of confidence in what they told me about
15:30:24 8  that -- told us about that, which was there
15:30:26 9  were no such accountings or projections.
15:30:30 10   Q. Did it surprise you that they couldn't
15:30:32 11 find any record of such accountings or
15:30:34 12 projections?
15:30:35 13   A. When I heard that was the case, it
15:30:38 14 doesn't particularly surprise me.
15:30:40 15   Q. Wouldn't you expect that there would be
15:30:42 16 some such projections or accountings given the
15:30:47 17 potential value of the royalty stream?
15:30:50 18        MR. BRAKEBILL: Objection. Scope.
15:30:51 19 If you have a personal view on it.
15:30:53 20        THE WITNESS: I beg your pardon?
15:30:54 21        MR. BRAKEBILL: If you have a
15:30:56 22 personal view on that.
15:30:56 23        A. Yeah, I guess I have a personal view on
15:30:58 24 it, which is not representative of the

Page 172

15:31:00 1  company's view, and that is, you know, not
15:31:02 2  necessarily.
15:31:03 3        I mean, certainly the revenue
15:31:07 4  associated with these licenses was significant
15:31:12 5  and was recorded every quarter; and my sense
15:31:18 6  is that it wasn't viewed as, you know, a
15:31:22 7  revenue stream that was being -- was to be --
15:31:25 8  was to be managed like the revenue streams in
15:31:28 9  other parts of the business, that were
15:31:31 10 associated with, you know, Novell software
15:31:35 11 licenses or subscriptions.
15:31:38 12        So I guess I'm not terribly
15:31:42 13 surprised it.
15:31:44 14   Q. The people you spoke with were people
15:31:48 15 who have been with Novell since 1996, some of
15:31:50 16 them, at least?
15:31:51 17   A. One of them, at least. Mr. Russell has
15:31:54 18 been with Novell since probably before that.
15:31:58 19        The other one I am referring to is a
15:32:00 20 gentleman named Chris Anderson, and he has not
15:32:03 21 been with Novell since then.
15:32:12 22   Q. We spoke earlier about the reference in
15:32:21 23 the June 6th, 2003 press release to Amendment
15:32:29 24 No. 2.

Page 173

15:32:29 1    A. Yes.
15:32:30 2    Q. And I think we did mark Amendment
15:32:33 3  No. 2.
15:32:34 4        MR. BRAKEBILL: Well, we used it.
15:32:36 5    Q. Or we used it.
15:33:01 6    A. Should I get the press release out?
15:33:03 7    Q. No. It would be Amendment No. 2 that I
15:33:05 8  would ask you about.
15:33:06 9    A. Okay.
15:33:07 10   Q. Last sentence of Paragraph A of
15:33:12 11 Amendment No. 2 says, "However, in no event
15:33:14 12 shall Novell be liable to SCO for any claims
15:33:17 13 brought by any third party pertaining to said
15:33:20 14 copyrights and trademarks."
15:33:22 15        Do you see that language?
15:33:23 16   A. I do.
15:33:23 17   Q. Do you recall whether Novell took
15:33:25 18 account of that language in making the
15:33:28 19 statements it did in its June 6th, 2003 press
15:33:31 20 release?
15:33:32 21   A. Well, we took account of the entire
15:33:37 22 Amendment No. 2 in making the statements that
15:33:39 23 we did.
15:33:40 24   Q. Do you recall, or do you know whether

093e1ec1-7c4e-42c7-847f-6b865b84be67

Page 174

15:33:43 1  Novell reached any particular conclusions with
15:33:46 2  respect to that last sentence of Paragraph A
15:33:49 3  of Amendment No. 2?
15:33:51 4      A. I don't recall that we did.
15:33:55 5      Q. In Novell's view does that last
15:33:57 6  sentence of Paragraph A of Amendment No. 2
15:34:00 7  support SCO's claim that there was a transfer
15:34:02 8  of the UNIX and UnixWare copyrights?
15:34:05 9      MR. BRAKEBILL: I object as outside
15:34:08 10 the scope, to the extent you are asking his
15:34:10 11 view or Novell's view of this provision
15:34:12 12 because Greg Jones was that witness.
15:34:14 13     MR. NORMAND: Let me just ask you
15:34:15 14 that -- this is something that was prepared
15:34:17 15 for me -- but was Topic No. 2 one of the
15:34:19 16 topics that was broken down between Greg
15:34:22 17 and --
15:34:23 18     MR. BRAKEBILL: It was, and I was
15:34:24 19 going to -- after you were done, that was one
15:34:27 20 I had left on my list as not having been
15:34:30 21 addressed, at least.
15:34:32 22     It actually was addressed in part,
15:34:35 23 but you didn't you say "Hey Topic 2," but Greg
15:34:39 24 addressed pre-2003 and Mr. LaSala would

