# EXHIBIT 27

Dockets.Justia.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

- - - - - - - - - - - - - - -

THE SCO GROUP, INC.,          :

a Delaware corporation,       :

        Plaintiff,           :

VS.                           :   CIVIL NO.

NOVELL, INC.,                 :   2:04CV00139

a Delaware corporation,       :

        Defendant.           :

- - - - - - - - - - - - - - -


  VIDEOTAPED DEPOSITION OF JOSEPH A. LASALA, a

witness called by and on behalf of the

Plaintiff, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Sandra L. Bray, Registered

Diplomate Reporter, CSR Number 103593, and

Notary Public in and for Commonwealth of

Massachusetts, at the offices of Ropes & Gray,

One International Place, Boston, Massachusetts,

on Thursday, February 8, 2007, commencing at

9:23 a.m.

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 38

```
1      acquisition of the UNIX and UnixWare
2      technologies.
3   Q. And I took it from an earlier answer that you
4      have a view that this language in Amendment
5      Number 2 allows for a process by which SCO could
6      obtain certain copyrights. Is that fair to say?
7          MR. BRAKEBILL: Mischaracterizes
8      testimony.
9   Q. Yeah, I didn't even mean to use the words you
10     said. I'm trying to understand --
11  A. Yes, I don't think I used the word "process."
12     So I didn't say that earlier.
13  Q. Well, let me ask you again.
14  A. Okay.
15  Q. Or if you don't want to, I can look at your
16     earlier answer.
17  A. Whatever.
18  Q. Your earlier answer was transcribed as, "It
19     provides for a limited circumstance under which
20     copyrights may be required to be transferred."
21  A. Yes.
22  Q. Do you recall that answer?
23  A. I do.
24  Q. And can you elaborate for me on what you mean by
```

Page 39

```
1      limited circumstance?
2   A. I was -- when I said -- when I made that answer,
3      I was referring to this exception that we've
4      been talking about, and in my opinion, for that
5      exception to apply, SCO would need to
6      demonstrate to Novell that the copyrights were
7      required for SCO to exercise its rights with
8      respect to the acquisition of the UNIX and
9      UnixWare technologies.
10  Q. So is it your view of this Paragraph A of
11     Amendment Number 2 that Novell is not
12     recognizing that any copyrights may be
13     required -- are necessarily required for SCO to
14     exercise its rights with respect to the
15     acquisition of UNIX and UnixWare technologies?
16  A. The existence -- excuse me.
17         MR. BRAKEBILL: Form.
18  A. If I understand your question properly, my
19     answer is the existence of this language in
20     Amendment Number 2 does not result in a transfer
21     of any copyrights.
22  Q. And do you have a view as you sit here as to how
23     Paragraph A of Amendment Number 2 could result
24     in the transfer of copyrights?
```

Page 40

```
1   A. I don't think the operation of the language in
2      the -- in Paragraph A here in itself could
3      result in the transfer of copyrights, if I
4      understood your question properly.
5   Q. Do you have a view as to how under Paragraph A
6      to Amendment Number 2 SCO could have attained
7      any copyrights?
8          MR. BRAKEBILL: Form.
9   Q. It was transcribed as "attained." I meant to
10     say "obtained."
11  A. Yes, I have a view as to how they might have
12     been able to obtain a transfer of copyrights.
13  Q. And what is that view?
14  A. That they would be able to demonstrate that the
15     copyrights that they desired would be required
16     for them to exercise their rights with respect
17     to the acquisition of UNIX and UnixWare
18     technologies.
19  Q. And to whom in your view would SCO have made
20     that demonstration?
21  A. Novell.
22  Q. What if Novell simply disagreed?
23  A. I guess there would not have been a transfer of
24     the copyrights.
```

Page 41

```
1   Q. Do you have a view as to whether Novell would
2      have been required to exercise some good faith
3      in that decision-making?
4          MR. BRAKEBILL: Form.
5   A. Yes, I would think Novell would be required to
6      exercise some good faith.
7   Q. And why do you think that?
8   A. Oh, because of the general duty to operate in
9      good faith.
10  Q. Do you recall whether when you read Amendment
11     Number 2, Paragraph A, signed version for the
12     first time you reached any conclusion as to the
13     significance, if any, on the issue of copyright
14     transfer, the second sentence of Paragraph A,
15     the sentence beginning, "However"?
16  A. No, I don't recall that I focused on the second
17     sentence of Paragraph A. So my focus was more
18     on the first sentence of Paragraph A at that
19     time.
20  Q. Understood. Do you recall focusing at some
21     subsequent point on the significance, if any, of
22     that second sentence in Paragraph A on the issue
23     of copyright transfer?
24  A. I just don't recall.
```

Esquire Deposition Services
1-800-944-9454

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 46

1    Q.  I mean, do you have -- have you formed a view as
2        to whether this is a legal or a technical issue?
3        I mean, is it a legal or a technical question as
4        to what SCO would or would not need in the way
5        of copyrights to exercise its rights with
6        respect to UNIX and UnixWare technologies?
7            MR. BRAKEBILL:  Form, speculation,
8        calls for a legal conclusion.
9    A.  No.
10   Q.  I mean what I'm generally getting at is, what
11       kind of person at Novell in your view of how
12       this language works would make this decision?
13       Who would make this decision as to what
14       copyrights were or were not required to exercise
15       SCO's rights with respect to UNIX and UnixWare?
16           MR. BRAKEBILL:  Form, compound.
17   A.  Well, if such a question were posed to us at
18       Novell, it would involve both business -- a
19       response to that question would involve both
20       business people and lawyers.
21   Q.  And would it involve, in your view, people with
22       expertise in programming or expertise in source
23       code?
24           MR. BRAKEBILL:  Form, speculation.

Page 47

1    A.  I don't know.  I don't know.  I think it's more
2        likely to involve business and legal people.
3    Q.  Do you have an understanding, Mr. LaSala, as to
4        what rights a copyright in source code gives the
5        copyright owner?
6            MR. BRAKEBILL:  Calls for a legal
7        conclusion.
8    Q.  I think that's right.  I basically am asking for
9        a legal conclusion.
10   A.  What rights a copyright in source code gives
11       a --
12   Q.  Gives the copyright owner.
13   A.  Gives the copyright owner.  Yes.
14   Q.  And what is your --
15   A.  The right to use and make copies of the code.
16   Q.  Do you recall considering at any time in the
17       first half of 2003 whether SCO needed to use and
18       make copies of the UNIX and UnixWare source code
19       in order to evolve that business?
20   A.  I have no recollection of that.
21   Q.  And do you have a view as you sit here today as
22       to whether SCO would need to use and make copies
23       of the UNIX and UnixWare source code in order to
24       evolve that business?

Page 48

1    A.  No.
2    Q.  And this is probably a rephrasing of a question
3        I asked earlier, but do you have a view as you
4        sit here today as to whether the APA gives SCO
5        the right to use and make copies of UNIX or
6        UnixWare source code in order to evolve that
7        business?
8    A.  I do have a view.
9    Q.  And what is your view?
10   A.  It does not.
11   Q.  So is it fair to say then that to the extent SCO
12       would have to use and make copies of UNIX and
13       UnixWare source code in order to evolve that
14       business, it would have needed the copyrights to
15       do so?
16   A.  I don't know whether it would have or it
17       wouldn't have.  I don't know.  I don't know
18       enough about the UNIX and UnixWare business to
19       know whether SCO would need the copyrights to
20       evolve that business.
21   Q.  It was sort of a two-part question.  Let me read
22       it back and make sure we're on the same page.  I
23       said, "Is it fair to say then to the extent that
24       SCO would have to use and make copies of UNIX

Page 49

1        and UnixWare source code in order to evolve that
2        business, it would have needed the copyrights to
3        do so?"
4            MR. BRAKEBILL:  Form.
5    A.  I feel like you sort of answered the first part
6        of the question in the second part of the
7        question.
8    Q.  Yeah, and I don't want to come off as kind of
9        unclear.
10   A.  That's what it sounded like to me.
11   Q.  I don't want it to come off as unclear or
12       tricky.  You don't have a view as to whether SCO
13       did have to make copies of UNIX or UnixWare
14       source code in order to evolve their business,
15       correct?
16   A.  Correct.
17   Q.  Now I'm saying what if they did.
18   A.  If they did --
19   Q.  If they did, the APA didn't give them the right
20       to do that; is that also fair to say?
21   A.  In my view, that's correct.
22   Q.  So if they did, because the APA didn't give them
23       the right to do that, they would have needed the
24       copyrights; is that fair to say?

Esquire Deposition Services
1-800-944-9454

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 50

1        MR. BRAKEBILL: Form, argumentative,
2    speculation.
3  A.  I'm sorry.  I don't get that.
4  Q.  Well, it's three parts.  First part is, let's
5    assume in this scenario that SCO did need to
6    make copies of UNIX and UnixWare source code in
7    order to evolve that business.
8  A.  Okay.  That's an assumption.
9  Q.  Correct.
10 A.  Okay.
11 Q.  The second part of the scenario -- and I don't
12   think this is an assumption.  I think your view
13   is the APA does not give SCO the right --
14 A.  Correct.
15 Q.  -- to make copies of UNIX and UnixWare source
16   code.
17 A.  Right.
18 Q.  My point is so it follows if Number 1 is true
19   and given what you've said of Number 2, SCO did
20   need the copyrights if they wanted to make use
21   of and copy UNIX and UnixWare source code to
22   evolve that business?
23       MR. BRAKEBILL: Argumentative, form.
24 A.  If Number 1 is true -- and I don't know that it

Page 51

1    is --
2        MR. BRAKEBILL: Speculation.
3  A.  -- it requires speculation on my part, but I
4    think logically what you're suggesting is right.
5  Q.  But I take it your view is if all those things
6    were satisfied, your interpretation of
7    Paragraph A is the onus was on SCO to come back
8    to Novell and ask for copyrights?  Is that fair
9    to say?
10       MR. BRAKEBILL: Form.
11 A.  Yes, to make a demonstration to us that they
12   needed those copyrights to evolve the business
13   that they acquired from us.
14 Q.  Do you recall whether you considered in the
15   first half of 2003 whether the APA licenses UNIX
16   and UnixWare source code to Santa Cruz?
17 A.  I don't recall that.
18 Q.  As you sit here today, do you have a view as to
19   whether the APA licenses to Santa Cruz the UNIX
20   and UnixWare source code?
21 A.  I think that might involve privilege.  The
22   answer to that question may involve privilege.
23       MR. BRAKEBILL: Are we ready for a
24   break?

Page 52

1        MR. NORMAND: If you'd like one, it's
2    convenient.
3        MR. BRAKEBILL: Great.
4        THE WITNESS: Great.
5        THE VIDEOGRAPHER: The time is 10:25
6    a.m. on February 8, 2007.  This is the end of
7    Tape Number 1 in the videotaped deposition of
8    Mr. Joseph LaSala.
9        (Recess)
10       THE VIDEOGRAPHER: The time is
11   10:38 a.m. on February 8th, 2007.  This is Tape
12   Number 2 of the videotaped deposition of
13   Mr. Joseph LaSala.
14 Q.  Mr. LaSala, before the break -- Mr. LaSala,
15   before the break, I was starting to hand you
16   Exhibit 1022, which has previously been marked
17   as such, letter dated June 26th, 2003, from
18   yourself to Mr. McBride.  Do you recognize the
19   document?
20 A.  I do.
21       MR. NORMAND: Why don't we take a
22   break for a second?  We have a transcription
23   problem.
24       THE VIDEOGRAPHER: Stand by.  The time

Page 53

1    is 10:28 a.m.  We're going off the record.
2        (Recess)
3        THE VIDEOGRAPHER: The time is
4    10:40 a.m.  We're back on the record.
5  Q.  Mr. LaSala, do you recognize Exhibit 1022?
6  A.  Yes, I do.
7  Q.  In the middle paragraph, you make the following
8    statement, quote, "We acknowledge, as noted in
9    our June 6th public statement, that Amendment
10   Number 2 to the Asset Purchase Agreement appears
11   to support a claim that Santa Cruz Operation had
12   the right to acquire some copyrights from
13   Novell.  Upon closer scrutiny, however,
14   Amendment Number 2 raises as many questions
15   about copyright transfers as it answers.
16   Indeed, what is most certainly not the case is
17   that, quote, any question of whether UNIX
18   copyrights were transferred to SCO as part of
19   the Asset Purchase Agreement was clarified in
20   Amendment Number 2," end quote, open parens, "as
21   SCO stated in its June 6th press release," close
22   parens, end quote.  Do you see that language?
23 A.  I do.
24 Q.  What did you mean in your statement that SCO's

Page 62

1    previously marked as Exhibit 1023, which is a
2    letter dated August 4th, 2003, from yourself to
3    Mr. McBride.  Do you recognize the letter?
4  A.  Yes.
5  Q.  The letter states in the beginning, quote, "This
6    is further to my letter of June 26th, 2003
7    concerning ownership of the copyrights in UNIX,
8    and follows your recent announcement that SCO
9    has registered its claim to copyrights in UNIX
10    System V with the U.S. Copyright Office."  Do
11    you see that language?
12  A.  I do.
13  Q.  And you say in the third paragraph, quote, "In
14    other words, under the Asset Purchase Agreement
15    and Amendment Number 2, copyrights were not
16    transferred to Santa Cruz Operation unless SCO
17    could demonstrate that such a right was required
18    for Santa Cruz Operation to exercise the rights
19    granted to it in the APA.  Santa Cruz Operation
20    has never made such a demonstration, and we
21    certainly see no reason why Santa Cruz Operation
22    would have needed ownership of copyrights in
23    UNIX System V in order to exercise the limited
24    rights granted SCO under the APA.  Nor is there

Page 63

1    any reason to think that a transfer of the
2    copyrights required for SCO to exercise its APA
3    rights necessarily entails transfer of the
4    entire set of exclusive rights associated with a
5    particular copyrighted computer program."  Do
6    you see that language?
7  A.  I do.
8  Q.  Why did it take Novell four or five weeks to
9    write further to the June 26th letter regarding
10    its interpretation of Amendment Number 2?
11        MR. BRAKEBILL:  Form.
12  A.  I don't recall.
13  Q.  You say, "We certainly see no reason why Santa
14    Cruz Operation would have needed ownership of
15    copyrights in UNIX System V in order to exercise
16    the limited rights granted SCO under the APA."
17    Do you see that language?
18  A.  Yes.
19  Q.  Why did you see no reason?
20  A.  Well, none had ever been articulated to us, and
21    based upon our understanding of the business
22    that SCO was acquiring -- my understanding of
23    the business that SCO was acquiring, we weren't
24    aware of any reason that SCO would need the

