**Westlaw.**

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Greyhound Financial Corp. v. Willyard
D.Utah, 1989.
Only the Westlaw citation is currently available.
United States District Court, D. Utah.
GREYHOUND FINANCIAL CORP., formerly known as Greyhound Leasing & Financial Corp., et al.
v.
J. R. WILLYARD, et al.
No. 87-C-0911B.

Dec. 26, 1989.

Memorandum and Order
BROOMFIELD, District Judge

*1 On August 21, 1989, through August 25, 1989, the court heard various defendants' motions for summary judgment and related motions to strike. After extensive briefing and argument by the parties, and after a preliminary review of the material by the court, the court took all of these matters under advisement. The following memorandum and order decides all issues pending before the court, including previous motions for summary judgment and partial summary judgment filed by some of the defendants that remained under advisement at the time of the August hearings. Any remaining issues to be decided by the court at this stage of the litigation may be raised by the parties at a status conference set by the court at the conclusion of this memorandum and order.

I. Introduction

This court has worked with the many attorneys on this case since the inception of both this litigation and the court's tenure on the federal bench in the late Summer of 1985. At the present time of the filing of this memorandum and order, almost 5,000 separate docket entries are listed in the Clerk of the Court's docket sheet for this case. This represents an estimated 120 linear feet of paper filed by the parties, all of which is presumably part of the record before the court at the present time. After extensive Rule 12 motion practice by defendants, several amendments to the pleading by plaintiffs, transfer of this action to the District Court for the District of Utah, and voluminous discovery practice by all sides, the court is now presented with defendants' Rule 56 motions and various motions to strike which relate to them. In toto, there are eighty-six motions before the court. The court will not attempt to estimate the height of the parties' motion papers except to say that the volume represents a considerable obstacle to the prompt and judicious determination of the pending motions.

However, it is an obstacle which the court must surmount both to maintain the integrity of the judicial system and in an effort to eventually resolve the parties' disputes. The court is able to complete this task only after careful consideration of the parties' positions on the facts and the law and after applying an ample dose of common sense. In this latter vein, the court will attempt to avoid further restriction of the Clerk of the Court's file drawers by limiting this memorandum to only those issues which necessarily must be discussed to resolve the pending motions. While it may have been perceived by many of the parties that their interests were best served by inundating the court with papers, this method of practice ends with the filing of this memorandum and order.

II. Procedural Background

In the Fall of 1988, the court granted several defendants leave to file motions for partial summary judgment on certain discrete issues. After a full briefing by the particular parties involved, and after conducting oral argument on the matters, the court took some of these motions under advisement. These motions now pending before the court are:(1) Ronald S. Hanson's ("Hanson") motion for summary judgment (docket # 3900); (2) Hanson's motion to strike the affidavit of William B. Watkins (docket # 4134); (3) Argus Leasing Corporation's ("Argus") motion for partial summary judgment (docket #### 4142); (4) Donald Timpson ("Timpson") and M. Scott Newbold's ("Newbold") motion for partial summary judgment (docket # 4140); and (5) plaintiffs Greyhound Financial Corporation and Greycas, Inc." motion re: Zions Defendants' Second Set of Requests for Admissions with Interrogatories (docket # 4087).

*2 At the beginning of 1989, the court also allowed each party the opportunity to file a single, consolidated motion for summary judgment designed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-2   Filed 06/07/2007   Page 2 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 2

to reach all issues perceived addressable by such a motion. A lengthy response and reply briefing period ensued and the parties eventually argued their motions before the court in August of this year. These dispositive motions pending before the court are: (1) First Interstate Bank of Utah, N. A.'s ("FI-Utah") motion for summary judgment (docket # 4412); (2) William Gurr's ("Gurr") motion for summary judgment (docket # 4343); (3) First Security Bank of Utah, N.A.'s ("FSB") motion for summary judgment (docket # 4352); (4) Zions First National Bank's ("ZFNB") motion for summary judgment (docket # 4354); (5) Zions Leasing Company's ("ZLC") motion for summary judgment (docket # 4356); (6) Argus' motion for summary judgment (docket # 4361); (7) Zion's Mortgage Company's ("ZMC") motion for summary judgment (docket # 4365); (8) Newbold's motion for summary judgment (docket # 4375); (9) Timpson's motion for summary judgment (docket #### 4373); (10) Hanson's motion for summary judgment (docket ## 4371); (11) First Security Financial's ("FSF") motion for summary judgment and for judgment on the pleadings (docket # 4348); (12) Richard A. Christenson's ("Christenson") motion for summary judgment and for judgment on the pleadings (docket # 4404); (13) George S. Diumenti's ("Diumenti") motion for summary judgment (docket # 4389); (14) William H. Lindsley and Diumenti & Lindsley's ("Lindsley") motion for summary judgment (docket # 4389); (15) Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's ("Allred") motion for summary judgment (docket # 4475); (16) William R. Stoddard's ("Stoddard") motion for summary judgment or for a pre-judgment writ of replevin (docket # 4347); (17) Vicki Roussin's motion for summary judgment (docket # 4339); (18) Michael R. Roussin's motion for summary judgment and dismissal (docket # 4338); (19) Thomas C. Mabey and The Consortium, Inc.'s ("Mabey") motion for summary judgment (docket # 4480); and (20) Syed A. Hasan's ("Hasan") motion for summary judgment (docket #### 3600).

After receiving plaintiffs' responses in opposition to these motions for summary judgment, several defendants filed motions/joinders to strike various declarations, affidavits, deposition testimony, and sworn statements filed by GFC. The parties fully briefed these matters and argued them before the court at a hearing on August 21, 1989. Grouped according to subject matter, the following motions/joinders to strike are pending before the court: (1) Lindsley (docket # 4700), Diumenti (docket # 4700), and Allred's (docket # 4725) motions to strike the testimony and affidavit of Jeffrey Leyton; (2) Mabey (docket # 4716) and Allred's (docket # 4729) motions to strike the declaration of Robert H. Damm; (3) Allred (docket # 4731), FI-Utah (docket # 4657), FSB (docket # 4620), Diumenti (docket ## # 4703 & 4810), Gurr (docket # 4694), and Mabey's (docket # 4715a) motions to strike the declaration of Robert W. Bertrand; (4) Allred (docket ## 4728), FI-Utah (docket ## 4610), FSB (docket # 4621); Diumenti (docket ## 4705), and Mabey's (docket ## 4718) motions to strike the declaration of Bruce H. Baum; (5) Gurr (docket ## 4628), Allred (docket # 4732), FI-Utah (docket ## 4658), FSB (docket # 4667), FSF (docket # 4636), Christenson (docket ## 4714), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket ## 4683) motions to strike designated portions of the affidavits of William B. Watkins; (6) Allred (docket # 4726), FI-Utah (docket # 4608), FSB (docket ### 4605), Diumenti (docket # 4706), FSF (docket # 4689), Mabey (docket # 4717), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4691) motions to strike the declaration of Robert M. Mathis; (7) plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s cross-motion to amend responses to FI-Utah's Seventh Set of Requests for Admissions (docket ### 4680); (8) FI-Utah (docket # 4626), FSB (docket # 4635); Gurr (docket # 4654); and Allred's (docket # 4733) motions to strike the affidavit of Gary A. Mathis; (9) Christenson (docket ## 4672), Vicki Roussin (docket # 4737), Gurr (docket # 4673), Allred (docket # 4737); FI-Utah (docket ## 4629), FSB (docket # 4619), Diumenti (docket # 4704), FSF (docket # 4640), Mabey (docket # 4715), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket # 4785) motions to strike various affidavits, deposition testimony, and sworn statements of Sheldon Player ("Player"); and (10) Christenson (docket ## 4892), Gurr (docket ## 4894 & 4909), FI-Utah (docket ## 4861), FSB (docket # 4866), Diumenti (docket ### 4882), Mabey (docket ## 4897), Stoddard (docket # 4918), FSF (docket ### 4880), and ZNFB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson's (docket ### 4899) motions to strike Player's August 4, 1989 sworn statement.

III. Factual Background

*3 The following factual summation of the case serves more as an effort to put the parties contentions into some semblance of order rather than as the court's conclusions concerning the legal sufficiency of the evidence thus far presented. To a large extent,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

the following factual setting is gleaned from the undisputed portions of the parties' statements of fact. Genuine disputes of material fact among the parties are discussed below by the court where they are specifically raised by the parties-in the various motions to strike and motions for summary judgment. Thus, the parties are directed to the court's analysis of the specific facts underlying their respective motions for an in-depth discussion of the factual disputes involved in their particular case.

A. The Parties

1. Plaintiffs

Plaintiff Greyhound Financial Corporation ("GFC") is a Delaware corporation and a wholly-owned subsidiary of The Greyhound Corporation ("TGC"), also a Delaware Corporation. Plaintiff Greycas, Inc. ("Greycas"), is an Arizona corporation and a wholly-owned subsidiary of GFC. Unless otherwise indicated, GFC and Greycas will be referred to by the court as "GFC". During the time period relevant to this litigation, both GFC and Greycas were engaged primarily in the business of financing real and personal property. Each had a division which financed commercial personal property as well as one involved in commercial real estate financing. Although separate corporations, all or most of the officers and employees at GFC were also employed in the same capacity by Greycas. Greycas's equipment finance division was engaged primarily in providing loans for the purchase, by its customers, of commercial property. Similarly, GFC's equipment finance department provided long-term and intermediate fixed rate leases for commercial equipment."

Leases and loans were both profitable methods of financing equipment for GFC. Under a lease, the lessor buys the equipment from an equipment vendor and leases it to the lessee for its own use or for sublease to an end user. Thus, while the lessor is the legal owner, the end user gets the full use of the equipment. Under a loan, the borrower purchases the equipment for its own use or lease to an end user. The borrower therefore holds title to the equipment, while the lender obtains a security interest in the equipment. In its leasing transactions, GFC obtained the tax benefits of depreciation and investment tax credits and passed these on to its parent company, TGC. In its secured loan transactions, these tax benefits remained with the borrower.

