Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 21

collapse, attempt to place the burden of its irresponsibility on another creditor that, by chance, had supplied it with incorrect information - however, that is not this case"), the court cannot conclude as a matter of law that GFC's actions were the proximate cause of the Player frauds. Put another way, the court cannot conclude as a matter of law that GFC's actions constitute gross negligence. While defendants argue that GFC has put forth no evidence of its own vigilance, the court disagrees. Questions of fact exist as to credit inquiries and telephone calls made by GFC employees, representations allegedly made by defendants, allegedly phony equity contribution checks and opinion letters, and purported violations of industry standards. Thus, even were the court to conclude that defendants' arguments were not legally barred, the court could still not grant summary judgment on this issue since disputes are raised which remain the ultimate province of the finder of fact.

C. Specific Elements of GFC's RICO Claims

1. § 1962(a)

GFC asserts claims against FSB, Cameron, FSF, Christenson, Diumenti, Lindsley, FI-Utah, Gurr, Allred, Mabey, ZFNB, ZLC, ZMC, Argus, Hanson, Timpson, and Newbold based on 18 U.S.C. § 1962(a). These causes of action, the Third and Fifth through Tenth Claims for Relief of GFC's Fourth Amended Complaint, correspond to Player's fraudulent schemes detailed in the pleading and the liability for which is alleged against all defendants. Section 1962(a) states in pertinent part:
It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

18 U.S.C. § 1962(a).

The requirement of alleging "investment injury" in order to plead a proper § 1962(a) claim was first raised in Timpson and Newbold's motion for partial summary judgment when they directed the court's attention to the law of this district, Huntsman-Christensen Corp. v. Mountain Fuel Supply Co., 5 RICO L. Rep. 424, 430 (D. Utah 1986), and the recent decision of the Tenth Circuit Court of Appeals in Grider v. Texas Oil & Gas Corp., 868 F.2d 1147 (10th Cir. 1989), petition for cert. filed, 58 U.S.L.W. 3022 (U.S. June 16, 1989) (No. 88-2045). The Grider court required a RICO plaintiff asserting a § 1962(a) claim to plead and demonstrate an "investment injury" as a result of defendant's "use" or "investment" of "racketeering proceeds." 868 F.2d at 1149-51. The court of appeals concluded that the plain meaning of § 1962(a) mandates that there is no claim unless there is investment injury:

**\*30** Significantly, the statute does not state that it is unlawful to receive racketeering income; rather, as the italicized language underscores, the statute prohibits a person who has received such income from using or investing it in the proscribed manner. As previously noted, § 1964(c) provides a civil damage remedy only to those persons injured "by reason of a violation of § 1962." It thus appears from the plain language of these two provisions that a plaintiff seeking civil damages for a violation of § 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income. Injury from the racketeering acts themselves is not sufficient because § 1962(a) does not prohibit those acts."

Id. at 1149. In other words, § 1962(a) is not a blanket prohibition against the receipt of racketeering income. Rather, the statute prohibits such receipt only by a principal in the underlying racketeering activity. What § 1962(a) does make unlawful is the use or investment of income derived from a pattern of racketeering activity. Id.

As a procedural matter, the court notes that this investment injury issue was originally framed by the parties as a purely legal question. The briefing process for Timpson and Newbold's motion for partial summary judgment revealed that GFC did not intend to prove investment injury as part of its § 1962(a) claim against Timpson and Newbold. See GFC's Response to Timpson and Newbold's Motion for Partial Summary Judgment, 1-2. The court also notes that the identical investment injury language is contained in GFC's § 1962(a) claims against each defendant named in the pertinent portions of the Fourth Amended Complaint. The three uncontroverted material facts set forth by Timpson and Newbold in their motion for partial summary judgment are that neither defendant: (1) received any income derived from the alleged pattern of racketeering activity; (2) invested or used any part of such income in the operation of the "Zions enterprise;" and (3) caused GFC to suffer any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 22

""""investment injury."

GFC contends that the court is not bound by the decision in Grider and that conflicting Ninth Circuit authority, First Interstate Bank of Oregon v. Wilcox, 815 F.2d 522, 529 (9th Cir. 1987), rejects the requirement of """investment injury." However, as the court previously concluded, Tenth Circuit authority on issues of federal common law is controlling precedent for the court in this litigation. In any event, the court doubts that it is confronted with a conflict of circuit precedent on this issue since the Wilcox decision did not address the investment injury requirement. The Wilcox court was presented with a case involving alleged violations of § § 1962(a), (b), and (c). The Ninth Circuit Court of Appeals rejected the requirement of racketeering injury in the context of a § 1962(c) claim. Wilcox, 815 F.2d at 531. However, the court of appeals did not distinguish between the requirements for claims arising under each separate subsection of § 1962 and this court declines to derive the implicit holding proffered by GFC. The court therefore grants Timpson and Newbold's motion for partial summary judgment on this issue and dismisses the Seventh Claim for Relief against these defendants. Because FSB, FSF, Christenson, Diumenti, Lindsley, FI- Utah, Gurr, Allred, Mabey, ZFNB, ZLC, ZMC, Argus, and Hanson also raised this issue in their motions for summary judgment, the court must also grant that portion of their motions and dismisses the Third, Fifth, Sixth, Eighth, Ninth, and Tenth Claims for Relief against these defendants.

2. § 1962(c)

*31 GFC asserts a claim against all defendants based on § 1962(c). This RICO statute provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

18 U.S.C. § 1962(d). A violation of § 1962(c) thus requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, 473 U.S. at 499, 105 S. Ct. at 3285 (footnote omitted).

The first element is not generally the subject of legal challenges made by defendants since the parties focus on the requisite conduct in the factual determination to be made as to the alleged participation of defendants in the Player frauds. However, the legal issue of whether this conduct must be managerial in nature is raised by the parties and thus will be addressed by the court below. The second (pattern) and third (enterprise) elements are subject to several legal challenges by defendants and are therefore discussed below. Finally, the fourth element of activity is the subject of a limited legal challenge concerning whether conspiracy itself may serve as predicate acts under GFC's section 1962(c) claim. The remainder of defendants' attacks concerning racketeering activity are the subject of the court's factual determinations related to the underlying dispositive motions.

(a) Conduct

Section 1962(c) prohibits any person within the meaning of the statute "to conduct or participate, directly or indirectly, in the conduct" of the enterprise's pattern of racketeering activity. 18 U.S.C. § 1962(c). Defendants contend that this language in RICO requires that they be shown to have engaged in a "dominant, active ownership or managerial role" in the RICO enterprise. See, e.g., Diumenti's Motion for Summary Judgment, 31-35 (citing Bennett v. Berg, 710 F.2d 1361, 1364 (8th Cir.)(en banc) ("'defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the operation or management of the enterprise"), cert. denied, 464 U.S. 1008, 104 S. Ct. 527, 78 L. Ed. 2d 710 (1983); United States v. Mandel, 591 F.2d 1347, 1375 (4th Cir. 1979) ("'conduct or participate' language in § 1962(c) require[s] some involvement in the operation or management of the business"), cert. denied, 445 U.S. 961, 100 S. Ct. 1647, 64 L. Ed. 2d 236 (1980)). See also Occupational-Urgent Care Health System v. Sutro & Co., 711 F. Supp. 1016, 1026-27 (E.D. Cal. 1989) (citing Bennett v. Berg and requiring allegations that defendants participated in operation or management of enterprise); Agristor Leasing v. Meuli, 634 F. Supp. 1208, 1223 (D. Kan. 1986) ("violation of § 1962(c) occurs only when the racketeering activity is being used as an integral part of the management of the enterprise's affairs") (citing Mandel, 591 F.2d at 1375; Bennett, 710 F.2d at 1364), aff'd, 865 F.2d 1150 (10th Cir. 1988); John Peterson Motors, Inc. v. General Motors Corp., 613 F. Supp. 887, 900 (D. Minn. 1985) (RICO defendant must play dominant, active ownership or managerial role in enterprise)."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 3 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 23

*32 The court notes, however, that there is a split in the circuits on this issue. Although defendants would have the court adopt this managerial conduct rule as expressed by the Eighth and Fourth Circuit Court of Appeals, the court is bound to follow the Tenth Circuit - and majority - position rejecting this requirement. See United States v. Killip, 819 F.2d 1542, 1549 (10th Cir.) ("in order to uphold the finding of a nexus between the illegal acts and the alleged RICO enterprise, ... we need only find a relation between the predicate offenses and the affairs of the enterprise") (citing United States v. Carter, 721 F.2d 1514, 1527 (11th Cir.), cert. denied, 469 U.S. 819, 105 S. Ct. 89, 83 L. Ed. 2d 36 (1984)), cert. denied, --- U.S. ----,--- S. Ct. ----, 98 L. Ed. 2d 139 (1987); see also Sun Savings & Loan Association v. Dierdorff, 825 F.2d. 187, 195 (9th Cir. 1987) ("rather than requiring that the enterprise itself conduct the racketeering activity, RICO simply requires a 'nexus' between the enterprise and the racketeering activity") (citing United States v. Scotto, 641 F.2d 47, 54 (2d Cir. 1980) (to establish pattern it is enough to demonstrate that "the predicate offenses are related to the activities of that enterprise"), cert. denied, 452 U.S. 961, 101 S. Ct. 3109, 69 L. Ed. 2d 971 (1981)); Bank of America National Trust & Savings Association v. Touche Ross & Co., 782 F.2d 966, 970 (11th Cir. 1986) ("not necessary that a RICO defendant participate in the management or operation of the enterprise"); Schact v. Brown, 711 F.2d 1343, 1360 (7th Cir.)(having 'little trouble in finding that defendants who are not managers or employees in the colloquial sense are nevertheless reached by § 1962(c)"), cert. denied, 464 U.S. 1002, 464 S. Ct. 1002, 78 L. Ed. 2d 698 (1983); Virden v. Graphics One, 623 F. Supp. 1417, 1428 (C.D. Cal. 1985) (the statute does not require that the defendant participate in the operation or management of the enterprise").

