Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

without added impermissible comments which plaintiffs attempt to sneak into the record as 'evidence'." FSB's Reply in Support of Motion to Strike Baum Declaration, 6. Although these inferences are indeed stricken from the factual record before the court, GFC's counsel are still free to argue the reasonableness of such inferences as they relate to the underlying motions for summary judgment. Inferences are for the parties to argue and for the court to accept or reject.

The court therefore grants the motions to strike portions of the Baum declaration. In order to state a clear resolution of this motion, the court quotes below all portions of the declaration at issue, and underscores the statements to be stricken from the record:

4. a. As set forth in paragraph 11A of his Declaration, Robert Mathis traced GFC funds to AMS' check no. 1023, payable to FI-Utah. AMS' check was used on or about July 31, 1979, for the purchase of a time certificate of deposit ("TCD") at FI-Utah, #50071, in the amount of $200,000 in the name of Sheldon G. and Brenda Jill Player. This TCD had a one-year maturity and appears to have been cashed on July 30, 1980. (A copy is attached as Exhibit 1).

b. On January 28, 1980, AMS obtained a loan from FI-Utah in the amount of $130,000, which was purportedly collateralized by Player's $200,000 TCD ###50071. On February 5, 1980, AMS obtained a loan from FI-Utah in the amount of $30,000, which was also purportedly collateralized with Player's $200,000 TCD #50071. These two loans were combined and renewed by FI-Utah on February 29, 1980. The maturity date for the renewed loan was July 30, 1980. (A copy is attached as Exhibit 2).

c. On February 19, 1980, AMS obtained a loan from FI-Utah in the amount of $40,000, which also purportedly collateralized by Player's $200,000 TCD ###50071. This loan was renewed on May 18, 1980, and the maturity date extended until July 29, 1980. (A copy is attached as Exhibit 3).

*60 d. On July 30, 1980, the loans to AMS described in subparagraphs b and c were repaid. It appears the repayment of these loans were from the proceeds of the Player $200,000 TCD #50071 were received by FI-Utah via repayment of the loans it granted AMS.

e. Thus, GFC's proceeds, which have been traced by Mathis to the check used to purchase the Player $200,000 TCD #50071 were received by FI-Utah via the repayment of the loans it granted AMS.

5. a. As set forth in paragraph 11B of his Declaration, Mathis traced a GFC drawdown check to FI-Utah. The check proceeds were used on or about June 16, 1982, for the purchase of a $200,000 TCD at FI-Utah, #122411, in the name of AMS. The TCD was cashed on August 17, 1982. (A copy is attached as Exhibit 4).

b. On July 30, 1982, AMS obtained a loan from FI-Utah in the amount of $200,000 which was purportedly collateralized by AMS' $200,000 TCD #122411. This loan was to mature on August 9, 1982. This loan was not renewed or extended.

c. It appears that this loan was paid on August 17, 1982. (A copy is attached as Exhibit 5). It also appears the repayment came from the proceeds of the AMS TCD #122411 cashed that same day.

d. Thus, GFC's proceeds which have been traced by Mathis to the purchase of AMS' $200,000 TCD #122411 were received by FI-Utah via repayment of the loan it granted to AMS.

6. a. As set forth in paragraph 12B of his Declaration, Mathis traced GFC's funds to the purchase of a $1,230,000 TCD at FSB, #746363, in the name of AMS on or about November 12, 1980. This TCD was cashed by FSB on May 11, 1981. (A copy is attached as Exhibit 6).

b. On or about December 3, December 4, and December 12, 1980, AMS obtained three loans from FSB totalling $1,230,000. These loans were purportedly collateralized by AMS' $1,230,000 TCD #746363 and had a maturity date of May 1, 1981. (A copy is attached as Exhibit 7).

c. On May 11, 1981, when AMS' $1,230,000 TCD #746363 was cashed, FSB applied the proceeds of the TCD as repayment of its three loans to AMS maturing that same day.

d. Thus, GFC's proceeds which have been traced by Mathis to the check used to purchase the AMS TCD were received by FSB via repayment of the three loans it granted AMS.

7. a. As set forth in paragraph 12D of his Declaration, Mathis traced GFC funds to the negotiation of GFC check #1722 dated July 1, 1982, in the amount of $301,098 at FSB. (A copy is attached as Exhibit 9).

b. On or about July 6, 1982, AMS purchased a $301,098 TCD #784243 at FSB which had a maturity date of August 5, 1982. (A copy is attached as Exhibit 10.)

c. On or about July 22, 1982, AMS obtained a loan in the amount $301,098. This loan was purportedly collateralized by the TCD in sub-paragraph b. The loan had a maturity date of August 5, 1982. (A copy is attached as Exhibit 11).

d. It appears that on August 5, 1982, when AMS' $301,098 TCD #784243 was cashed, FSB applied the proceeds of the TCD as repayment of its loan to AMS.

*61 e. Thus, GFC's proceeds which have been traced by Mathis to the purchase of the TCD were received

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 42
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

by FSB as repayment of its loan to AMS.

8. a. As set forth in paragraph 12C of his Declaration, Mathis traced GFC funds to FSB's $1,200,000 debit memo dated December 3, 1984.

b. FSB admitted in its response to GFC's Seventh Set of Interrogatories to FSB, Interrogatory No. 41, that the proceeds of this debit memo were used as repayment of its $1,200,000 loan to AMS/P&W, originally granted on or about June 1, 1984. (A copy is attached as Exhibit 12).

c. Thus, GFC's proceeds which have been traced by Mathis to this debit memo were received by FSB via repayment of its loan to AMS."

13. From this review [of the AMS and P&W checking accounts at FSB], after September 1978 the AMS and P&W FSB account records contained a daily balance listing which indicated the amount of funds in the account or, as was commonly the case, the extent to which the account was overdrawn. Prior to September 1978, the AMS account records did not indicate the daily balance on the monthly statements; however, there were numerous Return Check Notices in the AMS account, many of which revealed a negative account balance on specific days. From this information, a chart was created which chronicles the overdrafts in these accounts, for use in GFC's Statement of Facts in opposition to FSB's Motion for Summary Judgment.

14. For the years 1980 through 1982, every check and deposit in the AMS and P&W accounts at FSB was reviewed in order to determine the aggregate amount of overdraft advances that were being made in the accounts. The dates on the account statement were used to determine the clearing date of checks and deposits. For each day, deposits, if any, were first added to the account, to increase the balance in the account from the prior day, or, as was often the case, to reduce the outstanding overdraft. Thereafter, the day's checks, if any, were deducted, to determine the amount of overdraft advances, if any, made that day. By using this method, FSB was given the benefit of the doubt, by disregarding any daylight overdrafts-that is, funds advanced by FSB that were repaid with a deposit made later that same day. The information collected in this fashion was also used in GFC's Statement of Facts in opposition to FSB's Motion for Summary Judgment."

Baum Declaration of 5/8/89, ¶ ¶ 4-8 & 13-14.

F. Motions to Strike the Declaration of Robert M. Mathis and GFC's Cross-Motion to Amend Responses to FI-Utah's Seventh Set of Requests for Admissions

GFC submits the declaration of Robert M. Mathis, a partner at Price Waterhouse and GFC's "tracing" expert, in an attempt to trace proceeds of Player's frauds to various defendants. It is uncontested that tracing funds to the specific defendants is a necessary element of GFC's receipt of stolen property allegations asserted as predicate acts in GFC's RICO claims, as well as its fraudulent conveyance, conversion, and constructive trust claims. FI-Utah, FSB, FSF, Diumenti, Mabey, Allred, and the Zions Defendants contest the admissibility of various portions of the affidavit of Robert Mathis, dated January 9, 1989, and the declaration of Robert Mathis, dated May 8, 1989. Because GFC has also filed a cross-motion concerning a portion of contested declaration (¶ ¶ 8-10 of the declaration), the court will resolve this cross-motion before considering defendants' respective positions.

(a) GFC's Cross-Motion to Amend

*62 GFC seeks an order granting GFC leave to amend its responses to Requests 63, 78, and 80 of FI-Utah's Seventh Set of Requests for Admission. According to GFC, in the course of preparing its papers in response to FI-Utah's motion for summary judgment, GFC came across three errors among the responses to a set of 142 Requests for Admissions concerning GFC's constructive trust claims. Robert Mathis attempted to "correct these errors" in his declaration submitted in response to FI-Utah's dispositive motion. Because these three paragraphs are also the subject of the pending motions to strike, GFC filed an alternative cross- motion seeking leave to amend these responses pursuant to Fed.R.Civ.P. 36(b)."

The applicable rule gives the court discretion to consider the withdrawal or amendment of admissions "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits."Fed. R. Civ. P. 36(b). It is undisputed by the parties that the court may exercise its discretion only after both of the rules prerequisites are met. See, e.g., Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983) ("the court has the power to make exceptions to the

Not Reported in F.Supp. Page 43
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Rule only when (1) the presentation of the merits will be aided and (2) no prejudice to the party obtaining the admission will result"). FI- Utah contends that neither element of Rule 36(b) has been established and the court is therefore without the power to grant GFC's cross-motion. The court disagrees.

The court concludes that since the three transfers at issue in 7:63, 7:78, and 7:80 are not unique, it would serve a presentation of the merits for GFC to be able to amend these three responses to be consistent with the evidence and its theory of the case. As the Mathis declaration points out, these transfers at issue are but three instances among thirty-two alleged transfers by FI-Utah. Robert Mathis Declaration of May 8, 1989 at ¶ 11. Moreover, the amendments to these three responses do not prejudice FI-Utah in relation to its summary judgment papers. Rather, the amended responses merely change the applicable argument as these three transfers. Also persuasive is the fact that the original responses came at the close of discovery, thus obviating the possibility of further discovery on these transfers. The court therefore grants GFC's cross-motion to amend responses 7:63, 7:78, and 7:80 and denies the corresponding portion of FI- Utah's motion to strike the Mathis declaration.

