Not Reported in F.Supp.                                                                                                                Page 61
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

reasonable trier of fact infer the requisite criminal intent from this evidence. Knowledge of these rumors and generalized suspicions do not logically translate into actual knowledge of Player's equipment frauds perpetrated upon GFC. Therefore, this evidence does not raise a genuine issue of material fact which would preclude granting FI-Utah's motion for summary judgment."

Third, GFC's points to the alleged, prior knowledge of Richard Sandberg ("Sandberg"), and Ross Varoz "(Varoz"), both former employees at FMA Leasing ("FMA") and current employees at FI-Utah. Sandberg was head of FMA's loan recovery department in 1983 before becoming manager of FI-Utah's loan review department in March of 1984. Varoz was in charge of FMA's delinquent accounts until he left to become manager of FI-Utah's corporate banking department in May of 1984. The court has carefully reviewed the GFC's SOF ¶ ¶ 1214-1247, and FI-Utah's responses thereto, and concludes that this purported knowledge of Player's prior business practices while with FMA is too tenuous to raise a reasonable inference of FI-Utah's actual knowledge of Player's later equipment frauds perpetrated against GFC. The evidence offered by GFC does not logically support the inference plaintiffs desire."

**\*90** Next, the court finds a reasonable trier of fact could not conclude, as GFC argues, that FI-Utah officers were made aware of Player's fraudulent equipment deals from the bank's own loan reports as well as outside audits of Player entities. Regarding the loan documents, GFC contends that the very terms of the documents reflect that FI-Utah knew of a diversion of GFC loan proceeds since leases between sublessees and GFC were identified on the loan reports as the sources of repayment. See GFC's Response to FI-Utah's Motion for Summary Judgment, 20-21 ("FI-Utah's own loan documents confirm that in effect GFC was Player's unwitting guarantor."). However, a review of GFC's SOF ¶ ¶ 534, 991-97, and 1138-42, and FI-Utah's responses thereto, reveals that the loan reports were simply instances of bridge financing. When asked about one of these documents, James Miller ("Miller"), the head of FI-Utah's credit department, explained that "[t]he bank does a lot of what is called bridge financing for all sorts of purchases, whether the ultimate repayment is the refinancing by a leasing company, the refinancing by a long-term takeout insurance company or retirement fund. That is a common occurrence." James Miller Deposition of 4/17/87, 427:7-11. A reasonable trier of fact could not infer criminal intent from this neutral document and to allow the jury to do so would be to invite speculation.

The audit referred to by GFC is similarly deficient. GFC contends that the 1982 audited financial statement of AMS, prepared by Amembol & Isom ("A&I"), ""described the badges of fraud." GFC's Response to FI-Utah's Motion for Summary Judgment, 22. However, as GFC's own banking expert admitted, the A&I audit does not state that Player engaged in any frauds:
Q. Now, in the report, sir, do you agree that there is absolutely no express statement in which the auditors find that Mr. Player has engaged in any kind of improper or fraudulent activity?
Do you agree with that?
A. Correct.
Q. Do you agree that there is no place that they expressly indicate that they suspect any fraudulent or improper activity?
A. I don't agree with that statement.
Q. Well, did the auditors qualify their opinion on fraud?
A. They make reference in their qualification, not expressly to fraud, but implicitly.
Q. Under Generally Accepted Auditing Standards when an auditor qualifies his opinions based on fraudulent transactions, does he have to say that he is qualifying them because of the suspicion of fraud?
A. I believe that's correct, yes.
Q. Now, do you agree they did not qualify their opinion based on the suspicion of fraud?
A. Not-not expressly, yes, I agree with that."

William Watkins Deposition of 9/15/88, 2258:20-2259:22.

The court concludes that the trier of fact could not reasonably infer knowledge of the Player frauds on the part of FI-Utah officers-even if the court were to assume that these unnamed bank officials actually read this audit. The language of the audit does not support such a conclusion. Moreover, the leap from the express language of the document to the inferences GFC's expert would have the trier of fact draw does not fulfill plaintiffs' burden. This is so because the inferences to be drawn from the A&I audit do not go to the Player frauds perpetrated upon GFC, but rather to the more general conclusion that "its description of AMS conduct indicates a high probability that AMS is engaged in wrongful and fraudulent activities." Watkins Affidavit of 5/14/89, ¶ 41. This inferential reasoning is much too tenuous to defeat the present motion for summary judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 62

*91 Finally, GFC argues that FI-Utah's own analyses of Player entities' financial statements establishes that the bank knew of the fraudulent nature of the GFC equipment leases. GFC's Response to FI-Utah's Motion for Summary Judgment, 24-27. For example, GFC cites to a September 13, 1982 inter-office memo from Miller to Gurr regarding various deficiencies P&W's financial statements. At the bottom of the form letter advising Gurr that P&W's financial statements for 1981 were being rejected by FI-Utah's credit department, Miller concluded as follows:

Of course the killer is that real estate is probably carried at "market" rather than at historical cost as is required by standard accepted accounting principles. This "market" valuation mostly overstated equity. In this case equity is probably overdrawn substantially. As it is using the statements is like trying to build a house with wet tissue paper in a hurricane."

FI-Utah's Reply in Support of Motion for Summary Judgment, Exhibit 96. However, as FI-Utah correctly points out, it is undisputed that GFC itself was privy to Player's company-prepared statements and, in fact, reviewed them. FI-Utah's SOF ¶ ¶ 133 & 177. This simply points out that while FI-Utah's analysts may have raised questions as to the Player entities financial stability, as did the A&I audit, this alone does not support a reasonable inference that these same bank officials knew that Player's equipment deals were phony. The court finds that none of the bank's internal analyses proffered by GFC, see GFC's SOF ¶ ¶ 764- 73, 794-96, 843, 975-81, 1523-55, 1578-79, 1581-90, 1592-1600 & 16404-22, support a reasonable inference of FI-Utah's knowledge of the Player equipment frauds perpetrated upon GFC.

The court therefore concludes that GFC has failed to raise a genuine issue of fact as to FI-Utah's alleged knowledge of the Player frauds. As such, the court grants FI-Utah's motion for summary judgment on GFC's remaining RICO claims, § <u>§ 1962(c) & (d)</u>. Furthermore, as discussed above in relation to the Hanson motion for summary judgment, the court declines to exercise pendent jurisdiction over GFC's remaining state law claims. The court therefore dismisses these pendent claims as well and grants FI-Utah's motion in its entirety.

E. Christenson's Motion for Summary Judgment

GFC alleges that Christenson aided and abetted the Player frauds by extending credit and transferring cash to keep the fraudulent schemes going beginning no later than May of 1983. GFC's Fourth Amended Complaint, ¶ 195. GFC also claims that Christenson "induced Player to use part of what purported to be equipment loan proceeds disbursed to the Player entities enterprise to purchase land owned by an entity controlled by defendant Christenson." Id., ¶ 196.

Christenson joins in FSF's motion for summary judgment, legal arguments, and accompanying statements of facts, with the following specific reservation:

*92 FSF is clearly attempting to distance itself from its former president by painting itself as a victim of his actions. Christenson expressly denies FSF's conclusory allegations that he intended to defraud or manipulate FSF. He further denies any such similar conclusions drawn by Richard Passman or Bryon Larsen in their audit of FSF. Christenson specifically denies that he defrauded FSF, that he manipulated any of the transactions to his own benefit, or that he ever acted in his own interest contrary to the interest of FSF."

Christenson's Motion for Summary Judgment, 4. However, the court notes that Christenson contends that even if he did intentionally defraud his employer, he still is not liable to GFC in the present lawsuit. As with many other defendants to this action, Christenson focuses his legal arguments on the issue of knowledge. Thus, according to Christenson, "it does not follow that, if Christenson did engage in self-dealing in an effort to defraud FSF, that he thereby knew that Player was defrauding plaintiffs." Id., 5.

