Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

David Boies (admitted pro hac vice)
Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NOVELL, INC., a Delaware corporation, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S RESPONSE IN OPPOSITION TO NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE BASED ON FAILURE TO ESTABLISH SPECIAL DAMAGES** <br><br> **[REDACTED]** <br><br> **Civil No.: 2:04CV00139** <br><br> Judge Dale A. Kimball <br> Magistrate Brooke C. Wells |

RECEIVED CLERK

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

David Boies (admitted pro hac vice)
Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Devan V. Padmanabhan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131 DISTRICT OF UTAH
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, Plaintiff/Counterclaim-Defendant, vs. NOVELL, INC., a Delaware corporation, Defendant/Counterclaim-Plaintiff. | **SCO'S RESPONSE IN OPPOSITION TO NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE BASED ON FAILURE TO ESTABLISH SPECIAL DAMAGES** **FILED UNDER SEAL** **Civil No.: 2:04CV00139** Judge Dale A. Kimball Magistrate Brooke C. Wells |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................3

ARGUMENT.........................................................................................................................25

I.      SCO'S LOST PROFITS IN ITS SCOSOURCE LICENSING PROGRAM
CONSTITUTE SPECIAL DAMAGES.........................................................................25

      A.     Lost Profits Sought by SCO Are a Recognized Form of Special Damages. .........25

      B.     Novell's Wrongful Conduct Is a Direct and Immediate Cause of SCO's
Losses.................................................................................................................29

            1.    The "Substantial Factor Test" Applies to the Causation Element of
SCO's Claim..............................................................................................29

            2.    Evidence of Other Possible Causes Creates a Material Dispute of Fact
That Must Be Resolved in SCO's Favor....................................................33

      C.     The SCOSource Licensing Program Losses Claimed by SCO Are Realized
And Liquidated Losses. .....................................................................................34

III.     THE DECLINE IN SCO'S STOCK SUPPORTS SCO'S DAMAGES THEORIES,
BUT IS NOT CLAIMED AS A SEPARATE ELEMENT OF DAMAGES....................37

IV.     ATTORNEYS' FEES AND LITIGATION COSTS EXPENDED TO CLEAR SCO'S
TITLE ARE RECOVERABLE IN THIS ACTION .......................................................38

CONCLUSION......................................................................................................................41

20207 v1

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

Bansine v. Bodell,
   927 P.2d 675 (Utah App. 1996) ...............................................................................26

Basic Am., Inc. v. Shatila,
   992 P.2d 175 (Idaho 1999) ...................................................................................27

Bass v. Planned Mgmt. Servs.,
   761 P.2d 566 (Utah 1988) ...............................................................................29, 39

Bothmann v. Harrington,
   458 So. 2d 1163 (Fla. App. 3 Dist. 1984) .............................................................30

Childers v. Commerce Mortgage Investors,
   579 N.E. 2d 219 (Ohio Ct. App. 1989) ...........................................................31, 36

Collins v. Whitehead,
   34 F. 121 (D. Colo. 1888) ....................................................................................28

Computerized Thermal Imaging, Inc. v. Bloomberg,
   312 F.3d at 1300, 2001 U.S. Dist. LEXIS 24905 (D. Utah Mar. 28, 2001) .................37, 39, 40

Cox v. Thompson,
   254 P.2d 1047 (Utah 1953) ..................................................................................26

Devine v. Cook,
   279 P.2d 1073 (Utah 1955) ..................................................................................32

Dowse v. Doris Trust Co.,
   208 P.2d 956 (Utah 1949) ...............................................................................26, 39

Ezell v. Graves,
   807 S.W. 2d 700 (Tenn. Ct. App. 1991) ..............................................................27

First Sec. Bank of Utah, N.A. v. Banberry Crossing,
   780 P.2d 1253 (Utah 1989) ..................................................................................34

Fountain v. Mojo,
   687 P.2d 496 (Colo. Ct. App. 1984) ....................................................................31

Gillmor v. Cummings,
   904 P.2d 703 (Ut. Ct. App. 1995) ........................................................................39

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                           <u>Page</u>

<u>GKC Mich. Theaters, Inc. v. Grand Mall,</u>
    564 N.W.2d 117 (Mich. App. 1997)......................................................................30, 33

<u>G.O. Reaugh v. McCollum Exploration Co.,</u>
    163 S.W.2d 620, 622 (Tex. 1942)..............................................................................36

<u>Gould v. Mountain States Telephone & Telegraph Company,</u>
    309 P.2d 802 (Utah 1957).........................................................................................28

<u>Hall v. Blackham,</u>
    417 P.2d 664 (Utah 1966)..........................................................................................26

<u>Hicks v. McClain's Bldg. Materials, Inc.,</u>
    433. S.E. 2d 114, 192 (Ga. App. 1993)......................................................................40

<u>Hodges v. Gibson Products Co.,</u>
    811 P.2d 151 (Utah 1991)............................................................................................3

<u>Ideal Instruments, Inc. v. Rivard Instruments, Inc.,</u>
    434 F. Supp. 2d 598 (N.D. Iowa 2006).......................................................................25

<u>In re Cendant Corp. Sec. Litig,</u>
    109 F. Supp. 2d 235 (D.N.J. 2000) ............................................................................38

<u>Jensen v. Mountain States Telephone & Telegraph, Co.,</u>
    611 P.2d 363 (Utah 1980)...........................................................................................26

<u>Lee v. Washington Square Homeowners' Ass'n,</u>
    615 S.E. 2d 210, 212 (Ga. App. 2005).......................................................................39

<u>Macia v. Microsoft,</u>
    152 F. Supp. 2d 535, 542 (D. Vt. 2001)......................................................................34

<u>Marseilles Hydro Power, LLC. v. Marseilles Land & Water Co.,</u>
    No. 00 CV 1164, 2003 WL 259142 (N.D. Ill., Feb. 4, 2003)...............................36, 37

<u>McCorvery v. Utah State Dept. of Transp.,</u>
    868 P.2d 41 (Utah 1993)............................................................................................26

<u>Montgomery Props. Corp. v. Economy Forms Corp.,</u>
    305 N.W. 2d 470 (Iowa 1981) ............................................................................28, 31

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

Ostarly v. Johnson,
    700 S.W.2d 643, 644 (Tex. Ct. App. 1985) ............................................................................36

Patel v. Soriano,
    848 A.2d 803 (N.J. Super. App. Div. 2004) ......................................................................33

Penn Warranty Corp. v. DiGiovanni,
    810 N.Y.S.2d 807 (N.Y. Sup 2005)....................................................................................30

Reiman Assocs. v. R/A Advertising, Inc.,
    306 N.W.2d 292 (Wis. App. 1981)......................................................................................32

Robinson v. All Star Delivery, Inc.,
    992 P.2d 969 (Utah 1999)....................................................................................................26

Ruiz v. Varan,
    797 P.2d 267, 268 (N.M. 1990) ..........................................................................................34

Sannerud v. Brantz,
    879 P.2d 341, 345 (Wyo. 1994)..........................................................................................39

Shenefield v. Axtell,
    545 P.2d 876 (Ore. 1976)....................................................................................................26

Stoody Co. v. Royer,
    374 F.2d 672 (10th Cir. 1967) ............................................................................................31

Teilhaber Manufacturing Company v. Unarco Materials,
    791 P.2d 1164, 1167-68 (Colo. App. 1989)........................................................................25

Twin Disc, Inc. v. Big Bud Tractor, Inc.,
    772 F.2d 1329, 1336 (7th Cir. 1985) ..................................................................................32

TXO Production Corp. v. Alliance Resources Corp.,
    419 S.E.2d 870 (W. Va. 1992)............................................................................................39

U-Haul Int'l, Inc. v. Jartran, Inc.,
    601 F. Supp. 1140 (D. Ariz. 1984) ....................................................................................31

Valley Colour, Inc. v. Beuchert Builders, Inc.,
    944 P.2d 361 (Utah 1997)....................................................................................................36

## TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page**

Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.,
    136 A.D.2d 633 (N.Y.A.D. 2 Dept. 1988) ................................................................................30

The SCO Group, Inc. ("SCO") respectfully submits this Memorandum in support of its opposition to Novell Inc.'s ("Novell") Motion for Partial Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages.

## PRELIMINARY STATEMENT

Beginning on May 28, 2003, Novell embarked on a four-year campaign to cloud SCO's title to the UNIX copyrights and to claim that title for itself. Novell engaged in this conduct even though Novell had sold the UNIX business and copyrights for millions of dollars to SCO's predecessor years earlier – and even though the joint press release issued by the parties at the time, contemporaneous correspondence issued by Novell executives and other documentary evidence show that Novell knew at the time it had sold the copyrights. Novell's repeated and false claims of ownership were widely publicized and decimated SCO's SCOsource licensing business, costing SCO millions in lost profits as well as legal fees and costs incurred in seeking to clear its title.

Before it failed, the SCOsource division had offered licenses to Linux users as well as vendors of hardware and software. These licenses enabled companies to use Linux and to implement often expansive Linux strategies with the assurance that their programs and ongoing business would not be interrupted by litigation over Linux. The licenses sometimes also bundled expanded UnixWare source code rights with the right-to-use license. Ownership of the UNIX copyrights was essential to this licensing business because it was the copyrights that were being licensed.

Novell's slander impaired the vendibility of the SCOsource licenses, directly and immediately costing SCO millions of dollars of lost profits. Numerous potential customers

identified Novell's claims as a substantial reason for not purchasing a SCOsource license, and actual customers used Novell's claims as leverage to bargain lower prices. In addition to these customers, many potential licensees never contacted SCO at all because of Novell's false claims, or did not identify Novell even though they were deterred by Novell's false claims. These SCOSource profits have been irreparably lost, not deferred temporarily, as a result of Novell's longstanding campaign to undermine SCO's title to the copyrights.

Novell contends in its instant motion that SCO has failed to demonstrate that the "statement caused actual or special damages." However, lost profits and attorneys fees are recognized as special damages in a slander of title action. While slander of title does not allow for "presumed" damages, SCO's lost SCOsource profits and attorneys fees and costs are actual monetary losses, not presumed damages.

Novell, however, contends that the lost SCOsource profits are not the "direct and immediate" result of Novell's conduct, and are not "realized and liquidated." Both arguments fail. Novell here advances what is essentially a "metaphysical cause" test in which Novell would have SCO, the non-movant, prove beyond any possible doubt that Novell's wrongful conduct was the only force at play that had any impact on potential licensees, and that the SCOsource program has zero chance of revival after the title is cleared. This is not the proper standard, and no plaintiff could ever meet this standard. In fact, SCO need only show that Novell's claims were a "substantial factor" in the decisions by prospective licensees not to purchase SCOsource licenses, and that Novell's claims would have a residual impact on the SCOsource business, even after title is cleared. Novell has conceded potential licensees cited Novell's claim as their reason for declining a license. This evidence dooms Novell's motion for summary judgment.

Novell further contends that the attorneys' fees and costs SCO incurred in this slander of title action are not recoverable as special damages. This is contrary to Utah law. Utah has long recognized that fees and costs incurred in a slander of title action to clear title and undo harm constitute special damages.

In short, Novell misconstrues the "special damages" element of the slander of title cause of action and disregards record evidence that shows special damages. The special damages element requires that the damages be a "natural consequence of the injury caused." 06/09/2004 Memorandum Decision and Order (quoting Hodges v. Gibson Products Co., 811 P.2d 151, 162 (Utah 1991)). Because SCO has satisfied this standard, Novell's motion for summary judgment on special damages should be denied.

