# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., | |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| NOVELL, INC., | **Civil Case No. 2:04CV139DAK** |
| Defendant. | |

This matter is before the court on the following motions: Novell's Motion for Partial Summary Judgment or Preliminary Injunction [Docket No. 147]; SCO's Cross-Motion for Summary Judgment or Partial Summary Judgment on Novell's Third, Sixth, Seventh, Eighth and Ninth Counterclaims [Docket No. 180]; Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title for Failure to Establish Special Damages [Docket No. 277]; Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claims in its Second and Fifth Claims [Docket No. 273]; Novell's Motion for Partial Summary Judgment on Copyright Ownership of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition [Docket No. 271]; Novell's Motion for Partial Summary Judgment on its Fourth Claim [Docket No. 171]; SCO's Cross-Motion for Partial Summary Judgment on Novell's Fourth Claim [Docket No. 224]; SCO's Motion for Partial Summary Judgment on its First, Second, and Fifth Claims and Novell's First Claim [Docket No. 258]; and Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for Specific

Dockets.Justia.com

Performance [Docket No. 275]. The court held hearings on these motions on January 23, 2007,

May 31, 2007, and June 4, 2007, and took the motions under advisement. After carefully

considering the memoranda and other materials submitted by the parties, and the law and facts

applicable to these motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

The SCO Group, Inc. ("SCO") began this action in state court asserting a single cause of

action against Novell, Inc. ("Novell") for slander of title based on public statements Novell made

claiming that it had retained the UNIX and UnixWare copyrights when it sold certain assets of its

UNIX and UnixWare business to SCO's predecessor in interest. After Novell removed the case

to this court, the parties proceeded to add several claims and counterclaims to the action. SCO

added claims for breach of the parties' Asset Purchase Agreement and Technology License

Agreement, specific performance, copyright infringement, and unfair competition. Novell added

counterclaims against SCO for slander of title, breach of the Asset Purchase Agreement,

declaratory relief regarding the parties' rights and obligations under the Asset Purchase

Agreement, restitution/unjust enrichment, and accounting.

UNIX was originally developed by AT&T. In 1983, AT&T developed a new version of

UNIX called UNIX System V, Release 1. Other versions were also subsequently developed.

These releases are referred to as SVR1, SVR2, SVR3, and SVR4, or generically SVRX. In 1993,

Novell purchased UNIX-related assets from AT&T's subsidiary, UNIX System Laboratories, and

paid over $300 million for those assets. Decl. Tor Braham at ¶ 4.

2

## A. The APA and Contemporaneous Agreements

### (1) The APA

SCO's predecessor in interest, Santa Cruz Operations Inc.,[1] and Novell entered into an Asset Purchase Agreement ("APA") dated September 19, 1995. Decl. Mark James Ex. 1 ("APA"). The APA acknowledges in its "Recitals" section that Novell was "engaged in the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business")." APA Recital A. It is further stated in the APA that the Boards of Directors of Novell and Santa Cruz "believe it is in the best interests of each company . . . that [Santa Cruz] acquire certain of the assets of, and assume certain of the liabilities of [Novell] comprising the Business (the "Acquisition"). *Id.* Recital B. As part of the consideration for the Acquisition, Santa Cruz agreed to issue Novell 6,127,500 shares of Santa Cruz's Common Stock, which some witnesses have approximated to be worth between $125 to $150 million at the time of the transaction. *Id.* Recital C.

Article I of the APA outlines the Acquisition by breaking it down into categories relating to the purchase of assets, payments, the transfer of customers, non-assignment of certain items, transitional contracts, the license back of assets, and the closing. *Id.* §§ 1.1-1.7. The APA's provision entitled "Purchase and Sale of Assets" provides:

> On the terms and subject to the conditions set forth in this
> Agreement, Seller will sell, convey, transfer, assign and deliver to

---

[1]    Five years after the APA, Santa Cruz was purchased by Caldera. Caldera changed its name to The SCO Group.

> Buyer and Buyer will purchase and acquire from Seller on the
> Closing Date (as defined in Section 1.7) all of Seller's right, title,
> and interest in and to the assets and properties of Seller relating to
> the Business (collectively the "Assets") identified on Schedule
> 1.1(a) hereto.  Notwithstanding the foregoing, the Assets to be so
> purchased shall not include those assets (the "Excluded Assets")
> set forth on Schedule 1.1(b).

*Id.* § 1.1(a).  With respect to their "Intellectual Property" provisions, Schedule 1.1(a) and

Schedule 1.1(b) are consistent.  Schedule 1.1(b) sets forth as Excluded Assets the following

"Intellectual Property":  "All copyrights and trademarks, except for the trademarks UNIX and

UnixWare" and "All Patents."  *Id.* Sched. 1.1(b) § V.A, V.B.  Schedule 1.1(a) sets forth as Assets

to be transferred the following "Intellectual Property": "Trademarks UNIX and UnixWare as and

to the extent held by Seller (excluding any compensation Seller receives with respect of the

license granted to X/Open regarding the UNIX trademark)."  *Id.* Sched. 1.1(a) § V.

Another significant aspect of the APA is the agreement between the parties with respect

to future SVRX Royalties.  Under the payment provisions of the APA, Novell retained "all rights

to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to [Santa Cruz]."  *Id.*

§ 1.2(b).  Santa Cruz agreed to pass through one-hundred percent of the SVRX Royalties to

Novell, and Novell agreed to pay Santa Cruz a five percent administrative fee.  *Id.*  Santa Cruz

obtained "legal title and not an equitable interest in such royalties within the meaning of Section

541(d) of the Bankruptcy Code."  *Id.*   More specific details of the parties' agreement regarding

SVRX Royalties will be discussed later in this Background Section.

*(2) The Bill of Sale*

The APA itself did not transfer assets.  Rather, it described the assets that would be

transferred in the future when the transaction closed.  The APA provided that at the transaction's

Closing, Novell would deliver a "Bill of Sale" transferring Novell's title to the "Assets" described in the APA to Santa Cruz. Under Section 1.7 of the APA, Novell was to deliver to Santa Cruz "all bills of sale, endorsements, assignments, consents to assignments to the extent obtained and other instruments and documents as [Santa Cruz] may reasonably request to sell, convey, assign, transfer and deliver to [Santa Cruz] [Novell's] title to all the Assets." *Id.* § 1.7(b)(iii).

Accordingly, Novell and Santa Cruz executed a "Bill of Sale" on December 6, 2005, when the transaction closed. Decl. Mark James Ex. 3. The Bill of Sale stated that in accordance with Section 1.1(a) of the APA, Novell "does hereby transfer, convey, sell, assign, and deliver" to Santa Cruz "all of the Assets." *Id.* The Bill of Sale further stated that all capitalized terms had the meanings set forth in the APA as amended by Amendment No. 1. *Id.* Therefore, the Assets so transferred were those listed on Schedule 1.1(a) and not those listed on Schedule 1.1(b). *See* APA § 1.1(a). Moreover, the Bill of Sale recognized that it was intended only to document "the sale and assignment of the Assets to Buyer, and that the [APA] is the exclusive source of the agreement and understanding between Seller and Buyer respecting the Assets." Decl. Mark James Ex. 3.

### (3) The TLA

The APA also required Santa Cruz to execute a separate license granting Novell the right to use technology included in the transferred Assets and derivatives, subject to certain limitations. APA § 1.6. Section 1.6 of the APA states that Santa Cruz must execute a license agreement concurrent with the Closing of the APA which grants Novell "a royalty-free, perpetual, worldwide license to (i) all of the technology included in the Assets and (ii) all

5

derivatives of the technology included in the Assets." *Id.*

Novell and Santa Cruz implemented this requirement by executing the Technology License Agreement ("TLA") on December 6, 1995, in connection with the APA's Closing. Decl. Mark James Ex. 4 ("TLA"). The TLA states that Novell retains a "non-exclusive, non-terminable, worldwide, fee-free license" to use "Licensed Technology" under certain conditions. TLA II.A. As with the parties' Bill of Sale, the TLA states that certain defined terms, such as "Licensed Technology," have the "meanings attributed to such terms in the Asset Purchase Agreement." *Id.* I. The term "Licensed Technology" is defined in the APA as "all of the technology included in the Assets and all derivatives of the technology included in the Assets." APA § 1.6.

With regard to internal business operations, the TLA granted Novell an unrestricted license to "use, reproduce and modify, and authorize its customers to use, reproduce, and modify, Licensed Technology." TLA II.A.(1). With regard to external use, the TLA granted Novell a license to "sublicense and distribute, and authorize its customers to sublicense and distribute, such Licensed Technology and modifications thereof, in source and binary form." *Id.* II.A.(2). This license as to external use was subject to the following limitation: "provided, however, that (1) such technology and modifications may be sublicensed and/or distributed by Novell solely as part of a bundled or integrated offering ("Composite Offering"); (ii) such Composite Offering shall not be directly competitive with core application server offerings of SCO, and (iii) the Licensed Technology shall not constitute a primary portion of the value of such Composite Offering." *Id.* SCO contends that these provisions constitute a non-compete provision, whereas Novell argues that they are merely a limitation on its license.

6

The TLA further stated that this limitation "shall cease to exist" in the event of a "Change of Control" of Santa Cruz. *Id.* B. The TLA states that "Change of Control" shall have the meaning attributed to it in the APA. *Id.* I. Under Section 1.6 of the APA, which provides for the license back of assets and which provides the basis for entering the TLA, it states that "the license agreement shall also provide [Novell] with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of [Santa Cruz] described in Section 6.3(c) hereof." APA § 1.6. Section 6.3(c) of the APA is entitled "Expansion of Seller's Rights Relating to the Licensed Technology upon a Change of Control" and provides that

> [u]ntil two (2) years from the Closing Date, in the event [Santa Cruz] has merged with, sold shares representing 50% or more of the voting power of [Santa Cruz] to, sold all or substantially all of [Santa Cruz's] assets to, or engaged voluntarily in any other change of control transaction with, any party identified by [Novell] on Schedule 6.3(a) hereof, or in the event any party identified by [Novell] on Schedule 6.3(a) hereof, shall acquire shares representing 50% or more of the voting power of [Santa Cruz], [Novell] shall automatically have unlimited, royalty-free, perpetual rights to the Licensed Technology.

*Id.* § 6.3(c).

Section 1.6 of the APA further provides that "[i]n the event of a Change of Control of [Novell] (as described in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to [Novell's] products either developed or substantially developed as of the time of the Change of Control." *Id.* § 1.6. Section 6.6(c) of the APA is entitled "Change of Control" and provides that

> For purposes of this Agreement, a "Change of Control" with respect to one party shall be deemed to have occurred whenever (i)

7

> there shall be consummated (1) any consolidation or merger of
> such party in which such party is not the continuing or surviving
> corporation, or pursuant to which shares of such party's common
> stock would be converted in whole or in part into cash, other
> securities or other property, other than a merger of such person in
> which the holders of such party's common stock immediately prior
> to the merger have substantially the same proportionate ownership
> of common stock of the surviving corporation immediately after
> the merger, or (2) any sale, lease, exchange or transfer (in one
> transaction or a series of related transactions) of all or substantially
> all the assets of such party, or . . . (v) any other event shall occur
> with respect to such party that would be required to be reported in
> response to Item 6(e) (or any successor provision) of Schedule 14A
> of Regulation 14A promulgated under the Exchange Act."

*Id.* § 6.6(c)

In 2001, Santa Cruz sold its UNIX business to Caldera Systems, Inc., the immediate

predecessor to SCO.  The assets sold by Santa Cruz included all of the UNIX assets that it had

purchased from Novell in 1995, plus other assets that collectively accounted for 100% of Santa

Cruz's operating income and 94.7% of its net revenues.

In the TLA, the parties recognized that the TLA and the APA "constitute the entire

understanding between the parties with respect to its subject matter, and supersede all prior

understandings, both written and oral, between them relating to such subject matter."  TLA VIII.

*(4) Amendment No. 1*

On December 6, 1995, a few months after the APA was signed and the date the

transaction closed, Novell and Santa Cruz signed Amendment No. 1.  Decl. Mark James Ex. 2

("Am. No.1").  Amendment No. 1 made several clarifying amendments, including specific

revisions to Schedule 1.1(a) and 1.1(b).  Am No 1 ¶¶ K, L.  "All other terms and conditions of

the [APA] remain[ed] in full force and effect."  Am. No. 1 at 10.  Amendment No. 1 did not

change the description of Intellectual Property that was included and excluded from the transferred Assets under Schedules 1.1(a) and 1.1(b). *See id.* ¶¶ K, L.

Amendment No. 1 also made amendments to the APA with respect to the agreement regarding SVRX Licenses and Royalties that will be discussed in a later section.

*(5) Extrinsic Evidence*

Both parties have submitted a substantial amount of evidence in connection with the negotiation and execution of the APA and its amendments, as well as the parties' conduct after the APA was signed.

*(a) Purpose of Agreement*

Santa Cruz's stated purpose for entering the APA with Novell and acquiring the UNIX and UnixWare business was to be the supplier of Unix to the industry and to develop a future consolidated version of Unix that ran on an Intel processor. Decl. Mark James Ex. 6 ("Mohan Dep.") at 38-39. Beyond that, SCO has provided little evidence as to its intent with respect to specific provisions of the Agreement or its business strategy for structuring such a complex relationship between the parties. Novell, however, has produced significant evidence as to its business strategy and intent with respect to specific provisions.

In early 1995, Novell decided to divest itself of certain UNIX-related assets. Decl. James R. Tolonen at ¶ 4. Although Novell wanted to sell the entire UNIX and UnixWare business to focus on its Netware product, it became clear during negotiations with Santa Cruz that Santa Cruz could not afford to purchase the entirety of Novell's UNIX and UnixWare assets and rights. *Id.* ¶ 4. Consequently, Novell and Santa Cruz focused on a more limited deal that also included a forward looking revenue stream for Novell.

9

Novell has submitted evidence that an important consideration for its sale of UNIX assets was Santa Cruz's commitment to develop enhanced UnixWare products that were compatible with Novell's Netware product. The APA required Santa Cruz to develop a merged product that would combine Novell's version of the UNIX operating system with Santa Cruz's version of UNIX. APA § 4.18. Novell and Santa Cruz hoped that the merged product would provide a commercially successful alternative to Microsoft's Windows system. Decl. Tor Braham at ¶ 8. Novell's Netware product needed an alternative operating system if it was to compete with Microsoft. *Id.* Novell also had a strong interest in the development of a commercially successful UNIX operating system that would run on Intel's 64-bit processors because it would expand the market for Netware. *Id.* ¶ 13-14; Decl. David Bradford at ¶ 1,3; Decl. James Tolonen at ¶ 12.

Novell had concerns about entrusting the future of UNIX and Novell's UNIX-related interests to Santa Cruz. Decl. David Bradford at ¶ 7. David Bradford, Novell's Senior Vice President and General Counsel, states that there were serious concerns about Santa Cruz's viability as a company, and Novell became focused on building in protections for Novell in the event that Santa Cruz went bankrupt. *Id.* ¶ 8.

First, Santa Cruz was given legal title to SVRX Licenses "and not equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code." APA § 1.2(b). According to the principal drafter of the APA, Tor Braham, this provision was added to decrease the risk that Novell's receipt of SVRX revenues would be impacted if Santa Cruz went into bankruptcy. Decl. Tor Braham ¶ 10.

Second, Novell asserts that it intended to exclude all copyrights from the assets to be transferred in order to protect its future SVRX revenues. *Id.* at 18-19; Decl. David Bradford ¶¶

10

11-12; Decl James Tolonen ¶ 11.  In the event Santa Cruz went into bankruptcy, the UNIX and

UnixWare copyrights would not be part of the bankruptcy estate and the bankruptcy trustee could

not assert an interest in them.  Decl. Tor Braham ¶ 14, Decl David Bradford ¶ 9; Decl. James

Tolonen ¶ 12.  Excluding copyrights from the transferred assets also protected Novell's other

UNIX-related interests.  Retaining ownership of the copyrights would strengthen Novell's rights

to negotiate buy-outs of the SVRX Licenses and to receive future revenues.  Decl. Tor Braham ¶

14; Decl. James Tolonen ¶ 12.  Furthermore, it put Novell in a better position to ensure

successful development of future versions of the UNIX operating system.

    SCO's extrinsic evidence regarding Santa Cruz's inability to proceed with a cash deal

appears to conflict.  Many of SCO's witnesses refer to the value of the stock Santa Cruz provided

as consideration as evidence that such a sum would purchase Novell's whole UNIX-related

business.  Such testimony, however, is at odds with other witness testimony stating that the deal

would not have proceeded without the creation of a future revenue stream for Novell.  Testimony

that additional revenue was necessary is consistent with the amount Novell paid for its

acquisition of UNIX assets from AT&T and the fact that the shares of stock Santa Cruz

transferred were only part of the consideration provided in the APA.

    The consideration provided through future royalties significantly complicated the

agreement and the parties' ongoing relationship.  SCO, however, has provided virtually no

evidence from its perspective as to the purpose of or strategy behind the creation of a continuing

stream of revenue for Novell other than some testimony that it could not afford to acquire it and

the deal would not have proceeded otherwise.

11

*(b) Drafts of Agreement*

The correspondence between Novell and Santa Cruz prior to the date the APA was signed shows that significant revisions were made to the agreement. A September 8, 1995 draft of Schedule 1.1(a), which listed the assets to be transferred, included "all patents, patent applications, copyrights . . . and all other intellectual property . . . that pertain to Unix or UnixWare." Decl. Tor Braham at ¶ 15, Ex. 6.

Novell's outside counsel drafted a new schedule of assets to be included in the asset transfer as well as a schedule of assets to be excluded from the transfer. *Id.* ¶ 15. The new Schedule 1.1(a) deleted copyrights, patents, and all other intellectual property from the assets to be transferred. The revised Schedule 1.1(a) included only the UNIX and UnixWare trademarks as the "Intellectual Property" included in the transaction. The new Schedule 1.1(b), which listed the assets excluded from the transfer, listed all copyrights, all patents, and all trademarks except for the UNIX and UnixWare trademarks.

Novell submitted evidence demonstrating that during the negotiations, David Bradford, Tor Braham, Aaron Alter, and Burt Levine all reviewed and approved the language in the Excluded Assets Schedule 1.1(b). *Id.* ¶ 16. SCO has not provided evidence from witnesses on the Santa Cruz side of the transaction with respect to their review of the asset schedules. In fact, there is no evidence from any of Santa Cruz's outside counsel and very little evidence from Santa Cruz's in-house legal department regarding the drafting of the APA.

*(c) Parties' Conduct*

Both parties have also submitted in support of their respective interpretations of the APA extrinsic evidence of the parties' conduct in relation to the APA.

The day before the APA was signed, David Bradford, Novell's Senior Vice President and General Counsel, presented the agreement to the Novell Board of Directors for approval and reviewed its terms with them. The minutes from that board meeting state: "RESOLVED . . . Pursuant to the Asset Purchase Agreement . . . Novell will retain all of its patents, copyrights, and trademarks (except for the trademarks UNIX and UnixWare) . . . ." Decl. David Bradford at ¶¶ 13-14, Ex. 1.

On September 20, 1995, SCO claims that the parties issued a joint press release regarding the APA, stating that "[a]ccording to the terms of the agreement, SCO will acquire Novell's UnixWare business and UNIX intellectual property." Novell questions whether it was a "joint" press release because unlike a typical joint press release, the September 20, 1995 press release does not contain Novell's logo, contact information, or company description. Instead, it contains information only for Santa Cruz. In any event, the press release does not provide specific information about whether copyrights transferred. It is undisputed that trademarks did transfer, which would account for a statement that intellectual property passed. However, the vague use of the term "intellectual property" could not be read to include *all* intellectual property because it is also undisputed that no patents were transferred. Therefore, the press release, whether a joint statement or not, provides little information in its reference to unspecified "intellectual property." Novell also issued two press releases about the APA, which are on Novell's website, and neither mention of the transfer of copyrights or, more broadly, the transfer of intellectual property.

