http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

professional services groups as well as the elimination of certain third-party support contracts in order to increase the gross margin for these groups.

For the last two quarters of fiscal year 2004, we expect the dollar amount of our cost of services revenue to be lower than our cost of services revenue incurred in the second quarter of fiscal year 2004.

*Sales and Marketing*

| | | Three Months Ended April 30, | | |
| --- | --- | --- | --- | --- |
| | | 2004 | Change | 2003 |
| Sales and marketing expense | $ | 4,698,000 | (22%) $ | 6,051,000 |
| Percentage of total revenue | | 46% | | 28% |
| | | Six Months Ended April 30, | | |
| | | 2004 | Change | 2003 |
| Sales and marketing expense | $ | 9,719,000 | (22%) $ | 12,491,000 |
| Percentage of total revenue | | 45% | | 36% |

Sales and marketing expenses consist of the salaries, commissions and other personnel costs of employees involved in the revenue generation process, as well as advertising and corporate allocations. The decrease in sales and marketing expenses from the second quarter of fiscal year 2003 to the second quarter of fiscal year 2004 of $1,353,000, or 22 percent, and the decrease in sales and marketing expense from the first two quarters of fiscal year 2003 to the first two quarters of fiscal year 2004 of $2,772,000, or 22 percent, was primarily attributable to reductions in sales and marketing employees, reduced travel expenses, and lower commissions and lower co-operative advertising costs as a result of lower revenue. Our sales and marketing headcount decreased from 134 as of April 30, 2003, to 82 as of April 30, 2004.

For the last two quarters of fiscal year 2004, we anticipate the dollar amount of sales and marketing expenses will decrease compared to the second quarter of fiscal year 2004.

*Research and Development*

| | | Three Months Ended April 30, | | |
| --- | --- | --- | --- | --- |
| | | 2004 | Change | 2003 |
| Research and development expense | $ | 2,868,000 | 13% $ | 2,542,000 |
| Percentage of total revenue | | 28% | | 12% |
| | | Six Months Ended April 30, | | |
| | | 2004 | Change | 2003 |
| Research and development expense | $ | 5,575,000 | 7% $ | 5,192,000 |
| Percentage of total revenue | | 26% | | 15% |

Research and development expenses consist of the salaries and benefits of software engineers, consulting expenses as well as corporate allocations. The increase in research and development expense in the second quarter of fiscal year 2004 of $326,000, or 13 percent, compared to the second quarter of fiscal year 2003 and the increase in research and development expense in the first two quarters of fiscal year 2004 of $383,000, or 7 percent, compared to the first two quarters of fiscal year 2003 was primarily attributable to increased personnel and related costs attributable to development work and

33

NOV 000045975

Dockets.Justia.com

enhancements of our two UNIX operating system products, OpenServer and UnixWare. Our research and development personnel increased from 70 as of April 30, 2003, to 85 as of April 30, 2004.

For the last two quarters of fiscal year 2004, we anticipate the dollar amount of research and development expenses will decrease compared to the second quarter of fiscal year 2004 due to recently implemented cost reductions.

*General and Administrative*

|  | Three Months Ended April 30, | | |
|  | 2004 | Change | 2003 |
|---|---|---|---|
| General and administrative expense | $  2,392,000 | 64% | $  1,462,000 |
| Percentage of total revenue | 24% | | 7% |

|  | Six Months Ended April 30, | | |
|  | 2004 | Change | 2003 |
|---|---|---|---|
| General and administrative expense | $  4,586,000 | 47% | $  3,112,000 |
| Percentage of total revenue | 21% | | 9% |

General and administrative expenses consist of the salaries and benefits of finance, human resources and executive management and expenses for professional services as well as corporate allocations. Included in general and administrative expenses for the three and six months ended April 30, 2004 are $682,000 in payments made in connection with the elimination of approximately 16 percent of our workforce. The increase in general and administrative expense from the second quarter and first two quarters of fiscal year 2003 of $930,000 and $1,474,000, respectively, compared to the second quarter and first two quarters of fiscal year 2004, exclusive of the above mentioned termination payments, was primarily attributable to new compliance and reporting regulations under the Sarbanes-Oxley Act of 2002 and other new regulatory requirements, increased legal costs as a result of corporate legal matters and other legal and professional costs not categorized as SCOsource cost of revenue.

For the last two quarters of fiscal year 2004, we anticipate the dollar amount of general and administrative expenses will decrease compared to the second quarter of fiscal year 2004 due to recently implemented cost reductions.

*Restructuring Charges (Reversals)*

|  | Three Months Ended April 30, | | |
|  | 2004 | Change | 2003 |
|---|---|---|---|
| Restructuring charges (reversals) | $  — | n/a | $  136,000 |
| Percentage of total revenue | 0% | | 1% |

|  | Six Months Ended April 30, | | |
|  | 2004 | Change | 2003 |
|---|---|---|---|
| Restructuring charges (reversals) | $  — | n/a | $  (116,000) |
| Percentage of total revenue | 0% | | (0)% |

In March 2003, in connection with management's decision to establish strategic European headquarters in Dublin, Ireland, and our United Kingdom ("UK") subsidiary, SCO Group, Ltd., not performing at expected levels, we determined that SCO Group, Ltd would be wound up. On March 26, 2003, the board of directors of SCO Group, Ltd., obtained administrative relief in accordance with

34

NOV 000045976

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

2/19/2007 2:38 PM
NOV 000045977

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

Rule 2.2 of the Insolvency Rules 1986 of the UK. In connection with the approved administrative relief, the operations of SCO Group, Ltd. were transferred to an administrator that was appointed by the court to complete the winding-up process. As of April 30, 2003, the operations of SCO Group, Ltd. were no longer under our control. The winding-up of SCO Group, Ltd. resulted in a net restructuring charge during the quarter ended April 30, 2003 of $136,000. The net reversal for the first two quarters of fiscal year 2003 was a result of the restructuring charge discussed above related to our UK subsidiary and additional adjustments to previously recorded restructuring charges for actual payments made.

*Amortization of Intangibles*

|  | Three Months Ended April 30, | | |
| --- | --- | --- | --- |
|  | 2004 | Change | 2003 |
| Amortization of intangibles | $    593,000 | (15%) | $    700,000 |
| Percentage of total revenue | 6% | | 3% |

|  | Six Months Ended April 30, | | |
| --- | --- | --- | --- |
|  | 2004 | Change | 2003 |
| Amortization of intangibles | $    1,380,000 | (1%) | $    1,400,000 |
| Percentage of total revenue | 6% | | 4% |

Amortization of intangibles is the expensing of previously recorded amounts for assets recorded in prior acquisitions with finite lives. The decrease in amortization of intangibles of $107,000 for the second quarter of fiscal year 2004 compared to the second quarter of fiscal year 2003 was primarily attributable to reduced amortization expense recorded on certain assets and technology acquired from The Santa Cruz Operation (now Tarantella, Inc.).

*Loss on Impairment of Long-lived Assets*

We recorded a loss on impairment of long-lived assets totaling $2,139,000 for the second quarter and first two quarters of fiscal year 2004. The impairment related to goodwill and intangible assets acquired in connection with our acquisition of Vultus in June 2003. We concluded that an impairment triggering event occurred during the three months ended April 30, 2004 as an impending partnership that would solidify the Vultus revenue and cash flow opportunities did not materialize. Consequently, we have concluded that no significant future cash flows related to our Vultus assets will be realized. We performed an impairment analysis of our recorded goodwill related to the Vultus reporting unit in accordance with SFAS No. 142. Additionally, an impairment analysis of the intangible assets was performed in accordance with SFAS No. 144. As a result of these analyses, we wrote-down the carrying value of our goodwill related to our Vultus acquisition from $1,166,000 to $0, and wrote-down the intangible assets related to our Vultus acquisition from $973,000 to $0. We did not incur any impairment charges in the second quarter or first two quarters of fiscal year 2003. We did not have any losses on the impairment of long-lived assets during the second quarter or first two quarters of fiscal year 2003.

35

NOV 000045978

*Stock-based Compensation*

|  | Three Months Ended April 30, | | |
| --- | --- | --- | --- |
|  | 2004 | Change | 2003 |
| Stock-based compensation | $ 396,000 | (2)% | $ 406,000 |
| Percentage of total revenue | 4% | | 2% |

|  | Six Months Ended April 30, | | |
| --- | --- | --- | --- |
|  | 2004 | Change | 2003 |
| Stock-based compensation | $ 598,000 | (3)% | $ 618,000 |
| Percentage of total revenue | 3% | | 2% |

Stock-based compensation consisted of the following components for the three and months ended April 30, 2004 and 2003 (in thousands):

|  | Three Months Ended April 30, | | Six Months Ended April 30, | |
| --- | --- | --- | --- | --- |
|  | 2004 | 2003 | 2004 | 2003 |
| Amortization of stock-based compensation | $ 113 | $ 239 | $ 223 | $ 396 |
| Options and shares for services | 283 | 167 | 283 | 222 |
| Modifications to options | — | — | 92 | — |
| Total | $ 396 | $ 406 | $ 598 | $ 618 |

*Equity in Income (Losses) of Affiliates*

We account for our ownership interests in companies that we own at least 20 percent and less than 50 percent using the equity method of accounting. Under the equity method, we record our portion of the entities' net income or net loss in our condensed consolidated statements of operations. During the second quarter and first two quarters of fiscal year 2004 we recorded income of $37,000 and $74,000, respectively, primarily related to income from our joint venture in China compared to a loss of $75,000 and $100,000, respectively, in the second quarter and first two quarters of fiscal year 2003 primarily related to our investment in Vista, Inc. ("Vista"). We disposed of our investment in Vista in fiscal year 2003.

