# EXHIBIT 1

Dockets.Justia.com

Jean Acheson   *   March 20, 2007

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

THE SCO GROUP, INC., a           )
Delaware corporation,            ) Deposition of:
                                 )
     Plaintiff,                  ) JEAN ACHESON
                                 )
vs.                              )
                                 )
NOVELL, INC., a Delaware         ) Case No. 2:04CV00139
corporation,                     )
                                 ) Judge Dale A. Kimball
     Defendants.                 )


          MARCH 20, 2007 * 9:30 a.m.




          Location:   Anderson & Karrenberg

                   700 Chase Tower

                  50 West Broadway

              Salt Lake City, Utah  84101




          Reporter:  Diana Kent, CSR, RPR, CRR

       Notary Public in and for the State of Utah

            Videographer:  Max Nelson, CLVS

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 2

1           A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3       Mauricio Gonzalez, Esq.
        BOIES, SCHILLER & FLEXNER
4       Attorneys at Law
        333 Main Street
5       Armonk, New York  10504
        (914) 749-8200
6       (914) 749-8300  - Fax
        mgonzalez@bsfllp.com
7
8  FOR THE DEFENDANT:
9       Mark Pernick, Esq.
        MORRISON FOERSTER
10      Attorneys at Law
        425 Market Street
11      San Francisco, California 94105-2482
        (415) 268-7159
12      (415) 268-7522 - Fax
        mpernick@mofo.com
13
14              -oOo-
15
16          I N D E X
    JEAN ACHESON:          PAGE
17
    Examination by Mr. Pernick        4
18
    Examination by Mr. Gonzalez      243
19
    Further Examination by Mr. Pernick   294
20
    Further Examination by Mr. Gonzalez  302
21
22              -oOo-
23
24
25

Page 3

1           E X H I B I T S
2  NO.         DESCRIPTION            PAGE
3  112  12-11-06 Declaration of Jean Acheson    36
4  113  10-K for Caldera International, Inc.,    40
       fiscal year ended October 31, 2002
5
   114  April 26 e-mail from Jean Acheson to    88
6      Cindy L. at Novell.com bearing
7  115  Amendment X between IBM, the Santa Cruz  136
       Operation, and Novell
8
   116  Revenue to Cash Reconciliation and     138
9      Computation of Balances Due to SCO
       for November, '96
10
   117  Asset Purchase Agreement Compliance    149
11     Audit Report, March 2, 1999, with
       attachments
12
   118  2-16-98 letter from James Young to     169
13     Terry Dulin, with attachment
14 119  Novell Customer Compliance Audit of SCO 176
       Corporation, with handwritten notes
15
   120  SCO SVRX Revenue Process Draft         180
16
   121  Caldera International, Inc. form 10-Q   203
17     for the period ended April 30, 2003
18 122  May, 1997 Cash Received and Reconciliation 225
       Payment to Novell Report
19
   123  1-16-07 declaration of James Ludwick    235
20
21              -oOo-
22
23
24
25

Page 4

1              P R O C E E D I N G S
2
3              JEAN ACHESON,
4      called as a witness, being first duly sworn,
5          was examined and testified as follows:
6
7              EXAMINATION
8  BY MR. PERNICK:
9      Q.   Good morning, Ms. Acheson.
10     A.   Hi.
11     Q.   I represent Novell and I'm going to ask
12 you some questions today.  Have you had your
13 deposition taken before?
14     A.   No.  I have been interviewed but never
15 under oath.
16     Q.   And by "interviewed," what do you mean?
17     A.   Well, in a long past lifetime we were sued
18 by an employee and I was present at a deposition of
19 another employee within the company, and then
20 afterwards they asked me some stuff but nothing under
21 oath.  So I've never had a true deposition.
22     Q.   Okay.  Who were you employed with at that
23 point?
24     A.   It was a small marketing company in New
25 York City.

Page 5

1      Q.   Okay.  Named?
2      A.   Oh, great.  It's one of those names that's
3  so close to another company.  It was just a little
4  company that we had that marketed credit cards.
5      Q.   Well, since you've never been deposed
6  before, let me take a couple of minutes and just lay
7  out some logistical rules that will help this go more
8  smoothly.  You may have already heard these things
9  from your counsel, but I just want to go over them
10 again.
11          One thing is that it is very important for
12 us not to speak over each other, because the court
13 reporter can only take down one person at a time.  So
14 you need to wait until I'm done before answering, and
15 I'll wait until you're done before I start my next
16 question.  Is that okay?
17     A.   Uh-huh (affirmative).
18     Q.   And similarly, the court reporter can only
19 take down what you say as opposed to shrugs and
20 shakes of the heads and nods of the head.  So we need
21 you to answer audibly today.  Is that okay?
22     A.   Yes.
23     Q.   And do you understand you're under oath
24 today?
25     A.   Yes.

2 (Pages 2 to 5)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 6

1    Q.   And is there any reason you can't give us
2  your best and most accurate testimony today?
3    A.   No.
4    Q.   Will you, Ms. Acheson, tell me if you
5  don't understand the question I've asked you?
6    A.   Yes.
7    Q.   Okay.  And then is it fair of me, if you
8  don't ask for clarification, to assume that you do
9  understand my question?
10   A.   Yes.
11   Q.   Did you have any meetings to prepare for
12  your deposition?
13   A.   Yes.
14   Q.   And when were those?
15   A.   Yesterday.
16   Q.   Is that the only meeting?  Was it one
17  meeting?
18   A.   Yes.
19   Q.   Was that the only meeting you had to
20  prepare for your deposition?
21   A.   For a formal meeting, yes.  There were
22  some little phone calls.
23   Q.   When were the phone calls?
24   A.   Just over the past couple of weeks.
25  Basically for changing dates, because it did change a

Page 7

1  few times.
2    Q.   Right.  Was that it for the nature of
3  these phone calls?
4    A.   Yeah.  Basically some assurances and kind
5  of what happens in depositions.
6        MR. GONZALES:  Let me instruct you to be
7  careful when you answer these questions not to
8  divulge any communications you may have had with me
9  and other attorneys.  Those would be privileged.
10   Q.   (By Mr. Pernick)  On any of these phone
11  calls, was anyone present besides your attorneys at
12  Boies, Schiller?
13   A.   Not that I know of.
14   Q.   Who did you meet with yesterday?
15   A.   I met with Mauricio Gonzalez and Chris
16  Sontag.
17   Q.   Was anyone else present?
18   A.   No.
19   Q.   Anyone else patch in by phone?
20   A.   Yes.
21   Q.   Who was that?
22   A.   Bill Broderick.
23   Q.   Okay.  How long was the meeting?
24   A.   It was most of yesterday.
25   Q.   Did you look at any documents in the

Page 8

1  meeting?
2    A.   Yes, we reviewed some documents.
3    Q.   Do you remember what they were?
4    A.   Yes.
5    Q.   Can you tell me?
6    A.   They were basically the Novell reports,
7  some of the agreements, some spreadsheets with, you
8  know, numbers on them.  You know, basically about the
9  business that had been asked for production.
10   Q.   What do you mean by that?
11   A.   Well, that we had already produced to
12  Novell.
13   Q.   But "the business that was asked for
14  production"?
15   A.   Well, it was basically the UnixWare
16  numbers, the source code numbers.
17   Q.   And by "numbers," you mean -- UnixWare
18  numbers, source code numbers?
19   A.   Well, like the revenue numbers.
20   Q.   Any other documents you can remember
21  looking at?
22   A.   Specifically just -- not specifically.
23  But just basically agreements, the agreements like
24  the APA and those.  Some of the Unix documentation, I
25  mean Unix, you know, agreement documentation.  And as

Page 9

1  I said, just general worksheets.
2    Q.   What do you mean by the "Unix
3  documentation"?
4    A.   Well, like an agreement with Unisys, for
5  instance.
6    Q.   Any other Unix agreements you remember
7  looking at?
8    A.   Not in ...
9    Q.   You mentioned the Novell reports.
10   A.   Yes.  The monthly reports that we give to
11  Novell.
12   Q.   How many of them did you look at?
13   A.   I think only maybe one specifically.  But
14  in general we discussed.
15   Q.   Do you remember which one?
16   A.   No.
17   Q.   Do you remember anything about that report
18  that you looked at in particular?
19   A.   I'm not sure where privilege goes on this.
20   Q.   Well, did looking at that one report you
21  mentioned, did that refresh your recollection on
22  anything?
23   A.   Yes.
24   Q.   What?
25   A.   On how the payments worked under IBM.

3 (Pages 6 to 9)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 10

1    Q.   And what do you mean by that, more
2  specifically? What do you mean by "how the payments
3  worked under IBM"?
4    A.   There was the IBM buyout. Specifically
5  how much the IBM buyout was, and specifically how
6  much SCO has retained under the agreements.
7    Q.   Did you look at any other documents in
8  connection with the IBM buyout?
9    A.   Just the APA.
10   Q.   Did you look at any documents beyond this
11  report and the APA relating to how much SCO paid and
12  how much SCO retained in connection with the IBM
13  buyout?
14   A.   Not that I can remember.
15   Q.   And you think that was the only monthly
16  report you looked at?
17   A.   Yes. There may have been one or two
18  around it. You know, sometimes finding it may have
19  opened more than one.
20   Q.   Right. Okay. You mentioned that you
21  looked at some spreadsheets.
22   A.   Yes.
23   Q.   What spreadsheets were those?
24   A.   Some of them were printouts, once again of
25  the UnixWare business numbers, SCOsource business

Page 11

1  numbers. Let's see. And some of the SVRX payments
2  to Novell.
3    Q.   Is that different than the Novell reports?
4    A.   Yeah. It was just a recap of the reports.
5    Q.   Okay. We will come back to some of that
6  stuff. Can you just give me your educational -- just
7  chronologically your educational background. Where
8  you went to school and when?
9    A.   I graduated from Mt. St. Mary's college in
10  Emmitsburg, Maryland in 1974. I have done some
11  postgraduate work at various places, just taking a
12  course here and there in various subjects. And, you
13  know, studied some computer science, some psychology.
14  Nothing specific towards degrees.
15   Q.   What was your major at Mt. St. Mary's?
16   A.   I was an English major.
17   Q.   Did you take any accounting courses?
18   A.   No, I did not.
19   Q.   Any computer science courses?
20   A.   There weren't any.
21   Q.   And then post graduation you said here and
22  there you took some various courses?
23   A.   Uh-huh (affirmative).
24   Q.   What do you remember taking and when and
25  where?

Page 12

1    A.   I basically took some psychology courses
2  at Loyola in Baltimore, Maryland.
3    Q.   When was that?
4    A.   '76, somewhere around there.
5    Q.   Any others?
6    A.   Nothing specific. I have a Master's in
7  Oracle development from Oracle Corporation. And I
8  have just, as I've said, taken courses here and
9  there. Mostly self study.
10   Q.   What kind of courses here and there?
11   A.   Oh, history, art appreciation, whatever
12  struck my fancy at the time.
13   Q.   Okay. Any in accounting?
14   A.   I've taken -- not really. Just basic, you
15  know, maybe like a one-day course. Like I took a
16  revenue accounting course. Sort of a revenue
17  recognition course just last year for a couple of
18  days.
19   Q.   So is that one course or two?
20   A.   It was one course for a couple of days.
21   Q.   And what was the other one? Revenue
22  accounting?
23   A.   Revenue recognition. It was the one
24  course.
25   Q.   But you mentioned a different one.

Page 13

1  Revenue accounting?
2    A.   No. I meant revenue recognition. Revenue
3  accounting, revenue recognition. It's basically the
4  same thing. Because you can't book it if you can't
5  recognize it.
6    Q.   Have you taken any other courses in
7  accounting or any other training in accounting?
8    A.   No.
9    Q.   How about informal?
10   A.   Not very -- my parents owned businesses
11  most of my life and I did the books for them. So
12  basically I'm a full charge bookkeeper.
13   Q.   What kind of business?
14   A.   We have owned movie theaters and small
15  manufacturing companies.
16   Q.   What are the small manufacturing
17  companies?
18   A.   It was called Rema Corporation. It was in
19  Norwalk, Connecticut. I don't know if it is still in
20  business or not. But I worked there through high
21  school and college.
22   Q.   And you kept the books?
23   A.   Uh-huh (affirmative).
24   Q.   And you graduated college in 1974?
25   A.   That is correct.

4 (Pages 10 to 13)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 14

1    Q.   Can you walk through your job history
2  since then?
3    A.   It's rather been varied.  After college I
4  worked for a while for Vanderbilt Corporation, which
5  was a chemical corporation, as a traffic coordinator,
6  which basically ships chemicals all over the world.
7    Q.   What was the time frame of that?
8    A.   That was right after graduation.  I
9  probably worked for them for about a year or so.  Had
10  a couple of other small jobs.  Went back to my
11  university to work as a publicity director for a year
12  while the person who actually had the job was on
13  sabbatical.  After that I returned to Connecticut.
14    Q.   What was the time frame?
15    A.   That was probably about '76.  And then in
16  the latter part of that decade I worked for Caldors,
17  which was a retail chain, as a department manager.
18  And then in the early '80s I worked as a
19  photographer.  Portrait.  Mostly children.
20    Q.   What was the name of the company?
21    A.   I don't remember.  It was just one of
22  those things when you walk into a store and there's a
23  photographer set up to do children's photographs.  It
24  was one of those.  They have been acquired and
25  reinvented about twelve times.

Page 15

1        Then, let's see.  After that, that's
2  basically when I went to work in the marketing firm.
3  We started out as a barter company in the early '80s.
4    Q.   What was the name of this marketing firm?
5    A.   That's the one I can't think of at the
6  moment.
7    Q.   Okay.
8    A.   And we basically -- we had a hybrid credit
9  card that was a part affinity card and sort of worked
10  on a barter basis with the merchants.
11    Q.   What does that mean?
12    A.   It's a hard program to describe.  The
13  merchants who accepted it, rather than getting cash
14  received value in barter credits.  Barter was a very
15  big thing in the '80s.  And they could use these
16  credits with other merchants within the network.  But
17  you, as the consumer, would pay cash but get a
18  discounted rate.
19    Q.   Okay.
20    A.   And then we also turned that into
21  marketing Visa and Master Cards for small SLAs later
22  on in that decade.
23    Q.   What is SLA?
24    A.   Small savings and loans.  S&Ls, actually.
25  Sorry.

Page 16

1    Q.   So chronologically where are we right now?
2    A.   We are getting towards the end of the
3  '80s.
4    Q.   Okay.
5    A.   I then took, after -- the S & Ls, of
6  course, had a little bit of problems at the end of
7  the '80s and a lot of our portfolios got sold off.
8  And we weren't able to sustain that business any
9  longer.  And then we moved on.  And at that point I
10  took some jobs, basically part-time jobs, various
11  things.  Sometimes doing business plans for
12  companies.
13    Q.   What were you doing?  Before you moved on
14  in the marketing firm, what were you doing?  What was
15  your --
16    A.   I basically handled the finances.
17    Q.   What kinds of things?
18    A.   Keeping the books, writing marketing
19  pieces, working with the auditors.
20    Q.   Okay.
21    A.   And then worked in several jobs for a
22  while.  And then about 19-- end of 1990, went to work
23  as a temp for AT&T UNIX System Laboratories.
24    Q.   What were the several jobs before that?
25    A.   Just temp jobs.

Page 17

1    Q.   Any related to bookkeeping, accounting?
2    A.   Some.  Sometimes.  Sometimes not.
3    Q.   Okay.
4    A.   Also, I was living in New York City.  We
5  had the Jacob Javits Center there, so I sometimes
6  worked the shows.  Things like that.
7    Q.   So then you went to USL?
8    A.   Uh-huh (affirmative).
9    Q.   At the end of 1990?
10    A.   Yes, I believe it was.
11    Q.   And what were you --
12    A.   I went there as a temp, basically, to work
13  in the accounts payable and just ended up staying.
14  About a year later, hired permanently.  And probably
15  a little after that moved into revenue accounting.
16    Q.   Okay.  And what were your job
17  responsibilities in that?
18    A.   Processing the OEM reports.
19    Q.   Okay.  And what else?
20    A.   That was basically it.  Processing the
21  SVRX royalties for the quarterly reports, and all
22  ancillary stuff around it.  You know, forecasting,
23  accruals.
24    Q.   And how long did you do that?
25    A.   That's what I have been doing almost ever

5 (Pages 14 to 17)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

---

Page 18

1  since.
2      Q.   Well, I mean at AT&T USL.
3      A.   All the way through the time that Novell
4  purchased the company.
5      Q.   So when was that?
6      A.   19 -- oh, great. 1993. Yeah, I think it
7  was a couple of years later. 1994, somewhere in
8  there.
9      Q.   And you went to Novell?
10     A.   Yes.
11     Q.   Okay. And what were you doing then at
12  Novell?
13     A.   Basically the exact same thing.
14     Q.   Did your job responsibilities change while
15  you were at Novell?
16     A.   Not really. It was mostly just processing
17  the OEM reports. Worked on -- that's approximately
18  when I also received the Oracle Master's. So I was
19  also working on the financial systems to produce
20  reporting and things in revenue.
21     Q.   And what do you mean by that, "working on
22  the financial systems"?
23     A.   We used an Oracle financial system. So by
24  learning how to get the data out of it so as to
25  design custom reports and processes.

---

Page 19

1      Q.   Okay. Anything else change about your job
2  responsibilities while you were at Novell?
3      A.   Not until the end.
4      Q.   And what happened then?
5      A.   Well, at the point where Novell decided to
6  sell off the UNIX product line to the Santa Cruz
7  Operation, my then boss, who was the revenue manager,
8  decided to remain with Novell in another capacity,
9  and I started taking over the management responsibil-
10  ities. However, very soon in the transition process,
11  and prior to almost everyone else, I was hired by
12  Santa Cruz.
13     Q.   But you took over management
14  responsibilities, you mean before you left?
15     A.   It was sort of right in the same area. I
16  can't remember which came first.
17     Q.   Okay.
18     A.   But --
19     Q.   I'm sorry.
20     A.   That's okay. Go ahead.
21     Q.   And who was the boss that decided to
22  remain?
23     A.   Carol Lynn Kuchinsky.
24     Q.   So how did your responsibilities change as
25  you became the manager?

---

Page 20

1      A.   There were other aspects to the revenue
2  and so I took over the other aspects as well as
3  managing the revenue group. I also worked on the
4  Novell/SCO transition team from the finance
5  viewpoint. And then going into SCO we had a world-
6  wide revenue manager. I was basically the manager of
7  this small segment. So we took -- so basically that
8  ended up under SCO for royalty administration.
9      Q.   You said that you took over management
10  responsibilities and there were other aspects to
11  revenue. What did you mean by that?
12     A.   Well, there were services, source code.
13  But mostly just processing the OEM reports. But it
14  was larger than one person at that time could handle.
15     Q.   So who else worked on that with you?
16     A.   At that time, in Novell we had Barb
17  Cavalla, Kathy Stetzer, there was another woman and I
18  can't think of her name. And Joyce Charles. Because
19  we also had receivables and credit, collections.
20     Q.   You said you worked on the transition
21  team, also?
22     A.   Yes.
23     Q.   Did you have any role in negotiating the
24  Asset Purchase Agreement between Novell and Santa
25  Cruz?

---

Page 21

1      A.   No. Not directly on the first part. That
2  was held way, you know, closely from any of the
3  employees. The transition team may have shaped some
4  of what went into later addendums as we worked on
5  trying to understand the APA.
6      Q.   I think you said, I don't remember your
7  exact words, but employees had no role in the initial
8  Asset Purchase Agreement?
9      A.   Well, there were employees, yes. But they
10  were higher level.
11     Q.   Okay.
12     A.   And they were keeping it highly
13  confidential.
14     Q.   And on addendums, you might have had a
15  role?
16     A.   I might have had some clarifications. We
17  may have contributed to some of the clarifications in
18  Addendum 1.
19     Q.   What do you remember about that?
20     A.   Basically -- it's hard to say without
21  actually seeing the agreement, but I think there was
22  some clarifications as to revenue, and clarifications
23  on other, you know, just various things. Maybe on
24  audits.
25     Q.   And are you saying that you drove some of

---

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 22

1 the clarifications?
2      MR. GONZALES: Objection to form.
3   A. I don't know.
4      MR. GONZALES: Objection to form.
5      Go ahead and answer.
6   A. I don't know if I personally drove. But
7 it may have been as a result of some of the questions
8 that came out of our transition team.
9   Q. Do you remember whether -- did you look at
10 contractual documents and provide comments like, "It
11 should say this. This shouldn't say that"?
12   A. We weren't attorneys, so I'm not sure we
13 would have given comment as far as that. But we
14 probably would have requested clarifications. And
15 the document, as I stated, was negotiated at a very
16 high level and not by people who understood the
17 day-to-day processing. So it was sometimes hard to
18 reconcile what was in the APA with what actually
19 occurred on a day-to-day basis.
20   Q. Now, you are talking about at this point
21 you are at Santa Cruz?
22   A. At this point we are still very hybrid.
23 I'm, at this point, a SCO employee but we are still
24 on the Novell premises in New Jersey.
25      MR. PERNICK: Amendment 1 to the Asset

Page 23

1 Purchase Agreement I believe is already Exhibit 1026
2 in this matter but I'll give a copy of that to the
3 witness.
4   Q. (By Mr. Pernick) And I'll just ask you,
5 Ms. Acheson, I think you said you would be better
6 able to answer if you looked at the Amendment. I
7 wanted to ask you what you provided input on, or
8 comments on, as far as this amendment.
9      MR. GONZALES: Objection. I think you are
10 mischaracterizing her prior testimony.
11   A. Yes. As I said, I didn't sit and say,
12 "Oh, we need to change this or we need to change
13 that." I think in making questions, we may have
14 influenced some of the clarifications that are in
15 their addendum.
16   Q. Okay. And you suggested looking at the
17 document so I'm going to let you look at the document
18 and see if you can provide any more precision on
19 that.
20   A. I think monthly reports was an area that
21 would have come out of our discussions. There are
22 other things, too, that -- oh, the SVRX third-party
23 royalties was probably --
24   Q. What are you looking at?
25   A. Section 2. In other words, some of the

Page 24

1 amendments to Section 4.16.
2   Q. What page are you looking at?
3   A. Six.
4   Q. Page six of Amendment 1?
5   A. Uh-huh (affirmative).
6   Q. And you are looking at Section J?
7   A. No. Above that.
8   Q. Section I?
9   A. Yes.
10   Q. Can you read the provision you're talking
11 about?
12   A. It says, "The following is added at the
13 end before the period: ... together with a
14 remittance sufficient to cover applicable third party
15 payments (if any) which are attributable to
16 distributions giving rise to such SVRX Royalties (and
17 royalties from Royalty-Bearing Products) and for
18 which Buyer has assumed Seller's obligation of
19 payment to such third party."
20   Q. So you are looking at Section I(2)?
21   A. That is correct.
22   Q. And what were the discussions you had on
23 that point?
24   A. Well, the original -- within any
25 technology there is often other technology that does

Page 25

1 not belong to the principal, and it's what we call
2 third-party software. And usually you have to pay
3 some kind of a royalty for distribution of this
4 third-party software. The original APA did not make
5 allowances for this. And since Novell had handed
6 over all of the agreements surrounding SVRX and
7 UnixWare, Novell didn't have the right to distribute
8 or to pay third-party software.
9      So, as part of the administrative
10 function, SCO had to make these payments but it could
11 have been considerably more than the 5 percent
12 administrative fee. So it was decided that since
13 Novell had the lion's share of the revenue from the
14 transactions, that the third-party royalties should
15 come out of their share.
16   Q. And who did you discuss this with?
17   A. At that time, probably my boss, Terry
18 Dulin. From the Novell side, I believe we discussed
19 it with Stu Adams. There was Sandy Matheson, I think
20 was part of the discussions. There may have been
21 other people. Terry may have talked with Mike
22 Genaro. I don't know. But eventually it was all
23 amended to include this. We had committee meetings
24 kind of on an every other day basis. It's hard to
25 remember what specifically transacted.

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 26

1    Q.   Okay.  So looking at the amendment, do you
2  remember any other areas on which you had
3  discussions?
4    A.   Probably on reporting.  I mean, these are
5  -- you know, the Section 1 of that same area.
6    Q.   What do you remember the discussions being
7  on that topic?
8    A.   Vaguely remember the change from quarterly
9  to basically monthly.  But not much.  Sort of -- part
10  of the issue is often that companies have different
11  quarters and different expectations of quarters.  So
12  in order to book revenue accurately within a quarter,
13  monthly reporting is just usually better for each
14  company.  And I believe Novell and old SCO had a
15  different fiscal setup, so it was just easier.
16      I remember in Section L there were
17  discussions about Novell often worked on selling
18  product on a pre-paid basis and some of these pre-
19  payments were or had not been fully burned off by the
20  customers.  So some of those were discussions on how
21  to handle the pre-payments that's also in Attachment
22  B.  Because there were some rather large pre-payments
23  out there.  And so how to handle that situation where
24  basically SCO had to maintain the customer but there
25  was no revenue or cash was something that needed to

Page 27

1  be settled.
2    Q.   Okay.  Before you looked at the document,
3  you said that you might have had some role in
4  discussions about clarifying, making clarifications
5  about revenue in the amendment?  What did you mean by
6  that?
7    A.   Probably the Section 1 dot Section E.
8    Q.   Do you remember that or are you guessing?
9    A.   Maybe a little of both.
10    Q.   What do you remember in terms of having
11  discussions leading up to the Amendment Number 1 on
12  the subject matter of Section E?
13    A.   Basically working on clarifications of
14  what specifically had transferred to SCO versus what
15  was being retained by Novell from a financial basis.
16    Q.   And what discussions do you remember on
17  that?
18    A.   Basically the administration, and was
19  mainly centered around the SVRX royalties which were
20  the quarterly binary reports by the OEMs.
21      MR. PERNICK:  Could you read that answer
22  back, please.
23      (Previous answer was read back.)
24    Q.   (By Mr. Pernick)  What do you remember
25  being said about that?

Page 28

1    A.   There was the work on the third-party
2  royalties.  There were discussions around timings of
3  sending the reports and payments to Novell.  There
4  was also discussions in regards to the pre, you know,
5  the cutoff point as to what was Novell and what
6  belonged one-hundred percent to Novell from the past.
7  And then the going-forward point as to what belonged
8  under the administrative arrangement with SCO.
9    Q.   How does what you've mentioned relate to
10  Section E?
11    A.   Well, I believe one of the segments was
12  the services part for maintenance and support.
13    Q.   What are you pointing to?
14    A.   In E, Section 1.
15    Q.   Okay.  And what do you remember about
16  that?
17    A.   That basically if SCO is providing the
18  support, then SCO retains the revenue.
19    Q.   Do you remember any discussions on any of
20  the other subsections of this Section E?
21    A.   Not during that transition period.  Later
22  on, yes.
23    Q.   Okay.  Do you remember any other
24  discussions, having looked at Amendment 1, in this
25  transition period?

Page 29

1    A.   Not really.
2    Q.   So then what happened next in your
3  chronology of work history?
4    A.   Okay.  I remained as basically the manager
5  of the OEM royalties and any other royalty reporters
6  within SCO.  So we had the same arrangements with
7  UnixWare customers, and SCO also had some of the same
8  arrangements with Open Server customers.  And so we
9  continued on that way.  And then later, the worldwide
10  manager for revenue within SCO left the company and I
11  assumed her role.
12    Q.   When was that?
13    A.   That was probably a couple of years before
14  SCO sold.  No, it was probably after -- it was
15  sometime in 2000.  Yeah.  So a couple of years before
16  the sale to Caldera.
17    Q.   And who was it that left?
18    A.   Peggy Nelson, I believe was her name.
19    Q.   So before that happened, what were your
20  job responsibilities?
21    A.   As stated, I was basically responsible for
22  processing any customer who reported royalties, plus
23  all transactions around it; accounts receivable, cash
24  processing.
25    Q.   And this was relating to all SCO products?

8 (Pages 26 to 29)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 30

1    A.    Any SCO product where a customer had the
2 right to replicate and report. The majority of SCO's
3 business was selling a box.
4    Q.    What do you mean by that?
5    A.    Package product. Like if you walk into a
6 store and you buy a game in a box. That's the
7 majority of the way SCO sells product.
8    Q.    And your responsibilities did or did not
9 relate to that?
10    A.    Did not relate to that.
11    Q.    So you related to which --
12    A.    The royalty reporting.
13    Q.    And for which products?
14    A.    Any SCO product that replication was
15 allowed.
16    Q.    And what did those include?
17    A.    Open Server, UnixWare. I think we had
18 some other products, small products that allowed
19 replication.
20    Q.    SVRX 2?
21    A.    Well, yes. That was all part of the
22 Novell administration.
23    Q.    And then what about -- I mean, did you
24 have roles in audits at that point? This is
25 pre-2000.

Page 31

1    A.    Yes.
2    Q.    And what was or where does that come under
3 in what you just listed as your job responsibilities?
4    A.    It's just all part of it. We audited some
5 of the OEMs, and in turn Novell audited us. Also,
6 third-party royalty vendors. Also audit. It's all
7 part of the job respons-- part of the job, you might
8 say.
9    Q.    Did other people audit SCO besides Novell
10 in that time period?
11    A.    Novell, I don't remember if we did.
12    Q.    Let me --
13    A.    Under SCO, yes.
14    Q.    Were there other audits of SCO done other
15 than the audits Novell did?
16    A.    Yes.
17    Q.    Who else audited SCO?
18    A.    Well, we were a public company so of
19 course we had our quarterly audits by our own
20 auditors. And during that time period I remember
21 Microsoft auditing us. And I can't remember if there
22 was anybody else. There may have been, but I just
23 don't remember.
24    Q.    What was Microsoft auditing SCO in
25 connection with?

Page 32

1    A.    Within SVRX, UnixWare, and Open Server is
2 still some of the old Xenix code, which is owned by
3 Microsoft. And they were simply auditing us under
4 their rights in there, the third-party royalty
5 arrangements with them.
6    Q.    When did Microsoft conduct those audits of
7 SCO?
8    A.    I'm not sure I remember.
9        MR. GONZALES:   Let me object. I'm not
10 sure if there was one or multiple audits so maybe you
11 need to establish that as foundation.
12    Q.    Do you remember if there was one or more
13 audits conducted by Microsoft of SCO?
14    A.    I don't remember. The only one I
15 participated in might be -- you know, there was only
16 one that I remember participating in.
17    Q.    And when was that, roughly?
18    A.    That's what I'm trying to remember. I
19 think maybe '99, 2000. I can't remember.
20    Q.    And then how did your job responsibilities
21 change in 2000?
22    A.    I took over management for all revenue
23 within SCO. Had more direct responsibility for audit
24 as far as the quarterly audits were concerned, and
25 revenue reporting, and also my staff increased. So I

Page 33

1 was also responsible for managing I think about three
2 more people.
3    Q.    So how many people were you managing?
4    A.    I believe five. Somewhere around in
5 there.
6    Q.    What do you mean by "management of all
7 revenue of SCO"? What were your job responsibilities
8 on that?
9    A.    Revenue recognition. Making sure that we
10 were in compliance. Making sure reserves for returns
11 or allowances for bad debt were correct. Making sure
12 all amortizations of service revenues were correct.
13 Making sure that we had achieved the SOE, vendor
14 specific objective evidence of fair value. And still
15 maintained, of course, the Novell reporting and OEM
16 reporting, and at that point accounts receivable as
17 well.
18    Q.    So were these accounting functions?
19    A.    Uh-huh (affirmative).
20    Q.    Did you have responsibility for sales?
21    A.    For sales?
22    Q.    Yeah.
23    A.    No.
24    Q.    And what -- just take me next, what's the
25 next significant change in your job description after

9 (Pages 30 to 33)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 34

1  that?
2      A.   Didn't really change too much.  What
3  happened was the company name changed to Caldera as
4  the product line was sold.
5      Q.   But no substantive change in your job
6  responsibilities?
7      A.   Eventually.  More was added under -- I
8  also became responsible for third-party royalties,
9  credit, and later all COGs and gross margin report.
10     Q.   What does that mean?
11     A.   COGs are cost of goods sold.  So -- and
12  then gross margin is the relationship between revenue
13  and cost of goods.  So to make sure that the products
14  selling are profitable.
15     Q.   What did you mean by third-party royalties
16  when you said that was something you undertook?
17     A.   Third-party royalties, once again, is for
18  the product that does not belong to SCO that is
19  embedded within SCO's products, or products that we
20  may resell.
21     Q.   Okay.  And what happened next in your job
22  chronology?
23     A.   The only difference is that I moved from
24  New Jersey to Utah.
25     Q.   And when was that?

Page 35

1      A.   About three and a half years ago.
2      Q.   And how come?
3      A.   They asked if I wanted to move.
4      Q.   Was there any change in job
5  responsibility?
6      A.   At that point I was promoted from manager
7  to director.
8      Q.   Was there any change in job
9  responsibility?
10     A.   No.
11     Q.   And so do your job functions today remain
12  as you previously described?
13     A.   Yes.  I have done special projects and
14  things for the company, but ...
15     Q.   What special projects can you recall?
16     A.   Sarbanes Oxley.
17     Q.   What was the nature of that work?
18     A.   I worked with the auditors to prepare the
19  documentation for the finance group, as required.
20     Q.   Can you recall any other special projects
21  you have undertaken?
22     A.   Just recently we upgraded our financial
23  systems.
24     Q.   From what to what?
25     A.   From QAD 90 to QAD EB 2.1.

Page 36

1      Q.   Any other special projects?
2      A.   Those took up years.
3      Q.   Okay.  So does that mean you can't recall
4  any other special projects you are referring to?
5      A.   Not major special projects.
6      Q.   Okay.  You know what, I'd like to take a
7  quick break.
8           (Break taken from 11:02 to 11:11.)
9           (EXHIBIT-112 WAS MARKED.)
10     Q.   Okay, Ms. Acheson, I have marked as
11  Exhibit 112 a copy of the declaration that you filed
12  or that was filed in this case and that you signed on
13  December 11, 2006.  Do you see that?
14     A.   Yes.
15     Q.   Is that your signature?
16     A.   Yes, it is.
17     Q.   And I'm going to have some questions for
18  you about this.  First I'd like you to read to
19  yourself paragraph 3.
20     A.   Yes.
21     Q.   Okay.  You said in here that SCO was
22  tracking and transmitting "royalty payments that SCO
23  collects on behalf of Novell."  Do you see that?
24     A.   Yes.
25     Q.   And what did you mean there when you said

Page 37

1  "on behalf of"?
2      A.   It is in regards to the administrative
3  process as described throughout the APA and its
4  amendments.  Novell had assigned basically all of the
5  agreements, the customer relationships, the product,
6  everything over to SCO and therefore could not
7  administer, themselves, this revenue stream from the
8  SVRX binaries.  Old SCO didn't purchase that revenue
9  stream from them, and so in order to process the
10  royalties and meet the obligations of third-party
11  intellectual property, it required old SCO -- it
12  required old SCO to do the processing of these reports or
13  the tracking, as it states in here.
14     Q.   When you said "on behalf of," you were
15  referring to the administrative process that had
16  become SCO's responsibility; is that right?
17     A.   That is correct.
18     Q.   In connection with the royalties from SVRX
19  licenses due to Novell --
20     A.   Yes, the quarterly reports.
21          MR. GONZALES:  Objection to form.
22     Q.   In connection with the royalties from SVRX
23  licenses that were due to Novell, was SCO acting as
24  Novell's agent?
25          MR. GONZALES:  Same objection.  And also

10 (Pages 34 to 37)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 38

1  calls for a legal conclusion.
2       A.   I wouldn't know about whether we were
3  their agent or not.  In the APA it's described as
4  administration.
5       Q.   And what does that mean to you?
6       A.   It means that we received the reports and
7  payments.  We reviewed the reports in view of the
8  product schedules to make sure that the -- to make
9  sure the OEMs were reporting and calculating their
10  royalties and discounts correctly.  And then we, you
11  know, we booked these into a financial system and
12  then on a monthly basis produced reports for Novell
13  and turned over the cash that belonged to Novell to
14  Novell.
15            MR. PERNICK:  Why don't we mark the APA.
16  This has to have been marked already.
17            MR. GONZALES:  I believe that's marked as
18  number 1.
19            MR. PERNICK:  We'll go with that.
20            I'm showing Ms. Acheson what has been
21  marked as Exhibit 1, which is the Asset Purchase
22  Agreement by and between the Santa Cruz Operation and
23  Novell, dated as of September 19, 1995.
24       Q.   (By Mr. Pernick)  And Ms. Acheson, I'll
25  ask you to look at Section 4.16(a) of this agreement,

Page 39

1  which I think is on page 24.
2       A.   Yes.  I got there.
3       Q.   And do you see in the first sentence where
4  it says, "Following the Closing, Buyer shall
5  administer the collection of all royalties, fees and
6  other amounts due under all SVRX licenses"?  Do you
7  see that?
8       A.   Yes.
9       Q.   And do you see also in the last sentence
10  of this Section (a) it says, In consideration of such
11  activities described in the preceding sentence,
12  Seller shall pay to Buyer within 5 days of receipt of
13  SVRX Royalties from Buyer as set forth in the
14  preceding sentence, an administrative fee equal to 5
15  percent of such SVRX royalties"?  You see that?
16       A.   Yes.
17            MR. GONZALES:  Objection.  You may answer
18  the question but just want to be sure that you are
19  looking at only Section 4.16 in the original APA, not
20  as amended, right?
21            MR. PERNICK:  I'm looking right now at the
22  original APA, yes.
23            MR. GONZALES:  Okay.  Good.
24       Q.   (By Mr. Pernick)  Do you see those
25  provisions, Ms. Acheson?

