LEXSEE 2003 U.S. DIST. LEXIS 7608

**WRENCH LLC, a Michigan Limited Liability Company; JOSEPH SHIELDS; and THOMAS RINKS, Plaintiffs, v. TACO BELL CORP., a foreign corporation, Defendant.**

Case No. 1:98-CV-45

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

2003 U.S. Dist. LEXIS 7608

May 2, 2003, Decided
May 2, 2003, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Wrench LLC v. Taco Bell Corp., 2003 U.S. Dist. LEXIS 16271 (W.D. Mich., Sept. 9, 2003)*

**PRIOR HISTORY:** *Wrench LLC v. Taco Bell Corp., 2003 U.S. Dist. LEXIS 7607 (W.D. Mich., May 1, 2003)*.

**DISPOSITION:** [*1] Defendant Taco Bell Corp.'s Motion in Limine GRANTED. Defendant Taco Bell Corp.'s motions to Exclude or Limit Expert Testimony GRANTED IN PART AND DENIED IN PART. Plaintiffs' Motion in Limine to Exclude Certain Images of Psycho Chihuahua GRANTED. Plaintiffs' Motions in Limine to Exclude Testimony DENIED.

**COUNSEL:** For WRENCH LLC, JOSEPH SHIELDS, THOMAS RINKS, plaintiffs: Douglas A. Dozeman, Valerie P. Simmons, Daniel P. Ettinger, Warner, Norcross & Judd LLP, Grand Rapids, MI.

For TACO BELL CORP, defendant: Richard J. O'Brien, Paul E. Veith, Sidley & Austin, Jamie L. Secord, Sidley Austin Brown & Wood, Chicago, IL.

For TACO BELL CORP, defendant: Randall G. Litton, Price, Heneveld, Cooper, Dewitt, et al, Grand Rapids, MI.

For TACO BELL CORP, defendant: Arthur S. Friedman, Friedman, Wang & Bleiberg, PC, New York, NY.

**JUDGES:** GORDON [*2] J. QUIST, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** GORDON J. QUIST

**OPINION**

Plaintiffs (collectively "Wrench") and Defendant ("Taco Bell") have filed various motions in limine to exclude expert testimony and other evidence at the trial of this matter. Plaintiffs have filed the following motions: (1) motion to exclude the expert testimony of Marc Jacobson; (2) motion to exclude the expert testimony of Cate Elsten; and (3) motion to exclude certain images of Psycho Chihuahua. Taco Bell has filed the following motions: (1) motion regarding five evidentiary issues; (2) motion to exclude or limit certain expert testimony; and (3) motion to exclude testimony of John Jarosz, Wrench's damages expert.

**I. Proof of Implied Contract**

A preliminary matter to be resolved is the elements Wrench must prove in order to establish its implied contract claim. That issue is pertinent to some of the issues raised in the instant motions because whether particular evidence is admissible, admissible for a limited purpose, or should be excluded, depends upon what Wrench must show to proceed on its claim. Taco Bell contends that Wrench must prove that the parties agreed on all of the essential terms of whatever [*3] contract Wrench alleges was entered into by the parties. Wrench contends that it is only required to prove that Taco Bell understood that Wrench expected to be compensated if Taco Bell used its Psycho Chihuahua character and/or related ideas.

The answer to this issue is found in the portion of the Court's prior summary judgment opinion discussing Wrench's implied in fact contract claim. *See Wrench LLC v. Taco Bell Corp., 51 F. Supp. 2d 840, 847-48 (W.D. Mich. 1999)*. That portion of the Court's ruling, which concluded that Wrench had offered sufficient evidence to

support an implied in fact contract claim, was impliedly upheld by the Sixth Circuit. See *Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 456-57 (6th Cir. 2001)*. This Court, in rejecting Taco Bell's argument that Wrench's evidence failed to support the existence of an implied in fact contract because the parties did not agree on any of the essential terms that would normally be included in a licensing agreement, noted that the only essential requirements of an implied in fact contract are mutual assent and consideration. *Wrench LLC, 51 F. Supp. 2d at 847*. More specifically, **[*4]** the Court stated that Wrench could succeed on its claim by showing that the parties understood that Wrench would be paid for its services (if Taco Bell used Wrench's ideas), "even if no agreement was reached as to price, duration, or other terms of the contract." *Id*. What this boils down to is that the only relevant question is whether the parties knew that compensation was expected if Taco Bell used Wrench's ideas, without regard to whether the parties reached any agreement on the specific terms of a contract. Thus, whether Taco Bell agreed or would have agreed to non-exclusive use of Psycho Chihuahua is irrelevant to the question of whether an implied in fact contract existed. However, such evidence would be relevant to the issue of damages,, or the fair value of Wrench's services and/or a reasonable royalty rate, because non-exclusive use would presumably be worth less than exclusive use.

## II. Taco Bell's Motions

### A. Motion regarding five evidentiary issues

#### 1. Evidence of Attorney Fees

The first issue addressed by Taco Bell is Wrench's claim for attorney fees. Taco Bell asserts that although Wrench has requested an award of attorney fees on each of its claims, there **[*5]** is no basis under Michigan or California law to allow an award of attorney fees in this case. Wrench contends that attorney fees are appropriate in this case as part of exemplary damages, but notes that it does not intend to present evidence on this issue to the jury. Wrench contends that under Michigan law, it would be appropriate for the Court to make a special finding on this issue once the jury has determined whether exemplary damages are available.

In light of Wrench's stated intention not to present evidence to the jury on the issue of attorney fees, there is no issue for the Court to decide. The Court will permit the parties to address this issue if the jury's verdict provides an appropriate basis for an award of attorney fees.

