# EXHIBIT A

Dockets.Justia.com

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2001 WL 863552 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Page Mill Asset Management v. Credit Suisse First Boston Corp.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
PAGE MILL ASSET MANAGEMENT, Plaintiff,
v.
CREDIT SUISSE FIRST BOSTON CORPORATION, Collateralized Mortgage Securities Trust II, as successor to Collateralized Mortgage Securities Corp., and State Street Bank and Trust Company, Defendants.
No. 98 Civ. 6907(MBM).

July 30, 2001.

Charles R. Jacob III, Miller & Wrubel, New York, NY, for Plaintiff.
Frederick P. Schaffer, Schulte Roth & Zabel, New York, NY, for Defendant Credit Suisse First Boston Corporation, and Collateralized MortgageSecurities Trust II, as successor to Collateralized Mortgage Securities Corporation.
James Gadsden, James W. Rayhill, Carter, Ledyard & Milburn, New York, NY, for Defendant State Street Bank and Trust Company.
Deborah S. Griffin, Peabody & Arnold, Boston, MA, for Defendant State Street Bank and Trust Company.

OPINION AND ORDER
MUKASEY, J.

*1 In this diversity action, Page Mill Asset Management, the owner of bonds issued by Collateralized Mortgage Securities Corporation ("CMSC"), sued CMSC's successor, Collateralized Mortgage Securities Trust II ("CMST"), for breach of the indenture. Page Mill also sued CMST's affiliate, Credit Suisse First Boston ("CS First Boston"), for unjust enrichment, tortious interference with contract, and breach of fiduciary duty. Page Mill also sued the indenture trustee, State Street Bank and Trust Company ("State Street"), for breach of fiduciary duty. As to all its claims Page Mill sought both compensatory and punitive damages.

Pursuant to Fed.R.Civ.P. 56, Page Mill moved for summary judgment against CMST. CMSC, CMST, and CS First Boston (collectively, "the CS Defendants") cross-moved for summary judgment. In a previous opinion, I dismissed all of Page Mill's claims against the CS Defendants, except its claim for liability for breach of the indenture. As to that claim, I held that CMST breached the indenture by soliciting bids rather than quotes to value the collateral. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,* 2000 WL 335557, No. 98 Civ. 6907 (S.D.N.Y. Jun. 30 2000) ("Page Mill I").

State Street had also moved for summary judgment dismissing Page Mill's claim for breach of fiduciary duty. In a second opinion, I denied State Street's motion. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,* 2000 WL 877004, Nos. 84152, 98 Civ. 6907 (S.D.N.Y. Jun. 30, 2000). Now, Page Mill moves for summary judgment in its favor on that claim, and State Street cross-moves. For the reasons stated below, both motions are denied. However, State Street's motion for summary judgment dismissing Page Mill's punitive damages claim is granted. Finally, State Street moves to strike Page Mill's jury demand as to its breach of fiduciary duty claim. That motion is denied.

I.

In Page Mill I, I held that CMST breached the indenture by soliciting bids rather than quotes because "[t]here is a fundamental difference between bids and quotes...." I concluded that a bid is an offer to buy, and a quote is a description of market price. I further explained that if CMST were "required only to solicit offers from two market makers, it would have been free to take the collateral for less than its optimum price, provided only that the issuer could identify market makers who would not be high bidders for the collateral."

Case 2:04-cv-00139-DAK-BCW   Document 430-2   Filed 08/31/2007   Page 3 of 14

Not Reported in F.Supp.2d                                                                                       Page 2
Not Reported in F.Supp.2d, 2001 WL 863552 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

In contrast, if CMST were "required to solicit a price from market makers, it would have had to take the collateral for the market makers' highest estimate as to the collateral's price." *See Page Mill I,* 2000 WL 335557, at *7. Page Mill argues that when State Street allowed CMST to use bids rather than quotes, it also breached the indenture, and thus, its fiduciary duty. (8/29/00, Pl. Mem. at pp. 4-6)

State Street responds by offering evidence that the word "quote" as used in the indenture is synonymous with the word "bid ." Page Mill argues that I should disregard this new evidence because I have already decided that bids are fundamentally different from quotes, and that under the law of the case doctrine, the court should not reconsider its prior rulings unless, *inter alia,* new evidence becomes available. Page Mill argues that State Street's new evidence is not newly available, and therefore, I should disregard it. (10/6/00, Pl. Mem. at pp. 7-9) However, the law of the case doctrine is not absolute:

*2 [T]he decision whether or not to apply law-of-the-case is ... informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine. 'Prejudice' in this context 'does not mean harm resulting from the failure to adhere to the prior decision,' but instead 'refers to the lack of' ... sufficient 'opportunity to prepare armed with the knowledge that' the prior ruling is not deemed controlling.

*Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (quoting *United States v. Uccio,* 940 F.2d 753, 757-58 (2d Cir.1991)) Here, I will consider State Street's new evidence. As I will explain, Page Mill will get the opportunity to respond by conducting further discovery and submitting evidence.

Page Mill argues also that State Street should be estopped to introduce new evidence because at a conference prior to the previous opinions, I asked counsel whether any of the parties would offer further evidence relating to the meaning of bids and quotes, and they all said no. Page Mill explains that it relied on State Street's representation in not offering additional evidence on that issue, and that I relied on State Street's representation in deciding the motions treated in the two prior opinions. (10/6/00, Pl. Mem. at pp. 10-12) However, to establish an estoppel, Page Mill must show that it relied to its detriment on State Street's representation. *See e.g. Meyerson v. Werner,* 683 F.2d 723, 728 (2d Cir.1982). Regardless of whether Page Mill relied on State Street's representation in choosing not to conduct additional discovery and submit additional evidence either prior to the previous opinions or in preparation for this motion, I will ensure that Page Mill does not suffer any detriment from that reliance because Page Mill will get the opportunity to respond to State Street's new evidence.

The first new item of evidence is the American Heritage Dictionary's definition of "quote" as a "quotation," which is defined as "4a. [t]he quoting of current prices and bids for securities and goods. b. The prices or bids cited." Am. Heritage Dictionary 1439 (4th ed.2000). Webster's Third New International Dictionary also defines quotation as referring either to bids or prices. *See* Webster's Third New Int'l Dictionary 1868 (1993) ("the naming ... of current bids and offers of current prices of securities...."). In contrast, the Oxford English Dictionary and Black's Law Dictionary define quotation as referring to prices only. *See* 13 Oxford English Dictionary 52 (2d ed. 1991) ("The amount stated as the price of stocks ... for sale."); Black's Law Dictionary 1263 (7th ed. 1999) ("The amount stated as a stock's ... current price.") Nevertheless, the definitions in the American Heritage and Webster's dictionary create at least some uncertainty as to whether the term quote can refer not only to prices but also to bids.

*3 In addition, State Street submits Robert Landau's affidavit. From 1960 to 1991, he "led the worldwide corporate trust group at Bankers Trust Company," and from 1992 to 1996, he supervised the corporate trust functions at NationsBank in Atlanta. He is the author of Corporate Trust

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Administration and Management, which, he says, has been the basic industry text for 24 years. (Landau Aff., ¶ 1) He avers:[FN1]

> FN1. Page Mill argues that Landau's expert opinion is inadmissible because he does not provide a reliable foundation for it. (10/6/00, Pl. Mem. at p. 14) However, experience alone may provide a sufficient foundation for expert testimony. *See* Fed.R.Evid. 702 advisory committee's note) Page Mill cites *Roniger v. McCall*, 2000 WL 1191078, No. 97 Civ. 8009 (Aug. 22, 2000), for the proposition that an "expert has an obligation to do more than aver conclusively that his experience led to his opinion." (10/6/00, Pl. Mem. at p. 13) The court in *Roniger* stated that "although it is permissible for [the expert] to base his opinion on his own experience ..., he must do more than aver conclusively that his experience led to his opinion." *Roniger*, 2000 WL 1191078, at *4. Here, Landau did a lot more. He cited a long list of specific transactions involving corporate trust indentures. (Landau Aff., Ex. A)

[i]n my opinion and experience, the word "quotes" as used in the Indenture ... would be clearly understood by trustees to be synonymous with the word "bids," or any other specific indication of what price a potential purchaser was willing to pay.... I base this opinion of my familiarity with the reason for this type of provision being put into an indenture and my experience and understanding of our business as to what we understand words like this to mean and what this type of provision is for."
*Id.* at ¶ 3. Landaus's affidavit does create a genuine issue as to the correct meaning of "quote."[FN2] Accordingly, Page Mill's motion for summary judgment is denied.[FN3]

> FN2. Because State Street has submitted evidence creating a genuine issue as to the merits, I do not reach State Street's affirmative defenses.

> FN3. The other new item of evidence is the Desktop Guide's definition of quotation as "a price (bid and/or offer) in a subject market. A quotation is not necessarily the price at which a security can be bought or sold; it is an indication of market levels." (Barry Decl., Ex. A) However, this is consistent with my previous definition of quote as a "description of market price."

II.

State Street cross-moves for summary judgment on the same claim on the ground that State Street's new evidence establishes that the term quotes should be read as synonymous with bids, as well as on the ground of several affirmative defenses, which State Street failed to raise in its first motion on this claim. The motion is in effect an improper motion for reconsideration. Local Civil Rule 6.3 requires that such a motion be served within 10 days of the court's determination of the original motion. I decided State Street's prior motion for summary judgment on this claim on June 30, 2000. State Street did not serve its second motion on this claim until September 7, 2000. Accordingly, State Street's cross-motion for summary judgment is denied.

