LEXSEE 2000 U.S. DIST. LEXIS 3941

**PAGE MILL ASSET MANAGEMENT, Plaintiff, -against- CREDIT SUISSE FIRST BOSTON CORPORATION, COLLATERALIZED MORTGAGE SECURITIES TRUST II, as successor to COLLATERALIZED MORTGAGE SECURITIES CORP., and STATE STREET BANK AND TRUST COMPANY, Defendants.**

98 Civ. 6907 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 3941*

**March 29, 2000, Decided**
**March 30, 2000, Filed**

**DISPOSITION:** [*1] Page Mill's motion for summary judgment granted in part and denied in part, and the CS Defendants' motion for summary judgment granted in part and denied in part. All of Page Mill's claims against the CS Defendants dismissed, except its claim for liability for breach of the indenture provisions concerning evaluation of the collateral. As to this claim, Page Mill's motion for summary judgment granted.

**COUNSEL:** FOR PLAINTIFF: CHARLES R. JACOB III, ESQ., JOEL M. MILLER, ESQ., ADAM SAFER, ESQ., Miller & Wrubel, New York, NY.

FOR CREDIT SUISSE FIRST BOSTON CORPORATION and COLLATERALIZED MORTGAGE SECURITIES TRUST II, DEFENDANTS: FREDERICK P. SCHAFFER, ESQ., MATTHEW B. WHITE, ESQ., Schulte Roth & Zabel LLP, New York, NY.

FOR STATE STREET BANK & TRUST COMPANY, DEFENDANT: DEBORAH S. GRIFFIN, ESQ., Peabody & Arnold LLP, Boston, MA.

FOR STATE STREET BANK & TRUST COMPANY, DEFENDANT: JAMES W. RAYHILL, ESQ., Carter, Ledyard & Milburn, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

In this diversity action, Page Mill Asset Management, the owner of bonds issued by Collateralized Mortgage Securities [*2] Corporation ("CMSC"), sues CMSC's successor, Collateralized Mortgage Securities Trust II ("CMST"), for breach of the indenture. Page Mill also sues CMST's affiliate, Credit Suisse First Boston ("CS First Boston"), for unjust enrichment, tortious interference with contract, and breach of fiduciary duty. Finally, Page Mill sues the indenture trustee, State Street Bank and Trust Company ("State Street"), for breach of fiduciary duty. As to all its claims, Page Mill seeks both compensatory and punitive damages.

Pursuant to *Fed. R. Civ. P. 56*, Page Mill moves for summary judgment as to liability on its claim against CMST. In jointly-filed papers, CMSC, CMST, and CS First Boston (collectively, "the CS Defendants") oppose the motion, and cross-move for summary judgment as to all claims against them. State Street also moves for summary judgment. For the reasons stated below, Page Mill's motion is granted in part and denied in part, and the CS Defendants' cross-motion is granted in part and denied in part, such that summary judgment will be entered in Page Mill's favor on its claim arising from breach of the indenture provision regarding evaluation of the collateral. All of Page Mill's other [*3] claims are dismissed. [1]

[1] As explained below, CMST breached one provision of the indenture. *See infra* II.C. This finding is plainly important to the disposition of Page Mill's claim against State Street. *See, e.g.*, 10/19/99 State Street Rep. at 3-4. I have not considered that claim here in order to give Page Mill

Case 2:04-cv-00139-DAK-BCW   Document 438-3   Filed 09/04/2007   Page 2 of 10

Page 2
2000 U.S. Dist. LEXIS 3941, *

and State Street an opportunity to reevaluate their positions in light of this opinion, and in the hope that they will settle their dispute. However, if the parties are unwilling or unable to settle promptly, this court will decide the relevant motion.

I. Factual Background

The following relevant facts are not in dispute.

A. The Bonds

As part of a series called CMSC Series 1990-3, CMSC issued bonds ("1990-3 bonds") in May 1990. (Compl. P 12; CS Def. Rule 56.1 Statement P 1) The 1990-3 bonds were secured by pools of Government National Mortgage Association certificates ("the collateral"). (*Id.*) The collateral was held in a trust; the trustee was State Street. (*Id.*)

The 1990-3 bonds [*4] included a class of residual bonds ("the bonds") which are the focus of this action. The bonds were governed by the Amended and Restated Indenture dated August 1, 1988 ("the indenture") and the Series Supplement 1990-3 dated May 20, 1990 ("the supplement"). (Compl. P 12; CS Def. Rule 56.1 Statement P 2) New York law controls interpretation of the indenture and the supplement. (CS Def. Rule 56.1 Statement Ex. 1 at XI-7) (Indenture § 11.13)

The process by which the bonds were to be redeemed varied based on whether the redemption was initiated by the bondholders or the issuer. (CS Def. Rule 56.1 Statement Ex. 1 at X-1) (Indenture, Article 10) The bondholder-initiated redemption procedure is relevant to this case only incidentally, and need not be discussed here.

