# EXHIBIT A

Dockets.Justia.com

Westlaw.

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

(Cite as: Slip Copy)

Page 1

**C**

Israel v. Spring Industries, Inc.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Joseph ISRAEL, et al., Plaintiffs,
v.
SPRING INDUSTRIES, INC., et al., Defendants.
No. 98 CV 5106(ENV)(RML).

Nov. 3, 2006.

Lester B. Herzog, Brooklyn, NY, for Plaintiffs.
Thomas Francis Cerussi, Cerussi & Spring, White Plains, NY, for Defendants.

*MEMORANDUM AND ORDER*
LEVY, United States Magistrate Judge.
*1 Defendants Springs Industries, Inc. and Dundee Mills, Inc. (collectively, " defendants" or " Dundee" ) move to preclude the reports and testimony of three of plaintiffs' expert witnesses, Joseph Carfi, M.D., Leonard Freifelder, Ph.D and Lisa Altshuler, Ph .D. For the reasons stated below, Dr. Carfi is directed to appear in court for a *Daubert* hearing on the issue of medical causation with respect to Joseph Israel's eczema. The remainder of his report and testimony are inadmissible under *Daubert*. In addition, to the extent Dr. Altshuler has rendered an opinion as to the cause of Joseph's medical conditions, that portion of her opinion is inadmissible, but the remainder is admissible. Finally, Dr. Freifelder's report and testimony are inadmissible in their entirety.

### BACKGROUND AND FACTS

This case was removed from state court in August 1998. Familiarity with plaintiffs' claims is assumed. Briefly, however, plaintiffs allege that Joseph Israel (" Joseph" ), who is presently eleven years old,[FN1] has suffered certain medical conditions that have as their root cause the Dundee crib sheets on which he slept as an infant, starting at the age of approximately 3-4 months.[FN2] (*See generally* Complaint, dated July 9, 1998.) According to plaintiffs, the packaging on the sheets indicated that they were 100% cotton, when in fact they were not. (*Id.* ¶¶ 8, 9, 11.) Because Joseph allegedly was allergic to non-cotton synthetic products (*id.* ¶ 9), plaintiffs contend that his exposure

to the synthetic material caused a severe allergic reaction that exacerbated his atopic dermatitis and caused him to suffer permanent physical and psychological injuries. To support their claims, plaintiffs have named as experts, *inter alia,* Dr. Joseph Carfi, a physiatrist, Dr. Leonard Freifelder, an economist, and Dr. Lisa Altshuler, a pediatric psychologist. Defendants move to preclude the reports and testimony of all three experts under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).

> FN1. Joseph's date of birth is January 23, 1995.

> FN2. Joseph's mother, Beverly Israel, testified in her deposition that Joseph began sleeping on the crib sheets at 3-4 months of age and stopped sleeping on them in August 1997, when he was approximately 19 months old. (*See* Deposition of Beverly Israel, dated Dec. 29, 1999, annexed to the Affidavit of Jonathan A. Judd, Esq., dated Feb. 16, 2006, as Ex. E., at 14-15, 46.)

### DISCUSSION

Rule 702 of the Federal Rules of Evidence provides that:
if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In *Daubert,* 509 U.S. 579, the Supreme Court stated that before admitting evidence under Rule 702, the trial judge is required to ensure that the scientific testimony or evidence is both reliable and relevant. *Id.* at 589. The court must assess whether the expert's opinion is grounded in " methods and procedures of science," whether it consists of more than simply " subjective belief or unsupported speculation" (*id.* at 589), and " whether the reasoning or methodology underlying the testimony is scientifically valid and ... properly can be applied to the facts in issue." *Id.* at 592-93. In making this determination, the court may consider the following (nonexclusive) factors: (1) whether the theory or technique can be (and has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance in the scientific community. *Id.* at 591-93. Other factors courts tend to take into account include: (a) the existence of standards controlling the technique's operation, (b) the relationship of the technique to methods that have been established to be reliable, (c) the qualifications of the expert witness, and (d) the non-judicial uses to which the method has been put. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir.1994); *Finley v. NCR Corp.*, 964 F.Supp. 882, 885 (D.N.J.1996). Finally, the court must determine " whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have devolved their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995). The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 593 n. 10.

**\*2** The Second Circuit has adopted a flexible interpretation of *Daubert*. In *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995), the court explained that: by loosening the strictures on scientific evidence set by *Frye*, *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid " safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court has expressed its faith in the power of the adversary system to test " shaky but admissible" evidence and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.[FN3]

FN3. The court in *Borawick* discussed but did not apply *Daubert* directly because the issue of whether to admit or exclude the proposed expert, a hypnotist, was one of

competence, not reliability. *Borawick*, 68 F.3d at 610.

Moreover, in *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999), the Supreme Court emphasized that courts have " broad latitude" in deciding whether and how to apply the *Daubert* factors and that " the relevant reliability concerns may focus upon personal knowledge or experience." In fact, " [i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed.R.Evid. 702 advisory committee's note (2000). The Court in *Kumho Tire* also stressed that the *Daubert* elements are not a definitive checklist and that the trial court's gatekeeping inquiry must be " flexible" and " tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. *See also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir.1999) (" the district court's gatekeeper role is a flexible one and ... the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." ). The primary objective is " to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Importantly, however, " [i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply ' taking the expert's word for it.' " *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir.2005) (quoting Fed.R.Evid. 702 advisory committee note), *cert. denied*, 126 S.Ct. 338 (2005). In other words, expert opinions are inadmissible if based on speculative assumptions. *See In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 824 (2d Cir.1994) (*overruled on other grounds* by *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996), as recognized in *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1029 (2d Cir.1996)). *See also Kumho Tire*, 526 U.S. at 157 (" Opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted.).

*A. Joseph Carfi, M.D.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

*3 According to his *curriculum vitae*, Dr. Carfi is a board certified physician in the fields of physical medicine and rehabilitation and is a board certified medical examiner. (Affidavit of Jonathan A. Judd, Esq., dated Feb. 16, 2006 (" Judd Aff." ), Ex. J(2).) Dr. Carfi earned his M.D. from Mount Sinai School of Medicine in 1981 and completed his hospital training through residences at New York University Medical Center, Bellevue Hospital, and the Rusk Institute. (*Id.*) Dr. Carfi has an extensive list of presentations and publications, most dealing with his specialties of rehabilitation and physical medicine. (*Id.*)

Dr. Carfi's medical specialty is physical medicine and rehabilitation. (Affidavit of Joseph Carfi, M.D., sworn to May 23, 2006 (" Carfi Aff." ), ¶ 2, annexed as Ex. CC, Part 1, to Pls.' Opp'n.) This specialty is " ' concerned with diagnosis, evaluation, and management of persons of all ages, physical and/or cognitive impairment and disability' [.]" (*Id.* (quoting the American Board of Physical Medicine and Rehabilitation website, http://www.abpmr.org (last visited Aug. 2, 2006)).) Additionally, " ' Physiatrists are trained in the ... long term management of patients with disabling conditions.' " (*Id.*) Dr. Carfi therefore has received training in caring for a variety of musculoskeletal conditions and chronic disabilities; however, he has never treated an individual with atopic dermatitis or allergies. (Deposition of Joseph Carfi, M.D., dated July 16, 2004 (" Carfi Dep." ), annexed to the Judd Aff. as Ex. K, at 26-27, 81-82, 122.) Nor is he board certified in allergy. (*Id.* at 75.)

Plaintiffs intend to offer Dr. Carfi's testimony on four distinct points: (1) that Joseph's medical condition was caused by " exposure to the synthetic fiber allergen" ; (2) that Joseph " will incur extraordinary costs associated with his illness" which are delineated in a " Life Care Plan" that Dr. Carfi has created for Joseph; (3) that Joseph is " quite delayed in terms of educational skills" ; and (4) " that his employment opportunities will be severely hampered." (Report on Joseph Israel by Dr. Joseph Carfi, dated Apr. 1, 2004 (" Carfi Report" ), at 5, annexed as Ex. CC, Part 2 to Pls.' Opp'n.) Each of these opinions will be considered in turn.

