IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>                    Plaintiff,<br>vs.<br><br>NOVELL, INC.,<br><br>              Defendant.<br>_____<br><br>NOVELL, INC.,<br><br>              Counterclaimant,<br><br>     vs.<br><br>THE SCO GROUP, INC.,<br><br>              Counterdefendant. | FINDINGS OF FACT, CONCLUSIONS OF<br>LAW, AND ORDER<br><br><br>Case No.  2:04CV139DAK |

The parties tried this matter to the court on April 29 and 30, and May 1 and 2, 2008.
Plaintiff and Counterdefendant The SCO Group Inc. was represented by Stuart Singer, Edward
Norman, Jason Cyrulnik, Mauricio Gonzales, and Brent O. Hatch.  Defendant and
Counterclaimant Novell, Inc. was represented by Michael Jacobs, Eric Acker, and David
Melaugh.  Having heard the testimony of witnesses, reviewed the evidence, considered the
arguments of counsel at trial, and considered prior submissions of the parties as well as

undisputed facts as set forth in the Court's August 10, 2007 Summary Judgment Order (Docket No. 377, "Order"), the Court enters the following Findings of Fact, Conclusions of Law, and Order.

## BACKGROUND

This action began as a slander of title action against Novell.  Novell, however, asserted counterclaims against SCO for slander of title, breach of contract, and unjust enrichment.  The parties then both amended their pleadings to assert additional claims and counterclaims.

On August 10, 2007, the court issued a Memorandum Decision and Order on several summary judgment motions.  The court dismissed SCO's slander of title claim, concluding that SVRX copyrights did not transfer to Santa Cruz, SCO's predecessor, under the 1995 Asset Purchase Agreement between Novell and Santa Cruz.[1]  The court further ruled that (1) Novell retained rights to royalties under the SVRX Licenses, whether or not the SVRX Licenses were in existence at the time of the APA; (2) SCO's 2003 agreements with Microsoft and Sun contained SVRX Licenses because they license SVRX at least in part; (3) SCO was Novell's agent and fiduciary for purposes of collection of SVRX Royalties; (4) SCO breached its fiduciary duties to Novell by failing to account for and remit the appropriate SVRX Royalty payments to Novell for

---

[1] The parties have, both in motion papers and at trial, disputed the precise contours of the terms "SVRX," "System V," "UnixWare," and other, related terms.  Without passing on how those terms may have been used in any particular document, in this Order, the court will use the term "SVRX" to refer to the versions of UNIX listed in the APA (Schedule 1.1(a), Item VI), as to which SCO is under a fiduciary obligation to remit royalties to Novell.  The Court will use the term "SCO UnixWare" to refer to the versions of UNIX developed by SCO subsequent to the APA, as to which SCO is entitled to retain revenue subject to certain limitations not at issue here. The Court uses the term "UNIX" broadly to apply to all versions of that operating system.

2

the SVRX portions of the 2003 Sun and Microsoft Agreements; (5) SCO was liable for conversion of such SVRX Royalty payments; and (6) under the APA, an "incidental" SVRX license is considered an SVRX License.

The court, however, did not determine the value of the SVRX Licenses contained in the 2003 Sun or Microsoft agreements on summary judgment.  Rather, the court determined that there were issues of fact with respect to the SVRX Royalties to be paid to Novell under the Sun and Microsoft Agreements.  The court set for trial the issue of apportionment of value in the Sun and Microsoft Agreements between the SVRX components and the other components of the agreements.

 The court's prior summary judgment order did not address other SCOsource license agreements that SCO entered into with Linux end-users.  Therefore, the court was presented at trial with the issue of whether the other SCOsource license agreements were SVRX Licenses and, if so, what portion of the license fee should be attributed to those SVRX Licenses as SVRX Royalties.

In addition, the court set for trial the question of whether SCO was authorized to execute the SVRX Licenses in the Sun and Microsoft Agreements under a provision of the APA permitting SCO to amend or execute new SVRX Licenses "incidentally" with the licensing of UnixWare.  Novell's motion for partial summary judgment was based on this issue, and the court heard argument on that motion on the second day of trial.

Accordingly, the bench trial addressed the following issues: (1) whether the additional SCOsource licenses were SVRX Licenses triggering SCO's fiduciary duty to account for and

remit the appropriate SVRX Royalties to Novell; (2) the appropriate apportionment of SVRX

Royalties from the SCOsource licenses; (3) the amount by which SCO was unjustly enriched as a

result of SCO's retention of SVRX Royalties; (4) whether SCO had the authority to enter into the

SCOsource licenses, including the Sun and Microsoft Agreements, under the APA; and (5)

whether SCO had the authority under the APA to amend Sun's existing 1994 Buy-out Agreement

with Novell.

      Prior to the bench trial, the parties briefed Novell's partial motion for summary judgment

on its fourth claim for relief and SCO's motion for judgment on the pleadings on Novell's claims

for money or claim for declaratory relief.  Because these motions were not heard until trial, the

court will address these motions in its conclusions of law.

## FINDINGS OF FACT

### A.  The Governing Contracts Between Novell and SCO

      SCO's predecessor, Santa Cruz, and Novell entered into an Asset Purchase Agreement

("APA") dated September 19, 1995.  On December 6, 1995, a few months after the APA was

signed and the date the transaction closed, Novell and Santa Cruz signed Amendment No. 1 to

the APA.  Approximately one year after the APA was signed, on October 16, 1996, Novell and

Santa Cruz executed Amendment No. 2 to the APA.

### B.  SCO's Duties Under the APA

      When Santa Cruz and Novell negotiated the APA, Santa Cruz did not have sufficient

resources to purchase the entirety of Novell's UNIX business.  To bridge the gap, the parties

agreed, under section 1.2(b) of the APA, that Novell would continue to receive one hundred

4

percent of the SVRX Royalties.  Santa Cruz was to collect and pass through these royalties to Novell, and Novell, in turn, would pay Santa Cruz an administrative fee of five percent of the SVRX Royalties.

Section 1.2(b) of the APA states that SVRX Royalties are "defined and described in Section 4.16."  Section 4.16(a) of the APA provides that Santa Cruz was to "administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under Item VI of Schedule 1.1.(a) hereof and referred to as 'SVRX Royalties')."  Item VI of Schedule 1.1(a), in turn, refers to "[a]ll contracts relating to SVRX Licenses listed below." Instead of providing a list of license agreements with other parties, however, Schedule 1.1(a) provides a list of Unix System V software releases up to and including Unix System V Release No. 4.2MP.

Novell retained "all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to [Santa Cruz]."  The APA further specifies that Santa Cruz "only has legal title and not equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code."  As this court has previously determined, the APA created an agency relationship between the parties with respect to SVRX Royalties.

Section 4.16(b) of the APA provides that Santa Cruz "shall not, and shall not have the authority to, amend, modify, or waive any right under or assign any SVRX License without the prior written consent" of Novell.  Under this section, Novell retained the sole discretion to direct Santa Cruz to amend, supplement, modify, waive, or add rights under or to any SVRX Licenses. Novell's rights and SCO's obligations under section 4.16(b), as amended, apply to "any SVRX

License."

Amendment No. 1 to the APA modifies section 4.16(b) to create two exceptions whereby Santa Cruz has "the right to enter into amendments of the SVRX Licenses." Santa Cruz can enter into amendments of SVRX Licenses (1) as may be incidentally involved through its rights to sell and license SCO UnixWare software or the Merged Product or (2) to allow a licensee under a particular SVRX License to use the source code of the relevant SVRX products on additional CPUs or to receive additional distribution from Santa Cruz of such source code. Amendment No. 1 further provides that Santa Cruz can enter into new SVRX Licenses only as may be incidentally involved through its rights to sell and license SCO UnixWare.

