IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>Plaintiff and Counterclaim Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>Defendant and Counterclaim Plaintiff. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE BASED ON FAILURE TO ESTABLISH SPECIAL DAMAGES<br><br>Case No. 2:04-CV-139 TS |

This matter is before the Court on Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages. In this Motion, Defendant seeks summary judgment on Plaintiff's claim for slander of title. Defendant argues that Plaintiff has failed to establish special damages, a necessary element of a slander of title action. For the reasons discussed below, the Court will grant the Motion in part and deny it in part.

1

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."[1] In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[2] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[3]

## II. FACTUAL BACKGROUND

Simply stated, Plaintiff's slander of title claim is as follows. Plaintiff claims that it is the rightful owner of the UNIX and UnixWare copyrights under the terms of the Asset Purchase Agreement and various Amendments thereto. Defendant, in response, has disputed Plaintiff's claims of ownership and has publicly claimed that it, not Plaintiff, is the true owner of the copyrights in question. Defendant's claim of ownership and statements refuting Plaintiff's claim of ownership are the slanderous statements alleged by Plaintiff.

Plaintiff argues that they have lost sales because of Defendant's alleged slanderous statements. Plaintiff's claims of lost sales revolve around its SCOSource Initiative. Under the SCOSource Initiative, Plaintiff sought to offer licenses to those it believed were infringing on its

---

[1] Fed.R.Civ.P. 56(c).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[3] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

intellectual property rights.[4] Plaintiff claims that Defendant's alleged slanderous statements concerning the ownership of the copyrights caused the SCOSource Initiative to fail. Specifically, Plaintiff asserts that it was unable to enter into licensing agreements with various companies because those companies refused to enter into licensing agreements as a result of the ownership dispute.[5] Plaintiff further argues that it was forced to accept lower prices from those who did enter into agreements.

The majority of the evidence supporting Plaintiff's argument on this point comes from the statements of those that were involved in the development and implementation of the SCOSource Initiative.

SCO Vice President of Marketing Jeff Hunsaker testified that Novell's claims of ownership of the copyrights impacted the SCOsource business. Mr. Hunsaker testified that, because of Novell's claims, "the SCOsource licensing opportunities were killed, were negated before they even really got off the ground."[6] Mr. Hunsaker further testified:

> We put together the SCOsource licensing agreement, and that gave us the opportunity to go after new customers, anyone that uses Linux, and that's a huge marketplace, to sell them that license. We had buyers, we had pipelines. And then Novell, based on their timing and everything else, came out and said, "Sorry, we own it." Then, "We don't own it," and then, "We do own it." And so

---

[4] *See* James Decl. Ex. 47 (letter from SCO to Linux users).

[5] Docket No. 96 at ¶ 10 ("Novell's false and misleading representations that it owns the copyrights have directly caused and continue to cause significant irreparable harm to SCO's valuable UNIX and UnixWare copyrights, its business, and its reputation, and has caused third parties to refuse to enter into license agreements with SCO relating to SCO's UNIX and UnixWare business."); *id*. at ¶ 39(b) ("Potential customers have informed SCO that they will not enter into agreements to license SCO's UNIX technologies because of the cloud surrounding SCO's ownership of UNIX created by Novell's false public representations that it, and not SCO, owns UNIX.").

[6] Brakebill Decl. Ex. 31 at 151:19-21.

everyone that we dealt with said, "Sorry, guys. We're not interested in talking until you get your act together and figure this out with Novell."[7]

Mr. Hunsaker specifically mentioned that, because of Novell's statements, Google, the Pentagon, and HP stated "'Until you can resolve this, we are not interested in moving forward with any SCOsource licensing.'"[8] Mr. Hunsaker also testified about the frustrations that Larry Gasparro, an SCOSource salesperson, was having: "he was frustrated with the claims that Novell was making and how it impacted our business and opportunities, which were formidable for SCOsource licenses, with some very large customers that were shot dead."[9]

Chris Sontag, head of the SCOSource division, testified:

