IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>Defendant/Counterclaim Plaintiff. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S *DAUBERT* MOTION TO DISQUALIFY DR. CHRISTINE A. BOTOSAN<br><br><br><br>Case No. 2:04-CV-139 TS |

This matter is before the Court on Defendant's *Daubert* Motion to Disqualify Dr. Christine A. Botosan. Defendant seeks to disqualify Dr. Botosan on the grounds that (1) her opinions are inadmissible under Rule 702 because they are not based on sufficient facts or data and are not the product of reliable principles and methods reliably applied to the facts of this case; and (2) her proffered event study is irrelevant and inadmissible under Rule 402. For the reasons discussed below, the Court will deny Defendant's Motion.

## I. BACKGROUND

Dr. Botosan was "asked to calculate damages to SCO resulting from Novell's slander of title, unfair competition and breach of contract."[1] Dr. Botosan was "instructed that the proper measurement of these damages is SCO's lost profits due to Novell's public claims that SCO does not own the copyrights to the UNIX source code associated with the UNIX and UnixWare businesses."[2] Dr. Botosan concluded that Plaintiff's lost profits ranged from $136.965 million to $215.657 million.[3]

Dr. Botosan calculates lost profits in three steps. First, she identifies Plaintiff's projected revenues. Second, she subtracts Plaintiff's actual licensing revenues from what they were projected to be to determine lost revenues. Finally, Dr. Botosan deducts from lost revenues what she estimates Plaintiff's costs would have been to generate those revenues to arrive at lost profits. Defendant argues that there are two flaws in this portion of Dr. Botosan's analysis. Defendant first argues that Dr. Botosan cherry-picked the highest projections. Second, Defendant argues that, instead of performing any meaningful analysis on those projections, she merely parrots them.

Defendant further argues that Dr. Botosan's causation analysis is flawed because: (1) she bases her opinion on an event study purporting to show that Defendant caused Plaintiff's stock price to drop though the Court has ruled that decline in stock price is not an appropriate claim for damages; and (2) her event study is invalid, as is her reasoning therefrom.

---

[1] Docket No. 656, Ex. A at ¶ 1.

[2] *Id*.

[3] *Id*. at ¶ 3.

II.  DISCUSSION

Fed.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*[4] and *Kumho Tire Co., Ltd. v. Carmichael*,[5] the Supreme Court interpreted the requirements of Rule 702. "*Daubert* requires a trial judge to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"[6] "In applying Rule 702, the trial court has the responsibility of acting as a gatekeeper."[7] "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[8]

---

[4]509 U.S. 579 (1993).

[5]526 U.S. 137 (1999).

[6]*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1163 (10th Cir. 2000) (quoting *Daubert*, 509 U.S. at 589).

[7]*In re Breast Implant Litigation*, 11 F.Supp. 2d 1217, 1222 (D. Colo. 1998).

[8]*Daubert*, 509 U.S. at 592.

"The Supreme Court has provided some guidance for the task of determining scientific validity."[9] "This inquiry is 'a flexible one,' not governed by a 'definitive checklist or test.'"[10] Some factors to consider are whether the expert's theory or technique: (1) can be (and has been) tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error with standards controlling the technique's operation; and (4) enjoys widespread acceptance in the relevant scientific community.[11]

"Rule 702's second prong concerns relevancy, or 'fit.'"[12] "The trial court 'must ensure that the proposed expert testimony is 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case.'"[13] Because of the dangers of scientific evidence, "federal judgments must exclude proffered scientific evidence under Rule 702 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury."[14]

As set forth above, Defendant challenged Dr. Botosan's opinion on the amount of lost profits and her opinion concerning causation. The Court will discuss each in turn.

---

[9]*In re Breast Implant Litigation*, 11 F.Supp. 2d at 1223.

[10]*Atlantic Richfield*, 226 F.3d 1163 (quoting *Daubert*, 509 U.S. at 593).

[11]*Id*.

[12]*In re Breast Implant Litigation*, 11 F.Supp. 2d at 1223.

[13]*Id*. (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

[14]*Id*.

A.  LOST PROFITS

As set forth above, Dr. Botosan calculates lost profits in three steps. First, she identifies Plaintiff's projected revenues. Second, she subtracts Plaintiff's actual licensing revenues from what they were projected to be to determine lost revenues. Finally, Dr. Botosan deducts from lost revenues what she estimates Plaintiff's costs would have been to generate those revenues to arrive at lost profits. Defendant argues that Dr. Botosan's analysis is flawed because: (1) she cherry-picked the highest projections; and (2) she is a mere conduit for hearsay testimony.

   1.   *Cherry-Picking the Highest Projections*

Defendant argues that Dr. Botosan cherry-picked the highest projections to reach her conclusions regarding lost profits. Defendant argues that this is not a reliable method to reach a conclusion on lost profits. Plaintiff counters that Dr. Botosan did not cherry-pick the highest forecast amounts. Rather, Plaintiff argues that Dr. Botosan arrived at a more conservative estimate of damages than she would have if she used the highest numbers in each of the forecasts.

As set out by Plaintiff, the Deutche Bank Report set out four different scenarios. Dr. Botosan relied on the more conservative Scenario #2. Further, Dr. Botosan used a conservative price of $100 per license. Having reviewed Dr. Botosan's report and rebuttal report, as well as the parties' arguments, the Court finds that Dr. Botosan had a reasonable basis in reaching her conclusions on lost profits. Those perceived weaknesses in her analysis go to its weight, not admissibility and are proper fodder for cross examination.[15]

---

[15] *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996) (stating that "as long as a logical basis exists for an expert's opinion . . . the weaknesses in the underpinnings of the opinion[ ] go to the weight and not the admissibility of the testimony") (quotation marks and citation omitted).

### 2. *Mere Conduit for Hearsay Testimony*

Defendant next argues that Dr. Botosan, by relying on the various projections, is a mere conduit for hearsay testimony. Under Fed.R.Evid. 703, an expert may base his or her opinion on evidence not otherwise admissible, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[16] In her Declaration, Dr. Botosan states that "third-party projections with indicia of reliability are regularly relied upon by accountants when calculating lost profits."[17] As Dr. Botosan's lost profits calculation is based upon evidence that is "of a type reasonably relied upon by experts" in her field, it will not be excluded because it is based, in part, on hearsay.

### B. CAUSATION

Defendant next makes a number of challenges to Dr. Botosan's opinion concerning causation. Dr. Botosan is of the opinion that Defendant's actions "were a substantial factor in undermining SCO's ability to sell its SCOsource products."[18] To reach this conclusion, Dr. Botosan relied upon a number of things, including: (1) a review of the depositions of Plaintiff's employees which revealed that customers were deterred from purchasing SCOsource licenses because of Defendant's actions; (2) a May 21, 2004 Merrill Lynch letter which cited the legal and factual uncertainty surrounding Plaintiff's assertions regarding ownership of the copyrights and infringement as reasons to delay accepting a SCOsource license; (3) that Plaintiff's RTU program did not meet with the customer acceptance that was projected; and (4) an independent

---

[16] Fed.R.Evid. 703.

[17] Docket No. 721 at ¶ 15.

[18] Docket No. 656, Ex. A at ¶ 18.

6

event study to evaluate the market's reaction to Defendant's May 28, 2003 letter asserting ownership of the copyrights.[19]

Defendant quickly rejects the first three bases of Dr. Botosan's opinion and states that her opinion stands or falls with her event study. As an initial matter, the Court rejects Defendant's argument on this point. As set forth above, an expert can rely on hearsay, such as the deposition testimony of Plaintiff's employees and the statements of potential customers, when reaching an opinion. Defendant's contention that the Merrill Lynch letter states both ownership and infringement as reasons not to take a license goes to the weight of Dr. Botosan's conclusion on causation, not its admissibility. Thus, Defendant is incorrect that Dr. Botosan's causation opinion stands or falls with her event study. That being said, the Court turns to Defendant's arguments concerning the event study.

Defendant first argues that the event study is irrelevant because this Court has already ruled that a decline in stock price is not an appropriate claim for special damages in a slander of title action. Plaintiff, however, argues that the event study does not go to the issue of damages, but rather goes to the issue of causation. As stated by Dr. Botosan, the event study was employed to "demonstrate the connection between Novell's public announcements and the market's perception of SCO's future business prospects."[20] The Court agrees that the event study is relevant to the issue of causation.

Defendant next argues that the event study is based on a statistically invalid model and a statistically insignificant regression. Plaintiff counters that Defendant's argument is premised on

---

[19]*Id*. at ¶¶ 18-21.

[20]Docket No. 720 at ¶ 1.

an erroneous analysis of the event study by Defendant's expert. The Court finds that Defendant's arguments on this point go to the weight to be given to Dr. Botosan's testimony, not its admissibility and are appropriately addressed through cross examination.

Defendant finally argues that Dr. Botosan's reasoning from her event study is logically invalid and that her opinion is based on insufficient data. Considering the parties' arguments on these issues, the Court finds that Defendant's objections to Dr. Botosan's opinions go to weight of those opinions, not their admissibility and are appropriately addressed through cross examination.

## III. CONCLUSION

It is therefore

ORDERED that Defendant's *Daubert* Motion to Disqualify Dr. Christine A. Botosan (Docket No. 655) is DENIED.

DATED   March 2, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge