Brent O. Hatch (5715)
bhatch@hjdlaw.com
Mark F. James (5295)
mjames@hjdlaw.com
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666


David Boies (admitted pro hac vice)
dboies@bsfllp.com
Robert Silver (admitted pro hac vice)
rsilver@bsfllp.com
Edward Normand (admitted pro hac vice)
enormand@bsfllp.com
BOIES SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart Singer (admitted pro hac vice)
ssinger@bsfllp.com
Sashi Bach Boruchow (admitted pro hac vice)
sboruchow@bsfllp.com
BOIES SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022


*Attorneys for Plaintiff, The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., by and through the Chapter 11 Trustee in Bankruptcy, Edward N. Cahn,<br><br>　　　　Plaintiff/Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>　　　　Defendant/Counterclaim-Plaintiff. | **SCO'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Civil No. 2:04 CV-00139<br><br>Judge Ted Stewart |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................. 1

FINDINGS OF FACT AND CONCLUSIONS OF LAW ................................................. 2

   I.    JURISDICTION AND VENUE ............................................................................. 2

   II.    BACKGROUND ..................................................................................................... 2

   III.    THE JURY VERDICT ........................................................................................... 3

   IV.    THE UNIX BUSINESS ......................................................................................... 7

      A.   The Business of Licensing the UNIX Source Code ......................................... 7

      B.   SCO's Purchase of the UNIX Technology and Business. ............................. 10

      C.   SCO's UNIX-Based Business Since the Amended APA. ............................. 13

   V.    NOVELL'S OBLIGATION TO TRANSFER THE COPYRIGHTS .............................. 15

      A.   Specific Performance Pursuant to Amendment No. 2. .................................. 15

         1.   Novell's Obligation to Transfer "Required" Copyrights. ......................... 15

         2.   The UNIX and UnixWare Copyrights Are "Required." ........................... 19

      B.   Specific Performance to Effectuate the Parties' Intent. ................................ 25

         1.   The Prospect of Inadequate Transfer Documentation. ............................. 25

         2.   The Parties Intended to Transfer the Copyrights. .................................... 27

   VI.    NOVELL'S RIGHTS UNDER SECTION 4.16(b) .................................................... 47

      A.   SCO's Claims Against IBM ........................................................................... 48

      B.   The Scope of Novell's Waiver Rights with Respect to "SVRX Licenses." ................. 52

      C.   The Covenant of Good Faith and Fair Dealing ............................................. 65

         1.   The Governing Law. ................................................................................... 65

2.      Novell's Waiver Actions Violate the Implied Covenant. .......................................... 66

3.      Novell's "Waivers" Are Invalid and Unenforceable. ............................................... 69

VII.    Novell's Affirmative Defenses Fail. ............................................................................... 70

A.   Substantial Performance. .............................................................................................. 70

B.   Unclean Hands. .............................................................................................................. 72

CONCLUSION .......................................................................................................................... 74

# TABLE OF AUTHORITIES

## Cases

Aguilar v. Millot,
　　2007 WL 1806860 (Cal. Ct. App. June 25, 2007) .................................................. 71

April Enterprises, Inc. v. KTTV,
　　147 Cal. App. 3d 805 (Cal. Ct. App. 1983) ...................................................... 65, 66

Badie v. Bank of Am.,
　　67 Cal. App. 4th 779 (1998) ............................................................ 66, 69, 70

Bewick v. Mecham,
　　26 Cal. 2d 92 (1945) ........................................................................ 16

Blackburn v. Charnley,
　　117 Cal. App. 4th 758 (2004) ............................................................. 15, 26

Boghos v. Certain Underwriters at Lloyd's of London,
　　36 Cal. 4th 495 (2005) ........................................................................ 60

Bosetti v. U.S. Life Ins. Co. in City of New York,
　　175 Cal. App. 4th 1208 (2009) .............................................................. 68

Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.,
　　2 Cal. 4th 342 (1992) ........................................................................ 66

City of Hollister v. Monterey Ins. Co.,
　　165 Cal. App. 4th 455 (2008) ................................................................ 69

Davis v. Blige,
　　505 F.3d 90 (2d Cir. 2007)................................................................... 23

De Anza Enters. v. Johnson,
　　104 Cal. App. 4th 1307 (2003) ............................................................ 15, 26

DVD Copy Control Ass'n v. Kaleidescape, Inc.,
　　176 Cal. App. 4th 697 (2009) ................................................................ 26

Flying J Inc. v. Comdata Network, Inc.,
　　405 F.3d 821 (10th Cir. 2005) ............................................................... 42

Frankel v. Bd. of Dental Examiners,
　　46 Cal. App. 4th 534 (1996) ................................................................. 70

Gruenberg v. Aetna Ins. Co.,
  9 Cal. 3d 566 (1973) .................................................................................. 71

Hadden v. Consolidated Edison Co. of N.Y., Inc.,
  34 N.Y.2d 88 (1974) .................................................................................. 72

Haynes Trane Serv. Agency, Inc. v. Am. Std., Inc.,
  573 F.3d 947 (10th Cir. 2009) ................................................................. 3, 4

Home Design Servs., Inc. v. B&B Custom Homes, LLC,
  Civil Action No. 06-cv-00249-WYD-GJR, 2008 WL 2302662 (D. Colo. May 30, 2008) ...... 73

Homebridge Mortg. Bankers Corp. v. Vantage Capital Corp.,
  2008 WL 5146957 (S.D.N.Y. Dec. 5, 2008) ............................................... 72

In re ISOs Antitrust Litig.,
  989 F. Supp. 1131 (D. Kan. 1997) ........................................................... 73

ITOFCA, Inc. v. Megatrans Logistics, Inc.,
  322 F.3d 928 (7th Cir. 2003) .................................................................... 28

Leo F. Piazza Paving Co. v. Found Constr., Inc.,
  128 Cal. App. 3d 583 (1981) .................................................................... 63

Lexington Ins. Co. v. Travelers Indem. Co. of Ill.,
  2001 WL 1132677 (9th Cir. 2001) ........................................................... 63

MacDonald v. Lawyers Title Ins. Corp.,
  1996 WL 114719 (4th Cir. 1996) ............................................................. 63

Major v. W. Home Ins. Co.,
  169 Cal. App. 4th 1197 (2009) ................................................................. 68

McClain v. Octagon Plaza, LLC,
  159 Cal. App. 4th 784 (2008) .................................................................. 69

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,
  454 F. Supp. 2d 966 (C.D. Cal. 2007) ..................................................... 73

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,
  454 F. Supp. 2d 966 (citing authority) ..................................................... 73

Meyer v. AmerisourceBergen Drug Corp.,
  2008 WL 397412 (6th Cir. 2008) ............................................................. 63

Nieto v. Blue Shield of Cal. Life & Health Ins. Co.,
181 Cal. App. 4th 60 (2010) ........................................................... 68

Okun v. Morton,
203 Cal. App. 3d 805 (Cal. Ct. App. 1988) ........................................ 27

Ontario Downs, Inc. v. Lauppe,
192 Cal. App. 2d 697 (1961) ........................................................... 26

Parduhn v. Bennett,
112 P.3d 495 (Utah 2005) ............................................................... 72

Parsons v. Bristol Dev. Co.,
62 Cal. 2d 861 (1965) ..................................................................... 16

Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,
508 U.S. 49 (1993) .......................................................................... 73

Relational Design & Tech., Inc. v. Brock,
No. 91-2452-EEO, 1993 WL 191323 (D. Kan. May 25, 1993) ............... 28

Rogers v. Davis,
28 Cal. App. 4th 1215 (Cal. Ct. App. 1994) ....................................... 16

Roseleaf Corp. v. Radis,
122 Cal. App. 2d 196 (Cal. Ct. App. 1953) ........................................ 71

Rubin v. Fuchs,
1 Cal. 3d 50 (1969) ........................................................................ 70

Schwartz v. State Farm Fire and Cas. Co.,
88 Cal. App. 4th 1329 (2001) ......................................................... 69

Shakey's Inc. v. Covalt,
704 F.2d 426 (9th Cir.1983) ............................................................ 63

Shugrue v. Cont'l Airlines, Inc.,
977 F. Supp. 280 (S.D.N.Y. 1997) ................................................... 28

Silvers v. Sonly Pictures Entmt., Inc.,
402 F.3d 881 (9th Cir. 2005) ........................................................... 23

The SCO Group, Inc. v. Novell, Inc.,
578 F.3d 1201 (10th Cir. 2009) ................................................. passim

Traicoff v. Digital Media, Inc.,
  439 F. Supp. 2d 872 (S.D. Ind. 2006) ....................................................... 23

Trial Sys. Corp. v. Southeastern Exp. Co.,
  64 F.3d 1330 (9th Cir. 1995) ................................................................... 74

United States v. Gonzalez-Garcia,
  85 Fed. Appx. 160 (10th Cir. 2004) ......................................................... 60

United Truckmen v. Lorentz,
  114 Cal. App. 2d 26 (1952) ...................................................................... 26

Utah Labor Comm'n v. Paradise Town,
  660 F. Supp. 2d 1256 (D. Utah 2009) ...................................................... 72

Wm. R. Clarke Corp. v. Safeco Ins. Co.,
  15 Cal. 4th 882 (1997) .............................................................................. 70

## Other Authorities

1 Copyright Throughout the World § 19:29 (2009) ......................................... 21

1 The Law of Copyright § 4:44 (2009) .......................................................... 22

15 R. Lord, Williston on Contracts § 44:52 (4th ed. 2009) ............................ 73

17 U.S.C.A. § 101 ......................................................................................... 22

28 U.S.C. § 125 .............................................................................................. 2

28 U.S.C. § 1331 ............................................................................................ 2

28 U.S.C. § 1338(a) ....................................................................................... 2

28 U.S.C. § 1391(b) ....................................................................................... 2

3 Patry on Copyright § 7:2 (2010) ............................................................... 21

Cal. Civ. Code § 3392 .................................................................................. 71

Copyrights and Copywrongs: The Rise of Intellectual Property and
  How It Threatens Creativity, 3 J. High Tech. L. 1 (2003) ......................... 21

Nimmer on Copyright § 13.09 (2009) ..................................................... 74, 75

Restatement (Second) of Contracts § 362 (1981) ....................................... 25

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits these Proposed Findings of Fact and Conclusions of Law concerning the claims tried to the Court from March 8 through March 26, 2010.

## <u>INTRODUCTION</u>

The claims at issue are before this Court pursuant to the Tenth Circuit's mandate and remand in <u>The SCO Group, Inc. v. Novell, Inc.</u>, 578 F.3d 1201 (10th Cir. 2009).  The claims are SCO's claim for specific performance, seeking an order requiring Defendant/Counterclaim-Plaintiff, Novell, Inc. ("Novell"), to transfer to SCO the UNIX and UnixWare copyrights; Novell's counterclaim seeking a declaration of Novell's rights under Section 4.16(b) of the amended Asset Purchase Agreement ("APA"); and SCO's claim for breach of contract contending that Novell breached the implied covenant of good faith and fair dealing under the amended APA in exercising its alleged rights under Section 4.16(b).  These are, respectively, Questions (2), (3), and (4) of the Tenth Circuit's mandate and remand.  <u>Id.</u> at 1227.

These issues, as agreed by the parties, are to be decided by the Court (Docket No. 750 at 1), by the preponderance of the evidence.  The Court heard testimony and received evidence on these claims in the course of the jury trial on the parties' respective claims for slander of title, from March 8 through March 26, 2010.[1]

---

[1]     With respect to SCO's slander of title claim, SCO will file a renewed motion for judgment as a matter of law regarding copyright ownership under Fed. R. Civ. P. 50(b), and, in the alternative, for a new trial under Fed. R. Civ. P. 59.  If this Court grants the Rule 50 motion, SCO's claim for specific performance is moot, and if this Court grants a new trial under Rule 59, the Court may defer ruling on the claim for specific performance.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

**I.     JURISDICTION AND VENUE**

1.         This is an action for specific performance, declaratory relief, and breach of contract.  Jurisdiction of the Court is invoked under 28 U.S.C. §§ 1331, 1338(a), 2201(a), and 2202.  Venue is proper pursuant to 28 U.S.C. § 1391(b), and is laid in the Central Division of the District of Utah under 28 U.S.C. § 125.

**II.    BACKGROUND**

2.         SCO is a Delaware corporation with its principal place of business in Lindon, Utah.  (8:3-9:10 (Uncontroverted Facts).)  SCO is in the business of developing and selling software products.  (Id.)

3.         SCO is the successor-in-interest to all of the assets that The Santa Cruz Operation, Inc. (unless otherwise indicated, also "SCO") acquired under an amended Asset Purchase Agreement ("APA") with Novell.  (Id.)  On September 14, 2007, SCO filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  On August 25, 2009, that Bankruptcy Court appointed former United States District Judge Edward N. Cahn as Chapter 11 Trustee.

4.         Novell is a Delaware corporation with its executive offices in Waltham, Massachusetts, and its principal product development facility in Provo, Utah.  (Id.)  Novell is also involved in the development and sale of software products.  (Id.)

5.         SCO's claim for specific performance requires the Court to determine whether Novell must now transfer copyrights in the UNIX and UnixWare computer operating systems to SCO under the amended APA.

---

[2]         Any finding of fact that is appropriately considered a conclusion of law shall be regarded as such, and, likewise, any conclusion of law determined to involve a factual finding shall be regarded as a finding of fact to the extent appropriate.

6.      Novell's request for a declaration of its rights under Section 4.16(b) of the amended APA requires the Court to determine whether Novell had the authority to waive SCO's rights and claims against International Business Machines Corp. ("IBM"), as Novell purported to do in 2003 and 2004.

7.      SCO's alternative claim for breach of the implied covenant of good faith and fair dealing requires the Court to determine whether Novell's purported waivers of SCO's rights and claims against IBM are ineffective even if Novell had the authority to assert the waivers, because they were made in violation of the obligation of good faith and fair dealing implied by law in the amended APA.  The Court must decide this claim only if it determines that Novell had the right to waive SCO's claims under Section 4.16(b) in the first place.

8.      In <u>SCO</u>, 578 F.3d 1201, the Tenth Circuit found that the District Court's (Kimball, J.) summary judgment order in favor of Novell on each of the foregoing issues was in error and remanded these issues for determination after trial.

## III.    THE JURY VERDICT

9.      As a threshold matter, although the parties' claims for slander of title and SCO's claim for specific performance concern similar subject matter, the verdict the jury reached in this case does not govern the Court's resolution of the claim for specific performance.

10.     The "Seventh Amendment prevents district courts from applying equitable doctrines on the basis of factual predicates rejected, explicitly or implicitly, by a jury verdict." <u>Haynes Trane Serv. Agency, Inc. v. Am. Std., Inc.</u>, 573 F.3d 947, 959 (10th Cir. 2009).  The Seventh Amendment thus applies only if the verdict necessarily "resolves a factual issue."  <u>Id.</u>

11.     The verdict here does not resolve SCO's claim for specific performance.  SCO's primary basis for seeking specific performance is that Amendment No. 2 reflects Novell's obligation now to transfer to SCO those copyrights that SCO has demonstrated are required for

SCO to exercise its rights in the UNIX and UnixWare technologies that SCO acquired under the APA.  The question with respect to this request for relief therefore is whether the jury has already decided that there are no such "required" copyrights.  SCO's alternative basis for seeking specific performance is that the documents at issue fail properly to document the parties' intent to have Novell transfer the UNIX and UnixWare copyrights to SCO.  The question with respect to this request for relief therefore is whether the jury has already decided that the parties did not intend to transfer the copyrights to SCO.

12.     These questions are not determined by the jury's answer of "no" to the question: "Did the amended Asset Purchase Agreement transfer the UNIX and UnixWare copyrights from Novell to SCO?"  Considering the evidence and arguments at trial, the jury could have decided, for example, that the parties did intend to transfer the copyrights, but that the parties nevertheless failed adequately to incorporate and reflect that intent in either the APA or Amendment No. 2; that the parties had that intent, but that they needed to have executed – as Novell argued – a bill of sale in 1996 in connection with Amendment No. 2; that the parties had that intent, but that they needed to amend – again as Novell itself argued – Schedule 1.1(a) to effect that transfer; that the parties intended to transfer copyrights only if SCO subsequently made a showing that the copyrights were required for it to exercise its rights in connection with the UNIX and UnixWare business; or that some UNIX and UnixWare copyrights did transfer, but others did not.  The jury could have reached any of those decisions, moreover, regardless of the time the parties spent arguing for or against those points at trial.  The jury simply was not asked to address the specific questions now before the Court.  SCO's claim for specific performance thus rests on "findings not precluded by the jury's verdict." Haynes, 573 F.3d at 960 (brackets omitted).

13.     Indeed, in the Joint Submission Regarding Allocation of Issues for Bench and Jury Trial, the parties acknowledged that the two claims implicated different issues concerning the amended APA:

> As an alternative to its slander of title claim, SCO seeks specific performance of what it claims is an obligation imposed on Novell by the APA to transfer the UNIX copyrights. The underlying theory appears to be that if the APA does not itself transfer those copyrights, as required to sustain SCO's slander claim, the APA might nevertheless require Novell to transfer them.

(Docket No. 750 at 2-3.)  In its request for an advisory jury on the issue of specific performance, Novell recognized that the claim for specific performance focuses on a different, albeit related, question to the issue of whether the copyrights had already transferred:

> Because the jury will already be charged with interpreting the contract to determine whether it transfers copyright, it makes sense for the Court to take an advisory verdict from the jury as to whether those provisions, if they do not themselves transfer copyright, nevertheless obligate Novell to do so.

(Id. at 3.)  The Court denied Novell's request for an advisory jury.  (Docket No. 761 at 2.)

14.     Novell sought to convince the jury, both through argument and witnesses, that the absence of any reference to "copyrights" in the Bill of Sale, and the absence of any new bill of sale at the time of Amendment No. 2, meant that the copyrights had not transferred.

15.     In its opening statement, Novell argued to the jury:

> What else happens?  Well, the asset purchase agreement itself doesn't transfer anything.  It describes what will be transferred. The legal document that transfers the assets is called a bill of sale. If I were to go down the street and buy a new car from one of our fine auto dealers and I entered into a purchase agreement, that wouldn't give me title.  I've got to get a bill of sale.  That is the document that is memorializing the transfer.  The bill of sale doesn't say anything about copyrights, trademarks.  It says, instead, look to the agreement, look to the asset purchase agreement to describe.  I have shown you the language, all copyrights were excluded.

(76:15-77:8.)

16.         Novell proceeded to pursue its argument through witnesses.  For example, Novell

asked Mr. Thompson:

> Q.  And so that the jurors understand, the bill of sale is the
> document that actually transfers ownership from Novell to Santa
> Cruz; right?
>
> A.  Yes.
>
> Q.  And so business people and lawyers can get together and
> negotiate a deal and can decide we're going to transfer these assets,
> but until the bill of sale is actually transferred, nothing is
> transferred; right?
>
> A.  That's my understanding, yes.

(311:9-20.)

17.         Similarly, Novell asked Mr. Tolonen:

> Q.  Now we've talked about the schedule 1.1(b) of the asset
> purchase agreement, which is the excluded assets.  Under
> Amendment No. 2, did Amendment No. 2 also change the
> schedule of included assets?
>
> A.  No, it did not.
>
> Q.  Do you know when Novell closed the deal with Santa Cruz in
> December of 1995, whether there was a bill of sale for the assets
> being transferred?
>
> A.  Yes, there was.
>
> Q.  And in connection with Amendment No. 2, was there a
> revision of that bill of sale to include any UNIX related
> copyrights?
>
> A.  No, there was not.

(2038:4-16.)

18.         After making the argument with several other witnesses, Novell again referenced

its argument in its closing statement:

> Now, in addition, on December 6, 1995 there was a document that was entered into that actually transferred the assets. The asset purchase agreement itself transfers nothing. Instead, it is a promise that Novell would transfer assets, but the actual document that accomplishes that was the bill of sale. The bill of sale that you saw, Exhibit W-5, references the transfer only of the assets. The assets are, again, described in the asset purchase agreement, so to really understand what was sold one would have to look to the bill of sale and say what does the bill of sale say? The bill of sale tells us that to understand what was sold we look to the asset purchase agreement, the assets, Schedule 1.1-A. So that is straightforward and clear.

(2680:10-23.)

19.     The foregoing testimony alone shows that if the jury agreed with Novell's argument, it could have answered "no" as it did, even if it concluded that the parties did intend to transfer the copyrights, or that the copyrights are required.

20.     The Court therefore concludes that the jury verdict does not dispose of SCO's alternative claim for specific performance.

## IV.     THE UNIX BUSINESS

### A.     The Business of Licensing the UNIX Source Code.

21.     The UNIX operating system was originally developed by AT&T in the 1960s and became an operating system of choice for business.  (8:15-18 (Uncontroverted Facts).)  AT&T and the subsequent owners of UNIX, including Novell and SCO, continually developed and released updated versions of the operating system derived from and including the source code from prior versions.  (1729:11-1730:6 (Nagle); 1732:3-11 (Nagle); 1738:9-12 (Nagle); 1781:21-1784:22 (Nagle); 515:20-517:19 (Levine).)

22.     Starting in the early 1980s, AT&T built a business on licensing the source code to releases of the then-current version of UNIX known as UNIX System V to major computer manufacturers, also known as Original Equipment Manufacturers ("OEMs").  (515:20-516:8

(Levine); 251:5-6 (Thompson); 1685:11-1686:9 (Maciaszek).)  Source code is the human-readable form of a computer program, in contrast to binary code, which runs on computers and cannot be read by people.  (353:17-20 (Chatlos); 358:22-359:3 (Chatlos).)  Because the UNIX business that AT&T built involved releasing the crown jewels of the business to licensees, the company implemented "heavy duty" confidentiality protections to which licensees had to agree before receiving the source code.  (576:3-577:8 (Broderick); 369:15-19 (Chatlos).)  Those strict protections allowed the owner of the UNIX business to continue this revolutionary business of licensing source code to third parties.

23.        "UnixWare is the brand name for the more recent releases of the UNIX System V, Release 4 operating system developed and licensed in the early 1990s by Novell and its predecessors to the technology.  The product was called UnixWare because it was to be a combination of the latest releases of System V source code and some components of Novell's NetWare source code.  The first releases of UnixWare contain all or virtually all of the technology included in the immediately prior System V releases, SVR4.2 and SVR4.2MP." (Docket No. 542 at 7.)[3]

24.        Novell, like its predecessors, licensed the source code to the UnixWare releases of UNIX to licensees who used the source code to create derivative works subject to strict confidentiality restrictions under Sections 2.01 and 7.06(a) of the standard Software Agreement. (See, e.g., Ex. 4; see also 576:13-577:8 (Broderick); 1685:11-1686:9 (Maciaszek).)  These derivative works are sometimes referred to as UNIX "flavors" and were developed under license agreements that are very different from the amended APA through which SCO, in contrast to a

---

[3]        Novell tried certain of its claims against SCO in a bench trial (Kimball, J.) in April and May 2008, and on July 16, 2008, the Court issued Findings of Fact and Conclusions of Law. (Docket No. 542.)  To the extent not reversed by the Tenth Circuit, those factual findings are applicable here.

licensee, acquired ownership of the UNIX and UnixWare business, technology, and source code. (604:25-610:4 (Broderick); Ex. 1 (APA), Schedule 1.1(a).)  When SCO purchased the UNIX and UnixWare business from Novell, SCO acquired these software development agreements with OEM licensees and used the same contract forms to license the source code to future licensees. (Ex. 1, Schedule 1.1(a), Item III.L; 1688:2-24 (Maciaszek).)

25.        Aside from licensing the UNIX (including UnixWare) source code to OEM licensees, Novell also sold a binary version of UnixWare in competition with the UNIX flavors marketed by its licensees.  When SCO purchased the UNIX and UnixWare business from Novell, SCO continued to both license the UnixWare source code to OEM licensees and sell its own binary version of UnixWare.  (Ex. 1 (APA), Recital A; 1778:6-16 (Nagle).)  SCO continued to use the same form licenses that Novell used when it was licensing the UNIX and UnixWare source and binary products to third parties prior to the APA.  (1688:2-24 (Maciaszek); Ex. 1 (APA), Recital A § 1.3(a)(i).)

26.        OEM licensees such as IBM, Sun, and Hewlett-Packard used the UNIX source code to develop their own flavors best suited for use on their respective computers.  (608:2-4 (Broderick); 1685:11-1686:9 (Maciaszek).)  A licensee paid one-time fees for the rights to use the source code of a particular release to create and distribute its flavor and paid continuing royalties for each binary copy of the flavor sold to end-users; while licensees could distribute their flavors in binary form, the standard Software and Sublicensing Agreements used by AT&T, Novell, and later SCO, required licensees to keep the UNIX source code confidential.  (See, e.g., Ex. 4; 576:13-577:8 (Broderick); 1685:11-1686:9 (Maciaszek).)  IBM was such a licensee and developed its own flavor of UNIX, named AIX.  (959:7-8 (McBride); 1778:8-9 (Nagle).)

27.     There are three mains types of agreements associated with the licensing of the

UNIX and UnixWare operating system source code to OEM licensees and other third parties:

the aforementioned Software Agreement, the Sublicensing Agreement, and the Product Schedule

License.  (574:17-581:12 (Broderick); 247:4-22 (Thompson); 369:11-370:9 (Chatlos).)  The

Software Agreement is the "umbrella" or "master" agreement that must be executed by any party

wishing to license a specific product, including any UNIX or even non-UNIX product, under a

Product Schedule License.  (576:15-18; 555:18-556:9 (Broderick).)  The Software Agreement

requires the licensee to keep confidential both the source code that it licenses and the derivatives,

or flavors, that the licensee creates based on that source code.  (Ex. 4 §§ 2.01, 7.06(a); 576:15-

577:8 (Broderick); 369:15-20 (Chatlos).)  The Sublicensing Agreement allows the OEM licensee

to compile into binary form the source code of the UNIX derivative the licensee creates from the

source code that it licenses under a Product Schedule License, and also authorizes the licensee to

sublicense copies of the resulting binary product to end-users.  (581:1-12 (Broderick); 369:21-21

(Chatlos).)  The Product Schedule License for each particular version of UNIX actually licenses

the source code for that version to the OEM licensee and specifies the fees the licensee must pay

for the right to use that version of the source code to build a derivative work, and the royalties

the licensee must pay going forward for each binary copy of the derivative work the licensee

distributes to end-users.  (370:4-9 (Chatlos); 247:4-22 (Thompson).)  A licensee does not even

receive a copy of the source code to the UNIX release, let alone have any rights to that version of

the source code, until the licensee executes the corresponding Product Schedule License for that

release.  (522:15-523:6 (Levine).)

    **B.     SCO's Purchase of the UNIX Technology and Business.**

28.     In 1995, then Novell President and CEO Robert Frankenberg directed Senior Vice

President Duff Thompson "to sell the UNIX business in its entirety" so that Novell could cut

costs and focus on its Netware computer networking business.  (88:9-90:12 (Frankenberg); 221:18-222:15 (Thompson).)  In the summer of 1995, Novell started negotiations with SCO, a software company that was itself a UNIX licensee and that developed and sold a UNIX flavor known as OpenServer.  (92:14-94:1 (Frankenberg).)

29.        After initial negotiations, the parties realized that SCO could not afford to pay in cash or stock the total price that Novell sought.  (459:14-23 (Mohan).)  Accordingly, the transaction was structured so that Novell would receive the "SVRX Royalties" that would continue to be paid by licensees to the licensor – now SCO – for distributions of certain pre-UnixWare versions of UNIX System V designated in the APA as "SVRX," for "System V Release __."  (234:17-237:17 (Thompson); 459:14-23 (Mohan); 905:18-906:6 (Sabbath); 798:1-14 (Madsen).)  The APA specifies that SCO would be the owner of legal title to these royalties and Novell would have only an equitable interest.  (APA § 1.2(b).)  SCO also paid Novell over six million shares of SCO stock, or about 17-20 percent of SCO stock, valued at the time at $50-60 million.  (2065:3-25 (Tolonen).)  In addition, Novell received a conditional interest of up to $84 million in UnixWare sales through 2002.  (Ex. 1 (APA) § 1.2(b), Schedule 1.2(b) § (b)(i)(c); 146:9-15.)

30.        The parties argued at trial over whether only the stock payment or also the royalty interests retained or received are properly considered part of the "purchase price."  That dispute over labels is of no consequence, as all of the above three revenue streams were in fact set forth in the Asset Purchase Agreement, and all were specified as something Novell would "receive" from SCO as consideration in the Term Sheet submitted to the Novell Board of Directors to explain the transaction.  (Ex. 754 at 5.)  Novell did "modeling" of the future SVRX royalty stream and valued it in the "hundreds of millions of dollars."  (354:8-15 (Chatlos).)  Novell

forecast that the SVRX royalty stream for 1995 alone would approximate $50 million.  (Ex. 754; 2066:1-12 (Tolonen).)

31.　　　On September 19, 1995, Novell and SCO executed the APA.  (Ex. 1.)  The parties entered into amendments to the APA on the Closing Date of the transaction, December 6, 1995 (Amendment No. 1), and on October 16, 1996 (Amendment No. 2).  (Id.)  The parties executed other documents in connection with the APA, including the Technology License Agreement ("TLA") referenced in Section 1.6 of the APA, the Bill of Sale, and the Operating Agreement. (Ex. 162 (TLA); Ex. 90 (Bill of Sale); Ex. X5 (Operating Agreement).)

32.　　　The APA defines "the Business" that SCO acquired as including the business of developing, licensing, and supporting UNIX and UnixWare software products, including "the sale of binary and source code licenses to various versions of UNIX and UnixWare."  (Ex. 1 (APA), Recital A.)

33.　　　SCO's acquisition of the UNIX and UnixWare business from Novell in 1995 was not limited to the business of selling binary versions of UNIX, a business that it could already operate as a UNIX licensee.  Novell through the APA effectively transferred to SCO ownership of the UNIX and UnixWare business in its entirety, subject to Novell's receipt of certain royalty rights and protections of those royalty rights.  Specifically, under the APA, Novell:

- transferred to SCO ownership and all copies of the UNIX source code, wherever located (Ex. 1, Schedule 1.1(a) Item IV);

- transferred to SCO its workforce of employees running the UNIX Licensing Group (Ex. Z3 at 2);

- executed with SCO an Asset Purchase Agreement, as opposed to a UNIX license;

- executed with SCO the TLA, which licensed back to Novell rights to use UNIX under certain restrictions (Ex. 1 (APA) § 1.6; Ex. 162 (TLA) § II); and

- transferred to SCO all of Novell's claims pertaining to the UNIX and UnixWare source code (Ex. 1 (APA), Schedule 1.1(a) Item II).

The sale of assets to SCO was therefore different from a simple license agreement by which a licensee received from Novell the right to develop its own flavor of UNIX based on a single distribution of a release of UNIX source code that the licensee was obligated to keep strictly confidential.

34.     The APA is by its terms an agreement transferring assets, not licensing them.  If there were any doubt, the APA itself provides that Novell and SCO intended for SCO to acquire "all of the Business," as defined above.  (Id. § 1.3(a)(i).)

35.     The evidence addressed below demonstrates that the APA also expressly transferred all rights of ownership to the source code in all versions of UNIX and UnixWare, transfers the software development agreements as to which Novell and prior owners were the licensors, and, as discussed below, transferred all of Novell's legal claims.  Numerous Novell documents clearly state that full ownership of the UNIX and UnixWare business, including source code, claims, and many other components, was transferred from Novell to SCO. Licensees who obtained the right to develop a flavor of UNIX under a restricted UNIX licensing arrangement did not receive a transfer of such assets.  While it is true that Novell retained the right to receive SVRX Royalties and reserved certain rights to protect that royalty stream, in the Court's view, this does not transform the APA into simply a licensing arrangement whereby SCO could only develop and market UnixWare and serve as an agent to collect royalties.

### C.     SCO's UNIX-Based Business Since the Amended APA.

36.     Contrary to being a mere licensee, since signing and closing on the APA, SCO has owned and has been the company who licensed to others the right to use the source code that makes up the UNIX and UnixWare operating systems by entering into Software License Agreements with OEMs and other third parties.  (98:15-24 (Frankenberg); 608:16-610:4 (Broderick); Docket No. 542 at 12.)  In addition to licensing the source code, SCO also

distributes two UNIX-based products in binary form, OpenServer and UnixWare, which many customers use as their operating system of choice.

37.        "SCO released several subsequent releases of UnixWare, including multiple versions of each UnixWare 2 and UnixWare 7, which are the latest implementation of System V and the latest generation of UNIX SVR 4.2 with SVR 4.2MP.  All of the releases of UnixWare subsequent to Novell's transfer of the business are releases of System V."  (Docket No. 542 at 7-8.)  The "commercially valuable technology from the prior versions is included in UnixWare, and UnixWare would not operate without its System V components.  The current version of UnixWare supports the newest industry-standard hardware."  (Id. at 8.)

38.        In licensing the UNIX source code (including UnixWare releases), "SCO also licensed each of the prior products upon which the newest version was built.  This practice began with AT&T, was continued by Novell, and then adopted by SCO.  For example, a licensee who executed a license for SVR4.2, had the same rights to the earlier versions of UNIX on which 4.2 was built, and the list of prior products reflected that right.  SCO regularly listed the older releases of UNIX, including numerous releases of System V, with the current license. Customers paid no additional fees for the rights to the prior products regardless of whether they had a previous license to the prior products."  (Id. at 12.)

39.        "The practice of including rights to prior products recognized that licensees developed their own versions of UNIX based on the most recent product and as an assurance to the licensee that they had rights to any of the technology included in that licensed product.  At this time, SCO was primarily contracting with computer manufacturers, or OEMs."  (Id.)

40.        Under the APA, SCO was transferred and owns the aforementioned agreements under which the UNIX and UnixWare operating system source code has been licensed to others.

(Ex. 1 (APA), Schedule 1.1(a).)  The Software Agreement, as noted, reflects a crucial component of SCO's UNIX-based business – namely, the requirement that the licensed UNIX source code and the derivatives based on it, including the methods and concepts embodied in the code and derivatives, be kept confidential.  (Ex. 4 §§ 2.01, 7.06(a); 576:15-577:8 (Broderick); 369:15-20 (Chatlos).)

## V.     NOVELL'S OBLIGATION TO TRANSFER THE COPYRIGHTS

### A.     <u>Specific Performance Pursuant to Amendment No. 2.</u>

#### 1.     <u>Novell's Obligation to Transfer "Required" Copyrights.</u>

41.    California law governs the APA.  (Ex. 1 (APA) § 9.8.)  The law of specific performance in California is applicable to SCO's primary argument.

42.    "Specific performance of a contract may be decreed whenever:  (1) its terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate."  <u>Blackburn v. Charnley</u>, 117 Cal. App. 4th 758, 766 (2004).  The Court concludes that SCO meets each of these elements.

43.    The parties do not dispute that each has remedies available to it under the APA and the California law of contracts.  SCO's legal remedy is inadequate.  The jury determined that the APA did not already transfer the copyrights to SCO.  To obtain the copyrights at this time is a matter of specific performance, an equitable remedy, based on Amendment No. 2, with which the Court agrees, requiring Novell now to transfer the required copyrights.

44.    In addition, the terms of any decree of specific performance rests in the "sound discretion" of the Court.  <u>De Anza Enters. v. Johnson</u>, 104 Cal. App. 4th 1307, 1315 (2003).

45.    "An order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires.  It

need not be absolute in form and the performance that it requires need not be identical with that due under the contract." Restatement (Second) of Contracts § 358(1) (1981). "The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible." Id. cmt. a; accord Rogers v. Davis, 28 Cal. App. 4th 1215, 1222 (1994).

46.    "The function of the court is to do complete justice; and it has power to mold its decree to that end." Restatement, supra, cmt. b.  The decree "may command a performance by the defendant that is not identical with that which he promised to perform."  Id. cmt. c; accord Rogers, 28 Cal. App. 4th at 1222.

47.    The primary relief SCO seeks falls within the foregoing parameters.  SCO asks the Court to order Novell to execute the documentation necessary to transfer the UNIX and UnixWare copyrights from Novell to SCO.  The decree will thus effectuate the purposes for which the amended APA was made.

48.    The Court notes that, in the APA, Novell promised that it would use its commercially reasonable efforts "to consummate and make effective the transactions contemplated" under the APA.  (Ex. 1 (APA) § 4.9.)  Novell also promised to "execute and deliver such other instruments and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby."  (Id. § 4.12.)

49.    Under the well-established California law of contracts generally, moreover, "[e]ach party to a contract has a duty to do what the contract presupposes he will do to accomplish its purpose." Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 868 (1965); accord Bewick v. Mecham, 26 Cal. 2d 92, 99 (1945).

50.    SCO argues that ownership of UNIX and UnixWare copyrights are "required" to protect its intellectual property associated with the UNIX and UnixWare business and that

Novell must therefore transfer the copyrights to SCO now.  The APA defines the Business that

SCO acquired as the business of developing, licensing, and supporting UNIX and UnixWare

software products, including the sale of both source and binary code licenses.  (Ex. 1 (APA),

Recital A.)  The APA effectuated that asset transfer by specifying a schedule of transferred

assets, Schedule 1.1(a) (the Assets Schedule), and a schedule of excluded assets, Schedule 1.1(b)

(the Excluded Assets Schedule).  (Id. § 1.1(a).)

     51.      Item I of Schedule 1.1(a) identifies the full scope of the transferred assets as

consisting of:

> All rights and ownership of UNIX and UnixWare, including but
> not limited to all versions of UNIX and UnixWare and all copies of
> UNIX and UnixWare (including revisions and updates in process),
> and all technical, design, development, installation, operation and
> maintenance information concerning UNIX and UnixWare,
> including source code, source documentation, source listings and
> annotations, appropriate engineering notebooks, test data and test
> results, as well as all reference manuals and support materials
> normally distributed by Seller to end-users and potential end-users
> in connection with the distribution of UNIX and UnixWare, such
> assets to include without limitation the following:

Item I then proceeds to identify by name all UNIX and UnixWare source code products and

binary products.

     52.      Item III of Schedule 1.1(a) goes on to list additional specific assets that are part of

the UNIX and UnixWare business being transferred to SCO:

> All of Seller's [Novell's] rights pertaining to UNIX and UnixWare
> under any software development contracts, licenses and any other
> contracts to which Seller is a party or by which it is bound and
> which pertain to the Business (to the extent that such contracts are
> assignable), including without limitation . . .

Item III then separately lists specific types of software development contracts that were being

transferred to SCO.  Item III.L on that list of contracts with respect to which Novell was

transferring all of its rights is:

> Software and Sublicensing Agreements – This includes the
> software and sublicensing agreements that Seller has with its
> OEM, End User and Educational customers.  The total number of
> these agreements is approximately 30,000.

53.     Item II of Schedule 1.1(a) specifically lists Novell's claims as among the all rights

and ownership in UNIX and UnixWare that was being transferred to SCO:

> All of Seller's [Novell's] claims arising after the Closing Date
> against any parties relating to any right, property or asset included
> in the Business.[4]

54.     The Excluded Assets listed on Schedule 1.1(b) originally contained a provision

that stated the following:  "All copyrights and trademarks, except for the trademarks UNIX and

UnixWare."  (Ex. 1 (APA), Schedule 1.1(b), Item V.)  This language was replaced when the

parties executed Amendment No. 2.

55.     In connection with the APA, Novell and SCO also entered into a Bill of Sale,

confirming the transfer of all of the Assets to be transferred under the APA.  (Ex. 90.)

56.     In October 1996, to address a question raised for the first time with respect to the

transfer of the UNIX and UnixWare copyrights, the parties executed Amendment No. 2 to the

APA.  Paragraph A of Amendment No. 2 states that Schedule 1.1(b) of the APA "shall be

revised to read":

> All copyrights and trademarks, except for the copyrights and
> trademarks owned by Novell as of the date of the Agreement
> required for SCO to exercise its rights with respect to the
> acquisition of UNIX and UnixWare technologies.  However, in no
> event shall Novell be liable to SCO for any claim brought by any
> third party pertaining to said copyrights and trademarks.

---

[4]     Novell Vice President Duff Thompson confirmed that, as is evident from the plain
language of Schedule 1.1(a) of the amended APA, Novell intended to transfer to SCO all of the
legal claims that Novell otherwise would have relating to the UNIX and UnixWare business
being sold to SCO, which indisputably included the UNIX and UnixWare source code.  (248:20-
249:23.)  Novell did not offer any evidence to the contrary.

57.       Alison Amadia, Novell's negotiator of Amendment No. 2 and the principal

support for Novell's theory that Amendment No. 2 simply confirmed some type of a "license,"

acknowledged that copyrights that are required for SCO to exercise its rights in the UNIX and

UnixWare technologies it had acquired were intended to be <u>transferred</u>, not licensed, to SCO.

(2177:15-18.)  Ms. Amadia further testified that she did <u>not</u> have any view today as to what

copyrights are required for SCO to exercise its rights.  (2157:1-3.)

58.       Ms. Amadia's testimony that some further process was required under

Amendment No. 2 for SCO to obtain the copyrights is a basis that supports SCO's claim for

specific performance.  Ms. Amadia testified that "to the extent that they believe what was

required in order for them to exercise their rights under the APA was full copyright ownership,

then they would need to do something beyond this."  (2163:25-2164:9.)  If (as Novell has

contended) Amendment No. 2 was intended to constitute a process by which SCO could request

transfer of copyrights that were required, that would be consistent with a determination now that

such copyrights are required and that Novell must specifically perform by transferring the

copyrights to SCO.

## 2.       <u>The UNIX and UnixWare Copyrights Are "Required."</u>

59.       The UNIX and early UnixWare technology lies at the heart of SCO's current

version of UnixWare.  The source code of the versions of UnixWare that SCO acquired in 1995

(and built its business around licensing in the ensuing years) consists almost entirely of "UNIX"

source code (1732:1-11 (Nagle); 1781:21-26 (Nagle)), and the current version of UnixWare that

SCO sells still consists in significant part of "UNIX" source code (1784:20-22 (Nagle)).

60.       UnixWare was a "version of UNIX is – [that] was essentially rebranded and some

cosmetic and a few minor features added to it to create UnixWare 2.0.  UnixWare 2.0 is almost

19

entirely UNIX System V release 4.2." (1732:1-11 (Nagle).) Thus, "90, 95 percent" of UnixWare was older UNIX code. (1782:6 (Nagle).) UnixWare is not simply a separate, stand-alone version or block of UNIX that can be detached from the UNIX code and run on its own – it is the latest release of UNIX. Neither the early version of UnixWare nor the latest version of UnixWare would work if the "UNIX" source code were removed. (1784:7-22 (Nagle).)

61.     The evidence addressed below shows that given the technological reality of UnixWare's development and ancestry, without copyright ownership, SCO does not have the right to enforce in court the copyrights at issue in the UNIX and UnixWare technology, and thus to protect the core technology in UnixWare. Numerous witnesses testified that the ability to protect the intellectual property was and is critical to the UNIX and UnixWare business:

62.     <u>Former Novell and Current SCO UNIX Contract Manager Bill Broderick</u>. Mr. Broderick testified that "you show your ownership and protect your software" "by copyright," and that accordingly, SCO requires ownership of the copyrights to indemnify licensees and protect the software against third party misuse or disclosure. Mr. Broderick deemed "the ability to enforce prescriptions against third parties" as "integral to the operation of SCO's business" and thus testified without rebuttal that SCO "would be out of business" if it "couldn't protect [its] software" "through copyrights." (666:9-21; 667:16-668:6.)

63.     <u>SCO Manager of Law and Corporate Affairs Kimberlee Madsen.</u> Ms. Madsen testified that during her tenure at SCO, the company "required all" the UNIX and UnixWare copyrights "in order for this UNIX, UnixWare business to be successful." She explained that the copyrights were "essential" "to be able to protect and enforce [SCO's] intellectual property rights" in UNIX, such as when SCO took action against Microsoft in the European Union in 1997 (in which SCO, through the law firm that had represented it in the APA transaction with

Novell, specifically and expressly represented that it was the owner of the UNIX copyrights).
(780:23-24; 802:23-803:1; 865:16-21; 866:18-21; 875:7-14; 884:21-885:21.)

     64.    <u>SCO General Counsel Steven Sabbath.</u>  Mr. Sabbath testified that "we needed the copyright in order to defend the property" and "protect the technology" because "we didn't want somebody to be able to go off and pirate, for example."  Mr. Sabbath explained that "if you didn't own the copyrights, how could you even go after somebody that is pirating your software? How could you enforce your right to the technology?  So you would need all the copyrights and binaries and source code."  (913:1-15; 914:17-915:5.)

     65.    <u>SCO CEO Darl McBride.</u>  Mr. McBride explained that "ownership of the UNIX copyrights" was "absolutely" "required for SCO's business" because without that ownership you cannot "enforce your rights if somebody tries to take advantage of your property."  He explained that running the business without copyright ownership "would be like the Beatles trying to protect their music catalog without having the underlying copyrights.  You have to have the copyrights to protect it."  (997:11-23.)

     66.    <u>Former Novell and Current SCO UNIX Product Manager & OEM Relations Manager John Maciaszek.</u>  Mr. Maciaszek testified that "the copyrights are required to operate SCO's business" because you need ownership of the code and "the copyrights associated with it" in order "to have the ability to give a license to a client."  He further explained that "you would not be able to carry out that business" without "ownership" of those copyrights.  In addition, ownership of copyrights was required to be able to enforce and protect the intellectual property upon which the software products were predicated.  (1686:25-1687:24.)

     67.    <u>SCO General Counsel Ryan Tibbitts.</u>  Mr. Tibbitts explained that the "copyrights are critical for us to run the business that was purchased from Novell in '95, both the SCOsource

business and the right to protect that core UNIX intellectual property," and that "we own the core UNIX intellectual property and a very critical component of that at this point in time is to protect that IP, and we have got to have that IP to keep other people from encroaching into our marketplace."  (1844:25-1845:18.)

68.     There is no sensible interpretation of the amended APA under which SCO did not have the right to protect its business.  Protecting against misuse of the crown jewels of the business – the highly confidential source code – was a critical <u>part</u> of the business itself.  The evidence at trial further showed that SCO had concluded both that the use of Linux was hurting the UnixWare business and that assets SCO had acquired had been misappropriated into Linux.  (<u>See, e.g.</u>, 1836:23-1840:4 (Tibbitts); 1848:19-23 (Tibbitts); Ex. 575.)

69.     SCO's need to bring copyright enforcement actions does not turn on the existence of the SCOsource program whose demise Novell focused on at trial.  Mr. Tibbitts credibly explained that if SCO "could not protect" the "core intellectual property" in UnixWare, then "this venerable UNIX business that has been around for many years that many customers around the world are using would simply die off, and we have got to have that intellectual property to protect those crown jewels."  (1845:21-1846:1.)

70.     Shortly after the parties executed Amendment No. 2, for example, SCO, through the law firm that represented it in the APA, took the position in a formal petition against Microsoft Corporation in the European Union that SCO had acquired the UNIX copyrights and was the UNIX copyright holder.  (Ex. 127 at §§ 3.4, 4.9.)  Such copyright ownership was part and parcel of SCO's petition, and there can be no reasonable question that bringing the petition was part of SCO's pursuit and maintenance of its UNIX-based business.  The same is true for the settlement agreement between the parties that resolved the dispute.  (Ex. 199, Recital B.)

71.      In addition, as noted, SCO also acquired "All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business." (Ex. 1 (APA), Schedule 1.1(a), Item II.)  SCO thus acquired, among other claims, all of the claims, which Novell otherwise would have, relating to the use or misuse of the UNIX and UnixWare source code, all of which was included among the property in the Business.  (Id. at Items II, IV.)  The claims that SCO acquired are part of the "rights with respect to the acquisition of UNIX and UnixWare technologies" that SCO had acquired under the APA, and ownership of the copyrights is required to prosecute such claims.

72.      The parties do not appear to dispute that if SCO does not own the copyrights, it cannot enforce them in court.  See, e.g., Davis v. Blige, 505 F.3d 90, 98 (2d Cir. 2007) (owner of a copyright has the exclusive right to bring suit to enforce the copyrights); Silvers v. Sonly Pictures Entmt., Inc., 402 F.3d 881, 885 (9th Cir. 2005) (copyright owner cannot transfer its accrued copyright infringement claims without also transferring the copyrights); 1 Copyright Throughout the World § 19:29 (2009); Copyrights and Copywrongs:  The Rise of Intellectual Property and How It Threatens Creativity, 3 J. High Tech. L. 1 (2003); 3 Patry on Copyright § 7:2 (2010) (explaining that "copyright is not just a bundle of rights; it is also the ability to enforce those rights"); accord Jury Instruction No. 34A.[5]

---

[5]      Until the penultimate day of trial, Novell continued to reserve the right to argue to the jury that SCO had acquired some type of "exclusive license" under the amended APA.  When the prospect of such an argument arose during the charging conference, however, SCO pointed out that under the Copyright Act, if SCO had obtained an "exclusive license," then it necessarily had acquired ownership of the copyrights.   (3/25/10 Jury Instruction Conf. at 35-36.)  See 17 U.S.C.A. § 101; Traicoff v. Digital Media, Inc., 439 F. Supp. 2d 872, 877-79 (S.D. Ind. 2006) (surveying the relevant precedent); accord 1 The Law of Copyright § 4:44 (2009) (explaining that "the obvious conclusion is that an exclusive license is a transfer of copyright ownership under the statute").  The Court instructed the jury accordingly.  (Jury Instruction No. 33B.)  In fact, at the conference, Novell's counsel made clear that Novell's view was that SCO does not

73.     Novell has presented no conflicting evidence or law.  To the contrary, Novell's

former General Counsel Mr. LaSala admitted both generally that "the agreements speak to what

copyrights SCO requires in order to exercise its rights under the agreement" and specifically that

"SCO has the rights to bring claims to protect its business."  (1976:25-1977:7.)

74.     In its decision, moreover, the Tenth Circuit pointed to the claims that SCO had

acquired under the APA:

> SCO indisputably acquired certain assets under the APA.  SCO's
> claim, as we understand it, is that copyrights are necessary to
> protect the value of the assets themselves, and are therefore
> necessary to prosecute seller's claims "relating to any . . . asset"
> included in the Business.  Novell has not explained, for instance,
> what recourse SCO had under Novell's theory of the transaction if
> a third party had copied and attempted to resell the core UNIX
> assets Santa Cruz received in the deal.

SCO, 578 F.3d at 1218 n.4.

75.     It also bears emphasis that the relevant question is whether under Amendment No.

2 the copyrights are "required for SCO to exercise its rights with respect to the acquisition of

UNIX and UnixWare technologies."  The fact that there was evidence that SCO could physically

continue to sell its UnixWare and OpenServer products without copyright ownership (such as the

evidence that SCO contemplated selling that part of the business last year, while retaining its

pending claims, copyrights, and additional licensing rights and claims) is not dispositive.  (See,

e.g., 664:19-666:21 (Broderick).)  That in no way suggests that the copyrights are not required

for SCO to exercise and protect the full rights it acquired form Novell.  Amendment No. 2

requires Novell to transfer the UNIX and UnixWare copyrights if they are required for SCO to

exercise any of its ownership rights in connection with the UNIX and UnixWare business it

acquired.  Those rights also included the right to license the UnixWare source code, and the prior

_____

have any sort of "exclusive license" in the way that term is used in the Copyright Act or case
law.  (3/25/10 Jury Instruction Conf. at 31-34.)

UNIX source code therein, to existing and new licensees – which business depends on protection of that source code and thus requires copyright ownership.

76.     As to specific performance, the terms of the APA are sufficiently definite in this regard, because SCO is entitled to the transfer of the "required" copyrights identified in Amendment No. 2 – that is, the copyrights for the UNIX and UnixWare technology as of the date of the APA, which is specifically identified in Schedule 1.1(a) of the APA.

77.     In addition, the consideration that SCO paid to Novell under the APA is adequate. The parties agree that no consideration specific to Amendment No. 2 was paid or required. Instead, the significant consideration that SCO paid under the APA supports the requirement that Novell transfer the required copyrights.

78.     Accordingly, for all of the foregoing reasons, the Court concludes that transfer of the UNIX and UnixWare copyrights is required for SCO to protect the intellectual property that is related to the UNIX and UnixWare business and to pursue the legal claims transferred to SCO under the APA.  Therefore the copyrights are "required" for SCO pursuant to Amendment No. 2 and must now be transferred by Novell to SCO.

     **B.**     **Specific Performance to Effectuate the Parties' Intent.**

          **1.**     **The Prospect of Inadequate Transfer Documentation.**

79.     SCO further contends that specific performance is warranted on the ground that the parties intended that the copyrights transfer, that Amendment No. 2 allows for such transfer, and that any failure in the operative documents to accomplish such a transfer that the jury considered does not stand as an obstacle to this Court now effectuating the intent of the parties to the transaction that such transfer accompany the sale of the UNIX and UnixWare business, including the very source code as to which the copyrights indicate ownership.

80.      It is well established across jurisdictions that a court may order specific

performance to account for some technical failure in the documentation of the parties' intent, in

particular with respect to the transfer of property.  See, e.g., Schuler v. Graf, 862 N.E.2d 708,

712-15 (Ind. Ct. App. 2007); O'Berry v. Gray, 510 So. 2d 1135, 1137-38 (Fla. Ct. App. 1987);

Eliason v. Watts, 616 P.2d 427, 429-31 (Utah 1980).

81.      The law of specific performance in California also applies to this separate ground

for SCO's claim.  In determining the "parties' intent" in applying specific performance, the

Court may consider extrinsic evidence of such intent.  De Anza, 104 Cal. App. 4th at 1315;

United Truckmen v. Lorentz, 114 Cal. App. 2d 26, 28-29 (1952).  In DVD Copy Control Ass'n

v. Kaleidescape, Inc., 176 Cal. App. 4th 697 (2009), for example, the trial court had concluded

that the terms of the contract at issue were insufficiently definite to permit specific performance.

The appellate court reversed, finding that the extrinsic evidence at issue was sufficient to clarify

any ambiguity in that portion of the agreement and thus to permit specific performance

(depending on the trial court's assessment of other factual issues on remand).  Id. at 719-20.

Similarly, in Blackburn v. Charnley, 117 Cal. App. 4th 758 (2004), the court expressly

concluded that "the properly admitted extrinsic evidence rendered the description of the lots

conveyed by the purchase agreements sufficiently definite for enforcement.  The court did not err

in ordering specific performance."  Id. at 767; see also Ontario Downs, Inc. v. Lauppe, 192 Cal.

App. 2d 697, 704 (1961) (finding that if "any ambiguity remains, extrinsic evidence is

admissible to show the actual intent of the parties" with respect to prospect of "a decree of

specific performance" concerning property at issue).

82.      In assessing the intent of the parties on specific performance, "a court will avail

itself of all of the usual aids in determining the scope of the agreement."  Restatement (Second)

of Contracts § 362 (1981).  Such extrinsic evidence includes the parties' course of performance.

See, e.g., Okun v. Morton, 203 Cal. App. 3d 805, 819 (Cal. Ct. App. 1988).  "It is only when the

extrinsic evidence fails to remove the ambiguity that specific performance must be refused."  Id.

(quotations and citations omitted).  It is within the court's discretion to infer from the extrinsic

evidence what specific acts the parties must have intended for one party to undertake.  Id.; see

also SCO, 578 F.3d at 1217 (practical construction is "best evidence" of parties' intent).  The

Court finds it within its discretion to award specific performance on the foregoing ground.

### 2.      The Parties Intended to Transfer the Copyrights.

83.      Having concluded that an award of specific performance is within its discretion if

the amended APA failed adequately to implement or reflect the parties' actual intent, the Court

concludes that the parties to the amended APA did intend for Novell to transfer the UNIX and

UnixWare copyrights.

84.      **The Language of the Amended APA.**  The Asset Schedule of the APA covers

copyrights by virtue of providing for the transfer of all rights of ownership in, among other

things, the source code for all then-extant versions of UNIX and UnixWare.  While the language

of the Excluded Asset Schedule originally excluded all copyrights from the transferred assets,

that language was replaced by Amendment No. 2.[6]

85.      The APA, as noted, defines the Business that SCO acquired as the business of

developing, licensing, and supporting UNIX and UnixWare software products – including both

source and binary code licenses.  (Ex. 1 (APA), Recital A.)  The APA further provides that

---

[6]      Although Novell suggested otherwise to the jury at trial, the language of Amendment No.
2 replaced, as a matter of law, the old language in the Excluded Assets Schedule of the APA.
SCO, 578 F.3d at 1210-11.  The new language controls this Court's interpretation of the deal.  Id.
Accordingly, the old language of the APA concerning the exclusion of copyrights thus itself
could not serve as a basis to conclude that the copyrights are not required or not intended to have
transferred.

Novell and SCO intended for SCO to acquire "all of the Business."  (Id. § 1.3(a)(i).)  The APA

identifies as transferred assets those listed in Schedule 1.1(a) but not excluded by Schedule

1.1(b).  (Id. § 1.1(a).)

86.     Item I of Schedule 1.1(a) in turn identifies the full scope of the transferred assets

as consisting of "All rights and ownership of UNIX and UnixWare" including "without

limitation" the specific assets listed in the rest of Schedule 1.1(a).

87.     The specific, catch-all phrase "All rights and ownership of UNIX and UnixWare"

includes the copyrights of UNIX and UnixWare – the core intellectual property on which the

UNIX and UnixWare licensing business depends.  SCO, 578 F.3d at 1213-14.  A transfer of "all

right, title and interest to computer programs and software can only mean the transfer of the

copyrights as well as the actual computer program or disks."  Shugrue v. Cont'l Airlines, Inc.,

977 F. Supp. 280, 286 (S.D.N.Y. 1997) (emphasis added); see also ITOFCA, Inc. v. Megatrans

Logistics, Inc., 322 F.3d 928, 931 (7th Cir. 2003) (transfer of "all assets" to a business includes

copyrights); Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323, at

*6 (D. Kan. May 25, 1993) (transfer of "all rights" in a program includes copyrights).  In

addition, the "without limitation" language makes clear that the list of Items that follow in the

Assets Schedule is non-exhaustive.[7]  Where copyrights are one of the "rights and ownership" of

---

[7]     Novell witness Tor Braham agreed with that characterization of the "without limitation"
language.  Mr. Braham testified:

> If you are making a list of something under a general statement,
> then the list doesn't – if there's something that's not on the list, it
> doesn't necessarily mean that it's not included.  So, it enables you
> to talk about something and give examples but not necessarily give
> every single example, so your list is representative but not
> necessarily complete.  It may be complete.  It may not be.  But the
> – what you're saying is that, by virtue of making the list, you're
> not necessarily making it complete.

UNIX and UnixWare covered by Section I of Schedule 1.1(a), such copyrights need not have been expressly included in the intellectual property transferred in Section V of the Schedule.

88.     The inclusion of copyrights in the sale of the source code is logical.  Indeed, it is difficult to comprehend that a party would transfer "all rights and ownership of" source code while retaining the copyrights.  In a licensing arrangement, the licensor does <u>not</u> transfer all rights and ownership of the source code.  Here, having sold those rights, it logically follows that the copyright ownership would be included in the sale.  This common-sense proposition is reflected in the testimony of numerous witnesses, addressed below, who spoke to what they saw as the obvious inclusion of copyrights in the sale of the UNIX and UnixWare source code.

89.     In addition to requiring copyright ownership to protect the intellectual property contained within UNIX and UnixWare (as shown above), SCO also requires the copyrights to facilitate certain types of source code licensing, which was an indisputable portion of the UNIX and UnixWare business SCO acquired.  Such source code licensing was historically part of the UNIX and UnixWare business, SCO's business included in large part entering into new source code licenses, as contemplated by the APA,[8] and evidence at trial established that the copyrights were needed for such licensing to occur, as there was nothing in the APA which granted a license for such activity.  (2543:21-2544:3 (Frankenberg); 241:19-242:3 (Thompson); 666:9-21 (Broderick); 667:16-668:6 (Broderick); 503:9-11 (Michels); 504:6-7 (Michels); 442:15-443:6 (Wilt); 912:21-913:6 (Sabbath); 914:17-915:5 (Sabbath).)

_____

(2375:21-2376:2.)  He thus acknowledged with respect to the language:  "It includes the assets, without limitation, meaning at least the following, but there may be more."  (2376:3-5.)

[8]     SCO was permitted to enter into new source code licenses for both UnixWare (the latest version of UNIX) and the older versions of UNIX when licensed together with UnixWare. (APA, Amendment No. 1 ¶ J; Docket No. 542 at 6.)

90.     The only alternative interpretation that Novell offered at trial – that Amendment No. 2 merely "affirms" that SCO had obtained some sort of a "license" to use copyrighted material under the APA – is not reasonable and not supported by the evidence or the law.  As the Tenth Circuit observed:  "Whatever the Amendment means, it refers to the ownership of copyrights, not to licenses."  SCO, 578 F.3d at 1216.  The Tenth Circuit stated:  "Although Amendment No. 2 did not purport to amend Schedule 1.1(a), this does not mean that the balance of assets transferred to SCO remained unchanged.  The transaction was structured such that SCO would acquire 'all of Seller's right, title and interest in and to the assets . . . identified on Schedule 1.1(a),' but that 'the Assets to be so purchased not include those assets (the 'Excluded Assets') set forth on Schedule 1.1(b).'  Schedule 1.1(a), in turn, provided that SCO would receive '[a]ll rights and ownership of UNIX and UnixWare . . . including all source code,' a broad set of assets limited only by Schedule 1.1(b).  As a result, any change to the set of Excluded Assets in Schedule 1.1(b) necessarily implicated those copyrights actually transferred under Schedule 1.1(a)."  SCO, 578 F.3d at 1213-14.

91.     As indicated in the Tenth Circuit's decision, the sensible interpretation of Amendment No. 2 is that it does not merely "affirm" that SCO had received a "license" under the APA.  The Tenth Circuit considered the same argument that Novell makes to this Court – that Novell's rejection of certain language that SCO had proposed in an initial draft of Amendment No. 2 means that the parties did not intend to transfer the copyrights in agreeing to the final language of Amendment No. 2 – and found it wanting:

92.     "Novell contends that because it did not accept Santa Cruz's initial proposal, there is no basis for construing Amendment No. 2 as SCO would – an affirmation of the transfer of all UNIX and UnixWare copyrights.  It insists that the language reflects its explanation of

Amendment No. 2 as a mere affirmation of Santa Cruz's implied license to use the copyrights."

SCO, 578 F.3d at 1216. "As an initial matter, we are skeptical of Novell's interpretation of the

Amendment.  Whatever the Amendment means, it refers to the ownership of copyrights, not to

licenses." Id.

93.       "[I]t is plausible to think that Santa Cruz would have found the final language

equally sufficient for its purposes, given its insistence that all the UNIX copyrights were required

for it to exercise its rights under the deal.  Alternatively, the final language of Amendment No. 2

may have represented a compromise whereby Novell  agreed to confirm that Santa Cruz obtained

ownership only of those copyrights 'necessary' for Santa Cruz to run its business." Id.

94.       The absence of any reference to any "license" is particularly important where

neither the APA nor the Amendment uses the word "license" with respect to SCO's rights and

where neither "grants" SCO any rights – the words the parties would have used if they had

wanted to confirm any license, and the ones they did use in the APA in describing the

Technology License Agreement.  (Ex. 1 (APA) § 1.6, Ex. 162 (TLA) § II.)  Under that

Agreement, with certain restrictions on such use, Novell unambiguously did receive a "license"

to use the UNIX and UnixWare source code in Novell's own products.

95.       **Extrinsic Evidence Regarding Amendment No. 2.**  Ms. Amadia's testimony

regarding any SCO "license" is equally relevant to assessing the parties' intent to transfer the

UNIX and UnixWare copyrights.  Ms. Amadia ultimately acknowledged at trial that copyrights

that are required for SCO to exercise its rights in the UNIX and UnixWare technologies it had

acquired were intended to be transferred, not licensed, to SCO.  Ms. Amadia testified on cross-

examination that "if there are copyrights that are required for SCO to exercise its rights, like the

UNIX and UnixWare trademarks, they were transferred."  (2177:15-18.)

96.        Ms. Amadia had testified on direct examination to her view that Amendment No. 2 did not transfer copyrights, but it became clear thereafter that she took that position solely on the grounds that, in <u>her</u> view, there was no category of copyrights at the time that <u>were</u> required for SCO.  (21654:12-21; 2165:17-18.)  She further testified that she did <u>not</u> have any view today as to what copyrights are required for SCO to exercise its rights.  (2157:1-3.)  On cross-examination, she thus acknowledged that if there were any such category of copyrights, then they <u>did</u> transfer.  (2178:15-18; 2176:13-21; 2177:25-2178:3; 2160:3-7.)

97.        Ms. Amadia's testimony stands in agreement with the testimony of SCO negotiator and general counsel Steve Sabbath.  Mr. Sabbath testified to his intent and understanding that Amendment No. 2 was intended to confirm that SCO had acquired the copyrights.  Mr. Sabbath testified that "the intent was clearly to me that all the copyrights for the UNIX and UnixWare were to be transferred to Santa Cruz Operation" and that the Excluded Asset Schedule was intended to exclude the Netware copyrights.  (900:23-901:9.)  Mr. Sabbath further testified that SCO "bought the UNIX business from Novell, all copyrights pertaining to that business came with the product.  Amendment Number 2 was meant to confirm that." (911:6-14.)  Novell has pointed to prior declaration testimony that Mr. Sabbath had given, but that testimony is not substantive evidence at all; it was admissible only to suggest that Mr. Sabbath was not credible.  Moreover, Mr. Sabbath had never stated previously that Novell had retained the UNIX and UnixWare copyrights or that he never intended they be acquired.  To the contrary, even Ms. Amadia's testimony was that Mr. Sabbath told her that the copyrights had been excluded as a result of a "typographical error in the original APA" that required correction. (2184:25-2185:1.)

32

98.     The testimony of the only other Novell witness on Amendment 2, James Tolonen, does not support a contrary result.  Mr. Tolonen did not participate in the drafting or negotiation of the language, and while Mr. Tolonen expressed the view that he did not intend Amendment No. 2 to transfer copyrights, that absolutist view cannot be squared with the plain language of the Amendment.  As noted, the Tenth Circuit stated:  "Whatever the Amendment means, it refers to the ownership of copyrights, not to licenses."  SCO, 578 F.3d at 1216.

99.     Other provisions of the APA are consistent with SCO acquiring ownership of UNIX and UnixWare copyrights.  The TLA entered into as part of the APA gives Novell a license-back to use the "Licensed Technology," and that "Licensed Technology" includes the UNIX and UnixWare source code.  (Ex. 1 (APA) § 1.6, Schedule 1.1(a) Item I; Ex. 162 (TLA) § II.A.)  The TLA thus unambiguously gives Novell a license-back to use the UNIX and UnixWare source code in Novell's own products (subject to certain limitations).  Of course, if Novell had retained the UNIX and UnixWare copyrights, it would not have needed any license-back to use the UNIX and UnixWare source code in Novell's own products.  (107:23-108:1 (Frankenberg); 847:4-7 (Madsen).)  The evidence showed that Novell itself thinks that it is reasonable to read the TLA as inconsistent with a reading of the APA under which the UNIX and UnixWare copyrights were retained.  (1965:4-1966:4 (LaSala).)  The TLA also clearly identified SCO as the "owner" of the Licensed Technology.  (Ex. 162 (TLA) § III.)

100.    Novell suggests that the license-back was necessary because it would permit Novell to use in its products the technology in the "Merged Product" that SCO was to develop after the execution of the APA.  But the TLA unambiguously gives Novell a license-back to much more than just the source code in the Merged Product; it gives Novell such a license for the existing UNIX and UnixWare source code itself.  (Ex. 1 (APA) § 1.6, Schedule 1.1(a) Item I; Ex.

162 (TLA) § II.A.)  Where the APA expressly refers to the TLA and vice versa and the two agreements are obviously related agreements (Ex. 1 (APA) § 1.6; Ex. 162 (TLA) § I), it would be unreasonable to read the amended APA in a manner that renders it inconsistent with the unambiguous terms of the TLA.

101.    Novell has also previously argued that there is no inconsistency between the exclusion of copyrights and the TLA because where the copyrights are excluded, SCO could not have licensed the <u>copyrights</u> back to Novell.  This argument misses the point.  The relevant question is whether Novell would have needed any license to the UNIX and UnixWare <u>source code</u> – which indisputably <u>had</u> transferred to SCO under the APA – if Novell had retained the copyrights <u>to</u> that code.  The clear answer is no.

102.    **<u>The Testimony of the Negotiators and Principals Regarding the APA.</u>**  The preponderance of testimony of the negotiators and principals to the transaction on both Novell's and SCO's sides of the transaction shows that Novell intended to transfer the UNIX and UnixWare copyrights.

103.    A total of ten witnesses – including multiple witnesses from each of the SCO and Novell sides of the transaction – testified to their intent and understanding that Novell had sold and SCO had acquired the UNIX and UnixWare copyrights under the APA:

104.    <u>Novell President and CEO Robert Frankenberg.</u>  Mr. Frankenberg testified that it was the intent at the beginning of the transaction, throughout the transaction, and when the transaction closed, to sell the copyrights in UNIX and UnixWare and to exclude the NetWare copyrights because Novell was retaining the Netware business.  (176:9-177:3; (2558:17-2559:7.)  Mr. Frankenberg testified that no other member of his board of directors had the authority to negotiate a deal apart from what the executives had negotiated across the table from SCO.

(178:4-11.)  And Mr. Frankenberg testified that Messrs. Tolonen, Bradford, and Braham had no authority to decide whether copyrights would be part of the deal, as the deal had already been negotiated with SCO before those individuals even began their involvement in the process of documenting the deal.  (2541:18-2542:4.)  Confirming the obvious, Novell witness Jack Messman, a member of Novell's board of directors at the time and subsequently Novell's CEO, acknowledged that Mr. Frankenberg "was in a position to know what the deal was."  (2298:3-7.)

105.    Novell Senior Vice President Duff Thompson.  Mr. Thompson testified that Novell told SCO that it was selling all of the UNIX and UnixWare business "lock, stock and barrel, the whole thing" including the copyrights.  (230:15-231:13.)  He further testified that he never asked the attorneys documenting the deal from Novell's end to change the deal so that the UNIX and UnixWare copyrights would be retained.  (233:1-15.)

106.    Novell Senior Director and Chief Negotiator Ed Chatlos.  Mr. Chatlos testified that he participated in the face-to-face negotiations with SCO, including weekly travel from New Jersey to California for three months.  (351:2-7.)  He testified that "the deal with SCO was to include the copyrights" for UNIX and UnixWare and to exclude the copyrights for the Netware business that Novell was not selling, and that he understood Schedule 1.1(b)'s exclusion of copyrights to be referring to the NetWare copyrights.  (352:5-17; 359:20-362:3.)  He further testified that holding back the UNIX and UnixWare copyrights would have been inconsistent with the directives he was given from Mr. Thompson and with the directives and authority given to the lawyers who documented the deal.  (354:16-355:5.)  Mr. Chatlos testified that the deal he negotiated included the UNIX and UnixWare copyrights and that changing the deal to exclude the copyrights "would have been unethical."  (354:16-355:5.)

107.     Novell Vice President of Strategic Relations Ty Mattingly.  Mr. Mattingly testified that during the months of negotiations that he attended, no one from Novell ever suggested that Novell was retaining the UNIX and UnixWare copyrights and that the copyrights the parties intended to withhold were the Netware copyrights for the Netware business that Novell was retaining.  (677:5-13; 690:18-22.)

108.     Santa Cruz President and CEO Alok Mohan.  Mr. Mohan testified that the deal "absolutely" included the UNIX copyrights as part of the business that SCO was acquiring. (461:19-462:9.)  Like Novell's own witnesses, he testified that SCO's understanding was that it was acquiring the business "lock, stock, and barrel."  (464:4-19.)  He testified that no one from Novell ever said to him prior to the execution of the APA that Novell intended to retain any UNIX or UnixWare copyrights.  (467:24-468:6.)

109.     Santa Cruz Vice President of Business Development Jim Wilt.  Mr. Wilt testified that it was his "intent on behalf of SCO to acquire, through the APA, Novell's entire UNIX and UnixWare business, including the UNIX and UnixWare source code and all associated copyrights" and that he believed that Novell's intent was to sell those assets and rights as well. (445:21-446:5.)  He further testified that if Novell had ever said that it was retaining the UNIX and UnixWare copyrights that would have been "extremely remarkable and probably would have ended the negotiations."  (443:7-19.)

110.     Santa Cruz Assistant Negotiator Kimberlee Madsen.  Ms. Madsen testified that it was SCO's intent to acquire the UNIX and UnixWare copyrights as part of the business and that it was her understanding and belief after the transaction was completed that SCO had acquired those copyrights.  (783:3-784:4; 788:24-789:5; 814:24;815:3.)  She also testified that Mr. Seabrook's report to the SCO board of directors never suggested that Novell had retained any

UNIX or UnixWare copyrights.  (788:5-8;788:20-23.)  She further testified that no one from Novell had ever said that Novell would retain any UNIX or UnixWare copyrights.  (783:3-784:4.)  Ms. Madsen further testified that during the 1996 dispute with Novell concerning its conduct with respect to IBM, Novell never asserted that it had retained ownership of the UNIX and UnixWare copyrights.  (802:3-7.)

111.      Novell In-House Counsel Burt Levine.  Mr. Levine was involved in review of the very asset schedules that originally included language excluding copyrights.  Mr. Levine testified that that language did not reflect Novell's intent and that, under the APA, SCO "obtained a full right, title and interest in ownership" in UNIX and UnixWare that "would automatically convey the copyright along with the rest of the business assets."  (522:3-14.)  Indeed, Mr. Levine characterized the idea that Novell would sell the business while withholding the copyrights as not being "ethical."  (521:17-522:2.)

112.      SCO General Counsel Steve Sabbath.  Mr. Sabbath testified that "the intent was clearly to me that all the copyrights for UNIX and UnixWare were to be transferred to Santa Cruz Operation" and that the Excluded Assets Schedule was intended to exclude the Netware copyrights.  (900:23-901:9.)  Mr. Sabbath further testified that when SCO "bought the UNIX business from Novell, all copyrights pertaining to that business came with the product. Amendment Number 2 was meant to confirm that."  (911:6-14.)

113.      Santa Cruz Founder and Vice President Doug Michels.  Mr. Michels testified that "of course" SCO bought the UNIX and UnixWare copyrights and that, had any of his executives suggested otherwise, he would have "laughed them out of [his] office."  (501:1-18.)

114.      While Novell has pointed to the financial interest certain of these witnesses have in SCO, their testimony is consistent with the fact that Novell executed Amendment No. 2 to

eliminate the copyright exclusion, with the testimony of other witnesses such as Mr. Frankenberg and Ms. Madsen who have no financial interest in the matter, and with the parties' actions before this dispute arose.

115.     **<u>Novell's Dealings with SCO.</u>**  Even viewed most favorably to Novell, the evidence at trial showed a division within Novell's ranks as to whether the copyrights were intended to transfer, but united belief by SCO principals and negotiators that the copyrights were to be included.  Given SCO's understanding, and the importance of copyright ownership – a point no witness disputed – it is incomprehensible that exclusion of the copyrights reflected an intentional and knowing agreement of both parties, when there was no express negotiation of the point.  There would have been no need for such discussion up to the last week before the APA was signed, as SCO and Novell business negotiators agree that they contemplated that the copyrights were being sold.  During the week before the APA was signed, the language in the schedule excluding the copyrights was introduced by Novell's outside counsel, Tor Braham, acting perhaps with the approval of Novell's general counsel, David Bradford.

116.     Novell spent a good deal of time on the issue, but any internal decisions that the Novell board of directors made did not constitute negotiations of the agreement between the parties, and, of course, the language at issue in the board's resolution excluding copyrights (taken directly from the old language in the APA) was replaced by Amendment No. 2.  The copyright exclusion was added during the last week before the signing of the APA, and was not directly negotiated with Santa Cruz but rather simply added to a list of excluded assets, which itself was added to the APA only during the last week before it was signed.  (2401:25-2402:15 (Braham); 2403:6-10 (Braham).)  At the board level, moreover, the only term sheet in evidence provided to the directors did not even make the directors aware of the fact that copyrights were

being retained – and to the contrary suggested that they were being transferred by identifying

other assets  (like patents) that were being retained.  (Ex. 754; 678:3-681:18 (Mattingly); 2450:6-

2451:1 (Bradford); 2470:10-2471:1 (Bradford).)  In addition, there was no clear evidence that

any member of the board (other than Mr. Frankenberg) had actually read through the entire APA

to even see the exclusion of copyrights in the Excluded Assets Schedule.  The minutes did not

reflect that there was any actual discussion of any retention of copyrights during the

corresponding meeting of the Santa Cruz Board of Directors.  (Ex. 29; 784:23-788:23 (Madsen).)

Mr. Frankenberg further testified that if an exclusion of the UNIX copyrights had been discussed

at the Novell board meeting, he would have remembered that because the exclusion would be

"ludicrous" and that was not the intent of the deal.  (2543:12-2544:6.)

117.     Mr. Bradford's testimony was highly equivocal.  He admitted that he did not have

a recollection of what had occurred independent of his review of selected documents he was

provided in meeting with Novell's counsel.  (2434:24-2435:15; 2438:5-16; 2441:7-10; 2444:12-

21; 2446:22-2447:12.)  Mr. Bradford further acknowledged that his review of documents did not

include obviously relevant documents such as the TLA and Amendment No. 2.  (2461:12-24.)

118.     In contrast to the meeting of the minds between the business negotiators for both

sides, there was no such evidence with respect to the conduct of Novell's outside counsel.  It

does not appear that Novell ever expressly drew SCO's attention to the copyright exclusion

language that had been added in the schedule of excluded assets, which would explain why there

was no forcible pushback from SCO on the point.  Novell contends that the Brobeck law firm

knew of and accepted the language of the copyright exclusion, but the evidence did not end up

supporting that argument.  Mr. Braham testified that he could recall a discussion about "the

entire schedule of excluded assets," but that he did not actually know that he and any Brobeck

lawyer ever discussed that exclusion.  (2403:6-25.)  He acknowledged that he "thought the other side was talking about the copyright exclusion," but that he does not recall the Brobeck attorney "mentioning that specifically."  (2428:23-2429:4.)[9]

119.     That is also consistent with the testimony of Ms. Amadia.  Ms. Amadia testified that Novell executed Amendment No. 2 because Mr. Sabbath requested that Novell amend Schedule 1.1(b) of the APA to correct an unintended "clerical error" that could be read to exclude all copyrights from the sale.[10]  (2140:2-3; 2184:25-2185:1; 2140:20.)  Ms. Amadia further testified that she understood that Mr. Sabbath's understanding was that "the purpose of the Amendment was to clarify that the UNIX and UnixWare copyrights had transferred." (2169:17-2179:1.)  She further testified with respect to the Amendment that "it's reasonable to interpret this language as saying that among the copyrights included in the transfer are those that SCO needs to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (2160:25-2161:6; 2160:8-15.)

120.     Indeed, Ms. Amadia recognized the incongruity between her agreement to amend the schedule of excluded assets and her intent that the original exclusion of all copyrights not change at all, claiming that she nevertheless agreed to the language because "if you're a

---

[9]     The evidence thus does not support Novell's argument that SCO's attorneys understood the copyrights to have been excluded from the deal.  There is no evidence that the issue was ever discussed in the meeting of Santa Cruz's board of directors, and there is no evidence that the outside attorneys for SCO ever discussed that particular exclusion with Novell's outside attorneys.  (2428:23-2429:4 (Braham).)  One of Novell's witnesses did take the position that SCO "had Brobeck, Phleger as their voice" in the negotiations of the APA (2358:13-21 (Braham)), and the evidence showed that the Brobeck law firm put its name to the SCO filing from early 1996 in which SCO expressly represented that it had acquired the UNIX copyrights and was the UNIX copyright owner.  (Ex. 127 §§ 3.4, 4.9, signature block.)

[10]     Ms. Amadia's testimony is therefore consistent with Mr. Sabbath's direct testimony that the parties understood that copyrights were to transfer and that a declaration provided to IBM's counsel, to the extent it was inconsistent, did not accurately reflect his testimony.

transactional attorney and you understand the way these transactions work in the context of settling a threatened litigation, sometimes you're willing to live with a little bit of ambiguity in order to get a deal done." (2174:6-24.) Ms. Amadia testified with respect to Mr. Sabbath that she agreed "to work within the confines of his initial drafts" – which unambiguously clarified that the UNIX and UnixWare copyrights transferred – because "knowing Steve Sabbath and who he was and what his reaction was going to be to a whole modification of his proposed language, that was not going to bring the deal forward and get the parties on to do their businesses, which is where we all wanted to be." (2174:6-24.)

121.      Mr. Tolonen, like Ms. Amadia, relies substantially on the fact that the language in the executed version of Paragraph A of Amendment No. 2 differs from the draft language that Mr. Sabbath sent to Ms. Amadia. (2032:25-2033:10.) The difference in language does not support the weight Novell seeks to give it, and in fact counsels in favor of SCO's interpretation of Amendment No. 2. The evidence is that Mr. Sabbath believed that Amendment No. 2, which he signed, met his objective of clarifying the clerical error in the APA.

122.      The draft that Mr. Sabbath sent to Ms. Amadia would have replaced Item V.A of Schedule 1.1(b) with the following language: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment No. 2, which pertain to the UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks." (Ex. T34.) The first sentence thus conveyed that all of the copyrights and trademarks owned by Novell as of Amendment No. 2 pertain to the UNIX and UnixWare technologies, and that Novell has transferred all of its copyrights and trademarks to SCO. (See also 2170:11-2171:5 (Amadia); 2172:10-15 (Amadia); 2173:3-10 (Amadia).)

123.     Yet neither of those two propositions reflected either Ms. Amadia's <u>or</u> Mr. Sabbath's intent.  (903:3-9 (Sabbath); 2170:21-2171:14 (Amadia); 2172:3-9 (Amadia).)  Novell therefore had good reason to propose alternative language for reasons other than any concern over what the draft language said about the transfer of UNIX and UnixWare copyrights.  In addition, the last sentence of Amendment No. 2 also reflects that transfer of at least certain copyrights was contemplated.  That sentence would have no meaning if no copyrights would transfer.  Ms. Amadia also admitted (as noted) that in referring to the "trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies," the first sentence of Paragraph A refers to the UNIX and UnixWare trademarks that Novell intended to be transferred to SCO.  Amendment No. 2 does not distinguish between trademarks and copyrights.

124.     Ms. Amadia understood the intent Mr. Sabbath had in seeking Amendment No. 2, and she did not know if Mr. Sabbath accepted her intent as to how Amendment No. 2, as worded, would only affirm a license for SCO (a view that even Ms. Amadia ultimately recanted on the stand).  (2126:15-2127:12.)  Ms. Amadia testified only that "he did sign it."  (2127:9-12.)

125.     The Court finds that these circumstances are within what had been referred to as "the forthright negotiator rule" of contract interpretation, which the Tenth Circuit explained in <u>Flying J Inc. v. Comdata Network, Inc.</u>:

> Where the parties assign different meaning to a term, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

405 F.3d 821, 837 (10th Cir. 2005) (citing <u>Restatement (Second) of Contracts</u> § 201(2)).

126.     Under this rule and the preponderance of the evidence, Amendment No. 2 must be interpreted in accordance with the meaning attached by SCO (Mr. Sabbath), since Ms. Amadia knew or at least "had reason to know" that Mr. Sabbath intended the Amendment to be confirming that the UNIX and UnixWare copyrights were transferred to SCO, and knew that the language in Amendment No. 2 supported his intent.

127.     Novell also contended at trial that if Amendment No. 2 had transferred copyright ownership, that would have required the approval of the Novell board of directors.  That argument just begs the question.  Where the vast weight of the evidence showed that the parties had intended to transfer the copyrights in the first place, and where the language and extrinsic evidence of Amendment No. 2 show that it sought to clarify the parties' intent under the APA, there would have been no need for board approval.

128.     **<u>The Parties' Course of Performance.</u>**  The parties' course of performance is further compelling grounds for concluding that the parties intended for SCO to acquire the UNIX and UnixWare copyrights.  The Tenth Circuit held that such evidence is the "best evidence" of the parties' intent.  <u>SCO</u>, 578 F.3d at 1214.  This Court agrees with that proposition.

129.     This evidence, much of which is found in Novell documents, was created after the APA was signed but before the deal was closed and the first amendment to the APA was executed, after Amendment No. 1 but before Amendment No. 2, and after Amendment No. 2.  The evidence at trial reflected the following facts of the parties' (and even third parties') practical construction of the amended APA.

130.     The official press release that SCO issued on September 20, 1995, quoting Mr. Frankenberg states:  "According to the terms of the agreement, SCO will acquire Novell's UnixWare business and UNIX intellectual property."  (Ex. 526; 110:22-111:23.)  Novell

presented no evidence that it ever sought to correct the press release.  Novell tried to suggest at trial that "intellectual property" might refer just to source code, but there was no evidence to support that proposition, it is contrary to the ordinary meaning of the term, and one of Novell's own chief witnesses had to acknowledge that the core "intellectual property" in software "typically" included the copyrights.  (2144:13-16 (Amadia).)  Mr. Frankenberg himself testified that, in approving that press release for Novell, he understood the term "intellectual property" to include the copyrights.  (112:12-13.)  Burt Levine, a long-time Novell IP lawyer who worked on this transaction, testified that ownership of UNIX and UnixWare "would automatically convey the copyright along with the rest of the business assets."  (522:3-14.)

131.    Similarly, SCO reported in its 1996 Form 10-K that it had "acquired certain assets related to the UNIX business including the core intellectual property from Novell."  (Ex. 521 at 57; 804:1-5 (Madsen); 806:4-6 (Madsen).)  Ms. Madsen, who reviewed and edited those reports for SCO, testified that her understanding was that "the core intellectual property of the UNIX business include[d] the UNIX and UnixWare copyrights."  (803:12-15; 806:14-17.)

132.    At Novell's direction, Novell's own engineers placed SCO copyright notices on the existing versions of UnixWare – versions on which SCO had done no work at all.  (1704:18-1705:7 (Maciaszek); 1723:14-20 (Maciaszek); 1727:19-25 (Nagle); 1733:9-25 (Nagle); Ex. 655.)  Novell presented no evidence to explain how that would have made sense if SCO was to own the copyrights in only the UnixWare source code that SCO would add to those existing versions of UnixWare.

133.    The participants in the transition of the UNIX and UnixWare business from Novell to SCO – individuals who had not participated in the negotiations – understood SCO to have acquired the UNIX and UnixWare copyrights, including because no one ever suggested

otherwise.  (547:11-16 (Broderick); 1671:22-1672:18 (Maciaszek); 1676:17-20 (Maciaszek).)

Novell presented no evidence that any such participants believed that Novell continued to own

any such copyrights.

134.     In fact the only testimony regarding the transition meetings reflected that Novell

representatives told SCO that Novell had sold UNIX and that the copyright notices had to be

changed.  (548:10-17 (Broderick); 1704:18-1705:7 (Maciaszek); 1723:14-1728:21 (Nagle);

1732:12-1737:13 (Nagle); 1775:15-1776:16 (Nagle).)  There was no evidence that Novell ever

told anyone in these meetings that Novell was retaining any UNIX or UnixWare copyrights.

135.     Novell's own engineers thus replaced the "Novell" copyright notice on the CD for

the current version of the UnixWare product with a "Santa Cruz" copyright notice.  (1725:1-

1728:21 (Nagle); 1723:9-1736:17 (Nagle); Ex. 35.)  In sorting through the materials in its former

offices to determine what to keep and what not to keep, moreover, Novell gave to SCO the

copyright registration certificates for UNIX and instructed its transition team to retain only those

materials pertaining to the businesses it was retaining, Netware and Tuxedo.  (610:5-612:4

(Broderick).)

136.     In addition, in early 1996, Novell sent thousands of letters explaining that it had

transferred to SCO Novell's "existing ownership interest in UNIX System-based offerings and

related products," specifically identifying such products as including "All Releases of UNIX

System V and prior Releases of the UNIX System" and "All UnixWare Releases up to and

including UnixWare Release 2 (encompassing updates and upgrades to these releases as well."

(586:4-15 (Broderick); Ex. 580.)  In one such letter, which was co-signed by Novell and SCO,

Novell further explained that "Novell's right as licensor under such agreements have been

assigned to the Santa Cruz Operation" and that "the ownership of the UNIX operating system

has been transferred from Novell, Inc. to the Santa Cruz Operation."  (Ex. 751; 1682:23-1684:10 (Maciaszek); 1684:24-1685:7 (Maciaszek).)

137.    Novell argued at trial that these letters did not need to tell customers about Novell's claimed copyright exclusion, but the evidence showed otherwise.  In addition to the plain fact that Novell's assertion of ownership transfer would have been inaccurate if Novell had retained the copyrights, such an exclusion would have been relevant to customers.  Mr. Maciaszek testified, for example, that among the "things a customer does need to know" is "who can enforce the copyrights in the contracts" that SCO now owned.  (1710:8-22.)

138.    In concert with these letters, Novell representatives visited OEM licensees, including in Europe, to reiterate the statements in those letters and personally inform the licensees that "SCO had acquired all ownership rights in the business," without "any limitation ever."  (1678:4-16 (Maciaszek); 1680:22-1681:22 (Maciaszek); 1684:4-17 (Maciaszek).)

139.    Novell, SCO, and IBM engaged in a protracted dispute and negotiation throughout 1996 regarding the scope of Novell's rights under the APA.  SCO's evidence showed that Novell never contended that it owned the copyrights during that dispute, and Novell presented no evidence to the contrary.  (802:3-7 (Madsen).)

140.    During the dispute among the three corporations in 1996, even IBM took the position that SCO could protect itself through its ownership of the UNIX copyrights, asserting that "SCO is protected by copyright."  (Ex. 123.).  SCO's evidence showed that Novell never contended otherwise, and Novell presented no evidence to the contrary.  (802:3-13 (Madsen).)

141.    Just months after Amendment No. 2 was signed, SCO, through the law firm that represented SCO in connection with the Novell/SCO APA, took the position in formal litigation against Microsoft Corporation in the European Union that SCO had acquired the UNIX

copyrights and was the UNIX copyright holder.  (807:3-811:20 (Madsen); Ex. 127 §§ 3.4, 4.9.)

Novell presented no evidence to call into question the nature of SCO's assertions in that filing.

142.     In resolving the foregoing dispute, SCO entered into a settlement agreement with

Microsoft in which SCO again stated that it had acquired the UNIX copyrights and was the

UNIX copyright holder.  (811:21-813:24 (Madsen).)  The document states:  "SCO has acquired

AT&T's ownership of the copyright in the UNIX System V Operating System Program."  (Ex.

199 Recital B.)  Novell again presented no evidence to call into question the nature of SCO's

assertion in that settlement.[11]

143.     With respect to the elements of specific performance, the terms of the APA are

sufficiently definite in this regard as well, because the terms of the amended APA and the

extrinsic evidence demonstrate the parties' intent to transfer the UNIX and UnixWare

copyrights; the consideration that SCO paid to Novell under the APA is, as noted above,

adequate; and the specific performance that SCO seeks is identical (or nearly identical) to the

terms of the amended APA and consistent with the overwhelming evidence of the parties' intent.

144.     The Court therefore concludes that specific performance is appropriate to give

effect to the parties' intent that the UNIX and UnixWare copyrights be transferred to SCO.

## VI.   NOVELL'S RIGHTS UNDER SECTION 4.16(b)

145.     In its fourth counterclaim, Novell seeks a declaratory judgment that it is entitled,

at its sole discretion, to direct SCO to waive its claims against IBM, and that it is entitled to

---

[11]     Novell suggested that the transaction by which SCO acquired the UNIX assets from
Santa Cruz in 2002 reflects the view of the parties to that transaction that Santa Cruz did not own
the UNIX or UnixWare copyrights (Ex. O10), but that argument is of no moment to the specific
performance relief SCO seeks in its proposed findings.  The premise of that relief is that Novell
has not to date transferred to SCO the copyrights.  Moreover, a review of the full text of that
assignment, including Schedule C, shows that the language Novell argued from applies only to
the registration and recordation of copyrights, not ownership of the copyrights, which is clearly
represented as being assigned to Caldera.

waive on SCO's behalf SCO's claims against IBM.  The Tenth Circuit reversed the district court's summary judgment ruling that Novell did have such rights, finding that the contract was ambiguous regarding the question of which licenses Novell retained waiver rights over, requiring the consideration of extrinsic evidence at trial.  SCO, 578 F.3d at 1219-24.

146.     The Tenth Circuit also remanded for trial SCO's alternative claim that even if Novell had the right to waive SCO's contract claims against IBM, Novell's exercise of its rights under Section 4.16(b) to waive SCO's claims against IBM violated the duty of good faith and fair dealing, and therefore are of no force and effect.  Id. at 1224-25.

147.     Novell did not have the right to waive SCO's contract claims against IBM.  Even if Novell had the authority to waive such rights, it was required to comply with the covenant of good faith and fair dealing in doing so, and on the evidence presented, Novell's waiver actions breached those obligations and are therefore ineffective.

## A.     SCO's Claims Against IBM.

148.     In 2003, SCO asserted claims for breach of contract against IBM in litigation pending in this Court (Campbell, J.).  In those claims, SCO alleges that IBM breached Software and Sublicensing Agreements to which IBM and Sequent (a company that IBM acquired in the late 1990s) are parties by distributing protected UNIX source code and other confidential information to Linux, a competing operating system.  (See, e.g., Ex. J16.)  Based on these violations, as shown below, SCO also sought to terminate IBM's rights under the Software and Sublicensing Agreements.

149.     SCO contended that IBM was obligated to keep confidential the source code and certain other technology in the UNIX-derived flavor that IBM had developed, called AIX, based on the source code that IBM had licensed.  SCO explained to Novell, for example, that "IBM is transferring the UNIX code, derivative works and methods for use in Linux in violation of the

Software Agreement."  (Ex. J16 at 3.)  SCO took the view that IBM's disclosure of such

technology in connection with the development of Linux was a breach of its Software Agreement

and that IBM's conduct was "devastating" to SCO's UnixWare business, which competed with

Linux.  (1813:18-1814:8 (Tibbitts).)  SCO took the same view with respect to IBM's disclosure

of technology from the UNIX flavor that Sequent had developed, and which IBM controlled

after its acquisition of Sequent.  (1821:5-1822:1 (Tibbitts).)

150.    In a series of steps invoking Section 4.16(b) of the APA, Novell directed SCO to

waive those claims for breach of contract, and to rescind the termination of IBM's rights.

Following SCO's refusal to do so, Novell purported to waive those rights on behalf of SCO.

151.    In a letter dated June 9, 2003, Novell directed "SCO to waive any purported right

SCO may claim to terminate IBM's SVRX License enumerated in Amendment X or to revoke

any rights thereunder, including any purported rights to terminate asserted in SCO's letter of

March 6, 2003 to IBM."  (Ex. 675 at 1.)  Novell also directed SCO "to take this action by noon,

MDT, June 12, 2003."  (Id.)

152.    In a letter dated June 12, 2003, noting that "SCO has failed to take the action

directed by Novell" in its June 9 letter, Novell purported to waive "on behalf of" SCO and

"pursuant to Section 4.16(b)" of the APA, "any purported right SCO may claim to terminate

IBM's SVRX License enumerated in Amendment X or to revoke any rights thereunder,

including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM."

(Id. at 1-2.)

153.    In a letter dated October 7, 2003, Novell again invoked Section 4.16(b) and

directed "SCO to waive any purported right SCO may claim to require IBM to treat IBM Code

itself as subject to the confidentiality obligations or use restrictions of the Agreements."  (Ex.

49

243 at 3.)  Novell directed SCO "to take this action by noon, MST, on October 10, 2003, and to notify Novell that it has done so by that time."  (Id.)

154.     In a letter dated October 10, 2003, again noting that "SCO has failed to take the action directed by Novell," Novell again purported to waive, "on behalf of" SCO and "pursuant to Section 4.16(b)" of the APA, "any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements."  (Ex. 691 at 2.)

155.     In 2004, Novell similarly invoked its Section 4.16(b) rights to direct SCO to waive, and waive on SCO's behalf, SCO's rights under Sequent's Software and Sublicensing Agreements.  In a letter dated February 6, 2004, Novell directed "SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."  (Ex. 108 at 2.)  Novell directed SCO "to take these actions by noon, MDT, February 11, 2004, and to notify Novell that it has done so by that time."  (Id.)

156.     In a letter dated February 11, 2004, noting again that "SCO has failed to take the actions directed by Novell," Novell again purported to waive "on behalf of" SCO and "pursuant to Section 4.16(b)" of the APA, "any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."  (Ex. 500 at 2.)

157.     After Novell had attempted to exercise these purported waiver rights on IBM's behalf, it was announced that IBM was "investing" $50 million in Novell.  At trial, Novell's

witnesses contradicted one another regarding IBM's role in influencing Novell to purport to waive SCO's claims.  Christopher Stone, Novell's Vice Chairman at the time of the waivers, testified that IBM did not request Novell to assert the waivers "at all," and agreed that "no one from IBM had any conversation with anyone from Novell at all prior to the exercise of that waiver," because, as Mr. Stone put it, "We acted on our own.  No input from IBM at all." (1611:18-23.)  But when asked whether IBM counsel David Marriott had asked Novell to waive SCO's rights against IBM, Joseph LaSala, who was Novell General Counsel at that time, responded unequivocally:  "Yes.  He asked us to take – to assert our rights to waive all claims, yes, he did."  (1937:2-6.)  Mr. LaSala then confirmed that Novell "directed SCO to waive the termination of the IBM license," after Mr. Marriott asked Novell to "waive all of SCO's claims," impressing upon Novell that "the matter was urgent."  (1947:11-1948:15.)   The Court need not make a determination regarding what role, if any, IBM's investment of $50 million in Novell had; it is clear from the admissions of Mr. LaSala and the documentary evidence (Ex. 530; 1944:19-1945:23 (LaSala)) that Novell's waiver steps were taken at the express request of IBM.

158.      SCO refused to accede to Novell's requests on the grounds that they were inconsistent with SCO's rights under the APA.  In a letter dated June 11, 2003, SCO responded to Novell's efforts to exercise its Section 4.16(b) rights by waiving SCO's claims and rights under the Software and Sublicensing Agreements with IBM.  (Ex. J16.)  Quoting the Assets Schedule of the APA, SCO pointed out that the APA transferred to SCO, "All rights and ownership of UNIX and UnixWare," all right, title, and interest to all "Software and Sublicensing Agreements," and "all claims against any parties relating to any right or asset included in the Business," among other assets and properties.  (Id. at 1-2.)

159.     SCO also explained that Amendment No. 2 had clarified Section 4.16(b) by making clear that "Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement," particularly in the context of a licensee (such as IBM) who had previously obtained a buy-out of its SVRX royalty obligations.  (Id. at 1.)

160.     In addition, SCO underscored the effect Novell's alleged waiver would have on SCO's UNIX technology and business.  SCO noted that Novell was attempting to waive SCO's "claims against IBM under the AT&T/IBM Software and Sublicensing Agreements, the very agreements designed to protect the ***integrity and confidentiality of the UNIX source code.***"  (Id. at 3 (emphasis in original.))  SCO accordingly explained that SCO's claims against IBM for breach of those Agreements "go to the very core of protecting the UNIX source code," and that IBM was breaching the "confidentiality of UNIX protected under the Software Agreement in a concerted effort to destroy the entire economic value of the UNIX source code."  (Id.)

161.     SCO concluded that "for the reasons outlined above and for other reasons, we have no intention of waiving our rights against IBM for destroying the value of UNIX and UnixWare by ignoring the restrictions on use, transfer and confidentiality of source code, derivative works and methods."  (Id. at 4.)

**B.     The Scope of Novell's Waiver Rights with Respect to "SVRX Licenses."**

162.     Novell has claimed the right to waive, amend, and modify any and all of SCO's rights under its Software and Sublicensing Agreements.  Novell's interpretation of Section 4.16(b) is extremely broad and would permit Novell to control and undermine SCO's UNIX-based business.  (2353:21-2354:8 (Braham).)

163.     **The Tenth Circuit's Analysis.**  The Tenth Circuit observed that the waiver right Novell claims "would be a broad power indeed."  SCO, 578 F.3d at 1221.  With the rights it claims, Novell could "divest[] SCO of all title to any intellectual property in any UNIX product

52

for which a sublicensing agreement existed," and "Novell's interpretation of Section 4.16 would mean it was free to waive limitations on a licensee's ability to copy, transfer, or sell the derivative products it created based on UNIX, something that would substantially limit the value to Santa Cruz of its UNIX ownership rights."  Id.

164.     "To read Novell's rights as broadly as it asks would give it unlimited power not only to reduce or increase its own rights under an SVRX License after the APA (namely rights to royalties), but also to direct SCO to supplement a licensee's substantive rights 'in any manner,' even if by doing so, Novell forced SCO to divest rights unquestionably owned by SCO after the transaction.  As SCO argues, this would enable Novell, at its sole discretion, to destroy a substantial part of the value of Santa Cruz's acquisition of the UNIX business."  Id.

165.     The Tenth Circuit further observed:  "The issue is not whether independent consideration existed, but whether it is consistent with the context of the deal to imagine that Santa Cruz would have paid the price that it did if this was the only value it obtained in the deal, unencumbered from Novell's powerful discretionary rights to control the underlying UNIX code."  Id.  The Tenth Circuit further stated that Novell's interpretation of Section 4.16(b) would allow Novell to divest SCO of "its extensive and undisputed ownership rights in the underlying source code of UNIX," id. at 1224, and, notwithstanding the jury's verdict with respect to transfer of the copyrights to SCO under the APA, there was no dispute at trial that SCO owns all of the underlying source code of UNIX.

166.     **"SVRX Licenses" Under the APA.**  Novell's rights under Section 4.16(b) are limited to a set of licenses identified as "SVRX Licenses," and thus the extent of Novell's rights turns on what the parties meant by the term "SVRX License," because those are the licenses to which the waiver rights exclusively relate.

53

167.     Section 4.16(b) of the APA states in relevant part:

Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf.

168.     While Section 4.16(b) provides broadly that Novell may direct SCO to take certain actions or, if seller refuses, to take those steps for SCO, the waiver rights are not unlimited.  Section 4.16(b) limits Novell's rights to "SVRX Licenses."  Because the term SVRX Licenses is ambiguous, the Court must look at the language of the provision, the relationship of that provision to the contract as a whole, and to extrinsic evidence of the parties' intent, including their prior actions insofar as it sheds light on the intent of the provision.

169.     The term "SVRX License" is used in Section 4.16(a) of the APA, which states in relevant part:  "Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as SVRX Royalties)."  Item VI, in turn, does not contain a list of such licenses but instead contains a list of SVRX products.  The language of Item VI, states the following:  "All contracts relating to the SVRX Licenses listed below."  This language taken together with the reference in Section 4.16(a) of the APA that the SVRX Licenses are listed "in detail *under* Item VI"  indicates that the SVRX Licenses are not "all contracts" relating to these products but licenses to the products that are, in fact, "listed in detail" in Item VI of the

Schedule.[12]  The Software and Sublicensing Agreements with IBM (and Sequent) are not listed

under Item VI of the Schedule.

170.    **The Software and Sublicensing Agreement.**   Another Section of Schedule

1.1(a) expressly covers such Software and Sublicensing Agreements.  Item III identifies as assets

being transferred to SCO:

> All of Seller's rights pertaining to UNIX and UnixWare under any
> software development contracts, licenses and any other contracts to
> which Seller is a party or by which it is bound and which pertain to
> the Business (to the extent that such contracts are assignable),
> including without limitation:

Subsection L of that Item specifies:

> Software and Sublicensing Agreements – This includes the source
> code and sublicensing agreements that Seller has with its OEM,
> End User and Educational customers.  The total number of these
> agreements is approximately 30,000.

There can be no dispute that the "Software Agreement" and "Sublicensing Agreement" subject

to which IBM obtained access to UNIX source code, and which imposed limitations on IBM's

disclosure of such code, is included among the "Software and Sublicensing Agreements"

referenced in Item III.L of Schedule 1.1(a).

171.    **Witness Testimony.**   Several witnesses testified that in order to make sense,

Novell's "waiver" rights under Section 4.16(b) of the APA must extend only to the terms of the

Product Schedule Licenses through which licensees licensed particular UNIX products.

172.    Novell licensing group executive Mr. Broderick testified that Novell used the

term SVRX Licenses to refer to Product Schedule Licenses that licensed SVRX products.

(658:23-659:16.)

---

[12]     The primary purpose of Item VI of Schedule 1.1(a) (and of the Schedule as a whole) was
to identify the assets being transferred to SCO; Item VI therefore identifies "all contracts"
relating to the list of SVRX products, as all such contract were being transferred to SCO under
the APA.

173.     Messrs. Frankenberg, Chatlos, Thompson, Mohan, Wilt, Michels, and Sabbath, and Ms. Madsen all testified that the intent of Article 4.16(b) was to provide Novell rights over those licenses that were generating royalties for sales of SVRX products in which Novell had retained an interest and was still receiving payments – and <u>not</u> to provide Novell with the right to control Santa Cruz's actions under other agreements, such as the Software and Sublicensing Agreements that did not generate such royalties but instead protected the UNIX and UnixWare source code that SCO had acquired under the APA.  (110:8-21 (Frankenberg); 371:6-372:13 (Chatlos); 367:22-369:10 (Chatlos); 247:23-248:19 (Thompson); 251:7-15 (Thompson); 447:3-19 (Wilt); 469:9-13 (Mohan); 501:19-502:2 (Michels); 494:23-495:18 (Michels); 906:7-907:9 (Sabbath); 905:1-17 (Sabbath); 852:1-10 (Madsen); 892:24-893:12 (Madsen).)

174.     Their rationale was that it would make sense for Novell to retain control concerning the terms of the Product Schedule Licenses, because those Schedules dictated the amounts of the binary royalties that Novell was receiving under Section 4.16(b) of the APA. Accordingly, in order to protect that stream of royalties, it would make sense for Novell to have certain rights over those terms, such as to make sure that the royalty amounts kept pace with the Consumer Price Index from year to year.

175.     These witnesses testified that Novell's waiver rights could not extend further than the terms of the Product Schedule Licenses because to give Novell such a right would permit Novell to change the substantive terms of the agreements that essentially constituted the UNIX and UnixWare business itself.  (892:24-893:12 (Madsen); 593:15-594:5 (Broderick); 599:22-600:15 (Broderick).)

176.     The Tenth Circuit stated:

It is reasonable to think that the parties would have covenanted in such a manner as to protect Novell's substantial pecuniary interest

56

> in the revenue stream that, even under SCO's interpretation,
> financed the acquisition.  It is less easy to accept that SCO would
> have consented to giving Novell the unilateral power to unravel its
> exclusive and undisputed ownership rights in the underlying source
> code of UNIX.

SCO, 578 F.3d at 1224.

177.     **Course of Performance.**  The 1996 IBM buyout dispute also presents relevant

evidence of the parties' intent and understanding of the scope of Novell's rights under Section

4.16(b).  At that time, just a few weeks after the APA transaction closed, a Novell salesman

invoked precisely that provision to attempt granting IBM a buyout of its binary royalty

obligations and minor rights to distribute the source code to its UNIX-based derivative flavor.

(Ex. 67; 1689:5-1690:23 (Maciaszek).)  SCO objected both to the buyout and the expansion of

source code rights, and "began to institute a law suit" against Novell. (Ex. 179; 1690:24-1695:20

(Maciaszek).)  The parties' subsequent agreement in Amendment No. X was thus negotiated

specifically in response to and arising out of the foregoing dispute, and thus sought to clarify that

Novell did not and does not have the claimed rights under Section 4.16(b).

178.     During the months of negotiations between Novell and SCO that culminated with

Amendment X and Amendment No. 2 in November 1996, Novell did not once assert ownership

of the UNIX copyrights or the broad Section 4.16(b) rights it now claims, in response to SCO's

objections, even with respect to the buyout of the IBM royalties over which Novell had an

undisputed 95% interest.  (1695:21-1696: 9 (Maciaszek).)  Instead, Novell ultimately settled that

controversy by (1) cancelling the buyout agreement it had executed alone with IBM and

replacing it with Amendment No. X, a three-party agreement that included SCO, (2) paying SCO

about three times the APA-required 5% percent interest SCO would have ordinarily received of

the buyout amount, and (3) agreeing to clarify Section 4.16(b) in Amendment No. 2, including

with the language of Paragraph B.5 that the Tenth Circuit found significant to the issue. (1696:15-1697:24 (Maciaszek); 1708:1-1709:3 (Maciaszek); <u>SCO</u>, 578 F.3d at 1223.)

179.     Other than in connection with the 1996 IBM buyout, Novell never again attempted to direct SCO "to waive its rights under or to amend or to modify a software agreement" prior to 2003.  (599:22-600:15 (Broderick).)

180.     Because Novell acknowledged that its Section 4.16(b) rights were limited even in the context of buyouts, where Novell had its own interests to royalties, the Court cannot conclude that Novell's rights are essentially unfettered with respect to rights that SCO indisputably has under the APA to protect and license the valuable UNIX source code through the Software and Sublicensing Agreements.  On the contrary, the Court must and does conclude that Novell's Section 4.16(b) rights, as clarified by Amendment No. 2, cannot impinge upon SCO's rights to license the UNIX source code and cannot expand a licensee's rights to the source code, as Novell has attempted to do with IBM.

181.     **<u>Novell's Witnesses and Arguments.</u>**  The Court rejects the view of certain witnesses that Novell's waiver rights are essentially unlimited, extending even to the terms of the Software and Sublicensing Agreements themselves because the terms of the Product Schedule Licenses were ultimately incorporated by reference as part of those Agreements, and that in order to "bulletproof" Novell against the prospect of having SCO unduly reduce the amount of Novell's royalty stream, Novell intended to retain "complete rights to control what happened with the UNIX business."  (2354:6-8 (Braham).)  Novell attorney Tor Braham, for example, testified that "Novell has the right to tell SCO what it can do and can't do."  (2353:21-2354:4.) In response to questioning regarding the fact that Novell's rights were limited to "SVRX Licenses" as defined in the APA, Mr. Braham revealed that the premise of his view of Novell's

rights under Section 4.16(b) was that term "SVRX Licenses" is "not a defined term" in the APA because there are no "quotation marks" surrounding the phrase. (2407:2-24.) The Court disagrees with the premise of Mr. Braham's understanding of Novell's waiver rights, as the Tenth Circuit specifically held that "the APA expressly made 'SVRX License' a defined term, albeit one defined with some lack of clarity." SCO, 578.F3d at 1220.

182.    In addition, the Tenth Circuit addressed and was skeptical of Novell's contention regarding the scope of its waiver rights:

> [T]he sublicensing and software agreements grant certain rights to licensees, for instance, enabling them to use, modify, and prepare derivative works based on a given software product. But as we understand Novell's argument, it does not seek to waive rights given to the licensee in the licensing agreement – but rather the licensor's (SCO's) ability to enforce the boundaries of those rights extended to licensees. This would be a broad power indeed.

Id. at 1220-21.

183.    The Court similarly rejects Novell's suggestion that the reference to "all contracts" in Item VI means that an SVRX License refers to any agreement concerning SVRX source or binary code. First of all, the language of Item VI that "All contracts relating to the SVRX Licenses listed below" reflects that the term "all contracts" is separate from the "SVRX Licenses" themselves, which are to be listed below. Indeed, the reference to "all contracts" is not part of any definition of "SVRX License" as such. The SVRX Licenses to which the waiver rights apply are clearly a subset of "all contracts." As the Tenth Circuit noted:

> Novell argues, and the district court agreed, that its reading of SVRX Licenses to include all three sets of licensing agreements is most consistent with the APA's use of broad language referring to 'any' and 'all' SVRX Licenses. But we think it plain that this only begs the question of the scope of what an 'SVRX License' is.

SCO, 578 F.3d at 1223-24.

184.     The ambiguity is created because the list of products in Item VI indisputably is a list of products – not licenses.  That is, the products identified in Item VI are the same licensed products that are identified only in the Product Schedule Licenses that go along with the Software and Sublicensing Agreements, but that are <u>not</u> identified in those Agreements themselves.

185.     Moreover, the argument that Item VI refers to Software and Sublicensing Agreements runs up against the express reference to those Agreements in Item III.L of the same Assets Schedule.  Novell thus asks the Court to conclude that in identifying the Assets to be transferred, the parties decided redundantly to identify the same extensive set of agreements twice.  That runs against normal rules of contract interpretation.  <u>Boghos v. Certain Underwriters at Lloyd's of London</u>, 36 Cal. 4th 495, 503 (2005); <u>accord</u> <u>United States v. Gonzalez-Garcia</u>, 85 Fed. Appx. 160, 164 (10th Cir. 2004).

186.     In addition, to the extent there is ambiguity in the text of the APA as to what "SVRX Licenses" means, the plain language and extrinsic evidence of Amendment No. 2 precludes any reasonable interpretation of the APA to permit Novell to exercise waiver rights that amend or modify the terms of any Software or Sublicensing Agreement.

187.     With respect to the plain language, the Tenth Circuit has already found that Novell's interpretation of Section 4.16 is problematic.  Amendment No. 2 states that the "Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code."  The Tenth Circuit stated:  "If Novell already had the right under the APA itself to force SCO to increase any SVRX licensee's rights to SVRX code, then this provision would be pointless and ineffectual."  <u>SCO</u>, 578 F.3d at 1223.  This Court finds that the exact same reasoning applies with respect to the further statement in Amendment No. 2 that "Novell may not

prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement."

188.     Novell has argued that the foregoing language in Amendment No. 2 appears in a paragraph that generally concerns buy-outs, so that the language should be interpreted only with respect to buy-outs.  The Court finds no merit in that argument.  The point is that regardless of the scope of Paragraph B, the statements simply would not make any sense – they would be "pointless and ineffectual" – if Novell <u>already</u> had the rights at issue.

189.     Novell's reading also makes no sense of the language in Paragraph B.5 stating that Novell will not prevent SCO from exercising its source code rights.  Novell says that Paragraph B.5 applies only in the context of buyouts.  But under the express terms of Paragraph B, buyouts are bilateral.  It therefore makes no sense to read Paragraph B.5 to mean that, in the context of a process that by definition must work <u>bilaterally</u>, Novell promises that it will not prevent SCO from exercising certain of its rights.  The whole point of Paragraph B is to make clear that Novell could not undertake any unilateral conduct in a buyout with respect to <u>any</u> of SCO's rights.  Paragraph B.5 makes sense only if interpreted to speak to Novell's alleged waiver rights generally.

190.     In addition, Novell's interpretation cannot be squared with the uncontroverted extrinsic evidence.  The evidence showed that Amendment No. 2 resulted from a process whereby, over months, Novell had purported to do just what the language of sub-paragraph B.5 says that Novell <u>cannot</u> do – that is, unilaterally change the terms of SCO's Software and Sublicensing Agreements.  (Ex. 67; Ex. 707; Ex. 179.)  There was <u>no</u> evidence to suggest that in resolving that heated dispute, SCO's representatives had concluded or agreed to permit Novell to

continue to exercise any such purported rights, and there was countervailing evidence that SCO intended to make clear that Novell had no such rights.  (Ex. 179; 1689:5-1692:19.)

191.     During the months of negotiations that followed culminating with Amendment No. 2 in November 1996, Novell did not assert ownership of the UNIX copyrights or the broad Section 4.16(b) rights in response to SCO's objections, even with respect to the buyout of the IBM royalties over which Novell had an undisputed 95% interest.  (1695:21-1696:9 (Maciaszek).)  Instead, Novell ultimately settled that controversy by rescinding the buyout agreement it had executed alone with IBM and replacing it with a three-party agreement that included SCO and by agreeing to clarify Section 4.16(b) in Amendment No. 2, including with the language of Paragraph B.5, as explained above.  (1696:15-1697:24 (Maciaszek); 1708:1-1709:3 (Maciaszek).)

192.     Novell's actions in resolving the buyout dispute in 1996 – where Novell could have simply taken action to grant IBM the buyout under Novell's current interpretation of Section 4.16(b) – compel the conclusion that Amendment No. 2 was intended to foreclose the type of action in which Novell had engaged by making clear that Novell could not impinge upon SCO's rights to license the UNIX source code and could not expand a licensee's rights to source code.  Indeed, as Section B of Amendment No. 2 made clear, even Novell's rights to protect its royalties by way of Section 4.16(b) were subject to SCO's participation and approval when Novell sought to obtain an upfront lump-sum payment – that is, a buyout – of the royalties.

193.     Novell's limited extrinsic evidence to the contrary is not persuasive.  Novell, for example, points to a 2003 letter to Novell in which Mr. McBride referred generally to IBM's license as an "SVRX license."  (Ex. J16.)  This is not evidence that goes directly to what the parties actually intended in using the defined term "SVRX License" in the APA many years

194.        **Unreasonable Consequences of Novell's Interpretation.**  This Court cannot

endorse an interpretation that would permit Novell to destroy SCO's UNIX-based business,

which is true of Novell's interpretation.  See, e.g., Leo F. Piazza Paving Co. v. Found Constr.,

Inc., 128 Cal. App. 3d 583, 591 (1981). Where contract is susceptible to different interpretations,

courts will adopt one which will give it validity, if it is reasonable, rather than one which renders

it illusory.  Lexington Ins. Co. v. Travelers Indem. Co. of Illinois, 2001 WL 1132677, at *3 (9th

Cir. 2001) (applying California law); see also Meyer v. AmerisourceBergen Drug Corp., 2008

WL 397412, at *5 (6th Cir. 2008) (maxim of contract interpretation that courts disfavor

interpretations that render contracts illusory and instead prefer interpretations that give contract

vitality); MacDonald v. Lawyers Title Ins. Corp., 1996 WL 114719, at *6 (4th Cir. 1996)

(refusing to interpret contract in a way that that renders it illusory); Shakey's Inc. v. Covalt, 704

F.2d 426, 434 (9th Cir.1983) (preference given to contract interpretation  that does not render

obligations illusory).

195.        There are other strong reasons, moreover, for rejecting the interpretation that

Novell gives to the term "SVRX Licenses" in connection with its alleged waiver rights under

---

[13]        Novell asked Mr. Maciaszek to confirm that "the IBM SVRX license" included the IBM
Software Agreement and Sublicensing Agreement, but Mr. Maciaszek chose to use his own
language and stated that those agreements "would be two components of their total licenses."
(1704:12-17.)  In addition, Mr. Maciaszek's testimony is without regard to the actual use of the
phrase in the APA itself, and thus disregards the only sensible way the phrase can be interpreted
to mean therein.

Section 4.16(b).  If "SVRX Licenses" refers to an umbrella Software Agreement, for example, then Novell would have the right to amend, modify, or waive SCO's rights with respect to UnixWare.  As the umbrella agreement, the Software Agreement is also the ultimate agreement under which a prior SVRX licensee has agreed to keep confidential any UnixWare source code (and derivatives based on it) that the licensee subsequently licensed.  Novell's decision to amend, modify, or waive the terms of such a Software Agreement would thus permit Novell to undercut SCO's rights even with respect to UnixWare, a business that SCO indisputably acquired.

196.     Similarly, before it entered into the APA, SCO itself had licensed SVRX source code and built derivatives based on that code.  Under Novell's interpretation of the APA, Novell could amend, modify, or waiver any or all of SCO's rights under that "SVRX license" – which would thus preclude SCO from using source code it had used for decades.

197.     The same is true for the TLA, which by Novell's lights must constitute one of the contracts relating to SVRX.  Under the TLA, Novell could use SVRX source code in its own products but subject to particular restrictions.  If (as Novell contends) any contract relating to any of the SVRX releases identified in Item VI of the Assets Schedule is an "SVRX License," then the TLA must qualify, and then Novell could amend, modify, or waive any of SCO's rights under that Agreement.  That would create the completely non-sensical result that as a result of Section 4.16(b), Novell was free to lift the restrictions on the use of the SVRX code set forth in the TLA.  Novell offers no reasoned grounds for excluding the TLA from such a result.

198.     In sum, Novell's "waiver" rights under the amended APA do not extend to the terms of the Software or Sublicensing Agreements with IBM as to which  Novell sought to waive SCO's rights to either terminate or pursue claims for breach.

### C.   The Covenant of Good Faith and Fair Dealing.

199.      In the alternative, SCO has sought a declaration from the Court that even if

Novell had the right to waive SCO's claims, the exercise of its 4.16(b) rights is constrained by

the implied duty of good faith and fair dealing, and that under the facts presented, Novell's

action has breached those implied obligations.

### 1.      The Governing Law.

200.      The Tenth Circuit, in remanding, indicated that this Court must consider the

applicability of the implied covenant even though the language of Section 4.16(b) purports to

give Novell unfettered discretion regarding its waiver decisions.  SCO, 578 F.3d at 1224-25.

201.      "California recognizes at least two exceptional situations where the covenant of

good faith may inform the interpretation of even an express grant of contractual authority.  First,

where the express discretion makes the contract, viewed as a whole, contradictory and

ambiguous, the implied covenant may be applied to aid in construction.  Second, the covenant

may aid in the interpretation of a contract seemingly expressly granting unbridled discretion in

those relatively rare instances when reading the provision literally would, contrary to the parties'

clear intention, result in an unenforceable, illusory agreement."  SCO, 578 F.3d at 1225.

202.      The implied covenant should apply because Novell's interpretation makes Section

4.16(b) contradict other provisions of the APA, and would result in an unenforceable, illusory

agreement.  SCO, 578 F.3d at 1224-25.  The interpretation of the APA that Novell proposes

directly implicates the Tenth Circuit's citation of April Enterprises, Inc. v. KTTV, 147 Cal. App.

3d 805, 816 (Cal. Ct. App. 1983).  In that case, by the express terms of a contract, one party had

the right to syndicate episodes of a television show, while the other had the right to erase

episodes of the show.  Both parties shared revenues from compensation.  Although the contract

expressly granted one party the right to erase episodes, the court applied the covenant of good

faith, holding that the contract was contradictory and ambiguous as to whether tapes could be erased while the other party was negotiating for syndication.  Id.

203.     Novell's proposed reading of Section 4.16(b) creates the same contradiction and ambiguity in the APA.  If Novell could change any part of any of the contracts that embody the UNIX-based business that Novell had transferred, as the Tenth Circuit observed, it could destroy that business.

204.     The implied covenant is violated where a party exercises its rights in bad faith or in an objectively unreasonable way, regardless of the actor's motive.  Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 372-73 (1992); Badie v. Bank of Am., 67 Cal. App. 4th 779, 795-96 (1998).  Under the objective test, the covenant "requires the party holding such power to exercise it for any purpose within the reasonable contemplation of the parties at the time of formation – to capture opportunities that were preserved upon entering into the contract."  Carma, 2 Cal. 4th at 372; accord Badie, 67 Cal. App. 4th at 796.

### 2.     Novell's Waiver Actions Violate the Implied Covenant.

205.     Under the foregoing standards, the Court concludes that Novell has breached the implied covenant.  The sole rationale that Novell has offered for its exercise of its alleged rights – that it was seeking to avoid a situation in which it might end up somehow having to return royalties to IBM – does not withstand scrutiny.

206.     The parties agree that in 1996 IBM secured a buy-out of the royalties it had been paying under its Product Schedule License underlying AIX.  The parties also appear to agree that IBM was not paying any royalties under the Sequent Scheudles that IBM acquired in the late 1990s; there was certainly no evidence at trial that IBM was paying any such royalties.

207.     The evidence thus established that in exercising its alleged waiver rights, Novell

was not seeking to protect the payment of any ongoing royalties.  Mr. LaSala testified

concerning the reasons Novell exercised its Section 4.16(b) rights against SCO in 2003 by

purporting to waive SCO's claims against IBM for breach of its Software and Sublicensing

Agreements.  Mr. LaSala explained that SCO's termination of those agreements "could have a

significant negative implication for Novell" because IBM had paid Novell "about $10 million"

"for a fully paid up irrevocable perpetual license."  (1910:20-1912:4; 1949:23-35.)

208.     This basis for Novell to waive SCO's rights to have a court determine the validity

of its claims of breach cannot withstand scrutiny.  On the one hand, if SCO were not to prevail

on its contract claims against IBM, there would be no arguable effect on IBM's prior buyout.

(1950:21-1951:3.)  On the other hand, if SCO were to prevail, there would be a finding or verdict

that IBM has acted in breach of its Software and Sublicensing Agreements and that SCO had the

right to terminate those Agreements, and thus IBM would have no basis to demand a refund.

(Cf. 1950:1-1951:20.)  The Court cannot find, and Novell has not identified, any legal basis on

which in that posture – as a party in breach of the agreements at issue – IBM could argue over

against Novell that it must return to IBM the money IBM had paid for its buy-out.  When

confronted with this line of analysis on cross examination, Mr. LaSala responded "I don't know"

and ultimately admitted that IBM "would not have come and asked us for the $10 million."

(1950:1-25.)  These same points apply with respect to SGI's prior buyout and Novell's waiver of

SCO's rights with respect to that licensee.  (Ex. G21.)

209.     Moreover, the waiver cannot be defended on the grounds that Novell believed

SCO's position to be in error.  If SCO's position were correct and IBM had breached contractual

restrictions on the use of UNIX and UNIX-derived technology, the courts could so determine

and there is no justification for Novell substituting itself for the Court in making such decisions. Indeed, Amendment X, which arose from the prior 1996 dispute among IBM, Novell and SCO, specifically provided that "Notwithstanding the above, the irrevocable nature of the above rights will in no way be construed to limit Novell's or SCO's rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's or SCO's rights under this Amendment No. X, the Related Agreements, or under general patent, copyright, or trademark law." (Ex. O8 ¶ 1.)

210.     Similarly, Novell's waiver decision cannot be justified on the basis of Novell (or IBM) business interests in the success of the Linux operating system arising years later. "The fundamental purpose of the implied covenant of good faith and fair dealing is that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Major v. W. Home Ins. Co., 169 Cal. App. 4th 1197, 1209 (2009) (citations and quotations omitted); Bosetti v. U.S. Life Ins. Co. in City of New York, 175 Cal. App. 4th 1208, 1235 (2009) (same). Accordingly, the covenant "imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose," Bosetti, 175 Cal. App. 4th at 1235, and a party breaches the covenant if it engages "in a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving the party of the benefits of the agreement." Nieto v. Blue Shield of Cal. Life & Health Ins. Co., 181 Cal. App. 4th 60, 86 (2010) (citations and quotations omitted). That would be a meaningless restriction if a party's own economic self-interest, arising from activities apart from the contract in question, were sufficient justification for their action. In this connection, there was no consideration given by Novell to the effect of the purported waiver on SCO's rights. (1949:3-25 (LaSala).)

211.     The implied covenant, as noted, permits a party to realize benefits within the reasonable contemplation of the parties at the time of contracting.  The Court therefore concludes that in invoking Section 4.16(b) as it did, Novell was not seeking to protect interests that it was entitled to protect in keeping with its implied covenant of good faith and fair dealing.

212.     Accordingly, the Court concludes that if it did have the broad waiver rights it has claimed, Novell breached the implied covenant of good faith and fair dealing in exercising such rights with respect to SCO's contract claims against IBM.

### 3.     Novell's "Waivers" Are Invalid and Unenforceable.

213.     The implied covenant of good faith and fair dealing supplements the express terms of the contract, McClain v. Octagon Plaza, LLC, 159 Cal. App. 4th 784, 806 (2008), and generates "a contractual obligation."  City of Hollister v. Monterey Ins. Co., 165 Cal. App. 4th 455, 460 (2008).  A breach of the implied covenant therefore is a breach of the contract itself. Schwartz v. State Farm Fire and Cas. Co., 88 Cal. App. 4th 1329, 1339 (2001).

214.     Where a party has exercised its contractual discretion in breach of the contract, the party's actions are not valid or enforceable.  In Badie v. Bank of America, 67 Cal. App. 4th 779 (1998), for example, the court addressed certain language in Bank of America's account agreements with four of its credit-card account customers that allowed the Bank to change any "term, condition, service or feature" of a customer's credit account.  Invoking the provision, the Bank added an alternative dispute resolution (ADR) clause to the account agreements. Reversing the trial court's disposition of the issue, the court concluded that in adding the ADR clause, the Bank had breached the implied covenant of good faith and fair dealing in the account agreements.  Id. at 796-806.  The court therefore held that the "clause is not a part of the Bank's

contract with the four individual plaintiffs here and may not be enforced against them." Id. at 807.

215.     The Court therefore concludes that Novell's waivers of SCO's claims against IBM, even if within the scope of Section 4.16(b), were in breach of contract and are therefore invalid and ineffective.

## VII.   NOVELL'S AFFIRMATIVE DEFENSES FAIL.

### A.     **Substantial Performance.**

216.     Novell's affirmative defense of substantial performance does not apply to SCO's claim for specific performance.  "Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party."  Cal. Civ. Code § 3392 (emphasis added).  The statute pertains only to a party's failure to substantially perform a "condition precedent," in the event that the parties had agreed to impose any such conditions precedent.  The statute's limited scope makes sense, as a "condition precedent" is a condition "before some right dependent thereon accrues, or some act dependent thereon is performed."  Cal. Civ. Code § 1436 (emphasis added).

217.     The APA does not identify any "conditions precedent" to the sale of the UNIX and UnixWare copyrights, and Novell did not present any evidence at trial that there were any such conditions precedent.  Specifically, SCO's obligation to remit a portion of the payments it received under its 2003 agreement with Sun cannot be a "condition precedent" to Novell's sale of the UNIX and UnixWare copyrights to SCO in 1996, seven years prior.  "Provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction."  Wm. R. Clarke Corp. v. Safeco Ins. Co., 15 Cal. 4th 882, 885 (1997) (citing Rubin v. Fuchs, 1 Cal. 3d 50, 53 (1969)); see also Frankel v. Bd. of Dental Examiners, 46 Cal. App. 4th 534, 550 (1996) (courts shall not construe a term of the contract so

as to establish a condition precedent absent plain and unambiguous contract language to that effect").

218.        Novell's affirmative defense of substantial performance does not apply to SCO's claim for breach of the covenant of good faith and fair dealing for three independent reasons.

219.        First, SCO's breach of contract claim concerns Novell's breach of the covenant of good faith and fair dealing.  Under California law, Novell is obligated to satisfy those obligations independent of SCO's performance.  "A breach by one party to a contract does not absolve another party to the contract of the duty of good faith and fair dealing." Aguilar v. Millot, 2007 WL 1806860, at *7 (Cal. Ct. App. June 25, 2007) (citing Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 578 (1973)).

220.        Second, Novell has continued to accept the benefits of SCO's continued performance under the APA, including its continued administration and remittance of SVRX Royalties for years after the 2003 Sun Agreement (and as recently as this year), which were estimated at trial to be "hundreds of millions of dollars" that SCO remitted to Novell.  (354:8-15 (Chatlos); Ex. 754; 2066:1-12 (Tolonen).)  On those facts, Novell cannot now disavow its duties of good faith and fair dealing under the APA.  Roseleaf Corp. v. Radis, 122 Cal. App. 2d 196, 204-205 (1953); 15 R. Lord, Williston on Contracts § 44:52 (4th ed. 2009).

221.        Third, the law is that "[t]here is no simple test for determining whether substantial performance has been rendered and several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance.  Homebridge Mortg. Bankers Corp. v. Vantage Capital Corp.,

2008 WL 5146957, at *5 (S.D.N.Y. Dec. 5, 2008) (citing Hadden v. Consolidated Edison Co. of N.Y., Inc., 34 N.Y.2d 88, 96 (1974)).

222.     There was no evidence presented at trial that SCO did not "substantially perform" its obligations under the APA.  To the contrary, the evidence showed that SCO performed under the APA for more than a decade.[14]

### B.     Unclean Hands.

223.     In its Amended Trial Brief, Novell claimed that "SCO should be denied relief on all of its claims because it has unclean hands."  (Docket No. 767 at 12.)  Novell claimed that it would show at trial that, if SCO owned the copyrights, it "misused the copyrights by trying to collect royalties from companies that might not infringe the copyrights, and by refusing to give those companies the information they needed to either decide if they infringe the copyrights or change their code so they would not infringe."  (Id. at 13.)

224.     As a general rule, the "unclean hands" defense is for the Court alone to consider. Utah Labor Comm'n v. Paradise Town, 660 F. Supp. 2d 1256, 1263 (D. Utah 2009); Pelt, 611 F. Supp. 2d at 1286; Parduhn v. Bennett, 112 P.3d 495, 506 (Utah 2005).  Accordingly, the Court may determine as a matter of law not to apply the defense at all.

225.     The sole basis on which Novell contended that the defense applies is "copyright misuse."  As Novell has framed it, the defense cannot and does not apply in this case.

---

[14]     To the extent Novell relies on the additional royalties that Novell was awarded in 2008 under its claim for portions of the SCOsource agreements, that judgment is no basis for Novell's claim that SCO did not substantially perform under the APA.  Even in the context of those claims, the Court found against Novell on the substantial portion of their claims.  Novell originally sought more than $30 million from more than twenty agreements SCO entered into in 2003 and 2004, and the Court (Kimball, J.) found that SCO acted properly in retaining the payments it received under all of those agreements but one, and awarded Novell less than 10% of its claimed damages (and less than 2% of the over $200 million in total royalties that SCO has remitted under the APA) on the basis of a single section of a single agreement.  Those findings and evidence underscore SCO's substantial performance under the APA for more than a decade.

226.     Copyright misuse is a defense to a claim for copyright infringement in a court of equity, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 454 F. Supp. 2d 966, 994-95 (C.D. Cal. 2007) (citing authority); Home Design Servs., Inc. v. B&B Custom Homes, LLC, Civil Action No. 06-cv-00249-WYD-GJR, 2008 WL 2302662, at *2 (D. Colo. May 30, 2008); In re ISOs Antitrust Litig., 989 F. Supp. 1131, 1134 & n.1 (D. Kan. 1997), or else arguably a defense to a type of antitrust violation, Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 64-65 (1993).  The leading commentator identifies no other context in which the defense applies.  See Nimmer on Copyright § 13.09 (2009).

227.     In this case, no antitrust claim was asserted, and SCO's claim for copyright infringement was not at issue at trial because this Court previously stayed that claim pending arbitration, and the claim remains stayed.  Novell's "unclean hands" defense thus does not apply and fails as a matter of law.

228.     Even if the Court were to consider the defense, it fails as a matter of law for lack of any support in the case law.  The defense "is recognized only rarely," where the copyright owner has engaged in some transgression that "is of serious proportions and relates directly to the subject matter of the infringement action."  Nimmer, supra, § 13.09[B].  In those rare circumstances, the defense applies only if a copyright owner has leveraged its copyright to undermine the Constitution's goal of promoting invention and creative expression.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 995 (citing authority).

229.     Moreover, with respect to the allegation that SCO failed to disclose the infringing code in Linux, it is undisputed that there are copyright notices in UNIX.  Indeed, where a manufacturer's refusal to license software to third parties does not constitute "copyright misuse,"

<u>Trial Sys. Corp. v. Southeastern Exp. Co.</u>, 64 F.3d 1330, 1337 (9th Cir. 1995), it cannot be that SCO's alleged misconduct should qualify.

230.    Finally, the "alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." <u>Id.</u> At trial, Novell made no showing of how it was personally injured by the alleged misconduct by SCO.

231.    Novell's grounds for the alleged "copyright misuse" thus fail as a matter of law even if the Court were to conclude that Novell's "unclean hands" defense applies in this case.

## <u>CONCLUSION</u>

Based on the foregoing Findings of Fact and Conclusions of Law, the Court concludes and orders as follows:

(1)    The parties must prepare and execute documentation, including in satisfaction of Section 204 of the Copyright Act, sufficient to transfer from Novell to SCO the UNIX and UnixWare copyrights in existence at the time of the APA;

(2)    Novell lacked the authority to direct SCO to waive its claims against IBM, and those purported waivers are without any force or effect; and

(3)    In directing SCO to waive its claims against IBM, Novell breached the implied covenant of good faith and fair dealing under the amended APA, and for that additional reasons those purported waivers are without any force or effect.


DATED this 19th day of April, 2010.


By: <u>/s/ Brent O. Hatch</u>
HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
David Boies
Robert Silver
Stuart H. Singer
Edward Normand
Sashi Bach Boruchow

*Counsel for The SCO Group, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Brent O. Hatch, hereby certify that on this 19th day of April, 2010, a true and correct

copy of the foregoing **SCO'S PROSPOSED FINDINGS OF FACT AND CONCLUSIONS**

**OF LAW** was filed with the court and served via electronic mail to the following recipients:

Starling A. Brennan
David R. Wright
Kirk R. Harris
Cara J. Baldwin
WORKMAN | NYDEGGER
1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, UT 84111

Thomas R. Karrenberg
Heather M. Sneddon
ANDERSON & KARRENBERG
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101

Michael A. Jacobs
Eric M. Acker
Grant L. Kim
MORRISON & FOERSTER
425 Market Street
San Francisco, CA 94105-2482

*Counsel for Defendant and Counterclaim-Plaintiff Novell, Inc.*

By:  /s/ Brent O. Hatch
HATCH, JAMES & DODGE, P.C.
Brent O. Hatch