IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>      Plaintiff/Counterclaim Defendant,<br><br><br><br>      vs.<br><br><br>NOVELL, INC., a Delaware corporation,<br><br>      Defendant/Counterclaim Plaintiff. | FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br><br><br><br><br>Case No. 2:04-CV-139 TS |

This matter came before the Court for trial from March 8, 2010, through March 26, 2010. Having heard the evidence presented at trial, reviewed the materials submitted by the parties, and being otherwise fully informed, the Court makes the following findings of fact and conclusions of law.

## I. INTRODUCTION

"This case primarily involves a dispute between SCO and Novell regarding the scope of intellectual property in certain UNIX and UnixWare technology and other rights retained by Novell following the sale of part of its UNIX business to Santa Cruz, a predecessor corporate

entity to SCO, in the mid-1990s."[1] Following competing motions for summary judgment, this Court issued an opinion granting summary judgment to Novell on many of the key issues.[2] SCO appealed the Court's decision to the Tenth Circuit Court of Appeals which affirmed in part, reversed in part, and remanded for trial on the remaining issues. Specifically, the Tenth Circuit reversed the Court's "entry of summary judgment on (1) the ownership of the UNIX and UnixWare copyrights; (2) SCO's claim seeking specific performance; (3) the scope of Novell's rights under Section 4.16 of the APA; [and] (4) the application of the covenant of good faith and fair dealing to Novell's rights under Section 4.16 of the APA."[3] The Tenth Circuit remanded these issues for trial.[4]

Pursuant to the Tenth Circuit's remand, a trial was held in this matter beginning March 8, 2010, through March 26, 2010. Prior to trial, the parties agreed that certain issues were to be decided by the jury and certain issues were to be decided by the Court.[5] Specifically, SCO's claim for slander of title and Novell's counterclaim for slander of title were to be decided by the jury.[6] At the close of Novell's evidence, the Court granted SCO's Motion for Judgment as a

---

[1] *The SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1204 (10th Cir. 2009).

[2] *See* Docket No. 377.

[3] *The SCO Group, Inc.*, 578 F.3d at 1227.

[4] *Id.*

[5] Docket No. 750.

[6] *Id.* at 1.

Matter of Law Pursuant to Fed.R.Civ.P. 50 on Novell's counterclaim for slander of title.[7]  After

its deliberations, the jury found that the amended Asset Purchase Agreement ("APA") did not

transfer the UNIX and UnixWare copyrights from Novell to SCO.[8]  Because it found that SCO

was not the owner of the UNIX and UnixWare copyrights, there was no need for the jury to reach

SCO's slander of title claim.

The issues the Court must now decide include: (1) SCO's claim for specific performance,

seeking an order directing Novell to transfer the UNIX and UnixWare copyrights; (2) Novell's

counterclaim for declaratory judgment of its rights under Section 4.16 of the APA; and (3)

SCO's claim that Novell breached the implied covenant of good faith and fair dealing in

exercising its rights under Section 4.16 of the APA.[9]  Additionally, the parties agreed that

Novell's affirmative defense of unclean hands, if any, should be tried to the Court.[10]  Novell did

not include any discussion of its affirmative defense of unclean hands in its Proposed Findings of

Fact and Conclusions of Law.[11]  The Court finds that this constitutes a waiver of that defense and

---

[7]Docket No. 839.

[8]Docket No. 846.

[9]Docket No. 750, at 1.

[10]*Id.*

[11]Docket No. 852.

it will not be addressed by the Court.[12]  Therefore, only those three issues set forth above remain for the Court's determination.

## II.  FINDINGS OF FACT

**A.    THE PARTIES**

1.       Plaintiff, The SCO Group, Inc. ("SCO"), is a Delaware corporation with its principal place of business in Lindon, Utah.[13]  SCO is in the business of developing and selling software products.[14]

2.       Defendant, Novell, Inc. ("Novell"), is a Delaware corporation with its executive offices in Waltham, Massachusetts, and its principal product development facility in Provo, Utah.[15] Novell is also involved in the development and sale of software products.[16]

**B.    UNIX AND UNIXWARE**

3.       UNIX is the name of a computer operating system originally developed in the late 1960s by engineers at AT&T's Bell Laboratories.[17]

---

[12]Because of the Court's determination of the issues, discussion of Novell's defense of unclean hands is unnecessary in any event.  In addition, the Court need not rule on Novell's defense of substantial performance.

[13]Docket No. 731, at 3.

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]*Id.*

4.      "By the 1980s, AT&T had developed UNIX System V ("SVRX"); it built a substantial

business by licensing UNIX source code to a number of major computer manufacturers,

including IBM, Sun, and Hewlett-Packard.  These manufacturers, in turn, would use the

SVRX source code to develop their own individualized UNIX-derived "flavors" for use

on their computer systems.  Licensees could modify the source code and create derivative

products mostly for internal use, but agreed to keep the UNIX source code confidential."[18]

5.      "In 1993, Novell paid over $300 million to purchase UNIX System Laboratories, the

AT&T spin-off that owned the UNIX copyrights and licenses."[19]

6.      "UnixWare is the brand name for the more recent releases of the UNIX System V,

Release 4 operating system developed and licensed in the early 1990s by Novell and its

predecessors to the technology.  The product was called UnixWare because it was to be a

combination of the latest release of System V source code and some components of

Novell's NetWare source code.  The first releases of UnixWare contain all or virtually all

of the technology included in the immediately prior System V releases, SVR4.2 and

SVR4.2MP."[20]

---

[18]*The SCO Group, Inc.*, 578 F.3d at 1204-05.

[19]*Id*. at 1205.

[20]Docket No. 542 at 7.  Both parties agree that the Court's prior factual findings, to the
extent not reversed, are applicable here.  *See* Docket No. 852, at 21 & n.7; Docket No. 853, at 8
n.3; Trial Tr. 1917:8-1918:3.

7.      As will be discussed in more detail below, Novell sold the UnixWare business to Santa Cruz in 1995 under the APA.[21]  "The core members of Novell's UNIX licensing group became employees of Santa Cruz.  After the APA, Santa Cruz and then SCO developed and licensed SCO UnixWare."[22]

8.      "SCO released several subsequent releases of UnixWare, including multiple versions of each UnixWare 2 and UnixWare 7, which are the latest implementation of System V and the latest generation of UNIX SVR 4.2 with SVR 4.2 MP.  All of the releases of UnixWare subsequent to Novell's transfer of the business are releases of System V. Witnesses testified that the commercially valuable technology from the prior versions is included in UnixWare, and UnixWare would not operate without its System V components.  The current version of UnixWare supports the newest industry-standard hardware."[23]

9.      "Novell acknowledges that it is not entitled to royalties from any UnixWare licenses."[24]

## C.      THE SALE TO SANTA CRUZ

10.     In 1995, Robert Frankenberg, then-CEO of Novell, made the determination that it would be in the best interest of Novell to sell the UNIX business.[25]  Mr. Frankenberg appointed

---

[21]Docket No. 542, at 7.

[22]*Id.*

[23]*Id.* at 7-8.

[24]*Id.* at 9.

[25]Trial Tr. at 88:9-89:13.

Novell Senior Vice President Duff Thompson as the individual responsible for accomplishing the sale of the UNIX business.[26]  Mr. Thompson and others from Novell had discussions with various individuals from Santa Cruz, which was ultimately chosen as the buyer.[27]

11.    It was the initial intent of Novell to sell the entire UNIX business.[28]  However, during the negotiations, the parties realized that Santa Cruz could not afford to pay cash or stock for the entire purchase price sought by Novell.[29]  Therefore, the deal was structured so that Novell only sold certain of the assets that it had acquired when it purchased the UNIX business from AT&T.[30]  In particular, Novell sold Santa Cruz the UnixWare business, that is the right to exploit and develop UnixWare.[31]  As will be discussed below, Novell retained substantial rights in the UNIX business,[32] that is the UNIX System V source licensing business where source code was provided to customers to create a binary product.[33]  Specifically, Novell retained the UNIX and UnixWare copyrights and the right

---

[26]*Id*. at 90:13-25; *id*. at 223:4-11.

[27]*Id*. at 223:12-228:6; *id*. at 92:14-93:19.

[28]*Id*. at 90:2-12; *id*. at 221:24-222:2.

[29]*Id*. at 234:19-25; *id*. at 353:3-10; *id*. at 459:14-22; *id*. at 2344:1-19.

[30]*Id*. at 2346:23-2347:1.

[31]*Id*. at 2305:5-2308:10; *id*. at 2347:2-5.

[32]*Id*. at 2346:17-2348:3.

[33]*Id*. at 2305:11-16.

to receive SVRX royalties. For its part, SCO was to act as Novell's agent in the collection of those royalties and SCO acquired certain UNIX-related assets, such as contracts and employees, to aid in this role.[34]

12.    In exchange for selling these assets, Novell received the following: approximately 16% to 19% of Santa Cruz Stock; a royalty arrangement if Santa Cruz hit certain benchmarks on certain products; and the royalties from SVRX licenses.[35]

**D.    THE ASSET PURCHASE AGREEMENT**

13.    In September 1995, Novell and Santa Cruz entered into the APA memorializing the terms of the sale.[36] The APA was signed on September 19, 1995, and was amended in December 1995 and again in October 1996.[37] SCO is a successor-in-interest to all of the assets that Santa Cruz acquired under the amended APA with Novell.[38]

14.    Recitals A and B of the APA state:

    A.    Seller is engaged in the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business").

    B.    The Board of Directors of each of Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer

---

[34]*Id.* at 2347:6-2348:3.

[35]*Id.* at 235:4-236:15; *id.* at 353:3-10; *id.* at 2344:20-2347:5; *see also* Trial Ex. 1, § 1.2(a)-(b).

[36]Docket No. 731 at 3; *see also* Trial Ex. 1.

[37]Docket No. 731 at 3; *see also* Trial Ex. 1.

[38]Docket No. 731 at 3.

acquire certain assets of, and assume certain liabilities of Seller compromising the Business (the "Acquisition").[39]

15.     The "Acquisition" and those "certain assets" which Santa Cruz acquired are set forth in

more detail in Section 1.1(a) of the APA.  That section provides:

On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date . . . all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a) hereto.  Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).[40]

16.     Schedule 1.1(a) identifies those assets that were transferred under the APA.  Section I of

Schedule 1.1(a) states:

All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process), and all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code, source documentation, source listings and annotations, appropriate engineering notebooks, test data and test results, as well as all reference manuals and support materials normally distributed by Seller to end-users and potential end-users in connection with the distribution of UNIX and UnixWare . . . .[41]

That provision goes on to list a number of UNIX source code products, binary product

releases, products under development, and other technology.[42]

----

[39]Trial Ex. 1, Recitals A-B.

[40]*Id*. § 1.1(a).

[41]*Id*. Schedule 1.1(a), § I.

[42]*Id*.

17.    Section II of Schedule 1.1(a) transferred "[a]ll of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business."[43]

18.    Section III.L of Schedule 1.1(a) transferred to Santa Cruz "[a]ll of Seller's rights pertaining to UNIX and UnixWare under any software development contracts [or] licenses . . . and which pertain to the Business, . . . including without limitation: Software and Sublicensing Agreements . . . ."[44]

19.    Section IV of Schedule 1.1(a) transfers "[a]ll copies of UNIX and UnixWare, wherever located, owned by Seller."[45]

20.    Section V of Schedule 1.1(a), the "Intellectual Property" portion of the included asset schedule, transfers: "Trademarks UNIX and UnixWare as and to the extent held by the seller . . . ."[46]

21.    Section V of Schedule 1.1(b), the "Intellectual Property" portion of the excluded asset schedule, states:

"A.    All copyrights and trademarks, except for the trademarks UNIX and UnixWare.

B.     All Patents"[47]

---

[43]*Id*. Schedule 1.1(a), § II.

[44]*Id*. Schedule 1.1(a), § III.L.

[45]*Id*. Schedule 1.1(a), § IV.

[46]*Id*. Schedule 1.1(a), § V.

[47]*Id*. Schedule 1.1(b), § V.

22.    Section VIII of Schedule 1.1(b) excludes "[a]ll right, title and interest to the SVRx Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof."[48]

23.    Under the plain language of the original APA, all copyrights, including the UNIX and UnixWare copyrights, were clearly excluded from the transaction between Novell and Santa Cruz.[49]

24.    Another significant aspect of the APA is the treatment of SVRX royalties. Under the payment provisions of the APA, Novell retained "all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to [Santa Cruz]."[50] Santa Cruz agreed to collect and pass through 100% of the SVRX royalties, as defined in Section 4.16, and Novell agreed to pay Santa Cruz a 5% administrative fee.[51] Santa Cruz obtained only "legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code."[52]

25.    Section 4.16(a) of the APA, as amended by Amendment No. 1, provides:

Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI

---

[48]*Id.* Schedule 1.1(b), § VIII.

[49]*See The SCO Group, Inc.*, 578 F.3d at 1210 ("If we were to interpret the contract based initially only on the APA itself—without regard to Amendment No. 2—we agree that its language unambiguously excludes the transfer of copyrights.")

[50]Trial Ex. 1, § 1.2(b).

[51]*Id.*

[52]*Id.*

of Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties"). Within one (1) calendar month following each calendar month in which SVRX royalties (and royalties from Royalty-Bearing Products) are received by Buyer [except for those SVRX Royalties to be retained in their entirety by Buyer pursuant to paragraph (e) of Section 1.2 hereof] Buyer shall remit 100% of all such royalties to Seller or Seller's assignee. Buyer shall also provide to Seller, within six (6) days following the calendar month in which such royalties are received, and estimate the total amount of such royalties. . . . In consideration of such activities described in the preceding sentence, Seller shall pay to Buyer within 5 days of receipt of SVRX Royalties from Buyer as set forth in the preceding sentence, an administrative fee equal to 5% of such SVRX Royalties . . . .[53]

26.     Item VI of Schedule 1.1(a) states that among the assets to be transferred to SCO are "[a]ll contracts relating to the SVRX Licenses listed below."[54] Item VI of Schedule 1.1(a) goes on to provide a list of SVRX software releases, up to and including UNIX System V 4.2 MP.[55] UNIX System V 4.2 MP was the last version of UNIX before UnixWare.[56]

27.     Under Section 1.2(e), which was added by Amendment No. 1, Santa Cruz had the right to retain 100% of the following categories of SVRX Royalties: (1) fees attributable to stand-alone contracts for maintenance and support of SVRX products listed under Item VI of Schedule 1.1(a); (2) source code right to use fees under existing SVRX Licenses from the licensing of additional CPU's and from the distribution by Santa Cruz of additional source code copies; (3) source code right to use fees attributable to new SVRX licenses approved by Novell pursuant to Section 4.16(b); and (4) royalties attributable to the

---

[53]Trial Ex. 1, § 4.16(a) and Amendment No. 1.

[54]*Id*., Schedule 1.1(a), § VI.

[55]*Id*.

[56]Trial Tr. 1731:24-1732:5.

distribution by Santa Cruz and its distributors of binary copies of SVRX products, to the

extent such copies are made by or for Santa Cruz pursuant to Santa Cruz's own licenses

from Novell acquired before the Closing Date.[57]

28.     Section 4.16(b), as amended by Amendment No. 1, states:

Buyer shall not, and shall not have the authority to, amend, modify or waive any
right under any SVRX License without the prior written consent of Seller.  In
addition, at Seller's sole discretion and direction, Buyer shall amend, supplement,
modify or waive any rights under, or shall assign any rights to, any SVRX License
to the extent so directed in any manner or respect by Seller.  In the event that
Buyer shall fail to take any such action concerning the SVRX Licenses as required
herein, Seller shall be authorized, and hereby is granted, the rights to take any
action on Buyer's own behalf.  Notwithstanding the foregoing, Buyer shall have
the right to enter into amendments of the SVRX Licenses (i) as may be
incidentally involved through its rights to sell and license UnixWare software or
the Merged Product . . . or future versions of the Merged Product, or (ii) to allow a
licensee under a particular SVRX License to use the source code of the relevant
SVRX product(s) on additional CPU's or to receive an additional distribution,
from Buyer, of such source code.  In addition, Buyer shall not, and shall have no
right to, enter into new SVRX Licenses except in the situation specified in (i) of
the preceding sentence or as otherwise approved in writing in advance by Seller
on a case by case basis.[58]

29.     Another aspect of the APA is the License Back of Assets found in Section 1.6.  That

section states that Santa Cruz must execute a license agreement giving Novell "a royalty-

free, perpetual, worldwide license to (i) all of the technology included in the Assets and

(ii) all derivatives of the technology included in the Assets."[59]

---

[57]Trial Ex. 1, § 1.2(e) and Amendment No. 1.

[58]Id. § 4.16(b) and Amendment No. 1.

[59]Id. § 1.6.

30.    The parties did enter into a Technology Licensing Agreement ("TLA") in connection with the APA's closing.[60]  The TLA states that Novell retains a "non-exclusive, non-terminable, worldwide, fee-free licence to" use "Licensed Technology" under certain conditions.[61]  The TLA provides that the term "Licensed Technology" has the same meaning attributed to it in the APA.  The APA, in turn, defines "Licensed Technology" as "all of the technology included in the Assets and . . . all derivatives of the technology included in the Assets."[62]

31.    Novell's Board of Directors approved the APA on September 18, 1995.[63]  As part of that approval, the Board of Directors resolved that "Novell will retain all of its patents, copyrights and trademarks (except for the trademarks UNIX and UnixWare) . . . ."[64]

### E.    THE CLOSING AND AMENDMENT NO. 1

32.    The transaction between Novell and Santa Cruz closed on December 6, 1995.  At the same time, the parties entered into a Bill of Sale[65] and Amendment No. 1.[66]

---

[60]Trial Ex. 162.

[61]*Id.*

[62]Trial Ex. 1, § 1.6.

[63]Trial Ex. Z3.

[64]*Id.* at 2.

[65]Trial Ex. 90.

[66]Trial Ex. 1, Amendment No. 1; Trial Ex. T5.

33. As set forth above, Amendment No. 1 made various changes to the APA, including changes to Section 4.16. Amendment No. 1, however, did not amend the intellectual property portion of either the included or excluded asset schedules found in Schedule 1.1(a) and Schedule 1.1(b).[67]

## F. AMENDMENT NO. 2

34. The parties entered into Amendment No. 2 on October 16, 1996.[68] Amendment No. 2 amended the intellectual property provision of the excluded asset schedule, Schedule 1.1(b), as follows:

All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. However, in no event shall Novell be liable to SCO for any claim brought by any third party pertaining to said copyrights and trademarks.[69]

35. Amendment No. 2 also set out provisions for how the parties were to approach future buy-outs of SVRX licenses.[70] Section B.5 of Amendment No. 2 states:

This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code, nor does it give Novell the right to grant new SVRX source code licenses. In addition, Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement.[71]

---

[67]Trial Ex. 1, Amendment No. 1; Trial Ex. T5.

[68]Trial Ex. 1, Amendment No. 2; Trial Ex. N8.

[69]Trial Ex. 1, Amendment No. 2; Trial Ex. N8.

[70]Trial Ex. 1, Amendment No. 2; Trial Ex. N8.

[71]Trial Ex. 1, Amendment No. 2; Trial Ex. N8.

## G.   TESTIMONY ON SCO'S CLAIM FOR SPECIFIC PERFORMANCE

36.    The bulk of the evidence presented during the March 2010 trial focused on the intent of

the parties concerning the APA and what copyrights were "required" for SCO to exercise

its rights with respect to the acquisition of UNIX and UnixWare technologies.  The Court

will discuss that evidence below.

### 1.    The Intent of the Parties

#### a.    SCO's Witnesses

37.    SCO presented a number of witnesses who testified that it was the intent of the parties to

transfer ownership of the copyrights.

38.    Robert Frankenberg, the CEO of Novell at the time of the APA, testified that it was his

intent to sell the UNIX business in its entirety, including the UNIX copyrights.[72]

However, Mr. Frankenberg's testimony revealed that he was only involved in the high-

level negotiations, that he did not read the entire APA before he signed it, and that he

relied on the advice of the attorneys and others in accepting the APA.[73]

39.    Duff Thompson, the Senior Vice President of Corporate Development for Novell at the

time of the APA, testified that he was instructed to sell the UNIX business in its

entirety.[74]  As part of that sale, Mr. Thompson testified that he "assumed" that the

---

[72]Trial Tr. 90:2-9.

[73]*Id*. at 148:13-24.

[74]*Id*. at 221:24-222:2.

copyrights were being sold as well.[75]  Despite this assumption, Mr. Thompson offered no

testimony on any actual discussions concerning the copyrights.  Mr. Thompson also

testified that around the time of the APA he had already decided to leave Novell.[76]  Mr.

Thompson subsequently became a board member of Santa Cruz and ultimately of SCO.[77]

Mr. Thompson was part of the SCO board when SCO made the decision to sue Novell

and voted in favor of that decision.[78]  Mr. Thompson also has a financial interest in SCO

and stands to gain financially if SCO is successful in this lawsuit.[79]

40.     Edward Chatlos, the Senior Director of Strategic Relationships at Novell at the time of

the APA, was a primary negotiator of the deal between Novell and Santa Cruz.[80]  Mr.

Chatlos testified that the general nature of the transaction was to sell "the entire

business," including the copyrights.[81]  Mr. Chatlos admitted that his wife works for SCO

and that she had stock options that could become more valuable if SCO succeeded in this

lawsuit.[82]

---

[75]*Id*. at 230:24-231:4; *id*. at 304:2-10.

[76]*Id*. at 278:1-279:11.

[77]*Id*. at 279:12-280:8.

[78]*Id*. at 280:9-24.

[79]*Id*. at 281:13-282:13.

[80]*Id*. at 349:13-16.

[81]*Id*. at 351:8-11; *id*. at 351:20-22; *id*. at 352:5-8.

[82]*Id*. at 374:8-375:11.

41.     Jim Wilt, Santa Cruz's Vice President of Development at the time of the APA, testified

        that the intent of SCO was to acquire the entire UNIX and UnixWare business, including

        the copyrights.[83]  However, Mr. Wilt also testified that he became less active toward the

        end of the negotiations and that he could not recall any specific conversations concerning

        the transfer of copyrights.[84]

42.     Alok Mohan, the CEO of Santa Cruz at the time of the APA, testified that Santa Cruz

        bought the business from Novell.[85]  However, Mr. Mohan acknowledged that he was only

        involved in the negotiations at a high level.[86]  He also testified that he was not involved in

        writing the APA, which was drafted by others.[87]

43.     Doug Michels, the Executive Vice President of Santa Cruz at the time of the APA,

        testified that the intent of Santa Cruz was to buy the UNIX business from Novell.[88]  Mr.

        Michels testified that Santa Cruz bought the business "[a]nd as a result of buying the

        business, we owned all the intellectual property."[89]  Mr. Michels stated that there was "no

---

[83]*Id.* at 445:12-446:5.

[84]*Id.* at 442:11-444:8.

[85]*Id.* at 458:14-19.

[86]*Id.* at 455:20-456:9.

[87]*Id.* at 456:10-457:6.

[88]*Id.* at 491:15-21.

[89]*Id.* at 501:3-4.

way that [the] deal could have happened without getting the copyrights."[90]  However, Mr. Michels could not recall specific conversations concerning the copyrights.[91]  Mr. Michels further stated that he did not draft or review the APA,[92] did not have specific recollections of being involved in Amendment No. 1,[93] and did not know what Amendment No. 2 was.[94]

44.     Burt Levine, an attorney working with Novell at the time of the APA who later transferred to Santa Cruz, testified that the intent was to transfer ownership rights, including the copyrights.[95]  Mr. Levine testified that he disagreed with the language concerning intellectual property in the excluded asset schedule of the APA and would have stricken this language or reformed it in some way.[96]  However, Mr. Levine did review this portion of the APA when it was being drafted and did not alter the copyright exclusion.[97]

---

[90]*Id*. at 504:7-8.

[91]*Id*. at 504:9-505:7.

[92]*Id*. at 510:11-24; *id*. 512:13-15.

[93]*Id*. at 511:5-11.

[94]*Id*. at 511:11-15.

[95]*Id*. at 518:5-14.

[96]*Id*. at 530:13-531:17.

[97]*Id*. at 531:18-537:23; *see also* Trial Ex. X3.

45.    Ty Mattingly, Novell's Vice President of Corporate Development Strategic Relationships

at the time of the APA, was also involved in the sale of the UNIX business to Santa

Cruz.[98]  Mr. Mattingly testified that Novell "sold the business" to Santa Cruz and that

Novell only retained 95% of the SVRX royalties.[99]  Mr. Mattingly, however, stated that

he was not focused on the details of the transaction and was more of a "high level strategy

guy."[100]  While he was involved in the memorandum of understanding phase, he was not

involved in the actual drafting of the APA.[101]  Further, Mr. Mattingly testified that he

owns over 9,000 shares of SCO stock.[102]

46.    Kimberlee Madsen worked as the Manager of Law and Corporate Affairs for Santa Cruz

at the time of the APA.[103]  Ms. Madsen was involved in the transaction between Novell

and Santa Cruz as support for Santa Cruz's general counsel Steve Sabbath and was

involved in the negotiations as well.[104]  Ms. Madsen testified that the intent was for Santa

Cruz to purchase all of the UNIX and UnixWare assets, including the copyrights.[105]

---

[98]Trial Tr. at 674:23-675:6.

[99]*Id*. at 676:12-677:4.

[100]*Id*. at 711:2-4.

[101]*Id*. at 711:5-715:10.

[102]*Id*. at 701:12-23.

[103]*Id*. at 780:22-24.

[104]*Id*. at 781:9-17.

[105]*Id*. at 783:2-9.

However, Ms. Madsen conceded that the transaction was more complicated than simply buying the whole business.[106]

47.    Steve Sabbath, Santa Cruz's general counsel at the time of the APA, testified that Santa Cruz was buying the entire business, including the intellectual property.[107]  However, Mr. Sabbath previously executed a declaration where he made a number of contradictory statements, including that, under the APA, Novell would retain significant UNIX-related assets including much of the UNIX System V intellectual property.[108]

    b.    *Novell's Witnesses*

48.    Tor Braham, outside counsel for Novell and lead drafter of the APA, testified that Novell was selling to Santa Cruz the UnixWare business while Novell "retained all of the economics and relationships arising out of the UNIX business."[109]  Mr. Braham testified that the exclusion of the copyrights was agreed upon by the parties.[110]  He also stated that the purpose for excluding the copyrights was to protect Novell's interest in the UNIX business that it had retained.[111]  Mr. Braham further testified that Santa Cruz could use the assets that it received "to then build a new version of UnixWare, and it would own the

---

[106]*Id.* at 820:1-3.

[107]*Id.* at 899:12-16.

[108]*Id.* at 926:9-927:10.

[109]*Id.* at 2346:17-2347:5.

[110]*Id.* at 2363:19-23.

[111]*Id.* at 2364:3-11.

copyrights in what it built on top of the base UNIX and UnixWare software that it had a copy of."[112]  Santa Cruz could then license that product to third parties.[113]

49.    David Bradford worked as Novell's general counsel from 1985 to 2000.  Mr. Bradford testified that it was "very clear" that Novell retained the copyrights.[114]  Mr. Bradford further testified that the Novell board of directors agreed that under the APA Novell would retain all of its copyrights.[115]

50.    James Tolonen, Novell's Chief Financial Officer at the time of the APA, testified that the copyrights were purposefully excluded from the assets to be transferred to Santa Cruz.[116] Mr. Tolonen explained that retaining the copyrights was done: (1) as "part of [Novell's] strategy and [was] really necessary under the nature of the transaction"; (2) because Santa Cruz was relatively small and could not afford the entire value; (3) to avoid ownership issues with other products; and (4) because of concerns with the long-term viability of Santa Cruz.[117]  As will be discussed in more detail below, Mr. Tolonen also testified that Amendment No. 2 was meant to address use rights, not ownership of the copyrights.[118]

---

[112]*Id*. at 2365:2-9.

[113]*Id*. at 2365:10-13.

[114]*Id*. at 2438:14-16.

[115]*Id*. at 2442:13-19.

[116]*Id*. at 2021:24-2022:3.

[117]*Id*. at 2022:7-2023:18.

[118]*Id*. at 2036:5-22.

51.     Michael Defazio, an Executive Vice President at Novell at the time of the APA, testified that the intent of the APA was not to transfer the copyrights and that the copyrights were retained as a way to "bulletproof" Novell's financial asset stream.[119]

52.     Jack Messman was a member of Novell's Board of Directors at the time of the APA[120] and would later become CEO.  Mr. Messman was present for a telephonic meeting where the APA was discussed.[121]  Mr. Messman testified that, based upon that meeting, he understood that the copyrights were not sold as part of the transaction between Novell and Santa Cruz and that there was a specific discussion on that issue.[122]  Mr. Messman stated Novell retained the copyrights because SCO was a "fledgling company" and because Novell was worried about the SVRX revenue stream.[123]  Mr. Messman tesfied that retention of the copyrights "was the key part of the deal that convinced the board to do that deal."[124]  Mr. Messman further testified that the copyrights were not required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies as the plan was for SCO to develop new code.[125]

---

[119]*Id*. at 2311:7-17.

[120]*Id*. at 2284:2-3

[121]*Id*. at 2284:9-10.

[122]*Id*. at 426:9-13-428:5.

[123]*Id*. at 2284:17-2285:1.

[124]*Id*. at 2285:5-6.

[125]*Id*. at 429:2-10; *id*. at 437:5-439:24.

### c. Conclusions from the Testimony

53.    The Court finds the witnesses presented by SCO on the parties' intent to be less credible than Novell's witnesses for a number of reasons.  First, many of SCO's witnesses were involved only in the "high level" negotiations and did not participate in the actual drafting of the APA where the details of the deal were agreed to.  Thus, while these individuals may have provided relevant testimony as to what the parties were intending or hoping to do at the outset, their testimony has less relevance as to what actually happened as the negotiations unfolded and the APA was actually drafted.  This fact is critical here because the transaction could not be completed as it had been initially envisioned, specifically it had to be structured to account for the fact that Santa Cruz did not have the financial resources necessary to purchase the entire business and there was uncertainty about its long-term viability.  Second, many of these witnesses seemed to take for granted that the copyrights would transfer, but there was surprisingly little evidence of any actual discussions concerning the copyrights.  Finally, a number of SCO's witnesses, though not all, have a direct financial interest in this litigation.[126]

### d. Course of Performance

54.    SCO also points to the parties' course of performance to support its argument that it was the intent of the parties to transfer ownership of the copyrights.

---

[126]*Id*. at 281:13:282:13; *id*. at 445:12-446:5; *id*. at 701:12-23.

55.     SCO points to a "joint" press release issued after the transaction.  That press release announced an "agreement for SCO to purchase the UNIX business from Novell."[127]  The press release goes on to state that "SCO will acquire Novell's UnixWare business and UNIX intellectual property."[128]  While SCO described this as a "joint" press release, there is no indication that it was joined in by Novell and appears to be issued solely by SCO.  Further, the press release supports Novell's argument that SCO only acquired the UnixWare business, as opposed to the UNIX business.  Finally, though the press release mentions "UNIX intellectual property," it does not specifically mention copyrights and could just as logically refer to other UNIX-related assets which did transfer under the APA.

56.     SCO also points to its 1996 Form 10-K in which it stated that it "acquired certain assets related to the UNIX business including the core intellectual property from Novell."[129]  Again, there is no mention of copyrights and no description of what "core intellectual property" was acquired.

57.     SCO also relies on the fact that SCO copyright notices were placed on existing versions of UnixWare, but as SCO's own witness admitted, this does not answer the question of ownership.[130]  SCO also points to the physical possession of copyright registration

---

[127]Trial Ex. 526.

[128]*Id.*

[129]Trial Ex. 521.

[130]Trial Tr. at 1779:2-20.

certificates. However, SCO's witnesses testified that, when the APA was finalized, SCO staff and property simply remained in the same physical location as before.[131]

58.    SCO also argues that letters sent from Novell to its customers support the conclusion that the copyrights were transferred. These letters state that Novell transferred to SCO Novell's "existing ownership interest in UNIX System-based offerings and related products."[132] However, SCO's witnesses acknowledged that the letters were not meant to give the customers all of the details of the transaction, but merely to inform the customers that they were going to deal with SCO in the future.[133]

59.    SCO also points to the TLA as further evidence of the parties intent to transfer copyright ownership. However, testimony concerning the TLA affirmed that one of the purposes of that agreement was to allow Novell the right to use post-APA SCO-developed code.[134]

60.    The Court finds that SCO's course of performance evidence, either separately or in combination, does not support its position that it was the intent of the parties to transfer copyright ownership.

    e.    *Conclusion on the Intent of the Parties*

61.    Based on the evidence presented at trial, the Court finds that it was not the intent of the parties to transfer ownership of the UNIX and UnixWare copyrights. Rather, the Court

---

[131]*Id*. at 641:19-642:3.

[132]Trial Ex. 580.

[133]Trial Tr. at 1705:22-1707:25.

[134]*Id*. at 1964:8-22; *id*. at 1984:6-1985:21.

finds that Novell intentionally retained the UNIX and UnixWare copyrights. The Court

finds that the copyrights were retained by Novell for the following reasons: (1) to protect

the SVRX royalty stream; (2) because Santa Cruz could not afford to purchase the entire

UNIX business; and (3) because of concerns with Santa Cruz's future financial viability.

2.      *Whether the Copyrights are "Required"*

62.     SCO argues that the copyrights are, nonetheless, "required" under Amendment No. 2.

63.     As set forth above, Amendment No. 2 amended the excluded asset schedule (Schedule

1.1(b)) of the APA to state: "All copyrights and trademarks, except for the copyrights and

trademarks owned by Novell as of the date of the Agreement required for SCO to

exercise its rights with respect to the acquisition of UNIX and UnixWare

technologies."[135] The parties presented differing evidence on the intent and purpose of

Amendment No. 2, as well as which copyrights were "required."

a.      *SCO's Witnesses*

64.     SCO presented little evidence as to the intent of Amendment No. 2. Steve Sabbath,

general counsel for Santa Cruz at the time of the APA, testified that Amendment No. 2

was meant to confirm that Santa Cruz acquired all copyrights pertaining to the UNIX

business.[136] Mr. Sabbath stated that the copyrights were needed to protect the

technology.[137] As discussed above, however, Mr. Sabbath executed a contradictory

---

[135]Trial Ex. 1, Amendment No. 2.

[136]Trial Tr. at 911:8-10.

[137]*Id*. at 913:12-15.

declaration and, as will be discussed below, Mr. Sabbath's testimony is refuted by Novell witnesses.

65.     Kimberlee Madsen testified that the copyrights were essential for SCO to protect its intellectual property rights.[138]  However, when asked what copyrights were required for Santa Cruz to operate its UNIX and UnixWare business, she responded that Santa Cruz "would have acquired all the copyrights."[139]  Ms. Madsen also testified that she did not draft the language of Amendment No. 2 and had no specific recollection of any discussions with Mr. Sabbath about that Amendment.[140]

66.     A number of SCO witnesses testified that the UNIX and UnixWare copyrights were "required" for SCO to operate its business.  For instance, William Broderick, a former Novell and current SCO UNIX Contract manager, testified that the way "you show your ownership and protect your software is by copyright."[141]  But Mr. Broderick was not involved in the negotiation of the APA and had no involvement in either Amendment.[142]

67.     Darl McBride, the former CEO of SCO, testified that ownership of the copyrights was required for SCO's business.[143]  Mr. McBride testified that there were a number of

---

[138]*Id*. at 875:7-14.

[139]*Id*. at 802:23-803:1.

[140]*Id*. at 802:17-22.

[141]*Id*. at 667:20-21.

[142]*Id*. at 621:16-25.

[143]*Id*. at 997:3-14.

reasons for this, stating that copyrights were required in order to make copies, do deals, and enforce your rights against others.[144] Mr. McBride was also not involved with negotiation or drafting of either the APA or Amendment No. 2.[145]

68.  John Maciaszek, a former Novell and current SCO UNIX Product Manager, testified that copyrights are required for SCO to operate its business.[146] There is no evidence that Mr. Maciaszek was involved in negotiating or drafting the APA or its Amendments.

69.  Ryan Tibbitts, general counsel for SCO, testified that the copyrights were "critical" for SCO to run the business purchased from Novell.[147] Mr. Tibbitts stated: "Because we own the core UNIX intellectual property and a very critical component of that at this point in time is to protect that IP, and we have got to have that IP to keep other people from encroaching into our marketplace."[148] Mr. Tibbitts was similarly not involved with the APA or its Amendments.[149]

70.  Most of these witnesses testified that the copyrights were "required" for SCO to run its SCOsource licensing program.[150] However, as will be discussed below, this program was

---

[144]*Id*. at 997:14-23.

[145]*Id*. at 1054:5-12.

[146]*Id*. at 1687:22-24.

[147]*Id*. at 1844:25-1846:1.

[148]*Id*. at 1845:15-18.

[149]*Id*. at 1847:16-24.

[150]*Id*. at 1225:18-1226:10.

not something that SCO acquired from Novell. SCO only acquired the UnixWare business from Novell, while Novell retained significant rights in the UNIX business. Amendment No. 2 applies only to those copyrights "required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."

71.     SCO witnesses acknowledged that SCO could operate its UnixWare business without the copyrights. Mr. McBride admitted that SCO could run its UnixWare business without the copyrights.[151] Mr. Tibbitts similarly stated that SCO could run its UNIX product business without the UNIX and UnixWare copyrights.[152] Indeed, SCO had offered to sell its business without the copyrights.[153]

72.     Moreover, it was undisputed that SCO would own any newly developed code and could obtain copyrights to protect that code.[154]

     *b.      Novell's Witnesses*

73.     Novell presented a different view of the intent and meaning of Amendment No. 2.

74.     Allison Amadia worked as in-house counsel for Novell at the time of Amendment No. 2 and was the lead negotiator and drafter of that document for Novell.[155] Ms. Amadia was contacted by Steve Sabbath, general counsel for SCO, who requested an amendment to

---

[151]*Id*.

[152]*Id*. at 1850:11-1851:18.

[153]*Id*.

[154]*Id*. at 933:2-7; *id*. at 939:3-18; *id*. at 816:19-817:14; *id*. at 2365:2-9.

[155]*Id*. at 2105:18-25.

the APA.[156]  Mr. Sabbath stated that because of a "clerical error" the APA did not transfer copyright ownership.[157]

75.    Mr. Sabbath sent Ms. Amadia a proposed amendment which would have amended Section V of Schedule 1.1(b) of the APA (the intellectual property portion of the excluded assets schedule) to state: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of this Amendment No. 2, which pertain to the UNIX and UnixWare technologies and which SCO has acquired hereunder. . . ."[158]

76.    After review of the APA and discussions with Tor Braham and James Tolonen, Novell, through Ms. Amadia, made the decision not to alter the APA with regard to copyright ownership as requested by Mr. Sabbath.[159]  Rather than alter the APA to transfer copyrights, Ms. Amadia modified the amendment proposed by Mr. Sabbath to affirm that SCO had the rights to use the technology.[160]  Ms. Amadia testified that Amendment No. 2 was meant to affirm that SCO had the right to use, manufacture, and make modifications to the UNIX technology.[161]

_____

[156]*Id*. at 2107:2-12.

[157]*Id*.

[158]Trial Ex. T34.

[159]Trial Tr. at 2119:25-2120:6.

[160]*Id*. at 2120:17-25.

[161]*Id*. at 2128:1-19.

77.    James Tolonen, Novell's Chief Financial Officer at the time of the APA and Amendment

No. 2, similarly testified that Amendment No. 2 was meant to address use rights, not

ownership.[162]  Mr. Tolonen stated that the easiest way to show a transfer of the copyrights

would be to include them on the schedule of included assets, which did not happen.[163]

78.    Mr. Sabbath signed Amendment No. 2, as modified by Ms. Amadia, on behalf of Santa

Cruz with no apparent further protest.[164]

### c.    *Conclusions from the Testimony*

79.    The Court finds that Amendment No. 2 was not intended to confirm that the UNIX and

UnixWare copyrights were transferred to SCO under the APA, as argued by SCO.

Rather, the Court finds that Novell made a conscious decision to retain the copyrights in

the APA and that intent was reflected throughout the negotiating and drafting of

Amendment No. 2.  The Court finds that Amendment No. 2 was only meant to confirm

that SCO had the right to use the UNIX technology.  The Court finds the testimony of

Novell's witnesses, especially Ms. Amadia and Mr. Tolonen, to be credible.  The Court

finds SCO's witnesses to be less credible for a number of reasons, including the fact that

many were not directly involved in the negotiation and drafting of Amendment No. 2.

Additionally, as previously stated, many have a financial interest in this litigation.

---

[162]*Id*. at 2036:5-22.

[163]*Id*. at 2037:18-25.

[164]Trial Ex. 1, Amendment No. 2; *see also* Trial Tr. 2124:21-2127:18.

80.     Based on all of the above, the Court finds that it was not the parties intent to transfer

        ownership of the UNIX and UnixWare copyrights to SCO.  Rather, Novell purposefully

        retained those copyrights.  The purpose for doing so was to protect its significant interest

        in the SVRX royalty stream, to alleviate concerns of SCO's future financial viability, and

        because of the fact that SCO could not afford to purchase the entire UNIX business.  The

        Court further finds that the copyrights are not required for SCO to exercise its rights with

        respect to the acquisition of UNIX and UnixWare technologies.  SCO did not acquire the

        entire UNIX business from Novell, but only acquired the UnixWare business while

        Novell retained substantial rights in the UNIX business.  The undisputed evidence is that

        SCO did not need the UNIX and UnixWare copyrights in order to operate its UnixWare

        product business.  Further, ownership of the copyrights is not required for SCO to protect

        its own code.  SCO did present evidence that the copyrights were required for SCO to

        operate its SCOsource licensing program.  However, this was a business strategy

        designed by SCO after the APA and its Amendments, not something that it acquired from

        Novell.

**H.    NOVELL'S WAIVER RIGHTS UNDER SECTION 4.16**

81.    As stated above, Novell retained significant assets under the APA.  One of those assets were royalties from SVRX licenses.[165]  Novell recognized that this future royalty stream would be very significant.[166]

82.    Under the APA, SCO was to act as Novell's agent in the collection of these royalties.[167]  In connection with that role, SCO acquired certain assets, including certain agreements and certain employees of Novell.[168]

83.    Section 4.16 of the APA was "the key provision that embodied the deal that the UNIX business, as compared to the UnixWare business, . . . would remain with Novell, but be administered by SCO."[169]  The intent of Section 4.16 was to "bulletproof" Novell's ongoing financial interest.[170]  A number of SCO witnesses similarly recognized the purpose of Section 4.16 as a way of protecting and managing Novell's ongoing financial

---

[165]*See* Trial Ex. 1, § 1.2(b); *see also* Trial Tr. at 236:6-15; *id*. at 353:3-10; *id*. at 2344:20-2347:5.

[166]*Id*. at 2310:14-15.

[167]*Id*. at 2347:6-2348:3; *see* Trial Ex. 1, § 4.16(a); *see also* Trial Ex. 163 (stating that SCO "will manage the licensing business for UNIX prior to UnixWare 1.0 (SVRx)").

[168]Trial Tr. at 2347:6-2348:3.

[169]*Id*. at 2350:2-9.

[170]*Id*. at 2310:15-2311:6.

interests, though those witnesses disagreed on the scope of Novell's rights under that section.[171]

84.     Tor Braham testified that Section 4.16 was added to make very clear that SCO did not have the right to modify, change, or waive SVRX licenses without Novell's written consent and that if SCO did not act properly Novell "could step in and do it ourselves."[172] Mr. Braham testified that Section 4.16 was drafted to avoid any doubt that Novell had complete rights to control what happened with the UNIX business.[173] Mr. Braham further stated that, under Section 4.16, "[i]f SCO didn't do what it was supposed to do as [Novell's] agent, we could step in . . . and do it ourselves."[174]

85.     Section 4.16(a) states: "Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as 'SVRX Royalties'). . . ." Item VI of Schedule 1.1(a) states that among the assets to be transferred to SCO are "[a]ll contracts relating to the SVRX Licenses listed below." However, the list provided in Item VI of Schedule 1.1(a) provides a list of SVRX software releases, not a list of license agreements.

---

[171]*Id*. at 247:23-248:19; *id*. at 447:3-19; *id*. at 829:12-16.

[172]*Id*. at 2350:10-19.

[173]*Id*. at 2354:6-8.

[174]*Id*. at 2355:6-13.

86.     Section 4.16(b) preserved to Novell certain waiver rights with regard to SVRX licenses.

It states, in pertinent part:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any
> right under any SVRX License without the prior written consent of Seller.  In
> addition, at Seller's sole discretion and direction, Buyer shall amend, supplement,
> modify or waive any rights under, or shall assign any rights to, any SVRX License
> to the extent so directed in any manner or respect by Seller.  In the event that
> Buyer shall fail to take any such action concerning the SVRX Licenses as required
> herein, Seller shall be authorized, and hereby is granted, the rights to take any
> action on Buyer's own behalf.[175]

87.     The question here is what constitutes an "SVRX License."  SCO contends that the term

SVRX License applies only to product supplement agreements, while Novell contends

that the term is not so limited and applies to software agreements and sublicensing

agreements as well.

88.     William Broderick, the Director of Software Licensing for SCO, described the various

types of agreements.  The first type of agreement is called the software agreement or

umbrella agreement.[176]  The software agreement provided the general terms and

conditions that a company would agree to when licensing source code.[177]  The second

type of agreement is a product supplement agreement or product schedule license.  This

type of license actually licenses a software product.[178]  The third type of agreement is a

sublicensing agreement.  The sublicensing agreement grants the rights to distribute a

---

[175]Trial Ex. 1, § 4.16(b).

[176]Trial Tr. at 555:15-20.

[177]*Id*. at 555:21-556:9.

[178]*Id*. at 578:13-18.

binary product.[179] These agreements work together. The software and product license allow companies to create a UNIX flavor and the sublicensing agreement allows that company to distribute its UNIX flavor. A company could not take a product license if it did not have an umbrella software agreement.[180]

89.     SCO's witnesses asserted that Novell's waiver rights extend only to product schedule licenses. For instance, Mr. Broderick testified that Novell used the term SVRX Licenses to refer to product schedule licenses that licensed SVRX products.[181] However, Mr. Broderick had no involvement in the drafting, negotiation, or approval of the APA or its amendments.[182] Mr. Broderick also conceded that there was nothing in the APA so limiting Section 4.16.[183] Other SCO witnesses testified that this provision was only meant to give Novell control over binary royalties,[184] but this testimony suffers from the same flaws set forth above in relation to the intent of the parties. Further, many of these witnesses acknowledged that the language of Section 4.16 of the APA was not limited to product supplement agreements.[185]

---

[179]*Id.* at 581:1-12.

[180]*Id.* at 627:9-19.

[181]*Id.* at 658:23-659:16.

[182]*Id.* at 621:16-25.

[183]*Id.* at 654:24-655:7

[184]*Id.* at 110:2-21; *id.* at 247:23-248:19; *id.* at 367:22-369:10; *id.* at 447:3-19; *id.* at 494:23-494:18; *id.* at 852:1-10; *id.* at 906:7-23.

[185]*Id.* at 379:12-381:5; *id.* at 519:17-520:14; *id.* at 654:24-655:7.

90.     SCO also points to the parties' course of performance in arguing that Novell's waiver

        rights extend only to product schedule licenses.  Specifically, SCO points to a dispute

        between Novell, Santa Cruz, and IBM in 1996 where Novell attempted to grant IBM a

        buyout of its contractual royalty obligations.[186]  SCO objected and began to initiate a

        lawsuit against Novell.[187]  The dispute was ultimately settled by: (1) cancelling the buyout

        that Novell had executed with IBM and replacing it with Amendment No. X, a three-party

        agreement between IBM, Novell, and SCO; (2) a payment to SCO; and (3) clarifying how

        to approach future buyouts through Amendment No. 2.[188]  During that dispute, Novell did

        not invoke Section 4.16(b) to the extent it now has.[189]  However, the fact that Novell

        decided to settle this dispute in this way provides little support for SCO's ultimate

        argument.  As recognized by the Tenth Circuit, "[p]arties may choose to settle claims for

        a variety of reasons unrelated to their merits, not the least to avoid expensive litigation or

        to maintain civility in an important commercial relationship."[190]

91.     The Court finds that Novell's waiver rights extend to all three types of agreements and

        are not limited to product supplement agreements.  The Court bases this finding on a

        number of things.  First, a number of witnesses, including SCO witnesses, recognized the

---

[186]*Id*. at 1689:5-21.

[187]*Id*. at 1689:22-1695:20.

[188]*Id*. at 1696:16-1697:24.

[189]*Id*. at 1695:21-1696:9.

[190]*The SCO Group, Inc.*, 578 F.3d at 1223.

importance of the royalty stream that Novell was retaining and viewed Section 4.16 as the mechanism that Novell put in place to protect that royalty stream. While Novell did transfer certain assets to SCO, it did not transfer the SVRX royalty stream. In order to protect and maintain control over that royalty stream, Novell retained significant rights, as set out in Section 4.16. It only makes sense for Novell to retain control over all components of the SVRX licensing agreements in order to protect this significant asset. The reasoning behind this is the somewhat hierarchical nature of the agreements. Each company was required to sign a software agreement and termination of the software agreement would terminate the other agreements. If Novell did not retain control over the software agreement, SCO could terminate that agreement, thereby terminating the other agreements, and deprive Novell of revenue to which Novell would be entitled. Thus, in order for Novell to protect its SVRX revenue stream, it needed to retain rights with respect to all components of the SVRX licensing agreements.

92.     Second, the plain language of the APA states that Novell's waiver rights apply to "any SVRX License." The language of the APA is not limited to product supplement agreements. Several SCO witnesses conceded that the language of the APA was not limited to product supplement agreements.

93.     Third, Section 1.2(e) provides support for this finding. By identifying "source code right to use fees under existing SVRX Licenses" as a type of SVRX Royalty, this provision supports the conclusion that "SVRX License" includes software agreements covering source code rights.

94. Fourth, 4.16(a) refers to Item VI of Schedule 1.1(a). That provision states that "[a]ll contracts relating to the SVRX Licenses listed below" will be transferred to SCO. While Item VI does not go on to list licenses, it does go on to list releases of UNIX. Thus, under this provision, SVRX licenses include <u>all</u> contracts relating to UNIX System V releases, up to and including UNIX System V 4.2 MP, the latest version of UNIX prior to UnixWare.

95. Finally, the Court finds SCO's evidence on this to be less credible for many of the same reasons stated above in relation to SCO's claim for specific performance. Further, many witnesses acknowledged that the language of Section 4.16 of the APA was not limited to product supplement agreements.

96. Based on the above, the Court finds that Novell's waiver rights apply to all three types of agreements and are not limited to product supplement agreements. With this in mind, the Court turns to the actions taken by Novell under Section 4.16.

## I. LINUX, SCOSOURCE, AND NOVELL'S ACTIONS UNDER SECTION 4.16

97. "In 2002 and 2003, tensions increased between Novell and SCO. SCO asserted that users of Linux, an alternative to UNIX might be infringing on SCO's UNIX-related intellectual property rights."[191]

98. "In late 2002, SCO formally created a new division known as SCOsource. In approximately January 2003, SCO launched its SCOsource program. . . . As a general matter, the SCOsource program was an effort to obtain license fees from Linux users

---

[191]*Id*. at 1206.

based on SCO's claims to UNIX intellectual property allegedly contained in Linux."[192] Under its SCOsource program, SCO "purported to offer Linux users the opportunity to purchase an intellectual property license in order to continue using Linux without infringing any of SCO's copyrights."[193]

99. In January 2003, Joseph LaSala, Novell's then-General Counsel, learned of SCO's SCOsource program.[194] Mr. LaSala viewed this as a "campaign against Linux end users" and became concerned about SCO's program because of Novell's own involvement in the Linux business.[195] By that point, Novell had "announced its intention to get involved in the Linux business."[196] In connection with Novell's Linux business, IBM purchased $50 million worth of Novell stock.[197]

100. SCO filed a lawsuit against IBM in 2003 alleging that IBM had distributed UNIX source code and other confidential information to Linux.[198] As part of that litigation, SCO threatened to terminate IBM's SVRX license.

---

[192]Docket No. 542, at 13.

[193]The SCO Group, Inc., 578 F.3d at 1206-07.

[194]Trial Tr. at 1882:7-15.

[195]Id. at 1882:16-1883:19.

[196]Id. at 1883:3-10.

[197]Id. at 2289:6-2290:13.

[198]The SCO Group, Inc. v. Int'l Bus. Machs. Corp., 2:03-CV-294 TC (D. Utah).

101. After the initiation of that lawsuit, Mr. LaSala received a call from IBM's outside counsel.[199]  IBM's outside counsel informed Mr. LaSala that Novell had certain rights under the APA[200]

102. At some later point, Mr. LaSala participated in a call between himself, the general counsel of IBM, IBM's outside counsel, and Novell's outside counsel.[201]  During that call, IBM's outside counsel requested that Novell waive all claims that SCO had made or might make against IBM with respect to IBM's SVRX license.[202]  Novell, through its outside counsel, responded that they were looking at the issue, that they would evaluate each on a case by case basis, and that Novell would take action accordingly.[203]  Novell undertook that analysis, which resulted in letter written on June 9, 2003.[204]

103. On June 9, 2003, then-CEO of Novell Jack Messman wrote a letter to SCO CEO Darl McBride.[205]  In that letter, Novell stated that SCO was advancing unsubstantiated charges and threatening action that could potentially injure Novell, Novell's customers, and the

---

[199]Trial Tr. at 1886:19:1887:1.

[200]*Id*. at 1887:2-12.

[201]*Id*. 1908:18-1909:12.

[202]*Id*. at 1909:13-18.

[203]*Id*. at 1909:19-1910:4.

[204]*Id*. at 1910:5-8.

[205]Trial Ex. F16.

industry in general.[206]  Mr. Messman explained that Novell and SCO had granted IBM an

irrevocable, fully paid-up, perpetual right to exercise all of the rights under the IBM

SVRX Licenses that IBM then held and that IBM had paid over $10 million for this

right.[207]  Novell then quoted directly from Section 4.16(b) of the APA, stating that Novell

had the sole discretion to waive any rights under any SVRX License.[208]  Novell

concluded, acting pursuant to Section 4.16(b), by directing "SCO to waive any purported

right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X

or to revoke any rights thereunder."[209]  When SCO failed to take the action directed by

Novell, Novell wrote a second letter on June 12, 2003.[210]  In that letter, Novell, acting

pursuant to Section 4.16(b) and on behalf of SCO, waived "any purported right SCO may

claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any

rights thereunder."[211]

104.    Novell wrote another letter to SCO on October 7, 2003, responding to SCO's "position

that code developed by IBM, or licensed by IBM from a third party, which IBM

incorporated in AIX but which itself does not contain proprietary UNIX code supplied by

---

[206]*Id*.

[207]*Id*.

[208]*Id*.

[209]*Id*.

[210]Trial Ex. 675.

[211]*Id*.

AT&T under the license agreements between AT&T and IBM ('IBM Code'), must nevertheless be maintained as confidential and may not be contributed to Linux."[212] In that letter, Novell disputed SCO's position, citing to various agreements.[213] Novell again cited to Section 4.16(b) of the APA and directed "SCO to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of the Agreements."[214] When SCO failed to take the action directed by Novell, Novell, acting pursuant to Section 4.16(b), waived "any purported right SCO may claim to require IBM to treat IBM Code . . . which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements."[215]

105. A similar interaction took place in relation to another company, Silicon Graphics, Inc. ("SGI").  On October 7, 2003, Novell wrote a letter to SCO disputing SCO's "position that code developed by SGI, or licensed by SGI from a third party, which SGI incorporated in its UNIX variant but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreement between AT&T and SGI ("SGI Code"),

---

[212]Trial Ex. F21.

[213]*Id.*

[214]*Id.*

[215]Trial Ex. 691.

must nevertheless be maintained as confidential and may not be contributed to Linux."[216]

Novell stated that SCO's position was "not supportable" and detailed the reasons why.[217]

Citing to Section 4.16(b) of the APA, Novell directed SCO "to waive any purported right

SCO may claim to terminate SGI's SVRX license or to revoke any rights thereunder."[218]

Novell further directed SCO "to waive any purported right SCO may claim to require SGI

to treat SGI code itself as subject to the confidentiality obligations or use restrictions of

SGI's SVRX license."[219] Novell made clear that it was not "directing SCO to take any

action (other than to waive termination) with respect to claims that SGI incorporated in

Linux certain proprietary UNIX code supplied by AT&T under the SGI license

agreement."[220]

106.  SCO also took this position with a third company, Sequent Computer Systems.  Novell

responded in similar fashion.  On February 6, 2004, Novell wrote a letter to SCO

directing SCO, under Section 4.16(b) of the APA, "to waive any purported right SCO

may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to

the confidentiality obligations or use restrictions of Sequent's SVRX license."[221]  When

---

[216]Trial Ex. G21.

[217]*Id.*

[218]*Id.*

[219]*Id.*

[220]*Id.*

[221]Trial Ex. 108.

SCO failed to take the action directed by Novell, Novell, acting pursuant to Section 4.16(b), waived "any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."[222]

107. Chris Stone, Senior Vice President of Novell from 1997 to 1999 and Vice Chairman of Novell from 2002 to 2004, testified that when Novell took these actions with respect to IBM, it was concerned about Novell, Linux, and the open source movement, and that SCO's actions were damaging to that process.[223] Mr. Stone further testified that Novell's actions were not motivated by something said or done by IBM and were not motivated by IBM's purchase of $50 million of Novell stock.[224] Jack Messman, Novell's former CEO, similarly testified that Novell's action to waive SCO's claims against IBM was unrelated to IBM's investment in Novell.[225]

108. As will be discussed below, the Court finds that Novell had the right, under Section 4.16 of the APA, to take these actions.

---

[222]Trial Ex. 500.

[223]Trial Tr. at 1613:22-1614:3.

[224]*Id*. at 1638:3-11.

[225]*Id*. at 2298:24-2299:23.

### III. CONCLUSIONS OF LAW

**A.    SPECIFIC PERFORMANCE**

109.    SCO requests, as an alternative to its other claims for relief, an order directing Novell to

transfer the UNIX and UnixWare copyrights.  SCO's request for specific performance

must be rejected for three reasons.  First, the jury verdict has determined that the amended

APA did not transfer the copyrights from Novell to SCO.  Second, it was not the intent of

the parties to transfer ownership of the copyrights.  Finally, the copyrights are not

required for SCO to exercise its right with respect to the acquisition of UNIX and

UnixWare technologies.  Each of these conclusions will be discussed in detail below.

*1.    The Jury Verdict*

110.    As set forth above, this matter came before the jury on the parties' competing claims for

slander of title.  While Novell's slander of title claim was dismissed on a Rule 50 motion,

SCO's claim proceeded to the jury.  The jury determined that the amended APA did not

transfer the UNIX and UnixWare copyrights from Novell to SCO.  Because the jury

determined that SCO was not the owner of the copyrights, there was no need for the jury

to determine SCO's claim for slander of title.

111.    "[T]he Seventh Amendment prevents district courts from applying equitable doctrines on

the basis of factual predicates rejected, explicitly or implicitly, by a jury verdict."[226]  If

---

[226]*Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 959 (10th Cir.
2009).

"the jury verdict by necessary implication reflects the resolution of a common factual issue . . . the district court may not ignore that determination."[227]

112. SCO argues that the jury verdict does not resolve its claim for specific performance. SCO argues that its claim rests on findings not precluded by the jury verdict. In support of this argument, SCO posits a number of rather tenuous grounds on which the jury could have determined the question presented to it. The Court must respectfully disagree with SCO's assessment.

113. As stated previously, the bulk of the evidence at trial concerned two issues: (1) whether the parties intended to transfer ownership of the copyrights; and (2) whether the copyrights were "required" for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. Both parties presented substantial evidence and argument on these two issues.

114. The jury verdict in this case shows that the jury considered SCO's evidence on these points and rejected that evidence in favor of the evidence presented by Novell. The jury verdict necessarily means that the jury found that it was not the intent of the parties to transfer ownership of the copyrights from Novell to SCO and that the copyrights were not required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. As discussed in the Court's Memorandum Decision and Order Denying SCO's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, the jury's verdict is well supported by the evidence.

---

[227]*Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 732 (10th Cir. 2000).

115.     SCO's claim for specific performance rests upon factual predicates rejected by the jury

          verdict.  SCO's request for specific performance essentially asks the Court to ignore or

          overrule the jury verdict.  Such relief is prohibited under the Seventh Amendment.  For

          this reason, SCO's claim for specific performance must fail.  Even if the jury verdict did

          not preclude SCO's claim for specific performance, it would be rejected for the reasons

          discussed below.

          2.       *The Intent of the Parties*

116.     Much of the evidence at trial focused on the intent of the parties in drafting the APA.

          While Plaintiff presented a number of witnesses from both Novell and Santa Cruz who

          testified that it was the intent of the parties to transfer the copyrights, the Court, as

          evidently did the jury, finds the evidence presented by Novell on this issue to be more

          persuasive.  The Court finds particularly persuasive the testimony of Novell's outside

          counsel Tor Braham, who was the lead drafter of the APA.

117.     As set forth above, Mr. Braham's testimony showed that Novell purposefully retained

          ownership of the copyrights.  Novell did so in order to protect its substantial retained

          interest in the UNIX business.  Mr. Braham's testimony is supported by the testimony of

          James Tolonen who explained that retaining the copyrights was necessary: (1) because of

          the nature of the transaction; (2) because Santa Cruz could not afford the entire value; (3)

          to avoid ownership issues with other products; and (4) because of concerns with the long-

          term viability of Santa Cruz.  Mr. Braham's testimony is further supported by Michael

          Defazio, an Executive Vice President at Novell, who testified that the copyrights were

retained as a way to "bulletproof" Novell's financial asset stream. SCO's witnesses on this issue are less credible for the reasons set forth above.

118. The parties' dealings concerning Amendment No. 2 further support the conclusion that it was not the intent of the parties to transfer copyright ownership. As set forth above, Steve Sabbath, Santa Cruz general counsel, contacted Allison Amadia, in-house counsel for Novell, to discuss a "clerical error" resulting in the copyrights not being transferred. Santa Cruz sought an amendment which would have amended Schedule 1.1(b) to exclude all copyrights and trademarks, except for the copyrights and trademarks owned by Novell which pertain to the UNIX and UnixWare technologies. Upon further research, Ms. Amadia concluded that no clerical error had occurred and Novell specifically rejected the proposed amendment. Thus, Amendment No. 2 was written to state that all copyrights and trademarks were excluded, except for the copyrights and trademarks required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. As testified to by both Ms. Amadia and Mr. Tolonen, this amendment addressed use, not ownership. This interaction shows Novell's continued intent to retain the copyrights.

119. SCO argues that the forthright negotiator rule is applicable to Amendment No. 2. The Tenth Circuit has stated:

Where the parties assign different meanings to a term,
it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.[228]

Here, there is no evidence to support the argument that Ms. Amadia had reason to know that SCO attached a different meaning to Amendment No. 2. Indeed, Ms. Amadia specifically testified that she informed Mr. Sabbath that Novell would not transfer the copyrights.[229]

120. SCO also argues that other provisions of the APA are consistent with it acquiring ownership of the copyrights. Specifically, SCO cites to the license back provision of the APA, Section 1.6. However, that provision only applies to the assets listed in the included asset schedule, which does not include the UNIX copyrights. Further, testimony concerning the TLA affirmed that one of the purposes of that agreement was to allow Novell the right to use post-APA SCO-developed code.[230] SCO also points to Section II of Schedule 1.1(a), which transferred "[a]ll of [Novell's] claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business."[231] However, SCO provided no evidence of any such claims that it was entitled to pursue.

---

[228]*Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 837 (10th Cir. 2005) (citing Restatement (Second) of Contracts § 201(2)).

[229]Trial Tr. at 2120:15-2121:2.

[230]*Id*. at 1964:8-22; *id*. at 1984:6-1985:21.

[231]Trial. Ex. 1, Schedule 1.1(a), § II.

121.　While it may have initially been the wish of individuals in both entities for Novell to sell and Santa Cruz to buy the entire UNIX business, that is not what happened. Rather, because Santa Cruz could not purchase the entire business, the deal had to be structured in a way different than had been originally envisioned. As all witnesses seemed to recognize, a primary component of the transaction was Novell's retention of a significant royalty stream. One of the ways that Novell chose to protect that royalty stream was to retain ownership of the copyrights. Based on all of the above, the Court finds that the intent of the parties did not entail transfer of ownership of the copyrights.

### 3.　*Copyrights are not "Required"*

122.　SCO further argues that transfer of ownership is appropriate because the copyrights are "required" under Amendment No. 2. SCO makes two arguments as to why ownership of the copyrights is required. First, it argues that ownership of the copyrights are required in order for it to protect its intellectual property. Second, SCO argues that ownership of the copyrights are necessary for its SCOsource licensing program. The Court rejects both arguments.

123.　In order to fully understand both of these issues, the exact nature of the transaction between the parties must be understood. As set forth above, Novell initially envisioned selling the entire UNIX business that it had purchased from AT&T to Santa Cruz. However, because Santa Cruz could not afford the entire business, the transaction had to be restructured. The business was essentially divided into two components: the UNIX business and the UnixWare business. The UNIX business was the UNIX System V

source licensing business. Novell retained the royalties from the licenses and SCO acted as Novell's agent in their collection. Novell retained significant rights in order to protect its royalty stream. Additionally, Novell retained the copyrights as a way to "bulletproof" those royalties. The UnixWare business, on the other hand, was the business whereby SCO had the ability to go forward and create a new product. SCO would, of course, own the copyrights for whatever new code it created. With this understanding, the Court turns to SCO's arguments.

124. SCO argues that the copyrights are required to protect its intellectual property. The Court agrees with this general proposition. However, SCO was not the owner of the copyrights and, thus, had no right to enforce them. Further, the parties agree that SCO would own the copyrights to any newly developed code and could use those copyrights to protect against infringement. Thus, SCO has not shown that ownership of the UNIX copyrights is required to protect its own intellectual property.

125. SCO also argues that ownership of the copyrights is necessary to run its SCOsource licensing program. However, the language of Amendment No. 2 applies to copyrights required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. The SCOsource program is not something SCO ever acquired from Novell. It appears that SCOsource was not something that was envisioned by either party at the time of the APA and its amendments. Further, both Mr. Tibbitts and Mr. McBride acknowledged that SCO could run its UnixWare business, which is something SCO did acquire from Novell, without the copyrights. Therefore, the Court finds that the

copyrights are not required for SCO to operate the business that it had acquired from Novell.

126.     Based on the above, the Court finds that it was not the intent of the parties to transfer the copyrights and that the copyrights are not required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies. Further, the jury verdict precludes the Court from entering judgment in favor of SCO on its claim for specific performance. For all of the reasons stated, SCO's claim for specific performance must fail.

## B.     DECLARATORY JUDGMENT

127.     Novell seeks declaratory relief that: (a) under Section 4.16(b) of the APA, Novell is entitled to direct SCO to waive claims against IBM, Sequent and other SVRX licensees; (b) Novell is entitled to waive such claims on SCO's behalf; and (c) SCO is obligated to recognize such a waiver.[232]

128.     Section 4.16(b) of the APA states, in pertinent part:

Buyer shall not, and shall not have the authority to, amend, modify or waive any right under any SVRX License without the prior written consent of Seller. In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller. In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf.[233]

---

[232]Docket No. 142, at 26.

[233]Trial Ex. 1, § 4.16(b).

129.   "The scope of Novell's waiver rights turns on the meaning of the term 'SVRX License.'"[234]  In order to understand the meaning of Section 4.16(b) and the term SVRX License, it is again necessary to understand the nature of the transaction between the parties.

130.   As stated previously, Novell sold Santa Cruz the UnixWare business, while retaining substantial rights in the UNIX business.  While Novell retained the financial portion of the UNIX business (the royalties from SVRX licenses), SCO acted as Novell's agent in the collection of those royalties.[235]

131.   Witnesses from both SCO and Novell recognized Novell's ongoing financial interests and the importance of that interest.  Section 4.16(b) was the key provision of the APA designed to protect Novell's financial interest.  As Mr. Braham testified, Section 4.16 was drafted to avoid any doubt that Novell had the right to control what happened with the UNIX business and that if SCO did not do what it was supposed to as Novell's agent, Novell could step in and take what action it deemed necessary.[236]

132.   The Court concludes that Novell's waiver rights are not limited to product supplement agreements, as argued by SCO.  The Court reaches this conclusion based on a number of things.  First, the financial interest Novell had in the SVRX royalty stream necessitates such a finding.  As stated above, Novell retained a significant financial interest and Mr.

---

[234]*The SCO Group, Inc.*, 578 F.3d at 1219.

[235]Trial Ex. 1, § 4.16(a).

[236]Trial Tr. at 2354:6-2355:13.

Braham, as well as others, testified that Section 4.16 of the APA was designed to protect

that interest. The somewhat hierarchical structure of the three types of agreements leads

to the conclusion that Novell must retain rights over the software and sublicensing

agreements as well. As was explained by Mr. Broderick, each company was required to

obtain a software agreement. If Novell did not have the authority over the software

agreements, SCO could easily cancel that agreement, necessarily cancelling both the

sublicensing and product supplement agreements, and thereby deprive Novell of revenue.

133.    Another consideration in support of the Court's conclusion is the contract language itself.

The contract is not limited to product supplement agreements. The contract language

refers to "SVRX Licenses" and does not differentiate between the three types of

agreements. Further, other language in the APA, specifically Section 1.2(e) and Item VI

of Schedule 1.1(a), support a broad reading of the language.

134.    Finally, the Court considers SCO's evidence on this point to be less credible than that of

Novell. For all of these reasons, the Court finds that Novell's waiver rights extend to

software agreements, sublicensing agreements, and product supplement agreements.

135.    With this conclusion in mind, the Court turns to Novell's actions with regard to its waiver

rights. On June 9, 2003, Novell directed SCO to waive any right SCO may claim to

terminate IBM's SVRX Licenses or to revoke any rights thereunder. When SCO failed to

act, Novell waived those rights on SCO's behalf. On October 7, 2003, Novell directed

SCO to waive any right SCO may claim to require IBM to treat IBM code as subject to

the confidentiality obligations or use restrictions of IBM's SVRX Licenses. When SCO

failed to act, Novell waived that right on SCO's behalf. Novell took similar actions in relation to SGI and Sequent.

136. The Court finds that Novell had the authority under Section 4.16(b) of the APA to direct SCO to waive its claims against these SVRX licensees, that Novell had the authority to waive such claims on SCO's behalf, and that SCO was obligated to recognize such waivers.

## C. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

137. SCO argues that Novell's actions in directing SCO to waive certain claims against IBM, SGI, and Sequent breached the implied covenant of good faith and fair dealing.

138. The APA is governed by California law.[237] Under California law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[238] "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith."[239] That said, "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."[240] The Court is "aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from

---

[237]Trial Ex. 1, § 9.8.

[238]*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 726 (Cal. 1992) (quotation marks and citation omitted).

[239]*Id*.

[240]*Id*. at 727.

doing that which is expressly permitted by an agreement. On the contrary, as a general

matter, implied terms should never be read to vary express terms."[241]

139.     In this matter, the Tenth Circuit has cautioned "that it is not always the case that an

express grant of contractual authority is not constrained by the operation of the covenant

of good faith."[242] "California recognizes at least two exceptional situations where the

covenant of good faith may inform the interpretation of even an express grant of

contractual authority. First, where the express discretion makes the contract, viewed as a

whole, 'contradictory and ambiguous,' the implied covenant may be applied to aid in

construction."[243] "Second, the covenant may aid in the interpretation of a contract

seemingly expressly granting unbridled discretion 'in those relatively rare instances when

reading the provision literally would, contrary to the parties' clear intention, result in an

unenforceable, illusory agreement.'"[244]

140.     Considering Novell's actions, the implied covenant of good faith and fair dealing, and the

exceptional situations discussed by the Tenth Circuit, the Court finds that SCO's breach

of the implied covenant of good faith and fair dealing claim must fail.

---

[241]*Id*. at 728.

[242]*The SCO Group, Inc.*, 578 F.3d at 1225.

[243]*Id*. (citing *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (Cal. Ct. App. 1983)).

[244]*Id*. (quoting *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (Cal. Ct. App. 1995)).

141.    The Court finds, as an initial matter, that the actions Novell took with respect to IBM, SGI, and Sequent were pursuant to an express contractual provision granting it the authority to do so for the reasons discussed above. Thus, generally speaking, Novell's conduct would not be a breach of the implied covenant.

142.    Considering the exceptional circumstances discussed by the Tenth Circuit on appeal, the Court finds that neither are present here.

143.    The first exceptional circumstance applies where the express discretion makes the contract, viewed as a whole, "contradictory and ambiguous," the implied covenant may be applied to aid in construction.[245]  Under the contract at issue in *April Enterprises*, one party had the right to syndicate episodes of a television show, while the other had the right to erase episodes of the show. Both parties shared revenues from compensation. Although the contract expressly granted one party the right to erase episodes, the court applied the covenant of good faith, holding that the contract was contradictory and ambiguous as to whether tapes could be erased while the other party was negotiating for syndication.

144.    SCO argues that Novell's interpretation of Section 4.16(b) creates the same contradiction and ambiguity because, if Novell could change any part of the contracts that embody the UNIX-based business that Novell transferred, it could destroy that business. This argument, however, hinges on a faulty premise: that Novell transferred the UNIX business to SCO. As set forth above, Novell transferred the UnixWare business to SCO,

---

[245]*April Enters., Inc.*, 147 Cal. App. 3d at 816.

while retaining substantial rights in the UNIX business.  SCO's involvement with the

UNIX business was as Novell's agent and those portions of the UNIX business that did

transfer to SCO were transferred to aid SCO in this role.  Because Novell did not transfer

the entire UNIX business, it could take the above actions in relation to that business and

the contractual provision allowing for such action cannot be viewed as contradictory or

ambiguous.

145.    The second exceptional circumstance, as stated in *Third Story Music, Inc. v. Waits*,

provides that "courts are not at liberty to imply a covenant directly at odds with a

contract's express grant of discretionary power except in those relatively rare instances

when reading the provision literally would, contrary to the parties' clear intention, result

in an unenforceable, illusory agreement."[246]  As set forth throughout this Order, this is not

such a "rare instance."

146.    Further, the Court finds that SCO's claim for breach of the implied covenant of good faith

and fair dealing fails because Novell acted in good faith according to a reasonable

interpretation of the contract language.  A breach of the implied covenant requires

"objectively unreasonable conduct, regardless of the actor's motive."[247]  Here, the Court

finds that Novell's conduct was objectively reasonable, considering its actions and the

language of the APA.  The Court finds that Novell's actions were motivated to protect its

---

[246]*Third Story Music, Inc.*, 41 Cal. App. 4th at 808.

[247]*Carma Developers*, 826 P.2d at 727.

60

own interests and those of the open source community and were not taken because of

influence by IBM or any ill-will toward SCO.

## IV.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Novell's claim for declaratory judgment is GRANTED.  It is further

ORDERED that SCO's claims for specific performance and breach of the implied

covenant of good faith and fair dealing are DENIED.

DATED June 10, 2010.

BY THE COURT:

_____

TED STEWART
United States District Judge