Page 175

15:34:42 1  address Topic 2 to the extent it is 2003.
15:34:50 2      MR. NORMAND: That's where I guess
15:34:51 3  I -- so he could give me Novell's views on
15:34:56 4  these documents as of January 1st, 2003?
15:35:01 5      I don't understand how the time
15:35:02 6  restriction pertains to this one.
15:35:04 7      MR. BRAKEBILL: What he is here to
15:35:06 8  testify to the Novell 2003 internal
15:35:09 9  communications.
15:35:10 10     Greg Jones was Novell's witness for
15:35:12 11 all of the pre-2003 internal communications
15:35:15 12 and Novell's rights and obligations relating
15:35:17 13 to the APA.
15:35:23 14     MR. NORMAND: Okay.
15:35:27 15     Q. Okay. Do you recall whether there were
15:35:30 16 any internal communications at Novell
15:35:33 17 regarding this last sentence of Paragraph A of
15:35:38 18 Amendment No. 2 that are not privileged?
15:35:41 19     A. None that are not privileged, that I
15:35:45 20 recall.
15:35:50 21     Q. Let me show you, Mr. LaSala, what was
15:36:51 22 marked as Exhibit 1093, previously.
15:36:54 23     Exhibit 1093 is a letter dated
15:37:01 24 January 22, 1996, from Mike DeFazio to Robert

Page 176

15:37:07 1  Kurger of Microsoft, and in the first
15:37:10 2  paragraph Mr. DeFazio says, "As you may know,
15:37:13 3  Novell transferred to the Santa Cruz
15:37:17 4  Operations Inc., its existing ownership
15:37:20 5  interest in UNIX system-based offerings and
15:37:23 6  related products (collectively transferred
15:37:23 7  products)."
15:37:25 8      Do you see that language?
15:37:26 9      A. I do.
15:37:28 10     Q. Were there any internal communications
15:37:30 11 at Novell beginning in 2003 in which anyone
15:37:35 12 expressed the view that Novell had transferred
15:37:39 13 its existing ownership interests in UNIX-
15:37:42 14 system-based offerings to Santa Cruz in 1995,
15:37:50 15 or words to that effect?
15:37:52 16     A. Well, I would say if there were, the
15:37:58 17 ones that I'm aware of would be privileged
15:37:59 18 communications.
15:38:02 19     Q. So there were no nonprivileged
15:38:05 20 communications in which you can recall anyone
15:38:07 21 offering the view in an internal discussion at
15:38:10 22 Novell that Novell had transferred its
15:38:13 23 ownership interest in UNIX offerings or
15:38:16 24 UnixWare offerings under the APA?

Page 177

15:38:18 1      A. That's correct.
15:38:30 2      MR. BRAKEBILL: Are you still on
15:38:31 3  Topic 2? I have a chart.
15:38:32 4      MR. NORMAND: I should have done
15:38:34 5  that. Let's take a look at that.
15:38:35 6      MR. BRAKEBILL: You've already
15:38:36 7  addressed part of it. Just to be complete.
15:38:43 8      (Document tendered.)
15:38:43 9      EXHIBIT NO. 1114 MARKED
15:38:44 10     Q. So we have marked as Exhibit 1114 a
15:38:57 11 one-page document entitled "SCO's 30(b)(6)
15:39:02 12 Topic No. 2, with a paren (See also Topics
15:39:02 13 7,8, 24, S2)."
15:39:15 14     The middle entries says "Amendment
15:39:18 15 No. 2," and the first bullet point, "By
15:39:20 16 sometime in May 2003, Novell became aware of
15:39:23 17 the possibility of an Amendment No. 2."
15:39:27 18     Do you see that, Mr. LaSala?
15:39:29 19     A. I do.
15:39:29 20     Q. Can you identify with any more
15:39:33 21 specificity the date on which Novell became
15:39:35 22 aware of the possibility of an Amendment
15:39:37 23 No. 2?
15:39:37 24     A. No, I can't.

093e1ec1-7c4e-42c7-847f-6b865b84be67

# EXHIBIT 25

Snell & Wilmer L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah  84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

Cravath Swaine & Moore LLP
Evan R. Chesler (Admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 8th Avenue
New York, NY  10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim – Plaintiff*
*International Business Machines, Corporation.*

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **DECLARATION OF GREG JONES ON BEHALF OF NOVELL, INC.**<br><br>Civil No. 2-03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

Ex. 1006

I, Greg Jones, declare as follows:

1.      I am Associate General Counsel at Novell, Inc. ("Novell"). I have been employed as counsel in the Legal Department of Novell since 1992.

2.      This declaration is submitted in connection with the lawsuit filed by the SCO Group, Inc. ("SCO"), against International Business Machines, Corporation ("IBM"), Caldera Systems, Inc. v. International Business Machines, Corporation, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003).

3.      This declaration is based on Novell's knowledge and understanding of the matters described herein. I am authorized to submit this Declaration on behalf of Novell.

### Novell's Retention of UNIX Assets

4.      In 1995, Novell and a company called Santa Cruz Operation, Inc. ("Santa Cruz") entered into negotiations over the sale of certain business assets of Novell relating to its UNIX and UnixWare software business.

5.      On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement ("APA"). The APA provided each party with certain rights and obligations.

6.      The parties entered into two Amendments to the APA. On December 6, 1995, Novell and Santa Cruz executed "Amendment No. 1." Novell and Santa Cruz subsequently executed "Amendment No. 2" on October 16, 1996.

7.      Under the APA and its Amendments, Santa Cruz obtained a variety of assets, including assignment of tens of thousands of contracts and licenses, various trademarks, source code and binaries to UnixWare products, and physical assets such as furniture and personal computers. Santa Cruz also obtained the right to develop a "Merged Product," a derivative work that would run on Intel platforms.

8.      Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell for these acquired assets and rights. In order to bridge the price gap and consummate the transaction, Novell and Santa Cruz agreed that Novell would receive Santa Cruz

1

stock and retain certain rights as protection. For example, Novell retained the right to receive royalty payments under SVRX licenses, prior approval rights relating to new SVRX licenses and amended SVRX licenses, the right to direct Santa Cruz to take certain actions relating to SVRX licenses and the right to conduct audits of the SVRX license program.

     9.    Santa Cruz assumed several related obligations. One such obligation that Santa Cruz assumed under the APA was responsibility for administering the collection of royalty payments from SVRX Licenses. "SVRX Licenses" are defined by the APA to include "[a]ll contracts relating to" the various UNIX System releases and auxiliary products enumerated at Schedule 1.1(a)(VI) and Attachment A to Amendment No. 1. The APA provided that Santa Cruz shall collect and pass through to Novell 100% of all "SVRX Royalties" -- a term defined in the APA as "all royalties, fees and other amounts due under all SVRX Licenses." In return, Novell agreed to pay Santa Cruz an administrative fee of 5% of those royalty amounts. Under the APA, Santa Cruz also agreed to pay additional royalties to Novell relating to other products.

     10.    The APA transferred certain assets from Novell to Santa Cruz. However, as specified by Section V.A of Schedule 1.1(b) to the APA, certain assets were excluded from the transfer. Among the "Excluded Assets" from the APA asset transfer were "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare," "all patents," and "all right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof." The APA as executed on September 19, 1995, therefore, did not transfer any copyrights.

     11.    Novell also retained rights to supervise Santa Cruz's administration of SVRX licenses. For example, under Section 4.16(b) of the APA, Novell retained the "sole discretion" to direct Santa Cruz to amend, supplement, modify, waive or assign any rights under or to any SVRX Licenses; if Santa Cruz fails to take any such action, the APA specifically granted Novell the right to take these actions on behalf of Santa Cruz. Novell also retained the right to veto Santa Cruz's attempts to amend SVRX Licenses, subject to two exceptions laid out in Amendment No. 1 to the APA (where the amendment (i) "may be incidentally involved through its rights to sell and license UnixWare software or the Merged Product ... or future versions of

2

the Merged Product, or (ii) to allow a licensee under a particular SVRX License to use the source code of the relevant SVRX product(s) on additional CPU's or to receive an additional distribution, from [SCO], of such source code"). Novell also retained the right to veto Santa Cruz's attempts to enter into new SVRX Licenses, subject to one exception (as specified in (i) above or as otherwise approved in writing in advance by Novell on a case by case basis).

     12.    The APA gave Novell the right to confirm Santa Cruz's compliance with its contractual obligations under the SVRX licensing program. The APA explicitly provided that Novell "shall be entitled to conduct periodic audits" of Santa Cruz "concerning all royalties and payments due to Seller hereunder or under the SVRX Licenses." The APA required Santa Cruz to "diligently seek to collect all such royalties, funds and other amounts when due" and to "investigate and perform appropriate auditing and enforcement." The APA also required Santa Cruz to provide Novell monthly reports detailing the SVRX royalties it received.

SCO's Attempts to Acquire the UNIX Copyrights

     13.    In late 2002, SCO repeatedly contacted Novell. SCO requested access to or copies of any records concerning rights to UNIX, including any agreements between Novell and Santa Cruz. SCO also expressed its interest in a campaign to assert UNIX infringement claims against users of Linux. SCO asked Novell to partner with SCO in a Linux licensing program, under which SCO contemplated extracting a license fee from Linux end users to use the UNIX intellectual property purportedly contained in Linux. Novell refused to participate.

     14.    SCO further requested that Novell transfer its UNIX copyrights to SCO, thereby acknowledging that it did not own the UNIX copyrights. SCO contacted Novell on multiple occasions in late 2002 and early 2003. For example, SCO's CEO, Darl McBride, repeatedly contacted Novell and asked Novell to amend the Novell-Santa Cruz agreement to give SCO the UNIX copyrights. Novell rejected all of these requests.

3

15.     Notwithstanding Novell's rejections, SCO embarked on a campaign in which it falsely asserted ownership over the same copyrights via public statements, a series of letters to Linux end users, several lawsuits against Linux distributors and end users, and a licensing program purporting to offer SCO's Intellectual Property Licenses for Linux.  SCO has falsely claimed that Novell acquiesced to SCO's claims.  Novell has not acquiesced to SCO's claims.

16.     To the contrary, Novell vigorously contested SCO's claims in private correspondence with SCO at the very same time SCO was publicly claiming otherwise.  For example:

a.      On May 12, 2003, SCO's CEO, Darl McBride, sent Novell a letter asserting that it owned the UNIX copyrights and that Linux end users were infringing those copyrights.

b.      On May 28, 2003, Novell's CEO, Jack Messman, responded by letter, asserting in no uncertain terms that "SCO is not the owner of the UNIX copyrights."

c.      After SCO registered its claim to the UNIX copyrights with the U.S. Copyright Office, Novell's General Counsel, Joseph LaSala wrote to SCO, again disputing its claim to ownership of the copyrights.  In his August 4, 2003, letter, Mr. LaSala stated, "We dispute SCO's claim to ownership of these copyrights."

17.     In September and October 2003, Novell attempted to protect its ownership of the UNIX copyrights and to correct SCO's erroneous registrations claiming ownership, by filing its own copyright registrations.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this 4 day of September, 2006 in Provo, Utah.

Greg Jones

4

# EXHIBIT 26

Page 1

```
1                IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF UTAH
3
4   THE SCO GROUP, INC.,          :   Case No. 2:04CV00139
                                  :
5           Plaintiff,            :   Videotaped Deposition of:
                                  :
6   vs.                           :   GREGORY JONES
                                  :
7   NOVELL, INC.,                 :
                                  :
8           Defendant.            :
                                  :
9
10
11
12
                      January 26, 2007 - 9:35 a.m.
13
14                Location:  Hatch, James & Dodge
                    10 West Broadway, Suite 400
15                  Salt Lake City, Utah  84111
16
                Reporter:  Teri Hansen Cronenwett
17      Certified Realtime Reporter, Registered Merit Reporter
                Notary Public in and for the State of Utah
18
19
20
21
22
23
24
25
```

1  and --
2      Q.  Okay.  Well, let's just stick with the definition
3  we have been using then, so then -- in the interest of time.
4  So again, with respect to the example we have been citing
5  that Novell retained certain rights, in order to, quote,
6  bridge the gap and consummate the transaction, you acquired
7  the knowledge of those facts from Novell because Novell is
8  the party that had the knowledge and understanding of that
9  fact.  Is that correct?
10     A.  Yes.  That's -- I am making a declaration of
11 Novell's knowledge.
12     Q.  Good.  So my question with respect to privilege is,
13 if Novell told you that; Novell, your client, told you that,
14 and you have acknowledged that Novell has told you that and
15 this reflects Novell's having told you that, and there is no
16 privilege that applies to Novell's having told you that, why
17 is there a privilege that applies when someone at Novell gave
18 you that information?  And that's for Ken and you.
19         MR. BRAKEBILL:  Objection, privileged.  To the
20 extent that the basis of your assertions here derive from
21 attorney-client communications, those are privileged, and
22 those should be excluded from your answer.  To the extent
23 that the basis of the different paragraphs in your
24 declaration derive from something other than communications
25 of the attorney-client nature or through the work product

1  doctrine as well, you can answer those questions.
2      A.  So the information in here I either obtained from
3  counsel for Novell or I obtained in the process of doing
4  legal counsel for Novell.  So to the extent I have knowledge
5  of those things, that's where it comes from.
6          MR. GONZALEZ:  And so your instructions for him are
7  what, Ken, based on that statement?
8          MR. BRAKEBILL:  Well, I think he -- to the extent
9  that's true, I instruct you not to answer.
10         THE WITNESS:  Yeah.  There's nothing remaining.
11         MR. GONZALEZ:  Okay.  Thank you.
12         MR. BRAKEBILL:  However, I think there are areas
13 where you have said, just to kind of speed this along, that
14 you do have personal knowledge of, and the information was
15 derived from you.
16         THE WITNESS:  Right.
17         MR. BRAKEBILL:  And again, just in the interests of
18 expedition, I think you can get to those.
19         MR. GONZALEZ:  Yeah, and I will get to those.
20     Q.  (By Mr. Gonzalez)  I'm interested right now in this
21 question of, you know, to what extent and now how did you get
22 the information from Novell, and I think you have answered
23 that now.  Thank you.
24         So turning to page 3 of your declaration under the
25 subsection, the second subsection, let me just ask you

1  generally and see maybe if we can avoid getting into every
2  little part of every sentence.  I take it from your
3  declaration that starting in late 2002 you had the
4  opportunity or -- to communicate with SCO about several
5  topics, including the ownership of Unix copyrights?
6          MR. BRAKEBILL:  Mischaracterizes testimony.  You
7  can answer.
8      A.  Let me see.
9      Q.  (By Mr. Gonzalez)  Does that --
10     A.  Well --
11     Q.  Let me just save us time.  Did you have any
12 communications with SCO in late 2002?
13     A.  Yes.
14     Q.  Okay.  Did some of those communications involve the
15 transfer -- not the transfer.  Strike that.  Did any of those
16 communications involve the ownership of Unix copyrights?
17     A.  I believe so.
18     Q.  Okay.  And how many communications would you say
19 you have had with SCO about that topic?
20         MR. BRAKEBILL:  Vague and ambiguous.
21     Q.  (By Mr. Gonzalez)  About the topic of the ownership
22 of Unix copyrights.
23         MR. BRAKEBILL:  Just your original question said
24 late 2002.  I don't know if you intentionally meant forever.
25         MR. GONZALEZ:  Yeah, forever.

1      A.  Forever.
2          MR. BRAKEBILL:  Vague and ambiguous.
3      A.  So communication being a conversation, any form of
4  communication?
5      Q.  (By Mr. Gonzalez)  Yeah, with SCO.  You can give me
6  a rough number.  Are we in single digits?
7      A.  It's --
8      Q.  A range.
9      A.  It's hard.  I mean, anywhere from total maybe --
10 myself or just myself?
11     Q.  Just, I am interested in your personal knowledge
12 because that's what you have told me here.  It's based on
13 your personal knowledge.
14     A.  Probably --
15         MR. BRAKEBILL:  Just clarify.  He said personal
16 knowledge, which might be different from --
17         MR. GONZALEZ:  Yeah.
18         MR. BRAKEBILL:  -- Whether it was just you.
19         MR. GONZALEZ:  I want to clarify that.  Yeah.
20     A.  Anywhere from six to ten.
21     Q.  (By Mr. Gonzalez)  Okay.  So let me ask you a
22 little bit more about personal knowledge here because we have
23 to clarify that, you know, with respect to the first part of
24 the declaration.  When you told me that paragraphs 13 through
25 17 were based on your personal knowledge, do you mean that

1    A.   Yes.

2    Q.   What was it?

3    A.   Well, that Darl pointed out to me that the asset

4  purchase agreement excluded copyrights from being transferred

5  and told me that he thought that was a clerical error.

6    Q.   Uh-huh.

7    A.   And that's one where I know the phraseology that he

8  used, and basically he was asking for us to change that.  I

9  can't remember the specific language that he used in the

10  requests or that Chris used in his request, but I definitely

11  went away from every exchange just saying, we have an

12  agreement that expressly excludes copyrights.  They want

13  that -- they don't want that to be the case.

14    Q.   Uh-huh.

15    A.   And the only way that can be achieved is for that

16  to be changed, the agreement to be changed.

17    Q.   So I want to understand a little bit better.  They

18  told you that they saw this clerical error in the agreement.

19  Is that correct?

20    A.   Darl.

21    Q.   Darl told you?

22    A.   Darl pointed that out.

23    Q.   Did Mr. McBride at any point tell you that he

24  believed that because of that clerical error Novell and Santa

25  Cruz did not intend for the copyrights to be transferred to

1  Santa Cruz?

2    A.   Yeah.  I think he -- he expressed his belief that

3  they should have been transferred.

4    Q.   I'm not asking about whether they were or were not

5  transferred.  That would be a legal question, you know,

6  whether the document succeeded in transferring.  I'm asking

7  you whether he ever told you that Novell and Santa Cruz did

8  not mean -- did not intend for the APA to transfer the sacra

9  -- I'm sorry, the --

10    A.   I can't recall the --

11    Q.   Let me finish the question, I'm sorry.

12    A.   Yeah.

13    Q.   To transfer the copyrights.  Did he ever tell you

14  that?

15    A.   Well, I think that's -- when he calls it a clerical

16  error, I think that's what he's telling me.  And I can't

17  recall the specific language that he was using, but you know,

18  to me when he says there's an error in the agreement, he's

19  making -- he's saying that that must -- that can't be what

20  was intended.

21    Q.   Okay.  So --

22    A.   So --

23    Q.   Okay.  Great.  So then okay.  So is it fair to say

24  that he was seeking some way to correct that clerical error?

25    A.   Yes.

1    Q.   Okay.  Well, why didn't you say that in your

2  declaration?

3        MR. BRAKEBILL:  Argumentative.

4    A.   Yeah.  Also, I think I prepared this declaration in

5  consultation with counsel.

6    Q.   (By Mr. Gonzalez)  Okay.  Great.  I understand.

7  Thank you.  In the discussion we have had about this clerical

8  error, did that lead to any discussion of a document that

9  might correct that error or clarify the APA so that, you

10  know, the intent of the parties to the APA would be clearly

11  reflected therein?

12    A.   Yeah.  Eventually.  We had -- initially Darl had

13  made and his assistant had made repeated requests for Novell

14  to give them access to documents and things of that nature

15  that he wanted to -- that related to Unix that he wanted to

16  research, and we didn't agree to that.  He kept pressing and

17  pressing and being persistent, and Chris was being dutifully

18  persistent, I think, too.

19        And I -- and so at some point I just told them --

20  and but the request was turned down.  So ultimately I said,

21  look, I can't -- I can't give you access to documents.  If

22  you have a specific request to change something, you know, if

23  you want to give me a document, I'll look at it.

24    Q.   They were asking you to search for what kinds of

25  documents?

1    A.   They were vague.

2    Q.   Okay.

3    A.   But it was basically documents just relating to

4  Unix, SCO's rights with respect to Unix.  Joanie Bingham,

5  Darl's assistant said, you know, she wasn't sure what Darl

6  was after.  It was for IP tracking.  Darl had told us that --

7  in -- on October 10th he told me in a phone call that SCO was

8  starting to look into the possibilities of Linux end users

9  using Unix code, and they were interested in understanding

10  that better, understanding their rights better.  And so you

11  know, in that context they were asking for documents.

12    Q.   So in the context of seeking a better understanding

13  of their rights, did you associate that with that clerical

14  error that you were talking about that they wanted to

15  clarify, you know, what that error meant and what maybe

16  should have been there in lieu of the error?

17    A.   Not initially.  Initially I didn't know.  You know,

18  they were just these general requests for documents, and then

19  when we weren't providing the documents, then at some point

20  the conversation shifted to, look, the asset purchase

21  agreement says this, and you know, it's a clerical error

22  and --

23    Q.   Okay.  Did you have a view at the time as to

24  whether -- strike that.  What was your response to

25  Mr. McBride's or Mr. Sontag's request for these additional

47 (Pages 182 to 185)