Page 64

1    transfer of the copyrights to exercise its
2    rights.
3  Q.  And what was your understanding of the business
4    that SCO was acquiring?
5  A.  Well, this UNIX and UnixWare business that it
6    was to take and evolve to consolidate the UNIX
7    on Intel business.
8  Q.  Did you have a view as to what steps SCO or
9    Santa Cruz would take to evolve that business?
10  A.  No.
11  Q.  If you didn't have a view as to what steps they
12    would take to evolve the business, how could you
13    have concluded that they didn't need copyrights
14    to do so?
15        MR. BRAKEBILL:  Form, argumentative.
16  A.  I just wasn't aware of any reason that they
17    might need the copyrights.
18  Q.  Wouldn't you need to ask yourself whether they
19    needed to copy and use source code to evolve the
20    business?
21  A.  Well, if they --
22        MR. BRAKEBILL:  Form, argumentative.
23  A.  If they did -- I shouldn't speculate as to what
24    they might or might not have needed.  I guess I

Page 65

1    should say that.
2  Q.  But wasn't --
3  A.  I don't know what they need.
4  Q.  I mean I read this letter to suggest that you're
5    saying you see no reason why they would have
6    needed the right to copy or use UNIX source code
7    to evolve the business.  I'm not claiming to
8    read from this letter.  I'm saying that's what I
9    read this to mean, given your questions and
10    answers.  As of August 4th, you saw no reason
11    why Santa Cruz would have to copy UNIX source
12    code in order to evolve the UNIX business.  Is
13    that fair to say?
14  A.  No.
15        THE WITNESS:  I'm sorry.
16  Q.  What am I getting wrong?
17  A.  I think you said no reason for them to copy it,
18    and what the letter says, I didn't see any
19    reason for them to transfer the copyrights.  The
20    letter says, "No reason to transfer."
21  Q.  We talked earlier about what rights they would
22    have needed in order to copy UNIX source code.
23  A.  They likely had rights to copy the UNIX source
24    code, but they didn't have any right to the

17  (Pages 62 to 65)

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

1    copyrights -- to the ownership of the
2    copyrights.
3    Q.  What was the source of their likely right to
4    copy UNIX source code?
5    A.  My assumption is there's a license for them to
6    use UNIX copyrights, a license, an implied
7    license to use it.
8    Q.  That the APA provides for an implied license?
9    A.  Yes.
10   Q.  Is there particular language you have in mind
11   when you say that the APA has an implied license
12   for Santa Cruz to copy UNIX source code?
13   A.  No.
14   Q.  Your view is that such a license is inherent in
15   the capital B business that they had acquired?
16        MR. BRAKEBILL:  Form, argumentative.
17   A.  Yes.
18   Q.  Between June 26th and August 4th, did you have
19   any discussions with Mr. McBride regarding the
20   issue of copyright ownership at all?
21   A.  Did I personally?
22   Q.  Yeah.
23   A.  I don't recall that I did in that time frame.
24   Q.  I'm handing you, Mr. LaSala, what's been

1    previously marked as Exhibit 1008, which is
2    titled Technology License Agreement, dated
3    December 6th, 1995.  Do you recognize this
4    document, Mr. LaSala?
5    A.  Yes.
6    Q.  And do you recall whether you reviewed this
7    document in connection with your initial review
8    of the APA in early 2003?
9    A.  I don't recall.
10   Q.  Can you recall -- I take it then you can't
11   recall when you first reviewed this document?
12   A.  I don't recall that date.
13   Q.  Do you recall forming a view as to whether the
14   technology license agreement or TLA has any
15   bearing on the issue of copyright transfer under
16   the APA or Amendment Number 2?
17   A.  No, but I'm -- no, not at this moment.
18   Q.  As you sit here today, do you have a view as to
19   the relevance, if any, on the issue of copyright
20   transfer of the TLA?
21   A.  Not at this moment, no.
22   Q.  Do you have a view as to what rights, if any,
23   the TLA gives Novell?
24   A.  Yes.

1    Q.  And what is your view of those rights?
2    A.  Well, it gives Novell rights to license
3    technologies, as that term is defined in the
4    asset purchase agreement, which I understand to
5    be code that SCO was to evolve from their
6    acquisition of the business.
7    Q.  Do you understand the technology license
8    agreement to license to Novell the right to use
9    UNIX and UnixWare source code?
10   A.  Yes.
11   Q.  And why would Novell need such a license if it
12   owned the UNIX and UnixWare copyrights?
13   A.  I think I might have misspoken there.  I recall
14   that this technology license agreement, as I
15   said initially, gives Novell the right to
16   license technology and not to the UNIX and
17   UnixWare copyrights for the reason you state,
18   that we own them.
19   Q.  So to make sure I understand, it's your view
20   that the technology license agreement does not
21   license to Novell the right to use UNIX or
22   UnixWare source code in any Novell product?
23   A.  Correct.
24   Q.  And I think you've used the word

1    "technologies" -- well, to be fair, you said
2    technologies as defined in the APA?
3    A.  I think I said licensed technology as defined in
4    the APA.
5    Q.  I'm sorry.  Licensed technology as defined in
6    the APA.  Do you know where that is defined in
7    the APA?
8    A.  Not exactly, no.
9    Q.  And so to the extent that it's not UNIX or
10   UnixWare, as I've understood your answer, what
11   is the licensed technology?  Do you have an
12   understanding of what that licensed technology is?
13   A.  It would be merged product or a product that SCO
14   was intending to evolve as a result of the
15   acquisition of the business.
16   Q.  But wasn't the merged product going to be based
17   on UNIX and UnixWare source code?
18   A.  I don't know if it was to be based on.
19   Q.  Do you have a view as to what the merged product
20   would be merging?
21   A.  No.  Certainly new technology that SCO was
22   developing and some form of or -- some form of
23   the assets that were being conveyed in the asset
24   purchase agreement.

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

Page 94

1    agreement if it owned the copyrights in UNIX?
2         MR. BRAKEBILL: Form, argumentative,
3    speculation.
4  A.  Well, again, the license back of the assets was
5    to include, as this makes clear, the UNIX and
6    UnixWare products, and as those were to be used
7    as a foundation or part of the code that SCO
8    intended to create in the aftermath of this
9    transaction, Novell, as I understand it, wanted
10   the right to have a license back to all of that
11   technology.
12 Q.  But if Novell owned the UNIX and UnixWare
13   copyrights after the execution of the APA, why
14   would it need to license back the UNIX
15   technology?
16        MR. BRAKEBILL: Form, argumentative,
17   speculation.
18 A.  Yes, it does require speculation on an agreement
19   that I wasn't a party to, but I think the
20   answer, my understanding is that it would
21   become -- for the purposes of clarity, to ensure
22   that there is no doubt that Novell had rights to
23   the UNIX and UnixWare technology in the
24   aftermath of this agreement, looks like the

Page 95

1    parties included this in the license back of
2    assets.
3  Q.  Do you think the technology license agreement is
4    with respect to UNIX superfluous?
5  A.  No.
6  Q.  Do you think it's inconsistent with your view
7    that the copyrights in UNIX were retained by
8    Novell?
9  A.  No.
10 Q.  Do you think it would be reasonable for someone
11   to read the technology license agreement as
12   inconsistent with a reading of the APA that the
13   UNIX copyrights were retained by Novell?
14        MR. BRAKEBILL: Form, calls for
15   speculation.
16 A.  Yes.
17 Q.  I'm handing you, Mr. LaSala, what's previously
18   been marked as Exhibit 1021, which is a letter
19   to Mr. Jack Messman from Mr. McBride, dated
20   May 12th, 2003. Do you recognize the letter?
21 A.  Yes.
22 Q.  And do you recall whether you had occasion to
23   review this letter around the time it was sent?
24 A.  Yes.

Page 96

1  Q.  And do you recall what your reaction was?
2  A.  Not precisely, no.
3  Q.  Did you upon receiving this letter anticipate
4    litigation with SCO?
5  A.  Yes, I thought it was possible, yes.
6  Q.  And did you anticipate any litigation with SCO
7    prior to the time of this letter?
8  A.  Yes, I thought it was possible.
9  Q.  And I may have asked you that before, but can
10   you recall -- I don't think I did actually.
11 A.  I don't think you did either.
12 Q.  When did you first anticipate litigation with
13   SCO?
14 A.  You know, I don't recall precisely, but it was
15   prior to receipt of this letter, and it came in
16   the form of some communications from a lawyer
17   who works for me. So I don't know whether these
18   are privileged communications or not, but --
19        MR. BRAKEBILL: If you want to keep
20   exploring this, I should talk to him quickly.
21        MR. NORMAND: Okay. Why don't you
22   talk to him quickly.
23 Q.  Sorry.
24 A.  That's all right. Not your fault.

Page 97

1         THE VIDEOGRAPHER: The time is
2    11:50 a.m. We're going off the record.
3      (Recess)
4         THE VIDEOGRAPHER: The time is
5    11:51 a.m. We're back on the record.
6  Q.  Mr. LaSala, can you recall what, if anything,
7    prompted you to first consider or to first
8    anticipate that there might be litigation with
9    SCO?
10 A.  Yes.
11 Q.  And what was that?
12 A.  I'd received an e-mail from an attorney in-house
13   at Novell who works for me that referenced a
14   communication that he had had with Mr. McBride,
15   and my recollection of that e-mail is that,
16   among other things, it made reference to
17   statements that Mr. McBride had made about the
18   possibility of SCO pursuing the issue of
19   copyright ownership in court.
20 Q.  And can you recall with any specificity the date
21   of that communication from the in-house
22   attorney?
23 A.  I'm sorry. I can't.
24 Q.  And was that Greg Jones?

Esquire Deposition Services
1-800-944-9454

4a6a3b73-3400-4975-9ba5-7c00b68f1fcb

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

THE SCO GROUP, INC.,           )
                               )  Case No. 2:04CV-00139
        Plaintiff/             )
        Counterclaim Defendant, )  Videotaped Deposition of:
                               )  ROBERT J. FRANKENBERG
NOVELL, INC.,                  )
                               )

        Defendant/            )

        Counterclaim Plaintiff. )

---

February 10, 2007

10:00 a.m.


Fillmore & Spencer

3301 N. University avenue

Provo, UT 84604


Sharon Morgan, CSR, RPR, CRR

Notary Public in and for the State of Utah

Job: 191635

c3a46148-124e-4241-bc2b-dc12eefbc1b7

1  object.  Hopefully less frequently than more, but, in
2  any event, if you understand a question, you should
3  still seek to answer it.  The objections are for the
4  record and before a judge, if necessary, to rule upon
5  at some future time.
6      A.  Uh-huh (affirmative).
7      Q.  Are you represented by counsel here in
8  connection with this deposition?
9      A.  I am, yes.  Bill Fillmore is my attorney.
10     Q.  I would like to begin by asking you to
11  briefly summarize your educational background.
12     A.  I have a bachelor's degree in computer
13  engineering from San Jose State University, and I'm an
14  SEP graduate of the Stanford Graduate School of
15  Business.
16     Q.  Can you briefly summarize your employment
17  background prior to coming to Novell?
18     A.  I was in the U.S. Air Force from 1965 to
19  1969, joined Hewlett-Packard out of the Air Force as a
20  manufacturing technician, and stayed there nearly 25
21  years, just a few months short of 25 years.  And when
22  I left, I was the vice president responsible for
23  Hewlett-Packard's networking in personal computer
24  businesses.
25     Q.  When did you leave Hewlett-Packard?

1      A.  In April of 1994.
2      Q.  Where did you go?
3      A.  To Novell.
4      Q.  And what position did you assume at Novell?
5      A.  I became the CEO and president of Novell and
6  shortly thereafter also became chairman.
7      Q.  What was the date, Mr. Frankenberg, that you
8  assumed the office of chief executive officer of
9  Novell?
10     A.  It would have been in late March of 1994, or
11  early April.  I can't remember.  It was right at the
12  boundary.
13     Q.  Could you briefly describe the different
14  lines, major lines, of Novell's business at that
15  point?
16     A.  Novell's largest single business was NetWare.
17  The second largest business was training people in the
18  use, installation and application of NetWare.  After
19  that we had a number of smaller businesses including
20  UNIX, UnixWare, DR-DOS, and a range of much smaller
21  businesses having to do with document management and
22  so forth.
23     Q.  Can you briefly describe what the NetWare
24  business was?
25     A.  The NetWare business, as I said, was the

1  largest single business.  It provided the ability to
2  connect personal computers to shared resources such as
3  disks and printers and also, through those shared
4  resources, to connect to other networks.
5      Q.  Did there come a --
6      A.  It also provided the capability to write
7  applications on that shared resource and make further
8  use of it.
9      Q.  Did there come a time when you decided, as
10  CEO of the board, to explore divesting certain of the
11  business lines of the company?
12     A.  Excuse me, I misspoke.  At about the same --
13  at about the same time that I joined, Novell had just
14  purchased WordPerfect and the associated products
15  there.  So at the moment I was there it hadn't been
16  completed, but shortly thereafter those were added.  I
17  don't know whether that was the intent of your
18  question or not.
19     Q.  Well, it helps to add that to the picture.
20  WordPerfect, as a lot of people will be familiar with,
21  had a word processing program --
22     A.  Correct.
23     Q.  -- of the same name?
24     A.  Uh-huh (affirmative).
25     Q.  And did there come a time after you became

1  CEO when you decided it would be in the best interest
2  of Novell to sell one or more of these businesses?
3      A.  Yes.
4      Q.  Approximately when did you come to that view?
5      A.  That would have been late in '94 to early in
6  '95.
7      Q.  Can you recall your thinking as to why that
8  would be advantageous?
9      A.  Well, there were several reasons.  One, after
10  a very thorough study, we looked at the range of
11  businesses that we were trying to advance and came to
12  the conclusion that we weren't able to fund
13  appropriately all of those businesses.  And as such,
14  it made sense to get out of some of them or sell them
15  and concentrate our efforts on the ones that we
16  thought would be the most successful or the ones that
17  we thought we could have the greatest success with,
18  having moved the responsibility for some of the others
19  elsewhere.
20     Q.  Were there particular businesses that fell in
21  the category of those that you wanted to sell?
22     A.  Yes.
23     Q.  Which were those?
24     A.  The WordPerfect word processing software, and
25  the associated office product that we called Perfect

c3a46148-124e-4241-bc2b-dc12eefbc1b7

Page 10

1    Office is one of those that we decided to sell.  We
2    decided to sell UNIX and Unixware, which was a
3    combined implementation of UNIX and NetWare Services.
4    We decided to sell Tuxedo, which was a transaction
5    processing capability.  And then we decided to close
6    down several of the smaller businesses that were
7    referred to earlier because we didn't see that we
8    would be able to succeed with them as well as we might
9    if we concentrated our efforts on others.
10       Q.  Did you have a time frame in which you hoped
11   to accomplish these sales?
12       A.  I had hoped that we would be able to get out
13   of those as expeditiously as possible.  Once you
14   decide that you're going to make a change like that,
15   it's best to do well but with dispatch and hoped that
16   we would be able to be out of them by the end of '95.
17       Q.  Was it your interest to sell these businesses
18   in their entirety?
19          MR. JACOBS:  Objection, vague.
20       Q.  (By Mr. Fillmore)  Let me be more specific.
21   With respect to the UNIX and UnixWare business, was it
22   your intent to sell that business in its entirety?
23       A.  Yes.
24       Q.  Did there come a time when you directed
25   certain of the people who worked at Novell to take

Page 11

1    steps to have that sale occur?
2        A.  Yes.
3        Q.  Is there a gentleman who you know and who is
4    here at the deposition by the name of Duff Thompson
5    who worked at Novell?
6        A.  Yes.
7        Q.  What position did Mr. Thompson have in 1995?
8        A.  He was the senior vice president of business
9    development.
10       Q.  Did you ask Mr. Thompson to take any steps to
11   effectuate the sale of the UNIX and UnixWare business?
12       A.  Yes, I did.
13       Q.  What do you recall to be the directions that
14   you gave Mr. Thompson in that regard?
15       A.  Together with several other people, I gave
16   Mr. Thompson the charge to find a company to sell UNIX
17   to that, together with other efforts that we had under
18   way, would result in a unified UNIX on Intel -- on the
19   Intel processor, excuse me.
20       Q.  Was there a gentleman by the name of Ed
21   Chatlos who also worked at Novell at that time?
22       A.  Yes.
23       Q.  Did Mr. Chatlos also become involved in the
24   process of selling the UNIX business?
25       A.  He did, yes.

Page 12

1        Q.  Would it be fair to say that he was the --
2    became the lead negotiator on the transaction
3    reporting to Mr. Thompson?
4        A.  According to Mr. Thompson?
5        Q.  Reporting.
6        A.  Reporting.  I thought you said according.
7        Q.  Reporting.
8        A.  Reporting, yes.
9        Q.  Do you recall who became the buyer of the
10   UNIX system?
11       A.  Yes, the Santa Cruz operation.
12       Q.  Were you familiar with the Santa Cruz
13   operation at the time when you were making these
14   decisions regarding UNIX?
15          MR. JACOBS:  Objection.
16       A.  Yes.
17       Q.  (By Mr. Singer)  Do you recall how contact
18   was made with Santa Cruz regarding potential sale of
19   the business?
20       A.  I don't recall the specific details, but I do
21   recall having conversations with Doug Michael, who was
22   one of the principals there, and several other people.
23   If I remember correctly, it was at one of the industry
24   conferences that I attended regularly concerning the
25   possibility of creating a unified UNIX on Intel and

Page 13

1    the Santa Cruz operation being the team to do that.
2        Q.  Why did you believe Santa Cruz was the team
3    to do that?
4        A.  Well, number one, it -- the Santa Cruz
5    operation had a good reputation in UNIX.  It had
6    opened several products that had been out in the
7    market and had been quite successful.  It was also
8    independent of the warring factions in the industry at
9    the time and could effectively work with both sides,
10   which frankly was one of our challenges.
11          And they were well acquainted with UNIX, had
12   had successful -- as I said, successful products
13   there, but had a deep knowledge of it, as well as good
14   distribution to third parties who wrote applications
15   and provided installation services and other kinds of
16   service.
17       Q.  Mr. Frankenberg, you made a reference to the
18   warring factions in the industry.  Can you identify
19   those factions and what they were about?
20       A.  The two major factions in the industry at the
21   time in this arena were Novell and Microsoft.
22   Microsoft had disagreements with other people in the
23   industry as well, but in this particular arena it was
24   ourselves, Novell and Microsoft.
25       Q.  And was that disagreement centered on your

4 (Pages 10 to 13)

c3a46148-124e-4241-bc2b-dc12eefbc1b7

Page 18

```
 1        Is that, Mr. Frankenberg, an accurate
 2   statement in your understanding of the intent of the
 3   deal?
 4      A.  Yes.
 5      Q.  If we turn now -- now turn to Schedule
 6   1.1(a), which appears after page 49, I would like to
 7   direct your attention to the very first Roman numeral
 8   item on this list of the assets, which you'll recall
 9   as the assets being sold.  It states that "All rights
10   and ownership of UNIX and UnixWare, including but not
11   limited to all versions of UNIX and UnixWare and all
12   copies of UNIX and UnixWare (including revisions and
13   updates in process), and all technical, design,
14   development, installation, operation and maintenance
15   information concerning UNIX and UnixWare, including
16   source codes, source documentation, source listings
17   and annotations, appropriate engineering notebooks,
18   test data and test results, as well as all reference
19   manuals and support materials normally distributed by
20   seller to end users and potential end users in
21   connection with the distribution of UNIX and UnixWare,
22   such assets to include without limitation the
23   following," and it lists a variety of different
24   technologies.  Is that statement consistent with your
25   understanding of the intent of this transaction?
```

Page 19

```
 1      A.  Yes.
 2      Q.  Is it your understanding that that sale of
 3   all rights and ownership of UNIX and UnixWare would
 4   include copyrights associated with UNIX and UnixWare?
 5        MR. JACOBS:  Objection, calls for a legal
 6   conclusion.
 7      A.  I guess I have to answer the question?
 8      Q.  (By Mr. Singer)  Yes, you should if you
 9   understand the question.
10      A.  Okay.  I understand.  Yes.
11      Q.  Now, did you ever give any directions to the
12   team that was negotiating the deal, including
13   Mr. Thompson, Mr. Chatlos, that they should transfer
14   all right and title and interest to UNIX and UnixWare
15   but retain copyrights for UNIX and UnixWare from being
16   sold?
17      A.  No.
18      Q.  Did you ever tell anyone at Santa Cruz
19   Operation that copyrights for UNIX and UnixWare were
20   not part of the technology being sold?
21      A.  No.
22      Q.  Did you ever authorize anyone at Novell to
23   tell anyone at Santa Cruz that copyrights were not
24   being sold as part of the transaction?
25      A.  No.
```

Page 20

```
 1      Q.  Did you ever hear from anyone at Novell that
 2   copyrights were not being sold?
 3      A.  I have some memory of there being a
 4   discussion of whether copyrights would be sold or not.
 5      Q.  And as we've covered it, it was your intent
 6   under this transaction that those copyrights would be
 7   sold?
 8      A.  Yes.
 9      Q.  Now, I would like to briefly look at the
10   other assets which were being sold on Schedule 1.1(a).
11   If you look at III, is it your understanding that all
12   of the seller's rights pertaining to UNIX and UnixWare
13   under any software development contracts, licenses and
14   other contracts to which seller is a party or by which
15   it is bound and which pertain to the business (to the
16   extent that such contracts are assignable), was being
17   sold, including those listed without limitation in the
18   various subparts below that?
19      A.  Yes.
20      Q.  Is it your understanding that to the extent
21   there were contracts involving source code that had
22   been entered into by AT&T and IBM that pertain to UNIX
23   technology, that that was part of all of the seller's
24   rights which were being sold to Santa Cruz in this
25   transaction?
```

Page 21

```
 1      A.  Yes.
 2      Q.  There is a separate schedule that
 3   subsequently was amended by an amendment to the
 4   transaction that we will look at in a few moments --
 5   two amendments to the transaction, one in particular
 6   amended the schedule.  That's Schedule 1.1(b) of
 7   Excluded Assets.
 8        Now, as we begin at the top of that page, you
 9   see the NetWare operating system that any asset not
10   listed on Schedule 1.1(a), including the assets
11   pertaining to NetWare and the NetWare operating system
12   and services.
13        Is it fair to say that you wanted to be clear
14   that NetWare was not being transferred as part of the
15   transaction?
16      A.  Yes.  It was very important that we be clear
17   that it was not part of the transaction.
18      Q.  If you now look at V under Intellectual
19   Properties where it says, as part of the assets not
20   being transferred, "All copyrights and trademarks,
21   except for the trademarks UNIX and UnixWare," would
22   you understand that to be a reference to Novell not
23   transferring its own copyrights and trademarks with
24   respect to NetWare products?
25        MR. JACOBS:  Objection.  The document speaks
```

6 (Pages 18 to 21)

c3a46148-124e-4241-bc2b-dc12eefbc1b7

1  for itself.
2      A.  I think -- well, it says that copyrights
3  aren't transferred, so...
4      Q.  (By Mr. Singer)  Is it your understanding of
5  the intent of the transaction that the copyrights that
6  would be retained would be those pertaining to
7  NetWare?
8      A.  Yes.
9      Q.  And that the copyrights pertaining to UNIX
10  and UnixWare would be transferred?
11      A.  Yes.
12      Q.  I would like to show you a joint -- a press
13  release which was issued after the transaction.
14      A.  Are we through with this?
15      Q.  We're going to be coming back to it, but
16  we're through with it for the moment.
17      A.  I'll leave it partly open, then.
18          MR. GONZALEZ:  This is what was previously
19  marked as 1028.
20      Q.  (By Mr. Singer)  Do you recall,
21  Mr. Frankenberg, under the terms of the asset purchase
22  agreement, Novell and Santa Cruz were to agree upon
23  and issue a joint press release concerning a
24  transaction?
25      A.  Yes.

1      Q.  Take a moment and look at this press release,
2  and my first question to you is whether you recognize
3  this to be the jointly approved press release
4  pertaining to that transaction?
5      A.  Yes, it is.
6      Q.  If you turn to page 2 of the press release,
7  at the top of the page there's a quote attributed to
8  you which says, "SCO's Business Critical Server focus
9  and worldwide distribution channel makes them an ideal
10  partner for taking UNIX application servers forward on
11  the Intel platform.  By focusing on our areas of
12  expertise and working to integrate our technologies,
13  Novell and SCO together will meet the application
14  server needs of customers in a networked world."
15          Is that a direct quote that you made at the
16  time?
17      A.  It is, yes.
18      Q.  Right below that it states that "According to
19  the terms of the agreement, SCO will acquire Novell's
20  UnixWare business and UNIX intellectual property."  Is
21  that also consistent with your understanding of the
22  transaction?
23      A.  Yes.
24      Q.  And is it consistent with your understanding
25  that all right, title and interest, including the

1  copyrights for UNIX and UnixWare were so transferred?
2      A.  Yes.
3      Q.  I would like to show you a Wall Street
4  Journal article that appeared after the transaction,
5  which we'll mark as the next exhibit.
6          MR. GONZALEZ:  This has been previously
7  marked as 1030.
8      Q.  (By Mr. Singer)  Mr. Frankenberg, Exhibit
9  1030 appears to be an excerpt -- or a copy of an
10  article that appeared in The Wall Street Journal on
11  September 20, 1995 under the title "Novell to Cede
12  Control of UNIX To 2 Companies."
13          If you could take a moment to look at this, I
14  have just a couple of questions.
15          Does this summary of the transaction,
16  including specifically the statement on page -- in
17  paragraph two, "The deal includes the purchase by
18  Santa Cruz Operation of most trademarks and
19  intellectual property associated with UNIX software"
20  appear accurate to you?
21      A.  Yes, it does.
22      Q.  I would like to show you a Technology
23  Licensing Agreement that was entered into in December
24  of 1995.
25          MR. GONZALEZ:  This one has been previously

1  marked as 1008.
2      Q.  (By Mr. Singer)  Please take a moment to look
3  at Exhibit 1008.
4      A.  All right.
5      Q.  Do you recognize this to be an agreement
6  called the Technology License Agreement that was
7  entered into between Novell and Santa Cruz Operation
8  on December 6th, 1995?
9      A.  Yes, I do.
10      Q.  And it was signed by Mr. Thompson as senior
11  vice president - corporate development on behalf of
12  Novell; is that correct?
13      A.  Yes.
14      Q.  Do you have an understanding of what the
15  purpose was of the Technology License Agreement?
16      A.  To have a complete license back so that -- of
17  the technologies so that we could make use of them as
18  we saw fit internally and in our product.
19      Q.  Were there certain restrictions, which we'll
20  come back to in a few moments, as to how Novell could
21  use that technology with respect to the sale of
22  products?
23      A.  That would be included in Novell's products,
24  is my recollection.
25      Q.  You see Section II-A(2).  Did you understand

c3a46148-124e-4241-bc2b-dc12eefbc1b7

Page 26

1  that those were limitations on what Novell could do
2  with the technology which was being licensed back?
3      MR. JACOBS: Lacks foundation, objection.
4      Q.  (By Mr. Singer)  Take a moment to look at
5  that paragraph.
6      MR. JACOBS: Vague and ambiguous.
7      Q.  (By Mr. Singer)  The paragraph is II-A(2)
8  that I'm referring you to.
9      A.  Okay.  Yes, it is.
10     Q.  Do you have an understanding -- does reading
11  that paragraph refresh your understanding of certain
12  limitations under the Technology License Agreement as
13  to how Novell could use the technology which was
14  licensed back?
15     A.  Yes.
16     Q.  And are those the restrictions which are set
17  forth in this paragraph?
18     A.  Yes.
19     Q.  We'll come back to those a little bit later,
20  but was the purpose, then, of the Technology License
21  Agreement for Novell to be able to license back and
22  use in certain respects the technology that was being
23  sold to Santa Cruz?
24     A.  Yes, it was.
25     Q.  In your view, was that consistent with the

Page 27

1  transfer of that technology, including copyrights for
2  UNIX and UnixWare to Santa Cruz?
3      A.  Yes, it was.
4      Q.  We'll come back to this on a separate point
5  later in the deposition.
6          I would like to turn your attention now to an
7  issue which came up, we believe, sometime after the
8  closing of the Asset Purchase Agreement transaction.
9          Did there come a time when you became aware
10  of a transaction by which IBM would seek to buy out
11  its royalty obligations regarding UNIX?
12     A.  Yes.
13     Q.  And did Novell, while you were CEO of the
14  company, enter into a buyout agreement with IBM that
15  did not have Santa Cruz's participation?
16     A.  Explain what you mean by participation.
17     Q.  That Santa Cruz did not participate in the
18  negotiation and signing of the agreement, sort of a
19  first buyout before Santa Cruz later became involved.
20     A.  There was a buyout negotiated that SCO did
21  not participate in directly.
22     Q.  Is there a gentleman by the name of Jim
23  Sullivan who worked at Novell?
24     A.  Yes.
25     Q.  What was his position?

Page 28

1      A.  He was the vice president of North American
2  sales.
3      Q.  Did there come a time when you learned that
4  Mr. Sullivan had delivered source code for UNIX to
5  IBM?
6      A.  Yes.
7      Q.  What was your reaction to learning that?
8      A.  I was very unhappy.
9      Q.  Can you explain why?
10     A.  Because I didn't think we had the right to
11  deliver source code to IBM.
12     Q.  Is that because you believed that that had
13  been conveyed to Santa Cruz as part of the transaction
14  that the Asset Purchase Agreement reflected?
15     A.  Yes.
16     Q.  Now, did there come a time when you left
17  Novell as chief executive officer?
18     A.  Yes.
19     Q.  Do you recall when that was?
20     A.  Late August of 1996.
21     Q.  I would like to show you what has been
22  previously identified as Amendment No. 2 to the APA.
23     MR. GONZALEZ:  This is marked as Exhibit
24  1009.
25     Q.  (By Mr. Singer)  Please take a moment to look

Page 29

1  at Amendment 2, which is dated October 16th, 1996.
2      A.  Okay.
3      Q.  Now, although this agreement is dated shortly
4  after you left Novell as a CEO position in August of
5  1996, have you, previous to this deposition, seen
6  Amendment No. 2?
7      A.  I have, yes.
8      Q.  And if you turn to paragraph A of the
9  amendment where it amends -- do you understand that to
10  be an amendment which revises a section we were
11  looking at before, Section 5 of Schedule 1.1(b) of the
12  agreement which addressed excluded assets?  Do you see
13  that?
14     A.  I do.
15     Q.  If you want, for reference, you can open up
16  the APA to that schedule.
17     A.  I have it right there.
18     Q.  If you'll recall back when we looked at the
19  list of excluded assets in Section 5, it just said, in
20  the initial APA under Intellectual Property, quote,
21  "All copyrights and trademarks except for the
22  trademarks UNIX and UnixWare."
23          Do you see that under Amendment No. 2, that
24  subsection has been revised to read "All copyrights
25  and trademarks except for copyrights and trademarks

8 (Pages 26 to 29)

c3a46148-124e-4241-bc2b-dc12eefbc1b7

Page 82

1    Q.  (By Mr. Jacobs)  All right.  Then in the top
2  of page 2 it looks like there's a recitation of the
3  particular contents of the agreement that were
4  discussed, such as board seats, right of first
5  refusal.  Do you see that?
6    A.  Yes.
7    Q.  And the minutes indicate that it was a fairly
8  detailed discussion of the terms of the Asset Purchase
9  Agreement.  Is that consistent with any recollection
10  you have of the meeting itself?
11    A.  It could have been, but it's a long time ago.
12  I'm not sure I remember how extensive the discussion
13  was.
14    Q.  Now, if you look at the -- under the
15  resolution after the paragraph in which Novell
16  determines that it's in its best interest.  Do you see
17  that?
18      MR. SINGER:  There's several resolutions on
19  page 2.  Is there a particular one you're referring
20  to?
21    Q.  (By Mr. Jacobs)  Let me start over.  Do you
22  see that there's a first resolved?
23    A.  Yes.
24    Q.  And then there's a paragraph under it which
25  starts describing the terms of the Asset Purchase

Page 83

1  Agreement.  Do you see that?
2    A.  Yes.
3    Q.  And it says that pursuant to the Asset
4  Purchase Agreement, Novell will transfer to SCO its
5  UNIX and UnixWare technology assets.  Do you see that?
6    A.  Yes.
7    Q.  And then in the boxed portion -- Mr. Singer
8  is correct, that was boxed by us when we submitted
9  under this declaration.  It says, "Novell will retain
10  all of its patents, copyrights and trademarks."  Do
11  you see that?
12    A.  I do.
13    Q.  And I guess my question to you is when it
14  says "Novell will retain all of its patents,
15  copyrights and trademarks except for the trademarks
16  UNIX and UnixWare, as you sit here today and you read
17  this, do you believe that it's erroneously reporting
18  what was discussed at the board meeting?
19    A.  Looking back at it, I think what happened was
20  that we -- that our biggest concern were copyrights
21  and trademarks having to do with NetWare, and in no
22  way did those get blurred or sent anywhere else.  So I
23  think that that was what was meant to be described but
24  it isn't described here properly.
25    Q.  So your best --

Page 84

1    A.  Nor is it described properly in the
2  agreement.
3    Q.  So it may be that this -- that as you sit
4  here today and you look at this boxed paragraph, it's
5  accurately describing what was in the agreement, but
6  you think that the agreement may not have accurately
7  reflected your personal intent?
8    A.  Correct.
9    Q.  So setting aside your personal intent, is it
10  your testimony that the negotiating team acted outside
11  of its authority in drafting an exclusion to the Asset
12  Purchase Agreement that was broader than just network
13  copyrights?
14    A.  That's possible.
15    Q.  It's a possibility?
16    A.  It's a possibility.
17    Q.  What other possibilities are there?
18    A.  A drafting error is another possibility.
19    Q.  And does the fact that there was the
20  three-month period in which Amendment No. 1 had a
21  chance to be prepared in the wake of the signature of
22  the Asset Purchase Agreement and before the closing,
23  does that affect your estimate of the probability that
24  it was a drafting error?
25      MR. SINGER:  Object to the form.

Page 85

1    A.  I only said that both of those things were
2  possible.  I think it's still possible it was a
3  drafting error or that they acted outside of their
4  scope.  I think either of those are possible.
5    Q.  (By Mr. Jacobs)  Are there any other
6  possibilities?
7    A.  Not that I can think of.
8    Q.  Well, we discussed one, which was that you
9  gave them direction to try to make sure that they
10  could protect their right to do buyouts, correct?
11    A.  Correct.
12    Q.  Is it possible that they effectuated that
13  direction by obtaining the UNIX copyrights?
14      MR. SINGER:  Object to the form.
15    A.  I guess that's possible as well, yes.
16    Q.  (By Mr. Jacobs)  When you were asked about
17  Amendment No. 2, were you -- did you have any
18  contemporaneous -- sorry, strike that.  Let's turn to
19  Amendment No. 2, Exhibit 10.
20    A.  Okay.
21    Q.  You were asked about the paragraph under A,
22  "All copyrights and trademarks except for the
23  copyrights required for SCO," et cetera.  Do you see
24  that?
25    A.  Uh-huh (affirmative).

c3a46148-124e-4241-bc2b-dc12eefbc1b7

Page 170

1    A.  I'm sure I did, yes.
2    Q.  It was your practice to take a look at the
3  minutes and make sure they were accurate, correct?
4    A.  Yes.
5    Q.  So, in fact, since as you sit here today you
6  acknowledge that all could include Novell retaining
7  UNIX copyrights, you were alerted that Novell was
8  retaining the UNIX copyrights?
9        MR. SINGER:  Object to the form.
10   A.  Well, again, my interpretation of that could
11  also have been at the time that we were talking about
12  NetWare copyrights.
13   Q.  (By Mr. Jacobs)  So you're not sure whether
14  you were alerted or not?
15   A.  I'm sure that I read the minutes.  I'm not
16  sure it would have, to your description earlier, set
17  off an alarm bell, because I may have looked at that
18  and said -- interpreted, instead of the way you just
19  did, that this would apply to NetWare copyrights.
20   Q.  If the -- we saw that Mr. Bradford signed the
21  board minutes.  Do you recall that?
22   A.  Yes.
23   Q.  Was he usually precise with words?
24   A.  Yes.
25   Q.  Now, you said in response to Mr. Singer's

Page 171

1  question that you thought that Novell was in violation
2  of the TLA by distributing Linux.  What did you base
3  that on?
4    A.  I remember that provision very well because
5  it was a significant concession to SCO to allay their
6  concern about us coming back around and competing with
7  them in the marketplace.  And we had no intention of
8  being in the UNIX business or businesses directly in
9  competition with SCO, and that's what -- we
10  memorialized that in that agreement.
11   Q.  And you believe that Linux competes with SCO?
12   A.  It would certainly -- it certainly did
13  compete with SCO's products, yes.
14   Q.  But he asked you about present day.  Do you
15  believe that Linux competes with SCO today?  If you
16  have no opinion on that, fine.  I'm just trying to
17  clarify your answers to his questions.
18   A.  Yes, it does, because SCO still sells UNIX-
19  based software.
20   Q.  And the mere fact that Novell distributes
21  Linux, that's all -- and that Linux competes with
22  UNIX, that's all you need to know to know that you're
23  in violation of the TLA?
24   A.  Yes.
25   Q.  No other facts required?

Page 172

1    A.  No.
2    Q.  So your testimony is that as the CEO of
3  Novell in 1995, you bound Novell to an agreement that
4  forever precluded it from competing with SCO in
5  operating systems?
6    A.  Correct.
7    Q.  Forever and ever and ever?
8        MR. SINGER:  Objection.
9    A.  We didn't put a time limit on it, no.
10   Q.  (By Mr. Jacobs)  Did the board approve --
11  knowingly approve that Novell would never be able to
12  go into the operating system again for its natural
13  life as a corporation?
14   A.  No.
15   Q.  Does the board resolution --
16   A.  Although, I guess I object to your -- its
17  life forever.  I mean, if SCO didn't exist anymore,
18  then that wouldn't be the case.
19   Q.  But that wasn't anticipated, was it?
20   A.  No.
21   Q.  So let's look at the board minutes attached
22  to Ms. Carlton's declaration.  Does anything in these
23  board minutes alert the board that in your judgment
24  Novell was precluding itself from ever going into the
25  operating system business again?

Page 173

1        MR. SINGER:  Object to the form of the
2  question, foundation.
3    A.  No, because the Technology License Agreement
4  was signed in December and these board minutes are
5  from September.
6    Q.  (By Mr. Jacobs)  So it's only if the TLA so
7  provided as opposed to the Asset Purchase Agreement?
8    A.  That's what I recall, yes.
9    Q.  And you weren't -- what was your level of
10  involvement in the negotiation of the TLA?
11   A.  I followed up with Mr. Thompson.
12   Q.  Do you recall a specific discussion in which
13  you were alerted to the view that -- let me propose an
14  alternative interpretation to you for a minute and see
15  if this refreshes your recollection, because I have
16  now taken your recollection to its logical conclusion.
17       An alternative interpretation is that the TLA
18  is a license, and to the extent that Novell was
19  relying on the TLA as a license, it could only do so
20  if the scope of the use it was making of the TLA
21  technology was consistent with those limitations?
22   A.  Correct.
23   Q.  So if Novell wasn't relying on the TLA,
24  wasn't taking advantage of rights under the TLA, it
25  was not precluded by the TLA from doing anything?

44  (Pages 170 to 173)

c3a46148-124e-4241-bc2b-dc12eefbc1b7

# EXHIBIT 29

**The Wall Street Journal**, Wednesday, September 20, 1995

# Novell to Cede Control of Unix To 2 Companies

### By Don Clark
*Staff Reporter of The Wall Street Journal*

Novell Inc. today is expected to announce plans to relinquish control of the widely used Unix operating system to Santa Cruz Operation Inc. and Hewlett-Packard Co.

The deal includes the purchase by Santa Cruz Operation of most trademarks and intellectual property associated with Unix software, one person familiar with the situation said. He said he expects SCO to pay about $140 million, some of which will be shares of SCO, a Santa Cruz, Calif., company that sells its own version of Unix.

Hewlett-Packard, which sells computers equipped with Unix, is expected to collaborate with SCO and Novell in future technology development. The joint developments will include versions of Unix software tailored to future Intel Corp. chips, industry executives said.

Unix is used to control the inner workings of computers manufactured by numerous companies. Novell's announcements are pegged to a Unix industry trade show today and a Novell analyst meeting in New York tomorrow, during which Novell plans to explain new strategies that include a tighter focus on networking software, used to link computers. Novell, based in Provo, Utah, is the No. 1 maker of software for managing computer networks, but its NetWare program faces a withering assault by Microsoft Corp. and its Windows NT operating system.

Novell's former chairman, Raymond Noorda, agreed to buy Unix from AT&T Corp. in December 1992, in a stock swap then valued at $360 million. As a result of that deal, Novell took over the business of licensing the underlying code for Unix to numerous companies that create their own versions for different computer systems. Novell also sells its own version, called UnixWare, that also competes with Windows NT.

Robert Frankenberg, who succeeded Mr. Noorda in 1994, has been gradually dismantling elements of Novell's former strategy. Analysts believe he has concluded that the company can't afford to keep advancing Unix while investing heavily in NetWare and other networking technology.

"We are not going to fight Microsoft on NT anymore," said Rich Edwards an analyst at Robertson Stephens & Co. "Frankenberg is saying I can't beat them, so we are going back to our networking roots."

A Novell spokesman declined to comment pending a formal announcement and the analyst meeting tomorrow. "It will all be laid out on the table," he said.



EXHIBIT

1030

2-7-07 AD

Recall 0005688

# EXHIBIT 30

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


THE SCO GROUP, INC.,          :  Case No. 2:04CV00139
                              :
        Plaintiff,            :  Videotaped Deposition of:
                              :
vs.                           :  R. DUFF THOMPSON
                              :
NOVELL, INC.,                 :
                              :
        Defendant.            :
                              :


February 13, 2007 - 9:13 a.m.


Location:  HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, UT  84101


Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

6e60cdac-2231-408b-b03e-a2cd31e63189

Duff Thompson

Page 22

1  recused yourself?
2      A.  I did, and my recollection is that the -- while I
3  was aware that this amendment was in the works, that I was
4  not given any information by either party, by either side as
5  to how it was being negotiated and who was signing it and all
6  those sorts of things.
7      Q.  So you anticipated my next question, but just to be
8  clear, did you provide any input to the Novell side about
9  Amendment No. 2 as it related to ownership of the Unix
10  copyrights?
11      A.  I don't remember any instance in which I was either
12  asked to give input or that I did give input.  Is it
13  possible?  You have to understand that all of the legal staff
14  or many members of the legal staff at Novell were employees
15  of mine who I had hired and brought into the company, and so
16  I had not -- I hadn't brought them into Novell.  I had
17  brought them into a previous company which merged with
18  Novell.  And so I had interaction with these attorneys on a
19  fairly regular basis, socially and just in the community.
20      And so is it possible I had discussions?  Yes.  I
21  saw Bob Frankenberg on a social basis.  Is it possible I had
22  discussions?  Yes.  But I have no recollection that there was
23  any specific input that I was asked to give nor that I
24  actually gave that resulted in the creation of Amendment 2.
25      Q.  So just to prod your memory a little bit, you don't

Page 23

1  recall something along the lines of, Duff, there is a
2  provision in the asset purchase agreement that gives Novell
3  ownership of the Unix copyrights.  SCO is claiming that needs
4  to be clarified.  Do you recall why that provision is the way
5  it is in the asset purchase agreement?
6      A.  I don't recall having that discussion with anyone.
7      Q.  When you prepared this declaration that's in front
8  of us dated November 9th, 2006, did you have in mind the fact
9  that Amendment No. 2 had a provision relating to ownership of
10  the Unix copyrights?
11      A.  In the general sense.
12      Q.  So if you take a look at paragraph 8, for example.
13      MR. SINGER:  Paragraph 8?
14      A.  Did you say eight?
15      Q.  (By Mr. Jacobs)  Yes.  You say there in the first
16  sentence:  Likewise, it was my understanding and intent, as
17  the Novell executive responsible for the negotiation of the
18  transaction, that the Unix copyrights were transferred to
19  Santa Cruz as part of the transaction that was closed in
20  December 1995.  You see that?
21      A.  Yes.
22      Q.  Now, the Amendment No. 2 was executed in October
23  1996.  Does Amendment No. 2 and the fact that it has, as you
24  said, a clarifying provision relating to Unix copyrights,
25  bear on your testimony in that first sentence?

Page 24

1      A.  Not at all.  My understanding of the deal starting
2  in May and June of 1995 was exactly this, and the document,
3  the APA, that I -- that we signed in September of '95 to my
4  understanding said this.  And to the extent it didn't say
5  this, the -- or at least it didn't say it clearly, the
6  Amendment No. 2 was a clarification of the ambiguous
7  language.
8      But you have to read that whole paragraph 8
9  together to kind of understand part of the rationale there,
10  because not only did we sign the APA, but we signed the
11  technology license agreement in December of 1995.  And it
12  certainly wouldn't have made any sense to me to sign the
13  technology licensing agreement in December from SCO to Novell
14  if Novell had retained all of that intellectual property.
15      That was kind of -- I mean, I didn't -- maybe a way
16  to answer your question is, the Amendment 2 was not the
17  instructive document on where the copyrights were for me.
18  The instructions I received from Bob Frankenberg were the
19  instructive charge.  What I said to Alok Mohan when I was
20  negotiating this transaction were consistent with Bob's
21  directions, and the APA -- we intended in the APA to make
22  that clear.  So I didn't need Amendment 2 to help me
23  understand what we had conveyed and what we hadn't conveyed.
24  I just make that distinction.
25      Q.  So just to press that point a bit, do you recall

Page 25

1  specific discussions leading up to the execution of the APA
2  in September 1995 about copyright -- and I emphasize
3  copyright -- ownership?
4      A.  I don't recall any specific discussion about
5  copyright.
6      Q.  Do you recall any specific discussions about
7  copyright ownership leading up to the execution in December
8  1995 of Amendment No. 1?
9      A.  I mean, the answer is, I -- not only is this now 11
10  and a half years in the past, so trying to remember a
11  specific discussion about copyright is difficult, but what
12  I -- I guess what I can recall is the actual negotiations and
13  the tenor of those negotiations and what was said, what we
14  said and what they said.  And so if you are asking me --
15  well, what are you asking me?
16      Q.  I am asking you -- I think you're answering about
17  tenor or overall deal structure, and I am asking you
18  specifically about the legal question of copyright ownership.
19      A.  Yeah, and I guess I would answer that by saying, I
20  was instructed to sell the entire Unix business, everything,
21  everything.  That was the initial instruction, sell
22  everything, from Bob Frankenberg to me, and sell UnixWare.
23  So sell Unix, sell UnixWare.
24      And having practiced law in this area previous to
25  joining Novell, so I was a general counsel for another

7 (Pages 22 to 25)

6e60cdac-2231-408b-b03e-a2cd31e63189

Duff Thompson

Page 130

1    A.  Yes.
2    Q.  Does the fact that the board minutes record that
3  Novell will retain all the copyrights have any effect on your
4  recollections of the structure of the deal and what was
5  understood to be occurring with respect to the Unix
6  copyrights?
7    A.  Yeah, well.  What it says is, "Novell will retain
8  all of its patents, its copyrights and trademarks."  Now, my
9  mindset would say, of course it is.  It's keeping all of the
10  NetWare and NetWare-specific products.  Otherwise, everything
11  that Bob told me to do and the instructions I received were a
12  fraud.  So I kind of come at this from the standpoint that,
13  when it says Novell is keeping all of its trademarks and
14  copyrights and patents, I understand that to mean its, as in
15  Novell's, not those that it sold.
16      And as backup for that, in reading this boxed
17  language, it says, "Novell will retain all of its patents,
18  copyrights and trademarks and a royalty-free, perpetual
19  worldwide license back to Unix and UnixWare for internal use
20  and resale in bundled products."  And I guess that seems
21  perfectly consistent to me because it says it needed to have
22  a license back to be able to use those products because it
23  had sold the underlying asset to SCO.
24      So it kind of -- even though it's the first time I
25  have seen this, as I read it, I think to myself, I'm not

Page 131

1  sure -- I'm not sure that even today, if you were to ask the
2  members of the board who were there, if they understood that
3  to known Novell was retaining all the Unix copyrights because
4  it says in the next sentence, they're getting back a
5  royalty-free perpetual worldwide license back to Unix and
6  UnixWare for internal use.
7      So my own reading of this is that this is perfectly
8  consistent with what I understood we did and what we were
9  signing the next day in the September 19th APA.
10    Q.  Now, it does say, except for the trademarks Unix
11  and UnixWare, doesn't it?
12    A.  Right.
13    Q.  So it does get pretty granular about something
14  associated with Unix when it talks about trademarks?
15    A.  Trademarks, right.
16    Q.  But it doesn't have similar degree of granularity
17  when it's discussing copyrights?
18    A.  No.  But the license back to Unix and UnixWare in
19  the next line, it seems to me, is relatively granular.
20    Q.  So let's talk -- let's get granular about that,
21  then.  The -- you understood that there were a bundle of
22  assets associated with Unix and UnixWare that were being
23  transferred to SCO?
24    A.  That's right, that this was a business that
25  included a bundle of rights.  That's right.

Page 132

1    Q.  And a bundle of rights you believed included --
2  looking back on it, you believed the structure of the deal
3  meant that the bundle of rights included the copyrights?
4    A.  No.  At the time I believe it included the bundle
5  of the copyrights, at the time.
6    Q.  Well, I'm a little confused because I thought you
7  said this morning that you don't recall any specific
8  discussion about copyrights.
9    A.  Yeah, but that doesn't mean that that's not what I
10  understood we were doing at the time.
11    Q.  So you --
12    A.  So the fact that I may not have had a specific
13  discussion that I can recall 11 and a half years later should
14  not be taken to mean I don't recall what our intention was in
15  selling the business.  It is impossible for me to parse in my
16  mind the assignment that we received to sell the -- to sell
17  the entire business, all of Unix and UnixWare to SCO, and to
18  somehow also in that same breath say, except the copyrights.
19      I just -- I don't understand that kind of thinking,
20  and certainly I just have to tell you that that kind of trick
21  play was not something that Bob Frankenberg would have
22  directed, nor is it something he would have stood for.  It's
23  not something I would have done.
24      If we had intended not to transfer the copyrights,
25  we would have been very careful to say, you don't get the

Page 133

1  copyrights.  And it wouldn't have been an oblique reference.
2  It would have been, you get all the business except the
3  copyrights.  Not, you get all the business.
4    Q.  You know there are a lot of arguments on both sides
5  of this issue, and I don't want to get into a debate with you
6  that you and I can't resolve.  But if -- but does your
7  testimony on this point turn on your view that this is all a
8  trick if Novell in fact retained the copyrights?  If it were
9  demonstrated to you that it was not a trick, for example,
10  would that change your view?
11      MR. SINGER:  Object to the form of the question.
12    Q.  (By Mr. Jacobs) I'm trying to --
13    A.  I think --
14    Q.  -- let me be a little clearer.  What exactly -- as
15  you sit here today, what exactly are you calling upon in your
16  memory to testify that you understood it was Novell's intent
17  to transfer the copyrights?
18    A.  My conversations with my staff, Ed Chatlos in
19  particular.  Ty Mattingly was in some of those meetings.  My
20  conversations with Alok Mohan, Jeffrey Seabrook, I think was
21  his name, Steve Sabbath, in which I said, "We are selling our
22  Unix business, lock, stock and barrel, all of it."  That's
23  how it started.
24    Q.  Exactly.  That's how it started, isn't it?
25    A.  Yes.  We are selling everything.

34  (Pages 130 to 133)

6e60cdac-2231-408b-b03e-a2cd31e63189

# EXHIBIT 31

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH


-----------------------------------------x

THE SCO GROUP, INC.

            Plaintiff/Counterclaim Defendant

       vs.                    CASE NO. 2:04CV00139

   NOVELL, INC.

            Defendants/Counterclaim-Plaintiff.
-----------------------------------------x


                DEPOSITION OF EDWARD CHATLOS

                    March 22, 2007






      JOB NO: 192711

      REPORTED BY:

      Danielle Grant

Page 38

Chatlos

1
2  third sentence, "I do not recall anyone else ever
3  suggesting that Novell would retain any copyright
4  relating to UNIX, nor was I present for any
5  discussions general or specific during the
6  negotiations that contradicted my understanding
7  of the transaction described herein. None of my
8  superiors at Novell ever informed me that Novell
9  was not transferring the UNIX copyrights to SCO.
10  Likewise, I never communicated to SCO in any way
11  that the UNIX copyrights were not being sold to
12  SCO, nor am I aware of any instance in which
13  anyone from Novell ever informed SCO in any way
14  that the UNIX copyrights were not being sold to
15  SCO as part of this transaction."
16        Does that language accurately
17  reflect your recollection and intent regarding
18  the issue of copyrights?
19        A   Very much reflects it. It's intended
20  to sell the entire business, including the
21  copyrights. And there were no discussions to
22  counter that.
23        Q   Did anyone ever suggest to you that
24  Novell did not intend to sell the UNIX and
25  UnixWare copyrights to SCO?

Page 39

Chatlos

1
2        A   No, not when we were -- not at this
3  time.
4        Q   You say in Paragraph 10 in the
5  beginning, "Given my central role in the
6  negotiations, I believe I would have known if the
7  party's had agreed that Novell would retain any
8  UNIX copyrights. My intent and understanding as
9  the lead negotiator for Novell was that Novell
10  was transferring the copyrights to SCO and the
11  APA. At the time the transaction was signed and
12  closed, I did not observe anyone at Novell or SCO
13  stating or acting as if Novell had retained any
14  UNIX copyrights." Do you see that language?
15        A   Yes.
16        Q   Does that language accurately
17  reflect your intent and understanding on the
18  issue of copyrights?
19        A   Yes, it does.
20        Q   Why do you believe that you would
21  have known if the party's had agreed that Novell
22  would have retained any UNIX copyrights?
23        A   As the lead negotiator I was forming
24  a business arrangement between SCO and Novell.
25  And if they wanted to take out a significant

Page 40

Chatlos

1
2  portion of the assets, I potentially would have
3  fundamentally changed the deal and changed the
4  intent.
5        Q   I want to ask you, Mr. Chatlos,
6  about Paragraph 11 of your declaration which
7  references the APA, so I thought we could first
8  turn to schedule 1.1B of the APA, and that is
9  beginning on the page ending 954?
10        A   Yes, I see that.
11        Q   And it goes over to 955?
12        A   Yes.
13        Q   You say in your declaration in
14  Paragraph 11, "I have reviewed schedule 1.1B,
15  excluded assets of the APA, the excluded asset
16  schedule, with attention to the question of
17  whether Novell was to retain any UNIX copyrights.
18  In my opinion, the word copyrights in Paragraph
19  5A refers and was intended by the parties to
20  refer to Novell copyrights other than those
21  related to UNIX and UnixWare, including the
22  Netware assets referenced in Paragraph 1, two and
23  4 of the excluded assets scheduled." Do you see
24  that language?
25        A   Yes.

Page 41

Chatlos

1
2        Q   Does that language accurately
3  reflect your views of schedule 1.1B on the issue
4  of UNIX and UnixWare copyrights?
5        A   Yeah, 1.1B refers to those items in
6  that Novell was retaining and addressing all
7  those items it was retaining, not those that were
8  being transferred to SCO.
9        Q   Now, do you know whether this
10  excluded asset schedule was the subject of a
11  subsequent amendment?
12        A   I believe it was amended.
13        Q   Have you heard of Amendment No. 2 to
14  the APA?
15        A   Yes, I wasn't party of that.
16        Q   You left Novell by the time it was
17  negotiated; is that right?
18        A   Correct, um-hum.
19        Q   I'm handing you, Mr. Chatlos, what's
20  been previously marked as Exhibit 1009, which is
21  a copy of Amendment No. 2. We seem to be short
22  of copies, but you've probably heard of it. Do
23  we have one other that I can use?
24        MR. SOLECKI:  I can give you this
25        back if you need it.

ESQUIRE DEPOSITION SERVICES
220 West 42nd Street - 13th Floor - 10036 - 1-800-944-9454

676dc9e1-c278-4a57-b7a4-8e0f48a373d0

Page 42

```
1              Chatlos
2        MR. NORMAND:  Thanks, Al.
3        MR. SOLECKI:  Sure.
4  BY MR. NORMAND:
5        Q   I want to direct your attention to
6  Paragraph A of the Amendment No. 2, Mr. Chatlos,
7  which says, "With respect to schedule 1.1B of the
8  agreement entitled Excluded Assets, section 5
9  subsection A shall be revised to read all
10 copyrights and trademarks, except for the
11 copyrights and trademarks owned by Novell as of
12 the date of the agreement required for SCO to
13 exercise it's rights with respect to the
14 acquisition of UNIX and UnixWare technologies."
15 And that paragraph goes on.  Now, you didn't play
16 any role in drafting this language; is that
17 right?
18       A   Correct.
19       Q   I want to ask you, though, if you
20 have a view as to what copyrights, with respect
21 to UNIX and UnixWare did SCO need to exercise
22 it's rights with respect to its acquisition of
23 the UNIX and UnixWare technologies?
24       MR. JACOBS:  Objection to the form;
25       calls for speculation; calls for legal
```

Page 43

```
1              Chatlos
2  conclusion.
3        MR. SOLECKI:  You can answer if you
4        understand it.
5        A   Since Novell sold the entire
6  business to SCO, and for SCO to conduct business
7  as it would need to regarding all of the assets
8  and products it would need in associating
9  copyrights of the technology.  And the intent was
10 for them to transfer and it looks like this
11 addressed that same point.
12       Q   Is it your view that Santa Cruz
13 needed the same copyrights that Novell owned in
14 UNIX and UnixWare in order to operate the
15 businesses that Novell had?
16       MR. JACOBS:  Same objections.
17       A   Yes.
18       Q   You say in Paragraph 12 of your
19 declaration, the first declaration Mr. Chatlos,
20 "Pursuant to a technology licensing agreement
21 signed by the parties in early December 1995,
22 Novell licensed from SCO the use of the UNIX
23 source code.  I believe this licensing
24 arrangement was consistent with SCO's ownership
25 of the copyrights upon the closing of the APA."
```

Page 44

```
1              Chatlos
2  Do you see that language?
3        A   Yes.
4        Q   Why do you believe that the
5  licensing arrangement was consistent with SCO's
6  ownership of the copyrights?
7        A   It goes back to the original intent
8  of the agreement and that was to transfer the
9  entire business to SCO and, as such, Novell
10 needed to retain -- excuse me, to be licensed
11 back for some technology that is used or was used
12 in the network product line.  And since it was
13 transferred to SCO the license back gave Novell
14 those rights.
15       Q   You say in Paragraph 13 of your
16 first declaration, Mr. Chatlos, "Paragraph 4.16
17 of the APA was specifically designed and intended
18 to protect Novell's retained binary product
19 royalty stream based on the foregoing, including
20 my understanding over the party's intent.  I do
21 not believe Novell has any right to waive or to
22 direct or to require SCO to waive any of SCO's
23 source code rights including under customer
24 source code licenses."  Do you see that language?
25       A   Yes.
```

Page 45

```
1              Chatlos
2        Q   How does that language in Paragraph
3  13 comport with your understanding of Novell's
4  intent regarding paragraph 4.16 of the APA?
5        A   Those paragraphs deal with binary
6  royalties that are associated with the SVRX
7  licenses.  And the intent was for -- as I say
8  here, for Novell to protect that royalty stream.
9  And there were certain rights that Novell
10 retained to insure that nothing would happen to
11 that royalty stream.
12       Q   When you refer to SCO's source code
13 rights towards the bottom of the paragraph, what
14 do you mean?
15       A   Can you ask the question a different
16 way?
17       Q   You say towards the bottom of the
18 paragraph, "Based on the foregoing, including my
19 understanding of the party's intent, I do not
20 believe Novell has any right to waive or direct
21 or require SCO to waive any source code rights
22 including under customer source code licenses."
23 And what I need to ask is what you mean in that
24 sentence?
25       A   Well, specifically the entire
```

12 (Pages 42 to 45)

676dc9e1-c278-4a57-b7a4-8e0f48a373d0

# EXHIBIT 32

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


THE SCO GROUP, INC.,            :   Case No. 2:04CV00139
                                :
        Plaintiff,              :   Videotaped Deposition of:
                                :
vs.                             :   TY MATTINGLY
                                :
NOVELL, INC.,                   :
                                :
        Defendant.              :
                                :


              January 19, 2007 - 9:23 a.m.


            Location:  SCO Group
                 355 South 520 West
               Lindon, Utah  84042


          Reporter:  Teri Hansen Cronenwett
     Certified Realtime Reporter, Registered Merit Reporter
           Notary Public in and for the State of Utah

Page 18

1    A.  You know, there were -- there were a number of
2  other people, but really I think -- I think we had a lot of
3  engineers.  We brought in a lot of Unix marketing and
4  salespeople at various times, but most of my interaction in
5  the entire deal process was really with Ed Chatlos through
6  the negotiations and with the SCO team that they had
7  involved, as well as the executives inside of Novell.
8    Q.  When the notion of selling the assets first arose,
9  were there more than one company discussed as potential
10  purchaser?
11    A.  Yes.  There were more than one company discussions.
12  I think that the high level strategy was to try and find a
13  home that could take Unix on X-86 architecture, Intel's PC
14  architecture, and unify all of the different OEMs around a
15  common Unix on a common platform.  Once again, if you
16  remember, the reason I joined Novell was business
17  applications running on Unix solving business problems.
18    Q.  Uh-huh.
19    A.  So the opportunity and the reason why SCO was an
20  ideal candidate that we focused in on was because they were
21  the leader in Unix on the X-86 platform.  So we wanted to
22  take Unix, UnixWare, et al., and push that to SCO so that
23  those guys could try and rally all of the other hardware OEMs
24  around a common Unix.
25    Q.  Uh-huh.

Page 19

1    A.  And not have all the fragmentation that existed in
2  the minicomputer RISC architecture world, R-I-S-C.
3    Q.  Were there other, I guess, so-called Unix companies
4  that were considered apart from SCO or --
5    A.  Yeah.  We -- we talked about all of the candidates,
6  HP, Sun, Oracle.
7    Q.  Were there any serious discussions with any of
8  those three companies that you just mentioned?
9    A.  Well, HP was part of our process on the
10  divestiture.
11    Q.  Yeah.
12    A.  So we really polled them as an OEM to see how they
13  would view and support and basically kind of sustain SCO as
14  this unifier of Unix.
15    Q.  Uh-huh.
16    A.  And the industry.  So we wanted to have a potential
17  OEM that had a really impressive next generation architecture
18  coming out that was also an Intel partner so that we could
19  actually say, Hey, help us model this properly so that if you
20  will license it, then IBM will, then Sun will, etc., etc.
21    Q.  When did Novell's initial interest in selling its
22  Unix business rise to the next level, so to speak?  If you
23  can recall the chronology of events, what was the next step
24  after these initial discussions about whether we should sell
25  it and after having identified potential purchasers?

Page 20

1    MR. BRAKEBILL:  Objection, vague and ambiguous.
2    A.  Well --
3    Q.  (By Mr. Normand) I mean, I could ask a more
4  specific foundational question is, if you recall when the
5  initial discussions happened.
6    A.  You know, while I view myself as the high level
7  strategy guy --
8    Q.  Yeah.
9    A.  -- there is a higher level strategy, you know,
10  inside of Novell that kind of feeds down to my level.
11    Q.  Uh-huh.
12    A.  And so you know, those types of discussions likely
13  happened with Bob Frankenberg and Alok Mohan earlier on.  So
14  I don't know when that would have started, but you know, when
15  it surfaced and fed down to us, then that's when the team was
16  put together, and that's when we engaged there.
17    Q.  Did you have occasion to attend meetings with
18  representatives of Santa Cruz or SCO?
19    A.  Yes.
20    Q.  And to the best of your recollection, when did
21  those meetings begin?
22    A.  Well, they began not too long after the high level
23  strategy was made to divest of that asset, so myself and Ed
24  Chatlos and various other people as we needed them --
25    Q.  Yeah.

Page 21

1    A.  -- met with the SCO team out in Los Gatos for, you
2  know, one to two months.
3    Q.  If I said the summer of '95, does that sound right?
4    A.  Uh-huh.  It was warm.  It was nice time of the
5  year.
6    Q.  How many meetings can you recall attending in Los
7  Gatos with representatives of Santa Cruz?
8    A.  You know, we lived there in Los Gatos on and off
9  for probably a month and a half to two months, so between Los
10  Gatos and Palo Alto and San Jose.
11    Q.  Who were the principal representatives of Santa
12  Cruz that you met with, if you can recall?
13    A.  The principal people that were working the deal
14  structure were Jeff Seabrook and Jim Wilt, W-I-L-T.
15    Q.  You mentioned deal structure.  Were there other
16  sort of categories of involvement that you would describe
17  Santa Cruz as having been involved in?
18    A.  Yeah.  There was the negotiation of us divesting of
19  an asset and them buying it and how much you pay for that,
20  etc.
21    Q.  Yeah.
22    A.  And then once we do that, you know, how will you
23  sell it?  How will you market it?  How will you do all those
24  other things?  So at various times we would pull in different
25  people and put together little ad hoc tiger teams to talk

6  (Pages 18 to 21)

fc7210ab-5c79-4713-a720-d85ad5886cea

1   about those different aspects.
2       Q.   And were you part of any of those teams?
3       A.   You know, I may have sat in on the sales and
4   marketing team, but I think it's really important to
5   understand, you know, my involvement in all of this was high
6   level.  How do we implement this strategy that came down from
7   a higher level and try and put a deal together that works for
8   them and works for us.
9       Q.   And who were you that were out in Los Gatos, Palo
10  Alto, San Jose working on the deal structure for Novell?
11      A.   Who what?
12      Q.   Who were you?  What was the group?
13          MR. BRAKEBILL:  Objection, vague and ambiguous.
14      A.   Yeah.  I mean, the Novell deal team, so some of
15  those people that I referenced --
16      Q.   (By Mr. Normand)  I guess I took --
17      A.   -- would meet with some of the SCO deal team at
18  those hotels, at different hotels.
19      Q.   I guess I meant to ask, when you said that you had
20  moved out there.
21      A.   Oh, sorry.
22      Q.   Was there a sort of core group of you who had moved
23  out there?
24      A.   Yeah.  We didn't really move out there.  I mean,
25  it's just that we were traveling out there and staying in

1   hotels every week and doing all of the different various
2   meetings, and the meetings happened, you know, between Palo
3   Alto, as well as Los Gatos.
4       Q.   The members of that core group included yourself
5   and Ed Chatlos?
6       A.   Correct.
7       Q.   Who else was part of that group?
8       A.   You know, there were a number of other people that
9   were very important in that.
10      Q.   Uh-huh.
11      A.   But more on the technology side, and I am
12  embarrassed to say I don't remember all of their names.
13      Q.   When you say the technology side, what do you mean?
14      A.   There were actually people there that were, you
15  know, hard-core Unix programmers and architects and people
16  that had worked on the entire SuperNOS type of a strategy, as
17  well as were career AT&T people.  People in the Unix business
18  tend to be real enthusiasts, and so those folks had stayed
19  there through USL, through Novell, and I believe a lot of
20  them stayed even through the SCO transition.
21      Q.   How would you describe your role during the course
22  of the summer of 1995 as part of these negotiations?
23      A.   Well, I was very heavily involved at the kind of
24  senior executive level, so interfacing between Bob
25  Frankenberg and the SCO team and participating in the

1   meetings that we would have at times with Alok Mohan and Doug
2   Michaels.
3       Q.   Uh-huh.  I am going to ask you a series of more
4   specific questions about the negotiations, but let me ask you
5   up front if there's anything in particular that you can
6   recall focussing on in that summer of '95, meaning you
7   personally.
8       A.   Of what I focused on?
9       Q.   Yeah.
10      A.   Yeah.  You know, maybe I can help speed this up a
11  little bit by just giving you a little bit of dialogue versus
12  all of the questioning.  But I think, I think it's important
13  to recognize from the high level what we were doing was
14  divesting of the Unix business at all, and we were going to
15  focus on NetWare and GroupWise and the other applications
16  that we were keeping inside of Novell.
17          So my job and responsibility in this negotiation
18  was to be a part of that team and make sure that as we
19  divested of the Unix business to SCO that all of our other
20  parties would be okay and would understand what we were doing
21  and why we were doing that, etc.
22      Q.   When you say parties, you mean existing Novell
23  customers or contractual counterparties?
24      A.   Yeah, all of the different OEM potential players, I
25  mean, IBM and Sun, etc.

1       Q.   So in that role, I take it you had discussions with
2   representatives of those companies in the summer of '95
3   explaining what the negotiations were about?
4       A.   You know, a lot with HP and with some of the
5   others.  I did have a series of calls with different heads
6   from those various companies when the deal was complete and
7   we were updating our partners about the deal before we
8   announced it.  So you know, I probably called out and had a
9   number of meetings with -- telephonic meetings with a number
10  of the executives from the different companies maybe the day
11  before we announced what was taking place.
12      Q.   Uh-huh.  Can you recall -- now I'm testing your
13  recollection here.  Can you recall with whom you spoke from
14  those companies at that time?
15      A.   I can't recall all of them.  The one I can recall
16  is an IBM guy because it was -- it was -- oh, what was the
17  name?  Thompson, who is now the CEO of Symantec.  So because
18  he had, you know, risen to such prominence post that era, I
19  thought, wow, that's pretty interesting to see what has
20  happened in his career.
21      Q.   And he was one of the individuals you spoke with
22  after the deal was executed, I think you said?
23      A.   Yeah.  I believe it was him, John Thompson from
24  IBM.
25      Q.   And what did you tell him?

fc7210ab-5c79-4713-a720-d85ad5886cea

Page 50

1  sale of UnixWare technology as more fully set forth in the
2  asset purchase agreement. So that seems to be consistent.
3      Q. Okay. In that same paragraph there's a reference
4  in the preceding sentence to 95 percent of the SVRX
5  royalties. Do you see that phrasing?
6      A. Uh-huh, uh-huh.
7      Q. What did you understand that to mean?
8      A. Well, at the time we sold the business, Novell had
9  a number of existing SVRX OEMs that were predominantly these
10  minicomputer OEMs.
11     Q. Yeah.
12     A. And with respect to those people, and I guess you
13  can see down below who the big ones must have been, because
14  we had this right of first refusal on Sun Microsystems,
15  Microsoft, Hewlett-Packard, IBM, Digital and Fujitsu, so
16  those likely were some of the big licensees.
17         And the intent there was to, you know, is for SCO
18  to collect all of those existing SVRX royalty streams and
19  then pay Novell 95 percent of that and keep 5 percent as an
20  administrative fee.
21     Q. The minutes say that -- I'm looking now back at
22  page 1 at the end of the last paragraph on page 1. The
23  minutes say that you answered questions from the board. Do
24  you recall any of the questions?
25     A. You know, I don't. But I mean, as usual, I mean,

Page 51

1  you take a grilling in these types of meetings, and so I'm
2  sure I was grilled by the board, asking all of the obvious
3  questions that yes, we had thought of and --
4      Q. But nothing in particular comes to mind?
5      A. Not really. I mean, it's been a long time.
6      Q. The minutes say on page 2 in the paragraph that's
7  actually squared off.
8      A. Uh-huh.
9      Q. And as a side note, that's just how the document
10  was produced. They say, quote, Novell will retain all of its
11  patents, copyrights and trademarks, open parens, except for
12  the trademarks Unix and UnixWare, close parens. The sentence
13  goes on, but that's the phrase I want to focus on.
14         Do you recall the issue of copyrights being
15  discussed at the meeting?
16     A. You know, I don't. I mean, here where it talks
17  about the trademark Unix and UnixWare, that goes to the
18  naming convention that we talked about earlier, which was,
19  didn't want SCO to be able to not grant the ability to call
20  an EOM's product Unix if they met the certain specifications,
21  and so that's why that was not retained by Novell. It was
22  also not transferred to SCO because that was the piece that
23  was moved over to X/Open.
24     Q. Uh-huh. With respect to the reference to
25  copyrights, was it your understanding that Novell was

Page 52

1  retaining all of the Unix and NetWare copyrights?
2      A. Not the Unix copyrights, but Novell clearly -- and
3  you asked this earlier. Novell would not have transferred
4  any of their copyrights around NetWare and ZenWorks and
5  GroupWise or any of those bundled products that Novell sold
6  with UnixWare.
7         So I think, I think that's probably what that's
8  getting to is that, hey, look. We're going to own all our
9  intellectual property. They're going to own all of this,
10  with the exception of the naming of Unix and then, of course,
11  that 95 percent fee that you see above it.
12     Q. Is there anything else specific about this meeting
13  that you can recall?
14     A. No. I mean, I remember those are always -- they're
15  always tense meetings, and you know, when we got into that
16  final discussion, I think as you would expect, you take a
17  pretty thorough set of questioning from a number of directors
18  just firing questions away at you, but --
19     Q. But nothing specific?
20     A. Nothing specific. I think we had, you know, the
21  facts down pretty clearly at that point. And even though 12
22  years later I'm not as good on the facts, I was pretty good
23  back then.
24     Q. I think you said earlier that you were familiar
25  with some of the issues arising out of these lawsuits from

Page 53

1  reading press. Is that a fair description of what you said
2  before?
3      A. Yeah, I think press and some of these, you know,
4  hate SCO message boards and all that good stuff.
5      Q. You have been on those message boards?
6      A. I have looked at them back when they first -- back
7  when the first shots across the bow went out.
8      Q. Are you familiar with a claim that's arisen in
9  these litigations in which Novell claims the right to waive
10  SCO's claims against IBM for alleged breaches of IBM's Unix
11  agreements?
12     A. I am aware of that.
13     Q. And do you have a view from your experience in
14  negotiating the APA as to the merits of that claim?
15     A. Well, I mean, my perspective on that is that, you
16  know, quite honestly, Novell doesn't have any rights to do
17  that. And I, personally, you know, look at this whole
18  litigation between Novell and SCO and think it's absurd. I
19  think it's unbelievable to me that, you know, a great company
20  like Novell would suggest that somebody spent 125 million
21  dollars and didn't buy this Unix business.
22         And then I don't know what the relationships or
23  discussions are between Novell and IBM, and I don't know why
24  they have done some of those things. I mean, I have been out
25  of the company for, well, since 1998. So I don't have any

14  (Pages 50 to 53)

fc7210ab-5c79-4713-a720-d85ad5886cea

Page 106

1    know, that's probably why I maybe spent more time with him
2    than Duff, but that was based on working for him for a year
3    and a half.
4        Q.    You spoke with Mr. Brakebill about what was being
5    called, quote, Unix patents.  Do you recall that?
6        A.    I do.
7        Q.    What is a Unix patent?
8        A.    Well, I mean, basically it's a -- it's a right
9    issued to you by the patent and trademark office with respect
10    to certain inventions, designs, methods for -- in the
11    software world, and that basically gives you rights to those
12    various components that I just mentioned, and in theory the
13    ability to protect those rights and secure licensing
14    royalties from people that might infringe upon those patents
15    or some people that might want to come through the front door
16    and just license that technology from you to use it.
17        Q.    Were they patents for particular isolated
18    technologies that appeared in Unix products that Novell had
19    acquired?
20        A.    You know, I mean, that's -- you know, like I was
21    talking about with Ken, I mean, the specifics of what patents
22    and what may have been or may not have been on the asset
23    schedule or the excluded asset schedule, because I'm sure
24    that there is all of those schedules in the back of that
25    contract.  I just don't remember which specific ones.

Page 107

1        And so what I have stated here is that I assume
2    that that would have included all of those relevant patents
3    that are necessary for you to own Unix, to develop Unix, to
4    merge, you know, the acquired Unix offering with your
5    existing Unix offering and then, of course, license, sell,
6    etc., this future Unix offering to the industry.
7        But I don't know the -- I don't know the specifics.
8    I don't remember the specifics, and I would probably -- not
9    probably.  I am sure I wouldn't have been the individual that
10    looked at the included assets and the excluded assets list.
11        Q.    Uh-huh.  Do you know whether Duff Thompson signed
12    the technology license agreement?
13        A.    I don't, but my guess is that he might have been
14    the guy as the corporate development, you know, executive,
15    senior executive that did that.  And he also joined their
16    board as Novell's designee there, so I don't know.
17        Q.    You were not involved in the negotiation of
18    Amendment No. 1 or Amendment No. 2, correct?
19        A.    That's correct.
20        Q.    If IBM or Novell were claiming that there was
21    language in those amendments that gave Novell the right to
22    waive SCO's rights under the SVRX licenses that it had
23    acquired, would that be consistent with your understanding of
24    the parties' intent under the APA?
25        MR. BRAKEBILL:  Incomplete hypothetical.

Page 108

1        A.    That would not be consistent with the strategy that
2    we were attempting to accomplish and implement here via the
3    divestiture of the Unix business to SCO.  It's just
4    inconsistent with why we were doing the whole thing.
5        Q.    (By Mr. Normand)  Is the same true of the issue of
6    Novell's claim to own the Unix copyrights?
7        MR. BRAKEBILL:  Objection, vague and ambiguous,
8    incomplete hypothetical.
9        A.    Say that again.
10        Q.    (By Mr. Normand)  I just meant to ask the same
11    question that I asked earlier.  When I asked earlier about
12    waiver, I'm now asking about Unix copyrights.
13        A.    Yeah.  As I have stated earlier, I mean, I believe
14    that, given the level of consideration transferred from SCO
15    to Novell, that there is absolutely the strategic intent as
16    well as the rationale for this to be a viable business for
17    SCO to create and unify people around Unix on Intel, that if
18    that was not transferred at that moment in time, the entire
19    exercise was pointless.
20        MR. NORMAND:  That's all the questions I have.
21        MR. BRAKEBILL:  That's it.
22        THE WITNESS:  You mean I'm done?
23        VIDEOGRAPHER:  Going off the record.  The time is
24    12:49.  This concludes the deposition of Ty Mattingly.
25        (The deposition concluded at 12:49 p.m.)

Page 109

1    Case:  SCO v. Novell
     Case No.:  2:04CV00139
2    Reporter:  Teri Hansen Cronenwett
     Date Taken:  January 19, 2007
3
     W I T N E S S   C E R T I F I C A T E
4
     I, TY MATTINGLY, HEREBY CERTIFY that I have read
5    the foregoing testimony consisting of 105 pages, numbered
     from 4 to 108 inclusive, and the same is a true and correct
6    transcription of said testimony, with the exception of the
     following corrections listed below, giving my reasons
7    therefor.
8    Page  Line      Change/Correction  Reason
9    _____  _____  _____
     _____  _____  _____
10   _____  _____  _____
     _____  _____  _____
11   _____  _____  _____
     _____  _____  _____
12   _____  _____  _____
     _____  _____  _____
13   _____  _____  _____
     _____  _____  _____
14   _____  _____  _____
     _____  _____  _____
15   _____  _____  _____
     _____  _____  _____
16   _____  _____  _____
     _____  _____  _____
17
18   _____  No corrections were made.
19            _____
              TY MATTINGLY
20        Subscribed and sworn to at _____
     Utah, this _____ day of _____, 2007.
21
     My commission expires:
22
23            _____
              NOTARY PUBLIC
24
25

Esquire Deposition Services
1-800-944-9454

fc7210ab-5c79-4713-a720-d85ad5886cea

# EXHIBIT 33

James Wilt

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION


THE SCO GROUP, INC., a Delaware    )
corporation,                       )
                                   )
    Plaintiff and Counterclaim-    )
    Defendant,                     )NO. 2:04CV00139
                                   )
vs.                                )Judge Dale A.
                                   )  Kimball
NOVELL, INC., a Delaware           )
corporation,                       )Magistrate Judge
                                   )  Brook C. Wells
    Defendant and Counterclaim-    )
    Plaintiff.                     )
                                   )




        Videotape deposition of:


        JAMES WILT


        Taken on behalf of the Defendant
        and Counterclaim Plaintiff


        January 26, 2007




--------------------------------------------------------
        Reported by:  Martha B. Davis, RPR, RDR
         CLEETON DAVIS COURT REPORTERS, LLC
         200 Fourth Avenue North, Suite 825
             Nashville, Tennessee 37219
                 (615) 726-2737

9dca1273-d111-46f6-8e03-6ceaad00824b

James Wilt

Page 26

1  Q.    Yes, sir.
2  A.    I believe this was modified by one of the
3  amendments.
4  Q.    That's true, but my questions right now
5  concern only this document.  Can you and I agree as a
6  preliminary matter that this page lists, quote, all
7  copyrights, end quote, as one of the excluded assets?
8        MR. NORMAND:  Objection to form.
9        THE WITNESS:  Are you asking me to agree
10  that that's what the words on the page say?
11  BY MR. MELAUGH:
12  Q.    Yes, I am.
13  A.    That's what the words on the page say.
14  Q.    Based on that language, can you and I also
15  agree that if someone with no knowledge about the
16  background or negotiations of this contract came in and
17  read this list of excluded assets, they would conclude
18  that no copyrights were transferred under this
19  agreement?
20        MR. NORMAND:  Objection to form.  In this
21  hypothetical, has someone read anything other than the
22  list of excluded assets in the APA?
23        THE WITNESS:  Actually, I can't put
24  myself in somebody's shoes like that.
25  BY MR. MELAUGH:

Page 27

1  Q.    Why is that?
2  A.    Because I know what the agreement was about
3  and what the intents of the parties were, so what
4  somebody who had no knowledge of that would have is
5  something I can't do.
6  Q.    We can agree, though, that the face of this
7  contract, the language that's written here, excludes
8  all copyrights from the assets transferred?
9  A.    No, I can only agree that what we did before
10  is that what -- those are the words that are on this
11  page.  You asked me whether the words under A say all
12  copyrights and trademarks except for the trademarks
13  UNIX and UnixWare and, indeed, those are the letters
14  and words that are on this page.
15  Q.    So, again, the language of this contract
16  excludes all copyrights from the assets transferred?
17  A.    No, the language of the contract do not
18  exclude all copyrights and trademarks because the
19  language of the contract, including its amendments,
20  clarify and state about what was sold, which is when
21  you go back to -- I don't know exactly where the
22  sections are.  It talks about selling the UNIX and the
23  UnixWare business, and then the copyrights and
24  trademarks relative to the UnixWare business were part
25  of the assets that were conveyed.

Page 28

1  Q.    Part of your answer concerned the amendments,
2  and I am going to ask you about the amendments.  Right
3  now I want to talk only about the documents in front of
4  you, the Asset Purchase Agreement.  Do you understand
5  that?
6  A.    I understand that.  I also understand that
7  this agreement transfers and sells all the assets of
8  the UNIX and the UnixWare business.  The amendment
9  clarifies the wording in this contract.  It did not add
10  new business terms.
11  Q.    From the assets of the UNIX and UnixWare
12  business transferred, though, there are certain assets
13  that are excluded from transfer in this contract, isn't
14  that right?
15  A.    Yes, there are.
16        MR. NORMAND:  Objection to form.
17        THE WITNESS:  It did not include the
18  Empire State Building.
19  BY MR. MELAUGH:
20  Q.    Did Novell own the Empire State Building at
21  the time of the contract?
22  A.    I don't know if that was relevant.  You asked
23  if it excluded certain assets and it does.
24  Q.    And one of the assets excluded from transfer
25  in this contract is, quote, all copyrights, end quote?

Page 29

1  A.    No.
2        MR. NORMAND:  Objection to form.
3        THE WITNESS:  In this contract, the UNIX
4  and the UnixWare business and its assets were
5  transferred to SCO.
6  BY MR. MELAUGH:
7  Q.    And the contract also lists from within that
8  category certain assets that are excluded, isn't that
9  right?
10        MR. NORMAND:  Objection to form.
11        THE WITNESS:  No.  Are you saying that
12  the contract is ambiguous?
13  BY MR. MELAUGH:
14  Q.    I'm not asking that.
15  A.    No, I'm asking if that's what you're saying,
16  because that's the interpretation I would get from your
17  statements.  In one place it says that all the assets
18  of the UNIX and UnixWare business were transferred.
19  Q.    Well, let's take a couple of steps back.  The
20  way I understand this contract is that it sets out a
21  broad class of assets that are transferred and then it
22  carves out a portion of those assets that are excluded
23  from transfer.  Do I have -- does my understanding
24  match --
25  A.    Novell did not transfer their NetWare business

                              8 (Pages 26 to 29)

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

James Wilt

Page 30

1  to SCO, nor did it transfer the copyrights and
2  trademarks relative to the NetWare business to SCO.
3  Q.    Let's focus on my question for a moment.  Did
4  I state that accurately?  And I'll restate it.
5  A.    Restate it, please.
6  Q.    Sure.  As a general matter, this deal is
7  structured as a transfer of assets, the contract spells
8  out a broad class of assets, and then it spells out a
9  class of assets that are excluded from transfer.  Does
10 my understanding of the contract match your
11 understanding of the contract?
12       MR. NORMAND:  Objection to form.
13       THE WITNESS:  On an extremely high level
14 you could certainly make that statement.  You can't
15 draw any conclusions from that statement at that high
16 level.
17 BY MR. MELAUGH:
18 Q.    Let's look at page 8 and 9.  Again, I'm using
19 the page numbers that Novell has added to this
20 document.  If you could read Section 1.1(a) on these
21 two pages to yourself, I'll have a couple of questions
22 for you about that.
23 A.    I have read it.
24 Q.    So this was what I was talking about a moment
25 ago.  This transfers all of seller's right, title and

Page 31

1  interest to the assets relating to the business, and
2  then on the next page it says that those assets won't
3  exclude the things listed in the excluded assets?
4  A.    Uh-huh.
5        MR. NORMAND:  Objection to form.
6  BY MR. MELAUGH:
7  Q.    Do I have that right?
8  A.    That's what the words say.
9  Q.    And on the list of excluded assets is the
10 phrase, quote, all copyrights?
11       MR. NORMAND:  Objection to form.
12 BY MR. MELAUGH:
13 Q.    Isn't that right?
14 A.    That's what the words say.
15 Q.    And so wouldn't you agree then that on the
16 face of this contract, apart from the later amendment,
17 all copyrights are excluded from the assets
18 transferred?
19 A.    No.
20       MR. NORMAND:  Objection to form.
21       THE WITNESS:  You're picking out two
22 sections of the contract and ignoring other items in
23 the contract, in the amendment.
24 BY MR. MELAUGH:
25 Q.    So what items am I -- I'm not talking about

Page 32

1  the amendment.  I'm just talking about this document.
2  What items in --
3  A.    I'm sorry.  I'm having a problem for one
4  understanding why you talk about this contract and not
5  the amendments.
6  Q.    Well, with respect -- I get to ask the
7  questions and I'll get to the amendment, I promise you.
8  What I'm interested in here is just what's in this
9  Asset Purchase Agreement.  And I think you said that
10 there are other parts of this contract that I'm
11 ignoring and I would like to know what parts those are?
12       MR. NORMAND:  Objection, calls for a
13 narrative.  You want him to page through the APA?
14       MR. TIBBITTS:  Yeah, why don't we do
15 that?
16       THE WITNESS:  Yeah, do you want me to go
17 all the way through?  I mean, I covered some of this, I
18 believe, in one of my declarations where I had spent
19 the time to go through the APA and identify areas that
20 talk about what is sold and certainly what the intent
21 of what was sold.  And so, you know, it says -- well,
22 I'm not going to go through it.  I mean, unless you
23 want me to go through each page of the APA right now, I
24 can't answer your question with more specific --
25 BY MR. MELAUGH:

Page 33

1  Q.    You said earlier, quote, you're picking out
2  two sections of the contract and ignoring other items
3  in the contract.  I want to know what other items you
4  had in mind when you said that?
5        MR. NORMAND:  Objection to form.  The
6  rest of the contract.
7        MR. MELAUGH:  Mr. Normand, that may be
8  your answer, but --
9        THE WITNESS:  That's my answer.  That's
10 my answer.  I have asked you before do you want me to
11 go through each page of the agreement and start talking
12 about which sections of the agreement identify
13 statements about what was transferred and what was
14 sold?
15       I mean, for one, you can go back to --
16 was it -- a Schedule C which lists all the trademarks.
17 If they weren't transferred as part of this agreement,
18 why are they listed?  There is certainly no right in
19 this contract granted to use the trademarks, so they
20 obviously must have been transferred.  Otherwise, we
21 would have been using them without having any right to
22 do that.
23       The copyrights must have been
24 transferred.  There is no right in this contract to
25 make copies of the software, so obviously the

9 (Pages 30 to 33)

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

James Wilt

Page 34

1  copyrights must have been transferred.  Otherwise, we
2  would have been violating copyright law with no
3  objection from Novell for probably a good ten years.
4        Can you show me in this contract where
5  there is a right to reproduce or a right to grant
6  someone the right to reproduce other than to transfer
7  the copyright to us?
8  BY MR. MELAUGH:
9  Q.    Sir, I have a couple of questions about what
10 you have just said.  Did you say that no trademarks
11 were transferred under this contract and --
12 A.    No, they are transferred.
13 Q.    They are transferred?
14 A.    Because there is no right to use the
15 trademarks that's explicitly put into this agreement,
16 so the only way we had a right to use the trademarks is
17 if they were transferred to us.  Then you have an
18 implicit right to use the trademark because you own
19 them, which is what happened in this agreement.
20       And the same thing with the copyright.  There
21 is no explicit right to copy.  There is no explicit
22 right to grant others to copy.  You don't need it in
23 this agreement because the copyright was transferred to
24 us.
25 Q.    I take it then your testimony is that when the

Page 35

1  excluded assets says all copyrights, it means something
2  less than all copyrights?
3        MR. NORMAND:  Objection to form.
4        THE WITNESS:  It certainly does not mean
5  all copyrights in the broadest sense of the word.  In
6  fact, it was referring to the copyrights related to the
7  NetWare assets, which were not transferred and sold to
8  SCO.
9  BY MR. MELAUGH:
10 Q.    Where in this agreement does it say that the
11 phrase "all copyrights" refers only to NetWare
12 copyrights?
13       MR. NORMAND:  Objection to form.
14       THE WITNESS:  I don't know that I can say
15 that in this agreement those explicit words are there.
16 I believe it was the amendment that helped clarify that
17 issue because the contract may have been poorly
18 drafted.
19 BY MR. MELAUGH:
20 Q.    Okay.  I think you can put the Asset Purchase
21 Agreement to the side point now.  I have some more general
22 questions at this point.  Now, the time frame I'm going
23 to be asking about is just prior to the Asset Purchase
24 Agreement.  Can you give me a general overview of what
25 SCO is doing at this point?  What is SCO's business at

Page 36

1  this point?
2        MR. NORMAND:  Objection to the form.
3        THE WITNESS:  Yeah, what -- can you be a
4  little bit more specific?  We were in business to make
5  money.  I mean, that's --
6  BY MR. MELAUGH:
7  Q.    That's a good -- I think that's a fair
8  clarification.  What -- so how is SCO making money?
9  What is it doing to make money?
10 A.    Selling product and services to the company
11 and collecting that revenue.
12 Q.    And what sorts of products is it selling?
13 This is before the Asset Purchase Agreement.
14 A.    It was selling software products.
15 Q.    What kind of software products?
16 A.    Licenses and some boxes.  I mean, how specific
17 do you want to get?  If you want to get down to
18 specific -- clarify your question and I'll answer it
19 more specifically.
20 Q.    What kinds of licenses and boxes are you
21 selling?  I mean, what's the -- as a general matter,
22 what products is SCO -- I'm not talking about -- I
23 don't want to know lines and version numbers, but as a
24 general matter, what kind of licensing and boxing
25 business is SCO in?

Page 37

1  A.    We sold system software, and some people, to
2  clarify, classify it as Tarantella systems software,
3  some people wouldn't.  They would classify it as an
4  application.  Infrastructure products maybe is a more
5  general term.
6  Q.    And the sorts of -- you said that -- you
7  divided it into we're selling products and we're also
8  selling services.  What sorts of services was SCO
9  selling at the time just prior to the Asset Purchase
10 Agreement?
11 A.    The services were support contracts to either
12 provide assistance to customers, provide break-fix
13 assistance, services -- there were some installation
14 and bespoke programming services sold.
15       THE COURT REPORTER:  I'm sorry, something
16 services?
17       THE WITNESS:  Bespoke.  Oh, installation
18 services?
19 BY MR. MELAUGH:
20 Q.    Did the services always relate to the products
21 that SCO was selling or was there a broader class of
22 services?
23 A.    At that time prior to the -- actually prior to
24 the formation of the business unit, all the services
25 were related to the products that we sold.

10 (Pages 34 to 37)

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

9dca1273-d111-46f6-8e03-6ceaad00824b

# EXHIBIT 34

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 F7pg5JD6pWTGo/T6MxDKANdj0Hl+OVqWJ5vyP8OT61ztRRP/2/Og+t14ws6rRKMC
 7T064JiLDibz0es9vG7Ihg==

<SEC-DOCUMENT>0000891618-96-003164.txt : 19961225
<SEC-HEADER>0000891618-96-003164.hdr.sgml : 19961225
ACCESSION NUMBER:                    0000891618-96-003164
CONFORMED SUBMISSION TYPE:           10-K405
PUBLIC DOCUMENT COUNT:               6
CONFORMED PERIOD OF REPORT:          19960930
FILED AS OF DATE:                    19961224
SROS:                 NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:                   SANTA CRUZ OPERATION INC
                CENTRAL INDEX KEY:                        0000851560
                STANDARD INDUSTRIAL CLASSIFICATION:       SERVICES-PREPACKAGED SOFTWAR
                IRS NUMBER:                               942549086
                STATE OF INCORPORATION:                   CA
                FISCAL YEAR END:                          0930

        FILING VALUES:
                FORM TYPE:              10-K405
                SEC ACT:                1934 Act
                SEC FILE NUMBER:        000-21484
                FILM NUMBER:            96685426

        BUSINESS ADDRESS:
                STREET 1:               400 ENCINAL STREET
                STREET 2:               PO BOX 1900
                CITY:                   SANTA CRUZ
                STATE:                  CA
                ZIP:                    95060
                BUSINESS PHONE:         4084277172
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>FORM 10-K405
<TEXT>

<PAGE>   1
                              UNITED STATES
                   SECURITIES AND EXCHANGE COMMISSION
                        WASHINGTON, D.C. 20549


                              FORM 10-K

                                ---

         X ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d)
              OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 1996

---

TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM _____ TO _____

------------------------------------

COMMISSION FILE NUMBER 0-21484

THE SANTA CRUZ OPERATION, INC.
(Exact name of registrant as specified in its charter)

<TABLE>
<S>                                                                    <C>
        CALIFORNIA                                              94-2549086
        (State or other jurisdiction of                         (I.R.S. Employ
        incorporation or organization)                          Identification


        400 ENCINAL STREET, SANTA CRUZ, CALIFORNIA                  95060
         (Address of principal executive offices)               (Zip Code
</TABLE>

        Registrant's telephone number, including area code (408) 425-7222

        Securities registered pursuant to Section 12(b) of the Act: NONE

    Securities registered pursuant to Section 12(g) of the Act: COMMON STOCK

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90    Yes /X/    No / / days.

Registrant became subject to such filing requirements on May 25, 1993 as a
result of its initial public offering.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be the best of
registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. /X/

The aggregate market value of the voting stock held by non-affiliates of the
registrant, based upon the closing sale price of the Common Stock on December
16, 1996 as reported on the Nasdaq National Market was approximately
$131,354,906. Shares of Common Stock held by each executive officer and director
and by each person who owns 5% or more of the outstanding Common Stock have been
excluded in that such persons may be deemed to be affiliates. This determination
of affiliate status is not necessarily a conclusive determination for other
purposes.

As of December 16, 1996, registrant had 36,405,225 shares of Common Stock

31

<PAGE>   17
            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)


   The Company's management believes the uncertainty regarding the timing of the
realization of net deferred tax assets requires a valuation allowance.

   The Company has unused research credit carry-forwards of approximately $1.5
million for federal tax purposes as of September 30, 1996, which expire in
fiscal years 2008 through 2011.

   At September 30, 1996, the foreign subsidiaries of the Company had cumulative
unremitted foreign earnings of approximately $7.8 million. Had these earnings
been repatriated during fiscal 1996, the incremental U.S. tax liability would
not have been material after taking into account underlying foreign taxes and
tax credit carry-forwards. The management intends to reinvest these earnings
indefinitely.

Note 13 - ACQUISITIONS

VISIONWARE LIMITED In December 1994, the Company completed the acquisition of
Visionware Limited ("Visionware") for $13.7 million in cash and 114,342 shares
of common stock. Non-recurring charges of $14.1 million were incurred in fiscal
1995 for costs associated with the acquisition. Of the nonrecurring charges,
$11.2 million was related to non-tax deductible purchased research and
development for Visionware products which had not yet reached technological
feasibility, The remaining $2.9 million related to redundant facilities and
other one-time acquisition related charges. Intangibles of $5.2 million, arising
from the business acquisition, are amortized on the straight-line basis over
estimated useful lives ranging from three to seven years. Amortization expense
amounted to $.9 million in fiscal 1996 and $.7 million in fiscal 1995 and is
included in general and administrative expenses in the Company's Consolidated
Statements of Operations. The results of operations of Visionware have been
included in the consolidated financial statements since December 1994.
Visionware is engaged in the business of the development and distribution of PC
connectivity software integrating PCs running Microsoft Windows with servers
running UNIX applications.

UNIX BUSINESS In December 1995, the Company acquired certain assets related to
the UNIX business including the core intellectual property from Novell. The
consideration consisted of 6,127,500 newly issued shares of non-registered
common stock and assumed liabilities totaling approximately $9.3 million.
Additionally, cash payments to Novell with a present value of $84 million will
be paid periodically by SCO to Novell provided certain unit volumes of UNIX
system distribution is achieved. To date, distribution unit volume of UNIX
systems has not reached levels which have required the Company to make cash
payments to Novell. Such payments terminate at the end of the calendar year
2002. The acquisition has been accounted for using the purchase method of
accounting and, therefore, the accompanying financial statements include
the UNIX


32

<PAGE>   18
            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

business since the date of the acquisition. Non-recurring charges of $38.4
million were incurred in fiscal 1996 for costs associated with the acquisition.
The Company also purchased core intellectual property totaling $5.8 million,
software technology licenses totaling $5.5 million and intangibles of $1.7
million. Software technology licenses and intangibles are amortized as general
and administrative expenses on the straight-line basis over their estimated
useful lives, generally five years.

Note 14 - RELATED PARTY

In January 1995, the Company purchased 10% of one of its domestic distribution
channel partner's preferred series stock in exchange for cash, product and
equipment valued at $1.0 million. In addition, the Company has loaned $1.0
million to this partner. The loan matures on July 1, 1998, but may be converted
at any time prior to maturity for an additional 10% of either the partner's
preferred series stock or common stock. Interest on the outstanding borrowing
is due and payable at the loan's maturity.

   At September 30, 1996 and 1995, the Company had accounts receivable
outstanding with the related party of $1.6 million and $1.7 million,
respectively. Sales to the related party for fiscal years 1996 and 1995 were
$7.7 million and $4.6 million, respectively.


Note 15 - INFORMATION BY GEOGRAPHIC AREA

<TABLE>
<CAPTION>

| (in thousands) | Fiscal Year Ended September 30, | | |
| --- | --- | --- | --- |
| | 1996 | 1995 | 1994 |
| NET REVENUES: | | | |
| <S> | <C> | <C> | <C> |
| United States | $ 125,759 | $ 111,530 | $ 109,542 |
| Europe | 80,603 | 87,799 | 74,526 |
| Other international operations | 1,528 | – | – |
| Total net revenues | $ 207,890 | $ 199,329 | $ 184,068 |
| TRANSFERS BETWEEN GEOGRAPHIC AREAS: | | | |
| United States | $ 16,894 | $ 23,807 | $ 18,772 |
| Europe | 916 | 945 | 5,798 |
| Total transfers | $ 17,810 | $ 24,752 | $ 24,570 |
| OPERATING EARNINGS (LOSS): | | | |
| United States | $ (29,017) | $ (5,111) | $ 8,119 |
| Europe | 2,864 | 121 | 8,360 |
| Other international operations | 120 | (1,052) | 1,977 |
| Eliminations | 2,452 | (450) | 169 |
| Operating earnings (loss) | $ (23,581) | $ (6,492) | $ 18,625 |
| IDENTIFIABLE ASSETS: | | | |