2. Player and Player Entities/Partners

Until late 1984, when he moved his business operation to the Phoenix metropolitan area, Player was engaged in the machine tool and equipment business in Vernal, Utah. Vernal is a small community (population of approximately 10,000) located near the eastern Utah border, about 180 miles from Salt Lake City. While in Vernal, Player engaged in numerous lease and loan transactions with a variety of companies and also was involved to some extent in real estate development in the area. Player conducted his business through two primary business entities-Alpine Machinery Sales, Inc. ("AMS"), a corporation, and Player & Willyard ("P&W"), a partnership with J. R. Willyard ("Willyard"). AMS bought and sold equipment while P&W acquired and developed real estate in Vernal, Utah, and eventually in Salt Lake City, Utah, and Phoenix, Arizona. Willyard and Player agreed that Willyard would handle real estate matters while Player took care of financial matters for the companies. AMS and P&W were often considered to be a single entity, and were treated as such by Player and Willyard as well as by various third parties."

*4 Roussin began working for AMS and P&W in October of 1983, first as an accountant and then as a controller. From May of 1984 through August of 1985, Player employed Vicki Webb (who later married and changed her name to Vicki Roussin) as a secretary for the P&W entities.

Stoddard formed a partnership with Edward Heintz doing business as Financial Conveyance Company ("FCC") in August of 1982 and continuing through August of 1985. When FCC was formed in 1982, it operated out of the offices of Cottonwood Thrift & Loan ("CTL"), used the bank's secretary and receptionist, and devoted approximately eighty percent of their work to CTL. Stoddard lost this major client when the bank was sold and he went to work for Player in February of 1984. FCC also moved into offices leased by P&W and used the services of P&W's secretary Vicki Roussin. According to Player, Stoddard was hired to organize the financial operations of the various Player entities.

Unknown to Player, Hasan had a history of engaging in fraudulent transactions in both England and the United States that dated back to the early 1970's. Typically, Hasan and his assistants would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

fraudulently represent that he was a trustee of a Middle Eastern trust which would fund a prospective borrower's project if certain initial conditions (i.e., fees and expenses) were met. This was the scenario Hasan utilized with Player and his assistants.

Player moved from Vernal, Utah, to Phoenix, Arizona in November of 1984. At approximately this same time period, Hasan, and Vicki and Michael Roussin also transferred their bases of operation to the Phoenix area.

### 3. Allred/Mabey/Diumenti/Lindsley

Allred first met Player in late 1982. He is Chairman and President of Triangle Oil, Inc. ("Triangle"), a Utah corporation. Allred owns ninety percent of the company. The remaining ten percent is held by various Allred family members. He is also general partner in Allred Family Investment Company ("AFIC"). This partnership is wholly owned by Allred, his wife Geraldine, and their two children. Unless otherwise designated, the court will refer to these three defendants as Allred.

Mabey is a civil engineer. In 1978, he founded The Consortium, Inc., an engineering consulting firm and a Utah corporation based in Bountiful, Utah. Mabey did not meet Player until late in 1982, when Diumenti introduced the two of them and they began discussions concerning the RRI project. Unless otherwise designated, the court will refer to these two defendants as Mabey.

In 1982, when he first met Player, Diumenti was the managing partner of the Diumenti, Hayward & Nelson law firm. He was also a member of the Board of Directors of Rocky Mountain State Bank of Salt Lake City and the Rocky Mountain State Bank of Bountiful. Player and Diumenti became good friends. Since they first met in the mid-1970's, Allred and Mabey have also been friends of Diumenti. Diumenti acted as Allred and Mabey's personal attorney as well as the attorney for Triangle Oil, Inc., Allred's Company, and The Consortium, Inc., Mabey's company.

*5 Lindsley has been employed by Diumenti's law firm since graduating from law school and since forming a partnership with Diumenti, Lindsley receives twenty percent of the gross profits of the firm. Unless otherwise noted by the court, Lindsley and the law firm of Diumenti & Lindsley will be referred to collectively as Lindsley.

The partnership of Diumenti, Mabey, Player & Willyard ("DMP&W") came into existence in the Spring of 1983. Allred was a "silent partner" in this partnership. The purpose of the DMP&W partnership was the acquisition, rebuilding, and eventual sale of the Riverdale Rodeway Inn ("RRI"). According to the partnership agreement submitted to GFC, Diumenti, Mabey, Player, and Willard each shared twenty-five percent of the partnership contributions, liabilities, and profits.

Although not formally dissolved, DMP&W was succeeded within thirty days of its inception by the partnership of Allred, Diumenti, Mabey, Player & Willyard ("ADMP&W"). The purpose of this partnership was the acquisition and rebuilding of the RRI project and the Rodeway Inn in Ft. Collins, Colorado, as well as the acquisition of an aircraft and certain thrift and loans. The ADMP&W partnership also investigated a hotel project in Southern California as well as other real estate projects. This partnership remained in existence through 1984, although it was not formally dissolved. Instead, Allred and Diumenti were bought out by the remaining partners.

Thus, ADMP&W was succeeded by the partnership of Mabey, Player & Willyard ("MP&W") in late 1984 or early 1985. Although MP&W was never formally dissolved, Mabey too was bought out of the partnership. At approximately the same time, Mabey, Player, and Willyard formed Gulfstream Industries and other related entities. The primary function of Gulfstream Industries as well as MP&W was to acquire and develop real estate. Gulfstream Industries was also in the business of purchasing and reselling oil field equipment.

### 4. The Financial Institution Defendants

FSB is a national banking association with its principal place of business in Salt Lake City, Utah. Player began his banking relationship with FSB in the late 1960's. During the course of Player's tenure as a FSB customer, he and his companies obtained more than 170 loans from, and opened at least eleven depository accounts at, FSB. Bill Gibson, and later on, Roger Ford, served as the Vernal branch managers.

In the mid-1970's, Dale Cameron ("Cameron"), the assistant manager of FSB's Vernal branch, took over primary responsibility for Player's accounts. While he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was employed at FSB, Cameron occasionally socialized with Player and would join him on hunting and fishing trips as well as at dinner and lunch engagements. In June of 1981, Cameron left FSB to work for Player's company AMS. Cameron then returned to FSB in October of 1981. Cameron claims that he left AMS because he was not given any responsibility and because the salary and benefits were not as Player had initially represented them to be. Player claims that Cameron was fired at AMS because of a disagreement with Willyard.

*6 In November of 1982, Cameron became an Assistant Vice President of FSB and held the same duties at the Vernal branch as when he left. As loan officer for the Player accounts, Cameron was responsible for processing Player's loan requests. Loans exceeding Cameron's lending authority had to be approved by the Vernal branch manager or FSB's division supervisors. During this period, Player was one of the largest customers of FSB's Vernal branch. Cameron considered Player's accounts to be the largest in terms of loans and other banking activities with which he dealt during his employment at FSB.

FSB instituted a special investigation after Player leveled charges of bribery and assistance in his frauds on GFC, including provision of an FSB customer's signature card for forgery purposes, against Cameron. While the investigation was pending, Cameron was placed on a leave of absence with pay beginning in April of 1986. FSB was never able to confirm that Cameron accepted bribes from Player and Cameron steadfastly denies any such actions. On September 20, 1986, at the request of FSB division supervisor Calvin Jeppson, Cameron resigned from his position with the bank. For the purposes of these motions, FSB concedes that there may exist a fact issue as to Cameron's involvement in Player's fraudulent activities. The court notes that Cameron is not one of the movants seeking summary judgment.

FSF was incorporated on December 9, 1982, and is a wholly-owned subsidiary of First Security Corporation ("FSC"), a bank holding company. FSF was established by the holding company to enter the thrift business and to effect the purchase of Murray First Thrift & Loan ("MFT"). MFT operated as an industrial loan company until July 22, 1982, when the State of Utah declared it insolvent and took possession of it. Following state court approval, FSF acquired all of the assets and most of the liabilities of MFT and its sister corporation, MFT Leasing. Christenson was President of Capitol Thrift & Loan ("CT&L") from 1960 until December 10, 1982. On that date, FSF and CT&L entered into an agreement whereby FSF purchased CT&L's assets, assumed all of its liabilities, and hired CT&L's employees. Christenson was hired as President and Chief Operating Officer of FSF and began his duties in December of 1982. Early in 1983, Christenson first met Player.

At the end of its first year of operation, FSF was operating at an alarming loss. An extensive audit and examination was undertaken by FSF's auditing division. The auditors expressed concern about apparent incidents of self-dealing and conflicts of interest in upper level management, and about poor morale among lower echelon employees caused by a lack of confidence in upper management. Among other things, the final report by the auditors revealed several personal transactions between Christenson and Player in which Player purchased jewelry, three boats and trailers, and a fur coat from Christenson. In November of 1984, the Chairman of the Board for FSF, C. S. Cummins, and the Chairman of the Board for FSC, Spencer Eccles, met with Christenson after he was first given a copy of the 133-page audit report. They asked for Christenson's resignation, and by a letter dated November 26, 1984, Christenson obliged and formally resigned from FSF. Chairman Eccles claims that Christenson's relationship with Player had nothing to do with his decision to change FSF's management.

*7 FI-Utah is a national banking association with its principal place of business in Salt Lake City, Utah. Gurr was an Assistant Vice President (Vernal Branch Manager) of FI-Utah and was employed by the bank beginning in the mid-1970's. Player transacted business with Gurr as early as 1979. Between 1982 and 1984, Gurr and Player were partners in a business venture called "Lease Consultants." It is uncontested that Gurr's involvement in this venture violated FI-Utah's personnel policies and ultimately resulted in the termination of his services to the bank in October of 1986.

Player and his related companies became the largest customer of FI-Utah's Vernal Branch. According to the bank, Player, along with other good customers of the bank Player was regularly permitted to draw against uncollected funds on his accounts. Player also borrowed money regularly from FI-Utah. He was rarely out of debt and credit was extended at times when Player acknowledged cash flow problems and at times when certain FI-Utah credit analysts opined that Player's financial statements were inconsistent and unclear. It is undisputed that in response to credit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 6
Not Reported in F.Supp., 1989 WL 201,094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

reference inquiries, FI-Utah did not indicate that it had experienced any material problems with the Player accounts.

For example, in May of 1983 in relation to the RRI construction loan for $2.3 million, GFC's employee David Phillips ("Phillips") called Gurr and requested a credit reference for Player, Willyard, and their companies. The information that Phillips obtained from Gurr was included in the write-up on the RRI proposal, which stated, inter alia, that (1) FI-Utah had a five-year account relationship with Player and Willyard, (2) FI-Utah handled business as well as personal accounts, (3) Player and Willyard maintained checking accounts with average balances in the mid-six figures, (4) that Player and Willyard handled all accounts as agreed, and (5) that Gurr spoke highly of Player and Willyard and would entertain new business."

ZFNB is a national banking association with its principal place of business in Salt Lake City, Utah. ZFNB is a wholly-owned subsidiary of Zions Utah Bancorporation. Some of ZFNB's officers mentioned in the briefing process are: Roy Simmons ("Simmons"), Chief Executive Officer; Hanson, President; Noall Bennett ("Bennett"), Executive Vice President, Commercial Lending; Angus Belliston ("Belliston"), Senior Vice President, Southern Division Manager; James Anderson ("Anderson"), Vice President, Commercial Loan Officer; R. Kay Poulsen ("Poulsen"), Vice President, Real Estate Department Manager; and J. Robert Bonnemort ("Bonnemort"), Commercial Loan Officer. From 1979 through 1984, ZFNB's senior loan committee approved seven loans to Player totalling in excess of $1.2 million. ZFNB's loan officers are instructed to refer potential lease customers to Argus if the dollar amount of the lease exceeds $100,000 and to ZLC for leases under this amount."

*8 Argus is a Utah corporation established in 1974 and is a wholly-owned subsidiary of Zions Utah Bancorporation. In August of 1986, Argus changed its name to Zions Credit Corporation. The principal officers of Argus are: Richard Van Winkle ("Van Winkle"), President (until 1983); Bennett, President (1983-86); Bonnemort, Executive Vice President, Chief Operating Officer, and Manager (until 1978); and John Callis ("Callis"), Vice President and Manager (since 1978). Van Winkle, Bennett, and Callis together with Hanson also were directors of Argus. Argus supervises equipment leasing for ZFNB, including assistance to branch officers in negotiations with prospective customers, establishment of rates, terms, residual values, and documentation and administration of leases. Callis was authorized to arrange, inter alia, lease transactions, deal with the vendors of the equipment and the lessees, supervise collection efforts, monitor the transactions, and run the day to day affairs of Argus. ZFNB provided 99% of the funding for four of the five leases entered into by Argus with the Player companies."

ZLC is a Utah corporation established in 1961 (formerly Lockhart Leasing Corporation) and is also a wholly-owned subsidiary of Zions Utah Bancorporation. The principal officers of ZLC are: Van Winkle, President (until 1983); Max Barber ("Barber"), Vice President and Manager (until 1980); Timpson, Vice President and Manager (from 1980 through 1986); Newbold, Assistant Vice President and Assistant Manager. From approximately 1979 to 1983, Player engaged in numerous leasing transactions with ZLC.

Finally, ZMC is a Utah corporation and a wholly-owned subsidiary of Zions Utah Bancorporation. ZMC acts as an agent for ZFNB on all of its real estate loans.

B. The Player Frauds

[Equipment Leasing]

Player actively did business with GFC over a six-year period beginning in the Summer of 1979. Over the course of the next six years, GFC disbursed in excess of $74 million to Player through various loans and equipment leasing transactions. Under the equipment leasing transactions, GFC would purchase equipment which it would then lease to Player. Player, in turn, would sublease the equipment to the end-user. In many of these equipment leasing transactions, the equipment GFC purchased was to be shipped directly to the end-user by the vendor or manufacturer of the equipment. As a result, GFC never received or inspected the equipment it purportedly purchased. As noted by GFC's former President and Chief Executive Officer, Robert W. Bertrand, this was "the nature of the business."

Thus, in each of the GFC equipment leasing transactions with Player, either Player or one of his companies would submit an invoice to GFC for the equipment GFC had purchased. GFC would then issue a check made payable to whomever had

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 7

submitted the invoice. Consequently, GFC always paid Player or an affiliated company for the equipment in question. Player also obtained five loans from Greycas for the purchase of equipment. Player would then either keep the equipment for use by one of his companies or lease the equipment to a third party.

[Check Kiting]

*9 During the Summer of 1984, Player and Michael Roussin also implemented a check kiting scheme which involved accounts at FI-Utah, FSB, and ZFNB. A check kite is the utilization of a demand deposit account to make payments to other banks through overdrafts or the use of checks that are drawn against uncollected or insufficient funds. According to GFC, such payments are, in effect, unsecured loans. GFC contends that the check kite operated by Player and Roussin provided the Player companies with cash to make timely, monthly payments to GFC in the absence of sufficient revenues from other sources.

[Sham Leasing Transactions]

The unraveling of the Player frauds began in the Spring of 1985 when GFC sought to conduct physical inspections of the equipment and machinery it thought was securing the various transactions. Player stalled GFC's efforts for some time, but as GFC continued to press for the inspections in the Summer of 1985, Player was finally forced to reveal the nature and extent of his fraudulent activities. Player admits that he defrauded GFC into entering into the equipment lease transactions and mislead GFC into believing that the equipment and subleases existed, and that the GFC funds would be used towards equipment leases as intended by GFC. In virtually every case, the equipment did not exist. Rather, the sham transactions were designed to allow Player to obtain millions of dollars from GFC for use in his other business ventures.

[Financial Institutions' Roles]

It is undisputed that the various financial institution defendants, as well as defendants Gurr, Cameron, Christenson, Timpson, Newbold, and Hanson were aware that GFC was a major source of credit for Player and his companies. Proceeds from Player's transactions with GFC were often deposited at FI-Utah, FSB, and ZFNB. Moreover, Player often provided these banks and FSF with copies of GFC transaction documents to evidence his business relationship with GFC and to demonstrate the existence of a future source of income for his companies. Player defrauded GFC during much of the time that he maintained a banking relationship with FI-Utah, FSB, ZFNB, and FSF. Without exception, every former and present employee of the various financial institutions named as defendants in this action denies under oath having any knowledge that Player was defrauding GFC or that funds Player deposited or used to pay off loans from these institutions were the proceeds of these frauds. Portions of the above deposition testimony and affidavit statements are offered by the various defendants in support of their respective motions for summary judgment.

[Criminal Convictions]

Besides the initiation of the underlying civil lawsuit, these fraudulent circumstances also resulted in four criminal convictions in the District Court for the District of Arizona. In March of 1986, Player entered into a plea of guilty before this court to two counts of interstate transportation of money taken by fraud, 18 U.S.C. § 2314, and one count of mail fraud, 18 U.S.C. § 1341. He was sentenced in December of 1988, and is presently serving his prison term. In June of 1988, following a mistrial on eleven counts of mail fraud, four counts of interstate transportation of money taken by fraud, and one count of conspiracy, 18 U.S.C. § 371, Player's former partner Willyard entered into a plea of guilty before another judge to two counts of mail fraud and one count of conspiracy to commit mail fraud. He too has been sentenced and is presently incarcerated. In November of 1986, Roussin entered into a plea of guilty to two counts of wire fraud before this court and was subsequently sentenced to a term of probation. He has since relocated back to the Salt Lake City area with his wife Vicki. Finally, Hasan was convicted before another judge of crimes related to his participation in the Player frauds against GFC. Specifically, Hasan was found guilty of one count of interstate transportation of money taken by fraud, and one count of perjury, 18 U.S.C. § 1623. He is presently serving his prison sentence as well.

C. The Litigation

*10 GFC's original Complaint was filed on August 9,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

1985. It asserted claims against twenty-seven defendants, including Player, various Player entities, Willyard, Michael and Vicki Roussin, Hasan, Diumenti, FI-Utah, and FSB. GFC's First Amended Complaint, filed three days later, added defendants ZFNB and FSF. One week later, GFC was granted leave to file its Second Amended Complaint. GFC also filed a Consent to Judgment by Player and certain Player entities. On September 19, 1985, the court granted GFC judgment against Player for $79,730,135 and for other relief. At the same time, Player also entered into a Cooperation Agreement with GFC and promised to assist GFC in the recovery of its losses associated with the Player frauds.

From the filing of the Second Amended Complaint until February of 1986, the court conducted a series of preliminary injunction hearings. During this period, several defendants stipulated to the entry of preliminary injunctions. The court also granted and denied a number of these preliminary injunctions at the time of the hearings. Early on in this litigation, the court was also confronted with a number of bankruptcy petitions pursued principally by Hasan. The court withdrew the references to the bankruptcy court and dismissed these petitions, pursuant to 11 U.S.C. § 305(a) (1), for a variety of reasons and in lieu of an Intercreditors' Agreement entered into by most of the parties. The Agreement attempted to resolve ownership problems related to the properties acquired by Player during the time he was perpetrating his fraudulent schemes on GFC.

GFC next sought leave to file the Third Amended Complaint adding Greycas as a plaintiff. The court rejected defendants' objections to this amendment and on February 11, 1987, GFC filed this slightly modified pleading as the Fourth Amended Complaint. Although FSB was dismissed from the Second Amended Complaint it was renamed as a defendant in the Third and Fourth Amended Complaints. Allred, Mabey, Lindsley, Gurr, Christenson, Cameron, Stoddard, ZMC, ZLC, Argus, Lockhart, Hanson, Timpson, and Newbold were also added as defendants in the Fourth Amended Complaint.

The court previously noted that this amended pleading substantially altered the tenor and direction of the litigation. See Memorandum and Order of September 9, 1987, 8. In essence, a new lawsuit commenced almost a year and one-half after the filing of the original complaint. The principal architects of the Player Frauds are no longer defendants in this action, especially since Willyard entered into a Consent Judgement with GFC in December of 1988. Moreover, the various banking institutions, originally joined as stakeholder defendants, are alleged to be coconspirators in, and direct beneficiaries of, the Player frauds.

Following the filing of the Fourth Amended Complaint, several defendants filed motions to dismiss/transfer and motions for summary judgment. After a lengthy briefing and hearing process, the court granted in part and denied in part the motions in its Memorandum and Order dated September 9, 1987. Although the court denied the motions to dismiss and motions for summary judgment, it did order the transfer of this matter to the District of Utah. It also ordered GFC to timely supplement its allegations concerning the Player RICO enterprise and mail/wire fraud. GFC filed its First Supplemental Pleading on September 23, 1987, and pursuant to further order of the court, also filed its Second Supplemental Pleading on February 12, 1988. Finally, the court dismissed the anti-tying claims, GFC's Sixteenth and Seventeenth Claims for Relief, against FSB and ZFNB.

*11 Thus, GFC's current pleading in this litigation is a court-ordered, modified version of the Fourth Amended Complaint containing fourteen causes of action. These Claims for Relief are the subject of the pending motions for summary judgment. Overall, GFC's pleading seeks damages in excess of $79 million exclusive of interest, costs, and attorneys' fees. However, the court notes that GFC's Verified Amended General Damage Statement (docket # 4519) alleges total damages well in excess of this original amount. Damage discovery in this action remains to be concluded.

[RICO Claims]

The court will briefly discuss the individual causes of action seriatim. GFC's First Claim for Relief is asserted against all defendants and alleges a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). GFC contends that the Player frauds were perpetrated during the period from 1979 though August of 1985, and later in some instances. The frauds are generally broken down as follows: the June 1979, October 1980, March 1981, April 1982, September 1984, October 1984, and January 1985 Equipment Leasing Schemes; the Hotel Financing Scheme; the Check Kite and Money Laundering Schemes; the Shea Boulevard Scheme;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 9
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

the Bank Schemes to defraud in violation of public trust and fiduciary/statutory duties; and the Conspiracy to Commit Mail and Wire Fraud and Interstate Transportation and Receipt of Stolen Property.

The Equipment Leasing Schemes concern the fraudulent acquisition of loans from GFC for the purpose of purchasing and leasing machine tools and oil field equipment. This equipment was by and large never purchased by Player, or if it was purchased, it was sold and leased at substantially overinflated values. The Hotel Financing Scheme and Shea Boulevard Scheme are alleged to involve the fraudulent obtaining of GFC funds based on false representations of the value of the properties. The remaining Bank Schemes are directed at the financial institutions named as defendants in this action.

GFC's Second Claim for Relief alleges that all defendants took part in a conspiracy to commit mail fraud, wire fraud, and interstate transportation and receipt of stolen property in violation of § 1962(d) of the federal RICO statutes. This claim incorporates the various allegations of the First Claim for Relief and is based entirely on the schemes listed above.

The Third through Tenth Claims for Relief are premised on violations of § 1962(a) of the federal RICO statutes and are directed against the following defendants: Lindsley and Diumenti (Third); FSB (Fifth); FSF and Christenson (Sixth); ZFNB, ZLC, ZMC, Argus, Lockhart, Hanson, Timpson, and Newbold (Seventh); FI-Utah and Gurr (Eighth); Allred (Ninth); and Mabey (Tenth). Each of these claims for relief incorporates the preceding allegations of the complaint and further alleges that the named defendants received income from a pattern of racketeering activity and used or invested such income in the operation of one or more enterprises.

*12 GFC's Eleventh Claim for Relief sounds in Utah and Arizona statutory racketeering law, Utah Code Ann. § 76-10-1603 ("RICE") and Ariz. Rev. Stat. § § 13-2301D4 and 13-2312 ("AZRAC"), respectively. This state RICO claim is alleged against all defendants. It too incorporates the preceding language of the Fourth Amended Complaint and further alleges that defendants committed violations of the state racketeering statutes "including theft, resale of realty with intent to defraud, schemes and artifices to defraud and conspiracy, solicitation, requesting, commanding, encouraging, or intentionally aiding another in the commission of the same." GFC's Fourth Amended Complaint, ¶ 253.

Similarly, GFC's Twelfth Claim for Relief is directed against all defendants and sounds in common law fraud.

Finally, GFC's Thirteenth through Fifteenth Claims for Relief are directed against movants Diumenti, FSB, FSF, ZFNB, ZMC, Lockhart, Argus, FI-Utah, Christenson, Gurr, Allred, Mabey, Stoddard, Michael Roussin, Vicki Roussin, and Hasan. The Thirteenth Claim for Relief is based on the Uniform Fraudulent Conveyances Act. See Utah Code Ann. § § 25-1-1 to 25-1-16; Ariz. Rev. Stat § § 44-1001 to 1013. The Fourteenth Claim for Relief alleges that these defendants converted GFC's monies and properties and the Fifteenth Claim for Relief sounds in equity and seeks recovery under constructive trust and equitable lien theories.

Since the court's September 9, 1987 denial of defendants' motions to dismiss GFC's pleading in its entirety, the parties' discovery and motion practice has been governed by a series of scheduling orders set forth by the court. As all parties acknowledge, the parameters of the most recent phase of this litigation have been generous to all sides. The parties engaged in very extensive discovery concerning liability (concluded) and damages (yet to be concluded) issues. Player was deposed by the parties for seventy-three days and his deposition transcript totals 10,420 pages. In all, the parties have deposed 370 people, over seventy of whom are current employees of GFC. For the past two years the court conducted a monthly status conference in Salt Lake City, Utah, to hear and decide a wide range of motions filed by the parties. Over 300 motions and issues raised by the parties were decided by court at these monthly hearings, as well as specially set hearings in Phoenix, Arizona. Moreover, as detailed above, the parties have spent the better part of the past year briefing the pending motions for summary judgment allowed by the court's scheduling order.

[Knowledge]

In conclusion, the main allegation which runs throughout the statutory, common law, and equitable claims asserted in the Fourth Amended Complaint is that defendants knew of Player's fraudulent activities and knowingly joined in them. While all defendants deny that they had any knowledge of the Player frauds, the court notes that several defendants concede that one could reasonably conclude from the state of GFC's evidence that many of the parties were in a position in which they could have discovered, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 10

even should have discovered, the fraudulent nature of Player's operations. In fact, defendants would apply this same conclusion to the state of GFC's knowledge as well. These same defendants are quick to point out, however, that the possibility of specific knowledge is not the same as some proof of actual knowledge of the Player frauds. Thus, the central issue raised in the dispositive motions discussed below is whether there is sufficient evidence to reasonably infer that defendants did in fact know of the Player frauds and then consciously undertook to assist Player in perpetrating his schemes.

IV. Initial Questions of Law

*13 Several legal arguments raised by various defendants are best analyzed prior to the more fact-intensive, party-by-party approach adopted by the court in the final section concerning the motions for summary judgment. In a sense, many of these legal challenges to GFC's pleading are actually motions to dismiss the Fourth Amended Complaint for failure to state a particular cause of action. Of course, these same legal disputes also raise questions as to the sufficiency of GFC's evidence to support the pleading. As the majority of the dispositive motions raise, in one form or another, these same questions, judicial economy is best served by the court expressing its initial, legal conclusions on these key issues. Furthermore, because many defendants raise identical questions of law, the court will not generally attribute these positions to any particular defendant. Rather, the following analysis by the court will synthesize the parties' positions and apply the conclusions stated below to the specific facts raised in each defendants' motion for summary judgment.

A. Choice of Federal Law (Ninth or Tenth Circuit)

This action was originally filed in the District of Arizona. Once GFC added new parties to the lawsuit, several defendants sought a transfer of this case to the District of Utah in the Tenth Circuit. The movants argued that venue was improper under the general venue statute, 28 U.S.C. § 1391(b), and the specific RICO venue statute, 18 U.S.C. § 1965(b). Movants also argued that pursuant to 28 U.S.C. § 1404(a), the court should transfer the action to the District of Utah for the convenience of the parties and witnesses. The court granted the motion to transfer, in large part because it felt that a new lawsuit was begun with the filing of the Fourth Amended Complaint and the convenience of the parties required this result.

Finally, the court also maintained jurisdiction over this action in the transferee district at the request of the Chief Judge for the District of Utah and by special appointment from the Chief Justice of the Supreme Court.

The issue presented to the court is whether Ninth or Tenth Circuit law controls the court's decisions regarding questions of federal law. GFC contends that the law of the transferor court prevails and relies upon the Supreme Court's decision in Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964). But the Court in Van Dusen held that, where defendants seek transfer, the transferee court must apply the state law of the transferor court. Id. at 639, 84 S. Ct. at 821. The court reasoned that the rights plaintiff enjoyed in the forum it selected should be preserved, and that the transfer should result in nothing more than a "change of courtrooms." Id. at 636, 84 S. Ct. at 819. Thus, the Court concluded that the state law of the transferor federal forum controls to prevent forum shopping by defendants and to preserve the principles of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938). See Van Dusen, 376 U.S. at 637-38, 84 S. Ct. at 819-20.

*14 The Supreme Court has not directly addressed whether Van Dusen extends to conflicts of federal law between circuits. See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987), aff'd on other grounds sub nom., Chan v. Korean Air Lines, --- U.S. ----, --- S. Ct. ----, 104 L. Ed. 2d 1173 (1989). However, several courts have applied the Van Dusen approach to transfers involving federal law conflicts with little or no analysis. See, e.g., In re Plumbing Fixtures, 342 F. Supp. 756, 758 (J.P.M.D.L. 1972) ("It is clear that the substantive law of the transferor forum will apply transfer"); see generally Marcus, Conflicts Among Circuits and Transfers Within the Federal Judicial System, 93 Yale L.J. 677, 692 n.100 (1984) (citing cases extending Van Dusen to federal conflicts of law).

Defendants contend that the law of the transferee court controls and relies upon the Court of Appeals for the District of Columbia's decision in Korean Air Lines, 829 F.2d at 1172-73. The Court of Appeals concluded that the transferee court in multidistrict litigation is obligated to apply its circuit's interpretation of federal law. See id. at 1175 ("There is no room in the federal system of review for rote acceptance of the decision of a court outside the chain of direct review.") Defendants also contend that the Van Dusen holding should not be extended to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW    Document 359-2    Filed 06/07/2007    Page 11 of 20

Not Reported in F.Supp.                                                                     Page 11
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

questions of federal law in cases with federal question subject matter jurisdiction since the policy considerations present in diversity jurisdiction cases, as expressed in the Erie decision, are not present when a choice of federal law is at issue.

The court concludes that Tenth Circuit case law is controlling precedent on questions of federal common law. The court declines to apply the Van Dusen holding to litigation based on federal question subject matter jurisdiction. See Satellite Financial Planning Corp. v. First National Bank of Wilmington, 633 F. Supp. 386, 393-94 (D. Del. 1986); but see In re Dow Co. Sarabond Products Liability Litigation, 666 F. Supp. 1466, 1468 (D. Colo. 1987), aff'd in part. rev'd in part sub nom., Chase v. Dow Chemical Co., 875 F.2d 278 (10th Cir. 1989). The court also adopts as persuasive authority the Court of Appeals for the District of Columbia's holding in Korean Airlines, 829 F.2d at 1175.

The court also reaches this conclusion after considering the practical ramifications of GFC's position. The procedural background of this litigation is highly unusual in that the intra-circuit transfer of this case also resulted in the transfer of this court. The transferee court became the transferor court. This oddity serves to highlight the difficulties this court and any subsequent appellate court would have if GFC's position were adopted. No one disputes that the Court of Appeals for the Tenth Circuit would have jurisdiction over any subsequent appeal of this litigation. It would be an unworkable approach to expect the Court of Appeals for the Tenth Circuit to apply as controlling precedent the Ninth Circuit Court of Appeals' interpretation of federal law. The trial court will therefore not attempt to do so now.

B. General Elements of GFC's RICO Claims

*15 RICO provides plaintiffs with a private action to recover treble damages for injury "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The civil RICO claims at issue here are based on alleged violations of § § 1962(a), (c), and (d). The specific, requisite elements for each of these statutory causes of action are detailed below in the court's analysis of GFC's three separate RICO claims. What immediately follows is a discussion of the general elements of a RICO claim, as acknowledged by all sides: knowledge, intent, and causation.

1. Knowledge/Intent

Proof of knowledge is an essential element of any RICO claim. See United States v. Weisman, 624 F.2d 1118, 1123-24 (2d Cir.) (only willful conduct is punishable under RICO), cert denied, 449 U.S. 871 (1980); Dan River, Inc. v. Ichan, 701 F.2d 278, 291 (4th Cir. 1983) (criminal intent is necessary under RICO). This is so because the underlying predicate acts required to bring a § 1962(c) claim are criminal acts themselves, thus presupposing the requisite criminal mens rea. Furthermore, as will be discussed in greater detail below, GFC's RICO conspiracy claim under § 1962(d), like any conspiracy claim, requires knowing participation in the conspiracy. See United States v. Markopoulos, 848 F.2d 1036, 1040 (10th Cir. 1988); United States v. McMahon, 562 F.2d 1192, 1196 (10th Cir. 1977).

In the present litigation, GFC alleges defendants committed the predicate crimes of wire fraud, mail fraud, and transportation and receipt of stolen property. A successful claim of mail fraud requires proof of (1) a scheme or artifice to defraud; (2) the use of the United States mails in furtherance thereof; and (3) defendant's specific intent to deceive or defraud. California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1469 (9th Cir. 1987); United States v. Washita Construction Co., 789 F.2d 809, 814 (10th Cir. 1986). Similarly, a wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires in furtherance thereof; and (3) specific intent to deceive or defraud. United States v. Louderman, 576 F.2d 1383, 1387-88 & n.3 (9th Cir.), cert. denied, 439 U.S. 896, 99 S. Ct. 257, 58 L. Ed. 2d 243 (1978); United States v. O'Malley, 535 F.2d 589, 592 (10th Cir.), cert. denied, 429 U.S. 960, 97 S. Ct. 383, 50 L. Ed. 2d 326 (1976). The requirement of specific intent under these statutes may be established by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension," and this intention is shown by examining the scheme itself." United States v. Green, 745 F.2d 1205, 1207 (9th Cir.) (quoting United States v. Bohonus, 628 F.2d 1167, 1172 (9th Cir.), cert. denied, 447 U.S. 928, 100 S. Ct. 3026, 65 L. Ed. 2d 1122 (1980)), cert. denied, 474 U.S. 259, 106 S. Ct. 259, 88 L. Ed. 2d 266 (1985). Under the mail and wire fraud statutes, it is not necessary to establish that the scheme was successful or that the intended victim suffered a loss or that defendants secured a gain. O'Malley, 535 F.2d at 592. Finally, as to the predicate acts of transportation and receipt of stolen property, to succeed on such a claim, it must be shown that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 12

defendants had knowledge that the goods were actually stolen. United States v. Forest, 620 F.2d 446, 450 (5th Cir. 1980).

*16 Defendants raise a number of legal arguments related to the state of their knowledge of Player's fraudulent dealings with GFC as well as their specific intent to assist Player. First, defendants argue that under an aiding and abetting theory of RICO liability, GFC must demonstrate a high degree of specific criminal intent if alleged "inaction" by defendants is the premise for GFC's theory of secondary liability. Second, defendants also argue that evidence of regulatory violations cannot establish their knowing participation in the Player frauds. Third, defendants question the applicability of vicarious liability in a RICO action under the doctrine of respondeat superior. The court will consider each of these arguments in turn.

(a) Aiding and Abetting Liability and Alleged Inaction by Defendants

GFC's § 1962(c) Claim for Relief alleges defendants' liability on both primary and secondary bases. For example, GFC alleges that defendants associated with and participated in the affairs of an enterprise though a pattern of racketeering. See GFC's Fourth Amended Complaint, ¶ ¶ 37-38. The court presumes these allegations against the named defendants are intended by GFC to assert primary liability against culpable "persons" under section 1962 (c). Under this same Claim for Relief, however, GFC also alleges that each defendant is liable as an "aider and abettor" of violations of 18 U.S.C. § § 1962(c) and 2. See id., ¶ 38. GFC supports these allegations in its various responsive memoranda by interchangeably arguing both theories of liability. See, e.g., GFC's Response to FSB's Motion for Summary Judgment, 14. The court will thus focus its analysis on the standards governing this theory of secondary liability since failure on the part of GFC to prove secondary liability must logically preclude a finding of liability as a principal."

As the court in United States v. Cook, 745 F.2d 1311, 1315 (10th Cir. 1984), cert. denied, 469 U.S. 1220, 105 S. Ct. 1205, 84 L. Ed. 2d 347 (1985), noted, 18 U.S.C. § 2 merely abolished the common law distinction between principal and accessory and does not itself create an independent crime. However, to be found culpable as an aider and abettor, one must share in the intent to commit the offense, as well as participate in some manner to assist its commission.

United States v. Smith, 838 F.2d 436, 441 (10th Cir. 1988) (citing United States v. Fischel, 686 F.2d 1082, 1087 (5th Cir. 1982)). This does not mean that a defendant must commit all elements of the underlying offense, but only that he aided and abetted as to each element. Id.

Although some defendants contend that aiding and abetting liability is not appropriate in the civil RICO context, see e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, n.6, the parties for the most part focus on the applicable standards taken from analogous securities fraud cases. Moreover, the court notes that courts have in fact applied aiding and abetting theory to RICO liability. For example, the court in Armco Industrial Credit Corp. v. SLT Warehouse Co. held that "[t]o establish that [defendant] violated the mail fraud statute as an aider and abetter [sic], [plaintiff] must have proved that [[[[defendant] was associated with the mailing of the bogus invoices, participated in it as something that he wished to bring about, and sought by his actions to make it succeed." 782 F.2d 475, 485 (5th Cir. 1986) (citing Nye & Nissen v. United States, 336 U.S. 613, 620, 29 S. Ct. 766, 770, 93 L. Ed. 2d 919 (1949)); see Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356 (3d Cir. 1987) ("if all of RICO's other requirements are met, an aider and abettor of two predicate acts can be civilly liable under RICO"); see also Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 660 F. Supp. 1362, 1371 (D. Conn. 1987); Laterza v. American Broadcasting Co., 581 F.Supp. 408, 412 (S.D.N.Y. 1984).

*17 Thus, both sides cite a number of decisions which confronted aiding and abetting liability in the federal securities law field. see, e.g., Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985), cert. denied, 474 U.S. 1057, 106 S. Ct. 798, 88 L. Ed. 2d 774 (1986); Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 800 (3d Cir. 1978), cert. denied, 439 U.S. 930, 99 S. Ct. 318, 58 L. Ed. 2d 323 (1979). For example, in Hamsen v. Smith, 693 F.2d 932 (9th Cir. 1982), cert. denied, 464 U.S. 822, 104 S. Ct. 89, 78 L. Ed. 2d 97 (1983), the court listed the following essential elements of an aiding and abetting claim in the securities fraud context as: "(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong." 693 F.2d at 943. Because the parties focus on cases in the securities fraud field, and because the court finds merit in this analogous area of the law, the court concludes that this three prong test is applicable in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 13

the instant RICO context as well.

The first factor is obviously not the subject of the present motions -all concede for the purposes of the pending motions that Player's frauds on GFC serve as an independent primary wrong. Although the second and third factors are themselves the subject of much dispute, and thus might warrant separate treatment, the court will discuss the parties' positions on knowledge and substantial assistance together. The reason for this is that case law discussing these elements demonstrates the interrelation between them. As the court in Metge pointed out, knowledge and substantial assistance are not to be considered in isolation since "the two factors vary inversely relative to one another." 762 F.2d at 624. See Stokes v. Lokken, 644 F.2d 779, 784 (8th Cir. 1981) ("where there is a minimal showing of substantial assistance, a greater showing of scienter is required"); see also Woodward v. Metro Bank of Dallas, 552 F.2d 84, 95 (5th Cir. 1975).

However, as the court in Monsen noted, it is appropriate to begin with the alleged aider and abettor's state of mind or intent since "[c]ulpability of some sort is necessary to justify punishment of a secondary actor and mere unknowing participation in another's violation is an improper predicate to liability." 579 F.2d at 799 (citing Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, In Pari Delicto, Indemnification, and Contribution, 120 U. Pa. L.Rev. 597, 638 (1972)); see United States v. Smith, 838 F.2d 436, 441 (10th Cir. 1988)("[t]o aid and abet one must share in the intent to commit the offense"); Schneberger v. Wheeler, 859 F.2d 1477, 1480 (11th Cir. 1988)("knowledge of both the fraudulent scheme and one's own role in that scheme is required to satisfy the test for aider and abettor liability.") (citing Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985)).

*18 The factual question of whether GFC has proffered sufficient evidence to demonstrate this requisite knowledge and intent will be addressed below in the individual defendants' motions for summary judgment. Furthermore, although the substantial assistance element will be briefly addressed below in the context of defendants' alleged inaction, the court notes that since the substantial assistance requirement is really a causation concept, see Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 163-64 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1979, 40 L. Ed. 312 (1974), this element will also be discussed below in the portion of this memorandum and order concerning defendants' proximate causation arguments.

[Liability for Inaction]

The court must, however, resolve the remaining legal question that arises when the substantial assistance alleged to have taken place by defendants' actions consists not of affirmative misrepresentations but of "negative acquiescence" or inaction. Defendants contend that their inaction cannot as a matter of law be construed as substantial assistance of the Player frauds since they had no duty to disclose anything to GFC. see, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 88-89. They also contend that even if the court does not require some special duty owed to GFC, a higher level of knowledge or specific intent is nonetheless required before secondary liability may be imposed. The court finds no support from the cases cited by defendants for the first proposition and rejects it summarily. Although the Metge decision did state that "if the aider and abettor owes the plaintiff an independent duty to act to disclose, inaction can be a proper basis for liability under the substantial assistance test," 762 F.2d at 625 (citing Clearly v. Perfectune, 700 F.2d 774, 777 (1st Cir. 1983)), this holding does not foreclose aider and abettor liability absent a special duty.; But see United States v. Grey Bear, 828 F.2d 1286, 12293 (8th Cir. 1987) (a successful criminal prosecution for "[a]iding and abetting, therefore, requires conduct of an affirmative nature; mere negative acquiescence in a crime is insufficient.") (citing Johnson v. United States, 195 F.2d 673, 675 (8th Cir. 1952)).

The court finds more merit in defendants' alternative argument that a higher level of knowledge and intent is required for aider and abettor liability premised upon alleged inaction. As the Metge court concluded, "in the absence of a duty to disclose, an aider-abettor case predicated on inaction of the secondary party must meet a high standard of intent." 762 F.2d at 625. This is the logical consequence of viewing the two elements as inversely related. To the extent that an aider and abettor's "actions" are inactions, it is necessary for GFC to demonstrate that the aider and abettor specifically intended this result. See Monsen, 579 F.2d at 800 (inaction "may provide a predicate for liability where the plaintiff demonstrates that the aider and abettor consciously intended to assist in the perpetration of the wrongful act") (citing Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 780 (3d Cir. 1976)); Metge, 762 F.2d at 625. However, as the Metge court also noted, this requisite

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW    Document 359-2    Filed 06/07/2007    Page 14 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 14

intent and knowledge may be shown by circumstantial evidence. Id. The court will discuss this evidence below in its later analysis of the individual defendants' motions for summary judgment."

### (b) Regulatory Violations

*19 GFC argues that the financial institution defendants violated federal banking regulations and their own internal policies when they failed to report to various government officials suspected check kiting and large currency transactions by Player. see, e.g., GFC's Response to FSB's Motion for Summary Judgment, 34. Specifically, GFC argues that various bank personnel failed to report kiting activity in Player's accounts pursuant to Office of the Comptroller of the Currency ("OCC") Interpretive Ruling § 7.5225, and by failing to file currency transaction reports pursuant to 31 C.F.R. § 301.22. Defendants spend a great deal of energy attacking the legal premise and factual bases for these claims. The court will attempt to simplify this matter by breaking GFC's arguments into primary and secondary grounds.

GFC first contends that these alleged regulatory violations are themselves predicate acts of racketeering activity. see, e.g., GFC's Response to FI-Utah's Motion for Summary Judgment, 117 ("FI-Utah's reporting schemes, involving as they do activity which itself is criminal, are clearly prosecutable mail and wire frauds."). The court assumes that GFC is relying upon that portion of its pleading alleging "The Bank Schemes to Defraud in Violation of Public Trust and Fiduciary and Statutory Duties." GFC's Fourth Amended Complaint, ¶ ¶ 177-79. Specifically, GFC alleges as follows:
In addition to constituting frauds upon GLFC, the actions of defendants First Security Bank, Zions Bank and First Interstate Bank constitute frauds in breach of their public trust and fiduciary and statutory duties as national banking associations. These banks had a duty not to stay silent or to continue to provide banking facilities in the face of knowledge that some of their customers were engaging in check-kiting and money laundering, submitting false financial statements and applications for credit and defrauding third parties, much less aid and abet such conduct and associate with such an enterprise for their own pecuniary advantage."

Id., ¶ 177.

Defendants vigorously dispute that these alleged regulatory violations fall within the predicate criminal acts specifically enumerated at 18 U.S.C. ¶ 1961(1). See, e.g., FSB's Reply in Support of Motion for Summary Judgment, 38 ("even if FSB had consciously and repeatedly violated these requirements (which it did not), that would not constitute a pattern of racketeering activity on its part"). However, this argument misses the point and to the extent it may be construed as a motion to dismiss ¶ ¶ 177-79 of GFC's pleading for failure to state a claim, it must be denied. The underlying predicate acts at issue in the "Bank Schemes" are mail fraud (¶ 178) and wire fraud (¶ 179). The court sees no legal reason why this particular scheme cannot entail the named defendants' alleged active participation in Player's check kiting activities and large currency transactions-assuming use of the United States' mails and wire services is not at issue. See Moreno v. Story, 694 F. Supp. 1557, 1558 (S.D. Fla. 1988) (alleged failure to report currency transactions to Internal Revenue Service is "an intangible property loss ... sufficient to support the 'deprivation of property or money' requirement in mail fraud cases") (citing Carpenter v. United States, -U.S. -, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)). However, as previously discussed by the court, and as the very language of GFC's pleading indicates, these predicate acts still require defendants' actual knowledge of the Player frauds and specific intent to assist the frauds against GFC. In other words, this begs the issue of proving defendants' fraudulent intent."

*20 Thus, the court construes GFC's secondary position to be that these regulatory violations are offered to rebut the financial institution defendants' position that no evidence exists supporting their actual knowledge of the Player frauds. As GFC phrases the issue, "[t]hese deliberate concealments to third parties in the face of duties that required [the financial institution defendants] to speak are evidence of [their] intentional and knowing participation in Player's independent schemes." GFC's Response to FI-Utah's Motion for Summary Judgment, 123. Since these same defendants are the ones who have raised the issue of their lack of knowledge, the court sees nothing wrong with GFC's proffer of evidence on this point.

The real issue, however, is whether these alleged regulatory violations, standing alone are sufficient to establish a genuine issue of material fact on the issue of the financial institution defendants' knowledge of the Player frauds. Put another way, and as detailed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 15

below in the court's discussion of the applicable standards of review governing the pending dispositive motions, the court must determine whether a reasonable trier of fact could infer actual knowledge and specific intent solely from evidence of regulatory violations. The court concludes as a matter of law that this inferential leap is neither reasonable nor permissible absent other evidence demonstrating actual knowledge.

First, as defendants correctly point out, the bank regulations in question require banks to submit reports to government officials, not to other third-party financial institutions. See 31 C.F.R. § 103.47-103.49. As defendants also point out, violations of these banking regulations may occur whether the violator did so intentionally or negligently. Therefore, failure to comply with these regulatory requirements cannot in itself support a reasonable inference of specific criminal intent on the part of the financial institution defendants.

The court also reaches this conclusion after carefully distinguishing the various levels of legal culpability and corresponding evidence. Perhaps it is no more than a semantic difference, but rather than seeing GFC's evidence in terms of different categories or "boxes," see ZFNB's Reply in Support of Motion for Summary Judgment, 3, the court prefers to view GFC's arguments in terms of a pyramid of theories of liability and supporting evidence. The first and broadest tier is that of liability premised upon a negligence theory. Evidence of regulatory violations would surely be relevant to the trier of fact's determination as to whether the financial institution defendants breached some duty of care presumably owed to GFC. The intermediate level would be something akin to a recklessness, willfulness, or gross negligence theory. Again, this type of evidence might very well support a reasonable inference that these defendants did not act prudently or were in some manner willful or wanton. However, the top of this pyramid-requiring as it does specific criminal intent to violate RICO-demonstrates that differences in degree eventually create differences in kind. In this instance, evidence of regulatory failures standing alone cannot support a reasonable inference of actual knowledge and specific criminal intent. See United States v. Piepgrass, 425 F.2d 194, 199-200 (9th Cir. 1070) (in criminal fraud context, "relationship between what [defendant] could have known and a specific intent has no rational basis"); see also Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987) ("reasonable inferences themselves must be more than speculation and conjecture"). Simply put, GFC is not asserting a negligence or securities fraud (recklessness) claim against defendants and RICO liability is premised upon much more than regulatory violations."

*21 Since evidence of alleged regulatory violations is not in itself sufficient to establish defendant's specific intent to participate in the Player frauds, the court will assume for the purposes of the pending dispositive motions that this evidence is uncontroverted. The court will therefore focus its analysis below on other evidence offered by GFC in opposition to the motions for summary judgment. To the extent that GFC is unable to offer evidence of defendants' knowing and intentional participation in the Player frauds other than the alleged regulatory violations, then the court must grant these defendants' motions. As a final point, the court notes that this issue also arises in relation to several defendants' motions to strike various portions of the affidavit of William B. Watkins, GFC's banking expert. The parties are referred to the court's later discussion of these motions as well.

(c) Vicarious Liability

Although the separate legal issue of the applicability of RICO liability premised upon the doctrine of respondeat superior might warrant attention from the court apart from the issue of defendants' knowledge/intent, the court will discuss this issue at this portion of the order and memorandum. This is appropriate since GFC would utilize this doctrine to either impute the knowledge of an employee to a defendant or, in essence, abolish the requirement as it pertains to the financial institution defendants. Thus, the applicability of this common law doctrine to the instant RICO suit falls squarely within the court's analysis of the parties' requisite knowledge/intent.

This issue is raised by the financial institution defendants since GFC would hold them liable under its RICO claims for the acts of their employees/officers/agents. What is interesting to the court is that these defendants argue different legal theories as to the applicability of the doctrine of respondeat superior to this civil racketeering lawsuit. Some contrast common law standards with a higher level of scienter for a RICO claim. See, e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 130-36. Others contend that the very concept of respondeat superior liability is antithetical to the requirements of actual knowledge and specific intent under RICO. See, e.g., ZFNB's Reply in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW  Document 359-2  Filed 06/07/2007  Page 16 of 20

Not Reported in F.Supp.  Page 16
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Support of Motion for Summary Judgment, 106-08.

The court assumes two central facts for the purpose of this legal analysis. First, that GFC is unable to establish any facts-taken from the depositions of the banks' officers and directors and the documents generated by these same bank personnel-supporting a reasonable inference of actual knowledge on the part of a financial institution defendant. Second, the court assumes that GFC is able to establish a genuine issue of material fact concerning the knowledge and involvement of a particular employee, who is also a named defendant in this litigation. Under these circumstances, the court concludes as a matter or law that the doctrine of respondeat superior is unavailable to hold the financial institution defendants liable under RICO.

*22 It is undisputed by the parties that the premise of respondeat superior is that one who is without fault may be held vicariously liable for the wrongdoing of another. See W. Prosser, Law of Torts 458 (4th ed. 1971). The rationale for this extension of liability is that "it would be unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment and the frailties of those working under his direction and for his benefit." Restatement (Second) of Agency § 219 comment a (1958). Using this common law standard, some of the parties would have the court apply the following two-pronged analysis and determine whether the employee's acts were (1) within the scope of employment, and (2) done with the intent to benefit the principal or corporation. See FI-Utah's Reply in Support of Motion for Summary Judgment, 130; see, e.g., United States v. Cincotta, 689 F.2d 238, 240-41 (1st Cir.), cert. denied, 459 U.S. 991, 103 S. Ct. 347, 74 L. Ed. 2d 387 (1982). These same parties would also have the court focus on the requisite "intent to benefit" and require a showing of criminal mens rea. See FI- Utah's Reply in Support of Motion for Summary Judgment, 131.

This position is similar to the arguments presented to the Court of Appeals for the First Circuit in Schofield v. First Commodity Corporation of Boston:
Appellant apparently concedes that a wholesale adoption of the respondeat superior concept would conflict with the primary thrust of section 1962(c). In order to conform to Congress' obvious desire to insulate legitimate business from liability, she suggests that we could adopt a modified version of vicarious liability, perhaps requiring some level of scienter before imposing liability. For example, respondeat superior could be limited to acts of high corporate officials, whose actions may be deemed corporate policy, and thus would reflect corporate intent."

793 F.2d 28, 33 (1st Cir. 1986); see, also Dakis v. Chapman, 574 F. Supp. 757, 760 (N.D. Cal. 1983) (rejecting "quantum leap" from securities violation to RICO offense where defendant/agent was a "low-level corporate executive acting without corporate sanction"); Parnes v. Heinhold Commodities, 548 F. Supp. 20, 23-24 (N.D. Ill. 1982) (concluding that plaintiffs failed "to reshape a conventional (alleged) fraud, perpetrated by lower-level corporate executives acting without corporate sanction (albeit conducting themselves within the scope of their authority for common law purposes) into a Section 1962(c) violation by the corporation")

However, the court concurs with the court of appeals in Schofield that the "flaw in this approach is that it is no more than a recasting of the argument for direct liability." Schofield, 793 at 33. Similarly, much of the confusion generated from the parties' arguments on the subject of respondeat superior arises when the distinction between direct and vicarious liability is blurred. For example, when GFC argues that the acts of Gurr, and his alleged knowledge of the Player frauds, are to be imputed to FI-Utah, the court sees this as an attempt to establish either vicarious or direct liability under RICO. Under the less stringent standards associated with the doctrine of respondeat superior, the trier of fact might conclude that this employee was working within the scope of his employment, and also to benefit the bank (and possibly himself). However, in seeking to establish corporate knowledge and intent, any knowledge from this lower level employee, albeit an officer of the bank, may not automatically be imputed to the financial institution defendant. Cf. W. LaFave & A. Scott, Handbook on Criminal Law, § 3.10 (2d ed. 1986) ("the brain of the corporation" for purposes of establishing criminal mens rea, "consists only of those directors who supervise and manage the corporation"). As all parties acknowledge, a corporation may be a liable "person" under RICO, but this entity can only act, and hence sustain liability, through the actions of its agents, employees, officers, and directors. See American Medical Association v. United States, 130 F.2d 233, 253 (D.C. Cir. 1942) (a corporation has can act only through its agents, but has an identity and possible liabilities separate from those agents).

*23 Furthermore, the court notes that most of the

Not Reported in F.Supp. Page 17
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

case law discussing the applicability of respondeat superior to RICO focuses upon the distinction between "persons" and "enterprises" under the RICO statutory scheme-the subject of detailed discussion by the court below-and on the congressional intent behind the racketeering activities prohibited by § 1962(c). The facts in this case are therefore unique to much of this case law: the principals/corporations in the instant litigation are specifically named as defendants or "persons" and not as the RICO "enterprise." In these other civil lawsuits, the principal/corporation was often named as the "enterprise" and the courts therefore attempted to distinguish between "aggressor" and "conduit" enterprises. See Garbade v. Great Divide Mining & Milling Corp., 831 F.2d 212, 213 (10th Cir. 1987) ("Section 1962(c) makes it unlawful for a 'person' to enter the activities of an 'enterprise' using racketeering activities. References are to 'employed by' and 'associated with.' The section does not relate to corporate or enterprise liability.")(citing Schofield, 793 F.2d 28); Haroco v. American National Bank & Trust Co., 747 F.2d 384, 401 (7th Cir. 1984) ("it would make little sense to hold a corporation liable under RICO for the misconduct of lower level employees, at least where it appears that the corporation is a passive instrument or even a victim of the racketeering activity"), aff'd, 473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985); Gruber v. Prudential-Bache Securities, Inc. 679 F. Supp. 165, 181 (D. Conn. 1987) (holding that "a corporation may be found vicariously liable under Section 1962(c) only where the corporation may fairly be said to be a 'central figure' (or 'aggressor') in the alleged scheme"); Dakis, 574 F. Supp. at 760 ("it would be an anomalous result if, because [defendant] had misused his authority to trade the accounts, and had actually violated internal guidelines of the firms by so doing, the firms were nonetheless deemed 'aggressor' enterprises liable under RICO"); see generally Note, Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Corporate Liability, 65 B.U.L. Rev. 561(1985)."

Other courts have also interpreted the RICO statutory scheme to rule out vicarious liability in civil lawsuits. As noted above, the First Circuit Court of Appeals in Schofield rejected the application of the doctrine of respondeat superior. In doing so, the court of appeals concluded that
the concept of vicarious liability is directly at odds with the Congressional intent behind § 1962(c). Both the language of that subsection and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal "person" or "persons." Indeed, there is unlikely to be a situation, in the absence of an express statement, in which Congress more clearly indicates that respondeat superior is contrary to its intent."

\*24 793 F.2d at 32. But see Bernstein v. IDT Corp., 582 F. Supp. 1079, 1083 (D. Del. 1984) ("I perceive nothing in RICO or its legislative history which would suggest that the normal rules of agency law should not apply to civil liability created by that statute."). The Court of Appeals for the Eighth Circuit, citing the Schofield decision, also concluded that § 1962(c) was intended to foreclose vicarious liability, particularly where the principal is a victim of the agent's activities. Luthi v. Tonka Corp., 815 F.2d 1229, 1230 (8th Cir. 1987).

Thus, the courts of other circuits appear to have adopted this prohibition on the application of respondeat superior to RICO cases for reasons not directly analogous to the instant litigation. GFC named the various financial institutions as defendants, not the RICO enterprise. The court assumes GFC intends to establish these defendants' direct liability under RICO. It is only in the context of whether the principals/defendants can be held liable for the acts of the agents/defendants that the applicability of vicarious liability arises. However, this distinction does not render the above authority useless. In fact, the court finds this case law helpful in reaching a similar conclusion in the instant lawsuit.

As many of these same courts noted, because there is no general, federal common law, Erie R.R., 304 U.S. at 78, 58 S.Ct. at 822, before common law doctrines may be applied to federal statutes, the court must first determine whether such an application would advance the goals of the federal statute. American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556, 570, 102 S. Ct. 1935, 1944-45, 72 L. Ed. 2d 330 (1982) (applying doctrine of ""apparent authority" to anti-trust statutory scheme). As the opinions distinguishing "aggressor" enterprises from "victim" enterprises point out, RICO was designed to attack the person actually liable, the "violator" of RICO's statutory scheme. In a lawsuit factually apposite to the instant matter, the district court in Village of Fox Lake v. Waste Management of Illinois, Inc., No. 86-C-4888 (N.D. Ill. March 2, 1987) (1987 WL 7494), concluded that although "in this case Plaintiff alleges that the corporation in question is itself a liable 'person,' we do not think this changes the analysis as to whether that corporation can be held vicariously liable for acts of an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW    Document 359-2    Filed 06/07/2007    Page 18 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 18

employee-in this case, another alleged liable 'person.'" Id. at 5. As the district court in Village of Fox Lane reasoned, liability is directed at the violator of the statutory scheme, and the "violator is the 'person' that has engaged in the unlawful conduct." Id. at 4. The court concurs that adopting the doctrine of respondeat superior to a civil RICO lawsuit would disrupt the explicit statutory scheme of § 1962(c). Moreover, the court also declines to impute the requisite specific, criminal intent from one defendant to another absent facts independently supporting such an inference as to each defendant. See O'Brien v. Dean Witter Reynolds, Inc., [1984 Transfer Binder] FEDERAL SECURITIES LAW REPORTER (CCH) ¶ 91,509, at 98,562 (D. Ariz. March 26, 1984) (refusing to impute knowledge of one RICO defendant to another defendant via doctrine of respondeat superior)."

*25 Therefore, to the extent that GFC is unable to offer any evidence of defendants' knowledge of, and participation in, the Player frauds other than the acts of its employees-other than its controlling officers and directors- then the court must grant these defendants' motions for summary judgment. Thus, as an example only, the court may not deny FI-Utah's dispositive motion simply because it concludes that Gurr's motion is without merit. The court must still analyze GFC's evidence of corporate knowledge and actions pertaining to the Player frauds.

2. Causation

RICO liability is also predicated upon a finding that the victim was injured ""by reason of" the alleged racketeering activity. Thus, under § 1962(c) and RICO's civil enforcement provision, 18 U.S.C. § 1964(c), GFC is required to prove that there is a causal nexus between its injury and the predicate acts of racketeering allegedly committed by defendants. As the Supreme Court stressed in Sedima, S.P.R.L. v. Imrex, 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985), civil enforcement of RICO begins with the causal link between a defendant's racketeering activity and a plaintiff's injury:
[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated, "[a] defendant who violates § 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." ... [T]he compensable injury necessarily is the harmed caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."

Id. at 496-97, 105 S. Ct. at 3285 (citations omitted).

Furthermore, it is undisputed by the parties that RICO liability is predicated upon a finding of both factual and legal causation. See, e.g., Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 744 (5th Cir. 1989) ("person will be considered injured 'by reason of' a RICO violation if the predicate acts constitute (1) factual (but for) causation and (2) legal (proximate) causation of the alleged injury"). It is the latter issue which the parties focus upon since the court, similar to the court in Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988), decides this issue after assuming for the purposes of these pending motions that a RICO pattern (tantamount in this instance to factual causation) has sufficiently been alleged and proven. This is appropriate since while factual causation is ordinarily a question for the trier of fact, "the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." Id. at 1189 (citing Restatement (Second) of Torts § 548A comments a & b (1977).

*26 Looking to general tort liability principles, the Brandenburg decision articulates the proximate cause requirement for a RICO case as: "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Id. (quoting W. Prosser & G. Keeton, Torts § 42 at 272 (5th ed. 1984)). In an effort to further utilize general tort principles, several defendants direct the court's attention to the Restatement's qualification that "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts at § 548A. Moreover, the comment to this particular section states that:
Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in light of its tendency to cause those losses and the likelihood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 19
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

that they might follow."

In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether.
Id. at comment b.

The court notes that defendants essentially put forth two arguments as to why GFC cannot demonstrate that defendants proximately caused GFC's injuries. First, they focus upon their own alleged actions and argue either that no evidence exists to support GFC's allegations or that the alleged misrepresentations were not justifiably relied upon by GFC and thus could not have proximately caused the injuries. Second, they contend that GFC's own actions were the proximate cause for the Player frauds and any subsequent injuries. As Gurr succinctly phrases the issue, "[t]here are two principal legal causes of Greyhound's losses: Player's artful manipulations and Greyhound's artless (and even reckless) business decisions." Gurr's Reply in Support of Motion for Summary Judgment, 26. The court will discuss these two arguments seriatim.

(a) Player/Defendants' Actions

Defendants contend that their actions, as alleged in GFC's Fourth Amended Complaint, cannot be the legal cause of GFC's injuries sustained from the Player frauds. GFC puts forth two arguments to establish that defendants proximately caused GFC's losses: (1) defendants' direct misrepresentations and other fraudulent actions dictate defendants' legal responsibility for the Player frauds; and (2) defendants' actions aiding and abetting Player also suffice to legally cause GFC's injury.

Because the first argument assumes a sufficient showing of defendants' direct action/liability, this argument must await the court's analysis of the individual defendants' motions for summary judgment. It is also uncontested that a factual finding of direct actions, such as fraudulent misrepresentations, would mandate a finding that defendants proximately caused GFC's injuries. However, some defendants contend that even assuming (1) fraudulent behavior (misrepresentations) on the part of certain financial institution defendants' employees and (2) GFC's reliance upon this false information, defendants still did not proximately cause GFC's injuries because other events intervened. Specifically, FI-Utah suggests that

*27 Player's creation of the phony $40 million purchase order from NL Industries, on which he was not assisted by any FI-Utah employee, clearly intervened between the credit references on the RRI loan and the later decisions by Greyhound to purchase $66 million in non-existent equipment. Other intervening events of which FI-Utah had no role in creating included the changes in the tax laws, which prompted Greyhound to reinstitute its funding of equipment lease transactions, and the fact that Greyhound executives elected not to contact the proposed sublessees under the later (and much larger) transactions involving NL and Baker."

FI-Utah's Reply in Support of Motion for Summary Judgment, 102-03 (citations to statement of facts omitted). However, the court cannot conclude as a matter of law that any of these "intervening events" prevent a finding of proximate causation. Assuming intentional, fraudulent conduct on the part of defendants, the court clearly cannot find that this is "too speculative" to support a finding of proximate causation. See Community Bank v. Bank of Hallandale & Trust Co., 482 F.2d 1124 (5th Cir. 1973)."

GFC's second argument premises legal responsibility upon aiding and abetting liability. This is not surprising since it is undisputed by the parties that the substantial assistance element discussed earlier by the court in relation to aiding and abetting liability can also be seen as a causation concept. See Metge, 762 F.2d at 624 ("[plaintiff] had the burden of showing that the secondary party proximately caused the violation"); Edwards & Hanly v. Wells Fargo Securities, 602 F.2d 478, 484 (2d Cir. 1979) (but for- factual- causation is insufficient for aiding and abetting liability); Woodward, 522 F.2d at 95 ("remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud"). Thus, as the court concluded above, if GFC's sole evidence of defendants' substantial assistance of the player frauds concerns alleged inaction on the part of defendants, then GFC must also demonstrate that defendants had actual knowledge of the underlying fraud and intent to aid and abet a wrongful act. See Woodward, 522 F.2d at 97 (requiring "high conscious-intent" under these circumstances).

A final legal dispute related to proximate causation and aiding and abetting liability arises when GFC

Case 2:04-cv-00139-DAK-BCW   Document 359-2   Filed 06/07/2007   Page 20 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 20

contends that it need only establish "that any one predicate act comprising the pattern of racketeering caused it injury." GFC's Response to FI-Utah's Motion for Summary Judgment, 153. In support of this position, GFC cites to the holding of the district court in Virden v. Graphics One, that a RICO plaintiff "must demonstrate a causal nexus between his own injury and either (i) a predicate act of at least one RICO defendant or (ii) the pattern of racketeering activity by which at least one of the RICO defendants participated in the conduct of the enterprise's affairs." 623 F. Supp 1417, 1425 (C.D. Cal. 1985); see also Marshall & Ilsley Trust Co. v. Pate, 819 F.2d 806, 809 (7th Cir. 1987) ("If a plaintiff proves a violation of section 1962 by showing, for example, a pattern of racketeering activity in furtherance of an enterprise, then the plaintiff should recover for whatever damages are directly caused by any part of the acts that add up to a violation.") (citing Papangiannis v. Pontikis, 108 F.R.D. 177, 179 (N.D. Ill. 1985)); Deppe v. Tripp, 863 F.2d 1356, 1366-77 (7th Cir. 1988).

*28 Defendants contend that it would depart from proximate causation principles to find a defendant, who has committed no predicate acts actually causing GFC's injuries, nonetheless liable for RICO damages. See. e.g., FI-Utah's Reply in Support of Motion for Summary Judgment, 109. The court disagrees. As the court in Marshall & Ilsley Trust Co. noted, "[a]t what targets the acts of racketeering activity are aimed goes to the question of whether a 'pattern' has been demonstrated." 819 F.2d at 809. The court continued that "[o]nce a pattern is proven, however, a plaintiff must show only an injury 'resulting from the violation. It would be illogical to require a plaintiff to show that all the acts adding up to a 'pattern' injured him, especially in view of the fact that many such acts may be somewhat distinct and separate in time." Id. at 810. Thus, if a particular defendant is legally responsible for any one of the predicate acts alleged by GFC, then assuming a pattern of such acts, this same defendant is legally responsible for the injuries GFC suffered."

(b) GFC's Actions

Typical of defendants' second argument which focuses on GFC's actions is Diumenti's claim that "the frauds were caused by plaintiffs' own gross negligence or their wholesale failure to follow the most rudimentary industry standards of due diligence." Diumenti's Reply in Support of Motion for Summary Judgment, 157. Numerous defendants point to the fact that GFC conducted little or no actual inspections of the equipment leased to Player. GFC responds to this argument by stating that this is merely a contributory negligence theory which must be rejected because of the well-settled principle that negligence is not a defense to fraud. See, e.g., GFC's Response to FI-Utah's Motion for Summary Judgment, 160-68. The court agrees with GFC's position and, as set forth below, finds that it cannot grant summary judgment on the issue of proximate causation.

First, the parties are in agreement that the court must look to general tort principles to decide this issue. In fact, one of the cases cited by several defendants, General Motors Acceptance Corp., reaffirms the general tort principle that "contributory negligence is not a defense to liability for an intentional tort." 733 F.2d at 782 (citing Cenco v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir. 1982), cert. denied, 459 U.S. 880, 103 S. Ct. 177, 74 L. Ed. 2d 145 (1982)); see USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 509 (7th Cir. 1982) ("contributory negligence is a defense only to unintentional torts and fraud is an intentional tort"), cert. denied, 462 U.S. 1107, 103 S. Ct. 2455, 77 L. Ed. 2d 1334 (1983). Thus, assuming that GFC may go to the jury with its argument that defendants assisted Player in carrying out his frauds on GFC, then the court cannot allow defendants to argue that "'because your negligence allowed me to defraud you, you should not be allowed to recover from me to the extent that a reasonable person would not have allowed me to defraud him.' Such a defense is patently unfair and unjustifiable as a matter or law." Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa, 585 F. Supp 245, 249 (S.D.N.Y. 1984) (securities fraud context); cf. United States v. Brien, 617 F.2d 299, 311 (1st Cir.)("If a scheme to defraud has been or is intended to deceive, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts."), cert. denied, 466 U.S. 919, 100 S. Ct. 1854, 64 L. Ed. 2d 273 (1980).

*29 Second, even were the court to conclude that defendants can legally raise the issue of GFC's alleged lack of due diligence, there still exist factual disputes as to GFC's actions. Assuming that in certain circumstances, a fraud victim's gross negligence might be found to be the proximate cause of its own injuries, see, e.g., General Motors Acceptance Corp. v. Central National Bank, 733 F.2d 771, 782 (7th Cir. 1985) ("a company could embark on a course of foolhardy lending and then, after the debtor's