Some defendants contend that the Tenth Circuit Court of Appeals - and presumably appellate courts from several other circuits - have "confuse[d] RICO's 'nexus' requirement with the additional requirement that a defendant conduct or participate in the enterprise's affairs." Diumenti's Reply in Support of Motion for Summary Judgment, 89. The court disagrees and notes that in any event, this argument could not persuade the court to avoid binding Tenth Circuit precedent. Rather, the court adopts the majority view as expressed by the district court in Virden:
This court holds that a RICO plaintiff pursuing a private cause of action under section 1962(c) need only prove that the predicate acts are related to the affairs of the RICO enterprise. In other words, there must be some nexus between the pattern of racketeering activity and the enterprise's affairs. This liberal standard follows from section 1962(c)'s language requiring that the defendant merely conduct or participate directly or indirectly in the affairs of the enterprise through a pattern of racketeering."

*33 623 F. Supp. at 1428-29.

This holding also coincides with the policy considerations underlying RICO as expressed by the Fifth Circuit Court of Appeals in United States v. Elliot:
The substantive proscriptions of the RICO statute apply to insiders and outsiders-those merely "associated with" an enterprise-who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Cf. United States v. Forsythe, 560 F.2d 1127, 1135-36 (3d Cir. 1977). Thus, the RICO net is woven tightly to reap even the smallest fish, those peripherally involved with the enterprise."

571 F.2d 880, 903 (5th Cir. 1978), cert. denied, 439 U.S. 933, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978). However, the court also notes that the requisite knowledge/specific intent under the RICO statutory scheme pertains to all defendants, even the "smallest fish." See Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 660 F. Supp. 1362, 1371 n.7 (D. Conn. 1987) ("A construction of the terms 'conduct or participate' that would include those that assist a RICO enterprise without knowledge of its illegal activities would be inconsistent with the legislative intent of the Act.").

(b) Pattern

A "pattern of racketeering activity" is defined as two or more "acts of racketeering" occurring within ten years of each other, with at least one of those acts occurring after passage of the act." 18 U.S.C. § 1961(5). Although at least two predicate acts are required to establish a "pattern," two acts are not necessarily sufficient. Sedima, 473 U.S. at 486-490, 105 S. Ct. at 3297-3282. The Supreme Court recently reviewed and reversed an Eighth Circuit decision adopting a "multiple scheme" pattern requirement. H.J., Inc. v. Northwestern Bell Telephone Co., 829 F.2d 648, 650 (8th Cir. 1987) ("to demonstrate the necessary continuity appellants must allege that Northwestern Bell 'had engaged in similar endeavors in the past or that [it was] engaged in other criminal activities" because "[a] single fraudulent effort or

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 24

scheme is insufficient"). The court notes that this decision was handed down after GFC filed its responsive memoranda to the underlying motions for summary judgment, but before defendants filed their respective reply briefs."

The Supreme Court in H. J., Inc. concluded that "pattern" under the RICO statutory scheme requires that the predicate acts pose a threat of continuing activity. The Court began by restating the rule enunciated in Sedima that defined "pattern" as "continuity plus relationship," and then went a step further by attempting to set requirements for proving "continuity". Id. at -, 109 S. Ct. at 2900 (citing Sedima, 473 U.S. at 496, n.14, 105 S. Ct. at 3285 n.14).

The Court then discerned in RICO's legislative history a congressional intent that the pattern of predicate acts "amount to or pose a threat of continued criminal activity." Id. The Court in H. J., Inc. thus concluded that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement: Congress was concerned with long-term criminal conduct." Id. at -, 109 S. Ct. at 2902. Where the RICO action is brought before the required long-term continuity can be established, the threat of continuity must be shown. Id. Where the activity does not itself involve a threat, as where a hoodlum requires protection money, or the enterprise itself does not exist for criminal purposes, a threat of continuity may be shown if the predicate acts are a "regular way of conducting defendant's ongoing legitimate business" or of conducting a non-criminal RICO enterprise. Id."

*34 The Court in H. J., Inc. also reaffirmed that a viable pattern allegation requires that the predicate acts be both continuous and "related," that is, that they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at -, 109 S. Ct. at 2901.

The court notes that this issue was originally raised as essentially a legal challenge by defendants. They contended in their underlying dispositive motions that GFC's pleading was defective because it failed to allege multiple schemes. See, e.g., Diumenti's Motion for Summary Judgment, 77. However, since the Supreme Court's decision in H. J., Inc., defendants now assert that GFC fails to establish sufficient facts - commission of predicate acts and a pattern of such acts - to prove defendants were engaged in any "long-term criminal conduct." See. e.g., FSB's Reply in Support of Motion for Summary Judgment, 60-61. As such, the court will focus on the factual allegations supporting GFC's pleadings in its analysis of each defendants' underlying dispositive motion.

(c) Enterprise

It is undisputed by the parties that identification of an "enterprise" is a jurisdictional element of a colorable § 1962(c) claim. The statutory language defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A great deal of earlier motion practice by certain parties, most notably the various Zions defendants, focused on the enterprise allegations contained in GFC's pleading. After seeking approval to file its Third and Fourth Amended Complaints, GFC argued to the court that it should be permitted to plead several alternative enterprises. Over the objections of various defendants, the court allowed GFC to plead several alternative theories of the Player entities enterprise and to proceed with discovery on this basis. However, following defendants' partially successful Rule 12 motions and discovery motion practice, GFC was required to supplement its pleading to further define the enterprise element in its pleading to include no more than two possible alternatives. GFC identified this enterprise to consist alternatively of either (1) AMS and P&W, and their successor in interest (separately identified as Player Industries, Inc. ("PII")) or (2) AMS; P&W; ADMP&W; DMP&W; and MP&W. GFC's Third Supplemental Pleading, ¶ 1.

GFC contends in its pleading that defendants perpetuated
the appearance that the Player entities enterprise was engaged in a sound and lawful business, which in truth and fact it was not, that the prior transactions with the Player entities enterprise, which in truth and fact were fraudulent, were legitimate and that the Player entities enterprise, which in truth and fact was hopelessly insolvent, was solvent."

*35 GFC's Fourth Amended Complaint, ¶ 44. Thus, according to GFC the purpose of the various entities that comprised the association in fact enterprise was "to facilitate the execution and continuation of the fraudulent schemes and the secretion of proceeds of those schemes, which constituted a pattern of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 25

racketeering." GFC's Further Response to Zions Defendants Fourth Set of Consolidated Interrogatories, No. 17.

Defendants raise a number of legal arguments as to why GFC has not properly plead, or in any event cannot now prove, a viable "Player entities enterprise." First, defendants argue that GFC cannot put forth evidence to support the requisite distinction between the enterprise and the pattern elements of its RICO claim. Second, defendants contend that GFC has failed to demonstrate the requisite "enterprise continuity." Third, some defendants contend that GFC cannot properly distinguish the enterprise from the "person" as required under prevailing case law. Finally, defendants also argue that GFC's pleading is defective since an association in fact of partnerships or corporations cannot constitute a cognizable RICO enterprise and, that in any event, GFC is also unable to demonstrate that these entities existed simultaneously. As usual, each side disputes the prevailing legal standards governing these issues as well as the particular facts of this case as they apply to these issues. The court will analyze the legal questions seriatim and, where appropriate, also consider the factual questions raised by this portion of defendants' dispositive motions.

(1) Enterprise/Pattern Distinction

Two general elements are necessary to establish an enterprise within the meaning of § § 1961(4) and 1962(c)-(d). First, there must be "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981). Second, the Supreme Court also requires that the enterprise have an existence separate and apart from the pattern of racketeering activity in which it engaged. Id. Moreover, as to this second element, the Court noted the following:

The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other."

Id. at 584, 101 S. Ct. at 2528-29 (citations omitted). See generally Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts - Criminal and Civil Remedies, 53 Temp. L.Q. 1009, 1026 n.91 (1980) ("the concept 'enterprise' focuses on a group of people" while "[t]he concept 'pattern' focuses on the relationship between acts of racketeering").

*36 Some courts have focused on the above language in the Turkette decision, adopted a three-pronged, structural test for determining the validity of a RICO enterprise, and concluded that an enterprise must have an ascertainable structure distinct from that inherent in the pattern of racketeering activity. The court notes, however, that there is a conflict within the circuits on this issue. Compare United States v. Flynn, 852 F.2d 1045, 1051 (8th Cir. 1988) ("enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering"); Montesano v. Seafirst Commercial Corp., 818 F.2d 423, 424 (5th Cir. 1987) ("an enterprise 'is not a pattern of racketeering activity,' but must be 'an entity separate and apart from the pattern of activity in which it engages'") (quoting Turkette 542 U.S. at 583, 101 S. Ct. at 2528) and United States v. Tillett, 763 F.2d 628, 631 (4th Cir. 1985) ("government must prove that the association exists separate and apart from the pattern of racketeering activity in which it engages") and United States v. Riccobene, 709 F.2d 214, 221-24 (3d Cir.) ("not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses"), cert. denied, 464 U.S. 849, 104 S. Ct. 157, 78 L. Ed. 2d 145 (1983) with United States v. Weinstein, 762 F.2d 1522, 1537 n.13 (11th Cir.) ("[o]ur cases have repeatedly rejected" the contention that a "RICO enterprise must possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity"), modified, 778 F.2d 673 (11th Cir. 1985), cert. denied, 475 U.S. 1110, 106 S. Ct. 1519, 89 L. Ed. 2d 917 (1986) and United States v. Bagaric, 706 F.2d 42, 56 (2d Cir.) ("it is logical to characterize any associative group in terms of what it does, rather than by abstract analysis of its structure"), cert. denied, 464 U.S. 840, 104 S. Ct. 133, 78 L. Ed. 2d 128 (1983)."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 6 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 26

The court notes that the Tenth Circuit Court of Appeals has not been presented with this question, and the Ninth Circuit Court of Appeals has thus far specifically declined to resolve this issue. See United States v. Feldman, 853 F.2d 648, 660 (9th Cir. 1988). Two district court decisions within the Tenth Circuit, however, require this distinction between enterprise and pattern. See United States v. Rogers, 636 F. Supp. 237, 245 (D. Colo. 1986) ("If the government were allowed to prove the enterprise element solely by evidence indicating an association to commit the pattern of racketeering activity, the statute's requirement of an enterprise would be effectively eliminated."); Saine v. A.I.A., Inc., 582 F. Supp. 1299, 1305 (D. Colo. 1984) ("if the enterprise were merely the accumulation of the predicate acts of racketeering, RICO would be nothing more than a tool for combating recidivists")."

*37 GFC disputes that the language of the Turkette decision requires that an enterprise be separate and distinct from the pattern of racketeering activity. Not surprisingly, plaintiffs would have the court adopt the holdings of the Second and Eleventh Circuits on this issue. GFC also contends that, in any event, any distinctness requirement has been satisfied since "plaintiffs allege, and the facts clearly show that the enterprise is composed of companies with an identifiable structure separate and distinct from the mail and wire frauds and interstate transportation of stolen property which comprised the pattern of racketeering." GFC's Response to Diumenti's Motion for Summary Judgment, 39. Because the Tenth Circuit has yet to determine this issue, the court is reluctant to decide as a legal matter whether the court should apply the majority structural test or the minority interpretation of the Turkette decision.

However, under the facts of the present litigation, the court need not reach this issue since GFC avows that it has offered evidence distinguishing the pattern of racketeering acts from the existence of the enterprise. Thus, the court examines GFC's proffered evidence with the more stringent standard in mind. In doing so, the court concludes that GFC has adequately distinguished between the enterprise allegations and the alleged pattern of racketeering activity.

First, as a legal determination, the fact that the alternative enterprises consist of an association in fact of corporations and partnerships is sufficient to dispose of defendants' argument. As the Ninth Circuit Court of Appeals noted in the Feldman decision, an "individual corporation is in itself a legal entity and, alone, may be charged as the RICO enterprise." 853 F.2d at 655 (citing United States v. Griffin, 660 F.2d 966, 999 (4th Cir. 1981), cert. denied, 454 U.S. 1156, 102 S. Ct. 1029, 71 L. Ed. 2d 313 (1982)). Thus, the court of appeals concluded that "corporate entities ha[ve] a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure." Feldman, 853 F.2d at 660.

Second, even under the case law cited by defendants and tentatively adopted by the court, requiring a showing of distinctiveness should not impact upon the underlying dispositive motions since fact questions still remain. As the court in Riccobene commented, "[b]ecause the issues of ongoing organization, continuing membership and separate existence are questions of fact, they must be resolved in the first instance by the jury." 709 F.2d at 222. Applying this structural analysis to the alternative enterprises pleaded by GFC, and the facts presented in opposition to the motions for summary judgment, the court concludes that genuine issues of material fact exist as to the issue of separate existence of the enterprise from the pattern of racketeering activity. The remaining issue in this structural analysis, enterprise continuity, will be discussed below.

(2) Enterprise Continuity

*38 It is also essential that GFC demonstrate that the association in fact enterprise has a common purpose. This is "proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583, 101 S. Ct. at 2528. The organizational (structural) requirement has been dealt with above by the court. However, defendants also raise issues concerning the "continuity" of the alleged enterprise. Specifically, defendants contend that there is insufficient evidence to warrant a trial on the question of enterprise continuity of structure and personnel. See e.g., Diumenti's Motion for Summary Judgment, 20-27.

The court notes that this is essentially a factual dispute since neither side may stray from the language of the Turkette decision. The parties cite different lower courts' attempts to apply the fact patterns of particular cases to the Supreme Court's "continuity" language. See e.g., United States v. Leisure, 844 F.2d 1347 (8th Cir.) --- U.S. ----, 109 S. Ct. 324, 102 L. Ed. 2d 343 (1988); Foval v. First National Bank of Commerce, 841 F.2d 126 (5th Cir.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 7 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 27

1988); United States v. Hewes, 729 F.2d 1302, 1310-11 (11th Cir. 1984), cert. denied, 469 U.S. 1110, 105 S. Ct. 790, 83 L. Ed. 2d 183 (1985). Thus, defendants do not present the court with a legal challenge concerning the sufficiency of GFC's enterprise pleading, but rather, attack GFC's factual basis supporting the alleged continuity of the alternative enterprises.

As an initial matter, it is clear that enterprise continuity is not synonymous with pattern continuity, a concept discussed below by the court. See Ocean Energy II, Inc., 868 at 749 ("Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status."); Montesano, 818 F.2d at 247 ("'association-in-fact' enterprises, like corporate or partnership enterprises, must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts"); but see United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989) (en banc) ("relatedness and continuity are essentially characteristics of [the pattern of racketeering] activity rather than of enterprise"). Therefore, cases cited by the parties dealing with pattern continuity are not addressed in the court's instant analysis.

The court assumes that the parties cite the various appellate court decisions on this issue to demonstrate the legal continuum encompassing continuity of enterprise structure and personnel. In this vein, the Eighth Circuit Court of Appeals in Leisure contrasted its previous holding in United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir.) ("The distinct structure [of an enterprise] might be demonstrated by proof that ... it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure."), cert. denied, 459 U.S. 1040, 103 S. Ct. 456, 74 L. Ed. 2d 608 (1982), with its holding in United States v. Lemm, 680 F.2d 1193, 1200 (8th Cir. 1982) ("This is not an instance of sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes."), cert. denied, 459 U.S. 1110, 103 S. Ct. 739, 74 L. Ed. 2d 960 (1983), to support a jury finding of a RICO enterprise. 844 F.2d at 1363-64.

*39 Similarly, the court cannot conclude as a matter of law that GFC's alternative enterprises do not demonstrate sufficient continuity. Questions of fact remain for the jury to resolve, for example, as to whether the Player frauds were perpetrated on an ad hoc basis, as defendants' contend, and therefore lacked the requisite structural continuity. As the court concluded above in its analysis concerning the separate existence of pattern and enterprise concepts, GFC has met its initial burden of offering evidence to support its pleading. The factual determination of whether the alternative enterprises display continuity of personnel and structure is more properly directed at the ultimate trier of fact. Riccobene, 709 F.2d at 222.

(3) Enterprise/Person Distinction

There is also very little legal dispute among the parties that, for purposes of § 1962(c) of RICO, the "enterprise" and culpable "persons" within the meaning of the statutory scheme must be separate and distinct. See Garbade v. Great Divide Mining and Milling Corp., 831 F.2d 212, 213 (10th Cir. 1987); Schreiber Dist. Corp. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986); Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384, 400-02 (7th Cir. 1984), aff'd, 473 U.S. 606, 105 S. Ct. 3291, 87 L. Ed. 2d 437 (1985) (per curiam); but see United States v. Hartley, 678 F.2d 961, 988 (11th Cir. 1982) (rejecting necessity of distinction), cert. denied, 459 U.S. 1170, 1183, 103 S. Ct. 815, 834, 74 L. Ed. 2d 1014, 1027 (1983). Furthermore, as the district court in Saine noted, "[s]ection 1962(c) makes it unlawful for a 'person' to participate in the affairs of an enterprise through racketeering activity. It does not hold the 'enterprise' itself liable." 582 F. Supp. at 1306. Another way of approaching this issue is that "[i]f the ""person" were not separate from the "enterprise," the person could not conduct the affairs of the enterprise." NL Industries, Inc. v. Gulf & Western Industries, Inc., 650 F. Supp. 1115, 1128 (D. Kan. 1986)."

Defendants contend that GFC has failed both in its pleading and presentation of evidence to distinguish the culpable persons from the enterprise. See e.g., ZFNB's Reply in Support of Motion for Summary Judgment, 119-120. The court rejects this argument summarily. To the extent defendants' arguments are directed at GFC's pleadings, not one of the constituent entities of GFC's ""Player entities enterprise" is named as the culpable person for purposes of GFC's § 1962(c) cause of action. See GFC's Fourth Amended Complaint, ¶ ¶ 4-34. The court does not understand the relevance of the fact, offered by defendants, that these same entities were in earlier GFC pleadings listed as culpable persons. Defendants' dispositive motions are directed at the viability of GFC's current Fourth Amended

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 28

Complaint, as supplemented. As to the factual argument raised by defendants, the court cannot conclude as a matter of law that the culpable/person defendants listed by GFC are somehow one and the same as the alternative enterprises. The two groups do not on their face overlap. Hence, in this instance, the pleadings are self-sufficient.

(4) Association in Fact Enterprises

*40 Finally, as noted above, an enterprise "includes any individual, partnership, corporation, association, or legal entity, and any union, or group of individuals associated in fact although not a legal entity...." 18 U.S.C. § 1961(4). Although the Supreme Court concluded that this statutory language places "no restriction upon the associations embraced by the definition of enterprise," Turkette, 452 U.S. at 580, 101 S. Ct. at 2527, defendants raise two issues concerning how to interpret the language referring to "individuals associated in fact." First, defendants argue that the "entities" referred to cannot constitute an enterprise. As a fall-back position, defendants also contend that even if entities can associate in fact, they must have existed simultaneously at some point in time. See e.g., Diumenti's Reply in Support of Motion for Summary Judgment, 72. The court rejects both of these arguments."

Defendants' first argument requires only brief comment by the court. Referring to the above quoted statutory language, the Second Circuit Court of Appeals phrased the issue as follows: "The argument runs that since the term 'corporation' is in the singular, the only way a group of corporations may be an 'enterprise' within the meaning of the statute is if they come within the language," group of individuals associated in fact.'" United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979), cert. denied, 445 U.S. 927, 100 S. Ct. 1312, 63 L. Ed. 2d 759 (1980). The Huber court concluded that this argument ""makes nonsense of the statute." Id. The court agrees with this conclusion.

While some defendants may characterize this holding as "peculiar," see Diumenti's Reply in Support of Motion for Summary Judgment, 80, supporting case law would counsel otherwise. As defendants concede, a number of other circuit courts concur with the holding in Huber. See United States v. Feldman, 853 F.2d 648, 655-56 (9th Cir. 1988) ("enterprise charged in this indictment, consisting as it does of two individuals and seven corporations, is a 'group of individuals associated in fact'" under 18 U.S.C. § 1961(4)"); United States v. Navarro-Ordas, 770 F.2d 959, 969 n.19 (11th Cir. 1985) ("group of corporations can be a 'group of individuals associated in fact'" within the meaning of the 'enterprise' definition"), cert. denied, 475 U.S. 1016, 106 S. Ct. 1200, 89 L. Ed. 2d 313 (1986); United States v. Aimone, 715 F.2d 822, 828 (3d Cir. 1983) (four individuals and one corporation constitute an enterprise), cert. denied, 468 U.S. 1217, 104 S. Ct. 3585, 82 L. Ed. 2d 883 (1984); United States v. Thevis, 665 F.2d 616, 625-26 (5th Cir.) (accepting viability of enterprise described as "a group of individuals associated in fact with various corporations"), cert. denied, 456 U.S. 1008, 102 S. Ct. 2300, 73 L. Ed. 2d 1303 (1982)."

Moreover, the single court opinion cited by defendants as contrary to this majority position, United States v. McClendon, 712 F. Supp. 723 (E.D. Ark. 1988), is inapposite as to the facts of the instant litigation. As the district court in McClendon explicitly stated, it "respectfully disagree[d]" with the conclusion reached by the court in Huber because "[e]ven if the language might, for civil purposes, permit such an interpretation, it is clearly too vague to support such a construction in the criminal law context" 712 F. Supp. at 730.

*41 Defendants' second argument requires only slightly more analysis by the court. Defendants would have the court adopt a special "simultaneity" requirement for cases involving entities which are associated-in-fact in an enterprise. As discussed above, defendants' "simultaneity requirement is merely another way of stating that an association in fact enterprise must have both continuity of structure and personnel." Diumenti's Motion for Summary Judgment, 25. Moreover, according to Diumenti, he does not contend that "the participants who associate with the enterprise cannot change, but only that an association-in-fact enterprise must exhibit structure in the first instance. Such structure obviously requires simultaneous existence of the constituent entities." Diumenti's Reply in Support of Motion for Summary Judgment, 70-71 (emphasis added) (footnote omitted).

Thus, defendants urge the court to create an exception to the case law construing enterprise continuity and conclude that the enterprise could not begin until the entities listed by GFC were simultaneously in existence. In support of this position, defendants offer the following language from the McClendon opinion: "Under the clear allegations of the Indictment, the two corporations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 29
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

and the partnership 'together' constituted the RICO enterprise. It follows that until the last of these three legal entities was formed, the 'enterprise' charged in the indictment could not have come into existence." 725 F. Supp. at 725.

The court does not find this proposition persuasive. The district court in McClendon offered no citation of authority to support this legal proposition nor has any been offered by defendants. As previously noted by the court, the Ninth Circuit Court of Appeals has specifically rejected this proposition. See Feldman, 853 F.2d at 659 (entities "need not participate in [the enterprise] from beginning to end). Moreover, as the court discussed in its analysis of enterprise continuity, a number other circuits have concluded that the language in Turkette does not require participation of all the individuals associated in fact in an enterprise throughout the life of the enterprise. See e.g., Hewes, 729 F.2d at 1310-11. The court finds the holding in Feldman persuasive and, in any event, is unpersuaded by defendants' arguments that the case law concerning enterprise continuity should be disregarded because the "Player entities enterprise" consists of partnerships and corporations."

(d) Activity

The statute defines "racketeering activity" to include, among other things, any act "indictable" under numerous federal criminal provisions, including those alleged in the instant lawsuit: mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and interstate transportation of fraudulently obtained funds, 18 U.S.C. § 2314 (the so-called predicate acts as alleged in GFC's Fourth Amended Complaint). See 18 U.S.C. § 1961(1). The issue raised by several defendants is whether conspiracies to commit mail fraud, wire fraud, and transportation and receipt of stolen property may serve as predicate acts under GFC's § 1962(c) claim.

*42 GFC's Fourth Amended Complaint alleges that defendants took part in a number of conspiracies which also serve as RICO predicate acts. Specifically, GFC states that defendants conspired to commit mail fraud, wire fraud, and interstate transportation and receipt of property taken by fraud, 18 U.S.C. §§ 1341, 1343, and 2314-15, respectively. GFC's Fourth Amended Complaint, ¶ 180. While these three crimes are specifically listed in 18 U.S.C. § 1961(1)(B) as viable predicate offenses under RICO, several defendants contend that conspiracies to commit these crimes are not so enumerated under the statutory scheme and thus cannot serve as predicate acts of racketeering activity-either to support GFC's § 1962(c) claim or GFC's § 1962(d) claim. See e.g., FSB's Motion for Summary Judgment, 75-76. GFC responds that "the mail and wire frauds are in effect conspiracy statutes" and that even if these acts are not proper predicate offenses under RICO, "there remains ample evidence from which a jury could find that [defendants] committed numerous other predicate acts and aided and abetted others and that [they] engaged in a pattern of racketeering activity." GFC's Response to Diumenti's Motion for Summary Judgment, 110."

It will be necessary for GFC to present evidence on its fall-back position since the court agrees with defendants that these allegations of conspiracy cannot stand as predicate offenses under RICO. In reaching this conclusion the court adopts the reasoning of the district court in Allington v. Carpenter, which, when confronted with this same issue as to a wire fraud conspiracy claim, concluded as follows:
A conspiracy to violate § 1343 cannot serve as a predicate act for a RICO claim. Conspiracy may properly be charged as a predicate act for offenses listed in § 1961(1) (A) and (D), see United States v. Licavoli, 725 F.2d 1040 (6th Cir. 1984) (subsection A)[;] United States v. Weisman, 624 F.2d 1118 (2d Cir.), cert. denied, 449 U.S. 871, 101 S. Ct. 209, 66 L. Ed. 2d 91 (1980) (subsection D), but conspiracies can serve as racketeering activities under § 1961(1)(B) only when the enumerated statute includes conspiracy as an indictable offense. See Weisman, 624 F.2d at 1124 ("subsections B and C, which list most of the other predicate acts chargeable under RICO, conspicuously lack the broad "any offense involving" language of subsection D and, in fact, require that the act be indictable under specifically enumerated sections of the criminal code"). Cf. United States v. Brooklier, 685 F.2d 1208 (9th Cir. 1982) (conspiracy could serve as predicate act because offenses indictable under § 1951 include conspiracy to obstruct commerce by physical violence)."

619 F. Supp. 474, 477 n.2 (C.D. Cal. 1985). Similarly, although "[s]ection 1961(1)(B) lists mail fraud as a predicate offense; conspiracy to commit mail fraud is not included and is therefore not a predicate act." United States v. Martino, 648 F.2d 367, 400 (5th Cir. 1981), cert. denied, 456 U.S. 943, 102 S. Ct. 2006, 72 L. Ed. 2d 465 (1982). The court applies an identical analysis to GFC's claims of conspiracy to commit interstate transportation and receipt of property taken by fraud. The court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 30

therefore grants this portion of defendants' motions for summary judgment and will not consider the conspiracy predicate acts alleged by GFC.

### 3. § 1962(d)

*43 GFC also asserts a RICO conspiracy claim, pursuant to § 1962(d) against all defendants. The Fourth Amended Complaint alleges that defendants "each agreed to conduct or participate, directly or indirectly, in the affairs of the Player entities enterprise through a pattern of racketeering activity." GFC's Fourth Amended Complaint, 217. GFC also alleges that "[e]ach of the defendants also agreed, as alleged above, to participate in at least two of the activities constituting predicate offenses under 18 U.S.C. § § 1341, 1343, 2314, 2315, and 2." Id., ¶ 218.

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of [[[18 U.S.C. § 1962]." 18 U.S.C. § 1962(d). The Supreme Court defined the gravamen of a conspiracy charge under federal law as follows: "[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is, in either case, that agreement which constitutes the conspiracy which the statute punishes." Braverman v. United States, 317 U.S. 49, 53, 63 S. Ct. 99, 102, 87 L. Ed. 23 (1942).

It is uncontested by the parties that other tenets of conspiracy law also apply in the RICO context. First, "[p]roof of an agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases." Riccobene, 709 F.2d at 225. Second, it is uncontested that one conspirator need not know the identities of all his co-conspirators, nor be aware of all details of the conspiracy in order to be found to have agreed to participate in it. Blumenthal v. United States, 332 U.S. 539, 557-58, 68 S. Ct. 248, 256, 92 L. Ed. 154 (1947).

The Ninth Circuit Court of Appeals also noted that "[t]he essence of a RICO conspiracy is not an agreement to commit racketeering acts, but an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering." United States v. Brooklier, 685 F.2d 1208, 1216 (9th Cir. 1982) (citing United States v. Zemek, 634 F.2d 1159, 1170 n.15 (9th Cir. 1980)), cert. denied, 459 U.S. 1206, 103 S. Ct. 1194, 75 L. Ed. 2d 439 (1983); See also Schroeder v. Volcker, 864 F.2d 97, 98 (10th Cir. 1988) (quoting United States v. Hampton, 786 F.2d 977, 978 (10th Cir. 1986) ("object of a RICO conspiracy must be to violate a substantive RICO provision")). Thus, because a RICO conspiracy claim must prove the requisite agreement to commit a statutorily defined RICO violation, this of necessity assumes defendant's "knowledge of the conspiracy and intent to join or further the objectives of the conspiracy." Lochhead v. Alacano, 697 F. Supp. 406, 415 n.6 (D. Utah 1988).

Three legal issues are raised by the parties regarding GFC's RICO conspiracy claim: (1) whether a § 1962(d) claim depends upon a viable § 1962(c) cause of action; (2) whether GFC must show that the particular defendant/co-conspirator agreed to commit personally two predicate crimes in furtherance of the RICO conspiracy; and (3) whether proof of an overt act is required. The court will discuss these issues seriatim.

### (a) Relationship of § 1962(d) with § 1962(c)

*44 The parties cite the same case law on this first issue yet appear to reach opposite conclusions. Defendants contend that if a RICO plaintiff is unable to prove a violation of the substantive subsection of the statute-here, subsection (c) -then the RICO conspiracy claim based on subsection (d) must fail as well. See e.g., ZFNB's Reply in Support of Motion for Summary Judgment, 138 (citing Condict v. Condict, 826 F.2d 923, 927 (10th Cir. 1987) ("any claim under § 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fall if the substantive claims are themselves deficient"); Torwest DBC, Inc. v. Dick, 810 F.2d 925, 927 n.2 (10th Cir. 1987) (since "only RICO conspiracy alleged was the one to commit the substantive violation of § 1962(c)" then "resolution of the § 1962(c) claim is dispositive of the conspiracy claim as well").

GFC contends, on the other hand, that the courts in Condict and Torwest were not confronted with a situation in which summary judgment is granted on a § 1962(c) claim for failure to prove an element not required in a § 1962(d) claim. For example, GFC points to the holding in United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986), and hypothesizes that "if summary judgment were granted because a particular defendant was found not to have personally

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 31

committed acts of racketeering, as either a principal or an aider and abettor, there is still sufficient evidence from which a jury could find that the defendant agreed to the commission of such acts ...." GFC's Response to Diumenti's Motion for Summary Judgment, 111.

The court concludes that because the parties are engaged in an "apples and oranges" argument, both sides citation to the case law and the conclusions drawn therefrom are correct. As in Condict and Torwest, if the court concludes that GFC's § 1962(c) claim must be dismissed for failure to prove a necessary element of that cause of action, then the court will apply this same factual and legal conclusion to the accompanying § 1962(d) claim. If the prior conclusion also proves fatal to the RICO conspiracy claim, then that claim must also be dismissed. If, on the other hand, a factual situation such as the one in Joseph is presented, then the court cannot summarily dismiss the § 1962(d) claim but must decide the various other issues raised by the parties with respect to this cause of action. Cf. United States v. Alonso, 740 F.2d 862, 872 (11th Cir. 1984) ("We hold only that conviction of substantive RICO offenses is not an absolute prerequisite to conviction under the RICO conspiracy provisions.").

(b) Agreement to Personally Commit Predicate Crimes

Several defendants contend that in order to succeed on its RICO conspiracy claim, GFC must demonstrate that a defendant/co-conspirator agreed to commit personally two predicate crimes in furtherance of the RICO conspiracy. See e.g., Diumenti's Reply in Support of Motion for Summary Judgment, 161. As the First Circuit Court of Appeals framed the issue before the court:

*45 The statute, however, does not make clear the extent of the activity in which each defendant must engage to be culpable as RICO conspirators: must each RICO conspiracy defendant agree that someone in the enterprise will commit two predicate crimes, must each member agree to commit two such acts individually, or must each member actually commit two such acts individually?"

United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981).

Since under the statutory scheme, the agreement among the co-conspirators is to further the pattern of racketeering activity, defendants argue that it also follows that the two predicate acts requirement of § 1961(5) should also control in the conspiracy charge. GFC argues to the contrary that "a finding of conspiracy under RICO does not require that a defendant have agreed to personally commit two or more predicate acts or that he actually committed two such acts, although such proof is present in this case as to each defendant." GFC's Response to Diumenti's Motion for Summary Judgment, 100.

GFC also contends that it has demonstrated sufficient evidence of each defendant's agreement to participate-in fact, participation itself-in at least two predicate crimes. To the extent that GFC's evidence may reasonably be construed to establish direct or indirect commission of these acts, so much the better for plaintiffs since the inference that defendants agreed to violate RICO in that instance is more than reasonable. See United States v. O'Malley, 796 F.2d 891, 895 (7th Cir. 1986) ("When a defendant has personally committed several acts of racketeering in furtherance of the enterprise's affairs, '" the inference of an agreement [to join the conspiracy] is unmistakable.'") (quoting United States v. Elliot, 571 F.2d 880, 903 (5th Cir.), cert. denied, 439 U.S. 953, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978)).

The parties agree, however, that there is a conflict among the circuits on this issue. Compare United States v. Ruggiero, 726 F.2d 913, 921 (2d Cir.) ("for the government to convict on a RICO conspiracy it must prove that defendant himself at least agreed to commit two predicate crimes"), cert. denied, 469 U.S. 831, 105 S. Ct. 118, 83 L. Ed. 2d 60 (1984) and United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981) ("RICO conspiracy count must charge as a minimum that each defendant agreed to commit two or more specified predicate crimes in addition to charging an agreement to participate in the conduct of an 'enterprise's' affairs through a 'pattern of racketeering activity'"), cert. denied, 460 U.S. 1011, 103 S. Ct. 1250, 75 L. Ed. 2d 479 (1983) with United States v. Neopolitan, 791 F.2d 489, 498 (7th Cir.) ("only necessary that the defendant agree to the commission of the two predicate acts on behalf of the conspiracy"), cert. denied, 479 U.S. 939 107 S. Ct. 421, 93 L. Ed. 2d 371 (1986) and United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986) ("it is not necessary to prove that the defendant agreed to personally commit the requisite acts, but only that he agreed that another violate § 1962(c) by committing two acts of racketeering activity") and United States v. Adams, 759 F.2d 1099, 1116 (3d Cir.)("defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 12 of 20

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 32

acts"), cert. denied, 474 U.S. 906, 106 S. Ct. 275, 88 L. Ed. 2d 236 (1985) and United States v. Tille, 729 F.2d 615, 619 (9th Cir.) ("Proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d)."), cert. denied, 469 U.S. 845, 105 S. Ct. 156, 83 L. Ed. 2d 93 (1984) and United States v. Carter, 721 F.2d 1514, 1531 (11th Cir.)("when a defendant agrees to become a member of a conspiracy with the essential RICO objective, further proof that the defendant agreed to personally commit two predicate acts is not necessary"), cert. denied, 469 U.S. 819, 105 S. Ct. 89, 83 L. Ed. 2d 36 (1984)."

*46 Moreover, the court notes that although the Tenth Circuit Court of Appeals has declined to decide this issue, see United States v. Killip, 819 F.2d 1542, 1548 (10th Cir. 1987), the District Court for the District of Utah has adopted this two predicate acts requirement for conspiracy cases. See Bache Halsey Stuart Shields, Inc. v. Tracy Collins Bank, 558 F. Supp. 1042, 1047 (D. Utah 1983) ("under RICO, a civil conspiracy charge requires an allegation that a party agreed to commit two predicate crimes in furtherance of the conspiracy"). Because the Tenth Circuit has yet to determine this issue as well, the court is somewhat reluctant to decide as a legal matter whether GFC must prove that each defendant agreed to personally commit at least two predicate crimes. However, the court adopts the scholarly approach and conclusion of the Seventh Circuit Court of Appeals in United States v. Neopolitan, 791 F.2d at 496-99, and require only that GFC demonstrate that defendants agreed to participate in the racketeering affairs of the enterprise. Not only does the Neopolitan decision contain a very persuasive analysis of the case law and legislative history in this area, it also expresses the majority view. The court will therefore not require GFC to demonstrate that each alleged co-conspirator personally agreed to commit at least two predicate acts.

(c) Overt Act

There is also a dispute by the parties as to whether a RICO conspiracy claim requires proof of an overt act and, if so, whether defendant must have personally committed the overt act. However, the parties do not contest that the overt act need not itself be a RICO predicate act or crime. Compare GFC's Response to Diumenti's Motion for Summary Judgment, 105 n.** with Diumenti's Reply in Support of Motion for Summary Judgment, 164 n.95. See United States v. Zemek, 634 F.2d 1159, 1173 n.18 (9th Cir. 1980).

Defendants contend that a viable RICO conspiracy claim requires proof of an overt act personally committed by a defendant/co-conspirator in furtherance of the conspiracy. See e.g., Diumenti's Motion for Summary Judgment, 112. In support of this position, defendants cite the holding in Medallion TV Enterprises v. SelecTV of California, Inc. that "in order for a plaintiff to have a private cause of action under 18 U.S.C. § 1962(d), there must at the very least be one or more overt acts causing injury to the plaintiff or his 'business or property' under 18 U.S.C. § 1964(c)." 627 F. Supp. 1290, 1298 (C.D. Cal. 1986), aff'd, 833 F.2d 1360 (9th Cir. 1987). See also NL Industries, Inc. v. Gulf & Western Industries, Inc., 650 F. Supp. 1115, 1128 (D. Kan. 1986) ("A RICO conspiracy allegation requires at least the pleading of the existence of one or more overt acts by the defendant in furtherance of the conspiracy and the assent of each defendant to the conspiracy.") (citing Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984)); Saine, 582 F. Supp. at 1306 ("At a minimum, a conspiracy requires proof of one overt act by one defendant in furtherance of the conspiracy, and the assent of each defendant to the operation of the conspiracy.") (citing United States v. Sutherland, 656 F.2d 1181 n.4 & 1193 (5th Cir. 1981), cert. denied, 455 U.S. 949, 102 S. Ct. 1451, 71 L. Ed. 2d 638 (1982)).

*47 GFC contests defendants' legal conclusions and cites, inter alia, the holding of the Second Circuit Court of Appeals in United States v. Barton, that "[w]hile the general conspiracy statute [18 U.S.C. § 371], requires proof of an overt act, the RICO conspiracy does not." 647 F.2d 224, 237 (2d Cir. 1981), cert. denied, 454 U.S. 857, 102 S. Ct. 307, 70 L. Ed. 2d 152 (1981). See also United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983) (the "Second Circuit holding [in Coia] is both eminently reasonable and consistent with the Supreme Court's holding in Singer v. United States, 323 U.S. 338, 340-42, 65 S. Ct. 282, 283-84, 89 L. Ed. 285 (1945)"), cert. denied, 466 U.S. 973, 104 S. Ct. 2349, 80 L. Ed. 2d 822 (1984). Plaintiffs also contend that even if the court were to require proof of an overt act, "there is ample evidence of overt acts by each of the defendants." GFC's Response to Diumenti's Motion for Summary Judgment, 106.

The court concludes that for the present time, it will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 33

adopt the more stringent standard offered by defendants and require that GFC demonstrate at least one overt act committed by each defendant in furtherance of the alleged conspiracy to violate § 1962(c). The court reaches this tentative conclusion because although one district court within this circuit has adopted this approach, the Court of Appeals for the Tenth Circuit has yet to decide this issue. Moreover, this resolution seems appropriate since GFC is prepared to meet these requirements.

### V. Motions to Strike

#### A. Standards for Motion to Strike

Defendants seek an order from the court striking various portions of the evidence offered by GFC in opposition to the motions for summary judgment. Defendants rationale varies with the particular facts of the different motions, but all these motions are generally based on the federal rules of civil procedure and the case law that has built up around the admissibility of evidence offered at the summary judgment stage of litigation. Thus, the initial standards guiding the court are found in those portions of Rule 56 which pertain to evidence offered in support or opposition to a summary judgment motion.

Rule 56(e) provides in pertinent part: "Supporting and opposing affidavits ... shall set forth such facts as would be admissible in evidence ...." Fed. R. Civ. P. 56(e). This language has been construed as follows:
Turning to the requirements for affidavits filed on summary judgment motions, the first question to be addressed is whether the information they contain (as opposed to the affidavits themselves) would be admissible at trial. Thus, ex parte affidavits, which are not admissible at trial, are appropriate on a summary judgment hearing to the extent they contain admissible information."

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2738 at 470-73 (2d ed. 1983) (footnotes omitted). Pursuant to Rule 56(e), affidavits must also be made on the personal knowledge of the affiant and must show that the affiant possess the knowledge asserted. See e.g., Noblett v. General Electric Credit Corp., 400 F.2d 442, 445 (10th Cir. 1968).

*48 The same principles apply to deposition testimony and other forms of evidence approved for use on summary judgment by Rule 56(c) since the rule "expressly provides that the court may make use of depositions on a summary judgment motion. Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion, however. Id. § 2722 at 48-50. See. e.g., Miller v. United States, ___ F. Supp. ___, 1989 WL 123301 at 5 (D. Ariz. Oct. 19, 1989) ("inadmissible hearsay evidence may not be considered by the court in determining whether a genuine issue of material fact exists which precludes summary judgment") (citing Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 667 (9th Cir. 1980))."

Moreover, while GFC is correct that the Supreme Court has stated that the non-moving party is not required to produce evidence in a form that would be admissible at trial, see Celotex v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986), the Supreme Court also concluded that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), ..." Id. Hence, the court must focus on the admissibility of the substance of the evidence offered by the nonmoving party to defeat a summary judgment motion. See e.g., Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987) ("The Celotex court, however, was referring to the other means enumerated in Rule 56(c) for persuading the court that summary judgment is inappropriate including affidavits, which are evidence produced in a form that would not be admissible at trial."). Reading Fed. R. Civ. P. 56(c) & (e) in conjunction with the Supreme Court's analysis in Celotex, it is clear that "only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." Beyene v. Coleman Security Systems Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

This ruling also dove-tails with the Supreme Court's recently enunciated standards concerning summary judgment discussed by the court below. In short, the trial court faced with a Celotex-type motion is required to take part in a fiction. The trial court is asked to assume that all of the evidence presented by the non-movant (plaintiff) in opposition to the motion for summary judgment has actually been presented to the trier of fact at the time of trial in the non-movant's case in chief. The court is then asked to assume the movant (defendant) now seeks a directed verdict at the close of plaintiff's presentation of this evidence. By implication, the court would have already made countless rulings during the course of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 34

plaintiff's case concerning the admissibility of plaintiff's evidence. While this evidentiary and procedural posture is the logical corollary to summary judgment standards as set forth by the Supreme Court, it obviously places a great burden on the court when a case as massive as the present litigation is sought to be disposed of by summary judgment. In essence, the court is asked to make the countless evidentiary rulings in advance of the lengthy presentation of the evidence which would surely happen were this matter to go to trial. The court will endeavor to do so because of the implications of the trial of this matter on all parties.

*49 Fortunately, this task is made considerably easier by the movants specific objections as to admissibility of certain evidence and GFC's opportunity to respond both in written and oral form to the particular motions to strike. In this instance, the motions to strike before the court serve to give both sides a fair opportunity to argue the proper evidentiary standards governing the admissibility of selected portions of GFC's evidence. The court also notes that although the number and size of the motions to strike were not invited by the court, it will nonetheless go through the laborious process of analyzing these issues before reaching the dispositive motions. This is so because these motions bring to light the very issues which the court had hoped the parties' contrasting statements of fact would focus upon-the genuineness and materiality of the parties' purported factual disputes.

As discussed in more detail below, the court's analysis of defendants' dispositive motions must center on genuine issues of material fact. The court would deny these motions only if a genuine issue of material fact exists and defendants' legal positions are well taken. By implication, the fact that defendants seek an order striking portions of GFC's evidence offered in opposition to the dispositive motions indicates to the court that defendants are concerned that these same portions might prove fatal to their attempts to obtain summary judgment. Since in ruling on motions for summary judgment "[f] actual disputes that are irrelevant or unnecessary will not be counted," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2515, 91 L. Ed. 2d 202 (1986), the court assumes that they will also not be the subject of motions to strike. In other words, defendants' motions to strike should presumably assist the court in wading through the voluminous statements of fact and focus the court's attention on GFC's strongest evidence or, as the popular phrase goes, defendants' "smoking guns."

Finally, the parties will notice that in the following resolution of the parties' motions to strike and motions for summary judgment, the court quotes extensively from the record offered by both sides. The reason for this is that the parties' statements of fact often contained as much inference as fact. Rather than fall into the trap of citing or adopting one side or the other's ""spin" on a particular portion of the record, the court will simply place the quoted material in its proper, albeit somewhat lengthy, context.

### B. Motions to Strike the Testimony and Affidavit of Jeffrey Leyton

Lindsley, Diumenti, and Allred seek an order from the court striking certain court and deposition testimony as well as the subsequent affidavit of Jeffrey Leyton. Defendants contend this evidence is inadmissible because: (1) Leyton's testimony is not properly authenticated; and (2) Leyton's affidavit contradicts his prior testimony and cannot be used to create "sham facts." The court concludes that neither of these bases have merit and therefore denies the motions to strike.

### (1) Courtroom and Deposition Testimony

*50 According to movants, "Greyhound's entire case against Lindsley, and to a great extent, Diumenti, rests on testimony by Jeff Leyton to the effect that he had 'telephone conversations' with 'Diumenti and/or Lindsley' regarding the content of lease transactions in the fall of 1984 and early January of 1985." Lindsley & Diumenti's Motion to Strike Leyton Testimony and Affidavit, 1. According to Leyton, an attorney for GFC at the time of the Player frauds, he placed these telephone calls to the Diumenti & Lindsley law office on a number obtained from the law firm's stationary. See Court Proceedings of 8/20/85 at 62:19-65:17; Court Proceedings of 9/3/85 at 25:25-26:19. Leyton also states he confirmed the number with the telephone company information service. Id. On each occasion, Leyton states, he was greeted by a receptionist and put through to either Diumenti or Lindsley, who identified themselves as such; Lindsley himself was introduced by Diumenti. See Court Proceedings of 8/20/85, 31:9-15 & 88:11-14. Leyton also recounts that Diumenti and Lindsley acknowledged their representation of Player and the sublessee in the $40 million NL transaction, acknowledged the opinion letters received by Leyton, and discussed the need to issue, reissue, or amend the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 15 of 20

Not Reported in F.Supp.                                                                                    Page 35
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

opinion letters. See id. at 31:1-41:24. Movants deny that any such contacts or conversation ever took place.

The relevant portions of the Federal Rules of Evidence state as follows:
(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support of finding that the matter in question is what its proponent claims.
(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:"

(5) Voice identification. Identification of a voice, whether heard first hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.
(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business and the conversation related to business reasonably transacted over the telephone."

Fed. R. Evid. 901. Furthermore, as one commentator has noted, in admitting the conditioned evidence, the judge determines only that there is sufficient evidence of the allied or conditioning fact to permit a reasonable jury to find its existence. The judge does not make a conclusive determination; the final responsibility for determining fact is left to the jury."

J. Lilly, An Introduction to the Law of Evidence (West 1978) § 96 at 365 (footnote omitted).

*51 The court concludes that GFC has offered sufficient "conditioning facts" to permit a reasonable trier of fact to consider Leyton's testimony. GFC's evidence conforms with the authentication requirements of Fed. R. Evid. 901(b) (6) (A) & (B). Leyton claims that both Diumenti and Lindsley identified themselves. Movants vigorously dispute this, but that does not provide a legitimate basis to strike this evidence. Moreover, the court also concludes that the disputed testimony also complies with Fed. R. Evid. 901(b) (5) since Leyton claims that he became familiar with Diumenti and Lindsley's respective voices. See Leyton Affidavit, ¶ 4. Again, while movants argue that this is implausible and simply a post facto rationalization, this argument is better offered to the ultimate trier of fact. Moreover, as the very language of Rule 901(b) (5) makes clear, aural identification may be acquired after the telephone conversations."

Movants also make the rather curious argument that the court should draw certain "inferences" from the state of the present evidence, or lack thereof, in order to grant the motions to strike (and presumably the accompanying motions for summary judgment). Specifically, movants contend that "[b]ecause of Lindsley's late addition to this lawsuit, and Greyhound's failure to produce admissible documentation reflecting the calls, Lindsley is entitled to an inference that Leyton's calls did not take place." Lindsley's Reply in Support of Motion to Strike Leyton Testimony and Affidavit, 7. While this may or may not be true, it is for the trier of fact to draw such inferences. This is clearly not the proper basis for a motion to strike, let alone a motion for summary judgment. Similarly, movants also contend that Leyton's "inherent untrustworthiness" mandates an order striking this testimony. Id., 9. This argument must also be summarily rejected as it is directed at the weight, and not the admissibility, of the evidence. See United States v. Watson, 594 F.2d 1330, 1335 (10th Cir. 1979) ("all questions of weight and credibility [[[are] for the jury"). Finally, movants argue that Fed. R. Evid. 403 enables this court to strike the offending evidence because of its prejudicial nature. Lindsley & Diumenti's Motion to Strike Leyton Testimony and Affidavit, 12. The court declines to comment on this argument other than to note that the prejudice to which movants allude appears to be the defeat of their accompanying motions for summary judgment. Thus, this portion of the motions to strike must be denied."

(2) Affidavit Statements

Movants next argue that Leyton's affidavit should be stricken because it: (1) lacks an affirmation that it was made upon personal knowledge; (2) "does not otherwise indicate that Leyton met, knew, or recognized Lindsley's voice;" (3) contains "nothing but self-serving hearsay and conclusory language;" and (4) contradicts his prior testimony. Id. at 15-16. The court rejects the first three arguments summarily and focuses upon the brunt of movants' dispute:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 36

whether the affidavit contradicts prior deposition statements.

*52 Movants apparently take issue with the following portions of Leyton's affidavit:

3. As I have testified in court hearings and deposition, I made a number of phone calls to George Diumenti and William Lindsley in Utah regarding the opinions of counsel they were providing on behalf of P&W and NL Industries. During those phone conversations, which extended over multiple drawdowns, Mr. Diumenti and Mr. Lindsley represented to me that they were counsel to NL Industries, a party to the transaction by its consent to the assignment of sublease. I relied upon those representations from attorneys in going forward with the master lease and drawdowns. Messrs. Diumenti and Lindsley never expressed any doubt or hesitancy in our discussions; on the contrary, they affirmed their representation of the sublease.

4. I also worked on closings for the $50 million master lease with P&W involving Baker International. I received opinion letters from Mr. Diumenti as counsel for Baker International. After my prior personal communications with Mr. Diumenti, which were frequent enough that I came to recognize his voice, I had every reason to believe that his representations on behalf of Baker International were also legitimate."

6. Nevertheless, I believe that I acted prudently in closing the NL Industries and Baker International master lease and drawdowns by making personal contact with representatives of the sublesees [sic], including outside legal counsel.
Leyton Affidavit of 5/10/89, ¶ ¶ 3-4 & 6.

It is undisputed by the parties that district courts should disregard a declaration that is contrary to a deposition statement "when they conclude that [the declaration] constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); see Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983) ("If testimony under oath, however, can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."); Radobenko v. Automated Equipment Corporation, 520 F.2d 540, 544 (9th Cir. 1975) ("The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial."); Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). However, there is nothing "inherently inconsistent" between a failure to recall at one point and a recollection refreshed by a document at another point in time. Kennett-Murray Corp. v. Bone, 622 F.2d 887, 844 (5th Cir. 1980). As the Eleventh Circuit Court of Appeals stated in affirming a summary judgment granted by a trial court: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given testimony." Van T. Junkins & Assoc., Inc. v. U.S. Indust., Inc., 736 F.2d 656, 657 (11th Cir. 1984).

*53 However, this doctrine does not apply to the facts before the court in the instant motion. The court does not find that the fact that Leyton "came to recognize" Diumenti's voice in the course of his telephone conversations is inconsistent-let alone directly contradictory-with Leyton's testimony in open court. See Transcript of 8/20/85 at 32, 46, 66, and 88. Moreover, the court concurs with GFC that in the deposition testimony cited by movants, Leyton was asked only about his familiarity with Diumenti's voice prior to the first call. Thus, Leyton's affidavit does not fall within the "sham fact" doctrine and the remainder of Diumenti, Lindsley, and Allred's motion to strike must also be denied.

C. Motions to Strike the Declaration of Robert H. Damm

Mabey and Allred seek a court order striking a portion of the affidavit of Robert H. Damm ("Damm"), the former Executive Vice President at GFC and Greycas. They contend that this evidence should be stricken pursuant to the ""best evidence rule," Fed. R. Evid. 1002, and because the declaration "is in part hearsay." Mabey's Motion to Strike the Damm Declaration; Allred's Joinder in Motion to Strike Damm Declaration, 3. The court finds no merit in movants' positions and must therefore deny the motion.

Movants object to a specific portion of Damm's

Case 2:04-cv-00139-DAK-BCW  Document 359-3  Filed 06/07/2007  Page 17 of 20

Not Reported in F.Supp.  Page 37
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

affidavit, which reads as follows:
4. In reviewing [the $325,000 loan, $40 million master lease, and $50 million master lease] the creditworthiness of Player & Willyard was a consideration. The front of every write-up contained a section on the company's prior credit history with the customer. In each of the three write-ups referred to above, this section featured the fact that Player and Willyard had a $2.35 million construction loan that matured in the fall of 1984 and for which there was a take- out commitment from Zions First National Bank. If I knew the customer was in default or about to go into default on a $2.35 million loan, I would not have voted to recommend involving Player and Willyard."

Damm Affidavit of 5/10/89, ¶ 4.

Movants' arguments regarding Fed. R. Civ. P. 1002 & 802 must fail because copies of these three writeups are already before the court. See GFC's SOF to ZFNB's Motion for Summary Judgment, SOF ¶ 368 & Exhibit 163, ¶ SOF 387 & Exhibit 172, ¶ SOF 432 & Exhibit 184. Moreover, it is clear from the context of the declaration that it is not being used as a vehicle to put the actual writings into evidence. The disputed portion of Damm's declaration puts forth a particular fact relating to GFC's reliance: "If I knew the customer was in default on a $2.35 million loan, I would not have voted to recommend involving Player and Willyard." Finally, while Mabey also disputes that the RRI loan was ever about to go into default, this argument is better directed at the trier of fact. In other words, GFC has produced sufficient foundational evidence on this point as well. See GFC's SOF ¶ ¶ 1265 & 1267.

### D. Motions to Strike the Declaration of Robert W. Bertrand

*54 FI-Utah, FSB, Gurr, Diumenti, Allred, and Mabey seek a court order striking various portions of the declaration of Robert W. Bertrand ("Bertrand"), the former President and Chief Executive Officer of GFC and Greycas. Movants filed various joinders and separate motions objecting to a total of six paragraphs of the Bertrand declaration. They contend that the court must strike these portions of GFC's evidence pursuant to the "sham fact" doctrine. The court concludes that these portions of the Bertrand declaration do not directly contradict his earlier deposition statements and must therefore deny these motions.

The following portions of the Bertrand declaration are the subject of these motions to strike:
3. In each instance [of the four major GFC loans/leases to P&W], the primary credit was a Fortune 500 company, either NL Industries or Baker International. Player & Willyard was a secondary credit. However, "secondary" does not mean immaterial. I looked at the credit of all parties, including Player & Willyard, in passing on these proposals. If the credit of any of the parties had been unsatisfactory, I would not have approved and forwarded the proposals to the parent.
4. In fact, the credit of Player & Willyard, as represented to us, appeared to be a successful business with good banking and financing relationships with the largest banks in Utah (that is, First Interstate Bank, First Security Bank and Zions First National Bank) and had an excellent payment record with us. As of December 31, 1982, as I noted in my recommendation to the parent, Player & Willyard had a fair market net worth of approximately $15.5 million. Two years later, as I noted in a written recommendation, Player & Willyard's net worth was represented to be $22.3 million. I certainly never thought of Player & Willyard as a broker, and we did not enter into the transactions on this basis or deal with Player & Willyard as such. Player & Willyard was a customer to whom GFC had recourse under all the loans and leases.
5. I have since learned that Player & Willyard's financial condition was completely misrepresented. If I had learned that my understanding was based on false representations, I would not have recommended any loans or leases to Player & Willyard for approval, regardless of the soundness of the sublessee."

7. In reviewing the writeup [of the RRI construction loan] submitted and thereafter, I also considered the favorable credit reference that Player & Willyard received from First Interstate Bank of Utah. First Interstate represented that Player & Willyard maintained checking accounts with average balances of $400,000-$600,000, that its accounts were paid as agreed, and that in general, First Interstate regarded Player & Willyard highly and would entertain new business from it. Thus, my understanding was that P&W was a highly creditworthy business in the eyes of its major bank reference.
8. My favorable understanding of Player & Willyard's creditworthiness was further strengthened

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 18 of 20

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
(Cite as: Not Reported in F.Supp.)

Page 38

when Player & Willyard promptly paid off the construction loan in the Fall of 1984. In passing on the loan and lease to Player & Willyard in September and October 1984 and thereafter, I took into account the fact that Player & Willyard had a commitment for a long term financing on its hotel from Zions First National Bank. Similarly, the fact that Player & Willyard had paid off a loan from us of $2.35 million was important especially at the time I considered the $50 million master lease involving Baker International.

*55 9. My personal contact with Mr. Player was limited, but grew somewhat as he became a major customer. Thus, in May 1985, a luncheon and golf engagement with Mr. Player and senior GFC executives including myself was arranged. On that occasion I met Mr. Diumenti. Mr. Player came to cancel the golf engagement, accompanied by Mr. Diumenti, who was introduced as Mr. Player's attorney. According to Mr. Player, he and Mr. Diumenti were being called away unexpectedly to the Middle East to conduct further business with NL Industries. Mr. Diumenti was present for Mr. Player's explanation and said nothing inconsistent. On the contrary, he offered us the use of his yacht in his absence. This story, which I now realize to have been a complete fabrication, at the time lent credence to Mr. Player's continuing drawdowns pursuant to his sublease with NL Industries, and to the interest he was expressing at that time in our portfolio of repossessed oil drilling equipment."

Bertrand Declaration of 5/11/89, ¶ ¶ 3-5 & 7-9.

As to paragraphs three, four, five, seven, and eight, movants contend that  
Bertrand's declaration completely contradicts his deposition testimony, which took place over the course of at least three days. Throughout his deposition testimony, Bertrand consistently emphasized, under exhaustive questioning and with the opportunity for cross-examination, that Player's credit strength had no influence on his recommendation. He also testified that the banking relationship with the three Utah bank defendants was not a factor in his recommendation."

FSB's Motion to Strike Bertrand Declaration, 3. They therefore seek an order striking this portion of the declaration under the "sham fact" doctrine discussed earlier by the court in relation to the motion to strike the testimony and affidavit of Leyton. In support of this argument, movants cite the court to various portions of Bertrand's prior deposition testimony.Q. Would it be distressful to you as the president of the company to find out that you never obtained ever an audited financial statement from [P&W]?  
MR. CAMPBELL: I object to the form of this question, again, calling for a statement of an emotional state of mind about a hypothetical set of facts.  
THE WITNESS: Not necessarily.  
Q. Why not?  
A. Because we were not relying on Player & Willyard as the principal string underlying the transaction.  
Q. And what you were relying upon was what?  
A. We were relying on a variety of things, the credit of NL and Baker, the leases or subleases between NL and Player & Willyard. We were relying on the collateral. We were relying on the long-standing relationship we had with him. Those were the things we were relying on. And the financial strength of Player & Willyard as an entity was not of overwhelming importance. On the contrary, financial strength of Player & Willyard as we have already discussed was not particularly important. So not having an audited financial statement on Player & Willyard was not in my opinion a sign of bad judgment or mistake."

*56 Bertrand Deposition of 8/11/87, 559:10-560:12.Q. In the Player & Willyard deals, though, you didn't pay any attention to the Player & Willyard financial statements because you were looking to NL & Baker as the credits. Correct?  
A. Yes.  
Q. That was the creditworthiness that you were examining, not Player's?  
A. That's correct."

Bertrand's Deposition of 7/1/89, 919:16-23.Q. The fact of the matter is, sir, that Mr. Player's banking relationship with First Interstate Bank of Utah played no part in your decision to recommend those transactions for your company?  
A. I don't know that I can say that because I am not sure what the relationship was whether I knew about and whether if I knew about it that may have played a role in my being more favorably inclined to do business with Mr. Player.  
Q. As you sit here today, sir, you cannot give me one example of a transaction with Mr. Player in which your knowledge, if there was any, of his relationship with First Interstate Bank of Utah played a role in your decision to approve transactions. Correct?  
A. That's correct."

Id., 944:20-945:11.Q. Are you aware of anything that First Interstate Bank did that led your company to

Case 2:04-cv-00139-DAK-BCW   Document 359-3   Filed 06/07/2007   Page 19 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 39

enter into the transaction involving the Riverdale Roadway?
A. Not specifically, no.
Q. You approved that transaction, didn't you?
A. I may have. I don't recall."

Bertrand Deposition of 6/30/88, 799:1-6.

The court concludes that the above quoted deposition testimony does not directly contradict the Bertrand declaration offered in opposition to the motions for summary judgment. While movants dispute the validity of Bertrand's later explanation of "primary" and "secondary" credit, this does not convince the court that Bertrand's declaration "completely contradicts" his deposition testimony. Taken as a whole, this deposition testimony may have been less than illuminating for defendants, but it does not as a matter of law foreclose Bertrand's later declaration. To the extent that defendants find it at odds with Bertrand's deposition testimony, these inconsistencies should be pointed out to the trier of fact."

Furthermore, movants also point out that GFC uses this portion of the Bertrand declaration to support their statement of fact regarding GFC's reliance on information supplied from the financial institution defendants. These same movants also correctly note that the declarant does not go so far as to state that he "relied" on this information, as that would be in direct conflict with his prior deposition testimony. The court agrees with this point, but does not believe that it is the proper basis for a motion to strike. Rather, the court interprets this argument as a request to disregard or discredit this particular statement of fact when considering the underlying motion for summary judgment. This the court will do.

Finally, as to paragraph nine of the Bertrand declaration, movant Diumenti contends that "[p]laintiffs have obviously concocted this paragraph in an attempt to establish that Mr. Diumenti actually heard and/or in some fashion confirmed Player's alleged statement to GFC officials that he was traveling to the Middle East for business dealings with NL Industries." Diumenti's Joinder in Motion to Strike Bertrand Declaration, 3-4. The court will quote at length from Bertrand's previous deposition testimony, cited by Diumenti, because it speaks for itself. The following statements are alleged to "directly contradict" the declaration before the court:
*57 Q. Did Mr. Player introduce you to Mr. Diumenti as soon as they came into the country club?
A. As best I can recall, yes.
Q. What did he say to you in regard to Mr. Diumenti?
A. He introduced Mr. Diumenti and said that Mr. Diumenti was his attorney and friend and that they were on a trip or about to go on a trip to the Middle East to do business related to NL Industries; that they were flying to New York as I recall that afternoon, and that it was a continuation of the business that Sheldon and Mr. Diumenti somehow had been involved in involving NL Industries."

Bertrand Deposition of 12/31/86, 123:2-22.Q. Where was Mr. Diumenti when Mr. Player was informing you of who Mr. Diumenti was and telling you that he and Mr. Diumenti were going to the Middle East?
A. He was present at the table.
Q. Who else was present at that table?
A. Mr. Damm, and I believe, Mr. Vance.
Q. So at the time Mr. Player was introducing Mr. Diumenti, you were all seated at a table, correct?
A. That's correct."

Id., 124:7-15.Q. Do you recall any discussion regarding a boat Mr. Diumenti owned in San Diego?
A. Yes, I do.
Q. What do you recall in that regard?
A. I recall Mr. Diumenti indicating that he had a boat, fishing boat, I believe, in San Diego. In fact, I remember him stating that he and Mr. Player had used that boat and somehow offered to make it available to us or invited us to join them at some time in the future on that boat.
Q. Did Mr. Diumenti ever say during the time that you were seated at this table that he was going to the Middle East with Mr. Player with regard to some NL Industries business?
A. That is my recollection.
Q. It was Mr. Diumenti who said that?
A. I can't recall if it was Mr. Diumenti or Mr. Player who said they were both going. It was either Mr. Player said they were both going in the presence of Mr. Diumenti and Mr. Diumenti indicated he was going or Mr. Diumenti said he was going. I'm not sure.
Q. Was anything else discussed during that luncheon?
A. I can't recall.
Q. Did Mr. Diumenti or Mr. Player describe the particulars of this NL Industries trip?
A. By particulars you mean what?
Q. What they were going to do with regard to the NL Industries business?
A. I can't recall other than I believe it had something to do with some of the equipment transactions, machine tools and other types of equipment.
Q. But they said they were going to the Middle East?
A. That's correct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 40
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Q. During the luncheon did anyone discuss the leasing transactions that Mr. Player had with Greyhound?
A. I don't recall.
Q. One way or the other?
A. One way or the other.
Q. Did anyone discuss with Mr. Diumenti during that luncheon the letters that had been submitted to Greyhound Leasing that purportedly bore his signature?
MR. EHRENBARD: Object to form.
THE WITNESS: I don't recall.
*58 Q. Did anyone discuss with Mr. Diumenti in what capacity he was Mr. Player's attorney?
MR. EHRENBARD: Object to form.
THE WITNESS: I don't recall.
Q. Did Mr. Diumenti tell anyone during that conversation what his role in this NL Industries trip was?
A. My only recollection is that he was somehow involved in it and was accompanying Mr. Player on the trip.
Q. But you don't know whether that impression came from what Mr. Player said or what Mr. Diumenti said?
MR. EHRENBARD: Object to form.
THE WITNESS: I recall that Mr. Diumenti acknowledged somehow that he was going on that trip.
Q. But you don't know how he acknowledged it?
A. I don't remember precisely how he acknowledged it, but I have a distinct recollection that he acknowledged that he was going on that trip."

Id. 126:7-128:23.

The court concludes that a simple comparison of the Bertrand declaration and deposition testimony refutes any need to apply the "sham fact" doctrine. The court finds nothing directly inconsistent between these two sworn statements that requires such a court order. Moreover, while movant Diumenti may wish to argue that these statements are "irrelevant" because Player "made these statements only to avoid a golf game with GFC officials, not to further any fraudulent activity," Diumenti's Reply in Support of Motion to Strike Bertrand Declaration, 3 n.2, this argument does not support a motion to strike. While it is true that irrelevant evidence is inadmissible, Fed. R. Evid. 401, and thus the possible target of a motion to strike, the court notes that irrelevant evidence by its very nature cannot create material issues of fact that would foreclose summary judgment. As the court will discuss in more detail below, in relation to Diumenti's motion for summary judgment, Diumenti's arguments concerning the golf outing meeting are more appropriately placed before the ultimate trier of fact. The court must therefore deny the remainder of the motions to strike the Bertrand declaration.

### E. Motions to Strike the Declaration of Bruce H. Baum

FI-Utah, FSB, Allred, Diumenti, and Mabey seek an order from the court striking certain portions of the declaration of Bruce H. Baum ("Baum"), a lay witness working for GFC since 1981. The Baum declaration is offered by GFC to help establish that funds used by Player to purchase time certificates of deposit ("TCD") were ultimately received by various defendants as loan repayments when Player cashed the TCDs. As will also be noted in relation to the motions to strike the declaration of Robert Mathis, receipt of such funds by defendants is a necessary element of GFC's RICO claims based on racketeering acts of receipt of stolen property, as well as to GFC's fraudulent conveyance, conversion, and constructive trust claims. Movants contest the admissibility of seven paragraphs of the Baum declaration on the grounds that they violate Rule 56(e) because they: (1) are not made on personal knowledge; (2) do not set forth only facts as would be admissible in evidence; and (3) do not affirmatively show that Mr. Baum is competent to testify to the matters stated therein. See, e.g., FI-Utah's Reply in Support of Motion to Strike Baum Declaration, 1; Fed. R. Civ. P. 56(e).

*59 Although movants seek an order from the court striking the entire Baum declaration, the court notes that it is only certain portions of certain paragraphs of the declaration which are disputed by the parties. Close review of the parties' briefs on this issue reveal that little is actually contested in this motion. GFC and movants both agree that certain portions of Baum's declaration contain statements which are in fact "inferences.". See GFC's Response to FI-Utah's Motion to Strike Baum Declaration, 4 & 7-8. Other unobjectionable portions serve as a vehicle for introducing various exhibits into the record before the court. However, the court finds that while Baum may indeed be articulating inferences for the court's benefit, this method of proof is not sanctioned by Fed. R. Civ. P. 56(e).

Rather than strike the entire declaration, the court will grant the motion to the extent that it excises these disputed inferences. Thus, the appropriate remedy for these failures is that "Baum's declaration should be limited to an introduction of exhibits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.