(b) Defendants' Motions to Strike

Movants object to the admissibility of the following portions of Robert Mathis' declaration: ¶ ¶ 2; 3-7; 8-10; 11-11AF; 12-12AH; 13-13T; 16-16D; 17-21; and 23. The objections to the admissibility of ¶ ¶ 8-10 have already been rejected above. The remaining portions of the declaration may be discussed in two general categories: (1) those portions objected to on the grounds that the affiant lacks personal knowledge and speculates based on hearsay and surmise; and (2) those portions based upon the use of an improper and legally barred methodology. The court will discuss these arguments seriatim.

*63 Movants first object to the admissibility of ¶ 2 of Robert Mathis' declaration. This portion of the declaration states in full:
In some instances, plaintiffs' complaint alleged transfers to a bank defendant, which, upon our examination of the relevant documentation, we determined in fact went to the purchase of a cashier's check or certificate of deposit ("TCD"), or for some other reason did not go to the bank. In such instances, we usually removed those checks from our calculation of transfers to the bank defendant. In a few instances, however, plaintiffs have determined from their examination of bank records that the TCD was later cashed in to pay a loan to the bank. In those instances, we continued to count the checks as transfers, since the bank did in fact receive funds traced to GFC. See Declaration of Bruce H. Baum."

Robert Mathis Declaration of 5/8/89, ¶ 2 (emphasis added).

Consistent with the court's holding on defendants' motions to strike the Baum declaration, the court also grants defendants' motions to strike the above underscored portion of the declaration of Robert Mathis. However, the court notes that just as the trier of fact may draw the inferences posited in Baum's declaration, so too may GFC's tracing or banking expert draw these same inferences. Thus, even though as a technical matter the above portion of the declaration of Robert Mathis cannot incorporate stricken material, this ruling is not to be construed as ban on the same inferences at the time of trial.

Movants also object to the admissibility of ¶ ¶ 3-7; 11-11AF; 12-12-AH; 13-13T; 16-16D; 17-21; and 23 on the ground that Robert Mathis' "moving average" methodology is legally barred. GFC's tracing expert describes the moving average methodology in the context of tracing funds as follows:
If I deposit a check of $100.00 written to me by third party "A" into my new bank account, the bank credits my account $100. If I then write a check for $50.00 to another third party, "B," funds from "A" have flowed through my account to "B" even though no bank notes physically moved anywhere. If I then deposit another check for $50.00 from "C" and write a check for $30.00 to "D," there arises the question of how to account for the source of the $30.00 to "D" as between "A" and "C." I determined that it made most sense to employ a ""moving average" methodology, one that treats all deposits in an account on any given day as fungible and so recalculates the average each day there is a new deposit. To follow my example, the moving average methodology treats the $30.00 to "D" as being traceable to "A" and "C" proportionately, in this case 50% "A" and 50% "C."

Robert Mathis Affidavit of 1/9/89, ¶ 5.

Movants contend that, as a matter of law, the moving average tracing methodology cannot be used to establish the "stolen property" element of GFC's alleged receipt and transportation offenses. See, e.g., FI-Utah's Motion to Strike Declaration of Robert Mathis, 2-3. According to movants, this pro rata tracing methodology will always result in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 44

imposition of liability and, thus, the only reliable tracing methodology is the lowest balance theory. Id. (citing United States v. Poole, 557 F.2d 531, 534-36 (5th Cir. 1977)). GFC contests the legal argument raised by defendants and argues that its expert witness may use either methodology to arrive at his opinions.

*64 However, the court finds that it need not reach this issue at the present time since the briefing process reveals that under either theory, GFC has demonstrated at least two predicate acts per movant, with the one exception being Argus. Specifically, GFC contends that even under movant's lowest intermediate balance theory the following number of predicate violations of § § 2314-15 have been demonstrated: (1) ten instances against FSF, see Robert Mathis Declaration of 7/28/89, ¶ ¶ 2-12; (2) twenty instances against FSB, see Robert Mathis Declaration of 7/25/89, ¶ ¶ 3a-AC & 3AG; (3) two instances against ZLC, see Robert Mathis Declaration of 8/1/89, ¶ ¶ 3-5; (4) one instance against Argus, see Robert Mathis Declaration of 8/1/89, ¶ 7; (5) three instances against ZFNB, see Robert Mathis Declaration of 8/1/89, ¶ ¶ 9-12; thirteen instances against FI-Utah, see Robert Mathis Declaration of 7/17/89, ¶ 9; (6) five instances against Allred, see Robert Mathis Declaration of 8/15/89, ¶ ¶ 3-5 & 7-10; and (7) two instances against Diumenti, see Robert Mathis Declaration of 7/28/89, ¶ ¶ 3-4. Thus, defendants' motion does not go to a material issue, i.e., defendants' actual liability, but rather focuses on the extent of defendants' liability or, perhaps, the extent of GFC's damages. In any event, a determination either way does not affect the underlying motions for summary judgment. Nor does the court feel compelled to ignore the alternative theories of GFC's tracing expert simply because he is willing to adopt defendants' methodology for the purposes of the pending motions.

Moreover, this change in testimony is not what the court had in mind when it entered the scheduling order requiring all expert witnesses to testify in their depositions as if they were at trial. Striking the supplemental affidavits offered by Robert Mathis on such a basis would be inequitable since it was movants' position that forced the issue. The court therefore assumes for the purposes of the present motions to strike, and the underlying motions for summary judgment, that GFC's tracing expert is confined to utilizing the lowest intermediate balance methodology.

### G. Motions to Strike Designated Portions of the Affidavits of William B. Watkins

Gurr, FI-Utah, FSB, Allred, FSF, Christenson, and the Zions Defendants seek an order from the court striking certain portions of the affidavits of William B. Watkins ("Watkins"), a former national bank examiner for the OCC and GFC's expert witness on banking issues. Watkins' 196 page affidavit, submitted by GFC on May 14, 1989, is the subject of numerous legal challenges-too many, in fact, for the court to list the specific paragraphs challenged by movants. However, in an effort to simplify these pending motions, the court adopts structure of Gurr's analysis and groups Watkins' opinions into the following four general categories: (1) Watkins' expert opinions regarding defendants' subjective state of mind (actual knowledge) which are not based upon perceptions of defendants' actual conduct; (2) Watkins' conclusions regarding the alleged violations of certain statutes and regulations; (3) Watkins' opinions in fields in which defendants claim he lacks expertise; and (4) Watkins' alleged recantation of prior deposition testimony. See Gurr's Motion to Strike Portions of Watkins Affidavit, 2. The court notes that Hanson's earlier motion to strike the Watkins affidavit of November 10, 1988, raised similar legal arguments. Thus, the court will consider this previous motion as well in ruling on the motions to strike the latest Watkins affidavit."

#### (1) Opinions Regarding Defendants' Knowledge

*65 Movants first argument addresses the bulk of the disputed portions of the Watkins affidavit, those regarding defendants' alleged knowledge of the Player frauds. Watkins gives a general overview of his opinions on this subject early on in his affidavit:

12. Set forth below, and in my previous Affidavit, are certain facts and opinions regarding transactions between the Player companies and the bank defendants. While the specifics of the Player companies' transactions with each of the banks differ in some respects, there are certain common threads to each of the bank's relationship with the Player companies which become apparent, in my opinion, in reviewing the relevant transactional documents and sworn statements. Some of these common threads are:

i. Each of the banks knew relatively early on in their relationship with the Player companies-from the nature, frequency and amount of financings, the performance on these financings, the manner in which the Player companies maintained and utilized

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 45

their accounts and/or the banks own credit analyses- that the Player companies were in poor financial condition, if not insolvent;  
ii. Each of the banks knew that the Player companies were short of cash and relying heavily on bank or other financing in the continuation of their operations;  
iii. Each of the banks knew-from the A&I audit, credit analyses, transactions with affiliates and/or loan kiting, CD kiting or check kiting- that the player companies had submitted false financial information and were engaged in fraud;  
iv. Each of the banks continued, notwithstanding the foregoing, to extend substantial sums of money to the Player companies;  
v. Each of the banks knew-given the financial condition of the Player companies, the submission of false information by the Player companies and the fraudulent conduct on the Player companies-that they could not enter into legitimate transactions with the Player companies and that repayment could only come from illegal activity."

Watkins Affidavit of 5/14/89, ¶ 12.

Defendants first attack these conclusions on the grounds that certain portions of the affidavit are "not based on personal knowledge but rather upon inference, presumption and surmise." Gurr's Motion to Strike Portion of Watkins Affidavit, 14. The court, however, finds no merit to this argument. As GFC correctly points out, expert witnesses are allowed to base their opinions on information other than that gained by personal knowledge or observation. The governing rules of evidence expressly contemplate such a use of data by an expert witness:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

\*66 Fed. R. Evid. 703; see Mannino v. International Manufacturing Company, 650 F.2d 846, 851 (6th Cir. 1981) ("The purpose of Rule 703 is to make available to the expert all of the kinds of things an expert would normally rely upon in forming an opinion, without requiring that these be admissible in evidence."). Indeed, pursuant to the Notes of the Advisory Committee on the Federal Rules of Evidence, there are three ways an expert may garner facts upon which to base an opinion:First, the expert may gather information by means of firsthand observation. Second, the expert may base his or her testimony upon facts presented at trial, either in the form of hypothetical questions propounded by counsel or evidence before the court. Third, the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely in forming opinions."

Ramsey v. Culpepper, 738 F.2d 1092, 1101 (10th Cir. 1984).

Thus, for example, the following contested paragraph of the Watkins affidavit need not be based upon the affiant's personal knowledge since it is based upon, among other things, various bank documents provided during the course of discovery:  
My review of the FI-Utah transaction documents revealed that FI-Utah started making loans to the Player companies in 1977, and continued to do so through September 1984. With the exception of a $3.5 million real estate loan to Player and Willyard ("P&W") in August 1983 relating to the Vernal Sheraton Hotel, the loan requests which I discuss in this Affidavit involved Bill Gurr. Mr. Gurr was the manager of FI-Utah's branch located in Vernal, Utah. Sherman Fuller, Mr. Gurr's superior and an executive officer in FI-Utah's "Branch Administration" (located in Salt lake City), either approved himself, or approved as a member of FI-Utah's Senior Loan Committee, most of the Player company loans."

Watkins Affidavit of 5/14/89, ¶ 13. This data is clearly contemplated by Rule 703 as a proper basis for an expert's opinion. GFC has responded to defendants' dispositive motions by offering the opinions of its expert witness in affidavit form. This should not preclude the affiant from relying upon the same evidence he would base his opinions on at the time of trial. Rather, the court reads the requirements of Fed. R. Civ. 56(e) in conjunction with the language and intent of Fed. R. Evid. 703.

Defendants second legal argument is that Watkins' conclusions are based upon the "impermissible pyramiding of inferences." See, e.g., Gurr's Motion to Strike Portions of Watkins Affidavit, 17. Movants point to the following paragraph as an example of this legal flaw:  
I also believe my experience as a National Bank Examiner and subsequently, a senior executive officer with a bank and its holding company will assist the trier of fact to understand the evidence and determine the facts in issue in this litigation. For example, the issue of knowledge, i.e., whether particular bankers knew certain things and/or saw

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 46

certain documents, is in my experience not a matter which is often expressly acknowledged or admitted on the face of documents, particularly when such knowledge might lead to civil or criminal liability. Unfortunately, such knowledge can too readily and easily be denied.

**\*67** However, determining the meaning and effect of documents and the significance of other events and circumstances is part of the function of bank examiners and senior bank officers. In my experience, the examination and analysis of documents, events and circumstances can often provide an adequate and reasonable basis for an opinion as to whether individuals have knowledge of particular matters. Given the specialized and often technical nature of banking, I believe the type of expertise I have is essential to and will assist the trier of fact in understanding the documents, events and circumstances present in this case."

Watkins Affidavit of 5/14/89, ¶ 6. Movants would recharacterize the methodology utilized by Watkins in ferreting out defendants' knowledge as follows: "Mr. Watkins begins with specific facts (the contents of bank documents), draws an inference (interpretation of how they might be construed) [[[, ] adds a presumption (custom and practice of bankers who might share this interpretation), and draws another inference (knowing and intentional conduct)." Gurr's Motion to Strike Portions of Watkins Affidavit, 18. In support of this argument, movants cite the court to two Tenth Circuit Court of Appeals decisions, New Mexico Savings & Loan Assoc. v. United States Fidelity & Guaranty Co., 454 F.2d 328 (10th Cir. 1972) and Frase v. Henry, 444 F.2d 1228 (10th Cir. 1971).

However, a review of these precedents reveals that the appellate court in each case simply reaffirmed the principles embodied in Rules 702 and 704. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Furthermore, the rules also provide that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). Thus, the court in Frase concluded:
While an expert witness may opine on the ultimate issue, he may do so only insofar as the witness aids the jury in the interpretation of technical facts or to assist in understanding the material in evidence. When the normal experience and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper."

444 F.2d at 1231 (citations omitted). Similarly, in upholding the trial court's ruling that an expert could not express an opinion as to whether an accounting concealment was indicated by the books and records of the plaintiff, the appellate court in New Mexico reasoned:While the trial court observed that the expressions of [the expert's] opinion would invade the province of the jury, it seems to us that the court was actually determining that the jury, assisted by [the expert's] description of how the books were kept, and evidence as to all these matters, did not need expert help in deciding what [the bank's employee's] state of mind was at the time. As the court said, in up-holding the objections, "... the jury is very intelligent here, they know the answer without your interrogating the witness." We hold that, in so determining that the matter under inquiry was not properly the subject of expert testimony, the trial court did not abuse its discretion."

**\*68** 454 F.2d at 335.

As the court interprets the above opinions and the applicable rules of evidence, the contested portions of Watkins affidavit-even those embracing "ultimate issues" such as knowledge and specific intent-are admissible, and not the proper subject of a motion to strike, if they (1) assist the trier of fact in understanding the evidence, and (2) are otherwise admissible. It appears to the court that Watkins' "synthesis" of the evidence would probably assist the trier of fact in understanding customary bank practices as it relates to the voluminous evidence in this litigation. However, as the court noted earlier in its analysis of defendants' alleged regulatory violations, this is not a lawsuit directed at the financial institution's purported negligence under some theory sounding in tort. Thus, the court construes movants' primary argument to be that the conclusions Watkins is prepared to offer concerning defendants' knowledge of the Player frauds are not "otherwise admissible" because they are based on irrelevant data. As the court noted earlier in relation to the motions to strike the Leyton testimony, while irrelevant evidence is indeed inadmissible, the court interprets this type of argument at the motion to strike stage to be a cautionary note to the court: do not deny the underlying summary judgment motions on questions of immaterial (irrelevant) facts."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW    Document 359-4    Filed 06/07/2007    Page 7 of 20

Not Reported in F.Supp.                                                                                            Page 47
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Thus, the court will consider below key issue raised by all of movants arguments: whether Watkins' opinions on customary practice are relevant to the issues raised by the financial institution defendants' dispositive motions. This issue is also expressed by movants in their contention that Watkins' may not offer opinions regarding alleged violations of certain statutes and regulations by the financial institution defendants.

### (2) Opinions Regarding Statutory/Regulatory Violations

Defendants argue that portions of the Watkins affidavit should be stricken because GFC's expert merely expresses "legal conclusions" by parroting the language of various statutes and regulations. It is clear that portions of the Watkins affidavit do indeed contain references to defendants' purported """violations" of the regulatory and statutory guidelines governing financial institutions. GFC offers the following, telling response to movants' position."
Defendants' objections with regard to legal conclusions go so far as to include Mr. Watkins' opinion that in failing to report Player's check kite, the banks violated 12 C.F.R. 7.5225 (¶ 187), as well as his explanation of the regulations under the Bank Secrecy Act regarding who can be exempted from its reporting requirements and his conclusion that FSB violated it when it exempted AMS (¶ 260). Mr. Watkins' recitation and explanation of and conclusions regarding violations of these as well as other regulations such as 18 U.S.C. § § 1001 and 1014 are clearly useful to and will assist the trier of fact. Violations of regulations such as these, particularly when there are numerous violations over the course of an extended period of time, as in this case, are by themselves probative of the bank's knowledge of Player's frauds."

*69 GFC's Response to Motions to Strike Watkins Affidavit, 31. The court disagrees with GFC's premise. As the court previously held, such regulatory violations are not, by themselves, probative of the financial institution's actual knowledge of the Player frauds and specific intent to further these schemes to defraud GFC. See Andreo, 660 F. Supp. at 1370 ("Mere reckless disregard of the truth when drafting documents does not justify a finding of RICO civil liability on the basis that the party participated in the illegal enterprise."); O'Brien, [1984 Transfer Binder] Fed. Sec. L. Rep. at ¶ 98,562 ("Civil liability under RICO requires knowing or intentional participation and not mere negligence or recklessness."); Moss v. Morgan Stanley, Inc., 553 F. Supp. 1347, 1362 (S.D.N.Y.) (no participation in RICO scheme where defendant was allegedly negligent or reckless in aiding and abetting), aff'd on other grounds, 719 F.2d 5 (2d Cir. 1983), cert. denied, 465 U.S. 1025, 104 S. Ct. 1280, 79 L. Ed. 2d 684 (1984). In support of its position, GFC cites the court to decisions regarding securities fraud. However, these decisions are inapposite to the instant litigation as the scienter requirement of these cases encompasses willful or reckless behavior. See, e.g., Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 596 (10th Cir. 1972) (failure to comply with Federal Reserve regulations supported finding of securities fraud scienter since all that is required is that "one should have been aware of the improper goings-on in an investment firm") (citing Stead v. SEC, 444 F.2d 713, 716 (10th Cir. 1971), cert. denied, 404 U.S. 1059, 92 S. Ct. 739, 30 L. Ed. 2d 746 (1972)).

Thus, the most manageable way to resolve this issue and rule on the pending motions to strike the Watkins affidavit is as follows: (1) to the extent that a particular motion for summary judgment would be granted on the preliminary issue of defendants' lack of knowledge; (2) but for Watkins' assertion that the particular defendant "knew" of the Player frauds; (3) the court will carefully examine the basis for this conclusion; and (4) if the Watkins' opinion is based solely upon perceived regulatory and statutory violations; then (5) his conclusion is obviously irrelevant to the issue of defendant's criminal intent. In sum, since the court is unwilling to allow the ultimate trier of fact to make the speculative leap from negligent or reckless behavior to criminal behavior, it is also unwilling to allow GFC's expert witness to similarly speculate, let alone offer this speculation to the jury as "evidence."

### (3) Qualifications of Watkins

Defendants object to a few paragraphs of the Watkins' affidavit on the ground that he is unqualified to render some of the opinions expressed therein. As Watkins meets the threshold to be able to offer expert testimony, the court concludes that movants' arguments actually go to the weight of the evidence and not its admissibility. The court therefore rejects this argument summarily.

### (4) Recantation of Prior Testimony

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 48

*70 Finally, defendants' fourth argument focuses on the following introductory language contained in the Watkins affidavit: "None of the opinions expressed herein or in my previous Affidavit are based either in whole or in part on the assessment, if any, I have made of the credibility of any person." Watkins Affidavit of 5/14/89, ¶ 4. Various defendants point to previous deposition testimony by the affiant and argue that the court should invoke the ""sham fact" doctrine. The court finds little merit in these arguments. The deposition statements referred to by movants involve questions asked by defendants' counsel. Watkins simply stated the logical corollary to his conclusions regarding defendants' knowledge of the Player frauds-if defendants deny such knowledge then they are not telling the truth. Watkins' affidavit does not contain any such credibility questions because he states they are unnecessary to reach the conclusions he proffers to the court. The court can see no reason to strike this statement as a "sham fact."

### H. Motions to Strike the Affidavit of Gary A. Mathis

FI-Utah, Gurr, FSB, and Allred seek an order from the court striking the May 30, 1987 affidavit of Gary A. Mathis, a former installment loan officer at FI-Utah's Vernal branch. Movants object to various portions of the affidavit on the ground that it is not based upon the affiant's personal knowledge and that Gary Mathis "recanted" much of these statements in a later deposition. They seek an order striking the entire affidavit, however, because the allegedly inadmissible matter is "so interwoven or inextricably combined with the admissible portions that it is impossible, in the practical sense, to separate them." Southern Concrete Co. v. United States Steel Corp., 394 F. Supp. 362, 380-81 (N.D. Ga. 1975), aff'd, 535 F.2d 313 (5th Cir. 1976), cert denied, 429 U.S. 1096, 97 S. Ct. 1113, 51 L. Ed. 2d 543 (1977).

Movants present the court with an interesting converse to the usual "sham fact" scenario. Essentially, defendants contend that Gary Mathis signed off on an affidavit which was the product of GFC's attorneys' overreaching. They then contend that his later deposition tells the true story, from the affiant's mouth and not the attorney's pen. Movants would have the court strike the earlier affidavit of Gary Mathis and have the record before the court reflect only these deposition statements. However, the court concludes that all this evidence is before the court and that the affidavit should not be stricken in its entirety. To the extent that the two conflict, this goes to the credibility of the witness and thus the weight of GFC's evidence. As such, this is the province of the trier of fact.

As with the court's resolution of the motions relating to the Watkins affidavit, the court finds the only manageable resolution of the pending issue to be that the parties trust the court's ability to go beyond the mere excerpted conclusion that a particular defendant "knew" of the Player frauds upon GFC. Should the contested fact of "knowledge" hang upon the affiant's conclusion, the court will scrutinize the language and context of the affidavit statement and the corresponding deposition to find a reasonable foundation for such a damning statement. To the extent that no reasonable foundation exists, then Gary Mathis' affidavit statement does not create a genuine issue of material fact.

*71 Finally, the court notes that FSB, among other movants, also specifically objects to the following portion of Gary Mathis' affidavit:
No later than 1984 it was general knowledge in the Vernal banking community and in FIB's Vernal branch that Mr. Player was dishonest, could not be trusted and that his companies operated in a shady manner. In fact, Dale Cameron, Assistant Manager of the Vernal branch of First Security Bank, who had previously worked for Mr. Player and Mr. Willyard, told me after he stopped working for them, that Mr. Player was dishonest and could not be trusted. I related to Mr. Cameron's statement to Mr. Gurr. Debbie McCarrell, Mr. Gurr's secretary, also told me that she believed Mr. Player was dishonest."

Gary Mathis Affidavit of 5/30/87, ¶ 4. FSB contends that the portions of the above quoted affidavit paragraph concerning what defendant Cameron allegedly said are inadmissible hearsay and lack foundation. The court finds no merit in either argument since Gary Mathis is not required to supply foundation for the alleged statements of Cameron, which are, in any event, not hearsay since they constitute an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A) & (D).

### I. Motions to Strike the August 4, 1989 Sworn Statement of Sheldon Player

On August 9, 1989, GFC filed a "Notice of Filing and Service of Sworn Statement of Sheldon G. Player Dated August 4, 1989." The notice accompanying the eighty-nine page sworn statement announced that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-4   Filed 06/07/2007   Page 9 of 20

Not Reported in F.Supp.                                                                                                              Page 49
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

it was being filed and served: (1) in response to Gurr and FI-Utah's motions to strike Player's predeposition statements; (2) in opposition to various defendants' motions for summary judgment, pursuant to Fed. R. Civ. P. 56(c); and (3) in opposition to various defendants' motions to strike Player's testimony, pursuant to Fed. R. Civ. P. 6(d). FI-Utah, Gurr, Diumenti, FSB, Mabey, Stoddard, FSF, Christenson, ZFNB, ZLC, Argus, ZMC, Hanson, Newbold, and Timpson seek an order from the court striking this sworn statement in its entirety. Movants offer procedural (timeliness) and substantive ("sham fact" doctrine) grounds for striking this document. The court denies the motions to strike on both bases.

First, defendants argue that the August 4, 1989 sworn statement is untimely and prejudicial since it was filed long after liability discovery in this matter was halted and virtually on the eve of the summary judgment motion hearing dates. While the court is concerned with the timing of the filing of this statement-and inquired of GFC's counsel about this at the time of the hearings-the court nonetheless concludes that the filing of this sworn statement is in compliance with the court's scheduling order and the Federal Rules of Civil Procedure. The court has noted before to the parties that the close of discovery does not abate the parties' ability to marshall the evidence in support of their respective positions. In this vein, the taking of the sworn statement did not violate the discovery cut-off deadline as all parties are free to interview witnesses, including Player, provided that they do not seek the powers of the court to do so.

*72 Further, the filing of this sworn statement was in compliance with the governing federal rules as it was timely filed in response to FI-Utah and Gurr's motions to strike, and also filed at least one day prior to the motions to strike and the other defendants' motions for summary judgment. See Fed. R. Civ. P. 56(c) & 6(d). The court declines to read out the policy provisions behind these rules simply because the sworn statement, acknowledged by Player as taken under oath, is not technically in affidavit form. The court also reaches the same conclusion regarding FI-Utah's oral motion to strike GFC's errata sheet for statement of facts in opposition to FI-Utah motion for summary judgment. In fact, the Player sworn statement falls within the ambit of statutory provisions allowing such documents in lieu of an affidavit, since it is acknowledged by Player to be taken under oath, before a sworn court reporter, and since he waived the requirement of his signature. See 18 U.S.C. 1746.

Movants' second argument is directed at the substance of the August 4, 1989 sworn statement. They contrast portions of Player's latest statement with portions of his earlier deposition testimony. They then urge the court to strike this latter document pursuant to the "sham fact" doctrine discussed earlier by the court. The court concludes that the information contained within the August 4, 1989 sworn statement does not warrant invocation of this rather narrow doctrine. The court reaches this conclusion after placing this sworn statement in context with the motions to strike various Player testimony.

GFC's counsel was faced with a multitude of motions to strike portions of Player's prior affidavits, sworn statements, and deposition testimony. As will be discussed below in the court's analysis of these pending motions, many of the parties' contentions were directed at the speculative nature of Player's "beliefs" and conclusions about defendants' state of knowledge. It is clear to the court that among other reasons GFC's counsel probably traveled to Lompoc, California, was to have Player shore up his prior testimony by providing specific references to the contested statements. This they did in good measure."

For example, at least two such exchanges, quoted at length below, are indicative of GFC's attempt to defeat the motions to strike for lack of foundation and improper speculation:
MR. CAMPBELL: Okay. Why don't you please review Exhibit 2. And specifically, I'd like to direct your attention to the bottom of page 5851, going over to page 5852 from your deposition of June 2.
Do you see that?
A. Yes.
Q. And it says-you refer to the question that it was your belief that Mr. Gurr knew about your fraudulent conduct by determining that there were no checks going to equipment suppliers, and that there were several conversations with Mr. Gurr along those lines.
Do you see that?
A. Yes.
Q. And, in fact, did you have conversations with Mr. Gurr about that topic?
*73 A. Yes.
Q. Is there an explanation behind your use of the phrase "belief" in-if you look specifically at 5852, line 2?
A. Could you rephrase the question?
Q. Sure. Why did you say that it was your belief that Mr. Gurr knew about your fraudulent conduct from talking to you about there being no checks going to equipment suppliers?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 50
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

A. He knew of the fraudulent nature of the leases, based upon the facts that he had noted there were no checks going to equipment suppliers and that his bank received a total amount as funded by Greyhound Leasing.
Q. And when you say that his bank received a total amount, what are you referring to?
A. Initially, through a deposit of the proceeds check from Greyhound and, ultimately, a purchase of a time certificate of deposit, in many cases at his institution.
Q. And was your testimony that he had conversations about there being no checks going to equipment suppliers a specific fact that you recall?
A. Yes.
Q. It's not an opinion or conjecture; is that correct?
A. That's correct.
Q. Would you please tell me where that conversation or an example of that type of conversation occurred?
A. One such conversation occurred in approximately June of 1983. There were others.
Q. And where were you when the conversations occurred?
A. In his office at First Interstate Bank in Vernal, Utah.
Q. And who was present?
A. Myself and Mr. Gurr.
Q. And were there any occasions when the proceeds of these equipment leases from Greyhound went as repayments of loans to F. I. Utah?
A. Yes.
Q. And did you have any conversations with Mr. Gurr regarding the cash stream from the sublessees, N.L. and Baker?
A. Yes.
Q. When did you have those conversations?
A. As early as 1982. Possible before.
Q. And where were you when Mr.-who did you have the conversations with? Mr. Gurr?
A. Mr. Gurr, yes.
Q. Where were you when you had those conversations?
A. In his office at First Interstate Bank.
Q. And what did you say to him and what did he say to you?
A. Mr. Gurr, after analyzing our deposit account, made note of the fact that we had no lease income payments from N.L. and Baker International."

Player Sworn Statement of 8/4/89, 7:15-10:15.Q. BY MR. CAMPBELL: And let me show you the exhibit and direct your attention to the testimony that you gave on page 5857, starting at line 17, in which you were asked whether Mr. Gurr indicated to you indirectly that he understood transactions were fraudulent.

And you answered that you could- "I can say that at that time I believed that, based on the situation, based on conversations, that that was true."
"Q. And these were conversations that occurred with Mr. Gurr, were they?"
And you answered, "that's correct."
I'd like to ask you, and if you would, please, elaborate upon any particular conversation that you had with Mr. Gurr to which you were referring to his testimony.
*74 A. There was a conversation on or about September of 1984, whereby upon my issuing to Mr. Gurr a master lease document from Greyhound Leasing Company committing $40,000,000 of lease-funding money to our company, that I discussed with Mr. Gurr some details of the transaction. Also, prior to issuing him that document, I issued him the phony N.L. commitment letter of an equal amount of $40,000,000, whereby he had expressed to me his concern about knowledge that letter was phony and wanted to know how I intended to cover the letter and cover the phony purported commitment from N.L. It was one such conversation that led me to testify as I did in Exhibit Number 4.
Q. Now, this N.L. document was phony; correct?
A. That's correct.
Q. And it purported to be signed by Craig Rogers?
A. That's correct.
Q. Who was Craig Rogers?
A. Craig Rogers was a vice president of N.L. Industries.
Q. And a friend of yours?
A. Yes.
Q. And he, in fact, had not signed the letter?
A. That's correct.
Q. And N.L. Industries, in fact, had not agreed to purchase up to $40,000,000 of equipment at that time?
A. That's correct.
Q. And, in fact, it did not agree to purchase any equipment from you as represented by the Craig Rogers letter?
A. That's correct.
Q. And with respect to the G.F.C. master lease, did Mr. Gurr-excuse me. Let me back up.
With respect to the G.F.C. master lease, had you told him that Greyhound was going to fund money based on the Rogers letter?
A. Yes.
Q. And did he ask you what would happen if Greyhound called Craig Rogers?
A. Yes.
Q. And where were you and he when that conversation occurred?
A. In my office in Vernal, Utah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
(Cite as: Not Reported in F.Supp.)

Page 51

Q. And was this at the same time?
A. Yes.
Q. And what did you tell him?
A. I told him that I would telephone Craig Rogers, as I had been trying to get a hold of him and hadn't by that point in time, and ask Craig to cover the situation if anybody called and wanted to know if the commitment was good or not.
Q. And did you say anything else to Mr. Gurr at that time about Mr. Rogers receiving anything?
A. I told him that I would take care of Mr. Rogers financially as I had done in the past. And I did so.
Q. And how much did you give Mr. Rogers?
A. It was approximately $30,000.
Q. And did Mr. Gurr indicate to you whether he had spoken to someone from American Savings about the phony N.L. letter?
A. Yes. Mr. Gurr indicated that he had spoken with a Mr. Lowell Mielke, M- i-e-l-k-e, from American Savings, who had indicated to Mr. Gurr that he had also received a copy of the phony N.L. letter from me and he was advising Mr. Gurr that he had telephoned Mr. Rogers and had determined from the conversation with Mr. Rogers that the letter was phony. And he was apprising Mr. Gurr of that conversation with Mr. Rogers.
Q. And when you say that he was apprising him of that, I take it that Mr. Gurr did not say Mr. Mielke had told him literally, in the exact words, quote unquote, the Craig Rogers letter is a forgery; is that correct?
*75 A. That's correct.
Q. As best you can recall the conversation that you had with Mr. Gurr about Mr. Mielke, can you tell me what words he did use?
A. To the best that I can recall, he used the words "fake," "that was a fake equipment deal."

Id. at 39:25-43:25.

GFC also used this sworn statement to put forth a new wrinkle in an old dispute concerning Player's beliefs and defendants' knowledge. Throughout the course of this litigation, both sides have accused the various attorneys of over- reaching, "wood shedding," and, in at least one instance, subornation of perjury in relation to developing Player's testimony. GFC has argued for some time that much of the haziness of Player's conclusory beliefs can be attributed to the advice of his former counsel, Loni DeLand ("DeLand"). The court raises this point now to put GFC's arguments into perspective and not to lend credence one way or the other on this issue.

Major portions of the August 4, 1989 sworn statement concern the purported advice DeLand and some defense counsel gave Player regarding what facts constitute knowledge and the need for a "mutual exchange of confessions." The following excerpt of the sworn statement is typical in this regard:
Q. Well, let me just try, by way of example with anything in particular, and see if that jogs your recollection.
Did you have conversations with Mr. Gurr about the N.L. purchase order in 1984 and it being funded?
A. Yes.
Q. Were those face to face?
A. Yes.
Q. When did that occur, as best you can recall it?
A. That occurred approximately September of 1984.
Q. Okay. And where were you and where was Mr. Gurr?
A. We were in my office in Vernal, Utah.
Q. Okay. Was this before or after the September 4th, 1984, meeting in Salt Lake City with F.I. Utah officials.
A. It was before the meeting.
Q. Now, let's start with that. If you had that conversation with him, as you understood defense counsel and Mr. DeLand, even though Mr. Gurr talked to you about a phony N.L. Letter, you couldn't say that he knew about the fraud that you were implementing with Greyhound because he didn't acknowledge quoting that you are defrauding Greyhound with this phony letter?
A. Yes.
Q. Is that right?
A. That's correct.
Q. And that would be so, despite the fact that you had independently indicated to him that you were using this letter in connection with equipment leases at Greyhound?
A. Yes.
Q. So you could tell him part of this advice was, even if you told somebody what you were doing in conjunction with the fraud, it wasn't sufficient to say that they knew, even if you were present at these conversations, unless they responded by verbally acknowledging that they knew exactly, in literal terms, what you were doing?
A. That's correct.
Q. Am I overstating this in any way?
A. No.
Q. Did they use any examples in conjunction with Mr. Gurr about Mr. Gurr not knowing that Mr. DeLand was involved in phony opinion letters?
*76 Q. I believe you're speaking of Mr. Diumenti?
Q. Yeah. Excuse me.
A. Could you restate that?
Q. 'Yeah. Did they use any examples in conjunction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 52
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

with Mr. Diumenti about- to argue with you that even though you knew this fact and that fact and this other fact and had this conversation, nevertheless, you couldn't say that Mr. Diumenti knew?"
A. Yes.
Q. Can you give me an example?
A. Yes. One example was that, in September of 1984, Mr. Diumenti's office generated a legal opinion for the benefit of Greyhound Leasing, which was a fraudulent lease transaction or loan transaction, and that just because when I-when this was mentioned to Mr. DeLand that, just because that opinion letter was used, did not constitute Mr. Diumenti having knowledge of the full scope of the Greyhound fraud or scheme.
Also, there was another example. Earlier in 1984, approximately May or April of 1984, Mr. Diumenti's office also generated an opinion letter on a similar fraudulent lease transaction with Armco Financial Services, and just because that was generated by Mr. Diumenti, did not constitute the fact that he knew of the fraudulent nature of the business I was transacting. My argument was that it did. My advice from counsel was that it did not.
Q. So in other words, here's an example where you have pointed to a specific fact where Mr. Diumenti personally created a false document that was used in obtaining money by fraud; right?
A. Yes.
Q. And Mr. Diumenti knew that that document was false when he created it because there was no equipment and the deal was phony; correct?
A. Correct.
Q. And you pointed that out to counsel and their response was, you can't say that he knew because he only knew about this particular document, it doesn't mean that he knew about every other detail of the fraud?
A. That's correct."

Id. at 23:15-27:8.

Movants label this issue a "red herring" and argue that it is utilized by GFC as a pretext to amend their opposition papers. They point to Player's earlier deposition statements concerning various defendants' knowledge of the frauds and argue that while GFC might have focused on Player's beliefs, defense counsel were stymied in their efforts to get Player to divulge the factual underpinnings of his beliefs. Thus, in regard to the sham fact issue, they contend that this eleventh hour, sworn statement puts forth specific facts of which Player earlier denied any knowledge. The court disagrees. A close reading of Player's latest sworn statement leads the court to conclude that any arguments regarding the pretextual nature of this document and Player's explanations are better directed at the ultimate trier of fact. Although movants are correct that in many instances Player declined to give to them the specific examples he swears to in his August 4th statement, the court does not find that these are "sham fact."

The court is careful not to adopt any of the statements made by Player concerning certain defense counsels' purported dealings and conversations with Player. However, were the trier of fact to accept this evidence, it might also accept the veracity of the other portions of Player's sworn statement. This reason alone brings the facts of the instant document outside the ambit of the """"sham fact" doctrine.

*77 Finally, the court points out that at various times throughout this litigation, both sides have labeled Player a hostile witness or, at the very least, not a friendly witness. It is clear to the court that Player has indeed occupied both sides of the aisle in this matter. The court makes this point because it goes to the policy rationale behind the "sham fact" doctrine. The cases discussed by the parties all revolve around the following scenario: (1) defendant obtains in some form a fatal concession from plaintiff; (2) defendant seeks summary judgment based on the legitimate fruits of the discovery process; (3) plaintiff then attempts to circumvent the process by offering directly contradicting testimony; and (4) the court enforces the letter and intent of the rules by rejecting the sham affidavit. Thus, the instant situation differs since it is non-party Player, albeit through plaintiffs' efforts, who now comes forward with more evidence. Defendants would no doubt claim that GFC somehow "controls" the product of the declarant. However, even if this were true at the present time, it is also true that this has not always been the case. Thus, the court is left with the impossible task of deciding in whose camp Player was in at the time he made his myriad statements and then somehow applying them to the sham fact doctrine. It declines movants' invitation to usurp the trier of facts' role in weighing the credibility of witnesses and therefore must deny the motions to strike."


J. Motions to Strike Various Affidavits, Deposition Testimony, and Sworn Statements of Sheldon Player

FSB, FI-Utah, Gurr, Allred, Mabey, Diumenti, FSF, Christenson, Vicki Roussin, ZFNB, ZLC, Argus, Lockhart, ZMC, Hanson, Newbold, and Timpson seek orders from the court striking various portions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 53
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

of Player's affidavits, sworn statements, and deposition testimony. Different defendants attack different portions of the Player evidence. For example, some defendants seek to have Player's ""predeposition" statements stricken and allow only his deposition statements into evidence. See, e.g., Gurr's Motion to Strike Player's Pre- Deposition Statements. Other defendants, because only Player deposition statements are offered against them, seek an order striking certain portions of the Player deposition. See, e.g., FSB's Motion to Strike Player Testimony. Not surprisingly, a number of movants join in both of these efforts and seek an outright ban on all Player testimony. See, e.g., Diumenti's Motion to Strike. The court will comment on this last argument first.

At the August 21, 1989 hearing on defendants' motions to strike, the court was told repeatedly that "Sheldon Player blows like the wind" and that "he is a 180 degree tu rn." Thus, defendants initially ask the court to recognize the inherent credibility problems associated with this convicted felon and urge that it not consider any of this evidence. As counsel for FSB so colorfully suggested, the court should lock-up in another room all 10,400 pages of the Player deposition. These arguments, however, sound to the court like counsels' summations of evidence to the jury. Although this might be the easiest solution to the pending motions to strike, such a decision is for the trier of fact. As the jury would no doubt be instructed by this court at some later trial, it may credit the veracity of all, some, or none of a witness' testimony.

*78 The court also concludes that it cannot strike portions of the Player deposition testimony simply because it conflicts with other portions. For example, Allred makes the unusual argument that Player's testimony should be stricken because it is not "believable." See Allred's Reply in Support of Motion for Summary Judgment, 12 n.10 ("it should be noted that for every piece of apparently damaging testimony, Sheldon Player has given and on which Plaintiffs rely, there is a contradictory piece of testimony by Sheldon Player"). This again is an issue of witness credibility reserved for the trier of fact. In fact, much of the purported conflict in testimony arises from leading questions placed before the witness by both sides in this matter. As the court noted earlier, Player's role as a hostile witness fluctuated throughout his lengthy deposition. It is for the trier of fact to determine whether this testimony is internally inconsistent in whole or in part.

The final issue before the court raises the same legal questions discussed above in relation to defendants' motions to strike affidavits of Watkins and Gary Mathis. First, Player's predeposition statements contain several conclusory statements regarding various defendants' knowledge of the frauds perpetrated upon GFC. As with the court's resolution of the Watkins and Gary Mathis motions, the only manageable way to resolve this issue is to assume that the court will look behind this conclusion and demand a reasonable foundation for such a statement. Where none exists, the statement cannot be relied upon to create a genuine issue of material fact. Second, Player's deposition statements will also be considered as they relate to his pre-deposition statements and conclusions. To the extent that he explicitly retracts a portion of these statements, then the court will not consider this evidence in resolving the pending motions for summary judgment.

Thus, for a resolution of these motions to strike the Player evidence, the court directs movants' attention to its analysis below of the summary judgment motions. Before doing so, however, the court points out that at oral argument on these motions, several defendants contended that Player is an essential ingredient to GFC's case, and that his absence would be fatal to GFC's efforts. While not wishing to appear to argue GFC's case, it seems to the court that this somewhat overstates the issue. Player's admissible testimony does indeed simplify the court's task of ruling on some of the pending dispositive motions as the court need not consider other evidence once a genuine issue of material fact arises. But in those instances where Player's conclusions lack foundation or personal knowledge and are thus stricken, the court must still carefully scrutinize GFC's other layers of evidence to determine whether this matter should be sent to a jury.

VI. Motions for Summary Judgment

A. Motion for Summary Judgment Standards

The parties expend a great deal of time and effort arguing the exact standards which they contend govern the court's analysis of the pending dispositive motions. Much of this argument needlessly added to the bulk of the materials placed before the court. In an effort to set forth a concise overview of the controlling summary judgment standards, the court posits the following conclusions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-4   Filed 06/07/2007   Page 14 of 20

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 54

*79 To grant summary judgment, the court must hold that the record clearly establishes "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Matsushita Electric Industrial Co., v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356-57, 89 L.Ed. 2d 538 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The party opposing a motion for summary judgment cannot rest upon mere allegations or denials of the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2515, 91 L. Ed. 2d 202 (1986).

Under the standards as set forth by the Supreme Court, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2514. A material fact is any factual issue which might affect the outcome of the case under the governing substantive law. A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving part. Id. at 248, 106 S. Ct. at 2510.

At this summary judgment stage, it is the court's function to determine whether there is a genuine issue for trial. There is no issue for trial unless there exists sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. Id. at 249-50, 106 S. Ct. at 2511. As the Supreme Court emphasized in the Anderson decision:
[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position must be evidence on which the jury could reasonably find for the plaintiff."

Id. at 252, 106 S. Ct. at 2513.

*80 This last point warrants emphasis. For the past year, the court and the parties have discussed this phase of the litigation in terms of the requirements under the Celotex decision. The court specifically set forth the parameters and burdens upon the moving and non-moving parties before the briefing process occurred-to the point of creating a hybrid local rule melded from the summary judgment requirements mandated by the Districts of Utah and Arizona. After close review of the parties' lengthy statements of fact, and after almost an entire week of oral argument on the matter, it should surprise no one that the pivotal issue before the court is the reasonableness of the inferences which GFC would have a future trier of fact draw from the evidence thus far presented. If a reasonable juror could not draw such an inference, then summary judgment is warranted. See Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987); Neely v. St. Paul Fire & Marine Ins. Co., 584 F.2d 341, 345-46 (9th Cir. 1978). Conversely, if a reasonable juror could draw the inference which GFC proffers as fact, then summary judgment must be denied and the matter must await resolution by the trier of fact.

Moreover, this reasonableness standard of necessity requires the court to apply the governing rules of evidence and the standards of the applicable substantive law. As the Supreme Court made clear in the Anderson decision:
Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards."

Id. at 254-55, 106 S. Ct. at 2516. The rules governing summary judgment motions also requires that this evidence be viewed in the light most favorable to the non-movant, Gray v. Phillips Petroleum Co., 858 F.2d 610, 613 (10th Cir. 1988), in this case, GFC.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 55

When the court began this memorandum by referring to reliance upon common sense, it was not simply bemoaning the need for brevity of argument. Whether defendants wish to label GFC's assertions of fact as illogical, illegitimate, or impermissible, it is the reasonableness of these inferences which is at issue and upon which the success of defendants' dispositive motions depends. In arriving at whether GFC's inferences are reasonable, the court can only consider that evidence which would be admissible and which convinces the court through its quantity and quality that a reasonable juror could reach the same conclusions asserted by GFC.

### B. Hanson's Motions for Summary Judgment

GFC alleges that Hanson joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, ¶ 198. According to plaintiffs, Hanson "aided and abetted the schemes among other ways by transferring cash or extending credit as part of the execution of the schemes. These actions induced GLFC into advancing funds, which the defendants knew would not be used for the represented purposes, but to enrich them selves." Id., ¶ 156. For example, GFC claims that Hanson participated and aided and abetted the Player frauds in the Fall of 1984 when he provided Player a fully secured loan in the amount of $3,850,000. Id., ¶ 200. In total, GFC alleges that Hanson "wilfully, knowingly and fraudulently induced GLFC to advance a total of $40,501,175, over nine separate but related episodes from February through June 1985. Id., ¶ 158."

*81 In the Fall of 1988, the court granted Hanson leave to file an early dispositive motion. Hanson's moving papers focused on the central issue of his purported knowledge of the Player frauds. The matter was fully briefed and argued by the parties and taken under advisement by the court. Because GFC has failed to raise any genuine issue of material fact on the subject of Hanson's lack of knowledge of the Player frauds, the court must grant Hanson's motion for summary judgment.

GFC relies upon portions of Player's April 14, 1987 affidavit to prove Hanson's knowledge. See GFC's Response to Hanson's Motion for Summary Judgment, 7- 9, 24, 75, 78. In all, this Player affidavit mentions Hanson four times. The court quotes below all relevant portions of this affidavit:
In various ways, Zions First National Bank ("Zions Bank"), Zions Leasing Company ("Zions Leasing"), and Argus Leasing Corporation ("Argus Leasing") participated in, encouraged, and benefited from my schemes to defraud a number of people, including GLFC and Greycas. Among other things, these entities and their officers including Ronald Hanson, Donald Timspon [sic] and M. Scott Newbold knowingly helped bail my companies out by providing financing when the financial pressures on my companies were increasing. These entities received, as repayments of loans, funds which they knew or could not help knowing were obtained fraudulently from GLFC and Greycas."

Player Affidavit of 4/14/87, 30:2-13.Over the term of the [1979-84 equipment] lease transactions with Zions Leasing referred to above, Mr. Timpson and Mr. Newbold pressured me to make payments on transactions where I had no obligation to do so. During the Summer of 1984, Mr. Timpson and Mr. Newbold of Zions Leasing, and Ronald Hanson of Zions Bank requested that I pay off the leases and they charged amounts that were higher than I understood were owed under the leases. In November 1984, I paid Zions Leasing more than $147,000 as final payment on several transactions. Zions Leasing and Zions Bank knew that I was using funds fraudulently obtained from GLFC to make these payments."

Id., 31:6-16.In 1984, I applied to Zions Bank for a loan to repay GLFC's construction loan on the RRI. This loan was initially approved and R. Kay Poulsen of Zions Bank informed GLFC of this by a copy of a letter. Subsequently, Mr. Poulsen informed me that the loan had been considered and rejected by the Executive Committee of Zions Bank. After Zions Bank rejected the loan, I personally negotiated with Mr. Hanson, Paul Williams, Mr. Poulsen, and other officers and representatives of Zions Bank in an effort to obtain the loan. In the course of these negotiations, Mr. Hanson indicated that he needed $1,000,000 in cash as part of the collateral for the loan. I explained to him that I did not have the money and that the entire proceeds of the loan were needed to repay obligations owed in connection with the RRI. In response, Mr. Hanson stated that I should get the funds from Greyhound.
*82 Because I needed the RRI loan, I ultimately agreed to a $500,000 deposit as collateral for the loan. I also agreed to pay more than $147,000 for leases with Zions Leasing. At the time I agreed to these terms, I believe officers of Zions Bank, Zions Leasing and Argus Leasing knew that I had entered into the fraudulent NL Industries lease transaction with GLFC. Zions Bank, Zions Leasing and Argus Leasing knew that the payments I made from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 56
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

November 1984 forward were made with funds which I fraudulently obtained from GLFC."

Id., 32:21-33:16.

First, the statement that Hanson "knowingly helped bail my companies out" provides no factual foundation for the ambiguous reference to Hanson's knowledge. There is no statement as to what Hanson knew nor any facts offered to justify any inference on this issue. Second, the statement that Hanson requested payments "higher than I understood were owed under the leases," offers no facts to indicate the basis for any understanding nor does it state that the amounts requested were higher than the amounts owed. Third, the statement that Hanson told Player to "get the money from Greyhound" was put in its proper context by the affiant at his deposition on February 11, 1988. As to this specific portion of the affidavit, Player testified as follows:
Q. Were you bothered by that particular statement as it pertained to Mr. Hanson?
A. Yes.
Q. What was it that bothered you about the statement?
A. What bothered me and what still does bother me is that, again, I will say it for-I will repeat again-I don't know how many times I have repeated it but I will say it again.
If I were to have drafted this document, I would have made a fuller explanation, particularly in regards to Mr. Hanson. We did have this discussion as appears at the bottom of page 32, top of page 33. There was mention of Greyhound. Mr. Hanson was informed of who the underlying first mortgage lender was, meaning Greyhound.
The statement that Mr. Hanson stated I should get the funds from Greyhound, is not in any way, shape or form the way I would have worded what took place that day. It was simply that possibly the funds could be advanced from Greyhound on a step-up construction loan because they, being the underlying lender-that was a practice that-you know-was commonly done by construction lenders.
That was the type of conversation that was taking place. This is just another example how very, very technically this sentence is, I suppose, to a degree, correct to an outsider looking in, to someone that might assume that Greyhound did not have, for example, a real estate lending division of Greyhound Leasing & Financial, one could derive from this statement without a further explanation that Mr. Hanson was referring to getting money from Greyhound Leasing in the manner in which I had been getting it from them.

So this just goes back to my testimony on February [sic] 18 whereby I tried to portray that this is not-because of the way this thing is written, it can be misleading without a full explanation of everything. It very easily could and probably in many respects would be misleading.
*83 I don't know if that answers your question. It certainly wasn't a ""yes/no" answer, I realize that.
Q. I take it that you are suggesting here that you have no reason to believe or had any knowledge or information that Mr. Hanson of Zions First National Bank had any knowledge with respect to any fraudulent dealings that you have had with Greyhound Leasing?
A. At the time of our meeting?
Q. Yes.
A. That's correct.
Q. The response that you are referring to was in the context that Greyhound was the construction lender and this was a discussion about a take-out of the construction lender.
A. That's correct."

Player Deposition of 2/11/88, 1647:12-1649:16. Thus, these portions of Player's April 14, 1987 affidavit do not support GFC's position that Hanson had knowledge of the Player frauds.

In opposition to the Hanson motion, and in response to the above quoted Player deposition statement, GFC cites the following lengthy portion of Player's deposition:
Q. And when you also spoke to Mr. Hanson when you were negotiating with him on the Zions loan, that was at a point subsequent to the conversations where you had been threatened by Mr. Timpson and Mr. Newbold, correct?
A. That's correct.
Q. And, in fact, in the negotiations you had with Mr. Hanson he indicated to you that he had spoken to Mr. Timpson and/or Mr. Newbold about Zions Leasing transactions; is that right?
A. That's correct.
Q. And Mr. Hanson, in fact, in the course of the discussion you had with him was following up or conversations that Mr. Newbold and Mr. Timpson had had earlier with you on those lease transactions; is that right?
A. I would characterize it as such, yes.
Q. And the reason that you would characterize it as such is because Mr. Hanson, in fact, spoke to you about repayment of the Green River and other lease transactions at Zions Leasing; is that right?
A. That's correct.
Q. In connection with the discussions on the million

Not Reported in F.Supp. Page 57
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

dollars for cash security for the Zions loan when Mr. Hanson told you to get the money from Greyhound, that was in connection with a fraudulent lease transaction at Greyhound, correct?
A. I'll say I don't know what he was thinking at the time, but I'll say by that point in time I felt that was a possibility.
Q. Well, and one of the reasons you felt that was - one of the reasons that you felt that Mr. Hanson was referring to getting the money through a fraudulent lease transaction from Greyhound was that you couldn't get that kind of money on a legitimate lease transaction, right?
A. That's correct.
Q. In fact, if you entered into a legitimate transaction - lease transaction with Greyhound you would have to use the proceeds to buy whatever the equipment was and you wouldn't have any left over for Zions Bank, correct?
A. That would be correct.
Q. And Mr. Hanson also wasn't, as you understood it, referring to any additional loan on the hotel because you had informed him that you couldn't get anymore financing on that property from Greyhound, is that right?
*84 A. I had informed him that we had drawn the maximum on that loan.
Q. And all the proceeds on that loan including interest reserve that we discussed a moment ago, you had already spent those funds, correct?
A. That's correct.
Q. Now, you indicate in earlier testimony that you did not know - well, your exact testimony was: I do not know that he knew about the Greyhound fraud, referring to Mr. Hanson, and that was in your deposition of February 11th at pages 1660 and 1661. And do you recall that testimony?
A. Somewhat, yes?
Q. And when you said that you did not know that Mr. Hanson knew about the Greyhound fraud, you said that and that was your testimony because you did not have a conversation with him where you told him about the Greyhound's frauds and he acknowledged you knowing about those frauds; is that right?
A. That's correct.
Q. But short of that specific conversation, you did have a number of conversations and discussions with Mr. Hanson about your finances and where you are getting your money and your lease transactions where you understood that he was aware of your fraudulent lease transactions with Greyhound; is that right?
A. I believe he certainly could have been.
Q. And you knew by that point that Mr. Hanson had spoken to people who you believed knew about the Greyhound frauds including Mr. Timpson and Mr. Newbold; is that right?
A. That's correct.
Q. And Mr. Hanson acknowledged that he heard about your fraudulent transactions was something that he conveyed to you indirectly; is that right?
A. That's one way of characterizing it, yes.
Q. And that's one way of characterizing it, because in the course of your discussions he said - in words of substance he referred to transactions that other people at Zions, with whom he had spoken, knew were fraudulent; is that right?
A. That's the basis for my belief of the characterization, yes.
Q. And given the circumstances in the conversations you had with Mr. Hanson, that's a fair characterization; is that right?
A. That's correct.
Q. Now, in your testimony again on February 11, '88 you indicated: I might also reserve my beliefs, but I do not know that he knew about the Greyhound frauds, speaking about Mr. Hanson. With respect to your-the beliefs that you reserved, one of those beliefs was that you believed and understood that he did know about the Greyhound frauds; is that right?
A. I believed it.
Q. And your belief on-your belief that he knew about the Greyhound frauds was based on what he said?
A. In part, yes.
Q. And in part because he indicated to you that you should obtain money put up as security for the Zions loan from Greyhound; is that right?
A. In part, yes.
Q. And also in part your belief was based on the fact that Mr. Hanson took up where Mr. Newbold and Mr. Timpson had left off in trying to get you to repay obligations on lease transactions with Zions Leasing that were fraudulent?
*85 A. That's correct.
Q. And your belief is also based on the fact that Mr. Hanson made some veiled references to your fraudulent conduct; isn't that right?
A. That's a way of characterizing the conversation.
Q. And that's a fair way of characterizing it and was how you viewed the conversation; is that right?
A. That's correct.
Q. And, in fact, that's how you operated in trying to deal with the situation; that is, with the understanding that Mr. Hanson knew about your Greyhound frauds?
A. That's correct.
Q. And, in fact, that's also a fair way of characterizing it because that's exactly what happened; that is, you obtained the money from Greyhound for fraudulent transactions; is that right?
A. That's correct.
Q. Now, ultimately you did receive a loan from Zions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 58
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Bank on the Riverdale Rodeway Inn property, correct?
A. That's correct.
Q. And you paid off the Greyhound construction loan with proceeds from that loan; is that right?
A. That's correct.
Q. You also paid off other obligations on the Riverdale Rodeway Inn property with that loan; is that correct?
A. That's correct.
Q. And by obtaining that loan from Zions Bank you were able to clear the way for the fraudulent lease transactions of $40 and $50 million that you conducted with Greyhound in 1984 and 1985; is that right?
A. That's correct.
Q. And the loan from Zions Bank on the Riverdale Rodeway Inn bailed you out of the biggest single obligation you had in a period when your companies were on the verge of insolvency or actually insolvent; isn't that right?
A. That's correct."

Player Deposition of 6/22/88, 6444:7-6451:12.

The court concludes that the above passage further bolsters the court's findings regarding the April 14, 1987 Player affidavit. As the court has pointed out in previous orders, Player's "beliefs" alone will not be enough to defeat a motion for summary judgment. See Court Order of 9/9/87, 34. GFC must put forth evidence from which a reasonable trier of fact could reach this same inferential belief. In this instance, the only remaining issue raised by GFC's evidence is whether Hanson's contact with other ZFNB and ZLC employees and officers can somehow create a reasonable inference of Hanson's knowledge of the Player frauds. This same issue also raises and resolves the reference in Player's deposition testimony above to Hanson's "veiled threat."

The alleged knowledge of Timpson and Newbold is thus raised by GFC to defeat Hanson's motion. Timpson and Newbold also seek summary judgment and the court will discuss below the evidence offered by GFC against these motions. However, for the purposes of the present motion, the court will assume that GFC's evidence creates a material issue of fact as to Timpson and Newbold's knowledge of, and participation in, the Player frauds. Even under this scenario, the court finds that GFC offers no evidence from which a reasonable juror could impute the knowledge of Timpson and Newbold to Hanson. The following excerpt of the Player deposition demonstrates GFC's inability to fill in this crucial link:

*86 Q. And what were, why was it that Mr. Hanson was speaking to Mr. Murdock?
A. Apparently Mr. Hanson had been doing some investigative work in regards to the Riverdale Roadway [sic] Inn loan, and had occasion to speak to Mr. Murdock, and Mr. Murdock at least reported saying good things about us.
Q. Why was Mr. Murdock undertaking an investigation into you in connection with the Riverdale Roadway [sic] Inn?
A. You mean Mr. Poulson [sic], or excuse me, Mr. Hanson?
Q. I am sorry, did I say Mr. Murdock? I meant to say Mr. Hanson.
A. That was at a time when we had demanded that they, meaning Zion's [sic] Bank, make good on their commitment to issue us a loan. So I believe he was doing further investigative work.
Q. Did word get back to you from people associated with Zion's [sic] Bank or Zion's [sic] Leasing that he had in the course of this investigation made inquiry about the outstanding leases?
A. Yes.
Q. And where did that come from?
A. Actually it had come from Mr. Hanson himself. I do recall him telling me that he had been advised and was aware and wanted to discuss the matter about outstanding leases.
Q. And when did he make that statement to you?
A. That statement was made at a meeting with him and Mr. Stoddard I believe on or around this time, maybe possibly earlier.
Q. Where did it occur?
A. In his office at Zion's [sic] Bank.
Q. Was anyone else there?
A. Yes, Mr. Bill Stoddard.
Q. Did he allude to problems that existed with the outstanding leases?
A. Yes.
Q. And specifically what did he say about them?
A. At least he said that he was aware of our agreement to clear off, meaning pay off the outstanding leases that were bad with Zion's Leasing, and that we had at least in part agreed to do this for Zion's [sic] Leasing.
Q. Why did that topic come up in the conversation?
A. I believe that it came up as a matter of condition or precondition that he wanted in order to fund this Riverdale Roadway (sic) project.
Q. Who did he say he had spoken to about the leases?
A. I believe he said he had spoken to Mr. Timpson, if I am not mistaken.
Q. Did he say that Mr. Timpson had informed him about all of the problems that existed with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

underlying leases?
A. I guess I don't recall for sure. Only that they were, that he mentioned that they were bad leases."

Player Deposition of 10/4/88, 9026:10-9028:21.

This deposition testimony in no way supports an inference that Hanson was told of the Player frauds by Timpson or Newbold and used this as a "veiled threat" against Player in his negotiations on the RRI loan. Rather, it simply supports the other evidence offered by the parties which demonstrates that Hanson was told by these Zions Leasing officers that Player agreed to pay on a ZLC lease. This is evident from a reading of the October 3, 1984 memorandum from Hanson to Poulsen:

*87 I have been advised by Scott Newbold of Zions Leasing that they have been working with Sheldon Player to pay them approximately $60,000.00 on a piece of equipment which Player agreed to sell for Zions Leasing. Up until this time Player has not performed by paying for the equipment or remitting the sales proceeds to Zions Leasing. At the time we were negotiating the loan on the Roy motel Player indicated to Newbold that payment would be made to them when our mortgage loan is closed.

Zions Leasing would appreciate it very much if you would protect their interest in this matter at the time the proceeds of the loan to Player and Willyard are disbursed, if in fact, that loan is actually made and closed."

Hanson's Reply in Support of Motion for Summary Judgment, Exhibit C.

The court concludes that GFC has failed to meet its burden of establishing a genuine issue of material fact as to Hanson's knowledge of the Player frauds upon GFC. A close examination of all evidence offered by GFC, no matter how tangential, leads the court to the conclusion that a reasonable trier of fact could not conclude that Hanson knew of the Player frauds upon GFC. This ruling also includes granting GFC's motion re: Zions Defendants' Second Set of Requests for Admissions with Interrogatories and thus considering this accompanying evidence. Therefore, the court grants Hanson's initial motion for summary judgment on this issue as well as his later motion for summary judgment. Because GFC cannot establish the essential elements of knowledge and intent, Hanson is granted summary judgment on GFC's RICO claims based upon § § 1962(c) & (d). The court also declines to exercise pendent jurisdiction over the remaining state law claims, see United Mine Workers v. Gibbs, 383 U.S. 715, 725- 26, 86 S. Ct. 1130, 1138-39, 16 L. Ed. 2d 218 (1966), and the remainder of GFC's Fourth Amended Complaint asserted against Hanson must therefore be dismissed.

C. Gurr's Motion for Summary Judgment

GFC alleges that Gurr knowingly transferred cash and extended credit in furtherance of the Player frauds beginning no later than 1979. GFC's Fourth Amended Complaint, 202. GFC further contends that FI-Utah aided and abetted the Player frauds by providing the Player companies with cash transfers and credit extensions and by allowing Player to maintain bank accounts with FI-Utah. Id. In summing up the allegations of GFC's pleading and the core issues before the court, Gurr concludes that "[i]n eight different ways, Greyhound has alleged that Mr. Gurr knowingly and intentionally participated in fraudulent activity that caused plaintiffs to lose money." Gurr's Motion for Summary Judgment, 11 (footnote omitted). Hence, it is not surprising that, similar to other defendants' motions for summary judgment, Gurr would have the court focus upon the issue of knowledge and intent.

Gurr contends that GFC has not brought forth sufficient evidence to raise a genuine issue of material fact as to Gurr's knowledge of the Player frauds. The court disagrees. In fact, the court need look no further than the above quoted portions of Player's August 4, 1989 sworn statement to find an issue for the trier of fact. The court reaches no conclusions as to the veracity of Player's statements about Gurr's knowledge and participation in the frauds perpetrated upon GFC. It is enough at this point to conclude that a genuine issue of material fact exists on this element running throughout of GFC's claims.

*88 Gurr raises other legal arguments relating to GFC's pleading which have been already addressed by the court. None of these arguments warrants granting summary judgment in Gurr's favor on GFC's § § 1962(c) & (d) claims. However, it is apparent from GFC's responsive memorandum that plaintiffs have abandoned their fraudulent conveyance, conversion, and constructive trust claims asserted against Gurr. See GFC's Response to Gurr's Motion for Summary Judgment, 19. The court therefore grants Gurr's motion for summary judgment directed at these claims and dismisses GFC's Thirteenth through Fifteenth Claims for Relief against Gurr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 60
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

### D. FI-Utah's Motion for Summary Judgment

GFC alleges that FI-Utah knowingly transferred cash and extended credit in furtherance of the Player frauds beginning no later than 1979. GFC's Fourth Amended Complaint, 202. GFC further contends that FI-Utah aided and abetted the Player frauds by providing the Player companies with cash transfers and credit extensions and by allowing Player to maintain bank accounts with FI-Utah. Id. FI- Utah, like other movants, focuses the court's initial attention on GFC's evidence offered to support a reasonable inference of FI-Utah's actual knowledge of, and specific intent to further, the Player frauds. Because the court concludes that GFC has failed to raise a genuine issue of material fact on this essential element of its RICO claims, the court will grant FI-Utah's motion for summary judgment.

FI-Utah accurately categorizes GFC's evidence of the bank's knowledge and intent as follows:
As to the scienter element, Greyhound argues that actual knowledge by FI-Utah employees that Player's equipment deals were fraudulent, and an intent to further such fraud, can be inferred from: (1) certain Bank employees' suspicions of Player's dishonesty and "shady dealings" in other circumstances;"
(2) certain testimony by Player and others concerning what Bill Gurr, FI-Utah's former Vernal Branch Manager, knew about Player's equipment dealings; (3) FI-Utah's ability to review, and actual monitoring of, Player's checking accounts; (4) certain internal FI-Utah loan reports referring to Greyhound funding as a source of repayment for Bank loans to Player; (5) FI-Utah's receipt and review of an audited financial statement for AMS (the "A&I Audit"); (6) the Bank's internal analyses of Player's unaudited financial statements; (7) Player's history of continuous borrowings from FI-Utah; (8) Player's banking account activity, including drawings on uncollected funds, overdrafts and kiting; and (9) the presence of a motive to assist Player in obtaining funds from Greyhound so that Player's Bank loans could be repaid and the Bank could generate income. (See GFC Memo, at 3-7.)"

FI-Utah's Reply in Support of Motion for Summary Judgment, 9-10.

Many of these categories of GFC evidence have previously been analyzed and rejected by the court. For example, the court has already concluded that evidence of FI-Utah's failure to spot and properly report instances of Player's check kiting and large currency transactions cannot, as a matter of law, support an inference of actual knowledge of the equipment frauds and the necessary criminal intent to further Player's schemes. Thus, while much of GFC's evidence might permit a reasonable trier of fact to find FI-Utah negligent or even reckless, these are not the standards of knowledge and intent governing this racketeering lawsuit. The court will discuss the remaining evidence offered by GFC to demonstrate FI-Utah's actual knowledge of the Player frauds.

*89 First, although the court concludes that genuine issues of fact exist as to Gurr's alleged knowledge of, and participation in, the Player frauds, the court also holds that this does not establish FI-Utah's liability for GFC's RICO claims under the doctrine of respondeat superior. As the court pointed out above, such a finding of vicarious liability, absent evidence of knowledge and intent from officers and directors of FI-Utah, would be anathema to the requirement of specific criminal intent under the RICO statutory scheme. Phrased differently, the court's factual conclusions as to GFC's evidence offered against Gurr do not necessarily prove fatal to FI-Utah's efforts to obtain summary judgment. The court must look beyond this evidence to determine whether other evidence offered by GFC establishes a genuine issue of material fact.

Second, the court has already discussed Gary Mathis' statements regarding the Vernal banking community's "general knowledge" that Player was dishonest and operated his companies in a "shady manner." It is uncontested that sometime prior to August of 1984, Gary Mathis also called the main office in Salt Lake City and informed DeVere Watkins, the head of branch administration, that Player was involved in a check kite. FI-Utah's Motion for Summary Judgment, 17; FI-Utah's SOF ¶ 435. Moreover, FI-Utah's head of branch administration was further informed that
we've got a situation going on out here that you need to be aware of. I think Bill [Gurr]'s a little too close to Sheldon. The rumor is that, and you probably aren't aware of this, but the rumor is, as far as this town is concerned, that Sheldon is a dishonest person who can't be trusted. That comes from Dale Cameron who is a past general manager."

Gary Mathis Deposition of 7/20/87, 528:6-14.

The court concludes that Gary Mathis' suspicions about Player's "shady" business practices, and DeVere Watkin's awareness of these "rumors" does not establish FI-Utah's actual knowledge and specific intent to defraud. Nor, the court concludes, could a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.