While the court agrees with the logic of Christenson's argument, it also finds it irrelevant when compared with the evidence offered by GFC. GFC argues that Player has stated that Christenson knew of the Player frauds perpetrated upon GFC. A careful review of Player's testimony on this matter leads the court to conclude that it is more accurate to say that a reasonable juror could infer that Christenson knew of the Player frauds. Thus, the following deposition testimony alone raises a material question of fact on this issue:

Q. Now, you described Skip Christenson as a fairly sophisticated banker, right?
A. Yes.
Q. Fairly slick?
A. I would say that, yes.
Q. Not the kind to come out and say something outright if he didn't have to?
A. That's true.
Q. So he'd tell you things like I spoke to these people,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 3 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 63

they told me the way you do business?
A. That's true.
Q. The way he said it, you understood that he was saying he knew that if you were committing frauds?
A. I would say at a point, that's a true statement.
Q. Mr. Christenson would never go right out on the line and say that outright?
A. That's true.
Q. He was too slick for that?
A. That's true.
Q. But by the way he told you that he spoke to these people and they told him how you did business, that was the impression he was trying to convey, at least as you understood it?
A. I would amend that to say not only in his speech, but also in his actions.
Q. In the timing of them?
A. Timing and the things, the requests that he made of me to purchase items from him, that type of business.
Q. In other words, when he asked you to buy things, that was when he would drop little hints, isn't it?
A. That's correct."

Player Deposition of 6/1/88, 5714:7-5715:15. Other such deposition testimony also raises similar inferences of knowledge. See id., 5795:9-5796:22. Therefore, with the exception of GFC's § 1962(a) claim, the court therefore denies Christenson's motion for summary judgment in its entirety.

F. FSF's Motion for Summary Judgment

*93 GFC alleges that FSF aided and abetted the Player frauds by extending credit and transferring cash to keep the fraudulent schemes going beginning no later than May of 1983. GFC's Fourth Amended Complaint, ¶ 195. GFC also claims that FSF "induced Player to use part of what purported to be equipment loan proceeds disbursed to the Player entities enterprise to purchase land owned by an entity controlled by defendant Christenson." Id., ¶ 196. Hence, according to GFC, "a deal was struck-FSF would provide the funds necessary to keep Player's enterprise 'afloat,' and Player would assist FSF and Christenson by purchasing the interests that FSF wanted Christenson to divest." GFC's Response to FSF's Motion for Summary Judgment, 6.

FSF seeks summary judgment based on many of the same legal arguments offered by the other financial institutions. The court has previously dealt with these arguments and will not consider them further here other than to say that they do not counsel granting summary judgment in FSF's favor. What makes FSF unique from these other financial institution defendants is that FSF's dealings with Player center around only four loans spanning a relatively short period of time-GFC does not allege any contact or misrepresentations from FSF. Thus, the core of GFC's action against FSF is the "appearance of solvency and legitimacy" theory discussed elsewhere by the court. FSF, like other movants, focuses upon the requirement of knowledge which runs throughout GFC's federal RICO and pendent claims. Among other factual reasons put forth by this financial institution, it seeks summary judgment on this issue and challenges GFC to demonstrate that FSF knew of the Player frauds. Because the court concludes that GFC has met this burden, the court must deny the motion.

As set forth above in the court's discussion of Christenson's motion for summary judgment, a genuine issue of material fact exists concerning Christenson's knowing participation in the Player frauds on GFC. The court concludes that it need go no further with respect to FSF's purported liability in this present lawsuit. Christenson was the president, a director, and the highest officer of FSF at the time of the Player frauds. Christenson was there at the inception of FSF and it is undisputed that he had full power to run the company and did so as it pleased him. As the court concluded earlier in response to the financial institution defendants' legal arguments, the doctrine of respondeat superior is not appropriate in the RICO setting. However, as the court also pointed out, any consideration of corporate liability must involve applying theories of derivative or vicarious liability because a corporation can only act through the actions of its employees, agents, officers, and directors. Thus, the court imputes the liability of FSF not under respondeat superior principles, but rather through the direct liability it incurred from the actions of its highest officer.

*94 The court has also scrutinized FSF's arguments in relation to the pendent claims put forth by GFC and concludes that summary judgment is not warranted on any of these state law claims. Thus, with the exception of GFC's § 1962(a) claim asserted against FSF, the court denies FSF's motion for summary judgment in its entirety.

G. FSB's Motion for Summary Judgment

GFC alleges that FSB and Cameron joined the Player frauds not later than 1979 and continued to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 4 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 64

participate in them until at least 1985. GFC's Fourth Amended Complaint, § 191. GFC claims that FSB induced Player to defraud GFC and thus received transfers of funds which it knew were fraudulently obtained by Player from GFC. Id., ¶ 192. The complaint further alleges that FSB and Cameron aided and abetted the frauds perpetrated on GFC by transferring cash and extending credit to the Player companies and by allowing Player to maintain bank accounts at FSB. Id., ¶ 191.

The thrust of FSB's motion for summary judgment, similar to other defendants, is that the financial institution had no knowledge of the Player frauds and thus cannot be liable under GFC's RICO claims. In Player's April 14, 1987 affidavit, which has been the subject of much dispute in this litigation, Player stated that "[a]mong other things, First Security Bank knowingly assisted my check-kite schemes and misrepresentations to GLFC and Greycas, helped bail my companies out by lending them money especially at times of severe cash shortages, and received as repayments of loans money which it knew or could not help knowing was obtained fraudulently from GLFC or Greycas." Player Affidavit of 4/14/87, 15. The present issue before the court is whether GFC has produced any evidence to support Player's conclusory statements as to FSB's knowledge of the Player frauds. Because the court concludes that GFC has failed to raise a genuine issue fact as to this crucial element of its RICO claims, the court grants FSB's motion for summary judgment.

As an initial matter, the court finds that, consistent with the above analysis of FI-Utah and Gurr's motions for summary judgment, FSB cannot be held liable for GFC's RICO claims under the doctrine of respondeat superior. Thus, although the parties agree that genuine issues of fact arise over assistant branch manager Cameron's knowledge of, and participation in, the Player frauds, this does not prove fatal to FSB's dispositive motion. The court must therefore examine the evidence proffered by GFC to determine whether a reasonable inference of knowledge on the part of FSB may be drawn by the trier of fact. Furthermore, the court also notes that GFC attempts to establish FSB's knowledge of the Player frauds by evidence of Player's check kiting activities and FSB's purported violations of statutory and regulatory provisions. As the court concluded above, however, this evidence cannot support a reasonable inference of specific criminal intent. Thus, this evidence is also not sufficient to defeat FSB's motion for summary judgment.

*95 In further support of its position that FSB knew of the Player frauds, GFC asserts that FSB employees (aside from Cameron) Bill Gibson ("Gibson"), Roger Ford ("Ford"), Thomas Haymond ("Haymond"), Calvin Jeppson ("Jeppson"), Vard Openshaw ("Openshaw"), Ronald Schulthies ("Schulthies"), Ronald Eliason ("Eliason"), and Louis Harris ("Harris") knew of Player's frauds on GFC prior to the commencement of this litigation. FSB's SOF ¶ 151 (citing GFC's Supplemental Answers to FSB's Fourth Set of Interrogatories, No. 4). The court will examine below the evidence offered by GFC of the various FSB officer's knowledge of the Player frauds."

As mentioned in this memorandum's opening statement of facts, Gibson was Vice President and Manager of the Vernal Branch from 1976 until early 1983. Thereafter, Ford was Vice President and Manager of the Vernal branch from 1983 through 1985. Player dealt with Gibson prior to 1983 on a bi-monthly basis. Player Deposition of 2/22/88, 2225:8-2226:4. Player never told Gibson that he had procured money from GFC through fraudulent equipment leasing transactions nor did Gibson ever say anything to Player indicating that he knew of Player's fraudulent activities. Player Deposition of 11/21/88, 10181:12-10182:2. Player dealt with Ford several times each month from 1983 through 1984. Player Deposition of 2/22/88, 2224:5-2225:7. Player never told Ford he had procured money from GFC through the fraudulent equipment lease transactions. Id.

Openshaw, along with Cameron, was an assistant branch manager at FSB's Vernal branch. Player dealt with Openshaw on a weekly basis in connection with Player's account activity at FSB's Vernal branch. The two never spoke of the fraudulent leasing transactions and Openshaw never said anything to Player which indicated the bank employee's knowledge of the frauds. See id., 2223:7-2224:4.

Haymond was, from 1979 through 1985, Vice President of FSB and the commercial credit manager of the division containing the Vernal branch. Player recalled speaking to Haymond about "half a dozen times," but the two never discussed the fact that Player procured funds from GFC through fraudulent leasing transactions. Id., 2221:6-21. In fact, Haymond never said anything at all which indicated to Player that Haymond was aware of any of Player's fraudulent activities. See id.

Jeppson was Senior Vice President of FSB and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 5 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 65

supervisor of the division containing the Vernal branch from 1977 through 1985. Player also met with Jeppson, "maybe as many times as Mr. Haymond," and admits he never told Jeppson of the fraudulent GFC leasing transactions. Id., 2221:22-25; see id., 2222:13- 2223:3. Harris was from 1982 to 1985 Executive Vice President and Director of FSB. From 1983 to 1985, Harris was chairman of the FSB senior loan committee.

Schulthies was, from July 1983 forward, a Director and Senior Vice President of FSB, and the vice chairman of the senior loan committee. One of his assistants was Eliason, a Vice President in the commercial banking division. Player met Schulthies, at most, two times. See id., 2220:4-17. Player never told Schulthies that he had procured funds from GFC through fraudulent equipment leasing transactions; Schulthies never said anything to Player which indicated he was aware of the Player frauds. See id. Moreover, Player met Eliason only once and never discussed the fact that Player had procured money from GFC through fraudulent leases. Id., 2219:4-19.

*96 It is clear from the above recitation of undisputed facts that GFC does not rely upon the testimony of Player to impute fraudulent knowledge upon FSB. Rather, similar to the arguments directed against FI-Utah, GFC argues that the kiting activity, loan documents, and analyses generated by the bank (in fact, revolving around the same A&I audit) all support a reasonable inference of FSB's knowledge of the Player frauds. The court disagrees and will not repeat its analysis as to this evidence. It is enough to conclude that this evidence is much too tenuous to support a reasonable inference of the requisite knowledge and intent. Because GFC has failed to establish a genuine issue of material fact, the court grants FSB's motion for summary judgment against plaintiffs' RICO claims. The court also declines to exercise its pendent jurisdiction over the remaining state law claims and therefore dismisses the remainder of GFC's Fourth Amended Complaint against FSB.

H. Argus' Motions for Partial Summary Judgment and for Summary Judgment

GFC alleges that Argus joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, ¶ 198. According to plaintiffs, Argus "aided and abetted in the commission of the schemes by transferring cash and extending credit with knowledge of the fraud to other co-defendants, providing or using fraudulent documents or information or allowing the Player entities enterprise to maintain bank accounts." Id., ¶ 185. For example, GFC claims that Argus "knowing that Player was involved in schemes to defraud, providing financing to non-creditworthy customers of the Player entities enterprise for the ostensible purpose of purchasing equipment." Id., ¶ 198. All told, GFC alleges that Argus "wilfully, knowingly and fraudulently induced GFC to advance a total of $40,501,175, over nine separate but related episodes from February though June 1985." Id., ¶ 158.

In the Fall of 1988, the court granted Argus leave to file an early dispositive motion similar to the motion filed by Hanson. Argus' moving papers also focused on the central issue of this defendant's purported knowledge of the Player frauds. The matter was fully briefed and argued by the parties and taken under advisement by the court. Because GFC has failed to raise any genuine issue of material fact on the subject of Argus' proclaimed lack of knowledge of the Player frauds, the court must grant Argus' motion for partial summary judgment.

In opposition to Argus' motion, GFC first cites the court to portions of: (1) Player's April 14, 1987 affidavit; (2) Player's November 1, 1986 sworn statement; and (3) Kenneth Gabel's ("Gabel") "Death Spiral" manuscript. Plaintiffs also contend, in connection with the April 14, 1987 Player affidavit, that Argus' knowledge of the Player frauds is also demonstrated by evidence that Callis, Bennett, Van Winkle, Bonnemort, and Welling had knowledge of the frauds. The court will examine this evidence in turn.

*97 First, Player's April 14, 1987 affidavit contains five paragraphs that specifically refer to Argus. Besides those portions regarding Player's "belief" that Argus knew, already quoted by the court in connection with the Hanson motion and which are insufficient on their face, Player's affidavit makes the following three references to Argus:
During 1977 I arranged for funding by Argus Leasing to Alpine Machinery Sales, Inc. and Anchor Enterprises Inc. for equipment leases. In obtaining these leases, I "bumped" the price of the equipment significantly by inflating the actual price of the equipment. Based on my discussions with John Callis of Argus Leasing, it became apparent that he had discovered the bumping and he requested additional security. Subsequently, I learned from Ray Welling, formerly employed by Argus Leasing, that Callis knew that the Anchor lease transaction was bumped."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 66
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Player Affidavit of April 14, 1987, 30:14-23.On several occasions, Zions Bank, in conjunction with Zions Leasing and Argus Leasing, conditioned approval of loans I requested, on my leasing equipment owned or repossessed by them or on my payment of outstanding obligations owed by others to them. From speaking to many other customers of Zions Bank over the years, I am not aware of any instance where Zions Bank conditioned approval of loans to any other customers upon their lease of other property or payment of outstanding obligations owed by others.

In April 1984, I obtained an equipment loan in the amount of $300,000 from Zions Bank through its loan officer James Anderson. Prior to the approval of the loan, Mr. Anderson told me that the loan would be approved if I agreed to lease certain equipment which had been repossessed by Argus Leasing. In accordance with Mr. Anderson's instructions, I spoke to Mr. Callis and agreed to lease the equipment repossessed by Argus Leasing even though the price he wanted was excessive. Zions Bank then approved the loan."

Id., 31:26-32:15.

These portions of GFC's proof offer no reasonable inference that Argus knew of the Player equipment leasing frauds perpetrated upon GFC. Rather, the alleged prior knowledge of Player's bumping practices by Van Winkle, Bonnemort, Callis, and Welling is much too tenuous to defeat the pending motion. Although these inferences are hotly contested, even if the court were to assume that these Argus officers knew about the "bump" of the Anchor lease, this would not be enough to raise a genuine issue of material fact. Apparently referring to this pre-GFC frauds transaction, GFC makes the argument that "even if there was no evidence of Argus' knowledge of the GFC frauds, Argus' knowledge of the other racketeering acts suffices to raise a genuine issue of material fact on knowledge." GFC's Opposition to Argus' Motion for Partial Summary Judgment, 8. The court declines this invitation to reform RICO's statutory scheme and thus eliminate the need to prove actual knowledge and specific intent. As the court pointed out in relation to GFC's proffer of FI-Utah officers Sandberg and Varoz's alleged knowledge, this type of evidence cannot support the leap GFC would have the court and the trier of fact make. Again, this evidence does not support a reasonable inference of actual knowledge and specific intent.

*98 Next, GFC also cites Player's November 1, 1986 sworn statement in opposition to Argus' motion. This sworn statement contains the following two references to Argus or Argus officers:
Q. Did Jim Anderson and John Callis come to learn about the $40,000,000 transaction that you had with NL?
A. Yes.
Q. Or purported to have with NL?
A. Yes.
Q. They came to learn about it because you discussed it with them, right?
A. Yes."

Player's Sworn Statement of 11/1/86, 21:8-16.Q. Did Zions Bank, Zions Leasing and Argus Leasing know they were getting paid off by you with funds fraudulently obtained from Greyhound Leasing?
A. Yes.
Q. Just to make it clear, let me restate that question. Did Zions Bank, Zions Leasing and Argus Leasing know they were getting paid off by you with funds fraudulently obtained from Greyhound Leasing?
A. Yes."

Id., 22:11-20. Similar to the court's conclusions regarding the conclusory beliefs expressed by Player in his April 14, 1987 affidavit, the court finds that the above portions of Player's November 1, 1986 sworn statement fail to raise a genuine issue of material fact as to Argus' knowledge of the Player frauds. Player's conclusion is unsupported by any foundational facts and is clearly insufficient to defeat Argus' motion for partial summary judgment.

Finally, the court notes that it need not even bother to quote the proffered portion of the "Death Spiral" manuscript as this document quite clearly contains the hearsay statement of what Gabel contends Player said to him. In any event, the court finds no value in this portion of the manuscript since absolutely no mention is made of Argus. Thus, this evidence fails to raise a genuine issue of material fact as to Argus' knowledge of the Player frauds.

The court therefore grants Argus' motion for partial summary judgment on the issue of its lack of knowledge of the Player frauds. GFC's RICO causes of action asserted against this defendant must therefore fall. Because the court declines to exercise its jurisdiction over GFC's remaining pendent claims, these state law claims must also be dismissed. Finally, the court also grants Argus' later motion for summary judgment on the same grounds stated above.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 67
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

### I. ZFNB's Motion for Summary Judgment

GFC alleges that ZFNB joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, ¶ 198. GFC further alleges that ZFNB aided and abetted the Player frauds in the Spring of 1984 by extending credit to Player with knowledge of his companies' insolvency and that the monies were being used for the Player frauds. Id., ¶ 200. GFC also claims that ZFNB participated and aided and abetted the Player frauds in the Fall of 1984 when it provided Player a fully secured loan in the amount of $3,850,000. Id.

ZFNB seeks summary judgment, among other reasons, because it contends that GFC has failed to put forth any evidence of the bank's knowledge of the Player frauds. GFC argues that ZFNB's knowledge of the Player frauds is found in the ""composite knowledge" of the following bank officers and employees: Hanson, Bennett, Van Winkle, Belliston, Swegle, Poulsen, Anderson, Stillings, Acord, and Hall. GFC's Response to Zions Defendants' Motions for Summary Judgment, 21. Because the court concludes that GFC has failed to raise a genuine issue of material fact as to ZFNB's knowledge of the Player frauds, the court will grant ZFNB's motion for summary judgment.

*99 Much of GFC's evidence has already been raised and analyzed by the court in relation to the other pending dispositive motions of Hanson, Argus, FI-Utah, and FSB. The court has already concluded that a reasonable trier of fact could not infer Hanson's knowledge of the Player frauds. Similarly, the court also concludes that the presence of the A&I audit somewhere within the files of this financial institution does not support a reasonable inference of actual knowledge of the Player frauds. The remainder of GFC's evidence relating to the other ZFNB officers and employees concerns the alleged regulatory and statutory violations previously dismissed by the court as insufficient to raise a reasonable inference of the requisite knowledge and intent under the RICO statutory scheme. The court therefore grants ZFNB's motion for summary judgment in its entirety.

### J. ZMC's Motion for Summary Judgment

GFC alleges that ZMC also joined in the Player frauds no later than 1979. GFC's Fourth Amended Complaint, ¶ 198. GFC further states that ZMC participated and aided and abetted the Player frauds in the Fall of 1984 when it provided Player a fully secured loan in the amount of $3,850,000. Id., ¶ 200. However, on August 30, 1988, the court granted ZMC's motion for partial summary judgment and dismissed GFC's federal and state racketeering claims, as well as GFC's common law fraud claim. See Court Order of 8/30/88, 2-3. The order was based on GFC's failure to produce evidence of ZMC having any culpable knowledge of the Player frauds. Because the court declines to exercise its pendent jurisdiction over GFC's remaining claims against ZMC, the court grants ZMC's pending motion for summary judgment and dismisses GFC's conversion, fraudulent conveyance, and constructive trust claims.

### K. Newbold's Motion for Summary Judgment

Newbold seeks summary judgment on a number of grounds, the most prominent of which is that he had no knowledge of the Player frauds. He therefore argues in his moving and reply papers that GFC has failed to put forth any evidence from which a trier of fact could reasonably infer such knowledge and intent. The court disagrees and need look no further than portions of Player's April 14, 1987 affidavit quoted above in relation to Hanson's motion for summary judgment. Player's Affidavit of 4/14/87, 31 (Mr. Timpson and Mr. Newbold pressured me to make payments on transactions where I had no obligation to do so"). Moreover, the court concludes that genuine issues of fact - as to Newbold's knowledge - are raised by Player's statements regarding alleged conversations and phone calls he had with both Newbold and Timpson on this same subject. In this regard, Player's deposition testimony is also sufficiently specific to raise these same questions of fact. See Player Deposition of 6/22/88, 6383:9-6384:19; Player Deposition of 8/23/88, 8817:3-22.

The court has also reviewed the other arguments presented in support of Newbold's motion and concludes that none of these legal or factual arguments warrants summary judgment in defendant's favor. With the exception of GFC's failed § 1962(a) claim, the court therefore denies Newbold's motion in its entirety.

### L. Timpson's Motion for Summary Judgment

*100 Timpson offers similar reasons in support of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 8 of 19

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 68

motion for summary judgment as Newbold, and the court reaches a similar result. Player's April 14, 1987 affidavit, as well as subsequent deposition testimony, see Player Deposition of 6/22/88, 6358:10-20; 6367:12-6369:12; 6386:4-22; 6387:2-17, raise genuine issues of material fact which preclude granting Timpson's motion for summary judgment. Therefore, with the exception of GFC's previously dismissed § 1962(a) claim, the court denies Timpson's motion in its entirety.

### M. ZLC's Motion for Summary Judgment

ZLC seeks summary judgment, inter alia, on the ground that GFC has put forth no evidence of its knowing participation in the Player frauds. The court disagrees. Consistent with the court's rationale for denying FSF's motion for summary judgment, the court concludes that its rulings regarding Timpson and Newbold's motions for summary judgment preclude granting ZLC's dispositive motion. The inferences regarding the knowledge of the officers of this relatively small company allow the court to impute this same knowledge to ZLC. Thus, with the exception of GFC's dismissed § 1962(a) cause of action, the court denies ZLC's motion in its entirety.

### N. Diumenti's Motion for Summary Judgment

GFC alleges that Diumenti and Lindsley participated in the Player frauds by, inter alia, authorizing the signing of and actually signing fraudulent opinion letters on phony equipment transactions. GFC's Fourth Amended Complaint, ¶ 204. According to Diumenti, "Plaintiffs' 'factual' presentation concerning Mr. Diumenti's alleged involvement in Player's equipment leasing frauds contains no admissible evidence demonstrating that Mr. Diumenti knowingly assisted in the frauds." Diumenti's Reply in Support of Motion for Summary Judgment, 113. The court disagrees. The Leyton, Bertrand, and Player evidence already quoted and discussed at length by the court raise numerous genuine issues of fact as to this material element of GFC's claims. The court need look no further at the present time. Moreover, because none of the legal arguments presented by Diumenti are persuasive grounds for summary judgment, the court denies this motion in its entirety.

### O. Lindsley's Motion for Summary Judgment

According to Lindsley, GFC's entire case centers around "two isolated instances." (1) Leyton's testimony regarding alleged telephone calls with Lindsley; and (2) Lindsley's signature affixed to opinions of counsel which were not submitted to GFC nor discovered by plaintiffs until after the filing of the pending lawsuit. See Lindsley's Motion for Summary Judgment, 3. Lindsley contends that neither portion of GFC's evidence would allow a reasonable trier of fact to infer Lindsley's knowledge of Player's frauds. The court disagrees and therefore denies Lindsley's motion.

The court has previously discussed the Leyton testimony as it relates to both Lindsley and his law partner Diumenti. Although these defendants argue against the "plausibility" of Leyton's testimony, a review of the evidence presented by GFC compels the court to conclude that this argument is not a proper basis for granting either the previous motion to strike or the pending motion for summary judgment. The court also finds that the five Lindsley letters further support an inference of Lindsley's knowledge of the Player frauds. Lindsley argues at some length that GFC could not have relied upon the Lindsley letters because they were not discovered until after the pending lawsuit was commenced. See id., 1314. While this may form the basis for a successful legal challenge on causation grounds as to these particular letters, the court understands this evidence to be offered to demonstrate Lindsley's knowledge and intent of the Player frauds. The court therefore concludes that genuine issues of material fact preclude granting Lindsley's motion for summary judgment.

*101 Lindsley also raises many of the legal arguments (pattern, enterprise, and causation) analyzed above by the court. None of these arguments warrant a grant of summary judgment as to any of the RICO or pendent claims asserted against Lindsley or the law firm of Diumenti & Lindsley. As to this latter defendant, the court notes that both sides cite provisions of the Uniform Partnership Act, Utah Code Ann. § § 48-1-1 to 1-40; Ariz. Rev. Stat. § § 29-201 to 244, to support their respective positions regarding the liability of the partnership for the alleged conduct of the two partners. Because a determination by the court of which alleged actions were within the scope of the partnership is dependent upon the same issues of fact discussed above, the court cannot grant this portion of the motion for summary judgment either.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 69
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

### P. Allred's Motion for Summary Judgment

According to Allred, GFC's best case scenario pursuant to its pleading and the discovery obtained in this action is as follows: (1) Allred became involved with Player in the RRI partnership after DMP&W was formed; (2) Allred, according to Player, was informed about the GFC equipment frauds; (3) Allred agreed thereafter to lend Player money to cover Player's companies' overdrafts; (4) Player bought out Allred interests in the RRI project because he feared what Allred knew about the GFC frauds; and (5) thereafter, Allred talked with Player about investing in various pieces of real estate in the Phoenix area, including the piece of property known as the Shea Boulevard transaction. See Allred's Reply in Support of Motion for Summary Judgment, 8-11. Allred then concludes that, assuming the above scenario is supported by admissible evidence, these facts "fall short of establishing any knowing joinder of the Allred Defendants with Sheldon Player in his fraud on Greyhound, much less in a RICO enterprise." Id., 12.

The court concludes that while Allred may be correct, this argument is more properly directed at the trier of fact. Numerous factual disputes do not allow the court to grant the motion for summary judgment. For example, GFC offers the testimony of Player regarding an alleged conversation between Allred and Player at the Club Cabana, a restaurant in Salt Lake City, to demonstrate Allred's knowledge of the Player frauds:

Q. And the one [conversation] at the Club Cabana, who was there?
A. Myself, Mr.Allred, and Mr. Diumenti.
Q. And what did each of you say?
A. Well, basically Mr. Diumenti had directed the conversation and he basically run over how the idea of leasing worked, which I had been involved in and basically inflating the equipment and the fact that it was a neat way to get money, which Mr. Allred related to because of prior conversations that I had had directly with Mr. Allred between he and myself concerning leases in effect, which he had done purportedly with a company or for a company or with a company that he had an ownership position in or represented to have. So it wasn't-it was very clear to him what was going on.
*102 Q. And what did Mr. Diumenti say about that?
A. You mean, Mr. Allred?
Q. Was it Mr. Allred? Was it just between you and Mr. Allred, or was this conversation between you and Mr. Allred and Mr. Diumenti?
A. This one I just described was between-or among the three of us.
Q. About the neat way to make money?
A. Yes.
Q. And sticking just with that conversation, that's at the Club Cabana?
A. Yes.
Q. And is that in 1983?
A. I believe that was '84.
Q. Can you relate it to events that were going on at the same time?
A. I believe it was prior to the events of the-well, certainly to the events of the buy out. Prior to the events of the buy out, other current events, I'm not clear?
Q. Okay. Just sticking with that Club Cabana meeting with the three of you, what did Mr. Allred say and what did Mr. Diumenti say?
A. Well, as I've testified, Mr. Diumenti pretty much was showing Mr. Allred how the thing worked and it was not something that-Mr. Allred didn't fall off a turnip truck. It was a very simple explanation. Mr. Allred had reiterated, as he had in prior conversations, that he understood from my financial statements that-you know, how I got money from lease companies.
And basically I would say that he-there's no question about the fact that it was pretty well understood how I got my money. Therefore, at least during the subsequent negotiations for the buy out there's no question about the fact that I felt, to a certain degree, that Mr.Allred was buying to a large degree of pressure to get the money he wanted."

Player Deposition of 6/23/88, 6646:22-6648:22. Several other portions of the Player deposition also raise issues of fact as to Allred's knowledge of, and participation in, the Player frauds. See Player Deposition of 4/3/88, 4156:11-21 & 4159:723; Player Deposition of 6/24/88, 6735:22-6736:15 & 6670:13-6673:5.

However, in his papers and at oral argument, Allred stressed that even if genuine issues of material fact exists as to the state of his knowledge, summary judgment was nonetheless appropriate. In support of this position, Allred pressed the legal arguments adopted by other defendants concerning causation and the technical requirements of RICO pleading. With one exception concerning AFIC, the court rejects all of these arguments.

It is undisputed that AFIC is alleged to have committed only one predicate act-a single act of receiving stolen property in the form of the lump sum which Allred directed Player to pay to AFIC in June

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 10 of 19

Not Reported in F.Supp.  
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)  
**(Cite as: Not Reported in F.Supp.)**

Page 70

1985. Thus, GFC's allegations as to AFIC are fatally defective on their face as to the § 1962(c) claim. GFC contends that it is not "accurate" to conclude that AFIC committed only one predicate act because "there is evidence that AFIC is the alter ego of Allred, and that Allred has used AFIC regularly as a vehicle for fraud; in particular, the secretion of fraudulent proceeds of the removal of assets from judgment creditors." GFC's Response to Allred's Motion for Summary Judgment, 14.

*103 The court rejects GFC's argument for two reasons. First, AFIC's motion for summary judgment is directed at GFC's current pleading before the court, plaintiffs' Fourth Amended Complaint. The pleading speaks for itself and alleges one predicate act against AFIC. Second, the court agrees with AFIC that under the alter ego doctrine, it is the business entity's existence that is disregarded by the court in order to reach the individual, not the other way around. GFC offers no citation in support of its theory and the court declines to adopt it.

The court therefore grants AFIC's motion for summary judgment as to plaintiffs' § 1962(c) cause of action. However, consistent with the court's earlier legal analysis, GFC's § 1962(d) claim asserted against AFIC is not necessarily defective as well. See Joseph, 781 F.2d at 554. In fact, the court concludes that genuine issues of material fact preclude summary judgment on this remaining RICO conspiracy claim since GFC has offered evidence from which a reasonable trier of fact could infer AFIC's agreement to participate in the affairs of the enterprise. The court also declines to grant summary judgment regarding the remaining pendent claims asserted against AFIC.

Q. Stoddard's Motion for Summary Judgment or for Writ of Replevin

GFC alleges that Stoddard aided and abetted the Player frauds by finding real estate and other investments for the monies which he knew had been fraudulently taken from GFC. GFC's Fourth Amended Complaint, ¶ 214. Stoddard filed a counterclaim alleging GFC's conversion of the 1,000 shares of Robotool stock which have been the subject of previous motions by Stoddard. Stoddard seeks summary judgment in his favor on both GFC's complaint and his counterclaim. The court concludes that genuine issues of fact preclude the granting of summary judgment on either pleading.

Stoddard seeks summary judgment on GFC's §§ 1962(c) & (d) causes of action. Unlike the other movants, Stoddard concedes that there is a material issue of fact as to his knowledge of the Player frauds upon GFC. Instead, he focuses upon when he allegedly learned of the frauds as well as the motive behind his subsequent actions:

According to Sheldon Player, after Stoddard learned that Player had defrauded Greyhound (there is a factual dispute about when Stoddard learned about the frauds) Stoddard had only one role in performing subsequent consulting services for Player: Stoddard was to manage existing investments over which Stoddard had some responsibility, and to find new investments that could be purchased refinanced and sold for a gain, for the single and express purpose of helping Player pay Plaintiffs back for what he had taken."

Stoddard's Motion for Summary Judgment and/or Writ of Replevin, 21-22.

However, a review of the pleading and brief in opposition to Stoddard's motion reveals that GFC asserts Stoddard's participation in "at least 34 counts of mail and wire fraud as well as the substantial assistance he lent to the pattern of racketeering." GFC's Response to Stoddard's Motion for Summary Judgment and/or Writ of Replevin, 3 (citing GFC's SOFs 64-73). Moreover, while Stoddard may contend that he was attempting to pay GFC back and is thus somehow immune to suit under RICO because of this motive, this is simply a jury argument. GFC contends that Stoddard's investments allowed Player to continue "lulling payments" to its victim. GFC thus argues that these investment efforts themselves constitute predicate acts of interstate transportation and receipt of property taken by fraud. Plaintiffs put forth evidence to support their claim that Stoddard urged Player to increase the drawdowns in the face of GFC's inspection efforts. GFC's SOF 82. While Stoddard contest those statements made by Player in his deposition, this simply raises an issue of fact for the jury to decide. The court must therefore deny this portion of Stoddard's motion for summary judgment."

*104 Stoddard also seeks summary judgment on his counterclaim. Essentially, Stoddard is suing over the 1,000 shares of Robotool stock he claims GFC converted. It is uncontested that the reason GFC controls the share certificate is because Stoddard sent it to GFC. However, the parties do dispute why Stoddard gave the certificate to GFC. GFC asserts that Stoddard gave it the stock without any promises on GFC's part and because it constituted partial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

restitution of GFC's property. Stoddard, of course, contends that he sent GFC the Robotool stock "in exchange for plaintiffs' concession that they would take care of the 'good guys'...." Court Order of 9/9/87, 35. This dispute is clearly material to the question of GFC's liability for Stoddard's counterclaim sounding in conversion. Thus, the court also cannot grant summary judgment on Stoddard's counterclaim.

### R. Vicki Roussin's Motion for Summary Judgment

GFC alleges that Vicki Roussin used the cash and credit provided by the various banks doing business with Player "to create the false impression that the Player entities enterprise was legitimate, sound and solvent, when in fact it was a sham business hopelessly insolvent, and to lull plaintiffs into a false sense of security that its representations could be relied upon and that its obligations would be honored and paid." GFC's Fourth Amended Complaint, ¶ 185. Among other evidence offered to defeat Vicki Roussin's motion for summary judgment are the following statements from Player:
4. With respect to the fraudulent NL Industries and Baker International lease transactions, both Michael and Vicki Roussin assisted in the execution of the fraud. They both assisted in the preparation of false documents which were submitted as part of the scheme. At times, Michael Roussin composed the text of documents which Vicki Roussin typed onto stationery with fake letterhead. They called me over to the condominium in which they lived at 7611 East Pleasant Run in Scottsdale where they saw me sign other people's names to these documents. Vicki Roussin personally delivered the documents to GLFC and picked up disbursement checks.
5. Also, in the Summer of 1984, Michael Roussin assumed control of a check-kiting scheme which was employed to provide cash in the absence of revenues from other sources. From our offices in Vernal, Utah, Michael Roussin used to call Vicki Roussin, who at that time worked for the P&W entities at an office in Salt Lake City, and coordinated with her the deposit of checks drawn on certain accounts in certain amounts to certain payees. She either filled in a blank check which I had already signed or else signed my name to a blank check. She then deposited the checks at a Salt Lake City bank on the same day as Michael Roussin deposited a corresponding check at a Vernal bank. Due to the 'float,' the P&W entities were able to utilize money that did not exist. I believe Vicki Roussin knew that the accounts were overdrawn because I told her as much."

*105 Player Affidavit of 2/12/86, ¶ ¶ 4-5.

Vicki Roussin does not dispute that she performed various functions for Player and Michael Roussin that may now be construed as acts in furtherance of the frauds perpetrated upon GFC. However, she contends that "there is absolutely no evidence that VICKI ROUSSIN, a high school graduate and a secretary, ever had knowledge that the acts she was performing upon request or instruction were fraudulent or in furtherance of a massive fraud perpetrated on Plaintiff." Vicki Roussin's Motion for Summary Judgment, 4.

The court concludes that genuine issues of material fact preclude summary judgment in favor of Vicki Roussin. Indeed, Vicki Roussin's arguments are rife with questions of fact. Regardless of whether Player's beliefs are admissible or inadmissible, the court finds that a reasonable juror is entitled to make similar inferences. For example, the following argument points out the flaw in this motion for summary judgment:
Plaintiffs rely on Sheldon Player's testimony that Vicki Roussin typed letters for him on fake letterhead. While this act in itself may not be speculation or surmise on the part of Sheldon Player, it most certainly is speculation or surmise that Vicki Roussin knew the corporations themselves were fake. Simply because she carried out her secretarial duties by typing letters on stationary of a corporation owned by Sheldon Player, it cannot be inferred that she was aware that the corporation was a fake. This is the very type of 'inference built upon an inference that the Supreme Court has expressly disallowed."

Vicki Roussin's Reply in Support of Motion to Strike Player Testimony, 1-2. The court disagrees with Vicki Roussin's conclusion. Put in terms of the pending motions for summary judgment, a reasonable juror could conclude that someone typing stationery containing a letterhead and signature line other than her employer's had knowledge of the fraudulent nature of her acts. In this instance, it is not affiant/deponent Player who is speculating. The uncontroverted, direct evidence speaks for itself and movant should direct her arguments regarding inferences at the trier of fact. The court therefore denies this motion for summary judgment.

### S. Michael Roussin's Motion for Summary Judgment

Michael Roussin appears pro se in this matter. The bases asserted in support of his motion for summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 12 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 72

judgment appear to be the following affirmative defenses: (1) unclean hands; (2) accord and satisfaction; and (3) fraud on the court. The court concludes that this motion must be denied in its entirety. Even if the court were to conclude that these three legal arguments are available to movant in this action, there exist genuine disputes of material fact which bar entry of summary judgment. As to movant's unclean hands theory, fact questions abound as he himself concedes that "[t]he conduct of the Plaintiffs in their business dealings with Player is questionable at best." Michael Roussin's Reply in Support of Motion for Summary Judgment and Dismissal, 3. Michael Roussin's accord and satisfaction defense is premised on the allegations that GFC entered into the July Purchase Agreement with knowledge that the equipment did not exist. GFC disputes this conclusory allegation. Finally, movant's fraud on the court arguments are based on the much contested assertion that GFC's counsel "have knowingly tampered with witness testimony for the purpose of falsely incriminating innocent parties in this matter." Id. at 4 (footnote omitted). The court therefore denies Michael Roussin's motion for summary judgment.

T. Mabey's Motion for Summary Judgment

*106 The central allegations in GFC's pleading leveled against Mabey concern the RRI loan, listed in the complaint as the "Hotel Financing Scheme." GFC alleges that in September of 1983, Mabey and others "fraudulently induced GLFC to advance approximately $2,350,000 in eight separate drawdowns between October 1983 and June 1984 to the partnership of Diumenti, Mabey, Player & Willyard ostensibly for the construction costs of a hotel in Riverdale, Utah, that became the Riverdale Rodeway Inn." GFC's Fourth Amended Complaint, ¶ 112. Specifically, Mabey and his partners Diumenti, Player, and Willyard are alleged to have misrepresented their individual equity contributions (each for $71,000) in the form of bogus documents to GLFC. Id., ¶ 116. Mabey is also alleged to have "provided GLFC with false and fraudulent photocopies of checks in the amounts of approximately $21,4000 and $2,000 purporting to represent other equity contributions of his to the partnership." Id.

Mabey's moving papers raise many of the legal arguments brought forth by the other defendants-lack of causation and lack of duty-as well as the factual argument that he lacked knowledge of the Player frauds. Moreover, in his reply memorandum and at oral argument Mabey concentrated his efforts on demonstrating to the court that no "bump" existed on the RRI loan transaction. See. e.g., Mabey's Reply in Support of Motion for Summary Judgment, 19 ("Plaintiffs have no evidence to prove a 'bump' and their claims respecting the RRI must be dismissed."). The court has already discussed and rejected Mabey's legal arguments concerning the sufficiency of GFC's pleading.

The court also concludes that numerous, genuine issues of material fact exist regarding Mabey's purported lack of knowledge of the Player frauds as well as the existence of the RRI "bump." As to Mabey's knowledge of the Player frauds, the court need go no further than Player's deposition testimony regarding alleged conversations between Mabey and Player:
Q. What did Mr. Mabey say?
A. Well, he expressed his-also his discontent over the whole situation and the fact that he felt exactly the same way pretty much, but then he also went off with about $700,000 too, because he felt like he'd stayed in a little longer. He had about three times as much coming which makes sense, I guess.
Q. And during these conversations what did Mr. Mabey say about the Greyhound frauds?
A. Well, basically I don't recall at that point in time the particular Greyhound frauds being mentioned, only that he was aware that I got-that I was getting plenty of money and he just basically wanted a bunch of money and to get lost.
Q. He knew in addition that you'd gotten the money and the-by the manner of committing frauds on Greyhound, correct?
A. I believe that, yes.
Q. And you believe that because you talked to him about that?
A. I did talk to him at certain points in time, yes.
*107 Q. And where did those conversations occur?
A. At least the initial conversation took place back in 1983 in Salt Lake City.
Q. Can you tell me where you were?
A. We'd gone to dinner at some restaurant and actually the conversation that, in fact, took place was not at the restaurant. As I remember, it was as we were walking down the street after having dinner, so it was-
Q. Who else was at the dinner?
A. Actually at that particular dinner Mr. Mabey had invited Mr. Diumenti's secretary, Cheryl Green, to have dinner with us, so she was at the dinner and then she left. We went for a walk, discussed that situation.
Q. Who did you go for-and was it you, Diumenti, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 73
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Mabey went for a walk?
A. No. Actually it was Mr. Mabey and myself.
Q. And what did you say when you went on the walk?
A. Well, that was at a time when we had, of course, made a couple of attempts at getting construction financing for the Riverdale Rodeway Inn and I disclosed to Mr. Mabey that there were other ways of getting the money if we couldn't come up with construction financing and basically discussed the method of obtaining lease money from basically bumping up leases and that we were in a position to do that and had done so because of having an equipment-being an equipment vendor.
Q. And did you tell him how you'd done that with Greyhound?
A. I believe not that conversation.
Q. In subsequent conversations?
A. In subsequent conversations.
Q. Now, did you explain to him how you went about that, how you went about getting the money from the lease company?
A. I went through pretty much the mechanics of the situation, because it-at a subsequent time in a conversation where Mr. Diumenti was-or Mr. Mabey was quite inquisitive as to the actual mechanics and details because he suggested- we hadn't been successful. We had been turned down, or at least had not been shown any interest per se by any financial institutions to fund the Riverdale Rodeway.
Mr. Mabey was getting quite discouraged and he made the suggestion, maybe its time to do one of these lease transactions so we can get going.
Q. And before I get to that later conversations you want to stick with this earlier one you were telling me about? When did that later conversation occur and who was present for that?
A. Mr-just Mr. Mabey and myself. As I recall, we were in his office in Bountiful. It was again about spring, late spring of '83, and we had contacted, as I said, a couple of different financial institutions. Mr. Mabey had contacted a couple of them quite without success and so he-he made the suggestion that we do that."
In actuality that's how the topic of Greyhound got started, because I had mentioned to him Greyhound and that we had some leases of that nature and that actually initiated my call to Mr. Mayne in Salt Lake City. And during the course of the call, which I know I've testified about this many times, I did learn that Greyhound did have a real estate entity or had started a real estate branch of Greyhound at least in Salt Lake. I at least thought I would run it by them to give it a try that way first.
*108 Q. And going back to the first conversation-the second conversation was a meeting somewhere in Salt Lake you said?
A. I believe that was Mr. Mabey's office."

Player Deposition of 6/23/88, 6598:17-6602:11.

The court also concludes that genuine issues of material fact exist regarding the RRI transaction and the parties' characterization of that project. Mabey as well as other defendants most notably Diumenti, insist that no "bump" occurred and that the entire project was legitimate. GFC disputes this claim and points to the disparity between the initial RRI figures adopted by the RRI partners and the eventual proceeds received from GFC. Mabey and others argue that the initial figures represent estimates only and that GFC fails to support its ""bump" allegations with specific figures. While Mabey's argument may be correct, it is better directed at the ultimate trier of fact. As was made clear at oral argument on these issues, Mabey and GFC differed on the total amount of any "bump" and not on the fact that such a discrepancy exists. Moreover, while GFC acknowledges that it received back its money on this project, according to plaintiffs this simply supports its theory that the larger NL and Baker frauds would not have taken place but for these "lulling" payments. While movant may deem this argument to be meritless, this too is reserved for resolution by the trier of fact.

The court has also carefully reviewed Mabey's arguments, similar to those asserted by other defendants, directed at GFC's pendent claims. Because genuine issues of material fact also exist as to these claims, revolving around the same disputed facts noted above, the court cannot grant this portion of Mabey's motion. The court therefore denies Mabey's motion for summary judgment.

### U. Hasan's Motion for Summary Judgment

GFC alleges that Hasan "encouraged the commission of, joined in and/or directed the October 1984 and January 1985 schemes to defraud GLFC, with knowledge [sic] that some of the other defendants had perpetrated the above-alleged schemes and had wrongfully diverted substantial monies of plaintiffs." GFC's Fourth Amended Complaint, ¶ 208. GFC also claims that Hasan aided and abetted the secreting of GFC monies and proceeds. Id., ¶ ¶ 208, 212, and 213.

Hasan appears pro se in this matter and seeks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 74
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

summary judgment because "plaintiffs have produced no evidentiary facts supporting any conclusion that 'Hasan', and 'Waxiss' had knowledge of any illegal or fraudulent activity committed or conducted by Sheldon Player or the alleged 'Player entities enterprise'." Hasan's Motion for Summary Judgment, 2. The court denies this motion because obvious issues of material fact make such an order impossible. The court will not waste the time of the parties by citing to all the evidence offered by GFC in opposition to Hasan's motion. Suffice it to say that contrary to Hasan's argument, the record in this action, as well as the record of the criminal proceeding which resulted in his conviction, demonstrate that he had knowledge of and participated in the frauds perpetrated against GFC. This motion as well as Hasan's motion to strike plaintiffs' response to the motion for summary judgment are therefore denied in their entirety."

VII. Conclusion

*109 Finally, the court expressly determines, pursuant to Fed.R. Civ.P. 54(b), there is no just reason for delay in the entry of judgment in this matter as to defendants Hanson, ZFNB, Argus, ZMC, FI-Utah, and FSB. The court reaches this conclusion for three reasons. First, the nature of the racketeering allegations leveled at these defendants, and the public effect these allegations may have had on them, makes this determination prudent. Second, the court notes that damage discovery and other pre-trial matters remains to be completed in this matter. Third, the voluminous nature of this litigation also counsels toward a swift resolution of the parties' respective positions. In all respects, the court determines that the entry of judgment as to these successful movants serves the interests of justice.

In a somewhat related vein, the court also notes that throughout this litigation several parties have alluded to future, collateral litigation seeking sanctions. The court concludes that no party shall be allowed to file any motion pursuant Fed. R. Civ. P. 11 until the conclusion of the remainder of the litigation now pending before this court. The parties are advised not to construe this procedural ruling as an indication by the court of the ultimate success of any such motion. The court expressly takes no position on this issue and this ruling is not intended to be an invitation to further motion practice in this regard. Rather, the court so holds in the hopes that the remainder of this litigation can be brought before the trier of fact in as swift a manner, and with as little rancor, as possible.

For all the foregoing reasons:

It Is Ordered denying defendants William H. Lindsley and Diumenti & Lindsley's motion (docket # 4700) to strike the testimony and affidavit of Jeffrey Leyton.

It Is Further Ordered denying defendant George S. Diumenti's motion (docket # 4700) to strike the testimony and affidavit of Jeffrey Leyton.

It Is Further Ordered denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4725) to strike the testimony and affidavit of Jeffrey Leyton.

It Is Further Ordered denying defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket # 4716) to strike the declaration of Robert H. Damm.

It Is Further Ordered denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4729) to strike the declaration of Robert H. Damm.

It Is Further Ordered denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket # 4731) to strike the declaration of Robert W. Bertrand.

It Is Further Ordered denying defendant First Interstate Bank of Utah, N. A.'s motion (docket #4657) to strike the declaration of Robert W. Bertrand

It Is Further Ordered denying defendant First Security Bank of Utah, N. A.'s motion (docket #4620) to strike the declaration of Robert W. Bertrand.

*110 It Is Further Ordered denying defendant George S. Diumenti's motions (docket ##4703 & 4810) to strike the declaration of Robert W. Bertrand.

It Is Further Ordered denying defendant William Gurr's motion (docket ##4694) to strike the declaration of Robert W. Bertrand.

It Is Further Ordered denying defendant Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4715a) to strike the declaration of Robert W. Bertrand.

It Is Further Ordered granting in part and denying in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 359-5   Filed 06/07/2007   Page 15 of 19

Not Reported in F.Supp.                                                    Page 75
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket #4728) to strike the declaration of Bruce H. Baum.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N. A.'s motion (docket #4610) to strike the declaration of Bruce H. Baum.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N. A.'s motion (docket #4621) to strike the declaration of Bruce H. Baum.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket #4705) to strike the declaration of Bruce H. Baum.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4718) to strike the declaration of Bruce H. Baum.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket #4726) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N. A.'s motion (docket #4608) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N. A.'s motion (docket #4605) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket #4706) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket ###4689) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4717) to strike the declaration of Robert M. Mathis.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket #4691) to strike the declaration of Robert M. Mathis.

*111 It Is Further Ordered granting plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s cross-motion (docket #4680) to amend responses to defendant First Interstate Bank of Utah, N. A.'s Seventh Set of Requests for Admissions.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant William Gurr's motion (docket #4628) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket #4732) to strike designated portions of the affidavits of William B. Watkins:

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N. A.'s motion (docket #4658) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N. A.'s motion (docket #4667) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket ###4636) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW    Document 359-5    Filed 06/07/2007    Page 16 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
(Cite as: Not Reported in F.Supp.)

Page 76

defendant Richard A. Christenson's motion (docket ##4714) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant Ronald S. Hanson's motion (docket #4134) to strike the affidavit of William B. Watkins.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket #4683) to strike designated portions of the affidavits of William B. Watkins.

It Is Further Ordered denying defendant First Interstate Bank of Utah, N. A.'s motion (docket #4626) to strike the affidavit of Gary A. Mathis.

It Is Further Ordered denying defendant First Security Bank of Utah, N. A.'s motion (docket #4635) to strike the affidavit of Gary A. Mathis.

It Is Further Ordered denying defendant William Gurr's motion (docket ##4654) to strike the affidavit of Gary A. Mathis.

It Is Further Ordered denying defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket #4733) to strike the affidavit of Gary A. Mathis.

It Is Further Ordered denying defendant Richard A. Christenson's motion (docket #4892) to strike the August 4, 1989 sworn statement of Sheldon Player.

*112 It Is Further Ordered denying defendant William Gurr's motions (docket ##4894 & 4909) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant First Interstate Bank of Utah, N. A.'s motion (docket #4861) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant First Security Bank of Utah, N. A.'s motion (docket #4866) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant George S. Diumenti's motion (docket #4882) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4897) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendants Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket #4899) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant William R. Stoddard's motion (docket #4918) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant First Security Financial's motion (docket #4880) to strike the August 4, 1989 sworn statement of Sheldon Player.

It Is Further Ordered denying defendant First Interstate Bank of Utah, N. A.'s oral motion of August 21, 1989, to strike plaintiffs' Greyhound Financial Corporation and Greycas, Inc.'s errata sheet for statement of facts in opposition to First Interstate Bank of Utah, N. A.'s motion for summary judgment (docket #4911).

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant Richard A. Christenson's motion (docket ##4672) to strike affidavit and deposition testimony of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, Vicki Roussin's motion (docket #4737) to strike the affidavits, deposition testimony, and sworn statements of Sheldon Player.

It Is Further Ordered denying defendant William Gurr's motion (docket ##4673) to strike designated portions of the pre-deposition statements of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred, Triangle Oil, Inc., and Allred Family Investment Company's motion (docket #4737) to strike various portions of Sheldon Player's deposition testimony and affidavits.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 77
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Interstate Bank of Utah, N. A.'s motion (docket #4629) to strike the April 14, 1987 affidavit and November 1, 1986 sworn statement of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Bank of Utah, N. A.'s motion (docket #4619) to strike certain deposition testimony of Sheldon Player.

*113 It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket ####4704) to strike deposition testimony, affidavits, and sworn statements of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket ####4640) to strike affidavit and deposition testimony of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4715) to strike the affidavits, deposition testimony, and sworn statements of Sheldon Player.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant Zions First National Bank, Zions Leasing Company, Argus Leasing Corporation, Zions Mortgage Company, Ronald S. Hanson, M. Scott Newbold, and Donald Timpson's motion (docket #4785) to strike the April 14, 1987 affidavit and November 1, 1986 sworn statement of Sheldon Player.

It Is Further Ordered granting defendant Ronald S. Hanson's motions (docket ##3900 & 4371) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Ronald S. Hanson.

It Is Further Ordered granting defendant Argus Leasing Corporation's motion (docket #4142) for partial summary judgment.

It Is Further Ordered granting defendant Argus Leasing Corporation's motion (docket #4361) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Argus Leasing Corporation.

It Is Further Ordered granting defendants Donald Timpson and M. Scott Newbold's motion (docket #4140) for partial summary judgment.

It Is Further Ordered granting plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s motion (docket #4087) re: Zions Defendants' Second Set of Requests for Admissions with Interrogatories.

It Is Further Ordered granting defendant First Interstate Bank of Utah, N. A.'s motion (docket #4412) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant First Interstate Bank of Utah, N. A.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant William Gurr's motion (docket #4343) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Eighth, Thirteenth, Fourteenth, and Fifteenth Claims for Relief against defendant William Gurr.

It Is Further Ordered granting defendant First Security Bank of Utah, N. A.'s motion (docket #4352) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant First Security Bank of Utah, N. A.

*114 It Is Further Ordered granting defendant Zions First National Bank's motion (docket #4354) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Zions First National Bank.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

Page 78

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant Zions Leasing Company's motion (docket ##4356) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant Zions Leasing Company.

It Is Further Ordered denying defendant Zions Mortgage Company's request for entry of order presented to the court on August 23, 1989.

It Is Further Ordered granting defendant Zions Mortgage Company's motion (docket #4365) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s complaint and action against defendant Zions Mortgage Company.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant M. Scott Newbold's motion (docket #4375) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant M. Scott Newbold.

It Is Further Ordered granting in part and denying in part, consistent with this memorandum, defendant Donald Timpson's motion (docket #4373) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Seventh Claim for Relief against defendant Donald Timpson.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant Richard A. Christenson's motion (docket ##4404) for summary judgment and for judgment on the pleadings.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Sixth Claim for Relief against defendant Richard A. Christenson.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant First Security Financial's motion (docket ###4348) for summary judgment and for judgment on the pleadings.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Sixth Claim for Relief against defendant First Security Financial.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendant George S. Diumenti's motion (docket #4389) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Third Claim for Relief against defendant George S. Diumenti.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants William H. Lindsley and Diumenti & Lindsley's motion (docket #4389) for summary judgment.

*115 It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Third Claim for Relief against defendants William H. Lindsley and Diumenti & Lindsley.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Douglas J. Allred and Triangle Oil, Inc.'s motion (docket #4475) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Ninth Claim for Relief against defendants Douglas J. Allred and Triangle Oil, Inc.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, Allred Family Investment Company's motion (docket ##4475) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Second and Ninth Claims for Relief against defendant Allred Family Investment Company.

It Is Further Ordered denying defendant William R. Stoddard's motion (docket #4347) for summary judgment or for a pre-judgment writ of replevin.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 79
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)
**(Cite as: Not Reported in F.Supp.)**

It Is Further Ordered denying defendant William R. Stoddard's motion (docket #4615) to strike and objection to evidence.

It Is Further Ordered denying defendant Vicki Roussin's motion (docket ##4339) for summary judgment.

It Is Further Ordered denying defendant Michael R. Roussin's motion (docket #4338) for summary judgment and dismissal.

It Is Further Ordered granting in part and denying in part, consistent with the above memorandum, defendants Thomas C. Mabey and The Consortium, Inc.'s motion (docket #4480) for summary judgment.

It Is Further Ordered dismissing plaintiffs Greyhound Financial Corporation and Greycas, Inc.'s Tenth Claim for Relief against defendants Thomas C. Mabey and The Consortium, Inc.

It Is Further Ordered denying defendant Syed A. Hasan's motion (docket ##3600) for summary judgment.

It Is Further Ordered denying defendant Syed A. Hasan's motion (docket ##4688) to strike plaintiffs' response to defendants' motions for summary judgment.

It Is Further Ordered denying defendant Syed A. Hasan's supplemental motion (docket #4440) to incorporate defendants' summary judgment motions.

It Is Further Ordered denying defendant Syed A. Hasan's motion (docket ##3601) to proceed in forma pauperis and for appointment of counsel.

It Is Further Ordered denying defendant Syed A. Hasan's request (docket ####3766) for photocopying by the Clerk of the Court.

It Is Further Ordered denying defendant Syed A. Hasan's motion (docket ##3632) to alter judgment.

It Is Further Ordered directing the Clerk of the Court to enter judgment in favor of First Interstate Bank of Utah, N. A., First Security Bank of Utah, N. A., Ronald S. Hanson, Zions First National Bank, Argus Leasing Corporation, and Zions Mortgage Company.

It Is Finally Ordered scheduling a status conference with the parties to discuss a final scheduling order for the remaining phases of this litigation (including, inter alia, the conclusion of damage discovery, preparation of a pre- trial order, and the trial of this matter) on February 2, 1990, at 9:30 a.m. in the Federal Courthouse, Salt Lake City, Utah. The parties are requested to submit to the court at least ten days prior to the status conference any matters they wish the court to address at this hearing. Thereafter, the court will send out an agenda for this status conference at least three days prior to the hearing.

D.Utah, 1989.
Greyhound Financial Corp. v. Willyard
Not Reported in F.Supp., 1989 WL 201094 (D.Utah)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.