## BACKGROUND

### Santa Cruz's Acquisition of Novell's UNIX Business

1.    In early 1995, about two years after acquiring the UNIX and UnixWare business, Novell, Inc. ("Novell") decided to sell that business to focus on its flagship product Netware, cut costs, and increase shareholder values. (5/18/2007 James Decl. Ex. 10.)

2.    The Santa Cruz Operation ("Santa Cruz") decided to purchase the business. Santa Cruz had been founded in 1979 as a UNIX system porting and consulting company, and it was itself a UNIX licensee at this time. (5/18/2007 James Decl. Exs. 52, 17.)

3.    Through an Asset Purchase Agreement between Novell and Santa Cruz dated September 19, 1995 (the "APA"), and subsequent amendments, Santa Cruz acquired all right, title, and interest in and to the UNIX and UnixWare business, operating system, source code, license agreements, and copyrights, as well as the right to bring actions for infringement or other

3

violations relating to said assets (collectively, the "business" or the "UNIX and UnixWare
business"). (5/18/2007 James Decl. Ex. 5.)

4.    On or about May 7, 2001, The SCO Group, Inc. (Caldera International, Inc.)
("SCO") then acquired from Santa Cruz the same UNIX and UnixWare rights that Santa Cruz
had acquired from Novell.

5.    Santa Cruz, and then SCO, operated this business for over seven years without
any question being raised regarding the title to the UNIX copyrights.

**Novell's Slanderous Statements**

6.    On May 28, 2003, Novell issued a public letter claiming that Novell, not SCO,
owned the copyrights to the UNIX code. Novell stated:

> Importantly, and contrary to SCO's assertions, <u>SCO is not the
> owner of the UNIX copyrights</u>. Not only would a quick check of
> the U.S. Copyright Office records reveal this fact, but a review of
> the asset transfer agreement between Novell and SCO confirms it.
> To Novell's knowledge, the 1995 agreement governing SCO's
> purchase of UNIX from Novell <u>does not convey to SCO the
> associated copyrights</u>. We believe it unlikely that SCO can
> demonstrate that it has any ownership interest whatsoever in these
> copyrights.

(5/18/2007 James Decl. Ex. 36 (emphasis added).) This statement shattered the market's hitherto
unquestioned belief that SCO owned the UNIX copyrights.

7.    Mr. Messman admitted that, in publicizing its announcement that Novell, not
SCO, owned the UNIX copyrights, Novell was "trying to make the market aware of our side of
the story," and that Novell wanted its "position out as broadly as possible." (5/18/2007 James
Decl. Ex. 41 at 56:10-16 and 56:17-19.) He further admitted that Novell released the letter
regarding copyrights as a press release "so as many people as possible would read about it." (Id.

4

at 56:17-19.) Novell made these public statements without even taking minimal steps to verify them. (5/18/07 James Decl. Ex. 41 at 11:11-12:24, 50:4-20.)

      8.    Novell calculated the timing of its announcement to interfere with SCO's earnings announcement. The journalist Maureen O'Gara testified about her conversation with a high-level Novell executive (Chris Stone) the day before the announcement:

> Q. What did Mr. Stone tell you about Novell's public announcement in which it was going to assert its purported ownership of the UNIX copyrights?
>
> A. Well, he informed me of the substance of what this story is about, that they were going to, what's the right word, assert their ownership.
>
> Q. Did he say anything about the reasons why they were issuing that announcement on that date?
>
> A. Yes, he did.
>
> Q. And what did he say?
>
> A. He said they were doing it because SCO's earnings were that day.
>
> Q. And did he say anything about the effect, the intended effect of the announcement on that date?
>
> A. The reason that they were doing it, as I understood it, was to confound SCO's stock position.
>
> Q. When you say confound SCO's stock position, can you be a little more specific or can you clarify it in any way?
>
> A. Well, I think the object of the game was to throw a monkey wrench into the works.

(5/18/2007 James Decl. Exs. 66 at 11:11-12:7, 67 at 98:11-99:4.)

9.      On June 6, 2003, Novell appeared to retract its slanderous claims when SCO

directed Novell's attention to Amendment No. 2. In response to this document, Novell issued a

press release stating that Amendment No. 2 "appears to support SCO's claim that ownership of

certain copyrights for UNIX did transfer to SCO in 1996." (5/18/2007 James Decl. Ex. 38.)

10.      Novell's retraction was short-lived. Within weeks of its public acceptance of

Amendment No. 2, Novell reasserted its claim to copyright ownership. On June 26, 2003,

Novell notified SCO that:

> Upon closer scrutiny . . . Amendment No. 2 raises as many
> questions about copyright transfers as it answers. Indeed, what is
> most certainly *not* the case is that "any question of whether UNIX
> copyrights were transferred to SCO as part of the Asset Purchase
> Agreement was clarified in Amendment No. 2" (as SCO stated in
> its June 6 press release).

(5/18/2007 James Decl. Ex. 43 (emphasis in original).)

11.      In another letter to SCO, Novell responded to the announcement of SCO's

copyright registration by repeating its claim of copyright ownership, stating "SCO's claim to

ownership of any copyrights in UNIX technologies must be rejected, and ownership of such

rights instead remains with Novell." (5/18/2007 James Decl. Ex. 44.)

12.      In August or September 2003, Novell began direct discussions with SCO partners

and potential customers of the fact that it still contended that SCO was not the rightful owner of

the UNIX copyrights. (5/18/2007 James Decl. Ex. 81 at 8; Ex. 80 at 8; Ex.58 at 135:3-136:4.)

At that point, SCO was already constrained in its ability to reassure its existing and potential

customers regarding Novell's false claims of copyright ownership by virtue of Novell's June 26

and August 4 letters to SCO. (5/18/2007 James Decl. Ex. 81 at 7; Ex. 80 at 7.) Novell's

interaction with SCO's customers and partners further undermined SCO's position. (5/18/2007 James Decl. Ex. 81 at 8; Ex.80 at 8.)

13.    Moreover, in October 2003, Novell filed for and received UNIX copyright registrations – which Novell knew SCO owned and had already registered. In this process, Novell declared under oath to the U.S. Copyright Office "that it retains all or substantially all of the ownership of the copyrights in UNIX, including the U.S. Copyright Registration referenced above." (5/18/2007 James Decl. Ex. 46.)

14.    Novell then responded to SCO's ongoing sales efforts on December 22, 2003, by publicly reasserting its claim of ownership of the UNIX copyrights, publicizing that it had also applied for and received UNIX copyright registrations, and publishing its correspondence with SCO on the issue, purportedly to show that "SCO has been well aware that Novell continues to assert ownership of the UNIX copyrights." (5/18/2007 James Decl. Ex. 53.)

15.    On January 13, 2004, Novell announced that it would be offering a new indemnification program for qualifying Novell Linux enterprise customers. According to Novell, this new indemnification option would provide "a measure of protection against potential copyright infringement claims." (5/18/2007 James Decl. Ex. 45.) Novell also reiterated at this time that its copyright registrations confirmed that it retained ownership of UNIX copyrights. (Id.)

16.    On March 16, 2004, Novell's Vice President Chris Stone further expanded Novell's position to an audience of potential SCOsource customers when he addressed SCO in his keynote speech at the Open Source Business Conference, saying "You didn't invent Linux. Or intellectual property law. We still own UNIX." (5/18/2007 James Decl. Ex. 51.) This

7

plainly inaccurate statement was also widely reported in the IT press. (5/18/2007 James Decl. Exs. 55, 54.)

17.   Novell continues to assert that it owns the UNIX copyrights. Novell's slanderous claims therefore have been clouding SCO's title to the UNIX copyrights, and undermining SCO's business, for approximately four years.

**The SCOSource Licensing Program**

18.   SCO designed its SCOsource licensing program to protect its intellectual property and address the recognized market demand for the ability to use Linux without the risk of infringing SCO's intellectual property and risking litigation. SCO's customers specifically approached SCO and requested licenses that would enable them to use Linux without the risk of infringement. (5/18/2007 James Decl. Ex. 81 at 6; Ex.80 at 6.)

19.   SCO responded to this demand by offering several types of licenses. First, SCO offered a "library license" that gave customers the right to use SCO's UNIX libraries with Linux. These libraries enabled those customers who had already decided to transition from UNIX to Linux to use their existing UNIX applications with Linux. Second, SCO offered a "right-to-use license" that enabled customers to use SCO's intellectual property in Linux, that otherwise would have infringed SCO's copyrights, without the risk of legal action. Third, SCO offered flexible "vendor licenses" that enabled software and hardware vendors to obtain the right-to-use Linux, potentially bundled with expanded UnixWare source code rights. These licenses all offered companies substantial assurance that their Linux initiatives would not be interrupted by infringement litigation. (5/18/2007 James Decl. Ex. 81 at 4; Ex. 80 at 4.)

20.    SCO sent mailings to major companies and customers regarding Linux's infringement of SCO's intellectual property. For instance, in a mass mailing to Fortune 1000 companies, SCO explained that "Linux infringes on our UNIX intellectual property and other rights," and further reminded them: "Linux distributors do not warrant the legal integrity of the Linux code provided to customers. Therefore legal liability that may arise from the Linux development process may also rest with the end user." (Id.) (5/18/2007 James Decl. Ex. 42.) SCO sent a second mass mailing to commercial Linux and UNIX users expressing the commercial benefit of the SCOsource licensing program. The letters again advised that "use of the Linux operating system in a commercial setting violates our rights under the United States Copyright Act." (5/18/2007 James Decl. Ex. 47.) SCO indicated that "No one may use our copyrighted code except as authorized by us . . . Once you have reviewed our position, we will be happy to further discuss your options and work with you to remedy this problem." (Id.)

21.    · Ownership of the UNIX copyrights was essential to this business. If SCO's ownership of the copyrights was in question, customers would have little incentive to buy a license. (5/18/2007 James Decl. Ex. 71 at ¶¶ 7-9.)

**Impact of Novell's Slanderous Statements on SCO's Licensing Business**

22.    · Novell destroyed the SCOsource business. By the end of 2004, SCO was forced to dissolve is licensing program and release its salesforce. Without unquestioned title to the UNIX copyrights, the business could not survive.

23.    SCO CEO Darl McBride explained that Novell's actions ultimately led to the dissolution of the SCOsource program:

> I do remember that the Novell claims were what eventually got us to just shutter up the SCOsource licensing division for a number of

> years. It is still technically available on our web site. It has technically never really been closed. But in terms of going out and spending energy or cycles behind it, it just got to a point where there were so many problems of trying to get people to come to an understanding of where we were on this, given where Novell was coming from, that we basically said we've got to table this until we get through with our litigation with them.

(5/18/2007 James Decl. Ex. 61 at 219:14-220:1.) SCO Vice President of Marketing Jeff

Hunsaker agreed:

**REDACTED**

(5/18/2007

James Decl. Ex. 62 at 107:5-12.)

24.     Witnesses who were closest to the SCOsource program all agree that licensees were substantially deterred by Novell's false claims. For example, Chris Sontag, who headed up the SCOsource division, explained the reactions of potential licensees to Novell's statements:

> In discussions with potential licensees that I either had directly or for which I received copies of correspondence or write-ups of the discussion that occurred with other people such as the SCOsource sales people, I was aware of a number of situations and times where the person was right in front of me saying, "Well, there's questions about who even owns the copyrights so therefore I don't feel like I need to take a license for your SCO UNIX intellectual property or the right to use a license until that's resolved." And I would do my best to try and explain that I thought it was a baseless set of statements on the part of Novell. But in many cases, people I talked to would say, "Well, until it is resolved, I'm still not going to act upon this."

(5/18/2007 James Decl. Ex. 60 at 117:9-23).) He also testified more broadly about Novell's

impact on the SCOsource opportunity:

> [I]t started to become apparent in late 2003, early 2004, that we were getting highly impacted by Novell's statements that people could easily use as an excuse, the question on copyright ownership,

> as a reason why they would not need to take what I consider an insurance policy on IP protection. So that cloud that was created substantially impacted our licensing opportunity . . . .

(5/18/2007 James Decl. Ex. 60 at 114:19-115:21.)

25.    SCO General Counsel Ryan Tibbitts, who participated in some licensing meetings and communications with the SCOsource sales force, testified that when SCO was involved in the SCOsource program,        **REDACTED**

(5/18/2007 James Decl. Ex. 59 at 113:1-2.)

26.    Mr. Hunsaker similarly explained:                    **REDACTED**

(5/18/2007 James Decl. Ex. 62 at 162:12-163:2.)

27.    SCOsource salesperson Larry Gasparro confirmed that .          **REDACTED**

(5/18/2007 James Decl. Ex. 56 at 330:3-7.)  Mr. Hunsaker testified about

**REDACTED**

(5/18/2007 James

Decl. Ex. 62 at 233:4-8.)

11

28.    Similarly, SCOsource salesperson Phil Langer testified:

Q. Did there become a point in time when Novell raised a question
over the title to SCO's IP in Unix?

A. Yes.

Q. And then do you recall them making those pronouncements
publicly?

A. Yes.

Q. And did the fact that Novell made those public
pronouncements questioning SCO's ownership of Unix's IP
negatively impact your ability to sell licenses?

A. Yes.

(5/18/2007 James Decl. Ex. 58 at 126:24-127:9 (emphasis added).)  Langer further expounded:

Q. Do you know when Novell made this announcement that you
talked about with Mr. Samuels?

A. Novell first made the announcement, it was last year in 2003,
that they were questioning the claims of the Unix that I think we –
we came out with our amendment to.  They recanted.  And then
they came out later, I think it was like August 2003, that kind of
timeframe, they started leaking that they owned it.  And then once
the suit was filed it came to kind of a hole.  I mean, we were
always – We started to get a lot more once Novell started that they
owned and they can indemnify because they had Unix rights, were
making that public.  Then all the licensees. potential licensees
became very interested in. well, if you don't own it, we're not
going to buy a license from you, which really, you know, put a
hold to selling licenses.

(5/18/2007 James Decl. Ex. 58 at 135:3-136:4 (emphasis added).)  More succinctly, Langer

testified that "once the questioning of the ownership came out, the pipeline was killed."

(5/18/2007 James Decl. Ex. 58 at 137:14-15 (emphasis added).)

29.    In addition, numerous potential customers specifically mentioned the cloud on SCO's copyright ownership as a reason for not purchasing a SCOsource license.

30.

**REDACTED**

' (5/18/2007 James Decl. Ex. 48

(emphasis added).)

**REDACTED**

(5/18/2007 James Decl. Ex. 57 at 131:21-132:3 (emphasis added).)

31.    **REDACTED**

(5/18/2007 James Decl. Ex. 88 (emphasis added).)

32.

**REDACTED**

(5/18/2007 James Decl. Ex. 79 at SCO1783980.)

33.    **REDACTED**

(5/18/2007 James Decl. Ex. 49 (emphasis added).)

34.

## REDACTED

(5/18/2007 James Decl. Ex. 58 at 140:16-141:11 (emphasis added).)

35.          ## REDACTED

(5/18/2007 James Decl. Ex. 62 at 229:25-230:13.)

## REDACTED

(5/18/2007 James Decl. Ex. 62 at 230:19-231:3.)

**REDACTED**

(5/18/2007 James Decl. Ex. 60 at 120:3-7.)

(5/18/2007 James Decl.

Ex. 63 at 32:12-33:3; 37:7-40:2.)

36.

**REDACTED**

(5/18/2007 James Decl. Ex. 57 at 167:5-168:3 (emphasis added).)

37.                **REDACTED**

15

38.                    REDACTED


39.                    REDACTED


40.                    REDACTED

41.          **REDACTED**

Ex. 86.)

42.    The impact of Novell's claims was in reality far broader than reflected in written correspondence with licensees.  Predictably, only a small fraction of the customers actually influenced by Novell's widely publicized claims identified in writing that issue as a reason for not purchasing a license.  Mr. Sontag testified: "I actually wouldn't expect a large amount of written correspondence and documentation.  It was mostly oral communications with those customers and amongst ourselves." (5/18/2007 James Decl. Ex. 64 at 103:12-14.)  Furthermore, given the obvious threshold problem created by Novell's claims, many other customers would have been impacted who are unknown to SCO because they simply declined to follow up with SCO because they perceived that Novell's claims absolved their risk.  (5/18/2007 James Decl. Ex. 71 ¶¶ 6-10.)  For instance, Mr. Sontag testified:

> Q.  Of those [letters] that you – that were properly addressed, meaning to existing companies, existing licensees, what was the response rate on the compliance license letter?  And by "response rate" I mean actually reporting back to SCO substantively on the licensees' view of its compliance with the agreement.
>
> * * *
>
> A.  I don't remember the specific number, but I believe it was fairly low.  On the order of 1 to 2 percent.
>
> Q.  Is it your view that Novell's ownership claim had anything to do with the low response rate to the license compliance letter?
>
> A.  Yes, I believe it did.
>
> Q.  And what is that based on?

17

A. I believe we did have conversations with a number of companies in terms of follow-ups, and on a number of those occasions they referenced Novell as being one of the reasons why they chose not to respond, because there was issues related to ownership on the copyrights and they viewed the whole thing was embroiled in litigation so therefore, until that was all resolved, that they could ignore the request.

(5/18/2007 James Decl. Ex. 64 at 73:3-74:2.)

43.                         **REDACTED**

(5/18/2007 James Decl. Ex. 64 at 74:3-17.)

44.

**REDACTED**

(5/18/2007 James Decl. Ex. 62 at

229:8-13.)

18

**REDACTED**

**REDACTED**

e.

**REDACTED**

45.

46.     In addition to the multiple licensing deals that were never consummated as a

substantial result of Novell's false claims, SCO was also forced to ask for and accept lower

prices than it would have had there not been a cloud over its title.  Customers used the cloud over

SCO's title as bargaining leverage in their negotiations with SCO.  Mr. Sontag testified:

> Q . . . . Did any of the companies that actually took SCOsource
> licenses tell you that the reason they were only willing to pay a
> lower price than you would  have wished SCOsource to have
> brought to SCO was the existence of the Novell claim of
> ownership?
>
> MR. NORMAND:  Objection to form.
>
> A. Just about universally all the companies that we negotiated
> SCOsource licensing deals, in part of the negotiations would

20

mention the uncertainty, Novell's statements, as part of the reason why they wanted a better price.

Q. When you say "the uncertainty, Novell's statements," what kind of uncertainties were they referring to?

A. Well, primarily that Novell was making claims to the copyrights, which would be important to any rights granted or agreements made for intellectual property protection. So if there was an issue outstanding with Novell, that could cloud their need or the legitimacy of their license.

(5/18/2007 James Decl. Ex. 64 at 90:23-93:18.)

47.    The impact of Novell's announcement on the perceptions of Linux users is evident from the behavior of SCO's stock from the day of the initial Novell announcement. SCO expert Professor Christine Botosan, an accounting and financial expert and professor at the University of Utah, shows

REDACTED

SCO's Resulting Damages

48.    Professor Botosan examined the impact of Novell's wrongful conduct on SCO and concluded

She states:

REDACTED

21

REDACTED

(5/18/2007 James Decl. Ex. 87 ¶ 6.)

49.    SCO expert Professor Gary Pisano of Harvard University, a specialist in this industry, also examined the impact of Novell's wrongful conduct.  Dr. Pisano concluded that Novell's conduct        **REDACTED**

Professor Pisano

states:

REDACTED

(5/18/2007 James Decl. Ex. 71 ¶¶ 6, 7.)

50.    Professor Pisano further stated:

REDACTED

(5/18/2007 James Decl. Ex. 71 at ¶ 10.)

51.    Furthermore, Professor Pisano concluded that

REDACTED

**REDACTED**

52.    In addition to SCO's lost profits, SCO has incurred substantial attorneys' fees and costs to try to clear its title in this litigation and undo the harm caused by the slander. This is confirmed by Paul Moxley, whose extensive qualifications are set forth in his declaration. Specifically, Mr. Moxley concludes:

**REDACTED**

(5/18/2007 James Decl. Ex. 72 at 8.)

## ARGUMENT[1]

### I.    SCO'S LOST PROFITS IN ITS SCOSOURCE LICENSING PROGRAM CONSTITUTE SPECIAL DAMAGES.

#### A.    Lost Profits Sought by SCO Are a Recognized Form of Special Damages.

It is well established that lost profits are recoverable as special damages in a slander of title action. This Court recognized at the motion to dismiss stage that the harm alleged by SCO to its SCOsource licensing program "is a natural consequence of the alleged cloud of ownership and customer confusion and would amount to a realized pecuniary loss" under the claim.[2] (6/9/2004 Memorandum Decision and Order at p. 18, DE #29. Furthermore, while Novell fixates on identification of specific customers, "special damages" do not require the name and address of each and every lost customer. This Court recognized that once SCO shows that "there, in fact, has been a realized pecuniary loss as a result of Novell's statements," a showing of "a specific identification of customers may be impossible." (6/9/2004 Memorandum Decision and Order at p. 19, DE #29.

Utah's law is consistent with other jurisdictions and with the Restatement (Second) of Torts. For example, in Teilhaber Manufacturing Company v. Unarco Materials, 791 P.2d 1164, 1167-68 (Colo. App. 1989), the court recognized that identification of particular purchasers was "obviously impossible" where the slander was widely disseminated, and thus, held that "the plaintiff is required to be particular only if it is reasonable to expect him to be so." Id. at 1167-68; see also Ideal Instruments, Inc. v. Rivard Instruments, Inc., 434 F. Supp. 2d 598 (N.D. Iowa

---

[1] The facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing Statement of Facts.

[2] These damages were then alleged by SCO at oral argument and later in its amended complaint.

2006) (recognizing that loss of business, loss of current and/or potential customers, and loss of economic gain are special damages recoverable under the similar trade libel/product disparagement cause of action); cf. Shenefield v. Axtell, 545 P.2d 876, 878 n.3 (Ore. 1976) (reversing the dismissal of a slander of title action and holding that the plaintiff's allegations of special damages were sufficient even though the plaintiff did not specifically identify a single potential buyer lost on account of the slander).

Similarly, the Restatement (Second) of Torts § 633 provides that "pecuniary loss" is "the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement." Id. (emphasis added). The Restatement further explains that, where special damages are required, the pecuniary loss "may be established by . . . proof that the loss has resulted from the conduct of a number of persons [e.g., lost customers] whom it is impossible to identify." Id. The Restatement then sets forth the specific types of damages contemplated as recoverable under a slander of title: (1) loss caused by prevention of a particular sale; (2) loss caused by deprivation of opportunity to sell to a particular purchaser; (3) loss resulting from diminution in price; and (4) loss caused by prevention of sales to unknown purchasers. Id. (comments c, d, e, and g, respectively). Utah law follows the Restatement in this area.[3]

---

[3] Utah courts have adopted the Restatement's substantial factor test as the standard for causation generally, expressly applying the following sections of the Restatement: § 431, McCorvery v. Utah State Dept. of Transp., 868 P.2d 41, 45 n.10 (Utah 1993); Hall v. Blackham, 417 P.2d 664, 667 n.6 (Utah 1966); § 433A, Robinson v. All Star Delivery, Inc., 992 P.2d 969, 972-73 (Utah 1999); § 442B, Bansine v. Bodell, 927 P.2d 675, 677-78 (Utah App. 1996); § 447, Jensen v. Mountain States Telephone & Telegraph. Co., 611 P.2d 363, 365 (Utah 1980); and § 465, Cox v. Thompson, 254 P.2d 1047, 1051-52 (Utah 1953). Furthermore, the Utah Supreme Court has relied on Section 633 of the Restatement in holding that attorneys' fees and litigation costs incurred in a slander of title suit are recoverable special damages. See Dowse v. Doris Trust Co., 208 P.2d 956 (Utah 1949).

SCO has adduced evidence of these types of losses set forth in the Restatement and recognized in caselaw. First, SCO has provided evidence that at least the following customers specifically mentioned Novell's false claims when declining a SCOsource license:

## REDACTED

Third, SCO has provided evidence that Novell's claims prevented sales to unknown purchasers. (¶ 42.) SCO's experts have analyzed and confirmed SCO's losses.[4] (¶¶ 47-51.) These losses are plainly recognized forms of special damages.

Novell has essentially conceded that special damages of some amount exist by pointing to record evidence of specific customers that declined a SCOsource license because of Novell's claims. Novell acknowledges (at 22) that "SCO witnesses have testified that potential licensees cited Novell's claim and the need to resolve them as reasons there was no need to negotiate a license." Novell also admitted (at 23) that "a handful of documents ... mention Novell in the context of declining a SCOsource License." This evidence must be construed in SCO's favor, and it alone dooms Novell's motion for summary judgment.

There is no minimum amount of damages necessary to satisfy the special damages requirement: when damages of _any_ amount are caused by the loss, the damages can constitute special damages. This Court has recognized that, once SCO shows that "there, in fact, has been

---

[4] SCO may satisfy its burden of demonstrating the amount of loss through expert testimony, which is sufficient evidence for calculating an award of damages. See Basic Am., Inc. v. Shatila, 992 P.2d 175, 194 (Idaho 1999); see also Ezell v. Graves, 807 S.W.2d 700, 702 (Ct. App. Tenn. 1991) (reversing grant of summary judgment and finding plaintiffs had satisfied their burden of proof by presenting opinion testimony that value of property had decreased as a result of defendant's statement, notwithstanding absence of proof that plaintiffs even intended to sell the slandered property).

a realized pecuniary loss as a result of Novell's statements" a showing of "a specific amount of damages is not necessary." (6/9/2004 Memorandum Decision and Order at 18, DE #29.)[5] The rule has long been recognized in slander of title claims. In Collins v. Whitehead, 34 F. 121, 123 (D. Colo. 1888), the court upheld a special damage jury award on a slander of title claim despite the absence of specific proof of the amount of the loss. The court observed that the jury, having found that the defendant's wrongful conduct hindered the plaintiff's ability to sell his property, "could return damages as to them seemed just." Id. The court explained:

> Certainly one who wantonly puts on record such a paper, apparently with the intent to compel the owner of the property to come to terms with him, ought not to have refuge in the technicalities of the weakness of the law. The injury to plaintiff was real, however difficult the proof of it may be. He was compelled to bring suit to remove the cloud from his title, and, for the time, his property was useless to him.

Id. (emphasis added); see also Montgomery Props. Corp. v. Economy Forms Corp., 305 N.W. 2d 470, 478 (Iowa 1981) ("If uncertainty lies only in the amount of damages, recovery may be had if there is a reasonable basis in the evidence from which the amount can be inferred or approximated.").[6]

The cases cited by Novell on this point are not to the contrary. They stand for the proposition that damages in a slander of title action must be actual losses suffered by the plaintiff, and may not be presumed (as in defamation of reputation case where actual damages

---

[5] This rule was adopted by the Utah Supreme Court in Gould v. Mountain States Telephone & Telegraph Company, 309 P.2d 802, 805 (Utah 1957) (holding in a breach of contract action that "where the fact of substantial damage is shown, the court or jury cannot award nominal damages only on the ground that the amount of substantial damage has not been shown with reasonable certainty").

[6] Because SCO is not seeking lost sales for one hundred percent of the infringing Linux users, SCO's damages theory is consistent with evidence, offered by Novell, that factors other than Novell may have caused some licensees not to purchase a license, but others potential customers declined a license in substantial part because of Novell's claims.

need not be proven).  See, e.g., Bass v. Planned Mgmt. Servs., 761 P.2d 566, 568 (Utah 1988).[7]

SCO is not seeking the recovery of any "presumed" damages.  The losses to SCO's licensing

program (as well as the attorneys' fees and costs SCO has incurred to clear its title) are real and

have been proven.

    B.    Novell's Wrongful Conduct Is a Direct and
           Immediate Cause of SCO's Losses.

    SCO has met its burden of establishing that the losses sought by SCO "resulted from"

Novell's statements.  Novell advances what is essentially a "metaphysical" or "philosophical"

cause test in which Novell would have SCO, the non-movant, prove beyond any possible doubt

that Novell's wrongful conduct was the only force at play that had any conceivable impact on

potential licensees.  This is not the standard.  SCO need only show that Novell's slander was a

"substantial factor" in bringing about the losses claimed by SCO – not the "metaphysical" or

"philosophical" cause.  Novell's evidence of other possible causes for SCO's losses creates a

material dispute of fact, between that evidence and SCO's contrary evidence, which must be

construed in SCO's favor and does not entitle Novell to summary judgment.

    1.    The "Substantial Factor Test" Applies to
           the Causation Element of SCO's Claim.

    The Restatement (Second) of Torts, § 632, provides that the "publication of an injurious

falsehood is a legal cause of pecuniary loss if . . . it is a substantial factor in bringing about the

---

[7] In Bass v. Planned Management Services, Inc., 761 P.2d 566, 568 (Utah 1981), the court explained the difference between a slander of title claim and a slander or defamation claim as they relate to damages. The court recognized that the tort of slander of title is "based on an intentional interference with economic relations. They are not personal torts; unlike slander of the person, they do not protect a person's reputation." Id.  The court further explained that "[s]lander of title actions are based only on palpable economic injury and require a plaintiff to prove special damages, whereas injury to personal reputation may be based on both tangible and intangible losses and give rise to presumed and general damages. There are no general or presumed damages in slander of title actions." Id.

loss" (emphasis added.)  The Restatement has defined "substantial factor" in the context of a slander of title action:

> In order for the false statement to be a substantial factor in determining the conduct of an intending or potential purchaser or lessee, it is not necessary that the conduct should be determined exclusively or even predominantly by the publication of the statement.  It is enough that the disparagement is a factor in determining his decision, even though he is influenced by other factors without which he would not decide to act as he does.  Thus many considerations may combine to make an intending purchaser decide to break a contract or to withdraw or refrain from making an offer.  If, however, the publication of the disparaging matter is one of the considerations that has substantial weight, the publication of the disparaging matter is a substantial factor in preventing the sale and thus bringing financial loss upon the owner of the thing in question.

Id. (emphasis added).

Consistent with the Restatement, courts across the country have adopted and applied the "substantial factor" test in actions requiring special damages.  See, e.g., Penn Warranty Corp. v. DiGiovanni, 810 N.Y.S.2d 807, 813 (N.Y. Sup. 2005) (holding that trade libel plaintiff must establish "that the publication of the false material was a substantial factor in inducing others not to have business dealings with it"); GKC Mich. Theaters, Inc. v. Grand Mall, 564 N.W.2d 117, 120 (Mich. App. 1997) (noting that "Courts in other states have adopted this 'substantial-factor' test for determining causation in slander of title claims" and adopting that test); Bothmann v. Harrington, 458 So. 2d 1163, 1170 (Fla. App. 3 Dist. 1984) ("[T]he special damages pled must have been foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses."); Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C., 136 A.D.2d 633, 634 (N.Y.A.D. 2 Dept. 1988) ("The communication must play a material and substantial part in inducing others not to deal with the

plaintiff, with the result that special damages, in the form of lost dealings, are incurred."); see also, Montgomery Props. Corp. v. Economy Forms Corp., 305 N.W.2d 470, 477 (Iowa 1981) (affirming jury instruction modeled from § 632); Fountain v. Mojo, 687 P.2d 496 (Colo. Ct. App. 1984) (quoting § 632 and upholding award of attorneys' fees as special damages). Utah has adopted the Restatement's substantial factor test as the standard for causation generally and has also adopted the Restatement's position applicable to slander of title.[8] The "substantial factor" test therefore should be applied to the causation element of SCO's claim.[9]

Faced with unrefuted record evidence of licensees declining SCOsource licenses because of Novell's claims, there can be no serious dispute that SCO has satisfied the causation element under the "substantial factor" standard. Therefore, Novell posits (at 25) that comment (h) of Restatement § 633 revokes the "substantial factor" test and applies a higher standard to claims for lost profits from unidentified customers. To the contrary, the Restatement gives no indication that language in comment (h) regarding eliminating "other causes" is meant to set forth a new causation standard, different from the "substantial factor" test. Nor has a different or heightened standard generally been applied by courts where the claimed losses are from unidentified customers. For instance, in U-Haul Int'l, Inc. v. Jartran, Inc., 601 F. Supp. 1140 (D. Ariz. 1984) (rev'd in part on other grounds), the court applied the substantial factor test to the causation element of a disparagement claim, while noting that the plaintiff was not obligated to identify

---

[8]  See authority cited supra, note 3.

[9]  Indeed, Novell relied in its memorandum on cases which adhered to the substantial factor test or relied on the Restatement section in which the test is adopted. See, e.g., Childers v. Commerce Mortgage Investors, 579 N.E.2d 219 (Ohio Ct. App. 1989) (upholding award of attorneys' fees incurred, but remanding for determination of losses suffered in which defendant's slander "was a substantial factor in cause in the loss"); Stoody Co. v. Royer, 374 F.2d 672 (10th Cir. 1967) (quoting Restatement of Torts §§ 624, 626-27, and 633 for guidance in slander of title action).

specific lost customers. Id. at 1150 ("The causation element of a disparagement claim is met where the evidence establishes that the disparaging statements were a <u>substantial factor</u> in causing pecuniary loss. <u>Plaintiff need not prove loss of specific customers.</u>") (emphasis added). While other possible causes should be considered by the factfinder, as suggested in the Restatement, they should be considered within the framework of the "substantial factor" standard; they do not preclude recovery all together.[10]

Furthermore, comment (h) of the Restatement explains that proof of lost sales from unidentified customers in a slander of title action is "analogous" to proof of lost sales that result from other torts or breach of contract. These causes of action do not impose the heightened causation standard that Novell suggests applies to SCO's claim. <u>See, e.g.,</u> <u>Twin Disc, Inc. v. Big Bud Tractor, Inc,</u> 772 F.2d 1329, 1336 (7th Cir. 1985) (affirming jury award of $1.1 million in damages, upon evidence that plaintiff "suffered some lost sales," and evidence that defendant's conduct was "a substantial factor in causing those lost sales despite the evidence that other factors may have also contributed to or exacerbated [plaintiff's] problems"); <u>Reiman Assocs. v. R/A Advertising, Inc.,</u> 306 N.W.2d 292, 300 (Wis. App. 1981) (affirming jury instruction that requiring that defendant's conduct have been a "substantial factor" in plaintiff's damages, and affirming award of award for future lost profits).

---

[10] The Utah Supreme Court has rejected the type of "philosophical cause" test that Novell suggests. In <u>Devine v. Cook,</u> 279 P.2d 1073 (Utah 1955), [T]he court held that a defendant's conduct is a "substantial" factor where it "has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the proper sense in which there always lurks the idea of responsibility, <u>rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred.</u>" Id. at 1080 (emphasis added).

2.    Evidence of Other Possible Causes Creates a Material
Dispute of Fact That Must Be Resolved in SCO's Favor.

Even under the heightened (and inapplicable) standard proposed by Novell, Novell is not entitled to summary judgment on the inherently factual issue of causation. Evidence regarding more than one potential cause in the market, such as that cited by Novell, creates a material factual dispute between that evidence and SCO's contrary evidence; it does not entitle the defendant to summary judgment.

The decision in Patel v. Soriano, 848 A.2d 803, 839 (N.J. Super. App. Div. 2004), is instructive. While the defendant presented evidence of other possible factors impacting the plaintiff's losses, the court held that factfinder properly weighed that evidence and determined the plaintiff's damages. The court thus sustained the damages award for lost patient referrals over a two-year period, reasoning:

> Plaintiff received virtually no referrals from any doctor at IGH once he obtained his privileges, which plaintiff claimed was because every major player at the hospital was on the MEC and heard the defamatory statements uttered about him by defendant on July 13, 1995. While defendant noted that many factors went into a doctor's referral decision, that his own referrals came from many sources, and that it took a long time for a surgeon to build up a reputation at any particular institution, the judge properly awarded plaintiff damages for his lost IGH referrals based on the evidence presented.

Id. at 839 (emphasis added). Similarly, in GKC Michigan Theaters, 564 N.W.2d at 121, the court determined that a factual dispute precluded summary judgment on the question of causation because the factfinder had to assess the relative weight of the reasons for the delay; the court held that:

> there were issues of material fact regarding whether the filing of the invalid notice of termination was a substantial factor in the

33

purchaser's decision to delay the sale of the property. <u>The factfinder must assess the relative weight of all the reasons for delay</u> and determine whether the notice of termination was a substantial factor in the purchaser's decision to delay the closing.

<u>Id.</u> at 121 (emphasis added).

The cases cited by Novell do not contradict this authority. <u>See. e.g., Macia v. Microsoft,</u> 152 F. Supp. 2d 535, 542 (D. Vt. 2001) (denying motion to dismiss because special damages was adequately pled, and simply noting that it might be difficult "to prove damages to the <u>trier of fact</u>") (emphasis added); <u>First Sec. Bank of Utah, N.A. v. Banberry Crossing,</u> 780 P.2d 1253, 1257-58 (Utah 1989) (affirming appeal from directed verdict, and simply holding that "reason for the losses was never sufficiently established" without discussing evidence that was presented on causation); <u>Ruiz v. Varan,</u> 797 P.2d 267, 268 (N.M. 1990) (affirming decision in a <u>bench trial</u> in which judge, weighing the evidence, determined the plaintiff had failed to offer any evidence of the fact of injury).

C.    The SCOSource Licensing Program Losses Claimed by SCO Are Realized And Liquidated Losses.

The SCOsource division's lost sales constitute realized and liquidated losses. Novell argues (at 25) that SCO's losses do not constitute special damages because they are not "realized or liquidated," and (at 29) that SCO is seeking a double recovery. In support of these assertions, Novell posits (at 26 and 28) that potential licensees who identified Novell's claim in declining to take a license stated that they will "revisit" the license if the intellectual property issues are resolved. Therefore, Novell concludes, all of SCO's losses were delayed and not lost, and SCO did not suffer any special damages. This argument is flawed both legally and factually.

34

Novell wrongly places all the burden of mitigation, as well as the risk that mitigation would not succeed, on SCO's shoulders by assuming that former potential customers may yet buy a license from SCO. Essentially, Novell would have disputed facts construed in its favor. This is like a tortfeasor who intentionally injured someone saying that he does not have to pay damages because the paralyzed victim <u>might</u> walk again someday. It is for a jury to decide whether the SCOsource program will "walk again." Moreover, Novell steadfastly ignores the residual impact of Novell's four-year slander campaign against SCO; disregards the fundamentally changed market conditions between 2003 and the present; and simply assumes that a customer who said in 2003 that it would "revisit" taking a SCOsource license when the Novell copyright issue was resolved, would necessarily take a license in 2008. In fact, it is doubtful that customers who suggested SCO should get back to them when the issue was settled anticipated what a long process it would be, or expected SCO to return not in a few months, but many years after the initial contact.

SCO's evidence that Novell's slander will have a residual impact on the SCOsource program even after SCO's title is cleared, must be construed in SCO's favor for the purposes of summary judgment.[11] By the time SCO vindicates its title in a trial, Novell will have been publicly slandering SCO's copyright title – the <u>heart</u> of SCO's business – for well over four

## REDACTED

---

[11]

## REDACTED

# REDACTED

Novell's related concern about a "double recovery" is similarly misguided. Most of the cases cited by Novell in support of its position pertain to slander of title to real property. See Valley Colour, Inc. v. Beuchert Builders, Inc., 944 P.2d 361, 363 (Utah 1997); Marseilles Hydro Power, LLC. v. Marseilles Land & Water Co., No. 00 CV 1164, 2003 WL 259142, at *7 (N.D. Ill., Feb. 4, 2003); G.O. Reaugh v. McCollum Exploration Co., 163 S.W.2d 620, 622 (Tex. 1942); Ostarly v. Johnson, 700 S.W.2d 643, 644 (Tex. Ct. App. 1985). Naturally, courts addressing claims for slander of title to real property have concluded that losses must be realized so that a plaintiff cannot recover the full value of the lost sale, and also keep the title to the real property – a quintessential double recovery. Reaugh, 163 S.W.2d at 622; Childers v. Commerce Mortgage Investors, 579 N.E.2d 219, 222 (Ohio Ct. App. 1989). The circumstances of SCO's licensing program are fundamentally different than the sale of real property, and therefore, these losses become "realized or liquidated" under very different circumstances than real property. A SCOsource licensee obtains a right-to-use the intellectual property, not title to the intellectual property. Therefore, unlike the sale of real property, SCO would make the revenue on the

license sale and also retain title to the copyrights. As with almost any intellectual property licensing program, SCO could have sold numerous licenses under the same copyrights.[12]

The decision in Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., Case No. 1:00 CV 98K, 2001 U.S. Dist. LEXIS 24905, at *11 (D. Utah Mar. 28, 2001), discussed by Novell (at 25), is also inapplicable to these circumstances. In that case, the plaintiff was seeking as damages its lost stock value, or market capitalization – not lost profits, as SCO is seeking. Therefore, the conclusion that this market capitalization loss was not realized has no bearing on SCO's claim for lost SCOsource profits.[13]

An additional case cited by Novell actually is helpful to SCO. See Marseilles Hydro Power, LLC. v. Marseilles Land & Water Co., No. 00 CV 1164, 2003 WL 259142, at *7 (N.D. Ill., Feb. 4, 2003), cited by Novell (at 26). Granting the motion to dismiss, the Court noted that the claimant had not alleged that "even after the cloud on title was cleared, the alleged slander had a damaging residual effect on the vendibility or market value of the property" – thereby implying that the allegation would have satisfied the claimant's burden. Id. This residual impact is precisely what SCO has proven, as set forth above at ¶ 51.

## III.    THE DECLINE IN SCO'S STOCK SUPPORTS SCO'S DAMAGES THEORIES, BUT IS NOT CLAIMED AS A SEPARATE ELEMENT OF DAMAGES.

Novell also contends that SCO cannot seek damages for the decline in its stock price that was caused by Novell's false claims. This is a straw man. SCO is not seeking the decline in its

---

[12] Relatedly, Novell suggests (at 31) that SCO's damages are not realized because SCO "can continue" to seek its lost revenues from third parties if it has a right to do so. This is no response to the reality that Novell intentionally caused real harm to SCO's ability to obtain licensing revenue from those parties.

---

[13] Notably, the immediate and obvious impact of Novell's actions on SCO's stock, discussed in more detail at ¶ 47, does constitute powerful evidence of causation, as well as an approximation of the amount of lost profits SCO would ultimately suffer due to Novell's actions. But SCO is not claiming the amount of depreciation as its actual damages.

stock price as damages. Rather, SCO expert Professor Botosan has examined the significant drop in SCO's stock that occurred within hours of Novell's announcement. She concluded that

# REDACTED

Event studies are the preferred test for causation in fraud cases because, by measuring the price of the stock immediately before and immediately following the fraudulent statement, they most accurately test the impact of the statement on the market. See In re Cendant Corp. Sec. Litig, 109 F. Supp. 2d 235, 253-54 (D.N.J. 2000). While event studies have been most commonly used in securities fraud cases, the reasoning for their application applies equally to this case. Here, the event study evidence persuasively demonstrates the impact Novell's statement had upon SCO's business, as shown by the drop in stock price tightly correlated to the public dissemination of Novell's slander.

IV.    ATTORNEYS' FEES AND LITIGATION COSTS EXPENDED TO CLEAR SCO'S TITLE ARE RECOVERABLE IN THIS ACTION

Finally, even if no SCOsource lost profits had been shown, SCO has satisfied the special damages requirement because it has incurred legal fees and others costs bringing this slander of title action to clear its title and undo the harm caused by Novell. These costs are a pecuniary loss that constitutes special damages.

Novell's categorical assertion that such costs are not recoverable as special damages is flatly inconsistent with Novell's own claims in this action and with Utah law. In Novell's own slander of title claim in its Amended Counterclaims, Novell alleges that the slander of title has "resulted in special damages, inter alia, Novell's costs and fees in . . . prosecuting this action." (9/25/206 Novell Amended Counterclaims at ¶ 98, DE# 142.) In addition, the Tenth Circuit has

held that, under Utah law, "[a]ttorney's fees . . . are permitted as special damages in a slander of title action if incurred 'to clear title or to undo any harm created by whatever slander of title occurred.'" (Computerized Thermal Imaging, 312 F.3d at 1300 n.15 (quoting Bass, 761 P.2d at 569); see also Dowse, 208 P.2d at 959 (specifically rejecting a line of cases from other jurisdictions holding that attorneys' fees are not recoverable in a slander of title action); Gillmor v. Cummings, 904 P.2d 703, 708 (Ut. Ct. App. 1995) ("Attorney fees are recoverable as special damages if incurred to remove a cloud placed by a defendant on the title if the elements of slander of title have been proven.").[14] These cases remain the law in Utah, yet were not recognized in Novell's brief. All but one of the cases cited by Novell (at 33) apply Texas and Georgia law, which appears to differ from the controlling Utah authority discussed above.[15]

Novell's false claims are ongoing. The present action is the vehicle by which SCO's title will be cleared. Indeed, in deciding Novell's motion to dismiss, this Court recognized that the issue of falsity (whether or not SCO can prove ownership of the copyrights) is an element of its claim that must be established in this action. (Memorandum Decision and Order at 5, DE# 29.) This fact further distinguishes this action from the cases cited by Novell. Lee v. Washington Square Homeowners' Ass'n, 615 S.E. 2d 210, 212 (Ga. App. 2005) (affirming summary judgment where lien was discovered in 2001, lien was marked satisfied in 2002, and subject

---

[14] Indeed, the "clear majority rule," following the Restatement of Torts, is that "attorneys' fees incurred in removing spurious cloud from a title qualify as special damages in an action for slander of title." TXO Production Corp. v. Alliance Resources Corp., 419 S.E.2d 870, 881 (W. Va. 1992) (upholding award of $19,000 in attorneys' fees as special damages incurred in slander of title action).

[15] Novell also cites one decision from Wyoming, which is not informative. In Samnerud v. Brantz, 879 P.2d 341, 345 (Wyo. 1994), the trial court held that attorneys fees had not been proven "in a manner permitting judgment in that respect," and the appellate court concluded no special damages at all had been shown, while suggesting in passing that attorneys' fees may not be recoverable in a defamation action. However, defamation actions are distinguishable for the reasons set forth below.

property was sold without issue in 2003); Hicks v. McClain's Bldg. Materials, Inc., 433. S.E. 2d

114, 192 (Ga. App. 1993) (plaintiff filed action for damages without asking to have lien

removed, and continued in action after defendant released lien).

     Finally, Novell relies on this Court's opinion in Computerized Thermal Imaging, 2001

WL 670927, at *4, wherein the Court noted the absence of legal support permitting attorneys'

fees as special damages for a defamation action.  On appeal, the Tenth Circuit recognized the

distinction between the defamation action brought, where fees were not recoverable, and slander

of title actions, where fees and costs are recoverable.  See Computerized Thermal Imaging, 312

F.3d at 1300 n.15.  Accordingly, SCO's attorneys' fees and costs incurred in bringing this action

also warrant denial of summary judgment.

## CONCLUSION

Accordingly, for the foregoing reasons, SCO respectfully requests that Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages be DENIED.

DATED this 18th day of May, 2007.

> HATCH, JAMES & DODGE, P.C.
> Brent O. Hatch
> Mark F. James
>
> BOIES, SCHILLER & FLEXNER LLP
> David Boies
> Robert Silver
> Stuart H. Singer
> Stephen N. Zack
> Edward Normand
>
> DORSEY & WHITNEY LLP
> Devan V. Padmanabhan
>
> *Counsel for The SCO Group, Inc.*
>
> By:

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of SCO's Response In Opposition To Novell's Motion For Summary Judgment On SCO's First Claim For Slander Of Title Based On Failure To Establish Special Damages [Redacted] was served on Defendant, Novell, Inc., on this 11th day of June, 2007, via CM/ECF and emailed to the following:

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Matthew I. Kreeger
Kenneth W. Brakebill
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-248

_____ /s/ Sashi Bach Boruchow_____

## ADDENDUM A

### Response to Novell's Statement of Facts[1]

#### Background Facts: the APA

1.      In 1995, Novell was engaged in the business of developing a line of software
products known as UNIX and UnixWare, and was selling binary and source code licenses to
various versions of these products. (Declaration of Kenneth W. Brakebill In Support of Novell's
Motion for Partial Summary Judgment on Special Damages, filed herewith ("Brakebill Decl."),
Ex. 2 (APA) at 1 (Recital A).)

**SCO RESPONSE:**  Undisputed.

2.      Novell and Santa Cruz entered into an Asset Purchase Agreement ("APA") on
September 19, 1995.  Through the APA, Santa Cruz acquired "certain of the assets" comprising
Novell's UNIX and UnixWare business. (Brakebill Decl., Ex. 2, Recital B.)  The APA defined
the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the
transfer; and Schedule 1.1(b), which listed assets excluded from the transfer.

**SCO RESPONSE:**  The first sentence is undisputed.  The second sentence is disputed

in that, through the APA, Santa Cruz acquired more than just "certain of the assets comprising

Novell's UNIX and UnixWare business."  Instead, pursuant to Recital B of the APA, the

provision that Novell misquotes, Santa Cruz acquired certain of the assets _of Novell_ comprising

the UNIX and UnixWare business.  That is, Santa Cruz did not merely acquire some of the assets

of the Business; Santa Cruz acquired those assets of Novell comprising the Business.  Section

1.3(a)(i) of the APA confirms that "It is the intent of the parties hereto that _all of the Business_

and all of Seller's backlog, if any, relating to the Business _be transferred to Buyer_." (Emphasis

added.)

---

[1] In citing its basis for disputing a Novell statement of fact, SCO cites herein either paragraphs in SCO's
Statement of Facts above or directly to exhibits, or both.

3.    The Schedule 1.1(b) list of "Excluded Assets" expressly excluded "All copyrights and trademarks, except for the trademarks UNIX and UnixWare" and "All Patents" from the sale. (Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V.)

SCO RESPONSE: Partially disputed. This provision referenced by Novell was later revised by Amendment No. 2.

4.    In 2000, Santa Cruz entered into an agreement with Caldera Systems whereby Caldera would purchase the division of Santa Cruz that included Santa Cruz's UNIX-related business. (Novell's Amended Counterclaims, filed September 25, 2006 ("NAC") at ¶¶ 28 -31; SCO's Reply to Novell's Amended Counterclaims, filed October 16, 2006 ("Reply") at ¶¶ 28-31.) In August 2002, Caldera announced that it would change its name to "SCO" and began doing business under that name. (NAC ¶ 36; Reply ¶ 36.)

SCO RESPONSE: Undisputed.

5.    SCO, the plaintiff in this action, claims to be the successor-in-interest to Santa Cruz's rights and obligations under the APA. (SCO's Second Amended Complaint, filed February 3, 2006 ("SAC") at 22 (¶ 88).) As set forth in greater detail below, in early 2003, SCO launched a campaign asserting that it owned the copyrights to UNIX System V, and that portions of the Linux operating system infringed those copyrights (the SCOsource initiative).

SCO RESPONSE: Disputed in part. SCO is the successor-in-interest to Santa Cruz's rights and obligations under the APA. (¶ 4.) In 2003, SCO discovered that the Linux operating system infringed the UNIX copyrights that SCO had acquired from Santa Cruz, and that Santa Cruz had acquired from Novell. In response to customer demand, SCO launched the SCOsource division and offered SCOsource licenses whereby customers could rightfully use SCO's intellectual property in Linux. (¶¶ 18-19.)

6.    On May 28, 2003, Novell's Chairman, President and CEO, Jack Messman announced publicly that Novell did not transfer the UNIX and UnixWare copyrights to SCO, and that SCO was not the owner of the copyrights. (SAC at ¶ 37.) SCO and Novell continued to dispute this issue publicly for the next several months, up until the filing of this lawsuit by SCO. (*Id.*)

SCO RESPONSE: Undisputed.

7.     In June or July 2003, SCO registered certain copyrights in UNIX System V and UnixWare with the United States Copyright Office. (NAC ¶ 41(d); Reply ¶ 41.) In September and October 2003, Novell submitted certifications to the United States Copyright Office claiming to be the owner of the same UNIX System V and UnixWare copyrights. (SAC ¶ 37(g).)

SCO RESPONSE: Undisputed.

The SCOsource Program: SCO's Effort to Extract Licensing Fees Based on Linux

8.     Prior to the Santa Cruz acquisition, substantially all of Caldera's revenue was derived from sales of Linux products and services. (NAC ¶ 31; Reply ¶ 31.) Linux is the name of a computer operating system, which was developed as open-source software and has become a popular alternative to proprietary operating systems. (NAG ¶¶ 8, 9; Reply ¶ 8, 9.) However, Caldera had been unsuccessful at creating a profitable Linux business. (NAC ¶ 31; Reply ¶ 31.)

SCO RESPONSE: Undisputed.

9.     In January 2003, the newly rebranded SCO launched the SCOsource initiative. (NAC ¶ 37; Reply ¶ 37.) In connection with this announcement, SCO's CEO, Darl McBride, commented that "SCO owns much of the core UNIX intellectual property, and has full rights to license this technology and enforce the associated patents and copyrights." (NAC ¶ 46; Reply ¶ 46.) SCOsource was an effort to obtain license fees from Linux users based on claims to UNIX System V intellectual property.

SCO RESPONSE: Partially disputed. It is undisputed that Darl McBride made the statement quoted. SCO disputes Novell's characterization of SCO as "newly rebranded" in January 2003. Caldera began operating as "The SCO Group" in August 2002, and its predecessor Santa Cruz had been referred to as "SCO" for decades. In addition, the SCOsource initiative was an effort to protect SCO's intellectual property and at the same time enable Linux users to use Linux rightfully by purchasing a license to use SCO's intellectual property in Linux.

10.     Under the SCOsource licensing program, SCO offered Intellectual Property Licenses to Linux end users ("Intellectual Property Licenses"). The purported purpose of these licenses is to allow UNIX vendors to use SCO's UNIX intellectual property and to permit Linux end users to "properly compensate us for our UNIX intellectual property as currently found in Linux." One term of SCO's Intellectual Property Licenses for Linux is that licensees "will be held harmless against past and future copyright violations based on their use of SCO's intellectual property . . . in Linux distributions . . . ." (NAC ¶ 47; Reply ¶ 47.)

SCO RESPONSE: Undisputed.

11.    On or around May 12, 2003, SCO sent 1500 end-user corporations (including IBM and Novell) a letter threatening suit based on SCO's assertion that it owned the UNIX copyright. In these letters, SCO asserted that it had evidence that Linux included portions of UNIX System V software code, and that "Linux infringes on our UNIX intellectual property and other rights." (NAC ¶¶ 52-5 5; Reply ¶¶ 52-5 5.)

SCO RESPONSE: Partially disputed. Novell's characterization of the letter as threatening is disputed. The letter made no threats, and speaks for itself.

12.    In addition, SCO made many public statements asserting that end users of Linux are liable to SCO for infringement of the UNIX System V copyrights. This Court has noted SCO's "barrage of public statements about pursuing [ ] infringers of its alleged intellectual property rights." *The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK, Memorandum Decision and Order at 5-6 (Feb. 9, 2005). (NAC ¶ 56; Reply ¶ 56.)

SCO RESPONSE: Partially disputed. SCO made public statements regarding the fact that Linux infringed its UNIX copyrights, in order to inform the market of SCO's intellectual property rights and to protect its intellectual property. Users of Linux had the option of purchasing a SCOsource license in order to avoid the risk of infringement. (¶¶ 18-20.)

13.    SCO has convinced several Linux end users to participate in its licensing program. In fiscal year 2004, for example, SCO generated revenue from its SCOsource Intellectual Property licenses. (NAC ¶ 59; Reply ¶ 59.) The fees collected by SCO for its SCOsource licenses were not ⟨REDACTED⟩. SCO simply end-users ran Linux. Instead, : demanded that Linux end-users pay an up-front fee based on the number of CPUs on which they would run Linux. SCO charged $699 for a license to run Linux on a system with one CPU, $1,149 for a license to run Linux on a system with two CPUs, $2,499 for a license to run Linux on a system with four CPUs, *etc.* (*See* Brakebill Decl., Ex. 54 at SCO1556051; Ex. 55 at SCO1769410; Ex. 56 at SCO1463816; Ex. 63 (McBride Dep.) at 136, 220-21 (referring to "our list price of $700").)

SCO RESPONSE: Partially disputed. In 2004, SCO generated far less revenue than internal projections and external analysts expected, and far less than SCO had generated the prior year. (05/18/2007 James Decl. 87 at ¶¶ 5-6.) While SCO was able to convince some licensees

of the value of its licenses in the face of Novell's claims, many other licensees were not

persuaded and declined SCOsource licenses based in substantial part on Novell's false claims.

(¶¶ 18-51.) The pricing set forth by Novell refers to the discounted pricing that was intended to

be for the initial period only. (Brakebill Decl., Ex. 54 at SCO1556051.)

14.    Despite achieving successes with some licensees, the SCOsource licensing
campaign generated controversy that has impacted SCO's core software business. As SCO has
acknowledged in its public SEC filings, "the assertion of our legal rights relating to our UNIX
ownership and related copyrights and our other legal actions have resulted in our becoming the
focus of a significant amount of negative publicity from various sources that has to some degree
hampered our ability to compete favorably." (Brakebill Decl., Ex. 29 (SCO 2006 10K) at 5.)

SCO RESPONSE:  Partially disputed and immaterial.  Even if the SCOsource business

had some impact on SCO's core software business, SCO is claiming losses to its SCOsource

business.  Furthermore, Novell's false claims were a major source of the "negative publicity"

referenced in the filing. (¶ 6-17, 20-51.)

Public Reaction to SCO's Claims:  Litigation and Licensing Difficulties

15.    Even before the SCOsource initiative was launched, there were executives within
SCO who predicted that          REDACTED           In December 2002, SCO's then
Senior Vice President for Marketing Jeffrey Hunsaker forwarded an email from a senior systems
engineer Buck Carhart to the SCO executive team regarding    REDACTED

(Brakebill Decl. Ex. 30; Ex. 31 (Hunsaker Dep.) at 168:9-169:1.)  On January 13,
2003, Geoff Seabrook, who had negotiated the APA on behalf of Santa Cruz, sent an email to
colleagues at SCO        REDACTED

Decl., Ex. 32; Ex. 33 (Mohan Dep.) at 212:1-23.)

SCO RESPONSE:  Disputed and immaterial.

**REDACTED**

(05/18/06 James Ex. 62 at 174:3-14)

16.    In fact, the public reaction to SCO's claim that Linux might require a UNIX license was swift and hostile. Almost immediately after SCO made its announcement in January 2003, Mr. Hunsaker forwarded an article from .    **REDACTED**

(Brakebill Decl., Ex. 34; Ex. 31 (Hunsaker Dep.) at 188:23-189:24.)

SCO RESPONSE: Disputed. The evidence submitted by Novell does not support its statement that "the public reaction to SCO's claim that Linux might require a UNIX license was swift and hostile." Other documents submitted by Novell, such as the evidence discussed in response to Novell paragraphs 18 and 19, show that the reaction was mixed. Moreover,

**REDACTED**

17.    The SCOsource initiative was also associated with high profile litigation regarding the validity of SCO's infringement claim. In March 2003, SCO filed a complaint against IBM, alleging that IBM had breached its UNIX licenses by disclosing restricted information in connection with Linux. IBM counterclaimed in that action, seeking among other things a declaration that Linux does not infringe the UNIX copyrights. In August, 2003, Red Hat, Inc. filed suit against SCO seeking a declaratory judgment that the Linux operating system does not infringe UNIX intellectual property rights. (Brakebill Decl., Ex. 29 (SCO 2006 10K) at 16-17.)

SCO RESPONSE:  Undisputed that these lawsuits were filed, but disputed to the extent Novell suggests that these lawsuits had a negative impact on the SCOsource program, which is not supported by the evidence it cites.

18.    The trade press commented extensively on the SCOsource program and related litigation. For example, REDACTED seven press reports on SCO's claims, including an interview with Linus Torvalds on (the originator of Linux) challenging SCO's claims, an article by a developer who reported on visiting SCO to examine SCO's infringement evidence (and who was not impressed), and an article reporting that a leading open source advocate claimed to have evidence undermining SCO's claims. (Brakebill Decl. Ex. 35; Ex. 36 (Sontag Dep.) at 81:7-25.)

SCO RESPONSE:  Disputed. This single exhibit reinforces the factual disputes on these issues.

- The first article is entitled, "Don't ignore the fact that SCO could win." It explains that "extracting the [infringing] code is not really a feasible solution," and that companies could face liability even if they were not "deliberately, or even negligently, appropriating the code." It further criticized the Linux community for taking a "SCO is bad, and we are good" approach rather than addressing the merits of SCO's claims. This article supports SCO's position.

- The article Novell references about a developer who reported on visiting SCO to examine SCO's infringement evidence, who Novell says was not "impressed," simply creates factual issues. Notably, at the conclusion he admits his bias,

stating: "The [SCO] people I spoke with had to know when I came in that I would not be on their side." (Brakebill Decl. Ex. 35 at SCH13102) In addition, the developer noted that "there were indeed substantial similarities in the code" and that "SCO says many other examples exist, and it has found at least 10 to 20 specific examples of direct copying" and "much more derivative code." He further confirmed that the "code exists in current versions of the Linux kernel." His conclusions on liability were premised on the code being the "only example of Unix code appearing in Linux" -- which directly contradicted SCO's statements. Furthermore, he admitted that he would "hesitate to predict the actions of the legal system."

- An interview with Linus Torvalds, the creator of Linux, and an article from a "leading open source advocate" can hardly be viewed as unrefuted evidence that prospective licensees would not want to have purchased SCOsource licenses.

- The article Novell references about a developer who reported on visiting SCO to examine SCO's infringement evidence, who Novell says was not "impressed" simply creates factual issues. Notably, at the conclusion he admits his bias, stating: "The [SCO] people I spoke with had to know when I came in that I would not be on their side." (Brakebill Decl. Ex. 35 at SCH13102) In addition, the developer noted that "there were indeed substantial similarities in the code" and that "SCO says many other examples exist, and it has found at least 10 to 20 specific examples of direct copying" and "much more derivative code." He further confirmed that the "code exists in current versions of the Linux kernel."

His conclusions on liability were premised on the code being the "only example of Unix code appearing in Linux" – which directly contradicted SCO's statements. Furthermore, he admitted that he would "hesitate to predict the actions of the legal system." Moreover, other articles, not submitted by Novell, contain favorable sentiments about SCO's claims and evidence at this time. (05/18/2007 James Decl. 107, 108.)

19.    Industry analysts also freely opined on whether end users should take a SCOsource license or not. For example,

**REDACTED**

Other analysts offered similar opinions. (*Id.*, Ex. 40 (TechNewsWorld Story "Split Decision of SCO Impact, Response").) A May 15, 2003 paper by Eric Raymond and Rob Landley of the Open Source Initiative entitled

**REDACTED**    (Brakebill Decl., Ex. 41 at page 2 of 23.)

(*Id.* at 18-20.)

SCO RESPONSE: Disputed. These articles simply reinforce the factual dispute on these issues. Each article and document cited by Novell is addressed in turn:

- May 15, 2003, paper by Eric Raymond and Rob Landley of the Open Source Initiative entitled **REDACTED**    This is an advocacy piece written by an organization whose self-stated mission is to "advocate for the benefits of open source." (5/18/2007 James Decl. Ex. 77) Novell provides no evidence that its views were accepted by the largely corporate prospective licensees.

9

- July 29, 2003, TechNewsWorld Story "Split Decision of SCO Impact, Response" (Brakebill Decl., Ex. 40): This article says that the recommended response to SCO "is split," and goes on to quote both those who recommended purchase of a license, and those who did not. Quotes from analysts in the article include: "'This is not going away.'" SCO "has taken a 'linear, by-the-book approach.'" SCOsource fees "'would be reasonable compared with legal penalties if SCO were to prevail in its suit.'" And, regarding IBM's failure to respond, "'If I'm a CIO, that makes me nervous.'" Such industry opinions support SCO's position and are yet additional evidence creating a dispute of material fact.

- The August 12, 2003, March 23, 2004, and April 27, 2005 Gartner Papers (Brakebill Decl. Ex. 39, 38, 37, respectively): Novell provides no evidence, let alone unrefuted evidence, that the views expressed in this article were accepted by the largely corporate prospective licensees over the views of other analysts, such as that expressed in the article above (Ex. 40). This, again, is a purely factual issue. Furthermore, the papers were written well after Novell made its false claims, and the March 23, 2004 paper mentions the Novell lawsuit (at 3), and recommends (at 4) that users "await court resolutions."

20. Public skepticism regarding SCO's infringement claims was reinforced by a closely watched ruling in the SCO/IBM litigation. In ruling on IBM's motion for summary judgment in February 2005, this Court observed that given "SCO's plethora of public statements concerning IBM's and others' infringement of SCO's purported copyrights to the UNIX software, it is astonishing that SCO has not offered any competent evidence to create a disputed fact regarding whether IBM has infringed SCO's alleged copyrights through IBM's Linux activities." *The SCO Group Inc. v. Int'l Bus. Machs.*, Case No. 2:03CV294 DAK, Memorandum Decision and Order at 10 (Feb. 9, 2005).

SCO RESPONSE:  Partially disputed.  The same Order denied summary judgment on

IBM's motion for summary judgment on infringement issues; thus, SCO's infringement claims

are still pending.  Novell cites no evidence that public skepticism among prospective licensees

resulted from this ruling.

21.     Internal documents produced by SCO reveal that SCO's sales

•     On May 21, 2003, SCO's

**REDACTED**

(Brakebill Decl. Ex.

42; Ex. 31 (Hunsaker Dep.) at 208:3-21.)

•     On August 5, shortly after SCOsource license terms were made available online,

**REDACTED**

(Brakebill Decl. Ex. 43; Ex. 31

(Hunsaker Dep.) at 221:12-224:15.)

•     On December 11, 2003,

**REDACTED**

(Brakebill Decl., Ex.44; Ex.45 at 112:13-113:11.)

SCO RESPONSE:  Disputed.  The evidence cited by Novell does not support Novell's

claim that "[i]nternal documents produced by SCO reveal that SCO's sales

The August 5, 2003 email from

**REDACTED**

(Brakebill Decl. Ex. 43)  In a portion of the email omitted by Novell, he says    **REDACTED**

          (Id.)  Further, even if these scattering of documents did reflect

**REDACTED**          these documents would still be consistent with SCO's claims; SCO is

not claiming that all Linux users would have purchased a SCOsource license, just that more

would have. (¶¶ 47-51.)

22.     CEO Darl McBride testified that Mr. Gasparro maintained a log of contacts with
the companies SCO contacted as part of the SCOsource program. (Brakebill Decl. Ex. 65
(McBride Dep.) at 137:20-140;10). SCO has not specifically identified this log but it appears to
correspond to a spreadsheet SCO produced in discovery. (Brakebill Decl., Ex. 46.) There are
dozens if not hundreds of entries on the Gasparro log indicating that the target company was no
longer in business, or that SCO had the wrong address. (Id.) None of the entries indicate that
the target company mentioned Novell's ownership claim. (Id.) On or about April 21, 2004,

**REDACTED**

          (Brakebill Decl., Ex. 47.)

SCO RESPONSE: Partially disputed and immaterial. As discussed in ¶ 43, this list

does not support Novell's position. Erik Hughes testified that

**REDACTED**          . (5/18/2007 James Decl. Ex. 65. at 86:21-

87:4.) Mr. Sontag specifically explained that the list did not accurately or fully reflect SCO's

communications with licensees: "I talked to customers. I believe there was other personnel at

SCO that I heard back from, as well, who would corroborate the fact that on a number of

occasions some of these customers specifically referenced Novell as a reason why they felt they

did not have to respond." (5/18/2007 James Decl. Ex. 64 at 74:3-17.)

23.    SCO has produced hundreds of pages of correspondence with target SCOsource licensees in discovery that reveal
A compilation of such letters is attached to the Brakebill Declaration at Exhibit 53, including:

- May 22, 2003 letter from        **REDACTED**
  (SCO1512012-240);

- June 6, 2003 letter from       **REDACTED**

  (SCO1448056);      **REDACTED**

- January 12, 2004 response from
          (SCO 1448008);

- January 15, 2004 letter from     **REDACTED**

  (SCO1448031);

- January 23, 2004 email exchange with    **REDACTED**

         (SCOR 7680-81);
     **REDACTED**

- January 28, 2004 letter from
       (SCO1448027);

- January 29, 2004 letter from    **REDACTED**

  (SCO1512029-240);
     **REDACTED**

- January 30, 2004 letter from
      (SCO1512007-240);

- February 6, 2004 letter from
         (SCO1512006-240);

**REDACTED**

- March 19, 2004 letter from        **REDACTED**

  (SCO1512015-240);

- March 23, 2004 letter from        **REDACTED**

  (SCO1512016-240);

                                    **REDACTED**

- March 26, 2004 letter from

                                    (SCO1512021-240-1512022-240);

- May 21, 2004 email exchange with        **REDACTED**

  (SCO1765148-149).

  **SCO RESPONSE:** Partially disputed and immaterial. This evidence simply highlights the intense factual dispute that surrounds these issues. The _____ letter specifically mentioned the _____ in a clear reference to Novell's false claims.

  **REDACTED**

  The fact that the above prospective licensees asked for _____ could not possibly resolve the factual disputes that exist.

  <u>SCO's Discovery Response Regarding Damages</u>

  24.     Although the focus of SCO's suit has always been its charge that Novell caused the SCOsource program to fail, SCO has not been forthcoming about the specific facts supporting its claim to damages. On September 29, 2006, Novell propounded Interrogatory No. 15, in which Novell asked SCO to "[i]dentify all facts, bases, and evidence in support of SCO's claims for damages," including the amount of damage, the factual justification for such amount,

and all documents that SCO contends support its damages claims. (Brakebill Decl., Ex. 57.) SCO refused to respond to this interrogatory, relying on the sole objection that "the information it seeks is properly the subject of expert discovery." (Brakebill Decl., Ex. 58 at 29.)

SCO RESPONSE: Disputed and Immaterial. The scope and nature of the response that would be provided was discussed by the parties, as many of Novell's discovery responses have been, and the parties ultimately reached agreement about what would be provided in response to Interrogatory No. 15. Novell expressly agreed to limit the scope of what would be provided in Interrogatory No. 15. For instance, SCO stated: "SCO reserves the right to supplement the interrogatory response consistent with the completion of expert reports, and . . . Novell agrees that SCO's initial response to the interrogatory does not constitute a waiver or bar to SCO's expert theories or calculation of damages, and does not constitute a waiver of any privilege as to that work." (Brakebill Decl., Ex. 59.) Novell agreed, and stated: "We understand that your experts may rely on additional new materials." Novell also acknowledged that later documents might be relied upon by asking for confirmation that SCO would provide a "list of documents that SCO currently believes support its damages claims." (05/18/2007 James Decl. Ex. 76) (emphasis added.) SCO's response fully complied with that agreement.

25.    After Novell cited the body of case law requiring plaintiffs to disclose the bases for their damages claims during fact discovery, SCO finally agreed to respond to Interrogatory No. 15. SCO confirmed on March 19, 2007 that its response would "include the factual predicates for its damages claims," including "any facts concerning the alleged damage" and "a[] list of documents that SCO currently believes support its damages claims[.]" (Brakebill Decl., Ex. 59.)

SCO RESPONSE: Disputed and Immaterial. (See response to paragraph 24, supra.)

26.    On April 6, 2007, with just a few weeks of discovery remaining, SCO served its response. SCO recited two specific ways in which Novell's statements supposedly caused it harm. First, SCO maintained that Novell's actions "substantially impeded SCO's ability to make sales in [its SCOsource] business." (Brakebill Decl., Ex. 60 at 11, ¶ 22.) According to SCO, "[w]hile [it] was able to sell a limited number of SCOsource licenses . . . , prospective customers

frequently identified the cloud over SCO's title to UNIX copyrights—created by Novell—as a reason not to purchase a SCOsource license." (Brakebill Decl., Ex. 60 at 11, ¶¶ 22-23.)  SCO's response did not name these customers.  Second, SCO claimed that "[t]he significant damage to SCO from Novell's actions is reflected in the swift reaction of the market and the substantial decline in SCO's stock price[.]"  (Id. at 11, ¶ 23.)

SCO RESPONSE:  Disputed and Immaterial.  SCO provided its interrogatory response on the date agreed with Novell.  The response extensively explained Novell's slanderous statements and how they injured SCO; the document speaks for itself.  While Novell fixates on identification of specific customers, the law does not require it, as explained in SCO's Argument. (See also response to paragraph 24, supra.)

27.    SCO's response also listed 61 documents "supporting SCO's damages claims." (Id. at 17-20.)

# REDACTED

To the contrary, in response to Novell's questions about documentary evidence related to the deposition of the SCO executive who led the SCOsource division, SCO specifically referred Novell to its response to Interrogatory No. 15.  (Brakebill Decl., Ex. 62.)

SCO RESPONSE:  Disputed and Immaterial.  SCO identified in Interrogatory No. 15 all documents that were then known to it.  The correspondence from REDACTED REDACTED discussed in paragraphs 30, 32, 33, 41, were all identified as supporting documents in SCO's response to Interrogatory No. 15.  Novell's assertion that only one of the letters references Novell is disingenuous.  While the correspondence does not it plainly refers to REDACTED (¶¶ 30, 32, 33, 41.)  In the interrogatory response, SCO also listed the depositions that specifically identified prospective licensees who expressed concern over Novell's false claims.  Furthermore, as discussed, the law does not even require identification of specific lost customers.

28.    However, in a reversal of SCO's prior representation that its interrogatory response would list the "documents that SCO currently believes support its damages claims," SCO indicated just three days ago that the list of documents in SCO's response to Interrogatory No. 15 is merely "a non-exhaustive list of such correspondence." (Brakebill Decl., Ex. 62.)

SCO RESPONSE: Disputed and immaterial. Interrogatory 15 did list the documents that SCO believed supported SCO's claims. It was non-exhaustive because SCO did not identify every single piece of SCOsource correspondence that had been produced, and was not obligated to do so, and also because SCO had reserved the right to supplement the list of supporting documents as additional expert work was performed.

29.    As noted above, of the 61 documents SCO identified in support of its damages contentions, there is

# REDACTED

(Brakebill
Decl., Ex. 48.)

SCO RESPONSE: Disputed and immaterial.  (See response to paragraph 27, supra.)

Other Evidence Regarding Damages

30.    In addition to the broad allegations in its interrogatory response, SCO witnesses have testified that potential licensees cited Novell's challenge to SCO's ownership of the copyrights as a reason for their failure to sign up immediately for a SCOsource license. But these SCO executives have also admitted that potential licensees (most of whom remain unidentified) acknowledged that they would continue their licensing talks with SCO once SCO resolved its disputes over rights. For example:

(a)    Chris Sontag. On March 14, 2007, SCO's Vice President of Business Development and the executive in charge of the SCOsource program, Chris Sontag, testified that he "was aware of a number of situations and times where the [potential licensee] was right in front of me saying 'well, there's questions about who even owns the copyrights so therefore [don't feel like I need to take a license for your SCO UNIX intellectual property or the right to use a license until that's resolved.'" (Brakebill Decl., Ex. 36 (Sontag Dep.) at 1 16-17 (emphasis

added).) Mr. Sontag claims that he "would do [his] best to try and explain that I thought it was a baseless set of statements on the part of Novell. But in many cases, people I talked to say 'well, until it is resolved, I'm still not going to act upon this.'" (*Id.* (emphasis added).) The only companies Mr. Sontag could specifically identify as having cited Novell's assertions as a reason for deferring their decision on whether to take a license were Google and Morgan Stanley or "another Wall Street firm." (*Id.* at 119-20.)

(b)     Darl McBride. On March 27, 2007, SCO's CEO Darl McBride testified that SCO was in negotiations with HP over a SCOsource license, but that the negotiations stalled when HP, indirectly, indicated that Novell's copyright ownership claim was a concern. Mr. McBride stated that HP said, "Novell is making these claims. You guys don't have that resolved yet, so it's hard for us to pay more than that." (Brakebill Decl., Ex. 63 (McBride Dep.) at 130-34 (emphasis added).) He also recalled a similar interaction with Google. Mr. McBride reported that there were "multiple levels of discussions with them," but that Google ultimately said, "Until you get some court rulings on the ownership side, and on the infringement side, we can't move forward with you." (*Id.* at 135-36 (emphasis added). *See also id.* at 219-20 (SCO stopped actively pursuing SCOsource licenses because, "given where Novell was coming from, [ ]we basically said we've got to table this until we get through with our litigation with them").)

In addition to HP and Google, Mr. McBride stated that potential licensees such as Morgan Stanley (or Lehman Brothers or Merrill Lynch), Windham Hotels, Regal Entertainment, Just U.S.A. Sports [sic], and The Pentagon also raised the Novell ownership dispute during their discussions with SCO. (*Id.* at 136-37.) But he did not testify as to any specific discussions with them.

(c)     Jeff Hunsaker. On March 30, 2007, SCO's current Senior Vice President of Mobile Services, Jeff Hunsaker, testified

(Brakebill Decl., Ex. 31 (Hunsaker Dep.) at 229-31.)

## REDACTED

(*Id.* at 150-51 (emphasis

' (*Id.* at

162-63 (emphasis added).)

**REDACTED**    (*Id.* at 205-06 (emphasis added).)

**REDACTED**

(*Id.* at 229-31 (emphasis added).)

**REDACTED**

(*Id.* at 236-37 (emphasis added).)

SCO RESPONSE:  Partially disputed.  Much of this evidence demonstrates that

Novell's false claims had a significant impact on SCO's ability to sell SCOsource licenses, and

therefore, creates a genuine dispute of material fact.   Furthermore, this evidence does not even

come close to establishing beyond any dispute that all of the lost sales would be recouped if

SCO's title were cleared.  Indeed, substantial evidence contradicts Novell's position in this

regard.  (¶ 51.)                    **REDACTED**

     31.    In addition to the
interrogatory response, Novell itself undertook a search of documents produced by SCO and
third parties to identify documents that reference claims by Novell in response to SCO's license

**REDACTED**

For example:              **REDACTED**

(a)    On June 12, 2003,

(Brakebill Decl., Ex. 49.)

(b)     On March 24, 2004,                **REDACTED**

                                                                        (Brakebill Decl., Ex.
50.)
    (c)     On April 14, 2004, .          **REDACTED**

                                (Brakebill Decl., Ex. 51.)

    (d)     On May 21, 2004,              **REDACTED**

                                                                (Brakebill Decl., Ex. 52.)

        SCO RESPONSE:  Partially disputed.  (See response to paragraph 30, above.)