On October 4, 1995, two weeks after the signing of the APA, David Bradford certified a Notification and Report Form to the Federal Trade Commission. Decl. Mark James Ex. 84. The

language used in the Form was consistent with the language of the APA's "Recitals," stating that

Santa Cruz was acquiring "certain assets" of Novell's UNIX and UnixWare business. *Id.* In a

section of the Form entitled "Assets to be Acquired," Novell stated: "The assets to be acquired by

SCO are described with particularity in Schedule 1.1(a) of the Agreement." *Id.* Schedule 1.1(a)

was the list of assets included in the transfer. Novell also included specific portions of Schedule

1.1(a) in the Form which SCO claims could be read to mean that the whole business transferred.

The Form, however, clearly directed the FTC to the Agreement for the details regarding the

assets being transferred.

After the APA closed in December 1995, Santa Cruz came into physical possession of the

UNIX copyright registrations because they were kept in the business files of the UNIX unit in

New Jersey, which transferred to Santa Cruz under the APA. Decl. Mark James Ex. 23-25. The

UNIX unit and its business files remained in New Jersey throughout the changes in ownership of

the business—from AT&T to UNIX System Laboratories to Novell to Santa Cruz. Burt Levine

Dep. at 19-20. SCO asserts that its possession of these registrations is evidence that the parties

intended to transfer UNIX and UnixWare copyrights under the APA. Novell contests that this

evidence is relevant or indicative of the parties' intent under the APA. Novell makes no

assertion that it ever attempted to remove the registrations from the New Jersey facility or

otherwise obtain physical possession of them. Greg Jones 30(b)(6) Dep. at 177-79. Rather,

Novell comments only that the physical possession of the registrations was not a concern or

viewed as a necessity to it.

Since 1995, Santa Cruz and SCO have shipped UNIX-related products with copyright

notices affixed to them and entered into hundreds of license agreements for UNIX Products

containing express representations and warranties of SCO's rights and ownership in the intellectual property required to provide the licensed product. Decl. Edward Normand Ex. 27, 28. Novell notes that products were shipped with joint copyright notices that indicated Novell's original UNIX and UnixWare code and SCO's ownership of modifications to that code. For example, one of the joint copyright notices states: "Copyright 1996 The Santa Cruz Operation, Inc. All rights reserved. Copyright 1984-1995 Novell, Inc. All rights reserved." Decl. James McKenna at ¶ 5. SCO claims that this copyright notice indicates that Novell transferred the copyrights in 1995 under the APA, and Novell contends that the notice indicates Novell's continued ownership of the copyright to the original UnixWare code and SCO's ownership only of the copyright to modifications to that code made the year after the APA (1996). Furthermore, Novell asserts that if Santa Cruz owned the copyright to both the original code and the derivative work, the copyright notice would not have mentioned Novell at all.

With respect to licenses containing any incorrect representations and warranties, Novell contends it was not aware of any such licenses. Novell claims that the first license agreement with Integration Design does not appear to involve UNIX and UnixWare licenses so it would not have been necessary to submit it to Novell for approval. Normand Decl. Ex. 30. SCO itself has admitted that the other two licenses, with Lucent Technologies and Samsung Electronics, also did not need to be shown to Novell for approval. Supp. Brakebill Decl. Ex. 25, Response No. 7. In any event, none of these three licenses contains any representation or warranty of SCO's copyright ownership.

15

*(d) Witness Testimony*

There is extrinsic evidence from several individuals who were involved at different stages of the negotiations of the APA and from business people involved in the transition of the business to Santa Cruz.  Interestingly, many of the witnesses who were on the Novell side of the APA transaction went to work for Santa Cruz as a result of the deal.  The relevance of much of the testimony is questionable because few have a recollection of actual discussions regarding the transfer or retention of copyrights.  Many witnesses give an opinion as to whether they think the copyrights should have transferred, but they fail to establish an adequate foundation to support their opinion.  Given the volume of the testimony presented to the court and the number of attorneys and business people involved in the transaction, it is surprising that there is not more testimony on the drafting and negotiation of the intellectual property provisions from both sides of the deal.

Novell was represented in the transaction by the law firm of Wilson, Sonsini, Goodrich & Rosati ("Wilson Sonsini").  Tor Braham managed Wilson Sonsini's team, was the primary negotiator with respect to the contract language, and was the primary drafter of the APA text.[2] Braham testified that the APA was not a "straight up asset purchase" because Santa Cruz did not have the cash to buy both the UNIX assets that Novell had purchased in 1993 plus Novell's UnixWare business.  Decl. Tor Braham ¶ 7.   As a result, the deal became more complex, and

---

[2]  The record is not clear as to whether Braham was the primary drafter of the APA for Novell or both parties.  Nevertheless, in the APA, the parties agreed that they had both been represented by counsel during the negotiation and execution of the agreement and waived the application of any law "providing that ambiguities in an agreement . . . will be construed against the party drafting such agreement." APA § 9.9.

Novell needed to negotiate provisions into the contract to protect its business and legal interests. *Id.*

Braham had regular communications with Novell's General Counsel, David Bradford, and tried to achieve Novell's goals as communicated by Bradford. *Id.* ¶ 6. During the negotiations, Bradford indicated to Braham that Novell was unwilling to transfer intellectual property rights in UNIX and UnixWare, including patents and copyrights. *Id.* ¶ 14. Accordingly, Braham's team revised an early draft of a Schedule of Assets that had included patents, copyrights, and trademarks and drafted a new schedule of included assets and a schedule of excluded assets. *Id.* ¶ 15. Braham also made changes to Section 1.1(a) of the APA where the distinction between included and excluded asset schedules is made with respect to the assets transferred. *Id.* ¶ 19.

Braham testified that to his knowledge, and based on his review of the Wilson Sonsini files, at least four representatives of Novell reviewed and approved the excluded assets provision. *Id.* ¶ 16. During the course of the negotiations, the Wilson Sonsini team transmitted drafts of the two schedules to Santa Cruz representatives, and drafts would be redlined to show changes. *Id.* ¶ 17. Braham testified that although the APA did not transfer copyright ownership to Santa Cruz, Santa Cruz received other rights and interests in UNIX and UnixWare that gave it a license to copy and use Novell's copyrighted code as needed to implement the activities contemplated by the APA. Furthermore, it was Braham's understanding that while Novell retained the copyrights in the original code, Santa Cruz would own the copyrights in any code that it wrote and Novell would need a license to such code. *Id.* ¶ 23. Therefore, Braham added the term "Licensed Technology" in Section 1.6 of the APA during the drafting process to refer to newly developed

17

code and other technology in UNIX and UnixWare–such as trade secrets, software know-how, etc.–that were not excluded from the assets transferred to Santa Cruz. *Id.* ¶¶ 22, 23.

Robert Frankenberg, then-President and CEO of Novell, testified in a deposition that his initial intent in entering into negotiations, intent at the time the APA was signed, and intent when the transaction closed was that Novell would transfer copyrights to UNIX and UnixWare technology to Santa Cruz. Decl. Mark James Ex. 7 ("Frankenberg Dep.") at 7, 135. This testimony is obviously at odds with the minutes of the Board meeting and the testimony of the chief drafters of the APA for Novell. Somewhat self-contradictorily as well, Frankenberg also testified that he had high-level discussions with the negotiating team and recalled discussing the fact that retaining UNIX copyrights would facilitate Novell's exercise of rights with respect to capitalizing the SVRX revenue stream and facilitate the negotiation of SVRX License buyouts. *Id.* at 65-66, 68. The evidence submitted as to Frankenberg's role shows that he was not intimately involved in the deal. Frankenberg testified that he was involved in high-level discussions but was not involved in the negotiation or drafting of the APA. He further stated that he did not review the details of the deal and he signed the APA on the basis of the recommendation of his team. *Id.* at 68.

David Bradford, Novell's Senior Vice President and General Counsel, oversaw the negotiation and drafting of a contract between Novell and Santa Cruz. Decl. David Bradford at ¶ 4. During the negotiations of the APA, he discussed with Braham the need to increase Novell's protections in the transaction, including but not limited to retaining Novell's intellectual property rights in UNIX and UnixWare. *Id.* ¶ 9. Bradford testified that the exclusion of copyrights was intentional and "should any person suggest otherwise, they are mistaken." *Id.* ¶ 12. Bradford

18

reviewed the terms of the APA with the Novell Board of Directors at a meeting held on

September 18, 1995, the day before the APA was signed.  *Id.* ¶ 13.  Bradford received the final

APA on the day it was executed and was responsible for reviewing it and approving it for final

signature by Frankenberg.  *Id.* ¶ 17.  Bradford wrote a memorandum reflecting his approval of

the APA.  *Id.*  He testified in this litigation that he still agrees with the statement that the APA is

"an accurate reflection of the business and legal terms and conditions negotiated between the

parties."  *Id.*

James Tolonen, Novell's Chief Financial Officer from 1989 through 1998, testified that

he was actively involved in the preparation of the APA.  Tolonen Decl. ¶¶ 3, 7.  Tolonen

interacted with Bradford, who he described as the "point person" heading up Novell's

negotiation team, and Braham.  *Id.* ¶¶ 8, 9.  Tolonen reviewed drafts of the APA and reviewed

the final version of the APA to ensure that its terms were consistent with the intent of the deal.

*Id.* ¶¶ 9, 10.  Tolonen testified that "[a]s reflected in the plain language of the executed [APA],

Novell intended to retain and did retain, as an 'Excluded Asset,' all copyrights, including all

UNIX and UnixWare copyrights."  *Id.* ¶ 11.

Ed Chatlos, Novell's Senior Director for UNIX Strategic Partnerships and Business

Development, was a primary negotiator for Novell during the business negotiation of the deal.

Chatlos' Declaration states that he left Novell voluntarily in 1996, but it does not indicate his

current employment.  Decl. Mark James Ex. 12 ("Chatlos Decl.") at ¶ 4.  He did disclose in his

deposition, however, that his wife has been employed by SCO since the time of the APA in 1995.

Decl. Mark James Ex. 13 ("Chatlos Dep.") at 49.   During the business negotiations of the APA,

Chatlos recalled disputes over the price because SCO could not pay the full purchase price as

contemplated by Novell. *Id.* at 36. He testified that the royalty payments were used as a resolution to bridge the gap. *Id.* Chatlos also testified that there was no discussion about excluding or including copyrights because he believes it was implicit in the deal that the copyrights would be transferred. *Id.* at 122-24. He testified that he was not involved in any discussions with Novell's negotiation team regarding concerns of a potential bankruptcy by Santa Cruz. However, he also testified that he believes that the APA reflects the intent of the agreement. *Id.* at 130. Although he continued to review drafts of the agreement, his deposition testimony reflects that he had little recollection of the work done by Novell's legal team. *Id.* at 105. He could not recollect David Bradford's role in the deal or the names of the attorneys at Wilson Sonsini who worked on the APA. *Id.* at 37, 80.

Duff Thompson, a former Novell executive who now chairs SCO's litigation committee, testified that testified that his recollection of the deal was the initial direction from Frankenberg to sell the whole business. Decl. Mark James Ex. 10 ("Thompson Decl.") at ¶ 4. Thompson did not recall "any specific discussions around copyrights" or any "discussion with SCO about the excluded asset schedule" during negotiation of the deal. Decl. Mark James Ex. 11 ("Thompson Dep.") at 86. Ty Mattingly testified that Thompson was "not really involved in the details of the Novell, Santa Cruz transaction." Mattingly Dep. at 70-71. He stated that Thompson was "checked out" during the drafting of the APA and was "not in the office that often." *Id.* at 71-72. He also testified that he relied on Tor Braham and his team for the detail drafting of the agreement. *Id.* at 30-31. Braham confirmed that Thompson "was not involved in negotiating or drafting the APA contract language." Decl. Tor Braham ¶ 24. However, Thompson testified that if Novell had intended to retain the copyrights, it would have said "you get all the business

20

except the copyrights."  Thompson Dep. at 133.

Ty Mattingly, Novell's Vice President for Strategic Relations at the time of the APA, testified in his deposition that it was his belief that Novell sold the Unix business to SCO, and that SCO paid roughly 125 million dollars because it bought the UNIX business from Novell "basically in its entirety."  Decl. Mark James Ex. 9 ("Mattingly Dep.") at 10.  He further explained that his view was that "[t]he only things that did not go with that was a kind of an agent relationship whereby SCO was collecting the SVRX royalties from existing OEMs at the time we sold that business and then giving the bulk of those moneys back to Novell."  *Id.* at 29-32.  Mattingly, however, also testified that his role "related only to high level business strategy" and he was "not involved in the details of the legal document."  *Id.* at 66.  He admitted that he was involved "very superficially" in the "last two or three weeks before the contract was executed," which was "when the back and forth concerning the legal provisions was taking place."  *Id.* at 68-69.

Burt Levine, a former Novell in-house attorney who went to work for Santa Cruz after the APA, testified that he worked on some early drafts of the APA but cannot remember which specific provisions.  Levine did testify, however, that during APA negotiations, he reviewed and marked up drafts of Schedules 1.1(a) and (b).  Decl. Mark James Ex. 14 ("Levine Dep.") at 72-74.  He revised the list of included assets but did not add copyrights.  *Id.* at 74.  He then faxed his markup to outside counsel, who passed on his comments to Santa Cruz's outside counsel, Brobeck Phleger.  *Id.* at 72-73, 77-80.  However, he testified that he would have been surprised to hear that Novell retained the UNIX and UnixWare copyrights.  Assuming, however, that the copyrights were excluded from the APA, he testified that SCO would have an inherent license to

use those copyrights in the business.  *Id.* at 89.

William Broderick, a contract manager and member of the Novell APA transition team who is now the Director of Software Licensing for SCO, testified that his understanding of the sale of assets was that the UNIX copyrights were transferred.  Decl. Mark James Ex. 15 ("Broderick Decl.") ¶¶ 1, 6, 11.  Although SCO claims that Broderick testified that his understanding was based on Novell's explanation of the transaction during company-wide meetings and meetings of the transition team, he testified in his deposition that he did not recall any specific discussion about the transfer of copyrights.  *Id.* Ex. 16 ("Broderick Dep.") at 49-51.

Alok Mohan, CEO of Santa Cruz at the time of the APA, testified that he believes Santa Cruz bought the whole business, including copyrights.  Mohan Dep. at 138-40.  But he was not aware that the subject of UNIX copyrights was specifically addressed in the contract.  *Id.* at 143-44.  Mohan testified that he was involved in the negotiations "only at a high level," not in the "detail level of negotiations."  *Id.* at 10-11.  He was also not involved in the "specific drafting of the documents," was not on a distribution list of individuals at Santa Cruz to receive drafts of the agreement, and did not recall the firm or attorneys Santa Cruz hired to represent it in the transaction.  *Id.* at 10-11, 14-17.  He testified that "the issue of copyrights in or out was not discussed with me."  *Id.* 261-62.  Furthermore, he contends that Novell did not tell him that it had kept the copyrights, but he also admits that Novell did not tell him that it had given them to Santa Cruz either.  *Id.* at 261-262.  He did believe, however, that Santa Cruz "tried to make the document represent . . . the intent . . . . And we captured, I thought at that time, what the intent was."  *Id.* at 13.

Doug Michels, Senior Vice President of Santa Cruz at the time of the APA, stated in his deposition that "the only way that I know of, and anyone on my team knew of, to buy a software business is to buy the copyrights, and there is no way we would have ever done a deal to buy a software business where we didn't get the copyrights and all the other intellectual property." Decl. Mark James Ex. 18 ("Michels Dep.") at 134. Michels testified that he was very involved in the initiation of the APA, but that he was only involved in two or three meetings with Novell after the initial discussion about the deal. *Id.* at 11-12. He did not draft any language of the APA or review drafts of it. He does not recall "even vaguely" any debates in which he participated regarding the drafting of the APA. *Id.* at 12-13. He also does not recall any discussion by anyone either at Novell or Santa Cruz regarding the transfer or retention of UNIX copyrights. *Id.* at 50-52.

Jim Wilt, a business development executive at Santa Cruz, testified that it was his understanding and intent during the negotiations that SCO would acquire Novell's entire UNIX and UnixWare business, including the copyrights. Decl. Mark James Ex. 19 ("Wilt Decl.") ¶ 8. He viewed the copyrights as essential to the acquisition of a software company. *Id.* Ex. 20 ("Wilt Dep.") at 76-80. Although SCO refers to Wilt as the lead negotiator for Santa Cruz, Ed Chatlos testified that Wilt "dropped out" in the latter half of the negotiations of the Santa Cruz-Novell deal and Wilt, himself, concurred that he was less active at the end of the negotiations when the APA was being drafted. Chatlos IBM Dep. at 184-185; Wilt Dep. at 20-21. He also testified that the lawyers did the drafting of the APA. Wilt testified that he did not recall anyone from Novell stating that copyrights were being transferred. Wilt Dep. 57-59.

SCO also relies on the understanding of Kimberlee Madsen, a paralegal in Santa Cruz's legal department. Decl. Mark James Ex. 22 ("Madsen Dep.") at 6-7. She testified that she participated in the negotiations leading up to the drafting of APA and reviewed and drafted some of the agreement. Madsen Dep. at 13. She testified that it was always her understanding that the UNIX copyrights were part of the assets Santa Cruz purchased and she could not recall anyone in the negotiation team discussing the retention of copyrights. *Id.* at 79.

## B. Amendment No. 2 to the APA

Approximately a year after the APA was signed, on October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. Decl. Mark James Ex. 5 ("Am. No. 2"). APA Amendment No. 2 amends the Schedule of Excluded Assets in Schedule 1.1(b) to exclude "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the [APA] required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." Am. No. 2 § A.

Amendment No. 2 did not specify which copyrights, if any, were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." Amendment No. 2 also did not contain any provision actually transferring ownership of copyrights or other assets from Novell to Santa Cruz. Amendment No. 2 states that the APA was amended "[a]s of the 16th day of October 1996." *Id.* Therefore, it did not retroactively amend the APA as of the date the APA was signed or the date the transaction closed. Furthermore, the parties did not execute a "Bill of Sale" or any similar document transferring copyrights from Novell to Santa Cruz in connection with Amendment No. 2, nor did they amend the previous Bill

of Sale.  Moreover, Amendment No. 2 did not make any corresponding amendment to the transferred assets on Schedule 1.1(a).

During negotiations on Amendment No. 2, SCO attempted to effectuate a transfer of the copyrights of UNIX and UnixWare, but Novell rejected the proposal.  Decl. Allison Amadia at ¶ 6, 8, 10.  During the summer of 1996, Steve Sabbath, Santa Cruz's General Counsel, telephoned Allison Amadia, in-house counsel for Novell, about amending the APA.  *Id.* ¶ 6.  She testifies that Sabbath stated to her that the original APA explicitly excluded copyrights to UNIX and UnixWare and that Santa Cruz wanted to amend the original to give Santa Cruz those copyrights. *Id.*

Amadia had not been involved in the original deal.  After her conversation with Sabbath, she reviewed the APA and contacted Novell's outside counsel, Tor Braham, to gain his understanding of the transaction.  *Id.* ¶ 7.  Through these efforts, she learned that ownership of the UNIX and UnixWare copyrights did not transfer to Santa Cruz under the APA.  *Id.*

Sabbath later sent Amadia a draft proposal revising Schedule 1.1(b) of the APA to read: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment No.2, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder. . . ."  *Id.* ¶ 8, Ex. 1.  Novell rejected the proposed amendment.  *Id.* ¶ 10.  Amadia told Sabbath that while Novell was willing to affirm that Santa Cruz had a license under the APA to use Novell's UNIX and UnixWare copyrighted works in its business, Novell would not transfer ownership of any copyrights.  *Id.*

Instead of a blanket exception for copyrights pertaining to UNIX and UnixWare technologies, the final version of Amendment No. 2 was limited to copyrights that were

25

"required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." Amend. No. 2 § A. The final version of Amendment No. 2 also deleted Santa Cruz's proposed reference to copyrights "which SCO has acquired hereunder." Amendment No. 2 does not include any reference to an acquisition or transfer of copyrights.

Jim Tolonen, Novell's Chief Financial Officer and Novell's business executive assigned to Amendment No. 2, confirms that it was never Novell's intent to transfer copyrights by way of Amendment No. 2. Decl. Jim Tolonen at ¶ 13, 14. He states that he would not have signed it if he had believed it would do so. *Id.* ¶ 15. He testifies that Amendment No. 2 was also not meant to "clarify" what the parties intended to transfer in the original APA. *Id.* ¶ 14. Rather, he states that Novell intended to retain the UNIX and UnixWare copyrights in the APA, and Amendment No. 2 confirmed that Santa Cruz would be allowed to continue to use the Novell-retained copyrights–as it had been doing–as was required to exercise its rights under the APA. *Id.* ¶ 16.

Sabbath has no recollection of negotiating the copyright portion of Amendment No. 2. SCO relies on the testimony of Robert Frankenberg and Ed Chatlos regarding Amendment No. 2. However, both men had left Novell before Amendment No. 2 was negotiated and had no involvement in the negotiation of the amendment. Frankenberg Dep. at 86; Chatlos Decl. ¶ 4. SCO relies on the testimony of several other individuals involved in the business, but none of them admits to being involved in the negotiations of Amendment No. 2 or to having any specific recollection of the negotiations with respect to the transfer of copyrights.

## C. Santa Cruz/Caldera Assignment Agreement

Santa Cruz assigned various items of intellectual property to Caldera in an agreement dated May 7, 2001 ("Assignment Agreement"). Supp. Brakebill Decl. Ex. 1 ("Caldera

Agreement").   That Assignment Agreement purports to transfer various UNIX and UnixWare copyrights.  Caldera Agreement § 1, Sched. C.  In the Assignment Agreement, Santa Cruz made representations and warranties with respect to the intellectual property rights being transferred. *Id.* § 8(v).  The Assignment Agreement states that Santa Cruz "has no knowledge of any fact that would prevent [Caldera's] registration of any Rights related or appurtenant to the Inventions and Works or recording the transfer of Rights hereunder (except that Assignor may not be able to establish a chain of title from Novell Inc. but shall diligently endeavor to do so as soon as possible)." *Id.*

The initial draft of the Assignment Agreement had provided an unlimited representation and warranty from Santa Cruz.  Supp. Brakebill Decl. Ex. 5, at § 8(v).  In transmitting the draft, Caldera's attorney proposed that Santa Cruz's assignment of intellectual property obtained from Novell would require the inclusion in the Assignment Agreement of "a single exhibit from the Novell/SCO Asset Purchase Agreement." *Id.* at 1.  Four days later, an in-house attorney at Santa Cruz responded with a redlined draft that included an exception to Santa Cruz's representation and warranty stating "[e]xcept for the inability to obtain third party acknowledgments to establish a chain of title." *Id.* Ex. 6 at § 8(v).  Four days later, Caldera's counsel circulated a final draft of the agreement with a cover email stating that Santa Cruz was "trying to get Novell to sign a global IP assignment, for chain of title purposes." *Id.* Ex. 7 at 1.  But the final draft recognized that Santa Cruz may not be able to establish a chain of title from Novell. *Id.* Ex. 1 at § 8(v).

**D.  Private Communications Between SCO and Novell**

In late 2002, Darl McBride, SCO's CEO, contacted Novell on several occasions seeking copies of records concerning SCO's intellectual property rights to UNIX.  Greg Jones Decl. ¶ 13.

On January 4, 2003, McBride received an email from Michael Anderer, a consultant for SCO retained to examine its intellectual property.  Supp. Brakebill Decl. Ex. 12.  Anderer stated that the APA "transferred substantially less" of Novell's intellectual property than Novell owned.  Anderer noted that Santa Cruz's "asset purchase" from Novell "excludes all patents, copyrights, and just about everything else."  *Id.*  Anderer cautioned that "[w]e really need to be clear on what we can license.  It may be a lot less than we think."

On February 4, 2003, McBride contacted Christopher Stone, Vice Chairman of Novell, and stated that he wanted Novell to "amend" the APA to give SCO "the copyrights to UNIX."  Supp. Brakebill Decl. Ex. 17; *id.* Ex. 18 ("Stone Dep." at 108-09).  Then, on February 25, 2003, McBride twice called a Novell employee in business development, David Wright, and said, "SCO needs the copyrights."  Wright passed on McBride's request to Novell's in-house legal department.  Supp. Brakebill Decl. Ex. 13.  McBride's request was memorialized in an email written that day by a Novell in-house attorney, Greg Jones.  *Id.*

Also early in 2003, McBride and Chris Sontag of SCO contacted Greg Jones regarding the UNIX copyrights.  *Id.* Ex. 8 ("Decl. Greg Jones") at ¶¶ 13, 14; Decl. Christopher S. Sontag ¶ 6.  McBride stated that "the asset purchase agreement excluded copyrights from being transferred" and that it was a "clerical error."  Jones Dep. at 182.  On February 20, 2003, Chris Sontag also sent a draft letter to Novell that sought to clarify the parties' rights under the APA.  Decl. Christopher S. Sontag Ex.

Again in March 2003, McBride called Stone to ask him if Novell would "give him some changes so he could have the copyrights."  Christopher Stone Dep. at 248-49.  Ralph Yarro, Chairman of SCO, requested an in-person meeting with Stone.  In that meeting, on May 14,

2003, Yarro told Stone that he wanted Novell to amend the APA to give SCO the copyrights. Supp. Brakebill Decl. Ex. 17 at 4; Stone Dep. at 137-8. Stone refused. *Id.* On May 19, 2003, McBride called Stone and Joe LaSala, Novell's General Counsel, and again requested that Novell convey the copyrights to SCO. McBride said, "we only need you to amend the contract so that we can have the copyrights." Stone Dep. 249-250. Stone made notes in June 2003 memorializing both conversations. Supp. Brakebill Decl. Ex. 17.

**E. SCOsource Initiative**

In approximately this same time frame, in January 2003, SCO launched its SCOsource initiative, which was an effort to obtain license fees from Linux users based on claims to Unix System V intellectual property. McBride commented that "SCO owns much of the core UNIX intellectual property, and has full rights to license this technology and enforce the associated patents and copyrights."

Under the SCOsource licensing program, SCO offered intellectual property licenses to Linux end-users. The purported purpose of these licenses is to allow UNIX vendors to use SCO's UNIX intellectual property and to compensate SCO for the UNIX intellectual property that it claims is found in Linux. In May 2003, SCO sent 1500 end-user corporations a letter threatening suit based on SCO's assertion that it owned the UNIX copyright and that Linux infringes on its UNIX intellectual property. Decl. Mark James Ex. 42. Novell and IBM were among the recipients of this letter.

SCO generated participation in and revenues from its licensing program. Decl. Mark James Exs. 80, 81. Despite success with some licensees, however, SCO's campaign generated

controversy that impacted its core software business. Internal SCO documents demonstrate that SCO's sales force was having difficulties selling the SCOsource licenses for a variety of reasons.

**F. Public Statements**

On March 6, 2003, SCO filed suit against IBM alleging, among other things, that IBM had violated its UNIX Software and Sublicensing Agreements by disclosing UNIX-derivative source code. A few months later, while the public was reacting to SCO's claim that the use of Linux required a UNIX license, Novell went public with a statement of its belief that it had not transferred the UNIX copyrights to SCO. On May 28, 2003, Novell's Chairman, President, and CEO Jack Messman announced publicly that Novell did not transfer the UNIX and UnixWare copyrights to SCO, and that SCO was not the owner of the copyrights. Decl. Mark James Ex. 36.

SCO and Novell continued the ownership dispute in a series of public statements over the next several months. On June 6, 2003, Novell issued a press release stating that SCO had sent Amendment No. to Novell the night before, that Novell was not aware of having the amendment in its files, and that the amendment "appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996." *Id.* Ex. 38.

On June 26, 2003, Novell notified SCO that "[u]pon closer scrutiny . . . Amendment No. 2 raises as many questions about copyright transfers as it answers. Indeed, what is most certainly not the case is that 'any question about whether UNIX copyrights were transferred to SCO as part of the Asset Purchase Agreement was clarified in Amendment No. 2' (as stated in its June 6 press release)." *Id.* Ex. 43.

In June or July 2003, SCO registered certain copyrights in UNIX System V and UnixWare with the United States Copyright Office. In September and October 2003, Novell

submitted certifications to the United States Copyright Office claiming to be the owner of the same UNIX System V and UnixWare copyrights.

Because SCO alleges in its Complaint that it owns the copyrights to UNIX and UnixWare, it claims "Novell's wrongful claims of copyrights and ownership in UNIX and UnixWare have caused, and continue to cause, irreparable harm to SCO."  In response to discovery, SCO maintained that Novell's statements impeded its ability to make sales in its SCOsource business.  Christopher Sontag Dep. at 117.  SCO identifies approximately a dozen prospective customers who mentioned the cloud over SCO's title to UNIX copyrights as one of its reasons not to purchase a SCOsource license.  Decl. Mark James Exs. 49, 57, 58, 62, 79, 88.  Several customers also stated that their reasons for not entering into a SCOsource license was due to their skepticism as to the necessity of obtaining a Unix license to operate Linux.

## G.  SVRX Licenses

Apart from the dispute with respect to copyright ownership, the parties have had ongoing disagreements as to their respective roles concerning SVRX licenses and royalties.  A significant part of the consideration for the APA came from Novell's receipt of future SVRX Royalties and royalties from the transfer of and future sales of UnixWare products.  APA § 1.2(b).

Under the APA, Novell and SCO agreed to an arrangement whereby Novell would continue to receive one hundred percent of the SVRX Royalties.  *Id.*  Santa Cruz was to collect and pass through these royalties to Novell, and Novell, in turn, would pay Santa Cruz an administrative fee of five percent of the SVRX Royalties.  Novell retained "all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to [Santa Cruz]."  *Id.*  Santa

Cruz "only has legal title and not equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code." *Id.*

Section 1.2(b) states that SVRX Royalties are "defined and described in Section 4.16." Under Section 4.16(a), Santa Cruz was to "administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under Item VI of Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties")." *Id.* § 4.16(a). Item VI of Schedule 1.1(a), in turn, states, "All contracts relating to SVRX Licenses listed below." Instead of providing a list of license agreements with various other parties, however, the Schedule then provides a list of UNIX System V software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, and 4.2, and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No 2.0." *Id.* Sched. 1.1(a)(VI).

Schedule 1.1(b) to the APA, the Excluded Assets schedule, specifically memorializes that the APA did not transfer any rights to the SVRX Royalties to Santa Cruz. Listed as an excluded asset in Schedule 1.1(b) is "[a]ll right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16." *Id.* Sched.. 1.1(b)(VIII).

Section 4.16(b) of the APA also contains a significant provision regarding the parties' authority with respect to SVRX Licenses. This section provides that Santa Cruz "shall not, and shall not have the authority to, amend, modify, or waive any right under or assign any SVRX License without the prior written consent of [Novell]." APA § 4.16(b). Under this section, Novell retained the sole discretion to direct Santa Cruz to amend, supplement, modify, waive, or assign any rights under or to any SVRX Licenses. *Id.* Novell was also granted authority to take any action on Santa Cruz's behalf that Santa Cruz may fail to take concerning the SVRX

Licenses. *Id.* Furthermore, Santa Cruz acknowledged that it had no right to "enter into future licenses or amendments of the SVRX Licenses, except as may be incidently involved through its rights to sell and license the Assets or the Merged Product . . . or future versions thereof of the Merged Product." *Id.*

With respect to UnixWare royalties, Section 1.2(b) of the APA states: "In addition, [Santa Cruz] agrees to make payment to [Novell] of additional royalties retained by [Novell] in respect of the transfer of UnixWare and on account of [Santa Cruz]'s future sale of UnixWare products." *Id.* § 1.2(b). The parties agreed that "[t]he amounts and timing of additional royalties to be paid in connection with [Santa Cruz]'s sale of the UnixWare products are identified in detail on Schedule 1.2(b) hereto." *Id.* Schedule 1.2(b) identifies the "Royalty Bearing Products" for which Santa Cruz was to pay royalties on and provides a structure for the payment of the royalties. *Id.* Sched. 1.2(b). Schedule 1.2(b) also states that the royalty obligation set forth in this schedule would terminate after Novell received payments equal to $84 million or December 31, 2002, whichever is sooner. *Id.* Sched. 1.2(b)(c). Schedule 1.2(b)(f) also recognized that Santa Cruz had the right to convert existing SVRX-based customers to a UnixWare derived product. *Id.* Sched. 1.2(b)(f). The Schedule then sets forth a process for determining if a customer is validly converted from SVRX to UnixWare. *Id.*

    *(a) Amendments Relating to SVRX Licenses*

Amendment No. 1 to the APA further obligated Santa Cruz to give Novell: (1) an estimate of the total SVRX Royalties amount within six days following the calendar month when the royalties are received; and (2) a "report detailing all such royalties" within one calendar month following each calendar month in which SVRX Royalties are received by Novell. Decl.

Mark James Ex. 2 ("Am. No. 1") ¶ E(f).  "Such monthly reports shall be separately broken down by revenue type (i.e. source code right to use fees, gross and net binary per copy fees, and support fees), by product, by customer, by quarterly period by which distribution occurs, and by country . . . of distribution." *Id.*

Amendment No. 1 expands SVRX licenses to include those contracts relating to certain "Auxiliary Products" expressly identified in Attachment A to that Amendment.  *Id.* ¶ K.4(i).  The first line of Schedule 1.1(a)(VI) was amended to read "All contracts relating to the SVRX Licenses and Auxiliary Product Licenses (collectively "SVRX Licenses") listed below."  *Id.*

Amendment No. 1 also modifies Section 4.16(b) to create two limited exceptions where Santa Cruz has "the right to enter into amendments of the SVRX Licenses."  *Id.* ¶ J.  Santa Cruz could enter into amendments of SVRX Licenses (1) as may be incidentally involved through its rights to sell and license UnixWare software or the Merged Product or (2) to allow a licensee under a particular SVRX License to use the source code of the relevant SVRX products on additional CPUs or to receive additional distribution from Santa Cruz of such source code. *Id.*

Amendment No. 1 further amended the APA to permit Santa Cruz to retain 100% of four "categories of SVRX Royalties": (1) fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a) of the APA; (2) source code right to use fees under existing SVRX Licenses from the licensing of additional CPU's and from the distribution by Buyer of additional source code copies; (3) source code right to use fees attributable to new SVRX licenses approved by Novell pursuant to Section 4.16(b); and (4) royalties attributable to the distribution by Santa Cruz and its distributors of binary copies of SVRX products, to the extent such copies are made by or for Santa Cruz pursuant to Santa

Cruz's own licenses from Novell acquired before the APA through previous agreements.  *Id.* ¶ E.(e).

Approximately one year later, Amendment No. 2 to the APA also made amendments to Section 4.16 of the APA.  Decl. Mark James Ex. 5 (Am. No. 2"). Amendment No. 2 was entered the same day as the parties agreed to a buy-out agreement with IBM with respect to SVRX Licenses.  Under Section B of Amendment No. 2, Novell and Santa Cruz agreed to a procedure that would govern "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations."  Am. No. 2 at ¶ B(1)-(5).  The parties agreed to provide written notification to each other upon becoming aware of any potential buy-out transaction, to both attend any meetings or negotiations with the licensee unless agreed otherwise, to jointly consent to any written proposals to be presented to licensees prior to its delivery to the licensee, and to meet to discuss any potential buy-out transaction.  *Id.*  The parties further agreed that a buy-out transaction should not occur without the prior written consent of both parties.  *Id.*

As part of this section regarding the newly-agreed process for managing buy-out transactions, Amendment No. 2 provides that "[t]his Agreement does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses.  In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement."  *Id.* ¶ B(5).

*(b) SVRX Buyout Agreements with IBM and Sequent*

Between 1985 and 1996, IBM entered into various agreements, supplements, and amendments concerning its rights to use UNIX System V software products.  Decl. Kenneth

Brakebill Ex. 5-12.  On February 1, 1985, IBM and AT&T entered into a software agreement,

sublicensing agreement, substitution agreement, and side letter.  *Id.* Ex. 5-8.  Between April 21,

1986 and January 25, 1989, IBM and AT&T executed numerous supplements to the agreements

entered in 1985.  *Id.* Ex. 9-12.  These supplements granted IBM additional rights to UNIX SVRX

releases listed in Item VI of Schedule 1.1(a) of the APA.  *Id.*

Novell became the successor-in-interest to AT&T's rights under these agreements when it

purchased UNIX Systems Laboratories in 1993.  AT&T and its subsidiaries, and then Novell,

used a combination of agreements in licensing its SVRX technology, including software

agreements, sublicensing agreements, and product supplements.  *See id.* Ex. 5, 6.  The software

and sublicensing agreements set forth rights and obligations for the use and distribution of the

technology. While each agreement had a given purpose, the agreements referred to and

incorporated each other.  For example, the IBM and Sequent Software Agreements provide that

"additional supplements may be added to this Agreement . . . .  Each such additional Supplement

shall be considered part of this Agreement."  *Id.* Ex. 5, 15.  Furthermore, the Software

Agreement provides that "[t]his Agreement and its Supplements set forth the entire agreement

and understanding between the parties as to the subject matter hereof."  *Id.*  The IBM and

Sequent Sublicensing Agreements provide that "[t]his Sublicensing Agreement, together with the

Software Agreement and its Supplement(s), set forth the entire agreement and understanding

between the parties as to the subject matter hereof."  *Id.* Ex. 6, 17.

On October 17, 1996, IBM entered into Amendment No. X, which was executed by

Novell and Santa Cruz on October 16, 1996.  *Id.* Ex.13.  Amendment X modified the terms of

IBM's previous agreements and supplements thereto, referring to them collectively as Related

Agreements. Amendment X granted IBM additional source code rights and an "irrevocable, fully

paid-up, perpetual right to exercise all of its rights under the Related Agreements beginning

January 1, 1996 at no additional royalty fee."[3]  *Id.* at § 1.  The irrevocable nature of these rights,

however, are not to "be construed to limit Novell's or SCO's rights to enjoin or otherwise

prohibit IBM from violating any and all of Novell's or SCO's rights under this Amendment No.

X, the Related Agreements, or under general patent, copyright, or trademark law."  *Id.*

 In Amendment No. X, the parties explicitly recognized that although SCO had purchased

the Related Agreements, Novell "retained certain rights with respect to" that set of agreements.

*Id.* Recitals.  As consideration for the rights granted by Amendment No. X, IBM paid Santa Cruz

$10,125,000 in two installments–one payment of $4,860,000, and a second payment of

$5,265,000.  *Id.* § 4.  In November 1996 and January 1997, when Santa Cruz received these

payments, it treated 100% of the money as SVRX Royalties payable to Novell, subject to the 5%

administrative fee that Santa Cruz would pay itself.  *Id.* Ex. 14 at 1; 43 at 1, 3.

 Novell and Santa Cruz separately executed a General Release Agreement on October 16,

1996, which settled all disputes between the parties concerning IBM's buyout of royalty

obligations.

 Between April 18, 1985 and November 9, 1989, AT&T also entered into various

agreements for licensing rights to UNIX System V software products with Sequent.  In particular,

on April 18, 1985, AT&T entered into a Software Agreement giving Sequent the right to, among

other things, use, modify, and prepare derivative works of an SVRX product identified in Item VI

---

[3] IBM did agree, however, to pay for any additional copies of source code of the software
product–UNIX System V, Release 3.2–according to the fees listed in a prior product supplement.

of Schedule 1.1(a) to the APA. *Id. Ex.* 15, 16. On January 28, 1986, AT&T and Sequent entered

into a Sublicensing Agreement that gave Sequent the right to sublicense the software products

designated in the 1985 agreement. *Id.* Ex. 17. Between 1986 and 1989, Sequent and AT&T

executed several supplements to the previous agreements. *Id.* Ex. 18-22.

Novell became the successor-in-interest to AT&T's rights under the Sequent agreements

in 1993. Santa Cruz administered collection of revenue to be passed on to Novell from these

agreements with Sequent. For example, in January of 1997, Santa Cruz passed along revenue to

Novell in the amount of $6,560.49, and noted a five percent administrative fee. *Id.* Ex. 43 at 3.

In July of 1999, IBM purchased Sequent in a stock transaction and assumed its rights and

obligations under the Sequent agreements.

### (c) Termination of IBM SVRX License

In March of 2003, as part of SCO's SCOsource campaign, SCO sent a letter to IBM

notifying it that it would terminate IBM's license to SVRX technology as of June 13, 2003, if

IBM did not remedy certain alleged breaches of that license. Decl. Kenneth Brakebill Ex. 25.

On June 9, 2003, Novell wrote to SCO explaining that Section 4.16(b) of the APA gave Novell

the right to require SCO to waive any rights under any SVRX License and authorized Novell to

take such action on behalf of SCO should SCO fail to so act. *Id.* Ex. 27.

On June 11, 2003, SCO responded to Novell, refusing to take the action requested by

Novell but making reference to the IBM agreements as "IBM's SVRX Licenses." *Id.* Ex. 28. On

June 12, 2003, Novell sent SCO a letter explaining the legal basis for Novell's waiver, including

Novell's right to take action at its sole discretion. *Id.* Ex. 30. When SCO failed to take the

action demanded by Novell, Novell sent another letter to SCO that waived "any purported right

SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment No. X or to revoke any rights thereunder." *Id.* Ex. 31.  Notwithstanding Novell's directive, SCO publicly announced on June 16, 2003, that it had terminated IBM's Software and Sublicensing Agreements as of June 13, 2003.  *Id.* Ex. 32.

On October 7, 2003, in response to public positions being taken by SCO concerning code developed by IBM, Novell again sent SCO a letter notifying it of Novell's Section 4.16(b) authority and directing SCO to waive any purported right it may claim.  *Id.* Ex. 33.  SCO responded stating that "[y]our analysis of the obligations that IBM . . . owe[s] to SCO pursuant to the relevant Software Agreements is incorrect.  However, we need not debate the incorrectness of your views, particularly Novell's purported ability to waive any and all licensees' obligations under the Software Agreements, because, as you are well aware, we are currently litigating these issues with IBM." *Id.* Ex. 34.

The next day, Novell again wrote to SCO stating that because SCO had failed to take the action directed by Novell, Novell was waiving any claim SCO was making to require IBM to treat IBM code as subject to the confidentiality obligations or use restrictions of the IBM agreements.  *Id.* Ex. 35.  SCO responded that Novell was without authority to make such a waiver and thus it had no force and effect.  *Id.* Ex. 36.

At no point during the written correspondence between SCO and Novell in 2003 did SCO argue that the IBM agreements were not SVRX Licenses under the APA or that the SVRX licenses are limited to binary licenses or binary royalty streams.  SCO did not state the reasoning behind its actions or inactions.

*(d) Termination of Sequent License*

On May 29, 2003, SCO sent a letter to Sequent notifying it that SCO intended to terminate the Sequent agreements relating to SVRX technology as of September 2, 2003, for, among other things, allegedly violating the source code restrictions on Sequent's Dynix software product which SCO said was subject to Sequent's System V Release 4.0 License. Decl. Kenneth Brakebill Ex. 26. On August 11, 2003, SCO sent another letter to Sequent purporting to terminate the Sequent License, retroactively as of July 30, 2003. *Id.* Ex. 37.

On August 14, 2003, IBM, acting on behalf of Sequent, responded to SCO's termination notice by stating that it did not believe it had breached the Sequent License and requesting more information on the alleged breach. *Id.* Ex. 38. IBM also rejected SCO's claim that it had any right to terminate the Sequent License. On February 6, 2004, Novell sent a letter to SCO outlining the lack of support for SCO's position and directing SCO to waive any purported right it may claim to require Sequent to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's System V Release 4.0 License. *Id.* Ex. 38. SCO refused to waive its purported rights, and Novell purported to waive them on SCO's behalf. *Id.* Ex. 39-41.

*(e) Sun and Microsoft Agreements*

Another dispute between the parties relating to the SVRX royalty and license provisions of the APA focuses on SCO's execution of agreements with Sun Microsystems ("Sun") and Microsoft in 2003. On February 25, 2003, SCO executed an agreement with Sun in which Sun paid SCO approximately $10 million for the right to use, reproduce, prepare derivative works, market, disclose, make, and sell certain UNIX technology, including source and object (binary) code. Decl. Michael Jacobs, Ex. 9 ("2003 Sun Agreement"). The 2003 Sun Agreement purports

40

"to amend and restate" a Software License and Distribution Agreement, signed March 17, 1994, between Sun and Novell. *Id.* Recitals. In the 1994 Sun Agreement, Sun obtained a license that included certain UNIX System V technology. The 2003 Sun Agreement re-licenses the SVRX technology licensed in the 1994 Sun Agreement and licenses additional SVRX technology to Sun. *Id.* Ex. 10.

SCO also executed an agreement with Microsoft on April 30, 2003, and several amendments to that agreement over the following three months. *Id.* Ex. 11, 12 ("2003 Microsfot Agreement"). Microsoft paid SCO $16,750,000 for the license rights, a liability release, and for options to purchase additional licenses. *Id.* §§ 1, 3.5, 4.1. Under the Agreement, Microsoft received various rights to UNIX System V technology. SCO agreed to deliver to Microsoft this UNIX System V software in both binary and source form, which includes the same versions of Unix System V software that are expressly referenced as SVRX Licenses in the APA.

SCO did not contact Novell for approval before executing the 2003 Sun Agreement or the 2003 Microsoft Agreement. And Novell did not authorize either agreement. The agreements gave SCO its first profitable year in history. *Id.* Ex. 7 at 9. SCO never remitted to Novell any monies it received from either of the agreements. Decl. Joseph LaSala at ¶ 4.

On July 11, 2003, when Novell had not received any royalty reports from SCO for over half a year, it sent SCO a letter demanding royalty reports and payments as required by the APA. *Id.* ¶ 6, Ex. 1. In response, on July 17, 2003, SCO submitted limited royalty payments from November 2002 through May 31, 2003. *Id.* Ex. 2. These payments did not mention any royalties from the 2003 Sun or Microsoft Agreements. *Id.* ¶ 6.

Novell conducted an audit of SCO's compliance with the APA's agency provisions at the end of 2003. On November 21, 2003, Novell demanded copies of the Sun and Microsoft Agreements. Decl. Michael Jacobs Ex. 13 at 2. SCO did not respond. On December 29, 2003, Novell again contacted SCO requesting copies of the agreements. *Id.* Ex. 14. On January 7, 2004, SCO replied that it anticipated being in a position to respond in the near future. *Id.* Ex. 15. Novell sent subsequent inquiries in February, March, April, and November of 2004. SCO did not produce the agreements. *Id.* Ex. 16-19.

On February 7, 2006, Novell finally received the Sun and Microsoft Agreements from SCO in a production of documents pursuant to a discovery request in this litigation. SCO has had financial problems, posting operational losses for all years except 2003 when it entered into the Sun and Microsoft Agreements. Decl. Michael Jacobs Ex. 7, 21, 22. Because of the decrease in SCO's revenues and assets, Novell fears that it will be unable to collect on its claim for royalties.

## DISCUSSION

### I. Cross Motions on Copyright Ownership

The cross motions on the copyright ownership issue include: (1) SCO's motion for complete summary judgment on Novell's First Claim for slander of title on the basis that SCO purportedly owns the copyrights at issue; (2) SCO's motion for partial summary judgment on its slander of title claim, breach of contract claim, and unfair competition claim on the issue of whether SCO owns the UNIX and UnixWare copyrights; and (3) Novell's motion for summary judgment on SCO's slander of title and specific performance claims asserting that the plain language of the relevant contracts demonstrates that Novell owns the copyrights at issue.

42

As in all contract disputes, the court must begin its analysis of whether the UNIX and UnixWare copyrights were transferred to SCO with the language of the contract.[4]  Both parties argue that the plain language of the APA supports their respective positions.

The APA's provision entitled "Purchase and Sale of Assets" provides:

> On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7) all of Seller's right, title, and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a) hereto.  Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).

APA § 1.1(a).

SCO asserts that the APA provided for the transfer of the copyrights where it provided for the transfer of all of Novell's "right, title, and interest in and to" the Assets on Schedule 1.1(a), and Schedule 1.1(a), in turn, identifies "all rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and all copies of UNIX and UnixWare."  *Id.* APA § 1.1(a), Sched. 1.1(a).

SCO's analysis of the transfer of copyrights, however, completely ignores the Excluded Assets on Schedule 1.1(b).  Section 1.1(a) specifically states that the "Assets to be so purchased shall not include those assets (the "Excluded Assets) set forth on Schedule 1.1(b).  Because Section 1.1(a) of the APA transfers the Assets on Schedule 1.1(a) and excludes the assets on Schedule 1.1(b), the proper course of analysis is to examine both schedules.

---

[4]  Pursuant to the terms of the APA, the agreement "shall be governed by and construed in accordance with the laws of the State of California regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof."  APA § 9.8.

Not surprisingly in the transfer of a software business, the schedules both contain sections on intellectual property.  With respect to their "Intellectual Property" provisions, Schedule 1.1(a) and Schedule 1.1(b) are consistent.  Schedule 1.1(b) excludes from transfer "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare" and "[a]ll Patents."  *Id.* APA Sched. 1.1(b) § V.A, V.B.  Schedule 1.1(a) transfers only  "[t]rademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark)."  *Id.* APA Sched. 1.1(a) § V.

SCO claims that it is improper to rely on the Intellectual Property provision of the Excluded Asset Schedule in the original APA, because Amendment No. 2 revised that provision to read "All copyrights and trademarks, except for *the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies.*"  APA Amend. No. 2 (emphasis added to demonstrate amendment).  Throughout this litigation, SCO has vacillated between arguing that the transfer of copyrights was effectuated by the APA and contending that the transfer was effectuated instead by Amendment No. 2.  It now argues that the court must look only to the APA as amended by Amendment No. 2.  Novell, however, contends that the court must analyze whether the APA as amended when the transaction closed transferred the copyrights and also whether Amendment No. 2, which was entered a year later, effectuated a transfer of the copyrights retroactively or at that time.

Novell takes issue with SCO's argument that the "all copyrights" exclusion in Schedule 1.1(b) of the APA no longer exists for purposes of construing the APA because the exclusion was subsequently modified by Amendment No. 2.  Amendment No. 2, executed a year after the

APA, states that it amends the APA as of October 16, 1996, not the date of the original APA or the Closing date of the original APA. The APA does not constitute an instrument of conveyance because it merely describes the assets that Novell "will" sell in the future. The instrument of conveyance for the APA was the Bill of Sale that the parties signed on the date the APA closed. When the parties executed Amendment No. 2 a year later, it was not made retroactive, did not amend the previous Bill of Sale, did not refer to a new Bill of Sale, and did not itself contain any language of conveyance to transfer any copyrights. Novell contends that there is no basis for concluding that the Bill of Sale, executed on December 6, 1995, could have transferred any assets contained in an amendment executed ten months later without some language in the amendment allowing that to occur.

SCO cites to *Nish Noroian Farms v. Agricultural Labor Relations Board*, for the proposition that "[a] written instrument must be construed as a whole, and multiple writings must be considered together when part of the same contract." 35 Cal. 3d 726, 735 (Cal. 1984). In *Nish Noroian*, the court concluded that a waiver provision in an earlier settlement had to be examined in light of the formal agreement entered later which incorporated and superseded it. *Id.* The court referred to Sections 1641 and 1642 of the California Civil Code, which also provide basic contractual interpretation rules. Rule 1641 states that a contract is to be interpreted to give effect to every provision of the contract, when practicable. Cal. Civ. Code § 1641. And Rule 1642 states that contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together. *Id.* § 1642.

These legal principles, however, do not suggest that the court should analyze the transfer of copyright issue without giving any consideration to the text of the original APA. Rather, the

45

court must consider the original APA, the agreement executed in connection with the APA's

closing, Amendment No. 2, and Amendment No. 2's relationship to the original APA and the

agreements executed in connection with its closing.  The court concludes that the proper way to

analyze the issue, therefore, is to look at the Agreements in turn in the same chronological order

that the parties entered the agreements.  *See Universal Sales Corp. v. Cal. Press Mfg. Co.*, 128

P.2d 665, 671-72 (Cal. 1942) (suggesting that the court place itself in the same situation in which

the parties found themselves at the time of contracting).

### A.  Did Copyrights Transfer Under the APA and Contemporaneous Agreements?

SCO's plain language argument relies on cases holding that "[i]n a non-consumer setting

such as this, a transfer of all right, title and interest to computer programs and software can only

mean the transfer of the copyrights as well as the actual computer program or disks."  *Shugrue v.*

*Continental Airlines Inc.*, 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997); *see also Relational Design*

*& Tech., Inc. v. Brock*, 1993 WL 191323, at *6 (D. Kan. May 25, 1993); *Schiller & Schmidt, Inc.*

*v. NordiscoCorp.*, 969 F.2d 410, 413 (7th Cir. 1992).  These cases, however, do not support

SCO's contention.  Each of these cases recognized that the terms "all right, title, and interest"

transferred copyrights when there was no other language addressing copyrights.

In *Shugrue*, the court found a transfer of the copyrights based on the language "all right,

title, and interest" because "[n]o exception was carved out for copyrights" and "no rights, titles,

or interests were retained."  977 F. Supp. at 285.  Similarly, in *Schiller & Schmidt*, the court

noted that "the agreement does not mention the word 'copyright.'" 969 F.2d at 413.

Furthermore, the *Relational Design* case, cited by SCO, does not actually support SCO's

position.  The court concluded that where a contract stated that a party would own "all rights to

46

the completed program with no licensing or royalties fees due," the contract transferred only ownership in a material object–the source code–not the copyright embodied in the object. 1993 WL 191323, at *6 ("Ownership of a copyright, or of any exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").

In any event, because there is specific language in the APA regarding the inclusion and exclusion of copyrights, the cases SCO relies upon are factually distinguishable from this case. Even if this court were to accept SCO's contention that Schedule 1.1(b) of the original APA should not be considered because it was later amended, Schedule 1.1(a) of the original APA specifically addresses intellectual property and includes only trademarks. It is unlikely that any of the cases SCO relies upon would have agreed that a transfer of other intellectual property rights, such as copyrights and patents, occurred when only trademarks are identified under the heading of "Intellectual Property." In interpreting the plain language of the APA in this case, Schedule 1.1(a), itself, represents a limitation of the intellectual property the parties intended to transfer.

SCO's plain language arguments also focus on Recitals A and B and Section 1.3(a)(i) of the APA. SCO claims that these provisions demonstrate the parties' intent that "all of the Business" be transferred to Santa Cruz and, therefore, that the APA transferred copyrights. Recital A defines Novell's UNIX and UnixWare "Business" to include the development of a line of software, the sale of binary and source code licenses to the various versions of UNIX and UnixWare, the support of such products, and the sale of other products which are directly related to UNIX and UnixWare. Recital B defines the "Acquisition" contemplated by the parties to mean that Santa Cruz would "acquire certain of the assets of, and assume certain of the liabilities

47

of [Novell] comprising the Business." Section 1.3(a)(i), which provides the intent of the parties with respect to the transfer of customers, states that "[i]t is the intent of the parties hereto that all of the Business . . . be transferred to Buyer."

These general provisions provide little insight into whether the parties intended to transfer the UNIX and UnixWare copyrights to Santa Cruz. The Business is not defined specifically enough to include copyrights. And the definition of the Acquisition of the Business merely states that Santa Cruz would acquire *certain of the assets* comprising the Business. Where there are specific provisions of the document detailing the assets being transferred and the assets being excluded, such as Schedules 1.1(a) and 1.1(b), the more specific provisions control. *National Ins. Underwriters v. Maurice Carter*, 17 Cal. 3d 380, 386 (1976) ("[W]hen a general and particular provision are inconsistent, the latter is paramount to the former."). Schedule 1.1(a) provides that the only intellectual property Santa Cruz was acquiring were the UNIX and UnixWare trademarks. Moreover, there is nothing inconsistent with the provisions cited by SCO and the more specific schedules provided for in the APA. Recital B specifically defines the Acquisition as certain assets comprising the Business.

SCO further argues that the agreements executed by the parties in connection with the Closing of the APA support its position that copyrights transferred under the APA. "It is a general rule that several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract." *Harm v. Frasher*, 181 Cal. App. 2d 405, 412-13 (Ct. App. 1960). On the Closing Date, Novell and Santa Cruz executed the Bill of Sale which provides that it "does hereby transfer, convey, sell, assign, and deliver to Buyer . . . all of the Assets" in accordance with Section 1.1(a) of the APA. SCO

48

asserts that the Bill of Sale expressly effectuated the transfer of all assets identified in Section 1.1(a) of the APA, which included "all rights and ownership" of UNIX and UnixWare. Again, however, SCO fails to recognize that the term "Assets" in the APA is a defined term that does not include any of the assets on the Excluded Assets schedule. Moreover, the Bill of Sale specifically states that the defined terms have the meanings given in the APA and that the provisions of the APA control. Therefore, the Bill of Sale did not grant additional rights to any party, does not create an ambiguity with respect to any term in the APA, and did not effectuate a transfer of assets that was not provided for in the APA.

In addition, SCO contends that the TLA confirms that Novell transferred the copyrights to Santa Cruz on the Closing Date because Section 1.6 of the APA expressly provided for a license back to Novell of the technology transferred to Santa Cruz. Under the TLA, Santa Cruz granted a license to Novell with certain restrictions and specified that SCO owned the "Licensed Technology." SCO contends that Section 1.6 and the TLA would be senseless had Novell retained the ownership of the copyrights because Novell would not have needed a license to the Licensed Technology.

SCO, however, does not recognize that the TLA provided that the term Licensed Technology had the meaning given to it in the APA. The APA defines "Licensed Technology" as "all of the technology included in the Assets and all derivatives of the technology included in the Assets." The term Assets is defined in the APA as those assets included on Schedule 1.1(a) but not those assets excluded from transfer on Schedule 1.1(b). Novell would need a license to be able to use these other aspects of the technology sold to Santa Cruz and derivatives of the transferred assets. Because the "Licensed Technology" included rights distinct from Novell's

49

UNIX and UnixWare copyrights, it makes sense that Novell would need a license back with respect to those assets. Furthermore, the same logic would imply that Novell transferred ownership of UNIX-related patents because Novell would not have needed a license to these patents if it retained ownership. SCO's admission that Novell did not transfer ownership of the patents refutes SCO's argument that the TLA implies that Novell must have transferred ownership of all UNIX-related technology to Santa Cruz. The plain language of the APA, therefore, is in harmony with the plain language of the TLA.

Furthermore, SCO's attempt to rewrite "all copyrights" in Schedule 1.1(b) to mean "NetWare Copyrights Only" is contrary to the plain language of the Schedule 1.1(a) and Schedule 1.1(b). Schedule 1.1(b) clearly distinguished UNIX and UnixWare trademarks as assets being transferred. Schedule 1.1(a) also clearly transferred only UNIX and UnixWare trademarks. If the parties intended to transfer UNIX and UnixWare copyrights as well, they could have easily demonstrated that intent while they were making the distinction for UNIX and UnixWare trademarks. There is nothing in the text of the APA that would support an interpretation of "all copyrights" to mean only Netware copyrights.

In *Blumenfeld v. R. H. Macy & Co.*, 92 Cal. App. 3d 38 (1979), the California Court of Appeals rejected a similar attempt to interpret "all" to mean "less than all." The trial court relied on extrinsic evidence to interpret a contract assigning "all claims against third parties relating to the [shopping] Center" as limited to claims against current tenants of the Center. The court of appeals reversed, holding that the "all-inclusive language of the agreement is not reasonably susceptible of the meaning advanced." *Id.* at 46.

The language of Schedule 1.1(b) is not reasonably susceptible to being interpreted to

mean "all copyrights except for UNIX and UnixWare copyrights." The parties clearly delineated that the UNIX and UnixWare trademarks were exceptions and they clearly chose not to make a similar exception for the copyrights. There is also no basis for reading the language to mean that the only copyrights excluded were NetWare copyrights. If the parties had intended to exclude only NetWare copyrights, it would have been simple to use "NetWare copyrights" instead of "all copyrights." However, the parties used "all copyrights." The exclusion of "all copyrights" was all inclusive. Interestingly, SCO does not argue that Schedule 1.1(b)'s exclusion of "all patents" means "only Netware patents." The use of "all patents" after "all copyrights" clearly shows that "all copyrights" cannot be interpreted to mean "only Netware copyrights" while "all patents" means "all patents."

The court concludes that the APA as amended by Amendment No. 1 excluded UNIX and UnixWare copyrights from the Assets transferred to Santa Cruz by the Bill of Sale. The Bill of Sale executed by the parties on December 6, 1995, transferred ownership to Santa Cruz of the Assets as defined by the APA and Amendment No. 1. Thus, the scope of the Assets transferred by the Bill of Sale is determined by the definition of Assets set forth in the APA and Amendment No. 1. Amendment No. 1 made some revisions to Schedules 1.1(a) and (b) but did not change the description of the Intellectual Property included and excluded from the transfer. A review of Schedule 1.1(a) listing transferred assets and Schedule 1.1(b) listing Excluded Assets demonstrates that the transferred assets did not include the UNIX and UnixWare copyrights. The only "Intellectual Property" listed in the Schedule 1.1(a) list of assets to be transferred are the UNIX and UnixWare trademarks. Schedule 1.1(a) did not identify UNIX or UnixWare copyrights as an asset to be transferred. Conversely, the Schedule 1.1(b) list of "Excluded

Assets" expressly excluded from the transferred assets "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." Thus, the language of the APA and Amendment No. 1 at the time of the Bill of Sale is clear: all copyrights were excluded from the transfer.

Apart from the language of the agreements, SCO maintains that it has provided the court with extrinsic evidence that the parties intended the APA to transfer the UNIX and UnixWare copyrights to Santa Cruz. Under California law, extrinsic evidence is admissible both to support interpretations of contracts to which the language at issue is reasonably susceptible and to demonstrate the parties' intent under contractual provisions that the court deems to be ambiguous. *Universal Sales Corp. v. Call Press Mfg. Co.*, 128 P.2d 665, 671-72 (Cal. 1942). Therefore, oral testimony and other extrinsic evidence are not admissible to support an interpretation of a contract that is contrary to the plain language. The critical issue is "whether the offered evidence is relevant to prove a meaning which the language of the instrument is reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006). If the contract is not reasonably susceptible to the proposed interpretation, extrinsic evidence is inadmissible and does not create a triable issue of fact that would defeat summary judgment. *Id.* at 388, 391-93.

When a contract is integrated, "extrinsic evidence is admissible only to supplement or explain the terms of the agreement—and even then, only where such evidence is consistent with the terms of the integrated document." *EPA Real Estate Partnership v. Kang*, 12 Cal. App. 4th 171, 175-77 (1992). The APA includes an express integration clause stating that the "Agreement, and the Schedules and Exhibits" "constitute the entire agreement among the parties with respect to the subject matter . . . and supersede all prior agreements and understanding, both

52

written and oral." APA § 9.5. Novell and Santa Cruz further agreed, in connection with the Bill of Sale, that the APA is an integrated agreement not to be altered by any other understandings: "It is acknowledged and agreed . . . that the Agreement is the exclusive source of the agreement and understanding between the Seller and Buyer respecting the Assets." Bill of Sale ¶ 5.

The parol evidence rule precludes SCO from relying on extrinsic evidence to try to rewrite the exclusion of "all copyrights" from APA because the language is unambiguous and not reasonably susceptible to SCO's interpretation. Moreover, even if the court considered the extrinsic evidence, there is significant evidence that the exclusion "all copyrights" was deliberate and consistent with the basic objectives of the APA. While there is no specific evidence that business executives negotiated the issue of copyrights, the changes to the drafts of the agreement show that a significant change occurred. Novell has provided extrinsic evidence supporting the change in the language and the fact that it was relayed to SCO, whereas SCO has failed to present any evidence from witnesses on its side of the transaction who had any involvement with the actual drafting or negotiation of the language in the contract.

Attorneys for Novell and Santa Cruz exchanged specific communications about the scope of the assets to be transferred. The initial draft of the APA included "all patents, patent applications, copyrights . . . and all other intellectual property . . . that pertain to Unix or UnixWare" in the list of assets to be transferred to Santa Cruz. Novell then revised the list of assets to be transferred by deleting patents and copyrights, leaving only UNIX and UnixWare trademarks as intellectual property to be transferred. These revisions were sent to SCO sometime before September 18, 1995, because the September 18, 1995 draft, which ultimately became the final versions of Schedule 1.1(a) and Schedule 1.1(b), already included such changes.

53

Extrinsic evidence of business negotiators prior to the finalization of the agreement is not probative of the issue regarding copyrights because it is obvious that the deal changed over time. The extrinsic evidence demonstrates that Santa Cruz did not have the cash necessary to complete the deal. Therefore, the parties constructed a fairly complex mechanism to ensure Novell a future revenue stream. Novell has presented evidence that the transaction evolved as it became necessary for Novell to protect its future stream of revenue. Novell deliberately excluded the UNIX and UnixWare copyrights to protect its retained right to receive 95% of future SVRX revenues. Braham testified that the exclusion of UNIX and UnixWare copyrights ensured that copyrights would not be part of the bankruptcy estate if Santa Cruz went into bankruptcy and the retention of the UNIX and UnixWare copyrights strengthened Novell's legal basis for receiving royalties and negotiating buy-outs of SVRX licenses. SCO, however, provides no extrinsic evidence regarding the final negotiations of the deal that would contradict Novell's evidence.

In its attempt to argue that extrinsic evidence is necessary, SCO repeatedly overstates its case. SCO contends that the exclusion of the UNIX and UnixWare copyrights would render the APA meaningless because it would prevent Santa Cruz from pursuing its UNIX business. Braham testified that Novell's sale of UNIX and UnixWare products to Santa Cruz under the APA necessarily conferred a license on Santa Cruz to use the copyrights as needed to implement the APA. Contrary to SCO's assertions, there is evidence that SCO did not need to own the UNIX and UnixWare copyrights to pursue its UNIX business.

It is well established that a contract involving copyrighted works confers an implied license to use the copyrights as needed to implement the transaction. In *Food Consulting Group, Inc. v. Musil Govan Azalino*, 270 F.3d 821 (9th Cir. 2001), the defendant's predecessor paid

54

$175,000 to plaintiff to prepare a preliminary plot plan and final engineering drawings for a proposal to build a shopping center. *Id.* at 824. When defendant hired a different firm to complete the project using a modified version of plaintiff's plan, plaintiff claimed that the defendant had no right to use or modify plaintiff's copyrighted drawings. *Id.* at 824-25. The Ninth Circuit rejected this claim, holding that the contractor granted "an implied license to use the revised plot plan to build the project." *Id.* at 828. The Ninth Circuit emphasized that "[t]he central purpose of the contract" was the production of engineering documents for the shopping center and given this purpose and the amount of money paid, "it would have been surprising if the parties had intended for [defendant] to seek [plaintiff's] permission before using the plans to build the project." *Id.*

In this case, while copyrights were excluded from the transferred assets, Santa Cruz did acquire ownership of other rights in multiple versions of UNIX and UnixWare. Moreover, a central purpose of the APA was to enable Santa Cruz to develop and distribute an improved version of UNIX that combined Novell's "UnixWare" product with Santa Cruz's "OpenServer." Implementing this purpose required Santa Cruz to copy, modify, distribute, and sublicense code in Novell's UnixWare products. Thus, Novell's sale of its UNIX and UnixWare products necessarily conferred a license on Santa Cruz to use the related copyrights as needed to carry out the business activities contemplated by the APA.

The conclusion that Santa Cruz had a license to the UNIX copyrights is reinforced by the fact that Santa Cruz indisputably did not acquire ownership of Novell's UNIX-related patents. Santa Cruz needed to use these patents to be able to distribute and modify UNIX products. Therefore, Novell's sale of its UNIX products to Santa Cruz necessarily conveyed a license to

55

use the patents as needed to implement the APA.

Burt Levine, a former paid consultant to SCO and in-house attorney for AT&T, USL, Novell, and Santa Cruz, acknowledged that the APA "convey[ed] enough of a patent license under Novell's patents that would be necessary for SCO to conduct its business." Similarly, he agreed that if Novell had retained the copyrights, SCO would have had an inherent license to use those copyrights as necessary in the business.

Furthermore, there is extrinsic evidence that during the period of time between the signing of the APA on September 19, 1995, and its closing on December 6, 1995, the parties spent considerable time going through the documents and determining what amendments should be made. While there may be some claims that the original signing of the APA was rushed, there were months of further negotiations regarding certain provisions before the Closing. This resulted in the changes made in Amendment No. 1. Although changes to Schedule 1.1(a) and 1.1(b) were made in Amendment No. 1, there were no changes made to the intellectual property provisions.

SCO also argues that there is no evidence that Novell publicly asserted ownership of the UNIX copyrights between the APA's Closing and May 28, 2003. While the court fails to appreciate why SCO believes that Novell would have had a reason for publicly announcing its ownership of copyrights before that date, there is substantial evidence that Novell privately asserted its right to the copyrights during that time period. When SCO contacted Novell to enter into Amendment No. 2, Novell asserted its ownership of the copyrights and it refused to transfer them. There is evidence that when Santa Cruz sold its business to Caldera, Santa Cruz was unable to obtain a chain of title to the copyrights. In addition, there is evidence that in response

56

to several telephone calls from Darl McBride to various individuals at Novell, Novell refused to transfer copyrights to SCO. A failure to publicly announce its ownership is not particularly probative of whether the copyrights transferred.

In addition, the evidence with respect to joint copyrights being used on products does not demonstrate that copyrights transferred under the APA. Novell's explanation for the joint reference of both Novell's and Santa Cruz's copyrights is consistent with the fact that the copyrights in the original UNIX and UnixWare products remained with Novell, and SCO retained the copyright in the newly produced derivative products.

Therefore, even relying on the extrinsic evidence from the time the APA was signed and closed, the court is convinced that the UNIX and UnixWare copyrights did not transfer under the APA or the agreements executed in connection with the APA's Closing.

**B. Did Copyrights Transfer Under Amendment No. 2 to the APA?**

SCO contends that Amendment No. 2 clarified that the UNIX and UnixWare copyrights were not Excluded Assets. Amendment No. 2 amended the Excluded Asset schedule to read: "All copyrights and trademarks, except for *the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies.*" APA Amend. No. 2 (Emphasis added to demonstrate amendment.) SCO asserts that it is plain that the UNIX and UnixWare copyrights were so required because of the substantial rights to the Business Santa Cruz received in the transaction. Obviously, this contention is rebutted by the evidence above demonstrating that SCO could conduct its business with a license to the copyrights.

Novell argues that Amendment No. 2 did not transfer UNIX and UnixWare copyrights

because (1) it does not constitute an instrument of conveyance under the Copyright Act, (2) it did not include any provisions transferring ownership of copyrights nor did it purport to retroactively amend the Bill of Sale to transfer copyrights, (3) it did not specifically identify which copyrights, if any, should be transferred, and (4) Santa Cruz did not "require" ownership of the UNIX and UnixWare copyrights for its business because it already had a license to use these copyrights as needed to implement the APA.

The Copyright Act requires a signed written instrument to transfer ownership of copyrights. Section 204(a) states: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent. 17 U.S.C. § 204(a). This requirement is meant to "enhance[] predictability and certainty of copyright ownership." *Effects Assoc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990).

Section 204 is a prerequisite to a valid transfer of copyright ownership, and not merely an evidentiary rule. A transfer of copyright is simply "not valid" without the required written instrument. *Konisberg Int'l, Inc v. Rice*. 16 F.3d 355, 357 (9th Cir. 1994). Further, unlike a statute of frauds, Section 204 is not subject to equitable defenses, such as estoppel, because such defenses would "undermine the goal of uniformity and predictability in the field of copyright ownership and transfer." *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992).

"As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties. Accordingly, even though a written instrument may lack the terms 'transfer' and copyright,' it still may suffice to evidence their mutual intent to transfer the copyright

58

interest." *Nimmer on Copyrights* § 10.03[2]. SCO contends that, under the applicable authority, the language identifying the Assets by reference in Section 1.1(a) of the APA, as amended by Amendment No. 2, meets the statutory requirements.

Amendment No. 2 does not include any provision that purports to transfer ownership of copyrights. It merely revised the definition of the intellectual property category of the Excluded Assets schedule. Unlike the APA, Amendment No. 2 was not accompanied by a separate "Bill of Sale" transferring any assets. Nor did Amendment No. 2 purport to retroactively change the scope of the assets transferred by the Bill of Sale that was executed in connection with the APA in December 1995. Amendment No. 2 states that it "amended" the APA "[a]s of the 16th day of October, 1996." Thus, Amendment No. 2 did not retroactively cause the Bill of Sale to transfer copyrights that were expressly excluded from transfer by the APA and Amendment No. 1.

Furthermore, Amendment No. 2 also did not amend Schedule 1.1(a). It is undisputed that the Bill of Sale transferred the Assets contained on Schedule 1.1(a). Even after the execution of Amendment No. 2, however, Schedule 1.1(a) did not include any language regarding copyrights.

Also, significantly, Amendment No. 2 did not identify which copyrights, if any, were "required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." The written instrument required by Section 204 should contain sufficient information "to serve as a guidepost for the parties to resolve their disputes." *Konisberg Int'l*, 16 F.3d at 357. Amendment No. 2 does not meet these standards. SCO now claims that Santa Cruz required ownership of all of Novell's UNIX and UnixWare copyrights to exercise its rights regarding the UNIX assets it acquired under the APA. Novell, in contrast, contends that Santa Cruz did not need to own these copyrights because Santa Cruz already had a license to the

copyrights.

Where the plain language does not resolve the issue, among the relevant extrinsic evidence courts review to determine such "mutual intention" is "the surrounding circumstances under which the parties negotiated or entered into the contract" and "the object, nature and subject matter of the contract." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998). The contract may be explained by reference to the circumstances under which it was made. Cal. Civ. Code § 1647.

In this case, the extrinsic evidence surrounding Amendment No. 2 strongly favors Novell's position that Amendment No. 2 was merely affirming Santa Cruz's implied license to use the UNIX and UnixWare copyrights. Santa Cruz's in-house counsel, Steve Sabbath, approached Novell's in-house counsel, Allison Amadia, about obtaining the UNIX and UnixWare copyrights. Amadia testifies that she then reviewed the APA and spoke with Braham to learn about the history of the agreement and the intent of the parties.

Santa Cruz's first proposed draft of Amendment No. 2 referred to copyrights "owned by Novell as of the date of this Amendment, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder." This proposed language clearly intended to transfer the UNIX and UnixWare copyrights through the amendment. However, Novell rejected Santa Cruz's proposed language. Amadia testifies that she told Sabbath that while Novell was willing to affirm that Santa Cruz had a license under the original APA to use the UNIX and UnixWare copyrights in its business, it was not willing to transfer ownership of the copyrights. As a result, the final version of Amendment No. 2 does not refer to any specific copyrights and does not refer to Santa Cruz's "acquisition" of any copyrights.

This extrinsic evidence is consistent with the language of the Amendment, which reads like an implied license.  It is also consistent with the fact that the parties did not amend Schedule 1.1(a) when they executed Amendment No. 2.  No specific copyrights were, therefore, included as Assets to be transferred on Schedule 1.1(a).  As in interpreting the original APA, "the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.  Construing the language of Amendment No. 2 to be an affirmation of an implied license to the copyrights does not put the amended Excluded Assets Schedule at odds with the transferred Asset Schedule 1.1(a).

There is also significant evidence that Santa Crux did not "require" the UNIX and UnixWare copyrights.  Santa Cruz had been able to pursue its UNIX business from December 6, 1995 until October 16, 1996, without any problems due to its lack of ownership of the copyrights.  Santa Cruz indisputably did not own the copyrights during those ten months.  While SCO has submitted testimony from witnesses stating generally that the copyrights were necessary to running a software business, none of those witnesses give specific examples of how a lack of copyright ownership impeded Santa Cruz's ability to exercise its rights under the APA.  The APA conferred an implied license on Santa Cruz to use Novell's copyrights as needed to implement the purposes of the APA.  That implied license allowed SCO to license the copyrights to others.  Because Santa Cruz already had that license, it did not require ownership of the copyrights.  Therefore, even if Amendment No. 2 had a means of conveyance or conveyance language, Amendment No. 2 would not have transferred the UNIX and UnixWare copyrights as there is no evidence that any of the copyrights were "required."

For these reasons, the court concludes that Amendment No. 2 did not transfer the UNIX

and UnixWare copyrights to SCO.  Even if the Amendment met the requirements of Section 204, the extrinsic evidence demonstrates that the parties intended only to affirm the implied license granted under the original APA.  Furthermore, SCO has not provided evidence that it required ownership of the copyrights to exercise its rights under the APA.  Accordingly, the court concludes that Novell is the owner of the UNIX and UnixWare copyrights.

This court's conclusion that Novell owns the UNIX and UnixWare copyrights impacts several of the claims asserted by both parties and several pending motions.  Novell's motion on the copyright issue is brought with respect to SCO's First Claim for Relief for slander of title and Third Claim for Relief for specific performance.  Novell is entitled to summary judgment on SCO's First Claim for Relief for slander of title because SCO cannot demonstrate that Novell's assertions of copyright ownership were false.  *First Sec. Bank of Utah v. Banberry Crossing*, 780 P.2d 1253, 1256-57 (Utah 1989).   In addition, Novell is entitled to summary judgment in its favor on SCO's Third Claim for Relief seeking an order directing Novell to specifically perform its alleged obligations under the APA by executing all documents needed to transfer ownership of the UNIX and UnixWare copyrights to SCO.  Neither the original APA nor Amendment No. 2 entitle SCO to obtain ownership of the UNIX and UnixWare copyrights.

SCO's motion for summary judgment on copyright ownership is brought with respect to its First Claim for Relief for slander of title, its Second Claim For Relief for breach contract, its Fifth Claim for Relief for unfair competition, and Novell's First Claim for Relief for slander of title.  SCO's motion for partial summary judgment on its own claims is denied.  SCO's motion with respect to Novell's slander of title claim focuses only on the title/ownership issue.  A slander of title claim involves a false statement disparaging title, that is made with malice and

62

that causes actual or special damages. *First Sec. Bank of Utah*, 780 P.2d at 1256-57. Because SCO has not moved on the elements of malice or special damages, the court has no present basis for dismissing Novell's claim. Accordingly, the court denies SCO's motion for summary judgment on the Novell's slander of title claim.

## II. Novell's Summary Judgment Motions on Special Damages and the Copyright Ownership Portions of SCO's Unfair Competition Claim and Breach of Implied Covenant

Novell's motion for summary judgment on SCO's slander of title claim for failure to establish special damages is now moot because the claim has been dismissed on other grounds. Novell is also entitled to summary judgment on the copyright ownership portion of SCO's unfair competition and implied covenant of good faith claims because SCO cannot establish that Novell's assertion that it owns the UNIX and UnixWare copyrights was false.

Even if the court had found that SCO owned the copyrights, Novell would still be entitled to summary judgment on the copyright ownership portions of SCO's claims of unfair competition and breach of the implied covenant of good faith and fair dealing. Novell's assertions that SCO does not own the UNIX and UnixWare copyrights do not state a claim for unfair competition under Utah common law or statutory law, and do not state a claim for breach of the implied covenant of good faith under California law.

Utah common law does not recognize an unfair competition claim based on allegedly defamatory statements. *See Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551 (D. Utah 1996), *aff'd in part, rev'd in part*, 222 F.3d 1262 (10th Cir. 2000). Recognizing that "no Utah court has extended unfair competition . . . to include defamation in the marketplace," the court declined to "create a new cause of action under the umbrella of unfair competition which would essentially be identical to an already well-established cause of action and would offer no further

63

protection of commercial values." *Id.* at 1554.  Similarly, in this case,  SCO's unfair competition

claim is duplicative of its slander of title claim and there is no need to expand Utah law to create

a new cause of action.

Even though SCO argues that Novell did not publicly claim ownership in the copyrights

until it was presented with an opportunity to garner financial and strategic benefit in the market,

there is no evidence that Novell's public statements were based on anything but its good faith

interpretation of the contracts.  The evidence in this case demonstrates that on several occasions,

between the time the APA was signed and Novell made its public statements, Novell privately

refused to transfer the copyrights to Santa Cruz and SCO.  Santa Cruz attempted to gain the

copyrights under Amendment No. 2 to the APA, Santa Cruz attempted to get a chain of title from

Novell when it sold its assets to Caldera, and McBride repeatedly attempted to get Novell to

transfer the copyrights when SCO began its SCOsource initiative.  Whether or not SCO acquired

those copyrights under the APA, it was aware that the parties disagreed about the ownership of

the copyrights.  Therefore, there is no basis in the evidence before this court for finding that

Novell's public claims of ownership were a misappropriation or seizure of SCO's property.

Furthermore, Novell's allegedly false statements do not meet the statutory definition of

"unfair competition."  Unfair competition is defined as "an intentional business act or practice "

that falls within the categories of "(A) cyber-terrorism; (B) infringement of a patent, trademark,

or trade name; (C) a software license violation; or (D) predatory hiring practices."  Utah Code

Ann. § 13-5a-102(4)(ii) (2006).  Novell's alleged statements claiming ownership of copyrights

based on its interpretation of the parties' contracts do not fall within any of these categories.

Novell's statements are not a breach of Section 3 of the TLA, which states that SCO owns the

Licensed Technology. Section 3 does not prohibit the parties from making statements about whether or not copyrights were a part of the Licensed Technology that was transferred.

SCO's breach of contract claim alleges that Novell "breached the covenant of good faith and fair dealing under the APA and TLA" by "numerous acts of bad faith," including "making false and misleading statements denying SCO's ownership of the copyrights in UNIX and UnixWare." Sec. Am. Compl. ¶ 99. SCO has cited to no California case holding that the implied duty of good faith and fair dealing prohibits a party to a contract from making statements related to its understanding of the rights that are conferred or not conferred by the contract.

A breach of the implied covenant requires "objectively unreasonable conduct, regardless of the actor's motive." *Carma Developers Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992). A comment to Section 205 of the Restatement Second of Contracts states that the implied covenants are violated "by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts." *Id.* comment e.

Even if this court had ruled in SCO's favor on the copyright ownership issue, there is no evidence to demonstrate that Novell's position was contrary to its own understanding of the contractual language or objectively unreasonable given the history of the dispute between the parties.

### III. Novell's Summary Judgment Motion on SCO's Non-Compete Claims

Novell seeks summary judgment on the non-compete claims in SCO's Second Claim for breach of contract and Fifth Claim for unfair competition. SCO's non-compete claims allege that Section II.A(2) of the TLA and Section 1.6 of the APA contained non-compete provisions

65

prohibiting Novell from using the Licensed Technology to compete with SCO's core server operating systems.  Novell asserts that the provisions in the APA and TLA are limitations on the scope of Novell's license to the Licensed Technology rather than non-compete clauses.  Novell also argues that it is entitled to summary judgment on the alternative ground that Santa Cruz's sale of substantially all of its assets to SCO's predecessor in 2001 constituted a "Change of Control" that terminated any non-compete obligations under the APA and TLA.  Finally, Novell contends that any covenant not to distribute competing products would be void under California law.

## A.  The APA and TLA Provisions

Section 1.6 of the APA states that Santa Cruz must execute a license agreement concurrent with the Closing of the APA which grants Novell "a royalty-free, perpetual, worldwide license to (i) all of the technology included in the Assets and (ii) all derivatives of the technology included in the Assets."  APA § 1.6.  This licensed back technology is referred to collectively as "Licensed Technology."  *Id.*  Consistent with the court's conclusion above, however, this Licensed Technology does not include the UNIX and UnixWare copyrights. Therefore, to the extent that SCO's non-compete claims are based on its ownership in the UNIX and UnixWare copyrights, which this court has concluded were retained by Novell, SCO's non-compete claims are dismissed.

The parties, however, have not specifically addressed whether any of SCO's copyright infringement claims are based on copyrights SCO may have obtained in derivatives of the technology included in the Assets.  In the copyright ownership discussion, Novell recognized that SCO would have the copyright to the new merged product.  Novell also recognized that joint

copyright notices are used that demonstrate a copyright ownership by SCO as of 1996. SCO's

non-compete and copyright infringement claims also relate to SUSE Linux. The SUSE Linux

claims have been stayed pending arbitration. Although those claims are stayed, Novell asserts in

its motion that it should not be precluded from raising a motion relating to the meaning and

interpretation of the TLA. Assuming that SCO has a basis for asserting a copyright infringement

action other than based on ownership in the UNIX and UnixWare copyrights, the court will

address the merits of Novell's motion.

Under Section 1.6 of the APA, Novell has a license to "use the Licensed Technology

without restriction for internal purposes and for resale in bundled or integrated products sold by

[Novell] which are not directly competitive with the core products of [Santa Cruz] and in which

the Licensed Technology does not constitute a primary portion of the value of the total bundled

or integrated product." *Id.* Under the TLA, Novell retains a "non-exclusive, non-terminable,

worldwide, fee-free license" in the Licensed Technology to "sublicense and distribute, and

authorize its customers to sublicense and distribute, such Licensed Technology and modifications

thereof, in source and binary form." This license as to external use was subject to the following

restrictions:

> provided, however, that (1) such technology and modifications may
> be sublicensed and/or distributed by Novell solely as part of a
> bundled or integrated offering ("Composite Offering"); (ii) such
> Composite Offering shall not be directly competitive with core
> application server offerings of SCO, and (iii) the Licensed
> Technology shall not constitute a primary portion of the value of
> such Composite Offering.

TLA § II(A)(2).

Novell asserts that the clauses are limitations on the scope of the license, and if it has exceeded the scope of the license, then SCO can only assert a copyright infringement claim, and not a non-compete breach of covenant claim.  SCO argues that Novell presents a false choice between license limitations and covenants not to compete because it can bring state law claims for breach of contract and unfair competition based on the same conduct as its copyright infringement claim.

 "Generally, a 'copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement' and can sue only for breach of contract.'" *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) (citation omitted).  "If, however, a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Id.*  The *Sun* court stated that "[w]hether this is a copyright or a contract case turns on whether the compatability provisions help define the scope of the license." *Id.*

The language and the structure of the APA and the TLA suggest that the restrictions are a limitation on the scope of the license.  The restriction immediately follows the description of the license in both agreements.  The restriction necessarily limits how Novell was entitled to use the Licensed Technology and appears to define the scope of Novell's rights to use the Licensed Technology.  License limitations, such as the restrictions here, set the boundaries of the agreement.

 SCO, however, claims that the restrictions are covenants, and it cites to cases recognizing that "[c]ourts have held a breach of an independent covenant of a copyright license, such as a promise to pay royalties, is not a copyright infringement action, but a breach of contract

68

action." *Kabehie v. Zoland*, 102 Cal. App. 4th 513, 527-28 (2002) (holding state law claims not preempted by Copyright Act when based on something qualitatively different from copyright).  In *Fantastick Fakes Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 483-84 (5th Cir. Unit B 1981), the court found that the "mere breach of a covenant may support a claim of damages for breach of contract but will not disturb the remaining rights and obligations under the license including the authority to use the copyrighted material."

SCO argues that the restrictions are a contractual covenant because they constitute an agreement between the parties that is separate from the scope of the license grant.  Regardless of the scope of the license, if Novell had not agreed to the restrictions, SCO would not have consented to Novell's retention of any license in the Licensed Technology.  Furthermore, "conduct that may give rise to a federal suit for copyright infringement may also give rise to a state law claim in tort for unfair competition, tortious interference, or breach of contract."  *La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1199 n.2 (10th Cir. 2005).

The Copyright Act, however, preempts such claims if the "work is within the scope of the 'subject matter of copyright'" and the "rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright."  *Id.* (citations omitted).  Nonetheless, the court also recognized that a state law claim is "qualitatively different from, and not subsumed within, a copyright infringement claim if the "state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display."  *Id.*

Novell contends that it has not made an argument that the Copyright Act preempts SCO's state law causes of action and the preemption issue has no relevance to whether the language at issue is a license limitation or a covenant.  Although SCO cites to several Ninth Circuit cases for

the proposition that a failure to comply with the terms of a license to use copyrighted material can give rise to both copyright and breach of contract claims, Novell claims that the cases do not support SCO's position. *Germaine Music v. Universal Songs of Polygram*, 130 Fed. Appx. 153, 155 n.1 (9th Cir. 2005) (stating in dicta that "If [defendant] was using songs without paying royalties, it was likely both a breach of contract and a violation of the copyright."); *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967-68 (reversing district court's holding that plaintiff could not bring a breach of contract claim when copyright infringement claim was dismissed); *Guthy-Renker Corp. v. Bernstein*, 39 Fed. Appx. 584, 587 (9th Cir. 2002) (upholding district court's damage award for breach of contract and copyright infringement); *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (stating claims available to plaintiff where claim was preempted).

The court finds the analysis in *Nimmer's Information Law*, cited by SCO, helpful on the issue of whether SCO can have a claim under both copyright and contract law. "Breach of the license creates the potential of liability for contract breach and also the possibility of liability under property rights law. Subject to considerations that preclude double recovery for the same act, both forms of action may exist in a given case. The two claims entail completely different remedy structures." Raymond T. Nimmer, 2 *Information Law* § 11:154.

"An infringement claim exists, in addition to the contract claim, however, if the licensee's actions involve conduct prohibited by applicable property law and are either outside the scope of the license or occur after the license was cancelled or terminated. In effect, the infringement claim requires that the conduct not be protected by the license." *Id.* "A conclusion that a particular act constitutes a copyright (or patent) infringement does not indicate that there can be

70

no contract law remedies with that same act. Both an infringement and a contract breach may occur in the same act and be subject to remedies brought under one or both bodies of law." *Id.*

Nimmer's discussion of *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283 (2d Cir. 1999) is also instructive:

> the court held that a party who transferred rights to use a copyrighted executive management system, retaining only the right to use it in his own classes, did not have the right to use the system in a software product. Thus, doing so exceeded the scope of the license and was copyright infringement. Nevertheless, the court awarded both copyright infringement damages and contract damages. The infringement statutory damages stemmed from the author's willful acts of copyright infringement, while the contractual damage award represented the company's consequential damages of having to enforce its copyright rights stemming from the author's breach of the licensing agreement.

2 *Information Law* § 11:154.

In this case, SCO's breach of contract claims is based on Novell's alleged distribution of Licensed Technology as part of Linux, which is a directly competitive system. Sec. Am. Compl. ¶¶ 97-98. SCO's copyright infringement claim also alleges that Novell infringed SCO's copyrights by copying, reproducing, modifying, sublicensing, and/or distributing Linux products containing unauthorized contributions of SCO's copyrighted intellectual property. *Id.* ¶ 116. SCO also claims copyright infringement based on Novell's alleged use of the Licensed Technology in an operating system that competes with SCO's core application server products or in a product wherein the intellectual property constitutes a primary portion of the value of the product. *Id.* ¶ 118. Therefore, SCO alleges that Novell exceeded the scope of its license and breached the non-compete restrictions.

Even though the restrictions are limitations on the scope of Novell's license, there appears to be no restriction under the case law precluding SCO, as a matter of law, from pursuing a claim for an alleged breach of those restrictions and copyright infringement. Outside the context of determining whether the irreparable harm presumption in a copyright infringement action applies for purposes of analyzing a preliminary injunction, as was the case in *Sun,* the distinction appears to be meaningless because a party can obtain separate damages based on the same alleged conduct.

Novell did not bring its motion based on the factual merits of SCO's copyright and contract claims. Rather, its only position was that, as a matter of law, SCO could not state a separate contract claim on the same provisions and conduct as its copyright infringement claim. The court concludes that it is possible to have both claims. Therefore, the court denies Novell's motion for summary judgment on this basis.

## B.  Change of Control

Novell's next basis for dismissing SCO's claims based on the TLA and APA non-compete restrictions is that the license restrictions ceased to exist as a result of Santa Cruz's sale of its UNIX assets to Caldera in 2001, which constituted a "Change of Control" as defined in the APA.  SCO does not dispute the fact that Santa Cruz sold substantially all of its assets to Caldera in 2001.  SCO asserts, however, that Santa Cruz's sale of assets to Caldera did not constitute a Change of Control, as that term is defined in the APA, that would  terminate the non-compete covenants at issue.

The TLA states that the restrictions on Novell's license "shall cease to exist" in the event of a "Change of Control" of Santa Cruz.  *Id.* § II(B).  The TLA states that "Change of Control"

72

shall have the meaning attributed to it in the APA.  *Id.*  Under Section 1.6 of the APA, which

provides for the license back of assets and provides the basis for entering the TLA, it states that

"the license agreement shall also provide [Novell] with an unlimited royalty-free, perpetual,

worldwide license to the Licensed Technology upon the occurrence of a Change of Control of

[Santa Cruz] described in Section 6.3(c) hereof."  APA § 1.6.  Section 6.3(c) of the APA is

entitled "Expansion of Seller's Rights Relating to the Licensed Technology upon a Change of

Control" and provides that

> Until two (2) years from the Closing Date, in the event [Santa
> Cruz] has merged with, sold shares representing 50% or more of
> the voting power of [Santa Cruz] to, sold all or substantially all of
> [Santa Cruz's] assets to, or engaged voluntarily in any other change
> of control transaction with, any party identified by [Novell] on
> Schedule 6.3(a) hereof, or in the event any party identified by
> [Novell] on Schedule 6.3(a) hereof, shall acquire shares
> representing 50% or more of the voting power of [Santa Cruz],
> [Novell] shall automatically have unlimited, royalty-free, perpetual
> rights to the Licensed Technology.

*Id.* § 6.3(c).

Novell argues that based on the provisions of the TLA, Section 6.6 of the APA should

apply because it is the only provision that defines a "Change of Control."  Novell claims that

because the TLA was entered after the APA, its provisions should control.  Section 6.6(c) of the

APA is entitled "Change of Control" and provides that

> For purposes of this Agreement, a "Change of Control" with
> respect to one party shall be deemed to have occurred whenever (i)
> there shall be consummated (1) any consolidation or merger of
> such party in which such party is not the continuing or surviving
> corporation, or pursuant to which shares of such party's common
> stock would be converted in whole or in part into cash, other
> securities or other property, other than a merger of such person in
> which the holders of such party's common stock immediately prior
> to the merger have substantially the same proportionate ownership

73

> of common stock of the surviving corporation immediately after
> the merger, or (2) any sale, lease, exchange or transfer (in one
> transaction or a series of related transactions) of all or substantially
> all the assets of such party, or . . . (v) any other event shall occur
> with respect to such party that would be required to be reported in
> response to Item 6(e) (or any successor provision) of Schedule 14A
> of Regulation 14A promulgated under the Exchange Act."

*Id.* § 6.6(c)

Section 1.6 of the APA, however, states that Section 6.6 is the provision for determining a change of control of Novell: "In the event of a Change of Control of [Novell] (as described in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to [Novell's] products either developed or substantially developed as of the time of the Change of Control." *Id.* § 1.6.

The court disagrees with Novell's position that the TLA conflicts with the APA. The TLA states that it and the APA "constitute the entire understanding between the parties with respect to its subject matter." TLA § VIII. "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Cal. Civ. Code § 1642. The TLA does not identify which Change of Control in the APA applies. Section 1.6 of the APA, however, clearly directs that Section 6.3 applies to a change of control of Santa Cruz, and Section 6.6 applies to a change of control for Novell. The TLA merely codified the license agreed to in the APA, and the court finds no conflict between it and the APA. While the language of Section 6.6 broadly states "For purposes of this Agreement" and uses language that makes it appear that the provision would apply to both parties, the court concludes that Section 6.3 is the applicable provision for determining whether a Change of Control of Santa Cruz occurred for purposes of eliminating the license restrictions in Section 1.6

of the APA and the TLA. The court, therefore, concludes that the license restrictions did not cease to exist when Santa Cruz sold its assets to Caldera in 2001. Accordingly, Novell's motion for summary judgment on these grounds is denied.

## C. California Business and Professions Code § 16600

Novell further argues that the non-compete restrictions in the APA and the TLA are void under California law. California Business and Professions Code Section 16600 declares that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." California courts have strictly construed Section 16600 as requiring non-compete clauses to be stricken unless they meet one of the narrow exceptions provided for in the statute. *See Hill Med. Corp. v. Wycoff*, 86 Cal. App. 4th 895, 899 & n.4 (2001). The only exceptions set forth in the statute relate to the sale of the goodwill of a business, § 16601, and dissolution of a partnership or limited liability company, §§ 16602, 16602.5.

SCO asserts that the covenants not to compete in the license are valid under California law. SCO contends that California Business and Professions Code Section 16600 does not apply to limitations on grants of rights that Novell would not otherwise have to SCO's property. In *King v. Gerold*, 109 Cal. App. 2d 316, 318 (1952), the court held that Section 16600 did not apply to a non-compete clause where the licensee is not "prohibited from carrying on his lawful business" but is limited only in particular aspects of how he runs his business.

Other courts have also recognized that non-compete clauses used in the employment, supplier-distributor, and franchisor-franchisee context during the term of the relationship, are not void under Section 16600. *Shaklee U.S., Inc. v. Giddens*, 934 F.2d 324 (9th Cir. 1991) (allowing

75

restrictions to scope of distributor's activities);  *Great Frame Up Sys. Inc. v. Jazayeri Enterprises*, 789 F. Supp. 253, 255-56 (N.D. Ill. 1992).

The license in the APA and the TLA does not preclude Novell from pursing its business. Rather, the license merely restricts Novell's ability to use SCO's property and is part of an ongoing relationship between the parties.  Therefore, the court finds that there is no restraint on trade and the restrictions are not void under Section 16600.  The court, therefore, denies Novell's motion for summary judgment on SCO's non-compete claims on the grounds asserted by Novell. To the extent that SCO's non-compete claims are based on ownership of the UNIX and UnixWare copyrights, SCO's claims are dismissed as a result of this court's conclusion that Novell owns the copyrights.

## IV.  Cross Motions on Novell's Fourth Counterclaim re: SVRX Licenses

The cross motions on Novell's Fourth Counterclaim seek a declaration from the court on (1) whether Section 4.16(b) of the APA authorizes Novell to direct SCO to waive its purported claims for breaches of SVRX license agreements with IBM and Sequent, (2) whether Section 4.16(b) of the APA authorizes Novell to take action on SCO's behalf when SCO refuses to waive the claims, and (3) whether the IBM and Sequent Sublicensing Agreements are "SVRX Licenses" under the APA.

Novell argues that a declaration of rights is proper in this case because SCO's purported termination of IBM's and Sequent's licenses to SVRX technology creates an actual controversy as to the parties' rights, authority, and obligations with respect to SVRX Licenses under the APA.  To determine the parties' rights and authority under Section 4.16(b), the court must begin by analyzing the language of that provision.  Section 4.16(b) provides

> [SCO] shall not, and shall not have the authority to, amend modify or waive any right under or assign any SVRX License without prior written consent of [Novell]. In addition, at [Novell's] sole discretion and direction, [SCO] shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by [Novell]. In the event that [SCO] shall fail to take any such action concerning the SVRX Licenses as required herein, [Novell] shall be authorized, and is hereby granted, the rights to take any action on [SCO's] own behalf. [Santa Cruz] shall not, and shall have no right to, enter into future licenses or amendments of the SVRX Licenses, except as may be incidently involved through its rights to sell and license the Assets or the Merged Product . . . or future versions thereof of the Merged Product.

APA § 4.16(b). Therefore, these rights state that they apply to "any" SVRX License. The scope of Novell's authority, therefore, turns on the meaning of SVRX License.

The APA appears to set out a clear roadmap for determining the meaning of SVRX License. Section 4.16(a) defines SVRX Licenses as those licenses "listed in detail under item VI of Schedule 1.1(a)" of the APA. Item VI of Schedule 1.1(a) states "All contracts relating to the SVRX Licenses listed below."[5] Item VI then provides a list of SVRX software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, 4.2 and "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0." Item VI, however, does not provide a list of license agreements.

Novell argues that this wording plainly means that the term "SVRX Licenses" under the APA includes all contracts relating to the UNIX System V releases listed in Item VI. This would include contracts relating to UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1, 4.2 and

---

[5] This introductory language was amended by Amendment No. 1 to also include Auxiliary Product Licenses, which would be collectively referred to as "SVRX Licenses."

"[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0."

Novell, therefore, claims that its Section 4.16(b) authority extends to all licenses relating to each

of the listed software products.

SCO contends that the term "SVRX Licenses" in the relevant APA provisions is

ambiguous on its face. Section 4.16 directs one to Item VI in Schedule 1.1(a) for a detailed list

of SVRX Licenses. Item VI has an introductory provision stating "all contracts relating to the

SVRX Licenses listed below," but then it lists SVRX releases, not licenses. These listed SVRX

releases are products to which a party would obtain a license.

The court agrees that there appears to be some ambiguity in the APA's attempt to define

SVRX Licenses. But an ambiguity only exists if the language is reasonably susceptible to more

than one meaning. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. App. 4th 384, 391 (2006). Both

parties assert definitions for the term SVRX License. Thus, the court must determine whether

the contract language is reasonably susceptible to both interpretations. "When a contract is

reduced to writing, the intention of the parties is to be ascertained from the writing alone, if

possible." Cal Civ. Code § 1639.

## A. Novell's Interpretation

Novell does not believe that Item VI in Schedule 1.1(a) creates an ambiguity because it

contends that it is still clear that the intent of the language is that SVRX Licenses are all licenses

relating to the software releases listed in Item VI. That meaning requires a minor inferential step,

but it reconciles the ambiguity created by the listing of software releases instead of licenses. This

proposed meaning is also consistent with the APA's explanation that Novell was engaged in

developing a software product called UNIX System V, or SVRX, and selling binary and source

code licenses to the various versions of SVRX software. Novell contends, therefore, that the natural meaning of SVRX License includes any license to the listed SVRX releases. This interpretation is also consistent with the APA's repeated use of the broad language "any" and "all" SVRX Licenses.

SCO contends that Novell's interpretation that SVRX License means all licenses related to the listed SVRX products is not consistent with the text of the APA and is predicated on a fundamental misinterpretation of the limited rights Novell retained under Section 4.16 of the APA. As with the copyright issue, the court does not agree with SCO's characterization that Novell retained only limited rights under the APA. It is undisputed that the royalty stream Novell retained under the APA consisted of substantial future revenue and was a significant part of the consideration for the APA. Moreover, the language of Sections 1.2 and 4.16 of the APA does not suggest that Novell retained only limited rights. Section 1.2 states that while SCO acquired the SVRX Licenses and the legal title to SVRX Royalties, Novell retained *all rights* to SVRX Royalties. *Id.* § 1.2(b). SVRX Royalties are defined as "all royalties, fees and other amounts due under all SVRX Licenses." *Id.* § 4.16(a). Furthermore, the APA does not limit Novell's rights under Section 4.16(b) to "certain" SVRX Licenses, it unambiguously extends Novell's authority to direct SCO's actions as to "any SVRX License."

By interpreting SVRX License to mean all contracts related to the software releases listed in Item VI of Schedule 1.1(a), SCO contends that Novell would be able to negate the intent and purpose of transferring the entire UNIX and UnixWare business as set forth in the APA's other provisions. SCO interprets the APA's provisions regarding its acquisition of assets too broadly. Specifically, SCO fails to acknowledge that it acquired only "certain of the assets" comprising

79

Novell's UNIX and UnixWare business and that the transfer of assets was subject to specific exclusions on the Excluded Asset schedule.  The transfer of assets under the APA was also subject to the rights and obligations of Sections 1.2 and 4.16.  The court finds no conflict between the provisions describing the assets SCO acquired and Novell's retention of rights with respect to all contracts relating to SVRX software releases.

SCO further argues that Novell's proposed interpretation for the definition of SVRX License is at odds with the APA's license back provision and the TLA executed in connection with the APA's Closing.  SCO claims that the TLA license relates to the SVRX products listed in Schedule 1.1(a)(VI) and would constitute an SVRX License under Novell's interpretation.  If the TLA is an SVRX License, SCO contends that Novell could breach the license and require SCO to waive its breach.  Section 1.6 and the TLA, however, grant Novell a license in the "Licensed Technology."  As this court concluded above, the Licensed Technology does not include the UNIX and UnixWare copyrights–it includes only the technology included with the Assets listed on Schedule 1.1(a).  The TLA also gave Novell a license to derivatives of the technology in the included Assets, which included the derivative works that Santa Cruz was to develop pursuant to the terms of the APA.

**B.  SCO's Interpretation**

SCO argues for limiting the definition of SVRX License to product supplement agreements because it asserts that those agreements are the only agreements that generated the SVRX Royalties to which Novell was entitled.   Section 4.16 describes SVRX Royalties as "all royalties, fees, and other amounts due under SVRX Licenses."  Accordingly, SCO asserts that Novell's interests in protecting its royalty stream would be accomplished by retaining rights to

direct SCO's activities with respect to those product supplements. Novell, however, disputes that the royalty stream comes only from product supplements because no fees would be due and no license would be in place without the software and sublicensing agreements that make those product supplements operative.

SCO's contention that SVRX Licenses are limited to only agreements that collect royalties instead of SVRX software agreements, which specify the restrictions on a licensee's source code rights, appears to conflict with the language of the APA and the integrated nature of the licensing agreements entered into by AT&T and Novell. Given that AT&T, and then Novell, would typically enter into a set of agreements in connection with each license of SVRX technology–a software agreement, a sublicensing agreement, and product supplements– the APA would need to make a clear distinction between such agreements in its definition of SVRX License if it intended to exclude one or more of the agreements in the set. In Section 4.16 and Item VI of Schedule 1.1(a), the parties made no attempt to carve out a distinction between different types of agreements within the set.

Rather, Item VI states "all contracts" relating to the SVRX Licenses. The use of "all contracts" is consistent with Novell's interpretation that all of the agreements in the set comprise the SVRX License. The only ambiguity in Item VI is that it states that SVRX Licenses are listed below, but SVRX products, to which licenses are obtained, are listed instead. To incorporate a binary royalty distinction into the language of Section 4.16 and Item VI, however, would require a complete rewriting of those provisions.

The language of Section 4.16(b) also indicates that an SVRX License must be something that grants rights. Section 4.16 refers to "rights under" and "rights to" an SVRX License. SCO

81

admits that product supplements did not by themselves grant rights. The software and sublicensing agreements set forth the rights and obligations for the use and distribution of the technology. Because the software and sublicensing agreements set forth the general rights and obligations for the licensee's use of any software product, the product supplements identify only the product the licensee had a right to use, the CPUs on which it had that right, and the fees the licensor had a right to receive in exchange. The product supplement, therefore, serves only to give content to terms defined in the software and sublicensing agreements–"software product" and "designated CPU."

Moreover, the set of agreements refer to and incorporate each other. The software and sublicensing agreements state that the product supplement is a part of the agreement. The ability to assign, amend, modify, supplement, or waive any right under any product supplement, as is provided for in Section 4.16 for any SVRX License, would necessarily amend, modify, or supplement the other agreements. Therefore, SCO's attempt to distinguish product supplements from the other agreements used to license SVRX technology creates a distinction that is not supported by the license agreements or the terms of the APA.

If the parties had intended to limit SVRX Royalties to only those revenues generated by product supplements and to limit SVRX Licenses to only product supplement, they obviously could have used far less sweeping terms than "all SVRX Royalties" and "all SVRX Licenses." In Section 1.2, the parties could have merely stated that SCO had acquired "all product supplements" but had only legal title in the royalties generated by such product supplements, whereas Novell retained rights to receive royalties under "all product supplements." And, if Section 4.16 was only intended to give Novell powers over the explicit subset of product

supplements, it clearly could have been written that way as well.  It was not.  SCO's interpretation runs contrary to the language of Section 4.16(b).

SCO's narrow interpretation of SVRX License produces a result that is contrary to SCO's own conclusion that Novell's Section 4.16(b) authority extends to binary agreements.  SCO claims that SVRX source code licenses are not SVRX Licenses because "software agreements" governing SVRX source code are not mentioned in Item VI of Schedule 1.1(a) but are expressly referred to in Item III.L of that Schedule.  SCO's interpretation, however, would exclude so-called binary licenses from the universe of SVRX Licenses as well because Item VI does not mention "sublicensing agreements" governing SVRX binary code either.  Sublicensing agreements, like software agreements, are expressly referred to in Item III.L.  Therefore, SCO's interpretation would mean that Section 4.16(b) does not apply to source or binary licenses–a result that is at odds with the whole purpose and structure of the parties' agreement.

Reviewing other provisions of the APA demonstrates that the parties knew how to specifically distinguish between matters relating to source and binary code, including source and binary agreements.  In Schedule 1.1(a)(III)(M), the parties recognized binary licensing agreements and in Schedule 1.1(b) there are several items with "Binary only" included in a parenthetical after the item.  Yet, in regard to SVRX Licenses under Section 4.16(b), the APA makes no distinction whatsoever.  And Schedule 1.1(a) refers to "all contracts" when it easily could have stated binary only contracts.

SCO argues that Amendment No. 1 to the APA, which added Section 1.2(e), supports its conclusion that there is a distinction between source and binary licenses.  The introductory language of Section 1.2(e) states that Santa Cruz is "entitled to retain 100% of the following

categories of SVRX Royalties." Amend. No. 1 ¶ E(e). Section 1.2(e)(iv) then provides that, notwithstanding its obligation to remit to Novell the SVRX Royalties due under SVRX Licenses, Santa Cruz could keep royalties formerly due under "its own licenses from [Novell] acquired before the Closing Date through Software Agreement . . . and Sublicensing Agreement . . . ." *Id.*

According to SCO, Section 1.2(e)(iv) thus expressly identifies the multiple "licenses" that Santa Cruz had acquired "through" its software and sublicensing agreements, and the only such licenses to which "royalties" could be "attributable" were the numerous SVRX supplements that Santa Cruz had executed with Novell. SCO's attempt to make a distinction based on the fact that it entered the software and sublicensing agreements with AT&T and its product supplements with Novell is meaningless because Novell acquired all rights to the software and sublicensing agreements when it acquired the UNIX business from AT&T. Moreover, Section 1.2(e)(iv) recognizes that royalties come from software agreements and sublicensing agreements, which does not help SCO's position.

Amendment No. 1 also added Section 1.2(f), which details the process and form of Santa Cruz's obligation to submit monthly reports regarding SVRX Royalties. Section 1.2(f) states that the "monthly reports shall be separately broken down by revenue type (i.e. source code right to use fees, gross and net binary per copy fees, and support fees), by product, by customer . . . ." Amend. No. 1 ¶ E(f). This language further demonstrates that SVRX Royalties include fees other than merely binary fees.

Section 1.2, as amended, actually helps demonstrate that the parties intended SVRX Royalties to apply to all of the agreements associated with licenses to SVRX technology. It also demonstrates that when the parties intended to make a distinction regarding binary and source

code fees, they specifically identified the distinction. This section expressly refers to certain "source code right to use fees" as a category of SVRX Royalties. If, as SCO suggests, SVRX License refers only to binary agreements, the APA's use of the modifiers "source" and "binary" in particular instances and its use of "all" and "any" in connection with SVRX Licenses payment obligations must be ignored. While the APA makes distinctions between source and binary code in other provisions, it makes no such distinction in relation to SVRX Licenses under Section 4.16.

SCO also relies heavily on the language of Amendment No. 2 to the APA regarding source code. In fact, SCO claims that the court can deny Novell's motion based on Amendment No. 2 alone. Paragraph B of Amendment No. 2 states that "notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the [APA], any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations shall be managed as follows." Subparagraph 5 of Paragraph B then provides: "This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the [APA]."

Although SCO claims that the language of subparagraph 5 has a different tone than the subparagraphs that proceed it, all of the subparagraphs of paragraph B are limited to buy-out transactions. These additional provisions do not amend Novell's rights under Section 4.16(b) of the original APA. In fact, the amendment states that "notwithstanding the provisions of 4.16," the parties have agreed to the following procedures with respect to future potential buy-out transactions. Because the Amendment's language regarding Novell's rights with respect to

85

source code rights is limited by the plain language of Amendment No. 2 to buy-out transactions, it provides no insight into the source code rights SCO had or did not have under Section 4.16(b) of the original APA.  The amendment only states that those source code rights will not be altered in the context of any future buy-out transaction.

Therefore, the court concludes that there is no support in the language and structure of the APA for SCO's interpretation of SVRX License to mean product supplements rather than the entire set of agreements relating to the licensing of SVRX code.

## C.  Role of Extrinsic Evidence

SCO seeks to introduce extrinsic evidence to help prove its interpretation that SVRX License should be limited to product supplements.  "Where the contract is integrated, parol evidence still might be admissible if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 519-20 (1995).  However, because SCO's interpretation is a meaning to which the language of the APA is not reasonably susceptible, there is no amount of extrinsic evidence that would change the result.  Therefore, the extrinsic evidence SCO seeks to introduce is immaterial.[6]

_____

[6] Even if this court were to consider SCO's extrinsic evidence, it does not uniformly support SCO's interpretation as SCO claims.  If the contract language was susceptible to SCO's interpretation, SCO's evidence would, at most, create only a question of fact for the jury.

Prior to this litigation, SCO had publicly announced that its administrative duties under the APA extend to "customers who deploy SVRX technology."  SCO did not report that its administrative duties are limited to a more narrow set of SVRX customers licensing binary SVRX products.  In addition, in May 1996, Bill Broderick of Santa Cruz wrote a letter to Novell recognizing that the APA "requires prior written approval from Novell for all new agreements or changes to current agreements relating to UNIX System V."

SCO claims the circumstances surrounding the IBM buyout support its position because it demonstrates that Novell's rights under Section 4.16 were limited.  The dispute focused on

**D.   Breach of Covenant of Good Faith and Fair Dealing**

Finally, SCO argues that Novell's motion should fail because of Novell's breach of the

covenant of good faith and fair dealing.  SCO's Second Claim for Relief alleges that Novell

breached the covenant by, among other things, purporting to waive and revoke SCO's rights and

claims against IBM.  SCO claims that Novell is not entitled to summary judgment on either

declaration it seeks in this motion because there are material issues of fact indicating that

Novell's waiver is in breach of the covenant of good faith and fair dealing.

California law precludes application of the covenant of good faith and fair dealing where

a party is acting within an explicit grant of contractual authority.  In *Carma Developers, Inc. v.

Marathon Development Cal. Inc.*, 2 Cal. 4th 342, 374 (1992), the court stated that it was "aware

of no reported case in which a court has held that the covenant of good faith may be read to

prohibit a party from doing that which is expressly permitted by an agreement.  On the contrary,

as a general matter, implied terms should never be read to vary express terms."

--------

Novell's unilateral right to grant the buyout of binary royalties.  But SCO concedes that
Amendment No. X to the IBM SVRX Licenses involved a grant of additional source code rights
to IBM.  Also, significantly, SCO does not dispute that it treated all of the SVRX revenue from
Amendment No. X as subject to the 95/5 split that the APA applied exclusively to SVRX
Licenses.  In addition, Amendment No. X states that under the APA "Novell retained certain
rights with respect to the Related Agreements."  Amendment No. X defined the "Related
Agreements" as certain software and sublicensing agreements.  Thus, Santa Cruz agreed in
Amendment No. X that Novell's APA-retained rights extended to all those agreements.

Even when SCO purported to terminate IBM's System V license agreements and SCO's
CEO wrote to Novell refusing to waive its purported claims against IBM, he specifically called
IBM's System V license agreements "IBM's SVRX License."

This evidence regarding the parties' conduct is close in time to the execution of the APA
and, therefore, more persuasive as to the meaning of the agreement.  However, even the witness
testimony, which is less reliable given the passage of years and witnesses' mistaken beliefs, does
not, as SCO claims, entirely support its interpretation.  There is substantial testimony supporting
Novell's position as well.

The actions Novell took were pursuant to an express contractual provision granting it authority to so act. Therefore, SCO's covenant of good faith and fair dealing argument is contrary to California law. Accordingly, SCO's claim for breach of the covenant of good faith and fair dealing does not preclude this court from granting Novell's motion with respect to its rights and authority under Section 4.16(b) of the APA.

The court concludes that Novell's reading of Section 4.16(b) is the only reading that is consistent with all of the APA's provisions, its Schedules, and its Amendments. SCO's attempt to narrowly interpret SVRX License to include only product supplements is not tenable under the language of the APA. A comparison of the SVRX License language in the APA with the IBM and Sequent Licenses leaves no doubt that the IBM and Sequent Licenses are SVRX Licenses as a matter of law. The IBM and Sequent Licenses are contracts that license the UNIX System V software that is listed in Item VI of Schedule 1.1(a) of the APA. Therefore, the court grants partial summary judgment to Novell on its Fourth Claim for Relief and declares that it was and is entitled, at its sole discretion, to direct SCO to waive its purported claims against IBM and Sequent, and SCO is obligated to recognize Novell's waiver of SCO's claims against IBM and Sequent.

Accordingly, Novell's Motion for Partial Summary Judgment on its Fourth Claim for Relief for declaratory judgment is granted and SCO's Cross-Motion for Summary Judgment on Novell's Fourth Claim for Relief is denied.

## V.  Cross Motions Regarding Sun and Microsoft Agreements

Novell argues that SCO received payments under SCO's 2003 license agreements with Sun and Microsoft which constitute SVRX Royalties that SCO was obligated to remit to Novell

pursuant to Sections 1.2(b) and 4.16 of the APA.  Based on this conduct, Novell seeks partial

summary judgment on its Sixth, Seventh, Eighth and Ninth Claims for Relief, which allege

claims for breach of fiduciary duty, conversion, constructive trust, and accounting.  SCO has

filed a cross-motion for summary judgment on those same claims as well as on Novell's Third

Claim for Relief for breach of contract.

The APA expressly created an agency relationship between the parties with respect to

SVRX Royalties.  Section 1.2(b) provides that Novell retained "all rights to the SVRX Royalties

notwithstanding the transfer of the SVRX Licenses" to Santa Cruz, who has only "legal title and

not an equitable interest in such royalties."  APA § 1.2(b).  Under Section 1.2, Santa Cruz agreed

"to collect and pass through to [Novell] one hundred percent of the SVRX Royalties as defined

and described in Section 4.16 hereof."  *Id.*  Section 4.16 further provides that SCO "shall

administer the collection of all royalties, fees and other amounts due under all SVRX Licenses."

Those revenues are defined as SVRX Royalties.  *Id.* § 4.16(a).

## A.  Breach of Fiduciary Duty and Conversion

Novell seeks summary judgment on its Seventh and Eight Claims for Relief for breach of

fiduciary duty and conversion, alleging that SCO wrongfully retained payments made by Sun and

Microsoft that constitute SVRX Royalties under the APA.  Because California law governs

actions arising from the APA, and Novell's claim arises from the agency relationship created by

the APA, California law governs.  *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 468, 470

(1992).

To establish a breach of fiduciary claim under California law, Novell must show "the

existence of a fiduciary relationship, its breach, and damages proximately caused by that breach."

*Roberts v. Lomanto*, 112 Cal. App. 4th 1553, 1562 (2005).  A conversion claim is based on "the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property."  *Kasdan, Simonds, McIntyre, Epstein & Martin v. World Sav. & Loan Ass'n*, 317 F.3d 1064, 1069 (9th Cir. 2003).   To establish conversion, therefore, Novell must establish: (1) its "ownership or right to possession of the property; " (2) SCO's "conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages."  *Id.* at 1069.

Novell asserts that the undisputed facts establish that: (1) the APA creates an agency relationship between Novell and SCO; (2) as Novell's agent, SCO has a fiduciary duty to diligently collect, administer, and deliver to Novell any SVRX Royalties; (3) Novell is the equitable owner of the SVRX Royalties and holds all right, title, and interest to them; (4) SVRX Royalties are amounts due under all SVRX Licenses as defined in the APA; (5) the 2003 Sun and Microsoft Agreements are SVRX Licenses because they license the same UNIX System V technology listed in Item VI of Schedule 1.1(a) to the APA; and (6) SCO improperly retains the monies it collected from the 2003 Sun and Microsoft Agreements.

SCO does not dispute the agency relationship created by the APA, but it contends that the payments it retained under the 2003 Sun and Microsoft Agreements are not SVRX Royalties under the APA.  SCO asserts that the 2003 Sun and Microsoft Agreements are not SVRX Licenses because "SVRX License" refers only to binary licenses in existence at the time of the APA.  SCO also asserts that the 2003 Sun and Microsoft Agreements are primarily Unixware licenses with only incidental licensing of SVRX.

*(1) Temporal Requirement on SVRX License*

90

The court has already determined that there is not a binary limitation on the definition of SVRX License.  However, SCO's arguments on this motion require the court to consider whether the term "SVRX License" refers only to licenses in existence at the time of the APA.

In the prior discussion, this court concluded that the only possible interpretation of the APA was that SVRX Licenses mean all contracts relating to the list of SVRX products provided in Item (VI) of Schedule 1.1(a).  Item VI has no express temporal requirement on "all contracts." Therefore, there is no facial ambiguity.  SCO seeks to introduce extrinsic evidence that the parties intended the royalties to be limited to SVRX licenses in existence at the time of the APA. SCO must, therefore, demonstrate that the language of the APA is reasonably susceptible to such an interpretation.  *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006).

SCO first argues that nothing in the APA suggests that "all contracts relating to the SVRX Licenses" extends to any future agreement that Santa Cruz or its successors might execute.  Section 1.2(b) refers to Novell "*retaining* all rights to the SVRX Royalties notwithstanding *the transfer of the SVRX Licenses* to Santa Cruz."  APA § 1.2(b) (emphasis added).  SCO contends that this language indicates that the licenses are those transferred at the time of the APA.  But Novell's retention of rights places no temporal restriction on the exercise of that right.  Furthermore, if Novell's argument that the licenses had to be "the" licenses in existence at that time of the APA focuses on the use of the term "the" before SVRX Licenses, SCO's assumptions are contradicted by the many instances in which the agreement refers to "any" and "all" SVRX Licenses.  Specifically in connection with SCO's obligations to collect royalties, Section 4.16(a) refers to all royalties under "all SVRX Licenses."

Next, SCO points to Section 1.2(b), which requires SCO to pay royalties to Novell with

respect to SCO's "future sale of UnixWare products." *Id.* There is no similar language in Section 1.2(b) referring to future sales of SVRX Licenses. SCO posits that no reference is made to future SVRX Licenses because Section 4.16 states that SCO "shall not, and shall have no right to, enter into future licenses or amendments of the SVRX Licenses, except as may be incidently involved through its rights to sell and license the Assets or the Merged Product . . . or future versions thereof of the Merged Product." *Id.* 4.16(b).

Section 4.1(b) was amended, however, to include language stating that Santa Cruz "shall not, and shall have no right to, enter into new SVRX Licenses except in the situation specified in (i) of the preceding sentence or as otherwise approved in writing in advance by [Novell] on a case by case basis." Amend. No. 1 ¶ J. Contrary to SCO's interpretation, this language demonstrates that there are certain instances in which SCO was allowed to enter into new SVRX Licenses. There are no additional provisions that would exclude these new SVRX Licenses from the category of "all SVRX Licenses."

SCO further contends that Amendment No. 1 to the APA clarifies that Santa Cruz was obligated to remit to Novell only the royalties that were being paid and that would continue to be paid under the existing SVRX licenses. Amendment No. 1 added Section 1.2(e), which provided certain categories of SVRX Royalties that SCO was entitled to retain. *Id.* ¶ E(e). Subsection (ii) refers to "source code right to use fees under existing SVRX Licenses." Subsection (iii), however, refers to "source code right to use fees attributable to *new* SVRX licenses approved by" Novell. *Id.* (emphasis added). Therefore, Section 1.2(e) actually demonstrates that SVRX Royalties include payments under existing and new SVRX Licenses.

If, as SCO suggests, SVRX License refers only to those licenses in existence at the time

of the APA, the modifiers "new" and "existing" used in Sections 1.2(e) and 4.16(b) to modify

that term are rendered meaningless. Under general rules of contract interpretation, this court is

required to give effect to every part of the contract, if reasonably practicable. *See* Cal. Civ. Code

§ 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if

reasonably practicable, each clause helping to interpret the other.")

The court concludes, therefore, that there is no limitation in the APA to "then-existing"

SVRX Licenses. Such an interpretation would be contrary to express terms in the agreement and

render some express terms meaningless. Accordingly, the court rejects SCO's interpretation as a

matter of law.

### (b) UnixWare Licenses

SCO further argues that the 2003 Sun and Microsoft Agreements are licenses for

UnixWare which license SVRX only incidentally. The parties dispute whether the SVRX

component of these licenses is only incidental. Nevertheless, it is undisputed that the 2003 Sun

and Microsoft Agreements have some SVRX component.

The language and structure of the APA's Royalties provision in Section 1.2(b) makes a

clear distinction between royalties from SVRX Licenses and UnixWare licenses. SVRX

Royalties are governed by Sections 1.2 and 4.16, and UnixWare royalties are governed by

Section 1.2 and Schedule 1.2(b). While SCO's obligation to pay royalties for the sale of

UnixWare products expired on December 31, 2002, its obligation with respect to SVRX

Royalties does not expire.

Particularly relevant to this motion are the provisions in Schedule 1.2(b) regarding the

conversion of an SVRX customer to UnixWare and Section 4.16(b) regarding the incidental

licensing of SVRX technology with UnixWare.  It is undisputed that Sun had previous UNIX-related agreements with AT&T and Novell because the 2003 Sun Agreement purports to amend and restate a 1994 agreement between Sun and Novell.

First, Schedule 1.2(b) addresses the conversion of existing SVRX customers to a UnixWare derived product.  APA Sched. 1.2(f).  The process to determine if a customer "is validly converted" is as follows:

> The conversion of an SVRx customer to UnixWare will validly occur and result in the UnixWare based revenue flowing to SCO, without giving rise to a continued obligation to make payment to Seller of royalties due under the SVRx licenses, only if the following are true (note: if the customer continues to sell their SVRx based product separately, then these SVRx revenues continue to flow to Novell):
> . . . .
> (ii) The product is derived from a source version of UnixWare . . . and (i) none of the original SVRx code provided by Novell to the customer, under the SVRx license, is included in the new product or (ii) [Santa Cruz] shall demonstrate to [Novell]'s reasonable satisfaction that an insignificant amount of original SVRx code is so included and the adoption of UnixWare is so substantial as to constitute a valid conversion.

*Id.*  Therefore, even where a customer moves to a UnixWare product, SCO's SVRX Royalty obligations to Novell can continue unless there is no SVRX code or only an insignificant amount of SVRX code in the product.   It is undisputed that some of the original SVRX code is included in the Sun and Microsoft Agreements.  And, based on the arguments presented in this motion, it is also clear that SCO has not demonstrated to Novell's satisfaction that the amount of original SVRX code in these licenses is insignificant.  Moreover, whether or not Novell's present satisfaction is reasonable, which could present a question of fact, the language suggests that SCO was obligated to present the information to Novell before the customer would be considered

validly converted. The facts here demonstrate that Novell was not made aware of the 2003 Sun and Microsoft Agreements. Therefore, SCO never attempted to validly convert Sun or Microsoft. Under Schedule 1.2(b), then, Sun and Microsoft would not be considered validly converted.

The court must then analyze SCO's obligations with respect to incidental licenses of SVRX under Section 4.16. Section 4.16(b) is amended in Amendment No. 1 to allow SCO "to enter into amendments of the SVRX Licenses (i) as may be incidentally involved through its rights to sell and license UnixWare Software or the Merged Product." Amend. No. 1 ¶ J. This amendment further allows SCO to enter into "new SVRX Licenses . . . in the situation specified in (i)." *Id.*

Although this amendment allows SCO to enter into new SVRX Licenses and amendments of SVRX Licenses incidental to its license of UnixWare, nothing in the language releases SCO from the obligation to remit "all royalties, fees, and other amounts due" under those SVRX Licenses. The use of the defined term SVRX License in this section demonstrates that even incidental licenses of SVRX are considered an SVRX License.

The APA only permits SCO to keep SVRX Royalties in the narrow circumstances outlined in Section 1.2(e). Although SCO references Section 1.2(e)(ii)'s exception as applicable to the Sun and Microsoft Agreements, Novell disputes that it applies. But, even if this exception applies, it does not relieve SCO of its obligation to account for those fees. SCO agreed to administer the collection of all amounts due under all SVRX Licenses. APA § 4.16(a). Section 1.2(f) specifically states that SCO's monthly reports are to be "separately broken down by revenue type (i.e. source code right to use fees, gross and net binary per copy fees, and support

fees) . . ."  Amend. No. 1 ¶ E(f).  And under Section 1.2(e), even those fees SCO retains are considered "categories of SVRX Royalties."  *Id.* ¶ E(e).  Those fees, therefore, as still SVRX Royalties.  Section 1.2(e) merely provides that in those instances SCO may retain 100% of them instead of passing them through to Novell.  SCO's right to retain all of those fees, which may account for a portion of the SVRX Royalties under the 2003 Sun and Microsoft Agreements, does not relieve SCO of its administrative duties to account for and report all SVRX Royalties according to the provisions of the APA.

The court concludes SCO was required to account for and pass through to Novell the appropriate SVRX Royalties according to the SVRX portions of the 2003 Sun and Microsoft Agreements.  The parties dispute what portion of the payments SCO received from the 2003 Sun and Microsoft Agreements would relate to the products SVRX licensed.  Although this type of allocation and accounting is a part of SCO's duties under the APA, such scrutiny of the Sun and Microsoft Agreements by the court presents a question of fact.

As a matter of law, the court concludes that SCO breached its fiduciary duties to Novell by failing to account for and remit the appropriate SVRX Royalty payments to Novell for the SVRX portions of the 2003 Sun and Microsoft Agreements.  Accordingly, Novell is entitled to summary judgment on its Seventh Claim for Relief for breach of fiduciary duty, and SCO's cross-motion on this claim is denied.  To the extent that SCO has failed to pass through the appropriate amount of SVRX Royalties under the 2003 Sun and Microsoft Agreements to which Novell was entitled, Novell is also entitled to summary judgment on its Eight Claim for Relief for conversion.  Consequently, SCO's cross-motion for summary judgment on Novell's conversion claim is denied.

## C. Constructive Trust and Accounting

Novell contends that a constructive trust is an appropriate remedy for a breach of fiduciary duty and conversion. Novell's Sixth and Ninth Claims for Relief for constructive trust and accounting seek remedies available at the court's discretion. *Callery v. United States Life Ins. Co.*, 392 F.3d 401, 408 (10th Cir. 2004). Under California law, the constructive trust cause of action arises from California Civil Code §§ 2223 and 2224. Section 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." And Section 2224 provides that "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

Courts interpret these statutes broadly and apply them to "practically any case where there is a wrongful acquisition of property to which another is entitled." *Ornbaun v. Main*, 198 Cal. App. 2d 92, 99 (1961). To prove a constructive trust cause of action, Novell must demonstrate the "existence of a res (some property or some interest in property), the plaintiff's right to that res, and the defendant's gain of the res by fraud, accident, mistake, undue influence or other wrongful conduct." *Pegg*, 782 F.2d at 1500.

In this case, the *res* is the SVRX Royalties, to which Novell retains "all right, title, and interest." This res is traceable to the monies received from the Sun and Microsoft Agreements. SCO's conduct also amounts to a breach of fiduciary duty, conversion, unjust enrichment, and breach of express contract, all of which are sufficient "wrongful conduct" to impose a constructive trust.

97

In *GHK Assoc. v. Mayer Group Inc.*, the trial court imposed a constructive trust based on breach of obligations flowing from a contract. 224 Cal. App. 3d 856, 878 (1990). The appellate court explicitly recognized the lower court's power to grant equitable relief in the form of a constructive trust and held that the imposition of the constructive trust was proper to ensure the owner received its damages. *Id.* Like the defendants in *GHK,* SCO breached its fiduciary obligations by failing to remit the SVRX Royalties it collected from the SVRX License portions of the 2003 Sun and Microsoft Agreements.

Although the court finds that Novell meets the requirements for the imposition of a constructive trust, the question of fact as to the SVRX portion of the 2003 Sun and Microsoft Agreements precludes the court from imposing a trust for the appropriate amount. Furthermore, despite Novell's fears regarding its ability to collect its royalties, the appropriate amount of SVRX Royalties can be determined at trial. Because of the question of fact, the court denies both Novell's and SCO's motions for summary judgment on Novell's Sixth Claim for Relief for constructive trust.

Novell also seeks the equitable remedy of accounting under its Ninth Claim for Relief. The APA obligates SCO to give detailed monthly reports and to comply with audits. APA §§ 1.2(b), (f). To the extent that SCO has failed to comply with these requirements with respect to the 2003 Sun and Microsoft Agreements, the court notes that it has a continuing duty to fulfill its contractual obligations. Novell also has continuing rights under the APA to conduct audits as to SVRX Royalties.

The court assumes that, through discovery in this action, Novell has actually obtained the information it needs to demonstrate its damages with respect to the SVRX Royalties it is due

under the 2003 Sun and Microsoft Agreements. The imposition of an accounting usually arises where "the facts are peculiarly within the knowledge of one of the parties." *Van de Kamp*, 204 Cal. App. 3d 819, 864 (1988). In this case, Novell acknowledges that it received copies of the 2003 Sun and Microsoft Agreement during discovery. It is also apparent that Novell has received relevant financial records and documentation from SCO because it is aware of how SCO accounted for the payments under the 2003 Sun and Microsoft Agreements. Because Novell has the information that it would otherwise obtain through an accounting, the court denies Novell's Ninth Claim for Relief for an accounting.

### VI.  Novell's Motion for Preliminary Injunction

As an alternative to its Motion for Partial Summary Judgment on these claims, Novell seeks a preliminary injunction imposing a constructive trust and an accounting on the wrongfully withheld revenues from the 2003 Sun and Microsoft Agreements. The court views this motion as essentially moot given is rulings above. The question of fact that precludes the court from imposing a constructive trust for the appropriate amount of SVRX Royalties due to Novell under the 2003 Sun and Microsoft Agreements also precludes the granting of a preliminary injunction. Therefore, the court denies Novell's motion for a preliminary injunction.

### CONCLUSION

For the reasons stated above, the court concludes that Novell is the owner of the UNIX and UnixWare copyrights. Therefore, SCO's First Claim for Relief for slander of title and Third Claim for Relief for specific performance are dismissed, as are the copyright ownership portions of SCO's Fifth Claim for Relief for unfair competition and Second Claim for Relief for breach of the implied covenant of good faith and fair dealing. The court denies SCO's cross-motion for

99

summary judgment on its own slander of title, breach of contract, and unfair competition claims, and on Novell's slander of title claim. Accordingly, Novell's slander of title claim is still at issue.

The court also concludes that, to the extent that SCO has a copyright to enforce, SCO can simultaneously pursue both a copyright infringement claim and a breach of contract claim based on the non-compete restrictions in the license back of the Licensed Technology under APA and the TLA. The court further concludes that there has not been a change of control that released the non-compete restrictions of the license, and the non-compete restrictions of the license are not void under California law. Accordingly, Novell's motion for summary judgment on SCO's non-compete claim in its Second Claim for breach of contract and Fifth Claim for Relief for unfair competition is granted to the extent that SCO's claims require ownership of the UNIX and UnixWare copyrights, and denied in all other regards.

Furthermore, the court concludes, as a matter of law, that the only reasonable interpretation of the term "SVRX License" in the APA is all licenses related to the SVRX products listed in Item VI of Schedule 1.1(a) to the APA. Therefore, Novell is entitled to a declaration of rights under its Fourth Claim for Relief that it was and is entitled, at its sole discretion, to direct SCO to waive its claims against IBM and Sequent, and SCO is obligated to recognize Novell's waiver of SCO's claims against IBM and Sequent. Accordingly, Novell's motion for partial summary judgment on its Fourth Claim for Relief for declaratory judgment is granted, and SCO's cross-motion for summary judgment on Novell's Fourth Claim for Relief is denied.

Finally, the court concludes, as a matter of law, that the only reasonably interpretation of

100

all SVRX Licenses includes no temporal restriction of SVRX Licenses existing at the time of the

APA. The court further concludes that because a portion of SCO's 2003 Sun and Microsoft

Agreements indisputably licenses SVRX products listed under Item VI of Schedule 1.1(a) to the

APA, even if only incidental to a license for UnixWare, SCO is obligated under the APA to

account for and pass through to Novell the appropriate portion relating to the license of SVRX

products. Because SCO failed to do so, it breached its fiduciary duty to Novell under the APA

and is liable for conversion.

The court, however, is precluded from granting a constructive trust with respect to the

payments SCO received under the 2003 Sun and Microsoft Agreements because there is a

question of fact as to the appropriate amount of SVRX Royalties SCO owes to Novell based on

the portion of SVRX products contained in each agreement. Furthermore, because Novell has

obtained the information that it would otherwise obtain through an accounting during the course

of this litigation, the court denies Novell's Ninth Claim for Relief for an accounting. However,

the court also notes that SCO has a continuing contractual obligation to comply with the

accounting and reporting requirements set forth in the APA.

Accordingly, Novell's Motion for Partial Summary Judgment or Preliminary Injunction

[Docket No. 147] is GRANTED IN PART AND DENIED IN PART; SCO's Cross-Motion for

Summary Judgment or Partial Summary Judgment on Novell's Third, Sixth, Seventh, Eighth and

Ninth Counterclaims [Docket No. 180] is GRANTED IN PART AND DENIED IN PART;

Novell's Motion for Partial Summary Judgment on its Fourth Claim [Docket No. 171] is

GRANTED; SCO's Cross-Motion for Partial Summary Judgment on Novell's Fourth Claim

[Docket No. 224] is DENIED; SCO's Motion for Partial Summary Judgment on its First,

Second, and Fifth Claims and Novell's First Claim [Docket No. 258] is DENIED; Novell's

Motion for Partial Summary Judgment on Copyright Ownership of SCO's Second Claim for

Breach of Contract and Fifth Claim for Unfair Competition [Docket No. 271] is GRANTED;

Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claims in its Second

and Fifth Claims [Docket No. 273] is GRANTED IN PART AND DENIED IN PART; Novell's

Motion for Summary Judgment on SCO's First Claim for Slander of Title and Third Claim for

Specific Performance [Docket No. 275] is GRANTED; and Novell's Motion for Summary

Judgment on SCO's First Claim for Slander of Title for Failure to Establish Special Damages

[Docket No. 277] is MOOT.

      DATED this 10th day of August, 2007.

                            BY THE COURT:

                            _____

                            DALE A. KIMBALL,
                            United States District Judge