*Other Income (Expense), net*

Other income (expense) consisted of the following components for the three and six months ended April 30, 2004 and 2003 (in thousands):

|  | Three Months Ended April 30, | | Six Months Ended April 30, | |
| --- | --- | --- | --- | --- |
|  | 2004 | 2003 | 2004 | 2003 |
| Interest income | $ 242 | $ 11 | $ 512 | $ 50 |
| Change in fair value of derivative | 2,300 | — | 5,924 | — |
| Other expense, net | (120) | (59) | (251) | (54) |
| Total other income (expense), net | $ 2,422 | $ (48) | $ 6,185 | $ (4) |

NOV 000045979

Interest income increased by $231,000 for the second quarter of fiscal year 2004 compared to the second quarter of fiscal year 2003 and increased by $462,000 for the first two quarters of fiscal year 2004 compared to the first two quarters of fiscal year 2003 as a result of interest earned on higher cash

36

2/19/2007 2:38 PM
NOV 000045980

balances. The income recorded of $2,300,000 on the change in fair value of the derivative related to the now-exchanged Series A shares for the second quarter of fiscal year 2004 which represented the change in fair value between February 5, 2004 (the date of the exchange of all Series A shares for Series A-1 shares) and January 31, 2004. For the first quarter of fiscal year 2004, we recorded income of $3,624,000 for the change in fair value of the derivative between October 31, 2003 and January 31, 2004.

*Provision for Income Taxes*

The provision for income taxes was $966,000 in the second quarter of fiscal year 2004 and $302,000 in the second quarter of fiscal year 2003 and $1,094,000 for the first two quarters of fiscal year 2004 and $307,000 for the first two quarters of fiscal year 2003. The increase in the provision for income taxes for the second quarter and first two quarters of fiscal year 2004 compared to the second quarter and first two quarters of fiscal year 2003 was primarily attributable to accruals for withholding taxes that are estimated to be paid in connection with the operations of the Indian branch of our United Kingdom subsidiary, SCO Group, Ltd.

During the three months ended April 30, 2004, the Indian branch received a withholding tax assessment from the Government of India Income Tax Department ("Tax Department") for the period of April 2000 through March 2001. During the April 2000 through March 2001 period, SCO Group, Ltd. was owned by The Santa Cruz Operation (now Tarantella, Inc.), and not us. We acquired SCO Group, Ltd. in May 2001 as part of an asset purchase.

The Tax Department assessed SCO Group, Ltd. with a 15 percent withholding tax on certain revenue transactions in India that the Tax Department deemed royalty revenue under the Indian Income Tax Act. The total amount of the withholding tax is $396,000. We were not aware of this liability until March 2004, when we received the formal tax assessment from the Tax Department, as we believed that we had been appropriately accounting for the revenue and related taxes on transactions in India.

We have filed an appeal with the Tax Department and believe that our packaged software does not qualify for "royalties" treatment and would therefore not be subject to withholding tax. Additionally, as described above in this Item 2., under the caption "Restructuring Charges (Reversals)," SCO Group, Ltd, the company on which the assessment was levied, has filed for bankruptcy in the UK. Although we intend to vigorously defend this tax assessment, there can be no assurance we will prevail against the Tax Department.

We have recorded the charge for $396,000 in the in the second and first two quarters of fiscal year 2004 as a component of our provision for income taxes. In addition, we believe that the Tax Department probably will pursue similar assessments on SCO Group, Ltd. for taxable periods subsequent to March 2001. Because of this probability, and our inability to determine at this point if we may prevail against the Tax Department, we have accrued the full amount of the estimated withholding tax of $314,000 for these subsequent periods as provision for income taxes in our statements of operations for the second quarter and first two quarters of fiscal year 2004.

*Dividends Related to Redeemable Convertible Preferred Stock*

In connection with completing the February 5, 2004 exchange of Series A-1 shares for Series A shares, we removed the carrying value of the Series A shares and related derivative and recorded the fair value of the Series A-1 shares issued in the exchange transaction. The difference between these two amounts was $6,305,000 and was recorded as a non-cash dividend for the second quarter and first two quarters of fiscal year 2004.

37

Additionally, with respect to the Series A-1 shares currently outstanding, dividends will begin to accrue from October 16, 2004, the first anniversary of our original October 16, 2003 private placement of Series A shares, and will be paid quarterly beginning in the 30-day period following January 31, 2005 at a rate of 8 percent per annum, subject to annual increases of 2 percent per annum, not to exceed 12 percent per annum. Because dividends on the Series A-1 shares are not payable until after January 31, 2005, we have accrued dividends of $756,000 for the first quarter of fiscal year 2004 and an additional $740,000 in dividends for the second quarter of fiscal year 2004. We had no dividends accrued or payable in the second quarter or first two quarters of fiscal year 2003. If we repurchase the outstanding Series A-1 shares as contemplated in our May 31, 2004 agreement with BayStar as described in more detail above in this Item 2., under the caption "Recent Developments," then we will not be obligated to pay such dividends on the Series A-1 shares.

## Liquidity and Capital Resources

Our cash and equivalents and available-for-sale securities balances decreased from $68,523,000 as of October 31, 2003 to $61,346,000 as of April 30, 2004; however, our working capital increased from $37,168,000 as of October 31, 2003 to $39,556,000 as of April 30, 2004. Our cash and equivalents decreased from $64,428,000 as of October 31, 2003 to $45,696,000 as of April 30, 2004, primarily as a result of cash used in operations, principally from our SCOsource division, and cash used to purchase available-for-sale securities.

During fiscal year 2003, we generated positive cash flow from operations for the first time in our operating history. This was achieved through reductions in costs and increased gross margin generated from our UNIX business and significant license revenue generated from our SCOsource business. We also completed our private placement of 50,000 Series A shares for net proceeds of $47,740,000 in October 2003, which shares were exchanged for Series A-1 shares in February 2004. If we repurchase the outstanding Series A-1 shares from BayStar pursuant to our May 31, 2004 agreement, then the net proceeds received in our private placement would be reduced by the $13,000,000 cash component of the repurchase price. We intend to use the net proceeds from our preferred stock financing as well as our other cash resources to pursue our SCOsource initiatives. We believe that we will have sufficient cash resources to complete the Series A-1 repurchase transaction and fund our current operations for at least the next 12 months.

Our net cash used in operations for the first two quarters of fiscal year 2004 was $5,206,000 compared to cash generated from operations of $3,173,000 for the first two quarters of fiscal year 2003. Cash used in operations in the first two quarters of fiscal year 2004 included a net loss of $9,411,000, non-cash expenses of $1,280,000 and changes in operating assets and liabilities of $5,485,000. Our current liabilities decreased from $45,112,000 as of October 31, 2003 to $34,335,000 as of April 30, 2004 primarily related to the elimination of the fair-value of the derivative related to our now-exchanged Series A shares and the decrease in accrued compensation to law firms, which were offset by an increase in accrued liabilities.

Our investing activities have historically consisted of equipment purchases, investing in strategic partners and the purchase and sale of available-for-sale securities. During the first two quarters of fiscal year 2004, cash used in investing activities was $11,950,000, which was primarily a result of our purchase of available-for-sale securities (net of sales) of $11,555,000, equipment purchases of $186,000 and cash used to acquire the outstanding minority interest in our Japanese subsidiary of $209,000. Cash used in investing activities was $778,000 for the first two quarters of fiscal year 2003 and primarily attributable to equipment purchases of $328,000 and the investment in non-marketable securities of $450,000.

Our financing activities used $1,697,000 during the first two quarters of fiscal year 2004 and consisted primarily of cash used to purchase shares of our common stock on the open market of

38

NOV 000045982

$2,414,000 and cash used to exchange Series A-1 for Series A shares of $212,000. These uses of cash were offset from proceeds received from the exercise of stock options of $559,000 and proceeds from the purchase of shares of common stock by our employees through our employee stock purchase program of $370,000. Cash provided by financing activities was $782,000 for the first two quarters of fiscal year 2003 and was attributable to proceeds received from the exercise of stock options of $225,000, the issuance of a warrant of $500,000 and proceeds from the purchase of shares of common stock by our employees through our employee stock purchase program of $57,000.

The Certificate of Designation, Rights and Preferences creating our Series A-1 shares includes redemption provisions that, if triggered, would require us to repurchase for cash the outstanding shares of our Series A-1 shares. Our redemption obligation may be triggered by certain events including, among others, our company or any of its subsidiaries making an assignment for the benefit of creditors or consenting to the appointment of a trustee or receiver for it or a substantial part of its business, the bankruptcy, reorganization, liquidation or similar proceedings instituted by or against our company or any of its subsidiaries, a change in control event occurring with respect to our company or our failure to pay when due any indebtedness in excess of $1,000,000 or otherwise our default under any agreement binding us that would likely result in a material adverse effect on our business.

As stated above in this Item 2., under the caption "Recent Developments," on April 15, 2004, we received a redemption notice from BayStar requesting that we immediately redeem 20,000 shares of our Series A-1 shares then held by BayStar. The redemption notice asserted that BayStar is entitled to redemption of its shares under the Certificate of Designation for the Series A-1 shares because we allegedly had breached certain provisions of our February 5, 2004 exchange agreement relating to our exchange of Series A shares for Series A-1 shares. BayStar's redemption notice did not provide specific information regarding the factual basis for our alleged breaches of the exchange agreement, but we do not believe we have breached the Exchange Agreement. As a result, we do not believe we are obligated to redeem BayStar's Series A-1 shares. However, if we were required to pay cash to redeem BayStar's Series A-1 shares pursuant to the redemption notice or otherwise pursuant to the Certificate of Designation for the Series A-1 shares, it would have a material and adverse impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations.

Dividends on our Series A-1 shares, if not repurchased pursuant to our May 31, 2004 stock repurchase agreement with BayStar, will begin accruing from October 16, 2004 and will be paid quarterly beginning in the 30-day period following January 31, 2005 at a rate of 8 percent per annum, subject to annual increases of 2 percent per annum, not to exceed 12 percent per annum. Dividends may be paid in cash or additional Series A-1 shares, subject to certain limitations.

If we do complete our previously announced Series A-1 share repurchase transaction with BayStar, we will pay to BayStar $13,000,000 in cash and issue 2,105,263 shares of our common stock, payable and issuable upon the effectiveness of a shelf registration statement for the resale of the common stock issued to BayStar. The payment to BayStar will have a negative impact on our cash and working capital position, but will eliminate all remaining issued and outstanding Series A-1 shares and associated rights and preferences related to dividends, liquidation payments, voting and others.

Our net accounts receivable balance decreased by $2,471,000 from $9,282,000 as of October 31, 2003 to $6,811,000 as of April 30, 2004. This decrease was primarily attributable to the collection of year-end receivables and lower overall invoicing during the second quarter of fiscal year 2004. The majority of our accounts receivable are current and our allowance for doubtful accounts was approximately $155,000 as of April 30, 2004, which represented approximately 2 percent of our gross accounts receivable balance. This allowance as a percentage of gross accounts receivable is consistent with our experience in prior periods, and we expect this trend to continue. Our write-offs of uncollectible accounts during the second quarter of fiscal year 2004 were not significant.

39

NOV 000045983

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

During fiscal year 2003, we expanded our efforts with the law firms assisting us with our pursuit of our intellectual property claims and currently expect to devote substantially more financial resources to this effort. In addition to paying fees at reduced hourly rates to these firms, our agreement with the law firms provides that we will pay the law firms a contingency fee of 20 percent of the proceeds from specified events related to the protection of our intellectual property rights. These events may include settlements, judgments, certain licensing fees, subject to certain exceptions, and a sale of our company during the pendency of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees. Additionally, our agreement with the law firms may also be construed to include contingency fee payments in connection with our issuance of equity securities, which may harm our results of operations as we anticipate that these costs to the law firms will be expensed as incurred.

We expect that legal fees for the last two quarters of fiscal year 2004 paid to the law firms we have engaged to pursue our intellectual property claims will be consistent to the level of fees incurred during the second quarter of fiscal year 2004. However, legal expenses could increase over time depending on developments in litigation involving us, and certain events outside of our control could occur or certain contingent events could take place that would require us to pay additional fees to the law firms. To the extent that our SCOsource related costs and legal fees exceed our budgeted amounts in future quarters of fiscal year 2004 or SCOsource revenue is below our expectations, our liquidity will be adversely impacted and fewer financial resources will be available for other initiatives such as maintaining and enhancing our UNIX business. Additionally, future contingency fees payable to the law firms may be significant in future periods, which may have an adverse impact on our liquidity. Our compensation arrangement with our law firms could also impair our ability to raise equity capital in future periods.

We have entered into operating leases for our corporate offices located in the United States and our international sales offices. We have commitments under these leases that extend through fiscal year 2010. In corporate restructuring activities during fiscal years 2001 through 2003, we partially vacated some of these facilities, but still have contractual obligations to continue to make ongoing lease payments for one facility that will use available cash. We have pursued and will continue to pursue sublease opportunities, as available, to minimize this use of cash; however, we may not be successful in eliminating or reducing cash expenditures for this facility.

The following table summarizes our contractual lease obligations as of April 30, 2004:

|  | Total | Less than 1 year | 1 - 3 years | More than 3 years |
|---|---|---|---|---|
| Operating lease obligations | $ 6,748,000 | $ 2,702,000 | $ 3,277,000 | $ 769,000 |

As of April 30, 2004, we did not have any long-term debt obligations, purchase obligations or material capital lease obligations.

Our ability to cut costs to offset revenue declines in our UNIX business is limited to a certain extent because of contractual commitments to maintain and support our existing UNIX customers. The decline in our UNIX business may be accelerated if industry partners withdraw their support as a result of our SCOsource initiatives and in particular any lawsuits against end users violating our intellectual property and contractual rights. Our SCOsource initiatives, particularly lawsuits against such end users, may cause industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products. This may lead to an accelerated decline in our UNIX products and services revenue. If our UNIX products and services revenue is less than expected, our liquidity will be adversely impacted.

In the event that cash required to fund operations and strategic initiatives exceeds our current cash resources and cash generated from operations, we will be required to reduce costs and perhaps raise additional capital. We may not be able to reduce costs in a manner that does not impair our ability to

40

NOV 000045984

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

maintain our UNIX business and pursue our SCOsource initiatives. We may also not be able to raise capital for any number of reasons including those listed under the section "Risk Factors" below. Our ability to raise additional equity capital is restricted under the terms of our Series A-1 shares. If additional equity financing is available, it may not be available to us on attractive terms and may be dilutive to our existing stockholders. Our ability to raise debt financing is restricted under the terms of our Series A-1 shares. In addition, if our stock price declines, we may not be able to access the public equity markets on acceptable terms, if at all. Our ability to effect acquisitions for stock would also be impaired.

On March 10, 2004, our board of directors authorized management, in its discretion, to purchase up to 1,500,000 shares of our common stock over a 24-month period. Shares may be purchased in open market transactions, block purchases or privately negotiated transactions. Any repurchased shares will be held as treasury stock and will be available for general corporate purposes. During the second quarter of fiscal year 2004, a total of 290,000 shares of our common stock were repurchased for a total of $2,414,000. If we continue to repurchase a substantial number of shares during this 24-month period, and we do not generate off-setting revenue form our UNIX and SCOsource businesses, our cash position could decrease significantly and our ability to fund future operations could be adversely impacted. Purchases under stock repurchase program are subject to the discretion of management based on market conditions and other factors including the trading price of our common stock, availability of stock, alternative uses of capital and our financial condition.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Foreign Currency Risk.*    We have foreign offices and operations in Europe and Asia. As a result, a portion of our revenue is derived from sales to customers outside the United States. Most of this international revenue is denominated in U.S. dollars. However, most of the operating expenses related to our foreign-based operations are denominated in foreign currencies and therefore operating results are affected by changes in the U.S. dollar exchange rate in relation to foreign currencies such as the Euro, among others. If the U.S. dollar remains weak compared to the Euro, our operating expenses for foreign operations will be higher when translated back into U.S. dollars. Our revenue can also be affected by general economic conditions in the United States, Europe and other international markets. Our results of operations may be affected in the short term by fluctuations in foreign currency exchange rates.

We have in the past utilized foreign currency forward exchange contracts for market exposures of underlying assets and liabilities. We do not use forward exchange contracts for speculative or trading purposes. Our accounting policies for these instruments are based on our designation of such instruments. The criteria we use for designating an instrument include the instrument's effectiveness in risk reduction and one-to-one matching of forward exchange contracts to underlying assets and liabilities. Gains and losses on currency forward contracts that are firm commitments are deferred and recognized in income in the same period that the underlying transactions are settled. Gains and losses on currency forward contracts that are designated and effective for existing transactions are recognized in income in the same period as losses and gains on the underlying transactions are recognized and generally offset. Gains and losses on any instruments not meeting the above criteria are recognized in income in the current period. As of April 30, 2004, we had no outstanding instruments classified as hedges.

*Interest Rate Risk.*    The primary objective of our cash management strategy is to invest available funds in a manner that assures maximum safety and liquidity and maximizes yield within such constraints. We do not borrow money for short-term investment purposes.

*Investment Risk.*    We have invested in equity instruments of privately held and public companies in the technology industry for business and strategic purposes. Investments are accounted for under the

41

2/19/2007 2:38 PM
NOV 000045985

cost method if our ownership is less than 20 percent and we are not able to exercise influence over operations. Our investment policy is to regularly review the assumptions and operating performance of these companies and to record impairment losses when events and circumstances indicate that these investments may be impaired. As of April 30, 2004, our investments balance was approximately $524,000 and was related to our investment in a 30 percent owned Chinese company.

The stock market in general, and the market for shares of technology companies in particular, has experienced extreme price fluctuations. In addition, factors such as new product introductions by our competitors or developments in the litigation related to our SCOsource initiatives may have a significant impact on the market price of our common stock. Furthermore, quarter-to-quarter fluctuations in our results of operations caused by changes in customer demand may have a significant impact on the market price of our common stock. These conditions could cause the price of our common stock to fluctuate substantially over short periods of time.

## ITEM 4. CONTROLS AND PROCEDURES

*Evaluation of disclosure controls and procedures.*    Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were adequately designed to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms.

*Changes in internal control over financial reporting.*    During the most recent fiscal quarter ended April 30, 2004, there has been no change in our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### Forward-Looking Statements and Factors That May Affect Future Results and Financial Condition

*With the exception of historical facts, the statements contained in Management's Discussion and Analysis of Financial Condition and Results of Operations are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, which reflect our current expectations and beliefs regarding our future results of operations, performance and achievements. These statements are subject to risks and uncertainties and are based upon assumptions and beliefs that may or may not materialize. These forward-looking statements include, but are not limited to, statements concerning:*

- Our continued investment in and commitment to our UNIX operating systems, including investing in research and development efforts during fiscal year 2004 to enhance our OpenServer and UnixWare, which enhancements we believe will help prolong our UNIX revenue stream for future quarters;

- Our estimation that the decline in our UNIX business revenue may be accelerated if industry partners withdraw their support as a result of our SCOsource initiatives and in particular any lawsuits against end users violating our intellectual property and contractual rights;

- Our belief that the cuts made to our UNIX operations in the second quarter of fiscal year 2004 will have a positive impact on our operations for the last two quarters of fiscal year 2004;

- Our belief that the future success of our SCOsource initiatives will depend on our ability to protect our intellectual property, our intention to continue to devote resources to our SCOsource initiatives and our expectation that quarterly legal fees and other SCOsource related

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

42

2/19/2007 2:38 PM
NOV 000045987

costs for the remaining quarters of fiscal year 2004 will be consistent with the level of costs incurred in the second quarter of fiscal year 2004, although legal expenses could increase depending on developments in our litigation and the occurrence of certain events outside our control or certain contingent events could require us to pay additional fees to our law firms;

- Our intention to continue seeking to enter into license agreements with UNIX vendors and implementing our worldwide program offering SCOsource IP licenses to Linux end users;

- Our intention to continue to increase our SCOsource sales efforts in the last two quarters of fiscal year 2004;

- Our expectation that SCOsource licensing revenue will increase in the last two quarters of fiscal year 2004 in the form of vendor licenses and SCOsource IP licenses;

- Our anticipation that for the remainder of fiscal year 2004 our UNIX revenue generated in the Americas and the International divisions will be consistent with or slightly lower than revenue generated in the second quarter of fiscal year 2004;

- Our expectation that our UNIX business will continue to be impacted by competition from Linux;

- Our expectation that our future level of services revenue depends in part on our ability to generate UNIX products revenue from new customers and as well as renew certain annual support and services agreements with existing UNIX customers and our anticipation that our services revenue for the last two quarters of fiscal year 2004 to decline slightly from the revenue generated in the second quarter of fiscal year 2004;

- Our expectation for the remaining quarters of fiscal year 2004 that our cost of products revenue in dollars will be lower than cost of products revenue incurred in the second quarter of fiscal year 2004;

- Our expectation for the last two quarters of fiscal year 2004 that our cost of SCOsource licensing revenue will be consistent with our cost of SCOsource licensing revenue for the second quarter of fiscal year 2004, subject to quarter-to-quarter fluctuations based on unpredictable SCOsource licensing revenue, the possibility that legal expenses could increase depending on developments in our litigation, and the occurrence of certain events outside our control or certain contingent events could require us to pay an additional contingency fee to our law firms;

43

---

NOV 000045988

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

- Our expectation for the last two quarters of fiscal year 2004 that our cost of services revenue in dollars will be lower than in the second quarter of fiscal year 2004;

- Our expectation for the last two quarters of fiscal year 2004 that our sales and marketing expenses in dollars will decrease from our expenses incurred in the second quarter of fiscal year 2004;

- Our expectation for the last two quarters of fiscal year 2004 that our research and development expenses in dollars will decrease from our expenses incurred in the second quarter of fiscal year 2004 due to recently implemented cost reductions;

- Our expectation for the last two quarters of fiscal year 2004 that our general and administrative expenses in dollars will decrease compared to our general and administrative expenses incurred in the second quarter of fiscal year 2004 due to recently implemented cost reductions;

- Our belief that the India Income Tax Department probably will pursue tax assessments on revenue for taxable periods subsequent to March 2001 deemed by such tax authority to be royalty revenue of our UK subsidiary SCO Group, Ltd.;

- Our belief that we have sufficient cash resources to complete the Series A-1 repurchase transaction and fund our current operations for at least the next 12 months;

- Our belief that our allowance and bad debts for accounts receivable will remain consistent with our prior experience;

- Our belief that certain legal actions to which we are a party will not have a material adverse effect on us; and

- Our estimation that if we were required to pay cash to redeem BayStar's Series A-1 shares pursuant to its redemption notice or otherwise pursuant to the Certificate of Designation for the Series A-1 shares, it would have a material and adverse impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations.

We wish to caution readers that our operating results are subject to various risks and uncertainties that could cause our actual results and outcomes to differ materially from those discussed or anticipated, including the success of our SCOsource initiatives, competition from other operating systems, particularly Linux, the amount and timing of SCOsource licensing revenue, our ability to enhance our UNIX operating systems and maintain our UNIX products and services business, and the factors set forth in the subsection entitled "Risk Factors" below. We also wish to advise readers not to place any undue reliance on the forward-looking statements contained in this report, which reflect our beliefs and expectations only as of the date of this report. We assume no obligation to update or revise these forward-looking statements to reflect new events or circumstances or any changes in our beliefs or expectations, other than as required by law.

**Risk Factors**

*We do not have a history of profitable operations.*

Our fiscal year ended October 31, 2003 was the first full year we were profitable in our operating history. Our profitability in fiscal year 2003 resulted primarily from our SCOsource licensing initiatives. For the six months ended April 30, 2004, we incurred a net loss from operations of $14,576,000 and our accumulated deficit as of April 30, 2004 was $216,583,000. If we do not receive SCOsource licensing revenue in future quarters and our revenue from the sale of our UNIX operating system platform products and services continues to decline, we will need to further reduce operating expenses to maintain profitability or generate positive cash flow.

44

NOV 000045989

Our UNIX products and services revenue has declined in each of the last four years primarily as a result of increased competition from alternative operating systems, particularly Linux, lower information technology spending for UNIX products, and a general overall decline in economic conditions. In our quarterly results of operations, we recognize revenue from agreements for support and maintenance contracts and other long-term contracts that have been previously invoiced and are included in deferred revenue. Our deferred revenue balance increased from $5,501,000 as of October 31, 2003 to $7,554,000 as of April 30, 2004; however, this increase in deferred revenue may not continue into future quarters, which may have a negative impact on our UNIX revenue. Our future UNIX revenue may be adversely impacted and may continue to decline if we are unable to replenish these deferred revenue balances with long-term maintenance and support contracts or replace them with other sustainable revenue streams. If we are unable to continue to generate positive cash flow and profitable operations, our operations may be adversely impacted.

Additionally, on February 5, 2004, we completed the exchange transaction in which each outstanding Series A share was exchanged for one Series A-1 share, eliminating the derivative related to the Series A shares and the charge in our quarterly statements of operations for the change in the fair value of the derivative. We recorded other income of $2,300,000 in the second quarter of fiscal year 2004 related to the change in the fair value of the derivative between January 31, 2004 and February 5, 2004. We also recorded a non-cash dividend of $6,305,000 in the second quarter of fiscal year 2004 related to the difference between the fair value of the Series A-1 shares and the carrying value of the previously issued Series A shares and related derivative. This dividend will reduce earnings to common stockholders.

*Our future SCOsource licensing revenue is uncertain.*

We initiated the SCOsource licensing effort in January 2003 to review the status of UNIX licensing and sublicensing agreements. This effort resulted in the execution of two significant vendor license agreements during the fiscal year 2003 and generated $25,846,000 in revenue. During the three and six months ended April 30, 2004, we recorded SCOsource licensing revenue of $11,000 and $31,000, respectively, related to the execution of intellectual property compliance licenses. Due to a lack of historical experience and the uncertainties related to SCOsource licensing revenue, we are unable to estimate the amount and timing of future SCOsource licensing revenue, if any. If we do receive revenue from this source, it may be sporadic and fluctuate from quarter to quarter. Our SCOsource initiatives are unlikely to produce stable, predictable revenue for the foreseeable future. Additionally, the success of these initiatives may depend on the strength of our intellectual property rights and contractual claims regarding UNIX, including the strength of our claim that unauthorized UNIX source code and derivatives are prevalent in Linux.

*We may not prevail in our legal actions against IBM, Novell and end users, and unintended consequences of our actions against IBM, Novell and end users and other initiatives to assert our intellectual property rights may adversely affect our business.*

We continue to pursue our litigation against IBM. As described in more detail in Item 1. of Part II of this quarterly report, we seek damages for claims generally relating to our allegation that IBM has inappropriately used and distributed our UNIX source code and derivative works in connection with its efforts to promote the Linux operating system. IBM has responded to our claims and brought counterclaims against us asserting generally that we do not have the right to assert claims based on our ownership of UNIX intellectual property against IBM or others in the Linux community. Discovery is continuing in the case, and several motions are currently pending before the court. If we do not prevail in our action against IBM, or if IBM is successful in its counterclaims against us, our business and results of operations could be materially harmed. The litigation with IBM and potentially others could be costly, and our costs for legal fees may be substantial and in excess of amounts for which we have

45

NOV 000045990

budgeted. Additionally, the market price of our common stock may be negatively affected as a result of developments in our legal action against IBM that may be, or may be perceived to be, adverse to us.

In addition, we have publicly, and in individual letters, cautioned users of Linux that there are unresolved intellectual property issues surrounding Linux that may expose them to unanticipated liability to us. We have also notified a large number of licensees under our UNIX contracts requiring them to, among other things, certify they are in compliance with their agreements, including that they are not using our proprietary UNIX code in Linux, have not allowed unauthorized use of licensed UNIX code by their employees or contractors and have not breached confidentiality provisions relating to licensed UNIX code. Additionally, we have begun notifying selected Linux end users in writing of violations we allege under the Digital Millennium Copyright Act related to our copyrights contained in Linux. In concert with these notification efforts, in March 2004, and we brought suit against DaimlerChrysler Corporation for its alleged violations of its UNIX software agreement with us by failing to certify its compliance with such agreement as required by us. We also brought suit against AutoZone, Inc. for its alleged violations of our UNIX copyrights through its use of Linux. The lawsuits against DaimlerChrysler and AutoZone are also described in more detail in Item 1. of Part II of this quarterly report.

As a result of our action against IBM, our lawsuits against DaimlerChrysler and AutoZone and our other SCOsource initiatives to protect our intellectual property rights, several participants in the Linux industry and others affiliated with IBM or sympathetic to the Linux movement have taken actions attempting to negatively affect our business and our SCOsource efforts. Linux proponents have taken a broad range of actions against us, including, for example, attempting to influence participants in the markets in which we sell our products to reduce or eliminate the amount of our products and services they purchase from us. We expect that similar efforts likely will continue. There is a risk that participants in our marketplace will negatively view our action against IBM, DaimlerChrysler and AutoZone and our other SCOsource initiatives, and we may lose support from such participants. Any of the foregoing could adversely affect our position in the marketplace, our results of operations and our stock price. We have also experienced several denial-of-service attacks on our website, which have prevented web users from accessing our website and doing business with us for a period of time. If such attacks continue or if our customers and strategic partners are also subjected to similar attacks, our business and results of operations could be materially harmed.

Also, some of the more significant participants in the Linux industry have made efforts to ease Linux end users' concerns that their use of Linux may subject them to potential copyright infringement claims from us. For example, Hewlett-Packard, Novell and Red Hat have each established indemnification programs for qualified customers purchasing Linux-based products and services that may potentially become subject to a copyright infringement claims from us. Additionally, Open Source Development Labs, a non-profit organization ("OSDL"), has established a legal defense fund that will be used to defend Linux users against copyright infringement lawsuits brought by us. It has been reported that OSDL so far has attracted several million dollars in pledges from contributors including IBM and Intel among others. Similarly, Red Hat, Inc. has announced it has committed one million dollars for a separate fund it created to cover the legal expenses of other companies developing Linux.

As a further response to our SCOsource initiatives and claim that our UNIX source code and derivative works have inappropriately been included in Linux, Novell has publicly asserted its belief that it owns certain copyrights in our UNIX source code, and it has filed 15 copyright applications with the United States Copyright Office related to UNIX. Novell also claims that it has a license to UNIX from us and the right to authorize its customers to use UNIX technology in their internal business operations. Specifically, Novell has also claimed to have retained rights related to legacy UNIX SVRx licenses, including the license with IBM. Novell asserts it has the right to take action on behalf of SCO in connection with such licenses, including termination rights. Novell has purported to veto our termination of the IBM, Sequent and SGI licenses. We have repeatedly asserted that we obtained the

46

UNIX business, source code, claims and copyrights when we acquired the assets and operations of the server and professional services groups from The Santa Cruz Operation (now Tarantella, Inc.) in May 2001, which had previously acquired all such assets and rights from Novell in September 1995 pursuant to an asset purchase agreement, as amended. In January 2004, in response to Novell's actions, we brought suit against Novell for slander of title seeking relief for Novell's alleged bad faith effort to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare products. Our lawsuit against Novell is also described in more detail in Item 1. of Part II of this quarterly report.

Notwithstanding our assertions of full ownership of UNIX-related intellectual property rights, as set forth above, including copyrights, and even if we are successful in our legal action against Novell and end users such as AutoZone and DaimlerChrysler, the efforts of Novell and the other Linux proponents described above may cause Linux end users to be less willing to purchase from us our SCOsource IP licenses authorizing their use of our intellectual property contained in the Linux operating system, which may adversely affect our revenue from our SCOsource initiatives. These efforts of Linux proponents also may increase the negative view some participants in our marketplace have regarding our legal actions against IBM, Novell and end users such as AutoZone and DaimlerChrysler and regarding our SCOsource initiatives and may contribute to creating confusion in the marketplace about the validity of our claim that the unauthorized use of our UNIX source code and derivative works in Linux infringes on our copyrights. Increased negative perception and potential confusion about our claims in our marketplace could impede our continued pursuit of our SCOsource initiatives and negatively impact our business. Additionally, if we fail in our lawsuit against Novell and end users such as AutoZone and DaimlerChrysler, the negative perception and confusion in our marketplace about our intellectual property rights and claims likely would increase significantly, and the effectiveness of our SCOsource initiatives could be materially harmed.

*We may lose the support of industry partners leading to an accelerated decline in our UNIX products and services revenue.*

Our SCOsource initiatives, particularly lawsuits against end users violating our intellectual property and contractual rights, may cause industry partners, developers and hardware and software vendors to choose not to support or certify to our UNIX operating system products. This would lead to an accelerated decline in our UNIX products and services revenue and would adversely impact our results of operations and liquidity.

*Our claims relating to our UNIX intellectual property may subject us to additional legal proceedings.*

In August 2003, Red Hat brought a lawsuit against us asserting that the Linux operating system does not infringe on our UNIX intellectual property rights and seeks a declaratory judgment for non-infringement of copyrights and no misappropriation of trade secrets. In addition, Red Hat claims we have engaged in false advertising in violation of the Lanham Act, deceptive trade practices, unfair competition, tortious interference with prospective business opportunities, and trade libel and disparagement. We intend to vigorously defend this action, but if Red Hat is successful in its claim against us, our business and results of operations could be materially harmed.

In addition, other regulators or others in the Linux community have initiated or in the future may initiate legal actions against us, all of which may negatively impact our operations or future operating performance.

*Fluctuations in our operating results or the failure of our operating results to meet the expectations of public market analysts and investors may negatively impact our stock price.*

Fluctuations in our quarterly operating results or our failure to meet the expectations of analysts or investors, even in the short-term, could cause our stock price to decline significantly. Because of the potential for significant fluctuations in our SCOsource licensing revenue in any particular period, you

47

NOV 000045992

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

should not rely on quarter-to-quarter comparisons of our results of operations as an indication of future performance.

Factors that may affect our results include:

- our ability to successfully negotiate and complete licensing and other agreements related to our intellectual property;

- the interest level of resellers in recommending our UNIX business solutions to end users;

- the introduction, development, timing, competitive pricing and market acceptance of our products and services and those of our competitors;

- changes in general economic conditions, such as recessions, that could affect capital expenditures and recruiting efforts in the software industry;

- changes to, or developments in, our ongoing litigation with IBM, Novell, Red Hat, AutoZone and DaimlerChrysler concerning our UNIX intellectual property;

- changes in business attitudes toward UNIX as a viable operating system compared to other competing systems, especially Linux;

- the contingency fees we may pay to the law firms representing us in our efforts to establish our intellectual property rights; and

- changes in attitudes of customers and partners due to our aggressive position against the inclusion of our UNIX code and derivative works in Linux and our lawsuits against end users violating our intellectual property and contractual rights.

We also experience fluctuations in operating results in interim periods in Europe and the Asia Pacific regions due to seasonal slowdowns and economic conditions in these areas. Seasonal slowdowns in these regions typically occur during the summer months.

As a result of the factors listed above and elsewhere, it is possible that our results of operations may be below the expectations of public market analysts and investors in any particular period. This could cause our stock price to decline. If revenue falls below our expectations and we are unable to quickly reduce our spending in response, our operating results will be lower than expected. Our stock price may fall in response to these events.

*We rely on our indirect sales channel for distribution of our products, and any disruption of our channel at any level could adversely affect the sales of our products.*

We have a two-tiered distribution channel. The relationships we have developed with resellers allow us to offer our products and services to a much larger customer base than we would otherwise be able to reach through our own direct sales and marketing efforts. Some solution providers also purchase solutions through our resellers, and we anticipate they will continue to do so. Because we usually sell indirectly through resellers, we cannot control the relationships through which resellers, solution providers or equipment integrators purchase our products. In turn, we do not control the presentation of our products to end users. Therefore, our sales could be affected by disruptions in the relationships between us and our resellers, between our resellers and solution providers, or between solution providers and end users. Also, resellers and solution providers may choose not to emphasize our products to their customers. Any of these occurrences could diminish the effectiveness of our distribution channel and lead to decreased sales.

*If the market for UNIX continues to contract, it may adversely affect our business.*

Our revenue from the sale of UNIX products has declined over the last four years. This decrease in revenue has been

2/19/2007 2:38 PM
NOV 000045993

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

attributable primarily to increased competition from other operating systems,

48

2/19/2007 2:38 PM
NOV 000045994

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

particularly Linux and lower information technology spending for UNIX products. If the demand for UNIX products continues to decline, and we are unable to develop UNIX products and services that successfully address a market demand, our business will be adversely affected. Because of the long adoption cycle for operating system purchases and the long sales cycle of our operating system products, we may not be able to reverse these revenue declines quickly.

*We operate in a highly competitive market and face significant competition from a variety of current and potential sources; many of our current and potential competitors have greater financial and technical resources than we do; thus, we may fail to compete effectively.*

In the UNIX operating system market, our competitors include IBM, Hewlett-Packard, Sun, Microsoft and Linux distributors. These and other competitors are aggressively pursuing the current UNIX operating system market. Many of these competitors have access to substantially greater resources than we do. The major competitive alternatives to our UNIX products are Microsoft Windows Server, Linux and other UNIX systems. The expansion of Microsoft's and our other competitors' offerings may restrict the overall market available for our server products, including some markets where we have been successful in the past.

Our future success may depend in part on our ability to continue to meet the increasing needs of our customers by supporting existing and emerging technologies. If we do not enhance our products to meet these evolving needs, we may not remain competitive and be able to grow our business. Additionally, because technological advancement in the UNIX operating system market and alternative operating system markets is at an advanced pace, we will have to develop and introduce enhancements to our existing products and any new products on a timely basis to keep pace with these developments, evolving industry standards and changing customer requirements. Our failure to meet any of these and other competitive pressures may render our existing products and services obsolete, which would have an adverse impact on our revenue and operations.

The success of our UNIX business will depend on the level of commitment and certification we receive from industry partners and developers. In recent years, we have seen hardware and software vendors as well as software developers turn their certification and application development efforts toward Linux and elect not to continue to support or certify to our UNIX operating system products. If this trend continues, our competitive position will be adversely impacted and our future revenue from our UNIX business will decline. The decline in our UNIX business may be accelerated if industry partners withdraw their support from us as a result of our SCOsource initiatives and in particular any lawsuit against end users violating our intellectual property and contractual rights, such as our lawsuits against AutoZone and DaimlerChrysler.

*Our compensation arrangement with the law firms representing us to enforce our intellectual property rights may reduce our ability to raise additional financing.*

Our compensation arrangement with the law firms representing us in our efforts to establish our intellectual property rights could inhibit our ability to raise additional funding if needed. In addition to receiving fees at reduced hourly rates, our agreement with the law firms provides that the law firms will receive a contingency fee of 20 percent of the proceeds from specified events related to the protection of our intellectual property rights. These events may include settlements, judgments, certain licensing fees, subject to certain exceptions, and a sale of our company during the pendancy of litigation or through settlement, subject to agreed upon credits for amounts received as discounted hourly fees and unused retainer fees, and our agreement with the law firms may also be construed to include contingency fee payments in connection with issuances of our equity securities. Future payments payable to the law firms under this arrangement may be significant. Our law firms' right to receive such contingent payments could cause prospective investors to choose not to invest in our company or limit the price at which new investors would be willing to provide additional funds to our company.

49

*Our foreign-based operations and sales create special problems, including the imposition of governmental controls and taxes and fluctuations in currency exchange rates that could hurt our results.*

We have foreign operations, including development facilities, sales personnel and customer support operations in Europe, Latin America and Asia. These foreign operations are subject to certain inherent risks, including:

- potential loss of developed technology through piracy, misappropriation, or more lenient laws regarding intellectual property protection;

- imposition of governmental controls, including trade restrictions and other tax requirements;

- fluctuations in currency exchange rates and economic instability;

- longer payment cycles for sales in foreign countries;

- seasonal reductions in business activity; and

- political unrest, particularly in areas where we have facilities.

In addition, certain of our operating expenses are denominated in local currencies, creating risk of foreign currency translation losses that could harm our financial results and cash flows. When we generate profits in foreign countries, our effective income tax rate is increased.

In Latin America and Asia in particular, several countries have suffered and may be especially susceptible to recessions and economic instability which may lead to increased governmental ownership or regulation of the economy, higher interest rates, increased barriers to entry such as higher tariffs and taxes, and reduced demand for goods manufactured in the United States, resulting in lower revenue.

During the second quarter of fiscal year 2004, the Indian branch of our UK subsidiary was imposed with a withholding tax assessment from the Government of India Income Tax Department. The Tax Department assessed a 15 percent withholding tax on certain revenue transactions in India that the Tax Department deemed royalty revenue under the Income Tax Act. We have filed an appeal with the Tax Department and believe that our packaged software does not qualify for "royalties" treatment and therefore would not be subject to withholding tax. However, we may be unsuccessful in our appeal against the Tax Department and be obligated to pay the assessed taxable amounts. If other countries in which we have international operations, such as India, continue to develop and begin enforcing their tax regimes, we may be subject to withholding or other taxes.

*The impact of domestic and global economic conditions may continue to adversely impact our operations.*

During the last several quarters the U.S. and European economies have experienced an economic slowdown that has affected the purchasing habits of many consumers across many industries and across many geographies. This has caused the delay, or even cancellation of, technology purchases. The slowdown in the United States and Europe, together with the alleged unauthorized use of our UNIX code, has resulted in decreased sales of our products, longer sales cycles and lower prices. Although the slowdown has recently begun to dissipate in the United States and in parts of Europe, if such economic improvements are not maintained and the current slowdown continues or returns, our revenue and results of operations may continue to be lower than expected. In addition, a continued slowdown may also affect the end-user market making it more difficult for our reseller channel to sell our products.

*If we are unable to retain key personnel in an intensely competitive environment, our operations could be adversely affected.*

We will need to retain our management, technical, and support personnel. Competition for qualified professionals in the software industry is intense, and departures of existing personnel could be disruptive to our business and can result in

NOV 000045996

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

the departure of other employees. The loss or departure of any officers or key employees could harm our ability to implement our business plan and could

50

NOV 000045997

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

adversely affect our operations. Our future success depends to a significant extent on the continued service and coordination of our management team, particularly Darl C. McBride, our President and Chief Executive Officer. We do not maintain key person insurance for any member of our management team.

*Our stock price is volatile.*

The trading price for our common stock has been volatile, ranging from a low closing sales price of $1.09 in mid-February 2003, to a sales price of $20.50 per share in October 2003, to a current sales price of $4.89 on June 10, 2004. The share price has changed dramatically over short periods with increases and decreases of over 25 percent in a single day. We believe that the changes in our stock price are affected by changing public perceptions concerning the strength of our intellectual property claims and other factors beyond our control. Public perception can change quickly and without any change or development in our underlying business or litigation position. An investment in our stock is subject to such volatility and, consequently, is subject to significant risk.

*Risks associated with the potential exercise of our options outstanding.*

As of June 9, 2004, we have issued and outstanding options to purchase up to approximately 3,723,000 shares of common stock with exercise prices ranging from $0.66 to $28.00 per share. The existence of such rights to acquire common stock at fixed prices may prove a hindrance to our efforts to raise future equity and debt funding, and the exercise of such rights will dilute the percentage ownership interest of our stockholders and may dilute the value of their ownership. The possible future sale of shares issuable on the exercise of outstanding options could adversely affect the prevailing market price for our common stock. Further, the holders of the outstanding rights may exercise them at a time when we would otherwise be able to obtain additional equity capital on terms more favorable to us.

*If for any reason we are required to redeem BayStar's Series A-1 shares pursuant to its redemption notice, it would have a material and adverse impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations.*

As stated above in Item 2. of Part I of this quarterly report, in April 2004, we received a redemption notice from BayStar requesting that we immediately redeem 20,000 shares of our Series A-1 shares held by BayStar pursuant to the Certificate of Designation for the Series A-1 shares. Although we do not believe we are obligated to redeem BayStar's Series A-1 shares pursuant to the redemption notice, if we were required to pay cash to redeem BayStar's Series A-1 shares pursuant to the redemption notice or otherwise pursuant to the Certificate of Designation for the Series A-1 shares, it would have a material and adverse impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations.

On May 31, 2004, we entered into an agreement with BayStar to repurchase and retire BayStar's 40,000 Series A-1 shares for $13,000,000 in cash and the issuance to BayStar of 2,105,263 shares of our common stock. The repurchase transaction will not close unless a registration statement covering the resale of the shares of our common stock issuable to BayStar in the repurchase transaction is declared effective by the SEC. If we fail to cause such registration statement to be declared effective, then our repurchase agreement with BayStar may terminate. If the agreement terminates, BayStar may attempt to enforce its redemption notice, unless it is otherwise rescinded.

51

2/19/2007 2:38 PM
NOV 000045998

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

*BayStar, as the holder of our outstanding Series A-1 shares, has preferential redemption rights and rights upon liquidation that could adversely affect the holders of our common stock.*

If we fail to complete our Series A-1 share repurchase transaction with BayStar and it remains a holder of Series A-1 shares and otherwise chooses not to convert them to common stock, then, apart from the redemption notice we received from BayStar in April 2004, BayStar would be entitled to require us to repurchase for cash the Series A-1 shares held by it at a premium price if any of several redemption trigger events occurs as set forth in the Certificate of Designation for the Series A-1 shares.

Additionally, the Certificate of Designation for the Series A-1 shares provides that the number of shares of our common stock issuable upon the conversion of Series A-1 shares is limited to 2,863,135 shares in the aggregate, notwithstanding that the BayStar may otherwise be entitled to receive more shares of common stock upon conversion based on the applicable conversion price. If the number of shares of common stock issuable to BayStar upon conversion is limited in this manner, then we may be required by BayStar to redeem for cash the number of Series A-1 shares that were not issuable upon conversion as a result of such limits on conversion. If we were required to pay cash to BayStar for any reason for its Series A-1 shares at a premium price (and other than in connection with the proposed repurchase transaction), it could have a material impact on our liquidity, which may require us to obtain additional sources of cash to sustain operations and may negatively impact the holders of our common stock.

Further, BayStar, so long as it remains a holder of Series A-1 shares, will be entitled to receive a preferential distribution of our assets prior to any distribution to our holders of common stock upon a liquidation, dissolution, winding up or other change in control transaction in which we sell all or substantially all our assets or merge or consolidate or otherwise combine with another company or entity. Upon the occurrence of a liquidation event, BayStar, as a holder of Series A-1 shares, will be entitled to receive the greater of:

- the value of the Series A-1 shares held by it determined by multiplying the closing sale price of our common stock on the Nasdaq SmallCap Market on the date of the liquidation event by the number of shares of common stock into which the preferred shares could be converted at the time of the liquidation event; or

- up to $40,000,000, the aggregate purchase price paid for the 40,000 outstanding Series A-1 shares, plus eight percent of that amount less the amount of any dividends paid to BayStar in the calendar year in which the liquidation event occurs.

Depending on the amount of assets we have available for distribution to stockholders upon a liquidation event when Series A-1 shares remain outstanding, we may be required to distribute all such assets or a portion of such assets that exceeds BayStar's pro rata ownership of our common stock assuming full conversion of the Series A-1 shares into common stock, which could eliminate or limit the assets available for distribution to our common stockholders. Our potential obligation to pay to the law firms representing us in our efforts to establish our intellectual property rights a contingent fee of 20 percent of the proceeds we receive from a sale of our company, subject to certain limitations, could also contribute to eliminating or limiting the assets available for distribution to our common stockholders.

*The rights of BayStar as a holder of Series A-1 shares may prevent or make it more difficult for us to raise additional funds or take other significant company actions.*

NOV 000045999

The Certificate of Designation creating our Series A-1 shares requires us to obtain the approval of BayStar, as the current holder of all outstanding Series A-1 shares, to take the following actions, among others:

- change the rights, preferences or privileges of the Series A-1 shares or issue additional Series A-1 shares;

- create or issue any other securities that are senior or equal in rank to the Series A-1 shares;

- create or issue any convertible securities having floating conversion rate terms or a fixed conversion price below the then applicable conversion price of the Series A-1 shares or the closing sale price of our common stock on the Nasdaq SmallCap Market on the date of such issuance;

- incur any indebtedness, subject to limited exceptions; or

- sell or transfer any material asset or intellectual property to a third party.

The Certificate of Designation also provides that BayStar, as a holder of Series A-1 shares, has a participation right entitling it to purchase its pro rata share of any future equity securities, or debt that is convertible into equity, on the same terms offered by us to other purchasers of such securities. Additionally, we have agreed with BayStar that we will not complete a transaction or take any action that could result in a claim for a contingency payment by the law firms representing us in our efforts to establish our intellectual property rights, other than contingency payments related to certain license transactions, without first obtaining the consent of BayStar, as it currently holds all outstanding Series A-1 shares. This right of consent, and the participation right and other approval rights described above, may make it more difficult for management, our board of directors or our stockholders to reach a settlement in our litigation with IBM, raise capital in the future in either equity or debt financing transactions or to take other significant company actions. These provisions could also limit the price that some investors might be willing to pay for shares of our common stock in the future.

*The Series A-1 shares may have an adverse impact on the market value of our stock and the existing holders of our common stock.*

We have an effective registration statement relating to the sale or distribution by BayStar and RBC as selling stockholders of up to 3,703,704 shares of common stock that are issuable upon conversion of our outstanding Series A-1 shares. We will not receive any proceeds from the sales of these shares. The shares subject to this registration statement represent approximately 25.8 percent of our issued and outstanding common stock, although no selling stockholder and its affiliates may beneficially own more than 4.99 percent of our common stock at any time, and, in the aggregate, no more than 2,863,135 shares of our common stock may be issued upon the conversion of our outstanding Series A-1 shares, which number of shares represents 19.99 percent of the number of shares of our capital stock outstanding as of February 5, 2004, the date of issuance of our Series A-1 shares. Our Series A-1 shares are convertible into shares of our common stock at a variable price based upon the market price of our common stock, subject to a floor price of $13.50 per share.

Additionally, pursuant to our May 31, 2004 stock repurchase agreement with BayStar, we agreed to file a registration statement covering the resale by BayStar as a selling stockholder of the 2,105,263 shares of common stock issuable to BayStar as part of the repurchase. If this registration statement is declared effective by the SEC and we complete the repurchase transaction with BayStar, then we likely will amend the already-effective registration statement described above to reduce the number of shares it covers as BayStar will no longer will hold Series A-1 shares that could be converted into shares of common stock issuable upon conversion of Series A-1 shares. The 2,105,263 shares issuable to BayStar that would be subject to the new registration statement would represent approximately 12.1 percent of our then issued and outstanding common stock.

---

53

NOV 000046000

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

The sale of the block of stock covered by either registration statement, or even the possibility of its sale, may adversely affect the trading market for our common stock and reduce the price available in that market. The shares of common stock subject to our registration statements will, upon issuance, dilute the equity ownership percentage of the holders of our common stock. The market price of our common stock also could decline as a result of the perception or expectation that sales of a large number of shares of our common stock could occur following the conversion of our Series A-1 shares, if the repurchase transaction does not occur.

*The right of our board of directors to authorize additional shares of preferred stock could adversely impact the rights of holders of our common stock.*

Our board of directors currently has the right, with respect to the 4,920,000 shares of our preferred stock not designated as 80,000 Series A-1 shares, to authorize the issuance of one or more additional series of our preferred stock with such voting, dividend and other rights as our directors determine. The board of directors can designate new series of preferred stock without the approval of the holders of our common stock, subject to the approval rights of BayStar as the holder of our outstanding Series A-1 shares as described above. The rights of holders of our common stock may be adversely affected by the rights of any holders of additional shares of preferred stock that may be issued in the future, including without limitation, further dilution of the equity ownership percentage of our holders of common stock and their voting power if we issue preferred stock with voting rights. Additionally, the issuance of preferred stock could make it more difficult for a third party to acquire a majority of our outstanding voting stock.

54

NOV 000046001

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

*IBM Corporation*

On or about March 6, 2003, we filed a complaint against IBM. This action is currently pending in the United States District Court for the District of Utah, under the title *The SCO Group, Inc. vs. International Business Machines Corporation*, Civil No. 2:03CV0294. The initial complaint included claims for breach of contract, misappropriation of trade secrets, tortious interference, and unfair competition. The original complaint also alleged that IBM obtained information concerning the UNIX source code and derivative works from us and inappropriately used and distributed that information in connection with its efforts to promote the Linux operating system. As a result of IBM's actions, we are requesting damages in an amount to be proven at trial, alleged to be approximately $1 billion, together with additional damages through and after the time of trial. On or about June 13, 2003, we delivered to IBM a notice of termination of IBM's UNIX license agreement with us that underlies IBM's AIX software.

On or about June 16, 2003, we filed an amended complaint in the IBM case. The amended complaint essentially restates and re-alleges the allegations of the original complaint and expands on those claims in several ways. Most importantly, the amended complaint raises new allegations regarding IBM's actions and breaches through the products and services of Sequent Computer Systems, Inc. ("Sequent"), which IBM acquired. We allege that our license agreement with Sequent was breached in several ways similar to those set forth above and we seek damages for those breaches. We are also seeking injunctive relief on several claims.

IBM has filed a response and counterclaim to the complaint, including a demand for a jury trial. We have filed an answer to the IBM counterclaim denying the claims and asserting affirmative defenses. On February 4, 2004, we filed a motion for leave to file amended pleadings in the case proposing to amend our complaint against IBM and to modify our affirmative defenses against IBM's counterclaims. On February 25, 2004, the court granted our motion for leave. The second amended complaint, which was filed on February 27, 2004, alleges nine causes of action that are similar to those set forth above, adds a new claim for copyright infringement and removes the claim for misappropriation of trade secrets. IBM filed an answer and counterclaim. The counterclaim asserts 14 claims against us. In its counterclaim, as amended, IBM asserts that we do not have the right to terminate its UNIX license or assert claims based on our ownership of UNIX intellectual property against them or others in the Linux community. In addition, IBM asserts we have breached the GNU General Public License and have infringed certain patents held by IBM. IBM's counterclaims include claims for breach of contract, violation of the Lanham Act, unfair competition, intentional interference with prospective economic relations, unfair and deceptive trade practices, promissory estoppel, copyright infringement for a declaratory judgment of non-infringement of copyrights, and patent infringement.

On March 3, 2004, the U.S. Magistrate Judge issued an order addressing certain discovery matters relating to both our company and IBM. We have also filed a motion to dismiss IBM's tenth counterclaim for a declaratory judgment of non-infringement of copyrights. We have also filed a motion to amend the scheduling order and a motion to bifurcate IBM's patent counterclaims into another action. We filed on May 28, 2004, a publicly available reply brief in connection with our motion to amend the scheduling order, in which we set forth detailed and specific responses to IBM's claims made in connection with that motion. A hearing for these motions was held on June 8, 2004 and the court issued its ruling on June 10, 2004. The court granted our motion to amend the scheduling order, with certain changes, and denied IBM's opposition to such an amendment. The amended scheduling order now provides, among other things, that the deadline for completing fact discovery is February 11, 2005 (previously August 4, 2004), the deadline for completing expert discovery is April 22, 2005

55

NOV 000046002

(previously October 22, 2004), and the trial will begin on November 1, 2005 (previously April 11, 2005). The court also denied the motion to bifurcate the patent counterclaims without prejudce to our right to raise the issue again at a later stage. IBM has also filed a motion for partial summary judgment on its tenth counterclaim for a declaration of non-infringement. A hearing regarding our motion to dismiss and IBM's motion for partial summary judgment on IBM's tenth counterclaim for a declaration of non-infringement is currently scheduled for August 4, 2004. Discovery is continuing in the IBM case and we plan to vigorously oppose this IBM's motion.

*Red Hat, Inc.*

On August 4, 2003, Red Hat filed a complaint against us. The action is currently pending in the United States District Court for the District of Delaware under the case caption *Red Hat, Inc. v. The SCO Group, Inc.*, Civil No 03-772. Red Hat asserts that the Linux operating system does not infringe our UNIX intellectual property rights and seeks a declaratory judgment for non-infringement of copyrights and no misappropriation of trade secrets. In addition, Red Hat claims we have engaged in false advertising in violation of the Lanham Act, deceptive trade practices, unfair competition, tortious interference with prospective business opportunities, trade libel, and disparagement.

On or about September 15, 2003, we filed a motion to dismiss the Red Hat complaint. The motion to dismiss asserts that Red Hat lacks standing and that no case or controversy exists with respect to the claims seeking a declaratory judgment of non-infringement. The motion to dismiss further asserts that Red Hat's claims under the Lanham Act and related state laws are barred by the First Amendment to the U.S. Constitution and the common law privilege of judicial immunity. On April 6, 2004, the court issued an order denying our motion to dismiss; however, the court stayed the case. We intend to vigorously defend this action.

*Novell, Inc.*

On January 20, 2004, we filed suit in Utah State Court against Novell, Inc. for slander of title seeking relief for its alleged bad faith effort to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare product. The case is currently pending in the Third Judicial District Court, Salt Lake County, State of Utah, under the caption *The SCO Group, Inc. v. Novell, Inc.*, Case No. 040900936. In the lawsuit, we requested preliminary and permanent injunctive relief as well as damages. Through these claims we seek to require Novell to assign to us all copyrights that we believe Novell has wrongfully registered, prevent Novell from representing any ownership interest in those copyrights and require Novell to retract or withdraw all representations it has made regarding its purported ownership of those copyrights.

Novell has not yet answered our complaint, but has filed with the U.S. District Court for the District of Utah a notice removing the case to such federal court and a motion with the Third Judicial District Court in Salt Lake County, Utah to transfer the venue of the case from such court to the Fourth Judicial District Court in Utah County, Utah. Novell also filed a motion to dismiss our complaint claiming it never transferred the copyrights to The Santa Cruz Operation (now Tarantella, Inc.). We have filed a response to Novell's motion to dismiss and have also filed a motion to remand the case back to the state court. On June 10, 2004, the court issued a memorandum decision and order which denied our motion to remand the case to state court. The memorandum decision also denied Novell's motion to dismiss in part on claims of falsity. However, the court granted Novell's motion to dismiss regarding our allegations of special damages, but granted us 30 days leave to amend our complaint to plead special damages with more specificity. We plan to continue to vigorously pursue our claims against Novell.

56

NOV 000046003

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

*DaimlerChrysler Corporation*

On or about March 3, 2004, we brought suit against DaimlerChrysler Corporation for its alleged violations of its UNIX software agreement with us. Specifically, the lawsuit alleges that DaimlerChrysler breached its UNIX software agreement with us by failing to certify by January 31, 2004 its compliance with the UNIX software agreement as required by us. The lawsuit, filed in Oakland County Circuit Court in the State of Michigan, requests the court to declare that DaimlerChrysler has violated the certification requirements of its UNIX software agreement, permanently enjoin DaimlerChrysler from further violations of the UNIX software agreement, issue a mandatory injunction requiring DaimlerChrysler to remedy the effects of its past violations of the UNIX software agreement and award us damages in amount to be determined at trial together with costs, attorneys' fees and any such other or different relief that the Court may deem to be equitable and just. On April 15, 2004, DaimlerChrysler filed a motion to dismiss our claims. We are in the process of preparing our response to DaimlerChrysler's motion and the hearing on this motion is set for July 21, 2004.

*AutoZone, Inc.*

On or about March 2, 2004, we brought suit against AutoZone, Inc. for its alleged violations of our UNIX copyrights through its use of Linux. Specifically, the lawsuit alleges that AutoZone is infringing our UNIX copyrights by, among other things, running versions of the Linux operating system that contain code, structure, sequence and/or organization from our proprietary UNIX System V code in violation of our copyrights. The lawsuit filed in U.S. District Court in Nevada requests injunctive relief against AutoZone's further use or copying of any part of our copyrighted materials and also requests damages as a result of AutoZone's infringement in an amount to be proven at trial. On April 23, 2004, AutoZone filed a motion to transfer the case to Tennessee or to stay the case. We have filed an opposition to the AutoZone motion and a hearing is currently scheduled for June 21, 2004 in Nevada.

*IPO Class Action Matter*

We are an issuer defendant in a series of class action lawsuits, involving over 300 issuers that have been consolidated under *In re Initial Public Offering Securities Litigation*, 21 MC 92 (SAS). The plaintiffs, the issuers and the insurance companies have negotiated a Memorandum of Understanding ("MOU") with the intent of settling the dispute between the plaintiffs and the issuers. We have executed this MOU and have been advised that almost all (if not all) of the issuers have elected to proceed under the MOU. The terms of the MOU have been reduced to a settlement agreement that is in the process of being executed by all parties. This settlement agreement is still subject to court approval. If the settlement is approved by the court, and if no cross-claims, counterclaims or third party claims are later asserted, this action will be dismissed with respect to our directors and us.

We have notified our underwriters and insurance companies of the existence of the claims. We believe, after consultation with legal counsel, that the ultimate outcome of this matter will not have a material adverse effect on our results of operations or financial position. As of January 31, 2004, we have paid or accrued the full retention amount of $200,000 under its insurance coverage.

*Other Matters*

In April 2003, a former Indian distributor of ours filed a claim in India, requesting summary judgment for payment of $1,428,000, and an order that we trade in India only through the distributor until the claim is paid. The distributor claims that we are responsible to repurchase certain software products and to reimburse the distributor for certain other operating costs. We do not believe that we are responsible to reimburse the distributor for any operating costs and also believe that the return rights related to any remaining inventory have lapsed. We have engaged local counsel who has advised

57

NOV 000046004

that it is likely that the current claims will fail, but that the distributor will continue to pursue its claims either in the Indian courts or in the U.S. courts. Discovery has commenced and initial hearings have been held and are ongoing. We intend to vigorously defend this action.

We are a party to certain other legal proceedings arising in the ordinary course of business including legal proceedings arising from our SCOsource initiatives. We believe, after consultation with legal counsel, that the ultimate outcome of such legal proceedings will not have a material adverse effect on our results of operations or financial position.

## ITEM 2. CHANGES IN SECURITIES AND USE OF PROCEEDS

*Series A and Series A-1 share matters.*

On February 5, 2004, we issued 50,000 shares of our Series A-1 shares in exchange for all then outstanding Series A shares previously issued in our October 2003 private placement. We received no additional proceeds from this exchange transaction.

The Series A-1 shares are convertible into shares of our common stock at a conversion price equal to the average closing sales price of our common stock for the ten trading days immediately preceding the date of conversion, provided that in no event may the conversion price be less than $13.50 (as such conversion price and the $13.50 floor price may be adjusted for stock splits, stock dividends or similar occurrences in the future). The holders of Series A-1 shares have the right to convert their preferred shares into shares of common stock any time at their option, provided they convert enough preferred shares to receive at least 100,000 shares of common stock and subject to certain other limitations. Additionally, we may force conversion of the outstanding Series A-1 shares at any time the market price of our common stock exceeds $24.50 per share (as adjusted for stock splits, stock dividends or similar occurrences in the future) for 20 consecutive trading days, provided that we satisfy certain other requirements. Notwithstanding the foregoing conversion rights, in no event may the number of shares of our common stock issuable upon the conversion of Series A-1 shares exceed (i) 2,863,135 shares in the aggregate or (ii) cause any holder of Series A-1 shares and its affiliates to beneficially own more than 4.99 percent of the outstanding shares of our common stock, even though the holders thereof may otherwise be entitled to receive more shares of common stock upon conversion based on the applicable conversion price.

The Series A-1 shares generally has the same rights that the Series A shares had, except that the conversion price for the Series A shares was fixed at $16.93 per share (as adjusted for stock splits, stock dividends or similar occurrences in the future). Also, the holders of Series A-1 shares have certain limited voting rights that they did not previously have as holders of Series A shares.

We issued the unregistered, restricted shares of Series A-1 shares in reliance on the exemption from registration provided by Section 3(a)(9) of the Securities Act of 1933, as amended, as a transaction involving the exchange with our then-existing holders of our Series A-1 shares for the previously outstanding Series A shares in which no commission or other remuneration was paid or given directly or indirectly for soliciting such exchange.

On April 1, 2004, following the completion of the exchange of our outstanding Series A shares for Series A-1 shares, after which no Series A shares remained outstanding, we filed a Certificate of Elimination with the Secretary of State of the State of Delaware. The filing terminated the Certificate of Designation, Preference and Rights of our Series A shares, eliminating the previously designated Series A shares.

58

NOV 000046005

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

*Repurchases of our common stock.*

The following table shows the second quarter of fiscal 2004 stock repurchase activity (in thousands, except per share amounts):

|  | Total Number of Shares Purchased(1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plan | Maximum Number of Shares that May Yet to be Purchased Under the Plan |
|---|---|---|---|---|
| February 2004 | — | $ — | — | — |
| March 2004 | 290 | 8.27 | 290 | 1,210 |
| April 2004 | — | | — | 1,210 |
| Total | 290 | $ 8.27 | 290 | |

(1) On March 10, 2004, our Board of Directors authorized the repurchase of up to 1,500,000 shares of our common stock in open-market or private transactions. The plan will remain in effect for a period of 24 months from the date announced.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The following matters were submitted and approved by our stockholders at our annual meeting held April 20, 2004:

1. To elect eight members to the Board of Directors to serve until their successors have been appointed. All seven directors were elected with Ralph J. Yarro III receiving 11,319,000 votes in favor and 423,000 votes withheld; Thomas P. Raimondi, Jr. receiving 11,618,000 votes in favor and 125,000 votes withheld; Edward E. Iacobucci receiving 11,138,000 votes in favor and 605,000 votes withheld; Daniel W. Campbell receiving 11,682,000 votes in favor and 60,000 votes withheld; R. Duff Thompson receiving 11,627,000 votes in favor and 115,000 votes withheld; Darcy G. Mott receiving 11,324,000 votes in favor and 418,000 votes withheld; K. Fred Skousen receiving 11,682,000 votes in favor and 60,000 votes withheld; and Darl C. McBride receiving 11,679,000 votes in favor and 63,000 votes withheld.

2. To approve the 2004 Omnibus Stock Incentive Plan and to provide for up to 1,500,000 shares of common stock to be subject to awards issued under the plan. This resolution was passed with 6,254,000 votes in favor, 760,000 votes against and 474,000 abstentions.

3. To approve the appointment of KPMG LLP as our independent public accountants for the year ending October 31, 2004. This resolution was passed with 11,711,000 votes in favor, 19,000 votes against and 13,000 abstentions.

## ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

(a) Exhibits

3.1 Amended and Restated Certificate of Incorporation of Caldera International, Inc. (incorporated by reference to Exhibit 3.1 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911) ).

3.2 Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding consolidation of outstanding shares (incorporated by reference to Exhibit 3.2 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911) ).

2/19/2007 2:38 PM
NOV 000046006

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

59

___

2/19/2007 2:38 PM
NOV 000046007

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

3.3    Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding change of name to The SCO Group, Inc. (incorporated by reference to Exhibit 3.3 to SCO's Registration Statement on Form 8A12G/A (File No. 000-29911).

3.4    Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911)).

3.5    Certificate of Designation for Series A-1 Convertible Preferred Stock (incorporated by reference to Exhibit 4.1 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911)).

3.6    Certificate of Correction correcting the Certificate of Designation for Series A-1 Convertible Preferred Stock (incorporated by reference to Exhibit 4.2 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911)).

10.1    Letter Amending Engagement Agreement dated November 17, 2003 from Darl C. McBride, President and Chief Executive Officer of SCO, to David Boies of Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.2 to SCO's Current Report on Form 8-K filed on December 9, 2003 (File No. 000-29911)).

10.2    Letter Agreement dated December 8, 2003 among SCO, BayStar Capital II, L.P., Royal Bank of Canada and Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.3 to SCO's Current Report on Form 8-K filed on December 9, 2003 (File No. 000-29911)).

10.3    Exchange Agreement dated as of February 5, 2004 among SCO, BayStar Capital II, L.P. and Royal Bank of Canada (incorporated by reference to Exhibit 99.1 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911)). Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.1    Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

31.2    Certification of Bert Young, Chief Financial Officer, pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1    Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2    Certification of Bert Young, Chief Financial Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b)    Reports on Form 8-K

On February 9, 2004, we filed a current report on Form 8-K announcing we had completed an Exchange Agreement with the investors in our October 2003 Series A Convertible Preferred Stock financing.

On March 3, 2004, we filed a current report on Form 8-K announcing our financial results for the three months ended January 31, 2004.

NOV 000046008

On March 3, 2004, we filed a current report on Form 8-K announcing we had taken legal action against AutoZone, Inc. and DaimlerChrysler Corporation.

60

---

NOV 000046009

On March 5, 2004, we filed a current report on Form 8-K announcing we had received an order to compel discovery in our lawsuit against IBM.

On March 11, 2004, we filed a current report on Form 8-K announcing we had implemented a stock buyback program.

On April 16, 2004, we filed a current report on Form 8-K announcing we had received a redemption notice from BayStar Capital II, L.P.

## ITEM 7. SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: June 14, 2004                                THE SCO GROUP, INC.

                                      By:    /s/  BERT YOUNG
                                             _____

                                             Bert Young
                                             Duly Authorized Officer and
                                             Chief Financial Officer
                                             (Principal Financial and
                                             Accounting Officer)

61

NOV 000046010

## EXHIBIT INDEX

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Caldera International, Inc. (incorporated by reference to Exhibit 3.1 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911) ). |
| 3.2 | Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding consolidation of outstanding shares (incorporated by reference to Exhibit 3.2 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911) ). |
| 3.3 | Certificate of Amendment to Amended and Restated Certificate of Incorporation regarding change of name to The SCO Group, Inc. (incorporated by reference to Exhibit 3.3 to SCO's Registration Statement on Form 8A12G/A (File No. 000-29911). |
| 3.4 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to SCO's Registration Statement on Form 8-A12G/A (File No. 000-29911)). |
| 3.5 | Certificate of Designation for Series A-1 Convertible Preferred Stock (incorporated by reference to Exhibit 4.1 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911)). |
| 3.6 | Certificate of Correction correcting the Certificate of Designation for Series A-1 Convertible Preferred Stock (incorporated by reference to Exhibit 4.2 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911)). |
| 10.1 | Letter Amending Engagement Agreement dated November 17, 2003 from Darl C. McBride, President and Chief Executive Officer of SCO, to David Boies of Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.2 to SCO's Current Report on Form 8-K filed on December 9, 2003 (File No. 000-29911)). |
| 10.2 | Letter Agreement dated December 8, 2003 among SCO, BayStar Capital II, L.P., Royal Bank of Canada and Boies, Schiller & Flexner LLP (incorporated by reference to Exhibit 99.3 to SCO's Current Report on Form 8-K filed on December 9, 2003 (File No. 000-29911)). |
| 10.3 | Exchange Agreement dated as of February 5, 2004 among SCO, BayStar Capital II, L.P. and Royal Bank of Canada (incorporated by reference to Exhibit 99.1 to SCO's Current Report on Form 8-K filed on February 9, 2004 (File No. 000-29911). |
| 31.1 | Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Bert Young, Chief Financial Officer, pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Darl C. McBride, President and Chief Executive Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

32.2      Certification of Bert Young, Chief Financial Officer, pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

62

NOV 000046012

http://www.sec.gov/Archives/edgar/data/1102542/000104746904020342...

2/19/2007 2:38 PM
NOV 000046013