Page 40

1       A.   Yes.
2       Q.   What does it mean to you that the fee is
3  called an administrative fee?
4       A.   I think basically, as I described before,
5  it's that we receive 5 percent to process the
6  quarterly royalty reports and to track the payments
7  and track the per copy fees, make sure everything is
8  correct, and to calculate the third-party royalties
9  due, and to pay those on behalf of Novell.
10       Q.   So does that suggest to you that SCO was
11  acting as Novell's agent with regard to the SVRX
12  royalties?
13            MR. GONZALES:  Objection.  Calls for a
14  legal conclusion.
15       A.   I'm sorry.  I don't know the definition of
16  an agent.
17       Q.   Okay.  Let's mark next -- what are we up
18  to?  113?  As 113, the 10-K for Caldera International
19  Inc. for the fiscal year ended October 31, 2002.
20            (EXHIBIT-113 WAS MARKED.)
21       Q.   Ms. Acheson, I'll ask you to look at page
22  42 of this document, at the section entitled
23  Restricted Cash and Royalty Payable to Novell, Inc.
24       A.   Uh-huh (affirmative).
25       Q.   And do you see where it says, "The company

Page 41

1  has an arrangement with Novell, Inc. in which it acts
2  as an administrative agent in the collection of
3  royalties for customers who deploy SVRX technology.
4  Under the agency agreement, the Company collects all
5  customer payments and remits 95 percent of the
6  collected funds to Novell and retains 5 percent as an
7  administrative fee."  Do you see those statements?
8       A.   Yes, I do.
9       Q.   Do you think there's anything wrong with
10  them?
11       A.   No, I guess not.
12       Q.   Do they sound accurate to you?
13            MR. GONZALES:  Objection.  Calls for
14  speculation.
15       A.   I -- you know, I didn't write this.  You
16  know, people who wrote it probably knew.  I don't
17  know specifically.
18       Q.   Does it sound accurate to you?
19       A.   Yeah, I guess so.
20            MR. GONZALES:  Same objection.
21            You may answer.
22       A.   Okay.  I guess so, yes.
23       Q.   And it says in these statements that
24  Caldera, at the time, was acting as an administrative
25  agent in the collection of royalties under the APA;

11 (Pages 38 to 41)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 42

1  is that right?
2      A.   Yes, it states that.
3      Q.   What does that mean to you?
4          MR. GONZALES:  Calls for speculation.  May
5  call for a legal conclusion.
6      Q.   What does it mean to you, is all I'm
7  asking.
8      A.   I guess it means that we are administering
9  the royalties as it states under the APA.
10     Q.   Have you ever heard it said within SCO or
11 Caldera or Santa Cruz that SCO was acting as Novell's
12 agent in connection with the collection of SVRX
13 royalties?
14     A.   Not really, no.  Not that I can remember.
15     Q.   After the APA, was SCO trying
16 to build up its business in the SVRX licenses?
17     A.   No.  Never.  It wouldn't -- it wouldn't
18 really afford us anything.  Our sales representatives
19 weren't commissioned on it, and we would only receive
20 a 5 percent fee.  So it wouldn't make sense.
21     Q.   Do you think Novell knew that?
22     A.   That was the entire point of the
23 relationship.  The idea, the concept - as was kind of
24 put down to us from the higher-up management of both
25 Novell and SCO at the time of transition, because

Page 43

1  Novell, of course, had a highly vested interest in
2  SCO through some of the stock that it received - was
3  to forward the UnixWare business.  Because that was
4  the latest product and customers usually want the
5  latest product.  So in order to grow SCO's revenues,
6  you'd have to sell them UnixWare.
7      Q.   So that was SCO's focus, to increase the
8  sales of UnixWare?
9      A.   That is correct.  And its own products, of
10 course.
11     Q.   So did SCO, from the time of the APA
12 forward, have any expectation that it would develop
13 significant new SVRX license sales?
14     A.   No.  Not that I would have known of.
15     Q.   And do you think Novell had the same
16 understanding?
17     A.   Yes, I believe they did.
18     Q.   Can you say that again?
19     A.   I said yes, I believe they did.  I never
20 heard of anything different.
21     Q.   Looking again at your declaration which is
22 Exhibit 112, and paragraph 3 in particular, you said
23 that from '96 to the present you've been responsible
24 for tracking and transmitting the royalty payments
25 that SCO collects on behalf of Novell.  You see that?

Page 44

1      A.   Yes.
2      Q.   And is that accurate?
3      A.   Yes.
4      Q.   Tell me what you mean by the difference
5  between tracking and transmitting.
6      A.   Well, tracking is recording, transmitting
7  is sending the payments and the -- to me it's sending
8  the payments and the monthly reports to Novell.
9          MR. PERNICK:  Can you read that back.
10         (Previous question was read back.)
11     Q.   (By Mr. Pernick)  Can you explain, Ms.
12 Acheson, the tracking process that you refer to here?
13     A.   Well, as previously stated, once we
14 receive the OEM reports we review them for
15 correctness in accordance with the product schedules,
16 and we had a separate financial system where we would
17 then enter these into, so that we could then create
18 the reports for the monthly reports for Novell.
19     Q.   So the tracking process, you receive OEM
20 reports from third parties?
21     A.   That is correct.
22     Q.   And what happens?  What do you do with
23 them?
24     A.   Well, we take them and we have usually
25 developed spreadsheets with built-in formulas that

Page 45

1  check the accuracy of the OEM's calculations.  And if
2  we find any -- we enter the data, the unit
3  information into there in order to calculate the per
4  copy fees and the net amounts due, and also to
5  calculate the various discount programs.
6          Then later, if we find a discrepancy, we
7  then contact the OEM to work out the discrepancy.
8  And then later we enter that -- as I stated, we have
9  a separate financial system and we basically enter
10 the data as an invoice into it.  And then we just
11 pull reports out of that separate financial system to
12 give to Novell.  We basically dump the data and then
13 put it into a worksheet.  And then, of course, we
14 have to track the payments as received from the OEMs,
15 as well.
16     Q.   Has that -- now, is that tracking and
17 transmitting?  Or is that -- this is the tracking
18 half?
19     A.   That's mostly the tracking.  And then of
20 course the reporting is more towards the transmitting
21 part.
22     Q.   Right.  Now, this process that you've been
23 kind enough to explain on the tracking side, has that
24 stayed pretty much consistent from 1996 to the
25 present?

12 (Pages 42 to 45)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 46

1    A.    Oh, from even earlier than that. AT&T has
2  been doing this for decades.
3    Q.    Okay.
4    A.    And we just keep inheriting down the
5  process and refining it as technology gets better.
6    Q.    What refinements can you recall to the
7  process?
8    A.    Excel worksheets.
9    Q.    In a word?
10    A.    Pardon?
11    Q.    To sum it up, Excel worksheets?
12    A.    Yes. Versus doing the calculations out on
13  a piece of paper by hand.
14    Q.    But anyway, besides the fact that Excel
15  has made life easier, has the substance of the --
16    A.    No.
17    Q.    -- process changed?
18    A.    No. If we go back into the old AT&T
19  documents you will see it's basically the exact same
20  thing. The OEMs send in a quarterly report, somebody
21  reviews it for accuracy, negotiates the differences
22  with the customer, and records the revenue.
23    Q.    Okay. Can you tell me then, in thumbnail,
24  as you have been doing, can you tell me about the
25  transmittal part of when you said tracking and

Page 47

1  transmitting?
2    A.    On a monthly basis we take the transaction
3  data from the prior month and we fill in a worksheet
4  that we have pre-prepared, and we calculate the
5  amount of cash received, our 5 percent royalties.
6  Our 5 percent administrative fee, excuse me. And any
7  third-party royalties that may be due, and then
8  calculate the net amount due to Novell. We then
9  e-mail the report to Novell and wire the correct
10  amount of the funds to them.
11    Q.    What about in that process, what if you
12  have collected fees that aren't paid to Novell? What
13  do you do with those in the tracking and transmittal
14  process?
15    A.    Oh, we collect a lot of fees that aren't
16  due to Novell because we are also collecting the
17  funds for the rest of SCO's business. What we do is
18  we, over the years, obviously, know who the OEMs are
19  that report and pay. And we review reports as they
20  come in so that we can accurately and correctly
21  give -- you know, segregate the funds that belong to
22  Novell into separate GL accounts, and then transmit
23  those funds to them.
24    Q.    But if there are SVRX related fees that
25  you determine aren't related or aren't due to Novell,

Page 48

1  do those go anywhere in the transmittal reports?
2    A.    No.
3    Q.    Do those get mentioned to Novell somehow?
4    A.    No.
5    Q.    Can you look at paragraph 4 of your
6  affidavit, Ms. Acheson.
7    A.    Uh-huh (affirmative).
8    Q.    You said that you work closely with Barb
9  Cavalla-Rosenberg and Cindy Lamont, both from the new
10  Jersey office?
11    A.    Uh-huh (affirmative).
12    Q.    What were your interactions with those two
13  individuals?
14    A.    Well, during the -- prior to the
15  transition, Barb Cavalla had worked for me in
16  processing the OEM reports, and Cindy Lamont had
17  worked in the contract management section of Novell.
18  And then later, during the transition, Barb and Cindy
19  stayed with Novell and basically took the position as
20  sort of like a liaison between Novell and SCO for the
21  administration of the SVRX royalties.
22    Q.    And you said you worked closely with them?
23    A.    Yeah. Basically we had a lot of
24  discussions back and forth. They were part of the
25  transition team. We had conversations back and forth

Page 49

1  on the characterizations of various things. And we
2  also, each month, once the company started to
3  separate, which was approximately I think February of
4  '96, I don't remember. February of '96, that's when
5  we started reporting.
6        So what we did is we worked with Barb and
7  Terry Dulin, who was my boss, plus Barb Cavalla and
8  Cindy Lamont. We worked together to sort of develop
9  a report that would give them the information they
10  needed in order to review. And we would get together
11  on a monthly basis thereafter to review the monthly
12  reports and discuss the transactions.
13    Q.    Let me just ask. You say in paragraph 4,
14  "In that function, I worked closely with," these two
15  individuals. Do you mean for the whole period, '96
16  through --
17    A.    No.
18    Q.    What are you referring to?
19    A.    For the period that they were still
20  employed by Novell.
21    Q.    So from when to when? What's the --
22    A.    I don't remember. I think they were
23  employed by Novell for a year or so. Two years. I
24  don't remember specifically.
25    Q.    But in paragraph 4 you are referring to a

13 (Pages 46 to 49)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 50

1  couple-year period?
2      A.   Yeah.
3      Q.   Is that the idea?
4           And how often would you interact with Ms.
5  Cavalla-Rosenberg and Ms. Lamont?
6      A.   Well, at the beginning it was more.  Later
7  it turned into just basically a monthly meeting.
8      Q.   When you say "more," what do you mean by
9  "more"?
10     A.   Well, we were in the same building at the
11 beginning, so we saw each other probably almost on a
12 daily basis.  And during the transition period, we
13 met on the transition teams, various teams.  And then
14 just as time moved on, the meetings spaced further
15 and further, and then we weren't in the same
16 building.
17     Q.   What were the -- you just say you worked
18 closely with them.
19     A.   Uh-huh (affirmative).
20     Q.   What were the subjects you recall of your
21 interactions with them?
22     A.   Basically the administration, third-party
23 royalties.
24     Q.   And by "administration," you mean?
25     A.   The entire administration of the SVRX

Page 51

1  royalties.
2      Q.   And is third-party royalties again, when
3  you say that you mean --
4      A.   Well, it was on the royalties that were
5  embedded for other people's code within the SVRX
6  code.
7      Q.   And Novell was going to pay those
8  royalties?
9      A.   That is correct.
10     Q.   Who else did you regularly interact with
11 at Novell?
12          MR. GONZALES:  Objection.  Just to
13 clarify, you are still in the same time period of the
14 transition time?
15          MR. PERNICK:  Well, at any time.
16     A.   Not so much a regular interaction, but
17 Sandy -- Sandy, I mean Cindy and Barb also reported
18 in to Sandy Matheson and Mike Genaro.  I had less
19 interaction with them.  But I know that they were
20 working with them to, you know, come up with answers
21 and clarifications.
22     Q.   (By Mr. Pernick)  Anyone else that you
23 would regularly interact with or work closely with at
24 Novell after the APA?
25     A.   Not that I really remember.

Page 52

1      Q.   What about in post 2000?  Who would have
2  been your --
3      A.   Report@Novell.com.
4      Q.   And what does that mean?
5      A.   That means that's where we were told to
6  send the royalty reports.  It's an alias for -- we
7  have no idea.
8      Q.   What about as far as person-to-person
9  communications?
10     A.   Very little.  Once in a while a new person
11 in the credit department calls because they don't
12 understand the report, and we refer them back to
13 their own manager.
14     Q.   Okay.  And who do you recall having done
15 that?
16     A.   I don't remember names.  There's a lot of
17 turnover.
18     Q.   Who else on the SCO side, over time, has
19 been involved with the tracking and transmitting
20 royalty payments that SCO collects on behalf of
21 Novell?
22     A.   I've had various people that have worked
23 for me, and there would have been Terry Dulin, who
24 was my boss at SCO for the first couple of years.
25 And then of course various controllers that I

Page 53

1  reported in to afterwards.
2      Q.   Who were they?
3      A.   There's Susan Burford, Randy Breesé.
4  There's another woman, I can't think of her name.
5  And of course now Mike Olson.
6      Q.   Okay.  Who else worked with you or for you
7  on tracking and transmitting royalty payments that
8  SCO collects on behalf of Novell over time?
9      A.   Well, people working for me specifically?
10 Let's see.  It's Nora Gomez.  Joyce Charles.  I'm
11 trying to remember the transition points, sorry.
12 Rita Markowitz.
13     Q.   Is that "Rita"?
14     A.   Rita.  Kathy Stetzer.  I can't think of
15 her name.  Harneet Singh.  And then later, Nancy Lau
16 and Bryce Wells.
17     Q.   Anyone else you can remember?
18     A.   No.  I don't think so.
19     Q.   And what was Ms. Gomez's role in
20 connection with tracking or transmission of royalty
21 payments?
22     A.   Contract administrator.
23     Q.   What does that mean?
24     A.   She worked reviewing the OEM reports,
25 entering them into the database, financial system.

14  (Pages 50 to 53)

CitiCourt, LLC
801.532.3441

Jean Acheson    *    March 20, 2007

Page 54

1  And she would help me prepare the Novell reports.
2      Q.   What time frame is this?
3      A.   Let's see.  We hired Nora -- oh, there was
4  one other woman, Kathy Fenessey.  I forgot her.
5  Sorry.
6           We hired Nora probably in the latter part
7  of SCO, of old SCO, and then she stayed with me in
8  Caldera SCO until I moved out here in 2003.  So she
9  was probably there for three or four years.  Some of
10 these people were simultaneous, not successive.
11     Q.   Sure.  What was Ms. Charles's role?
12     A.   Joyce mainly worked on cash, accounts
13 receivable, and credit and collections.  We did some
14 of the smaller, simpler reports and helped with data
15 entry.
16     Q.   And this is in connection with
17 administering the APA?
18     A.   That, as well as any other royalties that
19 we were processing for.
20     Q.   Okay.  What about Ms. Markowitz; what was
21 her role?
22     A.   Same thing.  She was basically contract
23 administration.
24     Q.   So same as Ms. Gomez or Ms. Charles?
25     A.   More towards Ms. Gomez, although she

Page 55

1  didn't have as much of a role in preparing the
2  monthly report.
3      Q.   What time frame was she?
4      A.   She was there at the transition from
5  Novell to SCO, is when she started.  And she worked
6  for I think two or three years.
7      Q.   What about Ms. Stetzer; what was her role?
8      A.   Same thing.
9      Q.   Same as --
10     A.   Same as Rita.  She had actually worked for
11 me under -- had worked with me under Novell, and then
12 transitioned to work for me in SCO.  And she worked
13 for a couple of years and then was hired by AT&T.
14     Q.   And what about Ms. Singh?  What was her
15 role?
16     A.   Contract administration.
17     Q.   So her functions?
18     A.   She was hired -- same functions.  She was
19 hired about a year or so after we were SCO.
20     Q.   And when you say after SCO, that means
21 around '02?
22     A.   No.  SCO, old SCO.
23     Q.   Old.  Okay.
24     A.   Original SCO.
25     Q.   And what about Nancy Lau; what did she do?

Page 56

1      A.   Nancy was contract administration,
2  third-party royalties, accounts receivable, and she
3  worked in the Utah office in Lindon as part of
4  Caldera.
5      Q.   So that means what time frame?
6      A.   Let's see.  I hired her probably a year
7  before I moved out, so about 2002.  2001, 2002.  And
8  she worked for me for a couple of years, until she
9  transitioned into a general ledger position.
10     Q.   And what about Bryce Wells, is that --
11     A.   He's my current contract administrator,
12 third-party royalty.
13     Q.   When did he get involved?
14     A.   Basically hired Bryce right after Nancy
15 transitioned into the GL.
16     Q.   So that's about when?
17     A.   A couple of years ago.
18     Q.   And what about Kathy Fenessey, I think you
19 said the name was?
20     A.   Kathy Fenessey was way back under old SCO.
21     Q.   And what was her --
22     A.   She was hired as contract administrator.
23     Q.   And how long was she around?
24     A.   She was around for a couple of years.
25     Q.   Okay.  Ms. Acheson, could you look at

Page 57

1  paragraph 5 of your declaration which is Exhibit 112.
2  Do you see the first sentence where it says, "After
3  the APA was executed, but when I was still employed
4  by Novell, I attended a company-wide meeting in which
5  the terms of the APA and Amendment No. 1 to the APA
6  were explained."
7      A.   Uh-huh (affirmative).
8      Q.   So what meeting was that?
9      A.   They had many meetings.  I can't remember
10 specifically.  I mean, we had some like where it
11 would be just a company-wide.  And either somebody
12 from HR or some of the V.P.s would come in or the
13 local V.P.s would speak in explaining various
14 transactions.
15     Q.   Well, it looked to me in paragraph 5 like
16 in the first sentence you were referring to a
17 specific meeting.  There's another sentence where you
18 then talk about attending a number of I think other
19 meetings.
20     A.   Yeah.
21     Q.   But is the first sentence about a specific
22 meeting?
23     A.   Basically I remember they called all of us
24 together to explain that we had been sold.  And a lot
25 of what was explained was more the terms and how they

15  (Pages 54 to 57)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 58

1  were going to split up the employees, because there
2  was HP, Novell, and SCO.  And basically there were
3  different projects, there was a big project that was
4  working with HP, and HP wanted to hire a segment of
5  the Novell UNIX engineers.  And then, of course, SCO
6  wanted to retain or wanted to hire some.  And so
7  there was a lot of explanations in regards to that
8  and how the initial transition was going to occur.
9      Q.   Do you remember approximately when this
10 meeting was?
11     A.   It was, you know, right after, I guess,
12 the APA was signed initially.
13     Q.   Can you picture the season?
14     A.   Not really.
15     Q.   Do you remember where it was?
16     A.   At our premises in New Jersey.  We were in
17 Florham Park.
18     Q.   At the Novell premise?
19     A.   Yes.
20     Q.   How many people were there?
21     A.   However many people there were at the
22 location.  We had the whole building.  It was a large
23 building.  So I would say probably a couple of
24 hundred.
25     Q.   So, I mean, was it a big conference room,

Page 59

1  an auditorium?  Where was the meeting?
2      A.   There was a huge cafeteria that we used
3  for functions like this.
4      Q.   Okay.  What other subjects?  You've talked
5  about how employees would be divided up.  What other
6  subjects do you remember being discussed at this
7  meeting?
8      A.   It was very general at the very first
9  meetings.  You know, a lot of HR issues; what we
10 needed to do in order to apply for the various
11 companies and positions that were available.
12     Q.   You mentioned, again, meetings.  I want to
13 make sure we are focused on the same thing.  Are we
14 talking about the company-wide meeting that you
15 mention in the first sentence of paragraph 5?
16     A.   Yeah.  There was a big company meeting
17 explaining to us that we were being sold and the
18 basis of the sale and what we could expect as
19 employees.
20     Q.   Okay.  So what specific topics do you
21 recall being discussed in that meeting?
22     A.   I think I've just stated that basically
23 what the terms of the sale were, what happens.  Of
24 course, obviously people are interested in what
25 happens with their jobs, and what the transition

Page 60

1  plans -- some of the transition plans in general.  I
2  mean, it's hard at a large, all-hands meeting, to get
3  into huge specifics.  Because not everybody is
4  interested in every aspect.
5          And then we broke into smaller groupings
6  for the specific areas.  I know the engineers had
7  meetings in regards to what needed to happen for
8  their various segments.  Product management did the
9  same.  Finance did the same.  So we had a lot of very
10 smaller groups and then we would meet in bigger
11 groups and then there would be all-hands meetings.
12 It's hard to really state.
13     Q.   Can you focus on this meeting that you
14 referred to?  That's what I'm asking you about.
15     A.   Basically just a big generalized meeting
16 in which we were told that the product line was being
17 sold to SCO.
18     Q.   You say "in this meeting," you are
19 referring to a specific meeting, you said that terms
20 of the APA and Amendment Number 1 were explained?
21     A.   It was very generalized.  Once again, as
22 stated, at an all-hands meeting you are not going to
23 explain in minute detail all of the terms and
24 conditions of a sale.  An all-hands meeting is going
25 to be basically what is it that people want to hear.

Page 61

1  The majority of it is going to be are they employed
2  or not.
3      Q.   Can you recall any other -- I'll strike
4  that.
5          Can you recall any terms of the APA that
6  were discussed?
7      A.   Probably more just generalized terms.
8      Q.   What was said?
9      A.   Just saying generalized terms.  I don't
10 know specifically clauses.  It's been ten years or
11 more.
12     Q.   What about of Amendment 1; anything you
13 remember being discussed in that meeting about the
14 terms of Amendment 1?
15     A.   No.  Not necessarily.  It would have been
16 in broad strokes.  They wouldn't have referenced
17 specific page and line items of an agreement.
18     Q.   What about generally; do you remember what
19 was said about the terms of Amendment 1?
20     A.   I'm not sure on employment what goes from
21 Amendment 1 into the other.  I don't even know if --
22 potentially Amendment 1, I don't think actually was
23 signed at that point.  I may have generalized a
24 little too much in this statement.
25     Q.   Do you remember if, in this meeting, this

16  (Pages 58 to 61)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 62

1  all-hands company-wide meeting, do you remember
2  whether anything was discussed about SVRX royalties?
3      A.   I seriously doubt if they would have
4  gotten that specific at an all-hands meeting.
5      Q.   So do you remember it being discussed?
6      A.   No.  Maybe in general just that there were
7  different items transitioning to SCO and some
8  remaining with Novell.
9      Q.   Do you remember what was said about what
10 SCO would get and what Novell would retain?
11     A.   No.  It's hard to segregate, it's ten
12 years since these meetings occurred, what
13 specifically occurred at which meeting.  And if they
14 did it at an all-hands meeting, they are not going to
15 get into a line-by-line detail of an agreement.
16     Q.   Did you take any notes at this meeting?
17     A.   Not that I remember.
18     Q.   Were there any presentation materials?
19     A.   Possibly.
20     Q.   Do you remember any?
21     A.   Not really.
22     Q.   Any visual aids, do you remember?
23     A.   They usually tended to use them, so I
24 would assume that they did.  But I don't remember any
25 specifically.

Page 63

1      Q.   Okay.  Then in the -- who made the
2  presentation at this company-wide all-hands meeting?
3      A.   There were several people.  There was HR.
4  There was Vice-President of Development.  I can't
5  think of the guy's name.  I can't think of him.  I
6  think there was also, at that point -- no.  Never
7  mind.  But just basically then to answer
8  questions.  And there was, as I said, there was the
9  vice-president, I can't think of his name at the
10 moment, and some other people.  I think they flew in
11 some of the people from Novell out of Utah or
12 California at the time.  I don't remember who,
13 though.  Quite frankly, I usually didn't know them
14 because I never met with them.
15     Q.   Okay.  You then say in your declaration,
16 paragraph 5, "After I became a Santa Cruz employee, I
17 also attended a number of meetings with both Novell
18 and Santa Cruz participants in which the terms of the
19 APA were explained."
20          Can you tell me what meetings you recall
21 in which the terms of the APA were explained?
22     A.   These were the Novell transition meetings.
23     Q.   And tell me how many there were, where
24 were they, when were they?
25     A.   They were usually on Novell's premises.

Page 64

1  This was prior to our splitting up into separate
2  areas of the building.  It was usually in Novell's
3  premises.  I remember a lot of them occurring in Stu
4  Adams's office, several of them occurring in
5  conference rooms.  They were on an as-needed basis.
6  So they were usually one or more times a week.
7      Q.   For what time period?
8      A.   The first couple of months after this APA
9  was signed and the announcement was made.
10     Q.   And who do you remember attending any of
11 these meetings?
12     A.   Various people.  As I said, Stu Adamson
13 [sic] was the assistant controller for the New Jersey
14 location under Novell, usually spearheaded them.
15 Sandy Matheson from Novell in California, I think she
16 was in that office, she would attend via
17 teleconference.  She had a team of people out there.
18 I don't know who.  People on the order of Terry would
19 sometimes sit in, although usually I was doing more
20 of the liaison work there.  Cindy, Barb, various
21 people would kind of come and go on an as-needed
22 basis.  There were some of the general ledger people
23 from Novell there, because it wasn't just the
24 administration that was being discussed.  There was
25 also the fixed assets, employees, pay, transition of

Page 65

1  various assets and liabilities, although not so much
2  the liabilities.  But, well, and also kind of pricing
3  on things.
4      Q.   Can you give me an idea of how many
5  meetings you're referring to in this second sentence
6  of paragraph 5 of your declaration?
7      A.   Quite a few.
8      Q.   Yeah.  How many is that, approximately?
9      A.   I don't know.  Maybe for a couple of
10 months at least once or twice a week.
11     Q.   How many meetings in which the terms of
12 the APA were explained?
13     A.   That was usually the topic of discussion.
14     Q.   Okay.
15     A.   Because the APA was the guiding document
16 for all of the transition between the companies.
17     Q.   And can you remember anything being said
18 in these meetings about the SVRX royalties?
19     A.   Not so much there as more towards the
20 point where we actually were doing the
21 administration.  And then that ended up more as part
22 of the meetings with the Barb, Cindy, myself, and
23 Terry, monthly meetings or more.
24          These other meetings were more how to
25 transition things like computer systems, how to copy

17 (Pages 62 to 65)

Jean Acheson    *    March 20, 2007

Page 66

1  database histories.
2      Q.    Okay.  Ms. Acheson, if you'd look at
3  paragraph 5, the second sentence.
4      A.    Uh-huh (affirmative).
5      Q.    You're referring to a number of meetings.
6      A.    Uh-huh (affirmative).
7      Q.    With both Novell and Santa Cruz
8  participants, right?
9      A.    Yes.
10     Q.    In which the terms of the APA were
11 explained?
12     A.    Yes.
13     Q.    I don't know what meetings those were.
14 Only you do.
15     A.    Right.
16     Q.    In any of those meetings were the SVRX
17 royalties discussed?
18     A.    Yes.  There was some discussions about
19 some of the mechanics which, you know, because as
20 stated before, the APA had been written at a very
21 high level, which was necessary in order to keep
22 everything highly confidential.  So when trying to
23 figure out the mechanics of some of it, it becomes a
24 little hard to interpret what's going on with the
25 actual reality of day-to-day processing of

Page 67

1  transactions.  So as stated, there were some
2  refinements such as like for third-party royalties,
3  services fees, things on that order.
4      Q.    Can you recall any discussions in these
5  meetings about what portion of the SVRX royalties
6  Novell would be entitled to versus what portion SCO
7  would be entitled to?
8          MR. GONZALEZ:  Objection to form.
9      A.    Not really.  Because it was more
10 understood, I think at that time, what SVRX royalties
11 meant.
12     Q.    Was there any discussion in these meetings
13 about what royalties SCO would retain versus what
14 royalties Novell would retain?
15         MR. GONZALEZ:  Objection to form.
16     A.    Could you be more specific?
17     Q.    Yeah.  In these meetings that you're
18 referring to, was there any discussion about what
19 portion of the royalties SCO was going to administer
20 would belong to Novell versus belong to SCO?
21     A.    That's kind of hard to answer because,
22 once again, at that point in time people knew the
23 product lines pretty well between the companies.  So
24 it was understood that UnixWare was SCO's product,
25 that that was being -- was the ongoing development

Page 68

1  product.  It was basically understood.
2          There were discussions, I remember, in
3  regards to the prepayments on UnixWare that Novell
4  had already collected.  And there was some
5  discussions in regards to how SCO -- because Novell
6  -- it's kind of a controversy within revenue
7  recognition, but revenue can only exist once.  So
8  Novell had already recognized the revenue on these
9  transactions, yet SCO was taking over the
10 administration -- well, excuse me.  Bad term.  Was
11 taking over this entire revenue stream and having to
12 basically work with the customer for absolutely no
13 compensation.  So it was how -- but Novell, at the
14 same time, didn't want to have to go and unbook
15 revenue.  So there were discussions around that.  How
16 to work the mechanics of it.
17         And I think in the Addendum 1, there was
18 that attachment on -- excuse me.  Yes.  There was the
19 Attachment B on how to do the specifics.  So that
20 was, I know, something that I remember closely
21 discussing at some of these meetings because it was
22 large.  Things like there was an agreement that was
23 referred to as the TMAC agreement and it was
24 basically a huge, huge amount of revenue at stake.
25     Q.    What about on the issue of SVRX royalty

Page 69

1  streams and who would be entitled to what portion as
2  to SCO versus Novell?
3          MR. GONZALEZ:  Objection to form.
4          You may answer.
5      A.    The SVRX royalties, yes, there was some
6  discussion.  Basically it was we knew that SVRX
7  royalties were the quarterly royalty reports for the
8  ongoing and existing business as transitioned from
9  Novell.
10     Q.    Was there any discussion about which
11 company would be entitled to which portions of those
12 royalty streams?
13     A.    The quarterly royalties belong to Novell.
14         MR. GONZALEZ:  Same objection.  But you
15 can continue.
16     Q.    All of it?
17     A.    Well, within the scope of the APA where
18 SCO was entitled to a 5 percent administrative fee
19 and reimbursement for the third-party royalties.
20     Q.    Was there anything said in these meetings
21 about whether SCO would get to keep royalties for new
22 SVRX licenses?
23         MR. GONZALEZ:  Objection to form.
24     A.    I don't remember anything along those
25 lines.  But once again, it's kind of a moot point

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 70

1  because SCO had no vested interest in developing new
2  SVRX arrangements with customers. The entire
3  emphasis was to establish and go forward with the
4  UnixWare product line. That's what, you know,
5  everybody indicated at all of these various meetings;
6  that Novell was there to support SCO and the
7  development of its product line and its revenue
8  stream. That was not SVRX royalties. It was the
9  UnixWare business line.
10      Q.   Okay. But do you remember any discussions
11  in these meetings about whether SCO would be entitled
12  to keep the royalty stream from new SVRX licenses?
13          MR. GONZALEZ: Objection to form.
14      Q.   Whether or not a lot of them were
15  contemplated, do you remember any discussion about
16  that?
17      A.   No. Because the contemplation was to
18  hopefully transition customers to UnixWare and to
19  move forward with the UnixWare product line.
20      Q.   Do you remember any discussion about who
21  would get to keep royalties from source licenses on
22  new SVRX licenses?
23      A.   At that time, no.
24      Q.   Do you remember discussions on that topic
25  at any time?

Page 71

1      A.   Yes. Later.
2      Q.   With whom?
3      A.   In the meetings with Barb, Cindy, Terry
4  Dulin, and myself.
5      Q.   When were those?
6      A.   Those were probably after February of 1996
7  when we started doing the monthly reporting to Novell
8  as SCO.
9      Q.   And what was said on that topic in those
10  meetings?
11      A.   Well, one incident had come up. I have to
12  remind you that Barb and Cindy were very familiar
13  with the OEMs and with their reporting under the
14  various agreements. And so Cray Computers, who was
15  an OEM at the time, had reported -- and when we would
16  meet at these meetings, I usually brought the source
17  documentation with me. In other words, the OEM
18  reports.
19          And in discussing with Barb and Cindy, it
20  came up in regards to Cray's ability to distribute
21  source code. It was a very unusual situation. Cray
22  had the right to, in essence, sublicense source code.
23  Cray built these big, huge, super computers which
24  were sold often to government agencies such as the
25  CIA or to -- to the CIA or to NSA, various government

Page 72

1  agencies who really didn't like having their name
2  bandied about. They felt that if people knew what
3  they were buying, computer-wise, that it could
4  somehow breach security. So they did not want to
5  sign agreements directly with another entity. They
6  only wanted to deal directly with Cray, because Cray
7  had the security clearances.
8          So what we did is we allowed Cray -- and
9  the government also wanted copies of the actual
10  source code for their purposes. So we allowed Cray
11  to sign source code agreements on our behalf. So the
12  question came up whether these revenues belonged to
13  SCO or did they belong to Novell. And later it was
14  determined that they actually belonged to SCO.
15      Q.   Do you remember any other discussions
16  other than in the Cray context where you talked with
17  Novell personnel about who would be entitled to
18  revenue for new source licenses?
19      A.   I can't remember specific ones. But once
20  again, discussions were among people who knew
21  specifically what the business was, and we may or may
22  not have specifically discussed things on the order
23  of additional source code, like the additional CPUs.
24  Or HP or IBM would ask us to license somebody to be
25  able to see their code under things. And just

Page 73

1  basically was determined that it belonged to SCO. I
2  don't remember specifically where or how, but --
3      Q.   Do you remember any discussions with
4  anyone from Novell about who would get to retain
5  royalties for new SVRX licenses?
6      A.   There were none.
7          MR. GONZALEZ: Objection to form.
8      Q.   Excuse me? There were none what?
9      A.   There were no new product licenses for the
10  SVRX binary royalties that I knew of.
11      Q.   I didn't ask you about binary.
12          MR. GONZALEZ: Objection to form. My
13  objection I think is what I sense may be going on
14  here. You may be using "SVRX licenses" in a way that
15  may be different from what she has in mind. The same
16  with SVRX royalties. I don't know if you are
17  connecting all the time.
18      Q.   (By Mr. Pernick) Well, I didn't mention
19  binaries.
20      A.   Well, they were binaries.
21      Q.   Did you have any --
22      A.   The royalties were on binaries that we
23  were administering from Novell.
24      Q.   No, no, that wasn't my question, though.
25      A.   Okay.

19 (Pages 70 to 73)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 74

1    Q.    Did you have any discussions with anyone
2    from Novell about who would get fees from new SVRX
3    licenses?
4    A.    Then I need to know your definition of
5    SVRX licenses, because your question is not clear to
6    me.
7    Q.    Well, you used the phrase "SVRX licenses."
8    We will have to come back to this.  We
9    have to take a break.
10    (Lunch break was held from 12:16 to 1:38.)
11    Q.    (By Mr. Pernick) Ms. Acheson, do you
12    understand you are still under oath?
13    A.    Yes, I do.
14    Q.    I'd like you to look at paragraph 6 of
15    your declaration, please.  And do you see there in
16    the first sentence you say that, "My understanding
17    from the company meetings and from the course of
18    performance of the parties, in which I participated,
19    was that Santa Cruz acquired the entire ongoing UNIX
20    business from Novell, and only owed Novell binary
21    royalties on the SVRX licenses that were in existence
22    at the closing of the APA."  Do you see that?
23    A.    Yes, I see that.
24    Q.    And is that still your understanding
25    today?

Page 75

1    A.    Yes, it is.
2    Q.    Okay.  So I'm focusing on your
3    understanding that the only thing that Santa Cruz
4    owed to Novell were binary royalties on the SVRX
5    licenses that were in existence at the closing of the
6    APA.  And I just want to ask you what that
7    understanding is based upon.
8    A.    At the time of the Novell transition, the
9    APA, et cetera, it was basically understood among the
10    participants to the discussions that SVRX royalties
11    meant simply the royalties from the binary
12    replications as reported by the OEMs on a quarterly
13    basis from the existing business.  Now, whether we
14    specifically defined that, I don't think it was
15    necessary because the participants at the meetings
16    that I attended basically knew this.
17    Q.    Okay.  But I want to focus you on this and
18    I want to be very precise.  I want you to tell me
19    what your understanding as reflected in paragraph 6
20    was based upon.  If there was some communications you
21    had with Novell or Santa Cruz employees that formed
22    your understanding, I'm asking you to tell me about
23    those.  I'm asking you to tell me about documents
24    you've read that contributed to your understanding.
25    I'm asking you to tell me what contributed to your

Page 76

1    understanding that you've testified to here.
2    A.    Once again, it was the understanding,
3    sitting at these meetings and in discussions, that
4    this was the definition of the SVRX royalties; that
5    it was the ongoing binary replicated product stream
6    from the existing SVRX customers.  And nothing,
7    whether it's in reporting or any discussions, ever
8    contradicted that understanding.  It was never, you
9    know, after certain discussions such as with Cray
10    over the Cray issues or whatever, it just basically
11    even more emphasized that that was the correct
12    understanding.
13    Q.    Okay.  I understand that you had this
14    understanding.  What was said in these meetings?  I
15    want you to tell me precisely who said it and what
16    did they say that gave you this understanding?
17    A.    These meetings were ten years ago.  They
18    were participated in by management from both sides,
19    and any of our discussions never contradicted this
20    understanding.  I cannot give you specific chapter
21    and verse.  I do not remember it that way.  But I do
22    know that in my working relation over the years with
23    Novell, nothing has contradicted this understanding.
24    Q.    Can you tell me who said things that
25    contributed to your understanding on this?  Who?  The

Page 77

1    identity of people.
2    A.    It probably would have been people in our
3    legal group.  I know that, you know, discussions, I
4    had discussions with Burt Levine on various things.
5    I know I had discussions with my boss, Terry Dulin,
6    and with -- part of the discussions in participation
7    were with Stuart Adams.  And I believe -- you know,
8    once again with Cindy Lamont, Barb Cavalla, Sandy
9    Matheson, all from the Novell side.  And it's one of
10    those terms that everybody at that time understood.
11    It was the vernacular that was used in the company
12    that SVRX royalties was this ongoing binary royalty
13    stream from the existing SVRX customers that was
14    reported quarterly.
15    Q.    Mr. Matheson --
16    A.    Sandy was a woman.
17    Q.    What did Sandy Matheson say on this topic?
18    A.    I don't know specifically what she said,
19    but I know that in discussions this was the
20    understanding that was formed by all of us
21    approximately ten years ago or so.  And as I said, in
22    the working relationship since, I have had nothing
23    that contradicts it.
24    Q.    Do you recall generally what she said
25    about this?

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 78

1    A.   No.  Just that in discussing, it was just
2  always around the quarterly reports that were given
3  to us by the OEMs.  That's usually what was
4  discussed.  What format did we want to present that
5  material to Novell in.  So it was just, you know,
6  listing it in a worksheet.  How much detail did we
7  need to give?  It was that kind of thing from -- once
8  again, basically from the quarterly reports.
9    Q.   I'm talking about your understanding here
10 that Santa Cruz only owed Novell binary royalties on
11 the SVRX licenses that were in existence at the
12 closing of the APA.
13   A.   That's correct.
14   Q.   What did Ms. Matheson say on that topic?
15   A.   I'm not saying that she said anything
16 specifically that said that to me.  But it was just
17 the understanding of the parties in all of these
18 discussions that that is what we were reporting on to
19 Novell.  That we were passing through to Novell the
20 monies collected from the OEMs in regards to the
21 quarterly reports for the binary replicated revenues.
22   Q.   What did she say generally on this topic
23 of your understanding as reflected in paragraph 6?
24   A.   You know, more of my discussions were
25 probably with Barb and Cindy.  She was participating

Page 79

1  from afar in some of them.  And Barb and Cindy
2  probably went back to her.  But once again, it was
3  mostly -- the terminology was understood.  So there
4  was nobody sitting there defining, per se.  But it
5  was defined in the absence, because we always
6  discussed the quarterly reports given by the OEMs.
7    Q.   You may be confused here.  I'm not talking
8  about any terminology.  I'm not talking about SVRX
9  royalties as a capitalized term.  I'm just talking
10 about your understanding as reflected in the first
11 sentence of paragraph 6.
12   A.   Uh-huh (affirmative).  And that's where I
13 got it from.
14   Q.   Okay.  What did Barb Carvalla say on this
15 topic of whether Santa Cruz --
16   A.   No.
17   Q.   -- only owed Novell binary royalties on
18 the SVRX licenses that were in existence at the
19 closing of the APA?
20   A.   Well, as I brought up in that one
21 discussion as a case in point in regards to Cray
22 Computers, it was, you know, she eventually agreed
23 with my point that the source code belonged to SCO.
24   Q.   Barb Cavalla, what did she say?
25   A.   I don't know if she said it specifically.

Page 80

1  It was in discussions with Cindy and Barb.  It's a
2  back and forth conversation.  Once again, probably
3  nine or ten years ago.  And I don't remember the
4  specific details.
5    Q.   Do you remember anything generally that
6  Barb Carvalla said to agree on this point?
7    A.   I don't remember.  I just remember the
8  general discussion which was finally followed up with
9  an e-mail forwarded by -- you know, from Cindy,
10 copying Mike Genaro saying that they agreed.
11   Q.   Okay.  So what did Cindy Lamont say other
12 than this e-mail that you just mentioned?
13   A.   Well, she --
14   Q.   Did Cindy Lamont say anything on the topic
15 of whether Santa Cruz only owed Novell binary
16 royalties on the SVRX licenses that were in existence
17 at the close of the APA?
18   A.   Once again, I don't remember specifically
19 what any particular person stated.  Once again, these
20 were just general group discussions around a
21 conference table and, you know, the participants were
22 all discussing the topic.
23   Q.   Do you remember anything that Cindy said
24 other than this e-mail on the topic?
25   A.   No.  I remember at the time she wanted to

Page 81

1  look into it and then concluded that we were correct.
2    Q.   On Cray, you're talking about?
3    A.   Yes.
4    Q.   But other than Cray, do you remember Ms.
5  Lamont saying anything --
6    A.   Not specifically.
7    Q.   -- to indicate that she agreed that Santa
8  Cruz only owed Novell binary royalties on the SVRX
9  licenses that were in existence at the closing of the
10 APA?
11   A.   She always agreed that our revenue reports
12 to Novell were correct.
13   Q.   Is that all?
14   A.   She accepted them as such.  Because if she
15 had found anything in error, she pointed those out to
16 us and we would discuss and correct as required.
17   Q.   Did she know that you had source code
18 SVRX --
19   A.   She would have --
20   Q.   -- royalties that you didn't report?
21   A.   The source code fees, if I may clarify, we
22 only had ones for -- she probably did know because
23 she knew how the customers reported.  Once again, it
24 was a while back.  I don't remember specifically.
25       MR. GONZALEZ:  I don't want to interrupt,

21  (Pages 78 to 81)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 82

1  but I object to the last couple of questions.
2      Q.   Did she know that you had source code fees
3  for new SVRX licenses that you weren't reporting?
4          MR. GONZALEZ:  Objection to form.
5      A.   I guess -- we never had new licenses for
6  the existing customers.
7      Q.   I didn't just ask about existing
8  customers.
9      A.   But as far as I'm concerned, that is where
10 a new source code would have been of meaning to
11 Novell.
12     Q.   Did Ms. Lamont know about the other
13 instances, though, even if you thought --
14     A.   She may or may not have.
15     Q.   To your knowledge did she know?
16     A.   I don't remember.  I know she knew about
17 Cray.  She probably knew -- she knew that we issued
18 licenses for additional CPUs.  She knew that in the
19 relationships with the customers, that customers such
20 as HP or IBM might request reference licenses so that
21 third parties could view their code.  But she never
22 requested anything along those lines.
23     Q.   After the APA were there any new companies
24 to which SCO granted source code SVRX licenses?
25         MR. GONZALEZ:  Objection to form.

Page 83

1      A.   I don't -- new, as far as new licenses for
2  the existing sub -- the existing OEMs, no.
3      Q.   And what about --
4      A.   We never did.
5      Q.   And what about the ones that weren't
6  existing?
7      A.   Yes, some.  Like HP requesting for a
8  Referenced Software License Agreement.  That kind of
9  thing.
10     Q.   Other than HP?
11     A.   IBM would request.  I know we had some
12 other Reference Software Agreements.
13     Q.   Other than HP or IBM?
14     A.   I don't remember who specifically.  I'd
15 have to go back and look.
16     Q.   But are you aware of any -- are you aware
17 of any companies post APA to whom SCO granted source
18 code licenses for SVRX besides HP and IBM?
19     A.   Not as product schedules to a soft or
20 sublicensing agreement, no.
21     Q.   What about beyond that?
22     A.   Some reference agreements as previously
23 stated.
24     Q.   You mean IBM and HP?
25     A.   Some of the customers, I don't know what

Page 84

1  code they wanted to look at.
2      Q.   Did Cindy Lamont know about those?
3      A.   Potentially.
4      Q.   Do you know if Cindy Lamont knew --
5      A.   Not specifically.  But she knew this was
6  part of the ongoing business.  It would have been
7  part of the business prior, and it was still
8  continuing as part of the business.  And I don't ever
9  remember her requesting, either.
10     Q.   So did SCO grant new SVRX source code
11 licenses?
12     A.   Not under a product schedule.  The only
13 thing that was granted were reference software
14 agreements that I know of.
15     Q.   And why wouldn't SCO owe royalties to
16 Novell for those?
17     A.   Well, first of all, we wouldn't --
18     Q.   I said why?
19     A.   Basically source code belonged to SCO.
20     Q.   Well, not for --
21     A.   Source code fees belonged to SCO.  It was
22 the SVRX binary royalties that belonged to Novell.
23     Q.   But not for new licenses?
24         MR. GONZALEZ:  Objection.  Argumentative.
25     Q.   Right?

Page 85

1      A.   No.  Even for new licenses.
2      Q.   Where does it say that for new licenses
3  source code fees belong to SCO?
4      A.   That was the understanding that I was
5  instructed to work under in regard to the APA.
6      Q.   By who?
7      A.   By my management.
8      Q.   Who?
9      A.   Probably Terry Dulin and various folks.
10 And that's the way the understanding was among us.
11     Q.   Who else told you that?
12     A.   Probably discussed with legal, Bill
13 Broderick or Burt Levine, maybe.  I don't remember.
14     Q.   Did Novell ever say that to you?
15     A.   Once again, it may have been part of our
16 discussions with Barb and Cindy.  I don't remember,
17 but ...
18     Q.   Do you know if Novell ever had the
19 understanding that for new licenses, SCO would retain
20 source code fees?
21         MR. GONZALEZ:  Objection to form.
22     A.   I believe they did.
23         MR. GONZALEZ:  Vague and ambiguous, also.
24     Q.   You can answer.
25     A.   I guess maybe I also need a little more on

22 (Pages 82 to 85)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 86

1  definition of what you are trying to ask.
2      Q.   You said you had the understanding that
3  from new SVRX licenses, the source code fees would be
4  retained by SCO.
5          MR. GONZALEZ:  Objection to form.
6      A.   Yes.
7      Q.   And I'm asking you what the basis for that
8  belief is.
9      A.   The belief is the APA had been explained.
10     Q.   And I'm asking by whom.
11     A.   By management.
12     Q.   Did anyone from Novell indicate they
13  agreed with that understanding?
14     A.   I don't remember specifically, but I
15  believe that since it was never objected to, that it
16  was.
17     Q.   Why would they object?  How did they know?
18     A.   Because they knew the business.
19     Q.   What new licenses were they aware of that
20  included source code fees?
21     A.   Such as the Cray.
22     Q.   Cray was not a new license, was it?
23     A.   No, Cray wasn't, but they were licensing
24  new.
25     Q.   It was an additional CPU under an existing

Page 87

1  SVRX license, right?
2      A.   No.  They were --
3          MR. GONZALEZ:  Objection to form.
4  Argumentative.
5      A.   They were actually licensing government
6  agencies.
7      Q.   But they didn't get a new SVRX license,
8  right?
9          MR. GONZALEZ:  Objection to form.  You are
10  not asking questions, are you?  Are you making
11  statements, Counsel?  Sounds like you are making
12  argumentative statements instead of asking a
13  question.
14     Q.   You can answer.
15     A.   How can I answer if it's not a question?
16  I don't understand.
17         MR. PERNICK:  Can you read it back,
18  please.
19         (Record was read as follows:
20         Question:  But they didn't get a new SVRX
21  license, right?")
22     A.   I'm not one hundred percent certain of the
23  legalities of it.  But I don't believe it is an
24  additional CPU, either.
25     Q.   Can you read back my question, please?

Page 88

1          (Question:  But they didn't get a new SVRX
2  license, right?")
3      A.   And I said I don't know.  I'd have to go
4  back and read the agreement with Cray.  I just don't
5  remember on that one.
6          MR. GONZALEZ:  If I can just address the
7  witness, during these quick back and forth questions
8  and answers, take a little moment before you answer
9  in case I want to interject an objection.
10         THE WITNESS:  Okay.  Thanks.
11         MR. PERNICK:  What's the next number,
12  please?
13         REPORTER:  114.
14         (EXHIBIT-114 WAS MARKED.)
15     Q.   (By Mr. Pernick)  114 is an April 26
16  e-mail from Jean Acheson to Cindy L. at Novell.com
17  bearing Bates number SCO 1788879.  I'll ask you if
18  you can read that to yourself, Ms. Acheson.
19         So in the context of Cray, Ms. Acheson?
20     A.   Thank you.
21     Q.   You're welcome?
22     A.   Yes.
23     Q.   Didn't you tell Cindy Lamont that the Cray
24  situation dealt with additional CPUs under an
25  existing SVRX license?

Page 89

1      A.   Yes.  And it does.  Thank you.
2      Q.   Do you recall ever telling her anything to
3  the contrary?
4      A.   No.
5      Q.   So does this actually support your
6  understanding that Santa Cruz only owed Novell binary
7  royalties on the SVRX licenses that were in existence
8  at the closing of the APA?
9      A.   Yes.
10     Q.   How come?
11         MR. GONZALEZ:  Objection.  Argumentative.
12     A.   It also reminds me that while I am not an
13  attorney, that basically this section is the reason
14  why I believe, and it was explained to me, that SCO
15  retained 100 percent of -- it says, "Buyer shall be
16  entitled to retain 100 percent of the following
17  categories of SVRX royalties collected by Buyer."
18  And it says basically the fees attributable to stand-
19  alone contracts for maintenance and support, source
20  code right-to-use fees under existing SVRX license,
21  and source code right-to-use fees attributable to new
22  SVRX licenses approved by seller pursuant to section
23  4.16.
24     Q.   And you told Ms. Lamont that this was
25  covered by little Section 2 here, right?

23  (Pages 86 to 89)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 90

1    A.    That is correct.
2    Q.    You didn't say that SCO was entitled to
3 keep these fees because SCO was entitled to keep all
4 source code fees no matter what, right?
5    A.    Actually, this basically states that we
6 are.
7    Q.    Can you answer my question?
8        MR. GONZALEZ:  I think she is.  Objection.
9    Q.    No.  I was asking about the e-mail to Ms.
10 Lamont.
11    A.    Okay.  In this particular case, no.  This
12 is simply in regards to the Cray case.
13    Q.    And it is simply in regards to Section E,
14 little 2, right?
15    A.    Yes.
16    Q.    It does not address whether SCO was
17 entitled to all source code fees no matter what,
18 right?
19    A.    My e-mail does not.
20    Q.    Does section 1.2 that you just read to me
21 from Amendment Number 1, does it anywhere say that
22 SCO is entitled to keep fees for new SVRX licenses
23 that are not approved by Novell?
24    A.    It is my understanding that new SVRX
25 licenses, as contemplated, as has been explained to

Page 91

1 me, as contemplated in this section, are the new
2 supplements for existing SVRX customers for the new
3 product schedules.  So in other words, if, say, for
4 instance HP who was a 3.2 customer requested a 4.0
5 license, then we would need to update them.  But any
6 permission to so upgrade them.  But in any event, if
7 Novell were to agree, then yes, we would also keep
8 that source code fee.
9    Q.    What if there was an entirely new
10 licensee; does anything in this section say that SCO
11 is entitled to keep those royalties?
12    A.    There's nothing in this section that says
13 that we didn't, because an entirely new customer
14 would be an entirely new customer to SCO.  The only
15 concept was hurting the existing revenue stream that
16 Novell had at that time.  So it was the OEMs that
17 were in existence as of that time.
18    Q.    Ms. Acheson, I understand you need to get
19 out your theme.  I understand that.  But you also
20 need to answer my questions.
21        MR. GONZALEZ:  Objection.  Argumentative.
22        MR. PERNICK:  Can you read back my
23 question, please.
24        MR. GONZALEZ:  If you are asking her
25 whether she can see something or not, I think the

Page 92

1 document --
2        MR. PERNICK:  Counsel, I don't want --
3        MR. GONZALEZ:  Let me --
4        MR. PERNICK:  I don't need you to coach
5 the witness.
6        MR. GONZALEZ:  I'm not coaching.
7        MR. PERNICK:  I just want her to answer
8 without speaking objections, please.
9        MR. GONZALEZ:  Okay.  First of all, we are
10 objecting.
11        MR. PERNICK:  You can object to the form.
12        MR. GONZALEZ:  We are objecting to the
13 same extent and in the same way that counsel for
14 Novell has objected to in this litigation, so I don't
15 think there is anything improper, as you are
16 suggesting, with my objections.
17        Second of all, I'm simply addressing the
18 argumentative nature of the last line of questions.
19 If you want her to simply say that the statement
20 speaks for itself, she can say that.
21        MR. PERNICK:  When you ask her questions,
22 you can say what you want.
23        MR. GONZALEZ:  Again, I made my point and
24 I hope that you treat the witness appropriately.
25    Q.    (By Mr. Pernick)  Okay.  So Ms. Acheson,

Page 93

1 does Section 1.2(c), as reflected in Section E of
2 Amendment Number 1 here, does it say anywhere that
3 SCO is entitled to retain royalties or fees for new
4 companies that sign SVRX licenses?
5        MR. GONZALEZ:  Objection to form.
6        And just for clarification, I don't see
7 that -- I happen to be sitting next to the court
8 reporter.  I think your question said new SVRX
9 licenses, right?  I'm not sure the transcript
10 reflected that.
11    Q.    Let me clarify.  Ms. Acheson, before, you
12 just gave me an answer with a hypothetical.  I think
13 you said HP, I don't remember.  But you talked about
14 if a customer has a 3.2 SVRX license and upgrades to
15 a new license to 4.0.  I'm not talking about that
16 scenario.  I'm talking about a company that did not
17 have an SVRX license.  Post APA they come and sign up
18 an SVRX license.  Does anything in Section E here of
19 Amendment 1 say that SCO is entitled to the fees from
20 such a license?
21    A.    I believe that since it was my
22 understanding, though I'm not an attorney to know the
23 absolute nuances, but it was basically my
24 understanding that an absolutely new customer was a
25 customer to SCO.

24  (Pages 90 to 93)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 94

1      It wouldn't happen.  I mean, it is such a
2  moot concept.  Because usually if a customer wants a
3  product and they come to us, they want the latest and
4  greatest product.  We would have sold them UnixWare.
5      Q.   Does this agreement that we are looking at
6  here, Amendment 1, does it say anything that
7  indicates that the fees in that situation would go to
8  SCO?
9      A.   As stated, I believe that the customer, an
10  absolutely new customer would belong to SCO.
11      Q.   Does the agreement say anything on that?
12      A.   It's not necessarily just this segment.
13  There's all of the segments within the APA itself.
14  It speaks to ongoing.  It is not just one little
15  statement or one little paragraph.
16      Q.   Fine.  But does anything here say anything
17  on that?
18      A.   As I said, it is an agreement in whole.
19  It's not an agreement made up of just one or two
20  little clauses.
21      Q.   Does Amendment 1, Section E say anything
22  on that?
23      A.   Well, there's more to this agreement than
24  Section E, Number 1.
25      Q.   I really need you to answer my question.

Page 95

1  The law requires you to.
2      A.   Specifically in this section, I believe
3  that new SVRX license references a new product
4  schedule to an existing customer.  Therefore,
5  anything else, source code -- maybe it is ambiguous,
6  but the source code at that point, to me, would
7  belong to SCO under my understanding of the entirety
8  of the APA.
9      Q.   If there is a company that --
10      A.   It never -- to me it never happened.
11      Q.   Did it ever happen?
12      A.   No.  We never had a new soft license or
13  sublicensing agreement, that I was aware of, at
14  least.
15      Q.   Okay.  And if there were any and Novell
16  did not approve, would SCO get the royalties?
17      A.   Well, I don't agree that Novell would have
18  had to have approved it.
19      Q.   My question wasn't suggesting they needed
20  to.
21      A.   Yes, I thought it did.
22      Q.   I'm just asking you if there was a new
23  SVRX license --
24      A.   And Novell didn't approve it, you said.
25      Q.   That Novell did not approve, would the

Page 96

1  royalties be obtained by SCO?
2          MR. GONZALEZ:  Objection to form.
3  Incomplete hypothetical.
4      A.   I can't answer that.  I don't know how to
5  answer that.
6      Q.   Well, doesn't Section E of Amendment 1 --
7      A.   Right.
8      Q.   -- only address the situation in sub 3?
9      A.   It addresses a new source code in an
10  existing OEM, is my belief in the interpretation of
11  that.  So what you are saying is a moot point to it.
12  First of all, it never occurred that somebody wanted
13  it, so I can't even answer in the hypothetical.
14  Because it's a situation I would never have
15  contemplated.
16      Q.   I just want to be clear you understand
17  what I'm asking you, because I'm probably not saying
18  it right.  But assume there was a new company that
19  hadn't been a licensee of SVRX before the APA.  They
20  came and they wanted an SVRX license from SCO.
21      A.   Uh-huh (affirmative).
22      Q.   Absent approval by Novell, would SCO,
23  under this agreement, get to retain the fees?
24      A.   I honestly don't know, because it never
25  happened that I know of.

Page 97

1      Q.   But you've testified in your declaration
2  and here today that you had understandings of how the
3  royalty stream was to be handled.  So how would that
4  one be handled?  Who would get the fees?
5      A.   But we discuss these things often as they
6  happened, to make sure that we were clear on them.
7  And I just don't ever remember this one coming up in
8  discussion.
9      Q.   Does this Amendment 1 speak to that
10  situation?
11      A.   I don't believe it does.  I don't believe
12  that 2 or 3 does.
13      Q.   Can you look at paragraph 11 of your
14  declaration.  And this is where you discuss the Cray
15  situation.
16          Have you read that, Ms. Acheson?
17      A.   Yes.
18      Q.   And do you agree with everything it says
19  in paragraph 11?
20      A.   Yes.
21      Q.   Do you see the last sentence where you
22  say, "At that time, Novell and SCO both agreed that
23  SCO - not Novell - was entitled to that payment from
24  Cray because it was for source code and it was not
25  for any distribution of a derivative in binary form"?

25  (Pages 94 to 97)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Page 98

1    A.   Uh-huh (affirmative).
2    Q.   And that's not really what the agreement
3  was, right?
4         MR. GONZALEZ:  Objection.  Argumentative.
5    A.   I think it's the exact same thing.  It
6  was.  It was for source code.  Cray has a derivative.
7    Q.   But it was for a source code for
8  additional CPUs on an existing license, right?
9    A.   Well, yes.  But it's source code.
10   Q.   But there was no agreement that SCO gets
11  all source code fees.  That wasn't --
12   A.   No.  In this particular case it was in the
13  discussion of Cray.  We may have discussed other fees
14  at the time, but I think the concept was that, you
15  know, the source code basically belonged to SCO.
16   Q.   Unqualified?  Source code all belongs to
17  SCO?
18   A.   I don't know if necessarily unqualified.
19  But in these cases, yes.
20   Q.   But based on the correspondence that we
21  just looked at, Exhibit 114 --
22   A.   Yes.  I don't see anything that
23  contradicts.
24   Q.   But the only discussion you had with Ms.
25  Lamont on this issue was that SCO was entitled to

Page 99

1  source code fees for additional CPUs in existing SVRX
2  licenses, right?
3         MR. GONZALEZ:  Objection to form.
4    A.   You know, once again, the discussion
5  probably went to others.  I mean, this is the only
6  piece that is documented at this point.
7    Q.   What about in this piece, though, is the
8  way I said it, right?
9    A.   We may have discussed other things along
10  with it.
11   Q.   But in this e-mail correspondence --
12   A.   Yes.
13   Q.   Okay.  You did not say in this e-mail
14  correspondence that SCO was entitled to the Cray fee
15  because SCO was entitled to all source code fees,
16  period.  Right?
17   A.   No.  It was basically the source code in
18  this particular instance.
19   Q.   Which was for additional CPUs on existing
20  SVRX license, right?
21   A.   That's basically correct, yes.
22   Q.   So do you remember with Ms. Lamont ever
23  having discussions that suggested she agreed that SCO
24  was entitled to keep source code fees for all SVRX
25  licenses without qualification?

Page 100

1    A.   Well, by that time, the existing SVRX
2  customers had basically paid most of their up-front
3  fees.  The only leftover distributions were payments
4  at that time for source code, were these additional
5  CPUs from various customers as well as referenced
6  software which usually was like an additional CPU
7  because it was the request to look at usually
8  somebody else's source code.  There really wasn't any
9  more discussion needed around it, because the
10  hypotheticals never happened.
11   Q.   Okay.  I think the answer to my question
12  then, is no, I think.
13        Can you read my question back please.
14        (Record was read as follows:
15        "Question:  So do you remember with Ms.
16  Lamont ever having discussions that suggested
17  she agreed that SCO was entitled to keep source
18  code fees for all SVRX licenses without
19  qualification?")
20   Q.   (By Mr. Pernick)  If you are saying it
21  never came up so --
22   A.   Without qualification, no.
23   Q.   But you believe that SCO was entitled to
24  all source code fees from SVRX licenses without
25  qualification?

Page 101

1    A.   I believe that we were entitled to any of
2  the source code fees that were paid.
3    Q.   That were paid by?
4    A.   By various customers.
5    Q.   What's the difference between that and
6  what I said?
7    A.   Because I don't know every circumstance
8  out there under which somebody may have
9  hypothetically decided to purchase a source code
10  agreement.
11   Q.   You talked before about how Section E of
12  Amendment 1 is not the entirety of the written
13  agreement between SCO and Novell.  So I'd like you to
14  pull out the APA, please, which I think is Exhibit 1.
15  And I would ask you to look at Section 1.2 (b), which
16  I think is on page 2.  It's got a bottom page 2
17  indication.
18   A.   Uh-huh (affirmative).
19   Q.   I want to know if you believe anything in
20  Section 1.2 (b) suggests that SCO would retain fees
21  for companies that signed post APA SVRX licenses.
22        MR. GONZALEZ:  Objection to form.
23   Q.   Have you read 1.2(b)?
24   A.   Yes.
25   Q.   Is there anything in here that suggests

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 102

1  that for companies that sign post APA new SVRX
2  licenses, that SCO would keep the royalties or fees?
3      MR. GONZALEZ: Objection to form. And
4  also, Counsel, you are looking at 1.2(b). It says in
5  the original the APA Amendment Number 1 supplements
6  Section 1.2(b).
7      MR. PERNICK: I'm just giving Ms. Acheson
8  an opportunity to look at other parts. She said she
9  couldn't read -- that it's not appropriate to just
10  read Amendment Number 1 alone. So I'm asking her,
11  pointing at sections.
12      MR. GONZALEZ: Yes. At the moment you are
13  looking at only 1.2(b) within the original APA. I
14  just wanted to be sure that's clear for the record.
15      MR. PERNICK: That's right now what my
16  question is.
17      MR. GONZALEZ: Okay.
18      A.  Except that, not as an attorney, but it
19  does reference immediately into another section which
20  I feel I need to read in conjunction with this.
21      Q.  Do you mean 4.16?
22      A.  Yes.
23      Q.  I was going to ask you to read that next.
24  You can read that now if you want.
25      A.  Thank you.

Page 103

1      Q.  Does anything in 1.2(b) or 4.16 suggest
2  that the only thing Novell gets in terms of royalty
3  streams are binaries for pre-existing licenses?
4      MR. GONZALEZ: Objection to form. Calls
5  for a legal conclusion.
6      A.  Not as an attorney, but basically as, you
7  know, working with everybody at the time of the
8  transition, the SVRX royalties was basically
9  understood to be the binary royalties as reported by
10  the OEMs that existed at the time of the APA. And
11  basically that they were passing over this stream and
12  that it didn't fall under bankruptcy code so that if
13  we were or if SCO was to go bankrupt, then it would
14  just revert back to Novell. Because the concept was
15  not that the SVRX would be an ongoing business, would
16  be a future business line, but that the efforts of
17  SCO would go to UnixWare and developing the UnixWare
18  business.
19      Q.  Okay. I think you testified just now
20  about your understanding based on discussions.
21      A.  Uh-huh (affirmative).
22      Q.  But I'm asking you if anything in the
23  sections of the APA you just read speak to your
24  understanding that the only thing Novell got in terms
25  of royalty streams was for binaries on pre-existing

Page 104

1  contracts.
2      A.  Yes. But basically SVRX royalties, that's
3  what it meant to everyone at the time was the binary
4  royalty fees collected from the OEMs.
5      Q.  Is there any language in the sections you
6  just read that says that, or suggests that?
7      A.  It says SVRX royalties.
8      Q.  And that's all you can point to?
9      A.  Well, it's kind of the capitalized term.
10      Q.  And does that have a temporal component
11  and a limitation to binary?
12      A.  I don't understand.
13      Q.  So that term is limited to binaries only,
14  for existing licensees only?
15      A.  That's basically, you know -- it says,
16  "For purposes of administering the collection of SVRX
17  royalties, the parties acknowledge that the royalties
18  shall continue to be recognized as royalties." You
19  can't continue to recognize something that does not
20  exist.
21      Q.  And you are pointing in the middle of 1.2
22  (b), the sentence that begins, "For purposes of
23  administering the collection"?
24      A.  Uh-huh (affirmative).
25      Q.  And you're saying that indicates to you

Page 105

1  that Novell would only be entitled to the streams for
2  binary royalties on SVRX licenses that existed at the
3  time of the APA?
4      A.  Yes.
5      Q.  Anything else in the sections you've just
6  read that suggests to you that Novell would only get
7  the royalties for binary streams on SVRX licenses
8  that existed at the time of the APA?
9      A.  Basically in 4.16(a), you know, it says
10  the collection of royalties, fees, and other amounts
11  due under all SVRX licenses. And SVRX licenses can
12  only mean the product schedules attached to
13  supplements under the source code and the
14  sublicensing agreements.
15      Once again, the source code would have
16  already been collected by SCO. This segment later
17  is, from my understanding, amended so that the source
18  code, any other source code fees would go to us. So
19  to me, once again, the only thing that is basically
20  left are binary royalties and late fees, if there
21  were any.
22      Q.  So you are looking at 4.16(b)?
23      A.  Uh-huh (affirmative).
24      Q.  And what language are you saying suggests
25  to you that Novell's right to royalties was only for

27 (Pages 102 to 105)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 106

1  binaries on existing SVRX licenses?
2        MR. GONZALEZ:  Continue to assert an
3  objection because it calls for a legal conclusion
4  when you ask her what the document suggests.
5        But you may answer the question.
6        A.  Well, from what my understanding was
7  through some discussions and things, was that we
8  shall administer the collection of all royalties,
9  fees, and other amounts due under all SVRX licenses.
10  An SVRX license is basically a supplement that has
11  the product schedule attached to it.  And by that
12  time -- so let's say if HP, for instance, and I can't
13  remember exactly their product, but if they were
14  licensed for 3.2, then they have already paid the
15  source code fee for it.  And if they do want
16  additional CPUs, well, it was later amended that it
17  would come to us.  So to administer, it's the royalty
18  fees and maybe some late fees that are due.
19        Q.  You're saying the one-time source code
20  fees would have already been paid as of the time of
21  the APA?
22        A.  Yeah.  The new source code fee, yes.
23        Q.  The new source code fee would not have
24  already been paid.
25        A.  It would have been paid.  So in other

Page 107

1  words --
2        Q.  If it's new?
3        A.  Well, it would have been new at the time
4  that HP wanted that license, for instance.  So the
5  source code fee would have already been paid.  Novell
6  already had that.  So the only thing left to
7  administer and collect would be the binary royalty
8  fees, maybe some late fees if an OEM paid late or
9  paid incorrectly.  And possibly additional CPUs.  But
10  that was amended later to be -- to go under the -- to
11  belong to SCO.
12        Q.  Would the binary fees that had already
13  come due have been paid?
14        A.  Yes.  I'm saying the binary fees we would
15  pay.  The only thing that is left is the binary fees,
16  basically.
17        Q.  But why would the binary fees go to
18  Novell?
19        A.  Because that was what we were
20  administering for Novell.
21        Q.  So at the time of the APA, source code
22  fees that had already been paid are already off the
23  table?
24        A.  Right.
25        Q.  And new source code fees you are saying

Page 108

1  would go to SCO?
2        A.  No.  If an existing OEM -- if an existing
3  OEM had requested for a source code fee, then we
4  would have asked Novell and I believe then it was
5  amended that the source code fee would belong to
6  Novell -- or belong to SCO, if Novell allowed us to
7  sell a new SVRX license to the existing OEM.
8        Q.  And did you always ask Novell in those
9  situations?
10        A.  We never had the situation arise.
11        Q.  So there were no SVRX licensees at the
12  time of the APA who later came and asked for --
13        A.  A new version of SVRX.
14        Q.  -- a new version?
15        A.  Not that I know of.
16        Q.  And if there were any, you would have gone
17  to Novell to ask for approval?
18        A.  I would assume legal would have done that
19  because legal would have drawn the agreement and they
20  would have dealt with that part of the situation.
21        Q.  And that's the scenario you say is covered
22  by Section E of Amendment number 1, little 3.
23        MR. GONZALEZ:  Objection.  Vague and
24  ambiguous.
25        A.  Yes.  Because the little 3 starts with,

Page 109

1  "Buyer shall be entitled to retain 100 percent of the
2  following categories of SVRX collected by --
3  royalties collected by buyer."  And little 3 says,
4  "Source code right-to-use fees attributable to new
5  SVRX licenses approved by seller."
6        Q.  But that situation --
7        A.  And not --
8        Q.  I'm sorry.
9        A.  As I was going to say -- go ahead.
10        Q.  To your knowledge that never came up?
11        A.  To my knowledge, that never came up.
12        MR. GONZALEZ:  Objection.  Vague and
13  ambiguous to that question.
14        Q.  And I just want to make sure I'm clear --
15        A.  It never came up with the existing OEMs.
16        Q.  Right.  And then for OEMs that were --
17  that were not existing, OEMs that later took SVRX
18  licenses but who weren't licensees at the time of the
19  APA?
20        A.  We never --
21        Q.  No such thing?
22        A.  I do not believe we had any such thing.
23        MR. GONZALEZ:  Objection to form.
24        Q.  Okay.  I think we have been going an hour
25  and I know I need a restroom break.

28 (Pages 106 to 109)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 110

1          (Break taken from 2:37 to 2:50.)
2      Q.   (By Mr. Pernick) Okay, Ms. Acheson --
3      A.   Before we begin, I'm not a hundred percent
4   certain, I may have mistakenly said something about a
5   reference agreement being binary royalties.  I didn't
6   mean to.  Reference is a source code agreement.  So
7   if I did make that mistake, I'd just like to clarify.
8   I can't quite remember.
9      Q.   And what reference agreements are you
10  aware of --
11     A.   Any reference agreement.
12     Q.   -- are you aware of that were post APA?
13     A.   There were several.  Customers wanted to
14  look at the SVRX code or the derivative code.
15     Q.   And did you seek Novell's approval on
16  those?
17     A.   No.  Didn't need to, as far as I know.
18  Once again, legal was the one who drew those.  They
19  probably would, if there was any need, speak with
20  Novell.
21     Q.   Were there source code fees for those
22  reference agreements?
23     A.   Yes.
24     Q.   And so how come they weren't due to
25  Novell?

Page 111

1      A.   Because they were a post APA customer,
2   entirely new, and did not fall under the existing
3   SVRX licenses.
4      Q.   Are they additional CPU licenses?
5      A.   No.
6      Q.   So where are they addressed in the APA
7   documents?
8      A.   I'm not one hundred percent certain where
9   specifically.  But it was basically the
10  understanding, and what was communicated to us, was
11  that basically that SCO -- part of the reason for
12  this entire administrative setup was that SCO did not
13  have the money to buy out the entire revenue stream,
14  the binary royalties stream for the SVRX products.
15  It was quite considerable at that time.
16          And subsequently, while everything else
17  throughout the APA and throughout the relationship
18  was transferred over to SCO, and everybody understood
19  it to be, that this one revenue stream was not able
20  to be transferred because SCO could not purchase it.
21     Q.   Are the reference agreements that you
22  referred to, are they addressed in Amendment 1,
23  Section E?
24     A.   Well, basically it's not addressed because
25  it is a new customer entirely to the arrangements.

Page 112

1   So that customer then belonged to SCO.
2      Q.   So these are new customers?
3      A.   Yes.
4      Q.   Are you --
5      A.   It's not a new SVRX license to the
6   existing customers there were out there at the time
7   that Novell transferred the product lines over to
8   SCO.
9      Q.   Did Novell know about these agreements?
10     A.   I do not know.
11     Q.   Are you aware of any indication that
12  Novell knew about these agreements?
13     A.   Except that the people who we were in
14  contact with Novell at the time of transition knew
15  about the business and knew how it worked.
16     Q.   But did Novell know about you entering
17  into any of these reference agreements?
18     A.   I do not believe I had direct
19  communication in regards to them.
20     Q.   Well, still, you might know that someone
21  else told them about a reference agreement.  So it
22  doesn't answer my question.
23     A.   I do not know.
24     Q.   Okay.  So Ms. Acheson, I'm still focused
25  on your statement in paragraph 6 of your declaration

Page 113

1   where you say it was your understanding that the only
2   revenue stream from SVRX licenses that Novell was
3   entitled to were the binary royalties on the SVRX
4   licenses that were in existence at the closing of the
5   APA.
6      A.   Uh-huh (affirmative).
7      Q.   And I just want to know if you ever
8   expressed that you had that understanding to anyone
9   at Novell.
10     A.   I believe I have.  Once again, in
11  conversations with the transition team, I believe
12  that this conversation took place.  And I also
13  potentially -- I believe, too, that with the
14  auditors, Novell internal auditors, that we may also
15  have had this discussion.  I'm not one hundred
16  percent certain because I didn't have all the
17  dealings in the original one.
18     Q.   So in the transition meetings, can you
19  recall ever indicating that you had this
20  understanding?
21     A.   Well, I think it was that the discussions
22  centered around that SCO could not afford to purchase
23  the binary product line, the revenue stream from the
24  binary royalties, and that was the reason for
25  entering into the administrative arrangement.

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 114

1    Q.   Did anyone in those transition meetings
2  say that they also had the understanding that
3  Novell's rights were limited to binaries for
4  pre-existing SVRX licenses?
5    A.   I believe that was the discussions that we
6  had.
7    Q.   Who said that and when and where?
8    A.   Well, I don't remember -- as stated
9  before, I don't remember specifically.  These were
10 general discussions that we were having in a room
11 full of people.
12   Q.   Can you remember any in this room full of
13 people, any person who said it?
14   A.   Not specifically, no, I can't.
15   Q.   And what about with the auditors; can you
16 remember this coming up and this being expressed that
17 the only thing SCO needed to pay were binary
18 royalties on pre-existing licenses?
19   A.   I don't know if it was basically stated
20 that way, but they were satisfied with the reports as
21 given to Novell.
22   Q.   How was it stated, then?  Was it stated in
23 another way but substantially the same?
24   A.   No.  Basically in its absence.  They never
25 questioned for it.

Page 115

1    Q.   Why -- would they have expected that you
2  were withholding some post APA source royalties?
3    A.   No.
4    Q.   So why would it have come up?
5    A.   Well, they would have understood the
6  agreements and things that were out there.  They
7  would have asked.
8    Q.   But you've told me that there was no
9  expectation that there would be any source royalties
10 for post APA licenses, right?
11        MR. GONZALEZ:  Objection, mischaracterizes
12 her testimony.
13   A.   Yeah, because I don't think I quite said
14 that.
15   Q.   What did you say?
16   A.   I said that there probably -- I think I
17 said basically that the OEMs might not get new or we
18 wouldn't have new customers requesting a full soft
19 and sublicensing agreement.  I think it was known
20 that there would be additional CPUs or these
21 Reference Software Agreements.
22   Q.   On pre-existing, you mean?
23   A.   No.  Well, pre-existing --
24   Q.   So new licensees?
25   A.   Well, pre-existing as far as the

Page 116

1  additional, because you can't get any additional if
2  it isn't already pre-existing.  But, you know, the
3  reference agreements were on new customers, or were
4  requested by old customers for new customers.
5    Q.   What didn't the auditors ask you for that
6  suggests to you that they had the same understanding
7  as you?
8        MR. GONZALEZ:  Objection to form.
9    Q.   You just said that their silence on a
10 particular topic suggested to you that they agreed
11 with your understanding, right?
12   A.   Yeah.  It's more in the absence; that they
13 didn't ask to audit, they didn't ask for
14 documentation that I remember.
15   Q.   On what, though?  They didn't ask to audit
16 what?  Their silence on what indicated to you that
17 they agreed with your understanding?
18   A.   On source code fees.
19   Q.   Which source code fees?
20   A.   Source code fees in general.
21   Q.   Well, for existing customers on additional
22 CPU licenses?
23   A.   In general.  It could have been any
24 category of source code fee.
25   Q.   But you considered it uncontroversial --

Page 117

1  tell me if this is right.  You considered it
2  uncontroversial that SCO retained additional CPU
3  source fees for licensees that existed at the time of
4  the APA?
5    A.   Yes, I believe so.
6    Q.   So Novell's auditor's silence on that
7  wouldn't have been surprising, right?
8    A.   Correct.  But there are other categories
9  of source code fees.  And I think -- I don't remember
10 them asking about anything.
11   Q.   Like which ones?
12   A.   Like, for instance, the reference software
13 and if hypothetically there were new -- if an
14 existing OEM had requested a new version of SVRX.
15   Q.   There were no such ones, right?
16   A.   No.  Not that I know of.
17   Q.   And you didn't expect there to be any post
18 APA, right?
19   A.   No.
20   Q.   So why would the auditors have been asking
21 about that?  No one expected it?
22   A.   Well, precisely, or also because they are
23 auditors.  Auditors have a tendency to question
24 everything.  That's their job.
25   Q.   But you didn't expect there to be any of

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 118

1  those new version licenses?
2     A.  Of course not.  Our job was to sell
3  UnixWare and to further the business under UnixWare,
4  and of course the ongoing business of SCO which was
5  Open Server.
6     Q.  And you've no evidence that Novell was
7  aware of these reference agreements?
8     A.  I don't know one way or the other.
9     Q.  And what are the reference agreements?
10    A.  They basically allow somebody to look.
11 It's very, very limited rights to look at the source
12 code.  They can't do anything to it.  They cannot
13 replicate it.  They cannot make any changes to it.
14 Just a very, very limited right to look at the code.
15    Q.  And are those SVRX licenses under the APA?
16    MR. GONZALEZ:  Objection.  Calls for a
17 legal conclusion.
18    Q.  You can answer.
19    A.  Well, based on the concept that I'm not a
20 lawyer, my understanding that SVRX licenses under the
21 APA, as it's been explained, is basically the
22 licenses that existed with the product schedules
23 under the soft and SLA agreements existing at the
24 time.
25    Q.  So you don't think these were SVRX

Page 119

1  licenses under the APA?
2     A.  No, I do not.
3     Q.  So why --
4     A.  Not as such.
5     Q.  But why do you think the Novell auditors
6  should have been asking about them?
7     A.  No.  Just that auditors ask for different
8  things.
9     MR. GONZALEZ:  Just to be clear, I object
10 to the grounds that you mischaracterized her
11 testimony.
12    Q.  Okay.  Is there anything else you can
13 remember -- strike that.
14    Are you aware of any instances other than
15 what you mentioned where you expressed to Novell your
16 understanding that its rights to royalties were
17 limited to binary streams from pre-existing SVRX
18 licenses?
19    A.  Once again, at the time and even on a
20 go-forward basis, it was just something that was
21 understood at the time.  That the reporting, the
22 monthly reporting with Novell was in regards to the
23 quarterly reports that were submitted by the OEMs in
24 regards to the binary replicated revenue units that
25 they did.

Page 120

1     Q.  So you reported to them -- how is that you
2  expressing your belief that the only thing Novell got
3  was binaries for pre-existing contracts?
4     A.  Yes.  It's the replicate -- they have the
5  right to replicate, to compile the source code, their
6  derivative work, and compile it into binary format
7  and distribute it to their customers.
8     Q.  Who has this right?
9     A.  The OEMs.
10    Q.  Yeah.
11    A.  Under the existing SVRX licenses at the
12 time of the APA.
13    Q.  I thought we were talking about some
14 communication where you indicated to Novell your
15 understanding --
16    A.  No.  I'm saying that it was just simply
17 understood that that's what it was at that time.  Any
18 time -- you know, it was just one of those things
19 that was understood.
20    Q.  But can you identify any communications
21 where that understanding was communicated?
22    A.  It was just in any discussion.
23    Q.  Can you name any of them?
24    A.  It was never questioned in the transition
25 meetings, in the meetings with Cindy and Barb, that

Page 121

1  basically it was the ongoing binary revenue royalty
2  stream.
3     Q.  Can you name a person who said that?
4     A.  It's hard to say.  It's been ten years.
5  That was just the general understanding.  That's what
6  I believed.  And I believe that's what my management
7  believed, as well, and what we worked under.
8     Q.  Not just ten years ago.  In the time past,
9  since then.
10    A.  Well, we have been working under the same
11 circumstances on an ongoing basis.  We have not
12 changed our format, and we have continued to report
13 as required.
14    Q.  But when was the understanding expressed
15 out loud?
16    A.  I think it's just always been generally
17 agreed upon.  It was never questioned.
18    Q.  But when was it expressed?
19    A.  Once again, it was as -- just generally
20 understood.
21    Q.  Can you identify any times that that
22 understanding was expressed out loud?
23    A.  As I said, I vaguely remember or I
24 basically remember that it was during transition
25 meetings.  We had some discussions, or during, you

31 (Pages 118 to 121)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 122

1  know, some of the meetings with Barb and Cindy. And
2  then after a while it wasn't discussed because there
3  was nobody left at Novell to discuss it with. So we
4  just continued the normal monthly reporting, and
5  Novell just kept accepting the reports and we never
6  received any comments back from Novell in regards to
7  them.
8      Q.  But the reports never said anywhere, "You
9  guys are not entitled to any fees for post APA
10 agreements," right?
11     A.  Well, of course not, because the reports
12 were developed in an agreed-upon format in
13 conjunction with Barb and Cindy, and that's what we
14 used from that point on. If you look at the reports
15 over the years, they have changed very little.
16     Q.  But do the reports put Novell on notice
17 that you believed Novell was not entitled to any fees
18 for post APA SVRX licenses?
19         MR. GONZALEZ: Objection. Calls for legal
20 conclusion.
21     A.  I don't think it would be my position to
22 notice Novell on anything.
23     Q.  I didn't say it was. But you can answer
24 my question. Do you think the reports indicated
25 anywhere to Novell that you believed Novell had no

Page 123

1  rights to any post APA --
2      A.  The reports simply reported the binary
3  royalties revenues to Novell.
4      Q.  Okay. Did the reports, though, indicate
5  anywhere that you believed that Novell's rights to
6  royalties were limited to binaries only for licenses
7  that existed at the time of the APA?
8      A.  Why would they? This is the report, the
9  monthly report. No, it didn't.
10     Q.  Didn't say that, right?
11     A.  No.
12     Q.  Never suggested it?
13     A.  No.
14     Q.  Wouldn't have caused Novell to know that
15 you had that belief, right?
16     A.  I don't know. As I said, the reports were
17 developed in conjunction with Novell personnel in
18 order to administer the royalty revenue stream under
19 the APA.
20     Q.  You understand that the parties dispute
21 whether Novell is entitled to royalties for source
22 code fees for SVRX licenses entered after APA, right?
23         MR. GONZALEZ: Objection to form.
24 Mischaracterizes the dispute between the parties.
25     Q.  Do you understand that that's one issue in

Page 124

1  dispute?
2      A.  I guess. I'm not one hundred percent
3  familiar with all of the nuances of the case.
4      Q.  And do you think the royalty reports
5  indicate that you believed that Novell was not
6  entitled to any post -- any licenses post APA?
7      A.  I just believe --
8         MR. GONZALEZ: Objection to form.
9         Go ahead.
10     A.  I just believe that the reports were
11 developed to best report the royalty revenue stream
12 to Novell, and I did it in conjunction with my boss,
13 Terry Dulin, and with Cindy Lamont and Barb Cavalla,
14 all of whom knew exactly what the relationship was
15 and basically all understood it together.
16     Q.  Okay. You brought up the reports. I
17 asked you whether you remember ever expressing to
18 Novell your understanding that its right to royalties
19 was limited to binaries only for licenses that
20 existed at the time of the APA. I asked you that and
21 you brought up the reports.
22     A.  Well, that's what the reports always gave
23 them.
24     Q.  But how did the reports indicate that you
25 believe that was all Novell was entitled to?

Page 125

1      A.  Because that's all I ever reported to
2  them.
3      Q.  But does it suggest anywhere that if other
4  royalties came due, or --
5      A.  There weren't others.
6      Q.  -- or were paid to SCO, that Novell wasn't
7  entitled to them?
8      A.  No. The reports were inclusive. I can't
9  report a hypothetical that wasn't there.
10     Q.  And so the reports did not indicate your
11 belief that if there were new licensees after the
12 APA, that Novell would not get those royalties?
13         MR. GONZALEZ: Objection to form.
14     A.  Once again, to me the reports reported
15 exactly what I needed to report to Novell.
16     Q.  So they were silent -- am I right that
17 they were silent as to your belief that if new
18 licensees came along after the APA, that Novell would
19 not be entitled to binaries or source royalties from
20 those agreements. Am I right?
21         MR. GONZALEZ: Objection to form.
22     A.  Once again, they included what I believed
23 was necessary to report to Novell.
24     Q.  So can you tell me if what I said is
25 right?

32 (Pages 122 to 125)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 126

1    A.   The reports included what I believed was
2 right to report to Novell, and I did not include
3 anything else in them.
4    Q.   That doesn't answer my question, though?
5    A.   I believe it does.
6        MR. PERNICK:  Can you read back my
7 question, please.
8        (The record was read as follows:
9        "Question: So they were silent -- am I
10    right that they were silent as to your belief
11    that if new licensees came along after the APA,
12    that Novell would not be entitled to binaries or
13    source royalties from those agreements.  Am
14    I right?")
15    A.   Since the situation never occurred, we
16 never included them.  So I guess from that basis, you
17 are correct.
18    Q.   (By Mr. Pernick)  Can you look at
19 paragraph 7 of your declaration, Ms. Acheson, and
20 read it to yourself.
21    A.   Uh-huh (affirmative).
22    Q.   Can you explain -- you are saying in this
23 paragraph 7 you further understood that your
24 understanding about what Novell owed or what Novell
25 was entitled to made sense because the only two

Page 127

1 remaining sources of revenue from existing SVRX
2 licenses were, and then you identified two
3 categories.
4    A.   Uh-huh (affirmative).
5    Q.   But what -- can you explain to me your
6 chain of reasoning in this paragraph?
7    A.   Well, if you have the existing OEMs with
8 existing licenses, then the only thing they really
9 can report under those licenses, in accordance with
10 the product schedule, my understanding is they can
11 report -- well, there's a few things, but the only
12 ones that are going to be revenue bearing are the per
13 copy fees from their replication of their source code
14 and binary format.  And if they decide they need
15 another copy of the source code.  Anything else that
16 they could do -- they could also transfer source code
17 from one server to another server, but that would not
18 be royalty bearing.  That would not have a fee
19 associated with it.  So there really is only two
20 things that an existing could do under the existing
21 licenses.
22    Q.   So the first thing you mentioned, you said
23 they can report on replication per copy fees.
24    A.   Uh-huh (affirmative).
25    Q.   Is that the binary royalty?

Page 128

1    A.   Yes.
2    Q.   And then the second thing you mentioned is
3 they can make another copy of the source code; is
4 that an additional CPU issue?
5    A.   Yes.
6    Q.   Okay.  I'm with you.  You say for existing
7 OEM licensees with existing licenses, there are those
8 two types of royalty-bearing events.
9    A.   Uh-huh (affirmative).
10    Q.   So your paragraph 7, what are you saying
11 next?  What's the logical, what's the causal
12 analysis?
13        MR. GONZALEZ:  Objection to form.
14    A.   Well, since they were existing, any of
15 the major source code fees, what would be the
16 quote/unquote new source code fee would have already
17 been paid to Novell prior to the APA.
18    Q.   What does that mean?
19    A.   Well, in order to get a new supplement,
20 you have to pay for it.  You have to pay an initial,
21 I believe they called it under the product schedule,
22 an initial source code fee or something.  Some such
23 thing.  And this would have already been paid in
24 order for it to be -- to be the existing SVRX
25 license, it would have to have been already paid.

Page 129

1 That initial source code fee would have already been
2 paid to Novell.
3    Q.   You are saying by definition an existing
4 licensee would have already paid its one-time fees?
5    A.   Yes.  That's correct.
6    Q.   And what's the logical inference from
7 that?
8    A.   Well, there wouldn't have been any -- just
9 basically that.  That is the inference.  That the
10 major fee has already been paid to Novell.
11    Q.   But how does that buttress your
12 understanding?
13    A.   Because then the only thing that's left is
14 the binary royalty stream or additional CPUs under
15 the existing licenses at the time.
16    Q.   And one of those would go to Novell and
17 one of those would go to SCO.
18    A.   That is correct.
19    Q.   How does that -- but you are just saying
20 that's what the parties agreed to.
21    A.   Yes.  That was basically the understanding
22 at the time of the APA.
23    Q.   But you said, "I further understood that
24 this made sense because --" I mean, it sounds like
25 you are stating there is a separate basis for --

33 (Pages 126 to 129)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 130

1    A.   Well, I'm saying my understanding from
2  company meetings and from the course -- I mean, the
3  paragraph doesn't stand on its own.  It starts with
4  some of the other paragraphs within my declaration.
5  So it is saying, "I further understood this because,"
6  you know.  It made sense to me because you have your
7  existing SVRX licensees at the time of the APA.  So
8  if, for instance, HP is reporting under their 3.2
9  SVRX license, then they are not going to pay another
10  initial source code fee for it.  They have already
11  paid that.
12    What they are going to pay is either the
13  binary royalties, as they replicate each quarter, or
14  they are going to decide that they need another copy
15  of the source code and pay an additional CPU fee.
16  One or the other.  The binary royalty clearly
17  belonged to Novell, and the source code fee clearly
18  belonged to SCO.
19    Q.   But just because that's what the parties
20  agreed to, right?
21    A.   Yes.  That was the transaction.  I believe
22  we understood that, and that we agreed.
23    Q.   But there's nothing inherent about the
24  fact that those are the two remaining significant
25  royalty-bearing events that indicates the binaries

Page 131

1  would go one way and the source would go the other
2  way.  That's what the parties agreed to, you believe.
3  But there's nothing inherent about those scenarios --
4    A.   I don't understand the use of "inherent."
5    Q.   Well, I'm trying to understand.  I
6  understand in the previous paragraphs you said you
7  believe that's what the parties agreed to.
8    A.   Yes.
9    Q.   I thought in paragraph 7 you're saying,
10  "An additional reason my understanding made sense
11  is," and you've laid out an explanation?
12    A.   Uh-huh (affirmative).
13    Q.   But now it sounds like you are telling me
14  that no, I only believed that there was some
15  dichotomy and the parties agreed to split it that
16  way.
17    A.   Well, it's my belief the relationship was
18  in regards to, that through these explanations, and
19  it just made sense because this is the -- this is
20  basically the revenues that are left.  You either
21  have the binary royalty stream or any of the source
22  code fees from the additional CPUs.
23    Q.   Okay.  And the parties agreed, you
24  believe, to split those.
25    A.   I believe that's the entire -- what the

Page 132

1  entire relationship has been.
2    Q.   Of course these scenarios in paragraph 7,
3  they say nothing about sources of revenue for
4  licenses entered into after the date of the APA,
5  right?
6      MR. GONZALEZ:  Objection to form.
7    A.   I believe that the basic concept was to
8  preserve the existing binary revenue stream for
9  Novell, and that that belonged to Novell.  And
10  anything that was new and occurred after the fact did
11  belong to SCO.  But there wouldn't have been new SVRX
12  under a soft and SLA agreement because, once again,
13  SCO's interest was in developing the UnixWare
14  business.  If a customer had wanted source code, we
15  would have tried to interest them in using UnixWare
16  source code.
17    Q.   Okay.  But I'm just saying this paragraph
18  is silent on the revenue streams for licenses entered
19  into after the APA, right?
20      MR. GONZALEZ:  Objection to form.
21    Q.   It just doesn't address those, right?
22    A.   It basically addresses what I understood
23  to be the relationship in the revenue, the existing
24  revenue stream at that time where binary belonged to
25  Novell and source code belonged to SCO.  This

Page 133

1  basically states in regards to the existing OEMs
2  reporting.
3    Q.   And it's silent on the issue of revenues
4  from future SVRX licenses, right?
5      MR. GONZALEZ:  Objection to form.
6    A.   It basically wasn't contemplated.
7    Q.   Paragraph 7 doesn't speak to those, right?
8    A.   No, it does not.
9    Q.   I think you just said in one of your
10  answers that there was no expectation of source
11  revenue from product supplements and -- what did you
12  say?  I don't want to mischaracterize your testimony.
13    A.   I'm sorry.  Could you repeat?
14    Q.   There was an answer a block, a full
15  paragraph that Ms. Acheson said -- maybe two or three
16  answers ago you said, Ms. Acheson, "I believe that
17  the basic concept was to preserve the existing binary
18  revenue stream for Novell and that that belonged to
19  Novell and anything that was new and occurred after
20  the fact did belong to SCO.  But there wouldn't have
21  been new SVRXs under a soft and SLA agreement
22  because, once again, SCO's interest was in developing
23  the UnixWare business."  So you said there wouldn't
24  have been new SVRX under a soft and SLA agreement?
25  What does that mean?

34 (Pages 130 to 133)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 134

1     MR. GONZALEZ: Objection to form.
2     A.   Basically in the old SVRX world, when a
3  customer wanted to develop their own operating system
4  or what was, I believe, characterized as their own
5  derivative work, AT&T and later UNIX System
6  Laboratories and Novell would enter into a soft
7  agreement and an SLA first of all with that customer.
8  Now, these were just very basic agreements which only
9  contained very general Ts and Cs for the
10 relationship.  The actual meat of the agreement was
11 the minute that they purchased any one of the source
12 code licenses, at which point they would sign a
13 supplement with that product schedule attached to it.
14    Q.   And you said there wouldn't have been new
15 SVRXs under that --
16    A.   No.
17    Q.   -- under that scheme?
18    A.   No.  With the exception of a few customers
19 that wanted the ability to simply look at code, there
20 wouldn't be.  Because once again, SCO's interest was
21 not in developing the SVRX product line.  SCO's
22 interest was in developing the UnixWare product line.
23    Q.   So would there have been new SVRX under
24 other -- I mean, you said there wouldn't have been
25 new SVRX under soft agreements and SLA.  But would

Page 135

1  there have been new SVRX in other embodiments?
2     A.   No.
3        MR. GONZALEZ: Objection to form.
4     Q.   You qualified the answer and that's why I
5  was asking.
6     A.   No.
7     Q.   Okay.
8     A.   Because SVRX was sold in that other
9  scheme, as far as I know.
10    Q.   You mentioned IBM before, and I don't
11 remember what you said exactly, but I know you
12 mentioned IBM.  Are you aware of Amendment X between
13 IBM and SCO and Novell?
14    A.   Yes, I am aware of the situation.
15    Q.   And what was the situation?
16    A.   It was my understanding that after the APA
17 had occurred, Novell negotiated a buyout of the
18 royalty stream with IBM without letting SCO know
19 about it.  We basically discovered that, and I think
20 it was in my group, we weren't receiving royalty
21 reports.  So we called IBM to find out what was
22 happening and that is when we -- or at least one of
23 the ways that we learned that IBM had this buyout
24 arrangement with Novell.
25    Q.   Did the buyout give IBM rights to source

Page 136

1  code in addition to binary code?
2        MR. GONZALEZ: Objection to form.  Are you
3  talking about the Novell buyout that she just
4  testified to or the amendment X buyout?
5        MR. PERNICK: Amendment X.
6     A.   I'm not really an attorney and I'm not
7  quite sure of this.  So I think maybe if I -- and I
8  think there was some changes.  I'm not a hundred
9  percent sure to what or why.
10    Q.   But you think there were changes to what?
11    A.   To some of the -- to some of what IBM
12 could do with source code.  I'm not sure, though,
13 exactly what those changes were.
14    Q.   I'm sure this has been marked, but I don't
15 know the number.  115 will be Amendment X between
16 IBM, the Santa Cruz Operation, and Novell, bearing
17 Bates numbers SCON 6336 through SCON 6345.
18        (EXHIBIT-115 WAS MARKED.)
19    Q.   And Ms. Acheson, you can read as much of
20 this as you want.  I was going to focus you on
21 Section 3, which has a couple of subsections.  But I
22 was going to focus you on that section in particular.
23        MR. GONZALEZ: Section 3 you said,
24 Counsel?
25        MR. PERNICK: Right.

Page 137

1     A.   Okay.
2     Q.   (By Mr. Pernick) So Ms. Acheson, does
3  looking at this document refresh your recollection
4  that Amendment X did confer on IBM rights relating to
5  software?
6     A.   To source code.
7     Q.   Source code.  Sorry.
8        MR. GONZALEZ: Objection.  Calls for legal
9  conclusion, but you may answer.
10    A.   Yes.  Once again, without being an
11 attorney, it does sound like they were given certain
12 rights, certain limited rights that was above and
13 beyond the normal rights given in the normal SVRX
14 licenses for product schedules.
15    Q.   Just to be clear, are you saying that
16 you're understanding this from reading it now, but
17 you have never heard of this before?  Or do you
18 remember this to have come up and you knew it also
19 before and this refreshes your recollection?
20    A.   This is more refreshing the recollection.
21 It was signed back in 1996.
22    Q.   Right.  And do you see that in Section 4,
23 which is on the page that ends with Bates number
24 6340, it talks about consideration, and that IBM was
25 to pay SCO a nonrefundable fee of $10,125,000 in two

35 (Pages 134 to 137)

Jean Acheson    *    March 20, 2007

Page 138

1  payments?  Do you see that?
2      A.   Yes, I do.
3      Q.   Okay.  I'll mark as 116 a document
4  entitled Revenue to Cash Reconciliation and
5  Computation of Balances Due to SCO for November, '96,
6  bearing Bates numbers NOV 9958 through NOV 9960.
7          (EXHIBIT-116 WAS MARKED.)
8          MR. GONZALEZ:  This is 116?
9          MR. PERNICK:  Right.
10         MR. GONZALEZ:  Thank you.
11     Q.   (By Mr. Pernick)  Do you recognize this
12  document, Ms. Acheson?
13     A.   Yes.  This is part of a monthly report
14  that we would have prepared and given to SCO, or to
15  Novell, excuse me.
16     Q.   The front part?
17     A.   Yes.  This would usually have been the
18  first page and then these are the next or this is one
19  of the supporting documents.
20     Q.   And at least these portions, do they look
21  like they are in the format of those that SCO kept in
22  the regular course of business?
23     A.   Yes.
24     Q.   And are these revenue reports that you had
25  responsibility for maintaining and generating?

Page 139

1      A.   Yes.
2      Q.   So do you see in the -- there's a middle
3  section, Basis of Administrative Fees.  And there's a
4  line in there for IBM buyout and it says $4,860,000.
5  Do you see that?
6      A.   That is correct.
7      Q.   And does that correspond to the
8  consideration section in Amendment X and the first
9  payment called for by that Amendment X?
10     A.   Yes, it does.
11     Q.   And so based on the Revenue to Cash
12  Reconciliation document, does it look like SCO paid
13  to Novell the entirety of the first payment from IBM?
14     A.   No, it does not.
15     Q.   Why not?
16     A.   Because if you look in the section above,
17  we removed the $750,000 IBM payment retained by SCO.
18     Q.   So you think --
19     A.   The basis of administrative fee was simply
20  to calculate the 5 percent.
21     Q.   So what was the $750,000?
22     A.   That was an additional payment to SCO for
23  a few reasons.  The actual entire payment was $1.5
24  million plus 5 percent of the entire $10,125,000.  So
25  that would be approximately $2 million.  And the

Page 140

1  reason for it was two-fold.  First of all, by -- when
2  SCO purchased the UNIX business from Novell, they
3  anticipated a certain revenue stream which included
4  the 5 percent administrative fees --
5      Q.   Who is "they"?
6      A.   SCO.  SCO anticipated a certain revenue
7  stream which included the 5 percent administrative
8  fee on ongoing business from the SVRX royalties.  In
9  addition, the agreement as stated did give certain --
10  you know, Amendment X did give certain additional
11  source code rights to IBM.  So in consideration of
12  both of those, Novell agreed to allow SCO to deduct
13  an additional $1.5 million from the total payment of
14  $10 million in addition to the 5 percent
15  administrative fee.
16     Q.   But you calculated the 5 percent
17  administrative fee off the entire IBM payment, right?
18     A.   That is correct.  Because we were entitled
19  to a settlement of $2 million on this entire -- it
20  was $2 million plus change.  So basically they
21  allowed us the 5 percent and then they paid us back.
22  They gave us $1.5 million for the future
23  considerations issue as well as for source code
24  allowances within Amendment X.
25     Q.   Why didn't the 5 percent just come off of

Page 141

1  what Novell was actually getting paid?
2      A.   I do not know.  I was not part of the
3  negotiations for how much Novell was paying us for
4  this.
5      Q.   But are you saying that -- I mean, the
6  payment retained by IBM, the 750 K and this --
7      A.   No, it was not a payment retained by IBM.
8      Q.   I mean by SCO, thank you.
9      A.   Yes.
10     Q.   The payment retained by SCO, which on this
11  November 1996 spreadsheet is 750 K, that was for
12  settlement of a dispute, correct?
13         MR. GONZALEZ:  Objection.  Calls for legal
14  conclusion.
15     Q.   Is that your understanding?
16     A.   I believe I already stated my
17  understanding; that that was partial payment for the
18  considerations for source code within Amendment X as
19  well as the potential, the lost revenues.
20     Q.   The lost revenues were only for binaries
21  though, right?
22     A.   Or it could have also been for additional
23  CPU fees.
24     Q.   Right.
25     A.   It could also have been for, if they are

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 142

1  allowed 50 -- how do they characterize it? Excuse
2  me. If they are allowed to have up to 50 source
3  copies at any one point in time, if you figure that's
4  probably $10,000 to $15,000 per copy, so that would
5  have also been lost revenues to SCO. So --
6      Q. I'm sorry. SCO wasn't entitled to a 5
7  percent administrative fee on royalties for source
8  code fees that it wasn't paying to Novell, right?
9      A. No. But it was just that was the way the
10 settlement was negotiated; that we received a flat
11 1.5 million plus 5 percent on it. Why? How it was
12 characterized? Maybe the concept was just to come to
13 $2 million. I do not know.
14     Q. But in order to adhere to your
15 understanding of what Novell was entitled to versus
16 what SCO was entitled to, the 5 percent should have
17 just been calculated on the binary component of the
18 IBM payment, right?
19     A. On a buyout, it's hard to characterize
20 sometimes. It's just the way I was told to book it
21 and told to deduct the fees.
22     Q. But in order to be consistent --
23     A. Once again. I believe receiving $1.5
24 million in compensation for the source code fees is
25 very consistent.

Page 143

1      Q. But with your view that the only thing
2  Novell should get, I mean, was fees associated with
3  binaries, in order to be consistent with that you
4  should have calculated the 5 percent based only on
5  what was attributable to and binaries in this IBM
6  buyout, right?
7      A. So they would have just characterized the
8  $2 million differently, then. I think the concept
9  was that $2 million was the settlement amount. How
10 they characterized it, I don't think makes any
11 difference at this point. It's moot. In later
12 buyouts we only did receive 5 percent, but they
13 didn't have any source code components to them.
14     Q. This buyout affected source code, right?
15     A. That's correct. And that's why we
16 received -- part of the reason why we received $1.5
17 million in addition to the 5 percent.
18     Q. Five percent of the whole thing?
19     A. Well, it was the whole thing. In other
20 words, we got $2 million in the settlement fee.
21 Quite frankly, if it had gone as originally arranged
22 -- Novell did this without our knowledge and they
23 would have kept the entire fee to themselves.
24     Q. But you kept 5 percent of a sum that
25 related in part to source code fees, correct?

Page 144

1      A. I don't think it was characterized that
2  way. I think it was characterized as $2 million, and
3  this is just the way to calculate it. Keep 5 percent
4  of it in total because we are administering it, and
5  then keep $1.5 million to go to the source code fees.
6      Q. I'm not asking you how it was
7  characterized. I'm asking you, in fact, what
8  happened. And isn't it true that what happened is
9  that SCO kept 5 percent of a sum that did relate to
10 source code rights, in part. Right?
11     A. It was just the administration of the
12 entire fee. And I think it was just part of the
13 settlement for the entire thing. I don't think it
14 was thought of or characterized as source code, that
15 we were keeping 5 percent of source code. I think
16 the concept was that we were keeping $2 million.
17     Q. Okay. But that wasn't quite my question
18 about how it was characterized. I'm asking you isn't
19 it true that, in fact, SCO kept 5 percent of a sum,
20 where that sum related in part to source code rights?
21     A. I guess, you know, we kept 5 percent of
22 the total amount plus the $1.5 million. If you want
23 to characterize it one way or the other, that's fine.
24 The concept is that SCO settled for $2 million.
25     Q. Okay. But I need you to focus on my

Page 145

1  question and answer that question.
2      A. Because I have --
3      Q. I'm sorry.
4          MR. GONZALEZ: Counsel, ask your question
5  again.
6      Q. Okay. Ms. Acheson, you've got a lot of
7  years of experience in this kind of accounting and
8  how to account for these revenue issues. And I'm
9  just asking you in fact isn't it true that SCO
10 retained 5 percent of a sum from IBM where that sum
11 was paying for rights that included source code
12 rights?
13         MR. GONZALEZ: Objection. Asked and
14 answered. But you may answer again.
15     A. We kept 5 percent of the entire fee as
16 settled between SCO and Novell. I was not part of
17 the settlement so I don't know what the
18 characterization was. And in addition, Novell told
19 us to basically -- had us retain $1.5 million for the
20 loss in business and for the additional source code
21 rights that were given to IBM.
22     Q. Was any effort made to allocate how much
23 of the IBM payment related to binary versus how much
24 related to source code?
25     A. No. Not that I know of. It had usually

37 (Pages 142 to 145)

7406cc52-b716-43c6-afbd-3769cbec1290

Page 146

1  been the accounting treatment to simply book lump
2  sums.
3      Q.   And was there any -- was the fact that
4  part of the IBM payment related to source code, did
5  that factor into how much SCO should retain?
6      A.   I was not part of the negotiations so I
7  can't answer that entirely.  I just know that I was
8  told that it was in relation to -- the settlement
9  amount of $1.5 was in relation to the additional
10  source code rights and the loss in business.
11      Q.   Who told you that?
12      A.   This was from SCO management finance.
13      Q.   Who?
14      A.   Let's see.  Who was it at that time?
15  Well, the president was Alok Mahan and it was
16  probably down through Terry Dulin.  So I think Randy
17  Breesé was the controller at that point in time.  I'm
18  not sure, though.
19      Q.   So who do you think would have told you
20  this?
21      A.   More than likely the communication would
22  have been directly from Terry, or from legal.
23      Q.   And to your knowledge, in deciding how
24  much SCO should retain from the IBM payment, was the
25  extent of rights in source code taken into account?

Page 147

1      A.   From my understanding, yes, it was taken
2  into account as part of the $1.5 million.
3      Q.   Have you seen anything in writing on that
4  topic?
5      A.   Just that it's in Amendment X, and Novell
6  would have had to have given us part -- to give
7  additional source code rights is a very expensive
8  proposition.  I do not believe that when Novell
9  negotiated with IBM, they really took that into
10  consideration or the price tag would have been a lot
11  higher than $10 million.  But SCO realized this, and
12  that is part of the reason why they came to the
13  settlement of $1.5 million with Novell.
14      Q.   Have you seen anything in writing on the
15  SCO side on the topic of how to allocate?
16      A.   No.  I do not believe I have seen
17  anything.
18      Q.   Okay.  I think we only have 30 seconds on
19  the tape so we better go off.
20          (A break was taken.)
21      Q.   Ms. Acheson, we have been speaking today,
22  most of the time, about -- or strike that.  We have
23  been talking about the 5 percent administrative fee
24  and when SCO had to pay that.  Or when SCO got to
25  retain that, right?  In general we have been talking

Page 148

1  about the 5 percent fee, correct?
2      A.   Uh-huh (affirmative).
3      Q.   Was there a category of payments for which
4  Novell and SCO agreed that SCO would only get to
5  retain a 1 percent fee?
6      A.   Yes.
7      Q.   And what was that?
8      A.   That was -- it was early on in our
9  reports, and I'm sorry, I cannot remember.  But it
10  was because -- I would have to go back and look at
11  that one.  I remember that it did happen but I'm just
12  not remembering the why.
13      Q.   Was it for aged accounts receivable?
14      A.   I can't comment one way or the other at
15  the moment.  I just am not remembering.
16      Q.   I'll mark next as 117 a document with
17  pages that are out of order but the front page is
18  entitled Asset Purchase Agreement Compliance Audit
19  Report dated March 2, 1999.  I think the pages have
20  gotten jumbled but there's a cover letter -- let me
21  just give the Bates range of the whole document is
22  literally SCON 98318 through SCON 98323.  I think
23  there is actually a cover letter that's the second
24  page of this document to Jean Acheson from James
25  Young and then a cover page for the Compliance Audit

Page 149

1  Report.
2          MR. GONZALEZ:  Let me look at it before
3  you start asking questions because you said it might
4  be jumbled.
5          MR. PERNICK:  Yeah.  The only thing I was
6  going to say is I will ask Ms. Acheson to skim this,
7  at least.
8          MR. GONZALEZ:  I guess my only question, I
9  don't know if it matters one way or the other, but
10  when you said it is jumbled you mean that it appeared
11  to you to be out of order?  Is that what you mean?
12          MR. PERNICK:  Yeah, that's all I meant.
13          MR. GONZALEZ:  And do you know why that
14  would be?  Was that the way it was produced?
15          MR. PERNICK:  Yeah, this is the way it
16  came out of SCO's document production.
17          MR. GONZALEZ:  Okay.
18          (EXHIBIT-117 WAS MARKED.)
19      Q.   I think it's pretty apparent that there's
20  a cover letter and then a four-page memo, but I'm not
21  asking you to agree to anything.
22      A.   Can we take a break for a moment.  I just
23  broke my glasses and I can't read.
24          (Break taken 4:10 to 4:14.)
25      A.   Yes, I did run across the 1 percent.

Jean Acheson    *    March 20, 2007

Page 150

1    Q.   Okay, Ms. Acheson, actually why don't we
2  just step back for one second.  Do you think you
3  remember having seen this document before?
4    A.   Yes.
5    Q.   Do you remember -- I'm going to point you
6  to the cover letter which is the second page of our
7  deposition exhibit.  It ends with Bates numbers
8  98319.  Do you think you received it by letter
9  attachment from James Young?
10    A.   I'm sorry.  I don't understand what you
11  mean.
12        MR. GONZALEZ:  Objection.  Lacks
13  foundation.
14    Q.   It's a bad question.  I'm just noting that
15  there's a page here which is a cover letter dated March
16  2, 1999 from James Young addressed to you.
17    A.   Right.
18    Q.   It says, "The Customer Compliance audit
19  report is attached."  Do you remember getting by
20  letter from Novell the Asset Purchase Agreement
21  compliance audit report that's here?
22    A.   Yes, I do.
23    Q.   Okay.  So you beat me to the punch but I
24  just wanted to ask you if you could look at, on page
25  2, there's a section near the top entitled

Page 151

1  Administrative Fees.  And there's one sentence at the
2  end of that paragraph that says, "Additionally, as of
3  December, 1995, there was a verbal agreement for SCO
4  to receive only a 1 percent fee for outstanding
5  accounts receivable source code collections that
6  required a reduced level of effort on SCO's part."
7  Do you see that?
8    A.   Yes, I do.
9    Q.   Does that refresh your recollection that
10  there was such a verbal agreement between SCO and
11  Novell?
12    A.   There was a verbal agreement for the 1
13  percent.  I disagree with the way the auditor
14  characterized it as source code collections.  I'm not
15  one hundred percent sure I remember that it was only
16  for source code fees that we were collecting.
17        Part of it, though, in any event, I do
18  remember that this was for prior balances that were
19  due to Novell.  And Novell basically said, "Look, if
20  you'll help us collect it, we will give you 1 percent
21  for your effort."  Because basically, otherwise
22  what's the reason for us wanting to do this?
23    Q.   "We" being SCO?
24    A.   Yes.  Sorry.
25    Q.   You are saying there was no -- if you

Page 152

1  weren't going to get anything there was no incentive
2  to --
3    A.   Well, we probably would have.  It was just
4  nicer getting the incentive.
5    Q.   Why one --
6    A.   We had various little things that went
7  back and forth.  You know, you kind of had to, to
8  make it a living arrangement.  Unfortunately there
9  was supposed to have been another round of amendments
10  to shore up a lot of these things, but it kind of
11  fizzled out due to lack of interest.
12    Q.   Okay.  So why was it 1 percent as opposed
13  to 5 percent?
14    A.   Because it was on transactions that
15  occurred prior to the APA.
16    Q.   And you said you disagreed with the
17  statement by the Novell auditors here?
18    A.   I'm not saying I disagree.  I just don't
19  remember specifically what it was for.  I mean,
20  accounts receivable, I agree with.  I don't
21  remember if they were on source code or if it was
22  binary revenues or what it was.  That's the part.
23  That's all.
24    Q.   It might have been --
25    A.   It might have been source code.

Page 153

1    Q.   Or it might have been both?
2    A.   Correct.
3    Q.   Or it might have been binary only?
4    A.   It might have been.
5    Q.   You just don't remember?
6    A.   No, I don't.  I would need to see my
7  specific reports.
8    Q.   Okay.  Can you, Ms. Acheson, look at
9  paragraph 9 of your declaration.  And there's a first
10  sentence that says, "In 1998, Novell performed an
11  audit pursuant to Section 1.2 and Section 4.16 of the
12  APA."  Do you see that?
13    A.   Yes.
14    Q.   And do you remember that audit?
15    A.   For the most part, yes.
16    Q.   What was your role in it?
17    A.   Basically I supplied the auditors with the
18  documentation for their selections on the specific
19  customers from, you know, specific customer items
20  from the monthly reports.  So they wanted to see,
21  let's say a customer -- we had put down that a
22  customer was reporting $100,000 in binary fees.  They
23  wanted to see the report that backed that up.  And if
24  the report was different, then I would reconcile for
25  them how to get between the report and what we

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 154

1  reported to Novell.
2      Q.   Who else was involved on the SCO side in
3  this audit?
4      A.   Terry Dulin.
5      Q.   Anyone else?
6      A.   People such as Kathy Stetzer or Rita
7  Markowitz may have been, but more peripherally in
8  that they would have supplied me maybe with the
9  documentation or answered questions for me on how to
10  get from A to B on the reports, because they would
11  have had the specific day-to-day processing of the
12  contracts.
13     Q.   And when you say that, you're speaking of
14  Kathy Stetzer and Rita Markowitz?
15     A.   Yeah, maybe.  They were both there at the
16  time, I believe.
17     Q.   And what was Terry Dulan's role?
18     A.   Well, Terry Dulin was my boss.  She was
19  the controller of the New Jersey finance group.  And
20  her role, she basically negotiated the audit
21  circumstances.  I don't want to say "terms," but, you
22  know, in other words when they first came they said
23  they wanted to audit 100 percent and she negotiated
24  with them on that.  Because audits are not normally
25  100 percent.  They are usually 10 percent test, and

Page 155

1  then if anything is found in the test the scope is
2  widened.  So she worked with them on things on that
3  order.
4      Q.   What do you mean they wanted to audit 100
5  percent and Terry negotiated down to 10?  What does
6  that mean?
7      A.   Well, usually audits are not done auditing
8  every transaction that occurs.  An audit is usually
9  done by selecting a test group, and then if nothing
10  is wrong in the test group, then it is assumed that
11  all transactions are correct.  If something is found
12  wrong, then you widen the scope of the audit to test
13  more and to see if maybe this is just one aberration
14  or if it's a trend throughout.
15     Q.   So what do you remember on that subject,
16  the test size or sample size?  What do you remember
17  on that?
18     A.   They selected a lot.  They selected I
19  believe several from each monthly report.
20     Q.   And when you say they selected a lot, they
21  did what?  What do you mean?
22     A.   Well, they would just check it off and
23  say, "Okay, I want to see these ten customer reports
24  from this report, five from the next one."  That kind
25  of thing.  And then we would pull the documentation

Page 156

1  for them.  And since it was original documentation,
2  they stayed in our offices to review it.
3      Q.   And by that, you mean the underlying
4  customer reports that had been sent to SCO?
5      A.   That's correct.
6      Q.   But initially Novell's auditors had asked
7  for a hundred percent?
8      A.   I believe, yes.
9      Q.   And did you discuss that with Terry?
10     A.   Terry told me about it.  But she was the
11  one who negotiated the -- what the audit selection
12  was going to be with them.
13     Q.   And what was the ultimate resolution on
14  that?
15     A.   I don't remember.  Probably about 10 to 20
16  percent.
17     Q.   And did you consider that high?
18     A.   I'm not -- no.  I mean, it was a lot of
19  documents, yes, because there were a lot of
20  transactions at that time.
21     Q.   What was the discussion between you and
22  Ms. Dulin when Novell had asked for 100 percent at
23  the beginning?
24     A.   Terry had been a C.P.A. and had been an
25  auditor, and she did not feel it was anywhere near

Page 157

1  reasonable.
2      Q.   Because?
3      A.   Because audits just are not done on a 100
4  percent basis.  They are done on a test.  If you do a
5  100 percent basis, then the auditors are there for a
6  very long time, and that interrupts the normal course
7  of business.  An audit is not supposed to interrupt
8  the normal course of business.
9      Q.   How did Novell react, to your knowledge,
10  when Ms. Dulin tried to negotiate down?
11     A.   I think they were fine with it.  I think
12  they understood.  I think it was the normal -- you
13  open with, as in any negotiation, you open with one
14  thing and then you come to an agreement somewhere in
15  the middle.
16     Q.   Do you remember what other things Ms.
17  Dulin was involved in with regard to this 1998 audit?
18     A.   I believe she also worked with the
19  auditors proving that we did not need to pay any
20  additional consideration to Novell under the 40
21  percent unit plan.
22          MR. PERNICK:  Can you read that back,
23  please?
24          MR. GONZALEZ:  Just to clarify.  Have you
25  been talking about the 1998 audit, I think?

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 158

1        MR. PERNICK:  Yes.
2        MR. GONZALEZ:  Or are you talking about
3    both audits?
4        THE WITNESS:  I believe this is the first
5    audit.
6        MR. GONZALEZ:  Just want to make sure I
7    didn't lose track of that.
8        MR. PERNICK:  We are on the same page.
9        MR. GONZALEZ:  I want to make sure I am,
10    too.  Thank you.
11        (The record was read as follows:
12        "A.  I believe she also worked with the
13        auditors proving that we did not need to pay any
14        additional consideration to Novell under the 40
15        percent unit plan.")
16        Q.  And what do you mean by that, Ms. Acheson?
17    Is that related to the UnixWare royalties and whether
18    or not SCO had to pay for those?
19        A.  Yes.  Not UnixWare royalties.  UNIX are
20    units, product.
21        Q.  Okay.  Whether SCO had hit the threshold
22    under which it would have to transmit fees to Novell
23    for UnixWare sales?
24        A.  Well, additional purchase price
25    consideration.

Page 159

1        Q.  Okay.  Can you remember any other areas in
2    which Ms. Dulin was involved on this '98 audit?
3        A.  Those were the major areas.  I'm not sure
4    if I remember anything else specifically.
5        Q.  On the Novell side, who was involved in
6    this audit, to your knowledge?
7        A.  I think it was Jim Ludwick was one of the
8    auditors.  The person who sent this letter, I
9    believe, was there.
10        Q.  Is that Jim Young?
11        A.  Yes.  Then there was a host of peripheral
12    people that they had checking the reports, and I
13    think they went through and checked the formulas on
14    them to make sure they were footing correctly and
15    adding correctly.
16        Then Marty, I can't remember her last
17    name.  While she wasn't on our premises, she was the
18    director of the Novell internal audit at the time and
19    she was back at the Novell offices.  I can't remember
20    if she was out of California or Utah.
21        Q.  Do you remember any events leading up to
22    the '98 audit; any communications or discussions
23    between Novell and SCO about the audit?
24        A.  Basically it was a year later.  They had
25    the right to audit and they asked to audit.

Page 160

1        Q.  Do you remember any disputes or issues
2    about whether there should be one, who should do it,
3    anything like that?
4        A.  Not that I was aware of.  I mean, I think
5    we would understand that Novell would use their
6    internal auditors.  I don't know if there was a
7    dispute.  I don't remember.
8        Q.  Do you remember just any other -- you've
9    mentioned a few already.  Do you remember any other
10    issues that came up during this audit or that were
11    discussed during the audit?
12        A.  Yes.  The zero customer reports was a big
13    one.  Basically under the old reporting requirements
14    for the SVRX licensees, they had to report quarterly
15    even if they were no longer shipping product.
16        Q.  Who is "they"?
17        A.  The SVRX licensees.  And the audit found,
18    and it was really one of their biggest supposed
19    findings, that we really hadn't followed up too well
20    with getting these zero reports in.  But, you know,
21    there was new revenue probably that was in jeopardy.
22    Because, as I said, for years they had just been
23    reporting zero every quarter.
24        Q.  Does SCO require zero reports from
25    customers in other areas of its business?

Page 161

1        A.  Well, I would have to go through and see
2    specifically.  Usually if a customer is not reporting
3    any longer, they just say, "We are not using the
4    product anymore," and we put a stop to the agreement.
5    So whether -- you know, if somebody doesn't send us
6    an agreement, we will call them.  But usually that's
7    for people who we know are coming in with revenue.
8        Q.  But do you know whether SCO requires today
9    zero --
10        A.  From the SVRX licensees or from where?
11        Q.  From the SVRX licensees.
12        A.  No.  We don't pursue it.
13        Q.  Do you ask them to provide you zero
14    reports?
15        A.  If somebody asks us if they are required
16    to, we will tell them yes.  But if they have told us
17    that they are no longer distributing, we usually
18    don't continue to require.
19        Q.  And what about in other areas of the
20    business, not SVRX?
21        A.  Once again, as stated before, I'd have to
22    go and look.  Some of our agreements are not as
23    similar to each other as in the SVRX world.  And I
24    would have to check the individual reports,
25    individual contracts, excuse me, to see if that's a

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 162

1  requirement or not.
2      Q.   Who do you think would know best?
3      A.   Possibly Bill Broderick.
4      Q.   Okay.  Can you remember any other issues?
5  You mentioned now the zero customer reports.  Can you
6  remember anything else that came up?
7      A.   Well, in the reading of the letter it was
8  brought up that there were certain things where we
9  had verbally agreed to certain accommodations under
10  the agreement that weren't specifically in the APA.
11      Q.   I already asked you about the aged
12  accounts receivable.
13      A.   Uh-huh (affirmative).
14      Q.   Did you see any other mention of verbal
15  agreements in that memo where you disagreed or were
16  unsure about the characterization?
17      A.   I didn't read the entire thing.
18      Q.   Okay.  Well, you don't have to right now.
19  Did anything else though jump out at you from what
20  you did read?
21      A.   Basically that what we were doing is that
22  instead of remitting 100 percent fees to Novell, we
23  were netting the fees that had been agreed verbally
24  that we could send only 95 percent rather than having
25  to send the 100 percent and have Novell return the 5

Page 163

1  percent plus the third-party royalties to SCO.
2          Since this was another objection in a
3  later audit, we have since changed that where we are
4  now remitting, once again, 100 percent of the fees to
5  Novell.  However, they never remit back to us the 5
6  percent or the third-party royalties in the time
7  frame required by the APA.  So instead, I have
8  basically put Novell on notice that any time they did
9  not remit them back to us, we would simply deduct
10  them the following month.  So since not all months
11  have cash balances in them, we sometimes have to go
12  for months without getting our reimbursement.
13      Q.   How did the verbal agreement to net 95, at
14  least as of 1998, how did that come about?
15      A.   It just came about in the discussions with
16  Cindy, Barb, Terry, myself.  And I think Terry may
17  have appealed to Mike Genaro in regards to it.  And
18  it's an easier process.  As long as Novell is
19  satisfied that we are reporting decently, it just
20  makes life easier for all parties.
21      Q.   You think it was requested, though, by Ms.
22  Dulin?
23      A.   I believe it was.
24      Q.   Back on paragraph 9 of your declaration,
25  the next sentence says, "To the best of my

Page 164

1  recollection, in that audit, the Novell
2  representatives never asked for anything other than
3  the reports of the SVRX binary licenses that existed
4  at the time of the APA, and never asked about
5  licensing of source code."  Do you see that?
6      A.   Yes, I do.
7      Q.   What was that?
8      A.   I just said yes, I do.
9      Q.   All right.  Let me ask you about the first
10  part of that where you say that in that audit the
11  Novell representatives never asked for anything other
12  than the reports of the SVRX binary licenses that
13  existed at the time of the APA.  Do you mean
14  literally that the only information Novell sought in
15  this audit were those reports?
16      A.   Well, that's basically what they asked for
17  from me.  They gave me the reports with the OEMs
18  checked off that they wanted to see the underlying
19  documentation from.
20      Q.   But are you saying Novell didn't ask for
21  any other information whatsoever in this audit?
22      A.   No.  They asked of me.  I mean, they did
23  ask Terry for proof on the 40 percent test.  But as
24  far as the royalty reports or the source code
25  licenses were concerned, this is all they asked me

Page 165

1  for in relation to those, that I know of.
2      Q.   Okay.
3      A.   I mean, they probably also asked for maybe
4  some copies of checks, although those would have been
5  part of the royalty packet that we would have given
6  to them.
7      Q.   Who asked you for these reports?
8      A.   Well, I believe either they had, or we
9  sent a set of the monthly reports to the auditors.
10  They checked off what they wanted and it came back
11  through Terry, and then Terry gave it to me, and then
12  I pulled the documentation and worked with the
13  auditors on the reconciliation of them.
14      Q.   So what was the process, to your
15  knowledge?  Can you go over that again?
16      A.   Okay.  Novell took the monthly reports.
17      Q.   That they already had?
18      A.   I'm not sure if they took the ones they
19  already had or if they asked us for another set of
20  them.  I know on the second audit they asked us for
21  another set because they couldn't get them together
22  from their company.  So either they already had or we
23  supplied them with a set of the monthly reports.
24          They took them, reviewed them, checked off
25  what it was they wanted to review, and then probably

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 166

1  sent that back through Terry, since she was the one
2  negotiating the audit, who then gave it to me. I, in
3  conjunction with my people, probably pulled the
4  documentation, made sure that we could tie everything
5  back to the reports, and then supplied Novell with
6  the documentation for the report, for what they
7  wanted to test.
8      Q.   And what kind of documentation was that?
9      A.   It was the customer quarterly reports.
10     Q.   Now, you said they never asked for
11 anything other than the reports of the SVRX binary
12 licenses that existed at the time of the APA?
13     A.   Uh-huh (affirmative).
14     Q.   Did they use those words or are you saying
15 they asked more broadly for the reports and that's
16 all there were? What do you mean?
17     A.   I don't remember. Basically they handed
18 me back the reports and marked off what they wanted
19 to see, and that's what I gave them.
20     Q.   But no one from Novell said, or did they,
21 "We'd like the reports of the SVRX binary licenses
22 that existed at the time of the APA"?
23     A.   What else would they have been looking at
24 except to audit that the reports that we gave them
25 were correct, and that is what was on those reports?

Page 167

1      Q.   So they did ask in those terms?
2      A.   No. I'm not sure that people talk that
3  way normally, you know. So any request for
4  documentation, as I said, kind of came through Terry
5  to me. And so exactly how they requested it, I don't
6  know. But I would assume that the audit notification
7  letter basically said that they wanted to audit the
8  arrangement under the APA of some kind.
9      Q.   But you're not aware of any indication
10 that Novell requested information that was limited to
11 reports for licenses that existed at the time of the
12 APA, right?
13     A.   No. They requested documentation on the
14 monthly reports that I sent to Novell which would
15 have only been based on the existing licensees from
16 the time of the APA.
17     Q.   Were you excluding documentation for
18 reports of -- were you excluding documentation from
19 licenses that were entered into after the APA?
20     A.   Any licenses that were entered into after
21 the APA were for UnixWare. That was SCO's business
22 and none of Novell's business.
23     Q.   Do you think Novell knew you were
24 excluding that?
25     A.   Of course.

Page 168

1      Q.   How come?
2      A.   Because anything they looked at was only
3  SVRX, and they knew that we had a revenue stream from
4  the UnixWare royalties as well as packaged product
5  and other things.
6      Q.   So you weren't excluding any documentation
7  from SVRX licenses that were entered into after the
8  APA, right?
9      A.   We excluded nothing that they requested.
10     Q.   Okay. Can you -- were you excluding any
11 documentation --
12     A.   No.
13     Q.   -- from licenses that were -- SVRX
14 licenses that were entered into after the APA?
15     A.   No.
16          MR. GONZALEZ: Objection to form.
17     Q.   Were you excluding any documentation from
18 SVRX licenses that were entered into after the APA?
19          MR. GONZALEZ: Objection to form.
20     A.   There were no licenses that belonged in
21 Novell revenue that were entered into after the APA.
22     Q.   What do you mean "that belonged in Novell
23 revenue"?
24     A.   There was nothing entered into that would
25 have hit that category that you're talking about.

Page 169

1  There wasn't even that category.
2      Q.   But what do you mean when you say "that
3  category"?
4      A.   We have been over this before, I believe.
5      Q.   And what's your --
6      A.   That basically if we had ever contemplated
7  - which we would not have contemplated - entering
8  into a SVRX license with a totally new customer, that
9  was characterized to me as SCO revenue. But we never
10 did, because we would license UnixWare. And if an
11 existing licensee had requested a new supplement, a
12 new SVRX license, then we would have gone through
13 Novell for the review and determination on that.
14     Q.   But that didn't happen either?
15     A.   No. So it's not excluded. It's just not
16 there.
17     Q.   Okay. I'd like to mark as Exhibit 118 a
18 February 16, 1998 letter from James Young to Terry
19 Dulin with a one-page attachment, Bates stamp number
20 NOV 35336 through NOV 35337?
21          (EXHIBIT-118 WAS MARKED.)
22     Q.   Ms. Acheson, I would just ask you if
23 you've seen this letter or its attachment before.
24     A.   Yes. As I said, this was the initial
25 request. I don't remember specifically if I saw this

43 (Pages 166 to 169)

CitiCourt, LLC
801.532.3441

Jean Acheson    *    March 20, 2007

Page 170

1 or not. I may have. I just don't remember. But
2 anyway, this is basically the initial request where
3 Novell just asked for everything, one hundred percent
4 documentation. And that's at the point where Terry,
5 I believe, negotiated with them as to what
6 specifically we would provide to them.
7 Q. In this information request form, Novell
8 did not limit its requests to reports of just binary
9 licenses, right?
10 MR. GONZALEZ: Objection to form.
11 A. They basically asked for a copy of each of
12 the reports used in the process. The process was
13 reviewing and, you know, reconciling the customer OEM
14 reports each quarter, which were basically the --
15 which were the binary reports. And that's what we
16 reported back to Novell. So while it doesn't state
17 it in specific, it just says Asset Purchase Agreement
18 so it doesn't state it. But this is what we reported
19 to them.
20 Q. But their requests were not limited to
21 reports for SVRX binary licenses that existed at the
22 time of the APA, right?
23 A. Well, since that is all I reported to them
24 and they made their selections eventually from the
25 reports that I gave to them, then yes, in essence

Page 171

1 their request was solely for the binary reports that
2 existed at the time of the APA.
3 Q. Well, I think you're confusing two
4 concepts. I mean, that may have been all that
5 existed but their requests were not that narrow; do
6 you agree?
7 A. But what I am stating is that this was not
8 the actual request that we worked under. If you
9 remember correctly, I stated that Terry Dulin
10 negotiated with them as to what they specifically
11 received and what they specifically got under this.
12 Q. Okay. But the initial request I'm asking
13 about, which is here.
14 A. But it makes no difference. The initial
15 request is not the request that was finally acted
16 upon.
17 Q. Okay. That may be your view of this. But
18 I'm asking you as a factual matter whether Novell's
19 initial request was limited to information on reports
20 of the binary licenses that existed at the time of
21 the APA.
22 MR. GONZALEZ: Objection to form and asked
23 and answered.
24 A. Well, it states in there to track,
25 collect, remit, and report revenues due Novell under

Page 172

1 the APA. And then it says, "Please provide a fresh
2 copy -- please provide a copy of each of the reports
3 used in the process," referring back to that number
4 one statement.
5 And once again, I say that since the
6 process would have described our -- simply how we
7 reviewed the OEM quarterly reports, how we tracked
8 the payments, and then remitted such to Novell,
9 therefore, it can only be on the SCO customers at the
10 time of the -- excuse me the SVRX customers at the
11 time of the APA who were reporting the binary
12 royalties.
13 Q. You may have interpreted it that way, but
14 does this request --
15 A. That's not the --
16 Q. -- is it made that narrow?
17 A. Yes, it is. Because it says, "A
18 description and flowchart of the process used by SCO
19 to track, collect, remit, and report revenue due
20 Novell, Inc." That is exactly what we did.
21 Q. So -- but the request is limited to
22 information --
23 A. Uh-huh (affirmative).
24 Q. -- and reports? Like number two is asking
25 for reports only on binary licenses that existed at

Page 173

1 the time of the APA?
2 MR. GONZALEZ: Objection to form.
3 A. It is referencing back to number 1.
4 Q. Yeah.
5 A. And that process was the review and
6 collection of the quarterly reports from the existing
7 OEM customers at that time.
8 Q. So if you read in your interpretation of
9 what was due under the APA, then you are saying these
10 requests were narrowed in that way.
11 A. That is correct. And that is what
12 eventually, although in a much more limited form,
13 that I supplied to Novell for audit of the monthly
14 reports to Novell.
15 Q. What about -- doesn't number 4 ask for a
16 listing of all customers being tracked who have
17 provided revenue under this agreement, under past or
18 present?
19 A. Yes.
20 Q. Is that limited to customers who existed
21 at the time of the APA?
22 A. Since that was the only customers we had,
23 yes.
24 Q. Well, the request is not limited like
25 that, right?

44 (Pages 170 to 173)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 174

1    A.   But we didn't have any other customers to
2  supply to them.  So it could only be the past
3  customers who were now presently reporting.  Because
4  some of them would have dropped off.  Some of them
5  had switched to other products.  So they weren't any
6  longer reporting.
7    Q.   Well, the responsive information that
8  existed may have only been of customers who existed
9  at the time of the APA.
10   A.   Uh-huh (affirmative).
11   Q.   Fine.  I understand that.  But the request
12 is broader than that, isn't it?
13   A.   To me, because I think what they are
14 trying to cover is that they are going to be looking
15 at a year's worth of reports.  A year's worth of
16 monthly reports by the time this comes along.  So
17 what they are saying, if they asked for only a
18 present list it might not include customers who no
19 longer were reporting.  So they had to say past and
20 present in order to get the full scope of customers
21 that had reported from the time, you know, from the
22 beginning to this point of this audit.
23   Q.   And it would also include, if they
24 existed, customers who came into being after the APA,
25 right?

Page 175

1    A.   Only -- no.  Because the revenue would not
2  have belonged to Novell.
3    Q.   So why do you read the request that
4  narrowly?
5    A.   No, I'm not reading the request that
6  narrowly.  The request is for basically everything
7  for underneath what Novell has.  In other words, what
8  was due to Novell revenue-wise.  And that wasn't due
9  to Novell revenue-wise.  So if any had existed, they
10 wouldn't have been reported to them.
11   Q.   But the request is for a listing of
12 customers that is broader than just those that
13 existed at the time of the APA, right?
14   A.   I disagree with your interpretation.  Past
15 or present means the ones that are reporting at
16 present, and that is what I would have supplied to
17 them.
18   Q.   Did you discuss that with anyone at SCO?
19   A.   I don't think it needed discussion.  It
20 was basically a list of the customers who had or were
21 reporting during that approximately twelve-month
22 period.
23   Q.   I'll mark as Exhibit 119 a one-page
24 document bearing Bates number NOV 34811.  It's
25 entitled Novell Customer Compliance Audit of SCO

Page 176

1  Corporation, and it has handwritten notes dated
2  February 26, 1997.  Handwritten notes on a form
3  document.
4        (EXHIBIT-119 WAS MARKED.)
5    Q.   Have you read this, Ms. Acheson?
6    A.   Yes, now I have.
7    Q.   Do you think you have seen this document
8  before?
9    A.   No, I don't believe.
10   Q.   Do you see that there's a note labeled
11 number one that says, "Listing of all customers that
12 have signed an agreement in CUSTO number sequence"?
13   A.   Uh-huh (affirmative).
14   Q.   Do you interpret that to say listing of
15 all customers that have signed an agreement in
16 customer number sequence?
17   A.   Yes.  It had been the habit between UNIX
18 system laboratories and it was carried into Novell,
19 and we continue to use it to this day.  A number
20 listing for customers.  And it's just how we entered
21 it into a computer system.  I would assume by the
22 check mark that he received what he wanted.
23   Q.   Do you remember discussing with anyone at
24 SCO, including Terry Dulin, whether Novell was asking
25 for a listing of all customers that had signed SVRX

Page 177

1  agreements?
2    A.   This was not characterized one way or the
3  other and I believe my -- but it looks like what we
4  did is we gave them the SVRX customer list.  I'm not
5  sure why they wrote "cancelled" underneath it.
6    Q.   Don't you think that means that Mr.
7  Ludwick was asking for a list of all customers that
8  signed an SVRX agreement in sequence, as well as any
9  customers that had cancelled an agreement?
10   A.   Well, it would have just been a list.
11   Q.   What do you mean by that?
12   A.   Well, we would have just given them the
13 list out of the computer, probably, to comply for
14 this.
15   Q.   A list of what?
16   A.   Customers and customer numbers.
17   Q.   Do you see, though, that he was asking for
18 a listing of all customers without saying they are
19 limited to those that existed at the time of the APA?
20   A.   But what I would have given him was
21 basically only the customers that existed at the APA.
22 Any customers that were actual SCO customers would
23 have been outside of the scope of a Novell audit and
24 none of their business.  It would have been
25 confidential to SCO.

45  (Pages 174 to 177)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 178

1    Q.   Well, I understand that's your belief.
2    A.   Uh-huh (affirmative).
3    Q.   But doesn't this show that Mr. Ludwick was
4  asking for information on customers even that entered
5  into SVRX licenses after the date of the APA?
6       MR. GONZALEZ:  Objection.  Leading.
7    A.   I believe he was just asking for a listing
8  of customers and he says, "Received '92 to '95 SVRX
9  customer list (revenue reported)."
10   Q.   But wasn't he asking --
11   A.   So he seemed satisfied in what he
12 received.
13   Q.   But his initial request on this item, it
14 looks like, was for all customers regardless of when
15 they signed the agreement, right?
16   A.   Yes.  But the scope of the audit is only
17 for customers where Novell was entitled to see them.
18 To me, any customer that was a SCO customer, Novell
19 is not entitled to see.
20   Q.   But in terms of what Novell requested,
21 this suggests that Novell did request information
22 about customers that signed SVRX licenses after the
23 date of the APA also, right?
24   A.   And if Terry Dulin objected or said
25 anything, that was not listed here.  But I do know

Page 179

1  that we would have only given to Novell those lists
2  of customers that were reporting revenue that
3  belonged to Novell.
4       MR. GONZALEZ:  I would object to this line
5  of questioning as you are asking her, to some degree,
6  to speculate.  Because I think she testified that she
7  was not part of this communication.
8    Q.   Okay, Ms. Acheson.  But I'm asking you a
9  different question.  You're telling me what you would
10 have said or what Ms. Dulin would have said.  I'm
11 asking you about Mr. Ludwick's request.  And I'm just
12 asking you whether this shows that he did ask for
13 information about customers that signed an SVRX
14 license, regardless of when they signed.
15   A.   And he probably received it from us.
16   Q.   What do you mean?
17   A.   We would have given him a list of
18 customers.
19   Q.   That would have included even customers
20 that post-dated the APA, because there were none, you
21 mean?
22   A.   It would be hard to include that which
23 does not exist.
24   Q.   I think we have been on for an hour plus.
25 Why don't we take a quick restroom break.

Page 180

1       (Break taken from 5:02 to 5:21.)
2    Q.   (By Mr. Pernick)  Let's mark as Exhibit
3  120 a two-page document bearing Bates numbers NOV
4  43212 through NOV 43213.  It has a title that says
5  SCO SVRX Revenue Process Draft.
6       (EXHIBIT-120 WAS MARKED.)
7    Q.   I'll just ask you to look this over, Ms.
8  Acheson.
9       Have you read this, Ms. Acheson?
10   A.   Yes, I have.
11   Q.   Do you think you've ever seen this
12 document before?
13   A.   No, I don't believe I have.
14   Q.   You know, because it has handwritten notes
15 on it, I should ask:  Do you think you have seen this
16 document even in a form without the handwritten
17 notes?
18   A.   No.  It looks more like the outline of
19 what the auditors planned to perform, not what they
20 would give to me.
21   Q.   Are you aware that the Novell auditors had
22 a series of tests that they were performing on SCO's
23 SVRX revenue process?
24   A.   I was not necessarily aware of specific
25 tests.  But auditors usually do have a test program

Page 181

1  of some kind.
2    Q.   Are you aware of any tests in particular
3  that Novell's auditors were doing in connection with
4  the '98 audit?
5    A.   Well, the test was that they did a scope
6  selection of the royalty reporters and they checked
7  to see if they agreed with the calculations.
8    Q.   Is it possible they were doing other tests
9  that you didn't know of?
10   A.   I'm not --
11      MR. GONZALEZ:  Objection.  Calls for
12 speculation.
13   A.   Yeah, I'm sorry.  I wouldn't know.
14   Q.   So they might have been doing tests that
15 you're not aware of, right?
16      MR. GONZALEZ:  Objection.
17   A.   Well, yes.  If I wasn't aware, I wouldn't
18 know.
19   Q.   Can you look at the section here under the
20 numeral 1.  It's got a heading that says, "Are all
21 SVRX customers that owe royalties reporting to SCO
22 and paying royalties?"  Do you see that?
23   A.   Yes, I see that.
24   Q.   And at least as framed there, this test
25 area number 1 is not limited to looking at binary

46 (Pages 178 to 181)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 182

1  royalties being paid, right?
2      A.  Except -- except that the definition of
3  royalties among all of us was basically the binary
4  royalties.  It always has been.
5      Q.  You mean under the APA, that's your view?
6      A.  And it was the view of most everyone at
7  that time; that royalties meant the binary royalties.
8      Q.  But this just speaks of -- this is
9  broader.  This says, "Are all SVRX customers that owe
10 royalties reporting to SCO and paying royalties?"
11 Right?
12     A.  Yes.  But nobody is -- nobody is exact in
13 their language and this certainly is not exact in
14 their language.  And reporting just all points to the
15 binary royalties.  So basically in the vernacular of
16 the time, any time people spoke of royalty payments,
17 reporting, whatever, it was basically the SVRX binary
18 royalties.
19     Q.  This test is broader though, right?
20     A.  Actually, no, it wasn't.  They were just
21 looking -- from what I remember of the audit, they
22 were just looking at the royalty reports which were
23 the binary royalty reports.
24     Q.  But this test, as written here, this is
25 not limited to binary royalties, right?  This says

Page 183

1  "customers that owe royalties reporting to SCO and
2  paying royalties."  It says "all SVRX customers,"
3  right?
4          MR. GONZALEZ:  Objection.  Asked and
5  answered.  And to the extent you're asking her about
6  a document again that she cannot herself
7  authenticate, that she is not familiar with, you are
8  asking her also to speculate.  And I would object on
9  that basis, too.
10     A.  So to me it is binary royalties.
11     Q.  What in item 1 suggests that to you?
12     A.  The word "royalties reporting."
13     Q.  I mean, before you've pointed out --
14 you've pointed to other items on information requests
15 that were drawn to the APA that had context like
16 that.  This doesn't, right?  This says, "Are all SVRX
17 customers that owe royalties reporting to SCO and
18 paying royalties?"  Doesn't it?
19     A.  And basically he is euphemistically
20 talking about the royalty reporting process, because
21 especially when you do a trend analysis of royalties
22 by customer.  The only way you can have a trend is if
23 there is something consistent.  The only thing that
24 was consistent was the quarterly reporting of binary
25 royalties.

Page 184

1      Q.  What is --
2      A.  Because what they are doing, when you are
3  talking about trend analysis and is it reasonable --
4  because we used to do this, as well, to see if it
5  seemed as if customers were paying correctly.  You
6  would say, "Okay, for first quarter they paid
7  $100,000, for second quarter they paid $100,000, for
8  third quarter they paid $100,000, for fourth quarter
9  they paid $25,000.  This is not a reasonable trend.
10 Why did they drop off $75,000?"  You can only do a
11 trend analysis if something happens regularly.  And
12 that is one of the bullet points under all SVRX
13 customers that owe royalties reporting to SCO and
14 paying royalties.
15     Q.  What here suggests that the tests
16 identified in 1 and under 1 are based upon the
17 monthly reports SCO was providing to Novell?
18     A.  No.  The quarterly reports from the
19 customers.  The trend analysis.  You cannot do a
20 trend analysis unless there is something that happens
21 constantly.
22     Q.  Wouldn't customers report to SCO on any
23 SVRX license activity, even if it wasn't owed to
24 Novell?
25     A.  But if it's not owed to Novell, then it is

Page 185

1  none of Novell's business, regardless of what the
2  product is.
3      Q.  But this item is not limited to the --
4      A.  They are all SVRX customers that owe
5  royalties reporting to SCO and paying royalties.  If
6  there was something that did not belong to Novell, I
7  would not supply it to Novell.
8          Once again, this is one of those moot
9  points.  There were no royalties on SVRX outside of
10 those that started with the APA.  It was a totally
11 moot point.  It would never have even been thought
12 about because SCO's primary business objective was to
13 push UnixWare.  And for that, I certainly had no
14 obligation to show royalty revenue to Novell.
15     Q.  So you agree these tests in numeral 1 here
16 are not limited to binary royalties, right?
17     A.  No, I disagree with that entirely because
18 it says "trend analysis of royalties by customer."
19 You can only trend analysis of something that happens
20 consistently.  The only thing that happened
21 consistently was the quarterly reporting of the
22 binary royalties by the OEM customers who existed at
23 the time of the APA.
24     Q.  Why couldn't you do a trend of everything
25 the customer was reporting?

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 186

1    A.    Because it wouldn't trend.
2    Q.    Why couldn't you do a trend of everything
3 the customer was reporting?
4    A.    Because if they did something like
5 interest, it's an anomaly.  So in other words, the
6 customer doesn't always pay late.  They probably only
7 pay late once.  So you put that in.  That's not part
8 of a trend because interest is an anomaly.
9    Q.    So you wouldn't take that into account?
10    A.    Not for a trend, no.  You don't usually
11 count things that are anomalies because then they
12 throw the skew for a trend.
13    Q.    So you can't do a trend analysis of what
14 the customer is actually doing?
15    A.    You can do a trend analysis on what a
16 customer is consistently doing.
17    Q.    But how can you determine what a customer
18 is consistently doing if you don't know what they are
19 doing?
20    A.    Because we gave them the binary royalty
21 reports, and that is what the customers were
22 consistently doing.
23    Q.    This is about what reports SCO was getting
24 from the customers.
25    A.    Uh-huh (affirmative).  And it was the

Page 187

1 binary royalty reports.
2    Q.    SCO didn't seek all information from its
3 OEMs, licensees?
4    A.    We were -- according to the reporting
5 requirement, the reporting requirement on a quarterly
6 basis was simply the binary royalties.
7    Q.    What reporting requirement?
8    A.    That was under the product licensing
9 schedules that governed the SVRX licenses.
10    Q.    So the licensees could do whatever they
11 wanted with source code --
12    A.    No.
13    Q.    -- issues and didn't have to tell SCO?
14    A.    No, of course they did.  But what they did
15 there wasn't part of the quarterly report, usually.
16 It might have accompanied it, but it wasn't
17 considered part.  And if they had an additional
18 source code they would send -- usually send in a
19 purchase order.  Actually, they would go through
20 legal for that because that meant they had to get a
21 legal document for it.  And then they would pay.  We
22 would invoice them and they would pay for that.  But
23 additional CPUs were not revenues that belonged to
24 Novell, so we did not report them to Novell.
25    Q.    I'm not asking you about that.

Page 188

1    A.    Yes, you are.
2    Q.    No, I'm not.  I'm asking you didn't the
3 OEMs report to SCO all their royalty-bearing
4 activity?
5    A.    The royalty-bearing activity was the
6 binary royalties.
7    Q.    They didn't have to report if there were
8 other royalty-bearing activities?
9    A.    What else would there be but the
10 additional CPUs?  And the additional CPUs were
11 handled through legal, and they were not revenues
12 that were due to Novell so we never reported them to
13 Novell.
14    Q.    You are talking about SCO's legal, right?
15    A.    Correct.
16    Q.    So they were reported to SCO.
17    A.    The customer would usually send a purchase
18 order or something stating that they wanted to make a
19 copy of it.
20    Q.    SCO would get wind of all the royalty-
21 bearing activity each quarter by its SVRX licensees,
22 right?
23    A.    I don't understand what you mean by "get
24 wind of."
25    Q.    The licensee told SCO about all the

Page 189

1 royalty-bearing activity, not just binary, right?
2        MR. GONZALEZ:  Objection to form.
3    A.    No.  They reported the binary royalties on
4 a quarterly basis.  If and when they might need an
5 additional CPU or distribution of the source code,
6 they would contact our legal department to do so.
7 That was the process.
8    Q.    And they would tell SCO about it, right?
9    A.    Of course.  But once again, additional
10 CPUs were SCO revenue; therefore, were not included
11 under the SVRX audit.
12    Q.    Yeah.  Unfortunately item one is not
13 limited to royalties due under your interpretation of
14 the APA, right?  It's broader.
15    A.    And neither of us know what the auditors
16 were thinking when they wrote that.  But I do know
17 that the only thing that we probably would have
18 produced to them was the same revenue information
19 that we produced in the monthly reports.
20    Q.    What about in little (c) and little (d)
21 under number one here; (c) has a handwritten note
22 saying "dropped," and (d) has a handwritten note
23 saying "additions."  Correct?
24    A.    Yeah.
25    Q.    Doesn't that suggest that the Novell

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 190

1  auditors were also interested in additions to the
2  SVRX customer list?
3      A.   I do not know.
4      Q.   Does this refresh your recollection that
5  they were interested in additions to the SVRX
6  customer list post APA?
7      A.   Possibly.  But there weren't any, so I had
8  nothing to report to them.  There were no new binary
9  reporting customers.
10      Q.   Okay.  But I'm asking does that refresh
11  your recollection that they were interested in the
12  issue?
13      A.   No, because I don't remember.  And if they
14  did, I would have just told them there were none.
15      Q.   Other than through what SCO told the
16  Novell auditors, could those auditors have known what
17  royalties SCO was receiving from its licensees?
18      A.   I'm sorry.  Could you repeat that?
19      Q.   Yeah.  Other than through the information
20  that SCO provided, could the Novell auditors have
21  known what royalties SCO was receiving from the SVRX
22  licensees?
23      A.   We reported all of the SVRX binary
24  royalties to Novell.  So I just don't know how to
25  answer that.  As far as I'm concerned, we reported

Page 191

1  everything that was entitled to Novell.  And I don't
2  know.  I believe we showed cash reports.  I think
3  sometimes you show cash reports to the auditors and
4  they question certain transactions with in-house.
5      MR. PERNICK:  Can you read back my
6  question, please.
7      (The record was read as follows:
8      "Question:  Other than through the
9  information that SCO provided, could the Novell
10  auditors have known what royalties SCO was
11  receiving from the SVRX licensees?")
12      A.   I don't know.
13      Q.   You don't know, or "no"?
14      A.   Well, there was nothing else.  So if there
15  was something else, I don't know how they would have
16  ascertained that.  I guess through rumor, through
17  questioning.  I don't know.
18      Q.   Is it true that the Novell auditors had no
19  way to independently ascertain what payments SCO was
20  receiving from its SVRX licensees?
21      MR. GONZALEZ:  Objection to form.
22      A.   Well, they would ask to see the reports.
23  They would ask to see the checks.  There were
24  periodic audits done of certain selected customers.
25  I don't know how else they would look into things,

Page 192

1  but there was nothing to find.  So I don't know how
2  they would have -- if there had been, I don't know
3  how they would have dug - I'm not an auditor - for
4  something like this.  I'm not sure how they would
5  have dug for it.  I mean, maybe just looking at how
6  we report revenue.  I don't know if they can look at
7  something like that.  Maybe they worked with Terry on
8  something.  I have no idea.
9      Q.   But the information you just referenced,
10  that is all information on which the Novell auditors
11  were dependent upon SCO, right?
12      A.   Right.  But the audits of SCO customers
13  would have been done by independent auditors.  We
14  didn't do those audits.  So if there was some kind of
15  a discrepancy there, it would have been in the
16  royalty report and Novell would have seen that
17  royalty report, because we did give them copies of
18  the independent.
19      Q.   Novell only got that information through
20  SCO, right?
21      A.   Yes.  But it was a report that was signed
22  off on by an independent C.P.A. firm.  And if they
23  were so inclined, they could then call the auditor at
24  the C.P.A. firm and verify that it was correct.
25      Q.   Would SCO have let Novell talk to those

Page 193

1  auditors independently of SCO, all alone?
2      A.   I don't know.
3      MR. GONZALEZ:  Objection.  Assumes facts
4  not in evidence.
5      A.   I don't know.  I mean, the name and the
6  number was on the audit reports.  If they wanted to,
7  I guess they could have just picked up a phone and
8  called.
9      Q.   So it's your position that Novell was
10  entitled to all information from those auditors of
11  third parties and they could have gone around SCO?
12      A.   Well, maybe not the work papers as such.
13  But if they wanted to verify that we hadn't altered a
14  report or something, I don't see why they couldn't
15  have.  But the question never came up that I know of.
16  And I never asked.  I personally would not have had
17  an objection.
18      Q.   But would you have let them see all the
19  documentation you just referred to?
20      A.   Work papers are usually -- part of the
21  reason you use an independent third-party or
22  independent C.P.A. firm is the fact that the auditors
23  are going to gather information that is confidential
24  to the customer.  And both the customer, and in this
25  instance SCO and/or Novell, we are relying on the

49 (Pages 190 to 193)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 194

1  independence of this C.P.A. firm to review the
2  documentation and to come to an independent analysis
3  and conclusion. I mean, we were using good firms
4  like Deloitte, KPMG. So it wasn't like we were
5  hiring Joe Schmoe's cousin.
6      Q.   And Novell had unfettered access to those
7  firms and could take --
8      A.   I never saw the work papers.
9      Q.   But Novell, as far as you're concerned,
10 could go off with those auditors and get any
11 information it wanted?
12     A.   Yeah. As far as I know, yes. I don't
13 believe it was ever asked. I don't know if they ever
14 did. But I wouldn't have had a problem with it, if
15 they had asked me if they could call. I would have
16 called up the firm and said, "Yes, you can speak to
17 so-and-so from Novell.
18     Q.   And open the drawers, let Novell know
19 whatever it wants?
20     A.   As far as the SVRX royalties that were
21 entitled to them, yes. If in the case that some
22 customers we were auditing both the SVRX licenses and
23 the later UnixWare licenses, then from that viewpoint
24 I might say that it's only limited to that which
25 Novell is entitled to. But Novell could have

Page 195

1  discussed how the auditor determined which was which.
2  That would have been fine.
3      Q.   And Novell could have gotten from those
4  third-party auditors all the third party's
5  documentation about royalty reporting to SCO?
6      A.   That's a hard one because I'm not exactly
7  sure where independence draws that line. Because I
8  know I can't see work papers. So if I can't see
9  them, I would assume Novell can't see them. Because
10 I think, once again, it goes back to the reliance on
11 the independence of firms such as KPMG and Deloitte.
12     Q.   But any underlying documentation that SCO
13 could have gotten from those third parties, it was
14 your position that Novell could get that, too, and
15 not involve SCO at all, right?
16     A.   I think so. I don't see why not. I don't
17 know. As I said, it just never came up that I know
18 of. So I would have discussed it with my management
19 at the time, obviously. But I don't think it would
20 have been a huge issue.
21     Q.   What about licensees that weren't subject
22 to third party audits? Could Novell have gone and --
23 or that you weren't auditing? You mentioned that
24 there were a few where you hired auditors to go.
25     A.   Right. The ones that Novell selected.

Page 196

1      Q.   Right. What about the other licensees;
2  could Novell have gone to those licensees and gotten
3  the royalty --
4      A.   No. Because they would have no basis for
5  doing so. Because the contractual relationship and
6  everything had been sold to SCO. They had no rights
7  in that area to do that.
8      Q.   Why wouldn't you just let them check and
9  see if the royalties are being passed through, or the
10 ones that -- if there are some that are being passed
11 through, why couldn't Novell just go -- why wouldn't
12 you let them just go check?
13         MR. GONZALEZ: Objection to form.
14     A.   To me, once again, because the entire
15 contractual relationship was between SCO and the
16 customer. If Novell -- the way that Novell had to
17 handle that situation was to ask us to perform an
18 audit using an independent C.P.A. firm. And that was
19 the way that was also protecting the customer, was
20 that if we were questioning the customer's report,
21 that we also had to go in for a formal audit of the
22 customer's records. Once again, usually with
23 somebody who is independent.
24         So if Novell -- the correct mechanism for
25 Novell, if they wish to question one of the

Page 197

1  licensees, would have been simply to ask us to do an
2  audit of that licensee.
3      Q.   But apart from that process, why, as part
4  of the '98 audit of SCO, instead of you funneling the
5  documentation from third-party royalty reports, why
6  couldn't Novell just go to them and get them?
7      A.   Because as I said, the relationship was
8  the only thing that we would get is the report. The
9  reports were handed to Novell in unaltered form, and
10 that is what they had the right, as far as I was
11 concerned, to audit.
12         If they wished to audit a customer, or if
13 they had any questions that we were not reporting
14 correctly a customer's reports, passing it through to
15 Novell, then the correct mechanism was to request an
16 audit.
17     Q.   But why wouldn't you let Novell just go --
18     A.   Because you don't have people just calling
19 up customers. Customers object to that.
20     Q.   Do you think Novell's auditors were
21 diligent in the '98 audit?
22     A.   They were very thorough, I thought.
23     Q.   Do you remember discussing any trend
24 analysis with the Novell auditors?
25     A.   Along with the royalty reports, I would

50 (Pages 194 to 197)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 198

1  send trend analyses often.
2      Q.  In what --
3      A.  I'm not sure if I remember specific
4  discussions.  Possibly.
5      Q.  In what format?  What were these trend
6  analyses that you say you sent?
7      A.  We used to include a report by customer by
8  ship quarter of the reported royalties so that one
9  could easily see in matrix format how the revenue
10  stream was going.
11      Q.  But did you actually do any number
12  crunching and trend analysis that you sent to them?
13      A.  Yes.
14      Q.  Or did you just send them the raw data?
15      A.  No.  We used to send them the actual
16  matrix.
17      Q.  The actual matrix of?
18      A.  The customer by ship quarter revenues.
19      Q.  And that was something you created for the
20  audit?
21      A.  No.  It is actually created for Novell.
22      Q.  As part of the monthly reporting?
23      A.  Yes.
24      Q.  Not part of the audit?
25      A.  Well, they would have had it as part of

Page 199

1  the monthly reports that they used for the audit.
2      Q.  But does that -- is there any -- I mean,
3  is that trend analysis or does trend analysis go
4  further and look at the numbers and see if they make
5  sense or raise any red flags?
6      A.  Uh-huh (affirmative).  That's usually --
7      Q.  And did you send those?
8      A.  No.
9      Q.  Do you know -- I'm sorry.
10      A.  No, go ahead.
11      Q.  Do you know if Novell's auditors did do
12  that?
13          MR. GONZALEZ:  Objection to form.  Vague
14  and ambiguous.
15      A.  Like what?
16      Q.  Well, I don't know.  Any kind of trend
17  analysis where you look at the payments over time and
18  assess whether they make sense.
19      A.  They may have.  I'm not sure I
20  specifically remember.
21      Q.  Do you remember whether the Novell
22  auditors were asking about customers who had dropped
23  off the list or cancelled their SVRX licenses?
24      A.  I remember some discussion about the zero
25  reporters.  And I do remember once or twice their

Page 200

1  asking why somebody wasn't paying anymore.  I
2  remember a couple, one or two customers, there were
3  little ones that were bankrupt.  Some things like
4  that.
5      Q.  In paragraph 10 of your declaration, which
6  is somewhere in the pile - you should have seen his
7  pile - there's a first sentence that says, "Until
8  2003, Novell never contradicted this understanding or
9  made any request for fees from source code licenses
10  or for royalties from licenses that did not exist at
11  the time of the APA."
12      A.  Uh-huh (affirmative).  Basically.  As far
13  as I was concerned, as far as, you know, information
14  requests that I remember, it was basically -- and
15  even in the majority of the 2003 audit, they audited
16  the monthly reports that I sent to Novell, as well as
17  the unit report.
18      Q.  But why -- I'm just quoting what you said
19  here.  Why would the Novell -- why would Novell have
20  made any request for fees from source code licenses
21  or for royalties from licenses that did not exist at
22  the time of the APA?  Why would they have thought to
23  ask for that?
24      A.  Well, they didn't.
25      Q.  Well, they didn't, but why would they have

Page 201

1  asked for that?  As far as you knew, wasn't there an
2  expectation that there wouldn't be any?
3      A.  Right.  They never did.
4      Q.  Is it your belief that Novell had no
5  reason to expect that there would be significant SVRX
6  licenses entered after the time of the APA?
7      A.  No.
8          MR. GONZALEZ:  Objection to form.
9      A.  Of course not.  Because, once again, it
10  goes back to the concept that everybody understood
11  that SCO would be pushing their business, which was
12  the UnixWare business.  So if anybody needed
13  anything, they would request the latest technology.
14  Usually customers want the latest technology.  I
15  mean, there are cases where customers remain on very
16  old technology for very long periods of time.  But if
17  they are entering into new agreements, they usually
18  want the latest technology.
19      Q.  Then in paragraph 10, continuing, you say
20  that, "Novell's 2003 audit was the first time in the
21  history of the relationship that Novell ever asked
22  for information on source code licenses."  Do you see
23  that?
24      A.  Yes.
25      Q.  Is that still your belief?

51 (Pages 198 to 201)

CitiCourt, LLC
801.532.3441

Jean Acheson   *   March 20, 2007

Page 202

1    A.   Yes.  As far as I remember.
2    Q.   Was it in 2003 that SCO announced its
3  agreements with Microsoft and Sun?
4    A.   Yes.  That's correct.
5    Q.   And are you aware of any instances before
6  that where SCO had publicly announced that it had
7  granted new UNIX source licenses?
8        MR. GONZALEZ:  Objection.  Assumes facts
9  in evidence.  Lacks foundation.  Form.
10   A.   "UNIX source licenses" is very nebulous.
11  "UNIX" is basically an adjective.  It is either, to
12  me it's SVRX, it's the UnixWare.  You know, it's
13  agreements running our intellectual property.
14   Q.   I think this was 94 at Mr. Sontag's
15  deposition but I don't have a version with that
16  stamp, so I guess -- this is the SCO or Caldera 10-Q
17  for the period ended April 30, 2003.
18       Okay.  So this is 94, previously marked.
19       MR. GONZALEZ:  I didn't follow that
20  exchange.  What is this again?
21       MR. PERNICK:  This is -- I don't have a
22  version with the stamp on the bottom, but this was
23  Exhibit 94 to Mr. Sontag's deposition.  It is the SCO
24  Group or Caldera International, Inc. form 10-Q for
25  the period ended April 30, 2003.

Page 203

1        MR. GONZALEZ:  And you know that to be the
2  case based on reading this document?
3        MR. PERNICK:  Why don't we give it a new
4  number.  And we will call this 121.  I think it is
5  safer to just do that.
6        MR. GONZALEZ:  Thanks.
7        January 16, 2007 declaration of James
8  Ludwick filed(EXHIBIT-121 WAS MARKED.)
9    Q.   (By Mr. Pernick) Ms. Acheson, I'll ask
10  you to look at page 21, which comes under a heading
11  that was on page 20.  And the page numbers I'm
12  referring to are not the page numbers all the way on
13  the bottom where it gives 24 of 43 or 25 of 43.  It
14  is the page number of the SEC filing.  Am I making
15  any sense to you?
16   A.   No.  I'm sorry.  I don't see the first
17  pagination you are referring to.
18   Q.   So maybe it is just my printout.  Okay.
19  Page 21, which comes under a section labeled Recent
20  Developments.
21   A.   Okay.
22   Q.   And I'll ask you to read to yourself the
23  paragraph on the top of page 21 which begins with,
24  "We initiated the SCOsource effort."
25       Have you read that, Ms. Acheson?

Page 204

1    A.   Yes, I have.
2    Q.   Have you seen the last paragraph of --
3  first of all, this paragraph identifies or speaks of
4  two licenses.  It identifies one of the licensees as
5  Microsoft, but it is speaking of two.  Do you see
6  that?
7    A.   Yes.
8    Q.   Do you see the last sentence says, "These
9  license agreements will be typical of those we expect
10  to enter into with developers, manufacturers, and
11  distributors of operating systems, and that they are
12  nonexclusive perpetual royalty-free paid-up licenses
13  to utilize the UNIX source code, including the right
14  to license that code."  Do you see that?
15   A.   Yes.
16   Q.   Are you aware of any instances before this
17  where SCO had publicly announced that it had granted
18  UNIX source code licenses?
19       MR. GONZALEZ:  Objection to form.
20   A.   No.  I really don't remember the
21  chronology of a lot of this, so I'm not sure.
22   Q.   Could this have been the first time in the
23  history of the relationship between or -- let me
24  backtrack.  To your knowledge could this have been
25  the first time in the history of the relationship

Page 205

1  that -- let me try one more time.  To your knowledge,
2  could this have been the first time in the history of
3  the post APA relationship that SCO ever announced
4  granting new UNIX source code licenses?
5        MR. GONZALEZ:  Objection.  Calls for
6  speculation.  Assumes facts not in evidence.  And
7  form.
8    A.   I don't know.
9    Q.   Well, I mean you say, you go out of your
10  way to say in your declaration that the 2003 audit
11  was the first time in the history of the relationship
12  that Novell ever asked for information --
13   A.   Right.
14   Q.   -- on source code licenses.
15   A.   Uh-huh (affirmative).
16   Q.   I'm asking you is it possible that this
17  was the first time that SCO had announced that it had
18  new UNIX source code licenses?
19   A.   Well, you know, they use UNIX source code
20  but I believe the two agreements that were here were
21  basically UnixWare.  So to me, I'm not exactly sure
22  what we are getting at.  Sorry.
23   Q.   Well, you thought it was significant that
24  this was the first time in the history of the
25  relationship that Novell ever asked for information

52 (Pages 202 to 205)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 206

1  on source code licenses.
2      A.   Right.  Yes.
3      Q.   Does this 10-Q say that these were
4  UnixWare licenses?
5      A.   No.  It says UNIX source code.  But once
6  again, as I said, UNIX is an ambiguous adjective.
7  The agreements, I believe, were for UnixWare.
8      Q.   When --
9      A.   So maybe that's the reason why Novell
10  questioned it, because they had never seen us use
11  that before.  I don't know.
12      Q.   That would be logical, right?
13      A.   I have no idea.  Possibly.
14      Q.   Do you know at the time that Novell asked
15  for information in 2003 on source code licenses, do
16  you know if Novell had seen either the Microsoft or
17  the Sun license?
18      A.   No, they wouldn't have.
19      Q.   So doesn't it stand to reason that the
20  announcement would have given rise to curiosity on
21  Novell's part?
22          MR. GONZALEZ:  Objection.  Calls for
23  speculation.
24      A.   Yeah, I don't know what drove their
25  request.

Page 207

1      Q.   But you're not aware of any public
2  announcements SCO had made of UNIX source code
3  licenses post APA?
4      A.   I don't remember, one way or the other.
5      Q.   What about in paragraph 12 of your
6  declaration.  You start off by saying, "Novell, and
7  then Santa Cruz and SCO, commonly included licenses
8  for prior products in the current license."  And you
9  say that, "These licenses were incidental to the
10  license for the current technology."  Do you see
11  that?
12      A.   Yes.
13      Q.   And what is your understanding based upon
14  here?
15      A.   From what I've read in product schedules
16  and also heard from the product managers and stuff.
17  It actually goes further back.
18      Q.   What discussions with product managers are
19  you talking about?
20      A.   Well, just, you know, I've talked with
21  people like John Maciaszek and John Shepherd and
22  various other people in regards to the licenses,
23  various parts of the licenses.  And I've read some of
24  the product licenses, the product schedules, I should
25  say.  They are not licenses.  And just basically

Page 208

1  there was always a segment that kind of covered the
2  customer for prior products just in case -- since one
3  product built on the other, it would cover the
4  customer who was using the latest version in case
5  some of the prior code was in our code or in their
6  derivative work.
7      Q.   You say that -- you say these licenses
8  were incidental to the license for the current
9  technology.
10      A.   That's correct.  Because people wanted the
11  current technology.  The reason why they would take
12  UnixWare 2.1 is because they wanted UnixWare 2.1.  So
13  the backwards compatibility so that they could bring
14  up applications and things was simply incidental.
15      Q.   Would the scope of the different licenses
16  be identical?
17          MR. GONZALEZ:  Objection.  Vague and
18  ambiguous.
19      A.   I don't understand.
20      Q.   Well, you're talking about -- you are
21  saying there's several licenses in here.  You're
22  saying are licenses to the current product and the
23  prior products.
24      A.   Uh-huh (affirmative).
25      Q.   And I think you're saying that the

Page 209

1  licenses to the prior products were incidental to the
2  license for the current technology.  So there's
3  licenses to each.  And I'm asking you whether they
4  are identical in scope.
5          MR. GONZALEZ:  Objection.  Calls for a
6  legal conclusion and still vague and ambiguous.
7      A.   I don't believe that they would have been
8  of equal importance.  I believe the most important
9  component was the latest technology.  That's what the
10  customer was purchasing.  I'm not technical enough to
11  go really beyond that.
12      Q.   I'm not asking about the importance to
13  either SCO or the licensee.  I'm just saying you are,
14  in these sentences, talking about -- I assume in a
15  single document there's licenses to several products
16  you're seeing.  There's a license grant to the new
17  product.  There's a license grant --
18      A.   Correct.
19      Q.   I'm asking are the licenses always of the
20  same scope?  Do they allow the licensee to do the
21  same things?
22          MR. GONZALEZ:  Same objection.
23      A.   From a technical viewpoint, I don't know.
24  I just know that there is backwards compatibility
25  usually included within the license.

53 (Pages 206 to 209)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 210

1    Q.   Do you have any idea whether the scope of
2   the licenses, whether they are the same or not in
3   these agreements?
4    A.   Same or not what?
5         MR. GONZALEZ: Objection.
6    Q.   With each other. There's several
7   licenses; to the current product, to the one before
8   that, the one before that. That's what you are
9   saying, I think. Are the license grants of the same
10  scope?
11        MR. GONZALEZ: Same objection. Asked and
12  answered also.
13   A.   Once again, to me the customer was
14  purchasing the latest technology. The other was
15  there in order to help them to be backwardly
16  compatible. And in the event that -- you know. Just
17  that all of the code was there, that one built on the
18  other. So they ended up having to have the -- it was
19  just to let them know that they were going forward
20  with the product.
21   Q.   So do you have any idea what the scope of
22  the license grant was and how they compared to each
23  other across the different products?
24        MR. GONZALEZ: Objection.
25   A.   The scope -- no, I don't. It was very

Page 211

1   incidental on the older stuff. It's like -- as an
2   example, Novell licensed Unisys. I think it was for
3   2.1. And in that product schedule, and this was for
4   UnixWare 2.1, in that product schedule it listed all
5   of the prior versions of UnixWare back to 1.0 and it
6   listed a whole grouping of the old SVRX licenses from
7   4.2 NP, I think. Whatever the absolute latest one
8   has been was all the way back to I think it was the
9   3.2, the 2.0.
10        And at the time of transition, obviously
11  it was incidental because the going-forward binary
12  revenue stream was agreed that it belonged to SCO,
13  not to Novell. If it had been equal weight to each
14  of those components going backwards, then we would
15  have had to, I would think, divide that revenue up
16  between Novell and SCO. But we didn't have to.
17   Q.   But you just testified about how there
18  were licenses granted to 2.1, back to 1.0.
19   A.   Uh-huh (affirmative).
20   Q.   And I'm just asking you, have you ever
21  noted whether -- you're talking about a common
22  practice here of Novell and Santa Cruz and SCO and
23  all these licenses.
24   A.   Uh-huh (affirmative).
25   Q.   Do you know whether the license grant,

Page 212

1   what the licensee is allowed to do with each one of
2   the products, is it the same?
3    A.   No, I don't know. To me it's just that
4   it's there for backwards compatibility. What they
5   use -- they would just have reported it, since they
6   were reporting under the UnixWare 2.1 product
7   schedule, they would report as UnixWare 2.1.
8    Q.   You're saying this commonly, this happened
9   commonly.
10   A.   Yes.
11   Q.   How many licenses like these have you
12  reviewed?
13        MR. GONZALEZ: Objection. Lacks
14  foundation.
15        MR. PERNICK: It doesn't lack foundation.
16  I'm asking her about her statements. She's telling
17  me about this common practice, and I'm asking her how
18  many licenses she's read.
19   A.   Basically I've read the product schedules
20  for most of the products going back. And I have
21  noted usually that they contain a backwards
22  compatibility segment within them.
23   Q.   (By Mr. Pernick) And does the product
24  schedule say what license rights are being granted,
25  the scope of the rights the licensee is granted?

Page 213

1    A.   I would assume they do, probably. I just
2   don't remember the specific detail. And if I did, it
3   would probably be technical and I probably would not
4   understand it.
5    Q.   Well, maybe not. But you are opining on
6   these licenses here.
7    A.   Yeah.
8    Q.   So I'm asking you what it is based on.
9    A.   Well, it is based on reading the schedules
10  and discussions with product management so that if a
11  customer came and they wanted -- because usually a
12  company will only sell its latest product. So back
13  under Novell, if somebody wanted to license for
14  whatever reason 3.2, I'm not sure why they would do
15  this. But this was the explanation that was given to
16  me. What in reality we would do is to license them
17  for 4.2, which was the product at that time, and then
18  the customer would have the backwards compatibility
19  to whatever it was in 3.X that they needed. But they
20  would report as if they -- because they were licensed
21  for 4.2.
22   Q.   When you read these product licenses, do
23  you understand all the terms?
24   A.   No, I do not. That's why I discuss them
25  with product management, and also with legal.

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 214

1    Q.    And you said you typically would just read
2    the supplement; is that right?
3        A.    Well, it's --
4            MR. GONZALEZ:  Objection.
5        Q.    Schedule?
6        A.    It's a product schedule.
7        Q.    A product schedule.
8        A.    Yes.
9        Q.    Would you read the rest of the license
10    documents for that particular customer?
11       A.    If it was a question about -- okay.  Under
12    the way products were licensed, everybody had the
13    exact same product schedule.  If a customer requested
14    a change to the product schedule, then a side letter
15    was written with the agreed-upon changes.  So if I
16    was reading a schedule simply to read a schedule, I
17    would just read it.  If I was reading it in
18    conjunction with a customer's reporting rights, or
19    what they were reporting to me, then I would read it
20    in conjunction with any side letters that may have
21    been written that would affect the way that they
22    reported their binary royalties.
23       Q.    And what do you mean by "commonly" in the
24    first sentence of paragraph 12?  How often -- what
25    does "commonly" mean?  Does it mean universally?

Page 215

1        A.    I believe it was in all of the product
2    schedules that I remember.
3        Q.    And how many is that about?
4        A.    Well, it would be all the UnixWare 2.1 and
5    back.  And then I think all the SVRX ones had it, as
6    well.
7        Q.    How many have you reviewed?  You say that
8    Novell and Santa Cruz and SCO commonly included
9    licenses for prior products in a current license.
10       A.    Well, there's been -- let's see.  UnixWare
11    2.0 was basically where we started the current --
12    where AT&T started the current -- actually, no.  It
13    was about 3.X, but then they backed into 2.0.  So
14    2.0, 3.X.  And 3.X probably had five product
15    schedules.  And then the 4.Xs, there were
16    probably six or seven there.  UnixWare would have
17    been 1.1, 2.0, 2.1.  So I don't know.  For maybe a
18    couple, twenty releases or so.  I don't know.  There
19    were sometimes different iterations.
20       Q.    And what do you mean by "incidental"?  You
21    said these licenses were incidental.  What does that
22    mean?
23       A.    Usually -- it wasn't the older code that
24    the customer really wanted.  What they wanted was the
25    latest technology.  So it wasn't -- it was just to

Page 216

1    protect the customer and to protect, you know, so
2    that in case they needed something for an older
3    version of product, then they would have this
4    backwards compatibility.  It's sort of like when you
5    buy -- from what I understand, it's sort of like when
6    you buy Microsoft Windows, I can still -- maybe not
7    Vista, because I don't know Vista at all.  But if I
8    buy Windows 95, my games from prior releases of
9    Windows work on it.  So therefore there must be code
10    from the prior releases in there in order to allow my
11    older programs to run.  So it's backwards
12    compatibility.
13       Q.    But you said it's tied to whether it's
14    what the customer really wanted.
15       A.    Well, usually if you are going to pay a
16    lot of money, you usually want the latest code.
17       Q.    How do you know what code the customer
18    really wanted?
19       A.    Because that's what they paid for.
20       Q.    How do you know what they intended?
21       A.    I only know that if they sent in the money
22    and I saw the purchase order and it said UnixWare 2.0
23    on it, my assumption is they wanted UnixWare 2.0.
24       Q.    How do you know which version in the
25    schedule they really wanted?

Page 217

1        A.    To me, that's as far as I would know.
2        Q.    Just what the indication in that schedule
3    of the most current release was?
4        A.    That is correct.
5        Q.    Has anyone -- strike that.
6            We are out of tape.
7            (Break taken from 6:14 to 6:27.)
8        Q.    Okay, Ms. Acheson, in paragraph 12 in the
9    middle there, you also say, "This was important to
10    SCO's right to conduct its ongoing UNIX business."
11    Why was it important to SCO?
12       A.    Well, as stated under the Unisys
13    agreement, in case the customer needed the backwards
14    compatibility for their products.
15       Q.    If the customer needed it, why would it be
16    incidental?
17       A.    Well, because during a period of upgrade,
18    you know, it's just like is it one hundred percent
19    necessary that your old games are compatible?  You
20    know, it's just a nice point.  And as you're
21    upgrading products, you want to make sure that you
22    don't end up with compatibility issues.
23       Q.    Are you saying the only time it was ever
24    important for SCO was in the context of Unisys?
25       A.    No.  But I just know that that's one of

55 (Pages 214 to 217)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 218

1  the customers.
2      Q.   So you don't have anything broader in mind
3  when you say, "This was important to SCO's right to
4  conduct its ongoing UNIX business"?  Just one
5  example, Unisys?
6      A.   Well, I believe there were others, but I
7  don't have a list in front of me at the moment.  It's
8  just Unisys that basically stands out to me.
9      Q.   So having the prior products was something
10 that was -- having the prior products in the licenses
11 was something that was beneficial to SCO from a
12 business standpoint?
13     A.   I believe it was beneficial to SCO's
14 customers, that it saved them probably a lot of
15 upgrading expense while being able to integrate later
16 technology.  I'm not technical enough to really know
17 or understand that, but based on what I've heard from
18 product management.
19     Q.   And who do you mean by "product
20 management"?
21     A.   People like John Maciaszek, John Shepherd,
22 I don't know.  Various conversations.
23     Q.   Have you discussed this issue with them,
24 the incidental licensing of prior products?
25     A.   In the past I have.

Page 219

1      Q.   When?
2      A.   Just -- I believe back under Novell we
3  actually had a customer specifically ask, and I
4  forwarded them to product management.  They had
5  acquired I think another business, and so they wanted
6  to know if they were, for the other business's
7  products, if they were licensed or not for some of
8  the acquisition.  So I had to reference them to
9  product management.
10     Q.   You say also in this sentence that it was
11 also, "Standard practice when Novell owned the
12 business"; is that right?
13     A.   That's correct.
14     Q.   And why does that matter?  How does that
15 shape your opinion?
16     A.   Well, actually, it probably should have
17 been broader.  It was standard practice at all points
18 that I remember.  So under UNIX System Laboratories
19 as well.
20     Q.   At those points in time, though, didn't
21 the -- I mean, didn't Novell, for instance, own the
22 royalty stream from both the old and the new
23 versions?
24         MR. GONZALEZ:  Objection.  Vague and
25 ambiguous.

Page 220

1      A.   Well, yes, they owned the products.
2      Q.   And the royalty streams from the products?
3      A.   Yes, they did.
4      Q.   So the interests in the royalty stream
5  weren't split as they were with SCO and Novell,
6  right?
7      A.   That is correct.
8      Q.   So is it really -- isn't it apples and
9  oranges to compare?
10     A.   No.
11     Q.   How come?
12     A.   Because once again, like in the case of
13 Unisys, Novell knew that they were handing over
14 agreements to us for revenue that already had this
15 backwards compatibility built into it, or the
16 licenses for prior products.  So they must have also
17 thought it was an incidental right.
18     Q.   Does the APA address this question of who
19 gets royalties in this scenario?
20     A.   No.  But -- actually this is one incident
21 where the auditors actually probably did audit the
22 Unisys agreement and for UnixWare, because Unisys
23 used to report both the SVRX royalties and the
24 UnixWare royalties on one report.  And they never
25 objected that the UnixWare royalties did not belong

Page 221

1  to SCO.
2      Q.   When you say, "Based on my understanding
3  of the agreement and the course of practice of the
4  parties, the fact that a license to current
5  technology included an incidental license to the old
6  technology in no way entitled Novell to the revenue
7  from that license."  I mean, you reference the
8  agreement.  Does the APA address this?
9      A.   No.  That just basically -- you know, in
10 the APA, it stated that UnixWare scheduled -- the
11 UnixWare product was transferred to SCO.  Novell
12 would have known that this language was in the
13 product schedule.  So ergo, it transferred.  I mean,
14 these product schedules were not hidden from Novell.
15 It was Novell legal department that developed them.
16     Q.   So you said, "I have never included such
17 revenue when transmitting royalty payments to
18 Novell."
19     A.   Yes.  So in the case of let's say Unisys,
20 the UnixWare revenue was retained by SCO and the SVRX
21 revenue, that was also reported by Unisys, which was
22 being reported under a specific SVRX product
23 schedule, was given to Novell.
24     Q.   So the "such revenue" that you are talking
25 about in the last sentence of paragraph 1, is that

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 222

1  UnixWare based revenue?
2      A.   Well, yes.  Because the paragraph
3  basically, to me, speaks more to the concept of the
4  backward -- that in UnixWare there was backward
5  compatibility.
6      Q.   Is there other revenue that you did not
7  transmit to Novell that is discussed that you are
8  contemplating in this paragraph 12, or is it just
9  UnixWare?
10     A.   UnixWare would be the only one that was in
11 the product hierarchy.  So in other words, like we
12 have Open Server.  Well, it wasn't in the product
13 hierarchy from SVRX up through UnixWare.
14     Q.   Well, let me ask it a different way.  You
15 said, "Therefore I have never included such revenue
16 when transmitting royalty payments to Novell.
17     A.   Right.  So if it was a UnixWare schedule,
18 if it was royalties under a UnixWare schedule, I
19 would keep those.  If it was royalties under an SVRX
20 schedule, then that would go to Novell.
21     Q.   And is there, in fact, any other revenue
22 that you withheld on that basis from Novell?
23     A.   There wouldn't have been any other revenue
24 but UnixWare revenue that was in that hierarchy of
25 products.

Page 223

1      Q.   So on --
2      A.   We didn't have a product XYZ or anything
3  else.  So UnixWare is it.
4      Q.   So in terms of your belief that Novell is
5  not entitled to royalty streams for a license to
6  current technology that includes an incidental
7  license to old technology, is that only UnixWare that
8  you're talking about?
9      A.   Yes.  I believe UnixWare.  And -- yeah.
10 That's the only one that has that hierarchical
11 structure.
12     Q.   Has SCO ever paid anything to Novell based
13 on its sales of UnixWare?
14     MR. GONZALEZ:  Objection.  Vague and
15 ambiguous.
16     A.   Yeah, like what kind of payments?
17     Q.   Well, what kind of payments did SCO make
18 to Novell --
19     MR. GONZALEZ:  Asked and answered.
20     Q.   -- from UnixWare sales?
21     A.   There was a third party royalty component
22 called NetWare that was in earlier versions of
23 UnixWare.  I can't remember specifically which ones.
24 I think it was 2.0 and 2.1.  We then negotiated later
25 to remove it from later releases of UnixWare.  But

Page 224

1  yes, we had to pay a royalty on the NetWare to
2  Novell.
3      Q.   Okay.
4      A.   But that was because there was, just like
5  the other third-party royalty technology that I spoke
6  about, we did owe -- it was the same thing.  There
7  was a one-user license.
8      Q.   Okay.  So putting that to the side, is
9  there any revenue that Novell transmitted or that SCO
10 transmitted to Novell based on sales of UnixWare?
11     A.   Not after the transition date.  If we
12 received reporting from prior to the transition date
13 then yes, that belonged to Novell.
14     Q.   And for the post transition date how come
15 there was no payments made to Novell for UnixWare
16 sales?
17     A.   Because UnixWare was what SCO purchased
18 from Novell.  Therefore, all of those revenues
19 belonged to SCO.
20     Q.   Unless SCO hit some target numbers?
21     A.   Oh, yes.  The 40 percent.  But we never
22 hit those numbers.
23     Q.   How do you know they weren't hit?
24     A.   Because I know that Terry Dulin for the
25 first few years of the calculation, calculated that.

Page 225

1  And then for the last few years of it, I calculated
2  it.  And at no time did we make the unit mark.
3      Q.   Do you remember in the '98 audit whether
4  the Novell auditors were asking about whether the
5  UnixWare target numbers were hit?
6      A.   I believe the auditors, the Novell
7  auditors sat with Terry Dulin in regards to that.
8  And she showed them that we did not attain, and they
9  seemed to be satisfied.
10     Q.   Were there some royalty reports provided
11 to Novell where UnixWare sales were listed?
12     A.   Only if it was pre APA and Novell was
13 entitled to the revenue.
14     Q.   Okay.  So I'll mark as 122 what I think is
15 a May, 1997 Cash Received and Reconciliation to
16 payment to Novell report, bearing Bates numbers SCON
17 90729 through SCON 90775.
18     (EXHIBIT-122 WAS MARKED.)
19     Q.   And Ms. Acheson, I was going to ask you
20 some questions on the third page of this document
21 which -- I won't characterize.  I'll ask you what
22 this page is.  But it's got the number on the bottom
23 of SCON 90731.
24     A.   Okay.  And?
25     Q.   Just in general, what table is this?

57 (Pages 222 to 225)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 226

1     A.   Okay.  This is a cash report of all of the
2  cash receipts that were basically received by my
3  group in New Jersey for which we were responsible for
4  processing.
5     Q.   And this would be provided to Novell?
6     A.   No, we didn't.  This was SCO information.
7  This was something that we used to verify our
8  reportings to SCO.
9     Q.   So this was internal.
10    A.   This is correct.
11    Q.   Okay.  Well, let me ask you about -- you
12 see one of the -- I don't know.  Maybe it's the fifth
13 row down, there's an entry for Microport.
14    A.   Yes.
15    Q.   And it's got a product.  The product
16 column says UW?
17    A.   That is correct.
18    Q.   And then I think the entire payment is
19 allocated to the column SCO Retains 100 Percent of
20 Cash?
21    A.   That is correct?
22    Q.   So was this sales of UnixWare; is that
23 right?
24    A.   Yes.
25    Q.   Do you know whether in that kind of

Page 227

1  instance with Microport, the license would have also
2  had SVRX in it?
3     A.   It's possible.  Microport was -- yes.
4  Microport was based on, I think UnixWare 1.1 and then
5  they upgraded to 2.0.  And I believe that it would
6  have been the same product schedule as was used with
7  Unisys.
8     Q.   So how come there was no allocation to
9  SVRX?
10    A.   Because it was considered to be UnixWare.
11 And exactly the same with Unisys, Microport was a
12 customer that had converted to UnixWare, to the
13 UnixWare product schedule under Novell.  And when the
14 product line was sold to SCO, it was also understood
15 that this belonged to SCO.
16    Q.   What about there are some entries, for
17 instance if you go down maybe eight lines or so, ten
18 lines, for Samsung Electronics.  In the product line
19 it says UW/SVRX?
20    A.   That is correct.
21    Q.   And in the column for SCO Retains 100
22 percent there's --
23    A.   Hold on.  I haven't quite gotten there.
24 This is a hard schedule for me to read.  Sorry.
25 Okay.

Page 228

1     Q.   There's $88,000 and change on the SCO
2  Retains 100 percent of cash column?
3     A.   Yes.
4     Q.   And there's $184,000 and change in the
5  Returns to Novell column?
6     A.   Yes.
7     Q.   And how was that split arrived at?
8     A.   Because whatever for the 88,000 was
9  reported under a UNIX product schedule; whereas the
10 other amount was reported under an SVRX schedule, and
11 had not been converted or upgraded to UnixWare.
12    Q.   So in that instance there would be two
13 schedules you were operating under?
14    A.   That is correct.
15    Q.   And is that true any time there's a UNIX
16 W/SVRX entry?
17    A.   I would have to --
18    Q.   In general?  Well, let's see.  There's
19 another one for NCR.
20    A.   Yes.  I believe NCR worked that way, as
21 well.
22    Q.   And as a general matter, would that be
23 true?  If there were --
24    A.   Usually.  I mean, I haven't reviewed every
25 single one and sometimes the person keeping the

Page 229

1  schedule was confused, might not have one hundred
2  percent known the customers.
3     Q.   But if there was only one license and it
4  was -- and it had a current, a most recent version
5  that was UnixWare, would all the revenue be kept by
6  SCO?
7     A.   Only if the prior product had been
8  converted.  Okay?  This is beyond me technically.  So
9  I can't explain how the conversion works.  I just
10 know that somebody like Microport was converted.
11 Unisys was converted.  In the case of Samsung, there
12 was obviously some way that they were converted.  All
13 of those happened prior to the APA.
14       So as they transferred over to Novell, or
15 excuse me, to SCO, any that were the UnixWare
16 converted such as the NCR MP-RAS, those remained 100
17 percent SCO revenue.  Anything that had not been
18 converted remained as Novell.
19    Q.   Were there any valid conversions after the
20 APA?
21    A.   No.
22    Q.   How do you know that?
23    A.   Because it's what product management has
24 told me.
25    Q.   How did that come up?

58 (Pages 226 to 229)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 230

1    A.   It was asked in the -- I believe there
2   might have been an asking of that in the audit.  And
3   one of those audit papers actually it shows
4   "converted, zero."  And I know that in talking to
5   product management, it was a very hard thing under
6   the APA to convert a customer.  So we usually didn't.
7   So it did not occur.
8    Q.   Do you mean it was asked by Novell during
9   the '98 audit?
10    A.   It was on that list that you handed to me.
11    Q.   Okay.  What about post '98, like through
12   '02, '03?
13    A.   I don't remember.
14    Q.   Do you think that --
15    A.   They may have.
16    Q.   Do you think -- I'm sorry.
17    A.   They may have, and if they did I would
18   have asked.
19    Q.   They may have asked.  But I don't mean
20   whether Novell asked in the audit in '03.  I mean
21   were there any valid conversions post '98?
22    A.   It is my understanding there are not.
23    Q.   And that's based on discussions with
24   product managers?
25    A.   Yes.  Product managers and legal.

Page 231

1    Q.   Who have you spoken to on that topic?
2    A.   John Maciaszek.
3    Q.   In paragraph 13, Ms. Acheson, of your
4   declaration, you say that, "Through 2005, SCO has
5   paid to Novell approximately the following amounts in
6   binary royalties, complying with the APA," and you
7   identify the sum of $174,545,098.90.  Do you see
8   that?
9    A.   Yes, I see that number.
10    Q.   How did you come up with that number?
11    A.   I believe just by adding up all of the
12   reports that I have sent to Novell and all of the
13   reports that Japan has sent to Novell.
14    Q.   So it includes Japan, also?
15    A.   Yes.
16    Q.   Does that come under the rubric of the
17   Asset Purchase Agreement?
18    A.   Yes.
19    Q.   Do you know -- okay, so from the binary --
20   you're talking about binary royalty streams that gave
21   rise to this $174 million number, right?
22    A.   What?
23    Q.   There's a collection of binary royalty
24   streams that add up to this $174 million number?
25    MR. GONZALEZ:  Objection.  Vague.

Page 232

1    A.   Yeah.  Do you mean -- could you explain a
2   little more what you mean?
3    Q.   There's a number here $174 million plus,
4   correct?
5    A.   Right.
6    Q.   And that is composed of all these
7   different binary royalty payments that have been made
8   to SCO and passed through to Novell, right?
9    A.   Yes.
10    Q.   Do you know what source royalties SCO has
11   that collected from those licenses from that time
12   period?
13    MR. GONZALEZ:  Objection.  Vague and
14   ambiguous.
15    A.   Nothing.
16    Q.   Even like additional CPUs?
17    A.   Because that didn't belong to Novell.
18    Q.   I didn't ask you that.  I just asked do
19   you know for these binary royalty stream components
20   that add up to the $174 million number, do you know
21   what the corresponding source royalties collected by
22   SCO has been?
23    A.   Okay.  You said Novell before.
24    Q.   I'm sorry.  I meant SCO.
25    A.   Okay.  That's why I said zero.

Page 233

1   Off the top of my head, no.
2    Q.   Could you figure that out?
3    A.   Yes.
4    Q.   And just through your programs you could
5   do that?
6    A.   Yes.  I would have to look it up in our
7   databases.
8    Q.   Right.
9    A.   Yes.  All revenue, all transactions are
10   recorded.
11    Q.   Would all of that source royalty revenue
12   be attributable to additional CPU fees?
13    MR. GONZALEZ:  Objection to form.
14    A.   I believe that it is additional CPUs.  It
15   is units under Cray, and referenced software
16   agreements granted limiting rights for customers to
17   view derivative works.
18    Q.   That last category, the reference software
19   agreements, what's the magnitude of that royalty
20   stream; do you know?
21    A.   I don't know.
22    MR. GONZALEZ:  Vague and -- objection to
23   form.  Sorry.
24    Q.   Do you have any estimate, a ballpark?
25    A.   Not off the top of my head.

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 234

1    Q.    But you could figure it out?
2    A.    Yes.
3    Q.    What do you mean the units under Cray
4 falls under something that is not additional CPU?
5    A.    Well, it is additional CPU. Cray is a
6 little bit -- a hair different. But it's not the
7 normal that they are replicating an additional CPU
8 for use on their site. They were granted additional
9 rights.
10    Q.    But in your correspondence with Novell,
11 you characterize that revenue as additional CPU
12 revenue.
13    A.    That it's basically the same. And of
14 course there would be the $1.5 million from the IBM
15 buyout.
16    Q.    How much has SCO collected in SVRX binary
17 royalties that it hasn't paid to Novell?
18    A.    I don't believe we have collected any SVRX
19 binary royalties.
20    Q.    That you haven't --
21    A.    Well, that we have not paid to Novell.
22    Q.    Are you aware that Novell has calculated
23 that it only received $43.5 million from SCO through
24 June of 2003?
25    A.    Really?

Page 235

1    Q.    Are you aware of that? I'm just asking.
2    A.    No.
3    Q.    I'll mark as 123 a January 16, 2007
4 declaration of James Ludwick filed in this case.
5        (EXHIBIT-123 WAS MARKED.)
6    Q.    Do you see, Ms. Acheson, that Mr. Ludwick
7 says that he's reviewed the royalty reports for
8 February, '98 through June, 2003 and he calculated
9 that the total figure representing total payment due
10 to Novell for a period for those years, and the total
11 that he calculated was $43,521,144.76?
12    A.    Yes.
13    Q.    Do you have any -- have you heard that
14 before?
15    A.    Actually, now that I see this, yes, I
16 have. But it is not in the same context as my
17 statement in 13. First of all, he is only talking
18 about what is in my revenue to cash reconciliation
19 and computation of balances due to SCO. Therefore
20 that is what has been reported by my office to
21 Novell. That does not include the Japan royalties,
22 which I have included in the $174 million.
23        Additionally, he is saying that it is the
24 total payment due to Novell so, therefore, he is
25 really only looking at the cash portion, I believe.

Page 236

1 I have to go back and calculate his number to figure
2 that out accurately. However, when I speak in the --
3 to a certain extent "paid" is sometimes ambiguous,
4 and I would have to go back and exactly check which
5 column I used the $174 from. But it could be that I
6 was also -- the total binary royalties. Because
7 Novell can book, at 100 percent revenue, the full
8 amount of the binary royalties and then deduct, as
9 expense, any administrative fees that they pay to us.
10 So I would have to check exactly which is happening
11 here.
12        Also, there are two additional years in my
13 calculation to the calculation that Mr. Ludwick is
14 showing here.
15    Q.    So the discrepancies you've identified
16 are, one, and tell me if I'm right, that he was not
17 including Japan and you were?
18    A.    Yes.
19    Q.    And another one is additional years.
20    A.    Yes.
21    Q.    And was there a third one that he is
22 talking about cash and you are not?
23    A.    Yeah. I think I may have to check that.
24 I wouldn't know without looking at my calculations
25 exactly. I don't remember exactly where. But I may

Page 237

1 be characterizing the total SVRX payments versus the
2 net payments, less the third-party royalties and our
3 administrative fees.
4    Q.    So your number may be gross not net?
5    A.    Correct.
6    Q.    How did you hear about Mr. Ludwick's
7 statement? How did that come up?
8        MR. GONZALEZ: Go ahead.
9    A.    I believe somebody showed it to me.
10    Q.    Do you remember who or when?
11    A.    I am not sure who, but I believe it was
12 somebody at BSF asking me if that was correct.
13        MR. GONZALEZ: To the extent you would
14 have to, in answering any questions or the follow-up
15 on his question, you would have to divulge any
16 conversation you have with attorneys for SCO, please,
17 I would instruct you not to answer.
18    Q.    In paragraph 14, Ms. Acheson, you say
19 that, "In 2003, Novell requested the Sun and
20 Microsoft agreements, claiming that they were SVRX
21 licenses." And then you say, "Because those
22 agreements are not SVRX licenses, and because of
23 confidentiality restriction SCO did not provide those
24 agreements to Novell." Do you see that?
25    A.    Yes.

60 (Pages 234 to 237)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 238

1    Q.    And what's the basis for your conclusion
2  that the Sun and Microsoft agreements are not SVRX
3  licenses?
4    A.    Because they are UnixWare licenses.
5    Q.    And have you read those license
6  agreements?
7    A.    At the time, I probably read them in part.
8    Q.    At what time?
9    A.    At the time when we had to book the
10 revenue.
11   Q.    So in 2003?
12   A.    Yes.
13   Q.    Do you think that's the last time you read
14 them in part?
15   A.    I may have reviewed them since.
16   Q.    Do you remember if you did?
17   A.    I think I reviewed one of them on Monday.
18 I don't remember.  We were reviewing tons of
19 documents.
20   Q.    Why do you say they are UnixWare licenses?
21   A.    Because it was my understanding the
22 customers wanted the latest product from us.
23   Q.    What was your understanding based on?
24   A.    Based on what sales told me at the time,
25 as well as what I saw of the agreements.

Page 239

1    Q.    And who in sales did you talk to about
2  this?
3    A.    It would have been Chris Sontag.
4    Q.    What did he say?
5    A.    That we were selling UnixWare to these
6  customers.
7    Q.    Did you talk to anyone else about whether
8  the Sun and Microsoft agreements are UnixWare or SVRX
9  licenses?
10   A.    I don't think I would have talked in
11 characterization.  I think maybe I discussed it with
12 my boss, Mike Olson.  But that was more on booking of
13 the revenue and recognition.
14   Q.    Well, are there any persons besides Mr.
15 Sontag with whom you've had discussions that lead to
16 your conclusion that the Microsoft and Sun licenses
17 are UnixWare licenses?
18   A.    I may have discussed with legal.  I don't
19 remember.
20   Q.    Are you aware that the Sun and Microsoft
21 agreements also granted licenses to SVRX technology?
22   A.    In the same --
23       MR. GONZALEZ:  Objection.  Calls for legal
24 conclusion.  Assumes facts not in evidence.
25   Q.    You can answer.

Page 240

1    A.    If they do, I believe it would be under
2  the same circumstances as described in the other
3  incidental backwards compatibility of our products.
4  But even if they do, basically it's a UnixWare
5  license.
6    Q.    Do you have any knowledge of what Sun and
7  Microsoft wanted?
8    A.    No.  I have no direct knowledge.
9    Q.    Who made the determination to classify the
10 Sun and Microsoft licenses as UnixWare licenses?
11   A.    I don't remember specifically at the time.
12 I just believe it was conversations with my
13 management and with Chris.
14   Q.    Did you have any role in the decision-
15 making on that?
16   A.    Well, as I said, it was conversations.
17 They tend to be two-sided.  I probably would have
18 participated in them.
19   Q.    Okay.  So was it -- it wasn't just that it
20 was reported to you, like as a decision that had been
21 made?  You were involved in deciding how to classify
22 these?
23   A.    We would have reviewed and decided how
24 best -- how to book the revenue within the company.
25   Q.    And what was your analysis?

Page 241

1    A.    At the time, we booked it under the
2  SCOsource division where we were booking all source
3  code transactions at that time.
4       MR. GONZALEZ:  And again, as Mr. Pernick
5  proceeds down this same line of questioning, I would
6  caution you not to divulge any conversations that
7  involved counsel for SCO.
8       THE WITNESS:  Okay.
9    Q.    (By Mr. Pernick)  What was your view as to
10 how it should be booked, either the Sun or Microsoft
11 license?
12   A.    We actually just booked them very
13 generally under the SCOsource division.
14   Q.    Okay.  But what was your view or input on
15 that decision?
16   A.    Just basically there was a stock
17 component, I believe, on one of them.  And so it was
18 evaluating the stock, and what the stock is versus
19 what was product revenue.
20   Q.    Did you have any discussions about whether
21 the SVRX grants in those agreements were incidental?
22   A.    I do not believe so.
23   Q.    Do you know what or approximately what
24 SVRX license fees SCO has received since September
25 30, 2006?

61 (Pages 238 to 241)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 242

1      MR. GONZALEZ:  Objection to form.
2      A.   Yeah, I'm not understanding, quite
3  understanding what you mean.
4      Q.   Well, I think the last information we have
5  from SCO, at least in litigation, is reporting on
6  SVRX license fees collected since September 30, '06.
7  And I'm just asking if you know what's been collected
8  since then.
9      MR. GONZALEZ:  Same objection.
10      A.   Not off the top of my head, but I do have
11  the data.
12      Q.   So you could easily figure that out?
13      A.   If need be, yes.
14      Q.   Do you know approximately what UnixWare
15  fees have been received by SCO since September 30,
16  2006?
17      A.   Not separately, no.
18      Q.   But you could figure that out?
19      A.   Yes.
20      Q.   Do you know whether SCO has received any
21  additional royalty payments from IBM or Sequent since
22  the termination of their licenses?
23      A.   Well, Sequent would have rolled under IBM
24  and I think there may have been -- once again, I
25  would have to check my records; some very small

Page 243

1  payments that were made by IBM for SVRX product that
2  did not, you know, that was outside of the buyout.  I
3  can't remember the timing of when that came in,
4  however.
5      Q.   I may be done.  Why don't we take a quick
6  break and I'll go through my notes and make sure.
7      MR. GONZALEZ:  Great.  Thank you.
8      (Discussion off the record.)
9      Q.   Okay, Ms. Acheson, at this point I have no
10  further questions and I thank you for your time
11  today.
12
13          EXAMINATION
14  BY MR. GONZALEZ:
15      Q.   So Ms. Acheson, I do have a few questions
16  to follow up.  And hopefully these will help clarify
17  at least my understanding, if not the record, of your
18  testimony this morning and afternoon.
19      I'm going to start with some of the topics
20  that Mr. Pernick discussed towards the end of the
21  deposition.  When he asked you about the Sun and
22  Microsoft agreements that SCO had entered into in
23  2003.  Do you recall that, talking with Mr. Pernick
24  about that?
25      A.   Yes.

Page 244

1      Q.   He asked you about the basis for your
2  understanding that those agreements were UnixWare
3  licenses, as you've called them your declaration.  Do
4  you recall that testimony?
5      A.   Yes.
6      MR. PERNICK:  Objection to form.
7      Q.   And one of the bases that I think you --
8  one of the bases that I think you've testified about
9  was having talked to other people at SCO.  So during
10  those discussions, did you come to an understanding
11  as to what Sun and Microsoft thought that they were
12  receiving as part of those 2003 agreements?
13      MR. PERNICK:  Objection to form.
14      A.   It was my understanding, through
15  discussions with others, that they were receiving
16  UnixWare.
17      MR. PERNICK:  Objection to form and move
18  to strike.  Nonresponsive.
19      Q.   Did you have an understanding as to what
20  -- based on the meetings that you had at SCO,
21  nonprivileged meetings, did you have an understanding
22  as to what -- well, strike that.  Let me go back.
23  Back up.
24      Did SCO personnel meet with Sun and
25  Microsoft to negotiate these licenses?

Page 245

1      MR. PERNICK:  Objection to form.
2      Q.   Do you know if that took place?
3      MR. PERNICK:  Objection to form.
4      A.   Yes.
5      Q.   And do you have an understanding of how
6  SCO viewed what it was licensing to Sun and Microsoft
7  in those agreements?
8      MR. PERNICK:  Objection to form.
9      A.   It was my understanding that SCO was
10  licensing UnixWare.
11      Q.   And that SCO was licensing UnixWare, and
12  is it your understanding that people at SCO
13  understood that they were licensing UnixWare to Sun
14  and Microsoft through those 2003 agreements?
15      MR. PERNICK:  Objection to form.  Totally
16  lacking in foundation.
17      Q.   You may answer the question.
18      A.   I believe so.
19      Q.   Okay.  And he talked a little bit about
20  how it was, I believe in your declaration in you said
21  a common practice, a standard practice by SCO and its
22  predecessors to license the latest technology with
23  the prior products as an incidental part of that
24  license.  Do you recall those conversations with
25  Mr. Pernick?

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 246

1    MR. PERNICK: Objection to form.
2    A.    Yes.
3    Q.    So if you look back at 2003, at that time
4 period, what version of UnixWare did Sun and
5 Microsoft license through those 2003 agreements?
6    MR. PERNICK: Objection to form.
7    A.    I don't remember.
8    Q.    Do you have an understanding as to whether
9 it was the latest UnixWare version?
10    A.    I believe it was at the time.
11    Q.    Would it have been surprising to you if a
12 licensee had come to SCO and asked for a license to a
13 much earlier version of the UnixWare hierarchy, as
14 you called it?
15    MR. PERNICK: Objection to form. Totally
16 lacking foundation. Calls for speculation.
17    A.    Yes. Because it didn't very often happen.
18 Not from a new product viewpoint. You have customers
19 that are on older versions who need additional
20 licenses for their older versions. But rarely do you
21 have somebody who is a new customer come in and ask
22 for an older version. I can't even think of an
23 example.
24    Q.    So based on your --
25    MR. PERNICK: Move to strike.

Page 247

1 Nonresponsive.
2    Q.    So based on your experience in booking
3 revenues for SVRX and UNIX or licenses through the
4 years, is it fair to say that by and large a licensee
5 who came to SCO and asked for a license for a
6 product, they wanted the license for the latest
7 product?
8    MR. PERNICK: Objection to form.
9    Q.    Is that correct?
10    A.    Yes.
11    MR. PERNICK: Leading. Hypothetical.
12 Lacks foundation.
13    Q.    So in your mind did you consider it at all
14 unusual that Sun and Microsoft would be taking a
15 UnixWare license in 2003, given that that was the
16 latest version of the UNIX family?
17    MR. PERNICK: Objection to form. Leading.
18 Lacks foundation.
19    A.    No, I was not surprised.
20    Q.    And hypothetically, if Sun and Microsoft
21 had come to SCO and asked to license, let's say
22 hypothetically, SVRX 3.2, would you have been
23 surprised by that request?
24    MR. PERNICK: Objection to form.
25    A.    Yes.

Page 248

1    Q.    And why --
2    A.    Very.
3    Q.    -- would you have been surprised?
4    A.    Because it is very old product.
5    Q.    And with respect to Sun, had Sun
6 previously licensed SVRX products from SCO or one of
7 its predecessors?
8    A.    Yes.
9    Q.    And do you know what version that was of
10 SVRX?
11    A.    I believe Sun did 3 -- was both the 3.X
12 and the 4.X SVRX products.
13    Q.    And --
14    A.    Some Intel compatible, some not.
15    Q.    And when did Sun obtain that license from
16 SCO or one of its predecessors?
17    A.    Years and years ago. 3.2 is a very old
18 product. 4.0, I don't remember where exactly at the
19 point it came out. But it was -- 4.0 itself came out
20 prior to Novell, I believe.
21    Q.    And so Sun already had -- well, strike
22 that.
23    Do you have an understanding as to the
24 rights, the basic rights that Sun would have had
25 under its license to 4.0?

Page 249

1    MR. PERNICK: Objection to form.
2    A.    I believe so.
3    MR. PERNICK: Calls for speculation.
4 Lacks foundation.
5    Q.    And what would those basic rights have
6 been?
7    A.    They would have had the right to create a
8 derivative product, compile that product, distribute
9 that product to their customers with an end user
10 license. And then they would have had to, of course,
11 had to report those -- report that back to us and
12 make royalty payments.
13    Q.    In the history of Sun's relationship with
14 SCO or its predecessors, did there ever come a time
15 when Sun obtained a buyout of its binary royalties?
16    MR. PERNICK: Objection to form. Lacks
17 foundation. Leading.
18    A.    Yes. Sun obtained a buyout for their
19 royalty streams under Novell.
20    MR. PERNICK: Objection. Move to strike.
21    Q.    Do you know what year that was?
22    MR. PERNICK: Nonresponsive.
23    A.    I'm sorry?
24    Q.    Do you know what year that occurred?
25    A.    It was several years, a couple of years

63 (Pages 246 to 249)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 250

1  before the APA, I believe.
2        MR. PERNICK: Move to strike,
3  nonresponsive.
4     Q.   And do you know when was the period of
5  ownership by Novell of the UNIX and UnixWare
6  business, or the UNIX business?
7        MR. PERNICK: Objection. Lacks
8  foundation. Calls for speculation.
9     A.   I believe it was approximately 1993
10 through 19-- the end of 1995, beginning of '96.
11       MR. PERNICK: Objection. Move to strike.
12 Nonresponsive.
13    Q.   Do you have a basic understanding of the
14 basic rights that Sun obtained through that buyout
15 from Novell?
16       MR. PERNICK: Objection to form.
17    A.   I believe yes.
18    Q.   And what were some of those basic rights,
19 as you understand them?
20       MR. PERNICK: Objection to form.
21    A.   That Sun had the right to distribute 3.2
22 or -- yeah, I think whatever their current products
23 were, without having to report back quarterly
24 royalties to, at that time, Novell.
25    Q.   Any other basic rights that you have an

Page 251

1  understanding that Sun obtained through that buyout?
2        MR. PERNICK: Objection to form.
3     A.   I don't remember any others that were
4  relevant to my position at that point.
5     Q.   So coming back to the 2003 Sun agreement
6  with SCO that we have been discussing, is it your
7  understanding that Sun, through the buyout and its
8  prior licensing with Novell and perhaps other owners
9  of the UNIX business, that Sun already had rights to
10 SVRX code?
11       MR. PERNICK: Objection to form.
12    A.   Yes.
13    Q.   So that any licensing, or at least some of
14 the licensing of SVRX prior products in the 2003
15 agreement would have already been granted to Sun
16 prior to that agreement?
17       MR. PERNICK: Objection to form.
18    A.   That is correct.
19       MR. PERNICK: Leading.
20       MR. GONZALEZ: You know, Mark, you asked a
21 lot of leading questions and I let them go on.
22       MR. PERNICK: But she is not my witness.
23 We are adverse parties. You're not. You are
24 representing SCO, right?
25       MR. GONZALEZ: Yeah.

Page 252

1        MR. PERNICK: You're here for SCO. So I'm
2  allowed to ask leading question. You're not.
3     Q.   (By Mr. Gonzalez) Something I'd like to
4  clarify. Mr. Pernick asked you about whether, prior
5  to 2003, SCO had entered into any other licenses
6  granting source code rights. Do you recall having
7  that conversation with him?
8     A.   Yes.
9        MR. PERNICK: Objection to form.
10    Q.   And he said, also, in addition to that, he
11 asked you whether you knew whether, prior to the Sun
12 and Microsoft agreements, SCO - and I think he meant
13 Santa Cruz - had ever publicly announced the
14 licensing of SVRX source code. Do you recall that
15 question?
16       MR. PERNICK: Objection to form.
17    A.   Yes.
18    Q.   So let me ask you: Is it your testimony
19 today that between the sale of the APA, through the
20 APA to Santa Cruz and today, Santa Cruz or SCO have
21 entered into what you called reference agreements
22 with licensees?
23       MR. PERNICK: Objection to form. Leading.
24    Q.   Is that correct?
25    A.   Yes.

Page 253

1     Q.   And what were those reference agreements
2  again for?
3     A.   Reference Software Agreements gave the
4  customer the right to view source code under very
5  limited circumstances, usually derivative works made
6  by other OEMs, in order to develop products.
7        MR. PERNICK: Objection. Move to strike.
8  Nonresponsive.
9     Q.   Did Novell, during its period of ownership
10 of the UNIX business, grant reference licenses for
11 SVRX products?
12    A.   I believe so.
13    Q.   And did Santa Cruz continue to grant such
14 licenses?
15    A.   Yes.
16    Q.   Do you know if SCO has continued to grant
17 such licenses?
18    A.   Yes.
19    Q.   So do you believe that Novell, therefore,
20 has been aware that Santa Cruz and SCO may have
21 granted such licenses?
22       MR. PERNICK: Objection to form. Calls
23 for speculation. Lacks foundation. Leading.
24    A.   Yes. It's a continuing business practice.
25    Q.   Did you ever have conversations with

64 (Pages 250 to 253)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 254

1  people at Novell about reference source code licenses
2  that Santa Cruz or SCO were granting to licensees?
3      A.   I don't remember specific conversations.
4      Q.   Okay.  Another category of source code
5  licenses that you talked about were related to --
6  that I think you talked about, were related to the
7  Cray relationship.  Do you recall having
8  conversations along those lines --
9      A.   Yes.
10      Q.   -- with Mr. Pernick?
11      A.   Yes.
12      Q.   And if we could then look at what has been
13  previously marked as Exhibit -- or what was marked in
14  this deposition as one of the exhibits.  I believe
15  it's number 114.
16      MR. PERNICK:  Can you give me a minute?
17      MR. GONZALEZ:  Sure.
18      MR. PERNICK:  What document is that?
19      MR. GONZALEZ:  That's the e-mail from Jean
20  Acheson herself to Cindy Lamont in April, 1996.
21      MR. PERNICK:  Can you just give me a
22  minute?
23      MR. GONZALEZ:  Sure.
24      MR. PERNICK:  Thank you.
25      Q.   (By Mr. Gonzalez)  Do you see at the very

Page 255

1  last two lines of your e-mail to Ms. Lamont where you
2  say, "We have given the pertinent Cray Letter
3  Agreements to Burt and it is his opinion that these
4  source revenues do belong, in full, to SCO"?
5      A.   Yes.
6      Q.   Who is Burt?
7      A.   That was Burt Levine.
8      Q.   What was his position?
9      A.   He was one of the lawyers that -- well, he
10  came through from AT&T through UNIX System
11  Laboratories, Novell, and then transferred to SCO.
12      Q.   And when you are referring to source
13  revenues in that sentence that I just quoted from
14  that e-mail, can you be more specific, explain to me
15  what you meant by "source revenues"?
16      A.   It was the source code that Cray
17  distributed to classified customers who required
18  copies of the source code in order to view it, to
19  check for bad code or I guess terroristic back doors,
20  whatever, possibly to be able to drop their hooks
21  down into it so as to create drivers or to make their
22  product compatible on top of it.
23      And also, government usually likes to have
24  the source code from a viewpoint that they may use,
25  or they plan to use things for many, many years,

Page 256

1  longer than the retention and the time period that a
2  company has to retain something.  And also
3  potentially they may have blended some of the code
4  with their own products.  I don't know specifically.
5  But this is how it was explained to me on this.
6      MR. PERNICK:  Objection.  Move to strike.
7  Nonresponsive.
8      Q.   So the arrangement that you just
9  described, would that be reflected anywhere in this
10  e-mail?
11      MR. PERNICK:  Objection to form.
12      A.   In the third paragraph.  It basically
13  states, "In Cray's Letter Agreement, Cray was granted
14  a 'personal, nontransferable, nonexclusive limited
15  right to sublicense AT&T selected source code as part
16  of a Cray derivative work directly to customers who
17  were end-users in type A authorized countries solely
18  for use on customer CPUs."
19      Q.   And I take it, based on your prior
20  response, the customers would be the government
21  bodies that you were talking about?
22      A.   Yes.
23      MR. PERNICK:  Objection to form.  Leading.
24      Q.   Who were those customers that you are
25  talking about and quoting in this e-mail from Cray's

Page 257

1  Letter Agreement?
2      A.   I would not have known specifically,
3  because they were marked classified on Cray's
4  documentation.  But we speculated that they were such
5  customers as the CIA and the NSA.
6      Q.   But there were -- okay.  So if I
7  understand correctly, then, you're saying that Cray
8  was licensing the source code --
9      A.   Uh-huh (affirmative).
10      Q.   -- to these classified customers; is that
11  correct?
12      MR. PERNICK:  Objection to form.  Leading.
13      A.   Yes.
14      Q.   And licensing the source code -- let me
15  back up again.  Was this a unique arrangement?  Did
16  any other SVRX licensee have the authority to do
17  likewise; in other words, to go out and license a
18  source code to other parties?
19      MR. PERNICK:  Objection to form.  Lacks
20  foundation.  Calls for speculation.
21      A.   Not that I know of during my period of
22  working these agreements.
23      Q.   Okay.  And so under this agreement with
24  Cray that authorized it to, as it says here,
25  sublicense AT&T select source code, do you have an

65 (Pages 254 to 257)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 258

1  understanding as to how Cray went about sublicensing
2  the source code?
3      MR. PERNICK: Objection to form. Calls
4  for speculation. Vague. Overbroad.
5      A.  I believe that in the Cray Letter
6  Agreement, if I remember correctly, it did have
7  something that they had to enter into a licensing
8  agreement with whoever they were distributing the
9  code to. And it was Cray's derivative work, not our
10 original source code, that they had the right to
11 distribute.
12     MR. PERNICK: Objection to form.
13     I mean objection. Move to strike,
14 nonresponsive.
15     Q.  And what -- when we talk about Cray as an
16 SVRX licensee, are you aware of what version of SVRX
17 they were a licensee of?
18     MR. PERNICK: Objection to form.
19     A.  I believe Cray was on 4.0.
20     Q.  And so when they sublicensed the source
21 code, the SVRX source code to those classified third
22 parties through the sublicensing agreements --
23     A.  Yes.
24     Q.  -- would those sublicensing agreements
25 have been granting rights to a derivative product

Page 259

1  based on SVRX?
2      MR. PERNICK: Objection to form. Lacks
3  foundation. Calls for speculation. Leading.
4      A.  Could you repeat that, please?
5      Q.  Sure. In other words, Cray, I believe you
6  just testified, was an SVRX licensee; is that
7  correct?
8      A.  Yes.
9      MR. PERNICK: Objection to form.
10     Q.  And you believe it was for 4.0; is that
11 correct?
12     A.  Yes.
13     Q.  Version of System V?
14     A.  Yes.
15     Q.  And when you're stating here in your
16 e-mail that they had the right, under this letter
17 agreement that's referenced here, to sublicense that
18 source code, the source code they were sublicensing I
19 believe you testified was their derivative of the
20 licensed SVRX product that they had.
21     MR. PERNICK: Objection to form.
22     A.  Yes.
23     Q.  Correct?
24     A.  Yes.
25     Q.  And as they went out and sublicensed that

Page 260

1  source code, I believe you testified that they did
2  that through agreements with those classified
3  customers, correct?
4      MR. PERNICK: Objection to form. Leading.
5  Calls for speculation. Lacks foundation.
6      A.  Yes.
7      Q.  And would those licensing agreements with
8  the customers, the classified customers, therefore
9  have been sublicensing agreements that are related to
10 SVRX source code?
11     MR. PERNICK: Objection to form. Lacks
12 foundation. Calls for speculation. Leading.
13     A.  I believe it states there -- the quote
14 from the agreement states that it's a limited right
15 to sublicense AT&T selected source code.
16     MR. PERNICK: Move to strike.
17 Nonresponsive.
18     Q.  So I take it it's your understanding that
19 those sublicensing agreements between Cray and its
20 classified customers would have been licenses related
21 to SVRX source code; is that correct?
22     MR. PERNICK: Objection to form. Leading.
23     A.  Yes.
24     Q.  When did Cray acquire these unique rights
25 to distribute source code?

Page 261

1      MR. PERNICK: Objection to form. Lacks
2  foundation. Calls for speculation.
3      A.  I don't remember. For the time that I was
4  processing the Cray reports, they had this right.
5      MR. PERNICK: Move to strike.
6  Nonresponsive.
7      Q.  So you are saying it would be as early as
8  when that Cray acquired these unique rights?
9      A.  I was probably processing royalties
10 somewhere in '91, '92.
11     Q.  So these unique rights would have been in
12 place during the time that Novell was licensing UNIX
13 source code?
14     A.  Yes.
15     MR. PERNICK: Objection to form. Lacks
16 foundation. Leading. Calls for speculation.
17     Q.  When you were working at Novell, were you
18 aware that Cray had this unique arrangement
19 permitting it to sublicense the source code?
20     A.  Yes.
21     Q.  Were others aware of that arrangement?
22     MR. PERNICK: Objection to form. Lacks
23 foundation. Calls for speculation.
24     A.  Yes.
25     Q.  On what basis are you saying that other

66 (Pages 258 to 261)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 262

1  people had that awareness?
2      A.  Well, there would have been people in the
3  licensing group, legal department, my boss knew about
4  it.  And if any of the other contract administrators
5  potentially worked on Cray, they probably knew about
6  it, as well.
7      Q.  Okay.  Thank you.  So we have talked so
8  far about the reference agreements, we have talked
9  about the Cray sublicense agreements with its
10 classified customers.  Now let me ask you about a
11 category of licenses that you discussed, and in
12 discussing those with Mr. Pernick you gave the
13 example of Unisys.  Do you recall talking about
14 Unisys with Mr. Pernick?
15     A.  Yes, I do.
16         MR. PERNICK:  Objection to form.
17     Q.  And was Unisys an SVRX licensee --
18         MR. PERNICK:  Objection.
19     Q.  -- during the time that Novell was
20 licensing the UNIX source code?
21         MR. PERNICK:  Objection to form.  Lacks
22 foundation.  Calls for speculation.
23     A.  Yes, the customer was.
24     Q.  And did there ever come a time when Unisys
25 took out a UnixWare license?

Page 263

1      A.  Yes.
2          MR. PERNICK:  Objection to form.  Lacks
3  foundation.  Calls for speculation.
4      Q.  And when did that happen?
5          MR. PERNICK:  Same objections.
6      A.  They took out the UnixWare license under
7  Novell.  I don't remember the year.
8      Q.  And I believe --
9          MR. PERNICK:  Move to strike.
10 Nonresponsive.
11     Q.  And I believe that is consistent with your
12 prior testimony --
13     A.  Yes.
14     Q.  -- when Mr. Pernick asked you some
15 questions.
16         MR. PERNICK:  Objection for form.
17     Q.  Is that correct?
18     A.  Yes.
19     Q.  Was the UnixWare license that Novell
20 granted to Unisys transferred as part of the assets
21 that were transferred to Santa Cruz under the APA?
22         MR. PERNICK:  Objection to form.  Lacks
23 foundation.  Calls for speculation.
24     A.  Yes, they were.
25     Q.  And how do you know that?

Page 264

1          MR. PERNICK:  Same objections.
2      A.  Because all of the UNIX product lines were
3  transferred to SCO along with all of the customer
4  agreements and third-party royalty agreements, joint
5  development agreements, basically the UNIX business
6  with the exception of the binary royalty stream which
7  SCO could not afford to purchase.
8      Q.  Did Novell ever own the UNIX business?
9          MR. PERNICK:  Objection to form.  Lacks
10 foundation.  Calls for speculation.
11     A.  Yes.  It was my understanding that that's
12 what they purchased from AT&T and UNIX System
13 Laboratories.
14     Q.  And did Novell ever sell the assets
15 related to UNIX?
16         MR. PERNICK:  Objection to form.  Lacks
17 foundation.  Calls for speculation.  Leading.
18     A.  Yes.  It's what I believe was sold to SCO
19 under the APA.
20     Q.  So during the period that Novell owned and
21 licensed UNIX products, did Novell enter into other
22 UnixWare licenses?
23         MR. PERNICK:  Objection to form.  Vague.
24 Lacks foundation.
25     Q.  Other than Unisys.

Page 265

1      A.  Yes.
2      Q.  Tell me if I'm wrong, but I believe you
3  testified earlier that Novell granted those UnixWare
4  licenses, it was the common practice to also grant
5  rights to the prior products that are the basis for
6  the hierarchy, as you called it, for UnixWare.
7          MR. PERNICK:  Objection.  Leading.  Calls
8  for speculation.
9      Q.  Is that correct?
10         MR. PERNICK:  Lacks foundation.
11     A.  Yes.
12     Q.  And were those UnixWare licenses that
13 Novell entered into with licensees transferred to
14 Santa Cruz?
15         MR. PERNICK:  Objection.  Lacks
16 foundation.  Calls for speculation.
17     A.  Yes, it was part of the assets.
18     Q.  And were there UnixWare licenses that you
19 know of that were retained by Novell?
20         MR. PERNICK:  Objection.  Lacks
21 foundation.  Vague.
22     A.  No.
23     Q.  And so we talk about these reference
24 agreements, these UnixWare licenses, including those
25 for Unisys.  What happened to all those agreements

67 (Pages 262 to 265)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 266

1  after the closing date of the APA?
2       MR. PERNICK: Objection. Vague.
3       A.   The physical agreements?
4       Q.   Yes.
5       MR. PERNICK: Same objection. Calls for
6  speculation.
7       A.   We had them all actually scanned into an
8  imaging system, and the imaging system was
9  transferred to SCO.
10      Q.   And how about the relationships with those
11 licensees for UnixWare and SVRX products?  What
12 happened to those after the closing date of the APA?
13      A.   Well, all customer agreements were, in
14 regards to the UNIX business, were transferred to SCO
15 and so was the relationship with the customer.  We
16 were the ones who, you know, letters were sent out
17 from Novell instructing the customers to send all
18 future payments to SCO and any royalty reports or
19 anything else that they needed to do to exercise
20 their requirements under the various agreements.
21      Q.   Do you recall Mr. Pernick asking you about
22 conversations that you had as part of the transition
23 team --
24      A.   Yes.
25      Q.   -- during the time of the APA?

Page 267

1       A.   Yes.
2       Q.   Do you recall him also asking you about a
3  company-wide meeting that took place around the time
4  of the APA at Novell?
5       A.   Yes.
6       Q.   Do you recall any other communications by
7  Novell management involving Novell management where
8  the APA transaction was explained to Novell
9  employees?
10      MR. PERNICK: Objection. Lacks
11 foundation. Leading.
12      A.   The very first announcement was a world-
13 wide I guess conference call by Mr. Frankenberg where
14 he announced that basically the product line had been
15 sold; that Novell wanted to return to its core
16 competency of NetWare.  And that -- I believe at that
17 one he basically stated that the UNIX product line
18 had been sold to SCO, and that the other products
19 were being sold to various other companies.
20      MR. PERNICK: Move to strike.
21 Nonresponsive.
22      Q.   I believe you also testified earlier that
23 there were also subsequent meetings among smaller
24 groups regarding the APA transaction.  Do you recall
25 having those conversations with Mr. Pernick?

Page 268

1       A.   Yes.  That was more like an all-hands
2  meeting at the various locations within Novell to
3  whom this APA affected.
4       Q.   And then I also believe you told Mr.
5  Pernick earlier that subsequent to that, you also had
6  ongoing conversations with a smaller group of people,
7  I believe it was Cindy Lamont was one of them --
8       A.   Yes.
9       Q.   -- at Novell --
10      A.   Yes.
11      Q.   -- about how to implement the APA
12 provisions on a daily basis?
13      A.   Right.  Within the realm of finance.
14 Basically we broke up into smaller groups to handle
15 the various sections, responsibilities.  There was
16 engineering, there was legal, there was finance.
17      MR. PERNICK: Move to strike.
18 Nonresponsive.  The witness should try to answer the
19 questions.
20      Q.   In thinking of all these communications,
21 starting with the announcement by Mr. Frankenberg --
22 actually, let me back up.  Who was Mr. Frankenberg?
23      A.   He was the CEO of Novell.
24      Q.   So starting with that announcement and
25 thinking of the company-wide meeting you had, the

Page 269

1  all-hands meetings that you discussed, and then your
2  ongoing communications with Ms. Lamont and others at
3  Novell, did you arrive at an understanding about what
4  were the basic terms of the APA?
5       MR. PERNICK: Objection to form.  Lacks
6  foundation.
7       A.   Yes.  We basically learned that the UNIX
8  business was being sold to SCO; and customer
9  agreements, the products, the source code, the
10 intellectual property all went to SCO; and that in
11 executing this, SCO was paying, you know, a lump sum
12 of money and stock for the purchase; and that they
13 were not able to afford to buy out the binary royalty
14 stream, so while all of the customer relationships
15 and agreements did transfer to SCO, at the same time,
16 administrative arrangement had to be created so that
17 the binary royalty reports under SVRX were processed
18 and -- by SCO, since Novell couldn't do it at this
19 point, legally; and that we would then receive 5
20 percent of this revenue stream for our
21 administration, and 95 percent would be remitted to
22 Novell.
23      MR. PERNICK: Move to strike the
24 nonresponsive answer.
25      Q.   What was -- if you would just answer the

68 (Pages 266 to 269)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 270

1  immediate question that I'm asking you and then we
2  can -- I can follow up with questions, although I
3  appreciate you elaborating.
4      A.   Okay.
5      Q.   Can you summarize that answer?  In other
6  words, based on all those communications that you had
7  involving Novell personnel and Novell management
8  around the time of the APA and after the closing,
9  what was your basic understanding of the basic terms
10  of what Novell had sold to Santa Cruz and what it had
11  retained, if anything?
12      MR. PERNICK:  Objection.  Vague.  Lacks
13  foundation.
14      A.   Basically Novell had sold the entire UNIX
15  product line and its assets, its intellectual
16  property, its contracts, the third-party royalty
17  agreements.  There were other agreements.  They were
18  all assigned to SCO and beyond that.  And then there
19  was the administrative situation in order to handle
20  the binary royalties.
21      MR. PERNICK:  Move to strike.
22      Q.   So is your testimony that the only thing
23  that Novell retained out of the UNIX business was the
24  right to what you call the SVRX binary royalties?
25      MR. PERNICK:  Objection.  Lacks

Page 271

1  foundation.  Leading.
2      A.   That is correct.
3      Q.   Mr. Pernick asked you many questions about
4  instances when you or someone else at Novell or Santa
5  Cruz would have expressly stated that Novell did not
6  have a right after the sale under the APA to anything
7  other than what you call the binary royalty stream.
8  Do you recall those questions?
9      A.   Yes, I do.
10      Q.   And you stated a couple times that there
11  were some discussions; do you recall saying that?
12      MR. PERNICK:  Objection to form.
13  Mischaracterizes testimony.  Lacks foundation.
14  Leading.
15      A.   Sorry.  Could you repeat?
16      Q.   I'm just trying to short-circuit this for
17  everybody.  But based on his objections lets me walk
18  through everything and we will have to stay here
19  later.
20      A.   Okay.
21      MR. GONZALEZ:  But these are basic things
22  that she has already testified to before.
23      Q.   (By Mr. Gonzalez)  During these
24  communications that are the basis of your
25  understanding of the basic terms --

Page 272

1      A.   Yes.
2      Q.   -- were there some discussions as to the
3  rights that Novell had retained under the APA?
4      A.   Yes, I believe there were.
5      Q.   And based on those discussions, what was
6  your understanding of what Novell had retained under
7  the APA?
8      MR. PERNICK:  Objection.  Lacks
9  foundation.
10      A.   The SVRX binary royalty stream for the
11  customers that were existing at the time of the APA.
12      Q.   Can you and I agree, just as a shorthand,
13  that what you have just described as what Novell
14  retained, we can just call that the binary royalty
15  stream just to make this a little shorter?  Can we
16  have that agreement?
17      MR. PERNICK:  Objection.
18      Q.   Can we agree on that?  Can you and I agree
19  on that, Ms. Acheson?
20      A.   Yes.
21      Q.   So when you hear me say the binary royalty
22  stream I will mean what I believe you just said:  The
23  binary royalties from the existing customers at the
24  time of the APA.
25      A.   That's fine.

Page 273

1      Q.   Okay.  So during these communications that
2  you had which involved Novell people that are the
3  basis of your understanding of what Novell retained,
4  were there discussions with Novell people about that
5  subject matter of what Novell had retained?
6      MR. PERNICK:  Objection.  Vague.  Lacks
7  foundation.
8      A.   Yes.
9      Q.   And who were some of those people?
10      A.   Cindy Lamont, Barb Cavalla, Terry Dulin.
11      Q.   Those three names you just mentioned,
12  which meetings would those have --
13      A.   Those were usually --
14      Q.   -- would those have occurred?
15      A.   Those were usually more specific
16  agreements around the reporting of the royalties to
17  Novell.
18      Q.   Going back a little further in time.  When
19  you were meeting with the transition team, were there
20  discussions about the rights that Novell had retained
21  under the APA, namely this binary royalty stream?
22      A.   Among other things, yes, I believe there
23  was some.  It was just very generalized because, once
24  again, this was just sort of an understood point.
25      MR. PERNICK:  Move to strike.

69 (Pages 270 to 273)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 274

1 Nonresponsive.
2     Q.   And when you testified just now and
3 earlier today that this was something that everybody
4 understood, what do you mean by that, more precisely?
5     A.   Because in the explanations it was
6 basically understood that while the entire product
7 line went to SCO, including the customer
8 relationships, the customer agreements, the
9 third-party royalties, joint development
10 arrangements, the products, the source code tapes for
11 the entire hierarchy of products, the intellectual
12 property and stuff, it was just understood that the
13 one thing that SCO was unable to purchase from Novell
14 was this ongoing SRVX revenue stream.
15     Q.   And so besides your conversations with Ms.
16 Lamont and Ms. Dulin and Ms. Cavalla -- is that the
17 name?
18     A.   Yes.
19     Q.   Were there other conversations about what
20 Novell had retained during the transition team
21 meetings, for example?
22     A.   Yes, there probably was.
23     Q.   And were there conversations or
24 communications about that same subject matter, namely
25 what Novell had retained, during the company-wide

Page 275

1 meeting at Novell?
2         MR. PERNICK: Objection to form. Vague.
3     A.   That, I don't remember. I believe that
4 there was. That, once again, it was the entire
5 product line, but that there were segments where we
6 were going to have a continued relationship with
7 Novell.
8         MR. PERNICK: Move to strike.
9 Nonresponsive.
10     Q.   When you say "continued relationship with
11 Novell," what do you mean by that?
12     A.   Well, that NetWare was going to be
13 embedded within the UnixWare code. And the
14 relationship, the administrative relationship between
15 the two companies for the processing of the binary
16 royalty, SVRX binary royalty stream.
17     Q.   Do you recall Mr. Pernick asking you about
18 whether there were communications during these
19 meetings around the time of the APA that involved
20 Novell, communications about -- strike that. Let me
21 simplify that.
22         Focusing again on the meetings that
23 occurred with Novell or at Novell during the time of
24 the APA, Mr. Pernick asked you if there was ever a
25 discussion as to who would have the rights to the

Page 276

1 fees under new source code licenses. Do you recall
2 having conversations about that with Mr. Pernick?
3     A.   Yes.
4     Q.   And do you recall, what was your response?
5         MR. PERNICK: Objection to form.
6     A.   I believe I stated that if it was a new
7 customer to the SVRX, a customer that did not exist
8 at the time of the transfer under the APA, that those
9 fees would belong to SCO.
10     Q.   Did you respond further --
11         MR. PERNICK: Objection to form.
12     Q.   -- to Mr. Pernick's questions about that?
13     A.   I believe I also stated that it really
14 wasn't a situation that was thought about because
15 normally if a customer was coming and they wanted to
16 be able to develop a derivative work, it would have
17 been in SCO's best interest to sell UnixWare to them,
18 to keep them on the latest product. And usually
19 customers, when they are developing a derivative
20 work, wish the latest technology.
21         MR. PERNICK: Move to strike.
22 Nonresponsive.
23     Q.   What is your understanding today as to
24 whether SCO or Novell will be entitled or is entitled
25 to revenue for any new SVRX licenses whether for

Page 277

1 source code or for binary code?
2         MR. PERNICK: Objection. Lacks
3 foundation.
4     A.   It's my understanding that if there is a
5 new customer who wishes to purchase a UNIX product
6 from SCO, that this would be, you know -- that did
7 not exist at the time of the APA, so it's a new
8 customer, that they would -- that that would be
9 revenue due to SCO.
10     Q.   And what is your basis for that
11 understanding?
12     A.   Once again, discussions with management
13 and others around the transition period and later.
14 And legal, of course.
15     Q.   And when you say "discussions around the
16 transition period and later, including with legal,"
17 you are referring to people at which company?
18     A.   Well, if it was during the transition
19 period it would be both. If it was later, it would
20 normally be mostly my management. It was really kind
21 of a moot point I don't remember later discussions
22 coming up with Novell in regards to it.
23     Q.   Do you recall a series of questions by Mr.
24 Pernick about your education and professional
25 background?

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 278

1    A.    Yes.
2    Q.    That was way back today, right?
3    A.    Yeah.
4    Q.    And he asked you specifically at one point
5    about your training in accounting.
6    A.    Yes.
7    Q.    Do you recall a question or two about
8    that?
9    A.    Yes, I do.
10    Q.    And help me remember what was your
11    response to that question about your training in
12    accounting?
13        MR. PERNICK:  Objection to form.
14    A.    Basically that during my life and growing
15    up, my parents owned their own businesses where I
16    helped out doing -- keeping the books for those
17    businesses.  And then entered into various jobs where
18    I needed to do accounting work and I would learn from
19    the people I worked with, you know, how to perform
20    these functions.
21        Basically I have studied on my own.  I
22    have read textbooks and reviewed situations with
23    auditors, accountants and, once again, other -- my
24    management and such.  Reviewed documentation such as
25    from the AICPA, international revenue accounting.  We

Page 279

1    have a database where I go on line if I have
2    questions for revenue recognition or other accounting
3    issues where I go on line and can look this up in
4    accounting literature such as the AICPA or FASBE, et
5    cetera.
6        MR. PERNICK:  Move to strike.
7    Nonresponsive.
8    Q.    How else during your professional or
9    educational career did you acquire an understanding
10    of the accounting work that you perform?
11    A.    Just performing my day-to-day job.
12    Q.    Where?
13    A.    At various companies.  The marketing
14    company that we owned that I was part of in the '80s,
15    and then when I was working as a department manager
16    in retail.  And once again, as I said, from my
17    parents and all the way through from when I first
18    started working with or at, first of all, UNIX System
19    Laboratories and then all the way up through SCO
20    today.
21    Q.    So thinking about your career starting
22    with your job at USL in the early '90s through today,
23    how many years have elapsed, roughly?
24    A.    Fifteen, 16 years.
25    Q.    So during that 15 or 16 year period, have

Page 280

1    you been doing work that you would characterize as
2    accounting work?
3    A.    Oh, yes.  That's what my job is.
4    Q.    And what would you say has been common, if
5    anything, about your jobs at each one of those
6    companies; USL, Novell, Santa Cruz, and SCO?
7        MR. PERNICK:  Objection to form.
8    A.    That it's fine.  I mean, I was promoted to
9    manager and then given additional responsibilities,
10    different areas.  After revenue I've added credit,
11    accounts receivable, cost of goods, and also was
12    promoted to Director of Revenue.
13    Q.    Has there ever --
14        MR. PERNICK:  Move to strike.
15    Nonresponsive.
16    Q.    And while you were employed at USL,
17    Novell, Santa Cruz, or SCO, has there ever been a
18    complaint about your ability to perform the
19    accounting work you perform for those companies?
20    A.    Not that I know of.
21    Q.    Have you ever received a poor review for
22    your accounting work at those companies?
23    A.    No.
24    Q.    Have you been promoted in your capacity,
25    in your functions as -- strike that.

Page 281

1        Have you received any promotions during
2    that 15 or 16 year period?
3    A.    Yes.
4    Q.    And what would those promotions have been?
5    A.    Well, I started working in the AP
6    department, worked on AP supervision.  Then moved
7    over as a contract administrator which, under the
8    AT&T structure, was considered -- well, first of all,
9    they hired me.  And then was promoted to lower
10    management under the AT&T structure in UNIX System
11    Laboratories.
12        Then later, when transferring over to SCO,
13    I took over management of the revenue.  Even though,
14    as a SCO employee, since Carolyn Kuchinsky had moved
15    on in her position as revenue manager in two other
16    functions within Novell, I also basically worked the
17    day-to-day revenue management on the SVRX product
18    line for Novell, as well.  Later, under SCO, I was
19    promoted to worldwide revenue manager, and then, as
20    stated, I was promoted again to revenue director.
21        MR. PERNICK:  Move to strike.
22    Nonresponsive.
23    Q.    Do you recall questions by Mr. Pernick
24    about the questions that auditors for Novell asked
25    you during the -- asked Santa Cruz during the 1998

71 (Pages 278 to 281)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson     *     March 20, 2007

Page 282

1   audit?
2       A.   Yes.
3       Q.   And have you participated in other audits
4   of the companies that you've worked for where someone
5   came in and audited your company?
6       A.   Yes.
7       Q.   Roughly how many audits of that kind have
8   you been a part of?
9       A.   Well, they were all public companies, so
10  we have been audited each quarter.  So it was for
11  probably about 50 audits.  Plus we have been audited
12  by Microsoft.
13      Q.   And focusing on the audits, the Novell
14  audit in 1998, did Novell ask about -- what did
15  Novell ask about, again?
16      A.   Well, basically --
17          MR. PERNICK:  Objection to form.  Calls
18  for speculation.  Lacks foundation.
19      A.   To me, basically they were asking about
20  the SVRX binary royalties as reported to Novell in
21  the monthly reports from SCO.
22      Q.   So backing up a little bit, how were those
23  royalty reports that you sent to Novell, how were
24  those developed?
25      A.   They were basically developed through

Page 283

1   meetings with Barb Cavalla, Terry Dulin, Cindy
2   Lamont, and myself where we basically reviewed the
3   revenues that were received and decided on the best
4   format for them to calculate the administrative fees,
5   the third- party royalties, and to show the amounts
6   that were then due and transferable to Novell, and
7   the amounts that were transferable back to SCO.
8       Q.   And when you consider binary royalties and
9   source code fees, were either of those reflected in
10  the royalty report that you developed as you've
11  described?
12          MR. PERNICK:  Objection to form.  Lacks
13  foundation.  Vague.
14      A.   The binary royalties were.  That was what
15  was reported back to SCO.  Or to Novell, excuse me.
16      Q.   And in working with Novell to develop
17  these reports, why was there no part of the report --
18  was there a part of the report set aside for
19  reflecting source code fees that Santa Cruz would
20  collect going forward?
21          MR. PERNICK:  Objection.  Vague, leading.
22  Lacks foundation.
23      A.   No.
24      Q.   Do you know why that is?
25      A.   Because they weren't due to Novell.

Page 284

1       Q.   So going back to the 1999 audit, when --
2   again, tell me what did Novell auditors ask you
3   about, ask Santa Cruz about in those audits?
4          MR. PERNICK:  Objection to form.  Lacks
5   foundation.  Calls for speculation.
6       A.   The part of the audit that I participated
7   in was in regards to the monthly reports that we
8   submitted from SCO to Novell.  And the auditors asked
9   for the quarterly reports to substantiate the amounts
10  that were being sent to Novell by SCO.
11      Q.   Were you aware of any other requests that
12  they made whether to you or to someone else within
13  SCO?
14      A.   Well, I believe they asked Terry Dulin
15  about the 40 percent calculation on UnixWare.
16          MR. PERNICK:  Move to strike.
17  Nonresponsive.
18      Q.   What was the period covered by that audit?
19      A.   Let's see.  It was 19--
20      Q.   Do you know if it was for a one-year
21  period or --
22      A.   1998.  So it was approximately -- it would
23  have been -- I don't remember the time of the year
24  but it would have been the reports from February,
25  1996 through the time of the audit.

Page 285

1       Q.   What payments, if any, did Santa Cruz make
2   to Novell for UnixWare shipments under the APA prior
3   to the 1999 audit?
4          MR. PERNICK:  Objection to form.  Lacks
5   foundation.  Calls for speculation.
6       A.   None on shipments after the transfer of
7   product took place.
8          May I clarify something?
9       Q.   Sure.
10      A.   If a customer reported something from an
11  earlier period, that did belong to Novell and that
12  was remitted from SCO to Novell.
13          MR. PERNICK:  Move to strike.
14  Nonresponsive.
15      Q.   Do you recall our earlier conversations,
16  you and me, about the SVRX reference licenses that
17  Santa Cruz and SCO have entered into after the APA?
18      A.   Yes.
19      Q.   And do you recall also our conversation
20  about the UnixWare licenses that Novell entered into
21  with licensees?
22      A.   Yes.
23      Q.   Do you recall telling me that those
24  UnixWare licenses were then transferred to Santa
25  Cruz --

72 (Pages 282 to 285)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson      *     March 20, 2007

Page 286

1         MR. PERNICK: Objection to form.
2    Q.   -- under the APA?
3    A.   Yes.
4    Q.   And do you also recall our conversation
5  about the Unisys licenses in particular?
6    A.   Yes.
7    Q.   Both for UnixWare and SVRX products?
8    A.   Yes.
9    Q.   In the 1998 audit, did any of the Novell
10 auditors ask you about any payments under those
11 reference or UnixWare agreements?
12        MR. PERNICK: Objection to form. Lacks
13 foundation. Calls for speculation.
14   A.   No, not that I remember.
15   Q.   Do you have any knowledge about whether or
16 not they made requests for payment information or
17 reports -- strike that.
18        Do you have any knowledge as to whether
19 the auditors asked for that information from anyone
20 else at SCO?
21   A.   Not that I have knowledge of.
22   Q.   Do you have any reason to think they made
23 those requests to anyone else?
24        MR. PERNICK: Objection. Calls for
25 speculation. Lacks foundation.

Page 287

1    A.   The only thing I have to go on is some of
2  the information that was supplied today.
3    Q.   I'm sorry. What do you mean by that?
4    A.   Like the audit notes that the auditor
5  supposedly kept. Their outline. It's hard to tell.
6  They may have asked someone some of those questions,
7  but I don't know specifically.
8    Q.   If they had asked for information about
9  the payments that Santa Cruz had received under SVRX
10 reference licenses, who would have provided that
11 information?
12        MR. PERNICK: Objection to form. Lacks
13 foundation. Calls for speculation.
14   A.   At that time, if they had asked for
15 something like that, I would have referred them to
16 Terry.
17   Q.   And who would have provided information
18 about the payments that Santa Cruz had received under
19 the UnixWare licenses?
20        MR. PERNICK: Same objections.
21   A.   We didn't provide them that.
22   Q.   But if the auditors had asked for that
23 information and it had been provided to them, who
24 would have made that -- who would have provided that?
25   A.   I probably would have.

Page 288

1         MR. PERNICK: Lacks foundation. Calls for
2  speculation.
3    Q.   Did you ever, in fact, provide information
4  to Novell auditors about the payments that Santa Cruz
5  received for any UnixWare license?
6    A.   Not directly. Indirectly, if they had
7  audited one of the Unisys reports, they would have
8  seen it.
9         MR. PERNICK: Move to strike.
10 Nonresponsive.
11   Q.   And why would they have done it in the
12 case of Unisys, for example?
13        MR. PERNICK: Lacks foundation. Calls for
14 speculation.
15   A.   Unisys reported both SVRX and UnixWare and
16 they did so on the same report and paid for the total
17 royalties with one check. And so if they had
18 requested to see documentation on Unisys, which I
19 would assume they would have picked one because
20 Unisys had a very large amount that they reported,
21 then they would have seen -- inevitably they would
22 have seen it on the report I had to produce in order
23 for them to -- in order for them to see the SVRX.
24        MR. PERNICK: Move to strike.
25 Nonresponsive.

Page 289

1    Q.   Focusing, then, on UnixWare licensees who
2  were not also SVRX licensees, did you ever provide to
3  Novell or Novell's auditors information about the
4  payments that Santa Cruz was receiving from those
5  UnixWare licensees?
6    A.   No, I did not.
7    Q.   And did you or anyone that you know of at
8  SCO ever provide information about the payments that
9  Santa Cruz received for the licensing of any UnixWare
10 license or any SVRX reference license?
11        MR. PERNICK: Could you read that back?
12        (The pending question was read back.)
13        MR. PERNICK: Objection. Compound.
14   A.   Not that I know of.
15   Q.   Let's break it down for Mr. Pernick.
16        Did you or anyone else at Santa Cruz ever
17 provide payment information, any information, for the
18 payments that Santa Cruz received for the SVRX
19 reference licenses that we have been talking about?
20   A.   Not that I know of.
21   Q.   Did you or anyone else at Santa Cruz ever
22 provide any information regarding the payments that
23 Santa Cruz received for any UnixWare license that was
24 in existence at that time?
25        MR. PERNICK: Objection. Calls for

73 (Pages 286 to 289)

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 290

1  speculation. Lacks foundation.
2      A.  Not that I know of.
3      Q.  And did you or anyone at SCO ever, in
4  fact, remit any payments that Santa Cruz received for
5  any SVRX reference license?
6          MR. PERNICK: Objection. Calls for
7  speculation.
8      A.  Not that I know of.
9      Q.  And did you or anyone at Santa Cruz ever
10 remit to Novell any payments that you received under
11 any SVRX license that was in place at the time?
12         MR. PERNICK: Objection. Vague.
13     A.  We remitted the SVRX binary royalties to
14 Novell.
15     Q.  Yes. My question is did you or anyone
16 else at Santa Cruz ever remit to Novell any payments
17 that Santa Cruz received under any SVRX license that
18 was in place at that time, in 1998?
19         MR. PERNICK: Objection. Vague.
20     A.  Yes.
21     Q.  You did?
22     A.  For the binary royalties.
23     Q.  I'm asking --
24     A.  The SVRX licenses.
25     Q.  I'm asking you about UnixWare licenses.

Page 291

1      A.  Oh, UnixWare. I thought you were saying
2  SVRX.
3      Q.  Can you read back the question that I've
4  asked twice now?
5          (The record was read as follows:
6          "Question: Did you or anyone else at
7          Santa Cruz ever remit to Novell any payments
8          that Santa Cruz received under any SVRX license
9          that was in place at that time, in 1998?")
10         MR. PERNICK: Same objections.
11     A.  Yes. For SVRX binary licenses, for the
12 ones that were in place at the time of the APA, we
13 remitted payments from SCO to Novell.
14     Q.  But I'm not asking you about SVRX
15 licenses. I'm asking you about UnixWare licenses.
16     A.  But --
17     Q.  In other words --
18     A.  It's -- what she read back said "SVRX
19 licenses."
20     Q.  Did it?
21         MR. SONTAG: Yes.
22     Q.  I'm sorry. That was my fault.
23         So did you or anyone at Santa Cruz ever
24 remit to Novell any payments that Santa Cruz received
25 under any UnixWare license --

Page 292

1          MR. PERNICK: Objection. Calls for
2  speculation.
3      Q.  -- that was in place at that time?
4          MR. PERNICK: Lacks foundation.
5      A.  Only if a customer late-reported something
6  from a period prior to the APA transition.
7      Q.  But that exception aside, did you ever
8  remit any such payments to Novell?
9      A.  No.
10     Q.  After the 1998 audit, did Santa Cruz or
11 SCO ever remit any payments under any SVRX reference
12 license?
13     A.  No. Not that I know of.
14     Q.  After the 1998 audit, did Santa Cruz or
15 SCO ever remit to Novell any payments under any
16 UnixWare license?
17     A.  No.
18     Q.  I apologize. I kept insisting on a
19 question I asked in my mind but had not actually
20 articulated.
21         Do you recall Mr. Pernick asking you about
22 whether there had been any valid conversions?
23     A.  Yes.
24     Q.  Have any conversions of any kind, whether
25 valid or not, taken place --

Page 293

1          MR. PERNICK: Objection.
2      Q.  -- that you know of?
3          MR. PERNICK: Lacks foundation.
4      A.  Not since the APA.
5      Q.  What do you mean by "conversions"?
6      A.  Conversion would be an OEM customer --
7  well, it actually is defined in the APA and it is
8  pretty technical.
9      Q.  Okay.
10     A.  So this is going to be a total
11 nontechnical person's understanding.
12     Q.  Let me make it short, because we are
13 running out of time. Under your understanding of
14 what the APA provides to be a conversion, do you know
15 whether a conversion ever took place?
16     A.  No.
17     Q.  So you don't know, or no conversion took
18 place?
19     A.  From what my understanding is, no
20 conversions took place.
21     Q.  Thank you. I have nothing further.
22         MR. PERNICK: We are off the record,
23 right?
24         VIDEOGRAPHER: We've got a minute left.
25         MR. PERNICK: I think I'm going to have

74 (Pages 290 to 293)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 294

1    some questions.
2            (Break taken from 8:47 to 8:52.)
3
4            FURTHER EXAMINATION
5    BY MR. PERNICK:
6        Q.    Ms. Acheson, when the issue came up in
7    1996, did you tell Novell that the fees owed by Cray
8    were source code right-to-use fees associated with
9    additional CPU usage?
10        A.    I basically told them what was in my
11    e-mail.  So if it was in my e-mail, then yes.  I
12    mean, we had discussions in regards to it and then I
13    went back to research the two agreements.  So
14    basically it states it's a limited right to
15    sublicense AT&T selected source code, solely for use
16    on a customer's CPU.  So basically we said that Cray
17    is licensing additional CPUs, and that these were
18    part of the revenues that -- these were revenues to
19    be retained by SCO.
20        Q.    And you specifically cited Paragraph E of
21    Amendment 1 and you cited to subsection little (ii),
22    right?
23        A.    I believe that is correct, without going
24    back to the agreement and looking.
25        Q.    Well, can you just look at the second

Page 295

1    paragraph of your e-mail to Ms. Lamont?
2        A.    Oh, yes.  Sorry.  It is there.
3        Q.    Did you ever contradict that viewpoint in
4    a communication with someone from Novell?
5            MR. GONZALEZ:  Objection to form.
6        A.    Not that I remember.
7        Q.    On the worldwide conference call that you
8    referred to before, do you remember that?
9        A.    Yes.  The original announcement.
10        Q.    Right.  On that phone call, did anyone
11    from Novell say that Novell's rights to SVRX
12    royalties in the future would be limited to binary
13    royalties from licenses that existed at the time of
14    the APA?
15        A.    I do not believe Mr. Frankenberg became
16    that specific in his discussions.  I think he was
17    basically talking about very high level.  It was more
18    once we broke down into the more locally attended
19    meetings and the more functional meetings where there
20    were more discussions in regards to what had been
21    sold, what had been retained, and where various
22    people were going.
23        Q.    And in those meetings, did anyone from
24    Novell say that Novell's rights to SVRX royalties
25    would be limited to binary royalties from licenses in

Page 296

1    existence at the time of the APA?
2            MR. GONZALEZ:  Objection.  Asked and
3    answered.
4        A.    I believe one of the V.P.s at the time who
5    was, as I said before, I cannot remember his name,
6    basically stated that the entire business had been
7    sold to SCO, and that in the purchase price or the
8    agreement, that we could not afford -- that SCO could
9    not -- was not purchasing this or was unable to buy
10    out the one revenue stream, and that we would have an
11    ongoing relationship with Novell with NetWare in the
12    UnixWare product, and with this administrative
13    arrangement.
14        Q.    Did this V.P. say that Novell's rights
15    going forward to SVRX royalties would be limited to
16    binary royalties from licenses that existed at the
17    time of the APA?
18            MR. GONZALEZ:  Objection.  Asked and
19    answered.  Objection to form.
20        A.    SVRX royalties were the binary royalties.
21    It was the quarterly reports.  It was the revenue
22    stream from that.
23        Q.    And did he say that Novell's rights would
24    be limited to binary royalty streams from SVRX
25    licenses in existence at the time of the APA?

Page 297

1        A.    He probably didn't say the word "binary."
2    But if he said "royalties," that's what everybody
3    would have basically assumed.
4        Q.    And he said -- I'm sorry?
5        A.    It's all right.  Continue.
6        Q.    And he said that Novell would not be
7    entitled to royalty streams from any licenses entered
8    into after the APA?
9        A.    I do not believe he would have said it in
10    that particular way.  I think he basically stated
11    that the business had been sold to SCO and that it
12    belonged to SCO, with the exception of, you know, the
13    NetWare in UnixWare and this, you know, the binary --
14    the royalties for the ongoing royalty revenues.
15        Q.    And he limited, in what he said, he
16    limited what Novell was entitled to to the royalties
17    from licenses that were in existence at the time?
18        A.    Yes.  Because it was the ongoing revenue
19    stream which SCO could not afford to purchase.
20        Q.    What were his words that you recall?
21        A.    Oh, I don't remember specific words, but I
22    just remember the general discussions.  I don't
23    remember exactly the discussions as to who was going
24    where and who was hiring.  But I remember that that
25    was also part of the meeting.

75 (Pages 294 to 297)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 298

1    Q.    Do you remember who this person was?
2    A.    No.  I can't remember his name.  I
3    remember he was shorter than I am and he was an older
4    gentleman.
5    Q.    Did you see him live?
6    A.    Yes.  He was one of the V.P.s that was at
7    the Florham Park Novell.
8    Q.    And this was one of the company-wide
9    meetings you were talking about?
10    A.    Well, it was company-wide, meaning the
11    company, the piece at Florham Park.
12    Q.    Is this the company-wide meeting you
13    referred to in paragraph 5 of your declaration?
14    A.    Which number was that, please?
15    Q.    I think it's 112.  It would have been the
16    first one we marked today.  I don't know if they are
17    in order.
18    A.    It is.  We had put them in order.  I just
19    went by it.
20    Yes.  That's the one.
21    Q.    Okay.  And then you've referred to some
22    transition team meetings, too; is that right?
23    A.    Yes.
24    Q.    And in any of those meetings, did anyone
25    from Novell say that Novell's rights to SVRX

Page 299

1    royalties would be limited to binary royalties from
2    licenses in existence at the time of the APA?
3    A.    Once again, it was a grouping of people.
4    A lot of various things were discussed.  And to me
5    the understanding of these discussions was that SCO
6    had purchased the entire product line:  Customer
7    relations, third-party royalty agreements, joint
8    development, the IP, the source code tapes for the
9    entire UNIX product line, and that with the exception
10    that they could not afford to buy out the ongoing
11    royalty stream which, to better define it now, is the
12    binary revenue royalty stream for the existing SVRX
13    customers at the time of the APA.
14    Q.    Okay.  I know you say that was the
15    understanding that you had.  But do you remember
16    anyone saying that?
17    A.    It must have been, because that's how we
18    understood it.
19    Q.    But do you remember anyone saying it?
20    A.    No.  I have stated all along I don't
21    remember any particular person stating that within
22    the meetings.
23    Q.    It was just the understanding?
24    A.    Yes.  It was discussions and
25    understandings.

Page 300

1    Q.    Do you know why no one put it into the
2    APA?
3    MR. GONZALEZ:  Objection.
4    A.    I believe it was in the APA.
5    MR. GONZALEZ:  I object to that.
6    A.    I'm not an attorney, but I have been
7    working under the APA as it has been discussed and
8    described to me by my management, and throughout
9    these meetings.
10    Q.    And we have been going for a while today.
11    Have you had any new recollections as to provisions
12    in the APA that state that understanding?
13    A.    No.  I believe I have already pointed them
14    out in my previous testimony.
15    Q.    Did Cindy Lamont ever say that she
16    believed that Novell's rights to SVRX royalties would
17    be limited to binary royalties from licenses in
18    existence at the time of the APA?
19    A.    Well, I do not believe she ever stated it
20    100 percent like that.  She, as well as Barb Cavalla,
21    worked with me to develop the reports, and never was
22    a section put in for source code or for category of
23    product.  You don't even really see that something
24    that I'm reporting is SVRX binary fees.
25    Q.    Come again?

Page 301

1    A.    Well --
2    MR. GONZALEZ:  Objection to form.
3    A.    Well --
4    Q.    What do you mean by that?
5    A.    That when we developed the reports, which
6    I developed in conjunction with Cindy Lamont and Barb
7    Cavalla, we never even put in a column that said
8    "product category."
9    Q.    Why would you have?
10    A.    Well, we would have if they were
11    requesting that other products or that other
12    categories of products were put in.
13    Q.    But you've testified you didn't expect
14    any, and neither did Novell, right?
15    A.    Right.  But I'm just saying that while I
16    don't remember a specific statement that spelled out
17    exactly what we are saying now, I'm saying that
18    because she didn't request that information in the
19    report, she obviously knew that only binary royalties
20    were going to be in that report.
21    Q.    Only binary royalties for licenses in
22    existence at the time?
23    A.    That is correct.
24    Q.    Where do you get that temporal component
25    from?

76  (Pages 298 to 301)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 302

1    A.   From the ongoing revenue stream, or
2 whatever it was that was within the APA that I
3 pointed out earlier in my testimony.
4    Q.   But in the report, we are talking about
5 the reports, did the reports say anything about how
6 what you were reporting --
7    A.   No.  I just reported the customers.  The
8 reports didn't have to explain it.  It just had to
9 give the revenue information as reported by the SVRX
10 customers that were in existence at that time.
11    Q.   Did anything on the report suggest that
12 Novell would not be entitled to royalties for
13 licenses entered into after the date of the APA?
14    A.   No.
15    Q.   Okay.  I have no further questions at this
16 moment.
17
18        FURTHER EXAMINATION
19 BY MR. GONZALEZ:
20    Q.   I have a few minutes.  Just really one set
21 of questions.  Did these reports that you developed
22 with Ms. Cavalla and Ms. Lamont, was there any
23 section to decide where Santa Cruz would reflect any
24 of the reference licenses for SVRX source code --
25    A.   No.

Page 303

1    Q.   -- that was part of the business?
2        MR. PERNICK:  Objection.  Beyond the
3 scope.
4    A.   No.
5    Q.   And did they ask, Ms. Cavalla or Ms.
6 Lamont, did they ask for a section of the report that
7 would reflect those revenues as they came in to Santa
8 Cruz?
9        MR. PERNICK:  Same objection.  Calls for
10 speculation.
11    A.   No.
12    Q.   And did Ms. Lamont and Ms. Cavalla or
13 anyone at Novell ask you to ask the team developing
14 these reports to include a section where revenues for
15 any UnixWare license would be reflected as they came
16 in to Santa Cruz?
17        MR. PERNICK:  Same objections.
18    A.   No.
19    Q.   And did Ms. Lamont or Ms. Cavalla or
20 anyone else at Novell ask for a section of the
21 reports be set aside to reflect revenues that came in
22 for any new software agreements or sublicensing
23 agreements that you might have entered into and
24 product scheduled -- strike that.  Let me rephrase
25 that and make it a little shorter.

Page 304

1        Earlier, you testified to Mr. Pernick that
2 there were certain agreements that the parties didn't
3 really contemplate would be entered into after the
4 APA; is that correct?
5        MR. PERNICK:  Objection.  Beyond the
6 scope.  Lacks foundation.
7    A.   Yes.
8    Q.   And I believe you just testified that in
9 the last series of questions that Mr. Pernick just
10 asked you, correct?
11    A.   What?
12        MR. PERNICK:  Objection to the form.
13    Q.   Mr. Pernick just asked you, in the last
14 time he had an opportunity to question you --
15    A.   Yes.
16    Q.   -- about the fact that both parties did
17 not contemplate that there would be new agreements
18 for SVRX.
19    A.   Yes.  That's correct.
20    Q.   And your response was yes, as I recall; is
21 that correct?
22    A.   Yes.
23    Q.   And what agreements did you have in mind
24 at that time specifically?  What sorts of agreement?
25        MR. PERNICK:  Objection.  Vague.

Page 305

1    A.   To me it basically meant that somebody
2 would come and say, "Oh, gee, I'm a new customer and
3 I would like to develop a product derivative based on
4 3.2, SVRX 3.2."
5    Q.   And so such a new licensee, what sort of
6 agreements would it have signed in order to get the
7 SVRX source code and develop that derivative product
8 that you're talking about?
9        MR. PERNICK:  Objection.  Lacks
10 foundation.  Calls for speculation.
11    A.   As part of the business process brought
12 through from AT&T, the traditional SVRX licensing
13 meant that the customer had to sign a soft agreement;
14 and if they wished to distribute a sublicensing
15 agreement, then they would have had to have signed a
16 supplement that would have had the product schedule
17 attached to it.
18    Q.   And so when you were talking to Ms.
19 Cavalla and Ms. Lamont about developing these reports
20 that would be sent to Novell, did they ever ask for a
21 section of those reports that would reflect any
22 revenues that might come in in the future for the
23 software sublicensing and product schedules that
24 might be entered into with new licensees?
25        MR. PERNICK:  Objection.  Beyond the

77 (Pages 302 to 305)

7406cc52-b716-43c6-afbd-3769cbec1290

Jean Acheson    *    March 20, 2007

Page 306

1  scope.
2      A.    No.
3          MR. PERNICK:  Objection to form.
4      Q.    And so what, in fact, did those reports
5  reflect after you had met with Ms. Cavalla and Ms.
6  Lamont?  What sort of information did they reflect?
7          MR. PERNICK:  Objection to form.
8      A.    It reflected -- they reflected the binary
9  revenues as reported by the OEM customers in their
10  quarterly reports.
11      Q.    And would those OEM customers have been
12  those in place who were licensees at the time of the
13  APA?
14      A.    Yes.
15      Q.    I have nothing further.
16          MR. PERNICK:  I think we are done.
17          (The deposition concluded at 9:20 p.m.)
18
19
20
21
22
23
24
25

Page 307

1          REPORTER'S CERTIFICATE
2
   STATE OF UTAH         )
3                         ) ss.
   COUNTY OF SALT LAKE   )
4
5      I, Diana Kent, Registered Professional
   Reporter and Notary Public in and for the State of
6  Utah, do hereby certify:
       That prior to being examined, the witness,
7  JEAN ACHESON, was by me duly sworn to tell the truth,
   the whole truth, and nothing but the truth;
8      That said deposition was taken down by me
9  in stenotype on March 20, 2007, at the place therein
   named, and was thereafter transcribed and that a true
10  and correct transcription of said testimony is set
   forth in the preceding pages;.
11      I further certify that, in accordance with
12  Rule 30(e), a request having been made to review the
   transcript, a reading copy was sent to Jean Acheson
13  for the witness to read and sign before a notary
   public and then return to me for filing with Attorney
14  Mark Pernick.
15
       I further certify that I am not kin or
16  otherwise associated with any of the parties to said
   cause of action and that I am not interested in the
17  outcome thereof.
18      WITNESS MY HAND AND OFFICIAL SEAL this
   30th day of March, 2007.
19
20
21
22
23      _____
       Diana Kent, RPR, CRR
24      Notary Public
       Residing in Salt Lake County
25

Page 308

1  Case:  SCO v. Novell
   Case No.:  2:04CV00139
2  Reporter:  Diana Kent
   Date taken:  March 20, 2007
3
           WITNESS CERTIFICATE
4
       I, JEAN ACHESON, HEREBY DECLARE:
5      That I am the witness in the foregoing
   transcript; that I have read the transcript and know
6  the contents thereof; that with these corrections I
   have noted this transcript truly and accurately
7  reflects my testimony.
8  PAGE-LINE      CHANGE/CORRECTION      REASON
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  No corrections were made.
16      I, JEAN ACHESON, HEREBY DECLARE UNDER THE
   PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
17  OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE
   FOREGOING IS TRUE AND CORRECT.
18
19      _____
       JEAN ACHESON
20      SUBSCRIBED and SWORN to this _____ day
21  of _____, 2007, at _____
22
23      _____
       Notary Public
24
25

CitiCourt, LLC
801.532.3441

7406cc52-b716-43c6-afbd-3769cbec1290