#### 2. Evidence regarding "The Radio Spot"

Taco Bell requests that Wrench be precluded from introducing evidence regarding a Taco Bell radio commercial titled "Non-Corporate." The radio spot portrays a situation in which a fictitious Taco Bell division rejects a menu idea submitted by a fictitious customer and then introduces a menu item identical to the one suggested by the customer. The announcer says: "Another inspired breakthrough from the brilliant **[*6]** minds at that Taco Bell test kitchen." (Def.'s Br. Supp. Ex. C atCD 016855.) Taco Bell notes that Wrench stated in its summary judgment papers: "Taco Bell thought this ad funny; a jury might find it revealing." Taco Bell requests that Wrench be precluded under *Fed. R. Evid. 402 and 403* from offering this evidence because it is irrelevant and because its probative value is substantially outweighed by the danger of unfair prejudice.

The Court concludes that this evidence should be excluded because it is not relevant under *Federal Rule of Evidence 401*. The radio advertisement is not relevant to any issue regarding state of mind and has no probative value because it is based upon fiction, not fact. Moreover, even if the advertisement had some relevance, its probative value would be substantially outweighed by unfair prejudice to Taco Bell. *Fed. R. Evid. 403*. Therefore, this evidence will be excluded.

#### 3. Discovery Disputes, Pre-Trial Motions, Etc.

The issue raised here is whether Wrench is entitled to present evidence of Taco Bell's failure to preserve evidence. As the Court indicated to counsel in chambers, this issue is now before Magistrate Judge Brenneman in **[*7]** connection with Wrench's pending motion for discovery sanctions. In ruling on that motion, the magistrate judge can decide in the first instance whether a sanction is appropriate. Therefore, the Court need not determine, at this time, whether Wrench is entitled to present spoliation evidence at trial.

#### 4. Insurance and Indemnification Agreements

Taco Bell requests that Wrench be precluded from offering evidence regarding Taco Bell's insurance and evidence regarding an indemnification agreement between Taco Bell and Chiat Day. Wrench concedes that it is precluded by *Fed. R. Evid. 411* from presenting evidence regarding Taco Bell's insurance, but argues that it is entitled to introduce evidence regarding the indemnity agreement. Wrench asserts that the indemnity agreement does not raise the same concerns as insurance, because under the indemnity agreement, Taco Bell is required to indemnify Chiat Day, not vice versa.

The Court concludes that Wrench should be precluded introducing evidence of the indemnity agreement because it is irrelevant to the issues in the case. Although

Wrench has not identified the specific agreement it intends to offer, it appears that Wrench is relying [*8] on the indemnity provisions of the agency agreement between Taco Bell and Chiat Day. Having reviewed the provisions of that agreement, the Court notes that the indemnity provisions run both ways, i.e., cross indemnification, and nothing in that agreement specifically references the instant lawsuit. Moreover, there is no evidence that either party has made a claim for indemnification under that agreement in connection with this case. Under these circumstances, evidence of the indemnification provisions of the agency agreement is irrelevant and, even if it were relevant, the probative value of such evidence would be substantially outweighed by unfair prejudice to Taco Bell. *Fed. R. Evid. 401, 403*.

### 5. Size of Taco Bell and its Corporate Affiliations

Taco Bell also requests that Wrench be precluded from referring to the size of Taco Bell's corporate parent, YUM! Brands, Inc. (f/k/a "Tricon"), or Taco Bell's sister corporations, Pizza Hut, Kentucky Fried Chicken, A & W, etc. Taco Bell contends that Wrench should be precluded from referring to matters such as system-wide sales, profits, number of employees, etc., because Taco Bell is the only defendant in this case, and it is irrelevant [*9] that Taco Bell is part of a broad family of restaurant companies.

For the reasons set forth below regarding Taco Bell's motion to exclude the testimony of Wrench's damages expert as well as the reasons set forth in the Court's opinion regarding Taco Bell's motion for summary judgment on Wrench's tort claims, evidence regarding Tricon's size, profits, sales, etc. is not relevant to the claim in this case, which is asserted solely against Taco Bell. Therefore, such evidence will be excluded.

### B. Omnibus Motion to Exclude or Limit Expert Testimony

In its omnibus motion to exclude or limit expert testimony, Taco Bell contends that many of the subjects upon which Wrench's experts seek to testify are not proper for expert testimony, many of the opinions are not relevant to the issues the jury will be asked to decide, and the opinions lack any indicia of reliability. Taco Bell also argues that much of the proposed expert testimony is duplicative.

The experts identified by Wrench are Greg Battersby ("Battersby"), Mike Georgopolis ("Georgopolis"), Carol Francesca ("Francesca"), Arlene Scanlan ("Scanlan"), David Stewart ("Stewart"), and Donald Rutz ("Rutz"). Battersby, Georgopolis, [*10] Francesca, and Scanlan are offered as experts in the licensing industry. Stewart and Rutz are experts in the areas of advertising or marketing. While some of Wrench's proposed expert opine on the same issues, there is some variation in the subject matter of their opinions. Rather than seeking exclusion of a particular expert, Taco Bell seeks exclusion of the experts' testimony based upon identified issues or areas of testimony.

### 1. Understanding of the Parties

Taco Bell contends that Wrench's proposed experts, Battersby, Francesca, Georgopolis, and Scanlan, should not be permitted to testify regarding the parties' subjective understandings or expectations. Taco Bell contends that by testifying about what the parties believed or expected, the witnesses would simply be telling the jury what result to reach in deciding the issue of whether the parties had an implied in fact contract. Taco Bell thus argues that such testimony must be excluded under *Fed. R. Evid. 702* because it is merely advisory and would not be helpful to the trier of fact.

Wrench responds that it does not intend to offer expert testimony regarding the subjective expectations of the parties. However, it notes [*11] that it does intend to offer expert testimony on industry custom when a company such as Wrench submits creative ideas at the request of a company such as Taco Bell. Wrench argues that such evidence is consistent with this Court's discussion of implied in fact contracts in its previous summary judgment opinion because the evidence relates to the issue of whether compensation is customarily expected. Wrench asserts that in addition to industry custom, its experts will opine that based upon their review of the relevant facts, the understanding that the parties reached (presumably based upon the testimony of Wrench's witnesses) is consistent with the industry custom.

The Court will allow Wrench's experts to testify regarding custom in the licensing industry, insofar as it relates to whether parties in the industry generally understand that compensation is expected where one party, at the request of another party, submits an idea to the requesting party who in turn uses the idea. *See Duffy v. Charles Schwab & Co.,* 2001 U.S. Dist. LEXIS 14070, 2001 WL 1104689, at *4 (D.N.J. Sept. 4, 2001) (stating that the relevant question in an implied in fact contract case is "whether the [*12] conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay"). However, the Court will not permit Wrench's experts to testify regarding the parties' subjective intentions and expectations or whether an implied in fact contract was actually formed. Those issues are for the jury to determine, although they may do so in light of testimony regarding industry custom.

Taco Bell has raised the issue of industry custom and practice as part of a separate argument, in which it

asserts that Wrench may submit evidence of industry custom and practice only if it shows that: (1) the purported custom is well-accepted in the licensing industry; and (2) Taco Bell was aware of the custom. Taco Bell's argument is aimed primarily at showing that Wrench's experts have conceded that there is no established industry standard or practice regarding terms of a licensing agreement. This argument would deserve more weight if Wrench were alleging that the parties entered into an express licensing agreement, but, as discussed above, that is not Wrench's claim. Wrench may establish an implied in fact contract by showing circumstances that support the conclusion **[*13]** that Taco Bell accepted Wrench's ideas with the understanding that compensation would be paid if Taco Bell used those ideas, and industry custom and usage is relevant to the circumstances of disclosure. *Star Patrol Enters., Inc. v. Saban Entm't, Inc.,* 1997 U.S. App. LEXIS 29994, No. 95-56534, 1997 WL 683327, at *1 (9th Cir. Oct. 23, 1997). Taco Bell has cited nothing showing that no custom or usage exists in those circumstances. Moreover, Wrench has submitted sufficient evidence to show that Taco Bell's representatives were familiar with, or had reason to know of, the custom, because Taco Bell's representatives discovered Psycho Chihuahua at a licensing expo, Taco Bell hired a licensing agent at or around the time Wrench's licensing agent, Scanlan, submitted her proposed agreement to Taco Bell, and Taco Bell's representatives testified to an understanding consistent with the alleged industry custom.

**2. Independent Creation**

Taco Bell next asserts that testimony by Battersby, Francesca, Stewart, Georgopolis, Scanlan, and Rutz that independent creation was "highly unlikely", "virtually impossible," or "extremely unlikely" must be excluded for several reasons. In light of Wrench's admission **[*14]** that expert testimony on this issue would be improper, there is no issue for the Court to decide because the parties agree that independent creation is an issue to be decided solely on the testimony of fact witnesses. Therefore, neither party will be permitted to present expert testimony on this issue.

**3. Lifespan of the Taco Bell Chihuahua and/or its Probable Future Use**

Although Taco Bell ceased using the Chihuahua in its advertising in 2000, Wrench's experts have opined that it is likely that Taco Bell will use the Chihuahua in its advertising in the future. For example, in her amended supplemental report, Francesca notes that several companies have resurrected previously retired icons as part of retro/nostalgia programs aimed at consumers' associations with past campaigns. (Francesca Am. Supplemental Rep. at 5, Def.'s App. A Ex. 4.) Rutz and Stewart have also indicated in their supplemental reports that the Chihuahua will have value to Taco Bell for use in future advertising campaigns. (Rutz Supplemental Rep. at 3-4 (listing examples of re-introduced icons, such as the Planter's Peanut Man, the Kool-Aid frosted pitcher guy, and "Charlie the Tuna"), Def.'s App. A Ex. 10.)

**[*15]** The Court will not allow Wrench's experts to testify regarding Taco Bell's future use of the Chihuahua because such testimony would be speculative. Wrench's experts base their opinion on future use only upon the fact that other companies have resurrected retired icons rather than upon any evidence that Taco Bell has any specific plans to reintroduce the Chihuahua. The claims before the Court involve a discrete period of time ending in 2000. The value of the concept, or the damages sustained by Wrench, can be calculated through that period of time.[1] If Wrench can establish liability and Taco Bell does use the Chihuahua again, Wrench may have a new claim for damages. This alone might prevent Taco Bell from ever using the concept again. In this regard, a company's use of a prior theme is not particularly relevant unless the company used the theme after having been found liable for breach of implied contract, copyright infringement, or other claim prior to the re-use of the characters or theme.

> 1   The basis of the valuation by the jury (including whether it is a lump-sum payment or derived from royalty-type payments based upon usage) can be addressed through special jury instructions and interrogatories to the jury.

**[*16] 4. Industry Custom and Practice**

The Court has already ruled on Taco Bell's argument regarding expert testimony on industry custom in its discussion on the understanding of the parties. However, the issue framed by Wrench in its response to the motion is whether its experts may testify about whether the terms of the November 18, 1996, proposal submitted by Wrench's licensing agent, Scanlan, to Taco Bell, were reasonable based upon their years of experience and familiarity with licensing deals. This evidence is relevant to damages, specifically, the fair value of Wrench's services and/or ideas. In rendering an award on an implied contract claim, a jury may use a particular rate or fee if the evidence supports the conclusion that such rate or fee was customary in the particular industry or, if there is no customary rate or fee, the jury may determine the reasonable value of the plaintiff's services based upon any other competent evidence in the record. *See Havenfield Corp. v. H & R Block, Inc.,* 509 F.2d 1263, 1270-71 (8th Cir. 1975).

The testimony of Wrench's licensing experts cited by Taco Bell tends to support Taco Bell's assertion that there is no established [*17] royalty rate or other customary fee which a jury could apply in determining Wrench's damages. That does not mean that Wrench's experts may not offer an opinion regarding the reasonableness of the terms of the Scanlan proposal, based upon their experience in licensing deals, as a measure of the reasonable value of Wrench's services and/or ideas. There may be many ways to measure the reasonable value of Wrench's services, such as the amount Taco Bell paid Chiat Day, a reasonable royalty rate (assuming that the jury accepts Wrench's licensing paradigm), or a reasonable fee for graphic design work (assuming that the jury accepts Taco Bell's graphic design paradigm). The Scanlan proposal, whether reasonable or not, is simply evidence of what that value may be. Therefore, Wrench's experts will be permitted to testify regarding the reasonableness of the Scanlan proposal, even if there is no customary rate or fee in the industry. [2]

> 2   Taco Bell also argues that the testimony of Taco Bell's expert, Battersby, a licensing attorney, should be excluded because Battersby failed to produce certain files containing other licensing agreements, apparently because those agreements are protected by the attorney-client privilege. The Court will deny Taco Bell's motion on this issue because Wrench has indicated that it does not intend to question Battersby on those agreements, and Taco Bell has not shown that it was not otherwise able to question Battersby about his opinions.

[*18] 5. Brand Equity

Several of Wrench's experts have opined that the Chihuahua campaign significantly increased Taco Bell's brand equity. According to Wrench's expert Stewart, "brand equity" is "the set of consumers' beliefs, associations, experiences, feelings and intentions that add value to a product or service provided by a firm." (Stewart Rep. at 6, Def.'s App. A Ex. 12.) Wrench's experts all opine that the Chihuahua has significant "residual value" or "intrinsic value" to Taco Bell.

The Court will not allow Wrench to present evidence regarding Taco Bell's "brand equity," because such evidence pertains solely to the issue of "ill-gotten gains," the measure of damages for the tort claims, which have all been dismissed. The Court also rejects Wrench's argument that evidence regarding "brand equity" is still relevant, even if Wrench is limited to a contract-type measure of damages, because such evidence will help put the value of Wrench's ideas in context for the jury. Wrench states that it will argue that it is entitled to at least $ 37 million based on the Scanlan proposal, and evidence of the increase in brand equity will show that Taco Bell received something much more valuable [*19] than that amount. Although the jury will be asked to determine the reasonable value of Wrench's ideas, there is no evidence that an increase in "brand equity" is ever used by parties contracting for the use of ideas or licensing of caricatures as a means of formulating compensation. Thus, such evidence is irrelevant and would be unfairly prejudicial to Taco Bell.

6. Effectiveness or Success of the Chihuahua Campaign

Taco Bell contends that opinion evidence regarding the success of the Chihuahua campaign should be excluded because none of Wrench's experts made any attempt to quantify or measure the effect of the advertising on sales of Taco Bell food, and the effectiveness or success of the advertising campaign is irrelevant to the issues of liability and damages. Wrench responds that the opinion testimony regarding the success of the campaign is admissible because it goes to the issues of: (1) whether the Scanlan proposal was reasonable; and (2) if the measure of damages is "ill-gotten gains," the amount of those damages.

In light of the Court's dismissal of Wrench's tort claims, the Court concludes that evidence regarding the effectiveness or success of the Taco Bell campaign [*20] is not particularly relevant to the remaining issues in this case. Moreover, the Court fails to see how the success of the advertising campaign has any bearing upon whether the Scanlan proposal was reasonable. The Scanlan proposal provided compensation on a pay-for-use basis rather than upon the success of Taco Bell's advertising campaign. Such evidence would not explain how or why the percentages set forth in the Scanlan proposal were reasonable. However, at this time, the Court will not require exclusion of all evidence of the success of the advertising campaign to the extent that such evidence may serve to provide helpful background information for the jury or may be relevant to some other issue in the case. Thus, at trial, the Court may allow some testimony on the issue but will not permit Wrench to explore the issue in detail or through expert testimony.

7. Effect on Wrench's Licensing Efforts

Wrench's licensing experts (Battersby, Francesca, Scanlan, and Georgeopolis) opine that Taco Bell's use of the Chihuahua negatively impacted Wrench's licensing effort regarding Psycho Chihauhua. Taco Bell contends that these opinions are inadmissible because they are neither relevant [*21] nor reliable. The Court agrees with Taco Bell. The opinions regarding lost licensing opportunities, in the absence of any evidence of a single

lost opportunity, are speculative and not admissible. In addition, there is no evidence that anyone would license Psycho Chihuahua if it knew Taco Bell was using it or, conversely, that Taco Bell would license the character on other than an exclusive basis. There are far too many unresolved issues and factors to allow such evidence to be presented to the jury.

**8. Limitation of Testimony**

Taco Bell argues that to the extent testimony is allowed on any of the issues raised by Taco Bell in its motion, the Court should limit the number of experts called by Wrench. The Court will wait to resolve this issue at trial when it is better able to determine how the trial may proceed most efficiently. However, in light of the Court's ruling dismissing Wrench's tort claims, the parties should be in a better position to determine the necessary testimony for an efficient presentation of their cases.

**C. Motion to Preclude the Expert Testimony of Wrench's Damages Expert**

*Background*

Taco Bell contends that the expert testimony of Wrench's damages [*22] expert, John C. Jarosz, should be excluded for several reasons, but primarily because Jarosz's opinions are unreliable. Jarosz's expertise is in the area of valuation of intellectual property. Jarosz has issued three reports, dated January 15, 1999, April 22, 1999, and September 16, 2002 (Jarosz Report III.). Jarosz also provided supplemental calculations to Taco Bell in December 2002, immediately preceding his deposition. The only report at issue in this motion is Jarosz's September 16, 2002, report, which supersedes his two prior reports.

In all three of his reports, Jarosz segregated Wrench's damages into the following categories: (1) the benefit to Taco Bell as a result of its use of Wrench's ideas; (2) Wrench's lost royalties resulting from Taco Bell's failure to properly compensate Wrench for the use of its ideas; and (3) losses Wrench suffered in its own licensing efforts due to Taco Bell's misappropriation of Wrench's ideas. The basis for Jarosz's determination of the first category of damages was that the Chihuahua campaign dramatically increased Taco Bell's sales and profits. Jarosz identified four elements of "ill-gotten gains" within the first category of damages: (1) [*23] the increase in food sales as a result of the Chihuahua campaign; (2) sales of plush Chihuahua toys; (3) revenues from "internal licensing" of the Chihuahua, calculated using the percentages from the Scanlan proposal; and (4) revenues from external licensing of the Chihuahua. In his second and third reports, Jarosz included a section entitled "Brand Equity," in which he calculated Taco Bell's brand equity based upon a variety of methods. The brand equity analysis relates to Jarosz's computation of Taco Bell's "ill-gotten gains."

In his third report dated September 16, 2002, Jarosz attempted to show the increase in Taco Bell's sales resulting from the Chihuahua campaign through a multiple regression analysis demonstrating the "impact" that certain regular measures of consumer awareness of Taco Bell's advertising had on Taco Bell's food sales. Those measures were "top of mind ad awareness," which measures the share of consumers that mentioned Taco Bell first when prompted to list quick service restaurant advertisements, and "unaided ad awareness," which measures the share of consumers that list Taco Bell advertising without prompting. (Jarosz Rep. III at 11-12.) Based upon his analysis, [*24] Jarosz opines that the Chihuahua campaign increased Taco Bell's food sales by an amount between $ 22.5 million and $ 46.1 million. (*Id.* at 18-19.) Jarosz also calculated that Taco Bell earned $ 18.2 million in 1998 and 1999 on sales of Chihuahua toys and kids meals. In addition, Jarosz calculated that Taco Bell received revenues of $ 705,387 from internal licenses and $ 3.1 million in external license fees during that same period. Thus, Jarosz's total "ill-gotten" gains numbers range from $ 56.0 million to $ 86.0 million. (*Id.* at 20.)

Jarosz also calculated Taco Bell's brand equity as between value to between $ 235.6 million and $ 343.9 million and added an opinion that the Chihuahua campaign had a brand value impact of between $ 10.3 million and $ 222.4 million. (*Id.* at 17.) Finally, Jarosz calculated Wrench's loss of licensing revenue from Taco Bell as $ 37.7 million, based upon the terms of the Scanlan proposal.

*Standard for Admission of Expert Testimony*

*Rule 702 of the Federal Rules of Evidence* governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand [*25] the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed. R. Evid. 702*. In determining whether expert testimony meets the requirements of *Rule 702*, a court must as gatekeeper pursuant to *Federal Rule of Evidence 104(a)* to ensure that the testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993)*; *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999)*.

*Discussion*

**1. Opinions Regarding Taco Bell's Ill-Gotten Gains**

Jarosz's opinions regarding Taco Bell's ill-gotten gains, which include the increase in Taco Bell food sales as a result of the Chihuahua campaign, sales of plush Chihuahua toys, revenues from internal and external licensing efforts, **[*26]** and brand equity, are no longer relevant to the issues in this case in light of the Court's recent Order dismissing Wrench's common law tort and California statutory unfair competition claims. Those opinions would be relevant only if tort claims remained in the case. In addition, as noted above, the Court rejects Wrench's alternate argument for admission of those opinions-that proof of the benefit Taco Bell received from the Chihuahua campaign will help demonstrate the reasonableness of the Scanlan proposal. This argument must be rejected, because if the Scanlan proposal is reasonable, it is because the terms of the proposal are in line with other similar deals in the industry and not because it results in a number several million dollars less than some other number bearing no relationship to the Scanlan proposal. Moreover, Wrench has cited no evidence showing that compensation in licensing deals is ever based upon such considerations.

**2. Testimony Regarding Losses Under the Scanlan Proposal**

Taco Bell contends that the Court should exclude Jarosz's testimony regarding Wrench's lost licensing revenues based upon the terms of the Scanlan proposal because Jarosz's testimony will **[*27]** not assist the trier of fact. Taco Bell asserts that, assuming the Scanlan proposal is an appropriate basis for determining damages, Jarosz's testimony is unnecessary because the licensing revenues produced by the Scanlan proposal can be determined by applying the terms of the proposal to Taco Bell's data for advertising expenditures and internal and external licensing revenues. According to Taco Bell, calculation of revenues under the Scanlan proposal involves only simple math.

Wrench responds that Jarosz "offers more to the jury than 'simple math.'" (Pls.' Br. Opp'n Mot. Exclude Jarosz Test. at 16.) Wrench points out that Jarosz is an economist and an expert in the valuation of intellectual property, and Jarosz determined that the results produced by the Scanlan proposal are reasonable in relationship to his calculations of Taco Bell's "ill-gotten gains" as well as his own experience in valuing intellectual property. In addition, Wrench points out that Jarosz should be permitted to present calculations of damages under the Scanlan proposal, because sifting through Taco Bell's numbers is not an easy task, as Taco Bell contends, and it would be helpful to the jury to have this information **[*28]** in summary testimony.

The Court concludes that Jarosz should be permitted to testify regarding the calculations under the Scanlan proposal in order to simplify that process for the jury. Jarosz may also testify, to the extent he has relevant experience, whether the number produced by the Scanlan proposal is reasonable in light of the circumstances of this case. Jarosz may not testify, however, that the number produced by the Scanlan proposal is reasonable in comparison to his estimates of Taco Bell's "ill-gotten gains."

**3. Testimony Regarding Lost Licensing Opportunities**

Taco Bell argues that Jarosz should be precluded from testifying about Wrench's lost licensing opportunities because Jarosz has been unable to quantify such losses. The Court agrees. There is no evidence to support the claim that Wrench lost licensing opportunities as a result of Taco Bell's use of the Chihuahua, and Jarosz has failed to quantify any such losses. Accordingly, the Court will not allow testimony on that subject.

**4. Residual Value of the Chihuahua to Taco Bell**

Finally, Taco Bell argues that the Court should preclude Jarosz's testimony that the Chihuahua has substantial residual value **[*29]** to Taco Bell because it can be redeployed at some time in the future. Taco Bell contends that Jarosz's testimony is improper because Jarosz is not an expert in advertising and he has no specialized knowledge about when or whether Taco Bell will ever use the Chihuahua again.

The Court will preclude Jarosz from testifying about future use of the Chihuahua because, as mentioned above, any testimony regarding future use is too speculative at this point, at least without any evidence that Taco Bell has a present intent to use the Chihuahua at some point in the future.

**III. Wrench's Motions**

**A. Motion to Exclude Certain Images of Psycho Chihuahua**

Wrench argues that the Court should exclude images of Psycho Chihuahua that were not in the marketplace

Case 2:04-cv-00139-DAK-BCW    Document 425-3    Filed 08/31/2007    Page 8 of 11

Page 8
2003 U.S. Dist. LEXIS 7608, *

prior to July 1, 1997. Prior to the date Taco Bell began airing the Chihuahua commercials, Wrench marketed Psycho Chihuahua images on tee shirts, posters, notebooks, and other items. Wrench characterizes the images available at that time, which are attached to Wrench's motion as Exhibit A, as "colorful" but not "off color." (Pls.'Br. Supp. at 3.) Wrench also claims that some images created prior to that time ended up on the "cutting [*30] room floor" because they were too "edgy" or "off color" for public consumption. Examples of such images are attached to Wrench's brief as Exhibits E and F. According to Wrench, after Taco Bell began airing its Chihuahua commercials in July of 1997, the Chihuahua became associated with Taco Bell and Wrench was unable to continue its marketing efforts as it had in the past out of concern that the public would believe that Wrench had stolen the idea from Taco Bell. Wrench claims that it thereafter moved in a different direction: toward a more "risque grade of humor." (Pls.' Br. Supp. at 4.) Examples of these images are attached to Wrench's brief as Exhibit C.

Wrench argues that post-July 1997 and "cutting room floor" images should be excluded because they are not relevant to the issues in this case. Wrench notes that it did furnish images to Taco Bell during negotiations, shown in Exhibit D to Wrench's brief, and concedes that those images are relevant. Wrench also concedes that images in the marketplace prior to July 1997 (Exhibit A) are relevant. However, Wrench argues that images Taco Bell never saw, either because the images were "cutting room floor" material or were produced after [*31] Taco Bell began airing the Chihuahua commercials (after the time Taco Bell decided to abandon Wrench), are not relevant because Taco Bell was never aware of those images, and they could not have impacted any decision by Taco Bell. Wrench further argues that even if the images have some slight relevance in this case, the relevance is substantially outweighed by unfair prejudice to Wrench because the implication Taco Bell intends to create is that Psycho Chihuahua and its creators are "filthy" and "vile" and not worthy of the jury's consideration.

Taco Bell responds that the images are relevant to the issues in this case. First, Taco Bell notes that the case boils down to whether Taco Bell used Wrench's Psycho Chihuahua ideas, and one of the means of proof (for and against the proposition) is by allowing the jury to compare the images. Taco Bell contends that in spite of any prejudice to Wrench, Taco Bell will be prejudiced if it is not allowed to display the images to the jury. In other words, the value of the images is not in showing the jury what Taco Bell considered in evaluating whether to use Wrench's character, but in allowing the jury to determine whether Taco Bell's Chihuahua [*32] is actually Psycho Chihuahua. Taco Bell also argues that the images are relevant in proving that it never would have entered into any enforceable agreement with Wrench pertaining to the use of Psycho Chihuahua. For example, Taco Bell states that it will argue that it never would have agreed to use Psycho Chihuahua unless it had exclusive rights so it could control the use of Psycho Chihuahua (to preclude negative association with Taco Bell). Taco Bell asserts that the "R-rated" images are probative on this point.

Taco Bell also contends that the images are relevant to the issue of damages because the "R-rated" images will show that the terms of the Scanlan proposal, which allowed Wrench the freedom to create and market those images, were not reasonable. Finally, Taco Bell argues that admission of the images would not be unfairly prejudicial to Wrench because Taco Bell does not intend to use the images to suggest that Wrench and its principals are "filthy people."

The Court concludes that the motion should be granted because the images Taco Bell seeks to offer (set forth in Exhibits C, E, and F to Wrench's brief) may cause unfair prejudice to Wrench. While the Court does agree with [*33] Taco Bell that those images are relevant to some issues, the Court believes that the prejudice to Wrench will substantially outweigh any relevance those images have in this case. The substantial prejudice results from the fact that, despite Taco Bell's disclaimer, Wrench may be perceived by the jury to be "filthy" people. The jury could become confused or deflected from the true issues in this case. In addition, Taco Bell will not be prejudiced by the exclusion of such evidence. The images in Exhibits A and D, which will be admitted at trial, are sufficient to allow Taco Bell to show dissimilarity between Psycho Chihuahua and Taco Bell's Chihuahua and to allow Taco Bell to make its point that it would not have entered into a non-exclusive license as contemplated by the Scanlan proposal.[3] Therefore, the Court will grant Wrench's motion.

> 3   In light of the discussion above regarding proof of the implied in fact contract, Taco Bell's argument that it would not have agreed to a non-exclusive license can only be relevant to the issue of damages.

[*34] B. Motion to Exclude Testimony of Cate Elsten

Taco Bell has retained Cate Elsten ("Elsten") to provide expert testimony critiquing the damage calculations proposed by Jarosz. Elsten's report is limited to rebutting Jarosz's report. Wrench contends that Elsten is not qualified to testify regarding the licensing field or standards in the licensing industry because she has no specific training or education in that field, and she does not work in that field. Wrench asserts that Elsten's general experience

Case 2:04-cv-00139-DAK-BCW    Document 425-3    Filed 08/31/2007    Page 9 of 11

Page 9
2003 U.S. Dist. LEXIS 7608, *

as a consultant who has seen and analyzed licensing deals does not qualify her to opine on reasonable royalties in the licensing field.

The Court rejects Wrench's argument. Pursuant to *Rule 702*, the test for qualification of a witness as an expert is whether the proffered expert possesses sufficient qualifications through knowledge, skill, training, or experience to assist the trier of fact to understand the evidence or to determine a fact in issue. This requirement is met where the witness' qualifications provide a foundation for the witness to answer a specific question. *See Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994)*. Elsten is a principal [*35] in Tait Advisory Services, L.L.C. and serves as the head of the firm's Intellectual Property Practice. Elsten is a Certified Management Accountant and a member of the Licensing Executives Society and the American Marketing Association. (Elsten 10/29/02 Rep. at 49.) Elsten's practice includes providing consulting services in litigation and various transactions of tangible and intangible assets. (*Id.*) Elsten has also authored several articles, including *Valuing Intellectual Property Rights in Litigation,* Minnesota Institute of Legal Education, (1994), and *Do Licensing Negotiators Leave Money on the Table?,* Minnesota Institute of Legal Education, (1996). (*Id.* at 50.) In addition, Elsten testified that she has provided valuation services in many transactions involving the licensing of "all types" of property, including licensed characters. (Elsten Dep. at 9-15, 219-31, Def.'s Br. Opp'n Ex. B.1.) These qualifications are more than sufficient to permit Elsten to testify regarding a reasonable royalty rate. *Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183 (10th Cir. 1992)*, cited by Wrench, does not support Wrench's argument. The proffered expert [*36] in that case was an attorney who had some training and experience in the securities field, but he admitted that he had no experience representing large brokerage houses, clearing corporations, or transfer agents. *Id. at 1195*. The court of appeals held that the district court did not abuse its discretion in refusing to allow the witness to testify because the district court properly determined that the attorney's general experience and education did not qualify him to serve as an expert in the securities area. *Id.* In contrast, in this case, Elsten's experience in providing valuation services in licensing deals of characters is directly related to the issue of an appropriate royalty rate for the Psycho Chihuahua character and provides a sufficient foundation for her testimony.

Wrench's other argument, that Elsten must be precluded from testifying because she has refused to disclose the specifics of the various licensing transactions for which she provided services, is also rejected. While it is true that Elsten indicated that she was unable to disclose certain information because of confidentiality restrictions, Elsten did disclose many of the details of those deals. [*37] (Elsten Dep. at 12-13, 37-39.) Elsten did not disclose specific details of the transactions, such as the identities of the licensee, licensor, or character, or the specific terms of the agreements. However, she did disclose sufficient information to allow Wrench's counsel to effectively cross-examine Elsten regarding the basis for her opinions. Therefore, the motion will be denied.

### C. Motion to Exclude Testimony of Marc Jacobson

In its final motion, Wrench contends that the testimony of Taco Bell's proffered expert, Marc Jacobson, should be excluded because it is irrelevant to the issues in this case. Taco Bell retained Jacobson, whose area of expertise is in the "graphic design industry," to offer opinions in response to a hypothetical scenario. The hypothetical scenario posits that Taco Bell is interested in having a graphic program created for its use in promoting its brand and engages a graphic design firm to develop the program. The final product would be "reproducible, electronic artwork of the Graphic Program on its own and in conjunction with Taco Bell's pre-existing logos or marks." (Jacobson Rep. at 1, Pls.' Br. Supp. Ex. A.) Based upon the hypothetical, Jacobson [*38] is expected to testify about: (1) the basis upon which the graphic developer would be compensated; (2) the compensation a graphic developer could request and expect to be paid by Taco Bell; and (3) who would own the rights to the graphic program upon completion of the work. (*Id.* at 3-4.) Jacobson opines that a flat fee arrangement would likely be used, that the graphic developer could obtain a fee in the range of $ 175,000 to $ 250,000, and that it is almost certain that Taco Bell would own the rights to the graphic program. (*Id.* at 4.)

Wrench asserts that Jacobson's testimony is irrelevant in this case because it is unsupported by the known and undisputed facts. Wrench points out that this is not a case where Taco Bell engaged a graphic design firm to create a graphic program for Taco Bell's use, but instead it is a case about the licensing of a pre-existing character - an area which Jacobson concedes he lacks expertise. Jacobson also concedes that licensing of a pre-existing character and graphic design are two distinct and unrelated areas. Wrench states that the facts show that Taco Bell discovered Psycho Chihuahua at a licensing expo where Wrench's principals were attempting [*39] to solicit licensing interest in Psycho Chihuahua. Wrench notes that it is not engaged in the graphic design business and, in fact, had to hire a graphic design firm to assist it in creating materials for submission to Taco Bell. Therefore, Wrench argues, the facts of the hypothetical do not fit the facts of this case.

Taco Bell concedes that Jacobson is not an expert in the adaptation/licensing of pre-existing characters, but

argues that his testimony should not be excluded because it provides an alternative to Wrench's method of calculating damages based upon the Scanlan proposal. In other words, Taco Bell suggests that Jacobson's testimony would help the jury determine what Wrench should be paid if the jury rejects Wrench's licensing model.

The Court will deny the motion, because testimony from Taco Bell witnesses tends to refute Wrench's claim that Taco Bell agreed to some sort of licensing agreement. What was actually intended is a matter of dispute. Although Wrench may characterize the transaction as a licensing deal, other evidence shows that: (1) Taco Bell rejected the licensing proposal; (2) Taco Bell employees involved in the dealings with Wrench testified that Wrench had **[*40]** a "totally mistaken idea" of what the relationship would be; (3) Ed Alfaro, who dealt with Wrench on behalf of Taco Bell, testified that he was interested in more of a buyout than an ongoing royalty; (4) Taco Bell representatives referred to Psycho Chihuahua as a mascot; (5) Taco Bell's representatives referred to Wrench as a "small graphic design firm"; (6) much of the work Wrench created for Taco Bell was of the kind produced by graphic artists; (7) Alfaro included the Psycho Chihuahua images in a test against other potential designs; and (8) Wrench was not an advertising agency. Thus, even if Wrench can convince the jury that Taco Bell used Wrench's idea, there is room for argument about what Taco Bell that thought it was purchasing. If this case involved Taco Bell's actual use of Psycho Chihuahua, as opposed to use of ideas, Wrench's argument would carry more weight. However, Taco Bell can reasonably argue that it used ideas and materials similar to what a graphic design firm would produce. Given this evidence, Taco Bell's hypothetical is not irrelevant to the determination of the reasonable value of Wrench's ideas and/or services.

### IV. Conclusion

For the foregoing reasons, **[*41]** the Court will: (1) grant Taco Bell's motion in limine; (2) grant in part and deny in part Taco Bell's omnibus motion to exclude or limit expert testimony; (3) grant in part and deny in part Taco Bell's motion to exclude the testimony of Wrench's damages expert; (4) grant Wrench's motion to exclude certain images of Psycho Chihuahua; (5) deny Wrench's motion to exclude the testimony of Cate Elsten; and (6) deny Wrench's motion to exclude the testimony of Marc Jacobson.

An Order consistent with this Opinion will be entered.

Dated: *MAY -2 2003*

GORDON J. QUIST

UNITED STATES DISTRICT JUDGE

### *ORDER*

In accordance with the Court's Order filed this date,

**IT IS HEREBY ORDERED** that Defendant Taco Bell Corp.'s Motion in Limine (docket no. 283) is **GRANTED.** With regard to the issue of Taco Bell's failure to preserve evidence, the Court will allow Plaintiffs to raise the issue again at the time of trial in the event that Magistrate Judge Brenneman determines that Taco Bell has in fact failed to preserve evidence.

**IT IS FURTHER ORDERED** that Defendant Taco Bell Corp.'s omnibus motion to Exclude or Limit Expert Testimony (docket no. 286) is **GRANTED IN PART [*42] AND DENIED IN PART** as follows: (1) Plaintiffs' expert witnesses may testify regarding custom in the licensing industry as it relates to the parties' understanding of compensation in connection with the submission of ideas, but they may not testify regarding the parties' subjective intentions; (2) Plaintiffs' experts may not testify regarding independent creation; (3) Plaintiffs' experts may not testify regarding the lifespan of the Chihuahua or Taco Bell's probable future use of the Chihuahua; (4) Plaintiffs' experts may not testify about industry custom and practice with regard to specific licensing terms, but may testify regarding whether the Scanlan proposal would be considered reasonable in the licensing industry; (5) Plaintiffs' experts may not testify regarding Taco Bell's brand equity; (6) Plaintiffs' experts will be permitted to testify about the success of the Chihuahua campaign only as background information and not as part of any claim for damages; and (7) Plaintiffs' experts may not testify regarding Wrench's lost licensing opportunities.

**IT IS FURTHER ORDERED** that Defendant Taco Bell Corp.'s motion in Limine to Exclude Testimony of John Jarosz (docket no. 298) **[*43]** is **GRANTED IN PART AND DENIED IN PART.** Jarosz will not be permitted to testify regarding Taco Bell's "ill gotten gains," Taco Bell's brand equity, Wrench's lost licensing opportunities, or residual value of the Chihuahua to Taco Bell. Jarosz will be permitted to testify regarding Plaintiffs' losses under the Scanlan proposal.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion in Limine to Exclude Certain Images of Psycho Chihuahua (docket no. 279) is **GRANTED.** The images attached to Plaintiffs' brief as Exhibits C, E, and F are **excluded.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion in Limine to Exclude Testimony of Taco Bell's Expert Cate Elsten Regarding Licensing Issues (docket no. 280) is **DENIED.**

2003 U.S. Dist. LEXIS 7608, *

**IT IS FURTHER ORDERED** that Plaintiff's Motion in Limine to Exclude the Testimony of Marc Jacobson (docket no. 278) is **DENIED.**

Dated: *MAY -2 2003*

GORDON J. QUIST

UNITED STATES DISTRICT JUDGE