Now that both parties' motions for summary judgment on this issue have been denied, the issue of whether the word quote is synonymous with bid, and thus, whether State Street permitted CMST to use the wrong procedure in valuing the collateral, will be tried. I will, therefore, also withdraw my previous ruling that CMST breached the indenture by soliciting quotes rather than bids.

III.

State Street moves also for summary judgment dismissing Page Mill's request for punitive damages. "Punitive damages are allowable in tort cases ... so long as the very high threshold of moral culpability is satisfied." The defendant's conduct should be "willful, wanton, or reckless." *Giblin v. Murphy*, 73 N.Y.2d 769, 772, 536 N.Y.S.2d 54 (1988). Page Mill fails to submit any evidence that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 430-2   Filed 08/31/2007   Page 5 of 14

Not Reported in F.Supp.2d                                                Page 4
Not Reported in F.Supp.2d, 2001 WL 863552 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

State Street knew or consciously disregarded knowing that using bids rather than quotes breached the indenture.

Instead, Page Mill's evidence suggests that State Street knew or should have known that the bids it used were below market. For example, Page Mill cites a letter it sent State Street warning that using below market bids would violate the indenture. Page Mill also cites Paine Webber's unsolicited bid for nearly $1 million more than the bids Page Mill used, and Page Mill cites evidence that the bids used were well below the Issuer's internal pricing for similar collateral. (9/22/00, Pl. Mem., at pp. 5-7, & 10) However, none of this evidence supports a finding that State Street should have known that bids are not quotes. Thus, Page Mill fails to create a genuine issue as to whether the alleged breach was willful, wanton, or reckless. Accordingly, State Street's motion for summary judgment dismissing Page Mill's claim for punitive damages is granted.

IV.

*4 Finally, State Street moves to strike Page Mill's jury demand. The general rule is that "[a]ctions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'-carrying with them no right to trial by jury." *In re Evangelist,* 760 F.2d 27, 29 (1st Cir.1985). However, at least two circuits have stated that when a breach of fiduciary duty claim is predicated upon underlying conduct "which is actionable in a direct suit at common law," the jury should decide whether there has been a breach of fiduciary duty. *DePinto v. Provident Sec. Life Insur. Co.,* 323 F.2d 826, 837 (9th Cir.1963) ("Having in mind the necessity of scrutinizing, with utmost care, any seeming curtailment of the right to a jury trial, we hold that where a claim of breach of fiduciary duty is predicated upon underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is ... a jury question."); *Halladay v. Verschoor,* 381 F.2d 100, 109 (8th Cir.1967) ("Ordinarily, enforcement of administration of trusts and proceedings involving trusts are subjects for equity jurisdiction, but where the basic nature of the claims present only legal issues, it is entirely proper ... to treat the case as one belonging on the law docket."); *see also In re Evangelist,* 760 F.2d at 31 ("Conduct that breaches a fiduciary duty might also violate other legal rules; it might constitute a tort (such as fraud) or breach of contract. In each of the cases cited by petitioner, the relevant conduct was alleged to violate some such other legal principle, so it is not surprising that the courts viewed the complaint at issue as setting forth a claim for damages at law."); *cf. Moore's Federal Practice* § 38.31[11] ("The remedies of trust beneficiaries ... are generally considered equitable rather than legal, and there is no right to jury trial, although a breach of fiduciary duty predicated upon negligence or based on fraudulent conduct and seeking damages gives rise to a jury trial right."). Here, State Street's alleged breach of fiduciary duty is predicated upon an alleged breach of indenture, a legal claim. Therefore, State Street's motion to strike Page Mill's jury demand is denied.

For the reasons stated, Page Mill's motion for summary judgment as to liability is denied. State Street's cross-motion is denied. State Street's motion for summary judgment as to punitive damages is granted. Its motion to strike Page Mill's jury demand is denied.

S.D.N.Y.,2001.
Page Mill Asset Management v. Credit Suisse First Boston Corp.
Not Reported in F.Supp.2d, 2001 WL 863552 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Hockerson-Halberstadt, Inc. v. Saucony, Inc.
E.D.La.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
HOCKERSON-HALBERSTADT, INC.
v.
SAUCONY, INC.
No. Civ.A. 91-1720.

May 27, 2005.

James E. Uschold, James E. Uschold, PLC, Morris Samuel Borenstein, Morris S. Borenstein, Attorney at Law, Michael Douglas Carbo, Michael D. Carbo, PLC, Robert L. Hackett, Stephen Lewis Dunne, Hackett Law Office, Todd Robert Slack, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, LA, Donald Lee Nauman, Donald Lee Nauman, Attorney at Law, Santa Rosa, CA, Guy E. Matthews, William P. Jensen, Matthews & Associates, Houston, TX, Howard F. Fine, Baker & McKenzie, San Francisco, CA, Martin M. Zoltick, Zoltick Technology Law Group, PLLC, Sterling, VA, Neil D. Greenstein, Techmark, San Jose, CA, for Hockerson-Halberstadt, Inc.
Gregory Carlyle Smith, Garvey, Smith, Nehrbass & Doody, LLC, Charles F. Thensted, Charles F. Thensted, Attorney at Law, Metairie, LA, David Leroy Fox, Fulbright & Jaworski, Houston, TX, Nancy J. Marshall, Deutsch, Kerrigan & Stiles, Thomas K. Potter, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Raymond Gerard Areaux, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, Jacqueline Marie Daspit, Jacqueline M. Daspit, Attorney at Law, Peter Frank Liberto, Peter Frank Liberto, Attorney at Law, Stephen G. Bullock, Stone Pigman Walther Wittmann, LLC, New Orleans, LA, Patricia A. Lynch, Bush, Brooks & Augsperger, Orlando, FL, Alan H. Norman, Anthony G. Simon, John M. Howell, Howell & Haferkamp, LC, St. Louis, MO, Bruce A. Kaser, Davis, Wright & Tremaine, David A. Lowe, Black Lowe & Graham, Seattle, WA, Ilan N. Barzilay, James J. Foster, Wolf, Greenfield, et al, Boston, MA, for Saucony, Inc.

ORDER & REASONS
FALLON, J.
*1 The following motions pending before the Court were heard with oral argument on May 25, 2005:
(1) Defendant's Motion in Limine to Limit Testimony of Ian Whatley;
(2) Defendant's Motion in Limine to Clarify Rulings;
(3) Plaintiff's Motion for Partial reconsideration of Denial of Motion for Partial Summary Judgment and/or Motion For Leave to File Supplemental motion for Partial Summary Judgment; and
(4) Defendant's Motion Re Patent Infringement Claim.

The Court granted motion 4 at the hearing and dismissed the Plaintiff's patent infringement claim as moot. The remaining motions were taken under submission. For the following reasons, motions 1-3 are DENIED.

*BACKGROUND*

Plaintiff, Hockerson-Halberstadt, Inc. ("HHI") originally brought this action in May 1991 alleging patent infringement against Nike, Reebok, and various other footwear companies and distributors. Hyde Athletic Industries ("Hyde"), now known as Saucony, Inc., was named as a defendant in that suit. In December 1991, HHI and Hyde entered into a Patent License Agreement settling the patent infringement claims against Hyde and granting Hyde a license under United States Letters Patent Nos. 4,322,895 and 4,259,792. The license provided:
commencing with, but not before the date upon which a final judgment holding one or more claims of the HHI PATENTS valid, is entered from which no appeal has been taken in the CIVIL ACTIONS HYDE shall pay HHI, as a royalty, $0.25 (twenty five cents) for each pair of shoes that would otherwise infringe either or both of the HHI

Case 2:04-cv-00139-DAK-BCW    Document 430-2    Filed 08/31/2007    Page 8 of 14

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

PATENTS. (Paragraph 3.2)

Pursuant to the Patent License Agreement, the Defendant paid $50,000 to HHI and the parties agreed that HHI would be entitled to a running royalty of twenty-five cents ($0.25) per pair of shoes sold after a date to be determined in the future. The Patent License Agreement also contained a "most favored nation" clause which provided:6.1 HHI shall, within 30 (thirty) days of licensing third parties, provide [THE DEFENDANT] with a copy of such license.
6.2 In the event that HHI grants a license to another party under one or both HHI PATENTS on terms deemed more favorable to the licensee than those terms herein granted to [THE DEFENDANT], [THE DEFENDANT] shall on written notice to HHI, have the option of selecting such more favored terms provided, however, any sums paid prior to the date of such election by [THE DEFENDANT], shall not be returnable to [THE DEFENDANT].
6.3 In the event that [THE DEFENDANT] elects more favorable terms, such terms shall become effective on [THE DEFENDANT'S] election.

Hyde admits that it has not paid any royalties to HHI since this Patent License Agreement was instituted. On June 3, 2004, Plaintiff Hockerson-Halberstadt, Inc. ("HHI") brought this action against Defendant Saucony (referred to as "Hyde" in HHI's complaint) for declaratory relief, breach of contract, and patent infringement.[FN1]

> FN1. This case was consolidated with lead case, # 91-1720.

HHI's declaratory judgment action is based on a Consent Decree entered on January 30, 1992 ("Nike Consent Decree"), dismissing the patent infringement actions against HHI and Nike. HHI seeks a declaration that the Nike Consent Decree is a final judgment that satisfies the suspensive condition set forth in the Patent License Agreement with Hyde. The breach of contract claim hinges on the outcome of the declaratory judgment action. If the suspensive condition in the Patent License Agreement was satisfied by the Nike Consent Decree, then HHI claims that Hyde breached the Patent License Agreement by not paying royalties to HHI. Lastly, HHI argues, in the alternative, that the Defendant is liable for patent infringement because the Patent License Agreement was forfeited by the Defendant's refusal to pay royalties. Saucony responded to HHI's complaint by filing a counterclaim asserting that HHI breached the Patent License Agreement by failing to provide Saucony with a copy of each license that HHI entered into with third parties.

*2 The Defendant first moved for summary judgment on October 15, 2004. The Defendant argued that summary judgment should be granted in its favor because HHI's breach of contract claim had prescribed, HHI's patent infringement claim was barred by the Patent License Agreement between the parties, and HHI's declaratory judgment action was therefore moot. Oral argument was heard on the motion on December 15, 2004, at which time the motion was taken under submission. The Court concluded that HHI's breach of contract claim was partially prescribed, but that summary judgment was not warranted for a part of the breach of contract claim, the patent infringement claim, nor the declaratory judgment action. Therefore, the Defendant's first motion for summary judgment was granted in part and denied in part.

The Defendant again moved for summary judgment and the Court heard oral argument on the Defendant's second motion for summary judgment on January 5, 2005. In its motion, the Defendant argued that the "most favored nation" clause of the Patent License Agreement between the Defendant and HHI permits the Defendant to elect more favorable terms from other license agreements entered into by HHI and third parties. HHI entered into a license agreement with Brooks Shoe, Inc. ("Brooks") in September 1995 (the "Brooks License") for the same patents at issue in the Defendant's License Agreement. Like the Defendant, Brooks paid $50,000 to HHI. However, the $50,000 was considered a payment in full, and Brooks was not required to pay a running royalty.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 430-2   Filed 08/31/2007   Page 9 of 14

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

At oral argument, HHI argued that the Defendant never provided formal, written notice that it wished to exercise its right to more favorable terms, as required by the Patent License Agreement. The Court ruled that timely notice of the Brooks License was not given to the Defendant and that an election of the Brooks License terms had been made by the Defendant. The Court then took the Defendant's Second Motion for Summary Judgment under advisement and ordered the parties to file supplemental briefs addressing the effective date and significance of the Defendant's election of the more favorable terms. On March 30, 2005, the Court issued an Order and Reasons concluding: (1) that the Defendant does not have to pay an additional $50,000 in order to elect the terms of the Brooks License; (2) that the Defendant's election of the terms of the Brooks License is retroactive to 1995; and (3) that the Defendant may be liable for royalty payments owed prior to the Brooks License. Accordingly, The Defendant's Second Motion for Summary Judgment was denied as to HHI's claim for any royalties that may have become due on "otherwise infringing" shoes from June 3, 1994 up to the time that the Brooks License was executed. The Defendant's Second Motion for Summary Judgment was granted as to HHI's claim for any royalties that may have become due after the Brooks License was executed.

On April 13, 2005, the Court heard oral argument on five motions filed by the parties: (1) Plaintiff's Motion for Partial Summary Judgment; (2) Defendant's Motion for Partial Summary Judgment dismissing Patent Infringement Claim; (3) Defendant's Motion for Partial Summary Judgment Limiting Contract Damages; (4) Defendant's Motion for Partial Summary Judgment of No Royalties For Products Manufactured Prior to August 8, 1995; and (5) Defendant's Third Motion for Summary Judgment. The Court denied all of the motions, except that the Court granted the portion of the Defendant's motion for Partial Summary Judgment of No Royalties For Products Manufactured Prior to August 8, 1995 dealing with the patent infringement claim, but denied the motion with regard to the breach of contract claim.

The parties now file several subsequent motions.

### MOTIONS

### I. DEFENDANT'S MOTION IN LIMINE TO LIMIT TESTIMONY OF IAN WHATLEY

*3 Saucony moves the Court to limit the testimony of Ian Whatley to the four corners of his expert report that was served on January 25, 2005. Saucony argues that, according to the Court's October 26, 2004 scheduling order, HHI's expert reports were due by January 25, 2005. The Pretrial Notice attached to the scheduling order provided that expert witnesses whose reports have not been furnished shall not be permitted to testify nor shall experts be permitted to testify to opinions not included in timely furnished reports. Saucony believes that HHI will be relying upon expert testimony because, on January 25, 2005, Saucony received the Initial Expert Report of Ian Whatley. On March 15, 2005, HHI served Saucony with a Supplemental Expert Report from Whatley-seven weeks after the deadline. Whatley's Initial Expert Report describes in general terms the shoe models he remembers cutting up on the mid-1990's that "appeared to include the claimed structure of the '895 patent." (Initial Expert Report, ¶ 9). Whatley's Supplemental Expert Report, however, contained analyses of specific shoes sold by Saucony.

Saucony suspects that HHI plans to present testimony from Whatley that goes beyond his Initial Expert Report and argues that Whatley's testimony should be limited to the content of his Initial Expert Report. According to Saucony, the additional information included in the Supplemental Expert Report could have been included in the Initial Expert Report had HHI acted timely because the shoes at issue had been in the possession of Whatley's lawyers for the past several years. Saucony further argues that it decided not to retain an expert, believing that it's expert would have little to rebut because HHI's expert's testimony would be limited to his initial report in accordance with the Court's scheduling order.

HHI opposes Saucony's motion for several reasons.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First, HHI argues that Saucony's motion is untimely because the deadline for filing motions in limine relative to expert testimony was March 15, 2005, and Saucony did not file its motion until May 2, 2005. Second, HHI claims that in the Initial Expert Report, Whatley indicated that he would file a supplemental report after review of discovery materials to be provided by Saucony. (Initial Expert Report, ¶¶ 10, 11) Therefore, HHI argues that the reason the initial report did not list the specific shoe models is that Saucony failed to supply the information timely. Third, HHI points out that, as a professional courtesy, it granted Saucony's request for an extension of time to file its discovery responses which Saucony knew HHI needed to enable Whatley to prepare a more complete report. Finally, HHI further argues that Whatley testified at deposition that the shoes were not in his possession and that he obtained them on the earliest date that he could have obtained them, March 7, 2005, and thereafter promptly supplemented his initial report to name the specific models which his first report referred to in general terms.

## ANALYSIS

*4 The parties' understanding of the relevant discovery dates in this proceeding are all correct. Thus, the Supplemental Expert Report was submitted after the deadline for expert reports and Defendant's motion in limine regarding the expert report was also untimely. However, in this case, there would be no unfair prejudice to the Defendant in allowing HHI's expert to testify to his Supplemental Expert Report because the Supplemental Expert Report does not alter the opinion expressed by Whatley in the Initial Expert Report. In the Initial Expert Report, Whatley stated that "certain Saucony shoes" met the claim limitations of the HHI Patents. (Initial Expert Report, ¶¶ 4, 9). Whatley explained in his initial report that, though he could not specifically state the names of the shoe models to which he was referring, he had previously inspected shoes involved in this litigation and he intended to amend his report when the necessary information became available. (Initial Expert Report, ¶ 10) The Initial Expert Report was supplemented by a brief report giving the exact name of models at issue-the Saucony Jazz 5000 and Saucony Shadow 6000. (Supplemental Expert Report, ¶ 4). In the supplement, Whatley provides diagrams and analyses of those specific models as examples of the models that met the HHI Patents' claim limitations. Therefore, the Supplemental Expert Report merely uses additional information-subsequently obtained from Saucony-to support Whatley's initial opinion that the shoes at issue meet the claim limitations of the '895 patent. The Defendant is not prejudiced by a supplemental report that merely further explains the expert's initial opinion, rather than changes that opinion. *See Beller v. United States,* 211 F.R.D. 689 (D.N.M.2003) (court granted defendant's motion to strike untimely expert report supplement because the supplement presented new opinions rather than simply supplementing the first expert report).

Further, Saucony would not be prejudiced by introduction of the Supplemental Expert Report because Saucony was aware that Whatley intended to supplement his report once HHI received certain discovery from Saucony because Whatley so stated several times in his initial report. (Initial Expert Report, ¶¶ 10, 11, 26). Therefore, Saucony's argument that it is prejudiced by this new information and that it decided not to hire an expert because of the vagueness of Whatley's Initial Expert Report rings hollow. The evidence before the Court shows that the delay in the supplement was the result of Saucony's delay in responding to discovery. The supporting information in the Supplemental Expert Report was put together using evidence that was in the possession of Saucony. Therefore, Saucony should have been fully aware of what information Whatley intended to use to supplement his report. Saucony made the decision not to hire its own witness to rebut that information at its own risk. Rather than assuming that the Court would not allow Whatley to supplemental expert report with information which HHI had requested from Saucony, Saucony had ample time to challenge a potential supplement to the report before its own deadline to file an expert report

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-00139-DAK-BCW   Document 430-2   Filed 08/31/2007   Page 11 of 14

Not Reported in F.Supp.2d                                                                                                  Page 5
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

passed. Had Saucony made such a challenge and been unsuccessful, Saucony would have still had time to hire its own expert. For all of these reasons, Ian Whatley is not precluded form testifying to analyses contained in his Supplemental Expert Report.

## II. DEFENDANT'S MOTION IN LIMINE TO CLARIFY RULINGS

*5 Saucony next moves the Court to clarify its previous rulings regarding calculating royalties. This Court has previously ruled that "HHI can only recover payments based on a breach of contract claim for those royalties that became due between June 3, 1994 and July 25, 1995" and "HHI can only claim royalty payments for those allegedly due from June 3, 1994, to the effective date of election in 1995." Saucony seeks clarification that its potential liability for the periods indicated in the Court's previous rulings refers to the dates that payments would have come due, as opposed to dates on which sales were made. Saucony points out that, according to the Patent License Agreement, royalties for the sales of shoes during any calendar quarter would have become due 30 days after the end of the calendar quarter. Therefore, Saucony interprets the Court's prior rulings to mean that the base for calculating royalties is sales made from April 1, 1994 to March 31, 1995, because those sales would have generated royalties that became due between June 3, 1994 and July 25, 1995. HHI responds that Saucony's motion is frivolous because reference to the Patent License Agreement yields only one possible interpretation. According to HHI, the period of damages based on the Court's prior rulings, is from April 1, 1994 through July 25, 1995.

### ANALYSIS

Paragraph 3.3 of the Patent License Agreement provides in pertinent part:
The earned royalties provided for in paragraph 3.2 shall be computed quarterly, as of the first day of each of January, April, July and October for the preceding calendar quarter. Not later than 30 (thirty) days after the end of each calendar quarter, [Saucony] shall furnish to HHI a report in writing and signed by an officer of [Saucony] setting forth the royalties due hereunder for the calendar quarter. Each such report shall be accompanied by payment of the royalties due to HHI for the calendar quarter to which the report relates.

Both parties agree that, by saying that HHI can claim royalty payments based on its breach of contract claim for those royalties that became due between June 3, 1994 and July 25, 1995, the Court meant that HHI can claim royalties for sales made beginning April 1, 1994. This is because royalties for those shoes sold on April 1, 1994 would become due on June 30, 1994, the first possible day that any royalties would be owed during the period from June 3, 1994 to July 25, 1995. The parties, however, disagree on the end date for sales that may raise a royalty obligation.

This Court previously ruled that HHI can claim royalty payments based on its breach of contract claim for those royalties that became due between June 3, 1994 and July 25, 1995, for two reasons: (1) because HHI's claim for royalties that became due before June 3, 1994 had prescribed; and (2) because July 25, 1995 was found as the effective date of Saucony's election of the more favorable terms of the Brooks License. Starting on July 25, 1995, Saucony was no longer required to pay a running royalty to HHI. However, as HHI points out, the Court's ruling that Saucony made a valid election of the Brooks License effective on July 25, 1995 does not relieve Saucony of the obligation to pay royalties that accrued prior to that effective date. Therefore, HHI can claim royalties which accrued prior to July 25, 1995 though the payment of those royalties was not due until after July 25, 1995. Consistent with the Patent License Agreement's computation of royalties and the date the accrued royalties are required to be paid, the Court now clarifies its previous rulings by explaining that HHI can claim royalties based on breach of contract for *shoes sold* from April 1, 1994 through July 25, 1995.[FN2]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

FN2. In making this clarification, the Court is not making any finding on the merits of HHI;s claim for royalty payments. The Court is merely clarifying that HHI's breach of contract claim for royalties only applies to royalties allegedly owed on sales made from April 1, 1994 through July 25, 1995.

### III. PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION

*6 Plaintiff HHI moves for partial reconsideration of the Court's denial of its motion for partial summary judgment regarding whether the Nike Consent Decree triggered the royalty obligation under the Patent License Agreement. Concurrently and/or in the alternative, HHI moves for leave to file a supplemental motion for partial summary judgment. In its motion for partial summary judgment, HHI argued that the Nike Consent Decree is a valid final judgment satisfying the condition set forth in paragraph 3.2 of the Patent License Agreement, which calls for royalties to be payable upon the entry of a "final judgment ... holding one or more claims of the HHI PATENTS valid." Therefore, HHI requested that the Court declare that the suspensive condition set forth in that paragraph has been satisfied. HHI objected to Saucony's use of the March 15, 2005 declaration of David Wolf to explain the terms of the parties' agreement, arguing that the declaration contains parol evidence to explain the intent of the parties, though it has not been established that the word "holding" is so ambiguous as to require parol evidence. Saucony responded that, in the Nike Consent Decree, this Court did not reach a *holding* that the HHI Patents were valid. The Court found some ambiguity as to the meaning and intent of the instruments when looking within the four corners of the Patent License Agreement and the Nike Consent Decree and determined that this ambiguity raised issues of fact. Therefore, the Court concluded that it needed to depend upon on extrinsic evidence to interpret the intent of the parties, making summary judgment inappropriate at that time.

HHI now argues that the question is not whether a consent decree could trigger the royalty provision, but whether the Nike Consent Decree does or does not contain a "holding" that the HHI patents were not invalid. According to the Plaintiff, because the issue is the meaning of the word "holding", the intent of the parties can, and therefore must, be determined as a matter of law within the four corners of the contract. HHI maintains that resorting to parol evidence is unnecessary and, therefore, improper. Ultimately, HHI claims that there are no genuine issues of material fact precluding summary judgment in HHI's favor.

Saucony responds that all of the arguments raised by HHI are arguments that either were or could have been raised in earlier motions for partial summary judgment. According to Saucony, HHI is simply rehashing arguments that the Court has already rejected. Further, HHI believes that the Plaintiff has failed to show that Court's denial of the Plaintiff's motion for Partial Summary Judgment demonstrates manifest error.

### ANALYSIS

A district court may reconsider a previously denied summary judgment motion even in the absence of new material presented. *Enlow v. Tishomingo County, Mississippi,* 962 F.2d 501, 507 fn. 16 (5th Cir.1992); *see also Sewell Plastics, Inc. v. Coca-Cola, Co.,* 720 F.Supp. 1196, 1215 (W.D.N.C.1989). In this case, the Court once again looks to the law of contracts in Louisiana to determine whether the previous denial of the Plaintiff's motion for partial summary judgment should be reconsidered. Louisiana contract law dictates that "the interpretation of a contract is the determination of the common intent of the parties" with the Court giving the contractual words their "generally prevailing meaning." La. C.C. arts.2045, 2047. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties." La. C.C. art.2046. Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expression of the common intention of the parties is ambiguous. *Ortega v. State, Dept. of Transp. and Development*, 689 So.2d 1358, 1363-1364 (La.1997).

**\*7** The Court remains convinced that there is ambiguity regarding the intent of the parties at the time of executing the contract, which raises issues of fact. HHI takes issue with the Court's denial of its partial motion for reconsideration, believing that the Court considered parol evidence introduced by Saucony. However, in making its determination that summary judgment was not appropriate on the issue of whether the Nike Consent decree triggered royalty payments, the Court did not need to, and did not, turn to the parol evidence presented in Saucony's reply memorandum. Instead, the Court's ruling was based on looking within the four corners of the Patent License Agreement and the Nike Consent Decree. When looking at the written instruments, there was no "generally prevailing meaning" indicating the common intent of the parties. La. C.C. arts.2045, 2047. Therefore, the Court determined that it would need to look to extrinsic evidence to determine the meaning of the contracts. HHI has not presented any argument that changes this conclusion.

Due to the ambiguity regarding the common intent of the parties, the Court reserves its decision on whether the Nike Consent Decree triggered the Patent License Agreement royalty provision until a trial on the merits has been held. Though the issue regarding the Nike Consent Decree is brought as a declaratory action, the question can still be put to a jury. "A litigant is not deprived of a jury trial merely because an action in which it is a party is one for declaratory judgment." 9 Fed. Prac. & Proc. Civ.2d § 2313. A party's right to a jury trial in a declaratory action is determined by what type of action the issue would have come to the Court as if declaratory judgment were unavailable. 9 Fed. Prac. & Proc. Civ.2d § 2313; *see also Terrell v. DeConna, et al.*, 877 F.2d 1267 (5th Cir.1989). In the instant case, if there were no declaratory judgment procedure, the Plaintiff's claims would be for breach of contract and/or patent infringement, and the Plaintiff would be entitled to a jury trial. Therefore, HHI's right to a jury trial still stands in the declaratory action proceeding. *See Simler v. Conner*, 372 U.S. 221, 223, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963) ("The fact that the action is in form a declaratory judgment case should not obscure the essentially legal nature of the action.").

HHI argues that, even ambiguities in a contract can be resolved as a matter of law, and therefore, summary judgment is appropriate. *See Huggs, Inc. v. LPC Energy Inc.*, 889 F.2d 649 (5th Cir.1989); *see also Battig v. Hartford Accident and Indemnity Co.*, 608 F.2d 119, 120 (5th Cir.1979). According to HHI, any doubt must be resolved against Saucony as the drafter of the agreement. It is true that La. C.C. art.2056 provides that "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." However, in this case, there is some disagreement among the parties as to who drafted the Patent License Agreement. Therefore, even the issue of in whose favor doubt must be resolved is an issue of fact precluding summary judgment. Overall, HHI has not presented the Court with any compelling reason why it should reconsider its prior denial of HHI's motion for partial summary judgment.

**\*8** *CONCLUSION:* For the aforementioned reasons:

(1) Defendant's Motion in Limine to Limit Testimony of Ian Whatley is DENIED.

(2) Defendant's Motion in Limine to Clarify Rulings is GRANTED as to the need for clarification. The Court's previous ruling si now clarified by ordering as meaning that HHI can claim royalties based on a breach of contract claim for *sales of "otherwise infringing"* shoes made from April 1, 1994 through July 25, 1995.

(3) Plaintiff's Motion for Partial reconsideration of Denial of Motion for Partial Summary Judgment and/or Motion For Leave to File Supplemental motion for Partial Summary Judgment is DENIED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

E.D.La.,2005.
Hockerson-Halberstadt, Inc. v. Saucony, Inc.
Not Reported in F.Supp.2d, 2005 WL 1432376 (E.D.La.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.