The bonds could be redeemed at the option of the issuer provided that three notices were sent: first, by the issuer to the registered bondholders (*id.* at § 10.01(b)(A)); second, by the issuer to the trustee (*id.* at § 10.01(a)); and third, by the issuer or the trustee to the registered holders of all 1990-3 bonds (*id.* at § 10.02). The first notice had to precede the second by at least 15 days (*id.* at § 10.01(b)(A)); [*5] the second had to precede the redemption date by at least 30 days and be accompanied by an opinion of counsel as to the tax consequences of redeeming the bonds (*id.* at § 10.01(a), § 10.01(b)); and the third notice had to precede the redemption date by at least 10 days (*id.* at § 10.02).

To effect a redemption of the bonds, the issuer was required to deposit with the trustee the bonds' redemption price plus "an amount equal to the excess, if any, of (i) the market value of the Mortgage Certificates [on a specified day]. . . over (ii) the aggregate Redemption Price of the bonds." (*Id.* at § 10.05(b)) Market value was defined as "the highest of the quotes obtained . . . by the Trustee at the request of the Issuer from two National Association of Securities Dealers making a market in mortgage certificates selected by the Issuer." (*Id.*)

After the issuer made its deposit with the trustee, the collateral would be delivered to it. (*Id.* at § 10.05(c)) The residual bond holders would then receive the money deposited by the issuer less the amount required to redeem the bonds. (Pl. Rule 56.1 Statement PP 7 -10; 8/31/99 CS Def. Mem. at 5)

B. The 1995 and 1996 Notice [*6] and Opinion of Counsel

On December 18, 1995, a CS First Boston employee, John F. Campbell, mailed a letter to the registered bondholders, who are not parties to this action. (CS Def. Rule 56.1 Statement P 5; Pl. Resp. to State Street Rule 56.1 Statement P 5; Campbell Decl. P 5) After defining relevant terms, the operatic portion of the letter reads in its entirety as follows: "You are hereby notified of the Issuer's intent to exercise its right to redeem the Bonds pursuant to Section 10.01 of the Indenture. Such redemption will be effected only after notice to Bondholders by the Trustee." (Jacob Aff. Ex. G at 22)

On December 29, 1995, the law firm of Cleary, Gottlieb, Steen & Hamilton sent to State Street a letter containing an opinion of counsel. The letter was "delivered in connection with the delivery of a Notice of redemption of the bonds," and recorded Cleary, Gottlieb's opinion as to the tax consequences of an issuer-initiated redemption. (*Id.* Ex. I at 1-2)

On January 2, 1996, the fifteenth day after he sent the December 18 letter, Campbell delivered to State Street a letter reporting that "the Issuer has elected to redeem the bonds." (Campbell Decl. P 4; CS Def. Rule [*7] 56.1 Statement Ex. 4 (reproduction of the letter))

C. The 1997 Deposit Trust Agreement and its Aftermath

In October 1997, Page Mill purchased the bonds. (Carara Dep. at 74; Jacob Aff. Ex. H) On December 22, 1997, the Deposit Trust Agreement ("the trust agreement") was executed, pursuant to which the relationship between CMSC and the bondholders was altered in two relevant ways. First, CMST was created as a trust, CMSC assigned substantially all of its assets and liabilities to CMST, and CMST thus succeeded CMSC as issuer of the 1990-3 bonds. (CS Def. Rule 56.1 Statement Ex. 9 at §§ 2.01-2.02)

Second, the trust agreement created a "series participation," and stated that "the holder of a series participation shall direct and bear responsibility for the performance . . . [of CMST's] rights and duties in respect of any optional redemption of the related Series." (*Id.* at §

Case 2:04-cv-00139-DAK-BCW   Document 438-3   Filed 09/04/2007   Page 3 of 10

Page 3
2000 U.S. Dist. LEXIS 3941, *

2.09(a)) The series participation with respect to the 1990-3 bonds was acquired by CS First Boston. [2] (CS Def. Rule 56.1 Statement Ex. 12)

> [2] Pursuant to the trust agreement, an Amended and Restated Indenture dated December 22, 1997 was issued. (CS Def. Rule 56.1 Statement Ex. 10) Aside from its title page, which described CMSC as the "original issuer" and CMST as the "issuer" (*id.* at 1), the 1997 indenture was identical to the August 1, 1988 indenture discussed above. Accordingly, I will refer to both documents as "the indenture" without distinguishing between them.

[*8] On or about December 24, 1997, CS First Boston sent a letter to all registered holders of the bonds stating that CMST had "acquired substantially all of the assets . . . [of] CMSC and has succeeded CMSC as the 'Issuer' under the Indenture governing the [1990-3] Bonds." (CS Def. Rule 56.1 Statement Ex. 11) Further, the letter stated that CMST had "ratified and assumed CMSC's prior notice that Issuer intends to exercise its right to redeem the Bonds." (*Id.*)

D. The 1998 Redemption of the Bonds

On June 30, 1998, CS First Boston notified State Street that the bonds would be redeemed on July 25, 1998. (Lange Decl. P 3; Campbell Decl. P 8) On July 15, 1998, an "auction" for the collateral was conducted. As the CS Defendants explain, "although the Indenture calls for [the issuer to solicit] 'quotes' from two NASD members making a market in mortgage certificates, First Boston had developed a procedure to obtain bids from qualifying dealers to ascertain market value." (8/31/99 CS Def. Mem. Supp. at 11-12) (citations omitted) Using this procedure, a high bid was identified and the value of the collateral was calculated. (CS Def. Rule 56.1 Statement P 30) On July 17, 1998, First Boston [*9] deposited with State Street the redemption price of the bonds plus the difference between the value of the collateral, as calculated based on the July 15 high bid, and the aggregate redemption price of the bonds. (*Id.* P 33) State Street then released the collateral to CS First Boston. (*Id.* P 34)

II. Page Mill's Breach of Indenture Claims Against CMST

A. Notice

Page Mill argues that CMST breached the indenture by prematurely notifying the bondholders that it would be redeeming the bonds, with the result that the bondholders were unable to initiate and control the redemption themselves. (9/30/99 Pl. Mem. Opp'n at 19-25) In support of this claim, Page Mill argues that three clauses in the indenture establish a date before which the issuer was not permitted to notify the bondholders of its intent to redeem the bonds.

First, Page Mill cites § 8 of the supplement, which states that "the bonds may be called for redemption at the option of the Issuer . . . on any Payment Date on or after which . . . the aggregate outstanding principal balance of the Bonds is no more than 10% of the aggregate initial principal amount of the Bonds." (*Id.* at 20) Page Mill argues that under [*10] § 8 the issuer was permitted to notify the bondholders of its intent to redeem the bonds only after the 10% threshold was reached in 1998, and that CMST's 1995-1996 notice was thus premature. (9/30/99 Pl. Mem. Opp'n at 20)

When it is used as a verb in this context, "call" means to "make a request or demand." *Deluxe Black's Law Dictionary* 204 (2d. ed. 1990); *accord, e.g., West's Legal Thesaurus/Dictionary* 111 (1986). Therefore, "called for redemption" means "demanded for redemption," not "notified of a demand for redemption." Indeed, if "called for redemption" meant "notified of a demand for redemption," § 8 would be incoherent: the subject of § 8 is "the bonds," and although bonds can be demanded for redemption by an issuer, they cannot be notified of such a demand. Thus, § 8 does not set an earliest notice date.

Second, Page Mill notes that "Redemption Date" is defined in the indenture as "the Payment Date specified by the Issuer for the redemption of the Bonds." (9/30/99 Pl. Mem. Opp'n at 20) Substituting this definition for the phrase "Redemption Date," Page Mill renders § 10.01(a) as follows:

> If the Issuer shall elect to redeem bonds . . . it shall furnish [*11] notice . . . of such election to the Trustee not later than thirty days prior to the [Payment Date specified by the Issuer for the redemption of the Bonds] whereupon all Bonds to be redeemed shall be due and payable on such [Payment Date specified by the Issuer for the redemption of the Bonds] upon the furnishing of a notice . . .

(9/30/99 Pl. Mem. Opp'n at 21). Thus, Page Mill argues, because the issuer could not be "specify" a payment date before the 10% threshold was reached, it could not provide the bondholders with notice of its intent to redeem the bonds until the threshold was reached in 1998. (*Id.*)

The implicit premise of this argument is that the issuer was required to specify a payment date before notifying the bondholders of its intent to redeem the bonds. However, § 10.01(a) says nothing about when the issuer

must specify the payment date. Section 10.01(a) requires only that the issuer's notice to the bondholders precede the payment date by at least 30 days, regardless of when that payment date is itself specified. Accordingly, § 10.01(a) does not set an earliest notice date.

Finally, Page Mill cites § 10.01(b) of the indenture, which states that when [*12] the issuer notifies the trustee of its intent to redeem the bonds, it must provide an opinion of counsel "to the effect that such optional redemption and the proposed method of distribution of any remaining assets" to the bondholders will have certain desirable tax consequences. (8/31/99 Pl. Mem. Supp. at 25-27) (citing Indenture § 10.01(b)) Page Mill claims that CMST's notice to the bondholders was premature because it was provide before a valid opinion letter was furnished.

In support of this claim, Page Mill notes first that the Cleary, Gottlieb letter, *see supra* I.B., "was qualified by limitation to the application of [Internal Revenue] Code provisions, law and regulations in effect at the time the Opinion was furnished." (8/31/99 Pl. Mem. Supp. at 27) However, the indenture did not require that the opinion letter predict future tax enactments. Therefore, the opinion letter was not invalid simply because its analysis assumed the continued existence of those laws in force at the time it was written.

Page Mill argues also that the opinion letter was invalid because it "made no reference to a particular redemption or 'method of distribution'" (*id.* at 26) (quoting the [*13] indenture), but rather assumed that redemption and distribution would be "'undertaken in compliance with the relevant provisions of the Series Supplement and the Indenture.'" ³ (*Id.*) (quoting the letter) However, the indenture does not prohibit reliance on such assumptions. Indeed, because the opinion letter was required to be issued before redemption of the bonds, it would necessarily have had to rely on assumptions about the redemption and the "*proposed* method of distribution." (CS Def. Rule 56.1 Statement Ex. 1 at X-1) (Indenture § 10.01(b)) (emphasis added)

 3  The relevant portion of the letter reads as follows:

> We are of the opinion that the (i) deposit of the Redemption Price and any additional amounts as specified in Section 10.05 of the Indenture and Section 8 of the Series Supplement with the Trustee or a Paying Agent by the Issuer, (ii) subsequent delivery to the Issuer of the Mortgage Certificates held in the Trust Estate pursuant to Section 10.05 of the Indenture and (iii) redemption of the bonds by the Issuer, assuming that each of (i), (ii) and (iii) occur within a single period of ninety (90) consecutive days and that each is undertaken in compliance with the relevant provisions of the Series Supplement and the Indenture [will yield certain tax consequences].

[*14] In addition to its arguments from the indenture, Page Mill contends that the 1995-1996 notice was premature because it did not comport with its "reasonable expectations." (9/30/99 Pl. Mem. Opp'n at 22-24) This argument is based entirely on *Van Gemert v. Boeing Co., 520 F.2d 1373 (2d Cir. 1975)*, which held that the notice provided by a bond issuer was inadequate when it "conformed to the requirements of the Indenture [but] was simply insufficient to give fair and reasonable notice to the debenture holders." *Id. at 1383*.

However, the *Van Gemert* duty to provide "reasonable notice" does not apply in this case. The debentures at issue in *Van Gemert* "contained no indication as to the type of notice of redemption that was to be provided. It was the total lack of a notice provision in the debentures that [the *Van Gemert* Court] held necessary as a condition precedent to the imposition of a duty to provide 'reasonable' notice." *Meckel v. Continental Resources, Inc., 758 F.2d 811, 816 (2d Cir. 1985)*. In this case, the indenture contained a "notice provision" that described in detail how notice was to be provided. (CS Def. Rule [*15] 56.1 Statement Ex. 1 at X-1) (Indenture, § 10.02) Accordingly, there is no occasion for the court to impose the *Van Gemert* reasonable notice duty.

Moreover, even if such a duty had applied, it would not have been breached in this case. In *Van Gemert*, the debentures were "somewhat misleading." *Van Gemert, 520 F.2d at 1384*. In this case, the indenture is quite straightforward. *See Meckel*, F.2d at 817 (distinguishing *Van Gemert* because "the debentures here were not ambiguous"). In *Van Gemert*, the bondholders were "less sophisticated investors," for whom the notice provided "was effectively no notice at all." *Van Gemert, 520 F.2d at 1383*; *see also* Nina Laserson Dunn, *Put the Top Back on the Convertible: An Argument for a More Traditional Approach to Debentures*, 11 J. Corp. L. 405, 412 (1986) ("The keystone of the decision in *Van Gemert* was concern for the . . . unsophisticated investor."). In this case, no one suggests that the original holders of the residual bonds were unsophisticated. Moreover, the current residual bondholder, Page Mill, is an experienced investor (Greeley Dep. 478-479) represented by exceptionally

Case 2:04-cv-00139-DAK-BCW   Document 438-3   Filed 09/04/2007   Page 5 of 10

Page 5
2000 U.S. Dist. LEXIS 3941, *

**[\*16]** capable attorneys. [4] In *Van Gemert*, substantial notice was not provided to the bondholders until "the eleventh hour." *Van Gemert, 520 F.2d at 1384*. In this case, notice was mailed direct to the relevant bondholders 15 days before notice was sent to State Street, as the indenture required. [5] Finally, in *Van Gemert* notice was placed in newspapers and carried by wire services, and "almost all of these notices or items were in fine print, buried in the multitude of information and data published about the financial markets and scarcely of a kind to attract the eye of the average lay investor or debenture holder." *Van Gemert, 520 F.2d at 1379*. In this case, notice was mailed direct to Page Mill, and the statement sent was simple, precise, and wholly unambiguous. *See supra* I.B. (quoting the letter); *see Meckel, 758 F.2d at 816* (noting that the *Van Gemert* court "strongly implied that notice by mail would have been adequate" under the reasonable notice standard).

> 4   In this action both Page Mill and the CS Defendants have had the benefit of strikingly effective lawyers.
>
> **[\*17]**
> 5   Contrary to Page Mill's argument (8/31/99 Pl. Mem. Supp. at 29), it is irrelevant that these 15 days straddled the December holiday season. The indenture does not make any special provision for the holiday season and I will not do so.

In short, the clauses of the indenture cited by Page Mill do not establish an "earliest date" before which notice could not be sent. Further, the *Van Gemert* reasonable notice duty is inapplicable in this case, and in any event was not breached. Accordingly, the 1995-1996 notice was not premature.

B. Fair Value Certificates

Page Mill claims also that CMST breached § 11.01(b)(3) and § 11.01(b)(4) of the indenture. (8/31/99 Pl. Mem. Supp. at 32-34) Section 11.01(b)(3) reads as follows:

> Whenever any property or securities are to be released from the lien of this Indenture . . . the Issuer shall . . . furnish to the Trustee an Officers' Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such release) of the property or securities proposed to be released and stating that . . **[\*18]** . the proposed release will not impair the security under this Indenture . . . in contravention of the provisions thereof.

This Section requires that a "fair value" certificate be provided before one piece of collateral is substituted for another. Page Mill argues that § 11.01(b)(3) also requires the issuer to supply a fair value certificate in conjunction with redemption of the bonds, and claims that CMST breached the indenture because it failed to do so. (*Id.*)

Page Mill's interpretation of § 11.01(b)(3) would render that section of the indenture absurd and therefore must be rejected. *See generally, e.g., Smith v. Brown & Jones, 167 Misc. 2d 12, 633 N.Y.S.2d 436, 442 (Sup. Ct. New York County 1995)* (noting that under New York law contracts should not be interpreted in a way that renders them absurd) (collecting cases). Once bonds have been redeemed, there can no longer be any question about "impairing their security." It would be illogical to require the production of a certificate stating what must be true -- namely, that the security of the (redeemed) bonds is not impaired. The SEC has held that Section 314(a) of the Trust Indenture Act, [6] *15 U.S.C. § 77nnn* **[\*19]** *(d)(1) (1994)*, which the parties agree is to be read *in pari materia* with § 11.01(b)(3) (9/30/99 CS Def. Mem. Opp'n at 14; 10/19/99 Pl. Rep. Mem. at 10), does not apply to bond redemptions:

> Section 314(d), in terms, requires that the issuer deliver to the trustee appraisals of the fair value of property to be released from the lien of the indenture. It requires also that the certificate of appraisal state that the release would not 'impair the security under such indenture in contravention of the provisions thereof.' It would appear, therefore, that the section is not applicable in any case in which release could not possibly impair the security under the indenture. Cancelation [sic] of the indenture upon the deposit of sufficient cash to retire all outstanding obligations, or upon the deposit of all outstanding notes and coupons is, we believe, such a case. For whatever release takes place upon such cancelation [sic], it cannot impair the security under the indenture. All claims to, and the necessity of, such security have been wiped out.

*In the Matter of Hugo Stinnes Corp.*, SEC Release No. 33-2297, 1940 WL 1078, at \*5 (June 29, 1940). Page **[\*20]** Mill's interpretation of § 11.01(b)(3) is unreasonable, and its claim that CMST breached the indenture by failing to provide fair value certificates must be dismissed. Further, because a certificate must be provided pursuant to § 11.01(b)(4) only when one is required by §

11.01(b)(3), CMST did not breach that provision of the indenture either.

> 6  Section 314(a) reads in relevant part as follows:
>
>> (d) Certificates of fair value
>>
>> If the indenture to be qualified is or is to be secured by the mortgage or pledge of property or securities, the obligor upon the indenture securities shall furnish to the indenture trustee a certificate or opinion of an engineer, appraiser, or other expert as to the fair value--
>>
>>> (1) of any property or securities to be released from the lien of the indenture, which certificate or opinion shall state that in the opinion of the person making the same the proposed release will not impair the security under such indenture in contravention of the provisions thereof . . . .

 **[*21]** C. Evaluation of the Collateral

Page Mill argues also that CMST breached the indenture by soliciting "bids" on the collateral from market makers even though the indenture required solicitation of "quotes." (9/30/99 Pl. Mem. Opp'n at 25-28) Although the CS Defendants concede that the indenture required "quotes" and that CMST solicited "bids" (8/31/99 CS Def. Mem. Supp. at 11-12), they argue that the solicitation of bids did not violate the indenture because "quote" and "bid" are synonyms.

Not so. A "bid" is an offer to buy; a "quote" is a description of a market price. *Compare* 13 *Oxford English Dictionary* 53 (2d. ed. 1991) *and Webster's Third New International Dictionary* 1868 (1993) *with* 2 *Oxford English Dictionary* 173 (2d. ed. 1991); *Webster's Third New International Dictionary* 212 (1993); *Black's Law Dictionary* 153 (7th ed. 1999); *and Ballentine's Law Dictionary* 133-34 (3d. ed. 1969). Given the auction-like mechanism established by the indenture for evaluating the collateral, this distinction is especially important. If the issuer were required only to solicit offers from two market makers, it would have been free to take the collateral for less **[*22]** than its optimum price, provided only that the issuer could identify market makers who would not be high bidders for the collateral. [7] By contrast, if the issuer were required to solicit a price from market makers, it would have had to take the collateral for the market makers' highest estimate as to the collateral's price. There is a fundamental difference between bids and quotes, and by soliciting the former CMST breached the indenture.

> 7  Before an auction actually takes places, an issuer may have a good faith basis for believing that a particular market maker will be a relatively low bidder -- for example, the issuer may know that the market maker is not well off financially and thus will be unlikely to submit a high bid. Alternatively, an issuer may have illicit reasons for believing that a market maker will be a low bidder -- for example, the issuer may believe that the market maker will provide a low bid in exchange for a future accommodation. *See generally Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 17 F. Supp. 2d 275 (S.D.N.Y. 1998)* (discussing such "accommodation" bids).

 **[*23]** The CS Defendants make two arguments against this conclusion. First, they cite a series of letters and faxes from June and July 1998 which memorialize Page Mill's request that Paine Webber submit "bids" on the collateral. (10/19/99 CS Def. Rep. Mem at 17) Based on these letters, the CS Defendants argue that Page Mill understood the terms "quote" and "bid" as synonyms. (*Id.* at 17-18) However, there is nothing ambiguous about the meaning of the term "quote," and "it has long been the rule that when a contract is clear in and of itself, circumstances extrinsic to the document may not be considered." *Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 (1957)*. Moreover, the cited documents do not prove that Page Mill understood "quote" and "bid" as synonyms. Page Mill could have asked Paine Webber to supply a "bid" for reasons that had nothing to do with its understanding of the requirements of the indenture. For example, Page Mill may have believed that the issuer was going to solicit bids, and thus asked Paine Webber to do so as well in order to goad other market makers to bid higher, to create a record of a "neutral" **[*24]** market maker's bid, or for other tactical reasons.

Second, the CS Defendants note Page Mill's assertion that under the indenture the bondholders should receive the same amount of money under either the issuer-initiated bond redemption mechanism or under the bondholder-initiated mechanism. Reasoning from Page Mill's premise, the CS Defendants argue that

> [In the case of an issuer-initiated redemption, the bondholders] receive the difference between the Redemption Price and the market value of the Mortgage Certificates based on "quotes." (Indenture § 10.05(b)) In the . . . case [of a bondholder-initiated redemption], the residual bond holders receive the difference between the Redemption Price and the proceeds from the actual sale of the Mortgage Certificates pursuant to an Issuer Order. (Indenture § 10.05(c)) Those 'quotes' should be equivalent to the price at which dealers are willing to buy the Mortgage Certificates - i.e, their 'bids.'

(10/19/99 Rep. Mem. in Supp. at 17-18)

However, when an item is sold at auction, rather than in an ordinary market, the quote is not equivalent to the "price at which dealers are willing to buy," but rather the price at which [*25] the *highest* bidding dealer is willing to and does buy.

Accordingly, it makes sense for Page Mill to be indifferent as between the issuer-initiated redemption procedure, which ascertains the highest bid for the collateral by asking market makers to "quote" a price, and the bondholder-initiated redemption procedure, which ascertains the highest bid for the collateral by actually selling it. However, it does not follow, as the CS Defendants' argument assumes, that Page Mill should be indifferent as between a redemption procedure that ascertains the highest bid for the collateral by asking market makers to supply a price (*i.e.*, the issuer-initiated procedure using the dictionary definition of "quote") and another redemption procedure that ascertains the offers of only two market makers, neither of whom may be the high bidder (*i.e.*, the issuer-initiated procedure with "quote" defined as "bid").

Thus, CMST breached the indenture by soliciting bids instead of quotes, and Page Mill is entitled to summary judgment on this claim. Accordingly, CMST is liable to Page Mill for the difference between the highest bid for the collateral received on July 15, 1998 and the higher of the [*26] prices for the collateral that two issuer-selected market makers would have quoted on that date.

D. Breach of the Implied Covenant

Finally, Page Mill argues that CMST violated the indenture's implied covenant of good faith and fair dealing. Under New York law, every contract includes such an implied covenant. *See, e.g., Apfel v. Prudential-Bache Securities, Inc., 183 A.D.2d 439, 439, 583 N.Y.S.2d 386, 387* (1st Dep't 1992), *modified on other grounds and aff'd*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993). However, the implied covenant is not distinct from the underlying contract, *see Geler v. National Westminster Bank USA, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)*, and therefore "as a general rule, 'the cause of action alleging breach of [the implied covenant] is duplicative of a cause of action alleging breach of contract.'" *OHM Remediation Servs. Corp. v. Hughes Env'l Sys., Inc., 952 F. Supp. 120, 124 (S.D.N.Y. 1997)* (quoting *Apfel, 183 A.D.2d at 439, 583 N.Y.S.2d at 387*); *see also, e.g., W.S.A., Inc. v. ACA Corp., 1996 U.S. Dist. LEXIS 14198*, Nos. 94-1868 (CSH), 94-1493 (CSH), 1996 WL 551599, at *9 [*27] (S.D.N.Y. Sept. 27, 1996) (noting that "every court" faced with a complaint brought under New York law alleging both breach of contract and breach of the implied covenant has dismissed the latter claim as duplicative), *modified on other grounds on reconsideration*, 1996 U.S. Dist. LEXIS 18885, 1996 WL 735508 (Dec. 20, 1996). Therefore, breach of contract claims and breach of the implied covenant claims may be maintained simultaneously only if the damages sought by the plaintiff for breach of the implied covenant are not "intrinsically tied to the damages allegedly resulting from breach of contract." *Canstar v. J.A. Jones Constr. Co., 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731* (1st Dep't 1995); *accord Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369*, No. 97 Civ. 0662 (MBM), 1997 WL 691332, at *3 (S.D.N.Y. Nov. 6, 1997).

In this case, Page Mill contends that CMST breached the implied covenant by failing to provide adequate notice or a fair value certificate, and by soliciting bids instead of quotes so as to acquire the collateral at below market price. (Compl. P 49-51; 9/30/99 Pl. Mem. Opp'n at 33) However, these claims are identical to Page Mill's breach of indenture claims. Moreover, Page [*28] Mill does not allege that it has suffered damages from CMST's alleged breach of the implied covenant that are distinct from the damages it seeks for breach of the indenture. Therefore, Page Mill's breach of the implied covenant claims are duplicative and must be dismissed. *See Alter*, 1997 WL 691332, at *3 (dismissing breach of implied covenant claim when the damages sought on the basis of it are "identical" to the damages sought for breach of contract).

III. Page Mill's Claims against CS First Boston

In addition to its breach of indenture claims against CMST, Page Mill contends that CS First Boston was unjustly enriched as a result of CMST's breach; tortiously interfered with the indenture by causing CMST's breach of it; and participated in CMST's breach of the indenture in violation of its fiduciary duties to Page Mill.

A. Unjust Enrichment

Page Mill first claims that CS First Boston unjustly enriched itself by "manipualting the redemption process." (9/30/99 Pl. Mem. Opp'n at 41-43) To state a claim for unjust enrichment, a plaintiff must allege that the defendant was enriched at the plaintiff's expense and that equity and good conscience require that the **[*29]** defendant make restitution. *See Clark-Fitzpatrick, Inc. v. Long Is. R.R., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987)*. However, because unjust enrichment is a quasi-contractual remedy, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery . . . for events arising out of the same subject matter." *Id.; see also Bradkin v. Leverton, 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643 (1970)* ("a quasi-contractual obligation is one imposed by law where there has been *no* agreement") (emphasis added).

In this case, there is no dispute that the indenture is an enforceable contract: Page Mill seeks recovery for its breach. Furthermore, the event that forms the basis of Page Mill's unjust enrichment claim -- the redemption of the bonds -- "arises out of the same subject matter" as the indenture. Therefore, Page Mill's unjust enrichment claim fails.

Resisting this conclusion, Page Mill argues that CS First Boston is not a party to the indenture. (9/30/99 Pl. Mem. Opp'n 41-42) However, a written contract precludes recovery in quasi-contract "whether the contract **[*30]** is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." *Granite Partners, L.P., 17 F. Supp. 2d at 311*; *see also, e.g., Salomon v. Hampton Athletic Club, 245 A.D.2d 282, 666 N.Y.S.2d 19 (2d Dep't 1997)*; *Trustco Bank N.Y. v. S/N Precision Enters., 234 A.D.2d 665, 650 N.Y.S.2d 846 (3d Dep't 1996)*; *Mariacher Contracting Co. v. Kirst Constr., 187 A.D.2d 986, 987, 590 N.Y.S.2d 613 (4th Dep't 1992)*. Accordingly, Page Mill's unjust enrichment claim must be dismissed.

B. Tortious Interference with Contract

Page Mill contends also that CS First Boston tortiously interfered with the indenture by "causing" CMST's breach of it. (9/30/99 Pl. Mem. Opp'n at 39-41) "It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with contract." *Koret, Inc. v. Christian Dior, 554 N.Y.S.2d 867, 869, 161 A.D.2d 156, 157 (1st Dep't 1990)*. In this case, CS First Boston was not a "stranger" to the indenture. Pursuant to the trust agreement, CS First Boston was responsible for CMST's performance of its duties with **[*31]** respect to redemption of the bonds. *See supra* I.C. Therefore, Page Mill's tortious interference claim must be dismissed. *See G. Golden Assoc., Inc. v. Arnold Foods Co., 870 F. Supp. 472, 480 (E.D.N.Y. 1994)* (granting summary judgment dismissing tortious interference claim against successor-in-interest to contract because the successor "cannot be liable in tort for inducing the breach of its own rights and obligations under the [contract]"); *cf. Koret, 554 N.Y.S.2d at 869* (holding that parent corporation can not be liable for subsidiary's breach of contract where the contract was negotiated by an employee of both firms because the corporate parent had a right to interfere with the contract of its subsidiary).

C. Breach of Fiduciary Duty

Page Mill argues also that CS First Boston breached its fiduciary duty by engaging in self-dealing -- in particular, by participating to its benefit in the improper evaluation of the collateral. (9/30/99 Pl. Mem. Opp'n at 34-48) The elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty between the parties and (2) a breach of that duty by the defendant. *See Forum Ins. Co. v. Zeitman, 1995 U.S. Dist. LEXIS 13229, No. 91 Civ. 7980 (LLS), 1995 WL 546949,* **[*32]** at *2 (S.D.N.Y. Sept. 13, 1995)*. Page Mill presses three arguments to satisfy the first of these elements; none is persuasive.

First, Page Mill argues that it had a conflict of interest with CS First Boston, and that the conflict, standing alone, gave rise to a fiduciary duty. (9/30/99 Pl. Mem. Opp'n at 36) However, this argument proves too much: if a conflict of interest could itself create a fiduciary duty, almost every contractual relationship would be a fiduciary relationship. Moreover, Page Mill's argument is based entirely on a misreading of *Renz v. Beeman, 589 F.2d 735 (2d Cir. 1978)*. As Page Mill renders it, *Renz* held that "'it is the existence of the conflict alone that establishes the [fiduciary] obligation.'" (9/30/99 Pl. Mem. Opp'n at 36) (bracketed text inserted by Page Mill) However, there is no basis in *Renz* for Page Mill's insertion of the word "fiduciary." In *Renz*, there was no dispute that a fiduciary duty existed -- the defendants were trustees of a family trust. Instead, *Renz* turned on whether the defendants' fiduciary duty not to engage in self-dealing was limited by the trust instrument. *Id. at 744-45*. After **[*33]** finding that there was no clause in the instrument that permitted self-dealing, the *Renz* Court stated that "it is the existence of the conflict alone that

establishes the obligation." *Id. at 745*. The "obligation" the *Renz* Court referred to was the obligation not to engage in self-dealing *because* of fiduciary status, not an obligation to *become* a fiduciary because of a conflict of interest.

Second, Page Mill argues that under New York law a fiduciary relationship can be established by an "informal relationship" of special trust between the parties. (9/30/99 Pl. Mem. Opp'n at 34) This may be true, but Page Mill points to no facts that suggest it had such a relationship with CS First Boston.

Nonetheless, Page Mill argues that "whether CS First Boston owed Page Mill a fiduciary duty . . . requires a factual inquiry as to the nature of . . . [their] relationship," and that the necessity for such an inquiry precludes summary judgment. (*Id.*) However, a need for factual inquiry precludes summary judgment only if the plaintiff has made factual allegations as to the essential elements of its claim and they are disputed by the defendant. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; **[*34]** *Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992)*. In this case, Page Mill has not made any factual allegations that would suggest an "informal relationship of special trust" between Page Mill and CS First Boston. Of course, a factual inquiry ultimately might turn up evidence of such a relationship. But standing alone, this possibility does not preclude summary judgment.

Third, Page Mill suggests that bond issuers owe a fiduciary duty to their bondholders, and that CS First Boston, which in the trust agreement assumed the issuer's responsibilities vis-a-vis redemption, therefore owed a fiduciary duty to Page Mill. (9/30/99 Pl. Mem. Opp'n at 36-38) The basis of this argument is two cases -- *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 933 (3d Cir. 1982)* and *Green v. Hamilton Int'l Corp., 1981 U.S. Dist. LEXIS 13439, 76* Civ. 5433 (MJL) (S.D.N.Y. July 14, 1981).

*Pittsburgh Terminal* and *Green* concerned bonds that could be converted to equity. The bonds at issue in this case are not convertible, and under New York law issuers of non-convertible bonds generally do not owe a fiduciary duty to their bondholders. **[*35]** [8] *See, e.g., Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 737 n.5 (S.D.N.Y. 1993), aff'd, 99 F.3d 401 (2d. Cir. 1995)*; *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1524-25 (S.D.N.Y. 1989); see also, e.g., Katz v. Oak Indus., 508 A.2d 873, 879 (Del. Ch. 1986)* (applying Delaware law); American Bar Foundation, *Commentaries on Indentures* 2-3, 527 (1971) (restating general legal principles). Moreover, even as to convertible bonds *Pittsburgh Terminal* and *Green* do not state the majority rule. *See, e.g., Parkinson v. West End St. Ry., 173 Mass. 446, 53 N.E. 891, 892 (1889)* (Holmes, J.); *see also Lorenz v. CSX Corp., 1 F.3d 1406, 1417 (3d Cir. 1993); Browning Debenture Holders' Comm. v. DASA Corp., 560 F.2d 1078, 1084 (2d Cir. 1977)* (applying federal law); *Simons v. Cogan, 542 A.2d 785, 791 (1987); cf. In re Will of Migel, 71 Misc. 2d 640, 336 N.Y.S.2d 376, 379 (Sur. Ct. Orange County 1972)*.

  8   The one substantial exception to this rule is that an insolvent firm may owe fiduciary duties to its bondholders. *See Credit Agricole Indosuez v. Rossiyskiy Kredit Bank, 265 A.D.2d 257, 697 N.Y.S.2d 273 (1st Dep't 1999); see also In re Mortgage America Corporation, 714 F.2d 1266 (5th Cir. 1983); Simons v. Cogan, 542 A.2d 785, aff'd, 549 A.2d 300 (Del. 1988)* (Allen, Ch.); *cf. Pepper v. Litton, 308 U.S. 295, 307, 84 L. Ed. 281, 60 S. Ct. 238 (1939)*. Page Mill does not contend that CS First Boston has become insolvent.

 **[*36]** Page Mill has not established that CS First Boston owed it a fiduciary duty. Therefore, Page Mill's claim for breach of that duty must be dismissed.

IV. Punitive Damages

Finally, Page Mill contends that it is entitled to punitive damages. This argument is moot as to those claims that have been dismissed, and it fails as to the claim on which Page Mill has been granted summary judgment -- namely, its claim that CMST breached the indenture by soliciting bids.

"To state a claim for punitive damages . . . when the claim arises from a breach of contract. . . . defendant's conduct must be actionable as an independent tort." *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 315, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763 (1995)*. In this case, the Page Mill-CMST relationship grew out of the indenture, which CMST breached. However, Page Mill has not alleged that CMST committed any "independent" tort, and Page Mill's tort claims against CS First Boston have been dismissed. Accordingly, Page Mill can not recover punitive damages.

\* \* \*

For the reasons stated above, Page Mill's motion is granted in part and denied in part, and the CS Defendants' motion is granted in **[*37]** part and denied in part. All of Page Mill's claims against the CS Defendants are dismissed, except its claim for liability for breach of the indenture provisions concerning evaluation of the collateral. As to this claim, Page Mill's motion for summary judgment is granted.

SO ORDERED:

2000 U.S. Dist. LEXIS 3941, *

| | |
|---|---|
| Dated: New York, New York | Michael B. Mukasey, |
| March 29, 2000 | U.S. District Judge |