**(a) *Causation***

Dr. Carfi's assessment of Joseph's case consisted of a review of Joseph's medical history written by Joseph's mother, a review of some of Joseph's medical records, and an approximately hour-long examination of Joseph. [FN4] (Carfi Report at 1-5.) From these, Dr. Carfi concluded that the specific cause of Joseph's " current severely exacerbated medical condition" was the " chronic and intimate exposure to the synthetic fiber." (*Id.* at 5.) It is unclear from this statement what aspect of Joseph's medical condition Dr. Carfi is referring to. Joseph's medical records indicate that Joseph suffers from chronic sinusitis, asthma, eczema, gastroesophageal reflux disease, and severe food allergies.[FNS] (*Id.* at 2.) Dr. Carfi's report also indicates that Joseph is allergic to antibiotics and latex. (*Id.* at 3, 5; *see also* Carfi Dep. at 52.) Dr. Carfi's statement appears to suggest that *all* of Joseph's ailments stem from his exposure to the polyester in the crib sheets. However, in his deposition, Dr. Carfi testified, " [i]f you ask me what percentage is gastrointestinal, what percent is polyester, I can't give you that breakdown" (Carfi Dep. at 76), suggesting that the polyester may not have caused or contributed to Joseph's gastroesophageal reflux disease or food allergies. Later in the deposition, Dr. Carfi stated, " I can't give you a breakdown of GI versus pulmonary, versus the allergy to the synthetic fibers," suggesting that Joseph's asthma may not have been caused or affected by exposure to the sheets. (*Id.* at 105.) Indeed, when asked whether he could point " to any medical record that establishes or even suggests that the other conditions from which [Joseph] suffered [asthma, food allergies, gastrointestinal problems, sinusitis] cascaded from his exposure to the polyester," Dr. Carfi answered, " I cannot, no." (*Id.*) When asked whether he believed the exposure to polyester was the sole cause of all of Joseph's medical conditions, Dr. Carfi replied, " I never said it was the sole cause.... What I said was it was a significant substantial cause of his current problems and how everything flowed ... from that initial contact." [FN6] (*Id.*) His report, however, seems to implicate the polyester for all of Joseph's conditions. This is confirmed by the Life Care Plan (annexed as Ex. CC, Part 3, to Pls.' Opp'n), discussed further below, which lists Neocate, Joseph's food substitute, and pulmonary care, for asthma, as costs. Dr. Carfi testified that the costs he determined in the Life Care Plan are those that Joseph will incur due to the exposure to the polyester in the sheets. (Carfi Dep. at 104.)

FN4. At his deposition, Dr. Carfi could not recall exactly how long the examination

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

Page 4

lasted, but he stated that he typically schedules an hour for evaluations. (Carfi Dep. at 13.)

FN5. Joseph's medical records, as summarized in Dr. Carfi's report, indicate that Joseph is highly allergic to peanuts, soy, rice, corn and wheat. (*See* Carfi Report at 3.) According to his mother, Joseph is unable to eat any food whatsoever. (Deposition of Beverly Israel, dated Mar. 21, 2005 (" B. Israel Dep." ), annexed as Ex. F. to the Judd. Aff., at 87.)

FN6. Dr. Carfi conceded that Joseph is no longer in contact with polyester or other synthetics. (Carfi Dep. at 122.) He explained that, in his opinion, Joseph's exposure to polyester as an infant " was a significant factor in developing all the various hypersensitivities which lead up to what we see today. So although no, it's not due to the direct contact now, I do believe that that initial very prolonged exposure is why he is the way he is today." (*Id.* at 123.) The questioning proceeded as follows:
Q. Are you saying that the polyester that he slept on triggered some type of allergic reaction that led to this condition, the current condition?
A. In effect, yes.
Q. Even though that was years ago?
A. Even though that was years ago, yes, it set him up for his current travails.
(*Id.* at 124.)

*4 Plaintiffs mistakenly argue that because two other experts-Drs. Stewart H. Young and Vincent Beltrani-are qualified to testify, Dr. Carfi should also be allowed to testify. (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Second Motion, dated May 30, 2006 (" Pls.' Mem." ), at 3-4.) Plaintiffs also mistakenly assert that the only issue in this case is general causation, and seem to imply that this is what Dr. Carfi's report discusses. (*Id* . at 5.) Drs. Young and Beltrani will present testimony on the issue of whether polyester is a recognized allergic trigger, addressing general causation. Dr. Carfi, however, opines that the polyester in the sheets caused Joseph's symptoms, which addresses specific causation. Also, notwithstanding plaintiffs' contention, it is glaringly obvious that specific causation is at issue both in this motion and in the

case as a whole.

Defendants argue that Dr. Carfi's testimony on causation is unreliable because he relied on insufficient or inappropriate data. Specifically, they argue that Dr. Carfi: (1) relied extensively on a medical history provided by Joseph's mother, including the written history that she did not sign or date; (2) failed to obtain a full family medical history; (3) failed to review all relevant medical documents but instead relied only on records " sufficient to give [him] a synopsis" of Joseph's condition; (4) failed to read the records of Joseph's pulmonologist; and (5) failed to review any medical records from the period before he began sleeping on the sheets. (Defs.' Mem. at 6, 7.) Additionally, defendants claim that Dr. Carfi's opinions are not reliable because they are not based on reliable scientific principles and methods.

Given the liberal standard set by the Second Circuit, Dr. Carfi's training certainly qualifies him as an expert in his ability to determine medical causation and to create a Life Care Plan. However, three gaps in Dr. Carfi's analysis merit discussion: his failure to review Joseph's records from birth, including those of Joseph's pediatrician; his failure to seek out more complete medical records in the case of Joseph's gastrointestinal problems and food allergies; and his failure to consult the family history. Dr. Carfi argues that the pre-exposure records are immaterial because the defendants' expert on general causation stated that he did not need to review them extensively. (Carfi Aff. ¶ 19.) But that expert opines that polyester is not an allergen and, accordingly, that Joseph could not have developed his condition from the polyester in the sheets. That is very different from saying that it was the polyester that caused Joseph's medical problems, which is Dr. Carfi's position. Knowledge of Joseph's medical condition pre-exposure is thus highly relevant, particularly in light of defendants' claim that Joseph was born with a rash covering part of his body.[FN7] (Defs.' Mem. at 1. *See also* Records of treating pediatrician Dr. Melvin Koplow,[FN8] annexed as Ex. I to the Judd Aff.) Dr. Carfi also did not know the frequency of Joseph's hospital admissions after August 1997, when plaintiffs claim Joseph stopped sleeping on the crib sheets. (Carfi Dep. at 35.)

FN7. In his deposition, Dr. Carfi testified as follows:
Q. Did you ever request copies of [Joseph's] birth records to determine what conditions,

Slip Copy
Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

(Cite as: Slip Copy)

Page 5

if any, he was diagnosed with at birth?

A. I did not, no.

Q. Did you ever request any records indicating his condition prior, from birth through three months of age?

A. I did not make that request, no.

Q. In your report, you indicate that Joseph began to develop a rash on his cheeks at about three to four months of age and I just want to ask where you got that information from?

A. Yes, this information came from the medical summary which was provided by the parents, the parental synopsis of his medical background.

Q. Are you aware that Joseph was born with a skin condition?

A. No, I was not aware of that.

(Carfi Dep. at 33-34.)

FN8. Dr. Altshuler's report also makes reference to Joseph's having developed a "fiery red" rash on his face and body immediately after his birth. (*See* Report of Lisa Altshuler, Ph.D., annexed as Ex. J(1) to the Judd. Aff., at 1.)

*5 Greater knowledge of Joseph's food allergies would also be important, as Dr. Carfi opines that Joseph's food allergies stem from his exposure to polyester. Dr. Carfi did not know when the food allergies began or had first been diagnosed (Carfi Dep. at 55-56),[FN9] and he reviewed only six records relating to the food allergies. (Carfi Report at 2-3.)

FN9. With regard to the food allergies, Dr. Carfi testified:

Q. On Page 2 of your report, which is Exhibit A, you discuss Joseph's food allergies and at the very top of the page, second line, you say he developed multiple food allergies. Can you please tell me if you know when these food allergies developed?

A. I do not know specifically when those food allergies developed, no. It was certainly clear by May of 96 that he was suffering from failure to thrive, poor weight gain, which implies some sort of nutritional or gastrointestinal problem, but I do not know specifically when the food allergies per se developed.

Finally, Joseph's family history should have been

investigated, as Dr. Carfi appears to have concluded that Joseph's asthma was caused by exposure to the synthetic fibers in the sheets. Defendants point out that some of Joseph's siblings have asthma and that some of his uncles have asthma and allergies, citing Mrs. Israel's deposition. (Judd Aff. at 9; *see also id.,* Ex. E. at 13, 61.) This suggests the potential for Joseph's asthma to be congenital and not the result of exposure to polyester.[FN10]

FN10. Dr. Carfi testified as follows:

Q. Did you ever get a family history from Mrs. Israel?

A. No, I did not.

Q. Would that have been important in determining whether Joseph had some type of congenital condition?

A. No.

Q. Would that have been important in determining possible sources of his condition?

A. No, I don't see how that would be relevant.

* * *

Q. And did the mother tell you anything about any other illnesses that family members had?

A. She did not mention any other family members, no.

Q. Did you ask about any other illnesses that family members had?

A. I did not, no.

(Carfi Dep. at 49-50, 53.)

Most importantly, however, Dr. Carfi did not perform a differential diagnosis to establish that Joseph's medical problems were caused by the synthetic materials in the sheets. Rather, Dr. Carfi stated that he based his conclusion upon " the history, temporal sequence, the history provided to me, the records provided to me, the temporal sequence of events and the way the child presented to me and the data that I have and plus [sic] my own knowledge as a licensed physician." (Carfi Dep. at 76.)

" When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other alternative possible causes." *Yarchak v. Trek Bicycle Corp.,* 208 F.Supp.2d 470, 497 (D.N.J.2002) (citation omitted); *see also Zwillinger v. Garfield Slope Housing Corp.,* No. 94-4099, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (" To establish specific

causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a differential diagnosis." ) (citing *Mancuso v. Consolidated Edison Co. of New York, Inc.,* 967 F.Supp. 1437, 1445 (S.D.N.Y.1997)); Fed.R.Evid. 702 advisory committee's note (in assessing an expert's reliability, courts should determine whether the expert " has adequately accounted for obvious alternative explanations." ). The court has discretion to exclude as " unreliable" an expert's opinion as to the specific source or cause of a plaintiff's condition where " (1) the [expert] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the expert] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness." *Yarchak,* 208 F.Supp.2d at 497-98 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 760 (3d Cir.1994)).

While an expert need not rule out every potential cause in order to satisfy *Daubert,* the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant. *See, e.g., Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 609 (D.N.J.2002) (" While an expert is not required to rule out all alternative possible causes of a plaintiff's disease, ' where a defendant points to a plausible alternative cause and the doctor offers no reasonable explanation' for why he still concludes that the chemical was a substantial factor in bringing about the plaintiff's disease, ' that doctor's methodology is unreliable' " ) (quoting *Paoli,* 35 F.3d at 759-60), *aff'd,* 68 Fed. Appx. 356 (3d Cir. June 25, 2003); *see also Diaz v. Johnson Matthey, Inc.,* 893 F.Supp. 358, 376 (D.N.J.1995) (excluding expert medical testimony on issue of specific causation where physician " did little, if anything, to rule out alternative causes" and either " ignored" or offered " no satisfactory reason" for discounting " several alternative possible causes" for plaintiff's asthma identified by defendant).

*6 Here, Dr. Carfi did not rule out other materials in the sheets [FN11] or entirely separate causes, both of which have been suggested by the defendants; as he explained, he based his opinion on what he viewed as a temporal correlation between the onset of Joseph's

symptoms and the presence of the alleged cause.[FN12] The Second Circuit has dismissed cases where temporal proximity is the only connection between the plaintiff's symptoms and the alleged cause. *See, e.g., Washburn v. Merck & Co.,* No. 99-9121, 2000 U.S.App. LEXIS 8601, at *5 (2d Cir.2001).

> FN11. For example, at Dr. Carfi's deposition, defendants' counsel asked him if he knew whether the sheets in question contained any dispersed dyes or formaldehyde resins. Dr. Carfi replied that he did not. (Carfi Dep. at 125.)

> FN12. Even a temporal connection is missing with respect to Joseph's sinusitis, as Dr. Carfi did not mention any records of sinusitis outside of the mother's history, which did not provide a date for the onset of the chronic sinusitis.

There may be scientific support for Dr. Carfi's opinion that Joseph's eczema resulted from or was exacerbated by the alleged polyester exposure, but as Dr. Carfi implicitly concedes, there is no objective medical evidence to link Joseph's other medical conditions to the sheets. This might be cured if Dr. Carfi had any professional experience with allergies or atopic dermititis, but Dr. Carfi has never treated anyone with similar allergies and therefore cannot base his conclusions on his own knowledge of the subject. Nor did Dr. Carfi attempt to further his knowledge; he did not confer with any allergists or consult any treatises, reports, publications or texts. (Carfi Dep. at 75, 95-96.) *See Zwillinger,* 1998 WL 623589, at *11. His opinion on causation is therefore problematic because it " did not emanate from his own research in the field, but rather was developed for purposes of litigation." *Washburn,* 2000 U.S.App. LEXIS 8601, at *8; *see also Daubert,* 43 F.3d at 1317. Dr. Carfi's testimony regarding the causation of Joseph's gastrointestinal problems, food allergies, asthma and chronic sinusitis is therefore inadmissible under *Daubert.*

The admissibility of Dr. Carfi's opinion as to the causation or exacerbation of Joseph's eczema is the one gray area, as it is based on more than temporal proximity (*see* Carfi Report at 2), but still was not apparently subject to a differential diagnosis. Dr. Carfi is therefore directed to appear before me for a *Daubert* hearing, at which plaintiffs will be given an opportunity to meet their burden of establishing a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3196956 (E.D.N.Y.)
(Cite as: Slip Copy)

reliable scientific basis for Dr. Carfi's conclusion that Joseph's eczema was caused or exacerbated by his contact with synthetic fibers as an infant.

### (b) Life Care Plan

The Life Care Plan that Dr. Carfi prepared for Joseph estimates the yearly costs of his care that Dr. Carfi attributes to Joseph's exposure to polyester in his crib sheets. (Life Care Plan, annexed as Ex. CC, Part 3, to Pls.' Opp'n.) Defendants argue that the Life Care Plan is flawed because Dr. Carfi did not take into account insurance costs, relied on Mrs. Israel's statements, and used flawed calculations. (Defs.' Mem. at 13-16.) Dr. Carfi has authored numerous life care plans and views creation of them as " a natural extension of [his] training, knowledge, and experience as a physician in the field of physical medicine and rehabilitation." (Carfi Aff. ¶¶ 6, 8.) To create Joseph's Life Care Plan, Dr. Carfi relied on information provided by Joseph's mother, the physical examination, price research, and his own knowledge and experience as a physician. (See Carfi Dep. at 97-98.) He did not take into account Joseph's past medical expenses (id. at 97) and did not speak with any of Joseph's treating physicians or review any of his medical records in formulating the Life Care Plan. (Id. at 101-02.)

*7 Dr. Carfi's preparation of the Life Care Plan seems adequate as an estimation of the current costs associated with Joseph's many ailments. Dr. Carfi's reliance on Mrs. Israel appears professionally appropriate; although Mrs. Israel is a plaintiff, the information she provided was easily checked and is sufficiently accurate for an estimation. As for insurance coverage, the costs are the same regardless of who is paying for them; it therefore is not important to differentiate at this stage.[FN13] The defendants make an issue of the fact that Dr. Carfi estimated how much Neocate Joseph consumed by averaging the high and low daily consumption that Mrs. Israel provided, and that Dr. Carfi accepted her statements at Joseph's examination and in her history over those of a subsequent deposition. (Id. at 15.) It is obvious, however, that some kind of average was necessary, and it was reasonable to take the mother's office-visit estimation for Joseph's high/low consumption and assume that it was normal for him to consume somewhere in between those amounts daily.[FN14]

FN13. Mrs. Israel testified that Medicaid

covers the costs of Joseph's medications and Neocate. (B. Israel Dep. at 100-01, 116.)

FN14. As explored in Dr. Freifelder's deposition, discussed below, a difference of four ounces of Neocate per day results in an estimated difference of $2,166.84 annually, or approximately $420,000 total, taking into account an estimated price increase of three percent per year. (See Freifelder Dep. at 194-200.) An overestimate of the amount of Neocate Joseph is likely to consume therefore results in a significant overestimate of the projected cost. Regardless, Dr. Carfi's Life Care Plan is inadmissible for the reasons discussed infra.

The main problem with the Life Care Plan is that it relies on Dr. Carfi's conclusions about causation and does not attempt to separate out which costs relate to which conditions. In his deposition, Dr. Carfi testified that, in his opinion, the future costs reflected in the Life Care Plan are all linked to Joseph's exposure to the sheets. (Carfi Dep. at 104.) When asked the basis for this opinion, Dr. Carfi stated:
That's based upon again the exposure, how long that occurred, the results thereof, very clear relationship between that and his initial medical problems cascading into all of his other allergies as well as the medical records and all the treatments he has had for his allergic issues, there was this event and this exposure and everything else seemed to follow from that, that's the basis.

(Id.) Again, however, Dr. Carfi conceded that he could not identify any medical record that suggested a connection between Joseph's multiple chronic conditions-such as his asthma and his severe food allergies-and his exposure to synthetic fibers. (Id. at 105.) When asked at his deposition whether he could " say for certain that none of the costs that are reflected in [the] Life Care Plan were necessitated by any condition that Joseph was born with," Dr. Carfi answered, " I couldn't say that with confidence. I was not told of any serious condition that he had prior to that synthetic exposure." (Id. at 105-06.) This reflects a serious flaw in Dr. Carfi's methodology. For example, Dr. Carfi estimates that Joseph will require Neocate, at a cost of approximately $30,335.71 per year, for the remainder of his life. (Life Care Plan, annexed as Ex. CC, Part 3, to Pls.' Opp'n.) Yet he cites no scientific studies, peer-reviewed articles, or other research that indicates that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

there could be any causal connection between exposure to polyester and severe food allergies. The Life Care Plan also estimates that Joseph will incur $3,900 in annual costs, for the rest of his life, for visits to a pulmonary specialist to monitor Joseph's lungs. Yet, again, Dr. Carfi cites no reliable medical evidence to show a causal connection between polyester exposure and asthma. Nor does he reference any scientific evidence to support his assumption that Joseph will continue to experience his current symptoms permanently.[FN15] Since he has no direct experience treating patients with allergies similar to Joseph's, Dr. Carfi's Life Care Plan is speculative and is therefore inadmissible.

> FN15. Indeed, according to defendants' expert, Dr. Vincent Beltrani, an allergist and immunologist, " publications and guidelines of care for atopic dermatitis reflect that 90% of all infants born with this genetic condition improve significantly by puberty." (Affidavit of Vincent Beltrani, M.D., annexed as Ex. M to the Judd. Aff.)

### (c) Educational Development

*8 Dr. Carfi also determined that Joseph was functioning below grade level and was " quite delayed in terms of educational skills." (Carfi Report at 5.) He did this by asking Joseph a few math and spelling problems, out loud, over the span of a few minutes in the course of an hour-long physical examination. Joseph spelled some of the words incorrectly and added some of the numbers incorrectly. (Carfi Report at 4-5.) From Joseph's answers and Joseph's mother's statement of her assumption of his grade level, Dr. Carfi concluded that Joseph was working well below grade level. Id. at 3-5.) Dr. Carfi did not request or review any of Joseph's school records or attempt to speak with any of his teachers. (Id. at 56, 58.)[FN16]

> FN16. Dr. Carfi indicated in his report and deposition that Joseph was being home schooled (see Carfi Report at 4; Carfi Dep. at 56), but he did not know who instructed Joseph at home.

To assist in determining whether Dr. Carfi reached his conclusion using proper methodology, the court may consider whether his " theory or technique ... can be (and has been) tested." Daubert, 509 U.S. at 593. Clearly, spelling tests and math problems assist

educators in evaluating a child's skills. However, the four addition problems and four spelling problems that Dr. Carfi gave to Joseph were not from any educational guide, but were culled solely from his " own parental experience" (Carfi Dep. at 58), as Dr. Carfi has no educational credentials. (Id. at 59, 65.) Plaintiffs do not suggest that this method of assessment was tested, and it apparently was not.

The court may also consider whether the expert's " theory or technique has been subjected to peer review and publication." Id . Plaintiffs do not suggest that Dr. Carfi's technique has been subjected to peer review, and it is unlikely that it has been. There are many methods of educational testing that have been peer reviewed and are considered valid in the field, but a six-minute oral spelling and math test in a doctor's office is not one of them.

The court also must consider " the known or potential rate of error" for a particular technique. Id. at 594. Neither side presented a known rate of error for this method of educational testing. It seems clear, however, that it would be difficult to assess a child's grade level in five minutes, regardless of the technique. Dr. Carfi administered no written test and no reading test (id. at 22, 24, 130), and he conducted no testing of any area other than addition and spelling. There was not anything close to a full evaluation of Joseph's educational skills. The setting also creates significant potential for error; asking math and spelling questions to a nine-year-old [FN17] during a doctor's visit is unexpected and could easily result in confusion and incorrect answers.

> FN17. (See Carfi Report at 4.)

Finally, the court may consider whether the expert's theory or technique has general acceptance in the pertinent scientific community. Id. at 594. Plaintiffs do not present any evidence that educators would approve of this method of evaluation, and given the more rigorous standards school districts use in evaluating their students, the court safely assumes they would not. In short, Dr. Carfi's opinion as to Joseph's educational level was not based on rigorous scientific methods and is thus inadmissible.

### (d) Employment

*9 Finally, Dr. Carfi opines that Joseph's " employment opportunities will be severely hampered." (Carfi Report at 5.) Dr. Carfi does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Page 9
Slip Copy, 2006 WL 3196956 (E.D.N.Y.)
(Cite as: Slip Copy)

claim to be a vocational specialist (*see* Carfi Dep. at 93), and he does not explain the foundation for this conclusion, other than stating conclusorily that Joseph's allergies, poor social skills, " cognitive issues" and " endurance issues," taken together, make him " virtually unemployable in the competitive job market." (*Id.* at 126-27.) [FN18] This opinion is not grounded in " methods and procedures of science," but simply reflects Dr. Carfi's " subjective belief or unsupported speculation." *See* Daubert, 509 U.S. at 589. It is therefore inadmissible.

> FN18. Indeed, Dr. Carfi acknowledged that, with the proper guidance, education and treatment, there is the potential for Joseph's condition to improve before the age at which he would be expected to enter the job market. (Carfi Dep. at 127.)

### B: *Lisa Altshuler, Ph.D.*

Dr. Altshuler is a pediatric psychologist with approximately twenty years of professional experience. Her *curriculum vitae* indicates that she earned a Ph.D. in clinical psychology from the University of Louisville, Kentucky in 1986 and has been co-director of developmental and behavioral pediatrics in the Department of Pediatrics at Maimonides Medical Center since 1995. (*See* Judd Aff., Ex. J(1).) She has an extensive list of publications, most dealing with pediatric psychology, and has held a number of academic positions, including Assistant Professor in the Department of Pediatrics at Albert Einstein College of Medicine from 1989 to 1994.(*Id.*)

Dr. Altshuler's report describes Joseph's developmental history and current functioning, makes a number of behavioral observations, describes the results of various psychological evaluations, and concludes with diagnostic impressions. (*See* Report of Lisa Altshuler, Ph.D., annexed as part of Ex. J(1) to the Judd Aff.) Among Dr. Altshuler's diagnostic impressions is her opinion that Joseph demonstrates " borderline verbal and nonverbal cognitive abilities," although Dr. Altshuler acknowledges that " this must be considered an underestimate of his abilities as emotional and behavioral factors negatively affected his performance on cognitive tasks and may interfere with his learning." (*Id.* at 6.) Dr. Altshuler's report concludes that, in her opinion, " Joseph's medical history has strongly impacted his functioning and has

been a major contribution to psychological and social disability." (*Id.*) She further opines that:

It is difficult to tease out the relative contribution to his psychological difficulties caused by exposure to polyester sheets as compared to his underlying illness. However, as a factor that substantially increased the severity [of his] symptoms, medical treatment and hospitalizations it also correspondingly increased the likelihood of significant emotional damage. Given that the hospitalizations and treatments occurred at such an early age and persisted for over two years, the impact was magnified. Joseph was chronically ill, in discomfort and pain during a time when he was faced with the developmental tasks of acquiring a sense of basic trust in the world, a sense of autonomy, and of experiencing the beginnings of being able to be effective in mastering aspects of his environment. This was a critical time and illness and hospitalization during this time can have significant and life-long effects on emotional development. This, in my opinion, seems clearly to be the case with Joseph. While it is not possible to quantify the contribution to his emotional problems made by exposure to polyester, it is clear that this made a significant contribution to his current difficulties.

**\*10** (*Id.*)

Defendants object to Dr. Altshuler's opinion that Joseph's early exposure to synthetic fibers, and the medical interventions that purportedly resulted from that exposure, contributed significantly to his current psychological and emotional problems. They contend that her opinion on causation is unreliable because she (1) conducted a " very limited review" of Joseph's medical records; [FN19] (2) did not review any of Joseph's school records; FN20 (3) relied on uncorroborated information supplied by Joseph's mother, plaintiffs' counsel and a retained expert witness; (4) relied on information obtained informally and via an ongoing relationship with the plaintiffs through " Project DOCC" (which stands for " Delivery of Chronic Care" ), a hospital program involving parents of chronically ill children; [FN21] and (5) conducted only three brief interviews and testing sessions with Joseph, during which Joseph exhibited problems with motivation and cooperation. (*See* Judd Aff. at 33-34.)

> FN19. Dr. Altshuler testified that she reviewed Joseph's medical records at Maimonides Medical Center, from birth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                             Page 10

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

(Cite as: Slip Copy)

until approximately age three, but did not review his records from Johns Hopkins or Mount Sinai. (Deposition of Dr. Lisa Altshuler, dated Feb. 4, 2004 (" Altshuler Dep." ), annexed to the Judd Aff. as Ex. S, at 57-58, 66.) Nor did she review the records of Joseph's pediatrician, Dr. Koplow. (*Id.* at 76.)

FN20. Dr. Altshuler did testify that she spoke with Joseph's teacher and obtained a teacher's evaluation. (Altshuler Dep. at 55-56, 98.)

FN21. In her deposition, Dr. Altshuler testified that she first met plaintiff Beverly Israel when Mrs. Israel became involved in a program at Maimonides Hospital in which parents of chronically ill children meet with pediatric residents, often in the parent's home. (Altshuler Dep. at 25.) Dr. Altshuler explained that the purpose of the program is " to help [medical] residents understand the psychological and family impact of medical conditions," and that Mrs. Israel is a parent coordinator of the program. (*Id.* at 26-27.)

There can be no dispute that Joseph has experienced numerous hospital admissions, emergency room visits, and medical treatments throughout his infancy and childhood. Nor do defendants take issue with Dr. Altshuler's competency to administer psychological tests or to evaluate and treat psychological problems in children. Their primary objection is to the methodology Dr. Altshuler employed in drawing a causal connection between Joseph's ongoing psychological and social disabilities and his alleged exposure to polyester as an infant.

In conducting her review of Joseph's case, Dr. Altshuler used traditional tools to make an assessment of a patient: personal interviews, a medical record review, clinical rating scales,[FN22] and background facts of past symptoms, behaviors, and experiences. Defendants do not dispute that these tools are the appropriate ones for rendering an expert opinion, and the case law suggests that this is, indeed, the type of methodology employed to form a reliable psychiatric opinion. *See United States v. Finley,* 301 F.3d 1000, 1006, 1008 (9th Cir.2000) (appropriate psychology methodology includes " a history of the patient, consisting of family, vocational, educational, medical, and legal histories, the observation of the

patient's behavior, and the administration of standard psychological tests" ); *Skidmore v. Precision Printing and Packaging,* 188 F.3d 606, 618 (5th Cir.1999) (psychiatrist expert testimony regarding cause of plaintiff's post-traumatic stress disorder and depression was admissible where expert " testified to his experience, to the criteria by which he diagnosed [plaintiff], and to standard methods of diagnosis in his field" ).[FN23]

FN22. The clinical rating scales included the Wechsler Intelligence Scale for Children, the Vineland Adaptive Behavior Scales, the Achenbach Child Behavior Checklist, the Connors Parent Rating Scale, and the SNAP-IV Rating Scale. (*See* Altshuler Report at 4-5.)

FN23. As explained above, *Daubert* discussed the factors a court may consider in evaluating scientific validity: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community. *Daubert* emphasized, however that the inquiry is a " flexible one," and that the enumerated factors are not intended to be a definitive checklist. In *Kumho,* the Supreme Court reiterated that these factors " may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." 526 U.S. at 150-51 (citations and quotations omitted). Neither party explains how the four-factor *Daubert* test would apply to Dr. Altshuler's testimony, and plaintiffs argue that, in fact, the *Daubert* factors are not applicable here. (Pl.'s Mem. at 11.) Nonetheless, the court's gatekeeping function " is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. Thus, the court will examine whether: (i) the expert's testimony is based upon sufficient facts or data; (ii) the testimony is the product of reliable principles and methods; and (iii) the witness has applied

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

(Cite as: Slip Copy)

Page 11

the principles and methods reliably to the facts of the case. *Id.*

However, as explained above, to the extent Dr. Altshuler's testimony touches upon matters of causation, it will satisfy *Daubert's* prerequisites for reliability only if the expert conducted a meaningful differential diagnosis ruling out other possible contributing factors. During her deposition, Dr. Altshuler candidly admitted that she made no attempt to perform a differential diagnosis as to the cause of Joseph's medical conditions, as she is not a physician. (Deposition of Dr. Lisa Altshuler, dated Feb. 4, 2004 (" Altshuler Dep." ), annexed to the Judd Aff. as Ex. S, at 95.) [FN24] She testified that she never discussed with Joseph's mother what type of detergent was used for Joseph's bedding (*id.* at 79), and she did not know when Joseph first exhibited symptoms of asthma, eczema or food allergies, or which physical symptoms related to which conditions. (*Id.* at 94-97.) Nor could she recall whether the medical records she reviewed made any mention of exposure to polyester. (*Id.* at 102, 104.) [FN25]

> FN24. In her affidavit, Dr. Altshuler states that she has " not diagnosed Joseph with dermatitis" or opined that " an allergy to polyester bedding aggravated his dermatitis or resulted in any hospitalizations or specific medical treatment." (Affidavit of Lisa Altshuler, Ph.D., sworn to May 29, 2006, ¶ 14, Pl.'s Ex. EE.) Her report, however, states that " exposure to polyester sheets" was " a factor that substantially increased the severity" of Joseph's symptoms and therefore " made a significant contribution" to his current condition. (*See* Altshuler Report at 6.) These two statements are contradictory.

> FN25. When asked whether she would consider a mention of polyester exposure significant, Dr. Altshuler responded that she had only reviewed the records to determine the frequency of Joseph's hospitalizations and their effect on his behavior. She stated that she " wasn't trying to see specifically the issue of did they connect these hospitalizations to the polyester. That's something for the physician experts to talk about." (Altshuler Tr. at 102-03 .) It bears noting that, according to defendants, " there is no mention of any such exposure [to

polyester] in a single record of any of Joseph's medical treatment, whether from Maimonides Medical Center, Mt. Sinai, Johns Hopkins, Dr. Marcus or Joseph's pediatrician." (Judd Aff. at 30.)

*11 In her report, Dr. Altshuler states that " Joseph had been exposed to polyester bedding for approximately the first two years of his life, which exacerbated his allergies, eczema and asthma, and contributed to multiple hospitalizations." (Altshuler Report at 1.) In her deposition, she testified that she based this statement on information she received from Joseph's mother and from Dr. Young's report. (Altshuler Tr. at 115-16, 119.) Later in her report, Dr. Altshuler states that " Joseph's skin condition improved once his parents switched to 100% cotton sheets in 1997 and the rate of hospitalizations decreased." (Altshuler Report at 2.) She testified that she based this latter statement on information from Joseph's mother, and that she did not probe the substance of this assertion. (Altshuler Dep. at 67-68.) [FN26]

> FN26. Dr. Altshuler testified as follows:
> Q. And did you at any time attempt to confirm or corroborate the mother's information to you that the frequency of hospitalizations decreased after he was removed from [ ] that bedding?
> A. I didn't. (Altshuler Dep. at 69.)

In sum, Dr. Altshuler is not qualified to testify that exposure to polyester caused or contributed to the ailments she diagnoses in Joseph. Dr. Altshuler is not a medical doctor (Altshuler Dep. at 28), much less an expert on allergies or the effects of exposure to synthetic materials in people with atopic dermatitis. Her opinion about the effects of the alleged polyester exposure are based solely on hearsay and not on any scientifically reliable methodology.

This determination of Dr. Altshuler's reliability with respect to causation does not preclude her testimony on other aspects relevant to plaintiffs' claim for damages. As an experienced, licensed pediatric psychologist, Dr. Altshuler's testimony is admissible as to her observations of Joseph, her evaluation of his behavioral, cognitive and psychological problems, and her diagnosis of Joseph's condition. She is also competent to render an opinion as to the effect of Joseph's early hospitalizations and medical treatments on his psychological and cognitive development. To

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

the extent Dr. Altshuler did not review all of Joseph's medical and school records, relied on the subjective views of others, and had difficulty evaluating Joseph due to " fluctuation" in his motivation and cooperation, those issues go to the weight and credibility of the evidence, to be determined by the trier of fact. *See Ambrosini,* 101 F.3d at 141.

Presumably, defendants will explore those issues further at trial .[FN27]

> FN27. Defendants argue that their psychologist, Dr. Bridget Amatore, " received no cooperation from Joseph and therefore could not render a meaningful opinion regarding his psychological condition." (Judd Aff. at 35.) They request that, if Dr. Altshuler is permitted to testify in this case, Dr. Amatore " be afforded another opportunity to complete her neuropsychological evaluation of Joseph." (*Id.* at 36.) That request is granted. Plaintiffs are directed to make Joseph available for a neuropsychological evaluation by Dr. Amatore. If the parties cannot agree on a mutually convenient time for this examination, they are directed to contact my chambers to schedule a telephone conference on this issue.

*C. Leonard H. Freifelder, Ph.D.*

According to his *curriculum vitae,* Dr. Freifelder earned his doctorate and master's degrees in operations research [FN28] and statistics from the University of Pennsylvania. (*See* Judd. Aff., Ex. J(4).) He also has a bachelor's degree in actuarial science from The Wharton School of Business at the University of Pennsylvania. (*Id.*) He is the president of Freifelder & Associates Consulting, Inc.; in that capacity he prepares economic, statistical and actuarial studies for litigation and provides expert testimony in court. (*Id.*) Prior to starting his own consulting firm, Dr. Freifelder was a senior economist with The Center for Forensic Economic Studies, where he also prepared economic, statistical and actuarial studies for litigation and provided court testimony. (*Id.*) He has also worked as a manager of new business development at Warner Insurance Services, Inc. and as a Special Deputy Commissioner in the New Jersey Department of Insurance, and he has held a number of academic positions, including Associate Professor of Insurance at Baruch College,

City University of New York, and the University of Connecticut. (*Id.*) He holds no professional licenses. (Deposition of Leonard R. Freifelder, Ph.D ., dated Aug. 4, 2004 (" Freifelder Dep." ), annexed to the Judd Aff. as Ex. O, at 54.)

> FN28. Dr. Freifelder explained in his deposition that operations research " is a field of applied economics that uses-generally uses relatively sophisticated mathematical models to solve problems commonly that are problems faced by businesses[,][a]lthough operations research techniques are used to solve other nonbusiness problems as well." (Deposition of Leonard R. Freifelder, Ph.D., dated Aug. 4, 2004 (" Freifelder Dep." ), annexed to the Judd Aff. as Ex. O, at 54.)

**\*12** Plaintiffs intend to offer Dr. Freifelder's testimony to prove the aggregate net economic loss Joseph is expected to sustain as a consequence of his alleged injuries or conditions. For purposes of his report, Dr. Freifelder assumes, based on Dr. Carfi's and Dr. Altshuler's opinions, that Joseph will not receive a high school degree and that, if he is able to work, he will enter the workforce at the age of 18.43 and will work to the age of 62 or 67, 62 being the youngest age at which workers can begin to receive Social Security retirement benefits and 67 being Social Security full retirement age. (Report of Leonard H. Freifelder, dated May 2004 (" Freifelder Report" ), annexed as part of Ex. J(4) to the Judd. Aff., at 4-5.) Using U.S. Census Bureau data, U.S. Department of Labor statistics, actuarial tables and other data, Dr. Freifelder opines that Joseph's future loss of earnings and fringe benefits is $1,281,091 to $3,275,331, depending on the length of his work life and his pre-incident education level, meaning the education level Joseph would have achieved had he not been injured. (*See* Freifelder Report at 2-3.) He also estimates the cost of Joseph's future care as $20,373,425, and his total economic loss as ranging from $21,654,517 to $23,648,756, depending on Joseph's retirement age and pre-incident education level. (*Id.* at 14.) In estimating the cost of Joseph's future care, Dr. Freifelder assumes, among other things, that Joseph will require numerous medications and medical supplies and services for the remainder of his life, plus Neocate-at a cost of $30,336 per year-for nutrition. (*Id.* at 9 (listing all expected life care costs on an annual basis).) These assumptions are based entirely on Dr. Carfi's Life Care Plan for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

Joseph. (Freifelder Dep. at 192.)

Defendants object to Dr. Freifelder's report on the ground that his underlying assumptions are unjustified and based on " insufficient and unreliable data." (Defs.' Mem. at 4.) They also question Dr. Freifelder's qualifications' to render an opinion regarding Joseph's future health care costs and earning capacity, arguing that Dr. Freifelder " has no professional training in analyzing the future cost of health care" or the " earning capacity of persons in the labor force." (Judd Aff. at 19.)

At his deposition, Dr. Freifelder testified that he has never studied labor economics or medical economics and has never·held an academic position teaching economics. (Freifelder Dep. at 57-58.) He also testified that he did not review any of Joseph's medical records (*id.* at 22, 26-27, 38-39) and therefore did not reach any conclusions of his own regarding causation. (*Id.* at 31-33.) Nor did he conduct any independent research into Joseph's medical expenses. (*Id.* at 192.)

An expert may incorporate assumptions into his or her opinion, but those assumptions must be ones that a reasonable juror could find correct based on admissible evidence. *See Amorgianos v. Nat'l R.R. Passenger Corp.,* 137 F.Supp.2d 147, 176 (E.D.N.Y.2001), aff'd, 303 F.3d 256 (2d Cir.2002). *See also TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993) (expert could not rely on the figures calculated by another expert when the proffered expert did not conduct any investigation of the other expert's figures); *Total Containment, Inc. v. Dayco Prods., Inc.,* No. Civ. A.1997-CV-6013, 2001 WL 1167506, at *6-7 (E.D.Pa. Sept. 6, 2001) (excluding expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions); *Otis v. Doctor's Assocs., Inc.,* No. 94 C 4227, 1998 WL 673595, at *4 (N.D.Ill. Sept. 14, 1998) (precluding proffered expert's opinion on anticipated lost profits where plaintiff had shown no evidence that the expert's calculations were " anything more than an exercise in arithmetic based on inherently unreliable values." ). In other words, the expert's underlying assumptions must be evaluated for accuracy.

**\*13** Dr. Freifelder's underlying assumptions are problematic in a few respects. First, in determining Joseph's pre-incident earning capacity, he assumes that, had Joseph not been exposed to the polyester in

the crib sheets, he would have had a normal work life expectancy, meaning he would have been " able to work as a typical male[.]" (Freifelder Dep. at 78.) His calculations do not take into account the possibility that some of Joseph's medical conditions were pre-existing and would have affected Joseph's work life regardless of his purported exposure to polyester. In other words, Dr. Freifelder accepted, for purposes of projecting Joseph's pre-incident earning capacity, that Dr. Carfi's opinion on causation was scientifically valid. [FN29] This is also true with respect to Dr. Freifelder's projections on Joseph's future health care costs. Dr. Freifelder's estimates are based entirely on Dr. Carfi's Life Care Plan for Joseph, which links all of Joseph's medical expenses to his alleged early exposure to polyester crib sheets. [FN30]

FN29. Dr. Freifelder testified as follows:
Q. Is it your opinion that but for the alleged reaction to the sheets, Joseph would not have had any difficulty with his earnings capacity?
A. I don't have an opinion on that. I've accepted for purposes of my report the allegations that were made in this case regarding the sheets and the difficulties that the sheets have caused Joseph Israel, both with respect to his ability to work and as to his future medical care.
Q. And would his future ability to work and his future medical care not be affected as well by other conditions that he had?
A. I don't know the answer to that question. You are asking me for a medical or vocational opinion which I am unable to render.... For the purposes of preparing this report, I had assumed that the allegations in the materials I received as well as the conclusions drawn by the experts who were qualified to make those opinions are accurate and true, and I base my calculations on those opinions and those allegations.
* * *
Q. What if I told you to assume that there was medical evidence that Joseph was severely ill and that his illness would have impaired his earnings capacity even without ever being exposed to the sheets? Would that change your calculation of your lost future earnings growth?
A.... Under that hypothetical, the answer would be yes.... I guess if the allegations that have been made are not true, are false, then

Slip Copy                                                                Page 14

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

obviously my conclusions would change because my conclusions are based on the premise that the allegations made in the Complaint ... are premised on the sheets being the cause of Joseph Israel's problem. If that assumption is false, then clearly the conclusions would change.
(Freifelder Dep. at 83-84, 89-90, 91.)

FN30. When asked at his deposition how he arrived at the figure of over $20 million in future medical costs, Dr. Freifelder testified: " I projected the cost that Dr. Carfi indicated Joseph needed to care for his injuries that are related to the allegations in this case, and I estimated those costs from, I believe, July 1 of 2004 through to Joseph's life expectancy." (Freifelder Dep. at 111-12.)

Dr. Freifelder also assumes, based solely on his interpretation of Dr. Altshuler's report,[FN31] that Joseph will not graduate from high school.[FN32] However, as Dr. Freifelder conceded in his deposition, Dr. Altshuler did not opine that Joseph is unlikely to complete high school. (Id. at 163, 205.) This assumption is therefore wholly speculative, as Dr. Freifelder lacks the qualifications to make this prediction on his own and did not use any scientifically reliable methodology or evidence in doing so.

FN31. Dr. Freifelder testified:
Q. In the middle of Page 5, Paragraph 2 [of the report], you wrote that, " I have assumed that the plaintiff will enter the workforce without a high school degree on July 1, 2013, at the age of 18.43." Based on what did you assume that?
A. Based on the academic and other difficulties that are described in the report of Lisa Altshuler, Ph.D.
(Freifelder Dep. at 131.)

FN32. Dr. Freifelder testified in his deposition that he performed no independent review of Joseph's school records and did not speak with any of Joseph's teachers. (Freifelder Dep. at 44-45.)

Conversely, Dr. Freifelder's report also assumes that, had Joseph not been exposed to the sheets, he would have graduated from high school or completed some college without obtaining a degree. (See Freifelder

Report at 4.) Dr. Freifelder testified that he knew that both of Joseph's parents and one of Joseph's siblings had received high school diplomas and not continued on to college,[FN33] but he did not know whether any of Joseph's other siblings had plans to attend college. (Freifelder Dep. at 49-50.) Nor did he know what percentage of white males in the American population complete high school or attend college. (Id. at 155.) FN34 Again, Dr. Freifelder does not claim to be a vocational or educational specialist; he has no expertise in evaluating personal skill sets or predicting a particular individual's vocational or educational prospects. (See, e.g., id. at 97-100.) In making his calculations, he did not take into account Joseph's individual characteristics or his family's socioeconomic status. (Id. at 100.) In short, his assumption that, had Joseph been healthy, he would have graduated from high school or completed some college is speculative.

FN33. Plaintiffs state that Joseph's oldest brother is currently attending the College of Staten Island. (See Affidavit of Beverly Israel, sworn to May 30, 2006, Plaintiffs' Ex. BB(1).) However, there is no indication that Dr. Freifelder was aware of this when he rendered his opinion.

FN34. In his deposition, Dr. Freifelder was asked to refer to documents containing census information for the U.S. population generally. He testified that, according to the documents, approximately eighty-five to ninety percent of American males earn a high school degree, and approximately seventeen percent of American males attend some college without receiving a degree. (Freifelder Dep. at 155-56, 159.) This lends statistical support to Dr. Freifelder's assumption that Joseph's pre-incident education level would be a high school degree, but it does not support an assumption that Joseph would have attended college.

Dr. Freifelder is certainly competent to estimate life expectancy and earning capacity based on U.S. government statistics and actuarial tables. These are, in fact, fairly straightforward mathematical calculations. The flaw in Dr. Freifelder's analysis lies in his underlying assumptions, which lack any reliable foundation. As explained in detail above, Dr. Carfi's opinion on causation is inadmissible under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

**(Cite as: Slip Copy)**

*Daubert*-with the possible exception of his opinion on the causation or exacerbation of Joseph's eczema-because it is not grounded in any identifiable scientific methodology. Since Dr. Freifelder's assumptions are based on Dr. Carfi's conclusions, or are otherwise unsupportable, his opinions are likewise inadmissible.

### CONCLUSION

*14 For the reasons stated above, Dr. Carfi is directed to appear in court for a *Daubert* hearing on the issue of medical causation with respect to Joseph Israel's <u>eczema</u>. The parties are directed to contact my chambers to schedule the hearing at a mutually convenient date and time. The remainder of his report and testimony are inadmissible under *Daubert*. In addition, to the extent Dr. Altshuler has rendered an opinion as to the cause of Joseph's medical conditions, that portion of her opinion is inadmissible, but the remainder is admissible. Finally, Dr. Freifelder's report and testimony are inadmissible in their entirety.

SO ORDERED.

E.D.N.Y.,2006.
Israel v. Spring Industries, Inc.
Slip Copy, 2006 WL 3196956 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**

Otis v. Doctor's Associates, Inc.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
David OTIS, Plaintiff,
v.
DOCTOR'S ASSOCIATES, INC., Frederick A. Deluca,
and Peter H. Buck, Defendant(s).
No. 94 C 4227.

Sept. 14, 1998.

MEMORANDUM OPINION AND ORDER
WILLIAMS, J.
*1 Plaintiff David Otis (" Otis" ) is suing defendants
Doctor's Associates, Inc., Frederick DeLuca, and Peter
Buck (collectively referred to as " defendants" ) for fraud
arising out of a failed fast food franchise restaurant
known as Cajun Joe's Chicken (" Cajun Joe's" ). Otis
became involved with Cajun Joe's as a Development
Agent (" DA" ), which meant that he agreed to promote
Cajun Joe's restaurants in the Chicago area by selling
Cajun Joe's franchises and assisting the new franchisees.
The only claim remaining in this case is whether
defendants fraudulently induced Otis into his
Development Agent Agreement (" DA Agreement" ) by
misrepresenting that Cajun Joe's was a fully-developed
franchise. Currently before the court is Defendants'
Motion to Preclude Testimony of Plaintiff's Damage
Expert and Bar Other Evidence Regarding Plaintiff's
Alleged Lost Profit Damages. For the following reasons,
the court grants defendants' motion.

*Background*

The court incorporates by reference the statement of facts
from its March 17, 1998 Memorandum Opinion and
Order. *See Otis v. Doctor's Associates, Inc.*, No. 94 C
4227, 1998 WL 142383, at *1-4 (N.D.Ill. March 17,
1998). For purposes of this opinion, however, the court
will set forth additional facts necessary to understand the
motion presently before the court. The court notes that
Otis does not dispute any of the following facts.

Otis's fraud case involves a damages claim for lost profits
under the benefit-of-the-bargain theory. In short, Otis
claims that one of the appropriate measures of his
compensatory damages is the money he would have

earned during the 20 year life of his DA Agreement if
Cajun Joe's had been successful. To support his claim that
defendants' alleged fraud entitles him to lost profits under
this benefit-of-the-bargain theory, Otis retained a certified
public accountant named Kevin M. Carlie (" Carlie" ).[FN1]

> FN1. Although Carlie is a CPA, the record fails
> to establish that Carlie has any expertise in
> projecting sales of any kind twenty years into the
> future, not to mention franchise fast food sales
> forecasts.

Carlie performed damages calculations which purport to
determine Otis's lost future profits over the anticipated 20
year term of Otis's DA Agreement. Carlie's calculations
were, however, based exclusively on projections
contained in Otis's May 22, 1990 DA Agreement. (*See*
Defs.'s Mot.[FN2] at 5-7, quoting Carlie Dep. at 69, 85-86,
106-07, 110.) Carlie did not perform any independent
market analysis to verify the reasonableness or accuracy
of the projections in the DA Agreement. Nor did Carlie
perform any comparative analysis which measured the
DA Agreement's projections against actual results
achieved by other fast food chicken franchise restaurants.

> FN2. " Defs.'s Mot." refers to " Defendants'
> Motion to Preclude Testimony of Plaintiff's
> Damage Expert and Bar Other Evidence
> Regarding Plaintiff's Alleged Lost Profit
> Damages."

The DA Agreement upon which Carlie based his future
lost profits calculations required Otis to establish up to
121 Cajun Joe's franchise restaurants in the Chicago area
over a period of years.[FN3] Alternatively, the DA
Agreement required Otis to set up at least 89 Cajun Joe's
franchise stores in Chicago. (*See id.* at 2-3.) The DA
Agreement provided an interim development time
schedule during which Otis was to establish these Cajun
Joe's restaurants. Specifically, the DA Agreement
required Otis to set up Cajun Joe's restaurants as follows:

> FN3. This number arose out of the requirement
> that Otis " [e]stablish that number of units which
> will equal the number of units operated by the
> fast food chain with the most units in the
> Territory." When Otis signed his DA
> Agreement, McDonald's operated the most fast
> food restaurants in Chicago with 121.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 2

| Total Number of Units To Be Operating Including Existing Units | Date Required By |
|---|---|
| 1 | January 1, 1991 |
| 3 | July 1, 1991 |
| 6 | January 1, 1992 |
| 21 | January 1, 1993 |
| 28 | July 1, 1993 |
| 36 | January 1, 1994 |
| 51 | January 1, 1995 |
| 58 | July 1, 1995 |
| 66 | January 1, 1996 |
| 73 | July 1, 1996 |
| 81 | January 1, 1997 |
| 89 | July 1, 1997 |

**\*2** (Defs.'s Mot., Ex. A at 2-3.)

Otis's DA Agreement also provided that the total sales of all Cajun Joe's franchise restaurants in Otis's area must equal an average of $6,750 per restaurant. (*See* Defs.'s Mot., Ex. A.) In other words, if Otis had set up one Cajun Joe's restaurant, the DA Agreement required that its weekly sales must equal $6,750; if Otis had set up two restaurants, those two Cajun Joe's restaurants combined must produce weekly sales of $13,500; after Otis established three Cajun Joe's franchises, those three restaurants must combine to have made a total of $20,250 in sales every week. (*See* Defs.'s Mot. at 3 & n. 4.)

Finally, Otis's DA Agreement provided a formula for calculating Otis's share of the profits from the gross sales made by Cajun Joe's restaurants in Otis's territory. Neither party has supplied the court with a detailed explanation of precisely how this formula operates; however, Otis's " Schedule G-Itemized Statement of Damages" (" Schedule G" ) filed with the Final Pretrial Order sets forth a relatively simple formula for calculating Otis's alleged lost profits. According to Schedule G, Otis arrives at his lost future profits under one of three alternative methods. (1) $6,750 (the projected average weekly sales of one Cajun Joe's restaurant) x 89 (the minimum total number of Cajun Joe's restaurants the DA Agreement required

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

(Cite as: Not Reported in F.Supp.2d)

Otis to establish) x 1.3% (one-half of Otis's one-third of 8% royalty on franchisee's gross sales of royalties) x 52 (number of weeks in a year) x 20 (number of years the DA Agreement was supposed to last) = $8,122,140 in lost future profits.
(2) $6,750 (projected average weekly sales) x 121 (the target number of Cajun Joe's restaurants) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $11,042,460 in lost future profits.
(3) $3,450 (actual average weekly sales of Cajun Joe's restaurants in Otis's territory) x 20 (actual number of Cajun Joe's restaurants Otis opened in his territory) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $932,880.

Based on the DA Agreement's (1) projected average weekly sales requirement, (2) schedule by which Otis was to establish the required number of Cajun Joe's franchise restaurants, and (3) formula for calculating Otis's share of the profits, Carlie made two separate damages calculations. Carlie first determined that Otis would have earned $8,568,031 over the 20 year life of his DA Agreement if Otis had established the goal of 121 Cajun Joe's franchise restaurants. (Defs.'s Mot., Ex. C.) Carlie based his second lost profits calculation on the premise that Otis could only set up 89 Cajun Joe's restaurants during the predicted 20 year life of the DA Agreement. (*Id.*) Using that estimate, Carlie concluded that Otis would have reaped $6,709,610 in lost profits. (*See* Defs.'s Mot., Ex. D.) It is clear from comparing Carlie's lost profit estimates and Otis's lost profit estimates in Schedule G that the two are very inconsistent. Neither party has attempted to explain why Otis's calculations in Schedule G so greatly exceed Carlie's " expert" calculations. This discrepancy, however, does not interfere with the court's analysis of the admissibility of Carlie's expert testimony or Otis's other evidence of lost future profits.

*Analysis*

*\*3* Defendants argue that the court must exclude Carlie's proffered expert testimony because Carlie's calculations fail to meet the requirements imposed on expert testimony by Rule 702 of the Federal Rules of Evidence. The court agrees. Specifically, Rule 702 provides that:
[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The leading case interpreting Rule 702 is *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that the trial court must, under Rule 702, exercise " some degree of regulation of the subjects and theories about which an expert may testify." 509 U.S. at 589. When construing Rule 702, the Supreme Court explained that " the adjective ' scientific' implies a grounding in the methods and procedures of science" and " the word ' knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590.

Accordingly, a trial judge faced with a proffer of expert scientific testimony:
must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592-593. The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry, where both steps must be met before the testimony is admissible. According to the Seventh Circuit, *Daubert:* [first] directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out " subjective belief or unsupported speculation." Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must fit the issue to which the expert is testifying.

*O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.) (citing *Porter v. Whitehall Lab., Inc.,* 9 F.3d 607, 613, 616 (7th Cir.1993)); *see also Deimer v. Cincinnati Sub-Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1994); *Dukes v. Illinois Cent. R.R. Co.,* 934 F.Supp. 939, 947-948 (N.D.Ill.1996).

*Daubert* provides four nonexhaustive guideposts to assist district courts in determining whether the proffered scientific expert testimony can be fairly characterized as " scientific knowledge" within the meaning of Rule 702. The nonexclusive factors in *Daubert* are: (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 4

acceptance of the theory in the scientific community. *Daubert,* 509 U.S. at 591-95; *Gruca v. Alpha Therapeutic Corp.,* 51 F.3d 638, 643 (7th Cir.1995); *Porter,* 9 F.3d at 613; *Dukes,* 934 F.Supp. at 948. The most important factor in the Daubert analysis is whether the proffered scientific theory can be and has been tested by the scientific method. *Bradley v. Brown,* 42 F.3d 434, 438 (7th Cir.1994); *Stanczyk v. Black & Decker, Inc.,* 836 F.Supp. 565, 567 (N.D.Ill.1993). " Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert,* 509 U.S. at 593 (citation omitted). Accordingly, a scientific theory that is not supported by appropriate validation is not admissible under Rule 702. *Id.* at 590. Courts must exclude " subjective belief or unsupported speculation." *Porter,* 9 F.3d at 614 (citing *Daubert,* 509 U.S. at 590).

*4 Importantly, for purposes of this case, the court notes that several courts have applied the *Daubert* requirements not only to proffered expert " scientific" evidence, but also to the expert " mathematical" lost profits evidence at issue in this case. See *Target Mkt. Publ'g, Inc. v. Advo, Inc.,* 136 F.3d 1139, 1142-44 (7th Cir.1998) (applying *Daubert* test to lost profits calculation in breach of contract case); *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.,* No. 94 C 50392, 1998 WL 299300, at *1 (N.D.Ill. June 3, 1998) (same); *Terrell v. Childers,* No. 93 C 2460, 1996 WL 385310, at *8-11 (N.D.Ill. July 3, 1998) (applying *Daubert* analysis to lost profits calculation based on benefit-of-the-bargain theory in common law fraud case). Additionally, as the proponent of the proffered expert testimony, Otis bears the burden of establishing the admissibility of Carlie's testimony by a preponderance of the evidence. See *Dukes,* 934 F.Supp. at 946; *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.1994). With these legal principles in mind, the court evaluates Carlie's proffered expert testimony concerning Otis's alleged lost profits.

The court finds that Otis has failed to show that Carlie's lost profit calculations are based on " scientific knowledge" as Rule 702 requires. Most importantly, Otis has made no showing that the formula and projected values Carlie relied on is accurate or has been tested for accuracy. Carlie himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures used in the DA Agreement. Other than citing the target estimates in the DA Agreement, Otis has failed to establish that the average weekly sales estimates in the DA Agreement have any basis in fact or fast food market reality. For example, Otis has not demonstrated that other fast food chicken franchises in the Chicago market consistently average

sales of approximately $6,750 per week. Nor has Otis supplied any proof which shows that a fast food chicken franchise could establish and operate 89 or 121 restaurants in the Chicago marketplace in the limited time period provided by the DA Agreement. Finally, Otis has not shown that Carlie's lost profits formula accounts for possible future trends in the fast food business. Basically, Otis has failed to show any proof that Carlie's lost profits estimates have been subjected to any testing to verify the accuracy of the numbers Carlie used or the accuracy of Carlie's conclusions.[FN4]

> FN4. Although not addressing the issue at length, the court does not hesitate to conclude that Otis could have subjected Carlie's calculations to some sort of scrutiny or market analysis to verify their accuracy and reliability. See *Daubert,* 509 U.S. at 593 (" a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be *whether it can be* (and has been) tested" ) (emphasis added).

Likewise, the other *Daubert* factors also require the court to exclude Carlie's proffered expert testimony. Aside from failing to subject Carlie's formula to actual testing, Otis also fails to show that the theory Carlie relied on has been subjected to peer review and publication. In fact, Otis has shown no evidence indicating that the methodology Carlie used is anything more than an exercise in arithmetic based on inherently unreliable values. Additionally, Otis has not provided the court with the known or potential rate of error in Carlie's calculations. Finally, Otis has not shown that Carlie's theory of calculating lost future profits for a fast food franchise has been generally accepted by other experts who frequently predict future sales for similar franchise operations. Because Otis fails to show evidence that satisfies any of the *Daubert* factors, the court grants defendants' motion to exclude the expert testimony of Kevin Carlie.

*5 Rather than respond to defendants' argument that Carlie's methodology does not pass the *Daubert* analysis,[FN5] Otis simply insists that Illinois law entitles him to recover the benefit of his bargain on his fraud claim. Otis argues that defendants are attempting to confuse the *fact* of fraud damages with the *amount* of fraud damages in this case. This argument, however, appears to be a response to a separate argument advanced by defendants. Specifically, defendants argued in their brief that this court's March 17, 1998 Memorandum Opinion and Order eliminates any claim Otis may have for lost profits. On this point, the court agrees with Otis.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

The court's March 17, 1998 ruling was not fatal to Otis's claim for lost profits. The court must therefore determine whether, aside from the now-excluded Carlie expert testimony, Otis may introduce any remaining evidence of lost profits at trial.

> FN5. Otis's one paragraph response to the *Daubert* issue is woefully incomplete. (*See* Pl.'s Resp. at 11.)

Under Illinois law, when " a misrepresentation induced the victim to consummate the bargain, benefit-of-the-bargain damages are appropriate to give the victim the rewards he reasonably expected under the contract." *Roboserve v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 274 (7th Cir.1996). However, Illinois law also enforces the " new business rule" which precludes a plaintiff from recovering lost profits in some circumstances. Under Illinois law, " a new business generally has no right to recover lost profits." *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir.1995). Rather, " this element of damages is recoverable only if the business was previously established." *Id.* (citing *Hill v. Brown*, 166 Ill.App.3d 867, 117 Ill.Dec. 687, 520 N.E.2d 1038, 1043 (Ill.App.Ct.1988)). Moreover, proffered evidence demonstrating lost profits must provide " ' a reasonable basis for the computation of damages' and cannot be ' conjecture or sheer speculation." ' *Real Estate Value Co. v. USAIR, Inc.*, 979 F.Supp. 731, 741 (N.D.Ill.1997) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61, 66 (Ill.1987)).

Defendants argue that because Cajun Joe's was a new franchise with no proven track record of profitability, Illinois law precludes Otis from recovering lost profits. The court points out that Otis's response brief completely fails to address defendants' argument that the " new business rule" precludes Otis from recovering lost profits. Additionally, when this court questioned Otis's counsel during the hearing on defendants' motions in limine, counsel failed to provide any principled reason why the new business rule should not preclude Otis's claimed lost profits.

Based on the facts of this case, the court finds that Cajun Joe's was a start-up venture and therefore subject to the new business rule. Otis himself admitted at his deposition that Cajun Joe's was start-up business venture that might very well fail. (*See* Defs.'s Mot., Ex. B, Otis Dep. at 118.) Additionally, the undisputed facts of this case clearly show that Cajun Joe's was a brand new fast food

franchise. Since Cajun Joe's was a new business without a history of losses or profits, there is no " baseline against which the post-breach situation may be measured to arrive at a reasonably certain calculation of lost profits." *Real Estate Value Co.*, 979 F.Supp. at 741. Accordingly, the court holds that Illinois's new business rule precludes Otis from introducing any evidence of future lost profits.

**\*6** Assuming, arguendo, that the " new business rule" did not preclude evidence of Otis's theory of lost profits, Otis's proffered evidence still fails to provide the reasonable degree of certainty necessary to obtain future lost profits. As the court has already explained, Otis has provided no factual basis for the court to conclude that the DA Agreement's estimated average weekly profits of Cajun Joe's restaurants was reasonable. Nor has Otis shown that establishing the target numbers of 89 or 121 Cajun Joe's franchises in Chicago was a reasonable goal that could be achieved in the time period provided by the DA Agreement. Without some foundation to substantiate the legitimacy of these fundamental elements of the DA Agreement, any lost profits calculations based on these figures are speculative and inherently unreliable.

The court finds Otis's reliance on the projected average weekly sales and estimated number of stores strikingly similar to the marketing plan relied on by the plaintiff in *Target Market Publishing, Inc. v. Advo*, 136 F.3d 1139, 1145 (7th Cir.1998). In that case, the plaintiff cited a market report that estimated profits of more than $31,000 per month as its measure of lost profits damages. *Id.* The Seventh Circuit discredited the report because it was " identifying a target profit, not making a projection of actual profits." *Id.* The court also rejected the market report because the plan sought to demonstrate what " profits might be given certain assumptions that had not yet, and might never, come to pass." *Id.*

Similarly, Otis has failed to show that the projected average weekly profits and the estimated number of Cajun Joe's franchises in the DA Agreement represent anything more than aspirational hopes of a successful fast food franchise. As the court has explained, Otis provides no basis for the reasonableness of these projections. Accordingly, the court concludes that Otis's theory of lost profits is speculative and fails to establish lost profits with a reasonable degree of certainty. Because Otis fails to establish lost profits with a reasonable degree of certainty, the court precludes any evidence of future lost profits.

The court notes, however, that Otis may be entitled to recover his actual (as opposed to future) lost profits. Those actual lost profits could be easily calculated by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

determining the total gross sales actually made by the Cajun Joe's restaurants that Otis actually established during his tenure as a DA. The court does not now hold that Otis is entitled to those damages. Rather, the court merely suggests that applying the profit formula in Otis's DA Agreement to the actual gross sales made by the 20 Cajun Joe's that Otis actually opened would be a logical and reasonable method by which to calculate Otis's actual lost profits.

### *Conclusion*

The court grants Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages. The court bars any expert testimony from Kevin Carlie and precludes Otis from introducing any evidence of future lost profits based exclusively on the DA Agreement. The court instructs the parties to discuss settlement of this case. The court orders the parties to call the court on Friday, September 11, 1998 at 3:00 p.m. to report on the progress of settlement discussions.

N.D.Ill.,1998.
Otis v. Doctor's Associates, Inc.
Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.