Amendment No. 2 to the APA included an additional amendment to Section 4.16(b). Under Section B of Amendment No. 2, Novell and Santa Cruz agreed to a procedure that would govern "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations." The parties agreed to provide written notification to each other upon becoming aware of any potential transaction concerning a buy-out, to both attend any meetings or negotiations with the licensee unless agreed otherwise, to jointly consent to any written proposals to be presented to licensees, and to meet to discuss any potential buy-out transaction. The parties further agreed that a transaction concerning a buy-out should not occur without the prior written consent of both Novell and Santa Cruz.

Under the Amended APA, SCO is entitled to keep "source code right to use fees" under existing SVRX Licenses from the licensing of additional CPUs and from the distribution by SCO of additional source code copies. Under the Amended APA, SCO is also entitled to keep source

code right to use fees attributable to new SVRX Licenses approved by Novell. The court's prior August 10, 2007 Order acknowledged SCO's right to keep 100% of the source code right to use fees identified in Section 1.2(e) of the amended APA.

SCO has the right to enter into amendments of an SVRX License and new SVRX Licenses "as may be incidentally involved through its rights to sell and license UnixWare software." The word incidentally is not defined in either the APA or its Amendments. Several witnesses, however, testified that the word incorporates the practice whereby the owner of Unix or UnixWare technology granted rights to the System V prior products.

## C.  UNIX and UnixWare

UnixWare is the brand name for the more recent releases of the UNIX System V, Release 4 operating system developed and licensed in the early 1990s by Novell and its predecessors to the technology. The product was called UnixWare because it was to be a combination of the latest releases of System V source code and some components of Novell's NetWare source code. The first releases of UnixWare contain all or virtually all of the technology included in the immediately prior System V releases, SVR4.2 and SVR4.2MP.

Novell sold the UnixWare business to Santa Cruz in the 1995 APA between Novell and Santa Cruz. The core members of Novell's UNIX licensing group became employees of Santa Cruz. After the APA, Santa Cruz and then SCO developed and licensed SCO UnixWare. Under the 2001 transfer of assets from Santa Cruz to SCO, the core members of Santa Cruz's UNIX licensing group became SCO employees.

SCO  released several subsequent releases of UnixWare, including multiple versions of

each UnixWare 2 and UnixWare 7, which are the latest implementation of System V and the latest generation of UNIX SVR 4.2 with SVR 4.2MP.  All of the releases of UnixWare subsequent to Novell's transfer of the business are releases of System V.  Witnesses testified that the commercially valuable technology from the prior versions is included in UnixWare, and UnixWare would not operate without its System V components.  The current version of UnixWare supports the newest industry-standard hardware.

For the most part, older versions of UNIX are not marketable to consumers because those earlier versions do not take advantage of hardware enhancements to new processors and peripherals adopted by computer manufacturers.  As a practical matter, purchasers would not have the option to purchase the hardware on which the older versions of UNIX had run because computer manufacturers have adopted the newer hardware.

**D.  Royalties from UnixWare Licenses**

With respect to the payment of royalties to Novell, the APA distinguishes between SVRX Licenses and UnixWare licenses.  The APA's requirements for the payment of SVRX Royalties has been discussed above.  Section 1.2(b) of the APA specifies the circumstances in which any royalties would be paid to Novell for Santa Cruz's distribution of UnixWare products:

(b)(i)  Royalties on UnixWare, Eiger, MXU and derivatives

(a)  No royalties shall be payable in connection with any of the UW Products until Buyer shall have shipped or licensed, in any year, 40% of the units contemplated by the Plan for such year;

(b) Buyer shall pay royalties equal to $30.00 net per unit in connection with each and every net unit of

> UW Products shipped or licensed by Buyer over an
> above 40% and less than 70% of the total units
> contemplated by the Plan for such year;
>
> (c) Buyer shall pay royalties equal to $60.00 per net
> unit in connection with each and every net unit of
> UW Products shipped or licensed by Buyer over and
> above 70% of the total units contemplated by the
> Plan for such year.
>
>                . . . .
> (c) Termination of Royalty Obligation.  The royalty obligations set forth in
> subsection [b] above will terminate (i) after Buyer shall have made an aggregate
> cumulative payments to Seller equal to such amount which has a total net present
> value of $84,000,000 (determined as of the Closing) or (ii) December 31, 2002,
> whichever is sooner.

The parties agree that the requirements for subsection (b)(i) to apply were never met.

Pursuant to these terms, any royalty obligation that Santa Cruz could have had to Novell with

respect to UnixWare products terminated on December 31, 2002.

Novell acknowledges that it is not entitled to royalties from any UnixWare licenses.  For

example, at trial, Novell did not seek any payments with respect to the stand-alone UnixWare

license in Section 3 of the Microsoft Agreement.

Novell did not ask or suggest to Santa Cruz that it should remit any portion of the fees or

royalties that Santa Cruz received under any UnixWare license even where System V prior

products were listed as part of those licenses.   Novell never asked or suggested to Santa Cruz

that it should undertake to allocate to the System V prior products any value of the fees or

royalties that Santa Cruz received under any UnixWare license granting rights to such older

versions of System V.

9

In 1998, Novell conducted an audit of Santa Cruz to ensure that Santa Cruz was remitting to Novell all of the royalties to which Novell was entitled under the APA.  Novell knew at that time that SCO was licensing UnixWare with System V prior products listed, just as Novell had done, because that practice was discussed and agreed upon as part of implementing Santa Cruz's licensing procedures at the time of the asset transfer.  In the 1998 audit, Novell did not ask Santa Cruz to produce any information regarding the fees and royalties that Santa Cruz received under its UnixWare licensing business.  In the 1998 audit, Novell did not ask or suggest to Santa Cruz that it should undertake to allocate to the older versions of System V any value of the fees and royalties that Santa Cruz received under any UnixWare license granting rights to such older versions.

Santa Cruz did not believe that it was under any obligations to remit to Novell any portion of the fees or royalties from any UnixWare licenses because the thresholds for such payments under Schedule 1.2 of the APA had not been satisfied and, after 2002, the term under which the thresholds applied had expired.  SCO did not remit to Novell any of the royalties that SCO received from any of the UnixWare licenses that Santa Cruz had acquired from Novell in 1995 or into which Santa Cruz or SCO entered after 1995, whether or not those licenses included a list of System V prior products.

Novell conducted another audit of SCO in 2003.  Novell never asked or suggested to SCO that it should undertake to allocate to the older versions of System V any value of the fees or royalties that Santa Cruz received under any UnixWare license granting rights to such older versions.

10

**E.  OpenServer**

OpenServer is the brand name for the release of UNIX System V, Release 3 that Santa Cruz developed in the 1980s.  Novell never owned, or had any license to, Openserver. OpenServer was Santa Cruz's flagship product through the 1990s.  OpenServer produces two-thirds of SCO's UNIX revenue and has thousands of customers, including small to mid-sized businesses and large corporations, such as McDonald's.

**F.  Licensing Practices**

UNIX licensees often distributed and used binary products that included code from multiple releases of System V.  Novell and its successors required and allowed such licensees to pay only one set of royalties for the use or distribution of such a product.  To identify the proper license under which such a product could be used or distributed and to calculate the appropriate royalty payments required for using or distributing such a product, Novell and its successors employed the "one line of code" rule.

Under the "one line of code" rule, Novell and then SCO determined whether there was as little as one line of code from the latest release of System V (including UnixWare) contained in a binary product and then calculated royalty payments for the entire product under that latest license.  Novell and then SCO prohibited licensees from parsing out the relative amounts of code from different releases of System V and paying portions of the requisite royalties under multiple System V licenses.

For example, licensees who distributed a UNIX binary product that contained code from SVR3.0, SVR4.0, and SVR4.2 did not pay any SVR 3.0 or SVR4.0 royalties for distributing that

11

product, but instead paid only SVR4.2 royalties under the terms and prices of an SVR4.2 license. Similarly, licensees that used a product that contained SVR3.0, SVR4.0, and UnixWare 2.0 did not pay any SVR3.0 or SVR4.0 royalties for distributing that product, but instead paid only UnixWare royalties.

In licensing UnixWare, SCO also licensed each of the prior products upon which the newest version was built. This practice began with AT&T, was continued by Novell, and then adopted by Santa Cruz and SCO. For example, a licensee who executed a license for SVR4.2, had the same rights to the earlier versions of UNIX on which 4.2 was built, and the list of prior products reflected that right. Santa Cruz and SCO regularly listed the older releases of UNIX, including numerous releases of System V, with the current license. Customers paid no additional fees for the rights to the prior products regardless of whether they had a previous license to the prior products.

In 1995 and 1996, for example, Santa Cruz licensed UnixWare 2.0 and 2.1 to various licensees. A standard UnixWare 2.0 license included a one-time fee of $375,000 for the right to use the UnixWare 2.0 source code. As Novell had done, Santa Cruz included for many UnixWare 2.0 licensees a listing of System V prior products at no additional cost. The $375,000 price for a UnixWare 2.0 license with Unysis, whose license listed SVRX prior products, was the same as a contemporaneous UnixWare license with Alps, whose license did not include SVRX prior products.

The practice of including rights to prior products recognized that licensees developed their own versions of UNIX based on the most recent product and as an assurance to the licensee

that they had rights to any of the technology included in that licensed product.  At this time, SCO was primarily contracting with computer manufacturers, or OEMs.

By the late 1990s, Santa Cruz began to license UnixWare to distributors as a "packaged product," or product in binary format that was ready for distribution to end-users without further development.  The UnixWare licenses with such distributors did not list prior System V prior products because distributors, unlike OEMs, merely replicated and distributed the packaged product in the same form.

### G.  The SCOsource Initiative

In late 2002, SCO formally created a new division known as SCOsource.  In approximately January 2003, SCO launched its SCOsource program.  The terms of the specific licenses SCO executed as part of the SCOsource program are addressed below.  As a general matter, the SCOsource program was an effort to obtain license fees from Linux users based on SCO's claims to UNIX intellectual property allegedly contained in Linux.

The parties disputed at trial whether the SCOsource program was primarily concerned with SVRX or with SCO UnixWare. In litigating its claims against IBM, Novell, and a variety of other parties, the only infringing code SCO has identified is SVRX code.  SCO's expert witness in the IBM litigation identified only UNIX SVR4 code in Linux.  And SCO sued Novell for slander of title because Novell claimed ownership of the SVRX copyrights, not because it claimed ownership to the copyrights in SCO UnixWare.  Many contemporaneous press releases, correspondence, and other material introduced at trial describe SCOsource as focused on SVRX infringement in Linux.  SCO's internal memoranda and presentations also describe SVRX as the

"trunk" from which SCOsource took its value, distinguishing SVRX from "branches" such as SCO UnixWare.

Nonetheless, there was also testimony and evidence at trial demonstrating that SCOsource was not solely focused on SVRX. In January 2003, when SCO formally announced the SCOsource program, SCO was still focused on licensing both SCO UnixWare and Openserver technology. In February 2003, SCO created a "SCO V for Linux Sales Guide." The guide repeatedly refers to SCO's concern that "UnixWare" and "OpenServer" technology had been improperly used in Linux. The guide refers generally to "SCO System V," it did not specifically identify which technology comprised SCO System V. Also, in a December 2002 slide presentation, in describing the proposed "SCO System V for Linux" deliverable, SCO identified "SCO's shared UNIX Libraries from Open Server and UnixWare for use with Linux."

There is competing evidence as to whether in the SCOsource program SCO was attempting to increase revenue based on the SVRX technology or to protect its latest releases of UnixWare and OpenServer from competition with Linux. The court can only conclude that both factors played a role in SCO's determination to pursue the SCOsource licenses.

## H.  Novell and SCOsource Program

In late 2002, SCO and Novell engaged in several telephone conversations concerning SCO's plan to protect its alleged intellectual property in Linux through agreements with Linux users. SCO asked Novell to perform "due diligence on UNIX intellectual property before it launched the SCOsource program." SCO also asked for documents "to understand its IP rights" for purposes of "IP tracking" and for "documents that help give the history of SCO's rights to

UNIX."

Novell said it was not interested in providing the requested information to SCO and that it was not interested in participating with SCO's proposed program.

Darl McBride, SCO's CEO, testified that during his conversations with Greg Jones at Novell he pointed out that SCO's efforts to enforce the intellectual property in Linux would indirectly help the sale of the various UNIX flavors that compete with Linux in the market place and that such a boost would potentially increase the declining SVRX Royalty stream that SCO remitted to Novell from contracts that licensed out the older products.

Novell, however, at that time, viewed the SVRX Royalty stream as a less significant stream of income than its potential revenue interest in becoming directly involved in Linux.

**I.  The 2003 Microsoft Agreement**

On April 30, 2003, SCO and Microsoft entered into a "Release, License and Option Agreement" ("Microsoft Agreement").  Microsoft was not a UNIX licensee at the time of entering the Microsoft Agreement with SCO.  SCO described its license with Microsoft as part of its SCOsource campaign.  SCO received a total of $16,680,000 under the Microsoft Agreement. SCO did not pass through any of this revenue to Novell.

The Microsoft Agreement had several components, each contained in separate sections of the Agreement.  The Microsoft Agreement also contained an apportionment of the amounts Microsoft paid for each section of the Microsoft Agreement.

Section 2 of the Microsoft Agreement is entitled "Release and Licenses."  Microsoft paid $1.5 million for the release and license in that section.  Section 2.1 is a "Release of existing

15

general claims" that releases any claims "known or unknown, suspected or unsuspected, or contingent or fixed" that SCO might have against Microsoft.  The release does not mention any particular technology.  Section 2.2 is an "IP license to current SCO intellectual property in any of Microsoft's products."

Section 3 of the Microsoft Agreement is an "Option to Purchase UnixWare License." Microsoft paid $2 million for the option granted in Section 3.5 and, thereafter, paid $5 million for the license.  Novell recognizes Section 3 as a UnixWare license and does not claim entitlement to any of Microsoft's payments to SCO under Section 3.

Section 4 of the Microsoft Agreement is an "Option to Purchase License to Other SCO Assets."  Microsoft paid $250,000 for the option granted in Section 4.1.  Microsoft could exercise the option only if it had exercised the option of obtaining the UnixWare license set forth in Section 3.  After exercising its option under Section 3, Microsoft paid SCO $8 million for the license in Section 4.

Section 4 of the Microsoft SCOsource License lists at least 34 versions of UNIX.  At least 28 of those versions are identified in the APA as SVRX.  Section 4.1 and 4.2 state that the License is for the Assets in Exhibits A, B, and C to the Agreement.  Exhibit A lists components and features of UnixWare 7, Release 7.1.3.  Exhibit B pertains to components for use with UnixWare.  Exhibit C is a list of several operating systems:  Open UNIX 8 Release 8.x; UnixWare Release 7.0.x and prior versions of UnixWare; OpenServer Release 5.x and all prior versions and releases; and older versions of UNIX.

The license under Section 4 provided Microsoft with broader rights to distribute the

16

UnixWare source code than Section 3 granted.  Section 4 conveys a broad set of rights, including

the right to license, sublicense, and sell the identified UNIX versions.  The only substantive

limitation imposed is that Microsoft can only distribute the source code of these UNIX versions

"in connection with a Microsoft platform product or related offering." The licenses to UnixWare

and OpenServer that SCO granted to Microsoft under Section 4 of the Microsoft Agreement

allowed Microsoft to ensure that the company's software was compatible with the latest releases

of UnixWare and OpenServer that hardware manufacturers were using at the time.

        Under Section 4.4 of the Microsoft Agreement, the parties agreed that SCO may not be

able to deliver to Microsoft the assets "identified as non-deliverable in Exhibit C."  Exhibit C

provides:  "Items in italics are not readily available and may not be recoverable."  The items in

italics include SVR 4.0 and all prior SVR preceding SVR 2.0.

**J.  The 2003 Sun Agreement**

        In 1994, Sun entered into an SVRX License with Novell.  In that agreement, Sun bought

out its continuing royalty obligations regarding certain versions of SVRX.  On February 25,

2003, SCO executed an agreement with Sun that purports "to amend and restate" the 1994 SVRX

License.  SCO described its license with Sun as part of its SCOsource campaign.

        Under the 2003 Sun Agreement, Sun paid SCO $9,143,451.  SCO did not pass through

any of the Sun revenue to Novell.  The 2003 Sun Agreement does not ascribe any particular

prices to any of the specified rights granted in the Agreement.  At trial, SCO did not establish

distinct values for any of the various intellectual property rights conveyed in the 2003 Sun

Agreement.

Section 4 grants a license to all of SCO's intellectual property rights in the technology listed in Attachment 1 of the Agreement. Attachment 1 is a chronological list of UnixWare Releases 1.0, 1.1, 1.1.1, 2.0, 2.1, 2.1.2, 7.01, 7.1, 7.1.1, 7.1.1+LKP, MP2, MP3, and 7.1.3; the same prior UNIX products to which Sun already had a license; and new device drivers for UnixWare and OpenServer.

Attachment 1 comprises three specified categories of technology. The first category, "Description of Technology," lists over two dozen releases of System V to which Sun already had rights under the 1994 Agreement. The second category, "Description of Technology–Additional Technology," contains the list of UnixWare Releases, further prior UNIX products to which Sun already had a license, and five releases of System V to which Sun did not already have a license. The third category, entitled "Description of Technology – Device Drivers," lists the device drivers.

Of the five releases of System V to which Sun did not already have a license, three are not listed in the APA, which contains the list of products considered "SVRX Licenses." Accordingly, under Section 4, in addition to new SCO products, Sun received a license to two older System V versions and two versions of UnixWare that are considered SVRX in the APA.

In addition to UnixWare source code, Sun purchased drivers that would enable it to enhance the functionality of its Intel-based UNIX offering. A driver, also known as a device driver, is a file that contains information needed by a program to operate a device such as a hard disk or internet connection. Without the drivers that work with a particular operating system, a person or company in effect cannot use the operating system for any conventional tasks. Without

18

the drivers for a hard disk or internet connection, for example, the operating system cannot be used for any task that requires a hard disk or an internet connection.  The drivers are thus a prerequisite for an operating system to have any utility for conventional business purposes.  SCO understood during the negotiations that Sun was particularly interested in having access to SCO's UnixWare and OpenServer drivers.

Sun did not obtain any right to the delivery of any drivers for any of the old System V products.  Instead, Sun obtained the right to the delivery by SCO of all of the "drivers for UnixWare products and OpenServer products for which SCO has the right to license such drivers to third parties."

Approximately two months after entering into the Agreement, SCO and Sun executed a Clarification of License Grant to UnixWare and OpenServer Drivers ("Clarification Agreement") that detailed the specific drivers that Sun had received under the Agreement.  The Clarification Agreement and its four attachments identify more than five hundred individual source and object code drivers, exclusively relating to UnixWare and OpenServer.

Sun produces and markets a proprietary operating system known as "Solaris."  Solaris is based on UNIX code versions listed in APA Schedule 1.1(a), Item VI — i.e., SVRX.  Sun distributes Solaris without additional royalty obligations to Novell based on Sun's rights under the 1994 Sun Agreement.

The 1994 Sun Agreement had a 20-year confidentiality restriction prohibiting Sun from publicly disclosing the licensed source code.  These confidentiality restrictions prevented Sun from publicly releasing or "opensourcing" the Solaris source code.

19

Section 8.1 of the 2003 Sun Agreement provides that "use, reproduction, distribution or disclosure of the Technology or Derivative Matter thereof under any licensing model now known or developed hereafter in Sun's sole discretion, pursuant to the license granted by SCO herein, shall mean such Technology or Derivative Matter thereof is not Confidential Information to the extent that such Technology is licensed by Sun to a third party without a confidentiality obligation."  In other words, Section 8.1 permits Sun to unilaterally remove any confidentiality restrictions governing the licensed UNIX code if "such Technology is licensed by Sun to a third party without a confidentiality obligation."

Section 4 of the Agreement permits Sun to "use, reproduce, prepare Derivative Matters of, compile, publicly perform, publicly display, demonstrate, market, disclose, make, sell, offer to sell, import and distribute" SCO's intellectual property in the licensed technology at Sun's sole discretion, including the licensing of Solaris.  This provision further allows Sun to sublicense those rights to third parties "through multiple tiers of sublicensees."  In addition, any license "will be subject to SCO's copyright interest in the Technology," provided that Sun has the license grant in Section 4.1(a) and "Sun agrees that Sun will not transfer ownership in any Technology to which Sun does not have an ownership interest."

After entering into the 2003 Sun Agreement, Sun released an opensource version of its UNIX-based Solaris product, called "OpenSolaris."  As its name suggests, OpenSolaris is based on Sun's Solaris operating system, which is in turn based on Novell's SVRX intellectual property.  Absent the removal of the 1994 Sun Agreement's confidentiality restrictions, Sun would not have been licensed to publicly release the OpenSolaris source code.

20

The evidence presented at trial established that the 2003 Sun Agreement conveyed substantial rights to the SVRX intellectual property retained by Novell because of Sun's ability to open source Solaris.

Section 10 of the 2003 Sun Agreement also sets forth SCO's obligation to indemnify Sun for any claim brought against Sun asserting that the Section 4 licensed technology infringes the rights of any third parties.  Section 10 further provides that if the intellectual property rights in the technology become the subject of a claim of infringement, SCO shall ensure that Sun has the right to continue to use the technology or replace the technology to make it non-infringing.  The provision has not been implicated or applied.

Section 12 of the 2003 Sun Agreement is a release of any claims that either party may have with respect to the licensed technology or any derivative thereof.  Sco also waived claims "with respect to any 'moral' or equivalent rights" regarding the licensed technology in Section 5.3.

**K.  Other SCOsource Licenses**

SCO entered into SCOsource Licenses with twenty-two companies or individuals ("Other SCOsource Licenses"), for a total revenue of $1,156,110.  These additional SCOsource licenses include:

(1) Written SCOsource licenses with Computer Associates Int'l; Everyone's Internet, Ltd.; HEB; Questar Corp.; CDM; Leggett & Platt Inc.; Parkhead Systems; and Siemens AG (Océ Printing Sys.);

(2) Electronic SCOsource licenses with Denise Evans; Gotley Nix Evans Pty Ltd.; John

21

Curtis; Jose Garcia Rodriguez; Kellogg Corporation; Robert Twigg; Sphinx CST Ltd.; and

Stephen McManus; and

(3) SCOsource licenses Symphonix; DTR Business Systems, Inc.; IMCORP Inc.; MPA

Systems Pty Ltd.; Synnex Canada Ltd.; and Seneca Data Distributors Inc. each of whom were

acting as distributors of SCOsource licenses.

SCO obtained $1,156,110 from the Other SCOsource Licenses, but SCO did not pass

through any of the revenue from the Other SCOsource Licenses to Novell. Though the Other

SCOsource License terms differ in certain respects, for the purpose of analyzing the issues before

the court, the terms of the SCOsource license with Everyone's Internet, Ltd. ("EI") are

representative of the terms of the agreements entered with each of the entities.

The EI SCOsource license grants, with certain limitations, the "right and license to use

. . . SCO IP."  "SCO IP" is then defined as follows:

> "SCO IP" means the SCO UNIX®-based Code
> alleged by SCO to be included, embodied, or
> otherwise utilized in the Operating System.
> . . . .
>
> "UNIX-based Code" means any Code or Method
> that:  (i) in its literal or non-literal expression,
> structure, format, use, functionality or adaptation
> (ii) is based on, developed in, derived from or is
> similar to (iii) any Code contained in or Method
> devised or developed in (iv) UNIX System V or
> UnixWare®, or (v) any modification or derivative
> work based on or licensed under UNIX System V or
> UnixWare.

SCO acknowledges that the central feature of the other SCOsource Agreements is the

covenant not to sue and the waiver of claims by SCO for the companies' internal Linux usage. There was testimony at trial that the SCOsource license agreements differed from traditional licenses because they did not involve product.

As noted above, SCO's complaint about "companies' internal Linux usage" was in fact a complaint that those companies were using the UNIX code that SCO claims is in Linux. SCO has not identified any unique SCO UnixWare code in Linux supposedly released or waived by the Other SCOsource Licenses. However, there was testimony at trial that SCO was concerned with infringement of UnixWare and OpenServer.

## L.  Novell's Communications to SCO

Novell sent several letters to SCO in an attempt to gain information regarding the licenses SCO was entering into during 2003. On June 24, 2003, Novell's General Counsel wrote to SCO requesting information regarding two license agreements SCO had identified in securities filings. The letter asserted Novell's rights under Section 4.16(b) of the APA and Amendment No. 2 to the APA and stated that SCO's actions regarding the licenses referenced in the securities filings could not be reconciled with Novell's rights under those APA provisions.

In July 2003, Novell also notified SCO that it intended to conduct an audit in August of 2003. In November of 2003, Novell sought documents from SCO relating to amendments and modifications of SVRX Licenses, specifically copies of the Sun and Microsoft Agreements, as well as any new SVRX Licenses. SCO did not provide Novell with the requested documentation,  and Novell was required to again request the information in December of 2003.

Novell did not receive a response from SCO with respect to its June 24, 2003 letter until

February 5, 2004.  SCO asserted in its letter that the 2003 Sun Agreement did not fall under the

APA or its amendments and that the Microsoft Agreement was a new agreement not covered by

the APA.  SCO, however, did not provide Novell with copies of the agreements.

Novell responded on March 1, 2004, stating that from its review of the "Intellectual

Property License" on SCO's website, the licenses appeared to be SVRX Licenses.  Novell again

requested a response from SCO in April of 2004, but still did not receive a response from SCO.

At that time, this litigation had commenced.  Novell did not receive copies of the Sun or

Microsoft Agreements until they were produced in discovery during this litigation.

## CONCLUSIONS OF LAW

### A.  Burden of Proof

The parties disagree as to the appropriate burden of proof in this trial of the remaining

claims in the case.  The remaining claims heard at trial consist of Novell's counterclaims for

declaratory judgment, unjust enrichment, breach of fiduciary duty, and conversion.  SCO asserts

that Novell has the burden of proof because Novell is the party asserting the counterclaims.

Novell, however, contends that SCO has the burden to establish the amounts it owes Novell

because this court has already determined that SCO has breached its fiduciary duties to Novell.

Under California law, the general rule is that a counterclaim plaintiff bears the burden of

proving the elements of its counterclaims.  Section 500 of the California Evidence Code states:

"Except as otherwise provided by law, a party has the burden of proof as to each fact the

existence or nonexistence of which is essential to the claim for relief or defense that he is

asserting."  Cal. Evid. Code § 500.

24

In general, a plaintiff has the burden of proving the amount of unjust enrichment, *Foerstel v. Jeffrey*, No. B154638, 2003 WL 170418, at *2 n.2 (Cal. App. Jan. 27, 2003), the fact and amount of damages on a breach of fiduciary duty or conversion, *In re Marriage of Kapczynski*, No. H025433, 2004 WL 1119735, at *7 (Cal. App. May 20, 2004) (breach of fiduciary duty), *In re* Cruz, 198 B.R. 330 (Bkrtcy. S.D. Cal. 1996) (conversion), and the propriety of a requested declaratory judgment, *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 2007 WL 2069646, at *2 (Fed. Cir. July 20, 2007). "On rare occasions, the courts have altered the normal allocation of the burden of proof . . . . But the exceptions are few and narrow." *Sargent Fletcher Inc. v. Able Corp.*, 110 Cal App. 4th 1658, 1670 (2003).

Under California law, "where a fiduciary has a legal duty to allocate receipts between those in which its beneficiary has some interest and those in which the beneficiary has none, and is fully and singularly capable of making that allocation but fails to do so, a court is justified in calling upon the fiduciary to bear the burden of differentiation at trial." *Rosenfeld, Meyer & Susman v. Cohen*, 191 Cal. App. 3d 1035, 1051-52 (1987); *Kennard v. Glick*, 183 Cal. App. 2d 246, 250-51 (1960) ("An agent who fails to keep an account raises thereby a suspicion of infidelity or neglect, creates a presumption against himself, and brings upon himself the burden of accounting to the utmost for all that has come into his hands; and in such case every doubt will be resolved against the agent, and in favor of the principal . . . .").

This rule is well established when it comes to accounting for copyright royalties and in other contexts as well:

> [T]he defendants must be content to accept much of

> the embarrassment resulting from mingling the
> plaintiff's property with their own. . . . [W]e must
> make an award which by no possibility shall be too
> small.  It is not our best guess that must prevail, but
> a figure which will favor the plaintiffs in every
> reasonable chance of error.

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939); *see also Kim v. Fujikawa*, 871 F.2d 1427, 1430-31 (9th Cir. 1989) ("In determining the amount that a breaching fiduciary must restore to the Funds as a result of a prohibited transaction, the court should resolve doubts in favor of the plaintiffs" (internal quotation and citation omitted)); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty.   Any doubt or ambiguity should be resolved against them. . . .  This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer."); *Leigh v. Engle*, 727 F.2d 113, 138-39 (7th Cir. 1984) ("[T]he burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the Reliable Trust assets . . . . [W]hile the district court may be able to make only a rough approximation, it should resolve doubts in favor of the plaintiffs.").

In this case, the APA required SCO to account for SVRX Royalties, even in the circumstances where SCO was entitled to keep 100% of those Royalties. The APA also required SCO to obtain Novell's prior written approval before amending, modifying, or waiving any right under any SVRX License.   These provisions were intended, among other things, to further

SCO's duties as Novell's agent to account for and remit SVRX Royalties.

SCO takes issue with Novell's reliance on breach of fiduciary cases because these cases are based on the premise that a trustee has gained some advantage over its beneficiary in a transaction between them.  Whereas, in this case, the transactions at issue are not ones between SCO and Novell.  SCO's argument, however, fails to acknowledge that its fiduciary responsibilities under the APA were based on accurately accounting for such third-party transactions and SCO was in an advantageous position with respect to accounting for its third-party transactions.

SCO is correct, however, that the APA contemplated that SCO would enter into agreements that commingle an SVRX License when it is incidental to a UnixWare license.  In such situations, however, the APA appears to still require SCO to account for those licenses and demonstrate that the SVRX portion is only incidental.  In those instances, SCO has advantageous information as to whether the SVRX license is incidental.  Because Novell was not in a position to make such determinations, SCO had a duty to properly fulfill its fiduciary accounting obligations under the APA.

The court has already found that SCO breached its fiduciary duty in not properly reporting SVRX revenues under the APA.  Because of such breach, the court concludes that SCO has the burden of differentiating royalties properly retained by SCO from SVRX Royalties that SCO improperly retained.  SCO has the burden of demonstrating the proper allocation of SVRX Royalties.

The court recognizes, however, that additional issues are asserted in this trial that were

27

not raised or a part of the prior summary judgment motions or the court's summary judgment order. The court concludes that the issue of whether SCOsource licenses were SVRX Licenses under the APA is an issue on which Novell retains the burden of proof. It is not an issue that involves a breach of a fiduciary duty and SCO is not in an advantageous position with respect to facts weighing on that determination. If those licenses are determined to be SVRX Licenses under the APA, then SCO has the burden of establishing the proper allocation of SVRX Royalties under such licenses because it is a part of its fiduciary duty. Similarly, Novell retains the burden of proof on the issue of whether SCO had the authority under the APA, as amended, to enter into additional or amended SVRX licenses. Again, this declaratory judgment issue is not one in which SCO would have obtained any kind of advantageous position.

### B.  SCOsource Licensing Agreements

Separate from its licensing of products, SCO began entering into SCOsource licensing agreements that were unique in that they did not involve product. Instead, these license agreements were waivers and releases of conduct based on the buyer's use of Linux. Provisions of the 2003 Sun and Microsoft Agreements are such SCOsource licenses. SCO also entered into twenty-two other SCOsource licenses. In determining whether the SCOsource Agreements constitute SVRX Licenses, the court must look to the terms of the agreements and the provisions of the APA.

The central features of the SCOsource agreements are a covenant not to sue and a waiver of claims by SCO for the buyer's internal Linux usage. The agreements grant rights and a license to use SCO IP. "SCO IP" is defined as SCO UNIX-based code, and "UNIX-based Code" is

28

defined to mean "UNIX System V or UnixWare, or (v) any modification or derivative work based on or licensed under UNIX System V or UnixWare."  The purpose of these licenses was to excuse the licensee's purported infringement of SCO's IP.

SCO IP is defined in the agreements to include UNIX System V, which would appear to include SVRX.  But given the terms of the amended APA between Novell and SCO, as this court has previously ruled, the SVRX copyrights did not transfer to SCO.  Therefore, SCO IP cannot include SVRX and can only mean SCO UnixWare.

Although Novell asserts that these provisions should be viewed as a license because a license insulates a party from liability, the release terms of the SCOsource agreements, including Section 2 of the Microsoft Agreement and Section 12 of the 2003 Sun Agreement, are not licenses to product.  Unlike the licenses to products included under the APA, these releases are not royalty-bearing SVRX Licenses.  SVRX Licenses involved in the APA gave licensees rights to use and modify SVRX code to create royalty-bearing UNIX derivatives.  SCOsource licenses did not grant a right to use or modify any UNIX source code to create such derivatives.  SCOsource agreements did not give any licensee the right to use any UNIX IP apart from binary code in Linux.  The agreements are only releases of claims that SCO was entitled to bring.

Under the APA, SCO received all of Novell's "claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business."  The "Business" is defined as "the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly

related to Unix and UnixWare."  Based on this court's ruling that SVRX copyrights were not

included in the assets comprising the Business that was transferred from Novell to Santa Cruz,

SCO could not enter into any release for copyright infringement of SVRX technologies.

But SCO did receive some ownership rights and it was authorized to release whatever

claims its was to entitled bring concerning those ownership rights.  There was evidence presented

at trial that SCO was concerned with whether technology from its releases of UnixWare and

OpenServer was improperly in Linux.  UnixWare and OpenServer are both UNIX System V

operating systems.

SCO's July 2003 press release regarding SCOsource agreements states SCOsource

Agreements are UnixWare licenses and the hold harmless clauses are incidental to a UnixWare

license.  In the SCOsource program, the pricing of a SCOsource license was set as the same as

SCO's pricing for a UnixWare binary license.  This pricing is consistent with SCO's use of the

"one line of code" rule and practice of not charging additional amounts for the prior products

listed in a license for the latest release.  It also demonstrates that SCO believed that the

SCOsource license had a value equivalent to a binary license to its most recent release of

UnixWare.  Therefore, there was evidence that the SCOsource program was not solely focused

on older System V technology.

The court agrees with what SCO's counsel stated in his opening arguments:  If SCO had

less to release, it just means that the buyer got less for its money.  The claims SCO released in its

SCOsource licenses were only those claims SCO was entitled to bring.  The Agreements do not

encompass claims Novell would be entitled to bring based on its ownership of the SVRX

copyrights.  The court, however, does not agree that there was evidence at trial that established

either way whether the buyer of a SCOsource license was completely protected because all of the

old technology was part of UnixWare.  There was no definitive evidence on this point and the

issue of whether a buyer would be fully protected by a SCOsource license is not before the court.

Because the SCOsource licenses cannot be construed to include a release of SVRX

copyright infringement, the court does not find the licenses to be SVRX Licenses that generated

SVRX Royalties to Novell under the APA.  SCO could not release Novell's rights to claims

based on its ownership of  the SVRX copyrights.  Even if the releases contained in the

SCOsource Agreements were considered SVRX Licenses, there is no value in the agreements

with respect to Novell's SVRX interests.  As such, Novell has no entitlement to monies SCO

received with respect to a release of only SCO's rights.  The value of those SCOsource releases is

a matter between SCO and the parties who entered into such releases.  In addition, because the

court concludes that the releases in the SCOsource Licenses were not SVRX Licenses, SCO had

authority to execute the agreements.

### C.  2003 Microsoft Agreement

As discussed above in connection with the Other SCOsource Licenses, the court

determines that the release of claims and license in Section 2 of the Microsoft Agreement was

not an SVRX License that generated SVRX Royalties.  The release in Section 2 does not specify

any technology and the license in Section 2 refers only to SCO Intellectual Property.  Therefore,

as discussed above, the court concludes that this provision did not waive claims or grant a license

to SVRX because SCO could not release or waive Novell's claims or rights in the SVRX

31

copyrights.

The Microsoft Agreement, however, contained other provisions involving SVRX technology.  Therefore, the agreement is an SVRX License because it involves SVRX at least in part.  Section 4 of Microsoft Agreement is an option to license UnixWare, OpenServer, and other SVRX for $8.25 million.  This amount is half the price of the whole agreement.

The Microsoft Agreement was a new SVRX License which § 4.16 of the amended APA prohibits SCO from entering into unless it is "incidentally involved through its rights to sell and license Unixware."  The question, therefore, is whether the SVRX rights under Section 4 of the Microsoft Agreement are granted incidental to UnixWare.

Neither the APA nor its Amendments define the word incidentally.  The term, however, is generally defined to mean a minor accompaniment or something of a subordinate nature.  The parties agree as to the general definition of incidental.

Novell contends that in applying the term incidental to the agreement at hand, the court should not look to the parties' historical practice with respect to licensing because extrinsic evidence is unnecessary.  The court, however, must consider all relevant facts to determine whether the license to SVRX technology was incidental to UnixWare.  In addition, to the extent that the extrinsic evidence supports the general definition of the term incidental, the evidence is admissible under California contract interpretation law.

In licensing products, SCO adopted Novell's practice of including all prior products in the license.  After the APA, SCO entered into new UnixWare licenses but had very limited rights with respect to SVRX licenses.  The testimony at trial established that SCO included SVRX

32

products as prior products in SCO UnixWare licenses.  When such prior products were listed in

the UnixWare license, it did not change the price paid for the most recent version of UnixWare.

SCO presented evidence of specific licenses entered at relatively the same time between two

different companies.  One company received all of the prior products listed in the license and the

other company had no prior products listed.  The parties, however,  paid the same amount for

their licenses.

Novell had also licensed UNIX and UnixWare using this procedure.  UNIX licensees

often distributed and used products based on code from multiple releases of System V, including

UnixWare.  Novell and its successors required such licensees to pay only one set of royalties for

the use or distribution of such a product.  Under the "one line of code" rule, Novell and its

successors required licensees to identify code from the latest release of System V contained in a

product-- even if there was as little as one line of code contained in that license– and calculate

royalty payments for that entire product under only that latest license.

SCO's witnesses further testified that there was not a market for a license to prior SVRX

products because those prior products no longer utilized the most current hardware.  SCO

witnesses testified that they did not market or sell any prior SVRX product in a stand alone

license.

 The court finds that the term incidental as used in the APA is referring to the practice of

Novell and SCO to list prior products in licenses for the newest release and charge only for the

license to the newest release.  Under the APA, SCO had the authority to enter into SVRX

licenses that were incidental to UnixWare, and the court finds that the SVRX licensing in Section

33

4 of the Microsoft Agreement was incidental to a UnixWare license.

Accordingly, the court concludes that Novell is not entitled to any of the revenue SCO received under the 2003 Microsoft Agreement.

### D.  2003 Sun Agreement

The 2003 Sun Agreement increases Sun's rights to at least 30 versions of SVRX products provided in Item VI of Schedule 1.1(a) of the APA and gives Sun broad rights to several versions of SVRX.  The 2003 Sun Agreement is an SVRX License.

Section 12 of the Sun Agreement is a release and waiver provision similar to the Other SCOsource Licenses.  As with those licenses, the court finds that the provision does not release Novell's claims based on its ownership of the SVRX copyrights, and thus does not implicate SVRX technology and cannot be the basis for SVRX Royalties.

Section 4 of the Sun Agreement is a license to UnixWare and prior SVRX products. Although this section provides a license to prior SVRX products to which Sun did not previously have a right to under its 1994 Agreement with Novell, the court concludes that this section's inclusion of SVRX as prior products is only incidental to a license to the most recent version of SCO's UnixWare.  Accordingly, Novell is not entitled to revenue attributable to this section of the Sun Agreement.

Section 8.1 of the Sun Agreement, however, lifts the confidentiality provisions with respect to 30 versions of SVRX technology granted to Sun under its 1994 Buy-out Agreement with Novell.

Under Section 4.16 of the amended APA, SCO can only amend an SVRX license if it is

34

done incidentally to its licensing of UnixWare.  Also, Section B of Amendment No. 2 to the APA provides that before entering into any potential transaction with an SVRX licensee which "concerns" a buy-out of any such licensee's royalty obligations, SCO must obtain Novell's consent.  This provision requires either party who even "become[s] aware of any such potential transaction" to immediately notify the other in writing.  The provision further requires that any negotiations with the licensee be attended by both parties, and that both parties consent to any such transaction.  There are no exceptions to this provision.

The 2003 Sun Agreement specifically states that it "amends and restates" Sun's 1994 SVRX buy-out agreement with Novell.  SCO has no authority to enter such an agreement unless it is incidentally involved in the licensing of UnixWare.

The court concludes that the release of confidentiality requirements in Section 8.1 of the 2003 Sun Agreement is not merely incidental to a UnixWare license.  The provision had significant independent value to Sun as it allowed Sun to opensource its Solaris UNIX-based product.  While several of the provisions in the Agreement focus on UnixWare and specific device drivers, the amendment with respect to confidentiality relates to the same technology licensed in the 1994 Buy-out Agreement and had significant independent value to Sun apart from a license to the newest versions of UnixWare.

SCO argues that Section B of Amendment No. 2 to the APA relates only to future buy-out transactions, but the language of the provision broadly states that it relates to any potential transaction that "concerns a buy-out of any such licensee's royalty obligations."  This provision refers to any transaction that "concerns" a buyout, not just buy-outs.  SCO's interpretation would

allow SCO to unilaterally amend any buy-out agreement negotiated by all the parties if it wanted

to re-negotiate more favorable terms to itself.  Even if there is testimony about the parties

focusing on future buy-outs, it does not change the fact that Amendment No. 2 was drafted more

broadly.  In the 2003 Sun Agreement, SCO renegotiated a contract and expanded Sun's rights to

technology still owned by Novell.  And, SCO improperly received the money for granting such

rights even though those rights remained with Novell.

There is no dispute that Sun's 1994 Agreement with Novell was a "buy-out" of Sun's

SVRX royalty obligations as that term is used in Amendment No. 2.  Sun's 2003 Agreement

explicitly acknowledges that it is intended to "amend and restate" the 1994 buy-out agreement,

including expansion of Sun's existing license rights to permit opensource licensing of SVRX

code.  The Court concludes that Sun's 2003 Agreement License, therefore, "concerns" a buy-out,

and SCO was required to follow the additional restrictions imposed by Amendment No. 2 on

transactions that concern buy-outs.  SCO did not comply with these terms.  The Court thus

concludes and declares that SCO was without authority to enter into the 2003 Sun Agreement

under Amendment 2, Section B, of the APA.

SCO cites to agency law to argue that if an agreement was executed without authority and

Novell has not approved it, then the contract must be set aside and Novell is not entitled to any

revenues.  Agency law precludes a principal from accepting benefits of an agent's actions while

simultaneously disclaiming the agent's authority to act.   In addition, SCO argues that in the case

of an invalid contract, a counterparty who made payments is entitled to the restitution of those

payments.

This case law, however, does not apply to the 2003 Sun Agreement.  The cases cited by SCO involve situations where the agent already properly remitted the fruits to its principal and the dispute was whether the principal was required to return the fruits to the third party.  None of the cases hold that, where an agent improperly takes money from third parties in the principal's name, the agent is entitled to keep that money if the principal disclaims the agent's authority.

In this case, Sun obtained the rights to opensource Solaris, and SCO received the revenue for granting such rights even though such rights remained with Novell.  If the court were to declare that the contract was void and should be set aside, the court could not return the parties to the same position they were in prior to the 2003 Agreement.  Sun has already received the benefits of the agreement and developed and marketed a product based on those benefits.  There was also evidence at trial that OpenSolaris directly competed with Novell's interest.  The court, therefore, cannot merely void the contract.  Had SCO sought Novell's involvement in the amendment of the 1994 Agreement, Novell and SCO would have negotiated a suitable division of the royalties.

### 1) Breach of Fiduciary Duty

Because California law governs actions arising from the APA, and Novell's claims arise from the agency relationship created by the APA, California law governs.  *Nedlloyd Lines B.V. v. Super. Ct.,* 3 Cal. 4th 459, 468, 470 (1992).  To establish a breach of fiduciary duty under California law, Novell must show "the existence of a fiduciary relationship, its breach, and damages proximately caused by that breach."  *Roberts v. Lomanto,* 112 Cal. App. 4th 1553, 1562 (2003) (internal quotation and citation omitted).  As Novell's agent for purposes of the SVRX

37

Royalties, SCO owed Novell a fiduciary duty.

The Court concludes that SCO breached its fiduciary duties to Novell by failing to notify Novell and account for and remit the revenue it received from Sun as a result of modifying the confidentiality provisions of Sun's SVRX buy-out agreement with Novell.

### 2) Conversion

A conversion claim is based on "the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property." *Kasdan, Simons, McIntyre, Epstein & Martin v. World Sav. & Loan Ass'n,* 317 F.3d 1064, 1069 (9th Cir. 2003). To establish conversion, therefore, Novell must establish: (1) its "ownership or right to possession of the property"; (2) SCO's "conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *Id.*

Novell held equitable title to the SVRX Royalties under the APA.  SCO's failure to pass through to Novell the SVRX Royalties due under the Sun Agreement was a wrongful act inconsistent with Novell's rights.  The Court concludes that Novell has established SCO's conversion of the revenues due under the 2003 Sun Agreement.

### 3) Unjust Enrichment

SCO was unjustly enriched by retention of the revenue under the Sun Agreement and Novell is entitled to restitution.  Unjust enrichment is measured as the benefit the defendant wrongfully received at the expense of the plaintiff.  *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1662 (1992); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1528-29 (1997).

Here, SCO was unjustly enriched by retaining the revenues Sun agreed to pay to relax and

amend the confidentiality provisions of the 1994 Agreement.

### 4) SCO's Affirmative Equitable Defenses

The Court has considered SCO's equitable defenses and finds them without merit.

SCO raised estoppel as an affirmative defense. Estoppel arises out of the rule that "[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." Cal. Evid. Code § 623.

To make out estoppel, "four elements must be present . . . (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Lentz v. McMahon*, 49 Cal. 3d 393, 399 (1989). To prevail on its estoppel claim, therefore, SCO would have to have shown that Novell knew whether and to what extent SCO collected but did not remit SVRX Royalties, that Novell failed to seek such Royalties and intended for that failure to be taken by SCO as indication it could keep the money, and that SCO relied on Novell to SCO's injury.

The Court concludes that SCO cannot make out any element of its estoppel defense. SCO had an obligation to keep Novell apprised of the facts concerning SVRX Licenses and failed to do so. Novell repeatedly demanded audits and accounting of the 2003 Sun and Microsoft Agreements.

SCO introduced evidence it claims shows that Novell was silent when SCO withheld

SVRX Royalties in connection with a 1996 audit.  At best, this evidence showed that Novell said nothing when SCO licensed SVRX incidentally.  That is not sufficient to estop Novell from contesting an SVRX License that conveys greater-than-incidental rights.  Even were the evidence otherwise, courts typically require a duty to speak before imparting preclusive effect to silence. *See, e.g., Feduniak v. Cal. Coastal Comm'n*, 148 Cal. App. 4th 1346, 1362 (2007) ("It is settled that when the party to be estopped does not say or do anything, its silence and inaction may support estoppel only if it had a duty to speak or act under the particular circumstances.").  In fiduciary relationships, where the presumption is that the principal need *not* investigate the activities of its agent and can instead rely on the agent to fulfill its duties faithfully, there is no such duty.  *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App. 3d 174, 201-02 (1985) ("Where there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist.").  The Court concludes that Novell is not estopped to pursue its claims to SVRX Royalties.

SCO also raised "unclean hands" as an affirmative defense.  The doctrine of unclean hands, as partially codified in California Civil Code Section 3517, provides that "[n]o one can take advantage of his own wrong."  *See, e.g., Rosenfeld v. Zimmer*, 116 Cal. App. 2d 719, 722 (1953) ("A court of equity will not assist a party to a fraudulent scheme to secure the objective of such plan."); *Reynolds v. Roll*, 122 Cal. App. 2d 826, 836 (1954) ("courts will not lend assistance to persons whose claim for relief rests on an illegal transaction" (internal quotation marks and citation omitted)).

Even where such conduct is shown, it must be part of the same transaction at issue, and

40

the nature of the plaintiff's conduct must be *worse* than that of the defendant.  *See, e.g., Watson v. Poore*, 18 Cal. 2d 302, 313 (1941) ("[I]mproper conduct not necessarily connected with the transaction particularly involved . . . is not a reason for denying equitable relief on the ground of unclean hands."); *Belling v. Croter*, 57 Cal. App. 2d 296, 304 (1943) (unclean hands does not apply "if it be shown that [the plaintiff] is the one 'least at fault,' and that the party against whom relief is sought was guilty of wrongdoing in respect to the same matters and is 'most in fault'").

SCO has not shown any conduct by Novell that was in bad faith or wrongful.  The Court thus concludes that these affirmative equitable defenses do not preclude Novell from receiving equitable relief.

### 5) Allocation of Revenues to Novell

The court, therefore, concludes that Novell is entitled to the revenues paid by Sun under the 2003 Sun Agreement attributable to the release of the SVRX confidentiality provision in the 1994 Agreement.  While the parties debated the value of this provision at trial, neither established a specific value for this particular provision.  Nonetheless, the court believes it is appropriate and equitable to grant monetary relief in favor of Novell.

SCO contended that, for a variety of reasons, Novell is not entitled to both monetary and declaratory relief.  The Court was not persuaded by any of these arguments with respect to the 2003 Sun Agreement.

Under the 2003 Sun Agreement, SCO received from Sun a total amount of $9,143,451. The court concludes that the release provision in Section 12 of the Sun Agreement is worth an equivalent amount to the similar release provision in the Microsoft Agreement, or $1.5 million.

The remaining portions of the Agreement is divided between the UnixWare license, the associated UnixWare and OpenServer drivers, and the release of the confidentiality provisions contained in the 1994 Agreement.  Because SCO bears the burden of allocation on this issue and the law recognizes that the court is to resolve every doubt against the agent and in favor of the principal, the court divides the remaining portions of the Agreement equally.  Therefore, Novell is entitled to one-third of $7,643,451, or $2,547,817 as revenues paid by Sun under the 2003 Sun Agreement attributable to the release of the SVRX confidentiality provision in the 1994 Agreement.

### 6) Prejudgment Interest

Novell is directed to file a brief within 15 days of this Order describing what, if any, prejudgment interest Novell seeks based on the amount awarded in this Order.  At its option, SCO may then file within 10 days a brief opposing Novell's request for prejudgment interest.  Novell may file a reply within 7 days in further support of its claim for prejudgment interest.  This briefing shall not affect the deadlines to file requests for costs or attorneys' fees, which, pursuant to District of Utah Local Rule 54-2, shall run from the entry of final judgment.

### ORDER

After considering all of the evidence and the law as it applies to this case, the court awards Defendant and Counterclaimant Novell $2,547,817 on its Sixth, Seventh, and Eighth Claims for Unjust Enrichment, Breach of Fiduciary Duty, and Conversion.  On Novell's Fourth Claim for Relief, for the reasons stated above, the court concludes that SCO was entitled to enter into the 2003 Microsoft Agreement and the Other SCOsource Licenses, but was not authorized to

42

enter into the 2003 Sun Agreement based on its amendment of the provisions concerning Sun's

SVRX confidentiality requirements under the 1994 Agreement.

Novell is directed to file within ten days from the date of this order a Final Judgment

consistent with these Findings of Fact, Conclusions of Law, and Order, the court's August 10,

2007 Memorandum Decision and Order, and the parties' stipulations with respect to the

disposition of certain causes of action.  *See* Fed. R. Civ. P. Rule 58  ("Every judgment and

amended judgment must be set forth on a separate document"); *United States v. Clearfield State*

*Bank*, 497 F.2d 356, 359 (10th Cir. 1974) (interpreting Rule 58 to "require that there be a

judgment set out on a separate document – distinct from any opinion or memorandum – which

provides the basis for the entry of judgment") .

DATED this 16th day of July, 2008.

BY THE COURT:


DALE A. KIMBALL
United States District Judge

43