> [I]t started to become apparent in late 2003, early 2004, that we were getting highly impacted by Novell's statements that people could easily use as an excuse, the question on copyright ownership, as a reason why they would not need to take what I consider an insurance policy on IP protection.
> So that cloud that was created substantially impacted our licensing opportunity and I believe ultimately, by this time frame, was substantially impacting even the placeholder numbers or forecasted, you know, limited forecasting numbers that were put in to future budgets.[10]

Mr. Sontag was asked if he believed "that SCOsource initiatives would have led to more revenues if not for Novell's statements about copyrights?"[11] To which he responded: "Absolutely." Sontag further testified:

---

[7] *Id.* at 162:17-163:2.

[8] *Id.* at 206:4-14; *see also id.* at 229:8-13 (stating that Google, the Pentagon, and Hewlett Packard were companies that cited Novell as a reason for declining a license); *see id.* at 230:3-231:3.

[9] James Decl. Ex. 62 at 232:4-8.

[10] *Id.* Ex. 60 at 115:9-21.

[11] *Id.* at 116:9-12.

4

In discussion with potential licensees that I either had directly or for which I received copies of correspondence or write-ups of the discussion that occurred with other people such as the SCOsource sales people, I was aware of a number of situations and times where the person was right in front of me saying, "Well, there's questions about who even owns the copyrights so therefore I don't feel like I need to take a license for your SCO UNIX intellectual property or the right to use a license until that's resolved." And I would do my best to try and explain that I thought it was a baseless set of statements on the part of Novell. But in may cases, people I talked to would say, "Well, until its resolved, I'm still not going to act upon this."[12]

When asked to identify specific companies that identified the copyright dispute as a reason for not entering into a license agreement, Mr. Sontag was able to identify Morgan Stanley or another Wall Street firm and Google.[13]

In his declaration, Mr. Sontag describes his negotiations with Hewlett Packard for a SCOSource license.[14] Mr. Sontag stated that those negotiations were fruitful and that SCO and HP were near a deal, but that negotiations began to fall apart in the fall of 2003.[15] Mr. Sontag states that "HP began mentioning Novell's claims, and the problems those claims created for the deal."[16] Sontag further states that "[t]his retrenchment by HP coincided precisely with the time period in which I began to hear from other companies Novell was directly relaying to them its claim that SCO did not own the UNIX copyrights."[17]

---

[12]*Id*. at 117:9-23.

[13]*Id*. at 119:18-120:7.

[14]*Id*. Ex. 80 at ¶¶ 8-15.

[15]*Id*.

[16]*Id*. at ¶ 14.

[17]*Id*.

SCO CEO Darl McBride also testified in his deposition concerning the impact of Defendant's statements on the SCOSource Initiative.[18] As discussed in more detail below in relation to his declaration, Mr. McBride testified that HP cited the copyright issue as an issue which prevented HP from entering into a license.[19] Mr. McBride also testified that there were other instances in which the dispute over the ownership of the copyrights affected SCO's ability to enter into SCOSource Licenses. Mr. McBride stated that "there were a number of customers that came back and cited as problematic the Novell copyright issue."[20] McBride specifically cited Google as an example.[21] Mr. McBride also stated that an investment bank (either Morgan Stanley, Lehman Brothers, or Merrill Lynch), the Pentagon, Wyndham Hotels, Regal Entertainment, and Just U.S.A. Sports as companies that cited the copyright dispute as an issue.[22] Mr. McBride further stated "that the Novell claims were what eventually got us to just shutter up the SCOsource licensing division for a number of years."[23]

In his Declaration, Mr. McBride discusses the negotiations between SCO and Dell for a SCOSource license.[24] Mr. McBride states that Dell's general counsel "expressed concern over

---

[18]Brakebill Decl. Ex. 63; James Decl. Ex. 61.

[19]Brakebill Decl. Ex. 63 at 130-34.

[20]*Id*. at 135:10-11.

[21]*Id*. at 135:20-136:4.

[22]*Id*. at 137:2-19.

[23]*Id*. at 219:16-18.

[24]James Decl. Ex. 81 at ¶ 9.

Novell's ongoing claim that SCO did not own the UNIX copyrights. Their interest in the deal precipitously declined and the deal fell apart shortly thereafter."[25]

SCO General Counsel Ryan Tibbits testified that when SCO was working on the SCOSource program, "the Novell copyright dispute was continually thrown back in our face."[26] Mr. Tibbits testified that, in meetings with the Department of Defense, it was indicated that they would have taken a license if not for Novell's actions.[27] Instead, they stated "'As soon as you—the issues are cleared up, come and see me and I'll have to do a deal with you.'"[28] Mr. Tibbits further identified a New Mexico power utility as an entity that refused a license in part because of the copyright ownership issues.[29] Mr. Tibbits identified Cisco as another company that identified the ownership of the copyrights as an issue.[30] Mr. Tibbits also identified Google as a company that expressed concern over the copyright dispute.[31]

SCOSource salesperson Larry Gasparro testified that SCO's licensing program was "dramatically" affected by Novell's claim of ownership of the copyrights.[32]

---

[25] *Id*.

[26] *Id*. Ex. 59 at 113:1-2.

[27] *Id*. Ex. 63 at 20:18-22.

[28] *Id*. at 20:22-24.

[29] *Id*. at 26:7-24.

[30] *Id*. at 32:12-33:3.

[31] *Id*. at 37:15-20.

[32] *Id*. Ex. 56 at 330:5-7.

SCOSource salesperson Phil Langer testified that Novell's statements questioning SCO's ownership of the copyrights negatively impacted his ability to sell licenses.[33] Mr. Langer testified that "all the licensees, potential licensees became very interested in, well, if you don't own it, we're not going to by a license from you, which really, you know, put a hold on selling licenses."[34] When asked if he was unable to sell licences because of Novell's statements, Mr. Langer responded: "Yes. I mean, it put a pretty big dampening effect on how we were able to approach people when the intellectual property you're trying to license to them is in question of ownership."[35] Mr. Langer testified bluntly that "[o]nce the questioning of the ownership came out, the pipeline was killed."[36] Mr. Langer testified, specifically, that Regal Entertainment Group, cited the dispute of ownership of the copyrights as a reason not to seek a license, stating that "we can't buy your intellectual property because there's not clear title on it."[37]

Gregory Pettit, SCO's regional director of intellectual property licensing, testified that Novell's claims of ownership made it difficult to enter into licenses with Raytheon and other companies.[38] Mr. Pettit identified the questions raised by Novell as causing "great difficulty, if not impossibility, in selling any licenses[.]"[39]

---

[33]*Id*. Ex. 58 at 127:6-9.

[34]*Id*. at 135:18-21.

[35]*Id*. at 136:1-4.

[36]*Id*. at 137:14-15.

[37]*Id*. at 140:16-141:6.

[38]*Id*. Ex. 57 at 167:12-15.

[39]*Id*. at 167:21-25.

8

The parties have both submitted numerous letters sent by various companies to SCO in response to the SCOSource Initiative. Those letters provide some support for those statements made by those involved with the SCOSource Initiative.[40] Many of those letters mention the ongoing dispute between SCO and Novell concerning the ownership of the UNIX and UnixWare copyrights. Though, as Defendant points out, many of those letters also leave open the possibility of further discussion once the dispute between the parties is resolved.

Plaintiff has also submitted declarations from two experts: Gary Pisano and Christine Botosan. In his Declaration, Professor Pisano concludes

> that Novell's conduct had a substantial impact on SCO's ability to sell the SCOsource Intellectual Property License for Linux (also known as a "right to use" or "RTU" license). It is my opinion that, but for Novell's actions, SCO would have been able to sell significantly more SCOsource RTU licenses to the relevant Linux market than it was able to sell after Novell's statements.[41]

Professor Pisano also opines

> that even a court's determination that SCO owns the UNIX copyrights probably would not restore SCO to the position they were in before Novell's statements. As a practical matter, SCO's ability to sell SCOsource licenses in the future is highly uncertain. Nearly four years have passed since Novell's first attack on SCO's copyright ownership, and technology markets change rapidly. Based on my expertise in high technology industries, and my research and analysis in this case, I have no reason to believe that a court decision vindicating SCO's ownership rights would allow SCO simply to recover its losses through SCOsource sales at this time.[42]

In her Declaration, Professor Botosan states:

> I estimate the financial impact of Novell's statements by using SCO's financial records and internal projections, as well as several external analyst forecasts, to

---

[40] *See* Brakebill Decl. Exs. 48-53; James Decl. Exs. 48, 49, 86, 88.

[41] James Decl. Ex. 71, ¶ 6.

[42] *Id.* at ¶ 11.

calculate the projected revenue from SCOsource vendor licenses and SCOsource right to use licenses. In order to calculate SCO's damages, I compare the projected SCOsource revenue to the actual revenue realized by SCO over the relevant time period, and then deduct incremental expenses to arrive at SCO's lost profits. I have also relied upon the opinions of Professor Gary Pisano who has studied the expected demand for SCOsource products had Novell's slander of title not occurred. My forthcoming report will provide the details of my analysis in support of my opinion that SCO's damages resulting from the slander of title by Novell exceed $100 million.[43]

Another potential source of special damages are attorney's fees associated with removing the cloud on the title. In connection with this, Plaintiff has submitted the Declaration of Paul T. Moxley. Mr. Moxley provides the following opinions:

a. Substantial amounts of the work performed to date by SCO's attorneys was necessary in order to eliminate the "cloud" on the title and undo the harm caused by Novell's false assertions.
b. SCO has also incurred substantial legal fees and costs which were necessary to defend against Novell's counterclaim for slander of title.
c. Substantial costs and expenses were incurred by SCO to obtain expert opinions with respect to damages suffered, which are necessary to undo the harm caused by the slander.
d. To the extent some of the fees, costs and expenses are related either to other claims pursued by SCO or to the defense of other counterclaims asserted by Novell, those amounts may be apportioned and segregated from the amounts billed. That work is ongoing and my final analysis will be included in my expert report.[44]

## III. DISCUSSION

Defendant makes four arguments in its Motion for Summary Judgment. First, Defendant argues that Plaintiff's allegations that the SCOSource Initiative was harmed by Defendant's actions fails because Plaintiff cannot establish that Defendant was the cause of the failure. Defendant further argues that, if Plaintiff prevails, it will be able to pursue its claim to royalties.

---

[43]*Id*. Ex. 87 at ¶ 6.

[44]*Id*. Ex. 72 at ¶ 8.

10

Second, Defendant argues that Plaintiff's argument concerning a diminution in stock price is not a form of special damages. Third, Defendant argues that Plaintiff's claim for attorney's fees as a form of special damages must be rejected. Fourth, Defendant argues that Plaintiff has not produced evidence of any pecuniary loss based on its efforts to research and pursue copyright registration.

"To prove slander of title, a claimant must prove that (1) there was a publication of a slanderous statement disparaging claimant's title, (2) the statement was false, (3) the statement was made with malice, and (4) the statement caused actual or special damages."[45]

A slander of title action requires proof of actual or special damages, presumed or general damages are insufficient.[46]

> The special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales. This means that general, implied or presumed damages of the kind formerly available in cases of personal defamation are not sufficient as a ground for recovery in a disparagement claim.[47]

"Special damages are ordinarily proved in a slander of title action by evidence of a lost sale or the loss of some other pecuniary advantage. Absent a specific monetary loss flowing from a slander affecting the saleability or use of the property, there is no damage."[48] "It is not sufficient

---

[45] *First Sec. Bank of Utah, N.A. v. Banberry Crossing*, 780 P.2d 1253, 1256-57 (Utah 1989).

[46] *Id*. at 1257.

[47] *Id*. (quoting W. Keeton, *Prosser and Keeton on the Law of Torts*, at 971 (5th ed.1984)).

[48] *Bass v. Planned Mgmt. Servs., Inc.*, 761 P.2d 566, 568 (Utah 1988).

11

to show that the [property's] value has dropped on the market, as this is general damage, not a realized or liquidated loss."[49]

A. LOST SALES

Both parties agree that lost sales constitute special damages. The disagreement here is whether Plaintiff has presented sufficient evidence of lost sales and whether Defendant's actions were the "direct and immediate" cause of those lost sales and whether those lost sales alleged by Plaintiff are "realized and liquidated."

Based on the evidence set forth above, the Court finds that Plaintiff has presented sufficient evidence of lost sales to survive summary judgment. The Court further finds that there are genuine issues of material fact as to whether Defendant's actions were the "direct and immediate" cause and whether those lost sales are "realized and liquidated." Therefore, the Court must deny Defendant's Motion as it relates to lost sales.

B. STOCK PRICE

Defendant argues that Plaintiff's claim that Defendant's actions resulted in a diminution of its stock price is not an appropriate claim for special damages. Plaintiff states that it is not seeking the decline in its stock price as damages. The Court agrees that decline in stock price is not an appropriate claim for special damages.[50] Therefore, to the extent that Plaintiff is seeking to recover its decline in stock price as a form of special damages, Defendant's Motion will be granted.

---

[49]*Valley Colour, Inc. v. Beuchert Builders, Inc.*, 944 P.2d 361, 364 (Utah 1997).

[50]*See Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 2001 WL 670927, *3-4 (D. Utah 2001), *aff'd*, 312 F.3d 1292 (10th Cir. 2002).

C.	ATTORNEY'S FEES AND COSTS

Under Utah law, attorney fees are "recoverable as special damages if incurred to remove a cloud placed by the defendant on the title."[51] However, when "attorney fees were not incurred to clear title or to undo any harm created by whatever slander of title occurred, there [are] no special damages."[52] Defendant argues that Plaintiff's attorney's fees in pursuing this slander of title action are not recoverable. Plaintiff argues that, although this is a slander of title action rather than a quiet title action, "[t]he present action is the vehicle by which SCO's title will be cleared."[53]

The Supreme Judicial Court of Maine succinctly stated the majority rule as follows:

> We adopt the majority position that attorney fees incurred in removal of a cloud on a title caused by a spurious and vexatious deed do constitute proof of special damages in a slander of title action even in the absence of proof of an impairment of vendibility. In doing so, however, we emphasize that the costs of litigation and attorney fees in the action for slander of title itself cannot constitute the required special damages. The prevailing party in a slander of title action may recover as special damages those attorney fees and expenses incurred to remove the cloud on the title but not those incurred to prosecute the slander of title action.[54]

In the instant action, there are two sets of attorney's fees: those associated with removing the alleged cloud on the title of the copyrights and those associated with bringing the action for slander of title. As set forth above, the Declaration of Paul T. Moxley states as follows:

> a.	Substantial amounts of the work performed to date by SCO's attorneys was necessary in order to eliminate the "cloud" on the title and undo the harm caused by Novell's false assertions.

---

[51] *Bass*, 761 P.2d at 569.

[52] *Id.*

[53] Docket No. 307 at 39.

[54] *Colquhoun v. Webber*, 684 A.2d 405, 411 (Me. 1996) (citations omitted).

13

> b. SCO has also incurred substantial legal fees and costs which were necessary to defend against Novell's counterclaim for slander of title.
> c. Substantial costs and expenses were incurred by SCO to obtain expert opinions with respect to damages suffered, which are necessary to undo the harm caused by the slander.
> d. To the extent some of the fees, costs and expenses are related either to other claims pursued by SCO or to the defense of other counterclaims asserted by Novell, those amounts may be apportioned and segregated from the amounts billed. That work is ongoing and my final analysis will be included in my expert report.[55]

To the extent that Plaintiff can segregate and identify those attorney's fees associated with removing the cloud placed on the title of the copyrights, those fees would be considered special damages. However, those amounts that were not associated with removing the cloud placed on the title would not.

Defendant argues that courts refuse to award attorney's fees as special damages in cases where the claim to settle ownership and the slander of title claim are brought in the same case. Defendant's argument is without merit. For example, in *Colquhoun v. Webber*, a case cited by Defendant, the plaintiffs had brought an action raising, among other claims, claims for both quiet title/declaratory judgment and slander of title.[56] The trial court granted plaintiffs summary judgment and awarded special damages in the amount associated with the slander of title claim.[57] The court on appeal reversed the damage award.[58] The court found that the costs associated with the action for slander of title did not constitute special damages.[59] Rather, the court held that "the

---

[55] James Decl. Ex. 72 at ¶ 8.

[56] *Colquhoun*, 684 A.2d at 408.

[57] *Id*. at 413

[58] *Id*.

[59] *Id*.

prevailing party in a slander of title action may recover as special damages those attorneys fees and expenses accruing from removing the cloud on the title."[60] The trial court had awarded special damages based on the cost of prosecuting the slander of title action.[61] The court emphasized that "[i]t is the costs of prosecution of the counts which cleared the Colquhouns' title, *i.e.* the quiet title counts and the declaratory judgment count which are appropriately characterized as "special damages" and for which Webber should bear liability."[62] The court vacated the damage award and remanded for a redetermination.[63]

*Colquhoun* shows that courts do, in fact, allow for recovery of special damages in cases involving both slander of title and claims to settle the issue of ownership. This is the situation before the Court. Here, both the issue of ownership of title and slander of title will be decided in this action. Therefore, those attorney's fees and costs associated with removing the cloud from the title are appropriately considered and may be recoverable as special damages.

The cases relied upon by Defendant are inapposite. *C.P. Interests, Inc. v. California Pools, Inc.*,[64] applies Texas law, which provides "that attorneys fees are not considered a form of pecuniary loss and do not constitute special damages."[65] This is clearly not the law in Utah. *Lee*

---

[60]*Id*.

[61]*Id*.

[62]*Id*.

[63]*Id*.

[64]238 F.3d 690 (5th Cir. 2001).

[65]*Id*. at 695.

15

*v. Washington Square Homeowners' Ass'n, Inc.*,[66] applying Georgia law, also takes a position inconsistent with Utah law by stating that "[c]osts of litigation and attorney fees arising from slander of title do not constitute . . . special damages."[67] *Hicks v. McLain's Bldg. Materials, Inc.*,[68] also applies Georgia law which is inconsistent with Utah law.[69] In *Sannerud v. Brantz*,[70] the court found that there was insufficient evidence to support a claim in a defamation of title action and noting that the Wyoming Supreme Court had suggested that attorney's fees were not recoverable in a defamation of title action.[71] This is not a defamation of title claim.

D.      RESEARCHING COPYRIGHT REGISTRATIONS

Defendant's final argument is that Plaintiff has not produced evidence that it has incurred attorney's fees in researching and reviewing the copyright registrations. Plaintiff has not responded to this argument and it is, therefore, waived. Defendant's Motion will be granted to the extent that Plaintiff is seeking special damages related to the researching and reviewing copyrights that are not associated with those attorney's fees and costs allowable, as set forth above.

---

[66] 615 S.E.2d 210 (Ga. Ct. App. 2005).

[67] *Id*. at 214.

[68] 433 S.E.2d 114 (Ga. Ct. App. 1993).

[69] *Id*. at 116.

[70] 879 P.2d 341 (Wyo. 1994).

[71] *Id*. at 345.

## IV. CONCLUSION

It is therefore

ORDERED that Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages (Docket No. 277) is GRANTED IN PART AND DENIED IN PART as set forth above. The hearing set for February 4, 2010, is STRICKEN.

DATED   January 28, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge